# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLUMBIA

The Humane Society of the United States
2100 L Street NW
Washington, DC  20037;

Born Free, USA
1122 S Street
Sacramento, CA  95811;

Help Our Wolves Live ("HOWL")
4901 Second Ave. South
Minneapolis, MN  55419;

Friends of Animals and Their Environment ("FATE")
3333 Alabama Ave.
St. Louis Park, MN  55415,

          Plaintiffs,

     v.

Kenneth Salazar, Secretary of the Interior,
United States Department of the Interior
1849 C Street, NW
Washington, DC  20240;

United States Department of the Interior
1849 C Street, NW
Washington, DC  20240;

United States Fish and Wildlife Service
1849 C Street, NW
Washington, DC  20240;

          Defendants.

Civil Action No. 13-00186

**COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF**

## INTRODUCTION

1.      Plaintiffs, animal protection and conservation organizations, challenge the decision of the U.S. Fish and Wildlife Service ("FWS" or "Service") to strip gray wolves in the Great Lakes region of protection under the Endangered Species Act ("ESA"), 16 U.S.C. § 1531, *et seq*.  76 Fed. Reg. 81,666 (Dec. 28, 2011) ("2011 Delisting Rule").  Previous litigation concerning the listing status of this population of gray wolves resulted in this Court's decision in *Humane Soc'y of the United States v. Kempthorne*, 579 F. Supp. 2d 7 (D.D.C. 2008), which concerned many of the same factual and legal issues presented in this complaint.

2.      Shielded from the unrestrained killing that drove the species to the brink of extinction, the gray wolf has started its recovery in the Great Lakes region.  However, in order to be legally delisted under the ESA, there must be regulatory mechanisms in place that are adequate to protect gray wolves and ensure their continued survival once federal protections are removed.  16 U.S.C. § 1533(a)(1), (c).  Yet the existing regulatory mechanisms in the Great Lakes region are anything but adequate.  In the short time since federal protections were removed, hunters and trappers have killed hundreds of Great Lakes wolves.  Recent actions taken by states in the region further encourage dramatic reductions in wolf populations and are reminiscent of a time when bounties paid by local and federal governments promoted the widespread killing of wolves that nearly wiped out the entire species from the lower 48 states.

3.      For example, although Minnesota's Wolf Management Plan included a five-year moratorium on recreational killing following federal delisting, the state rushed to repeal this moratorium and allow a trophy hunting and trapping season immediately following delisting.  Similarly, Wisconsin enacted legislation mandating a wolf hunting and trapping season and requiring that the state wildlife agency authorize the use of dogs, night hunting, and snare and

leg-hold traps.   Minnesota also resurrected a program that pays certified private predator controllers for each wolf killed.  The FWS' decision to delist wolves in the face of such hostile management measures is biologically reckless and contrary to the ESA.

4.     Further, although the gray wolf was one of the first species listed as endangered when Congress enacted the ESA in 1973, the gray wolf is currently present across just five percent of its historic range.   Because the ESA mandates protection for a species that is endangered "throughout . . . a significant portion of its range," 16 U.S.C. § 1532(6), the wolf cannot legally be delisted, and the Great Lakes wolves cannot be classified by the Service in a manner to remove their protection, without violating the ESA.

5.     Nevertheless, the FWS has engaged in unrelenting efforts to delist the gray wolf in the Great Lakes region.  Because the ESA prohibits delisting under current circumstances, the FWS has tried to sidestep this problem and eliminate protection by its improper use of a legal tool which is actually designed to *increase* species prosperity and conservation – the "distinct population segment" ("DPS").

6.     The FWS' misuse of the DPS tool to prematurely delist the gray wolf has been rejected by numerous federal courts.  Indeed, in denying the FWS' 2007 delisting attempt, this Court found that the FWS had "misread the statute" and remanded to the agency for additional explanation, including how the agency's interpretation might undermine the ESA's policy objectives. *Humane Soc'y of the United States*, 579 F. Supp. 2d at 7 n.8.

7.     The 2011 Delisting Rule is nearly identical to the rule vacated by this Court in 2008 and suffers from similar defects.   In its current Delisting Rule, the FWS again simultaneously created and delisted the "Western Great Lakes DPS" even though this population was not previously listed under the ESA.  In doing so, the FWS has once again turned the DPS

tool on its head.  Until it has further recovered into other portions of its range, the gray wolf only exists in two isolated pockets in the United States – the Great Lakes and Northern Rocky Mountain regions.  By creating the DPS in the Great Lakes, and then looking only at the wolf population within that area, the FWS has created a false sense of security and recovery, using those concentrated populations as an excuse to avoid its responsibilities to the larger species-level listing.

8.     Moreover, although wolves are currently found in only parts of Minnesota, Wisconsin, and Michigan, the FWS' Western Great Lakes DPS designation includes the entirety of these states, as well as portions of six other states.  Such expansive boundaries sever crucial dispersal corridors leading from the core population to unoccupied portions of the historic range, and hamper the continued conservation and recovery of the species.  The FWS' cookie-cutter approach to removing federal protections within a larger currently listed range is in direct contravention of the ESA's conservation and rehabilitation purposes, and if upheld could lead to the decimation of any listed species whose populations have shrunken to small areas of their former range.

9.     In addition, the FWS failed to conduct the proper delisting analysis; improperly relied on the recovery plan for the "eastern timber wolf" who the FWS itself has found may not exist in the Great Lakes; and improperly decided to delist wolves in the western Great Lakes without an adequate understanding of what species of wolves now occupy and have historically occupied the western Great Lakes region, and what species currently and historically occupied areas of the eastern United States outside that region.

10.    Accordingly, the 2011 Delisting Rule is arbitrary, capricious, and otherwise not in accordance with the ESA or the Administrative Procedure Act, 5 U.S.C. §§ 553-59, 701-06

("APA"), and should be set aside.

## JURISDICTION AND VENUE

11.     Plaintiffs bring this action pursuant to the ESA's citizen suit provision, 16 U.S.C. § 1540(g), and the APA, 5 U.S.C. §§ 702, 704. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under United States law. Plaintiffs sent the Secretary of Interior notice of their intent to sue over ESA violations more than 60 days prior to the commencement of this litigation.

12.     Venue is proper in this judicial district because one or more Plaintiffs reside in the District of Columbia, the defendants reside in the District of Columbia and the violation occurred in the District of Columbia, *see* 28 U.S.C. § 1391(e)(1); 16 U.S.C. § 1540(g)(3)(A), and because this case is related to two cases previously filed in this Court – *Humane Soc'y of the United States v. Kempthorne*, Civ. No. 07-00677-PLF and *Humane Soc'y of the United States v. Kempthorne*, Civ. No. 09-01092-PLF. *See* D. D.C Civ. R. 40.5.

## PARTIES

13.     Plaintiff The Humane Society of the United States ("The HSUS") is a non-profit charitable organization incorporated in 1954. The HSUS is the largest animal protection organization in the world, with over 11 million members and constituents. The HSUS's mission is to promote the humane treatment of animals and to foster respect, understanding, and compassion for all creatures. The HSUS has shown particular interest in endangered and threatened species, and supports efforts aimed at the protection and recovery of such species and their habitats. The HSUS regularly submits comments to government agencies concerning proposed actions that would affect wild animals. The HSUS publishes a magazine and maintains a website for its members and the general public, and it regularly disseminates information

concerning the treatment of wild animals, including government decisions that affect wildlife. The HSUS has long been an active advocate for wolf protection and recovery.  The HSUS's members enjoy studying, photographing, and viewing wildlife in their natural habitat, including wolves, and these members place great importance on their ability to appreciate wolves in the wild.  The HSUS's members have thus attended meetings of state and federal agencies and other interested parties concerning the wolf situation.

