IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

THE HUMANE SOCIETY OF THE
UNITED STATES, BORN FREE, USA,
HELP OUR WOLVES LIVE, and
FRIENDS OF ANIMALS AND THEIR
ENVIRONMENT,

      Plaintiffs,

      v.                                      13-CV-0186-BAH

KENNETH SALAZAR, SECRETARY
OF THE INTERIOR, UNITED STATES
DEPARTMENT OF THE INTERIOR,
and UNITED STATES FISH AND
WILDLIFE SERVICE,

      Defendants.

---

MEMORANDUM IN SUPPORT OF UNOPPOSED MOTION TO INTERVENE
AS A PARTY DEFENDANT BY STATE OF WISCONSIN
AND WISCONSIN DEPARTMENT OF NATURAL RESOURCES

---

## INTRODUCTION

      This memorandum is filed in support of the motion to intervene as a defendant, filed by the State of Wisconsin (hereafter "the State") and State of Wisconsin Department of Natural Resources (hereafter "WDNR") (hereafter collectively "Wisconsin" unless otherwise indicated).

BACKGROUND

I.      PROCEDURAL POSTURE

This action was commenced on February 12, 2013, by plaintiffs The Humane Society of the United States, Born Free, USA, Help Our Wolves Live ("HOWL"), and Friends of Animals and Their Environment ("FATE") (hereafter "Plaintiffs"), by the filing of a Complaint For Declaratory And Injunctive Relief (hereafter "Complaint").

Plaintiffs challenge the decision in 76 Fed. Reg. 81,666 (December 28, 2011) of the U.S. Fish and Wildlife Service (hereafter "FWS" or "Service") to adopt a rule that revises the listing under the Endangered Species Act (hereafter "ESA")[1] of the "distinct population segment" or "DPS" of the gray wolves in the western region of the Great Lakes ("Western Great Lakes DPS" or "WGL DPS"), including in Wisconsin.  Under the rule revision, the Service revised the 1978 listing of the Minnesota population of gray wolves (Canis lupus) to conform to current statutory and policy requirements.  The Service renamed what was previously listed as the Minnesota population of the gray wolf as the WGL DPS, and delineated the boundaries of the expanded Minnesota population segment to include all of Minnesota, Wisconsin, and Michigan and portions of the adjacent states.  Under the rule, the Service removed the WGL DPS from the List of Endangered and Threatened Wildlife.  76 Fed. Reg. at 81,666.

---

[1] Endangered Species Act of 1973, 16 U.S.C. §§ 1531 *et seq.* (1973).

Plaintiffs seek an order vacating the rule and reinstating a previous rule that lists the WGL DPS as an endangered species under the ESA in the States of Michigan and Wisconsin and as a threatened species in the State of Minnesota.

The State of Wisconsin and WDNR have a vital interest in this matter, and their interests would be severely affected in the event the relief requested by plaintiffs were granted.

II.     FEDERAL AND STATE WOLF RECOVERY EFFORTS

Gray wolves in the western Great Lakes Region, along with several other then-recognized subspecies of gray wolves, were listed as endangered in 1974.  39 Fed. Reg. 1171 (Jan. 4, 1974).  Four years later, gray wolves throughout the conterminous 48 states were relisted as endangered at the species level, with the exception of Minnesota, where wolves were listed as threatened. 43 Fed. Reg. 9607 (March 9, 1978).

According to 76 Fed. Reg. 81,666 *et seq.* (December 28, 2012),[2] recovery plans were developed for the wolf populations in two regions of the United States: the northern Rocky Mountains in 1980, revised in 1987; and the eastern U.S. in 1978, revised in 1992. The 1978 Recovery Plan (hereafter Recovery Plan) and the 1992 Revised Recovery Plan for the Eastern Timber Wolf (hereafter Revised Recovery Plan), which is the plan applicable to Wisconsin; contain the same two recovery criteria.  The first recovery criterion states that the survival of the wolf in Minnesota must be assured.  The original

---

[2] The recovery efforts hereinafter described in this section of the memorandum are taken, in large part, from 76 Fed. Reg. 81,666 et seq. (December 28, 2012), citations omitted.

Recovery Plan did not specify where in the eastern United States the second population should be reestablished. Therefore, the second population could have been established anywhere within the triangular Minnesota-Maine-Florida area covered by the Recovery Plan and the Revised Recovery Plan, except on Isle Royale (Michigan) or within Minnesota.

