IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| THE HUMANE SOCIETY OF THE UNITED STATES, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 13-00186 (BAH) |
| | ) | |
| SALLY JEWELL, SECRETARY OF THE INTERIOR, et al. | ) | |
| | ) | |
| | ) | |
| Federal Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| HUNTER CONSERVATION COALITION | ) | |
| | ) | |
| Applicant Defendant-Intervenors. | ) | |

**HUNTER CONSERVATION COALITION'S UNOPPOSED MOTION TO INTERVENE
AND MEMORANDUM IN SUPPORT OF
HUNTER CONSERVATION COALITION'S MOTION TO INTERVENE**

## TABLE OF CONTENTS
## FOR UNOPPOSED MOTION TO INTERVENE

Table of Authorities ................................................................................................. iii

Table of Acronyms/Terms ........................................................................................ vi

MEMORANDUM IN SUPPORT OF HUNTER CONSERVATION
COALITION'S UNOPPOSED MOTION TO INTERVENE ............................................2

I.    Introduction ...................................................................................................2

II.   Factual and Procedural Background .............................................................4

III.  Proposed Defendant-Intervenors .................................................................6

      A.    SCI/NRA Intervenor Group ................................................................6

            1.    Safari Club International (SCI) ................................................6

            2.    National Rifle Association of America (NRA) .........................11

      B.    USSAF and Its Affiliated and Supporting Organizations
            Intervenor Group .............................................................................13

            1.    U.S. Sportsmen's Alliance Foundation (USSAF) ....................13

            2.    The Wisconsin Bear Hunters Association (WBHA) ...............15

            3.    Michigan United Conservation Clubs (MUCC) ......................16

            4.    Wisconsin Bowhunters Association (WBH) ...........................16

            5.    Upper Peninsula Bear Houndsmen Association (UPBHA) .....18

            6.    Michigan Hunting Dog Federation (MHDF) ..........................18

            7.    The Rocky Mountain Elk Foundation (RMEF) .......................19

IV.   Relevant Law ..............................................................................................21

V.    Status of Litigation .....................................................................................22

VI.   Argument ....................................................................................................22

      A.    HCC is Entitled to Intervene as of Right Under
            Federal Rule 24(a)(2) .......................................................................22

            1.    The Motion is Timely ............................................................23

            2.    HC and Its Organizational and Individual Members Have
                  Substantial Legal Interests in the Status of the Wolves
                  of the WGL DPS ....................................................................23

            3.    HSUS Plaintiffs' Proposed Relief Will Impair HCC's
                  Legal Interests ......................................................................25

            4.    The Parties to this Action Offer Inadequate Representation ....26

i

5.    HCC Also Has Demonstrated Its Standing to Intervene ............................ 29

B.    Alternatively, HCC Should be Permitted to Intervene Permissively
Under Rule 24(b)(2) ............................................................................................. 31

C.    Amici Curiae ........................................................................................................ 33

VII.   Conclusion ....................................................................................................................... 33

## TABLE OF AUTHORITIES

### UNITED STATES SUPREME COURT CASES

*Cascade Natural Gas Corp. v. El Paso Natural Gas Co.*,
386 U.S. 129 (1967) ............................................................................................24

*Hunt v. Wash. State Apple Adver. Comm'n*,
432 U.S. 333 (1977)............................................................................................31

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992)............................................................................................29

*NAACP v. New York*,
413 U.S. 345 (1973)............................................................................................23

*Trbovich v. United Mine Workers of Am.*,
404 U.S. 528 (1972)........................................................................................27, 28

### UNITED STATES COURTS OF APPEALS CASES

*Foster v. Gueory*,
655 F.2d 1319 (D.C. Cir. 1981) ......................................................................... 24

*Fund for Animals v. Norton*,
322 F.3d 728 (D.C. Cir. 2003) .......................................................................23, 27

*Humane Soc'y of the U.S. v. Kempthorne*,
527 F.3d 181 (D.C. Cir. 2008) ...........................................................................8, 28

*Military Toxic Project v. Envtl. Prot. Agency*,
146 F.3d 948 (D.C. Cir. 1998) ...........................................................................29

*Nat'l Wildlife Fed'n v. Hodel*,
839 F.2d 694 (D.C. Cir. 1988) ...........................................................................29

*Natural Res. Def. Council v. Costle*,
561 F.2d 904 (D.C. Cir. 1977) ....................................................................27, 28, 32

*Nuesse v. Camp*,
385 F.2d 694 (D.C. Cir. 1967) ......................................................................... Ibid.

*Save Our Sonoran, Inc. v. Flowers*,
408 F.3d 1113 (9th Cir. 2005) ...........................................................................29

*Sierra Club v. Envtl. Prot. Agency,*
292 F.3d 895 (D.C. Cir. 2002) ................................................................................31

**UNITED STATES DISTRICT COURT CASES**

*Am. Horse Prot. v. Veneman,*
200 F.R.D. 153 (D.D.C. 2001 ..................................................................................27

*Fund for Animals v. Norton,*
295 F. Supp. 2d 1 (D.D.C. 2003 ..............................................................................29

*Humane Soc'y of the U.S. v. Kempthorne,*
579 F. Supp. 2d 7 (D.D.C. 2008 ........................................................................... Ibid.

*Humane Soc'y of the U.S. v. Salazar*,
1:09-CV-1092-PLF (D.D.C.)................................................................................ Ibid.

*Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs,*
519 F.Supp.2d 89 (D.D.C. 2007 ..............................................................................33

**STATUTES**

16 U.S.C. § 1531 *et seq* .....................................................................................4, 21

16 U.S.C. § 1532 ....................................................................................................21

16 U.S.C. § 1533.........................................................................................21, 22, 30

16 U.S.C. § 1535....................................................................................................30

16 U.S.C. § 1538(a)(1)(B) ......................................................................................25

I.R.C. § 501 ......................................................................................6, 7, 11, 19

Minn. Stat. Ann. § 97B.647 (West 2012) ................................................................24

Wis. Stat. Ann. § 29.185 (West 2012) ....................................................................24

**REGULATIONS**

50 C.F.R. § 424.11(d) .............................................................................................21

39 Fed. Reg. 1,175 (Jan. 4, 1974) .............................................................................4

43 Fed. Reg. 9,607 (Mar. 9, 1978)............................................................................4

71 Fed. Reg. 15,266 (Mar. 27, 2006)........................................................................4

72 Fed. Reg. 6,052 (Feb. 8, 2007) ............................................................................5

73 Fed. Reg. 75,356 (Dec. 11, 2008) ............................................................................5

74 Fed. Reg. 15,470 (Apr. 2, 2009) ..............................................................................5

74 Fed. Reg. 47,483 (Sept. 16, 2009) ...........................................................................5

76 Fed. Reg. 81,666 (Dec. 28, 2011) ...........................................................5, 7, 12, 13

## RULES

Fed. R. Civ. P. 24 .................................................................................................. Ibid.

L.Cv.R. 7(m) ..............................................................................................................2

## **TABLE OF ACRONYMS/TERMS**

| | |
|---|---|
| ESA | Endangered Species Act |
| Federal Defendants | Sally Jewell, et al. |
| 2011 Delisting Rule | 12/28/2011 FWS Final Rule |
| FWS or Service | U.S. Fish and Wildlife Service |
| HCC | Hunter Conservation Coalition |
| HSUS Plaintiffs | Humane Society of the United States Plaintiffs |
| MHDF | Michigan Hunting Dog Federation |
| MUCC | Michigan United Conservation Clubs |
| NRA | National Rifle Association |
| RMEF | Rocky Mountain Elk Foundation |
| SCI | Safari Club International |
| SCIF | Safari Club International Foundation |
| UPBHA | Upper Peninsula Bear Houndsmen Association |
| USSA | U.S. Sportsmen's Alliance |
| USSAF | U.S. Sportsmen's Alliance Foundation |
| WBHA | Wisconsin Bear Hunters Association |
| WBH | Wisconsin Bowhunters Association |
| WGL DPS | Western Great Lakes Distinct Population Segment |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| THE HUMANE SOCIETY OF THE UNITED STATES, et al. | ) ) ) | |
| Plaintiffs, | ) ) | **Civil Action No. 13-00186 (BAH)** |
| v. | ) ) | |
| SALLY JEWELL, SECRETARY OF THE INTERIOR, et al. | ) ) ) ) | |
| Federal Defendants, | ) ) | |
| and | ) ) | |
| HUNTER CONSERVATION COALITION | ) ) | |
| Applicant Defendant-Intervenors. | ) | |

