# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

The Humane Society of the United States
2100 L Street NW
Washington, DC  20037;

Born Free, USA
1122 S Street
Sacramento, CA  95811;

Help Our Wolves Live ("HOWL")
4901 Second Ave. South
Minneapolis, MN  55419;

Friends of Animals and Their Environment ("FATE")
3333 Alabama Ave.
St. Louis Park, MN  55415,

Plaintiffs,

v.

Sally Jewell,[1] Secretary of the Interior,
United States Department of the Interior
1849 C Street, NW
Washington, DC  20240;

United States Department of the Interior
1849 C Street, NW
Washington, DC  20240;

United States Fish and Wildlife Service
1849 C Street, NW
Washington, DC  20240,

Defendants.

Civil Action No. 13-00186-BAH

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

**[ORAL ARGUMENT REQUESTED]**

---

[1] Pursuant to Fed. R. Civ. Pro. 25(d), Sally Jewell, Secretary of Interior, is automatically substituted for her predecessor in office.

**TABLE OF CONTENTS**

**Page**

I.   INTRODUCTION ................................................................................... 1

II.  BACKGROUND .................................................................................... 3

     A.   Statutory Framework ................................................................ 3

     B.   Factual Background .................................................................. 5

          1.   Wolf Biology ................................................................... 5

          2.   Prior Attempted Gray Wolf Delisting Actions ......................... 7

          3.   The FWS's Current (Fourth) Delisting of the Great Lakes Wolves ........ 10

III. LEGAL STANDARD ............................................................................ 13

IV.  ARGUMENT ....................................................................................... 14

     A.   The FWS Impermissibly Delisted the Wolves Based on Politics, Not
          Science ................................................................................. 15

     B.   The Final Rule Ignores the ESA Requirement That a Species Cannot Be
          Delisted Until It Is Recovered Throughout a Significant Portion of Its
          Range .................................................................................... 18

          1.   The Gray Wolf Remains Endangered Throughout A Significant
               Portion of its Range ......................................................... 19

          2.   The FWS Cannot Arbitrarily Redefine the Wolf's Historical Range
               to Satisfy its Desire to Delist ............................................. 21

     C.   The FWS Cannot use the DPS as a Delisting Tool............................ 25

     D.   Even if the DPS Could Be Used As A Delisting Tool, The Boundaries of
          the DPS Are Arbitrary and Capricious and Contrary to the ESA.............. 29

     E.   FWS's Decision to Delist Wolves Without Determining What Species
          Exist in the Region Demonstrates the Impropriety of its Decision ......... 31

          1.   The FWS Arbitrarily Delisted Wolves to Appease Political
               Interests Without Even Identifying the Affected Species ............... 32

          2.   The FWS Cannot Delist A DPS With Potentially Multiple Species ....... 35

          3.   Because the Species in the Great Lakes is Uncertain, Any
               "Significance" Finding is Arbitrary and Capricious ..................... 38

     F.   Inadequate Regulatory Mechanisms Prevent Delisting ...................... 40

V.   CONCLUSION...................................................................................... 43

# TABLE OF AUTHORITIES

**Page**

## CASES

*Am. Forest Res. Council v. Ashe,*
   2013 WL 1289724 (D.D.C. Mar. 30, 2013) ................................................................ 13, 39

*Bennett v. Spear,*
   520 U.S. 154 (1997) ................................................................................................... 31

*Biodiversity Legal Foundation v. Babbitt,*
   943 F. Supp. 23 (D.D.C. 1997) ................................................................................. 17

*Citizens to Preserve Overton Park v. Volpe,*
   401 U.S. 402 (1971) ................................................................................................... 14

*Defenders of Wildlife v. Babbitt,*
   130 F. Supp. 2d 121 (D.D.C. 2001) .......................................................................... 3, 18

* *Defenders of Wildlife v. Norton,*
   239 F. Supp. 2d 9 (D.D.C. 2002) ........................................................................ 19, 20, 30

*Defenders of Wildlife v. Norton,*
   257 F. Supp. 2d 53 (D.D.C. 2003) ............................................................................ 13

*Defenders of Wildlife v. Norton,*
   258 F.3d 1136 (9th Cir. 2001) ................................................................................... 18

*Defenders of Wildlife v. Salazar,*
   729 F. Supp. 2d 1207 (D. Mont. 2010) ..................................................................... 3, 34

* *Defenders of Wildlife v. Secretary, U.S. Dep't of Interior,*
   354 F. Supp. 2d 1156 (D. Or. 2005)...................................................................... *passim*

*Friends of Blackwater v. Salazar,*
   691 F.3d 428 (D.C. Cir. 2012) ............................................................................. 4, 20, 40

*Friends of the Wild Swan v. U.S. Fish & Wildlife Service,*
   12 F. Supp. 2d 1121 (D. Or. 1997)............................................................................ 23

*Fund for Animals v. Babbitt,*
   903 F. Supp. 96 (D.D.C. 1995) ................................................................................. 14

*Humane Soc'y of the United States v. Kempthorne,*
   481 F. Supp. 2d 53 (D.D.C. 2006),
   *vacated as moot by,* 527 F.3d 181 (D.C. Cir. 2008)............................................... 9

*Humane Soc'y of the United States v. Kempthorne,*
   Civ. No. 09-01092-PLF (D.D.C., filed June 15, 2009) ............................................ 10

* *Humane Society of the United States v. Kempthorne,*
   579 F. Supp. 2d 7 (D.D.C. 2008) ...................................................................... 2, 9, 28, 44

# TABLE OF AUTHORITIES
### (continued)

**Page**

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) ............................................................................................ 13

*Marsh v. Oregon Natural Res. Council,*
    490 U.S. 360 (1989) ............................................................................................ 13

*Motor Vehicle Manufacturer's Ass'n v. State Farm Mutual Automobile Ins. Co.,*
    463 U.S. 29 (1983) ............................................................................................ 14

\* *National Wildlife Fed'n v. Norton,*
    386 F. Supp. 2d 553 (D. Vt. 2005) .................................................................. 8, 31

*Or. Natural Res. Council v. Daley,*
    6 F. Supp. 2d 1139 (D. Or. 1998) ........................................................................ 40

*Rancho Viejo, LLC v. Norton,*
    323 F.3d 1062 (D.C. Cir. 2003) ............................................................................ 3

*S. Co. Servs., Inc. v. FCC,*
    313 F.3d 574 (D.C. Cir. 2002) ............................................................................ 27

*Safari Club Int'l v. Jewell,*
    2013 WL 4041541 (D.D.C. Aug. 9, 2013) .................................................. *passim*

*Safari Club Int'l v. Salazar,*
    852 F. Supp. 2d 102 (D.D.C. 2012) .................................................................... 14

*San Luis v. Badgley,*
    136 F. Supp. 2d 1136 (E.D. Cal. 2000) .............................................................. 34

\* *Save Our Springs v. Babbitt,*
    27 F. Supp. 2d 739 (W.D. Tex.1997) ...................................................... 15, 17, 32

*Sierra Club v. Clark,*
    755 F.2d 608 (8th Cir. 1985) ................................................................................ 8

*Southwest Ctr. for Biological Diversity v. Babbitt,*
    939 F. Supp. 49 (D.D.C. 1996) .......................................................................... 42

*Tenn. Valley Auth. v. Hill,*
    437 U.S. 153 (1978) ........................................................................................ 3, 29

*Trout Unlimited v. Lohn,*
    559 F.3d 946 (9th Cir. 2009) .............................................................................. 25

*Univ. Med. Ctr., Inc. v. Sebelius,*
    856 F. Supp. 2d 66 (D.D.C. 2012) ...................................................................... 13

## TABLE OF AUTHORITIES
(continued)

**Page**

*Western Watershed Project v. U.S. Fish and Wildlife Service,*
535 F. Supp. 2d 1173 (D. Id. 2007) ................................................................................. 17

*WildEarth Guardians v. Salazar,*
741 F. Supp. 2d 89 (D.D.C. 2010) ................................................................................... 38

## STATUTORY AUTHORITIES

5 U.S.C. § 706(2) ................................................................................................................. 13
* 16 U.S.C. § 1531 ............................................................................................................ *passim*
16 U.S.C. § 1531(b) ............................................................................................................... 3
16 U.S.C. § 1531(c)(1) ........................................................................................................... 5
16 U.S.C. § 1532(3) ............................................................................................................... 3
16 U.S.C. § 1532(6) .......................................................................................... 3, 14, 18, 22, 24
16 U.S.C. § 1532(16) ...................................................................................................... 26, 35
16 U.S.C. § 1533(a) ............................................................................................... 3, 4, 15, 40
16 U.S.C. § 1533(a)(1) ................................................................................................ 4, 7, 22
16 U.S.C. § 1533(a)(1)(D) ............................................................................................. 40, 42
16 U.S.C. § 1533(b)(1)(A) ......................................................................................... 5, 29, 31
16 U.S.C. § 1533(c)(2)(B) ........................................................................................ 2, 26, 27
16 U.S.C. § 1533(g)(1) ........................................................................................................ 41
16 U.S.C. § 1539(a)(l) ........................................................................................................... 9
Mich. Comp. Laws § 324.43526 (2012) ............................................................................ 42
Wis. Stat. § 29.185(2012) ................................................................................................... 41
Minn. Stat. § 97B.647 (2012) ............................................................................................. 41

## RULES AND REGULATIONS

50 C.F.R. § 402.01 ................................................................................................................. 3
50 C.F.R. § 424.11(d) ............................................................................................................ 4
50 C.F.R. pt. 17 ............................................................................................... 1, 7, 8, 9, 10
6 Fed. Reg. 81,703 .............................................................................................................. 31
32 Fed. Reg. 4001-02 ............................................................................................................ 7
43 Fed. Reg. 9607 ........................................................................................................... 7, 18
43 Fed. Reg. 9611 ............................................................................................................... 19
51 Fed. Reg. 6688 ............................................................................................................... 18
58 Fed. Reg. 34,928 ............................................................................................................ 18
* 61 Fed. Reg. 4722 .................................................................................................. 3, 4, 35
61 Fed. Reg. 4724 ............................................................................................................... 26
61 Fed. Reg. 4725 ............................................................................................... 26, 28, 35
65 Fed. Reg. 43,450 .............................................................................................................. 8
65 Fed. Reg. 43,462 ............................................................................................................ 19
65 Fed. Reg. 43,474 ............................................................................................................ 19
68 Fed. Reg. 15,804 ......................................................................................................... 6, 8
71 Fed. Reg. 15,279 ............................................................................................................ 19
72 Fed. Reg. 6052 ................................................................................................................. 9

# TABLE OF AUTHORITIES
### (continued)

**Page**

72 Fed. Reg. 6058 ........................................................................................................... 30
73 Fed. Reg. 75,356 .......................................................................................................... 9
74 Fed. Reg. 15,070 .......................................................................................................... 10
74 Fed. Reg. 47,483 .......................................................................................................... 10
76 Fed. Reg. 26,086 .................................................................................................... 10, 11
76 Fed. Reg. 26,088 .......................................................................................................... 37
76 Fed. Reg. 26,089 .................................................................................................... 11, 37
76 Fed. Reg. 26,090 .......................................................................................................... 32
76 Fed. Reg. 81,632 .................................................................................................... 41, 43
* 76 Fed. Reg. 81,666 .................................................................................................. 1, 7, 12
76 Fed. Reg. 81,667 ........................................................................................................... 3
76 Fed. Reg. 81,668 ......................................................................................................... 6, 7
76 Fed. Reg. 81,669 ........................................................................................ 32, 33, 36, 39
76 Fed. Reg. 81,670 .......................................................................................................... 30
76 Fed. Reg. 81,671 ................................................................................................ 19, 22, 24
76 Fed. Reg. 81,672 ..................................................................................................... *passim*
76 Fed. Reg. 81,673 .............................................................................................. 5, 6, 22, 30
76 Fed. Reg. 81,674 .......................................................................................................... 24
76 Fed. Reg. 81,675 ......................................................................................................... 6, 37
76 Fed. Reg. 81,676 ........................................................................................................... 6
76 Fed. Reg. 81,677-78 ...................................................................................................... 42
76 Fed. Reg. 81,679 ........................................................................................................... 5
76 Fed. Reg. 81,681 .......................................................................................................... 33
76 Fed. Reg. 81,682 ............................................................................................... 6, 31, 41
76 Fed. Reg. 81,686 .......................................................................................................... 41
76 Fed. Reg. 81,687 .......................................................................................................... 40
76 Fed. Reg. 81,689 .......................................................................................................... 21
76 Fed. Reg. 81,700 ............................................................................................... 23, 24, 42
76 Fed. Reg. 81,702 .......................................................................................................... 42
76 Fed. Reg. 81,705 .......................................................................................................... 43
76 Fed. Reg. 81,709 .......................................................................................................... 42
76 Fed. Reg. 81,717 .......................................................................................................... 41
76 Fed. Reg. 81,721 .......................................................................................................... 41
76 Fed. Reg. 81,722 ......................................................................................................... 5, 23
76 Fed. Reg. 81,762 .......................................................................................................... 19
78 Fed. Reg. 35,664 .......................................................................................................... 12
78 Fed. Reg. 35,670 ............................................................................................... 13, 34, 35

## LEGISLATIVE MATERIALS

H.R. Rep. No. 95-1625 (1978), reprinted in 1978 U.S.C.C.A.N. 9453 ..................................... 17
S. Rep. No. 96-151(1979) ................................................................................... 26, 27, 35

# TABLE OF AUTHORITIES
(continued)

**Page**

## OTHER

Katherine M. Hausrath, *The Designation of "Distinct Population Segments" Under the Endangered Species Act in Light of National Association of Homebuilders v. Norton,* 80 Chi.-Kent L. Rev. 449 (2005) ............................................................. 26

13 *Oxford English Dictionary* 524 (2d ed. 1989) .........................................................40

I.       **INTRODUCTION**

Plaintiffs challenge Defendants' decision to remove federal Endangered Species Act ("ESA"), 16 U.S.C. § 1531 *et seq*., protections from gray wolves in the Great Lakes region.  *See Endangered and Threatened Wildlife and Plants; Revising the Listing of the Gray Wolf (Canis lupus) in the Western Great Lakes*, 76 Fed. Reg. 81,666 (Dec. 28, 2011) (to be codified at 50 C.F.R. pt. 17) ("the Final Rule").  AR 651 at 019730A. It is hard to imagine a more clear-cut violation of federal law than that presented by this case.  The record before this Court demonstrates that the Fish and Wildlife Service ("the FWS") rushed to issue a far-reaching decision in order to meet arbitrary deadlines promised to politicians; that by itself should color the Court's review of the agency's action and alone is grounds for vacatur and remand of the Final Rule.  For the *fourth time*, the first three all having been either adjudicated or admitted to be illegal, the FWS is trying the *exact same illegal strategy* to strip ESA protections from gray wolves in the Western Great Lakes region.  And this decision is even more insupportable than previous ones, because the agency has not even taken the time to figure out what species it is delisting.  This Court should do as it has done before, and stop the FWS's disregard of its Congressional mandate under the ESA – to protect and conserve, not to divide and destroy, America's gray wolves.

