# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| THE HUMANE SOCIETY OF THE UNITED STATES, et al., | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| S.M.R. JEWELL, et al., | ) ) |
| Defendants. | ) ) ) ) |

Civil Action No. 1:13-cv-00186-BAH

**ORAL ARGUMENT REQUESTED**

### Federal Defendants' Cross-Motion for Summary Judgment

Pursuant to Federal Rule of Civil Procedure 56 and Local Civil Rule 7(h), Federal Defendants hereby cross-move for summary judgment on all claims in Plaintiffs' Complaint and submit the following memorandum in support of that cross-motion and in opposition to Plaintiffs' motion for summary judgment.

Dated: December 4, 2013

Respectfully submitted:
ROBERT G. DREHER,
Acting Assistant Attorney General
U.S. Department of Justice
Environment & Natural Resources Division
SETH M. BARSKY, Chief
KRISTEN L. GUSTAFSON, Assistant Chief
Wildlife & Marine Resources Section

/s/ *Andrea Gelatt*
Andrea Gelatt, Trial Attorney
Ben Franklin Station, P.O. Box 7611
Washington, DC 20044-7611
(202) 305-0388 | (202) 305-0275 (fax)
andrea.gelatt@usdoj.gov
*Attorneys for Federal Defendants*

Of Counsel:
Sharon Pudwill
Attorney Advisor
Twin Cities Field Solicitor's Office
5600 American Boulevard West, Suite 270
Bloomington, MN  55437-1173
(612) 713-7100 | (612) 713-7121 (fax)

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| THE HUMANE SOCIETY OF THE UNITED STATES, et al., | ) ) | Civil Action No. 1:13-cv-00186-BAH |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| S.M.R. JEWELL, et al., | ) ) | |
| Defendants. | ) ) ) | |

**Federal Defendants' Memorandum of Points and Authorities**
**In Support of Cross-Motion for Summary Judgment and in**
**Opposition to Plaintiffs' Motion for Summary Judgment.**

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................................. 1

BACKGROUND .................................................................................................................. 2

  I.    THE ENDANGERED SPECIES ACT ................................................................ 2
  II.   THE DPS POLICY ............................................................................................. 3

FACTUAL & REGULATORY BACKGROUND ................................................................ 5

  I.    FACTUAL BACKGROUND ............................................................................. 5
  II.   REGULATORY BACKGROUND .................................................................... 6
  III.  THE FINAL RULE ............................................................................................ 8

STANDARD OF REVIEW ................................................................................................ 12

ARGUMENT ..................................................................................................................... 13

  I.    FWS REASONABLY DELINEATED THE EXPANDED BOUNDARIES OF THE MINNESOTA 1978 POPULATION LISTING AND FOUND THAT THE CONSERVATION STATUS OF THE RESULTING WGL DPS WAS NEITHER THREATENED NOR ENDANGERED. ......................................................... 14

  II.   THE WESTERN GREAT LAKES DPS'S BOUNDARIES WERE PROPERLY DELINEATED. .................................................................................................. 21

  III.  FWS IN THE FINAL RULE RATIONALLY DETERMINED THE GRAY WOLF IN THE WGL DPS IS NOT THREATENED OR ENDANGERED IN A SIGNIFICANT PORTION OF ITS RANGE. ............................................................................... 25

  IV.  FWS'S DECISION TO DELIST THE WGL DPS GRAY WOLF WAS BASED ON SCIENTIFIC CONSIDERATION, NOT POLITICAL INTERFERENCE. ..................... 33

  V.   FWS CONSIDERED THE BEST AVAILABLE SCIENCE ON WOLF TAXONOMY AND DECIDED THAT ALL WOLVES IN THE WGL DPS ARE GRAY WOLVES, A DECISION ENTITLED TO DEFERENCE. .................................................... 37

  VI.  FWS'S DETERMINATION ABOUT THE ADEQUACY OF REGULATORY MECHANISMS WAS REASONABLE. ......................................................... 41

CONCLUSION .................................................................................................................. 44

# TABLE OF AUTHORITIES

CASES                                                                                          PAGE

*Am. Forest Res. Council v. Ashe*, 2013 WL 1289724 (D.D.C. Mar. 30, 2013)............................ 41

*Am. Wildlands v. Kempthorne*, 530 F.3d 991 (D.C. Cir. 2008)........................................ 13, 38, 39

*Amfac Resorts, LLC v. U.S. Dep't of Interior*, 143 F. Supp. 2d 7 (D.D.C. 2001)................... 13, 40

*AT&T Corp. v. FCC*, 448 F.3d 426 (D.C. Cir. 2006) .................................................... 12

*Baltimore Gas & Elec. Co. v. Natural Res. Def. Council*, 462 U.S. 87 (1983)............................ 13

*Biodiversity Legal Found. v. Babbitt,* 943 F. Supp. 23 (D.D.C. 1996)................................. 36, 42

*Bldg. Indus. Ass'n v. Norton*, 247 F.3d 1241 (D.C. Cir. 2001) ....................................... 37

*C & W Fish Co. v. Fox*, 931 F.2d 1556 (D.C. Cir. 1991)............................................... 40

*Chevron, U.S.A. v. Natural Res. Def. Council*, 467 U.S. 837 (1984) .................................... 26, 27

*Citizens to Pres. Overton Park v. Volpe*, 401 U.S. 402 (1971) ...................................... 33

*City of Arlington v. F.C.C.*, 133 S. Ct. 1863, 1867, 1874............................................. 20

*Colo. River Cutthroat Trout v. Salazar*, 898 F. Supp. 2d 191 (D.D.C. 2012) ....................... 22, 28

*Cytori Therapeutics v. FDA*, 715 F.3d 922 (D.C. Cir. 2013) ......................................... 31

*Defenders of Wildlife v. Hall*, 807 F. Supp. 2d 972 (D. Mont. 2011)........................................ 34

*Defenders of Wildlife v. Kempthorne*, 535 F. Supp. 2d 121 (D.D.C. 2008) ................................ 28

*Defenders of Wildlife v. Norton*, 258 F.3d 1136 (9th Cir. 2001) ......................................... 26, 29

*Defenders of Wildlife v. Salazar*, 729 F. Supp. 2d 1207 (D. Mont. 2010)................................... 25

*Defenders of Wildlife v. U.S. Dep't of Interior*, 354 F. Supp. 2d 1156 (D. Or. 2005) .......... passim

*Ethyl Corp. v. EPA*, 541 F. 2d 1 (D.C. Cir. 1976) (en banc) ........................................ 39

*Envtl. Def. Fund v. Costle*, 657 F.2d 275 (D.C. Cir. 1981) ........................................ 13

*Fla. Power & Light Co. v. Lorion*, 470 U.S. 729 (1985)................................................ 13, 40, 43

*Franks v. Salazar*, 816 F. Supp. 2d 49 (D.D.C. 2011)................................................................. 12

*\*Friends of Blackwater v. Salazar*, 691 F.3d 428................................................................. passim

*Greater Yellowstone Coal. v. Servheen*, 665 F.3d 1015 (9th Cir. 2011) ...................................... 29

*Humane Soc'y v. Kempthorne*, 579 F. Supp. 2d 7 (D.D.C. 2008) ......................................... passim

*In re Polar Bear ESA Listing & 4(d) Rule Litig.*, 794 F. Supp. 2d 65 (D.D.C. 2011), *aff'd* 709

    F.3d 1 (D.C. Cir. 2013) ....................................................................................... 18, 21, 22, 44

*Maine v. Norton*, 257 F. Supp. 2d 357 (D. Me. 2003)..................................................................... 4

*Marsh v. Or. Natural Res. Council*, 490 U.S. 360 (1989) ............................................................ 13

*Menkes v. U.S. Dep't of Homeland Sec.*, 637 F.3d 319 (D.C. Cir. 2011) ........................ 20, 21, 26

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983)...................... 12

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967 (2005) ............... 18, 26

*Nat'l Wildlife Fed'n v. Norton*, 386 F. Supp. 2d 553 (D. Vt. 2005)...................................... passim

*NetworkIP, LLC v. FCC*, 548 F.3d 116 (D.C. Cir. 2008) .............................................................. 12

*Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55 (2004).......................................................... 12

*Nw. Ecosystem Alliance v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136 (9th Cir. 2007) ........... 4, 19

*Oceana, Inc. v. Locke*, 725 F. Supp. 2d 46 (D.D.C. 2010) ........................................................... 34

*Oceana, Inc. v. Locke*, 831 F. Supp. 2d 95 (D.D.C. 2011) ........................................................... 13

*Rural Cellular Ass'n v. FCC*, 588 F.3d 1095 (D.C. Cir. 2009).................................................... 13

*Safari Club Int'l v. Jewell*, -- F. Supp. 2d --, 2013 WL 4041541 (D.D.C. Aug. 9, 2013)......... 3, 16

*Safari Club Int'l v. Jewell*, 134 S. Ct. 310 (2013) ....................................................................... 18

*Save Our Springs v. Babbitt*, 27 F. Supp. 2d 739 (W.D. Tex. 1997)............................................ 36

*Serono Laboratories v. Shalala*, 158 F.3d 1313 (D.C. Cir. 1998)................................... 30, 31, 35

*Sw. Ctr. for Biological Diversity v. Babbitt*, 215 F.3d 58 (D.C. Cir. 2000) .................... 31, 38, 40

*Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504 (1994)............................................................ 22

*Tucson Herpetological Soc'y v. Salazar*, 566 F.3d 870 (9th Cir. 2009) ....................................... 28

*Tyler v. Salazar*, (D. Minn. June 27, 2012), aff'd, 504 F. App'x 538 (8th Cir. 2013)................... 35

*United States v. Eurodif S.A.*, 555 U.S. 305 (2009)...................................................................... 26

*W. Watersheds Project v. Ashe*, -- F. Supp. 2d --, 2013 WL 2433370 (D. Idaho June 4, 2013) .. 28

*W. Watersheds Project v. U.S. Fish & Wildlife Serv*., 535 F. Supp. 2d 1173 (D. Idaho 2007).... 36

*Wyo. v. U.S. Dep't of Agric*., 661 F.3d 1209 (10th Cir. 2011) ....................................................... 34

## STATUTES

5 U.S.C. § 706.................................................................................................................. 12

16 U.S.C. § 1532(6) ...................................................................................... 2, 25, 26, 27

16 U.S.C. § 1532(16) .................................................................................... 2, 9, 10, 18

16 U.S.C. § 1533(a)(1)....................................................................................... 3, 24, 25

16 U.S.C. § 1533(b)(1)(A) ........................................................................................ 37

16 U.S.C. § 1533(b)(3)(A) ..................................................................................... 8, 34

16 U.S.C. § 1533(b)(3)(B) ....................................................................................... 34

16 U.S.C. § 1533(c)(1) ................................................................................... 16, 17, 20

16 U.S.C. § 1533(c)(2) .............................................................................................. 3

16 U.S.C. § 1533(f) .................................................................................................. 3

16 U.S.C. § 1535 .................................................................................................... 19

16 U.S.C. § 1539(j) ................................................................................................ 19

## FEDERAL REGULATIONS

50 C.F.R. § 402.02 ..................................................................................................... 3

50 C.F.R. § 424.11(a) ........................................................................................... 2, 38, 39

50 C.F.R. § 424.11(c) ...................................................................................................... 17

50 C.F.R. § 424.11(d) ................................................................................................... 3, 18

43 Fed. Reg. 9607 (Mar. 9, 1978) ...................................................................................... 5

*61 Fed. Reg. 4722 (Feb. 7, 1996) ............................................................................ passim

68 Fed. Reg. 15,804 (April 1, 2003) ................................................................................... 6

72 Fed. Reg. 6052 (Feb. 8, 2007) ....................................................................................... 7

73 Fed. Reg. 50,226 (August 6, 2008) ........................................................................ 28, 30

74 Fed. Reg. 15,070 (April 2, 2009) ................................................................................... 8

74 Fed. Reg. 47,483 (September 16, 2009) ....................................................................... 34

75 Fed. Reg. 55,730 (September 14, 2010) ................................................................... 8, 34

76 Fed. Reg. 26,086 (May 5, 2011) .......................................................................... 5, 8, 18

*76 Fed. Reg. 81,666 (December 28, 2011) ............................................................... passim

78 Fed. Reg. 35,664 (June 13, 2013) ................................................................................ 39

**GLOSSARY**

| | |
|---|---|
| APA | Administrative Procedure Act |
| AR | Administrative Record[1] |
| DOI | Department of the Interior |
| DPS | Distinct Population Segment |
| ESA | Endangered Species Act |
| Final Rule | *Final Rule Revising the Listing of the Gray Wolf (Canis lupus) in the Western Great Lakes*, 76 Fed. Reg. 81,666 (Dec. 28, 2011) |
| FWS | U.S. Fish and Wildlife Service |
| SPR | Significant Portion of the Range |
| WGL | Western Great Lakes |

---

[1] The administrative record citations in the brief from the first record DVD are of the form "AR [Doc. No.] at [Bates number]," e.g. AR 1 at 1A. Documents from the second DVD are of the form "2007 AR [Doc. No.] at [Bates number]."

**INTRODUCTION**

The U.S. Fish and Wildlife Service ("FWS"), in collaboration with states and other stakeholders, took a population of a few hundred wolves along the Minnesota-Ontario border, and brought that population to a point where wolves number well over 3,000, occupy northern Minnesota, Wisconsin, and Michigan, and meet the recovery goals established in FWS's Recovery Plan. In the Final Rule, FWS evaluated whether the Midwestern populations of wolves met the recovery goals presented in its longstanding conservation strategy, which separately addresses the wolf populations in United States by region. *See generally Final Rule Revising the Listing of the Gray Wolf (Canis lupus) in the Western Great Lakes*, 76 Fed. Reg. 81,666 (Dec. 28, 2011) ("Final Rule"). FWS determined that wolves in the Midwest have, for years, met the criteria in the Recovery Plan, expanded their range, and increased in density. Because these wolves are recovered, they were delisted. This is fully consistent with the Endangered Species Act ("ESA"), where one of the goals "is to recover listed species and then to delist them when they no longer qualify as threatened or endangered, thereby allowing [FWS] to focus its efforts on the many other species that do qualify as threatened and endangered." *Id.* at 81,682.

