UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

THE HUMANE SOCIETY OF THE
UNITED STATES, et al.,

      Plaintiffs,

    v.                                      Case No. 13-0186 (BAH)

SALLY JEWELL, Secretary of the
Interior,  et al.,

      Defendants,

STATE OF WISCONSIN, et al.,

      Intervenor Defendants,

---

MEMORANDUM OF POINTS AND AUTHORITY IN OPPOSITION TO
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

---

# TABLE OF CONTENTS

Page

INTRODUCTION ............................................................................................. 1

BACKGROUND AND LEGAL STANDARD...................................................... 2

ARGUMENT ..................................................................................................... 2

I.     WISCONSIN   MANAGES   ITS   WOLF   POPULATION
       CONSISTENT   WITH   THE   GOALS   OF   ITS
       PRESERVATION AND VITALITY ................................................ 2

II.    WISCONSIN   SUPPORTS   USFWS   DELINEATED
       BOUNDARIES OF THE WESTERN GREAT LAKES DPS ......... 9

CONCLUSION................................................................................................. 11

# TABLE OF AUTHORITIES

## Rules and Regulations

76 Fed. Reg. 81,666 (Dec. 28, 2011) ........................................................... 7, 11

Wis. Admin. Code § NR 12............................................................................. 9

## Statutes

Wis. Stats. § 29.888........................................................................................ 9

## Other Authorities

2011 Wisconsin Act 169 ................................................................................. 4

INTRODUCTION

Plaintiffs recklessly accuse the states, including Wisconsin, of maintaining inadequate regulatory mechanisms to protect wolves. Plaintiffs use this absolutely unsupported false accusation as a hook upon which to hang their contention that the Federal regulatory listing process is the only tool available to insure that wolves will not disappear. Plaintiffs' theory fails, and therefore their contention that wolves will disappear, has no merit or support. Wisconsin has responsibly and thoughtfully relied upon scientific studies to put into place a regulatory scheme that will guarantee the existence of a healthy Wisconsin wolf population in the future. Completely contrary to Plaintiffs' accusations, the supporting affidavits submitted with this brief, prove just how effectively and prudently Wisconsin's regulations protect its current wolf population. Plaintiffs outrageously accuse Wisconsin and the other states of planning and implementing regulatory mechanisms that are "…reminiscent of a time when bounties paid by state governments promoted the widespread killing of wolves…" (Dkt. 24-1 at p. 2). This is not only a completely unsubstantiated falsehood, it is insulting and ridiculous.

## BACKGROUND AND LEGAL STANDARD

Defendant Intervener State of Wisconsin is in agreement with the federal defendants regarding the factual background and legal standards that direct this case.

## ARGUMENT

I. WISCONSIN MANAGES ITS WOLF POPULATION CONSISTENT WITH THE GOALS OF ITS PRESERVATION AND VITALITY

Plaintiffs claim that the federal defendants are interested in appeasing the states with delisting and that it is somehow politically motivated. (Dkt. 24-1 at p. 40). They support this claim with a quote from the federal record stating that the states have an incredible vested interest in getting to a decision that is the most legally defensible decision possible. (Dkt. 24-1 at p. 40). Plaintiffs' claim makes no sense.

Of course, the states have an interest in a legally defensible decision. Why would Wisconsin wish for a decision that sustains ambiguity and does not address its concerns with finality? Why would Wisconsin wish for a litigation-embroiled saga which would prevent appropriate planning in a timely organized manner? Why wouldn't Wisconsin ask for a clear decision that allows the state to manage its own wolf population in a safe way in the future? The fact that Wisconsin has an interest in the outcome certainly does not prove Wisconsin is committed to eliminating its wolf population, as

Plaintiffs suggest.  The fact that Wisconsin and the other states have an interest in the federal delisting decision does not render that decision arbitrary.

