IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

THE HUMANE SOCIETY
OF THE UNITED STATES
and BORN FREE, USA and
HELP OUR WOLVES LIVE (HOWL)
and FRIENDS OF ANIMALS AND
THEIR ENVIRONMENT (FATE),

       Plaintiffs

v

SALLY JEWELL,
SECRETARY OF THE INTERIOR and
UNITED STATES DEPARTMENT OF
THE INTERIOR and UNITED STATES
FISH AND WILDLIFE SERVICE,

       Defendants

and

STATE OF MICHIGAN and
MICHIGAN DEPARTMENT
OF NATURAL RESOURCES,

       Defendant Intervenors.

Civil Action No. 1:13-cv-00186-BAH

**STATE OF MICHIGAN AND
MICHIGAN DEPARTMENT OF
NATURAL RESOURCES'
MEMORANDUM OF POINTS AND
AUTHORITIES IN OPPOSITION
TO PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT AND
CONCURRING IN FEDERAL
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT**

---

# TABLE OF CONTENTS

Page

Table of Contents .................................................................................................. i

Index of Authorities .............................................................................................. ii

I.    Introduction ................................................................................................. 1

II.   History of Wolves in Michigan .................................................................... 3

III.  Successful Recovery of Michigan's Wolf Population .................................. 4

    A.    Federal Recovery Criteria ................................................................. 6

    B.    Michigan Wolf Recovery Under the Federal Recovery Criteria ........... 8

IV.   Management of Wolves by the State and MDNR ......................................... 9

    A.    Michigan Law at the Time of the Final Rule ...................................... 11

    B.    Michigan Management Plans at the Time of the Final Rule ................. 12

        1.    Michigan Gray Wolf Recovery and Management Plan (1997 Plan) ........ 12

        2.    Michigan Wolf Management Plan (2008 Plan) ......................... 12

        3.    Specific Issues Under the 1997 and 2008 Plans ....................... 24

    C.    Michigan Wolf Management Following the Final Rule ....................... 30

        1.    Management Tools Within the Administrative Record ............... 30

        2.    Management Tools Outside the Administrative Record .............. 30

V.    Conclusion and Relief Requested ................................................................ 36

Certificate of Service (e-file) ................................................................................ 38

## INDEX OF AUTHORITIES

**Cases**

*Colo. River Cutthroat Trout v. Salazar*, 898 F. Supp. 2d 191, 208 (D.D.C. 2012) ...................... 11

*Envtl. Def. Fund, Inc. v. Costle*, 657 F.2d 275, 284 (D.C. Cir. 1981) .......................................... 31

*Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985) ................................................ 30

*Friends of Blackwater v. Salazar*, 691 F.3d 428, 436 (D.C. Cir. 2012) ....................................... 10

*Greater Yellowstone Coal., Inc. v. Servheen*, 665 F.3d 1015, 1031-32 (9th Cir. 2011).............. 10

*Tucson Herpetological Soc'y v. Salazar*, 566 F.3d 870, 881 (9th Cir. 2009)............................... 11

**Statutes**

16 U.S.C. § 669 *et seq.*............................................................................................................... 29

16 U.S.C. § 1531 *et seq.*................................................................................................................ 1

16 U.S.C. § 1533(a)(1)........................................................................................................ 9, 10, 11

16 U.S.C. § 1533(a)(1)(A) ............................................................................................................ 10

16 U.S.C. § 1533(a)(1)(D) ........................................................................................................ 9, 10

16 U.S.C. § 1533(b)(1)(A)................................................................................................... 9, 10, 11

Mich. Comp. Laws § 324.501(2) .................................................................................................. 32

Mich. Comp. Laws § 324.2010...................................................................................................... 29

Mich. Comp. Laws § 324.40103(7)............................................................................................... 11

Mich. Comp. Laws § 324.40105...................................................................................................... 2

Mich. Comp. Laws § 324.40106.................................................................................................... 11

Mich. Comp. Laws § 324.40107...................................................................................................... 2

Mich. Comp. Laws § 324.40110.................................................................................................... 32

Mich. Comp. Laws § 324.40113a.................................................................................................. 22

Mich. Comp. Laws § 324.40118(3)............................................................................................... 35

Mich. Comp. Laws § 324.40118(10)............................................................................................. 11

Mich. Comp. Laws § 324.95153 ............................................................................... 30

Mich. Comp. Laws § 324.95155(1) .......................................................................... 30

Mich. Comp. Laws § 324.95163 ............................................................................... 30

Mich. Comp. Laws § 324.95167(1) .......................................................................... 30

**Rules**

76 Fed. Reg. 81,666 ...................................................................................... 1, 4

76 Fed. Reg. 81,670 ........................................................................................ 17

76 Fed. Reg. 81,673 ..................................................................................... 5, 25

76 Fed. Reg. 81,675 .............................................................................. 6, 7, 8, 27

76 Fed. Reg. 81,675-76 ...................................................................................... 8

76 Fed. Reg. 81,676 .............................................................................. passim

76 Fed. Reg. 81,676-77 ...................................................................................... 7

76 Fed. Reg. 81,678 ............................................................................ 4, 5, 25, 27

76 Fed. Reg. 81,679 ................................................................................... 4, 8, 9

76 Fed. Reg. 81,680 ...................................................................................... 4, 7

76 Fed. Reg. 81,689-90 ..................................................................................... 25

76 Fed. Reg. 81,690 ........................................................................................ 26

76 Fed. Reg. 81,692 .......................................................................................... 7

76 Fed. Reg. 81,700 ........................................................................................ 25

76 Fed. Reg. 81,710 .................................................................................. 12, 26

76 Fed. Reg. 81,711 ............................................................................... 4, 28, 32

76 Fed. Reg. 81,712 .................................................................................. 28, 30

**STATE OF MICHIGAN AND MICHIGAN DEPARTMENT OF NATURAL
RESOURCES' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION
TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND CONCURRING IN
FEDERAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Defendants the State of Michigan (State) and the Michigan Department of Natural

Resources (MDNR), through their attorneys, Bill Schuette, Attorney General for the State of

Michigan, and Stephen D. Thill and Pamela J. Stevenson, Assistant Attorneys General, hereby

respond in opposition to Plaintiffs' motion for summary judgment (Doc. 24). The State and

MDNR also hereby concur in, and incorporate herein by reference, the motion for summary

judgment and supporting memorandum filed by Defendants Sally Jewell, Secretary of the

Interior; the United States Department of the Interior; and the United States Fish and Wildlife

Service (collectively, Federal Defendants) (Doc. 27). In accordance with LCvR 7(c), the State

and MDNR's proposed order denying Plaintiffs' motion for summary judgment (Doc. 24) and

granting Federal Defendants' motion for summary judgment (Doc. 27) is attached hereto as

Exhibit 1.

## I.    Introduction

In this lawsuit, Plaintiffs seek vacatur of a final rule issued by the United States Fish and

Wildlife Service (FWS) on December 28, 2011. *See* Endangered and Threatened Wildlife and

Plants; Revising the Listing of the Gray Wolf (Canis lupus) in the Western Great Lakes, 76 Fed.

Reg. 81,666 (Dec. 28, 2011). That rule (Final Rule), which took effect on January 27, 2012,

removed the gray wolves of the Western Great Lakes (WGL) Distinct Population Segment

(DPS) from the Federal List of Endangered and Threatened Wildlife for purposes of the

Endangered Species Act, 16 U.S.C. § 1531 *et seq.* (ESA). In so doing, the Final Rule returned to

the several affected States the responsibility of managing the WGL region's gray wolf population.

As defined by FWS in the Final Rule, the WGL region includes the entire State of Michigan. Under Michigan law, the State has sovereign authority over its population of gray wolves. *E.g.*, Mich. Comp. Laws § 324.40105. By State statutory mandate, MDNR is the governmental agency responsible for managing wildlife in the State of Michigan. *E.g.*, Mich. Comp. Laws § 324.40107. Thus, both the State and MDNR have strong interests in the subject matter of this litigation. The State and MDNR intervened as Defendants in this case to protect those interests and to defend the adequacy of State regulatory mechanisms pertaining to Michigan's gray wolf population.

