Exhibit 2

Wildlife Conservation Order
Amendment No. 13 of 2013

STATE OF MICHIGAN
DEPARTMENT OF NATURAL RESOURCES
LANSING

RICK SNYDER
GOVERNOR



KEITH CREAGH
DIRECTOR

SUBMITTED: May 13, 2013
RESUBMITTED: June 17, 2013

APPROVED
July 11, 2013
MICHIGAN NATURAL RESOURCES COMMISSION
(ASSISTANT TO THE COMMISSION)

MEMORANDUM TO THE NATURAL RESOURCES COMMISSION

Subject:    Designation of Game Species
            Wildlife Conservation Order Amendment No. 13 of 2013

Authority:

The Natural Resources and Environmental Protection Act, 1994 PA 451, as amended, authorizes the Director and the Commission to issue orders to manage wild animals in this state.

Discussion and Background:

Public Act 21 of 2013 granted the Natural Resources Commission (NRC) shared authority to designate a species as game. Accordingly, and based on its extensive experience administering the hunting and trapping of such species, the Department recommends that the NRC, in alignment with MCL 324.40103, designate the following species in Michigan as game: badger, bear, beaver, bobcat, brant, coot, coyote, crow, deer, duck, elk, fisher, Florida gallinule, fox, geese, hare, Hungarian partridge, marten, mink, moose, muskrat, opossum, otter, pheasant, quail, rabbit, raccoon, ruffed grouse, sharptailed grouse, skunk, snipe, sora rail, squirrel, Virginia rail, weasel, wild turkey, woodchuck, and woodcock.

Also pursuant to Public Act 21 of 2013, the Department further recommends that the NRC designate the wolf in Michigan as game.

The United States Fish and Wildlife Service removed wolves from the Federal list of Endangered Species on January 27, 2012, giving the State of Michigan full management authority for the species. Game species designation would give the NRC authority to determine the manner and method of take regarding wolves.

The 2008 Wolf Management Plan and Roundtable endorsed the public harvest of wolves to resolve conflicts, under certain conditions. Section 6.12 of the plan indicates that public harvest is appropriate when nonlethal and targeted lethal control measures are not effective, are not logistically feasible, or if issues are the result of high wolf densities. Consistent with the North American Model of Wildlife Conservation, NRC authorities encompass all applications of wolf harvest as the science-based management and conservation of wolves unfolds in concert with the science-based management and conservation of other wildlife resources.

In January of 2013, the Department began a process to evaluate the potential need for the use of public harvest of wolves to help achieve management goals – specifically conflict resolution.

STEVENS T. MASON BUILDING • 530 WEST ALLEGAN STREET • P.O. BOX 30028 • LANSING, MICHIGAN 48909-7528
www.michigan.gov/dnr • (517) 373-2329

37

Designation of Game Species
Wildlife Conservation Order Amendment No. 13 of 2013
Page 2
June 17, 2013

The Department also began engaging the public and Tribes to discuss the potential for public harvest of wolves as a management tool to resolve chronic negative wolf-human interactions.

The Wolf Management Advisory Council (WMAC) has met twice to discuss issues associated with a public harvest of wolves. The WMAC is a diverse group of stakeholders that provides input on wolf management issues and implementation of the Wolf Management Plan. In December of 2012, we asked the WMAC to provide their primary concerns regarding the potential use of public harvest as a wolf management tool (report available at www.michigan.gov/wolves). We used this list of concerns to help craft public engagement efforts and as a reference for the development of recommendations regarding public harvest of wolves. Our intention is to try to account for and address as many of these concerns as possible. Although we are not able to address all of the concerns brought forward, we have attempted to incorporate these concerns to the extent practicable. WMAC recommendations outlining the potential consequences of a public harvest of wolves were presented to the NRC in early May.

The Department also conducted four public meetings in March (Ironwood, Marquette, Gaylord and Lansing) to provide information to the public on the Wolf Management Plan and on the Department's review of the potential use of public harvest as a wolf management tool. Attendees were given the opportunity to provide questions regarding the use of public harvest to manage wolves which were answered during the meeting. Michigan State University also conducted a survey at each of these meetings to gather input from attendees regarding their concerns about the use of public harvest. Survey results were available at the April NRC meeting presentation.

