Exhibit 3

Wildlife Conservation Order
Amendment No. 14 of 2013




STATE OF MICHIGAN
DEPARTMENT OF NATURAL RESOURCES
LANSING

RICK SNYDER
GOVERNOR

KEITH CREAGH
DIRECTOR

SUBMITTED:     May 13, 2013
RESUBMITTED:   June 17, 2013

APPROVED
July 11, 20 13
MICHIGAN NATURAL RESOURCES COMMISSION
Debbie Whipple
(ASSISTANT TO THE COMMISSION)

MEMORANDUM TO THE NATURAL RESOURCES COMMISSION

Subject:   Wolf Regulations as Game Species
           Wildlife Conservation Order Amendment No. 14 of 2013

Authority:

The Natural Resources and Environmental Protection Act, 1994 PA 451, as amended, authorizes the Director and the Commission to issue orders to manage wild animals in this state.

Discussion and Background:

The United States Fish and Wildlife Service removed wolves from the Federal list of Endangered Species on January 27, 2012, giving the State of Michigan full management authority for the species. In addition, the Governor signed Public Act 21of 2013, granting the Natural Resources Commission the authority to designate a species as game and to establish the first open season for such a species. The Department has recommended that the Natural Resources Commission (NRC) designate the wolf as a game species through Wildlife Conservation Order No. 13 of 2013. Game species designation would give the NRC authority to determine the manner and method of take regarding wolves. The 2008 Wolf Management Plan and Roundtable endorsed the public harvest of wolves to resolve conflicts, under certain conditions.

Section 6.12 of the plan indicates that public harvest is appropriate when nonlethal and targeted lethal control measures are not effective, are not logistically feasible, or if issues are the result of high wolf densities. Consistent with the North American Model of Wildlife Conservation, NRC authorities encompass all applications of wolf harvest as the science-based management and conservation of wolves unfolds in concert with the science-based management and conservation of other wildlife resources.

In January of 2013, the Department began a process to evaluate the potential need for the use of public harvest of wolves to help achieve management goals – specifically conflict resolution. The Department also began engaging the public and tribes to discuss the potential for public harvest of wolves as a management tool to resolve chronic negative wolf-human interactions.

*Public and Tribal Considerations*

The Wolf Management Advisory Council (WMAC) has met twice to discuss issues associated with a public harvest of wolves. The WMAC is a diverse group of stakeholders that provides

STEVENS T. MASON BUILDING • 530 WEST ALLEGAN STREET • P.O. BOX 30028 • LANSING, MICHIGAN 48909-7528
www.michigan.gov/dnr • (517) 373-2329

42

input on wolf management issues and implementation of the Wolf Management Plan. In December of 2012, we asked the WMAC to provide their primary concerns regarding the potential use of public harvest as a wolf management tool (report available at www.michigan.gov/wolves ). We used this list of concerns to help craft public engagement efforts and as a reference for the development of these recommendations. Our intention is to try to account for and address as many of these concerns as possible. Although we are not able to address all of the concerns brought forward, we have attempted to incorporate these concerns to the extent practicable. WMAC recommendations outlining the potential consequences of a public harvest of wolves were presented to the NRC in early May.

The Department also conducted four public meetings in March (Ironwood, Marquette, Gaylord and Lansing) to provide information to the public on the Wolf Management Plan and on the Department's review of the potential use of public harvest as a wolf management tool. Attendees were given the opportunity to provide questions regarding the use of public harvest to manage wolves which were answered during the meeting. Michigan State University also conducted a survey at each of these meetings to gather input from attendees regarding their concerns about the use of public harvest. Survey results were available at the April NRC meeting presentation.

The Department and NRC members also hosted 4 meetings to discuss the issue with the 12 federally recognized Native American Tribes; 6 different Tribes participated in the meetings. Tribes also sent letters and resolutions expressing their concerns regarding a harvest. The Michigan Tribes that commented are uniformly opposed to the use of public harvest as a management tool. While specific discussions on allocation of possible harvests have not occurred, the Tribes are extremely unlikely to desire to harvest wolves in Michigan. Should harvest occur by the Tribes, they would be able to incorporate such harvest into state of Michigan harvest strategies. We designed the harvest recommendations to minimize the impact to the Upper Peninsula wolf population and to limit the take of wolves to those packs that have a history of conflicts.

*Public Harvest for Conflict Resolution*

We reviewed available data on negative wolf-human interactions throughout the Upper Peninsula, primarily livestock and dog depredations and nuisance wolf complaints. We also reviewed our records of management actions designed to address these issues. Based on these reviews we identified geographic areas where conflicts were persistent through time despite the application of a number of non-lethal and lethal control measures. The combination of localized chronic problems despite the application of both nonlethal and targeted lethal control measures suggests that the use of public harvest as an additional management tool may be beneficial in these areas. These conditions also meet the provisions for using a public harvest as a tool to address wolf-human conflicts outlined in the plan and the Wolf Roundtable Report.

