Exhibit 4

Declaration of Patrick E. Lederle

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

THE HUMANE SOCIETY
OF THE UNITED STATES
and BORN FREE, USA and
HELP OUR WOLVES LIVE (HOWL)
and FRIENDS OF ANIMALS AND
THEIR ENVIRONMENT (FATE),

    Plaintiffs

v

SALLY JEWELL,
SECRETARY OF THE INTERIOR and
UNITED STATES DEPARTMENT OF
THE INTERIOR and UNITED STATES
FISH AND WILDLIFE SERVICE,

    Defendants

and

STATE OF MICHIGAN and
MICHIGAN DEPARTMENT
OF NATURAL RESOURCES,

    Defendant Intervenors.

Civil Action No. 1:13-cv-00186-BAH

## DECLARATION OF PATRICK E. LEDERLE

1.    I have personal knowledge of the facts asserted in this declaration, and if called as a witness, I am competent to testify to these facts under oath.

2.    I have worked for the Wildlife Division of the Michigan Department of Natural Resources (MDNR) since 2000 and have held a number of positions with the agency. I have been the Endangered Species Coordinator, Research Section Supervisor, Acting Assistant Chief,

and am currently the Section Supervisor for the Planning and Adaptation Section. I am a Certified Wildlife Biologist and have a Ph.D. from Michigan State University.

3. I have direct personal knowledge of the biology and status of wolves in Michigan, wolf management policy in Michigan, State and Federal regulations pertaining to wolves in Michigan, and attitudes held by Michigan residents regarding wolves. I served on the Federal Recovery Team for the Eastern Timber Wolf, was a member of the Michigan Wolf Management Roundtable, and supervised the preparation of both the 384-page *Review of Social and Biological Science Relevant to Wolf Management in Michigan* and the 2008 Michigan Wolf Management Plan (2008 Plan).

4. I certify that Exhibit 2 to State of Michigan and Michigan Department of Natural Resources' Memorandum of Points and Authorities in Opposition to Plaintiffs' Motion for Summary Judgment and Concurring in Federal Defendants' Motion for Summary Judgment (Michigan Summary Judgment Memorandum) is a true copy of the Michigan Natural Resources Commission's Wildlife Conservation Order Amendment No. 13 of 2013, along with the MDNR memorandum recommending that amendment.

5. I certify that Exhibit 3 to the Michigan Summary Judgment Memorandum is a true copy of the Michigan Natural Resources Commission's Wildlife Conservation Order Amendment No. 14 of 2013, along with the MDNR memorandum recommending that amendment.

6. I certify that Exhibit 5 to the Michigan Summary Judgment Memorandum is a map prepared by MDNR that accurately depicts the Wolf Management Units in which public wolf harvest is permitted during the 2013 open season.

7. MDNR has the primary responsibility and statutory authority for the management of resident Michigan wildlife, including wolves. Any listing or delisting of wildlife as threatened or endangered under the Federal Endangered Species Act (ESA) does not abrogate this responsibility or authority. Accordingly, the State of Michigan (State) has always borne the majority of costs and responsibilities of wolf management in Michigan and continues to do so, regardless of the Federal status of wolves.

8. The Federal status of wolves in the Western Great Lakes (WGL) region does not affect the amount of funding available to the State for wolf management. The Federal government has not provided the State with any substantive ESA funding to help manage wolves in more than fifteen years, and the Federal government has not provided the State with any other funding specifically for the management of wolves. The Federal status of wolves does not affect the availability of other funding sources the State uses to manage wolves.

9. Relatively few costs and responsibilities of on-the-ground wolf management in Michigan were borne by the Federal government while wolves in the WGL region were Federally classified as threatened or endangered.

