IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

The Humane Society of the United States,
Born Free, USA, Help Our Wolves Live,
and Friends of Animals And Their
Environment,

       Plaintiffs,

  vs.

Sally Jewell, Secretary of the Interior,
United States Department of the Interior,
and United States Fish and Wildlife
Service,

       Defendants.

13-CV-0186-BAH

---

**AMICUS MINNESOTA DEPARTMENT OF NATURAL RESOURCES'
MEMORANDUM IN SUPPORT OF DEFENDANTS' CROSS MOTION FOR
SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT**

---

## INTRODUCTION

The federal government's removal of the wolf (*Canis lupus*) from the list of species protected by the federal Endangered Species Act ("ESA"), 16 U.S.C. § 1531 *et seq.*, within the Western Great Lakes Distinct Population Segment ("Western Great Lakes DPS") has shifted the management of the wolf population found within Minnesota to the State acting through Amicus Minnesota Department of Natural Resources ("MNDNR"). As it had on two prior occasions, MNDNR is now managing the State's

wolf population in a conservative and sustainable manner consistent with MNDNR's Minnesota Wolf Management Plan and State law.   Nonetheless, Plaintiffs assert that MNDNR is incapable of assuring that a strong and viable wolf population continues to exist within the State well into the future.   Plaintiffs' allegations are unfounded and are not supported by the record before this Court.   Consequently, MNDNR supports the federal Defendants' cross motion for summary judgment [ECF No. 27] seeking affirmation of the December 28, 2011, delisting decision and in opposition to Plaintiffs' motion for summary judgment [ECF No. 24].

## BACKGROUND

The State of Minnesota holds ownership of all wild animals within its borders in its sovereign capacity for the benefit of it citizenry. *See* Minn. Stat. § 97A.025 (2012). MNDNR is the agency of the State that is charged by the Minnesota legislature to "do all things the commissioner [of MNDNR] determines are necessary to preserve, protect, and propagate desirable species of wild animals." Minn. Stat. § 97A.045, subd. 1 (2012).   As a part of this charge, wolves are classified in Minnesota as a "protected wild animal," meaning it is "protected by a restriction in the time or manner of taking ...."  Minn. Stat. § 97A.015, subd. 39 (2012).

As a protected wild animal, wolves may only be taken pursuant to the statutes and rules for taking protected animals.   This includes open seasons set forth in rule promulgated by MNDNR.  Minn. Stat.§ 97B.647, subd. 2 (2012); *see also* 37 SR 279-282 (Aug. 20,   2012)   (promulgation   of   Minnesota's 2012-2013   wolf   season   rule);

38 SR 302-305 (Sept. 3, 2013) (promulgation of Minnesota's 2013-14 wolf season rule);[1] Minn. R. 6234.2105 (2011) (permanent wolf season rule). Wolves may also be taken in certain limited circumstances in defense of human life and to protect livestock, domestic animals, and domestic pets, or as otherwise prescribed by statute, rule or permit. Minn. Stat. §§ 97A.401, 97B.645, subds. 3, 5, and 6, 97B.671, subd. 4 (2012).

### A.     Wolf Recovery In Minnesota.

MNDNR has been extensively involved in the study and management of the wolves found within the State before and since the species' original listing in 1974 as protected under the ESA. *See* 39 Fed. Reg. 1171-1176 (January 4, 1974). MNDNR has participated in wolf recovery planning and implementation with the Defendant United States Fish and Wildlife Service ("USFWS") for more than thirty-five years and continues to manage, study and monitor the wolf population within the State after the 2011 delisting decision. (*See* Declaration of Edward K. Boggess ("Boggess Decl.") [ECF No. 20] at ¶¶ 6-8.)

As is documented in literature and well known to the general public, Minnesota's wolf population has served as the foundation for wolf recovery efforts outside the Rocky Mountain region of the United States since the original passage of the ESA. (*Id.* ¶ 6.) Recognizing the unique status of wolves in Minnesota, the USFWS designated the Minnesota wolf population as a threatened species in 1978 based upon "the best available data," finding that for management purposes there were two "species" of wolves in the

---

[1] These rules are found at Exhibits A and B attached to the Second Declaration of Edward K. Boggess ("2nd Boggess Decl.").

United States:  "For purposes of this rulemaking, the gray wolf (*Canis lupus*) group in Mexico and the 48 conterminous States of the United States, other than Minnesota, is being considered as one 'species,' and the gray wolf group in Minnesota is being considered as another 'species.'"   (AR 391 at 11450A.)   As a result, the Minnesota "species" of wolf was listed as threatened; the remaining wolf "species" was listed as endangered. (*Id.*)

With MNDNR's participation, the USFWS developed the first Wolf Recovery Plan in 1978; it then revised the Plan in 1992 ("Revised Recovery Plan").   (AR 5 at 301A-302A; Boggess Decl. ¶ 6.)  The Revised Recovery Plan set a population goal of 1,251 to 1400 wolves in Minnesota by the year 2000, a number the USFWS determined to be sufficient to ensure the survival of the wolf within the State, and established a goal of a combined Wisconsin-Michigan population of greater than 100 wolves for 5 consecutive years.   (AR 5 at 302A.)   After its listing, the population of wolves in Minnesota burgeoned, with the population goal for Minnesota set by the Revised Recovery Plan reached in approximately 1989.  (AR 5 at 303A; Boggess Decl. ¶ 10.)  By the mid-1990s, the Minnesota wolf population had reached a number that was nearly double the Revised Recovery Plan objective.   (AR 5 at 303A; Boggess Decl. ¶10.) Subsequent population surveys undertaken by MNDNR indicates that the wolf population had been numerically stable over the 10 or more years prior to delisting in December 2011.  (AR 651 at 19752A.)

