**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **THE HUMANE SOCIETY OF THE UNITED STATES**, *et al.*, | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 13-CV-00186-BAH |
| | ) | |
| **SALLY JEWELL**[1], *et al.*, | ) | |
| | ) | |
| Defendants. | | |

---

**MOTION OF THE ASSOCIATION OF FISH & WILDLIFE AGENCIES
TO PARTICIPATE AS *AMICUS CURIAE***

The Association of Fish and Wildlife Agencies (the "Association")[2], through and by its undersigned counsel, respectfully moves this Court, pursuant to Federal Rules of Civil Procedure 5 and 7, for leave to participate as *amicus curiae* in this action. The Association has also filed a proposed order and its proposed *amicus* brief contemporaneously with this motion.

Pursuant to Local Civil Rule 7(m), counsel for the Association has discussed this motion with counsel for plaintiffs and has been informed that plaintiffs will oppose this motion. Counsel for defendants and intervening defendants have indicated that they will not oppose this motion.

**INTRODUCTION**

This case concerns the United States Fish and Wildlife Service's ("FWS") recent removal of the gray wolf in the Western Great Lakes states from the endangered species list pursuant to the Endangered Species Act ("ESA").[3]

---

[1] Secretary Jewell is automatically substituted as a defendant for former Secretary Salazar pursuant to Fed. R. Civ. P. 25.

[2] The Association represents the collective perspectives of the state fish and wildlife agencies of all fifty states and the District of Columbia.  The Association's state agency members protect, conserve, and manage the fish and wildlife resources of North America.

[3] 16 U.S.C. § 1531, *et seq.*

FWS has been regulating the gray wolf under its ESA authority for over forty years, and its regulations have met perennial legal challenges.  A brief history of the regulatory actions and the lawsuits affecting the gray wolf in the Western Great Lakes states follows.

In 1974, FWS listed the eastern timber wolf as endangered in Minnesota and Michigan. In 1978, FWS issued a final rule which reclassified the gray wolf as endangered at the species level in the United States and Mexico, except for wolves in Minnesota and Michigan, which it listed as threatened.[4]  In 2000, FWS proposed to change the gray wolf's ESA status in the lower 48 states.[5]  Then, in 2003, FWS promulgated a final rule designating three distinct population segments ("DPS") for the gray wolf.  In addition to creating the Eastern DPS, which includes wolves in the Western Great Lakes states, the rule changed the status of the Eastern DPS from endangered to threatened.[6]  In 2005, two federal district courts upheld challenges to the 2003 rule.[7]  On February 8, 2007, FWS published a final rule simultaneously creating the Western Great Lakes DPS ("WGL DPS") and delisting the WGL DPS; the rule went into effect on March 12, 2007.[8]  A federal district court vacated and remanded the rule on September 29, 2008, and on December 11, 2008, FWS reinstated the WGL DPS to protection under the ESA, in compliance with court orders.[9]  In 2009, the FWS again finalized a rule designating and delisting the WGL DPS; a federal district court sustained a challenge to the rule.[10]  FWS subsequently relisted the WGL DPS.[11]  In 2011, FWS proposed a rule to designate and delist the WGL DPS, and on

---

[4] 43 Fed. Reg. 9,607 (Mar. 9, 1978).

[5] 65 Fed. Reg. 43,450 (July 13, 2000).

[6] 68 Fed. Reg. 15,804 (Apr. 1, 2003).

[7] *Defenders of Wildlife v. Sec'y of the U.S. Dept. of the Interior*, 354 F. Supp. 2d 1156, 1174 (D. Or. 2005) (vacating and enjoining final rule); *Nat'l Wildlife Fed'n v. Norton*, 386 F. Supp. 2d 553, 568 (D. Vt. 2005) (vacating final rule and remanding FWS for reconsideration).

[8] 72 Fed. Reg. 6,052 (Mar. 27, 2006).

[9] *Humane Soc'y of the United States v. Kempthorne*, 579 F. Supp. 2d 7, 22 (D.D.C. 2008); 73 Fed. Reg. 75,356 (Dec. 11, 2008).

[10] 74 Fed. Reg. 15,070 (Apr. 2, 2009); *Humane Soc'y of the United States v. Kempthorne*, Civ. No. 09-01092-PLF (D.D.C., filed June 15, 2009).

