## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| THE HUMANE SOCIETY OF THE UNITED STATES, et al., | |
| Plaintiffs, | |
| v. | Civil Action No. 13-00186 (BAH) |
| S.M.R. JEWELL, et al., | |
| Defendant, | |
| and | |
| HUNTER CONSERVATION COALITION, | |
| Defendant-Intervenor. | |

## HUNTER CONSERVATION COALITION'S CROSS-MOTION
## FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56 and Local Civil Rule 7, Hunter Conservation Coalition (HCC),[1] by and through their counsel, hereby cross-moves for summary judgment and seeks a denial of Plaintiffs' motion for summary judgment on all claims in Plaintiffs' Complaint.  HCC submits the following memorandum in support of that cross-motion and in opposition to Plaintiffs' motion for summary judgment.

---

[1] The Hunter Conservation Coalition consists of the U.S. Sportsmen's Alliance Foundation (USSAF), Safari Club International (SCI), the National Rifle Association (NRA), the Wisconsin Bear Hunters Association (WBHA), the Michigan United Conservation Clubs (MUCC), the Wisconsin Bowhunters Association (WBH), the Upper Peninsula Bear Houndsmen Association (UPBHA), the Michigan Hunting Dog Federation (MHDF), and the Rocky Mountain Elk Foundation (RMEF).

For the reasons stated in the attached Memorandum, HCC respectfully requests that the Court GRANT its Cross-Motion for Summary Judgment and DENY Plaintiffs' Motion for Summary Judgment.

Dated:  December 11, 2013

Respectfully Submitted,

/s/ Anna M. Seidman
Anna M. Seidman
D.C. Bar # 417091
Douglas S. Burdin
D.C. Bar # 434107
Safari Club International
501 2nd Street N.E.
Washington, D. C. 20002
Telephone: (202)-543-8733
Facsimile: (202)-543-1205
aseidman@safariclub.org
*Attorneys for Proposed Defendant-Intervenor*
*Safari Club International*


/s/Christopher A. Conte
Christopher A. Conte
D.C. Bar # 430480
NRA/ILA
11250 Waples Mill Rd., 5N
Fairfax, VA 22030
Telephone: (703) 267-1166
cconte@nrahq.org
*Attorneys for Proposed Defendant-Intervenor*
*National Rifle Association of America*


/s/ John I. Kittel
John I. Kittel
U.S.D.C. for D.C. Boar No. WI0030
Mazur & Kittel, PLLC
30665 Northwestern Hwy. Ste. 175
Farmington Hills, MI  48334
Tel: (248) 432-8000
Fax (248) 432-8010
jkittel@amzur-kittel.com
*Co-Counsel for Michigan Conservation Clubs and Rocky*
*Mountain Elk Foundation*

/s/ William P. Horn
James H. Lister
D.C. Bar # 447878
William P. Horn
D.C. Bar # 375666
Carissa D. Siebeneck
D.C. Bar # 1007526
Birch Horton Bittner and Cherot, PC
1155 Connecticut Avenue, NW
Suite 1200
Washington, DC  20036
Telephone: (202) 659-5800
Facsimile (202) 659-1027
whorn@dc.bhb.com
jlister@dc.bhb.com
csiebeneck@dc.bhb.com
*Attorneys for Proposed Defendant-*
*Intervenors:  U.S. Sportsmen's Alliance*
*Foundation; Wisconsin Bear Hunters*
*Association; Michigan United*
*Conservation Clubs; Wisconsin*
*Bowhunters Association; Upper*
*Peninsula Bear Houndsmen*
*Association; Michigan Hunting Dog*
*Federation; and Rocky Mountain Elk*
*Foundation*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| THE HUMANE SOCIETY OF THE UNITED STATES, et al., | |
| | Civil Action No. 13-00186 (BAH) |
| Plaintiffs, | |
| v. | |
| S.M.R. JEWELL, et al., | |
| Defendant, | |
| and | |
| HUNTER CONSERVATION COALITION, | |
| Defendant-Intervenors. | |

**HUNTER CONSERVATION COALITION'S MEMORANDUM
IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
AND CROSS-MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................... iii

INTRODUCTION AND BACKGROUND ................................................... 2

    A.    INTEREST OF HCC MEMBERS IN THIS CASE ...................... 2

    B.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY .................. 4

STANDARD OF REVIEW ......................................................................... 4

ARGUMENT ............................................................................................... 4

I.    ARGUMENTS IN SUPPORT OF HCC'S CROSS-MOTION AND IN
    OPPOSITION TO PLAINTIFFS' MOTION .................................... 4

    A.    FWS PROPERLY CONSTRUED AND APPLIED THE DISTINCT
        POPULATION SEGMENT AND SIGNIFICANT PORTION OF
        RANGE PROVISIONS OF ESA .................................................. 4

        1.    The Historic Range and Current Range Methods for Applying
            the Significant Portion of Range Analysis Reach the Same
            Results Under the Facts of this Case ...................................... 4

        2.    Plaintiffs Fail to Identify any Endangered or Threatened SPRs
            within the DPS and are not Entitled to Consideration of
            Potential SPRs Outside the DPS ............................................ 6

        3.    FWS Properly Recognized the WGL DPS ................................ 8

        4.    The DPS Boundaries Are a Valid Exercise of Agency Line-
            Drawing .................................................................................. 13

    B.    FWS PROPERLY DECIDED NOT TO DESIGNATE CANIS
        LYCAON AS A SEPARATE SPECIES FROM CANIS LUPUS IN
        THE 2011 DELISTING .............................................................. 14

    C.    FWS'S DECISION TO DELIST WAS NOT BASED ON
        POLITICAL INTERFERENCE .................................................. 21

        1.    Timeline of Events Regarding WGL DPS Delisting ................ 22

            a.    FWS Decides Previous WGL Wolf Delisting Cases ............ 22

            b.    FWS Receives Petition to Delist and Issues 90-Day
                "May Be Warranted" Findings ...................................... 23

            c.    FWS Receives Public Comments, Meets with Senator
                Klobuchar, and Issues 12-Month Findings Granting
                Petitions and Proposed Delisting Rules as Statutory
                Deadlines Arrive ........................................................ 23

            d.    FWS Takes Two More Rounds of Comments on
                Proposed Rule and Issues Final Rule ........................... 24

2.      **The Timeline Demonstrates that FWS Announced a Tentative Timetable for Response to Petitions that Addressed Its Statutory Deadline Obligations** ................................................. 25

D.      **FWS KNEW PRIOR TO DELISTING THAT STATE REGULATED HARVESTS WERE ALWAYS A LIKELY MANAGEMENT STRATEGY** .................................................................................... 27

E.      **SOCIAL TOLERANCE, ACHIEVED THROUGH DELISTING, WILL PLAY AN ESSENTIAL ROLE IN THE LONG-TERM CONSERVATION OF WOLVES** ................................................. 31

II.      **ARGUMENTS IN OPPOSITION TO PLAINTIFFS' MOTION** .............................. 37

A.      **HSUS'S INJURY AND REDRESSABIITY ALLEGATIONS ARE TOO CONJECTURAL TO SUPPORT STANDING** ....................................... 37

B.      **ANY REMEDY THAT THIS COURT ORDERS SHOULD AVOID HARMFUL AND NEEDLESS DISRUPTIONS TO RECOVERED WOLF MANAGEMENT IN THE WGL REGION** ......................................... 41

**CONCLUSION** ................................................................................................................... 42

## TABLE OF AUTHORITIES

**FEDERAL COURT CASES**                                              **PAGE(S)**

*Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*
    988 F.2d 146 (D.C. Cir. 1993) ......................................................................42

*Baltimore Gas & Elec. Co. v. Natural Res. Def. Council*
    462 U.S. 87 (1983)..........................................................................................15

*Bldg. Indus. Ass'n of Superior Cal. v. Norton*
    247 F.3d 1241 (D.C. Cir. 2001) ....................................................................21

*Biodiversity Legal Found. v. Babbitt*
    943 F.Supp. 23 (D.D.C. 1996) ......................................................................28

*Chevron, U.S.A. v. Natural Res. Def. Council*
    467 U.S. 837 (1984).............................................................................5, 10, 22

*Daingerfield Island Protective Soc'y v. Babbitt*
    823 F. Supp. 950 (D.D.C. 1993) ...................................................................20

*Defenders of Wildlife v. Hall*
    807 F. Supp. 2d 97 (D. Mont. 2011)..............................................................21

*Defenders of Wildlife v. Norton*
    239 F. Supp. 2d 9 (D.D.C. 2002) ....................................................................8

*Defenders of Wildlife v. U.S. Dep't of the Interior*
    354 F. Supp. 2d 1156 (D. Or. 2005) ..............................................................22

*Florida Power & Light Co. v. Lorion*
    470 U.S. 729 (1985)......................................................................................20

*Fox Television Stations v. FCC*
    280 F.3d 1027 (D.C. Cir. 2002) ....................................................................42

*Grocery Mfrs. Ass'n v. Envtl. Prot Agency*
    693 F.3d 169 (D.C. Cir. 2012) ......................................................................37

*Humane Soc'y of U.S. v. Kempthorne*
    481 F. Supp. 2d 53 (D.D.C. 2006) ................................................................32

*Humane Soc'y v. Kempthorne*
    579 F. Supp. 2d 7 (D.D.C. 2008) .............................................................22, 42

*Lujan v. Defenders of Wildlife*
    504 U.S. 555 (1992)......................................................................................37

*NAACP v. Sec. of Housing & Urban Dev.,*
    817 F.2d 149 (1st Cir. 1987)................................................................................41

*Nat'l. Wildlife Fed'n. v. Norton*
    306 F.Supp.2d 920 (E.D. Cal. 2004)...................................................................19

*Nat'l Wildlife Fed'n. v. Norton*
    386 F. Supp. 2d 553, 564-65 (D. Vt. 2005) ..............................................10, 22

*Oceana, Inc. v. Locke*
    725 F Supp. 2d 46 (D.D.C. 2010) ......................................................................21

*SunCom Mobile and Data Inc., v. FCC,*
    87 F.3d 1386 (D.C. Cir. 1996) ...........................................................................37

*Sw. Ctr. for Biological Diversity*
    215 F.3d 58 (D.C. Cir. 2000) ..............................................................................21

*Wyoming v. U.S. Dept. of the Interior*
    2010 WL 4814950 (D. Wyo. Nov. 18, 2010) ....................................................32

## STATUTES

16 U.S.C. § 706..................................................................................................................41

16 U.S.C. § 1538................................................................................................................11

16 U.S.C. § 1531 ...............................................................................................................11

16 U.S.C. § 1532........................................................................................5, 7, 9, 11, 13

16 U.S.C. §1533................................................................................................... *passim*

## FEDERAL REGISTER REFERENCES

43 Fed. Reg. 9607 (Mar. 9, 1978)......................................................................................8

68 Fed. Reg. 15804 (Apr. 1, 2003) ...................................................................................22

72 Fed. Reg. 6052 (Feb. 8, 2007) ...............................................................................10, 22

73 Fed. Reg. 10514 (Feb. 27, 2008) .................................................................................32

74 Fed. Reg. 15070 (Apr. 2, 2009) ...................................................................................22

75 Fed. Reg. 17352 (April 6, 2010) ..................................................................................18

75 Fed. Reg. 55730 (Sept. 14, 2010) ...........................................................................................23

76 Fed. Reg. 26086 (May 5, 2011) .......................................................................3, 15, 28, 38, 39

