**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **THE HUMANE SOCIETY OF THE** | ) | |
| **UNITED STATES**, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 13-CV-00186-BAH |
| | ) | |
| **SALLY JEWELL**, *et al.*, | ) | |
| | ) | |
| Defendants. | | |

_____

**BRIEF OF *AMICUS CURIAE* – ASSOCIATION OF FISH AND WILDLIFE AGENCIES**

**TABLE OF CONTENTS**

**INTRODUCTION**................................................................3

**STATEMENT OF FACTS**...................................................4

   I.   Gray Wolf Recovery ................................................4

   II.   State Wolf Management Plans....................................6

   III.   Public Trust Doctrine, Wildlife Conservation, and Regulated Harvest....................9

**ARGUMENT** ....................................................................11

   I.   States Have Legal Authority to Manage Wildlife, Including Federally-Protected Species, That Relisting Would Infringe ...................................11

   II.   States Have a Vested Interest in Managing Wolves and Relisting Wolves Would Harm That Interest............................13

   III.   State Management Benefits Wolves .....................................17

   IV.   State Wolf Plans Are Adequate Regulatory Mechanisms to Ensure the Continued Success of Wolves in the WGL ........................................20

   V.   "Recovery" Does Not Equate to Presence Throughout the Wolf's Historical Range, and to Find Otherwise is an Undue Burden on the WGL States ...................................22

**CONCLUSION** .................................................................25

**TABLE OF AUTHORITIES**

**Constitutional Provisions**

Minn. Const. art. XIII, § 12 ................................................................................. 13

**Federal Statutes**

16 U.S.C. § 1532(6) ........................................................................................... 22
16 U.S.C. § 1533 .................................................................................................. 6
16 U.S.C. § 1533(a)(1)(D) ................................................................................. 12
16 U.S.C. § 1533(f) .............................................................................................. 5
16 U.S.C. § 1533(f)(1)(B)(ii) ............................................................................... 5
16 U.S.C. § 1535(f) ............................................................................................ 12
Pub. L. No. 112-10,.......................................................................................... 16

**Cases**

*Chevron v. Nat. Resources Def. Council*, 467 U.S. 837 (1984)....................... 23
*Colorado River Cutthroat Trout v. Salazar*, 09-CV-2233-PLF (D.D.C. Oct. 16, 2012)............. 23
*Defenders of Wildlife v. Norton*, 258 F.3d 1136, 1144 (9th Cir. 2001) .................. 13, 23
*Hughes v. Oklahoma*, 441 U.S. 322, 337 (1979) ........................................... 11
*Martin v. Lessee of Waddell*, 41 U.S. 367 (1867) ......................................... 11
*Tucson Herpetological Soc'y v. Salazar*, 566 F.3d 870 (9th Cir. 2009)................................ 23, 24
*Wyoming v. U.S. Dept. of the Interior*, 09-cv-118-J, 2010 WL 4814950, *10 (D. Wyo. Nov. 18, 2010) ...................................................................................................... 17

**Legislative History**

93 Cong. Rec. S. 1983 (July 24, 1973)............................................................. 12
93rd Cong. 207 (1973) ..................................................................................... 13
93rd Cong. 61-62 (1973).................................................................................. 13
H.R. Rep. No. 412, 93rd Cong., 1 Sess. (1973).............................................. 25

**Federal Regulations**

76 Fed. Reg. 25590 .......................................................................................... 16
76 Fed. Reg. 81665 ................................................................................... passim
77 Fed. Reg. 55530 ........................................................................ 9, 10, 16, 18

**State Regulations**

Mich. Dept. Nat. Resources, Mich. 2013 Wolf Digest (2013) ....................... 19
Minn. 2013-2014 Wolf Season Regulations Handbook ................................. 19
Wis. Dept. Nat. Resources, Wis. 2013 Wolf Hunting and Trapping Regulations (2013) ........... 19

**Treatises**

Valerius Geist, The North American Model of Wildlife Conservation as a Means of Creating Wealth, Protecting Public Health While Generating Biodiversity, in Gaining Ground: In Pursuit of Ecological Sustainability 285, 285 (D.M. Lavigne ed., 2006) ................ 9, 14, 15

**Other Authorities**

1992 Eastern Timber Wolf Recovery Plan ................................................................. 5
2011 Mont. Wolf Hunting Season Rep. (2012) ..................................................... 16
2011 National Survey of Fishing, Hunting, and Wildlife-Associated Recreation....................... 15
2012 Minn. Wolf Season Rep. (2013) ............................................................ 10, 19
Michigan Wolf Management Plan (2008) ...................................................... 8, 20, 21
Minn. Dept. of Nat. Resources, 2013-2014 Wolf Season Regulations Handbook...................... 10
Minn. Dept. of Nat. Resources, Distribution and Abundance of Wolves in Minnesota, 2012-2013
............................................................................................. 10, 19
Minn. Dept. of Nat. Resources, Minn. Wolf Management Plan (2001) ................................... 6, 7
Montana Gray Wolf Conservation and Management 2012 Annual Report (2013)..................... 16
Press Release, Mich. Dept. Nat. Resources ................................................... 8, 11, 19
Press Release, Wis. Dept. of Nat. Resources, More Than 20,000 Apply for Wisconsin Wolf
License, (Sept. 11, 2012) ..................................................................... 10
Press Release, Wis. Dept. of Nat. Resources, Wisconsin Natural Resources Board Approves
2012 Wolf Hunt Quota, Zones and Rules, (July 17, 2012)....................................... 17
Tom Dickson, *A Steady First Step: What Montana Learned from Its First Regulated Wolf
Hunting Season*, MONTANA OUTDOORS, March-April 2010 ................................. 16, 18
Wis. Dept. of Nat. Resources, Wolf Hunting and Trapping ...................................... 11
Wis. Wolf Management Plan (1999) ............................................................ 7, 8, 22
Wis. Wolf Season Rep. 2012 .................................................................. 10, 11

## <u>INTRODUCTION</u>

The Association of Fish and Wildlife Agencies ("Association") welcomes the opportunity

to participate in this action.  The Association supports the United States Fish and Wildlife

