**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

The Humane Society of the United States
2100 L Street NW
Washington, DC  20037;

Born Free, USA
1122 S Street
Sacramento, CA  95811;

Help Our Wolves Live ("HOWL")
4901 Second Ave. South
Minneapolis, MN  55419;

Friends of Animals and Their Environment ("FATE")      Civil Action No. 13-00186-BAH
3333 Alabama Ave.
St. Louis Park, MN  55415,

      Plaintiffs,                **PLAINTIFFS' REPLY
                                                      MEMORANDUM OF POINTS AND
    v.                                    AUTHORITIES IN SUPPORT OF
                                                      PLAINTIFFS' MOTION FOR
                                                      SUMMARY JUDGMENT AND IN
                                                      OPPOSITION TO FEDERAL
Sally Jewell, Secretary of the Interior,              DEFENDANTS' AND HUNTER
United States Department of the Interior              CONSERVATION COALITION'S
1849 C Street, NW                                     CROSS-MOTIONS FOR
Washington, DC  20240;                                SUMMARY JUDGMENT**


United States Department of the Interior
1849 C Street, NW
Washington, DC  20240;                                **[ORAL ARGUMENT REQUESTED]**


United States Fish and Wildlife Service
1849 C Street, NW
Washington, DC  20240,

      Defendants.

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................... i

I.    INTRODUCTION ........................................................................................ 1

II.    ARGUMENT ............................................................................................... 3

    A.    The FWS Cannot Delist Wolves as a Western Great Lakes DPS......................... 3

        1.    The Final Rule Improperly Modifies the Listing Status of the Entire Lower 48 Wolf Population.......................................................... 3

        2.    The FWS Failed to Explain the Biological Relevance of its Newly Designated Minnesota Population ........................................... 6

        3.    The FWS's Final Rule Creates a DPS In Order to Delist, Contrary to the ESA and to the DPS Policy............................................... 8

        4.    The Solicitor's Opinion Is Self-Serving, and Not Entitled to Deference ...................................................................................... 12

        5.    Even if the FWS Could Use the DPS as a Delisting Tool, the Boundaries of the Western Great Lakes DPS Are Arbitrary and Capricious ................................................................................ 14

        6.    Any DPS Designation Must Apply to A Single Identifiable Species, But There is None for the Great Lakes DPS............................ 16

    B.    The Gray Wolf Cannot Be Delisted Because It Remains in Danger of Extinction Throughout a Significant Part of Its Range...................................... 18

        1.    The FWS's Interpretation of "Significant Portion of Its Range" Is Unreasonable.................................................................... 21

            a)    The ESA Mandates Consideration of Historical "Range"........... 22

            b)    The FWS Cannot Render the Statutory Phrase "Significant Portion" of the Range Superfluous .............................. 26

        2.    The Case Law Does Not Support the FWS's Interpretation that Focuses on Current Range Only ............................................ 27

        3.    The FWS Failed to Explain its Decision to Ignore the Gray Wolf's Lost Range As a Significant Portion of Its Range .................................. 30

        4.    The FWS Cannot Ignore the Requirement to Recover Wolves Throughout a Significant Portion of Their Range By Carving Up the Wolf's Range into DPSs .................................................... 34

    C.    The WGL DPS Does Not Satisfy the ESA's Criteria for Delisting.................... 38

        1.    The FWS Cannot Delist Wolves in the Great Lakes to Appease Political Interests and in the Face of Taxonomic Uncertainty................. 39

# TABLE OF CONTENTS
(continued)

**Page**

      a)    The FWS's Delisting Decision is Based on Politics, Not Science ........................................................................... 39

      b)    The FWS Cannot Delist When It Does Not Know What Species It Is Delisting ................................................... 41

    2.    Wolves Remain Threatened by Inadequate Regulatory Mechanisms to Protect them from Human-caused Mortality ................. 46

III.    CONCLUSION ............................................................................................ 52

## TABLE OF AUTHORITIES

### CASES

*Am. Wildlands v. Norton,*
  193 F. Supp. 2d 244 (D.D.C. 2002)........................................................................ 17
*Babbitt v. Sweet Home Chapter of Comys. for a Great Or.,*
  515 U.S. 687 (1995) ............................................................................................... 21
*Bennett v. Spear,*
  520 U.S. 154 (1997) ............................................................................................... 18
*Center for Auto Safety v. Peck,*
  751 F.2d 1336 (D.C. Cir. 1985)............................................................................. 43
*Christensen v. Harris Cnty.,*
  529 U.S. 576 (2000) ............................................................................................... 12
*Colorado River Cutthroat Trout v. Salazar,*
  898 F. Supp. 2d 191 (D.D.C. 2012)....................................................................... 27
*Conner v. Burford,*
  848 F.2d 1441 (9th Cir. 1986) ............................................................................... 45
*Ctr. for Biological Diversity v. Lubcheno,*
  758 F. Supp. 2d 945 (N.D. Cal. 2010)................................................................... 32
*Davis County Solid Waste Mgmt. v. EPA,*
  101 F.3d 1395 (D.C.Cir.1996)............................................................................... 24
*Defenders of Wildlife v. Babbitt,*
  No. 1:97-CV-02122-GK (D.D.C. Dec. 22, 1997) ................................................. 40
*Defenders of Wildlife v. Hall,*
  807 F. Supp. 2d 972 (D. Mont. 2011).................................................................... 50
*Defenders of Wildlife v. Kempthorne,*
  Civ. No. 04–1230 (GK), 2006 WL 2844232 (D.D.C. Sept. 29, 2006)................... 33
* *Defenders of Wildlife v. Norton,*
  239 F. Supp. 2d 9 (D.D.C. 2002)..................................................................... passim
* *Defenders of Wildlife v. Norton,*
  258 F.3d 1136 (9th Cir. 2001) ........................................................................ passim
*Defenders of Wildlife v. Norton,*
  89 Fed. Appx. 273, 2004 U.S. App. LEXIS 7502 (D.C. Cir. 2004)....................... 19
*Defenders of Wildlife v. Salazar,*
  729 F. Supp. 2d 1207 (D. Mont. 2010).......................................................... passim
* *Defenders of Wildlife v. Sec'y, U.S. Dep't of the Interior,*
  354 F. Supp. 2d 1156 (D. Or. 2005) ............................................................... passim
*Defenders of Wildlife, et al. v. Salazar, et al.,*
  No. 1:12-cv-01833-ABJ (D.D.C. Nov. 13, 2012) ................................................. 48
*Friends of Blackwater v. Salazar,*
  691 F.3d 428 (D.C. Cir. 2012)................................................................... 10, 28, 45
*Friends of the Earth v. Laidlaw Envtl. Serv.,*
  528 U.S. 167 (2000) ............................................................................................... 50
* *Friends of Wild Swan, Inc. v. U.S. Fish & Wildlife Serv.,*
  12 F. Supp. 2d 1121 (D. Or. 1997) ................................................................. passim

i

*Fund For Animals, Inc. v. Hogan*,
   428 F.3d 1059 (D.C. Cir. 2005)..................................................................... 40
*Greater Yellowstone Coal. v. Servheen*,
   672 F. Supp. 2d 1105 (D. Mont. 2009) *aff'd in part, rev'd in part, and remanded*, 665
   F.3d 1015 (9th Cir. 2011) ................................................................ 37, 43
*Greater Yellowstone Coal., Inc. v. Servheen*,
   665 F.3d 1015 (9th Cir. 2011) ............................................. 18, 37, 46, 47
\* *Humane Soc'y of the United States v. Kempthorne*,
   579 F. Supp. 2d 7 (D.D.C. 2008).......................................................... passim
*Humane Soc'y of U.S. v. Kempthorne*,
   481 F. Supp. 2d 53 (D.D.C. 2006) *vacated sub nom. Humane Soc. of U.S. v.
   Kempthorne*, 527 F.3d 181 (D.C. Cir. 2008)................................... 49, 51
*Humane Soc'y v. Dep't of Commerce*,
   432 F. Supp. 2d 4 (D.D.C. 2006)........................................................... 42
*In re Polar Bear Endangered Species Act Listing & Section 4(d) Rule Litig.--MDL No.
   1993*,
   709 F.3d 1 (D.C. Cir. 2013) *cert. denied*, 134 S. Ct. 310 (U.S. 2013) .................. 51
*Int'l Bhd. of Elec. Workers v. NLRB*,
   814 F.2d 697 (D.C. Cir. 1987).............................................................. 25
*Konstantinidis v. Chen*,
   626 F.2d 933 (D.C. Cir.1980)............................................................... 29
*Lands Council v. McNair*,
   537 F.3d 981 (9th Cir.2008)................................................................. 43
*Moses v. Howard Univ. Hosp.*,
   567 F. Supp. 2d 62 (D.D.C. 2008) *amended*, 601 F. Supp. 2d 1 (D.D.C. 2009) and
   *aff'd*, 606 F.3d 789 (D.C. Cir. 2010)................................................. 29
*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) .............................................................. 8, 21, 43
*Nat'l Ass'n of Home Builders v. Norton*,
   340 F.3d 835 (9th Cir. 2003) ............................................................ 9, 30
*Nat'l Wildlife Fed'n v. Norton*,
   386 F. Supp. 2d 553 (D. Vt. 2005) .......................................... 14, 21, 32, 39
*Nat'l Ass'n of Home Builders v. Norton*,
   325 F.3d 1165 (9th Cir. 2003) ............................................................. 30
*Natural Res. Def. Council v. Kempthorne*,
   506 F. Supp. 2d 322 (E.D. Cal.2007) ..................................................... 47
*New Hampshire v. Maine*,
   532 U.S. 742 (2001) ..................................................................... 29, 30
*NW Coalition v. EPA*,
   544 F.3d 1043 (9th Cir. 2008) ............................................................. 43
*Presley v. Etowah County Comm'n*,
   502 U.S. 491 (U.S. 1992) ................................................................. 44
*Royal Foods Co. v. RJR Holdings, Inc.*,
   252 F.3d 1102 (9th Cir. 2001) ............................................................ 12
*Safari Club Int'l v. Jewell*,
   11-CV-01564 BAH, 2013 WL 4041541 (D.D.C. Aug. 9, 2013) ........................... 40

*Save Our Springs Alliance v. Norton,*
  361 F. Supp. 2d 643 (W.D. Tex. 2005) ............................................................. 11
*Save Our Springs v. Babbitt,*
  27 F. Supp. 2d 739 (W.D. Tex.1997) ................................................................ 41
*Tenn. Valley Auth. v. Hill,*
  437 U.S. 153 (1978) .................................................................................... passim
*Tucson Herpetological Soc'y. v. Salazar,*
  566 F.3d 870 (9th Cir. 2009) ..................................................................... 19, 32
*United Gas Imp. Co. v. Continental Oil Co.,*
  381 U.S. 392 (1965) ........................................................................................... 3
*W. Watersheds Project v. Ashe,*
  4:11-CV-00462-EJL, 2013 WL 2433370 (D. Idaho June 4, 2013) ..................... 27
*WildEarth Guardians v. Salazar,*
  741 F. Supp. 2d 89 (D.D.C. 2010) ........................................................ 32, 49, 50
*Wildearth Guardians v. U.S. Sec'y of the Interior,*
  4:08-CV-00508-EJL-LM, 2011 WL 1225558 (D. Idaho Feb. 11, 2011), *report and
  recommendation adopted,* 4:08-CV-00508-EJL-LM, 2011 WL 1225547 (D. Idaho
  Mar. 28, 2011) ....................................................................................... 11, 32
*Wildlife Federation v. Nat'l Marine Fisheries Serv.,*
  524 F.3d 917 (9th Cir.2008) ............................................................................. 31

## STATUTORY AUTHORITIES

16 U.S.C. § 1531(b) ............................................................................................. 24
16 U.S.C. § 1532 ................................................................................................... 6
16 U.S.C. § 1532(16) ................................................................................ 1, 11, 34
16 U.S.C. § 1532(20) ............................................................................ 1, 22, 24, 35
16 U.S.C. § 1532(5)(A) ........................................................................................ 24
16 U.S.C. § 1532(6) ....................................................................................... passim
16 U.S.C. § 1533(a) ............................................................................................... 1
16 U.S.C. § 1533(a)(1) ................................................................................... passim
16 U.S.C. § 1533(a)(1)(D) .................................................................................... 46
16 U.S.C. § 1533(a)(1)(E) ..................................................................................... 46
16 U.S.C. § 1533(a)(3)(A) ...................................................................................... 5
16 U.S.C. § 1533(b)(1)(A) ................................................................. 1, 18, 39, 41
16 U.S.C. § 1533(b)(3)(A) ............................................................................. 11, 40
16 U.S.C. § 1533(b)(3)(B) ............................................................................. 11, 40
16 U.S.C. § 1533(c) .............................................................................................. 39
16 U.S.C. § 1533(c)(2)(B) ............................................................................. 4, 6, 9
16 U.S.C. § 1539(j) .............................................................................................. 13
16 U.S.C. § 1539(j)(2)(A) .................................................................................... 23
Public Law 81-135 § 3(a) (1969) ......................................................................... 25
Public Law 89-669 § l(c) (1966) .......................................................................... 25

## REGULATIONS

43 Fed. Reg. 9,607 ....................................................................................... passim
43 Fed. Reg. 9,608 ................................................................................................. 7
43 Fed. Reg. 9,610 ................................................................................................. 7

43 Fed. Reg. 9,612 ........................................................................................................ 5

50 C.F.R. § 424.11(b) ................................................................................................. 39

50 C.F.R. § 424.11(c) ........................................................................................... 39, 49

50 C.F.R. § 424.11(d) ................................................................................................. 39

50 C.F.R. § 424.14 ..................................................................................................... 11

50 C.F.R. § 424.14(b)(1) ............................................................................................ 11

51 Fed. Reg. 6,686 ...................................................................................................... 25

51 Fed. Reg. 6,688 ...................................................................................................... 25

58 Fed. Reg. 34,926 .................................................................................................... 25

58 Fed. Reg. 34,928 .................................................................................................... 25

* 61 Fed. Reg. 4,722 ...................................................................................................... 9

* 61 Fed. Reg. 4,725 ........................................................................................ 7, 10, 13

68 Fed. Reg. 15,804 ............................................................................................... 27, 44

68 Fed. Reg. 15,805 ............................................................................................... 27, 44

68 Fed. Reg. 15806 ..................................................................................................... 44

72 Fed. Reg. 6,052 ........................................................................................................ 4

72 Fed. Reg. 6,073 ...................................................................................................... 34

74 Fed. Reg. 15,070 ...................................................................................................... 4

74 Fed. Reg. 15,075 ...................................................................................................... 4

76 Fed. Reg. 26,090 .................................................................................................... 41

76 Fed. Reg. 61,782 .................................................................................................... 48

