**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| THE HUMANE SOCIETY OF THE UNITED STATES, et al., <br><br> Plaintiffs, <br><br> v. <br><br> S.M.R. JEWELL, et al., <br><br> Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

Civil Action No. 1:13-cv-00186-BAH

**Federal Defendants' Reply Memorandum
in Support of Cross-Motion for Summary Judgment**

## TABLE OF CONTENTS

**PAGE**

GLOSSARY .......................................................................................................... III

INTRODUCTION ....................................................................................................1

ARGUMENT ...........................................................................................................3

I.    Clarification of FWS's actions in the Final Rule. ............................................ 3

II.   FWS reasonably delineated the expanded boundaries
of the Minnesota 1978 population listing and found that
the conservation status of the resulting WGL DPS was
neither threatened nor endangered .................................................................. 6

   A.    FWS permissibly construed the ESA and applied the DPS Policy
in the Final Rule even though it was not using the DPS Policy here
to list locally vulnerable populations. ........................................................ 6

      1.    FWS reasonably defined the "species" at issue in the Final Rule as
the WGL DPS, consistently with its DPS Policy ....................................... 7

      2.    FWS reasonably delisted a DPS even though other members of the
taxon remain listed. ............................................................................... 9

   B.    The Western Great Lakes DPS's boundaries were properly
delineated. ............................................................................................. 14

III.  FWS in the Final Rule rationally determined that the WGL DPS
is not threatened or endangered in a significant portion of its
range. .......................................................................................................... 16

IV. The WGL DPS Satisfies the ESA's Criteria for Delisting. .............................. 25

   A.    FWS addressed the taxonomic science and the best available
science. .................................................................................................. 25

      1.    FWS's decision to delist the WGL DPS gray wolf was based on
scientific consideration, not political interference. ................................... 25

      2.    FWS considered the best available science on wolf taxonomy, and
its finding that all wolves in the WGL DPS are gray wolves (Canis lupus)
is entitled to deference. .......................................................................... 26

   B.  FWS's determination about the adequacy of regulatory mechanisms was
reasonable. ............................................................................................. 30

C.    FWS adequately considered the ESA factors in combination...................................... 34

CONCLUSION.......................................................................................................................... 35

# GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| AR | Administrative Record[1] |
| DOI | Department of the Interior |
| DPS | Distinct Population Segment |
| ESA | Endangered Species Act |
| Final Rule | *Final Rule Revising the Listing of the Gray Wolf (Canis lupus) in the Western Great Lakes*, 76 Fed. Reg. 81,666 (Dec. 28, 2011) |
| FWS | U.S. Fish and Wildlife Service |
| SPR | Significant Portion of its Range |
| WGL | Western Great Lakes |

---

[1] The administrative record citations in the brief from the first record DVD are of the form "AR [Doc. No.] at [Bates number]," e.g. AR 1 at 1A. Documents from the second DVD are of the form "2007 AR [Doc. No.] at [Bates number]."

**INTRODUCTION**

Plaintiffs' briefs are clear: they fundamentally disagree with the approach that the Fish and Wildlife Service ("FWS") has taken to recovering gray wolves in the United States. FWS's focus is and always has been on recovering three robust, geographically distributed populations in the Northern Rocky Mountains, the upper Midwest, and the Southwest. Plaintiffs would prefer to see wolves restored to the entirety of their historical range. Thus, rather than focusing their arguments on the only final agency action before the Court—the delisting rule for the Western Great Lakes Distinct Population Segment ("WGL DPS")—Plaintiffs have tried to make the case about their competing grand vision for wolf recovery. While Plaintiffs' vision presents one possible path to recovery FWS *might* have taken, it is not the path the agency took. The path that the agency took—a path forged over three decades ago—has involved recovering three well-distributed, distinct gray wolf populations. Included among them is the WGL DPS that grew out of the Minnesota wolf population previously designated as "threatened."

This course is eminently reasonable and is entitled to significant deference. It has also already been implemented to a large degree, since the recovered wolf populations in the Northern Rocky Mountains and the Western Great Lakes have been removed from the list of endangered and threatened species.[2] The Mexican wolf population in the Southwest has not recovered and remains listed as an endangered species. Plaintiffs' disagreement, however, is not an adequate basis for overturning the delisting rule for the WGL DPS. Delisting the recovered

---

[2] After a Congressional amendment requiring the reissuance of a prior rule, FWS delisted the wolves in the Northern Rocky Mountains DPS, with the exception of Wyoming. 76 Fed. Reg. 25,590 (May 5, 2011), which reissued 74 Fed. Reg. 15,123 (Apr. 2, 2009). FWS has now issued a rulemaking delisting the remaining wolves in the Northern Rocky Mountains DPS. 77 Fed. Reg. 55,530 (Sept. 10, 2012) (removing the recovered Wyoming wolf population from the ESA's list of threatened and endangered species, and returning management of wolves to Wyoming). FWS recently proposed rulemaking retaining endangered status for the Mexican wolf subspecies as part of a comprehensive status review of wolves in the remaining areas of the lower-48 states to evaluate the status of other possible wolf populations. 78 Fed. Reg. 35,664 (June 13, 2013). That status review is ongoing.

wolf population that forms the WGL DPS is lawful and appropriate under the ESA, and it is fully consistent with the FWS's long-standing vision for the recovery of the gray wolf in the United States.

Plaintiffs have unnecessarily complicated the relevant legal and factual issues, but the Court need not bother with such distractions. The chain of reasoning connecting the facts in the administrative record to the delisting rule for the WGL DPS is clear, and the choices made by the Fish and Wildlife Service comport with the ESA. First, the WGL wolf population has greatly exceeded the science-based recovery goals set forth in FWS's Eastern Timber Wolf Recovery Plan, a plan that establishes the baseline for determining whether the population has "recovered." Second, FWS applied its long-standing interpretation of the ESA embodied in its Distinct Population Segment ("DPS") Policy, and FWS reasonably concluded that the WGL wolf population is both "discrete" and "significant" and therefore properly a DPS under the ESA. Third, any action that the ESA authorizes or requires for a "species"—including delisting—is equally authorized or required for a DPS. 16 U.S.C. § 1532(16) (defining "species" to include DPSs). Fourth, FWS considered the WGL DPS's entire range in its significant-portion-of-the-range analysis, which means that no portion of the DPS's range was excluded from analysis. Therefore, for the purposes of this case, the debate over whether a significant portion of a species' range includes both current and historical ranges is irrelevant. Fifth, after reviewing the best available science, the opinions of expert peer reviewers, and all comments received during the public comment processes, FWS exercised its considerable scientific expertise and concluded that all wolves in the WGL DPS were gray wolves (*Canis lupus*). Finally, the States of Michigan, Wisconsin, and Minnesota have been active and responsible partners in achieving wolf recovery and there was no indication that their continued management efforts will be any less successful in maintaining a recovered wolf population in the foreseeable future. Each of these factors, and Plaintiffs' arguments pertaining to each factor, is further discussed below, and

FWS's Final Rule,[3] the administrative record, and the briefing in this case establish that none of the grounds Plaintiffs advance in opposition to FWS's rule has merit.

In short, this case is about whether FWS's Final Rule represents a valid exercise of its lawful discretion to apply its DPS Policy and the ESA, the statute it is charged with implementing, to the WGL wolf population. Because FWS's decision to update the Minnesota wolf population's conservation status—by identifying and defining the WGL DPS and concluding that the DPS is no longer a threatened or endangered species—is rational, based upon the best available scientific data, and complies with the ESA, it must be upheld. Accordingly, Federal Defendants respectfully request that the Court grant their cross-motion for summary judgment and deny Plaintiffs' motion for summary judgment.

## ARGUMENT

This memorandum proceeds as follows: Section I explains FWS's actions taken in the Final Rule in order to clarify the issues presented. The next three sections address Plaintiffs' arguments in their combined opposition and reply brief, generally following the order presented in that brief. Thus, Section II addresses the DPS issues discussed in Plaintiffs' Section A; Section III addresses arguments related to FWS's interpretation of significant portion of the range discussed in Plaintiffs' Section B; and Section IV addresses the remaining arguments raised in Plaintiffs' Section C.

## I.      Clarification of FWS's actions in the Final Rule.

The Final Rule is the natural conclusion to wolf management in the upper Midwest, a population that has been separately managed from other wolf populations for over 35 years. *See* Fed. Defs.' Mem. in support of Cross-Mot., ECF No. 28-1 ("Fed. Defs.' Br."), at 5-6. In March 1978, FWS replaced the existing subspecies-based listings of the gray wolf (*Canis lupus*) with listings for two populations of the species as a whole: a threatened Minnesota population, and an

---

[3]    *Final Rule Revising the Listing of the Gray Wolf (Canis lupus) in the Western Great Lakes*, 76 Fed. Reg. 81,666 (Dec. 28, 2011) ("Final Rule").

endangered population in the remainder of the lower-48 states and Mexico. *See Final Rule, Reclassification of the Gray Wolf*, 43 Fed. Reg. 9,607 (Mar. 9, 1978). The 1978 listing predated both the statutory provision adding "distinct population segment" to the definition of "species," *see* 16 U.S.C. § 1532(16), Pub. L. 95-632 § 2, 92 Stat. 3751 (Nov. 10, 1978), as well as FWS's 1996 DPS Policy.[4]

After this 1978 listing, FWS developed three recovery plans for the gray wolf: one in the eastern United States, another for the Northern Rocky Mountain states, and a third for the southwestern United States and Mexico, because FWS has long viewed the different wolf populations throughout the United States as distinct for purposes of recovery. Indeed, FWS treated the different U.S. wolf populations separately since before the 1978 rule. *See* 43 Fed. Reg. at 9,609 ("The U.S. Forest Service supported the reclassification and Critical Habitat designation, but requested assurance that biological subspecies would continue to be maintained and dealt with as separate entities. [FWS] can give this assurance."); *see also id.* at 9,608 (discussing the Eastern Timber Wolf Recovery Team and the development of the recovery plan) *id.* at 9,610. Courts have deferred to the three-recovery-plan approach, which focuses on restoring wolves in three core areas of the United States, one of which is the upper Midwest. *See, e.g.*, *Nat'l Wildlife Fed'n v. Norton*, 386 F. Supp. 2d 553, 568 (D. Vt. 2005).[5]

This litigation is the latest in a series of challenges to FWS's attempt to reconcile its long-standing, multi-population wolf management and recovery approach with listing decisions made without the benefit of the current ESA provisions. FWS's approach in the Final Rule uses a DPS, an entity that is now part of the definition of "species," as its species of analysis. This approach fully complies with the ESA and is reasonable.

