EXHIBIT D

# Minnesota Wolf Management Plan

February, 2001





**Prepared by the**

**Minnesota Department of Natural Resources**
**Division of Wildlife**

In consultation with the Minnesota Department of Agriculture

000287A

# Minnesota Wolf Management Plan

## Prepared by the

## Minnesota Department of Natural Resources
## Division of Wildlife

### in consultation with the Minnesota Department of Agriculture

## February 2001

Funding provided in part by the Legislative Commission on Minnesota Resources



Approved:  _Allen Garber_   3/14/01

Allen Garber, Commissioner          Date

_Timothy Bremicker_   3/9/2001

Timothy Bremicker, Director          Date
Division of Wildlife

_William Bernhjelm_   3/8/2001

William Bernhjelm, Director          Date
Division of Enforcement

_Gene Hugoson_   3/8/01

Gene Hugoson, Commissioner          Date
Minnesota Department of Agriculture

000288A

# Executive Summary

The goal of this management plan is to ensure the long-term survival of wolves in Minnesota while addressing wolf-human conflicts that inevitably result when wolves and people live in the same vicinity.  This plan was developed by holding 12 public information meetings throughout the state in January 1998, convening a wolf management roundtable (Roundtable) that held 8 days of meetings to develop consensus recommendations, and utilizing the wealth of biological, sociological, cultural, and economic data, reports, and experience available to the Minnesota Department of Natural Resources (DNR). Additional guidance and authority were provided by the Minnesota Legislature and Governor (Laws of 2000, Chapter 463).

The ecology of wolves and their relationships to humans have been more studied in Minnesota than anywhere else in the world.  We know much about their distribution, numbers, prey relationships, social organization, reproduction, and survival.  In general, wolf numbers are highest where prey is abundant and human-caused mortality is low.  We also know that humans hold a wide range of values related to wolves.  During the past 30 years, legal protection of wolves and management for a healthy prey base have contributed to a threefold increase in wolf numbers in Minnesota.   Wolves have been protected under Federal endangered species laws since 1974, and primary management authority since that time has resided with the United States Fish and Wildlife Service (USFWS).  With wolf numbers quickly increasing in Wisconsin and Michigan in recent years, the wolf in the western Great Lakes region now meets established criteria for removal from the federal listing of threatened and endangered species.

When management authority reverts to the states, DNR, in cooperation with the Minnesota Department of Agriculture (MNDA) and the United States Department of Agriculture (USDA) Wildlife Services, proposes to keep in place some current wolf management activities, and to enhance or add others.

DNR will conduct or facilitate the following management activities and programs:

<u>Population Monitoring</u>
- • employ and enhance the currently used methodologies to assess wolf population numbers, distribution and demography
- • encourage and conduct telemetry monitoring of wolves in selected areas
- • monitor aspects of wolf health and diseases

<u>Population Management</u>
- • wolf populations in Minnesota will be allowed to continue to expand, with a minimum population goal of 1,600
- • no general public taking of wolves will be proposed for the first 5 years following federal delisting

Public Safety
- harassment of wolves to discourage contact with humans will be allowed
- killing of wolves in defense of human life will continue to be allowed

Wolf Damage Management

An integrated wildlife damage management program that combines animal husbandry considerations, cost-effective nonlethal deterrents, lethal wolf removal, and compensation payments to owners of livestock and dogs will be developed, and include the following activities:
- the current USDA Wildlife Services wolf damage control program will be continued, under a new cooperative agreement
- State certified predator controllers will provide additional wolf damage control
- two wolf depredation management zones (Zone A and Zone B) are created, with different depredation control procedures
- Zone A comprises approximately 30,000 square miles in northeastern Minnesota; Zone B is the remainder of the state

- in Zone A (Northeastern Minnesota)
    - state administered wolf control by certified predator controllers will be limited to cases of verified losses, conducted within a one-mile radius of the depredation site, and limited to 60 days in duration
    - owners of livestock, guard animals, or domestic animals, and the owner's agents, may shoot or destroy wolves that pose an immediate threat to their animals, under certain conditions
    - owners of domestic pets may shoot or destroy wolves that pose an immediate threat to their animals, under certain conditions

- in Zone B (remainder of Minnesota)
    - state administered wolf control by certified predator controllers will be limited to cases of verified losses within the previous five years, and conducted within a one-mile radius of the depredation site
    - owners of livestock, domestic animals, or pets may shoot wolves to protect their animals, on land owned or leased by the owner, under certain conditions.  Additionally, owners of livestock, domestic animals, or pets may employ a State certified predator controller to trap wolves to protect their animals on and within one mile of land owned or leased by the owner

- a handbook for wolf depredation will be produced; investigating agents and predator controllers will be trained and certified
- a central public telephone contact for wolf depredation assistance will be created
- a database of all reported depredation losses will be created
- the use of Best Management Practices (BMPs) by livestock owners will be encouraged
- the harassment of wolves will be allowed under certain conditions, to discourage interaction between wolves and humans, livestock, or pets

- compensation for livestock losses will be increased to full market value, effective July 1, 2001

Habitat management
- Wolf habitat components, including wolf prey (deer and moose) and the vegetation and other environmental variables they depend upon will be monitored and managed
- human-caused wolf mortality and connectivity of wolf populations will be monitored

Enforcement
- illegal wolf taking is a gross misdemeanor, punishable by fines up to $3,000 and imprisonment in the county jail for up to one year
- the restitution value for illegally taken wolves is $2,000
- the release of captive wolves (except by permit) or wolf-dog hybrids is prohibited
- activities necessary to enforce wolf laws and regulations will be initiated and increased

Information and education
- timely and accurate information about wolves and wolf management will be available to the public in written, visual, and electronic formats
- wolf education programs and activities conducted by private organizations will be supported and facilitated
- timely news releases about wolves and wolf management will be prepared
- responsible wolf ecotourism will be supported as an important form of public education
- periodic knowledge and attitude surveys (5 years) of Minnesota citizens living both inside and outside wolf range may be conducted, because public attitudes directly impact wolf management

Research
- wolf research will be encouraged, coordinated, supported, and initiated when necessary
- primary research topics will include wolf population assessment, wolf-livestock interactions, and wolf-prey interactions

Staffing
- a wolf specialist position will be created, to provide overall coordination of wolf management activities
- a wolf research biologist position will be created, to coordinate and conduct wolf research and population monitoring
- three conservation officer positions will be created, to ensure that wolf laws and regulations are enforced, and depredation responsibilities are handled in a timely manner

000292A

# Table of Contents

**INTRODUCTION**                                                              9

    Plan goal                                             9
    Plan development                                      9
        Public information meetings   9
        Wolf Management Roundtable    10
        Legislation                   10
        Wolf Management Plan          10

**BIOLOGY AND HISTORY OF WOLVES IN MINNESOTA**                                10

    General knowledge and research                        10
    Biology                                               11
        Distribution and relations with other wolves and carnivores   11
        Prey relationships            11
        Social organization           12
        Territoriality                12
        Dispersal and reproduction    12
        Survival                      12
        Density                       13
    Interactions with humans                              13
        Values                        13
        Attitudes                     14
    Legal and conservation status                         14
        Federal                       14
        State                         14
        Tribal                        15
        Recovery criteria             15
    Density and distribution                              15
        Through the 1970s             15
        1988-89                       16
        1990s                         16
        Wisconsin and Michigan        16
    Management activities                                 16
        Monitoring                    16
        Depredation control           17
        Compensation payments         17
        Enforcement                   17

000293A

**Table of Contents, continued**

**FUTURE WOLF MANAGEMENT IN MINNESOTA**                         17

    Authority                                                        17
        Federal and State                                        18
        Tribal management                                        19
        Other government and private land management             19
    Population monitoring                                             19
        Assessment of wolf numbers and distribution              19
        Annual indices                                           19
        Radio-telemetry                                          19
        Population modeling                                       19
        Health                                                   20
    Population management                                             20
        Population goal                                           20
        Distribution                                             20
        Population management activities                          21
    Public Safety                                                    21
    Depredation management                                           21
        Administration                                           21
        Approach                                                 22
        Zones                                                    22
        State wolf control activities                            23
        Private wolf depredation control activities               23
        Best Management Practices                                24
        Compensation                                             24
    Habitat management                                               25
        Prey                                                     25
        Potential disturbance at den and rendezvous sites        26
        Subpopulation connectivity                               27
    Human-caused mortality                                           28
        Accidental mortality                                     28
        Illegal mortality                                        28
        Legal mortality                                          29
    Law enforcement                                                  29
        Administration and funding                               29
        Penalties                                                30
        Captive wolves and wolf-dog hybrids                      30

000294A

**Table of Contents, continued**

Public Education and Attitudes                                      30
    Program and material development              30
    Collaboration with other organizations        30
    Public and media relations                    31
    Ecotourism                                    31
    Assessment of public attitudes                31
Research                                                           31
    Population assessment                         31
    Livestock interactions                        32
    Prey interactions                             32
    Disease monitoring                            32
Program administration                                             32
    Personnel                                     32
    Funding                                       33
    Interagency cooperation                       33
    Volunteers                                    33
Plan monitoring and review                                         33

**SELECTED REFERENCES**                                            34

**APPENDICES**

I.    Wolf Management Legislation: Chapter 463, Laws of 2000
II.   Wolf Management Plan Budget: October 2000 Report to the Legislature
III.  Wolf Management Zones Map
IV.  Wolf Range Expansion 1978 to 1998
V.   1998 Wolf Management Roundtable Recommendations
VI.  Wolf Population Survey 1997-98
VII. Predator Control Statutes and Rules
VIII. Livestock Best Management Practices
IX.   Livestock Compensation Statutes

000295A

## INTRODUCTION

Since the eastern subspecies of the timber wolf, *Canis lupus*, (now referred to as the gray wolf, and in this plan, simply "wolf") was given full protection in 1974 by the Endangered Species Act of 1973 (ESA), the federal government and states in the western Great Lakes region have managed wolves with the primary objectives of enhancing populations in Minnesota and re-establishing viable populations in Wisconsin and Michigan.  The ultimate goal of such management was to exceed the population guidelines set forth in the 1992 federal Recovery Plan for the Eastern Timber Wolf, and have the subspecies removed from the federal list of endangered and threatened species because of its successful recovery.

**Plan goal**

In 1998, the Minnesota Department of Natural Resources (DNR) adopted the following position statement on wolf management goals in Minnesota:

> ***The Minnesota Department of Natural Resources is committed to ensuring the long-term survival of the wolf in Minnesota, and also to resolving conflicts between wolves and humans.***

For delisting (the removal of wolves from the federal list) to occur, each state not only needs to demonstrate that the biological requirements of wolf recovery have been met, but also must demonstrate future management plans for wolves that assure their continuing survival. After delisting, most legal responsibility for management will reside with state and tribal authorities.

**Plan development**

DNR conducted an extensive public involvement process, funded in large part by an appropriation approved by the Legislative Commission on Minnesota Resources (LCMR).

Public information meetings -- DNR held 12 public information meetings throughout the state in January 1998 to present an overview of the wolf management planning process, to answer questions about wolves and wolf management, and to seek public comments on management issues. Attendees were provided with two informational handouts and encouraged to complete a public comment sheet.  An estimated 3,275 people attended the meetings, and about half (1,572) submitted comment sheets at the meetings. Comments were tabulated by meeting place and in aggregate for future use.

000296A

Wolf Management Roundtable -- DNR convened a Minnesota wolf management roundtable (Roundtable) composed of representatives of environmental, agricultural, hunting, trapping, and wolf advocate organizations; government agencies; and private citizens who had specific interest in wolf management issues in Minnesota. The purpose of the Roundtable was to provide guidance to DNR in developing a wolf management plan for Minnesota by deriving consensus recommendations on wolf management plan options, with particular emphasis on the controversial aspects of wolf management. At the first meeting of the Roundtable in April 1998, Commissioner Rod Sando committed DNR to endorsing all Roundtable consensus recommendations, as long as the survival of the wolf in Minnesota would be assured and the recommendations were biologically sound. Seven meetings were held, and the consensus-based decision-making process was facilitated by Roger Williams, Director of the Office of Dispute Resolution of the Minnesota Bureau of Mediation Services. On 28 August 1998, the Roundtable completed deliberations and came to consensus on a wide range of wolf management issues (Appendix V.).

Legislation -- In 1999, DNR drafted a wolf management bill, consistent with the Roundtable recommendations. The 1999 Minnesota Legislature considered significant amendments to the bill, but ultimately did not pass any wolf management legislation. In 2000, DNR drafted a revised bill, still incorporating many Roundtable recommendations, but modified to reflect issues raised by legislators the previous year. The 2000 Minnesota Legislature passed a wolf management bill, which was signed into law by Jesse Ventura, Governor of Minnesota (see Appendix I, Chapter 463, Laws of 2000).

Wolf Management Plan -- As authorized by Section 16, Chapter 463, Laws of 2000, DNR prepared this plan, in consultation with the Minnesota Department of Agriculture (MNDA), consistent with all provisions of state law, and incorporating many Roundtable consensus recommendations. DNR professional staff and advisors fully considered various biological, sociological, and economic data, reports, and experience in preparing this plan.

## BIOLOGY AND HISTORY OF WOLVES IN MINNESOTA

### General knowledge and research

Worldwide, wolves have been scientifically studied more than any other carnivore species, resulting in a comprehensive understanding of their ecology and relationship to

humans.  Minnesota's wolves have been the subject of more scientific investigations than any other regional group of wolves, worldwide.  The first scientific study of wolves carried out in Minnesota was reported on 60 years ago by Sigurd Olson, and researchers still actively study wolves in a variety of areas of the state today.  The result of these efforts has been a voluminous literature that comprises much that we know about wolves and their relationships with the environment and with humans.  There are many papers and books that could be individually cited in a review of wolf biology and history in Minnesota, but for clarity and brevity, the following summary has been excerpted from compilations in a few pertinent publications, including a review and estimate of wolf distribution and numbers in Minnesota by Dr. Todd K. Fuller et. al. in 1992, the federal Eastern Timber Wolf Recovery Plan published in 1978 and revised in 1992, and a set of guidelines for wolf management in the Great Lakes region by Dr. Todd K. Fuller in 1997.

**Biology**

Distribution and relations with other wolves and carnivores -- Before settlement by Europeans, wolves inhabited all of Minnesota, from the southern prairies to the northern forests.  The Minnesota subspecies was formerly known as the eastern timber wolf (*C. l. lycaon*) but is now considered to be the buffalo wolf (*C. l. nubilus*).  To the human inhabitants of the region, all wolves looked and behaved rather similarly, and at present all wolves in Minnesota are considered a single subspecies by scientists.  There is genetic evidence that a few wolves bred with coyotes (*Canis latrans*) during the past century when wolf numbers were low and coyotes expanded their range into and through Minnesota, but the biological consequences of such interbreeding cannot be detected.  In general, wolves displace coyotes, but are tolerant of red fox.

Prey relationships -- Historically, wolves preyed on large hoofed mammals (ungulates) in Minnesota, such as white-tailed deer (*Odocoileus virginianus*), elk (*Cervus elaphus*), woodland caribou (*Rangifer tarandus*), moose (*Alces alces*), and bison (*Bison bison*) wherever they occurred.   Wolves are not habitat specialists; they can live anywhere prey is sufficiently abundant because they can kill the largest of ungulates and supplement their diet with a variety of smaller animals, such as snowshoe hares (*Lepus americanus*) and beavers (*Castor canadensis*).  Wolves most often kill very young ungulates and very old ungulates because they are the most inexperienced and debilitated, respectively, in the

population, and thus the easiest to capture.  Under unusual circumstances, such as extremely deep snow late in the winter, wolves may kill many more ungulates than they can eat, but usually wolves must constantly hunt to sustain themselves.

Social organization -- As in other areas of the northern hemisphere where they occur, most wolves in Minnesota live in family groups called packs.  These packs are composed of a breeding pair and their offspring of one or more years, and sometimes one or more nonrelated wolves.  A pair of wolves can be considered a pack, and some packs number 15 or more. The average pack in Minnesota consists of 5-6 wolves.  Throughout their lifetimes, wolves may also live on their own for some time, especially when they disperse from their natal pack and look for their own area in which to settle.  At any one time, the proportion of the wolf population consisting of lone wolves averages 10-15 percent, varying with the time of year and other factors.

Territoriality -- Wolf packs in Minnesota and elsewhere live in territories that are home ranges defended constantly against intrusion by other packs.  On a rangewide basis, territories comprise a mosaic of wolf packs with few uninhabited areas in between.  Territories may be as small as 25 square miles or as large as 200 square miles, depending on pack size and the density of ungulates (i.e., amount of food available).  Boundaries of territories sometimes are obvious topographical features such as lakes or rivers, but most often they are indiscernible to humans.  Boundaries usually are quite stable from year to year, except when pack composition changes substantially.

Dispersal and reproduction -- Wolves usually leave their packs when they are yearlings to seek a mate and establish their own territory and pack.  This dispersal often occurs during autumn and, if successful in pairing, results in breeding in February and pups born in April.  In most packs, only one female gives birth and litter sizes usually range from 4 to 7 pups.  All pack members contribute to raising pups during the summer, whether the pups are at dens or at resting areas called "rendezvous sites."  By autumn, pups have grown to nearly adult size and begin traveling with other pack members.

Survival -- Unless food is very abundant, up to one-half of wolf pups die before they reach 6 months of age.  Starvation is thought to be the major cause of death of pups, but diseases that particularly affect pups also are important.  Mortality of adults also is relatively high.  In a wolf population that remains at the same level from one year to the

next, about 35 percent of adult wolves die each year.  The most common natural causes of mortality to both pups and adults are starvation and intraspecific strife (i.e., wolves killing other wolves).  This happens when food is scarce and when wolves must "trespass" into adjacent wolves' territories to hunt.  Resident wolves defend their territory and food supply, and often the result is the death of one or more members of both packs.  Infrequently, disease may also be an important adult wolf mortality factor.  Wolf survival in Minnesota is not affected by competition with black bears (*Ursus americanus*) or coyotes.  Infrequently, motor vehicles or trains accidentally hit and kill wolves.  Wolves are also deliberately (illegally) killed by humans, but the frequency of these illegal actions is unknown.  In addition, about 150 wolves are killed each year by Federal depredation control activities.

Density -- A review of many wolf studies in North America indicates that wolf abundance is directly related to prey abundance.  When prey is relatively abundant, litter sizes are larger and pup survival is greater.  Under the best circumstances, wolf populations can increase 30-40 percent per year.  Conversely, when prey is scarce, litters are smaller and pup survival is lower.  The result is a sort of shifting balance between wolves and their food supply.  However, the density of wolves is also influenced by mortality.  High mortality rates, such as from disease or killing by humans, might reduce wolf numbers even though prey is relatively abundant.   Also, wolf numbers might be relatively low in areas of high prey abundance that wolves are just beginning to colonize, or relatively high in areas where ungulate density is declining due to some other factor, such as severe winter weather.   These differences in actual versus expected density are the result of  "time lags," or the time needed for wolf populations to adjust to the food supply.  In any one year, the ratio of wolves to ungulates may vary, but over a period of years with relatively stable ungulate populations there is the strong likelihood of a predictable ratio between wolf and prey abundance, albeit with wide variance.

**Interactions with humans**

Values --  Wolves have always played a prominent role in Native American culture and spirituality.  In general, wolves were revered by American Indians, who made no efforts to control wolf populations or eliminate them from the landscape.  However, American Indians did kill some wolves, usually for fur and cultural reasons.  Similarly,

000300A

early European fur traders seemed indifferent to wolves because they neither posed a threat to their livelihood nor were considered valuable furbearers.  Conversely, European settlers definitely did not value wolves and already had a long history of persecuting them in their homelands.  In Minnesota, the bounty system for wolves started in 1849 and continued through 1965.  Settlers not only had a mostly unfounded fear of wolves, but knew that wolves killed livestock and competed with humans for wild ungulates.  Culturally, wolves had little or no value to European settlers and were viewed as a species to be eliminated. Over time, some economic value of wolf pelts accrued, but there was no widely accepted protection or conservation of wolves in Minnesota prior to the 1960s.

Attitudes --  Public attitudes began to change significantly with the "environmental revolution" in the 1960s, and by 1966 the first federal Endangered Species Act was passed. Subsequently, wolf research and protection efforts increased substantially, as did educational efforts on behalf of the wolf.  Wolves remained a species to be eliminated in the eyes of some, but gradually more people became concerned about wolves and their long-term survival in Minnesota.

**Legal and conservation status**

Federal --  The federal Endangered Species Preservation Act of 1966 provided wolves limited protection, but only on federal lands.  In 1970 the Superior National Forest was closed by supervisory decree to the taking of wolves.  In 1974 the federal Endangered Species Act of 1973 legally protected all wolves in the lower 48 states as an endangered species.  Beginning in 1975, wolves depredating on livestock were captured and relocated elsewhere in extreme northern Minnesota by United States Fish and Wildlife Service (USFWS) trappers.   In 1978 an Eastern Timber Wolf Recovery Plan was published that called for wolf management zones, the re-establishment of wolves elsewhere, and reclassification of wolves in Minnesota.  Wolves in Minnesota were federally reclassified as threatened in 1978, thus allowing government trappers to kill depredating wolves under a set of strict guidelines.  In 1986 authority for federal wolf control efforts passed from USFWS to USDA Animal Damage Control (now Wildlife Services).   Under federal law, disposal of gray wolf parts and hides is by federal permit.

State -- Wolves were unprotected in Minnesota prior to the federal ESA and could be taken by public hunting and trapping.  In addition to the state bounty, Minnesota had for

a number of years an ongoing government wolf control program, including aerial shooting, which ended in 1956.  The last bounties on wolves were paid in 1965.  From 1965 through 1973, some wolves were killed for fur, while depredating wolves were killed from 1969 through1973 under a state directed predator control program.  Under State endangered species laws, wolves were listed by Minnesota as a threatened species in 1984, and were removed from the state list in 1996 because their populations had met recovery criteria.  In 1978, Minnesota created a compensation program administered by the Minnesota Department of Agriculture (MNDA) to pay livestock owners for wolf caused losses.

Tribal --  American Indian tribes in Minnesota are sovereign governments that by various treaties retain certain rights to regulate natural resources used by their members on tribal and public lands on reservations, and in some cases, on public lands in ceded territories.  Tribal governments also have the authority to dispose of gray wolf parts and hides taken under their authorities as they see fit, including use for religious and ceremonial purposes.

Recovery criteria --  In 1992 a revised federal recovery plan (1992 Recovery Plan) identified specific criteria for delisting wolves in Minnesota and adjacent states.  These included a Minnesota wolf population goal of 1,251-1,400 by the year 2000, a combined Wisconsin-Michigan population of greater than 100 for 5 consecutive years, and management programs in each state that would ensure the continued survival of wolves in the future.

**Density and Distribution**

Through the 1970s -- Wolf distribution and abundance have changed significantly in Minnesota over the past 150 years, as a consequence of changes in the human population composition, public attitudes, and legal status afforded wolves.  Wolves once occurred throughout the state, but by 1900 wolves were rare in southern and western Minnesota.  Wolf range continued to decrease, and by the 1940s the highest densities remained in remote areas of the northern third of the state, adjacent to and contiguous with the much larger wolf population in Canada.  During the early 1950s, wolves still occurred almost exclusively in 12,000 square miles of the northern and northeastern part of the state and numbered 450-700.  By the mid-1960s wolves might have numbered 350-700, and by 1970 numbers were estimated at 750 and their range probably covered almost 15,000 square

000302A

miles.  As a result of federal and state protection and increasing deer numbers, wolves numbered 1,000-1,250 by the late 1970s, and had increased at an average annual rate of about 5 percent per year.

1988-89 --  During the winter of 1988-89, the state conducted a comprehensive assessment of wolf distribution and abundance.  Federal, state, and county natural resources professionals, all familiar with wolves and wolf sign, were asked to record winter wolf observations.  This information (1,244 observations) was combined with other distribution data, such as location of wolf depredation activities and radioed research packs, to estimate total occupied wolf range in the state (20,500 square miles), which indicated a range expanding south and west.  The resulting population estimate of 1,500-1,750 wolves was well above the federal recovery plan goal.  Overall, wolf numbers had continued to increase at a rate of about 3 percent per year, and wolf range had also increased.

1990s --  During the 1990s, sightings, reports, DNR annual scent station surveys, and federal depredation trapping activities all indicated that wolves were continuing to expand their distribution and thus their abundance.  Given these observations and assuming that the continuing rate of wolf population increase was similar to that observed during the 1970s and 1980s, DNR estimated that there could have been 2,000-2,200 wolves in Minnesota in 1994.  During winter 1997-98, an effort similar to but expanded from the 1988-89 survey was made to document wolf distribution and estimate total numbers.  From more than 3,300 observations, DNR estimated that in winter 1997-98, 2,450 wolves ranged over approximately 33,970 square miles in Minnesota.

Wisconsin and Michigan --  In Wisconsin and the Upper Peninsula of Michigan the wolf population has also expanded, but at an even faster rate because of abundant prey and few wolves.  In the early 1970s, there were no more than six wolves in Michigan, and one pack in Wisconsin.  By 1994 wolves numbered 57 in each state, and by 1997 Wisconsin had 148 wolves (37% increase/year) and the Upper Peninsula of Michigan had 112 (25% increase/year).  By 1999-2000, Wisconsin had about 250 wolves and Michigan had 216. By 1999, both states had prepared wolf management plans.

**Management activities**

Monitoring --  Comprehensive monitoring of wolf numbers and distribution in Minnesota has been carried out by DNR at approximately 10-year intervals, and other

000303A

population surveys and depredation trapping have provided indications of annual
population trends.  In addition, state and federally funded research projects that estimate
wolf population trends and dynamics on specific study areas have been conducted for 2-30
year periods for the past 30 years.  These studies, all of which include monitoring of
numerous radio collared individuals, have occurred in all portions of wolf range in
Minnesota, and some continue today.  DNR also carries out annual evaluations of deer and
moose populations.  Ungulates are managed on a regional basis to ensure sustainable
harvests for hunters, sufficient numbers for aesthetic and nonconsumptive use, and to
minimize damage to natural communities and conflicts with humans such as depredation of
agricultural crops.

Depredation control -- Since 1986, control of depredating wolves has been the
responsibility of the USDA Wildlife Services wolf depredation program headquartered in
Grand Rapids.  During 1993-1999, that program was responsible for investigating 159-249
complaints annually, and killing an average of 153 depredating wolves each year, many of
which were utilized for scientific and educational purposes.  The annual budget for the
federal depredation program is approximately $250,000 per year.

Compensation payments -- Assessment of livestock losses and eligibility for
payment of compensation are a cooperative effort between USDA Wildlife Services, DNR
Division of Enforcement, MNDA, and county extension agents.  Compensation payments
made by the MNDA ranged from $31,000 to $67,000 each year during 1993-1998.

Enforcement -- Because wolves are protected under federal, state, and tribal laws,
enforcement of statutes prohibiting the illegal killing or harassment of wolves is the
responsibility of the enforcement staff of USFWS, DNR, and tribal natural resource
departments.


**FUTURE WOLF MANAGEMENT IN MINNESOTA**

The goal of this management plan is to ensure the long-term survival of wolves in
Minnesota while also adequately addressing the wolf-human conflicts that inevitably result
when wolves and people live in the same vicinity.  To achieve this goal DNR, in
cooperation with MNDA and USDA Wildlife Services, proposes to keep in place some
current wolf management activities, and to enhance or add others.   In particular, the plan

000304A

addresses wolf conservation concerns in the areas of population monitoring and management, depredation management, habitat management, law enforcement, public information and education, research, and program administration.

**Authority**

Federal and State -- Many aspects of this plan are superseded by federal laws, until the wolf is delisted from the ESA. When delisting occurs, all federally superseded state laws existing at that time will be immediately effective, and all federal wolf regulations eliminated. However, after delisting USFWS will continue to monitor the status of wolves in Minnesota for a period of 5 years to ensure that recovery goals are maintained. Should Minnesota or any state manage wolves in a manner that results in population declines below the 1992 Recovery Plan goals, USFWS has authority to immediately re-list the species. The 1992 Recovery Plan also requires USFWS to determine that the survival of the wolf in Minnesota is assured, before making a delisting decision. For these reasons, it is desirable for Minnesota to have a wolf management plan with legislatively authorized implementation provisions prior to federal delisting.

DNR authority to manage wolves is governed by the Minnesota Legislature through statutes. The 2000 Minnesota Legislature passed a wolf management bill, which was signed into law by the Governor (Laws of 2000, Chapter 463; see Appendix I.). These new laws, in conjunction with existing Minnesota Game and Fish Laws, authorize and constrain wolf management activities, and this management plan is consistent with those statutes.

Tribal management -- Various tribal authorities autonomously manage their wildlife and other resources on tribal lands in Minnesota. Current wolf range in Minnesota encompasses the Mille Lacs, Leech Lake, White Earth, Red Lake, Fond du Lac, Bois Forte, and Grand Portage Indian reservations. On reservation lands, tribal conservation codes may supersede state laws, and other provisions of this state wolf management plan. In addition, tribal conservation codes in force in both the 1837 and 1854 Ceded Territories may differ from state regulations. There are other tribes outside of the area that the State manages for wolves that may also be affected by this management plan. DNR will consult with individual tribes on a government-to-government basis through their designated agencies, including tribal governments, the Great Lakes Indian Fish and Wildlife

Commission, and the 1854 Authority, regarding wolf management, through agreed upon processes including those stipulated to and approved by the Courts.

Other government and private land management --   Authorizations of individuals to kill wolves under state law are, of course, subject to other laws and regulations, including trespass on private property; local firearm discharge ordinances; state, federal, and local park regulations; etc.

**Population monitoring**

Assessment of wolf numbers and distribution --  DNR will continue and enhance current methodologies to periodically assess wolf population abundance and distribution (see Appendix VI.).  In the past, these statewide population assessments have been conducted approximately every 10 years (1978-79, 1988-89, 1997-98).  The next comprehensive statewide estimates of wolf distribution and numbers will be scheduled and completed in the first and the fifth years following federal delisting.  Subsequently, statewide estimates of wolf distribution and numbers will be scheduled at 5 year intervals.

Annual indices --  Annual changes in wolf distribution and abundance will be monitored by means of currently used indicators such as wolf depredation complaints, autumn scent station surveys, winter furbearer track surveys, and other observations of field personnel from all natural resources agencies.  Such trend indicators likely will not identify small population changes or changes in specific areas, but an accumulation of evidence from multiple sources and/or multiple years should provide indications of overall wolf population trends between statewide population assessments.

Radio-telemetry -- Continuing area-specific telemetry monitoring of wolves will be encouraged.  Emphasis will be placed on areas of wolf population concern, such as newly colonized regions and areas where conflicts with humans are likely.  Such monitoring might be carried out directly by DNR, but also by other agencies or university scientists. The use of technological advancements such as satellite telemetry will be encouraged. Permits to conduct such research are authorized by DNR and as such have specific reporting criteria to ensure that the monitoring is helping to fulfill wolf management and conservation objectives.

Population modeling -- DNR will investigate and develop the use of computer modeling to predict wolf population trends.  Modeling may be a useful tool in predicting

impacts of management prescriptions on long-term wolf distribution and numbers in Minnesota.

Health -- Monitoring the health of wolves necessarily includes consideration of the effects of infectious diseases and parasites. Examples of health monitoring include collection and analysis of biological samples from live-captured wolves, analysis of wolf scats, and necropsies of dead wolves. Regular collection of pertinent tissues of live-captured or dead wolves will be initiated, and periodic assessments of wolf health will be carried out under authorization of DNR, when circumstances indicate that diseases or parasites may be adversely affecting portions of the wolf population.

**Population management**

Population goal -- Wolves in Minnesota will continue to be allowed to naturally expand their range in the state. To assure the continued survival of the wolf in Minnesota, the minimum statewide winter population goal is 1,600 wolves. There is no maximum goal. If the population falls under this minimum, DNR will take appropriate management actions to address the cause of the reduction and assure recovery to the minimum level in the shortest possible time. The 1992 Recovery Plan identified specific wolf management zones with differing population goals within Minnesota. Although this state plan identifies two zones, with different depredation management approaches (see **Depredation management** below), it does not prescribe population sub-goals for each zone. Zone A is identical to the 1992 Recovery Plan zones 1-4, which had an aggregate recovery population goal of 1,251-1,400 wolves. Zone B is identical to the 1992 Recovery Plan zone 5, which had a recovery population goal of zero wolves. Consequently, the state's ongoing wolf population goal of 1,600 minimum, statewide, substantially exceeds the 1992 Recovery Plan population goals in aggregate, and will likely exceed those goals in all 5 individual federal zones.

Distribution -- No general public taking of wolves is authorized by this plan within the first 5 years of implementation (see **Population management activities** below). The killing of depredating wolves will continue to be allowed at depredation sites, and in Zone B potentially depredating wolves may also be killed (see **Depredation management** below). Thus, wolves will continue to be protected on all public lands, but can be removed from private land (and in some cases, small areas of immediately adjacent public land).

Because of the way in which public and private lands are distributed in Minnesota, a natural system of "zones" will continue to develop, as it has in the past.  Where wolves are not in conflict with humans, they will be left alone; where they are in conflict with humans, problem wolves will be removed.  The effects of depredation-related mortality are not expected to change the current distribution of wolves in Minnesota.

Population management activities -- Population management measures, including public taking (i.e., hunting and trapping seasons) or other options, will be considered by DNR in the future but not sooner than 5 years after Federal delisting by USFWS.  If, in the future, public taking is proposed by DNR, there will be opportunity for full public comment.  Decisions on public taking will be based on sound biological data, including comprehensive population surveys.

**Public Safety**

No documented cases of wolves attacking and injuring people have occurred in Minnesota.  Nevertheless, many people are sincerely concerned about the threat of wolves to human safety, citing recent documented attacks of wolves on people in Ontario, Canada, and in India, and observations in Minnesota of bolder behavior of wolves around human habitations since full protection was provided by ESA.  In consideration of these safety concerns, private citizens are authorized  to take a wolf in defense of the person's own life or the life of another.  A person who takes a wolf in defense of human life must protect all evidence, and report the taking to a DNR Conservation Officer within 48 hours (see Appendix I.).

**Depredation management**

Administration -- DNR will assume administrative responsibility for an integrated wolf depredation management program, in consultation and cooperation with the MNDA and USDA Wildlife Services.  DNR's Wolf Specialist will assume primary responsibility for developing and coordinating wolf depredation management activities.  In addition, 3 DNR Conservation Officers, stationed within wolf range, will coordinate and conduct the depredation responsibilities of the DNR Division of Enforcement.  DNR may delegate some administrative responsibilities to USDA Wildlife Services, subject to terms of a future cooperative agreement.  DNR will establish a central public telephone contact for wolf depredation assistance.

000308A

Approach -- DNR will use an integrated wildlife damage management approach to reduce animal losses to wolves, similar to that currently used by the USDA Wildlife Services wolf depredation program. Because USDA Wildlife Services has extensive experience, success, and credibility in managing wolf depredation in Minnesota, DNR will develop a cooperative agreement with USDA Wildlife Services to continue and expand on that basic approach. Goals of the agreement will include continuation of current wolf depredation management programs, development and integration of new State wolf depredation control procedures, creation of a wolf depredation handbook, training of predator controllers and investigating agents, coordination with MNDA to provide information and education to livestock owners, and transfer of some recordkeeping and administrative tasks to USDA Wildlife Services.

Zones -- For purposes of wolf protection and effective depredation management, two wolf management zones are created in Minnesota. In Zone A (Northeastern Minnesota), the killing of depredating wolves is limited to situations of immediate threat, and immediately following verified losses of livestock, domestic animals, or pets. Zone A is identical to Federal wolf recovery zones 1-4, and includes the current primary wolf range in Minnesota. Because livestock, domestic animals and pets are present in this zone, depredation procedures are needed. However, they are limited to circumstances of immediate threat and verified losses. These constraints will likely result in no significant increase of depredating wolves killed, as they provide a level of wolf protection similar to previous ESA depredation management.

In Zone B, the killing of depredating wolves is allowed for the purpose of protecting livestock, domestic animals, or pets. Documentation of immediate threat or a verified loss is not required, but the killing of wolves is limited to land owned, leased or managed by the domestic animal owner or, by employing the services of a State certified predator controller, to a one-mile radius from that land. Zone B is identical to Federal recovery zone 5, in which elimination of wolves was recommended in the 1992 Recovery Plan. Because livestock, domestic animals, and pets are present in this zone in larger numbers and distribution than in Zone A, and because Zone B is not essential to wolf recovery in Minnesota, preventive depredation procedures will encourage greater private landowner tolerance of the general presence of wolves, without jeopardizing the long-term

000309A

survival of wolves in the state.  Although these depredation procedures will likely result in
a larger number of  wolves killed, as compared to previous ESA management, they will not
result in the elimination of wolves from Zone B.

State wolf depredation control activities  -- In Zone A, if DNR verifies that
livestock, domestic animals, or pets were destroyed by a wolf, and the owner requests wolf
control, a predator control area will be opened for up to 60 days.  The control area may not
exceed a one-mile radius surrounding the damage site.  Trained and certified predator
controllers, with permission of the owner and other landowners within the control area,
may take wolves subject to the provisions of MN Statutes 97B.671, related Rules, and
other restrictions DNR may impose (see Appendix VII).   Controllers must dispose of
unsalvageable wolf remains as directed by DNR, and surrender any salvageable wolf
remains to DNR.  Trained and certified predator controllers will be paid $150 for each wolf
killed.  With the exception of payment, any wolf control conducted by USDA Wildlife
Services personnel will be subject to these same regulations and restrictions.  In Zone B,
wolf control is subject to the same conditions and restrictions, with two exceptions.  Under
current Rule, a control zone may be opened for 30 days to 214 days, depending upon the
time of year.  Also, a control zone may be opened anytime within 5 years of a verified
depredation loss.  The effect of these different restrictions for Zone B is to allow preventive
and repetitive wolf depredation control, but only on sites with a verified damage history.

Private wolf depredation control activities -- Statewide, all persons are authorized to
harass wolves that are within 500 yards of people, buildings, dogs, livestock, or other
domestic pets or animals, to discourage wolves from contact or association with people and
their animals.  Harassment methods are not restricted, but cannot result in physical injury to
a wolf.   Additionally, owners (and the owners' agents) of livestock, guard animals, or
domestic animals may shoot or destroy wolves when they pose an immediate threat to such
animals, on lands owned, leased or occupied by the owners of such animals.  Immediate
threat is defined as the observed behavior of a wolf in the act of stalking, attacking, or
killing livestock, a guard animal, or a domestic pet under the supervision of the owner.  If a
wolf is not observed stalking or attacking, the presence of a wolf feeding on an already
dead animal whose death was not caused by wolves is not an immediate threat.   A person
who destroys a wolf under these circumstances must protect all evidence and report the

taking to a conservation officer as soon as practicable, but no later than 48 hours after the wolf is destroyed.  Similarly, an owner of a domestic pet may shoot or destroy a wolf that poses an immediate threat to a domestic pet under the supervision of the owner.  The owner is not restricted to lands owned or leased by the owner, but other restrictions apply (trespass, local ordinances, etc.)  The owner must protect all evidence, and report the taking to a conservation officer as soon as practicable but no later than 48 hours after the wolf is destroyed.

In Zone A, DNR will respond to all such reported takings by investigating and documenting the taking, confiscating any salvageable wolf remains, disposing of wolf remains by sale or donation for educational purposes, and compiling monthly reports.  In cases involving livestock and guard animals, DNR will notify the county extension agent, who may recommend to the owner cost-conscious measures to reduce depredation risks.  These recommendations must be consistent with the best management practices developed by MNDA.

The condition of immediate threat does not apply in Zone B.  A person may shoot a wolf on land owned, leased, or managed by the person at any time to protect the person's livestock, domestic animals, or pets.  Additionally, in Zone B a person may employ a State certified predator controller to trap a gray wolf on land owned, leased, or managed by the person or on land within one mile of the land owned, leased, or managed by the person to protect the person's livestock, domestic animals, or pets.  A person must report a wolf shot or trapped under these circumstances to a conservation officer as soon as practicable but no later than 48 hours after the wolf was shot or trapped.  DNR will determine the disposition of the wolf.

Best Management Practices -- Best Management Practices (BMPs) are agricultural management practices that may result in the reduction and prevention of livestock depredation by wolves and other predators.  MNDA has developed a guide to BMPs (see Appendix VIII.), and will continue to develop, update, and distribute this information to Minnesota livestock producers.

Compensation -- Compensation for livestock killed by wolves is provided under a program administered by MNDA (see Appendix IX.).  When wolf depredation is verified by an investigating agent, compensation is authorized.  Effective July 1, 2001, the amount

of compensation will be the fair market value for livestock lost, as determined by the commissioner of MNDA.

When livestock owners experience losses and apply for compensation, the following conditions apply:

1. A livestock owner will report the depredation claim to a Conservation Officer or county extension agent within 24 hours of discovery, and protect all associated evidence.

2. The investigating agent will determine if the loss was caused by gray wolves, taking into account factors in addition to a visual identification of a carcass, and make a recommendation to the commissioner of MNDA.  The investigating agent will record deficiencies, if any, in the owner's adoption of BMPs developed by MNDA.

3. The MNDA Commissioner shall evaluate the claim and investigating agent's report to determine if compensation is warranted.  MNDA will review the report for conformance with BMPs, and provide the owner with a list of any BMP deficiencies.

**Habitat management**

Good wolf habitat includes areas where ungulate prey is abundant, where human-related sources of mortality are low, and that are sufficiently large and connected to maintain existing populations and ensure the continued exchange of dispersing unrelated wolves.  Vegetation cover is significant only as it relates to these other factors because wolves are habitat generalists.  DNR will continue to identify and manage currently occupied and potential wolf habitat areas to benefit wolves and their prey on public and private land, in cooperation with landowners and other management agencies.

Prey -- In Minnesota, white-tailed deer are the primary prey for most wolves, though in some areas with few deer (e.g., the far northeastern part of the state), moose are the main prey.  Population and habitat management of deer and moose is primarily the responsibility of the DNR Division of Wildlife.  DNR will continue to maintain healthy populations of these species by regulating deer and moose harvest by hunters, estimating population numbers and reproductive success, monitoring and improving deer and moose habitat, and enforcing laws.  Deer and moose populations will continue to be managed in hunting management units that are based on habitat and environmental factors, land

ownership and use, and human attitudes.  Deer and moose population goals are designed to balance a variety of factors, including compatibility with habitats and ecosystems, sustainable harvests for hunters, deer observation and watching opportunities (aesthetics), and conflicts with humans such as vehicle accidents and crop depredation.  Populations that provide sustainable harvests for hunters must be large enough to withstand natural mortality sources and still provide a harvestable surplus.  Because wolf predation is one of several forms of natural mortality, any population capable of sustaining a hunting harvest will, by definition, also provide a healthy prey base for wolves.  Area-specific ungulate populations are assessed through models that incorporate all known factors influencing population dynamics.  Ungulate populations are managed by regulating hunting harvests and managing habitats.

Experience in Minnesota strongly suggests that, at the population level, wolves do not suppress deer numbers.  Recently, after the severe winters of 1995-96 and 1996-97, deer numbers in Minnesota's wolf range were reduced by 45-50 percent.  However, deer harvest management changes resulted in a quick recovery to former deer population levels, despite high wolf numbers.  Considering these recent events, it appears unlikely that wolves in Minnesota will suppress deer populations, unless an unprecedented combination of other factors were to cause a catastrophic deer population reduction.  For more than 20 years, Minnesota has successfully managed deer populations at levels that have provided increasing hunter harvests and ample prey for wolf recovery and persistence, despite variable winter conditions, highway collision losses, other predation, and other mortality factors.  DNR expects that continuation of current deer management prescriptions will fully accomplish the goal of managing the ecological impacts of wolves on Minnesota's deer population.

Potential disturbance at den and rendezvous sites -- Both the Wisconsin and Michigan wolf management plans recommend seasonally protecting, from timber harvesting and road or trail construction, a zone within 110-880 yards for wolf dens and rendezvous sites, depending on the regularity of use of the den and the wolf management zone in which it occurs.  The Superior and Chippewa national forests in Minnesota have similar recommendations.  In Wisconsin and Michigan, such protection is deemed warranted because of the small size (compared to Minnesota) and recovering nature of the

wolf populations in those two states, and because of the unknown but potential effects of human disturbance on pup survival.  However, Minnesota's much larger wolf population is not vulnerable to the minor losses these disturbances might cause.  In addition, wolves with pups in Minnesota and Wisconsin have been tolerant of nearby logging operations, moss harvesting work, military maneuvers, and road construction work.  Given these facts and the documented population growth and range expansion of wolves in Minnesota, no additional restrictions regarding rendezvous or den sites are planned.

Subpopulation connectivity -- Areas need to be of sufficient size to support a minimum of one to several wolf packs if they are to be identified as viable wolf habitat.  However, for wolves to persist in these small areas for any length of time, they must be able to periodically "exchange" wolves with other subpopulations.  In Minnesota, most of the occupied wolf range is contiguous; that is, most packs occur adjacent to or very near other packs.  In addition, all wolves in Minnesota are connected with the much larger population inhabiting southern Canada.  However, wolf habitat in Wisconsin is more fragmented, and somewhat isolated from the contiguous source population in Minnesota.  The original source of Wisconsin's wolves was undoubtedly Minnesota, and continued exchange of wolves between the two states is desirable.  Currently, no barriers to wolf dispersal exist between Minnesota and Wisconsin. Recently, wolf dispersals have been documented south of the existing Federal Wolf Zone 4, including dispersals  into extreme southern Minnesota.  The dispersal corridor within Zone 4 contains large land areas in public ownership (the Nemadji and St. Croix State Forests) that are contiguous with large areas of county forest land in Douglas County, Wisconsin.  The area immediately south of Zone 4 includes the Chengwatana State Forest and St. Croix State Park.  Because of  the substantial habitat security of the public land base between the Twin Cities and Duluth, there are no current nor anticipated needs to further protect wolf dispersal corridors between Minnesota and Wisconsin.  However, in cooperation with the Wisconsin Department of Natural Resources, DNR assessments of the effects of future development will be incorporated into long-term viability analyses of wolf populations and dispersal in the interstate area.

**Human-caused mortality**

Wolf mortality due to human causes can be a major factor in either reducing wolf numbers or limiting population growth.  Some of this mortality is accidental, such as collisions with vehicles or trains.   Other human-caused mortality is purposeful, either legal (wolf depredation trapping) or illegal (intentional shooting or trapping).

Accidental mortality --  Accidental mortality is not expected to significantly affect wolf population dynamics in Minnesota.  Other than continued monitoring, efforts to reduce accidental mortality are unnecessary.

Illegal mortality --  Illegal wolf mortality results from a combination of opportunity and intent to violate the law.  As evidenced by substantial wolf range expansion and population increases, illegal human-caused mortality has not constrained Minnesota wolves at the population level.  However, illegal wolf mortality has the potential to impact local wolf numbers, especially where wolves are living in areas of high road density and human populations, where there is more potential for frequent human contact with wolves.  A combination of education efforts, regulations, and enforcement will be used to reduce illegal wolf mortality.  First, animosity toward wolves will be reduced by continuing to educate citizens about the effects of wolves on livestock, ungulates, and human activities.  Education programs and information distribution will be encouraged and supported by DNR.  Second, an effective wolf depredation management program that, with restrictions, empowers people to protect livestock and pets should improve tolerance for the presence of wolves and reduce motivation for illegal killing.  Third,  the opportunity to illegally kill wolves may be affected by the extent of road and trail access to state forests and other lands.  Motorized access into wolf habitat, and the level of human use of such access, has been shown to be a key factor in establishing and maintaining wolf populations.   In the recent past, wolf packs rarely lived in territories where road densities were greater than about one mile of road per square mile of land.  At such densities, it appeared that illegal killing of wolves exceeded a level at which wolf populations could sustain themselves.  During winter 1988-89, it appeared that most wolf packs in Minnesota were located in areas with road densities less than1.1 miles of roads per square mile of land, and human population densities less than 10 people per square mile; and in areas with road densities less than 0.8 miles of road per square mile of land, and human population densities less

than 21 people per square mile of land.   The most recent analysis (the 1997-98 state wolf distribution survey) indicates that most wolves still live in such areas, but also that many more wolves are living in areas with much higher road and human densities.  As more tolerant attitudes toward wolves increase and depredations by wolves are controlled, wolves can be expected to continue to expand their range into areas with more roads and humans.  Given the current status of wolves, reducing current levels of road access is not necessary to increase either wolf density or distribution.  However, in areas of sufficient size to sustain one or more wolf packs, land managers should be cautious about adding new road access that could exceed a density of one mile of road per square mile of land, without considering the potential effect on wolves.  Finally, increases in DNR enforcement time and activities related to wolves will enhance the enforcement of regulations protecting wolves and decrease illegal human-caused wolf mortality.

Legal mortality -- USDA Wildlife Services has killed about 150 wolves annually, in recent years, in verified depredation situations.  The number of wolves killed annually by depredation control is likely to increase, as wolves continue to expand their range into transitional forest-agriculture landscapes.  However, the number of wolves legally killed in depredation situations has not prevented wolf range expansion and population increases, because this mortality has been less than 10 percent of the wolf population.  Wolves have tremendous reproductive potential, and can withstand human caused mortality rates of 28-53 percent annually, and still maintain growing populations.  The removal of depredating wolves will not be limited by population management objectives, unless the total number of wolves killed annually rises to a level that causes a statewide population decline.

**Law enforcement**

Administration and funding --  Legal protection has been a key to increasing wolf numbers and distribution in Minnesota.  Due to a continuing increase in the workload of DNR Conservation Officers, and their assumption of primary responsibility for wolf regulations enforcement after delisting, increases in staff and resources needed to fully implement this plan were presented in a report to the Minnesota Legislature (see Appendix II.).  Additional tribal conservation officers should be cross-deputized to increase law enforcement capabilities concerning wolves.  Cooperation with federal law enforcement officials will continue.

000316A

Penalties -- Enforcement and penalties for the illegal taking (pursuing, shooting, killing, capturing, trapping, snaring, including attempting to take, and assisting another person in taking) of wolves are comparable to those for other game and nongame species. Restitution value is established at $2,000 per wolf. Illegal taking of wolves is a gross misdemeanor, with maximum penalties of a $3,000 fine and one year in the county jail.

Captive wolves and wolf-dog hybrids -- Wolves may be kept in captivity, provided they are legally obtained from licensed game farms or other authorized sources. In other situations where DNR permits are required, no permits will be issued for the purpose of keeping wolves as pets. The release of wolf-dog hybrids is prohibited, and the release of captive gray wolves requires a special permit from DNR.

**Public education and attitudes**

The dissemination of factual information about wolves, their interactions with their environment, and their interactions with humans is a key component of successful wolf conservation. Such education efforts have been undertaken in Minnesota by a variety of private organizations and individuals, as well as state and federal agencies. The degree to which this information is useful and worthwhile depends on its presentation, accuracy, and relevancy.

Program and material development -- The major goal of DNR wolf education efforts will be to assure that timely and accurate information about wolves and wolf management is available to the public. Current information on the history of the wolf and its management in Minnesota, wolf behavior and biology, the wolf as part of the ecosystem, wolf status, human-wolf coexistence, and strategies for dealing with problem wolves will be available to all Minnesotans, in multiple formats.

Collaboration with other organizations -- Many private, nonprofit organizations currently provide educational programs and materials about wolves. Foremost is the International Wolf Center, at Ely, MN (IWC), which is focused exclusively on wolf education. Rather than "reinventing the wheel," DNR will collaborate and cooperate with IWC and other organizations to achieve its wolf education goals. Collaboration will include providing data, reports, news releases, and other information for distribution by other organizations, and/or incorporation into their educational programming. Collaboration may also include financial and other resource sharing and partnerships.

Public and media relations -- DNR staff will provide access to and information about wolf management by meeting with the public, compiling reports, collecting data, issuing news releases, and preparing information packages for the public and the media.

Ecotourism – Ecotourism is a recent and expanding additional use of natural resources in Minnesota. Its intent is to derive (for the private sector) financial benefits as the public enjoys and learns about large, healthy natural ecosystems with diverse wildlife populations. Wolves in Minnesota are a keystone ecotourism species, drawing tourists from around the world who come to view wolf tracks, scats, and kill sites, and to hear wild wolves howl. There is little information or research data that increasing human-wolf interactions associated with ecotourism is detrimental to wolves. Consequently, responsible wolf ecotourism will be encouraged.

Assessment of public attitudes --  Statewide surveys of public knowledge of and attitudes toward wolves and wolf recovery are extremely useful to wolf recovery and conservation. Understanding changes in public attitudes toward wolves is important for continued wolf existence, and periodic surveys (every 5 years) to assess shifts in public attitude and knowledge will be encouraged. Accurate information on public attitudes will help to ensure that wolf management adequately addresses citizens' needs, in addition to wolf conservation needs.

**Research**

Wolf research is expensive, and DNR-funded wolf research efforts should be focused on the topics most pertinent to achieving the goals of this management plan. Despite the abundance of wolf research in Minnesota and elsewhere, there are still several important areas of research that should be addressed.

Population assessment -- Because population assessment is the foundation for monitoring the status of wolves and the effectiveness of management programs, it is one of the most important aspects of a wolf management and conservation program. Population assessment methods must continue to be based on the best science and data available. The comprehensive statewide assessment of wolf distribution and density in Minnesota conducted in 1997-98 was state of the art. DNR intends to use the same methods in future statewide surveys, but they may be modified if alternative methods are developed that either increase statistical or biological precision, or reduce costs. In addition to the

comprehensive surveys, annual wolf population assessments based on annual population trend surveys will be conducted to detect any large changes in wolf distribution and numbers that could occur in the intervals between comprehensive surveys.  Additional annual indices and population modeling will be investigated, to improve the accuracy of annual wolf population trend assessments.

Livestock interactions -- Continued research is desirable to enhance BMPs that will result in reduced wolf depredation to livestock, livestock guard animals, and dogs. Foremost is research on cost-effective nonlethal means of wolf behavioral control to abate wolf depredation, including identification of the behaviors of depredating wolves and improvements in our ability to predict and avoid depredation losses.  DNR will coordinate with MNDA and USDA Wildlife Services regarding wolf depredation research.

Prey interactions -- More information is needed on the effects of wolf predation and severe weather on deer numbers.  Although there has been significant research on this topic in Minnesota, predicting the long-term effects of winter weather and wolf predation on deer populations is difficult.   Long-term monitoring of deer and wolf populations in various portions of Minnesota will be a DNR research priority, especially as it relates to the role that wolves may play in regulating deer at relatively low population densities.

Disease monitoring --  Standardized and comprehensive disease testing has not been part of Minnesota wolf management activities, although significant disease research has occurred in Minnesota and incidental records are maintained by DNR.  Wolves in Minnesota have greatly increased their distribution and numbers in Minnesota during the past 20 years, despite numerous documentations of various diseases.  Nevertheless, disease is a potentially important mortality factor affecting wolf populations.  DNR does not intend to initiate wolf disease studies, but will collaborate with other investigators and continue monitoring disease incidence, where necessary, by examination of wolf carcasses obtained through depredation control programs, and also through blood/tissue physiology work conducted by DNR and the U.S. Geological Survey.  DNR will also keep records of documented and suspected incidence of sarcoptic mange.

**Program administration**

Personnel --  The wolf management program in Minnesota will be under the immediate direction of a Wolf Specialist.  DNR will create this new position at the level of

senior Natural Resource Specialist in the Division of Wildlife, with duties focused exclusively on wolf management.  This person will be responsible for administering all aspects of wolf management, including coordinating depredation management and monitoring efforts within DNR; serving as liaison with USFWS, USDA Wildlife Services, MNDA, County Extension, and tribal authorities; coordinating data collection and information dissemination; and recommending research efforts that pertain to wolf conservation in Minnesota.  In addition, DNR proposes that once federal delisting is accomplished and full implementation of this plan occurs, a Wolf Research Biologist position should be created.  This position will directly conduct wolf population assessments, propose and conduct wolf research, and provide DNR with the necessary professional expertise to implement the wolf management plan.  Finally, DNR proposes the addition of three Conservation Officers, to ensure that enforcement of various provisions of the wolf plan is adequate, and to respond to depredation complaints.

Funding --  The costs for wolf research and management have been substantial in the past, and will continue to be substantial in the future.  DNR estimates the total annual cost to the state of Minnesota for full implementation of this plan, including depredation activities but not including MNDA staff costs, to be about $848,000 (See Appendix II.).

Interagency cooperation -- Cooperation between governmental agencies is of the utmost importance for ensuring the continued survival and competent management of wolves in Minnesota.  Various state, federal, county, and tribal landowners and authorities have been participating in wolf management activities, and this will continue in the future through partnerships.  A variety of agencies and organizations have participated in wolf management, and cooperation will continue to be invited by DNR.

Volunteers --  In order to enhance management efforts, participation of volunteers and volunteer organizations will be sought to help produce and present general wolf education programs and provide matching funds for research and development of wolf conservation strategies.  Thus, private individuals, schools and colleges, conservation organizations, and other partners will help achieve wolf management goals in Minnesota.

**Plan monitoring and review**

In addition to regularly reported assessments of wolf management progress, DNR will periodically convene an advisory group of agency natural resource and agricultural

000320A

managers and wolf biologists to review and comment on wolf management plan implementation and progress.  The advisory group will be asked to assess the degree to which each part of the plan has been successfully implemented, the effects of implementation on changes in wolf population levels and distribution, and changes in wolf interactions with humans.  Invited participants in the advisory group will include, but not be limited to, MNDA, USDA Wildlife Services, US Fish and Wildlife Service, US Forest Service, Wisconsin DNR, Michigan DNR, 1854 Authority, Great Lakes Indian Fish and Wildlife Commission, and wolf research scientists.

## SELECTED REFERENCES

Bailey, R. (ed.).  1978.  Recovery plan for the eastern timber wolf.  U.S. Fish and Wildlife Service, Washington, D.C., 79pp.

Berg, W.E., and D.W. Kuehn.  1982.  Ecology of wolves in north-central Minnesota.  Pages 4-11 *in* F.H. Harrington and P.C. Paquet, eds.  Wolves: a worldwide perspective of their behavior, ecology, and conservation.  Noyew Publ., Park Ridge, N.J.

Brand, C.J., M.J. Pybus, W.B. Ballard, and R.O. Peterson.  1995.  Infectious and parasitic disease of the gray wolf and their potential effects on wolf populations in North America.  Pages 413-439 in L.N. Carbyn, S.H. Fritts, and D.R. Seip, editors.  Ecology and conservation of wolves in a changing world.  Canadian Circumpolar Institute, Edmonton, Alberta.

DelGuidice, G.D.  1998.  Surplus killing of white-tailed deer by wolves in northcentral Minnesota..  Journal of Mammalogy  79:227-235.

Fuller, T.K.  1991.  Effect of snow depth on wolf activity and prey selection in northcentral Minnesota..  Canadian Journal of Zoology  69:283-287.

Fuller, T.K. 1997.  Guidelines for gray wolf management in the northern Great Lakes Region.  2nd edition.  Educational Publication Number IWC97-271, International Wolf Center, Ely, Minn.  20pp

Fuller, T.K., W.E. Berg, G.L. Radde, M.S. Lenarz, and G.B. Joselyn.  1992.  A history and current estimate of wolf distribution and numbers in Minnesota.  Wildlife Society Bulletin  20:42-54.

Kellert, S.R. 1985.  The public and the timber wolf in Minnesota.  Transactions of the
     North American Wildlife and Natural Resources Conference  51:193-200.

Kellert, S.R.  1991.  Public views of wolf restoration in Michigan. .  Transactions of the
     North American Wildlife and Natural Resources Conference  56:152-161.

Mech, L.D.  1998.  Estimated costs of maintaining a recovered wolf population in
     agricultural regions of Minnesota.  Wildlife Society Bulletin 26: 817-822.

Mech, L.D., L.D. Frenzel, Jr., and P.D. Karns.  1971.  The effect of snow conditions on the
     vulnerability of white-tailed deer to predation.  Pages 51-59 in L.D. Mech and L.D.
     Frenzel, editors.  Ecological studies of the timber wolf in northeastern Minnesota.
     USDA Forest Service Research Paper NC-52.  North Central Forest Experiment
     Station, St. Paul, Minnesota.

Mech, L.D., S.H. Fritts, G.L. Radde, and W.J. Paul.  1988.  Wolf distribution and road
     density in Minnesota.  Wildlife Society Bulletin  16:85-87.

Mech, L.D.,  and S.M. Goyal.  1993.  Canine parvovirus effect on wolf population change
     and pup survival.  Journal of Wildlife Diseases  29:330-333.

Mech, L.D., and S.M. Goyal.  1995.  Effect of canine parvovirus on gray wolves in
     Minnesota..  Journal of Wildlife Management  59:565-570.

Mech, L.D., E.K. Harper, T.J. Meier, and W.J. Paul.  2000.  Assessing factors that may
     predispose Minnesota farms to wolf depredations on cattle.  Wildlife Society Bulletin
     28: 623-629.

Michigan Gray Wolf Recovery Team.  1997.  Michigan gray wolf recovery and management
     plan.  Michigan Department of Natural Resources.  Lansing, Michigan.  58pp.

Mladenoff, D.J., T.A. Sickley, R.G. Haight, and A.P. Wydeven.  1995.  A regional
     landscape analysis and prediction of favorable gray wolf habitat in the Northern Great
     Lakes region.  Conservation Biology  9:279-294.

Nowak, R.M.  1995.  Another look at wolf taxonomy.  Pages 375-397 in L.N. Carbyn, S.H.
     Fritts, and D.R. Seip, editors.  Ecology and conservation of wolves in a changing world.
     Canadian Circumpolar Institute, Edmonton, Alberta.

Olson, S.F.  1938.  A study in predatory relationship with particular reference to the wolf.
     Sci. Mon. 66:323-336.

000322A

Thiel, R.P. 1985.  Relationship between road densities and wolf habitat suitability in
Wisconsin.  American Midland Naturalist  113:404-407.

Thiel, R.P., S. Merrill, and L.D. Mech.  1998.  Tolerance by denning wolves, Canis lupus, to
human disturbance.  Canadian Field-Naturalist  112:340-342.

Thiel, R.P., and T. Valen.  1995.  Developing a state timber wolf recovery plan with public
input: the Wisconsin experience.  Pages 169-175 in L N. Carbyn, S.H. Fritts, and D.R.
Seip, editors.  Ecology and conservation of wolves in a changing world.  Canadian
Circumpolar Institute, Edmonton, Alberta.

U.S. Fish and Wildlife Service. 1992.  Recovery Plan for the Eastern Timber Wolf.  Twin
Cities, Minnesota.  73pp.

Wayne, R.K.; Lehman, D.; Girman, D.; Gogan, P.J.P.; Gilbert, D.A.; Hansen, K.; Peterson,
R.O.; Seal, U.S.; Eisenhawer, A.; Mech, L.D.; Krumenaker, R.J.
Conservation genetics of the endangered Isle Royale gray wolf.  Conservation Biology;
1991. 5(1): 41-51. [In English with Spanish summ.]

Wisconsin Wolf Management Plan.  1999.  Wisconsin Department of Natural Resources,
Madison, Wisconsin, PUBL-ER-099 99, 74pp.

000323A

# APPENDIX I.

**WOLF MANAGEMENT LEGISLATION:**

**CHAPTER 463, LAWS OF 2000**

**(Go to http://www.revisor.leg.state.mn.us/slaws/2000/c463.html)**

# APPENDIX II.

**WOLF MANAGEMENT PLAN BUDGET:**

**OCTOBER 2000 REPORT TO THE LEGISLATURE**

000325A



## Minnesota Department of Natural Resources

### OFFICE OF THE COMMISSIONER
500 Lafayette Road
St. Paul, Minnesota 55155-4037

October 1, 2000

The Honorable Bob Lessard, Chair
Senate Environment and Natural Resources Committee
111 Capitol
St. Paul, MN 55155
and
The Honorable Jane Krentz, Chair
Senate Environment and Agriculture Budget Division
235 Capitol
St. Paul, MN 55155
and
The Honorable Dennis Ozment, Chair
House Environment and Natural Resources Policy Committee
479 State Office Building
St. Paul, MN 55155
and
The Honorable Mark Holsten, Chair
House Environment and Natural Resources Finance Committee
381 State Office Building
St. Paul, MN 55155

Dear Senators Lessard and Krentz, and Representatives Ozment and Holsten,

Enclosed for your consideration is a report recommending appropriations needed to accomplish the gray wolf management plan in Minnesota, as required by Section 21, Chapter 463, Laws of 2000. These recommended appropriations are needed to implement the policy provisions of Laws of 2000, Chapter 463 relating to gray wolf management.

Section 16, Chapter 463, Laws of 2000 requires the commissioner, in consultation with the commissioner of agriculture, to adopt a gray wolf management man. This gray wolf management plan is currently in draft, and is expected to be completed before January, 2001. The recommended appropriations in this report are our best estimates pending final completion of the plan.

Sincerely,

Allen Garber
Commissioner

enc.
c: Keith Bogut, Department of Finance
DNR INFORMATION: 651-296-6157, 1-888-646-6367   (TTY: 651-296-5484, 1-800-657-3929)   FAX: 651-296-4799

AN EQUAL OPPORTUNITY EMPLOYER
WHO VALUES DIVERSITY

PRINTED ON RECYCLED PAPER CONTAINING A
MINIMUM OF 10% POST-CONSUMER WASTE

000326A

# Report to the Minnesota Legislature (Section 21, Chapter 463, Laws of 2000) recommending appropriation needs for gray wolf management

## Prepared by the Minnesota Department of Natural Resources

## October 1, 2000

## Wolf Management Plan Budget Summary:

| Program/Activity | FY 02 | FY 03 | FY 04 (Ongoing Base) |
|---|---|---|---|
| **Professional Staff (2.5 FTE):** | | | |
| Wolf Specialist (1 FTE) | $70,000 | $70,000 | $70,000 |
| Wolf Research Biologist (1 FTE) | - | $70,000 | $70,000 |
| Support staff (0.5 FTE) | - | $20,000 | $20,000 |
| **Population Monitoring and Research:** | - | $100,000 | $100,000 |
| **Depredation:** Wildlife Services Cooperative Wolf Damage Management and State Directed Predator Control | - | $200,000 | $200,000 |
| **Enforcement (3 FTE):** | - | $300,000 | $210,000 |
| **Education/Public Participation:** | $25,000 | $25,000 | $25,000 |
| **DNR Totals** (all new appropriations)**:** | **$95,000** | **$785,000** | **$695,000** |
| Note: The MN Dept. of Agriculture may be recommending additional appropriations for the wolf depredation compensation program under their administration; this reflects their current base: | $158,000 | $158,000 | $158,000 |

000327A

## Wolf management plan budget narrative:

**Wolf Specialist (1FTE).**  This position is needed in FY02, to allow preparation and lead time for implementation of the gray wolf management plan, immediately following Federal delisting of the gray wolf in Minnesota from the Endangered Species Act of 1973 (estimated to be in FY03). The Wolf Specialist will coordinate all aspects of implementation of the gray wolf management plan, including coordination with the U.S. Fish and Wildlife Service in the delisting process, developing programs and procedures for depredation management, and public information duties.

**Wolf Research Biologist (1FTE).**  This position is needed in FY03, when the gray wolf management plan is implemented.  A primary responsibility of the Wolf Research Biologist will be developing and implementing wolf population monitoring programs.  It is essential that Minnesota maintain state of the art wolf population monitoring, so that wolf numbers can be monitored and evaluated after the State of Minnesota assumes management responsibility.  In addition, the Wolf Research Biologist will coordinate wolf research activities of other agencies, and administer or facilitate the development of DNR and other research projects pertaining to livestock depredation, effects of wolves on prey, and wolf dispersal/range expansion.

**Population Monitoring and Research.**  This funding would provide necessary project funding for programs of the Wolf Research Biologist, including radio-telemetry work to support population monitoring, and research projects on livestock depredation, wolf dispersal, or other topics with direct management applications.

**Depredation.**  Since 1978, federal agencies (US Fish and Wildlife Service, USDA) have provided essential wolf depredation control in Minnesota.  Because USDA/Wildlife Services has a very effective program and experience personnel, DNR intends to continue the USDA/Wildlife Services program, with modifications to include State certified predator controllers.  Wildlife Services depredation programs typically require a 50/50 cost share agreement with state agencies. Because the gray wolf has been under Federal control, Minnesota has, to date, successfully argued for full Federal funding of this program.  However, when gray wolf management becomes a state responsibility, continuation of the Wildlife Services program will require cost-sharing by the State.  DNR estimates that the State portion of a cost-shared Cooperative Wildlife Services wolf damage management program will be $125-150,000 annually.  The additional funding is needed to provide payments to State certified predator controllers and to conduct training programs.

**Enforcement (3FTE).**  Conservation Officers will be required to investigate gray wolf depredation complaints, verify wolf-caused losses, designate control areas, notify predator controllers, salvage wolf remains, and otherwise monitor and coordinate wolf control activities. In addition, Conservation Officers will be required to investigate all reports of public takings of gray wolves, and undertake other activities related to enforcement of Minnesota's wolf laws.  To ensure adequate responses to depredation complaints and enforcement of wolf laws, three new Conservation Officers are needed, strategically located within current gray wolf range in Minnesota.  These officers will assume primary responsibility for implementing the enforcement aspects of the gray wolf management plan, and will coordinate the efforts of other Conservation

Officers where necessary.  They will likely perform other enforcement duties, but implementation of the gray wolf management plan will be their priority.

**Education/Public Participation.**  Because gray wolf management continues to be controversial, and Minnesotans remain polarized on many wolf management issues, continuing education, public access to information, and public participation in gray wolf management is essential. Funding is needed to produce and distribute publications and electronic information, attend public and professional meetings, and conduct public meetings about the gray wolf management plan implementation, progress, and results.

# APPENDIX III.

## WOLF MANAGEMENT ZONES MAP

000330A



# APPENDIX IV.

## WOLF RANGE EXPANSION 1978 TO 1998

000332A



# Wolf Range Expansion 1978 to 1998

1978-79 Range

1988-89 Range

1997-98 Range

000333A

Copyright July 2000, Minnesota Department of Natural Resources, Division of Wildlife   steve.benson@dnr.state.mn.us

# APPENDIX V.

## 1998 WOLF MANAGEMENT ROUNDTABLE RECOMMENDATIONS

000334A

**On August 28, 1998, the Minnesota wolf management roundtable reached consensus on the following package of wolf management recommendations:**

**Wolf Population Management**

Wolves in Minnesota will be allowed to expand statewide. Population management measures, including public taking or other options, will be considered in the future but not sooner than the 5-year post-delisting monitoring period of the US Fish and Wildlife Service. If public taking is authorized by the legislature, the Department of Natural Resources will prepare and publish a rule, with opportunity for full public comment. Decisions on public taking will be based on sound data, including but not limited to the "5-year census" and the results of non-lethal control research.

To assure continued survival of the wolf in Minnesota, the roundtable recommends a minimum statewide population of 1,600 animals. This number is not a maximum population goal. If the population falls under the recommended minimum, appropriate management actions will be taken to address the cause of the reduction and assure recovery to the minimum level in the shortest possible time.

**Wolf Population Monitoring**

The roundtable accepts the current methodologies that the Minnesota DNR is using to indicate wolf population abundance and distribution, with the understanding that any results are estimates which may be higher or lower than the actual population. The roundtable recommends that for future wolf management decisions, the methodologies should move as close as possible toward an actual census. The roundtable understands that this movement toward a census for now will include:

a.  standardized training of the data collectors and objective verification of their data
b.  more continuous tracking and verification of information from more radio-collared control groups.

**Wolf Depredation Management**

Issue 1:    Animals/damages Covered by the Depredation Program

The roundtable supports the continuation of a compensation program for wolf depredation to livestock.

The roundtable recommends a compensation program for wolf depredation to dogs under the supervised control of the owner, and livestock guard animals including llamas, donkeys and, dogs.

The roundtable recommends that veterinary costs incurred as a result of wolf depredation be included as a compensated loss.

Issue 2:       Eligibility and Verification for Compensation and Lethal Control

The roundtable endorses the language in MN Rule 1515.3500 for determining eligibility for <u>compensation</u>, with the following additional recommendations:

a.  In addition to Conservation Officers and county extension agents, other agents (State, Federal, Tribal) certified by the State should be included.

b.  A handbook for wolf depredation investigations should be produced and all certified agents trained.

c.  A uniform evidence-reporting form should be developed including photographs of the kill site for the file.

d.  A central public contact (1-800 number) should be established.

e.  A database of all reported losses, not just verified losses, should be developed. the database should include information on all predator losses.

f.  The statutory requirement for a carcass to be present should be eliminated.

g.  MN Rule 1515.3500 should be amended to be specific to wolves, and not endangered species.

If there are physical remains of a wolf-killed animal, lethal control may be carried out by a government agency.

*Note:  Consensus was not reached on the level of verification required to initiate government agency control actions if physical remains are not present.*

Issue 3:       Best Management Practices

The roundtable supports current legislative efforts to encourage the use of Best Management Practices (BMP's). The roundtable believes that the use of BMP's is critical to the long-term survival of the wolf in Minnesota, and urges the Minnesota Legislature to appropriate $500,000 on a matching basis with any non-public funding source for ongoing research, development, and dissemination of BMP's and non-lethal means of wolf control to abate wolf depredation to livestock. The roundtable suggests that farms experiencing livestock depredation be used as research sites.

Issue 4:       Preventative Depredation Measures

Owners of livestock, livestock guard animals and dogs and/or their permitted agents may take action to destroy wolves that pose an "immediate threat" to human life, livestock, guard animals, or dogs. This action is permitted only on the livestock

owner's property. In the case of dogs, this action is permitted only for dogs under the controlled supervision of the owner.   "Immediate threat" is defined as follows: the wolf is observed in the act of pursuing or attacking. The mere presence of a wolf or a wolf feeding on an already dead animal does not constitute an immediate threat.

At any time, a farmer or dog owner may first "harass" any wolf within 500 yards of people, buildings, dogs, livestock or other domestic animals in a non-injurious, opportunistic manner. Wolves may <u>not</u> be purposely attracted, tracked, searched-out or chased and then harassed. Wolves showing abnormal behavior will be reported to an authorized agent for action.

The following conditions apply when taking action to destroy a wolf:

a. A farmer or dog owner will report the action to an authorized agent within 24 hours and protect all evidence.

b. The agent will investigate all reported taking of wolves and will:

1. keep written and photographic documentation of the kill site and any instances of poor husbandry that contributed to the attack occurring;

2. with farmers but not dog owners, evaluate what, if any, best management practices and non-lethal controls are needed to prevent future attacks and develop a reasonable written and signed plan with the farmer for implementation;

3. confiscate the wolf carcass(es).

c. State agents will report any evidence of abuse of this rule.

d. Failure to comply with the elements of this program, including failure to implement in a reasonable length of time the best management practices and non-lethal control plan developed with the authorized agent, or abuse of the program will result in loss of a farmer or dog owner's eligibility for future wolf damage compensation for a period of one year or until they implement the best management practices/non-lethal control plan.

e. Pelts will remain in the control of the state or tribal authorities and may be disposed of only by donation or sale for educational purposes.

f. This program will be reviewed at the annual gathering of roundtable participants who will make recommendations regarding the continuation, modification or termination of this program.

g. Monthly reports of this program will be made available to the public.

Issue 5:     Removal of Verified Depredating Wolves

The roundtable recommends that the Department of Natural Resources assume administrative responsibility for an integrated wolf depredation program funded from the general fund. The roundtable recommends that DNR contract for assistance with the USDA/Wildlife Services program. Investigation of a kill-site and verification of a wolf kill will be conducted by a state agent (as defined in Issue 2, a). Trapping may be accomplished by state certified contract trappers. Wolf pelts will be retained by the state and disposition will be only for educational purposes.

Issue 6:     Amount of Compensation

The roundtable recommends that the legislature consider compensation closer to fair market value than the $750 cap currently in law for verified wolf kills of livestock.

The roundtable recommends that compensation for the loss of guard animals (animals specifically bred, trained and used to protect livestock from wolf depredation) be the same as for livestock.

The roundtable recommends that compensation for dogs not qualifying as guard animals, under the supervised control of the owner, be at fair market value not to exceed $500.

## Habitat Management

DNR will identify currently occupied and potential wolf habitat areas with the objective of managing habitat to benefit wolves and their prey on public land and in cooperation with private, corporate and tribal landowners. Elements of wolf habitat that need to be considered include but are not limited to:

a. human access
b. disturbance at den and rendezvous sites
c. corridors and linkages

## Enforcement

Enforcement and penalties for the illegal taking (killing, injuring, beating, harassing, stalking, baiting/poisoning and other activities having the likelihood of injury or attempt to do the same) of wolves should be consistent with present statutes on the illegal taking of game. Fine levels should reflect the unique nature of the wolf. The roundtable further recommends that the restitution value of the wolf be established at $2,000. Injury to wolves caused by guard dogs used in the traditional manner is not considered illegal taking.

Due to the increased workload of conservation officers, the roundtable recognizes the need to substantially increase the number of conservation officers as well as the resources available to them. The roundtable urges the legislature to provide the general fund resources necessary for proper enforcement. The roundtable urges cross-deputization of additional tribal conservation officers and continued cooperation with federal law enforcement officials.

## Education

The management plan should include an education component, providing information about:

a. the history of the wolf in Minnesota
b. wolf management in Minnesota
c. wolf behavior and biology
d. the wolf as part of the ecosystem
e. wolf status
f. human/wolf coexistence
g. contacts for additional information about the wolf
h. strategies for dealing with wolves

## Eco-tourism

The roundtable recommends that DNR address eco-tourism in the management plan.

## Wolf-dog Hybrids/Captive Wolves

a. The release of wolf hybrids and captive wolves into the wild should be banned.
b. The legislature should consider appropriate regulatory measures, based on public safety concerns.

## Management Plan Monitoring

The Dept. of Natural Resources will convene a group, including all groups participating  in the existing roundtable, on an annual basis to review and comment on management plan implementation.

## Funding for Plan Implementation

State funding for implementing the management plan should come from sources other than the game and fish fund.

# APPENDIX VI.

## WOLF POPULATION SURVEY 1997-98

000340A

# UPDATED WOLF POPULATION ESTIMATE FOR MINNESOTA, 1997-1998

William Berg and Steve Benson

During this century, there have been several estimates by natural resources scientists of wolf *(Canis lupus)* numbers and distribution in Minnesota that have been both range-wide and study area-specific in scope. The early estimates, especially those derived from bounty records and heresay, were of necessity subjective and crude. As wolf studies commenced in Minnesota during the mid-1930's (Olson 1938) and late 1940's (Stenlund 1955), data reliability improved, and since the advent of radio telemetry, there has been a minimum of 11 wolf studies in the state, each of which has provided area-specific data on wolf density.

Estimates of wolf density and distribution over larger areas such as a state or province require considerable coordination and effort. Since state or province-wide total counts (i.e., census) are impossible (even if all packs are radio-collared), techniques involving sampling, extrapolations, large observer base, telemetry studies, and track surveys must be utilized (Fuller 1995).

Fuller et al. (1992) extrapolated range-wide wolf population and distribution estimates from various studies dating back to Olson (1938), and reported on the comprehensive Minnesota Department of Natural Resources (MN DNR) wolf surveys in 1978-79 (Berg and Kuehn 1982) and 1988-89. The latter survey combined observations of wolves and wolf sign by field personnel with telemetry, U.S. Department of Agriculture (USDA) depredations trapping, and other databases to derive a wolf population estimate of 1,500 - 1,750 within a 60,178 km$^2$ contiguous range, the greatest area since wolf studies began in Minnesota.

With the fulfillment of wolf population goals in Minnesota and the establishment of a second population in Wisconsin and Michigan as required in the 1992 Eastern Timber Wolf Recovery Plan (U.S. Fish and Wildlife Service 1992), delisting from the Endangered Species Act could have occurred as early as 1999. As a part of the delisting process and as a critical component of the MN DNR Wolf Management Plan, a comprehensive wolf population and distribution survey similar to those in 1978-79 and 1988-89 was conducted in 1997-98. This report summarizes the results of that survey.

## METHODS

The methodologies for conducting and analyzing the 1997-98 wolf population and distribution survey (Berg 1997) followed as closely as possible those used in 1988-89 (Fuller et al. 1992) and to a lesser extent, those used in 1978-79 (Berg and Kuehn 1982) (Table 1).

000341A

Instructions, forms, and maps were mailed in late October, 1997 to the field stations of several natural resources agencies statewide. Included were 1) all MN DNR disciplines, 2) U.S. Forest Service, 3) U.S. Fish and Wildlife Service, 4) USDA, 5) U.S. Geological Survey, 6) Wisconsin Department of Natural Resources, 7) Camp Ripley, 8) Voyageurs National Park, and 9) all county land departments, wood products industries, Indian Reservations, and Treaty Authorities located in the northern two-thirds of Minnesota.

Like the previous efforts (Table 1), the 1997-98 survey mailing consisted of two parts; 1) mapping of all location and group size observations of wolves and wolf tracks, and locations of scats, and 2) subjective ratings of wolf abundance and population trends in the last 5 years. The mapping effort was by far the most important and objective aspect of the survey, and other databases used to supplement the map locations were 1) 1997 scent station survey, 2) 1997 winter fisher *(Martes pennanti)* and marten *(M. americana)* track survey, 3) 5 wolf telemetry studies ongoing in 1997-98, and 4) USDA depredations trapping data for 1997-98. This combined database is abbreviated "WISUR '98" in the following text.

As maps and survey forms were received during spring 1998, data were digitally entered using ArcView GIS software and other data entry systems. Data entry continued until late summer, allowing some preliminary analyses to begin in August.

As in the 1988-89 survey, the township ($\bar{\ }$ 93 km$^2$) was used as the basis for analyzing wolf pack ($\geq$ 2 wolves) and single wolf occurrences, primarily because the most current GIS databases on human densities, roads, cover type, and land use were also categorized by township. The method for defining wolf range was to 1) digitally transfer points from all databases to maps, 2) code all townships to road and human density criteria used in Fuller et al. 1992 (roads <0.70 km/km$^2$ and humans <4/km$^2$ or roads <0.50 km/km$^2$ and humans <8/km$^2$; hereafter termed the 1988-89 road-human density model), and 3) include all townships fitting the 1988-89 road-human density model, plus all other townships with wolf packs, as wolf range. Townships with road and human densities higher than the 1988-89 road-human density model that had observations of single wolves were excluded from wolf range calculations, even though many townships in this class had several observations of lone wolves. Total wolf range was delineated on the west and south boundaries of these townships, and occupied wolf range was calculated by subtracting the areas of the excluded townships and large lakes from the total wolf range. Townships south and west of the total wolf range boundary, even though they had either observations of wolf packs or they conformed to the 1988-89 road-human density model, were not included in the wolf population or range calculations.

The WISUR '98 database was analyzed similarly to the wolf observation analyses in 1988-89 (Fuller et al. 1992) (Table 1). This consisted of 1) calculating the mean pack area (n=36) from the 1997-98 telemetry studies, 2) increasing the mean pack area by 37% to compensate for interstices between pack territories (Fuller et al. 1992:51), 3) dividing the occupied wolf range area by the increased mean pack area to obtain the number of wolf packs, 4) calculating the mean pack size (n=36) from the 1997-98 telemetry studies, and multiplying by the number of packs to obtain the number of wolves living in packs, and 5) dividing the number of pack wolves by 0.85 (to compensate for 15% single wolves in the population; Fuller et al. 1992:46) to calculate the total

number of wolves in the population. There were 90% statistical confidence intervals (90% CI's) on the final wolf population estimate.

## RESULTS

WISUR '98 data were received from 179 field stations (compared to 154 in 1998-99, a 16% increase) representing the input of a minimum of 464 persons (compared to a minimum of 362 persons in 1998-99, a 28% increase) (Table 2). The total number of WISUR '98 observations of wolves or wolf sign was 3,451, nearly three times higher than in 1988-89 (1,244). WISUR '98 observations consisted of 73% tracks, 12% visuals, 6% scats, and 9% other (Table 2); in 1988-89 these respective proportions were 72%, 17%, 4%, and 7%. Observations of single wolves and wolf packs ($\geq$ 2 wolves) (packs derived from WISUR '98 visual and track observations only) comprised 41% and 59%, respectively, of total observations, compared to 44% and 56% in 1988-89. Wolves in packs (total of 6,377) derived from all observations of $\geq$ 2 wolves comprised 82% of all wolves tallied in both 1988-89 and 1997-98.

The telemetry database consisted of 36 radioed packs during 1997-98 in five studies: Superior National Forest (n=21 packs), MN DNR (n=7), Agassiz Refuge (n=2), Camp Ripley (n=2), and Wisconsin Border (n=4). These packs, containing 195 total wolves and having a combined area approximating 8% of the total wolf range, were distributed over a wide array of habitats, prey densities, land use and ownership patterns, and road and human densities (Fig. 1). The proportions of land use and covertype such as forest, brush, and pasture as determined from both the WISUR '98 and telemetry databases were nearly identical, indicating that the five telemetry study areas were representative of the entire wolf range (Fig. 1). For the 22 packs that also had pack observations from the 1997-98 winter survey, 67% of 1997-98 survey sizes ($\bar{x}$ = 5.0 wolves) were less than telemetry pack sizes ($\bar{x}$ = 5.4), suggesting that the WISUR '98 observations underestimated pack size. The USDA database derived from depredations trapping consisted of 94 records in a minimum of 88 townships during 1997 - 1998.

### Distribution

The area occupied by wolves as indicated by the number of townships with wolf packs increased dramatically from 1988-89 to 1997-98, both statewide and within the 60,178 km$^2$ contiguous pack range identified in 1988-89 (Fuller et al. 1992:48) (Fig. 1). Statewide, 693 townships ($\bar{x}$ 64,450 km$^2$) were known to contain wolf packs in 1997-98, compared to 314 townships ($\bar{x}$ 29,400 km$^2$) in 1988-89, a 121% increase (Fig. 2).

The 1988-89 contiguous pack range (Fuller et al. 1992:48) had 293 townships (27,250 km$^2$) with known wolf packs in 1988-89, whereas in 1997-98 this same area had 418 townships ($\bar{x}$ 38,870 km$^2$) with pack observations. South and west of the 1988-89 contiguous pack range, 21 townships ($\bar{x}$ 1,950 km$^2$) had pack observations in 1988-89, compared to 175 townships ($\bar{x}$ 16,270 km$^2$) with packs, and another 69 townships with single wolves only, in 1997-98 (Fig. 2). Part of the wolf range expansion since 1988-89 can be attributed to wolves residing in townships with road and human densities higher than those in the 1988-89 road-human density model (see Methods). In 1997-98, 17% of the townships known to contain packs did not conform

000343A

to the 1988-89 road-human density model, (i.e., they had higher road and human densities) (Table 2), compared to 11% in 1988-89 (Fuller et al. 1992:48). This enabled large areas identified in the 1988-89 survey (Fuller et al. 1992:49) as having no potential to be occupied by wolves to be occupied by packs in 1997-98 (Fig. 2).

A new total wolf range was delineated from the WISUR '98 database that included 99% of all townships known to contain wolf packs in 1997-98 and excluded large (>200 km$^2$) lakes; this total wolf range encompassed 88,325 km$^2$ (Fig. 2). Within the total wolf range, the 1997-98 occupied range of 73,920 km$^2$ consisted of 1) 666 townships (61,943 km$^2$) known to contain packs, and 2) 107 townships (11,977 km$^2$) (14% of the total wolf range) that were presumed to contain packs because of low road and human densities.

## Wolf numbers

The 1997-98 population estimate using the WISUR '98 database and the 73,920 km$^2$ of occupied range is 385 packs and 2,450 wolves (90% CI=1,995-2,905), and was calculated according to Fuller et al. 1992:46 (73,920 km$^2$ ÷ 192 km$^2$ per pack x 5.4 wolves per pack ÷ 0.85 pack wolves = 2,450) (Fig. 3).

## Questionnaire Survey

The questionnaire part of the survey made no attempt to estimate the population, but rather, served as a subjective way to look at wolf distribution and population trends. By far the minor part of the survey, the 1997-98 questionnaire survey was identical to that in 1978-79 and 1988-89, and asked for a subjective rating of wolf density (high, medium, low) and population trend (increasing, stable, decreasing). There were responses from 150 work stations in 1997-98; most in the northern part of the wolf range reported a stable population in their work area, and those in the west and south portions generally reported increasing numbers (Fig. 4). There is strong agreement between the wolf ranges as estimated from the questionnaire and WISUR '98 databases (Figs. 2 and 4). It is noteworthy that none of the 129 respondents with wolves present in their work areas in 1997-98 reported declining numbers, and that 71% reported increasing numbers over the last 5 years.

000344A

## DISCUSSION

The distribution and population estimates derived from the 1997-98 survey were derived from extremely conservative criteria, for several reasons. The vast majority of survey cooperators worked for public land management agencies, and consequently, data were obtained from relatively few privately owned tracts. Outlying townships south and west of the total wolf range that had observations of packs were not included in the 1997-98 wolf population estimate, as they were in the1988-89 estimate. Townships with one to several observations of single wolves and that may have been adjacent to townships with packs, but that had high road and human densities (roads >0.5 km/km$^2$ and humans >8/km$^2$ $\underline{or}$ roads >0.7 km/km$^2$ and humans >4/km$^2$), were excluded from all range and population calculations. The pack size for the population estimate calculation (O=5.4) was
much less than the mean of 5.8 for 388 previously studied packs in Minnesota, and the territory area for the population estimate (192 km$^2$) was much greater than the mean of 154 km$^2$ for 131 previously studied packs for which territory area data were available (W. Berg, unpub. data).

The area within the 1997-98 total range that conformed to the 1988-89 road-human density model but in which no packs were observed (and thus was included in the range area estimate) was much less in 1997-98 than in 1988-89. In 1988-89, 23,700 km$^2$ (39% of the contiguous range) fell into this category, whereas it totaled 11,977 km$^2$ (14% of the total wolf range) in 1997-98.

Despite these conservative analyses, the wolf population increased 50% from1988-89 to 2,450 (90% CI=1,995-2,905) (Fig. 3). The calculated annual finite rate of population increase since 1988-89 was 1.045, nearly identical to the 1.04 calculated by Fuller et al. (1992:51) for the period 1970-1989.

The contiguous pack range in 1988-89 of 60,178 km$^2$ increased 48% by 1997-98 to 88,325 km$^2$, and the occupied area within those ranges increased 45% from 50,950 km$^2$ in 1988-89 to 73,920 km$^2$ in 1997-98.

In 1988-89, the lower wolf population estimate of 1,500 was derived from winter survey data similar to that in 1978-79 and 1997-98, and the upper estimate of 1,750 was derived from the relationship between wolf density and ungulate biomass (Fuller 1989:21). Only the winter survey data were used to derive the population estimate in 1997-98 in an effort to maintain relatively uniform survey methodologies for the three surveys since 1978-79, and because of recent questions concerning the reliability of using ungulate biomass to estimate wolf numbers in any one year (Mech et al. 1998, Mech pers. commun.).

As more wolf distribution surveys have been conducted, areas occupied by packs have continued to expand both within existing range and south and west into previously unoccupied areas. A study in 1983 by Mech et al. (1988:86) identified 59,900 km$^2$ of occupied primary, peripheral, and disjunct range, and 40,676 km$^2$ of unoccupied range, some of which contained only single wolves. In 1988-89, Fuller et al. (1992) found wolf packs in the peripheral, disjunct, and unoccupied ranges identified just 5 years earlier, and identified 60,178 km$^2$ of contiguous pack range and 11,500 km$^2$ of potential range south and west of the contiguous range. Additional areas

000345A

previously devoid of wolves contained packs in 1997-98. Approximately 128 townships (60 northeast and 68 southwest of the 1988 contiguous pack boundary) that the road and human density model identified in 1988-89 as having no potential to have wolves were known to contain packs in 1997-98, and 56 of these had human densities >8/km$^2$.

The road and human density analyses from the 1997-98 survey, combined with GIS land ownership, land use, and cover type databases, identified some possible areas of future wolf range expansion. Most occur just inside or south and west of the 1997-98 total pack range boundary, and include Clay, Benton, Sherburne, and central Marshall Counties (all of which contain single or pack wolves now) (Fig. 2), and blocks of 200-800 km$^2$ in southeastern Minnesota where single wolves have been reported. It is unknown how many additional wolves these areas will support, but the total will likely be small compared to the wolf population present in the late 1990's.

## ACKNOWLEDGMENTS

Thanks to Jane Mueller, who entered the WISUR '98 data and helped with some analyses, and to Gailyn Staydohar, who did all of the survey mailings and typed several stages of the manuscript. The following persons peer-reviewed earlier drafts: L.D., Mech, Steve Fritts, Bill Route, Todd Fuller, Bill Paul, John Hart, Tom Meier, Blair Joselyn, and Mike Nelson. Special thanks to L.D. Mech and Todd Fuller for additional helpful suggestions, and to Frank Martin for assistance in statistical analyses. Lastly, thanks to the 547 natural resource professionals who cooperated with the project, and to the Minnesota Legislative Commission on Minnesota Resources for funding it.

## LITERATURE CITED

Berg, W.E. 1997, Wolf population and distribution survey, winter 1997-98.  Pages 102-109 *in* B. Joselyn, ed. Summaries of wildlife research findings  1997.  Minn. Department of Natural Resources Populations and Research Unit. St. Paul, Minn. 236 pp.

Berg, W.E. and D.W. Kuehn. 1982.  Ecology of wolves in north-central Minnesota.  Pages 4-11 *in* F.H. Harrington and P.D. Paquet, eds. Wolves: a worldwide perspective of their behavior, ecology, and conservation. Noyes Publ., Park Ridge, N.J. 474 pp.

Fuller, T.K. 1989.  Population dynamics of wolves in north-central Minnesota. Wildl. Monogr. 105. 41 pp.

Fuller, T.K. 1995.  Guidelines for gray wolf management in the Northern Great Lakes Region. Int. Wolf Center Tech. Pub. No. 271.  Ely, Minn. 19 pp.

000346A

Fuller, T.K., W.E. Berg, G.L. Radde, M.S. Lenarz, and G.B. Joselyn. 1992.  A history and current estimate of wolf distribution and numbers in Minnesota. Wild. Soc. Bull. 20:42-55.

Mech, L.D., S.H. Fritts, G.L. Radde, and W.J. Paul. 1988.  Wolf distribution and road density in Minnesota. Wildl. Soc. Bull. 16:85-87.

Mech, L.D., L.G. Adams, T.J. Meier, J.W. Burch, and B.W. Dale. 1998.  The wolves of Denali. University of Minnesota Press. Minneapolis, Minn. 227 pp.

Olson, S. F. 1938.  A study in predatory relationship with particular reference to the wolf. Sci. Mon. 66:323-336.

Stenlund, M.H. 1955.  A field study of the wolf *(Canis lupus)* on the Superior National Forest, Minnesota.  Minnesota Dep. Conserv. Tech. Bull. 4. 55 p.

U.S. Fish and Wildlife Service. 1992.  Recovery plan for the Eastern Timber Wolf.  Twin Cities, Minn. 73 pp.

**Table 1.   Comparison of 1978-79, 1988-89, and 1997-98 wolf survey and population estimation methodologies.**

| | WINTER 1978-79 | WINTER 1988-89 | WINTER 1997-98 |
|---|---|---|---|
| 1. | Field personnel submitted maps with wolf/sign observations and numbers of wolves in approximately delineated pack areas. Personnel also rated wolf population trends in last 5 years and wolf abundance. | Field personnel from additional agencies submitted maps with wolf/sign observations and numbers of wolves. Personnel also rated wolf population trends in last 5 years and wolf abundance. | Field personnel from still more agencies over northern two-thirds of the state submitted maps with wolf/sign observations and numbers of wolves. Personnel also rated wolf population trends in last 5 years and wolf abundance. |
| 2. | Field observations consisting primarily of responses from personnel totaled 480. | Field observations were supplemented by data from USDA and scent station surveys and totaled 1,244. | Field observations were supplemented by data from scent station and winter track surveys, and USDA, and totaled 3,659. |
| 3. | Field observations were combined with telemetry data from four studies. | Field observations were combined with telemetry data from at least four studies. | Field observations were combined with telemetry data from five studies. |
| 4. | Two wolf range lines were calculated. The "primary" range of 36,500 km² included all pack range as determined from field observations and telemetry. A "peripheral" range of 55,600 km² included the area occupied by disjunct packs and single wolves. | A contiguous pack line was calculated that included 93% of townships with packs as determined from all databases, and encompassed 60,178 km² of northern Minnesota. Remote or untraversed townships with <0.7 km/km² roads and <4 humans/km² $\underline{or}$ <0.5 km/km²roads and <8 humans/km² but without known wolf packs were added to the total wolf range. Non-wolf range (8,000 km²) was subtracted from total area. | A contiguous pack line was calculated that included 99% of townships with packs as determined from all databases, and encompassed 88,325 km² of northern Minnesota. Remote or untraversed townships with <0.7 km/km² roads and <4 humans/km² $\underline{or}$ <0.5 km/km² roads and <8 humans/km² but without known wolf packs were added to the total wolf range. Non-wolf range (14,405 km²) was subtracted from the total area to derive total occupied wolf range (73,920 km²). |
| 5. | Number of wolves calculated from telemetry studies and areas known to contain wolves = 988. | Mean wolf territory size (166 km²) derived from previous and current telemetry studies was divided into total range (after increasing pack territory size by 37% for interstitial pack area) to estimate number of packs (233). | Mean territory size (140 km²) derived from current telemetry studies was divided into total range (after increasing pack territory size by 37% for interstitial pack area) to estimate number of packs (385). |
| 6. | Areas without observations but having low road and human densities were extrapolated from known wolf densities in known wolf areas; this amounted to an additional 148 wolves (988 + 148) to get the total number of pack wolves (1,136). | The mean winter pack size (5.55) derived from previous and current telemetry studies was multiplied by the number of packs (233 x 5.55) to get total number of pack wolves (1,293.). | The mean winter pack size (5.4) derived from current telemetry studies was multiplied by the number of packs (385 x 5.4) to get the total number of pack wolves (2,079). |
| 7. | An additional but very conservative 10% was added to account for lone wolves, providing a total of 1,235 wolves. This was a single point estimate without confidence intervals. | The total number of pack wolves was increased to compensate for 15% single wolves in the population (1,293 ÷ 0.85) = 1,521 total wolves. This was a point estimate with 90% confidence intervals. The upper range of the population estimate (1,750) was calculated from a regression of wolf/ungulate biomass ratios. | The total number of pack wolves was increased to compensate for 15% single wolves in the population (2,079 ÷ 0.85) = 2,450 total wolves. This was a point estimate with 90% confidence limits. The wolf to ungulate biomass ratios were not used in 1997-98. |

000348A

**Table 2. Observations of wolves and wolf tracks, scats, and other wolf sign in Minnesota as reported by 464 natural resources personnel from 179 work stations during 1997-1998. An additional 83 persons from 62 additional work stations (most in non-wolf range) responded to the questionnaire only and did not contribute wolf observations.**

| Affiliation | Observers n | Observers % | Number of observations Tracks | Wolves | Scats | Other[a] | Total observations n | Total observations % |
|---|---|---|---|---|---|---|---|---|
| Minnesota DNR | 78 | 17 | 728 | 114 | 64 | 166 | 1072 | 31 |
| Wildlife | 124 | 27 | 625 | 59 | 45 | 3 | 732 | 21 |
| Parks | 28 | 6 | 85 | 13 | 13 | 1 | 112 | 3 |
| Trails | 10 | 2 | 77 | 22 | 4 | | 103 | 3 |
| Other | 33 | 7 | 272 | 43 | 20 | 1 | 336 | 10 |
| **Subtotal** | 273 | 59 | 1787 | 251 | 146 | 171 | 2355 | 68 |
| | | | | | | | | |
| U.S. Forest Serv. | 57 | 12 | 134 | 37 | 10 | 3 | 184 | 5 |
| U.S. F & W Serv. | 33 | 7 | 13 | 5 | 11 | 5 | 34 | 1 |
| U.S. Geol. Surv. | 3 | – | | | | 21 | 21 | 1 |
| U.S. Dep. Agric. | 7 | 2 | | | | 94 | 94 | 3 |
| U.S. Park Serv. | 12 | 3 | 73 | 21 | 1 | 4 | 99 | 3 |
| **Subtotal** | 112 | 24 | 220 | 63 | 22 | 127 | 432 | 13 |
| | | | | | | | | |
| County Land Dept. | 33 | 7 | 399 | 53 | 8 | | 460 | 13 |
| Indian Reservations | 17 | 4 | 29 | 24 | 2 | 1 | 56 | 2 |
| Wood Prod. Ind. | 21 | 4 | 88 | 35 | 8 | | 131 | 4 |
| Other[b] | 8 | 2 | 8 | 1 | 1 | 7 | 17 | -- |
| **Subtotal** | 79 | 17 | 524 | 113 | 19 | 8 | 664 | 19 |
| **Grand total** | 464 | 100 | 2531 | 427 | 187 | 306 | 3451 | 100 |

[a] Includes winter track survey (n = 86), scent station (n = 66), USDA (n = 94), telemetry studies (n = 1 per pack), and miscellaneous wolf kill sites and howling (n = 24).
[b] Includes private natural resources consultants and Wisconsin DNR.

000349A

**Table 3 . Number of observations (total = 2,000) of wolf packs ($\geq$ 2 wolves) in townships with varying road and human densities during winter, 1997 - 1998.**

| $km^2$ roads/$km^2$ | Human density/$km^2$ | | | | |
|---|---|---|---|---|---|
| | $<1$ | $1-<2$ | $2-<4$ | $4-<8$ | $\geq 8$ |
| $<0.50$ | 956 | 225 | 62 | 53 | 5 |
| 0.51-0.60 | 72 | 58 | 58 | 7 | 0 |
| 0.61-0.70 | 114 | 17 | 57 | 32 | 6 |
| 0.71-0.80 | 18 | 29 | 53 | 26 | 4 |
| 0.81-0.90 | 3 | 11 | 41 | 6 | 1 |
| $>0.90$ | 0 | 6 | 6 | 34 | 46 |

000350A



Figure 1.   Observations of wolves, wolf tracks, wolf scats and other wolf sign (total n=3,451) in Minnesota, 1997-98 (see Table 1).   Polygons represent wolf pack territories from five studies, and shaded area is the  total wolf range (61,629 SqKm) in 1988-89.

000351A



Figure 2.   Total wolf range as identified from the 1997-98 wolf distribution survey (88,325 SqKm).
Dark shading represents townships with packs (many contained single wolves also) or townships that fit
the 1989 wolf model.   Light shading represents townships with single wolves only.   No shading represents
townships with no wolves.

000352A



Figure 3. Wolf population estimates for Minnesota, 1952 to 1998. The 1998 population estimate of 2,450 has a 90% confidence interval of 1,995-2,905.

000353A



Figure 4. Winter 1997-98 wolf questionnaire presence and population trend summary, based on responses from 150 field stations. No Stations reported a declining wolf population.

000354A

# APPENDIX VII.

**PREDATOR CONTROL STATUTES AND RULES**

000355A

**97B.671 Predator control program.**

Subdivision 1. **Authorization to take predators.** If the commissioner determines that predators are damaging domestic or wild animals and further damage can be prevented, the commissioner shall authorize the taking of the predators by predator controllers. The commissioner shall define the area where the predators may be taken, the objectives to be achieved, procedures for notifying predator controllers, payments to be made, the methods to be used, and when the predator control shall cease.

Subd. 2. **Certification of predator controllers.** (a) The commissioner shall certify a person as a predator controller if the person has not violated a provision of this section and meets qualifications of experience, ability, and reliability. The commissioner shall establish application procedures, prescribe forms, and maintain a list of predator controllers. The application procedures must include reports from conservation officers and other department field personnel as to the ability and reliability of the applicants.

(b) The commissioner may revoke a certification if the predator controller violates a provision of sections 97B.601 to 97B.671 or 97B.901 to 97B.945 or a rule of the commissioner relating to fur-bearing animals.

Subd. 3. **Predator control payments.** The commissioner shall pay a predator controller the amount the commissioner prescribes for each predator taken. The commissioner shall pay at least $25 but not more than $60 for each coyote taken. The commissioner may require the predator controller to submit proof of the taking and a signed statement concerning the predators taken.

Subd. 4. **Gray wolf control.** (a) The commissioner shall provide a gray wolf control training program for certified predator controllers participating in gray wolf control.

(b) After the gray wolf is delisted under the federal Endangered Species Act of 1973, in zone B, as defined under section 97B.645, subdivision 12, if the commissioner, after considering recommendations from an extension agent or conservation officer, has verified that livestock, domestic animals, or pets were destroyed by a gray wolf within the previous five years, and if the livestock, domestic animal, or pet owner requests gray wolf control, the commissioner shall open a predator control area for gray wolves.

(c) After the gray wolf is delisted under the federal Endangered Species Act of 1973, in zone A, as defined under paragraph (g), if the commissioner, after considering recommendations from an extension agent or conservation officer, verifies that livestock, domestic animals, or pets were destroyed by a gray wolf, and if the livestock, domestic animal, or pet owner requests gray wolf control, the commissioner shall open a predator control area for gray wolves for up to 60 days.

(d) A predator control area opened for gray wolves may not exceed a one-mile radius surrounding the damage site.

(e) The commissioner shall pay a certified gray wolf predator controller $150 for each wolf taken. The certified gray wolf predator controller must dispose of unsalvageable remains as

directed by the commissioner. All salvageable gray wolf remains must be surrendered to the commissioner.

(f) The commissioner may, in consultation with the commissioner of agriculture, develop a cooperative agreement for gray wolf control activities with the United States Department of Agriculture. The cooperative agreement activities may include, but not be limited to, gray wolf control, training for state predator controllers, and control monitoring and recordkeeping.

(g) For the purposes of this subdivision, "zone A" means that portion of the state lying outside of zone B, as defined under section 97B.645, subdivision 12.

HIST: 1986 c 386 art 2 s 56; 1993 c 231 s 39,40; 2000 c 463 s 17,18

Copyright 2000 by the Office of Revisor of Statutes, State of Minnesota.

000357A

**6234.3000 CERTIFICATION FOR PREDATOR CONTROL.**

Subpart 1. **Certification required.** A person may not participate in the predator control program unless the person is certified.

Subp. 2. **Application process.** Application for certification as a predator controller may be made on forms provided by the commissioner to a conservation officer in the applicant's county of residence on forms provided by the commissioner. The application shall include a summary of the applicant's experience and skill as a trapper or hunter.

Subp. 3. **Predator controller qualification requirements.** A person will not be certified unless the person completes all information requested on the application and meets the following qualifications:

A. for three years prior to the date of application, the person must not have been convicted of a violation of Minnesota Statutes, sections 97B.601 to 97B.671 or 97B.901 to 97B.951, or a rule of the commissioner relating to furbearing animals; and

B. the person must either demonstrate or attest to the person's skill in hunting or trapping, including the ability to distinguish signs, tracks, and trails of predators.

Subp. 4. **Revocation of certification.** A certificate may be revoked if the controller is inactive in the program for 24 consecutive months.

Subp. 5. **Inactivity in predator control program.** A certificate may be revoked if the controller is inactive in the program for two consecutive years.

STAT AUTH: MS s 97B.671; and others at 19 SR 6

HIST: 19 SR 484; 19 SR 2222

Current as of 11/02/00

**6234.3200 USE OF SNARES FOR PREDATOR CONTROL.**

Certified predator controllers may use snares statewide at any time when participating in the predator control program.

STAT AUTH: MS s 97B.671; and others at 19 SR 6

HIST: 19 SR 484

Current as of 11/02/00

**6234.3400 COMPENSATION FOR PREDATOR CONTROL.**

Subpart 1. **Presentation of carcass.** A predator controller must, within 48 hours, present the entire unskinned carcass of each predator to the conservation officer in the county where taken. The conservation officer must remove the front feet and the ears from the unskinned carcass. The remaining carcass is the property of the predator controller and must be immediately removed.

Subp. 2. **Identification of sites and methods.** Controllers must, upon request, specifically identify the method used to take the predator and the site where each predator for which payment is claimed was taken.

Subp. 3. **Payment schedule.** The payments in items A and B will be made for predators taken according to this part.

A. For predators taken from March 1 through September 30:

(1) coyote (Brush Wolf), $45; and

(2) fox, $15.

B. For predators taken from October 1 through the last day in February:

(1) coyote (brush wolf), $30; and

(2) fox, $10.

STAT AUTH: MS s 97B.671; and others at 19 SR 6

HIST: 19 SR 484; 19 SR 2222

Current as of 11/02/00

# APPENDIX VIII.

**LIVESTOCK BEST MANAGEMENT PRACTICES**

000361A



# Wolves in Farm Country

## A guide for Minnesota farmers and ranchers living in wolf territory

**Coyote track**
(track size up to 2.5 inches long)

**Wolf track**
(track size up to 5 inches long)

Track graphics courtesy of the International Wolf Center http://www.wolf.org

## CONTACTS

For information about wolf depredation in Minnesota or the MDA reimbursement program:

Blane White
Minnesota Department of Agriculture
90 West Plato Blvd
St. Paul, MN 55107
651-296-6591.

For information on the use of guard dogs:
Livestock Guard Dog Association
111 East Chestnut Hill Road
Montague, MA 01351

For trapping services:
USDA/APHIS/Wildlife Services
34912 US Hwy 2
Grand Rapids, MN 55744
218-327-3350, Fax 218-326-7039

For information on carcass disposal:
State Board of Animal Health
90 West Plato Blvd
St Paul, MN 55107
651-296-2942

To contact farmers and ranchers who have experienced wolf problems:
Minnesota Lamb and Wool Producers
Route 2, Box 63
Hinckley, MN 55037
320-384-7262

Minnesota State Cattlemen's Association
3311 Highway 65
Mora, MN 55051
320-679-5755 or 218-927-3495

## The Costs of Prevention

These preventive practices have implementation costs and have not been shown to work in all cases. The use of guard dogs, for example, is often a first response to predation. Unfortunately, this deterrent does not work as well for wolves due to their size and cooperative hunting habits. Increased costs must be balanced by a reduction in losses to be cost effective.

Raising animals in close proximity significantly increases disease risk. Again, this increased risk of loss must be weighed against the benefits of reduced predation.



## Warning Signs of Wolf Depredation

Farmers have reported some common signs that could indicate wolves have moved into your area. Signs may include:

- animals tightly bunched together instead of being spread across the pasture;
- the entire herd or flock is disturbed;
- sheep become panicked in the presence of herding dogs;
- increase of wolf signs on the farm;
- animals refuse to enter certain areas;
- cattle breaking through otherwise sound pasture fences;
- drastic changes in herd temperament.

000362A

For many years, the only place one could find gray wolves (also called timber wolves) in the continental United States was the deep forest of northern Minnesota. Today, wolves are making a strong comeback in Minnesota and Wisconsin, and they are spreading throughout the state. While the rebounding wolf population is an ecological success story, it creates challenges for farmers and ranchers who must find a way to protect livestock from these adaptable predators.

## Where is the wolf found today?



2000
Wolf Range

Most reports of wolf depredation on livestock still come from the northern half of the state where wolf numbers are highest. However, every year the wolf's range stretches deeper into central and southern Minnesota. In addition, the roaming tendency of wolves means they can cause livestock losses anywhere in the state.

## What should I do if I suspect wolves have killed my livestock?

Recognizing the economic harm wolf depredation can have on domestic livestock, the 1977

Minnesota Legislature authorized the Minnesota Department of Agriculture to reimburse livestock owners for losses caused by wolves. USDA/Wildlife Services provides wolf trapping for cases of verified wolf attacks on domestic animals. To receive trapping services and to be eligible for state reimbursement, farmers and ranchers need to follow specific reporting procedures.

Step 1: Carefully examine the kill site and dead livestock. Be cautious not to trample over animal tracks or disturb the site. A USDA trapper or DNR conservation officer may be able to read subtle clues that you may not recognize. If the examination suggests a wild animal killed your livestock, protect your remaining animals by temporarily moving them to a more secure location, if possible.

*CAUTION: Wolves are protected under federal law. It is illegal to harm or kill a wolf except in defense of human life. Any attempt to frighten away wolves returning to kill other animals or to feed on dead livestock must be done without harming the wolf.*

Step 2: Preserve the evidence of the suspected wolf kill as much as possible (see box) and then report the kill. To be eligible for state compensation, you must report a suspected wolf kill within 24 hours of discovery to a DNR conservation officer or county extension educator. Make a note of who took your report and the day and time of your report for future reference.

Step 3: After reporting the incident, a DNR conservation officer or county extension educator will investigate and verify the wolf kill for compensation. You will be asked to complete an application for state compensation. The report will then be sent to the county ex-

tension office for a determination of the market value of the livestock lost. The request will then be sent to the MDA for payment.

## What can I do to prevent wolf depredation?

The University of Minnesota conducted a study in early 1999 to determine if any livestock management practices could prevent wolf depredation. The study could find no management practices certain to prevent wolf depredation. The only method proven to prevent wolf depredation was removing the depredating wolves from the farm. However, farmers and ranchers have reported a few practices that may help in some cases. These include:

• **Maintaining healthy, well-fed animals.** Wolves typically select the weakest and easiest prey. Healthy animals are more difficult to take. Move lame or sick animals to a safe area when possible.

• **Using guard animals.** Although not always effective, the presence of guard dogs can be a deterrent. When using guard dogs against wolves it is important to use several dogs, as wolves may kill a single animal. Moving and consolidating sheep, as is done in rotational grazing, can help guard dogs be more effective. Keep in mind, however, that rotational grazing is less suitable during lambing as it may disrupt the bond between mother and offspring.

• **Moving calving or lambing activities closer to the barnyard.** Newborns are easy prey. Some farmers move calving and wolf closer to the barnyard and because it allows for more frequent monitoring.

*Recent research was unable to find a link between improper carcass disposal and wolf depredation. Regardless of research findings, Board of Animal Health regulations on proper carcass disposal must be followed.*

## Preserving evidence of a wolf kill

• Secure the area from the entry of livestock. Curious animals or upset mothers can destroy evidence quickly.

• Look for tracks or scat (droppings) that will show a wolf's presence. Cover with plywood or weighted cans.

• Cover livestock carcass or remains with a tarp and weight securely to keep other predators from destroying teeth marks or other evidence.

• Photograph or video tape the evidence. It is helpful to put some common object next to the evidence to document size.

• Do not disturb evidence until the federal trapper or conservation officer can investigate the site.

• Remember that under Board of Animal Health regulations you must properly dispose of carcasses within 48 to 72 hours. You may need to inform the Conservation Officer of this.

000363A

# APPENDIX IX.

## LIVESTOCK COMPENSATION STATUTES

000364A

**3.737 Livestock owners; compensation for destroyed or crippled animals.**

**Subdivision 1.** Compensation required. (a) Notwithstanding section 3.736, subdivision 3, paragraph (e), or any other law, a livestock owner shall be compensated by the commissioner of agriculture for livestock that is destroyed by a gray wolf or is so crippled by a gray wolf that it must be destroyed. The owner is entitled to the fair market value of the destroyed livestock as determined by the commissioner, upon recommendation of a university extension agent or a conservation officer.

(b) Either the agent or the conservation officer must make a personal inspection of the site. The agent or the conservation officer must take into account factors in addition to a visual identification of a carcass when making a recommendation to the commissioner. The commissioner, upon recommendation of the agent or conservation officer, shall determine whether the livestock was destroyed by a gray wolf and any deficiencies in the owner's adoption of the best management practices developed in subdivision 5. The commissioner may authorize payment of claims only if the agent or the conservation officer has recommended payment. The owner shall file a claim on forms provided by the commissioner and available at the university extension agent's office.

**Subd. 2.** Deduction from payment. Payments made under this section shall be reduced by amounts received by the owner as proceeds from an insurance policy covering livestock losses, or from any other source for the same purpose including, but not limited to, a federal program.

**Subd. 3.** Rules. The commissioner shall adopt and may amend rules to carry out this section which shall include: methods of valuation of livestock destroyed; criteria for determination of the cause for livestock loss; notice requirements by the owner of destroyed livestock; and other matters determined necessary by the commissioner to carry out this section.

**Subd. 4.** Payment, denial of compensation. (a) If the commissioner finds that the livestock owner has shown that the loss of the livestock was likely caused by a gray wolf, the commissioner shall pay compensation as provided in this section and in the rules of the department.

(b) For a gray wolf depredation claim submitted by a livestock owner after September 1, 1999, the commissioner shall, based on the report from the university extension agent and conservation officer, evaluate the claim for conformance with the best management practices developed by the commissioner in subdivision 5. The commissioner must provide to the livestock owner an itemized list of any deficiencies in the livestock owner's adoption of best management practices that were noted in the university extension agent's or conservation officer's report.

(c) If the commissioner denies compensation claimed by an owner under this section, the commissioner shall issue a written decision based upon the available evidence. It shall include specification of the facts upon which the decision is based and the conclusions on the material issues of the claim. A copy of the decision shall be mailed to the owner.

(d) A decision to deny compensation claimed under this section is not subject to the contested case review procedures of chapter 14, but may be reviewed upon a trial de novo in a court in the county where the loss occurred.  The decision of the court may be appealed as in other civil cases.  Review in court may be obtained by filing a petition for review with the administrator of the court within 60 days following receipt of a decision under this section.  Upon the filing of a petition, the administrator shall mail a copy to the commissioner and set a time for hearing within 90 days of the filing.

**Subd. 5.**   Gray wolf best management practices.  By September 1, 1999, the commissioner must develop best management practices to prevent gray wolf depredation on livestock farms.  The commissioner shall periodically update the best management practices when new practices are found by the commissioner to prevent gray wolf depredation on livestock farms.  The commissioner must provide an updated copy of the best management practices for gray wolf depredation to all livestock owners who are still engaged in livestock farming and have previously submitted livestock claims under this section.

HIST: 1977 c 450 s 4; 1982 c 424 s 130; 1982 c 629 s 1; 1983 c 247 s 2; 1986 c 444; 1Sp1986 c 3 art 1 s 82; 1988 c 469 art 1 s 1; 1998 c 401 s 11-13; 2000 c 463 s 1,22

*   NOTE:  The amendment to subdivision 1 by Laws 2000, chapter *463, section 1, is effective July 1, 2001.  Laws 2000, chapter *463, section 24.

Copyright 2000 by the Office of Revisor of Statutes, State of Minnesota.

000366A

# EXHIBIT E

**U.S. Fish & Wildlife Service**

# Post-delisting Monitoring Plan for the Western Great Lakes Distinct Population Segment of the Gray Wolf



000367A

**U.S. Fish & Wildlife Service**

# Post-delisting Monitoring Plan for the Western Great Lakes Distinct Population Segment of the Gray Wolf

## February 2008

Recommended Citation

U.S. Fish and Wildlife Service.  2008. Post-delisting monitoring plan for the Western Great Lakes Distinct Population Segment of the Gray Wolf.  U.S. Fish and Wildlife Service, Twin Cities Field Office and Midwest Region.  Bloomington, MN and Ft. Snelling, MN. 13pp.

000368A

# Table of Contents

Acknowledgements ................................................................................................................... 1

Background .............................................................................................................................. 1

Public Review and Comment ................................................................................................. 2

Monitoring by the States ........................................................................................................ 2

    Minnesota ........................................................................................................................... 3

    Wisconsin ........................................................................................................................... 4

    Michigan ............................................................................................................................. 5

    Summary of Monitoring in Wisconsin and Michigan ................................................... 6

Monitoring of Threats ............................................................................................................ 6

Implementation of Legal and Management Commitments ......................................... 7

Monitoring Duration and Methods ....................................................................................... 7

Events & Factors Indicating a Potential Need for Action by the Service ..................... 10

Events that Might Cause Consideration of Relisting or Emergency Relisting ............... 10

Others Factors Indicating a Potential Cause for Concern ............................................... 11

Literature Cited ..................................................................................................................... 13

000369A

**Acknowledgements**

This plan was originally drafted by Ron Refsnider, U.S. Fish and Wildlife Service (Service), Midwest Region, with input from members of the Service's recovery team.  It was then finalized after the completion of the public comment period by Phil Delphey, with assistance from Joel Trick and Christie Deloria-Sheffield all of U.S. Fish and Wildlife Service.

**Background**

Section 4(g) of the Endangered Species Act (Act) requires the Service to monitor, for a minimum of five years, any species that is delisted due to its recovery.  The intent of this monitoring is to determine whether the species should be proposed for relisting under the normal listing procedures, relisted under the emergency listing authority of the Act, or kept off of the list because it remains neither threatened nor endangered.  For the Western Great Lakes Distinct Population Segment of the Gray Wolf [WGLDPS, 71 Federal Register 15266; (March 27, 2006); Figure 1], the post-delisting monitoring (PDM) plan should focus on reviewing and evaluating (1) population characteristics of the distinct population segment (DPS), (2) threats to the DPS, and (3) implementation of legal and management commitments that are important in reducing threats to the DPS or maintaining threats at sufficiently low levels as these have a bearing on the five factors set forth in the Act.

For the delisted WGLDPS, focusing PDM on these three aspects is necessary and sufficient to ensure that the DPS does not decrease to the point of again meeting the definition of threatened or endangered without an appropriate and timely response from the Service.  Winter and late-winter estimates of wolf populations in Minnesota, Wisconsin, and Michigan have demonstrated that wolves in the WGLDPS have surpassed their numerical recovery criteria for a sufficient period due to a reduction in threats over the last 25 years [U.S. Fish and Wildlife Service (USFWS) 1992].  The protection and management of wolves by states will be critical in conserving the WGLDPS.  In addition, management of wolf habitat by tribes and federal land management agencies will continue to be important in conserving the WGLDPS.  Since delisting, state and tribal laws and regulations have become the primary mechanism to protect wolves from their primary former threat – excessive human-caused mortality.

PDM for the WGLDPS will be focused within the borders of Minnesota, Wisconsin, and the Upper Peninsula (UP) of Michigan, where wolf populations have attained the numerical recovery criteria specified in the Recovery Plan for the Eastern Timber Wolf (USFWS 1992).  The delisting of the WGLDPS of the Gray Wolf is based on wolf recovery in those three states.  Therefore, it is not necessary to conduct intensive monitoring in other parts of the DPS.  The Service is interested, however, in reviewing any data regarding the existence of individual wolves or wolf populations outside of the core recovery areas (Fig. 1), especially in the Northern Lower Peninsula (NLP) of Michigan.  Additionally, the Service is interested in obtaining disease and parasite data from wolves found in other portions of the DPS that may suggest a new or increasing threat that may impact wolves in the core recovery areas.

1

000370A



Figure 1. Western Great Lakes Distinct Population Segment

## Public Review and Comment

On June 4, 2007, the Service announced the availability of its draft plan to monitor the WGLDPS of the Gray Wolf for public review and comment.  After the comment period closed on July 5, 2007, the Service reviewed each comment received and prepared comments in response to any substantive comments (see Appendix).

## Monitoring by the States

The States of Minnesota, Wisconsin, and Michigan have carried out wolf monitoring for several decades, with significant assistance from numerous partners, including the U.S. Forest Service, National Park Service, U.S. Department of Agriculture (USDA)-Wildlife Services, tribal natural

2

resource agencies, and the Service.  In Minnesota, for example, these agencies provide data directly to the Minnesota Department of Natural Resources to support its development of statewide population estimates (Erb and Benson 2004).  The methods used in this monitoring are summarized below, and are described in detail by Erb and Benson (2004), Wydeven *et al.* (2006), and Potvin *et al.* (2005).

All three states intend to implement monitoring methodologies that would allow for comparison to data obtained before delisting.  As specified in the Recovery Plan for the Eastern Timber Wolf (USFWS 1992), population monitoring will be conducted during the late winter months when wolf populations are at the low point of their annual cycle and when snow cover and lack of foliage on deciduous trees facilitates tracking and aerial counting.

**Table 1.  Gray wolf winter populations in Minnesota, Wisconsin, and Michigan (excluding Isle Royale) from 1976 through 2006.**

| Year | Minnesota | Wisconsin (WI) | Michigan (MI) | WI & MI Total |
|------|-----------|----------------|---------------|---------------|
| 1976 | 1,000–1,200 | ? | | |
| 1978–79 | 1,235 | ? | | |
| 1988–89 | 1,500 & 1,750 | 31 | 3 | 34 |
| 1989-90 | | 34 | 10 | 44 |
| 1990-91 | | 39 | 17 | 57 |
| 1991-92 | | 45 | 21 | 66 |
| 1992-93 | | 40 | 30 | 70 |
| 1993–94 | | 54 | 57 | 114 |
| 1994–95 | | 83 | 80 | 163 |
| 1995–96 | | 99 | 116 | 215 |
| 1996–97 | | 148 | 113 | 261 |
| 1997–98 | 2,445 | 178 | 139 | 319 |
| 1998–99 | | 204 | 169 | 374 |
| 1999–2000 | | 248 | 216 | 464 |
| 2000–01 | | 257 | 249 | 506 |
| 2001–02 | | 327 | 278 | 604 |
| 2002–03 | | 335 | 321 | 656 |
| 2003–04 | 3,020 | 373 | 360 | 733 |
| 2004–05 | | 435 | 405 | 840 |
| 2005-06 | | 467 | 434 | 899 |
| 2006-07 | | 540 | 509 | 1,049 |

Minnesota

Minnesota Department of Natural Resources (DNR) will continue to use a rangewide survey/local intensive study approach, which is suitable for a wolf population of thousands of animals ranging across more than 34,100 square miles (88,325 square kilometer).  The most

3

000372A

recent survey was conducted during the winter of 2003-2004 and provided a population estimate used in making the Service's delisting decision.  The Minnesota Wolf Management Plan (Minnesota DNR 2001) specifies that the survey frequency will be increased from the previous 9-10-year interval.  Statewide wolf population and distribution estimates will be conducted during the first and fifth years after delisting and subsequently at 5-year intervals.

During the years between statewide population estimates, the DNR will collect and analyze data from its predator scent post survey, furbearer winter track survey, and recorded wolf depredations of domestic animals.  Each of these will furnish independent annual indices of wolf population trends and occupied rangebut will not provide population estimates.  In the "Forest Zone", which comprises the main portion of the wolf range in Minnesota, there were 173 scent station routes completed in 2006 (Erb 2006).  Each route is 2.7 miles long and contains ten scent stations.  Data from these indices must be interpreted with caution and may not by themselves be reliable indicators of population declines.  Since 1994, however, trends in these indices point to a stable or slowing growing wolf population in Minnesota, consistent with the results of the statewide population estimates [72 Federal Register 6054 (8 February 2007)].

To estimate statewide wolf abundance, Minnesota uses estimates of winter pack territory and pack size that are based on radio telemetry studies in different portions of Minnesota wolf range.  The extent of occupied wolf range is determined based on an extensive survey of hundreds of tribal, federal, state and other natural resource managers, wildlife biologists, conservation officers, and other knowledgeable field personnel, and also by using human density and road density criteria (Erb and Benson 2004).  Wolf density data from the localized radio telemetry studies are applied to the estimated wolf range to derive an estimate of the numbers of wolves in packs in Minnesota.  This number is adjusted upward to account for non-pack wolves and a 90 percent confidence interval for the resulting point estimate is calculated (Erb and Benson 2004).  Using those methods for the winter of 2003/2004, Minnesota DNR estimated 3,020 wolves in the state with a 90 percent confidence interval ranging from 2,301-3,708 (Erb and Benson 2004).

In addition to reviewing each statewide wolf population estimate and wolf population indices, the Service will request from Minnesota DNR an annual summary of recorded wolf mortality incidents.  In the years between statewide population estimates, these mortality data will provide an additional index to the wolf population in the state and may help to assess the relative importance of various mortality factors.

Wisconsin

Wisconsin DNR will continue its intensive radio-tracking and annual winter track and sign surveys to provide data directly comparable to those available for recent years.  Wisconsin's methods are based on weekly aerial radio-tracking of about 40 percent of Wisconsin wolf packs from mid- through late-winter, supplemented by multiple winter track and sign surveys conducted in all areas suspected of containing wolf packs.  Those complementary methods identify the locations and approximate territories of nearly all packs and have a high likelihood of detecting most or all members of each pack.  Detection probability is less than 100 percent.  Therefore, the method probably underestimates the number of wolves in packs.

4

In several years, packs have subsequently been documented where no packs were suspected. When this occurs, WI DNR retroactively adjusts the previous year's population estimate to account for the missed wolves. Although there currently are no data available to derive confidence limits, the DNR's survey methods probably underestimate packs and pack wolf numbers by less than 10 percent. Because some of the underestimate is removed by adjustment in the subsequent year, the ultimate underestimate probably averages 5 to 10 percent or less for pack wolves. Winters with less snow cover produce poorer conditions for track surveys and reduced contrast for aerial sightings, likely resulting in larger underestimates in those years.

A second cause of underestimation is the number of lone wolves that are not included in the final estimate. Lone wolves are generally believed to constitute about 10-15 percent of a wolf population in winter (Fuller et al. 1992, 2003). WI DNR recorded 2 to 13 percent of the wolf population as loners from 1991-2000, but among radio-collared wolves an average of 8 percent spent the whole winter as loners (range 0 to 15 percent, Wydeven *et al.* 2000). The 2006-2007 population estimate included 17 (3%) lone wolves. Wolf reports were received from numerous Wisconsin counties beyond the area surveyed by the DNR. Although many of these are likely misidentifications by the public, some of these reports likely are of dispersing lone wolves not included in the annual count. Thus, missing lone wolves may further underestimate the statewide wolf population in Wisconsin.

Due to the minimal likelihood of double-counting pack wolves and the conservative approach used to estimate numbers of lone wolves, Wisconsin's methods are unlikely to overestimate the number of late-winter wolves in the state. During the PDM period Wisconsin DNR might test other methods, but does not plan to replace its traditional radio tracking/snow tracking surveys (Wydeven in litt. 2006).

Michigan

Michigan DNR also plans to continue its intensive ground tracking, aerial observation, and radio telemetry-based methods during the PDM period. Michigan's methods are very similar to those used by Wisconsin, including weekly monitoring of radio-collared wolves in about 40 percent of the packs, although Michigan does not use volunteers to assist with ground tracking. With the assistance of USDA-Wildlife Services, Michigan DNR annually spends over 2,000 person hours conducting the ground tracking portion of the survey. This effort involves searching over 8,000 miles of roads and trails at least once for wolf sign, with many miles searched multiple times.

Due to the increases in wolf numbers and the corresponding increase in effort required to count wolves, Michigan DNR is planning to implement a sampling approach to more efficiently determine wolf abundance (Potvin *et al.* 2005). Under this approach, Michigan DNR would stratify the UP into three sampling areas and intensively survey about 40-50 percent of the wolf habitat area annually. This stratified sampling approach would produce unbiased and precise estimates of the total wolf population that may be compared statistically to estimates derived before delisting (Beyer in litt. 2006, Lederle in litt. 2006).

5

000374A

Summary of Monitoring in Wisconsin and Michigan

The late winter surveys by the Wisconsin and Michigan DNRs produce estimates of their wolf populations at the low points in their annual cycle.  By late winter, mortality factors such as starvation and hypothermia, perhaps exacerbated by mange and other diseases, have largely exerted their effects and the annual production of pups has not yet begun.  In early spring after pups are born it is likely that the wolf population approximately doubles the late-winter population.  Therefore, the late-winter population estimates must always be accompanied with this understanding when used to evaluate recovery progress and post-delisting viability – they are minimum estimates of the wolf population made at its annual low point.

**Monitoring of Threats**

The most important part of this monitoring plan is to determine, with sufficient confidence, that population levels exceed the objectives described in the recovery plan, as summarized above.  Where feasible, however, the Service should also review mortality records, diseases, prey abundance, and other information to determine whether or not significant problems for wolf populations may be developing during the post-delisting monitoring period.  Post-delisting threats are all the threats that may affect the species after the protections of the Act are removed.  These include ongoing threats whose magnitude has been reduced by conservation actions, continuing threats that have not been mitigated since listing, or new threats that are first recognized subsequent to delisting.  For purposes of this monitoring plan, we believe the most important threats to monitor are those that have been sufficiently reduced and contained, but not permanently eliminated, during the recovery process.  For gray wolves in the WGLDPS, those threats are primarily the various forms of human-caused mortality that were reduced by conservation actions before the DPS was delisted.  Additionally, a variety of known wolf diseases and parasites are of concern and new diseases represent a threat that requires vigilance.  All of these anticipated post-delisting threats are described in detail in **Summary of Factors Affecting the Species** in the preamble of the 2006 proposed delisting rule [75 Federal Register 15277-15302 (8 February 2007)].

Minnesota, Wisconsin, and Michigan DNRs will continue to compile summaries of human-caused and natural mortality and to provide this information to us annually.  This reporting will include information on: wolves killed legally and intentionally for depredation control, conservation actions taken to reduce threats, conduct research, or for other reasons, accidental mortality (e.g., vehicle collisions and incidental trapping mortalities), natural mortality (e.g., disease and intraspecific conflict), illegally killed wolves, and mortalities from unknown factors.  Although starvation may be the major cause of pup mortality, disease may also be important during some years and may also infrequently play a significant role in adult mortality.  Significant levels of mortality due to disease would be reflected in population surveys conducted by each state.  Nevertheless, each state plans to also implement some level of disease monitoring.

The wolf management plans for Minnesota and Wisconsin commit the respective DNRs to conduct necropsies on dead wolves, carry out disease screening on live-trapped wolves, and

000375A

analyze wolf scat for pathogenic microorganisms and parasites.  The Michigan DNR states that wolf health and disease monitoring will receive a high priority for a minimum of five years after Federal delisting.  The Service will request this information annually for review (see below).

Native American Indian tribes are responsible for wolf management within their reservations.  In addition, many tribes have rights and interests in wolves in a number of treaty ceded territories.  Consistent with our responsibilities to tribes and our goal to have the most comprehensive data available for our annual review, we will annually contact tribes and their designated intertribal natural resource agencies within the DPS to obtain any information they wish to share regarding wolf populations, the health of those populations, or changes in their management and protection.  Reservations within the WGLDPS that may have significant wolf data to provide during the post-delisting period include Bois Forte, Bad River, Fond du Lac, Grand Portage, Lac Courte Oreilles, Lac du Flambeau, Leech Lake, Menominee, Oneida, Red Lake, and White Earth.  The Service will annually contact the natural resource agencies of each of these reservations and that of the 1854 Treaty Authority and Great Lakes Indian Fish and Wildlife Commission to request wolf data as described below.

We will also annually contact the federal land management agencies with significant wolf populations on their units in Minnesota, Wisconsin, and Michigan to obtain any additional data they may have regarding wolf management/protection, numbers, mortality, injuries, or disease.

**Implementation of Legal and Management Commitments**

The recovered WGLDPS is dependent upon wolves receiving sufficient protection in Minnesota, Wisconsin, and Michigan to ensure that a viable wolf population will remain in Minnesota and a second viable population will exist in Wisconsin-Michigan for the foreseeable future.  When the Act's protection ended at the time of delisting, the focus of wolf protection shifted to state and tribal governments and to federal land management agencies.  Protections by the states as identified more fully in the Final Rule [72 Federal Register 6052 (8 February 2007)], may be most important because they affect the greatest number of wolves in the DPS.

The Service has concluded that the wolf management plans of Minnesota, Wisconsin, and Michigan and the protection of gray wolves by the tribes and federal land management agencies are sufficient to conserve viable wolf populations within the DPS.  Therefore, the Service will annually evaluate the implementation and outcomes of these wolf management plans, protections, and related guidelines and procedures.

**Monitoring Duration and Methods**

The Service will implement this PDM plan for five years after the delisting of the Gray Wolf WGLDPS.  Therefore, we plan to complete this monitoring in 2012 – for example, population data obtained during the winter of 2011-2012 will represent the final year of monitoring.  This will allow for five complete Wisconsin-Michigan population estimates after delisting has occurred and non-federal wolf management plans and protections become operational.  Minnesota DNR will develop statewide estimates for the winters of 2007-2008 and 2011-2012.

7

000376A

The WGLDPS population currently is estimated to be several times greater than the numerical delisting criteria stated in the 1992 Recovery Plan (USFWS 1992 and Table 1) and we currently envision no threat or combination of threats that are reasonably likely to drive wolf numbers rapidly downward.  Therefore, we believe 5 years of PDM is sufficient.  Under the circumstances described below we will consider extending the PDM period and/or taking action to restore federal protections under the Act.

We will gather available data annually from Minnesota, Wisconsin, and Michigan DNR's and from the Native American natural resource agencies and federal land management agencies with large land bases within occupied wolf range in these three states.  We will also contact the wildlife management agencies of the other states in the DPS to obtain any relevant data acquired during the previous year.

The Service will contact state and tribal wildlife resource conservation agencies and federal land management and research agencies to establish points of contact to obtain the relevant data annually.  Within the Service, the Endangered Species Coordinator at the Service's Twin Cities, Minnesota, Ecological Services Field Office will be the focal point for the data gathering, evaluation, and coordination with former members of the Eastern Gray Wolf Recovery Team and other experts, as appropriate.

Our data gathering will include the following, with the primary data shown in bold type:

- Wolf **population estimates, pack numbers, and estimated occupied area** from Minnesota, Wisconsin, and Michigan DNRs and from reservations within the wolf-occupied portions of these three states;
- Wolf **mortality data** from the three states and the reservations within occupied range in the WGLDPS;
- Data on the **occurrence of diseases and parasites** in wolves throughout the WGLDPS;
- Information on changes made within the previous year, or changes likely within the next year, to state **regulatory mechanisms that change the previously-provided protections** for gray wolves, gray wolf prey, or gray wolf habitat within the DPS;
- Summary data for all **law enforcement investigations** relating to wolves by the three states;
- Summary reports of **wolf depredation incidents** and the resolution of those incidents in the WGLDPS;
- Reports or publications on public attitudes toward WGLDPS wolves;
- Reports of wild gray wolves in other states within the WGLDPS;
- Wolf research reports or publications dealing with WGLDPS wolves or factors adversely affecting them;
- Educational materials, press releases, and other wolf-related public information/education documents distributed by the state, tribal, and federal agencies within the WGLDPS, and similar materials distributed within the WGLDPS by non-governmental agencies.

The Service will annually contact the following four categories of agencies, requesting the listed types of data.

8

000377A

1) Minnesota, Wisconsin, and Michigan Departments of Natural Resources:

- population estimates, pack numbers, occupied area
- mortality data
- disease/parasite occurrence in wolves
- verified or probable depredation incidents and follow-up actions
- changes to regulatory mechanisms affecting the protection or management of the species, its prey, and its habitat
- law enforcement investigations of wolf mortality
- other relevant information including any recent population estimates or indices for primary wolf prey, white-tailed deer (*Odocoileus virginianus*) and moose (*Alces alces*).

2) Tribal Natural Resource Agencies in the DPS:

- population estimates and pack numbers
- mortality data
- changes to management
- other relevant information including any recent population estimates or indices for primary wolf prey, white-tailed deer (*Odocoileus virginianus*) and moose (*Alces alces*).

3) Other States within the WGLDPS – North Dakota, South Dakota, Iowa, Illinois, Indiana, and Ohio:

- verified or probable wolf reports & disposition of any verified or probable wolves
- disease/parasite occurrence in documented wolves
- other relevant information

4) Federal Land Management Agencies with large land bases within occupied wolf range – Chippewa National Forest (NF), Superior NF, Chequamegon-Nicolet NF, Hiawatha NF, Ottawa NF, Voyageurs National Park; and national wildlife refuges with sufficient land base or known wolf presence:

- population estimates and pack numbers
- mortality data
- law enforcement investigations of wolf mortality
- regulatory mechanism changes
- other relevant information including any recent population estimates or indices for primary wolf prey, white-tailed deer (*Odocoileus virginianus*) and moose (*Alces alces*).

9

000378A

Wisconsin and Michigan DNRs currently finalize their annual population between April and June.  Therefore, we expect to gather this information annually during that timeframe and to complete our evaluation of the information later in the year.  The data and the Service's evaluations thereof may be provided in entirety or in summary form to the former members of the Eastern Gray Wolf Recovery Team for their independent review.  The Service may request additional reviews from other wolf experts and independent specialists, as appropriate.  We will attempt to focus these annual reviews on any indications of (1) increasing or new threats to wolf population viability, (2) a decline in wolf population or decrease in occupied range, (3) a change in state, tribal, or federal management and protection that might have adverse effects on wolf conservation.  We will also evaluate other factors that might indicate or cause a decline in wolf population viability in the WGLDPS and how these might affect the status of the species in terms of the Act's five listing factors.  Although the Service's review will focus on population trends, mortality data, and protection and enforcement activities, other data will be reviewed as appropriate.  We will post the results of these reviews in summary form on our Web site in a timely manner to allow interested parties to annually review our PDM and our evaluation of the data.

**Events & Factors Indicating a Potential Need for Action by the Service**

Although it may seem desirable to specify in advance a list of explicit quantitative triggers that would require specific actions by the Service (e.g., extension of the PDM period, initiating a formal status review, or publication of a relisting proposal), such actions should only be taken based on a more comprehensive review.  Thus, we are instead identifying three quantitative events and describing several examples of qualitative factors that would lead to our *consideration* of the actions (a) through (d) described below, but which *would not necessarily trigger* these actions.  Consultation with the former members of the Eastern Gray Wolf Recovery Team, other wolf experts, and endangered species biologists within the Service will help to identify the appropriate response.

**Events that Might Cause Consideration of Relisting or Emergency Relisting**

Any of the events described below might be evidence of a serious problem, but by themselves may not trigger Federal regulatory action.  The occurrence of any of the following could cause the Service to investigate the underlying cause, the likely duration of the decline, and other data relevant to wolf population viability in the WGLDPS to decide if a proposal to relist, an emergency relisting, or other action is warranted.

- A decline that reduces the combined Wisconsin-Michigan (excluding Isle Royale and the Lower Peninsula) late winter wolf population estimate to 200 or fewer wolves.[1]

---

[1] To calculate the total number of wolves in Michigan and Wisconsin, the Service will assume that the number of wolves in either state is equal to the lower end of the 90% confidence interval or, in the absence of any confidence intervals, the minimum value of the reported range.  As of this plan's completion, Michigan plans to annually compute confidence intervals for its statewide population estimate, whereas Wisconsin provides a range with minimum and maximum values.

000379A

- A decline that brings <u>either</u> the Wisconsin <u>or</u> the Michigan (excluding Isle Royale and the Lower Peninsula) wolf estimate to 100 or fewer wolves.

- A decline that brings the Minnesota winter wolf population point estimate or lower end of the 90% confidence interval to 1500 or fewer wolves.

The numeric recovery goals were 1251-1400 for Minnesota (USFWS 1992:28) and 100 for the Wisconsin-Michigan population (USFWS 1992:25).

**Others Factors Indicating a Potential Cause for Concern**

The Service may evaluate the potential impact of any of the following events on the conservation of the WGLDPS, but would not necessarily take additional actions.

- A rapid and large decline (for example, 25 percent or more from the previous year) in the late winter wolf population estimate for Wisconsin or Michigan.
- Any wolf population decline in Wisconsin Zones 1 and 2 or the Upper Peninsula of Michigan of three years or more in duration.
- A substantial and widespread increase in mortality from known or unknown causes.
- Evidence of a new wolf disease or substantial increase in virulence of a previously known wolf disease, even in the absence of noticeable demographic impacts on the wolf population.
- A substantial decline in the wolf prey base across a large portion of the occupied wolf range in the DPS.
- A significant adverse change in wolf, wolf prey, or wolf habitat management practices or protection across a substantial portion of the occupied wolf range in the WGLDPS.

If declines in wolf abundance in the WGLDPS (as described above under 'Events' and 'Other factors') are evident following an annual PDM review, the Service may take any or all of the following actions:

a) extend the PDM period;
b) add new components to the PDM;
c) initiate a comprehensive status review of the species within the DPS;
d) investigate or remedy the cause(s) of the decline.

In addition, the Service may determine that none of these four actions is appropriate.  For example, no action may be necessary if the decline is relatively minor, is likely to be temporary or readily resolved, or is not statistically significant.

As part of each annual evaluation the Service will also consider changes to the PDM

11

methodology and data review process.  If such changes are necessary to meet the Service's responsibilities under Section 4(g) of the Act, they will be promptly implemented, subject to available funding needed for their implementation.

During the monitoring period, if the Service detects a change in wolf populations or a significant increase in threats, it can evaluate and change monitoring methods or consider relisting.  At the end of the PDM period the Service will conduct a final internal review and may request reviews by the former members of the Eastern Gray Wolf Recovery Team and other independent specialists, as appropriate.  Based on those reviews, which will be posted on the Service's Internet site, the Service will decide whether to relist, continue monitoring, or end monitoring.

000381A

## Literature Cited

Beyer, Dean.  2006.  E-mail from Beyer, MI DNR Wildlife Research, to Ron Refsnider, USFWS Regional Office, Ft. Snelling, MN, dated 08/10/06.  Subject:  Potential for "MN-style" wolf monitoring in WI and MI?  2 pp. with 6-page attachment by Drummer.

Erb, J. and S. Benson.  2004.  Distribution and abundance of wolves in Minnesota, 2003-04.  Unpublished report by Minnesota Department of Natural Resources, Grand Rapids, MN 13 pp.

Fuller, T.K., W.E. Berg, G.L. Radde, M.S. Lenarz, and G.B. Joselyn.  1992.  A history and current estimate of wolf distribution and numbers in Minnesota.  Wildlife Society Bulletin 20:42-54.

Fuller, T.K., L.D. Mech, and J.F. Cochrane.  2003.  Wolf population dynamics.  Pp. 161-191 In Wolves:  Behavior, Ecology, and Conservation.  eds. L.D. Mech and L. Boitani.  Univ. of Chicago Press, Chicago.  448 pp.

Lederle, P.  2006.  E-mail from Lederle, MI DNR Wildlife Research Section Supervisor, to Ron Refsnider, USFWS Regional Office, Ft. Snelling, MN, dated 09/05/06.  Subject:  Support for the sampling protocols.  1 p.

Michigan Department of Natural Resources.  1997.  Michigan gray wolf recovery and management plan.  Lansing, MI  58 pp.

Minnesota Department of Natural Resources.  2001.  Minnesota wolf management plan.  Prepared by the Section of Wildlife, dated February 2001.  36 pp. plus 9 appendices.

Potvin, M.J., T.D. Drummer, J.A. Vucetich, D.E. Beyer, R.O. Peterson, and J.H. Hammill.  2005.  Monitoring and habitat analysis for wolves in Upper Michigan.  J. Wildl. Mgmt. 69:1660-1669.

U.S. Fish and Wildlife Service.  1992.  Recovery plan for the eastern timber wolf.  Twin Cities, MN  73 pp.

Wiedenhoeft, J.E.  2005 . Summary Report - "Minnesota-type" wolf survey for Wisconsin - GIS analysis. Unpublished report to State Wildlife Grants Program - CWCP. Wisconsin DNR, Park Falls, WI. 14 pp.

Wydeven, Adrian.  2006.  E-mail from Wydeven, WI DNR Mammalian Ecologist, to Ron Refsnider, USFWS Regional Office, Ft. Snelling, MN, dated 08/09/06.  Subject:  Potential for "MN-style" wolf monitoring in WI and MI.  2 pp. with 14-page attachment [Wiedenhoeft 2005, listed separately above].

Wydeven, A.P., J.E. Wiedenhoeft, B.E. Kohn, R.P. Thiel, R.N. Schultz, and S.R. Boles.  2000.  Progress report of wolf population monitoring in Wisconsin for the period October 1999 - March 2000.  Unpublished report by Wisc. Dept.  Natural Resources, Park Falls, WI.  31 pp.

Wydeven, A.P., J.E. Wiedenhoeft, R.N. Schultz, R.P. Thiel, S.R. Boles, and E. Heilhecker.  2006.  Progress report of wolf population monitoring for the period October 2005 – March 2006.  Unpublished report by WI DNR, Park Falls, WI.  39 pp.

000382A

**U.S. Fish and Wildlife Service**

# Appendix: Responses to Public Comments

**on the**

# Post-Delisting Monitoring Plan for the Western Great Lakes Distinct Population Segment of the Gray Wolf

November 2007

000383A

# **Table of Contents**

Introduction ................................................................................................ 1

Accuracy, Precision, and Sensitivity of the Proposed Monitoring Plan ........................ 1

Funding ................................................................................................... 3

Disease Monitoring ...................................................................................... 4

Cooperation with Native American Tribal Governments ................................................ 5

Recommended Actions at End of Five-Year Monitoring Period .................................. 5

Status of Wolves in Lower Michigan ............................................................. 6

Other Comments Specific to Monitoring in Minnesota .................................................. 6

Scope of Plan ............................................................................................. 7

Monitoring Effort ....................................................................................... 7

Typographical, Clarification, and other Minor Errors in Draft ...................................... 8

Potential Response of the Service to Monitoring Results ........................................... 8

000384A

Appendix – Responses to Public Comments

## Introduction

On June 4, 2007, U.S. Fish and Wildlife Service (Service) announced the availability of its draft plan to monitor the Western Great Lakes Distinct Population Segment (WGL DPS) of the Gray Wolf for public review and comment.  The comment period closed on July 5, 2007.  The plan is intended to fulfill the Service's responsibility under the Endangered Species Act of 1973, as amended, to monitor the status of the WGL DPS for five years after its removal from the Federal List of Threatened and Endangered Wildlife and Plants.  The Service announced the delisting of the WGL DPS on February 8, 2007 and the delisting became effective on March 12, 2007.

After the comment period closed, the Service reviewed each comment received and prepared comments in response to any substantive comments.  Those comments and the Service's responses are grouped and summarized below.

## Accuracy, Precision, and Sensitivity of the Proposed Monitoring Plan

Comment – The precision of the 'rangewide survey/local intensive study approach' to monitoring that is used by Minnesota Department of Natural Resources (MN DNR) may not be sufficient to readily detect rapid population declines, which may result from increased lethal control of wolves.

Response: The Service will review mortality data annually for each state and will also evaluate 'annual index' data collected by MN DNR (e.g., autumn scent station surveys; MN DNR 2001:19).  Although MN DNR plans to conduct statewide population estimates during only the first and fifth years after delisting, our review of mortality data and other indices of wolf population abundance would likely result in the detection of any sharp population decline between years.

Comment – The Service should consider the relative precision of each state's population estimate, especially for Minnesota.

Response – The 2003/2004 survey and subsequent analysis by MN DNR resulted in an estimate of 3020 wolves in Minnesota with a 90% confidence interval ranging from 2301 to 3708.  In other words, MN DNR may be 90% confident that the actual number of wolves in Minnesota during the winter of 2003/2004 was between 2301 and 3708.  On the other hand, there may only be a 10% chance that the number of wolves in Minnesota was less than 2301 or greater than 3708.  The Service agrees that it should consider the precision of statewide population estimates.  Therefore, under the heading, "Events that might cause Consideration of Relisting or Emergency Relisting", the Service will evaluate a decline that brings the Minnesota winter wolf population point estimate or 90% confidence interval to 1500 or fewer wolves.

Wisconsin DNR's (WI DNR) methods do not allow it to quantitatively describe the precision of its population estimate, although its methods likely produce a highly accurate and precise estimate.  Wisconsin typically reports its population estimate as a range and the Service will use the low end of the range when evaluating the state's wolf population estimate against the review triggers.

As stated in the draft post-delisting monitoring plan, Michigan DNR (MI DNR) has recently modified its monitoring plans to allow for the calculation of confidence intervals.  Thus, to calculate the total number of wolves in Michigan and Wisconsin, the Service will assume that the number of wolves in either state is equal to the lower end of the 90% confidence interval or the minimum of the reported range.

Comment – The population levels that would cause the Service to consider relisting gray wolves in the Western Great Lakes Distinct Population Segment are too low for Minnesota.

Response – In the draft post-delisting monitoring (PDM) plan, a decline that brought the Minnesota winter wolf population estimate to 1500 or fewer wolves would trigger the Service to consider relisting the gray wolf in the Western Great Lakes Distinct Population Segment.  As stated above, the Service will modify this 'trigger' to state that the Service will consider relisting if the lower end of the 90% confidence interval

000385A

Appendix – Responses to Public Comments

is less than 1500.  The Service's recovery plan established a planning goal of 1,250–1,400 animals for the Minnesota wolf population (USFWS 1992:28), concluding that a population of this size would be necessary to ensure resilience against potentially harmful demographic and environmental events.  In 1997, when wolf numbers in the Midwest appeared to be approaching the recovery criteria specified in the 1992 Plan, the Service reconvened its Recovery Team to reevaluate these criteria, which stated that the recovery criteria were ''sufficient'' (Peterson in litt. 1997, in litt. 1998).  Furthermore, a separate group of peer reviewers supported the Service's conclusion that the Western Great Lakes Distinct Population Segment of the Gray Wolf (WGL DPS) was recovered.  No one among this group expressed concern with the 1992 recovery criteria.  Therefore, we think that the plan to consider relisting if and when the 90% confidence interval falls below 1500 would be sufficiently sensitive to ensure a timely response to a situation in which the Minnesota population was at or approaching minimum recovery levels.

Comment – The monitoring methods used in the three states are inconsistent with one another.  For example, they vary in accuracy and precision and the methods used in Minnesota would have overestimated the number of wolves in Wisconsin in 2004.

Response – There is no clear reason for the monitoring methods to be entirely consistent among the three states as long as each is sufficient to describe the status of wolves in its respective state.  Thus far, each state has developed methods that have been sufficient for describing the numbers and distribution of gray wolves within its boundaries.  The cost and delay that would result from each state attempting to modify its monitoring methods to align with a single methodology would be significant and may hinder comparisons to pre-delisting abundance and distribution within the WGL DPS.  Nevertheless, each state may improve its monitoring methods as biologists find ways to improve the accuracy, precision, and efficiency of their methods.

Based on an analysis conducted by Wisconsin DNR (Wiedenhoeft 2005), the methods used in Minnesota to estimate wolf abundance and distribution there would not have been well suited for use in Wisconsin in 2004.  This may be due, in part, to the fact that the wolf population in Wisconsin is still expanding and the Minnesota methods assume that all suitable habitat is occupied by wolves.  That assumption may be valid for Minnesota, where all suitable habitat may already be occupied (Erb & Benson 2004), but would have overestimated wolf abundance in Wisconsin in 2004 where wolves were yet to inhabit all suitable habitat and where wolf habitat is more patchy (Wiedenhoeft 2005:12).

The Minnesota methods were also found to overestimate the area occupied by wolves in Michigan (D. Beyer, Michigan DNR, pers. comm. 8/10/06).  In the Upper Peninsula, deer are sparse in some areas during winter.  The habitat suitability model used in Minnesota is based on road and human density and does not consider winter deer density.  Therefore, some areas where human and road densities are sufficiently low in Michigan have insufficient prey densities to support resident packs.  The assumption that these areas were occupied by wolves resulted in an overestimate of wolf numbers in Michigan (D. Beyer, pers. comm. 7/27/07).  These underlying ecological differences among the states provide further support for not attempting to force a uniform monitoring methodology.

Comment – The Minnesota monitoring methods may make it difficult to measure rapid population declines.

Response – This comment focused on the methods used to calculate statewide population estimates in Minnesota.  The Service will not rely entirely on these statewide population estimates to assess trends in wolf abundance in Minnesota, but would also review wolf mortality data, law enforcement investigations of wolf mortality, verified or probable depredation incidents and associated follow-up actions, and wolf pack numbers on national forests, national parks, and national wildlife refuges.  These additional sources of information, in conjunction with review of the periodic statewide population estimates, are likely to allow for timely detection of any significant population declines in Minnesota.

2

000386A

Appendix – Responses to Public Comments

Comment – The Service should require the states to annually present confidence limits on these estimates.

Response – Wisconsin intensively monitors its wolf population using aerial radio tracking, intense snow track surveys, and collection of public reports of wolf observations  and will continue to do so during the five-year federal monitoring period (Wydeven et al. 2007:13).  Therefore, it likely provides a highly precise and conservative estimate of the statewide population.  It is conservative because it is taken in late winter before pups are born and it underestimates lone wolves.  Moreover, the Service would use the minimum value in the range to represent the size of the state population.  Confidence intervals are more important when only a subset of the population is intensively monitored, as in Minnesota and Michigan.

Comment - The "Events that might cause Consideration of Relisting or Emergency Relisting" should be made more stringent.  The scenarios presented appear to be based solely on baseline recovery population levels and do not consider the rate of decline or other factors.  Steep rates of decline should also be considered a quantitative event which might cause consideration of relisting.  This concept is considered under item 1 of the "Other factors indicated a potential cause for concern" section, but this should be elevated and incorporated into the "event" conditions.

Response – We will keep this concern where it was in the draft plan, but may take the following actions in response to a steep decline:

a)   extend the PDM period;
b)   add new components to the PDM plan;
c)   initiate a comprehensive status review of the species within the DPS;
d)   investigate and/or remedy any causes of the decline.

Comment – An "event" condition should also be developed based upon marked declines in the population indices that the MN DNR uses to monitor wolf population trends between state-wide surveys.

Response – The annual indices that MN DNR proposes to use to monitor wolf populations between statewide surveys include wolf depredation complaints, autumn scent station surveys, winter furbearer track surveys, and other observations of field personnel from all natural resources agencies (Minnesota Department of Natural Resources 2001:19).  In general, these indices must be interpreted with caution and may not by themselves be reliable indicators of significant population declines.  Nevertheless, the Service will review these data sources annually and may take the types of actions described in the immediately preceding comment, if appropriate.

Comment – The draft PDM plan stated that MN DNR's statewide population estimate "can only provide trend information and is not a population count."

Response – This comment in the draft PDM plan referred to the annual indices of wolf numbers and distribution (number of depredation complaints, scent post surveys, etc.) and did not refer to the five-year statewide population estimate.

## Funding

Comment - Funding sources that will support the population monitoring activities proposed by the states are not identified.  The Service must guarantee adequate funds are in place to support these plans.  The Service's plan must identify the resources that each state will use to support population monitoring activities.

Response – In 2000, MN DNR sent its recommendations for appropriations to implement its wolf management plan to the state legislature.  These described funds necessary for population monitoring and to hire a wolf specialist, which it hired in 2007.  The Service cannot guarantee that adequate funds are in place for the next five years of monitoring in each state.  Nevertheless, each state has acted in good faith thus far in monitoring its wolf populations and has also demonstrated that it can acquire funds necessary to fully

000387A

implement the monitoring components of its state plan.  The states have a variety of sources from which to fund wolf population monitoring, including Endangered Species Act Section 6 Conservation Grants.  The Service does not anticipate any of the states being unable or unwilling to implement the monitoring committed to in their state management plans.  Nevertheless, if any of the three states substantially reduce the robustness of their monitoring program (e.g., relative to the description of its monitoring in the Service's plan) the Service will consider revising the post-delisting monitoring plan.

Comment - Section 4(g) of the Endangered Species Act (ESA) mandates postdelisting monitoring (PDM) for a minimum of five years after a species is delisted.  Because PDM is a federal requirement, federal funding should be provided to the states of Minnesota, Wisconsin, and Michigan to fulfill it.  Furthermore, the level of federal funding provided should be commensurate with the standards and monitoring intensity required by the final PDM plan.

Response – The states are obviously critical in implementing the post-delisting monitoring described in the PDM plan.  Nevertheless, there is a variety of federal assistance funds that could be used by states to support their efforts.  These include Federal Aid in Wildlife Restoration, the State Wildlife Grant Program, and the Cooperative Endangered Species Conservation Fund.

## Disease Monitoring

Comment - The sampling protocol for necropsies and disease screening should be specifically stated to ensure that sampling is adequate to provide statistically significant results.

Response – Although starvation may be the major cause of pup mortality, disease may also be important during some years and may also infrequently play a significant role in adult mortality.  Significant levels of mortality due to disease would be reflected in population surveys conducted by each state.  Nevertheless, each state plans to implement some level of disease monitoring.  Although we understand the commenter's interest in a statistically robust disease monitoring program and the potential need for such monitoring in some cases, the continued population monitoring to be conducted by each state and the level of disease monitoring proposed by each state is sufficient for post-delisting monitoring of the Western Great Lakes DPS.

Below we summarize the disease monitoring proposed in each state's wolf management plan (Michigan Department of Natural Resources 2007; Minnesota Department of Natural Resources 2001; Wisconsin Department Natural Resources 2006):

Michigan

In its draft revised wolf management plan, MI DNR proposes to take the following actions to ensure diseases and parasites do not threaten the viability of wolves in Michigan:

- As necessary, update and refine protocols for collecting, submitting, and storing information on carcasses and biological samples.
- Train field staff on collection and submission protocols.
- Conduct necropsies and analyses of dead wolves and biological samples, respectively.
- Work with management partners to develop and conduct studies of wolf diseases and parasites.
- Continue to evaluate the feasibility and need for vaccinations of captured and free-ranging wolves.

Minnesota

- Will collaborate with other investigators and continue monitoring disease incidence, where necessary, by examination of wolf carcasses obtained through depredation control programs and through blood/tissue physiology work conducted by MN DNR and the U.S. Geological Survey.
- Will keep records of documented and suspected incidence of sarcoptic mange.

000388A

Appendix – Responses to Public Comments

- May initiate regular collection of tissue and conduct "periodic assessments of wolf health" "when circumstances indicate that diseases or parasites may be adversely affecting portions of the wolf population."

Wisconsin

- Will test live-captured wolves for diseases, physiological condition and parasites.  Ideally about 10% of a population of 100 wolves should be examined, but as the population continues to increase, the percentage of the population live-captured will decline. In recent years 20 to 40 wolves were captured annually.
- Will collect wolf scats to monitor for infectious diseases and parasites.
- Will necropsy dead wolves to determine cause of death, physical condition and disease status.
- Will archive tissues for future disease and genetic investigations.
- May occasionally conduct special studies on wolves – these should include health monitoring.
- Should continue wolf health monitoring as part of the capture protocol of studies of wild wolves in Wisconsin and should coordinate this monitoring with WDNR Wildlife Health Team.

## Cooperation with Native American Tribal Governments

Comment – The paragraph on page 6 which discusses tribal management has a generally negative tone.

Response – The commenter also provided replacement language for this paragraph, which we have largely adopted in the final version of the plan.

Comment – Expand the list of information that the Service will request from tribal natural resource agencies (i.e., include "changes to management" and "other relevant information") and request this information from tribal natural resource agencies within the range of wolf within the DPS, in general.

Response – The final version of the plan includes this slightly expanded list of information to be requested from tribal natural resource agencies and does not explicitly limit the information request to specific tribes.

## Recommended Actions at End of Five-Year Monitoring Period

Comment – The Service indicates at the end of the 5 year period, it "may" request reviews by the Recovery Team; this should be a required action.

Response – The Service, in developing and implementing recovery plans, may procure the services of appropriate public and private agencies and institutions and other qualified persons in the form of recovery teams.  Now that the gray wolf within the WGL DPS is delisted, the Service plans to disband the Eastern Gray Wolf Recovery Team.  Therefore, we will change any reference to the recovery team to "former members of the recovery team" in the final plan.  Nevertheless, the Service recognizes the substantial technical expertise of these persons and will likely seek their individual reviews of our findings, at least at the end of the five-year monitoring period.

Comment – The Service indicates that, except under fairly extreme circumstances, it believes a 5 year monitoring period will be adequate; the Service should retain an oversight role and program even after the five-year post-delisting period has ended.

Response – Now that the WGL DPS of gray wolves is no longer on the list of endangered and threatened species, the Service has no authority under the Endangered Species Act for formal oversight of wolf management.  If data are sufficient to indicate that the gray wolf in the DPS will be effectively conserved without protection of the Endangered Species Act, then the Service should focus its limited resources on species that remain on the list of endangered and threatened species or that may warrant addition to the list (i.e., "candidate" and 'at risk' species).

000389A

Comment - A public attitude survey should be conducted near the end of the monitoring period to gain insight into the trends in public acceptance of wolves.  Public attitudes may be the most significant factor in determining the long-term fate of the species in this DPS and it would be difficult to adequately determine if additional monitoring is necessary without an understanding of public attitudes and how they may be trending.

Response – The Service will annually review any reports or publications on public attitudes toward WGL DPS wolves and any educational materials, press releases, and other wolf-related public information/education materials produced by the states, tribes, or others.  In addition, we will directly evaluate the impacts of the public on wolves in the DPS by reviewing wolf population estimates and trends, the numbers of wolves killed legally and illegally, summary data for all law enforcement investigations, and reports of wolf depredation incidents.  Although the Service does not plan to commission any survey of public attitudes, it plans to review the results of any studies conducted by others (e.g., universities).

## Status of Wolves in Lower Michigan

Comment – A population survey should be conducted in the northern lower portion of Michigan in the final year of the 5-year post-delisting monitoring period.

Response –There is no clear need for wolves to occur in this area to ensure that the species no longer meets the definition of endangered or threatened under the Endangered Species Act.  Therefore, the Service's PDM plan will not refer specifically to wolves in this particular area.

## Other Comments Specific to Monitoring in Minnesota

Comment – MN DNR should conduct aerial wolf surveys and should not just gather "opinions" and data incidental to studies on other species.  We would like to see a list of participants and break down of their field positions in order to assess their qualifications for making these wolf observations.

Response – The statewide survey is based on much more robust methods than that suggested by the commenter.  MN DNR collects data from a variety of sources to prepare its five-year statewide population estimate.  It relies, in part, on data collected from regular monitoring that is not focused solely on gray wolf, including scent post surveys and winter furbearer track surveys.  There is nothing inherently wrong in using these types of data to ensure that all data revealing of wolf abundance and distribution contribute to the MN DNR's understanding of wolf trends in the state.  MN DNR also uses the best available information regarding the relationships between wolf densities and human population and road densities to describe occupied wolf range in the state.  In addition, ongoing radio telemetry studies help DNR to refine estimates of pack territory sizes.  We expect MN DNR to continue to investigate the most efficient methods to estimate its statewide wolf population as accurately and precisely as is feasible.  In its 2003-2004 report on its most recent statewide estimate, for example, MN DNR stated that aerial sampling methods show promise, but "may be logistically challenging when applied to broad expanses of dense forest" (Erb and Benson 2004).  Due to the logistical and other factors that each state must consider when designing its methods to monitor the widespread and dynamic wolf populations, it would not be appropriate for the Service to prescribe specific methodologies.

Comment – A significant portion of Minnesota's wolf range does not have any scent post sites and two of the largest counties in prime wolf range (Itasca and Koochiching) have only one station each.

Response – MN DNR actually conducts annual surveys along 24 2.7-mile routes (ten scent stations each - 240 scent stations total) in Itasca County and an additional ten routes (100 scent stations total) in Koochiching County (J. Erb, Minnesota Department of Natural Resources, Grand Rapids, MN, pers. comm. 8/24/07).  In the "Forest Zone", which comprises the main portion of the wolf range in Minnesota, there were 173 scent station routes completed in 2006 (Erb 2006).

Comment – The draft monitoring plan mentioned that MN DNR would furnish independent annual indices

and changes in occupied range of wolf in the state but they will not provide population estimates annually. Delisting and monitoring depend on population data.  Using limited trend data is an arbitrary way to "monitor" a species just removed from the list of threatened species.

Response – It is uncommon for populations of any species to be counted in their entirety.  Therefore, conservation agencies commonly use indices and population sampling to monitor population trends.  Of the three states inhabited by gray wolf packs in the WGL DPS, only Wisconsin may continue to conduct what may approach a complete count or census of its late winter wolf population.  Minnesota, however, may contain approximately six times the number of wolves as Wisconsin, distributed over a larger geographic area.  The combined use of annual population indices and a five-year statewide population estimate is adequate for monitoring the post-delisting status of gray wolves in the state.

## Scope of Plan

Comment – The post-delisting threats remain significant.  The draft plan does not adequately acknowledge those threats nor does it provide an adequate process for addressing those threats.

Response – The Service determined that the current threats to the species no longer warranted its listing as endangered or threatened under the ESA.  A reduction in threats to the species is the primary cause of the dramatic wolf population increase over the last 25 years and attainment of the numerical recovery criteria.  The intent of the post-delisting monitoring plan is to determine whether or not threats to gray wolves in the WGL DPS are adequately addressed by states, tribes, and others (e.g., federal land management agencies) to preclude the need to list the species under the ESA during the five years following its delisting.  For gray wolf WGL PDM purposes, we believe the most important threats to monitor are those that have been sufficiently reduced and contained, but not permanently eliminated, during the recovery process.  For gray wolves in the WGL DPS, those threats are primarily the various forms of human-caused mortality that have been reduced by the provisions of the Act.  Additionally, a variety of known wolf diseases and parasites are of concern.  Furthermore, the possibility of new diseases represents a threat that requires vigilance.  All these anticipated post-delisting threats are described in detail in "Summary of Factors Affecting the Species" in the preamble of the 2006 proposed delisting rule (75 FR 15277-15302) and are addressed by each state in their respective state management plans.

## Monitoring Effort

Comment – The same monitoring techniques should not be required both pre-and post delisting, particularly for populations that significantly exceed numerical delisting criteria outlined in recovery plans.  In reality, states should only be required, through the PDM plan, to reliably demonstrate that there is at least the minimum number required by recovery plans for delisting purposes.

Response – The Service agrees that the most important purpose of population monitoring per the ESA's PDM requirement is to determine, with sufficient confidence, that population levels exceed the objectives described in the recovery plan.  Where feasible, however, the Service should also review trends in population estimates, indices of abundance (e.g., scent post surveys), mortality records, diseases, and prey abundance to determine whether or not significant problems for wolf populations may be developing during the PDM period.

Comment - The final PDM plan should include language that allows the states to investigate and adopt alternative methods and protocols so as long as the data are scientifically comparable to data obtained prior to delisting.  States should have flexibility to refine and change monitoring protocols through time as new techniques are investigated and validated.  This flexibility is especially important given the potential for limited and declining availability of funding as wolf distribution expands.

Response – In the final PDM plan the Service will attempt to accurately describe each state's monitoring plans for the five years following delisting.  There is nothing in the Service's plan that would preclude changes by the states.  The Service would review any changes, however, to ensure that the revised methods

000391A

are likely to provide sufficiently accurate and precise information to effectively monitor the status of the species.  In fact, Michigan has been in the process of revising its methods and the nature of those revisions is briefly described in the PDM plan.

## Typographical, Clarification, and other Minor Errors in Draft

Comment - The PDM draft indicates actions (a) through (f) as potential actions USFWS might take after an annual review, but actions (e) and (f) are missing from the list on page 10 of the 04/23/07 draft.

Response – The draft plan should have said that the Service may take actions "(a) through (d)" listed below.  There were no potential response actions that were missing from the draft plan.

Comment - The difference and the nature of the relationships between "quantitative events" with "qualitative factors" are not clear.

Response – The response to the 'quantitative' triggers would be a focus on the potential need to relist the species, whereas the response to the 'qualitative' factors would not necessarily focus on the potential need to relist the species.  Situations that trigger one of the "qualitative events" will prompt the Service to evaluate the situation in detail and its underlying causes, but will not necessarily prompt an assessment of the potential need to relist the species.  We will attempt to make that more clear in the final PDM plan.

## Potential Response of the Service to Monitoring Results

Comment - We agree with the general USFWS approach, to consider a variety of data sets, events, and factors that influence wolf population trajectory, in addition to their interactions.  We agree that USFWS should not specify a set of strict triggers and automatic agency actions a priori.  Instead, USFWS should consider the collective body of information and data, consult with independent experts if appropriate, and proceed accordingly.

Response – We agree that it would not be appropriate to state in the PDM plan that the Service would relist the species, for example, if certain events transpired.  It is more appropriate to state, as clearly as is appropriate, what situations will prompt an evaluation by the Service to determine its appropriate response.

Comment – The PDM draft plan states that "in the event that WGL DPS declines are evident following an annual review, the Service may take any or all of the following actions."  Previous paragraphs suggest that this is the list (a) through (f) of potential USFWS actions.  But the list (a) through (d) published in the draft does not include the option of taking no action for a year.  The final PDM plan should not absolutely require the USFWS to take any action after only a single year's decline.  Wildlife populations are inherently variable and there is also variance associated with monitoring protocols, sampling, and population estimation procedures.  For example, monitoring protocols in the Great Lakes states rely heavily on snow tracking surveys, but low snow pack and poor tracking conditions can result in poor quality data and an apparent population decline when the population may have actually increased.

Response – We agree that evidence of a population decline in some years may not warrant that the Service implement one of the four actions described in the draft plan.  We will modify the plan to include 'no action' as a potential response, as appropriate.

Comment – As written, the Service could be required to take action after any single's year data shows "a decline", but the draft is not clear with respect to whether the decline was in one of the quantitative measures or the qualitative measures.  This should be clarified in the final DPM plan.

Response – We will attempt to clarify this in the final plan to indicate that the Service may act in response to annual declines in any of the 'quantitative' or 'qualitative' events or factors.

Comment – We encourage the Service to consider a combination of metrics (e.g., moving averages) and not

000392A

Appendix – Responses to Public Comments

a single metric of total number of wolves.  Furthermore, more than a single year's decline (or whatever combination of metrics is in the final PDM) in a state's wolf population should be required before extending the PDM period, initiating a status review, or an emergency relisting.

Response – The Service is likely to maintain a focus on total number of wolves or estimates thereof as described in the draft plan.  We agree that such a focus will result in a high degree of sensitivity to population fluctuations, but we will strive to ensure that our response to any declines is appropriate and based on factors such as the magnitude of the decline and our ability to identify the cause and duration of the decline.

000393A

Appendix – Responses to Public Comments

## Literature Cited

Erb, J. 2006. Carnivore Scent Station Survey Summary, 2006. Pages 67-74. Status of Wildlife Populations, 2007. Minnesota Department of Natural Resources, St. Paul, MN.

Erb, J. and S. Benson. 2004.  Distribution and abundance of wolves in Minnesota, 2003-2004. in. Minnesota Department of Natural Resources.  5 p.

Michigan Department of Natural Resources. 2007. Draft Michigan wolf management plan. Lansing, MI. 76 p.

Minnesota Department of Natural Resources. 2001. Minnesota wolf management plan. St. Paul, MN. 36 p. [http://files.dnr.state.mn.us/natural_resources/animals/mammals/wolves/wolfplan2000.pdf]

Wiedenhoeft, J. E. 2005. Summary Report: "Minnesota-type" wolf survey for Wisconsin – GIS analysis. Wisconsin Department of Natural Resources, Madison, WI. 14 p.

Wisconsin Department Natural Resources. 2006. Wisconsin Wolf Management Plan, Addendum 2006. Madison, WI. 60 p. [http://dnr.wi.gov/org/land/er/publications/wolfplan/pdfs/WIWolfManagementPlanAdd2006.pdf]

Wydeven, A. P., J. E. Wiedenhoeft, R. P. Thiel, R. N. Schultz, and S. R. Boles. 2007. Progress report of wolf population monitoring in Wisconsin for the period, October 2006 - March 2007. Wisconsin Department of Natural Resources, Park Falls, WI. 25 p.

000394A

EXHIBIT F

# MICHIGAN

# WOLF MANAGEMENT PLAN





**Michigan Department of Natural Resources**
**Wildlife Division Report No. 3484**
**July 10, 2008**

Printed by Authority of: PA 451 of 1994
Total Number of Copies Printed...........................100
Cost Per Copy: ...............................................$5.45
Total Cost: ............................................. $545.00

Michigan Department of Natural Resources

IC2579 (July 10, 2008)

000395A

2

000396A

# MICHIGAN

# WOLF MANAGEMENT PLAN

Approved:

_(signature)_

Rebecca A. Humphries, Director

Michigan Department of Natural Resources

Lansing, Michigan

Date: _July 10, 2008_

3

000397A

## ACKNOWLEDGMENTS

The Michigan Department of Natural Resources (DNR) appreciates the valuable contributions offered by many individuals, agencies and organizations during the development of this plan.

We thank the thousands of Michigan residents who helped shape the content of this plan through their participation in public wolf meetings held throughout the State, through the input and opinions they shared during public-comment periods, through their involvement in focus-group discussions, and through their participation in public-attitude surveys.

We express our appreciation to the members of the Michigan Wolf Management Roundtable for their dedication and hard work as they developed a set of principles to help guide wolf management in Michigan.  Those principles are directly reflected in the management strategies outlined throughout this document.

We extend a special thank-you to Dr. R. Ben Peyton, faculty member in the collaborative Partners in Ecological Research and Management program between the Michigan State University Department of Fisheries and Wildlife and the Michigan DNR.  As the facilitator of the Michigan Wolf Management Roundtable, Dr. Peyton rose to the challenge of building consensus among group members and played an integral role in the success of the group.  In addition, he and his colleague, Peter Bull, conducted an extensive study of attitudes held by Michigan residents regarding wolves, and their data were an indispensable component of the planning process.

We thank our Federal, State and tribal agency partners for their cooperation in wolf management and for the information and feedback they offered during the development of this plan.  We especially acknowledge the contributions of the USDA Wildlife Services, whose expertise and assistance has been and continues to be a critical component of the wolf management program in Michigan.

Finally, we thank members of the Michigan DNR Wolf Management Work Group, whose sustained efforts to coordinate all phases of the planning process have resulted in the production of this document.



A contribution of Federal Aid in Wildlife Restoration, Michigan Project W-147-R

**Equal Rights for Natural Resource Users**
The Michigan Department of Natural Resources (MDNR) provides equal opportunities for employment and access to Michigan's natural resources.  Both State and Federal laws prohibit discrimination on the basis of race, color, national origin, religion, disability, age, sex, height, weight or marital status under the Civil Rights Acts of 1964, as amended (MI PA 453 and MI PA 220, Title V of the Rehabilitation Act of 1973 as amended, and the Americans with Disabilities Act). If you believe that you have been discriminated against in any program, activity, or facility, or if you desire additional information, please write the MDNR, HUMAN RESOURCES, PO BOX 30028, LANSING MI 48909-7528, **or** the MICHIGAN DEPARTMENT OF CIVIL RIGHTS, STATE OF MICHIGAN PLAZA BUILDING, 1200 6TH STREET, DETROIT MI 48226, **or** the OFFICE FOR DIVERSITY AND CIVIL RIGHTS, US FISH AND WILDLIFE SERVICE, 4040 NORTH FAIRFAX DRIVE, ARLINGTON VA 22203.

For information or assistance on this publication, contact:  MDNR, WILDLIFE DIVISION, P.O. BOX 30444, LANSING, MI 48909-7944, -or- through the internet at " http://www.michigan.gov/dnr ".  This publication is available in alternative formats upon request.   TTY/TTD (teletype):  711 (Michigan Relay Center).

000398A

## COVER ART BY KEITH GROVE

Keith Grove has had a lifelong interest in wildlife and has promoted this interest as a specialty throughout his 25-year career as an award-winning, commercial illustrator.  After completing a commission for three white-tailed deer oil paintings for a series of prints that sold out in a national catalog, Keith decided it was time to concentrate on his own wildlife subjects.  Using alkyd oils and a realistic style, Keith tries to "tell a story" by capturing unique, cameo moments of wilderness life.  A graduate of the college of Associated Arts, St. Paul, Keith has also studied classical realism and continues to expand his knowledge of computer graphics and large-format printing techniques for the production of his own giclée prints.  For more information, contact Keith at grovewildife@aol.com.

## LIST OF ABBREVIATIONS

DNR           Department of Natural Resources

LP            Lower Peninsula

MSU           Michigan State University

UP            Upper Peninsula

USDA          United States Department of Agriculture

USFWS         United States Fish and Wildlife Service

000399A

# TABLE OF CONTENTS

1. INTRODUCTION..................................................................................................9
   1.1    Purpose of Plan ........................................................................................9
   1.2    Context of Plan ........................................................................................9
2. PLANNING PROCESS........................................................................................10
   2.1    Intra- and Inter-agency Scoping..........................................................10
   2.2    Public Meetings and Comment Period .................................................11
   2.3    Focus-group Meetings ............................................................................11
   2.4    Public-attitude Surveys .........................................................................12
   2.5    Review of Science Relevant to Wolf Management in Michigan .........12
   2.6    Michigan Wolf Management Roundtable .............................................13
   2.7    Plan Writing ...........................................................................................14
   2.8    Public Review and Comment .................................................................14
3. WOLF BIOLOGY AND ECOLOGY .................................................................14
   3.1    Physical Description...............................................................................14
   3.2    Social Structure and Behavior .............................................................14
   3.3    Reproduction ..........................................................................................15
   3.4    Causes and Rates of Mortality.............................................................15
   3.5    Immigration and Emigration ...............................................................16
   3.6    Wolf Food Habits ...................................................................................17
   3.7    Ecological Function ...............................................................................17
   3.8    Wolf Habitat ...........................................................................................18
4. WOLVES IN MICHIGAN ..................................................................................18
   4.1    History .....................................................................................................18
   4.2    Recent Population Size and Distribution.............................................20
   4.3    Isle Royale ..............................................................................................21
5. WOLF MANAGEMENT GOALS .......................................................................22
   5.1    Maintain a Viable Population ...............................................................22
         5.1.1   Definition of 'Viable Population' ..............................................22
         5.1.2   Need to Maintain a Viable Population......................................23
   5.2    Facilitate Wolf-related Benefits ...........................................................24
         5.2.1   Benefits Valued by Michigan Residents...................................24
         5.2.2   Providing Benefits through Management ..................................25
   5.3    Minimize Wolf-related Conflicts ..........................................................25
         5.3.1   Need To Minimize Conflicts ......................................................25
         5.3.2   Effective Conflict Management ..................................................26
   5.4    Conduct Science-based and Socially Acceptable Management .........27
6. WOLF MANAGEMENT STRATEGIES .............................................................27
   6.1    Increase Public Awareness and Understanding of Wolves and Wolf-related Issues. ........................................................................................28
         6.1.1   Coordinate with management partners to develop and implement a wolf-based information and education program. .......................................29
         6.1.2   Provide timely and professional responses to information requests..........29
         6.1.3   Support training opportunities for staff and management partners involved in the wolf-based information and education program. ..............30

000400A

|  |  |  |
|---|---|---|
| | 6.1.4 | Evaluate the effectiveness of the wolf-based information and education program. .................................................30 |
| **6.2** | **Maintain Active Research and Monitoring Programs to Support Science-based Wolf Management.**................................31 | |
| | 6.2.1 | Monitor the abundance of wolves in Michigan. ....................31 |
| | 6.2.2 | Monitor the health of wolves in Michigan............................32 |
| | 6.2.3 | Investigate biological and social factors relevant to wolf management. ..........................................................32 |
| | 6.2.4 | Coordinate with partners to support a wolf research program...................33 |
| **6.3** | **Enact and Enforce Regulations Necessary to Maintain a Viable Wolf Population.**.......................................................33 | |
| | 6.3.1 | Ensure adequate legal protection for wolves. ......................33 |
| | 6.3.2 | Inform the public on regulations pertaining to wolves. ..............34 |
| | 6.3.3 | Investigate and penalize violations of wolf regulations...............35 |
| **6.4** | **Maintain Sustainable Populations of Wolf Prey.**.........................36 | |
| | 6.4.1 | Maintain prey populations required to sustain a viable wolf population. ..........................................................36 |
| | 6.4.2 | Maintain prey populations to provide for sustainable human uses...........37 |
| **6.5** | **Maintain Habitat Necessary to Sustain a Viable Wolf Population.** ...............38 | |
| | 6.5.1 | Maintain habitat necessary to sustain adequate levels of wolf prey. .........39 |
| | 6.5.2 | Maintain habitat linkages to allow wolf dispersal. ................39 |
| | 6.5.3 | Minimize disturbance at known active wolf den sites. .............40 |
| **6.6** | **Monitor and Manage Adverse Effects of Diseases and Parasites on the Viability of the Wolf Population.**................................40 | |
| | 6.6.1 | Monitor the health of wolves in Michigan................................41 |
| | 6.6.2 | Assess the need to manage diseases and parasites in the wolf population. ..........................................................42 |
| **6.7** | **Achieve Compatibility between Wolf Distribution and Abundance and Social Carrying Capacity.**.......................................42 | |
| | 6.7.1 | Promote consistent public understanding and appreciation of the benefits and costs associated with particular wolf levels..........................44 |
| | 6.7.2 | Manage wolf-related interactions to increase public tolerance for wolves. ..........................................................44 |
| | 6.7.3 | Manage wolf distribution and abundance as necessary to maintain positive and negative wolf-related interactions at socially acceptable levels. ..........................................................45 |
| **6.8** | **Facilitate Positive Wolf–Human Interactions and Other Wolf-related Benefits.**....................................................46 | |
| | 6.8.1 | Inform the public on benefits derived from the presence of wolves..........48 |
| | 6.8.2 | Maintain a distribution and abundance of wolves adequate to maintain benefits at levels acceptable to the public.................48 |
| | 6.8.3 | Promote opportunities for people to experience and appreciate wolves. ..........................................................49 |
| **6.9** | **Manage Actual and Perceived Threats to Human Safety Posed by Wolves.** ..........................................................49 | |

000401A

6.9.1   Promote accurate public perceptions of the human-safety risks posed by wolves. ..................................................................................49

6.9.2   Provide timely and professional responses to reports of human-safety risks posed by wolves. ...............................................................50

6.9.3   Minimize the incidence of rabies in wild and domestic populations.........51

6.9.4   Prevent or minimize the habituation of wolves. ........................................51

6.9.5   Eliminate actual human-safety threats where they occur. ..........................52

**6.10   Manage Wolf Depredation of Domestic Animals.**..............................................53

6.10.1   Provide timely and professional responses to reports of suspected wolf depredation of domestic animals. ......................................................55

6.10.2   Minimize the risk of wolf depredation of domestic animals. ....................55

6.10.3   Eliminate or minimize ongoing wolf depredation of domestic animals. .........................................................................................................57

6.10.4   Develop a program to allow livestock producers to control depredating wolves on their property. ........................................................58

6.10.5   Facilitate financial compensation for livestock losses caused by wolves. .......................................................................................................59

6.10.6   Work with partners to discontinue compensation for privately owned cervids lost to wolves. ................................................................................60

**6.11   Minimize the Negative Impacts of Captive Wolves and Wolf–Dog Hybrids.**...................................................................................................................61

6.11.1   Minimize and deter the possession of captive wolves in Michigan...........61

6.11.2   Minimize and deter the possession of wolf–dog hybrids in Michigan. .....62

**6.12   Develop and Implement a Socially and Biologically Responsible Policy Regarding Public Harvest of Wolves.** ...............................................................63

6.12.1   Develop and implement a policy regarding public wolf harvest for the purpose of reducing wolf-related conflicts. ...............................................63

6.12.2   Develop and implement a policy regarding public wolf harvest for reasons other than managing wolf-related conflicts. .................................65

**7. PLAN MONITORING AND REVIEW** ..............................................................................66

**8. FUNDING** .........................................................................................................................66

**9. LITERATURE CITED** ......................................................................................................67

**10. APPENDIX: MICHIGAN WOLF MANAGEMENT ROUNDTABLE REPORT** ........78

000402A

# 1.  INTRODUCTION

## 1.1     Purpose of Plan

This plan provides strategic guidance for the management of wolves in Michigan.  It was developed to help:  1) maintain a viable Michigan wolf population above a level that would warrant its classification as threatened or endangered; 2) facilitate wolf-related benefits; 3) minimize wolf-related conflicts; and 4) conduct science-based wolf management with socially acceptable methods.

The Michigan DNR has the primary responsibility and statutory authority for the management of resident wildlife in Michigan.  Accordingly, this plan was developed primarily to guide the Michigan DNR's management of wolves.  This plan may also provide guidance to other Federal, State and tribal agencies and private organizations.  Consequently, it may encourage cooperation and consistent approaches among management partners in their efforts to manage wolves in Michigan.

This plan does not outline operational details of wolf management in Michigan.  Operational details will be specified within an adaptive-management framework, in which specific management methods are routinely adjusted and updated as local conditions, technology, regulations, and other aspects of management context change.

## 1.2     Context of Plan

In 1997, the Michigan DNR finalized the *Michigan Gray Wolf Recovery and Management Plan* (Michigan DNR 1997).  That plan was developed when the gray wolf (*Canis lupus*) in Michigan was classified as a federally endangered species and the number of wolves in the State was relatively small.  The plan focused on the biological needs of a small population and was a valuable tool for the recovery of wolves in Michigan.  It also contributed to the regional recovery of wolves in the western Great Lakes region:  in 2007, the U.S. Fish and Wildlife Service (USFWS) removed the gray wolf in the Western Great Lakes Distinct Population Segment, which includes all of Michigan, from the Federal list of threatened and endangered species (USFWS 2007).

Since 1997, the context of wolf management in Michigan has changed considerably.  Wolf population size and distribution have expanded, presenting a different set of biological and social issues that need to be addressed.  Understanding of wolf biology has improved significantly, enabling managers to better predict the consequences of their management decisions.  Regulations regarding wolves have changed, offering more flexibility for addressing new challenges.

Active involvement of the USDA Animal and Plant Inspection Service Wildlife Services in the Michigan wolf management program represents another significant change.  Since 2000, USDA Wildlife Services personnel have played a key role in population monitoring, research, training of field staff, and program planning.  The Michigan DNR and USDA Wildlife Services are

000403A

currently working to formalize their cooperative relationship in a memorandum of understanding.

Another notable development has been the preparation and implementation of *Michigan's Wildlife Action Plan* (Eagle et al. 2005). That plan, finalized in 2005, guides the conservation of all wildlife throughout the State. The plan identifies wolves as a Species of Greatest Conservation Need and establishes a framework of holistic wildlife conservation on which to base wolf management.

To address these changes and to continue to manage the wolf population based on the best available scientific information, the Michigan DNR has revised its original wolf plan. This new plan addresses the challenges associated with the current biological, social and regulatory context of wolf management in Michigan.

As of the finalization of this plan, Michigan wolves are not classified as threatened or endangered under the Federal Endangered Species Act. However, the 2007 Federal rule that de-listed wolves in the western Great Lakes Distinct Population Segment currently faces a legal challenge. As a result, the Federal status of Michigan wolves may be subject to change. The feasibility of implementing some parts of this plan will depend on the outcome of ongoing litigation.


## 2. PLANNING PROCESS

The Michigan DNR developed this plan through a process that included review of the best available scientific information and substantial involvement of affected stakeholder groups and the general public. The process included the following eight phases:

- Intra- and inter-agency scoping
- Public meetings and comment period
- Focus-group meetings
- Public-attitude surveys
- Review of science relevant to wolf management in Michigan
- Michigan Wolf Management Roundtable
- Plan writing
- Public review and comment

The information compiled and evaluated during all of these phases was used to produce a plan that is based on sound science and careful and respectful consideration of the diverse perspectives held by Michigan society. These phases are described under the following headings.

### 2.1   Intra- and Inter-agency Scoping

In August 2004, the Michigan DNR met with Federal and State agency partners to identify issues regarding wolves and their management in Michigan. Each agency shared its vision and

000404A

concerns regarding wolf management.  Agencies also identified future wolf management needs and opportunities for continuing partnerships.  After this initial meeting, the Michigan DNR Wolf Management Work Group conducted a situational analysis to identify the strengths, weaknesses, opportunities, threats and issues surrounding future wolf management in Michigan.  During the ensuing months, the group continued to explore the issues and formulated a plan and timeline for revising the Michigan wolf management plan.

## 2.2     Public Meetings and Comment Period

In May 2005, the Michigan DNR hosted ten public meetings to discuss wolf management in Michigan.  Six meetings took place in the Upper Peninsula (Watersmeet, Houghton, Escanaba, Newberry, Sault Ste. Marie and Marquette) and four meetings took place in the Lower Peninsula (Clare, Grand Rapids, Ann Arbor and Gaylord).  The purpose of the meetings was to provide the public with an opportunity to identify important issues and express opinions regarding wolves and wolf management in the State.  A professional facilitator not affiliated with the Michigan DNR moderated each meeting.  Meeting participants were given the opportunity to provide verbal comments, and they were also asked to complete a survey regarding their views on wolves and wolf management.

Based on information obtained from sign-in sheets, at least 560 people attended the public meetings.  Four hundred twenty-two of those individuals attended the Upper Peninsula (UP) meetings, and the remaining 138 individuals attended the Lower Peninsula (LP) meetings.  Four hundred thirty-three people who attended the meetings submitted a completed survey.  Results of the survey are summarized in Beyer et al. 2006.

The Michigan DNR press release that announced the public meetings also announced the opening of a public-comment period during which people were encouraged to mail or email their wolf-related comments.  From April 12 through August 31, 2005, the Michigan DNR received 133 emails and 36 letters that specifically dealt with wolves.

## 2.3     Focus-group Meetings

During the summer of 2005, the Michigan State University (MSU) Department of Fisheries and Wildlife coordinated nine focus-group meetings to discuss wolves and wolf-related issues.  The main purpose of the meetings was to refine understanding of issues identified as important by members of different stakeholder groups and to test and improve questions being considered for a statewide public-attitude survey.

The nine focus-groups included: 1) eastern UP livestock producers; 2) western UP livestock producers; 3) UP hunters who hunt with dogs; 4) northern LP hunters who hunt with dogs; 5) UP deer hunters; 6) northern LP deer hunters; 7) wolf conservationists (i.e., individuals focused on wolves at a population or ecosystem level); 8) wolf protectionists (i.e., individuals focused on the welfare and rights of individual wolves); and 9) trappers.  A total of 78 individuals participated in the focus-group meetings.

000405A

Topics of discussion differed somewhat among the focus-groups.  However, all focus-groups discussed the following six subjects:  1) benefits of having wolves in Michigan; 2) costs of having wolves in Michigan; 3) compensation and losses associated with wolf depredation; 4) preferences regarding quantification of wolf numbers in Michigan; 5) topics that should be addressed by the Michigan Wolf Management Roundtable (see 2.6); and 6) the role of the Michigan Wolf Management Roundtable in the development of the wolf management plan.  Overviews of the discussions are provided in Bull and Peyton 2005 (included as Appendix IX in Beyer et al. 2006).

## 2.4     Public-attitude Surveys

Studies conducted prior to 2005 had assessed the attitudes held by Michigan residents regarding wolves (e.g., Kellert 1990, Mertig 2004).  However, those studies may not reflect current public opinions given the substantial changes in wolf abundance and distribution in the UP and limitations of sample size.  To ensure current social data were available during development of this plan, the MSU Department of Fisheries and Wildlife undertook a new study that explored the attitudes of Michigan residents.

Data for this new study were obtained from public-attitude surveys designed to address specific management questions relevant to the planning process.  The questions focused on respondents' preferences and opinions regarding:  1) reasons for having wolves in Michigan; 2) the number of wolves and frequency of wolf-related interactions in different regions of the State; 3) options to address depredation of livestock, hunting dogs and other pets; 4) options to address public concerns regarding human safety; 5) options to address impacts to deer; and 6) a public harvest of wolves.

After survey questions were refined through focus-group discussions and tested through a pilot survey mailing, the final versions of the surveys were mailed repeatedly from November 2005 through January 2006.  A general-public survey was mailed to 8,500 Michigan driver's license holders statewide.  Slightly modified versions of the survey were mailed to 1,000 licensed furtakers and 1,000 livestock producers.  These modified versions were designed to obtain sufficient input from two groups of stakeholders that comprise a relatively small proportion of the general population but experience disproportionately high levels of conflicts with wolves.

Repeated mailings resulted in an overall response rate of 53% for the general-public survey, 69% for the furtaker survey, and 69% for the livestock-producer survey.  Data from the different versions of the survey were compiled and analyzed separately.  The methods and results of the study are provided in Beyer et al. 2006.  Survey responses regarding specific management issues (e.g., human-safety concerns, depredation of livestock, impacts on deer) are summarized under the relevant headings within section 6 (Wolf Management Strategies) of this plan.

## 2.5     Review of Science Relevant to Wolf Management in Michigan

Concurrent with the phases described above, the Michigan DNR and MSU Department of Fisheries and Wildlife developed a document entitled: *Review of Social and Biological Science Relevant to Wolf Management in Michigan* (Beyer et al. 2006).  The document summarized the

000406A

best available biological and social science relevant to wolves, wolf-related issues, and wolf management options in Michigan, and it described the remaining scientific uncertainty on those topics.  The information presented was obtained from published scientific literature, agency and university reports, unpublished agency data, and personal communication with wolf experts.  Results of public-attitude surveys and focus-group discussions conducted by MSU in 2005 and 2006 are presented throughout the document.

Science allows managers to predict the outcomes of particular management actions.  However, science alone does not establish wildlife management goals.  Those goals are often determined within a social context where stakeholder values and priorities must be addressed.  Accordingly, the *Review of Social and Biological Science Relevant to Wolf Management in Michigan* does not provide answers to questions of how wolves should be managed in Michigan.  Rather, it facilitates understanding of the potential consequences of particular management approaches, and it thus helps managers make decisions based on the best available science.

The *Review of Social and Biological Science Relevant to Wolf Management in Michigan* is a companion document to this plan, and much of the information it contains is incorporated by reference.  The document is available on the Michigan DNR website at www.michigan.gov/dnr.

## 2.6    Michigan Wolf Management Roundtable

To help it develop a plan that is acceptable to a wide range of stakeholder interests, the Michigan DNR convened an advisory committee called the Michigan Wolf Management Roundtable (Roundtable).  Membership included 20 agencies and organizations (see Appendix) that represented the diversity of Michigan interests in wolves.  These interests included environmental and ecological interests, hunting and trapping interests, livestock-producer interests, public-safety interests, tourism and resource-development interests, tribes, and wolf-protection interests.  Each organization on the Roundtable was selected to ensure the views of all Michigan residents would be represented in a fair and effective manner.  Membership included UP and LP residents in roughly the same numbers to ensure adequate representation of the different regions of the State.  The charge of the Roundtable, as given by the Michigan DNR, was to develop principles to guide management of Michigan wolves and wolf-related issues following Federal de-listing.

From June through September 2006, Roundtable members met for a total of 10 days to deliberate on wolf management.  They identified and prioritized important wolf-related issues, reviewed relevant social and biological science, and engaged in intense negotiations to reach consensus on a set of guiding principles for wolf management in Michigan.

The Roundtable submitted its final report to the Michigan DNR in November 2006.  That report, entitled *Recommended Guiding Principles for Wolf Management in Michigan* (Michigan Wolf Management Roundtable 2006; included as the Appendix to this plan; also available on the Michigan DNR website at www.michigan.gov/dnr), outlines guiding principles pertaining to wolf distribution and abundance, benefits of wolves, management of wolf-related conflicts, information and education, funding, research, hybrid and captive wolves, and future plan revisions.

000407A

## 2.7      Plan Writing

Between November 2006 and August 2007, the Michigan DNR evaluated the information and recommendations obtained during the previous phases to develop a draft of this plan.  Michigan DNR staff and the Michigan Wolf Management Roundtable reviewed the draft prior to its public release.

## 2.8      Public Review and Comment

In August 2007, the Michigan DNR released a draft of this plan for public review and comment.  During the 90-day comment period, agencies, organizations and individuals submitted approximately 1,480 emails and 15 hard-copy letters that offered comments on the draft plan.  Based on those comments, the Michigan DNR modified the plan, as appropriate, prior to its final approval.

# 3.  WOLF BIOLOGY AND ECOLOGY

## 3.1      Physical Description

Wolves are the largest members of the Canidae (dog family) in Michigan.  Other native Michigan canids are the coyote (*Canis latrans*), red fox (*Vulpes vulpes*) and gray fox (*Urocyon cinereoargenteus*).  Wolves are larger than coyotes, with body dimensions exceeding those of a fully grown German shepherd or Alaskan malamute.  In Michigan, weights of adult wolves range from 58 to 112 pounds (26–51 kg), with males (average: 87 lbs; 39 kg) weighing slightly more than females (average: 76 lbs; 34 kg).  Wolves are approximately 6 feet (1.8 m) long from the nose to the end of the tail.  Adults stand 30–34 inches (75–85 cm) tall at the shoulder.  The feet of wolves are large, with tracks measuring 3.5–4 inches (9–10 cm) wide and 4.5–5 inches (11–13 cm) long.

Wolves are well-adapted to cold and temperate climates.  The dense underfur in their winter coats is protected by guard hairs that may be up to 6 inches (15 cm) long over the shoulder.  Their skeletal and muscular structures make them well-adapted to travel.  They have tremendous stamina and often spend 8–10 hours per day on the move, primarily during early morning and evening.

## 3.2      Social Structure and Behavior

The life of a typical individual wolf is centered on a distinct family unit or pack (Baker 1983).  The basic functional unit of a pack is the dominant breeding pair, often called the 'alpha' pair (Mech and Boitani 2003*a*).  A pack is typically comprised of these two dominant animals, their pups from the current year, offspring from previous litters, and occasionally other wolves that may or may not be related to the alpha pair (Young and Goldman 1944, Stenlund 1955, Mech 1966).  A dominance hierarchy occurs within the pack, where each member occupies a rank or position (Mech 1970).  The alpha male and female are normally the only animals that breed, but there are exceptions (Ballard et al. 1987).

000408A

Based on ten studies, the average pack size of wolves that prey primarily on deer (*Odocoileus* spp.) is 5.7 animals (Fuller et al. 2003).  This size is similar to a recent estimate of average pack size in Minnesota (mean=5.3; Erb and Benson 2004) but higher than a recent estimate of average pack size in Wisconsin (mean≤4.3; Wydeven et al. 2006).  From 2003 through 2007, average winter pack size in Michigan ranged from 4.6 to 4.9 animals (B. Roell, Michigan DNR, unpublished data).

Wolves establish and maintain territories (Ballard et al. 1987, Fuller 1989, Mech and Boitani 2003*a*).  Howling between packs and scent-marking along territory edges are the principal means of spacing in wild wolf populations.  Territory size can vary greatly and depends upon the density of wolves and on the density and distribution of prey.

Estimated sizes of individual wolf pack territories in the UP have ranged from 22 mi$^2$ to 128 mi$^2$ (56–331 km$^2$); in 2004, average pack territory size in the UP was 65 mi$^2$ (169 km$^2$; Huntzinger et al. 2005).  Average pack territory size decreased approximately 37% from 2000 to 2004 as the UP wolf population increased (Huntzinger et al. 2005).

## 3.3     Reproduction

Some wolves that were held in captivity were capable of breeding at 9–10 months of age (Medjo and Mech 1976), but wild wolves typically reach sexually maturity at 22 months of age (Mech 1970, Fuller 1989).  Mating takes place in February, dens are dug in March, and pups are born in middle to late April (Peterson 1977, Fuller 1989).

Litter sizes can vary, but usually include 4–6 pups (Mech 1970).  Pups are born with their eyes and ears closed and lack the ability to properly regulate their body temperature (Mech 1970).  Their eyes open when they are between 11 and 15 days old (Rutter and Pimlott 1968, Mech 1970).  Pups emerge from their dens when they are approximately 3 weeks old (Young and Goldman 1944).  At approximately 9 weeks of age, they are weaned and moved to a rendezvous site, an above-ground area where pups develop until they are able to travel with the pack.  By the time pups are 4–6 months old, they are nearly as large as an adult wolf (Carbyn 1987).

## 3.4     Causes and Rates of Mortality

No animal habitually preys on wolves, but pups may occasionally be taken by bears (*Ursus* spp.) or other predators.  Both moose (*Alces alces*) and deer have injured or killed wolves (Nelson and Mech 1985, Mech and Nelson 1989).  Other natural mortality factors include accidents, malnutrition, starvation, parasites, diseases, and fatal encounters during territorial disputes between packs.  Human-induced mortality can involve vehicle strikes and intentional killing.  Causes of wolf mortality are often compensatory (Mech 2001, Fuller et al. 2003).  For example, human-induced mortality can sometimes replace mortality that would otherwise occur due to natural factors, such as starvation, disease or intraspecific aggression (Fuller et al. 2003).

Annual mortality of wolves can fluctuate widely from year to year.  Up to 60% of pups may die from disease and malnutrition during their first 6 months of life.  Mortality rates approximate 45% from 6 months to 1 year, and 20% between years 1 and 2 (Pimlott et al. 1969, Mech 1970,

000409A

Mech and Frenzel 1971, Van Ballenberghe et al. 1975, Fritts and Mech 1981).  Annual adult wolf mortality in Wisconsin averaged 39% during a period of population decline, and 19% during a period of population increase (Wydeven et al. 1995).  Adults may live past 11 years, but most die much sooner (Mech 1988, B. Roell, Michigan DNR, unpublished data).

Using two methods of data analysis, Huntzinger et al. (2005) estimated annual mortality rates of radio-collared wolves in the UP from 1999 to 2005.  Estimates of annual mortality rates varied between 15% and 46% and depended on the method of analysis.  Although the confidence limits were large and the estimates varied annually, there was no trend in annual mortality.  In other words, annual mortality of wolves did not increase or decrease with time.

In Michigan, illegal killing accounted for 34% of radio-collared wolf mortality from 1999 through 2006 (B. Roell, Michigan DNR, unpublished data).  Compared to uncollared wolves, radio-collared wolves could be more or less likely to be killed illegally because radio-collars can be visible when wolves are sighted.  When vehicle strikes, depredation-control activities, and other human-caused trauma are included, 60% of the radio-collared wolf mortality was directly attributable to humans (B. Roell, Michigan DNR, unpublished data).  Causes of wolf mortality may have been biased toward human actions during 1999–2004 because captured wolves were vaccinated for a variety of diseases and treated for mange prior to 2004; that is, the vaccination procedures may have reduced the amount of natural mortality that would have otherwise occurred in the Michigan sample.

## 3.5     Immigration and Emigration

Most wolves disperse because animals rarely assume a breeding position within their natal packs (Mech and Boitani 2003*a*).  Dispersal rates vary geographically and temporally with no clear differences between sexes (Mech and Boitani 2003*a*).  Wolves are capable of traveling long distances and movements greater than 500 miles (800 km) have been reported (Ballard et al. 1983, Fritts 1983, Boyd et al. 1995).  Long-distance movements and gene flow help preserve or enhance genetic diversity within populations and help mitigate the effects of detrimental demographic fluctuations due to environmental catastrophes (Simberloff and Cox 1987, Boitani 2000).

Movements of wolves among Michigan, Minnesota, Wisconsin and other States have been confirmed through the recovery or observation of marked animals (ear-tagged and/or radio-collared) (Mech et al. 1995, A. P. Wydeven, Wisconsin DNR, unpublished data, D. E. Beyer, Michigan DNR, unpublished data).  There is also evidence of wolf movements between the eastern UP and Ontario across Whitefish Bay and the St. Mary's River (Jensen et al. 1986, Thiel and Hammill 1988).

With regard to the documented movements of 29 wolves that traveled from the UP to other States, the average distance between the points of origin and the points of subsequent location was 134 miles (216 km; B. Roell, Michigan DNR, unpublished data).  The farthest documented dispersal by a Michigan wolf was made by a male that was captured, tagged and released in Gogebic County in 1999 and killed near Trenton, Missouri in 2001.  The straight-line distance between the two points is 457 miles (756 km).

16

### 3.6      Wolf Food Habits

Wolves prey on a variety of wildlife species, and predation on those species often changes seasonally and geographically (Voigt et al. 1976, Fritts and Mech 1981, Potvin et al. 1988, Fuller 1989, Mech and Peterson 2003).  In general, prey abundance, distribution, vulnerability and behavior influence a prey species' importance to wolves as a food source.  In multiple-prey systems, the more-vulnerable species commonly predominates as the main food source for wolves (Van Ballenberghe et al. 1975, Fritts and Mech 1981).

Mandernack (1983) analyzed scats of Wisconsin wolves to determine the relative abundance of prey species in their diet.  White-tailed deer (*Odocoileus virginianus*) comprised 55%, beaver (*Castor canadensis*) comprised 16%, snowshoe hare (*Lepus americanus*) comprised 10%, and other small mammals and miscellaneous items comprised 20% of wolf diet in that area.  Beaver provided as much as 30% of a Wisconsin wolf's spring diet.  In Minnesota, white-tailed deer, moose and beaver comprised the majority (>75%) of annual wolf diet (Van Ballenberghe et al. 1975).  The predominance of deer remains in wolf scat indicates deer were the principal prey throughout the year despite relatively high densities of moose.

In the UP, white-tailed deer and moose constitute the ungulate prey available for wolves. However, moose are rarely preyed upon by wolves, probably due to the lack of overlap in distribution with wolf-pack territories, the low abundance of moose in comparison to deer, and differences in vulnerability (D. E. Beyer, Michigan DNR, personal communication).  Research in Michigan indicates deer are the primary prey item for wolves during winter; smaller animals such as beaver, snowshoe hare and ruffed grouse (*Bonasa umbellus*) comprise relatively small percentages of winter wolf diet (Huntzinger et al. 2004).  Other food items known to have been eaten by wolves in the UP include shrews, squirrels, mice, crayfish, insects, berries and grass (Stebler 1944, 1951, B. Roell, Michigan DNR, personal communication).

### 3.7      Ecological Function

Wolves are top predators and can have a major influence on the ecological systems in which they live (Mech and Boitani 2003*b*).  Primary effects of wolves can include the removal of weak, sick or otherwise vulnerable individual prey, local influences on prey numbers, and increased availability of food for scavengers (Mech 1970).  Wolves may also limit populations of competitors such as coyotes (Crabtree and Sheldon 1999).  These primary effects can also cause changes (indirect effects) in other elements of the ecosystem.  These indirect effects have been termed 'trophic cascades' (Paine 1966) because changes at one trophic level (e.g., carnivores such as wolves) cause changes at another trophic level (e.g., herbivores such as deer).

Trophic cascades can be either 'bottom-up,' wherein changes at lower trophic levels affect higher levels, or 'top-down,' such as when predators cause changes at lower levels.  The relative importance of bottom-up versus top-down processes can vary depending on local circumstances. On Isle Royale, McLaren and Peterson (1994) documented a top-down trophic cascade among wolves, moose and balsam fir (*Abies balsamea*).  In this system, wolves controlled moose numbers and moose controlled growth of balsam fir.  A similar relationship is occurring in Yellowstone National Park as a result of the reintroduction of wolves.  Wolf predation on elk

000411A

(*Cervus elaphus*) is allowing several tree species, which were formerly limited by elk browsing, to recover (Ripple and Larsen 2000, Ripple et al. 2001, Ripple and Beschta 2003).  The mechanism that starts a trophic cascade may be direct (e.g., wolves limit prey numbers; McLaren and Peterson 1994), or indirect (e.g., the risk of wolf predation causes a change in ungulate behavior and browsing patterns; Ripple and Beschta 2004).

## 3.8     Wolf Habitat

Wolves are habitat generalists and have the potential to occupy areas with an adequate abundance of hoofed prey (Fuller 1995).  Given sufficient prey, the chance of an area being occupied and the number of wolves that could be supported is related to the proximity of source populations and the extent of human-caused mortality (Fuller 1995).

Road density has been used as an index of wolf–human contact and appears to be related to illegal and accidental killing of wolves (Mladenoff et al. 1995).  Mladenoff et al. (1995) developed a spatial habitat model based on road density that predicted wolves would be unlikely to occupy areas with greater than 0.72 miles of roads per square mile ($0.45$ km/km$^2$).  Although the model successfully predicted wolf occupancy in northern Wisconsin (Mladenoff et al. 1999), its predictions for the UP were questionable because areas of low deer density (Doepker et al. 1995) that were unlikely to be occupied by wolves were identified as suitable habitat.

Potvin et al. (2005) developed a spatial habitat model for the UP that incorporated measures of both road density and deer density.  This model identified a road-density threshold of 1.1 mi/mi$^2$ ($0.7$ km/km$^2$) and a deer-density threshold of 6–15 deer/mi$^2$ (2.3–5.8 deer/km$^2$).  The deer-density threshold is near the point where wolves become nutritionally stressed (Messier 1987).

The two models produced similar estimates of habitable area (Mladenoff et al. 1999:  11,331 mi$^2$ or 29,348 km$^2$; Potvin et al. 2005:  10,695 mi$^2$ or 27,700 km$^2$) but differed in how the suitable habitat was distributed.  The Mladenoff et al. model predicted many areas in the northern portion of the UP would be occupied, whereas the Potvin et al. model predicted that most habitat occupied by wolves would occur in the southern portion of the UP, where deer densities tend to be higher.

Using an earlier version of the Potvin et al. (2005) model, Potvin (2003) estimated the northern LP contained approximately 3,089 mi$^2$ (8,000 km$^2$) of suitable wolf habitat.  Gehring and Potter (2005) applied the Mladenoff et al. (1995) model to the northern LP and estimated 1,634 mi$^2$ (4,231 km$^2$) of suitable habitat was available.  Both modeling efforts indicated wolf habitat is more fragmented in the northern LP than in the UP.

# 4.  WOLVES IN MICHIGAN

## 4.1     History

Wolves have been part of the Great Lakes fauna since the melting of the last glacier and as such are native to the land area known as Michigan.  Stebler (1951) indicated that pioneer documents

000412A

and museum specimens show wolves were once present in the areas of all present-day Michigan counties.

Throughout the history of aboriginal peoples of present-day Michigan, wolves figured prominently in tribal culture and beliefs. For example, the wolf is a sacred clan animal among the Anishinaabe (Odawa, Ojibwe and Potawatomi) people. In the Anishinaabe creation story, Maahiingun (the wolf) is a brother to Nanaboozhoo (half man/half spirit); Gzhemnidoo (the Creator) instructed Maahiingun and Nanaboozhoo to travel together to name and visit all the plants, animals and places on earth; later, Gzhemnidoo instructed them to walk their separate paths, but indicated each of their fates would be always tied to that of the other; they would be feared, respected and misunderstood by the people that would later join them on earth (see 6.8 for a more-detailed account of the story of Maahiingun and Nanaboozhoo).

Settlers brought their wolf prejudices with them (Lopez 1978). European werewolf mythology, fairy tales, and religious beliefs, along with views that wolves were incompatible with human civilization, resulted in the persecution of wolves in Michigan as well as the rest of the United States. This practice led to the near-extermination of wolves in the contiguous United States.

The United States Congress passed a wolf bounty in 1817 in the Northwest Territories, which included what is now Michigan. A wolf bounty was the ninth law passed by the first Michigan Legislature in 1838. A wolf bounty continued until 1922, when it was replaced by a State-paid trapper system. The bounty was reinstated in 1935 and repealed in 1960, only after wolves were nearly eliminated from the State. Michigan wolves were given legal protection in 1965.

By the time bounties were imposed in the 1800s, wolves were nearly extirpated from the southern LP. They were absent from the entire LP by 1935, if not sooner (Stebler 1944). In the more sparsely settled UP, the decline was less precipitous. In 1956, the population was estimated at 100 individuals in seven major areas in the UP (Arnold and Schofield 1956). The Michigan wolf population was estimated at only six animals in the UP in 1973. Sporadic breeding and occasional immigration of wolves from more-secure populations in Ontario and Minnesota were postulated as the factors that maintained the small number of wolves in the UP (Hendrickson et al. 1975). It is likely that a few animals persisted in remote areas of the UP and that wolves were never completely extirpated from the State.

In the early 1970s, the wolf population in Minnesota began to expand southward from its northern range. In 1975, a pack of wolves occupied a territory that spanned the Minnesota–Wisconsin border (Thiel 1993), signifying the beginning of re-colonization of former wolf range in Wisconsin. After 1975, the wolf population in Wisconsin expanded into suitable habitat across the northern Wisconsin counties (Wydeven and Wiedenhoeft 2005). In the 1980s, wolves from Minnesota and Wisconsin began to re-colonize the western and central portions of the UP (Thiel 1988, Mech et al. 1995). In addition, wolves from Ontario may have crossed into the UP over ice at Whitefish Bay, along the St. Mary's River, and near northern Lake Huron islands (Jensen et al. 1986, Thiel and Hammill 1988). The beginning of wolf recovery in Michigan was first documented in 1989 when a pair established a territory in the central UP.

000413A

Only one wolf reintroduction was attempted in Michigan.  Four wolves from Minnesota were released in Marquette County in March 1974 and all died as a result of direct human activities between July and November 1974.  These wolves did not reproduce and did not contribute to the current wolf population (Weise et al. 1975).  The wild wolves that currently occur in the UP are the result of natural immigration and reproduction.

## 4.2    Recent Population Size and Distribution

The wolf population in the UP (excluding Isle Royale) showed steady growth after monitoring began in 1989 (Figure 4.1).  With the exception of 1997, documented wolf population size increased each year.  From 1994 to 2007, the population grew at an average annual rate of 19%.  From 2003 to 2007, the average annual growth rate was 12%.  The growth rate is expected to decline as the population moves toward the maximum level the UP can sustain (Huntzinger et al. 2005).  An estimated 509 wolves occurred on the UP mainland during the winter of 2007.



Figure 4.1.  Minimum winter estimates of the number of wolves in Michigan's Upper Peninsula (excluding Isle Royale), 1989–2007.

Since 1989, wolves have been found in every county of the UP, but they have been absent from Keweenaw County (excluding Isle Royale) during some years.  Wolf density has been higher in the western UP (approximately 12 wolves/1000 km$^2$ in 2005) than in the eastern UP (approximately 7 wolves/1000 km$^2$ in 2005) (Huntzinger et al. 2005).  Wolves may not be able to

000414A

establish year-round territories in the deep-snow areas of the northern UP because of low deer densities during the winter (Potvin et al. 2005).

In October 2004, a wolf that had been captured and radio-collared in the eastern UP was captured and killed by a coyote trapper in Presque Isle County of the LP.  This event represented the first verification of a wild wolf in the LP in at least 69 years.  Tracks of two other wolves were found in the same vicinity of Presque Isle County in December 2004.  However, winter track surveys during 2005, 2006 and 2007 failed to confirm the presence of any wild wolves in the LP.

## 4.3    Isle Royale

Wolves first appeared on Isle Royale in the late 1940s, when a wolf pair or two lone wolves crossed the ice from either Minnesota or Ontario (Mech 1966, Peterson 1995).  There is no physical evidence that wolves occurred on the island prior to this period, but research on that topic has been limited.  Wolves arrived on the island to find a substantial moose population, which became their primary food source.  Formal monitoring of the moose and wolf populations began in 1958.

The wolf and moose populations on the island followed a pattern of dynamic fluctuations, wherein high moose numbers (particularly older moose) were followed by high wolf numbers. Wolves influenced moose numbers predominantly through the direct killing of calves and have remained the only consistent source of moose mortality on the island.  The moose–wolf population patterns held until a dramatic crash occurred in the wolf population in the early 1980s, during which wolf numbers dropped from 50 to 14.  Circumstantial evidence suggests the decline in wolf numbers was related to the introduction of canine parvovirus (Peterson 1995*a*, Kreeger 2003).  Wolf reproduction progressively declined during 1985–1992 and numbers dropped to their lowest level (12 animals).  During the next decade, the wolf population increased slowly.  It reached 30 animals in 2005, and included the same number in 2006 (Peterson and Vucetich 2006).  Recently, the moose population has declined to its smallest size since monitoring began.  In 2007, the wolf population declined to 21 animals, most likely due to lack of food. (Vucetich and Peterson 2007).

Isle Royale was established as a national park in 1940, and protection of the native flora and fauna is the primary management goal for the area.  Management of the Isle Royale wolf population is guided by National Park Service (NPS) policy and ongoing research.  Scientists representing NPS management, wolf ecologists, disease and genetics experts, and conservation-biology specialists have agreed that the wolf population on the island should be allowed to proceed without intervention (including no introduction of new animals) while more research is conducted to better understand wolf ecology, population dynamics, and the causes of the population decline.  The results of ongoing research will play a major role in determining future management options for the Isle Royale wolf population.

000415A

## 5. WOLF MANAGEMENT GOALS

The principal goals of this plan are fourfold:  1) maintain a viable Michigan wolf population above a level that would warrant its classification as threatened or endangered; 2) facilitate wolf-related benefits; 3) minimize wolf-related conflicts; and 4) conduct science-based wolf management with socially acceptable methods.

To achieve those goals, the Michigan DNR must consider the complex interactions of many biological factors and implement measures that assure adequate protection and conservation of the species.  At the same time, it must also address the many complex and often controversial social issues that accompany wolf management.

The public is highly polarized on wolf management, as evidenced by the tremendous amount of public input and litigation that has been associated with management decisions in the United States during the past 30 years.  Stakeholder groups often have disparate or opposing views and needs regarding wolf management, and this plan reflects efforts to identify an appropriate balance among the biological needs of the species, the benefits wolves provide to some segments of society, the costs they impose on others, and the acceptability and feasibility of particular management methods.  These elements reflected in the principal goals of this plan are discussed under the following headings.

### 5.1    Maintain a Viable Population

#### 5.1.1    Definition of 'Viable Population'

The Michigan DNR is committed to maintaining a viable Michigan wolf population above a level that would warrant its classification as threatened or endangered at either the State or Federal level.  Therefore, the Michigan wolf population must exceed criteria used to define a viable population in the *Recovery Plan for the Eastern Timber Wolf* (USFWS 1992) and the *Michigan Gray Wolf Recovery and Management Plan* (Michigan DNR 1997).

The *Recovery Plan for the Eastern Timber Wolf* indicated:  "A population of at least 200 wolves . . . is believed to be large enough to be viable, as well as to have sufficient genetic diversity, to exist indefinitely in total isolation from any other wolf population" (USFWS 1992:25).  The 1997 *Michigan Wolf Recovery and Management Plan* adopted this definition of a viable isolated population as a criterion for wolf recovery in Michigan (Michigan DNR 1997).  When the winter population maintained a minimum level of 200 animals for 5 consecutive years and the species was federally de-listed, wolves could be removed from the State list of threatened and endangered species.

The Michigan wolf population does not exist in isolation.  Wolf movements among Minnesota, Wisconsin and Michigan are not uncommon (Mech et al. 1995, A. P. Wydeven, Wisconsin DNR, unpublished data, B. Roell, Michigan DNR, unpublished data), and those movements enhance intra-population genetic diversity and mitigate any adverse effects of demographic and environmental fluctuations.  Therefore, a Michigan wolf population connected to other populations through occasional dispersal may require fewer than 200 animals to remain viable

000416A

(USFWS 1992). However, the recovery criterion of 200 wolves was adopted in the *Michigan Gray Wolf Recovery and Management Plan* to ensure the viability of the Michigan wolf population regardless of the biological status of wolves in other neighboring States and Provinces.

The minimum criterion of 200 wolves does not reflect the maximum number of wolves the available habitat in Michigan can support. Indeed, the winter population exceeded 200 wolves in 2000, and it grew each year between 2000 and 2007, at an annual average rate of 13% (see Figure 4.1). During the winter of 2007, an estimated 509 wolves lived in the UP. Based on estimates of deer density, one model estimated the UP could sustain between 590 and 1,330 wolves and the northern LP could sustain between 210 and 480 wolves (Potvin 2003).

The winter Michigan wolf population must exceed 200 animals to achieve the first stated goal of this plan. However, this minimum requirement is not necessarily sufficient to provide all of the ecological and social benefits valued by the public (see 5.2). Accordingly, 200 wolves is not a target population size. Management will be conducted to maintain the wolf population above the minimum size requirement and facilitate those wolf-related benefits while minimizing and resolving conflicts where they occur (see 5.3). This plan does not identify a target population size, nor does it establish an upper limit for the number of wolves in the State. As a result, public preferences regarding levels of positive and negative wolf–human interactions will strongly influence the extent to which wolf abundance and distribution exceed the minimum requirements for a viable population.

5.1.2   Need to Maintain a Viable Population

The Michigan DNR is committed to the conservation, protection, management, use and enjoyment of the State's natural resources for current and future generations. Since wolves have become re-established in Michigan, they have once again become an integral part of the natural resources of the State and have improved the natural functioning of Michigan ecosystems. In the context of the Michigan DNR's mission and its implicit public trust responsibilities for the State's wildlife, natural communities and ecosystems, the maintenance of a viable wolf population is an appropriate and necessary goal.

Maintenance of a viable wolf population also helps preclude the need for Federal reclassification of the species as threatened or endangered. Anything that warranted such a reclassification would be detrimental to not only the wolf population; it would also have negative consequences for the people of Michigan. A decline in the wolf population below a viable level would reduce opportunities for positive wolf-related interactions and other benefits derived by many residents. Moreover, regulatory restrictions associated with Federal reclassification would complicate and impede some efforts to address the needs of people who experience wolf-related conflicts. Therefore, maintenance of a viable population serves the best interests of wolves and the human residents of Michigan.

The most-recent public-attitude research shows most Michigan residents support the presence of a wolf population in the State. The format of the general-public survey coordinated by MSU in 2005 and 2006 allowed respondents to identify themselves as either interested or not interested in

000417A

wolf-related issues.  When 'disinterested' respondents were removed from the analysis, the percentage of respondents who approved of having wolves in the State was 73% (52% in the UP, 71% in the northern LP, and 74% in the southern LP; Beyer et al. 2006).  These results indicate that maintenance of a viable wolf population is supported by the vast majority of residents who feel they have an interest and stake in the management of wolves.

## 5.2    Facilitate Wolf-related Benefits

### 5.2.1   Benefits Valued by Michigan Residents

Many Michigan residents value the diverse benefits derived from the presence of wolves (Beyer et al. 2006).  Many of those benefits fall within five general categories.

*Ecology*

As top predators, wolves fill an important ecological niche (Mech and Boitani 2003*b*) and are positive indicators of environmental health.  Wolves can improve natural ecosystem function by controlling prey numbers, improving the overall health of prey populations, and increasing food available to scavengers (Mech 1970).  In addition, they can help control populations of secondary predators and thus have indirect effects on many trophic levels (Paine 1966, Crabtree and Sheldon 1999; see 3.8 for additional information).  Seventy-two percent of interested Michigan residents who responded to the most-recent public-attitude survey believed ecological benefits were a 'very' or 'somewhat' important reason to have wolves in Michigan.

*Cultural and religious values*

Wolves are a species of great significance to many Native Americans.  Today, many Native American communities in Michigan value the return of Maahiingun (the wolf) as an intrinsic spiritual component in the reaffirmation and continued viability of their own cultural well-being.  Many other people value wolves for reasons that are based on personal or religious convictions.  Sixty-seven percent of interested survey respondents indicated at least moderate agreement with the statement:  "Regardless of our laws, wolves have a right to exist in Michigan."

*Interaction with nature*

The presence of wolves in Michigan provides a unique opportunity for people to interact with and experience a particular component of the natural world.  The opportunity to personally observe, photograph or study wolves in the wild may be restricted to a relatively small proportion of residents, but the option for those residents to have those experiences is highly valued by society.  "People want to view, hear, photograph or study wild wolves in Michigan" was ranked by 60% of interested survey respondents as a 'very' or 'somewhat' important reason to have wolves in the State.

000418A

*Personal appreciation*

Independent of cultural or religious convictions, many people feel wolves have an 'existence value' and they value the knowledge that they exist as a healthy, thriving, wild population in the State. This benefit can be realized whether or not people are able to see or hear those animals. "There are people who appreciate wolves and want to know that wolves exist in Michigan" was ranked by 54% of interested survey respondents as a 'very' or 'somewhat' important reason to have wolves in Michigan.

*Tourism and recreation*

Forty-two percent of interested survey respondents felt the economic benefits of wolf-based tourism were a 'very' or 'somewhat' important reason to have wolves in Michigan. However, additional survey results suggested the full potential economic benefits were not being realized: the presence of wolves in an area would attract some respondents while deterring others, but more than half of respondents indicated the presence of wolves would not be a consideration when choosing a vacation area. Promotion of tourism and recreational opportunities associated with wolves might attract a greater number of people to local communities within wolf range and thus increase the economic benefits derived from the species.

5.2.2   Providing Benefits through Management

Public support is critical for the long-term viability of a wolf population (USFWS 1992, Wisconsin DNR 1999, Bangs et al. 1995, Minnesota DNR 2001, Boitani 2003, Fritts et al. 2003). The depth and extent of that support is partially influenced by the physical, spiritual, psychological, and economic benefits provided by the population (Slovic 1987). Thus, management that enhances opportunities for positive wolf-related experiences fosters public support for the population and thus serves the best interests of both wolves and the human residents of Michigan.

This plan identifies and supports measures to promote positive wolf-related interactions. Many benefits will be provided through the maintenance of a viable wolf population. Other benefits may be achieved through efforts to develop and promote opportunities for people to experience and appreciate wolves.

**5.3     Minimize Wolf-related Conflicts**

5.3.1   Need To Minimize Conflicts

Although the wolf population offers benefits as described above, it also poses significant costs and concerns for some Michigan residents (Beyer et al. 2006). These costs include losses of domestic animals, anxieties over the presence of wolves near residential or recreational areas, and concerns over the impact wolves may be having on populations of game species. Given the unequal distribution of wolves in the State and the nature of certain types of conflicts, all segments of society do not bear these costs equally; the presence of wolves represents a greater challenge for some groups of Michigan residents than others.

000419A

Left unaddressed, sources of conflict can foster the development of negative public attitudes toward wolves, and those negative attitudes can lead to adverse impacts on wolf distribution and abundance. Indeed, negative public perception of wolves was the primary reason they were historically threatened with extinction in many areas (Mech 1970, Beaufort 1987, Thiel 1993). Negative perceptions, manifesting themselves in the form of widespread killing, nearly eliminated the species from the contiguous United States.

As stated previously, public support is critical for the long-term viability of a wolf population (USFWS 1992, Wisconsin DNR 1999, Bangs et al. 1995, Minnesota DNR 2001, Boitani 2003, Fritts et al. 2003). The risk and frequency of conflicts still influences human views and tolerance of wolves (e.g., Huber et al. 1992, Mishra 1997), and public support for a population of any large predator depends, in part, on confidence that conflicts will be resolved in a timely and effective manner (Frost 1985, Wolstenholme 1996, Beyer et al. 2006). Such resolution would allow people to tolerate greater abundance and distribution of wolves on the landscape (Bangs et al. 1995, Mech 1995, Boitani 2003, Fritts et al. 2003, Mech and Boitani 2003*a*). By contrast, a failure to address conflicts could foster negative attitudes that lead to adverse impacts on wolf distribution and abundance. Thus, effective management of wolf-related conflicts assists affected stakeholders and the wolf population as a whole.

Most Michigan residents recognize the importance of addressing wolf-related conflicts (Beyer et al. 2006). The most-recent public-attitude survey showed at least 76% of interested respondents would support some type of active wolf management to address strong public concerns regarding human-safety risks posed by wolves. At least 75% percent of interested respondents would support active management in areas experiencing high levels of wolf depredation of livestock, hunting dogs and other pets. At least 65% of interested respondents would support active management if evidence showed wolves significantly lowered the number of deer available for hunting in a particular region.

## 5.3.2   Effective Conflict Management

Setting numeric goals for wolf abundance at large geographic scales (e.g., the entire State, the entire UP) may not be necessary or effective for addressing most wolf-related conflicts. Broadly based abundance goals may not reflect the unequal distribution of wolf habitat, human activity and the potential for positive and negative interactions in local areas. Moreover, wolf numbers alone do not necessarily predict the frequency of certain types of interactions. In an area of abundant natural prey and few human residences, for example, a large number of wolves could cause a relatively low level of negative interactions. Conversely, a small number of wolves could create an unacceptably high level of negative interactions in local areas where natural prey is scarce or where human population density is high. Management driven by broad numeric abundance goals would not necessarily reduce negative interactions, could unacceptably restrict positive interactions desired by the public, and could promote an inaccurate public perception regarding the relationship between wolf numbers and the risk of conflict.

Previous management experience indicates most wolf-related conflicts can be best handled on an individual basis. Conflicts in local areas are often caused by the behavior of a few individual wolves, and management at small scales can often address problems effectively. Therefore, this

26

plan does not set broad numeric abundance goals for the purpose of managing most conflicts.  To the extent it is expected to be effective and logistically feasible, management under this plan will be conducted to prevent and minimize conflicts on a case-by-case basis.

## 5.4     Conduct Science-based and Socially Acceptable Management

Science allows managers to predict consequences of particular management actions.  It is thus a tool of primary importance for identifying those actions that could effectively achieve particular wildlife management goals.  The importance of using sound science when making wildlife management decisions is formalized in the Michigan Natural Resources and Environmental Protection Act (Part 401 of Public Act 451 of 1994).

Science can identify probable outcomes of particular management approaches, but as an objective process, it does not prescribe subjective values to those outcomes.  Rather, the desirability or acceptability of any outcome depends on the values of affected stakeholders. Moreover, when disagreements originate from differences in values rather than questions of fact, consideration of the available science alone will not be sufficient to resolve conflict. Consequently, a process of social deliberation is often necessary to determine which science-based management approaches are acceptable to individual stakeholder groups and society at large.

This plan outlines approaches for managing many wolf-related issues.  These approaches were chosen, in part, based on scientific evaluation of their potential impacts to the wolf population, their feasibility, and their probability of success.  In addition, they were chosen because they appear to be acceptable to most Michigan residents.  They are not expected to satisfy everybody; indeed, satisfying everybody with any single wolf management approach is not possible. However, the approaches outlined in this plan were supported by a majority (often a strong majority) of interested respondents to the most-recent public-attitude survey (Beyer et al. 2006), and they directly reflect the guidance collectively offered by the diverse interests represented on the Michigan Wolf Management Roundtable.

## 6.  WOLF MANAGEMENT STRATEGIES

The following wolf management strategies will be implemented to achieve the principal goals of this plan.  They provide guidance for the management of several wolf-related issues at the strategic level; they do not outline operational details of wolf management in Michigan. Operational details will be specified within an adaptive-management framework, in which specific management methods are routinely adjusted and updated as local conditions, technology, and feasibility of individual management techniques change.

The ensuing headings indicate strategic goals (in bold; e.g., **6.1**), objectives (underlined; e.g., 6.1.1) and actions.  They partition broad needs into manageable segments, and thus provide a structure for addressing individual management issues.

000421A

**6.1     Increase Public Awareness and Understanding of Wolves and Wolf-related Issues.**

Researchers, managers and stakeholder groups generally agree an informed public is important for successful wolf conservation and management (Fritts et al. 2003).  State and Federal wolf plans (e.g., USFWS 1992, Michigan DNR 1997, Wisconsin DNR 1999) frequently identify education and outreach as a high priority.  At the series of wolf-focused public meetings hosted by the Michigan DNR in May 2005, a large proportion of public comments underscored the need for an effective information and education program focused on wolves.

Although the need for an effective wolf-based education program is widely recognized, development of such a program is not a simple task. Strong public opinions, the controversial nature of many issues, and other barriers present agencies and other education partners with several challenges.

Wolves, perhaps more than any other wildlife species, tend to elicit strong emotions among stakeholder groups and the general public (Meadow et al. 2005), and personal views of wolves are often based on core beliefs, which are resistant to change (Fulton et al. 1996).  Therefore, the presentation of information alone is not always effective at influencing personal perceptions and opinions (Meadow et al. 2005).  Moreover, individuals tend to selectively accept and recall information that is consistent with their existing attitudes (Olson and Zanna 1993, Petty et al. 1997).  Similarly, people may interpret new information in ways that support their existing attitudes (Petty et al. 1997).

Another challenge of a wolf-based education program is to present information that is not biased toward a particular point of view.  Fritts et al. (2003: 297) cautioned that "there are important and critical differences between objective wolf education and wolf advocacy or activism."  Different groups may find difficulty agreeing on the focus of an education program, or even on the facts to be presented, because ethical and subjective values are often involved.  However, the presentation of accurate, unbiased information is especially important when education is used as a tool to help resolve wolf-related conflicts among stakeholders.

A third challenge involves popular presentations of wolf-related issues.  Controversy tends to receive attention, and the public may receive inaccurate or exaggerated impressions of the extent of wolf-related conflicts (Mech 1995, Bangs and Fritts 1996).  In addition, misinformation can spread quickly through a variety of media.

An additional challenge to development of an effective education program has been a lack of agency resources.  Although the Michigan DNR has engaged in several wolf education and outreach activities during the past several years (Beyer et al. 2006), it has lacked sufficient staff with the educational expertise necessary to develop and implement a comprehensive wolf-based education program.

The following objectives have been identified to help overcome many of the challenges identified above.  To the extent the objectives are achieved, public awareness and understanding of wolves and wolf-related issues are expected to increase.

000422A

6.1.1   Coordinate with management partners to develop and implement a wolf-based information and education program.

Coordinating an education program in cooperation with management partners (e.g., other agencies, tribes and private organizations) is the most-effective way to overcome many challenges and barriers.  Coordination can help identify target audiences, information needs, and the educational approaches that may be most effective.  Partnership with multiple organizations and stakeholder groups can also lend credibility to educational materials and help ensure those materials present unbiased, accurate information.  A coordinated program that involves the media can foster the presentation of accurate information to broad audiences.

Coordination also facilitates the involvement of partners who possess the expertise and resources necessary to develop and implement an effective program.  Therefore, it can accelerate the development and distribution of educational materials that address the specific needs and interests of particular target audiences.  It can also facilitate the organization of wolf-based events and programs, and thus expand opportunities for people to personally experience and appreciate wolves.  In these ways, a coordinated education program can maximize the available tools and opportunities for increasing public awareness and understanding.

*Actions:*

1.  Work with management partners to identify target audiences and information and educational needs.

2.  Work with management partners to develop and distribute materials that address the needs and interests of target audiences.

3.  Work with management partners to develop and deliver presentations that address the needs and interests of target audiences.

4.  Work with management partners to coordinate wolf-based programs and events.

5.  Work with media to present accurate information to broad audiences.

6.  When prudent, invite public and media participation in wolf-related projects.

7.  Support efforts of management partners to provide positive wolf-related experiences.

6.1.2   Provide timely and professional responses to information requests.

Providing prompt and professional responses to information requests is one way to increase individual understanding, dispel misconceptions, and generate support for wolf management efforts.  A clear process for responding to information requests will facilitate efforts to achieve this objective.

000423A

*Actions:*

1.     Increase public awareness regarding where to find and request information regarding wolves.

2.     Refine procedures for responding to a broad range of information requests.

3.     Train staff on response procedures.

6.1.3   Support training opportunities for staff and management partners involved in the wolf-based information and education program.

Agencies and other management partners can provide the public with accurate information only to the extent they understand wolf-related issues themselves.  Therefore, opportunities for personnel to attend regional wolf management meetings, to participate in training, and to review relevant scientific publications are important for an effective education program.

*Actions:*

1.     Provide staff with the training and information resources necessary for effective participation in the information and education program.

2.     Share information with management partners to facilitate understanding of current wolf-related issues.

6.1.4   Evaluate the effectiveness of the wolf-based information and education program.

During recent decades, much attention has been given to wolves through a variety of media.  Publication of wolf-related research in scientific literature has become increasingly common (Fritts et al. 2003).  Conservation organizations and centers have focused on educating the public about wolves.  In addition, numerous websites, books, documentaries, magazines and other media reports have provided the public with information on wolves.  The Michigan DNR has engaged in several wolf education and outreach activities (Beyer et al. 2006).

Despite the great availability of information, the general public still holds many misconceptions about wolves.  Mertig (2004) found that Michigan survey respondents generally had poor knowledge of wolves, noting that public understanding had not improved significantly during the 12-year period following re-establishment of the wolf population in the UP.  The persistence of misconceptions and lack of knowledge in the face of abundant information underscores the need to evaluate the effectiveness of any education program.

*Action:*

1.     Work with partners to develop and implement methods to evaluate the information and education program.

000424A

**6.2     Maintain Active Research and Monitoring Programs to Support Science-based Wolf Management.**

As wide-ranging and often controversial components of a large and complex Great Lakes ecosystem, wolves present many complicated management challenges.  As a result, the role of science is especially important in the management of the species.  Management decisions can have serious biological and social consequences and are often scrutinized by affected stakeholders.  To conduct responsible management and earn credibility among the public, agencies must make decisions that are scientifically defensible.

Wolf management in Michigan has regularly benefited from research and management experience from other parts of the world.  However, wildlife managers in Michigan cannot always rely on work conducted elsewhere due to differences among local biological and social environments.  For example, the experiences of managing wolves in Alaska, Canada or Italy are not always readily applicable to Michigan on account of differences in human density, infrastructure, habitat, wildlife communities, regulations, and public attitudes.  In addition, the management environment changes constantly, and scientific information must be regularly updated to reflect current conditions.

In many instances, the Michigan Wolf Management Roundtable felt the available science was inadequate to guide its recommendations for wolf management.  For example, the Roundtable identified needs for more research regarding the interactions between wolves and humans, the dynamics of wolf–ungulate systems, management options to address wolf-related conflicts, and the relationship between wolf population size and wolf-related conflicts.  As a result, the Roundtable recommended that the Michigan DNR place a high priority on wolf-related research.

The following objectives and actions address the need to maintain active wolf research and monitoring programs in Michigan.  These programs will investigate and integrate the biological and social questions associated with wolf management and thus improve the ability of wolf managers to make decisions that are based on sound science.

6.2.1   Monitor the abundance of wolves in Michigan.

To determine whether the population remains viable in the absence of Federal protection, the USFWS will use data collected by State agencies and other partners to closely evaluate the status of wolves in the western Great Lakes Distinct Population Segment during the first 5 years after Federal de-listing.  Annual estimates of wolf abundance will facilitate the evaluations during the 5-year period.  After that period, the frequency and/or necessary precision of wolf abundance estimates may change depending on the type of management actions implemented and the relative size of the wolf population.

As a document that offers guidance at the strategic level, this plan does not outline the operational details of wolf population monitoring.  Those details are available on the Michigan DNR website (www.michigan.gov/dnr) and will be updated as data needs, technology, and other aspects of management context change.

000425A

*Actions:*

1.  Estimate wolf abundance each year for at least 5 years after Federal de-listing.

2.  After wolves in Michigan have been federally de-listed for 5 years, assess the frequency and intensity of wolf abundance monitoring necessary to support the wolf management program.

3.  Conduct monitoring to assess wolf presence in the northern LP.

6.2.2   Monitor the health of wolves in Michigan.

In Michigan, wolves have been or could be affected by several diseases and parasites (see 6.6 for additional information).  Exposure to some diseases and parasites is continuous, and the wolf population has had the opportunity to develop individual or collective immunity to some of the more-common agents over time (Gillespie and Timoney 1981).  Other diseases and parasites can be significant sources of mortality for wolves, but they are generally not considered to be limiting at the population level.  In general, diseases and parasites are not expected to threaten the long-term viability of the wolf population (Kreeger 2003).  However, the Michigan DNR will continue to monitor their prevalence and their impacts on Michigan wolves.  Approaches for monitoring wolf health are outlined under 6.6.1.

6.2.3   Investigate biological and social factors relevant to wolf management.

Recent wolf research often focused on factors associated with the biological recovery of the species.  As a result, many important biological and social questions regarding wolf management after recovery remain unanswered.  An active wolf research program in Michigan could help answer these questions by focusing on two broad areas:  1) wolf ecology and the biological impacts of particular management approaches; and 2) attitudes of Michigan residents toward wolves and their management.

*Actions:*

1.  Determine wolf population responses to selected management options.

2.  Investigate the relationships between wolf and prey populations.

3.  Periodically monitor public attitudes on wolves and investigate factors that influence public tolerance for wolves.

4.  Assess public responses to selected wolf management practices (e.g., information and education activities, depredation-control measures).

000426A

6.2.4   Coordinate with partners to support a wolf research program.

In Michigan, an established network of research partners works in a coordinated manner to investigate questions regarding wolves and their management.  Although these partners effectively conduct many types of research, the expertise required to investigate particular questions may sometimes be found in agencies, organizations and institutions outside the established network.  Accordingly, the network will continue to expand to ensure the best possible expertise is applied to particular research questions.

In addition to allowing application of the best available expertise, coordination with research partners increases the funding and staff that are potentially available to support wolf research. Funding and staff available to the Michigan DNR alone are not sufficient to study all the important questions related to wolves.  Thus, collaboration with a greater number of partners could accelerate the rate at which those questions are answered.

*Actions:*

   1.   Expand and maintain cooperative relationships with agencies, organizations and institutions interested in investigating biological, ecological and social questions regarding wolves and their management.

   2.   Seek funding from additional sources to complement agency contributions.

## 6.3   Enact and Enforce Regulations Necessary to Maintain a Viable Wolf Population.

Legal protection under Federal and State regulations was a key component in the recovery of wolves in Michigan and other areas of the Midwest.  Although protection of Michigan wolves under the Federal Endangered Species Act is no longer warranted (USFWS 2007), legal protection remains necessary to help ensure the long-term persistence of a viable population. The following objectives focus on providing adequate legal protection, informing the public on regulations, and investigating and penalizing wolf-related violations.

6.3.1   Ensure adequate legal protection for wolves.

Options for general protection under State regulations involve designation of wolves as endangered, threatened, game, or protected animals.  Any of those four designations would prohibit a person from taking (which includes killing or otherwise harming), selling or purchasing wolves, except under permit, license, or certain specified conditions.  The Michigan Natural Resources Environmental Protection Act (Public Act 451 of 1994) defines each of those designations as follows.

'Endangered species means any species of fish, plant life, or wildlife that is in danger of extinction throughout all or a significant part of its range, other than a species of insecta determined by the [Michigan DNR] or the secretary of the United States [D]epartment of the [I]nterior to constitute a pest whose protection . . . would present an overwhelming and overriding risk to humans.'

000427A

'Threatened species means any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range.'

'Game' is defined as a list of species that currently hold that designation. The definition does not reference permissible and restricted activities associated with such a designation. Game-animal status allows but does not require the establishment of a regulated harvest season.

'Protected animal means an animal or kind of animal designated by the [Michigan DNR] as an animal that shall not be taken.'

Wolves in Michigan have surpassed State recovery criteria, and their classification as State endangered or threatened is no longer appropriate. Designation of game-animal status in Michigan would require action by the State Legislature and is therefore outside the authority of the Michigan DNR. The Michigan DNR does have the authority to amend the Wildlife Conservation Order to designate wolves as protected animals. In the event wolves would not be designated as either endangered, threatened or game animals, the Michigan DNR would use that authority to designate them as protected animals and avoid a lapse in legal protection for the species.

Other regulations could protect the wolf population in more-specific ways. For example, in recent years, the coyote season has been closed in the UP and the northern LP during the November 15–30 firearm season to help prevent the killing of wolves misidentified as coyotes. This restriction and other regulations will be reviewed, modified or enacted as necessary to provide the wolf population with appropriate levels of protection.

*Actions:*

1. Remove wolves from the Michigan list of threatened and endangered species, provided the Michigan wolf population continues to exceed criteria that have been used to define biological recovery (USFWS 1992, Michigan DNR 1997).

2. Re-classify wolves as endangered or threatened under State regulations if population size declines to 200 or fewer wolves.

3. Review, modify and enact regulations, as necessary, to ensure appropriate levels of protection for the wolf population.

4. If necessary to avoid a lapse in legal protection, amend the Wildlife Conservation Order to designate wolves as a protected animal.

6.3.2   Inform the public on regulations pertaining to wolves.

The Federal and State legal classifications of wolves changed four times from April 2003 through March 2007. Wolf legal status may continue to change beyond the finalization of this plan. Frequent regulation changes can create public confusion regarding permissible and

000428A

prohibited activities.  Public education on prevailing regulations could help reduce such confusion and prevent inadvertent violations.

*Actions:*

1.   Increase public awareness regarding where to obtain information on wolf regulations.

2.   Provide the public with information on wolf regulations as part of a wolf-based information and education program (see 6.1.1).

6.3.3    Investigate and penalize violations of wolf regulations.

A person who commits a violation regarding the possession or taking of most wildlife species with any of the four legal designations described in 6.3.1 (i.e., endangered, threatened, game, protected) is guilty of a misdemeanor punishable by imprisonment for not more than 90 days, or a fine of not less than $100 or more than $1,000, or both.  Penalties for violations involving game and protected animals also include the costs of prosecution and loss of hunting privileges during the remainder of the year of conviction and the next three succeeding calendar years.

Penalties for a first offense involving the illegal sale or purchase of most endangered, threatened, game or protected animals are the same as those described in the preceding paragraph, except that a minimum fine is not required for a game or protected animal violation.  Each subsequent offense involving the illegal purchase or sale of a game animal or a protected animal is a felony.

In addition, a person convicted of illegally killing, possessing, selling or purchasing an endangered, threatened, game or protected animal must reimburse the State for the value of the animal as established under State law.  Reimbursable values are $1,500 per threatened or endangered animal, $100–500 per animal of most game-animal species, and $100 per animal of most protected-animal species.

Penalties and reimbursable values associated with some game and protected animals (deer, bear, wild turkey, moose, elk, hawk and owl) have been set higher than those described above for biological or social reasons.  Penalties for wolf-related violations could be elevated in similar ways regardless of whether wolves are designated as endangered, threatened, game or protected animals.  Penalties are established by the State Legislature.

To help deter wolf-related crimes, the Michigan DNR will make its best efforts to investigate violations and to pursue the appropriate penalties based on available evidence.  Achieving this objective will require an efficient system for receiving and directing reports of violations, clear investigation procedures, and adequate training of staff.

*Actions:*

1.   Increase public awareness regarding where to report suspected violations of wolf regulations.

000429A

2.      As necessary, update and refine procedures for investigating violations of wolf regulations.

3.      Train field staff on investigation procedures.

4.      As appropriate, issue and pursue penalties for violations of wolf regulations.

## 6.4    Maintain Sustainable Populations of Wolf Prey.

Wolves prey on a variety of wildlife species (see 3.6 for additional information), and the importance of particular species as wolf food sources often varies seasonally and geographically (Voigt et al. 1976, Fritts and Mech 1981, Potvin et al. 1988, Fuller 1989, Mech and Peterson 2003).  In Michigan, the primary prey for wolves during winter is white-tailed deer (Huntzinger et al. 2004), and maintenance of an adequate deer herd is necessary for the long-term persistence of a viable wolf population.  Other prey, such as beaver, snowshoe hare and other small animals, are an important complement to deer in the diet of Michigan wolves (Huntzinger et al. 2004).

Many Michigan residents view the natural dynamics of wolf–prey relationships in a positive way (Beyer et al. 2006).  Seventy-two percent of interested Michigan residents who responded to the most-recent public-attitude survey believed a 'very' or 'somewhat' important reason to have wolves in Michigan was reflected by the following statement:  "As predators, wolves could benefit Michigan's ecosystem by helping to control some other wildlife populations."

Despite general appreciation for the ecological role of wolves, some Michigan residents are concerned about the impacts of wolves on populations of deer and other wildlife (Beyer et al. 2006).  They are concerned wolf predation may have adverse ecological consequences by reducing wildlife populations below sustainable levels.  Some residents are also concerned wolf predation will reduce opportunities for hunting, trapping and other wildlife-based benefits.

The following objectives address the need to ensure the persistence of healthy wildlife populations that simultaneously provide adequate prey for wolves and sustainable benefits to humans.

### 6.4.1    Maintain prey populations required to sustain a viable wolf population.

Several studies have estimated the average number of deer killed per year by individual wolves.  Some research indicates an individual wolf may kill roughly 15–19 deer per year (Mech 1971, Keith 1983, Fuller 1989), whereas other research indicates a single wolf may kill as many as 37–50 deer per year (Pimlott 1967, Huntzinger et al. 2004).  Some amount of scientific uncertainty accompanies each of these estimates.  This uncertainty derives from limitations of particular estimation techniques as well as geographic and temporal variability in kill rates.  Additional research is necessary to refine estimates of the numbers of deer killed by wolves in Michigan.

Regardless of whether the average kill rate occurs at or even somewhat above the high end of the existing estimates, the deer herd in Michigan exceeds the size required to support the wolf population.  Based on the higher estimated kill rates, a population of 509 wolves, as estimated to

36

000430A

occur in Michigan during late winter in 2007, could kill roughly 19,000–25,000 deer per year, which would have been roughly 6–7% of the estimated (2006) UP deer herd.  Given this situation, deer availability is not expected to become a limiting factor for the wolf population, even if wolf numbers and deer numbers undergo significant inverse fluctuations.

Management activities that maintain deer and other prey at numbers similar to those that occurred in the UP during the past decade would continue to ensure a prey base that is more than adequate to sustain a viable wolf population.  These management activities will be planned and implemented at several geographic scales (e.g., statewide, management unit, and deer management unit).

*Action:*

> 1.  Ensure management of deer and other prey populations at multiple geographic scales addresses the need to provide sufficient food for wolves.

6.4.2   Maintain prey populations to provide for sustainable human uses.

Wolf–prey interactions are dynamic and complex.  They are influenced by many factors, including the relative densities of wolves and prey, the responses of both wolves and prey to fluctuations in prey densities, and the effects of environmental conditions on wolves and prey (Mech and Peterson 2003).  Each of these factors varies geographically and temporally, and the impacts of wolves on prey populations depend on local conditions.  In some situations, wolves may significantly reduce local prey populations, whereas in others, the impact may be negligible (Mech and Peterson 2003).  Thus, there is no general answer to the question of how wolves affect prey densities.

Prey and predators coevolved.  As a result, prey possess physical and behavioral adaptations for avoiding predation (Mech and Peterson 2003).  Adaptive behavioral shifts that cause deer to become more elusive to predators also may reduce deer sightability by humans and contribute to a public perception that deer populations have been heavily impacted by wolf predation.  Despite these common perceptions, however, the efficacy of such adaptations generally allows prey populations to be sustained, even in areas with robust predator populations.

Although measurable impacts on prey populations can occur in localized areas, wolves are probably not causing significant reductions in the overall number of deer in the UP.  Based on existing kill-rate estimates and recent population estimates, wolves annually kill only a small proportion of the UP deer herd (see 6.4.1 for additional information).  Predation by wolves is a lesser source of mortality compared to the mortality collectively caused by other factors, such as vehicle collisions, hunter harvest, non-wolf predation, starvation and disease.  Moreover, wolf predation may be compensatory to those other sources of mortality.  In other words, mortality caused by predation may often replace mortality that would have otherwise occurred.  Evidence that wolves tend to kill weak, sick or otherwise vulnerable individuals supports the notion that wolf predation is at least partially compensatory (Mech and Frenzel 1971, Fritts and Mech 1981, Huntzinger et al. 2004), but the extent of such compensation in wolf–deer systems is unknown.

000431A

Additional research is necessary to assess the compensatory nature of predator-induced deer mortality in Michigan.

Given relative wolf and prey densities, existing wolf kill-rate estimates, and the reduced impacts of wolf predation due to compensatory mortality, wolves do not pose a significant threat to the sustainability of prey populations in Michigan, nor are they expected to significantly reduce the number of deer and other prey available for public harvest or other human uses.  The Michigan DNR will continue to manage the deer herd in a sustainable manner and take appropriate steps to ensure opportunities for public harvest of deer and other prey species.  In addition, it will work with partners to educate the public about the ecological role of wolves and to further research the dynamics of wolf–prey interactions.

*Actions:*

1.   Manage white-tailed deer in a sustainable manner to yield healthy fawns, does and bucks without negatively impacting habitat, other wildlife species, or creating undue hardship to private interests.

2.   Conduct management activities to provide for public harvest of deer and other prey species.

3.   Provide the public with information on wolf–prey interactions and the impacts of wolves on prey populations as part of a wolf-based information and education program (see 6.1.1).

4.   Support research to investigate wolf–prey interactions and the impacts of wolves on prey populations (see 6.2.3).

## 6.5    Maintain Habitat Necessary to Sustain a Viable Wolf Population.

Wolves occupy a broad range of habitat types and do not require wilderness areas, as previously believed (Mech 1995).  The suitability of any particular habitat is generally related to the availability of ungulate prey and the extent to which human-caused mortality can be avoided (Fuller 1995; see 3.8 for additional information).

Road density has been used as an index of wolf–human contact and appears to be related to illegal and accidental killing of wolves (Mladenoff et al. 1995).  Using models that incorporated measures of deer density and/or road density, researchers recently estimated that approximately 11,000 square miles of suitable wolf habitat occurred in the UP (Mladenoff et al. 1995, Potvin et al. 2005) and approximately 1600–3,000 square miles of suitable habitat occurred in the LP (Gehring and Potter 2005, Potvin 2003).

The current amount of available wolf habitat is expected to be sufficient to allow the long-term persistence of a viable wolf population.  Moreover, the amount of suitable habitat is expected to remain adequate into the foreseeable future.  Based on an assessment of several factors, including land ownership and stability of protection, rates of land-use conversion, and changes in

000432A

human and road density, Hearne et al. (2003) predicted the suitable habitat expected to be available in Michigan and northern Wisconsin in 2020 would be sufficient to maintain a viable population.

To ensure the continued availability of sufficient habitat, management will focus on three areas: 1) maintaining habitat necessary to sustain adequate levels of wolf prey; 2) maintaining wolf habitat linkages; and 3) minimizing disturbance at known active wolf den sites.

6.5.1   Maintain habitat necessary to sustain adequate levels of wolf prey.

As stated previously, prey availability strongly influences the suitability of an area for wolves. Therefore, many wolf habitat needs will be met through the maintenance of habitat for sufficient levels of wolf prey, primarily white-tailed deer.  Approaches for managing prey populations are outlined under 6.4 (Maintain Sustainable Populations of Wolf Prey).

6.5.2   Maintain habitat linkages to allow wolf dispersal.

Wolf recovery in the UP began with immigration of wolves from Minnesota, Wisconsin and Ontario (Thiel 1988, Mech et al. 1995).  Migration and gene flow among these areas help to preserve or enhance genetic diversity within populations and to mitigate the detrimental effects of random demographic fluctuations and environmental catastrophes (Simberloff and Cox 1987, Boitani 2000).  Thus, continued movement of wolves within and among jurisdictions will help ensure the long-term viability of the wolf population.

Wolves are effective dispersers (Forbes and Boyd 1997), and existing habitat linkages among the UP, Wisconsin and Minnesota appear to be adequate to allow long-distance movements. Between the early 1990s and 2006, researchers documented the movements of at least 14 marked wolves between the UP and either Minnesota or Wisconsin (Mech et al. 1995, B. Roell, Michigan DNR, unpublished data).  In addition, there is evidence that wolves have moved between the eastern UP and Ontario (Jensen et al. 1986, Thiel and Hammill 1988).

The types of landscape features that represent barriers to wolf movements are poorly understood. Long-distance movements of wolves through human-dominated landscapes in Minnesota and Wisconsin suggest highways and roads are not barriers (Mech et al. 1995, Merrill and Mech 2000).  Wolves are capable of traveling through crop and range land (Licht and Fritts 1994, Wydeven et al. 1998).  They can also cross ice-covered lakes and rivers (Mech 1966) as well as unfrozen rivers during the summer (Van Camp and Gluckie 1979).  However, a series of linear obstacles, such as a river flanked by roads, railways and disturbed habitat, may act synergistically and be more of a barrier to wolf movements (Blanco et al. 2005).  Jensen et al. (1986) suggested areas of human settlement along the St. Mary's River were barriers to dispersing wolves, but some wolves have been able to pass through or around those areas (Mech et al. 1995).

Although few natural or artificial landscape features may absolutely prevent wolf dispersal, maintenance of habitat linkages across the landscape may facilitate regular exchange of individuals and genetic material among areas.  The amount and distribution of public wild lands

39

000433A

in Minnesota, Wisconsin, Michigan and Ontario may facilitate efforts to conserve habitat linkages within the region.

*Action:*

    1.    Cooperate with Federal, State and tribal agencies and private landowners to identify and protect wolf habitat linkage zones.

6.5.3   Minimize disturbance at known active wolf den sites.

Wolves dig or otherwise establish sheltered dens to provide early protection for young pups. Early studies (Joslin 1967, Stephenson 1974, Allen 1979) suggested human disturbance can cause den abandonment or movements to new dens. Wydeven and Schultz (1993) documented possible abandonment of dens in Wisconsin as a result of nearby road construction and logging activity. However, some wolves have been tolerant of human disturbances, even denning near logging sites, open-pit mines, garbage dumps, moss harvesters and military firing ranges (Thiel et al. 1998).

The 1997 *Michigan Gray Wolf Recovery and Management* Plan recommended the seasonal protection of den sites. However, den sites are dynamic, often changing from year to year and even during the same year (Mech and Boitani 2003*b*). As a result, the detection of these areas is difficult, and only a small percentage of den sites have been identified in any given year. Although identified den sites have been protected during active use, most sites were not identified and did not receive active protection. The general lack of protection at most sites did not appear to hinder the recovery of the wolf population, and disturbance at den sites is not considered to be a significant threat.

The Michigan DNR does not plan to conduct systematic searches for wolf den sites. However, it will minimize management-related disturbance near the active den sites (i.e., sites currently used by wolf pups) that are identified on the land it manages. The agency will also work with management partners to help minimize disturbance near sites on other properties.

*Actions:*

    1.    Consider known active den sites during compartment reviews and other Michigan DNR management efforts.

    2.    Minimize management-related disturbance near known active den sites on land managed by the Michigan DNR.

    3.    Work with management partners to help minimize disturbance near known active den sites on other properties.

## 6.6    Monitor and Manage Adverse Effects of Diseases and Parasites on the Viability of the Wolf Population.

Michigan wolves have been or could be affected by a variety of diseases, including those caused by viruses (e.g., canine distemper, canine parvovirus, rabies), bacteria (e.g., Lyme disease,

000434A

leptospirosis, tularemia) and fungi (e.g., blastomycosis), as well as both internal (e.g., canine heartworm and intestinal worms of various species, echinococcosis) and external (e.g., sarcoptic mange, lice, ticks) parasites.

On account of their taxonomic and physiologic similarities, wolves and domestic dogs are susceptible to many of the same diseases.  Moreover, in all but the most-remote areas of Michigan, wolves face virtually continuous exposure to some of these diseases (e.g., distemper, parvovirus) which cycle through the dog population.  Others are enzootic in the wolf population itself (e.g., sarcoptic mange, echinococcosis), in prey (e.g., tularemia), or in the environment (e.g., *Blastomyces*).  Consequently, the wolf population has had the opportunity to develop individual and collective immunity to some of the more-common agents over time, which in some cases can be lifelong and conferred to offspring through maternal antibodies (Gillespie and Timoney 1981).  Although these established diseases can be significant sources of mortality for wolves, they are generally not considered to be limiting at the population level.  Despite evidence of ubiquitous exposure, affected wolf populations demonstrate good recruitment, suggesting long-term stability of a robust Michigan population is likely to remain unaltered by these diseases (Kreeger 2003).

The following objectives and actions focus on monitoring the prevalence and effects of wolf diseases and parasites and on assessing the most-appropriate approach for managing their impacts.

6.6.1 __Monitor the health of wolves in Michigan.__

Wolf health will be monitored through necropsies of dead wolves and analysis of biological samples from captured live wolves.  Necropsies provide information on condition, age, reproductive status, food habits, and cause of death, as well as the geographic distribution and prevalence of diseases and parasites.  Analysis of biological samples such as blood, feces, and skin scrapings provide similar information on diseases and parasites.  The Michigan DNR will continue to conduct these analyses at its Wildlife Disease Laboratory.  In addition, the Michigan DNR will collaborate with researchers interested in studying wolf diseases and parasites.

*Actions:*

1.    As necessary, update and refine procedures for collecting, submitting, and storing information on carcasses and biological samples.

2.    Train field staff on collection and submission procedures.

3.    Conduct necropsies and analyses of dead wolves and biological samples, respectively.

4.    Work with management partners to develop and conduct studies of wolf diseases and parasites.

000435A

6.6.2   Assess the need to manage diseases and parasites in the wolf population.

In most cases, treatment of diseases and parasites in free-ranging wolves is not practical.  Prior to 2004, wolves captured in Michigan for research purposes were administered vaccinations for canine distemper and parvovirus and were treated for sarcoptic mange.  These procedures may have reduced the amount of natural mortality that would have otherwise occurred in the Michigan sample (although objective assessment of any such effect was essentially impossible).  Discontinuing vaccination and treatment as part of handling procedures has eliminated this source of bias and has recently allowed more-accurate estimations of natural mortality.

At present, diseases and parasites do not pose a significant threat to the Michigan wolf population.  With the exception of euthanizing wolves observed to be suffering from serious detrimental effects of infection, active management of diseases and parasites in the wolf population is not currently warranted or recommended.  Thus, vaccinations are not expected to resume.  However, if wolf-health monitoring indicates that diseases and parasites someday pose a significant threat to the wolf population, managers will evaluate options for more-active management.

*Action:*

1.    Continue to evaluate the feasibility and need for vaccinations of captured and free-ranging wolves.

## 6.7    Achieve Compatibility between Wolf Distribution and Abundance and Social Carrying Capacity.

A principal goal of this plan is to maintain a viable Michigan wolf population above a level that would warrant its classification as threatened or endangered.  Therefore, the Michigan wolf population must exceed criteria that have been used to define biological recovery (USFWS 1992, Michigan DNR 1997).  However, the minimum requirement to preclude listing is not necessarily sufficient to provide all of the ecological and social benefits valued by the public.  Accordingly, management will be conducted to maintain the wolf population above the minimum size requirement and facilitate those wolf-related benefits while minimizing and resolving conflicts where they occur.  This plan does not identify a target population size, nor does it establish an upper limit for the number of wolves in the State.  As a result, public preferences regarding levels of positive and negative wolf–human interactions will strongly influence the extent to which wolf abundance and distribution exceed the minimum requirements for a viable population.

The attitudes and actions of society historically influenced the abundance and distribution of wolves on the landscape (Mech 1970, Beaufort 1987, Thiel 1993).  Indeed, public intolerance of wolves led to the virtual extirpation of the species from the State.  During recent decades, policies that reflected significant increases in public support for wolves facilitated the recovery of the Michigan population.  Public attitudes still have the power to influence wolf population levels.  People can take measures to either sustain or threaten the population.  These measures

000436A

can be direct (e.g., maintenance of adequate prey, illegal killing) or indirect (e.g., litigation, legislation).

'Social carrying capacity' refers to the range bounded by the minimum and maximum levels of wolves society will tolerate.  Inclusion of both a lower and an upper limit is critical to the definition, because society may not be willing to accept a decline in the wolf population below a certain level, nor may it be willing to accept the challenges and costs associated with wolves above a certain population level.  Social carrying capacity is strongly influenced by the actual and perceived benefits and costs associated with particular levels of wolf abundance and distribution.

All segments of society do not value the benefits or bear the costs of wolf presence equally.  Therefore, the minimum and maximum tolerable levels of wolves can vary regionally or by stakeholder group.  Defining social carrying capacity becomes complicated when different segments of society hold different tolerances, because a social carrying capacity exists only when the ranges of tolerance held by different groups overlap.  If the ranges of tolerance do not overlap, then a social carrying capacity can not be identified, and any goal for wolf abundance and distribution would be expected to encounter social resistance and conflict.

In such a situation, a social carrying capacity can be created only through a shift in tolerances at one or both ends of the range.  Such a shift could be caused through: 1) management of the interactions between wolves and humans to reduce costs and/or increase benefits to affected stakeholders or 2) information and education programs aimed at factors that influence tolerances for wolves and wolf-related interactions.

The most-recent public-attitude study found that a social carrying capacity for wolves in different regions of Michigan did not exist (Beyer et al. 2006).  That is, the minimum levels of wolves and wolf-related interactions some segments of society would tolerate were higher than the maximum levels others would tolerate.  No particular level was acceptable to a majority of interested survey respondents.

Survey-respondent preferences regarding the levels of wolves within each region varied according to region of residence and stakeholder group (Beyer et al. 2006).  For example, the preferred level of wolves in both the UP and northern LP was highest among residents of the southern LP and lowest among UP residents.  Compared to non-hunters, hunters tended to be less tolerant of wolves.  However, even among these two groups, hunters and non-hunters in the UP were less tolerant of wolves than were their counterparts in southern Michigan.  As a group, livestock producers were much less tolerant of wolves than was the general public.

Given the disagreement in preferences and tolerances among different segments of the public, a shift in public attitudes is necessary to create a social carrying capacity for wolves in Michigan.  Until management or education causes an adequate shift, any particular level of wolves will not be acceptable to society at large.  The following objectives were designed to help achieve compatibility between wolf abundance and distribution and public tolerance.

000437A

6.7.1    Promote consistent public understanding and appreciation of the benefits and costs associated with particular wolf levels.

People can hold preferences and tolerances regarding wolf abundance and distribution without a complete understanding of all the relevant issues.  For example, a person who is not willing to tolerate any wolves on the landscape may not be aware of or appreciate the benefits wolves provide to many residents.  Intolerance can also be caused by an inaccurate, exaggerated perception of the problems wolves cause.  Conversely, a person who demands the highest number of wolves the available habitat can support may be unaware of or may not appreciate the costs and risks such a level would impose on certain members of society.

Public education could help foster a realistic understanding of the positive and negative consequences associated with particular wolf levels.  This education could allow some Michigan residents to place a higher value on wolves, alleviate concerns held by some Michigan residents, and thus increase general tolerance for the wolf population.  It could also help other residents understand the real costs and risks associated with wolves and help them appreciate the potential adverse consequences of particular wolf levels for affected residents.

To some extent, personal preferences and tolerances will continue to reflect personal values, which are resistant to change (Fulton et al. 1996).  However, education efforts may encourage attitude shifts that are based on consistent, accurate information and thus facilitate the creation of a social carrying capacity for wolves in Michigan.

*Actions:*

1.    Increase public awareness regarding where to obtain information on the consequences of particular wolf levels.

2.    Provide the public with accurate information on the benefits and costs associated with particular wolf levels as part of a wolf-based information and education program (see 6.1.1).

6.7.2    Manage wolf-related interactions to increase public tolerance for wolves.

Social tolerance for a population of any large predator depends on the benefits attributed to the population and on confidence that conflicts will be resolved effectively (Slovic 1987, Frost 1985, Wolstenholme 1996, Beyer et al. 2006).  Therefore, facilitation of wolf-related benefits and effective conflict resolution could do more than serve the interests of Michigan residents.  Those actions could also reduce levels of intolerance among some stakeholders and cause a shift in attitudes that leads to the development of a social carrying capacity for wolves in the State.

Section 5.2 describes the many types of benefits people can derive from the presence of wolves. In brief, these benefits can be:  1) ecological, as wolves fill an important ecological niche and improve ecosystem function; 2) cultural or religious, as people derive spiritual satisfaction or fulfillment from the presence of wolves; 3) personal, as the presence of wolves provides unique opportunities to interact with, study, and appreciate a particular component of the natural world;

000438A

and 4) economic, as wolf-based tourism and recreation could draw a greater number of people to local communities. The approaches that will be used to foster these types of wolf-related benefits are outlined under 6.8 and 6.12.

Conflicts associated with wolves can involve human-safety concerns regarding the presence of wolves near residential or recreational areas, depredation of domestic animals, and concerns regarding the impact wolves may be having on populations of other wildlife species. The approaches that will be used to manage specific types of wolf-related conflicts are outlined under 6.9, 6.10, 6.11 and 6.12.

*Actions:*

1.     Facilitate positive wolf–human interactions and other wolf-related benefits (see 6.8 and 6.12).

2.     Minimize and manage wolf-related conflicts (see 6.9, 6.10, 6.11 and 6.12).

6.7.3   Manage wolf distribution and abundance as necessary to maintain positive and negative wolf-related interactions at socially acceptable levels.

As stated previously (see 5.3.2), broadly based abundance and distribution goals may not be necessary or effective for managing most negative wolf-related interactions. Wolf-related conflicts in local areas are often caused by the behavior of a few individual wolves, and management at small scales can often address problems effectively. Accordingly, management of wolf–human conflicts under this plan will be conducted at the level of individual wolves or packs to the extent that it is expected to be effective and logistically feasible.

Some situations may warrant consideration of reducing wolf numbers in localized areas as a means to reduce the risk of negative interactions. Such consideration could be necessary if a high density of wolves in an area, rather than the behavior of individual wolves, was determined to be responsible for problems that could not otherwise be addressed through non-lethal or individually directed lethal methods. As of this writing, a situation of this type has not occurred in Michigan.

Many Michigan residents would support local reduction of wolf numbers if it would reduce problems caused by wolves (Beyer et al. 2006). The extent of public support appears to depend on the nature of the problem to be addressed. The percentage of interested survey respondents that supported reducing wolf numbers through lethal means was highest with regard to human-safety concerns (59%), intermediate with regard to depredation problems (54%), and lowest with regard to impacts on the number of deer available for hunting (49%).

The severity, immediacy and frequency of conflicts will determine whether active management of wolf abundance or distribution in local areas is necessary. More-conservative management methods will be applied when the risk of problems is considered to be relatively small and non-immediate, whereas increasingly aggressive methods may be applied as the severity, immediacy and frequency of problems increase.

000439A

According to the results of the most-recent public-attitude survey, the public generally desires some presence of wolves in the northern LP (Beyer et al. 2006). Indeed, 79% of interested survey respondents indicated they would be unwilling to accept the complete absence of wolves in that area. However, respondents would be willing to tolerate lower minimum and maximum levels of wolves in the northern LP than in the UP. Even the respondents who were most tolerant of wolves preferred a lower level of wolf abundance and interactions in the northern LP than in the UP.

Wolves will not be prevented from colonizing the LP. However, their presence in that area is not necessary to maintain a viable population in Michigan. Additionally, if a wolf population becomes established in the LP, the higher density of human residences and livestock operations in that area relative to the UP (see 6.10 for additional information) would create a higher potential for wolf-related conflicts. The severity, immediacy and frequency of conflicts would guide management responses in the LP, but given the preceding considerations, relatively aggressive responses may be warranted in many cases.

The presence of wolves in the LP would be unlikely to: 1) exacerbate the prevalence of tuberculosis in the deer herd, 2) spread the disease geographically, or 3) increase the risk of tuberculosis transmission to cattle. Indeed, the presence of a natural predator might be expected to reduce tuberculosis prevalence in the deer herd; by preying upon individuals weakened by tuberculosis, a predator would remove the deer most likely to spread the disease. Although all mammals, including wolves and other canids, can be infected with bovine tuberculosis in certain circumstances, canids are generally resistant to infection. Moreover, there is no evidence that wolves or other wild canids transmit the disease to each other or to other species. In Canada, where tuberculosis is present in free-ranging bison (*Bos bison*) in Wood Buffalo National Park and in free-ranging elk in Riding Mountain National Park, there is no evidence that the wolf populations in those areas have contributed to the spread of the disease (Carbyn 1982, Tessaro 1986).

*Actions:*

1.  Effectively manage wolf-related conflicts at the smallest possible scale.

2.  Allow wolves to colonize and remain in the LP to the extent that the accompanying negative interactions can be managed within socially acceptable levels.

3.  Evaluate the outcomes of active management of wolf abundance and distribution.

## 6.8    Facilitate Positive Wolf–Human Interactions and Other Wolf-related Benefits.

A principal goal of this plan states the need to facilitate wolf-related benefits. Those benefits serve the interests of affected stakeholders and they foster the public support that is necessary for the long-term viability of the wolf population (USFWS 1992, Wisconsin DNR 1999, Bangs et al. 1995, Minnesota DNR 2001, Boitani 2003, Fritts et al. 2003). They can be ecological, personal, economic, and cultural or religious (see 5.2 for more information).

000440A

People hold diverse cultural values and religious beliefs regarding wolves.  Wolves can play major or minor roles or be viewed positively or negatively within particular cultures and religions.  As only one example among many different perspectives, the cultural and religious values regarding wolves are particularly important to many Native Americans.  To help illustrate those values held by many Native Americans in Michigan, the representatives of the Chippewa Ottawa Resource Authority and the Great Lakes Indian Fish and Wildlife Commission on the Michigan Wolf Management Roundtable provided the following account of the story of Maahiingun and Nanaboozhoo:

> *"Nanaboozhoo, (half man/half spirit) was placed on the Earth at the beginning of time and given instructions by Gzhemnidoo (The Creator) and told to walk the Earth to name the plants, animals, insects and the entirety of everything that comprised the world of his time.*

> *"Throughout his travels, Nanaboozhoo began to notice that the animals he was tasked to name came in pairs and also had the ability to repopulate their species.  Seeing the various animal families throughout all of creation, Nanaboozhoo became lonely and so he spoke of his feelings to Gzhemnidoo and asked "Why is there no other like me?"  Gzhemnidoo answered, "I will bring you someone to walk, talk and play with" and in his infinite wisdom, Gzhemnidoo sent Maahiingun (the wolf) to be with Nanaboozhoo and together they set out to complete the task that Gzhemnidoo had asked.*

> *"In their journey, they became very close to each other, like brothers.  It was through this closeness that they soon came to realize that they were also brothers to all of Creation.*

> *"Once they had finally completed the task that Gzhemnidoo asked of them, they talked with the Creator once again.  Gzhemnidoo was pleased with what he heard but this time Creator curiously replied, "From this day on, you are to separate and go different ways.  What happens to one of you will also happen to the other.  You will be feared by some, respected by others, but misunderstood by all of the people who will come to inhabit these lands."*

> *"Reluctantly, Maahiingun and Nanaboozhoo set off on their different journeys.  Their shared sadness is evident by Maahiingun's cry that can still be heard wherever the wolf still roams the Earth on his separate journey.*

> *"The teachings of Nanaboozhoo and Maahiingun serve as an important reminder for Indian People to this day.  All of what Gzhemnidoo said to Nanaboozhoo and Maahiingun has come true.  Indian and Maahiingun have come to experience the same things, both good and bad, that life has to offer.  Both take a mate for life, have a Clan System, and also are part of a Tribe.  Both have been stripped of their land and hunted for their skin.  Both have been pushed to the brink of extinction yet somehow miraculously survive to this day.*

000441A

*"It is our belief as Indian people that our ability to foretell our future is evident by looking at the wolf, who remains one of the most significant cultural indicators to our continued existence."*

The following objectives focus on increasing public awareness regarding the benefits provided by wolves, ensuring an adequate distribution and abundance of wolves, and providing specific opportunities for people to experience and appreciate wolves.

6.8.1   Inform the public on benefits derived from the presence of wolves.

The benefits of wolves may not be apparent to many Michigan residents.  Public education and outreach could help residents understand and appreciate those benefits.

*Action:*

    1.      Provide the public with information on the benefits of wolves as part of a wolf-based information and education program (see 6.1.1).

6.8.2   Maintain a distribution and abundance of wolves adequate to maintain benefits at levels acceptable to the public.

The size of some benefits depends on the abundance and distribution of wolves on the landscape. For example, an informed individual can derive personal satisfaction from the presence of a healthy wolf population only if such a population actually exists.

Maintenance of a viable wolf population will allow the level of positive wolf-related interactions desired and appreciated by many Michigan residents (Beyer et al. 2006).  However, some people prefer higher levels of interactions than others, and some people prefer the level of interactions associated with the largest number of wolves the available habitat can sustain (Beyer et al. 2006). Both positive and negative interactions can increase as wolf abundance or distribution expands. Although some individuals may prefer the level of benefits associated with a maximum level of wolves, the corresponding level of negative interactions may not be acceptable to other segments of society.  Therefore, wolf-related benefits will be maximized to the extent that the accompanying levels of negative interactions can be managed effectively.

*Actions:*

    1.      Facilitate the ecological, cultural, economic and personal benefits derived from the presence of wolves by maintaining a viable wolf population.

    2.      Facilitate the maximum level of positive wolf-related interactions that is possible while maintaining negative interactions at publicly acceptable levels.

000442A

6.8.3   Promote opportunities for people to experience and appreciate wolves.

Wolf-based programs and events can increase opportunities for people to appreciate the benefits of wolves.  Such programs and events can provide participants with positive, unique experiences, increase public knowledge of the positive values of wolves, and generate support for the wolf population.

*Actions:*

1.      Work with management partners to coordinate wolf-based programs and events.

2.      When prudent, invite public and media participation in wolf-related projects.

3.      Support efforts of management partners to provide positive wolf-related experiences.

## 6.9     Manage Actual and Perceived Threats to Human Safety Posed by Wolves.

Most Michigan residents place a high priority on wolf management that addresses public concerns for human safety (Beyer et al. 2006).  Eighty-seven percent of interested respondents to the most-recent public-attitude survey indicated human-safety issues should be an important factor when considering whether to reduce the number of wolves in a particular area.  At least 76% of interested respondents would support some type of active wolf management to address strong public concerns regarding human-safety risks posed by wolves.

The following objectives for the management of human-safety issues fall into three general categories.  The first category focuses on educating the public on the actual safety risks posed by wolves and ways to reduce those risks.  The second category focuses on managing the factors that influence the probability of wolf-related problems, including rabies and habituation of wolves to humans.  The third category focuses on eliminating actual safety threats.

6.9.1   Promote accurate public perceptions of the human-safety risks posed by wolves.

Most wildlife has the potential to be dangerous to humans in certain situations.  In most cases, people can take simple, sensible measures to avoid those situations and protect themselves against harm.  Other cases may warrant higher levels of concern and professional assistance.  Accurate perceptions of the human-safety risks posed by wildlife can facilitate appropriate levels of concern and responses to particular situations.

Segments of the public can overestimate or underestimate the actual human-safety risks posed by wolves.  Some people may feel the mere presence of a wolf population poses a serious safety threat, whereas others may not recognize that wolves could be dangerous to people in certain situations.  Perceptions and attitudes regarding safety risks can vary by geographic region and stakeholder group (Beyer et al. 2006).  For example, the most-recent public-attitude study showed that urban residents placed a lower priority on wolf-related safety concerns than did rural

000443A

residents.  Compared to the general public, livestock producers as a group were more concerned about wolf-related safety risks.

In Michigan, wolves are not likely to attack any person who does not deliberately invite aggression (i.e., by provoking or feeding wolves).  As of this writing, a wolf attack on a human has never been documented in Michigan or in any of the other 47 contiguous States.  However, wolves have attacked people in other areas of North America (McNay. 2002*a, b*), and concerns for public safety are warranted in some situations.  Regardless of the extent to which wolves pose a threat to human safety, anxieties over a perceived threat can impact the quality of life of affected residents as well as public tolerance for the wolf population.

Public education could help foster a realistic understanding of the human-safety risks associated with Michigan wolves.  This education could help alleviate concerns held by some Michigan residents, and thus increase general tolerance, if not support, for the wolf population.  It could also help other residents understand that some wolf-related human-safety concerns are legitimate, and thus help them appreciate the consequences of those concerns for affected residents.

*Actions:*

1.   Increase public awareness regarding where to obtain information on wolf-related threats to human safety.

2.   Provide the public with accurate information on the human-safety risks posed by wolves as part of a wolf-based information and education program (see 6.1.1).

3.   Provide prompt responses to requests for information regarding wolves and human safety.

6.9.2   Provide timely and professional responses to reports of human-safety risks posed by wolves.

The protection of human safety is a top priority, and the Michigan DNR, USDA Wildlife Services, and other management partners will make their best efforts to respond to reports of habituated, sick or injured wolves in a timely and professional manner.  Achieving this objective will require an efficient system for receiving and directing reports, clear investigation procedures, and adequate training of staff.

*Actions:*

1.   Increase public awareness regarding where to report wolf-related threats to human safety.

2.   As necessary, update and refine procedures for the investigation of reported threats to human safety.

000444A

3.      Train field staff on investigation procedures.

6.9.3    Minimize the incidence of rabies in wild and domestic populations.

Worldwide, most documented wolf attacks on humans during the past century involved rabid wolves.  For example, from 1900 through 2002, rabid wolves were involved in more than 80% of documented attacks in Europe and 70% of documented attacks in areas of Asia (Linnell et al. 2002, U.S. National Park Service 2003).

The role of rabies in wolf attacks has been smaller in North America than in other parts of the world.  In a summary of wolf attacks in Canada and Alaska since 1900, McNay (2002*a, b*) reported that only 12 of 80 (15%) reviewed attacks involved rabid wolves.  This low incidence may reflect the implementation of programs designed to minimize the incidence of rabies in domestic and wild animals (Centers for Disease Control and Prevention 1999, USDA Wildlife Services 2002).  Rabies has not been documented in Michigan wolves, and the potential for the disease to affect wolves in the State is small.

*Actions:*

1.      Support programs to assess and minimize the incidence of rabies in wild and domestic animal populations.

2.      Euthanize wolves and other animals suspected to be infected with rabies.

6.9.4    Prevent or minimize the habituation of wolves.

The most-important factor contributing to wolf attacks in Canada and Alaska appears to be habituation to humans.  Of the 80 wolf attacks reviewed by McNay (2002 *a, b*), 29 cases (36%) involved habituated wolves.  Wolves can become habituated and lose their fear of humans by having frequent and increasingly closer contact with humans, and by receiving food rewards for their boldness.

Several human behaviors can attract wolves and contribute to habituation.  Directly feeding wolves is the most obvious way to cause habituation.  Drawing deer into residential areas by feeding them also can attract wolves and other predators.  Feeding pets outside and leaving pets outside unattended also may attract wolves.  Avoiding these behaviors can reduce the chance a wolf will become habituated and lose its fear of humans.

In addition to avoiding the behaviors listed above, people can take other, active measures to prevent wolf habituation.  Wolves can be deterred by strange odors, sights or sounds (USDA 2002), and devices designed to scare wolves may help prevent problems.  Some examples of scare devices include lighting systems, sirens and other noisemaking devices, flagging (fladry), and movement-activated guard devices (Beyer et al. 2006).

000445A

Public education on ways to avoid attracting wolves and technical assistance on the appropriate use of scare devices could help prevent the habituation of wolves and help reduce associated risks to human safety.

*Actions:*

1. Provide the public with information on ways to help prevent wolf habituation as part of a wolf-based information and education program (see 6.1.1).

2. Provide property owners and residents with technical assistance on methods to help prevent wolf habituation.

3. As warranted, recommend modifications in law, policy or enforcement that could more-effectively discourage human activities that lead to the habituation of wolves.

6.9.5   Eliminate actual human-safety threats where they occur.

A habituated, sick or injured wolf in or near areas of human activity can represent an actual threat to human safety.  Where actual threats are identified, the Michigan DNR, USDA Wildlife Services and other management partners will take the steps necessary to eliminate those threats.

The severity, immediacy and frequency of safety threats will guide management responses. More-conservative management methods will be applied when the risk of physical harm to humans is considered to be relatively small and non-immediate, whereas increasingly aggressive methods may be applied as the severity, immediacy or frequency of threats increase.

This strategy places a high priority on developing, evaluating and applying non-lethal management methods to reduce human-safety threats.  Non-lethal methods will be applied wherever they are expected to be effective and where the severity and immediacy of a threat do not warrant more-aggressive action.  Non-lethal methods can include elimination of wolf attractants (see 6.9.4), use of scare devices (see 6.9.4), and aversive conditioning.  Aversive conditioning involves a stimulus (e.g., rubber bullets) that causes discomfort, pain or an otherwise negative experience without permanently injuring or killing a wolf.

To the extent non-lethal methods are effective at eliminating actual threats to human safety, lethal control of wolves will not be necessary.  However, when such practices prove to be ineffective, are not expected to be effective, or are infeasible, lethal control may be necessary to prevent problems.  Reserving lethal control as a management option allows the potential use of all the tools that might be required to help ensure the protection of human safety.  Results of the most-recent public-attitude survey showed that at least 76% of interested respondents supported some form of lethal control to address strong public concerns regarding human-safety risks posed by wolves.  The Michigan DNR and its management partners will apply lethal control methods as necessary to eliminate demonstrable threats to human safety.

000446A

Additionally, current regulations allow a person to remove, capture or kill a wolf when it poses an immediate threat to human life, and they require reporting of any such action to the Michigan DNR within 24 hours.  A situation of this type has not occurred in Michigan, nor is one expected.  However, maintaining these provisions, regardless of the future legal classification of wolves, would ensure people can legally protect themselves and others in the unlikely event of an ongoing or imminent wolf attack.  It would also allow the Michigan DNR and its management partners to investigate and document such an incident in a timely manner.

Relocation of wolves is often proposed by the public as a method to reduce wolf-related conflicts.  However, eliminating a threat to human safety through wolf relocation is not reasonably possible.  Data from radio-collared wolves indicate relocated wolves rarely settle in the areas where they are released, and relocated wolves may return to their original territories (D. E. Beyer, Michigan DNR, unpublished data).  Even if habituated wolves were relocated and did not return to the areas of capture, they would still be fearless of humans and would probably continue to cause human-safety threats elsewhere.  Relocating wolves is problematic for additional reasons.  Given the current widespread distribution of wolves across the UP, unoccupied, suitable release areas are no longer available, and any relocated wolves may be killed by resident packs.  Also, residents have expressed opposition to the release of wolves near their communities.

*Actions:*

1.  Support the development, evaluation and appropriate use of non-lethal and lethal management methods to reduce human-safety threats.

2.  As necessary, update and refine management responses according to the severity, immediacy and frequency of human-safety threats.

3.  Train field staff on response procedures.

4.  Preserve the legal authority for individuals to remove, capture or kill a wolf when it poses an immediate threat to human life.

5.  Continue to require individuals who capture, remove or kill a wolf in response to a human-safety threat to report the incident to the Michigan DNR within 24 hours.

## 6.10    Manage Wolf Depredation of Domestic Animals.

A depredation event occurs when a predator kills or injures one or more animals at a given time. Wolves normally kill or injure wild prey and competitors, but they may sometimes attack domestic animals.  Although its frequency is currently lower in Michigan than in Minnesota or Wisconsin, wolf depredation of domestic animals in Michigan has become an important management issue.

In the United States, farmers and ranchers as an overall group still hold strong negative views of wolves (Fuller et al. 2003, Nie 2003).  Indeed, the most-recent Michigan public-attitude study

000447A

indicated that livestock producers were far less supportive of having wolves in the State than was the general public. Whereas 73% of all interested respondents to the general-public survey indicated approval for having wolves in the State, only 24% of interested livestock producer survey respondents indicated such approval. Sixty-four percent of interested livestock producers disapproved of having wolves in the State. These results indicate a strong need to address livestock-producer concerns and thus foster greater tolerance for wolves. Without relief from depredation problems, intolerant stakeholders may adopt indiscriminate anti-wolf behaviors that could have adverse impacts on the population (Fuller et al. 2003).

More than 900 livestock farms occur in the UP (USDA 2004). From 1998 through 2007, the Michigan DNR and USDA Wildlife Services verified 70 wolf–livestock depredation events on 45 (5%) of those farms. However, the most-recent public-attitude study found that 31% of interested livestock producers in the UP suspected wolves had been responsible for recent livestock losses on their farms in at least 1 out of 5 years (Beyer et al. 2006). In Michigan, the annual frequency of depredation has been influenced more by the behavior of a small number of individual wolves or packs than by wolf population size. Annual frequency of verified depredation events in Michigan has not shown a discernible trend through time.

More than 2,100 livestock farms occur in the northernmost 21 counties of the LP (USDA 2004). There is an average of one farm per 5.1 square miles in this area versus an average of one farm per 18.1 square miles in the UP. To date, no wolf depredation events have been verified in the LP. However, if a wolf population becomes established in the northern LP, the higher density of livestock farms in this region suggests the number of wolf depredations could be higher than what has been experienced in the UP.

In addition to livestock, wolves sometimes attack domestic dogs. These attacks may be caused by inter-specific aggression or by perception of dogs as potential prey (Fritts and Paul 1989). Between 1996 and 2007, the Michigan DNR and USDA Wildlife Services verified 40 wolf attacks on domestic dogs in Michigan. Forty-three percent of those attacks involved bear-hunting hounds in the field. However, some dogs were attacked in close proximity to their owners' residences.

Many Michigan residents place a high priority on wolf management that addresses depredation of domestic animals (Beyer et al. 2006). Eighty-four percent of interested respondents to the most-recent general-public attitude survey indicated that "the number of farm animals actually lost to wolves" should be an important factor when considering whether to reduce the number of wolves in a particular area. Sixty-one percent and 85% of interested survey respondents respectively indicated that "the number of hunting dogs lost to wolves in the field" and "the number of pets actually attacked by wolves near the pets' homes" should be 'somewhat' or 'very' important factors in a decision to reduce wolf numbers in a particular area. At least 75% of interested respondents would support some type of active wolf management to address wolf depredation of domestic animals.

The following objectives for the management of depredation of domestic animals fall into three general categories. The first category focuses on educating the public and providing technical assistance on ways to reduce the risk of wolf depredation. The second category focuses on

000448A

managing ongoing depredation problems.  The third category focuses on compensation for losses of livestock caused by wolves.

As a document that offers guidance at the strategic level, this plan does not describe the operational methods of preventing and eliminating wolf depredation problems.  A description of those methods is available on the Michigan DNR website (www.michigan.gov/dnr) and will be updated as regulations, technology, and other aspects of management context change.

6.10.1  Provide timely and professional responses to reports of suspected wolf depredation of
        domestic animals.

The causes of depredation are not always apparent, and other causes of death or injury can often be mistaken for wolf depredation.  For example, at least 27% of the wolf-depredation complaints submitted by Michigan residents in 2004 were prompted by depredations that were actually caused by dogs or coyotes.  Another 23% of the alleged wolf-depredation events reported in 2004 could not be attributed to a specific cause because the available physical evidence was insufficient.

Given multiple potential causes and the need to assess the available evidence, professional investigation of a depredation event is necessary to determine whether it was caused by a wolf. On-site investigations also provide responding agencies with opportunities to provide affected stakeholders with information and technical assistance that may help them reduce future depredations.

To the extent possible, the Michigan DNR, USDA Wildlife Services, and other management partners will respond to reports of suspected wolf depredation in a timely and professional manner.  Achieving this objective will require an efficient system for receiving and directing reports, clear investigation procedures, and adequate training of staff.

*Actions:*

1.      Increase public awareness regarding where to report wolf depredation of domestic
        animals, the need to report depredation events rapidly, and how to preserve
        evidence at depredation sites.

2.      As necessary, update and refine procedures for the investigation of suspected wolf
        depredation of domestic animals.

3.      Train field staff on investigation procedures.

6.10.2  Minimize the risk of wolf depredation of domestic animals.

Certain human behaviors and practices can attract wolves and thus increase the risk of depredation of domestic animals.  Directly feeding wolves is the most obvious way to invite depredation problems.  Baiting and feeding other wildlife can attract and concentrate natural prey and thus attract wolves and other predators.  Feeding pets outside and leaving pets outside

000449A

unattended also may attract wolves.  Avoiding these behaviors and practices can help reduce the risk of depredation.

In addition to avoiding the behaviors and practices describe above, livestock producers can help prevent depredation of livestock through certain animal husbandry practices.  For example, prompt and proper disposal of livestock carcasses may eliminate attractants that could draw wolves to particular farms.  Barrier fencing, monitoring and pasturing of livestock based on their vulnerability, lighting systems, sirens and other noisemaking devices, flagging (fladry), movement-activated guard devices, and livestock-guarding animals are a few of the other tools and techniques that may help reduce the risk of depredation of livestock (Beyer et al. 2006).

There is an inherent risk to dogs allowed to range in areas frequented by wolves, but individuals who hunt with dogs can also take measures to reduce the risk of an attack on their animals (Wisconsin DNR et al. 2004).  Avoiding specific areas that are currently being used by wolves or where problems have occurred previously may be the most-effective way to reduce the risk of a wolf–dog conflict.  The Michigan DNR will provide information on its website (www.michigan.gov/dnr) and at local DNR offices to help hunters identify and avoid areas of probable or previous conflicts.  Staying close to dogs, using collars with bells or beepers, and avoiding bait sites recently visited by wolves are other techniques that may reduce the chance of a wolf attack on a hunting dog.

The Michigan DNR cannot compel residents to adopt any of the practices or techniques described above.  However, public education, information-sharing, and technical assistance could provide valuable information, encourage the use of beneficial practices and techniques, and thus help reduce the risk of depredation of domestic animals.

*Actions:*

1.   Provide the public with information on ways to help reduce the risks of wolf depredation as part of a wolf-based information and education program (see 6.1.1).

2.   Provide livestock producers, individuals who hunt with dogs, property owners and other residents with technical assistance on methods to help prevent or minimize wolf depredation.

3.   Share information on areas of probable or previous conflicts between wolves and dogs and advise avoidance of those areas.

4.   As warranted, recommend modifications in law, policy or enforcement that could more-effectively discourage human activities that increase the risk of wolf depredation.

5.   As warranted, recommend modifications in law, policy, enforcement or practice that could reduce wolf visitation to bear-bait sites.

000450A

6.10.3  Eliminate or minimize ongoing wolf depredation of domestic animals.

Many techniques can effectively prevent or deter depredation.  However, the effectiveness of some techniques may be temporary, and some techniques may fail to work altogether in certain situations.  Where depredation occurs despite reasonable efforts to prevent it, the Michigan DNR, USDA Wildlife Services and other management partners will take appropriate steps to eliminate or minimize ongoing problems.

The severity, immediacy and frequency of depredation problems will guide management responses.  More-conservative management methods will be applied when the risk of depredation is considered to be relatively small and non-immediate, whereas increasingly aggressive methods may be applied as the severity, immediacy and frequency of problems increase.

This strategy places a high priority on developing, evaluating and applying non-lethal management methods to reduce depredation problems.  Non-lethal methods will be applied wherever they are expected to be effective and where the severity and immediacy of a problem do not warrant more-aggressive action.  Non-lethal methods can include the elimination of wolf attractants, the use of improved husbandry practices and scare devices (see 6.10.2), as well as aversive conditioning.  Aversive conditioning involves a stimulus (e.g., rubber bullets) that causes discomfort, pain or an otherwise negative experience without permanently injuring or killing a wolf.

To the extent non-lethal methods are effective at eliminating or minimizing depredation problems, lethal control of wolves will not be necessary.  However, when such practices prove to be ineffective, are not expected to be effective, or are infeasible, lethal control may be necessary to prevent problems.  Reserving lethal control as a management option allows the potential use of all the tools that might be required to help prevent depredation problems.  Results of the most-recent public-attitude survey showed that at least 75% of interested respondents supported some form of lethal control to address wolf depredation of domestic animals.

Lethal control will be a management option in situations where loss of livestock has been documented or where a wolf is in the act of depredating livestock; it will not be used as a preventative measure in areas where livestock depredation has not yet occurred.  Similarly, lethal control will be a management option in specific areas where wolf attacks on free-ranging hunting dogs have been documented, but it will not be used as a preventative measure where attacks have not yet occurred.  In addition, lethal control will be a management option in specific areas where wolf attacks on dogs and other pets have occurred near human residences.

Relocation of wolves is often proposed by the public as a method to reduce wolf-related conflicts.  However, reducing depredation problems through relocation has become increasingly problematic and is no longer recommended as a management tool in Michigan.  Data from radio-collared wolves indicate relocated wolves rarely settle in the areas where they are released, and relocated wolves may return to their original territories (D. E. Beyer, Michigan DNR, unpublished data).  Even if depredating wolves were relocated and did not return to the areas of

000451A

capture, they may cause depredation problems elsewhere.  Relocating wolves is problematic for additional reasons, which are outlined under Objective 6.9.5.

*Actions:*

1.     Support the development, evaluation and appropriate use of non-lethal and lethal management methods to prevent or minimize wolf depredation of domestic animals.

2.     As necessary, update and refine management responses according to the severity, immediacy and frequency of depredation problems.

3.     Train field staff on response procedures.

### 6.10.4  Develop a program to allow livestock producers to control depredating wolves on their property.

The level of personal control with regard to depredation problems appears to be the most-important factor that influences livestock-producer tolerance for wolves (Beyer et al. 2006). Eighty-five percent of interested livestock producers recently surveyed indicated that being prevented from controlling or removing wolves that posed a threat to their livestock had 'greatly decreased' their willingness to have wolves in their farming area.  Seventy-eight percent of surveyed livestock producers indicated they would be 'very' or 'somewhat' satisfied with a management program that, among other things, empowered them to remove problem wolves from their own property.  By contrast, only 20% of respondents indicated they would be 'very' or 'somewhat' satisfied with a management program that lacked such a provision.  Seventy-five percent of interested respondents to the general-public attitude survey approved of empowering livestock growers to handle their own depredation problems.

Given this information, a carefully regulated program that allowed livestock producers to control depredating wolves would be generally acceptable to the public and it would address a major concern of livestock producers.  At the same time, it could assist efforts to maintain a viable wolf population.  Although such a program could cause the deaths of a small number of wolves, it could help prevent an increase in the prevalence and intensity of the negative attitudes that lead historically to widespread indiscriminate killing by intolerant stakeholders.  Indeed, a program that allowed responsible and effective personal control could allow livestock producers to tolerate a greater abundance and distribution of wolves on the landscape.

Personal control of depredating wolves by livestock producers could involve non-lethal (see 6.10.3) and lethal methods.  Lethal control would not be authorized when problems could be addressed through other, non-lethal methods.  However, a livestock producer could be authorized to kill problem wolves when reasonable efforts to deter depredation have failed or when other feasible options are unavailable.  Only the minimum level of lethal control necessary to resolve an ongoing depredation problem would be authorized.

000452A

Any program allowing personal control of depredating wolves by livestock producers would be administered to ensure it does not have adverse consequences for the long-term viability of the wolf population.  Monitoring, reporting and enforcement would be conducted to help ensure compliance with program requirements.

*Actions:*

1.   Develop a permitting process to allow livestock producers to control wolves on their property, as necessary, following a verified wolf depredation event.

2.   Develop a system to allow livestock owners to kill wolves in the act of livestock depredation.

3.   Monitor and enforce compliance with program requirements.

6.10.5  Facilitate financial compensation for livestock losses caused by wolves.

In the United States and other countries, compensation programs have been designed to assist livestock producers by reimbursing them for losses attributable to wolves, with the intention of increasing overall public acceptance for wolf populations (Fritts et al. 2003).  An expectation that compensation will increase tolerance for wolves is often based on an assumption that livestock producers primarily perceive wolf depredation as an economic problem.  Recent research has shown that other, non-economic factors more strongly influence livestock-producer attitudes toward wolves, and that compensation programs have not substantially improved tolerance among this group (Naughton-Treves et al. 2003, R. B. Peyton, MSU, personal communication).

Current Michigan law requires the State to compensate livestock owners for livestock killed by wolves, regardless of the extent to which efforts have been made to reduce depredation risks.  The Michigan Animal Industry Act (Public Act 466 of 1988) defines livestock as "those species of animals used for human food and fiber or those species of animals used for service to humans.  Livestock includes, but is not limited to, cattle, sheep, new world camelids, goats, bison, privately owned cervids, ratites, swine, equine, poultry, aquaculture, and rabbits.  Livestock does not include dogs and cats."  The Michigan Department of Agriculture provides payment to livestock owners, but it may do so only if the Michigan DNR or its designated agent (USDA Wildlife Services) verifies that the depredation was caused by a wolf.  The Michigan Department of Agriculture may seek reimbursement from the Michigan DNR for the costs of compensation.

Current Michigan law limits State compensation payments to the value of a livestock animal at the time it was lost.  As a result, the full expected fall market value of an animal lost during early summer, for example, can not be provided by State funds.  A private fund contributed by Defenders of Wildlife and a private individual and administered by the International Wolf Center has been used to pay the difference between the animal values at the time of loss and fall market values.  As with any funding source, use of that private fund depends on satisfying certain conditions stipulated by the contributors.  Through the end of 2007, the State paid $24,178 and Defenders of Wildlife paid $4,827 to compensate for wolf-related livestock losses in Michigan.

000453A

Livestock producers in Michigan strongly desire financial compensation as part of a depredation-management program, and they overwhelmingly support the use of tax dollars for this purpose (Beyer et al. 2006). A majority (58%) of interested respondents to the most-recent general-public attitude survey strongly or somewhat supported the use of tax dollars as compensation for lost livestock (excluding privately owned cervids).

Current Michigan law does not require or allow the State to compensate owners for dogs killed by wolves. The lack of State compensation for wolf depredation of dogs is consistent with the public preference on this issue (Beyer et al. 2006). Opposition (45% opposed) was greater than support (35% supported) for the use of tax dollars to compensate for hunting dogs lost to wolves. Support and opposition for the use of tax dollars to compensate for other pets were virtually identical, but support was indicated by less than a majority (40%) of interested survey respondents.

*Actions:*

1.   Investigate the causes of depredation to facilitate compensation to livestock producers for livestock losses caused by wolves.

2.   To the extent specified by law, reimburse the Michigan Department of Agriculture for costs incurred for compensation for livestock losses caused by wolves.

3.   Maintain and develop partnerships that facilitate compensation for the full expected value of livestock verified to be lost to wolf depredation.

### 6.10.6  Work with partners to discontinue compensation for privately owned cervids lost to wolves.

Cervids (i.e., deer, elk and other members of the Cervidae family) are the natural prey of wolves. Enclosures that contain privately owned cervids, often at unnaturally high densities, are expected to attract wolves. A wolf that gains entry to such an enclosure would be expected to exhibit natural predatory behavior.

The public generally does not support compensation for privately owned cervids lost to wolf depredation (Beyer et al. 2006). Thirty-three percent and 45% of interested respondents to the most-recent public-attitude survey respectively supported and opposed the use of tax dollars for that purpose.

The Michigan DNR does not recommend compensation for privately owned cervids lost to wolf depredation. However, privately owned cervids are defined as livestock under the Michigan Animal Industry Act (Public Act 466 of 1988) and current Michigan law requires the State to provide compensation for livestock lost to wolves. Elimination of the requirement to provide compensation for privately owned cervids would require modification of existing law.

000454A

*Actions:*

1.    Work with partners to eliminate the requirement for the State to provide compensation for privately owned cervids lost to wolf depredation.

2.    If legally feasible, discontinue compensation for privately owned cervids lost to wolf depredation.

## 6.11    Minimize the Negative Impacts of Captive Wolves and Wolf–Dog Hybrids.

Captive wolves and wolf–dog hybrids that are released or escape pose a threat to both people and the wild wolf population.  These animals could pose risks to human safety, they could cause adverse biological impacts, and they could reduce social acceptance for the wild population because the public is unlikely to distinguish between problems caused by released captive or hybrid wolves and those caused by wild wolves.  The following objectives focus on reducing the risks posed by these animals.

### 6.11.1  Minimize and deter the possession of captive wolves in Michigan.

Well-designed wolf exhibits at zoos open to the public may serve an educational function, but possession of captive wolves by private individuals will not help save the species in the wild, regardless of intentions.  Conservation of the species is better achieved through management of the wild population rather than efforts to save or breed individual animals.  Given the risks posed by captive wolves, minimizing their possession in Michigan will help protect human safety and the wild wolf population.

The capture of wild wolves for possession in captivity is illegal in Michigan.  However, regulations in place as of this writing do not prohibit the importation and possession of wolves that were legally obtained in other States and countries.  Designation of wolves as a game animal or a protected animal or other amendment of the Michigan Wildlife Conservation Order could allow the Michigan DNR to regulate the possession of such animals.  In addition, amendment of the Michigan Large Carnivore Act (Public Act 274 of 2000) to include wolves would provide another tool for limiting the possession of wolves in captivity.

When a severely injured wolf (e.g., hit by a vehicle) is encountered, euthanizing the animal is often more humane and prudent than subjecting it to long-term captive treatment and rehabilitation.  Severe injuries often result in permanent damage to an animal, making it unfit for release into the wild.  Captivity is a traumatic experience for any wild animal, and whether a wolf would be readily accepted into a pack after extended confinement is unknown.  The Michigan DNR does not advocate rehabilitation of sick or injured wolves.

*Actions:*

1.    Amend the Wildlife Conservation Order as necessary to prohibit the possession of wolves in captivity, except under permit.

61

000455A

2.  Support inclusion of wolves as animals covered by the Michigan Large Carnivore Act (Public Act 274 of 2000).

3.  Treat injured wolves in ways that avoid long-term captivity.

## 6.11.2  Minimize and deter the possession of wolf–dog hybrids in Michigan.

Wolf–dog hybrids are produced when a wolf interbreeds with a dog or another wolf–dog hybrid. Ownership and proliferation of these animals in Michigan could threaten public safety.  Most wolf–dog hybrids are poorly adapted as pets and are difficult to train (Jenkins 1991, Warrick 1991, Sikarskie 1993).  Hybrids are frequently destructive of their owners' property, attack people and domestic animals, and are generally too wary of people to be effective guard animals. In one instance in the UP, wolf–dog hybrids killed the pet dog of the owner and bit another person.  Those animals were subsequently killed for rabies testing, but other hybrids have either escaped or been released by their owners into the wild (B. Roell, Michigan DNR, personal communication).

Ownership and proliferation of wolf–dog hybrids could also threaten the viability of the Michigan wolf population in multiple ways.  First, escaped or released hybrids may breed with wild wolves and thereby introduce dog genes into the wolf population.  The Michigan DNR has documented the assimilation of at least one hybrid wolf into a pack of wild wolves in the UP (B. Roell, Michigan DNR, personal communication).  This behavior can jeopardize the genetic integrity of the population and cause population-wide changes in morphological and behavioral characteristics.  Second, a desire to breed and raise wolf hybrids may prompt some people to capture wild Michigan wolves illegally.  Third, problems caused by released hybrids are often incorrectly attributed to wolves and thus reduce social acceptance for a wolf population.

The Michigan Wolf–Dog Cross Act (Public Act 246 of 2000) currently prohibits the ownership and possession of wolf–dog hybrids, except under permit.  Maintaining the prohibitions and penalties under that law would help deter possession of hybrids and thus reduce the risks associated with them.

In many cases, wolf–dog hybrids can be difficult to identify.  Although the Michigan DNR does not have regulatory authority for the management of such animals, it can offer expertise to other agencies, law-enforcement officials, and local animal-control agents for the purpose of identifying and managing hybrids.

*Actions:*

1.  Support prohibitions and penalties associated with the possession of wolf–dog hybrids, as outlined under the Michigan Wolf–Dog Cross Act (Public Act 246 of 2000).

2.  Train staff on the identification of wolf–dog hybrids.

000456A

3.      Assist other agencies, law-enforcement officials, and local animal-control agents in efforts to identify and manage wolf–dog hybrids.

## 6.12    Develop and Implement a Socially and Biologically Responsible Policy Regarding Public Harvest of Wolves.

Harvest (i.e., hunting and trapping) of wolves by the public is a controversial issue that often polarizes stakeholder groups.  Indeed, "the issue of hunting and trapping wolves—a public take—after they become delisted is perhaps the most divisive and potentially explosive issue in the entire wolf debate" (Nie 2003: 59).  Public harvest of wolves is also biologically complex.  The effects of harvest on a wolf population are determined by a suite of factors, including population size, age and sex structure, immigration and emigration rates, birth rates, and natural and human-induced mortality rates (Beyer et al. 2006).

In certain situations, members of the public could be authorized to take wolves in the absence of a designated harvest season (e.g., with a permit issued by the Michigan DNR), regardless of the State legal classification of wolves.  However, a public harvest during a regulated season would require that wolves be classified as game animals.  Game-animal status in Michigan may be designated only by the State Legislature.  In addition, only the State Legislature could authorize the first harvest season.  If such designation and authorization were conferred, the Michigan Natural Resources Commission would then need to enact regulations pertaining to the methods and manner of public harvest.  Although the decisions regarding establishment of a harvest season will be made outside the purview of this plan, this strategy offers some relevant recommendations.

The following objectives separate the issue of a public wolf harvest into two categories.  The first category deals with harvest that addresses a need to reduce wolf-related conflicts.  The second category deals with harvest as a recreational or utilitarian benefit, independent of any need to reduce wolf-related conflicts through management.  Public support for a public harvest appears to differ according to the primary purposes reflected in those two categories.

### 6.12.1  Develop and implement a policy regarding public wolf harvest for the purpose of reducing wolf-related conflicts.

Wolf-related conflicts are often caused by the behavior of a few individual wolves, and management at small scales can often address problems effectively.  To the extent that it is expected to be effective and logistically feasible, conflict management under this plan will be conducted at the level of individual wolves or packs.

Some situations may warrant consideration of reducing wolf numbers in localized areas as a means to reduce the risk of negative interactions.  Such consideration could be necessary if a high density of wolves in an area, rather than the behavior of individual wolves, was determined to be responsible for problems that could not otherwise be addressed through non-lethal or individually directed lethal methods.  As of this writing, a situation of this type has not occurred in Michigan.

000457A

Many Michigan residents would support reduction of wolf numbers in localized areas if it would reduce problems caused by wolves (Beyer et al. 2006).  The extent of public support appears to depend on the nature of the problem to be addressed.  The percentage of interested survey respondents that supported reducing wolf numbers through lethal means was highest with regard to human-safety concerns (59%), intermediate with regard to depredation problems (54%), and lowest with regard to impacts on the number of deer available for hunting (49%).

Current public attitudes also vary according to management methods.  Public support for the use of trained, paid professionals to reduce wolf numbers is generally weak.  Thirty-eight percent and 26% of interested survey respondents supported the use of professionals to either shoot or trap wolves, respectively.  Opposition to the use of paid professionals to either shoot or trap wolves was expressed by 49% and 59% of respondents, respectively.  By contrast, the public indicated moderate or strong support for the use of licensed hunters and trappers during a controlled public harvest season.  Sixty-seven percent and 60% of respondents supported the use of licensed hunters and licensed trappers, respectively.  Opposition to the use of licensed hunters and licensed trappers was expressed by 26% and 31% of respondents, respectively.

The efficacy of using licensed hunters and trappers to reduce local wolf numbers would depend on the behavioral and reproductive responses of wolves and the method and manner of take. Wolves are prolific and can quickly re-colonize areas through immigration (Fuller et al. 2003). As a result, wolf populations can remain stable or increase despite relatively high mortality rates (Fuller 1989, Mech 2001).  Recent public wolf harvests in Alaska, Canada and other parts of the world did not cause long-term reductions in wolf populations (Boitani 2003); however, population reduction was not necessarily a goal of those harvests.  Where efforts to reduce wolf population sizes have been successful, the methods that were used (e.g., poisoning, aerial shooting) are generally considered to be politically and socially unacceptable (National Research Council 1997, Boitani 2003).  Public harvest with those methods will not be authorized in Michigan.  Any legal public harvest in Michigan would be conducted with socially and biologically responsible methods.

This strategy reserves the option to evaluate and apply, as appropriate, the use of hunters and trappers as a management tool for addressing conflicts that can not otherwise be resolved.  This strategy does not recommend or oppose establishing a regulated harvest season on wolves. Rather, it recommends evaluating local situations on a case-by-case basis, and then applying the assistance of hunters and trappers, as prudent, to reduce wolf-related risks to acceptable levels. If such action is deemed necessary, it will be planned based on the best available research and its effects will be evaluated to ensure it does not threaten the long-term viability of the Michigan wolf population.

*Actions:*

1.   Evaluate conflict situations to determine whether localized reduction of wolf numbers is necessary to reduce wolf-related conflicts.

2.   Evaluate the potential impacts of licensed hunters and trappers on local levels of wolf-related conflicts and the local and regional wolf population.

000458A

3.      If prudent, develop a program to recruit and use licensed hunters and trappers to reduce levels of wolf-related conflicts in localized areas.

## 6.12.2  Develop and implement a policy regarding public wolf harvest for reasons other than managing wolf-related conflicts.

Although the public generally supports the use of licensed hunters and trappers to reduce wolf-related conflicts, it is more ambivalent on the issue of a public wolf harvest specifically for recreational or utilitarian purposes (Beyer et al. 2006).  Fifty-five percent of interested survey respondents supported a controlled hunting season "in those areas of Michigan where wolf population could be hunted without endangering the population" and 33% of interested respondents opposed such a hunt.  Forty-eight percent and 41% of interested respondents respectively supported and opposed a controlled trapping season "in those areas of Michigan where wolf population could be hunted without endangering the population."

Although members of the Michigan Wolf Management Roundtable reached consensus on every other issue, they did not reach agreement on whether a regulated wolf hunting/trapping season should be provided in the absence of any need to reduce wolf-related conflicts.  Some Roundtable members supported such a hunting/trapping season because many Michigan residents would place an important value on and derive benefits from the opportunity to harvest wolves.  Other members opposed a hunting/trapping season in the absence of a specific need to reduce local wolf abundance because it would conflict with the cultural and personal values of many other Michigan residents.  After substantial deliberation, the group concluded consensus on any guiding principles regarding the issue was not possible because the disagreement focused primarily on important differences in fundamental values.

In other areas of the world where public wolf harvests recently have occurred, including Canada and Alaska, wolf populations appeared to remain stable or increase, even when hunters and trappers annually removed as much as 28% of local populations (Boitani 2003).  In the event a public wolf harvest is authorized in Michigan, the effects of particular levels of take on the wolf population would depend on a variety of factors, including local conditions and population characteristics.  Analyses of those factors would be important for the regulation of a sustainable harvest that does not threaten population viability.

Given the absence of a strong public preference, lack of specific guidance from the Roundtable, and the need to assess the biological effects of different levels of take, the following actions focus on the need to gather and evaluate additional biological and social information regarding a general wolf harvest.

*Actions:*

1.      Evaluate the potential biological effects of a public wolf harvest specifically for recreational or utilitarian purposes.

2.      Monitor and evaluate the demand for and public acceptability of a public wolf harvest specifically for recreational or utilitarian purposes.

000459A

3. If biologically defensible, legally feasible, and supported by the public, develop a program to offer opportunities for the public to harvest wolves for recreational or utilitarian purposes.

## 7.  PLAN MONITORING AND REVIEW

Regular communication among agencies, stakeholder groups and the general public would allow interested parties to monitor progress made toward implementation of this plan.  It would also provide opportunities for management agencies to receive input on specific management issues.  To facilitate these benefits, the Michigan DNR will establish a wolf management advisory group.  The group will convene on an annual basis, or as otherwise needed, to discuss management goals, educational opportunities, conflict resolutions, and other topics.  Membership of this group will represent the diversity of wolf-related interests and management responsibilities in Michigan.  The role of the advisory group will differ from that of the Michigan Wolf Management Roundtable, which fulfilled its charge and was disbanded following its review of this plan.

Wolf abundance and distribution, attitudes of Michigan residents, and wolf legal status may continue to change through time.  To address ecological, social and regulatory shifts in a timely manner, the Michigan DNR will review and update this plan at 5-year intervals.  The plan-revision process will include review of the best available scientific information and substantial involvement by affected stakeholder groups and the general public.

## 8.  FUNDING

Costs of wolf management are associated with salaries, wages, contracts, travel, equipment, facilities, livestock compensation, and information and education materials.  These costs have been significant for many of the agencies and partners involved in wolf management.  Given persistent management needs, they are expected to remain significant into the foreseeable future.

The Federal status of wolves does not influence the amount of funding available to the Michigan DNR for wolf management.  The levels and sources of funding that supported wolf management prior to the 2007 Federal wolf de-listing decision (USFWS 2007) continue to be available to support the implementation of this plan.  Similarly, the continuing contributions of USDA Wildlife Services to the Michigan wolf management program do not depend on the Federal status of wolves.

At all ten wolf-focused public meetings hosted by the Michigan DNR in May 2005, the public expressed diverse concerns pertaining to funding for wolf management.  Some people were concerned about the large expense of population monitoring and other management activities.  Others desired assurance that sufficient funds would be available to maintain adequate staffing levels and allow timely agency responses to depredation complaints and other concerns.  Others objected to a funding approach that has traditionally caused some stakeholder groups (i.e., hunters and trappers) to disproportionately bear the financial costs of wolf management.

000460A

Most funding for wildlife management has traditionally been derived from revenues generated by sportspersons.  For example, the Michigan Game & Fish Fund is generated by State hunting and fishing license revenues, and the Federal Aid in Wildlife Restoration Act (a.k.a. Pittman–Robertson Fund) provides funds derived from an excise tax on purchases of firearms and sporting goods.  In the absence of many other funding alternatives, the Michigan DNR wolf management program has been supported primarily by these two funding sources.  As a result, sportspersons have played a critical role in the recovery, conservation and management of Michigan wolves.

Other agencies, tribes and private organizations also have played an important role by addressing education, conservation and research needs.  The financial and staff resources applied by these groups have complemented traditional funding sources in ways that have broadened the wolf management program.

Sportspersons and other management partners have provided most of the funding for wolf management, but they currently represent only a small proportion of all Michigan residents. Regardless of the inequities that may be associated with such a system, a funding approach that relies on the disproportionate contributions of these groups may become inadequate, especially if the prevalence of sportspersons within the general population continues to decline.

Successful efforts to obtain funding from alternative sources could spread the financial support for wolf management among a greater variety of stakeholder groups than traditional funding sources currently allow.  Such an approach could help sustain the required levels of funding, and it could provide the general public with a greater stake and interest in wolf management.

The Michigan DNR will work with management partners to explore opportunities to identify new funding sources and to distribute the financial support for wolf management more-evenly among a greater diversity of stakeholders.  It will also assist its management partners in their efforts to maintain the funding required for their wolf management activities.  Finally, the Michigan DNR will take other prudent steps to ensure sufficient funding will be available to address management needs and to ensure funding is used in a responsible, efficient manner.

## 9. LITERATURE CITED

Allen, D. L.  1979.  Wolves of Minong.  Houghton Mifflin, Boston, Massachusetts, USA.

Arnold, D. A. and R. D. Schofield.  1956.  Status of Michigan timber wolves, 1954-1956.  Report number 2079.  Michigan Department Conservation, Lansing, Michigan, USA.

Baker, R. H.  1983.  Michigan Mammals.  Wayne State University Press, Detroit, Michigan, USA.

Ballard, W. B., R. Farnell, and R. O. Stephenson.  1983.  Long distance movement by gray wolves (*Canis lupus*).  Canadian Field Naturalist 97:333.

000461A

Ballard, W. B., J. S. Whitman, and C. L. Gardner.  1987.  Ecology of an exploited wolf population in south-central Alaska.  Wildlife Monographs 98:1-54.

Bangs, E. E. and S. H. Fritts.  1996.  Reintroducing the gray wolf central Idaho and Yellowstone National Park.  Wildlife Society Bulletin 24:402-413.

Bangs, E. E., S. H. Fritts, D. R. Harms, J. A. Fontaine, M. D. Jimenez, W. G. Brewster, and C. C. Niemeyer. 1995.  Control of endangered gray wolves in Montana.  Pages 127-34 in L. N. Carbyn, S. H. Fritts, and D. R. Seip, editors.  Ecology and conservation of wolves in a changing world.  Canadian Circumpolar Institute, Edmonton, Alberta.

Beaufort, F. G. D. 1987. Ecologie Historique du Loup en France. Rennes, Universit de Rennes**:**1104.

Beyer, D., T. Hogrefe, R. B. Peyton, P. Bull, J. P. Burroughs, and P. Lederle (editors).  2006.  Review of social and biological science relevant to wolf management in Michigan.  Michigan Department of Natural Resources, Lansing, Michigan, USA.

Blanco**,** J. C., Y. Cortes, and E. Virgos.  2005.  Wolf response to two kinds of barriers in an agricultural habitat in Spain.  Canadian Journal of Zoology 83: 312-323.

Boitani, L.  2000.  Action plan for the conservation of the wolves (*Canis lupus*) in Europe.  Convention on the conservation of European wildlife and natural habitats.  Nature and Environment 113.

Boitani, L. 2003. Wolf conservation and recovery. Pages 317-340 in L. D. Mech and L. Boitani, editors. Wolves: behavior, ecology and conservation. University of Chicago Press, Chicago, Illinois, USA.

Boyd, D. K., P. C. Paquet, S. Donelon, R. R. Ream, D. H. Pletsher, and C. C. White.  1995.  Transboundary movements of a colonizing wolf population in the Rocky Mountains.  Pages 135-140 in L. N. Carbyn, S. H. Fritts, and D. R. Seip, editors.  Ecology and conservation of wolves in a changing world.  Canadian Circumpolar Institute, Edmonton, Alberta.

Bull, P. and R. B. Peyton.  2005.  2005 Michigan wolf management focus group meeting results.  Appendix IX in Beyer, D., T. Hogrefe, R. B. Peyton, P. Bull, J. P. Burroughs, and P. Lederle (editors).  2006.  Review of social and biological science relevant to wolf management in Michigan.  Michigan Department of Natural Resources, Lansing, Michigan, USA.

Carbyn, L. N.  1982.  Incidence of disease and its potential role in the population dynamics of wolves in Riding Mountain National Park, Manitoba.  Pages 106-116 in Harrington, F. and P. Paquet, editors.  Wolves of the world:  perspectives of behavior, ecology and conservation.  Noyes Publications, New Jersey, USA.

000462A

Carbyn, L. N.  1987.  Gray wolf and red wolf.  Pages 358-376 *in* M. Novak, J. A. Baker, M. E. Obbard, and B. Malloch, editors.  Wild furbearer management and conservation in North America.  Ontario Ministry of Natural Resources, Toronto, Ontario.

Centers for Disease Control and Prevention.  1999.  Human rabies prevention — United States, 1999: recommendations of the Advisory Committee on Immunization Practices (ACIP).  MMWR 1999 48(No. RR-1).

Crabtree, R. L. and J. W. Sheldon.  1999.  The ecological role of coyotes on Yellowstone's northern range.  Yellowstone Science 7:15-23.

Doepker, R. V., D. E. Beyer, Jr., and M. Donovan.  1995.  Deer population trends in Michigan's Upper Peninsula.  Michigan Department of Natural Resources, Wildlife Division Report 3254, Lansing, Michigan, USA.

Eagle, A. C., E. M. Hay-Chmielewski, K. T. Cleveland, A. L. Derosier, M. E. Herbert, and R. A. Rustem.  2005.  Michigan's wildlife action plan.  Michigan Department of Natural Resources, Lansing, Michigan, USA.

Erb, J. and S. Benson.  2004.  Distribution and abundance of wolves in Minnesota, 2003-04.  Minnesota Department of Natural Resources Report. Grand Rapids, Minnesota, USA.

Forbes, S. H. and D. K. Boyd.  1997.  Genetic structure and migration in native and reintroduced Rocky Mountain wolf populations.  Conservation Biology 11:1226-1234.

Fritts, S. H.  1983. Record dispersal by a wolf from Minnesota. Journal of Mammalogy 64:166-167.

Fritts, S. H. and L. D. Mech.  1981.  Dynamics, movements, and feeding ecology of a newly protected wolf population in northwestern Minnesota. Wildlife Monographs 80.

Fritts, S. H. and W. J. Paul.  1989.  Interactions of wolves and dogs in Minnesota.  Wildlife Society Bulletin 17:121-123.

Fritts, S. H., R. O. Stephenson, R. D. Hayes, and L. Boitani.  2003.  Wolves and humans.  Pages 289-316 *in*  L. D. Mech and L. Boitani, editors.  Wolves: behavior, ecology, and conservation.  University of Chicago Press, Chicago, Illinois, USA.

Frost, J. R.  1985.  Living with the grizzly:  perceptions of Mission Valley residents.  Environmental Studies.  University of Montana, Missoula, Montana, USA.

Fuller, T. K.  1989.  Population dynamics of wolves in north-central Minnesota.  Wildlife Monographs 105:1-41.

Fuller, T. K.  1995.  Guidelines for gray wolf management in the northern Great Lakes region.  International Wolf Center Technical Publication 271.

000463A

Fuller, T. K., L. D. Mech, and J. F. Cochrane.  2003.  Wolf population dynamics.  Pages 161-191 *in* L. D. Mech and L. Boitani, editors.  Wolves: behavior, ecology, and conservation.  University of Chicago Press, Chicago, Illinois, USA.

Fulton, D. C., M. J. Mafredo, and J. Lipscomb.  1996.  Wildlife values orientations: a conceptual and measurement approach.  Human Dimensions of Wildlife 1:24–47.

Gehring, T. M. and B. A. Potter.  2005.  Wolf habitat analysis in Michigan: an example of the need for proactive land management for carnivore species.  Wildlife Society Bulletin 33:1237-1244.

Gillespie, J. H. and J. F. Timoney.  1981.  The *Paramyxoviridae*: canine distemper.  Pages 726-728 *in* Hagan and Bruner, editors.  Infectious diseases of domestic animals, with reference to etiology, pathogenicity, immunity, epidemiology, diagnosis and biologic therapy.  Cornell University Press, Ithaca, New York, USA.

Hearne, D., K. Lewis, M. Martin, E. Mitton, and C. Rocklen.  2003.  Assessing the landscape: toward a viable gray wolf population in Michigan and Wisconsin.  University of Michigan, Ann Arbor, USA.

Hendrickson, J., W. L. Robinson, and L. D. Mech.  1975.  Status of the wolf in Michigan, 1973.  American Midland Naturalist 94:226-232.

Huber, D., S. Mitevski and D. Kuhar.  1992.  Questionnaire on wolves in Croatia and Macedonia: comparison of public attitudes.  Pages 124-125 *in* Promberger, C. and W. Schroder, editors.  Wolves in Europe.  Oberammergau, Germany.

Huntzinger, B. A., J. A. Vucetich, T. D. Drummer, and R. O. Peterson.  2005.  Wolf recovery in Michigan, 2002-05 summary report.  Michigan Technological University, Houghton, Michigan, USA.

Huntzinger, B. A., J. A. Vucetich, L. Vucetich, T. D. Drummer, and R. O. Peterson.  2004.  Wolf recovery in Michigan, 2004 annual report.  Michigan Technological University, Houghton, Michigan, USA.

Jenkins, T.  1991.  Wolf–dog hybrids and humans.  How high the price?  International Wolf 1(4):4-9.

Jensen, W. F., T. K. Fuller, and W. L. Robinson.  1986.  Wolf, *Canis lupus*, distribution on the Ontario-Michigan border near Sault St. Marie.  The Canadian Field Naturalist 100:363-366.

Joslin, P. W. B.  1967.  Movements and homesites of timber wolves in Algonquin Park.  American Zoologist 7:279-293.

000464A

Keith, L. B.  1983.  Population dynamics of wolves. Pages 66-77 *in* L. N. Carbyn, editor. Wolves in Canada and Alaska: their status, biology, and management.  Canadian Wildlife Service Report Series number 45.

Kellert S.  1990.  Public attitudes and beliefs about the wolf and its restoration in Michigan.  Yale University School of Forestry and Environmental Studies.  New Haven, Connecticut, USA.

Kreeger, T. J.  2003.  The internal wolf:  physiology, pathology and pharmacology.  Pages 192-217 *in* L. D. Mech and L. Boitani, editors.  Wolves: behavior, ecology, and conservation.  University of Chicago Press, Chicago, Illinois, USA.

Licht, D. S., and S. H. Fritts.  1994.  Gray wolf (*Canis lupus*) occurrences in the Dakotas.  American Midland Naturalist 132:74-81.

Linnell J., R. Anderson, Z. Andersone, L. Balciauskas, J. Blanco, L. Boitani, S. Brainard, U. Breitenmoser, I. Kojola, O. Liberg, J. Loe, H. Okarma, H. Pedersen,          C. Promberger, H. Sand, E. Solberg, H. Valdeman, and P. Wabakken, 2002.  The fear of wolves: A review of wolf attacks on humans.  NINA Oppdragsmelding-731:1-65.

Lopez, B. H.  1978.  Of wolves and men.  Charles Scribner's and Sons, New York, New York, USA.

Mandernack, B. A.  1983.  Food habits of Wisconsin timber wolves.  Thesis, University of Wisconsin, Eau Claire, Wisconsin, USA.

McLaren, B. E. and R. O. Peterson.  1994.  Wolves, moose, and tree rings on Isle Royal.  Science 266:1555-1558.

McNay, M. 2002*a*.  Wolf-human interactions in Alaska and Canada: a review of the case history.  Wildlife Society Bulletin 30(3):831-843.

McNay, M. 2002*b*.  A case history of wolf-human encounters in Alaska and Canada.  Alaska Department of Fish and Game Wildlife Technical bulletin 13.  (http://wildlife.alaska.gov/pubs/techpubs/research_pdfs/techb13_full.pdf)

Meadow, R., R., P. Reading, M. Phillips, M. Mehringer, and B. J. Miller.  2005.  The influence of persuasive arguments on public attitudes toward a proposed wolf restoration in the southern Rockies.  Wildlife Society Bulletin 33(1):154-163.

Mech, L. D.  1966.  The wolves of Isle Royale.  U. S. Department of Interior, Fauna of the National Parks of the U. S.  Fauna Series number 7.

Mech, L. D.  1970.  The wolf, the ecology and behavior of an endangered species.  Doubleday, New York, New York, USA.

000465A

Mech, L. D.  1971.  Wolves, coyotes, and dogs.  The white-tailed deer in Minnesota.  Pages 19-22 *in* Proceedings Minnesota Chapter of the Wildlife Society, Minnesota Department of Natural Resources, St. Paul, Minnesota, USA.

Mech, L. D.  1988.  Longevity in wild wolves.  Journal of Mammalogy 69:197-198.

Mech, L. D.  1995.  The challenge and opportunity of recovering wolf populations.  Conservation Biology 992:1-9.

Mech, L. D.  2001.  Managing Minnesota's recovered wolf population.  Wildlife Society Bulletin 29:70-77.

Mech, L. D. and L. Boitani.  2003*a*.  Wolf social ecology.  Pages 1-34 *in* L. D. Mech and L. Boitani, editors.  Wolves: behavior, ecology, and conservation.  University of Chicago Press, Chicago, Illinois, USA.

Mech, L. D., and L. Boitani.  2003*b*.  Ecosystem effects of wolves.  Pages 158-160 *in* L. D. Mech and L. Boitani, editors.  Wolves: behavior, ecology, and conservation.  University of Chicago Press, Chicago, Illinois, USA.

Mech, L. D. and L. D. Frenzel.  1971.  Ecological studies of the timber wolf in northeastern Minnesota.  United States Department of Agriculture Forest Service Research Paper NC-148.  North Central Forest Experiment Station, St. Paul, Minnesota, USA.

Mech, L. D., S. H. Fritts, and D. Wagner.  1995.  Minnesota wolf dispersal to Wisconsin and Michigan.  American Midland Naturalist 133:368-370.

Mech, L. D. and M. E. Nelson.  1989.  Evidence of prey-caused mortality in three wolves.  American Midland Naturalist 123:207-208.

Mech, L. D. and R. O. Peterson.  2003.  Wolf- prey relations.  Pages 131-160 *in* L. D. Mech, and L. Boitani, editors.  Wolves; behavior, ecology and conservation. The University of Chicago Press, Illinois, USA.

Medjo, D. C. and L. D. Mech.  1976.  Reproductive activity in nine-and ten-month-old wolves.  Journal of Mammalogy 57:406-408.

Merrill, S. B. and L. D. Mech.  2000.  Details of extensive movements by Minnesota wolves (*Canis lupus*).  American Midland Naturalist 144:428-433.

Mertig, A. G.  2004.  Attitudes about wolves in Michigan, 2002.  Final report to Michigan Department of Natural Resources.  Department of Fisheries and Wildlife, Michigan State University, East Lansing, Michigan, USA.

Messier, F.  1987.  Physical condition and blood physiology of wolves in relation to moose density.  Canadian Journal of Zoology 65:91-95.

000466A

Michigan Department of Natural Resources.  1997.  Michigan gray wolf recovery and
     management plan.  Michigan Department of Natural Resources, Wildlife Division,
     Lansing, Michigan, USA.

Minnesota Department of Natural Resources.  2001.  Minnesota wolf management plan.
     Minnesota Department of Natural Resources, Division of Wildlife, St. Paul, Minnesota,
     USA.

Mishra, C.  1997.  Livestock depredation by large carnivores in the Indian trans-Himalaya:
     conflict perceptions and conservation prospects.  Environmental Conservation 24(4):338-
     343.

Mladenoff, D. J., T. A. Sickley, R. G. Haight, and A. P Wydeven.  1995.  A regional landscape
     analysis and prediction of favorable gray wolf habitat in the northern Great Lakes region.
     Conservation Biology 9(2):279-294.

Mladenoff, D. J., T. A. Sickley, and A. P. Wydeven.  1999.  Predicting gray wolf landscape
     recolonization:  logistic regression models vs. new field data.  Ecological Applications
     9:37-44.

National Research Council.  1997.  Wolves, bears, and their prey in Alaska:  biological and
     social challenges in wildlife management.  National Academy Press, Washington, D. C,
     USA.

Naughton-Treves, L., R. Grossberg, and A. Treves.  2003.  Paying for tolerance: rural citizens'
     attitudes toward wolf depredation and compensation.  Conservation Biology 17:1500–
     1511.

Nelson, M. E. and L. D. Mech.  1985.  Observations of a wolf killed by a deer.  Journal of
     Mammalogy 66:187-188.

Nie, M. A.  2003.  Beyond wolves: the politics of wolf recovery and management.  University of
     Minnesota Press, Minneapolis, Minnesota, USA.

Olson, J. A. and M. P. Zanna.  1993.  Attitudes and attitude change.  Annual review of
     Psychology 44:117-154.

Packard, J. M. and L. D. Mech.  1980.  Population regulation in wolves. Pages 135-150  in M.
     N. Cohen, R. S. Malpass, and H. G. Klein, editors.  Biosocial mechanisms of population
     regulation.  Yale University Press, New Haven, Connecticut, USA.

Paine, R. T.  1966.  Food web complexity and species diversity.  American Naturalist 100:65-75.

Peterson, R. O.  1977.  Wolf ecology and prey relationships on Isle Royale.  United States
     National Park Service Science Monograph Series 11.

000467A

Peterson, R. O.  1995.  The wolves of Isle Royale a broken balance.  Willow creek press, Minocqua, Wisconsin, USA.

Peterson, R. O. and J. A. Vucetich.  2006.  Ecological studies of wolves on Isle Royale.  Annual Report 2005-2006.  Michigan Technological University, Houghton, Michigan, USA.

Petty, R. E., D. T. Wegener, and L. R. Fabrigar.  1997.  Attitudes and attitude change.  Annual Review of Psychology 48:609-674.

Pimlott, D. H.  1967.  Wolf predation and ungulate populations.  American Zoology 7:267-278.

Pimlott, D. H., J. A. Shannon, and G. B. Kolenosky.  1969.  The ecology of the timber wolf in Algonquin Provincial Park.  Ontario Department of Lands and Forests Research Paper 87.

Potvin, M. J.  2003.  A habitat analysis for wolves in Michigan.  Thesis, Michigan Technological University, Houghton, Michigan, USA.

Potvin, M. J., T. D. Drummer, J. A. Vucetich, D. E. Beyer, Jr., R. O. Peterson, and J. H. Hammill.  2005.  Monitoring and habitat analysis for wolves in Upper Michigan.  Journal of Wildlife Management 69:1660-1669.

Potvin, F., H. Jolicoeur, and J. Huot.  1988.  Wolf diet and prey selectivity during two periods for deer in Quebec: decline versus expansion.  Canadian Journal of Zoology 66:1274-1279.

Ripple, W. J. and R. L. Beschta.  2003.  Wolf reintroduction, predation risk, and cottonwood recovery in Yellowstone National Park.  Forest Ecology and Management 184: 299-313.

Ripple, W. J. and R. L. Beschta.  2004.  Wolves and the ecology of fear: can predation risk structure ecosystems?  BioScience 54:755-766.

Ripple, W. J. and E. J. Larsen.  2000.  Historic aspen recruitment, elk, and wolves in Northern Yellowstone National Park, USA.  Biological Conservation. 95:361-370.

Ripple, W. J., E. J. Larsen, R.A Renkin, and D.W. Smith.  2001.  Trophic cascades among wolves, elk, and aspen on Yellowstone National Park's Northern Range. Biological Conservation 102:227-334.

Rutter, R. J. and D. H. Pimlott.  1968.  The world of the wolf.  J.B. Lippincott Company, Philadelpia, Pennsylvania, USA.

Sikarskie, J. G.  1993.  Problems of owning wolf hybrids.  Unpublished manuscript.  Michigan State University, East Lansing, Michigan, USA.

Simberloff, D. and J. Cox.  1987.  Consequences and costs of conservation corridors.  Conservation Biology 1:63-71.

000468A

Slovic, P. 1987.  Perception of risk.  Science, New Series, 236 (4799): 280-285.

Stebler, A. M.  1944.  The status of the wolf in Michigan.  Journal of Mammalogy 25:37-43.

Stebler, A. M.  1951.  The ecology of Michigan coyotes and wolves. Dissertation, University of Michigan, Ann Arbor, Michigan, USA.

Stenlund, M. H.  1955.  A field study of the timber wolf (*Canis lupus*) on the Superior National Forest Minnesota.  Minnesota Department of Conservation Technical Bulletin 4.

Stephenson, R. O.  1974.  Characteristics of wolf den sites.  Alaska Board of Fish and Game Project W-017-R-06.

Tessaro, S. V.  1986.  The existing and potential importance of brucellosis and tuberculosis in Canadian wildlife:  a review.  Canadian Veterinary Journal 27:119-124.

Thiel, R. P.  1988.  Dispersal of a Wisconsin wolf into Upper Michigan. Jack-Pine Warbler 66:143-147.

Thiel, R. P.  1993.  The timber wolf in Wisconsin : the death and life of a majestic predator. University of Wisconsin Press, Madison, Wisconsin, USA.

Thiel, R. P. and J. H. Hammill.  1988.  Wolf specimen records in Upper Michigan, 1960-1986. Jack-Pine Warbler 66:149-153.

Thiel, R. P., S. Merrill, and L. D. Mech.  1998.  Tolerance by denning wolves, Canis lupus, to human disturbance.  Canadian Field Naturalist 112:340-342.

U.S. Department of Agriculture.  2002.  Wildlife Services: helping producers manage predation. Program Aid No. 1722.

U.S. Department of Agriculture.  2004.  2002 Census of agriculture:  Michigan state and county data. Vol. 1 Geographic Area Series. <http://www.nass.usda.gov/census/census02/volume/mi/MIVolume104.pdf>.

U.S. Department of Agriculture Wildlife Services.  2002.  Cooperative rabies management program national report.  Concord, New Hampshire, USA.

U.S. Fish and Wildlife Service.  1992.  Recovery plan for the eastern timber wolf.  U.S. Fish and Wildlife Service, Twin Cities, Minnesota, USA.

U.S. Fish and Wildlife Service.  2007.  Endangered and threatened wildlife and plants:  final rule designating the western Great Lakes populations of gray wolves as a distinct population segment; removing the western Great Lakes distinct population segment of the gray wolf from the list of endangered and threatened wildlife.   Federal Register 72(26):6052-6103.

000469A

U.S. National Park Service.  2003.  Management of habituated wolves in Yellowstone National Park.  U.S. National Park Service, Wyoming, USA.

Van Ballenberghe, V., A. W. Erickson, and D. Byman.  1975.  Ecology of the timber wolf in northeastern Minnesota.  Wildlife Monographs 43.

Van Camp, J. and R. Gluckie.  1979.  A record long distance move by a wolf (*Canis lupus*).  Journal of Mammalogy 60:236-237.

Voigt, D. R., G. B. Kolensky, and D. H. Pimlott.  1976.  Changes in summer foods of wolves in central Ontario.  Journal of Wildlife Management 40:663-668.

Vucetich, J. A. and R. O. Peterson.  2007.  Ecological studies of wolves on Isle Royale.  Annual Report 2006-2007.  Michigan Technological University, Houghton, Michigan, USA.

Warrick, D. M.  1991.  Wolf–dog hybrids and humans.  Human responsibility and hybrids.  International Wolf 1(4):4-9.

Weise, T. W., W. L. Robinson, R. A. Hook, and L. D. Mech.  1975.  An experimental translocation of the eastern timber wolf.  Audubon Conservation Report 5.

Wisconsin Department of Natural Resources.  1999.  Wisconsin wolf management plan.  Wisconsin Department of Natural Resources, Madison, USA.

Wisconsin Department of Natural Resources, National Wildlife Federation, Wisconsin Wildlife Federation, USDA Wildlife Services, Wisconsin Bear Hunters Association, and Timber Wolf Alliance.  2004.  A guide for reducing conflict between wolves and hunting dogs.  http://dnr.wi.gov/org/land/er/mammals/wolf/pdfs/reduce_conflict_brochure.pdf.

Wolstenholme, R. C.  1996.  Attitudes of residents toward wolves in a rural community in northwestern Montana.  Environmental Studies.  University of Montana, Missoula, Montana, USA.

Wydeven, A. P., T. K. Fuller, W. Weber, and K. MacDonald.  1998.  The potential for wolf recovery in the northeastern United States via dispersal from southeastern Canada.  Wildlife Society Bulletin 26:776-784.

Wydeven, A. P. and R. N. Schultz.  1993.  Management policy for wolf den and rendezvous sites–background information.  Unpublished report.  Wisconsin Department of Natural Resources, Madison, Wisconsin, USA.

Wydeven, A. P., R. N. Schultz, and R. P. Thiel.  1995.  Monitoring of a gray wolf (*Canis lupus*) population in Wisconsin, 1979-1991.  Pages 147-156 *in* L. N. Carbyn, S. H. Fritts, and D. R. Seip, editors.  Ecology and conservation of wolves in a changing world.  Canadian Circumpolar Institute, Edmonton, Alberta, Canada.

000470A

Wydeven, A. P. and J. E. Wiedenhoeft.  2005.  Status of the timber wolf in Wisconsin performance report 1 July 2004 through 30 June 2005.  Wisconsin Department of Natural Resources, endangered resources report #132, Madison, Wisconsin, USA.

Wydeven, A. P., J. E. Wiedenhoeft, R. N. Schultz, R. P. Thiel, S. R. Boles, E. Heilhecker.  2006.  Progress report of wolf population monitoring in Wisconsin for the period October 2005–March 2006.  Wisconsin Department of Natural Resources, Park Falls, Wisconsin, USA.

Young, S. P., and E. A. Goldman.  1944.  The wolves of North America.  American Wildlife Institute, Washington, D.C., USA.

000471A

**10.  APPENDIX:**

**MICHIGAN WOLF MANAGEMENT ROUNDTABLE REPORT**

000472A

# RECOMMENDED GUIDING PRINCIPLES

# FOR

# WOLF MANAGEMENT IN MICHIGAN

**REPORT OF THE MICHIGAN WOLF MANAGEMENT ROUNDTABLE**

**TO**

**THE DIRECTOR OF THE MICHIGAN DEPARTMENT OF NATURAL RESOURCES**

**NOVEMBER 2006**

000473A

## MICHIGAN WOLF MANAGEMENT ROUNDTABLE

Primary Representatives
Gaylord Alexander, Michigan Resource Stewards
Benjamin Bartlett, Michigan State University Extension
Thomas Courchaine, Michigan DNR Law Enforcement Division
David Cromell, Michigan Sheriffs' Association
James Dabb, Safari Club International, Michigan Chapters
Jason Dinsmore, Michigan United Conservation Clubs
Douglas Erickson, Central Upper Peninsula Planning and Development Commission
Miles Falck, Great Lakes Indian Fish and Wildlife Commission
John Hongisto, Upper Peninsula Sportsmen's Alliance
Patrick Lederle, Michigan DNR Wildlife Division
Jimmie Mitchell, Chippewa Ottawa Resource Authority
Gary Modlin, Upper Peninsula Whitetails Association
Kerry Mullin, Michigan Humane Society
Richard Pershinske, Michigan Farm Bureau
Cynthia Radcliffe, National Wildlife Federation
Marvin Roberson, Sierra Club
Steven Schaub, Timber Wolf Alliance
Michael Thorman, Michigan Hunting Dog Federation
John Vucetich, The Wildlife Society
Nancy Warren, Defenders of Wildlife

Alternate Representatives
James Ballard, Michigan Hunting Dog Federation
Gary Boushelle, Michigan Resource Stewards
Anna Cellar, Defenders of Wildlife
James Crawford, Michigan Sheriffs' Association
Douglas Craven, Chippewa Ottawa Resource Authority
Peter David, Great Lakes Indian Fish and Wildlife Commission
Dale DuFour, Central Upper Peninsula Planning and Development Commission
Jeffrey Gaither, Michigan DNR Law Enforcement Division
Kirt Harmon, Upper Peninsula Whitetails Association
Todd Hogrefe, Michigan DNR Wildlife Division
Erin McDonough, Michigan United Conservation Clubs
Dorothy McLeer, Timber Wolf Alliance
G. Dale McNamee, Upper Peninsula Sportsmen's Alliance
Sarah Popp, Sierra Club
Brian Preston, National Wildlife Federation
Linda Reider, Michigan Humane Society
Gary Roloff, The Wildlife Society
Merle Shepard, Safari Club International, Michigan Chapters
John Talsma, Michigan Farm Bureau
Frank Wardynski, Michigan State University Extension
Matthew Wood, Michigan Hunting Dog Federation

000474A

## FACILITATOR'S NOTE

I believe it is important to convey the depth of thinking and the process that created this document. From June through September 2006, delegates from 20 Michigan organizations and agencies met for 10 full days to define wolf-management issues, review the relevant social and biological science, and address the difficult task of reaching consensus on guiding principles for wolf management in Michigan. The intellectual growth and experience this diverse group shared during that time allowed the development of guiding principles that are informed, considered and fair.

Delegates represented their organizations, their agencies, and the people of Michigan equally well. Collectively, they comprise a group that knows more and has thought more deeply about wolf management in Michigan than any other single group of organizations and agencies in the State. As the facilitator of the Wolf Management Roundtable process, I am grateful for their personal talents, sacrifices and persistence, and I am proud of the work they have done to produce this document for the people of Michigan.

R. Ben Peyton
Wolf Management Roundtable Facilitator
Department of Fisheries and Wildlife
Michigan State University

3

000475A

## INTRODUCTION

We, the Michigan Wolf Management Roundtable, present this report to the Michigan Department of Natural Resources (DNR) to help guide the management of wolves and wolf-related issues once the species is removed from the Federal list of threatened and endangered species. We ask the DNR to apply the guiding principles contained herein in its efforts to develop a wolf-management plan that addresses the diverse interests of Michigan society.

### Need to Revise the Existing Wolf Plan

The DNR developed the *Michigan Gray Wolf Recovery and Management Plan* in the early 1990s, following the natural re-colonization of wolves in the State. Since that time, the number of wolves in Michigan, as well as in Wisconsin and Minnesota, has increased substantially. Recently, the U.S. Fish and Wildlife Service proposed removing wolves in the western Great Lakes region, including Michigan, from the Federal list of threatened and endangered species.

When wolves in the western Great Lakes region achieve both biological and statutory recovery, anything that prompts a need to reclassify them as threatened or endangered would be detrimental to both the wolf population and the citizens of Michigan. The DNR has stated its commitment to maintain a viable Michigan wolf population above a level that would require its reclassification as threatened or endangered. To achieve that goal, the DNR must implement a wolf plan that assures adequate protection and management of the species. Although the existing State plan has been a valuable tool for recovery of the species, wolf population size and distribution have changed and understanding of wolf biology has improved significantly since it was written. To continue to manage the wolf population based on the best available scientific information, the DNR has initiated review and revision of the existing plan.

### Planning Challenges

Many Michigan citizens derive benefits from the presence of wolves. As top predators, wolves fill an important ecological niche and are indicators of environmental health. Wolf-based tourism may provide significant economic benefits to local economies. Many people value the presence of wolves for cultural and religious reasons. Many people also find personal enjoyment and satisfaction by observing wolves in the wild or by simply knowing they exist. Provision of these benefits fosters public support for a wolf population and thus serves the best interests of both wolves and Michigan citizens.

The presence of wolves also poses significant costs and concerns for some Michigan residents, and effective management must minimize and resolve wolf-related conflicts. Conflict-resolution is important to affected stakeholders, but it is also critical to wolf conservation. Citizen support for a wolf population depends, in part, on confidence wolf-related conflicts will be resolved effectively. Failure to address conflicts could foster negative attitudes that lead to adverse impacts on wolf distribution and abundance. Thus, effective management of wolf-related conflicts benefits affected stakeholders as well as the wolf population as a whole.

000476A

The needs to maintain a viable population, to provide wolf-related benefits, and to resolve conflicts are broadly accepted, but determining the methods that should be used to meet those needs tends to be more controversial. Interested parties often disagree on the ways wolves should be managed, and those disagreements often originate from differences in values and beliefs held within different segments of society. Although multiple management approaches could be used to achieve wolf-management goals, some of those approaches may not be acceptable to some stakeholder groups or to society at large. Effective planning must identify goals and objectives that are supported by Michigan society.

**Guidance from the Roundtable**

To help it develop a wolf plan that is acceptable to a wide range of stakeholder interests, the DNR convened the Michigan Wolf Management Roundtable. We, the members of that group, were selected to represent the diversity of Michigan interests in wolves. Our membership includes 20 agencies and organizations, which represent environmental and ecological interests, hunting and trapping interests, livestock-producer interests, public-safety interests, tourism and resource-development interests, Tribes, and wolf-protection interests. Our membership includes Upper Peninsula and Lower Peninsula residents in roughly the same numbers to ensure adequate representation of the different regions of the State. Our charge, as given by the DNR, was to develop principles to guide management of Michigan wolves and wolf-related issues following Federal de-listing.

The original *Michigan Gray Wolf Recovery and Management Plan* addressed issues at the strategic level. That is, it identified an overall goal for wolf recovery and management and it identified management objectives pertinent to specific issues; it did not outline the operational details of how those goals and objectives should be achieved. The revised plan will also be a strategic plan. Accordingly, the DNR asked us to develop guiding principles that addressed planning needs at a strategic level. We were not asked to provide recommendations regarding specific methods that should be used to achieve goals and objectives.

We have developed guiding principles consistent with the direction we were provided. Consequently, the DNR will have considerable latitude to select and implement specific methods for achieving strategic goals and objectives. We trust the DNR will, to the extent legally and practically possible, develop a strategic plan that is consistent with our recommendations. In the following sections, we have offered explanations to clarify our intent and thus ensure correct interpretation of the guiding principles.

Approval of the specific language for each guiding principle required consensus among all members of the Roundtable. Given the breadth of values and beliefs represented on the group, achieving consensus was often challenging and would not have been possible without considerable commitment and sincere, objective thinking by each member. The guiding principles are the product of months of substantial deliberation and compromise. We developed them after review of the best available science and with consideration and respect for all of the diverse perspectives represented.

5

000477A

We recommend the following guiding principles with the belief they will serve the best interests of the Michigan wolf population and the people of the State.

## WOLF ABUNDANCE AND DISTRIBUTION

We believe the goal of managing wolf abundance and distribution should be to maintain acceptable levels of positive and negative interactions while ensuring the long-term viability of a wolf population. Setting numeric goals for wolf abundance at large geographic scales (e.g., the entire State, the entire Upper Peninsula) would therefore be inappropriate, because it would not reflect the unequal distribution of wolf habitat, human activity and the potential for positive and negative interactions. Moreover, wolf numbers alone do not necessarily predict the frequency of certain types of interactions. In an area of abundant natural prey and few human residences, for example, a large number of wolves could cause a relatively low level of negative interactions. Conversely, a small number of wolves could create an unacceptably high level of negative interactions in local areas where natural prey is scarce or where human population density is high. Therefore, setting numeric goals for wolf abundance at large geographic scales should be avoided because it would not necessarily reduce negative interactions, could unacceptably restrict positive interactions desired by the public, and could promote an inaccurate public perception regarding the relationship between wolf numbers and the risk of conflict.

Previous management experience suggests most wolf-related conflicts are best handled on a case-by-case basis, and managing individual conflicts by reducing wolf numbers at a broad geographic scale would be inappropriate. However, we recognize some unique situations may warrant consideration of reducing wolf numbers in local areas as a means to reduce the risk of negative interactions. The potential feasibility and efficacy of such an approach in Michigan remains uncertain. Wolves are prolific and have quickly re-colonized other areas where population-control efforts have been conducted. Whether management could effectively reduce wolf numbers in local areas of Michigan, especially over the long-term, has not yet been proven. Moreover, conflicts in local areas are often caused by a few individual wolves, and the potential efficacy of generally reducing wolf numbers to manage conflicts remains unclear. Given this uncertainty, we stress that consideration of local population reduction should be approached with caution. If such action is ever deemed necessary, it should be planned based on the best available research, and its effects should be evaluated thoroughly to ensure the future use of the action is appropriate.

Guiding Principles:

- Goals for wolf management should be based on wolf impacts (positive and negative) rather than wolf abundance or numbers. When establishing strategic goals for wolf abundance and distribution on multiple geographic scales, the DNR should consider the importance of:

    o maintaining a wolf population to ensure adequate genetic diversity and population sustainability;
    o providing ecological and social benefits associated with wolves;
    o maintaining sustainable populations of wildlife and their habitats;

6

- o minimizing risks to human safety; and
- o limiting depredation of dogs, livestock and other domestic animals.

- Conflicts should be managed at an appropriate scale. Whenever applicable, wolf conflicts should be resolved at the individual and pack level. If wolf numbers are determined to be the cause of increased conflicts significantly affecting human safety, depredation of dogs, livestock and domestic animals, or sustainable wildlife populations, then population management at the broader scale can be considered.

- Wolf population management should be done in an adaptive management framework. Strategies should be researched and outlined to afford timely response to population-management needs. Application of control should include an evaluation component.

- In recent years, Michigan wolves have been killed on a case-by-case basis by government personnel for the purpose of addressing wolf-related conflicts. All reason suggests wolves will continue to be killed for this purpose. The DNR can use hunters for this management need. Satisfying, in part, the interest to recreationally hunt would be an outcome of killing wolves to address wolf-related conflicts.

- If wolves expand naturally into regions within the Lower Peninsula to the extent that social acceptance permits such expansion, proactive education should be aimed at developing tolerance among the public and understanding the value of the cost and benefits of living with wolves.

### BENEFITS OF WOLVES

We recognize wolves provide benefits to many citizens of Michigan. Accordingly, we feel the revised wolf plan should address ways to maximize those benefits and foster positive interactions associated with wolves. Although we were not able to agree on all of the positive experiences wolves provide or could provide, we did agree the presence of wolves is associated with the following benefits.

*Cultural Values:* Wolves are a species of great significance to Native Americans. Today, Native American communities in Michigan value the return of Ma'iingan (i.e., the wolf) as an intrinsic spiritual component in the reaffirmation and continued viability of their own cultural well-being.

*Effects on Tourism and Recreation:* A Michigan public-attitude survey conducted by Michigan State University in 2005 indicated the presence of wolves in an area would attract some citizens while deterring others, but nearly half of survey respondents indicated the presence of wolves would not be a consideration when choosing a vacation area. A marketing strategy that promotes the values of wolves could attract members of this latter group to local communities, thus yielding tourism and economic benefits.

*Personal Appreciation:* Many citizens feel the wolf has an 'existence value' and they benefit from knowing wolves exist as a healthy, thriving wild population in the State. This benefit can be realized whether or not people are able to see or hear those animals. The presence of wolves

7

signifies 'wilderness' for many people and those individuals may place a higher value and feel a sense of stewardship on Michigan's wolf range.

*Nature Appreciation:* The presence of wolves provides an exciting opportunity for those Michigan citizens who enjoy studying and observing nature. Although the opportunity to hear, see, photograph or study wolves in the wild of Michigan may be restricted to a relatively small portion of citizens, the experience and the option of having that experience are highly valued by those individuals.

*Ecological Benefits:* Not all citizens view the ecological role of the wolf in a positive way but most believe the wolf is an important component of a complex and dynamic ecosystem. Nearly three-quarters of interested Michigan citizens who responded to the 2005 public-attitude survey believed the ecological benefits were a 'very' or 'somewhat' important reason to have wolves in Michigan. Many Roundtable members viewed the presence of a self-sustaining population of wolves over time to be a positive indicator of ecosystem health.

Guiding Principles:

- The DNR should work with other agencies, Tribes and private organizations to foster benefits associated with wolves and to provide positive wolf–human interactions.

- Information describing the cultural and spiritual significance of wolves to Native Americans should be drafted in consultation with Michigan Tribes and appear in the body of the wolf-management plan.

## WOLF–RELATED CONFLICTS

We recognize the presence of wolves imposes more costs on some groups of Michigan citizens than others. These costs range from actual losses of domestic animals to anxieties over the presence of wolves in residential or recreational areas. The following guiding principles were developed to help minimize the incidence of wolf-related conflicts, provide relief to citizens adversely affected by the presence of wolves and certain wolf behaviors, and thereby foster public acceptance and long-term viability of the wolf population.

We accept lethal control of wolves should be an option for response to conflicts involving wolves and livestock. However, the revised wolf plan should place a high priority on developing, evaluating and applying non-lethal management methods to reduce negative wolf impacts wherever possible. The guiding principles regarding lethal removal of wolves that attack livestock apply to situations where livestock losses have been documented or where a wolf is in the act of livestock depredation; they do not recommend lethal removal of wolves as a preventative measure in areas where problems have not yet occurred.

An attack on a dog that enters the territory of a wolf pack is a predictable, normal behavior of wild canines and, in itself, does not justify removal of all or some wolves in the pack. Not until such attacks become a chronic occurrence should removal of all or some of the wolves in the pack be considered.

000480A

We also place a high priority on avoiding abuse of management options (e.g., lethal removal of depredating wolves by livestock owners). The revised wolf plan should ensure lethal removal of wolves will be accompanied by whatever reporting, monitoring and enforcement is necessary to prevent excessive or inappropriate use.

Guiding Principles:

*Depredation of Livestock*

- The DNR should provide timely and professional responses to wolf–livestock complaints.

- Economic and other incentives, including compensation for losses at fair value, should be provided to livestock producers who voluntarily implement best management practices that decrease the potential for wolf–livestock conflicts.

- The DNR should take an incremental approach to addressing wolf–livestock conflicts that is guided by severity and frequency of conflicts. When severity and frequency of conflicts are low, more conservative methods should be applied whereas increasingly aggressive control methods may be applied as the severity and frequency of conflicts increase.

- As part of the incremental approach to addressing livestock losses, a suite of approaches must be used, including technical support and non-lethal and lethal methods. After depredation losses have been confirmed, lethal take permits to landowners on private land may be issued if non-lethal methods are determined to be ineffective.

- Livestock owners should be allowed to kill wolves in the act of livestock depredation without a permit on private property. All such incidents must be reported immediately and investigated. Abuses should be referred for prosecution.

*Depredation of Dogs in Non-residential Areas*

- We acknowledge there are conflicts between wolves and dogs.

- We recognize there is an inherent risk to dogs allowed to range in areas frequented by wolves. The primary responsibility for avoiding or minimizing conflicts between wolves and dogs, which includes making good-faith efforts to avoid areas the DNR has identified as having had wolf–dog conflicts, rests with the dog owners. The DNR should provide timely and professional responses to conflicts between wolves and dogs. Further, the agency response should be guided by the severity and frequency of conflicts. Lethal control should not be used unless wolf-attacks on dogs become a chronic occurrence and non-lethal methods are determined to be ineffective.

9

- The DNR should make pack territory information in known areas of probable or previous conflicts between wolves and dogs available to the public in an effort to reduce those conflicts.

- In an attempt to reduce conflicts between wolves and dogs, the DNR should work with the Natural Resources Commission and stakeholders to allow voluntary alternatives to reduce wolf visitation to bear bait sites.

*Depredation of Pets in Residential Areas*

- The DNR should provide timely and professional responses to wolf–pet complaints.

- The DNR should take an incremental approach to addressing wolf–pet conflicts that is guided by severity and frequency of conflicts.

*Habituated Wolves*

- The DNR should provide timely and professional responses to reports of habituated wolves and take necessary measures to minimize or eliminate human-safety risks posed by identified habituated wolves.

- We support the concept of a legal framework to hold persons accountable for intentionally engaging in behaviors that lead to the habituation of wolves.

## WOLF HARVEST FOR REASONS OTHER THAN MANAGING WOLF-RELATED CONFLICTS

As addressed in the earlier section on wolf abundance and distribution, we accepted harvest of wolves by licensed hunters and trappers as a possible management tool to reduce wolf-related conflicts under specific conditions. We also considered the separate issue of whether a regulated wolf hunting/trapping season should be provided in the absence of any need to reduce wolf-related conflicts through management, provided good scientific data showed the harvest would be sustainable and would not threaten the viability of the wolf population.

We considered the available science and thoroughly explored many diverse perspectives on this issue. Some of us supported a hunting/trapping season in the absence of a specific need to reduce local wolf abundance because many Michigan residents would place an important value on and derive benefits from the opportunity to harvest wolves. Others of us opposed a hunting/trapping season in the absence of a specific need to reduce local wolf abundance because it would conflict with the cultural and personal values of many other Michigan residents. After substantial deliberation, we concluded consensus on any guiding principles regarding this issue was not possible because the disagreement focused primarily on important differences in fundamental values.

10

000482A

## INFORMATION AND EDUCATION

The 1997 *Michigan Wolf Recovery and Management Plan* stated an extensive public information and education (I&E) campaign was needed to develop a supportive social environment for the recovery of wolves in Michigan. The plan outlined five I&E objectives:

1. Develop a coordinated information and education plan.
2. Develop materials for specific educational needs.
3. Maintain public contact.
4. [Participate in] public presentations and events.
5. [Provide] training for agency personnel.

Those objectives are still valid today. In fact, given the larger wolf population and greater potential for wolf–human interactions, the public need and demand for I&E regarding wolves is even greater now than it was in 1997. We believe the DNR should give a high priority to planning and implementing an effective I&E program regarding wolves. As with all management, an important component of this effort should include a periodic needs assessment and an evaluation of program effectiveness.

During our deliberations, we identified many specific issues that an I&E program should address. In no particular order, some of the I&E needs include:

➢ Educate residents, legislators and other decision-makers about wolf ecology and natural history.

➢ Educate residents, legislators and other decision-makers about the benefits and risks associated with wolves.

➢ Inform livestock producers how to reduce risks of depredation of livestock.

➢ Inform dog owners how to reduce risks of wolf-attacks on dogs at locations away from their residences.

➢ Inform users of wild lands of the risk of conflicts between wolves and dogs in an effort to reduce those conflicts.

➢ Inform pet owners how to reduce risks of depredation near their residences.

➢ Inform residents how to help prevent habituation of wolves.

➢ Educate Lower Peninsula residents to prepare them for the potential presence of wolves in their region.

➢ Disseminate information emerging from current research programs on wolves and their relationships to the Great Lakes ecosystem.

11

000483A

These needs include separate information and education components. The information component should address immediate needs of residents regarding possible interactions with wolves. The education component should be designed to provide a broader understanding of the wolf and its presence in Michigan. This component should address a broad audience and include public school audiences.

We identified the lack of sufficient communication staff and resources in the DNR to be one barrier to an effective I&E program. Overcoming this barrier will require extensive cooperation and partnering among the DNR, other agencies, Tribes and private organizations to develop and disseminate informational materials and educational programs. The wolf-management advisory council (recommended later in this report) should play an instrumental role in helping the DNR identify and respond to I&E needs.

There is a public perception the DNR lacks a clear policy regarding the types of wolf-related information that should be provided to the public. The revised plan should address this apparent lack of policy and develop an open, systematic process for responding to information requests at all levels. In the past, requests for information often failed to receive a response from the DNR. However, the addition of a wolf coordinator in the Wildlife Division in recent years has improved the DNR response to information requests and this position should be maintained.

Guiding Principles:

*Information*

- The DNR should provide timely information to support education and management efforts.

*Education*

- The DNR should coordinate, and evaluate the effectiveness of, a comprehensive education program.

- The DNR should initiate discussion with diverse user groups and provide information and technical expertise so the groups can develop educational materials to meet specific needs of their constituents.

## RESEARCH

The gray wolf in Michigan is a component of a large and complex Great Lakes ecosystem. As such, the species presents many complicated management challenges. In our deliberations, we identified many instances where available science was not adequate to guide recommendations for wolf management. For example, we identified needs for more research regarding:

000484A

➢ the interactions between wolves and humans;

➢ the efficacy of different management options to address wolf-related conflicts (e.g., depredation of domestic animals);

➢ the complex interactions and population dynamics involved in wolf–ungulate systems;

➢ the nature and extent of the relationship between wolf population size and wolf-related conflicts; and

➢ the efficacy of wolf population reduction as a means to reduce the frequency of wolf-related conflicts.

We believe the DNR should place a high priority on wolf-related research. However, we recognize funding available to the agency will not be sufficient to study all the important questions related to wolves. For this reason, the DNR should continue to collaborate with partners to address research needs.

Guiding Principle:

- The DNR should continue an active wolf research program, with a focus on projects that clarify factors influencing the Great Lakes wolf population. This program should include investigations of biological and social questions to support science-based wolf management.

## FUNDING FOR WOLF MANAGEMENT

As stated in its mission statement, the DNR is committed to the conservation, protection, management, use and enjoyment of the State's natural resources for current and future generations. Since wolves have become re-established in Michigan, they have once again become an integral part of the natural resources of the State. Given the DNR's mission and its implicit trust responsibilities for the State's wildlife, we believe the DNR should expend funds to conduct research and management of wolves.

We recognize most funding for wildlife management has traditionally been derived from revenues generated by sportspersons. The Michigan Game & Fish Fund is generated by State hunting and fishing license revenues, and the Federal Aid in Wildlife Restoration Act (a.k.a. Pittman–Robertson Fund) provides funds derived from an excise tax on purchases of firearms and sporting goods. In the absence of many other funding alternatives, the current DNR wolf-management program has been supported primarily by these two funding sources.

We recognize the important contributions of sportspersons toward the recovery and management of the Michigan wolf population. We also acknowledge the contributions of agencies, Tribes and private organizations that have addressed wolf education, conservation and research needs in places where traditional funding has fallen short.

13

We recognize wolf management will require significant expenditures by the DNR into the foreseeable future. Costs associated with the DNR wolf program may include expenses for salaries, wages, travel, equipment, facilities, livestock compensation, information and education materials, and other program elements. In the face of growing DNR budget challenges, it will be increasingly difficult to adequately meet wolf-management needs using only traditional funding sources. In light of these anticipated challenges, we encourage the DNR to pursue additional and alternative funding sources and partnerships for the management of wolves. We believe the use of alternative funding sources and partnerships could spread the financial support of wolf management among a greater variety of user groups than traditional funding sources currently allow.

Guiding Principle:

- The DNR, in collaboration with other agencies, Tribes and private organizations, should seek and develop funds to support effective implementation of the wolf management program.

## WOLF–DOG HYBRIDS

Wolf–dog hybrids are produced when a wolf interbreeds with a dog or another wolf–dog hybrid. Ownership and proliferation of these animals in Michigan could threaten the viability of the Michigan wolf population for multiple reasons. First, released hybrids may breed with wild wolves and thereby introduce dog genes into the wolf population. This behavior can jeopardize the genetic integrity of the population and cause population-wide changes in morphological and behavioral characteristics. Second, a desire to breed and raise wolf hybrids may prompt some people to capture wild Michigan wolves illegally. Third, problems caused by released hybrids are often incorrectly attributed to wolves and thus reduce social acceptance for a wolf population. Collectively, these adverse consequences on the Michigan wolf population can be significant, and we believe the concerns expressed in the 1997 *Michigan Gray Wolf Recovery and Management Plan* are still valid today.

Guiding Principle:

- We are concerned wolf–dog hybrids will have negative effects on the wild wolf population in Michigan.

## CAPTIVE WOLVES

Captive wolves that are released or escape pose a threat to both people and the wild wolf population. These wolves could pose risks to human safety; they could also reduce social acceptance for the wild population because the public is unlikely to distinguish between problems caused by released captive wolves and those caused by wild wolves. Given these adverse effects potentially caused by released or escaped captive wolves, we do not believe private citizens should be allowed to possess wolves in captivity in Michigan.

000486A

The Michigan Large Carnivore Act (Public Act 274 of 2000) prohibits the possession of several large carnivore species, except under permit. However, the list of species covered by this law does not currently include wolves. To provide a tool for limiting the possession of wolves in captivity, we feel the law should be amended to include wolves.

Guiding Principle

- We support adding the wolf as a species covered by the Michigan Large Carnivore Act (Public Act 274 of 2000).

## WOLF-MANAGEMENT PLAN REVIEW PROCESS

Wolf abundance and distribution, attitudes of Michigan residents, and wolf legal status are likely to change after the revision of the wolf plan is complete. To address ecological, social and regulatory shifts in a timely manner, the wolf plan should be reviewed and revised at regular intervals. We ask the DNR to conduct timely reviews that incorporate adequate public input.

Guiding Principles:

- We encourage the DNR to include a provision in the plan for a wolf-management advisory council to continue to identify and discuss management goals, conflict resolutions, and public-education opportunities on an annual basis.

- The DNR should formally review and update the wolf management plan at 5-year intervals. The review process should provide for public input.

15

000487A

# CERTIFICATION

We, the members of the Michigan Wolf Management Roundtable, as the designated representatives of our respective organizations and agencies, reached consensus on all of the preceding guiding principles and hereby certify we support the recommendations set forth in this report.


Gaylord Alexander
Michigan Resource Stewards

11-2-06
Date


Benjamin Bartlett
Michigan State University Extension

11-2-06
Date


Thomas Courchaine
Michigan DNR Law Enforcement Division

11/2/06
Date


David Cromell
Michigan Sheriffs' Association

11/2/06
Date


James Dabb
Safari Club International, Michigan Chapters

11-2-06
Date


Jason Dinsmore
Michigan United Conservation Clubs

11/2/2006
Date

16

000488A

Douglas Erickson
Central Upper Peninsula Planning and Development Commission

11-2-2006
Date

Miles Falck
Great Lakes Indian Fish and Wildlife Commission

11/2/06
Date

John Hongisto
Upper Peninsula Sportsmen's Alliance

11/2/06
Date

Patrick Lederle
Michigan DNR Wildlife Division

11/2/2006
Date

Jimmie Mitchell
Chippewa Ottawa Resource Authority

11-2-06
Date

Gary Modlin
Upper Peninsula Whitetails Association

11/2 2006
Date

Kerry Mullin
Michigan Humane Society

11.2.2006
Date

17

Cynthia Radcliffe
National Wildlife Federation

Date 11/2/06

Marvin Roberson
Sierra Club

Date 11/2/06

Steven Schaub
Timber Wolf Alliance

Date 11-2-06

John Talsma
Michigan Farm Bureau

Date 11-2-06

Michael Thorman
Michigan Hunting Dog Federation

Date 11-2-06

John Vucetich
The Wildlife Society

Date 11/6/06

Nancy Warren
Defenders of Wildlife

Date 11/2/06

18

000490A

# EXHIBIT G



# United States Department of the Interior

### OFFICE OF THE SOLICITOR

## DEC 1 2 2008

M-37018

Memorandum

To:        Director, U.S. Fish and Wildlife Service

From:     Solicitor

Subject:   U.S. Fish and Wildlife Service Authority under Section 4(c)(1) of the Endangered Species Act to Revise Lists of Endangered and Threatened Species to "Reflect Recent Determinations"

## I.    INTRODUCTION

On February 8, 2007, the U.S. Fish and Wildlife Service (FWS) promulgated a Final Rule that revised the listing of the gray wolf under the Endangered Species Act (ESA or the Act).[1]  72 Fed. Reg. 6052 (2007).  In the Final Rule, FWS determined that the wolves within the western region of the Great Lakes were a "distinct population segment" (DPS) of gray wolves generally and that they were not an endangered or threatened species.  *Id.*  FWS therefore revised the listing of the gray wolf to reflect that determination, as it was required to do by section 4(c)(1) of the Act.[2]

In *Humane Soc'y of the United States v. Kempthorne*, No. 07-0677 (PLF), 2008 U.S. Dist. LEXIS 74495 (D.D.C. Sept. 29, 2008) (*Humane Society*), which challenged the Final Rule, the plaintiffs argued that the ESA does not "authorize FWS to simultaneously designate and delist DPSs within broader listings—that is, to 'carve out' healthy sub-populations of otherwise endangered or threatened species and remove from [them] the protections of the Act." *Id.* at *21. FWS argued that the Act gave it unambiguous authority to revise the listing of the gray wolf to reflect its determination about the western Great Lakes wolves.[3] *Id.* at *23.

The court concluded that the Act was ambiguous with respect to the following "precise question":

> [W]hether the ESA permits FWS to use the DPS tool to remove the protections of
> the statute from a healthy sub-population of a listed species, even if that sub-

---

[1] Endangered Species Act of 1973, 16 U.S.C. §§ 1531 *et seq.* (1973).

[2] The ESA grants authority to the Secretary of the Interior to administer its provisions.  Because the Secretary has delegated that authority to FWS with respect to all determinations made under section 4(a)(1), we will refer throughout this memorandum to the authority of FWS rather than to the authority of the Secretary.

[3] Although FWS made that general argument, it did not fully brief the issue of whether it had unambiguous authority to the court.  Therefore, this Memorandum will examine this issue in greater detail.

000491A

population was neither designated as a DPS nor listed as endangered or threatened beforehand.[4]

*Id.* at \*24.  Because the court determined that the Final Rule was "based on FWS' erroneous conclusion that the ESA is unambiguous on this point," the court remanded "the Final Rule to FWS to permit the agency to address the ESA's ambiguity in light of its expertise, experience and insight into the ESA's objectives." *Id.*  The court stated that "[w]hen an agency wrongly concludes that its interpretation is mandated by the statute at issue, a court will not impose its own interpretation of the statute.  Rather, a court will vacate the agency's action so the agency can 'interpret the statutory language anew[,]'" in light of the ambiguities found by the court. *Id.* at \*18.

This memorandum is the Department of the Interior's (Department's) response to the court's remand and will also inform future decision-making by the Department on these issues.  While the Department acknowledges that the ESA is arguably ambiguous on the "precise question" posed by the court, it notes that the court's question does not accurately describe what FWS did in the Final Rule.  What FWS actually did, under the terminology employed by the Act, was first to determine, pursuant to section 4(a)(1), that gray wolves in the western Great Lakes area constituted a DPS and that the DPS was neither endangered nor threatened,[5] and then to revise the list of endangered and threatened species, pursuant to section 4(c)(1), to reflect those determinations.[6]  FWS did not delist a previously unlisted species; rather, it revised the existing listing of a species (the gray wolf in the lower 48 States) to reflect a determination that a part of that species (the Western Great Lakes DPS) was healthy enough that it no longer needed the ESA's protections.

As explained below, FWS had clear authority to make these determinations and to revise the list accordingly.  Moreover, even if FWS's authority was not clear, FWS's interpretation of its authority to make determinations under section 4(a)(1) and to revise the endangered and

---

[4] FWS often uses the term "designation" as shorthand for the process of determining whether a group of organisms qualifies as a DPS under the discreteness and significance prongs of FWS's Policy Regarding the Recognition of Distinct Vertebrate Population Segments Under the Endangered Species Act (DPS Policy or Policy). *See* 61 Fed. Reg. 4722 (Feb. 7, 1996).  "Designation" of a DPS does not mean that FWS necessarily adds the DPS to the lists of endangered and threatened species; rather, it refers to the identification of a DPS that may or may not be endangered or threatened.  Once "designated," FWS must then revise the lists of endangered and threatened species, if appropriate, to reflect the DPS's conservation status by adding it to the lists, uplisting or downlisting it, or removing it from the lists.  FWS also interchangeably uses the terms "identification," "recognize," and "establish" to describe the same process as "designation."

[5] This Memorandum uses "endangered" and "threatened" as shorthand in referring to determinations made in accordance with the Act's definitions of "endangered species" and "threatened species." *See* 16 U.S.C. § 1532(6), (20).

[6] The lists of endangered and threatened species are reproduced at 50 C.F.R. §§ 17.11(h), 17.12(h).  The Code of Federal Regulations includes two lists, one for "endangered and threatened wildlife," *id.* at § 17.11, and the other for "endangered and threatened plants," *id.* at § 17.11.  The separate lists of endangered and threatened species contemplated by section 4(c)(1) of the Act are merged in the two lists reproduced in the Code with the list of wildlife and the list of plants each containing a "status" column indicating whether the listed species is an "endangered species" or a "threatened species."

2

000492A

threatened species list to reflect those determinations under section 4(c)(1) is reasonable and fully consistent with the ESA's text, structure, legislative history, relevant judicial interpretations, and policy objectives.

II.   FWS HAD CLEAR AUTHORITY TO IDENTIFY THE WESTERN GREAT LAKES GRAY WOLF DPS, DETERMINE ITS CONSERVATION STATUS UNDER SECTION 4(A)(1), AND REVISE THE GRAY WOLF LISTING UNDER SECTION 4(C)(1) TO REFLECT THAT DETERMINATION

The ESA authorizes and requires FWS to determine whether a "species" is "endangered" or "threatened" within the meaning of the Act. 16 U.S.C. § 1533(a)(1). This is sometimes referred to as a determination of its conservation status. FWS may make such a determination on its own initiative or in response to a petition by a third party. *Id.* § 1533(b)(3). If FWS determines that a species is "endangered" or "threatened," it must add that species to the published lists of all such species, *id.* § 1533(c)(1), and the species is thereafter subject to the protections provided by the Act. Once a species is determined to no longer be "endangered" or "threatened," and is removed from the lists, it is no longer subject to the protections of the Act. *See id.* § 1533(f), (g). The Act contains only one provision that authorizes FWS to revise its lists. That provision is section 4(c)(1). It provides that FWS must, "from time to time," revise the lists "to reflect recent determinations, designations, and revisions" made in the accordance with the provisions of the Act. *Id.* § 1533(c)(1). In essence, this provision requires FWS to keep the lists up to date as it makes determinations about the conservation status of species. A second provision, found in section 4(c)(2), is also relevant to FWS's list revision authority, but does not by itself authorize FWS to revise its lists. It requires FWS, at least once every five years, to conduct a review of all species that are on the lists to determine whether to remove them from the lists or have their conservation status on the lists changed. *Id.* § 1533(c)(2). If changes in the lists are warranted as a result of the review, they are made pursuant to section 4(c)(1).

"Species" is a defined term under the Act. The term "includes any subspecies of fish or wildlife or plants, and any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature." *Id.* § 1532(16). Thus, for purposes of the Act, a "distinct population segment," or DPS, of a larger group of organisms that is itself a species or subspecies is also a "species." There is no set of special rules in the ESA for DPSs. The rules that govern a determination of whether a DPS is "endangered" or "threatened," the listing of a DPS, and any list revision affecting a DPS, are the same for a DPS as for any other "species."

What FWS did in the Final Rule is as follows: On its own initiative, and in accordance with the provisions of section 4(a)(1), FWS determined that the gray wolves in the western region of the Great Lakes constituted a DPS—and therefore a "species" as defined by the Act—and that they were not endangered or threatened. Having made that determination, it then revised the listing of gray wolves, pursuant to the direction in section 4(c)(1), to reflect that determination, as it was required to do.

The court in *Humane Society* used a two-step analysis to examine FWS's contention that it had clear authority to revise the gray wolf listing. First, the court examined whether FWS had the authority under section 4(a)(1) to determine that the western Great Lakes gray wolves constituted

000493A

a DPS and then to determine whether they were endangered or threatened. *Humane Society*, 2008 U.S. Dist. LEXIS 74495, at *27. Section 4(a)(1) states, in relevant part, that the "Secretary shall by regulation … determine whether any species is an endangered species or a threatened species because of any of" five listed factors. 16 U.S.C. § 1533(a)(1). The court concluded that section 4(a)(1) "could be read to mean … that *when* it is appropriate to evaluate and/or revise the status of 'any species,' *then* the agency" can make a determination about the conservation status of the species. *Humane Society*, 2008 U.S. Dist. LEXIS 74495, at *27–28. We respectfully reject the court's conclusion because we can find no textual support for it. There is nothing in section 4(a)(1), or in any other provision of the Act, that suggests FWS must somehow pre-screen a group of organisms before undertaking the five-factor analysis of their conservation status set forth in section 4(a)(1). Nor are there any criteria provided in the Act on which FWS could base such a pre-screening exercise. All that section 4(a)(1) says is that FWS "shall … determine whether any species is an endangered species or a threatened species because of any" of five listed factors. There is no qualifying or limiting language attached to that grant of authority to FWS. It does not say that FWS shall undertake such a five-factor evaluation only in appropriate (and undefined) circumstances. In allocating its resources, FWS must necessarily choose what determinations to make and in what order, but the Act does not in any way limit FWS's discretion in this regard.

The court's conclusion about section 4(a)(1) was the foundation for the next step of its analysis. Because that conclusion was in error, there is no basis for the court's conclusion in the second step of its analysis. In other words, if FWS had the authority to make the status determination, there is no question that it had the authority, indeed the obligation, under section 4(c)(1) to revise the list to reflect the determination.

Having found, in the first step of its analysis, that there might be circumstances in which a section 4(a)(1) evaluation should not be undertaken, the court searched the Act to see if it could determine what those circumstances might be. It concluded that section 4(c)(2)(B), which directs FWS to determine at least every five years whether a species should be removed from the list, "strongly suggests—consistent with common usage—that the *listing* of any species (such as the western Great Lakes DPS) is a precondition to the *delisting* of that species." *Id.* at *29. Because the court viewed FWS as having engaged in a delisting of the Western Great Lakes DPS, its conclusion about the language in 4(c)(2)(B) meant that there was an ambiguity in the Act that had to be resolved, and that FWS's assertion that it had clear authority for its action could not be sustained.[7]

We acknowledge that FWS may bear some responsibility for the apparent confusion on what it was doing in the Final Rule. FWS did describe its action in the Final Rule as a "delisting." Keying on that description, the court made the reasonable observation that, logically, for there to be a delisting there must first be a listing. *See id.* at *29. What follows from that observation, according to the court, is that FWS lacked clear authority to revise the gray wolf listing. *See id.*

---

[7] We discuss below why the court's reliance on section 4(c)(2)(B) is misplaced, as FWS was not acting under the authority of that section in promulgating the Final Rule.

4

However, FWS was not, in fact, "delisting" the Western Great Lakes DPS of gray wolves in the literal sense of the term suggested by the court.[8]

Instead, in promulgating the Final Rule, FWS acted under the authority granted it in sections 4(a)(1) and 4(c)(1). Section 4(c)(1) states that FWS "shall from time to time revise [its existing lists] to reflect recent determinations, designations, and revisions made in accordance" with the provisions of the Act. 16 U.S.C. § 1533(c)(1). The "determinations" referred to are the determinations made under section 4(a)(1) as to whether a species is endangered or threatened. In this case, having made a determination under section 4(a)(1) that the gray wolves in the western region of the Great Lakes were a DPS and that they were not endangered or threatened, FWS clearly had the authority and the obligation to revise its existing listing of the gray wolf "to reflect [that] recent determination[]." *Id.* It certainly was not free to withhold its determination from the public. Having made the determination, FWS was required to publish it. The plain language of section 4(c)(1) compels that interpretation. In contrast, the argument of plaintiffs in *Humane Society* has the effect of reading section 4(c)(1) as follows: FWS shall from time to time revise its list to reflect recent determinations, *unless* the determination is that a group of organisms that is part of a listed species is a DPS and is not endangered or threatened. But, as noted above, the Act contains no special set of rules for making DPS determinations or for revising the list to reflect those determinations.

The court also found that the Act "resists FWS' interpretation in other ways as well." *Humane Society*, 2008 U.S. Dist. LEXIS 74495, at *30. It noted that "Congress' definition of 'species' does not encompass DPSs of all organisms; rather, it includes only DPSs of 'vertebrate fish or wildlife.'" *Id.* The court then asserted that from this "definitional choice," it was not "implausible" to conclude that "Congress [had] expressed an intent—or at least revealed an assumption—that the DPS tool would be used only to *list* [DPSs] in the first instance," and that, unless a DPS was first listed, it could not be delisted or removed from the listing of the broader species of which it was a part. *Id.* at *31. We discuss below why, even if this were a plausible interpretation of the uses to which FWS can apply the DPS tool, it is not the only reasonable interpretation of Congress's intent, and is therefore not an interpretation that FWS must adopt.

III.   THE FWS'S INTERPRETATION OF ITS LIST REVISION AUTHORITY UNDER
       SECTIONS 4(A)(1) AND 4(C)(1) IS REASONABLE

Even assuming that the plain language of sections 4(a)(1) and 4(c)(1) does not expressly authorize FWS to revise the gray wolf species listing, FWS's interpretation of those sections is

---

[8] The term "delist" is not defined, or even used, in the ESA. The implementing regulations do use the term extensively. *See, e.g.,* 50 C.F.R. § 424.11(d). Although the term could be interpreted merely as an action which deletes an entry from the lists of threatened and endangered species, and thus apply only if the entirety of a listed entity is removed, FWS does not use the term only in that sense. As used by FWS, "delisting" applies broadly to *any* action that revises the lists either to remove an already-listed entity from the appropriate list in its entirety, *or* to reduce the geographic or taxonomic scope of a listing to exclude a group of organisms previously included as part of an already-listed entity (as was the case with the Western Great Lakes DPS of gray wolves). The same reasoning applies to revisions to the lists that "uplist" and "downlist" species. For example, FWS may uplist to endangered status the entirety of a species already listed as threatened, or it may identify a part of that species (a subspecies or DPS) that now meets the definition of "endangered species" and uplist just that part of the species.

000495A

still entitled to judicial deference if it is a permissible construction of the statute. *See Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 843–45 (1984) (*Chevron*). *Chevron* requires a court to accept an agency's reasonable construction of a statute, "even if the agency's reading differs from what the court believes is the best statutory interpretation." *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005).

Because the court concluded that the Act did not plainly grant FWS the authority to revise the gray wolf species listing, the court asked FWS to address how its interpretation: (1) conforms to the text, structure, and legislative history of the ESA; (2) is consistent with judicial interpretations; (3) serves the ESA's myriad policy objectives; and (4) could undermine any of those policy objectives. *Humane Society*, 2008 U.S. Dist. LEXIS 74495, at *40–41. We will specifically address the court's first, third, and fourth questions and discuss relevant judicial interpretations where appropriate.

A.   The Text and Structure of the Act Support FWS's Interpretation of Its List Revision Authority

The text and structure of the Act support FWS's ability to revise a species listing to reflect the fact that a DPS of that species is no longer endangered or threatened. Neither of the two provisions cited by the court in *Humane Society*, nor any other of the Act's provisions, renders FWS's interpretation unreasonable.

1.   Section 4(c)(2) Does Not Render FWS's Interpretation Unreasonable

As explained above, a plain reading of the Act as a whole demonstrates that section 4(c)(2) does not limit FWS's discretion to revise the lists of endangered and threatened species at any time to reflect determinations made under section 4(a)(1). Instead, reading section 4(c)(2) in the context of the Act as a whole supports FWS's interpretation in several ways.

First, FWS's discretion to change the endangered or threatened status of a species is not limited in context to the five-year reviews contemplated by section 4(c)(2). The purpose of section 4(c)(2) is to require the review of all listed species at least once every five years to determine if a change in status is necessary for each reviewed species. It would be illogical to interpret this requirement to preclude FWS from changing the status of a species at any other time, particularly given section 4(c)(1), which authorizes FWS to revise the lists of endangered and threatened species to reflect recent determinations made under section 4(a)(1). Therefore, the ESA clearly authorizes conservation status changes in cases where section 4(c)(2) is never triggered.[9]

---

[9] Even if one were to assume that section 4(c)(2) somehow prevents simultaneous identification and removal of recovered DPSs from broader species listings, FWS could achieve the same result by proposing to delist the entire species if it is no longer endangered or threatened over its entire range and simultaneously proposing to list any DPS or significant portion of its range where that species still remains endangered or threatened. Section 4(a)(1) of the Act, even under the court's interpretation, would allow FWS to delist the entity listed: the gray wolf species. Section 4(a)(1) and the definitions of "endangered species" and "threatened species" would require FWS to ascertain during such a delisting whether any significant portion of the gray wolf's range remained endangered or threatened and to keep such portions listed if so. FWS would also have the discretion under section 4(a)(1), the section 3(16) definition of "species," and the DPS Policy to identify and propose the listing of any DPS within that range that remained endangered or threatened.

000496A

Second, reading section 4(c)(2) to require the separate listing of a DPS for some unspecified period of time before it can be removed from the broader species listing upon recovery leads to absurd results in the case of a recovered DPS of a currently-listed species (*i.e.*, how can FWS continue to list a "species" that no longer meets the criteria for listing?). This untenable situation violates the canon of statutory construction against construing a statute to produce absurd or futile results, *see Nixon v. Missouri Municipal League*, 541 U.S. 125, 138 (2004). Further, reading section 4(c)(2) to require separately listing a DPS for some period of time before removal from the broader species listing could frustrate the petition management requirements of the ESA, *see* 15 U.S.C. § 1533(b)(3), by requiring FWS to reject any petition requesting removal of a recovered DPS from a broader species listing.

Finally, even if one could read section 4(c)(2) as somehow requiring FWS to initially list a DPS before later removing it when recovered, FWS impliedly lists any DPSs that are part of a larger species or subspecies listing. In practice, FWS lists the largest entity for which the conservation status is the same across its range and does not separately list any included DPSs that have the same status. If FWS lists an entire species, or a significant portion thereof, as endangered, it may be effectively listing several smaller and otherwise separately-listable entities within the range of that species (subspecies, DPSs, or significant portions of its range).[10] Therefore, when identifying and removing a DPS from a broader species listing, FWS is not identifying and delisting a new DPS, it is separately recognizing an already-listed entity for the first time because it now has a different conservation status than the whole.

The D.C. district court in *Humane Society*, however, reasoned that section 4(a)(1) may still require individual analysis of the threat factors for each DPS or significant portion of its range even if the species has the same status throughout its range. *See Humane Society*, 2008 U.S. Dist. LEXIS 74495, at *29, n.10. Despite this statement, the court also noted that the implied inclusion of any valid DPSs within the range of a species listed at the taxonomic level "may be a permissible reading of the statute." *Id.* As to the latter statement, the court is correct. The ESA does not require FWS to separately list populations when listing larger taxonomic entities that have the same conservation status merely to preserve the ability to separately remove them at a later date.

Preventing the removal of healthy DPSs could also prompt FWS to slow down the listing process for those species FWS has discretion to review under section 4(a)(1). If one reads the Act to require that FWS identify and list DPSs as separate "species" in the first instance, FWS may consume valuable time analyzing individual DPSs of a species that may be critically imperiled range-wide for fear that it could not later remove DPSs of that species should they recover sooner than the whole. One could also consider listing DPSs of a species with the same conservation status redundant, which would violate the canon of statutory construction to read

---

[10] This view is supported by FWS's regulations:

> The listing of a particular taxon includes all lower taxonomic units. For example, the genus *Hylobates* (gibbons) is listed as Endangered throughout its entire range (China, India, and SE Asia); consequently, all species, subspecies, *and populations* of that genus are considered listed as Endangered for the purposes of the Act.

50 C.F.R § 17.11(g) (second emphasis added).

000497A

statutes to avoid redundancy. *See Gustafson v. Alloyd Co.*, 513 U.S. 561, 574 (1995). Finally, the congressional committee recommendation suggesting that FWS use DPSs "sparingly" counsels against a practice of separately listing DPSs of a larger taxon if they all have the same conservation status. *Cf. Friends of the Wild Swan v. U.S. Fish & Wildlife Serv.*, 12 F. Supp. 2d 1121, 1134 (D. Or. 1997) (holding that FWS must first look to the species' entire range to determine whether or not the species is endangered or threatened before examining individual DPSs).

2.  The Limitation of the DPS Language to Vertebrates Does Not Compel a Conclusion that Congress Intended FWS to Apply the DPS Language Only to List Species in the First Instance

The limitation of the DPS language to vertebrate species does not undermine FWS's reasonable interpretation of the Act to authorize the removal of healthy DPSs from broader species listings.

The court in *Humane Society* referenced plaintiffs' argument that the limitation of the DPS tool to species that it deemed most valuable somehow evinced a congressional intent that the DPS language should only be used to list species in the first instance. *Humane Society*, 2008 U.S. Dist. LEXIS 74495, at *31. But, as explained above, that argument is illogical and finds no support in the legislative history of the Act.[11] While Congress's limitation of the DPS language to vertebrates may express a preference for protecting vertebrate species on a finer scale, allowing FWS to identify and remove a recovered DPS from a broader species listing would not undercut that intent.

The court also correctly noted that Congress may have excluded plant and invertebrate DPSs from the definition of species for other reasons (*e.g.*, identifying and managing distinct insect and plant populations may be "unwieldy" or perhaps Congress considered populations of non-vertebrates to be less important or significant). *Id.* at *31. Moreover, the reasons for including the DPS language are unclear from the legislative history of the 1978 amendments, especially when one considers that Congress left in place FWS's ability to specify as threatened or endangered a "significant portion" of the range of any "species" (*i.e.*, why limit FWS's ability to list populations of a species or subspecies when FWS retains the ability to list portions of the range of the same species or subspecies?). *See generally* Solicitor's Opinion, M-37013 (March 16, 2007), *available at* http://www.doi.gov/solicitor/ opinions.html. Therefore, any hypothesis of congressional intent—beyond the fact that Congress wanted to narrow the circumstances in which FWS could list a population of a species—is purely speculative. Plaintiffs' argument does not, therefore, preclude FWS's interpretation.

Moreover, FWS's interpretation is consistent with FWS's Policy Regarding the Recognition of Distinct Vertebrate Population Segments Under the Endangered Species Act (DPS Policy or Policy). 61 Fed. Reg. 4722 (Feb. 7, 1996). The DPS Policy specifically contemplates the removal of healthy DPSs from the lists of endangered and threatened species.

---

[11] Section II explains why the plaintiffs' argument is illogical and section III.B.1 explains the legislative history referencing the DPS language.

000498A

The DPS Policy sets forth a two-step process: first, the Policy requires FWS to determine that a vertebrate population is discrete and significant; and second, if it passes these tests, the Policy requires a conservation-status determination to determine if it is endangered or threatened. *Id.* The conservation-status evaluation expressly allows FWS to "assign different classifications to different DPSs of the same vertebrate taxon." *Id.* at 4725. Therefore, because the status determination is part of the DPS identification and list revision process, the removal of a recovered DPS from a broader vertebrate taxon listing is perfectly consistent with the Policy. FWS subjected the DPS Policy to public review and federal courts have upheld the policy as a reasonable interpretation of ambiguous ESA language. *See, e.g., Northwest Ecosystem Alliance v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136 (9th Cir. 2007) (western gray squirrel).[12]

The Oregon district court also agreed that the DPS Policy allows conservation status changes for DPSs of broader-listed species and recited the following as examples: "if a distinct and significant population of an unlisted species is struggling while other populations are faring well, FWS may identify the struggling population as a DPS and list it as endangered. Likewise, FWS can downlist a DPS if that discrete and significant population is no longer endangered." *Defenders of Wildlife v. Sec'y, U.S. Dept. of the Interior*, 354 F. Supp. 2d 1156, 1169 (D. Or. 2005) (reviewing the downlisting of an Eastern DPS and a Western DPS of the gray wolf).[13] Though the court did not expressly conclude that FWS may remove a recovered DPS of an already-listed species under the Act or the DPS Policy, the court's conclusion that it may downlist such a DPS is in tension with the court's holding in *Humane Society*.[14]

### 3. The ESA's Other Relevant Provisions Do Not Undermine FWS's Interpretation

Several other ESA provisions specifically or impliedly reference removal of healthy species from ESA protection including the following provisions: recovery planning in section 4(f); post-delisting monitoring in section 4(g); federal-State cooperation in conserving species under section 6; and designation of experimental populations in section 10(j). FWS's interpretation is consistent with these provisions.

---

[12] FWS's interpretation does not reflect a change in position with respect to how FWS assesses the status of DPSs because it is in harmony with the requirements of the DPS Policy. Further, FWS also used its authority to remove the recovered Northern Rocky Mountain DPS from the gray wolf species listing, 73 Fed. Reg. 10,514 (Feb. 27, 2008), and the Greater Yellowstone Area DPS from the grizzly bear species listing, 72 Fed. Reg. 14,866 (Mar. 29, 2007).

[13] The court ultimately found that FWS's determination to downlist the Rocky Mountain DPS of the gray wolf improperly applied the DPS Policy and the ESA because the DPS designation incorporated geographic areas in which the wolf had not sufficiently recovered to justify the downlisting. *Defenders of Wildlife v. Sec'y, U.S. Dept. of the Interior*, 354 F. Supp. 2d at 1172-73.

[14] One other court has reviewed a similar removal of a DPS from a broader species listing and did not find it necessary to address the reasonableness of FWS's interpretation. *See Defenders of Wildlife v. Hall*, 565 F. Supp. 2d 1160 (D. Mont. 2008). FWS identified and removed the Northern Rocky Mountain DPS of the gray wolf from the broader gray wolf listing. *See* 72 Fed. Reg. 6106 (Feb. 8, 2007). The court appeared to read the ESA to authorize the removal, but enjoined the final rule because FWS had removed the DPS before an important goal of the recovery plan had been achieved and because the State of Wyoming's management plan was insufficient to justify removing ESA protections for wolves within that State. *Defenders of Wildlife v. Hall*, 565 F. Supp. 2d at 1168, 1172.

9

### a. Recovery Plan Requirements

Section 4(f) sets forth the requirements for recovery plans of listed species and requires the inclusion in each plan of "site-specific management actions as may be necessary to achieve the plan's goal for the conservation and survival of the species" and "objective, measurable criteria which, when met, would result in a determination ... that the species be removed from the list." 16 U.S.C. § 1533(f)(1)(B). These requirements emphasize the importance of local, site-specific recovery actions.

In practice, FWS often divides recovery plan conservation efforts for wide-ranging species such as the wolf into recovery units. These recovery units often correlate to major populations of the species, which may also qualify as DPSs. If the recovery of the species proceeds more rapidly in one particular unit due to more effective conservation efforts, or other reasons, FWS's interpretation allows it to identify that population and assess whether it qualifies as a DPS and, if so, remove it from the broader species listing if it is no longer endangered or threatened. For example, FWS removed the Greater Yellowstone Area population of the grizzly bear, which FWS covered in a separate section of the recovery plan for the entire listed species. *See* 72 Fed. Reg. 14,866 (Mar. 29, 2007). As with the Western Great Lakes DPS of the gray wolf, FWS worked with affected States, other federal agencies, and environmental and other non-governmental organizations for more than 10 years to develop the conditions and protections necessary to recover and remove that grizzly bear population from the grizzly bear species listing. *See id.*

Moreover, section 4(f) strongly suggests that FWS should remove the Act's protections from a DPS or subspecies when objective, measurable criteria set forth in a recovery plan are met and after an analysis of the section 4(a)(1) listing criteria. FWS's interpretation allows it to remove healthy DPSs from within the range of a listed species while focusing its time and limited recovery funding on recovery efforts and recovery plan goals in other areas of the species' range where conservation efforts have been inadequate or less effective.

### b. Post-Delisting Monitoring Plan Requirements[15]

Section 4(g) requires FWS to monitor for at least five years any species that has "been removed from either of the lists published under subsection (c)." 16 U.S.C. § 1533(g). At first blush, this requirement appears to reinforce an argument that section 4(c)(2) requires FWS to first separately list a DPS before it can later remove it when recovered. This is not, however, the proper reading of section 4(g). First, section 4(g) cross-references section 4(c) in its entirety, not section 4(c)(2) alone. Thus, any revision to the lists pursuant to FWS's authority under section 4(c)(1) to reflect a determination under section 4(a)(1) to remove a species would trigger the monitoring requirement under section 4(g). Second, "removed" need not and should not be

---

[15] FWS uses the term "post-*delisting* monitoring" when referring to the monitoring requirements of section 4(g), when section 4(g) in fact applies in a broader sense to all actions that remove any entity that qualifies as a species from the lists, including removal of a recovered DPS from a broader species listing. *See, e.g.,* 68 Fed. Reg. 67,697 (Dec. 3, 2003) ("Notice of Availability of the Post-Delisting Monitoring Plan for the American Peregrine Falcon"). FWS uses the term "delisting" as a term of art representing the broad spectrum of activities that fall under the umbrella of removing species from the list of endangered and threatened species as explained in note 8.

000500A

interpreted so narrowly as to support the argument that a species be separately listed prior to its removal from the lists. Such a narrow reading is not consistent with the fact that, when listing broad taxa such as the gray wolf, the species listing necessarily includes populations that are not separately identified until there is a need to change their status. When removing a recovered DPS, FWS alters the listing for the wider-ranging species to reflect that its range no longer includes the DPS that is being removed from the list. Therefore, FWS effectively removes the DPS from the overall species listing, which triggers section 4(g)'s requirement to monitor the DPS in cooperation with the States to ensure that it remains recovered.

      c.   Federal-State Cooperation under Sections 4 and 6

Section 6 sets forth several provisions whereby the federal government and States cooperate to protect and conserve listed species. *Id.* § 1535. Section 6(a) requires that FWS "cooperate to the maximum extent practicable with the States" in carrying out the Act's programs. Sections 6(b) and 6(c) establish the requirements for management and cooperative agreements designed to conserve (*i.e.,* recover) listed species and encourage cooperation in recovering species between State and federal agencies through such agreements and through the flexibility incorporated into the process for revising the list of endangered and threatened species. FWS's interpretation provides a crucial tool in fostering the cooperation between federal and State governments anticipated by the provisions of section 6. Revising an endangered or threatened species listing by downlisting or removing DPSs occurring in States that have worked with the government to successfully conserve them rewards those States by returning management authority over that species and improving federal-State cooperation in managing vulnerable species. Thus, section 6 provides additional evidence that FWS's interpretation is reasonable.

Further, State cooperation plays a large role in addressing the section 4(a)(1)(D) threat factor pertaining to the adequacy of existing regulatory mechanisms. *Id.* § 1533(a)(1)(D). Even if FWS finds that all other threat factors have been mitigated to the point where a species has recovered, in most situations, State cooperation is essential to ensure that existing regulatory mechanisms adequately assure the species' current and continued recovery, which is required before FWS may remove that species from the lists. In this way, section 4(a)(1)(D) encourages States to cooperate with FWS by revising their legal mechanisms to aid both in the conservation of listed species and their continued recovery after removal of the ESA's protections. Therefore, this provision encourages federal-State cooperation, is consistent with section 6, and reinforces FWS's interpretation in the same manner.

      d.   Experimental Populations Provisions

State cooperation is also crucial for the introduction of experimental populations under section 10(j). *Id.* § 1539(j). FWS may release experimental populations outside the current range of the species to improve that species' recovery potential. It is critical that FWS be able to downlist or remove a recovered experimental population to encourage State participation in reintroduction programs. If FWS cannot thereafter remove that population from the broader species listing and if it later becomes a DPS or part of a DPS that is no longer essential to species recovery, the States' incentive to work with FWS to introduce such populations is much reduced.

000501A

In conclusion, FWS's interpretation that the ESA authorizes the removal of recovered DPSs from broader-listed species is a reasonable interpretation of the Act's provisions and no specific provision renders that interpretation unreasonable or arbitrary or capricious under the Administrative Procedure Act. *See* 5 U.S.C. § 706.

B.      The Legislative History Demonstrates that FWS's Interpretation is Consistent with the Goals and Policies of the Act

There is little in the legislative history of the Act that directly and contemporaneously explains or discusses the addition of the DPS language through the 1978 ESA amendments. However, a congressional committee belatedly discussed the import and function of the DPS language in 1979. Further, the 1973 legislative history is informative regarding the context of the ESA's extension of protection to populations of species within the overarching policies and purposes of the Act, particularly in relation to delegating sufficient listing flexibility to FWS and federal-State cooperation.

1.   1978 and 1979

Congress added the DPS language as part of the 1978 Amendments to the Act. The new DPS language amended the previous definition of "species," which had included the phrase "any other group of fish or wildlife of the same species or smaller taxa in common spatial arrangement that interbreed when mature" (proto-DPS language). Pub. L. No. 93-205 § 3, 87 Stat. 885 (1973).

Congress amended the 1973 definition to expressly exclude from the "species" definition both (1) taxonomic categories below the subspecies level and (2) distinct populations of non-vertebrates. H.R. CONF. REP. NO. 95-1804, at 17 (1978).[16] At the same time, Congress rejected an amendment that proposed limiting the 1973 "species" definition to taxonomic species, which would have eliminated subspecies and populations. 124 CONG. REC. 38,155 (Oct. 14, 1978). This amendment would have removed FWS's flexibility to individually list as a "species" any subspecies or population that has a different conservation status than the taxonomic species to which it belongs. In opposing the amendment, Representative Dingell noted that it would require the listing of the bald eagle in Alaska, even though the Secretary[17] had determined that the eagle was not endangered or threatened there, and surmised that the alligator would also have

---

[16] There is no express basis in the legislative history for the plaintiffs' proposal quoted by the court in *Humane Society* that Congress included the DPS language primarily to increase vertebrate species protection. 2008 U.S. Dist. LEXIS 74495 at *31. Plaintiffs cite to no legislative history as the basis for their position. Instead, they cite to a law review article, which does not even support plaintiffs' main proposal; rather it claimed that Congress added the DPS language in response to the controversy surrounding the protection of non-charismatic populations of species and the potential cost and impracticality of protecting insect populations. *See* Katherine Hausrath, *The Designation of "Distinct Populations Segments" under the Endangered Species Act in Light of Nat'l Ass'n of Homebuilders v. Norton*, 80 CHI-KENT L. REV. 449, 455–6 (2005). Instead, this statement suggests that Congress was more interested in decreasing ESA protection of non-vertebrates than vice versa. In any case, the law review article does not cite to any legislative history for these propositions either. The article merely cites to a 2004 email between two college professors and is therefore of little weight. *Id.* at notes 58–59.

[17] The ESA's legislative history generally refers to the authority of the Secretary to implement the Act's provisions, which the Secretary has since delegated to FWS as explained in note 2.

000502A

to be listed throughout its range, thereby preempting State management of hunting over the part of its range where it was not then listed. *Id.* The 1978 legislative history provides no further window into the congressional thought process behind amending the "species" definition to include the DPS language.

Congress also considered amending the definition of "species" in 1979, but chose not to do so. In response to a General Accounting Office Report advocating the removal of the new DPS language from the Act in favor of relying on the significant portion of its range language contained within the definitions of "endangered species" and "threatened species" for partial species listings, Congress chose to leave the DPS language in place. A Senate Report stated that "there may be instances in which FWS should provide for different levels of protection for populations of the same species," but also cautioned FWS "to use the ability to list populations sparingly and only when the biological evidence indicates that such action is warranted." S. REP. NO. 96-151 (May 15, 1979).

The history behind the incorporation of the DPS language into the Act weighs neither for nor against FWS's specific interpretation that the Act permits the removal of recovered DPSs from broader species listings. However, though the 1979 Senate Report is of limited use because it is not contemporaneous with the addition of the DPS language, it reflects Congress's intent that the ESA should continue to authorize the separate treatment of populations or portions of a species' range that differ in conservation status with the larger taxonomic unit to which they belong. Conversely, this history nowhere demonstrates that Congress intended to restrict FWS from revising the endangered and threatened species lists to remove recovered DPSs.

### 2. 1973

The 1973 Act's definition of "species" did not refer to "distinct population segments," but did permit listing groups of organisms below the taxonomic level of subspecies. Hence, the legislative history of the 1973 Act provides important context for the congressional intent behind protecting such subgroups under the Act.

Congress discussed two important policy objectives that shed light on the inclusion of groups of organisms below the subspecies taxonomic level for protection under the Act at some length in the 1973 legislative history. First, Congress wanted to give FWS sufficient flexibility in listing species to meet the varying policy goals of the Act, particularly protection and recovery. Second, Congress was clearly concerned with the level of federal preemption of the traditional State role of wildlife management required by the Act and intended that management responsibility should be returned to the States upon recovery of a listed species.

#### a. Listing Flexibility

Several excerpts from the 1973 legislative history demonstrate Congress's intent to delegate maximum listing flexibility to FWS both to improve species conservation and survival and to prevent unnecessary regulatory intrusion.

First, Congress intended that FWS should have sufficient discretion in "listing and delisting" species to provide "present protection to those species which are either in present danger of extinction or likely within the foreseeable future to become so endangered." S. REP. NO. 93-307,

13

at 3 (1973). This statement indicates Congress's concern that the endangered species legislation in effect at the time required listing species at the taxonomic level throughout their range with no flexibility to exclude local areas or populations where the species may be doing well. As an example, Senator Tunney stated that:

> Under existing law, a species must be declared 'endangered' even if in a certain portion of its range, the species has experienced a population boom, or is otherwise threatening to destroy the life support capacity of its habitat. Such a broad listing prevents local authorities from taking steps to insure healthy population levels.

119 CONG. REC. 25,669 (July 24, 1973) (statement of Senator Tunney).

To rectify this perceived shortcoming, Congress included provisions in the ESA, including the proto-DPS language, designed to require federal protection in areas where species are actually in danger of extinction while avoiding federal preemption of successful local conservation efforts.

The floor debate and hearings for the various endangered species bills presented in 1973 contain numerous examples demonstrating Congress's concern that species should only be protected where necessary, whether by authorizing FWS to list vertebrate populations of species or subspecies or to list significant portions of a species' range. *See, e.g.*, 119 CONG. REC. 25,669 (July 24, 1973) (statement of Senator Tunney explaining that under the ESA, the Secretary would have the discretion to list a species as threatened or remove it from the list in States where it is overpopulated while protecting it in States where it is threatened with extinction); 119 CONG. REC. 42,912 (Dec. 20, 1973) (colloquy between Representatives Bergland and Dingell explaining that wolves may be listed in all States except Minnesota).

The 1973 legislative history reflects Congress's concern that the ESA should grant FWS sufficient flexibility to list species only where they need the Act's protections. FWS's authority to remove recovered DPSs from broader species listings is not only consistent with this legislative intent, it realizes that intent by providing an important and necessary tool to ensure that the restrictions of the Act are not applied in areas where a species is not endangered or threatened.

      b.   Federal-State Cooperation

Congress included section 6 of the Act authorizing federal funding and cooperation between federal and State governments through several federal-State programs to assuage concerns over the federal preemption of State wildlife management authority (take prohibitions in previous endangered species statutes had been limited to National Wildlife Refuges and trade through the Lacey Act).

Congress declared that a major purpose of the Act was to promote cooperative management between the federal government and the States. *See* S. REP. NO. 93-307, at 1 (1973). This priority was also reflected in statements by Senator Tunney—section 6 is "perhaps the most important section" of the ESA, 119 CONG. REC. 25,668 (July 24, 1973, statement of Senator Tunney)—and Senator Stevens—section 6 is the ESA's "major backbone," 119 CONG. REC. 25,670 (July 24, 1973, statement of Senator Stevens).

14

000504A

A Senate report succinctly summarized the federal-State relationship Congress intended to create in the statute stating that:

> While the Federal Government should protect such species where States have failed to meet minimum Federal standards, it should not pre-empt efficient programs. Instead, it should encourage these [State programs], and aid in the extension or establishment of others, to facilitate management by granting regulatory authority and making available financial assistance to approved schemes. The reported bill is designed to meet these requirements.

S. REP. NO. 93-307, at 3 (1973).

The Conference Report for the 1973 Act reflected the same priorities:

> It should be noted that the successful development of an endangered species program will ultimately depend on a good working arrangement between the federal agencies, which have broad policy perspective and authority, and the state agencies, which have the physical facilities and the personnel to see that state and federal endangered species policies are properly executed.

H.R. CONF. REP. NO. 93-740, at 26 (1973).

More specifically, the following passage from a House committee hearing reflects a concern that a federal statute should not unnecessarily preempt effective State management programs demonstrated to protect species, particularly when those State programs are sufficient to fully recover species:

> Mr. Casey: … Mr. Chairman, this record will stand close examination, and we just do not concur with the timber wolf being placed on the endangered species list. It is not endangered in Minnesota.
> Mr. Breaux: That is a good point, and I sympathize with you and point out that there is another provision of the bill which would allow the Secretary to designate the portion of the habitat or range of an endangered species.
> In other words, he might be able, under the law as I read it, to designate one State in which the timber wolf is indeed endangered, and maybe because of good sound management practices in your State he would designate it as not an endangered species as far as your State is concerned.
>
> * * *
>
> Mr. Breaux: And the problem that bothers me, and I agree that the States should have the primary and first responsibility in determining the management procedure for management of a species that is located within the State's boundaries, but what do we do from a national level with the States that do not have a good management practice.
> What do we do with States that have a bounty on the animal that is on the endangered species list? The States with good management practices are having to pay the penalty for the States that are not up to par.

15

*Endangered Species: Hearings on H.R. 37 Before the Subcomm. on Fisheries and Wildlife Conservation and the Env't of the H. Comm. on Merch. Marine and Fisheries*, 93d Cong. 327 (1973) (statements of Mike Casey, Director, Minnesota Department of Natural Resources and Representative John Breaux).

Congress also emphasized the role of listing flexibility in rewarding good State management. For example, a Senate report declared that "while the Federal Government should protect such species where States have failed to meet minimum Federal standards, it should not pre-empt efficient programs." S. REP. NO. 93-307, at 3 (1973).

In light of this legislative history, it would be counter-intuitive to conclude that Congress intended to prevent FWS from removing ESA protections for a recovered DPS of a broader-listed species within a State that actively cooperated with FWS to successfully recover that population of the species. *See Elliot Coal Mining Co. v. Director, Office of Workers' Compensation Programs*, 17 F.3d 616, 631 (3d Cir. 1994) (discussing the "mischief rule," which directs courts to look to the mischief the statute was intended to cure when interpreting statutory language).

In 1973, the Act's legislative history makes plain that one of Congress's primary concerns was federal preemption of State management authority. To assuage this concern, Congress intended that the ESA would only preempt State management when absolutely necessary and would return species management to the States upon recovery. FWS's interpretation reflects this intent and implements the flexibility Congress incorporated into the Act through the DPS language by returning management of listed species to States in which successfully recovered populations occur. Thus, FWS's interpretation is consistent with the ESA's legislative history.

C.     FWS's Interpretation is Consistent with the Policy Objectives of the ESA

Section 2 of the ESA sets forth the ESA's broad policy objectives. 16 U.S.C. § 1531. The primary objective is to protect and conserve (*i.e.*, recover) endangered and threatened species. *See id.* § 1531(c)(1); H.R. REP. NO. 93-740, at 23 (1973). Perhaps the most important secondary objective is federal-State cooperation in conserving listed species. *See* 16 U.S.C. § 1531(a)(5), (c)(2). Other policy objectives set forth in section 2 are the duty to take steps necessary to achieve the purposes of international treaties and conventions for wildlife protection, to provide federal financial assistance for meeting international commitments for wildlife protection and for State conservation programs, and to conserve the ecosystems upon which endangered and threatened species depend for survival. *See* 16 U.S.C. § 1531(a)(4)–(5), (b). The policy objective to maintain close cooperation between federal and State governments in particular bolsters FWS's interpretation allowing removal of recovered DPSs of currently-listed species.

1.   Removing Federal Protection of Healthy DPSs from within Wider Species Listings is Consistent with the Statute's Policy Goal of Achieving Recovery through Close Cooperation Between State and Federal Agencies

In addition to section 6, multiple references in section 2 of the Act encourage State cooperation with the federal government in conserving listed species. Removing ESA protection for

000506A

recovered DPSs of listed species reinforces the strong public policy goal of federal-State cooperation in three ways.

First, removing recovered DPSs from broader species listings rewards States that actively cooperate with the federal government to protect and conserve listed species by turning management responsibility for that species over to the States in which the DPS occurs. State agencies can manage recovered populations more locally and effectively with laws and programs tailored to local circumstances. For example, State programs may provide incentives to landowners to avoid taking species and may pay farmers compensation for domestic animals taken by predatory species, such as the gray wolf.[18] State agencies can also provide more human resources in many cases for implementing management plans and enforcing species management regulations.

While the DPS Policy concludes that State boundaries are not in and of themselves appropriate for delineating the boundaries of DPSs, *see* 61 Fed. Reg. at 4723–24, individual State conservation efforts can contribute significantly towards recovering discrete and significant populations of species that occur wholly or partly within that State's borders.[19] Further, if the natural boundary between separate populations of a species should fall in the vicinity of a State boundary, there appears to be nothing in the Policy that would prevent FWS from using State boundaries to delineate that DPS for practical purposes.

Second, removing healthy DPSs of wider-ranging species avoids needless expenditure of federal resources in areas where the species is no longer endangered or threatened. The consultation requirements of section 7, the permit requirements of section 10, and the take prohibitions in section 9 all require significant expenditure of FWS resources and create potentially significant regulatory burdens on State, federal, and local agencies, Indian Tribes, and the regulated community. FWS needs to carefully ensure that the Act's requirements and prohibitions are not applied in areas where they are not necessary to protect endangered or threatened species. Returning management authority relieves State and local agencies, and private entities and individuals of those federal regulatory burdens. Moreover, a statute should be read to require federal preemption of State authority only when explicitly stated. *See Will v. Mich. Dept. of State Police*, 491 U.S. 58, 65 (1989). Therefore, FWS should preempt State management only when necessary and required and must return management authority of recovered species to the States when ESA protection is no longer necessary and the States have agreed to provide adequate protection to the recovered species.

---

[18] The amicus brief of the National Wildlife Federation in *Humane Society* describes such programs in more detail and also discusses the policy implications of returning recovered species management to States. *See* Brief for Amicus National Wildlife Federation at 12, 15–16, *Humane Soc'y of the United States v. Kempthorne*, No. 07-0677 (PLF), 2008 U.S. Dist. LEXIS 74495 (D.D.C. Sept. 29, 2008).

[19] FWS's ability to list a species in a significant portion of its range also provides flexibility in listing and delisting populations with ranges covering several States. As an example, in the proposed rule to delist the Northern Rocky Mountain DPS of gray wolves, FWS stated that it would, in the alternative, consider keeping the gray wolf listed in the Wyoming portion of its range if the State of Wyoming should fail to provide adequate regulatory mechanisms to ensure the population would remain recovered. 72 Fed. Reg. 6106, 6117 (Feb. 8, 2007).

17

000507A

Third, removing healthy DPSs of wider-ranging species improves FWS's implementation of the ESA by allowing it to direct funding to species that are still in danger of extinction and require continuing conservation efforts rather than to those species that are healthy. Preventing FWS from removing ESA protections for such DPSs would require FWS to allocate time and resources to those DPSs no longer needing the protections of the ESA to the detriment of other species that continue to require broad-reaching federal protections. Such a counterintuitive result should not be read into the Act.

    2.   Removing Healthy DPSs from Wider Species Listings is Consistent with the Act's Other Policy Goals

FWS's interpretation is also consistent with the statute's policy goals in section 2 of recognizing and implementing international agreements, protecting and conserving species, and protecting ecosystems.

Protecting, conserving, and restoring endangered and threatened species is the primary goal of the Endangered Species Act. *See* 16 U.S.C. § 1531(c)(1); H.R. CONF. REP. NO. 93-740, at 23 (1973). Identifying and removing healthy DPSs from broader species listings is an important tool in protecting and recovering all listed species. For species composed of several distinct population segments that recover at different rates, removing recovered populations that qualify as DPSs allows the non-recovered populations to remain on the list and also allows FWS to focus conservation efforts on those populations. Removing such populations also benefits other species on the lists by diverting resources from those recovered populations to species that still require the Act's protections to achieve recovery.

Removing recovered DPSs of currently-listed species also fulfills the Act's policy objective of fostering international cooperation in protecting endangered and threatened species. *See* 16 U.S.C. § 1531(a)(4)–(5), (b). Removing such DPSs may encourage other countries to cooperate and conserve listed species in much the same way as with the federal-State relationship. Authorizing the removal of a DPS that occurs wholly or partly within a country may encourage close cooperation with the United States and speedier recovery efforts to protect and conserve listed species, particularly for species that may be economically important to that country. Upon removal of ESA protections for the DPS, the country may resume international trade in that species, which may be particularly important for game species, without endangering the species elsewhere in its range. Removal of the recovered DPS may also improve recovery efforts for the species as a whole. For example, allowing trade from a recovered DPS that occurs in one country may relieve illegal hunting pressure in other countries where that species is still endangered or threatened.

FWS's interpretation is also consistent with the Act's stated purpose of conserving ecosystems upon which endangered and threatened species depend. *See* 16 U.S.C. § 1531(b). Removing healthy DPSs from broader-listed species may encourage State conservation efforts if those efforts result in returning species management to those States. Many State and federal conservation efforts designed to protect and conserve listed species are also likely to protect and improve the ecosystem upon which those species depend. Moreover, improvement of the ecosystem to which a species belongs will be critical to recovering that species in many cases. A

18

000508A

recovered DPS indicates that the ecosystem on which that species depends is likely healthy and sufficiently protected. Therefore, the same policy goals that support FWS's ability to identify and remove healthy DPSs from broader-listed species are also likely to protect and improve the ecosystems that the species depends upon.

IV.   CONCLUSION

After an extensive review, this Office has concluded that FWS has clear authority to determine, pursuant to section 4(a)(1), that gray wolves in the western Great Lakes area constituted a DPS and that the DPS was neither endangered nor threatened, and then to revise the list of endangered and threatened species, pursuant to section 4(c)(1), to reflect those determinations. Moreover, even if FWS's authority was not clear, FWS's interpretation of its authority to make determinations under section 4(a)(1) and to revise the endangered and threatened species list to reflect those determinations under section 4(c)(1) is reasonable and fully consistent with the ESA's text, structure, legislative history, relevant judicial interpretations, and policy objectives.

This opinion was prepared with the assistance of Larry Jensen, Deputy Solicitor, Barry Roth, Deputy Associate Solicitor for Parks and Wildlife, Michael Young, Assistant Solicitor for the Branch of Fish and Wildlife, Margot Zallen of the Rocky Mountain Regional Solicitor's Office, Benjamin Jesup and Philip Kline of the Branch of Fish and Wildlife, and Sharon Pudwill of the Twin Cities Field Solicitor's Office.

David Longly Bernhardt

000509A

# EXHIBIT H

**North American Wolf Recovery**
**Structured Decision Making Project**
Report[1]
Draft, November 20, 2009

Michael C. Runge[2], Jean Fitts Cochrane[3], Wendy M. Brown[4], Mary J. Parkin[5], Paul J. Barrett[6], Steven M. Chambers[4], Maricela A. Constantino[7], Jesse D'Elia[8], Susan Jacobsen[4], Michelle Shaughnessy[7], Seth L. Willey[9].

## 1. Executive Summary

Between 1974 and 1976, four subspecies of gray wolf (*Canis lupus*) were listed as endangered in the United States; in 1978 these were combined into a single listed entity in the lower 48 United States and Mexico. Reclassifications have occurred over time to create, downlist, and delist distinct population segments (DPS) in the Southwest, northern Rocky Mountains and western Great Lakes, and to designate and establish an experimental non-essential (EXPN) population in the Southwest. These reclassifications occurred in the absence of any comprehensive vision or plan for gray wolf recovery, and perhaps partly for that reason have resulted in several unanticipated problems: (1) attempts to delist the DPSs have been sidetracked by a barrage of court challenges; (2) partner commitments to wolf recovery in the Southwest have wavered because of a lack of clear, objective recovery criteria for that population; and (3) the creation of the DPSs and EXPN has resulted in the remainder of the listed range consisting of a mix of unoccupied but potential habitat, areas no longer containing potential habitat, and areas that were never wolf habitat but were listed in error. At their core, each of these problems is an ESA listing issue. Listing and reclassification are powerful tools for recovery when done correctly, but the problematic history of the gray wolf suggests the current listing for this species may be flawed. To evaluate that possibility, a team of Fish and Wildlife Service (Service) biologists, led by experts in structured decision making (SDM) from the United States Geological Survey (USGS), and administrators in affected Service regions (decision-makers), undertook a comprehensive evaluation of a suite of alternative gray wolf listing classifications, including the existing classification, using decision analytical techniques. The evaluation was conducted using a process of iterative prototyping, which consists of the development of increasingly detailed analyses of alternatives, with regular review and input from the decision-makers. This report describes the results of this effort after three rounds of iterative prototyping, and outlines the remaining actions necessary to develop a comprehensive national vision for wolf recovery.

---

[1] Suggested citation: Runge MC, Cochrane JF, Brown WM, Parkin MJ, Barrett PJ, Chambers SM, Constantino MA, D'Elia J, Jacobsen S, Shaughnessy M, Willey SL. 2009. North American wolf recovery structured decision making project, report. Department of Interior, US Fish and Wildlife Service, Division of Endangered Species, Arlington, Virginia, USA.
[2] USGS Patuxent Wildlife Research Center, Laurel, MD
[3] IAP World Services, Patuxent Wildlife Research Center, Grand Marais, MN
[4] USFWS Region 2, Albuquerque, NM
[5] USFWS Region 5, Hadley, MA
[6] USFWS Las Vegas Field Office, Las Vegas, NV
[7] USFWS Branch of Recovery and Delisting, Arlington, VA
[8] USFWS Region 1, Portland, OR
[9] USFWS Region 6, Denver, CO

North American Wolf Recovery SDM Project

The initial prototype was developed by the SDM team in June 2008 and presented to decision makers for full analysis in October 2008.  That round, while helpful, clearly highlighted the need for a more careful review and synthesis of available information on North American wolf systematics and taxonomy to inform additional prototypes.  Toward that end, a group of Service scientists with extensive experience in gray wolf biology and taxonomy undertook a comprehensive review of the literature on wolf biosystematics (Chambers et al. 2009).  That review was subjected to extensive external peer-review, and the report and peer-review comments were considered in a second round of iterative prototyping in July 2009.  The biosystematic review suggested that: (1) the eastern wolf is actually distinct from *C. lupus*, and more closely affiliated with the red wolf (*C. rufus*) at either the species (*C. lycaon* and *C. rufus*) or subspecies (*C. lycaon lycaon* and *C. lycaon rufus*) level; (2) the continued recognition of gray wolf subspecies *C. lupus nubilus*, *C. l. occidentalis*, and *C. l. baileyi* is supported by the available information*,* with *C. l. baileyi* the most strongly differentiated of this group; and (3) available data suggest the gray wolf that occupies coastal portions of the Pacific Northwest has differentiated to some degree and may be distinct  from *C. l. nubilus*, the taxon currently recognized in the area.

Through the prototyping effort, the SDM team identified a set of 9 biological, legal, and administrative objectives important to strive for in a suite of wolf listing decisions:  (1) maintaining a representative distribution of wolf taxa; (2) facilitating connectivity between wolf populations; (3) minimizing the regulatory burden on the public; (4) maximizing recovery efficiency; (5) maximizing policy compliance; (6) maximizing consistency with past rulemaking; (7) maximizing consistency with best available science; (8) maximizing compliance with past case law; and (9) maximizing clarity to the public.  Measurable attributes were developed for each objective.  The SDM team developed a number of alternative sets of wolf geographical units, based on 13 fundamental assumptions:  key among them were that the biosystematics review constitutes the best available information on which to base the analysis, and that the geographic units should account for all of North America, even those areas not considered appropriate for listing.  Objectives were weighted to reflect their relative importance, and the listing alternatives were scored against them in a consequences analysis.  Based on this analysis, the highest performing alternative for eastern North America identified three potential DPSs of the taxon *lycaon*, one in the western Great Lakes, one in Canada, and one in the Northeast United States, and one unit for *C. l. rufus*.  In western North America the highest performing alternative identified three potential DPSs of subspecies in the lower 48 (*baileyi* in the Southwest, *occidentalis* in the northern Rocky Mountains, and *nubilus* in the Pacific Northwest) and several potential DPSs in Mexico and Canada.  Subsequent to the consequences analysis, the SDM team allowed each Service region to put forth a preferred, potentially new alternative.  This exercise, and subsequent discussion, revealed five specific elements of current consensus regarding representative distribution of wolves in North America:  (1) the Southwest is a listable entity and a desired part of the distribution of wolves in North America, either as a DPS or as the subspecies *baileyi*; (2) we care about wolves in the northeast (meaning *lycaon* in the Western Great Lakes, New England, and eastern Canada) as a unique piece of evolutionary heritage that needs to be accounted for, even if we do not yet know how to do that; (3) there is at least one DPS in the northwest that is separate from the rest of the country and has a northern boundary with Canada; (4) coastal wolves in the Pacific Northwest need to be considered; and (5) red wolves (*rufus*)*,* whether a full species or a subspecies, should continue to be listed where found.

North American Wolf Recovery SDM Project

Several key elements remain to be resolved before we have accomplished the goal of a comprehensive national vision for wolf recovery. The Chambers et al. (2009) report would benefit from further peer review; local, finer scale attributes potentially important in "significant portion of the range analyses" need to be conducted; the regulatory complexities of any listing, reclassification, or delisting actions need to be contemplated; and questions of whether DPS or subspecies listing is the more appropriate approach need to be considered. We see three possible approaches to further development of a national strategy: (1) conduct a full formal nationwide structured analysis, with revised maps, objectives, elicitation, and analyses, taking into account the many insights that have arisen thus far; (2) conduct an informal process to find consensus, beginning with the elements of agreement from the July workshop, and using unstructured discussion among the planning team and regional staffs to resolve outstanding issues; or (3) take an in-between path that identifies the areas of consensus from the July workshop and focuses additional structured analysis only on specific, unresolved issues. The working group recommends the third, focused approach, which involves first addressing some issues with the assumptions behind the national strategy (including policy clarification), and if any choices still remain to be made between specific units in particular regions, measuring their performance against simple, clear objectives to develop a final preferred vision.

## 2. Introduction

### 2.1. Purpose of this project
The purpose of this effort is to evaluate the status of wolves in North America under the Endangered Species Act (ESA) on first principles, as prelude to a more holistic approach to wolf recovery planning in the conterminous United States, using formal decision analytical techniques to guide the evaluation.

Recent court opinions on the Service's delisting rules for the Great Lakes Distinct Population Segment (DPS) and the Northern Rocky Mountain DPS highlight the need for a new, more comprehensive vision in determining how best to recover wolves in the contiguous United States. This process is also motivated by the desire to expedite recovery planning for Mexican wolves.

### 2.2. Background
Between 1974 and 1976, the Service listed as endangered a series of gray wolf subspecies, including the Northern Rocky Mountain gray wolf (*C. l. irremotus*, 39 FR 1171), the eastern timber wolf (*C. l. lycaon*, 39 FR 1171), the Mexican wolf (*C. l. baileyi*, 41 FR 17740), and the Texas gray wolf (*C. l. monstrabilis*, 41 FR 24064). In 1978, in order to "most conveniently" handle the gray wolf listing, the Service revised the listing to be endangered in the lower 48 states and Mexico, except for Minnesota where it was listed as threatened. In 2003, the Service finalized rules to remove from the protections of the ESA the recovered population of wolves that reside in the northern Rocky Mountains and the western Great Lakes. These rules began a series of lawsuits that have overturned these actions and resulted in three subsequent attempts to delist both populations. Most recently, the Northern Rocky Mountain (NRM) DPS was designated and delisted in April 2009, except for the significant portion of the range in Wyoming that continues to receive the protections of the ESA. This final rule is currently pending the

000808A

North American Wolf Recovery SDM Project

outcome of a lawsuit. A Western Great Lakes (WGL) DPS was simultaneously designated and delisted in April 2009, but due to a lawsuit, this rule was voluntarily vacated by the Service in July 2009. Therefore wolves in this area continue to receive the protections of the ESA.

The remainder of the listed gray wolf entity (the "rest of the U.S.") poses significant challenges for recovery planning and implementation. The range of the listed entity includes occupied habitat as well as potentially suitable unoccupied habitat, broad areas of historic range no longer suitable for wolves, and areas in the southeastern U.S. that were listed in error, i.e., areas occupied historically by red wolves (*C. rufus*). In addition, wolves continue to disperse into suitable habitat within the listed entity's range (e.g., from Canada to north-central Washington, from Idaho to eastern Oregon and Washington, and from Canada to the northeastern U.S.).

Outside the WGL and NRM DPSs the Service has centered wolf recovery efforts on reintroduction of the Mexican gray wolf subspecies[10] (*C. l. baileyi*) in the Blue Range wolf recovery area in Arizona and New Mexico. The Service has made a considerable investment over the past 30 years in wolf conservation in the Southwest, and approximately 50 wolves now occupy portions of the designated experimental population area. Mexico is also pursuing reintroduction and recovery efforts. However, controversy continues to surround wolf recovery across its range, and recovery planning for the Southwest population has been put on hold pending clarification of the wolf's rangewide status within the context of a changing policy environment. Efforts are underway to amend the experimental population rule to address critical conservation needs for the Southwest population, although interested parties on both sides of the wolf recovery issue are frustrated by the Service's inability to articulate long-term recovery goals for this population. The lack of a current recovery plan for the Southwest is impeding the Service's ability to make appropriate management decisions and implement actions, and is negatively impacting its relationship with key partners.

Agency decision makers want to get a firmer grasp on the biological and policy uncertainties surrounding the status and recovery of currently listed wolves in order to (1) resolve outstanding listing issues in a timely and defensible manner, and, (2) if needed, proceed with wolf recovery planning based on an improved understanding of the wolf's conservation status in North America.

### 2.3. History of the structured decision making initiative
This project was initiated shortly after the Service finalized the 2008 delisting of the NRM DPS. At that time, because the WGL DPS had been delisted in 2007 the Mexican gray wolf experimental population in the Southwest was the single remaining extant population of gray wolves protected under the ESA. Large areas of the U.S. outside the extant population remained listed as well.

---

[10] Under the Endangered Species Act of 1973, four subspecies of gray wolf were listed as Endangered, including *C. l. baileyi*, but in the 1978 reclassification, the entire species south of Canada was listed as either Threatened or Endangered, removing subspecies from listing recognition. Recovery efforts in the Southwest, however, have continued to focus on the subspecies. One of the issues to be examined in this process is whether or not the Southwest population should be reclassified as a subspecies or DPS under the ESA. By describing the history of subspecies management in the Southwest, we do not mean to prejudge this issue.

North American Wolf Recovery SDM Project

In order to commence recovery planning for Mexican gray wolves the Service needed to consider all remaining portions of the lower 48-State listing (minus the 2 delisted DPSs).  We also recognized the possibility that the Service would lose existing NRM and WGL court cases challenging the DPS delistings.  No comprehensive recovery strategy for gray wolves has ever been attempted before.  The decision was made to tackle this problem using a structured approach in partnership with two decision analysis experts from the U. S. Geological Survey (USGS).  It was further decided that the project would not include any additional outside experts.

The Service convened a planning team in May 2008 to develop a decision framework for addressing this problem.  The structured approach we are taking involves reevaluating the status of wolves in North America under the ESA.  In other words, if the Service were starting out today to list wolves, how would we do it?  We are using an iterative prototyping approach which involves repeated development of increasingly detailed prototype analyses, with regular review and input from decision-makers.  The initial prototype was developed by a small team in October 2008, and is described in Runge et al. (2008).

The first wolf structured decision making (SDM) workshop was held October 15-17, 2008, and was attended by decision-makers (Assistant Regional Directors or their proxies) from Regions 1, 2, 3, 5, 6, and 9, as well as regional staff, Washington office staff, solicitors, and others.  The purpose was to review the initial prototype of the analysis, refine and complete it, and identify the next steps in development.  A detailed summary of this meeting is available (USFWS 2009).  A number of uncertainties were identified at this workshop and subgroups of the planning team were tasked with addressing these prior to development of the next prototype.

One primary uncertainty identified at the October 2008 workshop involved how the Service should decide whether a subspecies or DPS listing is more appropriate for an entity under consideration that meets the criteria for both.  The Southwest Region took the lead for addressing the question of DPS/subspecies decisions in a smaller structured decision analysis workshop, the results of which were used to inform future gray wolf SDM workshops.  This DPS/subspecies workshop was held February 18-19, 2009, in Denver, CO, to analyze the trade-offs in using subspecies or DPS designations in listing.  Primary insights included:  tradeoffs were closely tied to putative boundaries, which must be clearly defined prior to analysis; consequences were species- and situation-specific; and, all else equal, subspecies should be the preferred default.

The Southwest Region then convened experts on Mexican wolf biology and management in April 6-7, 2009, to apply the DPS/subspecies tradeoffs analysis to the Mexican wolf.  Subspecies outranked DPS in this preliminary exercise, and a DPS with Mexico slightly outranked a DPS without.  However, concerns with a subspecies listing remained partly unresolved, specifically related to issues of genetic mixing and clarity to the public in regard to the protective status of individuals.  Concern about the potential impact of including Mexico in recovery planning also remained.  Further analysis of these consequences was brought forward in the analysis considered in this report.

Uncertainties regarding the taxonomic status of *C. lycaon* and the validity of taxonomic classifications of various gray wolf subspecies and their application in listing were also identified at the October 2008 workshop.  Workshop decision-makers tasked a subgroup of participants led

North American Wolf Recovery SDM Project

by Dr. Steve Chambers to develop a position paper that synthesizes genetic and morphological data regarding gray wolves and red wolves (*C. rufus*), and presents recommendations on which taxa (species and subspecies) and taxonomic boundaries the Service should recognize. Decision-makers further specified that the paper should be peer reviewed and available in time to inform the next wolf SDM workshop. This synthesis has been completed, has undergone external peer review, and has been revised (Chambers et al 2009)[11].

The taxonomic synthesis identifies the eastern wolf (*C. lycaon*) as a separate species from the gray wolf (*C. lupus*). The range of *C. lycaon* encompasses the WGL population, southeastern Canada, and the northeastern U.S. The taxonomic synthesis suggests that the red wolf (*C. rufus*) is very closely related to *C. lycaon*, perhaps to the point of being a subspecies of this taxon. These two wolves are much more closely related to each other than they are to *C. lupus*. The taxonomic synthesis upheld 4 of 5 of the remaining subspecific designations proposed by Nowak (1995, 2003), identifying, namely, *C. lupus nubilus*, *C. l. occidentalis*, and *C. l. baileyi* as appropriate subspecies. The very limited genetic data on *C. l. arctos* does not support its recognition, but information from other genetic markers is needed. The taxonomic synthesis evaluates considerable new information that may be relevant in reevaluating the classification of wolves in North America. This revelation significantly increased the scope of the wolf SDM project, which was originally focused on *C. lupus*, but needs now to consider *C. lycaon* as well. The planning team (the authors of this final report) met May 5-7, 2009, in Denver, CO, and worked to further develop the prototype analysis, expanding the analysis to include all wolf species in North America, including red wolf.

A second workshop, the focus of this report, was convened in July 2009. All of the October 2008 workshop participants plus decision-makers from Regions 4 and 8 participated. The purpose of this workshop was to complete a third iteration of the analysis. This involved reviewing the current structured framework and analysis for the decision regarding the identification of geographic units, revising the framework, eliciting weights on the objectives, and completing the analysis. In addition, we undertook a preliminary status assessment of the identified geographic units, to plan how to proceed with further assessment and regulatory action.

This document represents the final report for the July 2009 wolf SDM workshop. Although the July 2009 workshop did not result in a consensus solution for wolf listing nationwide, many issues have been resolved and a constrained range of alternatives have been established. The expectation is that by addressing the remaining unresolved issues in a structured way, we will be able to complete this analysis and be prepared to make a final recommendation to the Director.

---

[11] Although this report has been treated as the best available information for the purposes of this project, the Service is in the process of enlisting an independent third party to organize and conduct a scientific peer review of this report. Following this process, the Service will determine whether to adopt the report as representing the best available scientific information on wolf taxonomy in North America and use the report to help inform any subsequent rulemaking under the Endangered Species Act regarding wolves.

## 3.  Decision Framework

*3.1. Decision context and structure*
*Decision maker.*  The Director of the U.S. Fish and Wildlife Service is the final decision maker for this decision.  Principal input to the Director will come from the Assistant Director for Endangered Species and the Regional Directors from Regions 1, 2, 3, 4, 5, 6, and 8, or their delegates.

*Decision scope and timing*.  Ideally, this decision will be made at one point in time (not piecemeal or repeatedly) and will be structured and transparent.  The scope of the decision concerns all wolves in the conterminous United States.  The decision about the set of geographic units for consideration will give rise to a series of subsequent decisions about the listing status of those units and, in turn, another series of decisions about recovery planning for any listed units that do not already have recovery plans in place.  Any accepted recommendation that results from this effort must include appropriate public involvement and administrative procedures.

*Decision structure*.  There are multiple criteria that need to be used in determining the geographic units for listing consideration, but these criteria may not all be articulated, clear, or compatible.  Thus, this effort may be viewed as a multiple-objective decision problem.  In addition, some of the evaluation criteria are hierarchical and need to be applied in a sequential fashion.  Thus, we have developed a hybrid approach that first uses a logical flowchart to reduce the number of possible alternatives for consideration, then subjects the proposed alternatives to a multiple-objective analysis.  Following the development of an accepted set of geographic units, a status assessment will be performed on the individual units; this may include identification of significant portions of the range.  This whole suite of steps is depicted in Figure 1.

The purpose of the logical flowchart (steps 1-4 in Fig. 1) is to identify key considerations and their order of application for identifying possible geographic units for listing and/or reclassification.  For example, subspecies determination and evaluation of "discreteness" are two criteria that would lead to different types of units for consideration.  Use of the flowchart requires consensus on a substantial amount of policy interpretation, some of which has been previously addressed and some of which has not.  Thus, a list of fundamental assumptions was developed and is provided below.

The purpose of the multiple-objective decision analysis (step 6 in Fig. 1) is to evaluate the alternative sets of geographical units against a set of objectives, to explore tradeoffs among objectives, and to allow decision makers to identify an alternative that best balances multiple demands.  Primary fundamental objectives were identified and include how well each geographic set:  facilitates range-wide recovery of wolves, maximizes conservation and biodiversity benefit, conforms to the ESA, and facilitates partnerships and goodwill.

The outcome of the multiple-objective decision analysis is a recommended set of geographic units, that is, a way of dividing up the range of the gray wolf in North America into *potentially* listable entities.  The step after that (step 7 in Fig. 1) would be a status assessment of the geographic units in that set to determine whether they warrant listing and/or reclassification under the ESA.  After assessing the status of each unit, it might be possible to coalesce some

units (if they are neighboring and of the same status).  Finally, consideration of significant portions of the range (SPR's) within each listable unit could be undertaken (step 8 in Fig. 1).

### 3.2. Fundamental assumptions

Moving forward with this process required that the structured decision-making team reach a position on several key issues for the purposes of this exercise.  These fundamental assumptions formed the foundation for much of this process.  For example, we needed to make an assumption on the taxonomic validity of various subspecies in order to decide whether the sets of geographic units being scored should include subspecies and DPSs of subspecies.  Without such base maps, this process could not have proceeded.  The fundamental assumptions articulated as this analysis was developed included the following:

1. Listing and reclassification are powerful tools for recovery.  While wolf recovery might be facilitated by recovery planning alone, reclassification (including the designation of listable entities and their status assessment) might be needed to bring about effective recovery planning.

2. Chambers et al. (2009) evaluates available science, and its taxonomic conclusions constitute the best available information for the purposes of this analysis.

3. In cases when valid subspecies have been identified, the Service has the discretion to designate DPSs of either the species or the subspecies (assuming DPS policy criteria are met).

4. The configuration of geographic units should cover all or nearly all of North America.  All unit configurations should address both U.S. and Canada with equivalent levels of detail (i.e., if the U.S. is split up, Canada should be split up using the same basis).

5. Potential units being considered for listing should provide complete coverage of range.  Range is the potential range (future range, at recovery) and is not restricted to the current distribution.

6. Remaining areas of historical habitat not being considered for listing (areas like Nebraska) take into account the present and projected density of humans, their infrastructure (e.g., roads, agriculture), and inferred wolf mortality rates that preclude the area from supporting a sustainable wolf population and result in marked separation between future wolf populations.

7. All boundaries are rough approximations that need further refinement, including standardized national mapping of potential habitat.

8. We have the option to lump/split units as long as each option meets established criteria.

9. We have the option to use or not use the international boundary to define DPSs.

10. The Service has discretion regarding listing a DPS or a subspecies, if an entity can be listed as either; however, all else equal, subspecies is the preferred default.

11. Entities (DPSs or subspecies) should be listed in the same units we intend to delist (i.e., wolf populations will not be listed with the intention of breaking them into smaller units in the future to delist them).

12. Unit boundaries and recovery planning efforts can extend beyond our approximate understanding of historic subspecific range lines, recognizing that wolf historic range included large intergrade zones where multiple subspecies co-occurred, and historic range maps should be considered approximations.

13. Natural mixing of different wolf subspecies occurred historically and may be desired.  Such mixing among subspecies should not necessarily be precluded.

14. Persistence in an ecological setting unusual or unique for the taxon potentially indicates that a population segment represents a significance resource, whether or not there is evidence that the setting has led to special adaptations (61 FR 4724).

Many of these assumptions were discussed and critiqued during the July 2009 workshop. While some assumptions were accepted without debate, others were questioned. Based on these conversations, some of the assumptions will require revision. A detailed discussion of these assumptions is found in Section 8.2.


# 4. Objectives

## *4.1. Objectives hierarchy*
We developed an objectives hierarchy over the course of our prototyping efforts in which the fundamental objectives of wolf recovery strategies are sorted hierarchically. For some objectives, we also identified means objectives that describe how we want to achieve the fundamental objectives. These objectives represent where we want to end up and thus, provide an essential basis for evaluating contending sets of geographic units for listing analysis. In other words, they make explicit the considerations that are important in evaluating different ways of carving up the wolf range (e.g., into subspecies and/or DPSs). How can we evaluate, say, whether it's better to have more DPSs or fewer? Whether to treat the Southwest as a DPS, a subspecies, or no unit at all? Whether to conform to previously designated DPSs or not?

The objectives hierarchy for this analysis (Table 1) was synthesized from a variety of sources, including the first prototype report generated by the planning team prior to the October workshop (Runge et al. 2008), the results of the October 2008 Wolf Recovery SDM workshop (USFWS 2009), the February DPS/ subspecies workshop, and the April Mexican wolf DPS/subspecies workshop. All the objectives from these sources were considered in the development of the objectives hierarchy, and were retained in one form or another.

Four primary fundamental objectives were identified (Table 1):
1. Facilitate the range-wide recovery of wolves, both by directly promoting recovery and by facilitating administrative efficiency.
2. Maximize the conservation and biodiversity benefit of wolf listing and recovery for a broader range of taxa, taking into account the effects of wolf recovery on ecosystem processes, as well as its impact on listing and recovery planning for other species.
3. Conform to the Endangered Species Act, as potentially reflected in policy, listing actions, and judicial opinions, to fulfill regulatory requirements and minimize future litigation risk.
4. Facilitate partnerships with and the goodwill of other Federal and state agencies, non-government organizations, and the public, by being clear in decision making, minimizing public controversy, and minimizing regulatory burden on the public.

Each primary objective was further broken down into secondary and tertiary objectives, some fundamental themselves, and others means to higher fundamental objectives (Table 1). The sub-objectives within a fundamental objective were often factors that appeared to compete. For

example, maintaining and restoring populations in many parts of the historical range (objective 1a*ii*) might come at the cost of facilitating administrative efficiency (objective 1b), making it difficult to know what the right mix is to achieve the common fundamental objective of facilitating range-wide recovery (objective 1).  One of the purposes of the objectives hierarchy was to identify as many of these competing objectives as possible.

The final objectives hierarchy (Table 1) contained 50 objectives at various levels, too many to analyze formally in an expedient manner.  We identified nine objectives to carry forward for further analysis.  Ideally, these should have come from the lowest levels of the fundamental objectives, but in some cases we also included means objectives that we thought were important to describe an aspect of a fundamental objective that was not otherwise captured.  We tried to carry forward objectives that would vary across alternatives independently from other objectives, so as to highlight important considerations (that is, we avoided duplication of objectives, and focused on differences).  For example, the objectives to maintain or restore representative populations from the historic and current distribution, and promote dispersal and mixing (objectives 1a*ii* and 1a*iii*, respectively) clearly address the fundamental objective of promoting recovery through redundancy and representation, yet may not be strongly correlated across alternatives.  We also sought objectives that could be meaningfully measured through some quantifiable scale.

The nine objectives that were carried forward for further analysis were:

1a*ii*.  Maintain and restore representative populations from the historical and current range where feasible.  A representative distribution would provide for restoration of enough of historic and current populations in at least some portion of the historic range, including representation in the United States, provided there is suitable habitat.  Such listing provides a vehicle for recovery planning, where appropriate, and promotes recovery through redundancy and representation.

1a*iii*.  Preserve maximum genetic diversity but allow dispersal and mixing.  In particular, there was a desire to facilitate connectivity of wolf populations and discourage isolated populations, like *C. l. baileyi* and possibly *C. rufus*.  While mixing might cause loss of some distinctive aspects of population genetics, wolf populations in North America have always mixed, and there was a desire to maintain this aspect of wolf demography.

1b.  Facilitate administrative efficiency by having listing units constructed at an optimal scale, one that expedites recovery planning, anticipates delisting, and allows for effective use of section 7.  Very large units were seen as undesirable because of the ecological and political complexity of crafting recovery plans over heterogeneous regions and habitats.  Very small units were seen as undesirable because the number of recovery plans alone would create an administrative burden, and it might not be possible to craft a sensible recovery plan for a region that was too small.

3a.  Comply with listing guidance and policies.  As much as possible, there was a desire to comply with existing Service policies and internal guidance.

3b.  Conform to past Service statements regarding wolf management, listing, and recovery.  All else equal, there was a desire to be consistent with past listing and delisting decisions, environmental impact statements, biological opinions, and other statements made by the Service, not least because it would presumably reduce future litigation.  This objective was seen as challenging, because the past statements are not necessarily consistent with

North American Wolf Recovery SDM Project

each other, so to be consistent with one might mean being at odds with another.  In cases of conflict, there was a desire to show favor toward more recent statements.  That said, there was an awareness that past statements had led us to the need for this structured reassessment, so this objective was expected to conflict with other objectives.

3c.  Be consistent with the best available scientific information.  The first consideration in this objective is how consistent an alternative is with the current scientific information.  But how well an alternative conforms to the current scientific information should be tempered with the recognition that there are uncertainties in some of the current scientific information.  It is important to note that by having this as an objective that might be traded off with other objectives, we are not trying to violate the legal mandate to base listing decisions solely on the best available science.  Instead, we are recognizing two issues:  first, it is not always clear what constitutes the best available science; and second, the best available science does not always provide definitive answers.  Thus, while compliance with unassailable scientific conclusions is not negotiable, compliance with less certain conclusions requires judgment.

3d.  Comply with case law.  The case law considered may include rulings on any Service documents concerning wolves, but may also include non-wolf rulings when the legal concepts are applicable to the potential geographic or taxonomic designation.

4a.  Promote clarity to the public, as a means to facilitating partnerships and good will.  In particular, it was important to consider two aspects of clarity:  the ability for the public to understand the protective status of wolves in a particular area; and the ability for the public to understand the rationale behind the unit boundaries.

4c.  Minimize unnecessary regulatory burden.  There was some disagreement about whether this was a fundamental objective in its own right, or a means to facilitating partnerships and good will.  Either way, it was seen as a concern by some, and needed to be considered in further analysis.

There were many other objectives that were not brought forward for further analysis.  In some cases, they were perceived as redundant (or at least tightly correlated) with objectives that were included; in other cases, they were seen as not important, not relevant, or not appropriate to bring forward.  Three require some short comment.  (1) The desire to maximize persistence (objective 1a*i*) was deemed appropriate, as a principle contribution to promoting recovery through resiliency, and especially through the means of allowing flexibility in recovery tools (like reintroduction).  After considerable discussion, however, we concluded that the choice of geographic units did not play a large role in affecting this objective; that this objective was affected more by tactical considerations that would arise in recovery planning, not listing.  (2) One primary fundamental objective (maximizing conservation and biodiversity benefit) was not represented at all in the objectives that were brought forward.  Again, this did not reflect a judgment that this objective was unimportant, but rather that it would be achieved by decisions outside the scope of this analysis.  (3) There were a large number of lower-level objectives that were grouped under the desire to minimize public controversy (objective 4b), and initially we sought to develop a measurable attribute to capture this objective.  But, we realized that there were so many ways to generate public controversy that it was difficult to imagine alternatives that would not offend some group or another.  In addition, while some decision-makers felt this was an important objective, other decision-makers felt that this should not factor into selection of alternatives, i.e., that science and policy should drive the selection of geographic units or

000816A

North American Wolf Recovery SDM Project

alternatives, and we should focus on transparent communication to minimize public controversy. Not having a way to prioritize which segments of the public to please, and not knowing how to balance the different views of the decision-makers, we decided to table this objective.  If this turns out later to be an important and legitimate objective, it will have to be brought back into the analysis.

### 4.2. Measurable attributes
Thus, nine objectives were brought forward from the objectives hierarchy for further analysis and measurable attributes were created for these nine objectives (Appendix 1).  These measurable attributes described scoring systems that provided explicit guidance to experts about how to evaluate the performance of the geographic units or alternatives on each of the selected objectives.  In most cases, the measurable attributes were constructed scales requiring subjective judgments; in one case, a proxy attribute that blended subjective judgment and direct measurements (regulated area-years) was used.

It was a challenging task to craft measurable attributes for many of the objectives.  At the July workshop, there was considerable discussion about whether we had the right set of objectives, and whether the attributes measured what was important about the objectives.  Some of the objectives and measurable attributes were fine-tuned at the workshop (all those fine-tunings are incorporated in the analysis presented here), but there was a sense that if another round of analysis were to occur, it would be highly valuable to have the decision-makers (ARDs) directly involved in crafting or revising the objectives.

## 5.  Identifying Alternatives

We developed decision alternatives (sets of potential geographic units) for wolf listing/delisting in three steps.  First, we reviewed available information on wolf range and suitable habitat to produce a base map of potential range for recovery.  Second, we identified possible 'units' or contiguous geographical areas where wolves could be listed/delisted separately from other units, including both subspecies ranges and potential DPSs.  Third, we created decision alternatives for the analysis by combining the individual units into sets such that each set covered the entire range of wolves in North America.  We explain each of these steps in more detail here, with maps of the resulting alternatives.

### 5.1. Wolf habitat suitability synthesis
Understanding the distribution of potentially suitable wolf habitat, and therefore where wolf recovery might occur, is central to identifying appropriate conservation units.  Given the numerous wolf habitat modeling efforts in the literature, we decided to review that body of information and use it to create a base map from which we could evaluate alternative configurations of conservation units.

We conducted a literature search for all papers relating to wolf habitat suitability modeling that included portions of the conterminous U.S. (Table 2).  Since the various models provide different maps, we developed a synthesis map by identifying all subregions of Bailey's ecoregions of ecological provinces (Bailey et al. 1994) that contained blocks of suitable wolf habitat according

North American Wolf Recovery SDM Project

to one or more models. Subregions with relatively few disjunct pixels of suitable habitat that were not connected to other blocks of suitable habitat were not included in our selection (e.g., central Nevada). Our goal was to depict broad regions that contained potential habitat for the wolf and not to define precise habitat boundaries. The broad-brush approach was deemed sufficient given the purpose of the modeling (to identify broad areas for listing and recovery purposes) and the numerous uncertainties associated with wolf habitat modeling.

Spatially-explicit habitat models that provide wall-to-wall coverage were not available for the wolves in the southeast and mid-Atlantic states. Thus, inferences about the extent of wolf habitat in the southeast U.S. and mid-Atlantic states were not possible given the available information. This limitation may not be problematic for developing a North American wolf recovery strategy however, as red wolves (1) are currently listed 'where found,' and (2) have an extremely limited distribution. (In this analysis, we did not consider any alternative wolf units for the Southeast other than the current red wolf listing). As the red wolf recovery program makes progress, it might be useful to develop such a map to guide reintroduction planning, but it is not necessary for this effort.

With the exception of northern Michigan, northern Wisconsin, and northern Minnesota, habitat models were also not available for the Midwest. In this region we used 1-km resolution land-cover classes from the National Atlas (http://www.nationalatlas.gov/mld/landcvi.html) to select those subregions that were primarily in forested landcover (Fig. 2). A key assumption in our analysis is that agricultural land, grasslands, and shrublands in the Midwest are unlikely to provide potential habitat for the wolf, given the high density of livestock in this area (Fig. 3), lack of interconnected protected areas (Fig. 4), and the openness of the landscape, which would likely subject wolves in these areas to higher levels of human-caused mortality (because they are easier to detect and shoot in open country compared to forested areas). The incorporation of human tolerance is central to most wolf habitat suitability models (Table 2), as this factor appears to be the primary driver of wolf mortality rates. Thus, areas with forested land-cover, where agricultural and road densities tend to be lower, and which provide wild ungulate prey for wolves, are identified as potential habitat in most wolf habitat suitability models.

The results of our modeling synthesis are shown in Figure 5. We used this map to look for areas of range that could support wolf populations at recovery, and in parallel, broad geographical areas that would have little to no chance of being occupied by wolves even at continental recovery. As part of a North American wolf recovery strategy, areas that are not potential range could be removed from the 'range where listed' of gray wolves in the lower 48 states. Before any such regulatory actions are pursued, however, additional analysis and public input would be advisable to ensure that the suitable habitat definitions, and resulting models and maps, address ESA policy issues appropriately. A North American wolf recovery strategy might also be strengthened by additional modeling to delineate suitable habitat consistently across regions and with greater precision; to expand mapping to eastern and southern states; and to determine whether potential wolf range should include more of California (most of California was omitted from our analysis due to limited historical evidence of wolf occupancy).

North American Wolf Recovery SDM Project

## 5.2. Potential listing/delisting unit delineation

With the map of potential range as a base, we delineated potential geographical units for listing/delisting wolves (Fig. 1 illustrates a logical flowchart for identifying geographical units). We developed units for each subspecies of wolves identified in Chambers et al. (2009), with unit boundaries following the approximate current ranges for the subspecies, or for extirpated areas, the most recent historical range.  We also developed multiple DPS unit configurations; some as DPSs of species and some as DPSs of subspecies (including some with and some without international boundaries).  Potential DPS units must be large enough to support a viable population at recovery and meet policy criteria for discreteness (marked separation or cross-international boundary differences) and significance to the taxon.  We did not complete an in-depth review of the potential DPS units under these criteria; instead we relied on team member's judgment for minimum units that were likely to meet both the discreteness and significance criteria of the DPS policy (some team members have extensive experience with wolf DPS identification from past rulemakings).

In determining the minimum areas and significance needed to delineate a DPS, we considered potential population and territory sizes, plus dispersal areas (buffers).  We assumed that international boundaries would satisfy DPS discreteness criteria, based on differences in management and conservation status across international borders.  We made tentative assumptions about whether a potential DPS would meet significance criteria by considering the proportion of the taxon's total and U.S. range included within the DPS.  Additional viability analysis and policy assessment would be needed before making final decisions on DPS units.  In general form (the approximate location of units), however, we identified a broadly comprehensive array of potential listing/delisting units available for wolves in the conterminous U.S.

We encountered numerous uncertainties as we identified potential units for this analysis.  Additional or different size units may be possible, particularly in eastern states where we lacked habitat mapping.  In some cases where information was uncertain, we considered units that may not remain valid with further policy analysis.  (For example, whether the New England region provides sufficient habitat for a viable population, and more importantly, whether it can even be considered as a potential distinct *population* segment when no wolves occupy the area at present, are not certain.  At most this area may be identified as a possible future listing unit, although presently it may only qualify as potential habitat to be incorporated into another unit if listed.)  Modifications will be possible both at the strategic analysis level (e.g., the approximate number and configuration of units that cover the continent) and even more so at the tactical level, when individual units are assessed for actual regulatory action (listing or delisting), at which time unit boundaries would be evaluated and established more definitively.

All areas in the following unit descriptions are approximate; for example, describing a unit by the states it incorporates means that the range roughly covers those states (a majority of the state area would likely fall within the potential listing/delisting unit) not that the unit boundary would coincide precisely with political boundary lines.

*Not potential range.*  These areas were occupied by wolves historically (Chambers et al. 2009), but no longer contain habitat suitable for wolf occupancy based on the literature review

referenced above, or were never wolf habitat.  In a North American wolf recovery strategy, these areas may be treated as units under consideration for removal from the range where gray wolves are currently listed in the lower 48 states.

(1) Most of Nevada and California (note: the extent of historical range in California is particularly uncertain; our map of potential range includes much of the Sierra Nevada mountains based on the potential habitat literature and independent historical sightings as recorded by early settlers, however, there is limited physical evidence of historical occupancy).

(2) The Great Plains region east of the Rocky Mountains (including states from North Dakota through Iowa and Texas).

(3) Portions of the eastern U.S. outside of the northern Great Lakes (forested areas of Minnesota, Wisconsin and Michigan) and New England (forested areas of northern New York, Vermont, New Hampshire and Maine).  The extent of potential wolf range in the Appalachian Mountains, and other parts of the Southeast and Northeast is essentially un-studied outside of existing red wolf recovery areas, which cover a very small portion of available forested habitats.

*Southwest U.S./Mexico.*  All units delineated for the SW U.S. address recovery of the Mexican wolf *C. lupus baileyi*, except a potential unit for Colorado and Utah that addresses *C. lupus nubilus* recovery.  The potential units we identified in this region are:

(1) The historical *C. lupus baileyi* subspecies' range in Arizona, New Mexico and parts of Texas and Mexico (from Chambers et al. 2009).  Although this region has substantial gaps in potential range such that wolves will likely face high mortality dispersing across all parts of the unit even at full recovery, we do not include any subdivision of this potential range because any such units would likely not be sufficiently discrete and significant to qualify as DPSs by themselves.  Note, Region 2 has determined that this area would qualify for listing as either a subspecies range or DPS of *C. lupus* for Mexican wolf recovery so we consider this unit as potentially addressing both those options although we analyzed it as a subspecies listing.

(2) The historical portion of *C. lupus nubilus* range that falls within Colorado and Utah (Chambers et al. 2009).  For wolf listing/recovery, this area either could be a disjunct part of the unit comprising the continental range for *nubilus*, or could be considered extirpated wolf range.  We determined that Colorado-Utah suitable wolf range would not be included within a northern Rockies distinct population, except under the potential unit (7) described below, because dispersal from the existing population of *C. lupus occidentalis* in the northern Rocky Mountains to the south is minimal, supporting the existing delineation of a NRM distinct population segment boundary in southern Wyoming.  We further determined that the Colorado-Utah potential wolf range area would likely not be large enough to support an independent wolf population by itself even if wolves did disperse into the area in sufficient numbers to occupy this part of the range.  Thus, we did not include a potential DPS unit comprised solely of the Colorado-Utah area of potential range as an option in our analysis, although we recognize some uncertainty in this determination.

(3) A DPS of the historical *baileyi* range as in (1), but using the international boundary excluding Mexico.  We included this unit as an option in the analysis, despite some

uncertainty whether it would contain sufficient suitable habitat to support recovery (without Mexican or Colorado-Utah habitats available for recovery units).

(4) A DPS of *baileyi* historical range within Mexico (i.e., the complement to unit (3)).

(5) A DPS or subspecies listing that encompasses the *baileyi* historical range plus the area of historical intergrade with *C. lupus nubilus* extending over potential wolf range in Colorado and Utah because *nubilus* is extirpated from this region (i.e., a combination of units (1) and (2), above).  Note, this expanded range area for Mexican wolf could be listed as either a subspecies or as a DPS of *C. lupus;* we analyzed it as a DPS listing, recognizing the alternative option could be chosen.

(6) A DPS as in (5), but using the international boundary excluding Mexico.

(7) A single DPS of all *C. lupus* in the western US that does not separate (or recognize) subspecies, but uses the international boundaries with Mexico and Canada.


*Northern Rocky Mountains U.S.*  The units in this area address recovery of the gray wolf currently occupying the region, which was reintroduced and has immigrated naturally from *C. lupus occidentalis* populations in Canada.  The potential units we identified in this region are:

(1) The current range of *C. lupus occidentalis*, which includes the historical range in Canada (Chambers et al. 2009) and the region in the northern U.S. Rocky Mountains (encompassing most of Montana, Idaho, Wyoming, and the eastern third of Oregon and Washington) where this subspecies was introduced and has expanded to occupy suitable habitat.

(2) A DPS of *C. lupus occidentalis* in its current range in the conterminous U.S. (Montana, Idaho, Wyoming, and eastern Oregon and Washington) using the international boundary with Canada.  Geographically, this is similar to the current NRM DPS, although the current unit is a DPS of the species *C. lupus*, not the subspecies *occidentalis*.  Note, we did not consider any smaller DPS for this population since dispersal and non-discreteness exists within the existing DPS.

(3) A DPS of *C. lupus* that combines the range of *occidentalis* as in (2) plus potential wolf range in central and western Washington, Oregon and possibly parts of northern California, Nevada, and Colorado, using the international boundary with Canada.  This option is similar to the DPS identified in the 2003 downlisting rule.  Currently a few wolves from Canada have dispersed and established a pack in north-central Washington, although the subspecific status of this pack is not known.  (Chambers et al. [2009] described these as *C. l. nubilus,* sharing a genetic lineage with coastal British Columbia wolves, which are different from *C. l. occidentalis* wolves genetically, behaviorally, and morphologically.  However, whether or not it is truly the same subspecies, *C. l. nubilus*, as the plains wolves of central Canada and the upper mid-west is an area of uncertainty in our analysis.)  This region has substantial gaps in potential range such that wolves could experience high mortality dispersing across all parts of the unit at full recovery, and uncertainty remains on the degree of connectedness from east to west.  We determined however, that the total area was cohesive enough, with the international boundary with Canada and distance to *baileyi* range providing sufficient discreteness, to include this potential unit as a DPS option.  Note, the full extent of habitat available in the Northwest, particularly in California, remains an area of uncertainty to our analysis.

North American Wolf Recovery SDM Project

*Northwest conterminous U.S.*  The potential units in this region address the recovery of the coastal population of *C. lupus nubilus* in the conterminous U.S., or possibly the recovery of *C. lupus occidentalis* dispersing from the Northern Rockies population.  The potential units we identified in this region are:

(1) A DPS of *C. lupus nubilus* in the Pacific Northwest (Washington, Oregon and parts of California and possibly Nevada), using the international boundary with Canada.  While the full extent of habitat in this unit remains uncertain, as does the status of the few breeding wolves currently in Washington, we determined that sufficient potential habitat was available to tentatively qualify as a DPS for our analysis.  This option assumes the degree of habitat connectivity and dispersal between NRM and the Pacific Northwest is minimal enough to support discrete populations in these adjoining areas, a subject of some uncertainty.

(2) The same unit as (3) for Northern Rocky Mountains U.S., i.e., a DPS of *C. lupus* that includes potential wolf range in Washington, Oregon and parts of northern California and Nevada combined with *C. lupus occidentalis* range in the northern Rocky Mountains, using the international boundary with Canada.

*Alaska/ Canada.*  These units address extant populations of *C. lupus* and *C. lycaon*, none of which are currently listed under the ESA or in need of recovery, except for portions of the subspecies-based units where they cross into the lower 48 states.  The reason we extend the maps outside the conterminous U.S. and delineate units in these northern populations is to provide the continental context for assessing wolf population significance and recovery strategy within the lower 48 (for example, determining whether a U.S. DPS of the species *C. lupus* or of the subspecies *C. lupus occidentalis* is preferred depends in large part on what exists for those entities in Canada, not just in the lower 48).  The potential units we identified in this region are:

(1) The current subspecies range for *C. lupus occidentalis* in Canada and Alaska, extending into the conterminous U.S.

(2) The current subspecies range for *C. lupus nubilus* in Canada and Southeast Alaska, extending into the conterminous U.S.  This unit is disjunct in three parts (due to current gaps in suitable habitat and the southward extension of *C. lupus occidentalis*), including one part covering the eastern half of Canada above *C. lycaon* range (or possibly overlapping because these species overlap in southern Ontario), one part in coastal western Canada and southeast Alaska, and one part in the Rocky Mountains within the conterminous U.S. where *C. lupus nubilus* is extirpated (i.e., unit (2) of southwest U.S.).

(3) A DPS of *C. lupus* including all of Canada above *C. lycaon* range, and all areas of wolf range in Alaska.

(4) A DPS of *C. lupus* including all of Canada above *C. lycaon* range, using the international boundary with Alaska.

(5) A DPS of *C. lupus* including all areas of wolf range in Alaska, including southeast Alaska, using the international boundary with Canada.

(6) A DPS of *C. lupus nubilus* in eastern Canada, above *C. lycaon* range (or possibly overlapping ranges, with (11), below).

(7) A DPS of *C. lupus occidentalis* in Canada.

(8) A DPS of *C. lupus occidentalis* in Alaska (excluding southeast Alaska, which is *C. lupus nubilus* range – unit (10)).

(9) A DPS of *C. lupus nubilus* in western Canada.

(10) A DPS of *C. lupus nubilus* in southeast Alaska.
(11) A DPS of *C. lycaon lycaon* in southern Canada (Ontario, Quebec to Maritimes)
(possibly overlapping with (6) above, *C. lupus nubilus* in eastern Canada).

*Great Lakes and Northeast U.S.* All the units in this region address the recovery of *C. lycaon lycaon*, although portions of the range for this species overlap with *C. lupus.* The potential units we identified in this region are:

(1) The historical *C. lycaon lycaon* subspecies range (Chambers et al. 2009) in the northeastern U.S. and southeastern Canada. Note, this unit could be treated as a DPS of *C. lycaon* if the subspecific status of *C. l. lycaon* is not fully accepted or published.

(2) A DPS of *C. lycaon lycaon* in the U.S. Great Lakes (northern Minnesota, Wisconsin, Michigan), using the international boundary with Canada – i.e., the status quo DPS, but either designated for *lycaon* or for both *C. lupus nubilus* and *C. lycaon lycaon* based on new taxonomic information (Chambers et al. 2009).

(3) A DPS of *C. lycaon lycaon* in New England (portions of Maine, New Hampshire, Vermont and New York[12]), using the international boundary with Canada. The extent of suitable habitat in this area is particularly uncertain. We tentatively determined that sufficient area exists to support wolf occupancy and evaluated this unit as one option although we recognize this unit may not hold up as a potential DPS. Presently there is no population of wolves occupying New England, so it is not certain if a DPS unit can be designated here. We include this unit in the analysis simply to allow consideration of whether to include it future recovery planning if wolves became present (naturally or through state actions, for instance). For now, this unit could only be identified as a potential future DPS, or as suitable habitat with an extirpated wolf population.

(4) A DPS of *C. lycaon lycaon* in the U.S., using the international boundary with Canada, combining (2) and (3) in one unit with two, disjunct parts (assuming there is no suitable habitat in areas of historical range around Lakes Erie and Ontario, thus separating the two U.S. parts).

*Southeast U.S.* We consider only recovery of red wolves (*C. lycaon rufus* or *C. rufus*) in this region, with one geographical unit:

(1) The historical *C. lycaon rufus* subspecies range (Chambers et al. 2009) outside the range of *C. lupus* and *C. lycaon lycaon*, omitting areas that are not suitable habitat at a broad scale. Note that wolf range in the Southeast has not been delineated or published, so the red wolf unit in our analysis is a 'placeholder' representing the subspecies 'where found.' Also, for now, this unit is synonymous with the status quo subspecies listing of *C. rufus* and would not need to be revised to subspecies *C. lycaon rufus* if the revised taxonomy is not fully accepted and published. Since *rufus* is already 'listed where found' as a species and suitable wolf habitat has not been described, mapped, or published for the Southeast region, we did not complete any analysis for additional potential wolf listing/delisting units in the southeastern U.S. All areas of the southeastern U.S. could be removed from the range of the gray wolf, *C. lupus*, however, because *lupus* did not occupy this region historically and we believe this element of the current listing was made in error.

---

[12] We are aware the New York is not technically part of New England, but for ease of expression, our use of the term New England includes potential wolf habitat in New York, namely, the Adirondacks.

North American Wolf Recovery SDM Project

## 5.3. Decision alternatives (maps)

Finally, we assembled decision alternatives by putting sets of the individual geographic units together onto maps.  Each decision alternative followed a consistent theme or logic, such as all units comprising subspecies and whether or not the international boundary was considered in delineating potential DPS units.  We did not develop alternatives for every possible permutation of units simply to constrain the total number of alternatives and allow us to focus on strategic differences between the alternatives.  We expect that the eventual, preferred alternative set of units that will emerge from this analysis will consist of a mix of units from across the alternatives we developed.

We split *lycaon/rufus* from *lupus* wolves, so both the eastern and western U.S. regions have a set of alternatives, which includ the status quo listed units (Figs. 6-8).  The alternative sets contain units that represent: (1) subspecies ranges; (2) DPSs of full species (2 alternatives for *lupus* and 1 for *lycaon*); (3) DPSs of subspecies (3 alternatives drawn for *lupus* and 1 for *lycaon*); (4) DPSs of subspecies with unoccupied units designated 'extirpated'; and (5) status quo listing units.  In all alternatives, we assumed that gray wolves could be removed from the List of Endangered and Threatened Wildlife in regions of the lower 48 states that are *not* potential suitable range or no longer considered part of historical range due to taxonomic revisions (Chambers et al. 2009).  We did not address whether delisting would be based upon 'error' or 'extirpation' since this can be addressed once a national strategy is adopted.

# 6.  Consequence Tables

## 6.1. Elicitation and scoring methods

The next step of the process required predicting the consequences of each alternative map on the various objectives, that is, scoring the alternatives against the measurable attributes.  For each objective, we assembled a team of experts, then used a Delphi process (MacMillan and Marshall 2006) to develop scores for each alternative.  Experts were given an orientation to their task via conference call, then provided with written instructions and a scoring sheet, which they returned to the coordinators by email within a short period of time.  The preliminary results were compiled, and then a second conference call was held to discuss these results, elucidate differences, and allow individual rescoring as a result of insights obtained from the discussion.  In most cases, a summary score was found by calculating the average score across experts for each alternative.

For several of the objectives, seven of the report authors (all Service staff) served as the expert panel and independently estimated the degree to which the alternatives were likely to achieve these objectives.  The measurable attributes scored by this team include attributes C (connectivity of wolf populations), E2a (compliance with prior Service statements), E2b (compliance with best available science), and F (clarity to the public).  Attribute B (representative distribution) was initially scored by this same team using the Delphi method, but at the July 2008 workshop, the measurable attribute for this objective was revised.  The re-scoring took place using a group consensus method with the workshop participants.

For attribute D1 (regulated area-years), we queried six Service biologists who work on wolf recovery for their judgment of the present status (warranted for listing or not) for each of the geographic units in all of the alternatives.  For each warranted unit, they estimated the time expected until recovery/delisting (in categories of 0-5 yr, 5-15 yr, 15-30 yr, 30-17 yr, or >70 yr).  If they did not believe a unit warranted listing as a whole, they could respond that a significant portion of the range (SPR) would be warranted, in which case they described the SPR area they had in mind and the time to recovery/delisting for the SPR.  For each unit, we calculated the total land area by estimating the area of each state within the unit or SPR(s) of the unit (by visual inspection of our maps).  Then we estimated the total regulated area-years for each alternative by multiplying the area by years to delisting for all warranted units in the alternative, and compiled this for each expert as well as the overall average.

For attribute D2 (recovery efficiency), eight regional and Washington Office recovery coordinators provided the estimates for wolf recovery efficiency based on unit sizes.  Then for all likely warranted units (>50% of wolf biologists estimated as warranted, i.e., all except WGL), we calculated an average recovery efficiency score per unit, and calculated the average score across units in each alternative.

For attribute E1 (compliance with Service policies), six of the report authors (all Service staff) estimated the strength of compliance with ESA policies for each alternative.  For attribute E3 (compliance with case law), five Department of Interior solicitors with particular experience in section 4 of the ESA participated in the discussion, and four of them provided independent estimates of the strength of compliance with case law for each alternative.

## 6.2. Consequence tables

The results of the elicitations are arranged in consequence tables that array the alternatives against the objectives, with the values in the cells showing the average scores given by the experts.  Tables 3 and 5 show the average scores for *lycaon/rufus* and *lupus*, respectively.  Tables 4 and 6 show the ranked scores, where the ranks are calculated within each objective, from 1 (best performing alternative on that attribute) to 5 or 7 (worst performing alternative on that attribute).  The experts typically did not fully agree on the scores for any particular alternative and attribute pair.  The range of uncertainty is not shown in this report, but was retained and can be used to guide sensitivity analysis.  In general, however, the Delphi process generated a fair degree of consensus; the range of differences across experts was smaller than the differences across alternatives, for many of the attributes.  There was less agreement on whether the objectives themselves were properly constructed (see below).

## 6.3. Summary of elicitation results

*Representative distribution* (Objective B).  For all alternatives, the experts' responses differed by at most 1 point (on a 6 point scale), so there was fairly tight consistency in how different experts assessed this objective.  For the *lycaon/rufus* alternatives, alternative 3 scored the highest, because it leads to affirmative recovery in all three desired regions (WGL, New England, and Southeast).  Alternative 2 scored second best, but not as well as 1 because the commitment to recovery in New England is vague with the split *lycaon* DPS.  Alternative 3 scored even lower because it explicitly gives up on recovery in New England.  Alternative 1 and the status quo scored lowest.  For the *lupus* alternatives, alternative 5 (DPSs of subspecies) had a perfect score,

because it affirmed the intention for recovery in all the desired areas.  Alternatives 4 and 6 were next, followed by the status quo.  Alternatives 2 and 3 have DPSs that mix subspecies, so they didn't assure recovery of some of the desired populations.  Finally, alternative 1, the pure subspecies alternative, scored the lowest because, while it focused on subspecies, it did not assure the desired distribution within the U.S.

*Connectivity of wolf populations* (Objective C).  Scores for *lycaon*/*rufus* ranged from 0 – 2 on most alternatives, and differed based on individual interpretations of the attribute and many questions regarding the scale and habitat interpretations for the Southeast.   This attribute has little value for *lycaon*/*rufus* because all the new taxonomy alternatives were mapped with a similar gap between the two putative subspecies, while the status quo alternative retains *rufus* as a distinct species listed 'where found', so comparison of connectivity between these choices is challenging.  This attribute was very straightforward for interpreting *baileyi* or a SW DPS in the *lupus* alternatives.  Scores were unanimous for alternatives 1-5, and ranged from 0-1 on alternative 6 due to some uncertainty about the ability of wolves to disperse across an extirpated area.   However, the pattern was logical:  alternatives 3, 4, 5 scored equally well on this attribute, providing the highest potential for connectivity of the SW with wolves in the northern Rocky Mountains.

*Regulated area-years* (Objective D1).  Most of the wolf biologists believed that all the units within the lower 48 warrant listing (populations are threatened or endangered), except the WGL DPS.  The larger units (e.g., 1 western U.S. DPS) and the NRM DPS were seen as warranted in SPRs instead of the entire units (SPR areas differed among experts, however).  *Note, these warranted assessments were not from formal status reviews and were used only for estimating anticipated regulated area-years.*  Across the alternatives, the estimated regulatory impact varied from ~10 to >32 million mi$^2$-years for *lupus*, with the status quo and alternatives that provide smaller *baileyi* units (i.e., exclude CO-UT) having greater impacts due to longer times to delisting.  Impacts did not differ much between the *lycaon* alternatives (~5-8 million mi$^2$-years, except higher under status quo), but these results could change if different units were considered with better range mapping in the Southeast.

*Recovery efficiency* (Objective D2).  Average recovery efficiency scores ranged from 1.1 to 1.4 across *lycaon/rufus* alternatives, and from 0.5 to 1.5 across the *lupus* alternatives.  For both *lupus* and *lycaon*, scores were generally lower for alternatives with larger unit sizes and best for alternatives with multiple (smaller) DPSs.  The status quo received intermediate scores.

*Compliance with policies* (Objective E1).  The status quo alternatives (*lupus* and *lycaon*) received the lowest scores, including 0s from some experts for non-compliance with the DPS policy.  The alternatives with extirpated areas and the alternative with a split-DPS (WGL and New England) produced some 0 scores due to uncertain policy compliance.  Otherwise, scoring was not substantially different across the alternatives, although the subspecies unit alternatives received more consistent full scores than did the DPS-based alternatives.

*Compliance with prior Service statements* (Objective E2a).  Not surprisingly, for both *lycaon/rufus* and *lupus*, the status quo alternatives scored the best, being most consistent with prior rulemakings and statements by the Service.  For *lycaon/rufus*, the alternatives (3 and 4) that

respected the international border were more compliant that those that did not (1 and 2).  For *lupus*, alternative 5 is second best, in particular because it preserves a focus on NRM and *baileyi*, even if it adds novel complexity.  Alternative 3 is a close third, because of the recognition of *baileyi* and the inclusion of the NRM, at least as part of a larger northwestern unit.  Alternative 6 omits some extirpated areas, which is a departure from past statements.  Alternative 4 adds international boundaries that haven't been considered before.  Finally, alternatives 1 and 2 are such a departure from past rulings that they scored almost no points.

*Compliance with best available science* (Objective E2b).  This objective required a subtle interpretation—the focus was on whether the alternatives complied with current taxonomic understanding (as reflected by Chambers et al. 2009), but also evaluated the strength of evidence for the taxonomic recommendations in Chambers et al.  Of the *lycaon/rufus* alternatives, the status quo scored the worst, as it does not even correctly name the species identified in Chambers et al.  Alternatives 1 and 2 score the best, as they give full recognition to the new subspecies relationships.  Alternative 3 scores a little lower, because the identification of New England as a separate unit is not necessarily supported by the scant evidence.  Alternative 4 scores even lower, because there is historic evidence of wolves in New England, there is potential habitat there, and wolves do sometimes pass through.  Of the *lupus* alternatives, again the status quo scored the worst, because there is not subspecies recognition.  Alternative 2 (lower 48 DPS) scored the highest, because although it combines three subspecies in one unit, it maintains proper species recognition.  Alternatives 1, 3, and 4 tie for the second highest score, reflecting fairly strong compliance with current scientific understanding.  Alternatives 5 and 6 scored lower, because the genetic evidence to support the smaller divisions is less certain.

*Compliance with case law* (Objective E3).  The original phrasing of this attribute asked scorers to evaluate the strength of compliance with case law, including rulings on Service documents concerning wolves as well as non-wolf rulings when the legal concepts were applicable to the potential configuration of units.  After discussion, the attribute was revised to allow scorers to evaluate the probability of surviving court challenge in totality.  This included both case law and solicitor judgment of legal vulnerability.  This allowed solicitors to consider where the court is likely going given the totality of court rulings.  Of the *lycaon/rufus* alternatives, alternative 1 (the pure subspecies option) was viewed as least vulnerable to litigation, with the caveat that this alternative would have to be carefully justified with regard to why DPSs could not be identified.  The status quo alternative scored the worst, with the understanding that we're asking about legal vulnerability if we were starting from scratch—the experts felt that the divergence from current science made this alternative risky.  Alternative 2 scored quite low—the concern was whether a split-DPS would create a legal vulnerability.  Alternatives 3 and 4 scored in the middle, with some split opinions about whether the empty DPS in alternative 3 was more of a concern than taking New England off the list in alternative 4.  For *lupus*, nothing scored very well (high score of 0.88 out of 2), and there was little distinction between the alternatives (low score of 0.4).  The low score went to the status quo alternative, primarily because the "rest of the U.S." de facto DPS would be hard to defend if we were starting from scratch.  The other patterns are hard to generalize.  The issue of empty DPSs and the challenge of delisting extirpated areas were raised.

*Clarity to the public* (Objective F).  Of the *lycaon/rufus* alternatives, alternative 4 scored the best, because it provided clear boundaries of protection (DPSs) and communicated a clear intent about

what would happen in New England.  The status quo scored the worst, because it's not clear what the intent is with regard to recovery over most of the eastern range (save the WGL DPS).  Alternative 1 scored second worst, because it did not provide explicit geographic boundaries (all subspecies units) and the recovery intent in New England is not evident from the designation of geographic units.  Of the *lupus* alternatives, alternative 5 scored the highest, because the DPSs provide clear boundaries of protection and the small units provide clear intentions for recovery actions.  Alternatives 4, 6, 3, and 2 had fairly similar scores.  The status quo had a low score because it's not clear at all what the intent is for recovery in the de facto DPS, especially in the Southwest.  Alternative 1 scored the worst because the full reliance on subspecies listings and the large units provide little clarity to the public about boundaries and recovery intentions.

# 7.  Analysis

## 7.1. Preliminary analysis

The compiled results of the elicitation show the mean scores for each alternative in terms of each objective (Tables 3-6).  At this stage, some valuable patterns are already evident.  First, inspection of the consequence tables (Tables 3 and 5) reveals that there are no alternatives that can be easily eliminated from consideration because they perform worse than some other alternative on all objectives; in fact, every alternative performs best on at least one objective.  One way to see this is to look at the ranked results (Tables 4 and 6) and perform pairwise comparison of the alternatives.  For example, compare alternatives 1 and 2 for *lycaon/rufus* (Table 4):  alternative 1 outperforms alternative 2 on objectives D1, E1, and E3; alternative 2 outperforms alternative 1 on objectives B, D2, E2a, and F; and the alternatives are tied for objectives C and E2b.  Neither alternative dominates the other because neither outperforms or ties the other on all objectives.  All pairs of alternatives can be compared in this manner; there are no dominated alternatives, either for *lycaon/rufus* (Table 4) or *lupus* (Table 6).

Neither are there any objectives that are irrelevant in discriminating the alternatives.  First, none of the objectives were scored the same for all the alternatives, therefore all are relevant.  Second, none of the objectives show the exact same pattern of scores across alternatives, therefore none are redundant.  Thus, the consequence table cannot be simplified, because no alternatives or objectives can be eliminated during preliminary analysis.  This suggests that the alternatives and objectives were efficiently selected during the earlier stages.

More careful inspection of the consequence tables reveals some interesting patterns.  For eastern wolves (*lycaon/rufus*) (Table 3), the status quo alternative is either the best performing alternative or the worst, depending on the objective.  Alternative 1 (designation by subspecies) shows wide swings in performance across objectives, performing most poorly on facilitating recovery, best on compliance with ESA, and intermediate on facilitating good will.  In contrast, alternative 3 (the 3-DPS option) is ranked second or third on most objectives—it is not the best on many objectives, but it has fairly consistent performance.  Overall, the scores for alternatives that use DPSs were relatively similar, compared with either the status quo or subspecies alternatives.  A somewhat similar pattern is seen for western wolves (*lupus*) (Table 5).  The status quo alternative is generally worst performing, the subspecies alternative shows wide swings in performance across objectives, while an alternative like 4 (the 3-DPS option) has more

000828A

consistent, moderate performance.  In the west, alternatives 3 through 6 scored best on some objectives, and worst on none, in contrast to the east, where all alternatives scored worst on at least one objective.

These patterns show that there are real and consequential trade-offs among the alternatives.  The best choice is not readily identified.  To the extent that the measurable attributes selected for this analysis accurately represent the fundamental objectives (Table 1), it appears that the objectives under 'facilitate recovery' and those under 'facilitate partnerships' are scored fairly similarly for a particular alternative, different from the objectives under 'conform to ESA' (Tables 3 and 5).  The primary exceptions are among the connectivity and recovery efficiency objectives for *rufus*, and the inevitable contradiction between objectives E2a and E2b because the best available science attribute was defined as applying newly described taxonomy that is not reflected in compliance with past rulings.  Setting aside these two issues, the principal patterns are that subspecies (or the single lower 48 alternative for *lupus*) perform best on ESA conformity, but the multiple-DPS alternatives perform best for facilitating recovery and partnerships.

In the face of consequential trade-offs among alternatives, to identify the single best performing alternative we must assign relative importance to the various objectives.  That is, in choosing a set of geographic units for listing consideration and subsequent recovery planning, is it more important, say, to achieve a representative distribution, or to minimize regulatory burden, or to comply with policy, past rules, and case law?  These are judgments that should reflect public values as interpreted by the decision makers.  It is important to note here that the results from this prototype analysis to find a best solution are *not* intended to be binding; we fully expect that insights from the exercise could lead to developing even better alternatives.

### 7.2. *Swing weighting*
We elicited the weights on the objectives using a method known as swing weighting (Goodwin and Wright 2004).  Separately for eastern wolves and western wolves, we asked the decision-makers (the Assistant Regional Directors, or their proxies) to compare ten hypothetical management alternatives, one (the baseline) that achieved a minimum score on all nine objectives, and nine more that each achieve a maximum score on one objective but minimum scores on the other eight (Tables 7 and 8).  In making the comparison, the decision-makers had to consider how important an objective was to them absolutely, but also how important the particular "swing" was—how consequential was the change from the minimum to the maximum score?  Each decision-maker first ranked the hypothetical alternatives independently, then gave each a score between 0 and 100, with 100 for the first ranked alternative, 0 for the baseline, and the remainder falling in between.  After initial elicitation, the decision-makers were shown all the scores, and discussed the differences and the rationale they used to assign ranks and scores.  After discussion, the decision-makers were allowed to re-score the hypothetical alternatives, if they desired (after this revision, in some cases their top score was no longer 100).

The scores on each objective were converted into weights (by dividing each score by the sum across objectives), and the weights were averaged across decision-makers (Tables 9 and 10).  For eastern wolves (*lycaon*/*rufus*, Table 9), the highest weighted objectives were E2b (best available science, weight 0.219) and E3 (case law compliance, 0.200).  All of the decision-makers gave these objectives scores between 70 and 100.  The third ranked objective was E1 (policy

compliance, 0.159); there was disagreement about the importance of this objective, with scores ranging from 20 to 90. The connectivity (C), regulatory burden (D1), and recovery efficiency (D2) objectives were ranked lowest. Looking at the combined weights for attributes reflecting the highest level fundamental objectives, decision makers gave the most weight to 'conform to ESA' (mean 0.643, range 0.55-0.79 across regions), followed by 'facilitate recovery' (mean 0.198, range 0.14-0.30), and 'facilitate good will' (mean 0.159, range 0.07-0.25).

For western wolves (*lupus*, Table 10), the highest weighted objective was again E2b (best available science, 0.194), with scores ranging from 50 to 100. The second ranked objective was B (representative distribution, 0.164); this differed substantially from the weight for the same objective in the east, indicating that while one of the major issues for listing and recovery in the west is achieving an appropriate distribution, this issue is not as pressing in the east. The third ranked objective in the west was E1 (policy compliance, 0.141), and the fourth ranked objective was C (facilitate connectivity, 0.119). The connectivity objective is another striking difference between west and east. In the west, maintaining a connection between *baileyi* and more northern populations was seen as important, whereas in the east, a parallel connection between *rufus* and more northern populations was not seen as important, perhaps because *rufus* has long been recognized as a separate species. In the west, objective E3 (case law compliance, 0.118) was weighted lower than in the east (0.200) because the difference across alternatives was much smaller. Looking at the combined *lupus* weights for attributes reflecting the highest level fundamental objectives, decision makers gave the most weight to 'conform to ESA' (mean 0.510, range 0.29-0.73 across regions), followed by 'facilitate recovery' (mean 0.345, range 0.16-0.48), and 'facilitate good will' (mean 0.145, range 0.08-0.22). Thus, compared with the *rufus* scoring, the weights for *lupus* objectives valued 'conform to ESA' somewhat less and 'facilitate recovery' somewhat more, and the weights were less consistent across decision makers for *lupus* than for *rufus*.

### 7.3. Consequence table analysis

To complete the multiple-objective decision analysis, the weights on the objectives were combined with the consequence tables to derive weighted scores for each alternative (Tables 11 and 12). First, the scores of the alternatives for each objective were normalized to a 0-1 scale, using the same best and worst case values presented in the swing weighting. For instance, for Objective D1 in the east, the range of values considered in the swing weighting for the regulatory burden was 4.89 to 14.29 million mi$^2$-yr. The original scores for this objective (Table 3) were re-scaled so that a score of 4.89 (best case) would have a normalized score of 1.0 and a score of 14.29 (worst case) would have a normalized score of 0.0. The advantage of this re-scaling is that it puts all the scores on a comparable scale.

These normalized scores were then averaged across objectives, using the mean weights from the swing weighting elicitation. The composite score then represents an integrated evaluation of a particular management alternative, one that should balance the tradeoffs among objectives in a manner that reflects the values of the decision makers.

Based on this analysis, the highest performing alternative for *lycaon/rufus* was Alternative 3, the option that identifies three potential DPSs of the subspecies *lycaon* (WGL, Canada, and Northeast) and one unit for *rufus* (Table 11). Alternatives 4 (similar to 3 but omitting the

North American Wolf Recovery SDM Project

Northeast) and 1 (2 subspecies only) were close behind, alternative 2 was a bit further behind, and the status quo was very strongly disfavored.  Alternative 3 scored best on only one objective (B, with a weight of 0.113), but scored quite well on several highly weighted objectives (E2b, E1), and scored very poorly only on the lowest ranked objective (C).  To favor Alternative 4 over 3, higher weight would have to be given to objectives D1 (regulatory burden), D2 (recovery efficiency), E3 (case law compliance), and/or F (clarity to public), or lower weight given to objectives E1 (policy compliance), E2a (past rulings compliance) and/or E2b (best available science).  Alternative 1 would be favored if the weight on E1 and/or E3 increased considerably. These shifts between the alternatives that perform best are evident in sensitivity analysis using the different regional weights (Table 13).  Alternative 3 was highest rated for three regions and second best for all the other regions, alternative 4 was highest rated for three regions but second best for only two, and alternative 1 was highest rated by two regions and second best for one.

In the west, the highest performing alternative for *lupus* was Alternative 5, the option that identifies three potential DPSs of subspecies in the lower 48 (*baileyi* in the SW, *occidentalis* in the NRM, and *nubilus* in the Pacific Northwest (NW)) and several potential DPSs in Mexico and Canada (Table 12).  The closest contender was Alternative 4, which identifies three potential DPSs of the species *lupus* south of Canada (NRM-NW, SW, and Mexico) and also looks at Alaska as potentially separate from Canada.  To favor Alternative 4 over Alternative 5, the weights on objectives E1 (policy compliance), E2b (best available science), and/or E3 (case law compliance) would have to be increased, while the weights on objectives B (representative distribution), E2a (past rulings compliance), and/or F (clarity to the public) would have to be decreased.  Again, the status quo is the worst performing alternative, achieving high marks only on past rulings compliance, and very low marks on many other objectives.  Sensitivity analysis using the different regional swing weights (Table 14) shows that the regions were largely consistent in providing top rating to either alternative 5 (5 regions) or alternative 4 (3 regions).

In summary, the results of this analysis suggest that a desirable set of geographic units in the conterminous U.S. for listing or reclassification consideration consists of:  two potential DPSs of the subspecies *lycaon* in the WGL and New England, a potential DPS of the species/subspecies *rufus*, a potential DPS of the subspecies *baileyi* in the southwest U.S., a potential DPS of the subspecies *occidentalis* in the NRM, and a potential DPS of the subspecies *nubilus* in the Pacific NW.  Note, however, that the set of alternatives considered did not include any mixing of types of units within one set, so the 'best performing' alternative identified in this analysis may yet be improved upon.

This analysis is still a prototype, albeit one that is built on a substantial amount of structured reasoning.  At a minimum, it is still fairly vague about the exact boundaries of the units for consideration.  But, more importantly, there are both policy and scientific uncertainties that, when resolved, might change the scores and weights in such a manner as to favor different configurations.  Further, we know that the set of alternatives is incomplete (e.g., it did not consider mixed unit types) and it is possible that the set of objectives is also incomplete and that some of the attributes we developed for measuring performance may not have represented the objectives as well as intended.  Thus, at this point, the analysis proposes a solution; the best response is not implementation, but detailed deliberation that uses the insights from the analysis to guide pointed scientific assessments and policy determinations to craft an even better solution.

000831A

## 8.  Discussion

### 8.1. Challenging the decision analysis:  the "preferred alternative" exercise

At the July 2009 workshop, after the full analysis described above had been completed, we undertook an exercise to challenge all aspects of the analysis.  Each Region (as represented by the decision-maker present, with help from associated staff and experts) was asked to draw a map illustrating their preferred alternative, whether that alternative existed in the formal set or not.  The decision makers were asked to justify their map and articulate the rationale and assumptions behind it.  If new objectives were added, the rationale for them had to be presented.  The decision makers were allowed to alter the boundaries of geographic units and mix and match subspecies and DPS units as they saw fit.  The results of this exercise are presented here.  These new alternatives reveal, in particular, how the different decision makers interpreted the assumptions and weighed the objectives.

*Regions 1 & 9*.  Regions 1 and 9 produced similar maps (Fig. 9).  Region 1's objectives were to provide for viable, representative populations of each subspecies historically found in the conterminous U.S. while considering legal defensibility.  Subspecies were used with the exception of a single DPS of the species in the Northwest.  A DPS in the Northwest was used given the uncertainty regarding the historical taxonomic subspecies occupying this area and uncertainty regarding the subspecies most likely to colonize the area in the future (i.e., *occidentalis* or coastal B.C. wolves).  Each subspecies was presented as an independently viable population.  Region 9 emphasized maintaining the natural heritage of wolves in the lower 48 states.  They also focused on subspecies.  Among the units identified, Region 9 was not confident with the unit in the Northwest because it disrupted the consistency of using subspecies as the foundation for defining units.  Both R1 and R9 suggested there are two overlapping subspecies units in the western Great Lakes, representing the area where *C. lupus nubilus* and *C. lycaon lycaon* are sympatric.

*Region 2*.  Based on the Solicitors' discussion, past workshops, and scientific defensibility, Region 2 generally favors subspecies over DPSs, and their preferred alternative reflected that (Fig. 10).  That said, Region 2 favored using DPSs in some cases, and subspecies units in others.  Their primary objectives emphasized science as reflected in Chambers et al. (2009)—in other words, using the revised taxonomy of subspecies as a priority over clarity to the public or consistency with past rulings.  Nevertheless, clarity to public may be a deciding factor, everything else equal.  Finally, they wished to facilitate connectivity among populations, with particular emphasis on connecting southwestern wolves to populations farther north.

The Region 2 map agrees with the synthesis of the best available science as presented by Chambers et al. (2009), notably in designating *C. l. baileyi* as a subspecies in the Southwest, and recognizing *C. lycaon* in the Northeast and Midwest as either a species or subspecies.  They acknowledged the uncertainty of historical wolf distribution in Colorado and Utah by describing it as an intergrade zone of *C. l. baileyi*, *C. l. nubilus*, and *C. l. occidentalis* and recommended it be managed as a mixing zone.  With regard to the remainder of the U.S., they recognized several points of uncertainty in the taxonomy, and their recommendations accounted for those.  In the Northwest, evidence suggests historical wolves were *C. l. nubilus*, a subspecies also represented in the western Great Lakes region, but they did not feel there was enough information to support

listing as a subspecies, so treated the Northwest as a DPS of *C. lupus*.  California is an area of uncertainty—it may have potential habitat but they did not include it in their map; they defer to the Regions most affected for a decision on whether to include portions of California in any final alternatives.  Likewise, they deferred to Regions 5 and 3 for their judgment on the best geographic units in the Northeast and western Great Lakes, but assumed the taxonomic entity should be the basis for geographic units in the east.  In the Southeast, they did not want to alter the precedence of red wolf listing, but suggested a line that differentiates it from northern wolves should be defined.

*Region 3*.  Region 3's overriding objective was simplicity (Fig. 11).  Their map was driven by a desire to achieve representation of the species *C. lupus.*  They emphasized using full species rather than subspecies units, because they are uncertain of the taxonomy below species level, particularly in the western Great Lakes.  As a result, DPSs of species dominated their geographic units.  Their map included an eastern DPS for *C. lupus.*  They were not yet comfortable with Chambers et al. (2009), but think it did have sufficient peer review to support combining the western Great Lakes and Northeast with Canada and perhaps permitting the delisting of that DPS.  They support the full species listing of *C. rufus* where found with no changes to its existing status.  They also emphasized connectivity between the Northwest and Southwest by designating both as DPSs of *C. lupus.*  Finally they suggested the northern boundary of the *C. lupus* DPS in the Southwest may have to be adjusted.

*Region 4*.  Region 4 used a combination of species, subspecies, and DPSs (Fig. 12).  They emphasized management flexibility and were less concerned about whether units remained as currently listed.  In the Northwest they proposed a single DPS of *C. lupus* because of the uncertainty about which wolves (subspecies) should be there; they were more focused on representation of American wolves than wolves in California or any other locality.  In the east they suggested a DPS of *C. lupus*.  They concluded it is discrete because there is a northern boundary that separates it from wolves of pure *C. l. nubilus* stock.  It was noted that there is great uncertainty in the taxonomy of the wolves of this DPS.  In this alternative, *C. rufus* is listed as a full species, but the northern limit of the range is drawn farther north of the currently recognized historic range to coincide with the one Chambers et al. (2009) drew.  Due to strong taxonomic support, *C. l. baileyi* was designated as a subspecies.

*Region 5*.  Region 5 emphasized compliance with the Endangered Species Act (Fig. 13).  Their fundamental question was to determine to which taxonomic entity the Northeast belongs, as this relates directly to the mandates of the Act with respect to listing entities.  Their map was based upon the subspecies taxonomy as reviewed in Chambers et al. (2009), and they concluded the report has sufficient peer review to accept in its current form.  Region 5 deferred to Region 2 as to whether to propose designation of the Mexican wolf as a subspecies or a DPS but noted that if a subspecies is proposed, the northern border must be based on the best information regarding its historical location.  They proposed designation of a DPS of *C. l. occidentalis* in the northern Rocky Mountains, with the wolves in the Pacific Northwest being evaluated separately because they are something other than *C .l. occidentalis*.  They deferred to Region 1 in terms of managing wolves in their region irrespective of whether a DPS is designated.  In the east, Region 5 proposed a Western Great Lakes DPS consisting of *C. lycaon lycaon* and *C. lupus nubilus,* consistent with Chambers et al. (2009).  They recognized that this creates listing challenges for

the WGL population; however, they also believe that the Chambers et al. (2009) report does not have to be disregarded in order for the WGL population to qualify as a DPS.  Treating the WGL wolves as a single, discrete population of two interbreeding taxa that have remained genetically distinct is consistent with the ESA and is a rare situation that may not have been anticipated by the DPS policy; as such, the mixed population should be accommodated as a listing entity.  Although it may be problematic to say that the WGL *nubilus* are significant relative to that subspecies as a whole (and recognizing that it also raises the question of whether the NRM wolves are significant to *occidentalis* as a whole), the WGL population could be evaluated for its significance in an ecological context.  Region 5 concluded that the WGL population could be treated as a *nubilis-lycaon* mix, and that the remainder of the ranges of each of the two subspecies could be treated as a potential DPS; however, neither would qualify for listing, given the current absence of the two subspecies in the Lower 48 (outside the WGL population) and their abundance in Canada.  New England was seen as part of an expanded range of either *C. l. lycaon* or *C. l. rufus*.  Region 5 wanted more attention to be given to resolving the historical range boundary between *lycaon* and *rufus*.  Although this may be inconsequential in terms of describing a Northeast listing entity, given the current absence of wolves in the region, they considered it important to have an affirmative boundary recommendation, using best available information, for a national wolf strategy.

*Region 6*.  Region 6's principle objective was to have biologically-relevant units that represented the natural heritage of wolves and encompassed the entire U.S. (Fig. 14).  DPSs were generally favored over subspecies.  They emphasized that the Service should not make unilateral decisions based on Chambers et al. (2009), and that past decisions may have influenced their map.  Other objectives included the identification of clear boundaries, representing the natural heritage of wolves from genetic and ecological perspectives, and allowing natural connectivity to the extent possible.  The connectivity of *rufus* to the Northeast was not an objective.  In the Northwest, they proposed a DPS of *C. lupus* separating it from the northern Rocky Mountains population.  However, both the southern boundary into California and its connectivity with British Columbia wolves require further refinement.  A northern Rocky Mountains DPS of *C. lupus* was proposed.  At the workshop, Region 6 suggested a DPS of *C. lupus* for the Southwest, but after the workshop they reevaluated their conclusions and suggested a subspecies of *C. l. baileyi* is more appropriate.  In the Northeast they concluded there are two wolves but the taxonomy and ranges remain unclear.  In some parts of the range where two taxa coexist, the status of each should be evaluated independently.

*Region 8*.  Region 8's primary objective was to take advantage of decisions identified during the workshop (Fig. 15).  They also focused on connectivity, especially with *C. l. baileyi*.  They further assumed there would not be restoration of potential range.  With slight modification, they retained most of the international boundary with Canada and Mexico as unit boundaries.  In the west, they followed Alternative 4, with a DPS of *C. lupus* in the NRM and Pacific Northwest, a Canada or Alaska DPS, a DPS of *C. l. baileyi* in the southwest U.S., and a DPS of *C. l. baileyi* in Mexico.  This map differs from Alternative 4 in that it is based on the species, *C. lupus*, with the exception of the subspecies *C. l. baileyi*.  Given sufficient additional information they may delete the distinction between Mexican and U.S. populations of *C. l. baileyi*.  They remained unsure of designating any units in California, and did not include California because it is not necessary for recovery of the species.  In the east, they felt they did not have enough information to decide

between Alternatives 3 and 4, so created another option, with a DPS of *lycaon* in the western Great Lakes (leaving to further study the question of whether *lycaon* is a species or subspecies), and another DPS of *lycaon* that combines the appropriate areas in New England and Canada. The combination of New England and Canada arose because they were unsure how best to address an area that may not currently contain a wolf population.  If however, it is determined that wolves have moved into New England then they may be listed as either a SPR or through similarity of appearance.

*Synthesis of Regional Preferences.*  Figures 16-17 illustrate the regional "preferred alternatives" collectively, showing the areas of consensus and remaining, unresolved issues in the East and West, respectively.  In sum, the consensus consists of broad regions in the four quadrants of the lower 48 loosely associated with the historical species and subspecies distributions as reviewed by Chambers et al. (2009).  Whether or not the new taxonomy is formally adopted (an unresolved issue), the geographical, genetic and morphological differences between the populations described by the putative subspecies of *C. lupus* and *C. lycaon* provide the basis for recognizing listing units and recovery for wolves in these broad areas.  We have not reached a consensus, however, on which of these four broad regions warrant further separation into two DPSs (some of which are listed now).  It remains unresolved whether a national strategy should recognize a WGL DPS separate from other *lycaon* wolves in the Northeast and Canada, or a DPS of wolves in the NW separate from the NRM DPS and/or from other coastal *lupus* wolves in Canada.  Additional points of uncertainty include how to handle the mixture of *lycaon* and *lupus* wolves in the WGL region, and the unoccupied habitat in New England.

We discuss the regional alternative preferences further and compare them with the alternatives scored in the exercises following discussion about the assumptions and objectives of a national strategy.

## 8.2. Assumptions

Throughout the course of this analysis and particularly during the July 2009 workshop, the underlying assumptions were subject to deliberate and careful examination.  Following is a summary of the assessment of these assumptions.

*Assumption 1* (listing and reclassification are powerful tools for recovery).  The idea behind this assumption was that by listing geographic areas separately, we could guarantee separate recovery planning and implementation programs.  Such an approach provides some guarantee of representation across all key areas of concern and also makes clear to recovery planners and the public what units are fundamentally essential to wolf recovery.  The intent of this assumption, which has underpinned this entire effort since its inception, is two-fold:  (1) that recovery planning cannot proceed without an appropriate listing, and that the current listing has been an impediment to recovery planning; and (2) properly done, listing is a powerful way to make some aspects of recovery binding, a feature that not many other recovery tools possess.  This assumption does leave open the question of how prescriptive listing should be and how much deference should be left to the recovery planning process.  The alternative view, voiced by Region 1 in particular, is that using listing for recovery purposes is too time-consuming and litigious, and delays answering the difficult question of where and how many wolves are needed for national recovery.  Furthermore, separate listings without an overarching recovery strategy do

North American Wolf Recovery SDM Project

not guarantee that individual recovery strategies (for individual listed entities) fit together as a whole and address connectivity and dispersal between adjacent units (although it does not preclude it).  In this alternative view, the way to proceed is directly with a national recovery plan for the currently listed entity (with different regions being treated as recovery units), not with a process that would reclassify and relist wolves.

*Assumption 2* (the taxonomic conclusions of Chambers et al. (2009) constitute the best available information for the purposes of this analysis).  Most workshop participants thought Chambers et al. (2009) presented an excellent summary of the available literature on wolf genetics, morphometrics, and taxonomy.  That said, the workshop participants did not universally endorse the report's taxonomic conclusions.  Levels of agreement with the report's taxonomic conclusions largely mirrored the strength of the underlying science.  For example, participants' acceptance of the validity of Mexican wolves was much higher than acceptance of *C. lupus occidentalis* because the available data supporting subspecific status for *C. l. baileyi* are stronger and more definitive.

In the west, the vast majority of participants accepted the Mexican wolf *C. l. baileyi* as a valid taxon given the strength of evidence available.  Most participants found the evidence in support of other purported gray wolf *C. lupus* subspecies, including *C. l. nubilus* or another coastal NW wolf*, less compelling.  A dissenting minority view held that wolf biology, specifically the demonstrated dispersal capacity, made the subspecies concept irrelevant for wolves.

In the east, participants agreed that the red wolf represents a unique genetic lineage and a valid taxon.  However, there was no resolution over whether the red wolf should continue to be listed as a species or whether it should be listed as a subspecies of *C. lycaon*.  On the whole, the group felt the science was still premature and revision should be deferred until the issue is resolved.

In the Great Lakes, most participants found the available data compelling that there were two species of wolves co-occurring in the region, as well as hybrids.  Some participants thought the data in support of this proposition were not compelling.  All participants agreed that this issue should be further analyzed in the upcoming WGL rulemaking.

*Assumption 3* (the Service has the discretion to designate DPSs of either the species or subspecies, where valid subspecies have been identified).  Most participants supported the idea that we can designate DPSs of species or subspecies, assuming both taxonomic units are valid.  The participants (with Solicitor support) clarified, though, that in general, higher taxonomic levels provide a stronger basis for listing units.  The participants were generally not concerned that DPSs of full species would fail significance thresholds for the size of units the regions preferred (e.g., using NRM DPS of *C. lupus*).  Thus, despite the discretion to designate DPSs for any taxonomic level, DPSs of full species were often preferred.  A few participants questioned whether we should designate a DPS of a species that included portions of two subspecies.  This issue could arise in the Northwest depending upon the DPS selected and requires additional attention.

*Assumption 4* (the configuration of geographic units should cover all or nearly all of North America).  From the beginning of this effort, there was a sense that some of the current

North American Wolf Recovery SDM Project

difficulties with wolf listing and recovery had arisen because of myopic planning, and that what was needed was a holistic view of wolves in North America.  While it was never the intent to seriously consider listing wolves in Canada or most of Alaska, there was a desire to make sure that the logic being applied in the lower 48 was consistent with a broader view of wolf status in the continent as a whole.  Thus, there was a desire to identify *de facto* geographic units for Canada and Alaska.  At the July workshop, there was strong tacit agreement among the participants that the set of geographic units needed to address all of the lower 48 states with a comparable level of detail.  The need to address Canada, Alaska, and Mexico was not discussed as much since attention was focused on recovering wolves within the conterminous U.S.  But in many discussions it was clear that it was important to understand the implicit status of Canada and Alaska, because they provided the continental context for assessing wolf population significance and recovery strategy within the lower 48.  Thus, this assumption does not require us to consider alternative geographic units in Canada and Alaska with the same scrutiny and resolution applied to units in the lower 48, but it does require an understanding of the context that the northern areas provide.

*Assumption 5* (potential units being considered for listing should provide complete coverage of range, where range is defined as the potential future range at recovery).  While most participants agreed the potential units being considered should provide complete coverage of potential range, there was some disagreement on the definition of range.  Some participants were concerned that our definition of range was not consistent with the 2007 solicitor memorandum opinion on "the meaning of 'in danger of extinction throughout all or a significant portion of its range'" (M-37013).  Specifically, this memorandum opinion found that "the word 'range' in the significant portion of its range phrase refers to the range in which a species currently exists, not to the historical range of the species where it once existed," although the opinion goes on to discuss the importance of considering historical range for context.  The recent northern Rocky Mountain rulemaking (74 FR 15123, April 2, 2009) considered this guidance and defined the population's range as the entire northern Rocky Mountain DPS including both occupied areas and unoccupied areas where routine wolf dispersal could be expected.

*Assumption 6* (there are areas of historical habitat that are no longer suitable wolf habitat because of permanent changes that have occurred).  Participants agreed that some areas that once supported wolf populations are no longer capable of supporting resident wolf populations, and further that these areas would not be part of the national wolf strategy because sufficient suitable habitat is extant across broad regions to support the representative distribution of wolves at recovery.  For example, no one disputed that areas like Nebraska are unlikely to ever support a sustainable wolf population.  In general, the participants thought the Act's protections for gray wolves (*C. lupus*) could be removed in such areas as part of the national wolf recovery strategy.  There was, however, little discussion about and hence no agreement on the appropriate mechanism to delist selected areas of gray wolf range in the lower 48.  One participant questioned whether these areas should be titled "not potential range."  It was understood that more analysis would be needed before any regulatory action to redefine gray wolf range would be taken, including more detailed delineation of habitat suitability as well as policy clarification.

*Assumption 7* (all boundaries are rough approximations that need further refinement).  All participants recognized that the maps used in this exercise were rough approximations of

potentially suitable habitat.  Also, there was general agreement that further refinement of these maps would benefit the process, but no resolution on the best way to approach this need or whether it must be done before a broad national strategy can be settled upon.  While some in the planning team thought we should undertake a national mapping exercise with standardized methodology, others thought we should rely upon existing models at least for parts of the country where habitat is fairly well described and regulatory action needed most immediately (e.g., SW, WGL).  Through this discussion it became evident that this issue is most relevant for DPS designations.  In cases where we have listed or intend to list a taxonomic unit (e.g., a species or subspecies), more precise habitat mapping may not be necessary to define the listable entity.  Unlike DPS designations that tend to rely upon breaks in suitable habitat to demonstrate discreteness, taxonomic units do not require an independent discreteness analysis and are typically listed where found.

*Assumption 8* (the Service has the discretion to combine or split units as long as any combined or individual units meet the established criteria).  Most participants believed we have discretion to lump or split DPSs as long as each unit meets the DPS policy's criteria for discreteness and significance.  As noted above, a few participants questioned whether we should designate a DPS of a species that included portions of two subspecies (see discussion of assumption 3 for more detail on this issue).

*Assumption 9* (the Service has the discretion to use or not use an international boundary to define a DPS.  No participants disputed the belief that we have the option to use or not use the international boundary to define DPSs.  That said, several participants believed we should apply a consistent methodology in deciding where to use the international boundary in DPS designations.  These participants indicated that where a consistent methodology is not applied, we will need to fully explain the differences in these situations that warrant differences in application of the DPS policy.  For example, it would be perfectly appropriate to make different discreteness determinations at the U.S.-Mexico and U.S.-Canada boundaries if there were substantive differences in wolf conservation status or regulatory mechanisms at these borders.

*Assumption 10* (the Service has the discretion to list a unit as a subspecies or a DPS, if the unit qualifies as both).  Participants generally agreed that we have discretion to list a DPS or a subspecies when the unit qualified as either.  Most participants (including Solicitors) also agreed a subspecies designation was the preferred approach for most such situations.  One participant indicated that if we decide to list a wolf population at the taxonomic level (i.e., a subspecies or species), we may want to define "where listed" more precisely than entire range or where found.  This may be important for wolves given their demonstrated dispersal capacity.  For example, if a Mexican wolf dispersed to Montana (where wolves are delisted) and attacked livestock, the rancher should be able to defend his property without first conducting a genetic analysis to determine if the wolf is a state-regulated northern Rocky Mountain wolf or a Federally protected Mexican wolf well outside its normal range.

*Assumption 11* (entities, whether DPSs or subspecies, should be listed in the same units for which delisting is intended).  While most participants agreed it was desirable to list in the same units we intend to delist, practically, this may not always be possible.  For example, the northern Rocky Mountains may not have qualified as a DPS prior to our 1994-1995 reintroduction efforts.

North American Wolf Recovery SDM Project

Because the area did not include a population, it would have been difficult to it contained a discrete population.  Thus, we may be precluded from designating a New England DPS.  Some participants believed that a complication with this position may be the potential for an area to qualify as a DPS one year, but not the next year should a few mortalities occur.  Several participants found this potential for flip-flopping status troubling.  The concern about designating DPSs for regions with extirpated populations highlights the distinction between identifying fundamental recovery areas (areas where we would care about recovering a distinct unit, and thus may separately list/delist wolves, when possible) and current listing units.

Put another way, the desire to use listing to designate the key areas for recovery (assumption 1) and the desire to list the same units that we intend to delist (assumption 11) might be at odds with some of the current regulations, policies, and opinions.  Is there a way to accomplish all of this?  It may be that tactical considerations have to be brought to bear in the short-term, in service to long-term aims.  That is, perhaps the long-term aims can be summarized in a map of desired wolf units—areas where we intend wolves to be recovered in the long-term.  This might not equate, however, with how listing and recovery proceed in the short-term.  For example, if wolves in New England are deemed to be critical for full representation in a complete view of North American recovery, but cannot be listed now as a DPS because there is not a population extant, the solution might lie in listing them as part of a larger unit now, with the stated intent to subdivide the unit into separate DPSs once wolves have become established in New England (or perhaps simply the stated intent that New England is a non-negotiable part of recovery planning).  What assumption 11 is meant to capture, however, is that the long-term intent not be left to myopic and whimsical decisions in the future, rather, that it somehow be captured in strategic planning now, through listing if possible, through recovery planning otherwise.

*Assumptions 12 & 13* (unit boundaries and recovery planning efforts can extend beyond our understanding of historic subspecific ranges; and natural mixing of wolf subspecies occurred historically and should not necessarily be precluded).  All participants that accepted the concept of subspecies for wolves recognized that historic range maps were approximations of where each subspecies occurred and that large intergrade zones likely existed.  Because of this, most participants remained open-minded to the idea of allowing reintroductions outside of a subspecies' recognized historical range.  That said, nearly all participants thought we should only consider such reintroductions when there was a substantial biological benefit to employing this approach.

Many participants were supportive of the idea of reintroducing the Mexican wolf into unoccupied suitable habitat in Colorado/Utah if recovery experts deemed it important for recovery.  For example, some believe there may not be enough suitable habitat in the subspecies' recognized historic range where wolves are protected from excessive human caused mortality to support recovery in a foreseeable timeframe.  Under such a scenario, many participants were supportive of reintroductions outside of the subspecies historic range.  Other participants thought it was acceptable to reintroduce Mexican wolves into the Colorado/Utah area in order to facilitate gene flow among subspecies as likely occurred historically.  This could be especially important to the Mexican wolf because of its small founder population (n=7) and limited genetic diversity.  A few participants questioned whether establishing intermediate populations and facilitating gene flow might undermine the genetic uniqueness of the subspecies.  Several

000839A

participants indicated that gene flow could be accomplished via human assisted migration, if necessary.

*Assumption 14* (persistence in an ecological setting unusual or unique for the taxon potentially indicates that a population segment represents a significant resource).  No participants questioned this assumption.

### 8.3. Objectives

The relative weights given to the objectives at the July workshop (Tables 9 and 10) are the starting point for understanding what was important to the Regions, but in addition, a number of important insights regarding the objectives arose during discussion.

Participants generally cared the most about compliance with best available science (as judged by the weights given to this objective), although they disagreed on the extent to which they supported using the subspecies identified in Chambers et al. (2009) as the sole measure for this objective.   While participants were fully willing to support *baileyi* as a subspecies, some were not prepared to adopt other taxonomic revisions, including other subspecies of *C. lupus* and the recognition of *C. lycaon* as a species.  Even if the taxonomy was not formally changed and even if the very existence of 'subspecies' does not apply to wolves, the participants agreed generally that the best available science indicates sufficient distinctions between wolf populations to support separate listing units roughly along the lines of the putative subspecies where presently found.  So despite differences over accepting the new taxonomy, this objective still received high weights; higher in the West than in the East.

The objectives of case law compliance and policy compliance each had a wider range of weighting among participants than did other objectives, especially for alternatives in the West, but overall the mean weights for case law and policy compliance held moderate importance.  Most participants weighted compliance with past rulings very low.  One participant noted that "it's our job to explain our decisions, we don't base our decision upon past decisions."  When the solicitors provided their estimates for the case law compliance objective, they interpreted this attribute as "legal defensibility," which possibly encompasses all three of the compliance objectives and the use of best available science (i.e., all four objectives under 'conforms to ESA').  Indeed, except for the status quo alternative to which the solicitors gave lowest ranks, the case law scores (E3) were intermediate between the other 'conform to ESA' objectives (E1, E2a, E2b), consistent with a defensibility interpretation that blended all the E objectives (Tables 3 and 5).  These objectives should be re-evaluated before use in any additional rankings or prototypes.

After best available science, representative distribution was most heavily weighted by most participants, particularly for the West.  However, there was disagreement about exactly what representative distribution meant and how it should be defined.  The attribute considered only how the subspecies from Chambers et al. (2009) were represented in separate units within each alternative.  The discussion regarding "how much is enough" was especially pertinent to the Northeast regarding *C. lycaon* wolves in New England, and in the Northwest regarding *C. l. nubilus* wolves on the west coast.  Everyone agreed that it was important to have some

representation of taxa in the lower 48, but not everyone agreed upon the necessity of geographic representation of all historical populations.

The objective of connectivity was important to those concerned about isolation of *C. l. baileyi*, however, in general, this objective was not heavily weighted, in part because other wolf populations do not have the same issues with small population size.  Participants felt it was important not to preclude connectivity in recovery, but some saw the concept as outside the realm of consideration in a listing analysis.  Many thought that having a unit that was large enough for recovery was more important than assuring connectivity.  Some expressed concern that tailoring an objective to facilitate connectivity just for *baileyi* was inappropriate when developing objectives meant to pertain to a more holistic strategy.   That is, if the concern was that genetic exchange would be necessary for a viable population of *baileyi*, then conserving a viable population of *baileyi*, or of each subspecies, was the ultimate objective, not connectivity. Connectivity was simply a means to an end.

Participants found the objective of recovery efficiency (units not too large or too small) confusing, and it was not heavily weighted.  Some thought management flexibility was a more useful concept to capture in this objective.  Having the flexibility to formulate management decisions during recovery might favor larger units, in opposition to seeking a representative distribution through listing, which tends to favor smaller units in an effort to capture geographic heterogeneity.

Regulatory burden was also given low weight; most felt that it was not appropriate to consider this at the listing stage, as our listing decisions should be based on the best available science regardless of the resulting regulatory burden.  That said, reducing regulatory burden underlies the motivation to identify units that can be delisted, and to allow delisting as soon as possible, so it seems to have been operating in many past decisions.  Further, reducing regulatory burden is also seen as a means to increasing support for wolf recovery.  The elicitation for this attribute was complicated, in part because of the consideration of significant portions of the range.  Careful deliberation about this objective and how to capture it would be beneficial to future work.

Finally, clarity to the public was given low to moderate weight.  Participants felt it was an important consideration, but that decisions should not be driven by it.  One participant suggested that rather, we should make a decision, and pursue providing clarity to the public as part of the tactical rollout.  While most agreed, it was also noted that if you have two equal alternatives, the one with greater clarity to the public, or a court, should receive preference.

### 8.4. Alternatives

We conclude by summarizing the links between the structured analysis of alternatives developed before the July workshop (a prototype analysis), the subsequent discussion of assumptions, objectives, attributes, and alternatives, and the regions' preferred alternatives.  The consensus elements of the regions' alternatives both reflect and differ in specific details from the alternatives that scored highly in the prototype analysis, as follows.

In the Southwest, most regions preferred listing *C. l. baileyi* as a subspecies, as opposed to a DPS, with its range extending into Colorado and Utah (the historical intergrade zone of *baileyi*

and *nubilus*).  A Region 2 analysis suggested that this option most favors recovery for Mexican wolves.  However, this choice seems to conflict with the analysis, in which the subspecies-based alternative scored worse than the DPS-based alternatives.  The poor scoring for the 'subspecies units' alternative (West alternative 1) resulted in part because the prototype *baileyi* subspecies unit was drawn from historical range lines that do not provide the habitat in CO-UT thought necessary for Mexican wolf recovery and, in part, due to the challenges of trying to restore *C. l. nubilus* wolves in this intergrade zone.  In addition, the analysis assumed that delisting would be delayed by 'lumping' U.S. wolves with those in Mexico.  This assumption (part of the attribute scoring details) may not be valid, particularly if Region 2 would consider delisting a U.S. DPS when it recovers, even if the full subspecies is the best current strategy for listing.  In other words, the subspecies alternative for the West that was analyzed is not at all the same as the *baileyi* subspecies alternative preferred by the regions.

In the northern part of the West, all the regions preferred either one or two DPS units of *C. lupus*, which is consistent with the top performing prototype alternatives 4 and 5 in the West.  Wolves in the Pacific NW would be recognized as part of a national recovery strategy, either separate from or as part of the current NRM DPS.  Two regions placed these wolves in a separate DPS from NRM, including Region 6 which also suggested the DPS for NW wolves might extend across the international border (unlike NRM) and include all coastal wolves, pending further analysis of genetic and ecological distinctiveness separating these wolves from other *lupus* wolves.  Regions not preferring a separate NW DPS cited uncertainty about what wolves are immigrating into this area (source populations and genetics/taxonomy) and subspecies taxonomy for *C. lupus* in general, as well as recovery flexibility.  In other words, all regions support an intention to recover wolves in the NW, but could not fully support either the Chambers et al. (2009) taxonomy or the concern that representation is not assured with larger listing units.  Still, the regional preferences were consistent with the top alternatives in the prototype analysis.

In the northern part of the East, all regions except Region 5 supported the broad outline of a *lycaon* area unit as drawn in the prototype alternatives, although only some regions were ready to expressly designate these units as *C. lycaon*; the others would describe this region as a DPS of *C. lupus*.  The regions did not uniformly accept the assumption regarding Chambers et al. (2009).  While all the regions accept the uniqueness and significance of wolves in this region, they did not agree about using the new species/subspecies designation for these wolves.  In addition, Region 5 left the unoccupied habitat in New England outside any of the wolf recovery units because no population exists here.  It's not clear how this differs from alternative 4 where this region is designated "extirpated."  Region 5 did not accept the prototype assumption that all areas of potential suitable range needed to be accounted for in the national strategy.  All regions rejected the alternatives that identify a potential DPS for the unoccupied New England area (alternative 3) or combining two disjunct regions in one DPS (alternative 2), instead creating a new alternative that included the New England habitat with the Canadian portion of *lycaon* range.  One region then split *lycaon* wolves into two DPS (WGL and Canada/NE).  The preference by most regions to not recognize a DPS in WGL was not clearly explained; it may be due in part to lack of clarity in the taxonomic information for the region, in part to anticipation that listing is not warranted (because the population is already recovered), and in part to the difficulty of determining how to delineate a DPS with mixed species and hybrids.  The six regions preferring a single *lycaon*-type unit classified it variously as the subspecies *C. l. lycaon*,

North American Wolf Recovery SDM Project

the species *C. lycaon*, a DPS of *C. lupus*, or did not chose between these options.  Thus, only one region preferred an alternative that was even included in the prototype analysis (the single unit for subspecies *C. l. lycaon*).  The other DPS-based alternatives were rejected based on discussion about non-compliance with DPS policy (New England habitat unoccupied), and because designating this area as 'extirpated' for *lycaon* (East alternative 4) was also rejected as a valid option.  Hence it is not very useful to compare the scoring of the prototype alternatives with the new alternatives in this region because too many of the prototype assumptions and attributes were not universally accepted.

In the Southeast, the comparison of preferred alternatives and the prototype analysis is also not very informative because the prototype offered a very limited range of options.  Red wolves were not initially part of the analysis, and were only added to the alternatives when the taxonomic review raised issues of connections between wolves in the Northeast and Southeast that logically should be addressed as part of a cohesive national strategy.  That said, the regions consistently supported recovery for a single unit for '*rufus*' listed 'where found,' with the potential range extending north of current recovery areas to reflect new information from Chambers et al. (2009).  Further, the regions all supported removing areas of gray wolf habitat in the Southeast from the *C. lupus* listing, correcting what has long been viewed as a listing error.  Given the taxonomic uncertainty about *C. lycaon* and *C. rufus*, most regions (including affected Regions 4 and 5) preferred to stay with the status quo on red wolves for now.  This leaves it somewhat unclear whether the Southeast should be considered part of a national wolf recovery strategy or treated separately.

## 9.  Recommendation:  A National Vision for Wolf Recovery

### 9.1. The need for a national vision

We believe the work that was begun as part of this project should be carried forward, and developed into a national vision for wolf recovery, which includes a strategic plan for listing and reclassification, as well as recovery planning.  This project began as a prospective exercise, to explore what wolf listing might look like if we took a step back and reconsidered the problem from a fresh perspective.  As a result of this work, we are convinced that a holistic plan is both desirable and achievable.  The primary reason for pursuing a national vision is that past efforts, while well intentioned and extraordinarily successful in many respects, have been myopic, focusing on local and regional concerns without deference to a continental context.  The northern Rocky Mountain and Western Great Lakes recovery efforts have exceeded their goals and are iconic case studies of successful wildlife management, but the piecemeal delisting attempts have created challenges for those working to recover wolves in other regions, because the status and intent for wolves in the remainder of the listed area have been unclear.  We believe that a national vision for wolf listing and recovery would address these concerns, allow more efficient recovery of wolves in North America, and provide a clearer message to the public.  As a result of the work undertaken in this project, we think that a national vision is within our grasp.

### 9.2. Fundamental components of a nation vision

As a part of this project and during the July workshop, a number of components of a national vision were identified that were well supported among all decision-makers and participants.  These areas of agreement should form the core of a national vision.

000843A

North American Wolf Recovery SDM Project

The central purpose of the national vision is to sketch a broad outline of the long-term aims for wolf recovery, a specific geographic picture that identifies where wolves need to be to constitute full recovery in North America (with emphasis on the lower 48), and which provides strategic guidance for listing, reclassification, recovery planning, and delisting.  This geographic picture would identify subspecies and representative populations that need to be sustained to maintain the resilience, redundancy, and representation of wolves, while also specifically identifying those areas of non-suitable habitat in which wolf recovery is not appropriate or necessary.
A critical goal for wolf recovery, consistent with the intent of the ESA, is appropriate representation of wolves in the lower 48.  This representation should include as much of the extant wolf evolutionary legacy as we can achieve, including all extant species, all well-identified subspecies, and other populations that represent distinct and significant elements of the historical distribution.  We believe that the way we've captured this objective in the analysis herein is close to the desired distribution, namely, a stable population that represents each of the major historical subspecies in the U.S. (*baileyi, occidentalis, nubilus, lycaon, and rufus*), but with some open questions about nuances at a smaller scale that are outlined below.

The national vision needs to account for all the space in the lower 48 that was once historical range, is current range, or is potential range, so that there are no "left over" pieces whose status is uncertain.  All areas of potential range will be included in a unit, whether a listed subspecies or DPS, or an area representing a population that is already recovered.

The national vision should also be explicit about areas within the lower 48 that are no longer potential range and are not needed to meet recovery goals.  We recognize that there are areas of historical wolf habitat that are no longer suitable because of the substantial human influence on the landscape and unavoidable human conflicts that would cause unsustainable wolf mortality.  These areas should be identified and delisted.

A consistent, transparent logic should be evident across the nation for wolf listing units and recovery strategies.  This consistency does not need to be constricting—there does need to be enough flexibility to address regional and local considerations—but there should be common ground.  For instance, there does not need to be a rigid vision that says only subspecies will be listed; instead, a mix of types of units could be identified (some subspecies, some DPSs, etc.), but there should not be contradictions in logic.  Historical distribution and taxonomy do matter in this logical consistency, but are not strictly binding; recovery utility may be used to adjust boundaries, for instance.

Some specific elements of current consensus regarding representative distribution include the following.  (1) The Southwest is a listable entity and a desired part of the distribution of wolves in North America, either as a DPS or as a subspecies, *baileyi*.  (2) We care about wolves in the Northeast (meaning *lycaon* in WGL, New England, and eastern Canada) as a unique piece of evolutionary heritage that needs to be accounted for, even if we do not yet know how to do that.  (3) There is at least one DPS in the Northwest that is separate from the rest of the country and has a northern boundary with Canada.  (4) Coastal wolves in the Pacific Northwest need to be considered.  (5) Red wolves (*rufus*), whether a full species or a subspecies, should continue to be listed where found.

### 9.3. Issues that require resolution

While the process undertaken thus far has identified many areas of consensus, there remain a number of issues that have not yet been fully addressed or agreed upon. We believe these are important issues that need to be resolved as part of a national vision for wolf recovery.

The taxonomic review conducted by Chambers et al. (2009) suggested a substantially different picture than the one (or ones) that had guided wolf planning to date. Not all regions are ready to embrace the new taxonomy, especially regarding *lycaon*, and this may have a substantial influence on the vision for wolves in the east. The Service is initiating a third-party peer-review of this work, and after that is complete, will make a judgment about whether to use Chambers et al. (2009) to guide regulatory decisions.

One of the challenges of a national vision is that regional or local objectives may need to be negotiated to find a solution that is optimal at the large scale. Currently, a clear institutional mechanism for regional negotiation and joint deliberation does not exist. The development of a national vision may have to cut new ground in cooperative planning.

The Western Great Lakes poses a unique challenge that we did not grapple with in this analysis. It seems evident that there are two taxa with overlapping ranges in this area (Chambers et al. 2009 identify these as *C. lupus nubilus* and *C. lycaon lycaon*). Whether or not the taxonomy is accepted, how should these be handled? Does their status differ? Should they be listed separately or together?

To be complete about the North American context, what statements do we need to make about Alaska and Canada? Specifically, is the status of *occidentalis* the same across the Canadian border (how does NRM relate to *occidentalis* continentally)? Likewise for wolves along the Pacific coast—does the status differ across the WA/BC and BC/AK borders?

In the Southwest, we identified connectivity of *baileyi* (or an equivalent DPS) with wolves to the north as important for genetic mixing, historical distribution, and to promote recovery. Do we have the same concerns about the isolation of red wolves in the Southeast? If so, what could be done about it? If not, why does it differ from the Southwest?

Some specific geographic questions that require deliberation include the following. (1) Is the Southwest unit a DPS or a subspecies? Will it be split into two units at the Mexican border, or be a single, international unit? (2) Should the Pacific Northwest be split off from NRM? If so, does the Pacific Northwest have a border at Canada, or does it extend up to include coastal wolves as far as southeast Alaska? Does the status of coastal wolves differ across the international border? (3) How do we handle northeastern wolves (including WGL, New England and eastern Canada)? Do we wait for the taxonomy to be sorted out, or do we split it into several DPSs?

### 9.4. Regulatory strategy

A national vision will also need to address the regulatory complexities of any listing, reclassification, or delisting actions. This is challenging both in the long- and short-run. In the

North American Wolf Recovery SDM Project

long-run, while a national vision could paint a picture of the desired spatial arrangement of listable entities, it may be a challenge to figure out what regulatory steps to take to get from the current situation to the desired one. For instance, how could delisting of no-longer-potential habitat be accomplished? What order of regulatory steps would be most efficient? In the short-run, it's even more complicated, because while a national vision is being finalized, there will still be a number of regulatory actions taken (several are ongoing now). How can current actions be taken that do not undermine the long-term picture?

As a start, we believe it may be valuable to develop either an advanced notice of proposed rulemaking, or a common preamble for rules, that sketches the national vision, and puts any particular rulemaking in the context of the larger, long-range picture. This would, for example, allow Region 2 to proceed with a reclassification rule for *baileyi* or a comparable DPS sooner rather than later, without creating confusion about how such a listing would fit into the larger picture.

### *9.5. Developing a national vision*
We have used an iterative prototyping approach to prospectively craft the beginnings of a national vision for wolf recovery, with repeated development of increasingly detailed analyses, and regular review and input from the decision-makers. Our hope had been to complete a final round of this structured analysis with the decision makers at the July workshop, including settling upon a 'final prototype' set of listing unit alternatives (maps) and objectives (measurable attributes and their weights). We did not get that far at the workshop, however. Workshop time was devoted to more general discussion and the exercise to develop the set of preferred alternatives for each region without completing a final round of formal analysis or reaching a final consensus solution.

We see three possible approaches to further development. (1) Conduct a full formal nationwide structured analysis, with revised maps, objectives, elicitation, and analyses, taking into account the many insights that have arisen thus far. (2) Conduct an informal process to find consensus, beginning with the elements of agreement from the July workshop, and using unstructured discussion among the planning team and regional staffs to resolve outstanding issues. (3) Take an in-between path that identifies the areas of consensus from the July workshop and focuses additional structured analysis only on specific, unresolved issues. The working group recommends the third, focused approach, which involves first addressing some issues with the assumptions behind the national strategy (including policy clarification), and if any choices still remain to be made between specific units in particular regions, measuring their performance against simple, clear objectives to develop a final preferred vision.

Regardless of the approach taken, more intense involvement at the level of the assistant regional directors is needed, because many of the issues that would need to be resolved to craft a national vision require substantive policy interpretations. Further, involvement at the level of the regional directors is also needed because the development of a regulatory strategy as part of the national vision will require decisions about long-term commitments of staff and resources.

## Literature Cited

Bailey RG, Avers PE, King T, McNab WH, eds.  1994.  Ecoregions and subregions of the United States (map, 1:7,500,000).  U.S. Department of Agriculture, Forest Service, Washington, DC.  (including, McNab WH, Bailey RG, eds.  Supplementary table of map unit descriptions.)

Belongie C.  2008.  Using GIS to create a gray wolf habitat suitability model and to assess wolf pack ranges in the western Upper Peninsula of Michigan.  Papers in Resource Analysis 10.  Saint Mary's University of Minnesota Central Services Press, Winona, MN.

Carroll C.  2003.  Impacts of landscape change on wolf viability in the northeastern U.S. and southeastern Canada: Implications for wolf recovery.  Wildlands Project, Special Paper No. 5.  Richmond, VT.  31pp.

Carroll C.  2005.  Carnivore restoration in the Northeast U.S. and Southeastern Canada: A regional-scale analysis of habitat and population viability for wolf, lynx, and marten.  Report 2: Lynx and marten viability analysis.  Wildlands Project, Special Paper No. 6.  Richmond, VT.  46pp.

Carroll C, Noss RF, Schumaker NH, Paquet PC.  2001.  Is the return of the wolf, wolverine, and grizzly bear to Oregon and California biologically feasible?  Pages 25-46 in Maehr D, Noss RF, Larkin J, eds.  Large mammal restoration: ecological and sociological challenges in the 21st century.  Island Press, Washington, DC.

Carroll C, Phillips MK, Schumaker NH, Smith DW.  2003.  Impacts of landscape change on wolf restoration success: planning a reintroduction program based on static and dynamic spatial models.  Conservation Biology 17:536-548.

Carroll C, Phillips MK, Lopez-Gonzalez CA.  2004.  Spatial analysis of restoration potential and population viability of the wolf (Canis lupus) in the southwestern United States and northern Mexico.  Report Prepared for the Turner Endangered Species Fund.  July 12, 2004.  70pp + figures.

Carroll C, Phillips MK, Lopez-Gonzalez CA, Schumaker NH.  2006.  Defining recovery goals and strategies for endangered species: the wolf as a case study.  BioScience 56:25-37.

Chambers SM, Fain SR, Fazio B, Amaral M.  2009.  Evaluation of the taxonomy of North American wolves.  Department of Interior, U.S. Fish and Wildlife Service, Arlington, Virginia, USA.

Gehring TM, Potter BA.  2005.  Wolf habitat analysis in Michigan: an example of the need for proactive land management for carnivore species.  Wildlife Society Bulletin 33:1237-1244.

Goodwin P, Wright G.  2004.  Decision analysis for management judgment, 3rd edition.  John Wiley & Sons, West Sussex, England.

Harrison DJ, Chapin TB.  1997.  An assessment of potential habitat for eastern timber wolves in the northeastern United States and connectivity with occupied habitat in southeastern Canada.  Unpublished Summary Report and Position Paper for the Wildlife Conservation Society.  13pp.

Hearne D, Lewis K, Martin M, Mitton E, Rocklen C.  2003.  Assessing the landscape: toward a viable gray wolf population in Michigan and Wisconsin.  M.S. Thesis, University of Michigan, School of Natural Resources and Management, Ann Arbor, MI, USA.

Houts ME.  2001.  Modeling gray wolf habitat in the northern Rocky Mountains.  M.S. Thesis, University of Kansas, Department of Geography, Lawrence, KS, USA.

North American Wolf Recovery SDM Project

Houts ME.  2003.  Using logistic regression to model wolf habitat suitability in the northern Rocky Mountains.  World Wolf Congress, Banff, Canada.  Sept. 15-28, 2003.  8pp.

Larsen T, Ripple WJ.  2006.  Modeling gray wolf (*Canis lupus*) habitat in the Pacific Northwest, USA.  Journal of Conservation Planning 2:30-61.

MacMillan DC, Marshall K.  2006.  The Delphi process—an expert-based approach to ecological modelling in data-poor environments.  Animal Conservation 9:11-19.

Mladenoff DJ, Sickley TA, Haight RG, Wydeven AP.  1995.  A regional landscape analysis and prediction of favorable gray wolf habitat in the northern Great Lakes region.  Conservation Biology 9:279-294.

Mladenoff DJ, Haight RG, Sickley TA, Wydeven AP.  1997.  Causes and implications of species restoration in altered ecosystems.  BioScience 47:21-31.

Mladenoff DJ, Sickley TA.  1998.  Assessing potential gray wolf restoration in the northeastern United States: a spatial prediction of favorable habitat and potential population levels.  Journal of Wildlife Management 62:1-10.

Mladenoff DJ, Sickley TA, Wydeven AP.  1999.  Predicting gray wolf landscape recolonization: logistic regression models vs. new field data.  Ecological Applications 9:37-44.

Nowak RM.  1995.  Another look at wolf taxonomy.  Pages 375-397 in Carbyn LN, Fritts SH, Seip DR, eds.  Proceedings of the Second North American Symposium on Wolves, Canadian Circumpolar Institute, University of Alberta, Edmonton.

Nowak RM.  2003.  Wolf evolution and taxonomy.  Pages 239-258 in Mech LD, Boitani L, eds.  Wolves, Behavior, Ecology, and Conservation.  University of Chicago Press, Chicago.

Oakleaf JK, Murray DL, Oakleaf JR, Bangs EE, Mack CM, Smith DW, Fontaine JA, Jiminez MD, Meier TJ, Niemeyer CC.  2006.  Habitat selection by recolonizing wolves in the northern Rocky Mountains of the United States.  Journal of Wildlife Management 70:554-563.

Paquet PC, Strittholt JR, Staus NL.  1999.  Wolf reintroduction feasibility in the Adirondack Park.  Prepared for the Adirondack Citizens Advisory Committee on the Feasibility of Wolf Reintroductions. Conservation Biology Institute, Corvallis, OR, USA.  67pp.

Potvin MJ, Drummer TD, Vucetich JA, Beyer DE Jr, Peterson RO, Hammill JH.  2005.  Monitoring and habitat analysis for wolves in upper Michigan.  Journal of Wildlife Management 69:1660-1669.

Ratti JT, Weinstein M, Scott JM, Wiseman PA, Gillesberg A-M, Miller CA, Szepanski MM, Svancara LK.  2004.  Feasibility of wolf reintroduction to Olympic Peninsula, Washington.  Northwest Science 78:1-76.

Runge MC, Brown WM, Parkin M, Cochrane JF, Constantino MA, Barrett PJ, Chambers S, Morgan M, Jacobsen S.  2008.  Gray wolf recovery prototype decision analysis [Pre-decisional internal document].  U.S. Fish and Wildlife Service, Division of Endangered Species, Arlington, VA, USA.

U.S. Fish and Wildlife Service [USFWS].  2009.  Gray wolf recovery workshop, October 15-17, 2008.  (Meeting summary, February 12, 2009).  U.S. Fish and Wildlife Service, Southwest Regional Office, Albuquerque, NM, USA.

van Manen FT, Crawford BA, Clark JD.  2000.  Predicting red wolf release success in the southwestern United States.  Journal of Wildlife Management 64:895-902.

Wydeven AP, Fuller TK, Weber W, MacDonald K.  1998.  The potential for wolf recovery in the northeastern United States via dispersal from southeastern Canada.  Wildlife Society Bulletin 26:776-784.

000848A

North American Wolf Recovery SDM Project

**Table 1.**  Objectives hierarchy with measurable attributes for establishing geographic units for North American wolf listing and recovery.  The table shows primary, secondary, and tertiary fundamental objectives, where appropriate, as well as primary and secondary means objectives associated with the fundamental objectives.  Measurable attributes are given for the nine objectives that were carried forward in analysis.  The numbering of the objectives follows the structure of the hierarchy.  Measurable attributes (**A**, **G**) were developed for several objectives that were later dropped out of the analysis, but these are included in the table for completeness.

| Objectives | | | | | Attributes |
|---|---|---|---|---|---|
| **Fundamental** | | | **Means** | | |
| **Primary** | Secondary | Tertiary | Primary | Secondary [& Tertiary] | |
| **1. Facilitate range-wide recovery of wolves** | 1a. Promote Recovery (Consider Resiliency, Redundancy, Representation) | 1a*i*. Maximize persistence | 1a*i* (1). Maximize population size | | |
| | | | 1a*i* (2). Maximize flexibility of stocks for reintroduction | | **A** *[Average number of sources for translocation – DROP]* |
| | | 1a*ii*. Maintain/ restore representative populations (historical and current range) | | | **B** Amount of range in discrete units that don't mix subspecies (representation of subspecies in U.S.) |
| | | 1a*iii*. Preserve maximum genetic diversity but allow dispersal and mixing | 1a*iii* (1). Facilitate connectivity – discourage isolated populations (relevant for SW and SE) | | **C** Extent of separation b/t wolf populations – specific to *baileyi* and *rufus* |

North American Wolf Recovery SDM Project

**Table 1** (*continued*).

| Objectives | | | | | Attributes |
|---|---|---|---|---|---|
| **Fundamental** | | | **Means** | | |
| **Primary** | Secondary | Tertiary | Primary | Secondary [& Tertiary] | |
| (*continued*) **1. Facilitate range-wide recovery of wolves** | | | 1b. Facilitate administrative efficiency | 1b*i*. Units constructed at optimal scale (expedite recovery planning, anticipate delisting, beneficial use of Sec 7 authority) | **D2** Geographic units constructed at optimal scale to facilitate recovery planning (Goldilocks objective) |
| | | | | 1b*ii*. Minimize number of future rulemakings (consider what is currently listed) | |
| | | | | 1b*iii*. Minimize need for additional reintroductions | |
| **2. Maximize conservation and biodiversity benefit** | | | 2a. Maximize the function of ecosystems (geographic heterogeneity = max function?) | | |
| | | | 2b. Maximize future positive consequences for other species | | |
| | | | 2c. De-list recovered wolves quickly and efficiently | | |

North American Wolf Recovery SDM Project

**Table 1** (*continued*).

| Objectives | | | | | Attributes |
|---|---|---|---|---|---|
| **Fundamental** | | | **Means** | | |
| **Primary** | Secondary | Tertiary | Primary | Secondary [& Tertiary] | |
| **3. Conform to ESA** (as reflected, potentially, in policy, listing actions, judicial opinions)<br><br>*Fulfill regulatory requirements, minimize litigation risk* | | | 3a. Comply with listing guidance and policies | 3a*i*. Conform to subspecies designation regulations<br>3a*ii*.  Conform to DPS policy<br>3a*iii*.  Conform to draft listable entity guidance | **E1** Strength of compliance with policy/guidance |
| | | | 3b. Conform to past Service statements concerning wolf management (listings, EIS, delistings, etc.) | | **E2(a)** Consistency with past FWS statements |
| | | | 3c. Consistency with  best available scientific information (consideration of current information and certainty) | | **E2(b)** Consistency with best available science |
| | | | 3d. Comply with case law | | **E3** Strength of compliance with case law |
| | | | 3e. Reflect biological understanding | 3e*i*. Err towards evolutionary units/natural divisions with respect to discreteness | |
| | | | 3f. Deference to subspecies over DPS listing, all else equal | | |
| | | | 3g. Maintain clear process | | |

North American Wolf Recovery SDM Project

**Table 1** (*continued*).

| Objectives | | | | | Attributes |
|---|---|---|---|---|---|
| **Fundamental** | | | **Means** | | |
| **Primary** | Secondary | Tertiary | Primary | Secondary [& Tertiary] | |
| **4. Facilitate partnerships and good will** | | | 4a. Clarity to the public | 4a*i*. No remnant unit that is not a listable entity | **F** Clarity to the public, including clear rationale for the unit boundaries, and clear description of the listed entity (subspecies vs. DPS) |
| | | | | 4a*ii*. Maintain consistency with past actions (especially recent rules) | |
| | | | | 4a*iii*. Provide clear status for wolves that cross boundaries | |
| | | | | 4a*iv*. Provide clear boundaries for units (favors DPS) | |
| | | | | 4a*v*. Provide common sense rationale for units (intent for recovery) | |
| | | | 4b. Minimize public controversy | 4b*i*. Minimize additional reintroductions (facilitate dispersal) | **G** [DROP] |
| | | | | 4b*ii*. Minimize economic impact to private citizens | |
| | | | | 4b*iii*. Minimize real and perceived risks to humans | |
| | | | | 4b*iv*. Minimize loss of recreational opportunity | |
| | | | | 4b*v*. Minimize need for lethal control of wolves | |
| | | | | 4b*vi*. Honor previous commitments to partners | |

North American Wolf Recovery SDM Project

**Table 1** (*continued*).

| Objectives | | | | | Attributes |
|---|---|---|---|---|---|
| **Fundamental** | | | **Means** | | |
| **Primary** | Secondary | Tertiary | Primary | Secondary [& Tertiary] | |
| (***continued***) **4. Facilitate partnerships and good will** | | | (*continued*) 4b. Minimize public controversy | 4b*vii*. Conform to CDN and MEX designations for wolves | |
| | | | | 4b*viii*. Minimize scientific controversy         [4b*viii* (1) Use best available science] | |
| | | | 4c. Minimize unnecessary regulatory burden | 4c*i*. Promote efficient delisting | **D1** Regulated Area years (area, status, estimated years to delisting) – considers SPR |
| | | | | 4c*ii*. Minimize range under sections 7 & 9 | |
| | | | | 4c*iii*. Expedite de-regulation thru SPR, 4(d), 10(j) | |
| | | | | 4c*iv*. Expedite de-regulation outside potential habitat | |
| | | | | 4c*v*. Maximize flexibility in delisting | |

North American Wolf Recovery SDM Project

**Table 2.** Habitat suitability models for the wolf in the conterminous United States, listed by broad geographic regions.

| Region/ Subregion | Citation | Peer Review? | Model Type | Road density | Human density | Prey accessibility | Prey density | Prey availability | Land use/Owner | Land cover/use | Livestock density | Coyote density |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Western Region** | | | | | | | | | | | | |
| N/A; entire Western U.S. | Carroll et al. (2006) | Yes | Individual-based simulation (PATCH) | x | x | x | x | | | | | |
| Northern Rocky Mts. | Oakleaf et al. (2006) | Yes | Logistic Regression | x | x | x | x | | x | | | |
| Northern Rocky Mts. | Houts (2001) | No | Logistic Regression | x | | | x | | x | x | | |
| Pacific Northwest & N. Rocky Mts. | Houts (2003) | No | Logistic Regression | x | | | | | | x | | |
| N. Rocky Mts., Oregon, Calif. | Carroll et al. (2001) | No | GIS index | x | x | x | x | | | | | |
| Central Rockies | Carroll et al. (2003) | Yes | Static Resource Selection Function and Individual-based simulation (PATCH) | x | x | | | x | x | | | |
| Southwest U.S. & N. Mexico | Carroll et al. (2004) | No | Individual-based simulation (PATCH) | x | x | | x | | | | | |
| Olympic Peninsula | Ratti et al. (2004) | Yes | Logistic Regression (after Mladenoff and Sickly (1998)) | x | | | x | | | | | |
| Pacific Northwest & N. Rocky Mts. | Larsen and Ripple (2006) | Yes | Logistic Regression | x | x | | x | | x | x | | |

North American Wolf Recovery SDM Project

| Midwest Region | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| W. Upper Peninsula, MI | Belongie (2008) | No | GIS overlay, expert ranking | x | | x | | x | | |
| N. Lower Peninsula, MI | Gehring and Potter (2005) | Yes | After Mladenoff et al. (1995) | x | | | | | | |
| Upper Michigan and Wisconsin | Hearne et al. (2003) | No | GIS overlay, neighborhood analysis | x | x | | x | x | | |
| Upper Midwest | Mladenoff et al. (1995) | Yes | Logistic Regression | x | x | x | x | x | | |
| Upper Midwest | Mladenoff et al. (1997) | Yes | Logistic Regression | x | x | x | x | x | | |
| Upper Wisconsin | Mladenoff et al. (1999) | Yes | Logistic Regression | x | x | x | x | x | | |
| Upper Michigan | Potvin et al. 2005 | Yes | Logistic Regression | x | | x | | | | |
| Midwest and Northeast Regions | | | | | | | | | | |
| Upper Midwest and Northeast | Mladenoff and Sickley (1998) | Yes | Logistic Regression | x | | x | | | | |
| Eastern Region | | | | | | | | | | |
| Northeast | Carroll (2003) | No | Individual-based simulation (PATCH) | x | x | x | | | | |
| Northeast | Carroll (2005) | No | Individual-based simulation (PATCH) | x | x | x | | | | |
| Northeast | Harrison and Chapin (1997) | No | GIS, expert judgement | x | x | | | x | | |
| Adirondack State Park | Paquet et al. (1999) | No | Not specified | | | | | | | |
| Northeast | Wydeven et al (1998) | Yes | Expert opinion, model review | x | x | | | x | | |
| Southeast | van Manen et al. (2000) | Yes | Logistic Regression | x | x | x | | x | x | x |

North American Wolf Recovery SDM Project

**Table 3.** Consequence table for *lycaon/rufus* alternatives, mean results.  The best performing alternative in each objective is shaded green; the worst performing alternative in each objective is shaded pink.  Note, the worst and best performance depends on whether the objective is to be maximized or minimized, as indicated in the table.

| Objective | Description | Scale | | 1 Subspp. | 2 2-DPS | 3 3-DPS | 4 omit NE | Status quo |
|---|---|---|---|---|---|---|---|---|
| Facilitate range-wide recovery of wolves | | | | | | | | |
| B | Representative distribution | 0-6 | max | 3.00 | 4.00 | 4.00 | 4.00 | 3.00 |
| C | Facilitate connectivity | 0-2 | max | 0.57 | 0.57 | 0.57 | 0.57 | 0.86 |
| D2 | Recovery efficiency | 0-2 | max | 1.13 | 1.16 | 1.19 | 1.38 | 1.38 |
| Conform to ESA | | | | | | | | |
| E1 | Policy compliance | 0-2 | max | 1.67 | 1.33 | 1.25 | 1.00 | 0.17 |
| E2a | Past rulings compliance | 0-2 | max | 0.17 | 0.25 | 1.00 | 0.83 | 2.00 |
| E2b | Best available science | 0-2 | max | 1.50 | 1.50 | 1.33 | 0.83 | 0.33 |
| E3 | Case law compliance | 0-2 | max | 1.39 | 0.38 | 0.63 | 0.88 | 0.13 |
| Facilitate partnerships and good will | | | | | | | | |
| D1 | Regulatory burden | M mi$^2$-yr | min | 5.66 | 7.88 | 5.66 | 4.89 | 14.29 |
| F | Clarity to the public | 0-3 | max | 1.43 | 1.98 | 2.38 | 2.48 | 1.14 |

North American Wolf Recovery SDM Project

**Table 4.** Consequence table for *lycaon/rufus* alternatives, ranked results.  For each objective, a rank of 1 represents the best outcome across alternatives (the maximum for objectives we want to maximize, the minimum for objectives we want to minimize).

| Objective | Description | Scale | | 1 (Subspp.) | 2 (2-DPS) | 3 (3-DPS) | 4 (omit NE) | Status quo |
|---|---|---|---|---|---|---|---|---|
| Facilitate range-wide recovery of wolves | | | | | | | | |
| B | Repres. dist. | 0-6 | max | 4 | 1 | 1 | 1 | 4 |
| C | Facilitate connectivity | 0-2 | max | 2 | 2 | 2 | 2 | 1 |
| D2 | Recovery efficiency | 0-2 | max | 5 | 4 | 3 | 1 | 1 |
| Conform to ESA | | | | | | | | |
| E1 | Policy compliance | 0-2 | max | 1 | 2 | 3 | 4 | 5 |
| E2a | Past rulings comp. | 0-2 | max | 5 | 4 | 2 | 3 | 1 |
| E2b | Best avail. science | 0-2 | max | 1 | 1 | 3 | 4 | 5 |
| E3 | Case law compliance | 0-2 | max | 1 | 4 | 3 | 2 | 5 |
| Facilitate partnerships and good will | | | | | | | | |
| D1 | Regulatory burden | M mi$^2$-yr | min | 2 | 4 | 2 | 1 | 5 |
| F | Clarity to the public | 0-3 | max | 4 | 3 | 2 | 1 | 5 |

North American Wolf Recovery SDM Project

**Table 5.** Consequence table for *lupus* alternatives, mean results.  The best performing alternative in each objective is shaded green; the worst performing alternative in each objective is shaded pink.  Note, the worst and best performance depends on whether the objective is to be maximized or minimized, as indicated in the table.

| Objective | Description | Scale | | 1 Subspp. | 2 L48 | 3 2-DPS | 4 3-DPS | 5 DPS of subspp | 6 5 & omit | Status quo |
|---|---|---|---|---|---|---|---|---|---|---|
| Facilitate range-wide recovery of wolves | | | | | | | | | | |
| B | Representative distribution | 0-6 | max | 1.14 | 2.14 | 2.57 | 3.71 | 6.00 | 4.00 | 3.29 |
| C | Facilitate connectivity | 0-2 | max | 0.00 | 1.00 | 2.00 | 2.00 | 2.00 | 0.14 | 0.57 |
| D2 | Recovery efficiency | 0-2 | max | 0.55 | 0.86 | 1.11 | 1.50 | 1.50 | 0.93 | 0.86 |
| Conform to ESA | | | | | | | | | | |
| E1 | Policy compliance | 0-2 | max | 1.67 | 1.67 | 1.42 | 1.63 | 1.50 | 1.00 | 0.50 |
| E2a | Past rulings compliance | 0-2 | max | 0.33 | 0.00 | 1.00 | 0.75 | 1.08 | 0.83 | 1.83 |
| E2b | Best available science | 0-2 | max | 1.58 | 1.75 | 1.58 | 1.58 | 1.17 | 0.67 | 0.50 |
| E3 | Case law compliance | 0-2 | max | 0.70 | 0.65 | 0.61 | 0.66 | 0.64 | 0.88 | 0.40 |
| Facilitate partnerships and good will | | | | | | | | | | |
| D1 | Regulatory burden | M mi$^2$-yr | min | 17.53 | 22.57 | 14.09 | 10.67 | 10.67 | 19.55 | 32.53 |
| F | Clarity to the public | 0-3 | max | 1.14 | 2.43 | 2.61 | 2.64 | 2.74 | 2.62 | 1.86 |

North American Wolf Recovery SDM Project

**Table 6.** Consequence table for *lupus* alternatives, ranked results.  For each objective, a rank of 1 represents the best outcome across alternatives (the maximum for objectives we want to maximize, the minimum for objectives we want to minimize).

| Objective | Description | Scale | | 1 | 2 | 3 | 4 | 5 | 6 | SQ |
|---|---|---|---|---|---|---|---|---|---|---|
| Facilitate range-wide recovery of wolves | | | | | | | | | | |
| B | Repres. dist. | 0-6 | max | 7 | 6 | 5 | 3 | 1 | 2 | 4 |
| C | Facilitate connectivity | 0-2 | max | 7 | 4 | 1 | 1 | 1 | 6 | 5 |
| D2 | Recovery efficiency | 0-2 | max | 7 | 5 | 3 | 1 | 1 | 4 | 5 |
| Conform to ESA | | | | | | | | | | |
| E1 | Policy compliance | 0-2 | max | 1 | 1 | 5 | 3 | 4 | 6 | 7 |
| E2a | Past rulings comp. | 0-2 | max | 6 | 7 | 3 | 5 | 2 | 4 | 1 |
| E2b | Best avail. science | 0-2 | max | 2 | 1 | 2 | 2 | 5 | 6 | 7 |
| E3 | Case law compliance | 0-2 | max | 2 | 4 | 6 | 3 | 5 | 1 | 7 |
| Facilitate partnerships and good will | | | | | | | | | | |
| D1 | Regulatory burden | M mi$^2$-yr | min | 4 | 6 | 3 | 1 | 1 | 5 | 7 |
| F | Clarity to the public | 0-3 | max | 7 | 5 | 4 | 2 | 1 | 3 | 6 |

North American Wolf Recovery SDM Project

**Table 7.** Swing weighting table for eliciting weights on the *lycaon/rufus* objectives. The decision-makers were asked to fill in the gray cells; from the scores, weights for each objective could be calculated.

| | Objective | | | Range | | Hypothetical Alternatives | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Description | Scale | | low | high | Base line | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| Facilitate range-wide recovery of wolves | | | | | | | | | | | | | | | |
| B | Representative distribution | 0-4 | max | 3.00 | 4.00 | 3.00 | 4.00 | 3.00 | 3.00 | 3.00 | 3.00 | 3.00 | 3.00 | 3.00 | 3.00 |
| C | Facilitate connectivity | 0-2 | max | 0.57 | 0.86 | 0.57 | 0.57 | 0.86 | 0.57 | 0.57 | 0.57 | 0.57 | 0.57 | 0.57 | 0.57 |
| D2 | Recovery efficiency | 0-2 | max | 1.13 | 1.38 | 1.13 | 1.13 | 1.13 | 1.13 | 1.38 | 1.13 | 1.13 | 1.13 | 1.13 | 1.13 |
| Conform to ESA | | | | | | | | | | | | | | | |
| E1 | Policy compliance | 0-2 | max | 0.17 | 1.67 | 0.17 | 0.17 | 0.17 | 0.17 | 1.67 | 0.17 | 0.17 | 0.17 | 0.17 | 0.17 |
| E2a | Past rulings compliance | 0-2 | max | 0.17 | 2.00 | 0.17 | 0.17 | 0.17 | 0.17 | 0.17 | 2.00 | 0.17 | 0.17 | 0.17 | 0.17 |
| E2b | Best available science | 0-2 | max | 0.33 | 1.50 | 0.33 | 0.33 | 0.33 | 0.33 | 0.33 | 0.33 | 1.50 | 0.33 | 0.33 | 0.33 |
| E3 | Case law compliance | 0-2 | max | 0.13 | 1.39 | 0.13 | 0.13 | 0.13 | 0.13 | 0.13 | 0.13 | 0.13 | 1.39 | 0.13 | 0.13 |
| Facilitate partnerships and good will | | | | | | | | | | | | | | | |
| D1 | Regulatory burden | M mi$^2$-yr | min | 14.29 | 4.89 | 14.29 | 14.29 | 14.29 | 14.29 | 14.29 | 14.29 | 14.29 | 14.29 | 4.89 | 14.29 |
| F | Clarity to the public | 0-3 | max | 1.14 | 2.48 | 1.14 | 1.14 | 1.14 | 1.14 | 1.14 | 1.14 | 1.14 | 1.14 | 1.14 | 2.48 |
| | | | | | | | | | | | | | | | |
| | Rank | (1 is best; 10 is worst) | | | | 10 | | | | | | | | | |
| | Score | (100 is best; 0 is worst) | | | | 0 | | | | | | | | | |
| | Weight | (calculated) | | | | 0 | | | | | | | | | |

North American Wolf Recovery SDM Project

**Table 8.** Swing weighting table for eliciting weights on the *lupus* objectives. The decision-makers were asked to fill in the gray cells; from the scores, weights for each objective could be calculated.

| | Objective | | | Range | | Hypothetical Alternatives | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Description | Scale | | low | high | Base line | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| Facilitate range-wide recovery of wolves | | | | | | | | | | | | | | | |
| B | Representative distribution | 0-6 | max | 1.14 | 6.00 | 1.14 | 6.00 | 1.14 | 1.14 | 1.14 | 1.14 | 1.14 | 1.14 | 1.14 | 1.14 |
| C | Facilitate connectivity | 0-2 | max | 0.00 | 2.00 | 0.00 | 0.00 | 2.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| D2 | Recovery efficiency | 0-2 | max | 0.55 | 1.50 | 0.55 | 0.55 | 0.55 | 1.50 | 0.55 | 0.55 | 0.55 | 0.55 | 0.55 | 0.55 |
| Conform to ESA | | | | | | | | | | | | | | | |
| E1 | Policy compliance | 0-2 | max | 0.50 | 1.67 | 0.50 | 0.50 | 0.50 | 0.50 | 1.67 | 0.50 | 0.50 | 0.50 | 0.50 | 0.50 |
| E2a | Past rulings compliance | 0-2 | max | 0.00 | 1.83 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1.83 | 0.00 | 0.00 | 0.00 | 0.00 |
| E2b | Best available science | 0-2 | max | 0.50 | 1.75 | 0.50 | 0.50 | 0.50 | 0.50 | 0.50 | 0.50 | 1.75 | 0.50 | 0.50 | 0.50 |
| E3 | Case law compliance | 0-2 | max | 0.40 | 0.88 | 0.40 | 0.40 | 0.40 | 0.40 | 0.40 | 0.40 | 0.40 | 0.88 | 0.40 | 0.40 |
| Facilitate partnerships and good will | | | | | | | | | | | | | | | |
| D1 | Regulatory burden | M mi$^2$-yr | min | 32.53 | 10.67 | 32.53 | 32.53 | 32.53 | 32.53 | 32.53 | 32.53 | 32.53 | 32.53 | 10.67 | 32.53 |
| F | Clarity to the public | 0-3 | max | 1.14 | 2.74 | 1.14 | 1.14 | 1.14 | 1.14 | 1.14 | 1.14 | 1.14 | 1.14 | 1.14 | 2.74 |
| | | | | | | | | | | | | | | | |
| | Rank | (1 is best; 10 is worst) | | | | 10 | | | | | | | | | |
| | Score | (100 is best; 0 is worst) | | | | 0 | | | | | | | | | |
| | Weight | (calculated) | | | | 0 | | | | | | | | | |

North American Wolf Recovery SDM Project

**Table 9.** Objective weights, *lycaon/rufus* objectives. The scores provided by each decision-maker for the hypothetical alternatives, indicating the relative importance for each of the nine objectives, are presented along with the minimum, maximum, and mean scores across the eight decision makers. The lower half of the table provides the weights on the objectives (the weights sum to 1.0) for each decision maker, and the mean weights across decision makers. The summed weights for each of the three highest-level fundamental objectives are also shown.

| Decision Maker | Scores for Hypothetical Alternatives (and associated objective) | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1 (B) | 2 (C) | 3 (D2) | 1-3 total | 4 (E1) | 5 (E2a) | 6 (E2b) | 7 (E3) | 4-7 total | 8 (D1) | 9 (F) | 8-9 total |
| | Representa-tive distribution | Facilitate connectivity | Recovery efficiency | **Facilitate Recovery** | Policy compliance | Past rulings compliance | Best available science | Case law compliance | **Conform to ESA** | Regulatory burden | Clarity to the public | **Facilitate Good Will** |
| R1 | 20 | 10 | 10 | | 20 | 20 | 90 | 75 | | 20 | 20 | |
| R2 | 50 | 10 | 40 | | 70 | 1 | 90 | 70 | | 30 | 60 | |
| R3 | 60 | 20 | 50 | | 80 | 80 | 70 | 100 | | 40 | 75 | |
| R4 | 20 | 25 | 20 | | 55 | 50 | 90 | 80 | | 55 | 60 | |
| R5 | 60 | 0 | 0 | | 75 | 10 | 100 | 100 | | 20 | 20 | |
| R6 | 50 | 0 | 10 | | 90 | 50 | 100 | 90 | | 0 | 30 | |
| R8 | 50 | 30 | 50 | | 80 | 20 | 80 | 80 | | 30 | 20 | |
| R9 | 80 | 10 | 20 | | 85 | 5 | 100 | 75 | | 25 | 55 | |
| min | 20 | 0 | 0 | | 20 | 1 | 70 | 70 | | 0 | 20 | |
| max | 80 | 30 | 50 | | 90 | 80 | 100 | 100 | | 55 | 75 | |
| mean | 48.75 | 13.13 | 25 | | 69.38 | 29.5 | 90 | 83.75 | | 27.5 | 42.5 | |
| Weights | | | | | | | | | | | | |
| R1 | 0.07 | 0.04 | 0.04 | **0.15** | 0.07 | 0.07 | 0.32 | 0.26 | **0.72** | 0.07 | 0.07 | **0.14** |
| R2 | 0.12 | 0.02 | 0.10 | **0.24** | 0.17 | 0.00 | 0.21 | 0.17 | **0.55** | 0.07 | 0.14 | **0.21** |
| R3 | 0.10 | 0.03 | 0.09 | **0.23** | 0.14 | 0.14 | 0.12 | 0.17 | **0.57** | 0.07 | 0.13 | **0.20** |
| R4 | 0.04 | 0.05 | 0.04 | **0.14** | 0.12 | 0.11 | 0.20 | 0.18 | **0.60** | 0.12 | 0.13 | **0.25** |
| R5 | 0.16 | 0.00 | 0.00 | **0.16** | 0.19 | 0.03 | 0.26 | 0.26 | **0.74** | 0.05 | 0.05 | **0.10** |
| R6 | 0.12 | 0.00 | 0.02 | **0.14** | 0.21 | 0.12 | 0.24 | 0.21 | **0.79** | 0.00 | 0.07 | **0.07** |
| R8 | 0.11 | 0.07 | 0.11 | **0.30** | 0.18 | 0.05 | 0.18 | 0.18 | **0.59** | 0.07 | 0.05 | **0.11** |
| R9 | 0.18 | 0.02 | 0.04 | **0.24** | 0.19 | 0.01 | 0.22 | 0.16 | **0.58** | 0.05 | 0.12 | **0.18** |
| mean | 0.113 | 0.030 | 0.055 | **0.198** | 0.159 | 0.065 | 0.219 | 0.200 | **0.643** | 0.063 | 0.096 | **0.159** |

North American Wolf Recovery SDM Project

**Table 10.**  Objective weights, *lupus* objectives.  The scores provided by each decision-maker for the hypothetical alternatives, indicating the relative importance for each of the nine objectives, are presented along with the minimum, maximum, and mean scores across the eight decision makers.  The lower half of the table provides the weights on the objectives (the weights sum to 1.0) for each decision maker, and the mean weights across decision makers.  The summed weights for each of the three highest-level fundamental objectives are also shown.

| Decision Maker | 1 (B) Representative distribution | 2 (C) Facilitate connectivity | 3 (D2) Recovery efficiency | 1-3 Facilitate Recovery | 4 (E1) Policy compliance | 5 (E2a) Past rulings compliance | 6 (E2b) Best available science | 7 (E3) Case law compliance | 4-7 Conform to ESA | 8 (D1) Regulatory burden | 9 (F) Clarity to the public | 8-9 Facilitate Good Will |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Scores for Hypothetical Alternatives (and associated objective) | | | | | | | |
| R1 | 80 | 40 | 50 | | 40 | 40 | 100 | 70 | | 0 | 40 | |
| R2 | 100 | 90 | 90 | | 80 | 10 | 50 | 30 | | 80 | 50 | |
| R3 | 100 | 70 | 20 | | 80 | 60 | 60 | 30 | | 50 | 60 | |
| R4 | 80 | 60 | 10 | | 35 | 30 | 100 | 30 | | 40 | 45 | |
| R5 | 50 | 5 | 0 | | 60 | 5 | 100 | 90 | | 20 | 20 | |
| R6 | 80 | 80 | 15 | | 90 | 50 | 100 | 35 | | 10 | 30 | |
| R8 | 50 | 70 | 50 | | 60 | 20 | 90 | 95 | | 20 | 20 | |
| R9 | 80 | 50 | 20 | | 85 | 5 | 100 | 40 | | 25 | 50 | |
| min | 50 | 5 | 0 | | 35 | 5 | 50 | 30 | | 0 | 20 | |
| max | 100 | 90 | 90 | | 90 | 60 | 100 | 95 | | 80 | 60 | |
| mean | 77.5 | 58.13 | 31.88 | | 66.25 | 27.5 | 87.5 | 52.5 | | 30.63 | 39.38 | |
| | | | | | Normalized Weights | | | | | | | |
| R1 | 0.17 | 0.09 | 0.11 | **0.37** | 0.09 | 0.09 | 0.22 | 0.15 | **0.54** | 0.00 | 0.09 | **0.09** |
| R2 | 0.17 | 0.16 | 0.16 | **0.48** | 0.14 | 0.02 | 0.09 | 0.05 | **0.29** | 0.14 | 0.09 | **0.22** |
| R3 | 0.19 | 0.13 | 0.04 | **0.36** | 0.15 | 0.11 | 0.11 | 0.06 | **0.43** | 0.09 | 0.11 | **0.21** |
| R4 | 0.19 | 0.14 | 0.02 | **0.35** | 0.08 | 0.07 | 0.23 | 0.07 | **0.45** | 0.09 | 0.10 | **0.20** |
| R5 | 0.14 | 0.01 | 0.00 | **0.16** | 0.17 | 0.01 | 0.29 | 0.26 | **0.73** | 0.06 | 0.06 | **0.11** |
| R6 | 0.16 | 0.16 | 0.03 | **0.36** | 0.18 | 0.10 | 0.20 | 0.07 | **0.56** | 0.02 | 0.06 | **0.08** |
| R8 | 0.11 | 0.15 | 0.11 | **0.36** | 0.13 | 0.04 | 0.19 | 0.20 | **0.56** | 0.04 | 0.04 | **0.08** |
| R9 | 0.18 | 0.11 | 0.04 | **0.33** | 0.19 | 0.01 | 0.22 | 0.09 | **0.51** | 0.05 | 0.11 | **0.16** |
| mean | 0.164 | 0.119 | 0.063 | **0.345** | 0.141 | 0.057 | 0.194 | 0.118 | **0.510** | 0.062 | 0.083 | **0.145** |

North American Wolf Recovery SDM Project

**Table 11.** Consequence table for *lycaon*/*rufus* alternatives, with scores standardized and weighted (using the mean weights across the decision makers).  For the individual objectives as well as the weighted average score, green highlighting indicates the best performing alternative, pink the worst performing alternative.

| Objectives | | Weight | Alternatives | | | | |
|---|---|---|---|---|---|---|---|
| | Description | Weight | 1 (subspp.) | 2 (2 DPS) | 3 (3 DPS) | 4 (omit NE) | Status quo |
| Facilitate range-wide recovery of wolves | | | | | | | |
| B | Representative distribution | 0.113 | 0.000 | 1.000 | 1.000 | 1.000 | 0.000 |
| C | Facilitate connectivity | 0.030 | 0.000 | 0.000 | 0.000 | 0.000 | 1.000 |
| D2 | Recovery efficiency | 0.055 | 0.000 | 0.125 | 0.250 | 1.000 | 1.000 |
| Conform to ESA | | | | | | | |
| E1 | Policy compliance | 0.159 | 1.000 | 0.778 | 0.722 | 0.556 | 0.000 |
| E2a | Past rulings compliance | 0.065 | 0.000 | 0.045 | 0.455 | 0.364 | 1.000 |
| E2b | Best available science | 0.219 | 1.000 | 1.000 | 0.857 | 0.429 | 0.000 |
| E3 | Case law compliance | 0.200 | 1.000 | 0.198 | 0.396 | 0.594 | 0.000 |
| Facilitate partnerships and good will | | | | | | | |
| D1 | Regulatory burden | 0.063 | 0.918 | 0.682 | 0.918 | 1.000 | 0.000 |
| F | Clarity to the public | 0.096 | 0.213 | 0.627 | 0.920 | 1.000 | 0.000 |
| | | | | | | | |
| | Weighted Average Score | | 0.656 | 0.608 | 0.684 | 0.652 | 0.151 |

North American Wolf Recovery SDM Project

**Table 12.** Consequence table for *lupus* alternatives, with scores standardized and weighted (using the mean weights across the decision makers).  For the individual objectives as well as the weighted average score, green highlighting indicates the best performing alternative, pink the worst performing alternative.

| Objectives | | Weight | Alternatives | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Description | | 1 (subspp.) | 2 (L48 DPS) | 3 (2 DPS) | 4 (3 DPS) | 5 (DPS of subsp.) | 6 (5 & omit) | Status quo |
| Facilitate range-wide recovery of wolves | | | | | | | | | |
| B | Representative distribution | 0.164 | 0.00 | 0.21 | 0.29 | 0.53 | 1.00 | 0.59 | 0.44 |
| C | Facilitate connectivity | 0.119 | 0.00 | 0.50 | 1.00 | 1.00 | 1.00 | 0.07 | 0.29 |
| D2 | Recovery efficiency | 0.063 | 0.00 | 0.33 | 0.59 | 1.00 | 1.00 | 0.40 | 0.33 |
| Conform to ESA | | | | | | | | | |
| E1 | Policy compliance | 0.141 | 1.00 | 1.00 | 0.79 | 0.96 | 0.86 | 0.43 | 0.00 |
| E2a | Past rulings compliance | 0.057 | 0.18 | 0.00 | 0.55 | 0.41 | 0.59 | 0.45 | 1.00 |
| E2b | Best available science | 0.194 | 0.87 | 1.00 | 0.87 | 0.87 | 0.53 | 0.13 | 0.00 |
| E3 | Case law compliance | 0.118 | 0.63 | 0.53 | 0.45 | 0.55 | 0.50 | 1.00 | 0.00 |
| Facilitate partnerships and good will | | | | | | | | | |
| D1 | Regulatory burden | 0.062 | 0.69 | 0.46 | 0.84 | 1.00 | 1.00 | 0.59 | 0.00 |
| F | Clarity to the public | 0.083 | 0.00 | 0.81 | 0.92 | 0.94 | 1.00 | 0.93 | 0.45 |
| | | | | | | | | | |
| | Weighted Average Score | | 0.436 | 0.605 | 0.695 | 0.801 | 0.807 | 0.474 | 0.221 |

North American Wolf Recovery SDM Project

**Table 13.**  Sensitivity analysis of performance (weighted average scores) of the five *lycaon/rufus* alternatives, given each region's objective weights.  The last row provides the average score using the mean weight across the decision makers (from Table 11).  The top two performing alternatives are highlighted in dark green and light green, respectively, while the two poorest performing alternatives are highlighted in dark pink and pale pink.

| Region | Alternatives | | | | |
|---|---|---|---|---|---|
| | 1 (subspp.) | 2 (2 DPS) | 3 (3 DPS) | 4 (omit NE) | Status quo |
| R1 | 0.728 | 0.592 | 0.665 | 0.602 | 0.140 |
| R2 | 0.642 | 0.645 | 0.709 | 0.711 | 0.121 |
| R3 | 0.526 | 0.515 | 0.647 | 0.675 | 0.261 |
| R4 | 0.634 | 0.546 | 0.664 | 0.637 | 0.209 |
| R5 | 0.773 | 0.688 | 0.729 | 0.643 | 0.026 |
| R6 | 0.682 | 0.619 | 0.689 | 0.606 | 0.143 |
| R8 | 0.618 | 0.564 | 0.626 | 0.645 | 0.227 |
| R9 | 0.648 | 0.693 | 0.742 | 0.696 | 0.077 |
| | | | | | |
| Mean | 0.656 | 0.608 | 0.684 | 0.652 | 0.151 |

North American Wolf Recovery SDM Project

**Table 14.**  Sensitivity analysis of performance (weighted average scores) of the seven *lupus* alternatives, given each region's objective weights.  The last row provides the average score using the mean weight across the decision makers (from Table 12).  The top two performing alternatives are highlighted in dark green and light green, respectively, while the two poorest performing alternatives are highlighted in dark pink and pale pink.

| Region | Alternatives | | | | | | |
|---|---|---|---|---|---|---|---|
| | 1 (subspp.) | 2 (L48 DPS) | 3 (2 DPS) | 4 (3 DPS) | 5 (DPS of subsp.) | 6 (5 & omit) | Status quo |
| R1 | 0.388 | 0.571 | 0.656 | 0.762 | 0.774 | 0.490 | 0.264 |
| R2 | 0.344 | 0.550 | 0.709 | 0.864 | 0.907 | 0.466 | 0.228 |
| R3 | 0.371 | 0.547 | 0.698 | 0.792 | 0.851 | 0.484 | 0.298 |
| R4 | 0.404 | 0.595 | 0.718 | 0.800 | 0.816 | 0.447 | 0.247 |
| R5 | 0.624 | 0.703 | 0.664 | 0.761 | 0.707 | 0.547 | 0.107 |
| R6 | 0.439 | 0.611 | 0.713 | 0.793 | 0.801 | 0.412 | 0.259 |
| R8 | 0.454 | 0.606 | 0.692 | 0.803 | 0.776 | 0.476 | 0.185 |
| R9 | 0.473 | 0.674 | 0.718 | 0.829 | 0.822 | 0.465 | 0.184 |
| | | | | | | | |
| Mean | 0.436 | 0.605 | 0.695 | 0.801 | 0.807 | 0.474 | 0.221 |

North American Wolf Recovery SDM Project



**Fig. 1.** General flowchart for identifying geographic units for listing analysis. (* Potential Distinct Population Segments must be geographically delineated prior to further analysis.)

North American Wolf Recovery SDM Project



**Figure 2.** Forested land-cover in the conterminous United States.



**Figure 3.** Number of cattle and calves in the United States, by county (USDA, National Agricultural Statistical Service, 2002 Census of Agriculture; http://www.nass.usda.gov/Data_and_Statistics/SVG/index.asp).

North American Wolf Recovery SDM Project



**Figure 4.** Protected areas in the United States (source: Conservation Biology Institute 2005; http://protectedlands.net/images/national_CBI_PAD_PAGE.pdf).



**Figure 5.** Potential habitat for wolves in the conterminous United States (gray shading), based on a synthesis of existing wolf habitat models as explained in the text. Due to the lack of existing spatially-explicit habitat models for the wolf in the Southwest and mid-Atlantic States, these areas were not included in the analysis.

North American Wolf Recovery SDM Project



**Figure 6.** Maps of *lycaon/rufus* alternatives.

North American Wolf Recovery SDM Project



**Figure 7.** Maps of *lycaon/rufus* and *lupus* status quo alternatives.



North American Wolf Recovery SDM Project



**Figure 8.** Maps of *lupus* alternatives.

North American Wolf Recovery SDM Project



**Figure 9.**  Regions 1/9 preferred alternative.

North American Wolf Recovery SDM Project



### Region 2 Alternative

Map is similar to Region 1's, except doesn't agree with the California piece of DPS of *lupus*. Challenged that everything had to be DPS or subspecies.

Emphasized science as priority, recognized *baileyi* as a subspecies, *lycaon* as either species or subspecies, and defer to Regions 5 or 3 for what they think is best in the northeast and western Great Lakes, taxonomic entity should be the basis for geographic unit in east.

For a transparent record we ought to reflect how we dealt with smallest geographic units, e.g., we couldn't do DPS in northeast even if that is not what we come forward with, felt best available science supported *lycaon* in the northeast, *baileyi* in the southwest, but not enough information in northwest so treated the northwest as a DPS of *lupus*.

A subspecies designation was more defensible based on solicitors' discussion.

Devalued clarity to public and consistency with past rulings based on clearer picture from sound science, but clarity to public may be deciding factor if we have equal choices to chose from.

Flexibility on benefits of subspecies vs. DPS, Region 2 favors subspecies based on workshop and scientific basis, but recognized uncertainty with Colorado and Utah so in listing rule describe it as an intergrade zone of *baileyi* and *nubilus* and *occidentalis* and we should manage as mixing zone.

Don't want to change red wolf ruling, but ought to be defined by a line that differentiates it from northern wolves.

California is an area of uncertainty. It may have potential habitat so defer to the Regions that are most affected.

Addressed objective to facilitate connectivity.

Adopted map for alternative 3 with southwest subspecies *baileyi* with no DPS at border, alternative 1 for *lycaon*, but don't object to what Region 8 did for northwest.

**Figure 10.** Region 2 preferred alternative.

North American Wolf Recovery SDM Project



**Figure 11.**  Region 3 preferred alternative.

## Region 4 Alternative

Maps is combination of species, subspecies, and DPSs.

Emphasized management flexibility; less concern about species not remaining as listed, more focus on representation of American wolves as opposed to California wolves that may or may not have historically been here.

Northwest DPS of *C. lupus* – because we are uncertain which wolves (subspecies) should be there.

*C. lupus* DPS in east – discrete because there is a north boundary below pure *nubilus*, taxonomy mixed up and hard to sort out wolves in this DPS due to uncertainty in taxonomy.

Leave *rufus* listed as full species; draw line further north of historic range to coincide with the one Chambers et al. (2009) drew; get most management

List *baileyi* as a subspecies; there is strong taxonomy to support this.

**Figure 12.** Region 4 preferred alternative.

North American Wolf Recovery SDM Project

### Region 5 Alternative

Idea was to figure out who northeast belongs to; only need to deal with what exists as fundamental under ESA; we can only list and evaluate what exits.

Subspecies issue from best available science perspective is Chambers et al. (2009); does this information better support recognition or no recognition of subspecies?  ESA does not allow us to make decision based on making our job easier; some could say best available science supports recognition of subspecies more; peer review was good and don't think a peer reviewed journal will get us beyond that paper.

Defer to Region 2 for subspecies of *baileyi*; if go with subspecies, northern border has to be based on best information which shows historical range of that subspecies wherever that line is supported. DPS of *occidentalis* in northern Rocky Mountains as separate from the Pacific northwest.

Subspecies or SPR of Pacific northwest because it is not *occidentalis* and we will manage for wolves there whether DPS or not; don't know the situation; don't have population to evaluate DPS policy so can't draw northern line; uncertainty is high.

*lycaon* DPS in western Great Lakes.  New England area should be part of an expanded *rufus* range.

WGL *nubilus* DPS.  Recognition of overlapping taxa creates difficulties.  2 possibilities:  1) If WGL DPS meets significance test then we need to evaluate whether they are already recovered; 2) if we find that they are not significant, this may have implications for *occidentalis* (maybe DPS of *occidentalis* in northern Rocky Mountains  falls apart).



**Figure 13.**  Region 5 preferred alternative.



**Figure 14.** Region 6 preferred alternative.

## Region 8 Alternative

**Objective was to take advantage of decisions identified at the July workshop**

**Assumed we are not restoring potential range; kept most international boundaries with Canada and Mexico except with slight modification.**

**Used previously presented alternative 4 for western DPS of *lupus* species in lower 48; Canada or Alaska DPS, lower 48 *lupus* species DPS, *baileyi* subspecies DPS, Mexico DPS**

**Differs from alternative 4 in that it recognizes species except for *baileyi*; don't know what to do with northern California; didn't include California because it is not necessary for recovery of the species.**

**Objectives focused on distribution, Mexico, connectivity with Mexico, but *baileyi* recovery is not dependent on Mexico; helps with regulatory burden and efficiency.**

**Would do away with Mexico boundary if necessary and also given more information.**

**Eastern – combined alternatives 3 and 4, DPSs of *lycaon* (without making judgment about whether it's a species or subspecies): western Great Lakes DPS; northeast and Canada combined into one DPS because we didn't know what to do with an empty area; if it is determined that wolves have moved into the northeast then list either as SPR or by similarity of appearance**

**Focused on distribution, western Great Lakes, northeast, connectivity, smaller units, tried to keep simple and robust; having come into the process late, didn't feel we knew all the details.**

**Worked off alternatives we already had.**

**Figure. 15.** Region 8 preferred alternative.



Wolf Recovery Strategy in East – Consensus and Unresolved Issues

**Consensus**: 1 or 2 units for '*lycaon-like*' wolf recovery (whether a distinct species or not), distinct from *C. lupus* wolves to west and north, and from *rufus* wolves in SE.

**Unresolved in WGL/Canada/NE**:
• adopting *C. lycaon* taxonomy
• handling overlapping range, *C. lycaon* and *lupus*, in WGL
• including NE USA range with Canadian DPS (with potential for future split?)
Unit options (include recovered/not warrant listing):
• species *C. lycaon*, where found
• subspecies *C. lycaon lycaon*, where found
• 1 DPS *C. lycaon lycaon*
• 2 DPS *C. lycaon* (WGL DPS and NE-Canada DPS)
• 1 DPS *C. lycaon* only in WGL (no unit otherwise)
• WGL DPS of *C. lupus* or *lupus-lycaon* mix?

**Consensus**: remove East or at least parts of East from *C. lupus* listing
• Delist *C. lupus* in all areas that are not historical or current *C. lupus* range (use best available information)
• Exclude regions of unsuitable habitat in any *C. lycaon* unit listings (subspecies listed 'where found')

**Consensus**: 1 unit in SE for *rufus* recovery, 'where found'

**Unresolved in SE**:
• what is taxonomy for *rufus?*
• species *C. rufus*
• subspecies *C. lycaon rufus*

**Figure 16.**  Combined regional alternatives in the East, showing consensus and remaining unresolved issues.

## Wolf Recovery Strategy in West – Consensus and Unresolved Issues



**Figure 17.** Combined regional alternatives in the West, showing consensus and remaining unresolved issues.

North American Wolf Recovery SDM Project

**Appendix 1**
**Measurable Attributes**

**Species Split**

The consequence table analysis will be completed in two separate parts, one for *Canis lupus* and one for the *Canis lycaon/rufus* complex. The best arrangements for geographical units for each species will be combined at the end to make a single recommendation for geographic units in North America. The measurable attributes are thus designed to be applied separately to the *lupus* units and the *lycaon/rufus* units. For each objective described below, two versions of the measurable attribute may be given, for application to the two species. Note, importantly, that the different objectives may not be weighted the same way for *lupus* as for *lycaon/rufus*.

**Objectives and Measurable Attributes**

(Objective B) Maintain or restore representative populations from the historic and current distribution where feasible. A representative distribution would provide for restoration of enough of historic and current populations in at least some portion of historic range, including representation in the United States, provided there is suitable habitat. Such listing provides a vehicle for recovery planning, where appropriate.

> Measurable attribute (*lupus*): 6-point scale. Evaluate the historic or current range of each of three subspecies (*baileyi*, *nubilus*, and *occidentalis*) and assign 0, 1, or 2 points, depending on how well the candidate set of geographic units provides for preservation or restoration of wolves in that range, with particular emphasis on distribution in the lower 48.

> Measurable attribute (*lycaon/rufus*): 4-point scale. Evaluate the historic or current range of each of two subspecies of importance (*lycaon* and *rufus*) and assign 0, 1, or 2 points, depending on how well the candidate set of geographic units provides for preservation or restoration of wolves in that range, with particular emphasis on distribution in the lower 48.

>> 2 points: The historic or current range in the lower 48 of that subspecies or taxonomic unit is wholly contained within one or more geographic units and those units do not contain other subspecies or populations, so that recovery (or a not warranted finding) for that unit (or units) would insure preservation of that part of the range of wolves and would insure representation in the United States.

>> 1 point: The historic or current range in the lower 48 of that subspecies or taxonomic unit is included within one or more geographic units, which themselves are wholly within the United States, but the ranges of multiple subspecies or taxonomic units are mixed, to that recovery (or a not warranted finding) for that geographic unit (or units) would insure some representation in the United States, but not necessarily in the range of that subspecies.

>> OR

000883A

1 point:  The historic or current distribution in the lower 48 of that subspecies or taxonomic unit is included in a geographic unit that spans an international boundary and an important substantial portion of the unit lies within the United States, so that recovery (or a not warranted finding) for that unit (or units) would likely insure representation in the United States

0 points: The historic or current distribution in the lower 48 of that subspecies or taxonomic unit is not included in a geographic unit, or is included in a geographic unit that spans an international boundary but an important substantial portion of the unit does not lie within the United States, so that recovery (or a not warranted finding) for that unit (or units) would likely not insure representation in the United States.

(Objective C)  Facilitate connectivity of wolf populations (favor dispersal and mixing, discourage isolated populations).  This is relevant only for *baileyi* and *rufus*; all other populations are connected with Canada if not with each other.  The populations representing *baileyi* and *rufus* are the only isolated populations.

Measurable attribute (*lupus*):  2-point scale.  Degree of separation or potential separation of *baileyi* (or an equivalent DPS) from occupied wolf habitat.

0 points:  *baileyi* is identified as a separate unit (subspecies or DPS) that is separated from other wolf populations by an empty unit that could be delisted or not actively recovered.

1 point:  *baileyi* is not identified as a separate unit but is included in a larger unit that contains an extant wolf population (this does not preclude dispersal and mixing, but may not favor it – depends on recovery and management decisions).
                  OR
1 point:  *baileyi* is identified as a separate unit with a northern boundary >180 miles from occupied wolf habitat (assumes that southern boundary of NRM DPS is occupied).  This does not preclude dispersal and mixing with *baileyi*, but may disfavor it depending upon status and management of wolves within the northern unit.

2 points:  *baileyi* is identified as a separate unit (subspecies or DPS) with a northern boundary that is <180 miles from occupied wolf habitat (assumes that southern boundary of NRM DPS is occupied).  This favors dispersal and mixing based on long-range dispersal distances documented in the northern Rockies populations.

Measurable attribute (*lycaon/rufus*):  2-point scale.  Degree of separation or potential separation of *rufus* (or an equivalent DPS) from occupied wolf habitat.

000884A

0 points:  *rufus* is identified as a separate unit (species, subspecies or DPS) that is separated from other wolf populations by an empty unit that could be delisted or not actively recovered.

1 point:  *rufus* is not identified as a separate unit but is included in a larger unit that contains an extant wolf population (this does not preclude dispersal and mixing, but may not favor it – depends on recovery and management decisions).
                   OR
1 point:  *rufus* is identified as a separate unit with a northern boundary continuous with another wolf unit but >180 miles from occupied wolf habitat.  This does not preclude dispersal and mixing with *rufus*, but may disfavor it depending upon status and management of wolves within the northern unit.

2 points:  *rufus* is identified as a separate unit (subspecies or DPS) with a northern boundary that is <180 miles from occupied wolf habitat.  This favors dispersal and mixing.

(Objective D1)  Minimize regulatory burden and promote efficient delisting when warranted.  By minimizing this quantity, we favor listing that allows smaller units to come off the list as soon as they are warranted, without having to wait until some companion area is also recovered.

Measurable attribute D1 (applied the same way to both *lupus* and *lycaon/rufus*): regulated area-years.  For each geographic unit in the set, calculate the area, determine the probable current status (warranted or not), and, if warranted, the expected number of years until delisting.  Assemble these results into a graph of the regulated area as a function of time, and calculate the area under the curve.
- It is possible to consider SPR listings in this attribute.  If a large unit is judged to warrant listing, but only in a significant portion of the range, then only the area of the SPR is included in the regulated total.
- The expected number of years until delisting can be placed in bins:  0-5 yrs (use median of 2.5 in the calculation of the total), 5-15 yrs (10 yr), 15-30 yrs (22.5 yr), 30-70 yrs (50 yr), effectively never (use 100 yr).
- Note that other than SPRs, we are not considering other nuances (like 10-j, or 4-d) that might reduce the regulatory burden.

(Objective D2)  Geographic units are constructed at an optimal scale that facilitates recovery planning; they are neither too large nor too small.

Measurable attribute D2 (applied the same way to both *lupus* and *lycaon/rufus*):  2-point continuous scale.  For each geographic unit in the set *that would likely warrant listing*, assign a score of 0, 1, or 2 points, based on whether the size of the unit facilitates efficient recovery planning and achievement of recovery.  Average over the number of warranted geographic units in the set.

0 points:  the unit is either so large that it requires nearly impossible coordination over a wide and diverse area to develop a recovery plan, or so small that recovery

is nearly biologically meaningless and cannot be accomplished without coordination with other units anyway.

1 points:  intermediate between 0 and 2 points.

2 points:  the unit is of such a size that recovery planning can be focused on the single specific setting of that unit, that focus has biological relevance, and that recovery is achievable.

Note:  During initial scoring, it might be easiest to assign scores to all units, regardless of whether they warrant listing, then use the results of the elicitation for Objective D1 to decide which units to include in the average.

(Objective E)  Conform to ESA as reflected, potentially, in existing policies, guidance, past listing actions, and past judicial opinions.  In addition to fulfilling the regulatory obligation of the Service, this may also minimize future litigation risk.

Measurable attributes (applied the same way to both *lupus* and *lycaon/rufus*): 4 separate 2-point scales.  For each of the following categories of regulatory compliance, evaluate and assign 0, 1, or 2 points, depending on how well the alternative conforms to appropriate application of the ESA as currently understood.  Categories of regulatory compliance (each of which should be scored for each alternative) include:

- E1.  Strength of compliance with the Service guidance and policy related to whether each alternative's geographic units are valid listable entities.  Depending upon the mix of units utilized by a given candidate set of geographic units, this may consider: (1) compliance with our regulation's requirements for subspecies designations to use standard taxonomic distinctions while relying upon best scientific and commercial information available; (2) compliance with our Policy Regarding the Recognition of Distinct Vertebrate Population Segments.  (Note that a score of 0 is possible on this attribute, but not expected, because all of the alternatives that emerge from the logical flowchart should have met minimum standards of policy compliance.)

  2 points:  The best scientific information available strongly indicates that the candidate set of geographic units is fully compliant with criterion.  This suggests a minimal level of legal vulnerability related to the set of units (although other issues may still be legally vulnerable).

  1 point:  The best scientific information available indicates that the candidate set of geographic units is marginally compliant with the above criterion.  This suggests the set of units are likely to be a point of litigation scrutiny, but we believe the vulnerability is moderate.

  0 points:  The best scientific information available indicates that the candidate set of geographic units is not compliant with the above criterion.  This suggests a high level of legal vulnerability related to the set of units.

000886A

- E2a.  Strength of the alternative's consistency with past Service statements concerning wolf management.  This includes statements made in the original subspecies' listings, 1978 relisting, recovery plans, EISs, petition findings (for both listed and non-listed populations), 2003 downlisting, 2008 delistings, 2009 delistings, and other Service documents.  Since these statements and findings may be inconsistent with each other, you will need to weight them based on your assessment of importance, but presumably more recent statements carry more weight than older ones.

    2 points:  The candidate set of geographic units is fully compliant with the criterion.

    1 point:  The candidate set of geographic units is marginally compliant with the criterion.  This suggests the set of units are likely to be a point of litigation scrutiny with regard to this criterion, but we believe the vulnerability is moderate.

    0 points:  The candidate set of geographic units is not compliant with the above criterion.  This suggests a high level of legal vulnerability related to the set of units, at least with regard to this criterion taken alone.

- E2b.  Strength of the alternative's consistency with the best available scientific information.  This criterion includes consideration of both the consistency of the alternative with the current scientific information and the certainty associated with the current scientific information.

    2 points:  The candidate set of geographic units is fully compliant with the criterion and the uncertainty about the scientific information is low.

    1 point:  The candidate set of geographic units is marginally compliant with the criterion.  This suggests the set of units are likely to be a point of litigation scrutiny with regard to this criterion, but we believe the vulnerability is moderate.

    0 points:  The candidate set of geographic units is not compliant with the above criterion.  This suggests a high level of legal vulnerability related to the set of units, at least with regard to this criterion taken alone.

- E3.  Strength of compliance with case law.  This may include rulings on any Service documents concerning wolves.  This may also include non-wolf rulings when the legal concepts are applicable to our potential designation.

    2 points:  The candidate set of geographic units is fully compliant with this criterion.  This suggests a minimal level of legal vulnerability related to the set of units, at least with regard to this criterion.

000887A

North American Wolf Recovery SDM Project

1 point:  The candidate set of geographic units is marginally compliant with this criterion.  This suggests the set of units are likely to be a point of litigation scrutiny, but we believe the vulnerability is moderate.

0 points:  The candidate set of geographic units is not compliant with this criterion.  This suggests a high level of legal vulnerability related to the set of units.

(Objective F) Promote clarity to the public.

Measurable attribute (applied the same way to both *lupus* and *lycaon/rufus*):  3-point scale.  Evaluate each of the public clarity factors below on a constructed scale of 0-3, then average them.

- Ability for the public to understand the rationale behind the unit boundary.  It is clearer to the public when we have the ability to articulate what our intent is for the unit (i.e. actively recover, delist, allow for natural dispersal and mixing).
    - 0 = the majority of units do not contain wolves and our intent is unclear as to how or whether we would proceed with recovery.
    - 3 = the majority of units contain wolves and our intent is clear as to how or whether we would proceed with recovery.

- Ability for the public to understand the protective status of wolves in a particular area.
    - 0 = Geographic sets reflect a majority of subspecies units which are less clear because there are no defined boundaries of where protection ends.  Subspecies is protected wherever found.
    - 3 = Geographic sets reflect a majority of DPS units which are more clear because the boundary is defined (mapped) and protection exist only for wolves inside the boundary (geography is destiny).

000888A

# EXHIBIT I

# Minnesota Department of Natural Resources

500 Lafayette Road · Saint Paul, Minnesota · 55155-4037

## Office of the Commissioner

651-259-5555



March 15, 2010

The Honorable Ken Salazar
Secretary of the Interior
Office of the Secretary
Department of the Interior
1849 C Street, N.W.
Washington, D.C. 20240

**Re:**  Petition to Delist the Minnesota Gray Wolf from the List of Endangered or Threatened Species Under the Endangered Species Act

Dear Secretary Salazar:

The State of Minnesota (hereinafter "the State") hereby submits this formal petition, pursuant to 16 U.S.C. § 1533(c), to remove (delist) the Minnesota gray wolf *(Canis lupus)*, also known as the eastern timber wolf, from the list of species covered by the federal Endangered Species Act (hereinafter "the Act" and "the ESA"). The evidence clearly indicates that the Minnesota gray wolf species should be removed entirely (delisted) from the federal lists of endangered and threatened species. On the basis of evidence amassed over the past three decades, no reasonable assessment of the status of the Minnesota species, which was once restricted to northern Minnesota but now also occurs in Wisconsin and Michigan, would lead to a conclusion that it is currently in danger of extinction, or that it is likely to be in danger of extinction within the foreseeable future. We request that the U.S. Fish and Wildlife Service (1) make a determination as to whether this action may be warranted within 90 days by publishing such a determination in the Federal Register and (2) acknowledge, in writing, receipt of this petition within 30 days. *See* ESA § 4(b)(3)(A); 50 C.F.R. § 424.14(a), (b)(l). The State submits that this petition contains sufficient information to compel the Service to propose delisting the Minnesota gray wolf immediately.

## I.  REGULATORY HISTORY.

Wolves were essentially unprotected in Minnesota from the time that Minnesota became a state in 1858 until about 1970 (Erb, J. and DonCarlos, M.W., *An overview of the legal history and population status of wolves in Minnesota,* in Wydeven, A.P., et al., eds., *In Recovery of Gray Wolves in the Great Lakes Region of the United States* 49-63 (2009).) The first federal protection for gray wolves occurred with the passage of the Endangered Species Preservation Act of 1966, a precursor to the Endangered Species Act of 1973. In 1970, protections for the eastern timber wolf were instituted and the taking of wolves was closed on the majority of the Superior National Forest (SNF) in Minnesota. After passage of the Endangered Species Act of 1973, wolves in all of Minnesota were afforded complete federal protection in 1974 under a subspecies designation *Canis lupus lycaon*, the eastern timber wolf. 39 Fed Reg. 1171-1176 (January 1, 1974).

In 1978, the Fish and Wildlife Service issued a Final Rule reclassifying "the gray wolf in the United States and Mexico" and determining critical habitat for species of gray wolf in Michigan and Minnesota. 43 Fed. Reg. 9607-15 (March 9, 1978) (amending 50 CFR §§ 11 and 40). The Rule stated:

The reclassification is considered to accurately express the current status of the gray wolf, *based solely on an evaluation of the best available biological data*. The special regulations being established in Minnesota are deemed necessary and advisable to provide for the future well-being of the species.

*Id.* (emphasis added). On the basis of the above-mentioned "best available biological data," the Service established that there are two species of gray wolves in the contiguous United States:

As defined in section 3 of the Act, the term "species" includes any subspecies of fish or wildlife or plants and any other group of fish or wildlife of the same species or smaller taxa in common spatial arrangement that interbreed when mature. For purposes of this rulemaking, the gray wolf (*Canis lupus*) group in Mexico and the 48 conterminous States of the United States, other than Minnesota, is being considered as one "species", and *the gray wolf group in Minnesota is being considered as another "species."*

*Id.* at 9610 (emphasis added). The Service then went on to describe the disparate fates of the two gray wolf species. With regard to the Minnesota species, the Service stated:

The only major population of the gray wolf remaining anywhere in the 48 conterminous States is in northern Minnesota. This population, while small compared to the original numbers and range of the gray wolf in the lower 48 States, has not itself undergone a significant decline since about 1900. Indeed, within the last decade [*i.e.*, between 1968 and 1978] there appears to have been a numerical increase in some areas, and an overall range increase. The relatively remote primary habitat of the population, which is composed in large part of protected public lands, along with the continuity of the population with populations in Canada, has contributed to the survival of the wolf in Minnesota.

*Id.* at 9610-11. Noting that "[t]here appear to be no serious problems that could result in the immediate extirpation of" the Minnesota species from its habitat, the Service ruled that the Minnesota gray wolf would be listed as threatened, while the other gray wolf species would be placed on the endangered list. *Id.* at 9611 ("With respect to the gray wolf in the 48 conterminous States of the United States, except Minnesota, and in Mexico, all prohibitions of section 9(a)(1) of the Act, as implemented by 50 CFR 17.21 will apply."). As the Service stated, this dual-species determination was "based solely on an evaluation of the best available biological data." *Id.* at 9607.[1]

## II.   STATUTORY AND REGULATORY REQUIREMENTS FOR DELISTING.

### A.   General Procedures, Timeline and Notice Requirements.

The ESA provides that "after receiving the petition of an interested person under" 5 U.S.C. § 553(e)   to "remove a species" from "either of the lists published under subsection (c)" of ESA § 4, the Secretary "shall make a finding as to whether the petition presents substantial scientific or commercial information indicating that the petitioned action *may* be warranted." ESA § 4(b)(3)(A) (emphasis added). The petition process has been described as "strik[ing] a delicate balance between judicial review, agency expertise, and the public's right to a

---

[1] The State notes that the 1978 Rule was not, nor is this Petition, based on either a distinct population segment (DPS) or a "State-by-State" approach. Instead, the Petition follows the Service's accurate biological conclusion (quoted above) that Minnesota gray wolves are, for ESA purposes, a separate species from gray wolves in the remainder of the contiguous United States and Mexico. As the biological data showed in 1978 and continue to show today, Minnesota gray wolves are not an artificially created group, and they deserve the specific examination the Service gave them in 1978.

healthy, sustainable ecosystem which fosters biological diversity," by establishing "mandatory bright lines of both timing and behavior that are readily open to judicial review."  See *Wyoming v. U.S. Dep't of Interior*, 360 F.Supp.2d 1214, 1229 (D. Wyo. 2005).  A finding by the Secretary that a petition does not meet the "may be warranted" threshold is also subject to judicial review.  *See* ESA § 4(b)(3)(C)(ii).  In those cases in which the Secretary determines that a petition presents "substantial scientific or commercial information" that indicates that the requested delisting "may be warranted," the Secretary is then required to "promptly commence a review of the status" of the species at issue.  *Id.*  Thereafter, the Secretary must, within twelve months of initially receiving the petition, make one of the following findings:

(i)     The petitioned action is not warranted, in which case the Secretary shall promptly publish such finding in the Federal Register.

(ii)    The petitioned action is warranted, in which case the Secretary shall promptly publish in the Federal Register a general notice and the complete text of proposed regulation to implement such action.

(iii)   The petitioned action is warranted, but that —

    (I)    the immediate proposal and timely promulgation of a final regulation implementing the petitioned action . . . is precluded by pending proposals to determine whether any species is an endangered species or a threatened species, and

    (II)   expeditious progress is being made to add qualified species to either of the lists published under subsection (c) of this section and to remove from such lists species for which the protections [under the ESA] are no longer necessary;

in which case the Secretary shall promptly publish such finding in the Federal Register, together with a description and evaluation of the reasons and data on which the finding is based.

ESA § 4(b)(3)(B)(i)-(iii).  A finding that the petition is "not warranted" under clause (i), or that the petition is "warranted" but "precluded" under clause (iii), is subject to judicial review.  *Id.* § 4(b)(3)(C)(ii).

**B.     Implementing Regulations.**

The regulations adopted by the Service to implement the ESA requirements related to petitions to "delist" listed species largely track the relevant statutory provisions, while setting forth in greater detail the form of such petitions and elaborating upon the standards the Secretary should apply in ruling upon a delisting request.  The regulations specify that "substantial information" means "that amount of information that would lead a reasonable person to believe that the measure proposed in the petition may be warranted."  50 C.F.R. § 424.14(b)(l).

In assessing whether a petition meets the "may be warranted" threshold, the Secretary is directed to consider whether the petition

(1)    clearly indicates the administrative measure recommended and gives the scientific and any common name of the species involved;

(2)    contains detailed narrative justification for the recommended measure, based on available information, past and present numbers and distribution of the species involved and any threats faced by the species;

(3)    provides information regarding the status of the species over all or a significant portion of its range; and

(4)    is accompanied by appropriate supporting documentation in the form of bibliographic references, reprints of pertinent publications, copies of reports or letters from authorities, and maps.

*See* 50 C.F.R. § 424.14(b)(2)(i)-(iv).

When a "may be warranted" finding is made pursuant to 50 C.F.R. § 424.14(b)(1), the Secretary then is required to "commence a review of the status of the species concerned" and to make, "within 12 months of receipt" of the petition, one of the three possible findings specified by ESA § 4(b)(3)(B)(i)-(iii) and described above. While the Secretary is not required to undertake a status review for every petition the Service receives, the "standard for evaluating whether substantial information has been presented by an 'interested person' is not overly burdensome," in that "conclusive information" is not required at this stage of the process," and a "reasonable person" standard is used to determine whether "substantial information has been presented to indicate that the action may be warranted." *Moden v. U.S. Fish and Wildlife Service*, 281 F.Supp.2d 1193, 1204 (D. Ore. 2003).

The regulations make clear that a species may be delisted only if such information "substantiate[s] that [the species] is neither endangered nor threatened for one or more of the following reasons": (1) that the species is considered to be extinct; (2) that the species has recovered to the point that "protection under the Act is no longer required;" or (3) that initial classification of the species as endangered or threatened was in error. *See* 50 C.F.R. at § 424.11(d)(1)-(3).

## III.   THE MINNESOTA GRAY WOLF HAS RECOVERED.

Prior to the listing of gray wolves under the ESA, the wolf population in the conterminous United States declined as a result of habitat modification, reductions in wild ungulate populations, and widespread persecution through government trapping, state and federal bounties, aerial hunting, and poison. (*See* Mech, L.D., *The Wolf: The Ecology and Behavior of an Endangered Species* (1970); Boitani, L., *Wolf Conservation and Recovery*, in Mech, L.D., and Boitani, L., eds., *Wolves: Behavior, Ecology, and Conservation* 317-340 (2003).) Despite the attempt to eradicate wolves from the lower forty-eight states, wolves persisted in northern Minnesota and served as the foundation for wolf recovery efforts following passage of the ESA. (Bailey, R. *Recovery Plan for the Eastern Timber Wolf* (1978) (hereinafter "Bailey 1978"); U.S. Fish and Wildlife Service Recovery Plan for the Eastern Timber Wolf (1992) (hereinafter "USFWS 1992").) The Minnesota wolf population quickly responded with an increase in wolf numbers through range expansion, reached its current distribution by 1998, and has since remained stable. (Erb, J., *Distribution and Abundance of Wolves in Minnesota, 2007-08* (2008) (hereinafter "Erb 2008").)

As determined in 1978, the Minnesota gray wolf species was (and still is) not "in danger of extinction throughout all or a significant portion of its range"; and subsequent range expansion would show that it is not "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *See* ESA, 16 U.S.C. § 1532. The recovery plan for the eastern timber wolf stated that the primary objective is "to maintain and reestablish viable populations of the eastern timber wolf in as much of its former range as is feasible." (USFWS 1992) *Id.* It continued:

> Recovery of the eastern timber wolf will be achieved when the following two criteria are met . . .: (1) the survival of the wolf in Minnesota is assured and (2) at least one viable population (as defined below) of eastern timber wolves outside Minnesota and Isle Royale in the contiguous 48 states of the USA is re-established.

*Id.*

After passage of the ESA, Minnesota served as the foundation for wolf recovery efforts in the United States. In 1978 an Eastern Timber Wolf Recovery Plan was published that called for wolf management zones, the reestablishment of wolves elsewhere, and reclassification of wolves in Minnesota. (Bailey 1978.) The Eastern

Timber Wolf Recovery Team recognized that the Minnesota wolf population represented a viable wolf population; however, to achieve recovery, the team recommended that at least one other viable population be established in order to achieve recovery. (USFWS 1992.)

The Minnesota wolf species has recolonized portions of Wisconsin and Michigan, resulting in a regional population of approximately 4,000 wolves. (Mech, L.D., *Crying Wolf: Concluding that Wolves Were Not Restored*, 5 Biol. Lett. 65 (2008) (hereinafter "Mech 2008").) Michigan and Wisconsin maintain populations of wolves exceeding 500 wolves in each of the States. (*See* Michigan Department of Natural Resources, *Michigan Wolf Management 2008 Report* (2009); Wydeven, A.P., et al., *Progress report of wolf population monitoring in Wisconsin for the period October 2008 – March 2009* (2009).) The wolves in these regions outside of Minnesota satisfy the secondary criterion, identified in the 1992 Eastern Timber Wolf Recovery Plan, that at least one viable wolf population be found outside of Minnesota. (*See* USFWS 1992.)

A.    **Distribution and Abundance of Wolves in Minnesota**

At the time wolves came under federal protection in the mid-1970s, Minnesota contained the only known reproducing wolf population in the lower forty-eight states, except for that on Isle Royale. Efforts to delineate wolf distribution and enumerate populations have been made at various times over the last sixty years. (*See, e.g.,* Berg, W.E., and Kuehn, D.W., *Ecology of Wolves in North-Central Minnesota* (hereinafter "Berg and Kuehn 1982"), in Harrington, F.H., and Paquet, P.D., eds., *Wolves: A Worldwide Perspective of their Behavior, Ecology, and Conservation* 4-11 (1982); Fuller, T.K., et al., *A History and Current Estimate of Wolf Distribution and Numbers in Minnesota* (1992) (hereinafter "Fuller 1992"); Berg, W., and Benson, S. *Updated wolf population estimate for Minnesota, 1997-98* (1998) (hereinafter "Berg and Benson 1998"); Erb, J. and Benson, S., *Distribution and Abundance of Wolves in Minnesota, 2003-04* (2004) (hereinafter "Erb and Benson 2004"); Erb 2008.)

Since the late 1970s, Minnesota has monitored its statewide wolf population using an *ad hoc* approach that combines several sources of data. Methods have changed only slightly during this time. Previous surveys took place at ten-year intervals; more recently, the State has shifted to five-year intervals (1978-79, 1988-89, 1997-98, 2003-04, and 2007-2008). The 2007-08 survey was moved up one year from its originally scheduled date (winter 2008-09), consistent with procedures outlined in the Minnesota Wolf Management Plan. (*See* Minnesota Department of Natural Resources Wolf Management Plan 2001 (hereinafter "Minnesota DNR 2001").) Results indicated a geographically and numerically expanding population until the 1997-98 survey; there has been little geographic expansion since 1998. (*See* Berg and Kuehn 1982; Fuller 1992; Berg and Benson 1998; Erb and Benson 2004; Erb 2008.) These results are generally consistent with separate population trend indicators (annual scent station survey, winter track survey, and number of verified depredations) utilized in Minnesota.

The most recent Minnesota wolf survey in 2007-08 estimated a point population of 2921 wolves with a 90% confidence interval of 2192-3525. (Erb 2008.) The total wolf range remained unchanged from the previous two surveys (1997-98 and 2003-04), indicating a coarse wolf distribution occupying 88,325 square kilometers, or approximately forty-percent of the State. (*Id.*) In 2007-08, the estimated occupied wolf range was 71,514 square kilometers, 5% larger than in 2003-04, but 3% smaller than in 1997-98. (*Id.*)

Although total wolf range had increased over a period of twenty years, the last two wolf surveys indicate that the broad distribution of wolves in Minnesota has not changed since the mid to late 1990s. (Erb 2008.) While the duration between surveys has recently been shortened from ten years to five years, recent surveys nevertheless indicate that coarse-scale wolf distribution in Minnesota is now static. (*Id.*)

Recent and current wolf population estimates indicate that all of the areas in Minnesota that are likely to sustain wolves are currently occupied, and the population will fluctuate in response to prey availability, disease influence, and human mortality factors. (*See* Fuller, T.K., et al., *Wolf Population Dynamics* (hereinafter "Fuller 2003"), in Mech, L.D., and Boitani, L., eds., *Wolves: Behavior, Ecology, and Conservation* 161-91 (2003); Erb

2008.)  The population estimate is well above the 1251-1400 wolves required by the Eastern Timber Wolf Recovery Plan to assure the survival of the wolf in Minnesota.  (*See* USFWS 1992; Minnesota DNR 2001.)

### B.   Management of Minnesota Gray Wolves.

Wolves thrive where there is abundant prey and where mortality caused by humans is controlled.  (Mech, L.D., *Challenge and Opportunity of Recovering Wolf Populations*, 9 Conservation Biology 270 (1995); Fuller 2003.)  Early wolf management in Minnesota under the ESA was focused on limiting human-caused mortality.  The Service enacted changes in regulations regarding the taking of wolves, and the wolf population responded favorably.  As the population expanded and more conflicts with humans occurred, primarily through depredation of livestock, a shift to addressing wolf-human conflicts became the primary focus.  (Fritts, S.H., et al., *Trends and Management of Wolf-Livestock Conflicts in Minnesota*, U.S. Fish and Wildlife Service Resource Publication 181 (1992) (hereinafter "Fritts 1992").)  Implementation of the Minnesota Wolf Management Plan will address wolf-human conflicts and ensure the survival of the wolf in Minnesota.  (*See* Minnesota DNR 2001.)

The listing of wolves under the ESA required the State and Minnesota citizens to halt the killing of wolves.  Prior to that, Minnesota maintained a bounty system for wolves from 1849 to 1965; aerial hunting of wolves was allowed until 1956; from 1965 to 1973 wolves were legally harvested for fur; and depredation control was authorized through a directed predator control program until May of 1974.  (Minnesota DNR 2001.)

Beginning in 1975, wolves depredating livestock were captured and relocated elsewhere in extreme northern Minnesota by USFWS trappers.  (Fritts 1992.)  Following the reclassification of wolves in 1978, government trappers were allowed to kill depredating wolves under a set of strict guidelines.  *See* 43 Fed. Reg. 9607; 50 Fed. Reg. 50972; Fritts 1992.  In 1986 authority for federal wolf control efforts passed from USFWS to USDA Animal Damage Control (now Wildlife Services).  (*See* Minnesota DNR 2001.)

Wolf managers recognized that public acceptance and effective depredation management were necessary for wolf recovery.  (*See* Bailey 1978; Fritts 1992; Minnesota DNR 2001.)  Throughout the recovery period, wolf depredation management has been an important component of the federal wolf management plan.  The program continues today, and unpublished Wildlife Services data show that, since 1978, over 3,000 wolves have been trapped and euthanized in Minnesota in response to depredations on domestic animals.

The state of Minnesota has adequate regulatory mechanisms in place to assure that recovery of the wolf in Minnesota will be maintained.  Minnesota went through a lengthy public input process in 1998 to develop a sound management plan for wolves, including holding public information meetings and convening a wolf management roundtable to develop consensus recommendations regarding wolf management issues.  (Minnesota DNR 2001.)  Subsequently, the Minnesota Legislature passed a wolf management bill in 2000, and the law was signed by the governor that year.  *See* Minn. Stat. § 97B.645.

Wolves in Minnesota will continue to be allowed to expand their range naturally in the state.  To assure the continued survival of the wolf in Minnesota, the State's minimum statewide winter population goal is 1,600 wolves; there is no maximum numerical limit.  (Minnesota DNR 2001.)  If the population falls under this minimum, the Minnesota Department of Natural Resources will take appropriate management actions to address the cause of the reduction and assure recovery to the minimum level in the shortest possible time.  (*Id.*)

The 1992 Recovery Plan identified specific wolf management zones with differing population goals within Minnesota.  (*See* USFWS 1992.)  Although the State plan identifies two zones with differing depredation management approaches, it does not prescribe population sub-goals for each zone.  Zone A is identical to the 1992 Recovery Plan zones 1-4, which had an aggregate recovery population goal of 1,251-1,400 wolves.  (*See id.*)  Zone B is identical to the 1992 Recovery Plan zone 5, which had a recovery population goal of zero wolves (*see id.*); however, there are currently an estimated 500 wolves in this area of the State.  Consequently, the State's ongoing

wolf population goal of 1,600 minimum, statewide, substantially exceeds the 1992 Eastern Timber Wolf Recovery Plan population goals in aggregate, and the State will likely exceed those goals in all five individual federal zones.

Under the Minnesota Wolf Management Plan, the killing of depredating wolves will continue to be allowed at depredation sites; in Zone B, potentially depredating wolves may also be killed. *See* Minn. Stat. § 97B.645; Minnesota DNR 2001. Thus, wolves will continue to be protected on all public lands, but they can be removed from private land (and, in some cases, small areas of immediately adjacent public land). (Minnesota DNR 2001.) Because of the manner in which public and private lands are distributed in Minnesota, a natural system of "zones" will continue to develop, as it has in the past. Where wolves are not in conflict with humans, they will be left alone; where they are in conflict with humans, problem wolves will be removed. The effects of depredation-related mortality are not expected to change the current distribution of wolves in Minnesota. (*Id.*)

Population management measures, including public taking (i.e., hunting and trapping seasons) or other options, will be considered by DNR in the future—but not sooner than five years after Federal delisting by USFWS. *See* Minn. Stat. § 97B.645; Minnesota DNR 2001. If, in the future, public taking is proposed by DNR, there will be opportunity for public comment. Decisions on public taking will be based on sound biological data, including comprehensive population surveys. (*See* Minnesota DNR 2001.)

To achieve the goals of the Minnesota Wolf Management Plan, the State proposes to keep in place some current wolf management activities, and to enhance or add on to others. In particular, the plan addresses wolf conservation concerns in the area of population monitoring and management, depredation management, habitat management, law enforcement, public information and education, research and program administration. (Minnesota DNR 2001.)

## C.    ESA Factor Analysis for Delisting the Gray Wolf in Minnesota.

The Service has already reviewed the relevant ESA factors extensively in previous delisting rules for the gray wolf in the area recognized as the Western Great Lakes Distinct Population Segment. *See* 71 Fed. Reg. 115266-15305 and 74 Fed. Reg. 15070-15122. The same analysis of these factors as discussed in the Federal Register for these delisting efforts can be applied equally to the gray wolf group in Minnesota for the purposes of justifying removal of this species from the list of threatened species under the ESA, and therefore are incorporated by reference and will not be repeated here.

If the Service makes a finding, pursuant to ESA § 4(b)(3)(B), that delisting of the Minnesota gray wolf is "warranted," the State contends that there are no grounds to conclude that either (I) delisting "is precluded by pending proposals" and (II) "expeditious progress is being made . . . to remove" the Minnesota gray wolf from the ESA lists. *See* ESA § 4(b)(3)(B)(iii). The State is unaware of any other petition specifically directed at the status of the Minnesota gray wolf species; and in light of the fate of previous delisting and reclassification proposals for gray wolves in general over the last decade, the State submits that the progress made toward delisting Minnesota gray wolves has not been expeditious as required by ESA § 4(b)(3)(B)(iii).

We recognize that there is current debate as to the scientific species classification of wolves in Minnesota, Wisconsin, and Michigan. (Leonard, J.A., and Wayne, R.K., *Native Great Lakes Wolves Were Not Restored*, 4 Biol. Lett. 95 (2008); Mech 2008; Koblmuller, S., et al., *Origin and status of the Great Lakes wolf* (2009); Schwartz, M.K., and Vucetich, J.A., *Molecules and Beyond: Assessing the Distinctness of the Great Lakes Wolf*, 18 Mol. Ecol. 2307 (2009); Wheeldon, T., and White, B. N., *Genetic analysis of historic western Great Lakes region wolf samples reveals early Canis lupus/lycaon hybridization* (2009) (hereinafter "Wheeldon and White 2009").) However, it is clear that the species listing allowed the wolf population that was reclassified as threatened in Minnesota in 1978 to expand and recover in Minnesota, Wisconsin and Michigan. (Nowak, R.M., *Taxonomy, Morphology, and Genetics of Wolves in the Great Lakes Region*, in Wydeven, A.P., et al., eds., *In Recovery of Gray*

*Wolves in the Great Lakes Region of the United States* 233-50 (2009).)  Historical wolf samples from the region track closely to current population samples as to the genetic integrity of wolves in the region.  (Wheeldon and White 2009; Fain, S.R., et al., *Genetic Outcomes of Eastern Timber Wolf Recovery in the Western Great Lakes States,* ___ Conserv. Genetics ___ (in press).)  Recent developments in molecular genetics techniques may provide insight into the evolutionary history of wolves in North America.  This, however, should not delay delisting wolves that have successfully recovered to peak population levels in the region.  The wolf in Minnesota that has recovered is the same wolf group that was protected by the ESA, and it will continue to thrive in Minnesota under state management.

## IV.   CONCLUSION.

As the most recent population surveys demonstrate, the Minnesota gray wolf population currently occupies all suitable areas available in the State.  The wolf population has remained stable for at least ten years, with no significant change in numbers or the distribution of wolves. This indicates a fully recovered population.  Protection of wolves in Minnesota under the ESA does not provide any measurable benefit to the population that the State wolf management plan will not provide; leaving wolves protected under the ESA may contribute to the erosion of attitudes towards wolves and wolf conservation, meanwhile, the State plan allows more flexibility for private individuals to manage human-wolf conflicts.

Although the geographic distribution and number of wolves in Minnesota provide protection from any possibility of large-scale declines resulting from the influence of any known disease, potential catastrophic event, or human-caused mortality, viable populations outside Minnesota in Wisconsin and Michigan provide additional assurance of the Minnesota gray wolf species' survival.

Adequate regulatory mechanisms for wolves occur in Minnesota through enabling legislation and adoption of the Minnesota Gray Wolf Management Plan, which ensure the long-term survival of the wolf in Minnesota, while resolving conflicts between wolves and humans.

Wolves were temporarily delisted in March of 2007; the Minnesota Wolf Management Plan was implemented for eighteen months prior to the reversal of that decision.  During the time that wolves were delisted, there was a seamless transition to state wolf management:  there was essentially no change in the taking of wolves under the new regulations compared to federal protection of the wolf in Minnesota.

The Minnesota gray wolf is neither in danger of extinction now, nor is it likely to be in danger of extinction in the foreseeable future.  The State is confident that if this species were not already listed, the Service would not act to place it on the endangered or threatened species list today.  For these reasons, the State respectfully requests that the Service remove the Minnesota gray wolf from the threatened species list pursuant to 16 U.S.C. § 1533(c).

Sincerely,

Mark Holsten
Commissioner

MH/DS/jls

c Acting Director, U.S. Fish and Wildlife Service, 1849 C Street Northwest, Washington, DC 20240
  Mr. Tom Melius, Rgl Director, Region 3, U.S. Fish and Wildlife Service, One Federal Drive, Fort Snelling, MN 55111-4056
  Mr. David R. Schad, Director, Division of Fish and Wildlife, Minnesota Department of Natural Resources