# EXHIBIT J



**State of Wisconsin \ DEPARTMENT OF NATURAL RESOURCES**

Jim Doyle, Governor
Scott Hassett, Secretary

101 S. Webster St.
Box 7921
Madison, Wisconsin 53707-7921
Telephone 608-266-2621
FAX 608-267-3579
TTY Access via relay - 711

April 27, 2010

The Honorable Ken Salazar
Secretary of the Interior
Department of the Interior
1849 C Street, N.W.
Washington, D.C. 20240


Subject: Petition to de-list the Gray Wolf in the State of Wisconsin and Joinder in the March 15, 2010 Petition of the State of Minnesota to Delist the Minnesota Gray Wolf from the List of Endangered or Threatened Species Under the Endangered Species Act

Dear Secretary Salazar:

The State of Wisconsin ("State") hereby submits this petition to delist the gray wolf (*Canis lupus*), also known as the eastern timber wolf or Minnesota gray wolf, in the State of Wisconsin, and join in the March 15, 2010 State of Minnesota petition to delist Minnesota wolves pursuant to the Endangered Species Act ("ESA"). 16 U.S.C. Sec. 1533(c)(2)(b)(i). The gray wolf population in Wisconsin, Minnesota and Michigan has met and exceeded the goals of the federal and state recovery plans for gray wolves and immediate delisting of the species is supported by the best scientific and commercial data available to the U.S. Fish and Wildlife Service (Service) and the States. 50 C.F.R. § 424.11(d). An evaluation of the factors considered in delisting a species, show that the Minnesota gray wolf, (as listed in 1978 as threatened and which now also occupies Wisconsin and Michigan), is clearly not in danger of extinction nor in danger of extinction within the foreseeable future. We request that the Service acknowledge the receipt of this petition within 30 days and then publish a determination in the Federal Register within 90 days, that the petition to delist the Minnesota gray wolf in Wisconsin is warranted. 50 C.F.R § 424.14(a),(b)(1). We submit that this petition contains sufficient information to compel the Service to propose delisting the gray wolf immediately in Wisconsin, and we request that the Service take action to expeditiously remove the gray wolf in Wisconsin from the endangered species list, pursuant to 16 U.S.C. s. 1533(c).

## I. Procedural Requirements

### A. Petition and Initial Secretary Findings

When the Secretary receives a petition from an interested person, under the Administrative Procedures Act, 5 U.S.C. § 553, to delist an endangered or threatened species, the Secretary "shall make a finding" within 90 days "as to whether the petition presents substantial scientific



or commercial information indicating that the petitioned action may be warranted." 16 U.S.C. §1533(b)(3)(A).

To make a finding that the petition is warranted the Secretary must consider whether the petition contains: 1) the administrative measure sought, 2) the common and scientific name of the species, 3) a narrative justifying the measure based upon available information including past and present numbers, distribution and current threats to the species, 4) the status of the species in all or a significant portion of its range, and finally 5) supporting documentation such as a bibliography, copies of publications, reports or letters from authorities and maps. 50 CFR § 424.14(b)(2). If the Secretary finds that there is substantial information, in other words information that "would lead a reasonable person to believe that the measures proposed in the petition may be warranted," 50 CFR § 424.14(b)(1), the Secretary is then required to "promptly commence a review of the status" of the species. 16 U.S.C. § 1533(b)(3)(A).

### B.  The Finding Subsequent to a Review of the Species Status

After reviewing the species status, the Secretary shall, within twelve months of receiving the initial petition, issue a finding that the petitioned action is not warranted or the petitioned action is warranted. 16 U.S.C. § 1533(b)(3)(B). If the petitioned action is warranted, the Secretary must promptly publish "a general notice and complete text of proposed regulation to implement such action" or publish a finding that the action is warranted but precluded at that time because of other pending proposals or efforts to change the status of species on the lists. *Id.*  An action that is precluded because of other pending proposals or efforts to change the status of species on the lists, must then be re-reviewed by the Secretary for a determination under 16 U.S.C. § 1533(b)(3)(B) within 12 months of such a finding. 16 U.S.C. § 1533(c)(1).

To make a determination that a petition is warranted under 16 U.S.C. § 1533(b)(3)(B) and to change the status of a species, the Secretary must consider the "best available scientific and commercial information" available for the species. 50 CFR § 424.11(b).  The scientific and commercial information should consider whether there is: a "present or threatened destruction, modification or curtailment of its habitat or range; over utilization for commercial, recreational, scientific, or education purposes; disease or predation"; inadequate existing regulations or other factors that affect the species continued existence. 50 CFR § 424.11(c).  In addition, if the petition is for the delisting of the species, the scientific or commercial information must show that the species has either recovered to the point where protection of the species is no longer required or new information shows that the original data for classification was in error. 50 CFR § 424.11(d). The Secretary must also take into account the efforts of the States in protecting the species. 50 CFR § 424.11(e).


## II. The Gray Wolf Has Recovered In Wisconsin

### A.  History of Minnesota Wolves in Wisconsin

During pre-settlement times, wolves occurred throughout the State and population estimates ranged from 3000-5000 animals (Wydeven, A.P., J.E Wiedenhoeft, R.N. Schultz, R.P. Thiel,

000937A

R.L. Jurewicz, B.E. Kohn, & T.R. Van Deelen 2009. *History, Population Growth, and Management of Wolves in Wisconsin*. pp. 87-106, A.P. Wydeven, T.R Van Deelen, & E. J. Heske, eds. *Recovery of Gray Wolves in the Great Lakes Region of the United States: An Endangered Species Success Story*. Springer, NY; hereafter "Wydeven et al. 2009a").  However, indiscriminate killing, government financed bounties and habitat modification lead to a dramatic decrease in the wolf population to the point where the wolf population was confined to "less than a dozen suitable areas" by the late 1940's (Thompson, D.Q. 1950. *J. Mamm.*33:429-442), and was thought to have been completely eliminated by the late 1950's (Thiel, R.P. 1993. *The Timber Wolf in Wisconsin*. Univ. Wis. Press, Madison, WI; hereafter "Thiel 1993").  The species reappeared in the State during the late 1960's and early 1970's as lone wolves migrated into Wisconsin from neighboring Minnesota (Thiel, 1993).

The Endangered Species Preservation Act of 1966, a precursor to the Endangered Species Act of 1973, offered the first real federal protection for gray wolves in Wisconsin and resulted in U.S. Fish and Wildlife Service listing wolves as endangered in Wisconsin by 1967 and 1974. (U.S. Fish and Wildlife Service. 1992. *Recovery Plan for the Eastern Timber Wolf*, USFWS, Twin Cities, MN; hereafter as "USFWS 1992") Following the Service's lead, the State of Wisconsin listed the species as endangered in 1975 under Section 29.415 of the Wisconsin Statutes. Once wolves were listed in the state, population monitoring began in 1979.

As stated in Minnesota's March 15, 2010 petition, the Service in 1978 issued a final rule that listed the gray wolf population in Minnesota as threatened and treated the gray wolf in Minnesota as another species separate from the gray wolf species that was listed as endangered in the other conterminous 48 states and Mexico (March 9, 1978).  The Service stated that this dual species determination was "based solely on an evaluation of the best available biological data. … The only major population of the gray wolf remaining anywhere in the 48 conterminous states is in northern Minnesota."  Id. At 9607 & 9610-11.

Since listing in 1978, the Minnesota wolf has recolonized portions of Wisconsin and Michigan, resulting in a regional population of over 4,000 wolves.  The federal de-listing goal as set in the 1992 Eastern Timber Wolf Recovery Plan for Wisconsin and Michigan of 100 wolves was initially achieved in 1994 when 101 wolves were counted in the two states.  At the five year mark of the recovery goal in 1999, 278 wolves occurred in the two states, and by 2009 had grown to over 1200 wolves.  Thus the population in Wisconsin and Michigan has been at a level that could have been considered for delisting for over 11 years, yet gray wolves are still listed as endangered under the ESA for these two States.  Continued growth of this population far beyond recovery goals will result in a continued increase in levels of livestock and pet depredations in Wisconsin, as additional growth and expansion will be mainly into agricultural landscapes.

Minnesota gray wolves settled into eastern Pine County along the border with Wisconsin in 1974-1975 (Mech, L.D. and R.M. Nowak. 1981. *Am. Midl. Nat*. 105: 408-409), and soon spread eastward into Wisconsin.  The Wisconsin DNR began conducting intense surveys on the state wolf population in winter 1979-1980, when 25 wolves were counted in 5 packs (Wydeven et al. 2009a).  The wolf population grew to a winter population of at least 626 wolves in 2009 (**Exhibit 1**).

000938A

Movements of Minnesota wolves into Wisconsin and Michigan continued to be documented into the 1990s. A yearling female from northeast Minnesota was killed near Portage, Wisconsin in the southern part of the state in 1994 (Mech, L.D., S.H. Fritts, & D. Wagner. 1995. *Minnesota Wolf Dispersal into Wisconsin and Michigan. Am. Midl. Nat.* 133:368-370; hereafter "Mech et al. 1995"). A yearling female captured in eastern Minnesota was followed dispersing into northwest Wisconsin and establishing a new territory in 1994, 85 miles (137 km) east of Minnesota (Wydeven, A.P.1994. *Travels of a Midwestern Disperser. Int. Wolf* 4:20-22 ). Also in 1994, an adult male from northeastern Minnesota was captured and radio-collared in central portions of Upper Michigan; thus this wolf would also have had to travel across portions of northern Wisconsin (Mech et al. 1995). In 1999 a radio-collared adult female wolf from Camp Ripley traveled extensively throughout central and northern Wisconsin, traveling as far east as Green Bay and as far south as Portage, before returning to eastern Minnesota (Merrill & Mech 2000). More recent genetic analysis also demonstrates that Wisconsin and Michigan wolves are mostly from the same genetic mix as Minnesota wolves (Wheeldon, T. 2009. Genetic Characterization of *Canis* Populations in the Western Great Lake Region. M.S. Thesis. Trent Univ., Peterborough, ONT, Canada; hereafter " Wheeldon 2009", Fain, S.R., D.J. Straughan, & B.F. Taylor.2010. Genetic Outcomes of Wolf Recovery in the Western Great Lakes States, *Cons. Genet.* in press; hereafter "Fain et al. 2010").


## B. Distribution and Abundance of Wolves in Wisconsin DNR

Despite wolf extirpation from the state from about 1960 through 1975, protection of the ESA and state endangered species law, allowed wolves to return to Wisconsin in the mid 1970s, with a gradual spread of wolves from Minnesota. The WDNR began conducting wolf surveys in Fall 1979 (Wydeven et al. 2009a). By winter 1980, 3 or 4 packs were located in western Douglas County, an eastern expansion of the Minnesota wolf population. In addition, one pack was located 200 km (125 mi.) to the east in Lincoln County in north central Wisconsin, apparently animals that had dispersed out of Minnesota (**Exhibit 2**). In 1980 winter territorial areas occupied by wolves covered about 1469 km$^2$ or 567 mi$^2$ (Wydeven et al. 2009a), and total wolf range (wolf territories and areas over which wolves commonly traveled) covered about 3000 km$^2$ or 1150 mi$^2$, about 2 % of the state of Wisconsin.

Between 1980 and 1990 there was a slow gradual spread of wolf packs eastward across northwest and central Wisconsin, although until the early 1990s, packs in northcentral Wisconsin remained somewhat isolated from packs in the northwest (Wydeven, A.P., R.N. Schultz & R.P. Thiel. 1995. Monitoring of a recovering gray wolf population in Wisconsin, 1979-1991. pp.147-156 *in* L.N. Carbyn, S.H. Fritts, & D.R. Seip. eds. *Ecology of Wolves in a Changing World*. Canadian Circumpolar Institute, Edmonton, Alberta).

By the early 1990s wolf packs were broadly spread across northwest and northcentral Wisconsin. Research on total potential habitat and potential wolf populations indicated the state had about 14,864 km$^2$ (5739 mi$^2$) of suitable wolf habitat (Mladenoff et al. 1995. *Cons. Biol.* 9:279-294), and areas of suitable habitat in Wisconsin could support 262 to 662 wolves (Mladenoff et al. 1997. *Bioscience* 47: 21-31). Their research also identified potential wolf habitat in central

000939A

Wisconsin, and in 1995 a small population of breeding wolves were indentified in central Wisconsin (Thiel et al. 2009. A Disjunct Gray Wolf Population in Central Wisconsin. pp. 107-117 in Wydeven et al. eds. *Recovery of Gray Wolves in the Great Lakes Region of the United States.* Springer, NY; hereafter "Thiel et al. 2009").

In the 1990s the Minnesota gray wolves showed rapid rates growth rates in Wisconsin, with an annual growth rate of about 22% (Wydeven et al. 2009a).  By the late 1990s wolf packs began to occupy northeastern Wisconsin, the last large block of suitable wolf habitat identified by Mladenoff et al. (1995, 1997) that had yet to be occupied.

By winter 2008-2009 the Wisconsin wolf population had grown to 626-662 wolves in 162 packs spread across extensive areas of northern and central Wisconsin (**Exhibit 3**; Wydeven et. al. 2009b Progress Report of Wolf Monitoring, PUB-ER-635L 2009, WDNR, Park Falls, WI). In winter 2009 territorial wolves occupied about 7,008 mi$^2$ (18,151 km$^2$), and wolf range covered about 20,000 mi$^2$ (52,000 km$^2$) or 37% of the state.  Breeding packs of wolves occurred in at least 33 of the 72 counties in Wisconsin.  Wolf packs now occupy more extensive areas than the 5739 mi$^2$ predicted by Mladenoff et al. (1995) as suitable habitat, and had begun moving into more marginal habitat, and the population is near the top end of the predicted carrying capacity of 262-662 wolves by Mladenoff et al. (1997).  Wolves are showing greater flexibility to occupy forest habitat across the state, and recent analysis suggests that as much as 42,017 km$^2$ (16,223 mi$^2$) have a probability of $\geq$ 50% of being occupied by wolf packs (Mladenoff, D.J., M.K. Clayton, S.D. Pratt, T.A. Sickley, and A.P. Wydeven. 2009. Changes In Occupied Wolf Habitat in the Northern Great Lakes Region, pp. 119-138 in Wydeven et al. eds. *Recovery of Gray Wolves in the Great Lakes Region of the United States*. Springer, NY, NY; hereafter as "Mladenoff et al. 2009"). Because of wolf territory configurations, the patchwork nature of habitat units, and isolation of some habitat patches, suitable habitat is not likely to ever be fully occupied.  The current areas area of wolf range are very similar to areas of suitable habitat as depicted by Mladenoff et al. (2009). While Mladenoff et al. (2009) suggest the current model of suitable wolf habitat is more descriptive than predictive, it does appear that most areas of suitable habitat are currently occupied by wolves in Wisconsin. Population growth slowed down to an annual rate of 12 % between 2000 and 2007 in Wisconsin (Wydeven et al. 2009a). Recent updated estimates of potential carrying capacity for a Michigan/Wisconsin wolf population suggests a potential for about 1300 wolves of which about half would consist of the wolf population in Wisconsin (Van Deelen, T.R. 2009. Growth Characteristics of a Recovering Wolf Population in the Great Lakes Region, pp. 139-153 *in* Wydeven et al. eds. *Recovery of Gray Wolves in the Great Lakes Region of the United States.* Springer, NY).

Thus it appears that the Wisconsin wolf population and wolf range in Wisconsin are beginning to reach saturation levels. As wolves in Minnesota have filled most areas of suitable habitat, areas of wolf range and population size have stabilized in recent years (Erb, J. 2008. Distribution and a Abundance of Wolves in Minnesota, 2007-2008, Minnesota DNR). Although wolves more readily select wildland areas, and appear to avoid agricultural areas and human development (Mladenoff et al. 2009), saturation of suitable habitat will force additional wolves into more developed landscape where conflicts and depredations are likely to be much higher (Treves et  al. 2004. Predicting Human-Carnivore Conflict: A Spatial Model Derived From 25 years of Data on Wolf Depredation on Livestock. *Cons. Biol.* 18:114-125.).

000940A

Along with extensive coverage of wolf pack territories across large blocks of forest land, individual dispersing wolves travel extensively through Wisconsin and the Great Lakes region (Treves et al. 2009. Dispersal of Gray Wolves in the Great Lakes Region. pp.191-204 *in* Wydeven et al. 2009. *Recovery of Gray Wolves in the Great Lakes Region of the United States.* Springer, NY; hereafter "Treves 2009a"). In 2008, wolves were reported sighted in 50 of the 72 counties of Wisconsin (Wydeven, A.P. and J.E. Wiedenhoeft. 2009. Gray wolf population 2008-2009. *Wisconsin Wildlife Surveys* 19 [5]: 000-000.), and during the three year period from April 2006 through March 2009, wolves were reported in 64 counties (**Exhibit 4**). Although some of these observations may be mistaken identifications, since 2000 dead wolves have been found in 56 Wisconsin counties. Thus, it is apparent dispersing wolves are traveling extensively throughout the state.

### C.  Management of Wisconsin Gray Wolves

Some limited bounties were allowed on wolves in Wisconsin prior to statehood in 1848, and state bounties were in place for most of the period from 1865 through 1957 (Thiel 1993). Throughout the period of settlement by European-Americans from the early 1800s through the mid 1900s, wolf numbers and distribution declined across the state with decline of habitat, reduction of wild ungulates and intense human persecution. In 1957 the timber (gray) wolf was designated as a protected species by the State of Wisconsin, but breeding populations disappeared from the state within a few years. But Wisconsin's legal protection set the stage for eventual recovery of wolves, after federal protection allowed Minnesota gray wolves to increase and spread back into Wisconsin.

Soon after ESA listing of the eastern timber wolf (*Canis lupus lycaon)* in 1974, a wolf pack established itself along the Minnesota border with Wisconsin (Mech & Nowak 1981). Gray wolves (*Canis lupus)* were reclassified to threatened in Minnesota in 1978 and began spreading eastward across Wisconsin. Through the early 1990s Wisconsin wolves were as likely to disperse back into Minnesota, the apparent source population, than to other locations in Wisconsin (Wydeven et al. 1995).

The Wisconsin DNR developed a state recovery plan in the 1980s (Wisconsin DNR. 1989. *Wisconsin Timber Wolf Recovery Plan*. *Wis. End. Resour. Rep*. 50) that set a state downlisting goal to a threatened wolf population, at 80 wolves for 3 or more years. The same goal was adopted for federal reclassification to threatened status in Wisconsin in the eastern timber wolf recovery plan (USFWS 1992). The federal recovery plan set a delisted goal of 100 wolves for 5 years or more with Michigan if a second wolf population was within 100 miles of the Minnesota wolf population. Because the wolf populations in Wisconsin and Michigan are basically an extension of the Minnesota wolves, it qualifies as a second population to the Minnesota wolves, that is within 100 miles of that population.

In 1999 the Wisconsin DNR developed a new state wolf management plan (Wisconsin DNR 1999. *Wisconsin Wolf Management Plan. PUBL-ER-099 99*, Wisconsin DNR, Madison, WI). The plan set a state delisting goal of 250 wolves in winter outside of Indian reservations, and a long-term management goal of 350 wolves in winter outside Indian reservations. Most years 10-

000941A

25 wolves occurred on Indian reservations, thus these goals were 10-25 wolves less than the statewide wolf estimations.  In general the state delisting goal was at least 2.5 times higher than the federal delisting goal, and the management goal was at least 3.5 times higher than the federal delisting goals.

Management plans in the adjacent states also developed state goals that are well above federal delisting goals.  The 2001 wolf plan for Minnesota set a minimum goal of 1600 wolves, compared to the federal delisting goal for the state of 1251to1400 wolves (Minnesota DNR. 2001. *Minnesota Wolf Management Plan*).  The recent updated management plan for Michigan set a minimum goal of at least 200 wolves for the state, or two times the federal delisting goal for Michigan and Wisconsin (Michigan DNR. *Michigan Wolf Management Plan. Wildlife Division Report No. 3484*, Lansing, MI).  Unlike Wisconsin, neither Michigan or Minnesota set management goals for the state, and neither set caps or ceilings on maximum goals for the states.

The state of Wisconsin downlisted wolves to threatened status in 1999, when the state wolf count in winter was 204, and had been more than 80 wolves since 1995.  Wolves were removed from the state list of threatened and endangered species in 2004, and were listed as protected wildlife animal (s. NR 10.02 Wis. Admin. Code); when the state wolf count was 373 wolves. The wolf population had been >250 outside Indian reservations since 2002.  Gray wolves remain listed as protected under Wisconsin state law, s. NR 10.02, Wis. Adm. Code.

The 1999 Wisconsin wolf plan was developed with the intent of providing guidelines for wolf management and conservations in Wisconsin after federal downlisting to threatened and eventual federal delisting.  It was assumed that federal downlisting and delisting would be completed within a few years of completion of the plan.  On June 29, 1998 DOI Secretary, Bruce Babbitt and USFWS director Jamie Clark announced in Forest Lake, Minnesota, the intent to publish a rule for delisting wolves in the Western Great Lakes Distinct Population Segment (DPS) (MN, WI, MI, SD, & ND). Because wolves in the region were perceived to be nearing complete recovery, the DOI and USFWS intended to completely delist wolves in the region, without the intermediate step of downlisting to threatened.  The estimated wolf population for the region was nearly 2800 with 2445 in Minnesota and 317 in Wisconsin and Michigan.  Thus Minnesota was at roughly two times its delisting goal and Wisconsin and Michigan were more than three times their delisting goal.  Because an approved management plan was not developed in time in Minnesota, the proposed rule for the region published on July 13, 2000 (65 FR 43450) was only for downlisting to threatened, instead of delisting, thus not changing the status in Minnesota where wolves had been listed as threatened since 1978.

The final rule published on April 1, 2003 (68 FR 15804), based on the 2000 proposal, had drastically changed the downlisted DPS from one consisting of five states that contained all the breeding wolf packs in eastern US, to an Eastern DPS that included 21 states.  The Eastern DPS included only three states that contained breeding wolf packs, consisting only of breeding wolf packs that had originated from the Minnesota wolf population.  The downlisting rule did provide a 4(d) rule that allowed states limited authority to apply lethal controls to wolves causing depredations to domestic animals.

000942A

Because of the broad reach of the DPS Policy and downlisting rule for the Eastern DPS, and other portions of gray wolf range in the conterminous US, several environmental groups sued the USFWS and DOI.  As a result of these lawsuits wolves were again listed as endangered in Wisconsin, Michigan and other portions of the Eastern DPS, except Minnesota where they remained threatened, on January 31, 2005.  Because of the growing wolf population and the need for some lethal controls, the Wisconsin DNR was granted a section 10 sub-permit on April 1, 2005 to authorize some lethal controls on problem wolves as well as authorizing nonlethal controls and wolf monitoring activity.  The sub-permit remained in place for 166 days before being rescinded on September 13, 2005, due to legal challenges.  A new section 10 permit was issued on April 24, 2006, after an extensive environmental analysis and public comment period.  But this permit was rescinded after 108 days on August 10, 2006 after a legal challenge.  Thus some limited lethal control authority was available to the WDNR during the livestock grazing seasons in 2005 and 2006.

On March 27, 2006 the USFWS published new proposed rule for the delisting of wolves in the Western Great Lakes DPS (71 FR 15266).  The new designated DPS included all of the states of Wisconsin, Michigan and Minnesota, as well as portions of South Dakota, North Dakota, Iowa, Illinois, Indiana, and Ohio. Wolves in Wisconsin and other portions of the Western DPS were delisted from the federal list of endangered and threatened species on March 12, 2007, returning management authority to the states and tribes in the region (72 FR 6052).  Wolves remained off the endangered species list for 567 days, but on September 29, 2008, were again listed as endangered in response to a lawsuit by animal welfare groups.  An update version of the 2007 rule was published on April 2, 2009 and wolves were again delisted on May 4, 2009 (74 FR 15070).  But the rule remained in effect for only 58 days and on July 1, 2009 wolves were again listed as endangered in Wisconsin and Michigan, and listed as threatened in Minnesota.  Thus currently wolves are again a federally endangered species in Wisconsin.

Depredations on domestic animals were relatively low in Wisconsin during the initial recolonization by Minnesota wolves, but during the late 1990s and 2000s have grown rapidly in the state (**Exhibit 5**). Prior to 2000, eight or fewer farms per year suffered depredation to livestock or poultry, and 11 or fewer dogs were killed annually, but both have grown drastically in recent years.  Between 2000 and 2007 there was a 275% increase in farms with wolf depredations, while the wolf population only increased by 120%.  Since 2004, 13 to 24 dogs have been killed by wolves annually and as many as 11 dogs have been injured.  Livestock depredations in recent years were higher in Wisconsin than they were in Minnesota in 1978 at the time that wolf population was down-listed to threatened status (Ruid, D.B., W.J. Paul, B.J. Roell, A.P. Wydeven, R.C. Willging, R.L. Jurewicz, & D.H. Lonsway. 2009. Wolf-Human Conflicts and Management in Minnesota, Wisconsin and Michigan. Pp. 279-295 *in* Wydeven et al. eds. *Recovery of Gray Wolves in the Great Lakes Region of the United States.* Springer, NY; hereafter Ruid et al. 2009).

Wisconsin has the highest rate of depredations on dogs within the Great Lakes region (Ruid et al. 2009), and since recolonization of Minnesota wolves into Wisconsin, 181 dogs have been killed and 66 injured by wolves through 2009. Since recolonization, wolves have killed 330 cattle, of which 82% have occurred in the last 10 years.

000943A

Maintaining lethal controls of problem wolves is a standard and accepted practice for managing recovered population of wolves (Boitani, L. 2003. Wolf conservation and recovery. pp. 317-340 *in* L. D. Mech and L. Boitani, eds. *Wolves: Behavior, Ecology and Conservation*. Univ. Chicago Press, Chicago, IL, U.S.A.; Breck, S. and T. Meier. 2004. Managing Wolf Depredation in the United States: Past, Present and Future. *Sheep and Goat Res. J.*14: 41-46;  Harper, E. K., W.J. Paul, L.D. Mech, and  S. Weisberg. 2008. Effectiveness of lethal, directed wolf depredation control in Minnesota. *J. Wildl. Manage*. 72:778-784). There are also strong expectations and social acceptance of lethal controls of wolves killing domestic animals, and in a recent survey in 2009 of Wisconsin residence in wolf range, 63% indicated expecting lethal control on wolves killing livestock and 65% expected lethal controls on wolves killing pets (Treves, A., T. Shelly, & L. Naughton. 2009. Wisconsin wolf policy survey: Changing attitudes 2001-2009.U. WI, Madison http://www.nelson.wisc.edu/assets/docs/people/treves/Survey/2009_Survey_Results_Residents-of-Wolf-Range_smaller.pdf; hereafter "Treves et al. 2009b").

Limited lethal controls were available for Wisconsin between 2003 and 2009.  In 2003 and 2004 wolves were downlisted to threatened status, with a 4(d) rule allowing some lethal controls.  In 2005 and 2006 lethal controls were authorized by section 10 permits.  During portions of 2007, 2008 and 2009 lethal controls were authorized through federal delisting.  A total of 185 wolves were captured by government trappers(mainly by USDA-WS) over the seven years, and 174 wolves were euthanized (**Exhibit 5**).  Between 2003 and 2008, an average of 6% of the wolves in the state were removed in control actions, but only ten wolves (1.6%) were removed in 2009 due to short period during which wolves were delisted.  Additional wolves were also removed by landowners in 2007, 2008, and 2009, through special authority allowing landowners to shoot wolves attacking domestic animals on their property, or through special permits issued by the WDNR, resulting in eight wolves removed.  These lethal controls which removed about 6% of the wolf population annually, were very important in controlling levels of depredations and improving public acceptance of wolves, but had little impact on the population growth, with the population nearly doubling during the seven year period (335 to 626).

During the 19 months wolves were delisted and managed as a state protected wild animal (s. NR 10.02 Wis. Admin. Code) in 2007 and 2008, a total of 83 wolves were removed from the wolf population through control actions.  These included controls by government trappers (76 wolves) and seven wolves removed by landowner.  Landowner controls included five wolves shot by landowners in the act of attacks on domestic animals on their property, and two wolves were shot by a landowner after he was issues a permit to shoot wolves coming on his property after losing livestock to wolves.  The WDNR issued 67 permits during the 19 month period, but these resulted in only 1 landowner shooting 2 wolves.  But all landowners greatly appreciated these permits and the opportunity and ability to protect their property, and thus drastically improving tolerance toward wolves.  Despite the more intense and flexible removal of problem wolves, the wolf population between 2007 and 2009 still increased by 15%.  Thus the controls had little impact on the overall wolf population.

There is also some evidence that during years when wolves were downlisted or delisted and lethal controls were in place, illegal kill of wolves declined (**Exhibit 6**).  During 2003 to 2004 when wolves were mostly downlisted and 2007-2008 when wolves were mostly delisted, 11 to17 % of all wolves found dead were killed illegally, and 20 to 31% of radio collared wolves found dead were killed illegally.  In 2006 and 2009 when wolves were mostly relisted and only short

000944A

periods of lethal controls were available, 24 to 25 % of all wolves found dead were killed illegally and 54 to 67% of collared wolves found dead were killed illegally.  Mortality among radio collared wolves was generally the least biased estimate for overall rates of various mortality factors.  Thus this suggests that when lethal controls were available, illegal kill represented only about 30% or less of wolf mortality, but when lethal controls were not available, illegal kills could represent about 50% or more of wolf mortality.
.

**D.  ESA Factor Analysis for Delisting the Gray Wolf**

As stated in the March 15, 2010 Minnesota petition, the Service has already reviewed the relevant ESA factors extensively in previous delisting rules for the gray wolf in the area recognized as the Western Great Lakes Distinct Population Segment.  71 Fed. Reg. 115266-15305 and 74 Fed. Reg. 15070-15122.  Since these prior delisting efforts by the Service, the wolf population in Wisconsin has increased from 546 wolves in 2007 to 626 in 2009, and may exceed 700 in 2010. The same analysis of these factors as discussed in the Federal Register for these delisting efforts can be applied to the gray wolf group in Wisconsin for the purposes of justifying removal of this species from the list of endangered species under the ESA, and therefore are incorporated by reference and thus much of it will not be repeated here.

Also as stated in the March 15, 2010 Minnesota petition, the Service is currently evaluating the scientific species taxonomical classification of wolves in the Great Lakes region and the remainder of North America (Chambers, S.M., S.R. Fain, B. Fazio, & M. Amaral. draft. *Evaluation of the Taxonomy of North American Wolves*. USFWS; hereafter "Chambers et al. draft").  There is currently a debate about the scientific taxonomical species classification of wolves in Wisconsin, Minnesota and Michigan (Leonard, J.A. & R.K. Wayne, 2008. Native Great Lakes Wolves Were Not Restored, *Biol. Lett*. 4: 95-98 ; hereafter "Leonard & Wayne 2008"; Mech, L.D. 2009. Crying Wolf: Concluding That Wolves Were Not Restored, *Biol. Lett.* 5: 65-66; hereafter "Mech 2009"; Koblmuller, S., M. Nord, R.K. Wayne, & J.A. Leonard. 2009. Origin and Status of The Great Lakes Wolf. *Mol. Ecol*. 18:2312-2326; hereafter "Koblmuller et al.2008";  Schwartz, M.K., & J.A. Vucetich, 2009. Molecules and Beyond; Assessing The Distinctness of the Great Lakes Wolf, *Mol. Ecol.* 18:2307-2309;  Wheeldon, T., & B.N. White. 2009. Genetic Analysis of Historic Western Great Lakes Region Wolf Samples Reveals Early *Canis lupus/lycaon* Hybridization; *Biol. Lett.* 5: 101-104; hereinafter "Wheeldon and White, 2009; Wheeldon 2009; Fain et al. 2010).  Although Leonard & Wayne (2008) suggested wolves in the Great Lakes had not been restored and contained a mix of gray wolf-coyote hybrids (*Canis lupus* x *Canis latrans*), others have refuted these findings (Mech 2009, Wheeldon & White 2009, Fain et al. 2010).  An update of the work by Leonard & Wayne (2008) was done by Koblmuller et al. (2009) using additional genetic tests and more recent samples, indicated that the zone of wolf-coyote hybridization occurred mainly to the east of the Great Lakes states in southern Ontario. Others have also demonstrated a zone of coyote-wolf hybridization in southeastern Canada (Kyle, et al. 2006, Genetic Nature of Eastern Wolves: Past, Present and Future. *Cons. Genet.*; Wheeldon 2009). Morphological examples of wolf-coyote hybrids have not been found in the Minnesota, Wisconsin or Michigan, unlike southern Ontario (Mech, L.D. 2010. What is the Taxonomic Identify of Minnesota Wolves? *Can. J. Zool*. 88:129-138; hereafter "Mech 2010").

10

000945A

Both Leonard & Wayne (2008), and Koblmuller et al. (2009) felt the Great Lakes wolf is a gray wolf, *Canis lupus.* Other researchers suggested that wolves in the Great Lake states are a mixture of gray wolves and eastern wolves, *Canis lycaon* (Wheeldon 2009; Fain et al. 2010).

Although there is some confusion currently on the exact taxonomical status of wolves in the region, the wolf population displays a healthy level of heterozygosity (Fain et al. 2010), and show no evidence of genetic bottlenecks (Koblmuller et al 2009). Others have stated that "By all accounts, the return of wolves to the Great Lakes region has been successful…..they are doing superbly – both in terms of population viability and ecological function (Schwartz & Vucetich 2009)." In reference to genetics of the Great Lakes wolves, it has been stated that, "..populations could be considered as either mixing of differentiated groups or simply gene flow among *C. lupus* populations..(Cronin M.A. & L.D. Mech, 2009. Problems With The Claim of Ecotype and Taxon Status of the Wolf in the Great Lakes Region. *Mole. Ecol.* 18:4991-4993; hereafter "Cronin & Mech 2009")." Cronin & Mech (2009) state, "We suggest that wolves in the GL region can simply be called a wolf population with mixed ancestry." They further state that, "It is generally acknowledged that the Great Lakes wolf population is fit, with abundant genetic variation" (Cronin & Mech 2009).

Although Wheeldon (2009), Fain et al. (2010), and Mech (2010) all indicate that coyote hybridization is not a major concern with Great Lakes wolves, Fain et al. (2010) did detect wolf-dog hybrids in 6% of 124 wolf specimens examined. Through lethal control actions by government trappers, between 2006 and 2008, eight wolf-dog hybrids were captured and euthanized by special permit or delisted wolf status in Wisconsin. The greater flexibility possible with federal delisting will improve the ability of the state to cull such hybrids from the wolf population, improving the state's ability to maintain genetic integrity of wolves in the region.

It is clear that the Minnesota wolf population that was listed in 1978 as threatened has expanded its range and recovered in Minnesota, Wisconsin and Michigan (Nowak, R.M., 2009. Taxonomy, morphology and genetics of wolves in the Great Lakes Region, pp. 233-250 in Wydeven, et al., eds., *Recovery of Gray Wolves in the Great Lakes Region of the United States*, Springer, NY). Historical wolf samples from the region track closely to current population samples as to the genetic integrity of wolves in the region (Wheeldon 2009; Wheeldon and White, 2009; Fain et al. 2010; Mech 2010). The wolf in Wisconsin is the same genetic wolf group that was protected by the ESA in Minnesota 1978, and will continue to thrive under state management. Research on wolf genetics and taxonomy should continue in the region, and the states have been very cooperative and supportive of the research. But current research does not demonstrate any major concerns about wolf genetics for keeping wolves listed as endangered or threatened. The ESA goal of protecting an active evolutionary process is well served by the wolves in the Western Great Lakes region, and state management will maintain a genetically healthy wolf population.

Carroll et al. (2010), propose for purposes of delisting and recovery, that a species range in the context of "significant portion of range" be defined as "historical range that would provide suitable habitat if application of what the ESA defines as 'conservation' measures removed or mitigated the threat factors that led to the listing of the species as threatened or endangered"

000946A

(Carroll, C., J.A. Vucetich, M.P. Nelson, D.J. Rohlf, and M.K. Phillips. 2010. Geography and Recovery Under the U.S. Endangered Species Act. *Cons. Biol.* 24:395-403). Wolf recovery has occurred across all portions of the Laurentian Mixed Forest Province (Bailey, R.G. 1976. Ecoregions of the United States [map] USDA Forest Service, Ogden, UT), of the western Great Lakes, and federal protection has allowed wolves to recolonize most of the ecoregion in the these three states. Continuation of federal endangered status will not likely drastically increase areas were wolves will be able to expand. Thus federal listing is no longer needed to maintain wolves through the Laurentian Mixed Forest Province of the Great Lakes, and existing state management will maintain a thorough geographical wolf distribution in the region.

## III. Conclusion

Protection of the Minnesota wolf population through the ESA allowed it to spread and recover throughout most areas of suitable habitat across Minnesota, Wisconsin and Michigan, but the delisting of this recovered wolf population is long overdue. Gray wolves in Wisconsin have been well above population recovery goals for over 10 years, and are clearly no longer endangered or threatened. Protection of wolves in Wisconsin under the ESA does not provide any measurable benefit to the population that the State wolf management plan will not provide. Wolves have filled most areas of suitable habitat and any additional expansion of the wolf population will likely be into mixed farm areas or developed landscapes. The current expanding wolf population will continue to result in increased livestock and pet depredations in Wisconsin and will likely contribute to the erosion of attitudes towards wolves and wolf conservation. Illegal killing of wolves appears to be on the increase and recently as many as 17 % hunters in wolf range express a willingness to illegally shoot wolves (Treves et al. 2009b). Unless reversed, in the long run these deteriorating attitudes will reduce areas where wolves can live and reduce the ability of the state to maintain viable wolf populations. Managing wolves under state management allows more flexibility for private individuals to manage human-wolf conflicts, and improve public tolerance and acceptance of wolves.

Wisconsin, Minnesota and Michigan have adopted and implemented scientifically sound and comprehensive wolf management plans approved by the Service, and have adequate regulatory mechanisms in place to ensure that gray wolves in the three States are managed and maintained at population levels well above federal endangered and threatened species recovery goals. These plans assure the long term conservations of wolves across the Western Great Lakes region When wolves were de-listed in March 2007, wolves were protected and managed for 19 months according to the management plans of the three states prior to the reversal of that de-listing decision. During those 19 months, wolf populations in the three states did not decrease, but continued their trend of stability or slight increase. The management plans ensure that gray wolves are protected and managed in the three States upon delisting, so they will clearly not be in danger of extinction in the foreseeable future.

The large number of wolf packs in Wisconsin and the broad spatial distribution across the northern forest and the central forest provide protection from the possibility of large-scale declines resulting from the influence of disease, catastrophic events, or other threats to the status of the wolf population in Wisconsin. In addition, viable populations outside Wisconsin, in

000947A

Michigan and Minnesota that are highly connected across the region (Mladenoff et al 2009, Treves et al. 2009a) provide additional assurance of the wolf survival in the region.

The gray wolf in Wisconsin is clearly not in danger of extinction now, nor is it likely to be in danger of extinction in the foreseeable future. The wolf population that originated from Minnesota has recovered throughout the region. Consequently, the State of Wisconsin respectfully requests that the Service take immediate action to expeditiously remove the gray wolf in Wisconsin from the endangered species list pursuant to 16 U.S.C. s. 1533(c).

Sincerely,

Matthew J. Frank
Secretary

cc. Tom Melius – USFWS Fort Snelling

13



**Exhibit 1. Minimum Count of Gray Wolves in Wisconsin in Winter 1980-2010**

000949A



**Exhibit 2. Wolf Pack and Wolf Range in Wisconsin in 1980.**

000950A



**Exhibit 3. Distribution of Wolf Pack Territories and Wolf Range in Wisconsin 2009.**

000951A



**Exhibit 4. Reported Wolf Observations in Wisconsin from April 2006- March 2009.**

000952A

**Exhibit 5**.  Summary of verified wolf depredations on domestic animals in Wisconsin from 1990 -2009, and total number of wolves removed in control actions.

| Resources/ years | '90 | '91 | '92 | '93 | '94 | '95 | '96 | '97 | '98 | '99 | '00 | '01 | '02 | '03 | '04 | '05 | '06 | '07 | '08 | '09 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Farms | 0 | 2 | 2 | 3 | 0 | 4 | 1 | 2 | 8 | 6 | 8 | 5 | 10 | 14 | 22 | 25 | 25 | 30 | 32 | 29 |
| Sheep Killed | - | 1 | 8 | - | - | - | - | - | - | - | - | - | 7 | 24 | 5 | 3 | 6 | 6 | 1 | 3 |
| injured | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | |
| Horses Killed | - | - | - | - | - | - | - | - | - | - | - | - | 3 | - | - | 2 | - | 1 | - | 1 |
| injured | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 1 | 3 | 4 | - | - |
| Cattle Killed | - | - | 1 | - | - | 11 | 1 | 10 | 20 | 7 | 6 | 11 | 37 | 20 | 27 | 31 | 35 | 30 | 39 | 36 |
| injured | | | | 1 | | | | | | | 1 | 1 | | | | 4 | 5 | 6 | 4 | - |
| Farm Deer | - | - | - | - | - | - | - | - | 4 | 19 | 3 | - | 5 | 1 | 6 | - | - | - | 1 | - |
| Llama | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 1 | - |
| Pigs | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 1 | - |
| Donkeys | | | | | | | | | | | | | | | | | | | | 2 |
| Poultry Losses | - | 115 | - | 27 | - | - | - | - | - | 44 | 4 | 74 | - | - | - | - | 50 | - | 2 | - |
| Dogs killed | - | - | 2 | - | 2 | - | 5 | 5 | 11 | 2 | 5 | 17 | 10 | 6 | 15 | 17 | 24 | 13 | 22 | 23 |
| injured | 2 | - | - | - | - | - | 2 | 1 | 5 | 2 | - | 1 | 4 | 4 | 3 | 6 | 10 | 9 | 6 | 11 |
| Wolves captured | - | 1 | - | - | - | - | - | 2 | 4 | 2 | 2 | 8 | 18 | 17 | 27 | 34 | 18 | 40 | 39 | 10 |
| Wolves euthanized | - | 0 | - | - | - | - | - | 0 | 0 | 1 | 0 | 0 | 0 | 17 | 24 | 29 | 18 | 37 | 39 | 10 |

000953A

**Exhibit 6.** Illegal Kill on Wisconsin Wolves from 1999 through  2009.

| Year | Total Illegal kill | Total Dead Wolves | Percent | Total Illegal kill of Wolves Collared | Total Dead Collared Wolves Found | Percent |
|---|---|---|---|---|---|---|
| 1999 | 3 | 10 | 30% | 1 | 4 | 25% |
| 2000 | 2 | 25 | 8% | 2 | 12 | 17% |
| 2001 | 7 | 26 | 27% | 4 | 14 | 29% |
| 2002 | 15 | 59 | 25% | 4 | 14 | 29% |
| 2003 | 9 | 53 | 17% | 4 | 20 | 20% |
| 2004 | 8 | 66 | 12% | 4 | 13 | 31% |
| 2005 | 7 | 60 | 12% | 4 | 9 | 44% |
| 2006 | 17 | 72 | 24% | 6 | 9 | 67% |
| 2007 | 10 | 92 | 11% | 3 | 16 | 19% |
| 2008 | 14 | 94 | 15% | 4 | 14 | 29% |
| 2009 | 18 | 72 | 25% | 7 | 13 | 54% |

# EXHIBIT K



**Federal Affairs Office**
1155 Connecticut Avenue, NW, Suite 1200
Washington, D.C. 20036  phone 202 659-5800
fax 202 659-1027  e-mail whorn@dc.bhb.com

*Formerly The Wildlife Legislative Fund of America*

May 18, 2010

The Honorable Ken Salazar
Secretary of the Interior
Department of the Interior
1849 C Street, N.W.
Washington, D.C. 20240

**Protecting &**

**Advancing**

**America's**

**Heritage**

**of Hunting,**

**Fishing &**

**Trapping**

Re:   **Petition of the U.S. Sportsmen's Alliance, Wisconsin Bear Hunters Association, Dairyland Committee of Safari Club International Chapters of Wisconsin, National Wild Turkey Federation of Wisconsin, Whitetails Of Wisconsin, and Wisconsin Firearms Owners, Ranges, Clubs and Educators, Inc. to Remove Great Lakes Area Gray Wolves from the Lists of Threatened and Endangered Species**

Dear Secretary Salazar:

The U.S. Sportsmen's Alliance, Wisconsin Bear Hunters Association, Dairyland Committee of Safari Club International Chapters of Wisconsin, National Wild Turkey Federation of Wisconsin. Whitetails of Wisconsin, and Wisconsin Firearms Owners, Ranges, Clubs and Educators, Inc. (collectively, "Petitioners") hereby submit their formal petition, in accordance with 16 U.S.C. § 1533(c), to remove from the lists of threatened and endangered species ("delist") the gray wolves located in Minnesota, Wisconsin and Michigan. In the alternative, Petitioners request that the Service delist the gray wolves within the somewhat broader boundaries of the Western Great Lakes Distinct Population Segment (WGL-DPS) that was temporarily recognized and delisted in the Service's February, 2007 and April, 2009 Rules. The WGL-DPS encompassed Minnesota, Wisconsin, and Michigan plus portions of surrounding states within reasonable wolf dispersal distance from Minnesota, Wisconsin and Michigan.

### INTRODUCTION AND SUMMARY

The gray wolf has the scientific name *canis lupus* and the common name "gray wolf" or "eastern timber wolf." The Service maintains lists of endangered and threatened species under the Endangered Species Act, 16 U.S.C. §§ 1531 *et seq.* ("ESA").

801 Kingsmill Parkway, Columbus, Ohio 43229-1137 ● phone 614 888-4868 ● fax 614 888-0326
e-mail us at info@ussportsmen.org ● visit our website at http://www.ussportsmen.org

The Honorable Ken Salazar
May 18, 2010
Page 2 of 10

       As noted in this Petition and in the Petitions filed by Minnesota on March 15, 2010
("Minnesota Petition"), and Wisconsin on April 27, 2010 ("Wisconsin Petition"), and as
previously found by the Service in its February 2007 Rule and February 2009 Rule, the gray
wolf is fully recovered in the Western Great Lakes region. All relevant recovery goals set in
the Service's 1992 Wolf Recovery Plan have been met. Petitioners attach the Minnesota
Petition and Wisconsin Petition as Exhibits A and B to this Petition and expressly
incorporate the information presented in those Petitions into this Petition.[1] Petitioners also
expressly incorporate the Service's fact-findings in the February, 2007 Final Rule[2] and
April, 2009 Final Rule.[3]  In addition, Petitioners attach as Exhibits C, D, and E, respectively,
the Minnesota, Wisconsin, and Michigan state wolf management plans, and incorporate their
content into this Petition.  Finally, Petitioners attach and incorporate into their petition the
2008 Minnesota Wolf Survey (as Exhibit F) and 2009 Wisconsin Wolf Survey (as Exhibit
G), both of which provide updated information related to those states' wolf management
plans.

       Gray wolves in Minnesota, Wisconsin, and Michigan (and in surrounding areas
within the WGL-DPS) were delisted from February 8, 2007 to September 29, 2008 and
April 2, 2009 to July 2, 2009 pursuant to the Service's February 2007 and April 2009 Rules.
The Service has fully and adequately responded to the question posed by the U.S. District
Court for the District of Columbia in overturning its February 2007 Rule.   In its
September 29, 2008 Order, the District Court found that the text of the ESA was ambiguous
regarding whether the Service could simultaneously recognize and delist a DPS.  *Humane
Soc'y of the United States v. Kempthorne*, 579 F. Supp. 2d 7, 15 (D.D.C. 2008).  The Court
invited the Service to apply its discretion as the agency charged with administering the ESA
to decide whether simultaneous recognition and delisting of a DPS was appropriate in a
situation such as this one where the species had previously been listed as endangered or
threatened on a nationwide basis, and the effect of recognition and delisting of a DPS would
be to leave ESA protections in place outside the DPS while delisting within the DPS.

       In response to the Court's invitation, and based on a Department of the Interior
Solicitor's Opinion issued on December 12, 2008, the Service reviewed the ESA provisions

---

[1]   Petitioners encourage the FWS to process this petition simultaneously with those other two petitions.
Petitioners request that the FWS, in conjunction with its determinations on the petitions of Minnesota and
Wisconsin, (1) determine whether action on this petition is warranted within 90 days, and publish that
determination in the Federal Register, in accordance with 16 U.S.C. § 1533(b)(3)(A); and (2) acknowledge
receipt of this petition within 30 days, in accordance with 50 C.F.R. § 424.14(a).
[2]    72 Fed. Reg. 6051 *et seq.* (February 8, 2007).
[3]    74 Fed. Reg. 15,069 *et seq.* (April 2, 2009).

G:\10100.2\48\00020122.DOC

The Honorable Ken Salazar
May 18, 2010
Page 3 of 10

that the Court had found to be ambiguous.[4]  In its April, 2009 Rule, the Service determined to interpret the ESA provisions as permitting the Service to simultaneously recognize and delist a DPS, just as it may simultaneously recognize and list a DPS.[5]  Accordingly, in that order, the Service re-adopted the February, 2007 Rule, which had delisted wolves throughout the WGL-DPS.

Unfortunately, the Service adopted the April, 2009 Rule without first issuing a new Notice of Proposed Rulemaking (NPRM) under the Administrative Procedure Act seeking public comment on this course of action.  The Service believed that the NPRM it issued in March, 2006[6] before adoption of the February, 2007 Rule had provided a sufficient opportunity for public comment.  On judicial review, the Service conceded that it should have issued a new NPRM and consented to vacatur of the April, 2009 Rule for that reason. The Court vacated the April, 2009 Rule by consent and made no fact findings regarding the substance of the Rule.

The proper course in light of this procedural history is for the Service to:

(a)     acknowledge receipt of this petition within 30 days of its filing, as required by 50 C.F.R. § 424.14(a)(b);

(b)     find that delisting "*may* be warranted," 50 C.F.R. § 424.14(b)(1)), as is necessarily true since the Service has already twice found that delisting *is* warranted, and proceed to make a 12-month finding, 50 C.F.R. § 424.14(b)(3);

(c)     issue a new NPRM to seek comment on delisting and refresh the record generated by the 2006 NPRM, 50 C.F.R. § 424.16; and

(d)     issue a new final delisting rule.

---

[4]     On December 12, 2008, the Solicitor of the Department of the Interior published a memorandum specifically addressing that issue.  *See* Solicitor, Department of the Interior, Memorandum M-37018 (Dec. 12, 2008) (the "DOI Solicitor's Memorandum") (attached as Exhibit H).  The DOI Memorandum explains that the use of the DPS to evaluate the Western Great Lakes population as a separate "species" for ESA purposes and amend the FWS's regulations to extend the ESA's protections to gray wolves other than those in the Western Great Lakes DPS while not extending those protections to the Western Great Lakes DPS is a reasonable construction of the ESA, consistent with its language, goals, and policies. DOI Solicitor's Memorandum pp. 3-19.

[5]     *See* 74 Fed. Reg. 15,070 *et seq.* (Apr. 2, 2009).

[6]     *See* 71 Fed. Reg. 15,266 *et seq.* (Mar. 27, 2006).

G:\101002\48\00020122.DOC

000958A

The Honorable Ken Salazar
May 18, 2010
Page 4 of 10

## CURRENT GRAY WOLF LISTING STATUS

As a result of the judicial review litigation described above, wolves in the Great Lakes Region have been returned to the lists of endangered and threatened species. Wolves in the Great Lakes region are currently classified as threatened in Minnesota and as endangered in the surrounding States. The Service in 1978 recognized the wolves in Minnesota (eastern timber wolves) as a distinct sub-species of gray wolves.[7] Since 1978 the Minnesota sub-species has spread to Wisconsin and Michigan. Reference to the "gray wolf" in this Petition are intended to include both the sub-species originally identified in Minnesota and listed as threatened there and the broader gray wolf species listed a endangered outside Minnesota but part of the western Great Lakes population.

## GRAY WOLF RECOVERY

As biological and scientific information collected over the past 30+ years demonstrates, the Western Great Lakes population of gray wolves no longer qualifies for inclusion among threatened or endangered species under the ESA. The evidence overwhelmingly supports a finding that wolves have recovered in the Core Recovery Areas of Minnesota, Wisconsin and the Upper Peninsula of Michigan ("Core Recovery Areas"). Prior to the gray wolf's original listing in the late 1970s, the wolf population in the Western Great Lakes area was believed to number less than 1,000, all in Minnesota. *See* 72 Fed. Reg. at 6053. Following the original listing of the Western Great Lakes gray wolf, its numbers steadily increased. *See id.* As of 2006, when the FWS made its first attempt to delist the Western Great Lakes DPS, there were more than 3,000 wolves in Minnesota and approximately 900 in Wisconsin and Michigan. *See id.*, Table 1. These population statistics establish that the gray wolf is fully recovered in the WGL area.

The criteria set in the wolf recovery plans to trigger delisting have been satisfied. 16 U.S.C. § 1533 (f)(1)(B)(ii) (recovery plans set objective measurable criteria for delisting); *see* 72 Fed. Reg. at 6052-55 (making these findings in February, 2007 delisting rule). The Eastern Timber Wolf Recovery Plan, as revised by the FWS in 1992, established this recovery criteria:

> At least two viable populations within the 48 United States satisfying the
> following conditions must exist: (1) the Minnesota population must be stable
> or growing, and its continued survival must be assured, and (2) a second
> population outside of Minnesota and Isle Royale must be re-established,
> having at least 100 wolves in late winter if located within 100 miles of the

---

[7] *See* 43 Fed. Reg. 9607 *et seq.* (Mar. 9, 1978).

000959A

The Honorable Ken Salazar
May 18, 2010
Page 5 of 10

Minnesota wolf population, or having at least 200 wolves if located beyond
that distance.   These population levels must be maintained for five
consecutive years before delisting can occur.   A Wisconsin-Michigan
population of 100 wolves is considered to be a viable second population,
because continued immigration of Minnesota wolves will supplement it
demographically and genetically for the foreseeable future.

U.S. Fish and Wildlife Service, *Recovery Plan for the Eastern Timber Wolf*, as revised 1992
(the "1992 Recovery Plan") (attached as Exhibit I).  Since the original listing of the wolf in
1974, the then-remaining several hundred wolves in Minnesota have grown into a healthy
group of 3,000 wolves, meeting the first of the two recovery criteria.  *See* 72 Fed. Reg. at
6054-55.  In addition, there were, as of February 2006, approximately 460-500 wolves in
neighboring Wisconsin and approximately 430 more in the Upper Peninsula of Michigan.
72 Fed. Reg. at 6054-55.  These population figures as of February 2006 exceeded all
relevant recovery criteria in the 1992 Recovery Plan.

The Western Great Lakes gray wolf population has only continued to grow in the
years since 2006. The Minnesota Department of Natural Resources ("Minnesota DNR") and
the Wisconsin Department of Natural Resources ("Wisconsin DNR") each filed petitions to
delist the Western Great Lakes DPS of gray wolves – Minnesota on March 15, 2010, and
Wisconsin on April 27, 2010.  *See* Minnesota Petition (Exhibit A); Wisconsin Petition
(Exhibit B).  Both state petitions address the status of the wolf population in detail, including
the additional growth of that population since the FWS's February 2007 delisting rule.
Minnesota DNR estimates a Minnesota population of 2921 gray wolves as of 2007-2008,
occupying approximately 40 percent of the state, or all of its suitable range in the state.  *See*
Minnesota Petition p. 5.  This clearly meets the first recovery criterion, that "the Minnesota
population must be stable or growing, and its continued survival must be assured."  1992
Recovery Plan p. 4.  Wisconsin DNR notes that the winter 2008-2009 population was
approximately 626-662 wolves in Wisconsin, in 162 packs spread across northern and
central Wisconsin.  *See* Wisconsin Petition p. 5 & Exhibit 3.  This clearly meets the second
recovery criterion, that "a second population outside of Minnesota and Isle Royale must be
re-established, having at least 100 wolves in late winter if located within 100 miles of the
Minnesota wolf population, or having at least 200 wolves if located beyond that distance."
1992 Recovery Plan p. 4.

## RECOGNITION OF DPS AND BOUNDARIES OF DELISTING AREA.

Because the fact of Great Lakes gray wolf recovery is uncontestable and no court has
ever overturned the Services' repeated fact findings that the Great Lakes gray wolves have

The Honorable Ken Salazar
May 18. 2010
Page 6 of 10

recovered, the only legitimate debate is over setting the boundaries in which delisting occurs.

Petitioners' primary request is that the Service delist the wolves within Minnesota, Wisconsin, and Michigan. The Service has already found that gray wolves in these States will be protected under state law by effective State Wolf Management Plans after delisting. These three States effective y managed their wolf populations under state law during the two interim periods in which WGL-DPS wolves were delisted, from February 7, 2007 to September 29, 2008, and from April 2, 2009 to July 2, 2009.

The Service could lawfully reach this result in three ways. First, the Service could recognize a new narrower Distinct Population Segment ("DPS") consisting of those three States, and delist wolves throughout that newly-defined DPS. The Service, in response to public comments on its 1996 DPS Policy,[8] discourages the use of state borders to define DPSs. *See* 61 Fed. Reg. at 4723-24. Nonetheless, if the available scientific information indicates that the state borders constitute appropriate boundaries for the WGL-DPS, use of those state borders would be appropriate. Alternatively, the Service may consider revising its 1996 DPS Policy to further confirm the lawfulness of using state borders as DPS boundaries, and could give notice that it is considering such a revision to its 1996 DPS Policy in the NPRM issued in response to this petition and the petitions of Minnesota and Wisconsin. Because of the importance of the State wolf management plans in place in Minnesota, Wisconsin, and Michigan, the Service could reasonably find that, with respect to gray wolves in the Great Lakes area, state boundaries affect population status to a significant extent and are a more important factor in defining the relevant DPS boundaries than the physical ability of dispersing wolves to cross those boundaries.

Second, the Service could recognize a geographically broader DPS (such as the 2007 and 2009 WGL-DPS) that includes wolves outside Minnesota, Wisconsin, and Michigan but within reasonable dispersal distance of those three States, but delist wolves in only part of that DPS, specifically the part defined by the boundaries of Minnesota, Wisconsin, and Michigan. The 2008 Solicitor's Memorandum supports this option by finding that the Service may utilize ESA Section 4(a)(1) to list and delist wolf populations based on geographical areas smaller than DPSs.[9]

---

[8]    61 Fed. Reg. 4722 *et seq.* (Feb. 7, 1996) ("DPS Policy").
[9]    *See* 16 U.S.C. § 1533(a)(1); DOI Solicitor's Memorandum, Exhibit H, p. 17 & n.19. The Service has recognized that it may utilize man-made boundaries including state borders as DPS boundaries, and did so in designating and de-listing a portion of the Northern Rocky Mountains DPS of gray wolves. *See* 72 Fed. Reg. 6106, 6117 (Feb. 8, 2007). While one court has questioned the use of state borders for DPS boundaries, *see* Footnote Cont'd

The Honorable Ken Salazar
May 18, 2010
Page 7 of 10

Third, the Service could recognize that the gray wolf sub-species that it recognized in 1978 as being present and threatened in Minnesota has since spread to Wisconsin and Michigan and is no longer endangered or threatened. Under this approach, the Service would not need to define a DPS and would instead delist a previously-recognized sub-species. This approach works only if the Service recognizes that the gray wolves present in the three States are the same sub-species as the Minnesota sub-species identified in 1978.[10]

As an alternative to those three options for achieving a narrower delisting applicable to Minnesota, Wisconsin, and Michigan, another entirely appropriate course of action available to the Service is to re-recognize the broader WGL-DPS the Service recognized in the 2007 Final Rule and 2009 Final Rule, and delist the gray wolves throughout that DPS. *See* 72 Fed. Reg. at 6057-62.[11] The WGL-DPS recognized in 2007 and 2009 consisted of:

> [A]ll of Minnesota Wisconsin, and Michigan; the portion of North Dakota north and east of the Missouri River upstream to Lake Sakakawea and east from the centerline of Highway 83 from Lake Sakakawea to the Canadian border; the portion of South Dakota north and east of the Missouri River; the portions of Iowa, Illinois, and Indiana north of the centerline of Interstate Highway 80; and the portion of Ohio north of the centerline of Interstate Highway 80 and west of the Maumee River at Toledo.

Re-recognizing the 2007 and 2009 WGL-DPS boundaries is clearly consistent with the Services' DPS Policy. As the Service found in both rules, the 2007 and 2009 WGL-DPS boundaries are based on physical barriers to travel by dispersing wolves and the international boundary with Canada. Those boundaries define a population segment that encompasses the core recovery areas of Minnesota, Wisconsin, and Michigan plus a surrounding buffer zone that consist of largely unsuitable wolf habitat to which wolves in the core recovery areas may nevertheless occasionally disperse. Dispersal within the United States beyond the boundaries of the WGL-DPS will be rare due to physical barriers identified in the 2007 and 2009 Rules.

---

Order, *Defenders of Wildlife v. Salazar*, Nos. CV 09-77-M-DWM, CV 09-82-M-DWM (consolidated) (D. Wyo. Sept. 8, 2009), no court has held such a use of state boundaries to be invalid and it is fully supported by the ESA and the FWS's regulations and policies.

[10]  43 Fed. Reg. 9607 *et seq.* (Mar. 9, 1978).

[11]  The ESA provides for listing of endangered and threatened "species." 16 U.S.C. § 1533(a)(1). "Species" is defined to include "any subspecies of fish or wildlife or plants, and any ***distinct population segment*** of any species of vertebrate fish or wildlife which interbreeds when mature." 16 U.S.C. § 1532(16) (emphasis added).

G:\10100\248\00020122.DOC

000962A

The Honorable Ken Salazar
May 18, 2010
Page 8 of 10

Should the Service choose to re-recognize the 2007 and 2009 WGL-DPS boundaries, it could delist the entire DPS, as it did in 2007 and 2009, because none of the areas within the WGL-DPS but outside Minnesota, Wisconsin, and Michigan are significant portions of the range of the WGL-DPS wolves. The ESA requires listing a DPS as "threatened" if the portion of the population located in any "significant portion of its range" is "likely to become . . . endangered . . . in the foreseeable future." 16 U.S.C. § 1532(20); *see also* 16 U.S.C. § 1532(16) (a Distinct Population Segment is treated as a separate "species" for this analysis). Accordingly, a DPS must be delisted if the species has recovered in all significant portions of its range, even if there are some non-significant range portions in which it has not recovered. *Id.* This ESA provision recognizes the reality that a species (including a DPS) which has recovered in the significant portions of its range may never recover in habitat that is unsuitable for it and therefore outside of its range or insignificant to its range. In its 2007 and 2009 Final Rules, the Service correctly found that the portions of the WGL-DPS outside Minnesota, Wisconsin, and Michigan lack sufficient contiguous suitable wolf habitat to be significant portions of the range of the WGL-DPS wolves.

The reviewing court did not disagree with these (or any other) fact-findings made by the Service when it recognized and delisted the broader WGL-DPS in its 2007 and 2009 Rules. As discussed above, the reviewing court instead asked the Service to interpret ambiguous ESA provisions, which the Service has since done.

Petitioners request that the Service delist the gray wolves found in the Great Lakes areas using any one of the boundary options noted above or any other boundary option that results in delisting of the recovered wolf populations found in Minnesota, Wisconsin, and Michigan.

The legitimate debate over the best delisting and/or DPS boundaries cannot be allowed to delay the ESA-mandated delisting of the clearly recovered wolf populations in Minnesota, Wisconsin, and Michigan. The remarkable wolf recovery that has undisputedly occurred in Minnesota, Wisconsin, and Michigan results from 30 years of hard work by the Service, those three States, and many private parties.

**PROCEDURE FOR ACTING UPON THIS PETITION**

The ESA provides that an "interested person" may petition the FWS under 5 U.S.C. § 553 "to add a species to, or to remove a species from" the lists of endangered and threatened species. 16 U.S.C. § 1533(b)(3)(A). The implementing regulations require the Secretary to consider whether the petition:

G:\101002\48\00020122.DOC

The Honorable Ken Salazar
May 18, 2010
Page 9 of 10

    (i)    Clearly indicates the administrative measure recommended and gives the scientific and any common name of the species involved;

    (ii)    Contains detailed narrative justification for the recommended measure, describing, based on available information, past and present numbers and distribution of the species involved and any threats faced by the species;

    (iii)    Provides information regarding the status of the species over all or a significant portion of its range; and

    (iv)    Is accompanied by appropriate supporting documentation in the form of bibliographic references, reprints of pertinent publications, copes of reports or letters from authorities, and maps.

50 C.F.R. § 424.14(a)(2).[12]

    If the Secretary finds the petition to contain "scientific or commercial information" indicating that such a change in listing status "may be warranted[,]" the Secretary must "promptly commence a review of the status of the species concerned" and to "promptly publish each finding made . . . in the Federal Register." 16 U.S.C. § 1533(b)(3)(A). After reviewing the status of the species and determining that the proposal "may be warranted," the Secretary must publish within 12 months after receiving the petition a finding that the proposed change to listing status is warranted, is not warranted, or is "warranted but precluded" due to the fact that there are "other pending proposals to list, delist, or reclassify species, and . . . [e]xpeditious progress is being made to list, delist, or reclassify qualified species." 50 C.F.R. § 424.14(a)(3)(iii)(A); *see* 16 U.S.C. § 1533(b)(3)(B). Any finding that a proposed listing, delisting, or reclassification is warranted but precluded requires the Secretary to revisit the status of that proposal 12 months later with a finding that the proposal is warranted, no longer warranted, or still warranted but precluded. 50 C.F.R. § 424.14(a)(3). These required findings are mandatory and are subject to judicial review. *See Wyoming v. U.S. Dep't. of the Interior*, 360 F. Supp. 2d 1214, 1229 (D. Wyo. 2005). As discussed above, the Service itself has already made the findings that the WGL wolves have recovered and should be delisted, which necessarily means that Petitioners have shown that delisting "may be warranted," and so must proceed to take action on this Petition.

---

[12]   As noted above, in order to avoid duplicating much of the submissions by Minnesota and Wisconsin, Petitioners here incorporate those petitions and the information included therein.

The Honorable Ken Salazar
May 18. 2010
Page 10 of 10

## CONCLUSION

The "best availabl₂ scientific and commercial information" available supports delisting the Western Great Lakes wolf population under the ESA. The population of gray wolves in the Western Great Lakes region currently meets all relevant recovery criteria in the 1992 Recovery Plan. Tue Service must delist the gray wolves in the Great Lakes region. The Service can choose from any one of several reasonable options for setting the precise boundaries within which this delisting occurs, and Petitioners support and request delisting under any option that includes in the delisting the recovered wolf populations found in Minnesota, Wisconsin, and Michigan.

Sincerely,

William P. Horn
James H. Lister
David E. Lampp

*Counsel for Petitioners*

Enclosures

cc:    Honorable Tom Strickland
       Rowan Gould
       Tom Melius – USF WS Fort Snelling

G:\101002\48\00020122.DOC

000965A

RECEIVED

MAY 18 2010

FWS/R3/ES

LAW OFFICES
**BIRCH, HORTON, BITTNER AND CHEROT**
1155 Connecticut Avenue, N.W., Suite #1200
Washington, D.C. 20036

Telephone: (202) 659-5800                    Telecopier: (202) 659-1027

# FAX COVER SHEET

**TO:**    **TOM MELIUS**              FAX NO.: 612-713-5284

**FROM:**  **BILL HORN**               NO. OF PAGES:    11
                                        (including cover sheet)

**DATE:**    May 18, 2010

REMARKS:

Exhibits are being forwarded on a CD by regular mail.

File No.   101,002.48                    Telecopy Operator:  Judi Poppos

✔    Original will NOT follow by mail

IF YOU DO NOT RECEIVE ALL PAGES, PLEASE CALL AS SOON AS
POSSIBLE AT (202) 659-5800.

THE INFORMATION CONTAINED IN THIS COMMUNICATION IS CONFIDENTIAL, MAY BE ATTORNEY-CLIENT
PRIVILEGED, MAY CONSTITUTE INSIDE INFORMATION OR WORK PRODUCT, AND IS INTENDED ONLY FOR
THE USE OF THE ADDRESSEE. **NOTE:** ANY UNAUTHORIZED USE, DISCLOSURE OR COPYING IS **STRICTLY**
PROHIBITED AND MAY BE UNLAWFUL. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR,
PLEASE IMMEDIATELY NOTIFY US AT THE NUMBER LISTED ABOVE.

000966A

# EXHIBIT L





June 16, 2010

Ken Salazar
Secretary of the Interior
U.S. Department of the Interior
1849 C. Street N.W.
Washington, D.C. 20240

Rowan Gould
Acting Director, U.S. Fish and Wildlife Service
U.S. Department of the Interior
1849 C Street N.W.
Washington, D.C. 20240

     **Re:**    **Petition to Remove the Wolves of the Western Great Lakes from the Lists of Endangered and Threatened Species Under Authority of the Endangered Species Act**

Dear Secretary Salazar and Director Gould:

       Safari Club International, Safari Club International Foundation and the National Rifle Association of America (collectively "SCI and NRA") hereby submit this petition, pursuant to 16 U.S.C. §1533(b)(3)(A) and 5 U.S.C. 553, for the removal of the wolves of Western Great Lakes from the list of endangered and threatened species. This petition supplements and complements the three petitions previously filed by the state of Minnesota, on March 15, 2010; the State of Wisconsin, on April 27, 2010; and by a group of non-governmental organizations on May 14, 2010, and incorporates those petitions and their attachments by reference. SCI and NRA rely upon the scientific data included in the petitions submitted by the states of Minnesota and Wisconsin. The submission of this petition is intended to assist the U.S. Fish and Wildlife Service ("FWS" or "Service") with its decision-making process and should not alter the timetable triggered by the submission of Minnesota's petition and mandated by the Endangered Species Act.

## Introduction

       Over the last several years, the FWS has repeatedly recognized and formally identified the status of the Western Great Lakes (WGL) wolves as recovered and not at risk of becoming "endangered" or "threatened" from any of the statutory risk factors identified in 16 U.S.C. § 1533(a)(1). The Service's most recent pronouncement of the status of the WGL wolves appeared in the Final Rule published on April 2, 2009 that designated and delisted the WGL Distinct Population Segment ("DPS") of wolves. 74 Fed. Reg. 15070 (April 2, 2009).

June 16, 2010
SCI and NRA Petition to Delist the Wolves of the Western Great Lakes
Page 2 of 16

> We are taking these actions because available data indicate that this DPS
> no longer meets the definitions of threatened or endangered under the Act.
> The threats have been reduced or eliminated, as evidenced by a population
> that is stable or increasing in Minnesota, Wisconsin, and Michigan, and
> greatly exceeds the numerical recovery criteria established in its recovery
> plan. Completed State wolf management plans will provide adequate
> protection and management of the WGL DPS after this revision of the
> listing.

*Id.* On September 16, 2009, the FWS returned the WGL wolves to the endangered and
threatened species lists. 74 Fed. Reg. 47483 (September 16, 2009). Although the WGL
wolves do not qualify for "endangered" or "threatened" status, they are nevertheless
again under federal protection. The Service's decision to return the wolves to these lists
had nothing to do with their status or eligibility for listing. The relisting was prompted
exclusively by the Service's procedural error in failing to provide for notice and allow
public comment on its April 2, 2009 decision to delist these wolves. As a result, the
listing factors establish that the WGL wolves do not belong on the lists on which they
have been placed. Their continued placement on these lists violates the ESA just as much
as the absence of a species that qualifies for federal protection.

Once the Service concluded that the wolves of the Western Great Lakes are
neither "threatened" nor "endangered," the Service became obligated to issue a regulation
to carry out that determination. 16 U.S.C. § 1533(a)(1) states:

> The Secretary shall *by regulation* promulgated in accordance with
> subsection (b) of this section *determine* whether any species is an
> endangered species or a threatened species . . . .

*Id.* (emphasis added). Although the Service has made the required *determination, it* has
failed to promulgate the *regulation* required by that determination. This petition requests
that the FWS comply with its obligations under the ESA and the Administrative
Procedures Act ("APA") and to commence the process to officially remove the WGL
wolves from the threatened and endangered lists. Based on the determinations the
Service has made about the current status of the species, it should be able to quickly
make the 90-day finding, which should be a determination that the petitions present
substantial information that the delisting "may be warranted." That "may be warranted
finding" would trigger a status review of no more than one year in duration. Again
considering the extensive data and analysis already compiled, the Service should be able
to complete any status review in far less than 12 months. See 16 U.S.C. §
1533(b)(3)(A)&(B). In fact, the Service would be justified in, on its own initiative,
moving directly to proposing a rule to delist the wolves of Michigan, Minnesota, and
Wisconsin.

**Safari Club International - Washington DC Office**
501 2nd Street, NE, Washington, DC 20002 • Phone 202 543 8733 • Fax 202 543 1205 • www.safariclub.org

001055A

Upon reaching the proposed rule stage, the Service should consider options as alternatives to listing the WGL wolves as a DPS. Over the last several years, the Service's attempts to delist the WGL wolves have been stymied by the FWS's decision to use a DPS designation to carry out that delisting. In choosing the DPS strategy, the Service failed to take full advantage of agency precedent, statutory mandates and the advice of its own solicitors. The Service has the authority to (1) under 16 U.S.C. §1533(c)(1), specify that all wolves of the lower 48 conterminous states (other than the wolves of Montana and Idaho which are the subject of a separate delisting action) be kept on the list of "endangered" or "threatened" species and exclude from that specification that portion of range within Michigan, Minnesota and Wisconsin (thus removing the portion of Michigan, Minnesota and Wisconsin's wolves from the endangered species list); (2) utilize the species designation established by the FWS in 1978 for the wolves within Minnesota's boundaries and to simply expand the boundaries attributable to that species in order to encompass the wolves of Michigan and Minnesota; or (3) designate a species composed of the wolves within one or all of the three states of Michigan, Minnesota and Wisconsin and to delist such species.[1]

### Safari Club International and Safari Club International Foundation

Safari Club International ("SCI"), a nonprofit IRC § 501(c)(4) corporation, has approximately 53,000 members worldwide, including many who live and/or hunt in Michigan, Minnesota and Wisconsin. SCI has 12 chapters in Michigan, two in Minnesota and six chapters in Wisconsin. SCI's missions in Michigan, Minnesota and Wisconsin and throughout the world, include the conservation of wildlife, protection of the hunter, and education of the public concerning hunting and its use as a conservation tool.

Safari Club International Foundation ("SCIF") is a nonprofit IRC § 501(c)(3) corporation. Its missions include the conservation of wildlife, education of the public concerning hunting and its use as a conservation tool, and humanitarian services. More specifically, the conservation mission of SCIF is: (a) to support the conservation of the various species and populations of game animals and other wildlife and the habitats on which they depend; and (b) to demonstrate the importance of hunting as a conservation

---

[1] The FWS could also reinitiate the designation and delisting of the Western Great Lakes Distinct Population Segment, begun in 2006 and left unfinished with the withdrawal of the April 2, 2009 Final Rule on September 16, 2009. Although SCI and NRA have consistently supported the legality of the DPS strategy, for the reasons discussed throughout this petition, SCI and NRA recommend that the FWS now approach the delisting through alternative strategies.

**Safari Club International - Washington DC Office**
501 2nd Street, NE, Washington, DC 20002 • Phone 202 543 8733 • Fax 202 543 1205 • www.safariclub.org

001056A

and management tool in the development, funding and operation of wildlife conservation programs.

A significant percentage of SCI and SCIF's annual budget, including a portion of the dues and fees paid by each member, goes to support SCIF's conservation efforts around the world. For the year 2007, for example, SCI allocated $1.3 million of its annual budget for conservation projects and expenses. In addition, each individual chapter of SCI provides its own funding for conservation efforts locally and across the globe.

SCI and SCIF advocacy and conservation interests focus on the concept of "sustainable use" of wildlife. "Sustainable use" recognizes that the utilization of wildlife often produces benefits that provide incentives for conservation. Well-managed hunting has been a valuable tool in conservation and protection of many game species and associated habitats and biodiversity. The concept of sustainable use has been endorsed and adopted as a key principal of conservation by the International Union for the Conservation of Nature and Natural Resources, the oldest and largest conservation organization in the world, at its 2nd World Conservation Congress. Sustainable use is also one of the three primary principles of the Convention on Biological Diversity, commonly referred to as the Biodiversity Treaty, one of two major treaties opened for signature at the United Nations Conference on Environment and Development in 1992.

SCI and SCIF have, for a long time, aggressively supported the FWS's attempts to recognize the recovery of the WGL gray wolves as well as the FWS's efforts to restore to the states' management authority over the wolves within their states. SCI and SCIF have already been granted intervenor status in six different cases involving gray wolf classification, conservation and management:

- In 2003, SCI and SCIF successfully intervened as of right in a suit, filed in the U.S. District Court for the District of Oregon, in which animal rights and environmental groups challenged the FWS's attempt to reclassify wolves from "endangered" to "threatened" status. *Defenders of Wildlife v. Norton,* 354 F. Supp. 2d 1156, 1159 (D. Or. 2005).[2]

- SCI and SCIF also successfully intervened as of right in the case of *HSUS v. Kempthorne,* brought in the U.S. District Court for the District of Columbia to challenge the permit authority given by the FWS to the state

---

[2] SCI also participated as an amicus in a case brought in Vermont federal district court to challenge the reclassification of gray wolves. *National Wildlife Federation v. Norton,* 386 F.Supp. 2d 553, 556 (D.Vt.2005)

of Wisconsin to allow state wildlife management officials the ability to lethally remove problem "endangered" wolves (*HSUS v. Kempthorne*, 1:06-cv-01279(CKK)) and later successfully moved the D.C. Court of Appeals to vacate the District Court's ruling against the legality of that permit authority. 527 F.3d 181 (D.C.Cir. 2008).

- SCI and SCIF intervened in federal District Court in Montana in a challenge to the delisting of the Northern Rocky Mountain wolf population. *Defenders of Wildlife v. Hall*, 565 F. Supp. 2d 1160 (D. Mt. 2008).

- SCI and SCIF are currently participating as Defendant-Intervenors in defense of the Service's delisting of Montana and Idaho's wolves in an ongoing lawsuit in federal court in that same court. *Defenders of Wildlife v. Salazar et al.,* 9:09cv00077 (DWM).

- SCI and SCIF have also participated as intervenors in federal district court in the District of Columbia in the two challenges to the FWS's previous two attempts to designate and delist the WGL DPS. *HSUS v. Kempthorne*, 567 F.Supp. 2d 7, 9 (D.D.C. 2008); *HSUS v. Salazar*, 1:09-cv-01092-PLF.

The listing status of the WGL wolves greatly impacts the members of SCI who hunt and otherwise enjoy outdoor activities in Michigan, Minnesota and Wisconsin. SCI members in these states have lost hunting opportunities, prey, livestock, pets and hunting dogs as well as the success and enjoyment of their outdoor pursuits due to the increasing presence of wolves.

## The National Rifle Association of America

The National Rifle Association of America ("NRA") is a nonprofit corporation incorporated in the State of New York in 1871, operating under § 501(c)(4) of the Internal Revenue Code, with principal offices and place of business in Fairfax, Virginia. NRA's Federal Affairs Office is located in Washington, D.C. Its membership includes approximately 4,000,000 individuals from the United States and many of the countries around the world. Among its purposes and objectives are, "[t]o promote hunter safety, and to promote and defend hunting as a shooting sport and as a viable and necessary method of fostering the propagation, growth and conservation, and wise use of our renewable wildlife resources." (NRA Bylaws Article II Section 5.)

The NRA has a Director of Conservation, Wildlife and Natural Resources working from its headquarters in Fairfax, Virginia whose primarily responsibility is to promote the interests of the hunting community in wildlife management, healthy habitat,

**Safari Club International - Washington DC Office**
501 2nd Street, NE, Washington, DC 20002 • Phone 202 543 8733 • Fax 202 543 1205 • www.safariclub.org

001058A

June 16, 2010
SCI and NRA Petition to Delist the Wolves of the Western Great Lakes
Page 6 of 16

and sustainable populations to ensure that these wildlife populations continue to be available to be enjoyed by NRA members and to protect and sustain hunters legacy as the primary supporters of wildlife conservation throughout the United States.  It also has an Office of Hunting Policy whose role is to influence public policy in a way that protects hunting opportunities

Together with SCI and SCIF, the NRA has participated as a Defendant-Intervenor in many of the cases brought to challenge the FWS's attempts to delist the wolves of the Western Great Lakes and Northern Rocky Mountains.  The NRA defended the FWS's decision to delist the WGL wolves in the last two cases before the District of Columbia federal district court.  *HSUS v. Kempthorne*, 567 F.Supp. 2d 7, 9 (D.D.C. 2008) and *HSUS v. Salazar*, 1:09-cv-01092-PLF.  NRA has also defended the delisting of wolves in the Northern Rocky Mountains and is currently participating as a defendant-intervenor in the ongoing litigation over the delisting of Montana and Idaho's wolves.  *Defenders of Wildlife v. Hall*, 565 F. Supp. 2d 1160 (D. Mt. 2008); *Defenders of Wildlife v. Salazar et al.*, 9:09cv00077 (DWM).

NRA members hunt in the states included in the WGL DPS, frequently encounter wolves, and enjoy and appreciate the FWS and Michigan, Minnesota and Wisconsin's success with gray wolf recovery and seek to restore management authority over wolves to the states.  Their enjoyment of hunting and outdoor recreational activities and ability to pursue these activities safely and successfully are directly impacted by the uncontrolled presence of wolves in these states.

## History of the Listing Status of Western Great Lakes Wolves

In 1967, the FWS designated the Timber Wolf population (more recently designated as the Western Great Lakes population) in its entirety, as "endangered" under authority of the Endangered Species Preservation Act of 1966 (predecessor to the ESA), 32 Fed. Reg. 4001(March 11, 1967) and later under the ESA, 39 Fed. Reg. 1171, 1176 (January 4, 1974).  In 1978, under authority of the ESA, the Service identified the wolves within the boundaries of the state of Minnesota as a species and reclassified those wolves to "threatened" status, leaving the remainder of the wolves in the Western Great Lakes, and throughout the lower 48 conterminous states, classified as "endangered."  43 Fed. Reg. 9607 (March 9, 1978).

In 2000, the FWS received two delisting petitions.  Based at least in part on those petitions, the Service subsequently issued a rule that designated the WGL wolves as part of a distinct population segment and reclassified the wolves of that DPS as "threatened."  68 Fed. Reg. 15804 (April 1, 2003).[3]  In January and April of 2005, Oregon and Vermont

---

[3] In that rule, the wolves of the Western Great Lakes were designated to be part of an Eastern Wolf DPS that encompassed North Dakota, South Dakota, Nebraska, Kansas,

federal district courts respectively invalidated the reclassification rule, substantially on the basis of the breadth of the DPSs designated by the FWS. *Defenders of Wildlife v. Secretary, U.S. Department of the Interior*, 354 F. Supp. 2d 1156, 1172 (D. Or. 2005). *National Wildlife Federation v. Norton*, 386 F. Supp. 2d 553, 565 (D.Vt. 2005).

In February of 2007, the FWS issued a Final Rule newly designating a Western Great Lakes distinct population segment and delisting that DPS. 72 Fed. Reg. 6052 (February 8, 2007). The WGL DPS encompassed the wolves throughout Michigan, Minnesota, and Wisconsin and those in portions of Ohio, Iowa, Illinois, Indiana, North Dakota and South Dakota. Several animal rights groups challenged the delisting rule. In response to that challenge, a District of Columbia federal district court vacated and remanded the Final Rule on the legal question of the Service's authority to designate a distinct population segment for the purpose of delisting. Although the court directed the Service to provide justification that the designation of a DPS for delisting purposes conforms to the text, structure and legislative history of the ESA and that the strategy serves the law's policy objectives, the court did not direct the Service to reconsider its findings with respect to the WGL wolf population's recovery or as to their potential jeopardy from any of the five listing factors. *Humane Society of the U.S. v. Kempthorne*, 579 F. Supp. 2d 7, 20 (D.D.C. 2008); 16 U.S.C. 1533(a)(1). Despite being returned to the "endangered" and "threatened" species lists, the wolves of the Western Great Lakes, more specifically those within Michigan, Minnesota and Wisconsin, no longer qualified for "endangered" or "threatened" status. The FWS complied with the judge's remand and, on December 12, 2008, issued a Solicitor's Memorandum, M-37018, entitled, "U.S. Fish and Wildlife Service Authority under Section 4(c)(1) of the Endangered Species Act to Revise Lists of Endangered and Threatened Species to 'Reflect Recent Determinations.'" The Service subsequently issued a new Final Rule on April 2, 2009, in a second attempt to finalize the proposed rule issued on March 27, 2006. 74 Fed. Reg. 15070 (April 2, 2009).

> This final rule constitutes a new final determination on the March 27, 2006 proposed rule. It is also substantially similar to the vacated final rule in form and substance, including the biological and ecological basis for its conclusions. This final rule differs in that it contains a section entitled "Issues on Remand" that represents the Secretary's response to the issues raised by the Court, in consultation with the Department of the Interior's Solicitor's Office. This section of the final rule merely addresses the narrow legal issue within the agency's expertise and experience—namely, whether the Secretary may simultaneously identify and delist a currently listed species. The section entitled Distinct Vertebrate Population Segment

---

Minnesota, Iowa, Missouri, Wisconsin, Illinois, Michigan, Indiana, Ohio, Pennsylvania, New Jersey, New York, Connecticut, Rhode Island, Massachusetts, Vermont, New Hampshire, and Maine.

**Safari Club International - Washington DC Office**
501 2ⁿᵈ Street, NE, Washington, DC 20002 • Phone 202 543 8733 • Fax 202 543 1205 • www.safariclub.org

001060A

> Policy Overview responds to the court's question regarding the agency's
> past practice and use of DPSs. Before issuing this final rule, we verified
> that no new scientific data exist that would alter our previous analysis of
> the relevant facts that serve as the basis for the Secretary's decision to
> identify the Western Great Lakes DPS and the Secretary's conclusion that
> the Western Great Lakes DPS should be removed from the list of
> threatened and endangered species because it has recovered and no longer
> meets the criteria for remaining on the list. Note that we did examine
> updated monitoring data and the final Michigan plan and determined that
> this new data merely supplements our existing record. The Service is
> simply responding to the narrow legal issues raised by the Court.

*Id*. at 15076.

The April 2, 2009 Final Rule reiterated the FWS's position that the WGL wolves
had achieved recovery and were not placed at risk by any of the five factors identified in
16 U.S.C. §1533(a)(1). *Id*. at 15070. Once again, the Service's attempted delisting was
challenged in federal court. On July 1, 2009, the FWS entered into a stipulation and
settlement agreement with the Plaintiffs who had filed the case. In that stipulation, the
FWS admitted failing to comply with notice and comment procedural requirements and
agreed to withdraw the Final Rule and to take public comment before again delisting the
WGL wolves. Once again, although returned to the "threatened" and "endangered"
species lists, the WGL wolves failed to meet the criteria required for "endangered" or
"threatened" status. In neither the stipulation nor the September 16, 2009 Federal
Register notice that reinstated the listing of the Western Great Lakes wolves, did the
Service recant its position that the WGL wolves were recovered and not in jeopardy from
any of the five statutory listing factors. 74 Fed. Reg. 47483 (September 16 2009).

Since September 16, 2009, the only factor standing in the way of the removal of
the WGL wolves from the "endangered" and "threatened" species lists is the FWS's
obligation to provide notice and take comment on a proposed delisting. The fact that
notice and comment is all that stands between listing and delisting was admitted by the
Service itself as recently as April 20, 2010, in its Federal Register notice of Wisconsin
and Michigan's 10(a)(1)(A) permit applications for the take of problem wolves. 75 Fed.
Reg. 20621 (April 20, 2010). In that notice, the Service described the listing history of
the wolves and their current reinstatement on the "endangered" and "threatened" species
lists: "The effect of this withdrawal is reinstatement of Act protections for gray wolves
in the Western Great Lakes area while we gather additional public comment." *Id*.

**Safari Club International - Washington DC Office**
501 2nd Street, NE, Washington, DC 20002 • Phone 202 543 8733 • Fax 202 543 1205 • www.safariclub.org

001061A

**The Service Is Now Obligated to Promulgate Regulations To Reflect the Status of Species**

The FWS has determined the wolves of the Western Great Lakes to be recovered and not in jeopardy from any of the five listing factors.  The Service has specifically judged the regulatory mechanisms of Michigan, Minnesota and Wisconsin adequate to conserve and manage the WGL wolves following delisting.  74 Fed. Reg. 15070 (April 2, 2009).  The FWS has never recanted that determination, despite returning the WGL wolves to the "threatened" and "endangered" species lists.  The Service has a statutory obligation to promulgate regulations that reflect that the WGL do not qualify for "endangered" or "threatened" listing status.

16 U.S.C. § 1533 (a)(1), states:

> The Secretary shall *by regulation* promulgated in accordance with subsection (b) of this section *determine* whether any species is an endangered species or a threatened species . . . .

*Id.* (emphasis added).  At the very least, the Service should expeditiously make a 90-day finding and just as expeditiously conduct whatever remaining status review might be necessary.  More appropriately since these two steps have already been accomplished, the Service should simply move directly to proposing a delisting ruling on its own initiative.

**The Service Has the Ability to Bypass the Obstacles a Distinct Population Segment Designation Has Posed to a Successful Delisting Effort**

The FWS's previous attempts to reclassify and later delist the Western Great Lakes wolves have been thwarted by the Service's unsuccessful and unnecessary designations of these wolves as a distinct population segment.  The Service was never obligated to create a DPS for the purpose of delisting the WGL wolves.  The reliance on the distinct population segment designation saddled the Service with choosing and proving the propriety of the DPS's boundaries, as well as justifying the creation of the DPS for the purpose of delisting.  The decision to rely on the DPS strategy saddled the Service with the DPS policy's caution against utilizing state boundaries to delineate the DPS.  In choosing a DPS-based strategy, the Service failed to take advantage of its own precedent, a strategy the FWS concurrently relied upon in the delisting of the Northern Rocky Mountain wolves.[4]

---

SCI and NRA recognize that the Service's reliance on 16 U.S.C. 1533(c)(1) and its ability to specify different listing status for different portions of the species' range is subject to a litigation challenge in the Montana federal district court.  SCI and NRA, who are participating as defendant-intervenors in that litigation, certainly hope that the Montana court upholds the Service's interpretation of the ESA.  Whether or not the

June 16, 2010
SCI and NRA Petition to Delist the Wolves of the Western Great Lakes
Page 10 of 16

Alternative I – The FWS Has the Obligation to Delist a "Portion" of the Canis Lupus
Species

Since March of 2007, the FWS has renewed its interpretation of the ESA to allow
the Service to specify those portions of a listed species that should be classified as
"threatened" or "endangered" in accordance with 16 U.S.C. §1533(c). On March 16,
2007, The Solicitor of the U.S. Department of the Interior issued "Solicitor's
Memorandum" M-37013, entitled "The Meaning of 'In Danger of Extinction Throughout
All or a Significant Portion of Its Range.'" In that memorandum, the Solicitor explained
how, pursuant to 16 U.S.C. §1533(c)(1), the FWS has the authority to specify only those
*portions* of the range of a species that are threatened or endangered. The words of
Section 1533(c)(1) are a mandate. The Secretary of the Interior "shall" publish the list of
all species determined to be either endangered or threatened and "shall" specify over
what portion of the species' range that it is "endangered" or "threatened."[5]

> The Secretary of the Interior *shall* publish in the Federal Register a list of
> all species determined by him or the Secretary of Commerce to be
> endangered species and a list of all species determined by him or the
> Secretary of Commerce to be threatened species. Each list *shall* refer to
> the species contained therein by scientific and common name or names, if
> any, specify with respect to each such species over what portion of its
> range it is endangered or threatened, and specify any critical habitat within
> such range.

---

Montana court endorses the FWS's interpretation and delisting of Montana and Idaho's
wolves, should not dictate whether the utilizes Section 1533(c)(1) to delist the portion of
the canis lupus species that the Service has designated for the lower 48 conterminous
United States. A ruling on the issue from a single district court lacks precedential value
and should not deter the Service from moving forward with a legally defensible
interpretation of the ESA.

[5] The Solicitor's March 16, 2007 Memorandum did not represent a new
interpretation of the FWS's authority and obligations under the ESA. Instead, the
Memorandum confirmed an interpretation previously recognized by the Service. In
1978, the Service applied a similar approach to the classification of the bald eagle, by 43
Fed. Reg. 6230, 6232 (February 14, 1978), "Determination of Certain Bald Eagle
Populations as Threatened." (FWS listed the bald eagle as endangered throughout the
lower 48 United States, with the exception of the portion living in Washington, Oregon,
Minnesota and Michigan where they were classified as "threatened." The bald eagle also
was not listed at all in Alaska).

**Safari Club International - Washington DC Office**
501 2ⁿᵈ Street, NE, Washington, DC 20002 • Phone 202 543 8733 • Fax 202 543 1205 • www.safariclub.org

001063A

*Id.* (emphasis added). The FWS relied on the M-37013 and Section (c)(1) to delist the Northern Rocky Mountain Distinct Population Segment of wolves and to specify that the Wyoming portion of that DPS still qualifies for federally protected status. 74 Fed. Reg. 15123, 15152 (April 2, 2009). The Final Rule for the delisting of the Northern Rocky Mountain Wolves was issued on April 2, 2009, the very same day that the Service issued its most recent final rule to delist the wolves of the Western Great Lakes. 74 Fed. Reg. 15123. Despite relying on the Solicitor's Memorandum and Section 1533(c)(1) for the delisting of the Northern Rocky Mountain wolves, the Service has not attempted to apply the same strategies to delist the Western Great Lakes wolves. Instead, the Service has thus far chosen only to designate the WGL wolves as a DPS. The FWS's decision to designate a Western Great Lakes Distinct Population Segment of wolves tied the Service's hands and unnecessarily complicated the FWS's means of determining the territorial boundaries of the DPS. Because DPS policy ostensibly cautions the Service against using state boundaries to form the parameters of a DPS, the FWS made it impossible to delist only the wolves within the boundaries of Michigan, Minnesota and Wisconsin. Policy Regarding the Recognition of Distinct Vertebrate Population Segments (DPS policy); 61 FR 4722, 4725 (February 7, 1996).[6]

Once it has determined that the species gray wolf (canis lupus) is not threatened or endangered throughout all of its range, the FWS bears an obligation to specify that portion of the species' range that qualifies for "endangered" or "threatened" status, and by implication, to specify that portion of the species' range that does not qualify, namely the wolves in Michigan, Minnesota and Wisconsin. SCI and NRA recommend that the Service comply with that mandate by proposing and adopting a rule that does not attempt

---

[6] SCI and NRA agree with the petition filed on May 14, 2010, that a revision may be in order for the Service's DPS policy with respect to the avoidance of state boundaries as a means to delineate the boundaries for distinct population segments. Since one of the five factors that the ESA requires the FWS to evaluate for determining the need for listing or delisting a species is the adequacy of existing regulatory mechanisms available to prevent the species from requiring listing and a separate provision requires the FWS to "take into account" state conservation efforts, and since those regulatory mechanisms and conservation efforts are often unique to each state government's approach to wildlife management, the difference in state management strategies plays a fundamental role in determining a species' conservation status. When it comes to a species being removed from the endangered and threatened species lists, the adequacy of state regulatory mechanisms becomes just as significant as similar mechanisms employed by foreign governments – a fact that the Service has recognized as a factor in determining DPS boundaries. The Service requires a means to differentiate the conservation status of species from one state to another. If the Service intends to continue to rely on DPSs for the purpose of delisting, it should recognize the significance of these differences between state management strategies when determining the DPS boundaries.

to designate a DPS but instead relies on the species designation for the wolves of the lower 48 conterminous U.S. states and specifies the endangered status of only the portion of wolves that live outside the boundaries of Minnesota, Michigan and Wisconsin.  In so doing the Service will be following the mandates of Section (c)(1) and/or the guidance of Solicitor's Memorandum M-37013.[7]

<u>Alternative II – The Service Can Delist By Expanding the Boundaries of the Minnesota Wolf Species.</u>

The Minnesota species of wolves that the FWS designated in 1978 has grown and expanded in size and range and has moved into Michigan and Wisconsin.  The wolves of the Western Great Lakes are the progeny of the wolf species that the Service has already carved out and distinguished from the wolf species composed of all wolves of the lower 48 conterminous United States, other than the wolves of the Minnesota species.  Having already designated a species, the Service could simply recognize the territorial growth of the Minnesota species, redraw the boundaries of the pre-existing species and delist only that species as it currently exists within Minnesota, Michigan and Wisconsin.  As in Alternative I, reliance on a previously designated species would allow the Service to avoid the legal obstacles previously encountered through the designation and delineation of a DPS for the purpose of delisting the wolves of the Western Great Lakes states.  By choosing a species-based, rather than DPS-based approach, the Service, could, if it chose, include within the species boundaries only the states that have existing management plans.

<u>Alternative III - The FWS Could Create One or More "Species" Composed of the Wolves of Michigan, Minnesota and Wisconsin</u>

The FWS has always possessed the authority to designate as a separate species, a group of animals living within the boundaries of a specific state or states.  That is exactly what the FWS did when they divided the wolves of the lower 48 states and Mexico into two separate species, with one species composed of the wolves in Minnesota and the other species composed of all the rest of the wolves in the conterminous U.S. states and Mexico.

As defined in section 3 of the Act, the term "species" includes any subspecies of fish or wildlife or plants and any other group of fish or wildlife of the same species or smaller taxa in common spatial

---

[7] The Service followed this approach in delisting the portion of the Preble's Meadow Jumping Mouse's range in Wyoming, while maintaining the portion of the species' range in Colorado as threatened.  See Final Rule, 73 Fed. Reg. 39790, 39832-38 (July 10, 2008).

**Safari Club International - Washington DC Office**
501 2nd Street, NE, Washington, DC 20002 • Phone 202 543 8733 • Fax 202 543 1205 • www.safariclub.org

001065A

> arrangement that interbreed when mature. For purposes of this
> rulemaking, the gray wolf (Canis lupus) group in Mexico and the 48
> conterminous States of the United States other than Minnesota, is being
> considered as one "species", and the gray wolf group in Minnesota is
> being considered as another "species".

43 Fed. Reg. 9610 (March 9, 1978). The drafters of the ESA made it clear that they
expected the FWS to utilize state boundaries as a means of differentiating between listing
status. If one state's regulatory mechanisms would adequately conserve and manage
wolves while another state's would not, Congress intended to give the FWS the authority
to downlist or delist the animals within the former state, while retaining stricter federal
protections in the latter. The wolves of Minnesota provide the perfect example. The
legislative history of the ESA offers multiple examples where Congress discussed the
plan to single out Minnesota's wolves years before the Service formally reclassified the
state's wolves as threatened. On March 26, 1973, for example, during hearings on H.R.
4758, the Subcommittee on Fisheries and Wildlife Conservation and the Environment of
the House Committee on Merchant Marine and Fisheries heard the testimony of
Nathanial Reed, Assistant Secretary for Fish, Wildlife and Parks, U.S. Department of the
Interior. During his testimony, Mr. Reed engaged in the following discussion with
Subcommittee member Congressman John Breaux of Louisiana:

> Mr. Reed: . . . The problem in Minnesota as you and members of the
> committee know is that the wolf is in good numbers in one limited area.
> As that population grows it expels members. Those individuals drift south
> and get into trouble with dairy, farms. Minnesota feels very strongly that
> the wolf should be cropped. I feel we should try to identify other places to
> which they can be moved, and if there are no such places then I would
> have to agree with Minnesota that a certain percentage of the surplus
> animals that cannot find and establish a
> range well may have to be cropped.
> Mr. Breaux: *As I understand the bill, the department is allowed to
> designate areas in which the species is endangered and areas where it
> is not endangered.*

*Endangered Species: Hearing on H.R. 37, H.R. 470, H.R. 471, H.R. 1461, H.R. 1511,
H.R. 2669, H.R. 2735, H.R. 3310, H.R. 3696, H.R. 3795, H.R. 4755, H.R. 2169 and H.R.
4758 Before the Subcomm. On Fisheries and Wildlife Conservation and the Environment
of the H. Comm. On Merchant Marine and Fisheries,* 93rd Cong. 210 (1973) (testimony
of Nathanial Reed, Assistant Secretary for Fish, Wildlife and Parks, U.S Department of
the Interior). (emphasis added).  Later during that same hearing, the Subcommittee heard
the testimony of Mike Casey, Director of the Minnesota Department of Natural
Resources. During his testimony, Congressman Breaux engaged Mr. Casey in the
following exchange:

**Safari Club International - Washington DC Office**
501 2nd Street, NE, Washington DC 20002 • Phone 202 543 8733 • Fax 202 543 1205 • www.safariclub.org

001066A

> Mr. Casey: I think the record of the State of Minnesota will stand by itself. Mr. Chairman, this record will stand close examination, and we just do not concur with the timber wolf being placed on the endangered species list. It is not endangered in Minnesota.
>
> Mr. Breaux: That is a good point, and I sympathize with you *and point out that there is another provision of the bill which would allow the Secretary to designate the portion of the habitat or range of an endangered species. In other words, he might be able, under the law as I read it, to designate one State in which the timber wolf is indeed endangered, and **maybe because of good sound management practices in your State**, he would designate it as not an endangered species as far as your State is concerned.*

*Id.* at 326 (testimony of Mike Casey, Director of the Minnesota Department of Natural Resources) (emphasis added).  Similar discussions took place before the Senate committees considering ESA bills.  When Douglas P. Wheeler, Deputy Assistant Secretary for Fish, Wildlife and Parks, testified during hearings before the Senate Subcommittee on Environment of the Committee on Commerce on S. 1592 and S. 1983, on June 18 and 21, 1973, he answered a question from Senator Stevens of Alaska on the differences between the proposed Endangered Species Act and its predecessor:

> Senator Stevens. This bill would permit you to stop hunting in California because you made that finding in Florida.
>
> Mr. Wheeler. No, sir, exactly the opposite. This is exactly the point that we are trying to make; for the first time, under the authority of this bill, we would be able to fine-tune to the extent that we could prohibit the taking in that area where this condition of endangerment exists, and not in others. The law presently requires that we find a species to be endangered throughout all of its range. We are not able to say that in Florida it exists but in Alaska it does not.
>
> Senator Stevens. I want you to have that. I want you to have that even if it is in Alaska and not Florida.
>
> Mr. Wheeler. Or California, or Wyoming, or Nevada.

*Endangered Species Act of 1973: Hearing on S. 1592 and S.1983 Before the Subcomm. on Environment of the S. Comm. on Commerce*, 93rd Cong. 60-61 (1973) (testimony of Douglas P. Wheeler, Deputy Assistant Secretary for Fish, Wildlife and Parks, Department of the Interior).  Later that year, the House agreed to a Conference Report on S.1983 of the Endangered Species Act of 1973.  The debate over accepting the report into the record included the following discussion between Congressman Bergland and Congressman Dingell on December 20, 1973:

**Safari Club International - Washington DC Office**
501 2nd Street, NE, Washington, DC 20002 • Phone 202 543 8733 • Fax 202 543 1205 • www.safariclub.org

001067A

> Mr. Bergland. Mr. Speaker, if the gentlewoman will yield further, could the Secretary, under the terms of this conference report, designate the timber wolf as an endangered species in all States of the Union except Minnesota?
>
> Mr. Dingell. Mr. Speaker, if the gentlewoman from Missouri will yield, the answer to that question is that it could so do, if the population of wolves in question were to be found in Minnesota. His responsibility and discretion would extend to particular species, subspecies or populations of wolves and other kinds of endangered or threatened animals.

119 Cong. Rec. H 11835-11836 (1973).

The foregoing discussions demonstrate that the drafters intended the ESA to give the FWS the authority to differentiate species listing status by state. Since the Service has, since 2006, recognized the wolves within Minnesota, Michigan and Wisconsin all to have achieved recovered status, and all to be free of jeopardy from any or all of the risks identified in 16 U.S.C. 1533(a)(1), the Service has, since that time, possessed the authority to designate one or more new species to correspond with the states of Michigan, Minnesota and Wisconsin. SCI and NRA recommend that the Service exercise that authority and identify three individual species for the wolves of Michigan, Minnesota and Wisconsin, or alternatively a single species that encompasses the wolves of all three states. Following the precedent it set in 1978 with Minnesota's wolves, instead of relying on the legal but problematic DPS strategy, would facilitate the delisting of these undeniably recovered animals that no longer qualify as "endangered" or "threatened."

## Conclusion

Upon receiving this petition for the delisting of the wolves of the Western Great Lakes, the Secretary of the Interior is required to make a finding within no more than 90 days as to whether the petitioned delisting may be "warranted." 16 U.S.C. §1533(b)(3)(A); 50 CFR § 424.14(b)(2). Upon making that finding, the Secretary must "promptly commence a review of the status" of the Western Great Lakes wolves. 50 CFR § 424.14(b)(1); 16 U.S.C. § 1533(b)(3)(A). Once this finding is made, within no more than twelve months of receiving the petition (the time does not run from the time of the finding) , the Secretary must issue a determination on the petition by either proposing a rule to delist, deciding the petition is not warranted (the species stays on the list), or concluding that the petition is warranted but precluded by higher priorities. 16 U.S.C. § 1533(b)(3)(B).

As indicated earlier in this letter, the FWS has already made all the aforementioned findings and determinations and has repeatedly published proposed and final regulations and other Federal Register notices, announcing the wolves of the

**Safari Club International - Washington DC Office**
501 2ⁿᵈ Street, NE, Washington, DC 20002 • Phone 202 543 8733 • Fax 202 543 1205 • www.safariclub.org

001068A

Western Great Lakes to be recovered and not to be in danger of extinction now or in the foreseeable future from any of the five risk factors identified in 16 U.S.C. § 1533(a)(1). Having completed the preliminary stages of the delisting assessment, the Service's next obligation is to issue a proposed regulation that identifies the species or portion of that species to be delisted and gives the public notice and an opportunity to comment on that proposal. 16 U.S.C. § 1533(b)(3)(B). The Service's final obligation in response to this petition is to issue a Final Rule to delist the wolves of the Western Great Lakes.

It is well past time for the Service to follow through with its determination that the wolves of the Western Great Lakes no longer qualify as "threatened" or "endangered" and to carry through the delisting process to its appropriate resolution – a removal of these wolves from the "threatened" and "endangered" species lists.

Should you have any questions concerning this letter, please feel free to contact Anna Seidman, Director of Litigation, Safari Club International at 202-543-8733 or aseidman@safariclub.org; or Christopher A. Conte, Legislative Counsel, NRA/ILA at 703-267-1166 or CConte@nrahq.org.

Sincerely,

Lawrence Rudolph
President,
Safari Club International
Safari Club International Foundation


National Rifle Association of America
11250 Waples Mill Road
Fairfax, VA 22030
http://home.nra.org/#/home

**Safari Club International - Washington DC Office**
501 2nd Street, NE, Washington, DC 20002 • Phone 202 543 8733 • Fax 202 543 1205 • www.safariclub.org

001069A

# EXHIBIT M



# United States Department of the Interior

### FISH AND WILDLIFE SERVICE
Bishop Henry Whipple Federal Building
1 Federal Drive
Fort Snelling, MN 55111-4056

IN REPLY REFER TO:

FWS/R3/AES-TE

JUN 30 2010

Mr. Lawrence Rudolph
Safari Club International
501 2nd Street, NE
Washington, D.C. 20002

Dear Mr. Rudolph:

This letter is in regard to your petition dated and received on June 16, 2010, which requested that the U.S. Fish and Wildlife Service (Service) remove the gray wolf in Minnesota, Wisconsin, and Michigan, or in the alternative, in the Western Great Lakes Distinct Population Segment, from the list of endangered or threatened species under the Endangered Species Act (Act).

Under the provisions of section 4 of the Act, we must first make an initial finding as to whether or not a petition to remove a species from the list of threatened or endangered species presents substantial information indicating that the requested action may be warranted. Section 4(b)(3)(A) of the Act provides that, to the maximum extent practicable, this finding be made within 90 days of receiving the petition. If this initial finding concludes that the petition presents substantial information indicating that the requested action may be warranted, then section 4(b)(3)(B) gives the Service one year from the date the petition was received to either: decide that the petitioned action is not warranted; or decide that the petitioned action is warranted.

We appreciate your interest in the recovery of gray wolves in Minnesota, Wisconsin, and Michigan. If you have any questions, please contact Mr. T.J. Miller, Chief, Division of Endangered Species, at 612-713-5334.

Sincerely,

*Lynn M Lewis*

Lynn M. Lewis
Assistant Regional Director
Ecological Services

001070A

# EXHIBIT N

**Public Comments on 90-day Findings of Petitions to Delist the Gray Wolf in Minnesota, Wisconsin, Michigan, and the Western Great Lakes.**

All public comments can be accessed from regulations.gov within docket "FWS–R3–ES–2010–0062".  This site lists 301 submissions.  Most of these were submitted directly through the regulations.gov website.  A number of these were mailed to the U.S. Fish and Wildlife Service's Arlington Office and uploaded by the Service.  Several of these individual submissions include multiple comments.  All comments were analyzed and considered as appropriate.

For a direct link to these comments, go to:

http://www.regulations.gov/#!searchResults;rpp=25;po=0;s=FWS%25E2%2580%2593R3%25E2%2580%2593ES%25E2%2580%25932010%25E2%2580%25930062;dct=FR%252BN%252BPS%252BSR%252BPR

001320A

# EXHIBIT A

**COMMENTS OF PETITIONERS U.S. SPORTSMEN'S ALLIANCE
FOUNDATION ET AL., ON THE SERVICE'S PROPOSED RULE
DELISTING WESTERN GREAT LAKES WOLVES**

**PROPOSED RULE PUBLISHED AT 76 FED.REG. 2086 (MAY 5, 2011)
FWS DOCKET NO. FWS-R3-ES-2010-0062; 922220-1113-0000-C6**

Before the United States Fish and Wildlife Service

*Proposed Rule To Revise the List of Endangered
and Threatened Wildlife for the Gray Wolf (Canis
lupus) in the Eastern United States, Initiation of
Status Reviews for the Gray Wolf and for the
Eastern Wolf(Canis lycaon)*, 76 Fed.Reg. 26086,
(USFWS May 5, 2011).

FWS Docket No. FWS–R3–ES–2010–0062
;92220–1113–0000–C6

DECLARATION OF DR. LISETTE WAITS

*Qualifications and Objectives*

This affidavit is provided by Lisette Waits, PhD, professor, Department of Fish and Wildlife,
University of Idaho. While I am employee of the University of Idaho, this review is provided in
my role as an independent scientist and the views expressed are my own and not that of the
University of Idaho. A detailed resume of my qualifications is provided as an attachment (Waits
CV.pdf).  In summary, I received a BS in Genetics in 1991 from the University of Georgia and
PhD in Genetics in 1996 from the University of Utah.  My main research expertise is in the field
of wildlife genetics, and I have published over 100 papers in this research area.  I have also done
extensive research on hybridization of canids for the past 12 years as part of my genetic work on
red wolves (*Canis rufus*) and coyotes (*Canis latrans*) in North Carolina.

The objective of this affidavit is to review the existing scientific literature on wolf genetics and
hybridization and address the question of whether there are (a) one, or (b) more than one species
or sub-species of wolves present in Minnesota, Wisconsin, and Michigan.   This question relates
to the key issue of whether the US Fish and Wildlife Service (USFWS) should count all wolves
(or just a specific type/s of wolves) present in the Western Great Lakes (WGL) area for the
purposes of determining whether the number of wolves in the Great Lakes area meets the
numerical objectives set forth in USFWS's wolf recovery plans.

*Background*

The taxonomic status and evolutionary history of the WGL wolf has been a source of great
debate among scientists.  This debate is reviewed in detail in the Federal Register Proposed
Delisting Rule (76 FR 26086, May 5, 2011) in the section on "Taxonomy of Wolves in the
Western Great Lakes Region" and will not be repeated in detail here.  In summary, the WGL
wolves were originally classified as a subspecies of the gray wolf, *Canis lupus lycaon* (Goldman

1994, Nowak 1995, 2002, 2003), and this classification was used in the 1992 recovery plan. Early genetic work on the WGL wolf revealed that this population had been impacted by interbreeding with coyotes (Lehman et al. 1991, Roy et al. 1994) and raised questions about the taxonomic status and evolutionary history.  More recent genetic studies have suggested that the WGL wolf is part of a group of canids in northeastern North America that is genetically distinct from the gray wolf and should be elevated to full species status as *C. lycaon*, or the eastern wolf (Wilson et al. 2000, Baker et al. 2003).  It has also been suggested that *C. lycaon* could be the same species as the red wolf, *C. rufus* (Wilson et al. 2000).

The taxonomic debate concerning the WGL wolves is further complicated by a history of hybridization.  Some authors have suggested that the WGL wolves are a product of hybridization of the coyote and gray wolf (Lehman et al. 1991, Roy et al. 1994; Leonard & Wayne 2008; Koblmüller et al. 2009), hybridization between the gray wolf and red wolf (Nowak 2002, 2003, 2009), or hybridization between the gray wolf and eastern wolf (Wheeldon and White 2009, Fain et al. 2010, Wheeldon et al. 2010).  The taxonomic debate surrounding the WGL wolf is also impacted by the fact that there is no single definition of species or subspecies agreed upon by scientists, and this topic is beyond the scope of this review.  Thus, in addressing the question of whether the WGL wolf population in Michigan, Wisconsin and Minnesota constitutes a single taxonomic group or multiple groups, I will follow the advise of Cronin and Mech 2009 who state "*We suggest that for North American Canis it is wise to avoid typological thinking and designation of formal taxonomic names to what are essentially geographic populations with varying levels of past and present gene flow*" (p4992).

Thus, this review will not address the debate of whether the WGL wolf should be classified as a subspecies or distinct species, but will instead focus on the question of whether the WGL wolf represents a single distinct and cohesive genetic group which is the most relevant question related to the designation of the WGL wolf as a Distinct Population Segment (DPS) in the current proposed delisting rule.  This review will also address the role that hybridization has played in shaping the genetic composition of the WGL wolf and the implications of this for addressing the question of whether the USFWS should include all wolves in the recovery area or only certain "genetic types" of wolves in counts to achieve recovery plan objectives.

From a legal perspective the description of a Distinct Population Segment (DPS) was clarified in a 1996 policy statement (61 FR 4722, February 7, 1996). Under this policy drafted by USFWS and the National Marine Fisheries Service, two factors are considered in a decision regarding the potential identification of a DPS: (1) Discreteness of the population segment in relation to the remainder of the taxon, and (2) the significance of the population segment to the taxon to which it belongs.  Genetic, morphological, behavioral and biogeographic data are generally considered when evaluating the evidence for a DPS listing.  Below I review the current literature on the genetic composition and distinctiveness of the WGL wolves and evaluate the question of whether there are one or two taxonomic or genetic groups of wolves in this region.

The genetic composition of the WGL wolf and other North American canids has been evaluated using maternally-inherited mitochondrial DNA (mtDNA), paternally-inherited Y chromosome, biparentally-inherited nuclear DNA (nDNA) microsatellite and nuclear DNA single nucleotide polymorphism (SNP) datasets.  These datasets have been generated by multiple research groups

using different sample sets of individual animals from different spatial areas which can complicate comparisons among results (Schwartz and Vucetich 2009). For the mtDNA datasets, all studies have revealed the presence of two evolutionary divergent genetic clades of DNA sequences or haplotypes among current WGL wolves (Lehman et al. 1991, Leonard and Wayne 2008, Koblmüller et al. 2009, Wheeldon et al. 2010, Fain et al. 2010).  These clades can be defined as gray wolf or "lupus-type" DNA sequences and coyote or "latrans-type".  Within the coyote clade of haplotypes, some authors have defined an additional group of haplotypes described as eastern wolf or "lycaon –type" haplotypes (Wilson et al 2000, Wheeldon and White 2009, Fain et al. 2010, Wheeldon et al. 2010).

The detection of multiple mtDNA genetic clades in WGL wolves might lead to some debate over whether there are one, two or three different genetic groups of canids in the WGL region and possibly two kinds of wolves (*C. lupus* and *C. lycaon*).  However, it is important to note that mtDNA data represent a single maternally-inherited locus that can give useful information about the evolutionary history of a species or population, but haplotypes and phylogenies (gene trees) may not accurately represent the genetic composition of the genome as a whole particularly in recently diverged species or species that have a history of hybridization (Funk and Omland 2003).  Given the documented history of hybridization among canids in North America and in WGL wolves in particular, it is important to evaluate the genetic composition of wolves in this region using multiple nuclear DNA markers before making any conclusions about the number of taxonomic or genetic groups in the WGL region.  For example, multiple studies have documented individuals with "latrans-type" mtDNA that had a nuclear DNA profile of *C. lupus* (Koblmüller et al. 2009, Wheeldon et al. 2010, Fain et al. 2010).

### *Review of the Literature*

In the next few sections, I chronologically review the recent studies that specifically focus on the genetic status of the WGL wolves using a combination of mtDNA, Y chromosome, and nuclear DNA markers and evaluate whether the studies provide evidence for one or multiple genetic groups of wolves in the WGL region.  In discussing these results, I use the following terminology to describe the mtDNA haplotypes – "lupus-type" indicating gray wolf ancestry, "latrans-type" indicating coyote ancestry and "lycaon-type" indicating haplotypes in the coyote clade that have been identified as eastern wolf haplotypes. I use the abbreviation WGL to indicate samples from the western Great Lakes region only and GL to indicate samples collected from the broader Great Lakes region including Canada.

### *Wheldon and White 2009*

Wheeldon and White (2009) evaluated the genetic relationships of 3 historic samples from 1899 – 1908 WGL wolves (2 Minnesota and 1 Wisconsin) and other current North American canids using ~ 230 bp of mtDNA control region sequence data and 8 nDNA microsatellite loci. Samples sizes for current samples included Northwest Territories (67); Manitoba (41); Minnesota (9); northwestern Ontario (30); northeastern Ontario (34); Algonquin Provincial Park (49); Frontenac Axis (74); Adirondacks (66); Saskatchewan (36); and Texas (24).  This datatset is thus somewhat limited in terms of sample sizes for WGL wolves, but may provide some insight into the genetic composition of WGL wolves at the turn of the century.  The three historical samples had mtDNA

haplotypes that clustered in the coyote clade and are considered to be "lycaon-type" by the authors. They used a Bayesian clustering analysis (STRUCTURE) and factorial correspondance analysis to detect the number of genetic groups in the nDNA microsatellite dataset. The authors indicate that five groups were identified by STRUCTURE, but the likelihood plot is not given so it is not possible to critically evaluate this result.  However, the five groups include western coyotes from Texas and Saskatchewan, eastern coyotes from the Frontenac Axis and Adirondacks, Algonquin wolves, wolves from Manitoba, Minnesota and northwestern/northeastern Ontario, and wolves from the Northwest Territories.

The admixture proportions of the three historic samples revealed that their highest proportional memberships were primarily to the Manitoba, Minnesota and northwestern/northeastern Ontario wolf group (56 – 79%) with a smaller proportion in the Algonquin wolf group (18 – 35%). Because of sample sizes, this study is somewhat limited for addressing the question of the number of genetic groups in the WGL region, but the samples from Minnesota were classified within a single genetic group that included samples from Manitoba and Ontario.  For the historic samples, they show that the mtDNA sequences cluster in the coyote clade while the nDNA data support clustering among the Manitoba, Minnesota and northwestern/northeastern Ontario wolf group and the Algonquin wolf group which they interpret as historic hybridization between *C. lupus* and *C. lycaon*.   The results also demonstrate that coyote clade "lycaon-type" haplotypes and hybridization were present in WGL wolves well before the ESA listing.

*Koblmüller et al. 2009*

Koblmüller et al. 2009 evaluated the genetic relationships of current and historic Great Lakes wolves and other North American canids using ~ 400 bp of mtDNA control region sequence data, 6 Y chromosome microsatellite loci and 26 nDNA microsatellite loci.  The historic samples from the WGL region were collected from 1892 - 1912 before coyotes were believed to be in the region.  The sample size for mtDNA dataset was 58 gray wolves, 202 GL wolves, 48 eastern coyotes, 78 western coyotes, 15 historic GL wolves, 1 historic gray wolf. The sample size for the nDNA microsatellite dataset was 58 gray wolves, 195 GL wolves, 48 eastern coyotes, 78 western coyotes and 13 historic GL wolves. The Y-chromosome dataset included 30 gray wolves, 111 GL wolves, 25 eastern coyotes, 41 western coyotes, 4 historic GL wolves.  The current GL wolves had a combination of "latrans-like" (142) and "lupus-like" (75) mtDNA haplotypes while the historic samples only had "latrans-like" haplotypes.  These authors do not use the "lycaon-type" terminology, but I think many of the "latrans-like" haplotypes would have been classified as "lycaon-like" by other authors (Wilson et al. 2000 and Fain et al. 2010) based on their location in the phylogenetic tree.

The male-inherited Y chromosome haplotypes separated into two clades (coyote and wolf), and the current GL wolves carried haplotypes from both clades.  The 4 GL historic samples all had haplotypes that clustered in the wolf clade. There was no clear geographical structuring among current samples in the GL region based on mtDNA or Y chromosome classification.  The nDNA microsatellite data were analyzed using a Bayesian clustering method (STRUCTURE) and a principle component analysis (PCA) method to determine the number of genetic groups and the classification of individuals.  Both methods indicated that the GL wolves formed a distinct genetic group.  For the Bayesian clustering method, the first hierarchial grouping at K=2 groups

(identified using the Evanno approach) produced a cluster of coyotes and gray wolves and the GL wolves clustered with gray wolves.  Using the raw plot of likelihood values, there was also statistical support for 3 groups which separated GL wolves, gray wolves and coyotes and 4 groups which separated GL wolves, gray wolves, eastern coyotes and western coyotes.  This dataset also revealed a small percentage (< 5%) of current individuals in the WGL region with mixed ancestry (partial GL and partial coyote or gray wolf) representing recent hybridization among genetic groups.

Four important conclusions can be drawn from this study.  First, WGL wolves are more closely related to gray wolves than coyotes when considering the nDNA dataset which is the largest and most informative dataset because it represents 28 independent and biparentally-inherited genetic markers.  Second, analysis of this nDNA dataset indicated that the wolves in the WGL region represent a single-genetic group distinct from coyotes and gray wolves. Third, analyses of wolves in the WGL region indicated historic as well as current hybridization among WGL wolves and coyotes or other populations of gray wolves.  Forth, the allele frequencies at only 5 of 20 loci were significantly different between the historic and current samples indicating that the current population provides a good representation of the genetic composition of the historic WGL population in contrast to the mtDNA results reported in an earlier study by Leonard and Wayne 2008 that suggested major differences in the haplotype frequencies of historic and current WGL wolves.

*Fain et al. 2010*

Fain et al. 2010 evaluated the genetic relationships of current WGL wolves and other North American canids using ~ 224 bp of mtDNA control region sequence data, 7 Y chromosome microsatellite loci and 8 nDNA microsatellite loci. Samples were collected from the following regions: northeast Minnesota (MN; 42 wolves), northern Wisconsin (WI; 65 wolves and 132 coyotes) and Upper-Peninsula Michigan (UPMI; 17 wolves), Alaska (39 wolves), British Columbia (41 wolves) and Alberta (26 wolves) as well as 25 domestic dogs and 14 wolf–dog hybrids.  MtDNA and Y chromosome datasets were analyzed using phylogenetic and network analyses.  The nDNA microsatellite dataset was analyzed using a Bayesian clustering method (STRUCTURE). Five mtDNA haplotypes were observed among WGL wolves  - 34% of the WGL wolves carried "lupus-type" haplotypes, 50% exhibited a ''coyote-type'' haplotype and 16% had "lycaon-type" haplotypes. The "coyote-type" haplotype was not observed in sympatric coyotes suggesting current hybridization with coyotes is very limited, and the hybridization with coyotes was historical (estimated at 55,000 years ago).  Twelve Y chromosome haplotypes were observed in WGL wolves – 7 haplotypes had been previously observed in gray wolves (50% of samples) and 5 were unique to WGL wolves (50% of samples). In the network analysis, the 4 of the unique WGL haplotypes were intermediate between gray wolf and coyote haplotypes and 1 haplotype clustered in the coyote clade.

In the nDNA microsatellite analyses using STRUCTURE,  K=2 genetic groups was most strongly supported using the Evanno criteria with a secondary peak at K=9 and a minor peak at K=5.  Using the raw likelihood values, the optimal value of K is less clear as the curve plateaued at K=4 and only slightly increased from K=5 to K=8.  The authors suggest that the combination of the Evanno statistic and the likelihood plot support K=5 as the most likely number of genetic

groups, but in my opinion this is debatable given that the likelihood curve plateaued at K=4 and K=9 had more support than K=5 in the Evanno plot. For the microsatellite dataset, the first hierarchical level of structure at K=2, divided the sample into two groups – with gray wolves in one group and WGL wolves, dogs, and coyotes in the other. At K=3, the WGL wolves split off from the coyote/dog group. At K=4, dogs split out of the coyote group. At K=5, the WGL wolves split into two genetic groups that the authors interpret as a *lycaon* and *lupus* group, but it is difficult to determine how the authors come to this conclusion and if the mtDNA and Y chromosome results support those groupings. However, there is no geographic pattern to the location of group 4 or 5 individuals, the proportion of group 4 and group 5 ancestry is close to 50/50 in each state, and many individuals have mixed ancestry between the groups 4 and 5 suggesting K=5 might represent oversplitting of the dataset (Pritchard et al. 2000). Individual analyses of nDNA ancestry suggested that 38% of the wolves had mixed ancestry (q < 0.70 for WGL wolf group and q > .1 for coyote/dog/gray wolf), and this proportion was roughly the same across states. Approximately 25% were hybrids with gray wolves, 6% had some evidence of coyote ancestry, and 6% were more complex hybrids with evidence of wolf/dog/coyote ancestry. A comparison of mtDNA and Y chromosome haplotypes in male wolves also supported a similar amount of hybridization.

A number of important conclusions can be drawn from this dataset. First, as seen in other studies current WGL wolves have a combination of "lupus-type", "lycaon-type" and "latrans-type" mtDNA haplotypes indicating past hybridization events. Second, the Y chromosome haplotype analysis detected 7 haplotypes shared with gray wolves and 5 haplotypes found only in WGL wolves providing support for genetic distinctiveness of wolves in this area but also shared ancestry or past hybridization with gray wolves. Third, in the nDNA clustering analyses the WGL wolves split off as a distinct genetic group from coyotes, dogs and gray wolves at K=3 before coyotes split from dogs at K=4. The possible splitting of WGL wolves into two genetic groups at K=5 is not well supported as noted above, and the authors actually conclude that "Recovered WGL states wolves constitute a single interbreeding population as exemplified by high gene flow across the study area" (p. 1758). Thus, this study also provides support for a single genetic group in the WGL region. Forth, the authors provide evidence that hybridization among WGL wolves and gray wolves or coyotes has occurred historically as well as currently. However, they suggest current hybridization with coyotes is very rare.

*Wheeldon et al. 2010*

Wheeldon et al. 2010 evaluated the question of whether there is current hybridization between sympatric coyotes and WGL wolves using ~225 bp of mtDNA control region, 4 Y chromosome microsatellite loci and 12 nDNA microsatellites. Their sample included 234 wolves and 94 coyotes (classified by phenotype) from the WGL region and 84 unknown ancestry samples from Ontario. MtDNA and Y chromosome datasets were used to identify haplotypes that were classified as gray wolf (GW) or coyote/eastern wolf (C/EW). Thirty-three mtDNA haplotypes were observed. Wolves had gray wolf and "coyote/eastern wolf" haplotypes, and coyotes had only coyote/eastern wolf haplotypes. No haplotypes were shared between wolves and coyotes. Y chromosome analysis identified  29 haplotypes (11 of GW origin and 18 of CÆW origin). GW and CÆW haplotypes were observed in both wolves and coyotes, but only two haplotypes were shared between taxonomic groups. Ten GW haplotypes were detected in wolves, and only 2

C/EW haplotypes. The nDNA microsatellite dataset was analyzed using Bayesian clustering analysis (STRUCTURE) and factorial correspondance analysis (FCA).  Individuals with less than 80% ancestry in a single genetic group (estimated by STRUCTURE) were considered admixed.

Both STRUCTURE and the FCA analysis identified two genetic groups – group 1 included coyotes and group 2 included individuals classified as wolf. Five animals were assigned as admixed using the criteria of $q < 0.80$, but this was not definitive as the credibility intervals for 3 overlapped 1.0, and mtDNA and Y chromosome analysis did not support recent hybridization. In total, 98.5% of wolves with coyote/eastern wolf mtDNA haplotypes were classified as wolves based on nDNA analyses and the other 1.5% were admixed.  They conclude that the mixed ancestry in WGL wolves derives from hybridization between grey wolves and eastern wolves, and coyote introgression in WGL wolves is currently rare or nonexistent.  Concerning the number of taxonomic groups in this region they conclude that "the WGLR wolf population essentially represents a single interbreeding population (e.g. Fain et al. 2010), presumably having undergone extensive backcrossing to both parental species over time" (p. 4436).

*Vonholdt et al. 2011*

Vonholdt et al. 2011 is the most recent analysis of canid genetic relationships that includes WGL wolves.  This dataset contains genotypes for 48,036 nuclear DNA single nucleotide polymorphism (SNPs) loci for 208 gray wolves from Eurasia and North America, 57 coyotes and 12 red wolves.  In North America, 60 samples were included from across the range of western gray wolves and 18 from the WGL region (3 MI, 11 MN, 4 WI). While the number of samples from the WGL region is smaller than some other studies discussed above, this is by far the largest genetic dataset on this topic, and the largest nuclear DNA SNP dataset for any wild vertebrate group.  This dataset was also published after the development of the May 2011 proposed delisting rule, and thus was not included in the literature review of the delisting document.  The authors evaluated genetic structuring of these canids using principle component analysis (PCA) and Bayesian clustering analysis (STRUCTURE).

The PCA analysis indicated that the following North American gray wolf populations were distinct: Mexican, Great Lakes, Northern Quebec, and Western North America wolves.  The Bayesian clustering analysis was consistent with the PCA analysis, and the results give more information on the hierarchical level of distinctiveness among groups. From a statistical perspective, the highest supported grouping using the Evanno method was 3 groups, and for the raw likelihood scores the maximal value was 8 groups.  The authors also evaluated the groupings for $K = 9 – 12$ to determine if the groupings were biologically/geographically meaningful as recommended by Pritchard et al. 2000.  $K = 9$ and 10 provided meaningful results and are presented in figure 4.  Dogs and wolf-like canids formed the first hierarchical partition ($K = 2$), followed by coyotes and gray wolves ($K = 3$), Old and New World wolves ($K = 4$), Italian wolves ($K = 5$), Mexican wolves ($K = 6$), Spanish wolves ($K = 7$), Middle Eastern wolves ($K = 8$), red wolves ($K = 9$), and Great Lakes wolves ($K = 10$). The authors concluded that this degree of partitioning supports subspecies level of differentiation for WGL wolves.

WGL wolves show consistent signals of low levels of admixture with coyotes at $K= 3 – 10$, and

90% credibility intervals for coyote ancestry estimates did not overlap zero indicating strong statistical support for mixed ancestry. However, only one individual in MN showed evidence of greater than 20% coyote ancestry thus suggesting current hybridization with coyotes is rare. When evaluating the ancestry across groups, red wolves shared a high proportion of ancestry (~80%) with coyotes while WGL wolves shared a high percentage of ancestry (~80%) with gray wolves.  This is also supported by PCA analysis. Thus, the authors provide good evidence that red wolves and WGL wolves should not be placed in the same taxonomic group.  Vonholdt et al. also used the program SABER to estimate the number of generations since admixture and assign ancestry of chromosomal blocks of WGL wolves to coyote, gray wolf or dog reference ancestral populations.  They found that WGL wolves (n = 18) have an average of 14.9% of their genome assigned to coyotes (range: 13.4%–19.5%), and estimate that the timing of hybridization among gray wolves and coyotes occurred 546 to 963 yr ago assuming a 2–3-yr generation time. Fst analyses also indicate that the WGL wolves are distinct from gray wolves (0.05) and coyotes (0.08 – 0.11).

The following conclusions can be drawn from this dataset.  First, WGL and red wolves have different evolutionary histories and should not be classified in the same taxon.  WGL share much higher ancestry (~80%) with gray wolves in spite of the presence of coyote-like mtDNA haplotypes.  Second, the WGL wolves show evidence of genetic distinctiveness and represent a single genetic group or taxon.  Third, hybridization among WGL and other taxons occurred before European contact and has continued to occur.

### Summary and Conclusions

Based on reviewing the current literature and best available science on the topic, I believe the following conclusions are supported:
1) The WGL wolves represent a single genetic group consistent with a distinct population segment listing.  Individuals in this group have a range of ancestries reflected in the mtDNA, Y chromosome and nDNA that reflect past and current hybridization.
2) WGL wolves are not completely isolated from surrounding canid populations, and there is some gene flow with other populations of gray wolves and eastern wolves, but hybridization with coyotes is rare.
3) Hybridization among WGL wolves and other taxonomic groups occurred historically (before human contact and before ESA listing).
4) While mtDNA haplotype frequencies in WGL have shifted considerably compared to samples collected at the turn of the century, comparisons of allele frequencies at 20 neutral nDNA microsatellite loci showed significant differences at only five loci.  This suggests that the genetic composition of the current WGL population provides a good representation of the historic and pre-listing population.

I believe that these findings support inclusion of all wolf-like canids in the recovery area towards the count of animals to meet the delisting criteria.  Since the ESA does not currently have a formal policy on hybrid individuals, some questions may be raised about the conservation value of individuals in the WGL region with hybrid ancestry. I agree with the conclusions of Wheeldon et al. 2010 that all wolves in this region should be included in population counts regardless of evidence for past or current introgression and regardless of whether they have more "lupus-like"

or more "lycaon-like" ancestry.  This is a hybrid zone where mixed ancestry is expected, and individuals are filling the ecological niche for wolves regardless of their specific ancestry values or mtDNA haplotypes.

Management recommendations related to the conservation status and value of hybrids highlight the importance of hybridization as a natural evolutionary process and support conservation protection of natural hybrid taxons, natural introgression and natural hybrid zones (Allendorf et al. 2001). Hybridization is a natural process in this system based on evidence from genetic studies (discussed above) indicating that hybridization predated human impacts on the system. In addition, there is precedence under the ESA for including introgressed individuals in population counts for red wolves (Stoskopf et al. 2005) and westslope cutthroat trout (Federal Court 2008).

**I, Lisette Waits, have prepared the foregoing declaration and state under penalty of perjury that it is true and correct to the best of my knowledge information and belief and represents my best professional judgment.**

**Executed in Moscow, Idaho on July 1, 2011**


_____
Lisette Waits, Phd.

*Citations*

Allendorf,  F. W., R. F. Leary, P. Spruell, J. K. Wenburg. 2001. The problems with hybrids: setting conservation guidelines.  Trends in Ecology and Evolution 16: 613-622.

Baker, R. J., L. C. Bradley, R. D. Bradley, J. W. Dragoo, M. D. Engstrom, F. S. Hoffman, C. A. Jones, F. Reid, D. W. Rice, and C. Jones. 2003. Revised Checklist of North American Mammals North of Mexico. Museum of Texas Tech University, Occasional Papers Number 229, 1 December 2003.

Cronin M.A. and L.D. Mech. 2009. Problems with the claim of ecotype and taxon status of the wolf in the Great Lakes region. Molecular Ecology18:4991-4993

Fain, S. R., D. J. Straughan, and B. F. Taylor. 2010. Genetic outcomes of wolf recovery in the western Great Lakes states. Conservation Genetics 11:1747-1765.

Federal Register. 2011. Proposed Rule To Revise the List of Endangered and Threatened Wildlife for the Gray Wolf (*Canis lupus*) in the Eastern United States, Initiation of Status Reviews for the Gray Wolf and for the Eastern Wolf (*Canis lycaon*), 76 Fed.Reg. 26086, (USFWS May 5, 2011).

Federal Court. 2008. American Wildlands v. Kempthorne, 530 F.3d 991,1000 (D.C. Cir. 2008)

Funk, D. J., and K. E. Omland. 2003 Species-level paraphyly and polyphyly: frequency, causes, and consequences, with insights from animal mitochondrial DNA. Annual Review of Ecology, Evolution and Systematics 34:397-423.

Goldman, E. A. 1944. Part II. Classification of Wolves. In S. P. Young and E. A. Goldman. The Wolves of North America. The American Wildlife Institute, Washington, DC.

Koblmüller, S., M. Nord, R. K. Wayne, and J. A. Leonard. 2009. Origin and status of the Great Lakes Wolf. Molecular Ecology 18:2313-2326.

Lehman, N., A. Eisenhawer, K. Hansen, L. D. Mech, R. O. Peterson, P. J. P. Gogan, and R. K. Wayne. 1991. Introgression of coyote mitochondrial DNA into sympatric North American gray wolf populations. Evolution 45:104-119.

Leonard, J. A., R. K. Wayne. 2008. Native Great Lakes wolves were not restored.  Biology Letters 4: 95-98.

Nowak, R. M. 1995. Another look at wolf taxonomy. Pp. 375-397 in L. N. Carbyn, S. H. Fritts, and D. R. Seip (eds.), Proceedings of the Second North American Symposium on Wolves, Canadian Circumpolar Institute, University of Alberta, Edmonton.

Nowak, R. M. 2002. The original status of wolves in eastern North America. Southeastern Naturalist. 1:95-130.

Nowak, R. M. 2003. Wolf evolution and taxonomy. Pp. 239-258 in L. D. Mech and L. Boitani (eds.), Wolves, Behavior, Ecology, and Conservation. University of Chicago Press, Chicago.

Pritchard, J.K., M. Stephens, P. Donnelly. 2000. Inference of population structure using multilocus genotype data.  Genetics 155: 945-959.

Roy, M., E. Geffen, D. Smith, E. A. Ostrander, R. K. Wayne. 1994. Patterns of differentiation and hybridization in North American wolflike canids, revealed by analysis of microsatellite loci. Molecular Biology and Evolution 11: 553–570.

Schwartz, M. K, and J. A. Vucetich. 2009. Molecules and beyond: assessing the distinctiveness of the Great Lakes wolf. Molecular Ecology 19:2307-2309.

Stoskopf, M. K., K. Beck, B. B. Fazio, T. K. Fuller, E. M. Gese, B. T. Kelly, F. F. Knowlton, D. L. Murray, W. Waddell, L. P. Waits (2005) From the field: implementing recovery of the

red wolf- integrating research scientists and managers.  Wildlife Society Bulletin 33: 1145-1152.

Wheeldon, T. and B. N. White. 2009. Genetic analysis of historical western Great Lakes region wolf samples reveals early Canis lupus/lycaon hybridization. Biology Letters 5:101-104.

Wheeldon, T., B. Patterson, and B. N. White. 2010. Sympatric wolf and coyote populations of the western Great Lakes region are reproductively isolated. Molecular Ecology 19:4428-4440.

Wilson, P. J., S. Grewal, I. D. Lawford, J. N. M. Heal, A. G. Granacki, D. Pennock, J. B. Theberge, M. T. Theberge, D. R. Voigt, W. Waddell, R. E. Chambers, P. C. Paquet, G. Goulet, D. Cluff, and B. N. White. 2000. DNA profiles of the eastern Canadian wolf and the red wolf provide evidence for a common evolutionary history independent of the gray wolf. Canadian Journal of Zoology 78:2156-2166.

LAW OFFICES

# BIRCH, HORTON, BITTNER AND CHEROT
A PROFESSIONAL CORPORATION

1155 CONNECTICUT AVENUE, N.W.  •  SUITE 1200  •  WASHINGTON, D.C.  20036  •  TELEPHONE  (202) 659-5800  •  FACSIMILE  (202) 659-1027

HAL R. HORTON (1944 - 1998)

| | | | | |
|---|---|---|---|---|
| RONALD G. BIRCH** | TINA M. GROVIER | AMY W. LIMERES | OF COUNSEL: | 1127 WEST SEVENTH AVENUE |
| WILLIAM H. BITTNER | WILLIAM P. HORN* | JAMES H. LISTER†◊ | JENNIFER C. ALEXANDER | ANCHORAGE, ALASKA 99501-3399 |
| KATHRYN A. BLACK | STEPHEN H. HUTCHINGS | TIMOTHY J. PETUMENOS | | (907) 276-1550 |
| SUZANNE CHEROT | DANIEL C. KENT | ELISABETH H. ROSS** | | FACSIMILE (907) 276-3680 |
| ADAM W. COOK | CORTNEY H. KITCHEN | CARISSA D. SIEBENECK◊ | | |
| JON M. DEVORE** | THOMAS F. KLINKNER | AARON D. SPERBECK | | *   D.C. BAR |
| DOUGLAS S. FULLER* | DAVID E. LAMPP*◊ | KENNETH E. VASSAR | | **  D.C. AND ALASKA BAR |
| MAX D. GARNER | STANLEY T. LEWIS | HOLLY C. WELLS | | †   MARYLAND BAR |
| DAVID KARL GROSS | | | | ◊   VIRGINIA BAR |
| | | | | ALL OTHERS ALASKA BAR |

whorn@dc.bhb.com
Direct Dial:  202-862-8355
jlister@dc.bhb.com
Direct Dial:  (202) 862-8368

September 26, 2011

<u>Submitted Electronically</u>

Honorable Daniel Ashe                           Ms. Laura Ragan
Director, U.S. Fish and Wildlife Service         Listing and Petitions Coordinator
U.S. Department of the Interior                  Region 3
1849 C Street, NW                               U.S. Fish and Wildlife Service
Washington, D.C.  20240                         5600 American Blvd., West
                                                Bloomington, MN  55437

> Re:   Supplemental Comments of Petitioners U.S. Sportsmen's Alliance
> Foundation et al. in Response to Re-Opening of Comment Period
> Regarding Proposed Rule Delisting Western Great Lakes Wolves
>
> Comment period reopened at 76 Fed.Reg. 53379 (Aug. 26, 2011).
> Proposed rule published at 76 Fed.Reg.  26086 (May 5, 2011)
> FWS Docket No. FWS–R3–ES–2010–0062; 92220–1113–0000–C6

Dear Director Ashe and Ms. Ragan:

In response to the reopening of the comment period on the proposed rule  recognizing and delisting the Western Great Lakes (WGL) Distinct Population Segment (DPS) of gray wolves, Petitioners U.S. Sportsmen's Alliance Foundation, Wisconsin Bear Hunters Association, the Wisconsin Bear Hunters Association, Dairyland Committee of Safari Club International Chapters of Wisconsin, Whitetails of Wisconsin, and Wisconsin Firearms Owners, Rangers, Clubs, and Educators, Inc. file these supplemental comments ("Petitioners" or "USAAF, et al.") [1]

## Introduction

In response to petitions filed by Petitioners USAAF et al. and others, the U.S. Fish and Wildlife Service ("Service") proposed in February, 2011 to adopt a rule recognizing the WGL-DPS and removing it from the list of endangered and threatened species under the Endangered Species Act ("ESA"). [2]

---

[1]       *Proposed Rule, Correction, and Re-Opening of the Comment Period, Revising the List of Endangered and Threatened Wildlife for the Gray Wolf (Canis lupus) in the Eastern United States*, 76 Fed.Reg. 53379 (Aug. 26, 2011).

[2]       The Service published the proposed rule at 76 Fed.Reg.  26086 (May 5, 2011).

Petitioners filed comments on July 5, 2011 supporting the proposed rule but opposing the Service's accompanying proposal to declare that two wolf species, the previously-recognized *canis lupus* and the  proposed to-be-recognized, "*canis lycaon*," concurrently inhabit the WGL area.   Wildlife geneticist Dr. Lisette Waits supplied a supporting declaration ("Waits Dec.") that analyzed the scientific literature, evaluated the genetic evidence, and concluded that the WGL wolf population was a "single genetic group" that could not be split into separate "lupus" and "lycaon" units for management under the ESA.   Waits Dec. at 8 (attached to Petitioners' comments). Her expert conclusions are consistent with the determination of other recognized wolf taxonomic authorities, all of which are reviewed in her declaration.   See Wheeldon and White (2009 and 2010), VonHoldt et al. (2011), and Koblmuller (2009). (Full citations for literature references are supplied at the conclusion of these supplemental comments).

In reopening the comment period on August 26,, 2011, the Service sought reaction to: (a) a new paper published by Service employees Chambers, Fain, Fazio, and Amaral ("Chambers/Fain") regarding the lupus/lycaon issue, and (b) sub-dividing the Service's proposed rule so that WGL wolves are addressed in one rule and any wolves in the remainder of the eastern U.S. are addressed in another rule or rules.

Petitioners support the Service's sensible approach of adopting a rule addressed solely at the WGL wolves.   Wolves are thriving in the WGL, yet are rare or non-existent elsewhere in the rest of the eastern U.S.   WGL wolves are prevented by geographical barriers from dispersing to the rest of the eastern U.S.  Because the facts and legal issues vary so much by region, and because of the geographic barriers, it makes sense to adopt separate rules.

Petitioners appreciate the chance to comment on the Chambers/Fain paper, but are dismayed that this paper seems to be leading the Service down the scientifically unsupported and legally perilous path of splitting the unified WGL wolf populations into two separate wolf populations for delisting analysis under the ESA.   The remainder of these supplemental comments addresses the Chambers/Fain paper and whether to split the WGL wolves into two separate populations (lupus and lycaon) for ESA analysis.  Please review Dr. Waits declaration filed July 5, 2011 alongside these supplemental comments, as well as the VonHoldt, Wheeldon and Koblmuller papers, all of which reach conclusions contrary to Chambers/Fain on the crucial issue of whether the WGL has two separate wolf populations. The weight of scientific evidence does not support the Chambers/Fain conclusions.

**A.  Under Service precedent, recognition of a new species or sub-species requires multiple lines of persuasive and credible corroborating evidence.**

A candid concession in the Chambers/Fain paper confirms that the Service's proposal to declare that there are two separate species of wolves (*canis lupus* and the newly proposed "*canis lycaon*") concurrently inhabiting the Western Great Lakes states (Minnesota, Wisconsin, and Michigan) does not comply with the Service's existing requirements for recognition of new species and sub-species.

1.  Service requirements governing recognition of new species or subspecies.

In a 2010 decision declining to recognize a new species or subspecies of mountain whitefish, the Service reaffirmed its longstanding requirement that, when there is no pre-existing scientific consensus that a species or sub-species exists, recognizing the new species or sub-species is a "***change***" in taxonomic classification for which  the Service will "***require multiple***

BIRCH, HORTON, BITTNER AND CHEROT
A PROFESSIONAL CORPORATION

**lines of persuasive and credible corroborating evidence** to support any such change in classification, in accordance with our regulations at 50 CFR 424.11(a)."[3]

The "multiple lines of evidence" requirements calls for consideration of not just genetic evidence, but rather the "full suite of morphological, physiological, behavioral, and genetic characteristics." [4]   The Service does not define "corroborated." Using the ordinary meaning of that word, there must be at least two independent sources supporting a finding for that finding to "corroborated."[5] "Persuasive and credible" goes to weighing the evidence, considering the views of both scientists both supporting and scientists opposing the reclassification.

2.  <u>The proposal to declare that both *canis lupus* and "canis lycaon" inhabit the WGL is not supported by multiples lines of persuasive corroborated evidence.</u>

. The Chambers/Fain paper acknowledges that that "the predominant view of the taxonomy" is that there are only "two wolf species" in North America: *canis lupus* and *canis rufus* (red wolf).  Chambers, p. 78, lines 1763-1766 (citing Nowak 1979, 1985 and Hall 1981*).* So in advocating the recognition of a third North American wolf species, "canis lycaon," Chambers/Fain acknowledge that they are advocating a change in taxonomic classification.

That substantive change in taxonomic classification must be supported by multiple lines of persuasive corroborated evidence under the Service precedent discussed above.  This requirement is not satisfied as to the controversial idea that the wolves inhabiting areas to the west of the WGL are one species (*canis lupus*) and the wolves inhabiting eastern Canada are another species (the alleged "*canis lycaon*").  More pertinently, that requirement is certainly not satisfied as to the even more controversial proposition that the discrete WGL wolf population is itself split into separate but interbreeding *canis lupus* and "*canis lycaon*" populations.

.

Wolf genetics is a fast changing field in which research capabilities have greatly expanded in recent years.  The only recent original genetics research known by Petitioners to conclude that there are two separate wolf species concurrently inhabiting the WGL area is Fain et al. (2010).  Dr. Fain's work cannot "corroborate"   itself.  The new Chambers/Fain literature review paper (2011) explains that it evaluates pre-existing research rather than presenting new research, and so is a tool for evaluating research, but is not research itself, and so cannot corroborate Fain et al..  See Chambers/Fain p.8, lines 107-108 (paper "is an evaluation and synthesis of the available scientific literature.  It is not intended to generate and report results of new research").  The other scientists presenting original recent research come to the conclusion that there is a single wolf population in the WGL States.   Their work (as well as Fain et al) are reviewed in Dr. Waits' declaration filed with Petitioners' July 5, 2011 comments:

.(a).  <u>Wheeldon and White</u> (2009 and 2010) conclude the *canis lupus* exists as one species to the west of the WGL and that "*canis lycaon*" exists as another wolf species to the east of the WGL, but further conclude that a long history of hybridization in the WGL has resulted in the WGL area having a "single interbreeding population" with mixed

---

[3]      *12-month Finding on a Petition To List the Mountain Whitefish in the Big Lost River, Idaho, as Endangered or Threatened*, 75 FR 17352, 17354 (April 6, 2010) ("Mountain Whitefish 12-Month Finding") (emphasis added).

[4]      *See Mountain Whitefish 12-Month Finding*, 75 Fed.Reg. at 17355.

[5]      See Black's Law Dictionary, 8th Ed. (West Publishing, 1999) ("corroboration" defined as "confirmation or support by additional evidence or authority").

BIRCH, HORTON, BITTNER AND CHEROT
A PROFESSIONAL CORPORATION

ancestry, rather than two separate wolf species concurrently inhabiting the WGL.  *See* Waits Dec. at 7 (quoting Wheeldon and White, 2010).

(b).  VonHoldt et al (2011) reject the view that "*canis lycaon"* is a separate species. They further conclude that the WGL wolves are a single population that differs genetically to some extent from other regional *canis lupus* populations, and find no grounds for dividing the wolf population within the WGL.  *See* Waits Dec. at 7-8.

(c).  Koblmuller (2009) reaches conclusions similar to VonHoldt. Waits Dec. at 4-5.

In addition to being uncorroborated by other independent research, the Fain et al. work (and the Chambers/Fain literature review) concentrate on wolf genetics and so does not meaningfully address the "full suite of morphological, physiological, behavioral, and genetic characteristics" that must be considered before any new subspecies or species can be recognized.[6]  Chambers/Fain (like Fain et al) do not appear to cite physiological or behavioral research on WGL wolves.

The recent morphological research that Chambers/Fain rely upon is a paper by Mech and Paul (2008) that finds a slight increasing trend in wolf body size as one goes from the eastern end of Minnesota to the western end of Minnesota.  Chambers/Fain p. 38, lines 844-849; Mech and Paul (2008), p. 935.[7]  However, the cited researchers do not conclude from this morphological research on body size that there are two separate wolf populations concurrently present in the WGL.  *See* Mech and Paul (2008), p. 935 ("Whether masses of wolves in North-Central Minnesota are intermediate because the wolves are a combination of both eastern and western wolves or hybrids between the two cannot be distinguished from present data"). Indeed, Mech and Paul do not attempt to examine the DNA of the wolves whose bodies they measured.  *Id.* at 934 (they weighed wolves taken at different locations in Minnesota). In a single melting pot population, one would naturally expect individual wolves to have somewhat higher portions of "eastern" genes in eastern Minnesota and somewhat higher portions of "western" gene in western Minnesota.

While Mech and Paul in the same paper also conducted a literature review of older wolf genetics research, and suggested that the older research supported the possibility that there are a greater proportion of eastern genes in wolves in eastern Minnesota and a greater portion of western genes in wolves in western Minnesota, they stopped short of making any definitive conclusions.  *Id.* at 935.   Then, one year later, Mech along with Cronin published another review of the wolf genetics literature.  This time Mech came down on the side of the majority view that there is just one WGL wolf population of mixed ancestry: "one could call the wolves of the GL region *a* taxon (based on ancestry and phylogeny) or *an* ecotype (based on local adaptation) …. We suggest that  that the wolves in the GL region can simply be called *a* wolf population with mixed ancestry."  Cronin and Mech (2009), p. 4992 (emphasis added).

Were the Service to "split" that one WGL wolf population based on the minor genetic differences found by Fain et al. but discounted by other recent independent researchers, the Service would then be faced with the daunting task of applying that new precedent to the entire gamut of fish and wildlife listing and delisting petitions that the Service receives.  The reasoning

---

[6]       *See Mountain Whitefish 12-Month Finding*, 75 Fed.Reg. at 17355.

[7]       Specifically, Mech and Paul find that the average female wolf weight increases from 26 to 31 kg and the average male wolf weight increases from 30 to 36 kg as moves east-to-west across Minnesota.

for refusing to go down that road stated by the Service in its *Mountain Whitefish* decision last year remains compelling today:

> "[I]f one were to rely solely on the ability to distinguish between fish populations based on genetic differences to identify new subspecies or species, as Haig et al. (2006, p. 5, citing Mayden 1999) noted, 'every isolated creek and pond could have a unique subspecies or species of fish.' This ability to so finely subdivide species based purely on the ability for genetic discrimination between them has led the Service, as described above, to require a more holistic approach to species or subspecies analysis that builds upon multiple lines of evidence, including, where possible, a full suite of morphological, physiological, behavioral, and genetic characteristics, to support a formerly unrecognized taxonomic distinction."[8]

While it would be a difficult situation if every isolated creek or pond has its own protected whitefish species, it would be *even worse* if each habitat area supported multiple protected whitefish species that (1) extensively interbreed with each other, (2) have no confirmed significant physiological, behavioral, or morphological differences, and (3) can only be distinguished by counting relative portions of "eastern" and "western" genes in a DNA laboratory.  The Service should avoid that "even worse" scenario by declining to split the WGL wolf population.

### 3.   Splitting WGL Wolves at the sub-species or DPS levels is also inappropriate.

The only difference between the analysis of whether to split the WGL wolves at the species level and whether to split the WGL wolves at the subspecies level is that there has been past recognition in the scientific community of *canis lupus lycaon* (eastern timberwolf) as the subspecies of canis lupus inhabiting Eastern Canada and past recognition of *canis lupus nubilus* (plains wolf) as the subspecies of *canis lupus* inhabiting areas to the west of the WGL.

This difference does not support splitting WGL wolves at the subspecies level.   For more than 30 years, the Service has simply listed *canis lupus* as the protected species in the WGL, rather than recognizing and protecting wolf subspecies.  Petitioners know of no order from the Service making any final determination that two separate wolf subspecies inhabit the WGL.   Under these circumstances, splitting the WGL wolf population after so many years would constitute a "change" requiring multiple lines of persuasive corroborated evidence under the Service's *Mountain Whitefish* precedent discussed above.    Such evidence does not exist.  None of the scientists presenting recent original research (other than Fain) appear to conclude that the wolves present in the WGL States differ among themselves by enough to be split at the subspecies level.

Even apart from the multiple-lines-of-evidence/corroboration requirement, the widespread interbreeding among WGL wolves that all researchers acknowledge is occurring demonstrates that it would also be improper to split the WGL wolf population into two

---

[8]       *Mountain Whitefish 12-Month Finding*, 75 Fed.Reg. at 17355 (emphasis added).

populations at the subspecies or Distinct Population Segment (DPS) level.[9]  The DPS level is the finest level of splitting allowed by the ESA.   16 U.S.C. § 1532(15).  If a population cannot be split at the DPS level, it inherently cannot be split at the coarser subspecies or species levels.

While absolute reproductive or geographic isolation is not required to split a population at the DPS level, splitting a population concurrently living in the same habitat into two separate DPSs generally requires some evidence of substantial or at least significant reproductive isolation between the two allegedly separate populations.  *See 1996 DPS Policy*, 61 Fed.Reg. 4722, 4724 (Feb. 7, 1996) ("The Services do not consider it appropriate to require **absolute** reproductive isolation as a prerequisite to recognizing a distinct population segment," indicating that some lesser degree of reproductive isolation is needed)(emphasis added).   "Our DPS policy does not require **complete** geographic or reproductive isolation among populations, and allows **for some _limited_ interchange** among population segments considered to be discrete." *Final Rule Designating the Greater Yellowstone Area Population of Grizzly Bears as a Distinct Population Segment*, 72 FR 14866, 14926 (March 29, 2007) (emphasis added).

The relevance of reproductive isolation follows naturally from the text of the DPS Policy, which emphasizes factors such as the presence of "genetic or morphological discontinuities" and "[e]vidence that the discrete population segment differs markedly from other populations of the species in its genetic characteristics."   61 Fed.Reg. at 4725.  The gradual trends in variations in gene distributions and body size across the WGL are consistent with a single population of mixed ancestry, rather than two separate populations that show sharp "discontinuities" and "marked differences."

Underscoring the importance of there being at least some significant level of reproductive isolation, the Service declared that its 1996 DPS policy is "consistent" with the 1991 salmon-specific DPS policy used by the National Marine Fisheries Service.   The salmon-specific policy makes "substantial reproductive isolation" a express pre-requisite for recognizing a DPS.  *1996 DPS Policy*, 61 Fed.Reg. at 4722; *Policy on Applying the Definition of Species Under the Endangered Species Act to Pacific Salmon*, 56 Fed.Reg. 58612, 58618 (Nov. 20, 1991).  The two DPS policies interpret the same DPS provision, and so must be consistent.  16 U.S.C. § 1532(16), There is a little more flexibility in the general DPS Policy than in the salmon-specific policy, but the policies would not be "consistent" if the general DPS Policy were interpreted to allow the splitting of a population that interbreeds as freely as the WGL wolves.

Chambers/Fain (like Fain et al.) acknowledge the widespread interbreeding between the purportedly separate lupus and lycaon components of the WGL wolf population.  Chambers/Fain at 94, lines 212-2133 ("The existence of such a broad hybrid zone, particularly in the western Great Lakes States, indicates that reproductive isolation is incomplete").  However, they suggest that hybridization in the WGL has yet to go so far as to totally mix the gene pool to the point that every individual WGL wolf has approximately equal portions of "western" and "eastern" genes.  See Chambers/Fain at p. 95 , lines 2143-2148 ("Conspecific combinations of MtDNA and Y-chromosome haplotypes are more common in male wolves of the western Great Lakes region than expected by random mating, Wheeldon, et al. (2010), which suggests some constraint on admixture.   Without this detailed information on the fitness and reproductive success of hybrids, the population relationship of the two species and whether

---

[9]     In defining species, and in addressing subspecies and DPSs, the ESA explains that the members of each listing unit must "interbreed when mature."   16 U.S.C. § 1532(16).  Interbreeding is the only basis for recognizing listing units that specifically appears in this statutory definition.

BIRCH, HORTON, BITTNER AND CHEROT
A PROFESSIONAL CORPORATION

they are stable or tending toward the complete merging of gene pools cannot be determined.") For this conclusion, Chambers/Fain cite Wheeldon.   However, as discussed above, Wheeldon actually concluded that the WGL wolves are "single interbreeding population."   Wheeldon and White 2010, p. 4436.

In short, Chambers/Fain do not claim substantial reproductive isolation exists among any components of the WGL wolf population, just that the mixing of genes is not yet totally uniform. Chambers/Fain do not identify any behavioral or other factors that supposedly discourage "lupus" type WGL wolves from interbreeding with "lycaon" type WGL wolves.  *See* Chambers/Fain, p. 95.  The other recent researchers find that the admixture has already resulted in one cohesive WGL wolf population.  See Waits Dec. at 4-8 (reviewing Wheeldon, VonHoldt, and Koblmuller papers).  The Courts have held that extensively hybridizing populations are properly treated as a single population, despite lingering genetic differences among the individual members of the population that reflect varying ancestry. *See American Wildlands v. Kempthorne*, 530 F.3d 991, 1000 (D.C. Cir. 2008)(affirming decision not to "split" a trout population).

In short, there is no basis for splitting the WGL wolf population at any level.

**B.   If the Service insists on splitting the WGL wolves into separate entities, it
        should address the resulting wolf-counting issues by making three findings.**

If the Service insists on splitting the WGL wolves into two separate entities (such as *canis lupus* and "canis lycaon"), it should consider making the following findings, all of which Petitioners believe are supported by the facts:

(1).   First, the Service adopted the  1978 Recovery Plan (and the 1992 Amendment to that Plan) at times when scientists already recognized the possibility that two wolf types (*canis lupus nubilus* and *canis lupus lycaon*) might exist in the WGL States as separate *subspecies.*  See Chambers/Fain, p. 20, lines 447-450.  While the Service to Petitioners' knowledge has never made any final determination that  two or more wolf subspecies actually do co-exist in the WGL, the possibility was recognized at the time the Service adopted the Recovery Plan.   Knowing that an argument could be made to split the WGL wolves into two separate subspecies, the Service  elected to use its discretion in the Recovery Plan to set numerical criteria for delisting under which all wolves (regardless of type) were counted towards satisfaction of the criteria.

*By making this finding, the Service lays the basis for contending that action by the Service declaring that two or more wolf species or sub-species inhabit the WGL is not a material change in circumstances requiring reconsideration of the Recovery Plan delisting criteria.*

(2).   Second, Fain et al. come to the conclusion that there are substantial numbers of WGL wolves with lupus-like genes and substantial numbers of WGL wolves with lycaon-like genes. Fain et al., p. 1758 ("Fully 2/3 of the combined WGL states sample exhibited C. lycaon mtDNA and only 1/3 C. lupus mtDNA").  Because the total number of wolves in the WGL is large, far greater than the Recovery Plan delisting criteria, a finding that there are relatively large fractions of both the "lycaon" and "lupus" variety leads to the conclusion that neither variety is endangered or threatened.

*By making this finding, the Service begins to support a substantive conclusion that neither alleged wolf type is endangered or threatened in the WGL areas.*

(3).  Chambers/Fain  conclude based on researchers' examination of  museum specimens that "[d]ata from historical specimens from Minnesota and Wisconsin … also suggest that admixture of the eastern wolf and western C. Lupus had taken place prior to their extirpation from the region."  Chambers/Fain at 83, lines 1874-76.

*By making this finding, the Service shows that admixture of wolf genes in the WGL is ancient, not recent, so the gene pool is stable, and genetic diversity is not at risk.*

Making those findings might mitigate somewhat the risk of another reversal on judicial review that is the natural consequence of unnecessarily splitting the WGL wolf population.
.

## Conclusion

The Service should not split the thriving WGL wolf population into separate "lupus" and "lycaon" populations, whether at the species, subspecies or DPS levels.  Any minor fine genetic differences between "lupus" and "lycaon" wolves are a difference without a distinction as a matter of science and law. There is one WGL wolf population that fully warrants delisting, not two separate WGL wolf populations.

Sincerely,

/s/ James H. Lister
William P. Horn
James H. Lister

*Counsel for U.S. Sportsmen's Alliance Foundation and the other Petitioners listed on page 1 above.*

## Literature References

**Chambers, S.C., Fain, S.R., Fazio B., and Amaral, M. submitted for publication 2011,** *An Account of the Taxonomy of North American Wolves from Morphological and Genetic Analyses.*

**Cronin M.A. and L.D. Mech. 2009**. *Problems with the claim of ecotype and taxon status of the wolf in the Great Lakes region.* Molecular Ecology18:4991-4993

**Fain, S. R., D. J. Straughan, and B. F. Taylor. 2010**. *Genetic outcomes of wolf recovery in the western Great Lakes states.* Conservation Genetics 11:1747-1765 ("Fain et al.").

**Koblmüller, S., M. Nord, R. K. Wayne, and J. A. Leonard. 2009**. *Origin and status of the Great Lakes Wolf.* Molecular Ecology 18:2313-2326.

**Mech LD, Paul WJ. 2008**. Wolf body mass cline across Minnesota related to taxonomy? Canadian Journal of Zoology 86:933-936.

BIRCH, HORTON, BITTNER AND CHEROT
A PROFESSIONAL CORPORATION

**vonHoldt BM,** Pollinger JP, Earl DA, Knowles JC, Boyko AR, Parker H, Geffen E, Pilot M, Jedrzejewski W, Jedrzejewski B, Sidorovich V, Creco C, Ettore R, Musiani M, Kays R, Bustamante CD, Ostrander EA, Novembre J, Wayne RK. 2011. A genome-wide  perspective on the evolutionary history of enigmatic wolf-like canids. Genome Research 21:1294-1305.

**Wheeldon, T. and B. N. White. 2009**. Genetic analysis of historical western Great Lakes regionwolf samples reveals early Canis lupus/lycaon hybridization. Biology Letters 5:101-104.

**Wheeldon, T., B. Patterson, and B. N. White. 2010**. Sympatric wolf and coyote populations of the western Great Lakes region are reproductively isolated. Molecular Ecology 19:4428- 4440.

# EXHIBIT O

*Used "Proposed WGL DPS Delisting_Draft 11-9-2009 (addresses SOL comments v.1) clean.doc" as initial draft.*

**U.S. DEPARTMENT OF THE INTERIOR**

**Fish and Wildlife Service**

**50 CFR Part 17**

**[FWS-R3-ES-201009-0074]**

> **Formatted:** Font: Bold, Highlight

**[92220-1113-000; ABC Code: C6]**

**RIN 1018-AW41**

> **Formatted:** Font: Bold, Highlight

**Endangered and Threatened Wildlife and Plants; Proposed Rule To Identify the Western Great Lakes Populations of Gray Wolves as a Distinct Population Segment and To Revise the List of Endangered and Threatened Wildlife**

**AGENCY:** Fish and Wildlife Service, Interior.

**ACTION:** Proposed rule.

1

001324A

EXHIBIT P

*Used "Proposed WGL DPS Delisting_Draft 11-9-2009 (addresses SOL comments v.1) clean.doc" as initial draft.*

**U.S. DEPARTMENT OF THE INTERIOR**

**Fish and Wildlife Service**

**50 CFR Part 17**

**[FWS-R3-ES-2010-0074]**

**[92220-1113-000; ABC Code: C6]**

**RIN 1018-AW41**

**Endangered and Threatened Wildlife and Plants; Proposed Rule To Identify the Western Great Lakes Populations of Gray Wolves as a Distinct Population Segment and To Revise the List of Endangered and Threatened Wildlife**

**AGENCY:**  Fish and Wildlife Service, Interior.

**ACTION:**  Proposed rule.

1

001680A

EXHIBIT Q

*Used "Proposed WGL DPS Delisting_Draft 11-9-2009 (addresses SOL comments v.1) clean.doc" as initial draft.*

**U.S. DEPARTMENT OF THE INTERIOR**

**Fish and Wildlife Service**

**50 CFR Part 17**

**[FWS-R3-ES-2010-0074]**

**[92220-1113-000; ABC Code: C6]**

**RIN 1018-AW41**

**Endangered and Threatened Wildlife and Plants; Proposed Rule To Identify the Western Great Lakes Populations of Gray Wolves as a Distinct Population Segment and To Revise the List of Endangered and Threatened Wildlife**

**AGENCY:**  Fish and Wildlife Service, Interior.

**ACTION:**  Proposed rule.

1

001956A

# EXHIBIT R

| From: | Joel Trick |
|---|---|
| To: | Laura Ragan |
| Subject: | Re: WI DNR Updates to State Wolf Management Plan? |
| Date: | 12/02/2010 02:57 PM |

Laura -

I spoke with Adrian today, and after our conversation, I can summarize the situation like this;

The WI wolf plan is due for revision.

 Some work has been done, but they have been directed to put work on hold due to the uncertainty about delisting status.

Joel A. Trick
U.S. Fish and Wildlife Service
2661 Scott Tower Drive
New Franken, WI  54229
phone 920-866-1737
fax 920-866-1710
joel_trick@fws.gov

▼ Laura Ragan/R3/FWS/DOI

| | | | |
|---|---|---|---|
| **Laura Ragan/R3/FWS/DOI** | | To | Joel Trick/R3/FWS/DOI@FWS |
| | | cc | |
| 11/30/2010 11:56 AM | | Subject | WI DNR Updates to State Wolf Management Plan? |

Joel -

Can you give me an update on where things stand with WI DNR updating the state wolf management plan?  I know about a year ago there were beginning the process, and were talking about potentially increasing the state management goal,  but I have not heard anything since.

Thanks.

-Laura

002206A

EXHIBIT S

| | |
|---|---|
| **From:** | Laura Ragan |
| **To:** | Maricela Constantino |
| **Subject:** | Proposed Rule to Identify and Delist a WGL DPS of Gray Wolves |
| **Date:** | 12/03/2010 01:51 PM |
| **Attachments:** | Proposed WGL DPS Delisting_Draft 12-3-2010_For Wo and FSOL Prelim Review.doc |
| | References for 2010 Proposed Rule.doc |
| | Package BP_delisting proposal.doc |

Maricela -

Attached is the draft of the proposed rule to identify and delist the WGL DPS of gray wolves for your review.  I am sending the track changes version so you can clearly see what changes have been made from the fall 2009 version you reviewed.

I am also including the draft briefing paper and the list of references.  If there is anything else you need now in order to complete your review, please let me know.

-Laura



Proposed WGL DPS Delisting_Draft 12-3-2010_For Wo and FSOL Prelim Review.doc



References for 2010 Proposed Rule.doc



Package BP_delisting proposal.doc

# EXHIBIT T

**U.S. DEPARTMENT OF THE INTERIOR**

**Fish and Wildlife Service**

**50 CFR Part 17**

**[FWS-R3-ES-2010-XXXX]**

**[92220-1113-000; ABC Code: C6]**

**RIN 1018-AW41**

**Endangered and Threatened Wildlife and Plants; Proposed Rule To Identify the
Western Great Lakes Populations of Gray Wolves as a Distinct Population Segment
and To Revise the List of Endangered and Threatened Wildlife**

**AGENCY:**  Fish and Wildlife Service, Interior.

**ACTION:**  Proposed rule.

1

# EXHIBIT U

# Documents Cited in Proposed Rule to Delist the Gray Wolf WGL DPS

Avise, J. C.  2004.  Molecular Markers, Natural History, and Evolution, 2nd edition.  Sinauer, Sunderland, Mass.

Bailey, R.G.  1995.  Description of the ecoregions of the United States. http://www.fs.fed.us/land/ecosysmgmt/ecoreg1_home.html

Bailey, T.N., E.E. Bangs, and R.O. Peterson.  1995.  Exposure of wolves to canine parvovirus and distemper on the Kenai National Wildlife Refuge, Kenai Peninsula, Alaska, 1976-1988.  pp. 441-446 in Carbyn, L.N., S.H. Fritts, and D.R. Seip.  1995.  Ecology and conservation of wolves in a changing world.  Canadian Circumpolar Institute, Occasional Publication No. 35.  Edmonton, Alberta.  642 pp.

Baker, R. J., L. C. Bradley, R. D. Bradley, J. W. Dragoo, M. D. Engstrom, F. S. Hoffman, C. A. Jones, F. Reid, D. W. Rice, and C. Jones.  2003.  Revised Checklist of North American Mammals North of Mexico.  Museum of Texas Tech University, Occasional Papers Number 229, 1 December 2003.

Berg, W.E., and S. Benson.  1999.  Updated wolf population estimate for Minnesota, 1997-1998.  Minnesota Department of Natural Resources Report.  Grand Rapids, Minnesota. 14 pp.

Berg, W.E. and D.W. Kuehn.  1982.  Ecology of wolves in north-central Minnesota.  pp.4-11 in F.H. Harrington and P.C. Paquet, eds.  Wolves of the world:  perspectives of behavior, ecology, and conservation.  Noyes, Park Ridge, NJ.

Beyer, D., T. Hogrefe, R.B. Peyton, P. Bull, J.P. Burroughs, and P. Lederle (editors).  2006.  Review of social and biological science relevant to wolf management in Michigan.  Michigan DNR, Lansing, MI.  Wildlife Division Report No. 3457, June 2006.  149 pp. plus 11 appendices.

Beyer, D., B.J. Roell, and D.H. Lonsway.  2004.  2004 Survey of the gray wolf population in Michigan's Upper Peninsula.  Unpublished report by Michigan DNR.  Lansing, MI.  8 pp.

Beyer, D.E., R.O.  Peterson, J.A. Vucetich, and J.H. Hammill.  2009.  Wolf population changes in Michigan.  Pp. 65-85 in A.P. Wydeven, T. R. Van Deelen, and E.J. Heske, eds.  Recovery of Wolves in the Great Lakes Region of the United States: An Endangered Species Success Story. Springer, New York, NY, USA. 350 pp.

Blanco, J.C., Y. Cortes, and E. Virgos.  2005.  Wolf response to two kinds of barriers in an agricultural habitat in Spain.  Canadian Journal of Zoology/Revue Canadienne de Zoologie [Can. J. Zool./Rev. Can. Zool.]. 83(2):312-323.

Boyd, D.K., and D.H. Pletscher.  1999.  Characteristics of dispersal in a colonizing wolf population in the central Rocky Mountains.  J. Wildl. Mgmt. 3: 1094-1108.

Brand, C.J., M.J. Pybus, W.B. Ballard, and R.O. Peterson.  1995.  Infectious and parasitic diseases of the gray wolf and their potential effects on wolf populations in North America.  pp. 419-429 in Carbyn, L.N., S.H. Fritts, and D.R. Seip.  1995.  Ecology and conservation of wolves in a changing world.  Canadian Circumpolar Institute, Occasional Publication No. 35.  Edmonton, Alberta.  642 pp.

Cahalane, V.H.  1964.  A preliminary study of distribution and numbers of cougar, grizzly and wolf in North America.  New York Zool. Soc. 12 pp.

Carbyn, L.N.  1982.  Incidence of disease and its potential role in the population dynamics of wolves in Riding Mountain National Park, Manitoba. Wolves of the World. 106-116.

002457A

Cornicelli, L.  2007.  2007 Minnesota deer harvest report.  Pp. 206-256 in Status of Wildlife Populations Fall 2008.  ed. M.H. Dexter. Unpublished report by Minnesota Department of Natural Resources, St. Paul, MN.  300 pp.

Coyne, J. A., and H. A. Orr.  2004.  Speciation.  Sinauer, Sunderland, Mass.

Crawford, P.C., E.J. Dubovi, W.L. Castleman, I. Stephenson, E.P.J. Gibbs, L. Chen, C. Smith, R.C. Hill, P. Ferro, J. Pompey, R.A. Bright, M. Medina, Influenza Genomics Group, C.M. Johnson, C.W. Olsen, N.J. Cox, A.I. Klimov, J.M. Katz, and R.O. Donis.  2005.  Transmission of equine influenza virus to dogs.  Science 310: 482-485.

Drummer, D.D., B. Huntzinger, J.S. Johnson, R.O. Peterson, M.J. Potvin, L.M. Vucetich, and J.A. Vucetich.  2002.  Recovery of the gray wolf (*Canis lupus*) in Upper Michigan. 1999-2001.  Final Report from MTU: for Michigan Dept. of Natural Resources Grant Amendment Number 149-01 and Pictured Rocks National Lakeshore Cooperative Agreement Number 1443 CA 682098001.  158 pp.

Erb, J.  2005.  Furbearer winter track survey summary, 2004.  Unpublished report by Forest Wildlife Populations and Research Group, Minnesota Dept. of Natural Resources, Grand Rapids, Minnesota.  6 pp.

Erb, J.  2008.  Distribution and abundance of wolves in Minnesota, 2007-2008.  Unpublished report by Minnesota Department of Natural Resources, St. Paul, MN.  11 pp.

Erb, J. 2009. Furbearer Winter Track Survey Summary, 2009. Minnesota Department of Natural Resources, Grand Rapids, MN. 7 p.

Erb, J. and S. Benson.  2004.  Distribution and abundance of wolves in Minnesota, 2003-04. Unpublished report by Minnesota Department of Natural Resources, Grand Rapids, MN 13 pp.

Ethier,D., J. Sayers, and S. Windels. 2008. Estimates of abundance and distribution of gray wolves in Voyageurs National Park, 2008, using snow track surveys. Unpublished Report. 14 pp.

Fain, S. R., D. J. Straughan, and B. F. Taylor.  2010.  Genetic outcomes of wolf recovery in the western Great Lakes states.  Conservation Genetics, doi:10.1007/s10592-010-0068-x.

Forest Stewardship Council – US, Lake States Working Group (FSC).  2005.  Revised Final Regional Forest Stewardship Standard for the Lake States-Central Hardwoods Region (USA) Version LS V3.0 February 10, 2005.  56 pp.

Fox, J., R. Peterson, and T. Drummer.  2001.  Gray wolf biology research in Voyageurs National Park , 1998-2001.  Final Report, Natural Resource Preservation Program Project #197. 21 pp.

Frair, J.L. 1999.  Crossing paths: gray wolves and highways in the Minnesota-Wisconsin border region.  M.S. Thesis, University of Wisconsin - Stevens Point, Stevens Point, Wisconsin.  58 pp.

Fritts, S.H.  1983.  Record dispersal by a wolf from Minnesota.  J. Mammal. 64:166-167.

Fitzpatrick, B. M., J. R. Johson, D. K. Kump, H. B. Shaffer, J. J. Smith, and S. R. Voss.  2009. Rapid fixation of non-native alleles reveal3ed by genome-wide SNP analysis of hybrid tiger salamanders.  BMC Evolutionary Biology 9: 176.  Doi:10.1186/1471-2148-9-176.Fuller, T.K. 1989.  Population dynamics of wolves in north central Minnesota. Wildl. Monogr. 105.  41 pp.

Fuller, T.K., W.E. Berg, G.L. Radde, M.S. Lenarz, and G.B. Joselyn.  1992.  A history and current estimate of wolf distribution and numbers in Minnesota.  Wildlife Society Bulletin 20:42-54.

002458A

Fuller, T.K., L.D. Mech, and J.F. Cochrane.  2003.  Wolf population dynamics.  Pp. 161-191 In
Wolves:  Behavior, Ecology, and Conservation.  eds. L.D. Mech and L. Boitani.  Univ. of
Chicago Press, Chicago.  448 pp.

Gehring, T.M. and B.A. Potter.  2005.  Wolf habitat analysis in Michigan:  an example of the
need for proactive land management for carnivore species.  Wildlife Soc. Bulletin 33(4):
1237-1244.

Gogan, P.J.P, W.T. Route, E.M. Olexa, N. Thomas, D. Kuehn.  2004.  Gray wolves in and
adjacent to Voyageurs National Park, Minnesota:  research and synthesis 1987-1991.
Technical Report NPS/MWR/RRTR/2004-01.  Available from Technical Information
Center, Denver Service Center, National Park Service, P.O. Box 25287, Denver CO
80225-0287.  80 pp.

Goldman, E. A. 1944.  Part II. Classification of Wolves.  In S. P. Young and E. A. Goldman.
The Wolves of North America.  The American Wildlife Institute, Washington, DC.Great
Lakes Directory.  2003.  First wolf confirmed in Illinois since early 1900s.  Available at:
http://www.greatlakesdirectory.org/il/072503_great_lakes.htm.  2 pp.

Hall, E. R. 1981.  The Mammals of North America.  Volume II.  Second Edition.  Wiley, New
York.

Hall, E. R. and K. R. Kelson.  1959.  The Mammals of North America.  Volume II.  Ronald
Press, New York..

Harrison, D.J. and T.G. Chapin.  1997.  An assessment of potential habitat for eastern timber
wolves in the northeastern United States and connectivity with occupied habitat in
southeastern Canada.  Wildl. Cons. Soc., Bronx, NY.  Working Pap. No. 7.  12 pp.

Harrison, D.J. and T.G. Chapin.  1998.  Extent and connectivity of habitat for wolves in Eastern
North America.  Wildlife Society Bulletin 26(4):767-775.

Hearne, D., K. Lewis, M. Martin, E. Mitton, and C. Rocklen.  2003.  Assessing the Landscape:
Toward a Viable Gray Wolf Population in Michigan and Wisconsin.  Natural Resources
and Environment School of Natural Resources and Management, University of Michigan.
361 pp.

Hey, J. 2001. The mind of the species problem. Trends in Ecology and Evolution 16:326-329.

Huntzinger, B., J.A. Vucetich, T.D. Drummer, and R.O. Peterson.  2005.  Wolf recovery in
Michigan, 2005 annual report.  Michigan Technological University, Houghton, MI.  39
pp.

Illinois Statutes.  Illinois Endangered Species Protection Act.  520 ILCS 10.  Available at:
http://dnr.state.il.us/orep/nrrc/espa.htm.

Jensen, W.F., T.K. Fuller, and W.L. Robinson. 1986.  Wolf, *Canis lupus*, distribution on the
Ontario-Michigan border near Sault Ste. Marie.  Can. Field-Nat. 100(3):363-366.

Johnson, M.R.  1995.  Rabies in wolves and its potential role in a Yellowstone wolf population.
pp. 431-439 *in* Carbyn, L.N., S.H. Fritts, and D.R. Seip.  1995.  Ecology and
conservation of wolves in a changing world.  Canadian Circumpolar Institute, Occasional
Publication No. 35.  Edmonton, Alberta.  642 pp.

Kellert, S.R.  1985.  The public and the timber wolf in Minnesota.  Unpubl. Rep. Yale Univ.
School For. and Environ. Stud., New Haven, CN  175 pp.

Kellert, S.R.  1990.  Public attitudes and beliefs about the wolf and its restoration in Michigan.
HBRS, Inc.  Madison, WI  102 pp.

Kellert, S.R.  1999.  The public and the wolf in Minnesota, 1999.  Unpublished report of the
International Wolf Center, dated June, 1999.  412 pp.

3

002459A

Kolbmüller, S., M. Nord, R. K. Wayne, and J. A. Leonard.  2009.  Origin and status of the Great Lakes Wolf.  Molecular Ecology, doi: 10.1111/j.1365-294X.2009.04176.x.Kohn, B.E., J.L. Frair, D.E. Unger, T.M. Gehring, D.P. Shelley, E.M. Anderson, and P.W. Keenlance. 2000.  Impacts of the US Highway 53 Expansion Project on Wolves in Northwestern Wisconsin – Final Report.  Prepared for Wisconsin Department of Transportation by the Wisconsin Department of Natural Resources. 55 pp.

Kreeger, T.J.  2003.  The internal wolf:  physiology, pathology, and pharmacology.  Pp. 192-217 In Wolves:  Behavior, Ecology, and Conservation.  eds. L.D. Mech and L. Boitani.  Univ. of Chicago Press, Chicago.  448 pp.

Lehman, N., A. Eisenhawer, K. Hansen, L. D. Mech, R. O. Peterson, P. J. P. Gogan, and R. K. Wayne.  1991.  Introgression of coyote mitochondrial DNA into sympatric North American gray wolf populations.  Evolution 45(1):104-119.

Leirfallom, J.  1970.  Wolf management in Minnesota.  Pages 9-15 in S.E. Jorgensen, C.E. Faulkner, and L.D. Mech, eds.  Proc. of a symposium on wolf management in selected areas of North America.  U.S. Fish and Wildl. Serv., Twin Cities, MN.  50 pp.

Leonard, J. A., and R. K. Wayne.  2007.  Great Lakes wolves were not restored.  Biology Letters 4:95-98.

Licht, D.S. and S.H. Fritts.  1994.  Gray wolf (Canis lupus) occurrences in the Dakotas.  Am. Midl. Nat. 132:74-81.

Licht, D.S. and L.E. Huffman.  1996.  Gray wolf status in North Dakota.  Prairie Naturalist 28(4): 169-174.

Linnell, J.D.C., H. Broseth, E.J. Solberg, and S.M. Brainerd.  2005.  The origins of the southern Scandinavian wolf Canis lupus population:  potential for natural immigration in relation to dispersal distances, geography and Baltic ice.  Wildlife Biology 11:383-391.

Manitoba Conservation.  Undated.  Gray (timber) wolf.  Wildlife and Ecosystem Protection Fact sheet.  2 pp.  Available at: http://www.gov.mb.ca/conservation/wildlife/mamaging/fs_gray_wolf.html  Accessed 02/09/06.

Manitoba Conservation.  2009a.  Manitoba  Hunting Guide – Big Game Hunting – Gray Wolf and Coyote.  Wildlife and Ecosystem Protection Branch.  Available at http://www.manitoba.ca/conservation/wildlife/hunting/biggame/grwolf_coy/seasons.html  Accessed 7/6/2009.

Manitoba Conservation.  2009b.  Manitoba 2008/2009 Trapping Guide.  Wildlife and Ecosystem Protection Branch.  Available at http://www.manitoba.ca/conservation/wildlife/trapping/index.html.  Accessed 7/6/2009.

Mayden, R. L. 1997. A hierarchy of species concepts: The denouement in the saga of the species problem, in Claridge, MF, H.A. Dawah, and M.R. Wilson. Species: The units of biodiversity. London: Chapman and Hall. pp. 381–4.

Mayr, Ernst.  1942. Systematics and the origin of species from the viewpoint of a zoologist. New York: Columbia University Press.

Mayr, E.  1963.  Animal Species and Evolution.  Belknap Press, Harvard University Press, Cambridge, Mass.

Mayr, E. 1969.  Principles of Systematic Zoology.  McGraw-Hill, New York.

Mech, L.D.  1989.  Wolf population survival in an area of high road density.  Am. Midl. Nat. 121:387-389.

002460A

Mech, L.D.  1994.  Buffer zones of territories of gray wolves as regions of intraspecific strife. J. Mammalogy 75(1):199-202.  Mech, L.D.  1995a.  The challenge and opportunity of recovery wolf populations.  Conserv. Biol. 9(2):270-278.

Mech, L.D.  1995b.  What do we know about wolves and what more do we need to learn. pp. 537-545 in Carbyn, L.N., S.H. Fritts, and D.R. Seip.  1995.  Ecology and conservation of wolves in a changing world.  Canadian Circumpolar Institute, Occasional Publication No. 35.  Edmonton, Alberta.  642 pp.

Mech, L.D.  2006a.  Prediction failure of a wolf landscape model.  Wildlife Soc. Bull 34(3): 874-877.

Mech, L.D.  2006b.  Mladenoff et al. rebut lacks supportive data.  Wildlife Soc. Bull 34(3): 882-883.

Mech, L. D.  2009.  Crying wolf: concluding that wolves were not restored.  Biology Letters 5:65-66.

Mech, L. D., and N. E. Federoff.  2002.  $\alpha_1$Antitrypsin polymorphism and systematic of North American Wolves.  Canadian Journal of Zoology 80:961-963.

Mech, L.D. and S.H. Fritts.  1987.  Parvovirus and heartworm found in Minnesota wolves.  Endang. Spec. Tech. Bull. 12:5-6.

Mech, L.D., S.H. Fritts, D.L. Radde, and W.J. Paul.  1988.  Wolf distribution and road density in Minnesota.  Wildl. Soc. Bull. 16:85-87.

Mech, L.D. and S.M. Goyal.  1993.  Canine parvovirus effect on wolf population change and pup survival.  J. Wildl. Dis. 29:330-333.

Mech, L.D. and S.M. Goyal.  1995.  Effect of canine parvovirus on gray wolves in Minnesota.  J. Wildl. Manage. 59:565-570.

Mech, L.D. and S.M. Goyal.  Undated.  Parsing demographic effect of canine parvovirus on a Minnesota wolf population.

Mech, L.D., S.M. Goyal, C.N. Bota, and U.S. Seal.  1986.  Canine parvovirus infection in wolves (Canis lupus) from Minnesota.  J. Wildl. Dis. 22:104-106.

Mech, L.D., S.M. Goyal, W.J. Paul, and W.E. Newton.  2008.  Demographic effects of canine parvovirus on a free-ranging wolf population over 30 years.  J. Wildl. Dis. 44:824-836.

Mech, L.D. and H.J. Kurtz.  1999.  First record of coccidiosis in wolves, Canis lupus.  Can. Field-Nat. 113:305-306.

Mech, L.D. and M.E. Nelson.  1989.  Evidence of prey-caused mortality in three wolves.  Am. Midl. Nat. 123:207-208.

Mech, L. D., and W. J. Paul.  2008.  Wolf body mass cline across Minnesota related to taxonomy?  Canadian Journal of Zoology 86:933-936.

Mech, L.D. and R.A. Rausch.  1975.  The status of the wolf in the United States, 1973.  Pages 83-88 in D.H. Pimlott, ed.  Wolves.  Inter. Union. Conserv. Nature. and Nat. Resour. Publ, New Ser., Suppl. Pap. No. 43.  Morges, Switzerland.

Mech, L.D., R.P. Thiel, S.H Fritts, and W.E. Berg.  1985.  Presence and effects of the dog louse Trichodectes canis (Mallophaga, Trichodectidae) on wolves and coyotes from Minnesota and Wisconsin.  American Midland Naturalist 114:404-405.

Merrill, S.B. and L.D. Mech.  2000.  Details of Extensive Movements by Minnesota Wolves.  Am. Midl. Nat. 144:428-433.

Mertig, A.G.  2004.  Attitudes about wolves in Michigan, 2002.  Report to the Michigan Dept. of Natural Resources Wildlife Division.  108 pp.

Michigan Department of Natural Resources.  1997.  Michigan gray wolf recovery and

002461A

management plan.  Lansing, MI  58 pp.

Michigan Department of Natural Resources.  1999.  Wisconsin man sentenced for shooting U.P. wolf.  News release, dated July 20, 1999.  1 p.

Michigan Department of Natural Resources.  2004.  Gray wolf found in northern Lower Peninsula.  News release, dated October 25, 2004.  1 page.

Michigan Department of Natural Resources.  2005a.  Michigan Department of Natural Resources Wildlife Division Procedure – Guidelines for management and lethal control of wolves following confirmed depredation events.  Version 1.04, 9/02/2005.  10 pp., including 2 appendices.

Michigan Department of Natural Resources.  2005b.  Application for a new federal recovery permit.  With cover letter from Mindy Koch, dated September 2, 2005.  11pp. plus letter.

Michigan Department of Natural Resources.  2005c.  Operational management guidance for state-owned forest lands.  Michigan Department of Natural Resources Forest, Mineral, and Fire Management, Lansing, MI.  62 pp.

Michigan Department of Natural Resources.  2005d.  Proposed Deer Population Goals.  2 pp.  Accessed Nov. 15, 2006.  Available at: http://www.michigan.gov/documents/Deer_Population_Goals_141443_7.pdf

Michigan Department of Natural Resources.  2006a.  Winter survey results show increase in wolf population.  Press release dated July 5, 2006.  1 p.

Michigan Department of Natural Resources.  2006b.  2006 Michigan Deer Hunting Prospects, Statewide Forecast.  Available from Michigan DNR, Lansing Michigan.  15 pp.

Michigan Department of Natural Resources.  2008a.  Michigan wolf management plan.  Lansing, MI.  95 pp.

Michigan Department of Natural Resources.  2008b. 2008 Michigan Deer Hunting Prospects, Statewide Forecast.  Available from Michigan DNR, Lansing Michigan.  10 pp.

Michigan Department of Natural Resources.  2010.  Wolf pup captured and released in the northern lower peninsula.  http://www.michigan.gov/dnr/0,1607, 7-153-10371_10402-241284--,00.html.  Accessed on 11/28/2010.

Michigan Wolf Management Roundtable.  2006.  Recommended guiding principles for wolf management in Michigan.  Report to the Director of the Michigan Department of Natural Resources.  November 2006.  18 pp.

Minnesota Department of Natural Resources.  1998.  1998 wolf public information meetings public comment summaries.  Unpublished report dated March 5, 1998.  St. Paul, MN  25 pp.

Minnesota Department of Natural Resources.  2000.  Directions 2000: The strategic plan.  MN DNR.  St. Paul, MN.  45 p.

Minnesota Department of Natural Resources.  2001.  Minnesota wolf management plan.  Prepared by the Section of Wildlife, dated February 2001.  36 pp. plus 9 appendices.

Minnesota Department of Natural Resources.  2005.  OHV Report to Legislature.  Available at: http://files.dnr.state.mn.us/aboutdnr/reports/trails/ohvstudy.pdf.  Accessed 10/24/06.

Minnesota Department of Natural Resources.  2007. 2007 Minnesota deer harvest report, St. Paul, MN. 55 p.

Minnesota  Statutes.  2005.  Section 3.737, subdivision 5.  From Office of the Revisor of Statues at http://www.leg.state.mn.us/leg/statutes.asp, accessed 11/13/06.

Mladenoff, D.J., M.K. Clayton, T.A. Sickley, and A.P. Wydeven.  2006.  L.D. Mech critique of our work lacks scientific validity.  Wildlife Soc. Bull. 34: 878-881.

002462A

Mladenoff, D.J., R.G. Haight, T.A. Sickley, and A.P. Wydeven.  1997.  Causes and implications of species restoration in altered ecosystems.  Bioscience 47(1): 21-31.

Mladenoff, D.J., and T.A. Sickley.  1998.  Assessing potential gray wolf restoration in the Northeastern United States:  a spatial prediction of favorable habitat and population level.  J. Wildl. Mgmt. 62:1-10.

Mladenoff, D.J., T.A. Sickley, R.G. Haight, and A.P. Wydeven.  1995.  A regional landscape analysis and prediction of favorable gray wolf habitat in the Northern Great Lakes region.  Conserv. Biology 9:279-294.

Mladenoff, D.J., T.A. Sickley, and A.P. Wydeven.  1999.  Predicting gray wolf landscape recolonization:  logistic regression models vs. new field data.  Ecological Applications 9(1):37-44.

Mladenoff, D.J., M.K. Clayton, S.D. Pratt, T.A. Sickley, and A.P. Wydeven.  2009.  Change in occupied wolf habitat in the northern Great Lakes region.  Pp. 119-138 in A.P. Wydeven, T. R. Van Deelen, and E.J. Heske, eds. Recovery of Wolves in the Great Lakes Region of the United States: An Endangered Species Success Story. Springer, New York, NY, USA. 350 pp.

Moffett, K.E.  1997.  Landscape suitability:  a case study of wolf habitat in North Dakota.  Masters Thesis, available from Ohio University.  63 pp.

Naughton, L., A. Treves, R. Grossberg, and D. Wilcove.  2005.  2004/2005 Public opinion survey:  wolf management in Wisconsin.  Unpublished report available at http://www.geography.wisc.edu/livingwithwolves/public_reports.htm.  45 pp. + exec. summary.

Naughton-Treves, L., R. Grossberg, and A. Treves.  2003.  Paying for tolerance:  Rural citizens' attitudes toward wolf depredation and compensation.  Cons. Biol. 17: 1500-1511.

Nowak, R. M.  1995.  Another look at wolf taxonomy.  Pp. 375-397 in L. N. Carbyn, S. H. Fritts, and D. R. Seip (eds.), Proceedings of the Second North American Symposium on Wolves, Canadian Circumpolar Institute, University of Alberta, Edmonton.

Nowak, R. M.  2002.  The original status of wolves in eastern North America.  Southeastern Naturalist.  1:95-130.

Nowak, R. M.  2003.  Wolf evolution and taxonomy.  Pp. 239-258 in L. D. Mech and L. Boitani (eds.), Wolves, Behavior, Ecology, and Conservation.  University of Chicago Press, Chicago.

Nowak, R. M.  2009.  Chapter 15, Taxonomy, Morphology, and Genetics of Wolves in the Great Lakes Region. Pp. 233-250 in A. P. Wydeven, T. R. Van Deelen, & E. Heske (eds.), Recovery of Wolves in the Great Lakes Region.  Springer, New York.

Ontario Ministry of Natural Resources.  2005a.  Backgrounder on wolf conservation in Ontario.  52 pp.

Ontario Ministry of Natural Resources.  2005b.  Notice of Decision for Regulation.  http://www.ene.gov.on.ca/envretistry/023668er.html.  Accessed 02/09/06.

Ontario Ministry of Natural Resources.  2005c.  Province ensures conservation of Ontario wolves – Introduces new closed season for hunting and trapping in central and northern Ontario.  Press release dated March 10, 2005.

Patten, M. A., and P. Unitt.  2002.  Diagnosability versus mean differences of sage sparrow subspecies.  The Auk 119(1):26-35.

http://www.mnr.gov.on.ca/MNR/csb/news/2005/mar10nr_05.html.  Accessed 02/08/06.

Paul, W.J.  2004.  Wolf depredation on livestock in Minnesota, annual update of statistics - 2003.

002463A

U.S. Dep. of Agri., Animal & Plant Health Inspection Serv., Wildl. Serv.  Grand Rapids, Minnesota.  13 pp.

Paul, W.J.  2006.  Summary of basic data from USDA Wolf-Livestock Depredation Control Program in Minnesota, 2000-03 and 2004-05.  U.S. Dep. of Agri., Animal & Plant Health Inspection Serv., Wildl. Serv.  Grand Rapids, Minnesota.  4 pp.

Peterson, R.O., N.J. Thomas, J.M. Thurber, J.A. Vucetich, and T.A. Waite.  1998.  Population limitation and the wolves of Isle Royale.  J. Mammal.  79:828-841.

Peterson, R.O., J.D. Woolington, and T.N. Bailey.  1984.  Wolves of the Kenai Peninsula, Alaska. Wildlife Monographs 48(supplement):52 pp.

Pioneer Press.  2006.  Back in the pack.  Posted on Web August 2, 2006; accessed Oct. 10, 2006 at http://www.twincities.com/mld/pioneerpress/news/local/15175538.htm.

Potvin, M.J.  2003.  A habitat analysis for wolves in Michigan.  M.S. thesis, Michigan Technological University, Houghton, Michigan.  83 pp.

Potvin, M.J., T.D. Drummer, J.A. Vucetich, D.E. Beyer, R.O. Peterson, and J.H. Hammill.  2005. Monitoring and habitat analysis for wolves in Upper Michigan.  J. Wildl. Mgmt. 69:1660-1669.

Roell, B.J., D. E. Beyer, Jr., T. C. Hogrefe, D. H. Lonsway, K. L. Sitar, and P.E. Lederle.  2009. Michigan Wolf Management 2008 Report.  Michigan Department of Natural Resources, Lansing, Michigan.  21pp.

Rolley, R.E. 2007.  White-tailed deer population status 2007.  Unpublished report by Wisconsin Department of Natural Resources.  Available at: http://www.dnr.state.wi.us/org/land/wildlife/harvest/reports/wtaildeerpop07.pdf. Accessed on 07/14/2009.

Rolley, R.E. 2008.  White-tailed deer population status 2008.  Unpublished report by Wisconsin Department of Natural Resources.  Available at: http://www.dnr.state.wi.us/org/land/wildlife/harvest/reports/wtaildeerpop08.pdf. Accessed on 07/14/2009.

Rutledge, L. Y., K. J. Bos, R. J. Pearce, B. N. White.  2009.  Genetic and morphometric analysis of sixteeth century *Canis* skull fragments: implication for historic eastern and gray wolf distribution in North America.  Conservation Genetics doi 10.1007/s10592-009-9957-2.

Schanning, K, and J. Vazquez.  2005.  State of the wolf project:  findings from the 2003 Wisconsin survey.  International Wolf 15:8-9.

Schwartz, M. K., and V. A. Vucetich.  2009.  Molecules and beyond:  assessing the distinctness of the Great Lakes wolf.  Molecular Ecology, doi: 10.1111/j.1365-294X.2009.04177.x

Smith, D.W., K.M. Murphy, and D.S. Guernsey.  2001.  Yellowstone Wolf Project: Annual Report, 2002. National Park Service, Yellowstone Center for Resources, Yellowstone National Park, Wyoming. 14 pp.

Stenlund, M.H.  1955.  A field study of the timber wolf (*Canis lupus*) on the Superior National Forest, Minnesota.  Minnesota Dep. Conserv. Tech. Bull. 4.  55 pp.

Thiel, R.P.  1985.  The relationship between road densities and wolf habitat suitability in Wisconsin.  Am. Midl. Nat. 113:404:407.

Treves, A., K.A. Martin, J.E. Wiedenhoeft, and A.P. Wydeven.  2009.  Dispersal of gray wolves in the Great Lakes region.  Pp. 191-204 in A.P. Wydeven, T. R. Van Deelen, and E.J. Heske, eds. Recovery of Wolves in the Great Lakes Region of the United States: An Endangered Species Success Story. Springer, New York, NY, USA. 350 pp.

Trigo. T. C., T. R. O. Freitas, G. Kunzler, L. Cardoso, J. C. R. Silva, W. E. Johnson, S. J. O'Brien, S. L. Bonatto, and E. Eizirik.  2008.  Inter-species hybridization among

8

002464A

Neogropical cats of the genus *Leopardus*, and evidence for an introgressive hybrid zone between *L. geoffroyi* and *L. tigrinus*in southern Brazil.  Molecular Ecology 17:4317-4333.

U.S. Department of Agriculture, National Forest Service.  2004a.  Superior National Forest Land and Resource Management Plan.  Available at:
    http://www.fs.fed.us/r9/forests/superior/projects/forest_plan/2004_forest_plan.php

U.S. Department of Agriculture, National Forest Service.  2004b.  Chippewa National Forest Revised Forest Plan.  Available at:
    http://www.fs.fed.us/r9/forests/chippewa/projects/forest_plan/index.php

U.S. Department of Agriculture, National Forest Service.  2004c.  Chequamegon-Nicolet National Forest Plan (2004 Land and Resource Management Plan).  Available at:
    http://www.fs.fed.us/r9/cnnf/natres/final_forest_plan/lmp2004/index.html

U.S. Department of Agriculture, National Forest Service.  2006a.  Hiawatha National Forest Plan.  Available at:  http://www.fs.fed.us/r9/hiawatha/revision/rev_welcome.html

U.S. Department of Agriculture, National Forest Service.  2006b.  Ottawa National Forest Management Plan.  Available at:
    http://www.fs.fed.us/r9/ottawa/forest_management/forest_plan/revision/fp_final/final_forest_plan_internet.htm

U.S. Department of Agriculture - Wildlife Services. 2008. Wolf damage management in Minnesota - 2008, Grand Rapids, MN. 9 p.

U.S. Department of Agriculture - Wildlife Services. 2009. Wolf damage management in Minnesota - 2009, Grand Rapids, MN. 9 p.

U.S. Fish and Wildlife Service.  1978.  Recovery plan for the eastern timber wolf.  Washington, D.C.  79 pp.

U.S. Fish and Wildlife Service.  1992.  Recovery plan for the eastern timber wolf.  Twin Cities, MN  73 pp.

U.S. Fish and Wildlife Service.  2005.  Gray wolf Recovery Weekly Progress Report, week of 8/26 to 9/2, 2005.  From Gray Wolf Recovery Coordinator, Helena, MT.  7 pp.

U.S. Fish and Wildlife Service, Nez Perce Tribe, National Park Service, Montana Fish Wildlife and Parks, Idaho Fish and Game, and USDA Wildlife Services.  2006.  Rocky Mountain Wolf Recovery 2005 Interagency Annual Report.  C.A. Sime and E.E. Bangs, eds.  USFWS, Ecological Services, 585 Shepard Way, Helena, MT.  59601  130 pp.

Van Deelen, T.  2005.  Winter severity indices for 2003-2004.  Unpublished report by Wisconsin DNR, Madison, WI.  5 pp.

Vucetich, J.A. and R.O. Peterson.  2009.  Ecological studies of wolves on Isle Royale – Annual report 2008-2009.  Unpublished report by School of Forest Resources and Environmental Science, Michigan Technological University, Houghton, Michigan.  20 pp.

Wayne, R.K., N. Lehman, D. Girman, P.J.P. Gogan, D.A. Gilbert, K. Hansen, R.O. Peterson, U.S. Seal, A. Eisenhawer, L.D. Mech, and R.J. Krumenaker.  1991.  Conservation genetics of the endangered Isle Royale gray wolf.  Cons. Biol. 5: 41-51.

Weise, T.F., W.L. Robinson, R.A. Hook, and L.D. Mech.  1975.  An experimental translocation of the eastern timber wolf.  Audubon Conservation Report No. 5.  28 pp.

Wheeldon, T.  2009.  Genetic characterization of Canis population in the western Great Lakes region.  Thesis, Master of Science.  Trent University, Peterborough, Ontario, Canada.

Wheeldon, T. and B. N. White.  2009. Genetic analysis of historical western Great Lakes region wolf samples reveals early Canis lupus/lycaon hybridization.  Biology Letters 5:101-104.

002465A

Wheeldon, T., B. Patterson, and B. N. White.  2010.  Sympatric wolf and coyote populations of the western Great Lakes region are reproductively isolated.  Molecular Ecology, doi: 10.1111/j.1365-294X.2010.04818.x.

Whittington, J., C.C. St. Clair, and G. Mercer.  2004.  Path tortuosity and the permeability of roads and trails to wolf movement.  Ecology and Society 9(1): 4 [online] URL: http://www.ecologyandsociety.org/vol9/iss1/art4.  15 pp.

Whittington, J., C.C. St. Clair, and G. Mercer.  2005.  Spatial responses of wolves to roads and trails in mountain valleys.  Ecol Applications 15: 543-553.

Wiedenhoeft, J.E.  2005.  Summary Report:  "Minnesota-type" wolf survey for Wisconsin – GIS analysis.  Unpublished report by WI DNR, Bureau of Endangered Resources, Madison, WI.  14 pp.

Wiley, E. O.  1981.  Phylogenetics; The Theory and Practice of Phylogenetic Systematics. Wiley, New York.

Wilkins, John S.  2006.  A List of 26 Species Concepts. Science Blogs. http://scienceblogs.com/evolvingthoughts/2006/10/a_list_of_26_species_concepts.php. Accessed 08/20/2009.

Wilkins, John Simpson.  2003.  The Origins of Species Concepts: History, characters, Modes, and Synapomorphies. https://webspace.utexas.edu/deverj/personal/test/species.pdf. Accessed 08/20/2009.

Wilson, P. J., S. Grewal, I. D. Lawford, J. N. M. Heal, A. G. Granacki, D. Pennock, J. B. Theberge, M. T. Theberge, D. R. Voigt, W. Waddell, R. E. Chambers, P. C. Paquet, G. Goulet, D. Cluff, and B. N. White.  2000.  DNA profiles of the eastern Canadian wolf and the red wolf provide evidence for a common evolutionary history independent of the gray wolf.  Canadian Journal of Zoology 78:2156-2166.Wilson, P. J., S. Grewal, T. McFadden, R. C. Chambers, and B. N. White.  2003.  Mitrochondrial DNA extracted from eastern North American wolves killed in the 1800s is not of gray wolf origin. Canadian Journal of Zoology 81:936-940.

Wisconsin Department of Natural Resources.  1999.  Wisconsin wolf management plan - October 27, 1999.  Madison, WI  74 pp.

Wisconsin Department of Natural Resources.  2008.  Guidelines for conducting depredation control on wolves in Wisconsin following federal delisting.  May 15, 2008. Madison, WI. 10 pp.

Wisconsin Department of Natural Resources.  2006a.  Wisconsin Wolf Management Plan – Addendum 2006.  60 pp.

Wisconsin Department of Natural Resources.  2006b.  Administrative Rule Chapter NR 10. Game and Hunting.  Available at:  http://www.legis.state.wi.us/rsb/code/nr/nr010.pdf

Wisconsin Department of Natural Resources.  2006c.  Administrative Rule Chapter NR 12. Wildlife Damage and Nuisance Control.  Available at: http://www.legis.state.wi.us/rsb/code/nr/nr012.pdf

Wisconsin Department of Natural Resources.  Undated a.  Deer Population Goals.  Available at: http://www/dnr/state.wi.us/org/land/wildlifr/hunt/deer/popgoal.htm.  Accessed 01/27/06.

Wisconsin Department of Natural Resources.  Undated b.  Wisconsin Deer Harvest and Hunters 1966-08, with 04 and 05 data added.  Accessed Nov. 15, 2006.  Available at: http://www.dnr.state.wi.us/org/land/wildlife/hunt/deer/hist08.pdf

Wydeven, A.P.  1994.  Travels of a midwestern disperser.   Intern. Wolf.  4: 20-22.

Wydeven, A.P.  1998.  Wisconsin Endangered Resources Report.  Status of the timber wolf in

002466A

Wisconsin, performance report, July 1, 1997 through 30 June 1998.  Bur. Endangered
Res., Wisconsin Dept. Natural Resources.  20 pp.

Wydeven, A.P and R.L. Jurewicz.  2005.  Justification for lethal control authority for recovery
activity under section 10(a)(1)(A)of the Endangered Species Act on gray wolves in
Wisconsin.  Wisconsin Dept. of Natural Resources.  18 pp.

Wydeven, A.P, D.J. Mladenoff, T.A. Sickley, and R.G. Haight.  1999.  GIS evaluation of wolf
habitat and potential populations in the Great Lakes States.  Appendix C, pp. 46-49, in
Wisconsin Wolf Management Plan, October 27, 1999.  Wisconsin Dept. of Nat.
Resources, Madison, WI.  74 pp.

Wydeven, A.P, D.J. Mladenoff, T.A. Sickley, B.E. Kohn, R.P. Thiel, and J.L. Hansen.  2001a.
Road density as a factor in habitat selection by wolves and other carnivores in the Great
Lakes Region. Endangered Species UPDATE. 18:110-114.

Wydeven, A.P, R.N. Schultz, and R.P. Thiel.  1995.  Monitoring of a recovering gray wolf
population in Wisconsin, 1979-1991.  pp. 147-156 in Carbyn, L.N., S.H. Fritts, and D.R.
Seip.  1995.  Ecology and conservation of wolves in a changing world.  Canadian
Circumpolar Institute, Occasional Publication No. 35.  Edmonton, Alberta.  642 pp.

Wydeven, A.P, and J.E. Wiedenhoeft.  2000.  Gray wolf population 1999-2000.  Wisconsin
Department of Natural Resources, Park Falls, Wisconsin.  9 pp.

Wydeven, A.P, and J.E. Wiedenhoeft.  2001.  Progress Report of Wolf Population Monitoring in
Wisconsin for the Period October-December 2000.  Wisconsin Department of Natural
Resources, Park Falls, Wisconsin.  9 pp.

Wydeven, A.P, and J.E. Wiedenhoeft.  2002.  Progress Report of Wolf Population Monitoring in
Wisconsin for the Period October-December 2001.  Wisconsin Department of Natural
Resources, Park Falls, Wisconsin.  9 pp.

Wydeven, A.P, and J.E. Wiedenhoeft.  2003a.  Progress Report of Wolf Population Monitoring
in Wisconsin for the Period October-December 2002 and Summaries of 2002.  Wisconsin
Department of Natural Resources, Park Falls, Wisconsin.  14 pp.

Wydeven, A.P, and J.E. Wiedenhoeft.  2003b.  Status of the Timber Wolf in Wisconsin
Performance Report 1 July 2002 through 30 June 2003.  Bureau of Endangered
Resources: Wisconsin Department of Natural Resources.  30 pp.

Wydeven, A.P, and J.E. Wiedenhoeft.  2004a.  Progress Report of Wolf Population Monitoring
in Wisconsin for the Period October-December 2003.  Wisconsin Department of Natural
Resources, Park Falls, Wisconsin.  16pp.

Wydeven, A.P, and J.E. Wiedenhoeft.  2004b.  Status of the Timber Wolf in Wisconsin
Performance Report 1 July 2003 through 30 June 2004.  Bureau of Endangered
Resources: Wisconsin Department of Natural Resources.  33 pp.

Wydeven, A.P., and J.E. Wiedenhoeft.  2005.  Status of the Timber Wolf in Wisconsin
Performance Report 1 July 2004 through 30 June 2005.  WI DNR, Park Falls, Wisconsin.
33 pp.

Wydeven, A.P., and J.E. Wiedenhoeft.  2006.  Status of the Timber Wolf in Wisconsin
Performance Report 1 July 2005 through 30 June 2006.  WI DNR, Park Falls, Wisconsin.
38 pp.

Wydeven, A.P. and J.E. Wiedenhoeft.  2008.  Wisconsin gray wolf post-delisting monitoring,
Year 1 of post-desliting, period 12 March 2007 through 30 June 2008.  Unpublished
report by WI DNR, Madison, WI.  40 pp.

Wydeven, A.P. and J.E. Wiedenhoeft.  2009.  Gray Wolf Population 2008-2009.  WI DNR, Park

002467A

Falls, Wisconsin.  20 pp.

Wydeven, A.P., J.E. Wiedenhoeft, R.P. Thiel, R.N. Schultz, E. Heilhecker, and S. Rossler. 2007a.  Progress report of wolf population monitoring in Wisconsin for the period April - September 2006.  Unpublished report by WI DNR, Park Falls, WI.  48pp.

Wydeven, A.P., J.E. Wiedenhoeft, R.P. Thiel, R.N. Schultz, and S.R. Boles. 2007b.  Progress report of wolf population monitoring in Wisconsin for the period October 2006 - March 2007.  Unpublished report by WI DNR, Park Falls, WI.  30pp. Wydeven, A.P., J.E. Wiedenhoeft, R.N. Schultz, R.P. Thiel, S.R. Boles, W.H. Hall, Jr E., and Heilhecker. 2003.  Progress report of wolf population monitoring for the period October 2002 – March 2003.  Unpublished report by WI DNR, Park Falls, WI.  48 pp.

Wydeven, A.P., J.E. Wiedenhoeft, R.N. Schultz, R.P. Thiel, S.R. Boles, and E. Heilhecker. 2006a.  Progress report of wolf population monitoring for the period October 2005 – March 2006.  Unpublished report by WI DNR, Park Falls, WI.  39 pp.

Wydeven, A.P., J.E. Wiedenhoeft, R.N. Schultz, R.P. Thiel, S.R. Boles, E. Heilhecker, and W.H. Hall, Jr.  2005a.  Progress report of wolf population monitoring for the period October 2004 – March 2005.  Unpublished report by WI DNR, Park Falls, WI.  39 pp.

Wydeven, A.P., J.E. Wiedenhoeft, R.N. Schultz, R.P. Thiel, W.H. Hall, E. Heilhecker, and J.E. Hawley.  2004.  Progress report of wolf population monitoring in Wisconsin for the period April - September 2003.  Unpublished report by WI DNR, Park Falls, WI.  31 pp.

Wydeven, A.P., J.E. Wiedenhoeft, R.N. Schultz, R.P. Thiel, W.H. Hall, E. Heilhecker, and J.E. Hawley.  2005b.  Progress report of wolf population monitoring in Wisconsin for the period April - September 2004 & annual summaries for 2004.  Unpublished report by WI DNR, Park Falls, WI.  28 pp.

Wydeven, A.P., J.E. Wiedenhoeft, R.P. Thiel, R.N. Schultz, B.E. Kohn, and S.R. Boles.  2001b.  Progress report of wolf population monitoring in Wisconsin for the period October 2000 - March 2001.  Unpublished report by WI DNR, Park Falls, WI.  36pp.

Wydeven, A.P., J.E. Wiedenhoeft, R.N. Schultz, R.P. Thiel, and S. Rossler.  2006b.  Progress report of wolf population monitoring in Wisconsin for the period April - September 2005 & annual summaries for 2005.  Unpublished report by WI DNR, Park Falls, WI.  30 pp.

Wydeven, A.P., J.E. Wiedenhoeft, R.N. Schultz, and R.P. Thiel.  2009a.  Progress report of wolf population monitoring in Wisconsin for the period April - September 2008, and annual summaries for 2008.  Unpublished report by WI DNR, Park Falls, WI.  35 pp.

Wydeven, A.P., J.E. Wiedenhoeft, R.N. Schultz, R.P. Thiel, R. L. Jurewicz, B.E. Kohn, and T. R. Van Deelen. 2009b. History, population growth, and management of wolves in Wisconsin. Pp. 87-105 in A.P. Wydeven, T. R. Van Deelen, and E.J. Heske, eds. Recovery of Wolves in the Great Lakes Region of the United States: An Endangered Species Success Story. Springer, New York, NY, USA. 350 pp.

Wydeven, A.P., J.E. Wiedenhoeft, R.N. Schultz, R.P. Thiel, and S. Boles.  2010.  Status of the timber wold in Wisconsin, performance report 1 July 2009 through 30 June 2010.  Unpublished report by WI DNR, Park Falls, WI.  67 pp.

002468A

**Unpublished Documents, Noted as "in litt." and "pers. comm." in Final Rule**

Aarhus-Ward, Angela. 2009. E-mail from Ward, Wildlife Research Biologist, 1854 Authority to Phil Delphey, USFWS Twin Cites, MN, ES Field Office, dated 07/16/2009. Subject: wolf management plan.

Anschutz, Steve. 2003. E-mail from Anschutz, USFWS Nebraska Field Office Supervisor to Laura Ragan, USFWS Regional Office, Ft. Snelling, MN, dated 04/01/03. Subject: gray wolf shot. 1 p.

Anschutz, Steve. 2006. E-mail from Anschutz, USFWS Nebraska Field Office Supervisor to Ron Refsnider, USFWS Regional Office, Ft. Snelling, MN, dated 10/30/06. Subject: Nebraska wolf from 1995?

Barnhardt, Maria. 2006. E-mail from Barnhardt, ND DOT to Bill Bicknell and Ron Refsnider, USFWS Regional Office, Ft. Snelling, MN, dated 11/20/06. Subject: Road density for eastern Dakotas? 2 pp. plus 3 pages of attachments.

Bedeau, Lawrence. 1998. Letter from Bedeau, DNR Director, Red Lake Band of Chippewa Indians, to Marvin Moriarty, Deputy Regional Director, dated September 22, 1998. Regarding Red Lake Band's position on wolf delisting and future management. 8 pp.

Beheler, Kerry. undated. Memo from Beheler, WI DNR Wildlife Health Specialist, to Dean Beyer, MI DNR Wildlife Research Biologist. Subject: Michigan Gray Wolf Health Sample Analysis 1992-1999. 3 pp.

Beheler, Kerry. 2004. Memo from Beheler, WI DNR Wildlife Health Specialist, to Dean Beyer, MI DNR Wildlife Research Biologist. Subject: Michigan Gray Wolf Serologic Analysis: 2001 Captured Animals. Memo dated 04/14/04. 2 pp.

Berg, Bill. 1998. E-mail from Berg, MN DNR Wildlife Research to Ron Refsnider, USFWS Regional Office, Ft. Snelling, MN, dated 11/12/98. Subject: wolf mortality data - reply. 1 p.

Berkley, E. 2009. Telephone conversation between Berkley, Sherburne National Wildlife Refuge, and Phil Delphey, USFWS Twin Cites, MN, ES Field Office, on 07/14/09.

Beyer, Dean. 2005. Unpublished 1999-2004 wolf mortality data from Michigan DNR.

Beyer, Dean. 2006a. E-mail from Beyer, MI DNR Wildlife Research, to Ron Refsnider, USFWS Regional Office, Ft. Snelling, MN, dated 02/02/06. Subject: CPV data for MI wolves? 1 p. plus 2- and 3-page attached reports by Kerry Beheler, WI DNR Wildlife Health Specialist.

Beyer, Dean. 2006b. E-mail from Beyer, MI DNR Wildlife Research, to Ron Refsnider, USFWS Regional Office, Ft. Snelling, MN, dated 08/10/06. Subject: Potential for "MN-style" wolf monitoring in WI and MI? 2 pp. with 6-page attachment by Drummer.

Bicknell, William. 2009. Email from Bicknell, USFWS Bismarck, ND, ES Field Office, to Laura Ragan, USFWS Regional Office, Ft. Snelling, MN, dated 07/10/09. Subject: [Wolf status/protection in ND]. 1 p.

Boyle, Barbara. 2005. Email from Boyle, Tamarac NWR Manager, to Phil Delphey, USFWS Twin Cities, MN, ES Field Office, dated 11/21/06. Subject: Wolf Information Request – Reply Requested by November 30. 2 pp.

Brininger, W. 2009. Telephone conversation between Brininger, Tamarac National Wildlife Refuge, and Phil Delphey, USFWS Twin Cites, MN, ES Field Office, on 07/14/09.

Caldwell, Carolyn. 2005. E-mail from Caldwell, Program Administrator, OH DNR, to Ron Refsnider, USFWS Regional Office, Ft. Snelling, MN, dated 10/14/05. Subject: Request

13

002469A

for State Wolf Regulations, summary of wolf reports.  2 pp.

Collins, Roger.  1998.  Memo from Roger Collins, Supervisor, USFWS ND ES Field Office, to ARD-Ecological Services, Ft. Snelling, MN (Attn:  R. Refsnider).  Subject:  Wolf Information Request.  2 pp. with attached 2 pp. of maps.

DelGiudice, Glen.  2005.  E-mail from DelGuidice, MN DNR Wildlife Research, to Ron Refsnider, USFWS Regional Office, Ft. Snelling, MN, dated 11/22/05.  Subject:  Wolf mortality data in MN.  With unpublished data from Forest Wildlife Research Group, Minnesota DNR, Grand Rapids, MN  4 pp.

Delphey, P.  2009.  Email from Delphey, USFWS Twin Cities, MN, ES Field Office, to Laura Ragan, USFWS Regional Office, Ft. Snelling, MN, dated 08/12/09.  Subject:  SNF sq. km.  2 pp.

Dirks, Brian.  2009.  Telephone conversation between Dirks, MN DNR, Camp Ripley, and Phil Delphey, USFWS Twin Cites, MN, ES Field Office, on 07/14/09.  Subject:  Numbers and management of wolves at Camp Ripley, MN.

Donofrio, Mike.  1998.  Telephone conversation between Donofrio, Natural Resources Director, Keweenaw Bay Indian Community, and Mike DeCapita, USFWS East Lansing, MI, ES Field Office, on 11/04/98.  Subject:  Keweenaw Bay Indian Community contact.

Donofrio, Mike.  2003.  Letter from Donofrio, Natural Resources Director, Keweenaw Bay Indian Community, to Ron Refsnider, USFWS Regional Office, Ft. Snelling, MN, dated 08/12/03.  Regarding Keweenaw Bay Indian Community position on wolf delisting.  2 pp.

Edwards, Andrew J.  2003.  Letter from Edwards, Biological Services Director, 1854 Authority Biological Services, to Ron Refsnider, USFWS Regional Office, Ft. Snelling, MN, dated 08/07/03.  Regarding 1854 Authority position on EPS wolf delisting.  3 pp.

Eklund, D.A. 2009.  E-mail from Eklund, U.S. Forest Service, Chequamegon-Nicolet National Forest, to Joel Trick, USFWS Green Bay, WI, ES Field Office, dated 08/07/2009.  Subject: Current Wolf Numbers.  1 p.

Erb, John.  2005.  E-mail from Erb, MN DNR Wildlife Research to Ron Refsnider, USFWS Regional Office, Ft. Snelling, MN¸ dated 12/14/05.  Subject:  Wolves in Zones A and B?  1 p.

Evans, Robert A.  2005.  E-mail from Evans, Wildlife Biologist, Ottawa National Forest, to Christie Deloria, USFWS Marquette, MI, ES Suboffice, dated 11/21/05.  Subject:  Ottawa NF Response:  Information Request – Wolves on Federal Lands in U.P.  3 pp.

Fain, Steven.  2006.  E-mail from Fain, Supervisory Forensic Geneticist, USFWS Ashland, OR, to Ron Refsnider, USFWS Regional Office, Ft. Snelling, MN, dated 10/16/06.  Subject:  EDPS Dispersers.  1 p. with 3-page attachment with unpublished data.

Googgleye, George. Jr.  2004.  Letter from Googgleye, Leech Lake Band Tribal Council Chairman, to Gray Wolf Delisting Content Analysis Team, dated 08/27/04.  Regarding Leech Lake Tribal Council position on wolf harvest.  3 pp.

Gustin, Karen.  2003.  Letter from Gustin, Pictured Rocks National Lakeshore Superintendent, to Ron Refsnider, USFWS Regional Office, Ft. Snelling, MN, dated 08/11/03.  Regarding future management of wolves at Pictured Rocks National Lakeshore.  2 pp.

Hammill, Jim.  1999.  E-mail from Hammill, MI DNR, Crystal Falls, MI, to Ron Refsnider, USFWS Regional Office, Ft. Snelling, MN, dated 07/30/99.  Subject:  Wolf killings in MI.  1 p.

Hammill, Jim.  2002.  Faxes from Hammill, MI DNR, Crystal Falls, MI.  Series of 4 faxes to

002470A

Ron Refsnider, USFWS Regional Office, Ft. Snelling, MN, dated 03/08/02, 03/12/02, 03/15/02, and 03/22/02.  Michigan wolf mortality and depredation data.  10 pp.

Hart, John.  2009.  Telephone conversation between Hart, USDA – Wildlife Services, Grand Rapids, MN and Phil Delphey, USFWS Twin Cities, MN, ES Field Office, dated 07/30/2009.

Hassett, Scott.  2003.  Letter from Hassett, Secretary, WI DNR, to Charles Wooley, Asst. Regional Director, FWS, dated 12/22/03.  Responses to FWS questions.  1 page with 10-page attachment.

Hogrefe, Todd.  2006.  E-mail from Hogrefe, Endangered Species Coordinator, MI DNR, to Ron Refsnider, USFWS Regional Office, Ft. Snelling, MN, dated 11/08/06.  Subject: Completion schedule for revised MI wolf plan?  1 p.

Holbeck, Chris.  2005.  E-mail from Holbeck, Chief of Resources Management, Voyageurs National Park, to Phil Delphey, USFWS Twin Cities, MN, ES Field Office, dated 11/29/05.  Subject:  Wolf Data Request.  2 pp.

Hollar, Jeanne.  2005.  E-mail from Hollar, Refuge Biologist, Sherburne-Crane Meadows NWR Complex, to Phil Delphey, USFWS Twin Cities, MN, ES Field Office, dated 12/01/05.  Subject:  Wolf Information Request.  1 p.

Holtz, Signe.  2006.  E-mail from Holtz, Director Wisconsin DNR Endangered Resources Program, to Ron Refsnider, USFWS Regional Office, Ft. Snelling, MN, dated 11/08/2006.  Subject:  Copy of DRAFT wolf addendum.  1 p. with 59-page attachment "Wisconsin Wolf Management Plan Addendum 2006.

Howell, Daryl.  2005.  E-mail from Howell, Iowa DNR, to Ron Refsnider, USFWS Regional Office, Ft. Snelling, MN, dated 11/04/05.  Subject:  Request for State Wolf Regulations, summary of wolf reports.  1 p. with 3 attachments.

Humphries, Rebecca A.  2004.  Letter from Humphries, Director, Michigan DNR, to Robyn Thorson, USFWS Regional Director, dated May 27, 2004.  Regarding MI DNR's future intentions for future wolf management. 1 p.

Hunt, Eli.  1998.  Letter from Hunt, Chairman, Leech Lake Tribal Council, to Marvin Moriarty, Acting USFWS Regional Director, dated 09/24/98.  Regarding Reservation plans for wolves after federal delisting.  4 pp.

Huschle, Gary.  2005.  E-mail from Huschle, Wildlife Biologist, Agassiz NWR, to Phil Delphey, USFWS Twin Cities, MN, ES Field Office, dated 11/23/03.  Subject:  Wolf Information Request – Reply Requested by November 30.  2 pp.

Huseby, Jay.  2009.  Phone conversation between Huseby, Red Lake Reservation biologist, and Phil Delphey, USFWS Twin Cities, MN, ES Field Office, on 07/15/09, regarding wolf numbers on Reservation.

Jobman, Wally.  1995.  Inter-Office Transmittal from Jobman, USFWS Grand Island, Nebraska, Field Office, to Helena, MT, USFWS Wolf Coordinator, dated 01/10/95.  1 p.

Johnson, Scott.  2005.  E-mail from Johnson, Indiana DNR,  to Ron Refsnider, USFWS Regional Office, Ft. Snelling, MN, dated 11/01/05.  Subject:  Request for State Wolf Regulations, summary of wolf reports.  1 p.

Johnson, Scott.  2006.  E-mail from Johnson, Indiana DNR to Ron Refsnider, USFWS Regional Office, Ft. Snelling, MN, dated 01/26/06.  Subject:  Wolf protection in IN?  2 pp.

King, George.  2003.  Letter from King, Chairman, Red Lake Band of Chippewa Indians, to Ron Refsnider, USFWS Regional Office, Ft. Snelling, MN, dated 07/28/03.  Regarding information on wolves on Red Lake lands.  3 pp.

002471A

King, Rich.  2009.  Telephone conversation between King, Refuge Biologist, Necedah NWR, and Laura Ragan, USFWS Regional Office, Ft. Snelling, MN, on 08/24/2009, regarding wolves on Necedah NWR.

Kiogama, Archie L., Jr. and Gerald V. Chingwa.  2000.  Letter from Kiogama, Tribal Wildlife Biologist and Chingwa, Chairman, Little Traverse Bay Bands of Odawa Indians. Undated.  Comment letter on the Proposal to Reclassify/Delist the Gray Wolf.  2 pp.

Knutsen, Gregg.  2009.  Email from Knutsen, Wildlife Biologist, Agassiz NWR, to Phil Delphey, USFWS Twin Cities, MN, ES Field Office, dated 07/14/2009.  Subject: Wolf Information.  2 pp.

Koch, Mindy.  2006a.  Letter from Koch, Resource Management Deputy, MI DNR, to U.S. Fish and Wildlife Service, dated 06/22/06.  Regarding proposed delisting of gray wolf.  1 p.

Koch, Mindy.  2006b.  Letter from Koch, Resource Management Deputy, MI DNR, to Robyn Thorson, USFWS Region 3 Director, dated 11/30/06.  2 pp. with attached 18- page Michigan Wolf Management Roundtable Guidance [listed separately above].

Larson, Scott.  2005.  E-mail from Larson, USFWS Pierre, SD, ES Field Office, to Ron Refsnider, USFWS Regional Office, Ft. Snelling, MN, dated 11/09/05.  Subject: Legal status of wolves in SD?  2 pp.

Larson, Scott.  2006a.  E-mail from Art Smith to Scott Larson, USFWS Pierre, SD, ES Field Office, then to numerous FWS employees, dated 7/13/06.  Subject: Possible wolf.  2 pp.

Larson, Scott.  2006b.  E-mail from Larson, USFWS Pierre, SD, ES Field Office, to Ron Refsnider, USFWS Regional Office, Ft. Snelling, MN, dated 11/08/06.  Subject: Road Density for eastern Dakotas?  3 pp.

Lederle, Pat.  2004.  Phone conversation on 04/01/04 between Lederle, MI DNR Wildlife Research Section Supervisor, and Christie Deloria, USFWS ES Suboffice, Marquette, MI.  Regarding CWD and wolf depredation compensation program.

Lederle, Pat.  2006.  E-mail from Lederle, MI DNR Wildlife Research Section Supervisor, to Ron Refsnider, USFWS Regional Office, Ft. Snelling, MN, dated 09/05/06.  Subject: Support for the sampling protocols.  1 p.

Lindquist, Ed.  2005.  E-mail from Lindquist, Wildlife Biologist, Superior National Forest, to Phil Delphey, USFWS Twin Cities, MN, ES Field Office, dated 11/18/05.  Subject: Wolf Data Request.  3 pp.

Maercklein, Robin.  2003.  Letter from Maercklein, Resource Management Specialist, St. Croix National Scenic Riverway, to Ron Refsnider, USFWS Regional Office, Ft. Snelling, MN, dated 09/02/03.  Regarding future wolf management in St. Croix National Scenic Riverway.  2 pp.

McDowell, Michelle.  2005.  E-mail from McDowell, Wildlife Biologist, Rice Lake NWR, to Phil Delphey, USFWS Twin Cities, MN, ES Field Office, dated 11/17/05.  Subject: Wolf Information Request – Reply Requested by November 30.  3 pp.

McDowell, M.  2009.  Telephone conversation between McDowell, Rice Lake National Wildlife Refuge, and Phil Delphey, USFWS Twin Cites, MN, ES Field Office, on 07/23/09.

Mech, L. David. 1998.  E-mail from Mech, USGS/BRD, to Ron Refsnider, USFWS Regional Office, Ft. Snelling, MN, dated 09/21/98.  Subject:  Disease/parasite impacts on MN wolf population.  4 pp.

Mech, L. David.  2005.  E-mail from Mech, USGS/BRD, to Ron Refsnider, USFWS Regional Office, Ft. Snelling, MN, dated 10/11/05.  Subject:  Wolf dispersal.  1 p. with 1-page attachment.

002472A

Mech, L. David.  2006.  E-mail from Mech, USGS/BRD, to Ron Refsnider, USFWS Regional Office, Ft. Snelling, MN, dated 11/14/06.  Subject:  Wilson ms. [but subject matter deals with unpublished data from Mech, Goyal, and Paul regarding CPV impacting pup survival]  2 pp.

Moore, Randy.  2003.  Letter from Moore, Regional Forester, U.S. Forest Service, to Ron Refsnider, USFWS Regional Office, Ft. Snelling, MN, dated 08/21/03.  Regarding impacts of wolf delisting on national forests in EDPS.  4 pp.

Moritz, William.  2006.  Letter from Moritz, MI DNR Wildlife Division Chief, to potential Michigan Wolf Management Roundtable members and attached "Guidance to the Michigan Wolf Management Roundtable," dated 01/12/06.  2-page letter with 4-page attachment.

Mortensen, Steve.  2009.  Phone conversation between Mortensen, Leech Lake Wildlife Biologist, and Phil Delphey, USFWS Twin Cities, MN, ES Field Office, on 07/15/09, regarding wolf numbers on Leech Lake Reservation.

Myers, Sonny.  2004.  Letter from Myers, Executive Director, 1854 Authority, to Gray Wolf Delist Content Analysis Team, dated 11/04/04.  2 pp.

Nobles, Danny G.  2004.  Letter from Nobles, Colonel, Fort McCoy, to Ron Refsnider, USFWS Regional Office, Ft. Snelling, MN, undated.  Regarding Fort McCoy's intended wolf management after delisting.  5 pp.

Olson, Dave.  2005.  E-mail from Olson, Wildlife Biologist, Seney NWR, to Christie Deloria, USFWS, ES Suboffice, Marquette, MI, dated 11/14/05.  Subject:  Seney NWR: Information Request:  Wolfs on Federal Lands.  2 pp.

Paul, William.  2004.  Phone conversation between Paul, USDA-APHIS-Wildlife Services, and Phil Delphey, USFWS Twin Cities, MN, ES Field Office, on 03/24/04.  Regarding wolf depredation in Minnesota.

Paul, William.  2005.  Fax from Paul, USDA-APHIS-Wildlife Services, to Ron Refsnider, USFWS Regional Office, Ft. Snelling, MN, dated 11/23/05.  Subject:  Disease data for your wolves?  5 pp.

Paul, William.  2006.  Letter from Paul, USDA-APHIS-Wildlife Services, to USFWS, dated 06/16/06.  Peer Review Comments on USFWS Proposal to Delist WGL DPS of the Gray Wolf.  RIN 1018-AU54.  7 pp.

Peterson, Rolf.  1997.  Letter from Peterson, Leader Eastern Timber Wolf Recovery Team, to USFWS Regional Director William Hartwig, dated 06/02/97.  Regarding reclassification of Western Great Lakes DPS.  2 pp.

Peterson, R.  1998.  Letter from Peterson, Leader Eastern Timber Wolf Recovery Team, to USFWS Regional Director William Hartwig, dated 01/10/98, regarding review of recovery criteria and 7 questions asked by FWS.  8 pp.

Peterson, R.  1999a.  Letter from Peterson, Leader Eastern Timber Wolf Recovery Team, to USFWS Regional Director William Hartwig, dated 01/11/99, regarding review of state wolf recovery plans and Minnesota Roundtable recommendations.  4 pp.

Peterson, R.  1999b.  Letter from Peterson, Leader Eastern Timber Wolf Recovery Team, to USFWS Regional Director William Hartwig, dated 07/15/99, regarding Minnesota DNR wolf estimate and failure of MN Legislature to act on DNR wolf management plan.  2 pp.

Peterson, R.  2001.  Letter from Peterson, Leader Eastern Timber Wolf Recovery Team, to USFWS Regional Director William Hartwig, dated 05/22/01.  Regarding Recovery Team's Review of Minnesota Wolf Management Plan.  2 pp.

002473A

Piehler, Kirk G.  2005.  E-mail from Piehler, Hiawatha National Forest Wildlife Biologist, to
    Christie Deloria, USWFS Marquette, MN, ES Suboffice, dated 11/23/05.  Subject:
    Hiawatha NF Response -- Information Request – Wolves on Federal Lands in U.P.  3 pp.

Prieksat, Robert.  2009.  Email from Prieksat, USFWS Resident Agent In Charge  (OLE) for
    ND/SD/NE, Pierre, SD to Laura Ragan USFWS Regional Office, Ft. Snelling, MN, dated
    07/08/2009.  Subject: Wolf settlement - -Judge's approval [includes information on 2009
    wolf in South Dakota].

Roell. Brian.  2004.  E-mail from Roell, MI DNR Wildlife Biologist, to Mike DeCapita, USFWS
    East Lansing, MI, ES Office, then to Deloria, USFWS Marquette, MN, ES Suboffice,
    and Refsnider, USFWS Regional Office, Ft. Snelling, MN, dated 06/22/04.  Subject:
    Dead Wolf – incidental take.  1 p. with 1 p. attachment.

Roell, Brian.  2005a.  E-mail from Roell, MI DNR Wildlife Biologist, to Mike DeCapita,
    USWFW East Lansing, MN, ES Field Office, then to Refsnider, Fasbender, and
    Szymanski, USFWS Regional Office, Ft. Snelling, MN, dated 07/19/05.  Subject:  Dead
    wolves.  1 p. with 1 p. attachment. [3 other attachments irrelevant]

Roell. Brian.  2005b.  E-mail from Roell, MI DNR Wildlife Biologist, to Ron Refsnider, USFWS
    Regional Office, Ft. Snelling, MN, dated 11/28/05.  Subject:  Wolf diseases in MI.  2 pp.

Roell, Brian.  2006a.  E-mail from Roell, MI DNR Wildlife Biologist, to Ron Refsnider, USFWS
    Regional Office, Ft. Snelling, MN, dated 10/13/06 (10:22AM).  Subject:  MI wolf pop.
    est. for 2005-06 – published?   1 p.

Roell, Brian.  2006b.  E-mail from Roell, MI DNR Wildlife Biologist, to Ron Refsnider, USFWS
    Regional Office, Ft. Snelling, MN, dated 10/13/06 (10:31AM).  Subject:  MI wolf pop.
    est. for 2005-06 – published?

Roell, Brian.  2006c.  E-mail from Roell, MI DNR Wildlife Biologist, dated 08/09/06 to Mike
    DeCapita, USFWS East Lansing, MI, ES Field Office, Peter Fasbender, USFWS
    Regional Office, Ft. Snelling, MN, and Todd Hogrefe, MI DNR, Lansing, MI.   Subject:
    Re:  Dead Wolf.  4 pp.

Schlender, James H.  1998.  Letter from Schlender, Executive Administrator, Great Lakes Indian
    Fish and Wildlife Commission, to Marvin Moriarty, Acting USFWS Regional Director,
    dated 11/09/98.  Regarding GLIFWC position on management of ceded territory wolves
    after federal delisting.  2 pp.

Schlender, James H.  2004.   Letter from Schlender, Executive Administrator, Great Lakes
    Indian Fish and Wildlife Commission, to Gray Wolf Delisting Content Analysis Team,
    dated 11/16/04.  GLIFWC comments on wolf delisting proposal.  3 pp.

Schrage, Mike.  1998a.  Letter from Schrage, Fond du Lac Resource Management Division
    Wildlife Biologist, to Marvin Moriarty, USFWS Regional Office, Ft. Snelling, MN, dated
    10/06/98.  Conveying input on tribal wolf management and delisting.  2 pp.

Schrage, Mike.  1998b.  Letter from Schrage, Fond du Lac Resource Management Division
    Wildlife Biologist, to Marvin Moriarty, USFWS Regional Office, Ft. Snelling, MN, dated
    11/10/98.  Conveying resolution from Business Committee regarding wolf delisting.  3
    pp.

Schrage, Mike.  2003.  Letter from Schrage, Fond du Lac Resource Management Division
    Wildlife Biologist, to Ron Refsnider, USFWS Regional Office, Ft. Snelling, MN, dated
    08/07/03.  Regarding position of Fond du Lac Tribe on wolf delisting.  4 pp.

Schrage, Mike.  2009.  Telephone conversation between Schrage, Fond du Lac Resource
    Management Division Wildlife Biologist, and Phil Delphey, USFWS Twin Cites, MN,

002474A

ES Field Office, on 07/16/09.

Sickley, Theodore A. 2006. E-mail from Sickley, Univ. WI-Madison, to Ron Refsnider, USFWS Regional Office, Ft. Snelling, MN, dated 10/31/06. Subject: Table [providing unpublished data to update Table C2 of WI Wolf Management Plan]. 6 pp.

Stark, Dan. 2009a. Telephone conversation between Stark, Minnesota Department of Natural Resources, and Phil Delphey, USFWS Twin Cites, MN, ES Field Office, on 07/23/09.

Stark, Dan. 2009b. Email from Stark, Minnesota Department of Natural Resources, to Laura Ragan, USFWS Fort Snelling, MN, dated 08/20/09. 1 p.Stefanski, Mary. 2004. E-mail from Stefanski, Wildlife Biologist, Rice Lake NWR, to Phil Delphey, USFWS Twin Cities, MN, ES Field Office, dated 03/18/04. Subject: Gray Wolf Information Request for Proposed Delisting Rule. 1 p.

Symbal, Matt. 2003. E-mail from Symbal, Red Cliff Natural Resources Department Fish and Wildlife Biologist, to Ron Refsnider, USFWS Regional Office, Ft. Snelling, MN, dated 09/05/03. Subject: Wolf Comments. 1 p. plus 2- page attachment.

Thomas, Nancy. 1998. Letter from Thomas, Endangered Species Disease Specialist, USGS National Wildlife Health Center, Madison, WI, to Ron Refsnider, USFWS Regional Office, Ft. Snelling, MN, dated 11/06/98. Necropsy and parasite data on Great lakes wolves. 3 pp. plus 2 single-page data tables.

Thomas, Nancy. 2000. Letter from Thomas, Endangered Species Disease Specialist, USGS National Wildlife Health Center, Madison, WI, to T.J. Miller, USFWS Regional Office, Ft. Snelling, MN, dated 11/09/00. Peer reviewer comments on Gray Wolf Reclassification and Delisting Proposal of 07/13/00. 2 pp.

Thomas, Nancy. 2006. Letter from Thomas, Endangered Species Disease Specialist, USGS National Wildlife Health Center, Madison, WI, to WGL Wolf Delisting Comment Analysis Team, dated 06/16/06. Peer Reviewer comments on Proposed Rule to Delist Western Great Lakes Population of Gray Wolves. 3 pp. plus 80-page attachment [Gogan et al. 2004, listed separately above]).

Trick, Joel. 2006. E-mail from Trick, USFWS Green Bay, WI, ES Field Office, to Ron Refsnider, USFWS Regional Office, Ft. Snelling, MN, dated 01/27/06. Subject: wolves on federal lands in WI. 5 pp.

Werner, Todd. 2009. Telephone conversation between Werner, Keweenaw Bay Indian Community, and Christie Deloria, USFWS, East Lansing, MI, ES Field Office, dated 8/20/2009.

West, Barbara. 2004. Letter from West, Superintendent, Voyageurs National Park, to Ron Refsnider, USFWS Regional Office, Ft. Snelling, MN, dated 03/24/04. Regarding future of wolves in Voyageurs National Park. 3 pp.

White, Peter. 2003. Letter from White, Chairman, Leech Lake Tribal Council, to Ron Refsnider, USFWS Regional Office, Ft. Snelling, MN, dated 8/08/03. Regarding status of wolves on Leech Lake Reservation. 3 pp.

Wiedenhoeft, J. 2006. Wildlife Biologist, WI DNR, Bureau of Endangered Resources. Unpublished data. Percentage of known mortality for radio-tagged wolves dying in Wisconsin 1979-2006. Wisconsin DNR. 1 p.

Wilder, T. 2009. Email from Wilder Ft. McCoy to Joel Trick, USFWS Green Bay, WI, ES Field Office, dated 08/07/09. Subject: Current wolf numbers (on Ft. McCoy). 2 pp.

Williamson, Alan. 2005. E-mail from Williamson, Forest Ecologist, Chippewa National Forest, to Phil Delphey, USFWS Twin Cities, MN, ES Field Office, dated 11/17/05. Subject:

Wolf Data Request.  2 pp.

Wydeven, Adrian.  1998.  E-mail from Wydeven, WI DNR Mammalian Ecologist, to Ron
 Refsnider, USFWS Regional Office, Ft. Snelling, MN, dated 09/28/98.  Subject:  Wolf
 disease/parasite treatments.  1 p.

Wydeven, Adrian.  2005.  E-mail from Wydeven, WI DNR Mammalian Ecologist, to Ron
 Refsnider, USFWS Regional Office, Ft. Snelling, MN, dated 11/07/05.  Subject:  Wolves
 on Indian Reservations.  2 pp. with 2 attachments [irrelevant to subject]:
  wolfscicover.doc
  Wolf Science Committee Minutes 9-21-05.doc

Wydeven, Adrian.  2006a.  E-mail from Wydeven, WI DNR Mammalian Ecologist, to Ron
 Refsnider, USFWS Regional Office, Ft. Snelling, MN, dated 01/25/06.  Subject:
 Menominee Tribe wolf support.  2 pp.

Wydeven, Adrian.  2006b.  E-mail from Wydeven, WI DNR Mammalian Ecologist, to Ron
 Refsnider, USFWS Regional Office, Ft. Snelling, MN, dated 08/09/06.  Subject:
 Potential for "MN-style" wolf monitoring in WI and MI.  2 pp. with 14-page attachment
 [Wiedenhoeft 2005, listed separately above].

Wydeven, Adrian.  2006c.  E-mail from Wydeven, WI DNR Mammalian Ecologist, to Ron
 Refsnider, USFWS Regional Office, Ft. Snelling, MN, dated 10/13/06.  Subject:  wolf
 mortalities spreadsheet.  Attachments:  2006 Wolf Mortalities -Excel Spreadsheet
 showing wolves through WI-2006-56; Graph of mortalities by Wiedenhoeft [listed
 separately, above].

Wydeven, Adrian.  2006.  Phone conversation between Wydeven, WI DNR Mammalian
 Ecologist, and Ron Refsnider, USFWS Regional Office, Ft. Snelling, MN, on 10/24/06,
 regarding WI wolf management after federal delisting.

Wydeven, Adrian.  2009.  Email from Wydeven, WI DNR Mammalian Ecologist to Laura
 Ragan, USFWS Regional Office, Ft. Snelling, MN, on 08/21/2009, regarding Research/
 Monitoring related mortalities.

002476A

# EXHIBIT V

December 3, 2010

**INFORMATION MEMORANDUM FOR THE DIRECTOR**

FROM:          Thomas Melius, Regional Director, Region 3

SUBJECT:     Proposed Delisting of Gray Wolves in the Western Great Lakes

I.       INTRODUCTION

Wolves have exceeded the numerical recovery criteria in the Midwest since 1999, and Minnesota, Wisconsin, and Michigan DNRs have had completed and adequate wolf management plans in place since 2001.  Reasonably foreseeable post-delisting threats will be addressed by the state plans and will be monitored by the Service in accordance with the post-delisting monitoring plan for five years following delisting.

II.      BACKGROUND

A final rule delisting gray wolves in the WGL DPS was published on April 2, 2009.  This final rule was published in response to a U.S. District Court's September 29, 2008, ruling in favor of plaintiffs that vacated the February 8, 2007, Final Rule to delist the Gray Wolf - WGL DPS and remanded it back to the Service for response to the judge's concerns.  The court asked the Service to provide an explanation of our rationale for identifying and delisting a DPS simultaneously, and the 2009 final rule provided that explanation.

On June 15, 2009, we received a complaint from the Humane Society, Help Our Wolves Live, Born Free USA, and the Center for Biological Diversity, citing failure to request public comment on the April 2, 2009, rule.  The Service agreed with the plaintiffs that additional public review and comment was required under Federal law prior to making that final decision.  On July 1, 2009, a U.S. District Judge signed a settlement agreement that remanded the April 2, 2009, final rule back to the Service to provide an opportunity for the public to comment.

This current proposal includes new information (since the 2007 final rule was published) regarding the status of wolves, and addresses the judge's concern regarding the Service's authority to identify and delist a DPS simultaneously.  In this rule we accept the recently recommended identification of the eastern wolf as a unique species, *Canis lycaon* and that the current and historical population of wolves in the western Great Lakes region consists of an assembly of *C. lupus*, *C. lycaon*, and hybrids between those two species.  Because the wolf entity listed in this area is the same wolf entity that comprises the present-day wolf population in the western Great Lakes region and it is considered to be a single, interbreeding population, we are proposing to delist this biologically recovered population of wolves as *C. lupus.*

002477A

This rule delists an area including the core Midwest wolf population, plus a "dispersal zone" extending roughly 250-300 miles beyond the core area.  We will hold a 60-day public comment period on the proposal.  A 5-year post-delisting monitoring plan was completed in February 2008.

III.     POSITION of INTERESTED PARTIES

The States of Minnesota, Wisconsin, and Michigan (which constitute the core wolf range within the DPS) all have completed wolf management plans that would be implemented following removal from the list.  All three states support removal from the list.

IV.     POTENTIAL ISSUES

The removal of wolves from the protections of the Act has a history of litigation and will undoubtedly always be controversial because of vastly polarized public opinions on the issue.  In this proposal we are accepting the recent change in taxonomic classification for the eastern wolf from a subspecies of *C. lupus* (*C. lupus lycaon*) to a full species *C. lycaon*.  We are also acknowledging that the population of wolves that inhabits the western Great Lakes region is a mixed population of two species and their hybrids.

V.     COMMUNICATIONS AND OUTREACH

Outreach Lead:  Region 3
Media POC:  Press release to be issued by Region 3:  Laura Ragan (612-713-5157); Georgia Parham (812-334-4261 x 1203).
Congressional:  Region 3 will provide press release to Congressional District Offices; FWS CLA, in coordination with DOI OCL, will distribute press release to Members Offices on Hill.
State Contacts:   Regional Office will contact Governor's Office and Director's Office, Michigan Department of Natural Resources, Minnesota Department of Natural Resources, and Wisconsin Department of Natural Resources,.
Other contacts:  Field Offices will contact local partners, local officials and other interested parties.

002478A

# EXHIBIT W

**U.S. DEPARTMENT OF THE INTERIOR**

**Fish and Wildlife Service**

**50 CFR Part 17**

**[FWS-R3-ES-2010-XXXX]**

**[92220-1113-000; ABC Code: C6]**

**RIN 1018-AW41**

**Endangered and Threatened Wildlife and Plants; Proposed Rule To Identify the Western Great Lakes Populations of Gray Wolves as a Distinct Population Segment and To Revise the List of Endangered and Threatened Wildlife**

**AGENCY:**  Fish and Wildlife Service, Interior.

**ACTION:**  Proposed rule.

1

002479A

# EXHIBIT X

AMY KLOBUCHAR
MINNESOTA

COMMITTEES:
AGRICULTURE, NUTRITION,
AND FORESTRY
COMMERCE, SCIENCE,
AND TRANSPORTATION
ENVIRONMENT AND PUBLIC WORKS
JOINT ECONOMIC COMMITTEE
JUDICIARY

# United States Senate

WASHINGTON, DC 20510

December 7, 2010

The Honorable Ken Salazar
Secretary
United States Department of the Interior
1849 C Street Northwest
Washington, DC 20240

Dear Secretary Salazar:

Recently your department announced its support for delisting from the Endangered Species Act (ESA) the northern Rocky Mountains gray wolf. In December 2009, Congressman Jim Oberstar and I wrote to U.S. Fish and Wildlife Service (USFWS) Acting Director Gould requesting he take action to delist the western Great Lakes gray wolf. I write again to urge you to expedite the delisting of the gray wolf in the Great Lakes and inform you that I will be introducing legislation to help speed-up this process.

In the 1950s, the Minnesota's wolf population was estimated at fewer than 750 animals. The ESA plan establishes a minimum population of 1,600 wolves to ensure the long-term survival of the wolf in Minnesota. The most recent estimates of Minnesota's wolf population indicate that there are approximately 3,000 in the state. The increased wolf populations are threatening the citizens of my state as well as our livestock and hunting industries.

The increase in the wolf population also provides strong evidence that the ESA has been successful. Like other endangered species success stories, such as the Bald Eagle, delisting will allow states like Minnesota to implement and enforce their own species protection plans. The Minnesota Department of Natural Resources (DNR) currently has a management plan ready to implement if the U.S. Fish and Wildlife Agency delists the gray wolf from the ESA.

I am confident that the ESA has served its purpose and that the Minnesota DNR is ready and capable of ensuring the continued viability of the western Great Lakes wolf. I look forward to working with you to address this issue in a timely manner. Thank you for your attention to this.

Sincerely,

Amy Klobuchar
U.S. Senator

Cc:     Dan Ashe, Deputy Director, U.S. Fish and Wildlife Service

002732A

EXHIBIT Y

| | |
|---|---|
| **From:** | Lynn M Lewis |
| **To:** | TJ Miller; Laura Ragan; Jason Holm; Georgia Parham |
| **Subject:** | Fw: Follow-up Wolf Meeting |
| **Date:** | 12/07/2010 12:10 PM |

Lynn Lewis
Assistant Regional Director -
 Ecological Services
 U.S. Fish and Wildlife Service
Midwest Region
(612) 713-5345
(612) 713-5292 (fax)
lynn_lewis@fws.gov

----- Forwarded by Lynn M Lewis/R3/FWS/DOI on 12/07/2010 12:10 PM -----

| | | |
|---|---|---|
| **Gary D Frazer/ARL/R9/FWS/DOI** | To | Charles_Wooley@fws.gov, Lynn_Lewis@fws.gov, Marjorie_Nelson@fws.gov, Karen L Anderson/ARL/R9/FWS/DOI@FWS, "Maricela Constantino" <maricela_constantino@fws.gov>, Tom Melius/R3/FWS/DOI@FWS |
| 12/07/2010 01:14 AM | cc | |
| | Subject | Fw: Follow-up Wolf Meeting |

fyi

Gary Frazer
Assistant Director for Endangered Species
Phone: (202)208-4646
Fax: (202)208-5618
Email: Gary_Frazer@fws.gov

----- Forwarded by Gary D Frazer/ARL/R9/FWS/DOI on 12/07/2010 02:10 AM -----

| | | |
|---|---|---|
| **"Levison, Lara" <Lara_Levison@ios.doi.gov>** | To | "Huggler, Matthew" <Matthew_Huggler@fws.gov>, "Faeth, Lori" <Lori_Faeth@ios.doi.gov>, "Bean, Michael" <Michael_Bean@ios.doi.gov>, michaeljbean <michaeljbean@gmail.com>, "Eustis, Christine" <Christine_Eustis@fws.gov>, "Frazer, Gary D" <gary_frazer@fws.gov> |
| 12/06/2010 01:33 PM | cc | "Ashe, Dan" <Dan_Ashe@fws.gov> |
| | Subject | RE: Follow-up Wolf Meeting |

Thank you.  I won't be able to join you, but I wanted to pass along the following.  Tristan Brown with Sen. Klobuchar called me (and also Megan Kelhart) to request that FWS put out a public statement by the middle of this week saying that the FWS will move to delist the gray wolf.  The

002733A

Senator is sending the Secretary a letter today that will be an updated version of last year's letter, that will urge that the wolf be delisted in 2011. He said, whatever is said about the NRM gray wolf, say the same about Minnesota too.  He also asked for comments on their draft legislation, which he provided to Megan.  I'm sure some of you have gotten this update from Megan, but I wanted to make sure you were all aware of it.


Lara


**From:** Matthew_Huggler@fws.gov [mailto:Matthew_Huggler@fws.gov]
**Sent:** Monday, December 06, 2010 12:53 PM
**To:** Faeth, Lori; Levison, Lara; Bean, Michael; michaeljbean; Eustis, Christine; Frazer, Gary D
**Cc:** Ashe, Dan
**Subject:** Fw: Follow-up Wolf Meeting


All:

Dan and I are scheduled to meet with Senator Klobuchar and her staff today at 4:30pm.  We will probably leave MIB around 4:00pm via taxi.  Let me know if you would like to join us for the meeting.

- Matt

----
Matthew C. Huggler
Chief, Office of Congressional and Legislative Affairs
U.S. Fish and Wildlife Service
4401 N. Fairfax Drive, MS 330
Arlington, VA 22203
(703) 358-2243 (tel)
(202) 460-8402 (cell)
(703) 358-1780 (fax)

email: matthew_huggler@fws.gov

http://laws.fws.gov/
----- Forwarded by Matthew Huggler/ARL/R9/FWS/DOI on 12/06/2010 12:50 PM -----


**Matthew**

**Huggler/ARL/R9/FWS/DOI**

To   Dan Ashe/ARL/R9/FWS/DOI@FWS, "Faeth, Lori" <Lori_Faeth@ios.doi.gov>

002734A

| | |
|---|---|
| 12/06/2010 10:13 AM | cc "Levison, Lara" <Lara_Levison@ios.doi.gov>, "Bean, Michael" <Michael_Bean@ios.doi.gov>, "michaeljbean" <michaeljbean@gmail.com>, Christine Eustis/ARL/R9/FWS/DOI@FWS, "Gary Frazer" <Gary_Frazer@fws.gov>, "Roslyn Sellars" <Roslyn_Sellars@fws.gov>, "Stephanie McFadden" <Stephanie_McFadden@fws.gov> |
| | Subject Follow-up Wolf Meeting **Link** |

All:

Per our discussion last night, we will have a follow-up wolf meeting today at 5:15pm in Dan's office (MIB 3357).

We have reserved the following conference call number/passcode (different than yesterday):

866-556-7057
Passcode: 420129

Talk to you then,

- Matt


This message sent from a wireless blackberry.

---

 **From:** Dan Ashe
 **Sent:** 12/04/2010 12:42 PM EST
 **To:** "Faeth, Lori" <Lori_Faeth@ios.doi.gov>
 **Cc:** "Levison, Lara" <Lara_Levison@ios.doi.gov>; Matthew Huggler; "Bean, Michael" <Michael_Bean@ios.doi.gov>; michaeljbean@gmail.com; Christine Eustis
 **Subject:** Wolf Talk Tomorrow -- 4:45p


Okay, how's this for the ultimate compromise.  4:45p tomorrow.  30 minute call.

002735A

866-653-5882 (passcode/6593039)

Agenda:

What's Up for Monday And Who's on Point:
Finish redrafting legislation in response to comments
Prepare materials to send to each Governor (i.e., what's in this for your state and how it addresses -- or doesn't -- your comments)
Conference Call with MT, ID, and WY Governors (7p/est?/KLS told the Govs 5p/mst)
Pre-brief w/KLS (We need at least 15 minutes, better 30 minutes, to get him ready)

What's Up for Tuesday/Wednesday and Who's on Point:
Meeting w/enviro leaders: what level (i.e., CEO, VP, etc) and what organizations?
Briefing materials:  legislative language; summary; what's in it for you and how it addresses -- or doesn't -- your concerns)
Hill Meetings: who; when?
White House/CEQ?

Other stuff?

Be ready to be quick, so we can limit this to 30 minutes.

Thanks.

Dan.


Dan Ashe
Deputy Director
U.S. Fish and Wildlife Service
1849 C St., NW
Washington, DC  20240
dan_ashe@fws.gov
202.208.4545



"Faeth, Lori"
<Lori_Faeth@ios.doi.gov>


12/04/2010 11:56 AM

To  "Ashe, Dan" <Dan_Ashe@fws.gov>, "Levison, Lara"
<Lara_Levison@ios.doi.gov>

002736A

cc  "Huggler, Matthew" <Matthew_Huggler@fws.gov>, "Bean, Michael"
      <Michael_Bean@ios.doi.gov>

Subject  Re: wolves update

Or 4:30. :)
Lori Faeth
Director Intergovernmental Affairs
202-208-4852

**From**: Dan_Ashe@fws.gov <Dan_Ashe@fws.gov>
**To**: Levison, Lara
**Cc**: Faeth, Lori; Huggler, Matthew; Bean, Michael
**Sent**: Sat Dec 04 11:24:24 2010
**Subject**: Re: wolves update

Okay, how about 4:30p?

Dan Ashe
Deputy Director
U.S. Fish and Wildlife Service
1849 C St., NW
Washington, DC  20240
dan_ashe@fws.gov
202.208.4545

**"Levison, Lara"
<Lara_Levison@ios.doi.gov>**

12/04/2010 11:18 AM

To  "Faeth, Lori" <Lori_Faeth@ios.doi.gov>, "Ashe, Dan"
      <Dan_Ashe@fws.gov>

002737A

cc  "Huggler, Matthew" <Matthew_Huggler@fws.gov>, "Bean, Michael"
      <Michael_Bean@ios.doi.gov>
Subject  Re: wolves update

I may not be able to join you at that time because I have dinner guests. Any time
other than 6-8 pm would be better for me. Sorry about that.
Lara

---

**From**: Faeth, Lori
**To**: Ashe, Dan
**Cc**: Levison, Lara; Huggler, Matthew; Bean, Michael
**Sent**: Sat Dec 04 11:08:11 2010
**Subject**: Re: wolves update

That works!
Lori Faeth
Director Intergovernmental Affairs
202-208-4852

---

**From**: Dan_Ashe@fws.gov <Dan_Ashe@fws.gov>
**To**: Faeth, Lori
**Cc**: Levison, Lara; Huggler, Matthew; Bean, Michael
**Sent**: Sat Dec 04 10:24:02 2010
**Subject**: Re: wolves update

What if we plan to talk tomorrow evening?  Say 7pm?  That way everyone can have
dinner; we can talk together for 30 minutes; then still watch Sunday Night Football, or
whatever else one wants to do before Monday morning jumps up on us.

If this works, let's use this conference line:

866-653-5882  (passcode/6593039)

Dan.

002738A

Dan Ashe
Deputy Director
U.S. Fish and Wildlife Service
1849 C St., NW
Washington, DC  20240
dan_ashe@fws.gov
202.208.4545


**"Faeth, Lori"**
**<Lori_Faeth@ios.doi.gov>**


12/04/2010 10:10 AM

|  | |
|---|---|
| To | "Ashe, Dan" <Dan_Ashe@fws.gov>, "Levison, Lara" <Lara_Levison@ios.doi.gov> |
| cc | "Huggler, Matthew" <Matthew_Huggler@fws.gov>, "Bean, Michael" <Michael_Bean@ios.doi.gov> |
| Subject | Re: wolves update |

I can make anytime work as well. That said, would appreciate our nailing down a time today so I can plan my tomorrow.
Lori Faeth
Director Intergovernmental Affairs
202-208-4852

---

**From**: Dan_Ashe@fws.gov <Dan_Ashe@fws.gov>
**To**: Levison, Lara
**Cc**: Faeth, Lori; Huggler, Matthew; Bean, Michael
**Sent**: Sat Dec 04 09:11:04 2010
**Subject**: Re: wolves update

002739A

No negotiations over the weekend.  Just receiving comments.  However, we might want to caucus, on the phone, tomorrow afternoon, to compare notes and line things up for Monday.

I can be available anytime.

Dan.

Dan Ashe
Deputy Director
U.S. Fish and Wildlife Service
1849 C St., NW
Washington, DC  20240
dan_ashe@fws.gov
202.208.4545

**"Levison, Lara"
<Lara_Levison@ios.doi.gov>**

12/04/2010 08:33 AM

To  "Bean, Michael" <Michael_Bean@ios.doi.gov>, "Ashe, Dan"
    <Dan_Ashe@fws.gov>, "Huggler, Matthew" <Matthew_Huggler@fws.gov>,
    "Faeth, Lori" <Lori_Faeth@ios.doi.gov>

cc

Subject  Fw: wolves update

See below - do we expect there to be "negotiations" over the weekend, or simply to be recipients of text and suggestions from the Governors' staffs?

002740A

Lara

---

**From**: Wilkins, Paul (Baucus) <Paul_Wilkins@baucus.senate.gov>
**To**: Levison, Lara
**Sent**: Sat Dec 04 07:29:46 2010
**Subject**: Re: wolves update

Hi Lara,

Thanks again for sharing this with me. Please keep me updated as to any developments in the Secretary's negotiations with the Governors over the weekend.

As to our efforts in the Senate. If Wyoming will agree to this language, we will need your and the Secretaries help with Senator Feinstein and her Interior Appropriations staff. To date they have been unwilling to include any language.

Thanks,

Paul

**From**: Levison, Lara [mailto:Lara_Levison@ios.doi.gov]
**Sent**: Thursday, December 02, 2010 07:46 PM
**To**: Wilkins, Paul (Baucus)
**Subject**: RE: wolves update

Hi, Paul,

Here's the current draft.  Please do not share it outside your office.  There is no agreement yet, so this could change.

Lara

**Summary:  Provides statutory authority for the Secretary to delist the entire Northern Rocky Mountain distinct population segment of gray wolf, on the basis of satisfactory plans from Montana, Idaho and Wyoming.  In the absence of a Wyoming plan, provides authority for the Secretary to continue wolf management in Wyoming until the State submits and the Secretary approves a Wyoming plan.**

002741A

**A BILL**

To remove the Northern Rocky Mountain distinct population segment of the gray wolf from the list of threatened species or the list of endangered species published under the Endangered Species Act of 1973, and for other purposes.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

**SECTION 1. SHORT TITLE.**

This Act may be cited as the `Restoring State Wildlife Management Act of 2010'.

**SEC. 2. STATUS OF THE NORTHERN ROCKY MOUNTAIN DISTINCT POPULATION SEGMENT OF GRAY WOLF AS ENDANGERED OR THREATENED SPECIES.**

(a) Definitions- In this section:

(1)  NORTHERN ROCKY MOUNTAIN DISTINCT POPULATION SEGMENT OF GRAY WOLF – The term "Northern Rocky Mountain distinct population segment of gray wolf" means the distinct population segment described by the U.S. Fish and Wildlife Service in the April 2, 2009 Final Rule to Identify the Northern Rocky Mountain Population of Gray Wolf as a Distinct Population Segment and to Revise the List of Endangered and Threatened Wildlife (74 FR 15123-15188).

(2)   ACT – The term 'Act' means the Endangered Species Act of 1973, as amended (16 U.S.C. 1531 et seq.).(3) SECRETARY- The term `Secretary' means the Secretary of the Interior.

(b) Status of Northern Rocky Mountain Distinct Population Segment of Gray Wolf-

(1) IN GENERAL - Except as provided by section 2(c), any gray wolf, while in the area encompassed by the Northern Rocky Mountain distinct population segment of gray wolf, shall not be subject to the provisions of the Act.

(2) EFFECTIVE DATE- Subparagraph (b)(1) shall take effect on the date on which the Secretary publishes a notice in the Federal Register certifying that the Secretary  has, in his or her sole discretion, approved management plans providing for the long-term maintenance of the Rocky Mountain distinct population segment of the gray wolf in a condition that would not meet the definition of either a threatened species or an endangered species with respect to the States of Idaho, Montana, and Wyoming.

(3) MANAGEMENT IN LIEU OF APPROVED STATE MANAGEMENT PLAN FOR WYOMING -- Until such time that the State of Wyoming submits a plan for the management of the Rocky Mountain distinct population segment of gray wolves in the State of Wyoming that is approved by the Secretary, the Secretary shall continue to have management responsibility

over gray wolves in the State of Wyoming, and is hereby authorized to develop and approve a plan for management of gray wolves in the State and to publish such regulations as are necessary for plan implementation.  Any plan developed and approved by the Secretary shall be designed to maintain wolf numbers, distribution, and dispersal capability in the State of Wyoming so as to avoid the need to consider returning wolves within the area encompassed by the Northern Rocky Mountain distinct population segment of gray wolf to the list of endangered or threatened species and may, to the extent consistent with the foregoing, allow both lethal and non-lethal take of wolves when the Secretary determines such control is appropriate, including, but not limited to, control to defend private property, such as livestock and pets, and control to address unacceptable impacts to wild ungulate populations.  Any violation of this plan, or of the regulations promulgated to implement it, shall be a violation of the Endangered Species Act and be subject to the penalties and enforcement provisions of Section 11 of the Act.

        (c) Monitoring and Authority to Re-List –
(1) Consistent with the provisions of section 4(g) of the Act, the Secretary shall monitor the status of the Northern Rocky Mountain distinct population segment of the gray wolf for a period of not less than 3 years.  The Secretary shall initiate a review at any time, pursuant to section 4 of the Act, if the Secretary determines that changes in State law or management objectives would significantly increase the threat to gray wolves in the Northern Rocky Mountain distinct population segment of the gray wolf.
(2) The species subject to the review initiated by the Secretary pursuant to subsection 2(c)(1) shall be the Northern Rocky Mountain distinct population segment of the gray wolf and, if a proposed rule to return this species to the list of threatened or endangered species is found to be warranted, the provisions of section 4 of the Act shall apply without limitation.

**From:** Wilkins, Paul (Baucus)  [mailto:Paul_Wilkins@baucus.senate.gov]
**Sent:** Thursday, December 02, 2010 7:43 PM
**To:** Levison, Lara
**Subject:** Re: wolves update

Lara,

This is really helpful. I appreciate it. Can you tell me how WY would be treated under the contours of the plan?

Thanks,

Paul

002743A

**From**: Levison, Lara [mailto:Lara_Levison@ios.doi.gov]
**Sent**: Thursday, December 02, 2010 07:23 PM
**To**: Wilkins, Paul (Baucus)
**Subject**: wolves update

Hi, Paul,

I just left you a voice message.  I wanted to let you know that the Secretary and Governors had a good conversation this evening.  The Governors wanted more time to think about it. There is going to be another call on Monday.

When I receive the latest version of the legislative language, hopefully in the next few minutes, I will forward it to you.  Until then I will be at my desk if you would like to talk.

Lara
202-208-6340

# EXHIBIT Z



# United States Department of the Interior

OFFICE OF THE SECRETARY
Washington, DC  20240

DEC 0 9 2010

Honorable Amy Klobuchar
United States Senate
Washington, D.C.  20510

Dear Senator Klobuchar:

Thank you for your letter of December 7, 2010, regarding delisting the Western Great Lakes population of gray wolves from the Endangered Species Act.  The U.S. Fish and Wildlife Service (Service) appreciates hearing your views on this important wildlife conservation issue.

The recovery of the gray wolf in the Western Great Lakes is a remarkable success story.  When it was listed as endangered in 1974, the species had almost disappeared from the continental United States.  In 1978, wolves in Minnesota were classified as threatened.  Gray wolves in Minnesota and the Western Great Lakes area have now exceeded recovery goals and continue to thrive thanks to commitment from the States.

The Service issued a rule in April 2009 to remove gray wolves in the Western Great Lakes from the list of threatened and endangered species.  However, this decision to delist was litigated in District Court.  The Court found procedural flaws in the delisting process and overturned the decision, directing the Service to address the Court's concerns.

Currently, we are working to publish, by April 2011, a proposed rule to delist the wolf.  We aim to publish a final determination by the end of 2011.  I assure you that returning management of recovered species to the States remains a top priority for the Department.

Sincerely,

Thomas L. Strickland
Assistant Secretary for Fish and Wildlife and Parks

Senator -
Please contact me if you have further questions.
Best,
Tom

002769A

EXHIBIT AA

| From: | Jason Holm |
|---|---|
| To: | Laura Ragan; Georgia Parham; Charles Traxler; Lynn M Lewis |
| Cc: | Charles Wooley; Ryan Aylesworth |
| Subject: | Fw: FYI: gray wolf letter |
| Date: | 12/09/2010 09:04 AM |

Pls don't forward.  Current wolf status.    DOI is delivering a letter to Sen. Klobachar today, and she'll announce (today or Friday) that FWS will be delisting WGL in 2011.

Jason D. Holm
Assistant Regional Director, External Affairs
U.S. Fish & Wildlife Service, Midwest Region
1 Federal Drive, Fort Snelling, MN 55111
612-713-5310

http://www.fws.gov/midwest



----- Forwarded by Jason Holm/R3/FWS/DOI on 12/09/2010 09:02 AM -----

| "Lee-Ashley, Matt" <Matt_Lee-Ashley@ios.doi.gov> | To | "Huggler, Matthew" <Matthew_Huggler@fws.gov>, "Eustis, Christine" <Christine_Eustis@fws.gov> |
|---|---|---|
| 12/09/2010 08:59 AM | cc | "Vickery, Hugh B" <Hugh_Vickery@ios.doi.gov>, "Holm, Jason" <Jason_Holm@fws.gov>, "Montoya, Jordan" <Jordan_Montoya@ios.doi.gov>, "Kelly, Kate P" <Kate_Kelly@fws.gov>, "Barkoff, Kendra" <Kendra_Barkoff@ios.doi.gov> |
| | Subject | RE: Fw: FYI: gray wolf letter |

I just relayed to our congressional affairs folks that if the Senator is making  a statement today, our letter should go today.  Otherwise, we need to ask the Senator to hold off until she has the letter in hand.

It sounds like this is close to final, so if at all possible, let's try to push it out the door today.

That work?

**From:** Matthew_Huggler@fws.gov [mailto:Matthew_Huggler@fws.gov]
**Sent:** Thursday, December 09, 2010 9:58 AM
**To:** Eustis, Christine
**Cc:** Vickery, Hugh B; Holm, Jason; Montoya, Jordan; Kelly, Kate P; Barkoff, Kendra; Lee-Ashley, Matt
**Subject:** Re: Fw: FYI: gray wolf letter

Christine,

I shared our draft response with Tristan already.  He called this morning and said "it looks great."  So we are in good shape there.

- Matt

----
Matthew C. Huggler
Chief, Office of Congressional and Legislative Affairs
U.S. Fish and Wildlife Service
4401 N. Fairfax Drive, MS 330
Arlington, VA 22203
(703) 358-2243 (tel)
(202) 460-8402 (cell)
(703) 358-1780 (fax)

email: matthew_huggler@fws.gov

http://laws.fws.gov/


**Christine**
**Eustis/ARL/R9/FWS/DOI**

|  |  |
|---|---|
| 12/09/2010 09:46 AM | To Kendra_Barkoff@ios.doi.gov, kate_kelly@ios.doi.gov, Matt_Lee-Ashley@ios.doi.gov, Jordan_Montoya@ios.doi.gov, Hugh_Vickery@ios.doi.gov |
|  | cc Jason Holm/R3/FWS/DOI@FWS, Matthew_Huggler@fws.gov |
|  | Subject Fw: FYI: gray wolf letter |


FYI - Senator Klobaucher will announce that we're seeking to delist wolves in the Great Lakes.  We plan to sign a letter to her by Friday

Matt Huggler - Dan asked if you could send Tristan our draft response (per the

Secretary's request).

Christine Eustis
Acting Assistant Director
External Affairs
Main Interior
Washington, DC
202) 513-7733 (direct)
202) 208-6541(general)
703) 343-3939 (cell)
----- Forwarded by Christine Eustis/ARL/R9/FWS/DOI on 12/09/2010 09:42 AM -----

**Dan Ashe/ARL/R9/FWS/DOI**

12/09/2010 09:35 AM

| | |
|---|---|
| To | Matthew Huggler/ARL/R9/FWS/DOI@FWS |
| cc | christine_eustis@fws.gov, "Megan Kelhart" <megan_kelhart@fws.gov> |
| Subject | Re: Fw: FYI: gray wolf letter Link |

I'm fine with it.  Please let Matt Lee-Ashely and Kendra know.

Dan Ashe
Deputy Director
U.S. Fish and Wildlife Service
1849 C St., NW
Washington, DC  20240
dan_ashe@fws.gov
202.208.4545

**Matthew Huggler/ARL/R9/FWS/DOI**

002772A

12/09/2010 09:10 AM

To   Dan Ashe/ARL/R9/FWS/DOI@FWS

cc   christine_eustis@fws.gov, "Megan Kelhart" <megan_kelhart@fws.gov>

Subject   Fw: FYI: gray wolf letter

Dan -

Are you comfortable with Senator Klobuchar making the statement directly below today, likely before they receive our letter?  It seems harmless to me since it does not have a date and we will always seek to remove wolves from ESA everywhere.

Please advise,

- Matt

----
Matthew C. Huggler
Chief, Office of Congressional and Legislative Affairs
U.S. Fish and Wildlife Service
4401 N. Fairfax Drive, MS 330
Arlington, VA 22203
(703) 358-2243 (tel)
(202) 460-8402 (cell)
(703) 358-1780 (fax)

email: matthew_huggler@fws.gov

http://laws.fws.gov/
----- Forwarded by Matthew Huggler/ARL/R9/FWS/DOI on 12/09/2010 09:09 AM -----

"Brown, Tristan (Klobuchar)"
<Tristan_Brown@klobuchar.senate.gov>

002773A

12/09/2010 09:00 AM

|   |   |
|---|---|
| To | "'Levison, Lara'" <Lara_Levison@ios.doi.gov>, "Huggler, Matthew" <Matthew_Huggler@fws.gov> |
| CC | "Kelhart, Megan" <megan_kelhart@fws.gov> |
| Subject | RE: FYI: gray wolf letter |

Are you ok with our announcing in MN "the U.S. Fish and Wildlife Service will seek to remove the Great Lakes gray wolf from the Endangered Species Act (ESA) list in Minnesota and western Great Lakes states"?

Thanks
_____
**Tristan Brown**
Office of U.S. Senator Amy Klobuchar
302 Hart Senate Office Building
Washington, DC  20510
202.224.3244  |  www.klobuchar.senate.gov

---

**From:** Levison, Lara [mailto:Lara_Levison@ios.doi.gov]
**Sent:** Thursday, December 09, 2010 8:39 AM
**To:** Huggler, Matthew; Brown, Tristan (Klobuchar)
**Cc:** Kelhart, Megan
**Subject:** RE: FYI: gray wolf letter

Hi, Tristan,

We couldn't begin the formal review process till we received Senator Klobuchar's letter, but we are using an expedited review process, and as Matt said, we aim to have it to you this

002774A

week.

Lara



Lara Levison
Deputy Director
Office of Congressional and Legislative ...

Department of the Interior
1849 C St. NW
Washington, DC  20240

(202) 208-6340
Lara_Levison@ios.doi.gov

**From:** Matthew_Huggler@fws.gov [mailto:Matthew_Huggler@fws.gov]
**Sent:** Thursday, December 09, 2010 8:11 AM
**To:** Brown, Tristan (Klobuchar)
**Cc:** Levison, Lara; Kelhart, Megan
**Subject:** Re: FYI: gray wolf letter


Tristan,

We have a draft and we're expediting it through our review process and hope to have
something by the end of the week as planned.  I will make sure to give you an update
on where we are tomorrow, and of course will email you a copy as soon as it is
signed.

- Matt

----
Matthew C. Huggler
Chief, Office of Congressional and Legislative Affairs
U.S. Fish and Wildlife Service
4401 N. Fairfax Drive, MS 330
Arlington, VA 22203
(703) 358-2243 (tel)
(202) 460-8402 (cell)
(703) 358-1780 (fax)

email: matthew_huggler@fws.gov

http://laws.fws.gov/


"Brown, Tristan (Klobuchar)"
<Tristan_Brown@klobuchar.senate.gov>


12/08/2010 07:15 PM

To  "'Lara_Levison@ios.doi.gov'" <Lara_Levison@ios.doi.gov>,
    "'Matthew_Huggler@fws.gov'" <Matthew_Huggler@fws.gov>,
    "'megan_kelhart@fws.gov'" <megan_kelhart@fws.gov>

cc

Subject  Re: FYI: gray wolf letter

Hey y'all,

My boss wanted to check about a response from you tomorrow.

Thanks!

Tristan

**From**: Levison, Lara [mailto:Lara_Levison@ios.doi.gov]
**Sent**: Tuesday, December 07, 2010 02:29 PM
**To**: Huggler, Matthew <Matthew_Huggler@fws.gov>; Brown, Tristan (Klobuchar);
Kelhart, Megan <megan_kelhart@fws.gov>
**Subject**: RE: FYI: gray wolf letter

Hi, Tristan,

Have you sent us the final letter yet?  We can't really get a response rolling until we get a letter from your boss.

If the letter is still being finalized, could you make this change to the letter (below)?  We advise against implying that wolves are threatening humans.

Thanks,

Lara

**Lara Levison**
Deputy Director
Office of Congressional and Legislative ...

Department of the Interior
1849 C St. NW
Washington, DC  20240

(202) 208-6340
Lara_Levison@ios.doi.gov

**From:** Matthew_Huggler@fws.gov [mailto:Matthew_Huggler@fws.gov]
**Sent:** Tuesday, December 07, 2010 7:29 AM
**To:** Brown, Tristan (Klobuchar); Kelhart, Megan; Levison, Lara
**Subject:** Re: FYI: gray wolf letter


Thanks Tristan.  Is it possible to soften the language somewhat, i.e. something like:

"The escalating wolf population is causing concerns among Minnesota citizens, the livestock industry and the hunting community."

- Matt


This message sent from a wireless blackberry.

---


  **From:** "Brown, Tristan (Klobuchar)" [Tristan_Brown@klobuchar.senate.gov]
**Sent:** 12/06/2010 06:48 PM EST
**To:** Matthew Huggler; Megan Kelhart; "'Levison, Lara'" <Lara_Levison@ios.doi.gov>
**Subject:** FYI: gray wolf letter

Here's what we plan to send tomorrow.

Additionally, we'd certainly appreciate technical advice on the bill we discussed in the meeting today.

Thanks and best,
Tristan


December 7, 2010

002777A

The Honorable Ken Salazar
Secretary
United States Department of the Interior
1849 C Street Northwest
Washington, DC 20240

Dear Secretary Salazar:

Recently, your department announced its intentions to delist from the Endangered Species
Act (ESA) the northern Rocky Mountains gray wolf.  In December 2009, I wrote to U.S. Fish
and Wildlife Service (USFWS) Acting Director Gould requesting the he take action to delist
the western Great Lakes gray wolf.  I write again to urge you to expedite the delisting of the
gray wolf in the Great Lakes and inform you that I will be introducing legislation to help
speed-up this process.

In the 1950s, the Minnesota's wolf population was estimated at fewer than 750 animals. The
ESA plan establishes a minimum population of 1,600 wolves to ensure the long-term
survival of the wolf in Minnesota. The most recent estimates of Minnesota's wolf population
indicate that there are approximately 3,000 in the state.  The increased wolf populations are
threatening the citizens of my state as well as our livestock and hunting industries.

The increase in the wolf population also provides strong evidence that the ESA has been
successful.  Like other endangered species success stories, such as the Bald Eagle, delisting
will allow states like Minnesota to implement and enforce their own species protection plans.
The Minnesota Department of Natural Resources (DNR) currently has a management plan
ready to implement if the U.S. Fish and Wildlife Agency delists the gray wolf from the
ESA.

I am confident that the ESA has served its purpose and that the Minnesota DNR is ready and
capable of ensuring the continued viability of the western Great Lakes wolf. I look forward
to working with you to address this issue in a timely manner.  Thank you for your attention to
this.

Sincerely,

Amy Klobuchar
U.S. Senator

Cc:     Dan Ashe, Deputy Director

002778A

U.S. Fish and Wildlife Service

_____

**Tristan Brown**
Office of U.S. Senator Amy Klobuchar
302 Hart Senate Office Building
Washington, DC  20510
202.224.3244  |  www.klobuchar.senate.gov

# EXHIBIT BB

| From: | Lynn M Lewis |
|---|---|
| To: | Jack Dingledine |
| Cc: | Laura Ragan; Louise Clemency; TJ Miller; Tony Sullins |
| Subject: | Re: Wolf |
| Date: | 12/10/2010 03:08 PM |

State Directors have not been contacted (though I'd guess that MN is aware and maybe the others).  Tom M. will send the news release to the Directors this afternoon as an FYI.

I'll also forward to you the notification that Tim Patronski sent to the tribes.

Lynn Lewis
Assistant Regional Director -
 Ecological Services
 U.S. Fish and Wildlife Service
Midwest Region
(612) 713-5345
(612) 713-5292 (fax)
lynn_lewis@fws.gov

▼ Jack Dingledine/R3/FWS/DOI

| | | | |
|---|---|---|---|
| **Jack Dingledine/R3/FWS/DOI** | To | Lynn M Lewis/R3/FWS/DOI@FWS | |
| 12/10/2010 03:02 PM | cc | Laura Ragan/R3/FWS/DOI@FWS, Louise Clemency/R3/FWS/DOI@FWS, TJ Miller/R3/FWS/DOI@FWS, Tony Sullins/R3/FWS/DOI@FWS | |
| | Subject | Re: Wolf | |

Thank you, Lynn.

Laura did a good job of updating us on some of this earlier in the week.  I came away from that call with the understanding this action would be kept under wraps for awhile.  Can we assume that the state agency directors have been contacted in advance of the news release?

Jack Dingledine
Deputy Field Supervisor
U.S.Fish and Wildlife Service
East Lansing Field Office
2651 Coolidge Road
East Lansing, MI 48823
(517) 351-6320
jack_dingledine@fws.gov

▼ Lynn M Lewis/R3/FWS/DOI

**Lynn M**

002821A

| Lewis/R3/FWS/DOI | To | Tony Sullins/R3/FWS/DOI@FWS, Louise Clemency/R3/FWS/DOI@FWS, Jack Dingledine/R3/FWS/DOI@FWS |
|---|---|---|
| 12/10/2010 03:24 PM | cc | TJ Miller/R3/FWS/DOI@FWS, Laura Ragan/R3/FWS/DOI@FWS |
| | Subject | Wolf |

Tony, Louise, and Jack:

Lots happening with the wolf.  Want to keep you in the loop.

We were directed about 2 weeks ago to have a draft rule to delist the wolf into DC by last Friday.  Laura worked her magic and mission was accomplished.

This week we learned that Senator Amy Klobuchar (D-MN) was going to introduce legislation to delist the wolf in the western Great Lakes.  Instead, Secretary Salazar agreed that we would have a proposed rule published by April and a final rule completed by the end of 2011 (that presumably would delist WGL wolves).  We've been working a schedules, strategies, and staff needs to accomplish this.

The attached documents give you a little bit of background.  Stay tuned; I'm sure we'll get going in ernest next week.

Lynn Lewis
Assistant Regional Director -
  Ecological Services
 U.S. Fish and Wildlife Service
Midwest Region
(612) 713-5345
(612) 713-5292 (fax)
lynn_lewis@fws.gov

[attachment "klobuchar.docx" deleted by Jack Dingledine/R3/FWS/DOI] [attachment "Midwest_NR_wolf_Dec10_2010.pdf" deleted by Jack Dingledine/R3/FWS/DOI] [attachment "Klobuchar letter.pdf" deleted by Jack Dingledine/R3/FWS/DOI]

# EXHIBIT CC

| From: | Maricela Constantino |
|---|---|
| To: | Laura Ragan |
| Subject: | Re: Potential strategy for wolf proposal |
| Date: | 12/14/2010 04:00 PM |

Laura, I saw that April reference too.  I'll check into this and get back to you with what I find.

Just a quick note -  I'm not sure that delisting C. lupus in the lower 48 states and Mexico due to error is going to be an option for the March proposed rule since we have been told that it needs to be finalized in Dec 2011.  I don't think (although I guess anything is possible) that the western regions will have proposed and be ready to finalize actions for the western portion of the range by Dec 2011.  If this is the case then finalizing a delist due to error for lower 48 and Mexico would remove protections for areas that we believe still need them.

I'll be on travel to WO tomorrow.  I'll be working Thurs/Fri at Arlington Sq so will find out as much as I can about the current plans and get back to you soon after.

Maricela

_____
Maricela A. Constantino
U.S. Fish and Wildlife Service - Washington Office (R9)
Endangered Species, Branch of Recovery and Delisting
Remotely located at:
5398 Longwood Road
Huntington, WV 25705
571-969-9804 (phone)


▼ Laura Ragan/R3/FWS/DOI

| | | | |
|---|---|---|---|
| **Laura Ragan/R3/FWS/DOI** | To | Maricela Constantino/ARL/R9/FWS/DOI@FWS | |
| | cc | | |
| 12/14/2010 04:45 PM | Subject | Re: Potential strategy for wolf proposal  | |


Maricela -
Thanks for your thoughts on this.  You had a couple questions to which I can respond.

First, I used an April 15th date to the FR because the recent news release spoke of an April date.  Not sure if there have been any discussions about that, but that is way I used that date.

Secondly, you asked about delisting in areas where suitable habitat does not exist.  Although it has been a while since I have seen the maps outlining the range of C. lycaon, there are areas in the east that

002831A

are outside the WGL DPS, but still C. lupus range (e.g. parts of MO, IA).  If we end up not identifying a WGL DPS, but as Mary suggested in her comments on the comprehensive strategy, delist the current entity due to error and replace it with what should be listed (removing wolves in WGL area due to recovery and not defining a DPS), this won't be an issue (although our SPR discussion would need to be revised).  Otherwise, we will need to talk about those MO/IA, etc. areas.

Third, as far as who in R5 I had in mind for the C. lycaon portion, off the top of my head I would say Krishna or Michael Ameral (if Mary indeed does fill in for you), but I don't want to determine for them who they might want to have work on it.  We have someone in mind in our Region who we think could be the primary Service coordinator, but she would need to have a contact in R5.

-Laura

▼ Maricela Constantino/ARL/R9/FWS/DOI

| Maricela Constantino/ARL/R9/FWS/DOI | To | Laura Ragan/R3/FWS/DOI@FWS |
|---|---|---|
| | cc | |
| 12/14/2010 02:36 PM | Subject | Re: Potential strategy for wolf proposal 🖼 |

My initial thoughts on your strategy - good idea to write this out. [attachment "Components of Rule.mc comments.doc" deleted by Laura Ragan/R3/FWS/DOI]
_____
Maricela A. Constantino
U.S. Fish and Wildlife Service - Washington Office (R9)
Endangered Species, Branch of Recovery and Delisting
Remotely located at:
5398 Longwood Road
Huntington, WV 25705
571-969-9804 (phone)


▼ Laura Ragan/R3/FWS/DOI

| Laura Ragan/R3/FWS/DOI | To | Maricela Constantino/ARL/R9/FWS/DOI@FWS |
|---|---|---|
| | cc | |
| 12/14/2010 03:07 PM | Subject | Potential strategy for wolf proposal |

Maricela -

I wrote up my thoughts on a strategy for divvying up the work that needs to be done on the proposed rule.  This is just me brainstorming about how we might get the work done.  Do you have any thoughts to share?

-Laura

[attachment "Components of Rule.doc" deleted by Maricela Constantino/ARL/R9/FWS/DOI]

# EXHIBIT DD

| | |
|---|---|
| **From:** | Lynn M Lewis |
| **To:** | TJ Miller; Laura Ragan |
| **Subject:** | Fw: Wolf delisting |
| **Date:** | 12/22/2010 11:36 AM |

Lynn Lewis
Assistant Regional Director -
 Ecological Services
 U.S. Fish and Wildlife Service
Midwest Region
(612) 713-5345
(612) 713-5292 (fax)
lynn_lewis@fws.gov
----- Forwarded by Lynn M Lewis/R3/FWS/DOI on 12/22/2010 11:36 AM -----

| **Patrick Leonard/R4/FWS/DOI** | | |
|---|---|---|
| | To | Lynn M Lewis/R3/FWS/DOI@FWS |
| | cc | Paul Phifer/R5/FWS/DOI@FWS |
| 12/22/2010 11:19 AM | Subject | Re: Wolf delisting |

Of course we're ready to help, but I assume you're talking mostly about this item:

1)  Delisting Due to Error (outside historical range of C. lupus in SE and NE) and due to non-suitable habitat.

Who:  R5 (we would recommend Krishna Gifford or Michael Amaral) and R4 (we would recommend David Rabon)

Method:  R5 and R4 review past actions that delisted due to error (as examples) and draft language for the proposal.  R3 and WO-BRD review and provide comments to R4/R5.

and I'm not sure it's realistic to expect to settle the question of the historic range of C lupus by the beginning of february (and to tell the truth, I doubt R4 and R5 are the right people to lead that; the real question is, what was the historic range of C lupus, and let the "what wasn't" fall off; we can't try to prove the negative instead.)

I'm not sure exactly what was promised to the Senator, but my thought would be to **just** meet that promise, no more, by this deadline, and at this point not try to include all the things we'd like to do now too. I'd actually be surprised if the WO felt different; early February is on us way too fast. Though it will be interesting to hear what the SOLs have to say.

I hope you both have a nice christmas and happy new year!

002846A

p.l.

▼ Lynn M Lewis/R3/FWS/DOI

| | | |
|---|---|---|
| **Lynn M Lewis/R3/FWS/DOI** | To | Paul Phifer/R5/FWS/DOI@FWS, Patrick Leonard/R4/FWS/DOI@FWS |
| | cc | |
| 12/22/2010 10:52 AM | Subject | Wolf delisting |

Paul and Patrick:

As you've no doubt heard, the Service committed to Senator Amy Klobuchar (D-MN) to delist (presumably) Western Great Lakes wolves by the end of 2011 (draft rule to be published by April 15).  We've worked out a proposed schedule (attached) for getting the work done.  We've sent it to Gary in staff in DC but haven't heard anything from them.  We've also heard that solicitors are drafting a paper on why this won't work (so tell us what will work, already).  So, this is a heads up that we will likely be coming to you and asking for assistance as we put the draft rule together.

Thanks in advance for your help.

Happy holidays!

Lynn Lewis
Assistant Regional Director -
 Ecological Services
 U.S. Fish and Wildlife Service
Midwest Region
(612) 713-5345
(612) 713-5292 (fax)
lynn_lewis@fws.gov

002847A

# EXHIBIT EE

**U.S. DEPARTMENT OF THE INTERIOR**

**Fish and Wildlife Service**

**50 CFR Part 17**

**[FWS-R3-ES-2010-XXXX]**

**[92220-1113-000; ABC Code: C6]**

**RIN 1018-AW41**

> Comment [m1]: I'm requesting a new RIN for this action. I'll forward the # to you when I get it.

**Endangered and Threatened Wildlife and Plants; Proposed Rule To Identify the Western Great Lakes Populations of Gray Wolves as a Distinct Population Segment and To Revise the List of Endangered and Threatened Wildlife**

> Comment [m2]: This title will need to be edited to reflect the decision to include the comprehensive plan and possibly other proposed rulemakings.

**AGENCY:** Fish and Wildlife Service, Interior.

**ACTION:** Proposed rule.

1

002849A

For a discussion of the biology and ecology of gray wolves and general recovery planning efforts, see the proposed WGL wolf rule published on March 27, 2006, (71 FR 15266-15305) and available on our World Wide Web site.

**Taxonomy of Wolves in the Western Great Lakes Region**

Comment [m7]: In the event that we incorporate the comprehensive wolf plan into this proposed rule I believe that we would move this entire section into an earlier section that addresses the validity of the currently listed entity.  Then the issue of WGL taxonomy and how we intend to deal with it could mostly be resolved before you even get into the discussion of determining the conservation status of a WGL DPS.  We can discuss if you have concerns about this approach.

The taxonomic status of the wolf in the WGL region has long been debated.  It has been considered a subspecies of gray wolf, *Canis lupus lycaon* (Nowak 1995, 2002, 2003); a full species, *C. lycaon* (Wilson *et al.* 2000, Baker *et al.* 2003); the same species as the red wolf, *C. rufus* (Wilson *et al.* 2000); the result of hybridization between *C. rufus* and *C. lupus* (Nowak 2002, 2003, 2009), and, most recently, as a mixed population if *C. lupus*, *C. lycaon* , and their intercrosses (e.g., Weeldon and White 2009, Fain *et al.* 2010, Weeldon *et al.* 2010).  The taxonomic classification was previously based on morphology and phenotypic variation, but recent molecular techniques are resulting in additional information about the evolutionary history of wolves in the WGL region (Weeldon *et al.* 2010, p. 1). In light of this debate, the taxonomy of wolves in the WGL region warrants discussion in this proposed rule.

The Endangered Species Act (Act; 16 U.S.C. 1531 *et seq.*) adopts a novel definition of the word "species."  "Species" is defined by the Act as including any species or subspecies of fish or wildlife or plants, and any distinct vertebrate population segment of fish or wildlife that interbreeds when mature (16 U.S.C. 1532(16)).  It has not been uncommon in the years since the Act was passed for significant controversy to arise over the propriety of recognizing various groups of organisms as eligible for protection under

7

002855A

~~the Act.  Our implementing regulations (50 CFR §424.11) require us to use standard~~

~~taxonomic distinctions (such as species and subspecies) when they are available, clearly~~

~~defined, and generally accepted.  In determining that a taxonomic entity qualifies as a~~

~~species or subspecies we will carefully evaluate the best available taxonomic information~~

~~to determine whether we have sufficient information to conclude that a taxonomic entity~~

~~qualifies as a species under the Act.~~

The complexity of sorting out the taxonomy of wolves in the WGL region is aptly summarized by Schwartz and Vucetich (2009, p. 1) when they state, "Historical understandings are complicated by the fact that species distributions ebb and flow over time due to natural and anthropogenic causes, leading to changes in distributions of pure species, historical hybrids, and contemporary hybrids. … Sorting the evolutionary history of these canids that existed pre-European arrival and comparing it to the existing canids around the Great Lakes is no simple task."

Defining the taxonomy of the wolf is complicated by many factors, central among them the facts that 1) the science of taxonomy is a human construct involving many differing conceptual theories and 2) species are not static, nor do they have clearly defined boundaries.  The discussion below outlines these complicating factors, and illustrates why there is such debate as to the taxonomic status of wolves in the WGL region.

Species Concepts

8

002856A

In identifying species, there is not a single set of criteria, and therefore no single species concept that is accepted by all taxonomists.  In 1942, Ernst Mayr identified five different species concepts (Mayr 1942), and many more have been recognized since then (Wilkins 2006; 2003; Mayden 1997, pp. 381-384).   Many of these species concepts can be associated with one of two major classes of concepts or approaches.  The first is the biological species concept (BSC).  This concept is based on reproductive relationships among populations.  The ability to interbreed and realize gene flow between two populations is the indication that they belong to the same species.  The concept is most commonly associated with Mayr (1963), but has antecedents during the development of evolutionary biology in the 20th century.  The second major class of concepts is the phylogenetic species concept (PSC).  Under this group of concepts, species are identified by their genealogical (lineages) or phylogenetic (evolutionary) relationships and diagnosability.  The many variations of these concepts and others are reviewed by Wiley (1981), Avise (2004), and Coyne and Orr (2004).

There is, likewise no scientific consensus on what constitutes a subspecies, and some authorities (Wilson and Brown 1953) have questioned the utility of the subspecies level of classification.  Following is a description of various subspecies criteria that have been proposed and applied in the taxonomic literature.  Because some criteria are more stringent than others, a putative, or generally accepted, subspecies may meet the criteria and be recognized following one concept, but found to be invalid under a more stringent concept.

Comment [m8]: Given that we are adopting that wolves in the WGL constitute 2 species do you think this discussion is still necessary?

9

Nowak (1995, p. 394) discussed the standards he used when he revised the

subspecies of *Canis lupus*: "My investigation largely disregarded such questions

[concerning use of very localized characters] and concentrated on general trends in

measurable size and proportion that could be evaluated on a continent-wide or worldwide

basis.  Substantive statistical breaks in such trends, as discussed above, were taken as

evidence of taxonomic division".

In The Mammals of North America, Hall (1981, p. viii) included the following in

his "Criteria for Species versus Subspecies."

> If crossbreeding occurs in nature at a place or places where the geographic ranges
> of two kinds of mammals meet, the two kinds are to be treated as subspecies of
> one species.  If no crossbreeding occurs, the two kinds are to be regarded as two
> distinct, full species.

Mayr (1963, glossary) defined subspecies as, "an aggregate of local populations

of a species inhabiting a geographic subdivision of the range of the species, and differing

taxonomically from other populations of the species."  He further explains "differing

taxonomically" as differing "by diagnostic morphological characters" (Mayr 1963, p.

348).  Mayr (1969, p. 190) also describes a quantitative method for determining whether

populations differ taxonomically:

> A so-called 75-percent rule is widely adopted.  According to this, a
> population is recognized as a valid subspecies if 75 percent of the
> individuals differ from "all" (97 percent) of the individuals of a previously
> recognized subspecies.  At the point of intersection between the two

10

curves where this is true, about 90 percent of population A will be

different from about 90 percent of the individuals of population B (to

supply a symmetrical solution).

Patten and Unitt (2002, p. 27) provide another definition of subspecies as, "diagnosable clusters of populations of biological species occupying distinct geographic ranges."  They do not require that diagnosability be absolute, but advocate 90 percent separation as a more stringent criterion than the 75-percent rule.

Avise (2004, p. 362) attempted to incorporate phylogenetic information within a biological species concept in providing the following guidance on recognizing subspecies:

Within such units [=species], "subspecies" warranting formal recognition could then be conceptualized as groups of actually or potentially interbreeding populations (normally mostly allopatric) that are genealogically highly distinctive from, but reproductively compatible with, other such groups.  Importantly, the empirical evidence for genealogical distinction must come, in principle, from concordant genetic partitions across multiple, independent, genetically based molecular (or phenotypic; Wilson and Brown 1953) traits.

A common feature of all of the above definitions is that they recognize that subspecies are groups of populations, and most recognize that subspecies can be variable and overlap, to some degree, in distinguishing characters.  Taxonomists do not assign an

11

002859A

individual to one subspecies or another, instead individuals are assigned a specific taxonomic classification based on the population in which they exist.

The existence of multiple concepts of species and subspecies is not the only complicating factor in the debate surrounding the classification of organisms; it is further complicated by the way organisms occur in the natural world.  Taxonomists are determined to categorize natural organisms into specific groups and identify and name those groups, while also striving to understand the evolutionary processes that give rise to these specific groups (Hey 2001, pp. 328-329).  When viewed on the ground, a particular organism may appear to clearly fit into one group or another, but when their evolutionary history is viewed, these groups are revealed as changeable and without clear boundaries. In the reverse, individuals may appear different (that is be morphometrically distinct) but in fact be of the same taxon (that is, genetically similar).  In many situations, it is difficult to determine where one species ends and another begins.  This is especially true in wide-ranging species and in the zones where multiple forms (for example, where either two species or two subspecies) contact each other or meet, the ~~latter~~ former of which we believe is the situation with wolves in the WGL region (*Canis lupus ~~nubilis~~* and *Canis ~~lupus~~ lycaon*).  Ultimately, species are evolving, dynamic populations and at times are difficult to categorize.  The ~~structure~~ statutory construct of the Endangered Species Act and its definition of species does not ~~readily lend itself to the kind of flexibility~~recognize or account for the dynamic nature of species taxonomy. ~~to account for all taxonomic factors.  Nevertheless,~~ Congress, through the Act, ~~-~~directs that the Service classify as endangered or threatened, ~~populations as~~ species, subspecies ~~and~~ or DPSs, ~~despite~~

12

the~~without explicit recognition of the~~ difficulty and complexity of various taxonomic concepts.

Techniques for Distinguishing Species

The ability of newer genetic techniques to detect heretofore undetectable variation within and among populations sometimes reveals evidence of past or ongoing incidences of gene flow between populations and species.  Our improved ability to detect evidence of gene flow among populations and species has resulted in a number of situations where applying concepts of species and taxonomic relationships presents challenges.  This is a particular problem with members of the genus *Canis*—wolves, coyotes, and dogs—all of which can interbreed to some extent under certain circumstances and have historically done so. ~~Although there are reasons to believe that interbreeding among the different *Canis* may have been minimal or limited under natural conditions, human-caused or aided habitat alteration, changes in prey species, and persecution of wolf populations have increased the incidence of such interactions.~~ These interactions are detectable in the genetic data, where it can be difficult to distinguish between ancient and contemporary incidences of genetic exchange.

> **Comment [m9]:** Although not impossible?

A variety of techniques and methods have been developed to distinguish species. All attempt to measure variation among individuals in certain characteristics within a given area so that inferences can be made about which or how many species are present and their likely geographic ranges.  Ideally, taxonomic studies should be designed to examine series of individuals that are representative of the variability among individuals as well as the geographic ranges of the populations involved.  In practice, the ideal

13

002861A

situation is often not encountered, owing to logistic difficulties or where taxonomically

relevant information has been gathered for purposes other than a taxonomic evaluation, and thus inferences are made with existing, but incomplete, data sets.

Early applications of Linnaean taxonomy involved identification of diagnostic

characters that distinguished one species from another.  Such characters commonly

included number or size of various visible structures or color patterns.  As taxonomists

began to recognize variation within species, quantitative measures of relevant characters

were developed to describe both within- and between-species variation.  The importance

of non-morphological characters such as behavior also began to be recognized as the

taxonomic importance of such attributes as mating behavior and social structure was

recognized.

More elaborate statistical treatments of measured variation led to morphometric

analyses, such as principal components and discriminant function analysis.  These

techniques involve measuring multiple characters and portraying the results as two- or

three-dimensional plots that represent the overall similarities of the individuals and

populations studied.

Molecular genetic data is now routinely collected or evaluated by many

taxonomists.  Various techniques have been reviewed by Avise (2004, Chapter 3) and

those that have been applied to North American wolves are briefly summarized here.

There is no single "best" technique for all taxonomic questions.  An individual technique

may be more suitable for one type of question than for another.  When collected

following an appropriate sampling design and appropriately evaluated and integrated,

data from these different techniques can provide additional information about the

14

002862A

evolution of populations and species and thereby assist in making taxonomic

interpretations.  ~~Techniques for using variation in certain proteins to quantify genetic~~

~~relationships among populations were developed in the 1960s and were immediately~~

~~applied to taxonomic questions, and are still being used (Mech and Federoff 2002).~~

Studies of variation in mitochondrial DNA (mtDNA) began to appear in the late

1970s and were first applied to wolves by Lehman *et al*. (1991).  Mitochondria are

structures external to the nucleus within plant and animal cells that are involved in energy

metabolism.  They contain DNA that is maternally inherited, and thus gives information

about the history of mother-daughter lineages extending back in time.  As such, it is

sometimes referred to as a lineage marker.  Early studies identified short, scattered

sequences in the mtDNA, but now the characterization of longer, continuous sequences is

routine.  Techniques are also now available for lineage markers for males based on

various DNA sequences on the Y-chromosome, so that father-son lineages can also now

be traced.

A complement to these lineage markers is provided by autosomal microsatellite

DNA.  Autosomes are the chromosomes, other than the sex-determining chromosomes,

within the nucleus of the cell.  Although they generally do not provide important lineage

information, they are useful for quantifying gene flow between populations in contact and

evaluating the extent of any hybridization.


Taxonomic Status of the WGL Wolf

Wolves in Michigan, Wisconsin, and eastern Minnesota were considered by

Goldman (1944, p. 437 and Figure 14) to be within the range of the subspecies *Canis*

15

002863A

*lupus lycaon*.  According to Goldman, this was the subspecies of gray wolf historically found across a wide range east of the Mississippi River in the United States and in southeastern Canada.  Wolves immediately to the west of this range were considered to be part of the subspecies *Canis lupus nubilus*. This taxonomic interpretation was followed by Hall and Kelson (1959, p. 849) and Hall (1981, p. 932).

Nowak's (1995, p. 396; 2003, p. 243) revision of the subspecies taxonomy reduced the range of *C. l. lycaon* to southern Ontario and Quebec and northern portions of New York, Pennsylvania, and Ohio.  He considered gray wolves that historically occupied Michigan, Wisconsin, and Minnesota to be within the range of *C. l. nubilus*. Based on analysis of additional specimens, Nowak (2002, p. 119; 2003; 2009, p. 238) continued to recognize western Great Lakes wolves as *C. l. nubilus*, but noted that historical specimens from the Upper Peninsula (UP) of Michigan were somewhat transitional between the two subspecies.

Based on a study of mtDNA and autosomal microsatellite DNA variation in North American wolves, Wilson *et al.* (2000, p. 2165) proposed that the taxonomic standing of the eastern wolf be restored to full species as *Canis lycaon*.  They considered its geographic range as extending west across the Great Lakes region to Minnesota and Manitoba.

Leonard and Wayne (2007) have reported on the mtDNA variation from 17 historical ("pre-recovery") wolves from Ontario, Quebec, Michigan, and Wisconsin and compared it with that of the recent population of the area.  Their interpretation of these results is that the seven unique haplotypes (DNA sequences or groups of alleles of different genes on a single chromosome that are inherited together as a single unit) that

16

they identified in the 17 historical individuals indicate that the pre-recovery population was "an endemic American wolf," they call "the Great Lakes wolf", which evolved in North America. All but one of the 17 historical individuals had one of these seven haplotypes, but only one of the seven haplotypes has been found in the modern wolf population of the WGL area. They conclude that the modern population does not contain the diversity of haplotypes found in the pre-recovery population and that the current population is a mixed population with the New World Great Lakes wolf, Old World (evolving in Eurasia) *Canis lupus,* and coyote haplotypes.

The spatial representativeness of both the historical and recent samples reported by Leonard and Wayne (2007) has been questioned by Mech (2009). For example, 16 recent but no historical samples from Minnesota were included in the study. Leonard and Wayne (2009) responded that they did not believe that genetic differences were likely to be pronounced at the geographic scale discussed by Mech and Paul (2008) and Mech (2009).

Koblmüller *et al*. (2009) examined wolves from the Great Lakes region using three types of genetic markers: mtDNA, a maternally-inherited marker; Y-chromsome haplotypes based on microsatellite DNA loci on the Y-chromsome, which is a paternally-inherited marker; and autosomal microsatellite DNA, which provides information on recent and on-going interactions among populations rather than lineage information. The study supplemented the historical mtDNA sample of Leonard and Wayne (2007) by adding an historical individual from Minnesota. All historical Great Lakes wolf specimens had Great Lakes wolf or coyote, or coyote-like, mtDNA haplotypes, including the only four individuals for which Y-chromosome haplotype could be determined. The

17

002865A

Y-chromsome haplotypes of those four individuals, however, were more similar to those of western gray wolves, suggesting that interbreeding between Great Lakes wolves and western gray wolves was taking place in 1910, the year of collection of these four specimens.

Koblmüller *et al.* (2009) conclude that, despite both ancient and recent incidences of interbreeding with coyotes and western gray wolves, Great Lakes wolves remain morphologically distinct and represent a "distinct taxon" of gray wolf (*Canis lupus*) that is adapted to the region.  They do not, however, conclude that this taxon is unique enough to be recognized as a species separate from gray wolves, as proposed by Wilson *et al*. (2000).  ~~*Canis lupus lycaon* is the scientific name below the species level (Goldman 1944) that has been applied to wolves in the area occupied by Great Lakes wolves.~~

Recently, Mech (2010) reviewed the taxonomic history of wolves in Minnesota and provided a summary of numerous genetic studies.  He concluded that the genetic studies corroborated the historic presence of a western subspecies (*C. lupus nubilis*) of wolf in western Minnesota and an eastern "lycaon" wolf in eastern Minnesota.  Furthermore, he concluded that wolves now found in northern Minnesota, Wisconsin, and Michigan are a product of dispersal from the genetic mix of wolves that were in northeastern Minnesota at the time of listing.  That mixture included animals that are genetically gray wolf (*Canis lupus*), wolves that are genetically "*lycaon*", and wolves that are a mix of the two.  He does not provide a conclusion as to whether the "*lycaon*" wolf is a gray wolf subspecies (*Canis lupus lycaon*) or a separate wolf species (*Canis lycaon*).

Several recent studies conclude that the eastern wolf is a unique species, and should be recognized as *C. lycaon* (Wheeldon and White 2009, Wilson *et al*. 2009, Fain

18

002866A

*et al.* 2010, Wheeldon *et al.* 2010).  Wheeldon and White (2009, pp. 3-4) present that both the present-day and pre-recovery wolf populations in the western Great Lakes region are genetically similar and both were derived from hybridization between *C. lupus* and the eastern wolf, *C. lycaon*.  Fain *et al.* (2010, p. 10) recognize *C. lycaon* as a unique species of North American wolf and establish that the population of wolves in the western Great Lakes region is comprised of *C. lupus*, *C. lycaon*, and their hybrids. Furthermore, they conclude that the western Great Lakes states were included in the historical range of *C. lycaon*, and that hybridization between the two species "predates significant human intervention" (Fain *et al.* 2010, pp. 13-14).  Weeldon *et al.* (2010, p. 2) used multiple genetic markers to clarify the taxonomic status of *Canis* species in the western Great Lakes region, using samples from 410 wild canids collected between 1998 and 2009 from Minnesota, Wisconsin, Michigan, and western Ontario.  They conclude that the current western Great Lakes wolf population is "composed of gray-eastern wolf hybrids that probably resulted from historic hybridization between the parental species" (Weeldon *et al.* 2010, p. 10), and that the appropriate taxonomic designation for the western Great Lakes hybrid wolves is *C. lupus x lycaon*, replacing the previous wolf subspecies designation (*C. lupus lycaon*) of Nowak (2009).

~~Western Great Lakes wolves have variously been assigned to a subspecies of gray wolf, *Canis lupus lycaon*; a full species, *C. lycaon*; the same species as the red wolf, *C. rufus*; a result of hybridization between *C. rufus* and *C. lupus*, or a contact zone between~~

19

002867A

*C. lupus* and *C. lycaon*.  In light of the ongoing debate, and the fact that there is no clear resolution on taxonomy of wolves in the western Great Lakes, we are continuing to recognize the currently listed entity, *C. lupus* in the WGL.

It is clear from the above discussion that the taxonomic classification of wolves in the WGL is one that has been, and will continue to be, of great debate in the scientific community.  The most recent scientific information, however, supports the recognition of the eastern wolf as a unique species, *C. lycaon,* (rather than as a subspecies of *C. lupus*) and that this species intercrosses with *C. lupus* in the western Great Lakes region to establish a population composed of some assembly of *C. lupus*, *C. lycaon*, and hybrids between those two species (Wheeldon and White 2009, Fain *et al*. 2010, Mech *et al*. 2010, Weeldon *et al*. 2010).

In 2008, the U.S. Fish and Wildlife Service directed a group of Service scientists to conduct a review of the taxonomy of North American wolves, including subspecies of the gray wolf, *Canis lupus*, to assist in resolving how to proceed with recovery efforts for wolves in the United States.  The paper will provide recommendations only on whether the validity of each taxon is supported by credible evidence from the relevant scientific literature, and on the geographic boundaries of each taxon.  To date, a review of the currently available scientific literature, similar to what we have discussed above, has been completed and a draft paper has been prepared.  One of the conclusions made in the draft paper is that the existing evidence suggests that two separate species of wolves (*Canis lupus* and *Canis lycaon*) co-occur in eastern Canada, the UP of Michigan, Wisconsin, and Minnesota.  Recognizing that accepting this conclusion would be viewed as highly consequential, the Service, in partnership with the Association of Fish and Wildlife

**Comment [m10]:** Should we say something more than "the most recent" – maybe "currently the best available scientific information…"?

I'm also thinking that we shouldn't plan on being silent about Chambers et al.  We've been telling people about it and they are going to wonder why we don't even refer to it in the rule – this synthesis of the available information has everything to do with why we reconsidered taxonomy in the WGL.

20

002868A

~~Agencies (AFWA), is enlisting an independent third party to organize and conduct a rigorous scientific peer review of the draft paper.  Following this peer review process, the Service will determine whether to adopt the review as representing the best available scientific information on wolf taxonomy in North American.  The outcome of this decision may have consequences for this proposed delisting rule, however, no definitive conclusions have been made at this time.~~

~~Interpretations of Wolf-Coyote Relationships~~

~~For a discussion on interpretations of wolf-coyote relationships in the western Great Lakes, see the discussion under **Factor E. Other natural or manmade factors affecting its continued existence** in this proposed rule.~~

~~Present Situation of Wolves in the WGL~~ WGL Wolf Population

The current population of wolves in Minnesota, Wisconsin, and Michigan is likely derived from expansion of the remnant population in northeastern Minnesota (mostly *C. lupus*), supplemented by western gray wolves, *C. lupus* (Mech and Frenzel 1971; Mech 2010, p. 135), and in the case of UP Michigan, ~~possible~~ contributions from *C. lycaon* from southern Ontario (Fain *et al.* 2010).  Leonard and Wayne (2008) reported that four mtDNA haplotypes found in historical specimens from the western Great Lakes states had not been found in their sample of modern wolves in the area. This finding, together with some likely loss of allelic diversity (Fain *et al*. 2010), indicate that a genetic bottleneck occurred when wolves were nearly extirpated from the Region and the following period of slow recovery.  Despite these "founder effects" on the genetic

> Comment [m11]: What else?

21

composition of the western Great Lakes population, various measures of genetic diversity

remain comparable to other wolf populations (Koblmüller *et al*. 2009, Wheeldon 2009,

Fain *et al*. 2010), at least partially owing to contributions from western wolves (*C. lupus*).

While acknowledging the contribution of western gray wolves and, at least, historical

contribution of coyotes, researchers treat the wolves of the WGL area as a single

population (Koblmüller 2009; Wheeldon 2009, p. 24; 2010, p. 9; Fain *et al*. 2010, p. 14)

with minimal genetic differentiation across the region.  In other words, although there is a

debate in the scientific community regarding species concepts and exact taxonomic

categorization for this population of what to call the wolves in the western Great Lakes

region, researchers generally agree that the wolves that occur in this region are

functioning as one cohesive population.

Comment [m12]: Didn't the previous discussion already address the debate and conclude that the area is 2 sp and their intercrosses?  If so, why are we brining up the debate again here?  We've made a decision as to what the taxonomy is for the purposes of the ESA so I think we need to stick with it.

Leonard and Wayne (2008) have stated that Great Lakes wolves have not been

restored based on absence of certain historical mtDNA haplotypes from the current

population, an estimated historical population size far greater than the current population

size, and the admixture of coyote and western wolf haplotypes in the current population.

Mech (2009) has questioned the representativeness of their sample of current wolves (16

from Minnesota and 2 from Michigan).  Subsequent studies with larger samples of the

current wolf population find, despite acknowledged influence of western wolves, the

current population is generally representative of the historical population (Wheeldon

2009, p. 24; Fain *et al*. 2010, p. 1; Weeldon *et al*. 2010, p. 10).  Koblmüller *et al*. (2009,

pp. 10-11) found "comparatively slight" differentiation at autosomal microsatellite DNA

loci between historical and current Great Lakes wolves, and they conclude that Great

Lakes wolves are a unique population of gray wolves.  Wheeldon and White (2009) and

22

Wheeldon (2009, p. 52) present microsatellite DNA evidence that the hybridization

processes noted by Leonard and Wayne (2008) were taking place over a century ago, so

that the current population is comparable to the historical population with respect to

admixture.  Hybridization between eastern wolves and western wolves in the western

Great Lakes region occurred prior to significant human effects on population size or

habitat (Fain et al. 2010, p. 14).  According to Fain *et al*. (2010, p. 14), the current

population of wolves in the western Great Lakes "represents an ancient component of the

northeast ecosystem and have been established throughout the region for thousands of

years."

We agree with the most recent conclusion presented by Weeldon and White

(2009), Fain *et al*. (2010), Wheeldon *et al*. (2010), and others that the eastern wolf is a

unique species, and that wolves in the western Great Lakes region consist of an assembly

of *C. lupus*, *C. lycaon*, and hybrids between those two species.  However, bBecause the

wolf entity listed in this area in 1967 is the same wolf entity that comprises the present-

day wolf population in the western Great Lakes region and it is considered to be a single,

interbreeding population that is genetically similar to the historical population of this area

(Koblmüller 2009; Wheeldon 2009, p. 24; 2010, p. 9; Fain *et al*. 2010, p. 14), we are

proposing to delist this biologically recovered population of wolves as *C. lupus*.

When the gray wolf was first listed under the Endangered Species Preservation

Act of 1966 (32 FR 4001) on March 11, 1967, it was listed as the conterminous U.S.

population of *Canis lupus lycaon*.  By 1976 all or a portion of three additional subspecies

of gray wolf, *Canis lupus* were listed as endangered under the Endangered Species Act.

On March 9, 1978 (43 Federal Register 9607-9615), the species *Canis lupus* was listed as

23

> **Comment [m13]:** How do you see incorporating a C. lycaon status review into this?
>
> In the event that the Service adopts this approach (and I am not certain that we will) a rational for how this is consistent with the Act will be needed.

002871A

endangered in the conterminous United States, except in Minnesota where it was listed as
threatened.  This reclassification replaced the earlier listings of the four subspecies.  This
reclassification was enacted in part because the then-existing subspecific classification of
gray wolves was believed to be out of date, and it was needed to recognize that the entire
species, inclusive of all subspecies, was threatened or endangered south of Canada.  The
intent was to protect all gray wolves, including those that had been recognized by the
name eastern timber wolf, or *Canis lupus lycaon*.

Wolf-Coyote Relationships

For a discussion on interpretations of wolf-coyote relationships in the western
Great Lakes, see the discussion under **Factor E. Other natural or manmade factors
affecting its continued existence** in this proposed rule**.**

**Recovery Criteria**

The 1978 Recovery Plan for the Eastern Timber Wolf (Recovery Plan) and the
1992 revised Recovery Plan (Revised Recovery Plan) contain the same two delisting
criteria.  The first delisting criterion states that the survival of the wolf in Minnesota must
be assured.  We, and the Eastern Timber Wolf Recovery Team (Peterson in litt. 1997,
1998, 1999a, 1999b), have concluded that this first delisting criterion remains valid.  It
addresses a need for reasonable assurances that future state, tribal, and Federal wolf
management and protection will maintain a viable recovered population of wolves within

24

002872A

(2009) reported on mtDNA haplotypes of four wolf specimens from a 400-500 year old archaeological site from southern Ontario.  Two specimens had dog haplotypes, one had the same haplotype found in western coyotes, and one had a haplotype that was nearly identical to one from a western coyote.  Wilson *et al*. (2003) found a haplotype similar to a coyote haplotype in a late 19th century specimen from Maine, 50 years before recorded coyote sightings in Maine.

Lehman *et al*.'s (1991, p. 114) interpretation of coyote introgression into Great Lakes wolves included an explanation that it occurred at a time when wolf population densities were low in the region, so that wolves would be less likely to find mates of the same species and  mating with coyotes was more likely to take place.  Conversely, Lehman *et al*. (1991) suggested that coyote introgression does not appear to occur when wolf densities are higher.  The increase in population size that has occurred over the last thirty years renders the western Great Lakes wolf population less vulnerable to whatever threat may have been presented by coyote introgression.  The wolf population of the region has likely been exposed to this threat for centuries, and has rebounded from near extirpation, yet retains essential genetic, behavioral, and other biological features of wolves without being displaced by coyotes.  This suggests that the threat of coyote hybridization to a recovered wolf population is small.

Summary of Our Five-Factor Analysis of Potential Threats

As required by the Act, we considered the five potential threat factors to assess whether wolves are threatened or endangered throughout all or a significant portion of

234

003082A

their range in the proposed WGL DPS and, therefore, whether the proposed WGL DPS or an SPR thereof should be listed as threatened or endangered.  While wolves historically occurred over most of the DPS, large portions of this area are no longer significant, and the wolf population in the proposed WGL DPS will remain centered in Minnesota, Michigan, and Wisconsin.

While we recognize that wolves in the proposed WGL DPS do not occupy all portions of their historical range, including some disjunct but potentially suitable areas with low road and human density and a healthy prey base within the proposed WGL DPS, wolves in this DPS no longer meet the definition of a threatened or endangered species.  Although there may be historical habitat within the proposed DPS that remains unoccupied, many of these areas are no longer suitable.  None of these historical areas are significant portions of the range of the proposed WGL DPS.

We have based our proposed determinations on the current status of, and future threats likely to be faced by, existing wolf populations within the proposed WGL DPS in the foreseeable future.

The number of wolves in the proposed WGL DPS greatly exceeds the recovery criteria (USFWS 1992, pp. 24-26) for (1) a secure wolf population in Minnesota, and (2) a second population of 100 wolves for 5 successive years.  Based on the criteria set by the Eastern Wolf Recovery Team in 1992 and reaffirmed in 1997 and 1998 (Peterson in litt. 1997, in litt. 1998), and endorsed by the peer reviewers of a previous proposal (71 FR 15266), the proposed DPS contains sufficient wolf numbers and distribution to ensure their long-term survival within the DPS.  The maintenance and expansion of the Minnesota wolf population has maximized the preservation of the genetic diversity that

003083A

remained in the proposed WGL DPS when its wolves were first protected in 1974. Furthermore, the Wisconsin–Michigan wolf population has even exceeded the numerical recovery criterion for a completely isolated population.  Therefore, even if this two-state population was to become totally isolated and wolf immigration from Minnesota and Ontario completely ceased, it would still remain a viable wolf population for the foreseeable future, as defined by the Recovery Plan (USFWS 1992, pp. 25-26).  Finally, the wolf populations in Wisconsin and Michigan each have separately exceeded 200 animals for 11 and 10 years respectively, so if they each somehow were to become isolated, they are already above viable population levels, and each state has committed to manage its wolf population at or above viable population levels.  The wolf's numeric and distributional recovery criteria in the proposed WGL DPS clearly have been exceeded in both magnitude and duration.  The wolf's recovery in numbers and distribution in the proposed WGL DPS, together with the status of the remaining threats, indicates that the proposed WGL DPS of the wolf is not in danger of extinction, nor likely to become an endangered species, within the foreseeable future throughout all or a significant portion of its range.

Post-delisting wolf protection, management, and population and health monitoring by the states, tribes, and Federal land management agencies—especially in Minnesota Zone A, Wisconsin Zones 1 and 2, and across the UP of Michigan, which constitute the significant portion of the species' range -- will ensure the continuation of viable wolf populations above the Federal recovery criteria for the foreseeable future. Post-delisting threats to wolves in Zone B in Minnesota, Zones 3 and 4 in Wisconsin, and in the Lower Peninsula of Michigan — all areas that are not significant portions of the

003084A

range of the proposed WGL DPS ─ will be more substantial, and may preclude the establishment of wolf packs in most or all of these areas in Wisconsin and Michigan. Similarly, the lack of sufficient areas of suitable habitat in those parts of North Dakota, South Dakota, Iowa, Illinois, Indiana, and Ohio that are within the proposed WGL DPS are expected to preclude the establishment of viable populations in these areas, although dispersing wolves and packs may temporarily occur in some of these areas.  However, these areas are not an SPR and wolf numbers in these areas will have no impact on the continued viability wolves in the proposed WGL DPS.  Reasonably foreseeable threats to wolves in all parts of the proposed WGL DPS are not likely to threaten wolf population viability in the WGL DPS in the foreseeable future.

In summary, we find that the threat of habitat destruction or degradation or a reduction in the range of the wolf; utilization by humans; disease, parasites, or predatory actions by other animals or humans; regulatory measures by state, tribal, and Federal agencies; or other threats will not individually or in combination be likely to cause the proposed WGL DPS of the wolf to be in danger of extinction in the foreseeable future in all or a significant portion of the species' range.  Ongoing effects of recovery efforts over the past decades, which resulted in a significant expansion of the occupied range of wolves in the proposed WGL DPS, in conjunction with future state, tribal, and Federal agency wolf management across that occupied range, will be adequate to ensure the conservation of the SPR of the proposed WGL DPS.  These activities will maintain an adequate prey base, preserve denning and rendezvous sites and dispersal corridors, monitor disease, restrict human take, and keep wolf populations well above the numerical

003085A

recovery criteria established in the Federal Recovery Plan for the Eastern Timber Wolf (USFWS 1992, pp. 25-28).

After a thorough review of all available information and an evaluation of the previous five factors specified in section 4(a)(1) of the Act, as well as consideration of the definitions of "threatened" and "endangered" contained in the Act and the reasons for delisting as specified in 50 CFR 424.11(d), we propose that removing the WGL DPS from the List of Endangered and Threatened Wildlife (50 CFR 17.11) is appropriate. Wolves have recovered in the proposed WGL DPS as a result of the reduction of threats as described in the analysis of the five categories of threats.

We agree with the most recent conclusion presented by Weeldon and White (2009), Fain *et al*. (2010), Wheeldon *et al*. (2010), and others that the eastern wolf is a unique species, and that wolves in the western Great Lakes region consist of an assembly of *C. lupus*, *C. lycaon*, and hybrids between those two species. Because the wolf entity listed in this area is the same wolf entity that comprises the present-day wolf population in the western Great Lakes region and it is considered to be a single, interbreeding population that is genetically similar to the historical population of this area (Koblmüller 2009; Wheeldon 2009, p. 24; 2010, p. 9; Fain *et al*. 2010, p. 14), we are proposing to delist this biologically recovered population of wolves as *C. lupus*.

> **Comment [m50]:** Please consult with Chambers and Fain on the possibility of proposing that 1/3 of the wolves are C. lupus such that a status assessment could be conducted on that portion of the population. Such an approach would be more consistent with our DPS policy. As I recall the ARDs did not support identifying a DPS that contained two species and I think it would be a significant legal vulnerability.

Available Conservation Measures

Conservation measures provided to species listed as endangered or threatened under the Act include recognition, recovery actions, requirements for Federal protection,

003086A

and prohibitions against certain practices.  Recognition through listing encourages and results in conservation actions by Federal, state, and private agencies, groups, and individuals.  The Act provides for possible land acquisition and cooperation with the states and requires that recovery actions be carried out for all listed species.  This proposed rule, if made final, would remove these Federal conservation measures for all gray wolves within the proposed WGL DPS.

Effects of the Rule

This proposal, if made final, would remove the protections of the Act for the WGL DPS by removing the wolves in that DPS from the List of Endangered and Threatened Wildlife.

This proposal, if made final, would remove the special regulations under section 4(d) of the Act for wolves in Minnesota.  These regulations currently are found at 50 CFR 17.40(d).

Critical habitat was designated for the gray wolf in 1978 (43 FR 9607, March 9, 1978).  That rule (codified at 50 CFR 17.95(a)) identifies Isle Royale National Park, Michigan, and Minnesota wolf management zones 1, 2, and 3, as delineated in 50 CFR 17.40(d)(1), as critical habitat.  Wolf management zones 1, 2, and 3 comprise approximately 25,500 sq km (9,845 sq mi) in northeastern and north-central Minnesota. This proposal, if made final, would remove the designation of critical habitat for gray wolves in Minnesota and on Isle Royale, Michigan.

003087A

EXHIBIT FF

| | |
|---|---|
| From: | Maricela Constantino |
| To: | Laura Ragan |
| Cc: | Mary Parkin ; Marjorie Nelson |
| Subject: | Fw: SPR review of current draft WGL delisting rule |
| Date: | 01/07/2011 01:08 PM |

Below is the 2nd email
_____

Maricela A. Constantino
U.S. Fish and Wildlife Service - Washington Office (R9)
Endangered Species, Branch of Recovery and Delisting
Remotely located at:
5398 Longwood Road
Huntington, WV 25705
571-969-9804 (phone)


----- Forwarded by Maricela Constantino/ARL/R9/FWS/DOI on 01/07/2011 02:07 PM -----

| | | | |
|---|---|---|---|
| **Kelly Hornaday/ARL/R9/FWS/DOI** | To | Maricela Constantino/ARL/R9/FWS/DOI@FWS | |
| | cc | | |
| 01/05/2011 01:36 PM | Subject | Re: SPR review of current draft WGL delisting rule | |


The penguin rule is publishing soon (by end of Jan), but it will not rely on SPR as the basis for listing. There is some new information that indicates the entire DPS is declining, not just the Campbell plateau pops. So, we aren't going to apply the new approach in that rule (we can base the listing on status throughout all its range). As far as applying the new approach goes, I have no idea when/if the M-opinion will be withdrawn (I suspect that won't happen until we have the full policy significantly far along in drafting - right now we just have the approach figured out). I don't think we can project a timeline with any confidence either since we don't know what OMB will want as far as review goes and since it is a joint policy requiring two agencies to review and sign. I think that if they revise WGL to be similar to our current approach, they will not have to change that much to make it fit the new approach. The new approach is essentially the M-opinion approach, except that if you find a SPR is T/E, you list the whole thing. Significance is still defined in terms of biological/conservation importance, so I think the rationale for why some areas are not significant is still fine. The bar for significance is somewhat higher so I don't think there is any chance that they would find SPRs if they applied the new approach. Also, we have no language or guidance to provide them for including in the rule. If they really think they can easily dismiss the areas as being unimportant to the conservation of the species, then I think there is not much to worry about.

Does that help? (and I can help Laura as they get further along and as we get further along in getting a policy drafted)

Kelly

Kelly Hornaday
Endangered Species - Branch of Recovery & Delisting
U.S. Fish and Wildlife Service
4401 N. Fairfax Dr., MS 420
Arlington, VA 22203
(703)358-2352 (v)
(703)358-1735 (f)

▼  Maricela Constantino/ARL/R9/FWS/DOI

> **Maricela
> Constantino/ARL/R9/FWS/DOI**
>
> 01/05/2011 01:03 PM
>
> To    Kelly Hornaday/ARL/R9/FWS/DOI@FWS
> cc
> Subject   Re: SPR review of current draft WGL delisting
>           rule

Kelly,
Thanks for the comments and for looking at this so quickly.  I had this same general opinion last time we attempted to move this rule but it was on such a fast track we didn't fix it and thank goodness we didn't end up publishing it anyway.  The SPR sections are from the original 2007 delisting rule (pre-M-opinion) and when we delisted again in 2009 it was not modified.  I'll relay your comments to R3 and given that Laura Regan reviews the listing rules for R3 she should be familiar with what is typically done and how they are handling SPR now.  This rule will publish in April 2011.  Isn't the penguin rule publishing sooner?  If so, should we go ahead and adopt the new approach?  This will be on a very fast track so anything we can do to ward of delays late in the review process would be helpful.

Maricela

ps - Glad we could be of service.  :)
_____
Maricela A. Constantino
U.S. Fish and Wildlife Service - Washington Office (R9)
Endangered Species, Branch of Recovery and Delisting
Remotely located at:
5398 Longwood Road
Huntington, WV 25705
571-969-9804 (phone)

▼  Kelly Hornaday/ARL/R9/FWS/DOI

> **Kelly
> Hornaday/ARL/R9/FWS/DOI**
>
>                         To    Maricela Constantino/ARL/R9/FWS/DOI@FWS

003108A

cc

01/05/2011 12:09 PM        Subject   Re: SPR review of current draft WGL delisting
rule

Hi Maricela,

I quickly looked at this and have to say that the approach to SPR is not consistent
with our current approach or with how we would proposed to do it in the future.  I
think this SPR stuff might have been written pre-M-opinion and sounds more similar
to what we did for the lynx remand clarification of spr.  We are currently still bound
by the M-opinion since it has not been withdrawn.  In addition, we would still follow
a similar approach under what we've proposed to Gary.  We would first look at the
species throughout all its range before asking whether there are any portions to
consider.  The definition of significance would be similar (but a somewhat higher
bar), so I don't think that the reasoning is necessarily wrong.  I have no idea at what
point we would be adopting a new approach, so I think they need to follow the
general approach we've been taking in other rules and findings: first evaluate the
status "throughout all", then after making the conclusion about "all", ask whether
there are any portions to consider.  Recent rules and findings have a very cursory
discussion of this process (I pasted in a couple examples), and do not refer to the
M-opinion or go into any great detail.

I also think that this approach is really backwards in a delisting.  We can list
something because it is T/E in a SPR (that's from the definitions), but we can't delist
something because it is not T/E in a SPR.  In order to delist (there could be other
SPRs in which it is T/E).  In particular, from the delisting side, we really need to
show that it is not T/E throughout all and not T/E in any SPRs.

I went through this rather quickly so I didn't provide a lot of detailed comments, but
I recommend minimizing discussion of SPR wherever possible (and are we going to
retain all the response to comments even though this is a new proposed rule?).

Kelly

[attachment "Proposed WGL DPS Delisting_Draft 12-3-2010_For Wo and FSOL
Prelim Review.KH SPR comments.doc" deleted by Maricela
Constantino/ARL/R9/FWS/DOI]


ps - I'm so glad Antonia is enjoying the kitchen!  It makes Lauren and Aidan feel
good to know that someone else is enjoying their (loved but outgrown) toys.  It
makes it a lot easier for them to give them up if they feel like someone will love
playing with them as much as they did.  (so you actually did us a HUGE favor to
encourage them to let go of the kitchen stuff that they weren't really playing with
much.)

▼ Maricela Constantino/ARL/R9/FWS/DOI


**Maricela**

**Constantino/ARL/R9/FWS/DOI**

To  Kelly Hornaday/ARL/R9/FWS/DOI@FWS

cc

01/04/2011 02:47 PM

Subject  Re: SPR review of current draft WGL delisting rule

Yes, I still need your review of this and of course as with everything else ideally asap.

_____
Maricela A. Constantino
U.S. Fish and Wildlife Service - Washington Office (R9)
Endangered Species, Branch of Recovery and Delisting
Remotely located at:
5398 Longwood Road
Huntington, WV 25705
571-969-9804 (phone)

▼ Kelly Hornaday/ARL/R9/FWS/DOI

**Kelly Hornaday/ARL/R9/FWS/DOI**

To  Maricela Constantino/ARL/R9/FWS/DOI@FWS

cc

01/04/2011 01:17 PM

Subject  Re: SPR review of current draft WGL delisting rule

Hi Maricela,

Do you still need me to look at this?  If so, I assume you will need it ASAP?

Kelly

▼ Maricela Constantino/ARL/R9/FWS/DOI

**Maricela Constantino/ARL/R9/FWS/DOI**

To  Kelly Hornaday/ARL/R9/FWS/DOI@FWS

cc

12/23/2010 10:05 AM

Subject  SPR review of current draft WGL delisting rule

Good Morning Kelly,
I believe you are in today - if so, I'm forwarding you the current version of the WGL

delisting rule so that you can take a look at the SPR sections for us.  It is the original analysis that was put into the 2007 final delisting rule.  We did not change it for the 2009 final rule.  They took a different approach to SPR in this rule.  Instead of doing a status review of the whole entity and then looking for SPRs following the 5 factor analysis of the whole, they begin by identifying which portions of the DPS are significant portions of the range and then conduct their 5 factor analysis on those areas as a whole.  This may not make sense in my email but you'll see what I mean.  I've marked some of the major sections we'd like you to review with a comment that includes your name.

The pages are as follows -
pg 88 - response to issue #12
pg 105-111
pg 119-125
pg 134-135
pg 137
pg 233-236


[attachment "Proposed WGL DPS Delisting_Draft 12-3-2010_For Wo and FSOL Prelim Review.mc comments.doc" deleted by Kelly Hornaday/ARL/R9/FWS/DOI]

Thanks for doing this for us and let me know if you have any questions,
Maricela

ps - I'm only working until 11:45 am today, but will be in all of next week.  Happy Holdiays!

pss - Every night since we got home, Antonia has been serving me birthday cake from her new kitchen - thank the kids for us!  :)
_____
Maricela A. Constantino
U.S. Fish and Wildlife Service - Washington Office (R9)
Endangered Species, Branch of Recovery and Delisting
Remotely located at:
5398 Longwood Road
Huntington, WV 25705
571-969-9804 (phone)

# EXHIBIT GG

**U.S. DEPARTMENT OF THE INTERIOR**

**Fish and Wildlife Service**

**50 CFR Part 17**

**[FWS-R3-ES-2011-XXXX]**

**[92220-1113-000; ABC Code: C6]**

**RIN 1018-AW41**

> **Comment [m1]:** I'm requesting a new RIN for this action.  I'll forward the # to you when I get it.

**Endangered and Threatened Wildlife and Plants; Proposed Rule To Identify the Western Great Lakes** ~~Populations of Gray Wolves as a~~ **Distinct Population Segment of Gray Wolves, Identify the Western Great Lakes Distinct Population Segment of Eastern Wolves, and To Revise the List of Endangered and Threatened Wildlife**

> **Comment [m2]:** This title will need to be edited to reflect the decision to include the comprehensive plan and possibly other proposed rulemakings.

> **Comment [LJR3]:** Do we need to include in the title specific mention of the SA for C. lycaon, and the changes based on historical range?

**AGENCY:**  Fish and Wildlife Service, Interior.

**ACTION:**  Proposed rule.

1

004151A

**SUMMARY:**  We, the U.S. Fish and Wildlife Service (Service or USFWS) propose to identify the Western Great Lakes (WGL) Distinct Population Segment (DPS) of the gray wolf (*Canis lupus*) and the WGL DPS of the eastern wolf (*Canis lycaon*).  The geographic extent of this these DPSs are identical, and includes all of Minnesota, Wisconsin, and Michigan; the eastern half of North Dakota and South Dakota; the northern half of Iowa; the northern portions of Illinois and Indiana; and the northwestern portion of Ohio.  We also propose to revise the List of Endangered and Threatened Wildlife established under the Endangered Species Act of 1973, as amended (Act) by removing gray wolves and eastern wolves within the WGL DPSs.  We are proposing these actions because available data indicate that this these DPSs no longer meets the definitions of threatened or endangered under the Act.  The threats have been reduced or eliminated, as evidenced by a population that is stable or increasing in Minnesota, Wisconsin, and Michigan, and greatly exceeds the numerical recovery criteria established in the Recovery Plan for the Eastern Timber Wolf.  Completed state wolf management plans will provide adequate protection and management of wolves in the proposed WGL DPSs after revision of the listing.  This proposed rule, if made final, would remove wolves in this these DPSs from the lists of Threatened and Endangered Wildlife, remove the currently designated critical habitat for the gray wolf in Minnesota and Michigan, and remove the current special regulations for gray wolves in Minnesota.

On April 16, 2007, three parties filed a lawsuit against the U.S. Department of the Interior (Department) and the Service, challenging the Service's February 8, 2007 (72 FR 6052), identification and delisting of the WGL DPS.  On September 29, 2008, the U.S. District Court for the District of Columbia ruled in favor of the plaintiffs (*Humane*

2

004152A

*Society of the United States* v. *Kempthorne*, No. 1:07-CV-00677 (D.D.C.)).  In that ruling

the court vacated and remanded the Service's application of the February 8, 2007 (72 FR

6052), final delisting rule for the WGL DPS of the gray wolf.  On remand, the Service

was directed to provide an explanation as to how simultaneously identifying and delisting

a DPS is consistent with the Act's text, structure, policy objectives, legislative history,

and any relevant judicial interpretations. This proposed rule addresses the September 29,

2008, court ruling and any new information available since the 2007 delisting was

published.

In this proposed rule, we recognize recent taxonomic revisions that elevate the

subspecies *Canis lupus lycaon* to a full species *C. lycaon*.  Additionally, we accept the

position that *C. lycaon* intercrosses with *C. lupus* in the western Great Lakes region, to

establish a population composed of an assembly of *C. lupus*, *C. lycaon*, and their hybrids.

Additionally, we are initiating a status review for *C. lycaon* outside the WGL DPS.

We are proposing to delist the gray wolf in all or parts of 28 States because this

area is outside of the historical range of the gray wolf.  These areas currently contain no

gray wolves, and they should not have been included in the original listing of the species.

**DATES:**  We will accept comments received on or before [**INSERT DATE 60 DAYS

AFTER DATE OF PUBLICATION IN THE FEDERAL REGISTER**].

We must receive requests for public hearings, in writing, at the address shown in the

**FOR FURTHER INFORMATION CONTACT** section by [**INSERT DATE 45

DAYS AFTER DATE OF PUBLICATION IN THE FEDERAL REGISTER**].

004153A

**ADDRESSES:** You may submit comments by one of the following methods:

- Federal eRulemaking Portal: *http://www.regulations.gov*. Follow the instructions for submitting comments on Docket No. FWS-R3-ES-2010-0074.

- U.S. mail or hand-delivery: Public Comments Processing, Attn:  Docket No. FWS-R3-ES-2010-0074; Division of Policy and Directives Management; U.S. Fish and Wildlife Service; 4401 N. Fairfax Drive, Suite 222; Arlington, VA 22203.

We will post all comments on *http://www.regulations.gov*.  This generally means that we will post any personal information you provide us (see the **Public Comments** section below for more information).

**FOR FURTHER INFORMATION CONTACT:**  Laura Ragan, 612-713-5350.  Direct all questions or requests for additional information to:   GRAY WOLF QUESTIONS, U.S. Fish and Wildlife Service, Federal Building, 1 Federal Drive, Ft. Snelling, Minnesota 55111-4056.  Additional information is also available on our World Wide Web site at *http://www.fws.gov/midwest/wolf*.  Individuals who are hearing-impaired or speech-impaired may call the Federal Relay Service at 1-800-877-8337 for TTY assistance.

**SUPPLEMENTARY INFORMATION:**

**Public Comments**

       We intend that any final action resulting from this proposal will be as accurate and as effective as possible.  Therefore, comments, new information, or suggestions from

4

004154A

the public, other concerned governmental agencies, the scientific community, industry, or any other interested party concerning this proposed rule are hereby solicited.  Comments particularly are sought concerning:

**Comment [m4]:** We'll need to add a request for comments on our analysis of the listed entity and our recommended assessment units.

(1)  Biological, commercial trade, or other relevant data concerning any current or likely future threat, or lack thereof, to wolves in the WGL DPSs;

(2)  Additional information concerning the range, distribution, population size, population trends, and threats with respect to wolves in the WGL DPSs;

(3)  Current or planned activities in the WGL DPSs and their possible impacts on the wolf and its habitat;

(4)  Information concerning the adequacy of the recovery criteria described in the 1992 Recovery Plan for the Eastern Timber Wolf;

(5)  The extent and adequacy of Federal, state, and tribal protection and management that would be provided to the wolves in the WGL DPSs as a delisted species;

(6)  The proposed geographic boundaries of the WGL DPSs, and scientific and legal supporting information for alternative boundaries that might result in a larger or smaller DPSs, and including information on the discreteness and significance of the proposed DPSs; and

(7) Information or data regarding the taxonomy of wolves in the Western Great Lakes region.

Additionally, we are initiating a status review for *C. lycaon* outside the proposed WGL DPS.  For the status review to be complete and based on the best available

5

004155A

scientific and commercial information, we request information on *C. lycaon* from governmental agencies, Native American Tribes, the scientific community, industry, and any other interested parties.  We seek information on:

(1) The species' biology, range, and population trends, including:

    (a) Habitat requirements for feeding, breeding, and sheltering;

    (b) Genetics and taxonomy;

    (c) Historical and current range including distribution patterns;

    (d) Historical and current population levels, and current and projected trends; and

    (e) Past and ongoing conservation measures for the species, its habitat, or both.

(2) The factors that are the basis for making a listing determination for a species under section 4(a) of the Endangered Species Act of 1973, as amended (Act) (16 U.S.C. 1531 *et seq.*), which are:

    (a)  The present or threatened destruction, modification, or curtailment of its habitat or range;

    (b)  Overutilization for commercial, recreational, scientific, or educational purposes;

    (c)  Disease or predation;

    (d)  The inadequacy of existing regulatory mechanisms; or

    (e)  Other natural or manmade factors affecting its continued existence.


    You may submit your comments and materials by one of the methods listed in the **ADDRESSES** section.  We will not accept comments sent by e-mail or fax or to an

6

004156A

address not listed in the **ADDRESSES** section.  Comments must be submitted to *http://www.regulations.gov* before midnight (Eastern Time) on the date specified in the **DATES** section.  Finally, we will not consider hand-delivered comments that we do not receive, or mailed comments that are not postmarked, by the date specified in the **DATES** section.

We will post your entire comment—including your personal identifying information—on *http://www.regulations.gov*.  If you provide personal identifying information in addition to the required items specified in the previous paragraph, such as your street address, phone number, or e-mail address, you may request at the top of your document that we withhold this information from public review.  However, we cannot guarantee that we will be able to do so.

Comments and materials we receive, as well as supporting documentation we used in preparing this proposed rule, will be available for public inspection on *http://www.regulations.gov* at Docket No. FWS-R3-ES-2010-0074, or by appointment, during normal business hours at the at the following Ecological Services offices:

- Twin Cities, Minnesota Ecological Services Field Office, 4101 American Blvd. E., Bloomington, MN; 612-725-3548
- Green Bay, Wisconsin Ecological Services Field Office, 2661 Scott Tower Dr., New Franken, WI; 920-866-1717
- East Lansing, Michigan Ecological Services Field Office, 2651 Coolidge Road, Suite 101, East Lansing, MI; 517-351-2555

**Comment [LJR5]:** Should we add an office in the NE?

Public Hearing

**Comment [m6]:** Lets discuss whether or not we want to go ahead and schedule one now.

**Comment [LJR7]:** I think we should.

7

004157A

We have scheduled an informational meeting followed by a public hearing in Ashland, Wisconsin on June XXXXX, 2011, at the Northern Great Lakes Center, 29270 County Highway G.  The informational meeting will be held from 6:00 to 7:15 PM, followed by a public hearing from 7:30 to 9:00 PM.

**Background**

National Wolf Strategy

Between 1974 and 1976, the U.S. Fish and Wildlife Service (Service) listed as endangered a number of gray wolf subspecies, including the Northern Rocky Mountain gray wolf (*Canis lupus irremotus*, 39 FR 1171), the eastern timber wolf (*C. l. lycaon*, 39 FR 1171), the Mexican wolf (*C. l. baileyi*, 41 FR 17740), and the Texas gray wolf (*C. l. monstrabilis*, 41 FR 24064).  A 1978 reclassification under the Endangered Species Act (Act) identified a single listed entity for *Canis lupus* in the lower 48 States and Mexico, except for Minnesota where it was listed as threatened (43 FR 9607).  The 1978 listing has proven to be problematic [or "has posed significant challenges"] in terms of coordinating wolf recovery efforts.  The 1978 listing entity does not reflect current information about the taxonomic status of North American wolves, and the range described for *C. lupus* in the coterminous U.S. includes areas in the southeastern U.S. that were listed in error, i.e., areas occupied historically by red wolves (*Canis rufus*).  The described range also includes broad areas of historic range that are no longer suitable for wolves as well as areas where wolf populations were extirpated at the time of listing. Finally, although the 1978 rule lists two *C. lupus* populations, these listings predated the

**Comment [LJR8]:** This section is as of yet unedited from what Mary Parkin drafted.  As this will be included in all of the wolf rulemakings, we will need to make sure that as it is edited, the same edits are made to all versions.

8

004158A

Service's 1996 policy on determination of distinct population segments (DPS); thus, they are not predicated up a formal DPS analysis.  It has subsequently been recognized that in actuality the listed entity comprises multiple discrete and significant wolf populations that are eligible for independent listing and delisting actions under the Act.

Gray wolf recovery to date has focused on three discrete regions of the U.S.:  the western Great Lakes, the northern Rocky Mountains, and the Southwest.  Recovery efforts in the northern Rocky Mountain and western Great Lakes have been extremely fruitful in many respects; however, delisting of these populations has been successfully challenged in the courts.  Meanwhile, the southwestern wolf population is still in the early stages of recovering, and gray wolf packs are now becoming established in the Pacific Northwest.

Recognizing the dissonances [or "biological and legal complexities"] surrounding recovery of gray wolves as currently listed, in 2007 the Service initiated a structured process to articulate a more integrated and comprehensive strategy for wolf conservation in the lower 48 States and Mexico.  The first iteration of this process was conducted as an internal Service effort in order to develop a meaningful framework for consideration of scientific and policy questions based on two precepts that drive decision-making for wolves, as for other imperiled species, under the Act:  extinction probability and risk tolerance.

When a satisfactory framework had been developed, state and tribal management partners were invited to join the process (although tribes did not elect to participate).  A state-federal workshop was convened in August 2010 to review the framework and assess strategic alternatives that address wolf conservation within the context of North America.

9

004159A

These alternatives focused on population units at various scales and in various configurations and included the current listing as the status quo alternative.  The overall intent was to identify appropriate entities for status assessment that would lead to either confirmation or revision of the existing gray wolf listing based on:  (1) current scientific information, including our current understanding of North American wolf taxonomy; (2) existing regulatory and policy constraints; and (3) fundamental management objectives.  [cite draft August 2010 SDM report?].  Since August 2010, the Service has been engaged in formulating a comprehensive vision of wolf conservation for the three *Canis* species with extant populations in the coterminous U.S. – *Canis lupus*, *Canis lycaon*, and *Canis rufus* – taking into account workshop outcomes as well as completed and ongoing status reviews.  The resulting strategy is intended to (1) lay out a cohesive and coherent approach to addressing wolf conservation needs, including protection and management, within the Act's statutory framework; (2) ensure that actions taken for one wolf population do not happen in isolation or with unintended consequences for other populations; and (3) be explicit about the role of historical range in the conservation of extant wolf populations.

     The Service's national wolf strategy uses extant wolf populations as its starting point.  As such, four independent *Canis lupus* entities are being reviewed for possible reclassification or delisting actions.  These four entities conform to the definition of "species" in section 3(16) of the Act, whether as taxonomic species or subspecies or as distinct population segments.  These entities include: (1) the western Great Lakes population, identified as a DPS of *C. lupus* and proposed for delisting; (2) the northern Rocky Mountains population, identified as a DPS of *C. lupus* and proposed for either

10

delisting or reclassification to threatened; (3) wolves in the Pacific Northwest, classification pending completion of a status review; and (4) wolves in the Southwest, to be identified as either a DPS of *C. lupus* or as the subspecies *C. l. baileyi* pending completion of the conservation assessment initiated in May 2010 (75 FR 24741).  Until the Pacific Northwest status review and Southwest conservation assessment have been completed, these populations will retain their current classification as endangered within the historical U.S.-Mexico range of *C. lupus* outside the geographical boundaries described for the western Great Lakes and northern Rocky Mountains DPSs.

Range boundaries for each of the four populations will be based on population biology and range size needed for recovery, i.e., areas of historical range where wolves are extirpated and which are no longer associated with the distribution needs for recovery of the population will not be included in the range of the listed entities.  Although areas of historical range falling outside the boundaries for the four extant populations will not be considered necessary for wolf recovery under the Act, this doesn't preclude the future presence of wolves in these areas either incidentally or through measures taken under other authorities.

The national wolf strategy also address the two other wolf taxa that fall within the range described for *Canis lupus* in the 1978 listing.  Wolves identified through genetic analyses as *C. lycaon* currently comprise a distinct population of this species in the western Great Lakes region with range boundaries that coincide with the *C. lupus* DPS.  Based upon legal and policy constraints that do not allow identification of a DPS consisting of multiple species, we are identifying a separate but overlapping western Great Lakes DPS of *C. lycaon* and proposing its concurrent delisting with the western

11

004161A

Great Lakes *C. lupus* DPS.  By characterizing these DPSs as overlapping, the Service has taken into consideration not only the distribution of each taxon in the western Great Lakes region but also the interbreeding that has occurred between these two species.

In addition to *C. lycaon* in the western Great Lakes, the historical range of this species also appears to have extended into the northeast U.S., which is treated in the 1978 listing as part of the historical range of *C. lupus*.  In addition to being misclassified, wolves were extirpated from the Northeast at the time of the 1978 listing.  Given this, the role of the northeast U.S. in wolf conservation is being reconsidered based on a rangewide status review that is being initiated for *C. lycaon*.  This status review will incorporate the completed western Great Lakes review and will look at the conservation status of the extant population in Canada.  A determination as to whether to proceed with any listing action that may or may not include the northeast U.S. in a DPS outside the western Great Lakes will depend on the results of the rangewide  review.

Finally, the gray wolf listing will be removed from the southeastern States where the species historically did not occur and which comprise the range of *Canis rufus*.  Red wolves are currently listed as endangered where found; this listing will be retained and recovery efforts for red wolves will continue as planned.

Addressing Eastern Wolf (*C. lycaon*) in these actions when *C. lupus* is the name on the List of Endangered and Threatened Species.

When the Service revised the endangered species list in 1978 to include the species *C. lupus* in the lower 48 states, it intended to protect all individual wolves in the

12

**Comment [I9]:** Are we in danger here of saying something is clear (to us) and have a judge say it's not clear?

lower 48 States, which were recognized at that time as *C. lupus*.  The best available scientific information now indicates that *lycaon*, which was understood in 1978 to be a subspecies of *C. lupus*, should now be recognized as a full species and that a significant number of the wolves in the western Great Lakes area are *C. lycaon* rather than *C. lupus*.  When the Service accepts new taxonomy for a listed species, the individuals covered by the original listing remain protected according to their original listing status (i.e., endangered or threatened), even if the revised taxonomy indicates some or all of the individuals are members of a different taxonomic entity from the one that was originally included on the List of Endangered and Threatened Species.   Following this customary practice, we consider all *C. lupus* and *C. lycaon* wolves in the western Great Lakes area to have the status originally accorded *C. lupus* (endangered, except threatened in Minnesota) until we take action to revise the ESA status of wolves in the western Great Lakes (for example, 74 FR 47112, 74 FR 6700, and 75 FR 55686).  Therefore, we are addressing all wolves protected by the original lower 48 State listing of the gray wolf in our current proposed actions.

> **Comment [l10]:** Do we have some kind of a citation for why we do this?  Policy, guidance?

Biology and Ecology of ~~Gray~~ Wolves in the WGL

For a discussion of the biology and ecology of gray wolves and general recovery planning efforts, see the proposed WGL wolf rule published on March 27, 2006, (71 FR 15266-15305) and available on our World Wide Web site.

Historical Range of the Gray Wolf

13

EXHIBIT HH

Notes from March 3, 2011, call with Mary Parkin, Marj Nelson, Rich Sayers, Anna Munoz, Lynn Lewis, TJ Miller and Laura Ragan to discuss SOL and DOJ comments on the preliminary review draft of the WGL wolf proposal.

- Title should be simple – Proposed rule to revise the List of Endangered and threatened Species for the gray wolf (Canis lupus) (for the eastern U.S.)
- Regarding the historical range discussion - -We are revising the historical range of the gray wolf (C. lupus) - -we are not "delisting" 28 states.  Do we need to add more to our present discussion?  Or should we move the historical range text to a separate section of the rule and make our statements regarding the action we are taking in that section too?
- This is not a delisting action for 2 DPSs.  It is a status review and delisting action for 1 DPS (C. lupus) and a status review for another DPS (C. lycaon) where we recognize the entity for purposes of the review, but are not giving it any legal status under the Act.
    - Not listing or delisting C. lycaon in WGL.  We are evaluating a C. lycaon in the WGL as a DPS (because under ESA we evaluate species, subspecies or DPSs) and deciding that it does not warrant listing (i.e. is recovered).
    - My concern about this approach is that we will need to explicitly state that all individual wolves in the WGL are considered to be currently protected under the Act.
- Focus on the reduction/removal of threats.  The numbers do not matter if there are no threats to the population.  De-emphasize numbers and emphasize lack of threats.
    - Those individuals in the WGL that are actually C. lycaon are just as recovered as C. lupus, because of reduction in threats.  Based on the information currently available to us, we believe that neither species warrants listing under the Act in the WGL.  Before finalizing this decision, we will conduct a full status assessment for the eastern wolf (C. lycaon) to determine if it warrants listing in all of its range, or any DPSs.  If during that assessment we are made aware of additional information that causes us to question whether C. lycaon is T or E in the WGL, we will reconsider our determination.
    - Increasing numbers are a demonstration that the threats have been removed/reduced.
- Our understanding of the biology is changing faster that the policy is.
- Look into adding genetic testing to the PDM plan - -start by asking Adrian if this would be feasible.
- Ask states to verify that they intend to manage all wolves under their current management plans, regardless of their taxonomic identity.

Three possible approaches (per Rick S.)
1) 2 species that are behaving as one – use a single DPS and explain why it is reasonable in this situation to deviate from policy
2) 2 distinct species and will address each one as independently from each other as possible.
3) 2 species interdependent on each other, but 2 DPSs because of policy. Discuss as one.

005788A

# EXHIBIT II

| From: | Laura Ragan |
|---|---|
| To: | Lynn M Lewis |
| Subject: | Re: Fw: Wisconsin DNR Meeting - Agenda Items |
| Date: | 03/07/2011 03:36 PM |

Lynn - Do you think this is sufficient to address their question?

-Laura

The Service-initiated review of the current taxonomic information on wolves in North America is likely to be publicly available sometime in 2011.

Although that report will not be publicly available prior to publication of the proposal for the western Great Lakes (WGL), that proposal will be based on the best available taxonomic information on *Canis* species that is available in published literature (and, which was the basis for the Service-initiated review).   That available information supports that the previously recognized subspecies of gray wolf (*Canis lupus lycaon*) that occurs in the WGL area is a unique species, *C. lycaon*.   Furthermore, *C. lycaon* intercrosses with *C. lupus* in the western Great Lakes region, resulting in a mixed population composed of *C. lupus*, *C. lycaon*, and their hybrids.

The presence of two species of wolves in the WGL presents procedural challenges, but we have identified several alternatives to address this issue in the upcoming proposal.  The specifics on which alternative we will pursue are still under discussion.

▼ TJ Miller/R3/FWS/DOI

| **TJ Miller/R3/FWS/DOI** | | |
|---|---|---|
| | To | Laura Ragan/R3/FWS/DOI@FWS |
| 03/04/2011 11:59 AM | cc | Lynn M Lewis/R3/FWS/DOI@FWS |
| | Subject | Re: Fw: Wisconsin DNR Meeting - Agenda Items |

Laura,

I expect you'll provide something?

T. J. Miller
U. S. Fish and Wildlife Service
Bishop Henry Whipple Federal Building
1 Federal Drive
Fort Snelling, MN. 55111
(612) 713-5334
TJ_Miller@fws.gov

▼ Charles Wooley/R3/FWS/DOI

**Charles Wooley/R3/FWS/DOI**

03/04/2011 10:27 AM

To    Lynn M Lewis/R3/FWS/DOI@FWS, TJ Miller/R3/FWS/DOI@FWS

cc    Laura Ragan/R3/FWS/DOI@FWS

Subject    Fw: Wisconsin DNR Meeting - Agenda Items

Folks

Pls see below regarding wolf....can you provide answer by Weds next week......thx

----- Forwarded by Charles Wooley/R3/FWS/DOI on 03/04/2011 10:26 AM -----

**Pat Jelinek/R3/FWS/DOI**

03/04/2011 10:15 AM

To    Charles Wooley/R3/FWS/DOI@FWS

cc

Subject    Wisconsin DNR Meeting - Agenda Items

From Holly Lamers:

Here is one suggestion for the agenda from Kurt Thiede, Lands Division Administrator:  One of the issues we'd like to discuss is the potential impact to Wisconsin if the determination is made that we may have two sub-species of grey wolves in our state, and what that means to our delisting efforts.

One more issue, it appears that there is a chance that the three zone waterfowl zone option for Wisconsin may be delayed. We have told hunters that if it is approved that we'd like to have the change take effect for the 2011 waterfowl season. Zone lines are being discussed as part of the April Spring Hearings next month.

Pat Jelinek
Executive Assistant
U.S. Fish and Wildlife Service, Midwest Region
Pat_Jelinek@fws.gov

http://www.fws.gov/midwest

005805A



EXHIBIT JJ

| From: | Christie Deloria |
|---|---|
| To: | amy_berglund@levin.senate.gov; bbogaczyk@fs.fed.us; Curt Friez; Jim Northup; Katherine Mullett; Kirk G Piehler; Laura Ragan; Matthew G Cole; peter.h.butchko@aphis.usda.gov; phyllis_green@nps.gov; Sandra Kubilis; Sheri_Davie@Stabenow.senate.gov; ssjogren@fs.fed.us; Bruce_Leutscher@nps.gov; Mark Vaniman; katie_koch@fws.gov; Jean.M.Battle2@usace.army.mil; Benjamin E Toole; David Dillman |
| Cc: | Barbara Hosler; Jack Dingledine; Scott Hicks; Georgia Parham; christie_deloria@fws.gov |
| Subject: | Western Great Lakes Wolf Proposal |
| Date: | 04/19/2011 03:33 PM |

To:  Michigan Federal Agency Partners
From:  Christie Deloria, Upper Peninsula Sub-Office

Subject:  Proposal to delist wolves in the Western Great Lakes

The U.S. Fish and Wildlife Service has prepared a proposed rule to remove Endangered Species Act protection for wolves in the Western Great Lakes Distinct Population Segment, which includes Michigan, Minnesota and Wisconsin along with portions of adjacent states.  This rule has been submitted to the Federal Register, and we are awaiting a publication date.    The public comment period will begin with publication of the rule, and a public hearing has been scheduled for May 18, 2011, in Ashland, Wisconsin.   Once the rule appears in the Federal Register, we will provide you with additional information about the proposal.  In the meantime,  please do not hesitate to contact me if you have questions.  A news release describing the proposed rule is attached.

Christie

Christie Deloria-Sheffield
Fish & Wildlife Biologist

U.S. Fish & Wildlife Service
Upper Peninsula Sub-Office
Ecological Services
3090 Wright Street
Marquette, MI  49855
(906) 226-1240 Telephone
(906) 226-3632 FAX
(906) 360-1811 Mobile

011347A

# EXHIBIT KK





STATE OF MICHIGAN

DEPARTMENT OF NATURAL RESOURCES

LANSING

RICK SNYDER
GOVERNOR

RODNEY A. STOKES
DIRECTOR

May 3, 2011

Mr. Rowan Gould, Acting Director
U.S. Fish and Wildlife Service
1849 C Street NW
Washington, DC 20240

Dear Director Gould:

On April 15, 2011, the U.S. Fish and Wildlife Service (USFWS) issued a press release indicating that wolves in the Western Great Lakes have recovered and that a proposed rule to remove them from the Federal list of threatened and endangered species would be published this month.  We are encouraged to see that the USFWS has taken this step; which is consistent with the Federal recovery plan for this species and the science demonstrating their recovery in the Western Great Lakes, including Minnesota, Wisconsin, and Michigan.

The wolf is a conservation icon. Because of their cultural significance, wolves and their management elicit a strong response.  Our agencies have received a significant number of letters and phone calls on this issue.  Frustration with the situation has grown since the last proposed rule regarding wolves, and many citizens are eager to comment on the proposed rule change.  For this reason, we find this unconscionable that the USFWS plans to hold a public hearing in only Ashland, Wisconsin.  For most, that destination is simply too far to travel in one day.  They want to be heard, and after living with a growing wolf population for twenty years, they deserve to be heard.  The inability to comment at a public hearing will only aggravate the already considerable frustration.

We urge you to reconsider your decision to have only one public hearing on this topic, and ask that you seriously consider holding public hearings in each Great Lakes State with a wolf population: Wisconsin, Minnesota, and Michigan.

Sincerely,

Rodney A. Stokes, Director
Michigan Department of Natural Resources

Tom Landwehr, Commissioner
MN Department of Natural Resources

Cathy Stepp, Secretary
Wisconsin Department of Natural Resources

STEVENS T. MASON BUILDING • 530 WEST ALLEGAN STREET • P.O. BOX 30028 • LANSING, MICHIGAN 48909-7528
www.michigan.gov/dnr • (517) 373-2329

011379A

EXHIBIT LL



# FEDERAL REGISTER

| | |
|---|---|
| Vol. 76 | Thursday, |
| No. 87 | May 5, 2011 |

Part III

## Department of the Interior

Fish and Wildlife Service

50 CFR Part 17
Endangered and Threatened Wildlife and Plants; Proposed Rule To Revise the List of Endangered and Threatened Wildlife for the Gray Wolf (*Canis lupus*) in the Eastern United States, Initiation of Status Reviews for the Gray Wolf and for the Eastern Wolf (*Canis lycaon*); Proposed Rule

# DEPARTMENT OF THE INTERIOR

## Fish and Wildlife Service

### 50 CFR Part 17

[Docket No. FWS–R3–ES–2011–0029; 92220–1113–000; ABC Code: C6]

RIN 1018–AX57

### Endangered and Threatened Wildlife and Plants; Proposed Rule To Revise the List of Endangered and Threatened Wildlife for the Gray Wolf (*Canis lupus*) in the Eastern United States, Initiation of Status Reviews for the Gray Wolf and for the Eastern Wolf (*Canis lycaon*)

**AGENCY:** Fish and Wildlife Service, Interior.

**ACTION:** Proposed rule, initiation of status reviews.

**SUMMARY:** We, the U.S. Fish and Wildlife Service (Service or USFWS) are re-evaluating the listing of the Minnesota population of gray wolves (*Canis lupus*) and propose to revise it to conform to current statutory and policy requirements. We propose to identify the Minnesota population as a Western Great Lakes (WGL) Distinct Population Segment (DPS) of the gray wolf and to remove this DPS from the List of Endangered and Threatened Wildlife. We propose these actions because the best available scientific and commercial information indicates that the WGL DPS does not meet the definitions of threatened or endangered under the Act.

This proposed rule, if made final, would remove the currently designated critical habitat for the gray wolf in Minnesota and Michigan and the current special regulations for gray wolves in Minnesota. We also propose to revise the range of the gray wolf (the species *C. lupus*) by removing all or parts of 29 eastern states that we now recognize were not part of the historical range of the gray wolf. New information indicates that these areas should not have been included in the original listing of the gray wolf.

In this proposed rule, we recognize recent taxonomic information indicating that the gray wolf subspecies *Canis lupus lycaon* should be elevated to the full species *C. lycaon*. Given that a complete status review of this newly recognized species has never been conducted, we are initiating a rangewide review of the conservation status of *C. lycaon* in the United States and Canada. This rule also constitutes the initiation of our five-year review of the status of gray wolves under section 4(c)(2) of the Act, as well as the initiation of status reviews specific to gray wolves in the Pacific Northwest and Mexican wolves in the Southwest United States and Mexico.

**DATES:** *Comment submission:* We will accept comments received or postmarked on or before July 5, 2011.

*Public hearings:* We will hold two public hearings on this proposed rule scheduled on May 18, 2011 and on June 8, 2011. Informational meetings will be held from 6 p.m. to 7:15 p.m., followed by the public hearings from 7:30 p.m. to 9 p.m.

**ADDRESSES:** *Comment submission:* You may submit comments by one of the following methods:

*Electronically:* Go to the Federal eRulemaking Portal: *http:// www.regulations.gov.* In the Enter Keyword or ID box, enter FWS–R3–ES–2011–0029, which is the docket number for this rulemaking. Then, in the Search panel at the top of the screen, under the Document Type heading, click on the Proposed Rules link to locate this document. You may submit a comment by clicking on "Submit a Comment."

*By hard copy:* Submit by U.S. mail or hand-delivery to: Public Comments Processing, Attn: FWS–R3–ES–2011–0029; Division of Policy and Directives Management; U.S. Fish and Wildlife Service; 4401 N. Fairfax Drive, MS 2042–PDM; Arlington, VA 22203.

We will post all comments on *http:// www.regulations.gov.* This generally means that we will post any personal information you provide us (see the Public Comments section below for more information).

*Public hearings:* We have scheduled an informational meeting followed by a public hearing in Ashland, Wisconsin, on May 18, 2011, at the Northern Great Lakes Center, 29270 County Highway G. We have scheduled an informational meeting followed by a public hearing in Augusta, Maine, on June 8, 2011, at the Augusta Civic Center, 16 Cony Street. See the Public Hearings section below for more details.

**FOR FURTHER INFORMATION CONTACT:** Laura Ragan, 612–713–5350. Direct all questions or requests for additional information to: GRAY WOLF QUESTIONS, U.S. Fish and Wildlife Service, Federal Building, 1 Federal Drive, Ft. Snelling, Minnesota 55111–4056. Additional information is also available on our Web site at *http:// www.fws.gov/midwest/wolf.* Individuals who are hearing-impaired or speech-impaired may call the Federal Relay Service at 1–800–877–8337 for TTY assistance.

**SUPPLEMENTARY INFORMATION:**

## Public Comments

We intend that any final action resulting from this proposal will be as accurate and as effective as possible. Therefore, comments, new information, or suggestions from the public, other concerned governmental agencies, the scientific community, industry, or any other interested party concerning this proposed rule are hereby solicited. In particular, we are seeking targeted information and comments on our national wolf strategy and our proposed revision of the Minnesota listing; see items (1)-(2) below. Also, as part of this proposed rule we are announcing initiation of a 5-year status review for *C. lupus* in the conterminous United States and Mexico; initiation of status reviews specific to, respectively, gray wolves in the Pacific Northwest and in the Southwest United States and Mexico; and initiation of a status review for *C. lycaon* throughout its range in the United States and Canada. For these status reviews to be complete and based on the best available scientific and commercial information, we request information on items (9)–(11) below from governmental agencies, Native American Tribes, the scientific community, industry, and any other interested parties.

(1) Biological, commercial trade, or other relevant information concerning our analysis of the current gray wolf listing and the adequacy of our national wolf strategy, with particular respect to our recommended gray wolf listing units (*i.e.,* taxonomic or population units);

(2) Information that forms the basis for revising the currently listed Minnesota group of gray wolves under section 4(c) of the Endangered Species Act of 1973, as amended (Act) (16 U.S.C. 1531 *et seq.*), with particular respect to the factors in section 4(a) of the Act, which are:

(a) The present or threatened destruction, modification, or curtailment of its habitat or range;

(b) Overutilization for commercial, recreational, scientific, or educational purposes;

(c) Disease or predation;

(d) The inadequacy of existing regulatory mechanisms; or

(e) Other natural or manmade factors affecting its continued existence.

(3) Biological, commercial trade, or other relevant data concerning any current or likely future threat, or lack thereof, to wolves in the WGL DPS;

(4) Additional information concerning the range, distribution, population size, population trends, and threats with respect to wolves in the WGL DPS;

011435A

(5) Current or planned activities in the WGL DPS and their possible impacts on the wolves and their habitat;

(6) Information concerning the adequacy of the recovery criteria described in the 1992 Recovery Plan for the Eastern Timber Wolf;

(7) The extent and adequacy of Federal, state, and Tribal protection and management that would be provided to wolves in the WGL DPS as delisted species; and

(8) The proposed geographic boundaries of the WGL DPS, and scientific and legal supporting information for alternative boundaries that might result in a larger or smaller DPS, including information on the discreteness and significance of the proposed DPS.

(9) New information concerning the biology and conservation of the gray wolf in the conterminous United States and Mexico that may be informative to the 5-year status review of *Canis lupus*, with particular attention to the listing units described under (1) above, including:

(a) Habitat requirements for feeding, breeding, and sheltering;

(b) Genetics and taxonomy;

(c) Historical and current range including distribution patterns;

(d) Historical and current population levels, and current and projected trends;

(e) Historical, current, and projected levels of suitable wolf habitat;

(f) Past, ongoing, and emerging threats to extant gray wolf populations, their habitat, or both; and

(g) Past and ongoing conservation measures for the gray wolf, its habitat, or both.

(10) Information concerning the status of the gray wolf in the Pacific Northwest United States and the gray wolf subspecies *baileyi* (Mexican wolf) in the Southwest United States and Mexico, including:

(a) Habitat requirements for feeding, breeding, and sheltering;

(b) Genetics and taxonomy;

(c) Historical and current range including distribution patterns;

(d) Historical and current population levels, and current and projected trends;

(e) Historical, current, and projected levels of suitable habitat;

(f) Past, ongoing, and emerging threats to these populations, their habitat, or both; and

(g) Past and ongoing conservation measures for these populations, their habitat, or both.

(11) Information concerning the biology, range, and population trends of *Canis lycaon,* including:

(a) Habitat requirements for feeding, breeding, and sheltering;

(b) Genetics and taxonomy;

(c) Historical and current range including distribution patterns;

(d) Historical and current population levels, and current and projected trends;

(e) Historical, current, and projected levels of suitable habitat;

(f) Past, ongoing, and emerging threats to extant populations, their habitat, or both;

(g) Past and ongoing conservation measures for the species, its habitat, or both; and

(h) The potential role that any portion of the historical range of the *C. lycaon* in the United States may play in the persistence and viability of the species.

You may submit your comments and materials by one of the methods listed in **ADDRESSES**. We will not accept comments sent by e-mail or fax or to an address not listed in **ADDRESSES**. Comments must be submitted to *http:// www.regulations.gov* before midnight (Eastern Daylight Time) on the date specified in **DATES**. Finally, we will not consider hand-delivered comments that we do not receive, or mailed comments that are not postmarked, by the date specified in **DATES**.

We will post your entire comment— including your personal identifying information—on *http:// www.regulations.gov*. If you provide personal identifying information, such as your street address, phone number, or e-mail address, you may request at the top of your document that we withhold this information from public review. However, we cannot guarantee that we will be able to do so.

Comments and materials we receive, as well as supporting documentation we used in preparing this proposed rule, will be available for public inspection on *http://www.regulations.gov* at Docket No. FWS–R3–ES–2011–0029, or by appointment, during normal business hours at the following Ecological Services offices:

• Twin Cities, Minnesota Ecological Services Field Office, 4101 American Blvd. E., Bloomington, MN; 612–725–3548.

• Green Bay, Wisconsin Ecological Services Field Office, 2661 Scott Tower Dr., New Franken, WI; 920–866–1717.

• East Lansing, Michigan Ecological Services Field Office, 2651 Coolidge Road, Suite 101, East Lansing, MI; 517–351–2555.

• New England Ecological Services Field Office, U.S. Fish and Wildlife Service, 70 Commercial St., Suite 300, Concord, NH; 603–223–2541.

**Public Hearings**

We have scheduled an informational meeting followed by a public hearing in Ashland, Wisconsin, on May 18, 2011, at the Northern Great Lakes Center, 29270 County Highway G. The informational meeting will be held from 6 p.m. to 7:15 p.m., followed by a public hearing from 7:30 p.m. to 9 p.m.

A second informational meeting followed by a public hearing will be held in Augusta, Maine, on June 8, 2011, at the Augusta Civic Center, 16 Cony Street. The informational meeting will be held from 6 p.m. to 7:15 p.m., followed by a public hearing from 7:30 p.m. to 9 p.m.

**Peer Review**

In accordance with our policy, "Notice of Interagency Cooperative Policy for Peer Review in Endangered Species Act Activities," which was published on July 1, 1994 (59 FR 34270), we will seek the expert opinion of at least three appropriate independent specialists regarding scientific data and interpretations contained in this proposed rule. The purpose of such review is to ensure that our decisions are based on scientifically sound data, assumptions, and analysis. We will send copies of this proposed rule to the peer reviewers immediately following publication in the **Federal Register**.

**Background**

*National Overview*

Below we provide an overview of our proposed national approach to recovery of wolves in the conterminous United States and Mexico. This overview provides the context for our proposed actions for wolves in the eastern United States. In this overview, we discuss the listing history for the gray wolf, evaluate the current gray wolf listing, present the structured decision-making process we have used to date to formulate our national wolf strategy, and describe the strategy itself.

**Gray Wolf Listing History**

Here we present a brief overview of previous Federal actions relating to the listing of gray wolves and the recovery plans that have been developed pursuant to these listing actions. Additional Federal actions for western Great Lakes wolves are discussed in *Previous Federal Actions for WGL Wolves.*

Gray wolves were originally listed as subspecies or as regional populations of subspecies in the conterminous United States and Mexico. In 1967, we listed the eastern timber wolf (*Canis lupus lycaon*) in the Great Lakes region (32 FR 4001, March 11, 1967), and in 1973 we listed *C. l. irremotus* in the northern

Rocky Mountains (38 FR 14678, June 4, 1973). Both listings were promulgated under the Endangered Species Conservation Act of 1969; subsequently, on January 4, 1974, these subspecies were listed under the Endangered Species Act of 1973 (39 FR 1171). We listed a third gray wolf subspecies, the Mexican wolf (*C. l. baileyi*) as endangered on April 28, 1976 (41 FR 17740), in the southwestern United States and Mexico. On June 14, 1976 (41 FR 24064), we listed the Texas gray wolf subspecies (*C. l. monstrabilis*) as endangered in Texas and Mexico.

In 1978, we published a rule (43 FR 9607, March 9, 1978) reclassifying the gray wolf as an endangered population at the species level (*C. lupus*) throughout the conterminous 48 States and Mexico, except for the Minnesota gray wolf population, which was classified as threatened. At that time, we considered the Minnesota group of gray wolves to be a listable entity under the Act, and we considered the gray wolf group in Mexico and the 48 conterminous States other than Minnesota to be another listable entity (43 FR 9607, 9610, respectively, March 9, 1978). This reclassification was undertaken because of uncertainty about the taxonomic validity of some of the previously listed subspecies and because we recognized that wolf populations were historically connected, and that subspecies boundaries were thus malleable.

However, the 1978 rule also stated that "biological subspecies would continue to be maintained and dealt with as separate entities" (43 FR 9609), and offered "the firmest assurance that [the Service] will continue to recognize valid biological subspecies for purposes of its research and conservation programs" (43 FR 9610, March 9, 1978). Accordingly, recovery plans were developed for the wolf populations in the following regions of the United States: the northern Rocky Mountains in 1980, revised in 1987; the Great Lakes in 1978, revised in 1992; and the Southwest in 1982, the revision of which is now underway.

More detail on previous Federal actions for the Southwest and northern Rocky Mountains wolves is provided, respectively, within the 90-day finding for Mexican wolves (75 FR 46894) and in various notices and rulemakings for the management of northern Rocky Mountains wolves (59 FR 60252, November 22, 1994; 59 FR 60266, November 22, 1994; 68 FR 15804, April 1, 2003; 68 FR 15879, April 1, 2003; 70 FR 1286, January 6, 2005; 71 FR 6634, February 8, 2006; 71 FR 43410, August 1, 2006; 73 FR 4720, January 28, 2008; 73 FR 10514, February 27, 2008; 74 FR 15123, April 2, 2009) . Further detail on previous Federal actions related to the WGL DPS is provided in *Previous Federal Actions for WGL Wolves* below.

### Evaluation of the 1978 Gray Wolf Listing

The Service now considers the 1978 *Canis lupus* listing rule at 43 FR 9607 to be in need of revision. This need has been identified based on our review of the best available taxonomic information, which indicates that *C. lupus* historically did not occupy large portions of the eastern United States and on our reconsideration of the listing in light of current statutory and policy requirements under the Act. These considerations are discussed in turn below.

*Taxonomy and Historical Ranges of Wolves in the United States*

Our review of the best available taxonomic information indicates that *Canis lupus* did not occupy large portions of the eastern United States: *i.e.,* the northeastern United States was occupied by the eastern wolf (*C. lycaon*), now considered a separate species of *Canis* rather than a subspecies of *lupus,* and the southeastern United States was occupied by the red wolf (*Canis rufus*) rather than the gray wolf. Our review of North American wolf taxonomy also suggests that changes in listing classification are warranted in other portions of the country.

At the time the gray wolf was listed in 1978, and until the molecular genetics studies of the last few years, the range of the gray wolf prior to European settlement was generally believed to include most of North America. The only areas that were believed to have lacked gray wolf populations were the coastal and interior portions of California, the arid deserts and mountaintops of the western United States, and parts of the eastern and southeastern United States (Young and Goldman 1944, Hall 1981, Mech 1974, and Nowak 1995). We note, however, that some authorities have questioned the reported historical absence of gray wolves in parts of California (Carbyn *in litt.* 2000, Mech *in litt.* 2000).

Furthermore, we note long-held differences of opinion regarding the precise boundary of the gray wolf's historical range in the eastern and southeastern United States. Some researchers regarded Georgia's southeastern corner as the southern extent of gray wolf range (Young and Goldman 1944, Mech 1974); others believed gray wolves did not extend into the Southeast at all (Hall 1981) or did so to a limited extent, primarily at somewhat higher elevations (Nowak 1995). The southeastern and mid-Atlantic States were generally recognized as being within the historical range of the red wolf (*Canis rufus*), and it is not known how much range overlap historically occurred between the two *Canis* species. Morphological work by Nowak (2000, 2002, 2003) supported extending the historical range of the red wolf into southern New England or even farther northward, indicating either that the historical range of the gray wolf in the eastern United States was more limited than previously believed, or that the respective ranges of several wolf species expanded and contracted in the eastern and northeastern United States, intermingling in post-glacial times along contact zones.

The results of recent molecular genetic analyses (*e.g.,* Wilson *et al.* 2000, Wilson *et al.* 2003, Wheeldon and White 2009, Wilson *et al.* 2009, Fain *et al.* 2010, Wheeldon *et al.* 2010) and morphometric studies (*e.g.,* Nowak 1995, 2000, 2002, 2003) explain some of the past difficulties in establishing the gray wolf's range in the eastern United States. These studies show that the mid-Atlantic and southeastern United States historically were occupied by the red wolf (*C. rufus*), and that New England and portions of the upper Midwest (eastern and western Great Lakes regions) historically were occupied by *C. lycaon;* they also indicate that the gray wolf (*C. lupus*) did not occur in the eastern United States.

Based on these recent studies, we view the historical range of the gray wolf as the central and western United States, including portions of the western Great Lakes region, the Great Plains, portions of the Rocky Mountains, the Intermountain West, the Pacific Northwest, and portions of the Southwest. All or parts of 29 southern and eastern States (Maine, Massachusetts, Connecticut, New Hampshire, Rhode Island, Vermont, New York, New Jersey, Pennsylvania, Delaware, Maryland, Virginia, North Carolina, South Carolina, Georgia, Florida, Ohio (the part outside WGL DPS), West Virginia, Kentucky, Tennessee, Alabama, Mississippi, Louisiana, Texas (east of Interstate Highway 35), Oklahoma (east of Interstate Highway 35 and southeast of Interstate Highway 44 north of Oklahoma City), Arkansas, Missouri (southeast of Interstate Highway 44 and southeast of Interstate Highway 70 east of St. Louis), Indiana (the part outside WGL DPS), and Illinois (the part outside WGL DPS)) were not within the gray wolf's historical range.

In sum, we now recognize three wolf species with ranges in the conterminous United States: *Canis lupus, Canis lycaon,* and *Canis rufus.* The ranges of *C. lupus* and *C. lycaon* overlap in the western Great Lakes region, as discussed in *Taxonomy of Wolves in the Western Great Lakes Region* below; however, in the eastern United States, the historical range of *C. lupus* is considered to fall outside the historical ranges of *C. lycaon* and *C. rufus.*

*Conformance With the Act's Definition of Species*

Given the assurances we provided in the 1978 *C. lupus* listing that we would continue to treat gray wolf subspecies as separate entities for conservation purposes (as noted in Gray Wolf Listing History, above), we identified a need to reconsider the listing in light of current statutory and policy standards regarding the Act's definition of species. The Act provides for listing at various taxonomic and subtaxonomic levels through its definition of "species" in section 3(16): The term species includes any *subspecies* of fish or wildlife or plants, and any *distinct population segment* of any species of vertebrate fish or wildlife which interbreeds when mature (16 U.S.C. 1532(16) (italics added). As a matter of procedure, then, the Service determines whether it is most appropriate to list an entity as a full species, a subspecies, or a DPS of either a species or subspecies. The gray wolf has a Holarctic range; the current listing encompasses the United States-Mexico segment of the population and consists, in turn, of multiple entities.

The specific provision for listing distinct population segments of vertebrates was enacted through the 1978 Amendments to the Act (Pub. L. 95–362, November 10, 1978); these amendments replaced the ability to list "populations" with the ability to list "distinct population segments" and treat them as species under the Act. To interpret and implement the 1978 DPS amendment, the Service and the National Marine Fisheries Service jointly published the Policy Regarding the Recognition of Distinct Vertebrate Population Segments Under the Endangered Species Act (DPS policy) (61 FR 4722, February 7, 1996), setting policy standards for designating populations as "distinct."

The March 1978 gray wolf listing predated the November 1978 amendments to the Act. Although the 1978 rule lists two *C. lupus* entities, *i.e.,* the endangered and threatened entities described above, these listings were not predicated upon a formal DPS analysis and do not comport with current policy

standards. Nonetheless, subsequent recovery plans and all gray wolf rulemakings since 1996 have focused on units reflective of the evident intent of the 1978 rule to manage and recover gray wolves as "separate entities" (43 FR 9609), *i.e.,* subspecies or populations. This proposed rule and our proposed National Wolf Strategy, below, constitute an effort to bring the 1978 listing in line, insofar as possible, with the Act's requirements and current policy standards.

**Structured Decision-Making for Wolves**

In 2008, the Service embarked on a structured decision-making process as a means of developing a more integrated and comprehensive strategy for gray wolf conservation in the lower 48 States and Mexico. The overall intent of the process was to identify appropriate wolf entities (*i.e.,* listing units) for full status review, anticipating that such review would lead to either confirmation or revision of the existing gray wolf listing. We aimed to identify a coherent set of listing units based on best available scientific and commercial information, conformance with existing regulatory and policy requirements, and fundamental wolf management objectives.

We first conducted several iterations of the process in an internal Service effort to develop a viable framework for considering the scientific and policy questions that drive decision-making for wolves. The resulting framework incorporated decision analysis principles and techniques for crafting alternative listing units and then assessing the relative performance of each alternative in terms of achieving management objectives.

Management of wolves is shared among the Service, States, and Tribes. Thus, following our development of a satisfactory decision-making framework, representatives from several States involved with gray wolf conservation joined us to further explore alternative listing units that could qualify for future status review (Tribal representatives declined to participate). After acquainting state participants with the decision-making framework, we convened a State-Federal workshop in August 2010 to generate and assess alternative taxonomic and population units at various scales and in various configurations, including the 1978 listing as the *status quo* alternative.

Workshop participants also explored the different values that drive wolf decision-making; these values were expressed as the following fundamental management objectives: (1) Promote and sustain wolf recovery; (2) comply with

the requirements of the Act; (3) minimize the regulatory burden on States, Tribes, and the general public; (4) facilitate State and Tribal management of wolves; (5) minimize wolf-human conflicts; and (6) promote public acceptance of wolf listing and recovery actions.

Workshop outcomes provided important input to our continuing effort to formulate a comprehensive vision of wolf conservation. Based on further Service deliberations, this comprehensive vision has evolved into the proposed national wolf strategy discussed below. It is important to note that this strategy is a broad outline, the components of which are in various stages of execution.

**National Wolf Strategy**

The Service's national wolf strategy is intended to: (1) Lay out a cohesive and coherent approach to addressing wolf conservation needs, including protection and management, in accordance with the Act's statutory framework; (2) ensure that actions taken for one wolf population do not cause unintended consequences for other populations; and (3) be explicit about the role of historical range in the conservation of extant wolf populations.

The strategy is based on three precepts. First, in order to qualify for any type of listing or delisting action, wolf entities must conform to the Act's definition of "species," whether as taxonomic species or subspecies or as distinct population segments. Second, the strategy promotes the continued representation in this country of all substantially unique genetic lineages found historically in the lower 48 States. Third, wolf conservation under the Act is concerned with reducing extinction risks to imperiled entities; the strategy thus focuses on conservation of the four extant gray wolf entities identified through the structured decision-making process and being considered for section 4 actions: (1) The western Great Lakes population, (2) the northern Rocky Mountains (NRM) population, (3) gray wolves in the Pacific Northwest, and (4) the Southwestern population of Mexican wolves.

Various reviews and listing actions are underway for these gray wolf populations. The WGL DPS is proposed for delisting in the proposed rule being published in today's **Federal Register**. With regard to the NRM gray wolf population, Congress is considering legislation that would direct us to reissue our 2009 final rule (74 FR 15123, April 2, 2009), that delisted the NRM DPS in the States of Idaho and Montana,

and in portions of Oregon, Washington, and Utah. This rule retained ESA protections of wolves in Wyoming as non-essential experimental. If passed, we would publish a separate notice in the **Federal Register**. Negotiations regarding potential future post-delisting wolf management in Wyoming are ongoing.

The biological and conservation status of wolves in the Pacific Northwest (we are considering this to be the area west of the NRM gray wolf population, including portions of Oregon, Washington, northern California, and western Nevada) is being assessed to determine their appropriate listing classification. When this review is completed, we will evaluate a potential Pacific Northwest DPS in accordance with our DPS policy and will reclassify this population as appropriate through an additional rulemaking process. The status of the Southwestern population (*i.e.*, Mexican wolves within their historical range) is being reviewed pursuant to our 90-day finding on two listing petitions (75 FR 46894, August 4, 2010). We anticipate that the Southwestern population will be proposed for listing as either the subspecies *C. l. baileyi* or as a DPS of *C. lupus;* in the meantime, recovery planning will continue to proceed for these wolves.

As separate actions move forward for the NRM, Pacific Northwest, and Southwest, wolves in these regions will retain their current classification as endangered, except where delisted and where currently listed as non-essential experimental populations (see 50 CFR 17.84(k)). We plan to move forward with a rulemaking to replace the remainder of the 1978 listing with more targeted regional units, as appropriate, concurrently with publication of the final rule for the WGL DPS.

It is likely that revision of the 1978 gray wolf listing into finer-scale taxonomic or population units will result in removal of the Act's protections in areas of the historical *C. lupus* range, such as the Great Plains States and areas of the western States, that do not support extant wolf populations *and* do not play a role in the recovery of any of the four gray wolf entities. Although some of these areas are within the species' historical range, these areas lack sufficient suitable habitat for wolf pack persistence. Thus, we believe recovery in these areas is both unrealistic and unnecessary. We note, however, that such areas would not necessarily be precluded from wolf conservation efforts under other authorities, *e.g.*, Tribes, States, and Federal land management agencies.

Our national wolf strategy also addresses the two other wolf taxa that fall within the range described for *Canis lupus* in the 1978 listing, *C. lycaon* and *C. rufus.* With regard to *Canis lycaon,* we are announcing a rangewide status review of this species, which occurs in Canada and the western Great Lakes region of the United States. The historical range of *C. lycaon* also extends into the northeastern United States, which the 1978 listing inaccurately treated as part of the range of *C. lupus.* The role of the Northeast region in conservation of *C. lycaon* will be considered in the rangewide review, which will look at the status of extant populations in terms of uniqueness, demography, and extinction risks. A determination as to whether to proceed with any *C. lycaon* listing action—and, if listing is warranted, whether or not to include the northeastern United States in the listed range—will depend on the results of the status review. Notification of our intentions with regard to *C. lycaon* will be provided in conjunction with publication of the final rule for the WGL DPS. Meanwhile, we propose to revise the range of the gray wolf (the species *C. lupus*) by removing all or parts of 29 eastern states that we now recognize were not part of the historical range of the gray wolf. New information indicates that these areas should not have been included in the original listing of the gray wolf. These States are specified under *Taxonomy and Historical Ranges of Wolves in the United States,* above.

Finally, with regard to *Canis rufus,* we propose to remove the southeastern states included in the 1978 gray wolf listing from the List due to error, because we now recognize were not part of the historical range of the gray wolf. These states instead constitute the range of *Canis rufus;* see *Taxonomy and Historical Ranges of Wolves in the United States,* above. Red wolves currently are listed as endangered where found (32 FR 4001, March 11, 1967); this listing will be retained and recovery efforts for red wolves will continue as warranted (Red Wolf Recovery and Species Survival Plan; Service 1990).

**Five-Year Review of Gray Wolves**

Under section 4(c)(2) of the Act, we have a duty to review listed species' status every 5 years and determine whether a change in listing status is appropriate. We announce initiation of the 5-year review for the gray wolf in this rule and seek new information as requested in Public Comments above.

**Western Great Lakes Wolves**

*Previous Federal Actions for WGL Wolves*

The eastern timber wolf (*Canis lupus lycaon*) was listed as endangered in Minnesota and Michigan in the first list of species that were protected under the 1973 Act, published in May 1974 (USDI 1974). On March 9, 1978, we published a rule (43 FR 9607) reclassifying the gray wolf at the species level (*Canis lupus*) as endangered throughout the conterminous 48 States and Mexico, except for the Minnesota population, which we classified as threatened. The separate subspecies listings, including *C. l. lycaon,* thus were subsumed into the listings for the gray wolf in Minnesota and the gray wolf in the rest of the conterminous United States and Mexico. In that 1978 rule, we also identified Isle Royale National Park, Michigan, and Minnesota wolf management zones 1, 2, and 3, as critical habitat. We also promulgated special regulations under section 4(d) of the Act for operating a wolf management program in Minnesota at that time. The depredation control portion of the special regulation was later modified (50 FR 50793; December 12, 1985); these special regulations are found in 50 CFR 17.40(d)(2).

On April 1, 2003, we published a final rule revising the listing status of the gray wolf across most of the conterminous United States (68 FR 15804). Within that rule, we identified three DPSs for the gray wolf (see Gray Wolf Listing History, above), including an Eastern DPS, which was reclassified from endangered to threatened, except where already classified as threatened. In addition, we established a second section 4(d) rule that applied provisions similar to those previously in effect in Minnesota to most of the Eastern DPS. The special rule was codified in 50 CFR 17.40(o).

U.S. District Court rulings in Oregon and Vermont on January 31, 2005, and August 19, 2005, respectively, invalidated the April 1, 2003, final rule. Consequently, the status of gray wolves outside of Minnesota reverted back to endangered status, as had been the case prior to the 2003 reclassification. The courts also invalidated the three DPSs identified in the April 1, 2003, rule, as well as the associated special regulations.

On March 27, 2006, we published a proposal (71 FR 15266–15305) to identify a WGL DPS of the gray wolf, to remove the WGL DPS from the protections of the Act, to remove designated critical habitat for the gray wolf in Minnesota and Michigan, and to

remove special regulations for the gray wolf in Minnesota. The proposal was followed by a 90-day comment period, during which we held four public hearings on the proposal.

On February 8, 2007, the Service issued a rule that identified and delisted the WGL DPS of the gray wolf (*Canis lupus*) (72 FR 6052). Three parties challenged this rule (*Humane Society of the United States* v. *Kempthorne*, 579 F. Supp. 2d 7 (D.D.C. 2008)), and on September 29, 2008, the court ruled in favor of the plaintiffs and vacated the rule and remanded it to the Service. On remand, the Service was directed to provide an explanation as to how simultaneously identifying and delisting a DPS is consistent with the Act's text, structure, policy objectives, legislative history, and any relevant judicial interpretations.

The court's primary question was whether the Service has the authority to identify a DPS within a larger already-listed entity and, in the same decision, determine the DPS does not warrant the Act's protections even though the other populations of the species retain the old listing status. Our authority to make these determinations and to revise the list accordingly is a reasonable interpretation of the language of the Act, and our ability to do so is an important component of the Service's program for the conservation of threatened and endangered species.

Our authority to revise the existing listing of a species (the gray wolf in Minnesota and the gray wolf in the lower 48 States and Mexico, excluding Minnesota) to identify a Western Great Lakes DPS and determine that it is healthy enough that it no longer needs the Act's protections is found in the precise language of the Act. Moreover, even if that authority were not clear, our interpretation of this authority to make determinations under section 4(a)(1) and to revise the endangered and threatened species list to reflect those determinations under section 4(c)(1) is reasonable and fully consistent with the Act's text, structure, legislative history, relevant judicial interpretations, and policy objectives.

We consulted with the Solicitor of the Department of the Interior to address the issue in the court's opinion. On December 12, 2008, a formal opinion was issued by the Solicitor, "U.S. Fish and Wildlife Service Authority Under Section 4(c)(1) of the Endangered Species Act to Revise Lists of Endangered and Threatened Species to 'Reflect Recent Determinations'" (U.S. DOI 2008). The Service fully agrees with the analysis and conclusions set out in the Solicitor's opinion. This proposed

action is consistent with the opinion. The complete text of the Solicitor's opinion can be found at *http://www.fws.gov/midwest/wolf/*.

On December 11, 2008, we published a notice reinstating protections for the gray wolf in the western Great Lakes (and northern Rocky Mountains) pursuant to court orders (73 FR 75356).

On April 2, 2009, we published a final rule identifying the western Great Lakes populations of gray wolves as a DPS and revising the list of Endangered and Threatened Wildlife by removing the DPS from that list (74 FR 15070). We did not seek additional public comment on the 2009 final rule. On June 15, 2009, five parties filed a complaint against the Department and the Service alleging that we violated the Act, the Administrative Procedure Act (APA), and the court's remand order by publishing the 2009 final rule (74 FR 15070). On July 2, 2009, pursuant to a settlement agreement between the parties, the court issued an order remanding and vacating the 2009 final rule.

On March 1, 2000, we received a petition from Mr. Lawrence Krak of Gilman, Wisconsin, and on June 28, 2000, we received a petition from the Minnesota Conservation Federation. Mr. Krak's petition requested the delisting of gray wolves in Minnesota, Wisconsin, and Michigan. The Minnesota Conservation Federation requested the delisting of gray wolves in a Western Great Lakes DPS. Because the data reviews resulting from the processing of these petitions would be a subset of the review begun by our July 13, 2000, proposal (65 FR 43450) to revise the current listing of the wolf across most of the conterminous United States, we did not initiate separate reviews in response to those two petitions. While we addressed these petitions in our February 8, 2007, final rule (72 FR 6052), this rule was vacated by the subsequent District Court ruling. While we view our actions on these petitions as final upon publication of the **Federal Register** determinations, we nevertheless restate our 90-day findings that the action requested by each of the petitions may be warranted, as well as our 12-month finding that the action requested by each petition is warranted.

On March 15, 2010, we received a petition from the Minnesota Department of Natural Resources requesting that the gray wolf in Minnesota be removed from the List of Endangered or Threatened Wildlife under the Act. Likewise, on April 26, 2010, we received a petition from the Wisconsin Department of Natural Resources requesting that the gray wolf in Minnesota and Wisconsin

be delisted. On April 26, 2010, we received a petition from the Sportsmen's Alliance, representing five other organizations, requesting that gray wolves in the Great Lakes area be delisted. On June 17, 2010, we received a petition from Safari Club International, Safari Club International Foundation and the National Rifle Association of America requesting that wolves of the western Great Lakes be delisted. In response to those four petitions, on September 14, 2010, we published a 90-day finding determining that the petitions presented substantial information that delisting may be warranted and reinitiated a full status review. Therefore, this delisting proposal constitutes our 12-month finding that the action requested by each petition is warranted.

In response to a separate petition, on June 10, 2010, we made a 90-day finding that there was no evidence of any breeding population of wolves to support the requested listing of a DPS of the gray wolf in New England (75 FR 32869).

*Species Concepts*

As noted in Conformance with the Act's Definition of Species above, the Act defines "species" as including any species or subspecies of fish or wildlife or plants, and any distinct vertebrate population segment of fish or wildlife that interbreeds when mature (16 U.S.C. 1532(16)). It has not been uncommon in the years since the Act was passed for significant controversy to arise over the propriety of recognizing various groups of organisms as eligible for protection under the Act. Our implementing regulations (50 CFR 424.11) require us to use standard taxonomic distinctions (such as species and subspecies) when they are available, clearly defined, and generally accepted. In determining that a taxonomic entity qualifies as a species or subspecies we carefully evaluate the best available taxonomic data to determine whether we have sufficient information to conclude that a taxonomic entity qualifies as a species under the Act.

In identifying species, there is not a single set of criteria, and, therefore, no single species concept that is accepted by all taxonomists. In 1942, Ernst Mayr identified five different species concepts (Mayr 1942), and many more have been recognized since then (Wilkins 2006; 2003; Mayden 1997, pp. 381–384). Many of these species concepts can be associated with one of two major classes of concepts or approaches. The first is the biological species concept (BSC). This concept is based on reproductive relationships among populations. The

ability to interbreed and realize gene flow between two populations is the indication that they belong to the same species. The concept is most commonly associated with Mayr (1963), but has antecedents during the development of evolutionary biology in the 20th century. The second major class of concepts is the phylogenetic species concept (PSC). Under this group of concepts, species are identified by their genealogical (lineages) or phylogenetic (evolutionary) relationships and diagnosability. The many variations of these concepts and others are reviewed by Wiley (1981), Avise (2004), and Coyne and Orr (2004).

There is, likewise, no scientific consensus on what constitutes a subspecies, and some authorities (Wilson and Brown 1953) have questioned the utility of the subspecies level of classification. Following is a description of various subspecies criteria that have been proposed and applied in the taxonomic literature. Because some criteria are more stringent than others, a putative, or generally accepted, subspecies may meet the criteria and be recognized following one concept, but found to be invalid under a more stringent concept. Nowak (1995, p. 394) discussed the standards he used when he revised the subspecies of *Canis lupus:* "My investigation largely disregarded such questions [concerning use of very localized characters] and concentrated on general trends in measurable size and proportion that could be evaluated on a continent-wide or worldwide basis. Substantive statistical breaks in such trends, as discussed above, were taken as evidence of taxonomic division." In The Mammals of North America, Hall (1981, p. viii) included the following in his "Criteria for Species versus Subspecies."

If crossbreeding occurs in nature at a place or places where the geographic ranges of two kinds of mammals meet, the two kinds are to be treated as subspecies of one species. If no crossbreeding occurs, the two kinds are to be regarded as two distinct, full species.

Mayr (1963, glossary) defined subspecies as, "an aggregate of local populations of a species inhabiting a geographic subdivision of the range of the species, and differing taxonomically from other populations of the species." He further explains "differing taxonomically" as differing "by diagnostic morphological characters" (Mayr 1963, p. 348). Mayr (1969, p. 190) also describes a quantitative method for determining whether populations differ taxonomically: "A so-called 75-percent rule is widely adopted. According to this, a population is recognized as a

valid subspecies if 75 percent of the individuals differ from "all" (97 percent) of the individuals of a previously recognized subspecies. At the point of intersection between the two curves where this is true, about 90 percent of population A will be different from about 90 percent of the individuals of population B (to supply a symmetrical solution)".

Patten and Unitt (2002, p. 27) provide another definition of subspecies as "diagnosable clusters of populations of biological species occupying distinct geographic ranges." They do not require that diagnosability be absolute, but advocate 90 percent separation as a more stringent criterion than the 75-percent rule.

Avise (2004, p. 362) attempted to incorporate phylogenetic information within a biological species concept in providing the following guidance on recognizing subspecies: "Within such units [=species], "subspecies" warranting formal recognition could then be conceptualized as groups of actually or potentially interbreeding populations (normally mostly allopatric) that are genealogically highly distinctive from, but reproductively compatible with, other such groups. Importantly, the empirical evidence for genealogical distinction must come, in principle, from concordant genetic partitions across multiple, independent, genetically based molecular (or phenotypic; Wilson and Brown 1953) traits."

A common feature of all of the above definitions is that they recognize that subspecies are groups of populations, and most recognize that subspecies can be variable and overlap, to some degree, in distinguishing characters. Taxonomists do not assign an individual to one subspecies or another; instead individuals are assigned a specific taxonomic classification based on the population in which they exist.

The existence of multiple concepts of species and subspecies is not the only complicating factor in the debate surrounding the classification of organisms; it is further complicated by the way organisms occur in the natural world. Taxonomists are determined to categorize natural organisms into specific groups and identify and name those groups, while also striving to understand the evolutionary processes that give rise to these specific groups (Hey 2001, pp. 328–329). When viewed on the ground, a particular organism may appear to clearly fit into one group or another, but when their evolutionary history is viewed, these groups are revealed as changeable and without clear boundaries. In the reverse,

individuals may appear different (that is be morphometrically distinct) but in fact be of the same taxon (that is, genetically similar). In many situations, it is difficult to determine where one species ends and another begins. This is especially true in wide-ranging species and in the zones where multiple forms (for example, where either two species or two subspecies) contact each other or meet, which is the situation with wolves in the WGL region. Ultimately, species are evolving, dynamic populations, and at times are difficult to categorize. Nevertheless, Congress directs that the Service classify populations as species, subspecies, and DPSs, despite the difficulty and complexity of various taxonomic concepts.

*Taxonomy of Wolves in the Western Great Lakes Region*

The taxonomic status of the wolves in the western Great Lakes region has long been debated. They have been considered a subspecies of gray wolf, *Canis lupus lycaon* (Goldman 1944), Nowak 1995, 2002, 2003); a *Canis lupus* population that has been influenced by interbreeding with coyotes (Lehman *et al.* 1991); members of a full species, *Canis lycaon* (or eastern wolf) that is separate from *Canis lupus* (Wilson *et al.* 2000, Baker *et al.* 2003); possibly the same species as the red wolf, *C. rufus* (Wilson *et al.* 2000); the result of hybridization between *C. rufus* and *C. lupus* (Nowak 2002, 2003, 2009); and, most recently, as a mixed population of *C. lupus, C. lycaon,* and their intercrosses (for example, Wheeldon and White 2009, Fain *et al.* 2010, Wheeldon *et al.* 2010). These varying interpretations of the taxonomic status of western Great Lakes wolves are summarized, respectively, below.

Wolves in Michigan, Wisconsin, and eastern Minnesota were considered by Goldman (1944, p. 437 and Figure 14) to be within the range of the subspecies *Canis lupus lycaon.* Goldman based his classification on variation in body size and proportions, and in pelage (coat) color. According to Goldman, this was the subspecies of gray wolf historically found across a wide range east of the Mississippi River in the United States and in southeastern Canada. Wolves immediately to the west of the Mississippi River were considered to be part of the subspecies *Canis lupus nubilus.* This taxonomic interpretation was followed by Hall and Kelson (1959, p. 849) and Hall (1981, p. 932).

Nowak's (1995, p. 396; 2003, p. 243) revision of the subspecies taxonomy reduced the range of *C. l. lycaon* to southern Ontario and Quebec and northern portions of New York,

Pennsylvania, and Ohio. Nowak's classification was primarily based on statistical analysis of measurements of skull features. He considered gray wolves that historically occupied Michigan, Wisconsin, and Minnesota to be within the range of *C. l. nubilus.* Based on analysis of additional specimens, Nowak (2002, p. 119; 2003; 2009, p. 238) continued to recognize western Great Lakes wolves as *C. l. nubilus,* but noted that historical specimens from the Upper Peninsula (UP) of Michigan were somewhat transitional between the two subspecies.

Based on a study of DNA variation in North American wolves, Wilson *et al.* (2000, p. 2165) proposed that the taxonomic standing of eastern wolves be restored to full species as *Canis lycaon.* They found that eastern wolves were divergent from *Canis lupus* in both mitochondrial DNA (mtDNA) and autosomal microsatellite DNA composition. They considered the geographic range of *C. lycaon* as extending west across the Great Lakes region to Minnesota and Manitoba.

Leonard and Wayne (2008, pp. 2–3) have reported on maternally inherited mtDNA sequence haplotypes (DNA sequences or groups of alleles of different genes on a single chromosome that are inherited together as a single unit) from historical ("prerecovery") wolves from Ontario, Quebec, Michigan, and Wisconsin compared with the recent population of the area. Their interpretation of these results is that the 6 unique haplotypes identified in 15 historical individuals indicate that the pre-recovery population was "an endemic American wolf," which they call "the Great Lakes wolf" (p. 1). However, only the two haplotypes most common in the historical sample still occur in the modern wolf population of the western Great Lakes area. Leonard and Wayne (2007) conclude that the modern population does not contain the diversity of Great Lakes wolf haplotypes found in the prerecovery population and that the current population is primarily a mixture of *Canis lupus* and coyote hybrids, with minor influence from the endemic Great Lakes wolf (p. 3).

Koblmüller *et al.* (2009) examined wolves from the western Great Lakes region using three types of genetic markers: mtDNA; Y-chromosome haplotypes based on microsatellite DNA loci on the Y-chromosome, which is a paternally-inherited marker; and autosomal microsatellite DNA, which provides information on recent and ongoing interactions among populations rather than evolutionary lineage information. The historical sample from Minnesota was found to exhibit a third Great Lakes wolf mtDNA haplotype that is common in the modern population. However, the Y-chromosome haplotypes identified in the historical sample were more similar to those of western gray wolves, suggesting that interbreeding between Great Lakes wolves and western gray wolves had taken place before 1910, the year of collection.

Koblmüller *et al.* (2009) conclude that, despite what they consider both ancient and recent incidences of interbreeding with coyotes and western gray wolves, Great Lakes wolves remain morphologically distinct and represent a "distinct taxon" of gray wolf (*Canis lupus*) that is adapted to the region. They do not, however, conclude that this taxon is differentiated enough to be recognized as a species separate from gray wolves, as proposed by Wilson *et al.* (2000).

Several recent studies conclude that the eastern wolf is a unique species and should be recognized as *C. lycaon* (Wheeldon and White 2009; Wilson *et al.* 2009; Fain *et al.* 2010, p. 15; Wheeldon *et al.* 2010). Wheeldon and White (2009, pp. 3–4) state that both the present-day and pre-recovery wolf populations in the western Great Lakes region are genetically similar and that both were derived from hybridization between *C. lupus* and the eastern wolf, *C. lycaon.* Fain *et al.* (2010, p. 10) recognize *C. lycaon* as a unique species of North American wolf, and based on mtDNA and Y-chromosome haplotypes and autosomal microsatellite markers, they establish that the population of wolves in the western Great Lakes region comprise *C. lupus, C. lycaon,* and their hybrids. Contrary to Koblmüller *et al.* (2009), Fain *et al.* (2010, p. 14) found no evidence of interbreeding with coyotes. Furthermore, they conclude that the western Great Lakes States were included in the historical range of *C. lycaon* and that hybridization between the two species "predates significant human intervention" (Fain *et al.* 2010, pp. 13–14).

Wheeldon *et al.* (2010, p. 2) used multiple genetic markers to clarify the taxonomic status of *Canis* species in the western Great Lakes region of Minnesota, Wisconsin, Michigan, and western Ontario. They conclude that the current western Great Lakes wolf population is "composed of gray-eastern wolf hybrids that probably resulted from historic hybridization between the parental species" (Wheeldon *et al.* 2010, p. 10), and that the appropriate taxonomic designation for the western Great Lakes hybrid wolves is *C. lupus × lycaon,* replacing Nowak's (2009) wolf subspecies designation of *C. lupus lycaon.* We note, however, that a name in the form of *C. lupus × lycaon* has no standing as an available species name under the rules of zoological nomenclature (ICZN 1999).

It is clear from the studies discussed above that the taxonomic classification of wolves in the western Great Lakes region is one that has been, and will continue to be, of great debate in the scientific community. Most researchers, however, appear to agree that there is a unique and genetically identifiable form of wolf that occupies the western Great Lakes region, and that this form has hybridized with *Canis lupus,* whose origins were from elsewhere in North America. Researchers differ in whether this unique form of wolf should be recognized as a species (Wilson *et al.* 2000; Fain *et al.* 2010, p. 15; Wheeldon *et al.* 2010), a subspecies (Nowak 1995), or a distinct taxon or ecotype but without applying a formal scientific name to that form (Koblmüller *et al.* 2009). In choosing among these three alternatives, we find that the large divergence of both mtDNA and Y-chromosome haplotypes between Great Lakes wolves and *C. lupus* is greater than that found between subspecies of *Canis lupus* and favors recognition of the eastern wolf as a species. Currently, the best available scientific information supports recognition of the eastern wolf, *C. lycaon,* as a species (rather than, as previous believed, as a subspecies of gray wolf), and establishes that this species has intercrossed with *C. lupus* in the western Great Lakes region to constitute a population composed of *C. lupus, C. lycaon,* and their hybrids (Wheeldon and White 2009, p. 1; Fain *et al.* 2010, p. 14; Mech *et al.* 2010; Wheeldon *et al.* 2010).

The existence of two wolf species in the western Great Lakes region was not known or suspected in 1978, when the Service replaced the listings of four subspecies of gray wolf, including *C. lupus lycaon,* with the listing of all *Canis lupus* and *Canis lupus* subspecies in the conterminous United States and Mexico as endangered, except for the Minnesota population, which was listed as threatened (USFWS 1978). Since that time, increasingly powerful genetic techniques for the characterization of populations have been developed and applied to wild populations, including wolves. These advances have shown that hybridization between species is much more prevalent than was appreciated in 1978 (Schwenk *et al.* 2011); thus the detection of hybridization in western Great Lakes wolves is not unique among mammalian species.

Nowak's (1995, 2002, 2003) exclusion of the western Great Lakes region from *C. l. lycaon* was likely influenced by his inclusion of both *C. lupus* and *C. lycaon* in his western Great Lakes sample. In any event, the various genetic investigations of western Great Lakes wolves clearly show a distribution of eastern wolf (*C. lycaon*) genetic markers throughout the region.

We do not accept the proposal of Wilson *et al.* (2000) that *C. lycaon* and *C. rufus* (red wolf) are the same species. Their conclusion was based on red wolf and *C. lycaon* occurring on the same branch of a phylogenetic network representing mtDNA information (Wilson *et al.* 2000, Figure 5A). This relationship has not been found in subsequent studies (Wilson *et al.* 2003; Leonard and Wayne 2008, p. 2; Fain *et al.* 2010, p. 9), which placed the red wolf and *C. lycaon* on different branches separated by intervening coyote lineages. This suggests that the red wolf and *C. lycaon* may have evolved independently from common ancestors with modern coyotes, but does not support uniting them as a single species.

*Genetic Composition of Wolves in the Western Great Lakes Region*

Estimates of the genetic composition of the wolves of the western Great Lakes region with respect to the two species (*C. lupus* and *C. lycaon*) are based on the frequencies of different paternal (Y-chromosome) and maternal (mtDNA) markers specific to the each species in samples of wolves from the region. For mtDNA, 66 percent of sampled wolves had *C. lycaon* haplotypes (Fain *et al.* 2010, p. 13; Wheeldon *et al.* 2010). For Y-chromosome haplotypes, 54 percent (Wheeldon *et al.* 2010) or 50 percent (Fain *et al.* 2010, p. 7) of sampled wolves had haplotypes of *C. lycaon.* Male wolves carry both paternal and maternal markers. Of male wolves sampled by Fain *et al.* (2010, p. 12), 41 percent had both maternal and paternal haplotypes of *C. lycaon,* and 13 percent had both maternal and paternal haplotypes of *C. lupus.* Based on a larger sample that also included some wolves from western Ontario, Wheeldon *et al.* (2010) reported 42 percent of the sampled male wolves had both maternal and paternal haplotypes of *C. lycaon* and 21 percent had both maternal and paternal haplotypes of *C. lupus.* Maternal and paternal haplotypes were mixed with respect to the two species for the remaining wolves in both studies.

Although it is clear that *C. lycaon* and *C. lupus* have hybridized in the western Great Lakes region, same-species combinations of paternal and maternal markers in male wolves are more common than expected by random mating (Wheeldon *et al.* 2010). This suggests that there is some constraint on complete hybridization between the two species and that complete blending of the two components of the population is not inevitable. The limited number of historical specimens from the western Great Lakes region that have been genetically characterized all have mtDNA indicative of *C. lycaon* (Leonard and Wayne 2008, pp. 2–3; Wheeldon and White 2009, p. 1), but four of these from the early 20th century also had *C. lupus* Y-chromosome haplotypes, which indicates that hybridization had occurred by that time. The opportunity for hybridization between *C. lycaon,* which belongs to a North American lineage, and *C. lupus,* which evolved in Eurasia, has existed since *C. lupus* entered North America about 500,000 years ago (Kurtén and Anderson 1980), yet a predominantly *C. lycaon* population of wolves still persists in the western Great Lakes region.

*Wolf-Coyote Relationships*

For a discussion on interpretations of wolf-coyote relationships in the western Great Lakes, see the discussion under Factor E. Other Natural or Manmade Factors Affecting Its Continued Existence in this proposed rule.

*Procedural Aspects of Proposal Applying to the Gray Wolf (C. lupus)*

When the Service revised the endangered species list in 1978 to include the species *Canis lupus* in the lower 48 States and Mexico, regulatory protections were applied to all gray wolves in the lower 48 States, including all subspecies of gray wolves, which were subsumed at that time into *C. lupus.* That rule classified the Minnesota gray wolf population as a threatened "species" and gray wolves elsewhere in the lower 48 States and Mexico as another "species" with endangered status. The best scientific information available supports the existence of distinct taxa and populations within the *C. lupus* listing and changes our understanding of North American wolf taxonomy. With regard to the WGL wolf population, current scientific data indicate that *Canis lycaon,* which was understood in 1978 to be a subspecies of *C. lupus,* should be recognized as a full species, and that *C. lycaon* and *C. lupus* both occur, and to some extent, interbreed in the western Great Lakes area (see *Taxonomy of Wolves in the Western Great Lakes Region*).

The existence of this new information does not by itself change the regulatory status of the gray wolf (*C. lupus*) under the Act—such changes must be made through rulemaking. This proposed rule recognizes the taxonomic changes and the improved status of the WGL gray wolf populations and proposes those appropriate and necessary administrative changes for the gray wolf in the WGL and portions of the eastern United States.

Based on our current understanding of wolf systematics, we recognize that not all individual wolves in the WGL region are in fact, gray wolves, *Canis lupus.* Within this rule we are proposing changes to the listing for *C. lupus* and are initiating a status review for *C. lycaon.* These two actions combined will address all wolves in the WGL region.

The procedural aspects of this proposed rule (*e.g.,* the revision of the 1978 listing of the group of gray wolves in Minnesota as a "species" to a DPS and the delisting of that DPS) refer to the gray wolf (*C. lupus*), because that is the named entity currently on the List of Endangered and Threatened Wildlife. Our proposed action here is to establish the existence of a WGL distinct population segment of *C. lupus* and to determine that the DPS is neither endangered nor threatened, despite its proximity to a closely related species, *C. lycaon*—a species whose status we will evaluate for possible protection under the Act in the near future.

**Biology and Ecology of Wolves in the Western Great Lakes**

Gray wolves are the largest wild members of the Canidae, or dog family, with adults ranging from 18 to 80 kilograms (kg) (40 to 175 pounds (lb)) depending upon sex and subspecies (Mech 1974). The average weight of male wolves in Wisconsin is 35 kg (77 lb) and ranges from 26 to 46 kg (57 to 102 lb), while females average 28 kg (62 lb) and range from 21 to 34 kg (46 to 75 lb) (Wisconsin Department of Natural Resources (WI DNR) 1999). Wolves' fur color is frequently a grizzled gray, but it can vary from pure white to coal black. Wolves may appear similar to coyotes (*Canis latrans*) and some domestic dog breeds (such as the German shepherd or Siberian husky) (*C. lupus familiaris*). Wolves' longer legs, larger feet, wider head and snout, and straight tail distinguish them from both coyotes and dogs.

Wolves primarily are predators of medium and large mammals. Wild prey species in North America include white-tailed deer (*Odocoileus virginianus*) and mule deer (*O. hemionus*), moose (*Alces alces*), elk (*Cervus elaphus*), woodland caribou (*Rangifer caribou*) and barren

ground caribou (*R. arcticus*), bison (*Bison bison*), muskox (*Ovibos moschatus*), bighorn sheep (*Ovis canadensis*) and Dall sheep (*O. dalli*), mountain goat (*Oreamnos americanus*), beaver (*Castor canadensis*), snowshoe hare (*Lepus americanus*), and muskrat (*Ondatra zibethicus*), with small mammals, birds, and large invertebrates sometimes being taken (Chavez and Gese 2005, Mech 1974, Stebler 1944, WI DNR 1999, Huntzinger *et al.* 2005). In the WGL DPS, during the last 25 years, wolves have also killed domestic animals including horses (*Equus caballus*), cattle (*Bos taurus*), sheep (*Ovis aries*), goats (*Capra hircus*), llamas (*Lama glama*), pigs (*Sus scrofa*), geese (*Anser sp.*), ducks (*Anas sp.*), turkeys (*Meleagris gallopavo*), chickens (*Gallus sp.*), guinea fowl (*Numida meleagris*), pheasants (*Phasianus colchicus*), dogs, cats (*Felis catus*), and captive white-tailed deer (Paul 2004, 2005; Wydeven 1998; Wydeven *et al.* 2001; Wydeven and Wiedenhoeft 1999, 2000, 2001, 2005).

Wolves are social animals, normally living in packs of 2 to 12 wolves. Winter pack size in Michigan's Upper Peninsula (UP) averaged from 2.7 to 4.6 wolves during the 1995 through 2005 period and ranged from 2 to 14 wolves per pack (Huntzinger *et al.* 2005). Pack size in Wisconsin is similar, averaging 3.8 to 4.1 wolves per pack, and ranging from 2 to 11 wolves in winter 2004–05 (Wydeven and Wiedenhoeft 2005). In Minnesota the average pack size found in the 1988–89, 1997–98, and 2003–04 winter surveys was higher—5.55, 5.4, and 5.3 wolves per pack, respectively (Erb and Benson 2004).

Packs are primarily family groups consisting of a breeding pair, their pups from the current year, offspring from one or two previous years, and occasionally an unrelated wolf. Packs typically occupy, and defend from other packs and individual wolves, a territory of 20 to 214 square (sq) miles (mi) (50 to 550 sq kilometers (km)). Midwest wolf packs tend to occupy territories on the lower end of this size range. Michigan Upper Peninsula territories averaged 103 sq mi (267 sq km in 2000–01 (Drummer *et al.* 2002), Wisconsin territories 37 sq mi (96 sq km) in 2004–05 (Wydeven and Wiedenhoeft 2005), and Minnesota territory size averaged 39 sq mi (102 sq km) in 2003–04 (Erb and Benson 2004). Normally, only the top-ranking ("alpha") male and female in each pack breed and produce pups. Litters are born from early April into May; they range from 1 to 11 pups, but generally include 4 to 6 pups (Michigan Department of Natural Resources (MI DNR) 1997; USFWS 1992; USFWS *et al.*

2001). Normally a pack has a single litter annually, but the production of 2 or 3 litters in one year has been routinely documented in Yellowstone National Park (USFWS *et al.* 2002; Smith *et al.* 2005).

Yearling wolves frequently disperse from their natal packs, although some remain with their natal pack. Adult wolves and pups older than 5 months also may disperse but at much lower frequencies (Fuller 1989). Dispersers may range over large areas as lone animals after leaving their natal pack or they may locate suitable unoccupied habitat and a member of the opposite sex and begin their own pack. These dispersal movements allow a wolf population to quickly expand and colonize areas of suitable habitat that are nearby or even those that are isolated by a broad area of unsuitable habitat. Additional details on extraterritorial movements are found in *Delineating the Boundaries of the Proposed WGL Gray Wolf DPS,* below.

## Recovery of Western Great Lakes Wolves

### Recovery Criteria

Recovery plans are not regulatory documents and are instead intended to provide guidance to the Service, States, and other partners on methods of minimizing threats to listed species and achieving recovery. These documents include, among other elements required under section 4(f) of the Act, criteria for determining when a species can be delisted. There are many paths to accomplishing recovery of a species; in fact, recovery of a species is a dynamic process requiring adaptive management that may, or may not, strictly adhere to the guidance provided in a recovery plan.

We use recovery criteria in concert with evidence that threats have been minimized sufficiently and populations have achieved long-term viability to judge when a species can be reclassified from endangered to threatened or delisted. Recovery plans, including recovery criteria, are subject to change based upon new information and are revised accordingly and when practicable. In a similar sense, implementation of planned actions is subject to changing information and availability of resources. We have taken these considerations into account in the following discussion.

The 1978 Recovery Plan (hereafter Recovery Plan) and the 1992 Revised Recovery Plan for the Eastern Timber Wolf (hereafter Revised Recovery Plan) contain the same two recovery criteria. The first recovery criterion states that

the survival of the wolf in Minnesota must be assured. We, and the Eastern Timber Wolf Recovery Team (Peterson in litt. 1997, 1998, 1999a, 1999b), have concluded that this recovery criterion remains valid. It addresses a need for reasonable assurances that future state, Tribal, and Federal wolf management and protection will maintain a viable recovered population of wolves within the borders of Minnesota for the foreseeable future.

The Recovery Plan for the Eastern Timber Wolf was based on the best available information on wolf taxonomy at the time of its original publication and subsequent revision. As discussed above in *Taxonomy of Wolves in the Western Great Lakes Region,* since the publication of those plans, several studies have produced conflicting results regarding the taxonomic identity of the wolf that historically occupied the eastern States. Currently, the Service subscribes to the view that what was formerly recognized as the subspecies *C. lupus lycaon* should be recognized as a unique species, *C. lycaon*. Regardless of its taxonomic identity, however, this recovery program has always focused on recovering the wolf population that survived in, and has expanded outward from, northeastern Minnesota. Thus, the Plans guide our analysis of recovery of the wolves in the western Great Lakes area.

Although the recovery criteria identified in the Recovery Plan predate the scientific field of conservation biology, the conservation principles of representation (conserving the genetic diversity of a taxon), resilience (the ability to withstand demographic and environmental variation), and redundancy (sufficient populations to provide a margin of safety) were incorporated into these criteria. Maintenance of the Minnesota wolf population is vital in terms of representation and resilience, because the remaining genetic diversity of wolves in the eastern United States (other than red wolves) was carried by the several hundred wolves that survived in Minnesota into the early 1970s. The Recovery Team insisted that the remnant Minnesota wolf population be maintained and protected to achieve wolf recovery in the eastern United States. The successful growth of the remnant Minnesota population has maintained and maximized the representation of that genetic diversity among wolves in the WGL. Although the Revised Recovery Plan did not establish a specific numerical criterion for the Minnesota wolf population, it did identify, for planning purposes only, a population goal of 1,251–1,400

animals for that Minnesota population (USFWS 1992, p. 28). A population of this size would increase the likelihood of maintaining its genetic diversity over the long term. This large Minnesota wolf population also provides resiliency to reduce the adverse impacts of unpredictable demographic and environmental events. Furthermore, the Revised Recovery Plan specifies a wolf population that is spread across about 40 percent of Minnesota (Zones 1 through 4) (USFWS 1992, p. 28), adding a geographic component to the resiliency of the Minnesota wolf population.

The second recovery criterion in the Recovery Plan states that at least one viable wolf population should be reestablished within the historical range of the eastern timber wolf outside of Minnesota and Isle Royale, Michigan (USFWS 1992, pp. 24–26). The reestablished population enhances both the resiliency and redundancy of the WGL metapopulation.

The Recovery Plan provides two options for reestablishing this second population. If it is an isolated population, that is, located more than 100 mi (160 km) from the Minnesota wolf population, the second population should consist of at least 200 wolves for at least 5 years, based upon late-winter population estimates, to be considered viable. Late-winter estimates are made at a time when most winter mortality has already occurred and before the birth of pups, thus, the count is made at the annual low point of the population. Alternatively, if the second population is located within 100 mi (160 km) of a self-sustaining wolf population (for example, the Minnesota wolf population), it should be maintained at a minimum of 100 wolves for at least 5 years, based on late-winter population estimates, to be considered viable. A nearby second population would be considered viable at a smaller size because it would be geographically close enough to exchange wolves with the Minnesota population (that is, they would function as a metapopulation), thereby bolstering the smaller second population both genetically and numerically.

The original Recovery Plan did not specify where in the eastern United States the second population should be re-established. Therefore, the second population could have been established anywhere within the triangular Minnesota–Maine–Florida area covered by the Recovery Plan and the Revised Recovery Plan, except on Isle Royale (Michigan) or within Minnesota. The Revised Recovery Plan identified potential gray wolf reestablishment areas in northern Minnesota, the UP of Michigan, the Adirondack Forest Preserve of New York, a small area in eastern Maine, and a larger area of northwestern Maine and adjacent northern New Hampshire (USFWS 1992, pp. 56–58). Neither the 1978 nor the 1992 recovery criteria suggest that the restoration of the gray wolf throughout all or most of what was thought to be its historical range in the eastern United States, or to all of these potential re-establishment areas, is necessary to achieve recovery under the Act.

In 1998, the Eastern Timber Wolf Recovery Team clarified the application of the recovery criterion for the second population to the wolf population that had developed in northern Wisconsin and the adjacent UP of Michigan. This second population is less than 100 mi (160 km) from the Minnesota wolf population. The Recovery Team recommended that the numerical recovery criterion for the Wisconsin–Michigan population be considered met when consecutive late-winter wolf surveys document that the population equals or exceeds 100 wolves (excluding Isle Royale wolves) for the 5 consecutive years between the first and last surveys (Peterson in litt. 1998).

*Recovery Trends for Wolves in the Western Great Lakes Region*

Minnesota Recovery

During the pre-1965 period of wolf bounties and legal public trapping, wolves persisted in the remote northeastern portion of Minnesota but were eliminated from the rest of the State. Estimated numbers of Minnesota wolves before their listing under the Act in 1974 include 450 to 700 wolves in 1950–53 (Fuller *et al.* 1992, p. 43, based on data in Stenlund 1955, p. 19), 350 to 700 wolves in 1963 (Cahalane 1964, p. 10), 750 wolves in 1970 (Leirfallom 1970, p. 11), 736 to 950 wolves in 1971–72 (Fuller *et al.* 1992, p. 44), and 500 to 1,000 wolves in 1973 (Mech and Rausch 1975, p. 85). Although these estimates were based on different methodologies and are not directly comparable, each puts the pre-listing abundance of wolves in Minnesota at 1,000 or less. This was the only significant wolf population in the United States outside Alaska during those time periods.

After the gray wolf was listed as endangered under the Act in 1974, the Minnesota population estimates increased (see table 1 below). Mech estimated the population to be 1,000 to 1,200 wolves in 1976 (USFWS 1978, pp. 4, 50–52), and Berg and Kuehn (1982, p. 11) estimated that there were 1,235 wolves in 138 packs in the winter of 1978–79. In 1988–89, the Minnesota Department of Natural Resources (MN DNR) repeated the 1978–79 survey and also used a second method to estimate wolf numbers in Minnesota. The resulting independent estimates were 1,500 and 1,750 wolves in at least 233 packs; the lower number was derived by a method comparable to the 1978–79 survey (Fuller *et al.* 1992, pp. 50–51).

During the winter of 1997–98, the MN DNR repeated a statewide wolf population and distribution survey, using methods similar to those of the two previous surveys. Field staff of Federal, State, Tribal, and county land management agencies and wood products companies were queried to identify occupied wolf range in Minnesota. Data from 5 concurrent radio telemetry studies tracking 36 packs, representative of the entire Minnesota wolf range, were used to determine average pack size and territory area. Those figures were then used to calculate a statewide estimate of wolf and pack numbers in the occupied range, with single (non-pack) wolves factored into the estimate (Berg and Benson 1999, pp. 1–2).

TABLE 1—MINIMUM WINTER WOLF POPULATIONS IN MINNESOTA, WISCONSIN, AND MICHIGAN (EXCLUDING ISLE ROYALE) FROM 1976 THROUGH 2010. (NOTE THAT THERE ARE SEVERAL YEARS BETWEEN THE FIRST THREE ESTIMATES. MINNESOTA DOES NOT CONDUCT ANNUAL SURVEYS.)

| Year | Number of wolves | | | |
|---|---|---|---|---|
| | Minnesota | Wisconsin | Michigan | Wisconsin and Michigan total |
| 1976 | 1,000–1,200 | | | |
| 1978–79 | 1,235 | | | |
| 1988–89 | 1,500–1,750 | 31 | 3 | 34 |

011445A

Federal Register / Vol. 76, No. 87 / Thursday, May 5, 2011 / Proposed Rules

TABLE 1—MINIMUM WINTER WOLF POPULATIONS IN MINNESOTA, WISCONSIN, AND MICHIGAN (EXCLUDING ISLE ROYALE) FROM 1976 THROUGH 2010. (NOTE THAT THERE ARE SEVERAL YEARS BETWEEN THE FIRST THREE ESTIMATES. MINNESOTA DOES NOT CONDUCT ANNUAL SURVEYS.)—Continued

| Year | Number of wolves | | | |
|---|---|---|---|---|
| | Minnesota | Wisconsin | Michigan | Wisconsin and Michigan total |
| 1989–90 | ... | 34 | 10 | 44 |
| 1990–91 | ... | 40 | 17 | 57 |
| 1991–92 | ... | 45 | 21 | 66 |
| 1992–93 | ... | 40 | 30 | 70 |
| 1993–94 | ... | 57 | 57 | 114 |
| 1994–95 | ... | 83 | 80 | 163 |
| 1995–96 | ... | 99 | 116 | 215 |
| 1996–97 | ... | 148 | 113 | 261 |
| 1997–98 | 2,445 | 180 | 139 | 319 |
| 1998–99 | ... | 205 | 169 | 374 |
| 1999–2000 | ... | 248 | 216 | 464 |
| 2000–01 | ... | 257 | 249 | 506 |
| 2001–02 | ... | 327 | 278 | 604 |
| 2002–03 | ... | 335 | 321 | 656 |
| 2003–04 | 3,020 | 373 | 360 | 733 |
| 2004–05 | ... | 435 | 405 | 840 |
| 2005–06 | ... | 467 | 434 | 899 |
| 2006–07 | ... | 546 | 509 | 1,055 |
| 2007–08 | 2,921 | 549 | 520 | 1,069 |
| 2008–09 | ... | 637 | 577 | 1,214 |
| 2009–10 | ... | 690 | 557 | 1,247 |

The 1997–98 survey concluded that approximately 2,445 wolves existed in about 385 packs in Minnesota during that winter period (90 percent confidence interval from 1,995 to 2,905 wolves) (Berg and Benson 1999, p. 4). This figure indicated the continued growth of the Minnesota wolf population at an average rate of about 3.7 percent annually from 1970 through 1997–98. Between 1979 and 1989 the annual growth rate was approximately 3 percent, and it increased to between 4 and 5 percent in the next decade (Berg and Benson 1999, p. 5; Fuller et al. 1992, p. 51). As of the 1998 survey, the number of Minnesota wolves had reached approximately twice the number specified in the recovery planning goal for Minnesota (USFWS 1992, p. 28).

Minnesota DNR conducted another survey of the State's wolf population and range during the winter of 2003–04, again using methodology similar to the previous surveys. That survey concluded that an estimated 3,020 wolves in 485 packs occurred in Minnesota (90 percent confidence interval for this estimate is 2,301 to 3,708 wolves) (Erb and Benson 2004, pp. 7, 9). The MN DNR conducted its most recent survey of wolf population and range during the winter of 2007–08. That survey concluded that an estimated 2,921 wolves in 503 packs occurred in Minnesota (90 percent confidence interval for this estimate is 2,192 to 3,525 wolves). The results of

the past three surveys suggest that the wolf population has been numerically stable over the past 10 or more years (Erb 2008, p. 6).

As wolves increased in abundance in Minnesota, they also expanded their distribution. During 1948–53, the primary wolf range was estimated at 11,954 sq mi (31,080 sq km) (Stenlund 1955, p. 19). A 1970 questionnaire survey in Minnesota resulted in an estimated wolf range of 14,769 sq mi (38,400 sq km) (calculated by Fuller et al. 1992, p. 43, from Leirfallom 1970). Fuller et al. (1992, p. 44), using data from Berg and Kuehn (1982), estimated that Minnesota primary wolf range encompassed 14,038 sq mi (36,500 sq km) during the winter of 1978–79. By 1982–83, pairs or breeding packs of wolves were estimated to occupy an area of 22,000 sq mi (57,050 sq km) in northern Minnesota (Mech et al. 1988, p. 86). That study also identified an additional 15,577 sq mi (40,500 sq km) of peripheral range, where habitat appeared suitable but no wolves or only lone wolves existed. The 1988–89 study produced an estimate of 23,165 sq mi (60,200 sq km) as the contiguous wolf range at that time in Minnesota (Fuller et al. 1992, pp. 48–49; Berg and Benson 1999, p. 3, 5), an increase of 65 percent over the primary range calculated for 1978–79.

The 1997–98 survey concluded that the contiguous wolf range had expanded to 33,971 sq mi (88,325 sq km), a 47 percent increase in 9 years (Berg and

Benson 1999, p. 5). By that time the Minnesota wolf population was using most of the available primary and peripheral range identified by Mech et al. (1988, p. 86). The wolf population in Minnesota had increased in abundance and distribution to the point that its contiguous range covered approximately 40 percent of the State during 1997–98. In contrast, the 2003–04 survey failed to show a continuing expansion of wolf range in Minnesota, and any actual increase in wolf numbers since 1997–98 was attributed to increased wolf density within a stabilized range (Erb and Benson 2004, p. 7). The results of the 2007–08 survey also indicated that wolf range in Minnesota remained "essentially unchanged" since 2004 (Erb 2008, not paginated).

Although the Minnesota DNR does not conduct a formal wolf population survey annually, it includes the species in its annual carnivore track survey. This survey, standardized and operational since 1994, provides an annual index of abundance for several species of large carnivores by counting their tracks along 20-mile (32-km) long standardized survey routes in northern Minnesota. In 2009, wolves were detected on 71 percent of the 58 routes surveyed, and the resulting indices of abundance and distribution were not appreciably different from recent years (Erb 2009, not paginated).

Summary for Minnesota

The Minnesota wolf population has increased from an estimated 1,000 individuals in 1976 to nearly 3,000 today and the estimated wolf range in the State has expanded by approximately 225 percent (from approximately 15,000 sq mi (24,100 sq km) to approximately 34,000 sq mi (54,700 sq km)) since 1970. Over the past 10–12 years, the population size and range have remained stable, as most of the primary and peripheral habitat has been occupied. Based on the current abundance and distribution of the Minnesota wolf population, we believe its continued survival is ensured, and it achieves the first recovery criterion of the Revised Recovery Plan.

Wisconsin Recovery

Wolves were considered to have been extirpated from Wisconsin by 1960. No formal attempts were made to monitor the State's wolf population from 1960 through 1978. Although individual wolves and an occasional wolf pair were reported from 1960 through 1975 (Thiel 1978, Thiel 1993), there was no documentation of wolf reproduction occurring in Wisconsin, and the wolves that were reported may have been dispersing animals from Minnesota.

Wolves are believed to have reestablished breeding packs in Wisconsin in the winter of 1975–76. The Wisconsin Department of Natural Resources (WI DNR) began wolf population monitoring in 1979–80, estimating a statewide population of 25 wolves at that time (Wydeven and Wiedenhoeft 2000, pp. 151, 159; Wydeven et al. 2009c, pp. 93–97). This population remained relatively stable for several years, and then declined to approximately 15 to 19 wolves in the mid-1980s. In the late 1980s, the Wisconsin wolf population began an increase that has continued into 2010, when 690 wolves were counted (Wydeven et al. 2010, Figure 3).

Since 1979, WI DNR has intensively surveyed its wolf population on an annual basis using a combination of aerial, ground, and satellite radio telemetry complemented by snow tracking and wolf sign surveys (Wydeven et al. 2006a, pp. 4–5; Wydeven et al. 2009c, pp. 90–91). Wolves are trapped from May through September and fitted with radio collars, with a goal of having at least one radio collared wolf in approximately half of the wolf packs in Wisconsin. Aerial locations are obtained from each functioning radio collar about once per week, and pack territories are estimated and mapped from the movements of the

individuals who exhibit localized patterns. From December through March, the pilots make special efforts to visually locate and count the individual wolves in each radio-tracked pack.

Snow tracking is used to supplement the information gained from aerial sightings and to provide pack size estimates for packs lacking a radio-collared wolf. Tracking is done by assigning survey blocks to trained trackers, who then drive snow-covered roads in their blocks and follow all wolf tracks they encounter. Snowmobiles are used to locate wolf tracks in more remote areas with few roads. The results of the aerial and ground surveys are carefully compared to properly separate packs and to avoid over-counting (Wydeven et al. 2006a, pp. 4–5). The estimated number of wolves in each pack is based on the aerial and ground observations made of the individual wolves in each pack over the winter.

Because the monitoring methods focus on wolf packs, lone wolves are likely undercounted in Wisconsin. As a result, the annual population estimates are probably slight underestimates of the actual wolf population within the State during the late-winter period. Fuller (1989, p. 19) noted that lone wolves are estimated to compose from 2 to 29 percent of the total population in the area. Wisconsin DNR surveys have estimated 2–15 percent of the winter population as loners (Wydeven et al. 2009c, p. 96). These surveys, however, are focused on heavily forested portions of northern and central Wisconsin; therefore, dispersing wolves traveling other portions of the State are less likely to be detected, and often such wolves are only documented after vehicle collisions or accidental shootings. Broader use of trail cameras by members of the public is improving the WI DNR's ability to detect lone wolves across the State.

As previously stated, population estimates are made at the low point of the annual wolf population cycle. Thus, Wisconsin wolf population estimates are conservative in two respects. They undercount lone wolves, and the count is made at the annual low point of the population. This methodology is consistent with the recovery criteria established in the Revised Recovery Plan, which established numerical criteria to be measured with data obtained by late-winter surveys. Based on these considerations, an estimated 690 to 733 wolves in 181 packs, including 35 wolves on Native American reservations, were in Wisconsin in early 2010, representing an 8 percent increase from 2009 (Wydeven et al. 2010, pp. 12–13).

In the winter of 1994–95, wolves were first documented in Jackson County, Wisconsin, well to the south of the area occupied by other Wisconsin wolf packs in the northern part of the State (Thiel et al. 2009, pp. 109–110). The number of wolves in this central Wisconsin area has dramatically increased since that time. During the winter of 2009–10, there were 100–106 wolves in 25 packs in the central forest wolf range (Zone 2 in the Wisconsin Wolf Management Plan; Wydeven et al. 2010, p. 5) and an additional 46 to 48 wolves in 12 or 13 packs in the marginal habitat in Zone 3, located between Zone 1 (northern forest wolf range) and Zones 2 and 4 (Wydeven et al. 2010, p. 5).

During the winter of 2004–05, 11 to 13 wolves were believed to be primarily occupying Native American reservation lands in Wisconsin (Wydeven in litt. 2005); this increased to 16 to 17 in 2005–06, 17 to 19 in 2007–08 (Wydeven and Wiedenhoeft 2008, Summary), approximately 27 in 2008–2009 (Wydeven and Wiedenhoeft 2008, p. 1), and approximately 35 in 2009–10 (Wydeven et al. 2010, p. 1). The 2009–10 survey consisted of 3 packs totaling 10–11 wolves on the Bad River Chippewa Reservation and a pack of 2 wolves on the Lac Courtes Oreilles Chippewa Reservation, both in northwestern Wisconsin. There also were two packs of five wolves each on the Lac du Flambeau Reservation in north-central Wisconsin. A pack of four wolves and three pairs occurred on the Menominee Reservation and a three-wolf pack occurred on the Stockbridge Reservation, both in northeastern Wisconsin (Wydeven et al. 2010, Table 6). A pack of four to five wolves spent time on portions of the Red Cliff Chippewa Reservation along the Lake Superior shoreline. Wolf packs also used scattered lands of the St. Croix Chippewa in northwest Wisconsin, the Ho Chunk Nation in central Wisconsin, and Potawatomi in northeast Wisconsin. The Tribal land of the Ho-Chunk, St. Croix Chippewa, and Potawatomi are composed mostly of scattered parcels of land, and are not likely to provide significant amounts of wolf habitat. About 90 percent of packs in northern Wisconsin Zone 1, and northern portions of Zone 3 are located in ceded territory where Chippewa Bands have retained hunting and gathering rights.

In 2002, wolf numbers in Wisconsin alone surpassed the 1992 Revised Recovery Plan criterion for a second population within 100 miles of the Minnesota population (100 wolves for a minimum of 5 consecutive years (USFWS 1992, p. 4)). Furthermore, in 2004, Wisconsin wolf numbers

exceeded the 1992 recovery criterion of 200 animals for 6 successive late-winter surveys for an isolated wolf population (USFWS 1992, p. 4). Wisconsin population estimates for 1985 to 2010 increased from 15 to 690 wolves (see table 1 above) and from 4 to 181 packs (Wydeven *et al.* 2010, figure 3). This represents an annual population increase of 21 percent through 2000, and an average annual increase of 6 percent for the most recent 6 years. The slower rates of increase since 2000 are an indication that the State's wolf population growth and geographic expansion are beginning to level off.

Michigan Recovery

Except for Isle Royale, wolves were extirpated from Michigan as a reproducing species long before they were listed as endangered under the Act in 1974. Prior to 1989, the last known breeding population of wild Michigan wolves outside Isle Royale occurred in the mid-1950s. However, as wolves began to reoccupy northern Wisconsin, the Michigan Department of Natural Resources (MI DNR) began noting single wolves at various locations in the UP of Michigan. Wolf recovery in Michigan began with the documentation of three wolves traveling together and making territorial marks in the central UP during the fall of 1988; and the subsequent birth of pups in this territory during spring 1989 (Beyer *et al.* 2009, p. 73). Since that time, wolf packs have spread throughout the UP, with immigration occurring from Wisconsin on the west and possibly from Ontario on the east. Wolves now are found in every county of the UP, with the possible exception of Keweenaw County (Huntzinger *et al.* 2005, p. 6; Roell 2009, pers. comm.).

The MI DNR annually monitors the wolf population in the UP by conducting a winter survey. Roads and trails are searched intensively and extensively using trucks and snowmobiles (Potvin *et al.* 2005). Complete surveys conducted from 1999 to 2006 provided an opportunity to evaluate multiple sampling approaches (MI DNR 2008). Based on these evaluations, it was determined that a geographically stratified sampling protocol produced unbiased, precise estimates of wolf abundance (Potvin *et al.* 2005; Drummer, unpublished data). The sampling protocol implemented in 2007 allows trackers to spend more time in smaller areas (MI DNR 2008).

The UP is divided into 21 survey units from which a stratified random sample is drawn, covering roughly 50 percent of the UP every year (MI DNR

2008). Pack locations are derived from previous surveys, citizen reports, and extensive ground and aerial tracking of radio-collared wolves. During the winter of 2009–10, 557 wolves in 109 packs were resident in the UP (MI DNR in litt. 2010, Table 1). Surveys along the border of adjacent survey units are coordinated to avoid double counting of wolves and packs occupying those border areas. In areas with a high density of wolves, ground surveys by four to six surveyors with concurrent aerial tracking are used to accurately delineate territories of adjacent packs and count their members (Beyer *et al.* 2004, pp. 2–3; Huntzinger *et al.* 2005, pp. 3–6; Potvin *et al.* 2005, p. 1661). As with Wisconsin, the Michigan surveys likely miss lone wolves, thus underestimating the actual population.

Based on annual surveys in late winter, estimates of wolves in the UP increased from 57 wolves in 1994 to 557 in late winter 2009–10 (see table 1 above). Over the last 10 years, the annualized rate of increase has been about 12 percent (MI DNR in litt. 2010, table 1). This rate has varied from year to year, but there appear to be two distinct phases of population growth, with relatively rapid growth (25.8 percent average) from 1995 through 2000 and slower growth (10.1 percent average) from 2001 through 2010. In 2005, the number of wolves in the Michigan population alone surpassed the recovery criterion for an isolated wolf population of 200 animals for 6 successive late-winter surveys, as specified in the Revised Recovery Plan (USFWS 1992, pp. 24–26).

To date, no wolf packs are known to be primarily using Tribal-owned lands in Michigan (Roell 2011, pers. comm.). Native American Tribes in the UP of Michigan own small, scattered parcels of land relative to the size of wolf pack territories. Thus, no one Tribal property would likely support a wolf pack. However, as wolves occur in all counties in the UP and are wide-ranging, Tribal land is likely used periodically by wolves.

In October 2004, a coyote trapper mistakenly captured and killed a wolf in Presque Isle County in the northern Lower Peninsula (LP) of Michigan. This was the first verification of a wolf in the northern LP in at least 65 years (Roell *et al.* 2010, p. 4). This wolf had been trapped and radio-collared by the MI DNR the previous year (2003) while it was a member of an eastern UP pack. Since 2004, Michigan has surveyed the northern LP to determine whether wolves had successfully colonized the area. From 2005 through 2007, the survey had two components: A

prioritized area search and a targeted area search based on citizen reports of wolves or wolf sign. USDA–Wildlife Services, Little Traverse Bay Band of Odawa Indians, and Central Michigan University worked cooperatively on the surveys. Nine units ranging in size from 200–400 sq mi (322–644 sq km) were surveyed; however, no wolf sign was found (Roell *et al.* 2010, p. 4). Beginning in 2008, a targeted search approach was used. The MI DNR issued a press release asking citizens to report any wolves or wolf sign; again, no wolves were detected in winters of 2008–10 (Roell *et al.* 2009, p. 5; Roell 2010, pers. comm.).

In the summer of 2009, video images of single wolves were recorded in two of the three northern UP counties nearest to the UP (Roell *et al.* 2010, p. 4). The videos, taken in Emmet County in May 19, 2009, and Presque Isle County in July 27, 2009, may have been of the same animal (Roell 2009, pers. comm.). In 2010, USDA Wildlife Services and MI DNR staff confirmed a single breeding pair with three pups in Cheboygan County in the northern LP (MI DNR 2010). This is the first time a wolf pack has been verified in the LP since the early 1900s. In 2008, the DNR recognized the likelihood that small numbers of wolves would eventually move into the northern LP and form persistent packs (Potvin 2003, pp. 29–30; Gehring and Potter 2005, p. 1242; Beyer *et al.* 2006, p. 35), and revised its Wolf Management Plan in part to incorporate provisions for wolf management in the northern LP (MI DNR 2008a, p. 46).

The wolf population of Isle Royale National Park, Michigan, is not considered to be an important factor in the recovery of wolves in the WGL. The Park population is small and isolated and lacks genetic uniqueness (Wayne *et al.* 1991, pp. 47–49). In addition, this island population probably has not had any contact with mainland wolf populations since its founding pair crossed the Lake Superior ice in the late 1940s (Peterson *et al.* 1998, p. 828). For genetic reasons and constraints on expansion due to the island's small size, this wolf population does not contribute significantly towards meeting numerical recovery criteria; however, long-term research on this wolf population has added a great deal to our knowledge of the species. The wolf population on Isle Royale has ranged from 12 to 50 wolves since 1959, and was 19 wolves in the winter of 2009–2010 (Vucetich and Peterson 2010, p. 5).

Summary for Wisconsin and Michigan

The two-State wolf population, excluding Isle Royale wolves, has

exceeded 100 wolves since late-winter 1993–94 and has exceeded 200 wolves since late-winter 1995–96. Therefore, the combined wolf population for Wisconsin and Michigan has exceeded the second recovery criterion of the 1992 Revised Recovery Plan for a nonisolated wolf population, since 1999. Furthermore, the two-State population has exceeded the recovery criterion for an isolated second population since 2001.

Other Areas In and Near the Proposed Western Great Lakes DPS

No surveys have been conducted to document the number of wolves present in North Dakota or South Dakota, but an increasing number of wolves has apparently been detected in the eastern portions of these States. The eastern boundaries of North Dakota and South Dakota are approximately 19 and 81 mi (30 and 130 km), respectively, from occupied habitat in Minnesota. Biologists who are familiar with wolves in these States, however, generally agree that the wolves found there are primarily lone dispersers, although there were reports of pups being seen in the Turtle Mountains of North Dakota, in 1994 (Collins in litt. 1998).

Other records include an adult male shot near Devil's Lake, North Dakota in 2002, another adult male shot in Richland County in extreme southeastern North Dakota in 2003 (Fain in litt. 2006), and a vehicle-killed adult male found near Sturgis, South Dakota, in 2006 (Larson in litt. 2006). In contrast to the other South Dakota wolves of the last 25 years, the animal found near Sturgis was genetically identified as having come from the Greater Yellowstone area (Fain in litt. 2006). Most recently, a wolf was shot in Roberts County, South Dakota in January 2009 (reportedly running with two or three other wolves) (Prieksat in litt. 2009), and another wolf was found dead in a foothold trap that was set as part of an ongoing USDA Wildlife Service's coyote control operation in southeastern Eddy County, North Dakota (Bicknell in litt. 2009). See *Delineating the Boundaries of the Proposed WGL Gray Wolf DPS* in this proposed rule for a detailed discussion of movement of wolves.

Wolf dispersal is expected to continue as wolves travel away from the more saturated habitats in the primary range into peripheral areas where wolves are extremely sparse or absent. Unless they return to the primary range and join or start a pack there, they are unlikely to contribute to long-term maintenance of WGL wolf populations.

Although it is possible for these dispersers to encounter and mate with a mature wolf outside the primary range, the lack of large expanses of unfragmented habitat make it unlikely that wolf packs will persist in these peripheral areas; lack of contiguous habitat is expected to seriously impede further expansion. The only exception is the northern LP of Michigan, where several studies indicate that a persistent wolf population may develop (Gehring and Potter 2005, p. 1242; Potvin 2003, pp. 29–30), albeit dependent on occasional to frequent immigration of UP wolves. Despite the constraints on further expansion described here, however, current wolf populations in Minnesota, Wisconsin, and the UP of Michigan have already greatly exceeded the recovery levels defined in the 1992 Revised Recovery Plan, and maintenance of these numbers is not contingent on recruitment of wolves from areas outside the primary range that has been established for the WGL.

Summary of Wolf Recovery in the Western Great Lakes Region

Wolves in the proposed WGL DPS greatly exceed the recovery criteria (USFWS 1992, pp. 24–26) for (1) a secure wolf population in Minnesota, and (2) a second population outside Minnesota and Isle Royale consisting of 100 wolves for 5 successive years. Based on the criteria set by the Eastern Wolf Recovery Team in 1992 and reaffirmed in 1997 and 1998 (Peterson in litt. 1997, in litt. 1998), the proposed DPS contains sufficient wolf numbers and distribution to ensure their long-term survival within the DPS.

The maintenance and expansion of the Minnesota wolf population has maximized the preservation of the genetic diversity that remained in the proposed WGL DPS when its wolves were first protected in 1974. Furthermore, the Wisconsin–Michigan wolf population has exceeded the numerical recovery criterion even for a completely isolated second population. Therefore, even in the unlikely event that this two-State population was to become totally isolated and wolf immigration from Minnesota and Ontario completely ceased, it would still remain a viable wolf population for the foreseeable future, as defined by the Revised Recovery Plan (USFWS 1992, pp. 25–26). Finally, each of the wolf populations in Wisconsin and Michigan has exceeded 200 animals for 11 and 10 years, respectively, so if either were somehow to become isolated, they would remain viable, and each State has committed to manage its wolf population at or above viable

population levels. The wolf's numeric and distributional recovery criteria in the WGL have been met.

Have the Wolves of the Western Great Lakes Region Been Restored?

Leonard and Wayne (2008, p. 3) have stated that Great Lakes wolves have not been restored based on absence of certain historical mtDNA haplotypes from the current population, an estimated historical population size far greater than the current population size, and the admixture of coyote and western wolf haplotypes in the current population.

The spatial representativeness of both the historical and recent samples reported by Leonard and Wayne (2008) has been questioned by Mech (2009). For example, 16 recent but no historical samples from Minnesota were included in the study. Leonard and Wayne (2009) responded that they did not believe that genetic differences were likely to be pronounced at the geographic scale discussed by Mech and Paul (2008) and Mech (2009).

The current population of wolves in Minnesota, Wisconsin, and Michigan is derived from expansion of the remnant population in northeastern Minnesota (Fain *et al.* 2010, p. 12), which was likely to have included both *C. lupus* and *C. lycaon* (Mech and Frenzel 1971; Mech 2010, p. 135), and in the case of UP Michigan, with possible contributions from *C. lycaon* from southern Ontario (Fain *et al.* 2010, p. 12).

Subsequent studies with larger samples of the current wolf population find, despite acknowledged influence of western wolves, the current population is generally representative of the historical population (Fain *et al.* 2010, p. 14; Wheeldon *et al.* 2010). Koblmüller *et al.* (2009, pp. 10–11) found "comparatively slight" differentiation at autosomal microsatellite DNA loci between historical and current Great Lakes wolves. Wheeldon and White (2009, p. 4) present microsatellite DNA evidence that the hybridization processes noted by Leonard and Wayne (2008) were taking place over a century ago, so that the current population is comparable to the historical population with respect to admixture. Hybridization between eastern wolves and western wolves in the western Great Lakes region occurred prior to significant human effects on population size or habitat (Fain *et al.* 2010, p. 14). According to Fain *et al.* (2010, p. 14), the current population of wolves in the western Great Lakes "represents an ancient component of the northeast ecosystem and have been

011449A

established throughout the region for thousands of years."

The loss of mtDNA haplotypes found in historical but not the current western Great Lakes wolf population reported by Leonard and Wayne (2008, pp. 2–3) and the loss of allelic diversity (Fain *et al.* 2010, p. 11), indicate that a genetic bottleneck occurred when wolves were nearly extirpated from the western Great Lakes region and the period of slow recovery that immediately followed. Despite these "founder effects" on the genetic composition of the western Great Lakes population, various measures of genetic diversity remain comparable to other wolf populations (Koblmüller *et al.* 2009; Fain *et al.* 2010, p. 12; Wheeldon *et al.* 2010), at least partially owing to contributions from western wolves (*C. lupus*).

Wolves in the WGL region display a healthy level of heterozygosity (Fain *et al.* 2010, p. 12), and show no evidence of genetic bottlenecks (Koblmuller *et al.* 2009, p. 1). Schwartz and Vucetich (2009, p. 2) have stated that "By all accounts, the return of wolves to the Great Lakes region has been successful * * * they are doing superbly—both in terms of population viability and ecological function." Cronin and Mech (2009, p. 2) state, "We suggest that wolves in the [W]GL region can simply be called a wolf population with mixed ancestry." They further state that, "It is generally acknowledged that the Great Lakes wolf population is fit, with abundant genetic variation" (Cronin and Mech 2009, p. 2).

## Distinct Vertebrate Population Segment Policy Overview

Pursuant to the Act, we consider whether information is sufficient to indicate that listing, reclassifying, or delisting any species, subspecies, or, for vertebrates, any DPS of these taxa may be warranted. To interpret and implement the DPS provision of the Act and congressional guidance, the Service and the National Marine Fisheries Service (NMFS) published a policy regarding the identification of distinct vertebrate population segments under the Act (Policy Regarding the Recognition of Distinct Vertebrate Population Segments Under the Endangered Species Act, 61 FR 4722, February 7, 1996) (hereafter DPS Policy). Under the DPS policy, two factors are considered in a decision regarding the potential identification of a DPS: (1) Discreteness of the population segment in relation to the remainder of the taxon, and (2) the significance of the population segment to the taxon to which it belongs. If a population meets both tests, it can be

identified as a DPS. Then a third factor, the DPS's conservation status, is evaluated in relation to the Act's standards for listing, delisting, or reclassification, meaning that we undertake an analysis to determine whether the DPS is endangered or threatened or does not meet the criteria for listing. All three steps are necessary components of a complete DPS analysis.

## Past Practice and History of Using DPSs

As of February 1, 2011, of the 392 native vertebrate listings, 85 are listed as less than an entire taxonomic species or subspecies (henceforth referred to in this discussion as populations) under one of several authorities, including the "distinct population segment" language in the Act's definition of species (section 3(16)). Thirty-three of these 85 populations, which span 52 different taxa, predate the 1996 DPS Policy; as such, the final listing determinations for these populations did not include formal policy-based analyses or expressly designate the listed entity as a DPS. In several instances, however, the Service and National Marine Fisheries Service (NMFS) have established a DPS and revised the List of Endangered and Threatened Wildlife in a single action, as shown in the following examples.

In February 1985, the Service delisted the brown pelican (*Pelecanus occidentalis*) in the southeastern United States and continued to identify it as endangered throughout the remainder of its range (50 FR 4938). In June 1994, NMFS revised the entry for the gray whale (*Eschrichtius robustus*) to remove the eastern North Pacific population from the List while retaining the western North Pacific population as endangered (59 FR 31094). In July 2003, the Service established two DPSs of the Columbian white-tailed deer (*Odocoileus virginianus leucurus*)—the Douglas County DPS and the Columbia River DPS—and delisted only the Douglas County DPS, while listing the Columbia River DPS (68 FR 43647). In March 2007, the Service established a DPS of the grizzly bear (*Ursus arctos horribilis*) for the Greater Yellowstone Area and surrounding area within the existing grizzly bear listing in the lower 48 States, and delisted this DPS (72 FR 14865). Also in March 2007, the Service identified the American crocodile (*Crocodylus acutus*) in Florida as a DPS within the existing endangered listing of the American crocodile in the United States and reclassified the Florida DPS from endangered to threatened (71 FR 13027). Revising and delisting the WGL DPS of wolves is consistent with the

Service's past practice and does not represent a change in agency position.

## Proposed Western Great Lakes Distinct Population Segment

In 1978, based on what was at that time the "best available biological data," the Service stated that there were two "species" of gray wolves in the conterminous United States: "For purposes of this rulemaking, the gray wolf (*Canis lupus*) group in Mexico and the 48 conterminous States of the United States, other than Minnesota, is being considered as one "species," and the gray wolf group in Minnesota is being considered as another "species." (43 FR 9607, 9610, March 9, 1978). The Service then assigned a different status under the Act to each of those two "species," finding the Minnesota gray wolf "species" to be threatened, while the other gray wolf "species" (the 48 conterminous States, except Minnesota, and in Mexico) to be endangered. The 1978 rule referred to the Minnesota listing as the listing of a "species" when, clearly, based on the information available at that time, the Minnesota wolves did not taxonomically constitute a separate species of wolf. Therefore, the 1978 listing either effectively established a Minnesota DPS or listed an entity in a portion of its broader range.

The DPS Policy (61 FR 4725, February 7, 1996) expressly provides for reexamining pre-policy DPS listings: "Any DPS of a vertebrate taxon that was listed prior to implementation of this policy will be reevaluated on a case-by-case basis as recommendations are made to change the listing status for that distinct population segment. The appropriate application of the policy will also be considered in the 5-year reviews of the status of listed species required by section 4(c)(2) of the Act." Based on this provision, we are, within this proposed rule, (1) recognizing that a Minnesota DPS was established in 1978, (2) reevaluating that DPS listing, and (3) proposing to revise that DPS to meet the criteria in the DPS policy and to reflect the "best available biological data."

A gray wolf DPS that includes only Minnesota does not meet the criteria in the DPS policy because it is not discrete "* * * in relation to the remainder of the species to which it belongs" (61 FR 4725, February 7, 1996). The Minnesota wolf population has expanded beyond State boundaries and is connected to the wolf population in Wisconsin and Michigan, as evidenced by frequent movements of wolves among the States (Van Deelen 2009, p. 140; Treves *at al.* 2009, pp. 192–195) and genetic analyses

that demonstrate the Wisconsin and Michigan wolves are mostly from the same genetic mix as Minnesota wolves (Wheeldon and White 2009, p. 4; Fain *et al.* 2010). Therefore, we are proposing to revise the boundaries of the Minnesota DPS to meet the criteria in the DPS policy as discussed under the *Distinct Population Segment Analysis,* below.

*Geographical Area of the Proposed Western Great Lakes DPS*

The geographical area of the proposed WGL DPS is shown in figure 1, below, and is described as all of Minnesota, Wisconsin, and Michigan; the portion of North Dakota north and east of the Missouri River upstream to Lake Sakakawea and east of the centerline of

Highway 83 from Lake Sakakawea to the Canadian border; the portion of South Dakota north and east of the Missouri River; the portions of Iowa, Illinois, and Indiana north of the centerline of Interstate Highway 80; and the portion of Ohio north of the centerline of Interstate Highway 80 and west of the Maumee River at Toledo.

**BILLING CODE 4310–55–P**



## Figure 1. Western Great Lakes Distinct Population Segment

BILLING CODE 4310–55–C

*Distinct Population Segment Analysis*

Analysis for Discreteness

Under the 1996 DPS Policy (61 FR 4722), a population segment of a vertebrate taxon may be considered discrete if it satisfies either of the following conditions: (1) it is markedly separated from other populations of the

same taxon as a consequence of physical, physiological, ecological, or behavioral factors (quantitative measures of genetic or morphological discontinuity may provide evidence of this separation); or (2) it is delimited by international governmental boundaries within which differences in control of exploitation, management of habitat, conservation status, or regulatory

mechanisms exist that are significant in light of section 4(a)(1)(D) of the Act.

*Markedly Separated from Other Populations of the Same Taxon*—The western boundaries of the proposed WGL DPS are approximately 400 mi (644 km) from the nearest known gray wolf packs in Wyoming and Montana. The distance between those western packs and the nearest packs within the proposed WGL DPS is nearly 600 mi

(966 km). The area between Minnesota packs and northern Rocky Mountain (NRM) packs largely consists of unsuitable habitat, with only scattered islands of possibly suitable habitat, such as the Black Hills of eastern Wyoming and western South Dakota. There are no known populations of gray wolves to the south or east of the proposed WGL DPS within the United States.

As discussed in the previous section, wolves are known to disperse over vast distances, but straight line documented dispersals of 400 mi (644 km) or more are very rare. Although we cannot rule out the possibility of a WGL wolf traveling 600 mi (966 km) or more and joining or establishing a pack in the northern Rockies, such a movement has not been documented and is expected to happen very infrequently, if at all. Similar movements from the NRM wolf population into the proposed WGL DPS are unknown and are expected to happen infrequently. The 2006 Sturgis (South Dakota) wolf is the closest that an NRM wolf has come to entering the proposed WGL DPS (Fain in litt. 2006); however, the Sturgis wolf would still have had to travel over 300 mi (500 km) before encountering the nearest wolf pack in the proposed WGL DPS. As the discreteness criterion requires that the DPS be "markedly separated" from other populations of the taxon rather than requiring complete isolation, this high degree of physical separation between the WGL DPS and the northern Rocky Mountains satisfies the discreteness criterion.

*Delimited by International Boundaries with Significant Management Differences*—The DPS policy allows us to use international borders to delineate the boundaries of a DPS if there are differences in control of exploitation, conservation status, or regulatory mechanisms between the countries. The border between the United States and Canada has been used as the northern boundary of the listed entity since gray wolves were reclassified in the lower 48 States and Mexico in 1978. There remain significant cross-border differences in exploitation, management, conservation status, and regulatory mechanisms. About 52,000 to 60,000 wolves occur in Canada, where suitable habitat is abundant (Boitani 2003, p. 322). Because of this abundance, wolves in Canada are not protected by Federal laws and are only minimally threatened in most Canadian provinces (Pletscher *et al.* 1991, p. 546). In the United States, unlike Canada, Federal protection and intensive management has been necessary to recover the wolf (Carbyn 1983).

In general, Canadian gray wolf populations are sufficiently large and healthy so that population regulation, rather than protection and close monitoring, is the management focus. There are an estimated 4,000 wolves in Manitoba (Manitoba Conservation undated). Hunting is allowed nearly province-wide, including in those provincial hunting zones adjoining northwestern Minnesota, with last year's season running from August 31, 2009, through March 31, 2010 (Manitoba Conservation 2009a). Trapping wolves is allowed province-wide, except in and immediately around Riding Mountain National Park (southwestern Manitoba), with last year's season running from October 14, 2008, through February 28 or March 31, 2009 (varies with trapping zone) (Manitoba Conservation 2009b).

The Ontario Ministry of Natural Resources estimates there are 8,850 wolves in the province, based on prey composition and abundance, topography, and climate and wolf numbers in most parts of the province are believed to be stable or increasing since about 1993 (Ontario MNR 2005a, pp. 7–9). In 2005, Ontario limited hunting and trapping of wolves by closing the season from April 1 through September 14 in central and northern Ontario (Ontario MNR 2005b). In southern Ontario, the portion of the province that is adjacent to the proposed WGL DPS, wolf hunting and trapping is permitted year round (Ontario MNR 2005c). If delisted, Minnesota, Wisconsin, and Michigan would carefully monitor and manage wolves to retain populations at or above the recovery goal (see Factor D). Therefore, even though biologically the WGL wolf population is simply a well-connected southern extension of wolves in Canada, we will continue to use the United States-Canada border to mark the northern boundary of the DPS due to the difference in control of exploitation, conservation status, and regulatory mechanisms between the two countries.

*Conclusion*—We find, based on our analysis of the best available scientific information, that the proposed WGL DPS is markedly separated from other United States populations of gray wolves and difference in control of exploitation, conservation status, and regulatory mechanisms justifies discreteness between United States and Canadian wolf populations. Therefore, the proposed WGL DPS meets the criterion for discreteness under the DPS policy.

Analysis for Significance

If we determine that a population segment is discrete, we next consider available scientific evidence of its significance to the taxon to which it belongs. Our DPS policy states that this consideration may include, but is not limited to, the following: (1) Persistence of the discrete population segment in an ecological setting unusual or unique for the taxon; (2) evidence that loss of the discrete population segment would result in a significant gap in the range of the taxon; (3) evidence that the discrete population segment represents the only surviving natural occurrence of a taxon that may be more abundant elsewhere as an introduced population outside its historic range; and/or (4) evidence that the discrete population segment differs markedly from other populations of the species in its genetic characteristics. Factor 2 applies to the proposed WGL DPS and is included in our analysis for significance. Factors 1, 3, and 4 do not apply to the proposed WGL DPS and thus are not included in our analysis for significance.

*Significant Gap in the Range of the Taxon*—Wolves once lived throughout most of North America. Wolves have been extirpated from most of the southern portions of their historical North American range. The successful restoration of a viable wolf metapopulation to large parts of Minnesota, Wisconsin, and Michigan has filled a significant gap in the holarctic range of gray wolves in the United States, and it provides an important extension of the range of gray wolves in North America. The loss of the WGL wolf population would, therefore, represent a significant gap in the species' holarctic range in that the WGL wolf population is the only wolf population in the conterminous States east of the Rocky Mountains, except for the red wolves (a different species) being restored along the Atlantic Coast, and currently holds about 40 percent of North American gray wolves known to occur south of Canada.

*Finding*—We find, based on our analysis of the best available scientific information, that the proposed WGL DPS is significant to the taxon to which it belongs because its loss would result in a significant gap in the range of the taxon. Therefore, the proposed WGL DPS meets the criterion for significance under the DPS policy.

Discrete Vertebrate Population Segment Conclusion

We propose, based on our review of the best available scientific data, that the WGL DPS is discrete from other gray

wolf populations as a result of physical separation from other gray wolf populations in the United States and the international border with Canada. The DPS is significant to the taxon to which it belongs because it contains a wolf metapopulation that fills a large gap in the historical range of the taxon in the conterminous States. Therefore, we have determined that this population segment of wolves satisfies the discreteness and significance criteria required for a DPS. The evaluation of the appropriate conservation status for the proposed WGL DPS is found below.

*Delineating the Boundaries of the Proposed WGL Gray Wolf DPS*

In contrast to a species or a subspecies, a DPS is a biological population that is delineated by a boundary that is based on something other than established taxonomic distinctions. Therefore, the starting point for delineating a DPS is the biological population or metapopulation, and a geographical delineation of the DPS must reasonably represent the population or metapopulation and its biological characteristics and recovery needs.

To delineate the boundary of the proposed WGL DPS, we considered the current distribution of wolves in the Midwest and the characteristic movements of those wolves and of wolves elsewhere. We examined the best available scientific data on long-distance movements, including long-distance movements followed by return movements to the vicinity of the natal pack. We concluded that wolf behavior and the nature of wolf populations require that we include within the area of the DPS some subset of known long-distance movement locations. However, as explained below, wolf biology and common sense argue against including all known or potential long-distance movements within the DPS's boundaries.

The analysis detailed below resulted in the proposed boundaries of the WGL DPS that are shown in figure 1. This DPS has been delineated to include the core recovered wolf population plus a wolf movement zone around the core wolf populations. This geographic delineation is not intended to include all areas to which wolves have moved from the Great Lakes population. Rather, it includes the area currently occupied by wolf packs in Minnesota, Wisconsin, and Michigan; the nearby areas in these States in which wolf packs may become established in the foreseeable future; and a surrounding area into which Minnesota, Wisconsin, and Michigan wolves occasionally move but where

persistent packs are not expected to be established because suitable habitat is rare and exists only as small patches. The area surrounding the core wolf populations includes the locations of most known dispersers from the core populations, especially the shorter and medium-distance movements from which wolves are most likely to return to the core areas and contribute to the wolf population. Therefore, the DPS encompasses the current range of the population, which is considered to be viable, including the primary range and the peripheral range.

The WGL areas that are regularly occupied by wolf packs are well documented in Minnesota (Erb and Benson 2004, p. 12, fig. 3; Erb and Don Carlos 2009, pp. 57–60), Wisconsin (Wydeven *et al.* 2006, p. 33, fig. 1; Wydeven *et al.* 2009c, pp. 93–98), and the UP of Michigan (Huntzinger *et al.* 2005, pp. 25–27, figs. 4–6; Beyer *et al.* 2009, pp. 73–75). Wolves have successfully colonized most, perhaps all, suitable habitat in Minnesota. Minnesota data from the winter of 2007–08 indicate that wolf numbers and density have stabilized since 1997–98, and there was no expansion of occupied range in the State (Erb 2008, pp. 5–7). Wisconsin wolves now occupy most habitat areas believed to have a high probability of wolf occurrence except for some areas of northeastern Wisconsin, and the State's wolf population continues to annually increase in numbers and, to a lesser degree, in area (Wydeven and Wiedenhoeft 2009, p. 2). The UP of Michigan has wolf packs throughout the peninsula. In the last 22 years, the wolf population in the UP has grown every year except 1997 and 2010 (Roell 2010, pers. comm.). Over the past 5 years, the average annual growth has been about 7 percent. While the population trend continues to increase, the rate of increase has slowed, consistent with any population expanding into and then filling available habitat. The population may continue to grow or remain steady; however, a small or even negative growth rate may occur any year and should be considered a natural fluctuation seen in any wildlife population.

When delineating the proposed WGL DPS, we had to consider the high degree of mobility shown by wolves. The dispersal of wolves from their natal packs and territories is a normal and important behavioral attribute of the species that facilitates the formation of new packs, the occupancy of vacant territories, and the expansion of occupied range by the "colonization" of vacant habitat. Data on wolf dispersal

rates from numerous North American studies (summarized in Fuller *et al.* 2003, p. 179, Table. 6.6; Boyd and Pletscher 1999, p. 1102, Table 6) show dispersal rates of 13 to 48 percent of the individuals in a pack. Sometimes the movements are temporary, and the wolf returns to a location in or near its natal territory. In some cases, a wolf may continue its movement for scores or even hundreds of miles until it locates suitable habitat, where it may establish a territory or join an existing pack. In other cases, a wolf is found dead at a distance from its original territory, leaving unanswered the questions of how far it would have gone and whether it eventually would have returned to its natal area or population.

*Minnesota*—The current record for a documented movement by a wolf in North America is held by a Minnesota wolf that moved a minimum (that is, the straight-line distance from known starting point to most distant point) of at least 550 mi (886 km) northwest into Saskatchewan (Fritts 1983, pp. 166–167). Nineteen other primarily Minnesota movements summarized by Mech (in litt. 2005) averaged 154 mi (248 km). Their minimum distance of travel ranged from 32 to 532 mi (53–886 km) with the minimum dispersal distance shown by known returning wolves ranging from 54 mi (90 km) to 307 mi (494 km).

*Wisconsin*—In 2004, a wolf tagged in Michigan was killed by a vehicle in Rusk County in northwestern Wisconsin, 295 mi (475 km) west of his original capture location in the eastern UP (Wydeven *et al.* 2005b, p. 4). A north-central Wisconsin yearling female wolf traveled a similar distance (298 mi, 480 km) to the Rainy Lake region of Ontario during 1988–89 (Wydeven *et al.* 1995, p. 149).

*Michigan*—Drummer *et al.* (2002, pp. 14–15) reported 10 long-distance dispersal events involving UP wolves. One of these wolves moved to north-central Missouri and another to southeastern Wisconsin, both beyond the core wolf areas in the WGL. The average straight-line distance traveled by those two wolves was 377 mi (608 km), while the average straight-line distance for all 10 of these wolves was 232 mi (373 km). Their straight-line distances ranged from 41 to 468 mi (66 to 753 km).

*Illinois and Indiana*—In December 2002, a Marshall County (Illinois) wolf likely dispersed from the Wisconsin wolf population, nearly 200 mi (322 km) to the north (Great Lakes Directory 2003). The Randolph County (Indiana) wolf had traveled a minimum distance of at least 428 mi (689 km) to get around

Lake Michigan from its central Wisconsin birthplace; it likely traveled much farther than that unless it went through the city or suburbs of Chicago (Wydeven *et al.* 2004, pp. 10–11; Treves *et al.* 2009, p. 194). The Pike County (Illinois) wolf that was shot in late 2005 was about 300 mi (180 km) from the nearest wolf packs in central Wisconsin.

*North Dakota, South Dakota, and Nebraska*—Licht and Fritts (1994, p. 77) tabulated seven wolves found dead in North Dakota and South Dakota from 1981 through 1992 that are believed to have originated from Minnesota, based on skull morphometrics. Although none of these wolves were marked or radio-tracked, making it impossible to determine the point of initiation of their journey, a minimum travel distance for the seven can be determined from the nearest wolf breeding range in Minnesota. For the seven, the average distance to the nearest wolf breeding range was 160 mi (257 km) and ranged from 29 to 329 mi (46 to 530 km). One of these seven wolves moved west of the Missouri River before it died.

Genetic analysis of a wolf killed in Harding County, in extreme northwestern South Dakota, in 2001 indicated that it originated from the Minnesota-Wisconsin-Michigan wolf populations (Fain in litt. 2006). The straight-line travel distance to the nearest Minnesota wolf pack is nearly 400 mi (644 km).

The wolf from the Greater Yellowstone area that was killed by a vehicle on Interstate 90 near Sturgis, South Dakota, in March of 2006 traveled a minimum straight-line distance of about 270 mi (435 km) from the nearest known Greater Yellowstone pack before it died (USFWS *et al.* 2006, in USFWS Program Report, Figure 1).

A large canid was shot by a Boyd County (Nebraska) rancher in late 1994 or early 1995, likely after crossing the frozen Missouri River from South Dakota (Anschutz in litt. 2006, Jobman in litt. 1995). It was determined to be a wolf that originated from the Great Lakes wolf populations (Fain in litt. 2006), whose nearest pack would have been about 300 mi (480 km) away. A wolf illegally killed near Spalding, Nebraska, in December of 2002 also originated from the Minnesota-Wisconsin-Michigan wolf population, as determined by genetic analysis (Anschutz in litt. 2003, Fain in litt. 2006). The nearest Minnesota wolf pack is nearly 350 mi (563 km) from this location.

*Other notable extra-territorial movements*—The extra-territorial movements of several wolves were radio-tracked in sufficient detail to provide insight into their actual travel routes and total travel distances for each trek, rather than only documenting straight-line distance from beginning to end-point. Merrill and Mech (2000, pp. 429–431) reported on four such Minnesota wolves with documented travel distances ranging from 305 to 2,640 mi (490 to 4,251 km) and an average travel route length of 988 mi (1590 km). Wydeven (1994, pp. 20–22) described a Wisconsin wolf that moved from northwestern Wisconsin to the northern suburbs of St. Paul, Minnesota, for 2 weeks (apparently not seen or reported to authorities by the local residents), then moved back to north-central Wisconsin. The total travel distance was 278 mi (447km) from her natal pack into Minnesota and on to the north-central Wisconsin location where she settled down.

While investigating the origins of Scandinavian wolf populations, Linnell *et al.* (2005, p. 387) compiled wolf dispersal data from 21 published studies, including many cited separately here. Twenty-two of 298 compiled dispersals (7.4 percent) were over 300 km (186 mi). Eleven dispersals (3.7 percent) were over 500 km (311 mi). Because of the likelihood that many long-distance dispersers are never reported, they conclude that the proportion of long-distance dispersers is probably severely underestimated.

From these extra-territorial movement records, we conclude that wolf movements of over 200 mi (320 km) straight-line distance have been documented on numerous occasions, while shorter distance movements are more frequent. Movements of 300 mi (480 km) straight-line distance or more are less common, but include one Minnesota wolf that journeyed a straight-line distance of 300 mi (480 km) and a known minimum-travel distance of 2,640 mi (4,251 km) before it reversed direction, as determined by its satellite-tracked collar. This wolf ultimately returned to a spot only 24 mi (40 km) from its natal territory (Merrill and Mech 2000, p. 430). Although much longer movements have been documented, including some by midwestern wolves, return movements to the vicinity of natal territories have not been documented for extra-territorial movements beyond 300 mi (480 km).

Based on these extra-territorial movement data, we conclude that affiliation with the midwestern wolf population is diminished and essentially lost when dispersal takes a Midwest wolf a distance of 250 to 300 mi (400 to 480 km) beyond the outer edge of the areas that are continuously occupied by wolf packs. Although some WGL wolves will move beyond this distance, available data indicate that longer distance dispersers are unlikely to return to their natal population. Therefore, they have lost their functional connection with, and potential conservation value to, the WGL wolf population.

Wolves moving substantial distances outward from the core areas of Minnesota, Wisconsin, and Michigan will encounter landscape features that are at least partial barriers to further wolf movement and that may, if crossed, impede attempts of wolves to return toward the WGL core areas. If such partial barriers are in a location that has separate utility in delineating the biological extent of a wolf population, they can and should be used to delineate the DPS boundary. Such landscape features are the Missouri River in North Dakota and downstream to Omaha, Nebraska, and Interstate Highway 80 from Omaha eastward through Illinois, Indiana, and into Ohio, ending where this highway crosses the Maumee River in Toledo, Ohio. We do not believe these are absolute barriers to wolf movement. There is evidence that several Minnesota-origin wolves have crossed the Missouri River (Licht and Fritts 1994, pp. 75 & 77, Fig. 1 and Table 1; Anschutz in litt. 2003, 2006) and some Midwest wolves have crossed interstate highways (Merrill and Mech 2000, p. 430). There is also evidence that some wolves are hesitant to cross highways (Whittington *et al.* 2004, pp. 7, 9; Wydeven *et al.* 2005b, p. 5; but see Blanco *et al.* 2005, pp. 315–316, 319–320 and Kohn *et al.* 2000, p. 22). Interstate highways and smaller roads are a known mortality factor for wolves and, therefore, pose a partial barrier to wolf movements (Blanco *et al.* 2005, p. 320). The death of a NRM wolf near Sturgis in western South Dakota (Fain in litt. 2006) suggests that the area of the Dakotas west of the Missouri River may be traversed by a small number of wolves coming from both the NRM and WGL wolf populations, as well as wolves from Canada (Licht and Fritts 1994, pp. 75–77). Wolves in this area cannot be assumed to belong to the WGL wolf population, supporting our belief that the boundary should not be designed to include the locations of all known dispersers.

## Summary of Factors Affecting the Species

Section 4 of the Act and its implementing regulations (50 CFR part 424) set forth the procedures for listing species, reclassifying species, or removing species from listed status.

011454A

"Species" is defined by the Act as including any species or subspecies of fish or wildlife or plants, and any distinct vertebrate population segment of fish or wildlife that interbreeds when mature (16 U.S.C. 1532(16)). Once the "species" is identified, we then evaluate whether that species may be endangered or threatened because of one or more of the five factors described in section 4(a)(1) of the Act. We must consider these same five factors in delisting a species. We may delist a species according to 50 CFR 424.11(d) if the best available scientific and commercial data indicate that the species is neither endangered nor threatened because (1) the species is extinct, (2) the species has recovered and is no longer endangered or threatened, or (3) the original scientific data used at the time the species was classified were in error.

A recovered species is one that no longer meets the Act's definition of threatened or endangered. The analysis for a delisting due to recovery must be based on the five factors outlined in section 4(a)(1) of the Act. This analysis must include an evaluation of threats that existed at the time of listing, those that currently exist, and those that could potentially affect the species once the protections of the Act are removed.

In the context of the Act, the term "threatened species" means any species or subspecies or, for vertebrates, Distinct Population Segment (DPS) that is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range. The term "endangered species" means any species that is in danger of extinction throughout all or a significant portion of its range. The Act does not define the term "foreseeable future." For the purpose of this proposal, we define the "foreseeable future" to be the extent to which, given the amount and substance of available data, we can anticipate events or effects, or reliably extrapolate threat trends that relate to the status of the WGL DPS. For the proposed WGL DPS, the foreseeable future differs for each factor potentially affecting the DPS.

It took a considerable length of time for public attitudes and regulations to result in a social climate that promoted and allowed for wolf recovery in the proposed WGL DPS. The length of time over which this shift occurred, and the ensuing stability in those attitudes, gives us confidence that this social climate will persist. Also, the States have had a solid history of cooperating and assisting in wolf recovery and have made a commitment, through legislative actions, to continue these activities. We believe this commitment will continue.

When evaluating the available information, with respect to foreseeable future, we take into account reduced confidence as we forecast further into the future. As explained previously, our analysis of the factors affecting the WGL DPS refer to the gray wolf (*C. lupus*), because that is the named entity currently on the List of Endangered and Threatened Wildlife (see *Procedural Aspects of Proposal Applying to the Gray Wolf* above).

## A. The Present or Threatened Destruction, Modification, or Curtailment of Its Habitat or Range

A common misconception is that wolves inhabit only pristine forests or mountainous areas, where human developments and other activities have produced negligible change to the natural landscape. Their extirpation south of Canada and Alaska, except for the heavily forested portions of northeastern Minnesota, reinforced this popular belief. However, the primary reason wolves survived in those areas was not because of habitat conditions, but, rather, because remote areas were sufficiently free of the human persecution that elsewhere killed wolves faster than the species could reproduce (Mech 1995a, p. 271).

In the western Great Lakes region, wolves in the densely forested northeastern corner of Minnesota have expanded into the more agricultural portions of central and northwestern Minnesota, northern and central Wisconsin, and the entire UP of Michigan. Habitats currently being used by wolves span the broad range from the mixed hardwood-coniferous forest wilderness area of northern Minnesota, through sparsely settled, but similar habitats in Michigan's UP and northern Wisconsin, and into more intensively cultivated and livestock-producing portions of central and northwestern Minnesota and central Wisconsin.

Wolf research and the expansion of wolf range over the last three decades have shown that wolves can successfully occupy a wide range of habitats, and they are not dependent on wilderness areas for their survival. In the past, for instance, wolf populations occupied nearly every type of habitat north of mid-Mexico that contained large ungulate prey species, including bison, elk, white-tailed deer, mule deer, moose, and woodland caribou; thus, wolves historically occupied the entire Midwest. Inadequate prey density or high levels of human-caused mortality appear to be the only factors that limit wolf distribution (Mech 1995a, p 271; 1995b, p. 544).

### Suitable Habitat Within the Proposed Western Great Lakes DPS

Various researchers have investigated habitat suitability for wolves in the central and eastern portions of the United States. In recent years, most of these efforts have focused on using a combination of human density, density of agricultural lands, deer density or deer biomass, and road density, or have used road density alone to identify areas where wolf populations are likely to persist or become established (Mladenoff *et al.* 1995, pp. 284–285; 1997, pp. 23–27; 1998, pp. 1–8, 1999; pp. 39–43; Harrison and Chapin 1997, p. 3; 1998, p. 769–770; Wydeven *et al.* 2001a, pp. 110–113; Erb and Benson 2004, p. 2; Potvin *et al.* 2005, pp. 1661–1668; Mladenoff *et al.* 2009, pp. 132–135).

To a large extent, road density has been adopted as the best predictor of habitat suitability in the Midwest due to the connection between roads and human-related wolf mortality. Several studies demonstrated that wolves generally did not maintain breeding packs in areas with a road density greater than about 0.9 to 1.1 linear miles per sq mi (0.6 to 0.7 km per sq km) (Thiel 1985, pp. 404–406; Jensen *et al.* 1986, pp. 364–366; Mech *et al.* 1988, pp. 85–87; Fuller *et al.* 1992, pp. 48–51). Work by Mladenoff and associates indicated that colonizing wolves in Wisconsin preferred areas where road densities were less than 0.7 mi per sq mi (0.45 km per sq km) (Mladenoff *et al.* 1995, p. 289). However, recent work in the UP of Michigan indicates that, in some areas with low road densities, deer density appears to limit wolf occupancy (Potvin *et al.* 2005, pp. 1667–1668) and may prevent recolonization of portions of the UP. In Minnesota, a combination of road density and human density is used by MN DNR to model suitable habitat. Areas with a human density up to 8 people per sq km are suitable if they also have a road density less than 0.5 km per sq km. Areas with a human density of less than 4 people per sq km are suitable if they have road densities up to 0.7 km per sq km (Erb and Benson 2004, Table 1).

Road density is a useful parameter because it is easily measured and mapped, and because it correlates directly and indirectly with various forms of other human-related wolf mortality factors. A rural area with more roads generally has a greater human density, more vehicular traffic, greater access by hunters and trappers, more farms and residences, and more domestic animals. As a result, there is

a greater likelihood that wolves in such an area will encounter humans, domestic animals, and various human activities. These encounters may result in wolves being hit by motor vehicles, being controlled by government agents after becoming involved in depredations on domestic animals, being shot intentionally by unauthorized individuals, being trapped or shot accidentally, or contracting diseases from domestic dogs (Mech *et al.* 1988, pp. 86–87; Mech and Goyal 1993, p. 332; Mladenoff *et al.* 1995, pp. 282, 291). Based on mortality data from radio-collared Wisconsin wolves from 1979 to 1999, natural causes of death predominate (57 percent of mortalities) in areas with road densities below 1.35 mi per sq mi (0.84 km per sq km), but human-related factors produced 71 percent of the wolf deaths in areas with higher road densities (Wydeven *et al.* 2001a, pp. 112–113).

Some researchers have used a road density of 1 mi per sq mi (0.6 km per sq km) of land area as an upper threshold for suitable wolf habitat. However, the common practice in more recent studies is to use road density to predict probabilities of persistent wolf pack presence in an area. Areas with road densities less than 0.7 mi per sq mi (0.45 km per sq km) are estimated to have a greater than 50 percent probability of wolf pack colonization and persistent presence, and areas where road density exceeded 1 mi per sq mi (0.6 km per sq km) have less than a 10 percent probability of occupancy (Mladenoff *et al.* 1995. pp. 288–289; Mladenoff and Sickley 1998, p. 5; Mladenoff *et al.* 1999, pp. 40–41). Wisconsin researchers view areas with greater than 50 percent probability as "primary wolf habitat," areas with 10 to 50 percent probability as '"secondary wolf habitat," and areas with less than 10 percent probability as unsuitable habitat (WI DNR 1997, pp. 47–48).

The territories of packs that do occur in areas of high road density, and hence with low expected probabilities of occupancy, are generally near broad areas of more suitable habitat that are likely serving as a source of wolves, thereby assisting in maintaining wolf presence in the higher road density and, therefore, less-suitable areas (Mech 1989, pp. 387–388; Wydeven *et al.* 2001a, p. 112). The predictive ability of this model was questioned (Mech 2006a, 2006b) and responded to (Mladenoff *et al.* 2006), and an updated analysis of Wisconsin pack locations and habitat has been completed (Mladenoff *et al.* 2009). This new model maintains that road density is still an important indicator of suitable wolf

habitat; however, lack of agricultural land is also a strong predictor of habitat wolves occupy.

It appears that essentially all suitable habitat in Minnesota is now occupied, range expansion has slowed or possibly ceased, and the wolf population within the State has stabilized (Erb and Benson 2004, p. 7; Erb and Don Carlos 2009, pp. 57, 60). This suitable habitat closely matches the areas designated as Wolf Management Zones 1 through 4 in the Revised Recovery Plan (USFWS 1992, p. 72), which are identical in area to Minnesota Wolf Management Zone A (see Figure 2, below; MN DNR 2001, Appendix III).

Recent surveys for Wisconsin wolves and wolf packs show that wolves have now recolonized the areas predicted by habitat models to have high and moderate probability of occupancy (primary and secondary wolf habitat). The late-winter 2008–09 Wisconsin wolf survey identified packs occurring throughout the central Wisconsin forest area (Wolf Management Zone 2, Figure 3) and across the northern forest zone (Zone 1, Figure 3), with highest pack densities in the northwest and north-central forest; pack densities are lower, but increasing, in the northeastern corner of the State (Wydeven and Wiedenhoeft 2009, Figure 1).

Michigan wolf surveys in winter 2009–10 continue to show wolf pairs or packs (defined by Michigan DNR as two or more wolves traveling together) in every UP county except Keweenaw County (Huntzinger *et al.* 2005, p. 6; Roell 2011, pers. comm.), which probably lacks a suitable ungulate prey base during winter months (Potvin *et al.* 2005, p. 1665).

Habitat suitability studies in the Upper Midwest indicate that the only large areas of suitable or potentially suitable habitat areas that are currently unoccupied by wolves are located in the northern LP of Michigan (Mladenoff *et al.* 1997, p. 23; Mladenoff *et al.* 1999, p. 39; Potvin 2003, pp. 44–45; Gehring and Potter 2005, p. 1239). One published Michigan study (Gehring and Potter 2005, p. 1239) estimates that these areas could host 46 to 89 wolves; a graduate thesis estimates that 110–480 wolves could exist in the northern LP (Potvin 2003, p. 39). The northern LP is separated from the UP by the Straits of Mackinac, whose 4-mile (6.4-km) width freezes during mid- and late-winter in some years. In recent years there have been several documented occurrences of wolves in the northern LP, but until 2010, there had been no indication of persistence beyond several months. Prior to those occurrences, the last recorded wolf in the LP was in 1910.

In the first instance a radio-collared female wolf from the eastern UP was trapped and killed by a coyote trapper in Presque Isle County in late October 2004. In late November 2004, tracks from two wolves were verified in the same northern LP county. Follow-up winter surveys by the DNR in early 2005 failed to find additional wolf tracks in the northern LP (Huntzinger *et al.* 2005, p. 7); additional surveys conducted in 2006–10 also failed to find evidence of continued northern LP wolf presence (Roell *et al.* 2009, p. 5; Roell 2010, pers. comm.). A video of a single wolf was taken near Mackinac City in Cheboygan County in May 2009, and another trail-camera video-recorded a wolf in Presque Isle County in July 2009. These two sightings may have been the same animal (Roell 2009, pers. comm.). In 2010, USDA Wildlife Services and MI DNR staff confirmed a single breeding pair with pups in Cheboygan County in the northern LP (MI DNR 2010).

These northern LP patches of potentially suitable habitat contain a great deal of private land, are small in comparison to the occupied habitat on the UP and in Minnesota and Wisconsin, and are intermixed with agricultural and higher road density areas (Gehring and Potter 2005, p. 1240). Therefore, continuing wolf immigration from the UP may be necessary to maintain a future northern LP population. The Gehring and Potter study (2005, p. 1239) predicted 850 sq mi (2,198 sq km) of suitable habitat (areas with greater than a 50 percent probability of wolf occupancy) in the northern LP. Potvin (2003, p. 21), using deer density in addition to road density, believes there are about 3,090 sq mi (8,000 sq km) of suitable habitat in the northern LP. Gehring and Potter (2005, p. 1239) exclude from their calculations those northern LP low-road-density patches that are less than 19 sq mi (50 sq km), while Potvin (2003, pp. 10–15) does not limit habitat patch size in his calculations. Both of these area estimates are well below the minimum area described in the Revised Recovery Plan, which states that 10,000 sq mi (25,600 sq km) of contiguous suitable habitat is needed for a viable isolated gray wolf population, and half that area (5,000 sq mi or 12,800 sq km) is needed to maintain a viable wolf population that is subject to wolf immigration from a nearby population (USFWS 1992, pp. 25–26).

Based on the above-described studies and the guidance of the 1992 Revised Recovery Plan, the Service has concluded that suitable habitat for wolves in the proposed WGL DPS can be determined by considering four

**26108**    **Federal Register** / Vol. 76, No. 87 / Thursday, May 5, 2011 / Proposed Rules

factors: Road density, human density, prey base, and size. An adequate prey base is an absolute requirement, but in much of the proposed WGL DPS the white-tailed deer density is well above adequate levels, causing the other factors to become the determinants of suitable habitat. Prey base is primarily of concern in the UP where severe winter conditions cause deer to move away from some lakeshore areas, making otherwise suitable areas locally and seasonally unsuitable. Road density and human density frequently are highly correlated; therefore, road density is the best single predictor of habitat suitability. However, areas with higher road density may still be suitable if the human density is very low, so a consideration of both factors is sometimes useful (Erb and Benson 2004, p. 2).

Finally, although the territory of individual wolf packs can be relatively small, packs are not likely to persist as a viable population if they occupy a small isolated island of otherwise unsuitable habitat. The 1992 Revised Recovery Plan indicates that a wolf population needs to occupy at least 10,000 contiguous sq mi (25,600 sq km) to be considered viable if it is isolated from other wolf populations, and must occupy at least half that area if it is not isolated from another self-sustaining population (USFWS 1992, pp. 25–26).

Based on the information discussed above, we conclude that Minnesota Wolf Management Zone A (Federal Wolf Management Zones 1–4, Figure 2), Wisconsin Wolf Zones 1 and 2 (Figure 3), and the UP of Michigan contain a sufficient amount of suitable wolf habitat. The other areas within the DPS are unsuitable habitat, or are potentially habitat that is too small or too fragmented to be suitable for maintaining a viable wolf population.

*Wolf Populations on Federal Lands*

National forests, and the prey species found in their various habitats, have been important to wolf conservation and recovery in the core areas of the proposed WGL DPS. There are five national forests in Minnesota, Wisconsin, and Michigan (Superior, Chippewa, Chequamegon-Nicolet, Ottawa, and Hiawatha National Forests) with wolf packs that exclusively or partially reside on them. Their wolf populations range from approximately 484 on the Superior National Forest in northeastern Minnesota, to an estimated 182 on the UP's Ottawa National Forest, 164 on the Chequamegon–Nicolet National Forest in northeastern Wisconsin, and another estimated 49 on the Hiawatha National Forest in the

eastern UP (Delphey 2009, pers. comm.; Eklund 2009, pers. comm.; Roell 2011, pers. comm., Wydeven 2011, pers. comm.).

Voyageurs National Park, along Minnesota's northern border, has a land base of nearly 340 sq mi (882 sq km). As of the last survey in 2008, there were 31 to 46 wolves within 7 to 9 packs that exclusively or partially reside within the park, and at least 5 packs are located wholly inside the Park boundaries (Ethier *et al.* 2008, p. 5). The 2008 estimates fall within the range of wolf estimates for the Park from the 1990s (Gogan *et al.* 2004) and early 2000s (Fox *et al.* 2001, pp. 6–7).

Within the boundaries of the proposed WGL DPS, we currently manage seven units within the National Wildlife Refuge System with significant wolf activity. Primary among these are Agassiz National Wildlife Refuge (NWR), Tamarac NWR, and Rice Lake NWR in Minnesota; Seney NWR in the UP of Michigan; and Necedah NWR in central Wisconsin. Agassiz NWR has had as many as 20 wolves in 2 to 3 packs in recent years. Although in 1999 mange and illegal shootings reduced them to a single pack of five wolves and a separate lone wolf, since 2001, two packs with a total of 10 to 12 wolves have been using the Refuge. About 60 percent of the packs' territories are located on the Refuge or on an adjacent State-owned wildlife management area (Huschle in litt. 2005).

Data collected by Agassiz NWR staff during winter wolf sign surveys conducted in cooperation with the MN DNR during both the winters of 2007–08 and 2008–09 support the above wolf totals. Winter track data from 2007–08 suggest that one pack on Agassiz had a minimum size of five and one had a minimum size of six. The following winter's survey information suggested a minimum pack size of five for both packs (Knutson 2009, pers. comm.). Two packs of wolves that currently include about eight and five members, respectively, use Tamarac NWR and the territory of a third occurs partly on the Refuge (Brininger 2009, pers. comm.). The size of the one pack using Rice Lake NWR, in Minnesota, has been reported at six to nine in previous years; in 2009 a maximum of three wolves were confirmed on the Refuge (McDowell 2009, pers. comm.), although total pack size may be greater.

Other single or paired wolves pass through the Refuge frequently (Stefanski 2004, pers. comm.; McDowell in litt. 2005). Seney NWR has three packs, representing 8–10 wolves, which partially reside on the Refuge (Roell 2010, pers. comm.). In 2010, two packs

of six wolves each and at least one loner were detected on Necedah NWR (Wydeven *et al.* 2010, p. 41). Over the past 10 years, Sherburne and Crane Meadows NWR Complex in central Minnesota have had intermittent, but reliable, observations and signs of individual wolves each year. To date, no established packs have been documented on either of those Refuges. The closest established packs are within 15 mi (24 km) of Crane Meadows NWR at Camp Ripley Military Installation and 30 mi (48 km) north of Sherburne NWR at Mille Lacs State Wildlife Management Area (Berkley 2009, pers. comm.).

*Suitable Habitat Ownership and Protection*

In Minnesota, public lands, including national forests, a national park, national wildlife refuges, tax-forfeit lands (managed mostly by counties), State forests, State wildlife management areas, and State parks, encompass approximately 42 percent of current wolf range. American Indians and Tribes own 3 percent, an additional 1,535 sq mi (2,470 sq km), in Minnesota's wolf range (see Erb and Benson 2004, Table 1). In its 2001 Minnesota Wolf Management Plan, MN DNR states that it "will continue to identify and manage currently occupied and potential wolf habitat areas to benefit wolves and their prey on public and private land, in cooperation with landowners and other management agencies" (MN DNR 2001, p. 25). MN DNR will monitor deer and moose habitat and, when necessary and appropriate, improve habitat for these species. MN DNR maintains that several large public land units of State parks and State forests along the Wisconsin border will likely ensure that the connection between the two States' wolf populations will remain open to wolf movements. Nevertheless, MN DNR stated that it would cooperate with Wisconsin DNR to incorporate the effects of future development "into long-term viability analyses of wolf populations and dispersal in the interstate area" (MN DNR 2001, p. 27).

The MN DNR Divisions of Forestry and Wildlife directly administer approximately 5,330 sq mi (13,805 sq km) of land in Minnesota's wolf range. The DNR has set goals of enlarging and protecting its forested land base by, in part, "minimizing the loss and fragmentation of private forest lands" (MN DNR 2000, p. 20) and by connecting forest habitats with natural corridors (MN DNR 2000, p. 21). It plans to achieve these goals and objectives via several strategies, including the development of (Ecological) Subsection

Forest Resource Management Plans (SFRMP) and to expand its focus on corridor management and planning.

In 2005, the Forest Stewardship Council (FSC) certified that 4.84 million acres (1.96 million hectares) of State-administered forest land are "well managed" (FSC 2005); the Sustainable Forestry Initiative (SFI) also certified that MN DNR was managing these lands to meet its standards. For the FSC certification, independent certifiers assessed forest management against FSC's Lakes States Regional Standard, which includes a requirement to maximize habitat connectivity to the extent possible at the landscape level (FSC 2005, p. 22).

Efforts to maximize habitat connectivity in the range of wolves would complement measures the MN DNR described in its State wolf plan (MN DNR 2001, pp. 26–27). If the Service ultimately delists the DPS as proposed, the Service will review certification evaluation reports issued by FSC to assess MN DNR's ongoing efforts in this area as part of its post-delisting monitoring.

Counties manage approximately 3,860 sq mi (9,997 sq km) of tax forfeit land in Minnesota's wolf range (MN DNR unpublished data). We are aware of no specific measures that any county in Minnesota takes to conserve wolves. If most of the tax-forfeit lands are maintained for use as timber lands or natural areas, however, and if regional prey levels are maintained, management specifically for wolves on these lands will not be necessary. MN DNR manages ungulate populations "on a regional basis to ensure sustainable harvests for hunters, sufficient numbers for aesthetic and nonconsumptive use, and to minimize damage to natural communities and conflicts with humans such as depredation of agricultural crops" (MN DNR 2001, p. 17). Moreover, although counties may sell tax-forfeit lands subject to Minnesota State law, they generally manage these lands to ensure that they will retain their productivity as forests into the future. For example, Crow Wing County's mission for its forest lands includes the commitment to "sustain a healthy, diverse, and productive forest for future generations to come." In addition, at least four counties in Minnesota's wolf range—Beltrami, Carlton, Koochiching, and St. Louis—are certified by SFI, and four others (Aitkin, Cass, Itasca, and Lake) have been certified by FSC. About ten private companies with industrial forest lands in Minnesota's wolf range have also been certified by FSC.

There are no legal or regulatory requirements for the protection of wolf habitat, per se, on private lands in Minnesota. Land management activities such as timber harvest and prescribed burning carried out by public agencies and by private land owners in Minnesota's wolf range incidentally and significantly improves habitat for deer, the primary prey for wolves in the State. The impact of these measures is apparent from the continuing high deer densities in Minnesota's wolf range. The State's second largest deer harvest occurred in 2006, and approximately one-half of the Minnesota deer harvest is in the Forest Zone, which encompasses most of the occupied wolf range in the State (MN DNR 2009, Table 1).

Given the extensive public ownership and management of land within Minnesota's wolf range, as well as the beneficial habitat management expected from Tribal lands, we believe suitable habitat, and especially an adequate wild prey base, will remain available to the State's wolf population for the foreseeable future. Management of private lands for timber production will provide additional habitat suitable for wolves and white-tailed deer.

Similarly, current lands in northern and central Wisconsin that are judged to be primary and secondary wolf habitat are well protected from significant adverse development and habitat degradation due to public ownership or protective management that preserves the habitat and wolf prey base. Primary habitat (that is, areas with greater than 50 percent probability of wolf pack occupancy; Wydeven *et al.* 1999, pp. 47–48) totals 5,812 sq mi (15,053 sq km). The 1999 Wisconsin wolf plan listed land ownership of primary and secondary wolf habitat (Wydeven *et al.* 1999, p. 48). In 2006, Sickley (2006, pers. comm.) provided an update of the data with more accurate land ownership data. That data show that about 55 percent of primary habitat was in public land including, Federal, State, or county ownership, and 7 percent was on Tribal land. County lands, mostly county forests, comprised 29 percent of the primary habitat, and Federal lands mostly the Chequamegon–Nicolet National Forest, included another 17 percent.

Most Tribal land (7 percent of primary habitat), while not public land, will likely remain as suitable deer and wolf habitat for the foreseeable future. State forest ownership protects 10 percent. Private industrial forest lands comprised another 10 percent of the primary habitat, although some of these lands have been subdivided for second or vacation home sites, reducing this acreage in recent years. The remaining 29 percent is in other forms of private ownership and is vulnerable to loss from the primary habitat category to an unknown extent (Sickley in litt. 2006, unpublished data updating Table C2 of WI DNR 1999, p. 48).

Areas judged to be secondary wolf habitat by WI DNR (10 to 50 percent probability of occupancy by wolf packs; Wydeven *et al.* 1999, pp. 47–48) were somewhat more developed or fragmented habitats and were less well protected overall, because only 43 percent were in public ownership and 5 percent were in Native American reservations. Public land that maintained secure habitat included county (17 percent) and national (18 percent) forests ownership protecting the largest segments, and State land protected 7 percent. Private industrial forest ownership provided protection to 5 percent, and the remaining 47 percent was in other forms of private ownership (Sickley in litt. 2006).

County forest lands represent the single largest category of primary wolf habitat in Wisconsin. Wisconsin Statute 28.11 guides the administration of county forests, and directs management for production of forest products together with recreational opportunities, wildlife, watershed protection, and stabilization of stream flow. This Statute also provides a significant disincentive to conversion for other uses. Any proposed withdrawal of county forest lands for other uses must meet a standard of a higher and better use for the citizens of Wisconsin, and be approved by two-thirds of the County Board. As a result of this requirement, withdrawals are infrequent, and the county forest land base is actually increasing.

This analysis shows that nearly three-quarters of the primary habitat in Wisconsin receives substantial protection due to ownership or management for sustainable timber production. Over half of the secondary habitat is similarly protected. Portions of the primary habitat in northeastern Wisconsin remained sparsely populated with wolf packs until recently, but are filling in lately (Wydeven *et al.* 2010, Fig. 2, p. 66), although still allowing for some continuing wolf population expansion. In general, we believe this degree of habitat protection is more than adequate to support a viable wolf population in Wisconsin for the foreseeable future.

In the UP of Michigan, State and Federal ownership comprises 2.0 and 2.1 million acres respectively, representing 19.3 percent and 20.1 percent of the land surface of the UP. The Federal ownership is composed of

87 percent national forest, 8 percent national park, and 5 percent national wildlife refuge. The management of these three categories of Federal land is discussed elsewhere, but clearly will benefit wolves and their prey.

State lands on the UP are 94 percent State forest land, 6 percent State park, and less than 1 percent in fishing and boating access areas and State game areas. Part 525, Sustainable Forestry on State Forestlands, of the Michigan Natural Resources and Environmental Protection Act, 1994 PA 451, as amended, directs State forestland management in Michigan. It requires the MI DNR to manage the State forests in a manner consistent with sustainable forestry, to prepare and implement a management plan, and to seek and maintain a third party certification that the lands are managed in a sustainable fashion (MI DNR 2005c, p. 1).

Much of the private land on the UP is managed or protected in a manner that will maintain forest cover and provide suitable habitat for wolves and white-tailed deer. Nearly 1.9 million acres (0.8 million hectares) of large-tract industrial forest lands and another 1.9 million acres (0.8 million hectares) of smaller private forest land are enrolled in the Commercial Forest Act (CFA). These 3.7 million acres (1.5 million hectares) are managed for long-term sustainable timber production under forest management plans written by certified foresters; in return, the landowners benefit from a reduction in property taxes. In addition, nearly 37,000 acres on the UP are owned by The Nature Conservancy, and continue to be managed to restore and preserve native plant and animal communities. Therefore, these private land management practices currently are preserving an additional 36 percent of the UP as suitable habitat for wolves and their prey species.

In total, 39 percent of the UP is Federally and State-owned land whose management will benefit wolf conservation for the foreseeable future, and another 36 percent is private forest land that is being managed, largely under the incentives of the CFA, in a way that provides suitable habitat and prey for wolf populations. Therefore, a minimum of nearly three-quarters of the UP should continue to be suitable for wolf conservation, and we do not envision UP habitat loss or degradation as a problem for wolf population viability in the foreseeable future.

Hearne et al. (2003), determined that a viable wolf population (one having less than 10 percent chance of extinction over 100 years), should consist of at least 175 to 225 wolves (p.

170), and they modeled various likely scenarios of habitat conditions in the UP of Michigan and northern Wisconsin through the year 2020 to determine whether future conditions would support a wolf population of that size. Most scenarios of future habitat conditions resulted in viable wolf populations in each State through 2020. When the model analyzed the future conditions in the two States combined, all scenarios produced a viable wolf population through 2020. Their scenarios included increases in human population density, changes in land ownership that may result in decreased habitat suitability, and increased road density (pp. 101–151).

The large areas of unsuitable habitat in the eastern Dakotas; the northern portions of Iowa, Illinois, Indiana, and Ohio; and the southern areas of Minnesota, Wisconsin, and Michigan; as well as the relatively small areas of unoccupied potentially suitable habitat, will not contribute to the viability of wolves in the proposed WGL DPS. Therefore, we have determined that the existing and likely future threats to wolves outside the currently occupied areas, and especially to wolves outside of Minnesota, Wisconsin, and the UP, do not rise to the level that they threaten the long-term viability of wolf populations in Minnesota, Wisconsin, and the UP of Michigan.

In summary, wolves currently occupy the vast majority of the suitable habitat in the proposed WGL DPS, and that habitat is adequately protected for the foreseeable future. Unoccupied areas that have the characteristics of suitable habitat exist in small and fragmented parcels and are not likely to develop viable wolf populations. Threats to those habitat areas will not adversely impact the recovered wolf metapopulation in the DPS.

*Prey*

Wolf density is heavily dependent on prey availability (for example, expressed as ungulate biomass, Fuller et al. 2003, pp. 170–171), but prey availability is not likely to threaten wolves in the proposed WGL DPS. Conservation of primary wolf prey in the proposed WGL DPS, white-tailed deer and moose, is clearly a high priority for State conservation agencies. As Minnesota DNR points out in its wolf management plan (MN DNR 2001, p. 25), it manages ungulates to ensure a harvestable surplus for hunters, nonconsumptive users, and to minimize conflicts with humans. To ensure a harvestable surplus for hunters, MN DNR must account for all sources of natural mortality, including loss to wolves, and

adjust hunter harvest levels when necessary. For example, after severe winters in the 1990's, MN DNR modified hunter harvest levels to allow for the recovery of the local deer population (MN DNR 2001, p. 25). In addition to regulation of human harvest of deer and moose, MN DNR also plans to continue to monitor and improve habitat for these species.

Land management carried out by other public agencies and by private land owners in Minnesota's wolf range, including timber harvest and prescribed fire, incidentally and significantly improves habitat for deer, the primary prey for wolves in the State. The success of these measures is apparent from the continuing high deer densities in the Forest Zone of Minnesota, and the fact that the State's five largest deer harvests have occurred in the last 6 years, with a deer harvest averaging 241,000 deer over the last 5 years. Approximately one-half of the Minnesota deer harvest is in the Forest Zone, which encompasses most of the occupied wolf range in the State (Cornicelli 2008, pp. 208–209). There is no indication that harvest of deer and moose or management of their habitat will significantly depress abundance of these species in Minnesota's core wolf range. Therefore, lack of prey availability is not likely to pose a threat to wolves in the foreseeable future in the State.

The deer populations in Wisconsin and the UP of Michigan declined somewhat from historically high levels in recent years. Wisconsin's preseason deer population has exceeded 1 million animals since 1984 (WI DNR undated a; Rolley 2007, p. 6; Rolley 2008, p. 6), and hunter harvest has exceeded 400,000 deer in 10 of the last 12 years (WI DNR 2010, p.57). Across northern Wisconsin wolf range (Zone 1), winter deer density in northern deer management units averaged from 22–30 deer per sq mi (8.5–11.6 deer per sq km) between 2001–07, but declined to 17–18 deer per sq mi (6.6–6.9 deer per sq km) in 2009 and 2010. In Central Forest wolf range (Zone 2), winter deer density in deer management units averaged 29–50 deer per sq mi (11.2–19.3 deer per sq km) from 2001 to 2007, and was 35 deer per sq mi (13.5 deer per sq km) in 2009, and 26 deer per sq mi (10.0 deer per sq km) in 2010 (WI DNR data).

Michigan's 2009 October forecast for the deer population was approximately 1.8 million deer, with about 312,800 residing in the UP; the 2010 estimates projected a slightly higher UP deer population (Doepker 2010, pers. comm.; Rudolph 2010, pers. comm.). Because of severe winter conditions (persistent, deep snow) in the UP, deer populations

can change dramatically from year to year. Recently (2010) the MI DNR finalized a new deer management plan, to address ecological, social, and regulatory shifts. An objective of this plan is to manage deer at the appropriate scale, considering impacts of deer on the landscape and on other species, in addition to population size (MI DNR 2010, p. 20). Additionally, the Michigan wolf management plan addresses maintaining a sustainable population of wolf prey (MI DNR 2008, p. 36). Short of a major, and unlikely, shift in deer management and harvest strategies, there will be no shortage of prey for Wisconsin and Michigan wolves for the foreseeable future.

*Summary of Factor A*

The wolf population in the proposed WGL DPS currently occupies all the suitable habitat area identified for recovery in the Midwest in the 1978 Recovery Plan and 1992 Revised Recovery Plan and most of the potentially suitable habitat in the WGL DPS. Viable wolf populations are unlikely to develop and persist in unsuitable habitat and the small fragmented areas of suitable habitat away from these core areas. Although they may have been historical habitat, many of these areas are no longer suitable for wolves and they have not been considered necessary for the recovery of the proposed DPS.

The wolf population in the proposed WGL DPS exceeds its numerical, temporal, and distributional goals for recovery. The amount of habitat likely to support a delisted wolf population is considered to be adequate for maintaining the WGL population at or above recovery levels for the foreseeable future. Because much important wolf habitat in the DPS is in public ownership, the States will likely continue to manage for high ungulate populations, and the States, Tribes, and Federal land management agencies will adequately regulate human-caused mortality of wolves and wolf prey. This will allow these States to easily support a recovered and viable wolf metapopulation into the foreseeable future. We conclude that wolves within this proposed DPS are not in danger of extinction now, or likely to be in danger of extinction in the foreseeable future, as a result of destruction, modification, or curtailment of the species' habitat or range.

**B. Overutilization for Commercial, Recreational, Scientific, or Educational Purposes**

Threats to wolves resulting from uses for scientific or educational purposes are not likely to increase substantially following delisting of the proposed WGL DPS, and any increased use for these purposes will be regulated and monitored by the States and Tribes in the core recovery areas. Since their listing under the Act, no wolves have been legally killed or removed from the wild in any of the nine States included in the proposed WGL DPS for either commercial or recreational purposes. Some wolves may have been illegally killed for commercial use of the pelts and other parts, but illegal commercial trafficking in wolf pelts or parts and illegal capture of wolves for commercial breeding purposes happens rarely. State wolf management plans for Minnesota, Wisconsin, and Michigan help ensure that wolves will not be killed for commercial or recreational purposes for many years following the proposed Federal delisting, so these forms of mortality will not likely emerge as new threats upon delisting. See Factor D for a detailed discussion of State wolf management plans, and for applicable regulations in States without wolf management plans.

We do not expect the use of wolves for scientific purposes to increase in proportion to total wolf numbers in the proposed WGL DPS after delisting. While listed, the intentional or incidental killing, or capture and permanent confinement, of endangered or threatened wolves for scientific purposes has only legally occurred under permits or subpermits issued by the Service (under section 10(a)(1)(A)) or by a State agency operating under a cooperative agreement with the Service pursuant to section 6 of the Act (50 CFR 17.21(c)(5) and 17.31(b)). Although exact figures are not available, throughout the conterminous 48 States, such permanent removals of wolves from the wild have been very limited and probably comprise an average of not more than two animals per year since the species was first listed as endangered. In the proposed WGL DPS, these animals were either taken from the Minnesota wolf population during long-term research activities (about 15 wolves) or were accidental takings as a result of research activities in Wisconsin (5 to 6 mortalities and 1 long-term confinement) and in Michigan (4 mortalities) (Berg in litt. 1998; Mech in litt. 1998; Roell in litt. 2004; Roell in litt. 2005a; Roell 2011, pers. comm.; Wydeven 2009, pers. comm.).

The Minnesota DNR plans to encourage the study of wolves with radio-telemetry after delisting, with an emphasis on areas where they expect wolf–human conflicts and where wolves are expanding their range (MN DNR 2001, p. 19). Similarly, Wisconsin and Michigan DNRs plan to continue to trap wolves for radio-collaring, examination, and health monitoring for the foreseeable future (WI DNR 1999, pp. 19–21; MI DNR 2008a, pp. 31–32; WI DNR 2006a, p. 14). The continued handling of wild wolves for research, including the administration of drugs, may result in some accidental deaths of wolves. We believe that capture and radio-telemetry-related injuries or mortalities will not increase significantly above the level observed to date in proportion to wolf abundance; adverse effects to wolves associated with such activities have been minimal and would not constitute a threat to wolves in the proposed WGL DPS.

No wolves have been legally removed from the wild for educational purposes in recent years. Wolves that have been used for such purposes are the captive-reared offspring of wolves that were already in captivity for other reasons, and this is not likely to change as a result of Federal delisting. We do not expect taking for educational purposes to constitute any threat to Midwest wolf populations in the proposed DPS for the foreseeable future.

See Factor E for a discussion of Taking of Wolves by Native Americans for Certain Purposes. See the Depredation Control Programs sections under Factor D for discussion of other past, current, and potential future forms of intentional and accidental take by humans, including depredation control, public safety, and under public harvest. While public harvest may include recreational harvest, it is likely that public harvest will also serve as a management tool, so it is discussed in Factor D.

*Summary of Factor B*

Taking wolves for scientific or educational purposes in the other States in the proposed WGL DPS may not be regulated or closely monitored in the future, but the threat to wolves in those States will not be significant to the long-term viability of the wolf population in the proposed WGL DPS. The potential limited commercial and recreational harvest that may occur in the DPS will be regulated by State and/or Tribal conservation agencies and is discussed under Factor D. Therefore, we conclude that overutilization for commercial, recreational, scientific, or educational purposes will not be a threat sufficient to cause wolves in the proposed WGL DPS to be in danger of extinction in the foreseeable future in all or a significant portion of the range within the proposed WGL DPS.

## C. Disease or Predation.

*Disease*

Many diseases and parasites have been reported for the wolf, and several of them have had significant impacts during the recovery of the species in the 48 conterminous States (Brand *et al.* 1995, p. 419; WI DNR 1999, p. 61). If not monitored and controlled by States, these diseases and parasites, and perhaps others, may threaten wolf populations in the future. Thus, to avoid a future decline caused by diseases or parasites, States and their partners will have to diligently monitor the prevalence of these pathogens in order to effectively respond to significant outbreaks.

Canine parvovirus (CPV) is a relatively new disease that infects wolves, domestic dogs, foxes, coyotes, skunks, and raccoons. Recognized in the United States in 1977 in domestic dogs, it appeared in Minnesota wolves (based upon retrospective serologic evidence) live-trapped as early as 1977 (Mech *et al.* 1986, p. 105). Minnesota wolves, however, may have been exposed to the virus as early as 1973 (Mech and Goyal 1995, p. 568). Serologic evidence of wolf exposure to CPV peaked at 95 percent for a group of Minnesota wolves live-trapped in 1989 (Mech and Goyal 1993, p. 331). In a captive colony of Minnesota wolves, pup and yearling mortality from CPV was 92 percent of the animals that showed indications of active CPV infections in 1983 (Mech and Fritts 1987, p. 6), demonstrating the substantial impacts this disease can have on young wolves. It is believed that the population impacts of CPV occur via diarrhea-induced dehydration leading to abnormally high pup mortality (WI DNR 1999, p. 61). CPV has been detected in nearly every wolf population in North America including Alaska (Bailey *et al.* 1995, p. 443) and exposure in wolves is now believed to be almost universal.

There is no evidence that CPV has caused a population decline or has had a significant impact on the recovery of the Minnesota wolf population. Mech and Goyal (1995, p. 566, Table 1, p. 568, Fig. 3), however, found that high CPV prevalence in the wolves of the Superior National Forest in Minnesota occurred during the same years in which wolf pup numbers were low. Because the wolf population did not decline during the study period, they concluded that CPV-caused pup mortality was compensatory, that is, it replaced deaths that would have occurred from other causes, especially starvation of pups. They theorized that CPV prevalence affects the amount of population increase and that a wolf population will decline when 76 percent of the adult wolves consistently test positive for CPV exposure. Their data indicate that CPV prevalence in adult wolves in their study area increased by an annual average of 4 percent during 1979–93 and was at least 80 percent during the last 5 years of their study (Mech and Goyal 1995, pp. 566, 568).

Additional data gathered since 1995 suggests that CPV reduced pup survival both in the Superior National Forest and statewide, between 1984 and 2004; however, statewide there is some evidence of a slight increase in pup survival since about 1995. These conclusions are based on an inverse relationship between pup numbers in summer captures and seroprevalence of CPV antibodies in summer-captured adult wolves (Mech *et al.* 2008, pp. 827–830).

In a more recent study, Mech and Goyal (2010) looked more specifically at CPV influence on the Superior National Forest population by evaluating five 7-year periods to determine when CPV had its greatest effects. They found the strongest effect on wolf pup survival was from 1981 to 1993, and that after that time, little effect was seen despite the continued seroprevalence of CPV antibodies (Mech and Goyal 2010, pp. 6–7). They conclude that after CPV became endemic in the population, the population developed immunity and was able to withstand severe effects from the disease (Mech and Goyal 2010, p. 7). The observed population effects in the Superior National Forest population are consistent with results for studies in smaller, isolated populations in Wisconsin and on Isle Royale, Michigan (Wydeven *et al.* 1995; Peterson *et al.* 1998), but indicate that CPV also had only a temporary population effect in a larger population.

The WI DNR and the WI DNR Wildlife Health, in conjunction with the U.S. Geological Survey National Wildlife Health Center in Madison, Wisconsin, (formerly the National Wildlife Health Laboratory) have an extensive dataset on the incidence of wolf diseases, beginning in 1981. Canine parvovirus exposure was evident in 5 of 6 wolves tested in 1981, and probably stalled wolf population growth in Wisconsin during the early and mid-1980s when numbers there declined or were static; at that time 75 percent of 32 wolves tested positive for CPV. During the following years of population increase (1988–96), only 35 percent of the 63 wolves tested positive for CPV (WI DNR 1999, p. 62). More recent exposure rates for CPV continue to be high in Wisconsin wolves, with annual rates ranging from 60 to 100 percent among wild wolves handled from 2001 through mid-2006. Part of the reason for high exposure percentages is likely an increased emphasis in sampling pups and Central Forest wolves starting in 2001, so comparisons of post- and pre-2001 data are of limited value.

CPV appears not to be a significant cause of mortality, as only a single wolf (male pup) is known to have died from CPV during this period (Wydeven and Wiedenhoeft 2002, p. 8 Table 4; 2003a, pp. 11–12 Table 4; 2004a, pp. 11–12 Table 5; 2005, pp. 19–20 Table 4; 2006, pp. 23–25 Table 4; 2009, Table 2; Wydeven *et al.* 2007, pp. 12–14; 2008, pp. 19–21). While the difficulty of discovering CPV-killed pups must be considered, and it is possible that CPV-caused pup mortality is being underestimated, the continuing increase of the Wisconsin wolf population indicates that CPV mortality is no longer impeding wolf population growth in the State. It may be that many Wisconsin wolves have developed some degree of resistance to CPV, and this disease is no longer a significant threat in the State.

Similar to Wisconsin wolves, serological testing of Michigan wolves captured from 1992 through 2001 (most recent available data) shows that the majority of UP wolves have been exposed to CPV. Fifty-six percent of 16 wolves captured from 1992 to 1999 and 83 percent of 23 wolves captured in 2001 showed antibody titers at levels established as indicative of previous CPV exposure that may provide protection from future infection from CPV (Beheler in litt. undated, in litt. 2004). There are no data showing any CPV-caused wolf mortality or population impacts to the wolf population on the UP, but few wolf pups are handled in the UP (Hammill in litt. 2002, Beyer in litt. 2006a), so low levels of CPV-caused pup mortality may go undetected there. Mortality data are primarily collected from collared wolves, which until 2004 received CPV inoculations. Therefore, mortality data for the UP should be interpreted cautiously.

Sarcoptic mange is caused by a mite (*Sarcoptes scabiei*) infection of the skin. The irritation caused by the feeding and burrowing mites results in scratching and then severe fur loss, which in turn can lead to mortality from exposure during severe winter weather. The mites are spread from wolf to wolf by direct body contact or by common use of "rubs" by infested and uninfested animals. Thus, mange is frequently passed from infested females to their young pups, and from older pack members to their pack mates. In a long-

term Alberta, Canada, wolf study, higher wolf densities were correlated with increased incidence of mange, and pup survival decreased as the incidence of mange increased (Brand *et al.* 1995, p. 428).

From 1991 to 1996, 27 percent of live-trapped Wisconsin wolves exhibited symptoms of mange. During the winter of 1992–93, 58 percent showed symptoms, and a concurrent decline in the Wisconsin wolf population was attributed to mange-induced mortality (WI DNR 1999, p. 61). Seven Wisconsin wolves died from mange from 1993 through October 15, 1998, and severe fur loss affected five other wolves that died from other causes. During that period, mange was the third largest cause of death in Wisconsin wolves, behind trauma (usually vehicle collisions) and shooting (Thomas in litt. 1998). Largely as a result of mange, pup survival was only 16 percent in 1993, compared to a normal 30 percent survival rate from birth to one year of age (WI DNR 1999, p. 61).

Mange continues to occur on wolves in Wisconsin. From 2003 through 2007, 25 percent of live-trapped wolves showed signs of mange, but that declined to 11 percent of wolves handled in 2009 and 2010. Mortality data from closely monitored radio-collared wolves provides a relatively unbiased estimate of mortality factors, especially those linked to disease or illegal actions, because nearly all carcasses are located within a few days of deaths. Diseased wolves suffering from hypothermia or nearing death generally crawl into dense cover and may go undiscovered if they are not radio-tracked (Wydeven *et al.* 2001b, p. 14). Data from those closely monitored radio-collared wolves show that mange mortality ranged from 22 percent of deaths in 2006 and 12 percent in 2007 to 21 percent of deaths in 2008 (Wydeven in litt. 2009), 15 percent in 2009 (Wydeven *et al.* 2010, p. 13), and 6 percent in 2010 (Wydeven *et al.* 2011, p. 2).

Mange mortality does appear to be stabilizing or perhaps declining in Wisconsin. Not all mangy wolves succumb; other observations showed that some mangy wolves are able to survive the winter (Wydeven *et al.* 2001b, p. 14). Mange has been detected in Wisconsin wolves every year since 1991 when 45 to 52 wolves occurred in the State, and may have slowed the growth of the wolf population in the early 1990s (Wydeven *et al.* 2009c), but despite its constant presence as an occasional mortality factor, the wolf population grew to its present (2010) level of 690 or more wolves.

The survival of pups during their first winter is believed to be strongly affected by mange. The highest to date wolf mortality (30 percent of radio-collared wolves; Wydeven and Wiedenhoeft 2004a, p. 12) from mange in Wisconsin in 2003 may have had more severe effects on pup survival than in previous years. The prevalence of the disease may have contributed to the relatively small population increase in 2003 (2.4 percent in 2003 as compared to the average 18 percent to that point since 1985). However, mange has not caused a decline in the State's wolf population, and even though the rate of population increase has slowed in recent years, the wolf population continues to increase despite the continued prevalence of mange in Wisconsin wolves. Although mange mortality may not be the primary limiting factor for wolf population growth in the State, the impacts of mange in Wisconsin need to be closely monitored, as identified and addressed in the Wisconsin wolf management plan (WI DNR 1999, p. 21; 2006a, p. 14).

Disease monitoring in Wisconsin has identified a second form of mange in the wild wolf population—demodectic mange (Wydeven and Wiedenhoeft 2008, p. 8). Demodectic mange mites are relatively common in domestic dogs, where symptoms are often minor. The WI DNR is closely monitoring wolf pups and examining all dead wolves to determine if this becomes a significant new cause of wolf mortality.

Seven Michigan wolves died from mange during 1993–97, making it responsible for 21 percent of all mortalities, and all disease-caused deaths, during that period (MI DNR 1997, p. 39). During bioyears (mid-April to mid-April) 1999–2009, mange-induced hypothermia killed 18 radio-collared Michigan wolves, representing 15 percent of the total mortality during those years. Since 2004, 11 radio-collared wolves are known to have died from mange in the State (Roell 2010, pers. comm.). Before 2004, MI DNR treated all captured wolves with Ivermectin if they showed signs of mange. In addition, MI DNR vaccinated all captured wolves against CPV and canine distemper virus (CDV). These inoculations were discontinued in 2004 to provide more natural biotic conditions and to provide biologists with an unbiased estimate of disease-caused mortality rates in the population (Roell in litt. 2005b).

Wisconsin wolves similarly had been treated with Ivermectin and vaccinated for CPV and CDV when captured, but the practice was stopped in 1995 to allow the wolf population to experience more natural biotic conditions. Since

that time, Ivermectin has been administered only to captured wolves with severe cases of mange. In the future, Ivermectin and vaccines will be used sparingly on Wisconsin wolves, but will be used to counter significant disease outbreaks (Wydeven in litt. 1998).

Among Minnesota wolves, mange may always have been present at low levels and may currently infect less than 10 percent of the State's wolves. Of the 407 wolves trapped by Wildlife Services during 2006–08 in response to depredation complaints, 52 (13 percent) exhibited signs of mange (Hart 2009, pers. comm.); the proportion of wolves with signs of mange decreased from 17 percent in 2006 to 10 percent in 2008. During the previous 3-year period (2003–05), the proportion of trapped wolves with signs of mange was also about 13 percent, suggesting that mange has not increased in prevalence among wolves in Minnesota since 2003. The incidence of mange among wolves targeted by Wildlife Services is likely not representative of the prevalence of the disease in the statewide wolf population; wolves targeted for depredation control appear to be more likely to carry the disease (Hart 2009, pers. comm.).

In a separate study, mortality data from 12 years (1994–05) of monitoring radio-collared wolves in 7 to 9 packs in north-central Minnesota show that 11 percent died from mange (DelGiudice in litt. 2005). However, the sample size (17 total mortalities, 2 from mange in 1998 and 2004) is far too small to deduce trends in mange mortality over time. Furthermore, these data are from mange mortalities, while the Wildlife Services' data are based on mange symptoms, not mortalities.

It is hypothesized that the current incidence of mange is more widespread than it would have otherwise been, because the WGL wolf range has experienced a series of mild winters beginning with the winter of 1997–98 (Van Deelen 2005, Fig. 2). Mange-induced mortality is chiefly a result of winter hypothermia, thus the less severe winters resulted in higher survival of mangy wolves, and increased spread of mange to additional wolves during the following spring and summer. The high wolf population, and especially higher wolf density on the landscape, may also be contributing to the increasing occurrence of mange in the WGL wolf population.

Lyme disease, caused by the spirochete *Borrelia burgdorferi*, is another relatively recently recognized disease, first documented in New England in 1975, although it may have

011462A

occurred in Wisconsin as early as 1969. It is spread by ticks that pass the infection to their hosts when feeding. Host species include humans, horses, dogs, white-tailed deer, white-footed mice, eastern chipmunks, coyotes, and wolves. The prevalence of Lyme disease exposure in Wisconsin wolves averaged 70 percent of live-trapped animals in 1988–91, dropped to 37 percent during 1992–97 and was back up to 56 percent (32 of 57 tested) in 2002–04 (Wydeven and Wiedenhoeft 2004b, pp. 23–24 Table 7; 2005, pp. 23–24 Table 7). Clinical symptoms have not been reported in wolves, but infected dogs can experience debilitating conditions, and abortion and fetal mortality have been reported in infected humans and horses. It is possible that individual wolves may be debilitated by Lyme disease, perhaps contributing to their mortality; however, Lyme disease is not believed to be a significant factor affecting wolf populations (Kreeger 2003, p. 212).

The dog louse (*Trichodectes canis*) has been detected in wolves in Ontario, Saskatchewan, Alaska, Minnesota, and Wisconsin (Mech *et al* 1985, pp. 404–405; Kreeger 2003, p. 208; Paul in litt. 2005). Dogs are probably the source of the initial infections, and subsequently wild canids transfer lice by direct contact with other wolves, particularly between females and pups. Severe infestations result in irritated and raw skin, substantial hair loss, particularly in the groin. However, in contrast to mange, lice infestations generally result in loss of guard hairs but not the insulating under fur, thus, hypothermia is less likely to occur and much less likely to be fatal (Brand *et al.* 1995, p. 426). Even though observed in nearly 4 percent in a sample of 391 Minnesota wolves in 2003–05 (Paul in litt. 2005), dog lice infestations have not been confirmed as a cause of wolf mortality, and are not expected to have a significant impact even at a local scale.

Canine distemper virus (CDV) is an acute disease of carnivores that has been known in Europe since the sixteenth century and is now infecting dogs worldwide (Kreeger 2003, p. 209). CDV generally infects dog pups when they are only a few months old, so mortality in wild wolf populations might be difficult to detect (Brand *et al* 1995, pp. 420–421). CDV mortality among wild wolves has been documented only in two littermate pups in Manitoba (Carbyn 1982, pp. 111–112), in two Alaskan yearling wolves (Peterson *et al.* 1984, p. 31), and in two Wisconsin wolves (an adult in 1985 and a pup in 2002 (Thomas in litt. 2006; Wydeven and Wiedenhoeft 2003b, p. 20). Carbyn

(1982, pp. 113–116) concluded that CDV was a contributor to a 50 percent decline of the wolf population in Riding Mountain National Park (Manitoba, Canada) in the mid-1970s. Serological evidence indicates that exposure to CDV is high among some Midwest wolves— 29 percent in northern Wisconsin wolves and 79 percent in central Wisconsin wolves in 2002–04 (Wydeven and Wiedenhoeft 2004b, pp. 23–24 Table 7; 2005, pp. 23–24 Table 7). However, the continued strong recruitment in Wisconsin and elsewhere in North American wolf populations indicates that distemper is not likely a significant cause of mortality (Brand *et al.* 1995, p. 421).

Other diseases and parasites, including rabies, canine heartworm, blastomycosis, bacterial myocarditis, granulomatous pneumonia, brucellosis, leptospirosis, bovine tuberculosis, hookworm, coccidiosis, and canine hepatitis have been documented in wild wolves, but their impacts on future wild wolf populations are not likely to be significant (Brand *et al.* 1995, pp. 419–429; Hassett in litt. 2003; Johnson 1995, pp. 431, 436–438; Mech and Kurtz 1999, pp. 305–306; Thomas in litt. 1998, Thomas in litt. 2006, WI DNR 1999, p. 61; Kreeger 2003, pp. 202–214). Continuing wolf range expansion, however, likely will provide new avenues for exposure to several of these diseases, especially canine heartworm, raccoon rabies, and bovine tuberculosis (Thomas in litt. 2000, in litt. 2006), further emphasizing the need for disease monitoring programs.

In addition, the possibility of new diseases developing and existing diseases, such as chronic wasting disease (CWD), West Nile Virus (WNV) and canine influenza (Crawford *et al.* 2005, 482–485), moving across species barriers or spreading from domestic dogs to wolves must all be taken into account, and monitoring programs will need to address such threats. Currently there is no evidence that CWD can directly affect canids (Thomas in litt. 2006). Wisconsin wolves have been tested for WNV at necropsy since the first spread of the virus across the State: To date, all results have been negative. Although experimental infection of dogs produced no ill effects, WNV is reported to have killed two captive wolf pups, so young wolves may be at some risk (Thomas in litt. 2006).

In aggregate, diseases and parasites were the cause of 21 percent of the diagnosed mortalities of radio-collared wolves in Michigan from 1999 through 2004 (Beyer 2005, unpublished data) and 27 percent of the diagnosed mortalities of radio-collared wolves in

Wisconsin from October 1979 through December 2009 (Wydeven *et al.* 2010, p. 45). In recent years (2006–10), disease has been the cause of death for 14 percent (10 of 70 dead wolves) of the diagnosed mortalities of radio-collared wolves in Wisconsin and 3 to 7 percent of all wolves (radio-collared and not collared) found dead in the State (72 to 94 wolves). During that time period, disease was the cause of death of 12 percent (5 of 43) of the diagnosed mortalities of radio-collared wolves in Michigan, and of 3 percent (6 of 199) of the total known wolf mortalities in Minnesota.

Many of the diseases and parasites are known to be spread by wolf-to-wolf contact. Therefore, the incidence of mange, CPV, CDV, and canine heartworm may increase as wolf densities increase in the more recently colonized areas (Thomas in litt. 2006). Because wolf densities generally are relatively stable following the first few years of colonization, wolf-to-wolf contacts will not likely lead to a continuing increase in disease prevalence in areas that have been occupied for several years or more and are largely saturated with wolf packs (Mech in litt. 1998).

Disease and parasite impacts may increase because several wolf diseases and parasites are carried and spread by domestic dogs. This transfer of pathogens from domestic dogs to wild wolves may increase as wolves continue to colonize non-wilderness areas (Mech in litt. 1998). Heartworm, CPV, and rabies are the main concerns (Thomas in litt. 1998) but dogs may become significant vectors for other diseases with potentially serious impacts on wolves in the future (Crawford *et al.* 2005, pp. 482–485). However, to date wolf populations in Wisconsin and Michigan have continued their expansion into areas with increased contacts with dogs and have shown no adverse pathogen impacts since the mid-1980s impacts from CPV.

Disease and parasite impacts are a recognized concern of the Minnesota, Michigan, and Wisconsin DNRs. The Michigan Gray Wolf Recovery and Management Plan states that necropsies will be conducted on all dead wolves, and that all live wolves that are handled will be examined, with blood, skin, and fecal samples taken to provide disease information. The Michigan Plan states that the Michigan DNR will continue to monitor the prevalence and impact of disease on wolf health following Federal delisting (MI DNR 2008, pp. 32, 40–42).

Similarly, the Wisconsin Wolf Management Plan states that as long as the wolf is State-listed as a threatened

or endangered species, the WI DNR will conduct necropsies of dead wolves and test a sample of live-captured wolves for diseases and parasites, with a goal of screening 10 percent of the State wolf population for diseases annually. However, the plan anticipates that since State delisting (which occurred on March 24, 2004), disease monitoring will be scaled back because the percentage of the wolf population that is live-trapped each year will decline. Disease monitoring of captured wolves currently is focusing on diseases known to be causing noteworthy mortality, such as mange, and other diseases for which data are judged to be sparse, such as Lyme disease and ehrlichiosis (Wydeven and Wiedenhoeft 2006, p. 8). The State will continue to test for disease and parasite loads through periodic necropsy and scat analyses. The 2006 update to the 1999 plan also recommends that all wolves live-trapped for other studies should have their health monitored and reported to the WI DNR wildlife health specialists (WI DNR 1999, p. 21; 2006c, p. 14). Furthermore, the 2006 update identifies a need for "continued health monitoring to document significant disease events that may impact the wolf population and to identify new diseases in the population * * *." (WI DNR 2006a, p. 24).

The Minnesota Wolf Management Plan states that MN DNR "will collaborate with other investigators and continue monitoring disease incidence, where necessary, by examination of wolf carcasses obtained through depredation control programs, and also through blood or tissue physiology work conducted by the MN DNR and the U.S. Geological Survey. The DNR will also keep records of documented and suspected incidence of sarcoptic mange (MN DNR 2001, p. 32)." In addition, it will initiate "(R)egular collection of pertinent tissues of live captured or dead wolves" and periodically assess wolf health "when circumstances indicate that diseases or parasites may be adversely affecting portions of the wolf population (MN DNR 2001, p. 19)." Unlike Michigan and Wisconsin, Minnesota has not established minimum goals for the proportion of its wolves that will be assessed for disease nor does it plan to treat any wolves, although it does not rule out these measures. Minnesota's less intensive approach to disease monitoring and management seems warranted in light of its much greater abundance of wolves than in the other two States.

In areas within the proposed WGL DPS, but outside Minnesota, Wisconsin, and Michigan, we lack data on the incidence of diseases or parasites in transient wolves. However, the boundary of the proposed WGL DPS is laid out in a manner such that the vast majority of, and perhaps all, wolves that will occur in the DPS in the foreseeable future will have originated from the Minnesota–Wisconsin–Michigan wolf metapopulation. Therefore, they will be carrying the "normal" complement of Midwest wolf parasites, diseases, and disease resistance with them. For this reason, any new pairs, packs, or populations that develop within the DPS are likely to experience the same low to moderate adverse impacts from pathogens that have been occurring in the core recovery areas.

The most likely exceptions to this generalization would arise from exposure to sources of novel diseases or more virulent forms that are being spread by other canid species that might be encountered by wolves dispersing into currently unoccupied areas of the DPS. To increase the likelihood of detecting such novel or more virulent diseases and thereby reduce the risk that they might pose to the core meta-population after delisting, we will encourage these States and Tribes to provide wolf carcasses or suitable tissue, as appropriate, to the USGS Madison Wildlife Health Center or the Service's National Wildlife Forensics Laboratory for necropsy. This practice should provide an early indication of new or increasing pathogen threats before they reach the core metapopulation or impact future transient wolves to those areas.

Disease Summary

We believe that several diseases have had noticeable impacts on wolf population growth in the Great Lakes region in the past. These impacts have been both direct, resulting in mortality of individual wolves, and indirect, by reducing longevity and fecundity of individuals or entire packs or populations. Canine parvovirus stalled wolf population growth in Wisconsin in the early and mid-1980s and has been implicated in the decline in the mid-1980s of the isolated Isle Royale wolf population in Michigan, and in attenuating wolf population growth in Minnesota (Mech in litt. 2006). Sarcoptic mange has affected wolf recovery in Michigan's UP and in Wisconsin over the last 12 years, and it is recognized as a continuing issue.

Despite these and other diseases and parasites, the overall trend for wolf populations in the proposed WGL DPS continues to be upward. Wolf management plans for Minnesota, Michigan, and Wisconsin include disease monitoring components that we expect will identify future disease and parasite problems in time to allow corrective action to avoid a significant decline in overall population viability. We conclude that diseases and parasites will not prevent continued population growth or the maintenance of viable wolf populations in the DPS. Delisting of wolves in the proposed WGL DPS will not significantly change the incidence or impacts of disease and parasites on these wolves. Furthermore, we conclude that diseases and parasites will not be threats sufficient to cause wolves in the proposed WGL DPS to be likely to become endangered in the foreseeable future in all or a significant portion of the range within the proposed WGL DPS.

*Natural Predation*

No wild animals habitually prey on wolves. Large prey such as deer, elk, or moose (Mech and Nelson 1989, pp. 207–208; Smith *et al.* 2001, p. 3), or other predators, such as mountain lions (*Felis concolor*) or grizzly bears (*Ursus arctos horribilis*) where they are extant (USFWS 2005, p. 3), occasionally kill wolves, but this has only been rarely documented. This very small component of wolf mortality will not increase with delisting.

Wolves frequently are killed by other wolves, most commonly when packs encounter and attack a dispersing wolf as an intruder or when two packs encounter each other along a territorial boundary (Mech 1994, p. 201). This form of mortality is likely to increase as more of the available wolf habitat becomes saturated with wolf pack territories, as is the case in northeastern Minnesota, but such a trend is not yet evident from Wisconsin or Michigan data. From October 1979 through June 1998, 7 (12 percent) of the mortalities of radio-collared Wisconsin wolves resulted from wolves killing wolves, and 8 of 73 (11 percent) mortalities were from this cause during 2000–05 (Wydeven 1998, p. 16 Table 4; Wydeven and Wiedenhoeft 2001, p. 8 Table 5; 2002, pp. 8–9 Table 4; 2003a, pp. 11–12 Table 4; 2004a, pp. 11–12 Table 5, 2005, p. 21 Table 5).

Among radio-collared wolves dying from known causes between October 1979 and December 2009, overall rate of intraspecific strife was similar at 17 of 151 mortalities or 11 percent (Wydeven *et al.* 2010, p. 45). Gogan *et al.* (2004, p. 7) studied 31 radio-collared wolves in northern Minnesota from 1987 to 1991 and found that 4 (13 percent) were killed by other wolves, representing 29 percent of the total mortality of radio-collared wolves. Intra-specific strife

caused 50 percent of mortality within Voyageurs National Park and 20 percent of the mortality of wolves adjacent to the Park (Gogan *et al.* 2004, p. 22). The DelGiudice data (in litt. 2005) show a 17 percent mortality rate from other wolves in another study area in north-central Minnesota from 1994 to 2005. This behavior is normal in healthy wolf populations and is an expected outcome of dispersal conflicts and territorial defense, as well as occasional intra-pack strife. This form of mortality is something with which the species has evolved and it should not pose a threat to wolf populations in the proposed WGL DPS if this DPS is delisted.

*Human Predation*

Because our concern about human predation is its overall effect on wolf mortality, the following discussion addresses the major human causes of wolf mortality, including illegal killing, depredation control, and vehicle collisions.

Humans have functioned as highly effective predators of the wolf in North America for several hundred years. European settlers in the Midwest attempted to eliminate the wolf entirely in earlier times, and the U.S. Congress passed a wolf bounty that covered the Northwest Territories in 1817. Bounties on wolves subsequently became the norm for States across the species' range. In Michigan, an 1838 wolf bounty became the ninth law passed by the First Michigan Legislature; this bounty remained in place until 1960. A Wisconsin bounty was instituted in 1865 and was repealed about the time wolves were extirpated from the State in 1957. Minnesota maintained a wolf bounty until 1965.

Subsequent to the gray wolf's listing as a Federally endangered species, the Act and State endangered species statutes prohibited the killing of wolves except under very limited circumstances, such as in defense of human life, for scientific or conservation purposes, or under special regulations intended to reduce wolf depredations of livestock or other domestic animals. The resultant reduction in human-caused wolf mortality is the main cause of the wolf's reestablishment in large parts of its historical range. It is clear, however, that illegal killing of wolves has continued in the form of intentional mortality and incidental deaths.

Illegal killing of wolves occurs for a number of reasons. Some of these killings are accidental (for example, wolves are hit by vehicles, mistaken for coyotes and shot, or caught in traps set for other animals); some of these accidental killings are reported to State, Tribal, and Federal authorities. It is likely that most illegal killings, however, are intentional and are never reported to government authorities. Because they generally occur in remote locations and the evidence is easily concealed, we lack reliable estimates of annual rates of intentional illegal killings.

In Wisconsin, all forms of human-caused mortality accounted for 56 percent of the diagnosed deaths of radio-collared wolves from October 1979 through December 2009 (Wydeven *et al.* 2010, p. 45). Thirty-four percent of the diagnosed mortalities, and 62 percent of the human-caused mortalities, were from illegal killing (mainly shootings). Another 9 percent of all the diagnosed mortalities (15 percent of the human-caused mortalities) resulted from vehicle collisions. (These percentages and those in the following paragraphs exclude seven radio-collared Wisconsin wolves that were killed in depredation control actions by USDA–APHIS—Wildlife Services. The wolf depredation control programs in the Midwest are discussed separately under Depredation Control, below.) Data from 2006 through 2010 (68 diagnosed mortalities of radio-collared wolves) show the mortality percentages for disease to be slightly lower and illegal kills to be similar, with 14 percent of the mortalities resulting from mange or disease and 35 percent from being illegally killed. The mortality percentage for vehicle collisions during this time period remained constant (13 percent) (Wydeven *et al.* 2007, p. 10; and Wydeven and Wiedenhoeft 2008, Summary). Most recently for 2010, mortality data from actively monitored wolves show that of wolves that died, 38 percent were killed illegally (all shootings); 12 percent were euthanized for human safety concerns; 6 percent of the deaths were disease related; 6 percent died from apparent old age, 6 percent from intraspecific strife, and 12 percent from vehicle collisions; and the causes for 19 percent of the deaths were unknown (Wydeven *et al.* 2011, p. 2).

During the periods that wolves were Federally delisted (from March 2007 through September 2008 and from April through early July 2009), 92 wolves were killed for depredation control, including 8 legally shot by private landowners (Wydeven and Wiedenhoeft 2008, p. 8; Wydeven *et al.* 2009b, p. 6; Wydeven *et al.* 2010, p. 13).

As the Wisconsin population has increased in numbers and range, vehicle collisions have increased as a percentage of radio-collared wolf mortalities. During the October 1979 through June 1992 period, only 1 of 27 (4 percent) known mortalities was from that cause; but from July 1992 through June 1998, 5 of the 26 (19 percent) known mortalities resulted from vehicle collisions (Wydeven 1998, p. 6). From 2002 through 2004, 7 of 45 (16 percent) known mortalities were from that cause (Wydeven and Wiedenhoeft 2003a, pp. 11–12 Table 4; 2004a, pp. 11–12 Table 5; 2005, pp. 19–20 Table 4); and from 2005 through 2009, 126 of 459 (27 percent) known mortalities were from that cause (Wydeven and Wiedenhoeft 2005, p. 20; Wydeven and Wiedenhoeft 2006, p. 20; Wydeven *et al.* 2007a, p. 7; Wydeven *et al.* 2007b, p. 10; Wydeven and Wiedenhoeft 2008, p. 7; Wydeven *et al.* 2009a, pp. 19–21; Wydeven and Wiedenhoeft 2009, Table 3; Wydeven *et al.* 2010, Table 7).

A comparison over time for diagnosed mortalities of radio-collared Wisconsin wolves shows that 18 of 57 (32 percent) were illegally killed from October 1979 through 1998, while 12 of 42 (29 percent) were illegally killed from 2002 through 2004 and 24 of 72 (33 percent) were illegally killed from 2005 to March 2007 (WI DNR 1999, p. 63; Wydeven and Wiedenhoeft 2003a, pp. 11–12 Table 4; 2004a, pp. 11–12 Table 4; 2005, pp. 19–20 Table 4; Wydeven *et al.* 2006a, p. 6; 2006b, p. 8; 2007, pp. 6–7; 2008a, p. 10). In 2006, prior to the Federal delisting the following year, 17 of 72 wolves found dead in the state were killed illegally. Among nine radio-collared wolves that had died in 2006, six (67 percent) were illegally killed. In 2007, after Federal delisting, 10 of 90 dead wolves found in the State were illegally killed, and 3 (19 percent) of the radio-collared wolves found dead were illegally killed. In 2008, 14 of 94 dead wolves found in Wisconsin were illegally killed, and 4 (28 percent) of 14 radio-collared wolves found dead were illegal kills. In 2009, when wolves were again Federally listed for most of the year, 20 of the 72 dead wolves found in Wisconsin were illegally killed, and 8 (62 percent) of 13 radio-collared wolves found dead were illegal kills. In 2010, when wolves continued to be Federally listed, 14 of 72 dead wolves were illegally killed, and 6 (38 percent) of 16 radio-collared wolves were illegally killed.

Thus the number of known illegally killed wolves declined slightly from 17 in 2006, to 10 in 2007 and 14 in 2008, increased to 20 in 2009, and declined to 14 in 2010. Among radio-collared wolves found dead, illegal killing represented 67 percent of all mortality in 2006, 19 percent in 2007, 23 percent in 2008, 62 percent in 2009, and 38

percent in 2010 (Wydeven *et al.* 2010, p. 13; Wydeven *et al.* 2011, p. 2).

In the UP of Michigan, human-caused mortalities accounted for 75 percent of the diagnosed mortalities, based upon 34 wolves recovered from 1960 to 1997, including mostly non-radio-collared wolves. Twenty-eight percent of all the diagnosed mortalities and 38 percent of the human-caused mortalities were from shooting. In the UP during that period, about one-third of all the known mortalities were from vehicle collisions (MI DNR 1997, pp. 5–6). During the 1998 Michigan deer hunting season, three radio-collared wolves were shot and killed, resulting in one arrest and conviction (Hammill in litt. 1999, Michigan DNR 1999). During the subsequent 3 years, eight additional wolves were killed in Michigan by gunshot, and the cut-off radio-collar from a ninth animal was located, but the animal was never found. These incidents resulted in six guilty pleas, with three cases remaining open.

Data collected from radio-collared wolves from the 1999 to 2009 bioyears (mid-April to mid-April) show that human-caused mortalities still account for the majority of the wolf mortalities (66 percent) in Michigan. Deaths from vehicular collisions were about 18 percent of total mortality (27 percent of the human-caused mortality) and showed no trend over this 11-year period. Deaths from illegal killing constituted 39 percent of all mortalities (60 percent of the human-caused mortality) over the period. From 1999 through 2001, illegal killings were 31 percent of the mortalities, but this increased to 42 percent during the 2002 through 2004 bioyears and to 40 percent during bioyears 2005 through 2010 (Roell 2010, pers. comm.).

Most Michigan residents place a high priority on wolf management actions that address public concerns for human safety (Beyer *et al.* 2006). Quick and professional responses to wolf conflicts have been important for wolf recovery (Ruid *et al.* 2009, p. 280). In most cases, people can take simple, sensible measures to avoid those situations and protect themselves against harm. Other cases may warrant higher levels of concern and professional assistance. Michigan DNR solved most wolf-human conflicts using nonlethal methods (Roell 2010, pers. comm.). However, in a few incidents lethal control was warranted and carried out under Federal regulations (50 CFR 17.21, which allows the take of an endangered species when there is a "demonstrable but nonimmediate threat" to protect human safety, or to euthanize a sick or injured wolf, but only if it is not reasonably

possible to translocate the animal alive), or while wolves were not Federally protected (Roell 2010 *et al.,* p. 9). Since 2004 the Michigan DNR and USDA– Wildlife Services have killed 13 animals (12 involving human safety and 1 sick wolf) under the authority of this regulation (Roell 2010 *et al.,* p. 9). Two others were killed for human safety concerns while wolves were Federally delisted (Roell 2010, pers. comm.).

North-central Minnesota data from 16 diagnosed mortalities of radio-collared wolves over a 12-year period (1994– 2005) show that human-causes resulted in 69 percent of the diagnosed mortalities. This includes 1 wolf accidentally snared, 2 vehicle collisions, and 8 (50 percent of all diagnosed mortalities) that were shot (DelGiudice in litt. 2005). However, this data set of only 16 mortalities over 12 years is too small for reliable comparison to Wisconsin and Michigan data.

A smaller mortality dataset is available from a 1987–91 study of wolves in, and adjacent to, Minnesota's Voyageurs National Park, along the Canadian border. Of 10 diagnosed mortalities, illegal killing outside the Park was responsible for a minimum of 60 percent of the deaths (Gogan *et al.* 2004, p. 22).

Two Minnesota studies provide some limited insight into the extent of human-caused wolf mortality before and after the species' listing. On the basis of bounty data from a period that predated wolf protection under the Act by 20 years, Stenlund (1955, p. 33) found an annual human-caused mortality rate of 41 percent. Fuller (1989, pp. 23–24) provided 1980–86 data from a north-central Minnesota study area and found an annual human-caused mortality rate of 29 percent, a figure that includes 2 percent mortality from legal depredation control actions. Drawing conclusions from comparisons of these two studies, however, is difficult due to the confounding effects of habitat quality, exposure to humans, prey density, differing time periods, and vast differences in study design. Although these figures provide support for the contention that human-caused mortality decreased after the wolf's protection under the Act, it is not possible at this time to determine if human-caused mortality (apart from mortalities from depredation control) has significantly changed over the nearly 35-year period that the gray wolf has been listed as threatened or endangered.

Wolves were largely eliminated from the Dakotas in the 1920s and 1930s and were rarely reported from the mid-1940s through the late 1970s. Ten wolves were killed in these two States from 1981 to

1992 (Licht and Fritts 1994, pp. 76–77). Seven more were killed in North Dakota since 1992, with four of these mortalities occurring in 2002 and 2003; in 2001, one wolf was killed in Harding County in extreme northwestern South Dakota. The number of reported sightings of wolves in North Dakota is increasing. From 1993 to 1998, six wolf depredation reports were investigated in North Dakota, and adequate signs were found to verify the presence of wolves in two of the cases. A den with pups was also documented in extreme north-central North Dakota near the Canadian border in 1994. From 1999 to 2003, residents of North Dakota reported 16 wolf sightings or depredation incidents to USDA–APHIS–Wildlife Services, and 9 of these incidents were verified. Additionally, one North Dakota wolf sighting was confirmed in early 2004, two wolf depredation incidents were verified north of Garrison in late 2005, and one wolf was found dead in Eddy County in 2009. USDA–APHIS–Wildlife Services also confirmed a wolf sighting along the Minnesota border near Gary, South Dakota, in 1996, and a trapper with the South Dakota Game, Fish, and Parks Department sighted a lone wolf in the western Black Hills in 2002.

Several other unconfirmed sightings have been reported from these States, including two reports in South Dakota in 2003. Wolves killed in North and South Dakota were most often shot by hunters after being mistaken for coyotes, or were killed by vehicles. The 2001 mortality in South Dakota and one of the 2003 mortalities in North Dakota were caused by M–44 devices that had been legally set in response to complaints about coyotes.

In and around the core recovery areas in the Midwest, a continuing increase in wolf mortalities from vehicle collisions, both in actual numbers and as a percent of total diagnosed mortalities, is expected as wolves continue their colonization of areas with more human developments and a denser network of roads and vehicle traffic. In addition, the growing wolf populations in Wisconsin and Michigan are producing greater numbers of dispersing individuals each year, and this also will contribute to increasing numbers of wolf-vehicle collisions. This increase in accidental deaths would be unaffected by a removal of wolves in the proposed WGL DPS from the protections of the Act.

In those areas of the proposed WGL DPS that are beyond the areas currently occupied by wolf packs in Minnesota, Wisconsin, and Michigan, we expect that human-caused wolf mortality in the form of vehicle collisions, shooting, and

trapping have been removing all, or nearly all, the wolves that disperse into these areas. We expect this to continue after Federal delisting. Road densities are high in these areas, with numerous interstate highways and other freeways and high-speed thoroughfares that are extremely hazardous to wolves attempting to move across them. Shooting and trapping of wolves also is likely to continue as a threat to wolves in these areas for several reasons. Especially outside of Minnesota, Wisconsin, and Michigan, hunters will not expect to encounter wolves, and may easily mistake them for coyotes from a distance, resulting in unintentional shootings.

It is important to note that, despite the difficulty in measuring the extent of illegal killing of wolves, all sources of wolf mortality, including legal (for example, depredation control) and illegal human-caused mortality, have not been of sufficient magnitude to stop the continuing growth of the wolf population in Wisconsin and Michigan, nor to cause a wolf population decline in Minnesota. This indicates that total wolf mortality does not threaten the continued viability of the wolf population in these three States, or in the proposed WGL DPS.

Human Predation Summary

The high reproductive potential of wolves allows wolf populations to withstand relatively high mortality rates, including human-caused mortality. The principle of compensatory mortality is believed to occur in wolf populations. This means that human-caused mortality is not simply added to "natural" mortality, but rather replaces a portion of it. For example, some of the wolves that are killed during depredation control actions would have otherwise died during that year from disease, intraspecific strife, or starvation. Thus, the addition of intentional killing of wolves to a wolf population will reduce the mortality rates from other causes on the population. Based on 19 studies by other wolf researchers, Fuller *et al.* (2003, pp. 182–186) concludes that human-caused mortality can replace about 70 percent of other forms of mortality.

Fuller *et al.* (2003, p. 182 Table 6.8) has summarized the work of various researchers in estimating mortality rates, especially human harvest, that would result in wolf population stability or decline. They provide a number of human-caused and total mortality rate estimates and the observed population effects in wolf populations in the United States and Canada. While variability is apparent, in general, wolf populations increased if their total average annual mortality was 30 percent or less, and populations decreased if their total average annual mortality was 40 percent or more. Four of the cited studies showed wolf population stability or increases with human-caused mortality rates of 24 to 30 percent. The clear conclusion is that a wolf population with high pup productivity—the normal situation in a wolf population—can withstand levels of overall and of human-caused mortality without suffering a long-term decline in numbers.

The wolf populations in Minnesota, Wisconsin, and Michigan will stop growing when they have saturated the suitable habitat and are curtailed in less suitable areas by natural mortality (disease, starvation, and intraspecific aggression), depredation management, incidental mortality (for example, road kill), illegal killing, and other means. At that time, we should expect to see population declines in some years followed by short-term increases in other years, resulting from fluctuations in birth and mortality rates. Adequate wolf monitoring programs, however, as described in the Michigan, Wisconsin, and Minnesota wolf management plans, are likely to identify high mortality rates or low birth rates that warrant corrective action by the management agencies (see Regulatory Mechanisms in Minnesota, Wisconsin, and Michigan, below). The goals of all three State wolf management plans are to maintain wolf populations well above the numbers recommended in the Recovery Plan for the Eastern Timber Wolf to ensure long-term viable wolf populations. The State management plans recommend a minimum wolf population of 1,600 in Minnesota, 350 in Wisconsin, and 200 in Michigan.

Despite human-caused mortalities of wolves in Minnesota, Wisconsin, and Michigan, these wolf populations have continued to increase in both numbers and range. If wolves in the proposed WGL DPS are delisted, as long as other mortality factors do not increase significantly and monitoring is adequate to document, and if necessary counteract (see Post-Delisting Monitoring, below), the effects of excessive human-caused mortality should that occur, the Minnesota–Wisconsin–Michigan wolf population will not decline to nonviable levels in the foreseeable future as a result of human-caused killing or other forms of predation. Therefore, we conclude that predation, including all forms of human-caused mortality, will not be a sufficient future threat to cause wolves in the proposed WGL DPS to be likely to become endangered in the foreseeable future in all or a significant portion of the range within the proposed WGL DPS.

## D. The Inadequacy of Existing Regulatory Mechanisms

The inadequacy of existing regulatory mechanisms is one of five factors that, under the Endangered Species Act (Act), may result in a determination as to whether a species should be listed or not. In analyzing whether the existing regulatory mechanisms are adequate, the Service reviews relevant Federal, state, and Tribal laws, plans, regulations, Memorandum of Understandings, Cooperative Agreements and other such factors that influence conservation of the species in question, including analyzing the extent those mechanism can be relied upon. Other examples include State governmental actions enforced under a State statute or constitution, or Federal action under statute.

Strongest weight is given to statutes and their implementing regulations, and management direction that stems from those laws and regulations. Some other agreements are more voluntary in nature; in those cases we analyze the specific facts to determine the extent to which it can be relied on in the future, including how it addresses threats to the species. We consider all pertinent information, including the efforts and conservation practices of State governments, whether or not these are enforceable by law. Regulatory mechanisms, if they exist, may preclude the need for listing if such mechanisms are judged to adequately address the threat to the species such that listing is not warranted. Conversely, threats on the landscape are exacerbated when not addressed by existing regulatory mechanisms, or when the existing mechanisms are not adequate (or not adequately implemented or enforced).

The following sections discuss the adequacy of regulatory mechanisms that would be implemented if the WGL DPS were delisted, that is, removed from the List of Endangered and Threatened Wildlife. For the reasons described in the following section, the Service has determined that, if delisted, adequate regulatory mechanisms would be in place to ensure that this DPS of wolves is neither threatened nor endangered.

*Regulatory Mechanisms in Minnesota, Wisconsin, and Michigan*

State Wolf Management Planning

During the 2000 legislative session, the Minnesota Legislature passed wolf

management provisions addressing wolf protection, taking of wolves, and directing MN DNR to prepare a wolf management plan. The MN DNR revised a 1999 draft wolf management plan to reflect the legislative action of 2000, and completed the Minnesota Wolf Management Plan (MN Plan) in early 2001 (MN DNR 2001, pp. 8–9).

The Wisconsin Natural Resources Board (NRB) approved the Wisconsin Wolf Management Plan in October 1999 (WI Plan). In 2004 and 2005 the Wisconsin Wolf Science Advisory Committee and the Wisconsin Wolf Stakeholders group reviewed the 1999 Plan, and the Science Advisory Committee subsequently developed updates and recommended modifications to the 1999 Plan. The WI DNR presented the Plan updates and modifications to the Wisconsin NRB on June 28, 2006, and the NRB approved them at that time, with the understanding that some numbers would be updated and an additional reference document would be added (Holtz in litt. 2006). The updates were completed and received final NRB approval on November 28, 2006 (WI DNR 2006a, p. 1).

In late 1997, the Michigan Wolf Recovery and Management Plan (MI Plan) was completed and received the necessary State approvals. It primarily focused on wolf recovery, rather than long-term management of a large wolf population and the conflicts that result as a consequence of successful wolf restoration. In 2006 the MI DNR convened a Michigan Wolf Management Roundtable committee (Roundtable) to provide guiding principles to the DNR on changes and revisions to the 1997 Plan and to guide management of Michigan wolves and wolf-related issues following Federal delisting of the species. The MI DNR relied heavily on those guiding principles as it drafted a new wolf management plan. The Roundtable was composed of representatives from 20 Michigan stakeholder interests in wolf recovery and management, and its membership is roughly equal in numbers from the UP and the LP. During 2006, the Roundtable provided its "Recommended Guiding Principles for Wolf Management in Michigan" to the DNR in November (Michigan Wolf Management Roundtable 2006. p. 2). Based on those Roundtable recommendations, a revised Michigan Wolf Management Plan was completed in July 2008 (MI DNR 2008a). The complete text of the Wisconsin, Michigan, and Minnesota wolf plans can be found on our Web site (see **FOR FURTHER INFORMATION CONTACT**).

The Minnesota Wolf Management Plan

The Minnesota Plan is based, in part, on the recommendations of a State wolf management roundtable (MN DNR 2001, Appendix V) and on a State wolf management law enacted in 2000 (MN DNR 2001, Appendix I). This law and the Minnesota Game and Fish Laws constitute the basis of the State's authority to manage wolves. The Plan's stated goal is "to ensure the long-term survival of wolves in Minnesota while addressing wolf-human conflicts that inevitably result when wolves and people live in the same vicinity" (MN DNR 2001, p. 2). It establishes a minimum goal of 1,600 wolves in the State. Key components of the plan are population monitoring and management, management of wolf depredation of domestic animals, management of wolf prey, enforcement of laws regulating take of wolves, public education, and increased staffing to accomplish these actions. Following the proposed delisting, Minnesota DNR's management of wolves would differ from their current management while listed as threatened under the Act. Most of these differences deal with the control of wolves that attack or threaten domestic animals.

The Minnesota Plan divides the State into two wolf management zones— Zones A and B (see Figure 2 below). Zone A corresponds to Federal Wolf Management Zones 1 through 4 (approximately 30,000 sq mi (48,000 sq km) in northeastern Minnesota) in the Service's Recovery Plan for the Eastern Timber Wolf, whereas Zone B constitutes Zone 5 in that recovery plan (MN DNR 2001, pp. 19–20 and Appendix III; USFWS 1992, p. 72). Within Zone A, wolves would receive strong protection by the State, unless they were involved in attacks on domestic animals. The rules governing the take of wolves to protect domestic animals in Zone B would be less protective than in Zone A (see Post-delisting Depredation Control in Minnesota below).

**BILLING CODE 4310–55–P**

011468A

Figure 2. Minnesota wolf management zones.



Copyright February 2001, Minnesota Department of Natural Resources, Division of Wildlife

BILLING CODE 4310–55–C

The MN DNR plans to allow wolf numbers and distribution to naturally expand, with no maximum population goal, and if any winter population estimate is below 1,600 wolves, it would take actions to "assure recovery" to 1,600 wolves (MN DNR 2001 p. 19). The MN DNR plans to continue to monitor wolves in Minnesota to determine whether such intervention is necessary. The MN DNR plans to conduct another statewide population survey in the winter of 2012–13 and at subsequent 5-year intervals. In addition to these statewide population surveys, MN DNR annually reviews data on depredation incident frequency and locations provided by Wildlife Services and winter track survey indices (see Erb 2008) to help ascertain annual trends in wolf population or range (MN DNR 2001, pp. 18–19). The agency is currently evaluating alternatives to its current methodology with the potential to improve the efficiency and accuracy of its statewide population estimates (Stark 2009a, pers. comm.).

Minnesota (MN DNR 2001, pp. 21–24, 27–28) plans to reduce or control illegal mortality of wolves through education, increased enforcement of the State's wolf laws and regulations, discouraging new road access in some areas, and maintaining a depredation control program that includes compensation for livestock losses. The MN DNR plans to use a variety of methods to encourage and support education of the public about the effects of wolves on livestock, wild ungulate populations, and human activities and the history and ecology of wolves in the State (MN DNR 2001, pp. 29–30). These are all measures that have been in effect for years in Minnesota, although increased enforcement of State laws against take of wolves would replace enforcement of the Act's take prohibitions. Financial compensation for livestock losses has increased to the full market value of the animal, replacing previous caps of $400 and $750 per animal (MN DNR 2001, p. 24). We do not expect the State's efforts to result in the reduction of illegal take of wolves from existing levels, but we believe these measures will be crucial in ensuring that illegal mortality does not significantly increase if this proposed delisting is finalized.

The likelihood of illegal take increases in relation to road density and human population density, but

011469A

changing attitudes towards wolves may allow them to survive in areas where road and human densities were previously thought to be too high (Fuller *et al.* 2003, p. 181). The MN DNR does not plan to reduce current levels of road access, but would encourage managers of land areas large enough to sustain one or more wolf packs to "be cautious about adding new road access that could exceed a density of one mile of road per square mile of land, without considering the potential effect on wolves" (MN DNR 2001, pp. 27–28).

Under Minnesota law, the illegal killing of a wolf is a gross misdemeanor and is punishable by a maximum fine of $3,000 and imprisonment for up to one year. The restitution value of an illegally killed wolf is $2,000 (MN DNR 2001, p. 29). The MN DNR acknowledges that increased enforcement of the State's wolf laws and regulations would be dependent on increases in staff and resources, additional cross-deputization of Tribal law enforcement officers, and continued cooperation with Federal law enforcement partners. Minnesota DNR has designated three conservation officers who are stationed in the State's wolf range as the lead officers for implementing the wolf management plan (MN DNR 2001, pp. 29, 32; Stark 2009a, pers. comm.).

Minnesota DNR will consider wolf population management measures, including public hunting and trapping seasons and other methods, in the future. However, State law and the Minnesota Plan state that such consideration will occur no sooner than 5 years after Federal delisting, and there would be opportunity for full public comment on such possible changes at that time (Minnesota Statutes 97B.645 Subdiv. 9, see MN DNR 2001 Appendix 1, p. 6; MN DNR 2001, p. 20). The Minnesota Plan requires that these population management measures be implemented in such a way to maintain a statewide late-winter wolf population of at least 1,600 animals (MN DNR 2001, pp. 19–20), well above the planning goal of 1,251 to 1,400 wolves for the State in the Revised Recovery Plan (USFWS 1992, p. 28), therefore, implementing such management measures under that requirement would ensure the wolf's continued survival in Minnesota.

*Depredation Control in Minnesota*— Although Federally protected as a threatened species in Minnesota (since their 1978 reclassification), wolves that have attacked domestic animals have been killed by designated government employees under the authority of a special regulation (50 CFR 17.40(d)) under section 4(d) of the Act. However, no control of depredating wolves was allowed in Federal Wolf Management Zone 1, comprising about 4,500 sq mi (7,200 sq km) in extreme northeastern Minnesota (USFWS 1992, p. 72). In Federal Wolf Management Zones 2 through 5, employees or agents of the Service (including USDA–APHIS– Wildlife Services) have taken wolves in response to depredations of domestic animals within one-half mile of the depredation site. Young-of-the-year captured on or before August 1 must be released. The regulations that allow for this take (50 CFR 17.40(d)(2)(i)(B)(4)) do not specify a maximum duration for depredation control, but Wildlife Services personnel have followed internal guidelines under which they trap for no more than 10–15 days, except at sites with repeated or chronic depredation, where they may trap up to 30 days (Paul 2004, pers. comm.).

During the period 1980–2009, the Federal Minnesota wolf depredation control program euthanized from 20 (in 1982) to 216 (in 1997) wolves annually. Annual averages (and percentage of statewide population) were 30 (2.2 percent) wolves killed from 1980 to 1984, 49 (3.0 percent) from 1985 to 1989, 115 (6.0 percent) from 1990 to 1994, 152 (6.7 percent) from 1995 to 1999, and 128 wolves (4.2 percent) from 2000 to 2005. During 2006–10 an average of 157 wolves were killed each year—approximately 5.4 percent of wolves in the State (Erb 2008; USDA– Wildlife Services 2010, p. 3). Since 1980, the lowest annual percentage of Minnesota wolves killed under this program was 1.5 percent in 1982; the highest percentage was 9.4 in 1997 (Paul 2004, pp. 2–7; 2006, p. 1). Following the return of wolves in Minnesota to the list of threatened species in 2009, 195 and 192 wolves were killed in 2009 and 2010, respectively, in response to depredation of domestic animals in Minnesota. This is the highest 22-year consecutive total since authorization to control depredating wolves was allowed by special regulation under section 4(d) of the Act while wolves were Federally listed.

This level of wolf removal for depredation control has not interfered with wolf recovery in Minnesota, although it may have slowed the increase in wolf numbers in the State, especially since the late-1980s, and may be contributing to the possibly stabilized Minnesota wolf population suggested by the 2003–04 and 2007–08 estimates (see additional information in Minnesota Recovery). Minnesota wolf numbers grew at an average annual rate of nearly 4 percent between 1989 and 1998 while the depredation control program was taking its highest percentages of wolves (Paul 2004, pp. 2–7).

Under a Minnesota statute, the Minnesota Department of Agriculture (MDA) compensates livestock owners for full market value of livestock that wolves have killed or severely injured. An authorized investigator must confirm that wolves were responsible for the depredation. The Minnesota statute also requires MDA to periodically update its Best Management Practices (BMPs) to incorporate new practices that it finds would reduce wolf depredation (Minnesota Statutes 2010, Section 3.737, subdivision 5).

*Post-delisting Depredation Control in Minnesota*—If the WGL DPS is delisted, depredation control will be authorized under Minnesota State law and conducted in conformance with the Minnesota Wolf Management Plan (MN DNR 2001). The Minnesota Plan divides the State into Wolf Management Zones A and B. Zone A is composed of Federal Wolf Management Zones 1–4, covering 30,728 sq mi (49,452 sq km), approximately the northeastern third of the State. Zone B is identical to the current Federal Wolf Management Zone 5, and contains the 54,603 sq mi (87,875 sq km) that make up the rest of the State (MN DNR 2001, pp. 19–20 and Appendix III; USFWS 1992, p. 72). The statewide survey conducted during the winter of 2003–04 estimated that there were approximately 2,570 wolves in Zone A and 450 in Zone B (Erb in litt. 2005). As discussed in *Recovery Criteria above,* the Federal planning goal is 1,251–1,400 wolves for Zones 1–4 and no wolves in Zone 5 (USFWS 1992, p. 28).

In Zone A wolf depredation control is limited to situations of (1) immediate threat and (2) following verified loss of domestic animals. In this zone, if the DNR verifies that a wolf destroyed any livestock, domestic animal, or pet, and if the owner requests wolf control be implemented, trained and certified predator controllers may take wolves (specific number to be determined on a case-by-case basis) within a 1-mile radius of the depredation site (depredation control area) for up to 60 days. In contrast, in Zone B, predator controllers may take wolves (specific number to be determined on a case-by-case basis) for up to 214 days after MN DNR opens a depredation control area, depending on the time of year. Under State law, the DNR may open a control area in Zone B anytime within 5 years of a verified depredation loss upon request of the landowner, thereby providing more of a preventative approach than is allowed in Zone A, in

order to head off repeat depredation incidents (MN DNR 2001, p. 22).

State law and the Minnesota Plan will also allow for private wolf depredation control throughout the State. Persons may shoot or destroy a wolf that poses "an immediate threat" to their livestock, guard animals, or domestic animals on lands that they own, lease, or occupy. Immediate threat is defined as "in the act of stalking, attacking, or killing." This does not include trapping because traps cannot be placed in a manner such that they trap only wolves in the act of stalking, attacking, or killing. Owners of domestic pets may also kill wolves posing an immediate threat to pets under their supervision on lands that they do not own or lease, although such actions are subject to local ordinances, trespass law, and other applicable restrictions. The MN DNR will investigate any private taking of wolves in Zone A (MN DNR 2001, p. 23).

To protect their domestic animals in Zone B, individuals do not have to wait for an immediate threat or a depredation incident in order to take wolves. At any time in Zone B, persons who own, lease, or manage lands may shoot wolves on those lands to protect livestock, domestic animals, or pets. They may also employ a predator controller to trap a wolf on their land or within 1 mile of their land (with permission of the landowner) to protect their livestock, domestic animals, or pets (MN DNR 2001, p. 23–24).

The Minnesota Plan will also allow persons to harass wolves anywhere in the State within 500 yards of "people, buildings, dogs, livestock, or other domestic pets or animals." Harassment may not include physical injury to a wolf.

Depredation control will be allowed throughout Zone A, which includes an area (Federal Wolf Management Zone 1) where such control has not been permitted under the Act's protection. Depredation in Zone 1, however, has been limited to 2 to 4 reported incidents per year, mostly of wolves killing dogs, although Wildlife Services received one livestock depredation complaint in Zone 1 in 2008 (Hart pers. comm. 2009), and some dog kills in this zone probably go unreported. In 2009, there was one probable and one verified depredation of a dog near Ely, Minnesota, and in 2010 Wildlife Services confirmed three dogs killed by wolves in Zone 1 (USDA–Wildlife Services 2009, p. 3; USDA–Wildlife Services 2010, p. 3). There are few livestock in Zone 1; therefore, the number of verified future depredation incidents in that Zone is expected to be low, resulting in a correspondingly low

number of depredating wolves being killed there after delisting.

The final change in Zone A is the ability for owners or lessees to respond to situations of immediate threat by shooting wolves in the act of stalking, attacking, or killing livestock or other domestic animals. We believe this is not likely to result in the killing of many additional wolves, as opportunities to shoot wolves "in the act" will likely be few and difficult to successfully accomplish, a belief shared by the most experienced wolf depredation agent in the lower 48 States (Paul in litt. 2006, p. 5). It is also possible that illegal killing of wolves in Minnesota will decrease, because the expanded options for legal control of problem wolves may lead to an increase in public tolerance for wolves (Paul in litt. 2006, p. 5).

Within Zone B, State law and the Minnesota Plan provide broad authority to landowners and land managers to shoot wolves at any time to protect their livestock, pets, or other domestic animals on land owned, leased, or managed by the individual. Such takings can occur in the absence of wolf attacks on the domestic animals. Thus, the estimated 450 wolves in Zone B could be subject to substantial reduction in numbers, and at the extreme, wolves could be eliminated from Zone B. However, there is no way to reasonably evaluate in advance the extent to which residents of Zone B will use this new authority, nor how vulnerable Zone B wolves will be. While wolves were under State management in 2007–08, landowners in Zone B shot six wolves under this authority. One additional wolf was trapped and euthanized in Zone B by a State certified predator controller in 2009 (Stark 2009b, pers. comm.).

The limitation of this broad take authority to Zone B is fully consistent with the Recovery Plan for the Eastern Timber Wolf's advice that wolves should be restored to the rest of Minnesota but not to Zone B (Federal Zone 5) because that area "is not suitable for wolves" (USFWS 1992, p. 20). The Recovery Plan for the Eastern Timber Wolf envisioned that the Minnesota numerical planning goal would be achieved solely in Zone A (Federal Zones 1–4) (USFWS 1992, p. 28), and that has occurred. Wolves outside of Zone A are not necessary to the establishment and long-term viability of a self-sustaining wolf population in the State, and therefore there is no need to establish or maintain a wolf population in Zone B. Accordingly, there is no need to maintain significant protection for wolves in Zone B in order to maintain

a Minnesota wolf population that continues to satisfy the Federal recovery criteria after Federal delisting.

This expansion of depredation control activities will not threaten the continued survival of wolves in the State or the long-term viability of the wolf population in Zone A, the large part of wolf range in Minnesota. Significant changes in wolf depredation control under State management will primarily be restricted to Zone B, which is outside of the area necessary for wolf recovery (USFWS 1992, pp. 20, 28). Furthermore, wolves may still persist in Zone B despite the likely increased take there. The Eastern Timber Wolf Recovery Team concluded that the changes in wolf management in the State's Zone A would be "minor" and would not likely result in "significant change in overall wolf numbers in Zone A." They found that, despite an expansion of the national depredation control areas and an extension of the control period to 60 days, depredation control will remain "very localized" in Zone A. The requirement that such depredation control activities be conducted only in response to verified wolf depredation in Zone A played a key role in the team's evaluation (Peterson in litt. 2001). While wolves were under State management in 2007 and 2008, the number of wolves killed for depredation control (133 wolves in 2007 and 143 wolves in 2008) remained consistent with those killed under the special regulation under section 4(d) of the Act while wolves were Federally listed (105, in 2004; 134, in 2005; and 122, in 2006).

Minnesota will continue to monitor wolf populations throughout the State and will also monitor all depredation control activities in Zone A (MN DNR 2001, p. 18). These and other activities contained in their plan will be essential in meeting their population goal of a minimum statewide winter population of 1,600 wolves, well above the planning goal of 1,251 to 1,400 wolves that the Revised Recovery Plan identifies as sufficient to ensure the wolf's continued survival in Minnesota (USFWS 1992, p. 28).

### The Wisconsin Wolf Management Plan

Both the Wisconsin and Michigan Wolf Management Plans are designed to manage and ensure the existence of wolf populations in the States as if they are isolated populations and are not dependent upon immigration of wolves from an adjacent State or Canada, while still maintaining connections to those other populations. We support this approach and believe it provides strong assurances that the wolf in both States

will remain a viable component of the proposed WGL DPS for the foreseeable future.

The WI Plan allows for differing levels of protection and management within four separate management zones (see figure 3). The Northern Forest Zone (Zone 1) and the Central Forest Zone (Zone 2) now contain most of the State's wolf population, with approximately 6 percent of the Wisconsin wolves in Zones 3 and 4 (Wydeven and Wiedenhoeft 2009, Table 1). Zones 1 and 2 contain all the larger unfragmented areas of suitable habitat (see Wolf Range Ownership and Protection, above), so most of the State's wolf packs will continue to inhabit those parts of Wisconsin for the foreseeable future. At the time the Wisconsin Wolf Management Plan was completed, it recommended immediate reclassification from State-endangered to State-threatened status, because Wisconsin's wolf population had already exceeded its reclassification criterion of 80 wolves for 3 years. That state reclassification occurred in 1999, after the population exceeded that level for 5 years.

The Wisconsin Plan further recommends that the State manage for a wolf population of 350 wolves outside of Native American reservations, and specifies that the species should be delisted by the State once the population reaches 250 animals outside of reservations. The species was proposed for State delisting in late 2003, and the State delisting process was completed in 2004. Upon State delisting, the species was classified as a "protected nongame species," a designation that continues State prohibitions on sport hunting and trapping of the species (Wydeven and Jurewicz 2005, p. 1; WI DNR 2006b, p. 71). The Wisconsin Plan includes criteria that would trigger State relisting to threatened (a decline to fewer than 250 wolves for 3 years) or endangered status (a decline to fewer than 80 wolves for 1 year). The Wisconsin Plan will be reviewed annually by the Wisconsin Wolf Advisory Committee and will be reviewed by the public every 5 years. Recently the WI DNR began work on updating the State's wolf management plan, which may include increasing the State management goal (Wydeven and Wiedenhoeft 2009, p. 3).

The WI Plan was updated during 2004–06 to reflect current wolf numbers, additional knowledge, and issues that have arisen since its 1999 completion. This update is in the form of text changes, revisions to two appendices, and the addition of a new appendix to the 1999 plan, rather than as a major revision to the plan. Several components of the plan that are key to our delisting evaluation are unchanged. The State wolf management goal of 350 animals and the boundaries of the four wolf management zones remain the same as in the 1999 Plan. The updated 2006 Plan continues access management on public lands and the protection of active den sites. Protection of pack rendezvous sites, however, is no longer considered to be needed in areas where wolves have become well established, due to the transient nature of these sites and the larger wolf population. The updated Plan states that rendezvous sites may need protection in areas where wolf colonization is still underway or where pup survival is extremely poor, such as in northeastern Wisconsin (WI DNR 2006a, p. 17). The guidelines for the wolf depredation control program did not undergo significant alteration during the update process. The only substantive change to depredation control practices is to expand the area of depredation control trapping in Zones 1 and 2 to 1 mi (1.6 km) outward from the depredation site, replacing the previous 0.5 mi (0.8 km) radius trapping zone (WI DNR 2006a, pp. 3–4).

An important component of the WI Plan is the annual monitoring of wolf populations by radio collars and winter track surveys in order to provide comparable annual data to assess population size and growth for at least 5 years after Federal delisting. This monitoring will include health monitoring of captured wolves and necropsies of dead wolves that are found. Wolf scat will be collected and analyzed to monitor for canine viruses and parasites. Health monitoring will be part of the capture protocol for all studies that involve the live capture of Wisconsin wolves (WI DNR 2006a, p. 14).

Cooperative habitat management will be promoted with public and private landowners to maintain existing road densities in Zones 1 and 2, protect wolf dispersal corridors, and manage forests for deer and beaver (WI DNR 1999, pp. 4, 22–23; 2006a, pp. 15–17). Furthermore, in Zone 1, a year-round prohibition on tree harvest within 330 feet (100 m) of den sites, and seasonal restrictions to reduce disturbance within one-half mile of dens, will be WI DNR policy on public lands and will be encouraged on private lands (WI DNR 1999, p. 23; 2006a, p. 17).

**BILLING CODE 4310–55–P**

011472A

Figure 3. Wisconsin wolf management zones.

BILLING CODE 4310–55–C

The 1999 WI Plan contains, and the 2006 update retains, other recommendations that will provide protection to assist in maintenance of a viable wolf population in the State: (1) Continue the protection of the species as a "protected wild animal" with penalties similar to those for unlawfully killing large game species (fines of $1,000–$2,000, loss of hunting privileges for 3–5 years, and a possible 6-month jail sentence), (2) maintain closure zones where coyotes cannot be shot during deer hunting season in Zone 1, (3) legally protect wolf dens under the Wisconsin Administrative Code, (4) require State permits to possess a wolf or wolf-dog hybrid, and (5) establish a restitution value to be levied in addition to fines and other penalties for wolves that are illegally killed (WI DNR 1999, pp. 21, 27–28, 30–31; 2006a, pp. 3–4).

The 2006 update of the WI Plan continues to emphasize the need for public education efforts that focus on living with a recovered wolf population, ways to manage wolves and wolf-human conflicts, and the ecosystem role of wolves. The Plan continues the State reimbursement for depredation losses (including dogs and missing calves), citizen stakeholder involvement in the wolf management program, and coordination with the Tribes in wolf management and investigation of illegal killings (WI DNR 1999, pp. 24, 28–29; 2006a, pp. 22–23).

Given the decline and ultimate termination in Federal funding for wolf monitoring that would occur upon delisting, Wisconsin and Michigan DNRs are seeking an effective, yet cost-efficient, method for detecting wolf population changes to replace the current labor-intensive and expensive monitoring protocols. Both DNRs have considered implementing a "Minnesota-type" wolf survey. Such methodology is less expensive for larger wolf populations than the intensive radio monitoring and track survey methods currently used by the two States, and if the wolf population continues to grow there will be increased need to develop and implement a less expensive method. However, each State conducted independent field testing of the Minnesota method several years ago and found that method to be unsuitable for both States' lower wolf population density and uneven pack distribution. In both States the application of that method resulted in an overestimate of wolf abundance, possibly due to the more patchy distribution of wolves and packs in these States and the difficulty in accurately delineating occupied wolf range in areas where wolf pack density is relatively low in comparison to Minnesota and where agricultural lands are interspersed with forested areas (Wiedenhoeft 2005, pp. 11–12; Beyer in litt. 2006b).

Both States remain interested in developing accurate but less costly alternate survey methods. WI DNR might test other methods following any Federal delisting, but the State will not replace its traditional radio tracking/snow tracking surveys during the 5 year post-delisting monitoring period (Wydeven in litt. 2006b). The 2006 update to the Wisconsin Wolf Management Plan has not changed the

011473A

WI DNR's commitment to annual wolf population monitoring in a manner that ensures accurate and comparable data (WI DNR 1999, pp.19–20), and we are confident that adequate annual monitoring will continue for the foreseeable future.

*Depredation Control in Wisconsin*— The rapidly expanding Wisconsin wolf population has resulted in an increased need for depredation control. From 1979 through 1989, there were only five cases (an average of 0.4 per year) of verified wolf depredations in Wisconsin. Between 1990 and 1997, there were 27 verified depredation incidents in the State (an average of 3.4 per year), and 82 incidents (an average of 16.4 per year) occurred from 1998 to 2002. Depredation incidents increased to 23 cases (including 50 domestic animals killed and 4 injured) in 2003, 35 cases (53 domestic animals killed, 3 injured, and 6 missing) in 2004, and to 45 cases (53 domestic animals killed and 11 injured) in 2005 (Wydeven and Wiedenhoeft 2004a, pp. 2–3, 7–8 Table 3; Wydeven *et al.* 2005b, p. 7; Wydeven *et al.* 2006b, p. 7). From 2005 to 2008, depredation incidents continued to increase, with 52 cases (92 domestic animals killed (includes 50 chickens) and 16 injured) in 2006, 60 cases (51 domestic animals killed, 18 injured, and 14 missing) in 2007, and 57 cases (67 domestic animals killed and 10 injured) in 2008 (Wydeven *et al.* 2007a, p. 7; Wydeven and Wiedenhoeft 2008, pp. 8, 25–32; Wydeven *et al.* 2009a, p. 6). Similar levels of depredations continued to occur in 2009, with 55 cases (65 domestic animals killed and 11 injured), but increased again to 81 cases (99 domestic animals killed and 20 injured) in 2010 (Wydeven *et al.* 2010, pp. 9–10; Wydeven *et al.* 2011, p. 3).

The number of farms experiencing wolf depredations has increased from 5 farms in 2000, to 28–32 farms from 2007 to 2009, and to 47 farms in 2010, a nearly ten-fold increase in the number of farms experiencing depredations during the last decade. The number of counties with wolf depredations on farms also grew during that time period from 5 to 17 counties, indicating that wolf depredation problems on farms are continuing to expand (Wydeven in litt. 2009; Wydeven *et al.* 2009a, p. 23; Wydeven *et al.* 2011, p.3). Between 1995 and 2002, an average of 7 percent of packs in Wisconsin were involved in livestock depredations (Wydeven *et al.* 2004, p.36), and between 2002 and 2010, an average of 13 percent (from 7 to 17) of the State's packs were involved in livestock depredation (WI DNR data). More aggressive lethal controls possible

in 2007 and 2008 through State management following a temporary period of Federal delisting appear to have started to stabilize levels of livestock depredation in 2007–09, but loss of those control methods allowed major increases in levels of depredation in 2010.

A significant portion of depredation incidents in Wisconsin involve attacks on dogs, primarily those engaged in bear hunting activities or dogs being trained in the field for hunting. In most cases, these have been hunting dogs that were being used for, or being trained for, hunting bears, bobcats, coyotes, and snowshoe hare (Ruid *et al.* 2009, pp. 285–286). It is believed that the dogs entered the territory of a wolf pack and may have been close to a den, rendezvous site, or feeding location, thus triggering an attack by wolves defending their territory or pups. The frequency of attacks on hunting dogs has increased as the State's wolf population has grown. Between 1986 and 2010, 206 dogs were killed and 80 were injured by wolves in Wisconsin (WI DNR data files and summary of wolf survey reports). Generally about 90 percent of dogs killed were hunting hounds and about 50 percent of dogs injured were pet dogs attacked near homes (Ruid *et al.* 2009).

More than 80 percent of the dog kills occurred since 2001, with an average of 17.2 dogs killed annually (range 6 to 25 dogs killed per year), and 6.8 injured each year (range 1 to 14 dogs) during the period 2001–10 (WI DNR files). Data on recent depredations in 2009 and 2010 show a continued increase in wolf attacks on dogs, with 23 dogs killed and 11 injured by 20 wolf packs (12 percent of Wisconsin packs) in 2009, and 24 dogs killed and 14 injured by 21 wolf packs in 2010 (Wydeven *et al.* 2010, pp. 51–52; Wydeven *et al.* 2011 p.3). While the WI DNR compensates dog owners for mortalities and injuries to their dogs, the DNR takes no action against the depredating pack unless the attack was on a dog that was leashed, confined, or under the owner's control on the owner's land. Instead, the DNR issues press releases to warn bear hunters and bear dog trainers of the areas where wolf packs have been attacking bear dogs (WI DNR 2008, p. 5) and provides maps and advice to hunters on the WI DNR Web site (see *http://www.dnr.state.wi.us/org/land/er/mammals/wolf/dogdepred.htm*). In 2010, 14 wolf attacks on dogs had occurred near homes, which was the highest level seen of this type of depredation (Wydeven *et al.* 2011, p.3).

*Post-delisting Depredation Control in Wisconsin*—Following the proposed Federal delisting, wolf depredation

control in Wisconsin will be carried out according to the 2006 Updated Wisconsin Wolf Management Plan (WI DNR 2006a, pp. 19–23), Guidelines for Conducting Depredation Control on Wolves in Wisconsin Following Federal Delisting (WI DNR 2008), and any Tribal wolf management plans or guidelines that may be developed for reservations in occupied wolf range. The 2006 updates have not significantly changed the 1999 State Plan, and the State wolf management goal of 350 wolves outside of Indian reservations (WI DNR 2006a, p. 3) is unchanged. Verification of wolf depredation incidents will continue to be conducted by USDA–APHIS– Wildlife Services, working under a cooperative agreement with WI DNR, or at the request of a Tribe, depending on the location of the suspected depredation incident. If determined to be a confirmed or probable depredation by a wolf or wolves, one or more of several options will be implemented to address the depredation problem. These options include technical assistance, loss compensation to landowners, translocating or euthanizing problem wolves, and private landowner control of problem wolves in some circumstances (WI DNR 2006a, pp. 3– 4, 20–22).

Technical assistance, consisting of advice or recommendations to prevent or reduce further wolf conflicts, will be provided. This may also include providing to the landowner various forms of noninjurious behavior modification materials, such as flashing lights, noise makers, temporary fencing, and fladry (a string of flags used to contain or exclude wild animals). Monetary compensation is also provided for all verified and probable losses of domestic animals and for a portion of documented missing calves (WI DNR 2006a, pp. 22–23).

The WI DNR compensates livestock and pet owners for confirmed losses to depredating wolves. The compensation is made at full market value of the animal (up to a limit of $2,500 for dogs) and can include veterinarian fees for the treatment of injured animals (WI DNR 2006c 12.54). Compensation costs have been funded from the endangered resources tax check-off and sales of the endangered resources license plates. Current Wisconsin law requires the continuation of the compensation payment for wolf depredation regardless of Federal listing or delisting of the species (WI DNR 2006c 12.50). In recent years annual depredation compensation payments have ranged from $68,907.88 (2007) to $203,943.51 (2010). From 1985 through December 24, 2010, the WI DNR had spent $1,083,162.62 on

reimbursement for damage caused by wolves in the State, with 82 percent of that total spent since 2000 (*http://dnr.wi.gov/org/land/er/mammals/wolf/pdfs/wolf_damage_payments_2010.pdf*).

For depredation incidents in Wisconsin Zones 1 through 3, where all wolf packs currently reside, wolves may be trapped by Wildlife Services or WI DNR personnel and, if feasible, translocated and released at a point distant from the depredation site. If wolves are captured adjacent to an Indian reservation or a large block of public land, the animals may be translocated locally to that area. As noted above, long-distance translocating of depredating wolves has become increasingly difficult in Wisconsin and is likely to be used infrequently in the future as long as the off-reservation wolf population is above 350 animals. In most wolf depredation cases where technical assistance and nonlethal methods of behavior modification are judged to be ineffective, wolves will be shot or trapped and euthanized by Wildlife Services or DNR personnel. Trapping and euthanizing will be conducted within a 1-mi (1.6-km) radius of the depredation in Zones 1 and 2, and within a 5-mi (8-km) radius in Zone 3. There is no distance limitation for depredation control trapping in Zone 4, and all wolves trapped in Zone 4 will be euthanized, rather than translocated (WI DNR 2006a, pp. 22–23).

Following the proposed Federal delisting, Wisconsin landowners who have had a verified wolf depredation will be able to obtain limited-duration permits from WI DNR to kill a limited number of depredating wolves on land they own or lease, based on the size of the pack causing the local depredations (WI DNR 2008, p. 8). Such permits would be issued to: (1) Landowners with verified permits on their property within the last 2 years; (2) landowners within 1 mile of properties with verified wolf depredations during the calendar year; (3) landowners with vulnerable livestock within WI DNR-designated proactive control areas; (4) landowners with human safety concerns on their property, and (5) landowners with verified harassment of livestock on their property (WI DNR 2008, p. 8). Limit on number of wolves to control will be based on estimated number of wolves in the pack causing depredation problems. In addition, landowners and lessees of land statewide will be allowed to kill a wolf without obtaining a permit "in the act of killing, wounding, or biting a domestic animal," the incident must be reported to a conservation warden within 24 hours and the landowners are required to turn any dead wolves over

to the WI DNR (WI DNR 2006a, pp. 22–23; WI DNR 2008, p. 6). During the 19 months wolves were Federally delisted in 2007 and 2008, 5 wolves were shot in the act of depredations on domestic animals, and 2 wolves were shot by one landowner out of 67 permits issued. One wolf was shot in the act of attack on domestic animals during 2 months when wolves were delisted in 2009.

The updated Wisconsin Plan also envisions the possibility of intensive control management actions in sub-zones of the larger wolf management zones (WI DNR 2006a, pp. 22–23). Triggering actions and type of controls planned for these "proactive control areas" are listed in recent versions of the WI DNR depredation control guidelines (WI DNR 2008, pp. 7–9). Controls on these actions would be considered on a case-by-case basis to address specific problems, and would likely be carried out only in areas that lack suitable habitat, have extensive agricultural lands with little forest interspersion, in urban or suburban settings, and only when the State wolf population is well above the management goal of 350 wolves outside Indian reservations in late-winter surveys. The use of intensive population management in small areas will be adapted as experience is gained with implementing and evaluating localized control actions (Wydeven 2006, pers. comm.).

We have evaluated future lethal depredation control based upon verified depredation incidents over the last decade and the impacts of the implementation of similar lethal control of depredating wolves under 50 CFR 17.40(d) for Minnesota, § 17.40(o) for Wisconsin and Michigan, and section 10(a)(1)(A) of the Act for Wisconsin and Michigan. Under those authorities, WI DNR and Wildlife Services trapped and euthanized 17 wolves in 2003, 24 in 2004, 29 in 2005, 18 in 2006, 37 in 2007, 39 in 2008, 9 in 2009, and 16 in 2010 (WI DNR 2006a, p. 32; Wydeven *et al.* 2008, pp. 8–9; Wydeven *et al.* 2009, pp. 6–7; Wydeven *et al.* 2010, p. 15; Wydeven *et al.* 2011, p. 3). Although these lethal control authorities applied to Wisconsin and Michigan DNRs for only a portion of 2003 (April through December) and 2005 (all of January for both States; April 1 and April 19, for Wisconsin and Michigan respectively, through September 13), they covered nearly all of the verified wolf depredations during 2003–05, and thus provide a reasonable measure of annual lethal depredation control. Lethal control authority only occurred for about 3.5 months in 2006.

For 2003, 2004, and 2005, this represents 5.1 percent, 6.4 percent, 7.4

percent (including the several possible wolf-dog hybrids), respectively, of the late-winter population of Wisconsin wolves during the previous winter. Note that some of the wolves euthanized after August 1 were young-of-the-year who were not present during the late-winter survey, so the cited percentages are overestimates.

This level of lethal depredation control was followed by a wolf population increase of 11 percent from 2003 to 2004, 17 percent from 2004 to 2005, and 7 percent from 2005 to 2006 (Wydeven and Jurewicz 2005, p. 5; Wydeven *et al.* 2006a, p. 10). Limited lethal control authority was granted to WI DNR in 2006 by a section 10 permit resulting in removal of 18 wolves (3.9 percent of winter wolf population), and this permit remained in effect for 3.5 months (Wydeven *et al.* 2007, p. 7). Lethal depredation control was again authorized in the State while wolves were delisted in 2007 (9.5 months) and 2008 (9 months). During those times, 40 and 43 wolves, respectively, were killed for depredation control (by Wildlife Services or by legal landowner action), representing 7 and 8 percent of the late-winter population of Wisconsin wolves during the previous year.

This level of lethal depredation control was followed by a wolf population increase of 0.5 percent from 2007 to 2008, and 12 percent from 2008 to 2009, (Wydeven and Wiedenhoeft 2008, pp. 19–22; Wydeven *et al.* 2009a, p. 6). Authority for lethal control on depredating wolves only occurred for 2 months in 2009. During that time, eight wolves were euthanized for depredation control by USDA–WS, and one wolf was shot by a landowner; additionally a wolf was captured and euthanized by USDA–WS for human safety concerns later in 2009 after relisting (Wydeven *et al.* 2010, p. 15). Thus in 2009, 10 wolves, or 2 percent of the winter wolf population, were removed in control activities.

The Wisconsin wolf population in winter 2010 grew to 690 wolves, an increase of 8 percent from the wolf population in 2009 (Wydeven *et al.* 2010, pp. 12–13). In 2010, authority for lethal control of wolves depredating livestock was not available in Wisconsin, but 16 wolves or 2 percent of the winter population were removed for human safety concerns (Wydeven *et al.* 2011, p. 3). This provides strong evidence that this form and magnitude of depredation control will not adversely impact the viability of the Wisconsin wolf population. The locations of depredation incidents provide additional evidence that lethal control will not have an adverse impact

on the State's wolf population. Most livestock depredations are caused by packs near the northern forest-farm land interface. Few depredations occur in core wolf range and in large blocks of public land. Thus, lethal depredation control actions will not impact most of the Wisconsin wolf population (WI DNR 2006a, p. 30).

Control actions in Wisconsin also resulted in removal of wolf-dog hybrids from the wild that had begun associating with packs. Wolf-dog hybrid removal in depredation control activity by USDA–WS included 3 in 2005, 1 in 2007, 2 in 2008, and 1 in 2010 (WI DNR files).

One substantive change to lethal control that will result from the proposed Federal delisting is the ability of a small number of private landowners, whose farms have a history of recurring wolf depredation, to obtain DNR permits to kill depredating wolves (WI DNR 2006a, p. 23; WI DNR 2008, p. 8). During the time wolves were Federally delisted from March 12, 2007 through September 29, 2008, the DNR issued 67 such permits, resulting in 2 wolves being killed. Some landowners received permits more than once and permits were issued for up to 90 days at a time and restricted to specific calendar years. During that same time period, under Wisconsin depredation management guidelines, landowners were allowed to shoot wolves in the act of attacks on domestic animals on private land without a permit; under that authority, landowners killed a total of five wolves. The death of these seven additional wolves—only one percent of the State's wolves in 2008—did not affect the viability of the population. Another substantive change after the proposed delisting may be potential proactive trapping or "intensive control" of wolves in limited areas as described above. We are confident that the number of wolves killed by these actions will not impact the long-term viability of the Wisconsin wolf population, because generally less than 15 percent of packs cause depredations that would initiate such controls, and "proactive" controls will be carried out only if the State's late-winter wolf population exceeds 350 animals outside Indian reservations.

The State's current guidelines for conducting depredation control actions say that no control trapping will be conducted on wolves that kill "dogs that are free-roaming, roaming at large, hunting, or training on public lands, and all other lands except land owned or leased by the dog owner" (WI DNR 2008, p. 5). Controls would be applied on wolves depredating pet dogs attacked near homes and wolves attacking

livestock, which in 2010 included 25 packs attacking livestock (23 packs that were also documented in the previous winter surveys), 8 packs attacking dogs at homes, and 5 packs attacking both livestock and dogs. Thus control would have been applied to 31 packs (17 percent of State packs) previously detected and 2 new packs. Because of these state-imposed limitations, we believe that lethal control of wolves depredating on hunting dogs will be rare and, therefore, will not be a significant additional source of mortality in Wisconsin.

Lethal control of wolves that attack captive deer is included in the WI DNR depredation control program, because farm-raised deer are considered to be livestock under Wisconsin law (WI DNR 2008, pp. 5–6; 2006c, 12.52). However, Wisconsin regulations for deer farm fencing have been strengthened, and it is unlikely that more than an occasional wolf will need to be killed to end wolf depredations inside deer farms in the foreseeable future. Claims for wolf depredation compensation are rejected if the claimant is not in compliance with regulations regarding farm-raised deer fencing or livestock carcass disposal (Wisconsin Statutes 90.20 & 90.21, WI DNR 2006c 12.54).

Data from verified wolf depredations in recent years indicate that depredation on livestock is likely to increase as long as the Wisconsin wolf population increases in numbers and range. Wolf packs establishing in more marginal habitat with high acreage of pasture land are more likely to become depredators (Treves *et al.* 2004, p. 121–122). Most large areas of forest land and public lands are included in Wisconsin Wolf Management Zones 1 and 2, and they have already been colonized by wolves. Therefore, new areas likely to be colonized by wolves in the future will be in Zones 3 and 4, where they will be exposed to much higher densities of farms, livestock, and residences. During 2008, of farms experiencing wolf depredation, 25 percent (8 of 32) were in Zone 3, yet only 4 percent of the State wolf population occurs in this zone (Wydeven *et al.* 2009a, p. 23). Further expansion of wolves into Zone 3 would likely lead to an increase in depredation incidents and an increase in lethal control actions against Zone 3 wolves. However, these Zone 3 mortalities will have no impact on wolf population viability in Wisconsin because of the much larger wolf populations in Zones 1 and 2.

For the foreseeable future, the wolf population in Zones 1 and 2 will continue to greatly exceed the recovery

goal in the Recovery Plan for the Eastern Timber Wolf of 200 late-winter wolves for an isolated population and 100 wolves for a subpopulation connected to the larger Minnesota population, regardless of the extent of wolf mortality from all causes in Zones 3 and 4. Ongoing annual wolf population monitoring by WI DNR will provide timely and accurate data to evaluate the effects of wolf management under the Wisconsin Plan.

The possibility of a public harvest of wolves is acknowledged in the Wisconsin Wolf Management Plan and in plan updates (WI DNR 1999, Appendix D; 2006c, p. 23). However, the question of whether a public harvest will be initiated and the details of such a harvest are far from resolved. Public attitudes toward a wolf population in excess of 350 would have to be fully evaluated, as would the impacts from other mortalities, before a public harvest could be initiated.

The Wisconsin Conservation Congress, a group that advises the WI DNR on issues of fishing and hunting regulations, held hearings in 2008 (while wolves were Federally delisted in the WGL) to gather information on the public's attitudes toward a public harvest of wolves in the State. Of the people attending those meetings, 86 percent recommended that efforts begin to develop public harvest regulations for wolves in the State, indicating a strong interest among hunters and anglers to begin such development. Establishing a public harvest, however, would be preceded by extensive public input, including public hearings, and would require legislative authorization and approval by the Wisconsin Natural Resources Board. Because of the steps that must precede a public harvest of wolves and the uncertainty regarding the possibility of, and the details of, any such program, we consider public harvest of Wisconsin wolves to be highly speculative at this time. The Service will closely monitor any steps taken by States and Tribes within the proposed WGL DPS to establish any public harvest of wolves during our post-delisting monitoring program.

Future updates for the Wisconsin wolf management and conservation plan will likely contain more specific language on any potential public harvest for the State. The WI DNR is committed to maintaining a wolf population at 350 wolves outside of Indian reservations, which translates to a statewide population of 361 to 385 wolves in late winter. No harvest would be considered if the wolf population fell below this goal (WI DNR 1999, pp. 15, 16). Any harvest would consist of limited permits

on limited portions of the wolf range to reduce wolf-human conflict, and extensive areas in wolf range would be closed to harvest of wolves (WI DNR 1999, p. 21). Also, the fact that the Wisconsin Plan calls for State relisting of the wolf as a threatened species if the population falls to fewer than 250 for 3 years provides a strong assurance that any future public harvest is not likely to threaten the persistence of the population (WI DNR 1999, pp. 15–17). Based on wolf population data, the current Wisconsin Plan and the 2006 updates, we believe that any public harvest plan would continue to maintain the State wolf population well above the recovery goal of 200 wolves in late winter.

The Michigan Wolf Management Plan

In 1997, the Michigan DNR finalized the Michigan Gray Wolf Recovery and Management Plan (MI DNR 1997). That plan was developed when the number of wolves in the State was relatively small, and focused on recovery. In 2001, the MI DNR began reevaluating the 1997 Plan and appointed a committee to evaluate wolf recovery and management in the State. As a result of that evaluation, MI DNR concluded that the 1997 Plan needed revising, which prompted a more formal review, including extensive stakeholder input. Recognizing that wolf recovery had been achieved in Michigan, additional scientific knowledge had been gained, and new social issues had arisen since the 1997 Plan was drafted, the focus of the revised plan shifted from a recovery plan to a wolf management plan. To assist in this endeavor, the DNR convened a Michigan Wolf Management Roundtable, composed of a diverse group of citizens spanning the spectrum of those interested in, and impacted by, wolf recovery and management in Michigan, including Tribal entities and organizations focused on agriculture, hunting and trapping, the environment, animal protection, law enforcement and public safety, and tourism.

The Roundtable was asked to review the 1997 wolf management goal, to set priorities for management issues, and to recommend strategic goals or policies the DNR should use in addressing the management issues. The Roundtable provided "guiding principles" for managing wolves and wolf-related issues following Federal delisting (Michigan Wolf Management Roundtable 2006, pp. 6–7). Those guiding principles strongly influenced the 2008 Michigan Wolf Management Plan (MI Plan) (MI DNR 2008a).

The 2008 MI Plan describes the wolf recovery goals and management actions needed to maintain a viable wolf population in the UP of Michigan, while facilitating wolf-related benefits and minimizing conflicts. The four principal goals are to "1) maintain a viable Michigan wolf population above a level that would warrant its classification as threatened or endangered; 2) facilitate wolf-related benefits; 3) minimize wolf-related conflicts; and 4) conduct science-based wolf management with socially acceptable methods" (MI DNR 2008a, p. 22). The Michigan Plan details wolf management actions, including public education and outreach activities, annual wolf population and health monitoring, research, depredation control, ensuring adequate legal protection for wolves, and prey and habitat management. It does not address the potential need for wolf recovery or management in the Lower Peninsula, nor wolf management within Isle Royale National Park (where the wolf population is fully protected by the National Park Service).

As with the WI Plan, the MI DNR has chosen to manage the State's wolves as though they are an isolated population that receives no genetic or demographic benefits from immigrating wolves, even though their population will continue to be connected with populations in Minnesota, Wisconsin, and Canada. The Michigan wolf population must exceed 200 wolves in order to achieve the Plan's first goal of maintaining a viable wolf population in the UP. This number is consistent with the Federal Recovery Plan for the Eastern Timber Wolf's definition of a viable, isolated wolf population (USFWS 1992, p. 25). The MI Plan, however, clearly states that 200 wolves is not the target population size, and that a larger population may be necessary to meet the other goals of the Plan. Therefore, the State will maintain a wolf population that will "provide all of the ecological and social benefits valued by the public" while "minimizing and resolving conflicts where they occur" (MI DNR 2008a, pp. 22–23). We strongly support this approach, as it provides assurance that a viable wolf population will remain in the UP regardless of the future fate of wolves in Wisconsin or Ontario.

The 2008 Michigan Plan identifies wolf population monitoring as a priority activity, and specifically states that the WI DNR will monitor wolf abundance annually for at least 5 years post-delisting (MI DNR 2008a, pp. 31–32). This includes monitoring to assess wolf presence in the northern Lower Peninsula. As discussed previously, the size of the wolf population in Michigan is determined by extensive radio and snow tracking surveys. Recently the MI DNR also conducted a field evaluation of a less expensive "Minnesota-type" wolf survey. However, similar to WI DNR's experience, the evaluation concluded that the method overestimated wolf numbers, and is not suitable for use on the State's wolf population as it currently is distributed (Beyer in litt. 2006b).

From 1989 through 2006, the WI DNR attempted to count wolves throughout the entire UP. As the wolf population increased, this method became more difficult. In the winter of 2006–07, the MI DNR implemented a new sampling approach based on an analysis by Potvin *et al.* (2005, p. 1668) to increase the efficiency of the State survey. The new approach is based on a geographically based stratified random sample and produces an unbiased, regional estimate of wolf abundance. The UP was stratified into three sampling areas, and within each stratum the DNR intensively surveys roughly 40 to 50 percent of the wolf habitat area annually. Computer simulations have shown that such a geographically stratified monitoring program will produce unbiased and precise estimates of the total wolf population which can be statistically compared to estimates derived from the previous method to detect significant changes in the UP wolf population (Beyer in litt 2006b, see attachment by Drummer; Lederle in litt. 2006; Roell *et al.* 2009, p. 3).

Another component of wolf population monitoring is monitoring wolf health. The MI DNR will continue to monitor the impact of parasites and disease on the viability of wolf populations in the State through necropsies of dead wolves and analyzing biological samples from captured live wolves. Prior to 2004, MI DNR vaccinated all captured wolves for canine distemper and parvovirus and treated them for mange. These inoculations were discontinued to provide more natural biotic conditions and to provide biologists with an unbiased estimate of disease-caused mortality rates in the population (Roell in litt. 2005b). Since diseases and parasites are not currently a significant threat to the Michigan wolf population, the MI DNR is continuing the practice of not actively managing disease. If monitoring indicates that diseases or parasites may pose a threat to the wolf population, the MI DNR will again consider more active management similar to that conducted prior to 2004.

The 2008 Plan includes maintaining habitat and prey necessary to sustain a viable wolf population in the State as a management component. This includes maintaining prey populations required

for a viable wolf population while providing for sustainable human uses, maintaining habitat linkages to allow for wolf dispersal, and minimizing disturbance at known, active wolf dens (MI DNR 2008a, pp. 36–41).

The Plan does not determine whether a public harvest will be used as a management strategy in Michigan, but it discusses developing a "socially and biologically responsible policy regarding public harvest" (MI DNR 2008a, p. 65). Instituting public harvest during a regulated season would first require that the wolf be classified as a "game animal" in the State. Game-animal status in Michigan may be designated only by the State Legislature and, additionally, only the State Legislature could authorize the first harvest season. If such designation and authorization were conferred, the Michigan Natural Resources Commission could then need to enact regulations pertaining to the methods of a public harvest.

To minimize illegal take, the 2008 Plan calls for enacting and enforcing regulations to ensure adequate legal protection for wolves in the State. Under State regulations, wolves could be classified as threatened, endangered, game, or protected animal, all of which prohibit killing (or harming) the species except under a permit, license, or specific conditions. As discussed above, designating a species as a "game animal" would require action by the State Legislature. Michigan reclassified wolves from endangered to threatened in June 2002, and in April 2009, removed gray wolves from the State's Threatened and Endangered species list and amended the Wildlife Conservation Order to grant "protected animal" status to the gray wolf in the State (Roell 2009, pers. comm.). A person who commits a violation regarding the possession or taking of most wildlife species with the four legal designations (threatened, endangered, game, or protected animal) in Michigan is guilty of a misdemeanor punishable by imprisonment for not more than 90 days, or a fine of not less than $100 or more than $1,000, or both. Penalties may also include costs of prosecution, loss of hunting privileges, and reimbursing the value of the animal ($1,500 for a threatened or endangered species, $100 to $500 for most game species, and $100 for protected animals) (MI DNR 2008a, p. 35).

The 2008 Plan emphasizes the need for public education efforts that focus on living with a recovered wolf population and ways to manage wolves and wolf-human interaction (both positive and negative). The Plan recommends continuing reimbursement

for depredation losses, citizen stakeholder involvement in the wolf management program, continuing important research efforts, and minimizing the impacts of captive wolves and wolf-dog hybrids on the wild wolf population (MI DNR 2008a, pp. 31, 59, 61, and 66).

The 2008 Michigan Plan calls for establishing a wolf management advisory group that would meet annually to monitor the progress made toward implementing the Plan. Furthermore, the Plan will be reviewed and updated at 5-year intervals, to address "ecological, social, and regulatory" changes (MI DNR 2008a, p. 66). The plan also addresses currently available and potential new sources of funding to offset costs associated with wolf management.

The MI DNR has long been an innovative leader in wolf recovery efforts, exemplified by its initiation of the nation's first attempt to reintroduce wild wolves to vacant historical wolf habitat in 1974 (Weise *et al.* 1975). The MI DNR's history of leadership in wolf recovery and its repeated written commitments to ensure the continued viability of a Michigan wolf population above a level that would trigger State or Federal listing as threatened or endangered further reinforces that the revised 2008 Michigan Wolf Management Plan will provide adequate regulatory mechanisms for Michigan wolves. The DNR's primary goal remains to conduct management to maintain the wolf population in Michigan above the minimum size that is biologically required for a viable, isolated population and to provide for ecological and social benefits valued by the public while resolving conflicts where they occur (MI DNR 2008a, p. 22).

Depredation Control in Michigan— Data from Michigan show a general increase in confirmed events of wolf depredations on livestock (Table 2). These livestock depredations occurred at 59 different UP farms (approximately 7 percent of the existing farms); 16 (27 percent) of those 59 farms have experienced more than one depredation event. Over 80 percent of the depredation events were on cattle, with the rest on sheep, poultry, rabbits, and captive cervids (Roell *et al.* 2009, pp. 9, 11). In 2010, 26 (57 percent) of the depredation events occurred on a single farm. The relationship between the number of wolves and the number of depredation events suggests that for every 100 additional wolves in the population there will be about 3 additional livestock depredation events per year (Roell *et al.* 2010, p. 6).

TABLE 2—NUMBER OF VERIFIED LIVE-STOCK DEPREDATION EVENTS BY WOLVES IN MICHIGAN BY YEAR

| Year | Number of animals killed |
|------|--------------------------|
| 1998 | 3 |
| 1999 | 1 |
| 2000 | 5 |
| 2001 | 3 |
| 2002 | 5 |
| 2003 | 13 |
| 2004 | 11 |
| 2005 | 5 |
| 2006 | 10 |
| 2007 | 14 |
| 2008 | 14 |
| 2009 | 12 |
| 2010 | 46 |

Michigan has not experienced as high a level of attacks on dogs by wolves as Wisconsin, although a slight increase in such attacks has occurred over the last decade. Yearly losses vary and actions of a single pack of wolves can be an important influence. In Michigan, there is not a strong relationship between wolf depredation on dogs and wolf abundance (Roell *et al.* 2010, p. 7). The number of dogs killed in the State between 1996 and 2010 was 34; 12 additional dogs were injured in wolf attacks during that same period. Of the 34 wolf-related dog deaths during that time, 50 percent involved hounds used to hunt bears (Roell 2010, pers. comm.). Similar to Wisconsin, MI DNR has guidelines for its depredation control program, stating that lethal control will not be used when wolves kill dogs that are free-roaming, hunting, or training on public lands. Lethal control of wolves, however, would be considered if wolves have killed confined pets and remain in the area where more pets are being held (MI DNR 2005a, p. 6). However, in 2008, the Michigan Legislature passed a law that would allow dog owners or their designated agents to remove, capture, or, if deemed necessary, use lethal means to destroy a gray wolf that is in the act of preying upon the owner's dog, which includes dogs free-roaming or hunting on public lands.

During the several years that lethal control of depredating wolves had been conducted in Michigan, there is no evidence of resulting adverse impacts to the maintenance of a viable wolf population in the UP. A total of 41 wolves were killed by the MI DNR and USDA –Wildlife Services in response to depredation events during the time period when permits or special rules were in effect or while wolves were not on the Federal list of threatened and endangered species (Roell *et al.* 2010, p. 8). Four, five, two, seven, fourteen, eight, and one wolves, respectively,

were euthanized in 2003, 2004, 2005, 2006, 2007, 2008, and 2009 (2 months) (Beyer *et al.* 2006, p. 88; Roell in litt. 2006, p. 1; Roell *et al.* 2010, p. 19; Roell 2010, pers. comm.). This represents 1.2 percent, 1.7 percent, 0.5 percent, 1.6 percent, 2.7 percent, 2.5 percent, and 0.2 percent, respectively, of the UP's late-winter population of wolves during the previous winter. Following this level of lethal depredation control, the UP wolf population increased 12 percent from 2003 to 2004, 13 percent from 2004 to 2005, 7 percent from 2005 to 2006, 17 percent from 2006 to 2007, 2 percent from 2007 to 2008, and 11 percent from 2008 to 2009, demonstrating that the wolf population continues to increase at a healthy rate (Huntzinger *et al.* 2005, p. 6; MI DNR 2006a, Roell *et al.* 2009, p. 4). Lethal control of wolves during livestock depredation was not available in 2010.

*Post-delisting Depredation Control in Michigan*—Following the proposed Federal delisting, wolf depredation control in Michigan would be carried out according to the 2008 Michigan Wolf Recovery and Management Plan (MI DNR 2008) and any Tribal wolf management plans that may be developed in the future for reservations in occupied wolf range.

To provide depredation control guidance when lethal control is an option, MI DNR has developed detailed instructions for incident investigation and response (MI DNR 2005a). Verification of wolf depredation incidents will be conducted by MI DNR or USDA–APHIS—Wildlife Services personnel (working under a cooperative agreement with MI DNR or at the request of a Tribe, depending on the location) who have been trained in depredation investigation techniques. The MI DNR specifies that the verification process will use the investigative techniques that have been developed and successfully used in Minnesota by Wildlife Services (MI DNR 2005a, Append. B, pp. 9–10). Following verification, one or more of several options will be implemented to address the depredation problem. Technical assistance, consisting of advice or recommendations to reduce wolf conflicts, will be provided. Technical assistance may also include providing to the landowner various forms of noninjurious behavior modification materials, such as flashing lights, noise makers, temporary fencing, and fladry.

Trapping and translocating depredating wolves has been used in the past, resulting in the translocation of 23 UP wolves during 1998–2003 (Beyer *et al.* 2006, p. 88), but as with Wisconsin,

suitable relocation sites are becoming rarer, and there is local opposition to the release of translocated depredators. Furthermore, none of the past translocated depredators have remained near their release sites, making this a questionable method to end the depredation behaviors of these wolves (MI DNR 2005a, pp. 3–4). Therefore, reducing depredation problems by relocation is no longer recommended as a management tool in Michigan (MI DNR 2008a, p. 57).

Lethal control of depredating wolves is likely to be the most common future response in situations when improved livestock husbandry and wolf behavior modification techniques (for example, flashing lights, noise-making devices) are judged to be inadequate. As wolf numbers continue to increase on the UP, the number of verified depredations will also increase, and will probably do so at a rate that exceeds the rate of wolf population increase. This will occur as wolves increasingly disperse into and occupy areas of the UP with more livestock and more human residences, leading to additional exposure to domestic animals. In a previous application for a lethal take permit under section 10(a)(1)(A) of the Act, MI DNR requested authority to euthanize up to 10 percent of the late-winter wolf population annually (MI DNR 2005b, p. 1). However, based on 2003–05 and 2007–09 depredation data, it is likely that significantly less than 10 percent lethal control will be needed over the next several years.

The MI Plan provides recommendations to guide management of various conflicts caused by wolf recovery, including depredation on livestock and pets, human safety, and public concerns regarding wolf impacts on other wildlife. We view the MI Plan's depredation and conflict control strategies to be conservative, in that they commit to nonlethal depredation management whenever possible, oppose preventative wolf removal where problems have not yet occurred, encourage incentives for best management practices that decrease wolf-livestock conflicts without impacting wolves, and support closely monitored and enforced take by landowners of wolves "in the act of livestock depredation" or under limited permits if depredation is confirmed and nonlethal methods are determined to be ineffective. Based on these components of the revised MI Plan and the stated goal for maintaining wolf populations at or above recovery goals, the Service believes any wolf management changes implemented following the proposed delisting would not be implemented in

a manner that results in significant reductions in Michigan wolf populations. The MI DNR remains committed to ensuring a viable wolf population above a level that would trigger relisting as either threatened or endangered in the future (MI DNR 2008a, p. 9).

Similar to Wisconsin, Michigan livestock owners are compensated when they lose livestock as a result of a confirmed wolf depredation. Currently there are two complementary compensation programs in Michigan, one funded by the MI DNR and implemented by Michigan Department of Agriculture (MI DA) and another set up through donations (from Defenders of Wildlife and private citizens) and administered by the International Wolf Center (IWC), a nonprofit organization. From the inception of the program to 2000, MI DA has paid 90 percent of full market value of depredated livestock at the time of loss. The IWC account was used to pay the remaining 10 percent from 2000 to 2002 when MI DA began paying 100 percent of the full market value of depredated livestock. The IWC account continues to be used to pay the difference between value at time of loss and the full fall market value for depredated young-of-the-year livestock, and together the two funds have provided nearly \$38,000 in livestock loss compensation through 2008 (Roell *et al.*, p. 15). Neither of these programs provides compensation for pets or for veterinary costs to treat wolf-inflicted livestock injuries. The MI DNR plans to continue cooperating with MI DA and other organizations to maintain the wolf depredation compensation program (MI DNR 2008a, pp. 59–60).

In 2009, Michigan passed two House Bills that would become effective after Federal delisting. Those bills authorized a livestock or dog owner (or a designated agent) to "remove, capture, or use lethal means to destroy a wolf that is in the act of preying upon" the owner's livestock or dog. During the 2 months that wolves were Federally and State delisted in 2009, no wolves were killed under these authorizations. We are confident that the limited number of wolves expected to be taken under these Bills would not affect the viability of the Michigan wolf population.

*Regulatory Mechanisms in Other States and Tribal Areas Within the Proposed WGL DPS*

North Dakota and South Dakota

North Dakota lacks a State endangered species law or regulation. Any wolves in the State currently are classified as furbearers, with a closed season. North

011479A

Dakota Game and Fish Department is unlikely to change the species' State classification immediately following the proposed Federal delisting. Wolves are included in the State's Wildlife Action Plan as a "Level 3" Species of Conservation Priority. Level 3 species are those "having a moderate level of conservation priority, but are believed to be peripheral or do not breed in North Dakota." Placement on this list gives species greater access to conservation funding, but does not afford any additional regulatory or legislative protection (Bicknell in litt. 2009).

Currently any wolves that may be in South Dakota are not State listed as threatened or endangered, nor is there a hunting or trapping season for them. Upon the effective date of any Federal delisting, gray wolves in eastern South Dakota will fall under general protections afforded all State wildlife. These protections require specific provisions—seasons and regulations—be established prior to initiating any form of legal take. Thus, the State could choose to implement a hunting or trapping season for wolves east of the Missouri River; however, absent some definitive action to establish a season, wolves would remain protected. Following the proposed Federal delisting, any verified depredating wolves east of the Missouri will likely be trapped and killed by the USDA–APHIS–Wildlife Services program (Larson in litt. 2005). Non-depredating wolves in North and South Dakota not on the Federal list will continue to receive protection by the States' wildlife protection statutes unless specific action is taken to open a hunting or trapping season or otherwise remove existing protections.

*Post-delisting Depredation Control in North and South Dakota*—Since 1993, five incidents of verified wolf depredation have occurred in North Dakota, with one in September 2003 and two more in December 2005. There have been no verified wolf depredations in South Dakota in recent decades. Following the proposed Federal delisting we assume that lethal control of a small number of depredating wolves will occur in one or both of these States. Lethal control of depredating wolves may have adverse impacts on the ability of wolves to occupy any small areas of suitable or marginally suitable habitat that may exist in the States. However, lethal control of depredating wolves in these two States will have no adverse effects on the long-term viability of wolf populations in the proposed WGL DPS as a whole, because the existence of a

wolf or a wolf population in the Dakotas will not make a meaningful contribution to the maintenance of the current viable, self-sustaining, and representative metapopulation of wolves in the proposed WGL DPS.

Other States in the Western Great Lakes DPS

The proposed DPS includes the portion of Iowa that is north of Interstate Highway 80, which is approximately 60 percent of the State. The Iowa Natural Resource Commission currently lists wolves as furbearers, with a closed season (Howell in litt. 2005). If the State retains this listing following the proposed Federal delisting of the DPS, wolves dispersing into northern Iowa will be protected by State law.

The portion of Illinois that is north of Interstate Highway 80, less than one-fifth of the State, is included in the DPS, and is part of the geographic area where wolves are proposed for removal from Federal protection. Gray wolves are currently protected in Illinois as a threatened species under the Illinois Endangered Species Protection Act (520 ILCS 10). Thus, following the proposed Federal delisting, wolves dispersing into northern Illinois would continue to be protected from human take by State law.

The extreme northern portions of Indiana and northwestern Ohio are included within the proposed DPS. If this proposal is made final, any wolves that are found in this area would no longer be Federally protected under the Act. The State of Ohio classifies the gray wolf as "extirpated," and there are no plans to reintroduce or recover the species in the State. The species lacks State protection, but State action is likely to apply some form of protection if wolves begin to disperse into the State (Caldwell in litt. 2005). Indiana DNR lists the gray wolf as extirpated in the State, and the species would receive no State protection under this classification following any Federal delisting. The only means to provide State protection would be to list them as State-endangered, but that is not likely to occur unless wolves become resident in Indiana (Johnson in litt. 2005, in litt. 2006). Thus, if this proposal is made final, Federally delisted wolves that might disperse into Indiana and Ohio would lack State protection there, unless these two States take specific action to provide new protections.

Because the portions of Iowa, Illinois, Indiana, and Ohio within the proposed WGL DPS do not contain suitable habitat or currently established packs, depredation control in these States would not have any significant impact

on the continued viability of wolf populations in the proposed WGL DPS.

Tribal Management and Protection of Wolves

Native American Tribes and inter-Tribal resource management organizations have indicated to the Service that they will continue to conserve wolves on most, and probably all, Native American reservations in the core recovery areas of the proposed WGL DPS. The wolf retains great cultural significance and traditional value to many Tribes and their members (additional discussion is found in Factor E), and to retain and strengthen cultural connections, many Tribes oppose unnecessary killing of wolves on reservations and on ceded lands, even following any Federal delisting (Hunt in litt. 1998; Schrage in litt. 1998a; Schlender in litt. 1998). Some Native Americans view wolves as competitors for deer and moose, whereas others are interested in harvesting wolves as furbearers (Schrage in litt. 1998a). Many Tribes intend to sustainably manage their natural resources, wolves among them, to ensure that they are available to their descendants. Traditional natural resource harvest practices, however, often include only a minimum amount of regulation by the Tribal governments (Hunt in litt. 1998).

Although not all Tribes with wolves that visit or reside on their reservations have completed management plans specific to the wolf, several Tribes have informed us that they have no plans or intentions to allow commercial or recreational hunting or trapping of the species on their lands after the proposed Federal delisting. The Red Lake Band of Chippewa Indians (Minnesota) and the Little Traverse Bay Band of Odawa Indians (Michigan) have developed wolf monitoring and/or management plans. The Service has also awarded a grant to the Ho-Chunk Nation to identify wolf habitat on reservation lands.

As a result of many past contacts with, and previous written comments from, the Midwestern Tribes and their inter-Tribal natural resource management agencies—the Great Lakes Indian Fish and Wildlife Commission (GLIFWC), the 1854 Authority, and the Chippewa Ottawa Treaty Authority—it is clear that their predominant sentiment is strong support for the continued protection of wolves at a level that ensures that viable wolf populations remain on reservations and throughout the treaty-ceded lands surrounding the reservations. While several Tribes stated that their members may be interested in killing small numbers of wolves for spiritual or other

purposes, this would be carried out in a manner that would not impact reservation or ceded territory wolf populations.

The Red Lake Band of Chippewa Indians (Minnesota) completed a wolf management plan in 2010 (Red Lake Band of Chippewa Indians 2010). A primary goal of the management plan is to maintain wolf numbers at a level that will ensure the long-term survival of wolves on Red Lake lands. Key components of the plan are habitat management, public education, and law enforcement. To address human-wolf interactions, the plan outlines how wolves may be taken on Red Lake lands. Wolves thought to be a threat to public safety may be harassed at any time, and if they must be killed, the incident must be reported to Tribal law enforcement. Agricultural livestock are not common on Red Lake lands, and wolf-related depredation on livestock or pets is unlikely to be a significant management issue. If such events do occur, Tribal members may protect their livestock or pets by lethal means, but "* * * all reasonable efforts should be made to deter wolves using non-lethal means" (Red Lake Band of Chippewa Indians 2010, p. 15). Hunting or trapping of wolves on Tribal lands will be prohibited. The Reservation currently has seven or eight packs with an estimated 40–48 wolves within its boundaries (Red Lake Band of Chippewa Indians 2010, p. 12).

In 2009, the Little Traverse Bay Bands of Odawa Indians (LTBB) finalized a management plan for the 1855 Reservation and portions of the 1836 ceded territory in the northern LP of Michigan (Little Traverse Bay Bands of Odawa Indians Natural Resource Department 2009). The plan provides the framework for managing wolves on the LTBB Reservation with the goal of maintaining a viable wolf presence on the LTBB Reservation or within the northern LP should a population become established by (1) prescribing scientifically sound biological wolf management, research, and monitoring strategies; (2) addressing wolf-related conflicts; (3) facilitating wolf-related benefits; and (4) developing and implementing wolf-related education and public information.

The Tribal Council of the Leech Lake Band of Minnesota Ojibwe (Council) approved a resolution that describes the sport and recreational harvest of wolves as an inappropriate use of the animal. That resolution supports limited harvest of wolves to be used for traditional or spiritual uses by enrolled Tribal members if the harvest is done in a respectful manner and would not

negatively affect the wolf population. The Council is revising the Reservation Conservation Code to allow Tribal members to harvest some wolves after Federal delisting (Googgleye, Jr. in litt. 2004). The Tribe is currently developing a wolf management plan (Mortensen 2011, pers. comm.). In 2005, the Leech Lake Reservation was home to an estimated 75 wolves, the largest population of wolves on a Native American reservation in the 48 conterminous States (Mortensen 2006, pers. comm.; White in litt. 2003). Although no recent surveys have been conducted, the number of wolves on the reservation likely remains the same (Mortensen 2009, pers. comm.).

The Fond du Lac Band (Minnesota) believes that the "well being of the wolf is intimately connected to the well being of the Chippewa People" (Schrage in litt. 2003). In 1998, the Band passed a resolution opposing Federal delisting and any other measure that would permit trapping, hunting, or poisoning of the wolf (Schrage in litt. 1998b; in litt. 2003; 2009, pers. comm.). If this prohibition is rescinded, the Band's Resource Management Division will coordinate with State and Federal agencies to ensure that any wolf hunting or trapping would be "conducted in a biologically sustainable manner" (Schrage in litt. 2003).

The Red Cliff Band (Wisconsin) has strongly opposed State and Federal delisting of the gray wolf. Current Tribal law protects wolves from harvest, although harvest for ceremonial purposes would likely be permitted after Federal delisting (Symbal in litt. 2003).

The Menominee Indian Tribe of Wisconsin is committed to establishing a self-sustaining wolf population, continuing restoration efforts, ensuring the long-term survival of the wolf in Menominee, placing emphasis on the cultural significance of the wolf as a clan member, and resolving conflicts between wolves and humans. They are currently working on developing a Menominee Wolf Management Plan (Cox 2011, pers. comm.).

The Tribe has shown a great deal of interest in wolf recovery and protection. In 2002, the Tribe offered their Reservation lands as a site for translocating seven depredating wolves that had been trapped by WI DNR and Wildlife Services. Tribal natural resources staff participated in the soft release of the wolves on the Reservation and helped with the subsequent radio-tracking of the wolves. Although by early 2005 the last of these wolves died on the reservation, the Tribal conservation department continued to

monitor another pair that had moved onto the Reservation, as well as other wolves near the reservation (Wydeven in litt. 2006a). When that pair produced pups in 2006, but the adult female was killed, Reservation biologists and staff worked diligently with the WI DNR and the Wildlife Science Center (Forest Lake, Minnesota) to raise the pups in captivity in the hope that they could later be released to the care of the adult male. However, the adult male died prior to pup release, and they were moved back to the Wildlife Science Center (Pioneer Press 2006), and were subsequently transferred to the International Wolf Center in Ely, Minnesota, where they remain in captivity.

The Menominee Tribe continues to support wolf conservation and monitoring activity in Wisconsin. In recent years the Menominee Tribe has assisted the WI DNR in radio-telemetry wolf flights, allowing more regular flights to occur across all of northern Wisconsin.

The Keweenaw Bay Indian Community (Michigan) will continue to list the wolf as a protected animal under the Tribal Code following any Federal delisting, with hunting and trapping prohibited (Mike Donofrio 1998, pers. comm.). Furthermore, the Keweenaw Bay Community plans to develop a management plan that will address wolves (Donofrio in litt. 2003; Warner 20010, pers. comm.). At least three other Tribes (Stock-bridge Munsee Community, Lac Courte Oreilles Band of Ojibwe, the Mille Lacs Band of Ojibwe, and Grand Portage Band of Lake Superior Chippewa) have indicated that they are currently developing Tribal wolf management plans.

Several Midwestern Tribes (for example, the Bad River Band of Lake Superior Chippewa Indians and the LTBB) have expressed concern that Federal delisting will result in increased mortality of wolves on reservation lands, in the areas immediately surrounding the reservations, and in lands ceded by treaty to the Federal Government by the Tribes (Kiogama and Chingwa in litt. 2000). The Tribe's goal is to reduce the threats to reservation wolf packs when they are temporarily off the reservation. Other Tribes have expressed interest in such an agreement. If these and similar agreements are implemented, they will provide additional protection to certain wolf packs in the western Great Lakes area.

The GLIFWC has stated its intent to work closely with the States to cooperatively manage wolves in the ceded territories in the core areas, and will not develop a separate wolf

management plan (Schlender in litt. 1998). Furthermore, the Voigt Intertribal Task Force of GLIFWC has expressed its support for strong protections for the wolf, stating "[delisting] hinges on whether wolves are sufficiently restored and will be sufficiently protected to ensure a healthy and abundant future for our brother and ourselves" (Schlender in litt. 2004).

According to the 1854 Authority, "attitudes toward wolf management in the 1854 Ceded Territory run the gamut from a desire to see total protection to unlimited harvest opportunity." However, the 1854 Authority would not "implement a harvest system that would have any long-term negative impacts to wolf populations" (Edwards in litt. 2003). In comments submitted for our 2004 delisting proposal for a larger Eastern DPS of the gray wolf, the 1854 Authority stated that the Authority is "confident that under the control of State and Tribal management, wolves will continue to exist at a self-sustaining level in the 1854 Ceded Territory. Sustainable populations of wolves, their prey and other resources within the 1854 Ceded Territory are goals to which the 1854 Authority remains committed. As such, we intend to work with the State of Minnesota and other Tribes to ensure successful state and Tribal management of healthy wolf populations in the 1854 Ceded Territory" (Myers in litt. 2004). The 1854 Authority is currently developing a wolf management plan for the 1854 Ceded Territory, based on the above principles (Edwards 2011, pers. comm.).

While there are few written Tribal protections currently in place for wolves, the highly protective and reverential attitudes that have been expressed by Tribal authorities and members have assured us that any post-delisting harvest of reservation wolves would be very limited and would not adversely impact the delisted wolf populations. Furthermore, any off-reservation harvest of wolves by Tribal members in the ceded territories would be limited to a portion of the harvestable surplus at some future time. Such a harvestable surplus would be determined and monitored jointly by State and Tribal biologists, and would be conducted in coordination with the Service and the Bureau of Indian Affairs, as is being successfully done for the ceded territory harvest of inland and Great Lakes fish, deer, bear, moose, and furbearers in Minnesota, Wisconsin, and Michigan. Therefore, we conclude that any future Native American take of delisted wolves will not significantly impact the viability of the wolf population, either locally or across the proposed WGL DPS.

The Service and the Department of the Interior recognize the unique status of the Federally recognized Tribes, their right to self-governance, and their inherent sovereign powers over their members and territory. If we ultimately determine that delisting the WGL DPS is supported by the best available science, the Department, the Service, the Bureau of Indian Affairs (BIA), and other Federal agencies, as appropriate, will take the needed steps to ensure that Tribal authority and sovereignty within reservation boundaries are respected as the States implement their wolf management plans and revise those plans in the future. Furthermore, there may be Tribal activities or interests associated with wolves encompassed within the Tribes' retained rights to hunt, fish, and gather in treaty-ceded territories. The Department is available to assist in the exercise of any such rights. If biological assistance is needed, the Service may provide it via our field offices. Upon delisting, the Service would remain involved in the post-delisting monitoring of the wolves in the WGL, but all Service management and protection authority under the Act would end. Legal assistance would be provided to the Tribes by the Department of the Interior, and the BIA will be involved, when needed. If this proposal is finalized, we strongly encourage the States and Tribes to work cooperatively toward post-delisting wolf management.

Consistent with our responsibilities to Tribes and our goal to have the most comprehensive data available for our post-delisting monitoring, if the proposal to delist the WGL DPS is made final, we will annually contact Tribes and their designated intertribal natural resource agencies within the DPS during the 5-year post-delisting monitoring period to obtain any information they wish to share regarding wolf populations, the health of those populations, or changes in their management and protection. Reservations within the WGL DPS that may have significant wolf data to provide during the post-delisting period include Bois Forte, Bad River, Fond du Lac, Grand Portage, Keweenaw Bay Indian Community, Lac Courte Oreilles, Lac du Flambeau, Leech Lake, Menominee, Oneida, Red Lake, Stockbridge-Munsee Community, and White Earth. Throughout the 5-year post-delisting monitoring period, the Service will annually contact the natural resource agencies of each of these reservations and that of the 1854 Treaty Authority and Great Lakes Indian Fish and Wildlife Commission. We encourage the States and Tribes within the WGL DPS to work together on management and monitoring issues post-delisting.

*Federal Lands*

The five national forests with resident wolves (Superior, Chippewa, Chequamegon-Nicolet, Hiawatha, and Ottawa National Forests) in Minnesota, Wisconsin, and Michigan are all operating in conformance with standards and guidelines in their management plans that follow the 1992 Recovery Plan for the Eastern Timber Wolf's recommendations for the eastern timber wolf (USDA FS 2004a, chapter 2, p. 31; USDA FS 2004b, chapter 2, p. 28; USDA FS 2004c, chapter 2, p. 19; USDA FS 2006a, chapter 2, p. 17; USDA FS 2006b, chapter 2, pp. 28–29). Delisting is not expected to lead to an immediate change in these standards and guidelines; in fact, the Regional Forester for U.S. Forest Service Region 9 is expected to maintain the classification of the wolf as a Regional Forester Sensitive Species for at least 5 years after Federal delisting (Moore in litt. 2003). Under these standards and guidelines, a relatively high prey base will be maintained, and road densities will be limited to current levels or decreased. For example, on the Chequamegon-Nicolet National Forest in Wisconsin, the standards and guidelines specifically include the protection of den sites and key rendezvous sites, and management of road densities in existing and potential wolf habitat (USDA 2004c, Chap. 2, p. 19).

The trapping of depredating wolves would likely be allowed on national forest lands under the guidelines and conditions specified in the respective State wolf management plans. However, there are relatively few livestock raised within the boundaries of national forests in the upper Midwest, so wolf depredation and lethal control of wolves is neither likely to be a frequent occurrence, nor constitute a significant mortality factor, for the wolves in the proposed WGL DPS. Similarly, in keeping with the practice for other State-managed game species, any public hunting or trapping season for wolves that might be opened in the future by the States would likely include hunting and trapping within the national forests (Lindquist in litt. 2005; Williamson in litt. 2005; Piehler in litt. 2005; Evans in litt. 2005). The continuation of current national forest management practices will be important in ensuring the long-term viability of wolf populations in Minnesota, Wisconsin, and Michigan.

Wolves regularly use four units of the National Park System in the proposed WGL DPS and may occasionally use three or four other units. Although the National Park Service (NPS) has participated in the development of some of the State wolf management plans in this area, NPS is not bound by States' plans. Instead, the NPS Organic Act and the NPS Management Policy on Wildlife generally require the agency to conserve natural and cultural resources and the wildlife present within the parks. National Park Service management policies require that native species be protected against harvest, removal, destruction, harassment, or harm through human action, although certain parks may allow some harvest in accordance with State management plans. Management emphasis in National Parks after delisting will continue to minimize the human impacts on wolf populations. Thus, because of their responsibility to preserve all native wildlife, units of the National Park System are often the most protective of wildlife. In the case of the wolf, the NPS Organic Act and NPS policies will continue to provide protection following the proposed Federal delisting.

Management and protection of wolves in Voyageurs National Park, along Minnesota's northern border is not likely to change after delisting. The park's management policies require that "native animals will be protected against harvest, removal, destruction, harassment, or harm through human action." No population targets for wolves will be established for the National Park (Holbeck in litt. 2005). To reduce human disturbance, temporary closures around wolf denning and rendezvous sites will be enacted whenever they are discovered in the park. Sport hunting is already prohibited on park lands, regardless of what may be allowed beyond park boundaries (West in litt. 2004). A radio-telemetry study conducted between 1987 and 1991 of wolves living in and adjacent to the park found that all mortality inside the park was due to natural causes (for example, killing by other wolves or starvation), whereas the majority (60–80 percent) of mortality outside the park was human-induced (for example, shooting and trapping) (Gogan *et al.* 2004, p. 22). If there is a need to control depredating wolves outside the park, which seems unlikely due to the current absence of agricultural activities adjacent to the park, the park would work with the State to conduct control activities where necessary (West in litt. 2004).

The wolf population in Isle Royale National Park is described above (see Michigan Recovery). The NPS has indicated that it will continue to closely monitor and study these wolves. This wolf population is very small and isolated from the other wolf populations in the proposed WGL DPS; as described above, it is not considered to be significant to the recovery or long-term viability of the wolf (USFWS 1992, p. 28).

Two other units of the National Park System, Pictured Rocks National Lakeshore and St. Croix National Scenic Riverway, are regularly used by wolves. Pictured Rocks National Lakeshore is a narrow strip of land along Michigan's Lake Superior shoreline. Lone wolves periodically use, but do not appear to be year-round residents of, the Lakeshore. If denning occurs after delisting, the Lakeshore would protect denning and rendezvous sites at least as strictly as the Michigan Plan recommends (Gustin in litt. 2003). Harvesting wolves on the Lakeshore may be allowed (if the Michigan DNR allows for harvest in the State), but trapping is not allowed. The St. Croix National Scenic Riverway, in Wisconsin and Minnesota, is also a mostly linear ownership. Approximately 54–58 wolves from 11 packs used the Riverway on the Wisconsin side in 2010 (Wydeven 2011, pers. comm.). The Riverway is likely to limit public access to denning and rendezvous sites and to follow other management and protective practices outlined in the respective State wolf management plans, although trapping is not allowed on NPS lands except possibly by Native Americans (Maercklein in litt. 2003).

At least one pack of 4–5 wolves used the shoreline areas of the Apostle Islands National Lake Shore, with a major deer yard area occurring on portions of the Park Service land. Wolf tracks have been detected on Sand Island, and a wolf was photographed by a trail camera on the island in September 2009. It is not known if wolves periodically swim to this and other islands, or if they only travel to islands on ice in winter.

Wolves occurring on NWRs in the proposed WGL DPS will be monitored, and refuge habitat management will maintain the current prey base for them for a minimum of 5 years after delisting. Trapping or hunting by government trappers for depredation control will not be authorized on NWRs. Because of the relatively small size of these NWRs, however, most or all of these packs and individual wolves also spend significant amounts of time off these NWRs.

Wolves also occupy the Fort McCoy military installation in Wisconsin. In 2003, one pack containing five adult wolves occupied a territory that included the majority of the installation; in 2004 and 2006, the installation had one pack with two adults; in 2005 there was a single pack with four wolves. In 2008–09, there were seven wolves using the installation (Wilder 2009, pers. comm.). In 2010 a pack of three wolves occurred in the northern portions of the Fort, and a pack of two occurred on the south side (Wydeven *et al.* 2010, p. 42). Management and protection of wolves on the installation would not change significantly after Federal or State delisting. Den and rendezvous sites would continue to be protected, hunting seasons for other species (coyote) would be closed during the gun-deer season, and current surveys would continue, if resources are available. Fort McCoy has no plans to allow a public harvest of wolves on the installation (Nobles in litt. 2004; Wydeven *et al.* 2005a, p. 25; 2006a, p. 25).

Minnesota National Guard's (MNG) Camp Ripley contains parts of two pack territories, which typically include 10 to 20 wolves. MNG wildlife managers try to have at least one wolf in each pack radio-collared and to fit an additional one or two wolves in each pack with satellite transmitters that may record long-distance movements. There have been no significant conflicts with military training or with the permit-only public deer-hunting program at the camp, and no new conflicts are expected following delisting. Long-term and intensive monitoring has detected only two wolf mortalities within the camp boundaries—both were of natural causes (Dirks 2009, pers. comm.).

The protection afforded to resident and transient wolves, their den and rendezvous sites, and their prey by five national forests, four National Parks, two military facilities, and numerous National Wildlife Refuges in Minnesota, Wisconsin, and Michigan would further ensure the conservation of wolves in the three States after delisting. In addition, wolves that disperse to other units of the National Refuge System or the National Park System within the proposed WGL DPS will also receive the protection afforded by these Federal agencies.

*Summary of Factor D*

In summary, if this proposed delisting of the WGL DPS of gray wolves is made final, there would be varying State and Tribal classifications and protections provided to wolves. The wolf management plans currently in place for Minnesota, Wisconsin, and Michigan

011483A

will be more than sufficient to retain viable wolf populations in each State that are above the Federal recovery criteria for wolf metapopulation subunits, and even for three completely isolated wolf populations. These State plans provide a very high level of assurance that wolf populations in these three States will not decline to nonviable levels in the foreseeable future. Furthermore, the 2006 Update to the Wisconsin Wolf Management Plan (WI DNR 2006a, p. 3–4) demonstrates the State's commitment by retaining the previous management goal of 350 wolves, and it did not weaken any significant component of the original 1999 Plan. Similarly, the 2008 revised Michigan wolf plan continues to maintain the State's commitments to maintain viable wolf populations after Federal delisting. While these State plans recognize there may be a need to control or even reduce wolf populations at some future time, none of the plans include a public harvest of wolves, and all would maintain sufficient numbers of wolves to ensure their continued survival.

If Federally delisted, wolves in Minnesota, Wisconsin, and Michigan would continue to receive protection from general human persecution by State laws and regulations. Michigan met the criteria established in their management plan for State delisting and in April 2009 removed gray wolves from the State's threatened and endangered species list and amended the Wildlife Conservation Order to grant "protected animal" status to the gray wolf in the State (Roell 2009, pers. comm.). That status "prohibit[s] take, establish[es] penalties and restitution for violations of the Order, and detail[s] conditions under which lethal depredation control measures could be implemented" (Humphries in litt. 2004).

Since 2004 wolves have been listed as a "protected wild animal" by the WI DNR, allowing no lethal take unless special authorization is requested from the WI DNR (Wydeven *et al.* 2009c). Following the proposed Federal delisting, Wisconsin will fully implement that "protected wild animal" status for the species, including protections that provide for fines of $1,000 to $2,000 for unlawful hunting.

Minnesota DNR will consider population management measures, including public hunting and trapping, but this will not occur sooner than 5 years after Federal delisting, and MN DNR will maintain a wolf population of at least 1,600 animals (MN DNR 2001, p. 2). In the meantime, wolves may be taken legally in Zone A only when they pose an immediate threat to pets,

domestic animals, or livestock or to protect human safety (MN DNR 2001, pp. 3–4). Since the wolf management plan was completed in 2001, MN DNR has fully staffed its conservation officer corps in the State's wolf range (Stark 2009a, pers. comm.).

Except for the very small portions of Indiana and Ohio, if delisted, wolves in the proposed WGL DPS are likely to remain protected by various State designations for the immediate future. States within the boundaries of the DPS either currently have mechanisms in place to kill depredating wolves (North Dakota and South Dakota) or can be expected to develop mechanisms following the proposed Federal delisting of the DPS, in order to deal with wolf-livestock conflicts in areas where wolf protection would no longer be required by the Act. Because these States (Illinois, Indiana, Iowa, Ohio, North Dakota, and South Dakota) constitute only about one-third of the land area within the DPS, and contain virtually no suitable habitat of sufficient size to host viable wolf populations, it is clear that even complete protection for wolves in these areas would neither provide significant benefits to wolf recovery in the DPS, nor to the long-term viability of the recovered populations that currently reside in the DPS. Therefore, although current and potential future regulatory mechanisms may allow the killing of wolves in these six States, these threats, and the area in which they will be, will not impact the recovered wolf populations in the DPS now or in the foreseeable future.

Finally, based on our review of the completed Tribal management plans and communications with Tribes and Tribal organizations, Federally delisted wolves are very likely to be adequately protected on Tribal lands. Furthermore, the numerical recovery criteria (and for Minnesota, the numerical planning goal) in the Recovery Plan would be achieved and maintained (based on the population and range of off-reservation wolves) even without Tribal protection of wolves on reservation lands. In addition, on the basis of information received from other Federal land management agencies in Minnesota, Wisconsin, and Michigan, we expect National Forests, units of the National Park System, military bases, and National Wildlife Refuges will provide protections to wolves in the areas they manage if delisted that will match, and in some cases will exceed, the protections provided by State wolf management plans and State protective regulations.

Therefore, we conclude that the regulatory mechanisms that will be in

place subsequent to Federal delisting are adequate to control threats to wolves in the proposed WGL DPS such that wolves in the proposed WGL DPS are not likely to become endangered in the foreseeable future in all or a significant portion of the range.

## E. Other Natural or Manmade Factors Affecting Its Continued Existence

*Taking of Wolves by Native Americans for Certain Purposes*

As noted elsewhere in this proposed rule, the wolf has great significance to many Native Americans in the western Great Lakes area, especially to Wolf Clan members, and has a central role in their creation stories. The wolf, Ma"ingan, is viewed as a brother to the Anishinaabe people, and their fates are believed to be closely linked. Ma"ingan is a key element in many of their beliefs, traditions, and ceremonies, and wolf pack systems are used as a model for Anishinaabe families and communities. We are not aware of any takings of wolves in the Midwest for use in these traditions or ceremonies while the wolf has been listed as a threatened or endangered species. While wolves have been listed as threatened in Minnesota, we have instructed Wildlife Services to provide, upon request, wolf pelts and other parts from wolves killed during depredation control actions to Tribes in order to partially serve these traditional needs.

Some Tribal representatives, as well as the GLIFWC, have indicated that if wolves are delisted, there is likely to be interest in the taking of small numbers of wolves for traditional ceremonies (King in litt. 2003; White in litt. 2003). This take could occur on reservation lands where it could be closely regulated by a Tribe to ensure that it does not affect the viability of the reservation wolf population. Such takings might also occur on off-reservation treaty lands on which certain Tribes retained hunting, fishing, and gathering rights when the land was ceded to the Federal Government in the 19th Century. Native American taking of wolves from ceded lands would be limited to a specified portion of a harvestable surplus of wolves that is established in coordination with the Tribes, consistent with past Federal court rulings on treaty rights. Such taking would not occur until such time as a harvestable surplus has been documented based on biological data, and regulations and monitoring have been established by the States and Tribes to ensure a harvest can be carried out in a manner that ensures the continued viability of the wolf

population in that State. Previous court rulings have ensured that Native American treaty harvest of fish or wildlife species have not risked endangering the resource.

If requested by the Tribes, multitribal natural resource agencies, or the States, the Service or other appropriate Federal agencies will work with these parties to help determine if a harvestable surplus exists, and if so, to assist in devising reasonable and appropriate methods and levels of harvest for delisted wolves for traditional cultural purposes.

We conclude that the small number of wolves that may be taken by Native Americans would not be a threat sufficient to cause the wolves in the proposed WGL DPS to be in danger of extinction in the foreseeable future.

*Public Attitudes Toward the Wolf*

Human behavior has had a tremendous effect on wolf populations around the world. Theory and social science research have identified attitudes, and the beliefs on which they are based, as important drivers of behavior. Therefore, understanding public attitudes toward wolves is a key component of wolf management. The success of the United States wolf-eradication programs of the late-nineteenth and early twentieth centuries are often accepted as evidence of negative public attitudes that were based on perceptions and beliefs brought by European settlers that portrayed the wolf as an evil, menacing threat (Browne-Nunez and Taylor 2002, p. 1; Fogleman 1988; Kellert 1986; Schanning 2009, pp. 252–253) and were perpetuated by exaggerated accounts of marauding wolves preying on livestock (Schanning 2009, p. 253).

As the wolf arrived on the brink of extinction, there was a shift in management and a parallel shift in attitudes (Kellert *et al.* 1996; Schanning 2009, pp. 253–254; Williams *et al.* 2002, p. 581). In the Great Lakes region, bounty systems were repealed (Wisconsin in 1957, Michigan in 1960, and Minnesota in 1965) and, in 1972, the first of many attitudinal studies regarding wolves was carried out in Minnesota (Johnson 1974). In the last three decades, investigations of attitudes toward wolves and wolf management have burgeoned.

Minnesota

The first empirical examination of attitudes toward wolves was conducted using a convenience sample of 1,692 attendees of the Minnesota State Fair (Johnson 1974). It was based on the premise that children's stories, which typically cast the wolf as a villainous creature, shape attitudes from an early age. Although it found children to be more negative toward the wolf, a vast majority of adults held positive beliefs and attitudes. Most respondents felt that wolves were not a danger to humans, should not be exterminated, had value for Minnesota, and are good for the deer and moose populations.

Llewellyn (1978) reported the results of a content analysis of 1,083 public comment letters received by the Service regarding the proposed reclassification of the timber wolf in Minnesota from endangered to threatened. Of the 700 letters from Minnesota residents (the other letters were from out-of-state), 23 percent favored retention of endangered status, 7 percent supported reclassification, and 70 percent were in favor of delisting and return to State management. Of note were differences between urban and rural residents, with a large majority (78 percent) of urban residents and a minority (16 percent) of rural residents in favor of continued Federal protection of wolves. Support for delisting was largely based on concern for livestock and fear of wolves.

Kellert (1986) conducted a statewide phone survey of Minnesota residents' knowledge, attitudes, and behaviors toward the wolves. The study sample comprised the general public (Minneapolis-St. Paul residents and mostly rural, northern county residents), deer hunters, trappers, and livestock producers. Most respondents held favorable attitudes toward wolves (except farmers), supported protection of wolves and their habitat as long it did not interfere with human needs, and supported control of problem wolves. Urban residents expressed more protectionist attitudes, while rural residents' attitudes were more utilitarian in nature. There was "somewhat-limited" factual knowledge among the general public, but a higher knowledge level among trappers and, to a lesser degree, hunters and individuals with a higher income. Fear of wolves was expressed by some respondents, although most did not feel that wolves are a threat to people. Rather large percentages of farmers (12 percent) and trappers (17 percent) reported capturing or killing a wolf, and a majority of farmer, hunter, trapper, and northern county respondents reported knowing someone who captured or killed a wolf. Additionally, almost one-third of farmers, hunters, and trappers and a quarter of northern county respondents indicated that, given the opportunity, they might shoot a wolf while deer hunting.

In 1999, a second statewide phone survey of Minnesota residents was conducted, similar to the 1985 study, using a stratified random sample of northern residents, southern residents, farmers, hunters, and trappers (Kellert 1999). During this study period, Minnesota wolves were being considered for Federal delisting. Compared to the 1985 survey, this study found an overall increase in positive perceptions of the wolf. The general public expressed more affection and ethical concern for wolves than did farmers, although there was not a significant difference between groups in level of dislike of wolves. Over 70 percent of respondents believed wolves symbolize the beauty in nature and a large portion of the sample perceived other values of wolves, including ecological, scientific, and moral. Suburban and urban residents, the college educated, and younger respondents were more likely to have positive attitudes. Farmers were more knowledgeable about the wolf and more likely to support delisting. Of note was a substantial increase in the number of northern Minnesota residents who reported either killing a wolf themselves or knowing someone who did.

Chavez *et al.* (2005) assessed attitudes of residents of northwestern Minnesota. The sample of 600 rural residents was stratified by location: inside wolf range and outside but adjacent to wolf range. The study did not find large differences between geographic groups or farmers and non-farmers, with all groups indicating slightly unfavorable attitudes toward wolves. The authors suggest this could be attributable to shared rural cultural values and utilitarian attitudes. They also consider the possible influence of immigrant roots in Europe where folklore and early conflicts with wolves fostered negative attitudes. Both geographic groups agreed that wolves cause unacceptable levels of damage to northwest Minnesota's livestock industry, although predators were perceived as less of an agricultural threat than other threats (*e.g.*, livestock diseases, crop pests).

Using a random sample of 909 respondents (18 percent response rate), Schanning (2005) reported "pragmatic/utilitarian" beliefs regarding wolves among Minnesota residents. Most respondents supported compensation to livestock owners and having problem wolves shot by the DNR. Counter to Kellert's earlier findings, there was a significant level of fear of wolves among Schanning's sample, including fear for personal safety (31 percent), the safety of children (64 percent), and pets (70 percent).

Michigan

In Michigan, Hook and Robinson (1982, pp. 388–391) found that only a small percentage of respondents scored high on their anti-predator scale and most respondents were in favor of wolf restoration. Hunters were more positive toward predators than nonhunters. Fear of the wolf was the most important factor related to an anti-predator attitude, followed by negativistic attitudes toward all animals, and age, with older people holding more negative attitudes.

Kellert (1990) conducted a statewide mail survey of Michigan residents' knowledge, attitudes, and behaviors toward wolves. There were 639 respondents from the Upper (UP) and Lower (LP) peninsulas and members of three special interest groups: hunters, trappers, and livestock producers. Livestock producers were the most likely of the special interest groups to hold negative attitudes toward the wolf. LP residents were more likely than UP residents to express fear and dislike of wolves. A majority of respondents in each group, except livestock producers, supported restoration (64 percent of UP residents, 57 percent of LP residents, 76 percent of hunters, 66 percent of trappers, and 37 percent of livestock producers). Support was primarily motivated by the existence, ecological, and cultural values of the wolf.

A 2002 statewide survey of 557 Michigan residents' attitudes toward wolf recovery found that support for recovery by UP residents had declined since Kellert's 1990 study (Mertig 2004). At the time this study was conducted, the UP's wolf population had risen to about 250 animals (Hammill 2007), but in the LP, where wolves were not known to be present, there was increased support for wolf recovery in the UP. Other differences from Kellert's (1990) findings included increased support for wolf control and for hunting and trapping for pelts.

Based on a sample of 1,017 Michigan residents (20 percent response rate), Schanning (2004) found that a majority of respondents in his survey agreed with pro-wolf statements including "wolves are a part of our vanishing wilderness and should be protected" (51 percent). Similar to his 2005 study of Minnesota residents and his 2003 study of Wisconsin residents (reported below), Schanning found a substantial level of fear of wolves among the Michigan sample. Respondents reported fear for their personal safety (40 percent), the safety of children (70 percent), pets (7 percent), and livestock (66 percent).

Using a stratified random sample of respondents from five regions in Michigan, Beyer (2006) measured tolerance of wolves using a scale for social carrying capacity. The scale was based on Michigan wolves' perceived range, numbers, and the type and number of interactions with people. The study found that most people were at the most tolerant end of the scale, with smaller percentages classified as intolerant (7 percent) or least tolerant (20 percent).

Wisconsin

Knight (1985, reported in Schanning 2009, p. 257) surveyed hunter attitudes in two Wisconsin counties in wolf range where a minority (20 percent) of hunters reported negative attitudes toward wolves and most (69 percent) believed that wolves should not be eliminated.

In 1988, when there were only 20 wolves in Wisconsin, Nelson and Franson (1988) compared farmer' and non-farmers' attitudes toward wolves and wolf recovery in six Wisconsin counties. A series of agree-disagree belief statements was used to gauge attitudes toward wolves. Non-farmers were more positive than farmers, and a majority agreed that the wolf "symbolizes the beauty and wonder in nature" and "it would be wonderful to hear the wolf howl in the wild" (64 percent and 62 percent respectively). Almost half of farmers agreed with the same statements. Both groups disagreed that they would be afraid of an attack if they saw a wolf while walking in the woods. Farmers and non-farmers were divided about wolf restoration, with half of farmers and about one-third of non-famers opposed. Both groups favored trapping and removal of problem wolves.

Wilson (1999) examined knowledge, attitudes, and behaviors toward wolves in a 1997 survey of two random samples: all Wisconsin license plate owners and those who purchased an Endangered Resources (ER) license plate. Fifty percent of all license plate owners and almost 90 percent of ER license plate owners supported efforts to increase the State wolf population. There were slight differences between hunters (47 percent) and non-hunters (54 percent) who support wolf recovery.

Naughton et al. (2003) assessed tolerance of wolves among 535 rural Wisconsin residents using a mail-back questionnaire (82 percent response rate). They examined the influence of compensation for livestock losses to wolves and preferences for wolf management actions among different segments of the sample, including livestock producers, bear hunters,

general residents, wolf damage complainants, recipients of compensation, and demographic segments. The strongest predictor of tolerance was social group. A large majority of bear hunters (73 percent) were in favor of reducing or eliminating the wolf population, compared to 45 percent of the livestock producers and 29 percent of general residents. Individuals who had lost a domestic animal to a predator were less tolerant of wolves than those who had not. Preferences for management actions depended on the conflict situation. Approval for lethal control was highest for depredation on livestock and pets. Bear hunters also were highly in favor of lethal control when hunting hounds are killed, but other groups did not muster a majority for this option. Compensation was not associated with higher tolerance when comparing recipients to nonrecipients among those who reported losing a domestic animal to wolves.

Similar to his studies in Minnesota and Michigan, Schanning (2003) surveyed 644 Wisconsin residents' (13 percent response rate) attitudes toward wolves. He found a majority of respondents held pro-wolf attitudes based on their agreement with three belief statements: "the wolf is a symbol of the beauty and wonder in nature," "wolves are part of our vanishing wilderness and should be protected," and "wolves are essential to maintaining the balance in nature" (72 percent, 56 percent, and 62 percent in agreement, respectively). There was substantial support for wolf hunting (41 percent), and a majority (60 percent) indicated they would shoot a wolf if it threatened their pet.

In a followup to Naughton et al. (2001), Treves et al. (2009) reported attitudes of 1,364 respondents (62 percent response rate) toward compensation after wolf recovery. They compared the attitudes of individuals who contributed to Wisconsin's voluntary compensation fund with those of noncontributors and found that attitudes of each group differed in several ways. Contributors favored nonlethal over lethal problem wolf management actions and supported all types of payments more strongly with the exception of payment for hunting dogs injured or killed by wolves on public land, but a majority of respondents of both groups supported compensation "even when wolves are no longer threatened or endangered." Noncontributors were more likely to believe that wolf damages were part of raising livestock and should not be compensated.

Treves et al. (in review) report the first longitudinal results for change in individual attitudes over time using findings from surveys conducted in 2001 (Naughton et al. 2003), 2004 (Treves et al. 2009), and 2009. During the data collection period, wolf numbers nearly tripled and greatly exceeded the State population goal, the level of wolf depredation on pets increased and became the third most frequent conflict after attacks on beef calves and bear-hunting dogs, and wolf management authority was granted to State governments and subsequently revoked several times after Federal court challenges. The 2009 survey found attitudes toward wolves had become less favorable, and fear of wolves, perceived competition for deer, and reported inclination to illegally kill wolves increased. In the 2009 survey, 18 percent of hunters indicated they would shoot a wolf if they saw one while hunting. Nearly half of respondents agreed their tolerance for wolves in Wisconsin would increase if people could hunt them.

Shelley et al. (in review) compared attitudes of Ojibwe Indians and nontribal residents of Wisconsin's wolf range. Tribal membership was the best predictor of attitudes. Ojibwe respondents had more positive attitudes toward wolves, were more supportive of wolf protection policy, and were less supportive of a public wolf harvest and lethal control of problem wolves. A considerable percentage (Ojibwe 33 percent, nontribal 44 percent) of each group indicated they would be afraid if wolves lived near their homes. Fewer Ojibwe (8 percent) than nontribal respondents (16 percent) indicated that they would shoot a wolf if they saw one while hunting. Nontribal respondents (57 percent) were more likely than Ojibwe respondents (26 percent) to believe that wolves threaten deer hunting opportunities. Shelley et al. (in review) point out the potential significance of treaty rights, which grant the Tribe half of any harvest, including wolves, within the territories ceded by them in nineteenth century Federal treaties upheld by Federal courts in the 1980s.

Treves and Martin (2011) examined the attitudes of 2,320 respondents, hunters and nonhunters, living within or adjacent to wolf range in surveys conducted in Wisconsin in 2001 and 2004 (reported above) and the northern Rocky Mountain (NRM) States of Idaho, Montana, and Wyoming. A majority of respondents supported regulated, public wolf hunting, although support was dependent on potential justifications for a hunting season.

In Wisconsin, bear hunters in 2001, followed by other hunters, were most likely to support an immediate hunt, whereas nonhunters in favor of wolf hunting were more likely to be supportive when managers estimate the wolf population could sustain harvests or when the majority of the public believe damages have become intolerable. There was a shift in 2004 when a majority of hunters indicated they would support wolf hunting when the population was deemed to be at a level that could sustain harvests. More nonhunters agreed with a hunt when the public felt damages had become intolerable. Inclination to kill a wolf illegally in Wisconsin in 2001 and 2004 was high among hunters, particularly among likely carnivore-hunters. These two groups favored a significant reduction (up to half) of the Wisconsin wolf population.

In addition to the studies summarized above, citizen input on the wolf management plans of Minnesota, Wisconsin, and Michigan has provided additional insight on public support for wolf recovery. Namely, it shows strong support for wolf recovery if the adverse impacts on recreational activities and livestock production can be minimized (MI DNR 1997, pp. 13–14, 50–56; MN DNR 1998, p. 2; WI DNR 1999, pp. 51–55; WI DNR 2006c, pp. 9–11).

### Summary of Public Attitudes

While there is a lack of empirical data on early attitudes toward wolves, historical accounts describe an antagonist view of wolves during the 19th and early 20th centuries. Attitudinal research conducted throughout the lower 48 States in the last three decades has shown that a shift toward more positive attitudes took place during the 20th century (Browne-Nuñez and Taylor 2002, Kellert et al. 1996, Williams et al. 2002). Although the basis for this shift is not understood, suggested causes include changes in the portrayal of wolves in the media (Kellert et al. 1996) and a broader shift in societal values of wildlife (Manfredo et al. 2003).

Although direct comparisons cannot be made of each study summarized here, given different research methods and contextual circumstances, we can summarize some common findings and general conclusions. Similar to research conducted outside the Great Lakes region (summarized in Williams et al. 2002), many of the studies reviewed here demonstrate urban-rural differences in attitudes, with urban residents displaying more positive attitudes; farmers and livestock producers are more negative toward

wolves; those with higher education levels have more positive attitudes; and compensation does not translate into increased tolerance.

In several studies, hunters were mostly positive toward wolves (Hook and Robinson 1982, Kellert 1990, Knight 1985), with the exception of Wisconsin bear hunters who were the most negative among special interest groups (Naughton et al. 2003). Cross-sectional studies suggest increasing support for control of problem wolves and public harvest of wolves (Kellert 1985, Mertig 2004, Naughton et al. 2003), and one recent study shows this support has increased among individuals re-sampled over time (Treves et al., in review). Some respondents indicated they had or would kill a wolf illegally (Kellert 1985; Treves et al., in review).

While most respondents were positive toward wolves, it is evident that there have long been competing attitudes toward wolves. While attitudes in other regions have been shown to be relatively stable (Williams et al. 2002, Wilson and Bruskotter 2009), a troubling finding for managers in the Great Lakes region is the most recent research showing declining support for wolves (Hammill 2007; Mertig 2004; Treves et al., in review) and an increasing inclination to kill wolves illegally (Treves et al., in review). Possible explanations for this decline include increasing wolf numbers, negative interactions with humans, and negative media coverage (Hammill 2007). It is unclear how delisting will affect attitudes and behavior toward wolves. Also in question is how public wolf harvest might affect attitudes and behaviors. While we do not believe the affects of public attitudes on wolves will be a significant threat to the species in the foreseeable future, as the status and management of the wolf evolves, there will be a need for continued collaboration between managers and researchers to monitor public attitudes toward wolves and their management.

### Hybridization with Coyotes

Genetic data relevant to possible interbreeding between North American wolves and coyotes was first reported in a study of mtDNA restriction fragment length polymorphisms by Lehman et al. (1991). They found mtDNA haplotypes in wolf populations in the Great Lakes region that they interpreted as being derived from coyotes (Lehman et al., p. 108). As wolf haplotypes were not found in coyotes, the apparent introgression occurred through matings of wolf males with coyote females. They determined that a minimum of six instances of coyote-wolf hybridization

**Federal Register** / Vol. 76, No. 87 / Thursday, May 5, 2011 / Proposed Rules

could account for the diversity of "coyote-type" haplotypes observed in wolves (p. 112). Their general interpretation was that introgression primarily occurred as coyotes expanded their ranges into the Great Lakes region within historical time, although they allow that two coyote-type haplotypes commonly observed in Great Lakes wolves may have been the result of ancient hybridization. Their data also indicated (Lehman et al., Figure 4) that coyote-type haplotypes were less common in the western part of the Great Lakes region than in the east.

Wilson et al. (2000, Figure 6, p. 2165) provided a different interpretation of wolf-coyote relationships in the region. They found coyote-like mtDNA sequences in eastern Canadian wolves from Algonquin Provincial Park, Ontario, southern Manitoba, and northeastern Minnesota that were intermediate in sequence divergence between coyotes and gray wolves. As these haplotypes were apparently absent in coyotes, they were thought not to result from hybridization with coyotes, but to represent an eastern wolf species, Canis lycaon. They suggest that these Canis lycaon haplotypes may have been previously reported as "coyote-type" in the study of Lehman et al. (1991).

It is now generally agreed that historical and most contemporary Great Lakes wolves have unique mtDNA haplotypes that are distinct from those of other wolves, and more related to but still distinct from those of coyotes. Haplotypes specific to the early 20th century wolf population of the western Great Lakes region were identified by Leonard and Wayne (2008, pp. 2–3), from a study of 17 historical specimens from Michigan, Wisconsin, Ontario, and Quebec. Of the 17 specimens that gave conclusive results, 14 were either the same or most similar to the haplotypes described by Wilson et al. (2000) as C. lycaon. Only one had a coyote haplotype. Wheeldon and White (2009) reported haplotypes from three additional historical specimens from the western Great Lakes region. Two individuals from Minnesota (collected 1899 and 1900) had the same coyote-like haplotypes (C13) found in a late 19th century specimen from Maine, 50 years before recorded coyote sightings in Maine (Wilson et al. 2003), as well as in contemporary western Great Lakes wolves from Minnesota to Quebec (Leonard and Wayne 2008, pp. 2–3). The third specimen, collected in the winter of 1907–08 in Wisconsin, had the common Great Lakes wolf haplotype C1. Microsatellite DNA analysis of these three specimens grouped them with wolves rather than coyotes.

Koblmüller et al. (2009) addressed the issue of coyote hybridization in the Great Lakes region from analyses of mtDNA sequence and both Y-chromosome and autosomal microsatellite DNA. They found evidence of repeated incidences of ancient introgression of coyotes into Great Lakes wolves, although they also suggested that introgression by coyotes is recent and ongoing, especially north of the Great Lakes.

Wheeldon and White (2009, p. 2) and Fain et al. (2010) concluded that the coyote-related haplotype C13 is actually a C. lycaon marker based on its presence mainly in C. lycaon-C. lupus hybrids in the western Great Lakes region, the absence of C13 in non-hybridizing coyotes, and its occurrence in historical eastern wolves. Assessments based on mtDNA, Y-chromosome, and autosomal microsatellite DNA data consistently found that the wolf population in the western Great Lakes region does not currently interbreed with coyotes (Fain et al. 2010, p. 14; Wheeldon et al. 2010). Previous reports of coyote-wolf hybridization in the WGL region were based on the misidentification of coyote-like haplotypes, which are now understood to be unique markers for C. lycaon, as discussed above.

Lehman et al.'s (1991, p. 114) interpretation of coyote introgression into Great Lakes wolves included an explanation that it occurred at a time when wolf population densities were low in the region, so that wolves would be less likely to find mates of the same species and mating with coyotes was more likely to take place. Conversely, Lehman et al. (1991) suggested that coyote introgression does not appear to occur when wolf densities are higher. If so, the increase in population size that has occurred over the last 30 years renders the western Great Lakes wolf population less vulnerable to whatever threat may have been presented by coyote introgression. The wolf population of the region has likely been exposed to this factor for centuries and has rebounded from near extirpation, yet retains essential genetic, behavioral, and other biological features of wolves without being displaced by coyotes. This fact suggests that the threat of coyote hybridization to a recovered wolf population is small.

*Hybridization Between C. lupus and C. lycaon*

Although it is clear that C. lycaon and C. lupus have hybridized in the western Great Lakes region, same-species combinations of paternal and maternal markers in male wolves are more common than expected by random

mating (Wheeldon et al. 2010). This suggests that there is some constraint on complete hybridization between the two species and that complete blending of the two components of the population is not inevitable. The limited number of historical specimens from the western Great Lakes region that have been genetically characterized all have mtDNA indicative of C. lycaon (Leonard and Wayne 2008, pp. 2–3; Wheeldon and White 2009, p. 1), but four of these from the early 20th century also had C. lupus Y-chromosome haplotypes, which indicates that hybridization had occurred by that time. The opportunity for hybridization between C. lycaon, which belongs to a North American lineage, and C. lupus, which evolved in Eurasia, has existed since C. lupus entered North America about 500,000 years ago (Kurtén and Anderson 1980), yet a predominantly C. lycaon population of wolves still persists in the western Great Lakes region.

Hybrid indices based on the co-occurrence of species specific mtDNA and nuclear markers have been used to assess the depth and extent of hybrid zones in tiger salamanders, cutthroat trout, red deer, and wolves (Abernathy 1994; Riley et al. 2003; Wheeldon and White 2009). Wheeldon and White (2009) used the mtDNA haplotype of an individual wolf in combination with the program STRUCTURE assignment of its microsatellite genotype to identify C. lupus—C. lycaon hybrids in historical WGL wolves. Applying this index, half of WGL females with C. lupus mtDNA also exhibited high assignment to C. lupus and half of WGL females with C. lycaon mtDNA were similarly assigned to C. lycaon. Considering both lineage markers in males, 44 percent of males with C. lupus mtDNA and Y-chromosome haplotypes exhibited high assignment to C. lupus, but only 28 percent of males exhibiting C. lycaon mtDNA and Y-chromosome haplotypes also exhibited high assignment to C. lycaon. The 8–12 microsatellite loci typically used in studies of C. lupus—C. lycaon introgression (Grewal et al. 2004; Wilson et al. 2000, 2009; Fain et al. 2010; Rutledge et al. 2010; Wheeldon et al. 2010) can effectively estimate the amount of mixing at the population level, but not the individual level (Allendorf et al. 2010). Based on the information presented in these studies, there is no evidence showing that hybridization between C. lupus and C. lycaon is a threat to C. lupus.

**Conclusion of the 5-Factor Analysis**

As required by the Act, we considered the five potential threat factors to assess whether the wolves in the proposed

WGL DPS are threatened or endangered throughout all or a significant portion of their range. When considering the status of the species, the first step in the analysis is to determine whether the species is in danger of extinction or likely to become endangered in the foreseeable future throughout all of its range.

Human-caused mortality is the most significant issue to the long-term conservation status of the wolves in the proposed WGL DPS. Therefore, managing this source of mortality (*i.e.,* human predation) remains the primary challenge to maintaining a recovered wolf population into the foreseeable future. We have concluded that Minnesota, Wisconsin, and Michigan will maintain their share and distribution of the WGL wolf population above recovery levels for the foreseeable future, and that the threats have been sufficiently reduced. All three States have wolf management laws, plans, and regulations that adequately regulate human-caused mortality. Each of the three States has committed to manage its wolf population at or above viable population levels, and this commitment is not expected to change.

Regulatory mechanisms in all three States are adequate to facilitate the maintenance of, and in no way threaten, the recovered status of the wolves in the WGL DPS. If Federally delisted, wolves in Minnesota, Wisconsin, and Michigan would continue to receive protection from general human persecution by State laws and regulations. Violation of regulations will be subject to prosecution.

As long as populations are maintained well above minimal recovery levels, wolf biology (namely the species' reproductive capacity) and the availability of large, secure blocks of suitable habitat will maintain strong populations capable of withstanding all other foreseeable threats. In terms of habitat, the amount and distribution of suitable habitat in public ownership provides, and will continue to provide, large core areas that contain high-quality habitat of sufficient size to anchor a recovered wolf population. Our analysis of land management shows these areas will maintain their suitability into the foreseeable future, if not indefinitely.

While disease and parasites can temporarily impact population stability, as long as populations are managed above recovery levels, these factors are not likely to threaten the wolf population at any point in the foreseeable future. Natural predation is also likely to remain an insignificant factor in population dynamics into the

foreseeable future. Finally, we believe that other natural or manmade factors, such as potential hybridization with coyotes and public attitudes, are unlikely to threaten the wolves in the proposed WGL DPS in the foreseeable future in all portions of the range within the DPS.

We find that the threat of habitat destruction or degradation or a reduction in the range of the wolf; utilization by humans; disease, parasites, or predatory actions by other animals or humans; regulatory measures by State, Tribal, and Federal agencies; or other threats will not individually or in combination cause wolves in the proposed WGL DPS to likely become endangered within the foreseeable future throughout all of the species' range in the DPS. Ongoing effects of recovery efforts over the past decades, which resulted in a significant expansion of the occupied range of wolves in the proposed WGL DPS, in conjunction with future State, Tribal, and Federal agency wolf management across that occupied range, will be adequate to ensure the conservation of the proposed WGL DPS. These activities will maintain an adequate prey base, preserve denning and rendezvous sites, monitor disease, restrict human take, and keep wolf populations well above the numerical recovery criteria established in the Revised Recovery Plan (USFWS 1992, pp. 25–28). Thus, the gray wolves in the proposed WGL DPS do not merit continued listing as threatened or endangered throughout all of their range.

**Is the Species Threatened or Endangered in a Significant Portion of Its Range?**

Having determined that wolves in the proposed WGL DPS do not meet the definition of endangered or threatened throughout their entire range, we must next consider whether they are in danger of extinction or are likely to become so in a significant portion of their range. The Act does not define the term "significant portion of its range." Therefore, we must give meaning to this phrase based on our experience and expertise. We interpret a portion of a species' range as being significant if it is part of the current range of the species (species used here is as defined in the Act, to include species, subspecies, or DPS) and if it is important to the conservation of the species because it contributes meaningfully to the representation, resiliency, or redundancy of the species. The contribution must be at a level such that its loss would result in a decrease in the ability to conserve the species.

Applying the definition described above for determining whether a species is endangered or threatened in a significant portion of its range, we first address whether any portions of the range of wolves in the WGL DPS warranted further consideration. We evaluated the WGL DPS in the context of whether any potential remaining threats are concentrated in one or more areas, such that if there were concentrated impacts, those wolves might be threatened, and further, whether any such area might constitute a significant portion of the species ranges.

Wolves are highly adaptable habitat generalists, and their primary biological need is an adequate natural prey base of large ungulates. The primary current and likely future threats to wolves are excessive human-caused mortality and increased mortality from diseases and parasites. Based on the biology of the gray wolf, threats to its continued existence, and conservation biology principles, the Recovery Plan specifies that two populations (or what equates to a single metapopulation) are needed to ensure long-term viability (see *Recovery Criteria,* above). The Revised Recovery Plan states the importance of a large wolf population throughout Minnesota Wolf Management Zones 1 through 4 (geographically identical to Zone A in the 2001 Minnesota Wolf Management Plan, see Figure 2 in this rule) and the need for a second viable wolf population occupying 10,000 sq mi or 5,000 sq mi elsewhere in the eastern United States (depending on its isolation from the Minnesota wolf population) (USFWS 1992, pp. 24–29).

The Recovery Plan also discusses the importance of low-road-density areas, the importance of minimizing wolf–human conflicts, and the maintenance of an adequate natural prey base in the areas hosting these two necessary wolf populations. These portions of Minnesota (Management Zones 1 through 4) and the portions of the proposed DPS that support the second viable wolf population (Wisconsin Zones 1 and 2 and the entire UP of Michigan) provide an adequate wild prey base, suitably low levels of human-caused mortality, and sufficient representation, resiliency, and redundancy to buffer the impacts of disease and parasite-induced mortality (See the discussion under *Recovery Criteria,* above*)* regarding how achieving the goals of the Recovery Plan for the Eastern Timber Wolf assures a viable wolf population in terms of representation, resiliency, and redundancy).

011489A

Post-delisting wolf protection, management, and population and health monitoring by the States, Tribes, and Federal land management agencies will ensure the continuation of viable wolf populations above the Federal recovery criteria for the foreseeable future. This is particularly true in Minnesota Zone A, Wisconsin Zones 1 and 2, and across the UP of Michigan, because the State management plans provide for greater protections for the species in that area (see the discussion of the three plans in *State Wolf Management Planning*, above).

Post-delisting threats to wolves in Zone B in Minnesota, Zones 3 and 4 in Wisconsin, and in the Lower Peninsula of Michigan will be more substantial, and may preclude the establishment of wolf packs in most or all of these areas in Wisconsin and Michigan. The Recovery Plan f specifically recommends against managing wolves in large areas of unsuitable habitat, stating that Minnesota Zone 5 (identical to Minnesota Wolf Management Zone B, Figure 2) should be managed with a goal of zero wolves there, because "Zone 5 is not suitable for wolves. Wolves found there should be eliminated by any legal means" (USFWS 1992, p 20). Therefore, the Recovery Plan views Zone 5, which is roughly 60 percent of the State, as not an important part of the range of the wolf. This portion of the State is predominantly agricultural land, with high road densities, and high potential for wolves to depredate on livestock. Although individual wolves and some wolf packs occupy parts of Zone 5, these wolves are using habitat islands or are existing in other situations where conditions generally are not conducive to their long-term persistence.

The northern LP of Michigan appears to have the only unoccupied potentially suitable wolf habitat in the Midwest that is of sufficient size to maintain wolf packs (Gehring and Potter 2005, p. 1239; Potvin 2003, pp. 44–45), although its small size and fragmented nature may mean that northern LP wolf population viability would be dependent upon continuing immigration from the UP. The only part of Michigan's LP that may contain suitable habitat are those areas of fragmented habitat studied by Potvin (2003, pp. 44–45) and Gehring and Potter (2005, p. 1239). However, these areas amount to less than half of the minimal area identified by the Recovery Plan for the Eastern Timber Wolf as needed for the establishment of viable populations. These LP areas therefore might have difficulty maintaining wolf populations even with the help of occasional immigration of wolves from the UP (see *Suitable Habitat Within the*

*Proposed Western Great Lakes DPS*, above, for additional discussion). While the UP wolves may be significant to any LP wolf population (occasional UP to LP movements may provide important genetic and demographic augmentation crucial to a small population founded by only a few individuals), the reverse will not be true—LP wolves would not be important to the wolf population in the UP, as that population is already large enough in size and range to be self-sustaining.

The lack of sufficient areas of suitable habitat in those parts of North Dakota, South Dakota, Iowa, Illinois, Indiana, and Ohio that are within the proposed WGL DPS are expected to preclude the establishment of viable populations in these areas, although dispersing wolves and packs may temporarily occur in some of these areas. As a result, wolf numbers in these areas will have no impact on the continued viability of wolves in the proposed WGL DPS, and are not necessary to maintain adequate representation, resiliency, and redundancy for wolves in the proposed DPS.

In conclusion, Minnesota Zone A, Wisconsin Zones 1 and 2, and the UP of Michigan provide an adequate wild prey base, suitably low levels of human-caused mortality, and sufficient numbers and distribution of wolves to ensure adequate representation, resiliency, and redundancy to buffer the impacts of disease and parasite-induced mortality. Post-delisting wolf protection, management, and population and health monitoring by the States, Tribes, and Federal land management agencies will ensure the continuation of viable wolf populations in those areas above the recovery criteria established in the Recovery Plan for the foreseeable future.

In coming to this determination, we considered the quality, quantity, and distribution of the habitat relative to the biological needs of the species, the need to maintain the remaining genetic diversity, the importance of geographic distribution in coping with catastrophes such as disease, the ability of the habitat to provide adequate wild prey, and the need to otherwise meet the conservation needs of the species. Reasonably foreseeable threats to wolves in all parts of the proposed WGL DPS are not likely to threaten wolf population viability in the WGL DPS in the foreseeable future. Therefore, we find that wolves in the WGL DPS are not in danger of extinction and are not likely to become endangered in the foreseeable future throughout all or a significant portion of their range.

## Proposed Determination

After a thorough review of all available information and an evaluation of the five factors specified in section 4(a)(1) of the Act, as well as consideration of the definitions of "threatened" and "endangered" contained in the Act and the reasons for delisting as specified in 50 CFR 424.11(d), we propose that revising the boundary of the 1978 Minnesota gray wolf listing and removing the WGL DPS of gray wolf (*Canis lupus*) from the List of Endangered and Threatened Wildlife (50 CFR 17.11) is appropriate. Wolves have recovered in the proposed WGL DPS as a result of the reduction of threats as described in the analysis of the five categories of threats and no longer are in danger of extinction, nor are likely to become so in the foreseeable future, throughout all or a significant portion of their range.

We recognize recent taxonomic information indicating that the gray wolf subspecies *Canis lupus lycaon* should be elevated to the full species *C. lycaon*. Additionally, we acknowledge evidence that *C. lycaon* intercrosses with *C. lupus* in the western Great Lakes region, resulting in a mixed population composed of *C. lupus, C. lycaon,* and their hybrids. As discussed under *Procedural Aspects of Proposal Applying to the Gray Wolf* above, the procedural aspects of this proposed rule refer to the gray wolf (*C. lupus*), because that is the named entity currently on the List of Endangered and Threatened Wildlife. Our proposed action here is to establish the existence of a WGL distinct population segment of *C. lupus* that is neither endangered nor threatened, despite its proximity to a closely related species, *C. lycaon*—a species whose status we will evaluate for possible protection under the Act in the near future.

Because *C. lycaon* was recently recognized as a unique species (rather than a subspecies of *C. lupus*), a complete status review of this species has never been conducted. Therefore, we are initiating a status review for *C. lycaon* throughout its range in the United States and Canada.

We also are proposing to revise the range of the gray wolf (the species *C. lupus*) by removing all or parts of 29 states (see Effects of the Rule, below) because this area is outside of the currently known historical range of the gray wolf (see *Taxonomy and Historical Ranges of Wolves in the United States*). These areas should not have been included in the original listing of the gray wolf because gray wolves did not historically occur there; they were either

red wolf (*C. rufus*) range or eastern wolf (*C. lycaon*) range.

**Available Conservation Measures**

Conservation measures provided to species listed as endangered or threatened under the Act include recognition, recovery actions, requirements for Federal protection, and prohibitions against certain practices. Recognition through listing encourages and results in conservation actions by Federal, State, Tribal, and private agencies, groups, and individuals. The Act provides for possible land acquisition and cooperation with the States and requires that recovery actions be carried out for all listed species. This proposal rule, if made final, would remove these Federal conservation measures for gray wolves within the proposed WGL DPS.

**Effects of the Rule**

This proposal, if made final, would revise the pre-DPS policy Minnesota "species" listing and establish it as a WGL DPS of the gray wolf (*C. lupus*), expand the boundaries of that DPS, and remove the protections of the Act for that WGL DPS by removing the gray wolf wolves in that DPS from the List of Endangered and Threatened Wildlife.

This proposal, if made final, would remove the special regulations under section 4(d) of the Act for wolves in Minnesota. These regulations currently are found at 50 CFR 17.40(d).

Critical habitat was designated for the gray wolf in 1978 (43 FR 9607, March 9, 1978). That rule (codified at 50 CFR 17.95(a)) identifies Isle Royale National Park, Michigan, and Minnesota wolf management zones 1, 2, and 3, as delineated in 50 CFR 17.40(d)(1), as critical habitat. Wolf management zones 1, 2, and 3 comprise approximately 25,500 sq km (9,845 sq mi) in northeastern and north-central Minnesota. This proposal, if made final, would remove the designation of critical habitat for gray wolves in Minnesota and on Isle Royale, Michigan.

As described in the *Taxonomy and Historical Ranges of Wolves in the United States* section above, the species' historical range did not extend into many southern and eastern States. Therefore, our 1978 listing of the gray wolf throughout the 48 States and Mexico was partially in error. This proposed rule, if made final, would revise the geographic boundaries for the gray wolf as described in the 1978 listing by removing all or parts of 29 southern and eastern states (Maine, Massachusetts, Connecticut, New Hampshire, Rhode Island, Vermont, New York, New Jersey, Pennsylvania,

Delaware, Maryland, Virginia, North Carolina, South Carolina, Georgia, Florida, Ohio (the part outside WGL DPS), West Virginia, Kentucky, Tennessee, Alabama, Mississippi, Louisiana, Texas (east of Interstate Highway 35), Oklahoma (east of Interstate Highway 35 and southeast of Interstate Highway 44 north of Oklahoma City), Arkansas, Missouri (southeast of Interstate Highway 44 and southeast of Interstate Highway 70 east of St. Louis), Indiana (the part outside WGL DPS), and Illinois (the part outside WGL DPS)) because this area is outside of the currently known historical range of the gray wolf.

We also note that this proposed rule initiates a 5-year status review and request information for wolves in the western United States, which may inform future rulemakings to replace the remainder of the revised lower 48-State listing with more targeted regional units (as discussed above under National Wolf Strategy). This proposed rule does not apply to the separate listing and protection of the red wolf (*C. rufus*). Furthermore, the remaining protections of the gray wolf under the Act do not extend to gray wolf-dog hybrids.

**Post-Delisting Monitoring**

Section 4(g)(1) of the Act, added in the 1988 reauthorization, requires us to implement a system, in cooperation with the States, to monitor for not less than 5 years the status of all species that have recovered and been removed from the Lists of Endangered and Threatened Wildlife and Plants (50 CFR 17.11 and 17.12). The purpose of this post-delisting monitoring (PDM) is to verify that a species delisted due to recovery remains secure from risk of extinction after it no longer has the protections of the Act. To do this, PDM generally focuses on evaluating (1) demographic characteristics of the species, (2) threats to the species, and (3) implementation of legal and/or management commitments that have been identified as important in reducing threats to the species or maintaining threats at sufficiently low levels. We are to make prompt use of the emergency listing authorities under section 4(b)(7) of the Act to prevent a significant risk to the well-being of any recovered species. Section 4(g) of the Act explicitly requires cooperation with the States in development and implementation of PDM programs, but we remain responsible for compliance with section 4(g) and, therefore, must remain actively engaged in all phases of PDM. We also will seek active participation of other entities that are expected to assume

responsibilities for the species' conservation, after delisting.

We developed a PDM plan for the wolves in the proposed WGL DPS with the assistance of the Eastern Wolf Recovery Team. That document is available on our Web site (see **FOR FURTHER INFORMATION CONTACT**).

The PDM program will rely on a continuation of State monitoring activities, similar to those which have been conducted by Minnesota, Wisconsin, and Michigan DNR's in recent years, and Tribal monitoring. Minnesota, Wisconsin, and Michigan comprise the core recovery areas within the DPS, and, therefore, the numerical recovery criteria in the Recovery Plan apply only to the area encompassed by these States' boundaries. These activities will include both population and health monitoring of individual wolves. During the PDM period, the Service and the Recovery Team will conduct a review of the monitoring data and program. We will consider various relevant factors (including but not limited to mortality rates, population changes and rates of change, disease occurrence, range expansion or contraction) to determine if the population of wolves within the DPS warrants expanded monitoring, additional research, consideration for relisting as threatened or endangered, or emergency listing.

Minnesota, Wisconsin, and Michigan DNRs have monitored wolves for several decades with significant assistance from numerous partners, including the U.S. Forest Service, National Park Service, USDA–APHIS–Wildlife Services, Tribal natural resource agencies, and the Service. To maximize comparability of future PDM data with data obtained before delisting, all three State DNRs have committed to continue their previous wolf population monitoring methodology, or will make changes to that methodology only if those changes will not reduce the comparability of pre- and post-delisting data.

In addition to monitoring wolf population numbers and trends, the PDM will evaluate post-delisting threats, in particular human-caused mortality, disease, and implementation of legal and management commitments. If at any time during the monitoring period we detect a substantial downward change in the populations or an increase in threats to the degree that population viability may be threatened, we will work with the States and Tribes to evaluate and change (intensify, extend, and/or otherwise improve) the monitoring methods, if appropriate, and/or consider relisting the WGL DPS, if warranted.

This monitoring program will extend for 5 years beyond the effective delisting date of the DPS. At the end of the 5-year period, we and the Recovery Team will conduct another review and post the results on our Web site. In addition to the above considerations, the review will determine whether the PDM program should be terminated or extended.

## Required Determinations

### Clarity of the Rule

Executive Order 12866 requires agencies to write regulations that are easy to understand. We invite your comments on how to make this proposal easier to understand including answers to questions such as the following: (1) Is the discussion in the **SUPPLEMENTARY INFORMATION** section of the preamble helpful to your understanding of the proposal? (2) Does the proposal contain technical language or jargon that interferes with its clarity? (3) Does the format of the proposal (groupings and order of sections, use of headings, paragraphing, *etc.*) aid or reduce its clarity? What else could we do to make the proposal easier to understand? Send a copy of any comments on how we could make this rule easier to understand to: Office of Regulatory Affairs, Department of the Interior, Room 7229, 1849 C Street, NW., Washington, DC 20240. You may also e-mail the comments to this address: *Exsec@ios.doi.gov.*

### National Environmental Policy Act

We have determined that an environmental assessment or an environmental impact statement, as defined under the authority of the National Environmental Policy Act of 1969, need not be prepared in connection with regulations adopted pursuant to section 4(a) of the Act. We published a notice outlining our reasons for this determination in the **Federal Register** on October 25, 1983 (48 FR 49244).

### Paperwork Reduction Act

Office of Management and Budget (OMB) regulations at 5 CFR part 1320 implement provisions of the Paperwork Reduction Act (44 U.S.C. 3501 *et seq.*). The OMB regulations at 5 CFR 1320.3(c) define a collection of information as the obtaining of information by or for an agency by means of identical questions posed to, or identical reporting, recordkeeping, or disclosure requirements imposed on, 10 or more persons. Furthermore, 5 CFR 1320.3(c)(4) specifies that "ten or more persons" refers to the persons to whom

a collection of information is addressed by the agency within any 12-month period. For purposes of this definition, employees of the Federal Government are not included. The Service may not conduct or sponsor, and you are not required to respond to, a collection of information unless it displays a currently valid OMB control number.

This proposal does not include any collections of information that require approval by OMB under the Paperwork Reduction Act. As proposed under the Post-delisting Monitoring above, wolf populations in the Western Great Lakes DPS will be monitored by the States of Michigan, Minnesota, and Wisconsin in accordance with their wolf State management plans. There may also be additional voluntary monitoring activities conducted by a small number of Tribes in these three States. We do not anticipate a need to request data or other information from 10 or more persons during any 12-month period to satisfy monitoring information needs. If it becomes necessary to collect standardized information from 10 or more non-Federal individuals, groups, or organizations per year, we will first obtain information collection approval from OMB.

### Government-to-Government Relationship With Tribes

In accordance with the President's memorandum of April 29, 1994, Government-to-Government Relations with Native American Tribal Governments (59 FR 22951), E.O. 13175, and the Department of the Interior's manual at 512 DM 2, we readily acknowledge our responsibility to communicate meaningfully with recognized Federal Tribes on a government-to-government basis. In accordance with Secretarial Order 3206 of June 5, 1997 (American Indian Tribal Rights, Federal-Tribal Trust Responsibilities, and the Endangered Species Act), we readily acknowledge our responsibilities to work directly with Tribes in developing programs for healthy ecosystems, to acknowledge that Tribal lands are not subject to the same controls as Federal public lands, to remain sensitive to Indian culture, and to make information available to Tribes. We have coordinated the proposed rule with the affected Tribes and, furthermore, throughout several years of development of earlier related rules and this proposed rule, we have endeavored to consult with Native American Tribes and Native American organizations in order to both (1) provide them with a complete understanding of the proposed changes, and (2) to understand their concerns with those changes. If

requested, we will conduct additional consultations with Native American Tribes and multitribal organizations subsequent to any final rule in order to facilitate the transition to State and Tribal management of wolves within the proposed WGL DPS. We will fully consider all of the comments on the proposed rule that are submitted by Tribes and Tribal members during the public comment period and will attempt to address those concerns, new data, and new information where appropriate.

### References Cited

A complete list of all references cited in this document is available upon request from the Ft. Snelling, Minnesota, Regional Office and is posted on our Web site (see **FOR FURTHER INFORMATION CONTACT**).

### Data Quality Act

In developing this rule we did not conduct or use a study, experiment, or survey requiring peer review under the Data Quality Act (Pub. L. 106–554).

### Authors

The primary authors of this proposed rule are the staff members of the Ft. Snelling, Minnesota, Regional Office (see **FOR FURTHER INFORMATION CONTACT**), with contributions from staff from Service Regions 2, 4, and 5. Staff from the Michigan DNR, Minnesota DNR, and Wisconsin DNR provided current information regarding wolves in their States. Staff from the Nelson Institute for Environmental Studies at the University of Wisconsin-Madison compiled the current data on public attitudes toward the wolf.

### List of Subjects in 50 CFR Part 17

Endangered and threatened species, Exports, Imports, Reporting and recordkeeping requirements, Transportation.

### Proposed Regulation Promulgation

Accordingly, we hereby propose to amend part 17, subchapter B of chapter I, title 50 of the Code of Federal Regulations, as set forth below:

## PART 17—[AMENDED]

1. The authority citation for part 17 continues to read as follows:

**Authority:** 16 U.S.C. 1361–1407; 16 U.S.C. 1531–1544; 16 U.S.C. 4201–4245; Pub. L. 99–625, 100 Stat. 3500; unless otherwise noted.

### § 17.11    [Amended]

2. Amend § 17.11(h) by revising the entry for "Wolf, gray" under "MAMMALS" in the List of Endangered and Threatened Wildlife to read as follows:

§ 17.11   **Endangered and threatened wildlife.**

(h) * * *

\* \* \* \* \*

| Species | | Historic range | Vertebrate population where endangered or threatened | Status | When listed | Critical habitat | Special rules |
|---|---|---|---|---|---|---|---|
| Common name | Scientific name | | | | | | |
| **MAMMALS** | | | | | | | |
| * | * | * | * | * | * | * | |
| Wolf, gray ............... | *Canis lupus* ............. | Holarctic .................. | U.S.A.: All of CA, CO, KS, NE, NV, OR, UT, and WA; those portions of AZ, NM, TX, ID, MT, and WY not included in an experimental population as set forth below; and portions of IA, MO, ND, OK, SD, and TX as follows: (1) Southern IA, (that portion south of the centerline of Highway 80); (2) Northwestern MO (that portion northwest of the centerline of Interstate Highway 44 and northwest of the centerline of Interstate Highway 70 east of St. Louis); | E | 1, 6, 13, 15, 35 | N/A | N/A |
| | | ................................ | ................................ | (3) Western ND (that portion south and west of the Missouri River upstream to Lake Sakakawea and west of the centerline of Highway 83 from Lake Sakakawea to the Canadian border); | | | | |
| | | ................................ | ................................ | (4) Western OK (that portion west of the centerline of Interstate Highway 35 and northwest of the centerline of Interstate Highway 44 north of Oklahoma City); | | | | |
| | | ................................ | ................................ | (5) Western SD (that portion south and west of the Missouri River); and | | | | |
| | | ................................ | ................................ | (6) Western TX (that portion west of the centerline of Interstate Highway 35). Mexico. | | | | |
| Do ............................ | do ............................ | do ............................ | U.S.A. (portions of AZ, NM, and TX—see § 17.84(k)). | XN | 631 | N/A | 17.84(k) |

**Federal Register** / Vol. 76, No. 87 / Thursday, May 5, 2011 / Proposed Rules

| Species | | Historic range | Vertebrate population where endangered or threatened | Status | When listed | Critical habitat | Special rules |
|---|---|---|---|---|---|---|---|
| Common name | Scientific name | | | | | | |
| Do ........................... | do ........................... | do ........................... | U.S.A. (portions of ID, MT, and WY— see § 17.84(i)). | XN | 561, 562 | N/A | 17.84(i), 17.84(n). |
| * | * | * | * | * | * | * |

**§ 17.40   [Amended]**

3. Amend § 17.40 by removing and reserving paragraph (d).

**§ 17.95   [Amended]**

4. Amend § 17.95(a) by removing the critical habitat entry for "Gray Wolf (*Canis lupus*)."

Dated: April 12, 2011.

**Rowan W. Gould,**

*Acting Director, U.S. Fish and Wildlife Service.*

[FR Doc. 2011–9557 Filed 5–4–11; 8:45 am]

**BILLING CODE 4310–55–P**

011494A

EXHIBIT MM



# United States Department of the Interior

## U.S. GEOLOGICAL SURVEY
### National Wildlife Health Center
#### 6006 Schroeder Road
#### Madison, Wisconsin 53711-6223

IN REPLY REFER TO:

June 21, 2011

U.S. Fish and Wildlife Service
Whipple Federal Building
1 Federal Drive
Fort Snelling, MN 55111

Dear Gray Wolf Classification Team Members:

I greatly appreciate this opportunity to review and comment on the Proposed Rule To Revise the List of Endangered and Threatened Wildlife for the Gray Wolf (*Canis lupus*) in the Eastern Unites States.  I reviewed the Proposed Rule published in the Federal Register (Vol. 76, No. 87, Thursday, May 5, 2011, pp. 26086-26145) and other supplemental material, and will direct my comments to aspects within my area of expertise (disease and causes of mortality).

The Proposed Rule definitely contains an accurate, comprehensive synthesis of published and unpublished data on disease and predation threats to the Western Great Lakes (WGL) wolf populations.  In fact it leaves me with little to add other than to emphasize a few of its points. The impacts of disease and parasitism on WGL wolves are accurately described, and the conclusions in the five factor analysis regarding these threats are well founded.  Significant canid diseases have been present while the populations have been growing; therefore all evidence indicates that they are not likely to endanger the WGL wolf populations if delisted.

The Proposed Rule contains due caution regarding potential new disease problems that may emerge in the future, particularly where wolf range may intersect greater domestic dog densities. However, WGL wolf populations have grown despite introductions of new diseases (canine parvovirus and sarcoptic mange) that have caused documented mortalities. The key to timely intervention will be vigilance for important new sources of mortality if significant new disease problems emerge in the future.  This function should be well provided by the health monitoring and necropsy provisions described in the State wolf management plans for the growing and expanding populations in Wisconsin and Michigan.

Another concern for the future would be the combined effect of simultaneous increases in multiple mortality factors, should they mount to the point that the compensatory capacity of the populations is overcome.  Here, the State monitoring plans contain the critical elements for recognition of such a problem, so that timely intervention can maintain the populations above

011652A

recovery goals.

The recent scientific literature contains a few additional pertinent papers on gray wolf diseases and parasites. These are in agreement with the discussion points and conclusions in the Proposed Rule (p. 26112-26114).

- Sarcoptic mange emerged in the Northern Rocky Mountain gray wolf population of Montana and Wyoming from 2002-2008 (Jimenez et al., 2010).  It is too early to determine the overall effect from this disease, but the population has continued to grow.
- Two papers provided additional data on canine distemper (CD) occurrence in other stable or growing wolf populations:
  - Stronen et al. (2011) report the death from CD of an additional wolf (adult male) in Manitoba in 2005. A Riding Mountain National Park wolf survey found disease agents, including CD virus, similar to those reported to be there in the past.
  - Almberg et al. (2009) correlate high wolf pup mortality in Yellowstone National Park in 1999 and 2005 with serologic evidence of high CD virus exposure in wolves as well as other canids.  They detected CD virus in three wolf carcasses in 2008, indicating that distemper deaths also may have occurred during that year. In this and a related paper (Almberg et al. 2010), the authors predict periodic short-term declines from CD, but no long-term threat to the wolf population from maintenance of this virus among multiple hosts in the Yellowstone ecosystem.
- The susceptibility of wolves to chronic wasting disease was discussed by Wild et al. (2011), as they presented a model of the impact of selective predation on the disease dynamics of chronic wasting disease in deer. Their discussion reviews findings to date that there is no evidence that canids are susceptible to transmissible spongiform encephalopathies.

As stated earlier, these new papers only provide additional documentation and no conflict with the conclusions in the Rule.

In summary, I commend the Fish and Wildlife Service on a thoroughly researched, well considered Proposed Rule that reaches sound conclusions.  Thank you very much for the opportunity to comment.

Sincerely,

/s/ *Nancy J. Thomas*

Nancy J. Thomas, D.V.M., M.S., D.A.C.V.P.
Endangered Species Specialist
U.S. Geological Survey
National Wildlife Health Center
6006 Schroeder Road
Madison, Wisconsin  53711

Cc:  U.S. Fish and Wildlife Service – Region 3 (Laura Ragan)

Cited Literature:

Almberg, E.S., L.D. Mech, D.W. Smith , J.W. Sheldon, R.L. Crabtree.  2009.  A Serological Survey of Infectious Disease in Yellowstone National Park's Canid Community.  PLoS One 4(9):e7042

Almberg, E. S., P.C. Cross, D.W. Smith.  2010.  Persistence of Canine Distemper Virus in the Greater Yellowstone Ecosystem's Carnivore Community.  Ecological Applications 20(7):2058-2074.

Jimenez, M.D., E.E. Bangs, C. Sime, V.J. Asher.  2010.  Sarcoptic Mange Found in Wolves in the Rocky Mountains in Western United States.

Stronen, A.V., T. Sallows, G.J. Forbes, B. Wagner, P.C. Paquet.  2011.  Disease and Parasites in Wolves of the Riding Mountain National Park Region, Manitoba, Canada.  Journal of Wildlife Diseases 47(1):222-227.

Wild, M.A., N. T. Hobbs, M.S. Graham, M.W. Miller.  2011.  The Role of Predation in Disease Control: A Comparison of Selective and Nonselective Removal on Prion Disease Dynamics in Deer.  Journal of Wildlife Diseases 47(1):78-93.

011654A

EXHIBIT NN

Review of

# "Endangered and Threatened Wildlife and Plants; Proposed Rule to Revise the List of Endangered and Threatened Wildlife for the Gray Wolf (*Canis lupus*) in the Eastern United States, Initiation of Status Reviews for the Gray Wolf and for the Eastern Wolf (*Canis lycaon*)" issued on May 5, 2011

## L. David Mech

**U.S. Geological Survey, Northern Prairie Wildlife Research Center, 8711 – 37th St. SE, Jamestown, ND  58401-7317**

As a peer reviewer for "Endangered and Threatened Wildlife and Plants; Proposed Rule to Revise the List of Endangered and Threatened Wildlife for the Gray Wolf (*Canis lupus*) in the Eastern United States, Initiation of Status Reviews for the Gray Wolf and for the Eastern Wolf (*Canis lycaon*)" issued on May 5, 2011, I have read and studied the entire document.

I find the entity proposed for delisting, the gray wolf (*Canis lupus*), valid as per the qualification on p. 26094, column 3, 2nd full paragraph.  (See also my comments below on Great Lakes wolf taxonomy).

The data used in the proposal are valid and adequate except for taxonomic material published since May 5 or in press (see below).  The primary new publication of relevance is vonHoldt et al. (2011) "A genome-wide perspective on the evolutionary history of enigmatic wolf-like canids".

Otherwise the data used are sufficient to support the part of the proposed action that seeks to establish a western Great Lakes (WGL) Distinct Population Segment (DPS) for *Canis lupus* and to remove this DPS from the List of Endangered and Threatened Wildlife.

However, I do not think that there is sufficient reason or evidence for revising the range of *Canis lupus*.  Although it is true that at the writing of the Proposed Rule, it seemed like considerable evidence had accumulated supporting the existence of the separate species, *Canis lycaon*, or the Eastern Wolf, the vonHoldt et al. (2011) article published since adds enough doubt as to question that proposition.  At the least, the vonHoldt et al. (2011) article evinces that there is not consensus by the pertinent scientific community about the existence of *C. lycaon* and therefore about the original range of *C. lupus*.  This fact strongly suggests that any discussion about a putative Eastern Wolf be totally removed from the WGL delisting proposal.  To retain that material would open the delisting proposal to serious challenge based solely on the Gray Wolf/Eastern Wolf controversy.  I am also sending separately 2 articles in press, one being reviewed, and some unpublished data that pertain to this subject.

I have also studied the proposal's discussion of all 5 of the listing factors (p. 26106 – 26140) and concur with the conclusions therein.

However, I do think that the following specific items in the proposal bear further attention:

p. 26086, Summary –
     Only Minnesota is mentioned and later Minnesota and Michigan.  I'm not sure why this is, but the impression this very key part of the document gives is that Wisconsin or the other states are not included in the delisting proposal.

p. 26087, col. 1, item 11 – This assumes *Canis lycaon* is a valid taxon, but because this is still in dispute (vonHoldt et al. 2011), it would be more appropriate to delete this section.

p. 26089 col. 3, last paragraph – needs updating.

p. 26090, col. 1 – last par. – use of "suitable habitat" could be open to challenge, for any habitat with food and protection from human killing is suitable, and there are publications so stating.  Perhaps something like "lack sufficient space far enough from the kind of human activity with which wolves would be in constant conflict."  Or you could first define suitable habitat that way.

p. 26090, col. 2, end of 1st par. – Delete because of vonHoldt et al. (2011).

p. 26091, col. 2, 2nd full par. – Is 2000 the correct year in 3 places here?  In the current proposal I could find no previous mention of the July 13, 2000 proposal.

p. 26092, col. 3 – Taxonomy …"  In view of the vonHoldt et al. (2011) article, this section needs revision and perhaps shortening by acknowledging that there is an ongoing taxonomic controversy over the identity of the G. L. wolves and summarizing it without going into so much detail and merely concluding that (1) the controversy might continue for decades more; (2) the  historical genetic data matches current genetic data, thus documenting that the current recovered GL wolf population is genetically similar to the population listed regardless of whatever name or taxonomic status the population is ultimately given; and (3) that G.L. wolf population is now recovered.

Regarding the taxonomy of the G. L. wolves, I have attached the following new articles not yet published but developed before publication of vonHoldt et al. (2011).


Mech, L. D., R. M. Nowak, and S. Weisberg.  Submitted.  Use of cranial characters in
     Minnesota wolf  taxonomy.


Mech, L. D.  In press.  Minnesota wolf ear lengths as possible indicators of taxonomic
     differences.  Northeastern Naturalist.

Mech, L. D.  In press.  Non-genetic data supporting genetic evidence for the eastern
wolf.  Northeastern Naturalist

Also attached is a relevant document discussing the relevance of the above, and raw data
not yet submitted for publication ("Discussion of Minnesota Wolf Taxonomy").

p. 26095, col. 3, last 6 lines—As a member of the Revised Recovery Team, my
recollection is that the Plan did establish a numerical criterion, as stated in the Summary
(p. 4).  In par. 1 of the Summary, we estimated the Minnesota wolf population at 1,550 to
1,750 wolves and characterized it as "stable and growing," and in the 4th paragraph we
required that as one of the recovery criteria "the Minnesota population must be stable and
growing."  Therefore by implication, the MN wolf population must be at least 1,550
wolves.  The heading of Table 1 mentioning "for planning purposes" was meant to apply
only for the National Forest goals listed therein, simply because no forest can guarantee
the no. of packs or wolves that will inhabit their forests.  The 1,251 – 1,400 wolves
totaled at the bottom of the Zone goals in Table 1 was a holdover from the 1978 version
of the Plan, when the estimated minimum Minnesota wolf population was 1,251.

p. 26099, col. 3, 2nd full par. – It  has now been documented that a new immigrant
outbreeding wolf has been discovered on Isle Royale (Adams et al. 2011).

p. p. 26100, col. 3 – This section must be updated in view of vonHoldt et al. (2011), and
you might want to include some of the new material I have attached.

p. 26103, col. 1, 1st full par. – A movement by a wolf in Scandinavia covered 1,092 km
(Wabakken et al. 2007).

p. 26107, col. 2, 2nd full par., l. 4-5 – change to "low, moderate and high probability"
(Mech 2007).

p. 26107, col. 3, par. 2, last 10 lines – This material is repeated almost verbatim 2
paragraphs below.

p. 26108, col. 1., 2nd full par. – see last item.

p. 26112, col. 2, 2nd full par. – Mech and Goyal 2010 should be Mech and Goyal 2011 (3
places), and pages 6-7 and p. 7 cited should both be pages 28-29.  Full citation for this
paper follows:

Mech, L. D. and S. M. Goyal.  2011.  Parsing demographic effects of canine parvovirus
on a Minnesota wolf population.  Journal of Veterinary Medicine and Animal
Health Vol. 3(2):27-30.  (Available online at
http://www.academicjournals.org/JVMAH.)

p. 26113, col. 3 – could add that in the Superior National Forest from 1998 to 2010, 7 of approximately 163 wolves radio-collared were known to have died of mange. (L. D. Mech, USGS, unpubl.).

p. 26117, col 2 – Could add that in the Superior National Forest from 1998 to 2010, 6 of approximately 163 wolves radio-collared were known to have been killed illegally by humans (L. D. Mech, USGS, unpubl.).

p. 26118, col. 1, 2nd full par., last 6 lines – this conclusion was an error as pointed out by Creel and Rotella (2010).

p. 26132, col. 3, l. 15-19 – the International Wolf Center did not ever receive these pups, never possessed them, and still does not.

p. 26136, col. 1, 4th full par. – This seems quite overstated and at the least needs qualifications. The wolf was never "on the brink of extinction." There were always 60,000 in Canada, and even in Minnesota the minimum number was 750 (Fuller et al. 1992).

p. 26138, "Hybridization with Coyotes" – This entire section requires updating in view of vonHoldt et al. (2011). You might also find my in press paper (attached) of some use here.

p. 26139 – See item 26138

p. 26141, col. 1, par. 2, l. 8 – typo

p. 26142, col. 1, 2nd full par., l. 8 - typo

## REFERENCES CITED IN REVIEW BUT NOT IN PROPOSAL

Adams, J. R., L. H. Vucetich, P. W. Hedrick, R. O. Peterson, and J. A. Vucetich. 2011. Genomic sweep and potential genetic rescue during limiting environmental conditions in an isolated wolf population. Proceedings of the Royal Society B doi:10.1098/rspb.2011.0261.

Creel S, Rotella JJ (2010) Meta-Analysis of Relationships between Human Offtake, Total Mortality and Population Dynamics of Gray Wolves (Canis lupus). PLoS ONE 5(9): e12918. doi:10.1371/journal.pone.0012918

Mech, L. D. 2006. Prediction failure of a wolf landscape model. Wildlife Society Bulletin 34:874-877.

Wabakken, P, H. Sand, I. Kojola, B. Zimmermann, J. M. Arnemo, H. C. Pedersen, and O. Liberg. 207. Multistage, long-range natal dispersal by a global positioning

system-collared Scandinavian wolf.  Journal of Wildlife Management 71:1631-1634.

011713A