14.     Plaintiff  Born Free USA ("Born Free"), originally founded in 1968, is a national animal advocacy nonprofit 501(c)(3).  Its mission is to end the suffering of wild animals in captivity, rescue individual animals in need, protect wildlife – including potentially endangered species – in their natural habitats, and encourage compassionate conservation globally.  Its primary campaign areas currently include animals used in entertainment, captive exotic animals, trapping, and the international protection of wildlife.  Born Free has tens of thousands of members and supporters living throughout the country.  Born Free's work includes monitoring and studying the impacts of agency actions on animals, including wolves and other carnivores. One of Born Free's principal campaigns focuses on wildlife protection, and Born Free uses education and other methods to protect wild animals and their habitat.  Born Free regularly submits comments to government agencies concerning proposed actions that would affect animals.  Born Free publishes a magazine and maintains a website for its members and the general public, and it regularly disseminates information concerning the treatment of wild animals, including government decisions that affect animals.  Born Free's members enjoy viewing wildlife, including wolves, as well as photographing and being able to appreciate them in the wild.

15.     Plaintiff Help Our Wolves Live ("HOWL"), a Minnesota non-profit organization

founded in 1969, is an advocacy group whose purpose is to work for the protection and preservation of the gray wolf and other endangered species. HOWL's members enjoy observing and monitoring Minnesota's wolf population. HOWL uses education and science to discourage human activities that adversely affect wildlife, and HOWL has provided comments to government agencies concerning proposed actions that would affect wild animals, such as wolves.

16.     Plaintiff Friends of Animals and Their Environment ("FATE"), a Minnesota non-profit organization established in 1976, is committed to the protection of animals and the ecosystems on which they depend. FATE advocates on behalf of animals, and in particular wolves, through public education and political lobbying. FATE's members and supporters enjoy monitoring and observing wolves in the wild.

17.     The plaintiff organizations and their members are deeply committed to wolves and have long-standing interests in the preservation and recovery of wolves in the Great Lakes. Plaintiffs place a high value on wolves as a species and because gray wolves play a vital role in the maintenance of healthy ecosystems in the region. Plaintiffs seek to protect and recover gray wolves through a wide range of actions including public education and advocacy. Members of the plaintiff groups seek to view wolves and signs of wolves in the wild throughout the Great Lakes region, including specific packs and wolves they have come to recognize. Implementation of the 2011 Delisting Rule will result in the death of several hundred, if not thousands, of wolves, and fewer wolves within the region will reduce the members' opportunities to experience wolves, and will cause harm to the ecosystems throughout the Great Lakes region.

18.     Because the 2011 Delisting Rule will reduce Plaintiffs' opportunities to experience and enjoy wolves and the habitats upon which they depend, the legal violations

alleged in this Complaint cause direct injury to the aesthetic, conservation, recreational, scientific, educational, and wildlife preservation interests of the plaintiff organizations and their members. Plaintiffs' aesthetic, conservation, recreational, scientific, educational, and wildlife preservation interests have been, are being, and unless their requested relief is granted, will continue to be adversely and irreparably injured by the FWS' failure to comply with federal law. These are actual, concrete injuries, traceable to the FWS' conduct that would be redressed by the requested relief. Plaintiffs have no adequate remedy at law.

19.     Defendants Secretary of the Interior Kenneth Salazar, the United States Department of the Interior, and the United States Fish and Wildlife Service are charged with the administration of the ESA. The defendants are responsible for ensuring the protection and recovery of species listed as endangered or threatened under the ESA. They are sued in their official capacities.

## LEGAL FRAMEWORK

### The Endangered Species Act

20.     In enacting the ESA, Congress recognized that certain species "have been so depleted in numbers that they are in danger of or threatened with extinction." 16 U.S.C. § 1531(a)(2). Accordingly, a primary purpose of the ESA is "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such . . . species." *Id.* § 1531(b). The ESA defines "conservation" as "the use of all methods and procedures which are necessary to bring any endangered or threatened species to the point at which" ESA's recovery procedures are no longer necessary. *Id.* § 1532(3).

21.     Under the ESA, the Secretary of the Interior, acting through the FWS, must list all

species determined to be "endangered species" or "threatened species." *Id*. § 1533(c)(l).

22.     The Act defines an "endangered species" as "any species which is in danger of extinction throughout all or a significant portion of its range." *Id*. § 1532(6).  Similarly, the Act defines a "threatened species" as "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id*. § 1532(20).

23.     The ESA broadly defines a "species" to include "any subspecies of fish or wildlife or plants, and any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature."  16 U.S.C. § 1532(16).

24.     In making listing decisions, the "significant portion" of the range includes major geographical areas where the species was once present, regardless of whether the species currently exists in those areas.  *Defenders of Wildlife v. Norton*, 258 F.3d 1136, 1145 (9th Cir. 2001).

25.     Under Section 4 of the ESA, the FWS must list a species if the agency determines that the species is endangered or threatened due to the following factors:

> A.     the present or threatened destruction, modification, or curtailment of its habitat or range;
>
> B.     overutilization for commercial, recreational, scientific, or educational purposes;
>
> C.     disease or predation;
>
> D.     the inadequacy of existing regulatory mechanisms; or
>
> E.     other natural or manmade factors affecting its continued existence.

16 U.S.C. § 1533(a)(l); 50 C.F.R. § 424.11(c) (hereafter referred to as the "five listing factors").
The presence of any one of the five listing factors is a sufficient basis on which to list a species.

26.     Listing decisions under the ESA must be based solely upon "the best scientific

and commercial data available."  16 U.S.C. §§ 1533(b)(l)(A), (c)(2); 50 C.F.R. § 424.11(b), (d).

27.     Once a species is listed, it enjoys the substantial protections of the ESA.  For example, the ESA strictly prohibits the "tak[ing]" of endangered species.   16 U.S.C. § 1538(a)(1).  Further, to facilitate species recovery, the ESA directs the FWS to "develop and implement" detailed "recovery plans" for listed species, unless such a plan would "not promote the conservation of the species."  16 U.S.C. § 1533(f).  Each recovery plan shall include, to the "maximum extent practicable," (a) a "description of such site-specific management actions" necessary for the conservation and survival of the species, *id.* § 1533(f)(1)(B)(i); and (b) "objective, measurable criteria" that, if satisfied, would support delisting.  *Id.* § 1533(f)(1)(B)(ii).

28.     In addition, the ESA requires all federal agencies to further the purposes of the ESA by "carrying out programs for the conservation of endangered species and threatened species" and mandates that every federal agency, relying on "the best scientific and commercial data available," ensure its actions are "not likely to jeopardize the continued existence of any endangered species or threatened species."  *Id*. § 1536(a)(1), (2).

29.     Once listed as "endangered" or "threatened", a species can only be delisted if the best available scientific and commercial data indicate that it is no longer endangered or threatened because it is extinct, because it has recovered, or because the original listing decision was in error.  16 U.S.C. § 1533(c)(2)(B); 50 C.F.R. § 424.11(d).

30.     Decisions to delist or reclassify an already-listed species are governed by the same five-factor analysis as when listing a species.  A species has not recovered, and cannot be delisted, "until the threats to the species as analyzed under [the five listing factors] have been removed."  51 Fed. Reg. 19,926, 19,935 (June 3, 1986).

<u>The Distinct Population Segment Policy</u>

31.    The ESA broadly defines a "species" to include "any subspecies of fish or wildlife or plants, and any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature."  16 U.S.C. § 1532(16).