The 1992 Revised Recovery Plan identified potential gray wolf reestablishment areas in northern Wisconsin, the UP of Michigan, the Adirondack Forest Preserve of New York, a small area in eastern Maine, and a larger area of northwestern Maine and adjacent northern New Hampshire. In 1998, the Eastern Timber Wolf Recovery Team clarified the application of the recovery criterion for the second population to the wolf population that had developed in northern Wisconsin and the adjacent UP of Michigan. This second population is less than 100 miles from the Minnesota wolf population. The Recovery Team recommended that the numerical recovery criterion for the Wisconsin-Michigan population be considered met when consecutive late-winter wolf surveys document that the population equals or exceeds 100 wolves (excluding Isle Royale wolves) for the 5 consecutive years between the first and last surveys.

Wolves were considered to have been extirpated from Wisconsin by 1960. No formal attempts were made to monitor the State's wolf population from 1960 through 1978. Although individual wolves and an occasional wolf pair were reported from 1960 through 1975, (Thiel 1978, Thiel 1993), there was no documentation of wolf reproduction occurring in Wisconsin, and the wolves that were reported may have been dispersing animals from Minnesota.

After the gray wolf was listed as endangered under the Act in 1974, the Minnesota, Wisconsin and Michigan population estimates increased. Wolves are believed to have reestablished breeding packs in Wisconsin in the winter of 1975–76. The WDNR began wolf population monitoring in 1979–80, estimating a statewide population of 25 wolves at that time. This population remained relatively stable for several years, and then declined to approximately 14 to 19 wolves in the mid-1980s.

In the late 1980s, the Wisconsin wolf population began an increase that has continued into 2012, when 815 wolves were counted in midwinter. Since 1979, WDNR has intensively surveyed its wolf population on an annual basis using a combination of aerial, ground, and satellite radio telemetry complemented by snow tracking and wolf sign surveys, and collections of opportunistic wolf observations from the public and conservation agencies. An estimated 690 to 733 wolves in 181 packs, including 35 wolves on Native American reservations, were in Wisconsin in early 2010, representing an 8 percent increase from 2009. By winter 2012 the wolf population had grown to 815-880 wolves in 213 packs and included 41 wolves on Native American reservations.

Wolves were first documented in Jackson County, Wisconsin, well to the south of the area occupied by other northern Wisconsin wolf packs in the winter of 1994–95. The number of wolves in this central Wisconsin area has dramatically increased since then.

During the winter of 2009–10, there were 100–106 wolves in 25 packs in the central forest wolf range (Zone 2) and an additional 46 to 48 wolves in 12 or 13 packs in the marginal habitat (Zone 3). By 2002, wolf numbers in Wisconsin alone surpassed the 1992 Revised Recovery Plan criterion for a second population within 100 miles of the

Minnesota population (100 wolves for a minimum of 5 consecutive years).  Furthermore, in 2004, Wisconsin wolf numbers exceeded the 1992 recovery criterion of 200 animals for 6 successive late-winter surveys for an isolated wolf population.  From 1985 to 2010 Wisconsin population estimates increased from 15 to 690 wolves and from 4 to 181 packs.  This represents an annual population increase of 21 percent through 2000, and an average annual increase of 11 percent annually for the period 2004–2010.  The slower rates of increase since 2000 are an indication that the State's wolf population growth and geographic expansion are beginning to level off.   In Wisconsin, wolf populations increased from an estimated 26 in 1988 to 815 wolves in 2012.

In Michigan, estimates of wolves in the Upper Peninsula (hereafter "UP") increased from 57 wolves in 1994 to 557 in late winter 2009–10.  Over the last 10 years, the annualized rate of increase has been about 12 percent.  During the winter of 2009–10, the UP of Michigan had 557 wolves in 109 resident packs.  This rate has varied from year to year, but there appear to be two distinct phases of population growth, with relatively rapid growth (25.8 percent average) from 1995 through 2000 and slower growth (10.1 percent average) from 2001 through 2010.   In 2005, the number of wolves in the Michigan population alone surpassed the recovery criterion for an isolated wolf population of 200 animals for 6 successive late-winter surveys,

In Minnesota, wolf populations increased from a conservatively estimated 1500-1750 in 1988, to an average of about 3000 between 2003 to 2009.  Over that period of time, the combined wolf population in the States of Michigan and Wisconsin increased from approximately 34 to 1,469.

III.   THE INTERESTS OF WISCONSIN IN THE REMOVAL OF THE WGL DPS FROM THE LIST OF ENDANGERED AND THREATENED WILDLIFE.

A.   Proposed Defendant-Intervenors

The State of Wisconsin is a sovereign state of the United States of American with its principal offices at the State Capitol in Madison, Wisconsin.  The State of Wisconsin possesses sovereign police powers to protect the health, safety, and welfare of its citizens. It has enacted laws creating the WDNR and assigning authorities and duties to the WDNR, inter alia, to manage Wisconsin's environmental, natural, and wildlife resources, including wolves, for the protection of the public's safety, property, and for benefit and enjoyment of the public.