**HUNTER CONSERVATION COALITION'S**
**UNOPPOSED MOTION TO INTERVENE**

Members of the Hunter Conservation Coalition (HCC), by and through their counsel, move to intervene as defendants as of right in this action pursuant to Fed. R. Civ. P. 24(a)(2). The Hunter Conservation Coalition consists of two sets of organizations, and each set is represented by its own counsel: (1) Safari Club International (SCI) and the National Rifle Association of America (NRA) (collectively SCI/NRA); and (2) the U.S. Sportsmen's Alliance Foundation (USSAF) joined by the following USSAF-affiliated organizational members and supporting organizations—the Wisconsin Bear Hunters Association (WBHA), the Michigan United Conservation Clubs (MUCC), the Wisconsin Bowhunters Association (WBH), the Upper Peninsula Bear Houndsmen Association (UPBHA), the Michigan Hunting Dog Federation

(MHDF), and the Rocky Mountain Elk Foundation (RMEF) (an organization that has members and conducts conservation activities in Minnesota, Michigan and Wisconsin). If this Court determines that HCC fails to fulfill the criteria for intervention as of right, HCC then seeks leave to intervene permissively pursuant to Fed. R. Civ. P. 24(b)(1)(B). As a final alternative, HCC members seek to participate as *amici curiae* in support of Sally Jewell *et al.* (Federal Defendants). This Motion is supported by the Memorandum below, the accompanying declarations, and other documents on file in this case. HCC lodges with this motion a proposed Answer to be filed if the Court grants intervention.

Pursuant to L.Cv.R. 7(m), counsel for HCC has contacted counsel for both Plaintiffs and Federal Defendants with respect to their position on this Motion. Plaintiffs do not oppose intervention, but may request certain restrictions relating to briefing. Federal Defendants' counsel has informed counsel for HCC that Federal Defendants take no position on this motion to intervene and that this position (or lack thereof) is not conditioned on the imposition of conditions related to intervenors' briefing.

WHEREFORE, HCC respectfully requests that this Court grant intervention as of right. Alternatively, HCC seeks permissive intervention.

## MEMORANDUM IN SUPPORT OF HUNTER CONSERVATION COALITION'S MOTION TO INTERVENE

### I.     Introduction

In this lawsuit, Plaintiffs, the Humane Society of the United States *et al.* (HSUS Plaintiffs), seek to invalidate a Final Rule (2011 Delisting Rule) issued by the U.S. Fish and Wildlife Service (FWS or Service) on December 28, 2011, that removed the gray wolves of the Western Great Lakes Distinct Population Segment (WGL DPS) from the endangered species list.

If the HSUS Plaintiffs are successful in invalidating this delisting, the states whose wolf populations are included in the WGL DPS will be deprived of their authority to manage their own wolf populations, including the ability to establish sustainable wolf harvests as a means of managing and conserving their wolves.  As a consequence, HCC's members in Minnesota and Wisconsin will lose their ability to hunt wolves and to participate in sustainable wolf management and conservation.  HCC's members in Michigan will lose their future opportunities to enjoy wolf seasons and participate in wolf management and conservation when Michigan establishes its wolf harvests.  HCC members in all three states will lose their ability to use force to protect their hunting dogs from wolves, when in the field hunting for a variety of species. Further, members in all three states will likely see diminished opportunities to hunt for deer and possibly elk as the already large wolf population increases further and preys on even more deer and elk.  As a consequence, HCC members' enjoyment of hunting and observing wild deer and elk will diminish, their success at finding and taking game will decrease, and their efforts at conserving wildlife populations will be harmed.

A court-ordered reversal of the delisting will also harm each of HCC's organizational members' missions to promote and advocate wolf conservation and management through sustainable hunting.  Thus, HSUS Plaintiffs' success in this litigation would severely impair the interests of the Hunting Conservation Coalition organizations and their members.

HCC's member organizations are entitled to participate as intervenors in this matter as of right because: (1) the motion is timely; (2) HCC and its organizations' members have interests in the subject matter of this case; (3) the disposition of the case sought by HSUS Plaintiffs will impair the interests of HCC and its members; (4) HCC's interests are different from those of the Federal Defendants, who will not be able to adequately represent HCC in this litigation; and (5)

HCC has the Article III standing required of defendant-intervenors.  Alternatively, permissive intervention is appropriate because (1) HCC's defenses rely on the same factual and legal underpinnings as those presented by Federal Defendants, and (2) HCC's participation will not cause unduly delay or prejudice to any of the existing parties to this litigation.

## II.      Factual and Procedural Background

The wolves of the Western Great Lakes have been the subject of numerous listing and delisting regulations promulgated by the FWS under the authority of the Endangered Species Act, 16 U.S.C. §§ 1531 *et seq*. (ESA).  These regulations have prompted many legal challenges. HCC's participation in of the vast majority of this litigation helps demonstrate their interests in the pending case.

In 1974, the FWS listed as endangered both the Eastern Timber wolf population and the Northern Rocky Mountain wolf population.  39 Fed. Reg. 1175 (Jan. 4, 1974).  In 1978, the FWS converted the listing of the Eastern Timber wolf, along with the listing of three other gray wolf populations into a single listing and listed gray wolves as endangered throughout most of the conterminous United States.  The FWS singled out Minnesota's wolves and classified that population as threatened.  43 Fed. Reg. 9607 (Mar. 9, 1978).

As a result of recovery efforts by the FWS and the states of Michigan, Minnesota and Wisconsin, the wolf populations of the Western Great Lakes area increased dramatically in size and range.  On March 27, 2006, the FWS issued a proposed rule to recognize the Michigan, Minnesota and Wisconsin wolf populations as the WGL DPS of gray wolves and to remove that DPS from the endangered species list.  71 Fed. Reg. 15266 (Mar. 27, 2006).  The proposed WGL DPS included all of Minnesota, Wisconsin and Michigan; the eastern half of North Dakota and South Dakota; the northern half of Iowa; the northern portions of Illinois and Indiana; and the

northwestern portion of Ohio.  *Id.*  On February 8, 2007, the FWS finalized the rule to delist the

wolves of the WGL DPS.  72 Fed. Reg. 6052 (Feb. 8, 2007) (2007 Rule).  That rule went into

effect on March 12, 2007.

HSUS, Help Our Wolves Live and the Animal Protection Institute filed suit to challenge

that rule, and on September 29, 2008, this Court entered judgment in their favor.  *Humane Soc'y*

*of the U.S. v. Kempthorne*, 579 F. Supp. 2d 7, 20 (D.D.C. 2008).  The Court found ambiguity in

the language of the ESA concerning the Service's authority to designate a distinct population

segment for the purpose of delisting.  For that reason, the Court directed the FWS to explain how

its decision to designate a DPS for the purpose of delisting that DPS is consistent with the text,

structure, legislative history, judicial interpretations and policy of the ESA.  The Court vacated

and remanded the 2007 Rule to the FWS for further reasoned explanation.  *Id.*  In accordance

with the Court's order, the wolves of the WGL DPS were again listed under the ESA.  73 Fed

75356 (Dec. 11, 2008).

On April 2, 2009, the FWS issued a new rule to delist the WGL DPS, and included in that

rule the reasoned explanation required by this Court.  74 Fed. Reg. 15470 (Apr. 2, 2009) (2009

Rule).  That rule was again challenged by HSUS and others in litigation due to the Service's

failure to afford the public an opportunity to comment on the 2009 Rule.  On September 16,

2009, the FWS relisted the wolves of the WGL DPS, pursuant to a court approved, stipulated

settlement agreement between the Service and the plaintiffs.  74 Fed. Reg. 47483 (Sept. 16,

2009); *see Humane Soc'y of the U.S. v. Salazar*, 1:09-CV-1092-PLF (D.D.C.).  After fulfilling

the requirements of the settlement agreement, by proposing the delisting of the WGL DPS and

allowing public comment on the proposal, the FWS issued the 2011 Delisting Rule—a final rule

delisting the WGL DPS of the gray wolf on December 28, 2011.  76 Fed. Reg. 81666 (Dec. 28,

2011).  On February 12, 2013, HSUS Plaintiffs sued, seeking vacatur of the 2011 Delisting Rule, and a reinstatement of ESA protections for the wolves of the WGL DPS.