The wolf was one of the first species to be listed after the ESA was passed in 1973.  Under the ESA, gray wolf populations started to recover in the Great Lakes region. But even today the gray wolf remains absent from ninety-five per cent of its historical range.  Despite this fact, the Final Rule ignores the ESA prohibition against delisting a species until it recovers throughout all, or at least a significant portion of, its range.  Instead, the FWS improperly redefined the wolves' range and artificially shrinking the area in which the delisting analysis is conducted. In doing so, the FWS ignores, and the Final Rule eliminates, the potential for continued geographic expansion of wolves to areas of currently unoccupied but still viable habitat in wolves' historical range.

The ESA precludes delisting of the wolf everywhere it is currently listed, so the FWS has once again simultaneously designated and delisted a distinct population segment ("DPS") of wolves in the Great Lakes region.  And just like before, Defendants have violated the ESA by

reversing Congressional intent with respect to the use of the DPS designation. The DPS tool is intended to provide protection for locally vulnerable populations, not to remove protections from endangered species that are just barely starting to recover.  And in *Humane Society of the United States v. Kempthorne*, 579 F. Supp. 2d 7, 14 n.8, 17 (D.D.C. 2008), this Court expressly found that the FWS had "misread the statute" and that "Section 1533(c)(2)(B) does not suggest that FWS may simultaneously designate and delist a previously unlisted sub-population of vertebrates within a broader listing.  Rather, it quite strongly suggests – consistent with common usage – that the *listing* of any species (such as the western Great Lakes DPS) is a precondition to the *delisting* of that species."  This Court remanded to the FWS with specific directions that it has ignored in adopting the Final Rule, failing to show that using the DPS tool to delist the wolves is consistent with the ESA overall, or with the protective Congressional intent in adding the DPS tool as further safeguard for species like the wolves.  *See id.* at 20.

To make matters worse, the FWS arbitrarily employed the DPS without knowing which species the agency decided to delist – playing a taxonomic shell game that sacrifices species protection in favor of politically-motivated action.  FWS's own experts agree that further analysis is needed to determine which species and/or subspecies of wolves exist in the region included in the DPS; this failure to identify the target group is fatal to the agency's action.  Defendants have no authority to create and delist a DPS that may encompass multiple species; under the ESA's plain language, a DPS may only be designated for a population of a single species.

Finally, Defendants' decision to delist these wolves is invalid because there are inadequate regulatory mechanisms to protect wolves from threats in absence of federal protections. FWS's disingenuous view of what few regulatory mechanisms even exist ignores the fact that immediate and dramatic reductions in wolf populations – reminiscent of a time when bounties paid by state governments promoted the widespread killing of wolves that nearly wiped out the entire wolf species from the lower 48 states – are planned by the affected states.  Yet, in the face of such hostile state management plans, the FWS still removed federal protections from wolves, and hunters and trappers have killed hundreds of Great Lakes wolves in the short time since delisting.

For these reasons, the Final Rule should be vacated.

## II.     BACKGROUND

### A.     Statutory Framework.

The ESA is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tenn. Valley Auth. v. Hill,* 437 U.S. 153, 180 (1978).  It is intended "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species."  16 U.S.C. § 1531(b). The "plain intent of Congress in enacting this statute was to halt and reverse the trend toward species extinction, whatever the cost." *Defenders of Wildlife v. Babbitt*, 130 F. Supp. 2d 121, 124 (D.D.C. 2001) (internal quotation omitted). The FWS must "'use . . . all methods and procedures which are necessary to bring any [listed] species to the point at which the measures provided pursuant to this Act are no longer necessary.'"  *Defenders of Wildlife v. Salazar*, 729 F. Supp. 2d 1207, 1210 (D. Mont. 2010) (quoting 16 U.S.C. § 1532(3)).

The ESA directs the Secretary of the Interior, through the FWS, to list species that she determines are endangered or threatened.  *See* 16 U.S.C. § 1533(a); *Rancho Viejo, LLC v. Norton,* 323 F.3d 1062, 1064 (D.C. Cir. 2003); 50 C.F.R. § 402.01. An "endangered species" is one "in danger of extinction throughout all or a significant portion of its range"; a "threatened species" is one that is "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range."  16 U.S.C. § 1532(6), (20).  The term "species" includes "any subspecies of fish or wildlife or plants, and any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature."  *Id.* § 1532(16).

The specific provision for listing DPSs of vertebrates was enacted in 1978.  Pub. L. 95-362, November 10, 1978.  It allows the FWS to list DPSs and treat them as "species" under the ESA. 76 Fed. Reg. 81,667.  "DPS" is not defined in the ESA, but it was interpreted in a 1996 joint policy issued by the FWS and the National Marine Fisheries Service.  *See* Policy Regarding the Recognition of Distinct Vertebrate Population Segments Under the Endangered Species Act ("DPS

Policy"), 61 Fed. Reg. 4722 (Feb. 7, 1996).  The DPS Policy identifies three elements to be considered in deciding whether a DPS exists:  (1) discreteness of the DPS in relation to the remainder of its species; (2) significance of the DPS to its species; and (3) the DPS's conservation status in relation to the ESA's listing standards.  *Id*. at 4725.  A DPS's "significance" is determined by an evaluation of relevant factors, including but not limited to:  (1) its persistence in an ecological setting unusual or unique for the taxon; (2) evidence that its loss would result in a significant gap in the range of a taxon; (3) evidence that the DPS represents the only surviving natural occurrence of a taxon that may be more abundant elsewhere as an introduced population outside its historic range; and (4) evidence that it differs markedly from other populations of the species in its genetic characteristics.  *Id.*  The DPS designation is used to supplement protections under the ESA.  By extending the protections of the ESA to locally vulnerable populations, DPS status is intended to "protect and conserve species and the ecosystems upon which they depend before large-scale decline occurs that would necessitate listing a species or subspecies throughout its entire range."  *Id.*

Decisions to list, reclassify, or delist a species under the ESA must be made by assessing the five categories of threats to a species set forth in Section 4(a)(1) of the ESA: (A) the present or threatened destruction, modification, or curtailment of its habitat or range; (B) overutilization for commercial, recreational, scientific, or educational purposes; (C) disease or predation; (D) the inadequacy of existing regulatory mechanisms; and (E) other natural or manmade factors affecting its continued existence. 16 U.S.C. § 1533(a)(1).  "Section 4(a)(1) of the Act provides the Secretary 'shall' consider the five statutory factors when determining whether a species is endangered, and § 4(c) makes clear that a decision to delist 'shall be made in accordance' with the same five factors." *Friends of Blackwater v. Salazar*, 691 F.3d 428, 432 (D.C. Cir. 2012) (quoting 16 U.S.C. § 1533(a), (c)); *see also* 50 C.F.R. § 424.11(d). Thus, a species can only be delisted if, after examining threats to the species throughout its range, the FWS reasonably concludes that the species has achieved recovery and is no longer threatened or endangered.

The Secretary through the FWS must make listing determinations "solely on the basis of the best scientific and commercial data available . . . after conducting a review of the status of the species and after taking into account those efforts, if any, being made by any State or foreign nation . . . to protect such species."  16 U.S.C. § 1533(b)(1)(A).

### B.   Factual Background.

#### 1.   *Wolf Biology.*

The gray wolf (*Canis lupus*) is the largest wild member of the dog family.[2]  FWS Answer, Dkt. No. 8 ("Answer"),¶ 42.  Wolves are "highly adaptable habitat generalists," and if they are not persecuted by humans, can live anywhere that contains a sufficient population of ungulates. Administrative Record ("AR") 651 at 019778A; 76 Fed. Reg. 81,722.  Wolves are highly mobile and may move "scores or even hundreds of miles until [they] locate[] suitable habitat."  AR 651 at 019745A; 76 Fed. Reg. 81,673.  The process of wolves moving away from their home packs is called "dispersal."  *See*, *e.g.*, AR 651 at 019745A; 76 Fed. Reg. 81,673.  The dispersal of wolves from their natal packs and territories is a normal and extremely important behavioral attribute of the species that facilitates the formation of new packs, the occupancy of vacant territories, and the expansion of occupied range by the "colonization" of vacant habitat.  AR 651 at 019745A; 76 Fed. Reg. 81,673.  Wolf dispersal continues as wolves travel away from the more saturated habitats in their current range and into nearby areas where wolves are extremely sparse or absent.  AR 651 at 019758A; 76 Fed. Reg. 81,679.  Dispersal is crucial to wolf population recovery, because dispersing wolves often reoccupy areas in which wolves were previously eradicated, a direct realization of the goals of the ESA.  *See* 16 U.S.C. § 1531(c)(1).  Additionally, dispersal helps

---

[2] Zoological nomenclature identifies biological entities based on their genus, and the species (and sometimes subspecies) that are contained within that genus.  For example, with *Canis lupus*, *Canis* is the genus, and *lupus* is the species.  As discussed below, the FWS is still in the process of determining whether there is another distinct wolf species within the *Canis* genus, *Canis lycaon*, that has occupied the eastern United States.  If a subspecies is identified, its scientific name includes three names.  For example, *Canis lupus baileyi* (the Mexican wolf found in the southwestern United States) is a separate subspecies within *Canis lupus* – a subgroup within a larger population.  *See generally* Chambers *et al*., *An Account of the Taxonomy of North American Wolves from Morphological and Genetic Analyses*, AR 485 at 012265A-012267A.

maintain genetic diversity and expands the range of healthy populations.  *See* AR 651 at 019752A;
76 Fed. Reg. 81,676 ("As wolves increased in abundance in Minnesota, they also expanded their
distribution.").  Dispersal occurs over large distances, with wide ranges of distances traveled.[3]

Gray wolves' "historical range included a majority of North America."  Answer ¶¶ 50, 58;
AR 651 at 019743A; 76 Fed. Reg. 81,672.  Habitat destruction and government bounties
encouraged the widespread poisoning, trapping, and hunting of wolves, which resulted in the
extirpation of the gray wolf from more than ninety-five percent of its range in the conterminous
United States.  68 Fed. Reg. 15,804, 15,805 (Apr. 1, 2003).  Human-caused mortality continues to
constitute the majority of documented wolf deaths.  AR 651 at 019763A; 76 Fed. Reg. 81,682.

The wolves at issue in this action constitute the only sizable gray wolf population in the
conterminous United States east of the Rocky Mountains, and they are found mainly in Minnesota,
Wisconsin, and the Upper Peninsula of Michigan, with the majority of wolves in northern
Minnesota.  AR 651 at 019743A; 76 Fed. Reg. 81,672.  According to the FWS, this Great Lakes
population includes about seventy percent of North American gray wolves south of Canada. AR
651 at 019743A; 76 Fed. Reg. 81,672.  Maintenance and growth of this population is vital in terms
of representation and resilience, and to achieve wolf recovery in the eastern United States.  AR 651
at 019748A; 76 Fed. Reg. 81,675.

The basic subject of regulatory action under the ESA is the species.  *See* 16 U.S.C. § 1531.
Accurate species identification is a threshold scientific fact needed to invoke ESA protections and
to delist species.  Defendants have failed at this basic level by not adequately classifying the wolf
species in the Great Lakes, as demonstrated by the confusion in the FWS's determination of the
Great Lakes wolf species in the course of developing the Final Rule.  AR 651 at 019735A; 76 Fed.
Reg. 81,668.  The FWS has not done this basic work before embarking on a path that puts the gray

---

[3] In Minnesota, the farthest documented wolf dispersal was a straight-line minimum of at least
550 miles, with average dispersals of 154 miles.  Wolves in Wisconsin have been documented
traveling roughly 300 miles.  Michigan's longest documented dispersals averaged 377 miles.  A
wolf in Indiana traveled at least 428 miles, and a wolf in Illinois was documented dispersing a
minimum of 300 miles.  AR 651 at 019745A; 76 Fed. Reg. 81,673.

wolf in great danger, and has failed to establish what species of wolf lives in the Great Lakes.  AR at 019737A- 019738A; 76 Fed. Reg. at 81,668-69.  Rather than attempt to resolve this uncertainty, the FWS has instead played fast and loose with the science and the facts, cherry-picking what arguments it thinks might best support a quick, pre-determined, and politically convenient result.