Plaintiffs' disagreement with the Final Rule delisting a distinct population segment ("DPS") of wolves in the Western Great Lakes ("WGL") region has little to do with the viability and health of the Great Lakes wolf population. Rather, as a matter of policy, Plaintiffs object to FWS's decision to delist a DPS of wolves. They suggest a preference for federal over state management and for regulation of wolves in the lower-48 states as one entity rather than as several. Plaintiffs also claim that the Final Rule was based on political interference, instead of scientific decision-making. These allegations of political interference must be rejected out of hand as an attempt to insinuate "bad faith"—bad faith that did not exist and of which Plaintiffs have provided no evidence. Instead, Plaintiffs demonstrate that the Department of the Interior ("DOI") publicly committed to a timetable for the Final Rule, and a review of the relevant events dismantles Plaintiffs' theory of political motivation.

Plaintiffs also seek to extend the scope of their challenge, both temporally and geographically, beyond the 2011 Final Rule. However, FWS's actions in the rest of the country with respect to the wolf are beyond the scope of Plaintiffs' Complaint. If Plaintiffs believe events that post-date the Final Rule, including current state-managed wolf hunts, require the WGL wolf to be relisted, they have recourse: they could file a citizen petition seeking to have the WGL wolf listed as threatened or endangered based on these new developments. What they cannot do is attack the Final Rule as arbitrary and capricious based on evidence that post-dates the decision and was not available to agency decision-makers.

In evaluating the Final Rule, the Court is charged with determining whether it represents a valid exercise of FWS's lawful discretion. Because the decision to update the gray wolf's listing status—by acknowledging that the wolves in the listed Minnesota population have grown into a metapopulation that now occupies a Western Great Lakes DPS, and then analyzing the conservation status of that DPS—is rational, based upon the best available scientific data, and in full compliance with the ESA, it must be upheld by this Court.

## BACKGROUND

### I.    The Endangered Species Act

An "endangered species" is one "in danger of extinction throughout all or a significant portion of its range," and a "threatened species" is one likely to become endangered in the foreseeable future. 16 U.S.C. § 1532(6), (20). "Species" includes species, subspecies, or a "[DPS] of any species of vertebrate fish or wildlife which interbreeds when mature." *Id*. § 1532(16); 50 C.F.R. § 424.11(a) ("In determining whether a particular taxon or population is a species for purposes of the Act, the Secretary shall rely on standard taxonomic distinctions and the biological expertise of the Department and the scientific community."). In determining whether a species is "endangered" or "threatened," FWS considers five factors: "(A) the present or threatened destruction, modification, or curtailment of its habitat or range; (B) overutilization for commercial, recreational, scientific, or educational purposes; (C) disease or predation; (D)

the inadequacy of existing regulatory mechanisms; or (E) other natural or manmade factors affecting its continued existence." 16 U.S.C. § 1533(a)(1). FWS makes a listing determination "solely on the basis of the best scientific and commercial data available ... after conducting a review of the status of the species and after taking into account those efforts, if any, being made by any State or foreign nation ... to protect such species." *Id.* § 1533(b)(1)(A).

Once listed as a threatened or endangered species, "[t]he principal goal of the [FWS] is to return listed species to a point at which protection under the [ESA] is no longer required." 50 C.F.R. § 424.11(d)(2); *Safari Club Int'l v. Jewell*, -- F. Supp. 2d --, No. 12-cv-340 (BAH), 2013 WL 4041541, at *4 (D.D.C. Aug. 9, 2013). To this end, FWS prepares recovery plans for the "conservation and survival" of listed species, 16 U.S.C. § 1533(f), which are guidance documents that provide a roadmap to recovery, but "it is possible to reach … recovery of the species" by a pathway not contemplated in a recovery plan. *Friends of Blackwater v. Salazar*, 691 F.3d 428, 434, 438 n.* (D.C. Cir. 2012). The ESA imposes a non-discretionary duty on FWS to regularly review the list of endangered and threatened species and determine whether to remove a species from the list or "delist." 16 U.S.C. § 1533(c)(2); 50 C.F.R. § 424.11(d). In issuing a delisting decision, FWS applies the same statutory criteria used to list the species. *Id.*

FWS defines "recovery" as "improvement in the status of listed species to the point at which listing is no longer appropriate under the criteria set out in [ESA] Section 4(a)(1)." 50 C.F.R. § 402.02. To remove a species from the list, FWS must find that it is extinct, that it has recovered, or that the original data supporting classification was in error. *Id.* at § 424.11(d); *see* H.R. Rep. 95-1026 at 9 (Mar. 31, 1978) ("The status of a listed species must be continuously monitored and reviewed to maintain appropriate protective measures. This Department would be just as negligent in the performance of its duties under the act for not listing a critical species as for not delisting or downlisting a species that has or is recovering.").

## II.    The DPS Policy

The term DPS is not statutorily defined, nor is it commonly used in scientific discourse

and is inherently ambiguous. DPS Policy, 61 Fed. Reg. 4722 (Feb. 7, 1996); *see, e.g., Maine v. Norton*, 257 F. Supp. 2d 357, 386 (D. Me. 2003). The 1996 DPS Policy "adopts an interpretation of the term 'distinct population segment.'" for the purposes of listing, delisting, and reclassifying vertebrates." 61 Fed. Reg. at 4722. It provides a reasonable approach to an ambiguous statutory term and is entitled to *Chevron* deference. *See Nw. Ecosystem Alliance v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1144 (9th Cir. 2007) (citation omitted). The ability to list, delist, and reclassify DPSs enables FWS to assign varying levels of protection to vertebrate populations if their conservation status differs from other populations of the same taxon. *Id.* at 4725. FWS evaluates three elements for a possible DPS: (1) the *discreteness* of the population segment in relation to the remainder of the taxon to which it belongs; (2) the *significance* of the population segment to the taxon;[2] and (3) the *conservation status* of the population segment in relation to the ESA's standards for listing. *Id.* at 4725.

A population will be considered discrete if it is either markedly separate as a consequence of physical, physiological, ecological, or behavioral factors, or if it is delimited by international boundaries that are significant in light of the fourth ESA listing factor: inadequacy of existing regulatory mechanisms. *Id.* at 4723, 25. Once FWS establishes the discreteness of a population segment, the DPS Policy instructs FWS to consider the population segment's biological and ecological "significance" in light of Congress's guidance to use the authority to list DPSs "sparingly." *Id.* at 4725. FWS's consideration of the potential DPS's importance to its taxon may include, but is not limited to, the following examples: (1) the discrete population has persisted in an ecological setting unusual or unique for the taxon; (2) evidence that loss of the DPS would result in a significant gap in the range of a taxon; (3) evidence that the DPS represents the only surviving natural occurrence of a taxon that may be more abundant elsewhere as an introduced population outside its historical range; or (4) evidence that the DPS differs markedly from other

---

[2] "Significance" under the DPS Policy is distinguishable from "significant" in the statutory term "significant portion of its range," which is part of the definitions of "threatened species" and "endangered species." *Nw. Ecosystem Alliance*, 475 F.3d at 1143.

populations in its genetic characteristics. *Id.* If the population is a DPS, FWS evaluates its conservation status. *Id.*

## FACTUAL & REGULATORY BACKGROUND

### I.     Factual Background

When the ESA was passed in 1973, only several hundred wolves remained in the lower-48 United States, primarily in northeastern Minnesota and on Isle Royale, Michigan. *See Proposed Rule to Revise the List of Endangered and Threatened Wildlife for the Gray Wolf (Canis lupus)*, 76 Fed. Reg. 26,086, 26,096, 26,099 (May 5, 2011). In March 1978, after previous listings of gray wolf subspecies, FWS revised the listing of the gray wolf (*Canis lupus*) at the "species" level in the lower-48 states and Mexico[3] to address out-of-date wolf taxonomy and to re-categorize the Minnesota wolf population as threatened. *Final Rule, Reclassification of the Gray Wolf*, 43 Fed. Reg. 9607 (Mar. 9, 1978).[4]

After this revised listing, FWS developed three recovery plans for the gray wolf, one in the eastern United States, another for the Northern Rocky Mountain states, and a third for the southwestern United States and Mexico. Courts have deferred to the three-recovery-plan approach. *See, e.g.*, *Nat'l Wildlife Fed'n v. Norton*, 386 F. Supp. 2d 553, 568 (D. Vt. 2005). The eastern recovery plan for the gray wolf covers a region extending east from Minnesota to Maine and down into northeastern Florida and focuses on recovering the gray wolf population that survived in, and has expanded from, northeastern Minnesota. *Recovery Plan for the Eastern Timber Wolf* ("Recovery Plan") (1992), AR 1 at 1-74A. The Recovery Plan describes two recovery criteria: (1) a Minnesota population must be stable or growing, and its continued survival must be assured, and (2) a second population outside of Minnesota and Isle Royale must be re-established, having at least 100 wolves in late winter if located within 100 miles of the Minnesota wolf population, or at least 200 wolves beyond that distance. *Id.* at 5A, 26A

---

[3] This ESA "species"-level listing does not cover the entire biological wolf species, which extends beyond the lower 48 and Mexico to Canada, Alaska, and to other continents.

[4] The 1978 Rule pre-dated the amendment to the ESA later that year that added the term "distinct population segment" to the Act's definition of "species."

(explaining that the far option for the second population may be in New York or northern Maine); 76 Fed. Reg. at 81,675. The target management goal for the Minnesota population is 1,251 to 1,400 wolves. AR 1 at 28A. In 1998, the Eastern Timber Wolf Recovery Team clarified the second criterion by recommending "that the numerical recovery criterion for the Wisconsin-Michigan population be considered met when consecutive late-winter wolf surveys document that the population equals or exceeds 100 wolves (excluding Isle Royale wolves) for the 5 consecutive years between the first and last surveys." 76 Fed. Reg. at 81,675 (citation omitted).

The gray wolf population has far exceeded the numerical criteria for delisting in the Recovery Plan. 76 Fed. Reg. at 81,676; *see also Defenders of Wildlife v. U.S. Dep't of Interior ("Defenders (wolf)")*, 354 F. Supp. 2d 1156, 1170-71 (D. Or. 2005) ("The Western Great Lakes … population[] achieved the recovery goals"). In Minnesota, the wolf population has increased to an estimated population of 2,900 wolves at the time of the Final Rule. 76 Fed. Reg. at 81,676. The Minnesota population includes a dramatic increase in geographical distribution–from about 14,769 square miles in 1970 to approximately 33,971 square miles in 1997-98, which is about 40% of Minnesota. *Id.* at 81,676-77. Since the late 1990s, wolf populations have become more densely concentrated within a "stabilized range." *Id.* Similarly, in Wisconsin and Michigan, the populations have grown from a few dispersers at the time of listing to over 600 wolves in each State. *Id.* at 81,676-78 (in 2010-11, Wisconsin estimated 782 wolves; Michigan, 687). Based on these numbers, it is beyond dispute that the Western Great Lakes wolf population has greatly exceeded the recovery goals of the Eastern Timber Wolf Recovery Plan.

## II.      Regulatory Background

In 2003, FWS divided U.S. gray wolves into three large DPSs: the Western, Eastern, and Southwestern DPSs. 68 Fed. Reg. 15,804, 15,862 (Apr. 1, 2003) ("2003 Rule"). FWS also determined that the conservation status of the Eastern and Western DPSs was "threatened." *Id.* This rulemaking was challenged and held unlawful by two federal district courts. *Defenders (wolf)*, 354 F. Supp. 2d 1156; *Nat'l Wildlife Fed'n*, 386 F. Supp. 2d 553. The Oregon Court held

that FWS's interpretation of "significant portion of its range" violated the ESA because FWS failed to examine threats to the wolf in unoccupied, suitable habitat inside each DPS. *Defenders (wolf)*, 354 F. Supp. 2d at 1163-70. The Court also held that the 2003 Rule violated the DPS Policy because it downlisted the Eastern and Western DPSs despite large areas of suitable habitat within the DPSs without gray wolf populations. *Id*. at 1170-73. The opinion suggested that the Court might have approved the creation of smaller, biologically based DPSs, like a Western Great Lakes DPS. *Id.* It did not reach the merits of Plaintiffs' science-based claims. *Id*. at 1173.

The Vermont Court vacated the same 2003 Rule. *Nat'l Wildlife Fed'n*, 386 F. Supp. 2d 553. It held that: (1) FWS did not provide adequate notice and comment on the Eastern DPS; (2) the rule violated the DPS Policy because it "lump[ed]" gray wolves in the Northeast with gray wolves in the Great Lakes to create the Eastern DPS "based upon geography, not biology," and downlisted the Eastern DPS even though the Northeast lacked a gray wolf population; and (3) FWS's interpretation of "significant portion of its range" violated the ESA because major areas in the northeast portions of the DPS contained habitat unoccupied by gray wolves. *Id.* at 564-66. The Court also noted that the ESA, "allows defendants to provide varying levels of protection based upon biological evidence." *Id.* at 564. The Court agreed with plaintiffs that the ESA and DPS Policy allow FWS to "maintain[] its nationwide species listing [while] establishing DPSs in areas where FWS needs the kind of flexibility the DPS designation provides." *Id.* "Nowhere in the ESA is the Secretary prevented from creating a 'non-DPS remnant' designation, especially when the remnant area was already listed as endangered." *Id.* at 565.

Following vacatur of the 2003 Rule, FWS designated a WGL population of gray wolves as threatened. *See Final Rule*, 72 Fed. Reg. 6052 (Feb. 8, 2007) ("2007 Rule"). The 2007 Rule established a Western Great Lakes DPS and revised the list of threatened and endangered species to reflect the recovery of this DPS. The Humane Society and other groups challenged the 2007 Rule. *See Humane Soc'y v. Kempthorne*, 07-cv-677-PLF, ECF No. 1 (D.D.C.). The Court held that the ESA "could be construed" as permitting the actions taken in the 2007 Rule, *i.e.*,

simultaneously identifying a DPS and revising its status under the ESA, but that the ESA is "silent or ambiguous" on the issue. 579 F. Supp. 2d 7, 19 (D.D.C. 2008) (citation omitted). Because FWS had relied on the plain language of the ESA and had not supplied its interpretation on the question of simultaneously identifying and delisting a DPS, the Court vacated and remanded the 2007 Rule "to permit the agency to address the ESA's ambiguity in light of its expertise, experience and insight into the ESA's objectives." *Id*. at 15, 20-21.