Plaintiffs concede that Wisconsin is one of the states that does have a wolf management plan, but they are critical of the Wisconsin legislature for acting quickly to pass a law to regulate a wolf harvest.  (Dkt. 24-1 at p. 41).  While typically in a proceeding of this nature evidence in the form of affidavit that provides information outside the record is not considered, Plaintiffs have opened the door for consideration of such information.  In their Complaint for Declaratory and Injunctive Relief, Plaintiffs allege in great detail the ways in which Wisconsin's current management plan supports their claim.  (Dkt. 1, ¶¶ 3, 101–111).  Plaintiffs speculate that Wisconsin has neither the resources nor the will to design and implement an adequate state management program.  In fact, Plaintiffs allege that state management increases the risk that wolf populations will be decimated.  (Dkt. 1, ¶¶ 107 and 111).

Similarly, in Plaintiffs' Memorandum they state that regulatory mechanisms are inadequate to protect wolves in the absence of federal protections.  (Dkt. 24-1, p. 2).  Opening the door even wider, Plaintiffs are critical of Wisconsin in their Memorandum for enacting legislation that mandated rulemaking to regulate hunting and trapping of the state's wolves.  (Dkt. 24-1, p.  41).  Hence, in this brief Wisconsin submits certain affidavits

for consideration by the court to show that the Wisconsin regulatory mechanisms at the time of delisting and at the present time, are more than adequate.

Although Plaintiffs ascribe an evil motivation to enactment by the Wisconsin legislature of a mandate to create a regulated wolf hunt, the legislature did exactly what the federal rules contemplate.  In April 2012, the Wisconsin legislature enacted 2011 Wisconsin Act 169[1] designating wolves as a game species so that their population could be responsibly managed.  Act 169 mandated an emergency rule that would adequately regulate a wolf harvesting season, setting forth limitations and boundaries in order to protect the state's wolf population.  Wisconsin's implementation of its rule has fulfilled these policy objectives.

Wisconsin's wolf management program is guided by the Wisconsin Wolf Management Plan dated October 27, 1999 by the Wisconsin Department of Natural Resources (WDNR).  (AR 004 at 000153A-000286A; MacFarland Aff. ¶ 5).  This plan identifies a sustainable population objective of 350 wolves. (MacFarland Aff. ¶ 5).  The first wolf harvest began on October 15, 2012.  In accordance with the plan, quotas were set for each of 6 geographical harvest

---

[1] 2011 Wisconsin Act 169 is attached hereto as "Brief Attachment 1".

zones.  A total of 117 wolves were harvested statewide consistent with each zones' quota.  (MacFarland Aff. ¶ 6).

In April 2012, before the new law allowed a harvest, WDNR estimated Wisconsin's wolf population to be between 815 and 880 individual wolves. (Wydeven Aff. ¶ 8; MacFarland Aff., ¶ 4).   In April of 2013, after the implementation of the first harvest, WDNR estimated the wolf population to be between 809 and 834.  (MacFarland Aff., ¶ 7).  The consistency in the wolf population is striking.  Notably, during the year between April 2012, when the law was passed, and April 2013 when the above referenced estimate was established, WDNR recorded 230 wolf mortalities.   The primary causes of mortality were the season harvest and wolf depredation control (lethal control of wolves in the vicinity of farms experiencing depredation of livestock by wolves) representing 78% of the mortalities.  Significantly, season harvest and depredation control, the two primary components of Wisconsin's management program, did not substantially impact the wolf population which experienced a decrease of only 0.74% from 2012 to 2013.  (MacFarland Aff. ¶ 8).

It is important to emphasize that WDNR has the ability to mitigate future mortality through regulatory changes and quota adjustments. (MacFarland Aff. ¶¶ 8 and 10).  The 2013 harvest began on October 15, 2013, and the WDNR has set the harvest quota at 275.   (MacFarland Aff. ¶ 9).

WDNR has consulted with the Van Deelen Lab at the University of Wisconsin Department of Forest and Wildlife Ecology to assess the likely impacts of the harvest on the wolf population.  Population modeling conducted by the lab estimates a population reduction of about 12.72% if the 275 wolf quota is achieved this season.  The model predicts that if harvest and mortality rates remain the same, there will still be 595 wolves in Wisconsin in 20 years, still well above the 350 management goal. (MacFarland Aff. ¶ 10).  Wisconsin is taking a very conservative approach to managing the wolf population in a manner that will ensure the species is not placed at risk, thus accounting for any potential incorrect projections or unanticipated declines.  As the state gains more experience, regulators can be more precise about managing the population and continuing to do so consistent with the state management plan.