In attempting to support their motion for summary judgment, Plaintiffs blatantly mischaracterize State wildlife management efforts, alleging for example that Minnesota, Wisconsin, and Michigan all intend "immediate and dramatic reductions in wolf populations – reminiscent of a time when bounties paid by state governments promoted the widespread killing of wolves that nearly wiped out the entire wolf species from the lower 48 states." Pls.' Summ. J. Mem. (Doc. 24-1) at 9 of 51. Without any evidence to support their claim, Plaintiffs baldly label Michigan's management plans as "hostile" to wolves. Pls.' Summ. J. Mem. (Doc. 24-1) at 9 of 51. Such accusations ignore and disrespect the extensive State-level efforts that have helped foster the recovery of the very same wolf population that Plaintiffs now seek to protect. The administrative record flatly contradicts Plaintiffs' disingenuous and sensationalistic portrayals of Michigan's wolf management plans. Indeed, the record demonstrates that the State and MDNR are ready, willing, and able to continue managing and preserving Michigan's wolf population consistent with established, appropriate wildlife management principles.

## II.    History of Wolves in Michigan

Wolves are native to the land area now known as Michigan, having inhabited the Great Lakes region since the melting of the last glacier.  Administrative Record (AR) 007 at 000412A. Wolves figure prominently in the Tribal culture and beliefs of aboriginal peoples of present-day Michigan.  For example, the wolf is a sacred clan animal among the Anishinaabe (Odawa, Ojibwe, and Potawatomi) people.  In the Anishinaabe creation story, Gzhemnidoo (the Creator) instructed the brothers Maahiingun (the wolf) and Nanaboozhoo (half man/half spirit) to travel together to name and visit all the plants, animals, and places on earth.  Later, Gzhemnidoo instructed Maahiingun and Nanaboozhoo to walk separate paths, but foretold that their fates would be always intertwined.  AR 007 at 000441A.

Subsequent settlers of the Great Lakes region brought anti-wolf prejudices with them. European mythology, fairy tales, and religious beliefs fueled the notion that wolves were incompatible with human civilization and resulted in the persecution of wolves throughout the United States, including Michigan.  AR 007 at 000413A.  A wolf bounty was in effect in Michigan from 1838 until 1922, when it was replaced by a State-paid trapper system.  The bounty was reinstated in 1935 and was not repealed until 1960.  Michigan wolves were given legal protection under State law in 1965.  AR 007 at 000413A.

Persecution nearly led to the extermination of wolves in Michigan.  In 1956, Michigan's wolf population was estimated at 100 individuals, all of which were believed to be located in Michigan's Upper Peninsula (UP).  By 1973, the estimated Michigan wolf population had fallen to only six animals in the UP.  Probably due to sporadic immigration of wolves from more secure populations in Minnesota and the Canadian Province of Ontario, it is likely that a few animals persisted in the UP and that wolves were never completely extirpated from Michigan.  AR 007 at 000413A.

3

The State and MDNR have long been innovative leaders in wolf recovery efforts. Michigan's wolf population received legal protection under State law nearly a decade before it was first listed as endangered under Federal law. *See* 76 Fed. Reg. 81,666; AR 651 at 019732A. In 1974, MDNR initiated the nation's first attempt to reintroduce wild wolves to vacant historical wolf habitat. AR 007 at 000414A; *see also* 76 Fed. Reg. 81,711; AR 651 at 019821A. More recently, MDNR took the lead in requesting additional public hearings regarding the Final Rule and the status of the wolves of the WGL DPS. AR 374 at 011379A. MDNR successfully encouraged FWS to further engage the public about this important issue because MDNR properly recognizes the wolf as a "conservation icon" with great cultural significance. AR 374 at 011379A; *see also* 76 Fed. Reg. 81,680; AR 651 at 019760A. In further recognition of the wolf's cultural and ecological importance, MDNR is committed to managing Michigan's wolf population in a manner that will ensure that population's continued viability above a level that would trigger State or Federal listing as threatened or endangered. AR 007 at 000416A; *see also* 76 Fed. Reg. 81,711; AR 651 at 019821A.

## III.   Successful Recovery of Michigan's Wolf Population

Prior to 1989, the last known breeding population of wild Michigan wolves (outside what is now Isle Royale National Park) occurred in the mid-1950s. In fall 1988, a pack of three wolves established a territory in the central UP, and wolf pups were born in that area in spring 1989. 76 Fed. Reg. 81,678; AR 651 at 019755A. Since that time, the wolf population in the UP (excluding Isle Royale[1]) has shown steady growth. With the exceptions of 1997 and 2010,

---

1 The wolf population of Isle Royale National Park is not considered to be an important factor in the recovery of wolves in the WGL. For genetic reasons and constraints on expansion due to the island's small size, the Park's wolf population does not contribute towards meeting numerical recovery criteria. 76 Fed. Reg. 81,679; AR 651 at 019757A.

estimated wolf population size increased each year between 1989 and 2011.  76 Fed. Reg.

81,676; AR 651 at 019750-51A.  From 1994 to 2007, the population grew at an average annual

rate of 19%.  The average annual growth rate was 12% from 2003 to 2007.  AR 007 at 000414A.

While the general population trend continues to increase, the rate of increase has slowed.  The

decline in population growth rate suggests that the population is moving toward the maximum

level the UP can sustain.  AR 007 at 000414A; *see also* 76 Fed. Reg. 81,673; AR 651 at

019745A.  Small or even negative growth rates may occur in some years (such as 1997 and

2010) and represent natural fluctuations in the wildlife population.  76 Fed. Reg. 81,673; AR 651

at 019745A.  An estimated 687 wolves occurred on the UP mainland during the winter of 2010-

11.  76 Fed. Reg. 81,676; AR 651 at 019750-51A.

Michigan's Lower Peninsula (LP) does not contain a significant wolf population.  In

October 2004, a wolf that previously had been captured and radio-collared in the eastern UP was

mistakenly captured and killed by a coyote trapper in the northern portion of the LP.  AR 007 at

000415A; *see also* 76 Fed. Reg. 81,678; AR 651 at 019756A.  This was the first verification of a

wild wolf in the LP in at least sixty-nine years.  AR 007 at 000415A.  Tracks of two other wolves

were found in the same vicinity in December 2004.  AR 007 at 000415A.  From 2004 through

2010, MDNR used a combination of citizen reports of wolves or wolf sign, as well as habitat

suitability modeling, to conduct targeted area searches in the areas of the northern LP that are

most likely to contain wolves.  Those surveys failed to confirm the presence of any wild wolves

in the LP.  76 Fed. Reg. 81,678; AR 651 at 019756A.

Despite the lack of a significant wolf population in the LP, the gray wolf's recovery in

Michigan has been remarkable.  Michigan's wolf population was estimated at 3 in winter 1988-

89; 10 in winter 1989-90; 17 in winter 1990-91; 21 in winter 1991-92; 30 in winter 1992-93; 57

in winter 1993-94; 80 in winter 1994-95; 116 in winter 1995-96; 113 in winter 1996-97; 139 in winter 1997-98; 169 in winter 1998-99; 216 in winter 1999-2000; 249 in winter 2000-01; 278 in winter 2001-02; 321 in winter 2002-03; 360 in winter 2003-04; 405 in winter 2004-05; 434 in winter 2005-06; 509 in winter 2006-07; 520 in winter 2007-08; 577 in winter 2008-09; 557 in winter 2009-10; and 687 wolves in winter 2010-11. 76 Fed. Reg. 81,676; AR 651 at 019750-51A.

As will be discussed below, State-level wolf management in Michigan has helped make this extraordinary recovery possible. Yet Plaintiffs have the temerity to claim that "[t]he evidence is clear that [the State and MDNR] have failed, and will fail, to provide regulatory mechanisms adequate to protect the gray wolf in the face of human threats to wolves' continued existence." Pls.' Summ. J. Mem. (Doc. 24-1) at 47 of 51. Plaintiffs apparently believe that the States' alleged failure is so obvious that Plaintiffs need not bother to specify the "evidence" to which they refer. In reality, the record shows that the impressive recovery of Michigan's wolf population has been facilitated by successful cooperation between the State, MDNR, Federal Defendants, and a variety of other interested parties.

### A.     Federal Recovery Criteria

The two Federal recovery plans pertaining to Michigan's wolf population, namely the 1978 Recovery Plan and the 1992 Revised Recovery Plan for the Eastern Timber Wolf (Revised Recovery Plan), contain the same two recovery criteria.

The first recovery criterion states that the survival of the wolf in Minnesota must be assured. *E.g.*, AR 001 at 000005A; *see also* 76 Fed. Reg. 81,675; AR 651 at 019748A. The Revised Recovery Plan identified a planning goal of 1,251-1,400 animals for that Minnesota population. The Revised Recovery Plan also includes a geographic component of wolf survival

in Minnesota, specifying a wolf population that is spread across about 40% of Minnesota. 76

Fed. Reg. 81,675; AR 651 at 019749A. The Minnesota wolf population had reached the Revised

Recovery Plan's population planning goal by the winter of 1988-89, and Minnesota's estimates

strongly suggest that its wolf population has never subsequently fallen below that planning goal.