The Department and NRC members also hosted 4 meetings to discuss the issue with the 12 federally recognized Native American Tribes; 6 different Tribes participated in the meetings. Tribes also sent letters and resolutions expressing their concerns regarding a harvest. The Michigan Tribes that commented are uniformly opposed to the use of public harvest as a management tool. While specific discussions on allocation of possible harvests have not occurred, the Tribes are extremely unlikely to desire to harvest wolves in Michigan. Should harvest occur by the Tribes, they would be able to incorporate such harvest into state of Michigan harvest strategies.

We reviewed available data on negative wolf-human interactions throughout the Upper Peninsula, primarily livestock and dog depredations and nuisance wolf complaints. We also reviewed our records of management actions designed to address these issues. Based on these reviews we identified persistent conflicts through time, despite the application of a number of non-lethal and lethal control measures. The combination of chronic problems despite the application of both nonlethal and targeted lethal control measures suggests that the use of public harvest as an additional management tool may be beneficial. These conditions also meet the provisions for using a public harvest as a tool to address wolf-human conflicts outlined in the plan and the Wolf Roundtable Report.

Designation of Game Species
Wildlife Conservation Order Amendment No. 13 of 2013
Page 3
June 17, 2013

We anticipate two potential benefits resulting from game status of wolves. First, through time, hunting could change the behavior of wolves making them more wary of people, residential areas, and farms. A reduction in wolves displaying fearless behavior would reduce the number of nuisance wolf complaints. Second, hunting could also reduce the abundance of wolves, which may result in fewer conflicts.

The NRC has the authority to determine the method and manner of take of game animals. Game species designation does not mean that a hunting season will be established.

Recommendation:

This order was submitted for information on June 13, 2013, at the Natural Resources Commission Meeting. This item appeared on the Department's May 2013 calendar and may be eligible for approval on July 11, 2013.

Russ Mason, Ph.D., Chief
Wildlife Division

Gary Hagler, Chief
Law Enforcement Division

Bill O'Neill, Chief
Forest Resources Division

Ronald A. Olson, Chief
Parks and Recreation Division

James Dexter, Chief
Fisheries Division

William E. Moritz, Ph.D.
Natural Resources Deputy

I have analyzed and discussed these recommendations with staff and concur as to matters over which the Director has authority.

Keith Creagh, Director

7/11/13
Date

# WILDLIFE CONSERVATION ORDER

## Amendment No. 13 of 2013

By authority conferred on the Natural Resources Commission and the Director of the Department of Natural Resources by sections 40107 and 40113a of 1994 PA 451, MCL 324.40107 and 324.40113a, it is ordered that effective July 12, 2013, the following section(s) of the Wildlife Conservation Order shall read as follows:

### 1.2 Definitions.

Sec. 1.2 (1) Definitions in part 3 of 1994 PA 451, as amended, MCL 324.301; part 401, wildlife conservation, 1994 PA 451, as amended, MCL 324.40101 to 324.40119; and part 435, hunting and fishing licenses, 1994 PA 451, as amended, MCL 324.43501 to 324.43561, and in this order shall have the same meanings in this order. Additional definitions for terms used in this order are as defined in this section.

(2) "Advanced illness" means a medical or surgical condition with significant functional impairment that is not reversible by curative therapies and that is anticipated to progress toward death despite attempts at curative therapies or modulation, the time course of which may or may not be determinable through medical prognostication.

(3) "Antlered deer" means a deer having at least 1 antler that extends 3 inches or more above the skull. For the purposes of determining if an antler extends 3 or more inches above the skull, the measurement shall be taken on the longest antler beginning at the line where the antler and pedicel join, along the back of the antler, following the curve, if any, to the tip of the longest antler point. For the purposes of this section, "pedicel" means the bone of the skull to which the antler is attached.

(4) "Antlerless deer" means a deer without antlers or a deer with antlers where the longest antler extends less than 3 inches above the skull.

(5) "Modified bow" means a bow, other than a crossbow, that has been physically altered so that the bow may be held, aimed, and shot with one arm.

(6) "Game" means any animal designated as game under the authority of section 40110 of 1994 PA 451, as amended, MCL 324.40110, and any of the following animals: badger, bear, beaver, bobcat, brant, coot, coyote, crow, deer, duck, elk, fisher, Florida gallinule, fox, geese, hare, Hungarian partridge, marten, mink, moose, muskrat, opossum, otter, pheasant, quail, rabbit, raccoon, ruffed grouse, sharptailed grouse, skunk, snipe, sora rail, squirrel, Virginia rail, weasel, wild turkey, wolf, woodchuck, and woodcock. "Game" does not include privately owned cervidae species located on a cervidae livestock facility registered under 2000 PA 190, MCL 287.951 to 287.969.