Based on our analysis, we identified three areas in the Upper Peninsula that would benefit from the use of public harvest to aid in the reduction of wolf conflicts. Below we summarize the management actions that have occurred in these areas and the management objectives we hope to achieve by using public harvest of wolves in addition to our other non-lethal and lethal control

Wolf Regulations as Game Species
Wildlife Conservation Order Amendment No. 14 of 2013
Page 3
June 17, 2013

measures. Because we have current or historical information on the locations of wolf pack territories (based on movements of radio-collared wolves), we were reasonably certain about which wolf packs may have been responsible for these persistent issues. Using this information, we established wolf management units using the nearest easily recognized geographic features (roads, rivers, lakes) as unit boundaries.

We anticipate two potential benefits resulting from a public harvest of wolves in these areas. First, through time, hunting could change the behavior of wolves making them more wary of people, residential areas, and farms. A reduction in wolves displaying fearless behavior in these areas would reduce the number of nuisance wolf complaints. Second, hunting could also reduce the abundance of wolves in these management units, which may result in fewer conflicts.

*Wolf Target Harvests*

Target harvests are recommended for each Wolf Management Unit (WMU) by evaluating depredation history, wolf nuisance complaints, wolf survey data, telemetry information, as well as historical pack information.

The recommended target harvest for the season is 43 wolves. The recommendation for each of the WMUs is 16 for WMU A, 19 for WMU B, and 8 for WMU C. The season limit recommendation is one wolf per licensed hunter.

In order to be flexible and manage wolf-human conflicts, we will evaluate and make recommendation to the NRC to adjust the WMUs, bag limits, and harvest targets periodically, if necessary.

To reduce wolf abundance, results in the scientific literature suggest that levels of human-caused mortality need to exceed 29% of the total population. We cannot precisely predict the level of wolf abundance reduction in the management units because of several population responses that may compensate for the animals removed in the harvest. For example, evidence suggests that wolf populations appear to compensate for rates of human exploitation $\leq 29\%$, primarily through adjustments in dispersal (local dispersal, emigration and immigration). In other words, harvesting will create opportunities for wolves that would have otherwise dispersed from the area to remain in the area. Harvesting might also allow dispersing wolves from other areas to settle in the wolf management units, thereby offsetting reductions from harvesting. There is also evidence that rates of natural mortality decline when human-caused mortality exceeds 29%, again offsetting harvest reductions.

Without a harvest, our current estimate of human-caused mortality of wolves in the Upper Peninsula is about 17% of the total population. A target harvest of 20% in the management units should increase the overall human-caused mortality rate above 29% in those areas, resulting in a reduction in wolf abundance in the management units. However, actual population reductions in each management unit will depend on the compensatory processes described above.

For the entire Upper Peninsula wolf population, we would expect a harvest rate of 20% in the three wolf management units to remove about 5% of the total Upper Peninsula expected fall population. This harvest rate is extremely unlikely to impact the overall UP wolf population size. We expect the population trajectory to remain unchanged despite the harvest recommended in this order.

We determined the recommended harvest targets by estimating the number of wolves we expect to be present in each unit during the upcoming fall harvest season and applied a harvest rate of 20%. We developed the estimate of wolf abundance in the fall by considering the number of wolves found in these units during the most recent winter wolf survey. The 2013 survey information became available in early April. The minimum overall winter population estimate for 2013 is 658, a decline of 29 from 687 in 2011. Target harvests in this order have been adjusted based on this new information. Our estimates of wolf abundance during the winter survey represent the low point in the annual cycle. To derive an estimate of wolf numbers in the fall, we needed to account for the production of pups and mortality of pups and adults during the spring, summer, and early fall. We used estimates of litter size and summer/early fall mortality of pups from published reports from the region. We based estimates of summer/early fall mortality of adult wolves on data from Michigan.

Wolf Management Unit A

*Description*

This WMU is in Gogebic County in the far western Upper Peninsula. The WMU contains the city of Ironwood and the encompassing township. The WMU is approximately 337 square miles with 74% in privately owned lands.

*Management Objective*

The primary objective in this WMU is to reduce the number of nuisance wolf complaints in this WMU. Since 2010, we have recorded 91 complaints of nuisance wolf behavior including wolves traveling within the city limits, wolves chasing dogs in residential areas, and wolves traveling in close proximity to children waiting for school buses or at day care facilities. USDA Wildlife Services, under our direction, has spent a considerable amount of time responding to these complaints. Since 2010, they have employed harassment techniques (cracker shells) and provided technical advice to residents on avoiding negative wolf-human interactions. When the nonlethal techniques failed to resolve the problems, Wildlife Services removed 17 wolves from the area. We have also been working with the city of Ironwood to address the issue of deer feeding which is likely contributing to the problem and to increase specially permitted deer harvest (archery) within the city limits. Despite the extensive management responses in this area, nuisance wolf behavior has continued.