10. As an example, Fiscal Year 2012 (October 1, 2011 through September 30, 2012) was typical in terms of recent annual agency expenditures on wolf management. MDNR direct expenditures on the wolf management program during that period were approximately $494,000. This figure is likely an underestimate of the actual MDNR expenditures during that period because it does not reflect charges to multi-use cost codes that prevent determination of costs incurred for a particular species or project. Costs not reflected in this figure are substantial, and include those for education and outreach efforts, interaction with other agencies, certain wolf planning expenses, and wolf-related expenses of the MDNR Law Enforcement Division. The

costs reflected in the $494,000 figure were associated with population monitoring, research, training of field staff, responses to nuisance-animal and depredation complaints, depredation control activities, staff meetings to discuss wolves and wolf management, and reimbursement for wolf depredation of livestock.  During the same Fiscal Year 2012, and, for that matter, in previous years throughout which Michigan wolves were listed as endangered under the Federal ESA, the United States Fish and Wildlife Service (FWS) expended virtually no money or staff time on those activities in Michigan.

11. Contributions toward wolf-related law enforcement in Michigan have also come predominantly from the State rather than the Federal government.  State law enforcement officials have conducted the vast majority of the investigations and enforcement related to illegal wolf killings in Michigan.  For example, from the beginning of 2008 to the effective date of the 2011 Final Rule that removed Michigan wolves from the Federal List of Endangered and Threatened Wildlife, MDNR law enforcement officials investigated fifty-four wolf-related violations, at considerable expense to the State.  Federal law enforcement officials investigated nine wolf-related cases during that same time period (Agent Paul Beiriger, FWS, personal communication).  State law enforcement officials will continue to take the lead in combating wolf-related violations, as they have in the past, regardless of the Federal status of wolves.

12. To my knowledge, no violations involving the illegal killing of a wolf in Michigan have been prosecuted under the Federal ESA.  Instead, prosecutions have been made under State regulations, which were in effect prior to delisting, remain in effect following delisting, and continue to be enforced.  In this sense, compared to the Federal ESA, Michigan regulations have been more of a practical deterrent to the illegal killing of wolves.

13. An important Federal contribution to wolf management in Michigan has been the work conducted by the United States Department of Agriculture Animal and Plant Health Inspection Service (USDA APHIS) Wildlife Services. USDA APHIS Wildlife Services personnel have been involved with the wolf program in Michigan since at least 2000 and have played a key role in population monitoring, research, training of field staff, depredation investigations, and on-the-ground education and outreach to those Michigan citizens impacted by wolves. The continuing participation of USDA APHIS Wildlife Services in the Michigan wolf management program does not depend on the status of wolves under the Federal ESA.

14. As stated in the 2008 Plan, MDNR is committed to maintaining a viable Michigan wolf population above a level that would warrant its classification as threatened or endangered at either the State or Federal level. In the context of MDNR's mission and its public trust responsibilities for the State's natural resources, the maintenance of a viable wolf population is an appropriate and necessary goal.

15. Prior to Federal delisting, MDNR has communicated this commitment to FWS in multiple letters, documents, meetings, and conversations.

16. The 2008 Plan has been and continues to be the plan that guides State wolf management in Michigan. FWS has indicated its support for the wolf management approach outlined in the 2008 Plan. *E.g.*, Endangered and Threatened Wildlife and Plants; Revising the Listing of the Gray Wolf (Canis lupus) in the Western Great Lakes, 76 Fed. Reg. 81,666, 81,710-12 (Dec. 28, 2011).

17. MDNR will continue to conduct wolf management in Michigan under the guidance of a wolf management plan that is designed to maintain a viable wolf population above a level that would warrant its classification as threatened or endangered.

18. MDNR developed the 2008 Plan using a process that included substantial public involvement and a review of the best available scientific information. The process involved: (1) intra- and inter-agency scoping; (2) public meetings and a comment period; (3) focus group meetings; (4) public attitude surveys; (5) review of biological and social science relevant to wolf management in Michigan; (6) development of guiding principles by the twenty-member citizen and agency advisory group called the Michigan Wolf Management Roundtable; and (7) public review and comment.

19. MDNR developed the 2008 Plan with the understanding that FWS may re-classify wolves as Federally threatened or endangered if it finds that implementation of the plan would not adequately conserve the species.

20. Michigan laws and regulations that protect wolves remain in place and continue to be enforced. *E.g.*, Mich. Comp. Laws § 324.40118(3); Michigan Wildlife Conservation Order, *available at* http://www.michigan.gov/documents/dnr/wldlf_cnsrvtn_orders_382400_7.htm.