As wolves increased in abundance in Minnesota, they also expanded their distribution.  (*Id.*)  Population surveys since the recovery number has been reached

indicate that all of the areas in Minnesota that are likely to sustain wolves have been occupied.  (*Id.*)  More recent population surveys indicate that wolf range in Minnesota has remained essentially unchanged since 2004.  (*Id.*)

In anticipation of the removal of the wolf from the list of species protected by the ESA in Minnesota, MNDNR developed a wolf management plan in the late-1990s. (AR 5 at 296A-297A.)  As part of this development, MNDNR obtained extensive public input through public information meetings and a wolf management "Roundtable" comprised of representatives from all sides of the wolf management debate.  (*Id.*)  The resulting Minnesota Wolf Management Plan was completed in 2001, incorporating Roundtable recommendations made to and codified by the Minnesota Legislature in 2000.[2]  Minn. Stat. § 97B.645 (2012); 2000 Minn. Laws ch. 463, § 16; AR 5 at 297A; Boggess Decl. ¶ 7.

The Minnesota Wolf Management Plan states that MNDNR "is committed to ensuring the long-term survival of the wolf in Minnesota, and also to resolve conflicts between wolves and humans."  (AR 5 at 296A; AR 651 at 19804A.)  The Plan further states that "[d]ecisions on public taking will be based on sound biological data, including population surveys."  (AR 5 at 308A.)  The Plan includes monitoring, population management, law enforcement, and regulatory mechanisms that are more than adequate, and were found so by the USFWS, to ensure that recovery of the wolf in Minnesota will

---

[2] The 2000 legislation included a provision that "[t]here shall be no open season for gray wolves for five years after the gray wolf is delisted under the federal Endangered Species Act of 1973."  2000 Minn. Laws ch. 463, § 5.  This provision was also contained in the Minnesota Wolf Management Plan.  (AR 5 at 308A.)

be maintained.  *See* 76 Fed. Reg. 81, 666, 701-705, 721-724 (Dec. 28, 2011);  AR 651 at 19809A.

        With its Plan and statutory framework in place, MNDNR awaited what was then thought to be the imminent removal of the wolf from the ESA list of protected species by USFWS.  (Boggess Decl. ¶ 11.)   On two occasions beginning in 2007, the USFWS delisted the wolf in Minnesota and, during those periods, the wolf was under exclusive MNDNR management.  (*Id.*)  On both occasions, the Minnesota Wolf Management Plan and State statutes and rules were implemented by MNDNR without any detrimental impact on the continued recovery of Minnesota's wolf population.  (*Id.*)  Both periods of MNDNR management, however, were cut short by successful legal challenges brought against the USFWS.  (AR 651 at 19733A.)

        Due to the near near-ten-year delay in permanently delisting the wolf in the Western Great Lakes region even though recovery criteria had been met, on March 15, 2010, MNDNR petitioned the USFWS for the removal of wolves located in Minnesota from the ESA list of threatened species.  (AR 391 at 11440A; AR 15 at 889A-896A.) Noting that the USFWS had listed the wolf in Minnesota as a species separate from wolves located throughout the remaining 48 conterminous states, MNDNR asserted that the species found in Minnesota had reached federally-designated recovery numbers by the late-1980s and in the Great Lakes region by the late-1990s and, as of 2010, far exceeded those recovery numbers.  (AR 15 at 893A-894A.)  Consequently, MNDNR asserted that the recovered population of Minnesota wolves met the ESA factor analysis

for delisting and requested USFWS to "remove the Minnesota gray wolf from the threatened species list ...." (AR 15 at 896A.)

On September 14, 2010, the USFWS published its 90-day finding that Minnesota's petition (along with subsequent petitions filed by Wisconsin and several non-profit organizations) "presented substantial information that delisting may be warranted ...." (AR 391 at 11440A.) After review, the USFWS proposed to delist the Minnesota population of wolves, identifying the population as the Western Great Lakes DPS. (AR 391 at 11435A.) After accepting public comment, the USFWS reclassified the status of wolves in Minnesota by rule on December 28, 2011, determining that the population in the Western Great Lakes DPS did not warrant listing, resulting in the removal of federal ESA protection for this population of wolves where found. (AR 651 at 19731A.) This rule returned management of wolves in Minnesota to MNDNR effective January 27, 2012. (*Id.*)

> **B.    MNDNR Management Of The Wolf.**

In anticipation of the removal of the wolf from the protections of the ESA as a result of MNDNR's petition, and recognizing the near-ten-year delay in delisting since the wolf recovery criteria had been met due to frequent legal challenges, the Minnesota Legislature in 2011 amended Minn. Stat. § 97B.645, subd. 9 (2010), by removing the requirement that a wolf hunting and trapping season be delayed by five years after delisting. 2011 Minn. Laws 1st Sp. Sess. ch. 2, art. 5, § 51. The removal of the five-year waiting period was acknowledged by the USFWS in its December 28, 2011, delisting decision, where the agency stated:

> The legislation does not change the way the DNR will determine if Minnesota should have a wolf harvest or how such a harvest would be implemented, it only allows them to begin the decision-making process earlier. The Minnesota management plan requires that population management measures be implemented in such a way to maintain a statewide late-winter wolf population of at least 1,600 animals, well above the planning goal of 1,251 to 1,400 wolves for the State in the Revised Recovery Plan, therefore, implementing such management measures under that requirement would ensure the wolf's continued survival in Minnesota.