[11] 74 Fed. Reg. 47,483 (Sept. 16, 2009).

December 28, 2011, the U.S. Fish and Wildlife Service removed gray wolves in the Western

Great Lakes region from the protection of the ESA.[12]

## PROCEDURAL HISTORY

On February 12, 2013, plaintiffs filed this action against Kenneth Salazar, the Secretary

of the United States Department of the Interior, acting in his official capacity, as well as the

United States Department of the Interior and FWS (collectively, "defendants").  The lawsuit

challenged FWS's decision to designate and delist the WGL DPS.  Subsequently, several parties

intervened as defendants, including the States of Wisconsin and Michigan and their Departments

of Natural Resources, Minnesota Department of Natural Resources, Safari Club International,

National Rifle Association, U.S. Sportsmen's Alliance Foundation, Wisconsin Bear Hunters

Association, Michigan United Conservation Club, Wisconsin Bowhunters Association, Upper

Peninsula Bear Houndsmen Association, Michigan Dog Hunting Federation, and Rocky

Mountain Elk Foundation.  On September 9, 2013, plaintiffs filed a motion for summary

judgment.

The Association of Fish and Wildlife Agencies (the "Association")[13] respectfully submits

that the FWS delisting of the WGL DPS is consistent with applicable law and with the protection

of the gray wolf, and is an appropriate allocation of wildlife management responsibilities

between the federal and state governments.  The FWS decision correctly interprets and applies

the ESA and the court should defer to the agency's decision and uphold the rule.

## DISCUSSION

---

[12] 76 Fed. Reg. 26,086 (May 5, 2011); 76 Fed. Reg. 81,666 (Dec. 28, 2011).
[13] The Association is a not-for-profit association exempt from taxation under IRS §501(c)(6).  In 2005, the Association changed its name from International Association of Fish and Wildlife Agencies to Association of Fish and Wildlife Agencies.

The Association of Fish and Wildlife Agencies (the "Association") represents the collective perspectives of the fish and wildlife agencies of all fifty states, the Territories, the Commonwealth of Puerto Rico, and the District of Columbia.[14]  The Association coordinates the efforts of its state agency members to manage wildlife, promote comprehensive science-based resource management and conservation policies, and strengthen federal, state, and private cooperation to ensure the vitality and sustainability of fish and wildlife resources.  Moreover, the Association advocates for the states' authority to manage fish and wildlife on behalf of its state agency members before Congress, the courts, and the federal executive branch agencies.

In this lawsuit, plaintiffs are attempting to relist the WGL DPS in states that are affected by this decision, which relisting the Association opposes.  The Association respectfully requests *amicus curiae* status because it has an interest in this litigation and it was a signatory to the *amicus* brief filed by the states in earlier wolf litigation (*Humane Society v. Kempthorne,* case no. 1:07-CV-00677-PLF, dated January 18, 2008).  Further, the Association's participation as *amicus curiae* will assist the Court in resolving the case.

## I.   THIS COURT HAS AUTHORITY TO GRANT THE ASSOCIATION *AMICUS CURIAE* STATUS

"District courts have inherent authority to appoint or deny *amici* which is derived from Rule 29 of the Federal Rules of Appellate Procedure."[15]  Under Rule 29(a), "a private amicus may file if all parties consent or if the court grants leave."[16]  However,

> [w]hen a party objects to filing by a private amicus and leave of court is sought, Rule 29(b) provides that the motion for leave to file must be accompanied by the proposed

---

[14] Other members of the Association include the federal fish and wildlife, agriculture, and land managing agencies and the federal and provincial fish and wildlife agencies of Canada and Mexico.

[15] *Funbus Sys., Inc. v. State of Cal. Pub. Util. Comm'n*, 801 F.2d 1120, 1125 (9th Cir. 1986) (*quoting Smith v. Chrysler Fin. Co., L.L.C.*, 2003 WL 328719, at *8 (D.N.J. Jan.15, 2003)); *see also Sierra Club v. Fed. Emergency Mgmt. Agency*, 2007 WL 3472851, at *3 (S.D. Tex. Nov.14, 2007) (finding no statute, rule or controlling case defines a federal district court's power to grant or deny leave to file amicus brief).