76 Fed. Reg. 53379 (Aug. 26, 2011)...........................................................................................15

76 Fed. Reg. 81666 (Dec. 28, 2011) ................................................................................. *passim*

77 Fed. Reg. 55530 (Sept. 10, 2012) ...........................................................................................33

## **RULES**

Fed. R. Civ. P. 56.........................................................................................................................37

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| THE HUMANE SOCIETY OF THE UNITED STATES, et al., | |
| Plaintiffs, | |
| v. | Civil Action No. 13-00186 (BAH) |
| S.M.R. JEWELL, et al., | |
| Defendant, | |
| and | |
| HUNTER CONSERVATION COALITION, | |
| Defendant-Intervenors. | |

**HUNTER CONSERVATION COALITION'S MEMORANDUM
IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
AND CROSS-MOTION FOR SUMMARY JUDGMENT**

Members of the Hunter Conservation Coalition ("HCC"),[1] by and through their counsel, hereby submit their Memorandum in Opposition to Plaintiffs' Motion for Summary Judgment and in Support of the HCC's Cross-Motion for Summary Judgment. For the reasons stated herein, the HCC respectfully requests that the Court deny Plaintiffs' motion and grant the HCC's cross-motion, and thereby affirm the decision of the U.S. Fish and Wildlife Service to delist the recovered wolf population making up the Western Great Lake District Population Segment

---

[1]  The Hunter Conservation Coalition consists of the U.S. Sportsmen's Alliance Foundation (USSAF), Safari Club International (SCI), the National Rifle Association of America (NRA), the Wisconsin Bear Hunters Association (WBHA), the Michigan United Conservation Clubs (MUCC), the Wisconsin Bowhunters Association (WBH), the Upper Peninsula Bear Houndsmen Association (UPBHA), the Michigan Hunting Dog Federation (MHDF), and the Rocky Mountain Elk Foundation (RMEF).

1

("WGL DPS"). [2]   As described below, the Defendants and Defendant-Intervenors are entitled to prevail in this case because:

(1) Contrary to HSUS's contentions, the U.S. Fish and Wildlife Service ("FWS") properly applied the distinct populations segment ("DPS") and "significant portion of range" provisions of the Endangered Species Act.

(2) The FWS's decision not to designate *canis lycaon* as a separate species from *canis lupus* in the WGL states was correct and supported by the administrative record.

(3) FWS's delisting decision was not based on political interference, as HSUS posits, but was the product of proper agency deliberation and rulemaking.

(4) FWS contemplated prior to delisting that state-regulated harvests were a likely management strategy.

(5) Social tolerance of wolves, achieved through delisting, will play an important role in long-term wolf management.

(6) HSUS fails to establish standing, as its injury and redressability allegations are too conjectural.

## INTRODUCTION AND BACKGROUND

A.   **INTEREST OF HCC MEMBERS IN THIS CASE.**

The HCC members participating here as defendant-intervenors have intense interests in this action and the management of wolves in the Great Lakes region.  In their Motion to Intervene (ECF Doc. 11), which this Court granted (Minute Order of May 7, 2013), the HCC has set forth in detail the interests of its member groups.  The HCC includes national hunters' groups (Safari Club International and the U.S. Sportsmen's Alliance Foundation) a national shooting sports organization (National Rifle Association of America), a national organization focused on hunting and conservation of elk (Rocky Mountain Elk Foundation, which has members and conducts conservation activities in the WGL region), state or local associations whose members

---

[2]    Plaintiffs, Humane Society of the United States, *et al.,* are sometimes referred to herein as "HUSU."

use dogs in hunting other species and need the ability to protect their dogs from wolves (Wisconsin Bear Hunters Association, Upper Peninsula Bear Houndsmen Association, and Michigan Hunting Dog Federation), an association with general local conservation interests in the WGL area (Michigan United Conservation Clubs), and another state level hunting association (Wisconsin Bowhunters Association). The various hunting associations desire that wolf populations be properly managed so as not to threaten ungulate (e.g. deer and elk) populations and not to interfere with the safety and recreational pursuits of the hunters, their families and their hunting dog companions. Members of the hunting organizations also seek to hunt and sustainably conserve wolf populations, as regulated by state fish and wildlife authorities.

In addition, several of the HCC members, including USSAF and SCI, filed petitions to delist the WGL wolves that were granted by FWS in a May 5, 2011 decision, 76 Fed. Reg. 26,086 *et seq.* (May 5, 2011) ("*Proposed Delisting Rule*"), that FWS then implemented by adopting the Final Rule to delist the WGL wolf populations. *See Final Rule Revising the Listing of the Gray Wolf (Canis lupus) in the Western Great Lakes*, 76 Fed. Reg. 81,666 (Dec. 28, 2011) ("*Delisting Rule*"). The Delisting Rule recognized and removed from the endangered species list the wolves of the WGL DPS. Thus the HCC members were prevailing parties in the rulemaking proceedings before the agency under review here.

**B.**     **Factual Background and Procedural History**

The HCC hereby adopts the factual background and procedural history set forth in Federal Defendants' Memorandum of Points and Authorities in Support of Cross-Motion for

Summary Judgment and in Opposition to Plaintiffs' Motion for Summary Judgment (ECF Doc. 27) at 2-8 ("Fed. Mem.").[3]

## STANDARD OF REVIEW

The HCC adopts the standard of review stated by FWS.  Fed. Mem. at 12-13.

## ARGUMENT

I.   <u>ARGUMENTS IN SUPPORT OF HCC'S CROSS-MOTION AND IN OPPOSITION TO PLAINTIFFS' MOTION</u>

A.   **FWS PROPERLY CONSTRUED AND APPLIED THE DISTINCT POPULATION SEGMENT AND SIGNIFICANT PORTION OF RANGE PROVISIONS OF THE ESA.**

Federal Defendants' brief thoroughly covers most issues relating to the recognition of the WGL DPS and its delisting, as well as the "significant portion of range" issues that are intertwined with the DPS recognition issues.  Fed. Mem. at 14-25 (ECF Doc. 27).  The HCC here steps though aspects of the issues that benefit from additional discussion separate and apart from FWS's discussion.

1.   **The Historic Range and Current Range Methods for Applying the Significant Portion of Range Analysis Reach the Same Results Under the Facts of this Case.**

HSUS claims that FWS should have used an "historic range" test when determining if any given geographic area is a "significant portion of the range" ("SPR") of the species (here a DPS[4]) being considered for listing or delisting.  Memorandum of Points and Authorities in

---

[3]     Federal Defendants clearly and accurately set forth the long and complex history of the listing chronology of the WGL gray wolves with one exception.  Federal Defendants' incorrectly suggest that the  2007 Rule downlisted rather than delisted the WGL DPS of gray wolves.  Fed. Mem at 7.   The adjoining portion of the federal brief makes it clear that the reference to downlisting was inadvertent and that FWS recognized that the 2007 order was in fact a delisting that was later vacated on judicial review.

[4]     The ESA defines a "species" to refer to "species," "subspecies" or "distinct population segments (DPS)[.]" 16 U.S.C. §1632(16).  So a DPS is a narrowly-defined "species" under the

Support of Plaintiffs' Motion for Summary Judgment ("Pl. Mem.") at 21.  Under the ESA, FWS must delist a species if it is not endangered or threatened in either "all or a significant portion of its range."  16 U.S.C. §§ 1532(6) and (20), 1533(a)(1).[5]  Thus FWS must delist a species if it faces threats only in non-significant portions of its range.  *See* § 1532(6) and (20).  The current-versus-historical range issue goes to whether FWS evaluates only areas that contain present wolf occupation as potential endangered or threatened SPRs, or goes further and evaluates unoccupied areas that might in the past have harbored wolves.  HSUS advocates use of *historic* range.  Pl. Mem. at 21.  FWS reads the statute as calling for examination of *current* range.  *Delisting Rule*, 76 Fed. Reg. 81666, 81722 (Dec. 28, 2011); Fed. Mem. at 27.  The SPR language in the ESA does not specify whether the current or historic range test is used to evaluate SPR, so FWS has discretion to fill that statutory gap. 16 U.S.C. § 1532(6); *see Chevron, U.S.A. v. Natural Res. Def. Council*, 467 U.S. 837, 843 (1984) ("*Chevron*"); Fed. Mem. at 27.

The historic versus current range issue evaporates, however, when one reviews the final WGL delisting rule and sees the SPR analysis that FWS actually conducted.  In analyzing whether there were any endangered or threatened SPRs within the WGL, FWS cautiously examined whether there were significant swaths of "unoccupied" habitat within the WGL DPS boundaries that were suitable for wolf re-habitation.  *Delisting Rule*, 76 Fed. Reg. at 81722-23.  Because FWS looked for "unoccupied" but suitable habitat that might constitute a SPR, it did consider areas in which the wolves do not presently exist, and so, it did consider historic range as well as current range in conducting its SPR search.  *See id*.  Thus, on the historic-versus-current-

---

Act, and references in the Act to "species" are references to the "DPS" when a DPS has been recognized.  As Federal Defendants have informed this Court (Fed. Mem. at 2), in this case, the species at issue is a DPS.

[5]      There are alternative interpretations of the ESA that impose a less restrictive standard for delisting, but they need not be considered here as there are no unrecovered SPRs within the WGL DPS.

range issue, FWS did exactly what HSUS says FWS should have done – look for areas where wolves have not yet recovered, but might recover.  In this case, the historic and current range tests merged because FWS only excluded from the SPR search geographic areas in the WGL DPS that were both presently unoccupied by wolves and unsuitable for future occupation by wolves.  *See id.*  Clearly, unsuitable areas within the WGL DPS (e.g. non-forested road-filled lands) cannot be a SPR, because unsuitable areas cannot provide habitat for the wolf.

    **2.**    **HSUS Fails To Identify Any Endangered or Threatened SPRs Within the DPS and Are Not Entitled to Consideration of Potential SPRs Outside the DPS.**

Tellingly, HSUS in its brief does not identify any SPRs within the WGL DPS in which they claim wolves remain endangered or threatened.  HSUS skirts around this issue by suggesting that there is suitable unoccupied wolf territory in various extremely broad areas of the United States, identified by HSUS as the "Northwest," the "Northeast," the "Pacific Northwest," the "Dakotas," "North Dakota," Michigan," "Oregon" and "Utah."  Pl. Mem. at 19-20.  However, "Michigan" is the only one of those broad areas that is wholly within the WGL DPS, and HSUS does not describe where in Michigan any suitable unoccupied habitat might be.  *Delisting Rule*, 76 Fed. Reg. at 81671.  Parts of the Dakotas are within the DPS, *see id.*, but HSUS does not specify which parts they are addressing.  Pl. Mem. at 19-20.  The remaining areas of alleged suitable unrecovered habitat are *outside* the WGL DPS and so, as discussed below, cannot be SPRs of the DPS.  In addition to failing to identify suitable areas of unrecovered habitat within the WGL DPS, HSUS stops well short of arguing that any of those areas within the WGL DPS are "significant" enough to rise to the level of being a SPR.  *Id*.  Nor could HSUS make any such argument.  In conducting its search for endangered or threatened SPRs within the WGL DPS, FWS found that that almost all areas within the WGL DPS outside

the core recovery areas in Minnesota, Wisconsin, and Michigan were "unsuitable" for wolf occupation, due primarily to high road densities. *Delisting Rule*, 76 Fed. Reg. at 81722-23. FWS found one patch of potentially suitable habitat in the Northern Lower Peninsula of Michigan that was too small and fragmented to support a viable self-sustaining wolf population, and for that and other reasons did not rise to the level of being "significant," and so was not an SPR. *Id.* HSUS did not challenge that fact finding in its brief.