Service's ("FWS") action designating the gray wolf Western Great Lakes Distinct Population

Segment ("WGL DPS") and removing the WGL DPS from federal protection under the

Endangered Species Act ("ESA"), returning full wolf management authority to the respective

state wildlife agencies.  The Association recognizes that the FWS and the Department of the

Interior ("DOI"), as agencies with expert knowledge and authority regarding federal

management of wildlife, are in the best position to make factual and legal arguments in support

of their designation and delisting of the WGL DPS, so it will not duplicate their efforts.  Instead,

the Association seeks to bring the state wildlife management authorities' invaluable perspective

to the Court's attention, a perspective it is uniquely suited to provide.  Specifically, the

Association's brief will highlight the states' authority to manage wildlife; explain the states'

interest in ensuring adequate wolf protection; explain how state management of wolves and

sustainable harvest are strong tools to maintain, support, and protect the thriving WGL wolf

populations; posit that these states have adequate regulatory mechanisms in place to manage

wolves; and explain how relisting the wolf would unfairly impact the states' interests.

## ABOUT THE ASSOCIATION

The Association is the collective voice of North America's fish and wildlife agencies at

every level of government and speaks with a unified voice on important fish and wildlife issues.

The Association provides its member agencies and their senior staff with coordination services

on issues that range from migratory birds, fish habitat, and invasive species, to conservation

education, leadership development, and international relations. Further, the Association

represents the state agency members on Capitol Hill and before the Administration on key

conservation and management policies, and works to ensure that all fish and wildlife entities

work collaboratively on the most important issues. It also provides management and technical

assistance to both new and current fish and wildlife leaders.  Given the Association's charge and

expertise, it is uniquely positioned to represent the state wildlife agencies' perspective as to the

implications of this Court's decision in this case.

## STATEMENT OF FACTS

Rather than providing a full statement of the facts, the Association incorporates by

reference the statements of facts included in FWS's and DOI's brief, as well as those in the briefs

of the states of Michigan and Wisconsin.  The Association will, however, note some key facts

and provide some supplemental facts that bear on its arguments.

**I.    Gray Wolf Recovery**

ESA section (4)(f) requires the Secretary of the Interior to "develop and implement recovery plans" for listed species. 16 U.S.C. § 1533(f). Each plan contains recovery criteria that the subject species must meet before it can be delisted. *Id.* at § 1533(f)(1)(B)(ii). FWS first developed a recovery plan for the eastern timber wolf in 1978, which it updated and revised in 1992. Final Rule Revising Listing of Gray Wolf in the Western Great Lakes, 76 Fed. Reg. 81665, 81666 (Dec. 28, 2011) (to be codified at 50 C.F.R. pt. 17), 2011 AR 91732A. The recovery criteria, which remained the same after the 1992 revisions, are (1) that the "Minnesota [gray wolf] population must be stable or growing, and its continued survival must be assured," and (2) that "a second population outside of Minnesota and Isle Royale must be re-established, having at least 100 wolves in late winter if located within 100 miles of the Minnesota wolf population, or having at least 200 wolves if located beyond that distance." 1992 Eastern Timber Wolf Recovery Plan, 2011 AR 5A. Under the first criterion, FWS set a numerical goal of 1,251 – 1,400 wolves in Minnesota, and a geographical goal of having the wolves spread through about 40% of the state. *Id.* at 29A.

FWS estimates place the current Minnesota wolf population at around 3,000 individuals, and it also estimates that the wolves have expanded their Minnesota range by 225%, so it finds the first recovery criterion met. 76 Fed. Reg. at 81677, 2011 AR 19753A. FWS also estimated in 2010 that 782 wolves live in Wisconsin and 687 live in Michigan, which meets both alternatives under the second recovery criterion. *Id.* at 19751A. Further, the wolf counts are done at the time of year when the wolf population is at its lowest. *Id.* at 19750A. Having made those determinations, FWS concluded that "wolves in the WGL DPS greatly exceed the recovery criteria . . . the DPS contains sufficient wolf numbers and distribution to ensure their long-term survival within the DPS." *Id.* at 19758A. FWS then undertook further analysis under the five

listing factors in ESA § (4)(a)(1), determining that human-caused mortality was the main threat

to the continued recovery of the WGL DPS but that state regulatory efforts would adequately

manage that threat.  All other "foreseeable threats" to the wolf's recovery it deemed non-issues

"as long as populations are maintained at or above minimum recovery levels."  *Id.* at 81721-22,

2011 AR 19843A.  Thus, the FWS found the gray wolf to be recovered in the Western Great

Lakes states.  76 Fed. Reg. at 81723, 2011 AR 19846A.  FWS also noted that the recovery

criteria did not contemplate restoration of the wolf to all or most of its historical range.  *Id.* at

19749A.

## II.    State Wolf Management Plans

As part of its recovery analysis under ESA § 4(a)(1)(D), 16 U.S.C. § 1533, the "adequacy

of existing regulatory mechanisms" to protect the gray wolf, FWS vetted and approved state wolf

management and regulation:

> All three states have wolf management laws, plans, and regulations that
> adequately regulate human-caused mortality.  Each of the three states has
> committed to manage its wolf population at or above viable population levels, and
> this commitment is not expected to change.  Regulatory mechanisms in all three
> states are adequate to facilitate the maintenance of, and in no way threaten, the
> recovered status of the wolves in the WGL DPS.