76 Fed. Reg. 61,802 .................................................................................................... 48

76 Fed. Reg. 66,255 .................................................................................................... 11

76 Fed. Reg. 76,987 .................................................................................................... 22

76 Fed. Reg. 76,988 .................................................................................................... 22

76 Fed. Reg. 81,666 ........................................................................................... 4, 7, 31

76 Fed. Reg. 81,669 ............................................................................................... 18, 42

76 Fed. Reg. 81,671 ............................................................................................... 15, 33

76 Fed. Reg. 81,672 ............................................................................................... 27, 31

76 Fed. Reg. 81,673 .................................................................................................... 15

76 Fed. Reg. 81,674 ............................................................................................... 8, 15

76 Fed. Reg. 81,677 .................................................................................................... 45

76 Fed. Reg. 81,679 .................................................................................................... 45

76 Fed. Reg. 81,682 .............................................................................................. passim

76 Fed. Reg. 81,683 ......................................................................................... 31, 33, 47

76 Fed. Reg. 81,686 ............................................................................................... 36, 47

76 Fed. Reg. 81,687 .................................................................................................... 17

76 Fed. Reg. 81,688 .................................................................................................... 17

76 Fed. Reg. 81,690 .................................................................................................... 15

76 Fed. Reg. 81,692 .................................................................................................... 36

76 Fed. Reg. 81,700 .................................................................................................... 51

76 Fed. Reg. 81,709 ............................................................................................... 47, 48

76 Fed. Reg. 81,713 .................................................................................................... 47

76 Fed. Reg. 81,721 ............................................................................................... 17, 28

76 Fed. Reg. 81,722 ............................................................................................... 23, 26

78 Fed. Reg. 35,664 ...................................................................................................... 8

78 Fed. Reg. 35,670 .................................................................................................................... 42

**OTHER**

H.R. Rep. No. 412, 93rd Cong., 1 Sess. (1973) ..................................................................... 19, 25
H.R. Rep. No. 95-1625, 95th Cong., 2d Sess. at 5 (Sept. 25, 1978), reprinted in 1978
    U.S.C.C.A.N. 9455 ............................................................................................................. 24, 25
H.R. Rep. No. 97-567 at 17 (May 17, 1982), reprinted in 1982 U.S.C.C.A.N. 2807 .................. 23
Merriam-Webster Collegiate Dictionary, 11th Ed. ....................................................................... 35

## I.     __INTRODUCTION__

Try as they might, Federal Defendants simply cannot escape the reality that the U.S. Fish and Wildlife Service's ("FWS" or "Agency") decision to strip wolves in the Western Great Lakes ("WGL") of their federal Endangered Species Act ("ESA") protections was driven by politics.  This reality, reflected in numerous documents in the record, colored every step along the delisting process, from the FWS thumbing its nose at this Court's remand order, to its decision to delist wolves in the Great Lakes without first determining what species actually exist inside and outside the boundary lines it created.  But the ESA does not allow the FWS to avoid hard questions for the sake of political convenience.  Indeed, the ESA clearly mandates that the FWS base its delisting decision "solely" on the basis of the best available science, 16 U.S.C. § 1533(b)(1)(A), and prohibits the FWS from using the distinct population segment ("DPS") provision of the statute as a tool to reduce protections for the wolf, especially when the wolf remains imperiled throughout a significant portion of its range.  *Id.* §§ 1533(a); 1532(6), (16), (20).  The FWS's decision to delist the wolf in the Great Lakes contradicts each of these bedrock ESA principles.

Federal Defendants do not contest – as they cannot – that wolves are largely absent from ninety-five percent of their historical range.  Instead, Federal Defendants myopically focus on a population of wolves that exist in a portion of the Great Lakes region in an effort to defend the FWS's politically influenced decision to artificially shrink the wolf's historical range to a tiny fraction of what it was, draw a circle around that portion of the range, and remove federal ESA protections from all wolves within that circle.  But given the uncontested fact that the states within that artificial circle are already executing plans to *reduce* current wolf populations in the region, the Federal Defendants' effort to carve out and delist a population of wolves from within the larger

area that wolves historically occupied, and in which they remain ESA-listed, *will effectively halt wolf recovery in its tracks.*

The fact that wolves now exist in certain areas of Minnesota, Wisconsin, and Michigan, and do not currently exist in other areas, does not mean that the FWS can lawfully strip wolves of all federal protections at this time.  There are legal considerations that must be satisfied, which go beyond ticking off a box that a certain number of wolves has been reached.  The Federal Defendants broadly describe their inquiry in arriving at the Final Rule as "whether the *Midwestern populations* of wolves met the recovery goals" of the *Eastern wolf* recovery plan to enable the FWS to remove ESA protections from wolves in the Western Great Lakes. Federal Defs. Br. ("Defs. Br."), ECF No. 27 at 1 (emphasis added).  But yet this simplistic and piecemeal approach to the delisting determination formalized in the Final Rule demonstrates the problem with the Agency's decision making.  Under a proper delisting analysis, the FWS must examine whether the entire listed entity is threatened or endangered throughout a significant portion of its range, including its historical range, and can only delist the species if it determines that all five categories of threats set forth in Section 4(a)(1) of the ESA have been eliminated throughout that range.  16 U.S.C. §§ 1532(6); 1533(a)(1).  But the Agency has not operated under the mandates of the ESA or prior court decisions on these very same issues.  Instead, the Agency has contravened the letter and intent of the ESA by creating a DPS of a species for the sole purposes of delisting that portion of the species from within a broader listing, and doing so in order to appease certain political interests, in plain violation of the ESA's language and guiding principles.

Apparently recognizing the vulnerability of the Agency's decision in light of the relevant law and facts, Federal Defendants attempt to distract this Court from the fundamental legal issues at bar by trying to mask the true nature of the FWS's action in semantics, and stating that Plaintiffs

have "suggest[ed] a preference for federal over state management" of wolves and that Plaintiffs have sued Federal Defendants over "matter[s] of policy."   Defs. Br. at 1.   Indeed, it is Federal Defendants who as a matter of "policy" seem to be bound and determined to delist wolves in the Great Lakes region, regardless of the legal contortions required to accomplish that end.   E-mail from Matthew C. Huggler, the FWS, to Dan Ashe, the FWS (Dec. 9, 2010, 9:10am), AR 79 at 002773A  ("[The FWS] will always seek to remove wolves from ESA everywhere.").   Further, the contention that Plaintiffs have a preference for federal over state management of wolf populations both misstates Plaintiffs' arguments and misses the point that Federal Defendants are the ultimate responsible parties charged with carrying out and achieving the goals of the ESA, according to congressional mandate.   And as explained in Plaintiffs' opening brief and here, the Agency has run roughshod over the law and its obligations.

Based on the FWS's multiple violations of its ESA mandates – any one of which requires vacatur of the Final Rule – Plaintiffs request that this Court grant their request for summary judgment and restore ESA protections to wolves in the Western Great Lakes.

## II.   ARGUMENT

### A.   The FWS Cannot Delist Wolves as a Western Great Lakes DPS

#### 1.   *The Final Rule Improperly Modifies the Listing Status of the Entire Lower 48 Wolf Population*

The FWS's Final Rule fails to comply with this Court's remand order.  But an agency cannot ignore the directives of a court simply because it does not like the outcome.  *See, e.g., United Gas Imp. Co. v. Continental Oil Co.*, 381 U.S. 392, 406 (1965) (upon review of an administrative decision, the court may "correct errors of law and on remand the [agency] is bound to act upon the correction") (citation omitted).  In a thinly veiled attempt to avoid the ESA

construction proffered by this Court in *Humane Soc'y of the United States v. Kempthorne*, 579 F. Supp. 2d 7, 17 (D.D.C. 2008) that "Section 1533(c)(2)(B) . . . quite strongly suggests – consistent with common usage – that the *listing* of any species (such as the western Great Lakes DPS) is a precondition to the *delisting* of that species," Federal Defendants describe the Final Rule not as a simultaneous listing and delisting of a DPS, but rather as a "revis[ion]" of the 1978 listing of the Minnesota population of gray wolves. Defs. Br. at 14, 15; 76 Fed. Reg. at 81,666. This specious semantic trick should not detain the Court.

In 2007, the FWS attempted to simultaneously create and delist a Western Great Lakes DPS. *See Final Rule*, 72 Fed. Reg. 6,052 (Feb. 8, 2007) ("establish[ing] the Western Great Lakes (WGL) [DPS] . . . [and] remov[ing] the WGL DPS from the List of Endangered and Threatened Wildlife"). This final rule was struck down in *Kempthorne*, 579 F. Supp. 2d at 14 n.8, 20. After the 2007 rule was struck down, in 2009 the FWS published a final rule again identifying a Western Great Lakes DPS and simultaneously removing its ESA protections. *See Final Rule*, 74 Fed. Reg. 15,070 (Apr. 2, 2009) (identifying WGL DPS and "removing gray wolves within [that DPS]" from ESA protection). In the final rule for the 2009 delisting attempt, the FWS took issue with the *Kempthorne* opinion and that court's indication that the FWS had delisted a previously unlisted species. The FWS responded that "[it] did not delist a previously unlisted species; rather, [it] revised the existing listing of a species (the gray wolf in the lower 48 States) to reflect a determination that a sub-part of that species (the Western Great Lakes DPS) was healthy enough that it no longer needed the ESA's protections." 74 Fed. Reg. 15,075. In other words, in the 2009 delisting rule, the FWS recognized that designating the Western Great Lakes DPS required it to revise the lower 48 States' species listing. *See id.*

In this Final Rule, the FWS now has taken the *same* old action that it attempted before under the *new guise* of "revising" the 1978 Minnesota threatened wolf population listing.  Defs. Br. at 9, 14-16; *see also Final Rule*, 43 Fed. Reg. 9,607, 9,612 (Mar. 9, 1978) (designating "Minnesota" population as threatened).

Even suspending disbelief and accepting at face value that the FWS is simply "revising" an already listed entity with this Final Rule, nevertheless, because the "revised" Minnesota population listing now also includes other parts of the Great Lakes, specifically Wisconsin and Michigan and parts of North and South Dakota, Iowa, Illinois, Indiana, and Ohio, the Final Rule necessarily modifies not only the Minnesota threatened species listing but *also and again* the lower 48 States gray wolf listing.  This presents an additional reason why the Final Rule is unlawful.  The ESA requires that revisions to the List of Endangered and Threatened Wildlife be made in accordance with ESA section 4(a), which sets forth the listing factors and the requirement to designate critical habitat.  *See* 16 U.S.C. § 1533(a)(1), (a)(3)(A).  Because the FWS *has not* evaluated the gray wolf's status in the lower 48 States in relation to the ESA listing factors nor designated critical habitat, the FWS's purported revision to the Minnesota "species" listing was arbitrary and capricious agency action and a violation of the ESA.  *See Defenders of Wildlife v. Sec'y, U.S. Dep't of the Interior*, 354 F. Supp. 2d 1156, 1171 (D. Or. 2005) ("*Defenders (wolf)*") (2003 rule downlisting gray wolves was arbitrary and capricious because the FWS "did not apply the downlisting factors outside the core areas" as required by section 4 of the ESA).

Of course, the FWS's authority to revise a listing only extends to species that are already listed.  *Kempthorne,* 579 F. Supp. 2d at 17 (noting that section 4(c) "instruct[s] [the] FWS periodically to conduct a review of all species "*included* in a list, . . . which is in effect at the

time of such review," and to determine whether any particular species should be "*removed* from such list") (citing 16 U.S.C. § 1533(c)(2)(B), emphasis by court).  In order to avoid that problem with its actions, Federal Defendants claim that what the FWS did was permissible because it was merely revising an already listed entity – the Minnesota population.  Defs. Br. at 16.  But wolves protected by the lower 48 States listing were included in the listed entities that this Final Rule altered (as the FWS previously recognized in its 2009 delisting attempt).  Even accepting the FWS's explanation of its action, because the Final Rule both revises the Minnesota listing and changes the status of only some wolves in the lower 48 States listing, the Final Rule and the FWS's justification for it fly in the face of case law holding that the FWS cannot list something below the DPS level.  *Defenders of Wildlife v. Salazar*, 729 F. Supp. 2d 1207, 1221-22 (D. Mont. 2010) ("The words used in the ESA make clear that "species" excludes distinctions below that of a DPS. . . .  By listing and/or protecting something less than a DPS, the Service violated the plain terms of the ESA.") (citing 16 U.S.C. § 1532).

Because the Final Rule alters the status of some of the wolves protected by the lower 48 States species listing, and does so without conducting the requisite section 4(a) threats analysis to that portion of the population, it violates the ESA and must be vacated.

## 2. *The FWS Failed to Explain the Biological Relevance of its Newly Designated Minnesota Population*

Even if the FWS's purported "revision" to the Minnesota population was appropriate – which for the reasons stated above it was not – the Final Rule is arbitrary and capricious because the FWS failed to explain the biological significance of the revised Minnesota population.  In the early 1970s, the eastern timber wolf was listed as an endangered species.  *See* 43 Fed. Reg. at 9,607.  In 1978, the FWS published a rule reclassifying the gray wolf at the species level (*Canis lupus*) as endangered throughout the conterminous 48 States and Mexico and as threatened in

Minnesota.  *Id.*  In that rule, the FWS recognized the catastrophic loss of the gray wolf's range, finding that the wolf's historical range, which spanned "from Georgia to Maine, and between the Atlantic and the Great Plains" had been reduced to northern Minnesota and the adjacent Isle Royale National Park.  *Id.* at 9,608, 9,610.  Pursuant to that rule, the Minnesota wolves were listed as a separate "species" and classified as threatened.  *Id.* at 9,607, 9,610 ("For purposes of this rulemaking, the gray wolf (Canis lupus) group in Mexico and the 48 conterminous States of the United States, other than Minnesota, is being considered as one 'species,' and the gray wolf group in Minnesota is being considered as another 'species.'").

Federal Defendants try to justify the Final Rule as a revision to the Minnesota "species" listing because they claim that listing operated to make the Minnesota wolves a functional DPS, although the listing was never formally reclassified from a species-level listing to a DPS-level listing.  Defs. Br. at 14 n.6.  While it may be the case that a species-level listing enacted prior to the ESA amendment that added the DPS concept could be recognized to have functioned as a DPS, that does not alleviate the FWS's burden to demonstrate that the population is formally and biologically a DPS.  *See* 61 Fed. Reg. at 4,725 (the FWS's DPS policy requiring a population to be discrete and significant).  Here, the Agency has not explained how its new DPS boundaries compare biologically to the rest of the lower 48 States species listing on which there is still an open status review.  *See, e.g.,* 76 Fed. Reg. at 81,666 (referencing ongoing status review for wolves outside the WGL DPS).  As discussed in detail below, there is continuing taxonomic uncertainty regarding what wolf species and subspecies exist and where, but to enable the Final Rule, the FWS has ignored that major problem and simply declared that all wolves inside the DPS boundaries directly up until the boundaries' edges are *Canis lupus*, while simultaneously conducting review of the lower 48 species listing outside that line to determine what species are captured therein, and

despite including some wolves from the lower 48 endangered listing in the now-delisted WGL DPS.  *See* Proposed Lower 48 Delisting Rule, 78 Fed. Reg. 35,664 (Jun. 13, 2013) (the FWS proposing to remove ESA protection for the gray wolf (*Canis lupus*) throughout the lower 48 states, with the exception of the Mexican wolf subspecies (*C.l. baileyi)*, and recognizing *Canis lycaon* as a separate species historically occurring in the Western Great Lakes).