---

[4] No one challenged this separate listing. *See* Fed. Defs.' Br. at 14 n.6.

[5] As noted in a Defendant-Intervenor's memoranda, *see* Mem., ECF No. 33 n.3, Federal Defendants' memorandum in support of its cross-motion incorrectly described the 2007 rule as a downlisting, Fed. Defs.' Br. at 7 ("Following vacatur of the 2003 Rule, FWS designated a WGL population of gray wolves as threatened"). This sentence should have read "recovered" rather than "threatened." The 2007 rule, as explained later on the page, *see* Fed. Defs.' Br. at 7, was a delisting rule, rather than a downlisting.

Plaintiffs' Reply takes the reasonable management and recovery actions of the Final Rule as described in Federal Defendants' cross-motion and attempts to conflate distinct concepts and entities. Thus, it is necessary to reground this litigation with an accurate description of FWS's actions in the Final Rule. There, FWS: (1) defined the entity under evaluation, the WGL DPS, by applying its DPS Policy; (2) analyzed the impacts of the five-factors to the DPS to determine its conservation status pursuant to ESA § 4(a); and (3) after determining that the DPS was not threatened or endangered as a whole, analyzed whether there were significant portions of the DPS where wolves were threatened or endangered, that would therefore independently require listing the DPS.[6] On the basis of this thorough analysis, FWS concluded that the WGL DPS was recovered.

In defining the "species" to evaluate, from step 1 above, FWS addressed citizen petitions requesting delisting the wolves in the Midwest, and FWS applied the DPS Policy to determine whether those petitions addressed a proper "species." It did so by evaluating the two-pronged DPS Policy inquiry, which asks whether a population meets the FWS's tests for "discreteness" and "significance." *See* 76 Fed. Reg. at 81,671-74; 16 U.S.C. § 1532(16) (defining "species" to include DPS); *see also* Fed. Defs.' Br. at 3-5, 9, 20-21. The resulting WGL DPS is based on a reevaluation of the Minnesota "population" that was listed separately from the lower-48 gray wolf population in 1978. 76 Fed. Reg. at 81,682, 81,671-74, 81,679. After defining the "species" under consideration, FWS conducted its five-factor analysis under ESA § 4(a), as required by the

---

[6] Plaintiffs contend that the SPR definition provided in the Final Rule is the same as that in the withdrawn 2007 memorandum opinion ("M-Opinion") and also the same as the one criticized by the Ninth Circuit in *Defenders of Wildlife v. Norton ("Defenders (lizard)")*, 258 F.3d 1136, (9th Cir. 2001). *See* Reply at 26-27 & 22 n.2. The SPR analysis in the Final Rule is different than that described in *Defenders (lizard)* as discussed, *infra*. Additionally, the Final Rule does not rely on the now-withdrawn 2007 M-Opinion. Instead, FWS set forth is own SPR analysis and reasonably applied it in the Final Rule. Moreover, the 2007 M-Opinion addressed a subject not at issue in this litigation: whether, once the FWS designates a DPS, may it extend the ESA's protections for threatened or endangered species to only a portion of that DPS. *Defenders of Wildlife v. Salazar,* ("*Defenders (NRM wolf)"),* 729 F. Supp. 2d 1207, 1221-22 (D. Mont. 2010) (addressing the 2007 M-Opinion and holding that "the ESA makes clear that 'species' excludes distinctions below that of a DPS … and this definition of 'species' applies not only when defining a species, but to all sections of the ESA"), *vacated* 2012 U.S. App. LEXIS 26769 (9th Cir. Nov. 7, 2012).

ESA. *See Am. Wildlands v. Kempthorne*, 478 F. Supp. 2d 92, 99 (D.D.C. 2007) ("Once this taxonomic unit is classified and identified, then FWS engages in the separate process of analyzing the five statutory factors as to that taxonomic unit to determine whether listing the entire taxonomic unit is warranted."), *aff'd*, 530 F.3d 991 (D.C. Cir. 2008); *Safari Club Int'l v. Jewell*, -- F. Supp. 2d --, Nos. 11-cv-1564/12-cv-340 (BAH), 2013 WL 4041541, at *4 (D.D.C. Aug. 9, 2013) (stating that to make a listing determination, "the [FWS] must first define the species so the agency can estimate its population.") (citation omitted).

Given the straightforward steps taken in the Final Rule, it becomes clear that FWS's actions were fully consistent with its governing law and with its own policies. We now turn to the arguments in Plaintiffs' Reply brief.

II.    **FWS reasonably delineated the expanded boundaries of the Minnesota 1978 population listing and found that the conservation status of the resulting WGL DPS was neither threatened nor endangered.**

In the section below, we address Plaintiffs' arguments discussing FWS's identification of the DPS, a step that frames the "species" subject to review under the five factors of ESA § 4(a). *See* Fed. Defs.' Br. at 9, 14-15.

A.    **FWS permissibly construed the ESA and applied the DPS Policy in the Final Rule even though it was not using the DPS Policy here to list locally vulnerable populations.**

As we explained in our opening brief, FWS revised the boundaries of the Minnesota population, which was already listed as a threatened species, to come into line with the 1996 DPS Policy. Fed. Defs.' Br. at 15-16; *see* 61 Fed. Reg. 4,722, 4,725 (Feb. 7, 1996) (explaining that pre-DPS-Policy listings would be "reevaluated on a case-by-case basis as recommendations are made to change the listing status for that distinct population segment"). FWS recognized that the Minnesota population had expanded well beyond the state boundaries and was connected to the populations in neighboring states so that the 1978 Minnesota population alone would not meet the DPS criteria. *See* 76 Fed. Reg. at 81,670. It therefore revised the boundaries of the Minnesota population "to meet the criteria in the DPS policy and to reflect the current

geographic location of the population." *See id.* FWS then evaluated the DPS "based on the Act's definitions of [threatened species and endangered species] and a review of the [five factors]." *See* 61 Fed. Reg. at 4,725. FWS concluded that the DPS entity as a whole did not meet the ESA's definitions of "threatened species" or "endangered species."

### 1. FWS reasonably defined the "species" at issue in the Final Rule as the WGL DPS, consistently with its DPS Policy.

In defining the "species" at issue, in addition to reevaluating the Minnesota population listing, FWS was also responding to four 2010 citizen petitions that sought to have FWS delist a population of wolves in the Midwest. *See 90-Day Finding on Petitions to Delist the Gray Wolf in Minnesota, Wisconsin, Michigan, and the Western Great Lakes*, 75 Fed. Reg. 55,730 55,731 (Sept. 14, 2010). In response to Plaintiffs' arguments that FWS was not compelled to grant those petitions: FWS can certainly deny a citizen petition if the petitioned action is not warranted, or defer a determination if the action is warranted but precluded. *See* Fed. Defs.' Br. at 16, 34, *cf.* Pls.' Reply Mem., ECF No. 40, ("Reply") at 10-11. Regardless of the determination on the petition, however, FWS must address the scope of the petitioned action. *See Safari Club Int'l v. Jewell*, 2013 WL 4041541, at *38. FWS did exactly that in this case. In 2010, FWS addressed four citizen petitions that sought to have the wolf populations *in the WGL DPS* delisted. *See* 75 Fed. Reg. 55,730. FWS applied the DPS Policy to the upper Midwestern wolves and, in the Final Rule, determined that the WGL DPS was the proper ESA "species" under consideration in the rulemaking. *See* 75 Fed. Reg. at 55,733 ("We find that the four petitions provide substantial information that the wolf in Minnesota alone; in Minnesota and Wisconsin combined; in Minnesota, Wisconsin, and Michigan; and in the western Great Lakes area, may be considered as a "species" under the Act. In the 12-month finding, we will fully analyze whether gray wolves in those areas constitute "species" under the Act, and whether they are a threatened species or endangered species under the Act.").

Moreover, Plaintiffs' concerns with rulemakings that delist species that have never been previously recognized by FWS are inapposite here. *Cf.* Reply at 4. This is because FWS revised

the boundaries of the Minnesota population, which was already separately listed as threatened, to come into line with the 1996 DPS Policy. 76 Fed. Reg. at 81,670, 81,682 (FWS "recognize[d] that the Minnesota gray wolf population listed as a species in 1978 has functioned effectively as a DPS ever since the DPS provision was added to the Act later in 1978"); Fed. Defs.' Br. at 15-16. The DPS Policy—which Plaintiffs do not challenge— was issued in 1996, so many species listings predated its guidance. Therefore, in the Policy, FWS recommended that listings be revised in conformity with the Policy as the ESA list was revised. *See* 61 Fed. Reg. at 4,725. The DPS Policy instructs FWS to consider the conservation status of the population segment in relation to the ESA's standards for listing only after it has determined that the population segment meets the discreteness and significance criteria that qualify it as a DPS. *Id.* It also states that it is intended for "the purposes of listing, *delisting*, and reclassifying species under the Endangered Species Act." *Id.* at 4,722 (emphasis added); *see also id.* at 4,725 ("The Services' ability to address local issues (without the need to list, recover, and consult rangewide) will result in a more effective program.").

The DPS Policy has been upheld as a lawful exercise of FWS's discretion to interpret the ambiguous term "DPS" in the Act and is entitled to *Chevron* deference. *See Nw. Ecosystem Alliance v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1144 (9th Cir. 2007) (citation omitted). The D.C. Circuit has instructed that when FWS interprets and applies the DPS Policy, plaintiffs "carry a heavy burden … because the agency's interpretation of its own regulations 'must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation.'" *In re Polar Bear*, 709 F.3d 1, 11 (D.C. Cir. 2013) (citation omitted). Here, FWS reasonably applied its DPS Policy, which is entitled to deference.[7]

---

[7] Plaintiffs' argument that, because the WGL DPS contains states outside of the 1978 Minnesota "species" listing, the WGL DPS is something other than a DPS, Reply at 6, is illogical. The DPS Policy provides the relevant inquiry: whether a species meets the tests for "discreteness" and "significance." The WGL DPS met those tests and therefore is a DPS. Plaintiffs' cited case, *Defenders (NRM wolf)*, was addressing another question: whether, once the FWS designates a DPS, may it extend the ESA's protections for threatened or endangered species to only a portion of that DPS. *Defenders (NRM wolf)*, 729 F. Supp. 2d at 1221-22 (holding that "the ESA makes

2.     **FWS reasonably delisted a DPS even though other members of the taxon remain listed.**

Attempting to undercut FWS's decision to revise an existing listing consistently with the DPS Policy and, pursuant to that policy, assess its conservation status in the same rule, Plaintiffs offer their contrary interpretation of what the DPS Policy "is more naturally read to mean," and dicta from out-of-circuit district court cases that they contend show that the ESA limits the use of DPSs to *listing* locally vulnerable populations. Reply at 9; s*ee id.* at 8-10. However, "the agency remains the authoritative interpreter (within the limits of reason) of such statutes," not courts without the benefit of the agency's recent opinions on the issue. *See* Fed. Defs.' Br. at 18 (citing *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 982-83 (2005)). Consequently, even if those district court opinions addressed the issue at hand—which they do not—the Final Rule presents FWS's reasonable application of its own DPS Policy to allow the result in the Final Rule, a decision entitled to deference.