32.    Under this definition, the FWS can list a distinct population segment ("DPS") of a vertebrate species, even when the species as a whole is neither endangered nor threatened.  16 U.S.C. § 1532(16).  As recognized in the FWS' and National Marine Fisheries Service's 1996 policy for determining when DPSs can be designated under the ESA, Congress envisioned that DPS designations would be used to protect locally vulnerable populations of species that are otherwise abundant.  Specifically, by extending the protections of the ESA to locally vulnerable populations, the DPS designation is intended to be used by the FWS to "protect and conserve species and the ecosystems upon which they depend before large-scale decline occurs that would necessitate listing a species or subspecies throughout its entire range."  Policy Regarding the Recognition of Distinct Vertebrate Population Segments Under the Endangered Species Act, 61 Fed. Reg. 4,722, 4,725 (Feb. 7, 1996) ("DPS Policy").

33.    Whenever the DPS tool is used, it "should be aimed at carrying out the [conservation] purposes of the [ESA]."  *Id*.

34.    The DPS designation also should be used only "'sparingly and only when the biological evidence indicates that such action is warranted.'"  *Id*., quoting Senate Report 151, 96th Congress, 1st Session.

35.    Under the DPS Policy, the FWS must consider three elements in any DPS decision:

          a.    The discrete or separate nature of the population segment in
                relation to the remainder of the species to which it belongs;

b.     The significance of the population segment to the species to which it belongs; and

c.     The population segment's conservation status as measured by the ESA's five listing factors.

*Id.* at 4,725.

36.     A population segment is "discrete" if it is either:

a.     Markedly separated from other populations of the same species because of physical, physiological, ecological, or behavioral factors, including consideration of genetic or morphologic differences; or

b.     Delimited by foreign borders, with differences between the countries with respect to exploitation, management of habitat, conservation status, or regulatory mechanisms that are significant in light of the ESA's consideration of those mechanisms.

*Id.*

37.     Based on the mandate to use the DPS tool only "sparingly," the "significance"

prong is evaluated *only* if discreteness is established.  The significance of a population segment

is determined by an evaluation of relevant factors, including but not limited to the following:

a.     Persistence of the discrete population segment in an ecological setting unusual or unique for the taxon;

b.     Evidence that loss of the discrete population segment would result in a significant gap in the range of a taxon;

c.     Evidence that the discrete population segment represents the only surviving natural occurrence of a taxon that may be more abundant elsewhere as an introduced population outside its historic range;

d.     Evidence that the discrete population segment differs markedly from other populations of the species in its genetic characteristics.

*Id.*

38.     Again following the mandate to use the DPS status in a restricted fashion, *only* if

"discreteness" and "significance" are established can FWS move to the next step, which involves

consideration for protected status utilizing the five listing factors.  To determine the conservation status of the DPS, the DPS must be evaluated "for endangered or threatened status. . . based on the Act's definition of those terms and a review of the [five listing factors§ ]."  61 Fed. Reg. at 4,725.

39.     The factors on which the DPS analysis must be based – discreteness, significance, and conservation status – show that the DPS tool is meant to be a means of adding ESA protections to one population of an otherwise unprotected species, and *not* a means of eliminating those protections.

### The Administrative Procedure Act

40.     The Administrative Procedure Act ("APA"), 5 U.S.C. §§ 553-59, 701-06, provides for judicial review of final agency action such as the 2011 Delisting Rule.

41.     Under the APA, a reviewing court must hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  5 U.S.C. § 706(2)(A).

## FACTUAL BACKGROUND

### Gray Wolf Biology

42.     The gray wolf (*Canis lupus*) is the largest wild member of the dog family (*Canidae*).  Wolves prey primarily on wild ungulates (hoofed animals) such as deer, elk, moose, caribou, and bison.  When necessary, they also eat smaller prey like snowshoe hare, beaver, and rabbits.  Some wolves also occasionally prey on livestock, although this is not their preferred food; livestock predation generally occurs when natural prey species have been eliminated or greatly diminished.  Wolves are habitat generalists, and if they are not persecuted by humans, can live anywhere that contains a sufficient population of ungulates.

43.     Wolves are mobile animals and often travel 10 to 30 miles per day. They are social animals and regularly move in family units known as "packs." The pack usually consists of a dominant pair, their pups, and several other subordinate or young animals. Wolves work cooperatively within the pack, with each member of the pack occupying a specific function. The dominant pair leads the pack in hunting, finding den sites, and establishing the pack's territory. Scientific studies indicate that if one of the lead ("alpha") wolves is removed from a pack, the probability that the pack will successfully breed the following year is approximately halved. When both alpha wolves are killed, the short-term reproductive potential of the pack is generally destroyed. This impact is exaggerated for smaller wolf populations, as an alpha wolf that is eliminated from a pack generally must be replaced by a mature wolf from another pack to allow the pack to persist and produce pups the following year. The chances of reproduction and pup survival after the loss of one or both alpha wolves are greatly influenced by pack size and distribution.

44.     All wolves, and especially young pups, engage in regular social interactions, and are dependent upon the pack for their survival. Wolf packs in the Great Lakes region generally have between four and eight members, although packs with as many sixteen wolves have been recorded. The territories of these packs average between 42 and 100 square miles.

45.     Wolf pups remain with their parents for at least the first year of life, while they learn to hunt. After that, these yearlings typically leave the pack to find mates and territories of their own.

46.     This process of moving away from the home pack is called dispersal. Some wolves have been known to disperse more than 500 miles, although wolves usually travel a shorter distance before finding a suitable mate.

47.     Dispersal is crucial to wolf population recovery, because dispersing wolves often reoccupy areas in which wolves were previously eradicated.

48.     Dispersal is also essential to the viability of the gray wolf species.  When wolves travel over large geographic areas in order to find their mates, dispersal helps maintain genetic diversity and at the same time expands the range of healthy populations.

49.     The only gray wolf population in the conterminous United States east of the Rocky Mountains is found in Minnesota, Wisconsin, and the Upper Peninsula of Michigan. According to the FWS, this population holds about 70 percent of North American gray wolves that occur south of Canada.  76 Fed. Reg. at 81,672.

50.     Historically, wolves ranged across nearly all of North America, including the entire Great Lakes region.

<u>The Ecological Significance of the Gray Wolf</u>

51.     The ecological benefits of gray wolves are well-documented in the scientific literature.  Protection of the gray wolf is particularly vital because the wolf is an "umbrella species."  Umbrella species, many of which are large carnivores, are ecologically significant because, due to their large land-area requirements, they affect and influence the habitats and populations of many prey species, as well as the larger ecosystems containing these habitats and populations.

52.     Large carnivores, because of their position in the ecosystems and their sensitivity to human impacts, often also provide an early warning when the health of an ecosystem is imperiled.

53.     A healthy wolf population is vital to maintain the delicate balance between species.   The loss of wolves in an ecosystem skews the natural order, leading to the

overpopulation of nonnative species, and the depredation of otherwise healthy native species. The return of wolves to an ecosystem drives the mix back to a supportable structure that protects the health of all resident species.

54.     Scientists are in accord that a healthy wolf population is directly connected to the conservation of multiple species and vibrant biodiversity.  Numerous studies have shown that the loss of an apex predator species, like the wolf, has ripple effects throughout the ecosystem that may lead to reduced biodiversity.  Thus, protection of wolves helps to preserve functioning ecosystems, thereby serving to effectuate the ESA's broader goal of preserving functioning ecosystems.  *See* 16 U.S.C. § 1531(b); *see also* H.R. Rep. No. 93-412, reprinted in Congressional Research Service, A Legislative History of the Endangered Species Act of 1973, at 149 (Feb. 1982) (stating that one "essential purpose of the [ESA] is to provide a means for protecting the ecosystems upon which we and other species depend.").  For example, the loss of wolves has been documented to contribute to increased numbers of other groups, such as coyotes and moose, in a manner that harmed the environment and local species.  This kind of effect has been seen in the Great Lakes region, and specifically in Isle Royale National Park.  When the wolves returned, their presence was able to correct an overpopulation of moose that was damaging the Park's plant communities, and to force an adjustment in the increased numbers of coyotes, who were able to flourish in part because of the wolves' absence.