B.   Wisconsin State Law Authorizes the State to Manage its Wolf Population.

In Wisconsin, "The legal title to, and the custody and protection of, all wild animals within this state is vested in the state for the purposes of regulating the enjoyment, use, disposition, and conservation of these wild animals."  Wis. Stat. § 29.011(1).  This includes gray wolves in Wisconsin.[3]  Under Wis. Stat. § 29.014(1), "The department [of natural resources] shall establish and maintain open and closed seasons for fish and game and any bag limits, size limits, rest days and conditions governing the taking of fish and game that will conserve the fish and game supply and

---

[3] Under Wis. Stat. § 29.001(90), "'Wild animal' means any mammal, bird, fish, or other creature of a wild nature endowed with sensation and the power of voluntary motion. "

ensure the citizens of this state continued opportunities for good fishing, hunting and trapping."[4]

        C.      Wolf depredation in Wisconsin is a serious problem.

From 1985 to the present, depredation by wolves on domestic animals in Wisconsin has been significant.  During that time, wolves have been responsible for killing 1925 domestic animals, ranging from cattle and calves to sheep, horses, llamas, pigs, goats, chickens, turkeys, hounds and pets.  Under Wisconsin's wild animal damage payment programs, administered by the WDNR, Wisconsin has paid a total of $1,588,594.36 to partially compensate animal owners for their economic losses.  Total annual payments ranged from $200.00 in 1985 to $214,794.16 in 2012.  The upward trend in payments appears to track the increased numbers of wolves as a result of successful wolf recovery plans in Wisconsin.

IV.     WISCONSIN IS RESPONSIBLY MANAGING ITS HEALTHY WOLF POPULATION.

Leading up to the most recent federal rule, Wisconsin, particularly the WDNR, have invested expertise, staff, and other considerable resources for the recovery of the gray wolf in the state.  A wolf management plan was prepared for, and approved by, the Wisconsin Natural Resources Board on October 27, 1999, and an addendum and update to the plan were approved on August 15, 2007.  The State of Wisconsin has had Section 6 Cooperative Agreements with the US Fish and Wildlife Service since 1979 to conduct

---

[4] Under Wis. Stat. § 29.001(33), " "Game" includes all varieties of wild mammals or birds.

monitoring of the wolf population, investigate possible depredations, and conduct nonlethal control activities.  Between 1996-1999 and 2004-2006 the WDNR prepared a comprehensive wolf population management plan and plan addendum/update in consultation with diverse stakeholders, so that a broadly-supported management regime would be in place when delisting occurred.  The Wisconsin DNR has again begun the process for a new wolf management plan for the state that is anticipated to be completed in 2014.

Following the adoption and publication of the final rule that recognizes the success and recovery of the WGL DPS that is the subject of this action, on April 2, 2012, the Wisconsin Legislature enacted, and the Governor subsequently signed into law, 2011 Wisconsin Act 169 ("Act 169") creating, *inter alia*, Wis. Stat. § 29.185 entitled, "Wolf harvesting licenses."  The law went into effect on April 17, 2012.  It has wolf hunting, management, and depredation components.  Under Wis. Stat. § 29.185(1m):

> If the wolf is not listed on the federal endangered list and is not listed on the state endangered list, the department [of natural resources] shall allow the hunting and trapping of wolves and shall regulate such hunting and trapping as provided in this section and shall implement a wolf management plan. In regulating wolf hunting and trapping, the department may limit the number of wolf hunters and trappers and the number of wolves that may be taken by issuing wolf harvesting licenses.

The statute provides specific limitations with respect to wolf hunting licenses [Wis. Stat. § 29.185(2), (3)], hunting seasons and zones [Wis. Stat. § 29.185 (5)], and authorizes and prohibits hunting and trapping activities [Wis. Stat. § 29.185 (6)].  Act 169, Section 21, provides a nonstatutory provision directing WDNR to adopt emergency and permanent rules to implement the law.  Act 169 also created Wis. Stat. § 29.888, creating a wolf

depredation program funded from wolf hunting license fees as long as wolves are not listed as endangered or threatened in Wisconsin.