HSUS Plaintiffs' request for relief, if granted, will end state-regulated wolf hunting and the management and conservation of wolves through sustainable harvests; inhibit, if not prevent, necessary wolf population management; increase harm to the ungulate populations upon which the wolves prey;  and precipitate dangerous and harmful interactions between wolves and members of the hunting community.

## III.      Proposed Defendant-Intervenors

The two groups of intervenors making up the Hunter Conservation Council (the SCI/NRA group and the USSAF, et al. group) are discussed here, with a brief explanation of the interests of each individual organization that is seeking intervention.  The lead members of the HCC – SCI, NRA and USSAF – have already participated as intervenors in this Court in predecessor cases to this instant challenge.  *See Humane Soc'y of the U.S. v. Salazar*, Civil Action No. 09-1092, Order at 1 (D.D.C. June 24, 2009) (Dkt. 11); and *Humane Soc'y v. Kempthorne*, Civil Action No. 07-0677, Order at 1 (D.D.C. May 30, 2007) (Dkt. 14), 579 F. Supp. 2d 7 (D.D.C. 2008).  All the organizations that comprise the HCC seek intervention in their own names, and use the Coalition name "Hunter Conservation Coalition" merely as a collective reference to all of them.

### A.      SCI/NRA Intervenor Group

#### 1.    Safari Club International (SCI)

SCI is a nonprofit corporation incorporated in Arizona, operating under § 501(c)(4) of the Internal Revenue Code, with principal offices and place of business in Tucson, Arizona.  SCI's Governmental Affairs Office is located in Washington, D.C.  Its membership includes

approximately 51,000 individuals from the United States and many countries around the world. SCI has numerous members and chapters in Michigan, Minnesota and Wisconsin. Its missions are the conservation of wildlife, protection of the hunter, and education of the public concerning hunting and its use as a conservation tool. *See* Declaration of Safari Club International Legal Task Force Chairman, Rew Goodenow, Exhibit A.

SCI works with its sister organization, Safari Club International Foundation (SCIF), to carry out its conservation mission. SCIF is a nonprofit corporation, incorporated in Nevada, operating under § 501(c)(3) of the Internal Revenue Code, with principal offices and place of business in Tucson, Arizona. Its missions are to fund and manage worldwide programs dedicated to wildlife conservation, outdoor education and humanitarian services. A significant percentage of SCI and SCIF's annual revenues, including a portion of the dues and fees paid by each member of SCI, goes to support SCIF's conservation efforts around the world. In addition, each individual chapter of SCI provides its own funding for conservation efforts locally and across the globe. *Id.*

SCI and SCIF's advocacy and conservation interests focus on the concept of "sustainable use" of wildlife. Sustainable use recognizes that the utilization of wildlife often produces benefits that provide incentives for conservation. Well-managed hunting has been a valuable tool in conservation and protection of many game species and their associated habitats.

SCI has aggressively supported the FWS's attempts to recognize the recovery of the gray wolves of the WGL DPS as well as the FWS's efforts to restore management authority of the wolves to the states. SCI, together with the NRA, submitted a petition requesting the delisting of gray wolves in the Great Lakes area as noted by the 2011 Delisting Rule that granted that requested relief. 76 Fed. Reg. 81666, 81667 (Dec. 28, 2011). SCI has already been granted

intervenor status in many different cases involving gray wolf classification, conservation and management.  In particular, this Court granted SCI/NRA's motion to intervene in the challenges to the FWS's two previous attempts to designate and delist the WGL DPS.  Order Granting [SCI/NRA] Mot. Intervene, *Humane Soc'y of the U.S. v. Kempthorne*, Civil Action No. 07-0677 (D.D.C. May 30, 2007) (Dkt. 14), 579 F. Supp. 2d 7 (D.D.C. 2008); Order Granting [SCI/NRA] Mot. Intervene, *Humane Soc'y of the U.S. v. Salazar*, Case No. 1:09-cv-01092-PLF (D.D.C. June 24, 2009) (Dkt.11).  SCI also successfully intervened as of right in a case brought in this Court to challenge the permit authority given by the FWS to the states of Wisconsin and Michigan to allow state wildlife management officials to lethally remove problem wolves.  Order Granting Intervention, *Humane Soc'y of the U.S. v. Kempthorne*, No. 1:06-cv-01279-CKK (D.D.C. Aug. 9, 2006) (Dkt. 13), 527 F.3d 181 (D.C. Cir. 2008). [1]

SCI and SCI members have strong interests in hunting wolves and participating in the sustainable use management and conservation of wolves and other game species in Michigan, Minnesota and Wisconsin.  SCI members have an interest in the states' ability to manage wolves in balance with other game species.  SCI members also have an interest in having safe and successful recreational opportunities without excessive fear of wolf attacks on themselves, family members or their dogs.

For example, SCI members Wayne Johnson and Todd King hunted wolves in Minnesota in 2012 and plan to hunt wolves again in 2013 if their names are drawn for an opportunity to do so.  Johnson Decl. ¶ 8, Exhibit C; King Decl. ¶¶ 8–9, Exhibit D.  SCI member Daniel Bonk will apply for the appropriate license to hunt wolves in Wisconsin if his name is drawn.  Bonk Decl. ¶

---

[1] SCI later successfully moved the D.C. Court of Appeals to vacate the District Court's ruling against the legality of that permit authority due to the mootness of the underlying case.

8, Exhibit E.  SCI members Tyson Miller and Timothy Jones have hunted wolves in Canada in the past and hope to do so in their home state of Michigan.  They each plan to apply to obtain a license to hunt wolves if Michigan opens a wolf season.  Miller Decl. ¶ 8, Exhibit F; Jones Decl. ¶ 10, Exhibit G.  SCI member Mark Peterson has hunted wolves in Alaska and Canada in the past.  He plans to apply to hunt wolves in Michigan when the state opens a wolf season. Peterson Decl. ¶¶ 9–10, Exhibit H.

SCI members have seen wolves on or in the vicinity of their lands.  They have also seen wolves and signs of wolves while hunting.  For example, SCI member Michael Trenholm was followed by wolves while out hunting grouse near his home in Minnesota in 2012.  Mr. Trenholm saw more than one wolf following within 50 yards of him and his hunting dogs.  He was only able to scare them off by firing his shotgun in the air.  Trenholm Decl. ¶ 13, Exhibit I. That encounter and several other wolf encounters that Mr. Trenholm's neighbors have recounted to him have caused him and his family to protect themselves against wolves by always walking, exercising, and hunting with their dogs and to always arm themselves with rifles or handguns when outside.  *Id.* ¶ 14.  SCI member, Neal Porter III, draws on his past experience with wolves. He was hunting in Alaska when two wolves came into his camp and took the head of a caribou he had previously harvested.  Porter Decl. ¶ 11, Exhibit J.  For fifteen years, Mr. Porter hunted for deer in the same area in Michigan, but stopped hunting there in 2007 after several years of observing wolves and numerous tracks in the area and a dramatic drop in deer sightings in the area.  *Id.* ¶ 12.  SCI member Jonathan Kost believes that Wisconsin's largest wolf pack is getting close to his land.  When the wolves are in the area, Mr. Kost fears that it will be unsafe for his daughters to be outside.  Kost Decl. ¶¶ 10–11, Exhibit K.  Mr. King has also seen wolves while working on projects on his properties.  King Decl. ¶ 11, Exhibit D.  Wolves watched his niece

while she was walking alone on his farm.  *Id.*  Mr. King advises everyone who hunts on his

properties to keep their dogs under observation, and he never is without a firearm when out on

his land.  *Id.*

Many SCI members are concerned about the impacts that the WGL DPS wolves are

having on the other game species populations in the states.  Matthew Bluntzer, an SCI member

and current President of the Flint Regional Chapter, stopped hunting in certain areas of Michigan

due to a drastic decrease in the number of deer in the area.  Mr. Bluntzer believes that wolf

predation contributed to the low deer population numbers.  Bluntzer Decl. ¶ 11, Exhibit L.  Mr.

Bluntzer is also concerned about the number of elk in Michigan.  He has been applying for a

license to hunt elk in his home state for many years, but he has not been allowed to hunt elk yet.

He believes that without proper wolf management, the wolves will continue to have negative

impacts on Michigan's elk population and leave fewer and fewer elk to be harvested by hunters.

*Id.* ¶ 12.  Mr. Bluntzer, along with SCI and his local chapter, helped reintroduce moose into

Michigan and "would be very disappointed if the moose populations were negatively affected by

an increasing wolf population."  *Id.* ¶ 13.