**2.**     ***Prior Attempted Gray Wolf Delisting Actions.***

Over the last decade, multiple courts have found that the FWS has misused the DPS tool in order to illegally remove protections from the gray wolf.  This case represents yet another attempt by the FWS to create a DPS out of the Great Lakes wolf population and eliminate ESA coverage for that DPS, while ignoring the critically endangered status of the wolf population as a whole, and without the best available science to support its determination.

The gray wolf was among the first species to be listed under the Endangered Species Preservation Act of 1966, a forerunner of the ESA.  Native Fish and Wildlife Endangered Species, 32 Fed. Reg. 4001-02 (Mar. 11, 1967).  But protection was limited, and it was the 1973 passage of the ESA that marked the first serious protection for the wolf. Soon after the ESA was passed, the FWS listed several subspecies of the wolf.  Then, in 1978, Defendants published a rule reclassifying the gray wolf at the species level (*Canis lupus*) as endangered throughout the conterminous 48 States and Mexico and as threatened in Minnesota.  Reclassification of the Gray Wolf in the United States and Mexico, 43 Fed. Reg. 9607 (Mar. 9, 1978) (to be codified at 50 C.F.R. pt. 17).  In that rule, FWS recognized the catastrophic loss of the gray wolf's range, finding that the wolf's historical range spanning "from Georgia to Maine, and between the Atlantic and the Great Plains" had been reduced to northern Minnesota and the adjacent Isle Royale National Park. *Id.* at 9608, 9610.  In the West, FWS observed that except for the "occasional wanderer," the wolf had been restricted to remote areas of the Rocky Mountains.  *Id.* at 9610.  Applying the threats analysis required by 16 U.S.C. § 1533(a)(1), the FWS concluded that "the entire species *Canis lupus* is Endangered or Threatened to the south of Canada."  *Id.* at 9607.

Once protected by the ESA, the Great Lakes wolf population began reoccupying portions of its historical range and, after decades under federal protection, has moved slowly towards

recovery.  Yet almost immediately following their listing, the FWS began a campaign to reduce or eliminate federal protections for wolves.  Courts rejected the FWS's early attempts as violative of the ESA and APA.  *See Fund for Animals v. Andrus*, Civ. No. 5-78-66, 11 Env't Rep. Cas. (BNA) 2189, 2200-01 (D. Minn. 1978); *Sierra Club v. Clark*, 755 F.2d 608, 615 (8th Cir. 1985).  Then, beginning in 2000, the FWS made several more attempts to delist gray wolves and halt the species' still nascent recovery.  Because the gray wolf clearly remains endangered across its range, the FWS could not justify delisting the wolf under Section 4(a)(1) of the ESA, and instead has repeatedly, and unsuccessfully, tried to sidestep the statutory requirements by classifying the Great Lakes wolves as a DPS, in order to delist the gray wolf in piecemeal fashion.  *See*, *e.g.*, Proposal to Reclassify and Remove the Gray Wolf, 65 Fed. Reg. 43450 (proposed Jul. 13, 2000).

In 2003, Defendants published a final rule creating an Eastern and Western DPS for gray wolves and delisting both of those DPSs.  *See* Final Rule to Reclassify and Remove the Gray Wolf, 68 Fed. Reg. 15804 (April 1, 2003) (to be codified at 50 C.F.R. part 17).  This DPS ploy was challenged and rejected by two federal courts.  *See Defenders of Wildlife v. Secretary, U.S. Dep't of Interior*, 354 F. Supp. 2d 1156 (D. Or. 2005); *National Wildlife Fed'n v. Norton*, 386 F. Supp. 2d 553 (D. Vt. 2005).  In striking down this 2003 DPS designation, the court held that, despite the FWS's claim to the contrary, the gray wolf had not recovered across a significant portion of its range.  *See Defenders*, 354 F. Supp. 2d at 1167-69.  Both courts also found the FWS had improperly designated the DPS boundaries, because, just like the boundaries in this Final Rule, they were drawn to include a significant amount of land outside of where the wolves' healthy populations existed.  *See Defenders*, 354 F. Supp. 2d at 1172; *National Wildlife Fed'n*, 386 F. Supp. 2d at 566.  In other words, the FWS removed protections for wolves in crucial dispersal areas that wolves could use as corridors for re-establishment of populations in their historical range.  As one court put it, "the wolf DPS appears to be a tactic for downlisting areas the FWS has already determined warrants [sic] listing, despite the unabated threats and low to nonexistent populations outside of the core areas."  *Defenders*, 354 F. Supp. 2d at 1171.

Almost immediately after being rejected by two courts, the FWS tried a different strategy. Because its attempt to use the DPS tool to delist wolves had failed, the FWS tried to grant states in the Great Lakes the right to kill wolves on the theory that killing some wolves would increase "social tolerance" for the remainder and therefore enhance the survival of the species. *See* 16 U.S.C. § 1539(a)(l) (allowing limited take of an endangered species "for scientific purposes or to enhance the propagation or survival of the affected species"). This Court rejected the FWS's action as yet another unlawful interpretation of the ESA. *Humane Soc'y of the United States v. Kempthorne*, 481 F. Supp. 2d 53 (D.D.C. 2006), *vacated as moot by* 527 F.3d 181 (D.C. Cir. 2008).

In 2007, the agency tried its ill-conceived DPS tactic again, finalizing a rule simultaneously designating and delisting Great Lakes wolves as a DPS. *See* Final Rule Designating the Western Great Lakes Populations of Gray Wolves as a Distinct Population Segment; Removing [WGL DPS] From the List of Endangered and Threatened Wildlife, 72 Fed. Reg. 6052 (Feb. 8, 2007) (to be codified at 50 C.F.R. pt. 17). A coalition of animal protection groups, including most of the Plaintiffs in this action, challenged the decision. *Humane Society of the United States v. Kempthorne*, 579 F. Supp. 2d 7 (D.D.C. 2008). This Court held the FWS's decision was arbitrary, capricious, and not in accordance with the ESA. *Id*. at 9. This Court explained that the ESA does not clearly address whether the FWS can designate a sub-population of a listed species as a DPS and then simultaneously delist that sub-population. As the Court held, "FWS had misread the statute." *Id*. at 14 n.8. The Court questioned the same misuse of the DPS tool as this action presents, and found that the ESA "quite strongly suggests – consistent with common usage – that the *listing* of any species (such as the Western Great Lakes DPS) is a precondition to the *delisting* of that species." *Id*. at 17 (emphasis by court). The Court ordered the FWS to explain how its use of the DPS as a delisting tool could possibly be consistent with the ESA's "myriad policy objectives." *See id*. at 20-21.

Following this Court's decision, the wolves' protection under the ESA was reinstated. Reinstatement of Protections for the Gray Wolf, 73 Fed. Reg. 75,356 (Dec. 11, 2008) (to be codified at 50 C.F.R. pt. 17). One day later, the FWS's counsel issued its post hoc rationalization

of the FWS's misuse of the DPS tool.  *Mem. from David Longly Bernhardt, Office of the Solicitor, U.S. Department of the Interior, to Director, FWS* (Dec. 12, 2008), AR 8 at 000491A (the "Solicitor's Opinion").

Then, on April 2, 2009, the FWS flouted the ESA (and this Court's 2008 remand order) again.  Just like before, the FWS published a final rule simultaneously identifying Great Lakes wolves as a DPS and removing all their ESA protection.  Final Rule To Identify the Western Great Lakes Populations of Gray Wolves as a Distinct Population Segment and To Revise the List of Endangered and Threatened Wildlife, 74 Fed. Reg. 15070 (Apr. 2, 2009) (to be codified at 50 C.F.R. pt. 17).  That time, the FWS blatantly ignored its obligation to open the rulemaking for public comment and tried to sail a final rule through quickly without public scrutiny.  On June 15, 2009, the Plaintiffs in this action challenged the delisting rule in this Court, claiming that the rule violated the ESA, the DPS Policy, this Court's 2008 remand order, and the APA.  *Humane Soc'y of the United States v. Kempthorne*, Civ. No. 09-01092-PLF (D.D.C., filed June 15, 2009).  Rather than defend its decision, the FWS agreed it had acted illegally.  This Court entered the parties' stipulated settlement agreement, vacating the 2009 delisting rule, and the FWS reinstated ESA protection for Great Lakes wolves.  Reinstatement of Protections for the Gray Wolf in the Western Great Lakes, 74 Fed. Reg. 47,483 (Sept. 16, 2009) (to be codified at 50 C.F.R. pt. 17).

### 3.    *The FWS's Current (Fourth) Delisting of the Great Lakes Wolves.*

Despite losing many times over trying to abandon Great Lakes wolf protection, and despite the fact that its basis for that action is weaker in this round than it was before, the FWS has made a fourth run at the identical shell game of simultaneously designating and delisting a western Great Lakes DPS.  Proposed Rule To Revise the List of Endangered and Threatened Wildlife for the Gray Wolf (Canis lupus) in the Eastern United States, Initiation of Status Reviews for the Gray Wolf and for the Eastern Wolf (Canis lycaon), 76 Fed. Reg. 26,086 (proposed May 5, 2011) (the "Proposed Rule").  In the Proposed Rule, trying to avoid this Court's questioning of its decision to carve out a DPS from within a larger listing, the FWS also sought to, *inter alia*:  (1) revise the range of *Canis lupus* "by removing all or parts of 29 eastern states that we now recognize were not part

of the historical range of the gray wolf'" (despite clear evidence and the FWS's statements to the contrary that wolves' historical range includes the lower forty-eight states); (2) recognize recent taxonomic information indicating that *Canis lupus lycaon* – the eastern timber wolf, which had previously been considered a subspecies of gray wolf – should be elevated to the full species *C. lycaon* –the eastern wolf; and (3) conduct a rangewide review of the conservation status of this "newly recognized species." 76 Fed. Reg. 26,086. The FWS concluded in the Proposed Rule that "[it] now recognize[d] three wolf species with ranges in the conterminous United States: Canis lupus, Canis lycaon, and Canis rufus." 76 Fed. Reg. 26,089. With respect to the brand new species, and the previously recognized species, the FWS acknowledged that "[t]he ranges of C. lupus [the gray wolf] and C. lycaon [the eastern wolf] overlap in the western Great Lakes region." 76 Fed. Reg. 26,089.[4]

Defendants undertook to develop the Proposed Rule after the Secretary of the Interior received a letter from U.S. Senator Amy Klobuchar (M.N.) "urg[ing] [the Secretary] to expedite the delisting of the gray wolf in the Great Lakes." *Letter from Amy Klobuchar, U.S. Senator-M.N., to Hon. Ken Salazar, Secretary of the Interior* (Dec. 7, 2010), AR 66 at 002732A. After receiving the Senator's letter and "[i]nstead" of Senator Klobuchar introducing legislation to delist the gray wolf, the Secretary "agreed that [FWS] would have a proposed rule published by April and a final rule completed by the end of 2011 (that presumably would delist WGL wolves). [FWS officials were] working on schedules, strategies, and staff needs to accomplish this." E-mail from Lynn M. Lewis, FWS, to five FWS personnel (Dec. 10, 2010, 3:24pm), AR 87 at 002822A. Defendants confirmed in a letter response to the Senator that they would publish a final rule on the delisting by the end of 2011. Letter from Thomas L. Strickland, Assistant Secretary for Fish and Wildlife and Parks, to Hon. Amy Klobuchar, U.S. Senator-M.N. (Dec. 9, 2010), AR 78 at 002769A. FWS

---

[4] On August 26, 2011, the FWS reopened the comment period on this proposal and issued notice that there could be separate final rules regarding a creation and delisting of a Great Lakes DPS and the proposed determination for the 29 eastern states that the FWS had now decided to consider to be outside the historical range of the gray wolf.

officials, staff, and members of Congress worked together to coordinate their press releases announcing the delisting campaign, with one FWS official saying that there was no problem if the Senator announced FWS's delisting plan early because "[the FWS] will always seek to remove wolves from ESA everywhere."  E-mail from Matthew C. Huggler, FWS, to Dan Ashe, FWS (Dec. 9, 2010, 9:10am), AR 79 at 002773A.

Shortly thereafter, Defendants set a schedule to meet the deadline promised to the Senator. E-mail from Lynn M. Lewis, FWS, to Paul Phifer and Patrick Leonard, FWS (Dec. 22, 2010, 10:52am), AR 99 at 002847A ("As you've no doubt heard, the Service committed to Senator Amy Klobuchar (D-MN) to delist (presumably) Western Great Lakes wolves by the end of 2011"). Later, when Defendants had internal discussions of the obstacles and options for publishing a final delisting rule consistent with the Proposed Rule and with their own objectives, Defendants repeatedly cited their "commitment to Sen. Klobuchar" to have a final rule by the end of 2011.  E-mail from Nelson to FWS personnel, Attachment:  Eastern Options for the Director (Jul. 13, 2011, 9:02am), AR 451 at 011749A.

On December 28, 2011, the FWS issued the Final Rule, once again simultaneously designating and delisting the Great Lakes DPS.  AR 651 at 019730A; 76 Fed. Reg. 81,666.  In the Final Rule, the FWS freely admitted that it had not done the necessary work to identify the species it was delisting. Instead of doing its basic job to carefully identify the species prior to delisting, the FWS tried to shift the blame, citing "ongoing scientific debate, and the lack of clear resolution concerning the taxonomy of wolves in the western Great Lakes." *Id*. at 81,669.  The FWS simply decided not to resolve the foundational issue, summarily declaring that all wolves in the Great Lakes were gray wolves, and cherry-picking data in order to support this politically expedient guess. *Id.* at 81,688.