During the remand, FWS addressed the legal concerns identified by the *Humane Soc'y* court and, in 2009, identified a WGL DPS and removed it from the list of threatened and endangered species. *See Final Rule*, 74 Fed. Reg. 15,070 (Apr. 2, 2009) ("2009 Rule"). The Humane Society and several other environmental groups challenged the 2009 Rule. *See Humane Soc'y v. Salazar*, 09-cv-1092, ECF Nos. 1, 4 (PLF) (D.D.C.). One of the plaintiffs' principal arguments was that FWS failed to allow notice and comment. *Id.* The parties filed a settlement agreement which remanded and vacated the 2009 Rule; returned the wolves to their prior listing status; required FWS to open a 60-day public comment period for any new rulemaking relating to the WGL wolves' status under the ESA; and dismissed the action. *Id*.

## III.    The Final Rule

Beginning in March 2010, FWS received four citizen petitions to remove gray wolves in the Midwest from the ESA's list of threatened and endangered species, and FWS processed those petitions as required by statute. *See* 16 U.S.C. § 1533(b)(3)(A), (B); 75 Fed. Reg. 55,730, 55,731 (Sept. 14, 2010). On September 14, 2010, FWS issued its 90-day finding that the petitioned action may be warranted. 75 Fed. Reg. 55,730. After reinitiating a status review of WGL wolves, in May 2011, FWS found that the petitioners' requested action was warranted and proposed to designate a gray wolf DPS in the Midwest and to delist the gray wolf in the WGL. 76 Fed. Reg. 26,086. FWS also recognized, in addition to *Canis lupus* (gray wolf), another species of wolf, *Canis lycaon*, in the upper Midwest. *See id*. After two rounds of public comment, including one to address specifically this taxonomic question, FWS concluded that the best scientific data

available at that time was not consistent with recognizing *Canis lycaon* as a full species coexisting with *Canis lupus* in the upper Midwest. 76 Fed. Reg. at 81,687-88.

In December 2011, FWS issued its Final Rule to remove the gray wolf WGL DPS from the ESA's list in the upper Midwest, including Michigan, Minnesota, and Wisconsin. 76 Fed. Reg. 81,666. In the Final Rule, FWS: (1) defined the entity under evaluation, the WGL DPS; (2) analyzed the five-factor threats to the DPS to determine its conservation status; and (3) analyzed whether there were significant portions of the DPS where wolves were threatened or endangered. In defining the entity to analyze, FWS addressed citizen petitions requesting delisting the wolves in the Midwest and applied the DPS Policy to delineate the boundaries of the "species" under consideration. *See* 16 U.S.C. § 1532(16) (defining "species" to include DPS). The resulting WGL DPS is based on a reevaluation of the Minnesota "population" that was listed separately from other lower-48 gray wolf populations in 1978. 76 Fed. Reg. at 81,682, 81,671-74, 81,679. FWS analyzed the expanded Minnesota entity to determine whether it qualified as a DPS and concluded that it did because it met the tests for "discreteness" and "significance." *Id.* at 81,671-74. FWS explained that the WGL DPS met the definition of "discreteness" because it is "markedly separate" from the Northern Rocky Mountain wolf populations based on known wolf dispersal distances and separated by an international border from the 52,000-60,000 wolves in Canada. *Id.* at 81,671-72. The WGL DPS population met the definition for "significance" because the viable gray wolf metapopulation has "filled a significant gap in the holarctic range of gray wolves in the United States, and it provides an important extension of the range of gray wolves in North America." *Id.* at 81,672. FWS next evaluated the conservation status of the WGL DPS by evaluating the ESA's five statutory factors, throughout the range of the DPS. *Id.* at 81,688-722. For each factor, FWS concluded that it would not threaten the viability of the WGL DPS.

Factor A: The wolf population in the WGL DPS currently occupies all of the suitable habitat area identified in the Recovery Plan and most of the potentially suitable habitat in the

DPS. *Id.* at 81,689-90, 81,693. There is extensive tribal and public ownership and management of lands within wolf range, including actions to increase wolves' primary prey, deer. *Id.* at 81,691-92. Management of private lands for timber production will ensure that more than adequate high-quality habitat will remain available for the wolves. *Id.* Thus, FWS concluded that this factor will not cause the WGL DPS gray wolves to be in danger of extinction in the foreseeable future. *Id.* at 81,692. Although Plaintiffs disagree with FWS's "significant portion of the range" analysis by arguing that FWS must analyze habitat *outside* the DPS, addressed *infra*, they do not seriously challenge FWS's science-based findings with regard to Factor A.

Factor B: FWS found that "taking" wolves for scientific or educational purposes in the WGL DPS will not significantly threaten the long-term viability of the wolf population in the DPS. *Id.* at 81,693. Any potential commercial and recreational harvests were predicted to be adequately regulated by State and/or Tribal conservation agencies. *Id.* at 81,693-94 (explaining that public harvest is addressed under Factor D). Therefore, FWS concluded that Factor B threats will not cause the WGL DPS of gray wolves to become in danger of extinction in the foreseeable future. *Id.* at 81,700-01. Plaintiffs do not challenge FWS's findings with respect to this Factor.

Factor C: FWS concluded that diseases, parasites, and predation will not prevent the maintenance of viable wolf populations in the DPS. *Id.* at 81,698, 81,700-01. FWS recognized that several diseases have historically had noticeable impacts on wolf population growth in the Great Lakes region. However, despite these and other diseases and parasites, wolf populations in the WGL DPS continued to grow, and FWS concluded that the delisting of the WGL DPS wolves will not significantly change the incidence or impacts of disease and parasites. *Id.* at 81,698; AR 429 at 11652-53A (peer reviewer). FWS explained that "[t]he high reproductive potential of wolves allows wolf populations to withstand relatively high mortality rates." 76 Fed. Reg. at 81,700. Plaintiffs do not challenge FWS's findings with respect to Factor C.

Factor D: After reviewing the best available evidence, including the state management plans, FWS concluded that adequate regulatory mechanisms will maintain the distributional and

numerical goals of the Recovery Plan, even if there are public harvests of wolves. 76 Fed. Reg. at 81,701-17. No wolf hunts were fully authorized by the required state agencies at the time of the Final Rule. *Id.* This factor is discussed, *infra*, in response to Plaintiffs' challenges.

Factor E: With regard to other factors affecting the wolves' continued existence, FWS addressed the use of wolves and wolf pelts in ceremonies of certain tribal groups, and determined that use was not anticipated to pose a significant threat to the wolves in the WGL DPS. *Id.* at 81,718. FWS also reviewed public attitudes toward wolves and found that, after years of increasing public support, support has declined since the mid-2000s, potentially because of increased wolf-human conflicts. *Id.* at 18,720. Based on this decline, FWS concluded that the ongoing efforts of state wildlife agencies to present science-based information to foster public support for wolves will be important post-delisting. *Id.* FWS concluded, however, that although public attitudes should be monitored and reported to state wildlife managers, the effects of public attitudes on wolves will not be a significant threat to the species. *Id.* Finally, FWS evaluated hybridization with coyotes and recent research on whether interbreeding is occurring, and found that hybridization does not pose a significant threat to wolves. *Id.* at 18,721.

After analyzing these five factors, FWS concluded that the WGL DPS no longer meets the definition of threatened or endangered because none of the five factors, either individually or in combination, was likely to place the WGL DPS in danger of extinction in the foreseeable future in all or a significant portion of the metapopulation's range. 76 Fed. Reg. at 81,688. This determination was supported by FWS's three outside peer reviewers. *See* AR 429 at 11652A; 440 at 11710A; 521 at 12769A. Plaintiffs focus mainly on the "regulatory mechanisms" factor and do not challenge the remaining factors. *Cf.* Plaintiffs' Mem. of Points & Authorities, ECF No. 24-1 ("Br.") at 40 (citing factors D and E).

Finally, after determining that the WGL DPS entity was not endangered or threatened as a whole, FWS evaluated whether there were "significant portions of [the] range" ("SPR") of the wolf within the WGL DPS where the wolf was either threatened or endangered. Under its

interpretation of the ambiguous phrase "SPR," FWS evaluated whether "potential remaining threats are concentrated" in certain areas and then whether those areas constitute an SPR that contributed "meaningfully to the representation, resiliency, or redundancy of the species." 76 Fed. Reg. at 81,722-23. It evaluated areas that might prove problematic for wolf reoccupation, such as areas with dense roads or agricultural land. *Id.* at 81,722. Ultimately, FWS concluded that the WGL DPS contains core blocks of suitable, occupied habitat in each of the three recovery areas that "provide an adequate wild prey base, suitably low levels of human-caused mortality, and sufficient numbers and distribution of wolves to ensure adequate representation, resiliency, and redundancy" to support the existing, viable metapopulation of wolves in the DPS. *Id.* at 81,722-23. It then concluded that the WGL DPS was not threatened either as a whole, or in a significant portion of its range. *Id.* Based on these thorough evaluations, FWS concluded that the WGL DPS of gray wolves should be delisted.

## STANDARD OF REVIEW

Plaintiffs' challenge to FWS's Final Rule is reviewed pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, which requires courts to uphold agency actions unless they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *NetworkIP, LLC v. FCC*, 548 F.3d 116, 121 (D.C. Cir. 2008) (quoting 5 U.S.C. § 706(2)). It is Plaintiffs' burden to prove the particular manner in which FWS's actions are arbitrary and capricious. *Franks v. Salazar*, 816 F. Supp. 2d 49, 56 (D.D.C. 2011); *AT&T Corp. v. FCC*, 448 F.3d 426, 431 (D.C. Cir. 2006). An agency decision is arbitrary and capricious if it "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see Norton v. S. Utah Wilderness Alliance,* 542 U.S. 55, 66 (2004) ("The principal purpose of the APA limitations . . . is to protect agencies from undue judicial

interference with their lawful discretion, and to avoid judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve."). APA review is "very deferential," *Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1105 (D.C. Cir. 2009), especially where, as here, the agency is "making predictions, within its area of special expertise, at the frontiers of science." *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council*, 462 U.S. 87, 93, 96, 103, 105-106 (1983); *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 375-77 (1989); *Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1000 (D.C. Cir. 2008). This standard "mandates judicial affirmance if a rational basis for the agency's decision is presented . . . even though [a court] might otherwise disagree." *Envtl. Def. Fund v. Costle*, 657 F.2d 275, 283 (D.C. Cir. 1981) (citations omitted).[5] Judicial review under the APA is limited to the administrative record, which consists of those materials directly or indirectly considered by the agency decision-makers at the time they made the challenged decision. *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985); *see Amfac Resorts, LLC v. U.S. Dep't of Interior*, 143 F. Supp. 2d 7, 12 (D.D.C. 2001).

## ARGUMENT

The Final Rule is based upon a valid interpretation of the ESA, its implementing regulations, and the DPS Policy. FWS's taxonomic decisions about the classification of gray wolves in the upper Midwest and the adequacy of regulatory mechanisms to ensure the long-term survival of the Western Great Lakes wolf population are fully supported by the record. Rather than refuting either of these points, Plaintiffs attack FWS's policy choices and insinuate bad faith where there is none. At bottom, Plaintiffs fail to meet their heavy burden of showing that the Final Rule is arbitrary or capricious.

This memorandum proceeds as follows: the first three argument sections, I-III, address FWS's actions in the Final Rule: determining the entity at issue, the WGL DPS; evaluating its

---

[5] Summary judgment is the mechanism for "deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Oceana, Inc. v. Locke*, 831 F. Supp. 2d 95, 106 (D.D.C. 2011). No statement of facts is required. *See* LCvR 7(h) cmt.

conservation status within the entity and any SPRs; and concluding that it was recovered within reasonably defined DPS boundaries. These sections address Plaintiffs' arguments B-D. This memorandum's argument IV addresses Plaintiffs' argument A regarding purported improper political motivations. Finally, arguments V-VI address Plaintiffs' arguments D and E which are related to wolf taxonomy and regulatory mechanisms, respectively.

Before addressing the arguments raised by Plaintiffs, it is important to keep in mind what this case is, and is not, about. This case is not about whether FWS's decision to redefine the boundaries of the Minnesota population as a Western Great Lakes DPS and to delist it is good public policy. Policy choices are the province of the agencies and Congress. Similarly, this case is not about FWS's efforts with regard to the Northern Rocky Mountain or the Mexican gray wolves, which involve separate recovery programs and rulemakings. This litigation also does not turn on speculation about future rulemaking for the gray wolf. Rather, the issues before this Court are whether FWS properly interpreted the ESA, a statute that it is charged with implementing, and if so, whether the evidence before FWS supported its factual conclusions at the time those conclusions were made. A fair reading of the ESA, the Final Rule, and the administrative record makes it clear that FWS's actions were in full compliance with the law and exceedingly reasonable.

## I.    FWS reasonably delineated the expanded boundaries of the Minnesota 1978 population listing and found that the conservation status of the resulting WGL DPS was neither threatened nor endangered.