If projections prove inaccurate, or if there is an unanticipated population decline, WDNR can and will respond with adjustments in quotas and management actions. (MacFarland Aff. ¶ 10).  But to argue, as Plaintiffs have, that right now the state has inadequate management plans is completely without merit.  In fact, in fiscal year 2012-2013, Wisconsin spent over a half a million dollars on its wolf management program, a testimony to Wisconsin's commitment to manage its wolves safely and with respect for preservation of the species.  (Kolesik Aff. ¶ 2.a.)

Plaintiffs are also critical of the Wisconsin Wolf Management Plan that the U.S. Fish and Wildlife Service (USFWS) relied on at the time of delisting, claiming that it would have permitted a fifty percent decline in the Great Lakes wolf population, including a 250 minimum for Wisconsin. (Dkt. 24-1 at p. 42).   The fact is, however, that even if Wisconsin reduces its wolf population by 50%, the population will remain substantially larger than the recovery goal of 100 wolves, that was recommended by the interagency Eastern Timber Wolf Recovery Team and approved by USFWS as part of the recovery plan. (*Final Rule Revising the Listing of the Gray Wolf (Canis lupus) in the Western Great Lakes*, 76 Fed. Reg. 81,666, 81,675 (Dec. 28, 2011); AR 651 at 019730A).

Adrian Wydeven, is a highly qualified and experienced wildlife biologist who has authored 60 technical articles on wolf ecology and management and was the senior editor and co-author of the 2009 book: *Recovery of the Gray Wolves in the Great Lakes Region of the United States, An Endangered Species Success Story.* (Wydeven Aff. ¶¶ 1–7).   Wydeven headed the Wisconsin wolf recovery and management program for the Wisconsin Department of Natural Resources from July of 1990 through February of 2013.   In Wydeven's opinion the wolf population is clearly not presently endangered, nor is it likely to become endangered within the foreseeable future in a significant portion of its range.  (Wydeven Aff. ¶ 9).

As noted above, the wolf population level for considering federal delisting for the gray wolf population in the Great Lakes region was approved by USFWS at 100 wolves for Michigan and Wisconsin for a period of 5 years or more. (Wydeven Aff. ¶ 9).  In 1994, the combined Michigan Wisconsin wolf population was at about 111 to 118, and has been above 100 wolves ever since.  Therefore, the delisting process could have begun in 1999, when the estimated wolf population in the two states had grown to between 370 and 380. (Wydeven Aff. ¶ 9).

The federal delisting of wolves went into effect in January of 2012.  In Wisconsin alone, the population of gray wolves had increased from 34 in 1990 to between 815 and 880 in 2012 under the management of the WDNR. (Wydeven Aff. ¶ 8).  By 2013 the two-state wolf population had grown to at least 1467. (Wydeven Aff. ¶ 9).  Clearly wolves have been successfully recovered and are ready to be managed as a games species by the state natural resource experts.  (Wydeven Aff. ¶ 19). Wisconsin's wolves will continue to thrive, disperse, and colonize with delisting, and are definitely not at risk, as Plaintiffs suggest. (Wydeven Aff. ¶ 19).

Plaintiffs claim that Wisconsin is further jeopardizing the wolf population by allowing wolves to be taken from a wider radius around livestock depredation sites.   WDNR Wildlife Damage Specialists are responsible   for   Wisconsin's   depredation   program   as   outlined   in

Wis. Stats. § 29.888 and Wis. Admin. Code § NR 12.  WDNR partners with The Wildlife Services Division of the U.S. Department of Agriculture to implement the depredation program. (Koele Aff. ¶¶ 4 and 5).

Plaintiffs' claim is wrong because the wolves taken around depredation sites are registered and recorded.  Seventy six wolves were removed from wolf depredation sites in 2012, (Koele Aff. ¶ 6), and a total of 117 wolves were harvested from 6 wolf harvest units (MacFarland Aff. ¶ 6).  Both numbers were taken into account when setting the wolf quota for the following year.  Consequently, the number of wolves taken at and around depredation sites are accounted for so that WDNR can adjust the annual quota accordingly and ensure that the number of depredating wolves taken does not impact the population or place it in jeopardy.