By the winter of 2007-08, Minnesota's estimated wolf population was 2,921, more than double

the upper end of the Revised Recovery Plan's population planning goal. 76 Fed. Reg. 81,676;

AR 651 at 019750-51A. The Minnesota wolf population had achieved the Revised Recovery

Plan's geographic goal by winter 1997-98, when the population's contiguous range covered

approximately 40% of Minnesota. 76 Fed. Reg. 81,676-77; AR 651 at 019752A.

More relevant to the status of wolf recovery in Michigan is the Revised Recovery Plan's

second recovery criterion, which states that at least one viable wolf population should be

reestablished within the historical range of the eastern timber wolf[2] outside of Minnesota and Isle

Royale. AR 001 at 000005A; *see also* 76 Fed. Reg. 81,675; AR 651 at 019749A. A viable

population has been described as one having less than a 10% chance of extinction over one

hundred years. 76 Fed. Reg. 81,692; AR 651 at 019785A.

The Revised Recovery Plan provides two options for reestablishing this second viable

population. If it is an isolated population, meaning a population located more than 100 miles

from the Minnesota wolf population, then the second population should consist of at least 200

wolves for at least five years, based upon late-winter population estimates. AR 001 at 000005A;

*see also* 76 Fed. Reg. 81,675; AR 651 at 019749A. Alternatively, if the second population is

---

2 Regardless of the longstanding debate regarding the nomenclature of the wolves in the WGL
DPS, it is clear that the wolves currently inhabiting the WGL region are descendants of the
wolves that were listed in 1978. As such, the wolves of the WGL DPS are the wolves that were
the subject of the two Federal recovery plans. Those wolves, regardless of what they are called,
have met the long-established numerical recovery goals. 76 Fed. Reg. 81,680; AR 651 at
019760A.

located within 100 miles of the Minnesota wolf population, it should be maintained at a

minimum of 100 wolves for at least five years, based on late-winter population estimates.  A

non-isolated second population would be viable at a smaller size because it would be bolstered

both genetically and numerically through exchange of wolves with the Minnesota population.

AR 001 at 000005A; *see also* 76 Fed. Reg. 81,675; AR 651 at 019749A.

In 1998, the Eastern Timber Wolf Recovery Team clarified the application of the second

recovery criterion to the wolf population that had developed in Wisconsin and Michigan.  This

second population is less than 100 miles from the Minnesota wolf population.  Thus, the

Recovery Team recommended that the numerical recovery criterion for the Wisconsin-Michigan

population (excluding Isle Royale wolves) be considered met when the population equals or

exceeds 100 wolves for at least five consecutive years, as demonstrated through six consecutive

late-winter counts.  76 Fed. Reg. 81,675; AR 651 at 019749-50A.

### B.    Michigan Wolf Recovery Under the Federal Recovery Criteria

The combined Wisconsin-Michigan wolf population has exceeded the 100-wolf threshold

since winter 1993-94.  76 Fed. Reg. 81,676; AR 651 at 019750-51A.  Since winter 1998-99, that

combined population has satisfied the applicable recovery criterion, having equaled or exceeded

100 wolves for five consecutive years.  76 Fed. Reg. 81,675-76; AR 651 at 019749-51A.

Further, even if the Wisconsin-Michigan wolf population were isolated from the Minnesota

population, the Wisconsin-Michigan population has satisfied the recovery criterion for an

isolated population since winter 2000-01, having equaled or exceeded 200 wolves for five

consecutive years.  76 Fed. Reg. 81,679; AR 651 at 019757A.

The wolf population of Michigan alone (excluding Isle Royale) exceeded the 100-wolf

threshold in winter 1995-96.  76 Fed. Reg. 81,676; AR 651 at 019750-51A.  Since winter 2000-

01, the Michigan wolf population has satisfied the recovery criterion of having equaled or exceeded 100 wolves for five consecutive years. 76 Fed. Reg. 81,676; AR 651 at 019750-51A. Further, the Michigan population alone has satisfied the recovery criterion for an isolated population since winter 2004-05, having equaled or exceeded 200 wolves for five consecutive years. Thus, in the very unlikely event the Michigan wolf population were somehow to become isolated, it would remain viable. 76 Fed. Reg. 81,679; AR 651 at 019758A.

## IV.    Management of Wolves by the State and MDNR

Under the ESA, the determination of whether a species is threatened or endangered is governed by the following provision:

> The Secretary shall by regulation promulgated in accordance with subsection (b) of this section determine whether any species is an endangered species or a threatened species because of any of the following factors:
>
> > (A) the present or threatened destruction, modification, or curtailment of its habitat or range;
> >
> > (B) overutilization for commercial, recreational, scientific, or educational purposes;
> >
> > (C) disease or predation;
> >
> > (D) the inadequacy of existing regulatory mechanisms; or
> >
> > (E) other natural or manmade factors affecting its continued existence. [16 U.S.C. § 1533(a)(1).]

FWS must base the determinations required by 16 U.S.C. § 1533(a)(1) on the best scientific and commercial data available "after conducting a review of the status of the species and after taking into account those efforts, if any, being made by any State . . . or any political subdivision of a State . . . to protect such species, whether by predator control, protection of habitat and food supply, or other conservation practices." 16 U.S.C. § 1533(b)(1)(A).

9

While Michigan's laws, regulations, and wolf management plans may be most relevant to

FWS's determination as to the adequacy of existing regulation, *see* 16 U.S.C. § 1533(a)(1)(D),

those mechanisms are also highly relevant to the other four factors of 16 U.S.C. § 1533(a)(1) and

to the review of State efforts required by 16 U.S.C. § 1533(b)(1)(A).  With respect to 16 U.S.C. §

1533(a)(1), this is true because the five factors are not entirely distinct from one another.  As

noted above, the State and MDNR intervened as Defendants in this matter to defend the

adequacy of State regulatory mechanisms pertaining to Michigan's gray wolf population.  *See* 16

U.S.C. § 1533(a)(1)(D).  By the same token, the State and MDNR intervened in this case to

demonstrate that the present or threatened destruction, modification, or curtailment of the gray

wolf's habitat or range in Michigan does not justify listing the gray wolves of the WGL DPS as

threatened or endangered.  *See* 16 U.S.C. § 1533(a)(1)(A).

Recognizing the overlap among the five factors of 16 U.S.C. § 1533(a)(1), the D.C.

Circuit has held that FWS may consider the adequacy of regulations in light of other threats to

the species at issue.  *Friends of Blackwater v. Salazar*, 691 F.3d 428, 436 (D.C. Cir. 2012).  For

example, in determining whether existing regulatory mechanisms are adequate, FWS may

consider the present or threatened destruction, modification, or curtailment of the species' habitat

or range.  *Friends of Blackwater*, 691 F.3d at 436.  Again, Michigan's laws, regulations, and

wolf management plans are relevant to each of the determinations that FWS must make under 16

U.S.C. § 1533(a)(1) and 16 U.S.C. § 1533(b)(1)(A).

There can be no question that, in determining the adequacy of existing regulatory

mechanisms, FWS may consider laws and regulations that are binding and enforceable at the

time of its decision.  *See Greater Yellowstone Coal., Inc. v. Servheen*, 665 F.3d 1015, 1031-32

(9th Cir. 2011).  And although Plaintiffs deride Michigan's written wolf management plans as

lacking enforceable regulatory mechanisms, Pls.' Summ. J. Mem. (Doc. 24-1) at 47-48 of 51,

both the Ninth Circuit and this Court have held that FWS may consider the benefits of protective

measures contained in conservation agreements when making its determinations under 16 U.S.C.

§ 1533(a)(1).  *Tucson Herpetological Soc'y v. Salazar*, 566 F.3d 870, 881 (9th Cir. 2009); *Colo.*

*River Cutthroat Trout v. Salazar*, 898 F. Supp. 2d 191, 208 (D.D.C. 2012).  Thus, under the five

factors set forth in 16 U.S.C. § 1533(a)(1) and under the statutory mandate that FWS must

account for States' protection efforts and conservation practices, 16 U.S.C. § 1533(b)(1)(A), it is

legally appropriate for FWS to consider State management plans in determining whether a

species is threatened or endangered.

Moreover, the State and MDNR have earned the benefit of the doubt with respect to the

credence that should be given to their written wolf management plans.  For instance, even

accounting for the period from promulgation of the Final Rule to the present, Plaintiffs cannot

point to a single provision of the current Michigan Wolf Management Plan to which the State

and MDNR have not rigorously adhered since that plan was approved on July 10, 2008.  Instead,

Plaintiffs would have this Court simply presume that the State and MDNR, despite their decades

of effort toward wolf recovery, will suddenly and irrationally adopt an anti-wolf agenda after this

litigation is complete.  Principles of comity and common sense support the far less cynical view

that Michigan's written wolf management plans are some of the most reliable evidence of the

State and MDNR's long-term approach to wolf management.