(7)"Migratory game bird" means a bird as defined by 50 C.F.R. §20.11 (1988).

(8)"Physical therapist" means the same as defined in article 15 of the public health code, 1978 PA 368, MCL 333.17801.

(9) "Physician" the same as defined in article 15 of the public health code, 1978 PA 368, MCL 333.17001.

(10) "Raptor" means any bird species of the orders strigiformes, accipitriformes, and falconiformes.

(11) "Shotgun, handgun, black-powder firearms only area" means that area south of a line beginning at a point on the Wisconsin-Michigan boundary line directly west of the west end of highway M-46; then east to M-46 and east along M-46 to its junction with freeway US-131; then south along freeway US-131 to M-57; then east along M-57 to its intersection with Montcalm road on the Kent-Montcalm county line; then south along that county line and the Ionia-Kent county line to its intersection with M-44; then east along M-44 to its intersection with M-66; then north along M-66 to its intersection with M-57; then east along M-57 to its intersection with M-52; then north along M-52 to its intersection with M-46; then east along M-46 to its intersection with M-47; then north along M-47 to its junction with US-10; then east along US-10 to its junction with I-75; then north along I-75 and US-23 to its junction with beaver road, Kawkawlin township, Bay county; then east along beaver road to Saginaw bay; then north 50o east to the international boundary with Canada.

(12) "Waterfowl hunting north zone" or "north zone" means all of the Upper Peninsula.

(13) "Waterfowl hunting middle zone" or "middle zone" means that area of the Lower Peninsula north of a line beginning at the Michigan-Wisconsin boundary line in Lake Michigan, due west of the mouth of Stoney creek in section 31, T14N R18W, Oceana county, then easterly and southerly along the south shore of Stoney creek to Scenic drive, easterly and southerly on Scenic drive to Stoney lake road in section 5, T13N R18W, Oceana county, easterly on Stoney lake and Garfield roads to highway M-20 (Hayes road) in section 33, T14N R17W, Oceana county, easterly on highway M-20 through Oceana, Newaygo, Mecosta, Isabella, and Midland counties to highway US-10 business route in the city of Midland, easterly on highway US-10 business route to highway US-10 at the Bay county line, easterly on highway US-10 to highway I-75/US-23, northerly on highway I-75/US-23 to the highway US-23 exit at Standish, easterly on highway US-23 to the center line of the Au Gres river, southerly along the center line of the Au Gres river to Saginaw bay of Lake Huron, and from that point on a line directly east 10 miles into Saginaw bay, and from that point on a line directly northeast to the international boundary with Canada in Lake Huron.

(14) "Waterfowl hunting south zone" or "south zone" means all of that area of the Lower Peninsula south of the line described in middle zone.

(15) "Zone 1" means all of the Upper Peninsula.

(16) "Zone 2" means all of that part of the Lower Peninsula north of a line beginning at the Michigan-Wisconsin boundary line due west of the Lake Michigan shoreline which is north of Muskegon lake and due west of the western terminus of memorial drive at Scenic drive in Muskegon county, then easterly to said western terminus of memorial drive at Scenic drive, easterly on memorial drive to Ruddiman drive, northeasterly on Ruddiman drive to lake avenue, northeasterly on lake avenue to highway M-120 (also known as Holton road) in North Muskegon, northeasterly and then northerly on highway M-120 to highway M-20, easterly on highway M-20 to highway business route US-10 in the city of Midland, easterly on combined highway M-20 and highway business route US-10 to highway US-10 at the Midland-Bay county line, easterly on highway US-10 to Garfield road in Bay county, northerly on Garfield road to Pinconning road, easterly on Pinconning road to seven mile road, northerly on seven mile road to the Bay-Arenac county line (where seven mile road changes name to Lincoln school road), northerly on Lincoln school road (also known as county road 25) in Arenac county to highway M-61, easterly on highway M-61 to highway US-23, northeasterly then easterly on highway US-23 to the center line of the Au Gres river, southerly along the center line of the Au Gres river to Saginaw bay of Lake Huron, easterly 90° east for 7 miles into Saginaw bay, then northerly 78° east (dividing Arenac county islands from Huron county islands) to the international boundary line between the United States and the dominion of Canada.

(17) "Zone 3" means all that part of the Lower Peninsula south of the line described in zone 2.

Issued on this 11th day of July, 2013.

Approved as to matters over which the Natural Resources Commission has authority.

J. R. Richardson, Chairman
Natural Resources Commission

Approved as to matters over which the Director has authority.

Keith Creagh
Director

41