This WMU has also had a moderate level of wolf depredation on livestock and dogs. Both nonlethal (flagging, technical advice on animal husbandry) and lethal (one wolf removed) control measures have been employed.

*Recommended Target Harvest*

Problems experienced in this area are due, at least in part, to the local wolf population density. There are 10 wolf packs in the surrounding area, and because most wolves disperse from their natal pack there is a high probability that some dispersing wolves will continue to try to establish a territory in Ironwood Township. The Township is attractive to wolves because it contains good deer habitat. Removing wolves through a public harvest may reduce the number of dispersing wolves trying to use this area. Just as importantly, hunting may also reduce the fearless behavior that many of these wolves have been displaying. We recommend an initial target harvest of 16 wolves from this WMU. Over time, we will evaluate the success of our management (including public harvest, technical assistance, and nonlethal and lethal control measures) by monitoring the number of wolf complaints and the amount of effort we need to expend dealing with these issues.

Wolf Management Unit B

*Description*

This unit includes portions of Baraga, Houghton, Ontonagon, and Gogebic Counties. The unit is approximately 1,347 square miles with 57% in privately owned lands.

*Management Objective*

The primary objective in this unit is to reduce the number of chronic livestock depredations. Since 2010, we have recorded 80 livestock depredation events on 11 farms. This unit also had several dog depredation events and complaints of nuisance wolf behavior. We employed a number of nonlethal control measures including flagging, fencing, guard animals, flashing lights, sirens, and range guards as well as providing technical advice on animal husbandry practices. In addition, farmers and USDA Wildlife Services staff removed 17 wolves. Despite, the extensive management responses in this area, livestock depredations have continued.

*Recommended Target Harvest*

Removing wolves through a public harvest may decrease the number of livestock depredations in this area by reducing wolf abundance and/or changing wolf behavior. We recommend an initial target harvest of 19 wolves from this unit. Over time, we will evaluate the success of our management (including public harvest, technical assistance, and nonlethal and lethal control measures) by monitoring the number of wolf livestock depredations and the amount of effort we need to expend while dealing with these issues.

Wolf Management Unit C

*Description*

This unit includes portions of Luce and Mackinac Counties. The unit is approximately 386 square miles with 57% in privately owned lands.

*Management Objective*

The primary objective in this unit is to reduce the number of chronic livestock and dog depredations. Since 2010, we have recorded 25 livestock depredation events on seven farms and four depredation events involving 12 dogs. We employed a number of nonlethal control measures including fencing, guard animals, and cracker shells as well as providing technical advice on animal husbandry practices. In addition, a farmer removed two wolves. Despite the extensive management responses in this area, livestock and dog depredations have continued.

*Recommended Target Harvest*

Removing wolves through a public harvest may reduce the number of depredations in this area by reducing wolf abundance and/or changing wolf behavior. We recommend an initial target harvest of eight wolves from this unit. Over time, we will evaluate the success of our management (including public harvest, technical assistance, and nonlethal and lethal control measures) by monitoring the number of livestock and dog depredations and the amount of effort we need to expend dealing with these issues.

*Wolf Season Dates*

The Department recommends that the NRC authorize the establishment of the first open season for wolf. The 2013 recommended dates for the wolf season are November 15 to December 31. The season will close (by WMU) prior to December 31, 2013 if the target harvest for a given WMU is reached. It will be the responsibility of the licensee to verify if a WMU is still open before they hunt. It is recommended that licenses not be available for purchase during the open season for take of wolves.

*Wolf License Quotas*

The Department recommends that a licensed hunter be required to report successful harvest by the end of the day in which the wolf was harvested by calling a designated reporting phone line. Once the target harvest is met (or expected to be met imminently) for a WMU, the entire unit will be closed for the season. Notice of a WMU closure will be given online, through the call-in system, and through all retail license agents. The season will close 24 hours after notification of the closure has been posted online and on the call-in system. Licensed hunters will be required to check daily via an online system, at retail license locations, or by calling a designated phone line to determine if any units have been closed.

The Department recommends making 1,200 licenses available over the counter for all WMUs open in 2013. As previously described, a mandatory call-in system will be in place to ensure that the target harvest is not exceeded regardless of the number of individuals with licenses. Having licenses available over the counter eliminates the need for a lottery, maximizes the potential to reach the target harvest and allows any licensed hunter with an interest in pursuing wolves to do so. There is also no need to restrict non-residents.