21. Funding and implementation of the 2008 Plan has been and continues to be adequate to maintain a viable Michigan wolf population above a level that would warrant its classification as threatened or endangered. The level of funding and implementation of the 2008 Plan facilitated an increase in abundance of Michigan's wolf population from approximately 520 in 2008 to over 650 in 2013. Currently, the combined Michigan-Wisconsin wolf population is approximately 1,300 to 1,400 wolves. Under the applicable Federal recovery criterion, which was established in 1978 and reaffirmed in 1992, FWS has concluded that a consistent combined Michigan-Wisconsin wolf population of 100 wolves would constitute a viable wolf population in those States.

6

22. As part of its monitoring efforts, MDNR developed and implemented the wolf population monitoring methodology in use in Michigan today. The original methodology of counting all wolves in Michigan's Upper Peninsula became less efficient as the Michigan wolf population grew, because it was designed to track a relatively small number of wolves. The newer methodology saves time and money while providing reliable and accurate population estimates. This methodology has been described in a peer-reviewed journal, has been evaluated by respected scientists, has been tested in the field, and is widely considered to be an effective, reliable technique for estimating wolf population size.

23. The viability of any population depends on the rate of mortality in relation to rates of birth, immigration, and emigration. If birth and immigration rates equal or exceed mortality and emigration rates, viability of the wolf population will not be threatened, regardless of whether the leading cause of death is starvation, intraspecific aggression, disease, vehicle collision, illegal killing, or any other factor.

24. The viability of a population does not depend on the relative contributions of different mortality factors toward the overall mortality rate. In other words, simply because a particular factor is a leading cause of mortality does not mean that factor is a threat to the viability of a population. For example, harvest by hunters is one of the largest sources of mortality in white-tailed deer in Michigan (Brent Rudolph, MDNR, personal communication), but hunting under current Michigan regulations does not threaten the viability of the Michigan deer population. Similarly, cardiovascular disease may be a leading killer of humans worldwide, but its current prevalence does not threaten us with extinction. Certain human activities may be the leading cause of wolf mortality in the WGL region, but the current prevalence of those activities does not threaten the wolf population's viability.

25. Trends in Minnesota, Wisconsin, and Michigan over the past two decades show that rates of human-caused mortality (or mortality in general) have not been a problem for sustaining viable wolf populations. The population in Minnesota has increased and remained stable at a level that is approximately double the Federal abundance goal for that population. From 1994 to 2007, the Michigan population grew at an average annual rate of nineteen percent. Similar growth during that time period has been observed in Wisconsin. Although population growth rates have slowed, the current combined Michigan-Wisconsin wolf population is approximately 1,300 to 1,400 wolves. Under the applicable Federal recovery criterion, which was established in 1978 and reaffirmed in 1992, FWS has concluded that a consistent combined Michigan-Wisconsin wolf population of 100 wolves would constitute a viable wolf population in those States. If human-caused mortality rates (or overall mortality rates), birth rates, and dispersal rates remain in relative proportion to current levels, the wolf population in Michigan will continue to prosper.

26. Disease may be an important cause of wolf mortality in the WGL region, but its current prevalence does not threaten the wolf population's viability, for the same reason that human-caused mortality does not threaten the wolf population's viability.

27. MDNR will continue to monitor wolf health through necropsies of dead wolves and analysis of biological samples from captured live wolves.

28. MDNR has indicated the late-winter Michigan wolf population must consistently include no fewer than 200 wolves to preclude the need for its classification as threatened or endangered under State law. The identified minimum level of 200 wolves should not be interpreted as a maximum abundance goal. MDNR has not established, and does not intend to

establish, a goal for the maximum number of wolves in Michigan. Therefore, MDNR has no plans to reduce or limit the number of wolves in the State to a certain level.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

December 11, 2013

/s/ Patrick E. Lederle
Patrick E. Lederle, Ph.D.
Supervisor, Planning and Adaptation Section
Michigan Department of Natural Resources