(AR 651 at 19806A (citation omitted).)

Upon again assuming management of wolves in January 2012, MNDNR continued its program of closely monitoring the population and managing for depredation control. (2nd Boggess Decl. at ¶ 12.) In addition, MNDNR successfully implemented the first regulated wolf hunting and trapping season in State history in the fall and winter of 2012-2013.[3] (*Id.* at ¶ 8.) The hunting and trapping season was conducted in a conservative manner at a harvest level well below the estimated number of wolves that could be taken without endangering the population as a whole. (*Id.*) The successful season was intensively regulated and monitored by MNDNR and, along with the implementation of other management objectives, has demonstrated the adequacy of the terms and conditions of the Minnesota Wolf Management Plan.

Following the 2012-13 wolf hunting and trapping season, MNDNR undertook its scheduled five-year wolf population survey as set forth in the Minnesota Wolf

---

[3] While MNDNR's hunting and trapping season was initiated after USFWS's delisting decision, Plaintiffs assert that MNDNR has demonstrated that it intends to "aggressively hunt wolves as soon as the federal eye is not on the state's management plan ...." (Plaintiffs' Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Summary Judgment ("Pl. Mem.") at 41-42 [ECF No. 24].) Consequently, MNDNR provides the Court with an account of its management efforts since delisting.

Management Plan.  (2nd Boggess Decl. ¶ 15, Ex. D at 1.)  The study yielded a population estimate of 2,211 wolves, well above the post-delisting minimum of 1,600 wolves set forth in the Minnesota Wolf Management Plan.  (*Id.* Ex. D at 5.)  This mid-winter population survey was undertaken after the wolf harvest season but before the birth of wolf pups and, therefore, reflected a population temporarily reduced by the legal harvest. (*Id.* Ex. D at 7-8.)  Factoring in the harvest and depredation control numbers, DNR concluded that there were approximately 2,600 wolves before the beginning of the 2012-13 harvest season.  (*Id.* Ex. D at 7.)

Fundamental to Plaintiffs' challenge to the delisting of the gray wolf in the Western Great Lakes DPS is their repeated allegations that the States of Minnesota, Wisconsin, and Michigan are incapable of managing their resident populations of wolves in a manner that sustains the recovery of the species.  To the contrary, MNDNR has invested extensive resources, including staff for research, monitoring, and law enforcement, to ensure the wolf's continued recovery through the maintenance of a healthy wolf population.  (2nd Boggess Decl. ¶ 12.)  MNDNR's recent conservative wolf hunting and trapping season reflects MNDNR's intention to meet the objective set forth in State law and the Minnesota Wolf Management Plan to maintain a viable wolf population while reducing conflicts between wolves and humans.  (*Id.* at ¶ 8.)

## ARGUMENT

Plaintiffs claim that the delisting of the wolf by the USFWS is not supported by the record because the States, Minnesota included, have inadequate regulatory mechanisms and are unable to implement their respective state wolf management plans in

a manner that assures the continued viability of the wolf populations located within their borders.  (*See* Plaintiffs' Complaint for Declaratory and Injunctive Relief ("Pl. Compl.") [ECF No. 1] at ¶¶ 2-3, 94, 99-111; Pl. Mem. at 40-43.)  In particular, Plaintiffs state that "[t]he evidence is clear that the states within the western Great Lakes DPS have failed, and will fail, to provide regulatory mechanisms adequate to protect the gray wolf in the face of human threats to wolves' continued existence" and characterize state regulatory mechanisms as "non-existent."  (Pl. Mem. at 40.)

Particular to Minnesota, Plaintiffs claim that MNDNR has created "a virtual 'free-fire zone'" for wolves and that Minnesota landowners have "enormous discretion to kill wolves." (Pl. Compl. at ¶ 106; Pl. Mem. at 31.)   Plaintiffs go so far as to claim MNDNR has "resurrect[ed] the old bounty system ...."  (Pl. Mem. at 43 n.12.)

Plaintiffs' rhetoric regarding MNDNR's ability to manage its wolf population is without support in the record.   Nor is it reflected in the history of MNDNR's management efforts undertaken since the wolf's delisting.   MNDNR has managed its wolf population in the past, and continues to do so, in a conservative and sustaining manner guided by its Minnesota Wolf Management Plan and State statute and rule. Consequently, this Court should reject Plaintiffs' unsupported assertions.

I.      MNDNR HAS A LONG HISTORY OF COOPERATIVE STUDY AND MANAGEMENT OF WOLVES WITHIN THE STATE THAT LED TO THE WOLF'S RECOVERY UNDER THE ESA.

MNDNR's commitment to a strong and viable wolf population within the State is reflected in decades of study and a commitment of resources that ultimately resulted in the wolf's delisting.  Before originally listed under the ESA in 1974, it was estimated that

the State contained between 500 to 1,000 wolves.  (AR 391 at 11445A.)  This population was the only significant wolf population in the United States outside of Alaska.  (*Id.*)  Consequently, MNDNR's involvement in the recovery of the wolf began immediately with the wolf's listing under the ESA.