[16] *Neonatology Ass. v. Commissioner of IRS*, 293 F.3d 128, 130 (3rd Cir. 2002).

brief and must state: (1) the movant's interest; and (2) the reason why an amicus brief is desirable and why the matters asserted are relevant to the disposition of the case.[17]

This Court has, on multiple occasions, granted leave to organizations to participate as an *amicus curiae* participant in cases where the outcome of the case would have an impact on those *amicus curiae* and their members.[18]   Moreover, this Court has previously recognized that "[i]t is solely within the court's discretion to determine 'the fact, extent, and manner' of the participation."[19]

This Court has the authority to allow the Association to participate in this case as an *amicus curiae*, and should do so because the Association has an interest in the case and its input and perspective will help the court resolve the case.

## II.   THE ASSOCIATION HAS AN INTEREST IN THE LITIGATION

The Association has an interest in this litigation as the future regulation of the recovered WGL gray wolves is best addressed by its state agency members rather than by federal agencies. The Association's state agency members are vested with the authority and directed by state constitutions or statutes to manage and protect fish and wildlife resources of their respective states for the benefit of present and future generations of the people of the state.

### A.   Congress intended when it created the ESA that the states would retain some wildlife management authority, and relisting would deny the states the ability to use this authority.

---

[17] *Id*. at 130-131.
[18] *Ctr. for Public Integrity v. F.C.C.* , 505 F. Supp. 2d 106 (D.D.C. 2007) (Communications trade associations permitted to join as *amicus curiae* in FOIA action against FCC for release of records concerning telecommunications provider services); *Beverly Health & Rehab. Services, Inc. v. Thompson*, 223 F. Supp. 2d 73 (D.D.C. 2002) (Long-term care trade association permitted to participate as *amicus curiae* in a case brought by nursing home owner who challenged validity of protocol used to monitor Medicare and Medicaid compliance fur nursing homes).
[19] *Cobell v. Norton*, 246 F. Supp. 2d 59, 62 (D.D.C.2003).

The basic purpose of the ESA is to protect and recover endangered or threaten species and the ecosystems upon which they depend.[20]  FWS has the primary responsibility and authority to manage species that are endangered or threatened.  Although the ESA gives primary authority to the federal government, both the ESA itself and the ESA's legislative history demonstrate that Congress intended for states to retain some of their wildlife management authority over listed species.

Section 6(f)[21] of the ESA encourages states to develop and maintain conservation programs for threatened and endangered species.  In some cases, state laws and regulations are more restrictive than the ESA in regulating the threatened or endangered species in question.[22]

Congress's intent for states to retain certain authority over wildlife management is also apparent in the transcript from a floor debate on the ESA during which Senator Tunney stated:

> An animal might be "endangered" in most States but overpopulated in some. In a State in which a species is overpopulated, the Secretary would have the discretion to list that animal as merely threatened or to remove it from the endangered species listing entirely while still providing protection in areas where it was threatened with extinction. In that portion of its range where it was not threatened with extinction, the States would have full authority to use their management skills to insure the proper conservation of the species.[23]

Senator Tunney's statement indicates how state authority over endangered species is crucial when managing endangered species that live within the state's borders.  It also recognizes

---

[20] 16 U.S.C. § 1531 (b).

[21] 16 U.S.C. § 1535 (f) ("Any State law or regulation respecting the taking of an endangered species or threatened species may be more restrictive than the exemptions or permits provided for in this chapter or in any regulation which implements this chapter but not less restrictive than the prohibitions so defined.").

[22] *Id.*; *See* JOE SCHAEFER ET. AL., *Laws that Protect Florida's Wildlife*, (2012), *available at* http://edis.ifas.ufl.edu/pdffiles/UW/UW07600.pdf ("However, state law standards often are stricter than federal law standards. For example, the ESA (16 U. S. Code 1531-1544) prohibits the taking, possession, sale, and transport of species determined by the federal government to be in danger of extinction. Florida Statute § 379.411 declares that it is unlawful for a person to intentionally kill or wound any species of fish or wildlife listed as endangered, threatened, or of special concern (as determined by the state of Florida) or to intentionally destroy the eggs or nest of any such fish or wildlife, except as provided for in the rules of various state agencies. Wildlife Rule 68A-27.003 of the Florida Administrative Code states that no person shall pursue, molest, harm, harass, capture, possess, or sell any endangered species or parts thereof or their nests or eggs except as authorized by specific permit. This rule also lists all the endangered species in the state.").