This leaves HSUS with one remaining SPR argument – that FWS should have looked outside the boundaries of the WGL DPS for suitable habitat in other areas that might constitute SPRs. Pl. Mem. at 19-20. HSUS thus awkwardly claims that the Northwest, the Northeast, the Pacific Northwest, Utah, and Oregon might constitute "significant portions of the range" of the WGL DPS of wolves, even though those areas are nowhere near the Western Great Lakes. *See id*. However, FWS solidly rebuts this argument by showing that the ESA defines a DPS as a narrow limited scope "species." *See* Fed. Mem. at 18-19; 16 U.S.C. § 1532(16) (supplying three definitions of "species" that FWS may use, one of which is "a distinct population segment"). Thus the DPS is the "species" for purposes of determining whether the "species" is endangered or threatened in "all or a significant portion of its range." 16 U.S.C. §§ 1532(6) and (20), 1533(a)(1). Accordingly any significant portion of the range of a species, including a DPS defined by geographic boundaries, must be located within those same geographic boundaries that define and limit the DPS. *See* Fed. Mem. at 18-19; *Delisting Rule,* 76 Fed. Reg. at 81722 (explaining areas considered in SPR analysis). Consequently the agency and now this Court must disregard non-sequitur claims that lands outside the DPS geographic boundaries are a significant portion of the range of the DPS. The Canada lynx decision cited by HSUS in its brief involved the need to search for SPRs *within* a very broad DPS covering the "contiguous United

States," and so supports FWS's position, not HSUS's.  *See* Fed. Mem. at 31 (discussing *Defenders of Wildlife v. Norton*, 239 F.Supp.2d 9, 16, 21 (D.D.C. 2002)).

In summary, HSUS does not brief any argument that there are SPRs within the WGL DPS in which wolves remain threatened or endangered.  Further, HSUS does not brief any argument that the WGL DPS should have been drawn with broader boundaries that include additional areas of suitable habitat that might qualify as endangered or threatened SPRs.  To the contrary, HSUS advocates that the DPS boundaries be *narrowed* to encompass only the "core areas" in Minnesota, Wisconsin, and the Upper Peninsula of Michigan where wolves have recovered.  Pl. Mem. at 30.  Finally, HSUS incorrectly and illogically asserts that lands outside a DPS can be a SPR of the DPS.  This Court should deny each of HSUS's unsupported and/or unsupportable claims.

### 3.    <u>FWS Properly Recognized the WGL DPS</u>.

This leads to HSUS's primary argument – that FWS should not have recognized the WGL DPS in the first place and should have conducted the DPS analysis with respect to the entire Lower 48 wolf population, in which case it would have had to consider areas outside the Western Great Lakes region as potential SPRs.  Pl. Mem. at 18-19, 25-29.  To advance this argument, HSUS contends that FWS may not simultaneously recognize a DPS from within a broader listed entity (e.g. a taxon-wide endangered listing) and delist that DPS.  *Id*. at 25-29.  Federal Defendants' brief provides a thorough response.  It demonstrates first that the wolf population making up the WGL DPS is the same population as the Minnesota regional population that FWS listed in 1978 as "threatened" (unlike other wolves in the Lower 48 states, which FWS at that time listed separately as "endangered").  Fed. Mem. at 15-16; 43 Fed. Reg. 9607 (Mar. 9, 1978).  That original regional listing occurred before the enactment of the DPS

provision of the ESA that formalized the concept of regional populations being considered for listing and delisting, P.L. 95-632, 92 Stat. 3751 *et seq.*, §2 (Nov. 10, 1978), and before the Minnesota population expanded into Wisconsin and Michigan, which did not have wolves in 1978.  Thus the Court need not reach HSUS's argument that there must be some waiting period between recognition of a DPS and the delisting of that DPS.  The 33 years that passed from 1978 to 2011 satisfies any waiting period that HSUS might read into the ESA, although no waiting period appears in the ESA.

But if this Court does choose to consider the issue of simultaneous DPS recognition and delisting, the text of the ESA, the DPS Policy, and Judge Friedman's 2008 decision in the judicial review of the 2007 WGL delisting all support FWS's decision.  The ESA listing provision defining a DPS as a species does not differentiate in any way between using the DPS tool to list and using the DPS tool to delist.  16 U.S.C. §§ 1532(6), 1533(a)(1).  It is silent, and so leaves FWS discretion to fill gaps, and certainly imposes no prohibitions.  Meanwhile, the judicially affirmed 1996 DPS Policy, declares specifically that it applies equally to recognition of DPS both for purposes of listing and for purposes of delisting.  *Policy Regarding the Recognition of Distinct Vertebrate Population Segments under the Endangered Species Act,* 61 Fed. Reg. 4722, 4725 (FWS and NMFS, Feb. 7, 1996) ("DPS Policy") (The DPS Policy "guides the evaluation of distinct vertebrate population segments for the purposes of listing, delisting, or reclassifying under the Act" in order to achieve "[m]ore uniform treatment of DPS's").[6]

Even HSUS does not question that FWS can simultaneously recognize a DPS of a locally vulnerable population and list that DPS, while leaving the remaining non-threatened

---

[6]     As FWS notes, the 1996 DPS Policy has been judicially affirmed and found to be entitled to *Chevron* deference as the statutory term "distinct population segment" is undefined in the ESA.  Fed. Mem. at 4 (citing *Nw. Ecosystem Alliance v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1144 (9th Cir. 2007)).

populations outside the DPS unlisted.  Nothing in the ESA itself or the DPS Policy requires a waiting period between recognition of a DPS and the listing or delisting of the population within. So applying the listing/delisting parallelism principle in the DPS Policy, FWS is equally free to take the mirror image action, which is to simultaneously recognize a regionally recovered population as a DPS within a broader listed population and delist that DPS, while leaving the remaining arguably threatened populations outside the DPS listed.  As FWS notes in its brief, a reviewing court striking down (for other reasons) the 2003 wolf downlisting of Eastern Wolves from endangered to threatened status specifically held that FWS could recognize and delist a recovered DPS while leaving "a non-DPS remnant" listed.  Fed. Mem. at 24, n. 14 (citing *Nat'l Wildlife Fed'n v. Norton*, 386 F.Supp.2d 553, 565 (D. Vt. 2005).  As FWS also explains, Judge Friedman's 2008 opinion striking down the 2007 WGL delisting found the ESA was ambiguous regarding simultaneous recognition of a DPS and delisting, so FWS is free to reach any reasonable conclusion in applying the statute, and its interpretation is due deference.  Fed. Mem. at 18 (citing *HSUS v. Kempthorne*, 579 F.Supp.2d 7, 19 (D.D.C. 2008); *Chevron*, 467 U.S. at 843).[7]

Unreasonable consequences would follow if HSUS's interpretation is adopted and a DPS could be recognized without a waiting period for purposes of listing a regionally threatened population but not for purposes of delisting a regionally recovered population.  In the case of a regional population recovery where other populations of the taxon arguably struggling elsewhere, the regionally recovered population would then retain protections of the ESA that preclude state management, no matter how high the regional population rose, and no matter how

---

[7]    The 2007 action was a delisting.  72 Fed. Reg. 6052 (Feb. 8, 2007).  The FWS brief at one point inadvertently refers to that action as a downlisting of wolves from endangered to threatened status, but, as the next few sentences of the federal brief make clear, it was actually a delisting.  Fed. Mem. at 7-8.

much the inability to apply ordinary management tools to an abundant, yet ESA-listed population harms economic and recreational pursuits in the area.  16 U.S.C. §§ 1532(19), 1538(a)(1); *see* AR 630 at 018605A-018622A (summarizing impacts on citizens and other wolf damage management issues in Minnesota). Delisting would hinge on the fortuity of whether unrelated recovery efforts occurring far away succeed or fail. *See* Pl. Mem. at 19-20.   Such an interpretation would also violate the ESA which places the same obligation upon the FWS to delist a species (including a DPS) when it no longer qualifies for endangered (or threatened) status as it imposes on the FWS to list a species that qualifies for federally protected status.  16 U.S.C. § 1533(a)(1).  By the same token, such an interpretation would unreasonably favor citizens who invoke their statutory right to file a listing petition over citizens, such as the HCC organizations, who have invoked their equal statutory right to file a delisting petition. 16 U.S.C. § 1533(b)(3)(A) (stating right to petition to "add or remove" species, including DPSs, from the endangered and threatened lists).

Worse, consider the incentives at play at the earlier point in time when the regional population was endangered, and recovery efforts were just beginning.  If state officials and private citizens such as landowners knew that recovery of the regional population in their area could never result in delisting, unless other regional populations of the same taxon also recovered (which is what HSUS advocates here), they would have little or no incentive to assist in recovery efforts.  This is because the ultimate reward of delisting following a successful population recovery would then hinge on events beyond their control concerning other far-away populations.   Because FWS's resources are finite, state and private support are "key" to recovery.  16 U.S.C. § 1531(a)(5) (declaring in the ESA's opening section that "encouraging the

States and other interested parties … [to engage in recovery efforts] is a key to … better safeguarding for the benefit of all citizens, the Nation's heritage in wildlife and plants.").

In considering these policy consequences, it is important to remember that a DPS cannot be recognized under the DPS Policy unless the population making up the DPS is "discrete" from other populations of the same taxon. DPS Policy, 61 Fed. Reg. at 4725. Discrete means "markedly separated from other populations of the same taxon as a consequence of physical, physiological, ecological, or behavioral factors." *Id.* The most common separation factor is physical separation, and that is the controlling factor here, because FWS found that the wolves of the WGL DPS are separated by hundreds of miles of unsuitable habitat from the wolves of the Northern Rocky Mountains, the nearest substantial population outside the WGL DPS within the United States. *Delisting Rule,* 76 Fed. Reg. at 81671-72.[8] Arguments that a species cannot be delisted anywhere unless it is recovered everywhere may make marginal sense where there is one contiguous population so that areas where the species is doing better can support adjacent connected areas where the species is doing poorly. The argument that a species cannot be delisted anywhere unless it is recovered everywhere makes no sense, however, when as here the discreteness element necessary to recognize a DPS is satisfied, because then the recovered and unrecovered populations are effectively unconnected and the delisting of the recovered population is therefore highly unlikely to impact the recovery prospects of the unrecovered population. This highlights the illogic of HSUS's heated rhetoric about FWS being on a campaign to encircle recovered wolf populations by means of regional delisting so it can prevent wolf recovery in one region from spreading to other areas. There is no significant suitable wolf

---

[8]      Although not a physical barrier, international boundaries also qualify as DPS boundaries under the DPS policy, because international boundaries separate areas with different national-level regulatory policies. *DPS Policy*, 61 Fed. Reg. at 4725. The Canadian boundary line is the thus the northern border of the WGL DPS. Final WGL *Delisting Rule*, 76 Fed. Reg. at 81672.

habitat or struggling unrecovered wolf populations adjacent to the WGL DPS.  *Delisting Rule,* 76 Fed. Reg. at 81671-72 (WGL wolves would have to cross 600 miles of "largely … unsuitable habitat" to reach the Rocky Mountain wolves).  Future FWS decisions in other proceedings on whether it must engage in recovery of wolves outside of the WGL DPS have nothing to do with the question of whether the discrete wolf population of the Western Great Lakes qualifies for delisting status.  Consequently, delisting in Minnesota, Wisconsin, and Michigan is not going to harm wolf recovery in other non-adjacent regions, *e.g.* Oregon.  Delisting the regionally recovered discrete population in Minnesota, Wisconsin, and Michigan without waiting for proof of recovery in Oregon was not arbitrary and capricious.