76 Fed. Reg. at 81721, 2011 AR 19843A.

Minnesota developed its wolf management plan in 2001, and intends to "ensure the long-

term survival of wolves . . . while addressing wolf-human conflicts that inevitably result when

wolves and people live in the same vicinity."  Minn. Dept. of Nat. Resources, Minn. Wolf

Management Plan (2001), 2011 AR 289A.  The plan addresses myriad aspects of wolf

management, including population management, population monitoring, public safety issues,

wolf damage management, habitat management, enforcement, information and education,

research, and staffing.  *Id.* at 290A-293A.  The wildlife damage management program includes,

among other things, compensation for livestock losses, best management practices including

non-lethal deterrent measures, and some measure of lethal control.  *Id.* at 291A.  Between 1980

and 2010, the federal wolf depredation control program took from 20 to 216 wolves per year;

however, FWS concluded that the depredation control program "has not interfered with wolf

recovery," and observed that the state wolf population still grew at almost 4% per year in the

years when the program took the highest numbers of wolves.  76 Fed. Reg. at 81703, 2011 AR

19807A.  The Minnesota plan also provides for wolf habitat management to include wolf prey,

vegetation, and "other environmental variables," as well as for stringent criminal enforcement of

prohibitions on illegal wolf take.  It also dedicates conservation staff for wolf management.

Minn. Wolf Plan, 2011 AR 290A-293A.

The Wisconsin Plan was completed in 1999 by the Wisconsin Wolf Advisory Committee

for the Division of Land of the Wisconsin Department of Natural Resources ("DNR"); the state

updated the plan in 2006.  76 Fed. Reg. at 81705-706, 2011 AR 19810A.  Some of the plan's

salient aspects include "intensely monitoring wolf populations through threatened status and

delisted status," as well as populations' health; "cooperatively" managing wolf habitat through

work with public and private parties; a wolf depredation program that may include "technical

assistance" to landowners, compensation for lost livestock, translocation of problem wolves, and

lethal control of problem wolves; public education; establishing regulations to protect wolves;

and encouraging volunteer participation in the programs.  Wis. Dept. Nat. Resources, Wis. Wolf

Management Plan (1999), 2011 AR 155A.  Since 2003, FWS has authorized the Wisconsin DNR

to lethally control depredating wolves.  As in Minnesota, the wolf populations continued to grow

despite lethal control measures, and FWS has concluded that those measures "will not adversely

impact the viability of the Wisconsin wolf population." 76 Fed. Reg. at 81708, 2011 AR 19816A. The Plan set a minimum wolf number at 350. Wis. Wolf Plan, 2011 AR 167A.

Michigan's DNR completed its wolf management plan in 1997, which it reviewed in 2001, and upon deciding that the plan needed revision, appointed the Wolf Management Roundtable to gather stakeholder input. 76 Fed. Reg. at 81710, 2011 AR 19818A-19819A. The Roundtable developed "guiding principles" for wolf management following delisting, and the DNR took those principles into account when developing the 2008 Plan. *Id.* The 2008 Plan includes elements similar to elements of Minnesota's and Wisconsin's plans, and it sets a minimum number of wolves at 200, but notes that a population higher than 200 might be required to achieve some Plan goals. *Id.*; Mich. Dept. Nat. Resources, Michigan Wolf Management Plan (2008), 2011 AR 417A. FWS has especially high praise for Michigan's wolf management work, writing that the state's "history of leadership in wolf recovery and its repeated written commitments to ensure the continued viability of a Michigan wolf population above [the listing level] reinforces [the FWS's determination that the 2008 plan] will provide adequate regulatory mechanisms for Michigan wolves." 76 Fed. Reg. at 81711, 2011 AR 19821A. Also, as in Minnesota and Wisconsin, depredation control in Michigan has not negatively impacted wolf recovery, and FWS "views Michigan's depredation and conflict control strategies [detailed in its Plan] to be conservative," as the Plan urges the use of alternatives to lethal control. *Id.* at 81711-712. Michigan authorized a wolf season only after finding that non-lethal depredation control measures did not work. It does not expect the limited hunting it permits to negatively impact the Michigan wolf population. Press Release, Mich. Dept. Nat. Resources, Natural Resources Commission Authorizes Limited Public Wolf Harvest Aimed at Managing the State's Wolf

Population (July 11, 2013), available at http://www.michigan.gov/dnr/0,4570,7-153-10371_10402-308071--,00.html.

### III.     Public Trust Doctrine, Wildlife Conservation, and Regulated Harvest

The North American Model of Wildlife Conservation ("N.A. Model"), which is the philosophy underlying the approach to wildlife regulation in the United States, starts from the premise that wildlife is publicly-owned and is to be managed based on science and public input. Valerius Geist, *The North American Model of Wildlife Conservation as a Means of Creating Wealth, Protecting Public Health While Generating Biodiversity*, *in* GAINING GROUND: IN PURSUIT OF ECOLOGICAL SUSTAINABILITY 285, 285 (D.M. Lavigne ed., 2006).  States lead wildlife management under the N.A. Model.  Rule Delisting Gray Wolf in Wyoming, 77 Fed. Reg. 55530, 55566 (Sept. 10, 2012) (to be codified at 7 C.F.R. pt. 17).  Under the states' lead, hunters and conservation groups have enjoyed great success in promoting wildlife conservation, which they have achieved through helping protect wildlife and habitat, through financial contributions and license fees, and through education and outreach.  Geist, *North American Model* at 285-88.

Successful wolf conservation will probably depend in large part on improving public attitudes toward the wolf.  77 Fed. Reg. at 55591.  The major reason the wolf required federal protection in the 1970s was because of widespread negative perception of the wolf, which fueled extirpation efforts.  *Id*.  Two major ways to improve public attitudes toward the wolf are to increase local control over its management, and to allow regulated hunting.  *Id.* at 55592.  Canada and Sweden achieved greater wolf conservation success when they allowed hunting, while in the United States, black bear and mountain lion conservation efforts enjoyed greater success when authorities permitted hunting of these species.  *Id.*

Since FWS designated and delisted the WGL DPS in 2011, Minnesota, Wisconsin, and Michigan have authorized wolf hunting seasons.  In 2011, the Minnesota Legislature passed a law designating the wolf as a small game species, and in 2012 authorized the state DNR to open a wolf hunting season.  Minn. Dept. of Nat. Resources, 2012 Minn. Wolf Season Rep. (2013); Minn. Stat. 97B.647 (2012).  For the 2012 season, the state sold 6,123 licenses; the state set a quota of 400 wolves, and 413 were taken.  2012 Minn. Wolf Rep.  This year, the state cut the quota nearly in half, to 220 wolves.  Minn. Dept. of Nat. Resources, 2013-2014 Wolf Season Regulations Handbook (2013).  The state estimated the post-wolf season population to be 2,211, which it attributed in part to hunting and in part to diminished availability of wolf prey; the lower 2013 season quota reflects the state's response to the lower wolf population numbers.  Minn. Dept. of Nat. Resources, Distribution and Abundance of Wolves in Minnesota, 2012-2013 (2013).