Even a "functional equivalent" of a DPS must be a biologically independent population, and the FWS must rationally explain how all wolves inside the DPS boundaries are biologically distinct from all the wolves directly outside that line.  Yet the FWS has failed to do so.  This failure to provide a rational explanation is not surprising, considering there is an open review on the status of wolves just outside the DPS boundaries the FWS created, and the Agency's acknowledgment in the Final Rule that wolves can and do travel back and forth across that line. *See, e.g.*, 76 Fed. Reg. at 81,674.  While it may not be surprising, such a failure violates fundamental principles of administrative law that an agency "must examine the relevant data and articulate a satisfactory explanation for its action, including a rational connection between the facts found and the choice made."  *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983).

3.    ***The FWS's Final Rule Creates a DPS In Order to Delist, Contrary to the ESA and to the DPS Policy***

Despite Federal Defendants' attempt to disguise the FWS's actions in semantics, the fact of the matter is that the Final Rule yet again simultaneously creates and delists a Western Great Lakes DPS.  The Final Rule's action to create and delist a DPS of an otherwise imperiled species is contrary to the DPS Policy.  The fundamental purpose of a DPS is to protect and conserve locally vulnerable populations of otherwise non-threatened species.  This has been recognized by multiple federal courts.  For instance, the District of Oregon said that "[t]he purpose of the DPS

Policy is to allow the FWS to *list* a DPS as threatened or endangered, and thereby *provide a level of protection* that is different from other populations within the same species." *Defenders (wolf)*, 354 F. Supp. 2d at 1160 (citing DPS Policy, 61 Fed. Reg. at 4,722) (emphases added); *id*. at 1169 ("[I]f a distinct and significant population of an unlisted species is struggling while other populations are faring well, the FWS may designate the struggling population as a DPS and list it as endangered.").

Likewise, this Court said that "the 'DPS tool' . . . permits FWS to '*protect and conserve* species and the ecosystems upon which they depend before large-scale decline occurs that would necessitate listing a species or subspecies throughout its entire range." *Kempthorne*, 579 F. Supp. 2d at 11 (citing DPS Policy) (emphasis added). *See also Nat'l Ass'n of Home Builders v. Norton*, 340 F.3d 835, 842 (9th Cir. 2003) (under the DPS Policy "[t]he FWS does not have to list an entire species as endangered when only one of its populations faces extinction"); *Friends of Wild Swan, Inc. v. U.S. Fish & Wildlife Serv.*, 12 F. Supp. 2d 1121, 1133 (D. Or. 1997) (the "listing of population segments is a proactive measure to *prevent* the need for listing a species over a larger range") (emphasis in original).

Importantly, the DPS Policy itself provides that "[a]ny interpretation [of the term 'distinct population segment'] should also be aimed at carrying out the purposes of the Act." 61 Fed. Reg. at 4,722. While Federal Defendants point to the DPS policy to claim that the FWS can use it to delist species, Defs. Br. at 20, the language in the DPS Policy is more naturally read to mean that an *already listed* DPS can be delisted once it has recovered, which is consistent with the ESA. This Court already held that "Section 1533(c)(2)(B) . . . quite strongly suggests – consistent with common usage – that the *listing* of any species (such as the western Great Lakes

DPS) is a precondition to the *delisting* of that species." *Kempthorne*, 579 F. Supp. 2d at 17. Indeed, the intended "[e]ffects of [the DPS] Policy" itself are

> Listing, delisting, or reclassifying distinct vertebrate population segments [that] may allow the Services to protect and conserve species and the ecosystems upon which they depend before large-scale decline occurs that would necessitate listing a species or subspecies throughout its entire range.  This may allow protection and recovery of declining organisms in a more timely and less costly manner, and on a smaller scale than the more costly and extensive efforts that might be needed to recover an entire species or subspecies.  The Services' ability to address local issues (without the need to list, recover, and consult rangewide) will result in a more effective program.

DPS Policy, 61 Fed. Reg. at 4,725.  This excerpt underscores that the intent behind the DPS Policy is conservation, protection, and listing of vulnerable populations, rather than the delisting of pockets of species that remain endangered or threatened.  Federal Defendants argue that Plaintiffs are adding an additional requirement into the process.  Defs. Br. at 16-17.  Federal Defendants' citation to *Friends of Blackwater v. Salazar*, 691 F.3d 428, 434 (D.C. Cir. 2012), is unhelpful.  In that case, the Court of Appeals for the District of Columbia Circuit simply stated that the FWS need not follow a non-binding species recovery plan if some step in the plan becomes irrelevant.  *See id*.  In contrast, what Plaintiffs contend is that the language and purpose of the DPS Policy, where ambiguous, may not be interpreted by the FWS unreasonably or in any manner running afoul of the ESA.

Federal Defendants also bizarrely suggest that their statutory obligation to respond to a citizen's listing petition somehow places the Agency's conduct in response to such petition beyond challenge, so that the Final Rule is lawful simply because it arose in response to citizens' petitions.  Defs. Br. at 17, 34.  The notion is not credible on its face, or the Agency would be nothing more than a ministerial agent for every petitioner seeking a listing change.  But the statutory and regulatory procedure provide for far more discretion on the Agency's part.  Under the plain language of the statute, any "interested person" may petition the Secretary of the

10

Interior to list a "species" as endangered or threatened.  16 U.S.C. § 1533(b)(3)(A); 50 C.F.R. § 424.14; *see also* 16 U.S.C. § 1532(16) ("species" may be a "distinct population segment").  "To the maximum extent practicable, within 90 days after receiving [a] petition," the FWS must "make a finding as to whether the petition presents substantial scientific or commercial information indicating that the petitioned action may be warranted."  16 U.S.C. § 1533(b)(3)(A); 50 C.F.R. § 424.14(b)(1).  If the Agency concludes in its 90-day finding that the action requested in the petition may be warranted, then it must "promptly commence a review of the status of the species concerned."  16 U.S.C. § 1533(b)(3)(A).  Thus while the ESA mandates that the FWS *respond* to such petitions, the ESA does *not* mandate that the FWS approve or grant such petitions.  In fact, the FWS may respond that a petition is not warranted, is warranted but precluded, or may be warranted.  *See* 16 U.S.C. § 1533(b)(3)(A).  And even in situations in which the agency begins a status review of a species in response to a citizen's petition, the agency still has the discretion to deny a petition in its final 12-month determination.  *See id.* § 1533(b)(3)(B) (in its 12-month determination, the agency can find listing is "not warranted" or "warranted but precluded").

The FWS has discretion in determining how to respond to petitions and has exercised that discretion to deny petitions.  *See, e.g.*, *Wildearth Guardians v. U.S. Sec'y of the Interior*, 4:08-CV-00508-EJL-LM, 2011 WL 1225558, at *9 (D. Idaho Feb. 11, 2011), *report and recommendation adopted*, 4:08-CV-00508-EJL-LM, 2011 WL 1225547 (D. Idaho Mar. 28, 2011) (the FWS's "rejection of Plaintiff's petition was within the bounds of the APA and ESA"); *Save Our Springs Alliance v. Norton*, 361 F. Supp. 2d 643, 649 (W.D. Tex. 2005) (finding the FWS had set reasonable timetable to respond to petition and could delay issuance of its 12-month findings); 76 Fed. Reg. 66,255 (Oct. 26, 2011) (the FWS's 90-day finding that denied a

petition to delist the coastal California gnatcatcher and declining to reclassify it as a DPS).  The obligation to respond to a citizen petition clearly does not lead to an obligation to grant a citizen petition.

### 4.    *The Solicitor's Opinion Is Self-Serving, and Not Entitled to Deference*

In response to this Court's opinion in *Kempthorne*, the Solicitor General wrote its opposing views into an opinion on which the Agency relies here.  Defs. Br. at 18-20.  Federal Defendants claim that the Court should defer to the Solicitor's Opinion, but the document is not deserving of deference.  In *Kempthorne,* this Court found the ESA "ambiguous" with respect to the issue of whether simultaneous listing and delisting of a DPS was permissible.  579 F. Supp. 2d at 17-18.  The Court remanded the issue to the FWS to adopt an interpretation consistent with the ESA.  *Id.* at 20.  The FWS claims that the 2008 Solicitor's Opinion provides such an interpretation.  Defs. Br. at 18-20.  However, that Opinion does not address the FWS's authority to simultaneously list and delist species.  Instead, it rejects the Court's characterization of the agency action at issue in *Kempthorne* and proceeds to analyze an entirely different question.  *See* Solicitor Op. at 2, AR 8 at 000492A ("While the Department acknowledges that the ESA is arguably ambiguous on the '*precise question*' posed by the court, it notes that the court's question does not accurately describe what the FWS did in the Final Rule.") (emphasis added).

"An agency's interpretation or regulation is given deference if . . .  it is an opinion expressed when the agency is regulating the precise question at issue."  *Royal Foods Co. v. RJR Holdings, Inc.,* 252 F.3d 1102, 1109 (9th Cir. 2001) (citing *Christensen v. Harris Cnty.,* 529 U.S. 576, 586-88 (2000)).  Federal Defendants' suggestion that this Court must defer to the 2008 Solicitor's Opinion, even though that memorandum does not address the issue in this case, is unfounded.  *See id.* ("[A] strong statement made in the course of discussing a wholly different issue . . . does not constitute an agency interpretation that is entitled to deference in *this* setting.")

(emphasis in original).  The Solicitor's Opinion arguably only attempts to address the FWS's use of the DPS Policy to determine whether gray wolves in the Western Great Lakes area constitute a DPS and then to revise the listing of the gray wolf in the lower 48 States based on its determination that that DPS no longer met the definition of a threatened or endangered species. Solicitor Op. at 2, AR 8 at 000492A.  Therefore, the Solicitor's Opinion does not address the FWS's actions in this Final Rule, which Federal Defendants assert is merely revising the listing of the Minnesota population of gray wolves, and which ignores the lower 48 listed population.

Further, a review of the Solicitor's Opinion reveals that it is not entitled to deference because it is an unreasonable interpretation of the ESA.  *See, e.g.*, *Defenders of Wildlife v. Salazar*, 729 F. Supp. 2d at 1226 (rejecting as unreasonable FWS's interpretation of the ESA because it "render[ed] the DPS concept superfluous and would allow the Service to protect invertebrates and plants at a level Congress did not intend").  For instance, it relies on the experimental population provisions of the ESA to support its position.  Defs. Br. at 19.  Under those provisions, the FWS can introduce experimental populations "outside the current range of the species if the Secretary determines that such release will further the conservation of such species."  16 U.S.C. § 1539(j).  But these provisions are intended to recover a species, not to offer a mechanism to delist isolated pockets of species – and they are wholly inapposite to the issues here.

Moreover, the DPS Policy provides that a vertebrate population must be both "significant" and "discrete" to be designated as a DPS.  61 Fed. Reg. at 4,725.  Thus the DPS Policy instructs that a DPS be designated only if the population segment is important enough to warrant protection.  Like the ESA's restriction of the DPS tool to vertebrates, the DPS Policy's restriction of DPSs to "significant" populations makes no sense if this tool could be used, as

13

Federal Defendants insist, to remove protections from a population already protected by a species-level listing.  Under such a theory, the DPS Policy would allow the removal of federal protections from a "significant" population of an endangered species, while forbidding this option for insignificant populations.  This would create an absurd result, and the FWS's contrary claim highlights why the Solicitor's Opinion is an unreasonable interpretation under the ESA.

Federal Defendants also claim that their authority to delist healthy populations allows them to deploy scarce agency resources to address the threatened or endangered species members.  Defs. Br. at 20.  But as the healthy populations are crucial to the entire species' recovery, if the sole healthy populations lose their federal protections, the remnant species may be further jeopardized, thus failing to achieve the ESA's important objectives.

Lastly, there is no case law in support of the Agency's claims embodied in the Solicitor's Opinion, despite Federal Defendants' assertion to the contrary.  Defs. Br. at 20.  The Oregon and Vermont District Courts both vacated the FWS's prior gray wolf delisting attempts as violations of the ESA.  *See Defenders (wolf)*, 354 F. Supp. 2d at 1169, and *Nat'l Wildlife Fed'n v. Norton*, 386 F. Supp. 2d 553, 565 (D. Vt. 2005).  The Vermont District Court specifically stated that "the FWS simply cannot downlist or delist an area that it previously determined warrants an endangered listing because it 'lumps together' a core population with a low to non-existent population outside the core area."  *Id*.  Therefore, the Solicitor's Opinion's position finds no support in these rulings.

### 5.    *Even if the FWS Could Use the DPS as a Delisting Tool, the Boundaries of the Western Great Lakes DPS Are Arbitrary and Capricious*

The FWS's Final Rule is also unlawful for another reason – the boundaries of the WGL DPS are inconsistent with promoting wolf recovery.  Federal Defendants do not seriously contest this charge but rather fall back on the FWS's discretion to set these boundaries.  Defs. Br. at 22.

Once again, this discretion does not extend as far as actions that would hamper the purpose and language of the ESA.

Federal Defendants argue with Plaintiffs' claim that the boundaries of the DPS extend far beyond the wolf's current distribution, Defs. Br. at 23, but they cannot seriously contest this point, since the Final Rule recognizes that the core concentrations of wolves are only in parts of Minnesota, Michigan, and Wisconsin. *See*, *e.g.*, 76 Fed. Reg. at 81,673 ("This DPS has been delineated to include the core recovered wolf metapopulation plus a wolf movement zone around the core wolf metapopulation[,]" including the "primary range and the peripheral range"); *id.* at 81,690 ("There are five national forests in Minnesota, Wisconsin, and Michigan (Superior, Chippewa, Chequamegon-Nicolet, Ottawa, and Hiawatha National Forests) with wolf packs that exclusively or partially reside on them.").

Next, essentially conceding that the DPS boundaries extend beyond wolves' current areas, Federal Defendants assert that the DPS boundaries are sufficient because "dispersal of wolves from their natal packs and territories is a normal and important behavioral attribute of the species." Defs. Br. at 23. But if the dispersing young wolves are going out into unprotected territory, this admission simply proves Plaintiffs' point: dispersing wolves need protection to help reestablish other populations or expand the limited, core existing ones, and the Final Rule robs them of that protection.