Plaintiffs have identified no decision that resolves the question of whether a DPS may be delisted while other members of the taxon remain listed. For example, in *Defenders (wolf)*, the court stated "[t]he DPS Policy provides FWS the flexibility to list, downlist, or *delist* discrete and significant populations, even though the conservation status of the species may differ elsewhere" and noted that FWS "can downlist a DPS if that discrete and significant population is no longer endangered." *Defenders (wolf)*, 354 F. Supp. 2d at 1169 (citing *Nat'l Ass'n of Home Builders v. Norton*, 340 F.3d 835, 842 (9th Cir. 2003)) (emphasis added); *cf.* Reply at 9. The Oregon court invalidated the DPSs established in the 2003 wolf rule because the DPS boundaries were improperly drawn, not because establishing DPSs and simultaneously downlisting those DPSs was *per se* in violation of the ESA. *Id.* at 1169; *see also* Fed. Defs.' Br. at 32 (discussing *Friends of the Wild Swan*). The most recent decision on the issue, *Humane Soc'y v. Kempthorne*, remanded the DPS issue to FWS for further analysis, but did not require any particular

_____

clear that 'species' excludes distinctions below that of a DPS … and this definition of 'species' applies not only when defining a species, but to all sections of the ESA"). The Court held that it could not. *Id.* Here, in contrast, FWS is addressing a proper ESA "species" – a DPS.

interpretation. 579 F. Supp. 2d 7, 19 (D.D.C. 2008) (citing *Chevron*); *id.* ("In sum, the ESA could be construed in the way urged by FWS."); *id.* at 13; *see also* Fed. Defs.' Br. at 17. Thus, none of the cases cited by Plaintiffs support their position or demonstrates that the actions taken by FWS in the Final Rule are arbitrary and capricious or contrary to law.

Plaintiffs also raise the same arguments as before that "FWS's authority to revise a listing only extends to species that are already listed." Reply at 5, 9-10 (citing *Kempthorne*, 579 F. Supp. 2d at 17). As before, Plaintiffs overread *Kempthorne*, which did not impose its own interpretation of the ESA. Fed. Defs.' Br. at 17. Plaintiffs' attempts to add additional steps to the five-factor analysis that determines the appropriate conservation status of the species should not be entertained. *Friends of Blackwater v. Salazar*, 691 F.3d 428, 434 (D.C. Cir. 2012).[8]

Moreover, even if the Final Rule could be construed as a new "listing," simultaneously identifying a DPS and revising its status under the ESA is permissible. *See* Fed. Defs.' Br. at 16-17. As we explained in our opening brief, the Solicitor of the Department of the Interior provided a thorough memorandum opinion ("M-Opinion") explaining why the ESA, the DPS Policy, and relevant other authorities permitted FWS to simultaneously identify and delist a DPS. *See* AR 8; *see also* Fed. Defs.' Br. at 18-20. That M-Opinion was subject to notice-and-comment rulemaking via the rulemaking process for the Final Rule and the M-Opinion is thus is entitled to *Chevron* deference as a reasonable interpretation of the ESA. *See* Fed. Defs.' Br. at 18-20; *cf. In re Polar Bear*, 709 F.3d at 11 (citation omitted).

---

[8] Plaintiffs attempt to confine *Friends of Blackwater* to addressing ESA-mandated recovery plans. *See* Reply at 10. The decision, however, addressed whether a plaintiff could elevate an ambiguous statutory statement to a mandatory condition on the agency. 691 F.3d at 433-34. Plaintiffs read the ESA to suggest that, to address populations where other members of the taxon are listed, FWS must take additional steps like ensuring that the specific DPS has been previously part of the ESA list for some time before it can be delisted. Neither the ESA nor the DPS Policy contain such a mandatory condition, and therefore none may be imposed. *Friends of Blackwater*, its principles of deference to FWS in interpreting the ESA and its DPS Policy, and its counsel that FWS's interpretations and applications of the ESA must be upheld if permissible, are therefore directly applicable.

Plaintiffs disagree with the outcome of the M-Opinion regarding the ESA's statutory ambiguity, and on reply recast their arguments by suggesting that FWS could not rely on the M-Opinion's statutory interpretation bearing on the issues in the Final Rule because the Solicitor "does not address the FWS's authority to simultaneously list and delist species." Reply at 12. Plaintiffs are wrong. In *Humane Soc'y v Kempthorne*, the question at issue was "the propriety of simultaneously designating and delisting a DPS within a broader listing," 579 F. Supp. 2d at 20, and the Solicitor clearly responded to that question. *See* AR 8 at 491A-92A.[9] The Solicitor clarified his understanding of the Court's question to use the terminology of the Act, *id.* at 492A, and he answered the question remanded by the Court—"whether the ESA permits FWS to use the DPS tool to remove the protections of the statute from a healthy sub-population of a listed species, even if that sub-population was neither designated as a DPS nor listed as endangered or threatened." *Id.*

Moreover, the 2011 Final Rule takes a different approach from the 2007 or 2009 rules in explaining that its point of departure is the 1978 Minnesota population listing. Consequently, as explained above, FWS's decisions in the Final Rule, relying on the DPS Policy are reasonable and fully supported, even without reference to the M-Opinion. FWS has discretion to choose its own next steps when it commences a rulemaking after remand. *See, e.g.*, *Bennett v. Donovan*, 703 F.3d 582, 589 (D.C. Cir. 2013) (explaining that, after remand "it is the prerogative of the agency to decide in the first instance how best to provide relief"); *Town of Barnstable, Mass. v. FAA*, Nos. 12-1362, 12-1363, -- F.3d. --, 2014 WL 224444, at *3, *6 (D.C. Cir. Jan. 22, 2014) (upholding agency's decision that the remanded determination was no longer required and deferring to the agency's interpretation of its governing statute and handbook procedures). The Final Rule is the culmination of a new rulemaking process, with its own notice and comment

---

[9] Moreover, Plaintiffs did not bring a claim that the Final Rule was invalid for failure to respond to the Court's remand in another proceeding regarding another rulemaking or bring a claim to enforce the judgment of the *Humane Society v. Kempthorne* Court. *See* Pls.' Compl., ECF No. 1, ¶¶ 113-20 (Claim 1). Instead, they brought an APA challenge to the Final Rule, contending, among other claims, that the Final Rule violates the APA and ESA. *See id.*

period, and the statutory interpretations provided in the rule, including those from the M-Opinion, *see* Fed. Defs.' Br. at 18, are entitled to *Chevron* deference in their own right. *Menkes v. U.S. Dep't of Homeland Sec.*, 637 F.3d 319, 331 (D.C. Cir. 2011) (affording *Chevron* deference to Coast Guard decision issued in adjudicatory proceeding and on remand because it was "bound up with the administration of the ... scheme of regulating"); *Citizens Exposing Truth About Casinos v. Kempthorne*, 492 F.3d 460, 466 (D.C. Cir. 2007) (holding that *Chevron* deference is not precluded simply because the agency interpretation was announced in context of application of an agency delegated authority to a specific factual situation).

Next, Plaintiffs contend that the M-Opinion is itself unreasonable, citing to a district court decision addressing a different M-Opinion that addressed a different topic. Reply at 13. In that decision, *Defenders (NRM wolf)*, the Court decided that FWS erred when it determined that the Northern Rocky Mountain population of wolves constituted a DPS, but then removed the ESA's protections throughout the DPS except for Wyoming. 729 F. Supp. 2d at 1213. The Court explained that the ESA term "species" must be given the same meaning throughout the statute and therefore, FWS could not list something that was not a species, subspecies, or a DPS. *See id.* at 1221-22. The M-Opinion in that case is not at issue here and was later withdrawn, and FWS did not delist only part of the WGL DPS. Thus, Plaintiffs' citation is inapposite.

For the reasons explained in our opening brief, the Solicitor's 2008 M-Opinion addressing the use of the DPS to delist recovered populations is a reasonable construction of the ESA, the DPS Policy, and the relevant legislative history and policies of the ESA. Fed. Defs.' Br. at 18-20. Plaintiffs claim that the discussion of experimental populations is "wholly inapposite," Reply at 13, but as already explained in our opening brief (and in the M-Opinion), if FWS is unable to delist entities that are formerly listed as part of the broader species listing, like experimental populations, then separate, disconnected populations will remain listed as endangered or threatened even if those populations are eventually recovered (likely in the form of a DPS). This is an impermissible view of the statute as it is contrary to the ESA to maintain on the list any species that is not threatened or endangered. *See* Fed. Defs.' Br. at 19.

Plaintiffs conclude their DPS discussion with a series of short arguments, none of which has merit. Plaintiffs conflate the DPS analysis with the conservation status of a species. That argument was already addressed and refuted. *Compare* Reply at 13-14 (suggesting that it is illogical to delist a species that is "significant" to a taxon); *with* Fed. Defs.' Br. at 20-21. Plaintiffs now suggest that it is an absurd result that populations that meet the "significance" prong of the DPS analysis can be separately managed, whereas those that are not "significant" cannot. Reply at 14. This result reasonably follows from the DPS Policy as we explained in our opening brief. *See* Fed. Defs.' Br. at 20-21. The DPS Policy requires FWS to (1) evaluate the "discreteness" and "significance" elements to establish whether the entity is a DPS and then, if it is a DPS, (2) evaluate the conservation status of the DPS. 61 Fed. Reg. at 4,725. If a population is not "significant" under the DPS Policy, it is therefore not a DPS and may instead be a sub-part of another ESA entity (whether another DPS, taxon or subspecies). Thus, it makes perfect sense that "significant" populations may be managed separately from other populations of the same taxon whereas populations that do not meet the test for DPS may not, because they do not qualify as independent "species" under the ESA.