55.     The ecology of Yellowstone National Park and surrounding areas has improved since the reintroduction of the wolf in the mid-1990s.  In Yellowstone, the reintroduced wolves have changed the grazing behavior of elk and other ungulates along the region's waterways, thus allowing several tree species, including willow and cottonwood, to recover from over-browsing. The wolves' reintroduction also bolstered biodiversity by creating shelter and habitat for beavers

and songbirds, and by increasing potential trout habitat.

56.     Wolves also improve the health of large ungulates, like moose and elk, by culling weakened and diseased animals from the population, and benefit scavenger species such as bears, badgers, and eagles, which are provided a reliable food source on a year-round basis from the remnants of wolf kills.

57.     Because of their historical presence in the United States, and their value as an umbrella species, wolves also provide significant scientific and aesthetic value to individuals who are interested in observing and studying wildlife, and those who are motivated to protect our environment – including Plaintiffs in this action.

<u>The Wolf Was Persecuted To The Brink Of Extinction</u>

58.     The gray wolf once existed throughout most of North America.  Prior to European contact, the total North American wolf population may have been as high as 400,000 wolves. However, with the European settlers came the widespread persecution of wolves.  According to the FWS, "wolves were hunted and killed with more passion and zeal than any other animal in U.S. history."  FWS, *Gray Wolf*, http://digitalmedia.fws.gov/cdm/ref/collection/document/id/111 (July 1998).   Habitat destruction and government bounties that began before the Twentieth Century encouraged the widespread poisoning, trapping, and hunting of wolves, which resulted in the extirpation of the gray wolf from more than 95 percent of their range in the conterminous United States.  68 Fed. Reg. 15,804, 15,805 (Apr. 1, 2003).

59.     Wolves were effectively removed from the Dakotas by the 1920s or 1930s.  By 1960, the wolf had been eliminated from Wisconsin and Michigan.  Even as they began to disappear, the states' goals were to completely zero out the population.  Public bounties were offered in many states, and were paid in Minnesota even up to 1965, and wolves were frequently

killed there until as late as 1974.

60.     Before the ESA was enacted in 1973, the only gray wolves living within the conterminous United States consisted of a small community in Isle Royale National Park in Michigan, and a remnant population in northeastern Minnesota.

### The ESA's Mandate for Wolf Recovery

61.     The gray wolf was one of the first species to be listed under the Endangered Species Preservation Act of 1966, the predecessor of the ESA.  32 Fed. Reg. 4,001 (Mar. 11, 1967).  But these legal protections were limited, and it was the 1973 passage of the ESA that marked the true beginning of the wolf population's recovery.  In August 1974, the FWS listed various subspecies of gray wolves under the ESA, including the eastern timber wolf.

62.     For years, wolf biologists, conservationists, and geneticists debated the specific taxonomy of wolves.  Scientific confusion reigned over the nature of the species, and potential subspecies, of the wolves who remain on the American subcontinent.

63.     However, in 1978, the FWS added clarity by declaring all wolves in the United States to be gray wolves, and protecting them at the species level.  The FWS listed the gray wolf as endangered throughout the conterminous United States and Mexico, except in Minnesota, where wolves were listed as threatened.  43 Fed. Reg. 9,607 (Mar. 9, 1978).  This status provided national protection to all wolves, and has remained largely unchanged for over thirty years.

64.     Recovery of the wolves began, slowly, but in earnest.  The Minnesota population, which had been the most viable, began to increase in numbers.  The ESA's requirements of habitat protection also allowed the wolf to begin reoccupying portions of its historic range.  In the first twenty years of protection, the Minnesota wolf range more than doubled in size.  But this was still just one small population in one minuscule part of the species' potential range.

65.     Through the important process of dispersal, some wolves moved from Minnesota to Wisconsin and Michigan.  The slow process of recovery occurred only because of the absolute protection accorded the Minnesota wolves.  The populations were growing, but the range in which they lived was still a tiny fraction of their historical homeland.

66.     At the time of the ESA's passage, the gray wolf had been reduced to one per cent of its historic range within the lower forty-eight United States.  Since then, the wolf has just barely returned – now occupying only five per cent of its historic range.  This is very nascent and limited progress.  In fact, the gray wolf remains extirpated across the vast majority of its original territory, both within the Great Lakes region and nationwide.

<u>The FWS' Previous Attempts to Reduce Protections for Wolves</u>

67.     Over the last several decades, the FWS has repeatedly attempted to stunt or eliminate federal protections for wolves.  Several courts have reviewed the FWS' decisions and actions, and repeatedly rejected them as violative of the ESA and APA.

68.     First, in the 1970's the FWS authorized an aggressive trapping program of wolves in Northern Minnesota.  Over 150 wolves were killed before a District Court in Minnesota stopped the program.  *See Fund for Animals v. Andrus*, Civ. No. 5-78-66, 11 Env't Rep. Cas. (BNA) 2189, 2200-01 (D. Minn. 1978).

69.     In 1983, a second federal court overturned the FWS' next wolf hunting program. In that case, despite their protected status, the FWS had approved public trapping – for sport – of wolves in Minnesota.  *See Sierra Club v. Clark*, 755 F.2d 608, 615 (8th Cir. 1985) (the FWS' decision to authorize sport trapping is impermissible under the ESA).

70.     After the FWS' attempts to allow trapping of wolves were rebuffed multiple times by multiple courts, the Service shifted its efforts.  Its new master plan was to use the DPS tool to

single out, and then eliminate, the protections granted to the Great Lakes wolves.  Over the last decade, the FWS has attempted to prematurely remove protections from the gray wolf by misusing the DPS tool.  This case represents the fourth try by the FWS to create a DPS out of the western Great Lakes wolf population, thereby isolating the Great Lakes wolves from the rest of the country; then claim that within this artificially-drawn boundary the Great Lakes wolves are doing well; and then based on that inappropriate foundation, eliminate ESA coverage of that DPS, while ignoring the critically endangered status of the wolf population as a whole.

71.     The number of courts that have stricken the FWS' efforts similar to this approach (which is the basis for the 2011 Delisting Rule) is notable.  First, the FWS attempted to split the gray wolf's range into three DPSs and reduce protections for the wolf within two of those DPSs.  *See* 68 Fed. Reg. 15,804 (Apr. 1, 2003).  This rule also proposed to delist the gray wolf entirely in many regions that historically supported wolf populations.

72.     That first DPS ploy by the FWS was rejected by two federal courts that struck down that rule.  *See National Wildlife Fed'n v. Norton*, 386 F. Supp. 2d 553 (D. Vt. 2005); *Defenders of Wildlife v. Sec'y, U.S. Dept. of the Interior*, 354 F. Supp. 2d 1156 (D. Or. 2005).  These courts restored the ESA protections the FWS had tried to remove with its illegal rule.

73.     Both of these opinions disapproved of the boundaries established by the FWS for the new DPSs.  The courts specifically found the artificial boundaries to be too wide, because each DPS included a significant amount of land outside of where the wolves' healthy population existed.  They stressed that the ESA mandated a need for continued protection in unoccupied areas of the wolf range.  *See*, *e.g.*, *Defenders of Wildlife*, 354 F. Supp. 2d at 1171 ("[T]he wolf DPS appears to be a tactic for downlisting areas the FWS has already determined warrant listing, despite the unabated threats and low to nonexistent populations outside of the core areas.").