WDNR adopted a wolf harvest plan in 2012 pursuant to 2011 Wisconsin Act 169. The plan called for a safe harvest that will begin to reduce the wolf population. The plan included designation of 6 harvest zones with recommended wolf harvest of 20% of the previous winter wolf population in 3 zones of primary wolf habitat, 40% harvest in 2 zones in secondary wolf habitat, and harvest of 75% of the wolf population in marginal wolf areas. The total recommended harvest was a quota of 201 wolves from a population that consisted of 815-880 wolves the previous winter. Because pups were added to the population in spring 2012, the population would be somewhat higher by October 15, 2012 when the harvest began. The plan included procedures for emergency closure for each zone within 24 hours after the quotas were achieved. Both hunting and trapping would be allowed in any zone open to wolf harvest, and the DNR indicated plans to issue 10 permits for each quota harvest or potentially as many as 2,010 permits. But through discussion with the Chippewa tribes that maintained treaty rights within much of the wolf range, the WDNR reserved 85 wolves from the quota for the tribes, and provided a quota of 116 wolves for state hunters and trappers. Under their treaty rights, the Chippewa tribes are entitled to 50% of the harvestable surplus in the Ceded Territory of Wisconsin.

In the fall of 2012, WDNR adopted emergency rules to implement the first wolf hunt under the law during the fall and early winter 2012 (October 15 through December 23, 2012), amending Wis. Admin. Code chs. 10, 12 and 19. The rules limited the number of wolf hunters and trappers and the number of wolves that could be taken. The limit on

the number of hunters and trappers issued wolf harvest licenses was 1160. The number of wolves to be taken was limited to a total of 116 in a total of 6 wolf harvest zones – 32 wolves in zone 1, 20 in zone 2, 18 wolves in zone 3, 5 wolves in zone 4, 23 wolves in zone 5 and 18 wolves in zone 6. During the fall/winter 2012 wolf harvest, a total of 117 wolves were taken, with 32 wolves in Zone 1, 19 wolves in zone 2, 19 wolves in zone 3, 5 wolves in zone 4, 23 wolves in zone 5, and 19 wolves in zone 6. None of the quota of 85 wolves granted the Chippewa tribes were harvested.

## ARGUMENT

### I.   INTRODUCTION

Wisconsin seeks to intervene as of right. If this Court does not find that Wisconsin meets the requirements for intervention as of right, Wisconsin seeks permissive intervention. The D.C. Circuit requires intervenors as of right to demonstrate standing, but is undecided whether permissive intervenors must show standing. *In Re Endangered Species Act Section 4 Deadline Litigation*, 704 F.3d 972 (D.C. Cir. 2013). Satisfying constitutional standing requirements demonstrates the existence of a legally protected interest for purposes of Rule 24(a). See *Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 735 (D.C.Cir.2003); *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1076 (D.C.Cir.1998). Wisconsin will address intervention as of right first, standing second, and permissive intervention third.

II.     THE STATE AND WDNR ARE ENTITLED TO INTERVENE AS
        A MATTER OF RIGHT.

Rule 24(a) of the Federal Rules of Civil Procedure provides:

(a) Intervention of Right. On timely motion, the court must permit anyone to intervene
who:
    (1) is given an unconditional right to intervene by a federal statute; or
    (2) claims an interest relating to the property or transaction that is the subject of the
    action, and is so situated that disposing of the action may as a practical matter impair
    or impede the movant's ability to protect its interest, unless existing parties
    adequately represent that interest.

The Circuit Court for the District of Columbia Circuit has observed that

"qualification for intervention as of right depends on the following four factors:"

    (1) the timeliness of the motion; (2) whether the applicant "claims an interest relating to
    the property or transaction which is the subject of the action"; (3) whether "the applicant
    is so situated that the disposition of the action may as a practical matter impair or impede
    the applicant's ability to protect that interest"; and (4) whether "the applicant's interest is
    adequately represented by existing parties."

*Fund For Animals, Inc. v. Norton*, 322 F.3d 728, 731 (D.C. Cir. 2003), quoting *Mova*

*Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1074 (D.C.Cir.1998) (quoting Fed.R.Civ.P.

24(a)(2)) (citations omitted).

       In a motion to intervene under Rule 24(a)(2), the question is not whether the
    applicable law assigns the prospective intervenor a cause of action. Rather, the question
    is whether the individual may intervene in an already pending cause of action. See *Smuck*
    *v. Hobson*, 408 F.2d 175, 179 (D.C.Cir.1969) (en banc) ("[I]n the context of intervention
    the question is not whether a lawsuit should be begun, but whether already initiated
    litigation should be extended to include additional parties."). As the Rule's plain text
    indicates, intervenors of right need only an "interest" in the litigation-not a "cause of
    action" or "permission to sue."