Ronald Schmidt, another SCI member, expressed similar concerns in his declaration.  Mr.

Schmidt hunted deer in the same area in Minnesota for twenty years before abandoning the area

due to wolf predation.  "[Wolf predation on deer] has forced hunters like me to abandon hunting

areas we have used for generations."  Schmidt Decl. ¶ 12, Exhibit M.  Mr. Schmidt is worried

that that his opportunities to hunt will be reduced due to the continued reduction in the

populations of deer in Minnesota.  *Id.* ¶ 14.

Daniel Bonk, an SCI member from Wisconsin, has noticed a drastic decline in the

number of deer in the area where he and his son go hunting.  He estimates that he has only seen

ten percent of the amount of deer he used to see before wolves came to the area. Bonk Decl. ¶ 9, Exhibit E. Similarly, Mr. Bonk believes that the number of elk in a different area of Wisconsin has dropped sixty to seventy percent over the last five years. *Id.* Mr. Bonk is concerned that he and his family will lose hunting opportunities due to the continued drop in population numbers of deer and other game animals in Wisconsin. He fears that his family will lose the tradition of hunting when deer become too scarce due to wolf predation. *Id.* ¶ 10.

Todd King owns about 1,500 acres in northern Minnesota. The properties are enrolled in all available wildlife habitat improvement programs and a state-approved forest stewardship program. However, despite Mr. King's best efforts, the deer herd on his property has been "decimated" by wolf predation and other predators have been displaced by wolves. King Decl. ¶ 10, Exhibit D. He believes if the wolf population continues to grow unchecked, it will continue to have a negative impact on his land and a negative financial impact on the hunting and tourism industry on which the low-income northern counties depend. *Id.* ¶¶ 10, 14.

SCI and its members have strong, long-term interests in wolf recovery and management. They have an interest in the outcome of this lawsuit and in Michigan, Minnesota and Wisconsin's continued ability to manage their own wolf populations and to authorize and regulate wolf harvests as part of that management.

### 2.   National Rifle Association of America (NRA)

NRA is a nonprofit corporation incorporated in New York in 1871, operating under § 501(c)(4) of the Internal Revenue Code, with principal offices and place of business in Fairfax, Virginia. NRA's Federal Affairs Office is located in Washington, D.C. Its membership includes approximately 5,000,000 individuals from the United States and many of the countries around the world. Cox Decl., ¶ 5, Exhibit B. Among its purposes and objectives are, "[t]o promote

hunter safety, and to promote and defend hunting as a shooting sport and as a viable and necessary method of fostering the propagation, growth and conservation, and wise use of our renewable wildlife resources." *Id.* ¶ 4 (NRA Bylaws Article II Section 5).

The NRA has a Director of Conservation, Wildlife and Natural Resources working from its headquarters in Fairfax, Virginia whose primary responsibility is to promote the interests of the hunting community in wildlife management, healthy habitats and sustainable populations to ensure that these wildlife populations continue to be available to be enjoyed by NRA members and to protect and sustain hunters' legacy as the primary supporters of wildlife conservation throughout the United States.

NRA and its members have a strong interest in enhancing the survival of wolves in a manner that promotes proper wildlife management of the species. NRA, in collaboration with SCI, submitted a petition requesting the delisting of gray wolves in the Great Lakes area as noted by the 2011 Delisting Rule that granted that requested relief. 76 Fed. Reg. at 81667. NRA members hunt in the states included in the WGL DPS, frequently encounter wolves and appreciate Michigan, Minnesota and Wisconsin's success with gray wolf recovery. NRA members' encounters with wolves demonstrate the need for wolf population management and proper control of problem wolves. As evidenced by the declarations of Matthew Bluntzer, Tyson Miller and Ronald Schmidt, NRA members have an interest in Michigan, Minnesota and Wisconsin's continued ability to retain management authority over their own wolf populations. NRA seeks to protect Michigan, Minnesota and Wisconsin's legal authority to manage their states' growing wolf populations, to allow for wolf population control, including by wolf harvest seasons when such management efforts are necessary and appropriate, to target problem wolves,

and to enhance the long-term survival of the species.  *See* Miller Decl., Exhibit F; Bluntzer Decl.,

Exhibit L; Schmidt Decl., Exhibit M; King Decl., Exhibit D.

### B.  USSAF and Its Affiliated and Supporting Organizations Intervenor Group

#### 1.  U.S. Sportsmen's Alliance Foundation (USSAF)

Headquartered in Columbus Ohio, the U.S. Sportsmen's Alliance Foundation is a

national organization dedicated to protecting the heritage of America's sportsmen and

sportswomen to hunt, trap, and fish.  *See* Declaration of Evan Heusinkveld on Behalf of USSAF

(Heusinkveld Decl.), attached as Exhibit N, at ¶ 2.  The USSAF and its parallel organization the

U.S. Sportsmen's Alliance (USSA) represent approximately 1.5 million members through 1,300

affiliated conservation organizations.  USSA has both individual and organizational members

who live and hunt in Michigan, Minnesota, Wisconsin, and other states in the Great Lakes

region.  *Id.* ¶ 3.

USSAF is an experienced organization with a long-held interest in the issues at the heart

of the litigation.  USSAF (representing itself and five additional organizations) submitted a

petition requesting the delisting of gray wolves in the Great Lakes area as noted by the 2011

Delisting Rule that granted that requested relief.  76 Fed. Reg. at 81667.  In addition to filing its

petition, USSAF also filed extensive comments at several stages in the delisting process.

USSAF and its affiliated organizations were also granted intervenor status in the previous two

Great Lakes wolf delisting proceedings in this court.  *See Humane Soc'y of the U.S. v. Salazar*,

Civil Action No. 09-1092, Order at 1 (D.D.C. June 24, 2009); *Humane Soc'y of the U.S. v.

Kempthorne*, Civil Action No. 07-0677, Order at 1 (D.D.C. May 30, 2007).

The USSAF achieves its mission through, among other things, public education, issue

research, and participation in legal proceedings that affect hunting, trapping, fishing and wildlife

management.  Heusinkveld Decl. ¶ 4, Exhibit N.  USSAF's parallel entity, the U.S. Sportsmen's

Alliance (USSA) participates in legislative and political activities related to the same issues.  The

USSAF has a national perspective on wildlife management issues, supports the primacy of state

management of resident wildlife, supports scientific and professional wildlife management, is

experienced in defending litigation filed by animal rights activists across the nation, and often

works with state-specific hunters' associations including the Wisconsin Bear Hunters

Association which also seeks intervention here.  *Id.*

In addition to the national perspective on wildlife issues, USSAF represents organizations

and individual hunters in the Great Lakes region that hunt with dogs.  *Id.* ¶ 7.  These dogs are

often bred specifically for hunting and require significant amounts of training.  *Id.*  The

recovered, expanding gray wolf population in the WGL region represents a significant threat to

USSAF members' dogs and have attacked dogs and livestock on and off members' properties.

The safety of these dogs, and consequently the continued enjoyment of recreational hunting by

these members, depends upon USSAF members' abilities to protect their dogs.  The aftermath of

wolf attacks on hunting dogs is gruesome and emotionally distressing on the individual owners.

Wolf depredations substantially diminish hunters' enjoyment of hunting.

The Plaintiff's suit poses a significant threat to USSAF members' interests by attempting

to place the Great Lakes gray wolves back on the list of endangered or threatened species, and

therefore limiting the ability of USSAF's hunter members to hunt wolves, to protect their dogs

from wolves due to ESA prohibitions against take, and diminishing the opportunity of members

to hunt deer and elk, which will be eaten by the large uncontrolled wolf population.

USSAF members enjoy hunting a variety of large wildlife, including bears, bobcats,

wolves, deer, and elk.  Many USSAF members enjoy participating in wolf hunts and plan to

participate in future wolf hunts, which will not be possible if wolves are returned to the endangered/threatened species lists as advocated by HSUS Plaintiffs due to the ESA prohibitions against "take."   *Id.* ¶ 9.

### 2.   **The Wisconsin Bear Hunters Association(WBHA)**

The Wisconsin Bear Hunters Association (WBHA) is an organization dedicated to promoting responsible hunting for bears specifically and wildlife in general.  *See* Declaration of Al Lobner on behalf of WBHA (Lobner Decl.), attached as Exhibit O, at ¶ 2.  WBHA is also an organizational member of USSA and supporter of USSAF.  *Id.*  The WBHA has approximately 2,500 members within Wisconsin, many of whom are members of larger national hunting organizations like the USSAF.  *Id.* ¶ 5.  The organization has been protecting the rights of sportsmen and sportswomen in Wisconsin for over 40 years.  *Id.* ¶ 5.