At the same time, the FWS put off any decision as to the status of wolves in all or portions of the eastern twenty-nine states, which is subject to an ongoing status review. *Id*. at 81,666.  Yet now the FWS has changed course from its assertions in the Final Rule by publishing a new proposed rule to remove protections from the gray wolf in the lower 48 States.  Removing the Gray

Wolf (Canis lupus) From the List of Endangered and Threatened Wildlife, 78 Fed. Reg. 35,664 (proposed Jun. 13, 2013).  In this proposed rule, the FWS states that "[its] review of the best available taxonomic information indicates that . . . the northeastern United States and portions of the upper Midwest (eastern and western Great Lakes regions) were occupied by the eastern wolf (*C. lycaon*), now considered a separate species of *Canis* rather than a subspecies of *C. lupus*. . . ." 78 Fed. Reg. 35,670, expressly contradicting its recent position.  The agency's self-serving decisions violate the ESA.  To ensure that the gray wolf is protected until recovery has been achieved, Plaintiffs filed this action.[5]

## III.   LEGAL STANDARD

Summary judgment is appropriate when there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  Challenges to an agency's decision are reviewed according to the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2).  "Summary judgment thus serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review."  *Univ. Med. Ctr., Inc. v. Sebelius*, 856 F. Supp. 2d 66, 76 (D.D.C. 2012).

Under the APA, agency action must be overturned if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A); *Marsh v. Oregon Natural Res. Council,* 490 U.S. 360, 376 n.21 (1989).  In an APA case, "the function of the district court is to determine whether or not, as a matter of law, the evidence in the administrative record

---

[5] Because Plaintiffs have members who regularly view, enjoy, learn from and appreciate wolves in the Great Lakes region, whose ability to continue to engage in these activities will be harmed by the FWS' actions challenged here, and whose injuries will be remedied by the requested relief, Plaintiffs clearly have standing to bring this action. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562-63 (1992) (the "desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purpose of standing"); *Defenders of Wildlife v. Norton*, 257 F. Supp. 2d 53, 63 (D.D.C. 2003) (injury in fact where members of plaintiff groups "state that they have visited the region repeatedly and aver that they will be returning there within a period of months or a few years for study, work, and recreation"). *See generally* Declarations of Nancy Warren, Howard Goldman, Linda Hatfield, and Robert Waligora.

permitted the agency to make the decision it did." *Am. Forest Res. Council v. Ashe*, 2013 WL 1289724, at *5 (D.D.C. Mar. 30, 2013) (quotation omitted).

The court must engage in a "thorough, probing, in-depth review," *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 415 (1971), to determine whether an agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action. . . ." *Motor Vehicle Manufacturer's Ass'n v. State Farm Mutual Automobile Ins. Co.,* 463 U.S. 29, 43 (1983). The court considers whether the agency acted within the scope of its legal authority, whether the agency has explained its decision, whether the facts on which the agency purports to have relied have some basis in the record, and whether the agency considered the relevant factors. *Fund for Animals v. Babbitt,* 903 F. Supp. 96, 105 (D.D.C.1995) (citation omitted). The "deference a court must accord an agency's scientific or technical expertise is not unlimited," and a court may not simply "rubber stamp" an agency decision. *Safari Club Int'l v. Salazar*, 852 F. Supp. 2d 102, 110-11 (D.D.C. 2012).

## IV.    <u>ARGUMENT</u>

The record before this Court establishes the FWS's rush to comply with self-imposed, politically-motivated deadlines that violate the ESA, thwart species recovery, and imperil the Great Lakes wolves. In its "if at first you don't succeed, try try again" efforts, the FWS's Final Rule violates the ESA and the APA in seven primary ways – any one of which requires vacatur and the return of federal protections for wolves. First, the FWS's decision to remove protections for the Great Lakes wolves was based on its political commitments to Members of Congress urging a delisting decision, and not on the best available science. Second, Defendants once again have impermissibly ignored the requirement that a species be protected so long as it remains endangered "throughout . . . a significant portion of its range." 16 U.S.C. § 1532(6). Third, Defendants have continued their improper use of the DPS tool to delist a portion of an ESA-listed species (here, one that it cannot even adequately identify). Fourth, even if the DPS tool could be used to delist populations that were not previously listed – which it cannot – the boundaries of the subject DPS contravene the ESA's directive that species protection be given the highest of priorities. Fifth, the

FWS cannot possibly delist wolves in the Great Lakes region because it has failed to identify the exact species or subspecies targeted by the Final Rule as required by the ESA and basic tenets of administrative law, but instead chose the fastest option, cherry-picking the available facts in an attempt to justify its random, and unsupported, selection.  Sixth, Defendants have not established that the population losing protections pursuant to the DPS designation is "significant" in relation to the species as a whole.  Finally, under Section 4(a)(1) of the ESA, the Great Lakes wolf population remains endangered due to inadequate regulatory mechanisms and human predation and does not meet the statutory criteria for delisting.  The Final Rule is arbitrary, capricious, and unlawful, and should be vacated.

### A.      The FWS Impermissibly Delisted the Wolves Based on Politics, Not Science.

The language of the ESA is perfectly clear – the ESA commands that the FWS "*shall*" make a delisting determination "*solely* on the basis of the best scientific and commercial data available."  16 U.S.C. § 1533(a), (b)(1)(A) (emphasis added).  Such a command "requires [the FWS] to *disregard politics*" in making listing decisions.  *Save Our Springs v. Babbitt*, 27 F. Supp. 2d 739, 747 (W.D. Tex.1997) (emphasis added).  Yet, the administrative record before this Court reveals that the FWS not only failed to "disregard politics" in making its decision, but that the Final Rule was driven by promises made to members of Congress, not science.  This Court should not condone such a blatant disregard for the law.

The politically-motivated crusade to delist Great Lakes wolves under the current rule began less than two months after the FWS acknowledged the illegality of its 2009 delisting rule, when members of Congress sent a letter to the then-Acting Director of the FWS "requesting he take action to delist the western Great Lakes gray wolf."  *See Letter from Amy Klobuchar, U.S. Senator-M.N., to Hon. Ken Salazar, Secretary of the Interior* (Dec. 7, 2010), AR 66 at 002732A (referencing December 2009 letter from Senator Klobuchar and Congressman Oberstar to the FWS Director).  Nearly a year after the original letter, on December 6, 2010, FWS officials met with Senator Klobuchar and her staff, and the Senator "request[ed] that FWS put out a public statement by the middle of this week saying that the FWS will move to delist the gray wolf" and indicated

that she would "send[] the Secretary a letter . . . that will be an updated version of last year's letter, that will urge the wolf be delisted in 2011."  E-mail from Lara Levison, Dept. of Interior ("DOI"), to certain FWS and DOI personnel (Dec. 6, 2010, 1:33pm), AR 67 at 002733A- 002734A.  The following day, the Senator sent this letter to then-Secretary of the Interior Ken Salazar, requesting that he "expedite the delisting of the gray wolf in the Great Lakes."  AR 66 at 002732A.  Just days after Salazar received the Senator's letter, the Assistant Regional Director for the Midwest Region of the FWS sent an email to members of her staff stating that:

> [t]his week we learned that Senator Amy Klobuchar (D-MN) was going to introduce legislation to delist the wolf in the western Great Lakes.  *Instead, Secretary Salazar agreed that we would have a proposed rule published by April and a final rule completed by the end of 2011 (that presumably would delist WGL wolves).* We've been working on schedules, strategies, and staff needs to accomplish this.

E-mail from Lynn M. Lewis, FWS, to five FWS personnel (Dec. 10, 2010, 3:24pm), AR 87 at 002822A (emphasis added).  The communications between FWS officials, staff, and members of Congress culminated in a decision to publically announce that the FWS "was seeking to delist wolves in the *Great Lakes,"* E-mail from Christine Eustis, FWS, to DOI and FWS personnel (Dec. 9, 2010, 9:46am), AR 79 at 002771A,[6] and include an email in which one FWS official went so far as to say that making the announcement would not be a problem because "[the FWS] will *always seek to remove wolves from ESA everywhere*."  *Id.* at 002773A (emphasis added).  The FWS followed up with a letter to the Senator indicating that the FWS would propose delisting by April 2011, and publish a final rule "by the end of 2011."  Letter from Thomas L. Strickland, Assistant Secretary for Fish and Wildlife and Parks, to Hon. Amy Klobuchar, U.S. Senator-M.N. (Dec. 9, 2010), AR 78 at 002769A.  And the record in this case shows the FWS stuck close to its plan to meet its commitment to the Senator.

---

[6] The record reveals that the FWS also had various communications with congressional staff about the content of the press release announcing the FWS's intent to delist wolves in the Great Lakes.  AR 67 at 002733A- 002734A; AR 79 at 002774A.

Other documents in the record reveal that once the politically-driven decision to delist wolves in the Great Lakes was made, the specific substance of that decision was also driven by politics, not science.  In weighing the pros and cons of various options for the final delisting rule – that arose largely because FWS did not know what wolf species actually existed in the Great Lakes – the FWS listed as the sole "Con" that attempting to resolve the issue before issuing a final delisting rule "delays final decision on the WGL DPS beyond commitment to Sen. Klobuchar" and listed as a "Pro" that issuing a final rule without resolving this issue "[r]etains commitment to Sen. Kobuchar [sic]."  E-mail from Nelson to FWS personnel, *Attachment: Eastern Options for the Director* (Jul. 13, 2011, 9:02am), AR 451 at 011749A.

This kind of political intrusion into listing decisions is wholly improper under the ESA and precisely what the best available science requirement of the ESA was intended to guard against. *See* H.R. Rep. No. 95-1625 (1978), *reprinted in* 1978 U.S.C.C.A.N. 9453, 9463 ("[i]ndividuals charged with the administration of the [ESA] do not have the legal authority to weigh the political importance of an endangered species").  Courts consistently overturn FWS decisions where the agency sacrificed its ESA duties to imperiled species to appease the interests of political figures. For example, in *Save Our Springs*, the court held that the Secretary "acted arbitrarily and capriciously" when he "considered political factors" in making a decision whether to list the Barton Springs salamander as endangered.  27 F. Supp. 2d at 748.  Those "political factors" included opposition to the proposed listing by certain congressional representatives, *id.* at 745 – the exact same factors the FWS improperly considered in this case.  Similarly, in *Western Watershed Project v. U.S. Fish and Wildlife Service*, the District of Idaho vacated and remanded the FWS's decision not to list the sage-grouse under the ESA because its decision had been "taint[ed]" by "political meddling" that led the FWS to "steer the 'best science' to a pre-ordained outcome." 535 F. Supp. 2d 1173, 1176, 1188 (D. Id. 2007); *see also Biodiversity Legal Foundation v. Babbitt*, 943 F. Supp. 23, 25 n.4 (D.D.C. 1997) (suggesting the impropriety of basing a decision not to list the Archipelago wolf because it was the "[l]east controversial option with the Alaskan delegation to Congress" according to an agency document weighing the pros and cons of listing the species).

The record in this case tells an equally clear and disturbing story of political interference. The FWS delisted the wolf in the Great Lakes because of promises made to members of Congress, ignoring its duty to base listing decisions "solely" on the best available science in the process.  The FWS's Final Rule should therefore be vacated.

**B.    The Final Rule Ignores the ESA Requirement That a Species Cannot Be Delisted Until It Is Recovered Throughout a Significant Portion of Its Range.**

A species can only be delisted after an analysis demonstrates that none of the threats listed in Section 4(a)(1) of the ESA are present.  *Defenders of Wildlife v. Babbitt*, 130 F. Supp. 2d 121, 133 (D.D.C. 2001) ("the same five statutory factors must be considered in delisting as in listing") (citation omitted).  A focal inquiry is whether the species is threatened or endangered "throughout . . . a significant portion of its range."  16 U.S.C. § 1532(6).  It is vital that the FWS apply the proper definition of the phrase "significant portion of its range," or else an erroneous definition could easily skew the entire delisting determination.

FWS has consistently recognized that the term "range" refers to the species' *historical range*.  *See, e.g.*, 58 Fed. Reg. 34928 (June 30, 1993) (Carolina heelsplitter listed as endangered because it had "been eliminated from a significant portion of its historic range"); 51 Fed. Reg. 6688 (Feb. 25, 1986) (listing northern aplomado falcon after finding it was "endangered throughout its historic range").  The 1978 gray wolf listing implicitly recognized the incorporation of this definition into the analysis.  *See* 43 Fed. Reg. 9607 (listing the gray wolf throughout the conterminous United States after finding that "the species now occupies only a small part of its original range").  Accordingly, the FWS must consider the Section 4(a)(1) threats within the gray wolf's historical range to determine if it remains endangered across "a significant portion of its range."  The FWS cannot even *consider* delisting until it explains why the gray wolf's loss of *ninety-five percent* of its range is not significant.  *See Defenders of Wildlife v. Norton,* 258 F.3d 1136, 1145 (9th Cir. 2001) (Secretary "must at least explain her conclusion that the area in which the species can no longer live is not a significant portion of its range") (quotation omitted).  The need for an explanation is particularly crucial here, because any explanation will "appear[] to

conflict with the plain meaning of the phrase 'significant portion.'" *Defenders of Wildlife v. Norton*, 239 F. Supp. 2d 9, 19 (D.D.C. 2002) ("*Defenders (lynx)*"); *see also id.* (the word "significant" in the phrase "significant portion of its range" means "a noticeably or measurably large amount").[7]

### 1. The Gray Wolf Remains Endangered Throughout A Significant Portion of its Range.

It is undisputed: gray wolves once lived throughout most of North America.  76 Fed. Reg. 81,762.  Because the wolf was restricted to a small part of its historical range by widespread human persecution, habitat destruction, and inadequate regulatory mechanisms, the FWS determined that the species required protection throughout the conterminous United States and Mexico.  43 Fed. Reg. 9611.  The gray wolf is making slow progress toward recovery, *supra* Section II.B., but wolves are unequivocally not present throughout most of their historical range.  76 Fed. Reg. 81,672; *see also* 65 Fed. Reg. 43,462, 43,474 (FWS stating that "there are major geographic areas in which [the gray wolf] is no longer viable but once was").  Moreover, there are numerous areas within the conterminous United States that contain suitable habitat and yet remain devoid of wolves.  These areas include the Northeast, parts of Michigan and North Dakota, the Pacific Northwest, and other parts of the West.  *See Defenders*, 354 F. Supp. 2d at 1167 & n.8 (discussing wolf habitat and dispersing wolves in the Northeast, Northwest, and the Dakotas); 65 Fed. Reg. 43,462 (identifying favorable wolf habitat in the Northeast); 71 Fed. Reg. 15,279 (discussing unoccupied wolf habitat in Michigan and North Dakota); 65 Fed. Reg. 43,474 (noting that "there is certainly habitat that could support wolves" in western states such as Oregon, Utah, and Colorado).[8]

---

[7] The FWS faces an especially difficult burden in this case, given that the District of Oregon has already found many unoccupied parts of the wolf's range to be significant.  *See Defenders*, 354 F. Supp. 2d at 1167.