As noted, in the Final Rule FWS undertook three steps. First, FWS addressed citizen petitions requesting delisting of wolves in Minnesota, both Minnesota and Wisconsin, or in the Western Great Lakes, 76 Fed. Reg. at 81,667, and applied its DPS Policy to delineate the boundaries of the entity under consideration, *id.* at 81,682. FWS revised the boundaries of the Minnesota population[6] based on the range of the metapopulation of wolves that grew out of the

---

[6] When the Minnesota population was listed as a separate threatened species in 1978, the ESA had not yet been amended to add the phrase "distinct population segment" to the definition of "species." However, FWS recognized that the separately listed Minnesota population has functioned as a DPS ever since the term was added to the statute later in 1978. *See* 76 Fed. Reg. at 81,682.

original population. *Id.* at 81,671-74, 81,679. Second, pursuant to the DPS Policy and the citizen petitions, FWS applied its five-factor analysis and evaluated the conservation status of the WGL DPS. *See* 61 Fed. Reg. at 4125 (explaining that once a DPS is found its status must be evaluated). For many years, wolves in the WGL DPS have exceeded the goals of the Recovery Plan. AR 1 at 27A; 76 Fed. Reg. at 81,676-69; *see Defenders (wolf)*, 354 F. Supp. 2d at 1170-71. FWS concluded that the ESA's five-factor threats, individually or in combination, do not threaten wolves in the WGL DPS throughout its range. *See* 76 Fed. Reg. at 81,688-81,723. Third, FWS analyzed whether there are significant portions of the range within the DPS where gray wolves are threatened or endangered. *Id.* at 81,722-23. It concluded that there are not and, therefore, reaffirmed its conclusion that the DPS was neither threatened nor endangered throughout its range or in significant portions of its range. *Id.* at 81,722.

These steps satisfy the ESA. *See Friends of Blackwater v. Salazar*, 691 F.3d 428, 434 (D.C. Cir. 2012). However, Plaintiffs try to graft additional steps to the process by arguing that "there is no authority in the ESA for the FWS to delist a DPS simultaneous to its recognition and listing." Br. at 26; *see also id.* at 27. They also argue that the ESA limits the use of DPSs to *listing* locally vulnerable populations. *See* Br. at 25-29. Plaintiffs' arguments must be rejected for four reasons. First, contrary to the Plaintiffs' suggestion, the FWS was not simultaneously designating or listing a new DPS and adjusting its status. Rather, in response to citizen petitions requesting that FWS evaluate a WGL DPS, it adjusted the boundaries of the listed Minnesota population—an entity independently listed as a threatened species in 1978. Second, in any event, the ESA does not require a separate listing before a DPS may be delisted. Third, Plaintiffs overread the *Kempthorne* decision. Fourth, Plaintiffs conflate different steps in the DPS Policy.

1.   In the Final Rule, FWS was reevaluating an existing listed population.

First, contrary to the Plaintiffs' suggestion, FWS did not list a new DPS and simultaneously adjust its status. 76 Fed. Reg. at 81,682; *cf.* Br. at 26. Instead, FWS revised the boundaries of the Minnesota population, which was already separately listed as a threatened

species, to come into line with the 1996 DPS Policy. *Id.* at 81,670, 81,682 (FWS "recognize[d] that the Minnesota gray wolf population listed as a species in 1978 has functioned effectively as a DPS ever since the DPS provision was added to the Act later in 1978.").[7] Then it evaluated the DPS "based on the Act's definitions of [threatened species and endangered species] and a review of the [five factors]." *See* 61 Fed. Reg. at 4725. Plaintiffs' arguments that FWS impermissibly designated a new DPS and delisted it fall flat because FWS did not "delist a DPS simultaneous to its recognition and listing." Br. at 26. A Minnesota population was already listed.

> 2.   Even if the WGL DPS were a new listing, Plaintiffs' attempt to graft an extra step onto the five-factor analysis must be rejected.

Even if the WGL DPS could be considered a new "listing," simultaneously identifying a DPS and revising its status under the ESA is permissible. FWS evaluated the status of the Minnesota DPS in response to four 2010 citizen petitions that sought to have FWS delist a population of wolves in the Midwest. *See* 75 Fed. Reg. at 55,731. FWS retains wide discretion to determine whether or not to conduct a DPS analysis on its own, but "the ESA *mandates* that the FWS respond to [a citizen] petition." *Safari Club Int'l v. Jewell*, -- F. Supp. 2d --, Nos. 11-cv-1564/12-cv-340 (BAH), 2013 WL 4041541, at *38 (D.D.C. Aug. 9, 2013). Consequently, FWS was required to analyze whether the petitions addressed a proper ESA entity (here a DPS) and, if so, to evaluate its conservation status. *See* 61 Fed. Reg. at 4725. Moreover, the ESA also requires FWS to revise the ESA's lists to "reflect recent determinations." 16 U.S.C. § 1533(c)(1). Plaintiffs cannot reasonably argue that FWS was acting contrary to statute when it was following ESA mandates.

It appears that Plaintiffs would prefer that FWS first define the boundaries of a DPS in a separate rulemaking, wait some indefinite amount of time, and then proceed with rulemaking to

---

[7]   *See* 61 Fed. Reg. at 4725 (explaining that implementation of the DPS Policy will be "reevaluated on a case-by-case basis as recommendations are made to change the listing status for that distinct population segment"). In 1978, wolves occupying Minnesota were classified as *Canis lupus* – the same "species" of wolf that occupied the remainder of the lower 48—but FWS listed this Minnesota population separately from the remaining lower 47 states. 43 Fed. Reg. at 9607. No party (including Plaintiffs in this action) has challenged the separate listing of the Minnesota wolf population. It is this unchallenged 1978 population-level listing that FWS revised in the Final Rule.

re-evaluate whether that DPS meets the five statutory listing factors, even if the entity's conservation status is "recovered" when the DPS boundaries are clarified. *Cf.* Br. at 26; *see also* Br. at 27. This argument is inconsistent with caselaw and the DPS Policy. The D.C. Circuit has recently rejected attempts to graft additional procedures onto the ESA's delisting process. *Friends of Blackwater*, 691 F.3d at 434. Once a species no longer meets the ESA's definition of threatened or endangered, it cannot be defined as such. *See* 16 U.S.C. § 1533(c)(1); 50 C.F.R. § 424.11(c). Plaintiffs' arguments suggesting further process before delisting must be rejected.[8]

3.   <u>FWS permissibly construed the ESA and applied the DPS Policy in the Final Rule even though it was not using the DPS Policy here to list locally vulnerable populations.</u>

Plaintiffs next argue that the *Kempthorne* Court held in 2008 that the DPS Policy and the ESA's legislative history require an interpretation of the statutory term "DPS" and the DPS Policy as allowing DPS designation only to list locally vulnerable populations. Br. at 26 (quoting *Humane Soc'y v. Kempthorne*, 579 F. Supp. 2d 7, 18 n.12 (D.D.C. 2008)); Br. at 25-29 & 25 n.9 Plaintiffs appear to overread the Court's decision. In 2008, the Court held that FWS "misread the statute" when FWS argued that the ESA's plain language *compelled* the interpretation that FWS was permitted, in the Court's words, "to simultaneously designate and delist DPSs within broader listings—that is, to 'carve out' healthy sub-populations of otherwise endangered or threatened species and remove [them from] the protections of the Act." *Kempthorne*, 579 F. Supp. 2d at 14 n.8 & 19. The Court remanded the interpretive issue to FWS, but did not require any particular interpretation. *Id.* at 19 (citing *Chevron*); *see also id.* ("In sum, the ESA could be construed in the way urged by FWS."); *id.* at 13.

---

[8] To the extent that Plaintiffs rely on the Court's analysis in *Kempthorne*, 579 F. Supp. 2d at 16-18, Br. at 26-27, the 2011 Final Rule is distinguishable from the 2007 Rule. In the Final Rule, FWS was not creating a new DPS and delisting it—it was revising the listing for the Minnesota population to comply with the DPS Policy and to address citizen petitions. Moreover, the Court did not address whether a DPS may be simultaneously designated and delisted: it noted only that the statute "quite strongly suggests" that listing of a species is a precondition to delisting, but left the door open for FWS to further analyze the issue. *Id.* at 16-17 & 17 n.10 (explaining a contrary interpretation of the ESA "may be permissible" but is not "inevitable"). As explained below, DOI interprets the ESA to allow the simultaneous designation and delisting of a DPS and used that interpretation in the Final Rule, an interpretation which is entitled to *Chevron* deference.

Because the Court explicitly held that the ESA is ambiguous, 579 F. Supp. 2d at 19, Plaintiffs' arguments must be addressed under *Chevron* step 2. During the *Kempthorne* remand on the question of the proper place of the DPS in the ESA's listing and delisting process, the DOI's Solicitor considered the statutory question of the proper use of the DPS and provided DOI's analysis of the issue in a Memorandum. *See* M-Opinion, AR 8 at 492A; 76 Fed. Reg. at 81,682-83. This Solicitor's opinion was adopted in the Final Rule, which was subject to notice and comment, 76 Fed. Reg. at 81,682-83, 76 Fed. Reg. 26,091, and, is thus entitled to *Chevron* deference. *See In re Polar Bear ESA Listing & 4(d) Rule Litig.*, 794 F. Supp. 2d 65, 88 (D.D.C. 2011), *aff'd*, 709 F.3d 1 (D.C. Cir. 2013), *cert. denied sub nom., Safari Club Int'l v. Jewell*, 134 S. Ct. 310 (2013). As the Supreme Court has made clear, "the agency remains the authoritative interpreter (within the limits of reason) of such statutes." *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 982-83 (2005) ("A court's prior judicial construction of a statute trumps an agency construction otherwise entitled to *Chevron* deference only if the prior court decision holds that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion.").

The Solicitor's analysis begins with the statutory text. AR 8 at 493-494A. The ESA defines the term "species" as "any subspecies of fish or wildlife or plants, and any *distinct population segment* of any species of vertebrate fish or wildlife which interbreeds when mature." 16 U.S.C. § 1532(16) (emphasis added). Thus, under the ESA, the following three groups of organisms expressly qualify as a "species":

1. a group of organisms comprising all of the organisms in a species;
2. a group of organisms comprising all of the organisms in "any subspecies . . ."; or
3. as relevant here, a group of organisms comprising "any distinct population segment . . . ."

*Id*. at 493A. Accordingly, any action authorized by the ESA or its implementing regulations that addresses "species"—including revising the list of endangered or threatened species—is also authorized for a "distinct population segment." *See* 50 C.F.R. § 424.11(d) ("The factors considered in delisting a species are [the five factors] as they relate to the definitions of

endangered or threatened species."). Consequently, the ESA supports an interpretation that FWS may delist a DPS, even if other populations of the taxa are threatened or endangered.

The Solicitor reviewed other provisions of the ESA and concluded that Congress intended FWS to have the authority to delist populations of listed taxa. AR 8 at 500-502A. For example, the ESA provides for experimental populations, 16 U.S.C. § 1539(j), and successful introduction depends on state cooperation, AR 8 at 502A; *see also* 16 U.S.C. § 1535. If experimental populations could not be recognized as recovered (likely in the form of a DPS), the ESA must be read to require FWS to retain recovered species on the list. This would reduce a state's incentive to cooperate with the reintroduction, contravening the goals of ESA Section 6, 16 U.S.C. § 1535. AR 8 at 502A. Further, the ESA language restricting DPSs to vertebrate taxons does not necessarily suggest that Congress was focusing on protecting charismatic species. *Cf.* Br. at 26.[9] Congress may have restricted DPSs to vertebrate taxa for any number of reasons. AR 8 at 498A (discussing 579 F. Supp. 2d at 17).

The Solicitor next turned to the sparse legislative history surrounding Congress's 1978 addition of the DPS language to the ESA. AR 8 at 502-506A. It noted that the contemporaneous legislative history does not clarify Congress's meaning or intent on this issue. *Id.* at 502-03A. As for the 1979, post-enactment legislative history Plaintiffs cite—that DPSs should be used "sparingly"— Congress explained in the same report that there may be instances when FWS "should provide for different levels of protection for populations of the same species." *Id.* at 503A (citation omitted).[10] The Solicitor also noted that the history at the time of the ESA's

---

[9] Moreover, "[t]he [ESA] provides for equal legal protection of all life forms, including plants and invertebrates." Sen. Rep't. 97-418, at 13-14 (1982). Further, Plaintiffs misconstrue the law review article they cite. The article suggests that, in 1979, Congress addressed controversy over protecting "non-charismatic populations," but did not make a value judgment about the application of DPSs to "charismatic populations." *See* AR 8 at 502A n.16; *cf.* Br. at 26.

[10] The Ninth Circuit agrees that this post-enactment legislative history on "sparingly" using DPSs is of limited value. *Nw. Ecosystem Alliance v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1144 (9th Cir. 2007) ("Here the committee report's language was not in obvious tension with the statutory text and [FWS] did not err by relying on it in part."). As an aside, the DPS Policy relies in part on the "sparingly" statement in its definition of the "significance" factor, 61 Fed. Reg. at 4725, and, in its M-Opinion, DOI considered its interpretation of the ESA-term DPS to be consistent with its DPS Policy. AR 8 at 498A-50A. Plaintiffs do not challenge the Policy itself.

passage is consistent with the FWS's desire to use the DPS Policy to allow flexibility in where to list species and to promote the goals of federal-state cooperation by declining to unnecessarily preempt state programs. *Id.* at 504-06A.

His interpretation is justified on several policy grounds. The goal of the ESA is to protect and recover endangered and threatened species. *See* 16 U.S.C. § 1533(c)(1). Allowing FWS to delist healthy populations allows it to deploy its scarce resources to address actions that affect actual threatened and endangered species, as well as promoting state cooperation. AR 8 at 506-08A. Additionally, the Solicitor noted that his interpretation is consistent with DOI's own DPS Policy, which states that it is intended for "the purposes of listing, *delisting*, and reclassifying species under the Endangered Species Act." DPS Policy, 61 Fed. Reg. at 4722, 4725 (emphasis added); AR 8 at 499A. As long as the population at issue meets the discreteness and significance requirements of the DPS Policy, it is a valid DPS and can be listed, reclassified, or delisted as can a species or a subspecies. *See* DPS Policy, 61 Fed. Reg. at 4725.

The Solicitor's interpretation adopted in the Final Rule—an interpretation based on the text and structure of the ESA, its legislative history, and the agency's interpretation of the DPS Policy—is reasonable and entitled to *Chevron* deference.[11] *City of Arlington v. F.C.C.*, 133 S. Ct. 1863, 1867, 1874, -- U.S. -- (2013); *Menkes v. U.S. Dep't of Homeland Sec.*, 637 F.3d 319, 331 (D.C. Cir. 2011). Because it is permissible, it must be upheld.