## II.   WISCONSIN   SUPPORTS   USFWS   DELINEATED BOUNDARIES OF THE WESTERN GREAT LAKES DPS

The USFWS considered the best available scientific data to determine wolf distribution and dispersal in the Western Great Lakes.  The state of Wisconsin agrees that the delineated boundaries of the Western Great Lakes Distinct Population Segment (DPS) should include the core recovered wolf population.  USFWS concluded that the most reasonable way to identify the wolf population segment's biological characteristics was to use the international border between US and Canadian wolves as well as certain

landscape features that create barriers to further wolf movement.  Wisconsin disagrees with the Plaintiffs who assert that the DPS is too large. The federal agency's interpretation of its own regulations should be given controlling weight.

Plaintiffs argue that wolves need to be recovered in a significant part of all of their historic range before they can be de-listed anywhere, and specifically in the Great Lakes states.  By using the DPS tool, the USFWS was able to identify areas where wolves have been recovered and allow those states to manage their now replenished populations.  If Plaintiffs were to prevail on this issue, it would be virtually impossible to ever delist any of the Great Lakes wolves.  It is not feasible for wolves to recover across all of their historic range in the lower 48 states, because much of it is urban areas, highways and agriculture fields.

Moreover, if Plaintiffs were to prevail on their argument that there can be no delisting until the entire historic range is recovered, states like Wisconsin would have to continue to pay for depredations and damage caused by overabundant wolf populations, which far exceed the federal recovery goal. Depredations amounts paid by the state have decreased since the state has been able to manage its population.  (Koele Aff. ¶ 7; Kolesik Aff. ¶ 2.b.). Surely, it is not the intent of the ESA to require states to endure unnecessary

costs when overabundant listed species in their states have not recovered in other parts of the country.

Finally, Wisconsin agrees that the USFWS considered the best available science on wolf taxonomy and properly decided that all wolves in the Western Great Lakes are gray wolves. Wildlife biologist Adrian Wydeven of the Wisconsin Department of Natural Resources explains in his affidavit how Wisconsin wolves are of a genetic mix consisting of one interconnected Great Lakes population, which should be considered gray wolves or Great Lakes wolves. The wolves of the Western Great Lakes DPS is a gray wolf hybrid mix. The wolf population that was listed in 1978 as the threatened Minnesota wolf is the same genetic mix, as is the current wolf population that has recovered in this region. (Wydeven Aff. ¶¶ 13-19). The federal agency should be afforded deference on this complicated issue in that it relied on the best scientific data available at the time.

## CONCLUSION

Contrary to Plaintiffs' false contentions, Wisconsin is NOT putting its wolf population in jeopardy. In fact, the undisputed record shows that Wisconsin has sustained a wolf population since 1996 that is well above the federal recovery target of 100 individual wolves for both Wisconsin and Michigan combined. 76 Fed. Reg. at 81676; AR 651 at 019750A. For

Plaintiffs to suggest that USFWS's decision to delist wolves was arbitrary, capricious and contrary to the ESA, because it relied upon Wisconsin's Wolf Management Plan, completely contradicts the undisputed evidence that Wisconsin's plan is well managed, responsible and, most importantly, will not result in a decrease in its wolf population.

Dated this 11th day of December, 2013.

Respectfully submitted,

J.B. VAN HOLLEN
Attorney General


**/s/ Cynthia R. Hirsch**
CYNTHIA R. HIRSCH
Assistant Attorney General
State Bar #1012870

**/s/ Thomas J. Dawson**
THOMAS J. DAWSON
Assistant Attorney General
State Bar #1016134

Attorneys for Intervenor-Defendant
State of Wisconsin and
Wisconsin  Department of Natural Resources

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-8987 (Dawson)
(608) 266-3861 (Hirsch)
(608) 266-2250 (Fax)
hirschcr@doj.state.wi.us
dawsontj@doj.state.wi.us