### A.      Michigan Law at the Time of the Final Rule

When FWS published the Final Rule on December 28, 2011, the wolf was a "protected

animal" under Michigan law, and the taking of a wolf was illegal in Michigan.  *See* Mich. Comp.

Laws §§ 324.40103(7), 324.40106.  At that time, the illegal taking of a wolf in Michigan was a

misdemeanor, punishable by imprisonment for up to ninety days and/or a fine of up to $1,000.00, as well as the costs of prosecution. *See* Mich. Comp. Laws § 324.40118(10).

### B.   Michigan Management Plans at the Time of the Final Rule

Michigan has had two management plans that are relevant to FWS's determination of whether the gray wolves of the WGL DPS are threatened or endangered: the 1997 Michigan Gray Wolf Recovery and Management Plan, and the 2008 Michigan Wolf Management Plan.

### 1.   Michigan Gray Wolf Recovery and Management Plan (1997 Plan)

In 1997, MDNR finalized the Michigan Gray Wolf Recovery and Management Plan (1997 Plan). AR 003 at 000080A. That plan was developed at a time when the number of wolves in the State was relatively small: the late-winter wolf population estimate for winter 1996-97 was 113 wolves. AR 007 at 000403A; *see also* 76 Fed. Reg. 81,676; AR 651 at 019750-51A. Thus, the 1997 Plan focused on the biological needs of a small population and was aimed at the continued recovery of wolves in Michigan. AR 007 at 000403A; *see also* 76 Fed. Reg. 81,710; AR 651 at 019818A.

### 2.   Michigan Wolf Management Plan (2008 Plan)

In 2001, MDNR began reevaluating the 1997 Plan and appointed a committee to evaluate wolf recovery and management in the State. Based on that evaluation, MDNR concluded that significant wolf recovery had been achieved in Michigan, greater scientific knowledge about wolves had been gained, and new social issues had arisen since the 1997 Plan was drafted. MDNR thus initiated a more formal review of the 1997 Plan. That review shifted the primary focus from a recovery plan to a wolf management plan. AR 007 at 000403A; *see also* 76 Fed. Reg. 81,710; AR 651 at 019818A.

### a.       Development of the 2008 Plan

In order to develop its current management plan, MDNR engaged in a lengthy and thorough process that included review of the best available scientific information, as well as substantial involvement of affected stakeholder groups and the general public.  The process included eight phases, which are detailed below.  AR 007 at 000404A.

### i.       Intra- and Inter-Agency Scoping

In August 2004, MDNR met with Federal and State agency partners to identify current issues regarding wolf management in Michigan.  The agencies shared their visions and concerns regarding wolf management, and they identified future wolf management needs as well as opportunities for continuing partnerships.  AR 007 at 000404-05A.

### ii.      Public Meetings and Comment Period

In May 2005, MDNR hosted ten public meetings to discuss wolf management in Michigan.  Six meetings took place in the UP and four meetings took place in the LP.  The meetings' purpose was to give the public an opportunity express opinions regarding wolf management in the State.  Meeting participants were given the opportunity to provide verbal comments, and they were also asked to complete a survey regarding wolves and wolf management.  At least 560 people attended the public meetings.  The MDNR press release that announced the public meetings also announced the opening of a public comment period for submission of wolf-related comments.  From April 12 through August 31, 2005, MDNR received 133 emails and thirty-six letters specifically concerning wolves.  AR 007 at 000405A.

### iii.    Focus Group Meetings

During summer 2005, the Michigan State University (MSU) Department of Fisheries and Wildlife coordinated nine focus group meetings to discuss wolf-related issues.  The main purposes of those meetings were to refine MDNR's understanding of issues that various stakeholder groups had identified as important during the public meetings and comment period, and to develop questions for a statewide public attitude survey regarding wolves.  All nine focus groups discussed the following subjects, among others:  benefits of having wolves in Michigan, costs of having wolves in Michigan, compensation and losses associated with wolf depredation, and the role that interested stakeholder groups should play in the development of the wolf management plan.  The focus groups themselves included stakeholders such as livestock producers, hunters, and wolf conservationists and protectionists.  AR 007 at 000405-06A.

### iv.    Public Attitude Surveys

From November 2005 through January 2006, the MSU Department of Fisheries and Wildlife conducted a public attitude survey designed to address issues relevant to wolf management.  The survey focused on respondents' opinions regarding reasons for having wolves in Michigan; the number of wolves and frequency of wolf-related interactions in different regions of the State; options to address depredation of livestock, hunting dogs, and other pets; options to address public concerns regarding human safety; options to address impacts to deer; and public harvest (hunting and/or trapping) of wolves.  AR 007 at 000406A.

A survey designed for the general public was mailed to 8,500 Michigan driver's license holders statewide.  Modified versions of the survey were mailed to 1,000 licensed furtakers and 1,000 livestock producers, two groups of stakeholders that have great interest in wolves and can

14

experience disproportionately high levels of conflicts with wolves. Repeated mailings resulted in an overall response rate of 53% for the general-public survey, 69% for the furtaker survey, and 69% for the livestock-producer survey. AR 007 at 000406A.

<blockquote>

v.    **Review of Science Relevant to Wolf Management in Michigan**
</blockquote>

Together with the MSU Department of Fisheries and Wildlife, MDNR developed a document entitled *Review of Social and Biological Science Relevant to Wolf Management in Michigan*, which summarized the best available biological and social science relevant to wolves and wolf management options in Michigan. The document also identified the remaining scientific uncertainty on those topics. The information presented was obtained from published scientific literature, agency and university reports, and unpublished data from agencies and wolf experts. AR 007 at 000406-07A.

<blockquote>

vi.    **Michigan Wolf Management Roundtable**
</blockquote>

To help it develop a plan that is acceptable to a wide range of stakeholder interests, MDNR convened an advisory committee called the Michigan Wolf Management Roundtable (Roundtable). Membership included representatives from twenty diverse stakeholder agencies and organizations. The Roundtable was tasked with developing principles to guide management of Michigan wolves and wolf-related issues in the event of Federal delisting. From June through September 2006, Roundtable members met for a total of ten days. They identified and prioritized important wolf-related issues, reviewed relevant scientific literature, and engaged in negotiations to reach consensus on a set of guiding principles for wolf management in Michigan. Their report, entitled *Recommended Guiding Principles for Wolf Management in Michigan*, guided the drafting of the 2008 Plan. AR 007 at 000407A.

### vii.   Plan Writing

Between November 2006 and August 2007, MDNR developed a draft wolf management plan based on the information and recommendations obtained during the previous phases of the plan revision process.  MDNR staff and the Roundtable reviewed the draft prior to its public release.  AR 007 at 000408A.

### viii.   Public Review and Comment

In August 2007, MDNR published a draft wolf management plan for public review and comment.  During the ninety-day comment period, MDNR received approximately 1,480 emails and fifteen letters that offered comments on the draft plan.  Based on those comments, MDNR modified the plan, as appropriate, prior to its final approval.  AR 007 at 000408A.

### a.   Goals of the 2008 Plan

After engaging in the foregoing process, MDNR revised its wolf management plan effective July 10, 2008.  AR 007 at 000395A.  The current Michigan Wolf Management Plan (2008 Plan) was developed to achieve four basic goals:  (1) maintain a viable Michigan wolf population above a level that would warrant its classification as threatened or endangered; (2) facilitate wolf-related benefits; (3) minimize wolf-related conflicts; and (4) conduct science-based wolf management with socially acceptable methods.  AR 007 at 000403A.

### i.   Maintain a Viable Population

In order to establish a plan to maintain a viable population of wolves in Michigan, MDNR first had to define what constitutes a viable population for Michigan's purposes.  MDNR is committed to maintaining a Michigan wolf population above a level that would warrant its classification as threatened or endangered at either the State or Federal level.  Thus, for

Michigan's purposes, "viable" means that, at a bare minimum, the Michigan wolf population must meet or exceed criteria used to define a viable population in FWS's Revised Recovery Plan and Michigan's 1997 Plan. AR 007 at 000416A.