Only individuals who will be at least 10 years of age by the first day of the wolf open season, and who possess a previous hunting license (other than an apprentice license) or hunter safety certificate, may purchase a wolf license. Individuals under 14 years old may hunt wolves with a firearm only on privately owned land and a parent or guardian, or another individual authorized by a parent or guardian who is at least 18 years old, must accompany the minor child. This restriction aligns with firearm hunting of Michigan's other big game animals.

Wolf licenses will be valid for all open units in the Upper Peninsula. The license will be valid for any open WMU until the target harvest for the unit is reached or the season has ended. Once a WMU is closed, a licensee with an unused kill tag may continue to hunt in any of the remaining open WMUs. Individuals will not be compensated for unused licenses at the close of the season.

Licenses would be available for purchase from August 3 - October 31, 2013.

*Hunting Devices*

The Department recommends that only firearm, crossbow, and bow and arrow be permitted devices in taking a wolf. As this is the first open season and the recommended target harvest for the season is 43 wolves, hunting only, without the aid of dogs, during daylight hunting hours, aligns with this conservative approach.

Trapping may be authorized for specific control activity on a case-by-case permit basis.

*Mandatory Registration*

In addition to the requirement to report successful harvest of a wolf on the day of harvest, the Department also recommends that within 72 hours of harvest, the hunter must present the carcass to a Department check station and provide the location of kill. The Department will seal the wolf pelt and collect at least one tooth for aging and genetic testing from all wolves harvested. If a female wolf has been harvested, once the pelt is sealed, the Department reserves the right to collect additional materials such as reproductive tracts for research or management purposes.

Additional materials may be collected during registration or the hunter may elect to bring the carcass back to the check station within five business days from date of registration. Proof of sex of the animal must be retained on the carcass until the animal has been registered.

Recommendation:

This order was submitted for information on June 13, 2013, at the Natural Resources Commission Meeting. This item appeared on the Department's May 2013 calendar and may be eligible for approval on July 11, 2013.

Russ Mason, Ph.D., Chief
Wildlife Division

Gary Hagler, Chief
Law Enforcement Division

Bill O'Neill, Chief
Forest Resources Division

Ronald A. Olson, Chief
Parks and Recreation Division

James Dexter, Chief
Fisheries Division

Kristin Phillips, Acting Chief
Marketing and Outreach Division

William E. Moritz, Ph.D.
Natural Resources Deputy

I have analyzed and discussed these recommendations with staff and concur as to matters over which the Director has authority.

Keith Creagh, Director

7/11/13
Date

# WILDLIFE CONSERVATION ORDER

## Amendment No. 14 of 2013

By authority conferred on the Natural Resources Commission and the Director of the Department of Natural Resources by sections 40107 and 40113a of 1994 PA 451, MCL 324.40107 and 324.40113a, it is ordered that effective July 12, 2013, the following section(s) of the Wildlife Conservation Order shall read as follows:

**2.1 Taking of animals; prohibited methods, devices, and weapons; exceptions.**
Sec. 2.1 Unless otherwise specified in this order, a person shall not do any of the following:

(1) Make use of a pit, pitfall, deadfall, scaffold, raised platform, tree, cage, snare, trap, net, baited hook, or similar device, or a drug, poison, anti-coagulant, smoke, gas, explosive, weasel, ferret, fitchew, arbalest, spear, or mechanical device, for the purpose of taking an animal or driving an animal out of their hole or home. For the purpose of this order, a mechanical device shall not be construed to mean a firearm, crossbow, slingshot, or bow and arrow. When used in this order, "raised platform" means a horizontal surface constructed or manufactured by a person that increases the field of vision of a person using the horizontal surface beyond the field of vision that would normally be attained by that person standing on the ground.

(2) Use in taking an animal, or have in the person's possession in an area frequented by animals, a semiautomatic shotgun or rifle other than .22 caliber rimfire, capable of holding more than six shells at one time in the magazine and barrel combined, or use a cartridge containing a tracer bullet, or a cartridge containing an explosive bullet, or a firearm capable of firing more than one shot with a single pull or activation of the trigger.

(3) During the five days immediately preceding November 15, transport or possess in an area frequented by deer a rifle or shotgun with buckshot, slug load, ball load, or cut shell. A person may transport a rifle or shotgun to or from a hunting camp if the rifle or shotgun is unloaded and securely encased or carried in the trunk of a vehicle. This section shall not prohibit a resident who holds a fur harvester's license from carrying a rimfire firearm .22 caliber or smaller while hunting or checking a trap line during the open season for hunting or trapping fur-bearing animals.

(4) Use in hunting, or, subject to section 43510, 1994 PA 451, MCL 324.43510, possess afield in an area inhabited by wild birds and animals within the "shotgun, handgun, black-powder firearms only area" from November 15 to November 30, or use to take a deer during any firearm deer season in the "shotgun, handgun, black-powder firearms only area," a firearm other than:

(a) A shotgun with a smooth or rifled barrel.