MNDNR participated in the preparation of both the 1978 and the Revised Recovery Plans.  (Boggess Decl ¶ 6.)  MNDNR also invested extensive resources into the study of wolves in Minnesota, working hand-in-hand with its federal partners in assuring the recovery of the wolf in Minnesota.  (*Id.* ¶¶ 6-7.)  Efforts included monitoring the wolves' population numbers and range, monitoring of radio-collared wolves, population surveys, annual evaluations of wolf prey species (deer and moose), and annual winter track and scent station surveys.  (AR 5 at 303A-304A.)  In addition, a compensation payment program was implemented through the Minnesota Department of Agriculture to address livestock losses due to wolves with the goal of increasing public acceptance of the wolf.  (AR 5 at 304A.)

These efforts, accompanied by State law protection, ultimately resulted in the relatively quick recovery of the wolf.  Specifically, a 1989 MNDNR population monitoring survey revealed that the recovery goal for wolves in the State had been achieved, and the 1997-98 MNDNR survey results concluded that approximately 2,445 wolves resided in Minnesota, almost twice the number specified in the Revised Recovery Plan for Minnesota.  (AR 391 at 11446A.)

As wolves increased in abundance in Minnesota, MNDNR's population monitoring studies revealed that wolves also expanded their distribution.  (*Id.*)  The

1997-98 MNDNR study concluded that the Minnesota wolf population was using most of the available primary and periphery range previously identified as available to the wolf, a conclusion that was subsequently verified by studies undertaken in 2003-04 and 2007-08. (*Id.*)  By the time the USFWS proposed delisting the wolf on May 5, 2011, the estimated wolf range in the State had expanded by approximately 225 percent since 1970.  (AR 391 at 11447A.)  This led the USFWS to conclude that "[b]ased on the current abundance and distribution of the Minnesota wolf population, we believe its continued survival is ensured, and it achieves the first recovery criterion of the revised recovery plan."  (*Id.*) This achievement was in part due to MNDNR's decades of effort to establish a recovered population of wolves in the State through research, management programs, and legal protection.

II.   **THE MINNESOTA WOLF MANAGEMENT PLAN AND STATE LAW REFLECTS MNDNR'S COMMITMENT TO MAINTAINING A RECOVERED POPULATION OF WOLVES.**

   A.   **The Minnesota Wolf Management Plan And State Law Is More Than Adequate To Assure The Continued Recovery Of The Wolf.**

The adequacy of existing regulatory mechanisms is one of the five factors considered under the ESA to determine whether a species should be removed from the list of threatened and endangered species.  16 U.S.C. § 1533(a)(1)(D).  The Minnesota

Wolf Management Plan[4] and its implementing State statutes and rules certainly meet this criterion.

The Minnesota Wolf Management Plan establishes a minimum goal of 1,600 wolves within the State.  (AR 391 at 11468A.)  If any winter population estimate is below 1,600 wolves, MNDNR is committed to take action to assure recovery to 1,600 wolves.    (AR 391 at 11469A;  AR 5 at 306A.)    As noted above, the Plan encompasses all aspects of maintaining wolf recovery, including population monitoring and management, management of wolf depredation of domestic animals, management of wolf prey, enforcement of laws regulating the take of wolves, public education, and increased MNDNR staffing to accomplish these actions.[5]  (*Id.*)  The Plan also allows both numbers and distribution of wolves to naturally expand, with no maximum population goal.  (AR 651 at 19805A.)  Consequently,  MNDNR's commitment to continue to study, monitor, and appropriately manage its wolf population after delisting is fully reflected in the Minnesota Wolf Management Plan and State laws, a fact recognized by the USFWS in its delisting decision.  (AR 651 at 19804A-19810A.)

---

[4] The Minnesota Wolf Management Plan and its implementation is a requirement of Minnesota law.  Specifically, Minn. Stat. § 97B.646 (2012) states:

> The commissioner [of MNDNR] shall adopt a wolf management plan that includes goals to ensure the long-term survival of the wolf in Minnesota, to reduce conflicts between wolves and humans, to minimize depredation of livestock and domestic pets, and to manage the ecological impact of wolves on prey species and other predators.

[5] A "wolf management and monitoring account" is authorized by Minnesota statute and funds in the account must be used for "wolf management, research, damage control, enforcement, and education."  Minn. Stat. § 97A.075, subd. 7(b) (2012).

MNDNR states in its Plan that it "will continue to identify and manage currently occupied and potential wolf habitat areas to benefit wolves and their prey on public and private land, in cooperation with landowners and other management agencies." (AR 651 at 19782A; AR 5 at 312A.)   The USFWS recognizes this commitment, noting that MNDNR, along with Wisconsin and Michigan, "have committed to continue their previous wolf population monitoring methodology ...." (AR 651 at 19848A.)   The record reflects that MNDNR also has "plans to encourage the study of wolves with radio telemetry after delisting, with an emphasis on areas where they expect wolf-human conflicts and where wolves are expanding their range."   (AR 391 at 11460A.) Specifically, the Minnesota Wolf Management Plan calls for MNDNR to "continue and enhance current methodologies to periodically assess wolf population abundance and distribution."   (AR 5 at 306A.)   The Plan calls for monitoring wolf distribution and abundance using a variety of indices, including wolf depredation complaints, autumn scent station surveys, winter furbearer track surveys, and other observations of field personnel. (*Id.*)  Emphasis is placed on radio-telemetry for areas of population concern, such as newly colonized regions and areas where conflicts with humans are likely.  (*Id.*)