[23] 93 CONG. REC. S. 1983 (July 24, 1973) (statement of Sen. Tunney).

Congress's intent that the federal government under the ESA would work closely with the state

governments in order to establish the most viable management authority to further the ESA's

goal of recovery.

Using state wildlife management authority as an endangered species conservation

strategy also allows for more selective and precise management of endangered species.

Congress's intent to provide for selective management is evident in the ESA's legislative history.

In the hearing on S. 1592, Senator Cook questioned Dr. Earl Baysinger, Assistant Chief, Office

of Endangered Species and International Activities, on this point:

> Dr. Baysinger: If this were an animal about which we were concerned, that was obviously
> getting in trouble in part of its range, for whatever reason, we would be able to sit down,
> look at the animal, determine with the other agencies with whom we are dealing what
> actions needed to prevent that animal from deteriorating to the point where it would
> become endangered, make the finding that this animal is likely to become threatened over
> a portion of its range, and then apply such techniques as would be needed to prevent it
> from deteriorating further with that portion of its range.

> Senator Cook: In other words, S. 1592 gives you a degree of selectivity that you never
> had before.

> Dr. Baysinger: Yes, it gives us a scalpel rather than a broad sword.[24]

This testimony demonstrates the selectivity that Congress intended the ESA to have in

determining the listing of a species within portion of its range, and that the ESA was intended to

be a tool in which species could be deemed recovered on a selective basis, such as in some  states

and not in others.

Assistant Secretary Reed also expressed the ESA's selectivity principle when speaking in

a Committee hearing:

> However, we find ourselves in a bind. We must [under the 1969 Act] put an animal on
> the endangered species list to give it protection over all of its range when it could be
> surplus in part of its range. The alligator, which for instance, in Florida and Louisiana are

---

[24] *Endangered Species Act of 1973:Hearing Before the Subcomm. on Environment of the Comm. on Commerce United States Senate*, 93ʳᵈ Cong. 61-62 (1973) (statement of Sen. Cook and Dr. Earl Baysinger).

numerous and coming back may be able to stand a harvest. But, the alligator is in real
trouble throughout the rest of its range. The administration's bill gives the Secretary the
power to allow harvest in areas where the animal is not presently threatened with
extinction and protect in areas where is in trouble, that is, where is likely to become
threatened with extinction.[25]

Further, when Congress created the ESA, it was sensitive to the states' traditional wildlife

management role, and to the states' concerns about preemption of their managerial authority.

This concern is evident in the following excerpt of Congressional testimony in which

Representative Bob Eckhardt questions A. Gene Gazlay, Director of Michigan Department of

Natural Resources:

Mr. Gazlay: Yes, I understand, but let us take a specific example. At the moment, the
American alligator and the Eastern timber wolf are on the U.S. list of native endangered
species. Yet in Louisiana several years of State protection have increased the number of
alligators to the point that a limited harvest is ecologically needed. Similarly, Minnesota's
population of timber wolves can support limited hunting. If Federal legislation were
passed which provided that the present Federal listing prohibited the taking of any
alligators in Louisiana or timber wolves in Minnesota, it would be a clear case of
improper preemption, in my opinion. Certainly the State should continue to have the right
to be more restrictive than Federal laws or regulations, but certainly blanketing Federal
decreases that disregard local situations should not be permitted.

Mr. Eckhardt: Well, I suppose what you are calling for is not that the Federal
Government preempt, but that the Federal Government approve with respect to the
attention of these topics in the beginning.

Mr. Gazlay: Yes, sir.

Mr. Eckhardt: But I suppose you would recognize in some areas the Federal Government
should probably put in effect minimum standards applicable everywhere to be enlarged
by the States.

Mr. Gazlay: I think the States will be able to live comfortably if the legislation has
criteria which clearly spell out under what circumstances the Department of the Interior
will preempt the State and not leave that completely up to the discretion of the Secretary.
I should, perhaps

---

[25] *Endangered Species: Hearings on H.R. 37 and 4758 Before the Subcomm. on Fisheries and Wildlife Conservation of the House Comm. on Merchant Marine and Fisheries*, 93rd Cong. 207 (1973) (statement of Nathaniel Reed, Assistant Secretary for Fish and Wildlife and Parks, Department of Interior).

Mr. Eckhardt: In other words, you were using the term "preempt" as making a final and positive ruling with respect to regulations which will be nationwide.