In short, the ability to delist a regionally recovered population as a DPS is as essential to the effective administration of the ESA as is the ability to list a regionally endangered or threatened population as a DPS.

### 4.        The DPS Boundaries Are a Valid Exercise of Agency Line-Drawing

HSUS's final alternative argument regarding DPS issues is that FWS drew the DPS boundaries too broadly by including wolf dispersal territory surrounding the core recovery areas in the Western Great Lakes states and should have limited any delisting to the core recovery areas.  Pl. Mem. at 29.  The answer to HSUS's claim is the discreteness element for recognizing a DPS under the DPS Policy discussed above.  A DPS is a "*distinct* population segment." 16 U.S.C. § 1532(6) (emphasis added).  This is why the DPS Policy requires that the population making up a DPS be "discrete" (i.e. "markedly separate") from other populations of the same taxon. 61 Fed. Reg. at 4725.  Wolves dispersing from the core recovery areas of the WGL states into nearby portions of far eastern North Dakota or other outlying regions in the WGL might return to the core recovery areas and thus, of these core areas, do not remain separate and

discrete from the WGL population.  *Delisting Rule*, 76 Fed. Reg. at 81764.  By contrast, FWS reasonably found that wolves that defy the odds and travel from the WGL DPS through hundreds of miles of unsuitable territory to reach the Northern Rocky Mountain population have indeed separated themselves from the DPS.  *Id.*

Thus FWS drew a boundary line around the WGL DPS, largely based on interstate highways and rivers and encompassing portions of states surrounding Minnesota, Wisconsin, and Michigan, within reasonable dispersal distances from the WGL core areas.  *Id.* at 81670-74. This was a scientifically-based agency line-drawing determination, that deserves due deference. Because FWS correctly applied the discreteness element of the DPS Policy, HSUS's argument for narrower DPS boundaries limited to the core recovery areas was effectively a plea for waiver of the discreteness element of DPS Policy, which is critical to implementation of the term "distinct" in the statutory phrase "distinct population segment."  Whether or not HSUS made such a waiver request, which is unclear, rejection of such relief was not arbitrary and capricious.

**B.   FWS PROPERLY DECIDED NOT TO DESIGNATE CANIS LYCAON AS A SEPARATE SPECIES FROM CANIS LUPUS IN THE 2011 DELISTING RULE**

The following section will elaborate on the taxonomic issue of the *Canis lupus* versus *Canis lycaon* debate that was part of the rulemaking process.  This section will provide further detail on the genetics issue briefly introduced in Federal Defendants' brief (*See* Fed. Mem. Sect. V, p. 37) – with which defendant-intervenors wholly agree – and will more fully describe the genetic evidence supplied to FWS by those who petitioned FWS for delisting and by independent scientists and peer reviewers of the Delisting Rule.

The genetics issue was an intensely factual dispute in which the defendant-intervenors and amicus (who were petitioners for delisting before FWS) and plaintiffs (who commented in opposition to delisting) presented their own sides of the dispute.  Several defendant-intervenors

14

submitted substantial scientific evidence to the agency during this process.    After initially proposing a two-species finding in its Proposed Delisting Rule, FWS ultimately decided, based on the Administrative Record and the weight of the scientific data, that the best available science did not support the recognition of *Canis lycaon* in the WGL states at the time of the 2011 Final Rule, agreeing with defendant-intervenors that there was one species inhabiting the WGL states. As Federal Defendants noted, the Court must give great deference to an agency decision that is not arbitrary and capricious, particularly if that decision involves consideration of evidence "at the frontiers of science." *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council*, 462 U.S. 87, 103 (1983); Fed. Mem. at 13.

During the rulemaking process of the Delisting Rule, FWS held two public comment periods seeking relevant scientific information about the taxonomic information of the WGL wolf population.   AR 391; 76 Fed. Reg. 26086 (May 5, 2011); AR 504; 76 Fed. Reg. 53379, 53379 (Aug. 26, 2011) ("We seek information, data, and comments from the public with respect to new information relevant to the taxonomy of wolves in North America.").   A summary of comments received addressing the taxonomy of *Canis lupus* and *Canis lycaon* in the Administrative Record show several scientific viewpoints that agree that 1) there is one cohesive population of wolves in the WGL states with mixed ancestry, and 2) the degree of doubt and lack of scientific consensus that *Canis lycaon* is actually a separate species from *Canis lupus* makes taxonomic revision premature at this stage.   AR 517 at 012512A.

HCC member and delisting petitioner USSAF presented an independent expert opinion by wildlife geneticist Dr. Lisette Waits of the University of Idaho with its July 5, 2011 comments on the proposed rule.   The declaration of Dr. Waits is part of the AR and available at http://www.regulations.gov/#!documentDetail;D=FWS-R3-ES-2011-0029-0630;   ID:  FWS-R3-

ES-2011-0029-0630 ("Waits Decl."). Her supporting declaration analyzed the scientific literature, evaluated the genetic evidence, and concluded that the WGL wolf population was a "single genetic group" that could not be split into separate "lupus" and "lycaon" units for management under the ESA. Waits Decl. at 8.

HCC member and delisting petitioner Safari Club International submitted the declaration of Dr. Matthew Cronin, Research Associate Professor of Animal Genetics at the University of Alaska, Fairbanks, who questioned the basis for FWS's proposed two-species determination and FWS's failure to mention the significant vonHoldt article that directly disputed FWS's taxonomic findings in the Proposed Rule. *See* SCI comments at 5-6, *available at* http://www.regulations.gov/#!documentDetail;D=FWS-R3-ES-2011-0029-0622; ID: FWS-R3-ES-2011-0029-0622 ("SCI Comments July 5, 2011").

Another petitioner for delisting, and now defendant-intervenor, the State of Wisconsin DNR submitted information documenting that "the best available science suggests that the eastern wolf occurs in a relatively pure form only in and around areas of southern Ontario or southern Quebec," AR 630 at 018838A, and noting that "[w]hile the wolf population in the Western Great Lakes is admixed, for practical and delisting purposes, they can be delisted as a DPS of gray wolves." AR 630 at 018839A.

The evidence presented by petitioners/defendant-intervenors that the WGL wolves are a single, homogeneous group with slightly varying genetics across the region is consistent with the determinations of independently recognized wolf taxonomic authorities not affiliated with the petitioners. Dr. Waits reviewed the work of these independent researchers in her declaration. She described the findings of Wheeldon and White, who, although they agreed that there might be two wolf species in areas outside the WGL states, concluded that the long history of

hybridization of wolves with *Canis lupus* and *Canis lycaon* genes in the WGL region had resulted in a "single interbreeding population" with mixed ancestry currently inhabiting the WGL states, rather than two separate wolf species.  Waits Decl. at 7 (quoting Wheeldon and White).  The vonHoldt *et al.* article rejected the view that *Canis lycaon* is a separate species from *Canis lupus* and concluded that the WGL wolves are a single population with some genetic variations from other regional *Canis lupus* populations, finding no grounds for dividing the wolf populations within the WGL into two separate species.  AR 630 at 018631A-018676A;  Waits Decl. at 7-8.  The vonHoldt conclusions were supported in a separate paper by Koblmüller.  AR 630 at 017796A-017809A; Waits Decl. at 4-5.

Many other comments and scientific studies received by FWS during the comment periods, which appear as part the Administrative Record, support the notion that, contrary to HSUS's contentions, FWS did in fact rely on the best available scientific information in ruling that *Canis lycaon* is not a separate species from *Canis lupus*.  Peer Reviewer of the Proposed Rule L. David Mech disagreed with a dual species approach and noted in his review that:

> [A]lthough it is true that at the writing of the Proposed Rule, it seemed like considerable evidence had accumulated supporting the existence of the separate species, *Canis lycaon*, or the Eastern Wolf, the vonHoldt et al. (2011) article published since adds enough doubt to question that proposition.  At the least, the vonHoldt et al. (2011) article evinces that there is not consensus by the pertinent scientific community about the existence of *C. lycaon*.

AR 440 at 011709A.

Even organizations normally sympathetic with HSUS supported a one-species conclusion.  In its comments in support of delisting, the Natural Resources Defense Council

("NRDC")[9] offered an extensive analysis on why FWS should not recognize *Canis lycaon* as a separate species at this particular juncture. Their letter included information on why the taxonomic revision is not supported by the best available science as well as explanations of why the existence of *Canis lycaon* is not necessary to explain genetic variation across the wolf population, and why *Canis lycaon* is not identifiable. AR 630 at 018270A; 018275A-018280A. Because a one-species finding might cut in favor of groups opposing delisting in other areas of the country, the ideological lines were not cleanly drawn on this issue.[10]

In re-opening the comment period, FWS sought review of a paper by FWS in-house employees. AR 484 at 012080A ("Chambers/Fain paper"). That paper was highly focused on wolf genetics and did not meaningfully address the "full suite of morphological, physiological, behavioral, and genetic characteristics" that must be considered before any new subspecies or species can be recognized. *See 12-month Finding on a Petition To List the Mountain Whitefish in the Big Lost River, Idaho, as Endangered or Threatened*, 75 Fed. Reg. 17352, 17355 (Apr. 6, 2010). The Chambers/Fain paper itself makes the candid concession that the proposal to divide the WGL wolf population into two species does not meet FWS's existing requirements for recognition of a new subspecies. AR 484 at 012157A (acknowledging that "the predominant view of the taxonomy" is that there are only "two wolf species" in North America: canis lupus

---

[9]     For example, the NRDC joined HSUS in lawsuits challenging the delisting of wolves of the Northern Rocky Mountain DPS. *See, e.g., Defenders of Wildlife v. Salazar*, 729 F. Supp. 2d 1207 (D. Mont. 2010).

[10]     FWS ultimately chose not to address in the Delisting Rule the status of any wolves in the Eastern U.S. outside the WGL DPS boundaries. It appears that the NRDC and some other groups thought that a one-species finding might assist them in opposing delisting of wolves outside of the WGL DPS.

and *canis rufus* (red wolf)) (internal quotations omitted); therefore, advocating recognition of a third species advocates a change in taxonomic classification).[11]

Administrative law did not require that FWS give greater weight to one paper by its employees, concluding there are two wolf species in the WGL states than to the multiple papers submitted by independent scientists, petitioners/defendant-intervenors, and the agency's peer reviewers concluding that there was a single admixed species in the WGL states.  Just as "the mere existence of internal disagreements between agency experts does not make the agency's decision arbitrary or capricious," *Nat'l. Wildlife Fed'n. v. Norton*, 306 F. Supp. 2d 920, 928 n.15 (E.D. Cal. 2004), disagreement between internal and external experts does not render FWS's decision arbitrary or capricious.  FWS's ability to not follow internal recommendations is particularly important when the great weight of scientific evidence in the record supports the opposite outcome.  The agency made the call and its decision is entitled to deference on appeal and should be respected.  The fact that the agency changed its mind between the proposed Delisting Rule stage (where it proposed making a two-species finding in the WGL and delisting the WGL) and the final Delisting Rule (where it made a one-species finding and delisted) only shows that the agency carefully considered public comment at this final stage in the process, contrary to HSUS's view that the agency had a closed mind throughout the process.[12]

Furthermore, the practical consequences of unnecessarily splitting the WGL wolves into two species could easily create a regulatory disaster in which there are two indistinguishable interbreeding "species," in the same areas, one that is listed under the ESA and one that is not

---

[11]     A full discussion of the scientific evidence requirements for FWS to recognize a new subspecies can be found at http://www.regulations.gov/#!documentDetail;D=FWS-R3-ES-2011-0029-0770; ID: FWS-R3-ES-2011-0029-0770 ("USSAF Supp. Comments Sept. 26, 2011").