Wisconsin authorized wolf hunting through 2011 Act 169, which became law in April 2012.  Wis. Wolf Season Rep. 2012, Wis. Dept. of Nat. Resources (2013).  The state authorized hunting in part to "begin to reduce the statewide wolf population toward the wolf management plan population goal; maintain a sustainable wolf population; [and to] reduce conflicts [between human activities and wolves]." *Id.*  Wisconsin held its initial wolf hunting season in winter 2012-2013, set the quota at 201, and planned to sell 1,160 wolf licenses.  Wis. Wolf Rep.; Press Release, Wis. Dept. of Nat. Resources, More Than 20,000 Apply for Wisconsin Wolf License, (Sept. 11, 2012), available at http://dnr.wi.gov/news/Weekly/Article_Lookup. asp?id=2298.  Hunters took 117 wolves during the 2012-2013 season.  Wis. 2012 Wolf Rep.  This year, Wisconsin set a quota of 251 wolves.  Wis. Dept. of Nat. Resources, Wolf Hunting and Trapping, http://dnr.wi.gov/topic/HUNT/wolf.html, (last visited Oct. 16, 2013).

Michigan's DNR recommended that the wolf be designated a game species in June 2013, and the state Natural Resources Commission accepted the recommendation on July 11, 2013. Press Release, Mich. Dept. Nat. Resources  Allowing harvest will help the state achieve its management goal of reducing conflicts between wolves and human activities. *Id.*  Michigan plans to hold in November and December of this year its first wolf season since delisting, and for that season set a statewide limit of 43 wolves. *Id.*

## ARGUMENT

## I.      STATES HAVE LEGAL AUTHORITY TO MANAGE WILDLIFE, INCLUDING FEDERALLY-PROTECTED SPECIES, THAT RELISTING WOULD INFRINGE

Principles of state authority to manage wildlife can be found in many places in U.S. law, including in constitutional law, in federal statutes such as the ESA, and in state constitutions and statutes.  Wildlife management has primarily been the province of the states, especially since the early twentieth century.

The Supreme Court recognized state ownership of wildlife under the public trust doctrine as early as the mid-19[th] century.  In *Martin v. Lessee of Waddell*, 41 U.S. 367 (1867), at issue was the property right to an oyster bed in a New Jersey mudflat; the private party claiming ownership traced his claim to grants from the English crown.  *Id*. at 407-08. The Court held that the state owned fisheries and held them in trust for the common use of all state citizens.  *Id.* at 416-17.  Later, in *Hughes v. Oklahoma*, the Supreme Court recognized states' right to manage wildlife, which they derive from their power to regulate for legitimate local purposes. 441 U.S. 322, 337 (1979).

Congress has also recognized states' role in managing wildlife.  Without going into the same level of detail as in its Motion to Participate as an *Amicus Curiae* ("Motion"), the Association would like to briefly recall the Court's attention to this issue.  ESA § 6(f) encourages

states to develop and maintain conservation programs for threatened and endangered species. 16 U.S.C. § 1535(f).

Further, the ESA requires FWS to consider, when making a recovery determination, "the inadequacy of existing regulatory mechanisms." 16 U.S.C. § 1533(a)(1)(D). FWS "reviews . . . relevant . . . State . . . laws, plans, regulations . . . including analyzing the extent to which those mechanisms can be relied upon." 76 Fed. Reg. at 81701, 2011 AR 19803A. In assessing these mechanisms, FWS accords "strongest weight . . . to statutes and their implementing regulations, and management direction that stems from those laws and regulations." *Id.* As the Association will explain later, the three states have strong and appropriate regulatory efforts in place to manage wolves now that the FWS has returned the wolves to the states' care. Congress's mandate that FWS consider state regulatory mechanisms when making delisting decisions is a strong indication of its belief that states can adequately manage and conserve species of concern once they are delisted, and this Court should follow Congressional intent and give weight to the states' management capabilities.

Also, the Congressional record from the ESA's path to enaction shows the drafters' intent that states would retain some authority to manage federally protected species following the ESA's passage. Sen. Tunney's statement that states can assist in managing native species that are federally protected in other states, along with Assistant Secretary Reed's testimony, expresses the ESA's selectivity principle. 93 CONG. REC. S. 1983 (July 24, 1973) (statement of Sen. Tunney); *Endangered Species: Hearings on H.R. 37 and 4758 Before the Subcomm. on Fisheries and Wildlife Conservation of the House Comm. on Merchant Marine and Fisheries*, 93rd Cong. 207 (1973) (statement of Nathaniel Reed, Assistant Secretary for Fish and Wildlife and Parks, Dept. of the Interior); *see also Defenders of Wildlife v. Norton*, 258 F.3d 1136, 1144

(9th Cir. 2001) (recognizing Congressional intent to "encourage cooperation between federal and state agencies and to allow the Secretary more flexibility in her approach to wildlife management").  The gray wolf's status in the Western Great Lakes states is stable, and the species has recovered, according to the expert agency.  The selectivity principle Congress expressed in the creation of the ESA addresses this exact situation: the Western Great Lakes states in which the wolf has recovered should be allowed to manage the wolf now that it has recovered there.  Congress also had concerns about preempting state authority to manage wildlife.  *See Endangered Species Act of 1973: Hearing Before the Subcomm. on Environment of the Comm. on Commerce United States Senate*, 93rd Cong. 61-62 (1973) (statement of Sen. Cook and Dr. Earl Baysinger). The ESA's drafters clearly intended for the states to be able to manage species and populations of species that FWS determines are not endangered, and this Court should follow Congressional intent by rendering a decision upholding FWS's rule.  In addition, as mentioned in the Motion, other federal statutes such as the Multiple Use-Sustained Yield Act and the Federal Land Management Policy Act recognize states' wildlife management powers and contain provisions instructing the federal government to avoid acting to infringe thereon.