As stated in the Final Rule, there is a distance of approximately 400 miles between the western boundary of the Great Lakes DPS and the nearest known gray wolf packs in Wyoming and Montana. 76 Fed. Reg. at 81,671. That territory contains "scattered islands of possibly suitable habitat." *Id.* Wolves have been known to disperse distances greater than 500 miles. 76 Fed. Reg. at 81,674. And the FWS recognizes that dispersal is important and natural behavior. Defs. Br. at

23 (citing 76 Fed. Reg. at 81,673).  But in violation of the ESA mandate, the Final Rule *removes*

protection across those crucial dispersal corridors that are part of the gray wolf's historical range.

Federal Defendants claim that Plaintiffs have inconsistently argued for expansive DPS

boundaries.  Defs. Br. at 22.  But Plaintiffs' position is consistent with the ESA and DPS Policy:

listing of DPSs should draw boundaries that provide the necessary protections to achieve the

purpose of the DPS listing in the first place.  And ESA protections should not be removed in any

areas beyond where the population has fully recovered from its imperiled state.[1]

Beyond violating the purpose of the ESA and DPS Policy, drawing wide DPS boundaries

also runs afoul of the same problem previously identified with the FWS's method.  Specifically,

one of the problems with the 2003 downlisting rule was that "the conservation status of

populations within each DPS varies dramatically."  *Defenders (wolf)*, 354 F. Supp. 2d at 1171.

By extending the boundaries of the WGL DPS far beyond the existing wolf populations, the

FWS has repeated the error identified by the Oregon District Court.

### 6.      *Any DPS Designation Must Apply to A Single Identifiable Species, But There is None for the Great Lakes DPS*

Even if this Court accepts the FWS's actions as a valid use of the DPS tool, the Final

Rule is still unlawful because the record reveals that the FWS does not even know what species

it delisted as a DPS.  Contrary to Federal Defendants' assertions, *see e.g.,* Defs. Br. at 37,

Plaintiffs do not contend that the ESA demands taxonomic or other scientific certainty prior to

the FWS making listing or delisting actions.  Plaintiffs do, however, assert that the FWS

improperly ignored serious taxonomic uncertainty raised in the rulemaking process and took

---

[1] The FWS may have other intentions for drawing a wide boundary around the WGL DPS.  By drawing the DPS boundaries so widely, the FWS sets itself up for a third phase in its gray wolf delisting campaign – to delist the remaining, non-DPS areas as extinct and to get out of the wolf recovery business entirely.  *See* 2007 AR Doc. 35 at 159 (stating that a possible future step for Option 2 is to "[d]elist remaining states as extinct").

final action that was not based on sufficient science because the FWS faced substantial political pressure to reach its predetermined delisting outcome.

As this Court has held, the FWS "may not base its [listing decisions] on speculation or surmise or disregard superior data." *Am. Wildlands v. Norton*, 193 F. Supp. 2d 244, 251 (D.D.C. 2002) (internal quotation omitted). "[O]ccasional imperfections" in data do not violate ESA's requirement that the FWS list and delist based on the best available science. *Id.* But the rampant uncertainty evident in the record does render the Final Rule arbitrary and capricious, given the Agency's cavalier decision about the basic unit of measure – the identifiable species – required for ESA action. The Final Rule and record establish that several conflicting studies find that the wolves in the Great Lakes may be gray wolves, eastern wolves, some hybrids thereof, and/or some hybrids with coyotes, *see* Final Rule, 76 Fed. Reg. at 81,687 – 81,689, 81,721 – doubts that go to the core of which species are being delisted – and these cannot reasonably be considered "occasional imperfections" in the data on which the FWS relied. *Am. Wildlands*, 193 F. Supp. 2d at 251.

Moreover, in this case where "the best available scientific data is not sufficient to allow [the FWS] to clearly identify the intended population subject to review," the FWS must "explain how hybridized [species and subspecies] might contribute to the viability of the [species and demonstrate] that some degree of hybridization is benign." *Id.* at 255 (listing determination was arbitrary and capricious where the FWS did not explain how hybrid trout stock included in listing determination might affect the genetically pure trout species). Here as in *Wildlands*, the FWS failed to distinguish "between hybridization that is a threat to a population, and hybridization that is benign." *Id.* at 256.

Four years ago, the FWS recognized that any delisting of this DPS required "new taxonomic information." AR 14 at 000823A. It still has not obtained that vital information, yet it decided to delist anyway. The FWS admits in the Final Rule that there is ongoing confusion and uncertainty regarding taxonomy based on *current science* for wolves across the United States. 76 Fed. Reg. at 81,669. And the FWS certainly was not required to grant the citizen petitions seeking gray wolf delisting. What the FWS is required to do, though, is to make listing determinations "solely on the basis of the best scientific and commercial data available." 16 U.S.C. § 1533(b)(1)(A). "The obvious purpose of the requirement . . . is to ensure that the ESA not be implemented haphazardly, on the basis of speculation or surmise." *Bennett v. Spear*, 520 U.S. 154, 176-77 (1997). The FWS reviewed the gray wolf listings and resolved in the Final Rule that it would call all Great Lakes wolves *Canis lupus*, despite the FWS's obvious confusion regarding that conclusion. When agencies rely on dubious information to expedite a decision, the courts have "a responsibility to ensure that an agency's decision is not arbitrary," and invoking "scientific uncertainty" to justify agency action is unacceptable. *Greater Yellowstone Coal., Inc. v. Servheen*, 665 F.3d 1015, 1028 (9th Cir. 2011) (the FWS had to explain why scientific uncertainty counseled in favor of delisting rather than continuing to study the issue).

**B.      The Gray Wolf Cannot Be Delisted Because It Remains in Danger of Extinction Throughout a Significant Part of Its Range**

As an entirely separate basis for vacatur and a return to protection for the Western Great Lakes Wolves, the Final Rule violates the ESA and is arbitrary and capricious for the fundamental reason that the gray wolf (*Canis lupus*) remains threatened or in danger of extinction throughout a significant portion of its range. The FWS's attempt to avoid this reality, by cordoning off wolves as a distinct population segment in the Great Lakes region and ignoring the severe range constriction suffered by gray wolves, is contrary to the ESA.

In similar situations, this Court has made clear that the "the FWS's exclusive focus on one region where the [species] is more prevalent, despite its historical presence in [other] additional regions, is contrary to the expansive protection intended by the ESA," and arbitrary and capricious agency action in violation of the APA. *Defenders of Wildlife v. Norton*, 239 F. Supp. 2d 9, 19, 21 (D.D.C. 2002) ("*Defenders (lynx)*"), *remedy vacated on other grounds by Defenders of Wildlife v. Norton*, 89 Fed. Appx. 273, 2004 U.S. App. LEXIS 7502 (D.C. Cir. 2004). Similarly, the Ninth Circuit has concluded that "a species can be extinct 'throughout . . . a significant portion of its range' if there are major geographical areas in which it is no longer viable but once was." *Defenders of Wildlife v. Norton*, 258 F.3d 1136, 1145 (9th Cir. 2001) ("*Defenders (lizard)*"). The Ninth Circuit in *Defenders* recognized that Congress consciously expanded the definition of endangered species "to include species in danger of extinction 'in *any* portion of its range.'" *Id*. at 1144 (quoting H.R. Rep. No. 412, 93rd Cong., 1 Sess. (1973) (emphasis in original). In other words, the case law demonstrates that the Agency's interpretation of the phrase "significant portion of the range" in the Final Rule is unreasonable and violates the ESA.

Moreover, because the gray wolf here is absent from major geographical areas in which it was once viable, "the Secretary must at least explain her conclusion that the area in which the species can no longer live is not a 'significant portion of its range.'" *Defenders (lizard)*, 258 F.3d at 1145; *see also Tucson Herpetological Soc'y v. Salazar*, 566 F.3d 870, 877 (9th Cir. 2009) ("It is insufficient . . . to point to one area or class of areas where lizard populations persist to support a finding that threats to the species elsewhere are not significant; the ESA requires a more thorough explanation."). Yet in the Final Rule, the FWS failed to explain why these areas no longer constitute a "significant portion of its range." In fact, the Agency here cannot provide

a satisfactory explanation for ignoring most of the gray wolf's historical range, and should be estopped from doing so, since the FWS already determined that the lower 48 States constituted a significant portion of the wolf's range when it listed the wolf across this area in 1978. Reclassification of the Gray Wolf in the United States and Mexico, 43 Fed. Reg. 9,607, 9,608 (Mar. 9, 1978) (listing gray wolves in the lower 48 States, noting that the "rulemaking clearly indicates that the gray wolf is listed everywhere to the south of the Canadian border, but nowhere to the north").

Rather than taking the required approach of considering the entire historical range established by multiple federal courts, the FWS instead, illogically, created the fiction that the core recovery area in the Western Great Lakes where wolves currently exist constitutes a significant portion of the wolves' range. The unlawful assumption that the Western Great Lakes wolves' current range equates to a significant portion of the gray wolves' entire range paved the way for the FWS to carve off the Western Great Lakes population as a DPS. Creating a DPS enabled the FWS to limit its consideration and assessment of threats to the wolf to only those areas where recognized populations currently exist. This practice is improper and contrary to the ESA. *See Friends of Wild Swan*, 12 F. Supp. 2d at 1133-34 (rejecting the FWS's attempt to divide a species' range into five DPSs without scientific explanation of why a species-wide listing was not merited).

Nevertheless, Federal Defendants contend that the FWS satisfied the significant portion of the range requirement in the Final Rule. First, they argue that the FWS applied an acceptable definition of "significant portion of its range" because the "range" referred to is a species' current range. Defs. Br. at 27. Second, they claim that, irrespective of the "range" to which the statute refers, the Final Rule is lawful because the FWS designated this portion of the range as a

DPS *before* conducting the section 4(a)(1) threats analysis.  Defs. Br. at 25-26, 29.  Neither contention has merit.  Had the FWS properly assessed the status of the gray wolf across all significant portions of its range, it would have determined that delisting is prohibited by the ESA.

Federal Defendants also attempt to recast the agency's actions "to redefine the boundaries of the Minnesota population as a WGL DPS" as "[p]olicy choices."  Defs. Br. at 14.  The Court should not be so misled.  Plaintiffs' challenge presents pure questions of law, not policy, and the FWS may not invoke *Chevron* deference to escape scrutiny of its actions.  *State Farm,* 463 U.S. at 43.

### 1.     *The FWS's Interpretation of "Significant Portion of Its Range" Is Unreasonable*

Federal Defendants claim that because the phrase "significant portion of its range" is ambiguous, the FWS has the statutory authority to fill in the gaps left by Congress.  Defs. Br. at 26.  But the FWS's interpretive authority does not extend so far.  Any interpretation must be consistent with statutory text, purpose, and legislative history.  *See Nat'l Wildlife Fed'n v. Norton*, 386 F. Supp. 2d at 565 (the FWS's interpretation of the phrase "significant portion of its range" entitled to deference only if reasonable in light of the governing statute).  Here, Federal Defendants' interpretation of the term "significant portion of its range" is unreasonable and contrary to the ESA's core purpose and the "plain intent of Congress in enacting this statute [ ] to halt and reverse the trend toward species extinction, whatever the cost." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 184 (1978).  Such intent is reflected "not only in the stated policies of the Act, but in literally every section of the statute." *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 699 (1995) (internal quotation omitted).

### a)        The ESA Mandates Consideration of Historical "Range"

The FWS's interpretation of the term "range" as referring to a species' current range as opposed to a species' *historical* range is unreasonable and not entitled to deference by this Court because the interpretation is inconsistent with the ESA.   The ESA defines the phrase "endangered species" as "any species which is in danger of extinction throughout all or a significant portion of its range."   16 U.S.C. § 1532(6).  And a threatened species is defined in the ESA as one "which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range."  *Id.* § 1532(20).  If a species is threatened or endangered in a significant portion of the species' range, then the *entire* species must be listed and protected under the ESA.  *Defenders of Wildlife v. Salazar*, 729 F. Supp. 2d at 1219 ("[L]isting depends on when a species is endangered in all or in a significant portion of its range."); 16 U.S.C. § 1532(6), (20).

Consistent with the FWS's historical practice, courts have found that a species is endangered "'throughout . . . a significant portion of its range' if there are major geographical areas in which it is no longer viable but once was."  *Defenders (lizard)*, 258 F.3d at 1145.[2] Similarly, in *Defenders (lynx)*, this Court held that the "FWS's exclusive focus on one region where the [species] is more prevalent, despite its historical presence in [other] additional regions, is contrary to the expansive protection intended by the ESA," and arbitrary and capricious agency action in violation of the APA.  *Defenders (lynx)*, 239 F. Supp. 2d at 19, 21.   In

---

[2] The Solicitor of the Department of the Interior issued a legal opinion in 2007 addressing several issues regarding the meaning of the "significant portion of its range" (SPR) phrase (referred to as the "M-Opinion") (DOI 2007). The M-Opinion's conclusion regarding the interpretation of the phrase that provided for applying the Act's protections to a listed species in only a portion of its range was rejected by subsequent court rulings, so the M-Opinion was withdrawn on May 4, 2011 (DOI 2011).  The FWS is currently drafting a new policy regarding its interpretation of the "significant portion of its range" phrase.  *See* 76 Fed. Reg. 76,987, 76,988 (Dec. 9, 2011).  The Final Rule appears to be based on the FWS's interpretation of the term according to the now-withdrawn M-Opinion.

*Defenders (lynx)*, the FWS was prohibited from focusing on only one region of the lynx's population — the Northern Rockies — to the exclusion of three-quarters of the lynx's historical range. *Id.* Federal Defendants admit they are doing just that here, and make a meager attempt to try to justify it.

Specifically, they attempt to explain why an analysis focused solely on a species' current range is a reasonable interpretation of the term "significant portion of its range" by claiming that "the FWS is focusing on threats to the long-term health of the species where they currently exist by focusing on threats arising out of areas of current range." Defs. Br. at 27 (citing 76 Fed. Reg. at 81,722). The logic of this position is dubious if not completely lacking. While it makes sense for the FWS to "focus[ ]" on present threats in the areas where the wolves currently exist in order to assess the wolves' long-term survival prospects, this does not explain why this focus should change the definition of "significant portion of its range," a term that carries with it the import of the ESA's mission to protect and promote the recovery of endangered and threatened species. The FWS's myopic focus on the wolf's current range – particularly for a species that it already has determined warrants protection across the lower 48 states – is contrary to the ESA.