Plaintiffs also misstate the goals of the ESA by asserting that delisting species is not one of them. However, delisting healthy populations is fully consistent with the goals of the ESA, including the recovery and the subsequent return of healthy species to state management. *See* Fed. Defs.' Br. at 3, 25. Delisting DPSs of recovered populations is also consistent with past practice—although FWS has used its authority sparingly. *See* 76 Fed. Reg. at 81,669-70 (listing examples beginning in 1985); Fed. Defs.' Br. at 32. And Plaintiffs continue to incorrectly assert that the *Kempthorne* court's prior holdings are inconsistent with the 2008 M-Opinion. However the *Kempthorne* court and the Solicitor's 2008 M-Opinion both acknowledge that the DPS Policy allows listing flexibility. *See* 579 F. Supp. 2d at 19 (discussing the 2005 court decisions addressing the 2003 wolf rule); *cf.* Reply at 14. Thus, the *Kempthorne* court did not hold that the plain language of the ESA supports Plaintiffs' construction of the ESA, and that court certainly

did not reject FWS's reasoned interpretations of the ESA that were later provided on remand and now in the Final Rule.

**B.     The Western Great Lakes DPS's boundaries were properly delineated.**

FWS considered the best available scientific data on wolf distribution and dispersal and delineated the boundaries of the Western Great Lakes DPS to include the core recovered wolf population and a wolf movement zone to include the wolves that disperse and are likely to return to that population. *See* Fed. Defs.' Br. at 21-22; 76 Fed. Reg. at 81,672-74. FWS determined that the most reasonable means to reflect the wolf population segment's biological characteristics was to use the international border between U.S. and Canadian wolves and landscape features, including rivers and highways that are partial barriers to further wolf movement. *Id.* at 81,671, 74. These interpretations are entitled to significant deference. *In re Polar Bear*, 709 F.3d at 11 (holding that those challenging FWS's application of the DPS Policy carry a heavy burden because an agency's interpretation of its own regulations "must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation") (citation omitted).

Throughout their arguments with respect to the DPS boundaries, Plaintiffs continue to assert that the boundaries are inconsistent with promoting wolf recovery.[10] Whether a species qualifies as threatened or endangered is an inquiry that occurs after the DPS population boundaries are established. *See Trout Unlimited v. Lohn*, 559 F.3d 946, 949 (9th Cir. 2009). Thus, as set forth in the DPS Policy, defining the population at issue is a conservation-status neutral inquiry so that the need for "recovery" is not at issue when defining the boundaries of the DPS. Moreover, Plaintiffs' arguments arise from an underlying assumption that the WGL wolf populations are not healthy or recovered, such that the wolves are in need of "recovery" in the first instance. But, Plaintiffs' criticism of the DPS boundaries for failing to promote recovery is a red herring—the WGL DPS is healthy and recovered. *See* Fed. Defs.' Br. at 24-25. These wolves

---

[10] "Recovery" means "improvement in the status of listed species to the point at which listing is no longer appropriate under the criteria set out in section 4(a)(1) of the Act." *See* 50 C.F.R. § 402.02. That is, a species must have a conservation status of endangered or threatened to be in need of "recovery" for purposes of the ESA.

have far exceeded the numerical and distributional criteria for delisting in the Recovery Plan that agency biologists have determined are "sufficient wolf numbers and distribution to ensure their long-term survival within the DPS." 76 Fed. Reg. at 81,679. The results of the FWS's five factor analysis show that the population is not threatened or endangered; thus the WGL DPS is already recovered under the ESA. *Id.* at 81,723; Fed. Defs.' Br. at 6; *Cf.* Reply at 14-16.

As to Plaintiffs' contentions that the DPS boundaries are simply too large, Plaintiffs contend, without citation, that "[t]he boundaries of the DPS established extend far beyond the wolf's current distribution." Pls.' Br. at 30; Reply at 15. Instead, however, the DPS includes the locations of most known dispersers from the core populations, especially the shorter and medium-distance movements from which wolves are most likely to return to the core areas and contribute to the recovered wolf population. 76 Fed. Reg. at 81,673, 81,683. FWS appropriately drew the boundaries of the WGL DPS to circumscribe a metapopulation, using principles of conservation biology. 76 Fed. Reg. at 81,673. The borders were also drawn to be consistent with the holdings in the 2005 decisions, decisions which addressed much larger DPSs, extending far beyond the WGL DPS. *See* Fed. Defs.' Br. at 24 & nn.13-14; 76 Fed. Reg. at 81,683 ("We have delineated the DPS to be closely tied to the biological wolf population in the area, and to be consistent with the two relevant court rulings"). This rational, science-based line-drawing is entitled to deference and must be upheld.

Finally, Plaintiffs reassert their arguments on wolf taxonomy, and suggest that FWS "does not even know what species it delisted as a DPS." Reply at 16. Plaintiffs contend that, while taxonomic certainty is not required before rulemaking, in this instance the taxonomic uncertainty is "serious" and "rampant," Reply at 16-17, or "substantial," *id.* at 41, and therefore FWS was required to find "new" taxonomic information.  Federal Defendants already explained that FWS confronted the scientific literature on the wolf taxonomy question, reopened public comment to ensure that it reviewed the best available science, and made a judgment call, one that is entitled to deference. Fed. Defs.' Br. at 37-41; *see also* 76 Fed. Reg. at 81,681 (comment 4); *id.* at 81,720-21. Thus, these assertions are baseless, as further addressed in Section IV.

For all of the foregoing reasons, FWS's decision to revise the Minnesota listing and respond to the citizen petitions by redefining this entity as the WGL DPS and delisting it are reasonable and are amply justified by the ESA, the DPS Policy, and FWS's reasonable interpretations thereof.

### III. FWS in the Final Rule rationally determined that the WGL DPS is not threatened or endangered in a significant portion of its range.

Courts have concluded that the phrase "throughout … a significant portion of its range" provides an independent basis for listing, such that if FWS: (1) identifies a significant portion of a species' range ("SPR"); and (2) finds that the species is threatened or endangered throughout that portion of the range, then the entire "species" is subject to listing and protection under the ESA. *See, e.g., Defenders (NRM wolf)*, 729 F. Supp. 2d at 1219.[11] As explained in our opening brief, under the ESA, threatened and endangered species are "species" in danger of extinction or likely to become so in the foreseeable future "throughout all or a significant portion of [their] range[s]." 16 U.S.C. § 1532(6), (20); *see* Fed. Defs.' Br. at 11-12; 25-27. Thus, the definitions of "endangered species" and "threatened species" must be read together with the definition of "species," *i.e.,* a species, subspecies, or DPS. *Id.* § 1532(16). To determine whether a species, subspecies, or DPS is an endangered species or a threatened species, FWS must analyze the five factors in ESA Section 4(a)(1). *Id.* § 1533(a)(1). The geographic scope of the five-factor analysis depends on the "range" of the specific entity being considered for listing, reclassification, or delisting. Here, the appropriate scope for the "significant portion of its range" analysis was the range of the WGL DPS, not the range of the entire taxon.

---

[11] Plaintiffs question this citation to *Defenders (NRM wolf)*, suggesting that it does not support the proposition that when evaluating if a DPS is threatened or endangered one looks only at the DPS's range. Reply at 38. At minimum, the Court's holding supports Federal Defendants' arguments that Plaintiffs cannot define species one way when evaluating listing decisions and another way when evaluating delisting decisions. In any event, Federal Defendants cited this case for the proposition that the term "significant portion of its range" provides an independent basis for listing species that are not threatened throughout their entire ranges, *see also* Fed. Defs.' Br. at 25, which is why, as discussed, FWS separately evaluated whether there were SPRs within the WGL DPS before concluding that delisting is warranted.

The status analysis itself proceeds in two parts: first evaluating the status of the species as a whole and then determining whether there are significant portions of its range that warrant further analysis. Thus, when FWS analyzed the conservation status of the WGL DPS, FWS analyzed first whether the relevant ESA-species, the WGL DPS, was, as a whole, a threatened or endangered species. Second, FWS analyzed whether there were any portions of the DPS's range that warranted further consideration as possibly both significant and threatened or endangered, which could provide an independent basis for listing the DPS. *See* Fed. Defs.' Br. at 25-27, 29-30. In so doing, FWS reasonably defined the statutory SPR phrase and inquiry, and fully explained its analysis. FWS's reasonable analysis should be upheld. *See, e.g.*, *Colo. River Cutthroat Trout v. Salazar*, 898 F. Supp. 2d 191, 202-03 (D.D.C. 2012).

In the Final Rule, FWS's SPR inquiry first examines whether there are any "significant portions" of the WGL DPS's range for purposes of the listing or delisting inquiry. Under this step, FWS asked whether there are areas where "potential remaining threats are concentrated" and considered if those areas were "significant" because they contributed "meaningfully to the representation, resiliency, or redundancy of the species." 76 Fed. Reg. at 81,722. FWS applied its definition of "significant" and analyzed fragmented habitat and areas in former habitat in the DPS and concluded that the existing areas of habitat provide an adequate prey base, low levels of human-caused mortality, and can support sufficient numbers and distribution of wolves relative to the biological needs of the species. 76 Fed. Reg. at 81,722-23. It found that there were no portions of the range that met its definition of "significant" and were threatened or endangered and, therefore, concluded its analysis. 76 Fed. Reg. at 81,722-23; *id.* at 81,683.

Plaintiffs continue to question this reasonable and consistently described analysis.[12] Principally, Plaintiffs suggest that FWS was required to look outside the DPS when performing its SPR analysis. *See* Reply at 20. That is, Plaintiffs contend that FWS skipped a step in its

---

[12] Plaintiffs have abandoned their argument, based on a misreading of the record, that FWS staff counseled a different approach to the SPR analysis in the Final Rule, and appear to concede that FWS maintained a consistent approach throughout rulemaking. *See* Fed. Defs.' Br. at 29-30; *contra* Pls.' Br. at 20-22.

analysis—that once the species was defined (*i.e.*, WGL DPS), FWS had to step back and analyze "the gray wolf's status in the lower 48 states in relation to the ESA listing factors." Reply at 5, 35.[13] This argument fails. The ESA's conservation status inquiry plainly starts and ends with the five-factor analysis for the species at issue. *Am. Wildlands v. Kempthorne*, 478 F. Supp. 2d 92, 99 (D.D.C. 2007).