74.     Almost immediately after these decisions and the wolf's return to protected status under the ESA, the FWS decided to again try to remove federal protections, continuing its concerted efforts that were detrimental to wolf recovery.  Because their attempt to use the DPS tool to remove federal protections had failed, the FWS tried to grant states in the Great Lakes the right to kill wolves on the theory that killing some wolves would increase "social tolerance" for the remainder and therefore enhance the survival of the species.  *See* 16 U.S.C. § 1539(a)(l) (allowing limited take of an endangered species "for scientific purposes or to enhance the propagation or survival of the affected  species").  This Court enjoined the hunt, rejecting the Service's reasoning as yet another unlawful interpretation of the ESA.  *Humane Soc'y of the United States v. Kempthorne*, 481 F. Supp. 2d 53 (D.D.C. 2006), *vacated as moot by* 527 F.3d 181 (D.C. Cir. 2008).

75.     Undeterred by prior judicial repudiations, the FWS tried the DPS/delisting tactic again.  This time, in 2007, the Service attempted to designate the western Great Lakes wolves as a DPS and, despite the fact that this area was merely a portion of a larger area that was already listed, at the exact same time the FWS removed ESA protection for wolves within that DPS.  72 Fed. Reg. 6,052 (Feb. 8, 2007).

76.     The 2007 Western Great Lakes DPS, like the previous one rejected by two separate federal courts in 2005, had extremely expansive boundaries, encompassing the eastern Dakotas, all of Minnesota, Wisconsin, and Michigan, and parts of Iowa, Illinois, Indiana, and Ohio.  This 2007 DPS included large areas the wolves had not yet populated, but that could have been used as transit zones for the important process of dispersal.  In other words, the DPS boundaries reached far beyond the current distribution of the wolf, removing federal protections from areas where the wolf remains extirpated, further inhibiting true recovery.

77.     In 2007, the agency proposed the exact same thing on the exact same day with the Northern Rocky Mountain wolves – designating those wolves as a DPS, and stripping them of ESA protection.  *See* 72 Fed. Reg. 6,106 (Feb. 8, 2007).  The FWS finalized its proposal on February 27, 2008.  73 Fed. Reg. 10,514 (Feb. 27, 2008).  The combined effort, if it had been successful, would have removed federal protection for the only two small areas in the country where the gray wolf had managed to reestablish.  Moreover, it was clear that the FWS intended to later eliminate ESA protection in the remainder of the listed areas by claiming wolves could not possibly recover to those areas.

78.     A coalition of animal protection groups, including most of the Plaintiffs in this action, challenged the 2007 delisting of wolves in the Great Lakes in this Court, seeking injunctive and declaratory relief.  *Humane Society of the United States v. Kempthorne*, 579 F. Supp. 2d 7 (D.D.C. 2008).  This Court granted summary judgment to plaintiffs, and vacated the FWS' delisting rule, finding that the FWS' decision to remove federal protections for the gray wolf was arbitrary, capricious and not in accordance with the ESA.  *Id.*  Another federal court enjoined the rule delisting the Northern Rocky Mountains DPS.  *Defenders of Wildlife v. Hall*, 565 F. Supp. 2d 1160 (D. Mont. 2008).

79.     In vacating and remanding the delisting of the Western Great Lakes DPS, this Court explained that the ESA does not clearly address whether the FWS can designate a sub-population of a listed species as a DPS and then delist that sub-population, even if that sub-population had not been recognized as a DPS or listed beforehand.  The Court found that no deference was due the agency because the "FWS had misread the statute."  579 F. Supp. 2d at 14, n.8.  The Court questioned the FWS' use of the DPS tool, and stated that the text of the ESA "quite strongly suggests – consistent with common usage – that the *listing* of any species (such

as the Western Great Lakes DPS) is a precondition to the *delisting* of that species." *Id.* at 17

(emphasis in original). The Court remanded to the FWS to provide a more thorough explanation

for its interpretation of the ESA, including how its interpretation might undermine the ESA's

policy objectives. *See id.* at 20-21.

80. In accord with the ruling, the Service reinstated protections for the gray wolf in

the Great Lakes region. 73 Fed. Reg. 75,356 (Dec. 11, 2008). However, one day after federal

protections had been reinstated, on December 12, 2008, the Office of the Solicitor for the

Department of the Interior released an opinion attempting to defend the FWS' decision to

simultaneously designate and delist the Western Great Lakes DPS. One month later, the FWS

announced in a press release its intention to publish rules that would again delist wolves in the

Western Great Lakes and Northern Rocky Mountains. *See* U.S. Fish & Wildlife Service, *Service*

*removes Western Great Lakes, Portion of Northern Rocky Mountain Gray Wolf Populations*

*from Endangered Species List* (Jan. 14, 2009), *available at* http://www.fws.gov/midwest/wolf.

81. Then, on April 2, 2009, the FWS issued a final rule simultaneously identifying

western Great Lakes wolves as a DPS and removing all ESA protection from the DPS.

Undoubtedly worried about the public comments it would get, the Service simply ignored its

obligation to open the rulemaking for public comment, and tried to sail the rule through quickly.

82. The Plaintiffs in this action challenged the deslisting in this Court, claiming that

the rule violated the ESA, the DPS Policy, and the Court's 2008 remand order, as well as the

APA, based on the FWS' failure to comply with its statutory public notice and comment

requirements. *Humane Soc'y of the United States v. Kempthorne*, Civ. No. 09-01092-PLF

(D.D.C., filed June 15, 2009). Rather than defend its action, the FWS conceded they erred by

publishing the 2009 delisting rule without providing for notice and comment as required by the

APA, and the parties reached a stipulated settlement agreement.  *Id.*, Doc 27.  Pursuant to the stipulation, this Court vacated the 2009 delisting rule and remanded it back to the FWS for further proceedings consistent with the ESA, the APA, and this Court's 2008 Remand Order.  *Id*.  In accordance with the agreement, the FWS published a final rule reinstating federal protections for wolves in the Great Lakes region.  74 Fed. Reg. 47,483 (Sept. 16, 2009).

<u>The 2011 Delisting Rule Challenged By This Action</u>

83.  Following reinstatement of federal protections, the FWS proposed to simultaneously designate and delist the Western Great Lakes wolves DPS yet again.  76 Fed. Reg. 26,086 (May 5, 2011).  Noting that this Court had questioned the agency's decision to carve out an area from within a larger listing, the FWS' proposed rule suddenly declared that the eastern wolf – which had previously been considered a subspecies of gray wolf known as the eastern timber wolf – is actually a separate species from the gray wolf.  *Id.* at 26,088–89.  Further, the FWS' proposed rule claimed that this newly recognized species – the eastern wolf – also occupied the Great Lakes region, but that only eastern wolves, and not gray wolves, existed in the 29 eastern states outside the Great Lakes.  *Id.*  The FWS announced its initiation of a range-wide status review of the conservation status of the eastern wolf.  *Id.*

84.  On August 26, 2011, the FWS reopened the comment period on its proposed rule to allow the public additional time to comment on the agency's determination that wolves in the Great Lakes were composed of two separate species – the gray wolf and the eastern wolf – and that the eastern wolf was the only species to occupy the eastern United States.  76 Fed. Reg. 53,379 (Aug. 26, 2011).  However, review of the scientific literature demonstrates an uncertainty that results in regularly shifting opinions about the unknown genetic nature of the wolves who inhabit our country.  Several commenters, including Plaintiff HSUS and several scientists, filed

comments questioning the FWS' creative but dubious taxonomic epiphany.