*Jones v. Prince George's County, Maryland*, 348 F.3d 1014, 1017-1018 (D.C. Cir. 2003),

citing Fed.R.Civ.P. 24(a)(2); *Trbovich v. United Mine Workers of America*, 404 U.S. 528,

92 S.Ct. 630, 30 L.Ed.2d 686 (1972).

A.      Wisconsin's Motion to Intervene is Timely.

Intervention at this early stage of the litigation meets the timeliness requirements of FRCP 24(a).  The Complaint was filed February 12, 2013.  The defendants' Answer is due April 23, 2013.  Wisconsin's motion to intervene was filed contemporaneously with the anticipated filing of the federal defendants' answer.  Applications for intervention made before the parties have joined issue in the pleadings are "clearly timely."  7C Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1916 & n. 16 (3d ed. 2007).  Given the early stage of this litigation, Wisconsin's intervention will not prejudice any party or disrupt the proceedings in any manner.  Wisconsin's motion to intervene is unopposed.

B.      Wisconsin has Significant and Protectable Interests in the
         Subject Matter of this Litigation.

It is indisputable that Wisconsin has a significant and protectable interest in the removal of the WGL DPS from the list of endangered and threatened wildlife and the concurrent assumption of state management over wolves.

It is apparent from the Complaint itself that plaintiffs regard the State of Wisconsin (as a sovereign exercising its police powers) and the Wisconsin Department of Natural Resources (as Wisconsin's wildlife management agency), as having significant interests in the survival, vitality, and management of gray wolves.  See Complaint ¶¶ 3, 8, 49, 59, 65, 76, 88, 95, 104, 105, 107, 110, 111, 119.

"The legal title to, and the custody and protection of, all wild animals within this state is vested in the state for the purposes of regulating the enjoyment, use, disposition,

and conservation of these wild animals."   Wis. Stat. § 29.011(1).  The State has the right to exercise, and has exercised, its police powers both conserve the gray wolf game supply, Wis. Stat. § 29.014(1), as well as to protect the public's property from wolf depredation.   "The wild animals . . . within the state . . . are owned by the state in its sovereign capacity in trust for the benefit of the people of the state, and hunting regulations in the interest of conservation may be enacted in the exercise of the police power. . . ."   *State v. Herwig*, 17 Wis. 2d 442, 446, 117 N.W.2d 335 (1962).  "It is equally well settled that hunting is a privilege as against the state (commonly called hunting rights in reference to land), which the state can grant, or deny, or regulate, -a privilege of reducing wild life, which the hunter did not own, to possession and to ownership by a means and at a time and place which are lawful."  *Herwig*, 17 Wis. 2d at 446.  This State's right was recognized by the U.S. Supreme Court when it observed that ". . . States have broad trustee and police powers over wild animals . . . ."  *Kleppe v. New Mexico*, 426 U.S. 529, 545, 96 S.Ct. 2285 (1976).

Long before 2011 Wisconsin Act 169's enactment, the State of Wisconsin charged the WDNR to "establish and maintain open and closed seasons for fish and game and any bag limits, size limits, rest days and conditions governing the taking of fish and game that will *conserve* the fish and game supply and ensure the citizens of this state continued opportunities for good fishing, hunting and trapping."  Wis. Stat. § 29.014(1) (emphasis added).  Wisconsin has shown that it has managed the wolf population for recovery and brought the species back from extirpation in the state.   Wisconsin has adopted and revised a wolf management plan to assure continued vitality of the species in the State.

In Wisconsin, wolf populations increased from a conservatively estimated 26 in 1988 to 815 in 2012. .

Continuing through removal of the WGL DPS from the list of endangered and threatened wildlife, Wisconsin resumed management of gray wolves pursuant to its state police powers in 2011.  See *Baldwin v. Fish and Game Commission of Montana*, 436 U.S. 371, 391, 98 S.Ct. 1852 (1978), quoting *LaCoste v. Dept. of Conservation*, 263 U.S. 545, 552, 44 S.Ct. 186, 189, 68 L.Ed. 437 (1924) ("[p]rotection of the wildlife of the State is peculiarly within the police power, and the State has great latitude in determining what means are appropriate for its protection.")   A state's interest in protecting the wildlife within its borders is a widely-recognized basis for intervention.  See *United States v. State of Oregon*, 745 F.2d 550, 553 (9th Cir. 1984) (granting Idaho intervention in litigation addressing fishing on Columbia River given "Idaho's legitimate interest in the anadromous fish runs which are the subject of this litigation").