Many WBHA members use dogs to assist them in hunting.  As stated above, these dogs generally require significant amounts of training and thus members have a vested interest in protecting their dogs.  *Id.* ¶¶ 6-8.  Protecting dogs becomes much more difficult wolves were to return to endangered or threatened status, because then force could not be used to protect the dogs from wolves.  If delisted and left unmanaged, the recovered, expanding gray wolf population in the WGL region would pose a significant threat to WBHA members' hunting dogs. In fact, WBHA members have reported at least 27 attacks in recent years by gray wolves on their dogs.  *Id.*  Collectively the dogs were worth over $150,000.  *Id.*  The safety of these dogs, and consequently the continued enjoyment of recreational hunting by these members, depends upon WBHA members' abilities to protect their dogs.  This lawsuit threatens both the personal value of WBHA members' relationships with their dogs and the value of the dogs as their personal property.

In addition, many WBHA members seek to hunt wolves—opportunities that will be lost if delisting is voided. *Id.* ¶¶ 9-10.

### 3. Michigan United Conservation Clubs (MUCC)

The Michigan United Conservation Clubs (MUCC) is comprised of 42,000 individuals and 250 affiliated clubs. It is the largest state-wide sportsmen association in Michigan. *See* Declaration of Kent Wood on behalf of MUCC (Wood Decl.), attached as Exhibit P, at ¶ 2. The MUCC's mission is to unite citizens to conserve Michigan's natural resources and to protect our outdoor heritage. *Id.* Members of the organization engage in hunting, fishing, habitat preservation, and other outdoor sportsmen pursuits. *Id.* ¶ 3. The organization values hunting and trapping as tools of conservation, which are employed alongside habitat preservation and other tools, to ensure responsible management of wildlife resources. *Id.* ¶ 4. MUCC believes that the wolf population has recovered, and it must be managed. *Id.* ¶¶ 4-6. Members are concerned about unchecked wolf populations having a negative impact on game species, which in turn jeopardizes current and future members' abilities to hunt. *Id.* ¶¶ 5-6. In addition, members believe the WGL wolf DPS should remain delisted to ensure that members maintain the ability to defend their animals (property) from wolf predation. *Id.* ¶ 5. *See also*, Declaration of Timothy Jones, Ex. G.

### 4. Wisconsin Bowhunters Association (WBH)

The Wisconsin Bowhunters Association (WBH) was founded in 1941 to promote, preserve and protect bowhunting in Wisconsin. WBH has approximately 5,800 active members. WBH is an organizational member of the U.S. Sportsmen's Alliance and supports the U.S. Sportsmen's Alliance Foundation. *See* Declaration of Mike Brust on behalf of WBH (Brust Decl.), attached as Exhibit Q, at ¶ 2.

WBH members hunt a variety of animals, primarily deer.  WBH values a balanced approach to wildlife management.  *Id.* ¶ 4.  As the number of wolves has increased in Wisconsin, WBH members have noticed a decrease in the deer population corresponding to the area where wolves are present.  *Id.*  They are concerned that an unchecked wolf population will result in low deer populations (due to wolves preying on deer) that would cause further restrictions limiting or prohibiting them from deer hunting, which would substantially decrease their ability to enjoy hunting for food and recreation.  *Id.*  WBH advocates managing the wolf population to ensure that prey species populations are also balanced.  *Id.*

Many WBH members also value the opportunity to hunt wolves.  It is extremely difficult to take a wolf with a bow and arrows, but some WBH members seek the challenge and enjoyed wolf hunting last season.  *Id.* ¶ 5.

Affirming the removal of the successfully recovered gray wolf population in the Western Great Lakes area from the list of endangered or threatened species provides WBH members with a better opportunity to hunt balanced populations of deer, bear, coyote, wild turkeys and other game species, because their populations will not be excessively diminished due to a large, uncontrolled number of wolf predators.  It also allows WBH members to hunt and responsibly harvest wolves through Wisconsin's wolf hunt lottery.  By contrast, if the Plaintiffs are successful and the gray wolf is returned to the list of endangered or threatened species, deer and other prey species' populations will likely decrease, and WBH members' abilities to hunt for food and recreational enjoyment of bowhunting will be further limited; members would also be prohibited from hunting wolves.  *Id.* ¶ 6.

### 5. Upper Peninsula Bear Houndsmen Association (UPBHA)

The Upper Peninsula Bear Houndsmen Association (UPBHA) is a Michigan-based organization that was established in 1980 to promote fellowship among hound hunters and to promote and protect the sport. UPBHA has 540 members, and it is an organizational member of the USSA and supporter of USSAF. *See* Declaration of Nancy Hudson on behalf of UPBHA (Hudson Decl.), attached as Exhibit R, at ¶¶ 1-2. UPBHA members hunt a variety of wildlife with their dogs, including hunting bear, deer, bobcats, mountain lions, and other animals. *Id.* at ¶ 4. Many UPBHA members hunt deer, which is an important tourism and economic draw to the Upper Peninsula region. Preserving the deer populations at high enough levels to sustain hunting is important to UPBHA members and the region's economy. *Id.* at ¶ 5. UPBHA believes in a balanced approach to wildlife management, including a balancing of the wolf population to ensure the balanced populations of prey animals. *Id.* UPBHA members are concerned that an unchecked wolf population will result in low deer populations (due to wolves preying on deer), and if the deer populations fall too low, hunters will be limited or prohibited from deer hunting. *Id.* Such restrictions or prohibitions would greatly decrease UPBHA members' abilities to enjoy hunting for food and recreation and could have a negative impact on the area's economy. *Id.*

### 6. Michigan Hunting Dog Federation (MHDF)

The Michigan Hunting Dog Federation (MHDF) has more than 1500 members and brings together 54 dog organizations in Michigan. *See* Declaration of Mike Thorman on behalf of MHDF (Thorman Decl.), attached as Exhibit S, at ¶ 2. MHDF monitors all legislation that may impact dogs or hunting with dogs. *Id.* Many MHDF members hunt, trap, and/or fish. *Id.* ¶¶ 3-5. Many members use their hunting dogs to hunt coyotes, bobcats, bears, and other animals. *Id.* ¶ 4. MHDF members believe in managing the wolf population to mitigate overpopulation and

competition among wolves.  *Id.* ¶ 6.  As the wolf population numbers and density increases, it is increasingly more important to have the ability to defend livestock, dogs, and other domestic animals from wolf predation.  *Id.*  MHDF believes that the wolf population is healthy and growing.  *Id.* ¶ 5.  Its members believe that the WGL wolf DPS should remain delisted to ensure that states can strategically manage the wolf population and to ensure that members are at liberty to defend their property from wolf attacks.  *Id.* ¶¶ 6-8.

### 7. The Rocky Mountain Elk Foundation (RMEF)

The Rocky Mountain Elk Foundation (RMEF) is a 501(c)(3) nonprofit public benefit corporation based in Montana.  RMEF's members include hunters, ranchers and other conservationists in Michigan, Minnesota and Wisconsin.  *See* Declaration of Rodney J. Triepke on behalf of RMEF (Triepke Decl.), attached as Exhibit T, at ¶2.  RMEF's members live, recreate, and hunt elk and other wildlife in Michigan, Minnesota, Wisconsin, and all other states. *Id*. ¶ 12; Declaration of Lee Swanson on behalf of RMEF (Swanson Decl.), attached as Exhibit U, at ¶ 6; Declaration of Willis Joseph Beer II on behalf of RMEF (Beer Decl.), attached as Exhibit V, at ¶¶ 6-8.  RMEF has more than 196,000 members, with over 4,737 members in Michigan, over 5,464 members in Minnesota and over 8,354 members in Wisconsin.  Triepke Decl. ¶ 3.

RMEF's mission is to ensure the future of elk, other wildlife and their habitat, and it has helped restore elk to their historic ranges in many areas of North America, including Michigan, Minnesota and Wisconsin.  *Id.* ¶¶ 4, 6.  Since RMEF was created in 1984, it has permanently protected and enhanced more than 6.2 million acres of North America's most vital habitat for elk and other wildlife.  *Id.* ¶ 5.  This work includes land acquisitions, exchanges, conservation easements and improving habitat quality through stewardship projects such as prescribed burns,

thinning, weed treatments, planting native vegetation, removing old barbed-wire fence and installing wildlife-friendly fence.  *Id.*

In Michigan, RMEF has helped permanently protect more than 1,500 acres of key wildlife habitat valued at more than $3.1 million, and contributed more than $147,000 to help enhance more than 1,300 additional acres over the past 28 years.  *Id.* ¶ 8.