[8] There are other parts of the wolf's historic range that may contain suitable habitat.  *See, e.g.*, AR 92 at 002831A-002832A (noting that MO and IA are areas that are "still C. lupus range"; 76 Fed. Reg. 81,671 (identifying "possibly suitable habitat [in] eastern Wyoming and western South Dakota"); 2007 AR* Doc. 57 at 230 (noting that some suitable wolf habitat "may exist in southern MO, southern IL, southern IN, southern OH, and in western and central PA").

*(Footnote continued on next page)*

Plain and simple, the absence of wolves from their historical range means that wolves *cannot be delisted*, whether by use of the DPS tool or otherwise. *See Defenders (lynx)*, 239 F. Supp. 2d at 19 (finding the FWS's conclusion that three-fourths of the Canada lynx's historical regions were "collectively not a significant portion of its range" to be "counterintuitive and contrary to the plain meaning of the ESA phrase 'significant portion of its range'"); *cf. Friends of Blackwater v. Salazar*, 691 F.3d 428, 431 (D.C. Cir. 2012) (FWS "hired a biologist to investigate the possibility of removing the squirrel from the list of endangered species," conducted a five-year review of the squirrel's status, and concluded that the squirrel did "'not meet the definition of endangered or threatened' because it *persisted throughout its historic range*.'") (quotation omitted) (emphasis added).

Defendants' prior wolf delistings have been struck down for this same reason – because the gray wolf has not recovered across a significant portion of its range. *See*, *e.g.*, *Defenders*, 354 F. Supp. 2d at 1167-69. And its current decision offers less support than ever before. In fact, the record reflects that the FWS *knows* that the range it designated in the Final Rule is neither the historical range nor the entirety of the range where suitable habitat exists. *See*, *e.g.*, AR 92 at 002831A-002832A (FWS staff e-mail stating that if a DPS for Great Lakes wolves were established by the Final Rule, then the FWS "will need to talk about those MO/IA, etc. areas" that are "still C. lupus range"); *see also* E-mail from Patrick Leonard, FWS, to Lynn Lewis, FWS (Dec. 22, 2010 at 11:19 am), AR 99 at 002846A ("I'm not sure it's realistic to expect to settle the question of the historic range of C lupus by the beginning of [F]ebruary (. . . the real question is, what was the historic range of C lupus, and let the "what wasn't" fall off; we can't try to prove the negative instead). I'm not sure exactly what was promised to the Senator, but my thought would be to [just] meet that promise, no more, by this deadline, and at this point not try to include all the

---

*(Footnote continued from previous page)*

*References to "2007 AR" are to documents that were part of the administrative record in the 2007 delisting litigation challenge and that Defendants submitted again as part of the administrative record in this present action.

things we'd like to do now too.").  Even if Defendants could somehow justify limiting the

consideration of the historical range of the gray wolf to the Midwest region – which they cannot –

the FWS admits, and the Final Rule recognizes, that "wolves can occupy a wide range of

habitats . . . [and] wolves historically occupied *the entire Midwest*.  Inadequate prey density or high

levels of human-caused mortality appear to be the only factors that limit wolf distribution."  76

Fed. Reg. 81,689 (emphasis added).  Yet it is indisputable that gray wolves are not even currently

present throughout "the entire Midwest" but rather are limited to existing in parts of three states.

76 Fed. Reg. 81,672; *id*. at 81,721 ("We have concluded that Minnesota, Wisconsin, and Michigan

will maintain their share and distribution of the WGL wolf population.").  But in adopting the Final

Rule, the FWS failed to conduct a threats analysis across the wolf's range, and failed to provide a

reasonable explanation for why the Northeast, Pacific Northwest, and other identified areas are no

longer significant portions of its range – presumably because the analysis would lead to the

conclusion that delisting was prohibited under the ESA.

## 2.    *The FWS Cannot Arbitrarily Redefine the Wolf's Historical Range to Satisfy its Desire to Delist.*

The delisting analysis must be done by examining each of the Section 4(a)(1) threats and

the fact that the gray wolf remains extirpated across most of its historic range.  The inescapable

conclusion is that the wolf is still endangered.  Unhappy with that reality, the FWS has taken upon

itself to recreate history and law.  Trying to avoid this absolute obstacle to delisting the gray wolf,

the FWS keeps carving up the species' range under the guise of the DPS.  By improperly shrinking

the area in which the threats analysis is conducted, FWS intentionally avoids addressing the serious

problems faced by the wolf *rangewide*.  *See* 2007 AR Doc. 23 at 115 (describing an advantage of

this approach as being able to "conduct threats analysis over [a] smaller area").  FWS clearly

realized the illegality of its approach in the current decision.  *See*, *e.g.*, E-mail from Kelly

Hornaday, FWS, to Maricela Constantino, FWS (Jan. 5, 2011, 12:09pm), AR 107 at 003108A-

003109A (noting that the delisting rule's approach to analyzing the significant portion of the range

inquiry "is not consistent with our current approach or with how we would propose to do it in the

future," and FWS must "first evaluate the status 'throughout all', then after making the conclusion about 'all', ask whether there are any portions to consider."); *id.* at 003109A ("[T]his approach is really backwards in a delisting.  We can list something because it is [threatened or endangered, T/E] in a SPR (that's from the definitions), but we can't delist something because it is not T/E in a SPR. . . .  In particular, from the delisting side, we really need to show that it is not T/E throughout all [of its range].").

The FWS's rewriting of the wolf's range prevents gray wolves from reestablishing populations in virtually their entire historical range by cutting off vital potential corridors to which they could expand.  For instance, going back to 2009, the agency explained that one of the problems of delisting a gray wolf DPS is that "*the remainder of the listed range consist[s] of a mix of unoccupied but potential habitat*, areas no longer containing potential habitat, and areas that were never wolf habitat but were listed in error."  AR 14 at 000806A.  *See also* 76 Fed. Reg. 81,671 (noting a comprehensive review of published studies, including many cited by FWS in the Rule, concluding that "the proportion of long-distance dispersers is *severely* underestimated") (emphasis added).  Defendants try to justify this obvious shutdown of the wolves' lifesaving potential for recovery based on the supposition that wolves will not travel to distant areas to reestablish their populations.  But this determination is arbitrary and capricious because it flies in the face of their own admissions, AR 651 at 019745A; 76 Fed. Reg. 81,673, and of the ESA mandate to promote conservation throughout a species' historical range, 16 U.S.C. §§ 1533(a)(1), 1532(6), and the unquestionable policies behind the ESA with respect to endangered and threatened species.  In order for the "significant portion of [the] range" requirement to have any teeth, this threats analysis must be conducted at a meaningful geographic scale.  If the FWS were allowed to divvy up a species' range into small portions, and then focus solely on the threats within those areas, FWS could justify delisting *any* endangered species whose remaining populations are clustered in isolated pockets and, like the gray wolf, had started the slow progress towards full recovery in tiny, limited areas like the Great Lakes.

Indeed, this tactic, of carving up a species' range to circumvent the "significant portion of the range" requirement, has been rejected by several courts as contrary to the ESA.  Specifically, this Court has held that "FWS's exclusive focus on one region where [a species] is more prevalent, despite its historic presence in three additional regions, is contrary to the expansive protection intended by the ESA."  *Defenders (lynx),* 239 F. Supp. 2d at 19. Likewise, in *Friends of the Wild Swan v. U.S. Fish & Wildlife Service,* the court also rejected the very tactic employed here.  12 F. Supp. 2d 1121 (D. Or. 1997).  In that case, where FWS had previously found the bull trout to be endangered throughout the conterminous United States, the agency tried to circumvent that finding by divvying up the trout's range into five DPSs.  *Id.* at 1124.  The court rejected this misuse of the DPS tool, tellingly concluding (for this case as well) that "listing of population segments is a proactive measure to *prevent* the need for listing a species over a larger range – *not* a tactic for subdividing a larger population that USFWS has already determined . . . warrants listing throughout a larger range."  *Id.* at 1133.

Moreover, in erroneously deciding that the western Great Lakes wolf population is recovered in a significant portion of its range, the FWS failed to adequately justify the supposed "insignificance" of the potential habitat lying outside the boundaries of the DPS it created.  In the Final Rule, the FWS determined that all areas outside the core recovery area are not "significant" because they purportedly do not contain suitable wolf habitat.  For example, the FWS asserts that wolves will not occupy potential dispersal corridors – and that therefore these areas are not significant – because "vehicle collisions, shooting, and trapping have been removing all, or nearly all, the wolves that disperse into these areas," and this extirpation will continue after the delisting. 76 Fed. Reg. 81,700.  The logic of the FWS is again contrary to its mandate under the ESA – if wolf extirpation will continue in dispersal corridors, then wolves *need protection* in these areas, not abandonment to external human impacts.  In direct conflict with the ESA, the FWS's decision actively prevents dispersal and recovery of the species.  In addition, the FWS also wrote off potential habitat because it consists of "agricultural land, with high road densities, and high potential for wolves to depredate on livestock."  *See, e.g.*, *id.* at 81,722.

Under the ESA, a species must be afforded legal protections whenever it is threatened or endangered in "a significant portion of its range" as a result of "the present or threatened destruction, modification, or curtailment of its habitat or range," the "inadequacy of existing regulatory mechanisms," or "other . . . manmade factors affecting its continued existence." 16 U.S.C. §§ 1532(6), (20); 1533(a)(1)(A), (D), (E). The FWS's habitat assessment ignores these mandates, declaring large portions of the wolf's range "insignificant," and thus irrelevant to the agency's endangerment analysis, as a result of the very type of threats to the species that the ESA was designed to address. *See* 76 Fed. Reg. 81,700.

Additionally, as stated in the Final Rule, there is a distance of approximately 400 miles between the western boundary of the Great Lakes DPS and the nearest known gray wolf packs in Wyoming and Montana. 76 Fed. Reg. 81,671. That territory contains "scattered islands of possibly suitable habitat, such as the Black Hills of eastern Wyoming and western South Dakota." *Id.* Wolves have been known to disperse distances greater than 500 miles. 76 Fed. Reg. 81,674. Defendants concede that "[d]ispersers may range over large areas . . . [and] [t]hese dispersal movements allow a wolf population to quickly expand and colonize areas of suitable habitat that are nearby *or even those that are isolated by a broad area of unsuitable habitat*." Answer ¶ 45 (emphasis added). Moreover, Defendants aver that "lone dispersers are able to survive without a pack." Answer ¶ 44. But in violation of its mandate, FWS's Final Rule *removes* crucial dispersal/connecting territories, which Defendants recognize contains possibly suitable habitat, and which is part of the gray wolf's historical range. This action is unjustifiable, in light of the FWS's recognition that such dispersal occurs and could represent gains beyond the current five per cent occupancy of the historic range of *Canis lupus*.

The Final Rule is contrary to what the FWS understands is the correct, lawful approach, namely to first consider whether the whole species is threatened or endangered throughout a significant portion of its range. If that is answered affirmatively, then FWS must protect the species. *See* E-mail from Kelly Hornaday, FWS, to Maricela Constantino, FWS (Jan. 5, 2011, 1:36pm), AR 107 at 003107A ("The new approach is . . . that if you find a SPR is T/E, you list the

whole thing. . . .  If they really think they can *easily dismiss the areas as being unimportant* to the conservation of the species, then I think there is not much to worry about.").  The Great Lakes is one of very few areas in the historical range of the gray wolf species that still contain healthy members, so these wolves and this area of regeneration cannot rationally be "dismissed" as "unimportant" to the conservation of the species. Indeed, if these wolves are lost, this vital segment of the species – and the their chance for true recovery – may very well also be lost.

In short, the Final Rule distorts the appropriate population and range, and only conducts its pretextual analysis based on that restrictive view, in order to ignore the greater species listing and reach its foregone conclusion.  The FWS's position turns ESA policy on its head, with the agency identifying a tiny area where gray wolf recovery has begun, then claiming a healthy species exists based on that small percentage of recovery, then removing protection from that population *while ninety-five per cent of the species' historical range remains devoid of wolves*.  In issuing the Final Rule, the FWS drastically subverted the very purpose of the ESA – recovery of the entire species in its range – by delisting an isolated population and abandoning it to inadequate state control, despite the vital place of that group in species survival rangewide.