    4.    <u>Plaintiffs conflate the two key steps of the DPS Policy and therefore their argument based on compliance with the DPS Policy must fail.</u>

Finally, Plaintiffs' argument that it is illogical for FWS to "strip" ESA protections from a species after finding that the DPS meets the "significance" factor conflates steps one and two of the DPS Policy's analysis. Br. at 28. The two-part analysis permits just this result and allows recovered populations to be delisted. The DPS Policy requires FWS to (1) evaluate the

---

[11] Indeed, other courts have already suggested that delisting DPSs of recovered populations may be proper under the ESA. *See Kempthorne*, 579 F. Supp. 2d at 18-19 (explaining that the District of Vermont's opinion on the 2003 Delisting Rule "may be consistent with the approach taken in the [2008] Final Rule") (discussing *Defenders (wolf)*, 354 F. Supp. 2d at 1169, and *Nat'l Wildlife Fed'n v. Norton*, 386 F. Supp. 2d 553, 565 (D. Vt. 2005)).

"discreteness" and "significance" elements to establish whether the entity is a DPS and then, if it is a DPS, (2) evaluate the status of the DPS. 61 Fed. Reg. at 4725. Consequently, under step one, FWS determined that the DPS was "discrete," because it is markedly separate from other wolf populations and separated by an international border from Canadian wolves, and "significant" because "[t]he successful restoration of a viable gray wolf metapopulation ... to large parts of Minnesota, Wisconsin, and Michigan has filled a significant gap in the holarctic range of gray wolves in the United States, and it provides an important extension of the range of gray wolves in North America." 76 Fed. Reg. at 81,672. Thus, "[t]he loss of the WGL gray wolf population would, therefore, represent a significant gap in the species' holarctic range." *Id.* In step two, FWS conducted its five-factor analysis and concluded that the DPS was neither threatened nor endangered. It could not, therefore, retain the DPS as a listed species, because it failed to meet the statutory definitions. Moreover, Plaintiffs are wrong to suggest that the delisting decision is a "rejection" of the WGL wolf population. Br. at 28. Quite the contrary, FWS determined that the population is robust, that its long-term viability is secure, and thus it is recovered. Plaintiffs clearly prefer federal management to state management, but this policy preference is insufficient to challenge the Final Rule. *In re Polar Bear*, 794 F. Supp. 2d at 69. For all of the foregoing reasons, and because FWS complied with the ESA and the DPS Policy, judgment must be entered for Federal Defendants on this claim.

## II.     The Western Great Lakes DPS's boundaries were properly delineated.

FWS considered the best available scientific data on wolf distribution and dispersal and delineated the boundaries of the Western Great Lakes DPS to include the core recovered wolf population plus a wolf movement zone. 76 Fed. Reg. at 81,672-74. FWS determined that the most reasonable means to reflect the wolf population segment's biological characteristics was to use the international border between U.S. and Canadian wolves and landscape features, including rivers and highways that are partial barriers to further wolf movement. *Id.* at 81,671, 74. As the D.C. Circuit recently explained in addressing nearly identical arguments challenging FWS's

interpretation and application of its DPS Policy, the plaintiffs "carry a heavy burden in advancing this claim because the agency's interpretation of its own regulations 'must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation.'" *In re Polar Bear*, 709 F.3d at 11 (citation omitted). Plaintiffs assert that the DPS is too large, but Plaintiffs offer no support for their contention that the boundaries of a DPS should include only the "core areas in which a population has fully recovered." Br. at 29. Indeed, Plaintiffs themselves do not have a consistent position on boundary drawing, arguing that where a DPS is used for *listing* purposes, FWS should use "wide boundaries–based on the species' dispersal distances." Br. at 30. Contrary to Plaintiffs' preferences, the ESA and the DPS Policy make no such distinctions between listing and delisting. FWS appropriately drew the boundaries of the WGL DPS to circumscribe a metapopulation, using principles of conservation biology. 76 Fed. Reg. at 81,673. This rational, science-based line-drawing is entitled to deference.

FWS has wide discretion in interpreting its DPS Policy and drawing the DPS boundaries. *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994); *see, e.g.*, 2007 AR 77 at 311 (2007 Decision Memorandum) (recognizing that FWS has little statutory guidance and a great deal of discretion in drawing DPS boundaries).[12] No matter where the lines were drawn, stakeholders were going to disagree; *e.g.*, some urged that the DPS was too small while others argued that the DPS was too large. 76 Fed. Reg. at 81,683 (cmt. 11-12). Rather than trying to satisfy any particular interest, FWS reviewed the best available biological information and designed the DPS to include the core recovered wolf population in the Great Lakes plus a wolf movement zone, whose size is based on scientific data on wolf movements and dispersal. *Id.* at 81,672-74.

---

[12] Plaintiffs argue that FWS interpreted its discretion too broadly and cite an earlier version of this Decision Memorandum in their brief, Br. at 29-30 (citing 2007 AR Doc. 58 at 232-33), which provides an unnamed person's draft and evolving interpretation of prior judicial opinions that guide DPS boundary lines. The Decision Memorandum and its drafts provide evidence that FWS carefully evaluated the applicable legal authority on DPS boundaries and understood that FWS's discretion to define the boundaries of the DPS is indeed broad. *See, e.g.*, *Colo. River Cutthroat Trout v. Salazar*, 898 F. Supp. 2d 191, 209 (D.D.C. 2012) ("Judicial deference to the agency is greatest when reviewing technical matters within its area of expertise, particularly its choice of scientific data and statistical methodology.") (internal quotations and citation omitted).

Plaintiffs contend, without citation, that "[t]he boundaries of the DPS established extend far beyond the wolf's current distribution." Br. at 30. Instead, however, the DPS includes the locations of most known dispersers from the core populations, especially the shorter and medium-distance movements from which wolves are most likely to return to the core areas and contribute to the recovered wolf population. 76 Fed. Reg. at 81,673, 81,683. The DPS boundaries were not drawn to include the location of all known dispersers or to extend the boundaries to the western-most borders of the Dakotas because those dispersers were not known to contribute to the core populations. *See id.* at 81,683. Similarly, the boundaries were not drawn tightly around the core recovered population given FWS's recognition of the "high degree of mobility shown by wolves" and that "dispersal of wolves from their natal packs and territories is a normal and important behavioral attribute of the species." *Id.* at 81,673. And FWS recognized that wolves west of the Missouri River may come from both Canada and the Rocky Mountains, so "[w]olves in this area cannot be assumed to belong to the WGL wolf population, supporting our belief that the boundary should not be designed to include the locations of all known dispersers." *Id.* at 81,674.

This was a rational course of action that was thoroughly explained in the Final Rule. *Id.*; *see also id.* at 81,683. Although Plaintiffs might have drawn the DPS boundaries differently, they have failed to show that FWS's DPS boundary was arbitrary and capricious. Likewise, Plaintiffs' related contention that Minnesota's management plan will "further inhibit successful dispersal" was amply addressed in the Final Rule. FWS explained that wolves are "effective dispersers … through human-dominated landscapes," the states' management plans include "maintaining habitat linkages and dispersal corridors as a management component," and the wolves in Minnesota are connected to the larger Canadian population. *Id.* at 81,684. Therefore FWS concluded that the WGL DPS population would remain viable post-delisting and retain robust dispersal opportunities.

Plaintiffs' claim that the DPS boundaries run afoul of court decisions discussing the 2003 Rule is equally baseless.[13] The 2005 Oregon decision held that FWS erred by creating a super-DPS called the Eastern DPS, which combined the robust population in the WGL with an unoccupied area in the Northeast, because FWS failed to complete the proper analysis within the large DPS. *Defenders (wolf)*, 354 F. Supp. 2d at 1170-71 ("Instead of drawing a line around the distinct populations in the Western Great Lakes … FWS extended the boundaries from these core areas to encompass the wolf's entire historical range."); *id.* at 1172; *see also Nat'l Wildlife Fed'n*, 386 F. Supp. 2d at 564.[14] Here, unlike the invalidated 2003 Rule, FWS established a DPS that includes a core group of wolves and the surrounding area where these wolves are likely to disperse. *See* 76 Fed. Reg. at 81,683.[15]

Finally, Plaintiffs' allegation that the DPS boundaries' ultimate effect is to prevent further recovery efforts is inaccurate. *Cf.* Br. at 31 ("The current DPS … will imprison the wolf in core areas where recovery has already begun."). In the Final Rule, FWS determined that the WGL DPS was recovered for purposes of the ESA. *See* 16 U.S.C. § 1533(a)(1); 76 Fed. Reg. at 81,688-722. Plaintiffs apparently disagree, but this is insufficient to show that the rule is arbitrary and capricious. Moreover, FWS's finding is fully consistent with the ESA, where one

---

[13] The 2011 WGL boundaries differ from the 2003 DPSs boundaries, but are the same as those in 2007. *See* Br. at 30. However, the 2008 remand addressing the 2007 Rule was based on statutory interpretation, not the scientific basis for the boundaries. *Kempthorne*, 579 F. Supp. 2d at 19-20.

[14] FWS's rationale for the 2003 Rule was that it could not create narrowly tailored DPSs separately for the western Great Lakes, Northern Rocky Mountain, and southwestern Mexican wolf populations because the still-listed remainder of the United States would be neither a species, subspecies, nor a DPS. Thus, it created much larger DPSs: the Eastern DPS, etc. Both the Oregon and Vermont courts rejected that reading of the statute. *Defenders (wolf)*, 354 F. Supp. 2d at 1169 ("The DPS Policy provides FWS the flexibility to list, downlist, or delist discrete and significant populations, even though the conservation status of the species may differ elsewhere."); *Nat'l Wildlife Fed'n*, 386 F. Supp. 2d at 565 ("Nowhere in the ESA is the Secretary prevented from creating a 'non-DPS remnant' designation, especially when the remnant was already listed as endangered.").

[15] Indeed, during public comment on the 2007 Rule, the lead, named plaintiffs in both the Vermont and Oregon wolf cases "acknowledge[d] that the western Great Lakes gray wolf population may constitute a DPS as that term defined by [FWS]/NMFS DPS Policy. We find scientific and legal justification for the boundaries established for this newly created DPS." 2007 AR Doc. 228 at 8248 (Defenders of Wildlife Comment Letter); *see also* 2007 AR Doc. 228 at 7717 (National Wildlife Federation Comment Letter) (noting that "NWF also supports the FWS designation of the Western Great Lakes DPS").

of the goals "is to recover listed species and then to delist them when they no longer qualify as threatened or endangered, thereby allowing [FWS] to focus its efforts on the many other species that do qualify as threatened and endangered." 76 Fed. Reg. at 81,682; *see also* H.R. Rep. 95-1625, at 6 (Sept. 25, 1978). Once it is recovered, states resume management of the species and undertake any further recovery efforts that may be necessary under state law. *See, e.g.*, *id.* at 81,684. Put simply, the Final Rule narrowly addresses the ESA status of the WGL DPS; wolves located outside of that DPS are beyond the scope of the Final Rule. 76 Fed. Reg. at 81,686; *Nat'l Wildlife Fed'n*, 386 F. Supp. 2d at 567 (holding that the ESA allows the Secretary broad discretion to allocate scarce recovery resources).[16] For the foregoing reasons, Plaintiffs' challenges to FWS's biologically based definition of the DPS boundaries for the WGL wolves must fail.

## III.    FWS in the Final Rule rationally determined the gray wolf in the WGL DPS is not threatened or endangered in a significant portion of its range.

Plaintiffs' argument that the wolf cannot be delisted because it remains endangered throughout a "significant portion of its range," Br. at 18-25, fails because it relies on an interpretation of the term that is at odds with FWS's reasonable construction. Under the ESA, threatened and endangered species are "species" (*i.e.*, a species, subspecies, or DPS) in danger of extinction or likely to be in danger of extinction in the foreseeable future "throughout all or a significant portion of [their] range." 16 U.S.C. §§ 1532(6), (20). Courts have concluded, the phrase "throughout … a significant portion of its range" provides an independent basis for listing, such that if FWS: (1) identifies a significant portion of a species' range; and (2) finds that the species is threatened or endangered in that portion of the range, then the entire "species" is subject to listing and protection under the ESA. *Defenders of Wildlife v. Salazar*, 729 F. Supp. 2d 1207 (D. Mont. 2010).

Congress did not define "significant portion of its range," and courts find this language

---

[16]    Additionally, as FWS recognized, it is not uncommon for States to lead the way in wolf recovery. In fact, with regard to the recovered WGL wolf population, the States deserve much of the credit for reaching the recovery goals. *See id.* at 81,686 ("Wisconsin and Michigan DNRs have led the efforts to restore wolves to their States for several decades").