The Revised Recovery Plan indicated that a population of at least 200 wolves is large enough and has sufficient genetic diversity to exist indefinitely in isolation from any other wolf population. AR 001 at 000026A. Michigan's 1997 Plan adopted this definition of a viable isolated population as a criterion for wolf recovery in Michigan. AR 003 at 000106A. Thus, the 1997 Plan recommended that wolves be removed from the State list of threatened and endangered species when the late-winter population maintained a minimum level of 200 animals for five consecutive years. AR 003 at 000106A.

Notably, the Michigan wolf population does not exist in isolation. Wolf movements among Minnesota, Wisconsin, and Michigan are common and help mitigate demographic and environmental fluctuations by enhancing the genetic diversity of Michigan's wolf population. AR 007 at 000416A; *see also* 76 Fed. Reg. 81,670; AR 651 at 019741A. Because Michigan's wolf population is connected to other populations through occasional dispersal, it may actually require fewer than 200 animals to remain viable. AR 001 at 000026A. However, the 1997 Plan and the 2008 Plan adopted the recovery criterion of 200 wolves for Michigan alone, in order to ensure the viability of the Michigan wolf population regardless of the biological status of wolves in other States and Provinces. AR 007 at 000417A.

Michigan's late-winter wolf population must consistently meet or exceed 200 animals to achieve the first stated goal of the 2008 Plan. However, the 2008 Plan recognizes that this minimum requirement is not necessarily sufficient to provide all of the ecological and social benefits valued by the public. Thus, the 2008 Plan clearly states that "*200 wolves is not a target*

17

*population size.*" AR 007 at 000417A (emphasis added). The 2008 Plan also explicitly provides

that "management will be conducted to maintain the wolf population *above* the minimum size

requirement." AR 007 at 000436A (emphasis added). The 2008 Plan does not identify a specific

target population size, nor does it establish an upper limit for the number of wolves in the State.

AR 007 at 000417A. Rather, the 2008 Plan contemplates that public preferences regarding

levels of wolf-human interactions, both positive and negative, will guide the extent to which wolf

abundance and distribution exceed the minimum requirements. AR 007 at 000417A. These

provisions of the 2008 Plan belie Plaintiffs' baseless claims that the State and MDNR will permit

Michigan's wolf population to decline to 200 wolves. *See* Pls.' Summ. J. Mem. (Doc. 24-1) at

49 of 51.

   MDNR has many good reasons to ensure the maintenance of a viable wolf population in

Michigan. In general, MDNR is committed to the conservation, protection, management, use,

and enjoyment of the State's natural resources. Since wolves have become re-established in

Michigan, they have once again become an integral part of the natural resources of the State and

have improved the natural functioning of Michigan ecosystems. In light of its mission and

public trust responsibilities, MDNR considers the maintenance of a viable wolf population to be

an appropriate and necessary goal. AR 007 at 000417A.

   Maintenance of a viable wolf Michigan population also helps preclude the need for

Federal reclassification of the species as threatened or endangered. A situation that warranted

such a reclassification would be detrimental not only to the wolf population, but also to the

people of Michigan. A decline in the wolf population below a viable level would reduce

opportunities for positive wolf-related interactions. Moreover, regulatory restrictions associated

with Federal reclassification would complicate and impede some State-level efforts to address

the needs of people who experience wolf-related conflicts.  Therefore, maintenance of a viable wolf population serves the best interests of wolves and the human residents of Michigan.  AR 007 at 000417A.

Furthermore, public attitude research shows most Michigan residents support the presence of a wolf population in the State.  The 2005-06 MSU survey of the general public allowed respondents to identify themselves as either interested or not interested in wolf-related issues.  When disinterested respondents were removed from the analysis, the percentage of respondents who approved of having wolves in the State was 73%.  These results indicate that the vast majority of residents who feel they have an interest and stake in the management of wolves support the maintenance of a viable Michigan wolf population.  AR 007 at 000417-18A.

### ii.    Facilitate Wolf-Related Benefits

Michigan residents value a range of benefits that can be derived from the presence of wolves.  For example, wolves can improve natural ecosystem function by controlling prey numbers, improving the overall health of prey populations, increasing food available to scavengers, and controlling populations of secondary predators.  Seventy-two percent of interested Michigan residents who responded to the 2005-06 public attitude survey believed ecological benefits were a "very" or "somewhat" important reason to have wolves in Michigan. AR 007 at 000418A.

Wolves also have great cultural and religious value.  As detailed above, wolves are a species of great significance to many Native Americans.  Moreover, many other Michigan residents value wolves due to personal or religious convictions.  Sixty-seven percent of interested survey respondents indicated at least moderate agreement with the statement:  "Regardless of our laws, wolves have a right to exist in Michigan."  AR 007 at 000418A.

The presence of wolves in Michigan also provides a unique opportunity for people to experience a particular component of the natural world.  And even though only a small proportion of Michigan residents is likely to actually observe, photograph, or study wolves in the wild, survey respondents placed a high value on the opportunity for residents to have those experiences.  "People want to view, hear, photograph or study wild wolves in Michigan" was ranked by 60% of interested survey respondents as a "very" or "somewhat" important reason to have wolves in Michigan.  AR 007 at 000418A.

Similarly, independent of cultural or religious convictions, many people value the simple knowledge that wolves exist as a healthy, thriving, wild population in Michigan.  "There are people who appreciate wolves and want to know that wolves exist in Michigan" was ranked by 54% of interested survey respondents as a "very" or "somewhat" important reason to have wolves in Michigan.  AR 007 at 000419A.

Wolves can also have a positive effect on tourism and recreation in Michigan.  Forty-two percent of interested survey respondents felt the economic benefits of wolf-based tourism were a "very" or "somewhat" important reason to have wolves in Michigan.  The 2008 Plan contemplated promotion of tourism and recreational opportunities associated with wolves in order to increase the economic benefits derived from the species.  AR 007 at 000419A.

The 2008 Plan joined numerous other authorities in acknowledging that public support is critical for the long-term viability of a wolf population.  AR 007 at 000419A.  Thus, in order to serve the best interests of both wolves and humans in Michigan, the 2008 Plan committed to management that enhances opportunities for positive wolf-related experiences while maintaining and fostering public support for the wolf population.  AR 007 at 000419A.

### iii.    Minimize Wolf-Related Conflicts

The 2008 Plan recognized that, although the wolf population offers benefits as described above, it also presents significant costs and concerns for some Michigan residents.  These include losses of livestock and pets, anxieties over the presence of wolves near residential or recreational areas, and concerns over wolves' impact on populations of game species such as deer.  AR 007 at 000419A.

Left unaddressed, conflicts can lead to negative public attitudes toward wolves, and those negative attitudes can adversely affect wolf distribution and abundance.  Indeed, negative public perception was the primary reason wolves were historically threatened with extinction in many areas.  The risk and frequency of conflicts influences human tolerance of wolves, and public support for the wolf population depends in part on confidence that conflicts will be resolved in a timely and effective manner.  Thus, effective management of wolf-related conflicts benefits not only the people who experience those conflicts, but also the wolf population as a whole.  AR 007 at 000420A.

Most Michigan residents recognize the importance of addressing wolf-related conflicts.  The 2005-06 survey showed at least 76% of interested respondents would support active wolf management to address public concerns regarding human safety risks posed by wolves.  At least 75% of interested respondents would support active management to control wolf depredation of livestock, hunting dogs, and other pets.  And at least 65% of interested respondents would support active management if wolves significantly lowered the number of deer available for hunting.  AR 007 at 000420A.

For the foregoing reasons, and to carry out its statutory mandate to manage Michigan's wildlife, MDNR committed to managing wolf-related conflicts, albeit in a manner that fosters the other crucial goals of the 2008 Plan.

### iv.   Conduct Science-Based and Socially Acceptable Management

The use of sound science when making wildlife management decisions is formalized and mandated by the Michigan Natural Resources and Environmental Protection Act. *E.g.*, Mich. Comp. Laws § 324.40113a; *see also* AR 007 at 000421A. In the wildlife management context, science is most useful in identifying probable outcomes of particular management approaches. However, science does not assign subjective values to those outcomes. Instead, the desirability or acceptability of any outcome depends on the values of affected stakeholders. Consequently, the 2008 Plan contemplates an ongoing process of social deliberation to determine which science-based management approaches are acceptable to individual stakeholder groups and society at large. AR 007 at 000421A.

### c.   Strategies of the 2008 Plan

In order to achieve its four principal goals, the 2008 Plan identified a number of strategies to be implemented. Each of those strategies was then broken down into more specific objectives and action items, thus providing a manageable, well defined structure for addressing wolf-related issues.

The first strategy was to increase public awareness and understanding of wolves and wolf-related issues. MDNR committed to coordinate with other agencies, Tribes, and interested private organizations to develop and implement a wolf-based information and education program. MDNR trains its staff members to ensure they are fully equipped to provide timely and

professional responses to information requests, and MDNR makes appropriate improvements to its wolf-based information and education program on an ongoing basis.  AR 007 at 000422-24A.