(b) A .35 caliber or larger pistol capable of holding no more than nine shells at one time in the barrel and magazine combined and loaded with straight-walled cartridges.

(c) A muzzle-loading rifle or black-powder pistol loaded with black-powder or a commercially manufactured black-powder substitute.

(5) Injure, destroy, or rob the eggs of birds protected by the laws of this state or this order, or molest, harass, or annoy those birds upon their nests.

(6) Possess or use an apparatus known as a silencer on a gun while hunting in this state.

(7) Make use of a sink box or battery as these devices are defined by the United States fish and wildlife service.

(8) Set afire or assist in setting afire a marshland or other lands for the purpose of driving out wild birds or wild animals, or take or attempt to take a wild bird or wild animal so driven out of a marshland or other land.

(9) Take any animal at any time other than during the hunting hours and open seasons established in this order, except as may otherwise be provided in chapter VI.

(10) Take in 1 day more than the daily limit, or possess at one time more than the possession limit, or possess on the first day of the open season more than the daily limit, or possess more than the season limit of any animal.

(11) Destroy, disturb, or molest at any time any bear, beaver, muskrat, raccoon, squirrel, mink, badger, or rabbit house, hole, burrow, nest, dam, or den which may be used by such animals.

(12) Make use of a dog in hunting deer, except as noted in section 2.1a of this order.

(13) Affix any device to a bow, which aids in the cocking or holding of a bow string in a drawn position. This subsection shall not prohibit the use of a hand-held device to release the bow string. This subsection shall not apply to a permanently or temporarily disabled person who holds a special permit provided for in section 40101 to 40119 of 1994 PA 451, MCL 324.40101 to 324.40119, or section 5.95 of this order.

(14) Use aircraft to aid in the taking of a wild bird or wild animal.

(15) Take game with a crossbow unless the hunter meets the following criteria:

(a) Possesses a valid license and a crossbow stamp to take game. The crossbow stamp shall be part of the license to hunt with a crossbow.

(b) Uses only arrows, bolts, and quarrels for taking deer, bear, elk, wolf, and turkey with a broadhead hunting type of point not less than 7/8 of an inch wide with a minimum of 14 inches in length.

(16) Take deer with a crossbow or a modified bow in zone 1 from December 1 to March 31. This subsection shall not apply to a person who holds a special permit provided for in part 401, wildlife conservation, natural resources and environmental protection act, 1994 PA 451, as amended, MCL 324.40101 to 324.40119, or section 5.95 of this order.

**2.8 Hunt with bow and arrow from scaffold, raised platform, or tree allowed; taking deer or bear with firearm from scaffold, raised platform or tree allowed; use of scaffold, platform, ladder, steps or certain other devices in taking an animal on publicly owned lands, exception.**

Sec. 2.8 A person may hunt with a crossbow or a bow and arrow from a scaffold, raised platform, or tree. A person taking deer or bear with a firearm may use a scaffold, raised platform, or tree. A person taking fox, coyote, or wolf with a firearm one-half hour before sunrise to one-half hour after sunset may use a scaffold, raised platform, or tree, pursuant to all other hunting regulations. In taking an animal, a person shall not do any of the following on publicly owned lands:

(1) Permanently construct or affix to a tree or other natural feature a scaffold, platform, ladder, steps or any other device to assist in climbing a tree, or use any item that penetrates the cambium of a tree in the construction or affixing of any device to assist in climbing a tree.

(2) Use or occupy a scaffold, raised platform, ladder, or step that has been permanently affixed or attached to any tree or other natural feature.

(3) Nothing in this section shall prohibit a scaffold or platform temporarily affixed to a tree by use of a T-bolt or similar device supplied by the manufacturer at the time the scaffold or platform was purchased.

(4) Use or occupy a scaffold or raised platform without having first etched, engraved, implanted, burned, printed, or painted on the scaffold or raised platform, the name and address of the user in legible English easily read from the ground.

(5) Use, occupy, or place a scaffold, raised platform, ladder, steps, or any other device to assist in climbing a tree if the scaffold, raised platform, ladder, steps, or other device is on public lands earlier than September 1 of each year or is not removed by March 1.

**3.700 Wolf hunt; establishment of open season; season closed; method of take; season limit.**
Sec. 3.700 (1) The natural resources commission hereby authorizes the establishment of the first open season for wolf.

(2) Unless otherwise specified in this order, an individual with a license to take wolf shall not do any of the following:

(a) Take a wolf other than during the open season from November 15 to December 31. The department may close the open season prior to December 31, by wolf management unit, if the department harvest objectives have been reached. It is the responsibility of the licensee to confirm, either at www.michigan.gov/dnr or by calling the designated department telephone line, to ensure a wolf management unit remains open to hunting on the day of the licensee's hunt.