The Minnesota Wolf Management Plan also commits MNDNR to "collaborate with other investigators and continue monitoring disease incidents, where necessary, by examination of wolf carcasses obtained through depredation control programs, and also through blood or tissue physiology work conducted by the MNDNR and the U.S. Geological Survey."  (AR 651 at 19796A; AR 5 at 307A.)  In addition, MNDNR has committed to the regular collection of pertinent tissue of live captured or dead wolves to

14

periodically assess wolf health "when circumstances indicate that diseases or parasites may be adversely affecting portions of the wolf population."  (AR 651 at 19796A; AR 5 at 306A.)   Notwithstanding the fact that diseases and parasites can impact wolf populations, USFWS recognized that "the overall trend for wolf populations in the [Western Great Lakes DPS] continues to be upward.  Wolf management plans for Minnesota, Michigan, and Wisconsin includes disease monitoring components that we expect will identify future disease and parasite problems in time to allow corrective action to avoid a significant decline in overall population viability."[6]   (AR 651 at 19797A.)

Since the initial removal of ESA protection for wolves in Minnesota in 2007, MNDNR has conducted two comprehensive wolf surveys and conducted increased radio-collar monitoring and disease studies.  (2nd Boggess Decl. ¶ 14.)  These studies have been conducted in several areas of the State with the cooperation of other federal agencies and tribal natural resources agencies.  (*Id.*)  For example, a two-year study that assessed the disease prevalence of wolves in Minnesota and additional radio-collar monitoring was undertaken in collaboration with the USFWS, the National Park Service, the United States Geological Survey, the Red Lake Band of Chippewa, and the Fond du Lac Band of Chippewa.  (*Id.*)   Such activities have increased the distribution of

---

[6] The impact of disease is one of the criteria considered for the delisting of a protected species.  16 U.S.C. § 1533(a)(1)(C).  MNDNR's efforts to monitor and react to disease in wolves were found by USFWS to be sufficient to "identify future disease and parasite problems in time to allow corrective action to avoid a significant decline in overall population viability."  (AR 651 at 19763A.)

radio-collar monitoring of wolves in Minnesota as well as increased population monitoring methodology. (*Id.*)

As discussed above (*supra*, at 2), the wolf in Minnesota is a "protected wild animal" and therefore wolves may only be taken pursuant to State statutes and rules applicable to protected animals. Minn. Stat. § 97A.015, subd. 39 (2012). As noted by the USFWS, MNDNR has committed to increased enforcement of the State's laws against the illegal take of wolves. (AR 651 at 19805A.) As a protected wild animal, the illegal take of a wolf under state law is a gross misdemeanor and is punishable by a fine of up to $3,000 and imprisonment for up to one year. Minn. Stat. §§ 97A.301, subd. 2; 97A.015, subd. 39 (2012); AR 651 at 19805A; AR 5 at 316A. Consistent with its commitment set forth in the Minnesota Wolf Management Plan, MNDNR has designated three MNDNR conservation officers who are stationed in the State's wolf range as the lead officers for implementation of the Wolf Management Plan and enforcement of State wildlife laws as they apply to wolves. (AR 651 at 19806A, 2nd Boggess Decl. ¶ 12.) Consequently, MNDNR has committed the necessary resources to assure that the legal protections provided to wolves are enforced.

While Plaintiffs characterize MNDNR's management of wolves as endangering the continued recovery of the wolf, the record reflects otherwise. Consequently, USFWS was justified in relying upon MNDNR's commitment set forth in the Minnesota Wolf Management Plan and in State law to determine that there are sufficient regulatory mechanisms in place to justify delisting the wolf in the Western Great Lakes DPS.

**B.    The Minnesota Wolf Management Plan Includes Extensive Population Survey And Monitoring Commitments.**

As noted above (*supra*, at 11, 15), MNDNR has cooperated with other agencies to carry out wolf population monitoring within the State for several decades. This includes the mid-winter population survey that had typically been undertaken at 10-year intervals. (AR 5 at 306A.) To be consistent with federal monitoring guidelines, the MNDNR survey frequency was increased to five-year intervals, a change that was included in the Minnesota Wolf Management Plan.  (AR 5 at 306A.)

In addition to this comprehensive survey, MNDNR collects annual data on wolf population trends, as it has done since the early 1970s.[7]  (2nd Boggess Decl. ¶ 13.)  These annual indices include fall carnivore sent station surveys and winter track surveys that monitor presence of wolves at standardized locations throughout wolf range, wolf depredation indices, and radio-telemetry research in smaller study areas.  (*Id.*)  While these annual indices do not provide the specific population estimates for the entire wolf population, they do provide valuable data for evaluating whether the population is increasing or decreasing between the more comprehensive five-year surveys.  (*Id.*)  The data collected through these surveys provide MNDNR corroborating assessments of wolf population trends in Minnesota, thereby adding confidence that MNDNR's monitoring program is reliable.  (*Id.*)  With these extensive survey and monitoring tools, MNDNR is able to closely follow wolf population trends within the State and use that knowledge to

_____

[7] This collection of annual data has continued since the wolf's delisting in January 2012. (2nd Boggess Decl. ¶ 13.)

modify its management objectives, including wolf harvest seasons, to assure the continued recovery of the wolf in Minnesota.[8]  (*Id.*)

> **C.    The Depredation Program Detailed In The Minnesota Wolf Management Plan And State Statute Does Not Threaten The Continued Recovery Of The Wolf.**

The Minnesota Wolf Management Plan and State statute do allow for the taking of depredating wolves.[9]   However, contrary to Plaintiffs' assertion that MNDNR has resurrected "the old bounty system" (Pl. Mem. at 43 n.12), the depredation program's details are well reasoned and will not endanger the continued recovery of the wolf in Minnesota.