Mr. Gazlay: Right.

Mr. Eckhardt: But not in the sense of so occupying the field so that the State may not further act in the total area.

Mr. Gazlay: True.

Mr. Eckhardt: Thank you.

Mr. Gazlay: I should also mention that this is a sensitive matter with the States because they view resident wildlife as being within their purview to manage, as opposed to migratory wildlife, which are clearly national and international in scope, and most species of endangered fish and wildlife come under this category of resident wildlife, so many of the States, whether right or wrong, would view the Federal identification and control and regulation as being preemptive of what historically and traditionally has been their sphere of influence.[26]

The conversation between Mr. Gazlay and Mr. Eckhardt demonstrates that states have always been in charge of managing wildlife within their borders and that Congress did not intend to fully preempt that authority.  Thus, states retained certain wildlife management authority even after the passage of the ESA.  The states' interest in maintaining and exercising that authority is at issue in this case, and the Association seeks to represent that interest by participating as an *amicus*.

**B.  States have state constitutional or statutory authority to manage fish and wildlife populations and relisting would curtail their ability to exercise that authority.**

States generally have statutory or constitutional trust or stewardship requirements which provide them with the authority to regulate fish and wildlife.  For example, the Michigan legislature declares it to be state policy that "animals found in this state, whether resident or migratory and whether native or introduced, are the property of the people of the state, and the

---

[26] *Id*. at 245-46 (statement of Representative Bob Eckhardt and A. Gene Gazlay, director, Michigan Department of Natural Resources, and chairman, Legislative Committee of the International Association of Game, Fish, and Conservation Commissioners).

taking of all animals shall be regulated by the department as provided by law."[27]   Likewise, the

Minnesota legislature declares that fish and wildlife are the property of the state and has a policy

of the state that "fish and wildlife are renewable natural resources to be conserved and enhanced

through planned scientific management, protection, and utilization."[28]

Most states have statutes which declare wildlife as public trust resources with the state

being the steward or trustee for the resource.  For example, in Michigan,

> [t]he department, in accordance with this part, may regulate the taking or killing of all
> fish, game and fur-bearing animals, and game birds protected by the laws of this state,
> and may suspend or abridge the open season provided by law for the taking or killing of
> such fish, animals, or game birds in any designated waters or area of this state, if in the
> opinion of the department it is necessary to assist in the increased or better protection of
> the fish, game or fur-bearing animals, or game birds, or any particular kinds or species of
> fish, game or fur-bearing animals, or game birds, which may in the opinion of the
> department be threatened from any cause or causes with depletion or extermination in the
> waters or area.[29]

Wisconsin has a statute granting similar authority:  "protection of, all wild animals within this

state is vested in the state for the purposes of regulating the enjoyment, use, disposition, and

conservation of these wild animals."[30]

Congress has recognized such state authority to manage wildlife and the need to preserve

that authority, explicitly stating in the Multiple Use-Sustained Yield Act that federal legislative

enactments are not to be construed as "affecting the jurisdiction or responsibilities of the several

States with respect to wildlife and fish on the national forests." Multiple Use-Sustained Yield

---

[27] MICH. COMP. LAWS ANN. § 324.40105 (West 2013).
[28] MINN. STAT. ANN. § 84.941 (West 2013).
[29] MICH. COMP. LAWS ANN. § 324.41102 (West 2013).
[30] WIS. STAT. ANN. § 29.011 (West 2013).

Act.[31]  Similar language also appears in the Federal Land Policy Management Act,[32] the National

Wildlife Refuge System Administration Act,[33] and the National Wild & Scenic Rivers Act.[34]

     In representing its state members, the Association has a substantial interest in preserving

state authority to manage fish and wildlife conservation within state borders.  The Association's

state agency members have both the statutory and constitutional responsibility to manage and

protect fish and wildlife resources.[35]  Where wildlife population levels have been significantly

impacted, the states have already taken proactive steps to implement regulations and

management plans.  The Association seeks to participate as an *amicus curiae* to further the legal

interests of its member state agencies to manage wildlife within their respective jurisdictions.

**C.  The gray wolf has recovered within the states at issue, and relisting it when it has recovered will defeat the purpose of the ESA and deny the states their right to manage the wolf.**

     The ESA's goal for listed species is for the responsible agency to foster the species'

recovery to a point where further conservation measures are "no longer necessary."[36]  The ESA's

---

[31] 16 U.S.C.A § 528 (West 2011).