[12]     See part I.C. of this brief, addressing Plaintiffs' "foregone conclusion"/"political interference" claims.

listed, even though they could only be distinguished (if at all) by counting relative portions of "eastern" and "western" genes in a DNA laboratory.

HSUS argues that FWS is involved in a new rulemaking proceeding concerning the listing status of wolves elsewhere in the U.S. (not WGL wolves) and that, as part of this rulemaking, FWS is reconsidering its findings regarding the one species or two species issue. This extra-record evidence of a FWS proposal in a case concerning other wolves who are not the subject of this case (other "Lower 48 wolves") has no bearing on this Court's present task of judicially reviewing the 2011 rule delisting the WGL wolves.  The fast-evolving world of wolf genetics changes daily.

First, if courts were permitted to consider post-rulemaking scientific evidence that was not available to the agency during the rulemaking process, there would be no meaningful judicial review of agency decisions.  FWS's 2013 proposed rule delisting wolves in other areas of the country was issued well after this final rule in question.  Thus, the discussion in that recent proposed rule of the two species theory is outside the Administrative Record and cannot be a basis for the Court's judicial review of the Delisting Rule.  This additional discussion was not available at the time the Delisting Rule was issued, and it is simply not relevant to whether FWS considered the best available scientific information in the 2011 final rule.  *See Daingerfield Island Protective Soc'y v. Babbitt,* 823 F. Supp. 950, 956 (D.D.C.1993) (noting the Court could not properly consider evidence published after the agency decision was made); *see also* Fed. Mem. at 39-40, *citing Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985). Second, the 2013 proposed rule is simply a *proposal* being offered for review and comment to the public, including the scientific community.  It does not represent a final agency decision and could easily be rejected, much as FWS rejected the dual species approach in the final version of

the Delisting Rule.  Even if this Court could consider the proposed rule in its review of the Delisting Rule, it would have little if any value for the Court's analysis of FWS's decision for the WGL wolves.

## C.   FWS'S DECISION TO DELIST WAS NOT BASED ON POLITICAL INTERFERENCE

FWS's decision to delist was not based on political interference, contrary to HSUS's assertions.  Pl. Mem. at 15-18.  The Federal Defendants address the issue of political interference on pages 33-37 of their brief, and the cases they cite control here: *Defenders of Wildlife v. Hall*, 807 F. Supp. 2d 972, 985 (D. Mont. 2011) (*"Setting internal deadlines is not the irretrievable commitment of resources needed for a court to conclude the Service predetermined the result…"*); *Bldg. Indus. Ass'n of Superior Cal. v. Norton*, 247 F.3d 1241, 1246 (D.C. Cir. 2001) (agency had a statutory obligation to "utilize the 'best scientific … data *available*,' not the best scientific data *possible*").[13]

HCC agrees with the Federal Defendants' analysis and will not replicate it here.  Instead, HCC supplements the Federal Defendants' analysis by providing a detailed timeline of events that further rebuts HSUS's claims of political interference and also shows that the FWS was statutorily bound to a timetable for deciding the delisting petitions filed by HCC members and others that was similar to the timetable FWS provided to Senator Klobuchar.

---

[13]    *See also*, *Oceana, Inc. v. Locke*, 725 F. Supp. 2d 46, 67 (D.D.C. 2010) (an aggressive schedule did not demonstrate that the agency prejudged the outcome), *rev'd on other grounds*, 670 F.3d 1238, 1243 (D.C. Cir. 2011); *Sw. Ctr. for Biological Diversity*, 215 F.3d 58, 60 (D.C. Cir. 2000) (D.C. Circuit reversed a district court that ordered further analysis, explaining "[t]he 'best available data' requirement makes it clear that the Secretary has no obligation to conduct independent studies.").

### 1.      Timeline of Events Regarding WGL DPS Delisting

### a.      FWS Decides Previous WGL Wolf Delisting Cases.

- **2003-2005**:  Following receipt of public comment, FWS issues a rule downlisting Eastern U.S. wolves including the Western Great Lakes wolves from endangered to threatened.[14] The 2003 Rule is set aside due to the expansiveness of the DPS boundaries, which included the entire Eastern U.S., well beyond dispersal range of the WGL wolves.[15]

- **2007-2008**:  Following receipt of public comments, FWS issues a rule delisting the WGL wolves, confining the DPS boundaries to the WGL states and a surrounding wolf dispersal area.[16]  The 2007 Rule is vacated and remanded due to an issue involving interpretation of the ESA, which the Court finds is ambiguous and, therefore, must be construed by FWS using its *Chevron* power to establish a meaning for ambiguous statutory provisions.[17]  FWS made factual findings that wolves have recovered, and its findings on DPS boundaries are not set aside.[18]

- **2009-2010**:  Without taking additional public comment, FWS issues an interpretation of the ambiguous statutory provision and reissues its delisting rule.[19]  The 2009 Rule is vacated by consent due to the lack of a public comment period, while FWS's factual findings that wolves have recovered and DPS boundary findings are not set aside.[20]

---

[14]      68 Fed. Reg. 15804, 15862 (Apr. 1, 2003) ("2003 Rule").

[15]      *Defenders of Wildlife v. U.S. Dep't of the Interior*, 354 F. Supp. 2d 1156, 1163-73 (D. Or. 2005); *Nat'l Wildlife Fed'n v. Norton*, 386 F. Supp. 2d 553, 564-65 (D. Vt. 2005).

[16]      72 Fed. Reg. 6052 (Feb. 8, 2007) ("2007 Rule").

[17]      *Humane Soc'y v. Kempthorne*, 579 F. Supp. 2d 7, 19-21 (D.D.C. 2008).

[18]      *Id.* at 8-10, 20-22.

[19]      74 Fed. Reg. 15070 (Apr. 2, 2009) ("2009 Rule").

[20]      Delisting Rule 76 Fed. Reg. at 81666, 81667 (Dec. 28, 2011); Stipulated Settlement Agreement and Order, *Humane Soc'y v. Salazar*, No. 1:09-cv-1092-PLF, (D.D.C. July 2, 2009), ECF No. 27.

### b.    FWS Receives Petitions to Delist and Issues 90-Day "May Be Warranted" Findings.

- **March 15 - June 17, 2010**:  FWS received petitions to delist from the Amicus Minnesota DNR on March 15, 2010,[21] and Intervenors Wisconsin DNR on April 26, 2010,[22] U.S. Sportsmen's Alliance on April 26, 2010,[23] and SCI/NRA on June 17, 2010.[24]

- **September 14, 2010**:  FWS publishes a 90-day finding stating that delisting may be warranted and that it was reinitiating a full status review and seeking public comment.[25] FWS missed the statutory deadlines (June 13 through June 17, 2010) for making this initial 90-day decision on the first three petitions and just barely made that deadline on the last petition.

### c.    FWS Receives Public Comments, Meets with Senator Klobuchar, and Issues 12-Month Findings Granting Petitions and Proposed Delisting Rule as Statutory Deadlines Arrive.

- **Statutory Deadlines for 12-Month Findings Set**.  The September 24, 2010 "may be warranted" findings (90-day findings) and dates of the petitions established March 15, April 25, May 18, and June 17, 2011 as the statutory deadlines for final decisions ("12 Month Findings") on the four petitions to delist WGL wolves.  16 U.S.C. §1533(b)(3)(B).

---

[21]    75 Fed. Reg. 55730, 55731 (Sept. 14, 2010).  *See also*, AR 15 at 000889A (Minnesota DNR's Delisting Petition requesting that the gray wolf in Minnesota be removed from the List of Endangered or Threatened Wildlife under the Act.).

[22]    75 Fed. Reg. at 55731 (Sept. 14, 2010).  *See also* AR 18 at 000936A (Wisconsin DNR's Delisting Petition requesting that the gray wolf in Minnesota and Wisconsin be delisted).

[23]    75 Fed. Reg. at 55731.  *See also* AR 20 at 000956A (USSA's delisting petition representing five more organizations and requesting that gray wolves in the Great Lakes area be delisted).

[24]    75 Fed. Reg. at 55731.  *See also* AR 29 at 001054A - 001069A (SCI and NRA's Delisting Petition requesting that wolves of the Western Great Lakes be delisted); AR 30 at 001070A (letter from FWS to SCI documenting receipt of the petition).

[25]    75 Fed. Reg. 55730 (Sept. 14, 2010).

AR 47, 001324A (dated Nov. 22, 2010).  If FWS issues a 12-Month Finding granting a petition, it must propose an implementing rule.  16 U.S.C. § 1533(b)(3)(B)(ii).

- **November 22, 2010**:   After receiving public comments on the "may be warranted" finding, FWS completes a draft 261-page proposed rule delisting the WGL wolves.[26] This document continues to evolve as FWS continues its work.[27]

- **December 6, 2010**: FWS meets with Sen. Amy Klobuchar of Minnesota.[28]

- **December 9, 2010**:   Thomas Strickland, Assistant Secretary for Fish and Wildlife and Parks, writes to Sen. Klobuchar outlining the department's goals for publishing proposed and final rules concerning the Western Great Lakes wolf:   "Currently, we are working to publish, by April 2011, a proposed rule to delist the wolf.  We aim to publish a final determination by the end of 2011."  AR 78 at 002769A.

- **May 5, 2011**: FWS issues 12-Month Finding/Proposed Rule that the petitions to delist are warranted and issues a proposed rule to delist the WGL wolves.[29]   This action coincided approximately with both the statutory deadlines for 12-month findings on the four delisting petitions (March 15, April 25, May 18, and June 17, 2011) and the predicted timeframe for issuing a proposed rule given to Sen. Klobuchar (April 2011).

**d.** **FWS Takes Two More Rounds of Comments on Proposed Rule and Issues Final Rule.**

- **July 5, 2011**: FWS receives public comment on the proposed delisting rule.

---

[26]     AR 47 at 001324A (dated Nov. 22, 2010).

[27]     *See* AR 53 at 001680A (draft proposed rule dated Nov. 28, 2010); AR 56 at 001956A (revised draft proposed rule Dec. 2, 2010); AR 59 at 002207A (email dated Dec. 3, 2010 with attached draft (AR 60 at 002208A), references (AR 61 at 002457A), and Information Memorandum for Director on proposed delisting of gray wolves in the WGL (AR 62 at 002477A)); AR 63 at 002479A (clean draft for Washington Office preliminary review).

[28]     AR 67 at 002733A.

[29]     Proposed Delisting Rule, 76 Fed. Reg. 26086 (May 5, 2011).

- **August 26, 2011**:  FWS reopens the comment period "to allow for additional public review and the inclusion of any new information, specifically concerning North American wolf taxonomy" relating to the unpublished Chambers/Fain article.[30]

- **September 26, 2011**:  FWS receives this additional round of public comment.