Further, as the Association detailed in its Motion, state constitutions and statutes vest the states' property rights in wildlife, indicating that states hold wildlife for the benefit of the public, and give states the authority to manage their own wildlife.  *E.g.*, MINN. CONST. art. XIII, § 12; Minn. Stat. § 97A.025 (1996). Vacating the rule would once again withdraw state authority to manage wolves, which is rightly the states' prerogative under state law.

## II.     STATES HAVE A VESTED INTEREST IN MANAGING WOLVES AND RELISTING WOLVES WOULD HARM THAT INTEREST

The N.A. Model is the dominant model of wildlife conservation in the United States, and it dates from the early twentieth century, a period which saw the extinction of species like the

passenger pigeon and the near extinction of others, such as the American bison.  Geist, *North American Model*, at 287.  It treats wildlife as a publicly-owned resource, held in trust by the states for the benefit of the public, and managed through science and democratic process.  *Id.* at 289.  State-based wildlife management under the N.A. Model has been extremely successful in restoring populations of many different game species, and game species restoration efforts have indirectly benefited many non-game species.  *Id*. at 287-88.  N.A. Model-based management offers additional benefits to society, including public involvement in conservation, inspired by the sense of participation and public ownership generated by the N.A. Model; habitat conservation; development and funding of wildlife biological research and creation of jobs in this field; putting a price on wildlife through license fees and taxes that in turn are put toward conservation efforts; and a yearly economic benefit totaling in the hundreds of billions.  *Id*. at 288-291.  Recognizing their role under the N.A. Model as a trustee of wildlife resources, states have codified their wildlife trustee duties, and are thus bound by law to carry them out.  Minn. Stat. § 84.941 (1986); Wis. Stat. § 29.011 (2001); Mich. Comp. Laws § 324.40105 (1995).

In addition to their incentive to follow their own laws by working to manage wolves within their borders, these three states will benefit from being allowed to manage their wolf populations in accordance with the N.A. Model, as they already do other native species.  This wildlife management model allows the state to determine, based on science and public input, the size of its wildlife populations and thus whether sustainable harvest is prudent.  Geist, *North American Model* at 291-92.  If states determine that there is surplus wildlife, they can allow sustainable harvest of the surplus.  *Id*. at 291.

Opening the surplus for harvest generates many benefits for the state, its citizens, and for future conservation efforts.  First, having public ownership of the wildlife instead of private

ownership allows for public buy-in and creates a sense of ownership of the wildlife; this not only builds public support for conservation, but incentivizes volunteerism and other efforts to support conservation, which helps the state manage its wildlife resources. *Id.* Second, it allocates the costs of supporting wildlife mainly to those who "use" it – i.e., hunters and fishers – through the sale of licenses and tags. *Id.* The revenues can then be put back into wildlife conservation efforts. Further, hunting-and-fishing-related economic activity is a substantial benefit to states; in 2011, sportsmen spent about $145 billion on hunting and fishing and related goods and services, which represented about 1% of the U.S. GDP. U.S. Dept. of the Interior, U.S. Fish & Wildlife Serv. and U.S. Dept. of Comm., U.S. Census Bur., 2011 National Survey of Fishing, Hunting, and Wildlife-Associated Recreation. Meanwhile, Minnesota saw sportsmen spend about $3.9 billion in 2011, Wisconsin about $5.5 billion, and Michigan about $6.1 billion. U.S. Dept. of the Interior, U.S. Fish & Wildlife Serv. and U.S. Dept. of Comm., U.S. Census Bur., 2011 National Survey of Fishing, Hunting, and Wildlife-Associated Recreation - Minnesota; U.S. Dept. of the Interior, U.S. Fish & Wildlife Serv. and U.S. Dept. of Comm., U.S. Census Bur., 2011 National Survey of Fishing, Hunting, and Wildlife-Associated Recreation - Wisconsin; U.S. Dept. of the Interior, U.S. Fish & Wildlife Serv. and U.S. Dept. of Comm., U.S. Census Bur., 2011 National Survey of Fishing, Hunting, and Wildlife-Associated Recreation - Michigan.

In all, states have much to benefit generally from managing their wildlife. In particular, allowing these three states manage their own wolf populations provides financial benefits to the states that the states in turn can use to further wolf conservation.

Montana's successful experience with wolf hunting is instructive as to states' ability to manage wolf populations in a way that benefits both the state and wolves. Congress ordered

FWS to remove federal protections for the gray wolf in much of the Northern Rocky Mountains region in April 2011, while leaving in place the protections for the wolf in Wyoming. Department of Defense and Full-Year Continuing Appropriations Act, 2011, Pub. L. No. 112-10, § 1713.  FWS complied in May 2011, and in September 2012, delisted the wolf in Wyoming.  76 Fed. Reg. 25590; 77 Fed. Reg. 55530.  These delistings opened the door to wolf hunting in those states, which Montana instituted after years of work on its wolf management plan, and due to its determinations that the population needed to be managed and public support for the wolf was dwindling.  Tom Dickson, *A Steady First Step: What Montana Learned from Its First Regulated Wolf Hunting Season*, MONTANA OUTDOORS, March-April 2010, http://fwp.mt.gov/mtoutdoors/HTML/articles/2010/2009wolfhunt.htm#.UmAyXvmsj0t. Montana's 2011-2012 wolf season generated $407,389 in licensing fees.  Mont. Fish, Wildlife, and Parks, 2011 Mont. Wolf Hunting Season Rep. (2012).  Fees will go to fund wolf conservation efforts.  *See* Mont. Code Ann. § 87-1-623 (2011).  Montana set its wolf quota at 220, and hunters took 166 wolves.  *Id.*  The state minimum wolf population count dropped from 653 in 2011 to 625 in 2012, showing some resiliency to hunting pressures.  Mont. Fish, Wildlife, and Parks, Montana Gray Wolf Conservation and Management 2012 Annual Report (2013).