For example, section 10(j) of the ESA gives the FWS the authority to reintroduce wolves in areas "outside the current range" if doing so would promote the species' conservation. 16 U.S.C. § 1539(j)(2)(A). Section 10(j) was added to the ESA in 1982. Pub. L. 97-304, § 6(6) (1982). The House Report explained that the provision was added to correct the FWS's "tendency to discourage voluntary introduction of species in areas of their *historical range*." H.R. Rep. No. 97-567, at 17 (May 17, 1982), *reprinted in* 1982 U.S.C.C.A.N. 2807, 2817 (emphasis added). If the ESA defines endangerment only in terms of a species' current range, as the FWS argues, the statutory authority to establish experimental populations outside of the

current range under section 10(j) would be meaningless.  *See Davis County Solid Waste Mgmt. v. EPA,* 101 F.3d 1395, 1404 (D.C. Cir. 1996) ("[I]t is of course a well-established maxim of statutory construction that courts should avoid interpretations that render a statutory provision superfluous.").

Similarly, in designating the critical habitat of a species, the ESA directs the FWS to limit critical habitat to "areas within the geographical area occupied by the species," unless it is essential that critical habitat be designated in "areas outside the geographical area occupied by the species."  16 U.S.C. § 1532(5)(A).  In other words, Congress's direct reference to "current range" and careful distinction between areas inside and outside "the geographical area occupied by the species" demonstrate that when Congress intended to refer to a species' current range, it did so explicitly.  *See id*.  In contrast, in defining the terms endangered and threatened species, Congress used the more general term "range."  *See* 16 U.S.C. § 1532(6), (20).

The FWS's interpretation of "range" as referring to current range only is also inconsistent with the ESA's purpose.  By ignoring and failing to analyze threats to the wolf across its historical range and the wolf's extirpation across portions of its historical range, the FWS rejects a primary purpose of the ESA:  ecosystem conservation.  16 U.S.C. § 1531(b) (ESA enacted "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved"); *see also* H.R. Rep. No. 95-1625, 95th Cong., 2d Sess. at 5 (Sept. 25, 1978), reprinted in 1978 U.S.C.C.A.N. 9455 (Congress realized "the loss of habitat for many species is universally cited as the major cause for the extinction of species worldwide.").

Moreover, the FWS's interpretation of "range" contradicts the ESA's legislative history.  Prior to 1973, weaker predecessor statutes allowed listing and protection of an endangered species only "when it [was] threatened with worldwide extinction."  H.R. Rep. 93–412, at 11; *see*

*also Defenders (lizard),* 258 F.3d at 1144; Endangered Species Conservation Act, Pub. L. 81-135

§ 3(a) (1969); Endangered Species Preservation Act, Pub. L. 89-669 § l(c), 80 Stat. 926 (1966).

Rather than continuing with this approach, Congress made clear in enacting the ESA in 1973

that:

> The term "Endangered Species" means any species of fish or wildlife which is in danger
> of extinction throughout its entire range, *or in any portion of its range.* This definition is
> a *significant shift* in the definition in existing law….

H.R. Rep. No. 412, 93rd Cong., 1st Sess. (1973) (emphasis added); *id.* at 4-5 ("[S]heer self-

interest impels us to be cautious," and "the institutionalization of that caution lies at the heart of

the [ESA]."). When Congress enacted this phrase, it unequivocally declared that "[t]he term

'range' . . . refers to the historical range of the species." H.R. Rep. 95-1625 (Nov. 25, 1978),

*reprinted in* ESA Legislative History at 742 (1982); *see also Int'l Bhd. of Elec. Workers v.

NLRB*, 814 F.2d 697, 712 (D.C. Cir. 1987) (observing that "a committee report may ordinarily be

used to interpret unclear language contained in a statute").

In short, Federal Defendants' interpretation of the word "range" to mean the species'

current range is unreasonable and in violation of the ESA because it contravenes the statutory

text, purpose, and directly relevant legislative history. Indeed, this legislative history is why the

FWS has consistently – at least until its various attempts to delist the gray wolf – adhered its

interpretation and understanding of the "significant portion of its range" phrase to mean the

species' historical range. *See, e.g.*, 58 Fed. Reg. 34,926, 34,928 (June 30, 1993) (Carolina

heelsplitter listed as endangered because it had "been eliminated from a significant portion of its

historical range"); 51 Fed. Reg. 6,686, 6,688 (Feb. 25, 1986) (listing northern aplomado falcon

after finding it was "endangered throughout its historical range").

**b)** **The FWS Cannot Render the Statutory Phrase "Significant Portion" of the Range Superfluous**

In addition to subverting the purpose and legislative history of the ESA by ignoring the wolf's historical range, the Agency's definition of "significant portion of its range" is unreasonable for yet another reason. In the Final Rule, the FWS considers a portion of a range to be a "significant portion" if "its loss would result in a decrease in the ability to conserve the species." 76 Fed. Reg. at 81,722. This definition fails to give full meaning to each term in the statutory definition of an endangered species. The ESA requires listing a species as endangered when it is "in danger of extinction throughout all *or* a significant portion of its range." 16 U.S.C. § 1532(6) (emphasis added). There is no difference between the danger of extinction throughout "all" and "a significant portion" of the species' range if "significant portion of its range" is defined only in terms of survival of the *entire species*, as it is under the FWS's reading.

By its definition of a "significant portion of its range," the FWS is committing the exact error stuck down by the Ninth Circuit in *Defenders (lizard)*. In that case, the FWS argued that "a species is eligible for protection under the ESA if it 'faces threats in enough key portions of its range that the entire species is in danger of extinction, or will be within the foreseeable future.'" *Id.* at 1141. The court rejected this construction:

> If, however, the effect of extinction throughout "a significant portion of its range" is the threat of extinction everywhere, then the threat of extinction throughout "a significant portion of its range" is equivalent to the threat of extinction throughout *all* its range. Because the statute already defines "endangered species" as those that are "in danger of extinction throughout all . . . of [their] range," the Secretary's interpretation of "a significant portion of its range" has the effect of rendering the phrase superfluous. Such a redundant reading of a significant statutory phrase is unacceptable.

*Id.* at 1141-42. The FWS's interpretation of "significant portion of its range" here is similarly unreasonable and not owed deference by this Court since it contravenes the statutory intent of the

ESA and renders superfluous other statutory terms, violating ordinary rules of statutory construction.

### 2. *The Case Law Does Not Support the FWS's Interpretation that Focuses on Current Range Only*

Contrary to Federal Defendants' suggestion, Defs. Br. at 27-28, no court has found that the FWS's "current range" interpretation is a generally permissible definition of "range." Indeed, in *W. Watersheds Project v. Ashe*, 4:11-CV-00462-EJL, 2013 WL 2433370 (D. Idaho June 4, 2013), the court specifically found that evidence in the record demonstrated that the species at issue was currently "distributed *throughout its historical range*, as well as in new areas where it was not historically located." *Id.*, 2013 WL 2433370 at *22 (emphasis added).[3] Here, in contrast, there is no dispute that gray wolves have suffered severe range contraction. Answer ¶¶ 50, 58; AR 651 at 019743A; 76 Fed. Reg. at 81,672; 68 Fed. Reg. 15,804, 15,805 (Apr. 1, 2003).

Similarly, *Colorado River Cutthroat Trout v. Salazar*, 898 F. Supp. 2d 191 (D.D.C. 2012) is unhelpful to Federal Defendants' claim that "range" reasonably refers to current range. In that case, the court, without much analysis, upheld the FWS's determination to focus on current range because it found that the FWS had offered a reasonable explanation for this decision. *Id.* at 201. Moreover, the court cited the FWS's explanation "detailing the cessation of the primary cause of past reduction [in the species' range]." *Id.* at 203. The facts in that case stand in contraposition to those here. First, as addressed in detail below, the FWS has not offered a reasonable explanation for its decision to ignore the wolf's historical range. And second, under

---

[3] The parts of the *Watersheds* opinion to which the Federal Defendants refer to supposedly bolster their interpretation of "significant portion of its range" are actually not relevant to what is meant by "range" but rather to how the FWS analyzes what is "significant." *Id.*, 2013 WL 2433370 at *21 (finding action was not arbitrary and capricious where the FWS relied upon specific test to evaluate significance).

the Final Rule, which strips wolves throughout the Western Great Lakes of federal protections, the causes of reduction of the gray wolf's range have, and will continue to, increase following federal delisting. *See*, *e.g.*, 76 Fed. Reg. at 81,721 ("[A] troubling finding for managers in the Great Lakes region is the most recent research showing declining [public] support for wolves and an increasing inclination to kill wolves illegally.") (internal parentheses omitted); 76 Fed. Reg. at 81,682 ("[FWS's] detailed review of the past, current, and likely future threats to wolves within the WGL DPS identified human-caused mortality of all forms to constitute the majority of documented wolf deaths."). Lastly, the Agency's reliance on *Friends of Blackwater* is misplaced and supports Plaintiffs' contention that "range" refers to historical range. *See id*., 691 F.3d at 432 (data analyzed "show[ed] persistence across 80 percent of the squirrel's *historical* range") (emphasis added). As Federal Defendants state in their brief, the species at issue in *Friends of Blackwater* had a current range that closely matched the extent of its historical range. Defs. Br. at 28. The same is, without any dispute, not true for gray wolves.

Federal Defendants' attempts to distinguish the cases on which Plaintiffs rely to define range with respect to the species' historical range also fall far short. Federal Defendants try to dismiss the importance of *Defenders (lynx)* by claiming that the court's decision was based on the FWS's decision to follow the "plain meaning" of the "significant portion of its range" phrase rather than define it. Defs. Br. at 31-32. Federal Defendants argue that *Defenders (lynx)* does not matter here because the FWS defined the term "significant portion of the range" for purposes of the Final Rule. *Id*. at 32. However, even if the phrase is ambiguous and the FWS sets out an interpretation of it, that interpretation must be reasonable and cannot run afoul of the ESA's overarching purpose and congressional intent. *Tenn. Valley Auth.,* 437 U.S. at 183-85. The

court in *Defenders (lynx)* unequivocally stated that excluding three-fourths of a species' range from a listing analysis is antithetical to the purposes of the ESA.  239 F. Supp. 2d at 20.

Federal Defendants also misrepresent the findings in *Friends of Wild Swan*.  Defs. Br. at 32.  The court in that case did find that the FWS's approach at looking solely at DPSs was inadequate to address the full scope of the listing petition that it received.  12 F. Supp. 2d at 1133.  However, the court also recognized that listing DPSs "is a proactive measure to *prevent* the need for listing a species over a larger range — *not* a tactic for subdividing a larger population that the FWS has already determined, on the same information, warrants listing throughout a larger range."  *Id*.  The court also chastised the FWS because it apparently "ignored its own conclusion that fragmentation, isolation, and loss of the migratory forms . . . contribute[d] to the decline of the *entire* population of [the subject species.]"  *Id*.

The FWS's interpretation of "significant portion of the range" also should be rejected on the basis of judicial estoppel, because the Agency has made contradictory arguments in other settings, blithely switching course to support its particular litigation strategy.  The purpose of judicial estoppel is to "protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment."  *New Hampshire v. Maine*, 532 U.S. 742, 749-50 (2001) (internal citations and punctuation omitted); *see also Konstantinidis v. Chen,* 626 F.2d 933, 938 (D.C. Cir.1980) (purpose of the doctrine is to prevent "improper use of judicial machinery").[4]

---

[4] Courts generally apply three factors in determining whether to invoke judicial estoppel:  (1) whether a party's position is clearly inconsistent with its former position, (2) whether the party succeeded in persuading a court to accept its former position, and (3) whether the party would obtain an unfair advantage in the litigation if not estopped.  However, "the factors identified by the Supreme Court in *New Hampshire v. Maine* are not intended to be 'inflexible prerequisites' to application of the doctrine."  *Moses v. Howard Univ. Hosp.*, 567 F. Supp. 2d 62, 67 (D.D.C. 2008) *amended*, 601 F. Supp. 2d 1 (D.D.C. 2009) and *aff'd*, 606 F.3d 789 (D.C. Cir. 2010).

The FWS has previously argued to the Ninth Circuit that a DPS was properly classified and listed as "endangered" because it had been eliminated from large parts of its historical range. *See* J. Br. Federal Appellees, *Nat'l Ass'n of Home Builders v. Norton*, 325 F.3d 1165 (9th Cir. 2003), 2002 WL 32102866, at \*33-\*36 ("*Norton Br.*").  The FWS was sued in *NAHB v. Norton* for listing a DPS of Arizona pygmy owls as an endangered species, and the FWS argued that the DPS was properly listed as an endangered species as evidenced by the "parallel declines of both the pygmy-owl population and its habitat in Arizona over the last century." *Norton Br.*, at \*34. The FWS defended its listing decision because of "a significant change from the pygmy-owl's former status as a common bird . . . in southern Arizona, even in its northern range which extended thirty-five miles north of Phoenix. . . . [ ] 100 years ago, the pygmy-owl was abundant in riparian habitats, but [ ] now, . . . both the habitat type and the owls are rare." *Id.* at \*35-\*36. Here, the FWS should be judicially estopped from arguing that it need not consider the gray wolf's historical range when determining whether the Great Lakes DPS is an endangered species because it has previously defended a DPS listing decision on this very basis.  The FWS should not be permitted to "deliberately chang[e] positions according to the exigencies of the moment." *New Hampshire*, 532 U.S. at 750.[5]  This Court should "protect the integrity of the judicial process" by disregarding the FWS's self-serving litigation position. *See id.* at 749.

### 3. *The FWS Failed to Explain its Decision to Ignore the Gray Wolf's Lost Range As a Significant Portion of Its Range*

Even if the FWS's interpretation of "significant portion of its range" could somehow be considered reasonable – which, for the reasons stated above, it cannot – because there are major

---

[5] The Ninth Circuit Court of Appeals initially remanded to the Arizona District Court on a procedural issue, *Nat'l Ass'n of Home Builders v. Norton*, 325 F.3d 1165 (9th Cir. 2003), and subsequently held that FWS had not properly explained its determination that the pygmy owl constituted a DPS.  *See Nat'l Ass'n of Home Builders v. Norton*, 340 F.3d 835, 847 (9th Cir. 2003).  Thus, the question of whether that DPS was endangered was never reached.

geographical areas in which the wolf is no longer viable but once was, the FWS must at least explain why the areas in which the species can no longer live do not constitute a significant portion of its range. *Defenders (lizard)*, 258 F.3d at 1145. That is particularly important in this case, where the FWS already determined that the lower 48 States were a significant portion of the wolf's range and listed the wolf across that range. See 76 Fed. Reg. at 81,672 (gray wolves lived throughout North America, though now 70 per cent of gray wolves in U.S. are in the Great Lakes region); 76 Fed. Reg. at 81,666 (citing 43 Fed. Reg. 9,607 (Mar. 9, 1978) listing the gray wolf (*Canis lupus*) throughout the conterminous 48 States and Mexico). Yet the FWS provides no such explanation and would have the Court accept an about-face in its policy interpretation without further explanation. No such deference is warranted. *See Nat'l Wildlife Federation v. Nat'l Marine Fisheries Serv.,* 524 F.3d 917, 928 (9th Cir.2008) (noting that a novel approach completely at odds with past approaches by the agency receives little deference); *Defenders of Wildlife v. Salazar*, 729 F. Supp. 2d at 1223 (the agency's explanation of its interpretation must consist of *explaining the change* in interpretation of the statutory provision, not whether the agency's new interpretation is consistent with the statute); *Friends of Wild Swan*, 12 F. Supp. 2d at 1133 ("[The FWS's] prior conclusions are relevant in determining whether its current decisions are arbitrary and capricious.")