Plaintiffs cite no cases standing for the proposition that FWS must look outside of the "species" being reviewed. For example, *Defenders (wolf)* addressed a DPS that encompassed all of the eastern United States, including the WGL DPS. *See* 354 F. Supp. 2d at 1172 ("the proposed [WGL] DPS grew to incorporate the Northeastern states"). This case therefore stands for the proposition that, when making a conservation status determination, FWS must consider impacts to the species from the five factors across the entire DPS at issue in the rulemaking, but says nothing about whether those factors must be considered for other subspecies, DPSs, or taxa. *See also* Fed. Defs.' Br. at 24 & n.14.

More broadly, Plaintiffs identify no decision holding that, because of the "significant portion of its range" language in the definitions of "endangered species" and "threatened species," FWS must evaluate a taxon's range *outside* the DPS it is evaluating. *See, e.g.*, *Defenders of Wildlife v. Norton, ("Defenders (lynx)")*, 239 F. Supp. 2d 9, 21 (D.D.C. 2002) (holding that FWS must look at significant portions of the range within the DPS); *Defenders of Wildlife v. Kempthorne,* Civ. No. 04–1230(GK), 2006 WL 2844232, at *13 (D.D.C. Sept. 29, 2006) (a subsequent decision in the same case as *Defenders (lynx)* remanding the question of

---

[13] Plaintiffs at times suggest that the proper unit of analysis was the "species as a whole" without defining what they mean by that term. *See* Reply at 35. In other places, they ask for consideration of the "lower 48 states gray wolf listing," *id.* at 5, 7, which presumably refers to the 1978 listing of the lower-48 states less Minnesota plus Mexico. Elsewhere, they contend without support that FWS found previously that "the lower 48 States constituted a significant portion of the wolf's range when it listed the wolf across this area in 1978." *Id.* at 20, 31; *see also* Pls.' Br. at 19-20 (suggesting that the focus of the inquiry should be the gray wolf taxon). Plaintiffs also consistently fail to acknowledge that, prior to the Final Rule, the lower-48 listing was permanently altered by Congress delisting part of the Northern Rocky Mountains DPS. *See* 76 Fed. Reg. 25,590 (May 5, 2011).

whether portions of the DPS constituted an SPR); *Greater Yellowstone Coal., Inc. v. Servheen*, 672 F. Supp. 2d 1105, 1125-26 (D. Mont. 2009) (discussing extirpation from 98-99% of historical range and explaining "This case deals with a distinct population segment of grizzlies, which by definition is a discrete segment of the entire species, so it would be nonsensical to require the Service to consider the grizzlies' historic range throughout the United States as significant in relation to the Yellowstone grizzly bear."), *aff'd in part, rev'd in part on other grounds and remanded*, 665 F.3d 1015 (9th Cir. 2011).[14] Moreover, as we explained in our opening brief, *see* Fed. Defs.' Br. at 32, although the *Friends of the Wild Swan* court held that rangewide consideration was required, the *Wild Swan* court so held because the FWS failed to address the species-wide petition and because FWS had previously found range-wide listing to be warranted "on the same information" that it was using to support its decision to list several DPSs. *See* 12 F. Supp. 2d 1121, 1133-34 (D. Or. 1997) (explaining that no court has addressed the issue of whether FWS must address an "an entire species or larger populations before addressing [DPSs]. However as this court indicated in its earlier opinion … USFWS's findings should be at least comprehensive enough to address the scope of the petition to list."); *id.* at 1133 ("In both the original 1994 Finding and the 1995 finding, USFWS found that listing of the bull trout was warranted, although precluded, throughout the coterminous United States.").

To the extent Plaintiffs are arguing that something else beside the WGL DPS also must be evaluated in the Final Rule, such as the lower-48 states wolf population or the gray wolf taxon more broadly, it is well within FWS's discretion and reasoned judgment to limit its inquiry to the status of the WGL DPS. The statute expressly permits FWS to focus its inquiry on a "species," such as the WGL DPS, and nothing in the ESA or governing law requires FWS to address other,

---

[14] *See also Defenders (wolf)*, 354 F. Supp. 2d at 1167-68; *Nat'l Wildlife Fed'n v. Norton*, 386 F. Supp. 2d 553, 565 (D. Vt. 2005) (FWS impermissibly "limited the significant portion of the wolf's range and the application of the five ESA § 4(a)(1) listing factors to the 'current status of, and threats faced by, the existing wolf populations within' the Western Great Lakes and Northern Rockies' rather than the entire DPS."); *cf. Tucson Herpetological Soc'y*, 566 F.3d at 873 n.2 (explaining that the plaintiffs did not suggest that the lizard should be listed as a DPS, thus the question of the proper scope of the SPR analysis was not at issue).

related "species" or issues in a single rulemaking. *See Mobil Oil Exploration v. United Distrib. Co.*, 498 U.S. 211, 230-31 (1991) (reversing judgment that invalidated agency orders on the basis that the agency declined to address related, but distinct, issues, explaining that "[a]n agency enjoys broad discretion in determining how best to handle related, yet discrete, issues in terms of procedures … and priorities.") (citations omitted); *see also Tenn. Valley Mun. Gas Ass'n v. Fed. Energy Regulatory Comm'n*, 140 F.3d 1085, 1088 (D.C. Cir. 1998) ("An agency has broad discretion to determine when and how to hear and decide the matters that come before it."); *Ctr. for Biological Diversity v. Jackson*, 815 F. Supp. 2d 85, 94 (D.D.C. 2011) (same).

Plaintiffs raise several further concerns with FWS's analysis, but none of them has merit. First, Plaintiffs appear to confuse the terms "significance" from the DPS Policy and the statutory term "significant portion of its range." *See Tucson Herpetological Soc'y v. Salazar*, 566 F.3d 870, 873 n.2 (9th Cir. 2009); *Nw. Ecosystem Alliance v. FWS*, 475 F.3d 1136, 1143 (9th Cir. 2007) ("Actually, the two significance requirements serve different functions. The significance requirement in the DPS Policy pertains to whether a population qualifies as a species, while significance in § 1532(6) relates to whether a species is endangered."). Plaintiffs' confusion of these concepts is pervasive and highlights why many of their arguments are unsupported by the ESA or existing law.

For example, Plaintiffs suggest that the basis for FWS's analysis in the Final Rule was that the WGL is "a significant portion of the wolves' range," or that this was the basis for the finding that the wolves in the upper Midwest indeed constituted a DPS. *See* Reply at 20. In contrast, as already explained, the DPS Policy was the basis for the determination that the WGL DPS is a proper DPS under FWS's interpretation of the statute. The separate statutory term "significant portion of its range," from the definitions of "endangered species" and "threatened species," *see* 16 U.S.C. § 1532(6), (20), had no bearing.[15] *See* Fed. Defs.' Br. at 4 n.2.

---

[15] Plaintiffs also cite a portion of the 1978 rule to suggest that FWS already determined that the lower-48 states constituted a significant portion of the wolf's range. Plaintiffs' argument, however, is not substantiated by the 1978 rule. *See Defenders (NRM wolf)*, 729 F. Supp. 2d at 1227 ("That [1978] reclassification of the timber wolf, however, was not based upon the 'portion

Plaintiffs next question FWS's definition of "significant portion of its range." As courts have recognized, FWS's definition of this ambiguous term is reasonable and entitled to deference. *See* Fed. Defs.' Br. at 25-26. Moreover, FWS retains the interpretive discretion to define this term, even if prior courts have suggested their preferences in dicta or even defined the term differently. *See Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967 982-83 (2005) ("A court's prior judicial construction of a statute trumps an agency construction otherwise entitled to *Chevron* deference only if the prior court decision holds that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion.").

Plaintiffs spend several pages attacking FWS's definition of "range" as "current range" rather than "historical range." Reply at 22-25.[16] FWS did define "range" that way in the Final Rule, but this definition did not preclude FWS from considering all areas within the WGL DPS. *See* 76 Fed. Reg. at 81,722-23 (defining "range" for purposes of the SPR analysis as "current range" but considering the five factors with respect to the gray wolf in all areas within the DPS, regardless of location); *cf. Colo. River Cutthroat Trout*, 898 F. Supp. 2d at 203 (upholding interpretation of range as "current range"). FWS considered the *entire* WGL DPS, including

---

of its range' language the Service now relies upon, but rather it was based on the definition of 'species.'").

[16] Plaintiffs raise a judicial estoppel argument related to the historical-or-current-range issue, Reply at 29-30, which as explained in the text above, is irrelevant. In any case, the portion of the government's brief cited by Plaintiffs defended FWS's actions in designating as endangered a DPS of pygmy owls primarily on the basis of ESA listing factor § 4(a)(1), "the present or threatened destruction, modification, or curtailment of its habitat or range" within the DPS. *See Nat'l Assoc. of Home Builders v. Norton*, 02-15212 (9th Cir.), Ans. Br. for Fed. Appellees, 2002 WL 32102866 at *33-*34. It did not discuss what kind of range was contemplated in the phrase "significant portion of the range." *Id.* The government also clarified that "[w]hether the Arizona population of pygmy-owls has declined due to habitat loss is primarily relevant to the question of whether the population is *currently* in danger of extinction due to habitat loss." *Id.* at *36. Moreover, the brief, even if it were on point, does not meet the test for judicial estoppel, as the Ninth Circuit never addressed the government's position on this issue, much less accepted it. *Cf.* Reply at 29 n.4 & 30 n.5; *see Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 170 (2010) ("Perhaps more importantly, in approving the settlement, the District Court did not adopt petitioners' interpretation").

unoccupied portions, in its SPR analysis. *See* 76 Fed. Reg. at 81,722-23; Fed. Defs.' Br. at 27. That is, the "range" of the WGL DPS was identified and defined through FWS's reasoned application of its DPS Policy, as discussed above. With the range defined, FWS analyzed the status of and potential threats to wolves in all portions of the DPS.[17] Thus, Plaintiffs' argument that "range" as used in "significant portion of its range" means "historic" rather than "current" range is irrelevant.[18] Regardless of interpretation, the facts are the same—FWS expressly considered all portions of the WGL DPS's range. *See* Fed. Defs.' Br. at 9-10, 27 (discussing FWS's analysis of impacts to the species resulting from present or threatened destruction, modification, or curtailment of its range, and further analyzing all portions of the DPS's range).