85.     Then, on December 28, 2011, the FWS issued its final rule simultaneously designating and delisting the Western Great Lakes DPS of the gray wolf, which became effective on January 27, 2012.  76 Fed. Reg. at 81,666 ("2011 Delisting Rule").

86.     In the final rule, the FWS also admitted that there is "ongoing scientific debate, and the lack of clear resolution concerning the taxonomy of wolves in the western Great Lakes." *Id.* at 81,669.  Despite its admission of lingering uncertainty, the FWS decided to separate its decision to delist wolves in the Great Lakes from its determination as to the conservation status of wolves in all or portions of the eastern 29 states, which is subject to an ongoing status review. *Id.* at 81,666.

### The Delisting Rule Suffers From the Same Defects Previously Identified By Plaintiffs and Multiple Federal Courts

87.     The FWS' newest delisting rule is nearly identical to its prior delisting rules that have been repeatedly rejected by federal courts, including the 2007 delisting rule vacated by this Court, and the 2009 rule that was voluntarily rescinded.

88.     In the 2011 Delisting Rule, the FWS attempts to circumvent these prior judicial repudiations by claiming that wolves in Minnesota, which had been listed as threatened in 1978, now constitute the Western Great Lakes DPS and that that the FWS is merely expanding the boundaries of the DPS to include all of Wisconsin, Michigan, and parts of six other states, in addition to Minnesota.  76 Fed. Reg. at 81,666.  However, these semantics do not change the reality of the FWS' action – the 2011 Delisting Rule simultaneously creates and delists a previously unlisted DPS from within a larger listed area.

89.     The 2011 Delisting Rule, and the related opinion by the Office of the Solicitor,

offers retooled but unconvincing rationale in support of the agency's misuse of the DPS tool. Dismissive of much of this Court's reasoning expressed in the 2008 opinion vacating and remanding the 2007 delisting rule, the FWS continues to argue that the ESA gives it clear authority to simultaneously designate and delist the Western Great Lakes DPS.

90.     This Court specifically mandated that the FWS "address any legitimate concerns that its interpretations could undermine [the ESA's] policy objectives."  579 F. Supp. at 20-21. However, the 2011 Delisting Rule does not address how the FWS' interpretation of the ESA could undermine the Act's policy objectives.

91.     The 2011Delisting Rule represents another abdication of the FWS' mandate to do everything it can to *promote* wolf recovery "throughout all or a significant portion of its range." 16 U.S.C. § 1532(6).  The FWS is ignoring this essential element of conservation, which is the heart of the ESA.

92.     The ESA and its implementing policies bar the use of the DPS tool to hinder, rather than promote, species recovery.  Yet that is precisely what the FWS has done yet again.

93.     The FWS cannot use the DPS tool to encircle and delist one of only two gray wolf populations in the conterminous United States that have made any substantial progress towards recovery.  The FWS is using the DPS tool with the Great Lakes wolves in the opposite way from which it was intended.  The nature and language of the ESA, as well as the DPS Policy, create one primary use for the DPS tool – to protect locally vulnerable pockets of otherwise healthy populations.  Instead, the FWS is taking a highly endangered species, drawing self-serving lines around the species' only healthy (but tiny) areas, and then using that concentrated population as an excuse to avoid its responsibilities to the larger species-level listing.

94.     If the Service's use of the DPS tool in this situation is upheld, it could allow for

the delisting of any population that is huddled within a discrete area, regardless of the health of the species outside that line.  This tactic would effectively stop recovery in its tracks, preventing developing populations from ever reaching areas of unoccupied range where the species still retains and needs the protections of the ESA, especially where (as here) the state governments within the carved-out DPS area have affirmed their intent to *reduce, and inhibit further expansion of,* current populations of the species.  This is contrary to the purpose of the DPS tool and in direct conflict with the elemental purpose of the ESA to conserve species and the ecosystems on which they depend.  16 U.S.C. § 1531(b).

95.    The boundaries of the Western Great Lakes DPS are arbitrary and capricious because they reach far beyond the current distribution of the wolf, eliminating federal protections from areas in which the wolf remains nearly extirpated.  Indeed, the DPS boundaries cover a range that, as acknowledged by the Service, is hundreds of miles wider than the area currently occupied by wolves.  *See* 76 Fed. Reg. at 81,670 (Figure 1).  Specifically, although the gray wolf is found only in parts of Minnesota, Wisconsin, and Michigan, the Western Great Lakes DPS includes the entirety of these states as well as portions of six other states – North Dakota, South Dakota, Iowa, Illinois, Indiana, and Ohio.  The areas the wolf actually occupies makes up less than one-quarter of the area identified as the DPS.

96.    To escape the confines of the DPS and reach areas where the wolves remain protected, wolves must travel hundreds of miles across "wolf movement zones."  These are areas where, under the 2011 Delisting Rule, wolves will be unprotected and states and individuals have broad authority to kill dispersing wolves, negating the possibility that wolves will ever make it through these zones.

97.    As recognized by multiple federal courts, but ignored by the FWS in the 2011

Delisting Rule, the ESA requires that the DPS boundaries be much more narrowly drawn.  This would maintain protection for wolves involved in the vital dispersal process, so that they were not subject to state regulation and killing as they crossed from the areas of high concentration into those areas where they have not yet reestablished healthy populations.  The DPS boundaries drawn by the FWS will thus work against the ESA's mandate, preclude any natural expansion of the species, and prevent recovery in a significant portion of their former range.  *Cf.* 16 U.S.C. § 1532(6).

<u>The Statutory Requirements for Delisting Wolves Within the DPS Have Not Been Met</u>

98.     Wolves remain extirpated in *over ninety-five percent* of their historic homeland.  The FWS' determination that wolves are not threatened or endangered over a "significant portion" of their range is erroneous, because it refuses to consider the true range of wolves in the United States, as reflected in the nationwide listing of the gray wolf.  As such, this determination is arbitrary, capricious, and in direct conflict with the ESA.  The gray wolf remains endangered across broad swaths of its historic range, and until the gray wolf has recovered across a significant portion of that range, the wolf cannot be delisted.

99.     Given the geographic description of the DPS, the gray wolf has virtually no chance of expansion to *any* further part of its range, let alone a "significant portion."  Compounding this statutory failure is the fact that there are *inadequate* regulatory mechanisms in place for wolves.  Indeed, it is clear that, if the FWS' action is not stopped, the current range of the wolf will actually *shrink* under overly hostile state management plans designed to precipitously reduce wolf populations to minimal levels.

100.    The 2011 Delisting Rule "rel[ies] heavily on the State wolf management plans for [its] assessment of the degree of protection and monitoring that will occur after Federal

delisting," 76 Fed. Reg. at 81,686, and naively assumes that "plans will be funded and implemented largely as written." *Id.*

101.     The undeniable truth is that turning over control to the states will result in a substantial detriment to the wolf population, limiting its ability to disperse and recover.  There is a significant amount of evidence that the financially strapped states cannot afford to implement vital aspects of their management plans, including monitoring and increased law enforcement to guard against illegal killings.  Compounding this problem is the fact that now that wolves are delisted, the federal funds dedicated to wolf monitoring and other research disappear.  *See*, *e.g.*, 76 Fed. Reg. at 26,124 (noting that federal funding for wolf monitoring will terminate following delisting).  The lack of identified resources for state-level monitoring throughout the DPS creates a risk that problems will go unnoticed and unaddressed, and that wolf population numbers will plummet.  Yet the FWS paid no mind to these very real and likely harms.