Wisconsin's interest in revision of the federal endangered and threatened species list is recognized in the ESA itself.  The very purpose of the ESA is to bring listed species to a point where the species is recovered and returned to state management. See 16 U.S.C. § 1532(3) (defining "conservation").  Section 4 of the ESA provides that delisted species are to be monitored "in cooperation with the States." 16 U.S.C. § 1533(g)(l). The adequacy of state regulatory mechanisms is an element to be considered in any delisting decision. 16 U.S.C. § 1533(a)(D).  Wisconsin has invested considerable resources in preparing to assume wolf management upon delisting.  As described above, a wolf management plan was prepared for, and approved by, the Wisconsin Natural Resource

Board in 1999 and 2007. On Jan. 27, 2012, the effective date of the wolf delisting, Wisconsin assumed full oversight authority for wolf management within Wisconsin with the federal delisting of wolves in the Western Great Lakes region.  In late 1990s and 2004-2006, the WDNR spent many months preparing a comprehensive wolf population management plan and addendum in consultation with diverse stakeholder groups, so that a broadly-supported management regime would be in place when delisting occurred.

Wisconsin's efforts reflect its sovereign interest in protecting and achieving the objectives established by Wisconsin for wolf management: maintain viable wolf populations in the state, reduce conflicts through population management, provide sport harvest opportunities, and provide for non-consumptive benefits (The Wisconsin Wolf Management Plan (1999); Wisconsin Wolf Management Plan Addendum 2006 and 2007).  The outcome of this case will determine Wisconsin's ability to pursue these objectives and exercise its police powers to manage wildlife within its borders.

C.     As a Practical Matter, Wisconsin's Legally Protected Interests May be Impaired by the Disposition of this Litigation.

The present action seeks to set aside the rule revision of the federal endangered and threatened species list that removes wolves in the WGL DPS from the list of threatened and endangered species.  Setting aside the rule will have the practical effect of divesting Wisconsin of its sovereign authority to manage wolves for the foreseeable future.

Such divestment would injure Wisconsin in two ways: first, it would inhibit the state's ability to manage and regulate its wildlife.  See *Minnesota v. Mille Lacs Band of*

*Chippewa Indians*, 526 U.S. 172, 204, 119 S.Ct. 1187 (1999) ("States have important interests in regulating wildlife and natural resources within their borders"). Second, it would inhibit Wisconsin's ability to enforce its laws and regulations. See *Maine v. Taylor*, 477 U.S. 131, 137, 106 S.Ct. 2440 (1986) ("a State clearly has a legitimate interest in the continued enforceability of its own statutes").

Setting aside the rule would effectively preempt the statutes, regulations, and management plans that Wisconsin has put in place to assume responsibility for wolf management under its wolf management plan. See 2011 Wisconsin Act 169. Preemption of state statutes and regulations would impair the state's ability to exercise its sovereign interests in wolf management. See *Maine v. Norton*, 257 F.Supp.2d 357, 374 (D. Me. 2003) (ESA "listing injures the State by interfering with its sovereign interests in managing its own natural resources and enacting and enforcing its own legal code.") Setting aside the rule will also render meaningless the numerous preparations Wisconsin has undertaken over the course of the last several years to prepare for the assumption of wolf management responsibilities.

> D.   Wisconsin's Interests are not Adequately Represented by the Other Parties.

The burden of showing inadequacy of representation is minimal and will be met by showing that representation may be inadequate. *Trbovich v. United Mine Workers of America*, 404 U.S. 528, 538 and n.10, 92 S.Ct. 630 (1972) (burden is met if applicant raises "sufficient doubt" about adequacy to warrant intervention); see also *Prete v.*

*Bradbury*, 438 F.3d 949, 956 (9th Cir. 2006) ("[t]he burden of showing inadequacy of representation is minimal").

While it is generally presumed that a government represents adequately the interests of its citizens when both share common objectives, such presumption is not necessarily valid when the federal government and a state are pursuing a common goal.

While Wisconsin has worked cooperatively with the FWS on the recovery of gray wolves and state assumption of wolf management, tension between federal and state interests is inherent, intentional, and healthy in our system of government, and it cannot be presumed that the federal government will zealously defend Wisconsin's sovereign authorities over wildlife in general and wolves in particular.  Moreover, Wisconsin is in a unique position to explain and define the adequacy of Wisconsin's regulatory mechanisms for ensuring the long-term viability and vitality of wolves in Wisconsin. Wisconsin's perspective on these issues will not necessarily be made known to the Court by the named parties.  See *Sagebrush Rebellion, Inc. v. Watt*, 713 F.2d 525, 528 (9th Cir. 1983) (an important factor in "assessing the adequacy of the Interior Secretary's representation" was whether "the intervenor offers a perspective which differs materially from that of the present parties to this litigation").