In Minnesota, RMEF has helped permanently protect more than 943 acres of key wildlife habitat valued at more than $447,000, and contributed more than $228,000 to help enhance more than 26,100 additional acres over the past 28 years.  *Id.* ¶ 9.

In Wisconsin, RMEF has helped permanently protect more than 1,510 acres of key wildlife habitat valued at more than $2.8 million, and contributed more than $274,000 to help enhance more than 760 additional acres over the past 28 years.  *Id.* ¶ 10.

In addition, RMEF has also actively lobbied in support of delisting wolves once they met the delisting criteria in 2002.  *Id.* ¶ 11.

RMEF members intend to participate in any Michigan, Minnesota, and Wisconsin 2013 and other future) wolf seasons.  *Id.* ¶14.  Members enjoy hunting, watching, and listening to elk, deer, and moose populations.  Swanson Decl. ¶ 8, Ex. U.  However, members are concerned that populations of these animals are being adversely impacted by the large population of wolves.  Triepke Decl. ¶ 15, Ex. T.  If plaintiffs are successful, RMEF members will likely lose their ability to hunt wolves and their ability to hunt and otherwise enjoy other wildlife populations may be diminished or eliminated due to wolf predation from increasing numbers of unmanaged wolf populations.  Triepke Decl. ¶ 15, Ex. T; Swanson Decl. ¶ 12, Ex. U; Beer Decl. ¶¶ 11, 13, Ex. V.  *See also*, Johnson Decl., Ex. C; Schmidt Decl., Ex. M.

IV.     **Relevant Law**

The Endangered Species Act was enacted in 1973 for the purpose of conserving

threatened and endangered species and their ecosystems.  16 U.S.C. § 1531(b).  Through the

ESA, Congress authorized the Secretary of the Interior to achieve the ESA's conservation goals

through the listing, reclassification and delisting of plant and animal species.  16 U.S.C. § 1533.

The Secretary has delegated these responsibilities to the FWS.  The ESA was not designed with

the sole purpose of permanently listing and federally protecting species.  Congress intended to

authorize the Service to recognize species recovery, facilitate the removal of recovered species

from the threatened and endangered species lists, and return management for recovered species

to the appropriate state game and fish authorities.  16 U.S.C. § 1533(a)(2)(C); (b)(3)(A);

(b)(3)(B)(iii)(II); (c)(2)(B)(i).

Under the ESA, an endangered species is "any species which is in danger of extinction

throughout all or a significant portion of its range."  16 U.S.C. § 1532(6).  A threatened species

is "any species which is likely to become an endangered species within the foreseeable future

throughout all or a significant portion of its range."  *Id.* § 1532(20).  The ESA authorizes the

FWS to remove a species from the endangered or threatened species list when that species has

recovered to the point that it is no longer in danger of extinction throughout all of a significant

portion of its range.  *Id.* § 1532(3); 1533(b)(1)(A); 1533(c)(2); 50 C.F.R. § 424.11(d).  The

statute defines species as "any subspecies of fish or wildlife or plants, and any distinct population

segment of any species of vertebrate fish or wildlife which interbreeds when mature." 16 U.S.C.

§ 1532(16).  Neither the phrase "significant portion of its range" or "distinct population

segment" is defined in the law.  Congress left it to the FWS to define and apply both of these

concepts.

The Act provides five factors that the FWS is directed to consider when making listing, reclassification and delisting decisions:

> (A) the present or threatened destruction, modification, or curtailment of its habitat or range;
> (B) overutilization for commercial, recreational, scientific, or education purposes;
> (C) disease or predation;
> (D) the inadequacy of existing regulatory mechanisms; or
> (E) the other natural or manmade factors affecting its continued existence

*Id.* § 1533(a)(1). The FWS is also required to "tak[e] into account those efforts, if any, being made by any State of foreign nation, … to protect such species, whether by predator control, protection of habitat and food supply, or other conservation practices, …." *Id.* § 1533(b)(1)(A). The FWS has reviewed the best scientific and commercial data available and has determined that based on an evaluation of the aforementioned factors, the wolves of the WGL DPS are no longer endangered or threatened.

## V.      Status of Litigation

HSUS Plaintiffs filed their Complaint on February 12, 2013. Federal Defendants have not yet filed an Answer or any other form of response to HSUS Plaintiffs' Complaint. To HCC's knowledge, no other substantive pleadings or motions have been filed between the date of the filing of the Complaint and the filing of this Motion to Intervene.

## VI.     Argument

### A.      HCC is Entitled to Intervene as of Right Under Federal Rule 24(a)(2).

HCC's interests (including the interests of individual members of HCC's organizations) will be impaired by the relief that HSUS Plaintiffs seek and will not be adequately represented by the existing parties in this case. Therefore, they are entitled to intervene as of right in this litigation. Federal Rule of Civil Procedure 24(a)(2), which governs intervention as of right, states in pertinent part:

> On timely motion, the court must permit anyone to intervene who: claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represented that interest.

The D.C. Circuit has determined that intervention as of right depends upon the applicant's ability to satisfy five prerequisites: (1) the timeliness of the motion; (2) a showing of "adequate interest;" (3) a possible impairment of that interest; (4) a lack of adequate representation by the existing parties to the action; and (5) standing. *Fund for Animals v. Norton*, 322 F.3d 728, 731 (D.C. Cir. 2003). HCC satisfies each of these five prerequisites.

### 1.    This Motion is Timely

HCC has promptly moved to intervene. This litigation is approximately 10 weeks old and is still in the earliest stages. Federal Defendants have not yet responded to HSUS Plaintiffs' Complaint. HCC has acted promptly to assert its own interests and the interests of the coalition's members who will be significantly impacted by the outcome of this litigation. No prejudice will come to any party from the granting of this motion at this stage of the litigation. *See NAACP v. New York*, 413 U.S. 345, 366 (1973). Consequently, this Motion to Intervene is timely.

### 2.    HCC and Its Organizational and Individual Members Have Substantial Legal Interests in the Status of the Wolves of the WGL DPS

HCC's member organizations have substantial legal interests in the subject matter of this suit, including their members' ability to enjoy safe and successful wolf and other game harvests and other recreational activities in Michigan, Minnesota and Wisconsin. HCC also has a legal interest in promoting, supporting and participating in the sustainable use management and conservation of wolves and other game species in these states.

For intervention as of right, a party must assert an interest in the subject matter of the suit. *Foster v. Gueory*, 655 F.2d 1319, 1324 (D.C. Cir. 1981). The interest need not be a direct one in the property or transaction at issue, provided that it is an interest that would be impaired by the outcome of the litigation. *Cascade Natural Gas Corp. v. El Paso Natural Gas Co.*, 386 U.S. 129, 135–36 (1967). The D.C. Circuit has defined the interest test as one of efficiency rather than one of exclusivity. In the case of *Nuesse v. Camp*, the Circuit court explained that "[t]he 'interest' test is primarily a practical guide to disposing of lawsuits by involving as many apparently concerned persons as is compatible with efficiency and due process." 385 F.2d 694, 700 (D.C. Cir. 1967).

HCC possesses the requisite interest in issues in this litigation. As conservationists, HCC and its members seek a solution that will enable Michigan, Minnesota and Wisconsin to continue to manage and conserve their own wolf populations and to maintain an appropriate balance between wolves and other wildlife species upon which wolves prey, including by authorizing sustainable wolf harvests in which HCC members can participate. The ability to participate in these wolf hunts, in which HCC's individual members have already participated and intend to participate in the future (see Section III above), are created and protected by State law. *See* MINN. STAT. ANN. § 97B.647 (2012), WIS. STAT. ANN. § 29.185 (2012). In addition, HCC members are concerned that as the number of wolves has increased in the Western Great Lakes area, members have noticed a decrease in the deer population corresponding to the area where wolves are present. Its members are concerned that an unchecked wolf population will result in low deer and elk populations (due to wolf predation). HCC members are concerned that these decreases in deer, moose and elk populations, as well as other prey species would prompt restrictions that would further limit or prohibit them from hunting deer, moose, elk and other

prey species, which would substantially decrease their ability to enjoy hunting for food and recreation.  Moose and elk hunting in each of the three Great Lakes states is already very limited, and increased wolf predation on moose and elk would restrict this opportunity even more. Therefore, HCC's members also advocate managing the wolf population in balance with the species on which wolves prey.   HCC members also greatly value the ability to defend their hunting dogs, livestock, and other animals from wolf predation; members will likely lose this right to defend their dogs and other property if the WGL DPS is relisted, due to the ESA prohibition against "taking" listed species.  Consequently, HCC has the requisite legal interests at stake in this litigation and should be permitted to intervene to protect these interests.