## C.     The FWS Cannot Use the DPS As a Delisting Tool.

In addition to ignoring the significant portion of the range requirement – a fatal flaw that requires vacatur of the Final Rule – the FWS improperly used the DPS tool to reduce species protection, which also renders the Final Rule arbitrary and capricious.  The ability to designate and list DPSs allows the FWS "to provide different levels of *protection* to different populations of the same species." *Trout Unlimited v. Lohn,* 559 F.3d 946, 949 (9th Cir. 2009) (emphasis added).  In other words, the FWS may list a DPS when listing at the species or subspecies level is not warranted, but where a local population of the species is facing additional threats. *Kempthorne*, 579 F. Supp. 2d at 11; *Defenders,* 354 F. Supp. 2d at 1169.[9]

---

[9] Contrary to assertions in the Solicitor's Opinion, the holding in *Defenders of Wildlife,* 354 F. Supp. 2d 1156, is consistent with this Court's ruling in *Kempthorne*.  Both courts recognized that

*(Footnote continued on next page)*

Congress intended the DPS to be a tool for the protection of species *in addition to* that protection already provided under the ESA, and directed the FWS to "*list* populations sparingly and only when the biological evidence indicates that such action is warranted."  S. Rep. No. 96-151, at 7 (1979), *reprinted in* ESA Legislative History at 1397; *Safari Club Int'l v. Jewell*, 2013 WL 4041541, at *4-*5 (D.D.C. Aug. 9, 2013) (emphasis added); *see also* 61 Fed. Reg. 4724. Congress further restrained the use of this tool by restricting the designation of DPSs to vertebrate fish and wildlife. 16 U.S.C. § 1532(16).  In other words, Congress was not willing to incur the costs of protecting DPSs of insect and plant species, and instead was focused on the protection of keystone species like the grizzly bear and gray wolf.  Katherine M. Hausrath, *The Designation of "Distinct Population Segments" Under the Endangered Species Act in Light of* National Association of Homebuilders v. Norton*, 80 Chi.-Kent L. Rev. 449, 455-56 (2005). Instructing the FWS to list DPSs "sparingly," and limiting its ability to use this tool for vertebrates only, would make little sense if Congress intended DPSs to be used for delisting purposes. Indeed, in examining the legislative history instructing the FWS "to use the ability to *list* [DPSs] sparingly," this Court noted that the legislative history "suggests that Congress thought of the DPS tool primarily – if not exclusively – as a tool for listing locally vulnerable populations."  *Kempthorne*, 579 F. Supp. 2d at 18 n.12 (citations omitted, emphasis in original). In this way, as the FWS itself has recognized, the DPS tool permits the agency to "protect and conserve species and the ecosystems upon which they depend before large-scale decline occurs that would necessitate listing a species or subspecies throughout its entire range."  DPS Policy, 61 Fed. Reg. 4725.  Moreover, there is no authority in the ESA for the FWS to delist a DPS simultaneous to its recognition and listing.  As this Court has previously recognized,

> Section 1533(c)(2)(B) does not suggest that the FWS may simultaneously designate and delist a previously unlisted sub-population of vertebrates within a broader listing. Rather, it quite

---

*(Footnote continued from previous page)*
the DPS Policy is intended to be used to protect DPSs, not to create DPSs in order to strip species of protections.  The FWS's use of it for the opposite ends violates the ESA.

> strongly suggests – consistent with common usage – that the *listing*
> of any species (such as the western Great Lakes DPS) is a
> precondition to the *delisting* of that species.

*Kempthorne*, 579 F. Supp. 2d at 17 (citing 16 U.S.C. § 1533(c)(2)(B)).  Finding the FWS had

"misread the statute," this Court vacated the delisting rule and ordered the FWS to explain, *inter*

*alia*, how its interpretation of the DPS rule could be consistent with the ESA's language and policies,

and how it might undermine the ESA's policy objectives.  *Id.* at 7 n.8, 20.

The FWS attempted to justify its illegal actions, but the *post hoc* Solicitor's Opinion falls

far short of the mark, focusing on inapposite arguments, failing to show how use of the DPS tool to

*destroy* federal protections meets congressional intent to *increase* species protections, or how the

FWS's *seriatim* abuse of the DPS tool serves the language or meaning of the ESA, and fails to

comply with this Court's remand order.

The Solicitor's Opinion states that an interpretation of the ESA requiring that a DPS be

listed before it be delisted would "requir[e the] FWS to reject any petition requesting removal of a

recovered DPS from a broader species listing."  AR 008 at 00497A.  This is precisely the problem:

how can there be a request to remove ESA protections from a DPS before the FWS has ever listed

the DPS?  The Solicitor's Opinion also states that whenever a species is listed and given

protections of the ESA, the "FWS impliedly lists *any* DPSs that are part of a larger species or

subspecies listing."  *Id.* (emphasis added).  It flies in the face of the congressional mandate to use

the DPS tool "sparingly" to suggest that any number of unidentified "implied" DPSs exist in all

vertebrate species listed under the ESA.  "Indeed, Congress expressed its reluctance to allow the

DPS authority to be used widely, and noted that it was 'aware of the great potential for abuse of

this authority.'"  *Safari Club Int'l*, 2013 WL 4041541, at *3, quoting S.Rep. No. 96–151, at 1397.

Equally unsound is the agency's position that when it identifies and delists a DPS on the same day,

it is merely "separately recognizing an already-listed entity for the first time because it now has a

different conservation status than the whole [species]."  AR 008 at 00497A. Where an agency's

interpretation of a statute is counter to the express mandate of Congress, that interpretation is not

entitled to deference. *S. Co. Servs., Inc. v. FCC,* 313 F.3d 574, 579 (D.C. Cir. 2002). No deference is owed here, where Congress intended the ESA and the DPS Policy to protect and conserve, and the FWS is using both to isolate and eliminate the gray wolf.

Perhaps most telling is the FWS's threat to game the system if it is not given its way here. Specifically, the Solicitor's Opinion suggests that if the Court again rejects its twisted application of the DPS tool, it can simply play around with species listings to achieve the same end result that it wants. *See* AR 008 at 00496A (the "FWS could achieve the same result by proposing to delist the entire species if it is no longer endangered or threatened over its entire range and simultaneously proposing to list any DPS or significant portion of its range where that species still remains endangered or threatened."). But this scenario suggests a power of the FWS that it does not have (delisting the entire species) and a scenario notably not before this Court.

The FWS's use of the DPS tool here flouts congressional intent and the DPS Policy itself. As discussed above, under the DPS Policy, a vertebrate population must be both "significant" and "discrete" to be designated as a DPS. 61 Fed. Reg. 4725. The Final Rule strips Great Lakes wolves of all ESA protections based on the illogical reasoning that those wolves are "significant . . . because [their] loss would result in a *significant gap* in the range of the taxon." 76 Fed. Reg. 81,672 (emphasis added). This statement highlights the absurdity of the Final Rule's invocation of the DPS Policy, and proves what this Court has suggested – that it makes no sense to designate a DPS solely for the purpose of delisting that species. *Kempthorne*, 579 F. Supp. 2d at 17. The Great Lakes is unequivocally one of the central hopes for dispersal and reintroduction of the gray wolf to the ninety-five percent of its historical range in which it has disappeared. Clearly this group needs protection, not rejection. Yet the folly of the Final Rule is that the FWS has reversed the basis for DPS designation here, opining that the possibly most significant population of wolves, in terms of contribution to the species' conservation and re-establishment, should be robbed of ESA protections. Under this logic, if the Great Lakes population were "insignificant", the FWS would not be permitted to designate a DPS and would instead be required to maintain the protections of the ESA.

"Congress enacted the ESA . . . to ensure the continued existence of species to perform vital biological services to maintain a balance of nature within their environments and provide for biological diversity for scientific purposes." *Safari Club Int'l*, 2013 WL 4041541, at *3 (internal quotations omitted). The Final Rule recognizes that the wolves in the western Great Lakes region make up seventy per cent of North American gray wolves occurring south of Canada, yet this is the very population – one that could disperse and recolonize areas of extirpation – that has been targeted for delisting. The FWS is ignoring its ESA mandate and jeopardizing the gray wolf's ability to recover in its range, by stripping protection from a group of wolves that provide some hope to the recovery of this protected species. 76 Fed. Reg. 81,672. Wolves have only started their slow progress from the brink of extinction, because of the ESA, in a few small pockets. Delisting through this abuse of the DPS process cuts off the wolves' recovery progress – certainly not what was intended when the DPS was conceived.

D.   **Even if the DPS Could Be Used As A Delisting Tool, The Boundaries of the DPS Are Arbitrary and Capricious and Contrary to the ESA.**

Even if a DPS could be created solely for delisting purposes – which, for the reasons stated above, it cannot – the boundaries should include, at most, core areas in which a population has fully recovered. But the DPS boundaries that the FWS created include vast areas that extend far beyond the wolf's current distribution. These boundaries, which appear to be nothing more than an attempt to *thwart* further wolf recovery, are contrary to the ESA's express directive that imperiled species "be afforded the highest of priorities." *Tenn. Valley Auth v. Hill*, 437 U.S. at 174.

In originally establishing the boundaries of the DPS in the 2007 delisting rule, the rule's principal author declared that the FWS has nearly unlimited discretion in establishing the boundaries of a DPS. *See* 2007 AR Doc. 58 at 232 ("The boundary can be placed anywhere between the population that is the subject of the DPS and any other populations of the same taxon – Period!"). Indeed, though the ESA stresses the need to make listing decisions based on the best available science, 16 U.S.C. § 1533(b)(1)(A), and virtually all the criteria used to designate DPSs are based on biological and ecological features, the principal author dismissed the

importance of these considerations for delineating DPS boundaries: "[I]t is difficult to see how FWS could be found to be 'arbitrary and capricious' *even if we established DPS boundaries based entirely on non-biological considerations*." 2007 AR Doc. 58 at 233 (emphasis added).

The FWS's position that it can essentially create whatever boundaries it wants has changed little since its prior attempt to delist wolves was overturned by this Court. *Compare* 72 Fed. Reg. 6058, Figure 1 *with* 76 Fed. Reg. 81,670 (Figure 1) (establishing the same boundaries for the Western Great Lakes DPS). The boundaries of the DPS established extend far beyond the wolf's current distribution. For example, the DPS once again includes extensive swaths of North Dakota, South Dakota, and other states, even though these areas have no viable reproducing wolf populations. Likewise, the western boundary of the DPS is approximately 200 miles outside of the wolf's current range. *See* 76 Fed. Reg. 81,670 (Figure 1). As the FWS explained, these boundaries were designed to include "a wolf movement zone around the core wolf populations." *Id.* at 81,683; *see also id. at* 81,673 (the DPS "includes the locations of most known dispersers from the core populations"). But establishing such broad boundaries is inconsistent with the "expansive protection intended by the ESA." *Defenders (lynx)*, 239 F. Supp. 2d at 19. When a DPS is established for purposes of *listing* a species, as it was intended, the use of wide boundaries – based on the species' dispersal distances – fits directly within the purpose of conservation, and provides the at-risk population greater protection and makes it more likely that it can recover across a significant portion of its range. But assuming a DPS could be created for delisting purposes as FWS again is trying – which it cannot, for the reasons stated above – the boundaries should include, at most, core areas in which a species has fully recovered. Retaining ESA protections for animals in dispersal corridors that leave the core recovery area promotes continued expansion across the species' historical range, as the ESA envisioned.

The negative effects of these expansive boundaries are particularly acute because of their interplay with the wolf management schemes – or lack thereof – of states in the Great Lakes region. For example, the Minnesota Plan divides the state into two management zones, and effectively corrals wolves into the northeast corner of the state. Outside that core area, Minnesota

landowners have wide authority to kill wolves.  Minnesota Wolf Management Plan (Feb. 2001), AR 005 at 000308A-000310A.  Minnesota's provisions create a virtual "free-fire zone" through which dispersing wolves must cross.  And prior to issuance of the Final Rule, Minnesota reneged on its promise to wait five years before authorizing a public hunt of wolves.  76 Fed. Reg. 81,703; *see also* AR 005 at 000308A ("[P]ublic taking (i.e., hunting and trapping seasons) or other options, will be considered by [MN] DNR in the future but *not sooner than 5 years after* Federal delisting by USFWS.") (emphasis added).  Such expansive hunting and trapping seasons further inhibit successful dispersal.  Even if wolves could successfully make it through this zone to reach the borders of neighboring states, like North and South Dakota, the lack of management plans in those jurisdictions would thwart any chance at wolf recovery.  Answer ¶ 102; 76 Fed. Reg. 81,682.

The courts have rejected previous attempts by FWS to reduce protections by creating DPSs with expansive boundaries.  In the 2003 downlisting rule, the agency drew boundaries for three DPSs that went far beyond the core wolf populations.  As the District of Vermont put it, "FWS simply cannot downlist or delist an area that it previously determined warrants an endangered listing because it 'lumps together' a core population with a low to non-existent population outside of the core area."  *Nat'l Wildlife Fed'n*, 386 F. Supp. 2d at 565; *see also Defenders*, 354 F. Supp. 2d at 1172 (expanded DPS boundaries were "not supported by sound biological principles" and thus violated the DPS policy).  The current DPS suffers from the same problem; its broad boundaries, and the lack of protections under state law, will imprison the wolf in core areas where recovery has already begun.  The boundaries therefore contravene the ESA's mandate to promote species recovery across a significant portion of its historical range.