"inherently ambiguous." *Defenders of Wildlife v. Norton*, 258 F.3d 1136, 1141 (9th Cir. 2001); *Colo. River Cutthroat Trout*, 898 F. Supp. 2d at 201. Thus, it is FWS's responsibility "to fill any gap left, implicitly or explicitly, by Congress." *Chevron, U.S.A. v. Natural Res. Def. Council*, 467 U.S. 837, 843 (1984) (citation omitted). FWS did so here. 76 Fed. Reg. at 81,722-23.[17] Under FWS's interpretation, a "significant portion" of a species' range is identified based on the biological contribution of the portion of the range to the conservation of the species. *Id.* at 81,722. FWS explained that a portion of a species range is "significant" if, "its loss would result in a decrease in the ability to conserve the species." *Id.*

Applying this interpretation, FWS evaluated whether any portions of the area in the WGL DPS constituted a "significant portion of the range." It asked whether there are areas where "potential remaining threats are concentrated" and then considered if those areas contribute "meaningfully to the representation, resiliency, or redundancy of the species" such that those areas might constitute an SPR. In conducting that analysis, FWS found that the WGL DPS contains core blocks of suitable, occupied habitat that "provide an adequate wild prey base, suitably low levels of human-caused mortality, and sufficient numbers and distribution of wolves to ensure adequate representation, resiliency, and redundancy" to support the existing, viable metapopulation of wolves in the DPS. *Id.* at 81,722-23. Other areas of the WGL DPS, by contrast, contain areas with high road densities or fragmented patches of small size that are not conducive to long-term persistence of the wolf, but wolves may occasionally disperse there. *Id.*

---

[17] Because the statute is ambiguous, FWS's reasonable interpretation is entitled to controlling weight. *See United States v. Eurodif S.A.*, 555 U.S. 305, 309-11, 315-16 (2009) (granting *Chevron* deference to agency's interpretation issued through analogous adjudicatory process); *Menkes*, 637 F.3d at 331. Plaintiffs ignore FWS's interpretation at the time of the delisting determination and, as discussed *infra*, inaccurately characterize staff emails explaining that position. Instead, they rely on their construction of judicial interpretations of the ambiguous statutory phrase and argue based on "plain meaning." Pls.' Br. at 19 & 19 n.7 (discussing *Defenders (wolf)*, 354 F. Supp. 2d at 1167-68, which addresses a different DPS than the one at issue), 20 (discussing *Defenders (lynx)*, 239 F. Supp. 2d at 19); *see generally* Br. at 18-25. This line of argument fails. *See Nat'l Cable*, 545 U.S. at 982-83 ("A court's prior judicial construction of a statute trumps an agency construction otherwise entitled to *Chevron* deference only if the prior court decision holds that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion.").

at 81,722. Likewise, the lack of suitable habitat in the portions of North Dakota, South Dakota, Iowa, Illinois, Indiana, and Ohio included in the DPS is "expected to preclude the establishment of viable populations in these areas although dispersing wolves and packs may temporarily occur in some of these areas." *Id.* at 81,723. Thus, FWS rationally determined that the loss of areas of unsuitable habitat within the WGL DPS would not result in a decrease in the ability to conserve the species. *Id.* Moreover, by evaluating habitat and threats to wolves throughout the upper Midwest, FWS also necessarily evaluated the lost portions of historical range of gray wolves within the DPS and evaluated whether any of those portions constituted "significant portions" of that range. *See id.* at 81,689 (explaining that gray wolves historically occupied the entire Midwest), 81,722-23.

Despite FWS's reasoned explanation addressing the resiliency, redundancy, and representation of wolf populations in the DPS, Plaintiffs raise several challenges to FWS's analysis. Br. at 19-25. First, Plaintiffs incorrectly redefine "significant portion of its range" as evaluating the significance of currently unoccupied areas of historical range. Br. at 19-21. This is not the approach taken by FWS, which defines the SPR analysis based on the importance of portions of species' *current* range to the representation, resiliency, or redundancy of the species. 76 Fed. Reg. at 81,722. Plaintiffs cite to pre-2000 rules to suggest that "FWS has consistently recognized that the term 'range' refers to the species' *historical range*." Br. at 18. But the species highlighted by Plaintiffs were not based on FWS's current definition of the term "significant portion of the range" and are therefore inapposite. *Id.* The interpretation of the term in the Final Rule is the only one at issue. There, FWS explains its use of current range: FWS is focusing on threats to the long-term health of the species where they currently exist by focusing on threats arising out of areas of current range. 76 Fed. Reg. at 81,722.

Moreover, FWS's interpretation of "significant portion of the range" has recently been upheld, even in some cases where the species was still absent from large portions of its historical range. *See, e.g.*, *W. Watersheds Project v. Ashe*, -- F. Supp. 2d --, No. 4:11-cv-462-ELJ-REB,

2013 WL 2433370, at *18, 19-20 (D. Idaho June 4, 2013) (explaining the "traditional significant portion of range" test, which applies the concepts of population redundancy, resiliency, and representation and upholding a rule based on that test); *cf. Colo. River Cutthroat Trout*, 898 F. Supp. 2d at 203 (upholding FWS's analysis of significant portion of the range where FWS analyzed "the distribution of the Trout's current range, identif[ied] recent population trends, and detail[ed] the cessation of the primary cause of past reduction"). Additionally, the D.C. Circuit upheld a determination that a squirrel was no longer threatened or endangered under the ESA based on data suggestive of recovery of the subspecies throughout portions, but not all, of its historical range. *See Friends of Blackwater v. Salazar*, 691 F.3d 428, 432 (D.C. Cir. 2012) (noting that the rule was based on "data showing persistence across 80 percent of the squirrel's historic range"); *see also* 73 Fed. Reg. 50,226, 50,227, 50,239 (Aug. 6, 2008) (rule addressed in *Blackwater*) (best available science showed that 242,000 acres of habitat remains of the greater-than-500,000 acres of historically preferred habitat for the subspecies of squirrel, *i.e.*, 48 %, although when measured by the outline of the current distribution, "the current distribution of the [squirrel] closely match[es] the extent of its historical range"); *see also Tucson Herpetological Soc'y v. Salazar*, 566 F.3d 870, 877 (9th Cir. 2009) (upholding FWS's conclusion that portions of the species' range did "not provide any unique or critical function for the well-being of the species"); *cf. Defenders of Wildlife v. Kempthorne*, 535 F. Supp. 2d 121, 129 (D.D.C. 2008) ("The ESA permits some habitat loss, so long as that loss does not rise to the level of a threat. … Accordingly, habitat loss or fragmentation can occur, so long as the black bear is not threatened.") (citations omitted).

While Plaintiffs explain their own preferences for reframing the SPR analysis and then find the Final Rule lacking based on their analysis, Plaintiffs' arguments ultimately fail to show that the Final Rule is arbitrary and capricious. Their policy preferences must give way to FWS's reasonable definition of SPR and its careful application.

Second, Plaintiffs attempt to refocus the "significant portion of the range" analysis of the

gray wolf as "species-wide," under their own definition of species. Br. at 19. Indeed, Plaintiffs state: "Plain and simple, the absence of wolves from their historical range means that wolves *cannot be delisted*, whether by use of the DPS tool or otherwise." Br. at 20. This interpretation of the ESA–that unless a species exists throughout the entirety of its historical range it must be listed–has been adopted by no court. Not even *Defenders of Wildlife v. Norton*, on which Plaintiffs heavily rely, requires such an outcome.[18] As explained, FWS defined the relevant unit of analysis as the WGL DPS. Thus, it performed the SPR analysis *within* the DPS to determine whether the DPS is a threatened or endangered species. This approach is reasonable and, moreover, recent courts have criticized FWS for looking outside the relevant DPS when conducting delisting determinations. *Cf. Greater Yellowstone Coal. v. Servheen*, 665 F.3d 1015, 1027 (9th Cir. 2011) (addressing rule to designate and delist a DPS of grizzly bears in the Greater Yellowstone Area, *id.* at 1023, and holding that FWS may not "base its delisting determination on observations pertaining entirely to a different [DPS]"). This makes sense, because ESA section 4 requires evaluation of the relevant "species," here the DPS; it does not provide that FWS shall evaluate a DPS *and* every other related taxonomic entity ("subspecies," "species," etc.) in performing a listing or delisting decision.

In addition to its reasonable definition of "significant portion of the range," the Final Rule's approach is consistent with recommendations from FWS staff on the SPR analysis. Plaintiffs' argument that FWS "realized the illegality of its approach" is based on a staff email that, contrary to Plaintiffs' interpretation, actually supported the SPR approach taken in the Final Rule. *See* Br. at 20-22 (citing AR 107).[19] In the email, one staff member explains that an initial draft of the 2011 proposed rule evaluated whether portions of the range within the DPS met the

---

[18] *Defenders of Wildlife*, 258 F.3d at 1143 n.9 (finding compelling the Secretary's argument that a purely quantitative measure of range does not fulfill the purposes of the ESA because "this interpretation could erroneously result in listing of species that are in no danger of extinction merely because they no longer inhabit all of their historical range").

[19] A draft options paper from 2005, presenting what FWS non-attorneys considered to be permissible approaches to addressing wolves, does not suggest that FWS's actions in the Final Rule in 2011 are illegitimate. *Cf.* Br. at 21 (citing 2007 AR 23 at 115).

definition of threatened or endangered and then evaluated those areas combined, rather than initially addressing the entire DPS. AR 107 at 3108-09A; 3111A. The staff member, quoted by Plaintiffs, disagreed with the analysis in the draft proposed rule and advocated evaluating the status "throughout all" of the species range (*i.e*, the DPS) before evaluating whether "there are any portions to consider." *Id.* at 3109A (explaining that the proper order is to evaluate whether "it is not T/E throughout all and not T/E in any SPRs"). This was the approach taken in the Final Rule. *See* 76 Fed. Reg. 81,721-22. Plaintiffs excerpt the email to suggest that the "whole" was something other than the DPS; however, it is clear from context that the author was talking about the DPS rather than some other kind of species. *Id.* Thus, even if preliminary comments and drafts were relevant to the Court's analysis, which they are not, *Serono Laboratories v. Shalala*, 158 F.3d 1313, 1321 (D.C. Cir. 1998), FWS was acting consistently with the recommended analysis which, as discussed elsewhere, is consistent with the Act and caselaw. The remaining emails Plaintiffs cite in this argument section address taxonomy rather than FWS's SPR analysis, and are irrelevant here. *See* AR 92 at 2831-32A (discussing areas some scientists believe were *C. lycaon* range) & 99 at 2846A (discussing whether areas outside the WGL in the "NE" and "SE" were historically *C. lupus* range).

Third, Plaintiffs reprise their arguments that FWS will eliminate dispersal corridors for the gray wolf by delisting the WGL DPS. Br. at 22-24. This argument arises from a false premise: Plaintiffs equate state management with "extirpation" of dispersing wolves. *See* Br. at 23. FWS evaluated dispersal, 76 Fed. Reg. at 81,673, 81,683, and concluded that, because the states' management plans include "maintaining habitat linkages and dispersal corridors as a management component," and wolves in Minnesota are connected to the much larger Canadian population, delisting will not cut off dispersal. *Id.* at 81,684. Indeed, state management plans provide for additional protection of corridor habitat. *Id.* FWS also evaluated current threats to dispersal habitat. FWS recognized that certain areas in the DPS are densely roaded and therefore hazardous to dispersing wolves. *Id.* at 81,700. But it concluded these sources of wolf mortality

have not stopped the continuing growth of the Wisconsin and Michigan populations or the steady state of the Minnesota population and, therefore, are unlikely to threaten the continued viability of the WGL DPS. *Id.* at 81,673. Moreover, FWS noted that accidental deaths from vehicle collisions and other unintentional human-caused mortality would occur whether or not the WGL DPS is removed from the protections of the Act. *Id.* Plaintiffs did not submit new or better scientific data on dispersal that calls into question these conclusions, which is fatal to their arguments. *See Sw. Ctr. for Biological Diversity v. Babbitt*, 215 F.3d 58, 60 (D.C. Cir. 2000); *see also Cytori Therapeutics v. FDA*, 715 F.3d 922, 923 (D.C. Cir. 2013) ("In [APA] cases alleging arbitrary and capricious agency action, courts must be careful not to unduly second-guess an agency's scientific judgments."). In any event, the ESA does not mandate absolute protection of dispersal corridors or reoccupation of all historical range. Plaintiffs again are trying to create additional steps to the delisting process that do not exist which is inconsistent with the D.C. Circuit's decision refusing to add more procedures to the ESA delisting analysis. *Blackwater*, 691 F.3d at 432.

Likewise, Plaintiffs' cited caselaw addressing the term SPR does not support their position. These cases are distinguishable and, in some instances, rely on "plain language" interpretations of "significant portion of its range," where later courts have found the term ambiguous and, therefore, to be defined by the agency. Specifically, *Defenders of Wildlife v. Norton ("Defenders (lynx)")* is inapposite because it was based on FWS's lack of explanation. In that case, the Court held that FWS failed to explain its determination that several regions were not a significant portion of the lynx's range within the DPS. 239 F. Supp. 2d 9, 21 (D.D.C. 2002). It remanded the decision for further explanation. *Defenders (lynx)*, thus stands for the unremarkable proposition that *if* FWS creates a DPS that encompasses the entire historical range of the species, *id.* at 16, it must identify the SPRs within that range and explain its decision, rather than rely on the lynx's natural rarity. *Id.* at 21. Moreover, perhaps because FWS did not itself define SPR in the lynx listing rule, the Court relied on a dictionary definition of

"significant" for its analysis. *Id.* at 19. Here, FWS defined the term SPR, used it to identify potential SPRs, and explained its decision. *Cf.* Br. at 23.

*Friends of the Wild Swan, Inc. v. U.S. Fish & Wildlife Service*, is similarly unhelpful to Plaintiffs' argument. *Cf.* Br. at 23. In that case, environmental groups challenged FWS's decision to list only two of five bull trout populations as DPSs. 12 F. Supp. 2d 1121 (D. Or. 1997). The Court held that FWS's decision was arbitrary and capricious because FWS failed to address the complete scope of the plaintiffs' listing petition, which asked the agency to list the bull trout throughout its entire range. *Id.* at 1133-34. The Court noted that FWS had to determine whether the entire bull trout species qualified for listing before it could proceed by population segment, not because the ESA required it, but because FWS's findings had to be "at least comprehensive enough to address the [plaintiffs'] petition to list." *Id.* at 1134. Thus, *Friends of the Wild Swan* does not stand for the proposition that every listing or delisting determination must address the entire species before it addresses a DPS. Instead, it stands for the proposition that a determination on a listing petition must address the complete scope of that petition. Whether the rulemaking adequately addressed the scope of a listing petition is not at issue here, and FWS more than adequately explained its decision to define and delist the WGL DPS, thereby fully responding to citizen petitions to delist wolves there. Consequently *Friends of the Wild Swan* does not support Plaintiffs' argument.

Finally, Plaintiffs suggest that if their challenge to the Final Rule fails, FWS might become emboldened to delist otherwise imperiled species "clustered in isolated pockets." Br. at 22. Past practice does not suggest this is a likely scenario: FWS has used sparingly its authority to delist DPSs when part of the entity remained listed. *See* 76 Fed. Reg. at 81,699-700. Moreover, Plaintiffs' description of "isolated pockets" does not describe the Final Rule. Instead, the Rule addresses a viable wolf metapopulation of over 3,500 in a multi-state area, connected to a healthy population of over 50,000 wolves in Canada. *See* AR 440 at 11712A (discussing Canadian population) (citation omitted). Second, given that the ESA allows only the delisting of

a species or DPS that is not in danger of extinction now or in the foreseeable future, it is unlikely FWS could "divvy up a species' range into small portions" and still comply with the Act if the species or DPS is truly imperiled. Finally, Plaintiffs' barb appears aimed at Congress and the Courts, rather than FWS, because Plaintiffs are effectively asserting that it was folly for Congress to define "species" to include DPSs and for Courts to uphold the DPS Policy.