MDNR understands that to maintain a viable wolf population, it has a responsibility to enact and enforce appropriate State regulations.  Those regulations must provide adequate protection to Michigan's wolf population, they must be effectively communicated and explained to the public, and they must be enforced.  MDNR is committed to investigating and penalizing violations of its wolf regulations.  AR 007 at 000427-30A.

The 2008 Plan further commits MDNR to maintaining sustainable populations of wolf prey.  A viable wolf population requires an adequate prey base, and MDNR must balance that need against sustainable human uses of the wildlife that serves as wolf prey.  For example, management of Michigan's wolf population requires appropriate management of the white-tailed deer population.  Thus, under the 2008 Plan, MDNR must support research to investigate the impacts of wolves on prey populations and educate the public on the relationship between wolves and their prey.  AR 007 at 000430-32A.

Similarly, the 2008 Plan calls for MDNR to help maintain the habitat necessary to sustain a viable wolf population.  This includes maintaining habitat necessary to sustain adequate levels of wolf prey.  It also includes maintaining habitat linkages to allow wolf dispersal, as wolves are effective dispersers and migration enhances genetic diversity within populations.  MDNR is also committed to identifying active wolf den sites and taking actions to minimize disturbances at those sites.  AR 007 at 000432-34A.

The 2008 Plan also calls for MDNR to work toward compatibility between wolf distribution and abundance and social carrying capacity.  This includes promoting public understanding and appreciation of both the benefits and costs associated with various levels of

wolf abundance.  It also requires MDNR to facilitate positive wolf-human interactions while seeking to minimize and manage wolf-related conflicts.  As noted above, the 2008 Plan recognizes that public support for the wolf population depends in part on confidence that the State will resolve conflicts in a timely and effective manner.  AR 007 at 000436-40A.

One type of wolf-related conflict that MDNR must manage is actual and perceived threats to human safety.  The 2008 Plan calls for MDNR to promote accurate public perceptions of the human safety risks posed by wolves, while also committing to the elimination of actual human safety threats where they occur.  The 2008 Plan advocates preventing wolves from becoming habituated to humans as a proactive approach to preventing conflicts.  AR 007 at 000443-47A.

The 2008 Plan also calls for MDNR to develop and implement a socially and biologically responsible policy regarding public harvest of wolves.  The 2008 Plan contemplates public harvest of wolves for the purpose of reducing wolf-related conflicts, and also for recreational or utilitarian purposes.  The 2008 Plan itself does not set forth the specific circumstances under which a public harvest will be implemented, but it clearly provides that any public harvest will be planned based on the best available research and evaluated to ensure it does not threaten the long-term viability of the Michigan wolf population.  AR 007 at 000457-60A.

### 3.   Specific Issues Under the 1997 and 2008 Plans

#### a.   Plan Monitoring and Review

The 2008 Plan recognizes the utility of monitoring the implementation of the plan itself. To that end, the 2008 Plan calls for MDNR to establish a wolf management advisory group to discuss management goals, educational opportunities, conflict resolution, and other relevant topics on an ongoing basis.  The 2008 Plan envisions an advisory group that will represent the

diversity of wolf-related interests and management responsibilities in Michigan.  AR 007 at 000460A.

The 2008 Plan also recognizes that the circumstances pertaining to wolf management are continually evolving.  For instance, wolf abundance and distribution, attitudes of Michigan residents, and the legal status of wolves may continue to change through time.  To address ecological, social, and regulatory shifts, the 2008 Plan calls for MDNR to review and update its wolf management plan at five-year intervals.  The plan revision process is to include review of the best available scientific information and substantial involvement by affected stakeholder groups and the general public.  AR 007 at 000460A.

### b.     Wolf Range

In geographic terms, the WGL DPS includes the area currently occupied by wolf packs in Minnesota, Wisconsin, and Michigan; nearby areas in those States where wolves may become established in the foreseeable future; and a surrounding area into which Minnesota, Wisconsin, and Michigan wolves occasionally move but where persistent packs are not expected to be established because suitable habitat is rare.  76 Fed. Reg. 81,673; AR 651 at 019744A.

The UP of Michigan has wolf packs throughout the peninsula.  Packs have spread across the UP since 1989, with immigration occurring from Wisconsin on the west and possibly from Ontario on the east.  Wolves now are found in every county of the UP, with the possible exception of Keweenaw County, which probably lacks a suitable ungulate prey base during winter months.  AR 007 at 000414-15A; *see also* 76 Fed. Reg. 81,678, 81,689-90; AR 651 at 019755A, 019779-80A.

As noted, Michigan's LP does not have a significant wolf population.  This may be partially explained by the fact that road densities in the LP are relatively high, with numerous

highways and high-speed thoroughfares that are extremely hazardous to wolves. Whatever the cause, MDNR's wolf population surveys tend to confirm FWS's expectation that wolves are unlikely to establish a viable population in the LP. AR 007 at 000415A; *see also* 76 Fed. Reg. 81,700; AR 651 at 019802A.

However, the State and MDNR acknowledge that habitat suitability studies indicate that the northern LP contains potentially suitable wolf habitat. Researchers have estimated that the northern LP could potentially host anywhere from forty-six to 480 wolves. AR 007 at 000417A; *see also* 76 Fed. Reg. 81,690; AR 651 at 019780A. Therefore, under the 2008 Plan, MDNR will not prevent wolves from colonizing the LP. It is important to note, however, that in light of the viable wolf population in the UP, wolves' presence in the LP is not necessary to maintain a viable population in Michigan. AR 007 at 000440A.

### c.    Disease

Pursuant to the 2008 Plan, MDNR will continue to monitor the impact of parasites and disease on the viability of Michigan's wolf population. This monitoring is achieved through necropsies of dead wolves and analyzing biological samples from captured live wolves. AR 007 at 000435A; *see also* 76 Fed. Reg. 81,710; AR 651 at 019820A.

Before 2004, MDNR treated all captured wolves for mange and vaccinated them for canine distemper and parvovirus. In 2004, MDNR discontinued these treatments in order to provide biologists with an unbiased estimate of disease-caused mortality rates in the wolf population. Based on population monitoring, MDNR does not believe that disease or parasites currently pose a significant threat to the Michigan wolf population. However, if future monitoring indicates that diseases or parasites may pose a threat to the overall wolf population,

MDNR will again consider more active management.  AR 007 at 000436A; *see also* 76 Fed. Reg. 81,710; AR 651 at 019820A.

### d.    Population Monitoring

MDNR monitors the wolf population in the UP by conducting a late-winter survey.  Late-winter estimates are made at a time when most winter mortality has already occurred and before the birth of pups.  Thus, the count is made when the population is at its lowest point for the year in which the survey is conducted.  76 Fed. Reg. 81,675; AR 651 at 019749A.  In addition, MDNR's survey method likely misses some lone wolves, thus underestimating the actual population.  76 Fed. Reg. 81,678; AR 651 at 019756A.

MDNR has evaluated multiple sampling approaches and determined that a geographically stratified sampling protocol produces unbiased, precise estimates of wolf abundance.  The UP is divided into twenty-one survey units from which a stratified random sample is drawn, with each survey covering roughly 50% of the UP.  Pack locations are derived from previous surveys, citizen reports, and extensive ground and aerial tracking of radio-collared wolves.  Surveys along the border of adjacent survey units are coordinated to avoid double counting of wolves occupying those border areas.  In areas with a high density of wolves, a combination of ground surveys and aerial tracking is used to accurately delineate packs' territories and count their members.  76 Fed. Reg. 81,678; AR 651 at 019755-56A.

### e.    Managing Conflict

MDNR has developed a detailed protocol for investigating and responding to reports of wolf depredation incidents.  Verification is conducted by MDNR or the United States Department of Agriculture (USDA) Wildlife Services, using investigative techniques that USDA

Wildlife Services has used successfully in Minnesota.  If a wolf depredation incident is verified, technical assistance is provided.  This includes advice or recommendations to reduce wolf conflicts, and may also include providing the landowner with various forms of nonlethal controls, such as flashing lights, noise makers, temporary fencing, and fladry (flagging).  AR 007 at 000450A; *see also* 76 Fed. Reg. 81,712; AR 651 at 019823A.