(b) Take a wolf by any method other than by firearm, bow and arrow, or crossbow legal for the taking of deer in Michigan.

(3) 1,200 licenses shall be available over the counter August 3 to October 31 of the year in which the wolf season occurs.

(4) Only an individual who possesses a previous hunting license (not apprentice) or hunter safety certificate and who will be at least 10 years of age by the first day of the wolf open season may purchase a wolf license.

**3.702 Wolf hunting; kill tag requirements; reporting requirements; baiting; legal weapons; exceptions; hunt with a dog; unlawful acts.**
Sec. 3.702 (1) The department shall issue a kill tag as part of the wolf hunting license. The licensee must possess while hunting the unused kill tag issued with the wolf license and provide to a conservation officer upon request.

(2) A licensee who kills a wolf shall immediately validate the kill tag by notching out the appropriate information on the tag and attach the kill tag to the hide of the wolf from the upper jaw to the eye socket or through the lower jaw of the wolf in a secure and permanent manner. The kill tag shall remain attached to the wolf until the animal is registered and sealed by the department. A person shall not possess an untagged wolf or wolf hide unless a department seal is attached as provided by section 3.703, notwithstanding any other provisions of this order, and subject to the requirements of applicable statutes.

(3) On the same day of killing a wolf, a licensee shall report the kill by calling a department designated telephone number.

(4) It shall be unlawful to use any portion of any protected animal, protected bird, or domestic animal as bait for the purpose of taking a wolf. This subsection shall not be construed to prohibit a person from using the carcasses and parts thereof of game animals or game birds, lawfully taken and possessed during their open season, as bait, except as stated in section 5.31 of this order.

(5) A licensee less than 14 years of age may hunt wolf with a firearm only on private land and a parent or guardian, or another individual authorized by a parent or guardian who is at least 18 years old, must accompany the minor child.

(6) It shall be unlawful for any individual to use a snare, cable restraint, conibear, or any other kind of trap for the taking of wolf.

(7) It shall be unlawful for an individual to hunt a wolf with a dog.

(8) It shall be unlawful for an individual to take more than 1 wolf in a wolf hunting season.

(9) A wolf with a radio collar may be taken by hunting in any open wolf management unit with a valid wolf license, subject to all other wolf hunting provisions of this order. A recovered radio collar shall be returned to the department.

**3.703 Wolf registration, pelt sealing; examination; possession; exceptions.**

Sec. 3.703 (1) Within 72 hours of harvest, the pelt with proof of sex and skull of any male wolf shall be presented, by the licensee that killed the wolf, to the department for examination, sealing, and registration. The licensee shall provide the identification used to acquire the license and shall provide harvest information and kill location as requested by the department.

(2) Within 72 hours of harvest, the carcass and skull of any female wolf shall be presented, by the licensee that killed the wolf, to the department for examination, sealing, and registration. The licensee shall provide the identification used to acquire the license and shall provide harvest information as requested by the department. After the pelt is sealed, the department reserves the right to collect additional wolf parts, such as a reproductive tract, for research or management purposes. Any additional wolf parts shall be collected during the initial registration or the hunter shall bring the skinned female carcass back within five business days of initial registration to allow for additional wolf parts' collection as needed.

(3) During an examination of a wolf, the department or department designee may take possession of the following wolf parts:

(a) At least one tooth.

(b) The female carcass (excluding head).

(4) During the registration of a wolf, the department shall attach the confirming seal in such a manner that it cannot be removed without cutting or ripping the wolf pelt or damaging the seal.

(5) An official seal attached by the department shall not be removed from the wolf pelt until the wolf pelt is processed or tanned. Subsequent to three days following the close of wolf season, it shall be unlawful to possess a wolf pelt without an official department seal attached unless the pelt has been processed or tanned, notwithstanding any other provisions of this order, and subject to the requirements of applicable statutes.

(6) It shall be unlawful to possess or transport a wolf or parts of a wolf without a kill tag and confirming seal, notwithstanding any other provisions of this order, and subject to the requirements of applicable statutes.

**9.1 Permitted acts; certain species.**

Sec. 9.1 (1) English sparrows, feral pigeons, and starlings may be taken by hunting statewide, year around except within state park and recreation areas from April 1 to September 14. English sparrows and starlings may be taken without a permit when doing or about to do damage to property or committing or about to commit depredations. Opossum, weasels, ground squirrels, and red squirrels may be taken by hunting and trapping statewide, year around except within state park and recreation areas from April 1 to September 14.

(2) Mute swans and their eggs and nests may be taken by department personnel, and persons authorized by the department to control mute swans under one or more of the following situations:

(a) To stabilize or reduce mute swan population levels or to prevent new populations of feral mute swans from being established in this state.