Addressing in part MNDNR's depredation program, the USFWS noted that "[t]he high reproductive potential of wolves allows wolf populations to withstand relatively high mortality rates, including human-caused mortality."   (AR 391 at 11467A.)   The USFWS further noted that, despite human-caused mortality of wolves in Minnesota in the past, the State's wolf population had continued to increase in both numbers and range. (*Id.*) This fact led the USFWS to conclude "that predation, including all forms of human-caused mortality, will not be a sufficient future threat to cause wolves in the [Western Great Lake DPS] to be likely to become endangered in the foreseeable future in all or a significant portion of the range within the proposed [Western Great Lakes DPS]."

---

[8]  These studies are funded in part through the dedicated wolf management and monitoring account.  Minn. Stat. § 97A.075, subd. 7(b) (2012); 2nd Boggess Decl. ¶ 13.
[9]  A similar depredation program was in effect for decades while the wolf was federally-listed as threatened in Minnesota without negatively impacting the wolf's recovery.  (AR 5 at 308A-312A; AR 391 at 11470A; 2nd Boggess Decl. ¶ 15.)

(*Id.*)  The USFWS specifically noted that the level of wolf removal through depredation control during the period in which the wolf was under ESA protections in Minnesota did not interfere with the wolf's recovery within the State.  (AR 391 at 11470A.)  To the contrary, as stated by the USFWS, "Minnesota wolf numbers grew at an average annual rate of nearly 4 percent between 1989 and 1998 while the depredation control program was taking its highest percentage of wolves."  (*Id.* (citation omitted).)

Rather than an "old bounty system" as asserted by Plaintiffs, MNDNR's depredation plan is detailed and conservative.  *See* Minn. Stat. § 97B.645 (2012).  Under State law and the Minnesota Wolf Management Plan, private wolf depredation control efforts may be taken by a member of the public where a wolf poses an *immediate* threat to the person's livestock, guard animals, or domestic animals on lands that the person owns, leases, or occupies.  Minn. Stat. § 97B.645, subd. 5 (2012); AR 391 at 11471A. Owners of domestic pets may also kill wolves posing an *immediate* threat to a pet.  (*Id.*) The Minnesota Wolf Management Plan and State law allow persons to harass wolves anywhere in the state within 500 yards of people, buildings, dogs, livestock, or other domestic pets or animals.  Minn. Stat. § 97B.645, subd. 4 (2012); AR 361 at 1147A; AR 5 at 310A.  Harassment *does not* include physical injury to the wolves.  (*Id.*)

As reflected in State law and the Minnesota Wolf Management Plan, the State is divided into two wolf zones for more specific depredation control activities: Zone A, where wolves receive strong protection under state statute; and Zone B, which is less protective.  Minn. Stat. § 97B.645, subd. 8 (2012); AR 5 at 309A; AR 391 at 11470A.  In Zone A, encompassing the northeastern part of the State where wolf habitat is abundant,

depredation control is limited to situations of immediate threat (as noted above) or following a verified loss of domestic animals.  Minn. Stat. § 97B.645 subds. 3, 5 (2012); AR 5 at 309A.  In the latter situation, MNDNR must investigate and verify that a wolf has destroyed livestock, a domestic animal, or a pet, and only trained and certified predator controllers[10] may then take wolves within a one-mile radius of the depredation area. (*Id*.)

Zone B includes the remainder of the State, which is not considered to be viable wolf habitat.[11]   (AR 391 at 11471A.)   In Zone B, any person who owns, leases, or manages lands may shoot wolves on those lands to protect livestock, domestic animals, or pets.  Minn. Stat. § 97B.645, subd. 8 (2012); AR 5 at 311A.  The person may also employ a certified predation controller to trap wolves on or within one mile of land owned, leased, or managed by the person to protect livestock, domestic animals, or pets. (*Id*.)  The take of a wolf by either shooting or trapping must be reported to MNDNR within 48 hours of the taking.  (*Id*.)  MNDNR has also implemented a directed predator control program whereby MNDNR-trained and certified controllers are authorized to take

---

[10] By State law, MNDNR implements a wolf control training program for certification of predator controllers.  Minn. Stat. § 97B.671, subd. 4(a) (2012).

[11] This conclusion is consistent with the USFWS's finding that "[w]olves outside of Zone A are not necessary to the establishment and long-term viability of a self-sustaining wolf population in the State [of Minnesota] and, therefore, there is no need to establish or maintain a wolf population in Zone B."  (AR 651 at 19809A.)

wolves within limited control areas designated by MNDNR or as otherwise authorized by law.[12]  (2nd Boggess Decl. ¶ 16.)

While Plaintiffs characterizes Zone B as a "free-fire zone," in reality State law only authorizes the take of a wolf by a limited class of persons for the purpose of protecting domesticated animals, livestock, and pets.  (AR 391 at 11471A.)  There is no "bounty" awarded for the indiscriminate take of a wolf in either zones under the Minnesota depredation plan.  Nor is this inconsistent with the goals of the federal Revised Recovery Plan—the USFWS notes that "[t]he limitation of this broad take authority to Zone B is fully consistent with the Recovery Plan for the Eastern Timber Wolf's advice that wolves should be restored to the rest of Minnesota but not to Zone B (Federal Zone 5) because the area 'is not suitable for wolves.'"  (AR 391 at 11471A.)