[32] 43 U.S.C.A §1732(b) (West 2011) ("[N]othing in this Act shall be construed as . . . diminishing the responsibility and authority of the States for management of fish and resident wildlife.").

[33] 16 U.S.C.A § 668dd(m) (West 2011) ("Nothing in this Act shall be construed as affecting the authority, jurisdiction, or responsibility of the several States to manage, control, or regulate fish and resident wildlife under State law or regulations in any area within the System.").

[34] 16 U.S.C.A § 1284(a) (West 2011) ("Nothing in this chapter shall affect the jurisdiction or responsibilities of the States with respect to fish and wildlife.").

[35] States have  constitutional or statutory authority affecting wildlife. Some other examples besides Michigan, Wisconsin, and Minnesota are: the Oregon legislature declares it to be "the policy of the State of Oregon that wildlife shall be managed to prevent serious depletion of any indigenous species and to provide the optimum recreational and aesthetic benefits for present and future generations of the citizens of this state."  OR. REV. STAT. ANN. § 496.012 (West 2011).  Likewise, the Washington legislature declares that fish and wildlife are the property of the state and directs the Department of Fish and Wildlife to "establish[] policies to preserve, protect, and perpetuate wildlife, fish, and fish habitats."  WASH. REV. CODE ANN. § 77.04.055 (West 2011). Other state constitutions also declare wildlife as public trust resources with the state being the steward or trustee for the resource.  For example, in Virginia, "[t]he people have a right to hunt, fish, and harvest game, subject to such regulations and restrictions as the General Assembly may prescribe by general law." Va. Const. art. XI, § 4.  Also, in Georgia, "[t]he tradition of fishing and hunting and the taking of fish and wildlife shall be preserved for the people and shall be managed by law and regulation for the public good." Ga. Const. art. I, § 1, ¶ XXVIII.

[36] 16 U.S.C. § 1532 (3) (Definitions of  "terms 'conserve', 'conserving', and 'conservation' mean to use and the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this Act are no longer necessary.").

recovery goal of the ESA is satisfied when a population has been brought back to levels established with the best available data by the FWS.  The gray wolf's population numbers have been above the FWS's prescribed recovery level for a number of years, which level FWS set with sound scientific data and studies. [37]  A 1998 survey concluded that the Minnesota wolves had "reached approximately twice the number specified in the recovery planning goal for Minnesota."[38]  The decision to delist the WGS GPS properly allows for state authority and management plans to handle the continued management of the species within each individual state.  However, relisting the recovered gray wolf would improperly deny the states their right to manage the wolf.  The Association seeks to file an *amicus* brief to forward its members' interest in managing the now-recovered wolf.

### D.  Relisting the gray wolf would set a bad precedent for future ESA cases in all states.

The Association represents the fish and wildlife agencies of all fifty states.  Currently, no existing party in this lawsuit represents the fifty states' collaborative interests in the relisting decision being asked of this court.

Gray wolf delisting has been challenged by advocates across the United States, not only in the Western Great Lakes region.  For example, in *WildEarth Guardians v. U.S. Fish and Wildlife Serv.*, plaintiffs challenged FWS's final rule removing the gray wolves in Wyoming from ESA protection.[39]  FWS issued the rule to address the "recovered status of the Northern Rocky Mountain ("NRM") gray wolf population that is located in the States of Idaho, Montana, Wyoming, and the eastern portions of Utah, Oregon, and Washington."[40]  The decision in the

---

[37] 76 Fed. Reg. 81,676 (Dec. 28, 2011) ("We are taking this action because the best available scientific and commercial information indicates that the WGL DPS does not meet the definition of threatened or endangered under the Act.").
[38] *Id.* (Goal of 1,251 -1,400 animals in the Minnesota population, which in the winter in 1997-98 was documented at 2,445 animals.).
[39] *WildEarth Guardians v. U.S. Fish and Wildlife Serv.*, 2013 U.S. Dist. LEXIS 3969 (D. Colo. Jan. 9, 2013).
[40] *Id.* at *2.