- **December 28, 2011**:  FWS published the final Delisting Rule.[31]  This date was near the mid-point between the earliest date (approximately September 5, 2011) and latest date (May 5, 2012) FWS could have made this decision under the statutory timeline.[32]

### 2.    The Timeline Demonstrates that FWS Announced a Tentative Timetable for Response to Petitions that Addressed Its Statutory Deadline Obligations

In alleging that FWS acted precipitously in order to meet timeframes contained in an alleged commitment to a U.S. Senator representing a State (Minnesota) populated by almost 3,000 wolves,[33] HSUS fails to acknowledge key facts evident from the timeline above.

First, FWS had already been crafting rules and studying the relative science and research in the field for eight years, and had made multiple findings in previous delisting rules that WGL wolves had greatly surpassed all Recovery Plan numerical targets – fact findings that were never overturned by the reviewing courts.   Second, before meeting with Senator Klobuchar on December 6, 2010, FWS had already made 90-day "may be warranted" findings on the four delisting petitions filed by the Defendant-Intervenors and Amicus, had already taken public comment on those findings, and had already prepared a complete draft proposed delisting rule. Third, the timeframe given to Senator Klobuchar for issuance of a proposed rule (April 2011)

---

[30]     76 Fed. Reg. 53379 (Aug. 26, 2011), *discussed by* Delisting Rule, 76 Fed. Reg. at 81666, 81667.   On September 19, 2011, FWS also published a notice informing the public that supplementary materials were available.  76 Fed. Reg. 57943 (Sept. 19, 2011); Delisting Rule, 76 Fed. Reg. at 81666, 81667.
[31]     76 Fed. Reg. 81666.
[32]     16 U.S.C. § 1533(b)(5)(A), (b)(6)(A).
[33]     Delisting Rule, 76 Fed. Reg. at 81677.

coincided with the statutory deadlines for making the 12-month findings on the four delisting petitions (various dates in March through June, 2011), so FWS's timing representations to Senator Klobuchar followed statutory obligations independently established by the ESA.  Fourth, once FWS granted the four delisting petitions on May 5, 2011 by finding each of them "warranted," the remaining proposed rule process served to implement a decision FWS had already been required to make as a result of finding the petitioned delistings to be "warranted." 16 U.S.C. § 1533(b)(3)(B).  Fifth, FWS acted with reasonable promptness but not undue haste in taking almost eight (8) months after issuance of the Proposed Rule on May 5, 2011 to issue a final rule on December 28, 2011.  As noted above, courts have stated that setting internal deadlines or even an aggressive schedule is not evidence that the agency decision is pre-determined.  FWS issued the final rule about halfway between when the minimum statutory consideration period ended (about September 5, 2011) and when the statutory deadline arrived (May 5, 2012).[34]  Sixth, during that eight-month period, FWS took two more rounds of public comment, including one devoted specifically to obtaining comment on evolving wolf genetics issues that were likely to be debated by scientists for years to come, and so unlikely to be definitively resolved in the scientific community in just a few months time.[35]  FWS balanced its statutory obligations to utilize the best scientific data available with its statutory response deadlines triggered by the intervenors' and amicus's petitions.  *See* Fed. Mem. at 37-38.

In light of all the foregoing, the commendable fact that FWS succeeded in fulfilling its "aim to make a final determination in December, 2011" that it referenced in Department of

---

[34]     16 U.S.C. §§ 1533(b)(5)(A) (proposed rule must precede effective date of final rule by "not less than 90 days"); 1533(b)(6)(A) (FWS must make final determination on proposed rule "within one-year").
[35]     See part I.B. of this brief for a discussion of the evidence in the administrative record on wolf genetics.

Interior Assistant Secretary Thomas Strickland's December 9, 2010 letter to Senator Klobuchar is hardly cause for dismay, or cause to find the delisting rule unlawful under the deferential arbitrary and capricious standard.

HCC also notes that the Assistant Secretary's letter to Senator Klobuchar stating that FWS was "aim[ing] to publish a final determination"[36] reflects the proper caution of an agency decision-maker who appropriately provides Congress with public information on where the agency is heading, while still recognizing that the agency must consider public input and then make a final determination. "Aiming" also falls well short of making an ironclad commitment even as to timing. Other mid-ranking agency employees discussing what they had heard about the conversations with Senator Klobuchar noted that delisting would "presumably" be the outcome of the case. *See, e.g.*, AR 99 at 002847A (December 22, 2010 email from FWS Assistant Regional Director, Lynn Lewis). A presumption of delisting was entirely appropriate as the FWS over the last eight years had made numerous findings that the Minnesota, Wisconsin, and Michigan wolf populations far exceeded recovery plan objectives, and FWS had issued prior delisting orders that were struck down for technical reasons not having to do with any claim that wolves had not recovered in those three states. Delisting Rule, 76 Fed. Reg. at 81666, 81666-67.[37]

**D.     FWS KNEW PRIOR TO DELISTING THAT STATE REGULATED HARVESTS WERE ALWAYS A LIKELY MANAGEMENT STRATEGY**

HCC agrees with the Federal Defendants as to the adequacy of the states' regulatory mechanisms for the ongoing management and conservation of the WGL wolf population. The regulatory mechanisms implemented by Minnesota, Michigan and Wisconsin after delisting are

---

[36]     AR 78 at 002769A.

[37]     *See also*, Fed. Mem. at 35, n. 23 (reviewing email from Congressional affairs staff not involved in decision-making who made more strident and possibly sarcastic comments).

more than adequate to keep the wolf populations in each state well above the established recovery goals. *See* Fed. Mem. Sect. VI, p. 41. The HCC refers the Court to the memoranda being filed contemporaneously with this one by Defendant-Intervenors Wisconsin DNR and Michigan DNR and *amicus curiae* Minnesota DNR for additional information regarding state regulatory mechanisms and hunts.

In making listing decisions, FWS is constrained to consider only existing regulatory mechanisms and cannot rely on future or speculative measures to determine the correct listing status for a species. *Biodiversity Legal Found. v. Babbitt*, 943 F.Supp. 23, 26 (D.D.C. 1996) (rejecting FWS's decision to rely on future Forest Service plan in rejecting listing petition for Alexander Archipelago Wolf). Consequently, FWS appropriately made its determination on existing state statutes, regulations and management plans when it concluded that such mechanisms were adequate to prevent WGL wolves from returning to endangered status. 16 U.S.C. § 1533(a)(1)(D). However, regulated harvests, while not codified in statute or regulation at the time of delisting, were encompassed within those existing management plans and were identified by each of the states for future implementation.

The state regulated wolf harvests do not undermine the adequacy of the states' regulatory mechanisms and, in fact, likely enhance the success of their long-term wolf recovery efforts. *See Proposed Delisting Rule*, 76 Fed. Reg. at 26118 (citing Fuller, *et al.* summary of studies demonstrating that regulated wolf harvest up to 40% likely would not result in overall decreases to wolf population) and Section II.A. of this brief. While specific state seasons or harvest limits might not have been formally established in December 2011, when FWS published the Delisting Rule, FWS was nevertheless fully cognizant of the fact that the states intended to take the steps necessary to open biologically sustainable wolf seasons, and that these seasons would be

established in accordance with recovery criteria.   Thus FWS acted with knowledge of the situation and its judgment should be respected.

The Administrative Record contains ample evidence that the states were likely to implement wolf hunts following the delisting of the WGL DPS.  Most telling, as noted by the Federal Defendants (Fed. Mem. at 42), was that Minnesota's legislature changed state law to allow wolf hunts when the wolves were delisted, eliminating a previous requirement that the state wait five years after the delisting before allowing a hunt.  AR 552 at 014159A; AR 553 at 014160A.  This action confirmed that Minnesota likely would develop a wolf hunt after the delisting of the WGL wolves.  Dan Stark, Large Carnivore Program Leader of the Division of Fish and Wildlife for the Minnesota Department of Natural Resources, underscored Minnesota's intent to implement wolf harvest strategies when he submitted edits to FWS's draft "Questions and Answers" page regarding the delisting.  Stark changed FWS's draft answer to one question from "state protections would be nearly as strict as current protections under the Endangered Species Act…" to "state protections are similar to protections under the Endangered Species Act, *with the exception of a state wolf season in the future*…."  AR 623 at 017384A; AR 624 at 017386A, 017389A-90A (emphasis added).[38]  Accordingly, in the Delisting Rule, FWS noted that "Minnesota DNR will consider population management measures, including public hunting and trapping seasons and other methods, in the future."  76 Fed. Reg. at 81703.  At the time of delisting, little question remained as to whether Minnesota would allow wolf harvests.

Although evidence concerning the imminence of wolf seasons for Michigan and Wisconsin is less concrete than for Minnesota, FWS had plenty of clues to recognize that those states would also develop wolf hunts after the delisting.  In the Delisting Rule, FWS recognized

---

[38]     Although Mr. Stark's e-mail indicated that he was changing item "11" to include a reference to state harvests, his edits were made to Item "10."

the possibility of future wolf harvests in both Michigan and Wisconsin. 76 Fed. Reg. at 81711, 81709. Even though the establishment of wolf hunts in each state would require legislative action, it was clear that both states would likely take those actions and develop wolf hunts after the delisting.

In 2008, well before the delisting, the Wisconsin Conservation Congress started the process toward developing wolf seasons by holding hearings and gathering information regarding the public's attitudes toward a wolf hunt. Eighty-six percent of meeting attendees supported wolf hunts. 76 Fed. Reg. at 81709. Wisconsin's Wolf Management Plan included the results of a survey conducted in 2004 of both residents and non-residents of the state, the majority of whom supported wolf harvests. (Addendum 2006-2007) AR 004 at 000267A. The survey reported that 55.5 percent of participants stated that public wolf harvests were desirable if the wolf population exceeded state goals (which describes the current wolf population situation in Wisconsin). *Id*. at 000272A. Of all the strategies considered, public wolf harvests were found to be the most popular method of wolf management by those surveyed. *Id*. at 000271A.

Similarly, Michigan showed every sign of readying itself for the implementation of wolf harvests after the delisting. Responses to a survey reported in Michigan's 2008 Wolf Management Plan indicated that more people supported a controlled wolf hunting season than opposed it. AR 007 at 000459A. The plan recommended the following "actions" regarding potential wolf hunts:

> (1) Evaluate the potential biological effects of a public wolf harvest specifically for recreational or utilitarian purposes;
>
> (2) Monitor and evaluate the demand for and public acceptability of a public wolf harvest specifically for recreational or utilitarian purposes;
>
> (3) If biologically defensible, legally feasible, and supported by the public, ***develop a program to offer opportunities for the public to harvest wolves for recreational or utilitarian purposes.***

*Id*. at 000459A-60A (emphasis added).  Michigan's plan states that "any legal public harvest in Michigan would be conducted with socially and biologically responsible methods."  AR 007 at 000458A.

Although Minnesota, Michigan and Wisconsin had not approved wolf hunts prior to the publication of the Delisting Rule, the likelihood of their incorporation into the three states' management strategies was evident to FWS from the actions of Minnesota's state legislature, discussions between state agencies and stakeholders, and the management plans already in effect. The hunts that the states have now developed and allowed do not depart from regulatory mechanisms contemplated by FWS and do not prevent the states from maintaining viable wolf populations above the federal recovery goals.