Minnesota and Wisconsin have each held one wolf hunting season since delisting. Minnesota sold 6,123 wolf licenses, while Wisconsin sold 1,160, and had over 20,000 applications.  Given Minnesota's fees of $30 for residents and $250 for non-residents, and Wisconsin's $10 application fee as well as its $100 resident license fee and $500 non-resident (lowered to $250 as of June 2013), each state gained a substantial sum that it was able to put toward further conservation efforts.  For example, Wisconsin's license fees first go to depredation compensation, then to other wolf management costs.  Press Release, Wis. Dept. of

Nat. Resources, Wisconsin Natural Resources Board Approves 2012 Wolf Hunt Quota, Zones

and Rules, (July 17, 2012) available at http://dnr.wi.gov/news/BreakingNews_Lookup.asp?id

=2433.  These states stand to benefit from a decision upholding the rule, as it will allow them to

continue to permit hunting, which in turn better enables them to manage the wolf populations.

III.      **STATE MANAGEMENT BENEFITS WOLVES**

Allowing Minnesota, Wisconsin, and Michigan to continue to manage their wolf

populations in accordance with N.A. Model-based conservation principles will also benefit the

wolf populations and help sustain them in two key ways.  First, allowing regulated harvest of

wolves should increase public tolerance toward wolves.  Second, allowing regulated harvest of

wolves will decrease the frequency of and damage resulting from human-wolf interactions.

Human-caused mortality is the main threat toward the gray wolf's continued viability in

the subject states.  76 Fed. Reg. at 81721, 2011 AR 19843A.  The judge presiding in *Wyoming v.*

*U.S. Dept. of the Interior*, 09-cv-118-J, 2010 WL 4814950, *10 (D. Wyo. Nov. 18, 2010)

(vacating FWS's decision to not delist the gray wolf in Wyoming), wrote that human tolerance of

and public perceptions of wolves "can have serious consequences" for wolf survival.  Negative

attitudes toward wolves, which stem in part from historically-held fears and misinformation

about wolf behavior and the threats wolves pose, and in part from people's personal experiences

with wolves killing their pets or livestock, or taking ungulates that hunters intended to hunt, fuel

people's desire to eradicate wolves and to withhold tolerance of wolves.  76 Fed. Reg. at 81718,

19835A-19836A.  As wolf populations increase and exceed state population goals, conflicts

between humans and wolves increase, as do negative attitudes toward wolves.  *Id.* at 19836A;

*see also* Dickson, *A Steady First Step*.  Brian Schweitzer and Dirk Kempthorne, the respective

governors of Montana and Idaho, wrote a 2005 letter to DOI Secretary Norton expressing this

same concern regarding the growing wolf populations in their states and growing anti-wolf

sentiments.  2007 AR 118-119.

On the other hand, allowing regulated wolf harvest can have positive effects on attitudes

toward wolves.  Canada and Sweden saw marked increases in tolerance of wolves when they

permitted wolf hunting, while allowing black bear and mountain lion hunts in the United States

increased public tolerance of those species. 77 Fed. Reg. at 55592.  That tolerance and the

increasingly favorable attitudes develop when hunters begin to view wolves as a valuable game

species, when lethal control of problem wolves is allowed, and when those who live in wolf-

inhabited areas have more of a say in managing those wolves.  *Id*.   In fact, allowing more local

control of wolves has already worked in Wisconsin.  Illegal wolf kills dropped during the 2007-

2008 period when wolves were delisted and lethal controls were allowed, and the wolf

population still increased.  *Id.*  Given this evidence of past success from allowing regulated

hunting of predators in Wisconsin, in other U.S. jurisdictions, and in foreign countries, it follows

that allowing states to manage wolves based on sound science and allow regulated harvest when

research demonstrates the utility of such harvest will only serve to further wolf conservation in

the subject states, as it will mitigate the main risk to wolf viability: human intolerance.

Plaintiffs, Humane Society of the United States, Born Free, HOWL, and FATE,

("Plaintiffs") baldly assert that Minnesota, Wisconsin, and Michigan will seek to "aggressively

hunt" wolves following delisting.  Pls. Mem. P. & A. 41, ECF No. 24-1.  This is a gross

mischaracterization of the states' wolf management programs.  First, Minnesota and Wisconsin

have carefully planned for and managed wolf harvests, while Michigan has planned its first wolf

season for this year.  Michigan's DNR's statement regarding the careful, science-based planning

procedure behind the hunting decision is telling: the "'decision [to allow hunting] was the

culmination of a long and thorough process by the NRC,' said [Mich. DNR Director] Creagh. 'The DNR will continue to work closely with the commission to be certain that Michigan's wolf population is managed according to the principles of sound science.'" Press Release, Mich. Dept. Nat. Resources  Also noteworthy is the fact that Minnesota cut the current season's wolf harvest nearly by half from last year's quota when its management authority determined that was the best policy in managing the wolf populations.  Minn. 2012 Wolf Season Rep.; Minn. 2013-2014 Wolf Season Regulations Handbook; Distribution and Abundance of Wolves in Minnesota, 2012-2013.  Wisely, all three states will close the wolf season early if harvest quotas are reached prior to the end of the season.  Minn. 2013-2014 Wolf Season Regulations Handbook; Wis. Dept. Nat. Resources, Wis. 2013 Wolf Hunting and Trapping Regulations (2013); Mich. Dept. Nat. Resources, Mich. 2013 Wolf Digest (2013). These states will carefully manage their wolf harvest programs as part of their overall wolf management strategy.