The Final Rule states that the FWS analyzed the "areas of potentially suitable habitat [within the Western Great Lakes DPS boundaries] that are currently unoccupied [and] are relatively small" and determined that even if wolves occupied those small areas, it "[would] not make a significant contribution to the long-term viability of the gray wolf population in the DPS or in the United States, and thus [those areas] are not considered to be a significant portion of the species range," 76 Fed. Reg. at 81,683. But the FWS did not go far enough in its analysis in the

31

Final Rule, as established in multiple cases in which "significant portion of its range" was at issue.  As the Ninth Circuit has made perfectly clear, the Secretary must "analyze lost historical range" and that "[i]t is insufficient . . . to point to one area or class of areas where lizard populations persist to support a finding that threats to the species elsewhere are not significant; the ESA requires a more thorough explanation." *Tucson Herpetological,* 566 F.3d at 876, 877.

Applying *Defenders (lizard)* and *Tucson Herpetological*, courts reviewing ESA listing decisions have similarly recognized that the FWS must evaluate the significance of a species' lost historical range.  *See Wildearth Guardians*, 2011 WL 1225547 at * 6 ("the reduction of the historical range must be considered;" finding the FWS did so); *Ctr. for Biological Diversity v. Lubcheno*, 758 F. Supp. 2d 945, 956 (N.D. Cal. 2010) (recognizing listing decisions "include[] consideration of lost historical range"); *Defenders (wolf)*, 354 F. Supp. 2d at 1168-69 (finding the FWS illegally "ma[de] all other portions of the wolf's historical or current range insignificant and unworthy of stringent protection" by only evaluating areas where the species exists); *National Wildlife Federation v. Norton*, 386 F. Supp. 2d at 566 (ruling the FWS cannot rely on alleged viability of "core" populations while ignoring "historical or current range outside of the core gray wolf populations").

This Court has also found the reasoning of *Defenders (lizard)* and *Tucson Herpetological* persuasive on numerous occasions.  *See Defenders (lynx),* 239 F. Supp. 2d at 20 (rejecting the FWS's focus on "only one region of the Lynx's population -- the Northern Rockies/Cascades -- to the exclusion of three-quarters of the Lynx's historical regions" as contrary to ESA's purpose); *WildEarth Guardians v. Salazar*, 741 F. Supp. 2d 89, 98-101 (D.D.C. 2010) (finding that the FWS arbitrarily failed to "explain in the first instance how the Utah prairie dog's reduction [in 87 percent] of its historical range does not" warrant reclassification from a

threatened to endangered species); *see also Defenders of Wildlife v. Kempthorne*, Civ. No. 04–1230 (GK), 2006 WL 2844232, at *5 (D.D.C. Sept. 29, 2006) (applying the Ninth Circuit's definition of "significant portion of its range" and holding the FWS's decisions unlawful because it failed to explain how a loss of three of a species' four population regions did not constitute a significant portion of the species' range).   In other words, when the FWS fails to evaluate a species' lost range to assess whether it constitutes a significant portion of the range, the agency has failed to consider a relevant factor under the ESA.

The FWS's approach in the Final Rule ignores the mandate of all of these cases by focusing its range analysis *only* on the boundaries of the DPS that it created.   In so doing, the FWS entirely failed to consider lost habitat outside of the boundaries that it drew around the Great Lakes wolves – excluding habitat that is recognized as the wolves' historical range and previously deemed a significant portion of the wolves' range.   *See* 43 Fed. Reg. 9,607 (Mar. 9, 1978).   Indeed, the Final Rule itself identifies regions that were part of the gray wolves' historical range but yet are excluded from the "significant portion of its range" analysis with no explanation as to why they were excluded.   *See* 76 Fed. Reg. at 81,671 (noting "scattered islands of possibly suitable habitat, such as the Black Hills of eastern Wyoming and western South Dakota"); Defs. Br. at 23 ("The DPS boundaries were *not* drawn to include the location of all known dispersers or to extend the boundaries to the western-most borders of the Dakotas because those dispersers were not known to contribute to the core populations.") (citing 76 Fed. Reg. at 81,683) (emphasis added); 76 Fed. Reg. at 81,683 ("DPS delineation is appropriately based . . . by being centered on the areas occupied by the core population, but also including a surrounding area that encompasses *a reasonable portion* of the areas visited by core population wolves.") (emphasis added); *see also Defenders (wolf)*, 354 F. Supp. 2d at 1167 n.8 (discussing wolf

habitat and dispersing wolves in the Northeast, Pacific Northwest, and Dakotas); 2007 AR Doc. 468A at 14792 (noting that "the state of North Dakota can support a wolf population"); *id.* at 14791 (finding that "large areas of habitat exist within North Dakota in which human population density and road density is low"); 72 Fed. Reg. at 6,073 (the FWS's recognition that suitable habitat exists in the Turtle Mountain region of North Dakota). The FWS's failure to provide a sufficient explanation as to why it chose to ignore lost historical range renders the Final Rule invalid.

  **4.**  ***The FWS Cannot Ignore the Requirement to Recover Wolves Throughout a Significant Portion of Their Range By Carving Up the Wolf's Range into DPSs***

  The ESA precludes the FWS from piecemeal delisting a species by divvying up the species' range into small portions and restricting the section 4(a)(1) threats analysis to those areas. *See Defenders (lynx)*, 239 F. Supp. 2d at 19; *Friends of Wild Swan*, 12 F. Supp. 2d at 1133. The Agency nevertheless argues that the Final Rule is lawful because it designated the Western Great Lakes wolf population as a DPS *before* conducting the threats analysis. *See* Defs. Br. at 25-26. In other words, Federal Defendants contend that the FWS need not conduct a section 4(a)(1) threats analysis across a species' entire range if the agency avoids that analysis by first dividing that range into DPSs.

  Federal Defendants point to the statutory definition of "species" in support of their claim that the FWS can delist this select group. Defs. Br. at 25. The definition of "species" "includes. . . any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature." 16 U.S.C. § 1532(16). This definition authorizes the FWS to create a DPS to *protect* a locally vulnerable population of a vertebrate species even though that species as a whole is neither threatened nor endangered beyond the local population. As the District of Oregon observed, if the FWS "legitimately concludes, after proper and sustainable analysis, that

listing of the entire species" is unnecessary, the agency can "proceed[] on a population segment basis." *Friends of Wild Swan*, 12 F. Supp. 2d at 1134. This "two-tiered approach," *id.*, is consistent with the ESA's policy of "institutionalized caution." *Tenn. Valley Auth.,* 437 U.S. at 194.

Federal Defendants, however, want to flip this added protection on its head. They claim that when Congress amended the statute in order that the FWS extend ESA protections to DPSs, now the expanded "species" definition permits the FWS to skip the first analytical step (a section 4(a)(1) threats analysis across a species' historical range) and proceed directly to the second step (evaluating a potential DPS). But nothing in the Act directs or allows the agency to restrict its scale of analysis to the DPS level *before* conducting a 4(a)(1) threats assessment for the species as a whole.[6] And allowing the FWS to skip that step, as it did here, would gut the definition of an endangered or threatened species – one of the central provisions of the ESA – by eliminating the need to consider the species' status across a "significant portion of its range." 16 U.S.C. § 1532(6), (20). The same analysis applies when the agency considers delisting, as opposed to listing, a species. If the FWS could divvy up a species-level listing into DPSs, and then delist those DPSs without considering the species as a whole (including the historical range of the species as a whole), then the FWS would never have to explain why the unoccupied portions of the range are not significant to the recovery of the species.

The case law does not support such a tortured reading of the ESA. In *Defenders (wolf)*, the court overturned the FWS's 2003 gray wolf delisting rule in part because the FWS "limited

---

[6] Indeed, one of the five categories of threats the agency must consider under section 4(a)(1) is the "…curtailment of [the species'] habitat or range." 16 U.S.C. § 1533(a)(1)(A). The plain meaning of "curtail" means "to make less by or as if by cutting off or away some part." Merriam-Webster Collegiate Dictionary, 11th Ed. at 307. Accordingly, FWS must review "curtailed" – or lost – "range" in deciding whether a species deserves listing as an endangered or threatened species.

the phrase 'significant portion of its range' to areas that ensure the viability of the DPS." 354 F. Supp. 2d at 1169; *see also id.* at 1171 ("[T]he wolf DPS appears to be a tactic for downlisting areas the FWS has already determined warrant listing, despite the unabated threats and low to nonexistent populations outside of the core areas."). And that is precisely what the FWS did again in the Final Rule delisting the Western Great Lakes DPS. *See* 76 Fed. Reg. at 81,682 ("The WGL gray wolf DPS no longer meets the definition of a threatened or endangered species, as it has achieved long-standing recovery criteria by greatly expanding in numbers and geographic range and threats to its long-term viability have been reduced or eliminated."); 76 Fed. Reg. at 81,686 ("The WGL gray wolf DPS no longer meets the definition of a threatened or endangered species, and has achieved the recovery criteria established in the Eastern Timber Wolf Recovery Plan (Service 1992) by greatly expanding in numbers and geographic range."); 76 Fed. Reg. at 81,692 ("The large areas of unsuitable habitat in the eastern Dakotas; the northern portions of Iowa, Illinois, Indiana, and Ohio; and the southern areas of Minnesota, Wisconsin, and Michigan; as well as the relatively small areas of unoccupied potentially suitable habitat, will not contribute to the viability of wolves in the WGL DPS. . . . In summary, wolves currently occupy the vast majority of the suitable habitat in the WGL DPS, and that habitat is adequately protected for the foreseeable future."). The text of the Final Rule makes clear that the FWS did not analyze threats to wolves and their range beyond the boundaries of the Western Great Lakes DPS, or outside the protected population pockets the FWS selected. Instead, they ignored "significant portions" of the wolves' range, and carved up the range in order to meet the politically expedient delisting of the WGL DPS, in violation of the bedrock principles of the ESA.

Federal Defendants claim that "recent courts have criticized the FWS for looking outside the relevant DPS when conducting delisting determinations."  Defs. Br. at 29 (citing *Servheen*, 665 F.3d at 1027).  But this mischaracterizes the holding of *Servheen*.  There, the Ninth Circuit concluded that the FWS took arbitrary and capricious action when the agency found that Yellowstone grizzlies, who the FWS determined were a DPS based on their unique dependence on whitebark pine seeds for food, would not be threatened by a decline in whitebark pine because a separate population of grizzly bears in Northern Montana (that the FWS found was not uniquely dependent on whitebark pine) had continued to thrive despite a decline in whitebark pine.  *Id*. at 1027.  The Ninth Circuit found that the FWS's final decision was contrary to the record evidence and at odds with the agency's own conclusions.  *Id.*  The question was not even presented to the Ninth Circuit, let alone resolved, whether the FWS must conduct a "significant portion of its range" analysis for the whole species rather than only looking within a DPS's boundaries.

Notably, part of the Montana District Court opinion that was not overturned on appeal stated that "[b]y defining 'significant portion of range' based on the DPS boundaries, the Service's definition potentially renders the phrase 'superfluous.'"  *Greater Yellowstone Coal. v. Servheen*, 672 F. Supp. 2d 1105, 1124 (D. Mont. 2009) *aff'd in part, rev'd in part, and remanded*, 665 F.3d 1015 (9th Cir. 2011) (citing *Defenders (wolf)*, 354 F. Supp. 2d at 1168).  Moreover, the district court observed that it is "illogical to establish a DPS and state that the only range significant to its survival is where it exists currently.  Under such an interpretation, the Service could remove virtually any species from the threatened and endangered list simply by designating it a DPS."  *Id.* at 1125 n.9.  The FWS's use of the DPS tool in the Final Rule

demonstrates this precise approach and why it takes the teeth out of the ESA's species protections.

Federal Defendants suggest that *Defenders of Wildlife v. Salazar*, 729 F. Supp. 2d 1207, supports the proposition that the FWS may look only at a DPS's range to determine whether the species is threatened or endangered. Defs. Br. at 25. This suggestion is erroneous. That case only stands for the proposition that the FWS cannot list something less than a DPS. *Defenders of Wildlife v. Salazar*, 729 F. Supp. 2d at 1219 ("[A] species must be protected if it faces worldwide extinction, or something less than that. The listing depends on when a species is endangered in all or in a significant portion of its range."); *id.* 1219 n.2 (rejecting defendants' argument "that the Service has the flexibility 'to limit the listing of a species to that portion of the species range in which it is actually endangered or threatened.'").

If the Final Rule is upheld and Federal Defendants are permitted to delist a gray wolf population that represents a principal hope for the species' overall recovery despite the wolves' present extirpation from vast portions of their historical range, the FWS will be free to delist other imperiled species in any pockets where the species has been able to survive. Federal Defendants are simply wrong when they claim that such a move is inconsistent with the FWS's past practice. Defs. Br. at 32. In fact, past practices with the gray wolf prove just the opposite – that the FWS has consistently tried this tactic to remove species-wide protections from any small, successful population instead of recognizing that under the ESA, the species must be protected because it remains imperiled through a significant portion of its range.

## C.     The WGL DPS Does Not Satisfy the ESA's Criteria for Delisting

The WGL DPS may not be delisted because the FWS improperly predetermined its delisting decision in response to political pressures and failed to make the delisting determination

based solely upon the best available science.  In addition, the existing regulatory mechanisms are inadequate to ensure the Great Lakes gray wolf's existence in the face of human-caused mortality.