The Final Rule's explanation of the entire area of the DPS and the recent range expansion of the gray wolf is therefore clearly distinguishable from Plaintiffs' cited cases where explanation was wholly absent. *Cf. WildEarth Guardians v. Salazar*, 741 F. Supp. 2d 89, 99-101 (D.D.C. 2010) (remanding consideration of range where FWS neither defined "significant portion of its range" nor, of course, applied that definition in its rulemaking) (cited Reply at 32-

---

[17] For the same reasons, FWS did not define "significant portion of its range" based on the DPS boundaries. *Cf.* Reply at 37 (citing *Servheen*); *see* 672 F. Supp. 2d at 1125-26. It is clear from the SPR analysis that the DPS circumscribes the SPRs and is not coextensive with them.

[18] As part of their historic-versus-current range discussion, Plaintiffs suggest that *Friends of Blackwater* is distinguishable because the flying squirrel persisted in areas similar to its historical range. Reply at 28. First, *Blackwater* was discussing one of the five factors, and did not address SPR, so it is inapposite. *See* 691 F.3d at 432 (describing claims at issue). Second, as discussed above, FWS does not take the position that lost historical range is irrelevant, so the fact that determinations (and reviewing courts) discuss lost historical range is hardly surprising. Without rehashing the question of how one should calculate range contraction, *see* Fed. Defs.' Br. at 28, the relevant point is that the court upheld a delisting based on an analysis of the status of the species in its current range, which was less than its historical range. Third, to the extent Plaintiffs are trying to resurrect the idea that the word "significant" in SPR is about size or must be tied to some percentage of range contraction, that notion has been rejected. *See Defenders (lizard)*, 258 F.3d at 1143 ("A species with an exceptionally large historical range may continue to enjoy healthy population levels despite the loss of a substantial amount of suitable habitat."); *see also Colo. River Cutthroat Trout*, 898 F. Supp. 2d at 203 (species had been reduced to 14% of "probable historically occupied stream miles," but FWS properly declined to list the species as threatened or endangered); Fed Defs.' Br. at 29; *cf.* Reply at 28; Pls.' Br. at 20 ("Plain and simple, the absence of wolves from their historical range means that wolves *cannot be delisted*, whether by use of the DPS tool or otherwise.").

33). It is instead more like the discussion upheld in *Colorado Cutthroat Trout* where the Court upheld the SPR discussion because "FWS also provided an adequate analysis of the Trout's historic range and discussed why the historic contraction of its range does not render the Trout vulnerable in any significant portion of its currently occupied habitat." *Colo. River Cutthroat Trout*, 898 F. Supp. 2d at 203; *see also Servheen*, 672 F. Supp. 2d at 1125 (upholding analysis that explained "why some areas were not considered significant and set[] forth factors to determine significant range").

Plaintiffs attempt to distinguish the *Cutthroat Trout* case because, in the Final Rule, FWS acknowledged that there are ongoing impacts to wolves from human-caused factors, including from negative public attitudes and human-caused mortality. *See* Reply at 27-28.[19] First, the *Colorado Cutthroat* decision was not based on the cessation of all sources of threats to the species, but rather based on FWS's reasoned evaluation of significance. 898 F. Supp. 2d at 205 ("FWS's explicit discussion of how it evaluated significance, accompanied by its explanation of those areas of the range occupied by Trout sport fish populations, renders discernible the FWS's reasoning with respect to its evaluation of a significant portion of the Trout's range."). Second, in any event, FWS analyzed those factors identified by Plaintiffs and concluded that they would not cause the WGL DPS gray wolves to be in danger of extinction in the foreseeable future. FWS analyzed declining public opinion support for wolves in the late 2000s but concluded that because of the professional outreach components of State wildlife agencies and others, as well as an expected improvement in public attitudes once wolf-human conflicts can be managed by the states, public attitudes did not pose a threat to the wolves' continued existence in the WGL DPS. 76 Fed. Reg. at 81,720. Similarly, while FWS concluded that human-caused mortality is the source of the majority of wolf deaths, *see id.* at 81,682, FWS discussed the major forms of human-caused mortality and concluded that "[d]espite human-caused mortalities of wolves in

---

[19] Plaintiffs appear to be quoting from 76 Fed. Reg. at 81,720.

Minnesota, Wisconsin, and Michigan, these wolf populations have continued to increase in both numbers and range." 76 Fed. Reg. at 81,700; *see also id.* at 81,698-701.[20]

Plaintiffs also suggest that FWS's definition of SPR in the Final Rule is inconsistent with the Ninth Circuit's holding in *Defenders (lizard)*, where the Court held that a prior definition of SPR (made for the first time in litigation) rendered part of the definition of "endangered species" superfluous. Reply at 26-27. Plaintiffs are incorrect—the two definitions differ. In *Defenders (lizard)*, "significant" was explained as follows: a species may be listed based on an SPR if it "faces threats in enough key portions of its range that the *entire species* is in danger of extinction, or will be within the foreseeable future." 258 F.3d at 1141. In the Final Rule, FWS defined "significant" as portions whose "loss would result in a decrease in the ability to conserve the species" (*i.e.,* would not have rendered the whole species threatened or endangered). 76 Fed. Reg. at 81,722. Clearly this is a different standard than that rejected by *Defenders (lizard)*.[21] Plaintiffs' arguments improperly seek to re-write FWS's rule and therefore fail.[22]

In short, because the Final Rule is in full compliance with the ESA, reasonably evaluates the entire range of the DPS to determine whether there are significant portions of its range that merit further consideration, and explains its conclusions, the Final Rule should be upheld by the Court.

---

[20] The ESA does not require the abatement of all possible sources of wolf mortality before a determination that a species is not endangered or threatened. *Cook Inlet Beluga Whale v. Daley,* 156 F. Supp. 2d 16, 21-22 (D.D.C. 2001) (holding that the ESA does not require listing "simply because the agency is unable to rule out factors that could contribute to a population decline"); *Servheen*, 665 F.3d at 1032 ("delisting cannot require the imposition of legal protections commensurate with those provided by the ESA itself'; the ESA contemplates that "something less" than ESA protections "can be enough to maintain a recovered species").

[21] Relatedly, a court recently upheld a decision based on FWS's definition of "significant" in SPR as whether a portion contributes "meaningfully to the representation, resiliency, or redundancy of the species." *See W. Watersheds Project v. Ashe*, 948 F. Supp. 2d 1166, 1186 (D. Idaho 2013); *see* 76 Fed. Reg. at 81,722-23.

[22] Moreover, Plaintiffs' arguments are again focused on an entity not at issue—wolves in the lower-48 states and Mexico outside of the WGL DPS. They do not seriously argue that there were significant portions of the range *within the WGL DPS* that FWS failed to consider and that independently warrant the listing of the DPS.

**IV. The WGL DPS Satisfies the ESA's Criteria for Delisting.**

    **A.**    **FWS addressed the taxonomic science and the best available science.**

        **1.**    **FWS's decision to delist the WGL DPS gray wolf was based on scientific consideration, not political interference.**

As explained in the cross-motion, the Final Rule is based on the best available science regarding the gray wolf in the WGL DPS and seeks to remove from the ESA list a population of wolves that FWS has determined, since at least 2007, is healthy and has recovered. Fed. Defs.' Br. at 33-37. In their Reply, Plaintiffs have presented no evidence that would dislodge the presumption that FWS drew its conclusions from the best available science and acted consistently with its statutory obligations. *Cf.* Reply at 39-41. Nevertheless, Plaintiffs continue to assert their baseless claim that the Final Rule was motivated by political interference rather than science. They try to make much of the fact that FWS's staff was aware of a tentative timeline that the Assistant Secretary for Fish Wildlife and Parks sent to Senator Klobuchar in late 2010 for making a final determination on whether to delist wolves in the WGL DPS, *see* AR 78 at 2769A ("We aim to publish a final determination by the end of 2011")—a timeline that also fell within the statutory deadlines for responding to the citizen petitions and was announced after the FWS had already determined that the petitioned action to delist was warranted. *See* 16 U.S.C. § 1533(c)(3)(A)-(D); Reply at 40-41; Fed. Defs.' Br. at 34-35. Plaintiffs' efforts fail. That a member of Congress was interested in FWS's actions or that political appointees at the Department of the Interior discussed rulemaking matters with a U.S. Senator does not signal any improper political interference in FWS's rulemaking. And, even in cases where there is some evidence of political interference, which is not the case here, such political interest does not call into question the entire rulemaking. *See Cook Inlet Beluga Whale*, 156 F. Supp. 2d at 22 ("These bits of evidence show that the agency's decision was a difficult one and that political considerations may have been lurking in the corridors. They do not establish that, but for 'politics,' the whale would have been listed under the ESA or that political considerations became part of the decision making process").

Plaintiffs do not confront the caselaw that holds that creating a tentative timeline for an action does not impermissibly predetermine the result. *See, e.g.*, *Friends of Southeast's Future v. Morrison,* 153 F.3d 1059, 1063 (9th Cir. 1998); *Oceana, Inc. v. Locke*, 725 F. Supp. 2d 46, 67 (D.D.C. 2010) (an aggressive schedule did not demonstrate that the agency prejudged the outcome), *rev'd on other grounds* 670 F.3d 1238, 1243 (D.C. Cir. 2011); Fed. Defs.' Br. at 34 n.20. Nor do they acknowledge that, although internal emails discuss the tentative timeline as a factor against reopening public comment, FWS did in fact reopen public comment to ensure its decision was based upon the best-available science. *See* Fed. Defs.' Br. at 35-36. Lastly, although Plaintiffs cite the same cases as in their opening brief, *cf.* Reply at 40-41, unlike *Save Our Springs* or the other decisions, Plaintiffs cite no evidence that FWS's staff biologists were forced to alter their scientific conclusions to satisfy improper political concerns. Instead, the record easily refutes Plaintiffs' insinuations—FWS biologists at all times addressed the available science, and the Final Rule's analysis and conclusions are based upon and directly supported by ample scientific support. *See* 76 Fed. Reg. 81,666-726; AR 629 (list of literature cited in the Final Rule). For all those reasons, as well as those presented in the cross-motion, Plaintiffs' insinuations of "bad faith" or impermissible "political meddling" are devoid of merit and must be rejected.