102.     Even if the state management plans were fully funded and implemented, the gray wolf would not be adequately protected.  Of the nine states included in the DPS, six of them have absolutely no wolf management plans.  In effect, the FWS is casting the wolves to the winds of fate so that, even if by some miracle they were able to disperse to currently unoccupied areas of their natural range, there would be zero protective regulation of that new group – leading undoubtedly to a quick end.  The FWS expressly acknowledges the absence of protections, should the wolves succeed in moving into these states.  *See*, *e.g.*, 76 Fed. Reg. at 81,713.

103.     Even the three states in the DPS that do have wolf management programs have proven both an unwillingness to protect the wolves and even a hostility towards them.  Following federal delisting all three states acted quickly to amend state law to allow sport hunting and trapping of wolves.  Minnesota previously made a commitment to a five-year moratorium on

recreational killing following federal delisting.   However, prior to finalization of the 2011

Delisting Rule, the state went back on its word and authorized the state wildlife agency to

establish rules for an open season on wolves immediately following delisting.   Just six months

after the 2011 Rule was in place, the state Department of Natural Resources established a public

hunting and trapping season via emergency regulations.   The state-authorized hunt for the 2012-

2013 season set a quota of 400 wolves, roughly 14 percent of the estimated wolf population in

the state.

104.    Wisconsin also made clear its intention to begin killing wolves as soon as possible

after federal delisting.   Just three months after the 2011 Delisting Rule went into effect, the

Wisconsin legislature mandated emergency rulemaking in order to begin active hunting and

trapping of that state's wolves.   Wisconsin's quota for the 2012-2013 hunting season was set at

201 wolves, roughly 24 percent of the estimated wolf population in the state.   In December of

2012, Michigan enacted a law designating the wolf as a game species and authorizing the state

Natural Resources Commission to establish a recreational wolf hunting and trapping season.

105.    Collectively, the plans in these three states would permit at least a 50 percent

decline in the Great Lakes wolf population.   *See* 76 Fed. Reg. 81,710, 81,717 (summarizing the

state plans that provide a minimum population of 1,600 in Minnesota, a 350 population target for

Wisconsin, and minimum population of 200 in Michigan).   This drastic population decline would

not only threaten the Great Lakes population, but it would also prevent this population from

serving as a source of dispersing wolves that could repopulate unoccupied portions of the wolf's

range.

106.    Adding insult to injury, even the three states within the DPS that have

management programs have authorized the unregulated killing of wolves in many situations.   For

example, landowners throughout most of Minnesota now have enormous discretion to kill wolves, even when there is no immediate threat to livestock or domestic pets.  In 60 percent of the state, Minnesota landowners can kill a wolf to "protect[]" other animals – even if there is no immediate threat of harm to those other animals.  The Minnesota plan also resurrects a bounty system by paying state certified private predator controllers $150 for each wolf killed.

107.    Wisconsin's state plan also significantly liberalizes the conditions under which wolves can be killed.  Private individuals can kill wolves attacking domestic animals and can obtain permits to kill wolves in areas of previous depredations.

108.    In Michigan, landowners previously were required to engage in non-lethal protection measures for other animals.  Now, however, state law has removed that restriction, so that lethal means can be the first response, even where there is no immediate threat to other animals or humans.

109.    Setting aside the inadequacy of the state management programs, other threats to wolves are of equal concern, but were cursorily dismissed by the FWS.  By example, illegal wolf killings are a serious problem, as are other deaths caused by humans (such as highway accidents).  Indeed, even with full protection, human-caused wolf deaths thwart recovery.

110.    In Wisconsin, approximately half of the deaths of radio-collared wolves have come from human causes, such as vehicle accidents, illegal shootings, and livestock depredation controls.  Similar figures with respect to human-caused deaths of wolves have been reported for Minnesota and Michigan.  But instead of addressing these problems, the 2011 Delisting Rule aggravates them by lifting the protections of the ESA.

111.    State management also increases the risk that disease will decimate wolf populations.  Without adequately funded monitoring programs, the wolf remains vulnerable to a

catastrophic population loss from diseases like mange. As the Wisconsin plan recognizes, but does not address, wolves could suffer a significant decline if there were a severe mange outbreak.

112.     Further, in an attempt to justify its 2011 Delisting Rule, the FWS relies heavily on the Recovery Plan for the Eastern Timber Wolf. This out-of-date plan, issued in 1978, and revised in 1992, focuses on the eastern timber wolf (*Canis lycaon*), a subspecies that lost relevance as a listed entity when the FWS listed the gray wolf at the species level in 1978. In fact, in the proposed 2011 Delisting Rule, the FWS claimed that the subspecies formerly known as the Eastern Timber Wolf was actually a wholly different species from the gray wolf – which the FWS decided to call the "eastern wolf." 76 Fed. Reg. at 26,088–89. The proposed rule also conveniently asserted that both the "eastern wolf" and gray wolf occupied the newly created Great Lakes DPS area, but only the "eastern wolf" had ever occupied areas of the eastern United States outside the DPS area. *Id.* After many commenters questioned the veracity of this claim, the FWS changed course in the final rule and admitted that there is currently some uncertainty as to the taxonomy of wolves in the eastern United States, but nonetheless maintained that there is some distinction between gray wolves and "eastern wolves." 76 Fed. Reg. at 81,688. The FWS cannot rely on a recovery plan for what it now believes to be a separate species that does not exist in the Great Lakes region to delist gray wolves in the Great Lakes.

## CLAIMS FOR RELIEF

## COUNT I

### (Violation of the ESA and APA – DPS Designation and DPS Boundaries)

113.     Plaintiffs restate and incorporate the prior allegations in this Complaint.

114.     The ESA seeks "to provide a means whereby the ecosystems upon which

endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species."  16 U.S.C. § 1531(b).

115.    The DPS Policy was developed to carry out the ESA's conservation mandate, and to this end provides that DPSs be designated "to protect and conserve species and the ecosystems upon which they depend before large-scale decline occurs that would necessitate listing a species or subspecies throughout its entire range."  61 Fed. Reg. at 4,725.  The DPS Policy emphasizes that "[i]t is important in light of the Act's requirement to use the best available scientific information in determining the status of species that this interpretation [of the meaning of a DPS] follows sound biological principles" and, necessarily, "[a]ny interpretation adopted should also be aimed at carrying out the purposes of the Act."  *Id.* at 4,722.

116.    The FWS' 2011 Delisting Rule designating the gray wolves in the western Great Lakes region as a DPS and stripping that DPS of protections under the ESA violates the ESA and DPS policy in two ways.

117.    First, neither the ESA nor the DPS Policy permit the FWS to use the DPS tool to remove protections of the Act from a population of a listed species if that population was not designated as an endangered or threatened DPS beforehand.  In simultaneously designating the Western Great Lakes DPS and delisting that DPS, the FWS has declared the DPS recovered without ever having made the prerequisite findings that the DPS is threatened or endangered, in violation of the ESA.  *See* 16 U.S.C. § 1533(c)(2)(B).  In addition, the FWS failed to adequately explain how creating a DPS for delisting purposes would not undermine the policy objectives of the ESA, in violation of this Court's 2008 Remand Order.

118.    Second, even if a DPS could legally be created to delist a previously unlisted entity (which it cannot), the boundaries of the DPS fail to comply with the ESA and the DPS Policy.

Instead of focusing its delisting decision on a wolf population with a conservation status different from that of other populations of the species, as required under the ESA, the Western Great Lakes DPS arbitrarily and capriciously includes large expanses presently unoccupied by wolves. The FWS' action, therefore, eliminates protections beyond the currently occupied range, though the wolf's conservation status in those areas has not changed from when the wolf was first listed.