Wisconsin's participation is also necessary to ensure that any equitable remedies take into account the unique circumstances in Wisconsin relating to the conservation of wolves in a manner consistent with the maintenance of proper predator-prey balances while including protections against avoidable and costly depredations on livestock and domestic pets.  While the federal defendants have an unquestioned interest in defending

the integrity of the rule and those aspects of state management upon which the rule relies, they do not share Wisconsin's fiscal concerns or its interest in defending against injunctive relief, whether preliminary or permanent, which may disrupt the integrity of the full suite of state laws and regulations relating to wolf management.

### III. THE STATE AND WDNR HAVE DEMONSTRATED THEIR STANDING TO INTERVENE.

#### A. Standing Required For Rule 24 Intervention

The District of Columbia Circuit Court "has held that a movant seeking to intervene as of right must additionally demonstrate Article III standing." *In re Endangered Species Act Section 4 Deadline Litigation-MDL No. 2165*, 704 F.3d 972, 976 (D.C. Cir. 2013). "Rule 24(a)(2) requires the intervenor to demonstrate 'an interest relating to the property or transaction which is the subject of the action.' The rule impliedly refers not to any interest the applicant can put forward, but only to a legally protectable one." *Southern Christian Leadership Conference v. Kelley*, 747 F.2d 777, 779 (D.C. Cir. 1984). Constitutional standing generally requires the party to show (1) an injury-in-fact that is (a) concrete and particularized and (b) actual and imminent, (2) causation, and (3) redressability. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 566-561, 112 S.Ct. 2130 (1992). Standing for a defendant-intervenor requires a showing that the possible outcome of the case would harm the applicant's concrete interests. *Military Toxic Project v. EPA*, 146 F.3d 948, 954 (D.C. Cir. 1998).

B.   Wisconsin is Likely to Suffer Injury in Fact to its Legally Protected Interests.

The above-stated interests that could be adversely affected by plaintiffs' suit are concrete and particularized *legally protected* interests, and therefore satisfy all the criteria for standing.  If plaintiffs are successful, Wisconsin is likely to suffer injury in fact to its sovereign, ownership, conservation, stewardship, management, investment, and police power interests in the sustainable management of wolves in balance with other State and public interests to protect property and other wildlife, as well as to provide public hunting, tracking, and viewing opportunities.  As stated previously, the State of Wisconsin has the legally protected sovereign right, and the WDNR has legislatively derived authorities and duties, to manage the State's wildlife, including wolves, through regulated hunting and other management tools for assuring the sustainability and success of its recovered wolves on a long-term basis to protect game species health and numbers, safety of hunters, and the success and enjoyment of their state's recreational opportunities.  Wisconsin thus has a sovereign, legal, and management interest in managing its wolves in the public interest that will be impaired if the correct decision of the federal defendants is not affirmed.

Conservation and recreational interests, here required to be balanced and managed under Wisconsin state law, have been accepted as a basis for Constitutional standing. *National Wildlife Federation v. Hodel*, 839 F.2d 694, 704 (D.C. Cir. 1988); *Fund for Animals v. Norton*, 295 F.Supp.2d 1, 2 (D.D.C. 2003); see also *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1119 (9th Cir. 2005) ("The 'injury in fact' requirement in

environmental cases is satisfied if an individual adequately shows that she has an aesthetic or recreational interest in a particular place, or animal, or plant species and that that interest is impaired by a defendant's conduct.")

The injury to these legally recognized state interests is actual and imminent, and will occur if Plaintiffs are successful in overturning federal governments revised endangered and threatened species list with respect to Wisconsin's wolves.  It would reinstate prohibitions on government control of problem wolves, landowner authority to shot wolves attacking pets and livestock on their land, and public harvest of wolves, thus taking management authority out of the hands of the State, and make it harder to balance the ecological, social and economic factors affected by wolf populations.  Thus, the harm would be caused immediately by this outcome of the case.

This threat to Wisconsin's interests is redressable if Plaintiffs fail in their attempt to return wolves to the endangered species list, the goal of Wisconsin in intervening.  If Plaintiffs are unsuccessful in this litigation, Wisconsin will retain its management authority over wolves, and will be able to continue to practice sustainable use methods to manage this predator species in a way that can maintain optimum ecological, cultural, recreational, and aesthetic benefits, while reducing conflicts, economic losses to citizens, and negative social effects.

### IV.   ALTERNATIVELY, WISCONSIN SHOULD BE PERMITTED TO INTERVENE UNDER FRCP 24(B).

Rule 24(b) of the Federal Rules of Civil Procedure provides:

(b) Permissive Intervention.
   (1) In General. On timely motion, the court may permit anyone to intervene who:

(A) is given a conditional right to intervene by a federal statute; or
(B) has a claim or defense that shares with the main action a common question of law or fact.
(2) By a Government Officer or Agency. On timely motion, the court may permit a federal or state governmental officer or agency to intervene if a party's claim or defense is based on:
(A) a statute or executive order administered by the officer or agency; or
(B) any regulation, order, requirement, or agreement issued or made under the statute or executive order.
(3) Delay or Prejudice. In exercising its discretion, the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights.