### 3.    HSUS Plaintiffs' Proposed Relief Will Impair HCC's Legal Interests

If HSUS Plaintiffs succeed in this litigation, wolves of the WGL DPS will revert to threatened and endangered status.  Prohibitions on take, including through hunting, will again apply.  16 U.S.C. § 1538(a)(1)(B).  Minnesota and Wisconsin will have to cancel future wolf harvests, and Michigan will have to stop considering authorizing a hunt.  HCC members will lose their opportunity to hunt wolves and to participate in wolf conservation and management through wolf harvests.  They will also suffer diminished experiences in hunting deer, moose and elk (and other prey species) as these wildlife populations will be reduced by growing wolf populations (a wolf harvest is the best way to manage populations).  HCC members are concerned that unmanaged wolf populations will lead to lower populations of prey animals such as deer, would result in limiting or prohibiting hunting of deer and other prey animals.  The lack of state-managed wolf harvests will diminish HCC members' peace of mind about participating in recreational activities in the wild.  See Section III above.

If the WGL DPS is relisted, HCC's members will also lose the ability to defend their

hunting dogs, livestock, and other property from wolf predation.  Furthermore, if the wolf

population continues to grow unmanaged, HCC members expect additional increases in the

number of wolf attacks.

If HSUS Plaintiffs prevail and wolves are returned to the threatened and endangered

species list, HCC's interests in participating in sustainable use wolf conservation and its

members' interest in safe, productive and enjoyable outdoor recreational opportunities will be

jeopardized, if not lost.  HCC should have the right to defend against this litigation threat.

### 4.      The Parties to this Action Offer Inadequate Representation

Although the federal government intends to defend against HSUS Plaintiffs' challenges,

they, like all regulators at the federal and state levels, are nonetheless unable to adequately

protect HCC's interests and do not share those exact interests.  The Federal Defendants do not

seek to hunt wolves in Michigan, Minnesota or Wisconsin, or to participate in the sustainable use

management and conservation of wolves through hunting.  The Federal Defendants also do not

seek to hunt deer, moose or elk as members of the HCC organizations.  The Federal Defendants

are not in the field, engaged in recreational activities with their children and pets, where the

threat of growing wolf populations threatens safety and peace of mind.  In short, the Federal

Defendants do not share the same interests as HCC and its members.

Even though Federal Defendants intend to defend their conduct and their authority to

delist the wolves of the WGL DPS, they nonetheless do not adequately represent HCC and its

members' stake in this litigation.  Federal Defendants, by necessity, come to this litigation with

ambivalent or potentially conflicting motivations.  The FWS's purposes are divided (like all

federal and state regulators), because the agency bears an obligation to represent the interests of

all those who enjoy and seek to conserve wolves, including individuals who do not support sustainable use conservation and those who do not believe that wolves should ever be removed from the threatened and endangered species list.

To satisfy the inadequate representation standard for intervention as of right, a proposed intervenor need only show that the existing representation "may be" inadequate, and the showing required is "minimal." *Trbovich v. United Mine Workers of America*, 404 U.S. 528, 538 n.10 (1972). Moreover, even where the potential intervenor's interest in the issuance or administration of a specific regulation may coincide with that of a defendant regulatory agency, that interest, by itself, does not necessarily mean that "adequacy of representation is ensured for purposes of rule 24(A)(2)." *Natural Resources Defense Council v. Costle*, 561 F.2d 904, 912 (D.C. Cir. 1977). "[M]erely because parties share a general interest in the legality of a program or regulation does not mean their particular interests coincide so that representation by the agency alone is justified." *American Horse Protection v. Veneman*, 200 F.R.D. 153, 158 (D.D.C. 2001). Similarly, in *Fund for Animals v. Norton*, the D.C. Circuit Court found that the FWS could not adequately represent the "more narrow and parochial" interests of Mongolia in litigation challenging the FWS's listing and importation obligations with respect to foreign species of argali sheep, even though both entities participating in the litigation were involved in efforts to conserve the sheep species and were attempting to defend the legality of the same ESA regulation. 322 F.3d at 737. "[E]ven 'a shared general agreement . . . does not necessarily ensure agreement in all particular respects,' . . . and '[t]he tactical similarity of the present legal contentions of the [parties] does not assure adequacy of representation or necessarily preclude the [intervenor] from the opportunity to appear in [its] own behalf.'" *Nuesse v. Camp*, 385 F.2d 694, 703 (D.C. Cir. 1967).

The FWS may be concerned about defending its decision to delist the wolves of the WGL DPS, but HCC has a broader interest in both defending sustainable use methods generally as a means of enhancing the survival of endangered species and in enjoying recreational and personal activities. Consequently, HCC's focus may be much narrower and yet much deeper than that of the FWS. The D.C. Circuit has acknowledged the potential benefits offered by an intervenor whose depth of interest can enhance the defense provided by a more broadly concerned governmental entity. *See Natural Resources Defense Council v. Costle*, 561 F.2d 904, 912 (D.C. Cir. 1977) (intervenor "likely to serve as a vigorous and helpful supplement to [agency's] defense").

In some cases, an intervenor may find the need to pursue the litigation beyond the point where the original defendant is willing or able to go. In *Humane Society of the U.S. v. Kempthorne*, 527 F.3d 181, 188 (D.C. Cir. 2008), SCI, as a defendant-intervenor was able to move the D.C. Circuit Court to vacate a ruling made moot by regulations issued by Defendant U.S. Fish and Wildlife Service. Although the FWS also filed a motion to vacate, the Court denied the Service's motion due to the role the agency's regulation played in mooting the matter. As SCI had not been the cause of mooting the case, the Court was able to grant SCI's motion for vacatur.

Where, as here, a federal agency is obligated to represent the interests of different groups with competing motivations, the agency cannot adequately represent the interests of all of these groups at the same time. *Trbovich*, 404 U.S. at 538–39. Consequently, while HCC may share some common interests with Federal Defendants, the obligations of the FWS to a larger constituency make it impossible for them to provide representation that will protect the unique and sometimes contrary interests of HCC and its members.

### 5. HCC Also Has Demonstrated Its Standing to Intervene

For some of the same reasons that HCC has demonstrated the impairment of its interests, it satisfies all the criteria for defendant-intervenor standing. Constitutional standing generally requires the party to show: (1) an injury-in-fact that is (a) concrete and particularized and (b) actual and imminent; (2) causation; and (3) redressability. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561 (1992). Standing for a defendant-intervenor requires a showing that the possible outcome of the case would harm the applicant's concrete interests. *Military Toxic Project v. Evtl. Prot.* Agency, 146 F.3d 948, 954 (D.C. Cir. 1998) (Court agreed that organization had defendant-intervenor standing because it benefited from a challenged rule and would suffer concrete injury if the court granted relief sought by petitioners).

HCC's members have an injury-in-fact based on their interest in the sustainable use conservation of wolves through hunting and in Michigan, Minnesota and Wisconsin's authority and success at managing recovered wolves on a long-term basis. HCC's members' conservation and recreational interests in the wolves of the WGL DPS and other game species have long been accepted as a basis for injury in fact and constitutional standing. *Nat'l Wildlife Fed'n v. Hodel*, 839 F.2d 694, 704 (D.C. Cir. 1988); *Fund for Animals v. Norton,* 295 F. Supp. 2d 1, 2 (D.D.C. 2003) (noting that the court had earlier in the case allowed intervention of SCI and other hunting organizations in lawsuit concerning game animals); *see also Save Our Sonoran, Inc. v. Flowers,* 408 F.3d 1113, 1119 (9th Cir. 2005) ("The 'injury in fact' requirement in environmental cases is satisfied if an individual adequately shows that she has an aesthetic or recreational interest in a particular place, or animal, or plant species and that that interest is impaired by a defendant's conduct."). Injury to these interests will occur if HSUS Plaintiffs are successful in overturning the delisting of the WGL DPS's wolves. This would reinstate prohibitions on the hunting of

wolves, take management out of the hands of the states, prevent members from defending their property (including hunting dogs, livestock, and other animals) from wolf attacks, and make it harder to manage the wolves in balance with other game species. As discussed in Section III, HCC's members have concrete plans to participate in upcoming seasons for wolf and other species. In addition, without wolf harvests, population numbers will continue to grow and affect both other game species (primarily deer, moose and elk) and people living or recreating in the area where wolves exist.