> **E.      FWS's Decision to Delist Wolves Without Determining What Species Exist in the Region Demonstrates the Impropriety of Its Decision.**

As explained above, the FWS is required to make listing determinations "solely on the basis of the best scientific and commercial data available."  16 U.S.C. § 1533(b)(1)(A).  "The obvious purpose of the requirement . . . is to ensure that the ESA not be implemented haphazardly, on the basis of speculation or surmise."  *Bennett v. Spear*, 520 U.S. 154, 176-77 (1997).  Yet that is

just what the FWS has done here.  The administrative record unequivocally shows that once the FWS made the politically-driven decision to delist wolves in the Great Lakes, the specific substance of that decision *was not* based on science, but rather that the FWS played fast and loose with the facts in order to reach a hurried, pre-determined, and politically convenient result.  *See*, *e.g.*, AR 87 at 002822A ("Secretary Salazar agreed that we would have a . . . final rule completed by the end of 2011 (that presumably would delist WGL wolves)" after Senator Klobuchar planned to introduce delisting legislation); AR79 at 002773A (stating Senator's timing of press announcement was harmless because "[FWS] will always seek to remove wolves from ESA everywhere."); AR 451 at 011748A-0117449A (repeatedly citing FWS's "commitment" to Senator Klobuchar to delist gray wolves).  And a blinders-on decision to delist, based on the arbitrary desire to appease promises made to politicians to delist wolves in the Great Lakes, and do so by a certain date, violates the ESA.  *See*, *e.g.*, *Save Our Springs*, 27 F. Supp. 2d at 747 (agency must "disregard politics" and acts arbitrarily and capriciously when it "consider[s] political factors in making [its] listing decision").  The record demonstrates that the agency acted with conscious disregard of what species it delisted, and delisted a DPS that very well may contain two separate species.  Such an approach violates the ESA and basic principles of administrative law.

### 1.    *The FWS Arbitrarily Delisted Wolves to Appease Political Interests Without Even Identifying the Affected Species.*

The facts here are telling.  It was only a matter of months between the Proposed Rule, in which Defendants said "[w]ith regard to Canis lycaon, [we are] announcing a rangewide status review of this species, which occurs in Canada and the western Great Lakes region," 76 Fed. Reg. 26,090, and the Final Rule, in which Defendants said "[we are] at this time continuing to recognize C. lupus as the only species that occurs in the Great Lakes."  76 Fed. Reg. 81,669.  There is no plausible explanation, other than the time pressure from the political side, for this reversal.  The record does not adequately identify a viable species, and Defendants cannot, on that basis, establish that a gray wolf DPS in the Great Lakes region properly exists.  The FWS's failure at this basic level constitutes arbitrary and capricious conduct in violation of the ESA.

Four years ago, the FWS recognized that any delisting of a DPS required "new taxonomic information." AR 14 at 000823A. But it still has not obtained that vital information, yet it decided to delist anyway. The FWS admits in the Final Rule that there is ongoing confusion and uncertainty regarding the best taxonomy based on *current science* for wolves across the United States. 76 Fed. Reg. 81,669. The recent Chambers manuscript that Defendants considered so significant as to warrant reopening the period for public comment on the Proposed Rule states that

> [t]he recent scientific proposal that the eastern wolf, Canis lupus lycaon, is not a subspecies of gray wolf, but a full species, Canis lycaon, is well-supported by both morphological and genetic data and should be accepted. This species' range extends westward to Minnesota, and it hybridizes with gray wolves where the two species are in contact in eastern Canada, the Upper Peninsula of Michigan, Wisconsin, and Minnesota.

AR 484 at 012082A. In other words, according to the FWS's own experts, there are probably multiple species in the delisted DPS – which is impermissible. Responding to comments received on the Proposed Rule indicating that FWS had to account for hybridization of wolf species in the Great Lakes region, FWS simply stated its position in the Final Rule as follows: "In light of the ongoing scientific debate, and *the lack of clear resolution concerning the taxonomy of wolves in the western Great Lakes*, we are at this time continuing to recognize C. lupus as the only species that occurs in the Great Lakes." AR 651 at 019762A-019763A; 76 Fed. Reg. 81,681 (emphasis added). Put more simply, "we don't know, and we want to issue the Final Rule right away, so we are going to substitute convenience for science." The agency's decision begs the question why Defendants are taking any delisting action at all at this time given the "lack of clear resolution" regarding species in the region. That question is answered in the record – Defendants moved ahead with delisting to prevent political backlash. *See, e.g.*, AR 66 at 002732A (letter from Sen. Klobuchar "urg[ing the Secretary] to expedite the delisting"); AR 87 at 002822A ("Secretary Salazar agreed that we would have a . . . final rule completed by the end of 2011" because Senator Klobuchar planned to introduce delisting legislation); AR 99 at 002847A ("As you've no doubt

heard, the Service committed to Senator Amy Klobuchar (D-MN) to delist (presumably) Western

Great Lakes wolves by the end of 2011").

In violation of the ESA, agency discussions over delisting wolves in the eastern United

States and in the Great Lakes region did not focus primarily on whether the agency's decision

"conform[ed] to the dictates of the best available science" but rather whether the option

"[m]aintain[ed] [the agency's] commitment to Sen. Klobuchar for a final determination by

December 2011." AR 451 at 011748A. But "judgments [regarding a species' conservation status]

must be made within the context of the law, and the mandate of Congress cannot be altered or

diminished to satisfy political or other purposes that are contrary to the plain meaning of the ESA."

*Defenders of Wildlife*, 729 F. Supp. 2d at 1210; *see also Defenders*, 354 F. Supp. 2d at 1170 (the

FWS's desire to delist the gray wolf as quickly as possible was an improper factor to consider).

It is clear that Defendants have not done the work needed to determine scientifically which

species are present in the Great Lakes region. Defendants issued the Final Rule challenged here

without the requisite knowledge, and without a viable resolution of the species present in the Great

Lakes region – a vital determinant when considering delisting.  Instead, Defendants promised

political figures that a Great Lakes wolf delisting would happen by date certain, and science was

dropped from the equation.  And if the administrative record was not already sufficiently

contradictory, after publishing this Final Rule declaring all Great Lakes wolves to be *Canis lupus*,

Defendants have since proposed another delisting rule for gray wolves in which they assert that the

Great Lakes region contained *Canis lycaon*, a separate species from *C. lupus*, and in which they

recognize three wolf species with ranges in the contiguous U.S.  78 Fed. Reg. 35,670.

In short, in deciding to delist wolves in the Great Lakes, the FWS did nothing more than

guess what species might exist in the Great Lakes, cross their fingers and hope that guess turns out

to be right, cherry-picking certain facts in an attempt to support its guess in the process.  That

guesswork impermissibly imperils the continued recovery of the gray wolf and is the essence of

arbitrary agency decision-making.  *San Luis v. Badgley*, 136 F. Supp. 2d 1136, 1147-52 (E.D. Cal.

2000) (FWS's final rule listing the Sacramento splittail as threatened under the ESA was arbitrary

and capricious where at the time the rule was promulgated, FWS was aware of conflicting data regarding population size and where final rule failed to show relationship between data relied upon and conclusion regarding conservation status).  Defendants' publishing of a later proposed rule recognizing *Canis lycaon* lays bare the lack of scientific justification for this challenged Final Rule. 78 Fed. Reg. 35,670.

## 2. *The FWS Cannot Delist A DPS With Potentially Multiple Species.*

Setting aside the political motivations for Defendants' actions, the Final Rule is *de facto* arbitrary and capricious because it improperly designates a DPS that may very well contain more than one species.  By definition, a DPS contains a population of a single species.  16 U.S.C. § 1532(16); 61 Fed. Reg. 4725.  Where the taxonomy of various species is unknown, the FWS may not properly designate a DPS of a "species" without definitively establishing *which species* are affected thereby.  And a DPS designation, where the agency has not taken the time to figure out what species is at issue, flies directly in the face of the congressional requirement that a DPS be used only "'sparingly' and only in instances 'when the biological evidence indicates that such action is warranted.'"  *Safari Club Int'l*, 2013 WL 4041541, at *5 (quoting S. Rep. No. 96-151, at 1397 (1979), *reprinted in* ESA Legislative History at 1397).

The DPS Policy is in accord, as it mandates that "the term 'distinct population segment' be interpreted in a clear and consistent fashion."  61 Fed. Reg. 4722.  Consistency in DPSs requires at a minimum knowing what species exist in a DPS. In assessing a potential DPS, the FWS must consider the "[d]iscreteness of the population segment in relation to the remainder of *the species to which it belongs*." *Id*. at 4725 (emphasis added).  The DPS Policy also requires that FWS determine "the significance of the population segment to *the species to which it belongs*." *Id*. (emphasis added).  In other words, a DPS designation must be exacting, and with the level of planned uncertainty present on the current record, use of the DPS tool is entirely inappropriate. Indeed, the record reveals that FWS *repeatedly* conceded the taxonomy of wolves in the Great Lakes region does not permit application of a DPS under the plain language of the ESA.  Then, despite all its own internal concession, it designated one anyway.

In 2009, the agency announced that the eastern wolf (*Canis lycaon*) had a range that "encompasse[d] the Great Lakes population, southeastern Canada, and the northeastern U.S." North American Wolf Recovery Structured Decision Making Project – Report (Nov. 20, 2009), AR 14 at 000811A. Furthermore, one alternative described for a Great Lakes DPS was "[a] DPS of *C. lycaon lycaon* in the U.S. Great Lakes (northern Minnesota, Wisconsin, Michigan), using the international boundary with Canada – i.e., the status quo DPS, but either designated for *lycaon* or for both *C. lupus nubilus* and *C. lycaon lycaon based on new taxonomic information* (Chambers et al. 2009)."  AR 14 at 000823A (final emphasis added).  Given this uncertainty, the FWS was required to reach a scientifically-based conclusion in order to designate a DPS.

As of December 3, 2010, the FWS planned to delist the gray wolves in the Great Lakes while "acknowledging that the population of wolves that inhabits the western Great Lakes region is a mixed population of two species and their hybrids."  AR 62 at 002478A.  But only a few months after FWS said that the wolves in the Great Lakes are *C. lupus* and *C. lycaon*, it delisted all of the wolves in the Great Lakes as *C. lupus*.  76 Fed. Reg. 81,669.  The FWS recognized internally the fallacy of its approach to delisting the gray wolf in the Great Lakes in the face of this taxonomic conclusion.  *See*, *e.g.*, AR 101 at 002871A (Comment [m13]:  "In the event that the Service adopts this approach [of delisting the DPS as *C. lupus*] a rationale for how this is consistent with the Act will be needed."); *id.* at 003086A (Comment [m50]:  "Please consult with Chambers and Fain on the possibility of proposing that 1/3 of the wolves are C. lupus such that a status assessment could be conducted on that portion of the population.  Such an approach would be more consistent with our DPS policy.  As I recall the ARDs *did not support identifying a DPS that contained two species* and I think it would be a significant legal vulnerability.") (emphasis added).

Similarly, as of February 2011, Defendants' draft of the Proposed Rule "recognize[d] recent taxonomic revisions that elevate the subspecies *Canis lupus lycaon* to a full species *C. lycaon*" and recognized that "*C. lycaon* intercrosses with *C. lupus* in the western Great Lakes region, to establish a population composed of an assembly of *C. lupus*, *C. lycaon*, and their hybrids." *Proposed Great Lakes DPS Delisting Draft dated 14 February, 2011, Preliminary*

*review with multiple comments* (Feb. 14, 2011), AR 191 at 004153A.  This same version of the

Proposed Rule stated that

> [w]olves identified through genetic analyses as *C. lycaon* currently
> comprise a distinct population of this species in the western Great
> Lakes region with range boundaries that coincide with the *C. lupus*
> DPS.  Based upon legal and policy constraints that *do not allow
> identification of a DPS consisting of multiple species*, we are
> identifying a separate but overlapping western Great Lakes DPS of
> *C. lycaon* and proposing its concurrent delisting with the western
> Great Lakes *C. lupus* DPS.

AR 191 at 004161A-004162A (emphasis added); *see also* AR 451 at 011749A ("The Great Lakes

DPS is an odd entity with respect to the ESA and is based on the Chambers et al. interpretation of

taxonomy."); E-mail from Laura Ragan, FWS to Lynn M. Lewis, FWS (Mar. 7, 2011, 3:36 p.m.),

AR 238 at 005804A ("The presence of two species of wolves in the Great Lakes presents

procedural challenges . . ."); Notes from Call with FWS personnel on the preliminary review draft

of the WGL wolf proposal (Mar. 3, 2011), AR 235 at 005788A ("This is not a delisting action for 2

DPSs. . . .   My concern about this approach is that we will need to explicitly state that all individual

wolves in the Great Lakes are considered to be currently protected under the Act. . . .  [W]e believe

that neither species warrants listing under the Act in the Great Lakes.").

The FWS's own discomfort with its action is clear.  These communications reveal that, in

just a few short months, the FWS bounced back and forth between saying that there are two wolf

species in the Great Lakes region, then realizing the problem with that under the DPS Policy (i.e, it

would not allow the delisting of wolves in the Great Lakes), and then declaring that all of the

wolves in the Great Lakes are *Canis lupus* for purposes of delisting the DPS, without ever doing

the necessary analysis to determine if that declaration was in fact scientifically accurate.[10]  FWS's

---

[10] The FWS's reliance on the Recovery Plan for the Eastern Timber Wolf, 76 Fed. Reg. 81,675,
highlights the arbitrary nature of its decision.  This outdated 1978 plan, revised in 1992, focuses
on the eastern timber wolf (Canis lupus lycaon), a subspecies that lost relevance as a listed entity
when the FWS listed the gray wolf as a species in 1978.  In fact, in the Proposed Rule, the FWS
claimed that the subspecies formerly known as the Eastern Timber Wolf was actually a wholly
different species from the gray wolf – which the FWS decided to call the "eastern wolf."  76 Fed.

*(Footnote continued on next page)*

cavalier approach to particularizing which species are delisted by the Final Rule is contrary to the plain language of the ESA and fundamental concepts of administrative law that require agency decisions to be based on reasoned decisionmaking.  *See*, *e.g.*, *WildEarth Guardians v. Salazar*, 741 F. Supp. 2d 89, 97 (D.D.C. 2010).