In sum, by providing a reasoned interpretation of the statute and a cogent explanation of its analysis of "significant portions of [the] range" within the DPS, FWS fully complied with the law. In fact, FWS went one step further and–although not required to do so—analyzed all areas within the DPS, not just the current range. Therefore, FWS's SPR analysis should be upheld.

## IV.    FWS's decision to delist the WGL DPS gray wolf was based on scientific consideration, not political interference.

In issuing the Final Rule, FWS considered the best available science and the ESA's five statutory factors. Plaintiffs' claim that the Final Rule was based on political interference rather than sound scientific decision-making, Br. at 15-18, should be rejected out of hand as an attempt to insinuate "bad faith"—where none existed and where no evidence suggests otherwise. The starting point for judicial review is that a presumption of regularity attaches to agency decision-making. *See, e.g., Citizens to Pres. Overton Park v. Volpe*, 401 U.S. 402, 415 (1971). Plaintiffs' allegations demonstrate nothing more than that FWS publicly committed to a timetable for the Final Rule, while also complying with the ESA's and APA's mandates. Completing work on a preplanned schedule poses no legal error, contrary to Plaintiffs' suggestion, much less gives rise to an inference of bad faith. A review of the relevant events dismantles Plaintiffs' theory of political motivation.

After the remand decision of the 2008 *Humane Society* litigation, FWS prepared a proposed rule for public comment in 2009, AR 12 (draft of proposed rule for comment in 2009), but eventually issued it as a final rule, without public comment, in April 2009. In light of an admitted lack of public comment, the parties filed a stipulated settlement agreement that: (1) remanded and vacated the 2009 Rule; (2) required FWS to provide a 60-day public comment

period for any new rulemaking relating to the WGL wolves' status under the ESA; and (3) provided for the dismissal of the action. *See Reinstatement of Protections for the Gray Wolf in the Western Great Lakes in Compliance With Settlement Agreement and Court Order*, 74 Fed. Reg. 47,483 (Sept. 16, 2009). Thus, in 2009, FWS's rule to delist the wolves had been vacated by agreement, solely for failure to allow public comment.

Starting in mid-March 2010, FWS received four citizen petitions to delist gray wolves in the Midwest, including a WGL DPS, and FWS processed those petitions pursuant to the statutory framework. *See* 16 U.S.C. § 1533(b)(3)(A), (B); 75 Fed. Reg. 55,730, 55,731 (Sept. 14, 2010). In September 2010, FWS issued its required 90-day finding on these petitions and concluded that the petitioned action may be warranted. 75 Fed. Reg. 55,730. This required FWS to produce a proposed rule regarding the WGL DPS or to conclude that the action was not warranted or warranted but precluded, within 12 months of the citizen petitions. 16 U.S.C. § 1533(b)(3)(B). In December 2010, the Assistant Secretary for Fish, Wildlife and Parks responded to Senator Klobuchar's December 7, 2010 letter requesting prompt action on the gray wolf, and presented FWS's timeline for a rule to delist the wolf, including issuing a proposed rule by May 2011. AR 78; AR 79 (communications with Senator Klobuchar's office about her announcement of this proposed action). Importantly, at the time the Assistant Secretary sent his letter, FWS had already announced that removing ESA threatened or endangered status for upper Midwest gray wolves may be warranted—a position it had been publicly announcing for more than a decade.

Plaintiffs suggest that the rulemaking was "rushed," Pls.' Br. at 1, to meet arbitrary deadlines, although they fail to acknowledge that the ESA imposes statutory rulemaking deadlines after a citizen submits a petition to reclassify a species. *See* 16 U.S.C. § 1533(c)(3)(A)-(D).[20] Plaintiffs further fail to note that FWS has consistently proposed to either downlist to

---

[20] Courts in similar contexts do not find that creating a timeline predetermines the result. In *Friends of Southeast's Future v. Morrison,* for example, the Ninth Circuit affirmed a holding that a tentative operating schedule for planned timber supply contract did not commit the agency to a particular action. 153 F.3d 1059, 1063 (9th Cir. 1998); *see also Wyo. v. U.S. Dep't of Agric.*, 661 F.3d 1209, 1265 (10th Cir. 2011), *cert. denied*, 133 S. Ct. 417 (2012); *Defenders of Wildlife v. Hall,* 807 F. Supp. 2d 972, 985 (D. Mont. 2011); *Oceana, Inc. v. Locke*, 725 F. Supp. 2d 46, 67

threatened status or to remove the Midwest gray wolves from the list of threatened or endangered species since 2000.[21] *See also* Br. at 8. The Secretary's letter discusses the procedures and timelines for agency decision-making. AR 78. It simply does not show any political interference, much less political interference in the substance of any scientific finding or decision made in FWS's rule.[22]

Plaintiffs also cite excerpts from the record that show only that FWS was trying to comply with its own timeline and address the available science and respond to public comment.[23] For example, because FWS had already announced that delisting the gray wolf may be warranted, and the regional FWS office had already submitted a proposed rule to delist to the Washington office, AR 87 at 2822A, emails that FWS staff were aware that FWS had begun work on a draft delisting rule are unsurprising and do not reveal improper political interference. AR 87 at 2822A (referring to rules that "presumably would delist [the] WGL wolves").

Finally, Plaintiffs cite several documents presenting options to suggest that FWS sacrificed scientific integrity for the sake of political convenience, but they fail to mention here

---

(D.D.C. 2010) (an aggressive schedule did not demonstrate that the agency prejudged the outcome), *rev'd on other grounds* 670 F.3d 1238, 1243 (D.C. Cir. 2011).

[21] In fact, FWS was sued based on a purported unlawful failure to quickly issue a new proposed rule following the 2009 remand. *See Tyler v. Salazar*, Civ. No. 11-1161 (JNE/LIB), 2012 WL 3113866 (D. Minn. June 27, 2012), *aff'd*, 504 F. App'x 538 (8th Cir. 2013). Plaintiffs there claimed that FWS violated the ESA and APA in part by taking years to review the best available taxonomic science before drafting another proposed rule. *See* 2012 WL 3113866, at *6 n.9.

[22] It appears that Plaintiffs' allegations of political interference are based on the mere fact that political appointees at the Department of the Interior discussed rulemaking matters with a United States Senator. By this rationale, the Department of the Interior could be viewed as engaging in improper political interference by discussing the rulemaking with environmental organizations that participate actively in various political venues. Just as DOI's discussion of rulemaking matters publicly and with various interest groups is not improper, neither is it improper to discuss such matters with members of Congress or to respond to Congressional inquiries.

[23] Plaintiffs cite what appears to be a sarcastic comment by a legislative affairs chief officer who stated that he believed that FWS would always seek to delist the gray wolf everywhere. Pls.' Br. at 16. He was not acting as a biologist and was not part of the regulatory process on where to propose delisting the wolf. AR 79 at 2773A. At the outset, the comment is incorrect: FWS is currently seeking to maintain protections for the Mexican subspecies of the gray wolf. In any event, what is at issue is the Final Rule, not the off-hand remarks of one non-scientist employee. *See, e.g., Serono Labs. v. Shalala*, 158 F.3d 1313, 1321 (D.C. Cir. 1998) ("deference is owed to the decisionmaker authorized to speak on behalf of the agency, not to each individual agency employee").

that FWS reopened public comment to ensure that it was relying on the best available science, even though that comment period made complying with the timeline more difficult. FWS reopened public comment on the proposed rule in August 2011 to address a new taxonomic study that was in a journal's peer-review process. *See* AR 451, 453, 455 (discussing whether to allow public comment on Chambers et al. because certain peer reviewers and other commenters suggested that it warranted further evaluation); AR 469 at 12024A-27A (explaining that FWS staff could be convinced by public comment that declining to recognize *Canis lycaon* as a full species was the right option). Plaintiffs cite an email from this discussion that explains that reopening public comment would complicate meeting the timeline (AR 451 at 11749A), Br. at 17, but do not cite the discussion's resolution. That is, FWS *did* reopen public comment on Chambers et al. to ensure that it was complying with its statutory mandate to consider the best available scientific data and to evaluate the taxonomic debate. *See* AR 453 (weighing whether to reopen the rule for public comment); AR 455 at 11756A; AR 504; AR 499.

Because the Final Rule reflects a proper scientific evaluation of the status of the wolf and the taxonomic literature, Plaintiffs' caselaw authority is also inapposite. For example, in *Save Our Springs*, the regional office of FWS and its biologists had concluded in a regionally approved draft final rule that a species was endangered. *See Save Our Springs v. Babbitt*, 27 F. Supp. 2d 739, 742-44 (W.D. Tex. 1997). The Court found that the Secretary arbitrarily switched course and withdrew the proposed rule based on an ineffective conservation agreement with the state of Texas rather than based on the ESA's statutory factors. *Id.* at 745 (finding that lobbyists and others had also taken political measures to influence the listing decision). Here, the biologist preparing the draft and final rules as well as the peer reviewers concluded based on the best available science that delisting was warranted. For that reason, Plaintiffs' other cited decisions miss the mark because they describe political officials meddling in FWS's scientific conclusions. *See W. Watersheds Project v. U.S. Fish & Wildlife Serv.*, 535 F. Supp. 2d 1173, 1176, 1188 (D. Idaho 2007); *Biodiversity Legal Found. v. Babbitt*, 943 F. Supp. 23, 25 & n.4 (D.D.C. 1996).

Here, no decision was "undone" or reversed at the behest of political meddling.

In short, FWS's rule—its detailed scientific analysis supported by years of rigorous scientific reviews—demonstrates that FWS followed the science and made reasoned, expert findings on the biological status of gray wolves in the Western Great Lakes. It is this scientific analysis and FWS's expert conclusions that are subject to judicial review here, and Plaintiffs' efforts to circumvent reasoned decision-making with wholly unsubstantiated allegations of political interference and bad faith are specious and must be rejected.

**V.    FWS considered the best available science on wolf taxonomy and decided that all wolves in the WGL DPS are gray wolves, a decision entitled to deference.**

In the May 2011 proposed rule regarding the WGL, FWS proposed to recognize a separate species of wolf, *Canis lycaon*, as coexisting with *Canis lupus* in the WGL. However, based on two rounds of public comment, including comments from the scientific community, a review of the scientific literature, and peer reviews, FWS concluded that the best scientific data available at that time was not consistent with recognizing *Canis lycaon* as a full species coexisting with *Canis lupus* in the upper Midwest. 76 Fed. Reg. at 81,668-69. Plaintiffs reject FWS's conclusion regarding this complex, scientific issue. Instead, they reprise—in the guise of a best available science argument—their unsupported view that the Final Rule was issued not based on FWS's scientific judgment, but instead, based on a "hurried, pre-determined, and politically convenient result." Br. at 32; *see also id.* at 31-40.

Plaintiffs' arguments must be rejected because they ask this Court to require taxonomic certainty that is simply not required under the ESA. The ESA requires a species' threatened or endangered status to be determined based on the best available science. 16 U.S.C. § 1533(b)(1)(A). This provision permits—and in fact requires—FWS to make decisions in the face of conflicting scientific information. Moreover, the statutory deadlines for responses to citizen petitions to list or delist species require regulatory action based on a timeline, not scientific certainty. *See* 16 U.S.C. § 1533(b)(3)(A)-(D); *see also Bldg. Indus. Ass'n v. Norton*, 247 F.3d 1241, 1246 (D.C. Cir. 2001) (FWS "must utilize the 'best scientific … data *available*', not the

best scientific data *possible*.”). The D.C. Circuit, reversing a district court that ordered further analysis, explained, “[t]he ‘best available data’ requirement makes it clear that the Secretary has no obligation to conduct independent studies.” *Sw. Ctr. for Biological Diversity*, 215 F.3d at 60; *see also Am. Wildlands v. Kempthorne*, 530 F.3d 991, 998 (D.C. Cir. 2008).

To mount a successful best available science claim, Plaintiffs must point to better science that FWS failed to consider. The best available data requirement “merely prohibits the Secretary from disregarding available scientific evidence that is in some way better than the evidence [she] relies on. Even if the available scientific and commercial data were quite inconclusive, [she] may—indeed must—still rely on it at that stage.” *Sw. Ctr. for Biological Diversity*, 215 F.3d at 60 (quotation omitted). Plaintiffs, however, do not point to any better science. Instead, Plaintiffs allege that “[t]here is no plausible explanation” for FWS to recognize only *C. lupus* as the wolf species in the upper Midwest “other than the time pressure from the political side, for this reversal.” Br. at 32. Plaintiffs’ suspicions simply are not relevant to the question of what science was available to FWS. Because they have not presented better science available at the time of delisting that FWS failed to consider, Plaintiffs’ claim fails.[24]

Here, FWS sought two rounds of public comment on the issue of the taxonomic status of the wolves in the WGL and, based on those public comments and the scientific literature available, reached a conclusion. To address the regulatory definition of “species,” FWS had to address a complicated and unsettled taxonomic debate about what constitutes a biological species. *See* 76 Fed. Reg. at 26,091-92. FWS is required to use its expertise to resolve such questions and cannot, as Plaintiffs apparently would have it, defer or delay a decision pending results of future scientific reviews, awaiting new information. 50 C.F.R. § 424.11(a) (“In determining whether a particular taxon or population is a species for purposes of the Act, the

---

[24] Likewise, Plaintiffs’ suggestion that FWS could not rely on its Recovery Plan is misplaced. FWS analyzed whether the wolves recovered in the WGL are those listed in 1978 as the Minnesota population. It concluded that the best available science indicated that they were, and therefore that the Recovery Plan still applied. 76 Fed. Reg. at 81,679-80. Moreover, the D.C. Circuit recently held that “it is possible to reach … recovery of the species[]” by a pathway not contemplated in a recovery plan. *Friends of Blackwater*, 691 F.3d at 434, 438 n.*.