The 2008 Plan's depredation and conflict control strategies are conservative.  The 2008 Plan commits to nonlethal management whenever possible, opposes preventative wolf removal where problems have not yet occurred, encourages management practices that minimize impact on wolves, and supports closely monitored and enforced take when nonlethal methods are ineffective.  AR 007 at 000451A; *see also* 76 Fed. Reg. 81,712; AR 651 at 019824A.  The 2008 Plan does not determine whether a public harvest will be used as a management strategy in Michigan, but it discusses developing a "socially and biologically responsible policy regarding public harvest."  AR 007 at 000457-60A; *see also* 76 Fed. Reg. 81,711; AR 651 at 019820A.

Another method of managing conflict is that Michigan livestock owners are compensated when they lose livestock due to confirmed wolf depredation.  The State operates a compensation program that is funded by MDNR and implemented by the Michigan Department of Agriculture and Rural Development (MDARD).  When the compensation program began in 2000, MDARD paid 90% of full market value of depredated livestock at the time of loss.  In 2002, MDARD began paying 100% of the full market value of depredated livestock at the time of loss.  Through 2008, the State's compensation program had combined with a private fund administered by the nonprofit International Wolf Center to provide nearly $38,000 in loss compensation to Michigan livestock owners.  The vast majority of that amount came from the State's compensation program.  76 Fed. Reg. 81,712; AR 651 at 019824A.

f.      **Funding**

Without question, sufficient funding is a crucial component of the adequacy of the State's

management of its wolf population.  Costs of wolf management, such as equipment, facilities,

and livestock compensation, are significant and, given persistent management needs, are

expected to remain significant into the foreseeable future.  Thus, the 2008 Plan addresses funding

for MDNR's wolf management efforts.  AR 007 at 000460-61A.

Crucially, the Federal status of wolves does not influence the amounts or sources of

funding available to MDNR for wolf management.  Most funding for wildlife management has

traditionally been derived from revenues generated by sportspersons.  For example, the Michigan

Game and Fish Protection Account is largely generated by State hunting and fishing license

revenues, *see* Mich. Comp. Laws § 324.2010, and the Federal Aid in Wildlife Restoration Act,

16 U.S.C. § 669 *et seq.*, provides funds derived from an excise tax on purchases of firearms and

sporting goods.  MDNR's wolf management program has been and will continue to be supported

primarily by these two funding sources, which are not dependent on the Federal status of wolves.

In addition, Michigan wolf management has received significant contributions from USDA

Wildlife Services, and those contributions likewise do not depend on the Federal status of

wolves.  Other agencies, Tribes, and private organizations also have played an important role by

addressing the education, conservation, and research components of wolf management.  AR 007

at 000460-61A.

Although wolves' Federal status does not influence the funding available to MDNR for

wolf management, the 2008 Plan nonetheless recognizes that obtaining funding from alternative

sources could spread the financial support for wolf management among a greater variety of

stakeholder groups, which could in turn create greater interest in wolves and wolf management.

The 2008 Plan therefore calls for MDNR to work with management partners to identify new

funding sources and to distribute the financial support for wolf management more evenly among a greater diversity of stakeholders.  MDNR is committed to ensuring that sufficient funding is available and that such funding is used in a responsible, efficient manner.  AR 007 at 000461A.

## C.   Michigan Wolf Management Following the Final Rule

Since the Final Rule took effect on January 27, 2012, MDNR has continued to conduct significant management activities with respect to Michigan's wolf population.  Some of those activities were already written into Michigan law at the time FWS promulgated the Final Rule, and were therefore part of the administrative record that was before FWS.  MDNR has also employed new management tools that were contemplated, but not yet finalized, when FWS compiled and considered its administrative record.

### 1.   Management Tools Within the Administrative Record

In 2008, the State enacted two wolf-related laws designed to take effect only in the event of a potential Federal delisting.  *See* Mich. Comp. Laws §§ 324.95155(1), 324.95167(1).  Those laws are now in effect and authorize a livestock or dog owner, or a designated agent, to "remove, capture, or, if deemed necessary, use lethal means to destroy a gray wolf that is in the act of preying upon" the owner's livestock or dog.  Mich. Comp. Laws §§ 324.95153, 324.95163.  FWS was aware of these laws when it promulgated the Final Rule and rightly concluded that the very limited number of wolves taken under these laws will not affect the viability of the Michigan wolf population.  76 Fed. Reg. 81,712; AR 651 at 019824A.

### 2.   Management Tools Outside the Administrative Record

The State and MDNR recognize the well settled principle that judicial review of agency action is normally confined to the administrative record that was before the agency at the time

the decision was made. *See Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985). "The focal point for judicial review should be the administrative record already in existence, not some new record completed initially in the reviewing court." *Envtl. Def. Fund, Inc. v. Costle*, 657 F.2d 275, 284 (D.C. Cir. 1981) (citations omitted).

Despite this limitation on the scope of this Court's review, Plaintiffs attempt to support their motion for summary judgment by reference to State management actions that fall outside the administrative record, having occurred subsequent to promulgation of the Final Rule. For example, Plaintiffs state that "in December of 2012 Michigan enacted a law designating the wolf as a game species and authorizing the state's Natural Resources Commission to establish a recreational wolf hunting and trapping season." Pls.' Summ. J. Mem. (Doc. 24-1) at 49 of 51. The State and MDNR are compelled to address matters outside the administrative record in order to respond fully to Plaintiffs' motion.

Although the gray wolves of the WGL DPS were removed from the Federal List of Endangered and Threatened Wildlife effective January 27, 2012, the wolf remained a protected animal in Michigan throughout the late-2012 hunting season. In January 2013, MDNR began a process to evaluate the appropriateness of using public harvest of wolves to help achieve management goals, specifically conflict resolution. As part of that process, MDNR began engaging the public, including Native American Tribes, to discuss public harvest of wolves as a management tool to resolve chronic wolf-human conflict. (Exhibit 2 (Wildlife Conservation Order Amendment No. 13 of 2013) at 1-2; Exhibit 3 (Wildlife Conservation Order Amendment No. 14 of 2013) at 1; *see also* Exhibit 4 (Declaration of Patrick E. Lederle) at ¶¶ 4-5.)

The 2008 Plan indicates that public harvest is appropriate when nonlethal and targeted lethal control measures do not provide sufficiently effective or logistically feasible means of

reducing wolf-human conflict, or if issues are the result of high wolf densities.  AR 007 at

000457A.  In determining the parameters for a potential public harvest of wolves, MDNR

reviewed available data on negative wolf-human interactions throughout the UP, primarily

livestock and dog depredations and nuisance wolf complaints.  For instance, MDNR considered

the fact that, in 2010 alone, forty-six animals were killed in verified livestock depredation events

in Michigan.  76 Fed. Reg. 81,711; AR 651 at 019822A.  MDNR also reviewed the management

actions it had taken to address these issues.  Based on those reviews, MDNR identified three

discrete geographic areas of the UP where conflicts were chronic despite the application of a

variety of nonlethal and targeted lethal control measures.  MDNR found that the persistence of

localized problems despite the application of both nonlethal and targeted lethal control measures

suggested that public harvest could be beneficial as an additional management tool in the

affected areas.  These circumstances satisfy the conditions outlined in the 2008 Plan and the

Michigan Wolf Management Roundtable's report for using public harvest as a management tool.

(Exhibit 2 at 2; Exhibit 3 at 2.)

Effective in May 2013, Public Act 21 of 2013 empowered Michigan's Natural Resources

Commission[3] to designate game species and to establish the first open hunting season for such

species.  *See* Mich. Comp. Laws § 324.40110.  On July 11, 2013, the Natural Resources

Commission designated the wolf as a game species and authorized a very limited public wolf

harvest to take place from November 15 through December 31, 2013.  (Exhibit 2 at 1, 4-5;

Exhibit 3 at 6, 11, 15.)  In accordance with MDNR's findings regarding the localization of

persistent wolf-human conflict, Michigan's 2013 public wolf harvest is limited to the three

discrete geographic units discussed above.  (Exhibit 3 at 4-6, 14-15; Exhibit 5 (Map of Wolf

---

[3] The Natural Resources Commission is a seven-member public body that acts as "the head of
the department of natural resources" and "establish[es] general policies related to natural
resources management and environmental protection."  Mich. Comp. Laws § 324.501(2).

Management Units); *see also* Exhibit 4 at ¶ 6.) MDNR defined the three Wolf Management Units (WMUs) using the nearest easily recognizable geographic features (such as roads, rivers, and lakes) as boundaries. (Exhibit 3 at 3.) Wolf hunting remains illegal outside the three WMUs. (*See* Exhibit 3 at 11; Exhibit 5.)