(b) To prevent mute swans interference with the establishment, reestablishment, or reproductive success of native wildlife and with the establishment or reestablishment of native vegetation.

(c) To prevent mute swans interference with the establishment, reestablishment, or reproductive success of endangered or threatened species.

(d) To protect public health, safety, or welfare.

(3) Mute swans taken as provided in this section shall not be released back into the wild in this state.

(4) A bat may be taken whenever there is any reason to believe the bat was involved in a bat-human or bat-domestic animal exposure to rabies or other health hazard. Bats taken under this subsection shall not be held in

captivity except for temporary holding of the animal at the request or recommendation of a physician or public health official for public health reasons. Bats held in captivity for public health reasons shall be humanely euthanized. Except for threatened or endangered species, or as otherwise provided by this order, bats may be taken:

(a) When creating a damage or nuisance problem on privately-owned property.

(b) Incidental to normal forest management activities occurring on public or private lands.

(c) Incidental to closure of an abandoned mine as a result of public safety concerns.

(d) Incidental to demolition of buildings or other structures.

(e) To test for a wildlife disease, as authorized by the department in writing.

(f) To humanely euthanize a bat that is not listed as threatened or endangered and is showing symptoms of a terminal disease, such as white-nose syndrome.

(5) Double-crested cormorants and their eggs may be taken only as follows:

(a) Double-crested cormorants may be harassed without a permit by nonlethal means to deter or prevent damage to private property or to public fishery resources using such devices as noise makers or scare devices and other recognized and recommended means of preventing damage which do not kill, harm, capture, trap, or collect animals.

(b) Double-crested cormorants may be taken and their eggs destroyed or oiled by department employees and designated agents of department employees at times and by manners identified through a state breeding colony or local breeding population control action which has been submitted to the United States fish and wildlife service.

(6) Individuals of a cervidae species not native to Michigan, including, but not limited to sika deer, fallow deer, mule deer, and hybrids thereof, but excluding red deer, elk, and hybrids thereof, found in the state outside of the perimeter fence of a registered cervidae livestock operation for more than 48 hours that do not bear visible identification may be taken by hunting statewide, year around, except within state park and recreation areas from April 1 to September 14, if the animal is submitted for registration and disease testing in a manner specified by the department by the person killing the animal.

(7) Red deer, elk and hybrids thereof found in zone 3 outside of the perimeter fence of a registered cervidae livestock operation for more than 48 hours that do not bear visible identification may be taken by hunting year around, except within state park and recreation areas from April 1 to September 14, if the animal is submitted for registration and disease testing in a manner specified by the department by the person killing the animal.

(8) In addition to the provisions of subsections (6) and (7), the wildlife permit specialist may issue a permit authorizing a department employee or federal employee to kill a cervidae species not native to Michigan, including elk, red deer and hybrids thereof, in a specified part of the state during a specified time period, whether or not visibly marked, if all of the following conditions are met:

(a) The animal is documented by a department employee or federal employee to have been outside of the perimeter fence of a registered cervidae livestock operation for more than 48 hours.

(b) No report of release has been filed with the department matching the species of animal and visible identification, if any, on the animal for the locality in which the animal was found.

(c) The department is unable to determine ownership of the animal by the visible identification, if any, displayed on the animal.

(d) The animal is submitted for registration and disease testing in a manner specified by the department.

**9.3 Protected animals; unlawful acts.**

Sec. 9.3 (1) Moose, wolverine, and all birds not defined as game, except those listed in section 9.1, shall not be taken at any time, except as authorized elsewhere in this order.

(2) Mute swans and bats shall not be taken at any time except as specified in section 9.1.

**12.1000 "Wolf management unit A" defined.**

Sec. 12.1000 "Wolf management unit A" means that area of Gogebic county bounded by a line beginning southeast of Chaney lake at the intersection of the Michigan-Wisconsin state line (county line) and county road 519 (also known as Chaney lake road; east side of section 15, T45N R45W), then northerly along county road 519 to Sunday lake street (south of the town of Wakefield; section 28, T47N R45W), northerly along Sunday lake street to highway M-28 and highway US-2 in center of the town of Wakefield, northeasterly on highway M-28 to county road 519 (also known as Presque isle road), northerly on county road 519 to south boundary road near the Lake Superior shoreline, easterly on south boundary road to the Presque isle river, northerly/downstream along the center of the Presque isle river to its mouth on the Lake Superior shoreline, northwesterly into Lake Superior to the county/state line (Michigan-Wisconsin), southwesterly then southeasterly along the county/state line, including all offshore islands, to the point of beginning.