While MNDNR's depredation program is broader than existed while wolves were under federal protection, USFWS concluded that "[t]his expansion of depredation control activities will not threaten the continued survival of wolves in the state [of Minnesota] nor the long-term viability of the wolf population in Zone A, a large part of the wolf range in Minnesota.  Significant changes in wolf depredation control under state management will primarily be restricted to Zone B, which is outside the area necessary for wolf recovery."  (*Id.* (citation omitted).)  The record supports this conclusion.

---

[12] Under this program, the certified controllers are paid by MNDNR.  (2nd Boggess Decl. ¶ 16.)

### III.   MNDNR'S 2012-13 WOLF HUNTING AND TRAPPING SEASON.

An example of MNDNR's ability to sustainably manage wolves in Minnesota is reflected in the 2012-13 Minnesota wolf harvest season.  MNDNR instituted the State's first wolf hunting and trapping season in the fall and winter of 2012-13.[13]  (2nd Boggess Decl. ¶ 8.)  Contrary to Plaintiffs' assertion that this season was adopted quickly and without due consideration (Pl. Mem. at 41), in fact it was developed by MNDNR pursuant to legislative statutory guidelines and in a thoughtful and public manner.[14]

MNDNR first informed the public of its intention to hold a conservative, science-based wolf hunting and trapping season for the following fall and winter in January 2012 following USFWS's delisting decision.  (2nd Boggess Decl. ¶ 4.)  This was done through a press conference in conjunction with MNDNR's annual fish, wildlife, ecological and water resources Roundtable and through a press release announcing its initial wolf season harvest proposal that included the number of wolves to be taken, the number of hunting licenses that would be offered, and the manner in which wolves would

---

[13] *See* 2012 Minnesota Wolf Season Report, dated July 5, 2013, found on the MNDNR website at *http://Files.dnr.state.mn.us/fish_wildlife/wildlife/wolves/2013/wolfseasoninfo_2012.pdf* and attached to the Second Declaration of Edward K. Boggess as Exhibit C.

[14] Plaintiffs assert that MNDNR "went back on its word" by removing from statute a five-year waiting period after delisting before implementing a wolf hunting and trapping season.  (Pl. Compl. ¶ 103; *see also* Pl. Mem. at 41.)  To the contrary, as noted above (*supra* 7-8), the 5-year waiting period was adopted by the Minnesota Legislature in 2000 when wolf recovery goals had been met and it was anticipated that the wolf's removal from ESA protection was imminent.  (Boggess Decl. ¶ 11.)  Over the subsequent eleven years, management of wolves was returned to MNDNR on two occasions, albeit only temporarily.  (AR 651 at 19733A.)  In 2011, the Minnesota Legislature determined that the waiting period was no longer necessary, or relevant, and repealed it.  (AR 651 at 19806A.)

be registered.   (*Id.*)   The press release also stated that MNDNR would take public comment prior to finalizing a wolf season.  (*Id.*)

Simultaneously with MNDNR's wolf season planning, the 2012 Minnesota State Legislature considered the structure of a wolf season in its Game and Fish Bill.   (*Id.* at ¶ 5.)  Testimony was taken from numerous stakeholders arguing on all sides of the issue. (*Id.*)  The Game and Fish Bill was thereafter approved by the Legislature and became law in May 2012.  2012 Minn. Laws, ch. 277, art. I, §§ 23, 42-43, 65, 68, 71, 85, 2nd Boggess Decl. ¶ 6.  The law defined a wolf license, established fees for wolf licenses, created a wolf management and monitoring account in the State game and fish fund, established the opening day of the season, gave the Commissioner of MNDNR the authority to prescribe open seasons for wolves, established quotas, designated areas where wolves could be taken, established possession limits and limits on the number of hunters and trappers that could take wolves, and prescribed an application and fee for the wolf season. (*Id.*)

Following conclusion of the legislative action on the wolf season and further refinement of its proposal based on that action, MNDNR issued a press release in May 2012 describing the details of its proposed wolf season, including harvest targets, season structure, the application process, and registration.   (2nd Boggess Decl. ¶ 7.) MNDNR then took online comments over a period of 30 days on its proposal, especially seeking input on how the season was structured.  (*Id.*)  MNDNR also received thousands of emails, telephone calls, and letters from the public regarding their thoughts on the proposed hunting and trapping season.  (*Id.*)

23

The Minnesota 2012-13 wolf season opened on November 3, 2012, concurrent with the firearms deer hunting season opener.  (37 SR 274-282; 2nd Boggess Decl. ¶ 3, Ex. A, and ¶ 8, Ex. C at 1.)   Six thousand wolf licenses were issued.  (*Id.*)   The wolf season was divided into three segments:  an early hunting season that coincided with the firearms deer season, a late hunting season; and a concurrent late trapping season.  (*Id.*) A total target of 400 wolves was established to limit total potential take of wolves and to initiate the closing of the season.  (*Id.*)   The wolf range was further divided into three zones and each of the three zones had independent target harvests for early and late seasons.  (*Id.*)   Hunters and trappers were required to register wolves harvested by 10 p.m. the day of harvest and were also required to monitor by telephone or internet the season progress and check for an announcement of season closure when the target harvest by zone or season was reached.  (*Id.*)   Successful hunters and trappers were also required to bring harvested wolves to MNDNR offices for pelt tagging, the collection of additional harvest information such as the location of harvest, and the collection of biological samples, including a tooth, tissue samples, and female reproductive tracts, for characterizing demographics of wolves taken during the season.[15]   (2nd Boggess Decl. ¶ 9.)  The season closed on January 3, 2013, at which time 413 wolves had been taken by hunting and trapping.  (*Id*. at ¶ 10.)