*WildEarth Guardians* case will affect at least those six states directly, and is likely to set a precedent for future gray wolf cases and possibly for future ESA cases involving other species. This case will likely also affect all the states in the United States and the process of delisting in the future. In fact, the gray wolf's status continues to be litigated in various parts of the country.[41] Thus, what happens in this case will likely inform courts nationwide that addressing delisting cases in the future.

The delisting of the WGL DPS not only affects the surrounding states, but will have effects on other states throughout the United States that have wolves within their borders. A decision to relist the WGL gray wolf could also have serious negative consequences as to all states' authority in managing their wildlife. Accordingly, the decision in this case will affect all of the Association's members and the Association requests leave to participate in the case as an *amicus*.

## III.   THE ASSOCIATION'S PARTICIPATION WILL ASSIST THE COURT IN RESOLVING THE CASE

"'An amicus curiae, defined as 'friend of the court,' . . . does not represent the [original] parties but participates [in the lawsuit] only for the benefit of the Court.'"  Courts generally rely on *amicus curiae* participants to  "[provide] particular expertise not possessed by any party to the case, . . . explain the impact a potential holding might have on an industry or other group, . . . [and] give a voice to persons who are not parties but who may be affected by a decision."[42]

### A.    The Association can provide expertise not possessed by any existing party.

The Association has extensive knowledge of the issues being litigated and has served as an *amicus curiae* participant in other cases affecting states' fish and wildlife management

---

[41] *See, e.g., Defenders of Wildlife v. Salazar*, 729 F. Supp. 2d. 1207 (D. Mont. 2010)*; Humane Soc'y of the U.S. v. Merriam,* Civ. No. 06-2922 (D. Minn. Feb. 1, 2007).
[42] Luther T. Munford, *When Does the Curiae Need An Amicus?*, 1 J. APP. PRAC. & PROCESS 279, 281 (1999).

authority.  Since 1969, the Association has participated in cases in federal and state courts

involving important issues affecting protection and management of fish and wildlife either as a

party, intervener, or *amicus curiae*.  Specifically, the Association has filed a number of *amicus*

*curiae* briefs in several courts.[43]  Because of its extensive knowledge of issues being litigated and

prior *amicus curiae* experience, the Association is in the best position to assist the Court in

resolving this case.

The Association has also adopted Best Management Practices ("BMPs") that help state

agencies "collect important information about wildlife and sustain healthy and diverse

populations."[44]  Over the past few years the Association's furbearer resources program has

implemented "research projects…for capturing [the] Gray Wolf.  The Association plans to

publish a BMP for this species in 2013."[45]  Thus, the Association's knowledge of wolf

conservation and management gained through its work on BMPs makes the Association's input

valuable to the Court.

### B.     The Association can explain the impact a potential holding might have on its state members.

The Association can assist the Court by explaining the impact that a relisting of the WGL

gray wolf will have on its state agency members.  The Association and its state agency members

understand the potential risk that the relisting of the WGL gray wolf will have on states and the

---

[43] The following is a list of some cases that the Association was permitted to participate as an *amicus curiae* party and in which it filed an *amicus* brief: *New Mexico State Game Comm'n v. Udall*, 410 F.2d 1197 (10th Cir. 1969), cert. denied, 396 U.S. 961 (1969);  *Akers v. Resor*, 339 F. Supp. 1375 (W.D. Tenn. 1972); *Kleppe v. New Mexico*, 426 U.S. 529 (1976); *Michigan United Conservation Clubs v. Lujan*, 949 F. 2d 202 (6th Cir. 1991).  In 1978, the Association's legal counsel argued before the United States Supreme Court for states' rights to charge license fees to hunt elk.  *See Baldwin v. Fish & Game Comm'n of Montana*, 436 U.S. 371 (1978) (affirming the states' right to charge license fees, including on federal property).
[44] Association of Fish & Wildlife Agencies, *2013-2015 Strategic Plan*, (2013), http://www.fishwildlife.org/files/AFWA-Strategic-Poster_FINAL-lowRes.pdf.
[45] *Id*. at 18.

overall process of delisting all other listed animals.[46]  Likewise, the Association's state agency members are in the best position to assess the impact of a relisting of the WGL gray wolf on the fish and wildlife within their borders.  The Association's strategic plan has a goal to "[p]romote policies, legislation, laws, regulations and legal strategies that enhance and protect the member agencies' ability to conserve and manage fish and wildlife resources."[47]  Furthermore, while "advocat[ing] for state, provincial and territorial authority for fish and wildlife conservation," the Association has a goal of enhancing conservation actions throughout the states to "[p]romote [an] improved endangered species policy and implementation."[48]  The Association strongly advocates that state fish and wildlife agencies are the appropriate entities to accept management of their resident species.