## E.    SOCIAL TOLERANCE, ACHIEVED THROUGH DELISTING, WILL PLAY AN ESSENTIAL ROLE IN THE LONG-TERM CONSERVATION OF WOLVES

A restoration of endangered status for the WGL wolves stands to undermine social tolerance for the species, which will undermine the overall goal of long-term conservation of the species.  Social tolerance plays an important role in the conservation of a species – particularly a species like the gray wolf that poses problems for the communities that must deal with it on a day-to-day basis.  Wolves that regularly attack livestock, pets and hunting dogs, and that compete in the field with hunters for wildlife, present ongoing challenges to the tolerance of the hunting and farming communities of the WGL states.  Because of these challenges, the social tolerance of these communities is the key to the future of the WGL wolves.  In their article, *Assessing the Impact of Decision Frame and Existing Attitudes on Support for Wolf Restoration in the United States*, Robyn S. Wilson and Jeremy T. Bruskotter quoted renowned wolf biologist David Mech:  "The long term survival of wolves . . . ultimately depends on human tolerance." AR 630 at 018868A.  Wildlife biologist, James Hammill, explained: "The long-term prospects

for the wolf's persistence on Great Lakes states landscapes will be tied to the public's tolerance of wolves and to developing a larger segment of the public who value having wolves present." Hammill, J. 2007. *Policy issues regarding wolves in the Great Lakes Region. Transactions of the 72nd North American Wildlife and Natural Resources Conference*, pp. 378-390, AR 630 at 017755A, 017762A.

Courts have similarly recognized social tolerance as an important component of the FWS's analysis concerning the listing status of wolves.  Judge Alan B. Johnson of the Wyoming District Court validated the concept when considering the legality of Federal Defendants' 2008 decision to exclude Wyoming from the delisting of wolves in the Northern Rocky Mountain region (*see* 73 Fed. Reg. 10514 (Feb. 27, 2008)).  Judge Johnson expressed specific approval for consideration of "human tolerance and public attitudes" as a manmade factor affecting Wyoming wolves' long term survival.  *Wyoming v. U.S. Dept. of Interior*, 2010 WL 4814950, *10 (D. Wyo. Nov. 18, 2010).[39]

In accordance with the role that social tolerance plays in the conservation of a species like the wolf, FWS placed significant emphasis on public acceptance of wolves in its decision to delist:

---

[39]    Non-Governmental Defendant-Intervenors are aware of the single District of Columbia District Court opinion that rejected the argument that permits issued for the lethal removal of problem members of the then-endangered WGL wolf population would enhance the survival of the endangered population by increasing social tolerance.  *Humane Soc'y of U.S. v. Kempthorne*, 481 F. Supp. 2d 53 (D.D.C. 2006), *vacated* 527 F.3d 181 (D.C. Cir. 2008).  Even if that opinion had not been vacated by the D.C. Circuit, it would have no bearing on this case.  The issue in the 2006 case concerned the question of lethal removal of members of an endangered species, as opposed to the social tolerance needs for ongoing conservation of a species that has met all recovery goals and no longer legally qualifies for endangered status.

> Human behavior has had a tremendous effect on wolf populations around the world. Theory and social science research have identified attitudes, and the beliefs on which they are based, as important drivers of behavior. Therefore, understanding public attitudes toward wolves is a key component of wolf management.

76 Fed. Reg. at 81718.

Not surprisingly, tolerance for wolves varies based on the nature and outcome of an individual's interaction with the species. Some individuals' livelihoods, pets, hunting companions and recreational opportunities are tested if not jeopardized by wolves. Researchers have determined that human tolerance for wolves varies based on a variety of factors, such as the potential vulnerability to wolf predatory behavior. Bear hunters whose hunting dogs are at risk in the field from wolf attacks and livestock owners whose animals fall prey to wolves were among the least tolerant of wolves. "Individuals who had lost a domestic animal to a predator were less tolerant of wolves than those who had not." 76 Fed. Reg. at 81719.

The need to maintain the social tolerance of those who are most greatly tested by the presence of the species undermines HSUS's assumption that a return to endangered listing status will benefit wolf conservation. Instead, a restoration of endangered status could in fact undermine existing social tolerance for the species. In another recent delisting rule for wolves, FWS confirmed that prolonging the delisting of a recovered wolf population had done damage to the population's conservation. In its rule to delist Wyoming wolves, FWS explained that "human attitudes are important to the long term preservation of the gray wolf population" of the Northern Rocky Mountain DPS, and concluded that the Service's failure to delist the DPS for years after it reached established recovery goals had "negatively affected public tolerance" for the wolves. 77 Fed. Reg. 55530, 55569 (Sept. 10, 2012). Like the wolves of Wyoming, the wolves of the WGL DPS remained on the endangered species list long after surpassing their

established recovery goals.   FWS has been attempting to successfully delist the WGL DPS

wolves since  March of 2006.  76 Fed. Reg. at 81666-67.

Research has confirmed the adverse impact of FWS's inability to delist recovered

wolves.  Wildlife biologist and oft-cited author Dr. Adrian Treves documented the frustration

experienced by the hunting and farming communities during the extended period from 2001-

2009 during which FWS made multiple unsuccessful attempts to delist WGL wolves, causing

wolves to be repeatedly removed from and then returned to endangered species status.

> During the data collection period, wolf numbers nearly tripled and greatly
> exceeded the State population goal, the level of wolf depredation on pets
> increased and became the third most frequent conflict after attacks on beef calves
> and bear-hunting dogs, and wolf management authority was granted to State
> governments and subsequently revoked several times after Federal court
> challenges. The 2009 survey found attitudes toward wolves had become less
> favorable, and fear of wolves, perceived competition for deer, and reported
> inclination to illegally kill wolves increased.

76 Fed. Reg. at 81719-20.   Research conducted by the states of Michigan, Minnesota and

Wisconsin demonstrated that the public tolerance for wolves that deteriorated during the years in

which wolves were repeatedly returned to endangered status would improve when states have

and use the authority to manage wolf behavior.  That research showed "strong support for wolf

recovery if the adverse impacts on recreational activities and livestock production can be

minimized (MI DNR 1997, pp. 13-14, 50-56; MN DNR 1998, p. 2; WI DNR 1999, pp. 51-55;

WI DNR 2006c, pp. 9-11)."  76 Fed. Reg. at 81720.

Management of adverse impacts to improve social tolerance requires more than the lethal

removal of individual problem wolves.   In other countries, wolf population control, through

regulated harvests, is used to keep wolf populations in balance with other wildlife to make sure

that wolves do not interfere with the livelihoods and recreational pursuits of the hunting

community.  Wildlife authorities in British Columbia, for example, are using wolf harvests to

improve social tolerance and to conserve and manage their wolf population:

> The British Columbia Wildlife Branch will continue to use regulated hunting and
> trapping to control wolf population growth to meet provincial wolf population
> objectives and to balance wolf predation on ungulates with the demands of
> hunters.  Provincial biologists believe that most local residents will tolerate wolf
> recovery if wolves do not reach levels where hunter opportunity to harvest
> ungulates decreases substantially.  If wolves are allowed to reach levels where
> hunter harvest of ungulates is seriously impacted, support for wolf recovery will
> quickly fade and illegal, uncontrolled taking will result.

Daniel H. Pletscher *et al.*, *Managing Wolf and Ungulate Populations in an International

Ecosystem*, AR 629 at 017413A[40].

At the time of the delisting in December 2011, WGL DPS wolves had never been off the

endangered species list long enough for the states to take the measures necessary to implement

wolf seasons.  Consequently, no previous wolf seasons were held in the WGL DPS states to

provide concrete data on how such harvests would impact social tolerance for WGL wolves.

Nevertheless, FWS did have information involving social tolerance benefits resulting from the

harvests of other predator species.  Wildlife biologist James Hammill offered black bear

harvesting as a template for increasing social tolerance for wolves through regulated seasons:

> During the past 50 years, attitudes toward many predators in the Great Lakes
> states have undergone a significant evolution.  Bounties were paid by states for
> coyotes, wolves, foxes and bobcats.  Black bears, for most of the past five
> decades, were considered vermin.  The repeal of bounties on all predators and the
> elevation of the black bear to trophy big-game status happened in recent times.
> This change has elevated the status and value of these species in the public eye.
> Now, a segment of the public (consumptive users) places a high value on the
> wellbeing of these predators and takes keen interest in their protection and
> management.  Because of this interest, populations of these predators now are
> managed by regulated seasons.  Established through the use of best available
> science, this has resulted in sustainable populations and an annual harvest through

---

[40]     This article was identified in the Administrative Record as a "Document Cited in the
Final Rule for the Wolf WGL DPS" (AR 629 at 017413A) but HCC has been unable to locate a
copy of the article itself in the Record.

> hunting and trapping.  Predator hunting is becoming an increasingly popular outdoor activity, and demand for black bear harvest permits far exceeds supply in several Great Lakes states.  Human attitudes toward wolves, it seems, have also undergone great transformations.  Once despised and slated for extirpation by both public attitude and government policy, the wolf's fortunes improved as bounty systems were eliminated.  The pendulum then swung to complete protection by federal law.  Now, with expanding populations, society needs to redefine a place for wolves.  Fortunately, wildlife management success in North America has identified a template that may serve wolves and people equally well.

AR 630 at 017764A-65A.  Hamill explained that the participation of hunters in the long-term sustainable conservation of wildlife species follows the principles of the North American Model:

> The basic tenants of the North American model are that wild animals belong to all of us, that future generations are deserving of wildlife undiminished by our actions and that they should be managed using the best science available (Mahoney 2004).

*Id*. at 017762A.

To the hunting community, who will play a key role in the success or failure of long-term wolf conservation in the WGL DPS, a species that can be hunted becomes a species of value, enhancing the incentive to conserve that species for future generations to enjoy.  In a 2009 survey on Wisconsin public attitudes toward wolves "nearly half of respondents agreed their tolerance for wolves in Wisconsin would increase if people could hunt them."  76 Fed. Reg. at 81720.

Although HSUS may not be able to appreciate the role that wolf seasons will play in the conservation of the species, social tolerance remains an essential component in the future of wolves in the WGL DPS.  Wolf management, including regulated harvests, increases social tolerance amongst groups that must deal with wolf behavior on a daily basis.  For that reason, the delisting of wolves makes it possible for the involved states to authorize wolf seasons, thereby enlisting the support of the hunting community and providing essential conservation benefit to the species.

## II.      ARGUMENTS SUBMITTED ONLY IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

### A.      HSUS'S INJURY AND REDRESSABILITY ALLEGATIONS ARE TOO CONJECTURAL TO SUPPORT STANDING

To invoke the jurisdiction of this Court, HSUS must demonstrate the requisites for Article III standing to sue.  Article III standing consists of three requirements: (1) injury in fact — an invasion of a legally protected interest that is concrete and particularized, and actual or imminent; (2) causation — a fairly traceable connection between the injury and the challenged conduct; and (3) redressability — a likelihood that the injury will be redressed by a favorable decision.  *Grocery Mfrs. Ass'n v. Envl. Prot. Agency*, 693 F.3d 169, 174 (D.C. Cir. 2012), *citing Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61 (1992).   The party seeking the court's jurisdiction is the one that bears the burden of demonstrating each element necessary for standing.  Unless standing is self-evident, the plaintiff must offer documentary evidence such as affidavits or declarations.  *Grocery Mfrs.*, 693 F.3d at 174.  As this Court has stated:

> The burden rests on the party seeking judicial review clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers. . . .  If he fails to make the necessary allegations he has no standing.

*SunCom Mobile and Data Inc., v. FCC,* 87 F.3d 1386, 1388 (D.C. Cir. 1996) (quotations and citations omitted).  Neither injury nor redressability may be based on speculation.  The injury must be concrete or particularized and actual or imminent.  It also must be likely, as opposed to conjectural, that a favorable ruling will redress those injuries.  *Lujan v. Defenders of Wildlife,* 504 U.S. at 560-61.  HSUS must fulfill each of these evidentiary burdens in order to establish standing, and must carry the even higher burden to prevail on summary judgment.   Fed. R. Civ. P. 56.