Plaintiffs also claim that the subject states have a "clear . . . intent to further harm the wolf populations," and cite the states' minimum wolf populations set in the state plans.  Pls. Mem. P. & A. 42, ECF No. 24-1.  However, these minima are above FWS's recovery goal numbers; in fact, Michigan's minimum is by itself enough to meet both alternatives of the second recovery criterion.  Further, Michigan's plan clearly states that a number higher than its minimum might be necessary to maintain a healthy population, so it is very possible that the state will not allow its wolf numbers to dip to 200.  Mich. Wolf Plan.  Plaintiffs also imply that the state of Minnesota is responsible for wolf kills during the 2009 and 2010 period, when wolves were still federally protected and wolf kills were the highest in a 30-year period, and that indicates states' eagerness to kill more wolves as soon as they are delisted.  Pls. Mem. P. & A. 42, ECF No. 24-1.  In actuality, federal wildlife agents took those wolves under a federally-

authorized depredation control program, authorized by the U.S. Department of Agriculture by

special regulation at 50 C.F.R. 17.40(d), so these wolf deaths are certainly not evidence of state

intent to kill wolves once they are delisted.  In fact, as noted elsewhere in the brief, states are

bound by law to manage wildlife resources for their citizens, and they have financial incentives

to manage wolves and allow regulated hunting of them.

## IV.     STATE WOLF PLANS ARE ADEQUATE REGULATORY MECHANISMS TO ENSURE THE CONTINUED SUCCESS OF WOLVES IN THE WGL

FWS, the federal agency best-placed to know whether a species is in need of federal

protection, given its statutory duties and experience implementing and operating under the ESA,

has made the expert determination that the best available science indicates that the gray wolf in

the Western Great Lakes region has recovered and is no longer in need of federal protection.  76

Fed. Reg. at 81666, 2011 AR 19846A.  As part of its charge under ESA § 4(a) to determine

whether a species warrant further listing, it considers whether existing regulatory mechanisms,

such as state management, are adequate to protect the species in question.  In this case, FWS

took pains in its final rule to describe in detail and to vet the state wolf management plans, and

determined that they will be adequate to protect the wolf in the Northern Great Lakes.  76 Fed.

Reg. at 81684, 81701-13; 2011 AR 19767A, 19803A-19824A.  FWS's imprimatur on the state

wolf management plans is weighty evidence of their sufficiency, and this Court should defer to

FWS's expert determination.

In making its determination that the five listing factors were met such that delisting was

appropriate, FWS noted that the sole significant threat to the continued success of the gray wolf

in the WGL is human-caused mortality.  *Id.* at 19843A.  The best way to ensure that human-

caused mortality does not negatively impact wolf populations, FWS found, is through state-based

laws, regulations and management plans.  *Id.*  It further correctly found that the three states'

management plans and legal penalties for illegal wolf taking are sufficient to manage for human-caused mortality.  *Id.*

The state wolf management plans are well-designed, science-based, and will be effective in managing wolf populations and sustaining them above recovery levels.  They incorporate myriad elements that will work together to address the potential human-caused mortality threat.  First, each state carefully monitors wolf population numbers, ensuring accurate counts and that the populations will remain above recovery levels.  Wisconsin does annual monitoring using radio collars and winter track surveys.  76 Fed. Reg. at 81705, 2011 AR 19811A.  The states also have in place criminal penalties for illegal killing of wolves; for example, in Minnesota, illegally killing a wolf is a misdemeanor, carrying criminal penalties of up to 90 days' imprisonment and a maximum fine of $1,000.  Minn. Stat. §§ 97A.301 (2000), 609.03 (1991).  And since wolf depredation on livestock and pets is a major source of wolf-human conflicts, each state has strong wolf depredation programs in place that include payments for livestock kills and that look to implement non-lethal control methods before resorting to lethal control measures.  *See, e.g.*, Mich. Wolf Management Plan.  Additionally, plan elements such as public outreach and education, as well as encouraging volunteer participation in wolf management, such as Wisconsin's plan provides for, will help turn public attitudes toward favoring wolves, which as discussed  is important in reducing human-caused mortality and in generally promoting healthy wolf populations.  *See* Wis. Wolf Management Plan.  These plan elements will address and mitigate human-caused mortality as a factor affecting wolf population viability.  FWS's analysis in its final rule recognizes this, and as the designated expert agency on endangered and threatened species, its decision should get deference.

Plaintiffs' brief also picks up on human-caused mortality as the main threat to the continued success of the gray wolf in the WGL.  Pls. Mem. P. & A. 41, ECF No. 24-1.  Plaintiffs focus on state-permitted hunting as a potential source of human-caused mortality to the wolf, also mentioning the states' wolf population minima and implying that the states will actively work to drive wolf numbers down to those levels.  *Id.* at 41-42.  First, as discussed in the previous section, hunting will benefit wolf populations in several ways, ultimately promoting more human tolerance of and even appreciation for wolves.  It should also help relieve depredation pressures, helping landowners in wolf country tolerate the local presence of wolves and decreasing their desire to take wolf control measures into their own hands.  The current state hunting programs are carefully planned and executed, and Minnesota even partially rolled back its wolf hunting when it became clear that the wolf numbers have dropped such that hunting quotas should also be dropped.  Second, states have a vested interest in maintaining healthy wolf populations, as previously discussed.  Plaintiffs also cite depredation kills from the USDA depredation program in Minnesota, claiming those kills as evidence that states will kill wolves. Again, the federal government carried out those depredation kills, not the states, and so those numbers are not evidence of what states will do.  Also, the need for depredation should decrease as states conduct appropriately-managed wolf hunting seasons, further rendering those numbers of no import.

## V.     "RECOVERY" DOES NOT EQUATE TO PRESENCE THROUGHOUT THE WOLF'S HISTORICAL RANGE, AND TO FIND OTHERWISE IS AN UNDUE BURDEN ON THE WGL STATES

In making its recovery determination, FWS properly considered all five recovery criteria, including the first, whether the gray wolf remains endangered or threatened "throughout . . . a significant portion of its range."  16 U.S.C. § 1532(6).  The ESA does not define the term, and

courts have recognized the ambiguity of "significant portion of its range," thus affording

deference to the agency's definition under *Chevron v. Nat. Resources Def. Council*, 467 U.S.