The FWS must determine whether a species should be listed as threatened or endangered based solely upon the five statutorily prescribed listing factors.  16 U.S.C. § 1533(a)(1) (collectively referred to as "listing factors").  The listing factors are: (1) the present or threatened destruction, modification, or curtailment of its habitat or range; (2) overutilization for commercial, recreational, scientific, or educational purposes; (3) disease or predation; (4) the inadequacy of existing regulatory mechanisms; or (5) other natural or manmade factors affecting its continued existence.  *Id.*  "Each factor is equally important and a finding by the Secretary that a species is negatively affected by *just one* of the factors warrants a non-discretionary listing as either endangered or threatened."  *Nat'l Wildlife Fed'n v. Norton*, 386 F. Supp. 2d 553, 558 (D. Vt. 2005) (citing 50 C.F.R. § 424.11(c)) (emphasis added).  Delisting requires a determination that none of the above five factors threatens or endangers the species.  50 C.F.R. § 424.11(d).  Both listing and delisting determinations must be made "solely on the basis of the best available scientific and commercial information regarding a species' status, without reference to possible economic or other impacts of such determination."  *Id.* § 424.11(b); 16 U.S.C. § 1533(b)(1)(A), (c).

### 1. *The FWS Cannot Delist Wolves in the Great Lakes to Appease Political Interests and in the Face of Taxonomic Uncertainty*

#### a)   **The FWS's Delisting Decision is Based on Politics, Not Science**

Federal Defendants make a weak attempt to minimize the role that politics played in the development of the Final Rule.  Defs. Br. at 33-37.  Specifically, Federal Defendants claim that the FWS's actions were not based on politics, but were based on its mandatory duty to respond to citizen petitions submitted under the ESA.  *Id.*  Yet there is nothing in the record that indicates that the FWS at any time seriously considered that the citizen petitions were not warranted.  The question that the FWS asked itself from the beginning was not "What must we do?" but rather "How should we do it?"  And while the ESA requires that the FWS *respond* to petitions within a

definite timeframe, it nowhere requires the FWS to *grant* such petitions.   *See* 16 U.S.C. § 1533(b)(3)(A), (B).

In fact, the FWS denies listing and delisting petitions all the time, including petitions to list or delist DPSs of already-listed species.  *See Safari Club Int'l v. Jewell*, 11-CV-01564 BAH, 2013 WL 4041541, at *19 (D.D.C. Aug. 9, 2013) (citing the FWS's denial of plaintiffs' petition after finding that captive or captive-bred specimens "d[id] not qualify as separate 'species' or otherwise qualify for separate legal status under the [ESA]"); *Fund For Animals, Inc. v. Hogan*, 428 F.3d 1059, 1064 (D.C. Cir. 2005) (affirming judgment for the FWS after the FWS's belated 90-day finding that concluded that plaintiffs' petition failed to demonstrate that a group of tri-state trumpeter swans was a distinct population segment).   And the FWS also regularly delays or misses deadlines.  *See*, *e.g.*, *Defenders of Wildlife v. Babbitt*, No. 1:97-CV-02122-GK (D.D.C. Dec. 22, 1997) (interim order) ("[d]efendants' own 12–month finding makes clear" that "total extinction of the Lynx population is a distinct possibility," and that "the government's failure to have even raised the possibility of a preclusion finding – with its concomitant substantial delay [in initiating the required rulemaking process] – is very troubling . . ."); *FFA v. Hogan*, 428 F.3d at 1061.

Federal Defendants' attempts to distinguish the political meddling cases cited by Plaintiffs are unpersuasive.  Defs. Br. at 36-37.  For example, Federal Defendants argue that "no decision was 'undone' or reversed at the behest of political meddling."  Defs. Br. at 37.  But here the FWS's decision to delist the WGL DPS – and its entire delisting schedule – were driven by politics from the outset.  The discussions with Senator Klobuchar began *before* the FWS even received the citizens' petitions on which it claimed it based its decision and timeline.  *See Letter from Amy Klobuchar* (Dec. 7, 2010), AR 66 at 002732A (referencing December 2009 letter from

Sen. Klobuchar and Congressman Oberstar to the FWS Director).  And none of the documents referenced by Plaintiffs even discuss the statutory deadlines which should control the Agency's conduct; instead, those documents all reference promises to politicians about the scheduled delisting.  *See*, *e.g.*, AR 87 at 002822A ("Secretary Salazar agreed that we would have a . . . final rule completed by the end of 2011 (that presumably would delist WGL wolves)" after Senator Klobuchar planned to introduce delisting legislation); AR 451 at 011748A-0117449A (repeatedly citing the FWS's "commitment" to Senator Klobuchar to delist gray wolves).  And perhaps most telling is the fact that the FWS pushed ahead with a final decision to create and delist the DPS even after it was confronted with new and conflicting taxonomic information.  The administrative record demonstrates that FWS failed "to disregard politics" in arriving at the Final Rule and violated the clear requirement that it act "solely" on the basis of the best available science. *Save Our Springs v. Babbitt*, 27 F. Supp. 2d 739, 747 (W.D. Tex.1997); 16 U.S.C. § 1533(b)(1)(A).

> **b)** **The FWS Cannot Delist When It Does Not Know What Species It Is Delisting**

Even if Federal Defendants could lawfully create and delist DPS, or revise a functional DPS as they claim the FWS did in the Final Rule, the Agency cannot do so without, at the very least, identifying the species subject to delisting or downlisting.  Without the species identification, the listing factors analysis mandated by the ESA cannot be undertaken and the process is a sham.  The Final Rule violates the ESA because it delists wolves despite the FWS's substantial uncertainty regarding the identity of the species that it has delisted.

It was only a matter of months between the Proposed WGL DPS Delisting Rule, in which the FWS said "[w]ith regard to Canis lycaon, [we are] announcing a rangewide status review of this species, which occurs in Canada and the western Great Lakes region," 76 Fed. Reg. 26,090,

41

and the Final Rule, in which the FWS said "[we are] at this time continuing to recognize C. lupus as the only species that occurs in the Great Lakes." 76 Fed. Reg. at 81,669.  There is no plausible explanation, other than pressure from the political side, for the driving forward to delist by a date certain, given this complete reversal in the identification of the species at issue.  The Court should carefully scrutinize the timeline over which the FWS did an about-face on the species to be delisted.  Indeed, only months after the Final Rule, the FWS changed its mind about the taxonomy of wolves in the WGL DPS yet *again*.  *See* Proposed Lower 48 Delisting Rule, 78 Fed. Reg. at 35,670 (stating that "[its] review of the best available taxonomic information indicates that . . . the northeastern United States and portions of the upper Midwest (eastern and western Great Lakes regions) were occupied by the eastern wolf (*C. lycaon*), now considered a separate species of *Canis* rather than a subspecies of *C. lupus*. . .").[7]  In other words, rather than actually determining what species of wolf actually exists inside and outside the WGL DPS, the FWS just picks whatever is the most convenient result to achieve its desired outcome – delisting the wolf, nationwide, piecemeal.

Plaintiffs do not argue that the FWS must possess absolute taxonomic certainty before acting.  But the record in this case reveals that the taxonomic disagreements are substantial, and given that the Final Rule removes all protections from the subject species, potentially putting the species in jeopardy of extinction, that level of uncertainty is unacceptable.  The Ninth Circuit has

---

[7] Despite the Agency's efforts at defending this arbitrary decision, the fact that the FWS changed course from the proposed rule to the Final Rule is relevant.  Plaintiffs do not cite the various proposed wolf delisting rules for their  legal or interpretive value but only to show that the FWS has no idea what species it is delisting with the Final Rule.  Moreover, contrary to Federal Defendants' assertion, this Court can consider the Proposed Lower 48 Delisting Rule.  *See Humane Soc'y v. Dep't of Commerce*, 432 F. Supp. 2d 4, 14 (D.D.C. 2006) (While courts typically can only consider the administrative record, "the D.C. Circuit, however, has recognized a number of exceptions to this rule, indicating that additional evidence may be considered where ' . . . evidence arising after the agency action shows whether the decision was correct or not.'") (citing *Esch v. Yeutter*, 876 F.2d 976, 991 (D.C. Cir.1989)).

addressed a similar issue in the ESA context, where the administrative record makes clear that

the agency has substantial uncertainty about a critical piece of the delisting puzzle:

> We recognize that scientific uncertainty generally calls for deference to agency expertise. *See Lands Council v. McNair,* 537 F.3d 981, 993 (9th Cir.2008) (en banc) ("We are to be most deferential when the agency is making predictions, within its area of special expertise, at the frontiers of science." (internal quotation marks and brackets omitted)).

> But we nonetheless have a responsibility to ensure that an agency's decision is not arbitrary. *See id.* It is not enough for the Service to simply invoke "scientific uncertainty" to justify its action. As the Supreme Court has explained, "[r]ecognizing that policymaking in a complex society must account for uncertainty ... does not imply that it is sufficient for an agency to merely recite the terms 'substantial uncertainty' as a justification for its actions." *State Farm,* 463 U.S. at 52, 103 S.Ct. 2856. The Service must rationally explain why the uncertainty regarding the impact of whitebark pine loss on the grizzly counsels in favor of delisting now, rather than, for example, more study. *See id.* Otherwise, we might as well be deferring to a coin flip.

*Servheen*, 665 F.3d at 1028. The Final Rule is a shining example of a coin flip. When

confronted with new and divergent taxonomic classification options, the FWS decided – its

reasoning and justifications not clear from the record – to call all DPS wolves *Canis lupus*. The

Final Rule resulting from that coin flip is not a case of the "best available science" or agency

expertise entitled to deference – it is arbitrary and capricious decisionmaking.

To be sure, this Court's authority extends to reviewing the FWS's decision on this point.

"[T]here is "an important difference between the *depth* of [the court's] review of an agency's

action and the *scope* of that review." *NW Coalition v. EPA*, 544 F.3d 1043, 1052 n.7 (9th Cir.

2008) (emphasis in original). "'Although the ultimate scope may be narrow, the depth must be

sufficient for us to be able to comprehend'" the agency's decision. . . . [W]here the agency's

reasoning is irrational, unclear, or not supported by the data it purports to interpret, we must

disapprove the agency's action.'" *Id.* (quoting *Center for Auto Safety v. Peck*, 751 F.2d 1336,

1373 (D.C. Cir. 1985) (Wright, J., dissenting)). *See also Presley v. Etowah County Comm'n*, 502

U.S. 491, 508 (U.S. 1992) ("[T]he principle has its limits.   Deference does not mean acquiescence.").

Notably, when faced with this same taxonomic uncertainty regarding wolf species and subspecies, the FWS has previously recognized that it *could not* take the listing action that it had proposed and wanted to take – because of these persistent taxonomic uncertainties.  *See*, *e.g.*, *Final Rule to Reclassify and Remove the Gray Wolf from the List of Endangered and Threatened Wildlife in Portions of the Conterminous United States*, 68 Fed. Reg. 15804, 15805-06 (April 1, 2003) (describing significant, continuing scientific debate concerning both the species and subspecies identity of the large canids that historically occupied the Northeast); *Nat'l Wildlife Fed'n v. Norton*, 386 F. Supp. 2d 553, 559 (D. Vt. 2005) ("in light of new doubts about whether the gray wolf historically occupied the Northeast, the FWS concluded, based upon its interpretation of the ESA and its DPS policy, that it could not finalize its proposal to designate a separate Northeastern DPS." (quoting the FWS's motion for summary judgment)).

Here, the Federal Defendants confronted the same taxonomic uncertainty regarding which species or subspecies of wolves is present in Great Lakes region and in the newly created "range" of those wolves as drawn by the Final Rule; indeed, the taxonomic uncertainty may be even greater now than at the time of the 2003 downgrading attempt since Federal Defendants reopened the comment period to address this very issue.  *See* Defs. Br. at 8.  Yet because of the Agency's political promises to delist wolves in the Great Lakes, the FWS decided in 2011 that it could do what it recognized was contrary to the ESA and DPS Policy back in 2003.  Delisting in the face of the void of knowledge about the proper species violates the ESA because the FWS cannot take action when its doubt could harm rather than benefit a species' survival.  *See Tennessee Valley Auth.*, 437 U.S. at 194 ("Congress has spoken in the plainest of words, making

44

it abundantly clear that the balance has been struck in favor of affording endangered species the highest of priorities, thereby adopting a policy which it described as 'institutionalized caution.'"); *Conner v. Burford*, 848 F.2d 1441, 1454 (9th Cir. 1986) (Congress "inten[ded] to give the benefit of the doubt to the species."). The basic ESA principles expressed in these cases and the spirit of the ESA require the FWS to act with utmost caution to protect the species that it may not have adequately identified, rather than delist it and ignore the consequences.

Finally, because of the unsettled taxonomic questions, the FWS cannot rely on the Recovery Plan for Eastern Timber Wolf to delist the WGL DPS, because delisting in the face of substantial taxonomic uncertainty and on the basis of a recovery plan drafted for what the FWS now believes might be a *different species* than the wolves that exist in the Western Great Lakes DPS violates the ESA. In the Final Rule, the FWS relied heavily on that Recovery Plan as justification for its delisting decision. *See e.g.,* Defs. Br. at 1 (noting the FWS's inquiry was "whether the Midwestern populations of wolves met the recovery goals" of the Eastern wolf recovery plan). In contrast, in *Friends of Blackwater*, which Federal Defendants cite in their defense, Defs. Br. at 38, the FWS defended its right *not* to rely on a recovery plan for the flying squirrel at issue because recovery plans do not provide "explicit criteria" and are not binding on the Agency. *See Friends of Blackwater*, 691 F.3d at 433-34. Here, the Agency treated a non-binding recovery plan, for a different species, in a different habitat, as its leading principle. *See*, *e.g.*, 76 Fed. Reg. at 81,677 ("This methodology is consistent with the recovery criteria established in the Revised Recovery Plan."); *id*. at 81,679 ("[T]he combined wolf population for Wisconsin and Michigan has exceeded the second recovery criterion of the 1992 Revised Recovery Plan."); *id*. at 81,679 ("The recovery of all wolves in the WGL was guided first by the 1978 Recovery Plan and then by the 1992 revised Recovery Plan for the Eastern Timber Wolf.").

The fact that the FWS looked to this unrelated plan for guidance further emphasizes the precarious nature of its decision, contrary to indisputable ESA principles.

### 2. *Wolves Remain Threatened by Inadequate Regulatory Mechanisms to Protect them from Human-caused Mortality*

The Final Rule violates the ESA because there are inadequate regulatory mechanisms to protect wolves from human-caused mortality in the absence of federal protections. *See* 16 U.S.C. § 1533(a)(1)(D), (E). Federal Defendants' concern was not only meeting its political promises but also creating a Final Rule that would accord with the States' interests. *See* AR 451 at 011749A ("A final delisting that is in effect by March will provide the States (particularly [Michigan and Wisconsin]) a window of spring depredation control before any potential litigation.").

The regulatory mechanisms that the FWS evaluated prior to issuing the Final Rule are not sufficient to ensure the gray wolves' survival because they are piecemeal, non-binding promises from states that have indicated their intention to ignore long-time wolf survival in response to public pressure. This is in sharp contrast to the facts in *Servheen*, where the FWS reasonably found adequate regulatory mechanisms to protect the Yellowstone grizzly bear in light of "an impressive inter-agency, multi-state cooperative blueprint for long-term protection and management of sustainable grizzly population" which was "legally binding . . . on 98% of the critical [primary conservation area] (PCA) and are buffered by legal protections afforded by the Wilderness Act on significant portion of grizzly habitat outside PCA". 665 F.3d at 1019, 1032.