      **2.**     **FWS considered the best available science on wolf taxonomy, and its finding that all wolves in the WGL DPS are gray wolves (*Canis lupus*) is entitled to deference.**

Based on two rounds of public comment, including comments from the scientific community, a review of the scientific literature, and peer reviews, FWS concluded that the best scientific data available at that time was not consistent with recognizing *Canis lycaon* as a full species coexisting with *Canis lupus* in the upper Midwest. 76 Fed. Reg. at 81,668-69. Plaintiffs \ reject this conclusion, but do not directly confront the record evidence demonstrating that FWS reasonably drew the conclusion. *See* Fed. Defs.' Br. at 37-41; *cf.* Reply at 41-46.

Instead, Plaintiffs respond that, while taxonomic certainty is not required before rulemaking, in this instance the taxonomic uncertainty is "serious" and "rampant," Reply at 17,

or "substantial," *id.* at 41, and therefore FWS was required to find "new" taxonomic information. For the proposition that new information was required, they cite a document that urges consideration of some then-new taxonomic information—a 2009 article. Reply at 18 (AR 14 at 823A). In fact, of course, FWS also considered that and later articles addressing the best available science regarding taxonomy. 76 Fed. Reg. at 81,669. And, fatal to their claims here, Plaintiffs do not confront the D.C. Circuit's admonition that "[t]he 'best available data' requirement makes it clear that the Secretary has no obligation to conduct independent studies." *See Sw. Ctr. for Biological Diversity v. Babbitt*, 215 F.3d 58, 60-61 (D.C. Cir. 2000); *see also Am. Wildlands v. Kempthorne*, 530 F.3d 991, 998 (D.C. Cir. 2008).

Whatever the proper word for the uncertainty inherent in the complicated, scientific questions posed by gray wolf taxonomy that FWS resolved in the Final Rule, FWS did all that it was required to do, and more—it sought an additional round of public comment to ensure that it in fact had all "new" information available at the time of rulemaking and confronted that data. *See* Fed. Defs.' Br. at 37-39. Plaintiffs' arguments thus must be rejected as misconstruing the applicable law and record.

Plaintiffs again cite the post-decisional 2013 proposed rule in support of their claim that the FWS did not decide which species of wolf inhabits the WGL DPS. Reply at 42. This proposal includes statements about gray wolves' historical taxonomy that Plaintiffs suggest impugn FWS's scientific judgment in the 2011 Final Rule about the identity of gray wolves. *Id.* As already explained, this proposal is not properly considered in the Court's review of the Final Rule because it is not part of the administrative record in this litigation, it is an unfinalized proposal that is subject to change before rulemaking is completed, and it postdates the Final Rule. Fed. Defs.' Br. at 40; *Am. Wildlands*, 530 F.3d at 1002 (affirming decision that letters written after the issuance of the challenged rule were properly excluded and "are [] not part of the administrative record").[23] Plaintiffs also do not address the limited persuasive value of a

---

[23]   In support of their assertion that post-decisional, extra-record proposed rulemaking may be considered, Plaintiffs cite a district court opinion that relies on the *Esch v. Yeutter*, 876 F.2d 976,

proposed rulemaking. Moreover, debate in the scientific community did not relieve FWS of its responsibility to make the taxonomic decisions necessary to respond to the pending delisting petitions or to complete rulemaking. The law requires FWS to issue decisions based on the best "available" scientific data, and that is exactly what FWS did in this case.

Plaintiffs' citation to the Ninth Circuit's *Greater Yellowstone Coal., Inc. v. Servheen* decision is no more helpful. *See* Reply at 43. There, the Ninth Circuit remanded to the agency the question of whether whitebark pine declines would threaten the grizzly bear when the evidence appeared to the court to be lopsided: there was "considerable data—demonstrating a relationship between pine seed shortages, increased bear mortality, and decreased female reproductive success." *Servheen*, 665 F.3d at 1030 (also explaining there was no data indicating that these declines would *not* threaten the Yellowstone grizzly population). The taxonomic question facing FWS in the Final Rule is unlike the issue in *Servheen*. There the Court found the record evidence pointing in one direction. Here, of course, FWS received comments from its own peer reviewers and other scientists that supported its taxonomic decision. Fed. Defs.' Br. at 37. Thus, *Servheen* does not stand for the proposition that, if there is record support for FWS's decision, it must stay its hand waiting for the issue to be finally resolved—especially with respect to an issue like taxonomic classification where the debate has continued since the time the wolf was first listed.

Plaintiffs' citations to FWS's rulemaking regarding a possible Northeastern DPS are similarly beside the point. First, decisions involving separate rulemakings and distinct species are not relevant to the scientific question at hand, *see Servheen*, 665 F.3d at 1027, let alone years

---

991 (D.C. Cir. 1989) record supplementation factors for the proposition that extra-record evidence can be considered to show "whether the decision was correct or not." *See* Reply at 42 n.7. Plaintiffs' characterization of the circumstances in which supplementation is appropriate is at odds with recent D.C. Circuit precedent and should be rejected.  *See Am. Wildlands*, 530 F.3d at 1002 (identifying three "unusual circumstances" in which supplementation of the record is appropriate, none of which are cited by plaintiffs or apply here); *see also Tindal v. McHugh*, 945 F. Supp. 2d 111, 124 n.13 (D.D.C. 2013) ("More recently, the D.C. Circuit 'appears to have narrowed these exceptions to four: (1) when the agency failed to examine all relevant factors; (2) when the agency failed to explain adequately its grounds for its decision; (3) when the agency acted in bad faith; or (4) when the agency engaged in improper behavior.'") (citation omitted).

after the fact. *See* 68 Fed. Reg. at 15,805-06 (Apr. 1, 2003) (describing the conflicting taxonomic information regarding the historical wolf populations that occupied the Northeastern United States); *see id.* at 15,861 (showing map 2 with proposed Northeastern DPS). Second, through their reliance on this kind of support, it is clear that Plaintiffs cannot present information calling into question FWS's decision in the 2011 Final Rule that the WGL DPS wolves were *Canis lupus* and thus are forced to rely on speculation of political interference. *See* Reply at 44. Without better information that FWS failed to consider, Plaintiffs' challenge fails. The best available data requirement "merely prohibits the Secretary from disregarding available scientific evidence that is in some way better than the evidence [she] relies on. Even if the available scientific and commercial data were quite inconclusive, [she] may—indeed must—still rely on it at that stage." *Sw. Ctr. for Biological Diversity*, 215 F.3d at 60 (quotation omitted).

Because they have presented no better available science FWS failed to consider, Plaintiffs now advance the theme that, when FWS is faced with scientific uncertainty, the benefit of the doubt goes to the species and it is this principal that always resolves a scientific debate in the ESA context. *See, e.g.*, Reply at 35, 44-45 (citing cases for the authority that, by enacting the ESA, Congress afforded endangered species the highest of priorities). The concept of giving the benefit of the doubt to the species does not mean that any time there is arguably competing scientific data or evidence, FWS is required to disregard its own reasonable conclusions in favor more conservative action. Indeed, in *TVA v. Hill*, the Supreme Court explained that it was interpreting the "explicit provisions" of the ESA. *See* 437 U.S. 153, 193-94 (1978). Similarly, the ESA's text demands that FWS make decisions in the face of scientific uncertainty by relying on the best *available* information and scientific uncertainty is no crutch for inaction. *See Oceana v. Evans*, 384 F. Supp. 2d 203, 219-20, 228 (D.D.C. 2005); *In re Polar Bear Endangered Species Act Listing*, 794 F. Supp. 2d 65, 110 n.53 (D.D.C. 2011), *aff'd sub nom. In re Polar Bear Endangered Species Act Listing & Section 4(d) Rule Litig.--MDL No. 1993*, 709 F.3d 1 (D.C. Cir. 2013).

FWS's rule applies these standards, and does so reasonably. *See Sw. Ctr. for Biological Diversity*, 215 F.3d at 60. For that reason, Plaintiffs efforts to impose their own resolution of the existing scientific data must give way to the reasoned, expert choices of FWS. *See Ethyl Corp. v. EPA*, 541 F.2d 1, 36 (D.C. Cir. 1976) (*en banc*).

Finally, Plaintiffs suggest that FWS was incorrect to rely on its recovery plan, but this argument is derivative of their general taxonomic arguments, already addressed. *See* Reply at 45 ("because of the unsettled taxonomic questions, the FWS cannot rely on the Recovery Plan for Eastern Timber Wolf to delist the WGL DPS"). FWS's taxonomic conclusion must be upheld for all the reasons discussed and, if that were not enough, FWS specifically analyzed whether the recovery plan still applied. Apart from its rejection of FWS's taxonomic decision, discussed *supra*, Plaintiffs do not directly confront FWS's analysis of whether the wolves recovered in the WGL DPS are those listed in 1978 as the Minnesota population. *See* Fed. Defs.' Br. at 38 n.24. FWS concluded that the best available science indicated that they were, and therefore that the Recovery Plan still applied. 76 Fed. Reg. at 81,679-80. For all those reasons, Plaintiffs' taxonomic arguments fail.

### B.      FWS's determination about the adequacy of regulatory mechanisms was reasonable.

As part of the five-factor analysis, the ESA requires consideration of the "inadequacy of existing regulatory mechanisms." 16 U.S.C. § 1533(a)(1)(D). FWS's interpretation of the Section 4(a)(1) listing factors is reviewed under the familiar two-step *Chevron* inquiry. *Friends of Blackwater*, 691 F.3d at 432 (citation omitted).

After reviewing the best science information available, which included the state management plans in Michigan, Wisconsin, and Minnesota, FWS appropriately concluded that adequate regulatory mechanisms were in place to maintain viable wolf populations in the WGL DPS and management plans existed that would be implemented upon delisting. 76 Fed. Reg. at 81,701-17. FWS relied not only on state management plans and state laws and regulations, but on a case-by-case basis, other mechanisms in use. *See* 76 Fed. Reg. at 81,701; *cf.* Reply at 46

(suggesting that consideration was limited to the state management plans).

On Reply, Plaintiffs contend that the state management plans are inadequate because they are "piecemeal, non-binding promises," that the Ninth Circuit's decision in *Servheen* supports its argument, and that FWS should have more fully considered state wolf hunts—hunts that were developed, finalized, and authorized after the Final Rule—in that rulemaking. Plaintiffs present little support for their contentions, preferring, as they did in the opening brief, to rest their allegations on speculation of political interference and bad faith on the part of states in implementing their own management plans. *See* Fed. Defs.' Br. at 41-44; *cf.* Reply at 46-49. To prevail, Plaintiffs must identify better information available at the time FWS was developing the Final Rule that FWS failed to consider. *See In re Polar Bear*, 794 F. Supp. 2d at 69. Plaintiffs have still not pointed to such evidence.