119.    By including within the Western Great Lakes DPS largely unoccupied portions of Minnesota, Wisconsin, and Michigan, as well as portions of North Dakota, South Dakota, Iowa, Illinois, Indiana, and Ohio, the FWS has essentially created a moat around existing wolf populations in core recovery areas that will ensure that wolves do not disperse to suitable habitat outside of the DPS where the wolf is still protected as endangered.  Rather than promoting the continued recovery of wolves outside the DPS, the FWS' action severs crucial dispersal corridors by eliminating federal protections for dispersing wolves and leaving them subject to inadequate state mechanisms and intensive federal, state and private predator control actions.

120.    The 2011 Delisting Rule is therefore arbitrary and capricious, and otherwise contrary to the ESA, 16 U.S.C. §§ 1531(b), 1533, the DPS policy, and the APA, 5 U.S.C. § 706(2), and must be set aside.

## COUNT II

### (Violation of the ESA and APA – Failure to Follow the Statutory Criteria for Delisting)

121.    Plaintiffs restate and incorporate the prior allegations in this Complaint.

122.    Section 4(a) of the ESA sets forth a five-factor test for determining whether a "species" is threatened or endangered.  16 U.S.C. § 1533(a).  A species has not recovered, and cannot be delisted "until the threats to the species as analyzed under section 4(a)(1) of the Act have been removed.  51 Fed. Reg. at 19,935.  As such, when deciding whether to delist a species,

the FWS must conduct the analysis of the Section 4 listing and delisting factors *on the species level*.  Because the previous listing consisted of the conterminous United States, the FWS must make its delisting termination based on threats to the originally listed entity, not merely a portion thereof.  Yet, in the final 2011 Delisting Rule, the FWS only analyzed threats to wolves within the DPS it created, while ignoring the status of the entity it listed in 1978.  *See* 43 Fed. Reg. at 9,607.

123.    In addition, the Section 4 factors must be analyzed throughout "all or a significant portion of [the species'] range."  *Id.* § 1532(6), (20).  A species' range includes "major geographical areas in which [a species] is no longer viable but once was."  *Defenders of Wildlife v. Norton*, 258 F.3d 1136, 1145 (9th Cir. 2001).  The previous listing covered the conterminous United States, but in the 2011 Delisting Rule, the FWS limited its "range" analysis to that portion of the DPS known to be presently occupied by wolves, ignoring the largely unoccupied region where wolves were once viable.  The FWS failed to adequately explain why the conterminous United States is no longer the appropriate geographic context for measuring the gray wolf's condition.

124.    Moreover, in concluding that the Great Lakes DPS is recovered in a "significant portion" of its range, the FWS failed to adequately justify the "insignificance" of the potential habitat lying outside of the boundaries of the DPS it created.  In the 2011 Delisting Rule, the FWS determined that all areas outside the core recovery area are not "significant" because they purportedly do not contain suitable wolf habitat.  However, the FWS reached this conclusion based in part on present and future threats posed by the human-caused mortality of wolves that disperse into these areas, the development of these areas, and that some areas are places where wolves are likely to engage in unwanted depredation on livestock.  To ignore a large portion of

the wolf's historic range due to preventable, anthropogenic threats or because livestock might be killed is arbitrary, capricious and not in accordance with the ESA.

125.    Finally, because a species can be listed solely on the basis of "the inadequacy of existing regulatory mechanisms," 16 U.S.C. § 1533(a)(1)(D), a species cannot be delisted until adequate regulatory measures exist to protect the species and ensure its long-term survival once federal protections are removed.  In delisting wolves in the Great Lakes, the FWS improperly determined that wolves are not endangered or threatened by inadequate state regulatory mechanisms.  Few states within the Western Great Lakes DPS have plans or laws governing wolf management and those that do fail to adequately protect existing wolf populations.  In addition, the gray wolf remains threatened by disease, human predation and hybridization with coyotes. *See* 16 U.S.C. § 1533(a)(1)(C), (E).

126.    The 2011 Delisting Rule is therefore arbitrary, capricious, an abuse of discretion, and is otherwise contrary to the ESA, 16 U.S.C. § 1533, and the APA, 5 U.S.C. § 706(2), and must be set aside.

## COUNT III

### (Violation of the ESA and APA - Reliance on Eastern Timber Wolf Recovery Plan and Delisting in the Face of Taxonomic Uncertainty)

127.    Plaintiffs restate and incorporate the prior allegations in this Complaint.

128.    In an attempt to justify its delisting decision, the FWS relies heavily on the Recovery Plan for the Eastern Timber Wolf.  This outdated plan, issued in 1978 and revised in 1992, focuses on the eastern timber wolf (*Canis lycaon*), a subspecies that lost relevance as a listed entity when the FWS listed the gray wolf at the species level in 1978.  In fact, in the proposed 2011 Delisting Rule, the FWS claimed that the subspecies formerly known as the Eastern Timber Wolf was actually a wholly different species from the gray wolf – which the

FWS decided to call the "eastern wolf."  76 Fed. Reg. at 26,088–89.  The FWS cannot rely on a recovery plan for what it now believes to be a separate species that does not exist in the Great Lakes region to delist gray wolves in the Great Lakes.

129.    In addition, in the proposed rule, the FWS indicated that both gray wolves and a new species – the eastern wolf – occupied the Great Lakes area, and that the FWS was initiating a status review for the eastern wolf.  76 Fed. Reg. at 26,086; 76 Fed. Reg. 53,379.  Then, in the final 2011 Delisting Rule, the FWS stated it had changed its mind and determined that the wolf population in the western Great Lakes consisted of only the gray wolf, but that it would make a subsequent decision at an unspecified time as to the status of wolves – whether they are gray wolves or a separate species – in the other 29 eastern states.   76 Fed. Reg. at 81,687-88. However, the FWS must resolve the question of what species of wolves now occupy and have historically occupied the western Great Lakes region and areas of the eastern U.S. outside that region before delisting wolves in the Great Lakes.

130.    The 2011 Delisting Rule is therefore arbitrary, capricious, an abuse of discretion, fails to use the best available science, and is otherwise contrary to the ESA, 16 U.S.C. § 1533, and the APA, 5 U.S.C. § 706(2), and must be set aside.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs request the following relief:

1.    A declaration that the FWS violated the ESA and its implementing regulations, the FWS' own DPS policy, the APA and this Court's September 29, 2008 Opinion and Order, and that the 2011 Delisting Rule is arbitrary, capricious, an abuse of discretion, and not in accordance with law;

2.      An order vacating the 2011 Delisting Rule and reinstating the FWS' prior rule affording ESA protections for gray wolves in the Great Lakes region;

3.      An order that Plaintiffs recover their costs, including reasonable attorneys' fees, incurred in connection with this action, as provided for under the ESA, 16 U.S.C. § 1540(g)(4), the Equal Access to Justice Act, 28 U.S.C. § 2412(d), or other applicable law; and

4.      Such other relief as the Court deems just and proper.


Dated: February 12,  2013                    By:

                                             _____
                                             Ralph Henry, D.C. Bar No. 982586
                                             rhenry@humanesociety.org
                                             The Humane Society of the United States
                                             2100 L Street, NW
                                             Washington, DC  20037
                                             (202) 452-1100
                                             (202) 778-6132 (facsimile)

                                             Bruce A. Wagman, *pro hac vice* pending
                                             bwagman@schiffhardin.com
                                             SCHIFF HARDIN LLP
                                             One Market, Spear Street Tower
                                             Thirty-Second Floor
                                             San Francisco, CA  94105
                                             (415) 901-8700
                                             (415) 901-8701 (facsimile)

                                             *Attorneys for Plaintiffs The Humane Society of the United States; Born Free, USA; Help Our Wolves Live ("HOWL"); and Friends of Animals and Their Environments ("FATE")*