The District of Columbia Circuit's precedent provides that the threshold for permissive intervention under Rule 24(b) is minimal.  "[A]s Professor Moore points out, . . . intervention has been allowed in situations where 'the existence of any nominate 'claim' or 'defense' is difficult to find.  And establishing a 'claim or defense' for purposes of permissive intervention is, of course, not dependent upon a showing of 'direct pecuniary interest' in the litigation." *Textile Workers Union of America, CIO v. Allendale Co.*, 226 F.2d 765, 769 (D.C. Cir. 1955).  See also, *SEC v. US. Realty & Improvement Co.*, 310 U.S. 434, 459 (1940).

> A. Intervenor-Defendants have a Claim or Defense that they Share with the Main Action with Common Questions of Law or Fact under FRCP 24(b)(1)(B).

Here, Wisconsin asserts defenses directly responding to the Plaintiffs' claims that the Wisconsin's statutes and regulations will not adequately protect existing populations of wolves, that viable populations of wolves do not currently exist, and that the new rule is contrary to the best scientific data regarding wolf recovery. See Proposed Answer of Intervenor-Defendants State of Wisconsin and WDNR (filed concurrently with this memorandum). Because Wisconsin participated in the federal recovery process that

defined recovery goals, established a state plan with even more conservative goals, and has assumed responsibilities for management of a significant population of the wolves in the WGL DPS, Wisconsin has a unique perspective on many of the issues presented in the Complaint, and will be uniquely affected by the results of this litigation. By presenting defenses responsive to the allegations and claims in the Complaint, Wisconsin has fulfilled the requirements of Rule 24(b) for permissive intervention to be warranted.

> B.   Intervenor-Defendants' Defenses are Based, in part, on a State Statute Adopted by the Wisconsin Legislature and a Regulation Administered by the WDNR.

Further, Rule 24(b)(2) provides that the court may permit a state governmental officer or agency to intervene if a party's claim or defense is based on either a statute or executive order administered by the officer or agency; or any regulation, order, requirement, or agreement issued or made under the statute or executive order.

In part, the Plaintiffs' claims rest upon the allegation that "the existing regulatory mechanisms in the Great Lakes region (including Wisconsin) are anything but adequate." Complaint ¶ 2, 3.  They also rest upon the hyper-exaggerated and false claim that, "Recent actions taken by states in the region further encourage dramatic reductions in wolf populations and are reminiscent of a time when bounties paid by local and federal governments promoted the widespread killing of wolves that nearly wiped out the entire species from the lower 48 states."  *Id*.  Plaintiffs allege Wisconsin's "regulatory mechanisms" for wolf management are "inadequate," Complaint ¶ 99, 119, 125.  Thus,

Plaintiffs directly attack the adequacy of Wisconsin's statutes and regulations governing management of wolves.

Pursuant to Rule 24(b), Wisconsin is entitled to permissive intervention to defend against such allegations.

C.     Permissive Intervention Will Not Delay the Action or Prejudice any Party.

Permissive intervention at this stage will not delay the action or prejudice the adjudication of the rights of the original parties. No substantive orders or rulings have been issued by the Court; Movant-Intervenors do not seek to expand the scope of issues to be resolved by the Court. Movant-Intervenors agree to abide by whatever briefing or other schedules are established by this Court.

CONCLUSION

For the foregoing reasons, Movant-Intervenors State of Wisconsin and Wisconsin Department of Natural Resources request the Court to grant their motion to intervene as party defendants as a matter of right and, alternatively, to intervene as a party defendant by permission.

Dated this 22nd day of April, 2013.

                        Respectfully submitted,

                        J.B. VAN HOLLEN
                        Attorney General


                        **/s/ Thomas J. Dawson**
                        THOMAS J. DAWSON
                        Assistant Attorney General
                        State Bar #1016134


                        **/s/ Cynthia R. Hirsch**
                        CYNTHIA R. HIRSCH
                        Assistant Attorney General
                        State Bar #1012870

                        Attorneys for Intervenor-Applicants
                        State of Wisconsin and
                        Wisconsin Department of Natural Resources

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-8987 (Dawson)
(608) 266-3861 (Hirsch)
(608) 266-2250 (Fax)
hirschcr@doj.state.wi.us
dawsontj@doj.state.wi.us