This threat to HCC's interests will be redressed (prevented) if HSUS Plaintiffs fail in their attempt to return wolves to the threatened and endangered species list. If the wolves of the WGL DPS remain delisted, Michigan, Minnesota and Wisconsin will retain their management authority over wolves and will be able to continue to authorize wolf seasons and to practice sustainable use methods to manage the wolves in a way that can maintain a balance with the other game species that will ultimately benefit all.[2] Members will also retain the ability to protect their hunting dogs, livestock, and other animals from wolf attacks.

Finally, HCC's members have organizational standing. Standing for an association exists when:

> (1) at least one of its members would have standing to sue in his own right, (2) the interests the association seeks to protect are germane to its purpose, and (3) neither the claim asserted nor the relief requested requires that an individual member of the association participate in the lawsuit.

---

[2] In addition, HCC satisfies any prudential zone of interest standing requirements. The ESA concerns the proper management of wildlife and promotes the delisting of species as much as the listing of them. 16 U.S.C. § 1533(c)(2) (directing the Service to conduct reviews to determine whether to remove a species from the threatened or endangered list based on the same criteria as listing); see Section IV above. As the ESA recognizes the role of States in the management of resident wildlife, *see, e.g.,* 16 U.S.C. §§ 1533(b)(1)(A), 1535, the delisting supported by HCC furthers the goals of the ESA and is within the zone of interest at issue here.

*Sierra Club v. Envtl. Prot. Agency*, 292 F.3d 895, 898 (D.C. Cir. 2002) (citing *Hunt v. Wash. State Apple Adver. Comm'n,* 432 U.S. 333, 342–43 (1977)).  HCC meets these requirements because: (1) as described in detail in Section III above, HCC's members hunt wolves and otherwise seek to enjoy outdoor opportunities in areas where wolves are present and threaten to interfere with these opportunities; (2) the right to hunt, enjoy outdoor recreational opportunities, and practice sustainable use conservation of predator species is germane to HCC's missions, see Section III; and (3) the relief requested by HSUS Plaintiffs does not require the direct participation of HCC individual members.  Accordingly, as HCC demonstrates standing in addition to the other four criteria required for intervention as of right, the Court should grant their motion to intervene as of right.

### B.     Alternatively, HCC Should Be Permitted to Intervene Permissively Under Rule 24(b)(2)

Should this Court choose not to grant HCC leave to intervene as of right, it alternatively seeks permissive intervention under Federal Rule of Civil Procedure 24(b), which states:

> On timely motion, the court may permit anyone to intervene who: has a claim or defense that shares with the main action a common question of law or fact . . . .  In exercising its discretion, the Court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights.

"Rule 24(b) . . . provides basically that anyone may be permitted to intervene if his claim and the main action have a common question of law or fact."  *Nuesse v. Camp*, 385 F.2d 694, 704 (D.C. Cir. 1967).  "Although the rule speaks in terms of a 'claim or defense' this is not interpreted strictly so as to preclude permissive intervention."  *Id.* [3]

As discussed above, HCC's motion to intervene is timely and they and their members have significant protectable interests in the subject matter of this action.  HCC's defenses will

---

[3] Permissive intervention is not a substitute for intervention as of right.  If the party qualifies for intervention under FRCP Rule 24(a), the Court must grant that status.  Fed. R. Civ. P. 24(a).

respond to the HSUS Plaintiffs' claims and will include, but not be limited to, the recovery of the WGL DPS wolves and the legality of Michigan, Minnesota and Wisconsin's regulatory mechanisms for wolf management. Several of HCC's member organizations (e.g. SCI, NRA, USSAF) have extensive litigation experience in this Court and other courts in responding to the arguments challenging the delisting of a predator species. HCC's defenses share substantial questions of law and fact with the claims raised by the HSUS Plaintiffs' Complaint and the Federal Defendants' defenses.

Moreover, by allowing HCC to intervene, the Court will have a party to this action that will advocate for the rights of those who wish to be able to continue to hunt wolves and to participate in wolf conservation and management through sustainable harvest practices. HCC will have the ability to provide what "can reasonably be expected to contribute to the informed resolutions of . . . questions when, and if, they arise before the District Court." *Natural Resources Defense Council v. Costle,* 561 F.2d 904, 913 (D.C. Cir. 1977).

Furthermore, HCC's intervention at this time will not unfairly delay or prejudice the adjudication of the parties' rights. Briefing has not yet been scheduled in this case. As it has done in countless other cases, HCC will abide by all briefing schedules established by this Court and will work to avoid duplicative briefing. As the permissive intervention rule references delay or prejudice to the "adjudication" of the parties' right, not the rights themselves, the focus is on whether intervention will help or hinder the court in resolving the case. As engaged defendant-intervenors, HCC's organizational members have proven helpful in the resolution of wolf and other wildlife cases, and can do so here. Accordingly, even if this Court denies HCC's intervention as a matter of right, there is ample basis to permit its intervention in this action.

C.    **Amici Curiae**

If, for any reason, this Court chooses not to grant HCC's member organizations' intervenor status for this litigation, HCC requests that the Court allow them to participate as amici and to file briefs on the merits of this case, including in support of any motion for summary judgment by Federal Defendants.  The Court has "broad discretion" to allow the participation of amici curiae.  *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Engineers*, 519 F.Supp.2d 89, 93 (D.D.C. 2007).  For all the reasons described above, concerning HCC's interests in this case, the Court should exercise that discretion so that HCC's members have a voice in this important public interest case.

**VII.    Conclusion**

HCC satisfies the requirements for intervention as of right and permissive intervention. This motion is timely and documents the substantial interests that HCC and its members have in the gray wolves of the WGL DPS, in the authority of the FWS to delist a recovered species, and in the ability of HCC's members to participate in the sustainable use conservation and management of wolves and other game species.  The Federal Defendants in this action will defend their delisting decision, but do not share HCC's interest in the sustainable harvesting of wolves in Michigan, Minnesota and Wisconsin.  In addition, Federal Defendants must defend this case in a way that will balance the competing interests of the diverse groups who claim an interest in enhancing the survival of wolves.  Without HCC's participation, the interests of non-governmental persons and entities who enjoy recreational outdoor activities in Michigan, Minnesota and Wisconsin and who support wolves though necessary and valuable sustainable use methods, will not adequately be protected.

Dated:  April 23, 2013

Respectfully Submitted,

/s/ Anna M. Seidman
Anna M. Seidman
D.C. Bar # 417091
Douglas S. Burdin
D.C. Bar # 434107
Safari Club International
501 2nd Street N.E.
Washington, D. C. 20002
Telephone: (202)-543-8733
Facsimile: (202)-543-1205
aseidman@safariclub.org
*Attorneys for Proposed Defendant-Intervenor*
*Safari Club International*


/s/ Chris Conte
Christopher A. Conte
D.C. Bar # 430480
NRA/ILA
11250 Waples Mill Rd., 5N
Fairfax, VA 22030
Telephone: (703) 267-1166
cconte@nrahq.org
*Attorneys for Proposed Defendant-Intervenor*
*National Rifle Association of America*

/s/ James H. Lister
James H. Lister
D.C. Bar # 447878
William P. Horn
D.C. Bar # 375666
Carissa D. Siebeneck
D.C. Bar # 1007526
Birch Horton Bittner and Cherot, PC
1155 Connecticut Avenue, NW
Suite 1200
Washington, DC  20036
Telephone: (202) 659-5800
Facsimile (202) 659-1027
whorn@dc.bhb.com
jlister@dc.bhb.com
csiebeneck@dc.bhb.com
*Attorneys for Proposed Defendant-*
*Intervenors:*
*U.S. Sportsmen's Alliance Foundation;*
*Wisconsin Bear Hunters Association;*
*Michigan United Conservation Clubs;*
*Wisconsin Bowhunters Association;*
*Upper Peninsula Bear Houndsmen*
*Association; Michigan Hunting Dog*
*Federation; and Rocky Mountain Elk*
*Foundation*