Faced with the option of keeping its political promise to Senator Klobuchar to delist gray wolves in the Great Lakes, and do so by a particular date, AR 472 at 012039A (assuring plans for "final rule date . . . for December 31, 2011, as promised"), or creating a DPS composed of at least two species, AR 101 at 003086A, Comment [m50], the agency chose to arbitrarily delist all of the wolves in this Final Rule as *Canis lupus*, despite the mountains of contradictory available scientific data, for the simple reason that the FWS did not want to have to defend a DPS containing two species because "*that would be a significant legal vulnerability*."  *Id*. (emphasis added).

### 3. *Because the Species in the Great Lakes is Uncertain, Any "Significance" Finding is Arbitrary and Capricious.*

The FWS's inability to identify which species are in the Great Lakes also precludes its ability to reach the "significance" finding required by the DPS Policy.  Under the DPS Policy, if FWS determines that a population segment is discrete, it "next consider[s] available scientific evidence of *its significance to the taxon* to which it belongs."  AR 651 at 019743A (emphasis added).  This consideration may include:  (1) persistence of the DPS in an ecological setting unusual or unique for the taxon; (2) evidence that loss of the DPS would result in a significant gap in the range of the taxon; (3) evidence that the DPS represents the only surviving natural occurrence of a taxon that may be more abundant elsewhere as an introduced population outside its historic range; and/or (4) evidence that the DPS differs markedly from other populations of the species in its genetic characteristics.  *Id*.

---

*(Footnote continued from previous page)*

Reg. 26,088–89.  The FWS cannot rely on a recovery plan for what it now believes to be a separate species that does not exist in the Great Lakes region to delist gray wolves in the Great Lakes.

Defendants concluded in the Final Rule that only the second "significance" factor applied to the Great Lakes DPS, i.e., whether loss of the DPS would result in a significant gap in the range of the taxon.  *Id.*  And it concluded that the second factor demonstrated that the Great Lakes wolves were significant because

> [t]he successful restoration of a viable gray wolf metapopulation (a regional group of connected populations of *a species*) to large parts of Minnesota, Wisconsin, and Michigan has filled a significant gap in the holarctic range of gray wolves in the United States, and it provides an important extension of the range of gray wolves in North America. The loss of the Great Lakes gray wolf population would, therefore, represent a significant gap in the species' holarctic range.

*Id.* (emphasis added).  However, the FWS cannot reasonably conclude that the DPS is significant with respect to the *Canis lupus* species listing when the FWS has not taken the time to figure out what species it is delisting – and that potentially as little as one-third of the wolves in the Great Lakes region are gray wolves (*Canis lupus*), while another one-third are *Canis lycaon*, and another one-third are hybrids of those two (and possibly other) species.  AR 101 at 003086A.  Defendants made their "significance" determination by ignoring the scientific findings regarding the separate species in the Great Lakes region; instead, Defendants arbitrarily labeled all of the wolves in the Great Lakes region *Canis lupus*, regardless of their actual species or subspecies classifications.  76 Fed. Reg. 81,669.  An agency decision that is so obviously result-oriented is the epitome of an arbitrary and capricious decision.

As established above, DPS designations rely, as a threshold, on scientifically reliable species determinations.  Defendants must be able to accurately describe and analyze each species that would be covered by a potential DPS to determine whether *each* of those present species satisfies any of the significance factors of the DPS Policy.  *See Am. Forest Res. Council v. Ashe*, 2013 WL 1289724, at *10 n.3 (D.D.C. Mar. 30, 2013) (ordering remand for DPS significance determination where FWS found that a tri-state population of murrelets was significant; question of whether central California murrelets should have been included in the DPS affected whether

FWS's significance finding would hold where significance was based on potential loss in range and potential loss in genetic characteristics that were only in the central California murrelets). Because they did undertake that analysis before delisting the Great Lakes wolves DPS, the delisting decision is arbitrary, capricious and not in accordance with the ESA.

**F.      Inadequate Regulatory Mechanisms Prevent Delisting.**

Delisting decisions require the FWS to "consider the five statutory factors" and "decision[s] to delist 'shall be made in accordance' with the same five factors." *Friends of Blackwater*, 691 F.3d at 432 (quoting 16 U.S.C. § 1533(a), (c)). The agency is bound to "include an evaluation of threats that existed at the time of listing, those that currently exist, and those that could potentially affect the species once the protections of the Act are removed." 76 Fed. Reg. 81,687.

The FWS cannot strip gray wolves of ESA protections because, in light of other threats to the species, there are inadequate regulatory mechanisms to protect wolves. *See*, *e.g.*, 16 U.S.C. § 1533(a)(1)(D), (E). The evidence is clear that the states within the western Great Lakes DPS have failed, and will fail, to provide regulatory mechanisms adequate to protect the gray wolf in the face of human threats to wolves' continued existence. 16 U.S.C. § 1533(a)(1)(D), (E). And Defendants' interest in appeasing the states with this delisting – again placing political considerations over those required under the ESA – is clear from the record. *See*, *e.g.*, AR 451 at 011749A ("The States have an incredible vested interest in getting to a decision that is [the] most legally defensible decision possible. . . . A final delisting that is in effect by March will provide the States (particularly MI WI) a window of spring depredation control before any potential litigation."). Given this information, it is hardly surprising that FWS has presumed that the states will properly and adequately protect gray wolves in the absence of federal protections.

The ESA prohibits the agency from turning over protection of imperiled wildlife to the void of non-existent regulatory mechanisms. Rather, consistent with the statutory word "regulatory" – the adjective form of "regulate," meaning "to control, govern, or direct by rule," 13 *Oxford English Dictionary* 524 (2d ed. 1989) – the ESA demands that conservation measures be

embodied within specific legal mandates with "some method of enforcing compliance." *Or. Natural Res. Council v. Daley*, 6 F. Supp. 2d 1139, 1155 (D. Or. 1998). That is especially true here where only three of nine involved states have wolf management plans, and the FWS admits that "human-caused mortality is the most significant issue influencing" wolf-population levels in the Great Lakes, and that it must be "adequately regulated." 76 Fed. Reg. 81,721, 81,682.[11]

In the past, when the FWS has removed federal protections, affected states have done the same. Not surprisingly, the only three states with wolf management plans have immediately reacted to the Final Rule by making wolves more vulnerable to human-caused mortality. For instance, just three months after the Final Rule went into effect, the Wisconsin legislature mandated emergency rulemaking in order to begin active hunting and trapping of that state's wolves. *See* Wis. Stat. § 29.185 (2012). Wisconsin's quota for the 2012-2013 hunting season was set at 201 wolves, about 26 percent of the estimated wolf population in the state. Wisconsin Dept. of Natural Resources, *Wisconsin Wolf Season Report 2012*, available at http://dnr.wi.gov/topic/hunt/documents/WolfReport.pdf.

Minnesota also reacted quickly to the prospect of unprotected wolves. After the FWS issued its Proposed Rule on May 5, 2011, Minnesota state law was changed to allow immediate hunting of wolves as soon as they were delisted. *See* Minn. Stat. § 97B.647 (2012). This unequivocally disproves the FWS's "reasonable and proper [assumption] that the three State wolf plans w[ould] not be significantly changed . . . in a manner that would jeopardize the viability of any State's wolf population" following federal delisting. 76 Fed. Reg. 81,686. And even if, contrary to its stated intent, Minnesota had kept its promise not to kill wolves for a limited time, 76 Fed. Reg. 81,717, this simply demonstrates that the state is willing to appease the FWS during its five-year post-delisting monitoring (16 U.S.C. § 1533(g)(1)) but will be free to aggressively hunt

---

[11] Defendants' claim that wolf management plans "are only needed for" three of the nine states affected by the DPS delisting, AR 651 at 019764A; 76 Fed. Reg. 81,632, relies on their own violations of the ESA. That is, there is only no need for other plans because the Final Rule actively and improperly prevents the dispersal of wolves to any of the other involved states.

wolves as soon as the federal eye is not on the state's management plan and is not scrutinizing post-delisting state activities.  Lastly, just as Minnesota and Wisconsin did, in December of 2012 Michigan enacted a law designating the wolf as a game species and authorizing the state's Natural Resources Commission to establish a recreational wolf hunting and trapping season.  *See* Mich. Comp. Laws § 324.43526 (2012).

Even without this clear state intent to further harm the wolf populations, the management plans in Minnesota, Wisconsin, and Michigan on which Defendants *relied* to delist the DPS would permit at least a fifty percent decline in the Great Lakes wolf population from what it was when the wolves lost ESA protections.  *See* 76 Fed. Reg. 81,677-78, 81,700 (summarizing the state plans that provide a minimum population of 1,600 in Minnesota, a 350 population target (250 minimum) for Wisconsin, and minimum population of 200 in Michigan, compared to the most recent population counts).  Notably, the killing of wolves in Minnesota – at a time when the wolves *were* federally protected – saw the "highest two-year consecutive total" of killings in 2009 and 2010, in which 195 and 192 wolves, respectively, were killed.  76 Fed. Reg. 81,702.  That number is only likely to increase now that federal protections have been removed.

In addition, Defendants relied on the state management plans even though the plans were not designed specifically to respond to managing wolves after this Final Rule was enacted, and were incomplete.  Wisconsin was supposed to be in the process of "updating" and "increasing the state management goal" prior to 2010, but on December 2, 2010, the FWS confirmed that the plan was still "due for revision" and on hold.  AR 058 at 002206A; *see also* 76 Fed. Reg. 81,709 (noting future changes to Wisconsin's Wolf Management Plan that will contain more specific management measures).  FWS cannot rely on regulatory mechanisms that are not actually "*existing*" at the time that it adopted the Final Rule.  16 U.S.C. § 1533(a)(1)(D).  This court has affirmed that "promises of proposed future actions" are no substitute for regulatory mechanisms.  *Southwest Ctr. for Biological Diversity v. Babbitt,* 939 F. Supp. 49, 51 (D.D.C. 1996) (the FWS "cannot use promises of proposed future actions" in a Section 4(a)(1) listing determination).

Setting aside the incomplete revisions to outdated state plans, what Defendants had to rely on when publishing the Final Rule was and is woefully inadequate to ensure wolves' survival absent ESA protections.  For instance, Wisconsin's state wolf plan increases depredation efforts by allowing wolves to be taken from a wider radius around any depredation site.  76 Fed. Reg. 81,705 (wolves may be killed within a one-mile radius of a site where livestock, poultry, or pets have been killed).  Similarly, under the Minnesota Wolf Management Plan, landowners within "Zone B" – which is approximately 60% of the state – may kill a wolf "to protect[] livestock, domestic animals, or pets," even when there is no immediate threat, and without interpretation of the scope of that "protection".  AR 005 at 000308A-000310A.[12]  Defendants arbitrarily and capriciously concluded that these state management plans were adequate to ensure wolves' protection, and the states have rushed to follow the federal government's lead by further reducing even state-level protections for gray wolves.  Because FWS failed to rationally support its determination that wolves in the Great Lakes are not endangered by human-caused mortality and inadequate regulatory mechanisms, the FWS's decision to delist wolves in the Great Lakes was arbitrary, capricious and contrary to the ESA.  Thus the Final Rule should be vacated.

## V.     CONCLUSION

In its effort to reach a pre-determined and politically convenient result – that wolves in the Great Lakes would be delisted by a date certain – the FWS has circumvented clear requirements of the ESA, basic tenets of administrative law, and this Court's 2008 remand order, sacrificing true

---

[12] The Minnesota plan also authorizes the establishment of "predator control area[s]" to take wolves near a depredation site.  *Id.*, AR 005 at 000310A.  These zones, which can remain open for approximately seven months, can be established up to five years after the depredation incident.  *Id.*  In fact, the Minnesota plan goes so far as to resurrect the old bounty system by paying state-certified predator controllers $150 for each wolf killed.  *Id.*

wolf recovery in the process.  Therefore, Plaintiffs respectfully request that this Court vacate the

Final Rule[13] and restore federal protections to wolves in the Great Lakes region.


Dated:  September 6, 2013          By:   _/s/ Bruce A. Wagman_____
                                        Bruce A. Wagman, Admitted *pro hac vice*
                                        bwagman@schiffhardin.com
                                        SCHIFF HARDIN LLP
                                        One Market, Spear Street Tower
                                        Thirty-Second Floor
                                        San Francisco, CA  94105
                                        (415) 901-8700
                                        (415) 901-8701 (facsimile)

                                        Ralph Henry, D.C. Bar No. 982586
                                        rhenry@humanesociety.org
                                        The Humane Society of the United States
                                        2100 L Street, NW
                                        Washington, DC  20037
                                        (202) 452-1100
                                        (202) 778-6132 (facsimile)

                                        *Attorneys for Plaintiffs The Humane Society of*
                                        *the United States; Born Free, USA; Help Our*
                                        *Wolves Live ("HOWL"); and Friends of Animals*
                                        *and Their Environments ("FATE")*


## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was today served via the Court's CM/ECF system on all counsel of record.

                                        _/s/Bruce A. Wagman_____
                                        Bruce A. Wagman, Admitted *pro hac vice*
                                        Attorneys for Plaintiffs

35026-0010
SF\320789187.1

---

[13] Because Defendants' actions violated the ESA on numerous grounds, vacatur of the Final Rule is warranted.  *See Kempthorne*, 579 F. Supp. 2d at 21 (vacating 2007 DPS delisting rule given rule's "fundamental" deficiency of not being obviously reconcilable with the ESA's mandate and "the ESA's preference for protecting endangered species counsel[ing] strongly in favor of vacat[ur]"); *Defenders*, 354 F. Supp. 2d at 1174 (vacating the 2003 wolf downlisting rule).