Secretary shall rely on standard taxonomic distinctions and the biological expertise of the Department and the scientific community … ."). As noted *supra*, after the close of the 60-day comment period, FWS reopened public comment on the taxonomic issue of what species of wolves occupy the upper Midwest in part to receive comment on a new taxonomy study. *See* AR 504; AR 499. Based on the comments and literature received and its own expert review of the taxonomic literature as of 2011, FWS recognized *C. lupus* as the only species in the area. *See* 76 Fed. Reg. 81,668, 81,682, 81,687. During public comment, FWS received letters from the scientific community, including prominent wolf biologists, who noted their concerns with the recognition of *Canis lycaon* as a separate species of wolf in the upper Midwest. AR 517 at 12512A (summary of public comments regarding taxonomy, including those from scientific community). One of FWS peer reviewers specifically disagreed with recognizing *Canis lycaon* as a full species in the Midwest. AR 440 at 11709A. Here, in light of the complex and contradictory science, FWS's conclusion is particularly within FWS's expertise and entitled to deference. Particularly where FWS is making taxonomic decisions, "[i]n an area characterized by scientific and technological uncertainty[,] this court must proceed with particular caution, avoiding all temptation to direct the agency in a choice between rational alternatives." *Am. Wildlands v. Kempthorne*, 530 F.3d at 1000 (citations and quotations omitted); *see also Ethyl Corp. v. EPA*, 541 F. 2d 1, 36 (D.C. Cir. 1976) (*en banc*) ("Thus, after our careful study of the record, we must take a step back from the agency decision. We must look at the decision not as the chemist, biologist or statistician that we are qualified neither by training nor experience to be, but as a reviewing court exercising our narrowly defined duty of holding agencies to certain minimal standards of rationality.").

Next, Plaintiffs attempt to discredit the Final Rule's taxonomic conclusion based on a *proposed* rulemaking that was issued in 2013, 78 Fed. Reg. 35664 (June 13, 2013). The 2013 proposed rule includes statements about gray wolves' historical taxonomy that Plaintiffs suggest impugn FWS's scientific judgment call in the 2011 Final Rule about the identity of gray wolves.

*See* Br. at 34-35. First, because the 2013 proposal post-dates the 2011 Final Rule, it is outside the administrative record and the Court's review of the Final Rule. *See, e.g.*, *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985); *see Amfac Resorts, LLC v. U.S. Dep't of Interior*, 143 F. Supp. 2d 7, 12 (D.D.C. 2001) ("Were courts cavalierly to supplement the record, they would be tempted to second-guess agency decisions in the belief that they were better informed than the administrators empowered by Congress and appointed by the President. The accepted deference of court to agency would be turned on its head . . . ."). FWS relied on the best available science in 2011, as required by the ESA, and that decision must be reviewed based on the information available at the time.[25] Second, a proposed rule has no legal effect. It is only a proposal which is currently subject to public comment and thus it could change. 78 Fed. Reg. at 35,670 ("We do not view this issue as 'resolved,' and we fully expect that *Canis* taxonomy will continue to be debated for years if not decades to come, and scientific opinion on what represents the current best available science could well shift over time."). The proposed rule shows only that questions of taxonomy continue to be analyzed in the scientific community. *See also* AR 440 at 11710A. Debate in the scientific community did not relieve FWS of its responsibility to make the taxonomic decisions necessary to respond to the pending delisting petitions. The law requires FWS to issue decisions based on the best "available" scientific data, and that is exactly what FWS did in this case. *See Sw. Ctr. for Biological Diversity*, 215 F.3d at 60. A "court will not second guess an agency decision or question whether the decision made was the best one." *C & W Fish Co. v. Fox*, 931 F.2d 1556, 1565 (D.C. Cir. 1991).

Finally, Plaintiffs suggest FWS cannot make a "significance" determination as part of its rulemaking without establishing which taxonomic species is in the DPS. Br. at 39. But FWS did decide what species was in the DPS. It decided based on the best available science that all wolves in the WGL DPS are gray wolves (*Canis lupus*). Plaintiffs' arguments about whether FWS could have designated a WGL DPS if it had found that two species coexist within its

---

[25] Plaintiffs did not move for consideration of the proposed rule under the scheduling order. Min. Order (July 11, 2013).

boundaries are irrelevant and they ask the Court for an advisory opinion on facts not presented. Plaintiffs' citations to Court-remanded rulemakings based on an agency's failure to explain its position are therefore inapposite. *Cf. Am. Forest Res. Council v. Ashe*, 12-111 JDB, 2013 WL 1289724, at *11 (D.D.C. Mar. 30, 2013) (explaining that the agency, with expertise in biology, must make its own scientific decision and remanding to allow FWS to opine on the issue).[26]

Based on FWS's careful consideration of the scientific literature, comments from peer reviewers, and comments from other scientists, FWS decided in 2011 that wolves in the upper Midwest were *C. lupus*, and addressed them as one DPS. Much of Plaintiffs' argument assumes that FWS never came to a decision on the issue, when in fact it did. The Court must defer to FWS's reasoned decision, made after public comment, and based on the views of experts. Judgment should be entered for Federal Defendants on Plaintiffs' taxonomic arguments.

## VI.   FWS's determination about the adequacy of regulatory mechanisms was reasonable.

The only listing factor that Plaintiffs seriously dispute is the adequacy of existing regulatory mechanisms. After reviewing the best science information available, which included the State management plans in Michigan, Wisconsin, and Minnesota, FWS appropriately concluded that adequate regulatory mechanisms were in place to maintain viable wolf populations in the WGL. 76 Fed. Reg. at 81,701-17. FWS relied not only on state management plans, but on a case-by-case basis, other mechanisms in use. *See* 76 Fed. Reg. at 81,701.

---

[26] Plaintiffs cite to comments on drafts of the proposed rule that question whether, *if* FWS decided that the best available science showed that recognition of *Canis lycaon* as a full species was warranted, a DPS consisting of only *Canis lupus* could be delisted. These are irrelevant because they are discussions predating the close of public comment. *Cf.* AR 101 (cited in Br. at 36), AR 101 at 2871A (Plaintiffs omit the commenters' caveat "In the event that the Service adopts this approach [i.e., recognizing *C. lycaon* but delisting only *lupus*] *(and I am not certain that we will)* a rationale for how this is consistent with the Act will be needed") (emphasis added); 3086A (commenter proposing ideas to discuss with staff scientists and discussing thoughts on one DPS with multiple species); *see also* Br. at 37-38 (citing emails and drafts that predate the close of public comment). As discussed, public comment on the proposed rule was reopened and the scientific community commented and provided further analysis. FWS ultimately changed its conclusion on the taxonomic classification of wolves in the DPS.

Plaintiffs contend that the state management plans will allow a large decline in the wolf population. Br. at 42-43.[27]

The issue before FWS was whether the wolf population would remain at or above recovered levels after delisting. Contrary to Plaintiffs' implication, the possibility of a population decline after delisting is not inconsistent with the Act. Rather, the issue before FWS was whether the population would meet the definition of a "threatened species" or an "endangered species" after delisting. After reviewing the state management plans, FWS was confident that the population would remain above the numerical and distributional recovery goals. 76 Fed. Reg. at 81,716-17. Plaintiffs summarize the minimum populations contemplated in the state plans, but they fail to explain how that population would place wolves below recovered levels. Br. at 42. Moreover, these minimum population numbers are floors, not population targets, and even these minimum numbers exceed the recovery goals. *See* 76 Fed. Reg. 81,676.

At the time of the Final Rule, Minnesota's legislature had changed the law to allow public harvests (i.e., wolf hunting) when wolves were delisted. 76 Fed. Reg. at 81,703. The 2011 law allowed the Department of Natural Resources to begin to evaluate whether Minnesotans were in favor of hunting wolves and to seek approval from the legislature before any hunt. *Id.* It provided that any hunting regulations must first be subject to public notice and comment. *Id.* These further steps had not occurred at the time of rulemaking, making any discussion about hunts speculative. Moreover, because the Minnesota state management plan still requires the state to manage for at least 1,600 wolves, which exceeds the recovery goals, FWS determined that the law to begin the process of evaluating a wolf hunt did not call into question FWS's determination that Minnesota would ensure the wolves' continued survival in the state. *Id.*[28]

---

[27] Plaintiffs are inaccurate in asserting that the Wisconsin plan was not "existing" at the time of the Final Rule, because the plan was under revision. *Cf.* Br. at 42. FWS must rely on the management plans in existence at the time of rulemaking. *See Biodiversity Legal Found*, 943 F. Supp. at 26. The fact that the plan was under revision does not render it non-existent.

[28] Likewise, although Wisconsin's state plan contemplated a public harvest "the question of whether a public harvest [would] be initiated and the details of such a harvest [were] far from resolved." 76 Fed. Reg. 81,709. FWS therefore concluded that, given the number of legislative

Even if the current wolf hunts were relevant to the 2011 Final Rule, which they are not, because states had not yet approved hunts in 2011,[29] *see, e.g.*, *Florida Power & Light Co.* 470 U.S. at 743-44, Plaintiffs have failed to point to any evidence that regulated hunts will cause the wolf population to become threatened or endangered. FWS considered whether "the use of [regulated wolf hunts] might reduce the number of wolves in such a way that they would again be considered a threatened or endangered species." 76 Fed. Reg. at 81,685. Its primary concern was the viability of wolf populations, not any particular management method. *Id.* FWS concluded that the state plans would ensure the wolf's continued survival by requiring populations to exceed the Recovery Plan goals. *Id.* at 81,703. Likewise, regardless of whether the state permits a public harvest, Wisconsin's plan commits to managing a population above 350, which exceeds the Recovery Plan goals for a second population in the Midwest. *Id.*; *see also id.* at 81,711 (same for Michigan). Because the states will manage wolves to exceed recovery goals, even if they allow public harvest, FWS concluded that adequate regulatory mechanisms remain in place to ensure a viable metapopulation. For those reasons, Plaintiffs' challenges to the Final Rule should be rejected.[30]

Plaintiffs' attempt to paint a dismal picture of the states' management of human-wolf conflicts is equally unproductive. Thus, Plaintiffs claim that "under the Minnesota Wolf Management Plan, landowners within 'Zone B'—which is approximately 60% of the state—may kill a wolf 'to protect livestock, domestic animals, or pets.'" Br. at 43. What they neglect to

---

and regulatory steps remaining before a harvest, predicting its impacts would be "highly speculative." 76 Fed. Reg. at 81,709.

[29] Like the 2013 proposed rule, discussed *supra*, the final approval of state hunts and the details of those hunts post-dated the Final Rule. *Cf.* Br. at 42. Judicial review under the APA is limited to the record, which consists of those materials directly or indirectly considered by the agency decision-makers at the time they made the challenged decision and therefore does not include post-rulemaking details about the hunts.

[30] FWS will remain involved in monitoring wolves with data collected from states, tribes, and intertribal natural resources agencies. 76 Fed. Reg. at 81,723-24, 81,685; AR 6 at 371-72A. FWS experts will review the data and "[i]f … we detect a substantial downward change in the populations or an increase in threats to the degree that population viability may be threatened, we will work with the States and Tribes to evaluate and change … the monitoring methods, if appropriate, and/or consider relisting the WGL DPS, if warranted." *Id.* at 81,724.

mention is that Minnesota's Zone B contains only approximately 15% of the state's wolf population. Consequently, even assuming *arguendo* that a majority of the wolves within Zone B were killed, which is unlikely, the Minnesota wolf population would remain highly viable and well above the numerical recovery goals. *See* AR 5 at 307A. Similarly, Plaintiffs incorrectly assert that the Minnesota Plan "resurrect[s] the old bounty system." Br. at 43 n.12. Under a bounty system, anyone who provides evidence of having killed a wolf—under any circumstances and via any means—is paid a bounty. Under the Minnesota Plan, only trained and certified predator control agents, under very restricted and documented circumstances, would receive a fee. AR 5 at 310A. Likewise, under Wisconsin's plan, wolves may be subject to depredation efforts only within a one-mile radius of a wolf-conflict event. 76 Fed. Reg. at 81,705. Plaintiffs also fail to note that depredation control does not always involve killing the wolf, but may include technical assistance, compensation, and translocation of wolves in certain circumstances. *See* AR 4 at 177A; 76 Fed. Reg. at 81,705. Plaintiffs provide no record support for their contention that the state plans are "woefully inadequate," beyond disagreeing with depredation control to address wolves that may kill livestock. To prevail, Plaintiffs must identify better information available at the time FWS was developing the Final Rule that FWS failed to consider. *See In re Polar Bear*, 794 F. Supp. 2d at 69. Plaintiffs point to no such evidence. For all the foregoing reasons, FWS's conclusions at the time of rulemaking that the management plans and other mechanisms in place were adequate to control threats to wolves is entitled to deference and must be upheld.[31]

## CONCLUSION

For the reasons set forth above and based on the materials in the administrative record, Plaintiffs' motion for summary judgment should be denied and Federal Defendants' cross-motion granted.

---

[31] A FWS staff member noted the states' interest in having FWS comply with the ESA in delisting the wolves. *Cf.* Br. at 40 (citing AR 451, also discussed *infra*). Plaintiffs again insinuate with no support that FWS's decision was guided impermissibly by political motivations. *Id.*

Dated: December 4, 2013                    Respectfully submitted:

                                           ROBERT G. DREHER,
                                           Acting Assistant Attorney General
                                           U.S. Department of Justice
                                           Environment & Natural Resources Division
                                           SETH M. BARSKY, Chief
                                           KRISTEN L. GUSTAFSON, Assistant Chief
                                           Wildlife & Marine Resources Section

                                           /s/ *Andrea Gelatt*
                                           Andrea Gelatt, Trial Attorney
                                           Ben Franklin Station, P.O. Box 7611
                                           Washington, DC 20044-7611
                                           (202) 305-0388 | (202) 305-0275 (fax)
                                           andrea.gelatt@usdoj.gov
                                           *Attorneys for Federal Defendants*

Of Counsel:

Sharon Pudwill
Attorney Advisor
Twin Cities Field Solicitor's Office
5600 American Boulevard West, Suite 270
Bloomington, MN  55437-1173
(612) 713-7100 | (612) 713-7121 (fax)