Michigan's UP has a land area of well over 16,000 square miles. The three WMUs in which hunting is allowed in 2013 combine for a land area of approximately 2,070 square miles, which is less than 15% of the total land area of the UP, and about 2% of the total land area of Michigan. (*See* Exhibit 5.) Within the WMUs, only firearm, crossbow, and bow and arrow are permitted devices for taking a wolf. Trapping is not permitted, nor is hunting with the aid of dogs. (Exhibit 3 at 7, 11.)

Wolf Management Unit A is approximately 337 square miles in area. The primary objective in WMU A is to reduce the number of nuisance wolf complaints within the WMU. Since 2010, MDNR has recorded at least ninety-one complaints of nuisance wolf behavior in WMU A, including wolves entering the City of Ironwood, wolves chasing dogs in residential areas, and wolves traveling in close proximity to children. Nuisance wolf behavior has continued in WMU A despite extensive use of nonlethal and targeted lethal control measures. The target harvest for WMU A is sixteen wolves. (Exhibit 3 at 4-5.)

Wolf Management Unit B is approximately 1,347 square miles in area. The primary objective in this WMU is to reduce the number of chronic livestock depredations. Since 2010, MDNR has recorded at least eighty livestock depredation events on at least eleven farms in WMU B. WMU B also has had several dog depredation events, as well as other complaints of nuisance wolf behavior. The depredation events have persisted despite extensive use of

nonlethal and targeted lethal control measures.  The target harvest for WMU B is nineteen wolves.  (Exhibit 3 at 5.)

Wolf Management Unit C is approximately 386 square miles in area.  The primary objective in WMU C is to reduce the number of chronic livestock and dog depredations.  Since 2010, MDNR has recorded at least twenty-five livestock depredation events on seven farms, as well as depredation events involving at least twelve dogs, in WMU C.  The depredation events have persisted despite extensive use of nonlethal and targeted lethal control measures.  The target harvest for WMU C is eight wolves.  (Exhibit 3 at 6.)

With the target harvests for WMUs A, B, and C being sixteen, nineteen, and eight wolves, respectively, the total target harvest for the season is forty-three wolves.  In order to ensure that no more than forty-three wolves are taken, the open season will close, by WMU, prior to December 31, 2013 if the target harvest for a given WMU is reached.  (Exhibit 3 at 6, 11.)

The target harvest for each WMU represents approximately 20% of that particular WMU's expected fall wolf population.  (Exhibit 3 at 4.)  Without a harvest, MDNR's current estimate of human-caused mortality of wolves in the UP is approximately 17% of the total wolf population.  Even accounting for compensatory factors such as wolf dispersal, a harvest of 20% in the WMUs should increase the overall human-caused mortality rate above 29% in the WMUs.  (Exhibit 3 at 3.)  Relevant scientific literature suggests that, to reduce the abundance of a wolf population, levels of human-caused mortality must exceed 29% of the wolf population in question.  (Exhibit 3 at 3.)  MDNR's target harvests are designed to raise human-caused mortality above 29% in the three WMUs only, while keeping such mortality well below 29% outside the WMUs.  In other words, the target harvests are designed to reduce wolf abundance in

the three WMUs while not affecting overall wolf abundance in the UP.  (Exhibit 3 at 3-4.)

MDNR expects the overall trajectory of Michigan's wolf population to remain unchanged

despite the public harvest that will be allowed in 2013.  (Exhibit 3 at 4.)

Perhaps most importantly, MDNR anticipates two potential benefits resulting from a

public harvest of wolves in the three WMUs.  First, hunting could make wolves more wary of

people, residential areas, and farms.  A reduction in wolves displaying fearless behavior would

reduce the number of nuisance wolf complaints.  Second, MDNR anticipates that hunting will

reduce the abundance of wolves in the WMUs, which may result in fewer conflicts.  (Exhibit 3 at

3.)  Again, reducing wolf-human conflict is crucial because the long-term viability of the wolf

population largely depends upon public support for wolves.  AR 007 at 000419A.

As detailed above, Michigan's 2013 public wolf harvest is highly restricted.  Wolf

hunting is allowed only within the three WMUs and only using certain prescribed methods.  The

illegal taking of a wolf in Michigan remains a misdemeanor, punishable by mandatory

imprisonment for up to ninety days and a mandatory fine of up to $1,000.00, as well as the costs

of prosecution.  Mich. Comp. Laws § 324.40118(3).

As this Court can see, Plaintiffs' claim that the State and MDNR intend "immediate and

dramatic reductions in wolf populations," Pls.' Summ. J. Mem. (Doc. 24-1) at 9 of 51, is simply

untrue, even in light of the limited public harvest that will be allowed in 2013.  The forty-three

wolves that may be taken during Michigan's 2013 public wolf harvest represent less than 7% of

Michigan's late-winter wolf population.  Further, because wolf pups are born after the late-

winter count is completed, the forty-three wolves that may be taken during Michigan's 2013

public harvest represent an even lesser percentage of the wolf population that exists at the time of

harvest.  Again, scientific literature suggests that, to reduce the abundance of a wolf population,

levels of human-caused mortality must exceed 29% of the population.  (Exhibit 3 at 3.)  Thus, while the 2013 wolf harvest may help to reduce and resolve wolf-human conflict, MDNR fully expects the trajectory of Michigan's wolf population to remain unchanged.

## V.      Conclusion and Relief Requested

Both the State and MDNR recognize and appreciate the cultural and ecological significance of wolves and are committed to preserving and maintaining a viable wolf population in Michigan.  The State and MDNR have a clear interest in managing all the wildlife over which the State has sovereign authority, and that interest is especially strong where the State and MDNR have expended great efforts and resources toward the recovery of a particular species.

Since wolves were first afforded legal protections, the State and MDNR have worked alongside Federal Defendants to ensure the reestablishment and recovery of a wolf population in Michigan, and Plaintiffs cannot reasonably dispute that all localized recovery goals have long been satisfied.  The Michigan wolf population has satisfied the Federal recovery goal for a non-isolated population for well over a decade.  And even though Michigan's wolf population is not isolated from populations in Minnesota and Wisconsin, the Michigan population alone has satisfied the more stringent recovery goal for an isolated population since winter 2004-05.

Michigan's State-level wolf management is more than adequate to prevent the Michigan wolf population from becoming threatened or endangered in the future.  In fact, one of the primary goals of the 2008 Michigan Wolf Management Plan is to maintain a viable Michigan wolf population above a level that would warrant its classification as threatened or endangered.  The 2008 Plan contains mechanisms to ensure the continued achievement of that goal, and even the management actions that the State and MDNR have undertaken since the Final Rule took effect demonstrate a continuing commitment to a viable wolf population in Michigan.

In the face of evidence that the Final Rule will not have the dire consequences they imagine, Plaintiffs are left to mischaracterize State-level wolf management efforts in Michigan. Despite Plaintiffs' exaggerated claims, the simple fact is that the State and MDNR have no intention of reversing course and harming a wolf population that is thriving thanks in large part to the State and MDNR's own recovery and management efforts. The recovery criteria that the State and MDNR have adopted are not population targets, and even in the two years since FWS promulgated the Final Rule, the State and MDNR have not sought any long-term reduction in Michigan's wolf population. In short, both the administrative record and the factual record subsequent to the Final Rule prove that the State and MDNR are capable of and committed to managing and maintaining a viable population of wolves in Michigan.

For all the foregoing reasons, this Court should deny Plaintiffs' motion for summary judgment (Doc. 24) and grant Federal Defendants' motion for summary judgment (Doc. 27). A proposed order to that effect is attached hereto as Exhibit 1.

Respectfully submitted,

Bill Schuette
Attorney General

/s/ Stephen D. Thill
Stephen D. Thill
(Mich. Bar No. P75808)
thills@michigan.gov
Pamela J. Stevenson
(Mich. Bar No. P40373)
stevensonp@michigan.gov
Assistant Attorneys General
Attorneys for State of Michigan and
Michigan Department of Natural Resources
Environment, Natural Resources, and
Agriculture Division
P.O. Box 30755
Lansing, MI 48909
(517) 373-7540

Dated:  December 11, 2013

## CERTIFICATE OF SERVICE (E-FILE)

I hereby certify that on December 11, 2013, I electronically filed the above document(s) with the Clerk of the Court using the ECF System, which will provide electronic copies to counsel of record.

/s/ Stephen D. Thill
Stephen D. Thill
(Mich. Bar No. P75808)
thills@michigan.gov
Pamela J. Stevenson
(Mich. Bar No. P40373)
stevensonp@michigan.gov
Assistant Attorneys General
Attorneys for State of Michigan and
Michigan Department of Natural Resources
Environment, Natural Resources, and
Agriculture Division
P.O. Box 30755
Lansing, MI 48909
(517) 373-7540

38