**12.1001 "Wolf management unit B" defined.**

Sec. 12.1001 "Wolf management unit B" means that area of Ontonagon, Houghton, Gogebic, and Baraga counties bounded by a line beginning in Baraga county in the center of L'Anse bay (southern Keweenaw bay of Lake Superior), then north-by-northwest to the intersection of highway US-41 and highway M-38 in the town of Baraga, south on US-41 to highway US-141/M-28 (section 6, T48N R33W), southwesterly and westerly on US-141/M-28 into Houghton county, past the town of Agate, and then into Ontonagon county to Shortcut road near the crossing of the middle branch of the Ontonagon river (section 7, T47N R38W), westerly on Shortcut road, southerly and then westerly on south Paynesville road, westerly on Himanka hill road to intersection with highway US-45, southerly on highway US-45 to Sleepy hollow road near the town of Paulding, westerly on Sleepy hollow road to 2 mile road, westerly on 2 mile road to Federal forest road 6930 (also known as National forest road 6930 or NF-6930, as Federal forest roads may be named/signed as National forest or NF followed by the road number in some areas; section 9, T46N R40W), northwesterly on Federal forest road 6930 (also known as Matchwood tower road, after cross the county line) into Gogebic county, northerly on Federal forest road 6930 (also known as Tower road, after cross the county line) into Ontonagon county to Old highway M-28 (also known as Railroad street), west on Old M-28 to Big Bear road, north on Big bear road to highway M-28, northwesterly on highway M-28 to Federal Forest road 400 near the town of Bergland, northeasterly on Federal forest road 400 to Federal forest road 630 (also may be named NF-219; section 4, T49N R41W), easterly on Federal forest road 630 to Norwich road, northeasterly on Norwich road to Victoria road (section 35, T50N R41W), easterly on Victoria road to Victoria dam road (section 30, T50N R39W), northeasterly on Victoria dam road to the town of Rockland and highway US-45, northwesterly on US-45 to Greenland road in the town of Ontonagon, southeasterly on Greenland road to Park avenue, easterly on Park avenue to Firesteel road, easterly on Firesteel road and continue on Firesteel road as it turns south (section 34 T52NR38W) to highway M-38 southeasterly on M-38 to highway M-26 in the town of Greenland, northeasterly on M-26 into Houghton county and then into the town of Houghton to the center of the Portage canal (at the Houghton-Hancock lift bridge), easterly then southerly along the center of the Portage canal into the center of Portage lake, southerly down center of Portage lake to the Portage river, southeasterly along the center of Portage river to Lake Superior, due southeast into Lake Superior to the Houghton-Baraga county line, southerly paralleling along the Lake Superior shoreline into Baraga county to the center of Keweenaw bay, southerly along the center of Keweenaw bay to the center of L'Anse bay (southern Keweenaw bay), including all offshore islands along the Lake Superior, Keweenaw bay and L'Anse bay shorelines, to the point of beginning.

**12.1002 "Wolf management unit C" defined.**

Sec. 12.1002 "Wolf management unit C" means the area of Mackinac and Luce counties bounded by a line beginning, in southern Mackinac county near the town of Epoufette, at the intersection of Bellant road (section 10, T42N R7W) and highway US-2, southeasterly to intersection of US-2 and Hiawatha trail road, northerly along Hiawatha trail road to Trout lake road (section 33, T44N R7W), westerly on Hiawatha trail road (also known as H-40) to Borgstrom road (also known as county road 393, west-side line of section 4, T43N R8W), northerly and westerly on Borgstrom road into Luce county then northerly on Borgstrom road (in Luce county, also known as McLeads road or county road 393) to highway M-28, westerly on M-28 to county road 135 (also known as Manistique lakes road or road H-33, section 10, T45N R11W), southeast of the town of McMillan, westerly and southerly on county road 135 continuing south past the town of Helmer into Mackinac county, southerly on

55

Manistique lakes road to the intersection of county road 135 and Curtis road (also known as road H-42; section 18, T44N R11W) east of the town of Curtis, easterly on Curtis road then southerly on Manistique lakes road (also known as Old highway M-135 or road H-33; section 19, T44N R11W) to highway US-2, easterly on US-2 past the town of Gould city to south Gould city road, southerly on south Gould city road to the lakeshore of Lake Michigan (section 9, T41N R11W), due southeast approximately 600 yards into Lake Michigan then northeasterly and easterly paralleling along the lakeshore of Lake Michigan including all offshore islands of Mackinaw county along the shore, to a point out in Lake Michigan and approximately 600 yards due west-by-southwest of the intersection of Epoufette bay road and Bellant road (section 10, T42N R7W), easterly on Bellant road to the point of beginning.

Issued on this 11th day of July, 2013.

Approved as to matters over which the Natural Resources Commission has authority.

J. R. Richardson, Chairman
Natural Resources Commission

Approved as to matters over which the Director has authority.

Keith Creagh
Director