---

[15] These efforts are consistent with MNDNR's commitment in the Wolf Management Plan to continue its efforts to monitor the wolf population by assessing wolf population genetics and health.  (AR 651 at 19796A, 19848A.)

This highly regulated and conservative harvest is far removed from Plaintiff's allegation that MNDNR "aggressively hunt wolves as soon as the federal eye is not on the state's management plan and is not scrutinizing post-delisting state activities." (Pl. Mem. at 41-42.) Such rhetoric glosses over the thoughtful effort employed by MNDNR to assure a successful wolf harvest season, implemented consistent with the Minnesota Wolf Management Plan and State law, that would not harm the wolf recovery effort of the past four decades. MNDNR conducts sustainable seasons for more than 50 species of game animals and the 2012 wolf season was the most intensively managed and monitored of any of the seasons MNDNR conducts.[16] (2nd Boggess Decl. ¶ 8.)

## IV.    MNDNR's 2013 WINTER WOLF POPULATION SURVEY RESULTS.

In the winter of 2013, MNDNR undertook its five-year population survey as set forth in the Minnesota Wolf Management Plan.[17] (AR 5 at 306A; 2nd Boggess Decl. ¶ 15.) The survey yielded a population estimate of 2,211 wolves with a confidence range from 1,652 to 2,640 wolves. (Id. ¶ 15, Ex. D at 5.) While total wolf range remained stable for 15 years, the information gathered since MNDNR's 2007-08 five-year study indicated that wolf range had expanded in several areas along the southern and western

---

[16] At the time of the filing of this Memorandum, the 2013-14 Minnesota wolf season is underway. (2nd Boggess Decl. ¶ 11.) The structure of the season is essentially the same as used for the 2012-13 season. (Id.) A total harvest goal of 220 wolves is in place for the season. (Id.)

[17] The results can be found on the MNDNR website at *http://Files.dnr.state.mn.us/fish _wildlife/wolves/2013/wolfsurvey_2013.pdf.* and attached to the Second Declaration of Edward K. Boggess at Exhibit D. This effort was consistent with MNDNR's commitment to undertake comprehensive population surveys on a 5-year cycle. (AR 5 at 306A; 2nd Boggess Decl. ¶ 15.)

periphery.  (*Id.*)  However, the area estimated to be occupied by wolf packs remained similar to the 2007 survey.  (*Id. ¶* 15, Ex. D at 6.)

The population estimate of 2,211 wolves is approximately 700 wolves less than the 2007 survey estimate (*Id.* ¶ 15, Ex. D at 5.)   However, the population number represents a mid-winter post-hunt population prior to the birth of wolf pups.  (*Id.*)  MNDNR has estimated that approximately 2,600 wolf pups were likely born in spring 2013 after the survey was completed.  (*Id.* ¶ 15, Ex. D at 6.)  MNDNR further notes that:

> [W]olf populations typically have high reproductive potential and can fluctuate notably from year to year, often attributable to variations in recruitment of pups to the fall population.  Hence, periodic population estimates likely mask the shorter-term fluctuations that may commonly occur in an established wolf population.  With an estimated 438 wolf packs in Minnesota, and average litter size recently estimated to be 6, ~ 2,600 wolf pups were likely born in spring 2013.  Management actions (e.g., depredation control, wolf harvest) and variable recruitment rates of pups attributable to prey, weather, and disease fluctuations will continue to influence the size of the pre- and post-hunt wolf population in Minnesota.

(*Id.* ¶ 15,Ex. D at 5-6 (citation omitted).)

MNDNR's comprehensive five-year survey demonstrates that the Minnesota wolf population remains robust under MNDNR management, notwithstanding the implementation of a conservative harvest season and the continuation of depredation control efforts.

## CONCLUSION

Wolves in Minnesota have now been under MNDNR's management authority for two years.  Rather than mere "promises of proposed future actions" as Plaintiffs assert

(Pl. Mem. at 42), the Minnesota Wolf Management Plan and wolf management statutes and rules have been implemented successfully and in a manner that assures the continued recovery of the State's wolf population.  Plaintiffs' arguments to the contrary, there is no evidence that MNDNR cannot, has not, or will not manage the State's wolf population in a conservative and self-sustaining manner.  To the contrary, it is in the best interest of MNDNR to manage the State's wolves in a manner that sustains a viable recovered population to provide the ecological and social values that this species contributes to the State's environment and its citizens while minimizing conflicts.  Therefore, MNDNR respectfully requests that the Court deny Plaintiffs' motion for summary judgment and grant Defendants' cross motion for summary judgment.

Dated:  December 11, 2013.

Respectfully submitted,

OFFICE OF THE ATTORNEY GENERAL
State of Minnesota

s/**David P. Iverson**

David P. Iverson
Assistant Attorney General
Atty. Reg. No. 180944

445 Minnesota Street, Suite 1800
St. Paul, Minnesota 55101-2134
Telephone:  (651) 757-1466
Fax:  (651) 297-1235
dave.iverson@ag.state.mn.us

Attorney for the Minnesota Department of
Natural Resources