### C.    The Association can give a voice to its state members who are not parties to the litigation but who will be affected by the Court's decision.

Currently, no existing parties represent all 50 states' collaborative interests in the relisting of species impacts within state borders, and the since the Association is the voice of the state fish and wildlife management agencies, it can provide this unique public-interest-related perspective to the Court if allowed to participate as an *amicus curiae*.[49]  The Association has a mission to "[p]rotect state authority and support provincial and territorial authority for wildlife conservation; promote sound resource management; and strengthen federal, state, provincial, territorial and private cooperation in conserving fish and wildlife and their habitats in the public interest." *See* Resolution #2005-1 Promoting A National Initiative for Fish and Wildlife Health

---

[46] The ultimate goal of the ESA is the removal of a species from the Federal Lists of Endangered and Threatened Wildlife and Plants. The FWS monitors the status of listed species and once appropriate may either reclassify or delist species. *See* 16 U.S.C. § 1533(c).

[47] Association of Fish & Wildlife Agencies, *2013-2015 Strategic Plan*, (2013), http://www.fishwildlife.org/files/AFWA-Strategic-Poster_FINAL-lowRes.pdf.

[48] *Id.* at 1.

[49] An important purpose *amici* serve is "assisting [the Court] in a case of general public interest." *Funbus Sys., Inc. v. State of Cal. Pub. Util. Comm'n*, 801 F.2d at 1125.

(Attached as "Exhibit A").  The Association has long supported that "the maintenance of a healthy federal system has two aspects, the first that states be alert to the legitimate needs of their citizens…the second, that national government refrain from taking over activity that the states are competently performing lest the vitality of federalism be undermined." *See* Authority for Management of Fish and Resident Wildlife (Attached as "Exhibit B").  Specifically, the Association seeks to give voice to its members' unique perspective on FWS's designation and delisting of the WGL wolves, as well as its perspective on the potential for relisting were the Court to vacate the rule.  The Association's members support the FWS's action and urge the Court not to vacate the rule, as a decision to relist will affect every state's authority to manage the fish and wildlife within its borders.

> **D.     The Association's involvement in the litigation will not unduly burden the court.**

The Association will not submit a brief that simply echoes the arguments made by others. The Association will follow the existing briefing schedule and any modifications that the Court might set to accommodate *amicus curiae* participation, and it will abide by any restrictions this Court deems necessary to apply to *amicus curiae* participation.  The Association plans to submit a brief that discusses the issues that affect its state agency members.  Further, the Association's brief will complement the defendants' and intervening defendants' summary judgment briefs. The Association has reviewed defendants' brief to ensure that its brief avoids unnecessary repetition. This approach is consistent with the Federal Rules of Appellate Procedure's rule on *amicus curiae* briefs.[50]

---

[50] *See* Fed. R. App. P. 29(e).

## CONCLUSION

**WHEREFORE,** the Association respectfully requests that this Court allow it to

participate in this case as an *amicus curiae*, as it has an interest in the issues in this case and its

participation will aid the Court's decision in this case.

DATED: 12/11/2013

Respectfully submitted,

> */s/  M. Carol Bambery*
> M. Carol Bambery
> Michigan State Bar # 37915[51]
> General Counsel
> Association of Fish & Wildlife Agencies
> 444 N. Capitol Street, N.W., Suite 725
> Washington, D.C. 20001
> (202) 624-7890
> Email: cbambery@fishwildlife.org

> */s/ C. Parks Gilbert, III*
> C. Parks Gilbert, III
> Alabama State Bar # 2067-C45G
> c/o Association of Fish & Wildlife Agencies
> 444 N. Capitol Street, N.W., Suite 725
> Washington, D.C. 20001
> (202) 624-7890
> Email: parksgilbert@gmail.com

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was today served via the Court's CM/ECF

system on all counsel of record.

> */s/  M. Carol Bambery*
>
> M. Carol Bambery,
> Attorney for the Association of Fish
> & Wildlife Agencies

---

[51] Member, Bar of the U.S. District Court for the District of Columbia