HSUS has submitted four declarations to satisfy these evidentiary requirements. The declarations demonstrate the interest criteria for Article III standing. HCC does not question that each of the declarants has a genuine, passionate interest in the wolves of the WGL DPS. Despite the intensity of their interests, however, the declarants fail to offer sufficient evidentiary support for the injury and redressability criteria of constitutional standing.

In essence, HSUS, through its declarants, asks this Court to accept a simple "If/then" proposition:

> *If* post-delisting state authorized take of wolves results in the lethal removal of wolves from the three states, *then* there will be fewer wolves for HSUS *et al*. and their members to enjoy.

That proposition might prove true if this case concerned inanimate objects, or even if it involved a wildlife species with less reproductive potential than wolves. It does not characterize the impact of the lethal removal of wolves. Because wolves reproduce so quickly and substantially large numbers may be lethally removed from a population without preventing that wolf population from increasing from year to year. While biologists offer different estimates on the extent of lethal removal necessary to cause a wolf population to actually decrease, collective research indicates that percentage to be 40 percent of the population or higher. In the proposed rule to delist the WGL DPS, the FWS offered the following summary of research on wolf mortality impact:

> Fuller et al. (2003, p. 182 Table 6.8) has summarized the work of various researchers in estimating mortality rates, especially human harvest, that would result in wolf population stability or decline. They provide a number of human-caused and total mortality rate estimates and the observed population effects in wolf populations in the United States and Canada. While variability is apparent, in general, wolf populations increased if their total average annual mortality was 30 percent or less, and populations decreased if their total average annual mortality was 40 percent or more. Four of the cited studies showed wolf population stability or increases with human-caused mortality rates of 24 to 30 percent. The clear conclusion is that a wolf population with high pup productivity — the normal

> situation in a wolf population — can withstand levels of overall and of human-
> caused mortality without suffering a long-term decline in numbers.

76 Fed. Reg. at 26118 (May 5, 2011).  Researchers have determined that with a population reduction of up to 30 percent, wolf numbers could actually increase from year to year.[41] Consequently, when the take is in the 30-40% percent range, it is likely that wolf populations will simply remain stable.  In other words, despite the concerns expressed by the declarants about their fears that they will lose opportunities to view, hear or otherwise enjoy wolves, in truth the number of wolves and the opportunities to enjoy wolves are unlikely to decrease because of their delisted status.

For example, wolf population numbers are the primary focus of declarant Howard Goldman's statement.  Mr. Goldman expresses concern that wolf harvests and other authorized methods of take will render him "less likely to see wolves and signs of wolf presence or to hear them howl."  Goldman Decl. ¶ 8.  He bases his injury allegations on the statement that Wisconsin's wolf harvest resulted in a take of 33% of the state's wolves.  Goldman Decl. ¶ 9. This fact does not support his injury allegation.  According to the research reported by the FWS (*see supra*), a take of that percentage would not result in a population decline and should instead result in a population stabilization.  In other words, basically the same number of wolves would remain available for him to enjoy.  Similarly, Mr. Goldman's concern regarding Minnesota's take of 413 wolves in its wolf harvest does not support a finding that Minnesota's wolf hunt would be responsible for a decrease in the state wolf population.  He simply assumes that this will be the case because delisting allows humans to lethally remove members of the population.

---

[41]      In its standing declarations, HSUS concedes that levels of wolf take below 30% do not significantly impact wolf populations, thereby admitting that take of levels below 30% resulting from delisting cannot be the cause of HSUS et al.'s members' inability to enjoy wolves.  *See* Declaration of Howard Goldman, ¶9 (ECF Doc. 24-5) ("Goldman Decl.").

Because wolves have such a high reproductive capacity and are likely to replenish their own numbers, Mr. Goldman's injury allegations are purely conjectural.   Moreover, he cannot demonstrate that the remedy that HSUS seeks – a restoration of endangered status – would ensure or even make it more likely that he will continue to see as many wolves as he has seen previously.

Similarly, declarant Linda Hatfield alleges injury based on the premise that "every wolf that is killed decreases the chance that [she] could observe wolves in the wild."  Hatfield Decl. ¶ 15.  Her alleged injury is also conjectural.  The take of wolves in Minnesota, upon which she bases her injury allegations, represented less than 25% of the state's estimated population. Consequently, that take, standing apart from any other factors that could have an impact on wolf numbers, is more likely to have resulted in an increase than a decrease of the population.

Declarant Robert Waligora's injury allegations also focus on his concern that delisting will reduce his opportunities to see and enjoy wolves.  Declaration of Robert Waligora (ECF Doc. 24-2) ("Waligora Decl.") ¶ 5.  Since he cannot demonstrate that delisting or even the lethal removal of wolves pursuant to state management actions will in fact decrease the population or reduce his wolf viewing and enjoying opportunities, his declaration fails to demonstrate the requisite injury for standing.  Since he cannot show that the relisting of wolves as endangered will ensure that he will continue to be able to enjoy the same number of wolf experiences, his redressability allegations are also too speculative to demonstrate Article III standing.

Finally, declarant Nancy Warren alleges a potential injury if members of her "resident wolf pack" were killed in Michigan's first wolf season.  Declaration of Nancy Warren (ECF Doc. 24-4) ("Warren Decl.") ¶ 5.  She admits that members of the pack have died from other causes, including an automobile collision and an illegal shooting.  *Id*.  She alleges that, even

prior to the start of the Michigan season, the pack has become less vocal and that it has become rare to hear them howl.  *Id.*  By her own admission, these losses have had nothing to do with the delisting of wolves and yet she alleges that wolf delisting will be the source of her harm.  Once again, the injury she alleges is based on conjecture.  She has no way to determine whether it is likely that members of the wolves that live in her vicinity will be successfully hunted or that they will not succumb to death from other causes.  She also cannot isolate the impact of the delisting from other factors that could affect her ability to see, hear, and enjoy wolves.  For that reason, her assumption that HSUS's success in this lawsuit will prevent future harm is too speculative to satisfy the requirements for Article III standing.

While it is true that the state authorized harvests and other lethal take management strategies will remove wolves from the WGL DPS population, that removal does not automatically result in population reductions that would decrease HSUS's members' ability to see, hear and enjoy wolves.  HSUS's allegations to that effect are merely conjecture and fail to justify a finding that HSUS possesses the requisite standing to give this Court jurisdiction to consider their claims.  As they cannot make the evidentiary finding necessary to justify summary judgment, this Court should dismiss their motion.

**B.   ANY REMEDY THAT THIS COURT ORDERS SHOULD AVOID HARMFUL AND NEEDLESS DISRUPTIONS TO RECOVERED WOLF MANAGEMENT IN THE WGL REGION.**

As none of HSUS's claims in the case have merit, the appropriate "remedy" in this case is to uphold FWS's final rule delisting WGL wolves.  However, if this Court finds that FWS erred in some way in this complex rulemaking, the remedy should be proportional to the error.  *NAACP v. Sec. of Housing & Urban Dev.*, 817 F.2d 149, 159 (1st Cir. 1987) ("A court, where it

finds unlawful agency behavior, may tailor its remedy to the occasion"); *see also*, U.S.C. § 706 (rule of "prejudicial error," i.e. harmless error rule, applies in judicial review).

Some of HSUS's claims, if successful, are particularly appropriate for a disposition in which the Court remands without vacating the delisting so that the FWS may address that claim without having to start over from scratch and without having to transfer the responsibility for wolf management form the state departments of natural resources to the federal government.[42] See, e.g. *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993) (whether to vacate or remand without vacatur depends on (1) the seriousness of the agency action's deficiencies and the curability of those deficiencies, and (2) the disruption if the court vacates the action and the agency later cures the deficiencies and reinstates the vacated action.).[43]   Because the HCC does not expect there to be any successful claims, and it is difficult to brief remedy without having a liability finding in hand, the HCC respectfully request the opportunity to submit a supplemental brief on remedy should the Court find any non-harmless error by FWS in this case.[44]

## CONCLUSION

WHEREFORE, HCC respectfully requests that the Court deny the Motion for Summary Judgment submitted by HSUS, grant the Motion for Summary Judgment submitted by HCC as

---

[42]   For example, concerns about DPS boundaries could be addressed by the agency without need to remove management authority for wolves from the states.  Such an error might well prove to be easily curable.

[43]   As this is a balancing test, a strong showing on one factor can be enough.  *See Fox Television Stations v. FCC*, 280 F.3d 1027, 1048-49 (D.C. Cir. 2002)

[44]   In 2009, Judge Friedman in reviewing FWS's 2007 WGL delisting rule found that FWS wrongly treated ambiguous statutory text regarding the recognition of DPSs as unambiguous, and therefore did not explain its policy decisions in construing the statute and/or did not realize it had broader leeway in decision-making than it thought it had.  *See Humane Society of the United States v. Kempthorne*, 579 F.Supp.2d 7, 21 (D.D.C. 2008).   Judge Friedman held that this error required vacatur because it was "fundamental."  *Id.*   Not all errors fall in that category.

well as the motions submitted by the Federal Defendants and Defendant-Intervenors in this matter, dismiss HSUS's Complaint and enter judgment in favor of HCC, Federal Defendants and all Defendant-Intervenors.

Dated:  December 11, 2013

Respectfully Submitted,

/s/Anna M. Seidman

Anna M. Seidman
D.C. Bar # 417091
Douglas S. Burdin
D.C. Bar # 434107
Safari Club International
501 2nd Street N.E.
Washington, D. C. 20002
Telephone: (202)-543-8733
Facsimile: (202)-543-1205
aseidman@safariclub.org
*Attorneys for Proposed Defendant-Intervenor*
*Safari Club International*

/s/ Christopher A. Conte

Christopher A. Conte
D.C. Bar # 430480
NRA/ILA
11250 Waples Mill Rd., 5N
Fairfax, VA 22030
Telephone: (703) 267-1166
cconte@nrahq.org
*Attorneys for Proposed Defendant-Intervenor*
*National Rifle Association of America*

/s/ John I. Kittell

John I. Kittell
U.S.D.C. for D.C. Boar No. WI0030
Mazur & Kittell, PLLC
30665 Northwestern Hwy. Ste. 175
Farmington Hills, MI  48334
Tel: (248) 432-8000
Fax (248) 432-8010
jkittel@amzur-kittell.com
*Co-Counsel for Michigan Conservation Clubs and Rocky*
*Mountain Elk Foundation*

/s/ William P. Horn

James H. Lister
D.C. Bar # 447878
William P. Horn
D.C. Bar # 375666
Carissa D. Siebeneck
D.C. Bar # 1007526
Birch Horton Bittner and Cherot, PC
1155 Connecticut Avenue, NW
Suite 1200
Washington, DC  20036
Telephone: (202) 659-5800
Facsimile (202) 659-1027
whorn@dc.bhb.com
jlister@dc.bhb.com
csiebeneck@dc.bhb.com
*Attorneys for Proposed Defendant-Intervenors:  U.S. Sportsmen's Alliance Foundation; Wisconsin Bear Hunters Association; Michigan United Conservation Clubs; Wisconsin Bowhunters Association; Upper Peninsula Bear Houndsmen Association; Michigan Hunting Dog Federation; and Rocky Mountain Elk Foundation*