837 (1984).  *See, e.g.*, *Tucson Herpetological Soc'y v. Salazar*, 566 F.3d 870 (9th Cir. 2009)

*quoting Defenders*, 258 F.3d at 1145 (the agency "maintains a wide degree of discretion in

delineating [the phrase]").  In these cases and in this one, the crux of the issue is whether "range"

should be defined as the species's historical range or as its current range.  To enjoy *Chevron*

deference on its interpretation of "range" as current range and not as historical range, FWS must

"at least explain [its] conclusion that the area in which the species can no longer live is not a

significant portion of its range."  *Defenders* at 1145.  FWS has effectively met this standard in

some past cases, and its analysis in this case should also stand.

In *Colorado River Cutthroat Trout v. Salazar*, 09-CV-2233-PLF (D.D.C. Oct. 16, 2012),

FWS issued a Not Warranted Finding for the Colorado River Cutthroat Trout; plaintiffs

challenged FWS's decision not to list the trout.  One issue in the case was whether FWS had

adequately defined the trout's range, as it did not include the trout's entire historical range.

Finding that FWS had properly defined range as current range, and that the agency adequately

explained how "historic contraction of its range does not render the [t]rout vulnerable in any

significant portion of its currently occupied habitat," this Court approved FWS's definition of

range.  *Id.* at 15.

And in *Tucson Herpetological Soc'y,* FWS's definition of range as current range and

exclusion of some historical range was also at issue.  566 F.3d at 876.  Plaintiffs challenged

FWS's decision to not list the flat-tailed horned lizard as threatened.  *Id*. at 870.  The Ninth

Circuit applied its *Defenders* standard, deferring to the agency's definition of "range."  *Id*. at

876.  The court found that FWS had properly supported its decision to define range to exclude

large portions of the lizard's former range, in part because FWS explained how isolated populations would maintain genetic viability without the need for individual lizards to disperse, and because it explained that most of the lizard's historical range is no longer sustainable habitat due to human conversion of that habitat.  *Id*. at 878.  The court reversed and remanded on other grounds the district court's grant of summary judgment for the government.  *Id.* at 882.

In this case, FWS has appropriately defined the range of the WGL DPS as shown in Figure 1 in its final rule.  76 Fed. Reg. at 81670, 2011 AR 19741A.  FWS also clearly indicated that it did not look to the wolf's historical range for recovery purposes, as the recovery plan did not contemplate that the wolf had to occupy its entire former historical range before it could be deemed recovered.  *Id*. at 19749A.  FWS, properly taking a science-based approach, concluded that the WGL DPS would not benefit from a more expansively-defined range.  First, the wolf currently occupies almost the entirety of suitable habitat in the WGL region.  *Id*. at 19778A-19786A.  Also, the closest wolf population, in the Northern Rockies, is almost 600 miles from the closest pack in the WGL region, and it is "very rare" for a wolf to disperse further than 400 miles.  *Id*. at 19741A.  The vast majority of habitat in between the populations is unsuitable to support wolves, so by implication, the possibility of wolves using any "islands" of habitat in the sea of unsuitable habitat as means for establishing inter-population interaction is very low.  *Id*.  Finally, "affiliation with the midwestern wolf population is diminished and essentially lost when [a wolf disperses] 250 to 300 mi beyond the edge of [continually wolf-occupied] areas . . . .[far-dispersing] wolves have lost their functional connection with, and potential conservation value to the WGL population."  *Id*. at 19747A  Having made appropriate findings to support its decision to define the wolf's range as other than historical range and having explained its decision in accordance with *Defenders*, FWS's decision should receive deference from this Court.

24

Further, to decide that FWS's definition of range should be more expansive and that the recovery designation must wait until wolf numbers grow will unfairly burden the WGL states. It will in effect force the WGL states to serve as wolf nurseries, which will unfairly burden state resources and citizens, who would have to live with unwieldy and troublesome wolf populations. When the Senate debated the ESA, the case of the American alligator came up frequently. Some acknowledged that the alligator needed protection in some portions of its range such as in Florida, but worried that protecting it also in Louisiana would unduly burden that state, where alligator "harvesting was needed to keep alligators from overrunning the human population." H.R. Rep. No. 412, 93rd Cong., 1 Sess. (1973). The solution, then, is to keep the wolf protected in states where suitable, but unoccupied, wolf habitat exists, but to allow for management and harvest in the WGL states where it has recovered. FWS's designation of the WGL DPS accomplishes this goal, and it is consistent with the spirit of the ESA.

## CONCLUSION

The states of Minnesota, Wisconsin, and Michigan will appropriately manage their wolves. They have legal authority to do so, and a strong interest in exercising that authority. Minnesota, Wisconsin, and Michigan have balanced and science-based wolf management plans in place that they are effectively carrying out and will continue to do so, as they have a legal duty to manage the wolves under the public trust doctrine, and they stand to benefit from maintaining healthy wolf populations. Further, the wolves themselves will benefit from state management practices, to include regulated harvest based on appropriate science. Lastly, the Association urges this Court to accept FWS's reasoned definition of the wolf's range, and brings to the Court's attention their potential burden from excessive wolf populations. For these reasons and

others articulated *supra*, the Association respectfully requests that this Court find for Federal

Defendants by upholding the rule.

DATED: 12/11/2013

Respectfully submitted,

/s/ *M. Carol Bambery*
M. Carol Bambery
Michigan State Bar # 37915[1]
General Counsel
Association of Fish & Wildlife Agencies
444 N. Capitol Street, N.W., Suite 725
Washington, D.C. 20001
(202) 624-7890
Email: cbambery@fishwildlife.org

/s/ *C. Parks Gilbert, III*
C. Parks Gilbert, III
Alabama State Bar # 2067-C45G
c/o Association of Fish & Wildlife Agencies
444 N. Capitol Street, N.W., Suite 725
Washington, D.C. 20001
(202) 624-7890
Email: parksgilbert@gmail.com

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was today served via the Court's CM/ECF

system on all counsel of record.

/s/ *M. Carol Bambery*

M. Carol Bambery,
Attorney for the Association of Fish
& Wildlife Agencies

---

[1] Member, Bar of the U.S. District Court for the District of Columbia