In this case, the mechanisms on which the FWS relied in delisting wolves in the Western Great Lakes are Minnesota, Michigan, and Wisconsin's wolf management plans. As stated in the Final Rule, "[the FWS] reviewed the 2001 Minnesota Plan, the 1999 and 2006 Updated Wisconsin Plan, and the 1997 and 2008 revised Michigan Plan . . . to determine if they will provide sufficient protection and reduce threats. [The FWS is] primarily concerned with the

outcome of the plan's implementation."  76 Fed. Reg. at 81,686.  In other words, while the FWS

reviewed these States' plans and found them adequate, there is no guarantee that the plans will

be implemented as drafted.  Moreover, six of the states in the Western Great Lakes region in

which gray wolves are now partially delisted do not even have wolf management plans.  *See e.g.*,

*id.* at 81,682 (noting that these states do not have wolf management plans); *id.* at 81,713 (noting

that wolves in Indiana and Ohio lack state protections and that wolves in the Dakotas are treated

the same as all other wildlife in the state).  In other words, there is nothing coming even close to

the type of plan approved in *Servheen*.  665 F. 3d at 1019, 1032.

Instead, the only assurance that conservationists and gray wolf enthusiasts have is that the

FWS is obligated under the ESA to "continue to monitor the status of the species for a minimum

of 5 years after delisting, and [ ] can list it again if the monitoring results show that to be

necessary."  76 Fed. Reg. at 81,683.  And the FWS promises to "closely monitor any steps taken

by States and Tribes within the WGL DPS to establish any public harvest of wolves during our

post-delisting monitoring program."  *Id.* at 81,709.  In other words, take a chance on wolf

survival, and come back later to see if it worked.

But this type of agency reassurance that the FWS will be "closely monitor[ing]" if the

States fail to protect delisted wolves has been found inadequate under the ESA.  *See Servheen*,

665 F.3d at 1029 (rejecting "out of hand any suggestion that the future possibility of relisting a

species can operate as a reasonable justification for delisting" and requiring the FWS to detail its

"adaptive management" response plan, "tied to more specific triggering criteria" to explain why

those responses "would be reasonably likely to mitigate population declines caused by [the

identified potential threat]") (citing *Natural Res. Def. Council v. Kempthorne,* 506 F. Supp. 2d

322, 341 (E.D. Cal.2007) (rejecting adaptive management plan under the ESA when it did not

47

include "defined action criteria")).  The Final Rule does not provide any such specifics regarding how the FWS will respond if its apprehensions regarding the States' implementations of the management plan are realized, beyond the mandatory minimum monitoring that the FWS must do to avoid violating the ESA.

In opposing Plaintiffs' regulatory-mechanisms argument, the FWS does not dispute that adequate regulatory mechanisms are essential to address the threat of human-caused wolf mortality once the Western Great Lakes DPS is no longer protected by the ESA.  *See* Defs. Br. at 42-43.  Rather, Federal Defendants try to dismiss their duty to analyze the potential effects of the States' hunts because at the time of the Final Rule, the States had not actually authorized public wolf hunts.  Defs. Br. at 42-43; 76 Fed. Reg. at 81,709 ("The possibility of a public harvest of wolves is acknowledged in the Wisconsin Wolf Management Plan. . . .  [W]e consider public harvest of Wisconsin wolves to be highly speculative at this time.").  But the FWS cannot feign ignorance in this area.  The FWS is well acquainted with what can happen when it delists a protected species such as the gray wolf.  *See, e.g., Defenders of Wildlife, et al. v. Salazar, et al.*, No. 1:12-cv-01833-ABJ (D.D.C. Nov. 13, 2012), ECF No. 1 ¶¶ 5-6 (after wolves in Montana and Idaho were stripped of ESA protections, both states instituted aggressive state management tactics and committed to minimum numbers of wolves that represented a substantial decrease in current populations); 76 Fed. Reg. 61,782, 61,802 (Oct. 2011) (proposed rule to delist wolves in Wyoming noting that in 2009, when wolves were briefly delisted in parts of the northern Rocky Mountains both Montana and Idaho held public hunts, and that following the 2011 Congressional delisting of wolves in those states, both states are "planning more aggressive hunts for fall 2011 to reduce the population below current levels"); *Humane Soc'y of U.S. v. Kempthorne*, 481 F. Supp. 2d 53, 57 (D.D.C. 2006) *vacated sub nom. Humane Soc. of U.S. v. Kempthorne*, 527 F.3d

181 (D.C. Cir. 2008) (following the vacatur of the FWS's 2003 downlisting rule and the return of gray wolves to endangered status, Wisconsin sought a permit from the FWS to kill wolves).

Notably here, the States have made it clear how important it is to begin hunting wolves as soon as possible. *See*, *e.g.*, Amicus Minn. Dep't of Natural Res. Br., ECF No.31 at 7 (in 2011 the Minnesota Legislature "remov[ed] the requirement that a wolf hunting and trapping season be delayed by five years after delisting. The removal of the five-year waiting period was acknowledged by the USFWS in [the Final Rule].") (internal citation omitted); Defendant-Intervenor State of Mich. and Michigan Dep't of Natural Res. ("MI DNR") Br., ECF No. 30 at 24 (noting that Michigan's 2008 wolf management plan that the FWS reviewed contemplated a public hunt).

While inadequate regulatory mechanisms alone are a sufficient reason to prohibit the delisting of the Western Great Lakes DPS, the Final Rule is also arbitrary and capricious because it lacks an examination of how all of the threats to wolves in combination may affect species survival. A species must be listed under and protected by the ESA if the best scientific and commercial data available show "that the species is endangered or threatened because of any one *or a combination of* the [five listing] factors." 50 C.F.R. § 424.11(c) (emphasis added). Thus, the threats to wolves must be analyzed *cumulatively* to determine if wolves are threatened or endangered. *See WildEarth Guardians v. Salazar*, 741 F. Supp. 2d at 102. In the Final Rule, Federal Defendants pay lip service to the FWS's requirement to analyze the cumulative threats to wolves by stating that the five listing factors do not individually "or in combination" threaten or endanger wolves. 76 Fed. Reg. at 81,682, 81,722. However, a mere invocation of the words "in combination" is not sufficient to discharge the FWS's substantive duty to analyze the listing factors' cumulative effects, "because it does not *explain how* the individual factors combine to

affect the [species]."  *WildEarth Guardians v. Salazar*, 741 F. Supp. 2d at 102 (emphasis added).

Because this explanation regarding cumulative effects is lacking, the Final Rule is arbitrary and

capricious.

Finally, Defendant-Intervenors State of Michigan and Michigan Department of Natural

Resources and Defendant-Intervenor Hunter Conservation Coalition offer a series of inapt policy

arguments regarding delisting wolves to improve social tolerance and state management plans

contemplating "public harvest of wolves for the purpose of reducing wolf-related conflicts, and

also for recreational or utilitarian purposes."  MI DNR Br. at 24; *see also* Hunter Conservation

Coalition Br., ECF No. 33 at 31, 36.[8]  But their arguments are irrelevant given that the primary

existing threat to the wolf population – human-caused mortality – *is not addressed by sport

hunting.  See In re Polar Bear Endangered Species Act Listing & Section 4(d) Rule Litig.--MDL*

---

[8]  Defendant-Intervenor Hunter Conservation Coalition is the only party that challenges Plaintiffs' standing to bring this action.  Hunter Conservation Coalition Br. at 37-41.  This argument is easily dismissed, as standing was previously affirmed in *Kempthorne*, in which this Court found that these Plaintiffs had standing because "(1) plaintiffs have submitted declarations in support of their standing, (2) neither the FWS nor defendant-intervenors have identified any deficiencies in those declarations, and (3) these declarations establish all of the elements of constitutional and prudential standing."  579 F. Supp. 2d at 10 n.4.  The present action involves the same Plaintiffs, challenging the same agency action, in the same court.  Indeed, the allegations in the declarations of Plaintiffs' members, including the fact that their recreational and aesthetic interests in observing wolves are impaired by the FWS's delisting rule, *see e.g.,* Warren Decl. ¶¶ 3, 5, 6, 9, 11, 18; Waligora Decl. ¶¶ 4, 5, 7, 8; Hatfield Decl. ¶¶ 7, 15, 16 ; Goldman Decl. ¶¶ 6-9,10, 11, are precisely the types of allegations courts routinely find satisfy Article III standing requirements.  *See, e.g., Friends of the Earth v. Laidlaw Envtl. Serv.*, 528 U.S. 167, 183 (2000) ("environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity") (citations omitted); *Defenders (wolf)*, 354 F. Supp. 2d at 1163 (finding plaintiffs who had members with aesthetic and recreational interests in observing wolves had standing to challenge FWS rule issued under the ESA that decreased protections for the gray wolf by allowing "takes" because "the decreased protection impairs the members' ability to observe wolves"); *Defenders of Wildlife v. Hall*, 807 F. Supp. 2d 972, 981 (D. Mont. 2011) (finding plaintiffs had standing to challenge rule designating a particular gray wolf population as nonessential experimental species under the ESA where their individual members averred an interest in observing wolves and the rule "broaden[ed] the circumstances under which wolves can be killed – making the killing of wolves more likely.").  Such injuries would clearly be redressed by the requested relief.  *See e.g., id.,* 807 F. Supp. 2d at 981; Goldman Decl. ¶ 12.  Hunter Conservation Coalition's half-hearted standing challenge should not give the Court pause.

No. 1993, 709 F.3d 1, 16-17 (D.C. Cir. 2013) *cert. denied*, 134 S. Ct. 310 (U.S. 2013) (upholding

the FWS's determination that purported benefits of sport hunting "do not offset or reduce the

overall threat to polar bears from loss of sea ice habitat" and thus did not undermine ESA listing

determination).   While Defendant-Intervenors also suggest that "wolf seasons" "provid[e]

essential conservation benefit to the species," Hunter Conservation Coalition Br. at 36, their

position defies the North American Model of Wildlife Conservation that they themselves extol.

*See id.*; AR 630 at 017762A. ("[F]uture generations are deserving of wildlife undiminished by our

actions.").[9]

   In contrast with Defendant-Intervenors' and Amici's claims, sport hunting is a crucial

threat that the FWS must consider *before* it can delist, because human-caused mortality continues

to be the biggest wolf killer and is the primary threat to the wolf's continued survival.  AR 651 at

019763A; 76 Fed. Reg. at 81,682; *id.* at 81,700 (noting that human-caused mortality is "strongly

additive in total [wolf] mortality").   Hence, the FWS must make a reasonable analysis and

determination of the threat of state hunts, and consider those threats in a cumulative fashion, in

order to properly assess whether there are adequate regulatory mechanisms in place to lawfully

---

[9] The "social tolerance" arguments advanced by Defendant-Intervenors in support of the Final
Rule have previously been rejected out of hand by this Court as irrelevant considerations under
the ESA.  *See Humane Soc'y of U.S. v. Kempthorne*, 481 F. Supp. 2d at 71-72 ("Defendants state
that 'the public interest in the long-term health and recovery of the gray wolf population in
Wisconsin will be best served by permitting the states to continue their depredation control
activities,' and that 'granting Plaintiffs' request for a preliminary injunction will not further the
ESA's overarching purpose of recovering species,' citing the allegedly increased public support
that will accompany lethal control of 'problem' wolves.   The Court finds this argument
disingenuous, particularly in light of Defendants['] focus in its Opposition just a page earlier
reflecting concerns about the 'rapi[d] growth of the gray wolf population in Wisconsin.
Congressional intent behind the adoption of the ESA and iterated throughout the language of the
Act itself makes crystal clear that the 'public interest' lies in the protection of the endangered
gray wolf – not in the lethal taking of 'problem' gray wolves in the hopes of creating a selected-
for gray wolf population that never interferes with livestock or hunters' kills.  Simply put, the
recovery of the gray wolf is not supported by killing 43 gray wolves.") (internal citations
omitted).

permit a delisting decision.  It has not done so here, and the Final Rule should be vacated as a result.[10]

## III.   **<u>CONCLUSION</u>**

In its effort to reach a pre-determined and politically convenient result – that wolves in the Great Lakes would be delisted either as a newly created DPS or a "revision" to the 1978 Minnesota population listing – the FWS has violated the intent and letter of the ESA.  The FWS's application of the ESA and the DPS Policy in the Final Rule are unreasonable interpretations of the ESA and are arbitrary and capricious.   Therefore, Plaintiffs respectfully request that this Court grant Plaintiffs' motion for summary judgment, deny Federal Defendants' and Hunter Conservation Coalition's cross-motions for summary judgment, vacate the Final Rule, and restore federal ESA protections to wolves in the Great Lakes region.

---

[10] Because the Final Rule violates the ESA, it should be vacated.  *See Kempthorne*, 579 F. Supp. 2d at 21 (vacating 2007 DPS delisting rule given rule's "fundamental" deficiency of not being obviously reconcilable with the ESA's mandate and "the ESA's preference for protecting endangered species counsel[ing] strongly in favor of vacat[ur]"); *Defenders (wolf)*, 354 F. Supp. 2d at 1174 (vacating the 2003 wolf downlisting rule); *Defenders of Wildlife v. Salazar*, 729 F. Supp. 2d at 1212 (vacating the final rule delisting a northern Rocky Mountain gray wolf DPS where FWS's interpretation of the DPS Policy violated the ESA).

Dated:  January 10, 2014          By:    */s/ Bruce A. Wagman*
                                         Bruce A. Wagman, Admitted *pro hac vice*
                                         bwagman@schiffhardin.com
                                         SCHIFF HARDIN LLP
                                         One Market, Spear Street Tower
                                         Thirty-Second Floor
                                         San Francisco, CA  94105
                                         (415) 901-8700
                                         (415) 901-8701 (facsimile)

                                         Ralph Henry, D.C. Bar No. 982586
                                         rhenry@humanesociety.org
                                         The Humane Society of the United States
                                         2100 L Street, NW
                                         Washington, DC  20037
                                         (202) 452-1100
                                         (202) 778-6132 (facsimile)

                                         *Attorneys for Plaintiffs The Humane Society of*
                                         *the United States; Born Free, USA; Help Our*
                                         *Wolves Live ("HOWL"); and Friends of Animals*
                                         *and Their Environments ("FATE")*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was today served via the Court's CM/ECF system on all counsel of record.

                                    */s/Bruce A. Wagman*
                                    Bruce A. Wagman, Admitted *pro hac vice*
                                    Attorneys for Plaintiffs