Plaintiffs cite to *Servheen* to suggest that the decision provides a standard for assessing whether the state management plans evaluated in the Final Rule are adequate regulatory mechanisms. *See* Reply at 47. The Ninth Circuit in *Servheen* did not address whether all measures evaluated by FWS constituted "regulatory mechanism[s]." 665 F.3d at 1030-31. In reversing the district court, which held that a multi-state, multi-agency conservation plan was not a regulatory mechanism, the Ninth Circuit never reached the question of whether a conservation agreement constituted a "regulatory mechanism," or even decided whether a regulatory mechanism must be legally binding in order to be properly considered under Factor D. *See id.* at 1031. Thus, *Servheen* does not support Plaintiffs' arguments in this case.

More importantly, while the statute requires FWS to consider "regulatory mechanisms," as well as State conservation efforts, *see* 16 U.S.C. § 1533(a)(1)(D), 1533(b)(1)(A), Congress did not define those terms. Thus, the ESA does not resolve the proper scope of regulatory mechanisms, and the Court therefore should defer to the administering agency's interpretation "as long as it reflects 'a permissible construction of the statute.'" *Sherley v. Sebelius*, 644 F.3d 388, 393 (D.C. Cir. 2011) (quoting *Chevron*, 467 U.S. at 843).

In this case, FWS interpreted the ambiguous term and set out a clear framework for its

analysis of "regulatory mechanisms." *See* 76 Fed. Reg. at 81,701. FWS noted that, strongest weight is given to statutes and regulations, and agreements that are more voluntary in nature are analyzed based on the specific facts "to determine the extent to which [they] can be relied on in the future, including how [they] address[] threats to the species." FWS explained that "[w]e consider all pertinent information, including the efforts and conservation practices of State governments, whether or not these are enforceable by law." *Id.* FWS therefore interpreted the statutory terms, and this interpretation plainly comports with the ESA. For example, *Defenders of Wildlife v. Kempthorne* upheld FWS's reasonable consideration of state management plans as part of its evaluation of "regulatory mechanisms." *See* 535 F. Supp. 2d 121, 131-32 (D.D.C. 2008).

Using that reasonable interpretation of regulatory mechanisms, FWS analyzed the pertinent state management plans, tribal management plans and other measures, as well as relevant statutes that affect wolf management. 76 Fed. Reg. at 81,701-17. After reviewing the state management plans and the other relevant mechanisms, FWS was confident that the population would remain above the numerical and distributional recovery goals. 76 Fed. Reg. at 81,716-17; *id.* at 81,686. Plaintiffs have not cited any authority calling into question this reasonable rubric—nor have they questioned reliance on the state management plans based on any citation to particular aspects of the plans or FWS's consideration of them. Reply at 46-47. Instead, as before, they speculate without support that the states do not have a good-faith interest in maintaining recovered wolf populations in their states and suggest, without any support, that there is no guarantee that the state plans will be implemented as drafted. *See* Reply at 46 (citing a record excerpt discussing States' interest in depredation control). The states in the litigation are well equipped to further respond to these points, but suffice it to say that this speculation is insufficient to call into question FWS's careful consideration of the state management plans and its reasonable conclusions based on that review.

Plaintiffs reprise their argument that FWS should have more fully considered then-speculative public harvests of wolves in its review of regulatory mechanisms by contending that

Federal Defendants are trying to "dismiss their duty to analyze the potential effects of the States' hunts." Reply at 48. First, as explained, the details of the state hunts were not yet fully available at the time of rulemaking, so a discussion about specific hunting regulations yet-to-be authorized could not have occurred. *See Sw. Ctr. for Biological Diversity*, 215 F.3d at 60. Second, Plaintiffs' suggestion that FWS failed to consider the impacts of possible wolf hunts is wrong. In reviewing the adequacy of existing regulatory mechanisms, FWS considered whether "the use of [regulated wolf hunts] might reduce the number of wolves in such a way that they would again be considered a threatened or endangered species." 76 Fed. Reg. at 81,685. FWS concluded that the state plans—which included the possibility of using public harvest as a management option— would ensure the wolf's continued survival by requiring populations to exceed the Recovery Plan goals. *See id.* at 81,703, 81,709-10, 81,711-12; Fed. Defs.' Br. at 43. Plaintiffs have failed to point to any evidence that regulated hunts will cause the wolf population to become threatened or endangered. *See* Fed. Defs.' Br. at 42-43. For those reasons, Plaintiffs' challenges to the Final Rule should be rejected.

Plaintiffs appear to suggest that FWS is relying on post-delisting monitoring to justify its conclusion that the species is not threatened. In support of this suggestion, they cite a comment response, where FWS briefly summarized its entire conservation status analysis in response to comments that opposed delisting on the basis that wolves should always be protected by the ESA. *See* Reply at 47 (quoting language from 76 Fed. Reg. at 81,682). In fact, FWS did not rely on post-delisting monitoring to justify its decision. Instead, FWS was merely acknowledging the role that monitoring plays *after* FWS determines that a species no longer meets the definition of a "threatened species" and is delisted. Monitoring requires that FWS consider new data that becomes available after delisting and, if necessary, take appropriate action. *See* S. Rep. No. 100-240, at 10 (Dec. 9, 1987).[24] Here, there is ample record support demonstrating the WGL DPS is

---

[24] FWS will remain involved in monitoring wolves with data collected from states, tribes, and intertribal natural resources agencies. 76 Fed. Reg. at 81,723-24, 81,685; AR 6 at 371-72A.

recovered and is not in danger of extinction in the foreseeable future; this evidence, combined with post-delisting monitoring, will ensure wolves remain recovered.

### C.   FWS adequately considered the ESA factors in combination.

Lastly, Plaintiffs make a new argument on reply that FWS failed to consider the ESA listing factors in combination. The Court need not consider this argument given that it is new and not properly raised. *Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1001 (D.C. Cir. 2008) (argument forfeited where it was raised "for the first time in [plaintiffs'] reply brief"); Am. Compl. at ¶ 125 (not raising 50 C.F.R. § 424.11(c)); Pl.'s Br., ECF No. 24-1, at 40-43 (discussing some of the listing factors, but not raising § 424.11(c)).

In any case, FWS did consider the factors in combination as indicated in its regulations. *See* 50 C.F.R. § 424.11(c) ("A species shall be listed or reclassified if the Secretary determines … that the species is endangered or threatened because of any one or a combination of the following factors"). FWS and Plaintiffs agree that human-caused mortality is the most significant issue that has the potential to affect the long-term status of the wolves. 76 Fed. Reg. at 81,721. For this reason, FWS conducted an exhaustive analysis of human-caused mortality and analyzed the sources in the Final Rule. 76 Fed. Reg. at 81,698-01 (analyzing sources of human-caused mortality and then providing a summary of the combination of all forms of human-caused mortality). Moreover, FWS addressed human-caused mortality in conjunction with other stressors to wolves and concluded that the natural fecundity of wolves has not declined, despite the identified impacts. *See id.* Finally, after analyzing each of the five listing factors, FWS reviewed its findings and concluded that the factors singly or in combination were not likely to threaten the wolf population in the foreseeable future. 76 Fed. Reg. at 81,721-22; *id.* at 81,682. This is clearly sufficient. *Cf. Colo. Cutthroat Trout*, 898 F. Supp. 2d at 205-06.

Because Plaintiffs cannot legitimately claim that FWS failed to conduct an analysis of the factors in combination, they are forced to argue that the analysis is too short for their taste. Plaintiffs' comparison of this case to *WildEarth Guardians v. Salazar*, Reply at 49-50, shows the limitation of their argument: in that case the contested finding failed entirely to "explain how the

individual factors combine to affect the Utah prairie dog," and "failed to cite" even a single document in the entire administrative record "that evidences, in a non-conclusory fashion, that FWS considered the listing factor's cumulative effect." 741 F. Supp. 2d 89, 102-103 (D.D.C. 2010).[25]

## CONCLUSION

For the reasons set forth above and in prior briefing, and based on the materials in the administrative record, Plaintiffs' motion for summary judgment should be denied and Federal Defendants' cross-motion granted. The answer to the conundrum of how to address the 1978 dual listings must be that FWS can revise outdated listings with its own DPS Policy and, where the scientific evidence supports it, as in the Final Rule, delist those species as recovered. Federal Defendants respectfully request that this Court upheld FWS's reasonable and abundantly well-supported rulemaking delisting a recovered population of wolves.

---

[25] If Plaintiffs believed that the discussion of the factors in combination was too short, they could have commented on the analysis and its length during rulemaking. They, however, did not, thereby also waiving the issue. *See Koretoff v. Vilsack,* 707 F.3d 394, 398 (D.C. Cir. 2013); *Tindal v. McHugh*, 945 F. Supp. 2d 111, 129-30 (D.D.C. 2013) (explaining that, under *Koretoff*, this Circuit "require[s] 'the argument [the plaintiff] advances here' to be raised before the agency, not merely the same general legal issue.") (citations omitted). Public comments on the Final Rule are part of the administrative record and available at regulations.gov, Docket FWS-R3-ES-2011-0029. Individual comments can be accessed at: http://www.regulations.gov/#!documentDetail;D=FWS-R3-ES-2011-0029-**0601**, where the bolded number is the comment number. The linked comment is that of Plaintiff Help Our Wolves Live (dated July 5, 2011). Plaintiff The Humane Society of the United States's comment number is 0649 (dated July 5, 2011). Born Free, USA, and FATE do not appear to have submitted their own comment letters.

Dated: February 5, 2014              Respectfully submitted:

ROBERT G. DREHER,
Acting Assistant Attorney General
U.S. Department of Justice
Environment & Natural Resources Division
SETH M. BARSKY, Chief
KRISTEN L. GUSTAFSON, Assistant Chief
Wildlife & Marine Resources Section

/s/ *Andrea Gelatt*
Andrea Gelatt, Trial Attorney
Ben Franklin Station, P.O. Box 7611
Washington, DC 20044-7611
(202) 305-0388 | (202) 305-0275 (fax)
andrea.gelatt@usdoj.gov
*Attorneys for Federal Defendants*

Of Counsel:

Sharon Pudwill
Attorney Advisor
Twin Cities Field Solicitor's Office
5600 American Boulevard West, Suite 270
Bloomington, MN  55437-1173
(612) 713-7100 | (612) 713-7121 (fax)

36