# EXHIBIT OO

**Options for finalizing the decisions regarding the status of wolves in the eastern States**

**Background:**

After publication of the May 2011 proposed rule to identify and remove from the list of threatened and endangered species the Western Great Lakes DPS (WGL DPS) and 29 states that were not historically occupied by *Canis lupus*, vonHoldt et al. (2011) published a study regarding North American wolf genetics and taxonomy.   Unlike the Service's position as described in the May 2011 proposed rule, this paper does not recognize *Canis lycaon* as a separate species.  Despite the large number of samples, vonHoldt et al. (2011) did not weigh their results against the conflicting results from other studies using differing genetic material (e.g., Y chromosome data).  Chambers et al. did a comprehensive review and did weigh the conflicting studies.

Taxonomy of canids in North America has been subject to much scientific disagreement.  As such, the Service wolf structured decision making team tasked a group of Service scientists with expertise in genetics and wolf taxonomy to evaluate the differing permutations.  The resulting review (Chambers et al.) was based on a spectrum of studies that used a variety of techniques.  The Service then used this interpretation as an underlying assumption as we continued our structured decision making effort, including the August 2011 workshop with the States.   Chambers et al. has been submitted to North American Fauna for publication, and will include an addendum addressing vonHoldt et al. (2011).  It is currently in the Journal's peer review process (the 3rd peer review on this manuscript).  As such, it was not referenced in the proposed rule with the expectation that it would be accepted for publication and included in the administrative record for the final determination in December 2011.  The proposed rule cited original literature that supported the Chambers et al. taxonomic interpretation.

The public has not had an opportunity to see the full analysis of Chambers et al.  As such vonHoldt et al. (2011) is viewed by some as the most current comprehensive review of wolf taxonomy.   Environmental organizations, who have a strong interest in maintaining a listed wolf in the northeast, have expressed particular concern about the pending delisting of the 29 eastern states based on the taxonomic treatment recommended by Chambers et al.  A final decision to delist *C. lupus* in the east would be strengthened considerably by reopening the comment period to allow the public to review Chambers et al.  However, providing that opportunity would likely require us to delay the final decision until February 2012.

**Eastern Final Rule Options:**

1)  Finalize the proposed rule as planned.

   **Pros:**  Maintains commitment to Sen. Klobuchar for a final determination by December 2011.
   **Cons:**  Final rule will be litigated.  The Service's reliance on the interpretations of Chambers et al. without making that synthesis available for public review and comment is a great vulnerability.

2) Reopen the comment period for 30 days to provide public review and comment on Chambers et al.
   upon its acceptance for publication.  After close of the comment period, prepare final determination
   in 60 days.  SOL review and WO processing for 60 days.

   **Pros:**  Reopening the comment period will considerably reduce the legal vulnerability of the rule
   with respect to taxonomy of the WGL DPS and the NE states.  The States have an incredible vested
   interest in getting to a decision that is most legally defensible decision possible.  We have received
   request to extend the comment period by at least NY.  A final delisting that is in effect by March will
   provide the States (particularly MI WI) a window of spring depredation control before any potential
   litigation.

   **Cons:** Delays final decision on the WGL DPS beyond commitment to Sen. Klobuchar.   Most likely
   timeline for completion is late February 2012.

3) Separate the WGL delisting decision from the 29 eastern states delisting decision.  Finalize WGL DPS
   in a separate rule in December 2011 or combine with option 2 above to reduce APA vulnerability of
   the WGL decision.

   **Pros:**  Severing the final decision on WGL from the 29 eastern states means potential litigants can
   challenge only the eastern states delisting  separate from the the WGL delisting delisting, therefore
   shielding the WGL DPS from an adverse court decision on the eastern states.  Considerably reduces
   vulnerability of the rule with respect to taxonomy of the NE states.  Retains commitment to Sen.
   Kobuchar with respect to the WGL DPS.

   **Cons:** The WGL DPS is an odd entity with respect to the ESA and is based on the Chambers et al
   interpretation of taxonomy.  Finalizing a WGL DPS rule alone by December would not have the
   benefit of public review of Chambers et al.

011749A

# EXHIBIT PP

**Options for finalizing the decisions regarding the status of wolves in the eastern States**

**Background:**

After publication of the May 2011 proposed rule to identify and remove from the list of threatened and endangered species the Western Great Lakes DPS (WGL DPS) and part or all of 29 states that were not historically occupied by *Canis lupus*, vonHoldt et al. (2011) published a study regarding North American wolf genetics and taxonomy.  Unlike the Service's position as described in the May 2011 proposed rule, this paper does not recognize *Canis lycaon* as a separate species.  Despite the large number of samples, vonHoldt et al. (2011) did not weigh their results against the conflicting results from other studies using differing genetic material (e.g., Y chromosome data).  Chambers et al. did a comprehensive review and did weigh the conflicting studies.

Taxonomy of canids in North America has been subject to much scientific disagreement.  As such, the Service's wolf structured decision making team tasked a group of Service scientists with expertise in genetics and wolf taxonomy to evaluate the differing permutations.  The resulting review (Chambers et al.) was based on a spectrum of studies that used a variety of techniques.  The Service then used this interpretation as an underlying assumption as we continued our structured decision making effort, including the August 2011 workshop with the States.   Chambers et al. has been submitted to North American Fauna for publication, and will include an addendum addressing vonHoldt et al. (2011).  It is currently in the Journal's peer review process (the 3rd peer review on this manuscript).  As such, it was not referenced in the proposed rule with the expectation that it would be accepted for publication and included in the administrative record for the final determination in December 2011.  The proposed rule cited original literature that supported the Chambers et al. taxonomic interpretation.

> **Comment [LJR1]:** Can we add anything about how they intend to address it?  Do they intend to explain the difference in  their findings and why Chambers et al still holds to its original conclusions?

The public has not had an opportunity to see the full analysis of Chambers et al.  As such vonHoldt et al. (2011) is viewed by some as the most current comprehensive review of wolf taxonomy.   Furthermore, Eenvironmental organizations, who have a strong interest in maintaining a listed wolf in the northeast, have expressed particular concern about the pending delisting of the 29 eastern states based on the taxonomic treatment recommended by Chambers et al.  A final decision to delist *C. lupus* in the east would be strengthened considerably by reopening the comment period to allow the public to review Chambers et al., and the addendum address vonHoldt et al. (2011).   However, providing that opportunity would likely require us to delay the final decision, likely until late February 2012.

> **Comment [LJR2]:** Is this reasonable? When do we anticipate Chambers et al. will publish?

**Eastern Final Rule Options:**

1) Finalize the proposed rule as planned (that is, finalize as one rule by December 2011).

   **Pros:**  Maintains commitment to Sen. Klobuchar for a final determination by December 2011.
   **Cons:**  Final rule will be litigated.  The Service's reliance on the interpretations of Chambers et al. without making that synthesis available for public review and comment is a great vulnerability.

2) Reopen the comment period for 30 days to provide public review and comment on Chambers et al. upon its acceptance for publication.  After close of the comment period, the RO will prepare a final

determination in 60 days followed by an additional 60 days for  SOL review and WO processing for 60 days.

**Comment [LJR3]:** Is this what you mean here? Or did you mean a total of 60 days for all this?

**Pros:** Reopening the comment period will considerably reduce the legal vulnerability of the rule with respect to taxonomy of the WGL DPS and the NE states.  The States have an incredible vested interest in getting to a decision that is the most legally defensible decision possible.  We have received a request to extend the comment period by at least NY.  A final delisting that is in effect by March will provide allow the States (particularly MI WI) a window of to conduct spring depredation control before any potential litigation.

**Cons:** Delays final decision on the WGL DPS beyond commitment to Sen. Klobuchar.   Most likely timeline for completion is late February 2012.

3)  Separate the WGL delisting decision from the 29 eastern states delisting decision.  Finalize WGL DPS in a separate rule in December 2011 or combine with option 2 above to reduce APA vulnerability of the WGL decision.

**Pros:** Although environmental organizations have expressed concern about the proposed delisting of the 29 eastern states, most of those same organizations have expressed support for delisting the WGL DPS.  Severing the final decision on WGL from the decision on the 29 eastern states means potential litigants can challenge only the eastern states delisting  separate from the the WGL delisting delisting, therefore shielding the WGL DPS from an adverse court decision on the eastern states.  Considerably reduces vulnerability of the rule with respect to taxonomy of the NE states.  Retains commitment to Sen. Kobuchar with respect to the WGL DPS.

**Cons:** The WGL DPS is an odd entity with respect to the ESA and is based on the Chambers et al. interpretation of taxonomy.  Finalizing a WGL DPS rule alone by December would not have the benefit of public review of Chambers et al.

4)   At least one State (WI) and two peer reviewers comment that there is not consensus by the scientific community about the existence of *C. lycaon* as a unique species, and that the debate regarding taxonomy of wolves is far from over.  Therefore, they suggest that we should not conclusively conclude in our delisting decision that C. lycaon is a separated species.   We should directly review our decision regarding this issue in the final rule in light of those comments.

**Pros:** May allow us to finalize a decision on the WGL DPS by December 2011 without awaiting publication of Chambers et al. and reopening comment period to accept it.

**Formatted:** Normal, Indent: Left:  0.25",  No bullets or numbering

**Cons:** May delay decisions regarding the NE.

011752A

EXHIBIT QQ

**Options for Finalizing the Decisions Regarding the Status of Wolves in the Eastern States**

**Background:**

After publication of the May 2011 proposed rule to identify and remove from the list of threatened and endangered species the Western Great Lakes DPS (WGL DPS) and part or all of 29 states that were not historically occupied by *Canis lupus*, vonHoldt et al. (2011) published a study regarding North American wolf genetics and taxonomy.   Unlike the Service's position as described in the May 2011 proposed rule, this paper does not recognize *Canis lycaon* as a separate species. Despite the large number of samples, vonHoldt et al. (2011) did not weigh their results against the conflicting results from other studies using differing genetic material (e.g., Y chromosome data).  Chambers et al. did a comprehensive review and did weigh the conflicting studies.

Taxonomy of canids in North America has been subject to much scientific disagreement.  As such, the Service's wolf structured decision making team tasked a group of Service scientists with expertise in genetics and wolf taxonomy to evaluate the differing permutations.  The resulting review (Chambers et al.) was based on a spectrum of studies that used a variety of techniques.  The Service then used this interpretation as an underlying assumption as we continued our structured decision making effort, including the August 2011 workshop with the States.   Chambers et al. has been submitted to North American Fauna for publication, and will include an addendum explaining why vonHoldt et al. (2011) does not alter their interpretation.  It is currently in the Journal's peer review process (the 3rd peer review on this manuscript).  As such, it was not referenced in the proposed rule with the expectation that it would be accepted for publication and included in the administrative record for the final determination in December 2011.  The proposed rule cited original literature that supported the Chambers et al. taxonomic interpretation.

The public has not had an opportunity to see the full analysis of Chambers et al.  As such vonHoldt et al. (2011) is viewed by some as the most current comprehensive review of wolf taxonomy. Furthermore, environmental organizations, who have a strong interest in maintaining a listed wolf in the northeast, have expressed particular concern about the pending delisting of the 29 eastern states based on the taxonomic treatment recommended by Chambers et al.  A final decision to delist *C. lupus* in the east would be strengthened considerably by reopening the comment period to allow the public to review Chambers et al., and the addendum addressing vonHoldt et al. (2011).   However, providing that opportunity would require us to delay the final decision, likely until late February 2012.

**Eastern Final Rule Options:**

1) *Finalize the proposed rule as planned, finalizing one rule by December 2011.*
   **Pros:**  Maintains commitment to Sen. Klobuchar for a final determination by December 2011.
   **Cons:**  Final rule will be litigated.  The Service's reliance on the interpretations of Chambers et al. without making that synthesis available for public review and comment is a great vulnerability.

011755A

2) *Reopen the comment period for 30 days to provide public review and comment on Chambers et al. upon its acceptance for publication. After close of the comment period, the RO will prepare a final determination in 60 days followed by an additional 60 days for SOL review and WO processing.*
**Pros:** Reopening the comment period will considerably reduce the legal vulnerability of the rule with respect to taxonomy of the WGL DPS and the NE states. The States have an incredible vested interest in getting to a decision that is the most legally defensible decision possible. We have received a request to extend the comment period by at least New York State Department of Environmental Conservation. A final delisting that is in effect by March will allow the States (particularly MI WI) to conduct spring depredation control before any potential litigation.
**Cons:** Delays final decision on the WGL DPS beyond commitment to Sen. Klobuchar. Most likely timeline for completion is late February 2012.

3) *Separate the WGL delisting decision from the 29 eastern states delisting decision. Finalize WGL DPS in a separate rule in December 2011 or combine with option 2 above to reduce APA vulnerability of the WGL decision.*
**Pros:** Although environmental organizations have expressed concern about the proposed delisting of the 29 eastern states, most of those same organizations have expressed support for delisting the WGL DPS. Severing the final decision on WGL from the decision on the 29 eastern states means potential litigants can challenge the eastern states delisting separate from the WGL delisting, therefore shielding the WGL DPS from an adverse court decision on the eastern states. Considerably reduces vulnerability of the rule with respect to taxonomy of the NE states. This option retains commitment to Sen. Kobuchar with respect to the WGL DPS.
**Cons:** The WGL DPS is an odd entity with respect to the ESA and is based on the Chambers et al. interpretation of taxonomy. Finalizing a WGL DPS rule alone by December would not have the benefit of public review of Chambers et al.

4) *Make a final determination without concluding that C. lycaon is a separate species. The final determination can be configured according to any of the above options.*
**Pros:** At least one State (WI) and two peer reviewers commented on the lack of consensus by the scientific community about the existence of *C. lycaon* as a unique species, and that the debate regarding taxonomy of wolves is far from over. Therefore, they suggest that we should not conclude in our delisting decision that *C. lycaon* is a separated species. This option may allow us to finalize a decision on the WGL DPS by December 2011 without awaiting publication of Chambers et al. and reopening comment period to accept it.
**Cons:** Our record reflects that the Service requested a review of the taxonomy by Chambers et al. with the specific purpose of making sense of the and thereby informing the Service as to the best scientific interpretation of the existing taxonomic controversy. The removal of the States in the northeast is largely predicated upon the Chambers et al. taxonomic interpretation, leaving a *C. lupus* entity on the list that does not comport with the ESA nor does it have any wolf populations. Not accepting Chambers et al. may appear to ignore the best available science.

011756A

# EXHIBIT RR

| From: | Maricela Constantino |
|---|---|
| To: | TJ Miller |
| Cc: | Laura Ragan; Lynn M Lewis; Marjorie Nelson; Rick Sayers; Sean Marsan |
| Subject: | Re: Does R3 want to have a call tomorrow afternoon to discuss the schedule for completing the final rule for the WGL DPS delisting determination? |
| Date: | 08/10/2011 02:42 PM |

TJ,
Your email made me realize that I left off another key assumption.

We will make a final determination on the WGL delisting proposal by the end of the year, continuing to recognize *lycaon* unless the public comments convince us otherwise;

Of course, this leaves open the possibility of course correction late in the schedule.

_____
Maricela A. Constantino
U.S. Fish and Wildlife Service - Washington Office (R9)
Endangered Species, Branch of Recovery and Delisting
Remotely located at:
5398 Longwood Road
Huntington, WV 25705
571-969-9804 (phone)


▼ TJ Miller/R3/FWS/DOI

| **TJ Miller/R3/FWS/DOI** | | |
|---|---|---|
| | To | Maricela Constantino/ARL/R9/FWS/DOI@FWS |
| 08/10/2011 03:17 PM | cc | Laura Ragan/R3/FWS/DOI@FWS, Sean Marsan/R3/FWS/DOI@FWS, Lynn M Lewis/R3/FWS/DOI@FWS, Marjorie Nelson/ARL/R9/FWS/DOI@FWS, Rick Sayers/ARL/R9/FWS/DOI@FWS |
| | Subject | Re: Does R3 want to have a call tomorrow afternoon to discuss the schedule for completing the final rule for the WGL DPS delisting determination? |


Maricela,

For us it all has to do with how long we're going to deliberate before we have a clear approach.

As I see it, our options are:
1.   revise list for Canis Lupus and not presently recognize Canis Lycaon due to ongoing scientific debate
2.  revise list for Canis Lupus, recognizing Canis Lycaon and conclude that the threats to Canis Lycaon are ameliorated, thus no need to list in WGL
3.  revise list for Canis Lupus recognizing the WGL population of Canis Lupus contains genetic intercrosses that  are essential for preserving wolves in the WGL

012024A

The last two options are affected greatly by deliberations.  Ending deliberation really needs to coincide with the end of the 30 of the public comment period.  Even with this, we will not have the necessary time to address specifically the comments received during the comment period.  The writing is beginning and must continue without significant course correction (meaning switching from one option to another) for us to be successful.

I appreciate all your efforts,

T. J. Miller
U. S. Fish and Wildlife Service
5600 American Blvd West, Suite 990
Bloomington, MN 55437-1458
(612) 713-5334
TJ_Miller@fws.gov
▼ Maricela Constantino/ARL/R9/FWS/DOI

| | | |
|---|---|---|
| **Maricela Constantino/ARL/R9/FWS/DOI**<br><br>08/10/2011 01:36 PM | To | Laura Ragan/R3/FWS/DOI@FWS |
| | cc | Sean Marsan/R3/FWS/DOI@FWS, TJ Miller/R3/FWS/DOI@FWS |
| | Subject | Re: Does R3 want to have a call tomorrow afternoon to discuss the schedule for completing the final rule for the WGL DPS delisting determination? |

Laura,
I apologize for my delay in getting back to you.  I spoke with Marj late yesterday afternoon and we decided that we didn't need a conference call since I'm sure you were already are aware of the decision to reopen the comment period to release Chambers et al.  The only thing we need from you is a drop dead date (excuse the phrase) for reopening the comment period such that we can still make the Dec 30, 2011 scheduled FR deliver date for the final rule.  I can work with you on this.  In summary, we are working under the following assumptions -

1. We are reopening the comment period to post Chambers et al for public review
2. The comment period will be open for 30 days
3. We will finalize WGL delisting decision separate from the 29 states delisting decision
4. We intend to deliver the WGL decision to the FR on or before Dec 30th of this year

Marj drafted the reopening notice for the FR last Friday.  It is going to PDM today and I believe the intent is to get it to Main Interior by the end of this week.  I'll email you an electronic version of the notice in a separate email.

If you still want to have a call let me know.  Marj will be out of the office on Friday and all of next week.

_____

Maricela A. Constantino
U.S. Fish and Wildlife Service - Washington Office (R9)
Endangered Species, Branch of Recovery and Delisting
Remotely located at:
5398 Longwood Road
Huntington, WV 25705
571-969-9804 (phone)


▼ Laura Ragan/R3/FWS/DOI

| | | | |
|---|---|---|---|
| **Laura Ragan/R3/FWS/DOI** | | To | Maricela Constantino/ARL/R9/FWS/DOI@FWS |
| | | cc | Sean Marsan/R3/FWS/DOI@FWS, TJ Miller/R3/FWS/DOI@FWS |
| 08/10/2011 12:11 PM | | Subject | Re: Does R3 want to have a call tomorrow afternoon to discuss the schedule for completing the final rule for the WGL DPS delisting determination? |


Any word on whether we can chat today?

-Laura

▼ Maricela Constantino/ARL/R9/FWS/DOI

| | | | |
|---|---|---|---|
| **Maricela Constantino/ARL/R9/FWS/DOI** | | To | Laura Ragan/R3/FWS/DOI@FWS |
| | | cc | Sean Marsan/R3/FWS/DOI@FWS, TJ Miller/R3/FWS/DOI@FWS |
| 08/09/2011 08:46 AM | | Subject | Re: Does R3 want to have a call tomorrow afternoon to discuss the schedule for completing the final rule for the WGL DPS delisting determination? |


Laura,
Let me check with Marj.  She may be in a meeting from 12-5pm tomorrow - but that is still tentative.  I'll get back to you when I talk with her - probably after 11 am.
_____
Maricela A. Constantino
U.S. Fish and Wildlife Service - Washington Office (R9)
Endangered Species, Branch of Recovery and Delisting
Remotely located at:
5398 Longwood Road
Huntington, WV 25705
571-969-9804 (phone)

▼ Laura Ragan/R3/FWS/DOI

| | | |
|---|---|---|
| **Laura Ragan/R3/FWS/DOI** | To | Maricela Constantino/ARL/R9/FWS/DOI@FWS |
| | cc | TJ Miller/R3/FWS/DOI@FWS, Sean Marsan/R3/FWS/DOI@FWS |
| 08/09/2011 09:27 AM | Subject | Re: Does R3 want to have a call tomorrow afternoon to discuss the schedule for completing the final rule for the WGL DPS delisting determination? |

Maricela -  Any chance we can do this tomorrow (Wednesday) instead?  Between 10:30 and 2:00 CT or after 3:00 CT should work for us here.

-Laura

▼ Maricela Constantino/ARL/R9/FWS/DOI

| | | |
|---|---|---|
| **Maricela Constantino/ARL/R9/FWS/DOI** | To | Laura Ragan/R3/FWS/DOI@FWS |
| | cc | |
| 08/08/2011 03:19 PM | Subject | Does R3 want to have a call tomorrow afternoon to discuss the schedule for completing the final rule for the WGL DPS delisting determination? |

This is in light of the decision to reopen the comment period for 30 days. Marj and I are available at 1:30 or 2pm ET.
_____
Maricela A. Constantino
U.S. Fish and Wildlife Service - Washington Office (R9)
Endangered Species, Branch of Recovery and Delisting
Remotely located at:
5398 Longwood Road
Huntington, WV 25705
571-969-9804 (phone)

# EXHIBIT SS

| | |
|---|---|
| **From:** | Georgia Parham |
| **To:** | Laura Ragan; Charles Traxler |
| **Cc:** | Jason Holm |
| **Subject:** | Fw: GI wolves |
| **Date:** | 08/11/2011 12:30 PM |

FYI - looks like DC will take the first crack at doing outreach on the reopening of the comment period.

Georgia Parham
External Affairs
U.S. Fish and Wildlife Service
620 South Walker Street
Bloomington, IN 47403
812-334-4261 x 1203

----- Forwarded by Georgia Parham/R3/FWS/DOI on 08/11/2011 01:29 PM -----

| **Vanessa Kauffman/ARL/R9/FWS/DOI** | | |
|---|---|---|
| | To | Georgia Parham/R3/FWS/DOI@FWS |
| | cc | |
| 08/11/2011 01:27 PM | Subject | Fw: GI wolves |

Got your message! Yes, here is what we are thinking. And I am going to check with ES to see what they can help me write.

Vanessa C. Kauffman
Office of Public Affairs
U.S. Fish and Wildlife Service
4401 N. Fairfax Drive, MS 330
Arlington, VA 22203

703-358-2138 (direct)
571-319-6342 (cell)
703-358-1930 (fax)
vanessa_kauffman@fws.gov
Visit us online at: http://www.fws.gov

----- Forwarded by Vanessa Kauffman/ARL/R9/FWS/DOI on 08/11/2011 01:27 PM -----

| **"Fetcher, Adam K" <Adam_Fetcher@ios.doi.gov>** | | |
|---|---|---|
| | To | "Eustis, Christine" <Christine_Eustis@fws.gov>, "Kelly, Kate P" <Kate_Kelly@ios.doi.gov> |
| 08/11/2011 12:52 PM | cc | "Kauffman, Vanessa" <vanessa_kauffman@fws.gov>, "Rieben, Craig" <Craig_Rieben@fws.gov> |
| | Subject | RE: GI wolves |

012036A

Thanks Christine – keep us posted.


**From:** Christine_Eustis@fws.gov [mailto:Christine_Eustis@fws.gov]
**Sent:** Thursday, August 11, 2011 12:50 PM
**To:** Kelly, Kate P; Fetcher, Adam K
**Cc:** Kauffman, Vanessa; Rieben, Craig
**Subject:** Fw: Gl wolves


FYI: We will be reopening the public comment period for Great Lakes wolves delisting rule for a short time period
to allow some new scientific papers to be submitted during the rule making process. We plan to do a short
news bulletin and post on the website.  Timing is in the next few weeks.  Will share news bulletin once we have it.

Christine Eustis
Deputy Assistant Director
External Affairs
Arlington, VA
703) 358-1706 (office)
703) 343-3939 (cell)
----- Forwarded by Christine Eustis/ARL/R9/FWS/DOI on 08/11/2011 12:48 PM -----


**Matthew Huggler/ARL/R9/FWS/DOI**

|  |  |
|---|---|
| 08/10/2011 11:37 AM | To  christine_eustis@fws.gov |
|  | cc |
|  | Subject  Fw: Gl wolves |


FYI - In case you want to share the latest with Betsy.  Sounds like Heather has what she needs for now though.

- Matt

012037A

----
Matthew C. Huggler
Chief, Office of Congressional and Legislative Affairs
U.S. Fish and Wildlife Service
4401 N. Fairfax Drive, MS 330
Arlington, VA 22203
(703) 358-2243 (tel)
(202) 460-8402 (cell)
(703) 358-1780 (fax)

email: matthew_huggler@fws.gov

http://laws.fws.gov/

----- Forwarded by Matthew Huggler/ARL/R9/FWS/DOI on 08/10/2011 11:37 AM -----


**Megan Kelhart/ARL/R9/FWS/DOI**


08/10/2011 09:56 AM


To   Matthew Huggler/ARL/R9/FWS/DOI@FWS

cc   Marjorie Nelson/ARL/R9/FWS/DOI@FWS

Subject   Re: Fw: Gl wolves Link


Matt,

WGL Wolf announcement:

When:  No timeline for announcing yet that I'm aware of - Marj Nelson said they were still working out the kinks with the Region.  ES expects it to be announced in the next several weeks, but that was a guestimate.

Why: There is an APA weakness in the rule with regard to the genetics piece -

generally speaking.  Specifically, there was a paper they were citing (Chambers, et.al) but also a paper that the Service has been using I think to discuss the genetics of eastern wolves and WGL (vonHoldt) and it has not been published yet.  It was submitted for publication and was not available for comment when we published the proposed rule in May.  In this comment period, we will likely ask for comments on the paper (or some part of it - I'm not entirely sure) prior to its publication.

This reopening of the public comment period will not modify the final rule date.  We are still shooting for December 31, 2011, as promised.

I copied Marj in the very good likelihood that I totally mucked up the explanation.

Megan

Megan Debranski Kelhart
Office of Congressional and Legislative Affairs
U.S. Fish and Wildlife Service
4401 N. Fairfax Drive
Arlington, VA 22203
Office: (703) 358-2536
Fax: (703) 358-1780
megan_kelhart@fws.gov

**Matthew Huggler/ARL/R9/FWS/DOI**

08/10/2011 09:39 AM

To  "Megan Kelhart" <megan_kelhart@fws.gov>

cc

Subject  Fw: GI wolves

Megan,

See below, similar to the query you had from Heather yesterday.  Have you heard about a timeline yet for GL wolves?  If you do, will you let me know asap?  Thanks,

- Matt

----
Matthew C. Huggler
Chief, Office of Congressional and Legislative Affairs
U.S. Fish and Wildlife Service
4401 N. Fairfax Drive, MS 330
Arlington, VA 22203
(703) 358-2243 (tel)
(202) 460-8402 (cell)
(703) 358-1780 (fax)

email: matthew_huggler@fws.gov

http://laws.fws.gov/

----- Forwarded by Matthew Huggler/ARL/R9/FWS/DOI on 08/10/2011 09:38 AM -----


**Matthew Huggler/ARL/R9/FWS/DOI**


08/10/2011 09:38 AM


|  | |
|---|---|
| To | "Hildebrandt, Betsy" <Betsy_Hildebrandt@fws.gov> |
| cc | "Eustis, Christine" <Christine_Eustis@fws.gov> |
| Subject | Re: Gl wolves Link |


Betsy,

I don't think we know yet when we would announce, since they're still working on all of the details.  We will check in with ES and see if they have timeline.

- Matt

----
Matthew C. Huggler
Chief, Office of Congressional and Legislative Affairs
U.S. Fish and Wildlife Service
4401 N. Fairfax Drive, MS 330
Arlington, VA 22203
(703) 358-2243 (tel)
(202) 460-8402 (cell)
(703) 358-1780 (fax)

email: matthew_huggler@fws.gov

http://laws.fws.gov/


**"Hildebrandt, Betsy"**
**<Betsy_Hildebrandt@fws.gov>**


08/10/2011 09:24 AM

|       |                                                                                          |
|-------|------------------------------------------------------------------------------------------|
| To    | "Eustis, Christine" <Christine_Eustis@fws.gov>, "Huggler, Matthew" <Matthew_Huggler@fws.gov> |
| cc    |                                                                                          |
| Subject | Gl wolves                                                                               |


What's the timing on this?  Heather urban wants Gary to do calls with klobuchar and stabenows offices.

Sent from my iPad

# EXHIBIT TT

*This manuscript has been submitted by the authors for publication in a scientific journal.  Its contents should not be incorporated into other writings or publications without crediting the authors by citation of this manuscript.*

1    **An Account of the Taxonomy of North American Wolves from Morphological and Genetic**

2    **Analyses**

3

4    **Steven M. Chambers,**[*] **Steven R. Fain, Bud Fazio, Michael Amaral**

5

6    **S.M. Chambers**

7    Division of Ecological Services, U.S. Fish and Wildlife Service, PO Box 1306, Albuquerque,

8    New Mexico 87103

9

10   **S.R. Fain**

11   National Forensics Laboratory, U.S. Fish and Wildlife Service, 1490 East Main Street, Ashland,

12   Oregon 97520-1310

13

14   **B. Fazio**

15   Mexican Wolf Recovery Program, New Mexico Ecological Services Field Office, U.S. Fish and

16   Wildlife Service, 2105 Osuna Road, NE, Albuquerque, New Mexico 87113.  Current address:

17   Wildlife and Sport Fish Restoration Program, U.S. Fish and Wildlife Service, PO Box 1306,

18   Albuquerque, New Mexico 87103.

19

20   **M. Amaral**

21   New England Field Office, U.S. Fish and Wildlife Service, 70 Commercial Street, Suite 300

22   Concord, New Hampshire 03301-5087

23

012080A

This manuscript has been submitted by the authors for publication in a scientific journal.  Its contents should not be incorporated into other writings or publications without crediting the authors by citation of this manuscript.

24    *Corresponding author: steve_chambers@fws.gov

25

26

27

28

29

30

31

32

33

34

35

36

37

38

39

40

41

42

43

44

45

46

012081A

*This manuscript has been submitted by the authors for publication in a scientific journal. Its contents should not be incorporated into other writings or publications without crediting the authors by citation of this manuscript.*

47                                              **Abstract**

48         The available scientific literature was reviewed to assess the taxonomic standing of North

49   American wolves, including subspecies of the gray wolf, *Canis lupus*. The recent scientific

50   proposal that the eastern wolf, *Canis lupus lycaon*, is not a subspecies of gray wolf, but a full

51   species, *Canis lycaon*, is well-supported by both morphological and genetic data and should be

52   accepted. This species' range extends westward to Minnesota, and it hybridizes with gray

53   wolves where the two species are in contact in eastern Canada, the Upper Peninsula of Michigan,

54   Wisconsin, and Minnesota. Genetic data support a close relationship between eastern wolf and

55   red wolf (*Canis rufus*), but do not support the proposal that they are the same species; it is more

56   likely that they evolved independently from different lineages of a common ancestor with

57   coyotes. The Mexican wolf (*Canis lupus baileyi*) is a well-supported subspecies. The available

58   genetic and morphometric data do not provide clear support for the recognition of the Arctic

59   wolf (*Canis lupus arctos*), but the available genetic data are almost entirely limited to one group

60   of genetic markers (microsatellite DNA) and are not definitive on this question. The northern

61   timber wolf (*Canis lupus occidentalis*) and the plains wolf (*Canis lupus nubilus*) are valid

62   subspecies. Their recognition is supported by morphological data and extensive studies of

63   microsatellite DNA variation where both subspecies are in contact in Canada. The wolves of

64   coastal areas in southeastern Alaska and British Columbia should be assigned to *Canis lupus*

65   *nubilus*. There is scientific support for the taxa recognized here, but delineation of exact

66   geographic boundaries presents challenges. Rather than sharp boundaries between taxa,

67   boundaries should generally be thought of as intergrade zones of variable width.

68

69

012082A

*This manuscript has been submitted by the authors for publication in a scientific journal. Its contents should not be incorporated into other writings or publications without crediting the authors by citation of this manuscript.*

1753  gray wolves, eastern wolves, and individuals that are admixed with respect to these two kinds of

1754  wolves (Fain et al. 2010, Wheeldon et al. 2010).

1755      In contrast to the unique, coyote clade mtDNA haplotype of captive red wolves, one of

1756  the two Y-chromosome haplotypes found in red wolves was identical to a haplotype found in

1757  Texas coyotes (Hailer and Leonard 2008), and the other was identical to a haplotype found in

1758  domestic dogs (Bannasch et al. 2005).

1759

1760                    **Analysis and Discussion**

1761      Views vary on the number and identity of modern species of *Canis* in North America.

1762  There is general agreement only that coyote is a separate species, and that dogs are derived from

1763  *Canis lupus* (Vilà et al 1997,1999). The predominant view of the taxonomy of those surviving

1764  North American *Canis* known by the general vernacular name of "wolves" follows Goldman

1765  (1944) in recognizing two species: *Canis lupus* (including the subspecies *Canis lupus lycaon*)

1766  and *Canis rufus* (Nowak 1979, 1985; Hall 1981). A variant of this view incorporates the

1767  contention that *Canis rufus* is the result of hybridization between *C. lupus* and coyote (Wayne

1768  and Jenks 1991). Wilson et al. (2000) also recognize two wolf species, but propose that eastern

1769  wolf, *Canis lycaon*, is the same species as *C. rufus*, and that these together are specifically

1770  distinct from *C. lupus*. Baker et al. (2003) recognize three species: *C. lupus*, *C. lycaon*, and *C.

1771  rufus*. Wilson and Reeder (2005) include all North American wolves in *C. lupus*, which includes

1772  subspecies *C. l. rufus* and *C. l. lycaon*.

1773      The following analysis and discussion will first address the number of species of wolf in

1774  North America. It will begin with probably the most contentious question of whether the eastern

1775  wolf is within the species limits of *C. lupus*. The taxonomic status of red wolf and eastern wolf

012157A

*This manuscript has been submitted by the authors for publication in a scientific journal. Its contents should not be incorporated into other writings or publications without crediting the authors by citation of this manuscript.*

1776   with respect to each other and coyote will then be addressed. Last, the subspecies classification

1777   within *C. lupus* will be evaluated.

1778

1779   **Species limits of *Canis lupus* relative to eastern wolf**

1780   The most contentious issue related to the species limits of *C. lupus* in North America is

1781   the placement of the eastern wolf, which has also been referred to as the Great Lakes wolf

1782   (Leonard and Wayne 2008): Is the eastern wolf within the species limits of *C. lupus* as either a

1783   subspecies, *C. l. lycaon* (Goldman 1937) or a unique ecotype (Koblmüller et al. 2009a), or does

1784   it represent a different species, *C. lycaon*, outside the species limits of *C. lupus*? This section

1785   assesses whether populations referred to as eastern wolves should be considered members of *C.*

1786   *lupus*.

1787   The positions of various authors of taxonomic studies on the geographic range of the

1788   eastern wolf were summarized earlier in the section on taxonomy. All extant wolves that might

1789   be assigned to the eastern wolf occur in the general area from southern Ontario and Quebec, west

1790   to Minnesota and Manitoba. Wolves in this range were nearly exterminated and, by the 1970s,

1791   the only known wolves remaining in the conterminous United States were in northeastern

1792   Minnesota (Figure 1 of this paper, Mech 1974). At about this time, wolves had been eliminated

1793   from southern Ontario and Quebec (Mech 1974) and replaced by a population of coyotes that

1794   had been influenced by hybridization with wolves (Kolenosky and Standfield 1975, Rutledge et

1795   al. 2010b). Wolves have subsequently expanded their range in Minnesota and re-occupied

1796   Wisconsin and the Upper Peninsula of Michigan.

1797   The eastern wolf and gray wolf are known to interbreed within the Great Lakes region.

1798   Where available data permit, the approach here will be to first evaluate divergence between

012158A

# EXHIBIT UU

*This manuscript has been submitted by the authors for publication in a scientific journal. Its contents should not be incorporated into other writings or publications without crediting the authors by citation of this manuscript.*

1  **An Account of the Taxonomy of North American Wolves from Morphological and Genetic**

2  **Analyses**

3

4  **Steven M. Chambers,**[*] **Steven R. Fain, Bud Fazio, Michael Amaral**

5

6  **S.M. Chambers**

7  Division of Ecological Services, U.S. Fish and Wildlife Service, PO Box 1306, Albuquerque,

8  New Mexico 87103

9

10  **S.R. Fain**

11  National Forensics Laboratory, U.S. Fish and Wildlife Service, 1490 East Main Street, Ashland,

12  Oregon 97520-1310

13

14  **B. Fazio**

15  Mexican Wolf Recovery Program, New Mexico Ecological Services Field Office, U.S. Fish and

16  Wildlife Service, 2105 Osuna Road, NE, Albuquerque, New Mexico 87113. Current address:

17  Wildlife and Sport Fish Restoration Program, U.S. Fish and Wildlife Service, PO Box 1306,

18  Albuquerque, New Mexico 87103.

19

20  **M. Amaral**

21  New England Field Office, U.S. Fish and Wildlife Service, 70 Commercial Street, Suite 300

22  Concord, New Hampshire 03301-5087

23

012258A

*This manuscript has been submitted by the authors for publication in a scientific journal. Its contents should not be incorporated into other writings or publications without crediting the authors by citation of this manuscript.*

161   suggested by de Queiroz (2007) as a feature common to all species concepts, with the criteria

162   from various concepts serving as operational criteria for assessing lineage separation.

163   Operational criteria include fixation of character states, correlated divergence between

164   morphology and genetics or between different genetic marker systems, character divergence,

165   monophyly, diagnosability, ecological divergence, and behavioral differences. Different

166   operational criteria can lead to different conclusions because their necessary properties for

167   species diagnosis develop at different times during the process of lineage divergence and

168   speciation (de Queiroz 2007). Sites and Marshall (2004) and de Queiroz (2007) advocate an

169   eclectic approach that uses the appropriate operational criteria for all available classes of

170   scientific information.

171

172   **Subspecies concepts**

173        There is no scientific consensus on what constitutes a subspecies, and some authorities

174   (e.g., Wilson and Brown 1953, Zink 2003) have questioned the utility of the subspecies level of

175   classification. Following is a description of various subspecies criteria that have been proposed

176   and applied in the taxonomic literature. Because some criteria are more stringent than others, a

177   putative subspecies may meet the criteria and be recognized following one concept, but found to

178   be invalid under a more stringent concept.

179        Nowak (1995, p. 394) discussed the standards he used in revising the subspecies of *Canis*

180   *lupus*: "My investigation largely disregarded such questions [concerning use of very localized

181   characters] and concentrated on general trends in measurable size and proportion that could be

182   evaluated on a continent-wide or worldwide basis. Substantive statistical breaks in such trends,

183   as discussed above, were taken as evidence of taxonomic division."

012265A

*This manuscript has been submitted by the authors for publication in a scientific journal.  Its contents should not be incorporated into other writings or publications without crediting the authors by citation of this manuscript.*

184   In *The Mammals of North America* (Second Edition), Hall (1981, p. viii) included the

185   following in his "Criteria for Species versus Subspecies."  "If crossbreeding occurs in nature at a

186   place or places where the geographic ranges of two kinds of mammals meet, the two kinds are to

187   be treated as subspecies of one species.  If no crossbreeding occurs, the two kinds are to be

188   regarded as two distinct, full species."

189   Mayr (1963, glossary) defined subspecies as:  "An aggregate of local populations of a

190   species inhabiting a geographic subdivision of the range of the species, and differing

191   taxonomically from other populations of the species."  Mayr (1963, page 348) explains

192   "differing taxonomically:"  'Therefore subspecies are to be named only if they differ

193   "taxonomically," that is, by diagnostic morphological characters.'  Mayr (1969, p. 190) describes

194   a quantitative method for determining whether populations differ taxonomically:  'A so-called

195   75-percent rule is widely adopted.  According to this, a population is recognized as a valid

196   subspecies if 75 percent of the individuals differ from "all" (= 97 percent) of the individuals of a

197   previously recognized subspecies.  At the point of intersection between the two curves where this

198   is true, about 90 percent of population A will be different from about 90 percent of the

199   individuals of population B (to supply a symmetrical solution).'

200   Patten and Unitt (2002, p. 27) define subspecies as: "diagnosable clusters of populations

201   of biological species occupying distinct geographic ranges."  They do not require that

202   diagnosability be absolute, but advocate 90 percent separation as a more stringent criterion than

203   the 75-percent rule."

204   Avise (2004, p. 362) attempted to incorporate phylogenetic information within a

205   biological species concept in providing the following guidance on recognizing subspecies:

206   'Within such units [=species], "subspecies" warranting formal recognition could then be

012266A

*This manuscript has been submitted by the authors for publication in a scientific journal. Its contents should not be incorporated into other writings or publications without crediting the authors by citation of this manuscript.*

207  conceptualized as groups of actually or potentially interbreeding populations (normally mostly

208  allopatric) that are genealogically highly distinctive from, but reproductively compatible with,

209  other such groups.  Importantly, the empirical evidence for genealogical distinction must come,

210  in principle, from concordant genetic partitions across multiple, independent, genetically based

211  molecular (or phenotypic; Wilson and Brown 1953) traits.'

212      The most stringent criterion that has been proposed for subspecies recognition is

213  reciprocal monophyly (Zink 2004).  Application of a monophyly criterion requires that all

214  individuals in a taxon be genealogically closer to one another than to any individual in another

215  taxon.  A number of objections to monophyly as a subspecies criterion have been raised, perhaps

216  foremost is that in phylogenetic classifications it is a species-level criterion and inappropriate for

217  application below the species level (Goldstein et al. 2000, Patten and Unitt 2002).  Its application

218  using genetic data is limited to genetic sequences that do not recombine, such as mitochondrial

219  DNA, and therefore usually depends on one type of marker rather than multiple markers that can

220  be tested for concordance, as in the Avise (2004) criterion.  In addition, there are many instances

221  of related species that have achieved reproductive isolation but are not reciprocally monophyletic

222  (Avise 2004); it takes many generations (on the order of four to seven times the effective

223  population size) after putative taxa are separated for reciprocal monophyly to be achieved

224  (Hudson and Coyne 2002).

225      A common feature of all of the above definitions is that they recognize that subspecies

226  are groups of populations, and most recognize that subspecies can be variable and overlap in

227  distinguishing characters to some degree.

228

229  **Limitations of the available data**

012267A

# EXHIBIT VV

# U.S. Fish & Wildlife Service

# News Release



Office of Public Affairs

**4401 North Fairfax Drive**

**Arlington, VA 22203**

**Phone 703/358 2220   Fax: 703/358 1930**

August 25, 2011                              Contact:        Vanessa Kauffman
                                                             703-358-2138
                                                             vanessa_kauffman@fws.gov

## Fish and Wildlife Service Reopens Comment Period on
## Revising the List of Endangered and Threatened Wildlife
## for the Gray Wolf in the Eastern United States

The U.S. Fish and Wildlife Service (Service) today announced the reopening of the comment period on the May 5, 2011, proposed rule to delist the gray wolf population in the Western Great Lakes and revise the listing to remove all or parts of 29 eastern states where the listed species did not historically occur. The action will allow for additional public review and the inclusion of any new information.

Gray wolves were originally listed as subspecies or as regional populations of subspecies in the lower 48 states and Mexico under the Endangered Species Act (ESA) and its predecessor statutes. In 1978, the Service reclassified the gray wolf as an endangered species across all of the lower 48 states and Mexico, except in Minnesota where the gray wolf was classified as threatened.

In the rule issued earlier this year, the Service proposed to remove gray wolves in the Western Great Lakes area — which includes Minnesota, Michigan and Wisconsin, and portions of adjoining states — from the Federal List of Endangered and Threatened Wildlife because wolves have recovered in this area and no longer require the protection of the ESA. The Service also proposed to revise the range of the gray wolf (*Canus lupus*) in all or parts of 29 eastern states, which, based in part on recognition of the eastern wolf (*Canus lycaon*) as a full species, were not part of the historical range of the gray wolf.

The comment period for this proposed rule closed on July 5, 2011, and the Service received significant comments from states and other stakeholders concerning North American wolf taxonomy. The Service is seeking all information, data, and comments from the public with respect to any new information relevant to the taxonomy of wolves in North America. Written comments on this proposal may be submitted by one of the following methods:

012468A

- Federal eRulemaking Portal: *http://www.regulations.gov*. Follow the instructions for submitting comments to Docket No. [FWS-R3-ES-2011-0029].
- U.S. mail or hand-delivery: Public Comments Processing, Attn: Docket No. [FWS-R3-ES-2011-0029]; Division of Policy and Directives Management; U.S. Fish and Wildlife Service; 4401 N. Fairfax Drive, MS 2042-PDM; Arlington, VA 22203.

All comments and materials, as well as supporting documentation used in preparing the proposed rule will be made available for public inspection.

The notice reopening the comment period will publish in the *Federal Register* on August 26, 2011. Comments must be received within 30 days, on or before September 26, 2011. The Service will post all comments on *http://www.regulations.gov*. This generally means the agency will post any personal information provided through the process. The Service is not able to accept email or faxes.

More information is available online at http://www.fws.gov/midwest/wolf/.

The ESA provides a critical safety net for America's native fish, wildlife and plants. The Service working to actively engage conservation partners and the public in the search for improved and innovative ways to conserve and recover imperiled species. To learn more about the Endangered Species Program, visit http://www.fws.gov/endangered/.

*The mission of the U.S. Fish and Wildlife Service is working with others to conserve, protect, and enhance fish, wildlife, plants, and their habitats for the continuing benefit of the American people. We are both a leader and trusted partner in fish and wildlife conservation, known for our scientific excellence, stewardship of lands and natural resources, dedicated professionals, and commitment to public service. For more information on our work and the people who make it happen, visit* **www.fws.gov**. *Connect with our Facebook page at* www.facebook.com/usfws, *follow our tweets at* www.twitter.com/usfwshq, *watch our YouTube Channel at* http://www.youtube.com/usfws *and download photos from our Flickr page at* http://www.flickr.com/photos/usfwshq.

-FWS-

# EXHIBIT WW

The other respondent recommended that the CAS Board take no further action and close this case. This respondent referred to the observation in the SDP that FAR 31.205–19 and CAS 416 both use the word "catastrophic" to refer to infrequent and unpredictable events involving major losses. The respondent believed there is no conflict between allocability under CAS 416 and allowability under FAR 31.205–19(e), explaining his belief as follows:

CAS 416 controls the measurement and allocation of the cost of infrequent and difficult to predict events. The FAR at 31.205–19(e) and 28.308 disallow the cost unless the Government accepts the risk and associated cost of such infrequent and difficult to predict events.

Neither respondent provided any data or other information describing disputes or other problems arising from the use of the term "catastrophic losses" in 9904.416–50(b)(1).

*Response*

In deciding to discontinue rulemaking on this case, the Board reviewed the history of the development of the CAS and the FAR provisions on the term "catastrophic losses." The CAS Board was clearly addressing the allocation of large losses from infrequent and unpredictable events in paragraph (6) of the preamble to CAS 416 (43 FR 42239, September 20, 1978), which stated:

Obviously, a catastrophic loss would be one which would be very large in relation to the average loss per occurrence for that exposure, and losses of that magnitude would be expected to occur infrequently.

9904.416–50(b)(1) treats "catastrophic losses" as a contingency and recognizes the cost of "catastrophic losses" separately from the projected average loss, or actual loss experience if used. This treatment is consistent with general insurance practices that exclude catastrophic losses from the insurable risk covered by an insurance policy. As part of its cost accounting practices the contractor establishes the threshold for reinsuring a portion of the catastrophic loss which might occur at a segment. The Board explained in the preamble that the reinsurance arrangement can reflect the relative size and activities of the segment:

The Board believes that what constitutes "catastrophic loss" depends on the individual circumstances of each contractor. The determination should be made at the time the internal loss-sharing policy is established and should be revised, as necessary, for changes in future circumstances.

Notwithstanding the description of the issue in the SDP, there does not appear to be a substantive difference between the implied definition of the term "catastrophic losses" in 9904.416–50(b)(1) and FAR 31.205–19. The Board believes that the deliberations and actions of the original Board adequately address the narrow question of how the term "catastrophic losses" is used in 9904.416–50(b)(1). Questions of allowability under FAR 31.205–19 are beyond the purview of the Board.

*Conclusions*

After reviewing the comments and the history of the CAS rules, the Board believes use of the term "catastrophic losses" in CAS 416 is consistent with the intent of its original promulgators that a "catastrophic loss" is "very large in relation to the average loss per occurrence for that exposure," is "expected to occur infrequently," and is dependent "on the individual circumstances of each contractor." The original promulgators intended the definition of what constitutes a "catastrophic loss" be part of the contractor's cost accounting practice where the determination of what constitutes a catastrophic loss "should be made at the time the internal loss-sharing policy is established and should be revised, as necessary, for changes in future circumstances." (See Preamble to CAS 416 (43 FR 42239, Sept. 20, 1978).)

Although CAS 416 has been in effect for over 30 years, the respondents provided no data on problems or disputes related to the meaning of the term "catastrophic losses." At this time, the Board believes that no amendments to CAS 416 regarding the use of the term "catastrophic losses" are necessary and is hereby discontinuing further rulemaking in this case.

**Daniel I. Gordon,**

*Chair, Cost Accounting Standards Board.*

[FR Doc. 2011–21898 Filed 8–25–11; 8:45 am]

**BILLING CODE P**

---

# DEPARTMENT OF THE INTERIOR

## Fish and Wildlife Service

### 50 CFR Part 17

**[Docket No. FWS–R3–ES–2011–0029 ; 92220–1113–000; ABC Code: C6]**

**RIN 1018–AX57**

### Endangered and Threatened Wildlife and Plants; Revising the List of Endangered and Threatened Wildlife for the Gray Wolf (Canis lupus) in the Eastern United States

**AGENCY:** Fish and Wildlife Service, Interior.

**ACTION:** Proposed rule; correction and reopening of comment period.

**SUMMARY:** On May 5, 2011, we, the U.S. Fish and Wildlife Service (Service), published a proposed rule to reevaluate the listing of the Minnesota population of gray wolves *(Canis lupus)* and revise the listing to conform to current statutory and policy requirements (76 FR 26086). In that proposed rule, we recognized recent taxonomic information indicating that the gray wolf subspecies *Canis lupus lycaon* should be elevated to the full species *C. lycaon*. We proposed to identify the Minnesota population as a Western Great Lakes (WGL) Distinct Population Segment (DPS) of the gray wolf and to remove this DPS from the List of Endangered and Threatened Wildlife. We also proposed to revise the range of the gray wolf (the species *C. lupus*) by removing all or parts of 29 eastern States, which, based in part on recognition of *C. lycaon*, were not part of the historical range of the gray wolf.

We announce the reopening of the comment period for our May 5, 2011, proposed rule to provide for public review and comment of additional information regarding our recognition of *C. lycaon* as a separate species. We seek information, data, and comments from the public with respect to new information relevant to the taxonomy of wolves in North America. In addition we are making a correction to our May 5, 2011, proposed rule and notifying the public that we are considering concluding that proposed rule with two or more final rules.

**DATES:** We request that comments on this proposal be submitted by the close of business on September 26, 2011. Any comments that we receive after the closing date may not be considered in the final decision on this action.

**ADDRESSES:** *Document availability:* See **SUPPLEMENTARY INFORMATION** for information on how to access the new report described in this revised proposed rule.

*Comment submission:* You may submit comments by one of the following methods:

*Electronically:* Go to the Federal eRulemaking Portal: *http:// www.regulations.gov.* In the Enter Keyword or ID box, enter FWS–R3–ES–2011–0029, which is the docket number for this rulemaking. Then, in the Search panel at the top of the screen, under the Document Type heading, click on the Proposed Rules link to locate this document. You may submit a comment by clicking on "Submit a Comment."

*By hard copy:* Submit by U.S. mail or hand-delivery to: Public Comments

Processing, Attn: FWS–R3–ES–2011–0029; Division of Policy and Directives Management; U.S. Fish and Wildlife Service; 4401 N. Fairfax Drive, MS 2042–PDM; Arlington, VA 22203.

We will post all comments on *http://www.regulations.gov*. This generally means that we will post any personal information you provide us (see the Public Comments section below for more information).

**FOR FURTHER INFORMATION CONTACT:** Laura Ragan, 612–713–5350. Direct all questions or requests for additional information to: GRAY WOLF QUESTIONS, U.S. Fish and Wildlife Service, Ecological Services, 5600 American Blvd. West, Suite 990, Bloomington, MN 55437–1458. Additional information is also available on our Web site at *http://www.fws.gov/ midwest/wolf*. Individuals who are hearing-impaired or speech-impaired may call the Federal Relay Service at 1–800–877–8337 for TTY assistance.

**SUPPLEMENTARY INFORMATION:**

## Background

In our May 5, 2011, proposed rule (76 FR 26086), we specifically recognized the eastern wolf *(Canis lycaon)* as a full species. Within the proposed rule, we recognized three wolf species with ranges in the conterminous United States: *Canis lupus* (gray wolf), *Canis lycaon* (eastern wolf), and *Canis rufus* (red wolf). We also recognized that the ranges of *C. lupus* and *C. lycaon* overlap in the Western Great Lakes region, and the population of wolves in the Western Great Lakes region includes both gray wolf and eastern wolf. However, the available evidence suggested the range of *C. lupus* did not otherwise historically overlap with the ranges of *C. lycaon* or *C. rufus* in the eastern United States. Thus, the May 5, 2011, proposed rule reflected our understanding that the wolf species that historically occupied the northeastern United States was the eastern wolf and the wolf species that historically occupied the southeastern United States was the red wolf. Accordingly, we proposed to revise the gray wolf listing to remove those States.

The comment period for that proposed rule closed on July 5, 2011. We received significant comments from States and other stakeholders highlighting the controversy in North American wolf taxonomy. As such, we are reopening the comment period to provide further information regarding the taxonomic interpretation recognized in the May 5, 2011, proposed rule and seek comment as to the best scientific and commercial data available regarding the recognition of *Canis lycaon* as a full

species. In part, this conclusion was based on information summarized in a manuscript prepared by Service employees that is currently undergoing review for publication (Chambers *et al.,* in prep.).

On May 5, 2011, we simultaneously reissued our April 2, 2009, final rule that identified the Northern Rocky Mountain (NRM) population of gray wolf as a distinct population segment (DPS) and revised the List of Endangered and Threatened Wildlife by removing most of the gray wolves in the DPS (76 FR 25590). This action became effective upon publication in the **Federal Register**. The May 5, 2011, proposed rule did not reflect language from our separate May 5, 2011, final rule delisting most of the NRM DPS. The proposed rule language below corrects this to reflect the current status of those wolves. Finally, it is also worth noting that we received several comments on our May 5, 2011, proposal requesting that we further subdivide the proposal into regional pieces. Thus, we are hereby providing notice that we are considering issuing separate final rules for our final determinations on the delisting of the Western Great Lakes DPS and the delisting of all or portions of the 29 States outside the historical range of the gray wolf, which may itself be split into separate rules for the Northeast and the Southeast.

## Public Comments Solicited

We intend that any final action resulting from this proposal will be as accurate and as effective as possible. Therefore, we hereby request data, comments, new information, or suggestions from the public, other concerned governmental agencies, the scientific community, Tribes, industry, or any other interested party concerning this proposed rule. We particularly seek comments concerning:

(1) The taxonomic classification of wolves in the midwestern and northeastern United States as described in a Service manuscript prepared by Chambers *et al.,* in particular the recognition of the eastern wolf *(Canis lycaon)* as a full species.

(2) Any other relevant information regarding wolves in eastern North America.

You may submit your comments and materials concerning this proposed rule by one of the methods listed in **ADDRESSES**. We request that you send comments only by the methods described in **ADDRESSES**. Comments must be submitted to *http:// www.regulations.gov* before midnight (Eastern Daylight Time) on the date specified in **DATES**. All comments that

were submitted during the earlier public comment period will be included as part of the administrative record for this action and need not be resubmitted.

We will post your entire comment— including your personal identifying information—on *http:// www.regulations.gov*. If you provide personal identifying information, such as your street address, phone number, or e-mail address, you may request at the top of your document that we withhold this information from public review. However, we cannot guarantee that we will be able to do so.

Comments and materials we receive, as well as supporting documentation we used in preparing this proposed rule including the Chambers *et al.* manuscript (in prep), will be available for public inspection on *http:// www.regulations.gov* at Docket No. FWS–R3–ES–2011–0029; on the Service's Internet site at *http:// www.fws.gov/midwest/wolf/;* or by appointment, during normal business hours at the following Ecological Services offices:

• Twin Cities, Minnesota Ecological Services Field Office, 4101 American Blvd. E., Bloomington, MN; 612–725–3548.

• Green Bay, Wisconsin Ecological Services Field Office, 2661 Scott Tower Dr., New Franken, WI; 920–866–1717.

• East Lansing, Michigan Ecological Services Field Office, 2651 Coolidge Road, Suite 101, East Lansing, MI; 517–351–2555.

• New England Ecological Services Field Office, U.S. Fish and Wildlife Service, 70 Commercial St., Suite 300, Concord, NH; 603–223–2541.

**Authority:** The authority for this action is the Endangered Species Act of 1973, as amended (16 U.S.C. 1531 *et seq.*).

## List of Subjects in 50 CFR Part 17

Endangered and threatened species, Exports, Imports, Reporting and recordkeeping requirements, Transportation.

## Proposed Regulation Promulgation

Accordingly, we propose to further amend part 17, subchapter B of chapter I, title 50 of the Code of Federal Regulations, as proposed to be amended at 76 FR 26086, May 5, 2011, as follows:

## PART 17—ENDANGERED AND THREATENED WILDLIFE AND PLANTS

1. The authority citation for part 17 continues to read as follows:

**Authority:** 16 U.S.C. 1361–1407; 16 U.S.C. 1531–1544; 16 U.S.C. 4201–4245; Pub. L. 99–625, 100 Stat. 3500; unless otherwise noted.

2. Amend § 17.11(h) by revising the entry for "Wolf, gray" under MAMMALS in the List of Endangered and Threatened Wildlife to read as follows:

§ 17.11   [Amended]

\*   \*   \*   \*   \*

(h) \* \* \*

| Species | | Historic range | Vertebrate population where endangered or threatened | Status | When listed | Critical habitat | Special rules |
|---|---|---|---|---|---|---|---|
| Common name | Scientific name | | | | | | |
| MAMMALS | | | | | | | |
| \* | \* | \* | \* | \* | \* | \* | \* |
| Wolf, gray ........ | *Canis lupus* ..... | Holarctic .......... | U.S.A.: All of CA, CO, KS, NE, and NV; those portions of AZ, NM, TX, and WY not included in an experimental population as set forth below; and portions of IA, MO, ND, OK, OR, SD, TX, UT, and WA as follows: (1) Southern IA, (that portion south of the centerline of Highway 80); (2) Northwestern MO (that portion northwest of the centerline of Interstate Highway 44 and northwest of the centerline of Interstate Highway 70 east of St. Louis); (3) Western ND (that portion south and west of the Missouri River upstream to Lake Sakakawea and west of the centerline of Highway 83 from Lake Sakakawea to the Canadian border); (4) Western OK (that portion west of the centerline of Interstate Highway 35 and northwest of the centerline of Interstate Highway 44 north of Oklahoma City); (5) Western OR (that portion west of the centerline of Highway 395 and Highway 78 north of Burns Junction and that portion of OR west of the centerline of Highway 95 south of Burns Junction); (6) Western SD (that portion south and west of the Missouri River); (7) Western TX (that portion west of the centerline of Interstate Highway 35); (8) Most of Utah (that portion south and west of the centerline of Highway 84 and that portion south of Highway 80 from Echo to the UT/WY Stateline); and (9) Western WA (that portion west of the centerline of Highway 97 and Highway 17 north of Mesa and that portion west of the centerline of Highway 395 south of Mesa). Mexico. | E | 1, 6, 13, 15, 35 | N/A | N/A |
| Do ................... | ...... do ............ | ...... do ............ | U.S.A. (portions of AZ, NM, and TX—see § 17.84(k)) ........... | XN | 631 | NA | 17.84(k) |
| Wolf, gray [Northern Rocky Mountain DPS]. | *Canis lupus* ..... | U.S.A. (MT, ID, WY, eastern WA, eastern OR, and north central UT). | U.S.A. (WY—see § 17.84(i) and (n)) ...................................... | XN | 561, 562 | NA | 17.84(i) 17.84(n) |
| \* | \* | \* | \* | \* | \* | \* | \* |

Dated: August 16, 2011.

**Gregory E. Siekanic,**

*Acting Director, U.S. Fish and Wildlife Service.*

[FR Doc. 2011–21839 Filed 8–25–11; 8:45 am]

**BILLING CODE 4310–55–P**

---

# DEPARTMENT OF THE INTERIOR

**Fish and Wildlife Service**

**50 CFR Part 17**

**[Docket No. FWS–R8–FHC–2011–0046; 94310–1337–0000–D2]**

**RIN 1018–AX51**

**Endangered and Threatened Wildlife and Plants; Termination of the Southern Sea Otter Translocation Program**

**AGENCY:** Fish and Wildlife Service, Interior.

**ACTION:** Proposed rule; notice of availability.

**SUMMARY:** We, the U.S. Fish and Wildlife Service (Service), propose to remove the regulations that govern the southern sea otter (*Enhydra lutris nereis*) translocation program, including the establishment of an experimental population of southern sea otters, and all associated management actions. We are also proposing to amend the Authority citation for 50 CFR part 17 by removing the reference to Public Law 99–625, the statute that authorized the Secretary to promulgate regulations establishing the southern sea otter translocation program. Removal of the regulations will terminate the program. We are proposing this action because we believe that the southern sea otter translocation program has failed to fulfill its purpose, as outlined in the southern sea otter translocation plan, and that our recovery and management goals for the species cannot be met by continuing the program. Our conclusion is based, in part, on an evaluation of the program against specific failure criteria established at the program's inception. This proposed action would terminate the designation of the experimental population of southern sea otters, abolish the southern sea otter translocation and management zones, and eliminate the current requirement to remove southern sea otters from San Nicolas Island and the management zone. This proposed rule would also eliminate future actions, required under the current regulations, to capture and relocate southern sea otters for the purpose of establishing an experimental population, and to remove southern sea otters in perpetuity from an "otter-free" management zone. As a result, it would allow southern sea otters to expand their range naturally into southern California waters. We have prepared a

EXHIBIT XX

Summary of Comments that Address Taxonomy (through 9/20/2011)

- Two peer reviewers (L. David Mech and Rolf Peterson) comment that there is enough doubt and that caution should be used in fully accepting the taxon C. lycaon, especially in light of the recent vonHolt et al. publication.

- Debate in scientific community regarding C. lycaon, thus taxonomic revision is premature.  Dr. L. David Mech (USGS), Dr. Rolf Peterson (Michigan Technological University); Dr. Roland Kays (Curator of Mammals at NY State Museum and coauthor of vonHoldt et al.); Dr. Robert Wayne (University of CA, Los Angeles), Dr. John Pollinger (University of CA, Los Angeles), and Dr. Bridgett vonHoldt (University of CA, Irvine); Dr. Jennifer Leonard (Conservation and Evolutionary Genetics Group, Consejo Superior de Investigaciones Científicas); Dr. Matthew Cronin (Associate Professor of Animal Genetics, University of Alaska, Fairbanks); Wisconsin DNR; Minnesota DNR; New York Department of Conservation; Michigan Environmental Council; Voigt Task Force (Great Lakes multi-tribal organization); Society for Conservation Biology; National Wildlife Federation; Sierra Club; NRDC; Defenders of Wildlife; Safari Club International; Center for Biological Diversity; Humane Society U.S.

- Emphasize the existence of one distinct, cohesive population of wolves of mixed genetic ancestry.  NWF, Michigan DNR, WI DNR, MN DNR, NRDC, Dr. Lisette Waits (University of Idaho), Dr. Roland Kays.

- Dr. Mech and WI DNR both reiterated their previous positions, following review of Chambers *et al*.

EXHIBIT YY

| From: | Rolf Peterson |
|---|---|
| To: | Laura Ragan |
| Subject: | Re: Western Great Lakes Wolf Proposed Delisting - Peer Review |
| Date: | 09/25/2011 11:47 AM |
| Attachments: | R3 Peer Reviewer_Instructions_delisting.doc |

Laura - I just submitted a comment through the FWS website on the wolf delisting proposal (Tracking # 80f2aa2c).  Following is the text of my comment.

The proposal is to delist the gray wolf in the western Great Lakes DPS and 29 other states where FWS considers the gray wolf never existed, while a range-wide review of the status of the eastern wolf in the U.S. and Canada is ongoing.  Furthermore, the FWS states that when the review of the eastern wolf is complete there may be listing decisions for the taxon in specific geographic regions.

After reviewing the manuscript by Chambers et al., I continue to support the delisting of the gray wolf in the Western Great Lakes Distinct Population Segment, or WGLDPS (Fig. 1 of the proposal). I concur that there is abundant scientific information that justifies the acceptance of the taxon now referred to as the eastern wolf, Canis lycaon.

However, I continue to see no compelling reason to delist the gray wolf in the other 29 states prior to completion of the review of the eastern wolf.  When the FWS proposes conservation measures for the eastern wolf, I believe that would be an appropriate time for conservation decisions regarding the gray wolf in the 29 states named in the current proposal.  Proposing delisting in these 29 states along with the highly justified delisting within the WGLDPS unnecessarily complicates the latter, inviting further controversy and legal challenges.

Chambers et al. provide a detailed justification for the conclusion that the eastern wolf extends into the western Great Lakes, and here hybridizes with the gray wolf.  The array of scientific detail is considerable, and Chambers et al. point out that fine-scale analysis is required for this interpretation.  It would seem reasonable to expect a similar fine-scale analysis to elucidate the relationship between gray wolf and eastern wolf at the eastern extent of the gray wolf, except both wolves are currently absent in much of the area of interest (the exception is in eastern and southern Ontario).  However, Chambers et al. point out that DNA characterization is far from complete for historical samples in museum collections.  While there has been considerable scientific attention to Canis in Ontario and the western Great Lakes, there is relatively little information currently available on areas to the south and east of southern Ontario (extending from upper Ohio River valley to New England), where both gray wolves and eastern wolves are either extinct or compromised by coyote introgression.  Perhaps the status review for eastern wolf that is ongoing by FWS will provide a better understanding of Canis in the regions adjacent to historic gray wolf distribution in the northeastern states.

Although I chair the Recovery Team for the Gray Wolf, Eastern Population, please note that the above comment is my own recommendation, and does not represent the opinion or deliberations of the Recovery Team.
Rolf Peterson


----- Original Message -----
From: "Laura Ragan" <Laura_Ragan@fws.gov>
To: "Rolf Peterson" <ropeters@mtu.edu>
Sent: Monday, August 29, 2011 10:21:32 AM GMT -05:00 US/Canada Eastern
Subject: Re: Western Great Lakes Wolf Proposed Delisting - Reopening Public Comment Period


Rolf -

I apologize for any confusion my recent message may have caused. I truly thought I had sent the below correspondence to you back on May 10, formally requesting your peer review of the May proposal. However, I have searched my files and my email sent folder, and can find no record of it being sent. I located our correspondence from earlier in April, where I asked if you would be willing to act as a peer reviewer and your affirmative response. I also have the records for the formal requests to the other peer reviewers. When I saw the comments you submitted on the proposal, I simply thought you had not been able to find the time to perform the full peer review.

Whether you submit further comments as a formal peer reviewer, or whether you do it simply as the comments of a non-peer reviewing expert, I would appreciate hearing anything else you have to offer, primarily on the taxonomy subject.

Thank you.

Laura Ragan
Endangered Species Classification Coordinator
U.S. Fish and Wildlife Service
1 Federal Drive
Fort Snelling, MN 55111
Tel: 612-713-5157 laura_ragan@fws.gov

--------------------------------------------------------------------------------
--------------------------------------------------------------------------------
Dear Dr. Peterson:

Thank you for your willingness to review the subject proposal. When undertaking the listing, delisting, or reclassification of plants and animals as threatened or endangered under the Endangered Species Act, the U.S. Fish and Wildlife Service (Service) is required to do so solely on the basis of the best scientific and commercial data available. In addition, the Service has established a peer review policy to ensure that a minimum of three independent specialists are asked to review the data and to provide comments to be considered during these decisions.

The goals of peer review during the delisting process are: (1) to ensure that the best biological and commercial data, scientifically accurate analyses of those data, and the reviews of recognized experts are used in the decision-making process; and (2) to indicate to the public, to other agencies and conservation organizations, and within the Service, that the best data and scientific

analyses were used in the decision-making process.

You have indicated your willingness to become part of the peer review process for the proposed rule to revise the List of Endangered and Threatened Wildlife for the gray wolf ( Canis lupus ) in the eastern United States, as published in the Federal Register on May 5, 2011 (76 CFR 26086). The comment period closes on July 5, 2011, so your review comments must be received by the Service on or before that date in order to receive consideration during the final delisting decision. Comments received after that date cannot be considered in the delisting decision unless the comment period is extended or reopened.

The following materials are attached for use during your review:

Proposed Rule To Revise the List of Endangered and Threatened Wildlife for the Gray Wolf ( Canis lupus ) in the Eastern United States as published in the Federal Register on May 5, 2011, can be downloaded from the internet at http://www.fws.gov/midwest/wolf/delisting/FRProposedDelistMay2011.htm .

Notice of Interagency Cooperative Policy for Peer Review in Endangered Species Act Activities - This July 1, 1994, Federal Register notice established a peer review process for listing and recovery actions taken under the Authorities of the Endangered Species Act of 1973, as amended. This policy is available at http://www.fws.gov/endangered/laws-policies/policy-peer-review.html .

Guidance for Peer Reviewers of Delisting Proposals - This Region 3 document provides general background information on the peer review process as well as definitions and detailed instructions for reviewers. Please carefully study this guidance before beginning your review.

(See attached file: R3 Peer Reviewer Instructions_delisting.doc)

Policy Regarding the Recognition of Distinct Vertebrate Population Segments Under the Endangered Species Act - The Endangered Species Act allows the listing, delisting, and reclassification of plant and animal species, subspecies, and distinct population segments of vertebrate species. This February 7, 1996, policy specifies three criteria for determining whether a vertebrate population can qualify for listing or reclassification as a threatened or endangered species or for delisting. While you may wish to study the entire Notice, digesting the Policy section (page 4725) should provide sufficient background for your review. This policy is available at http://www.fws.gov/endangered/laws-policies/policy-distinct-vertebrate.html .

Published and Unpublished Data - A list of all literature cited in the proposal is available at http://www.fws.gov/midwest/wolf/delisting/LitCitPropRuleMay2011.html . Please let me know if you require copies of any of the published or unpublished citations referenced in the proposal and we will provide you with a copy.

Please submit your comments and recommendations on the proposed rule by one of the following methods:

Federal eRulemaking Portal : http://www.regulations.gov . Follow the instructions for submitting comments to Docket No. [FWS-R3-ES-2011-0029].

U.S. mail or hand-delivery: Public Comments Processing, Attn: Docket No. [FWS-R3-ES-2011-0029]; Division of Policy and Directives Management; U.S. Fish and Wildlife Service; 4401 N. Fairfax Drive, MS 2042-PDM; Arlington, VA 22203.
Also, please send a copy of your comments to me, by e-mail to laura_ragan@fws.gov.

As a reminder, all peer reviews and comments will be public documents, and portions may be incorporated verbatim into the Service's final decision document with appropriate credit given to the author of the review. If you do not want your name to appear in the final decision document, as published in the Federal Register , please inform us of this as soon as possible.

We appreciate your interest in furthering the conservation of rare plants and animals by becoming directly involved in the process of listing and delisting our Nation's threatened and endangered species. You can be certain that your comments and recommendations will receive serious consideration when we make our final decision on this delisting.

We hope that you view the peer review process as a worthwhile undertaking, and we would appreciate your suggestions on ways that this process can be improved.

If you have questions, please contact me at (612) 713-5157.

Thank you very much for your assistance.

Sincerely,

Laura Ragan
Endangered Species Classification Coordinator
U.S. Fish and Wildlife Service
1 Federal Drive
Fort Snelling, MN 55111
Tel: 612-713-5157 laura_ragan@fws.gov
Inactive hide details for Rolf Peterson <ropeters@mtu.edu>Rolf Peterson <ropeters@mtu.edu>

Rolf Peterson <ropeters@mtu.edu>

08/28/2011 08:33 AM

To
Laura Ragan <Laura_Ragan@fws.gov>

cc

012770A

Subject
Re: Western Great Lakes Wolf Proposed Delisting - Reopening Public Comment Period
Laura - as I understand it, peer reviews are solicited by the Service. I don't recall being asked
to be a peer reviewer for the May 5 proposal, but I submitted a few comments during the public
review. If I am to be a peer reviewer, please let me know, along with any specific instructions.
Thanks,
Rolf

----- Original Message -----
From: "Laura Ragan" <Laura_Ragan@fws.gov>
To: undisclosed-recipients:;
Sent: Thursday, August 25, 2011 9:48:58 AM GMT -05:00 US/Canada Eastern
Subject: Western Great Lakes Wolf Proposed Delisting - Reopening Public Comment Period


Good Afternoon,

As a peer reviewer of the May 5, 2011 proposal to delist the Western Great Lakes DPS of gray
wolves and to revise the range of the gray wolf (the species Canis lupus ) by removing all or
parts of 29 eastern states due to newer taxonomic information indicating that the gray wolf did
not historically occur in those states, I would like to inform you that we will reopening the
comment period on the proposal.

During the original comment period, we received significant comments highlighting the controversy
in North American wolf taxonomy. We are reopening the comment period for 30 days to share the
Chambers et al. (in prep) manuscript with the public and seek comment as to the best scientific
and commercial data available regarding the recognition of Canis lycaon as a full species. The
notice announcing the reopened comment period will publish in the Federal Register on Friday,
August 26th. The Chambers et al. (in prep) manuscript will be available on
http://www.regulations.gov at Docket No. FWS-R3-ES-2011-0029 and on the Service's internet site at
http://www.fws.gov/midwest/wolf/ beginning on Friday, August 26th .

In addition, this Federal Register notice will inform the public that we are considering issuing
separate final rules for our final determinations on the delisting of the Western Great Lakes DPS
and the delisting of all or portions of the 29 States outside the historical range of the gray
wolf, which may itself be split into separate rules for the Northeast and the Southeast.

The 30-day comment period will close on Monday, September 26, 2011 .

As a peer reviewer, I encourage you to review the Chambers et al. manuscript and provide, during
the open public comment period, any further comment you may have on this matter.

Sincerely,

Laura Ragan
U.S. Fish and Wildlife Service
5600 American Blvd., West, Suite 990
Bloomington, MN 55437
Tel: 612-713-5157
laura_ragan@fws.gov

# EXHIBIT ZZ

**Public Comments**

All public comments can be accessed from regulations.gov within docket "FWS-R3-ES-2011-0029". This site lists 766 unique submissions. Most of these were submitted directly through the regulations.gov website. A number of these were mailed to the U.S. Fish and Wildlife Service's (Service) Arlington Office and uploaded by the Service. Others were submitted as oral comments at four public hearings.  Several of these individual submissions include multiple comments. All comments were analyzed and considered as appropriate.

For a direct link to these comments (and other documents), go to:

http://www.regulations.gov/#!searchResults;rpp=25;po=0;s=FWS%25E2%2580%2590R3%25E2%2580%2590ES%25E2%2580%25902011%25E2%2580%25900029



July 5, 2011

Public Comments Processing
Attn: FWS-R3-ES-2011-0029
Division of Policy and Directives Management
U.S. Fish and Wildlife Service
4401 N. Fairfax Drive
MS 2042-PDM
Arlington, Virginia 22203

**Re:  Proposed Rule to Delist the Western Great Lakes
Population of Canis Lupus and Initiation of Status Reviews for
the Gray Wolf and for the Eastern Wolf, 76 Fed.Reg. 26086
(May 5, 2011)**

Dear Sir or Madam:

Safari Club International ("SCI") appreciates the opportunity to comment on the

proposed delisting of the Western Great Lakes Distinct Population Segment of Wolves,

the initiation of status reviews for the Gray Wolf (*Canis lupus*) and the Eastern Wolf

(*Canis lycaon*), and the adequacy and propriety of the U.S. Fish and Wildlife Service's

("FWS" or "Service") decision to address the wolves of the lower 48 states via a

"national wolf strategy."  While we agree with the designation of the Western Great

Lakes Distinct Population Segment (WGL DPS) via an expansion of the boundaries of

the Minnesota wolf species, previously designated by the Service in 1978, we strongly

disagree with the Service's decisions to recognize a completely new species of wolves,

identified as *Canis lycaon* or "The Eastern Wolf" with a range overlapping that of the

gray wolf.  We also strongly question the Service's decision to pick this time to revamp

its wolf recovery strategies, including the decision to consider designation and recovery

Safari Club International Comments
WGL Wolf Delisting, Designation of Canis Lupus and National Wolf Strategy
July 5, 2011
Page 2 of 9

of a Pacific Northwest population of wolves.  Wolves have proven to be the Endangered

Species Act's greatest success and failure.  Although success has been met in the

recovery of wolves in both the Western Great Lakes and the Northern Rocky Mountains

("NRM"), the Service's inability to remove these populations from federal ESA

protection has required Congress to step in and delist by statute.  The states that

participated in wolf recovery have been forced to endure years of federal prohibitions and

management long after they had achieved the criteria established in the populations'

recovery plans.  Federal endangered and threatened species lists have become inescapable

repositories for listed species and courts and legislators threaten to take over for

biologists as the ultimate decision-makers in questions of conservation, recovery and

management.  Wolves have demonstrated how badly the ESA is broken.  Before the

Service embarks upon any further wolf species designations, recovery plans or formal

listings, changes must be made to both the statute and the regulations applicable to

species listing and delisting.  The ESA needs to be corrected before the FWS conducts

any further wolf recovery efforts and before it expects any other states and the people

living in those states to participate in that recovery.

**Safari Club International and Safari Club International Foundation**

Safari Club International, a nonprofit IRC § 501(c)(4) corporation, has

approximately 53,000 members worldwide, who actively hunt and conserve wildlife in

the Western Great Lakes, Northern Rocky Mountains, Pacific Northwest, Southwest and

Northeast – in every region where wolves either exist or are the subject of the Service's

proposed five year status review and national wolf strategy.  Safari Club International

Safari Club International Comments
WGL Wolf Delisting, Designation of Canis Lupus and National Wolf Strategy
July 5, 2011
Page 3 of 9

members have lost prey and hunting dogs to wolves and are among those whose ability to hunt and enjoy outdoor recreational activities have been greatly influenced by the presence of wolves.  In addition, Safari Club International has participated in almost every lawsuit involving the status of the WGL and NRM wolf DPSs during the last ten years.  In most of these cases, SCI has participated as a defendant-intervenor to defend the Service's attempts to downlist and later delist the wolves of the WGL DPS.  More recently, SCI is participating as an amicus in the case filed by Dale Lueck and Gerald Tyler to challenge the Service's failure to complete the delisting of the WGL DPS of wolves.  SCI was also one of the four petitioners who submitted petitions to the Service that prompted the WGL delisting rule that the FWS has now proposed.

SCI's sister organization, Safari Club International Foundation is a nonprofit IRC § 501(c)(3) corporation.  Its missions include the conservation of wildlife, education of the public concerning hunting and its use as a conservation tool, and humanitarian services.  More specifically, the conservation mission of SCIF is:  (a) to support the conservation of the various species and populations of game animals and other wildlife and the habitats on which they depend; and (b) to demonstrate the importance of hunting as a conservation and management tool in the development, funding and operation of wildlife conservation programs.

**The Delisting of the WGL Population of Wolves is Appropriate and Long Overdue**

SCI strongly supports the FWS's decision to expand the boundaries of the Minnesota population of wolves, and to change the name of that group to the Western Great Lakes DPS.  Congress' intent in drafting the ESA was to give the FWS the

Safari Club International Comments
WGL Wolf Delisting, Designation of Canis Lupus and National Wolf Strategy
July 5, 2011
Page 4 of 9

authority to distinguish listing status between populations of wildlife living in different states.  The Service had the authority to create a Minnesota wolf DPS in 1978.  The Service also has the authority to expand those boundaries, now that the wolves of the Minnesota population have increased their range and have established themselves in neighboring states. [1]

As SCI has explained in their comments submitted in response to previous attempts by the FWS to delist the WGL DPS of wolves, the WGL DPS has met all recovery plan requirements and none of the five statutory risk factors place the WGL DPS at risk of endangered or threatened status.  16 U.S.C. §1533(a)(1).   The status of these wolves has not significantly changed since the Service first proposed to delist these wolves in 2006.  71 Fed. Reg. 15266-15305 (March 27, 2006).  The delisting of these wolves is long overdue.

SCI does disagree with one element of the Service's analysis.  In the Proposed Rule, the FWS reports that "it is unclear how delisting will affect attitudes and behavior toward wolves" and "how public wolf harvest might affect attitudes and behaviors."  76 Fed. Reg. at 26138.  This statement appears to ignore the data that the states of Wisconsin and Michigan submitted to the Service in support of their applications for Section 10(a)(1)(A) permits to lethally remove problem endangered wolves.  75 Fed. Reg. 20621 (April 20, 2010).  As a result of these submissions, as well as the comments that SCI

---

[1] The interpretation in the Service's 1996 DPS policy that the FWS cannot distinguish between DPS's based on state boundaries is an incorrect interpretation of the ESA and should be corrected.

Safari Club International Comments
WGL Wolf Delisting, Designation of Canis Lupus and National Wolf Strategy
July 5, 2011
Page 5 of 9

provided in support of those permit applications, the Service has in its files significant

data on the conservation benefits of the social tolerance achieved through lethal

management of predators.  The Service should take this data into account when

considering the role that state management, including wolf harvests, will play in

continued wolf conservation.

 **The Designation of a New *Canis lycaon* Species Is Not Supported By Sound Science and Serves No Purpose in the Recovery and Conservation of Wolves in the Lower-48 States**

The decision to designate a new species of wolves is unsupportable and stands to

undermine future wolf recovery.  In 1978, the FWS declared the wolves of the lower 48

contiguous states as a single taxonomic species.   For the last three decades, the states of

Minnesota, Michigan and Wisconsin have been working towards meeting wolf recovery

goals based upon that taxonomic classification.  Now, after they achieved recovery and

stand at the brink of delisting, the Service has announced that it chooses to recognize a

second taxonomic species.  By doing so, the FWS has introduced uncertainty to the

identity of wolves in the WGL, which threatens to jeopardize the long-awaited and

deserved return of the WGL wolves to state management.  Not only does the Service's

decision to change the rules mid-game betray the trust of the states that worked so

diligently to recover the wolves of the Western Great Lakes, but it discourages other

states from engaging in conservation efforts for other species.

To evaluate the scientific underpinnings of the new species classification, SCI

consulted with Matthew Cronin, Research Associate Professor of Animal Genetics at the

School of Natural Resources and Agricultural Sciences, University of Alaska, Fairbanks,

Safari Club International Comments
WGL Wolf Delisting, Designation of Canis Lupus and National Wolf Strategy
July 5, 2011
Page 6 of 9

and co-author with L. David Mech. 2009 of "Problems with the claim of ecotype and

taxon status of the wolf in the Great Lakes region," Molecular Ecology 18:4991-4993.

First, Dr. Cronin questioned the basis for the species determination, since although the

Proposed Rule describes several different species classification concepts, it does not

identify which if any of these concepts the Service used to recognize the *Canis lycaon*

species.  In fact, several of the concepts that the Proposed Rule described would prohibit

the Service from designating the new taxonomic category as a species.  Under the most

commonly accepted species concept (the biological species concept), the very fact that

the two groups have interbred and have given birth to offspring that can reproduce makes

it inappropriate for them to be classified as two different species.

Second the Proposed Rule fails to identify who in the Service made the scientific

decision to designate *Canis lycaon* as a species as opposed to some other type of

taxonomic classification.  Nothing in the proposed rule indicates that the decision-makers

have expertise in species taxonomy or genetics.  Species designation is a serious

scientific enterprise and cannot be simply be done by fiat by individuals.  Science

requires extensive review and replication according to taxonomic principles for species

designations.

Third, the Proposed Rule makes no mention of the recent article by Bridgett M.

von Holdt, et al. entitled "A genome-wide perspective on the evolutionary history of

enigmatic wolf-like canids," which directly disputes the Service's taxonomic findings.

This study found that the Great Lakes wolf shares approximately 80% of its genome with

the gray wolf from the northern and western parts of its range and some of them have

Safari Club International Comments
WGL Wolf Delisting, Designation of Canis Lupus and National Wolf Strategy
July 5, 2011
Page 7 of 9

considerable genetic similarity to coyotes.  The Great Lakes wolf had a genetic profile similar to other wolf subspecies and regional populations, not full species.

SCI questions not only the science but the wisdom of the new species designation. The Service can accomplish nothing in terms of species recovery or conservation by designating a second species overlapping the range of the original *Canis lupus* species in the Western Great Lakes.  Even if the two species have not yet completely hybridized, there is no question of continued hybridization.  The Service is powerless to isolate the two species or to do anything to preserve pure strains of either one.  By a natural course of events, the two species that share the Western Great Lakes range are also sharing genetic material and will continue to do so.

The Service also fails to confront the question of the status of the hybrids of the two species, which, if the dual species classification is correct, constitute a rather significant portion of the population of wolves in the Western Great Lakes.  The Service must decide to which species these hybrids belong and/or whether they constitute a new species entirely or are actually unlistable because they do not fall into any species.  Thus, by designating a second species, the Service may actually have created three species, none of which it has any ability to persist in a pure genetic state (which is why the Service should not deem them separate species).

The designation of a second species does nothing more than create confusion, undermine the confidence of the states and the public that worked towards gray wolf recovery, and jeopardize future recovery efforts.

Safari Club International Comments
WGL Wolf Delisting, Designation of Canis Lupus and National Wolf Strategy
July 5, 2011
Page 8 of 9

**Now Is Not The Time to Consider New Wolf Populations and Recoveries and To Implement a New National Wolf Strategy**

The Service should not be considering additional wolf populations and recovery strategies at a time when Congress has been forced to intervene in order to take wolves out of the courts and off the endangered species list.  The last thing that the Service needs to do is to recognize more wolf populations for recovery and to create more obstacles to removing recovered populations from the endangered species list.  Under the current Endangered Species Act and its regulations, as implemented by the Service and Courts, the endangered and threatened species lists function as flypaper where species land but cannot be removed.  Before taking on any further wolf recovery efforts, the Service needs to revise existing regulations in order to define the phrase "inadequate regulatory mechanisms." The Service needs to establish finite adequate regulatory mechanism criteria so that the adequacy of a state's wildlife management strategies never again becomes the source of endless litigation.  The Service also needs to establish a definition for the phrase "population pressures" as used in the statutory definition for conservation (16 U.S.C. 1532), so that regulated take can be used to achieve/restore cultural carrying capacity and so that social tolerance is recognized by the Service as a legitimate conservation tool.

The Service should also join SCI in advocating statutory ESA changes that will clarify the delisting process, encourage private and voluntary conservation efforts, direct ESA attorney fee recovery to species conservation and recognize the role that economics play in species recovery and conservation.  Until these amendments are achieved, further

Safari Club International Comments
WGL Wolf Delisting, Designation of Canis Lupus and National Wolf Strategy
July 5, 2011
Page 9 of 9

plans to designate and recover wolf populations will result in the same stalemates and

litigation battles that have plagued both the WGL and NRM wolf populations.

Thank you again for the opportunity to comment on this important step in

Western Great Lakes wolf conservation.  If you have any questions concerning these

comments, please contact Anna Seidman, Director of Litigation, Safari Club International

202-543-8733, aseidman@safariclub.org.

Thank you.

Sincerely,

Kevin Anderson
President
Safari Club International

# EXHIBIT AAA

| | |
|---|---|
| **From:** | Stark, Dan (DNR) |
| **To:** | Laura_Ragan@fws.gov |
| **Subject:** | statute change & wheeldon comment |
| **Date:** | 11/03/2011 10:43 AM |
| **Attachments:** | 2011 Legislative changes for gray wolf.docx |
| | Wheeldon et al .pdf |

I've attached the specific changes to MN Statutes that occurred this year. Here's a link to an article that the wolf center did to answer questions they were getting from members that you may find helpful. http://www.wolf.org/wolves/news/live_news_detail.asp?id=6653

Also, I came across these comments when reviewing the federal register sight after the latest comment period. These are from Tyler Wheeldon (and others) correct?

Dan

Dan Stark
Large Carnivore Program Leader
Division of Fish and Wildlife
MN Department of Natural Resources
218-999-7802
dan_stark@state.mn.us

# EXHIBIT BBB

2011 Legislative changes for gray wolf.

CHAPTER 2--S.F.No. 3

(link to entire bill - https://www.revisor.mn.gov/laws/?id=2&doctype=Chapter&year=2011&type=1)

Key: (1) ~~language to be deleted~~ (2) new language

Sec. 16. Minnesota Statutes 2010, section 97A.015, subdivision 45, is amended to read:
   Subd. 45. **Small game.** "Small game" means game birds, gray squirrel, fox squirrel, cottontail rabbit, snowshoe hare, jack rabbit, raccoon, lynx, bobcat, gray wolf, red fox and gray fox, fisher, pine marten, opossum, badger, cougar, wolverine, muskrat, mink, otter, and beaver.

Sec. 51. Minnesota Statutes 2010, section 97B.645, subdivision 9, is amended to read:
   Subd. 9. **Open season.** There shall be no open season for gray wolves ~~for five years~~ until after the gray wolf is delisted under the federal Endangered Species Act of 1973. After that time, the commissioner may prescribe open seasons and restrictions for taking gray wolves but must provide opportunity for public comment.

Sec. 71. **EFFECTIVE DATE; RELATIONSHIP TO OTHER APPROPRIATIONS.**
Unless otherwise specified, this article is effective retroactively from July 1, 2011, and supersedes and replaces funding authorized by order of the Second Judicial District Court in Case No. 62-CV-11-5203.
Presented to the governor July 19, 2011
Signed by the governor July 20, 2011, 9:05 a.m.

# EXHIBIT CCC

| | |
|---|---|
| **From:** | Stark, Dan (DNR) |
| **To:** | Laura_Ragan@fws.gov |
| **Cc:** | Merchant, Steve S (DNR); Niskanen, Chris (DNR); Charles_Traxler@fws.gov |
| **Subject:** | RE: WGL Wolf Final Delisting Rule |
| **Date:** | 12/16/2011 03:12 PM |
| **Attachments:** | Great_Lakes_Wolf_Final_Delist_FAQs_draft_1216_MNedits.doc |

Hi Laura,

I've made some recommended changes to the FAQ's. One is with the population number. This is often quoted in FWS documents as 2,922 wolves rather than that actual 2,921 estimate that was published in our final report in 2008. Also, edited number 11 to reflect what is likely going to develop over the next year or so with a wolf season as an option for wolf management in the state of Minnesota. Although I agree population numbers are not likely to change as a result, but it would be hard to argue that protections are the same as under ESA protections.

Dan

---

**From:** Laura_Ragan@fws.gov [mailto:Laura_Ragan@fws.gov]
**Sent:** Thursday, December 15, 2011 1:37 PM
**To:** Adrian.Wydeven@Wisconsin.gov; Christie_Deloria@fws.gov; Stark, Dan (DNR); Joel_Trick@fws.gov; Phil_Delphey@fws.gov; ROELLB@michigan.gov; Rebecca.Schroeder@wisconsin.gov; BEYERD@michigan.gov; Peter_Fasbender@fws.gov
**Subject:** WGL Wolf Final Delisting Rule


Dear All -

Thanks for making yourselves available for the call this afternoon. Attached are the draft Q&As for the final delisting rule for the WGL gray wolf DPS, so you may begin preparing for the announcement that will take place later this month. Please keep the information internal to your agency until the time of the public announcement. At this point, the timing of a public announcement is still up in the air. It could take place as soon as the middle of next week, or sometime during the week of December 27-30. We will notify you as soon as a solid date is available.

Please call with any questions.

The scientists that comment on the proposal included: Dr. L. David Mech (USGS), Dr. Rolf Peterson (Michigan Technological University); Dr. Roland Kays (Curator of Mammals at NY State Museum); Dr. Robert Wayne (University of CA, Los Angeles), Dr. John Pollinger (University of CA, Los Angeles), Dr. Bridgett vonHoldt (University of CA, Irvine); Dr. Jennifer Leonard (Conservation and Evolutionary Genetics Group, Consejo Superior de Investigaciones Científicas); Dr. Lisette Waits (University of Idaho); Dr. Matthew Cronin (Associate Professor of Animal Genetics, University of Alaska, Fairbanks).

-Laura

*(See attached file: Great Lakes Wolf Final Delist FAQs_draft 121411.doc)*

Laura Ragan
Regional Endangered Species Classification Coordinator
U.S. Fish and Wildlife Service

017384A

5600 American Blvd. West, Suite 990
Bloomington, MN 55437
Tel: 612-713-5157
Email: laura_ragan@fws.gov

017385A

EXHIBIT DDD

 

**U.S. Fish & Wildlife Service**

## Final Decision to Delist Wolves in the Western Great Lakes
## Questions and Answers

**1. What action is the U.S. Fish and Wildlife Service taking?**
The U.S. Fish and Wildlife Service (Service) is publishing a Final Rule to remove Endangered Species Act (ESA) protection for the Gray Wolf Western Great Lakes Distinct Population Segment. The Final Rule is expected to be published in the *Federal Register* XXXXX. This rule provides the Service's final decision on a proposal that was published in the *Federal Register* on May 5, 2011.

**2. What is a Final Rule and what does this one include?**
A Final Rule is an official decision or determination made related to an earlier proposed rule. Both the proposed and final rules are published in the Federal Register.

In 1978, the Minnesota population of gray wolves was listed as threatened, and gray wolves throughout the remaining lower 48 states were listed as endangered. This Final Rule acknowledges that the Minnesota population of gray wolf listing in 1978 was, in effect, a Distinct Population Segment listing. Since then, wolves from the Minnesota population dispersed into Wisconsin and Michigan, establishing packs and expanding the Minnesota wolf population well beyond state boundaries. This rule revises the Minnesota population  listing to identify it as the Western Great Lakes Distinct Population Segment (DPS). The boundaries of the DPS include all of Minnesota, Wisconsin, and Michigan and portions of adjacent states (see Question 3 for a map)).

Most importantly, the Western Great Lakes DPS is removed from the List of Endangered and Threatened Wildlife. The Service is removing Endangered Species Act protection for (i.e., delisting) the Western Great Lakes DPS because this wolf population no longer meets the definitions of threatened or endangered (see Question 5 for more details). This final rule also removes designated critical habitat for the gray wolf in Minnesota and Michigan and the special regulations under section 4(d) of the Act for wolves in Minnesota.

**3. What is a Distinct Population Segment?**
The ESA allows the listing and delisting of species, subspecies, and **distinct population segments** of vertebrate animals. A Distinct Population Segment, or DPS, is a significant population that occurs in a distinct portion of a species' or subspecies' range. The DPS is usually described geographically, such as "all members of XYZ species north of 40 degrees north latitude."

The Western Great Lakes DPS encompasses a core area where wolf recovery has occurred. This core area includes northern and central forested areas of Minnesota and Wisconsin and the Upper Peninsula of Michigan. The DPS also includes Michigan's Lower Peninsula and portions of adjacent states that are within the range of wolves dispersing from the core area.

**Gray Wolf Western Great Lakes Distinct Population Segment**



**4. How does this action affect wolves in the northeast, or elsewhere outside the Western Great Lakes DPS boundary?**
The status of wolves outside the DPS boundary is not changed by this action.

**5. Why did the Service delist gray wolves in the Western Great Lakes DPS?**
The goal of the Endangered Species Act is to improve the status of a listed species to the point that it no longer needs ESA protection. Generally, this means reducing or removing threats to its survival, resulting in increasing numbers and distribution of the species. The Service delisted the Western Great Lakes DPS because it supports a robust, self-sustaining wolf population. In the past, unregulated mortality encouraged by bounties resulted in the near extinction of gray wolves in the conterminous U.S. After delisting, this threat will continue to be controlled because, with state management plans in place, Minnesota, Wisconsin, and Michigan will manage wolf populations in accordance with population objectives to ensure survival of the species in the DPS into the foreseeable future.

The approved recovery plan for the gray wolf in the eastern United States set forth population criteria that, when achieved, would ensure the survival of the gray wolf into the future. Those population criteria are:

- The Minnesota population's continued survival is assured.
- A second population outside of Minnesota and Isle Royale (Michigan) is re-established, having at least 100 wolves in late winter if located within 100 miles of the Minnesota wolf population or having at least 200 wolves if located beyond that distance. A Wisconsin-Michigan population of 100 is considered viable because continued immigration of Minnesota wolves will supplement it.
- These population levels (outside of Minnesota) are maintained for five consecutive years (that is, for six annual wolf surveys).

Wolf numbers and distribution in the Western Great Lakes DPS have exceeded the population criteria identified in the recovery plan continuously since at least 2001. The ~~estimated~~ population estimate for ~~in~~

Minnesota in 2008 is 2,~~922~~921, and its continued survival is assured due to protections afforded on lands that are federally managed by the National Park Service and the U.S. Forest Service and due to management provided under the Minnesota Wolf Management Plan. Wolves are established in Michigan and Wisconsin and number about 687 and 782, respectively.

In addition to exceeding population criteria set out in the recovery plan, potential threats after delisting have been addressed by Minnesota, Michigan and Wisconsin state management plans. To prepare for federal delisting, each of those states developed a wolf management plan with the goal of ensuring future survival of the state's wolf population. Those plans were signed by the head of each state's Department of Natural Resources after input from wolf experts and extensive public involvement.

**6. How does this final rule differ from the proposal?**
In this final rule, the Service is making two substantive changes from the May 2011 proposal. First, the Service is separating a decision on whether to delist the Western Great Lakes DPS from a decision on whether to delist all or portions of the 29 eastern states considered to be outside the historical range of the gray wolf. This rule finalizes the Service's decision for the Western Great Lakes DPS. A subsequent decision will be made for the rest of the eastern United States.

Secondly, the Service is no longer accepting a new taxonomic interpretation of wolves in the Western Great Lakes. In the proposed rule, the Service presented recent taxonomic information indicating that the gray wolf subspecies *Canis lupus lycaon* should be elevated to the full species *Canis lycaon,* and that the population of wolves in the Western Great Lakes is a mix of the two full species, *Canis lupus* and *Canis lycaon.* Extensive information submitted during the comment periods, recent publications on the subject, and the widely diverging views expressed in the pertinent scientific studies underscore the ongoing nature of the debate regarding the taxonomy of North American wolves — a debate that may not be resolved for some time. Although there is not a significant number of new publications that have become available since the Service published its proposal in May, 2011, the substance of those new publications and the substantive comments the Service received lead the agency to reconsider its proposed decision to accept *Canis lycaon* as a full species. Therefore, the Service has decided the better conclusion is to retain our previous taxonomic recognition of wolves in the WGL as gray wolves *(Canis lupus).*  In this final rule, the Service considers all wolves in the Western Great Lakes DPS to be gray wolves *(Canis lupus)* and are delisting them as such.

Taxonomic information evaluated in the final rule, including papers that became available during the public comment period, are available at http://www.fws.gov/midwest/wolf/delisting/LitCitFinalRuleDec2011.html. Public comments the Service received on the proposed rule are available onthe Federal eRulemaking Portal: *http://www.regulations.gov.* Follow the instructions for viewing comments on Docket No. [FWS–R3–ES–2011–0029].

**7. Will the status assessment for the eastern wolf (*Canis lycaon*), that was initiated by publication of the May 2011 proposed rule, be completed?**
Yes the status assessment will be completed. The eastern timber wolf (*Canis lupus lycaon*) remains a valid subspecies with an historical distribution that included the eastern U.S. and Canada. The Service will use information from the assessment to make a final decision regarding the proposal for the eastern U.S.

**8. When will the new rule become effective?**

The final rule will become effective 30 days after its publication in the *Federal Register*.

**9. What happens to gray wolves in the Western Great Lakes DPS now that they are delisted?**
Wolves in the Western Great Lakes DPS are no longer protected by the Endangered Species Act. Instead, state and tribal laws will dictate the level of wolf protection and management. Minnesota, Wisconsin and Michigan developed wolf management plans in preparation for the delisting. Those plans will take effect following delisting.

In the portions of North Dakota, South Dakota, Iowa, Illinois, Indiana and Ohio that are within the Western Great Lakes DPS, wolves would be protected by state and tribal law. The following is the state regulatory designation or status of wolves **in the portions of those states within the DPS**:

> North Dakota – furbearer, with closed season
> South Dakota – protected wildlife, no season
> Iowa – furbearer, closed season
> Illinois – threatened
> Indiana – extirpated, no protection
> Ohio – extirpated, no protection

In the portions of North Dakota, South Dakota, and Iowa **outside the boundaries of the DPS**, the gray wolf would remain endangered and protected under the Endangered Species Act.

Even though the Endangered Species Act no longer protects wolves in the Western Great Lakes DPS, the law requires the Service to monitor wolves in the DPS for five years after delisting. The DPS could be re-listed as threatened or endangered if necessary.

**10. How do the Michigan, Minnesota and Wisconsin wolf management plans ensure the survival of wolves in those states?**
The state plans implement management actions and protections that will maintain wolf populations above the federal recovery criteria for the foreseeable future. All three state wolf management plans are designed to maintain minimum wolf populations that exceed the recovery criteria identified in the federal Eastern Timber Wolf Recovery Plan for an "isolated wolf population."

The Michigan plan, revised in July 2008, calls for a minimum sustainable population of 200 wolves in the Upper Peninsula. Habitat, prey and land-use analysis showed that the Upper Peninsula can support between 590 and 1,300 wolves. No upper population limit is specified, but an upper limit will be strongly influenced by "…public preferences regarding levels of positive and negative wolf–human interactions." The plan acknowledges that in the future, "some degree of wolf population stabilization and control" may be needed and that "some wolves will likely need to be killed under controlled conditions." The DNR's goal is to ensure the wolf population remains viable and above a level that would require either federal or state reclassification as a threatened or endangered species.

Under the Minnesota plan, wolves will be allowed to continue to naturally expand their range within the state. The statewide winter population goal is a minimum of 1,600 wolves; there is no maximum goal. The Minnesota Department of Natural Resources will take appropriate actions to remedy the situation if the population falls below the minimum goal. The plan divides the state into wolf management zones A and B, which correspond to zones 1-4 and zone 5, respectively, in the federal Eastern Timber Wolf Recovery Plan. In zone A, where over 80 percent of the wolves reside, state protections ~~would be nearly~~

~~as strict as current~~ are similar to protections under the Endangered Species Act, with the exception of a state wolf season in the future, and the Service expects little or no resulting post-delisting population decline there. The protection provided by the plan to the zone A wolves will ensure a state wolf population well above 1,600 in that zone. In zone B, wolves could be killed to protect domestic animals, even if attacks or threatening behavior have not occurred. While some decrease in the zone B wolf population may result, such a result would be consistent with the federal recovery plan, which discourages the establishment of a wolf population in that portion of the state.

In Wisconsin, the minimum population management goal is 350 outside of Native American Reservations. Because the wolf population now exceeds this level, the state delisted wolves to Protected Wild Animal status in 2004. If numbers decline and stay below 250 for three years, the state will relist as threatened. If they decline to less than 80 for one year, the state will relist or reclassify the wolf as endangered.

**11. How will the Service ensure the state management plans are sufficient to protect the future survival of wolves in the Western Great Lakes DPS?**
The Service will monitor wolf populations in Wisconsin, Minnesota and Michigan for a minimum of five years to ensure that delisting has not occurred prematurely. If it appears, at any time, that the status of the gray wolf may again warrant the protections of the Endangered Species Act, the Service can initiate the normal or emergency listing process.

**12. How will wolves be monitored now that they are delisted?**
A post-delisting monitoring plan for the Western Great Lakes DPS was completed in February 2008. That plan focuses on three areas: wolf population dynamics, threats and mechanisms in place to reduce threats. The goal of the plan is to ensure that new threats do not arise or increase unexpectedly after delisting to the degree that wolves may again become threatened. Monitoring will be conducted in Minnesota, Wisconsin and Michigan, the core wolf recovery area.

Wolf populations in Minnesota, Wisconsin and Michigan have been surveyed and studied for several decades, primarily by the three state natural resource departments, but also by many partners, including the U.S. Forest Service, U.S. Geological Survey – Biological Resources Division, National Park Service, U.S. Department of Agriculture - Wildlife Services, tribal natural resource agencies, and the Service. All three states are continuing their previous wolf population monitoring practices with only minor changes.

In addition to monitoring population numbers and trends, the monitoring plan includes evaluating threats, in particular disease, human-caused mortality, and any legal or management measures imposed by states or tribes.

If at any time during the monitoring period the Service detects a substantial decline in the populations or a new or expanded threat, it will evaluate and change the monitoring methods, if appropriate, and consider relisting the Western Great Lakes DPS. At the end of the monitoring period, the Service will decide if relisting, continued monitoring, or ending Service monitoring is appropriate. If warranted (for example, data show a significant decline or increased threats), the Service will consider continuing monitoring beyond the specified time.

**13. Now that gray wolves in the Western Great Lakes DPS are delisted, can they be hunted and trapped?**

States and tribes are responsible for wolf protection and management now that the Western Great Lakes DPS is delisted. Each state or tribe must decide whether activities such as hunting and trapping will be allowed. For example, in Wisconsin, public harvest would only be considered if the population continues to exceed 350 wolves outside of Native American Reservations and would require authorization by the Legislature following major public input. The Michigan management plan does not determine whether a public harvest will be used in Michigan, but it discusses developing a "socially and biologically responsible policy regarding public harvest." As with Wisconsin, instituting a public harvest in Michigan would require authorization by the Legislature and public input. Minnesota DNR will consider options for managing its wolf population, including hunting and trapping seasons, in the future. As in the other states, this would only be done with public input.

The Service does not prescribe the specifics of how states and tribes manage delisted wolves, but rather the agency ensures that they implement management and protective measures that effectively conserve the wolves in their states so federal relisting as threatened or endangered will not be necessary.

**14. What is the Service's Federal trust responsibility to tribes, as it pertains to wolf management, after delisting?**
The Interior Department, the Service, the Bureau of Indian Affairs, and other federal agencies will ensure that tribal authority and sovereignty within reservation boundaries are respected as the states implement their wolf management plans and revise those plans in the future. Also, there may be tribal activities or interests associated with the wolf encompassed within the tribes' retained rights to hunt, fish, and gather in treaty-ceded territories. The Department will assist in the exercise of any such rights. If biological assistance is needed, the Service may provide it via field offices. Legal assistance would be provided to the tribes by the Department, and the Bureau of Indian Affairs will be involved, when needed.

**15. What is the role of tribes in post-delisting monitoring?**
The Service will annually contact tribes within the DPS to obtain any information the tribes wish to share about wolf populations, the health of those populations, or changes in their management and protection. Reservations within the Western Great Lakes DPS that may have significant wolf data to provide during the post-delisting period include Bois Forte, Bad River, Fond du Lac, Grand Portage, Keweenaw Bay Indian Community, Lac Courte Oreilles, Lac du Flambeau, Leech Lake, Menominee, Oneida, Red Lake, Stockbridge-Munsee Community, and White Earth. The Service will annually contact the natural resource agencies of each of these reservations and that of the 1854 Treaty Authority and Great Lakes Indian Fish and Wildlife Commission.

**16. How did wolves in the western Great Lakes fare during the time they were delisted in 2007-2008 and 2009?**
During the time wolves in the Western Great Lakes DPS were delisted (from March 12, 2007, to September 29, 2008, and from May 4, 2009, to July 1, 2009) the wolf population remained stable under state management. The ~~late~~ winter 200~~8~~7-200~~9~~8 population estimates were 2,~~922~~921 wolves in Minnesota, 626 in Wisconsin, and 580 in Michigan. Although the Minnesota population estimate is down slightly compared to the previous estimate (from 2003-2004), the change is not statistically significant, which indicates that the population has remained stable since the previous survey.

The number of wolf deaths that occurred during the time wolves were delisted closely mirror what the

017391A

Service predicted in the 2007 final rule. Illegal killing of wolves actually dropped in Wisconsin and remained unchanged in Michigan (no data are available from Minnesota). The number of wolves killed by USDA Wildlife Services and individuals for depredation control increased in both Michigan and Wisconsin, but not any more than predicted in the 2007 final rule. The number remained about the same in Minnesota.

**17. Where can more information be found?**

The *Federal Register* publication of the rule, as well as information about gray wolf populations, is available online at http://www.fws.gov/midwest/wolf/ or can be obtained by writing to: U.S. Fish and Wildlife Service, Gray Wolf, 5600 American Blvd., West, Suite 990, Bloomington, MN 55437.

017392A

# EXHIBIT EEE

# Documents Cited in Final Rule for the Wolf WGL DPS

Almberg, E.S., L.D. Mech, D.W. Smith , J.W. Sheldon, R.L. Crabtree.  2009.  A Serological Survey of Infectious Disease in Yellowstone National Park's Canid Community.  PLoS One 4(9):e7042.

Almberg, E. S., P.C. Cross, D.W. Smith.  2010.  Persistence of Canine Distemper Virus in the Greater Yellowstone Ecosystem's Carnivore Community.  Ecological Applications 20(7):2058-2074.

Avise, J. C.  2004.  Molecular Markers, Natural History, and Evolution, 2nd edition.  Sinauer, Sunderland, Mass.

Bailey, T.N., E.E. Bangs, and R.O. Peterson.  1995.  Exposure of wolves to canine parvovirus and distemper on the Kenai National Wildlife Refuge, Kenai Peninsula, Alaska, 1976-1988.  pp. 441-446 *in* Carbyn, L.N., S.H. Fritts, and D.R. Seip.  1995.  Ecology and conservation of wolves in a changing world.  Canadian Circumpolar Institute, Occasional Publication No. 35.  Edmonton, Alberta.  642 pp.

Baker, R. J., L. C. Bradley, R. D. Bradley, J. W. Dragoo, M. D. Engstrom, F. S. Hoffman, C. A. Jones, F. Reid, D. W. Rice, and C. Jones.  2003.  Revised Checklist of North American Mammals North of Mexico.  Museum of Texas Tech University, Occasional Papers Number 229, 1 December 2003.

Ballard, W. B., L. N. Carbyn, and D.W. Smith.  2003.  Wolves interactions with non-prey.  pp. 259-271 in L.D. Mech and L. Boitani.  Wolves, Behavior, Ecology, and Conservation University of Chicago Press, Chicago, IL.  448 pp.

Berg, W.E., and S. Benson.  1999.  Updated wolf population estimate for Minnesota, 1997-1998.  Minnesota Department of Natural Resources Report.  Grand Rapids, Minnesota. 14 pp.

Berg, W.E. and D.W. Kuehn.  1982.  Ecology of wolves in north-central Minnesota.  pp.4-11 *in* F.H. Harrington and P.C. Paquet, eds.  Wolves of the world:  perspectives of behavior, ecology, and conservation.  Noyes, Park Ridge, NJ.

Beyer, D., T. Hogrefe, R.B. Peyton, P. Bull, J.P. Burroughs, and P. Lederle (editors).  2006.  Review of social and biological science relevant to wolf management in Michigan.  Michigan DNR, Lansing, MI.  Wildlife Division Report No. 3457, June 2006.  149 pp. plus 11 appendices.

Beyer, D., B.J. Roell, and D.H. Lonsway.  2004.  2004 Survey of the gray wolf population in Michigan's Upper Peninsula.  Unpublished report by Michigan DNR.  Lansing, MI.  8 pp.

Beyer, D.E., R.O.  Peterson, J.A. Vucetich, and J.H. Hammill.  2009.  Wolf population changes in Michigan.  Pp. 65-85 in A.P. Wydeven, T. R. Van Deelen, and E.J. Heske, eds.  Recovery of Wolves in the Great Lakes Region of the United States: An Endangered Species Success Story. Springer, New York, NY, USA. 350 pp.

Blanco, J.C., Y. Cortes, and E. Virgos.  2005.  Wolf response to two kinds of barriers in an agricultural habitat in Spain.  Canadian Journal of Zoology/Revue Canadienne de Zoologie [Can. J. Zool./Rev. Can. Zool.]. 83(2):312-323.

Boitani, L. 2003. Wolf Conservation and Recovery. Pages 317-340 *in* Wolves: Behavior, Ecology, and Conservation. L.D. Mech and L. Boitani, eds. University of Chicago Press, Chicago. 448 pp.

Boyd, D.K., and D.H. Pletscher.  1999.  Characteristics of dispersal in a colonizing wolf

017406A

population in the central Rocky Mountains.  J. Wildl. Mgmt. 3: 1094-1108.

Brand, C.J., M.J. Pybus, W.B. Ballard, and R.O. Peterson.  1995.  Infectious and parasitic diseases of the gray wolf and their potential effects on wolf populations in North America.  pp. 419-429 *in* Carbyn, L.N., S.H. Fritts, and D.R. Seip.  1995.  Ecology and conservation of wolves in a changing world.  Canadian Circumpolar Institute, Occasional Publication No. 35.  Edmonton, Alberta.  642 pp.

Browne-Nuñez, C., and J.G. Taylor. 2002. Americans' Attitudes Toward Wolves and Wolf Reintroduction: An Annotated Bibliography: U.S. Geological Survey Information and Technology Report 2002-0002. 14 p.

Cahalane, V.H.  1964.  A preliminary study of distribution and numbers of cougar, grizzly and wolf in North America.  New York Zool. Soc. 12 pp.

Carbyn, L.N.  1982.  Incidence of disease and its potential role in the population dynamics of wolves in Riding Mountain National Park, Manitoba. Wolves of the World. 106-116.

Carbyn, L.N. 1983. Management of non-endangered wolf populations in Canada. Acta. Zool. Fenn. 174:239-243.

Chavez, A.S., E.M. Gese, and R.S. Krannich. 2005. Attitudes of rural landowners toward wolves in northwestern Minnesota. Wildlife Society Bulletin 33(2):517-527.

Cornicelli, L.  2008.  2007 Minnesota deer harvest report.  Pp. 206-256 in Status of Wildlife Populations Fall 2008.  ed. M.H. Dexter. Unpublished report by Minnesota Department of Natural Resources, St. Paul, MN.  300 pp.

Coyne, J. A., and H. A. Orr.  2004.  Speciation.  Sinauer, Sunderland, Mass.

Crawford, P.C., E.J. Dubovi, W.L. Castleman, I. Stephenson, E.P.J. Gibbs, L. Chen, C. Smith, R.C. Hill, P. Ferro, J. Pompey, R.A. Bright, M. Medina, Influenza Genomics Group, C.M. Johnson, C.W. Olsen, N.J. Cox, A.I. Klimov, J.M. Katz, and R.O. Donis.  2005.  Transmission of equine influenza virus to dogs.  Science 310: 482-485.

Creel, S. and J.J. Rotella.  2010.  Meta-analysis of relationships between human offtake, total mortality and population dynamics of gray wolves (*Canis lupus*).  PLoS ONE 5(9): e12918. Doi:10.1371/journal.pone.0012918.

Cronin M.A. and L.D. Mech. 2009. Problems with the Claim of Ecotype and Taxon Status of the Wolf in the Great Lakes Region. Molecular Ecology 18:4991-4993

Drummer, D.D., B. Huntzinger, J.S. Johnson, R.O. Peterson, M.J. Potvin, L.M. Vucetich, and J.A. Vucetich.  2002.  Recovery of the gray wolf (*Canis lupus*) in Upper Michigan. 1999-2001.  Final Report from MTU: for Michigan Dept. of Natural Resources Grant Amendment Number 149-01 and Pictured Rocks National Lakeshore Cooperative Agreement Number 1443 CA 682098001.  158 pp.

Erb, J.  2008.  Distribution and abundance of wolves in Minnesota, 2007-2008.  Unpublished report by Minnesota Department of Natural Resources, St. Paul, MN.  11 pp.

Erb, J. 2009. Furbearer Winter Track Survey Summary, 2009. Minnesota Department of Natural Resources, Grand Rapids, MN. 7 p.

Erb, J. and S. Benson.  2004.  Distribution and abundance of wolves in Minnesota, 2003-04. Unpublished report by Minnesota Department of Natural Resources, Grand Rapids, MN 13 pp.

Erb, J. and M. W. DonCarlos. 2009. An overview of the legal history and population status of wolves in Minnesota. pp. 49-64 *in* A.P. Wydeven, T. R. Van Deelen, and E.J. Heske. Recovery of Gray Wolves in the Great Lakes Region of the United States: An Endangered Species Success Story.  Springer, New York, NY, USA.

2

Ethier,D., J. Sayers, and S. Windels. 2008. Estimates of abundance and distribution of gray wolves in Voyageurs National Park, 2008, using snow track surveys. Unpublished Report.  14 pp.

Fain, S. R., D. J. Straughan, and B. F. Taylor.  2010.  Genetic outcomes of wolf recovery in the western Great Lakes states.  Conservation Genetics, doi:10.1007/s10592-010-0068-x.

Fogleman, V.M. 1988. American attitudes towards wolves: A history of misperception. Environmental Ethics 10: 63-94.

Forest Stewardship Council – US, Lake States Working Group (FSC).  2005.  Revised Final Regional Forest Stewardship Standard for the Lake States-Central Hardwoods Region (USA) Version LS V3.0 February 10, 2005.  56 pp.

Fox, J., R. Peterson, and T. Drummer.  2001.  Gray wolf biology research in Voyageurs National Park , 1998-2001.  Final Report, Natural Resource Preservation Program Project #197. 21 pp.

Fritts, S.H.  1983.  Record dispersal by a wolf from Minnesota.  J. Mammal. 64:166-167.

Fuller, T.K.  1989.  Population dynamics of wolves in north central Minnesota.  Wildl. Monogr. 105.  41 pp.

Fuller, T.K., W.E. Berg, G.L. Radde, M.S. Lenarz, and G.B. Joselyn.  1992.  A history and current estimate of wolf distribution and numbers in Minnesota.  Wildlife Society Bulletin 20:42-54.

Fuller, T.K., L.D. Mech, and J.F. Cochrane.  2003.  Wolf population dynamics.  Pp. 161-191 In Wolves:  Behavior, Ecology, and Conservation.  eds. L.D. Mech and L. Boitani.  Univ. of Chicago Press, Chicago.  448 pp.

Gehring, T.M. and B.A. Potter.  2005.  Wolf habitat analysis in Michigan:  an example of the need for proactive land management for carnivore species.  Wildlife Soc. Bulletin 33(4): 1237-1244.

Gogan, P.J.P, W.T. Route, E.M. Olexa, N. Thomas, D. Kuehn.  2004.  Gray wolves in and adjacent to Voyageurs National Park, Minnesota: research and synthesis 1987-1991. Technical Report NPS/MWR/RRTR/2004-01.  Available from Technical Information Center, Denver Service Center, National Park Service, P.O. Box 25287, Denver CO 80225-0287.  80 pp.

Goldman, E. A. 1944.  Part II. Classification of Wolves.  In S. P. Young and E. A. Goldman. The Wolves of North America.  The American Wildlife Institute, Washington, DC.Great Lakes Directory.  2003.  First wolf confirmed in Illinois since early 1900s.  Available at: http://www.greatlakesdirectory.org/il/072503_great_lakes.htm.  2 pp.

Grewal, S. K., P. J. Wilson, T. K. King, K. Shami, M.T. Theberge, J. Theberge, and B. N. White. 2004.  A genetic assessment of the eastern wolf (Canis lycaon) in Algonquin Provincial Park.  Journal of Mammalogy 85 (4): 625-632.

Hall, E. R. 1981.  The Mammals of North America.  Volume II.  Second Edition.  Wiley, New York.

Hall, E. R. and K. R. Kelson.  1959.  The Mammals of North America.  Volume II.  Ronald Press, New York. 536 pp.

Hammill, J. 2007. Policy issues regarding wolves in the Great Lakes Region. Transactions of the 72nd North American Wildlife and Natural Resources Conference, pp. 378-390.

Harrison, D.J. and T.G. Chapin.  1997.  An assessment of potential habitat for eastern timber wolves in the northeastern United States and connectivity with occupied habitat in southeastern Canada.  Wildl. Cons. Soc., Bronx, NY.  Working Pap. No. 7.  12 pp.

3

017408A

Harrison, D.J. and T.G. Chapin.  1998.  Extent and connectivity of habitat for wolves in Eastern North America.  Wildlife Society Bulletin 26(4):767-775.

Hearne, D., K. Lewis, M. Martin, E. Mitton, and C. Rocklen.  2003.  Assessing the Landscape: Toward a Viable Gray Wolf Population in Michigan and Wisconsin.  Natural Resources and Environment School of Natural Resources and Management, University of Michigan.  361 pp.

Hey, J. 2001. The mind of the species problem. Trends in Ecology and Evolution 16:326-329.

Hook, R.A. and W.L. Robinson. 1982. Attitudes of Michigan citizens toward predators. In Wolves of the World, eds. R.H. Harrington and P.C. Paquet, pp. 382-394. Park Ridge: Noyes Publications.

Huntzinger, B., J.A. Vucetich, T.D. Drummer, and R.O. Peterson.  2005.  Wolf recovery in Michigan, 2005 annual report.  Michigan Technological University, Houghton, MI.  39 pp.

International Commission on Zoological Nomenclature.  1999.  International Code for Zoological Nomenclature.  4th edition. London: The International Trust for Zoological Nomenclature.  http://www.iczn.org/iczn/index.jsp.

Jackson, H.H.T.  1961.  Mammals of Wisconsin.  University of Wisconsin Press, Madison, WI.  504 pp.

Jensen, W.F., T.K. Fuller, and W.L. Robinson. 1986.  Wolf, *Canis lupus*, distribution on the Ontario-Michigan border near Sault Ste. Marie.  Can. Field-Nat. 100(3):363-366.

Johnson, R.T. 1974. On the spoor of the "Big Bad Wolf." Journal of Environmental Education 6:37-39.

Johnson, M.R.  1995.  Rabies in wolves and its potential role in a Yellowstone wolf population.  pp. 431-439 *in* Carbyn, L.N., S.H. Fritts, and D.R. Seip.  1995.  Ecology and conservation of wolves in a changing world.  Canadian Circumpolar Institute, Occasional Publication No. 35.  Edmonton, Alberta.  642 pp.

Kellert, S.R.  1985.  The public and the timber wolf in Minnesota.  Unpubl. Rep. Yale Univ.  School For. and Environ. Stud., New Haven, CN  175 pp.

Kellert, S.R.  1990.  Public attitudes and beliefs about the wolf and its restoration in Michigan.  HBRS, Inc.  Madison, WI  102 pp.

Kellert, S.R.  1999.  The public and the wolf in Minnesota, 1999.  Unpublished report of the International Wolf Center, dated June, 1999.  412 pp.

Kellert, S.R., M. Black, G.R. Rush, and A.J. Bath. 1996. Human culture and large carnivore conservation in North America. Conservation Biology 10: 977-990.

Knight, J.M.  1985.  Survey of deer hunters attitudes toward wolves in two Wisconsin counties.  Madison:  MS Thesis, University of Wisconsin – Madison.

Koblmüller, S., M. Nord, R. K. Wayne, and J. A. Leonard.  2009.  Origin and status of the Great Lakes Wolf.  Molecular Ecology 18:2313-2326..

Kohn, B.E., J.L. Frair, D.E. Unger, T.M. Gehring, D.P. Shelley, E.M. Anderson, and P.W. Keenlance.  2000.  Impacts of the US Highway 53 Expansion Project on Wolves in Northwestern Wisconsin – Final Report.  Prepared for Wisconsin Department of Transportation by the Wisconsin Department of Natural Resources.  55 pp.

Kreeger, T.J.  2003.  The internal wolf:  physiology, pathology, and pharmacology.  Pp. 192-217 In Wolves:  Behavior, Ecology, and Conservation.  eds. L.D. Mech and L. Boitani.  Univ. of Chicago Press, Chicago.  448 pp.

Kurtén, B. and E. Anderson.  1980.  Pleistocene Mammals of North America.  1980.  Columbia

017409A

University Press, New York.

Lehman, N., A. Eisenhawer, K. Hansen, L. D. Mech, R. O. Peterson, P. J. P. Gogan, and R. K. Wayne.  1991.  Introgression of coyote mitochondrial DNA into sympatric North American gray wolf populations.  Evolution 45(1):104-119.

Leirfallom, J.  1970.  Wolf management in Minnesota.  Pages 9-15 in S.E. Jorgensen, C.E. Faulkner, and L.D. Mech, eds.  Proc. of a symposium on wolf management in selected areas of North America.  U.S. Fish and Wildl. Serv., Twin Cities, MN.  50 pp.

Leonard, J. A., and R. K. Wayne.  2008.  Native Great Lakes wolves were not restored.  Biology Letters 4:95-98.

Leonard, J. A., and R. K. Wayne.  2009. Wishful thinking: imagining that the current Great Lakes wolf is the same entity that existed historically. *Biology Letters*, 5, 67–68.

Licht, D.S. and S.H. Fritts.  1994.  Gray wolf (*Canis lupus*) occurrences in the Dakotas.  Am. Midl. Nat. 132:74-81.

Linnell, J.D.C., H. Broseth, E.J. Solberg, and S.M. Brainerd.  2005.  The origins of the southern Scandinavian wolf Canis lupus population:  potential for natural immigration in relation to dispersal distances, geography and Baltic ice.  Wildlife Biology 11:383-391.

Llewellyn, L. 1978. Who speaks for the timber wolf? Transactions of the North American Wildlife and Natural Resource Conference 43: 442-452.

Manfredo, M.J., T.L. Teel, and A.D. Bright. 2003. Why are public values toward wildlife changing? Human Dimensions of Wildlife 8:287-306.

Manitoba Conservation.  Undated.  Gray (timber) wolf.  Wildlife and Ecosystem Protection Fact sheet.  2 pp.  Available at: http://www.gov.mb.ca/conservation/wildlife/mamaging/fs_gray_wolf.html  Accessed 02/09/06.

Manitoba Conservation.  2011a.  Manitoba  Hunting Guide – Big Game Hunting – Gray Wolf and Coyote.  Wildlife and Ecosystem Protection Branch.  Available at http://www.manitoba.ca/conservation/wildlife/hunting/biggame/grwolf_coy/seasons.html Accessed 12/8/2011.

Manitoba Conservation.  2011b.  Manitoba 2011/2012 Trapping Guide.  Wildlife and Ecosystem Protection Branch.  Available at http://www.manitoba.ca/conservation/wildlife/trapping/index.html.  Accessed 12/8/2011.

Mayden, R. L. 1997. A hierarchy of species concepts: The denouement in the saga of the species problem, in Claridge, MF, H.A. Dawah, and M.R. Wilson. Species: The units of biodiversity. London: Chapman and Hall. pp. 381–4.

Mayr, E. 1942. Systematics and the origin of species.  New York: Columbia University Press.

Mayr, E. 1963. Animal species and evolution. Cambridge, MA: Harvard University Press.

Mayr, E. 1969.  Principles of Systematic Zoology.  McGraw-Hill, New York.

Mech, L.D. 1974. Current techniques in the study of elusive wilderness carnivores. Proceedings of the Eleventh International Congress of Game Biologists. 315-322.

Mech, L.D.  1989.  Wolf population survival in an area of high road density.  Am. Midl. Nat. 121:387-389.

Mech, L.D.  1994.  Buffer zones of territories of gray wolves as regions of intraspecific strife. J. Mammalogy 75(1):199-202.  Mech, L.D.  1995a.  The challenge and opportunity of recovery wolf populations.  Conserv. Biol. 9(2):270-278.

Mech, L.D.  1995b.  What do we know about wolves and what more do we need to learn. pp. 537-545 in Carbyn, L.N., S.H. Fritts, and D.R. Seip.  1995.  Ecology and conservation of

017410A

wolves in a changing world.  Canadian Circumpolar Institute, Occasional Publication No. 35.  Edmonton, Alberta.  642 pp.

Mech, L.D.  2006a.  Prediction failure of a wolf landscape model.  Wildlife Soc. Bull 34(3): 874-877.

Mech, L.D.  2006b.  Mladenoff et al. rebut lacks supportive data.  Wildlife Soc. Bull 34(3): 882-883.

Mech, L. D.  2009.  Crying wolf: concluding that wolves were not restored.  Biology Letters 5:65-66.

Mech, L. D.  2010.   What is the taxonomic identity of Minnesota wolves?  Can. J. Zool. 88:129-138.

Mech, L. D.  2011.  Minnesota Wolf Ear Lengths as Possible Indicators of Taxonomic differences.  Northeastern Naturalist 18:265-274.

Mech, L.D. and L. D. Frenzel Jr. 1971. Ecological studies of the timber wolf in northeastern Minnesota. U.S. Forest Service Research Paper NC-52.

Mech, L.D. and S.H. Fritts.  1987.  Parvovirus and heartworm found in Minnesota wolves.  Endang. Spec. Tech. Bull. 12:5-6.

Mech, L.D., S.H. Fritts, D.L. Radde, and W.J. Paul.  1988.  Wolf distribution and road density in Minnesota.  Wildl. Soc. Bull. 16:85-87.

Mech, L. D., S. H. Fritts, and D. Wagner. 1995. Minnesota wolf dispersal to Wisconsin and Michigan. American Midland Naturalist 133:368-370.

Mech, L.D. and S.M. Goyal.  1993.  Canine parvovirus effect on wolf population change and pup survival.  J. Wildl. Dis. 29:330-333.

Mech, L.D. and S.M. Goyal.  1995.  Effect of canine parvovirus on gray wolves in Minnesota.  J. Wildl. Manage. 59:565-570.

Mech, L.D. and S.M. Goyal.  2011.  Parsing demographic effect of canine parvovirus on a Minnesota wolf population.  Journal of Veterinary Medicine and Animal Health Vol. 3(2):27-30.

Mech, L.D., S.M. Goyal, C.N. Bota, and U.S. Seal.  1986.  Canine parvovirus infection in wolves (*Canis lupus*) from Minnesota.  J. Wildl. Dis. 22:104-106.

Mech, L.D., S.M. Goyal, W.J. Paul, and W.E. Newton.  2008.  Demographic effects of canine parvovirus on a free-ranging wolf population over 30 years.  J. Wildl. Dis. 44:824-836.

Mech, L.D. and H.J. Kurtz.  1999.  First record of coccidiosis in wolves, *Canis lupus*.  Can. Field-Nat. 113:305-306.

Mech, L.D. and M.E. Nelson.  1989.  Evidence of prey-caused mortality in three wolves.  Am. Midl. Nat. 123:207-208.

Mech, L. D., R. M. Nowak and S. Weisberg.  In press.  Use of Cranial Characters in Minnesota Wolf Taxonomy.  Canadian Journal of Zoology.

Mech, L. D., and W. J. Paul.  2008.  Wolf body mass cline across Minnesota related to taxonomy?  Canadian Journal of Zoology 86:933-936.

Mech, L.D. and R.A. Rausch.  1975.  The status of the wolf in the United States, 1973.  Pages 83-88 *in* D.H. Pimlott, ed.  Wolves.  Inter. Union. Conserv. Nature. and Nat. Resour. Publ, New Ser., Suppl. Pap. No. 43.  Morges, Switzerland.

Mech, L.D., R.P. Thiel, S.H Fritts, and W.E. Berg.  1985.  Presence and effects of the dog louse *Trichodectes canis* (Mallophaga, Trichodectidae) on wolves and coyotes from Minnesota and Wisconsin.  American Midland Naturalist 114:404-405.

Merrill, S.B. and L.D. Mech.  2000.  Details of Extensive Movements by Minnesota Wolves.

6

017411A

Am. Midl. Nat. 144:428-433.

Mertig, A.G.  2004.  Attitudes about wolves in Michigan, 2002.  Report to the Michigan Dept. of Natural Resources Wildlife Division.  108 pp.

Michigan Department of Natural Resources.  1997.  Michigan gray wolf recovery and management plan.  Lansing, MI  58 pp.

Michigan Department of Natural Resources.  1999.  Wisconsin man sentenced for shooting U.P. wolf.  News release, dated July 20, 1999.  1 p.

Michigan Department of Natural Resources.  2005a.  Michigan Department of Natural Resources Wildlife Division Procedure – Guidelines for management and lethal control of wolves following confirmed depredation events.  Version 1.04, 9/02/2005.  10 pp., including 2 appendices.

Michigan Department of Natural Resources.  2005b.  Application for a new federal recovery permit.  With cover letter from Mindy Koch, dated September 2, 2005.  11pp. plus letter.

Michigan Department of Natural Resources.  2005c.  Operational management guidance for state-owned forest lands.  Michigan Department of Natural Resources Forest, Mineral, and Fire Management, Lansing, MI.  62 pp.

Michigan Department of Natural Resources.  2006a.  Winter survey results show increase in wolf population.  Press release dated July 5, 2006.  1 p.

Michigan Department of Natural Resources.  2008a.  Michigan wolf management plan.  Lansing, MI.  95 pp.

Michigan Department of Natural Resources.  2008b. 2008 Michigan Deer Hunting Prospects, Statewide Forecast.  Available from Michigan DNR, Lansing Michigan.  10 pp.

Michigan Department of Natural Resources.  2010.  Wolf pup captured and released in the northern lower peninsula.  http://www.michigan.gov/dnr/0,1607, 7-153-10371_10402-241284--,00.html.  Accessed on 11/28/2010.

Michigan Wolf Management Roundtable.  2006.  Recommended guiding principles for wolf management in Michigan.  Report to the Director of the Michigan Department of Natural Resources.  November 2006.  18 pp.

Minnesota Department of Natural Resources.  1998.  1998 wolf public information meetings public comment summaries.  Unpublished report dated March 5, 1998.  St. Paul, MN  25 pp.

Minnesota Department of Natural Resources.  2000.  Directions 2000: The strategic plan.  MN DNR.  St. Paul, MN.  45 p.

Minnesota Department of Natural Resources.  2001.  Minnesota wolf management plan.  Prepared by the Section of Wildlife, dated February 2001.  36 pp. plus 9 appendices.

Minnesota Department of Natural Resources.  2009. 2009 Minnesota deer harvest report, St. Paul, MN. 41 p.

Mladenoff, D.J., M.K. Clayton, T.A. Sickley, and A.P. Wydeven.  2006.  L.D. Mech critique of our work lacks scientific validity.  Wildlife Soc. Bull. 34: 878-881.

Mladenoff, D.J., R.G. Haight, T.A. Sickley, and A.P. Wydeven.  1997.  Causes and implications of species restoration in altered ecosystems.  Bioscience 47(1): 21-31.

Mladenoff, D.J., and T.A. Sickley.  1998.  Assessing potential gray wolf restoration in the Northeastern United States:  a spatial prediction of favorable habitat and population level.  J. Wildl. Mgmt. 62:1-10.

Mladenoff, D.J., T.A. Sickley, R.G. Haight, and A.P. Wydeven.  1995.  A regional landscape analysis and prediction of favorable gray wolf habitat in the Northern Great Lakes region.

017412A

Conserv. Biology 9:279-294.

Mladenoff, D.J., T.A. Sickley, and A.P. Wydeven.  1999.  Predicting gray wolf landscape recolonization:  logistic regression models vs. new field data.  Ecological Applications 9(1):37-44.

Mladenoff, D.J., M.K. Clayton, S.D. Pratt, T.A. Sickley, and A.P. Wydeven.  2009.  Change in occupied wolf habitat in the northern Great Lakes region.  Pp. 119-138 in A.P. Wydeven, T. R. Van Deelen, and E.J. Heske, eds. Recovery of Wolves in the Great Lakes Region of the United States: An Endangered Species Success Story. Springer, New York, NY, USA. 350 pp.

Naughton-Treves, L., R. Grossberg, and A. Treves.  2003.  Paying for tolerance:  Rural citizens' attitudes toward wolf depredation and compensation.  Cons. Biol. 17: 1500-1511.

Nelson, E. and D. Franson. 1988. Timber wolf recovery in Wisconsin: The attitudes of Northern Wisconsin farmers and landowners. Research management findings 13, Madison: Wisconsin Department of Natural Resources.

Nowak, R. M.  1995.  Another look at wolf taxonomy.  Pp. 375-397 in L. N. Carbyn, S. H. Fritts, and D. R. Seip (eds.), Proceedings of the Second North American Symposium on Wolves, Canadian Circumpolar Institute, University of Alberta, Edmonton.

Nowak, R. M.  2002.  The original status of wolves in eastern North America.  Southeastern Naturalist.  1:95-130.

Nowak, R. M.  2003.  Wolf evolution and taxonomy.  Pp. 239-258 in L. D. Mech and L. Boitani (eds.), Wolves, Behavior, Ecology, and Conservation.  University of Chicago Press, Chicago.

Nowak, R. M.  2009.  Chapter 15, Taxonomy, Morphology, and Genetics of Wolves in the Great Lakes Region. Pp. 233-250 in A. P. Wydeven, T. R. Van Deelen, & E. Heske (eds.), Recovery of Wolves in the Great Lakes Region.  Springer, New York.

Ontario Ministry of Natural Resources.  2005a.  Backgrounder on wolf conservation in Ontario.  52 pp.

Ontario Ministry of Natural Resources.  2005b.  Notice of Decision for Regulation.  http://www.ene.gov.on.ca/envretistry/023668er.html.  Accessed 02/09/06.

Ontario Ministry of Natural Resources.  2005c.  Province ensures conservation of Ontario wolves – Introduces new closed season for hunting and trapping in central and northern Ontario.  Press release dated March 10, 2005.  http://www.mnr.gov.on.ca/MNR/csb/news/2005/mar10nr_05.html.  Accessed 02/08/06.

Patten, M. A., and P. Unitt.  2002.  Diagnosability versus mean differences of sage sparrow subspecies.  The Auk 119(1):26-35.

Paul, W.J.  2004.  Wolf depredation on livestock in Minnesota, annual update of statistics - 2003.  U.S. Dep. of Agri., Animal & Plant Health Inspection Serv., Wildl. Serv.  Grand Rapids, Minnesota. 13 pp.

Paul, W.J.  2005.  Summary of basic data from USDA Wolf-Livestock Depredation Control Program in Minnesota, 2000-04.  U.S. Dep. of Agri., Animal & Plant Health Inspection Serv., Wildl. Serv.  Grand Rapids, Minnesota. 3 pp

Peterson, R.O., N.J. Thomas, J.M. Thurber, J.A. Vucetich, and T.A. Waite.  1998.  Population limitation and the wolves of Isle Royale.  J. Mammal.  79:828-841.

Pletscher, D.H., R.R. Ream, R. Demarchi, W.G. Brewster, and E.E. Bangs. 1991.  Managing wolf and ungulate populations in an international ecosystem. Trans. 56th N.A. Wildlife and Natural Resources Conference 56:539-549.

017413A

Potvin, M.J.  2003.  A habitat analysis for wolves in Michigan.  M.S. thesis, Michigan
    Technological University, Houghton, Michigan.  83 pp.

Potvin, M.J., T.D. Drummer, J.A. Vucetich, D.E. Beyer, R.O. Peterson, and J.H. Hammill.  2005.
    Monitoring and habitat analysis for wolves in Upper Michigan.  J. Wildl. Mgmt.
    69:1660-1669.

Roell, B.J., D. E. Beyer, Jr., T. C. Hogrefe, D. H. Lonsway, K. L. Sitar, and P.E. Lederle.  2009.
    Michigan Wolf Management 2008 Report.  Michigan Department of Natural Resources,
    Lansing, Michigan.  21pp.

Rolley, R.E. 2007.  White-tailed deer population status 2007.  Unpublished report by Wisconsin
    Department of Natural Resources.  Available at:
    http://www.dnr.state.wi.us/org/land/wildlife/harvest/reports/wtaildeerpop07.pdf.
    Accessed on 07/14/2009.

Rolley, R.E. 2008.  White-tailed deer population status 2008.  Unpublished report by Wisconsin
    Department of Natural Resources.  Available at:
    http://www.dnr.state.wi.us/org/land/wildlife/harvest/reports/wtaildeerpop08.pdf.
    Accessed on 07/14/2009.

Ruid, D.B., W.J. Paul, B.J. Roell, A.P. Wydeven, R.C. Willing, R.L. Jurewicz, and D.H.
    Lonsway. 2009.  Wolf-human conflict and management in Minnesota, Wisconsin, and
    Michigan. pp. 279-295 in A.P. Wydeven, T. R. Van Deelen, and E.J. Heske. Recovery of
    Gray Wolves in the Great Lakes Region of the United States: An Endangered Species
    Success Story.  Springer, New York, NY, USA.

Rutledge, L. Y., K. J. Bos, R. J. Pearce, B. N. White.  2010.  Genetic and morphometric analysis
    of sixteenth century Canis skull fragments: implication for historic eastern and gray wolf
    distribution in North America.  Conservation Genetics doi 10.1007/s10592-009-9957-2.

Rutledge, L.Y., C.J. Garroway, K.M. Loveless, and B.R. Patterson.  2010.  Genetic
    differentiation of eastern wolves in Algonquin Park despite bridging gene flow between
    coyotes and grey wolves.  Heredity doi:10.1038/hdy.2010.6.

Shanning, K.  2003.  The state of the wolf project: Michigan survey results.  Ashland: Sigurd
    Olson Environmental Institute, Northland College.

Shanning, K.  2004.  The state of the wolf project: Wisconsin survey results.  Ashland: Sigurd
    Olson Environmental Institute, Northland College.

Schanning, K. 2009. Human dimensions: Public opinion research concerning wolves in the Great
    Lakes States of Michigan, Minnesota, and Wisconsin In Recovery of Gray Wolves in the
    Great Lakes Region of the United States: An Endangered Species Success Story, eds.
    A.P. Wydeven, T.R. Van Deelen, E.J Heske, pp. 251-265. Springer: New York.

Schanning, K, and J. Vazquez.  2005. State of the wolf project:  findings from the 2003
    Wisconsin survey.  International Wolf 15:8-9.

Schwartz, M. K., and V. A. Vucetich.  2009.  Molecules and beyond:  assessing the distinctness
    of the Great Lakes wolf.  Molecular Ecology, doi: 10.1111/j.1365-294X.2009.04177.x

Schwenk K., N. Brede, and B. Streit.  2008.  Introduction. Extent, processes and evolutionary
    impact of interspecific hybridization in animals.  Phil. Trans. R. Soc.363: 2805-2811.

Shelley, V., A. Treves, and L. Naughton. In review. Attitudes to wolves and wolf policy among
    Ojibwe tribal members and non-tribal residents of Wisconsin's wolf range.

Smith, D.W., K.M. Murphy, and D.S. Guernsey.  2001.  Yellowstone Wolf Project: Annual
    Report, 2002. National Park Service, Yellowstone Center for Resources, Yellowstone
    National Park, Wyoming. 14 pp.

017414A

Smith, D.W., D.R. Stahler, and D.S. Guernsey.  2005.  Yellowstone Wolf Project: Annual Report, 2004. National Park Service, Yellowstone Center for Resources, Yellowstone National Park, Wyoming. 18 pp.

Stebler, A. M.  1944.  The status of the wolf in Michigan.  Journal of Mammalogy 25:37-43.

Stenlund, M.H.  1955.  A field study of the timber wolf (*Canis lupus*) on the Superior National Forest, Minnesota.  Minnesota Dep. Conserv. Tech. Bull. 4.  55 pp.

Stronen, A.V., T. Sallows, G.J. Forbes, B. Wagner, P.C. Paquet.  2011.  Disease and Parasites in Wolves of the Riding Mountain National Park Region, Manitoba, Canada.  Journal of Wildlife Diseases 47(1):222-227.

Thiel, R.P. 1978.  The status of the timber wolf in Wisconsin in 1975.  Transactions of the Wisconsin Academy of Science Letters, and Arts. 66: 186-194. Wisconsin.

Thiel, R.P.  1985.  The relationship between road densities and wolf habitat suitability in Wisconsin.  Am. Midl. Nat. 113:404:407.

Thiel, R.P. 1993. The Timber Wolf in Wisconsin: The Death and Life of a Majestic Predator. University of Wisconsin Press. Madison, WI , USA.

Thiel, R.P. 2009. A disjunct gray wolf population in Central Wisconsin.  pp. 107-117 *in* A.P. Wydeven, T. R. Van Deelen, and E.J. Heske. Recovery of Gray Wolves in the Great Lakes Region of the United States: An Endangered Species Success Story.  Springer, New York, NY, USA.

Treves, A. and K. Martin. In press. Hunters as stewards of wolves in Wisconsin and the Northern Rocky Mountains, USA. Society and Natural Resources.

Treves, A., K.A. Martin, J.E. Wiedenhoeft, and A.P. Wydeven.  2009.  Dispersal of gray wolves in the Great Lakes region.  pp. 191-204 in A.P. Wydeven, T. R. Van Deelen, and E.J. Heske, eds. Recovery of Wolves in the Great Lakes Region of the United States: An Endangered Species Success Story. Springer, New York, NY, USA. 350 pp.

Treves, A. , L. Naughton-Treves, E.K. Harper,  D.J. Mladenoff, R.A Rose, T.A. Sickley, and A.P. Wydeven 2004.  Predicting human-carnivore conflict: a spatial model based on 25 years of wolf depredation on livestock. Conservation Biology 18: 114-125.

Treves, A., L. Naugton, and V. Shelley. In review. Sinking public tolerance for gray wolf recovery in Wisconsin exposes a global challenge for predator conservation.

U.S. Department of Agriculture, National Forest Service.  2004a.  Superior National Forest Land and Resource Management Plan.  Available at:
http://www.fs.fed.us/r9/forests/superior/projects/forest_plan/2004_forest_plan.php

U.S. Department of Agriculture, National Forest Service.  2004b.  Chippewa National Forest Revised Forest Plan.  Available at:
http://www.fs.fed.us/r9/forests/chippewa/projects/forest_plan/index.php

U.S. Department of Agriculture, National Forest Service.  2004c.  Chequamegon-Nicolet National Forest Plan (2004 Land and Resource Management Plan).  Available at: http://www.fs.fed.us/r9/cnnf/natres/final_forest_plan/lmp2004/index.html

U.S. Department of Agriculture, National Forest Service.  2006a.  Hiawatha National Forest Plan.  Available at:  http://www.fs.fed.us/r9/hiawatha/revision/rev_welcome.html

U.S. Department of Agriculture, National Forest Service.  2006b.  Ottawa National Forest Management Plan.  Available at:
http://www.fs.fed.us/r9/ottawa/forest_management/forest_plan/revision/fp_final/final_forest_plan_internet.htm

U.S. Department of Agriculture - Wildlife Services. 2009. Wolf damage management in

017415A

Minnesota - 2009, Grand Rapids, MN. 9 p.

U.S. Department of Agriculture - Wildlife Services. 2010. Wolf damage management in Minnesota - 2010, Grand Rapids, MN. 9 p.

U.S. Fish and Wildlife Service. 1978. Recovery plan for the eastern timber wolf. Washington, D.C. 79 pp.

U.S. Fish and Wildlife Service. 1990. Red Wolf Recovery/Species Survival Plan. Atlanta, GA 115 pp.

U.S. Fish and Wildlife Service. 1992. Recovery plan for the eastern timber wolf. Twin Cities, MN 73 pp.

U.S. Fish and Wildlife Service. 2005. Gray wolf Recovery Weekly Progress Report, week of 8/26 to 9/2, 2005. From Gray Wolf Recovery Coordinator, Helena, MT. 7 pp.

U.S. Fish and Wildlife Service, Nez Perce Tribe, National Park Service, and USDA Wildlife Services. 2001. Rocky Mountain Wolf Recovery 2000 Annual Report. U.S. Fish and Wildlife Service, Ecological Services, 100 N. Park, Suite 320, Helena, MT. 59601. 35 pp.

U.S. Fish and Wildlife Service, Nez Perce Tribe, National Park Service, and USDA Wildlife Services. 2002. Rocky Mountain Wolf Recovery 2001 Annual Report. T. Meier, ed. U.S. Fish and Wildlife Service, Ecological Services, 100 N. Park, Suite 320, Helena, MT. 59601. 43 pp.

U.S. Fish and Wildlife Service, Nez Perce Tribe, National Park Service, Montana Fish Wildlife and Parks, Idaho Fish and Game, and USDA Wildlife Services. 2006. Rocky Mountain Wolf Recovery 2005 Interagency Annual Report. C.A. Sime and E.E. Bangs, eds. USFWS, Ecological Services, 585 Shepard Way, Helena, MT. 59601 130 pp.

Van Camp, J. and R. Gluckie. 1979. A record long distance move by a wolf (*Canis lupus*). Journal of Mammalogy 60:236-237.

Van Deelen, T. 2005. Winter severity indices for 2003-2004. Unpublished report by Wisconsin DNR, Madison, WI. 5 pp.

VanDeelen, T. 2009. Growth charachteristics of a recovering wolf population in the Great Lakes region. pp. 139-154 in A.P. Wydeven, T. R. Van Deelen, and E.J. Heske, eds. Recovery of Wolves in the Great Lakes Region of the United States: An Endangered Species Success Story. Springer, New York, NY, USA. 350 pp.

vonHoldt, B.M., J.P. Pollinger, D.A. Earl, J.C. Knowles, A.R. boyko, H. Parker, E. Geffen, M. Pilot, W. Jedrzejewski, B. Jedrzejewski, V. Sidorovich, C. Greco, E. Randi, M. Musiani, R. Kays, C.D. Bustemante, E.A. Ostrander, J. Novembre, and R.K. Wayne. 2011. A genome-wide perspective on the evolutionary history of enigmatic wolf-like canids. Genome Research, 21: doi:10.1101/gr.116301.110.

Vucetich, J.A. and R.O. Peterson. 2011. Ecological studies of wolves on Isle Royale – Annual report 2010-2011. Unpublished report by School of Forest Resources and Environmental Science, Michigan Technological University, Houghton, Michigan. 16 pp.

Wabakken, P., H. Sand, I. Kojola, B. Zimmermann, J.M. Arnemo, H.C. Pedersen, and O. Liberg. 2007. Multistage, long-range natal dispersal by global positioning system-collared Scandinavian wolf. Journal of Wildlife Management 71:1631-1634.

Wayne, R.K., N. Lehman, D. Girman, P.J.P. Gogan, D.A. Gilbert, K. Hansen, R.O. Peterson, U.S. Seal, A. Eisenhawer, L.D. Mech, and R.J. Krumenaker. 1991. Conservation genetics of the endangered Isle Royale gray wolf. Cons. Biol. 5: 41-51.

Weise, T.F., W.L. Robinson, R.A. Hook, and L.D. Mech. 1975. An experimental translocation

017416A

of the eastern timber wolf.  Audubon Conservation Report No. 5.  28 pp.

Wheeldon, T. and B. N. White.  2009. Genetic analysis of historical western Great Lakes region wolf samples reveals early Canis lupus/lycaon hybridization.  Biology Letters 5:101-104.

Wheeldon, T., B. Patterson, and B. N. White.  2010.  Sympatric wolf and coyote populations of the western Great Lakes region are reproductively isolated.  Molecular Ecology, doi: 10.1111/j.1365-294X.2010.04818.x.

Whittington, J., C.C. St. Clair, and G. Mercer.  2004.  Path tortuosity and the permeability of roads and trails to wolf movement.  Ecology and Society 9(1): 4 [online] URL: http://www.ecologyandsociety.org/vol9/iss1/art4.  15 pp.

Wiedenhoeft, J.E.  2005.  Summary Report:  "Minnesota-type" wolf survey for Wisconsin – GIS analysis.  Unpublished report by WI DNR, Bureau of Endangered Resources, Madison, WI.  14 pp.

Wild, M.A., N. T. Hobbs, M.S. Graham, M.W. Miller.  2011.  The Role of Predation in Disease Control: A Comparison of Selective and Nonselective Removal on Prion Disease Dynamics in Deer.  Journal of Wildlife Diseases 47(1):78-93.

Wiley, E. O.  1981.  Phylogenetics; The Theory and Practice of Phylogenetic Systematics. Wiley, New York.

Wilkins, J. S.  2003.  The Origins of Species Concepts: History, characters, Modes, and Synapomorphies. https://webspace.utexas.edu/deverj/personal/test/species.pdf.  Accessed 08/20/2009.

Wilkins, J. S.  2006. A List of 26 Species Concepts. Science Blogs. http://scienceblogs.com/evolvingthoughts/2006/10/a_list_of_26_species_concepts.php. Accessed 08/20/2009.

Williams, C.K., G. Ericsson, and T.A. Heberlein. 2002. A quantitative summary of attitudes toward wolves and their reintroduction (1972-2000). Wildlife Society Bulletin 30: 575-584.

Wilson, E. O. and W. L. Brown.  1953.  The subspecies concept and its taxonomic application. Systematic Zoology 2(3): 97-111.

Wilson, M.A. 1999. Appendix H. Public Attitudes toward wolves in Wisconsin. Wisconsin Wolf Management Plan. Madison: Wisconsin Department of Natural Resources.

Wilson, P. J., S. Grewal, I. D. Lawford, J. N. M. Heal, A. G. Granacki, D. Pennock, J. B. Theberge, M. T. Theberge, D. R. Voigt, W. Waddell, R. E. Chambers, P. C. Paquet, G. Goulet, D. Cluff, and B. N. White.  2000.  DNA profiles of the eastern Canadian wolf and the red wolf provide evidence for a common evolutionary history independent of the gray wolf.  Canadian Journal of Zoology 78:2156-2166.

Wilson, P. J., S. Grewal, T. McFadden, R. C. Chambers, and B. N. White.  2003.  Mitrochondrial DNA extracted from eastern North American wolves killed in the 1800s is not of gray wolf origin.  Canadian Journal of Zoology 81:936-940.

Wilson, P.J., S.K. Grewal, F.F. Mallory, B.N. White.  2009.  Genetic characterization of hybrid wolves across Ontario. Journal of Heredity, 100, S80–S89.

Wilson, R.S. and J.T. Bruskotter. 2009. Assessing the impact of decision frame and existing attitudes on support for wolf restoration in the United States. Human Dimensions of Wildlife 14:353-365.

Wisconsin Department of Natural Resources.  1999.  Wisconsin wolf management plan - October 27, 1999.  Madison, WI  74 pp.

Wisconsin Department of Natural Resources.  2006a.  Wisconsin Wolf Management Plan –

017417A

Addendum 2006.  60 pp.

Wisconsin Department of Natural Resources.  2006c.  Administrative Rule Chapter NR 12.
Wildlife Damage and Nuisance Control.  Available at:
http://www.legis.state.wi.us/rsb/code/nr/nr012.pdf

Wisconsin Department of Natural Resources.  2008.  Guidelines for conducting depredation
control on wolves in Wisconsin following federal delisting.  May 15, 2008. Madison, WI.
10 pp.

Wisconsin Department of Natural Resources. 2010. Wisconsin Big Game Hunting Summary,
2009: Deer, Bear, Turkey.  PUB-WM-284-2010. Wisconsin Department of Natural
Resources, Madison, WI, USA 82 pp.

Wisconsin Department of Natural Resources.  Undated a.  Deer Population Goals.  Available at:
http://www/dnr/state.wi.us/org/land/wildlifr/hunt/deer/popgoal.htm.  Accessed 01/27/06.

Wydeven, A.P.  1994.  Travels of a midwestern disperser.   Intern. Wolf.  4: 20-22.

Wydeven, A.P.  1998.  Wisconsin Endangered Resources Report.  Status of the timber wolf in
Wisconsin, performance report, July 1, 1997 through 30 June 1998.  Bur. Endangered
Res., Wisconsin Dept. Natural Resources.  20 pp.

Wydeven, A. P., T. K. Fuller, W. Weber, and K. MacDonald. 1998. The potential for wolf
Recovery in the northeastern United States via dispersal from southeastern Canada.
Wildlife Society Bulletin 26:776-784.

Wydeven, A,P and R.L. Jurewicz.  2005.  Justification for lethal control authority for recovery
activity under section 10(a)(1)(A)of the Endangered Species Act on gray wolves in
Wisconsin.  Wisconsin Dept. of Natural Resources.  18 pp.

Wydeven, A,P, D.J. Mladenoff, T.A. Sickley, and R.G. Haight.  1999.  GIS evaluation of wolf
habitat and potential populations in the Great Lakes States.  Appendix C, pp. 46-49, in
Wisconsin Wolf Management Plan, October 27, 1999.  Wisconsin Dept. of Nat.
Resources, Madison, WI.  74 pp.

Wydeven, A,P, D.J. Mladenoff, T.A. Sickley, B.E. Kohn, R.P. Thiel, and J.L. Hansen.  2001a.
Road density as a factor in habitat selection by wolves and other carnivores in the Great
Lakes Region. Endangered Species UPDATE. 18:110-114.

Wydeven, A.P. and C.M. Pils.  2008.  Changes in mammalian conrnivore populations.  Pp. 257-
272 in D.M. Waller and T.P. Rooney, editors.  The Vanishing Present: Wisconsin's
Changing Lands, Water, and Wildlife.  University of Chicago Press, Chicago, IL.  507pp.

Wydeven, A,P, R.N. Schultz, and R.P. Thiel.  1995.  Monitoring of a recovering gray wolf
population in Wisconsin, 1979-1991.  pp. 147-156 in Carbyn, L.N., S.H. Fritts, and D.R.
Seip.  1995.  Ecology and conservation of wolves in a changing world.  Canadian
Circumpolar Institute, Occasional Publication No. 35.  Edmonton, Alberta. 642 pp.

Wydeven, A.P., A. Treves, B. Brost, and J.E. Wiedenhoeft, 2004. Characteristics of wolf packs
in Wisconsin: identification of traits influencing depredation. pp. 28-50 in N. Fascione,
A. Delach, and M.E. Smith. People and Predators: From Conflict to Coexistence.
Defenders of Wildlife, Island Press, Washington, D.C. USA.

Wydeven, A.P., and J.E. Wiedenhoeft.  1999.  Progress Report of Wolf Population Monitoring in
Wisconsin for the Period October-December 1998. Wisconsin Department of Natural
Resources, Park Falls, Wisconsin. 8 pp.

Wydeven, A,P, and J.E. Wiedenhoeft.  2000.  Gray wolf population 1999-2000.  Wisconsin
Department of Natural Resources, Park Falls, Wisconsin.  9 pp.

Wydeven, A,P, and J.E. Wiedenhoeft.  2001.  Progress Report of Wolf Population Monitoring in

017418A

Wisconsin for the Period October-December 2000.  Wisconsin Department of Natural Resources, Park Falls, Wisconsin.  9 pp.

Wydeven, A.P, and J.E. Wiedenhoeft.  2002.  Progress Report of Wolf Population Monitoring in Wisconsin for the Period October-December 2001.  Wisconsin Department of Natural Resources, Park Falls, Wisconsin.  9 pp.

Wydeven, A.P, and J.E. Wiedenhoeft.  2003a.  Progress Report of Wolf Population Monitoring in Wisconsin for the Period October-December 2002 and Summaries of 2002.  Wisconsin Department of Natural Resources, Park Falls, Wisconsin.  14 pp.

Wydeven, A.P, and J.E. Wiedenhoeft.  2003b.  Status of the Timber Wolf in Wisconsin Performance Report 1 July 2002 through 30 June 2003.  Bureau of Endangered Resources: Wisconsin Department of Natural Resources.  30 pp.

Wydeven, A.P, and J.E. Wiedenhoeft.  2004a.  Progress Report of Wolf Population Monitoring in Wisconsin for the Period October-December 2003.  Wisconsin Department of Natural Resources, Park Falls, Wisconsin.  16pp.

Wydeven, A.P, and J.E. Wiedenhoeft.  2004b.  Status of the Timber Wolf in Wisconsin Performance Report 1 July 2003 through 30 June 2004.  Bureau of Endangered Resources: Wisconsin Department of Natural Resources.  33 pp.

Wydeven, A.P., and J.E. Wiedenhoeft.  2005.  Status of the Timber Wolf in Wisconsin Performance Report 1 July 2004 through 30 June 2005.  WI DNR, Park Falls, Wisconsin.  33 pp.

Wydeven, A.P., and J.E. Wiedenhoeft.  2006.  Status of the Timber Wolf in Wisconsin Performance Report 1 July 2005 through 30 June 2006.  WI DNR, Park Falls, Wisconsin.  38 pp.

Wydeven, A.P. and J.E. Wiedenhoeft.  2008.  Wisconsin gray wolf post-delisting monitoring, Year 1 of post-desliting, period 12 March 2007 through 30 June 2008.  Unpublished report by WI DNR, Madison, WI.  40 pp.

Wydeven, A.P. and J.E. Wiedenhoeft.  2009.  Gray Wolf Population 2008-2009.  WI DNR, Park Falls, Wisconsin.  20 pp.

Wydeven, A.P., J.E. Wiedenhoeft, R.P. Thiel, R.N. Schultz, E. Heilhecker, and S. Rossler.  2007a.  Progress report of wolf population monitoring in Wisconsin for the period April - September 2006.  Unpublished report by WI DNR, Park Falls, WI.  48pp.

Wydeven, A.P., J.E. Wiedenhoeft, R.P. Thiel, R.N. Schultz, and S.R. Boles.  2007b.  Progress report of wolf population monitoring in Wisconsin for the period October 2006 - March 2007.  Unpublished report by WI DNR, Park Falls, WI.  30pp. Wydeven, A.P., J.E. Wiedenhoeft, R.N. Schultz, R.P. Thiel, S.R. Boles, W.H. Hall, Jr E., and Heilhecker.  2003.  Progress report of wolf population monitoring for the period October 2002 – March 2003.  Unpublished report by WI DNR, Park Falls, WI.  48 pp.

Wydeven, A.P., J.E. Wiedenhoeft, R.N. Schultz, R.P. Thiel, S.R. Boles, and E. Heilhecker.  2006.  Progress report of wolf population monitoring for the period October 2005 – March 2006.  Unpublished report by WI DNR, Park Falls, WI.  39 pp.

Wydeven, A.P., J.E. Wiedenhoeft, R.N. Schultz, R.P. Thiel, W.H. Hall, E. Heilhecker, and J.E. Hawley.  2004.  Progress report of wolf population monitoring in Wisconsin for the period April - September 2003.  Unpublished report by WI DNR, Park Falls, WI.  31 pp.

Wydeven, A.P., J.E. Wiedenhoeft, R.N. Schultz, R.P. Thiel, W.H. Hall, E. Heilhecker, and J.E. Hawley.  2005b.  Progress report of wolf population monitoring in Wisconsin for the period April - September 2004 & annual summaries for 2004.  Unpublished report by WI

017419A

DNR, Park Falls, WI.  28 pp.

Wydeven, A.P., J.E. Wiedenhoeft, R.P. Thiel, R.N. Schultz, B.E. Kohn, and S.R. Boles.  2001b.
    Progress report of wolf population monitoring in Wisconsin for the period October 2000 -
    March 2001.  Unpublished report by WI DNR, Park Falls, WI.  36pp.

Wydeven, A.P., J.E. Wiedenhoeft, R.N. Schultz, R.P. Thiel, and S. Rossler.  2006b.  Progress
    report of wolf population monitoring in Wisconsin for the period April - September 2005
    & annual summaries for 2005.  Unpublished report by WI DNR, Park Falls, WI.  30 pp.

Wydeven, A.P., J.E. Wiedenhoeft, R.N. Schultz, and R.P. Thiel.  2009a.  Progress report of wolf
    population monitoring in Wisconsin for the period April - September 2008, and annual
    summaries for 2008.  Unpublished report by WI DNR, Park Falls, WI.  35 pp.

Wydeven, A.P., J.E. Wiedenhoeft, R.N. Schultz, R.P. Thiel, R. L. Jurewicz, B.E. Kohn, and T.
    R. Van Deelen. 2009b. History, population growth, and management of wolves in
    Wisconsin. Pp. 87-105 in A.P. Wydeven, T. R. Van Deelen, and E.J. Heske, eds.
    Recovery of Wolves in the Great Lakes Region of the United States: An Endangered
    Species Success Story. Springer, New York, NY, USA. 350 pp.

Wydeven, A.P., J.E. Wiedenhoeft, R.N. Schultz, R.P. Thiel, and S. Boles.  2010.  Status of the
    timber wolf in Wisconsin, performance report 1 July 2009 through 30 June 2010.
    Unpublished report by WI DNR, Park Falls, WI.  67 pp.

Wydeven, A.P., J. E. Wiedenhoeft, J. Bruner, R.P. Thiel, R. N. Schultz, and S R. Boles. 2011.
    Wolf Population Monitoring in Wisconsin in 2010, Year end summary. Wisconsin
    Department of Natural Resources, Park Falls, WI 15 pp. (unpublished report).

**Unpublished Documents, Noted as "in litt." and "pers. comm." in Final Rule**

Anschutz, Steve.  2003.  E-mail from Anschutz, USFWS Nebraska Field Office Supervisor to
    Laura Ragan, USFWS Regional Office, Ft. Snelling, MN, dated 04/01/03.  Subject:  gray
    wolf shot.  1 p.

Anschutz, Steve.  2006.  E-mail from Anschutz, USFWS Nebraska Field Office Supervisor to
    Ron Refsnider, USFWS Regional Office, Ft. Snelling, MN, dated 10/30/06.  Subject:
    Nebraska wolf from 1995?

Beheler, Kerry.  undated.  Memo from Beheler, WI DNR Wildlife Health Specialist, to Dean
    Beyer, MI DNR Wildlife Research Biologist.  Subject:  Michigan Gray Wolf Health
    Sample Analysis 1992-1999.  3 pp.

Beheler, Kerry.  2004.  Memo from Beheler, WI DNR Wildlife Health Specialist, to Dean Beyer,
    MI DNR Wildlife Research Biologist.  Subject:  Michigan Gray Wolf Serologic
    Analysis:  2001 Captured Animals. Memo dated 04/14/04.  2 pp.

Berg, Bill.  1998.  E-mail from Berg, MN DNR Wildlife Research to Ron Refsnider, USFWS
    Regional Office, Ft. Snelling, MN, dated 11/12/98.  Subject:  wolf mortality data - reply.
    1 p.

Berkley, E.  2009.  Telephone conversation between Berkley, Sherburne National Wildlife
    Refuge, and Phil Delphey, USFWS Twin Cites, MN, ES Field Office, on 07/14/09.

Beyer, Dean.  2005.  Unpublished 1999-2004 wolf mortality data from Michigan DNR.

Beyer, Dean.  2006a.  E-mail from Beyer, MI DNR Wildlife Research, to Ron Refsnider,
    USFWS Regional Office, Ft. Snelling, MN, dated 02/02/06.  Subject:  CPV data for MI
    wolves?  1 p. plus 2- and 3-page attached reports by Kerry Beheler, WI DNR Wildlife
    Health Specialist.

017420A

Beyer, Dean.  2006b.  E-mail from Beyer, MI DNR Wildlife Research, to Ron Refsnider, USFWS Regional Office, Ft. Snelling, MN, dated 08/10/06.  Subject:  Potential for "MN-style" wolf monitoring in WI and MI?  2 pp. with 6-page attachment by Drummer.

Bicknell, William.  2009.  Email from Bicknell, USFWS Bismarck, ND, ES Field Office, to Laura Ragan, USFWS Regional Office, Ft. Snelling, MN, dated 07/10/09.  Subject:  [Wolf status/protection in ND].  1 p.

Brininger, W.  2009.  Telephone conversation between Brininger, Tamarac National Wildlife Refuge, and Phil Delphey, USFWS Twin Cites, MN, ES Field Office, on 07/14/09.

Caldwell, Carolyn.  2005.  E-mail from Caldwell, Program Administrator, OH DNR, to Ron Refsnider, USFWS Regional Office, Ft. Snelling, MN, dated 10/14/05.  Subject:  Request for State Wolf Regulations, summary of wolf reports.  2 pp.

Carbyn, Ludwig.  Canadian Wildlife Service, in litt. 2000.

Center for Biological Diversity.  2011.  Comment letter on May 2011 Proposed Rule To Revise the List of Endangered and Threatened Wildlife for the Gray Wolf (*Canis lupus*) in the Eastern United States, Initiation of Status Reviews for the Gray Wolf and for the Eastern Wolf (*Canis lycaon*).  Letter dated 7/5/2011.

Collins, Roger.  1998.  Memo from Roger Collins, Supervisor, USFWS ND ES Field Office, to ARD-Ecological Services, Ft. Snelling, MN (Attn:  R. Refsnider).  Subject:  Wolf Information Request.  2 pp. with attached 2 pp. of maps.

Defenders of Wildlife.  2011.  Comment letter on May 2011 Proposed Rule To Revise the List of Endangered and Threatened Wildlife for the Gray Wolf (*Canis lupus*) in the Eastern United States, Initiation of Status Reviews for the Gray Wolf and for the Eastern Wolf (*Canis lycaon*).  Letter dated 9/26/2011.

DelGiudice, Glen.  2005.  E-mail from DelGuidice, MN DNR Wildlife Research, to Ron Refsnider, USFWS Regional Office, Ft. Snelling, MN, dated 11/22/05.  Subject:  Wolf mortality data in MN.  With unpublished data from Forest Wildlife Research Group, Minnesota DNR, Grand Rapids, MN  4 pp.

Delphey, P.  2009.  Email from Delphey, USFWS Twin Cities, MN, ES Field Office, to Laura Ragan, USFWS Regional Office, Ft. Snelling, MN, dated 08/12/09.  Subject:  SNF sq. km.  2 pp.

Dirks, Brian.  2009.  Telephone conversation between Dirks, MN DNR, Camp Ripley, and Phil Delphey, USFWS Twin Cities, MN, ES Field Office, on 07/14/09.  Subject:  Numbers and management of wolves at Camp Ripley, MN.

Donofrio, Mike.  1998.  Telephone conversation between Donofrio, Natural Resources Director, Keweenaw Bay Indian Community, and Mike DeCapita, USFWS East Lansing, MI, ES Field Office, on 11/04/98.  Subject:  Keweenaw Bay Indian Community contact.

Donofrio, Mike.  2003.  Letter from Donofrio, Natural Resources Director, Keweenaw Bay Indian Community, to Ron Refsnider, USFWS Regional Office, Ft. Snelling, MN, dated 08/12/03.  Regarding Keweenaw Bay Indian Community position on wolf delisting.  2 pp.

Edwards, Andrew J.  2003.  Letter from Edwards, Biological Services Director, 1854 Authority Biological Services, to Ron Refsnider, USFWS Regional Office, Ft. Snelling, MN, dated 08/07/03.  Regarding 1854 Authority position on DPS wolf delisting.  3 pp.

Eklund, D.A. 2009.  E-mail from Eklund, U.S. Forest Service, Chequamegon-Nicolet National Forest, to Joel Trick, USFWS Green Bay, WI, ES Field Office, dated 08/07/2009.  Subject: Current Wolf Numbers.  1 p.

017421A

Eklund, D.A. 2011.  Public comments prepared by Eklund, U.S. Forest Service, Chequamegon-Nicolet National Forest, regarding the Service's proposal to revise the List of Endnagered and Threatened Wildlife for the gray wolf in the western Great Lakes.  4 pp.

Erb, John.  2005.  E-mail from Erb, MN DNR Wildlife Research to Ron Refsnider, USFWS Regional Office, Ft. Snelling, MN, dated 12/14/05.  Subject:  Wolves in Zones A and B?  1 p.

Evans, Robert A.  2005.  E-mail from Evans, Wildlife Biologist, Ottawa National Forest, to Christie Deloria, USFWS Marquette, MI, ES Suboffice, dated 11/21/05.  Subject:  Ottawa NF Response:  Information Request – Wolves on Federal Lands in U.P.  3 pp.

Fain, Steven.  2006.  E-mail from Fain, Supervisory Forensic Geneticist, USFWS Ashland, OR, to Ron Refsnider, USFWS Regional Office, Ft. Snelling, MN, dated 10/16/06.  Subject:  EDPS Dispersers.  1 p. with 3-page attachment with unpublished data.

Googgleye, George. Jr.  2004.  Letter from Googgleye, Leech Lake Band Tribal Council Chairman, to Gray Wolf Delisting Content Analysis Team, dated 08/27/04.  Regarding Leech Lake Tribal Council position on wolf harvest.  3 pp.

Gustin, Karen.  2003.  Letter from Gustin, Pictured Rocks National Lakeshore Superintendent, to Ron Refsnider, USFWS Regional Office, Ft. Snelling, MN, dated 08/11/03.  Regarding future management of wolves at Pictured Rocks National Lakeshore.  2 pp.

Hammill, Jim.  1999.  E-mail from Hammill, MI DNR, Crystal Falls, MI, to Ron Refsnider, USFWS Regional Office, Ft. Snelling, MN, dated 07/30/99.  Subject:  Wolf killings in MI.  1 p.

Hammill, Jim.  2002.  Faxes from Hammill, MI DNR, Crystal Falls, MI.  Series of 4 faxes to Ron Refsnider, USFWS Regional Office, Ft. Snelling, MN, dated 03/08/02, 03/12/02, 03/15/02, and 03/22/02.  Michigan wolf mortality and depredation data.  10 pp.

Hart, John.  2009.  Telephone conversation between Hart, USDA – Wildlife Services, Grand Rapids, MN and Phil Delphey, USFWS Twin Cities, MN, ES Field Office, dated 07/30/2009.

Hassett, Scott.  2003.  Letter from Hassett, Secretary, WI DNR, to Charles Wooley, Asst. Regional Director, FWS, dated 12/22/03.  Responses to FWS questions.  1 page with 10-page attachment.

Holbeck, Chris.  2005.  E-mail from Holbeck, Chief of Resources Management, Voyageurs National Park, to Phil Delphey, USFWS Twin Cities, MN, ES Field Office, dated 11/29/05.  Subject:  Wolf Data Request.  2 pp.

Holtz, Signe.  2006.  E-mail from Holtz, Director Wisconsin DNR Endangered Resources Program, to Ron Refsnider, USFWS Regional Office, Ft. Snelling, MN, dated 11/08/2006.  Subject:  Copy of DRAFT wolf addendum.  1 p. with 59-page attachment "Wisconsin Wolf Management Plan Addendum 2006.

Howell, Daryl.  2005.  E-mail from Howell, Iowa DNR, to Ron Refsnider, USFWS Regional Office, Ft. Snelling, MN, dated 11/04/05.  Subject:  Request for State Wolf Regulations, summary of wolf reports.  1 p. with 3 attachments.

Humane Society of the United States.  2011.  Comment letter on May 2011 Proposed Rule To Revise the List of Endangered and Threatened Wildlife for the Gray Wolf (*Canis lupus*) in the Eastern United States, Initiation of Status Reviews for the Gray Wolf and for the Eastern Wolf (*Canis lycaon*).  Letter dated 7/5/2011.

Humphries, Rebecca A.  2004.  Letter from Humphries, Director, Michigan DNR, to Robyn Thorson, USFWS Regional Director, dated May 27, 2004.  Regarding MI DNR's future

017422A

intentions for future wolf management.  1 p.

Hunt, Eli.  1998.  Letter from Hunt, Chairman, Leech Lake Tribal Council, to Marvin Moriarty, Acting USFWS Regional Director, dated 09/24/98.  Regarding Reservation plans for wolves after federal delisting.  4 pp.

Huschle, Gary.  2005.  E-mail from Huschle, Wildlife Biologist, Agassiz NWR, to Phil Delphey, USFWS Twin Cities, MN, ES Field Office, dated 11/23/03.  Subject:  Wolf Information Request – Reply Requested by November 30.  2 pp.

Jobman, Wally.  1995.  Inter-Office Transmittal from Jobman, USFWS Grand Island, Nebraska, Field Office, to Helena, MT, USFWS Wolf Coordinator, dated 01/10/95.  1 p.

Johnson, Scott.  2005.  E-mail from Johnson, Indiana DNR,  to Ron Refsnider, USFWS Regional Office, Ft. Snelling, MN, dated 11/01/05.  Subject:  Request for State Wolf Regulations, summary of wolf reports.  1 p.

Johnson, Scott.  2006.  E-mail from Johnson, Indiana DNR to Ron Refsnider, USFWS Regional Office, Ft. Snelling, MN, dated 01/26/06.  Subject:  Wolf protection in IN?  2 pp.

King, George.  2003.  Letter from King, Chairman, Red Lake Band of Chippewa Indians, to Ron Refsnider, USFWS Regional Office, Ft. Snelling, MN, dated 07/28/03.  Regarding information on wolves on Red Lake lands.  3 pp.

Kiogama, Archie L., Jr. and Gerald V. Chingwa.  2000.  Letter from Kiogama, Tribal Wildlife Biologist and Chingwa, Chairman, Little Traverse Bay Bands of Odawa Indians. Undated.  Comment letter on the Proposal to Reclassify/Delist the Gray Wolf.  2 pp.

Knutsen, Gregg.  2009.  Email from Knutsen, Wildlife Biologist, Agassiz NWR, to Phil Delphey, USFWS Twin Cities, MN, ES Field Office, dated 07/14/2009.  Subject: Wolf Information.  2 pp.

Larson, Scott.  2005.  E-mail from Larson, USFWS Pierre, SD, ES Field Office, to Ron Refsnider, USFWS Regional Office, Ft. Snelling, MN, dated 11/09/05.  Subject:  Legal status of wolves in SD?  2 pp.

Larson, Scott.  2006.  E-mail from Art Smith to Scott Larson, USFWS Pierre, SD, ES Field Office, then to numerous FWS employees, dated 7/13/06.  Subject:  Possible wolf.  2 pp.

Lederle, Pat.  2006.  E-mail from Lederle, MI DNR Wildlife Research Section Supervisor, to Ron Refsnider, USFWS Regional Office, Ft. Snelling, MN, dated 09/05/06.  Subject: Support for the sampling protocols.  1 p.

Lindquist, Ed.  2005.  E-mail from Lindquist, Wildlife Biologist, Superior National Forest, to Phil Delphey, USFWS Twin Cities, MN, ES Field Office, dated 11/18/05.  Subject:  Wolf Data Request.  3 pp.

Maercklein, Robin.  2003.  Letter from Maercklein, Resource Management Specialist, St. Croix National Scenic Riverway, to Ron Refsnider, USFWS Regional Office, Ft. Snelling, MN, dated 09/02/03.  Regarding future wolf management in St. Croix National Scenic Riverway.  2 pp.

McDowell, Michelle.  2005.  E-mail from McDowell, Wildlife Biologist, Rice Lake NWR, to Phil Delphey, USFWS Twin Cities, MN, ES Field Office, dated 11/17/05.  Subject:  Wolf Information Request – Reply Requested by November 30.  3 pp.

McDowell, M.  2009.  Telephone conversation between McDowell, Rice Lake National Wildlife Refuge, and Phil Delphey, USFWS Twin Cites, MN, ES Field Office, on 07/23/09.

Mech, L. David.  1998.  E-mail from Mech, USGS/BRD, to Ron Refsnider, USFWS Regional Office, Ft. Snelling, MN, dated 09/21/98.  Subject:  Disease/parasite impacts on MN wolf population.  4 pp.

017423A

Mech, L. David.  in litt.  2000.

Mech, L. David.  2005.  E-mail from Mech, USGS/BRD, to Ron Refsnider, USFWS Regional Office, Ft. Snelling, MN, dated 10/11/05.  Subject:  Wolf dispersal.  1 p. with 1-page attachment.

Mech, L. David.  2006.  E-mail from Mech, USGS/BRD, to Ron Refsnider, USFWS Regional Office, Ft. Snelling, MN, dated 11/14/06.  Subject:  Wilson ms. [but subject matter deals with unpublished data from Mech, Goyal, and Paul regarding CPV impacting pup survival]  2 pp.

Mech, L. David.  2011.  Comment letter on May 2011 Proposed Rule To Revise the List of Endangered and Threatened Wildlife for the Gray Wolf (*Canis lupus*) in the Eastern United States, Initiation of Status Reviews for the Gray Wolf and for the Eastern Wolf (*Canis lycaon*).  Letter dated 6/28/2011.

Michigan Environmental Council.  2011.  Comment letter on May 2011 Proposed Rule To Revise the List of Endangered and Threatened Wildlife for the Gray Wolf (*Canis lupus*) in the Eastern United States, Initiation of Status Reviews for the Gray Wolf and for the Eastern Wolf (*Canis lycaon*).  Letter dated 9/23/2011.

Michigan Department of Natural Resources.  2011.  Comment letter on May 2011 Proposed Rule To Revise the List of Endangered and Threatened Wildlife for the Gray Wolf (*Canis lupus*) in the Eastern United States, Initiation of Status Reviews for the Gray Wolf and for the Eastern Wolf (*Canis lycaon*).  Letter dated 6/29/2011.

Minnesota Department of Natural Resources.  2011.  Comment letter on May 2011 Proposed Rule To Revise the List of Endangered and Threatened Wildlife for the Gray Wolf (*Canis lupus*) in the Eastern United States, Initiation of Status Reviews for the Gray Wolf and for the Eastern Wolf (*Canis lycaon*).  Letter dated 9/27/2011.

Moore, Randy.  2003.  Letter from Moore, Regional Forester, U.S. Forest Service, to Ron Refsnider, USFWS Regional Office, Ft. Snelling, MN, dated 08/21/03.  Regarding impacts of wolf delisting on national forests in EDPS.  4 pp.

Mortensen, Steve.  2006.  Phone conversation between Mortensen, Leech Lake Wildlife Biologist, and Phil Delphey, USFWS Twin Cities, MN, ES Field Office, on 02/22/06, regarding wolf numbers on Leech Lake Reservation.

Mortensen, Steve.  2009.  Phone conversation between Mortensen, Leech Lake Wildlife Biologist, and Phil Delphey, USFWS Twin Cities, MN, ES Field Office, on 07/15/09, regarding wolf numbers on Leech Lake Reservation.

Mortensen, Steve.  2011.  Phone conversation between Mortensen, Leech Lake Wildlife Biologist, and Tim Patronski, USFWS Fort Snelling, MN, on 02/09/11, regarding wolf numbers on Leech Lake Reservation.

Myers, Sonny.  2004.  Letter from Myers, Executive Director, 1854 Authority, to Gray Wolf Delist Content Analysis Team, dated 11/04/04.  2 pp.

National Wildlife Federation.  2011.  Comment letter on May 2011 Proposed Rule To Revise the List of Endangered and Threatened Wildlife for the Gray Wolf (*Canis lupus*) in the Eastern United States, Initiation of Status Reviews for the Gray Wolf and for the Eastern Wolf (*Canis lycaon*).  Letter dated 7/5/2011.

Natural Resource Defense Council.  2011.  Comment letter on May 2011 Proposed Rule To Revise the List of Endangered and Threatened Wildlife for the Gray Wolf (*Canis lupus*) in the Eastern United States, Initiation of Status Reviews for the Gray Wolf and for the Eastern Wolf (*Canis lycaon*).  Letter dated 7/05/2011.

017424A

Paul, William.  2005.  Fax from Paul, USDA-APHIS-Wildlife Services, to Ron Refsnider, USFWS Regional Office, Ft. Snelling, MN, dated 11/23/05.  Subject:  Disease data for your wolves?  5 pp.

Paul, William.  2006.  Letter from Paul, USDA-APHIS-Wildlife Services, to USFWS, dated 06/16/06.  Peer Review Comments on USFWS Proposal to Delist WGL DPS of the Gray Wolf.  RIN 1018-AU54.  7 pp.

Peterson, Rolf.  1997.  Letter from Peterson, Leader Eastern Timber Wolf Recovery Team, to USFWS Regional Director William Hartwig, dated 06/02/97.  Regarding reclassification of Western Great Lakes DPS.  2 pp.

Peterson, R.  1998.  Letter from Peterson, Leader Eastern Timber Wolf Recovery Team, to USFWS Regional Director William Hartwig, dated 01/10/98, regarding review of recovery criteria and 7 questions asked by FWS.  8 pp.

Peterson, R.  1999a.  Letter from Peterson, Leader Eastern Timber Wolf Recovery Team, to USFWS Regional Director William Hartwig, dated 01/11/99, regarding review of state wolf recovery plans and Minnesota Roundtable recommendations.  4 pp.

Peterson, R.  1999b.  Letter from Peterson, Leader Eastern Timber Wolf Recovery Team, to USFWS Regional Director William Hartwig, dated 07/15/99, regarding Minnesota DNR wolf estimate and failure of MN Legislature to act on DNR wolf management plan.  2 pp.

Peterson, R.  2001.  Letter from Peterson, Leader Eastern Timber Wolf Recovery Team, to USFWS Regional Director William Hartwig, dated 05/22/01.  Regarding Recovery Team's Review of Minnesota Wolf Management Plan.  2 pp.

Piehler, Kirk G.  2005.  E-mail from Piehler, Hiawatha National Forest Wildlife Biologist, to Christie Deloria, USWFS Marquette, MN, ES Suboffice, dated 11/23/05.  Subject:  Hiawatha NF Response -- Information Request – Wolves on Federal Lands in U.P.  3 pp.

Roell, Brian.  2004.  E-mail from Roell, MI DNR Wildlife Biologist, to Mike DeCapita, USFWS East Lansing, MI, ES Office, then to Deloria, USFWS Marquette, MN, ES Suboffice, and Refsnider, USFWS Regional Office, Ft. Snelling, MN, dated 06/22/04.  Subject:  Dead Wolf – incidental take.  1 p. with 1 p. attachment.

Roell, Brian.  2005a.  E-mail from Roell, MI DNR Wildlife Biologist, to Mike DeCapita, USWFW East Lansing, MN, ES Field Office, then to Refsnider, Fasbender, and Szymanski, USFWS Regional Office, Ft. Snelling, MN, dated 07/19/05.  Subject:  Dead wolves.  1 p. with 1 p. attachment. [3 other attachments irrelevant]

Roell. Brian.  2005b.  E-mail from Roell, MI DNR Wildlife Biologist, to Ron Refsnider, USFWS Regional Office, Ft. Snelling, MN, dated 11/28/05.  Subject:  Wolf diseases in MI.  2 pp.

Roell, Brian.  2006.  E-mail from Roell, MI DNR Wildlife Biologist, dated 08/09/06 to Mike DeCapita, USFWS East Lansing, MI, ES Field Office, Peter Fasbender, USFWS Regional Office, Ft. Snelling, MN, and Todd Hogrefe, MI DNR, Lansing, MI.   Subject:  Re:  Dead Wolf.  4 pp.

Safari Club International.  2011.  Comment letter on May 2011 Proposed Rule To Revise the List of Endangered and Threatened Wildlife for the Gray Wolf (*Canis lupus*) in the Eastern United States, Initiation of Status Reviews for the Gray Wolf and for the Eastern Wolf (*Canis lycaon*).  Letter dated 9/26//2011.

Schlender, James H.  1998.  Letter from Schlender, Executive Administrator, Great Lakes Indian Fish and Wildlife Commission, to Marvin Moriarty, Acting USFWS Regional Director, dated 11/09/98.  Regarding GLIFWC position on management of ceded territory wolves after federal delisting.  2 pp.

017425A

Schlender, James H.  2004.   Letter from Schlender, Executive Administrator, Great Lakes Indian Fish and Wildlife Commission, to Gray Wolf Delisting Content Analysis Team, dated 11/16/04.  GLIFWC comments on wolf delisting proposal.  3 pp.

Schrage, Mike.  1998a.  Letter from Schrage, Fond du Lac Resource Management Division Wildlife Biologist, to Marvin Moriarty, USFWS Regional Office, Ft. Snelling, MN, dated 10/06/98.  Conveying input on tribal wolf management and delisting.  2 pp.

Schrage, Mike.  1998b.  Letter from Schrage, Fond du Lac Resource Management Division Wildlife Biologist, to Marvin Moriarty, USFWS Regional Office, Ft. Snelling, MN, dated 11/10/98.  Conveying resolution from Business Committee regarding wolf delisting.  3 pp.

Schrage, Mike.  2003.  Letter from Schrage, Fond du Lac Resource Management Division Wildlife Biologist, to Ron Refsnider, USFWS Regional Office, Ft. Snelling, MN, dated 08/07/03.  Regarding position of Fond du Lac Tribe on wolf delisting.  4 pp.

Schrage, Mike.  2009.  Telephone conversation between Schrage, Fond du Lac Resource Management Division Wildlife Biologist, and Phil Delphey, USFWS Twin Cites, MN, ES Field Office, on 07/16/09.

Sickley, Theodore A.  2006.  E-mail from Sickley, Univ. WI-Madison, to Ron Refsnider, USFWS Regional Office, Ft. Snelling, MN, dated 10/31/06.  Subject:  Table [providing unpublished data to update Table C2 of WI Wolf Management Plan].  6 pp.

Sierra Club.  2011.  Comment letter on May 2011 Proposed Rule To Revise the List of Endangered and Threatened Wildlife for the Gray Wolf (*Canis lupus*) in the Eastern United States, Initiation of Status Reviews for the Gray Wolf and for the Eastern Wolf (*Canis lycaon*).  Letter dated 6/27/2011.

Society for Conservation Biology.  2011.  Comment letter on May 2011 Proposed Rule To Revise the List of Endangered and Threatened Wildlife for the Gray Wolf (*Canis lupus*) in the Eastern United States, Initiation of Status Reviews for the Gray Wolf and for the Eastern Wolf (*Canis lycaon*).  Letter dated 7/5/2011.

Stark, Dan.  2009a.  Telephone conversation between Stark, Minnesota Department of Natural Resources, and Phil Delphey, USFWS Twin Cites, MN, ES Field Office, on 07/23/09.

Stark, Dan.  2009b.  Email from Stark, Minnesota Department of Natural Resources, to Laura Ragan, USFWS Fort Snelling, MN,  dated 08/20/09. 1 p.

Stefanski, Mary.  2004.  E-mail from Stefanski, Wildlife Biologist, Rice Lake NWR, to Phil Delphey, USFWS Twin Cities, MN, ES Field Office, dated 03/18/04.  Subject:  Gray Wolf Information Request for Proposed Delisting Rule.  1 p.

Symbal, Matt.  2003.  E-mail from Symbal, Red Cliff Natural Resources Department Fish and Wildlife Biologist, to Ron Refsnider, USFWS Regional Office, Ft. Snelling, MN, dated 09/05/03.  Subject:  Wolf Comments.  1 p. plus 2- page attachment.

Thomas,  Nancy.  1998.  Letter from Thomas, Endangered Species Disease Specialist, USGS National Wildlife Health Center, Madison, WI, to Ron Refsnider, USFWS Regional Office, Ft. Snelling, MN, dated 11/06/98.  Necropsy and parasite data on Great lakes wolves.  3 pp. plus 2 single-page data tables.

Thomas, Nancy.  2000.  Letter from Thomas, Endangered Species Disease Specialist, USGS National Wildlife Health Center, Madison, WI, to T.J. Miller, USFWS Regional Office, Ft. Snelling, MN, dated 11/09/00.  Peer reviewer comments on Gray Wolf Reclassification and Delisting Proposal of 07/13/00.  2 pp.

Thomas, Nancy.  2006.  Letter from Thomas, Endangered Species Disease Specialist, USGS

21

017426A

National Wildlife Health Center, Madison, WI, to WGL Wolf Delisting Comment Analysis Team, dated 06/16/06.  Peer Reviewer comments on Proposed Rule to Delist Western Great Lakes Population of Gray Wolves.  3 pp. plus 80-page attachment [Gogan et al. 2004, listed separately above]).

Warner, T.  2011.  Email noting telephone conversation between Warner, Keweenaw Bay Indian Community and T. Patronski, USFWS Regional Office, Ft. Snelling, MN, dated 03/01/2011.

West, Barbara.  2004.  Letter from West, Superintendent, Voyageurs National Park, to Ron Refsnider, USFWS Regional Office, Ft. Snelling, MN, dated 03/24/04.  Regarding future of wolves in Voyageurs National Park.  3 pp.

Wheeldon, T., B. Patterson, L. Rutledge, B. Wayne, J. Pollinger, B.  vonHoldt, J. Leonard, and R. Kays.  2011.  Comment letter on May 2011 Proposed Rule To Revise the List of Endangered and Threatened Wildlife for the Gray Wolf (*Canis lupus*) in the Eastern United States, Initiation of Status Reviews for the Gray Wolf and for the Eastern Wolf (*Canis lycaon*).  Letter dated 9/23/2011.

White, Peter.  2003.  Letter from White, Chairman, Leech Lake Tribal Council, to Ron Refsnider, USFWS Regional Office, Ft. Snelling, MN, dated 8/08/03.  Regarding status of wolves on Leech Lake Reservation.  3 pp.

Wilder, T.  2009.  Email from Wilder Ft. McCoy to Joel Trick, USFWS Green Bay, WI, ES Field Office, dated 08/07/09.  Subject: Current wolf numbers (on Ft. McCoy).  2 pp.

Williamson, Alan.  2005.  E-mail from Williamson, Forest Ecologist, Chippewa National Forest, to Phil Delphey, USFWS Twin Cities, MN, ES Field Office, dated 11/17/05.  Subject: Wolf Data Request.  2 pp.

Wisconsin Department of Natural Resources.  2011.  Comment letter on May 2011 Proposed Rule To Revise the List of Endangered and Threatened Wildlife for the Gray Wolf (*Canis lupus*) in the Eastern United States, Initiation of Status Reviews for the Gray Wolf and for the Eastern Wolf (*Canis lycaon*).  Letter dated 9/12/2011.

Wydeven, Adrian.  1998.  E-mail from Wydeven, WI DNR Mammalian Ecologist, to Ron Refsnider, USFWS Regional Office, Ft. Snelling, MN, dated 09/28/98.  Subject:  Wolf disease/parasite treatments.  1 p.

Wydeven, Adrian.  2005.  E-mail from Wydeven, WI DNR Mammalian Ecologist, to Ron Refsnider, USFWS Regional Office, Ft. Snelling, MN, dated 11/07/05.  Subject:  Wolves on Indian Reservations.  2 pp. with 2 attachments [irrelevant to subject]:  wolfscicover.doc  Wolf Science Committee Minutes 9-21-05.doc

Wydeven, Adrian.  2006a.  E-mail from Wydeven, WI DNR Mammalian Ecologist, to Ron Refsnider, USFWS Regional Office, Ft. Snelling, MN, dated 01/25/06.  Subject:  Menominee Tribe wolf support.  2 pp.

Wydeven, Adrian.  2006b.  E-mail from Wydeven, WI DNR Mammalian Ecologist, to Ron Refsnider, USFWS Regional Office, Ft. Snelling, MN, dated 08/09/06.  Subject:  Potential for "MN-style" wolf monitoring in WI and MI.  2 pp. with 14-page attachment [Wiedenhoeft 2005, listed separately above].

Wydeven, Adrian.  2006.  Phone conversation between Wydeven, WI DNR Mammalian Ecologist, and Ron Refsnider, USFWS Regional Office, Ft. Snelling, MN, on 10/24/06, regarding WI wolf management after federal delisting.

Wydeven, Adrian.  2009.  Email from Wydeven, WI DNR Mammalian Ecologist to Laura Ragan, USFWS Regional Office, Ft. Snelling, MN, on 08/21/2009, regarding Research/

017427A

Monitoring related mortalities.

017428A

EXHIBIT FFF

# Policy Issues Regarding Wolves in the Great Lakes Region

**James Hammill**
*Iron Range Consulting and Services, Inc.*
*Crystal Falls, Michigan*

## History and Status of the Wolf in the Great Lakes Region

Though native to the region, by 1970 the gray wolf (*Canis lupus*) was nearly extirpated from the Great Lakes states (Michigan, Wisconsin and Minnesota), with breeding populations largely relegated to portions of the Superior National Forest in northern Minnesota (Hendrickson et al. 1975; Thiel 1993; Thiel and Hammill 1988). A failed reintroduction effort in Michigan in 1974 concluded that public sentiment was so overwhelmingly antiwolf that recovery through translocation was likely to fail unless public attitudes changed significantly (Weise et al. 1975). However, shortly after being federally listed as an endangered species in 1974, wolves began to expand their range in Minnesota, and they were known to breed in Wisconsin by 1975 and to breed in Michigan by 1989 (Michigan Department of Natural Resources 1997). By 2005, these naturally recovering populations grew to estimated overwinter numbers of 405 in Michigan, between 435 and 465 in Wisconsin and of 3,000 in Minnesota, without the aid of reintroduction. Michigan and Wisconsin have typically had a 15-percent annual rate of increase in the number of wolves since 1977. The Minnesota population has also continued to grow but at a slower rate of roughly 4 percent annually (Wydeven et al., 2008). Figures 1 and 2 illustrate wolf population growth in the Great Lakes states.

The Great Lakes states all had a similar history of wolf persecution, with government-sponsored bounties enacted in the 19th century ending in the later part of the 20th century. These early policies resulted in the near extirpation of wolves in the region. Currently, wolves are protected by state statutes in all three states. As a result of the numerical recovery and of the existence of state recovery and management plans, the U.S. Fish and Wildlife Service (USFWS) announced on February 29, 2007, its intent to delist gray wolves as a federally endangered species in the western Great Lakes area. The western Great Lakes distinct population segment proposed for delisting is shown in Figure 3. When delisted, states within the recovery area will have primary responsibility for wolf

Figure 1.  Wolf population growth in Michigan and Wisconsin, 1980 to 2005. (Wydeven et al., 2008)



Figure 2.  Wolf population growth in Minnesota, 1980 to 2005. (Wydeven et al., 2008)



Figure 3.  Distinct Population Segment boundary. (U. S. Fish and Wildlife Service 2007)



management. In all three states where core wolf populations currently reside, that authority will rest with each state's department of natural resources. This change in administrative responsibility for wolves takes place as habitat changes are occurring, as the societal costs for maintaining an increasing wolf population are mounting and as public support for wolves in wolf country is eroding. Further, public value for wolves is becoming increasingly polarized.

## Wolf Habitat

The Great Lakes states wolf population is thriving in close proximity to major metropolitan areas like Minneapolis-St. Paul and Duluth (Minnesota), Milwaukee (Wisconsin), and Chicago (Illinois), with a combined population of nearly 9 million people. The combined, total population of the Upper Peninsula of Michigan and of Chicago, Wisconsin and Minnesota is nearly 18 million people. The forested landscapes of these states are major outdoor recreation destinations for people from these states, and most of these forests are actively managed for a variety of amenities. Wolves in the Midwest do not have access to large, designated wilderness areas where human contact is limited or can be avoided.

Gray wolves are thought to be habitat generalists that, historically, survive best in areas with relatively low road densities (Thiel 1985). In recent years however, wolves have demonstrated much higher tolerance to road densities that are significantly above a threshold of 1 lineal mile per square mile, previously thought to represent the upper limit of wolf tolerance for roads. Midwest forests are a major woodshed for a variety of forest-product industries. Accessing this raw material for industrial use has resulted in forests that are roaded and very accessible to people. In addition, the universal use of all-terrain vehicles has increased accessibility on most forest ownerships. Today, wolves thrive in many areas of the Great Lakes states that are easily accessed by people, which has resulted in increased wolf-human contact.

Private industrial forestlands exist on more than 5 million acres (2,023,500 ha), which are well distributed across current wolf range in the Great Lakes states. This acreage represents 13 percent of the entire forested land base. The previous model for managing these lands was based on industrial landowning firms growing and harvesting trees for their own consumption from their holdings. Industrial firms now purchase most of their wood from the open market. Ownership of these lands is undergoing major changes and the rate of ownership

turnover of industrial forestland has increased in recent years. Since 2002, 1.6 million acres (647,520 ha) have been sold to real estate investment trusts or to closely related landholding businesses (Davies 2007). These new owners, in turn, manage the areas not only as a source of wood but, primarily, as real estate. Portions of these lands that are most suitable and profitable for real estate development will be subdivided and sold.

In addition to the change in ownership of forestland, a substantial portion of currently occupied wolf range in the Great Lakes states is located in watersheds where private lands are projected to experience housing density increases of up to 20 percent by the year 2030. Figure 4 illustrates the areas where these projected changes are likely to occur within currently occupied wolf range (Stein et al. 2005). Note that the northern lower peninsula of Michigan is likely to experience these changes across much of its land base. This is also one of the areas thought to be a likely area of wolf population expansion.

Figure 4.  Projected housing density change (Stein et al. 2005).



The direct effects of these large-scale land changes to wolves is difficult to predict. However, both forest fragmentation in wolf range for real estate development purposes and increases in housing densities are likely to result in more human-wolf interactions and conflict. An efficient system is needed for dealing with likely increasing human-wolf conflicts in newly fragmented wolf range and settled but newly occupied wolf range.

017758A

## Social Costs

The Great Lakes wolf population began to expand naturally shortly after being listed as an endangered species. With this increase, depredation losses to livestock and pets have increased. Livestock operators and some pet owners feel that they are carrying the burden of wolf recovery for the remainder of society. Since 1978, 2,590 wolves have been killed in the Great Lakes states in response to livestock or pet depredation complaints by the public. These wolf removals have been accomplished primarily by U.S. Department of Agriculture (USDA) Wildlife Services employees or state department of natural resources employees under permit from USFWS. These removals have normally represented a low percentage of the total estimated state wolf population in any one year (average 4.09 percent). However, in 1997, agents in Minnesota removed 216 wolves, which was 9.2 percent of the estimated total population (Wydevan et al., 2008). One of the often publicized effects of wolf impact on humans is their depredation on livestock and pets. All Great Lakes states have a compensation program available to indemnify livestock owners for verified losses due to wolf depredation. Wisconsin also indemnifies owners for pet losses. Through 2004, Minnesota has paid $1,072,725 to livestock owners for wolf depredation compensation (J. Erb, personal communication 2007); Wisconsin has paid $581,463.90 (A. P. Wydeven, personal communication 2007); Michigan payments have totaled $21,746 (B. Rowell, personal communication 2007). Historical data of chronic wolf depredation on farms and on predictive modeling of farm-wildland interface has helped managers anticipate the areas that depredation on livestock is likely to occur (Treves et al. 2004). In many cases, removing wolves from depredation sites creates a void soon filled by other wolves and is only a short-term solution to the problem.

As the wolf population has increased, time and personnel necessary to address the wolf-livestock depredation issue has increased in the Great Lakes states. USDA Wildlife Services agents assist all three states with handling wolf-human conflicts. Also, state agency personnel in occupied wolf habitat have been devoting an increased amount of time to dealing with wolf-related issues. Wolf depredation reports require immediate attention and action to alleviate the problem. Besides the actual budgetary implications of this, other important resource management activities are receiving less attention as a result of the need to handle depredation events. Typically, other equally deserving issues are prioritized below handling wolf depredation complaints. Further, several thousand

017759A

wolves have been killed in the process, resulting in little direct public benefit as a result of the loss of these animals.

With the combined wolf population in the Great Lakes states currently at nearly 4,000 animals, societal costs are mounting. Wolf conflicts with pets have been increasing and have proven to be a very difficult issue to deal with in Wisconsin and Michigan. Both states have a strong tradition of bear hunting with hounds, and most wolf-dog conflicts in these two states involve bear dogs. However other dogs attacked by wolves include upland bird hunting breeds, hounds used for raccoon hunting and household pets. Minnesota does not allow the hunting of bears with dogs, but it has not been immune to loss of pets by wolf depredation. Wolves have attacked and killed pets in the immediate vicinity of homes and within city limits of rural communities in all three Great Lakes states.

## Public Attitudes

Since 1989, public surveys of people's attitudes toward wolves have indicated strong support for wolf recovery. In 1990, a survey indicated that 80 percent of upper Michigan deer hunters favored a reintroduction of wolves to Michigan (Kellert 1990). In 1993, as part of the wolf-planning process in Michigan, 15 public forums were held throughout the state. At that time there were fewer than a dozen wolves known to live in the Upper Peninsula of Michigan. Eight-hundred and twelve people either attended one of these meetings or provided written comments. All comments were categorized as supportive, nonsupportive or undetermined of having wolves in Michigan. Ninety percent of written and oral comments were supportive. In contrast, a dozen public meetings were held in 2005. The wolf population in Michigan at the time of the 2005 survey was estimated to be 405 animals. Three-hundred thirty-four people attended meetings in the Upper Peninsula during this survey and were asked how many wolves they would prefer in the Upper Peninsula. Twenty-two percent indicated they preferred that no wolves exist in the Upper Peninsula, and 36 percent said that they preferred some but less than there are now. Neither of these surveys represented a cross section of the general public, but they are comparable because they represent people who attended similar informational meetings about wolves. The results reflect a decline in tolerance for wolves.

A 2002 study of attitudes toward wolf recovery in the Upper Peninsula is revealing (Mertig 2004). Parts of this survey were directly comparable to Kellert's 1990 study. The surveys reflect Michigan citizens as a whole. During

017760A

the Kellert study period, wolves were newly discovered as a recovering species in the Upper Peninsula, with fewer than 10 animals present. The Mertig study was conducted when the population of wolves in the Upper Peninsula had risen to about 250 animals. Mertig found that support for wolf recovery by Upper Peninsula residents had significantly declined. Whereas, support for Upper Peninsula wolf recovery had increased among persons who reside in the Lower Peninsula of Michigan, where wolves were known not to be present (Figure 5). Further, in direct comparison to the Kellert study, people in Michigan had become more supportive of management options, such as the need to control wolves. Also, support for wolf recovery in the Upper Peninsula for the purpose of harvesting pelts or for hunting increased between the two survey periods. The study also revealed that people in wolf range prefer to have occasional sightings of wolves rather than regular contact with them.

Figure 5. Change in support for wolves in Michigan from 1990 to 2002 (Mertig 2004).



Although no survey data exist, Wisconsin Department of Natural Resources personnel working with wolves believe there has also been an erosion of support for wolves among the public in that state (A. P. Wydeven, personal communication 2007). In Minnesota, no recent public surveys gauging wolf support exist, but wolf program personnel there feel that there has not been a significant change in public support (J. Erb, personal communication 2007). As wolf populations have increased in the Great Lakes states and elsewhere, the

number and frequency of articles concerning wolves in popular sporting magazines has also increased. Most of the articles reflect an antiwolf sentiment and focus on concern for predation effects on cervids, primarily white-tailed deer (*Odocoileus virginianus*). Hundreds of thousands of periodicals carrying these articles are sold monthly. It is not known to what extent this literature helps to form public opinion. However, with the volume of antiwolf articles being produced, it is likely that public demand for treatment of this topic is high. The long-term prospects for the wolf's persistence on Great Lakes states landscapes will be tied to the public's tolerance of wolves and to developing a larger segment of the public who value having wolves present. The current trajectory of public attitudes, especially in Michigan and Wisconsin, is not favorable to sustaining wolves in those states. After delisting, wolf monitoring plans of Great Lakes states do not require the states to monitor public attitudes toward wolves. Public education about wolves in the Great Lakes states is primarily handled by nongovernmental organizations, despite the fact that public outreach is identified in the states' plans as being important. It seems unlikely that current efforts in wolf education alone will be enough to change public attitudes about wolves.

As wolf populations continue to grow and expand in the western Great Lakes states, the management paradigm for wolves may need to shift from near-complete protection to active management, including the general reduction of wolf numbers to protect societal interests. If this major shift in management direction does occur, extensive public input will likely be necessary. Wolf-management policy that incorporates human-dimensions research findings and appropriate scientific knowledge of the species will need to be developed. Midwest wolf policy will need to be developed with consideration given to societal costs of maintaining wolf numbers, to changes in wolf habitat and to people's attitudes toward this predator.

## North American Model

Management of wolves in the continental United States where the wolf is delisted or is under consideration for delisting has been or may soon be transferred to the states within the affected, distinct population segment. Except for postdelisting monitoring requirements, the USFWS (under authority of the Federal Endangered Species Act) will no longer be responsible for wolf populations in delisted areas. As such, there is a broad spectrum of options before us regarding wolf management at this critical juncture. We're now in a

017762A

position to ponder what management paradigm may be the best for wolves and for future generations of North Americans. The answer may lie within the philosophical framework of the North American model of wildlife conservation, the most successful wildlife management philosophy in the world. The basic tenants of the North American model are that wild animals belong to all of us, that future generations are deserving of wildlife undiminished by our actions and that they should be managed using the best science available (Mahoney 2004). Indeed, with the help of this philosophical framework, wolves have rebounded from near-total extirpation in the continental United States, as have elk (*Cervus canadensis*), pronghorn (*Antilocapra americana*), white-tailed deer, wild turkeys (*Meleagris gallopavo*), wood ducks (*Aix sponsa*), and bald eagles (*Haliaeetus leucocephalus*). We have witnessed an incredible recovery and the evolution of our collective thinking about wolves—from conquerors to custodians. As with many other species that benefited by the North American model, wolves have now become a species in which many people see personal identity and relevance. At one time, our nation was at war with the wolf. As wolves were driven nearer to extirpation, new knowledge about wolves offered the opportunity to see wolves in a new way, where facts slowly replaced myths, the descendents of generations of hate and fear. Wolf research has benefited this transition greatly. This metamorphosis of thought was also a necessary component of early conservation efforts to save many other species we have in great abundance today.

## Conclusion

The recovery and delisting of the Great Lakes states wolf population represents a significant accomplishment for the Endangered Species Act and is a milestone for wildlife management. Wolves in the Great Lakes states have demonstrated that they are adaptive to the presence of people and numerically have increased to a metapopulation of approximately 4,000 animals occupying 42,607 square miles (110,352 km²). The management of this newly recovered population is now the responsibility of the states of Minnesota, Wisconsin and Michigan. Policy for management of wolves within these states is the responsibility of each state's department of natural resources. Although people living in wolf country are significantly less supportive of wolf recovery now than they were in the earlier days of recovery, the support for a regulated wolf population is still strong. Survey data suggests that the public is more supportive of wolf-control

measures to help farmers avoid livestock depredation and to maintain wolves within social carrying capacity. Further, support is shown to be increasing for population control using time-honored methods, like hunting and trapping.

At this important juncture in wolf management, it may be enlightening to reflect on what has worked historically for North American wildlife. The North American model has laid the foundation of recovery for many of our economically important species and for hundreds of other species that share the same habitat. Indeed, the North American model has been so successful that some of our greatest challenges in wildlife management exist not because of a failure to produce wildlife, but in our inability to control wildlife populations. This failure to regulate numbers has resulted in great social cost and environmental degradation. A well-documented example of this can be seen with white-tailed deer. In many states, white-tailed deer populations are at unprecedented highs. As a result, direct social costs have been high, and environmental degradation is becoming increasingly apparent. Over 1 million car-deer crashes occur yearly in the United States. Research data that implicates white-tailed deer herbivory in ecosystem damage is mounting. One of the key tenets of the North American model is its dependence on science to guide management decisions. Although the wolf is among the world's most studied animals, there will always be the need for additional research. However, many of the basic questions for managing wolves have been answered, setting the stage for a new paradigm of wolf management.

If current population trajectories continue, wolf numbers may double in Wisconsin and Michigan to approximately 1,700 animals by the end of the postdelisting monitoring period in 2012. Assuming a slower, 4-percent rate of increase for Minnesota, populations there could top 4,000 animals in the same time frame. The western Great Lakes states wolf population in 2012 could be 5,700 animals, i.e., 44 percent above current population levels. Social costs associated with this projected population would likely be significantly higher than present levels. It is unknown how a population increase such as this would affect public attitudes about wolves. We do know, however, that public tolerance for wolves has declined as the population of wolves has increased.

During the past 50 years, attitudes toward many predators in the Great Lakes states have undergone a significant evolution. Bounties were paid by states for coyotes, wolves, foxes and bobcats. Black bears, for most of the past five decades, were considered vermin. The repeal of bounties on all predators and the elevation of the black bear to trophy big-game status happened in recent

times. This change has elevated the status and value of these species in the public eye. Now, a segment of the public (consumptive users) places a high value on the wellbeing of these predators and takes keen interest in their protection and management. Because of this interest, populations of these predators now are managed by regulated seasons. Established through the use of best available science, this has resulted in sustainable populations and an annual harvest through hunting and trapping. Predator hunting is becoming an increasingly popular outdoor activity, and demand for black bear harvest permits far exceeds supply in several Great Lakes states. Human attitudes toward wolves, it seems, have also undergone great transformations. Once despised and slated for extirpation by both public attitude and government policy, the wolf's fortunes improved as bounty systems were eliminated. The pendulum then swung to complete protection by federal law. Now, with expanding populations, society needs to redefine a place for wolves. Fortunately, wildlife management success in North America has identified a template that may serve wolves and people equally well.

The story of wolf recovery represents the first great wildlife success story of the new millennium. Wolves have been saved from extirpation in this country in spite of their low economic value, high social intolerance and government-sponsored programs to eliminate them. The fact that wolves are either delisted or in the process of being delisted in significant portions of their former range is testimony to a management philosophy—the North American model—that has worked again. Now, it seems appropriate that the model be allowed to proceed to its next logical and time-tested step, which is to allow control of wolf numbers by allowing a public take of wolves while we apply the best wildlife science and human-dimensions science to the process. This critical step has been part of the success of many wildlife recovery programs in the past and a template for ensuring that wolves will be present for generations to come. Allowing a public harvest of wolves could create a new opportunity for many people to find new value in wolves, thus gaining support for wolves from a critical segment of the public in wolf range. Such a strategy would also create an efficient, cost-effective way to control wolf populations that currently does not exist, reducing financial burdens on society. In addition, a message would be sent to U.S. citizens that we have learned the difficult lessons that wildlife overabundance and its associated social costs have taught.

Kellert (1996) notes that a common problem of many endangered species programs is that value differences among critical stakeholders is not

adequately incorporated into recovery efforts. Wolves have recovered or in the process of meeting numerical recovery standards in significant parts of suitable habitat. As a result, many people who have a wide range of values for wolves presumably have already been served. Clearly, wolves generate strong expressions from people. This makes policy decisions concerning wolves more difficult because there are likely to be more strongly held values being expressed and demanding equal consideration. Wolves have strong opponents as well as supporters. Consensus decision-making for policy makers in such an environment may not be possible. Except for the most ardent antiwolf element, a common thread among other stakeholders is that wolves should be allowed to exist in sustainable numbers for this and future generations. With this nearly universal value in mind, states will need to make policy for wolf management that is sensitive to the values of their citizens and that assures the sustainability of wolf populations. Most importantly, it is imperative that gridlock be avoided and that a new era of wolf-management leadership become a reality. Wolf population, available habitat for wolves and human attitudes about wolves are rapidly changing. The decision-making process must be sensitive to the trajectory of these factors and to the speed at which changes are occurring.

The recovery of wolves in the Great Lakes states is truly a success story. We have protected wolves, which has allowed them to return to the Midwest. Now, it is up to us, as their stewards, to manage the recovered population from overabundance and within social carrying capacity. While we show respect for people's values, unless we are successful in this effort, history may repeat itself. Negative, adversarial attitudes towards wolves are likely to grow, and we may again be struggling to assure the wolf's survival.

## Reference List

Davies, P. 2007. Not out of the woods yet. *Fedgazette*. http://www.minneapolisfed.org/publications_papers/pub_display.cfm?id=1271.

Hendrickson, J., W. L. Robinson, and L. D. Mech. 1975. Status of the wolf in Michigan, 1973. *American Midland Naturalist*. 94:226–32.

Kellert, S. R. 1990. *Public attitudes and beliefs about the wolf and its restoration in Michigan*. Madison, Wisconsin: HBRS, Inc.

Kellert, S. R. 1996. *The value of life: Biological diversity and human society*. Washington, DC: Island Press.

017766A

Mahoney, S. 2004. The North American wildlife conservation model. *Bugle*. http://www.rmef.org/NewsandMedia/PubsTV/Bugle/2004/MayJune/ Features/NAModel.htm.

Mertig, A. G. 2004. *Attitudes about wolves in Michigan, 2002: Report to the Michigan Department of Natural Resources (MDNR) Wildlife Division*. East Lansing, Michigan: Department of Sociology, Michigan State University.

Michigan Department of Natural Resources. 1997. *Michigan gray wolf recovery and management plan*. Lansing, Michigan: Michigan Department of Natural Resources.

Stein, S., R. McRoberts, R. J. Alig, M. D. Nelson, D. M. Theobald, M. Eley, M. Dechter, and M. Carr. 2005. *Forests on the edge: Housing development on America's private forests, general technical report PNW-GTR-636*. Portland, Oregon: U.S. Department of Agriculture, Forest Service, Pacific Northwest Research Station.

Thiel, R.P. 1985. The relationship between road densities and wolf habitat suitability in Wisconsin. *American Midland Naturalist*. 113:404–07.

Thiel, R. P. 1993. *The timber wolf in Wisconsin: The death and life of a majestic predator*. Madison, Wisconsin: The University of Wisconsin Press.

Thiel, R. P., and J. H. Hammill. 1988. Wolf specimen records in Upper Michigan. *Jack Pine Warbler*. 66:149–53.

Treves, A., L. Naughton-Treves, E. K. Harper, D. J. Mladenoff, R. A. Rose, T. A. Sickley, and A. P. Wydeven. 2004. Predicting human-carnivore conflict: A spatial model derived from 25 years of data on wolf predation on livestock. *Conservation Biology*. 18:114–25.

Weise, T., W. L. Robinson, R. A. Hook, and L. D. Mech. 1975. An experimental translocation of the eastern timber wolf. In *Audubon Conservation Report Number 5*. Twin Cities, Minnesota: National Audubon Society.

Wydeven, A. P., R. L. Jurewicz, T. R. VanDeelem, J. Erb, J. H. Hammill, D. E. Beyer Jr., B. Roell, J. E. Wiedenhoeft, and D. A. Weitz. In press. *Gray wolf conservation in the western Great Lakes region of the United States*. Madison, Wisconsin: Wisconsin Department of Natural Resources.

Molecular Ecology (2009) **18**, 2313–2326

doi: 10.1111/j.1365-294X.2009.04176.x

FAST TRACK

# Origin and status of the Great Lakes wolf

STEPHAN KOBLMÜLLER,*§** MARIA NORD,*§ ROBERT K. WAYNE† and JENNIFER A. LEONARD*‡¶

*Department of Evolutionary Biology, Evolutionary Biology Centre, Uppsala University, Norbyvägen 18d, SE-75236 Uppsala, Sweden, †Department of Ecology and Evolutionary Biology, University of California, Los Angeles, CA 90095, USA, ‡Center for Conservation and Evolutionary Genetics, National Zoological Park and National Museum of Natural History, Smithsonian Institution, Washington, DC 20013, USA, ¶Estación Biológica de Doñana-CSIC, Avd. Americo Vespuccio s/n, 41092 Seville, Spain

## Abstract

An extensive debate concerning the origin and taxonomic status of wolf-like canids in the North American Great Lakes region and the consequences for conservation politics regarding these enigmatic predators is ongoing. Using maternally, paternally and biparentally inherited molecular markers, we demonstrate that the Great Lakes wolves are a unique population or ecotype of gray wolves. Furthermore, we show that the Great Lakes wolves experienced high degrees of ancient and recent introgression of coyote and western gray wolf mtDNA and Y-chromosome haplotypes, and that the recent demographic bottleneck caused by persecution and habitat depletion in the early 1900s is not reflected in the genetic data.

*Kewords*: aDNA, *Canis latrans*, *Canis lupus lycaon*, conservation, hybridization, introgression, Y chromosome

*Received 31 October 2008; revision received 31 December 2008; accepted 13 January 2009*

## Introduction

Hybridization and introgression have long been recognized by botanists as important factors influencing evolution (e.g. Abbott 1992; Arnold 1997; Ellstrand & Schierenbeck 2000), whereas its importance in animal evolution has been a subject of extensive debate (Arnold 1992; Dowling & Secor 1997; Seehausen 2004). Recently, numerous studies have demonstrated that closely related animal species often share a history of introgressive hybridization (e.g. Melo-Ferreira *et al.* 2005; Roca *et al.* 2005; Berthier *et al.* 2006; Patterson *et al.* 2006), indicating that hybridization may be frequent in some cases before the completion of reproductive isolation in animals. Even though it seems that natural hybridization and introgression are more common in animals than previously assumed, it is still not known how widespread this phenomenon is and whether particular taxa or biogeographical regions are more prone to it. A recent spatially explicit simulation study (Currat *et al.* 2008) demonstrated that massive introgression of neutral genes can occur during the invasion of an occupied area as

long as interbreeding is not severely prevented between the invading and the local species. Importantly, it was found that introgression occurs almost exclusively from the local to the invading species, regardless of the relative densities of the two species. Introgressive hybridization can have a variety of consequences, but its greatest evolutionary importance might lie in it being the source of new genetic variability within taxa. However, under different circumstances it might cause a merging of the hybridizing species (Arnold 1997). For the latter reason, conservation policy generally discourages hybridization between species because hybridization can jeopardize the continued integrity of the hybridizing species (O'Brien & Mayr 1991; Leonard & Wayne 2008).

The wolves of the Great Lakes region in the USA were almost exterminated at the beginning of the last century due to habitat depletion associated with the spread of agriculture and direct persecution. However, they have recovered under the protection of the US Endangered Species Act to currently > 3000 individuals, resulting in an extensive debate concerning their potential delisting. Over the last century, coyotes have invaded this region and hybridized with wolves (Lehman *et al.* 1991, Leonard & Wayne 2008). At present, there is still no general consensus about which species of wolf-like canid currently inhabits the Great Lakes region and if the integrity of the population is under threat by hybridization. The Great Lakes (GL) wolf is morphologically distinct from both western gray

Correspondence: Jennifer Leonard, Fax: +46-18-471 6310; E-mail: jennifer.leonard@ebc.uu.se

§Stephan Koblmüller and Maria Nord contributed equally to this work.

**Current address: Department of Zoology, Karl-Franzens-University Graz, Universitätsplatz 2, 8010 Graz, Austria

© 2009 Blackwell Publishing Ltd

**2314** S. KOBLMÜLLER *ET AL.*



**Fig. 1** Map of North America, showing the number of samples per taxon and state. NWT, Northwest Territories; AB, Alberta; MN, Minnesota; WI, Wisconsin; MI, Michigan; ON, Ontario; QC, Quebec; NY, New York; MA, Massachusetts; NE, Nebraska; CO, Colorado; NV, Nevada; IL, Illinois.

wolves (*Canis lupus*) and coyotes (*Canis latrans*) (Nowak 2002). It has been suggested that the GL wolf is either (i) a smaller subspecies of the gray wolf (*Canis lupus lycaon*), possibly resulting from hybridization between gray wolves (*C. lupus*) and red wolves (*Canis rufus*) (Nowak 2002); (ii) a hybrid zone between gray wolves (*C. lupus*) and coyotes (*C. latrans*) (e.g. Lehman *et al*. 1991; Roy *et al*. 1994); or (iii) a distinct species (*C. lycaon*) closely related to, and perhaps conspecific with, the red wolf (*C. rufus*). This unique wolf-like canid is hypothesized to have evolved from a coyote-like ancestor, thus representing a small wolf indigenous to North America (Wilson *et al*. 2000; Kyle *et al*. 2006).

Here we use maternally, paternally and biparentally inherited molecular markers to analyse modern and historic pre-bottleneck and pre-coyote invasion GL wolves, western gray wolves and coyotes in order to evaluate (i) alternative hypotheses regarding the evolutionary origin of the GL wolves; (ii) ongoing hybridization between GL wolves, western gray wolves and coyotes in the Great Lakes region; and (iii) population integrity.

## Material and methods

### Samples and extraction

The modern samples used in this study included western gray wolves from the Northwest Territories and Alberta,

Canada; GL wolves from Ontario and Quebec, Canada and Minnesota, Wisconsin, Michigan, and New York, USA; coyotes from New York, Massachusetts, Nebraska, Colorado, Nevada and Illinois, USA. Western coyotes from Nebraska, Colorado, Nevada and Illinois correspond to the original distribution of North American coyotes, whereas eastern coyotes from New York and Massachusetts represent the recent northeastward range expansion. The GL wolf samples from Canada and Minnesota were from Lehman *et al*. (1991) and Roy *et al*. (1994).

Historic samples consisting of skulls from the collection of the National Museum of Natural History, Smithsonian Institution, included 18 GL wolf samples from Ontario and Quebec, Canada and Michigan, Wisconsin, Minnesota and New York and a historic gray wolf from Labrador (Fig. 1, Table 1). The historic GL wolves were all collected before coyotes became established in the region.

Whole genomic DNA was extracted from recent muscle tissue samples using a modified phenol/chloroform protocol (Sambrook *et al*. 1989). Extraction of historic specimens followed Leonard *et al*. (2005).

### Amplification and sequencing of the mitochondrial control region

Amplification of 420–425 bp of the 5′ end of the mitochondrial control region followed Vilà *et al*. (1999) for the

© 2009 Blackwell Publishing Ltd

| Museum no. | Subspecies | Year | Locality |
|---|---|---|---|
| USNM 178452 | *Canis lupus lycaon* | 1910* | Algonquin Park, Ontario, Canada |
| USNM 140561 | *C. l. lycaon* | 1905 | Mattawa, Quebec, Canada |
| USNM 140562 | *C. l. lycaon* | 1905 | Mattawa, Quebec, Canada |
| USNM 223171 | *C. l. lycaon* | 1916 | Quebec City, Quebec, Canada |
| USNM 148897 | *C. l. lycaon* | 1906 | Marquette Co., Michigan, USA |
| USNM 148898 | *C. l. lycaon* | 1906 | Marquette Co., Michigan, USA |
| USNM 168820 | *C. l. lycaon* | 1909 | Calderwood, Michigan, USA |
| USNM 168821 | *C. l. lycaon* | 1909 | Calderwood, Michigan, USA |
| USNM 170566 | *C. l. lycaon* | 1910 | Hulbert, Michigan, USA |
| USNM 170567 | *C. l. lycaon* | 1910 | Taquahmenon River, Michigan, USA |
| USNM 170621 | *C. l. lycaon* | 1910 | Taquahmenon River, Michigan, USA |
| USNM 170692 | *C. l. lycaon* | 1910 | Cusino, Michigan, USA |
| USNM 171132 | *C. l. lycaon* | 1911 | Sault Sainte Marie, Michigan, USA |
| USNM 180798 | *C. l. lycaon* | 1912 | Dickinson Co., Michigan, USA |
| USNM A01804 | *C. l. lycaon* | † | Adirondacks, New York, USA |
| USNM 150421 | *C. l. lycaon* | 1907 | Eagle River, Wisconsin, USA |
| USNM 156838 | *C. l. lycaon* | 1908 | Taylor Co., Wisconsin, USA |
| USNM 45560 | *C. l. lycaon* | 1892 | Elk River, Minnesota, USA |
| USNM 210059 | *Canis lupus labradorius* | 1912 | Porcupine, Labrador, Canada |

**Table 1** Historic wolf samples from the National Museum of Natural History, Smithsonian Institution. Collection number, subspecies as in collection, date, and locality are indicated

*Approximation, †specimen accessioned before 1892.

recent specimens and Leonard *et al.* (2005) for the historic samples. Polymerase chain reaction (PCR) products were purified using ExoSAP-IT (Amersham Biosciences) and sent to Macrogen (Macrogen Online Sequencing System) for sequencing with same primers as PCR. When available, previously published sequences were used (Leonard *et al.* 2005, Musiani *et al.* 2007, Hailer & Leonard 2008, Leonard & Wayne 2008, Muñoz-Fuentes *et al.* 2009). Sample size for mtDNA was as follows: 58 gray wolves, 202 GL wolves, 48 eastern coyotes, 78 western coyotes, 15 historic GL wolves, 1 historic gray wolf.

### Nuclear and Y-chromosomal microsatellite genotyping

Twenty-six unlinked biparentally inherited autosomal microsatellites were typed for 58 gray wolves, 195 GL wolves, 48 eastern coyotes, 78 western coyotes and 13 historic GL wolves: Ren94K11, C17.402, Ren239K24, C18.460, Ren274F18, Ren181K04, C11.873, Ren73F08, C02.894, Ren204K13, Ren160J02, Ren106I06 (Breen *et al.* 2001), FH3109, FH2887, FH2914, FH2785, FH2759 (Guyon *et al.* 2003), Ren37H09, Ren49F22 (Jouquand *et al.* 2000), c2017 (Francisco *et al.* 1996), u109, u225, u250, u253 (Ostrander *et al.* 1993), vWF (Shibuya *et al.* 1994) and PEZ05 (PerkinElmer, Zoogen; see NHGRI Dog Genome Project at http://research. nhgri.nih. gov/dog_genome/). Amplification of the microsatellite loci followed Björnerfeldt *et al.* (2008). PCR products were pooled in seven different batches for genotyping.

Allelic dropout, where one allele at a heterozygous locus fails to amplify, is the most common error associated with amplifications from low concentration DNA, such as historic

DNA, resulting in a potential misinterpretation of a heterozygous individual as being homozygous at that particular locus (Taberlet *et al.* 1996). Therefore, we only scored historic genotypes as homozygous when the same single allele was amplified in at least four replicate PCRs. When only one allele was amplified from a sample fewer than four replicates — due to PCR failure and depletion of DNA extract — we scored the genotype as consisting of the observed allele and one missing allele. Allele frequencies for differentiation analysis ($\theta_{ST}$; see below) were then calculated relative to the total number of scored alleles. This is justified by observations that, despite higher rates of allele dropout in loci with large fragments, dropout was random with respect to allele sizes within a locus (Sefc *et al.* 2003).

A total of six Y-chromosomal microsatellites were typed for all males and samples of unknown sex (final sample size: 30 gray wolves, 111 GL wolves, 25 eastern coyotes, 41 western coyotes, 4 historic GL wolves): 650–79.3, 990–35 (Bannasch *et al.* 2005), MS41A, MS41B, MS34A, MS34B (Sundqvist *et al.* 2001). All amplifications were carried out in 10-μL reactions. The PCR mix for 650–79.3 and 990–35 included 1× Smart *Taq* buffer (QIAGEN), 2.5 mM MgCl$_2$ 0.25 μM of each dNTP, 0.4 μM of each primer, 0.25 U Smart *Taq* (QIAGEN) and 1 μL of DNA template (~10 ng). The PCR profile for 650–79.3 included an initial denaturation step at 95 °C for 15 min followed by 38 cycles (30 s annealing temperature at 65 °C, extension at 72 °C for 1 min, followed by denaturation at 95 °C for 30 s) and a final annealing step at 65 °C for 1 min and an extension step at 72 °C for 10 min. For 990–35 the annealing temperature was 57 °C. Amplification of MS41A, MS41B, MS34A and MS34B followed

© 2009 Blackwell Publishing Ltd

Hailer & Leonard (2008). For genotyping, the PCR products 650-79.3 and 990-35 were pooled. Genotyping was carried out on a MegaBACE 1000 instrument (Amersham Biosciences). Genotypes were identified using the software Genetic Profiler version 2.2 (Amersham Biosciences).

### Data analysis

Genetic diversity indices for mtDNA sequences and Y-chromosomal data [number of haplotypes (H), haplotype diversity ($H_D$), and, for mtDNA sequences, nucleotide diversity (π)] were calculated in Arlequin version 3.0 (Excoffier *et al.* 2005). Microsatellite variability in modern samples was estimated as the number of alleles ($N_A$), allelic richness ($A_R$), observed ($H_O$) and expected ($H_E$) heterozygosity, using Arlequin. We used Micro-Checker 2.2 (van Oosterhout *et al.* 2004) to test for errors due to stuttering, large allelic dropout and the presence of null alleles. Exact tests of Hardy–Weinberg equilibrium for each microsatellite locus were calculated in Arlequin with Markov chains of 100 000 steps following 1000 dememorization steps. We also estimated the probability of linkage disequilibrium between loci in Arlequin based on 10 000 permutations. *P* values were corrected for multiple testing following the method of Benjamini & Hochberg (1995).

Mitochondrial sequences were checked and aligned manually to minimize the number of indels using the program Sequencher version 4.6 (Gene Codes). The best-fit model of nucleotide substitution suggested by Model-Generator version 0.85 (Keane *et al.* 2006) was HKY + I + G (Hasegawa *et al.* 1985) with base frequencies A = 0.27609, C = 0.29369, G = 0.15267 and T = 0.27755, proportion of invariable sites I = 0.50, and a gamma shape parameter α = 0.43. Pairwise HKY + I + G distances between individual sequences computed in PAUP (Swofford 2002) were imported into MEGA 4 (Tamura *et al.* 2007) to visualize phylogenetic relationships by means of a neighbour-joining (NJ) tree.

Due to complete linkage of all loci on the Y-chromosome, composite Y-chromosome genotypes represent haplotypes. Phylogenetic relationships among the Y-chromosomal haplotypes were visualized by a full median-joining network (Bandelt *et al.* 1995, Bandelt *et al.* 1999) with maximum parsimony post-processing (Polzin & Daneschmand 2003) as implemented in Network (version 4.5; available at www.fluxus-engineering.com/sharenet.htm), putting equal weight on each locus.

We analysed the genetic structure based on autosomal microsatellites (excluding the historic samples) with the Bayesian model-based clustering method implemented in Structure 2.2 (Falush *et al.* 2007). The log likelihood of our data [ln Pr(X | K)] was estimated, given different numbers of genetic clusters *K*, using an admixture model with independent allele frequencies and ignoring prior population information. To assess the possible range of *K*, short [20 000 burn-in cycles, 100 000 Markov chain Monte Carlo (MCMC) iterations] runs for *K* = 1–17 were repeated five times. Based on the results of these initial runs, 10 long runs (20 000 burn-in cycles, 1 000 000 MCMC iterations) were run for *K* = 1–7. Following Evanno *et al.* (2005) we calculated Δ*K*, which corresponds to the rate of change of the likelihood between successive *K* values. The modal value of this distribution was considered as the uppermost level of genetic structuring (Evanno *et al.* 2005). To visualize the distribution of genetic variation in the autosomal microsatellites across individuals, we performed a factorial correspondence analysis (FCA) in Genetix 4.05 (Belkhir *et al.* 1996–2004). Population bottlenecks are expected to cause heterozygosity excess compared to expectations based on the observed number of alleles at microsatellite loci (Cornuet & Luikart 1996). We used Wilcoxon tests to evaluate whether the number of loci with excess heterozygosity was significantly larger than expected assuming a two-phase mutation model with 90% single-step mutation (SSM) and 10% infinite allele model (IAM, Luikart *et al.* 1998) implemented in the program Bottleneck (Piry *et al.* 1999).

To assess whether the genetic composition of the historic GL wolves differed significantly from that of the modern samples, we calculated locus-by-locus θ_ST (Weir & Cockerham 1984) from allele frequencies at 20 microsatellite loci (the loci with the largest fragment sizes did not amplify in any of the historic samples) and evaluated the significance with 10 000 permutations as implemented in Arlequin 3. Global θ_ST was calculated as the ratio of the average locus specific $V_a$ (variances among groups) and the averages of total variances. Locus-by-locus probabilities were combined to a global *P* value by means of Stouffer's *Z*-transform test (Stouffer *et al.* 1949; also see Whitlock 2005). We used this approach because the standard AMOVA in Arlequin is very sensitive to missing data, which is the case in our historic sample. For comparative purpose, we also estimated microsatellite θ_ST between the historic GL samples and the modern gray wolves, eastern and western coyotes, respectively using the locus-by-locus approach as described above and between modern GL samples and modern gray wolves, eastern and western coyotes using standard AMOVA in Arlequin 3. Furthermore, we estimated θ_ST between historic and modern GL wolves from mtDNA haplotypes.

## Results

### Mitochondrial DNA sequence data

The NJ tree (Fig. 2a) shows two clades with bootstrap support of 100%, of which one contains all western gray wolf haplotypes (the 'wolf clade') and the other all coyote haplotypes (the 'coyote clade'). In contrast, GL wolves from all locations around the Great Lakes were found in both clades, with 75 and 142 individuals possessing

© 2009 Blackwell Publishing Ltd



**Fig. 2** (a) Neighbour-joining tree (HKY + I + G distances) of mitochondrial control region sequences sampled in modern western gray wolves, GL wolves, western and eastern coyotes and historic gray and GL wolves. Haplotype designations refer to GL haplotypes identified by Leonard & Wayne (2008) and the most common wolf haplotype in North America (lu32; Leonard *et al.* 2005). Bootstrap support was only high for the split between the two major clades (bootstrap 100), whereas it was generally very low within the clades. (b) Median-joining network of Y-chromosomal haplotypes in modern western gray wolves, GL wolves, western and eastern coyotes, and historic GL wolves. The size of each circle is proportional to the haplotype frequency. Shared haplotypes are represented by circles with mixed colours, in which the relative frequency is indicated by the proportion of the different colours. Branch lengths are proportional to the number of nucleotide differences. Small open circles represent median vectors.

© 2009 Blackwell Publishing Ltd

**2318** S. KOBLMÜLLER *ET AL.*

| | Gray wolf | GL wolf | Coyote E | Coyote W |
|---|---|---|---|---|
| **Mitochondrial DNA** | | | | |
| $N$ | 58 | 202 | 48 | 78 |
| $H$ | 8 | 19 | 7 | 46 |
| $H_D$ | 0.575 ± 0.071 | 0.741 ± 0.018 | 0.780 ± 0.030 | 0.982 ± 0.005 |
| $\pi$ | 0.006 ± 0.004 | 0.045 ± 0.022 | 0.016 ± 0.009 | 0.018 ± 0.009 |
| **Y-chromosome** | | | | |
| $N$ | 30 | 111 | 25 | 41 |
| $H$ | 17 | 41 | 15 | 34 |
| $H_D$ | 0.936 ± 0.027 | 0.896 ± 0.034 | 0.947 ± 0.025 | 0.990 ± 0.008 |

**Table 2** Mitochondrial and Y-chromosomal diversity of North American wolf like canids (excluding historic samples)

$N$, sample size; $H$, number of haplotypes; $H_D$, haplotype diversity; $\pi$, nucleotide diversity.

wolf and coyote-clade haplotypes, respectively. Most of the historic GL wolves (haplotypes GL8, GL5, GL1, GL6, GL2) occupied the most basal branches in the coyote clade; only two possessed more derived haplotypes (haplotypes GL4, GL10). Due to low bootstrap support, except for the wolf–coyote split, no definite conclusions on the chronologic appearance of haplotypes can be drawn based on branching order. Three haplotypes found in the historic samples were also present in modern GL wolves (GL1, GL2, GL10). Of these, GL1 was also quite frequent in eastern coyotes. Other haplotypes shared between GL wolves and eastern coyotes are GL11, GL13 and GL16. Of these, GL11 and GL13 were also found in western coyotes. One haplotype (la28; Hailer & Leonard 2008) was exclusively shared between GL wolves and western coyotes. Most GL wolves that were assigned to the wolf clade had haplotype lu32, the most common haplotype in American gray wolves (Leonard *et al.* 2005). Haplotype diversity in GL wolves was much higher than that in western gray wolves, and was highest in eastern and western coyotes (Table 2). The occurrence of both wolf- and coyote-clade haplotypes in GL wolves resulted in extraordinarily high nucleotide diversity compared to the other taxa (Table 2). Differentiation between historic and modern GL wolf haplotypes was significant with $\theta_{ST} = 0.2404$ and $P < 0.0001$.

### Y-chromosomal data

Y-chromosomal diversity was generally high, but lowest in GL wolves, and highest in western coyotes (Table 2). Similar to the mitochondrial sequence data, the median-joining network based on Y-chromosomal haplotypes revealed a separation into a wolf and a coyote clade, with GL wolf haplotypes present in both clades (Fig. 2b). Unlike the mitochondrial data, eastern coyote haplotypes appeared in both clades. Only one western coyote haplotype from Illinois, the border zone between western and eastern coyotes, was found in the wolf clade, sharing its haplotype with both an eastern coyote and a GL wolf. Whereas nine haplotypes were shared between GL wolves and western

wolves, only three haplotypes were shared between GL wolves and coyotes (two in the coyote clade, one in the wolf clade). As in the mitochondrial data, no clear geographical substructuring was evident within GL wolves. Each of the four historic GL wolves which were successfully genotyped at all six Y-chromosome loci had a unique haplotype in the wolf-clade. Within the coyote clade, two major GL wolf clusters were evident. The first cluster, which includes the most frequent as well as eight additional GL-specific haplotypes, is closely related to four divergent western coyotes. In the second cluster, the most frequent haplotype is shared between GL-wolves and eastern coyotes and is closely related to, but not nested within, the majority of the western coyotes.

### Autosomal microsatellites

Microsatellite diversity was similar in the western gray wolves, GL wolves, eastern and western coyotes (Table 3), with slightly less diversity in wolves than in coyotes. Slight, but significant departure from Hardy–Weinberg expectations at, and linkage disequilibrium between, several loci indicate some degree of population substructure within and introgression into GL wolves. Extreme heterozygote deficiency at loci Ren239K24 and u225 in the eastern coyotes and Ren239K24 in the western coyotes might indicate the presence of null alleles; however, this should not have a large effect on the assignment tests performed (Carlsson 2008).

Structure analyses showed a peak in $\Delta K$ (Evanno *et al.* 2005) for $K = 2$, corresponding to two clusters, which separated wolves (western gray wolf plus GL wolf) and coyotes (Fig. 3a–c). However, the log-likelihood values [ln Pr($X | K$)] consistently increased up to $K = 4$, where the curve reached a plateau such that ln Pr($X | K$) for values of $K > 4$ were almost identical (Fig. 3a). For $K = 3$, the three clusters separated gray wolf, GL wolf and coyote, and for $K = 4$, clusters corresponded to gray wolf, GL wolf, eastern and western coyotes (Fig 3c). Although $\Delta K$ for $K$ of 3 and 4 were lower than for $K = 2$ (Fig. 3b), the distribution of samples into

© 2009 Blackwell Publishing Ltd



**Fig. 3** Clustering analysis in recent North American wolf-like canids, using (a–c) Bayesian assignment and (d) a factorial correspondence analysis. (a) Mean likelihood [$L(K) \pm$ SD] over 10 runs assuming $K$ clusters ($K = 1$–7). (b) $\Delta K$, where the modal value of the distribution is considered as the highest level of structuring. (c) Individual assignment to each of the $K$ ($K = 2$–4) clusters. Each individual is represented by a bar, with coloured sections indicating the likelihood of assignment to the corresponding cluster. NWT, Northwest Territories; AB, Alberta; MN, Minnesota; WI, Wisconsin; MI, Michigan; ON, Ontario; QC, Quebec; NY, New York; MA, Massachusetts; NE, Nebraska; CO, Colorado; NV, Nevada; IL, Illinois. (d) Results of the factorial correspondence analysis, showing the first two axes. Western gray wolves, GL wolves, eastern coyotes and western coyotes are depicted in blue, green, yellow and red, respectively.

© 2009 Blackwell Publishing Ltd

**2320** S. KOBLMÜLLER *ET AL.*

**Table 3** Microsatellite diversity in North American wolf-like canids (excluding historic samples)

| Locus | Gray wolf (n = 58) | | | | GL wolf (n = 195) | | | | Coyote E (n = 48) | | | | Coyote W (n = 78) | | | | Historic GL wolf (n = 13)* |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | $N_A$ | $A_R$ | $H_O$ | $H_E$ | $N_A$ | $A_R$ | $H_O$ | $H_E$ | $N_A$ | $A_R$ | $H_O$ | $H_E$ | $N_A$ | $A_R$ | $H_O$ | $H_E$ | $N_A$ |
| Ren94K11 | 8 | 7.8 | 0.655 | 0.785 | 10 | 8.2 | 0.728 | 0.731 | 8 | 8.0 | 0.750 | 0.713 | 11 | 9.6 | 0.846 | 0.837 | 8 |
| C17.402 | 6 | 5.8 | 0.621 | 0.685 | 9 | 7.6 | **0.692** | 0.754 | 9 | 8.9 | 0.729 | 0.827 | 9 | 8.9 | 0.744 | 0.795 | 6 |
| FH3109 | 7 | 6.8 | 0.793 | 0.816 | 9 | 5.9 | 0.631 | 0.703 | 7 | 7.0 | 0.870 | 0.812 | 11 | 10.8 | 0.833 | 0.860 | 4 |
| Ren239K24 | 7 | 6.8 | 0.741 | 0.741 | 13 | 7.7 | 0.677 | 0.679 | 8 | 8.0 | **0.500** | 0.811 | 8 | 7.6 | **0.384** | 0.767 | — |
| C18.460 | 8 | 7.6 | 0.672 | 0.779 | 9 | 7.1 | 0.656 | 0.675 | 10 | 10.0 | 0.851 | 0.793 | 11 | 9.6 | 0.769 | 0.845 | 6 |
| Ren274F18 | 7 | 6.9 | 0.690 | 0.681 | 9 | 7.7 | 0.703 | 0.735 | 7 | 7.0 | 0.787 | 0.813 | 11 | 9.5 | 0.769 | 0.802 | 5 |
| Ren181K04 | 8 | 7.8 | 0.603 | 0.700 | 9 | 7.8 | **0.610** | 0.731 | 9 | 9.0 | 0.604 | 0.788 | 11 | 10.4 | 0.833 | 0.878 | 6 |
| FH2887 | 6 | 6.0 | 0.638 | 0.645 | 11 | 8.0 | 0.682 | 0.717 | 7 | 6.9 | 0.750 | 0.777 | 11 | 10.6 | 0.833 | 0.840 | 7 |
| C11.873 | 7 | 7.0 | 0.741 | 0.781 | 9 | 8.2 | 0.749 | 0.828 | 7 | 7.0 | 0.896 | 0.814 | 12 | 11.1 | 0.833 | 0.866 | 8 |
| FH2914 | 8 | 8.0 | 0.862 | 0.845 | 9 | 6.2 | 0.713 | 0.751 | 4 | 4.0 | 0.667 | 0.623 | 8 | 7.2 | 0.718 | 0.730 | 7 |
| FH2785 | 9 | 9.0 | 0.810 | 0.842 | 12 | 9.3 | **0.626** | 0.634 | 11 | 10.8 | 0.750 | 0.720 | 16 | 14.6 | 0.846 | 0.888 | — |
| Ren73F08 | 4 | 4.0 | 0.603 | 0.574 | 7 | 5.9 | 0.651 | 0.680 | 7 | 7.0 | 0.875 | 0.793 | 13 | 12.2 | 0.705 | 0.740 | 4 |
| C02.894 | 9 | 9.0 | 0.724 | 0.795 | 10 | 8.9 | **0.749** | 0.825 | 10 | 10.0 | 0.854 | 0.844 | 10 | 9.2 | 0.821 | 0.813 | 8 |
| Ren37H09 | 8 | 8.8 | 0.776 | 0.811 | 9 | 7.9 | **0.708** | 0.764 | 8 | 8.0 | 0.771 | 0.844 | 10 | 9.8 | 0.872 | 0.871 | 9 |
| Ren204K13 | 5 | 4.8 | 0.569 | 0.674 | 7 | 6.3 | **0.718** | 0.730 | 6 | 6.0 | 0.833 | 0.732 | 8 | 7.4 | 0.769 | 0.778 | — |
| Ren160J02 | 10 | 9.7 | 0.638 | 0.786 | 11 | 9.3 | **0.713** | 0.799 | 9 | 9.0 | 0.702 | 0.728 | 6 | 5.4 | 0.397 | 0.430 | — |
| FH2759 | 8 | 8.0 | 0.828 | 0.823 | 11 | 8.6 | 0.810 | 0.826 | 10 | 10.0 | 0.851 | 0.845 | 12 | 11.4 | 0.769 | 0.805 | 5 |
| Ren49F22 | 8 | 7.8 | 0.793 | 0.815 | 10 | 8.0 | **0.662** | 0.703 | 6 | 6.0 | 0.404 | 0.439 | 7 | 5.4 | 0.423 | 0.470 | 6 |
| Ren106I06 | 8 | 8.0 | 0.793 | 0.822 | 12 | 11.5 | **0.795** | 0.845 | 7 | 7.0 | 0.804 | 0.832 | 12 | 11.3 | 0.795 | 0.884 | — |
| u253 | 6 | 5.7 | 0.328 | 0.381 | 8 | 6.8 | 0.697 | 0.715 | 9 | 8.9 | 0.792 | 0.783 | 9 | 9.0 | 0.756 | 0.868 | 5 |
| u2017 | 3 | 3.0 | 0.362 | 0.349 | 6 | 4.5 | 0.282 | 0.273 | 6 | 5.9 | 0.729 | 0.722 | 9 | 8.3 | 0.667 | 0.743 | — |
| u109 | 7 | 6.8 | 0.879 | 0.762 | 7 | 6.1 | 0.579 | 0.591 | 7 | 7.0 | 0.688 | 0.766 | 10 | 9.6 | 0.795 | 0.837 | 5 |
| u225 | 4 | 4.0 | 0.724 | 0.648 | 5 | 4.7 | 0.703 | 0.688 | 7 | 7.0 | **0.298** | 0.765 | 8 | 7.8 | | 0726 | 5 |
| u250 | 8 | 7.8 | 0.776 | 0.814 | 7 | 6.1 | **0.605** | 0.674 | 9 | 8.9 | 0.667 | 0.739 | 11 | 10.0 | 0.744 | 0.862 | 6 |
| vWF | 7 | 6.8 | 0.724 | 0.761 | 9 | 6.8 | 0.631 | 0.688 | 8 | 8.0 | 0.792 | 0.838 | 9 | 8.6 | 0.756 | 0.834 | 6 |
| PEZ05 | 4 | 4.0 | 0.603 | 0.639 | 7 | 6.1 | 0.682 | 0.661 | 6 | 6.0 | 0.750 | 0.780 | 6 | 6.0 | 0.756 | 0.774 | 3 |
| Mean | 7.0 | 6.8 | 0.690 | 0.721 | 9.0 | 7.4 | 0.671 | 0.708 | 7.8 | 7.7 | 0.729 | 0.767 | 10.0 | 9.3 | 0.736 | 0.790 | 6.0 |
| SD | 1.8 | 1.7 | 0.130 | 0.125 | 2.0 | 1.5 | 0.095 | 0.106 | 1.6 | 1.6 | 0.141 | 0.083 | 2.2 | 2.1 | 0.132 | 0.110 | 1.5 |

$N_A$, number of alleles per locus; $A_R$, allelic richness; $H_O$, observed heterozygosity; $H_E$, expected heterozygosity. Deviations of $H_O$ from Hardy–Weinberg expectations at a significance level of 0.05 after Benjamini-Hochberg (1995) correction are indicated by bold print. *The six loci with the largest allele sizes were not used for the historic samples due to bad amplification results; heterozygosity estimates are not shown because of potential allelic dropout.

three and four clusters corresponded well to geographical groupings. We assume that the drop in $\Delta K$ reflects less substructure within wolves and within coyotes than between the two species. This conclusion is also suggested by the FCA analysis where axis 1 explained most of the variance and clearly differentiated wolves from coyotes (Fig. 3d). Axis 2 separated GL wolves from western gray wolves and eastern from western coyotes.

Both Structure and FCA analyses showed that GL wolves were distinct from western Canadian wolves, but the clear separation may in part be due to the lack of wolf samples from intervening areas. Supporting this conclusion is the presence of admixed genotypes in Alberta and further east in Ontario that show western wolf and GL wolf influences. In contrast, the most geographically disparate wolf populations in Northwest Territories and southeast in Minnesota, Wisconsin and Michigan showed little evidence of admixture (Fig. 3c).

Despite the overall distinction between western gray wolves, GL wolves and coyotes, GL individuals with mixed ancestry were identified in Structure based on the autosomal microsatellite data. These individuals, that are likely $F_1$-hybrids, have varied combinations of Y-chromosomal and mtDNA haplotypes, which indicates a prior history of hybridization. Surprisingly, some GL wolf individuals with high proportions of eastern coyote autosomal DNA had wolf-like Y-chromosomal and mtDNA haplotypes. Also, some GL wolf individuals with high proportions of western gray wolf autosomal DNA had coyote-clade Y-chromosomal and mtDNA haplotypes. All these data point to recurrent incidents of hybridization in the ancestry of these individuals.

© 2009 Blackwell Publishing Ltd

Although we detect evidence for past episodic and ongoing hybridization between GL wolves, coyotes and western wolves, there is no indication of a unique hybrid origin of the GL wolf. If the GL wolves owed their origin to a discrete episode of past hybridization, we would expect them to have consistently mosaic genotypes in the structure analysis and an intermediate position between western wolves and coyotes in the FCA plot. Rather, our results are consistent with previous studies that showed varying degrees of ongoing and historic introgression across the Great Lakes area. For example, as in Lehman *et al.* (1991), our microsatellite results suggest introgression of coyote genetic material into GL wolves is much more prominent north of the Great Lakes (Ontario, Quebec) than in the south (Minnesota, Wisconsin, Michigan). Thus, the Great Lakes appears to be a zone of limited hybridization between gray wolves, GL wolves and coyotes.

The test for heterozygosity excess revealed no evidence for a recent genetic bottleneck in the GL wolves ($P = 0.945$). Although it is known that GL wolves experienced a severe bottleneck in the last century, the allelic signal has apparently been eroded due to high levels of introgression from both coyotes and other wolf populations. Alternatively, the bottleneck may have been limited in geographical scope to the US Great Lakes states which were rapidly repopulated by wolves from Canada that have suffered less of a population decline.

Modern GL wolves differed significantly from the modern western gray wolves ($\theta_{ST} = 0.0775$, $P < 0.0001$), eastern ($\theta_{ST} = 0.1419$, $P < 0.0001$) and western coyotes ($\theta_{ST} = 0.1329$, $P < 0.0001$), indicating genetic isolation between GL wolves and both coyotes and western gray wolves. The average number of alleles scored per historic sample (at 20 loci) was 33 (SD 6.7, range 17–40). The average number of alleles used to calculate $\theta_{ST}$ per microsatellite locus was 20.5 (SD 2.6, range 16–26). Using the subset of 20 microsatellite loci which amplified most successfully from the historic material, the genetic composition of the historic GL wolves differed significantly from that of western gray wolves ($\theta_{ST} = 0.0572$, $P < 0.0001$), eastern ($\theta_{ST} = 0.1225$, $P < 0.0001$) and western coyotes ($\theta_{ST} = 0.0898$, $P < 0.0001$). The majority of the 20 analysed loci were significantly differentiated between the historic GL wolves and the western gray wolves (13 loci), eastern (19 loci) and western coyotes (17 loci) (Appendix). In contrast, only five loci showed significant differentiation between the historic and modern GL wolves (Appendix), whereas the remaining 15 loci were not differentiated between the historic and modern samples, despite the observed highly significant mitochondrial differentiation (see above and Leonard & Wayne 2008). Apparently, some degree of genetic continuity has been retained over the last century despite population bottlenecks and current hybridization with coyotes and other wolf populations. Nonetheless, despite the low number of significantly

differentiated loci and the low global $\theta_{ST}$ value of 0.0355, differentiation between the historic and the recent GL sample was significant with a global $P < 0.0001$.

## Discussion

### Evolutionary history of the Great Lakes wolf

The autosomal microsatellite data clearly indicate that the GL wolves should be considered gray wolves, despite the high proportion of coyote-like mitochondrial and Y-chromosomal haplotypes. The numerous GL wolf haplotypes (or haplotype groups) in the coyote clade in the mtDNA and Y-chromosomal data, in particular the ones present in the historic samples and not shared with western coyotes, point to recurrent incidents of ancient introgression from coyotes into the GL wolves. Since western coyotes apparently show no distinct phylogeographical substructuring (Lehman & Wayne 1991), this lack of haplotype sharing between historic GL wolves and western coyotes indicates that sufficient time has passed since introgression for new haplotypes to evolve, rather than being an artefact due to insufficient geographical sampling of coyotes. We do not find evidence for a unique grouping of GL wolves in microsatellite, mtDNA or Y-chromosome analyses that would support the past presence of a unique species of wolf in the Great Lakes area (Wilson *et al.* 2000; Kyle *et al.* 2006), nor do we find evidence for a unique episode of hybridization that might have led to the intermediate phenotype of wolves throughout the region (Nowak 2002).

The Great Lakes wolves constitute a small-sized wolf ecotype that is adapted to the intermediate prey base of the region (Schmitz & Lavigne 1987). Abundant evidence for ecological based factors explaining phenotypic and genetic diversity of gray wolves in the New and Old World is accumulating (Carmichael *et al.* 2001; Geffen *et al.* 2004; Pilot *et al.* 2006; Musiani *et al.* 2007; Carmichael *et al.* 2007; Muñoz-Fuentes *et al.* 2009). For example, ecotypes associated with coastal habitats, Arctic islands, tundra, boreal forest and the Pleistocene megafauna have been identified (Musiani *et al.* 2007; Carmichael *et al.* 2007; Leonard *et al.* 2007; Muñoz-Fuentes *et al.* 2009). Many of these ecotypes have evolved recently, in the past 10 000 years with the retreat of the Laurentide and Cordilleran ice sheets. The GL wolves, however, have likely had a long history, perhaps 300 000 years, based on mtDNA sequence divergence (Leonard & Wayne 2008). Therefore, the Great Lakes ecotype may have persisted for a long time period despite genetic exchange with coyotes and other gray wolves.

The presence of coyote clade haplotypes in historic GL wolves suggests an ancient history of interbreeding between coyotes and GL wolves. Hybridization between GL wolves and coyotes may be more likely when the former is relatively rare (Lehman *et al.* 1991). This condition may

© 2009 Blackwell Publishing Ltd

have occurred repeatedly with the recurrent cycles of glaciation and deglaciation in the Pleistocene and the associated change in range and the relative abundance of the two species in eastern North America. Our results are consistent with the idea that glacial cycles repeatedly pushed the GL wolves southward into the original range of coyotes where they experienced introgression from the resident species. However, the reason why hybridization between coyotes and wolves is so extensive in the Great Lakes area and not elsewhere in Canada or the USA where the species now co-exist is uncertain, but it may have to do with the smaller disparity in size between GL wolves and coyotes (e.g. Lehman *et al*. 1991; Roy *et al*. 1994; Pilgrim *et al*. 1998; Hailer & Leonard 2008).

### Recent hybridization between wolf-like canids in the Great Lakes region

In addition to evidence for ancient introgression of coyote mitochondrial and Y-chromosomal DNA into GL wolves, our results suggest extensive recent and ongoing hybridization between GL wolves and both coyotes and other populations of gray wolves. Microsatellite genotypes and mtDNA haplotypes suggested the presence of recently admixed wolves in the Great Lakes region (Fig. 3c, d). Similarly, significant mitochondrial differentiation between historic and modern GL wolves is consistent with extensive recent gene flow between GL wolves and eastern coyotes and other wolf populations. In contrast, little recent gene flow between GL wolves and eastern coyotes is indicated by Y-chromosomal data, suggestive of sex-biased introgression (see Lehman *et al*. 1991).

The recent gene flow between GL wolves and eastern coyotes is surprising given that coyote abundance is usually limited by wolves in areas where they coexist by direct killing (e.g. Paquet 1992) and interference competition (Murray Berger & Gese 2007). However, once coyotes are established in an area, their extirpation is unlikely as spatial heterogeneity in habitat and in wolf distribution facilitate the persistence of coyotes in wolf-abundant areas (Murray Berger & Gese 2007). Coyotes are usually found in more urban and agricultural regions, whereas wolves occur in more remote pristine areas. These habitats are closely juxtaposed in the Great Lakes region and consequently, coyotes and GL wolves often live in close proximity, increasing the opportunity for interspecific interactions and matings.

The extent of hybridization varies throughout the Great Lakes area. Microsatellite data indicate that the wolves north of the Great Lakes are much more impacted by hybridization with coyotes and other gray wolf populations than areas to the south, a result supported by previous mtDNA analyses (Lehman *et al*. 1991). A clear cline in body size from large individuals in the northwest to small

individuals in the southeast has been observed and hypothesized to result from varying degrees of hybridization between North American wolf-like canids (Kyle *et al*. 2006). However, the extent to which this morphological cline is due to differential hybridization or adaptation and environmental constraints (Schmitz & Lavigne 1987) remains to be determined. A similar cline in body size has been observed in wolves from Minnesota, again interpreted as corresponding to different degrees of hybridization between GL wolves and western gray wolves (Mech & Paul 2008), although contrary to the situation in Ontario, the Minnesota wolves appear less impacted by hybridization in our analysis (Fig. 2c).

### Population integrity and implications for conservation

A substantial change in the frequency of maternally inherited mitochondrial DNA haplotypes between historic and recent GL wolves was previously described (Leonard & Wayne 2008), and was further supported by the haplotype distributions and levels of mtDNA differentiation found in the present study. The dramatic change in haplotype composition reflects recent hybridization and introgression of both coyote and western gray wolf mtDNA into the GL wolf population (Leonard & Wayne 2008) and hence a change in the genetic composition of that population (Leonard & Wayne 2008, 2009). Autosomal microsatellite data detected comparatively slight — but significant — genetic differentiation between historic and modern GL wolves, but high levels of differentiation between GL wolves and western gray wolves, eastern and western coyotes. This suggests that, despite population bottlenecks in the early 1900s and gene flow from coyotes and western gray wolves, the GL population has retained genetic distinction from coyotes and wolves elsewhere. Gene flow that occurred after the bottleneck could have in part restored previous genotypic diversity. It is also possible that the demographic bottleneck in US GL wolves was not sufficient to create a signal of a bottleneck over the entire Great Lakes population. These two factors are not mutually exclusive and both may have contributed to the lack of signal for demographic change.

The exact level of introgression of coyote and/or western gray wolf nuclear genetic material is unknown. However, the discovery of admixed individuals in the microsatellite analysis, and the mixed profile of Y-chromosome and mtDNA haplotypes in GL wolves shows that recent introgression must have occurred. In addition to the data presented here, the results of Roy *et al*. (1994) which found lower microsatellite differentiation between wolves and coyotes in the Great Lakes area than elsewhere, also support recent hybridization. With evidence for ancient hybridization, introgression into GL wolves was apparently not only a human-mediated phenomenon. However, despite

© 2009 Blackwell Publishing Ltd

017805A

high levels of introgression from coyotes, autosomal markers support GL wolves as a discrete wolf taxon.

The habitat in the Great Lakes region has changed dramatically over the last century, especially due to the large-scale conversion of forests to agriculture. These habitat changes, in combination with direct persecution of the gray wolves, led to the decline of the wolf and enabled the natural colonization of the area by coyotes. The habitat continues to change, as many farms are abandoned and the forests are now expanding. Nonetheless, it is very unlikely that coyotes will cease to be a part of this ecosystem in the foreseeable future. Hybridization between the GL wolves and especially eastern coyotes appears to be ongoing, and thus still has the potential to further undermine the integrity of the GL wolves. The hybridization does not appear to impact all GL wolves equally, so more information on the variation in ecological factors and the extent of hybridization in the different regions could help determine which circumstances favour hybridization, and provide guidelines for management to maintain GL wolf integrity in the future.

## Acknowledgements

For providing samples we would like to thank Tom Cooley (Michigan Department of Natural Resources), John Hart, Bill Paul, D. Pete Sahr, Shawn Mcdowell (USDA APHIS Wildlife Services, Minnesota), John Hobbs, Ronald Fryder, Wayne Homan, Randy Benben (USDA APHIS Wildlife Services, Nebraska), Roland Kays (New York State Museum), Thomas Decker (Vermont Department of Fish & Wildlife), Craig Coolahan (USDA APHIS Wildlife Services, California), Bob Beach (USDA Wildlife Services, Nevada), George Hubert (Illinois Department of Natural Resources) and Bob Fisher (National Museum of Natural History, Smithsonian Institution). We are grateful to Kristina M. Sefc for valuable comments on the analyses and for providing scripts to handle large amounts of data; and to Carles Vilà for comments on the manuscript. Financial support was provided by the Carl Tryggers Foundation, the Sven and Lilly Lawski Foundation, the Swedish Research Council and the National Science Foundation (NSF; OPP 0352634 and OPP-IOS 0733033). Logistical support was provided by Jesus Maldonado and the Center for Conservation and Evolutionary Genetics, National Zoological Park, Smithsonian Institution, USA.

## References

Arnold MJ (1997) *Natural Hybridization and Evolution*. Oxford University Press, Oxford, UK.

Arnold MJ (1992) Natural hybridization as an evolutionary process. *Annual Review of Ecology and Systematics*, **23**, 237–261.

Abbott RJ (1992) Plant invasions, interspecific hybridization and the evolution of new plant taxa. *Trends in Ecology & Evolution*, **7**, 401–405.

Bandelt HJ, Forster P, Sykes BC, Richards MB (1995) Mitochondrial portraits of human populations using median networks. *Genetics*, **141**, 743–753.

Bandelt HJ, Forster P, Rohl A (1999) Median-joining networks for inferring intraspecific phylogenies. *Molecular Biology and Evolution*, **16**, 37–48.

Bannasch DL, Dannasch MJ, Ryun JR, Famula TR, Pedersen NC (2005) Y chromosome haplotype analysis in purebred dogs. *Mammalian Genome*, **16**, 273–280.

Belkhir K, Borsa P, Chikhi L, Raufaste N, Bonhomme F (1996–2004) *Genetix 4.05, logiciel sous Windows TM pour la génétique des populations*. Laboratoire Génome, Populations, Interactions, CNRS UMR 5171, Université de Montpellier II, Montpellier, France.

Benjamini Y, Hochberg Y. (1995) Controlling the false discovery rate: a practical and powerful approach for multiple testing. *Journal of the Royal Statistical Society. Series B*, **57**, 289–300.

Berthier P, Excoffier L, Ruedi M (2006) Recurrent replacement of mtDNA and cryptic hybridization between two sibling bat specie *Myotis myotis* and *Myotis blythii*. *Proceedings of the Royal Society B: Biological Sciences*, **273**, 3101–3109.

Björnerfeldt S, Hailer F, Nord M, Vilà C (2008) Assortative mating and fragmentation within dog breeds. *BMC Evolutionary Biology*, **8**, 28.

Breen M, Jouquand S, Renier C *et al*. (2001) Chromosome-specific single-locus FISH probes allow anchorage of an 1800-marker integrated radiation-hybrid/linkage map of the domestic dog genome to all chromosomes. *Genome Research*, **11**, 1784–1795.

Carlsson J (2008) Effects of microsatellite null alleles on assignment testing. *Journal of Heredity*, **99**, 616–623.

Carmichael LE, Nagy JA, Larter NC, Strobeck C (2001) Prey specialization may influence patterns of gene flow in wolves of the Canadian northwest. *Molecular Ecology*, **10**, 2787–2798.

Carmichael LE, Krizan J, Nagy JA *et al*. (2007) Historical and ecological determinants of genetic structure in arctic canids. *Molecular Ecology*, **16**, 3466–3483.

Cornuet JM, Luikart G (1996) Description and power analysis of two tests for detecting recent population bottlenecks from allele frequency data. *Genetics*, **144**, 2001–2014.

Currat M, Ruedi M, Petit RJ, Excoffier L (2008) The hidden side of invasions: massive introgression by local genes. *Evolution*, **62**, 1908–.

Dowling TE, Secor C (1997) The role of hybridization and introgression in the diversification of animals. *Annual Review of Ecology and Systematics*, **28**, 593–619.

Ellstrand NC, Schierenbeck KA (2000) Hybridization as a stimulus for the evolution of invasiveness in plants? *Proceedings of the National Academy of Sciences, USA*, **97**, 7043–7050.

Evanno G, Regnaut S, Goudet J (2005) Detecting the number of clusters of individuals using the software Structure: a simulation study. *Molecular Ecology*, **8**, 2611–2620.

Excoffier L, Laval G, Schneider S (2005) Arlequin (version 3.0): an integrated software package for population genetics data analysis. *Evolutionary Bioinformatics Online*, **1**, 47–50.

Falush D, Stephens M, Pritchard JK (2007) Inference of population structure using multilocus genotype data: dominant markers and null alleles. *Molecular Ecology Notes*, **7**, 574–578.

Francisco LV, Langston AA, Mellersh CS, Neal CL, Ostrander EA (1996) A class of highly polymorphic tetranucleotide repeats for canine genetic mapping. *Mammalian Genome*, **7**, 359–362.

Geffen E, Anderson MJ, Wayne RK (2004) Climate and habitat barriers to dispersal in the highly mobile grey wolf. *Molecular Ecology*, **13**, 2481–2490.

Guyon R, Lorentzen TD, Hitte C *et al*. (2003) A 1-Mb resolution radiation hybrid map of the canine genome. *Proceedings of the National Academy of Sciences, USA*, **100**, 5296–5301.

Hailer F, Leonard JA (2008) Hybridization among three native North American *Canis* species in a region of natural sympatry. *PLoS one*, **3**, e3333.

© 2009 Blackwell Publishing Ltd

Hasegawa M, Kishino H, Yano T (1985) Dating of the human-ape splitting by a molecular clock of mitochondrial DNA. *Journal of Molecular Evolution*, **22**, 160–174.

Jouquand S, Priat C, Hitte C *et al.* (2000) Identification and characterization of a set of 100 tri- and dinucleotide microsatellites in the canine genome. *Animal Genetics*, **31**, 266–272.

Keane TM, Creevey CJ, Pentony MM, Naughton TJ, McInerney JO (2006) Assessment of methods for amino acid matrix selection and their use on empirical data shows ad hoc assumptions of matrix are not justified. *BMC Evolutionary Biology*, **6**, 29.

Kyle CJ, Johnson AR, Patterson BR *et al.* (2006) Genetic nature of eastern wolves: past, present and future. *Conservation Genetics*, **7**, 273–287.

Lehman N, Wayne RK (1991) Analysis of coyote mitochondrial-DNA genotype frequencies — estimation of the effective number of alleles. *Genetics*, **128**, 405–416.

Lehman N, Eisenhawer A, Hansen K *et al.* (1991) Introgression of coyote mitochondrial DNA into sympatric North American gray wolf populations. *Evolution*, **45**, 104–119.

Leonard JA, Vilà C, Wayne RK (2005) Legacy lost: genetic variability and population size of extirpated US gray wolves (*Canis lupus*). *Molecular Ecology*, **14**, 9–17.

Leonard JA, Vilà C, Fox-Dobbs K, Koch PL, Wayne RK, Van Valkenburgh B (2007) Megafaunal extinctions and the disappearance of a specialized wolf morph. *Current Biology*, **17**, 1146–1150.

Leonard JA, Wayne RK (2008) Native GL wolves were not restored. *Biology Letters*, **4**, 95–98.

Leonard JA, Wayne RK (2009) Wishful thinking: imagining that the current Great Lakes wolf is the same entity that existed historically. *Biology Letters*, **5**, 67–68.

Luikart G, Sherwin WB, Steele BM, Allendorf FW (1998) Usefulness of molecular markers for detecting population bottlenecks and monitoring genetic change. *Molecular Ecology*, **7**, 963–974.

Mech LD, Paul WJ (2008) Wolf body mass cline across Minnesota related to taxonomy? *Canadian Journal of Zoology*, **86**, 933–936.

Melo-Ferreira J, Boursot P, Suchentrunk F, Ferrand N, Alves PC (2005) Invasion from the cold past: extensive introgression of mountain hare (*Lepus timidus*) mitochondrial DNA into three other hare species in northern Iberia. *Molecular Ecology*, **14**, 2459–2464.

Muñoz-Fuentes V, Darimont CT, Wayne RK, Paquet P, Leonard JA (2009) Ecological factors drive differentiation in wolves from British Columbia. *Journal of Biogeography*, [Epub ahead of print] doi: 10.1111/j.1365-2699.2008.02067.x.

Murray Berger K, Gese EM (2007) Does interference competition with wolves limit the distribution and abundance of coyotes? *Journal of Animal Ecology*, **76**, 1075–1085.

Musiani M, Leonard JA, Cluff HD *et al.* (2007) Differentiation of tundra/taiga boreal coniferous forest wolves: genetics, coat color and association with migratory caribou. *Molecular Ecology*, **16**, 4149–4170.

Nowak RM (2002) The original status of wolves in eastern North America. *Southeastern Naturalist*, **1**, 95–130.

O'Brien SJ, Mayr E (1991) Bureaucratic mischief: recognizing endangered species and subspecies. *Science*, **251**, 1198–1199.

Ostrander EA, Sprague GF, Rine J (1993) Identification and characterization of dinucleotide repeat (CA) n markers for genetic-mapping in dog. *Genomics*, **16**, 207–213.

Paquet PC (1992) Prey use strategies of sympatric wolves and coyotes in Riding Mountain National Park, Manitoba. *Journal of Mammalogy*, **73**, 337–343.

Patterson N, Richter DJ, Gnerre S, Lander ES, Reich D (2006) Genetic evidence for complex speciation of humans and chimpanzees. *Nature*, **441**, 1103–1108.

Pilgrim KL, Boyd DK, Forbes SH (1998) Testing for wolf-coyote hybridization in the Rocky Mountains using mitochondrial DNA. *Journal of Wildlife Management*, **62**, 683–689.

Pilot M, Jedrzejewski W, Branicki W *et al.* (2006) Ecological factors influence population genetic structure of European grey wolves. *Molecular Ecology*, **15**, 4533–4553.

Piry S, Luikart G, Cornuet J-M (1999) Bottleneck: a computer program for detecting recent reductions in the effective population size using allele frequency data. *Journal of Heredity*, **90**, 502–503.

Polzin T, Daneschmand SV (2003) On Steiner trees and minimum spanning trees in hypergraphs. *Operations Research Letters*, **31**, 12–20.

Roca AL, Georgiadis N, O'Brien SJ (2005) Cytonuclear genomic dissociation in African elephant species. *Nature Genetics*, **37**, 96–100.

Roy MS, Geffen E, Smith D, Ostrander E, Wayne RK (1994) Patterns of differentiation and hybridization in North American wolf-like canids revealed by analysis of microsatellite loci. *Molecular Biology and Evolution*, **11**, 553–570.

Sambrook J, Fritsch EF, Maniatis T (1989) *Molecular Cloning: A Laboratory Manual*. Cold Spring Harbor Laboratory Press, Cold Spring Harbor, New York.

Schmitz OJ, Lavigne GB (1987) Factors affecting body size in sympatric *Canis. Journal of Mammalogy*, **68**, 92–99.

Seehausen O (2004) Hybridization and adaptive radiation. *Trends in Ecology & Evolution*, **19**, 198–207.

Sefc KM, Payne RB, Sorenson MD (2003) Microsatellite amplification from museum feather samples: effects of fragment size and template concentration on genotyping errors. *Auk*, **120**, 982–989.

Shibuya H, Collins BK, Huang TH, Johnson GS (1994) A polymorphic (AGGAAT)n tandem repeat in an intron of canine von Willebrand factor gene. *Animal Genetics*, **25**, 122.

Stouffer SA, Suchman EA, DeVinney LC, Star SA, Williams RA Jr (1949) *The American Soldier, Vol. 1: Adjustment during Army Life*. Princeton University Press, Princeton, New Jersey.

Sundqvist A-K, Ellegren H, Olivier M, Vilà C (2001) Y chromosome haplotyping in Scandinavian wolves (*Canis lupus*) based on microsatellite markers. *Molecular Ecology*, **10**, 1959–1966.

Swofford DL (2002) *PAUP\*. Phylogenetic Analysis Using Parsimony (\*and Other Methods)*, Version 4.0. Sinauer & Associates, Sunderland, Massachusetts.

Taberlet P, Griffin S, Goossens B *et al.* (1996) Reliable genotyping of samples with very low DNA quantities using PCR. *Nucleic Acids Research*, **15**, 3189–3195.

Tamura K, Dudley J, Nei M, Kumar S (2007) MEGA 4: molecular evolutionary genetics analysis (MEGA) software version 4.0. *Molecular Biology and Evolution*, **24**, 1596–1599.

van Oosterhout C, Hutchinson WF, Wills DP, Shipley P (2004) Micro-Checker: software for identifying and correcting genotyping errors in microsatellite data. *Molecular Ecology Notes*, **4**, 535–538.

Vilà C, Amorim IR, Leonard JA *et al.* (1999) Mitochondrial DNA phylogeography and population history of the gray wolf *Canis lupus. Molecular Ecology*, **8**, 2089–2103.

Weir BS, Cockerham CC (1984) Estimating *F*-statistics for the analysis of population structure. *Evolution*, **38**, 1258–1370.

Whitlock MC (2005) Combining probability from independent tests: the weighted *Z*-method is superior to Fisher's approach. *Journal of Evolutionary Biology*, **18**, 1368–1373.

© 2009 Blackwell Publishing Ltd

Wilson PJ, Grewal S, Lawford ID *et al.* (2000) DNA profiles of eastern Canadian wolf and red wolf provide evidence for a common evolutionary history independent of the gray wolf. *Canadian Journal of Zoology*, **78**, 2156–2166.

Maria Nord worked on the wolves as part of a fellowship project, and this project reflects her general interest in conservation biology. Since then she has begun her PhD on bird diversity in the Swedish archipelago and the effects of human disturbance. Stephan Koblmüller and Robert Wayne apply molecular genetic techniques to study questions in ecology, behaviour, conservation and evolution of animals. Jennifer Leonard combines genetic and other data to determine how and why populations are structured through time and space, and which factors drive some populations to extinction or expansion.

**Note added in proof**: Additional genetic analysis of the Great Lakes wolf was recently published by Wheeldon & White (2009) which further supports the conclusions presented here.

Wheeldon T, White BN (2009) Genetic analysis of historic western Great Lakes region wolf samples reveals early *Canis lupus/lycaon* hybridization. *Biology Letters*, **5**, 101–104.

© 2009 Blackwell Publishing Ltd

## Appendix

Locus-by-locus $\theta_{ST}$ and corresponding *P* values (in parentheses) between historic Great Lakes (GL) wolves and modern GL wolves, western gray wolves, eastern and western coyotes. Significant *P* values (at the 5% level) are indicated in bold lettering.

|  | Locus | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
|  | Ren94K11 | C17.402 | FH3109 | C18.460 | Ren274F18 | Ren181K04 | FH2887 | C11.873 | FH2914 | Ren73F08 |
| Modern GL wolf | 0.0806 | 0.0159 | 0.0600 | 0.0289 | 0.0272 | 0.0158 | −0.0130 | 0.1448 | 0.0223 | −0.0092 |
|  | **(0.0027)** | (0.1446) | **(0.0212)** | (0.0546) | (0.1171) | (0.1678) | (0.6309) | **(< 0.0001)** | (0.1173) | (0.6168) |
| Gray wolf | 0.0666 | 0.0010 | 0.0217 | 0.00435 | 0.0999 | 0.0035 | −0.0066 | 0.1479 | 0.0813 | −0.0156 |
|  | **(0.0052)** | (0.3582) | (0.1172) | **(0.0200)** | **(0.0073)** | (0.3210) | (0.4390) | **(< 0.0001)** | **(0.0008)** | (0.6833) |
| Coyote E | 0.1522 | 0.0314 | 0.0799 | 0.0735 | 0.0740 | 0.2151 | 0.1626 | 0.1181 | 0.2018 | 0.0589 |
|  | **(< 0.0001)** | (0.0508) | **(0.0036)** | **(0.0011)** | **(0.0099)** | **(< 0.0001)** | **(0.0001)** | **(< 0.0001)** | **(0.0001)** | **(0.0113)** |
| Coyote W | 0.0540 | 0.0758 | 0.0441 | 0.0377 | 0.1316 | 0.1767 | 0.0820 | 0.0900 | 0.1523 | 0.0294 |
|  | **(0.0052)** | **(0.0010)** | **(0.0138)** | **(0.0150)** | **(0.0002)** | **(<0.0001)** | **(0.0020)** | **(< 0.0001)** | **(< 0.0001)** | **(0.0530)** |

|  | Locus | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
|  | C02.894 | Ren37H09 | FH2759 | Ren49F22 | u253 | u109 | u225 | u250 | vWF | PEZ05 |
| Modern GL wolf | 0.0580 | 0.0164 | 0.0091 | 0.0125 | 0.0108 | −0.0041 | 0.0141 | 0.1179 | 0.0102 | 0.0334 |
|  | **(0.0029)** | (0.1740) | (0.2160) | (0.1936) | (0.2131) | (0.4604) | (0.1760) | **(0.0005)** | (0.2209) | (0.1007) |
| Gray wolf | 0.0074 | 0.0726 | 0.0456 | 0.0728 | 0.0705 | 0.1636 | 0.0511 | 0.0540 | 0.0901 | −0.0090 |
|  | (0.2434) | **(0.0075)** | **(0.0225)** | **(0.0026)** | **(0.0215)** | **(< 0.0001)** | **(0.0379)** | **(0.0058)** | **(0.0016)** | (0.5155) |
| Coyote E | 0.0805 | 0.0432 | 0.1197 | 0.2650 | 0.1877 | 0.1422 | 0.0461 | 0.1714 | 0.0894 | 0.1493 |
|  | **(0.0002)** | **(0.0253)** | **(0.0001)** | **(< 0.0001)** | **(< 0.0001)** | **(0.0002)** | **(0.0289)** | **(< 0.0001)** | **(0.0005)** | **(< 0.0001)** |
| Coyote W | 0.0842 | 0.0223 | 0.0716 | 0.2777 | 0.0663 | 0.1369 | 0.0203 | 0.0283 | 0.0967 | 0.1215 |
|  | **(0.0008)** | (0.0808) | **(0.0037)** | **(< 0.0001)** | **(0.0016)** | **(< 0.0001)** | (0.1121) | **(0.0318)** | **(0.0003)** | **(0.0002)** |

© 2009 Blackwell Publishing Ltd



NATURAL RESOURCES DEFENSE COUNCIL

**By Electronic Submittal and U.S. Mail**

July 5, 2011

Public Comments Processing
Attn: FWS-R3-ES-2011-0029
Division of Policy and Directives Management
U.S. Fish and Wildlife Service
4401 N. Fairfax Drive, MS 2042-PDM
Arlington, VA 22203

> Re: Proposed Rule to Revise the List of Endangered and Threatened Wildlife
> for the Gray Wolf (*Canis lupus*) in the Eastern United States, Initiation of Status
> Reviews for the Gray Wolf and for the Eastern Wolf (*Canis lycaon*)

To Whom It May Concern:

On behalf of the Natural Resources Defense Council (NRDC) and our 1.3 million members and activists, please accept these comments on the U.S. Fish and Wildlife Service's (Service) proposed rule to remove the Upper Midwest's population of gray wolves from the list of endangered species and to recognize a new species of wolf, *Canis lycaon*, in the Eastern United States.  See Proposed Rule to Revise the List of Endangered and Threatened Wildlife for the Gray Wolf (*Canis lupus*) in the Eastern United States, Initiation of Status Reviews for the Gray Wolf and for the Eastern Wolf (*Canis lycaon*), 76 Fed. Reg. 26086-26144 (May 5, 2011) (Proposed Rule).

Fundamentally, NRDC supports the delisting of gray wolves in the Midwest, including in Minnesota, Wisconsin and Michigan.  However, NRDC does not believe that the best available scientific evidence supports the recognition of *Canis lycaon* as a species. Additionally, the proposed reclassification of many wolves occurring in the Midwest and all wolves in the northeastern United States, as *Canis lycaon* is unnecessary at this time and undermines, perhaps fatally, the Service's delisting proposal for Midwest wolves.  Finally, NRDC strongly urges the Service to recognize and list a Distinct Population Segment (DPS) of wolves in the Pacific Northwest.

**I.     Wolves in the Upper Midwest Constitute a Valid Distinct Population Segment and Should Be Delisted; However, the Proposed Rule Needs Improvement**

As a general matter, NRDC supports the delisting of wolves in the Great Lakes region. We agree with the Proposed Rule that wolves in the Upper Midwest constitute a distinct, significant, and recovered population.  However, the Service could strengthen the Proposed Rule's delisting of a Great Lakes DPS, and make it better reflect current scientific research, with some modifications.

A.    The Service Should Treat Wolves in the Upper Midwest as a Single,
       Connected Population and Analyze Them as Such

As the Proposed Rule acknowledges, wolves in the Great Lakes region represent well
over 4,000 individuals in a continuous "connected" population across Minnesota,
Wisconsin and Michigan.  76 Fed. Reg. at 2601. As described below, the best available
science shows that a population of this size constitutes a viable, recovered population
of wolves.  However, instead of analyzing this single connected population for what it
is, the Proposed Rule repeatedly implies that isolated wolf populations of 200 or even
100 individuals in the Great Lakes, as identified in the revised recovery plan for the
region (USFWS 1992), would still be considered "viable."  See, e.g., id. at 26096,
26098, 26100. The best available science does not show, however, that such small
isolated populations of wolves are viable and the Service's delisting analysis should not
be premised on such an assumption.  Rather, it should analyze the gray wolf's
recovery in the Great Lakes Region based on the maintenance of a single, large and
connected population.

It is a well-established principle of conservation biology that populations of organisms
need substantial and robust numbers of individuals to maintain viability. An often cited
estimate for minimum population viability (MPV) is an effective population size (Ne) of
500 individuals to avoid the effects of genetic loss due to drift (Soule and Wilcox 1980,
Frankel and Soule 1981, Soule 1986, Franklin and Frankham 1998). For these
reasons, Soule and Simberloff (1986) concluded that "estimates of MVPs for many
animal species are rarely lower than an *effective size* of a few hundred." Since effective
population sizes are generally only 10-20% of the census population, this lower limit
translates into a total population count of 2,500-5,000 individuals (Frankham 1995,
Palstra and Ruzzante 2008).

Other estimates have predicted that viable population numbers should be even higher.
For example, Lande (1988) criticized the application of a blanket number like Ne=500
because it fails to consider critical species-specific demographic data. Lande then
outlined examples in which demographic parameters, such as an alee effect,
stochasticity, edge effects or local extinctions in a patchy habitat, could require
populations to have even larger numbers than an effective population of 500. Lande
(1995) further explored this topic in the context of genetic variation and mutation and
concluded that effective populations should number in the 5,000s. C. D. Thomas
(1990) also estimated that MVPs should number in the thousands – ideally, 10,000
individuals for populations that experience fluctuations. Similarly, in 2004, Reed and
Hobbs examined the population viability of 2,387 populations of 203 species and found
that vertebrates need to number in the thousands for effective conservation.

Recently, a number of studies have been published that examine population viability of
gray wolves specifically, based on empirical data. Brook et al. (2006) estimated the
MVP for 1,198 species including the gray wolf and found that the median overall
estimate was 1,377 individuals. Traill et al. (2007) conducted a meta-analysis of MVPs
for 212 species including gray wolves and concluded that the MVP for most species
will exceed a few thousand individuals. Finally, Reed et al. (2003) estimated the
minimum viable population size for over 100 vertebrate organisms, including the gray

018271A

wolf. The MVP for *adult* gray wolves was estimated at 1,403. When Reed et al. (2003) corrected for 40 generations worth of data, the MVP for gray wolves was estimated to be 6,332.

Finally, Traill, Brook, Frankham and Bradshaw (2009) jointly reviewed empirical and theoretical MVP estimates published over the past few decades and determined:

> This literature collectively shows that thousands (not hundreds) of individuals are required for a population to have an acceptable probability of riding-out environmental fluctuation and catastrophic events, and ensuring the continuation of evolutionary processes.  The evidence is clear, yet conservation policy does not appear to reflect these findings, with pragmatic concerns on feasibility over-riding biological risk assessment.

Furthermore, these researchers conclude:

> Current evidence from integrated work on population dynamics shows that setting conservation thresholds at a few hundred individuals only is a subjective and non-scientific decision, not an evidence-based biological one which properly accounts for the synergistic impacts of deterministic threats…Many existing conservation programs might therefore be managing inadvertently or implicitly for extinction.

While a subsequent paper criticized Traill et al. (2009) by arguing that species are likely to have unique ecological traits such that a blanket "magic number" cannot be applied broadly across all species, those authors nonetheless conclude, "We also suspect (as have others long before [60]) that multiple populations totaling thousands (not hundreds) of individuals will be needed to ensure long-term persistence." (Flather et al. 2011).

In short, there is now substantial and compelling evidence that populations must number in the thousands of individuals to ensure long-term viability, which suggests that the Service's original determination that wolf populations of 100-200 wolves constitute a viable population is not based on the best available science.  As such, we believe that the Service should base its evaluation of wolf recovery in the Great Lakes region on the population as a whole.

      B.     <u>The Service Should Recognize That North Dakota Has and Will Continue to Support Breeding Pairs of Wolves</u>

While the Proposed Rule includes the eastern half of North Dakota in the Great Lakes DPS, it excludes the entire state from the "current wolf range."  76 Fed. Reg. at 26102.  Yet, the number of documented wolf sightings in North Dakota has been increasing. 76 Fed. Reg. at 26,117.  Between 1981 and 1992, ten wolves were killed in the Dakotas (Licht and Fritts 1994, pp. 76-77).  Six more have been killed in North Dakota since 1992, including an adult male shot near Devil's Lake in 2002 and an adult male shot in Richland County in 2003.  76 Fed. Reg. at 26100.  In 2005, one wolf was

018272A

sighted near the Carter Dam area north of Greene, three wolves were sighted near Minot, and one wolf was sighted near Carpio.  In 2009, a wolf was found dead in Eddy County.  76 Fed. Reg. at 26,117.  From 1993 to 1998, six wolf depredation reports were investigated in North Dakota, two of which were verified.  From 1999-2003, 16 wolf sightings and depredation incidents in North Dakota were reported to USDA-APHIS-Wildlife Services, nine of which were verified.  76 Fed. Reg. at 26117.  And in late 2005, two wolf depredation incidents were verified north of Garrison.  Id.

Many of the wolf sightings in North Dakota have occurred in the Turtle Mountains, a deciduous forest ecosystem in the northern part of the state that straddles the Canadian border.  Between January 1, 1992, and December 31, 1995, the Service's Ecological Services program recorded 34 wolf sightings, 12 of which were in the Turtle Mountains (Licht and Huffman 1996, p. 171).  During the same time period, U.S. Department of Agriculture Animal Damage Control (no Wildlife Services) personnel reported 17 incidents of wolf tracks in the Turtle Mountains, and other reports of wolves came from within 25 kilometers (km) of the Turtle Mountains.  Id.  Unlike in other areas of North Dakota, there is evidence that wolves in the Turtle Mountains are not simply dispersers.  Rather, at least one breeding pair has been reported in the vicinity.  Id. (citing Collins in litt. 1998).  Clusters of wolf reports are a better indicator of established wolf territory than are individual reports (Fritts et al. 1995, pp. 107-126).  The relatively high number of wolf reports in the Turtle Mountains area, combined with the fact that the reports have been made during every season, suggests that wolves have established populations in the vicinity (Licht and Huffman 1996, p.172).

Not only is there evidence that a non-dispersing population of wolves exists in the Turtle Mountains, but also the area appears to provide suitable habitat for wolves due to its low road density, low human density, and adequate prey base. According to the Proposed Rule, road density is the best predictor of habitat suitability in the Midwest due to the correlation between roads and human-related wolf mortality. 76 Fed. Reg. at 26107-08.  In fact, road density is such a strong indicator of established wolf territory that some scientists have used this factor alone to determine areas of suitable wolf habitat.  76 Fed. Reg. at 26106. Most scientists have concluded that, in order to maintain breeding packs, an area should have a road density of 0.7 km per square (sq) km or less (Mladenoff et al. 1995, p. 289).[1] The North Dakota section of the Turtle Mountains meets this criterion, with 0.54 km of roads per sq km (Licht and Huffman 1996, p. 172).  In terms of human density, at least one study has indicated that the 1.2 humans per sq km in North Dakota's section of the Turtle Mountains is low enough for wolves to establish a viable population (Id., p. 172).  This is bolstered by the Proposed Rule, which states that in Minnesota, areas with a human density of up to 4 people per sq km are suitable if they have road densities of less than 0.7 km of roads per sq km. 76 Fed. Reg. at 26,106.  Lastly, the Turtle Mountains maintain a sufficient prey base of

---

[1]While the Proposed Rule discusses a number of studies regarding road density, it does not explicitly state what it considers to be an acceptable figure.  Additionally, the Proposed Rule does not specify the road densities in areas that *have* been included in the current range of the Great Lakes wolf.  Thus, it is difficult to discern what the Service views as an acceptable road density.  However, the majority of the studies the Proposed Rule cites deem road densities of 0.7 km per sq km acceptable.

large ungulate species to support a viable wolf population, with white-tailed deer, moose, and elk populations (Licht and Huffman 1996, p. 172).

Given these facts, we question the Proposed Rule's conclusion that the existence of a wolf population in North Dakota would not "make a meaningful contribution to the maintenance of the current viable, self-sustaining, and representative metapopulation of wolves in the proposed WGL DPS." 76 Fed. Reg. at 26131. We therefore recommend that the Service revise the Proposed Rule to include North Dakota's Turtle Mountains in the current range of the Great Lakes wolf and analyze its delisting rule accordingly.

C.    The Service Should Seek Improvements in State Management Plans

As part of its delisting analysis, the Proposed Rule examines the adequacy of regulatory mechanisms that will be in place to protect wolves in the Great Lakes region, post-delisting. 76 Fed. Reg. at 26118; 16 U.S.C. § 1533(a)(1)(C). Most important among these mechanisms are the presence and adequacy of management plans in the States in which wolves are found.

In evaluating these or other existing regulatory mechanisms, however, the Service is not permitted to rely on non-binding or speculative conservation plans. Greater Yellowstone Coal., Inc. v. Servheen, 672 F. Supp. 2d 1105, 1115-17 (D. Mont. 2009); Or. Natural Res. Council v. Daley, 6 F. Supp. 2d 1139, 1141 (D. Or. 1998); Save Our Springs v. Babbitt, 27 F. Supp. 2d 739, 748 (W.D. Tex. 1997). Specifically, the Service cannot rely on state management plans if the plans contain "goals" and "guidelines" rather than legally enforceable standards. Greater Yellowstone, 672 F. Supp. 2d at 1117. The Service is also forbidden from relying on plans that fail to require action in the event stated goals are not achieved. Id. This limitation on the "existing regulatory mechanisms" factor makes sense, because "[a]bsent some method of enforcing compliance, protection of a species can never be assured." Or. Natural Res. Council, 6 F. Supp. 2d at 1155.

In this case, wolf management plans have been approved in Minnesota, Wisconsin, and Michigan.[2] While these plans have many strengths, they could be improved. Most troubling, perhaps, is the fact that while the Minnesota wolf management plan is state law, the Wisconsin and Michigan plans are non-binding agreements instead of legally enforceable standards. But the Minnesota Plan is also flawed because it states only that the Minnesota Department of Natural Resources (DNR) will "take appropriate management actions to address the cause of the reduction and assure recovery to the

---

[2] As the Proposed Rule notes "North Dakota lacks as State endangered specie slaw or regulation and wolves are currently classified in the state as only "having a moderate level of conservation priority" because they "are believed to be peripheral or do not breed in North Dakota." 76 Fed. Reg. at 26131. Given the existence of suitable wolf habitat in North Dakota as well as documented instances of breeding pairs in the State we urge the Service to encourage North Dakota to revise its classification of the wolf and adopt a wolf management plan for the State.

minimum level in the shortest possible time" if the population falls below this number.[3] However, the Plan does not specify what these actions are or mandate any required actions if the wolf population falls below minimum levels.  By contrast, if the wolf population falls below 250 wolves for 3 years, the Wisconsin Plan commits the State to recommend listing wolves as threatened under Wisconsin's Endangered Species Act, and wolves will reach endangered status if their population falls below 80 for 1 year. 76 Fed. Reg. at 26123.

Additionally, whereas the Minnesota and Michigan plans allow for possible population growth, we are concerned that Wisconsin's state plan aims to manage the state's wolf population at half of its current size (350 versus ,) which would likely require aggressive reduction efforts.

Despite these flaws, however, we believe that the Minnesota, Wisconsin, and Michigan plans, if successfully implemented, will succeed in maintaining a viable wolf population. Even if these three states allowed their wolf populations to drop to the minimum numbers identified in their plans, the tri-State wolf population would still number above 2,000 individuals. Therefore, while we maintain that these state management plans should be legally enforceable and could be strengthened, we also believe that, if followed as described, the Great Lakes population of wolves will continue to be managed for a recovered population upon delisting.

## II.     The Service Should Not Recognize *Canis lycaon* at This Time

### A.     The Service's Taxonomic Revision is Not Supported by the Best Available Science

While the issue of wolf taxonomy has long been debated, the existence of an Eastern wolf, *C. lycaon*, as a separate species is not fully supported by the scientific community.  In fact, the Service has based its taxonomic revision on a fundamental misunderstanding of the data.  Additionally, the taxonomy of wolves in this region is the subject of current and active research.  As such, it is premature to declare the existence of *C. lycaon* as a distinct species and the Service should, at a minimum, reevaluate its proposed taxonomic revision in a separate rule-making process outside of the Great Lakes delisting rule.

The taxonomy of canids in the Great Lakes region and the northeastern United States is complicated by a series of both historic and recent hybridization events between wolf and coyote populations.  Scientists generally agree that wolves in the Great Lakes and northeastern United States are characterized by a smaller body size than their western gray wolf relatives.  This could be due to local adaptation to the smaller prey size of deer in this region and may, in part, explain why hybridization with coyotes has occurred in this area but not in other regions of the gray wolf's range (see Koblmuller et

---

[3] *Minnesota Wolf Management Plan*, MINNESOTA DEPARTMENT OF NATURAL RESOURCES, 20 (Feb. 2001) (available at http://www.fws.gov/midwest/wolf/stateplans/pdf/mn-wolf-plan-01.pdf).

018275A

al. 2009).  The smaller body size may, alternatively, be a result of early hybridization with coyotes.

        1.      Alternative Hypotheses Regarding Coyote-like Haplotypes Found in Wolves

Controversy over the existence of *C. lycaon* centers around the fact that some wolf-like canids have been found to contain genetic material that groups more closely with coyotes than with gray wolves (Wilson et al. 2000, 2003, Kyle et al. 2006, Leonard and Wayne 2007, Koblmuller et al. 2009, Wheeldon et al. 2010).  Notably, certain haplotypes that are coyote-like are currently found only in wolves – including some historic samples of wolves in an area in the east before coyotes were present there. This pattern has been explained by competing hypotheses.  One hypothesis is that the existence of the coyote-like haplotypes in current wolves is a reflection of an ancient hybridization event between gray wolves (*C. lupus*) and coyotes (*C. latrans*) in which the corresponding haplotype in coyotes has since diverged or disappeared (Leonard and Wayne 2007, Koblmuller et al. 2009).  The hybridization event would have taken place within the geographic range of overlap for the two species and moved east geographically via gray wolf dispersal.  The competing hypothesis, embraced by the Proposed Rule, is that although the haplotypes are coyote-like, they actually represent a separate species of wolf—*C. lycaon*, which is distinct from gray wolves (*C. lupus*) and closely related to coyotes (Wilson et al. 2000, Wheeldon and White 2009, Wheeldon et al. 2010). This conclusion essentially designates certain genetic haplotypes that group most closely with coyotes as wolf, *C. lycaon.*  There are several flaws with this hypothesis.

        2.      Existence of *C. lycaon* is Unnecessary to Explain the Data

First, the existence of a separate wolf species, *C. lycaon*, is not necessary to explain the observed data.  Instead, the pattern of observed haplotypes can be more easily explained by hybridization between gray wolves, *C. lupus*, and coyotes, *C. latrans.*

Indeed, even researchers who *support* the existence of *C. lycaon* admit that they cannot rule out the possibility that what they refer to as *C. lycaon* is actually a reflection of past hybridization between coyotes and gray wolves (*C. lupus*).  For example, Wheeldon et al. (2010), who argue that wolves and coyotes are not hybridizing in the Great Lakes area, state that they "cannot rule out the occurrence of historic hybridization between [Western Great Lakes Region] wolves and coyotes" (pg. 8). Similarly, Kyle et al. (2006) conclude, "[t]he hypothesis that eastern wolves are the result of *C. lupus/C. latrans* hybridization cannot be rejected by all of the molecular data."  As recently as last month, Brent Patterson, a co-author of Wheeldon et al. (2010) wrote, "[f]uture research might yet reveal that there never was a North American evolved Red wolf or Eastern wolf, and that these animals are indeed merely hybrids between *C. lupus* and *C. latrans.*"  (Patterson, email communication) (attached).  In short, despite some researchers' conclusion that a separate wolf species, *C. lycaon*, exists, these authors cannot definitively distinguish between their conclusion and the conclusion that *C. lycaon* is not a species all, but a hybrid between gray wolves and coyotes.

018276A

Because the data are entirely consistent with the more parsimonious explanation that gray wolves (*C. lupus*) and coyotes (*C. latrans*) have periodically hybridized in this geographic region the Service should not take the drastic step of declaring a new species of wolf to exist in the Proposed Rule.

> 3.      Additional Data Not Cited in the Proposed Rule Do Not Support the Existence of Two Wolf Species in the Great Lakes

Second, other researchers who have worked on this same issue have found no evidence to support the existence of a separate wolf species. Yet the Proposed Rule fails to note this fact or mistakenly conflates the findings of these researchers as supporting the Service's identification of a new species.

For example, the Proposed Rule relies on the conclusions of Leonard and Wayne (2007) and Koblmuller et al. (2009) to support the existence of a separate taxonomic wolf unit in the Great Lakes region, 76 Fed. Reg. at 26093. But these researchers disagree that a *C. lycaon* species or any other new wolf taxon exists. Leonard and Wayne (2007) and Koblmuller et al. (2009) believe that wolves in the Great Lakes are a distinguishable gray wolf (*C. lupus*) *population* with a history of hybridization with coyotes (*C. latrans*). This is distinctly different than Wilson et al. (2000), Kyle et al. (2006) and Wheeldon et al. (2010)'s conclusion that a separate coyote-like wolf *species* (*C. lycaon*) existed that has hybridized with gray wolves (*C. lupus*) in the Great Lakes. In fact, in direct response to the conclusion of a separate *C. lycaon* wolf species, Koblmuller et al. (2009) conclude:

> We do not find evidence for a unique grouping of GL wolves in microsatellite, mtDNA or Y-chromosome analyses that would support the past presence of a unique species of wolf in the Great Lakes area (Wilson et al. 2000; Kyle et al. 2006).

They additionally conclude, "[Great Lakes] wolves *should be considered gray wolves*" (Koblmuller et al. 2009, pg. 2321) (emphasis added).

Other genetic studies of wolves in the western Great Lakes region, including the most extensive analysis of canid genomics ever conducted, have concluded that the wolves in this region represent a cohesive population of gray wolf, *C. lupus* (Leonard and Wayne 2007, Koblmuller et al. 2009, vonHoldt et al. 2011). While these authors recognize wolves in the Great Lakes as an ecotype or distinct population of gray wolves, these papers have *not* detected the presence of a second separate species of wolf – nor evidence for hybridization between two separate wolf species. Again, data from the research group that supports the *C. lycaon* hypothesis is also consistent with the conclusion that the Great Lakes population represents a single cohesive population rather than two distinct species and their hybrids. For example, Wheeldon et al. (2010) write, "[a]lthough the mtDNA and Y-chromosome data appear to indicate that nonhybridized gray wolves and eastern wolves exist in the WGLR…, our autosomal microsatellite data indicates that *they cluster in the same population*." (emphasis added). This is highly significant because non-hybridized individuals cannot be

identified by mtDNA and Y-chromosome data alone since this type of DNA is inherited from a single parent.  Autosomal microsatellite data, which are inherited bi-parentally, demonstrate a single cohesive population rather than the existence of two separate wolf species.

The Proposed Rule's reliance on mtDNA and Y-chromosome haplotypes to identify *C. lycaon* is extremely problematic, as these components could easily reflect past hybridization with coyotes rather than a more accurate representation of the individual's entire genome.  A recent study examined North American canids at the genome level and was able to clearly distinguish the extent to which wolves in the Great Lakes and Northeast United States represent gray wolf versus coyote ancestry (vonHoldt et al. 2011).  Again, while these authors recognize wolves in the Great Lakes as an ecotype or distinct population of gray wolves, this study did not reveal the presence of a second species of wolf – only introgression between gray wolves, *C. lupus* and coyotes, *C. latrans*.

For the purposes of the Service's review of the Proposed Rule, it must be emphasized that this issue is *not* simply a disagreement between whether the wolves in the Great Lakes region constitute a population, subspecies or species.  These researchers have fundamentally different conclusions about the taxonomy of wolves in the Great Lakes.  This fundamental disagreement stems from the fact that Wilson/Kyle/Wheeldon's conclusions hinge on a handful of genetic haplotypes that group with coyotes, but that they consider to be wolf (*C. lycaon*).  The "coyote-like" haplotypes that Wilson/Kyle/Wheeldon refer to as *C. lycaon*, Leonard/Wayne/Koblmuller/vonHoldt interpret simply to be coyote.  That is, while Leonard/Wayne/Koblmuller/vonHoldt et al. believe that gray wolves in the Great Lakes are a unique ecotype, they believe that gray wolves (*C. lupus*) and coyotes (*C. latrans*) (and their hybrids) are the only species-level canids from the genus Canis that exist in the United States.  This is significant because it suggests that what the Service is recognizing as a distinct species of wolf is actually a gray wolf (*C. lupus*) that has hybridized with coyotes.  In addition to possibly being scientifically inaccurate, the Service's conclusion affects wolves well outside the region of the proposed Great Lakes DPS in a way that would remove protections from wolves in the eastern United States due to an "erroneous" taxonomic reclassification.  76 Fed. Reg. at 26090.

4.      *C. lycaon* Is Not Identifiable

A third problem with the Service's proposed taxonomic reclassification is that it is not currently possible to identify *C. lycaon* in the wild.  In fact, any so-called eastern wolf, *C. lycaon*, does not appear to be readily distinguishable in any way from individuals otherwise referred to as *C. lupus* in the Great Lakes and Northeast regions except by matching specific genetic profiles to a handful of selected 'coyote-like' haplotypes that are inherited from one parent and furthermore are not monophyletic (the mtDNA haplotypes that are used to identify *C. lycaon* do not form a single clade).  Additionally, *C. lycaon* does not appear to be identifiable based on bi-parentally inherited genetic markers such as autosomal microsatellites and SNPs.

This is simply not a sufficient criterion for recognizing a species under any species concepts discussed in the Proposed Rule, 76 Fed. Reg. at 26091-92, including the biological species concept and the phylogenetic species concept (Avise 2004). Furthermore, researchers who support the existence of *C. lycaon* admit that hybridization of *C. lycaon* (if such species has ever existed) with *C. lupus* and *C. latrans* has been so extensive that "there are likely no remaining unhybridized eastern wolves in the wild" (Patterson, email communication).  If there are no true representatives of the species in the wild that are identifiable either by morphology, geography or genetics, there seems to be no basis for the designation of a separate species.[4]

In short, the Service's reliance on Leonard and Wayne (2007) and Koblmuller et al. (2009) to support the existence of *C. lycaon* as a separate wolf taxon represents a fundamental misunderstanding of the data and the disagreement between research groups working on this issue.  Leonard/Wayne/Koblmuller/vonHoldt et al. believe that wolves in the Great Lakes region and the Northeast United States represent a population of gray wolves (*C. lupus*) with a history of hybridization with coyotes (*C. latrans*).  They do *not* believe there is any scientific support for the existence of a separate species of coyote-like wolf, *C. lycaon*, as described by Wilson/Kyle/Wheeldon et al.  Furthermore, what Wilson/Kyle/Wheeldon et al. describe as *C. lycaon* is distinctly different than what Leonard/Wayne/Koblmuller/vonHoldt et al. describe as a Great Lakes ecotype.  To equate the two or use their differing conclusions to support the Service's taxonomic revision is both inaccurate and unjustifiable.  Finally, the existence of *C. lycaon* is highly questionable both historically and presently as researchers who support its existence cannot rule out the possibility that the 'species' is simply a hybrid between gray wolves, *C. lupus*, and coyotes, *C. latrans*;  and they do not believe that there are any true representatives of the species currently in the wild.

Because we are not convinced that the data support the existence of a separate species, *C. lycaon*, we do not believe this taxonomic issue should have an effect on the Service's proposal to delist a Great Lakes DPS.  Accordingly, we also believe it is entirely premature, if not inappropriate, for the Service to propose to revise the geographic range and taxonomy of the gray wolf, *C. lupus*, as listed under the Endangered Species Act.  As recent data has shown, the genetic signature of *C. lupus* has been present within the Northeast and Southeast United States including within the range of *C. rufus* (vonHoldt et al. 2011).  The Service relies on other morphological

---

[4] While the current mtDNA composition of wolves in the region does not appear to be identical to the historic population that occupied the area (Leonard and Wayne 2007), autosomal DNA seems to indicate only a slight change to the population, indicating a continuity in the genetic composition of wolves in the Great Lakes over time (Koblmuller et al. 2009).  There is continuing research and debate over the extent of current hybridization with coyotes, but this hybridization appears to have occurred historically as well, indicating that it is a phenomenon that extends beyond human-mediated factors.  Therefore, although we believe that research should continue to explore the historic origin of Great Lakes wolves and the extent and cause of hybridization between Great Lakes wolves and coyotes, we believe that these factors do not currently pose any complications to the proposal to recognize and delist the Great Lakes DPS.

evidence to support this revision; however, such evidence is not as reliable for species identification as genetic data (Wayne and Jenks, 1991, Roy et al., 1996).  For example, this morphological data could easily be inconsistent with genetic identification of the same individual.

Given that genetic data suggest that *C. lupus* was present in many of the twenty-nine eastern states, we suggest the Service suspend this geographic revision of the *C. lupus* range until there is greater clarity on the historic range of the species and until there is greater clarity within the scientific community regarding the existence of *C. lycaon*.  As described below, if the Service is compelled to proceed with amending the geographic range and taxonomy of *C. lupus*, we think this would be more appropriately addressed within the context of the species' 5- year review or, alternatively, in a separate rulemaking altogether.  It is unnecessary for this complicated and controversial decision to be made in concert with the decision to delist the Great Lakes DPS.

B.      The Proposed Reclassification Casts Doubt on the Service's Delisting
        Analysis for the Great Lakes DPS

It should also be noted that the Service's recognition of a new species of wolf, *C. lycaon*, occurring within the Great Lakes DPS would greatly (and, as described above, unnecessarily) complicates the proposed delisting.

On the one hand, the Proposed Rule asserts that *C. lupus* and *C. lycaon* are both present in the Midwest and that these two "species" interbreed.  See 76 Fed. Reg. at 26094. Indeed, the Proposed Rule discusses hybridization of *C. lupus* and *C. lycaon* as a potential "threat" to the existence of the *C. lupus* DPS.  Id. at 26139.  Yet nowhere in the Proposed Rule does the Service actually estimate the number of *C. lupus* individuals (or breeding pairs) that are actually present in the Great Lakes DPS.[5]

This is particularly problematic because in much of the rest of the Proposed Rule the Service treats all wolves in the Great Lakes region as if they were gray wolves.  For example, when describing "Recovery Trends for Wolves in the Western Great Lakes Region," the Proposed Rule discusses the total number of "wolves" in Minnesota, Wisconsin, and Michigan.  See 76 Fed. Reg. at 26096-26100.  In this portion of the Proposed Rule the Service repeatedly asserts, for example, that "[a]s of 1998 Minnesota wolves had reached approximately twice the number specified in the recovery planning goal for Minnesota." Id. at 26097.  Similar language is present for all three states.  See id. at 26098 ("[i]n 2002, wolf numbers in Wisconsin alone surpassed the 1992 Revised Recovery Plan criterion for a second population within 100 miles of the Minnesota population."); 26099 ("[s]ince that time, wolf packs have spread

_____

[5] The closest the Proposed Rule comes to such an estimate is to note that 66% of mtDNA samples of wolves in the region showed *C. lycaon* haplotypes and 50-54% of Y-chromosome samples showed these haplotypes.  76 Fed. Reg. at 26094.  As discussed above, relying solely on mtDNA and Y-chromosome samples is inherently problematic. See, supra, p. 9 Regardless, the Proposed Rule never elucidates how the Service translates these studies into actual population estimates for *C. lupus* in the Great Lakes DPS.

throughout the UP.").  And, in summarizing wolf recovery in the Great Lakes, the Proposed Rule asserts that "[t]he wolf's numeric and distributional recovery criteria in the [Western Great Lakes] have been met."  Id. at 26100.  But, of course, if the Service's taxonomic distinction between *C. lupus* and *C. lycaon* is to be taken seriously the number of "wolves" in the Great Lakes region is irrelevant.  In assessing the recovery of the gray wolf in the Great Lakes the relevant metric is the population of *gray wolves*—not gray wolves plus another canid species.  The Service can no more rest its proposed delisting of gray wolves on population estimates of *C. lupus* and *C. lycaon* than it could, for example, base a proposed delisting of red wolves (*C. rufus*) in the Southeast by combining red wolf and coyote (*C. latrans*) into a single population estimate.

To be clear, NRDC does not believe that, ultimately, this problem should prohibit the recognition and delisting of gray wolves in the Great Lakes because the scientific evidence does not support the recognition of *C. lycaon* as a species in the first place.  The Proposed Rule's treatment of the Great Lakes DPS would be far more defensible if the Service simply treated all wolves in the Great Lakes as constituting a distinct and significant population of gray wolves (indeed, the presence of unique haplotypes in this population would strengthen the case for recognizing a DPS).

In short, when viewed as a single species, the Service's conclusion that a recovered DPS of gray wolves can be found in the Great Lakes region is well-supported and defensible.  But when combined with an already tenuous identification of a new species of Eastern wolves mixed with that population it becomes far more problematic.

### III.    If the Service is Determined to Proceed with the Reclassification it Should, at a Minimum, Simultaneously Determine Whether to List *C. lycaon*

As discussed above, we do not believe that the best available science supports the Proposed Rule's recognition of the existence of a new wolf species, *C. lycaon*, and the corresponding revision of the recognized historic range of the gray wolf, *C. lupus*.

However, if the Service proceeds with this reclassification and revision, it should at least maintain protections for *C. lupus* and *C. lycaon* during that process.  Protecting these species throughout their historic range during the Service's reconsideration will maintain the status quo and help ensure that *C. lycaon* is able to survive and recover.  Both the Service and the National Marine Fisheries Service (NMFS) have protected species that were already listed during taxonomic reclassifications.

For example, in 2007 scientific information was published indicating that the flatwoods salamander, which had been listed as a threatened species since 1999, should actually be considered as two distinct species.  Both the newly recognized salamander species—the reticulated flatwoods salamander and the frosted flatwoods salamander—occupied the previously designated flatwoods salamander range.  Responding to these studies, in 2008, the Service published a proposed rule to split the flatwoods salamander into two separate species.  Proposed Endangered Status for Reticulated Flatwoods Salamander; Proposed Designation of Critical Habitat for Frosted Flatwoods Salamander and Reticulated Flatwoods Salamander, 73 Fed. Reg.

018281A

47258 (Aug. 13, 2008); Proposed Endangered Status for Reticulated Flatwoods Salamander; Proposed Designation of Critical Habitat for Frosted Flatwoods Salamander and Reticulated Flatwoods Salamander, 73 Fed Reg. 54125-02 (Sept. 18, 2008).

Unlike the Proposed Rule here, however, the flatwood salamander proposal simultaneously assessed the status of both salamander species, proposing to maintain the frosted flatwoods salamander's threatened status, 73 Fed. Reg at 54132, and to reclassify the reticulated frosted salamander as endangered, 73 Fed. Reg. at 47260. The final rule replaced the flatwood salamander's place on the threatened list with both the reticulated the flatwoods salamander and the frosted flatwoods salamander. Determination of Endangered Status for Reticulated Flatwoods Salamander; Designation of Critical Habitat for Frosted Flatwoods Salamander and Reticulated Flatwoods Salamander, 74 Fed. Reg. 6700-01 (Feb. 10, 2009). Thus, the Service appropriately ensured that there was no "gap" during which either species lacked protections that might be warranted.

NMFS took a similar approach when revising the taxonomic status of the right whale. The right whale had been listed as a single endangered species since 1970, but in 2006, after reviewing a petition to separately list the North Pacific right whale as endangered, NMFS recognized that right whales in the northern hemisphere are two genetically distinct species. 71 Fed. Reg. 77694, 77698-77699 (Dec. 27, 2006). Because of this determination, NMFS was "requir[ed] . . . to consider these species separately for the purposes of listing under the ESA." Id. In the same proposed rule, NMFS reviewed the status of the North Pacific right whale, and published a second proposed rule that day to review the North Atlantic right whale's status. Id.; Endangered and Threatened Species; Proposed Endangered Status for North Atlantic Right Whales, 71 Fed. Reg. 77704-01 (Dec. 27, 2006). NMFS determined that both the North Pacific right whale and the North Atlantic right whale should be classified as endangered. 71 Fed. Reg. at 77703; 71 Fed. Reg. at 77714. In 2008, FWS published a final rule announcing that both North Pacific and North Atlantic right whales would be listed as endangered species. Endangered Status for North Pacific and North Atlantic Right Whales. 73 Fed. Reg. 12024-01, 12024 (Mar. 6, 2008).

Here, however, the Service has apparently taken a different approach. Rather than simultaneously determining whether *C. lycaon* merits protection under the ESA and, if so, simultaneously proposing to list them as either endangered or threatened, the Proposed Rule states:

> With regard to *Canis lycaon* we are announcing a rangewide status review of this species…A determination as to whether to proceed with any *C. lycaon* listing action—and if listing is warranted, whether or not to include the northeastern United States in the listed range—will depend on the results of the status review. Notification of our intention with regard to *C. lycaon* will be provided in conjunction with publication of the *final rule for the WGL DPS.* Meanwhile, we propose to revise the range of the gray wolf (the species C. lupus) by removing all or parts of the 29 eastern states that we now recognize were not part of the historical range of the gray wolf.

76 Fed. Reg. at 26090.

At a minimum, the Service has created a situation where it may withdraw all protections for wolves (under the umbrella of *C. lupus*) in the Northeast while a proposal to list *C. lycaon* is pending, thus (absent an emergency listing) temporarily depriving wolves of all protections, even if the Service itself thinks they are warranted. At worst, the Service may conclude that listing *C. lycaon* is "warranted but precluded," which would effectively deny wolves in the Northeast any federal protections indefinitely.

This approach is both unnecessary and not in the best interests of wolf conservation. If the Service delists *Canis lupus* in the East and proceeds with a status review for *Canis lycaon*, the Service should, at a minimum, ensure that its rulemaking maintains Endangered Species Act protections for wolves in the Northeast while conducting its status review and any rulemakings to list *Canis lycaon*.

### IV.  Wolves in the East Should Remain Protected Under the Endangered Species Act in the East

If the Service proceeds with reclassification and removes Endangered Species Act protections for *Canis lupus* in the East, the Service must list *Canis lycaon* as endangered under the Endangered Species Act to enable the recovery of wolves in the Northeast, where significant suitable wolf habitat still exists and dispersing wolves have recently been found.

Harrison and Chapin (1998) analyzed wolf habitat in the northeastern United States and found that tens of thousands of square kilometers of suitable, viable wolf habitat exist in the Northeast.  They noted that the Service's 1992 recovery plan for the eastern timber wolf "identified 24,287 km² in New York and 35,751 km² in Maine as areas that warranted further consideration as potential habitat for wolves, but those areas were not quantified and mapped."  As part of this study, the authors quantified and mapped the extent, distribution, and connectivity of potential habitat for wolves in the northeastern United States.  The authors also mapped potential dispersal corridors between wolf populations in southeastern Canada and these areas.

For wolf habitat in the Northeast, Harrison and Chapin (1998) ultimately found:

> The [Service's] recovery plan considered potential wolf habitat in northwestern and eastern Maine as discreet areas; however, our analysis suggests that potential habitat is contiguous throughout northern, western, and eastern Maine, and extends well into northern New Hampshire.  Contiguous core habitat in Maine and New Hampshire could likely support 488 - 1,951 wolves; . . . The Adirondack Mountains region of northern New York also represents a large, contiguous area (14,618 km²) of land meeting our criteria as potential core habitat for wolves. . . . New York would likely support 146 - 584 wolves. . . . [Finally,] [t]here is limited and widely scattered potential core (2,470 km²) and dispersal

018283A

(1,430 km²) habitat for wolves in Vermont. . . . Much of the limited habitat
for wolves in Vermont occurs in the extreme northeastern portion of the
state and is contiguous with an expansive area of suitable habitat in
northern New Hampshire, Quebec, and Maine.  That habitat could
contribute incrementally to regional populations if wolves return to Maine
and New Hampshire.

The analyses performed by Harrison and Chapin (1998) "were based on thresholds of
road and human densities established for long-established wolf populations in
Minnesota (Fuller et al. 1992)" and clearly show that the large swaths of contiguous
wolf habitat needed to host a wolf population that will be viable over the long term are
still present in the northeastern United States.

Furthermore, multiple wolves have been documented dispersing into the Northeast.  In
October 2007, a wolf was killed on a farm in Shelburne, Massachusetts, and in March
2008 Thomas J. Healy, head of the Service's Northeast regional office, said that recent
DNA tests at the Service's Oregon labs confirmed it was a gray wolf with no indication
it was ever held in captivity.[6]  Additionally, two wolves were killed in Maine in 1993 and
1996.[7]  The Maine Department of Inland Fisheries and Wildlife also notes that "[t]racks
and other evidence suggest there may be additional wolf-like canids in the state, but
there is no conclusive evidence of reproduction or establishment of packs."[8]  Other
recent wolf sightings in the Northeast have also occurred.[9]

Given the fact that wolves are currently dispersing into the Northeast, as well as the
documented presence of significant suitable habitat sufficient to support a breeding
population of wolves, if the Service proceeds with its taxonomic reclassification of the
gray wolf, it is vitally important that it maintain ESA protections for wolves in the
Northeast while conducting its status review for *Canis lycaon* – and then list *Canis
lycaon* as endangered under the ESA to enable the recovery of wolves in the
Northeast.

---

[6] Beth Daley, *First wolf found in Mass. in 160 years*, BOSTON GLOBE, Mar. 4, 2008, available at
http://www.boston.com/news/local/breaking_news/2008/03/first_wolf_foun.html (last visited
June 29, 2011); Stephanie Reitz, Associated Press, *Rare Gray Wolf Appears in Western
Massachusetts*, NATIONAL GEOGRAPHIC NEWS, Mar. 5, 2008, available at
http://news.nationalgeographic.com/news/2008/03/080305-AP-wolf-return.html (last visited
June 29, 2011).

[7] Maine Department of Inland Fisheries and Wildlife, available at
http://www.maine.gov/ifw/wildlife/species/endangered_species/gray_wolf (last visited June 29,
2011); *Signs Suggest a Return Of Timber Wolf to Maine*, NEW YORK TIMES, Dec. 22, 1996,
available at http://www.nytimes.com/1996/12/22/us/signs-suggest-a-return-of-timber-wolf-to-
maine.html (last visited June 29, 2011).

[8] Maine Department of Inland Fisheries and Wildlife, available at
http://www.maine.gov/ifw/wildlife/species/endangered_species/gray_wolf (last visited June 29,
2011).

[9] See January 31, 2009, Petition to Interior Secretary Salazar re: Northeast Wolf Recovery,
available at http://mainewolfcoalition.org/wp-content/uploads/2010/09/ESA-petition-2009-
final.htm (last visited June 29, 2011).

**V.     If the Service Delists Wolves in the Lower-48, It Should Create a Pacific
Northwest DPS and Protect that DPS under the Endangered Species Act**

The Proposed Rule states that "[t]he biological and conservation status of wolves in the
Pacific Northwest is being assessed to determine their appropriate listing classification.
When this review is completed, we will evaluate a potential Pacific Northwest DPS in
accordance with our DPS policy and will reclassify this population as appropriate
through an additional rulemaking process." 76 Fed. Reg. at 26090. Because
significant suitable wolf habitat exists in the Pacific Northwest and wolves currently
inhabit parts of the Pacific Northwest, if the Service delists wolves in the lower-48, it
should designate a broad Pacific Northwest DPS and protect that DPS under the ESA.

In determining whether to recognize a DPS, the Service examines two factors: the
"discreteness" of the population and the population's "significance" to the taxon as a
whole. Policy Regarding the Recognition of Distinct Vertebrate Population Segments
Under the Endangered Species Act, 61 Fed. Reg. 4722, (Feb. 7 1996); 76 Fed. Reg. at
26101. If a population meets both of those tests, it can be identified as a DPS. Id.
Then, a third factor, the DPS's conservation status, is evaluated in relation to the ESA's
standards for listing, delisting, or reclassification. Id. Here, the wolf population in the
Pacific Northwest meets both the discrete and significance tests and its conservation
status unquestionably merits an endangered listing under the ESA.

Pacific Northwest wolves constitute a discrete population. Carroll et al. (2006) noted
that wolf habitat "is not distributed uniformly across the western United States" and
that, among other regions, the "Pacific states . . . could serve as the basis for [a] DPS[]
or multistate management coordination area[]." The habitat-suitability map created by
Carroll et al. (2006) (Figure 2) clearly shows a significant north-south stretch of
unsuitable habitat that separates the suitable wolf habitat in the Pacific Northwest from
the Northern Rocky Mountains. Carroll et al. (2006) specifically noted that "[e]cological
barriers, such as expanses of unsuitable habitat, are more appropriate for delineating
DPSs than geographic divisions, such as state boundaries," and the Service's DPS
policy explicitly states that "a population segment of a vertebrate taxon may be
considered discrete if it . . . is markedly separated from other populations of the same
taxon as a consequence of physical, physiological, ecological, or behavioral factors."
76 Fed. Reg. at 26102.

The Pacific Northwest wolf population is also significant because of its geography, the
unique ecology of the region, the fact that the loss of this population would lead to a
significant reduction in wolves' range, and because the wolves currently occupying the
region appear to be genetically different from wolves in the Northern Rocky Mountains
or other regions.

Recent genetic data adds to both the discreteness and the significance of the Pacific
Northwest wolf population. According to the Draft Wolf Conservation and Management
Plan for Washington, genetic testing of the breeding male and female of the Lookout
Pack in north-central Washington, the first confirmed pack in the Pacific Northwest in
years, suggested they are partially descendants from wolves in coastal British

Columbia.[10]  In their recent paper on a genome-wide perspective on the evolutionary history of enigmatic wolf-like canids, vonHoldt et al. (2011) found that "in the New World, Mexican wolves appear as the most genetically distinct group, . . . [but] [o]ther genetic partitions were defined in North America as well, including distinct populations on the British Columbian coast, Northern Quebec, and interior North America."  Pacific Northwest wolves may thus represent a genetically distinct population of gray wolf (a mixture of the Interior and British Columbia wolves) that is not found in other areas.

Clearly, the Pacific Northwest wolf population meets both the discrete and significance tests, and with wolves just recently beginning to return to the ample suitable wolf habitat in the region, the conservation status of the wolf population in the Pacific Northwest should certainly be listed as endangered under the ESA.

Finally, regarding the geographical scope of the Service's review of wolves in the Pacific Northwest, the Proposed Rule states that it considers the Pacific Northwest to be the area "west of the [Northern Rocky Mountain] gray wolf population, including portions of Oregon, Washington, northern California, and western Nevada." 76 Fed. Reg. at 26090. But in its May 2011 Gray Wolf Recovery Questions and Answers, the Service also includes "the Sierra Nevada Mountains" in its description of what the "appropriate geographic extent of the status review" should be.[11] The Service should include the Sierra Nevada Mountains in its designation of the Pacific Northwest and broadly construe the Pacific Northwest area.  Carroll et al. (2006) analyzed and mapped "potential wolf habitat and population viability across the western contiguous United States, from the western edge of the Great Plains to the Pacific Ocean, an area of about 2,800,000 square kilometers (km²)."  In their map of suitable wolf habitat in the West (Figure 2), Carroll et al. (2006) identified the Sierra Nevada Mountains as suitable wolf habitat.  As such, and given the proximity of the Sierra Nevada Mountains to the Pacific Coast, these areas should be included with northern California, western Nevada, and those portions of Oregon and Washington west of the Northern Rocky Mountain DPS, in any designation of a Pacific Northwest DPS.

## VI.    Conclusion

Today a healthy population of gray wolves exists in the Upper Midwest.  The recovery of the population is a major conservation success and a credit to the Endangered Species Act and to the Service.  NRDC believes that the time to delist these wolves has arrived.  However, the manner in which the Service has gone about its proposed delisting of this population is troubling.  Current scientific evidence does not support the recognition of a new species of wolf, *C. lycaon.* Moreover, it certainly does not support the Service's proposal to withdraw all protections from wolves in the northeastern United States, which contain both dispersing wolves and large expanses of suitable

---

[10] Draft Wolf Conservation and Management Plan for Washington, p. 22, May 25, 2011, available at http://wdfw.wa.gov/publications/00001/draft_wolf_plan_052311.pdf (last visited June 29, 2011).

[11] (May 2011 Gray Wolf Recovery Questions and Answers, p. 12 available at http://www.fws.gov/home/feature/2011/pdf/Wolf_Actions_FAQs.pdf (last visited June 29, 2011).)

NRDC Midwest Gray Wolf Delisting Comments
July 5, 2011
Page 18


wolf habitat, while the Service conducts a status review of *C. lycaon*.  Finally, the
Service should recognize and list a Pacific Northwest gray wolf DPS to further advance
the recovery of this endangered and crucial keystone species.

Thank you for considering these comments.



Very truly yours,



Andrew E. Wetzler
Director, Land & Wildlife Program

018287A

# USDA-WILDLIFE SERVICES WOLF DAMAGE MANAGEMENT IN MINNESOTA 2009

## Background

The USDA-Wildlife Services (WS) gray wolf (*Canis lupus*) depredation management program based in Grand Rapids, Minnesota uses a variety of methods to manage wolf damage.  Wolves in Minnesota regularly kill and/or wound livestock (cattle, sheep, poultry and occasionally horses) and pets (primarily dogs).  While the magnitude of damage is relatively small (1-2% of farms in wolf range), the losses to individual producers can be significant.

The Minnesota Department of Natural Resources (DNR) estimated that there were 2,921 wolves in Minnesota over the winter of 2007-2008.  Considering a 90% confidence interval, the actual population size could range from 2,192 to 3,525 wolves (Erb 2008).

WS investigates claims of wolf damage to livestock and pets in cooperation with the Minnesota DNR.  If damage is verified and there is potential for future losses, WS may initiate wolf removal efforts near the depredation site to reduce the likelihood of additional damage.  WS also uses non-lethal methods and provides technical assistance to cooperators to reduce wolf damage where appropriate.  In addition to resolving individual depredation situations, the WS program assists managing agencies in defining the extent of wolf depredations in Minnesota, provides accurate information to livestock producers, resource managers and other interested parties.  The ability to mitigate losses associated with wolves has ultimately contributed to wolf recovery in Minnesota by providing a buffer between wolves and those experiencing wolf damage.

## Recent Legal Changes

On September 29, 2008 a federal judge rescinded the March 2007 U.S. Fish and Wildlife Service (USFWS) decision which delisted wolves in Minnesota, Wisconsin, Michigan and three adjacent states (Western Great Lakes).  This decision immediately afforded the gray wolf in Minnesota protection under the Endangered Species Act as a "Threatened" species.  This decision meant that wolves in Minnesota could only be killed by the public to protect human life and that only authorized Federal and state agency personnel would be allowed to take wolves that cause damage to domestic animals.

On May 4, 2009, the USFWS again delisted the wolf in the Western Great Lakes states, which returned management of the wolf in Minnesota to the DNR.  On July 1, 2009 after a settlement agreement was reached by the USFWS and plaintiffs in a lawsuit challenging the USFWS 2009 rule removing ESA protections from gray wolves in the Western Great Lakes the gray wolf population in the Western Great Lakes states (Minnesota, Wisconsin, Michigan) was once again placed back under federal protection by the USFWS.

Under state management, the DNR wolf management plan contains provisions, per Minnesota Statute 97B.645, which allow livestock and pet owners to shoot wolves in certain situations to protect their domestic animals.  From March 2007 – September 2008, when wolves in Minnesota were under state management, 10 wolves were legally killed and reported under these provisions.  From May 4, 2009 - June 30, 2009, one wolf was legally killed under these provisions and one was taken under the state's gray wolf controller

program, where private trappers, certified by the DNR as gray wolf controllers may assist private landowners with wolf damage in Minnesota.

The primary changes to WS wolf control efforts under federal management are that wolf control must be conducted within ½ mile of the depredation site (it was 1 mile under state management) and that wolf pups of the year caught on or before August 1 must be released on site.  In addition, lethal wolf control is not allowed in federal wolf management Zone 1 in extreme northeastern Minnesota (Figure 1).  Federal wolf management Zone 1 comprises a generally remote area with minimal livestock production from approximately Voyageurs National Park in the west to Taconite Harbor on Lake Superior in the east (See Figure 1). However, Federal wolf management Zone 1 does include several towns and communities where there appears to be an increase in negative wolf-human interactions, especially related to pet dogs.   In 2009 there was one verified and one probable incident of wolf depredation to domestic dogs in the Ely area.  Also in 2009 there were increased reports of wolf sightings in and near the city limits of Ely, including a wolf that was eating trash near a public housing complex.



Figure 1. Minnesota Wolf Management Zone 1.

## 2009 Summary

Verified  wolf conflicts in Minnesota during 2009 were up 29% compared to 2008 and up 14% over the 5 year average (see Figures 2 and 3).  Throughout 2009 a total of 97 complaints of wolf depredation were verified at 83 sites and 195 wolves lethally removed (4 released) in

018606A

response to the depredations. Eight-five complaints involving livestock/poultry were verified. Twelve complaints involved verified depredations on domestic dogs (see Figures 2 and 3). One complaint involved human health and safety.   In 2009, WS provided technical assistance via personal consultations, telephone, site visits, and instructional sessions to individuals and livestock producers groups resulting in approximately 750 people instructed in ways to reduce or deter wolf damage.  Flashing highway lights were also loaned to eight individuals to deter wolves from their property.

BASIC DATA FROM WS WOLF-LIVESTOCK DEPREDATION CONTROL PROGRAM IN MINNESOTA, 2006 - 2009

|  | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|
| Total complaints received | 191 | 179 | 137 | 211 |
| Complaints received involving livestock/poultry | 164 | 158 | 126 | 177 |
| Total complaints verified* | 91 | 102 | 75 | 97 |
| No. complaints involving livestock/poultry that were verified | 86 | 93 | 71 | 85 |
| Percentage of total complaints that were verified | 47.6 | 56.9 | 51.8 | 46 |
| No. farms where livestock (excluding dogs) were verified lost by USDA | 73 | 63 | 66 | 73 |
| Domestic animals verified by USDA as lost to wolves | 9 cows, 1 yrl. 75 calves, 17 sheep 554 turkeys 2 pigs 2 dogs | 3 cows, 83 calves 1 horse, 1 foal, 10 sheep 3 dogs 365 turkeys | 10 cows 42 calves 22 sheep 326 turkeys 26 chickens 2 dogs 2 horses | 4 cows 82 calves 16 sheep 11 dogs 2 horses 1 llama 1 donkey |
| Complaints trapped | 83 | 85 | 65 | 90 |
| Wolves captured | 131 | 133 | 143 | 199 |
| Wolves killed | 122 | 133 | 143 | 195 |

* A verified complaint is one in which USDA determines that wolves have killed or injured one or more domestic animals as evidenced by:
(1) Observing wounded animals or remains of animals killed and (2) finding evidence of wolf-involvement.

Figure 2.  Summary of basic data from USDA Wolf-Livestock Depredation Control program, 2005 - 2009.

018607A



Figure 3.  Indices to wolf-livestock depredation in Minnesota.



Figure 4.  Wolves Captured and/or
             Removed in Minnesota.

018608A



Figure 5. Location of verified wolf complaints in Minnesota in 2009.

Verified wolf complaints peaked during the summer grazing season and were highest in July and August. (see Figure 6).

018609A



Figure 6. Seasonal Distribution of Wolf Depredations 2009

As in previous years, verified damage was primarily to cattle (72% of all verified damage), followed by dogs, sheep, and other domestic animals. (see Figure 7).



Figure 7. 2009 verified wolf complaints by type

Wolf damage was verified in 18 Minnesota counties in 2009 (see Table 1).

018610A

| County | # of verified wolf depredations in 2009 | County | # of verified wolf depredations in 2009 |
|---|---|---|---|
| Aitkin | 3 | Mahnomen | 1 |
| Becker | 1 | Marshall | 5 |
| Beltrami | 11 | Mille Lacs | 0 |
| Carlton | 8 | Morrison | 4 |
| Cass | 15 | Pennington | 0 |
| Cook | 0 | Pine | 8 |
| Crow Wing | 2 | Polk | 0 |
| Isanti | 0 | Red Lake | 0 |
| Itasca | 13 | Roseau | 6 |
| Kanabec | 1 | St. Louis | 3 |
| Kittson | 6 | Todd | 0 |
| Koochiching | 5 | Wadena | 1 |
| Lake of the Woods | 2 | | |

Table 1.  Verified wolf depredations by county.

## Compensation

Livestock verified as killed by wolves are eligible for compensation from the Minnesota Department of Agriculture (MDA).  No compensation is currently paid for pets that are killed or wounded in Minnesota.  No compensation is paid for livestock that are wounded, unless injuries are so severe the animal needs to be euthanized.

Conditions for compensation
1. A livestock owner will report the depredation claim to a Conservation Officer or County Extension Agent within 48 hours of discovery, and protect all associated evidence.
2. The investigating agent will determine if the loss was caused by gray wolves, taking into account factors in addition to a visual identification of a carcass, and make a recommendation to the commissioner of MDA.  The investigating agent will record deficiencies, if any, in the owner's adoption of best management practices developed by MDA.
3. The MDA Commissioner shall evaluate the claim and investigating agent's report to determine if compensation is warranted.  University of Minnesota Extension Service estimates fair market value for livestock. Any insurance payments are deducted from market value.  MDA will review the report for conformance with best management practices and provide the owner with a list of best management practices deficiencies.

Definition of best management practices:
*Agricultural management practices that may result in the reduction and prevention of livestock depredations by wolves and other predators.*  Some examples are: maintaining healthy, well-fed animals, using guard animals, moving calving or lambing areas closer to the barnyard/homes and proper disposal of dead livestock carcasses.

018611A

In State FY 2009 (July 1, 2008 – June 30, 2009) compensation paid out by the MDA for verified wolf damage to livestock and poultry was $88,366.  In state Fiscal 2010 the MDA paid out $96,514 in wolf damage compensation through 2/10/10. (see Table 2).

| State Fiscal year (July 1-June 30) | Total wolf claims | Number of wolf claims |
|---|---|---|
| 1993 | $30,996.00 | |
| 1994 | $34,328.00 | |
| 1995 | $29,697.00 | |
| 1996 | $31,777.00 | |
| 1997 | $39,309.00 | |
| 1998 | $57,479.50 | 111 |
| 1999 | $66,052.25 | 103 |
| 2000 | $91,584.55 | 121 |
| 2001 | $80,174.19 | 70 |
| 2002 | $69,514.76 | 67 |
| 2003 | $82,645.80 | 97 |
| 2004 | $42,076.75 | 47 |
| 2005 | $45,099.50 | 37 |
| 2006 | $72,894.90 | 71 |
| 2007 | $81,683.19 | 82 |
| 2008 | $95,526.00 | 82 |
| 2009 | $88,366.00 | 87 |
| 2010 to 2/1/10 | $96,514.00 | 70 |

**2008 claims exceeded $100,000 fund so about $14,852 in claims were paid in 2009**
**2009 claims exceeded $100,000 fund in October so  $58867 in claims were paid in 2010**

Table 2.  Compensation paid by Minnesota Department of Agriculture for livestock destroyed by wolves.  Source: Minnesota Department of Agriculture.

Acknowledgements:

WS wolf damage control personnel during 2009 included: John Hart, Duane Sahr, Jeff Grabarkewitz, Shawn McDowell, Abraham Wolf, Paul Volkmann, Kevin Fuller, Gale Halvorson, Jim Natvik, John Mietdke, David Kuehn and WS Contractor Bill Paul.  WS received valuable administrative support for the wolf depredation control program from Constance Timm.

*For more information contact:*
USDA-APHIS-Wildlife Services
34912 U.S. Hwy. 2 Grand Rapids, MN 55744

018612A

(218) 327-3350
e-mail:  john.p.hart@aphis.usda.gov

LITERATURE CITED

Erb, J. 2008. Distribution and abundance of wolves in Minnesota, 2007-08. Minnesota Department of Natural Resources, St. Paul.

018613A

# USDA-WILDLIFE SERVICES WOLF DAMAGE MANAGEMENT IN MINNESOTA 2010

## Background

The USDA-Wildlife Services (WS) Minnesota gray wolf (*Canis lupus*) depredation management program uses a variety of methods to manage wolf damage.  Wolves in Minnesota regularly kill and/or wound livestock (cattle, sheep, poultry and occasionally horses) and pets (primarily dogs).  While the magnitude of damage is relatively small (1-2% of farms in wolf range), the losses to individual producers can be significant.

The Minnesota Department of Natural Resources (MNDNR) estimated that there were 2,921 wolves in Minnesota over the winter of 2007-2008.  Considering a 90% confidence interval, the actual population size could range from 2,192 to 3,525 wolves (Erb 2008).

WS investigates claims of wolf damage to livestock and pets in cooperation with the Minnesota MNDNR.  If damage is verified and there is potential for future losses, WS may initiate wolf removal efforts near the depredation site to reduce the likelihood of additional damage.  WS also uses non-lethal methods and provides technical assistance to cooperators to reduce wolf damage when possible.  In addition to helping resolve individual depredation situations, the WS program assists managing agencies in documenting the extent of wolf depredations in Minnesota, and provides wolf related information to livestock producers, resource managers and other interested parties.  The ability to mitigate losses associated with wolves has ultimately contributed to wolf recovery in Minnesota by providing a buffer between wolves and those experiencing wolf related damage.

## Recent Legal Changes

On September 29, 2008 a federal judge rescinded the March 2007 U.S. Fish and Wildlife Service (USFWS) decision which delisted wolves in Minnesota, Wisconsin, Michigan and three adjacent states (Western Great Lakes).  This decision immediately afforded the gray wolf in Minnesota protection under the Endangered Species Act as a "Threatened" species.  This decision meant that wolves in Minnesota could only be killed by the public to protect human life and that only authorized Federal and state agency personnel would be allowed to take wolves that cause damage to domestic animals.

On May 4, 2009, the USFWS again delisted the wolf in the Western Great Lakes states, which returned management of the wolf in Minnesota to the MNDNR.  On July 1, 2009 after a settlement agreement was reached by the USFWS and plaintiffs in a lawsuit challenging the USFWS 2009 rule removing ESA protections from gray wolves in the Western Great Lakes the gray wolf population in the Western Great Lakes states (Minnesota, Wisconsin, Michigan) was once again placed back under federal protection by the USFWS.  During 2010 wolves in Minnesota remained under federal protection as a "Threatened" species, despite several petitions requesting that the USFWS delist wolves.

When wolves in MN are under state management, the MNDNR wolf management plan contains provisions, per Minnesota Statute 97B.645, which allow livestock and pet owners to shoot wolves in certain situations to protect their domestic animals.  From March 2007 – September 2008, when wolves in Minnesota were under state management, 10 wolves were legally killed and reported under state provisions.  From May 4, 2009 - June 30, 2009, one

wolf was legally killed under these provisions and one was taken under the state's gray wolf controller program, where private trappers certified by the MNDNR as gray wolf controllers may assist private landowners with wolf damage in Minnesota.

The primary changes to WS wolf control efforts under federal management are that wolf control must be conducted within ½ mile of the depredation site (it was 1 mile under state management) and that wolf pups caught on or before August 1 must be released on site.  In addition, lethal wolf control is not allowed in federal wolf management Zone 1 (Figure 1) in northeastern Minnesota unless a demonstrated, but non-immediate threat to human safety by a wolf is documented.  Federal wolf management Zone 1 comprises a generally remote area with minimal livestock production from approximately Voyageurs National Park in the west to Taconite Harbor on Lake Superior in the east (See Figure 1). However, federal wolf management Zone 1 does include several towns and communities where there appears to be an increase in negative wolf-human interactions, especially related to pet dogs.   During 2010 WS received 13 wolf complaints in federal wolf management Zone 1.  During that time WS confirmed three dogs being killed by wolves in Zone 1 in three separate instances and documented one case of a human safety threat by a wolf.



Figure 1. Minnesota Wolf Management Zone 1.

### 2010 Summary

Verified wolf conflicts in Minnesota during 2010 were up 34% compared to 2009 and up 31% over the 5 year average (see Figures 2 and 3).  During 2010 a total of 130 complaints of

018615A

wolf depredation were verified at 116 sites and 192 wolves lethally removed in response to the depredations. The 130 total complaints received in 2010 included 106 involving livestock/poultry, 23 involving depredations on domestic dogs (see Figures 2 and 3), and one complaint involving human health and safety.   During 2010, WS provided technical assistance via personal consultations, telephone, site visits, and instructional sessions to individuals and livestock producers groups resulting in approximately 500 people instructed in ways to reduce or deter wolf damage.  During 2010 WS personnel loaned flashing highway lights to four individuals and temporary fladry to 3 individuals to deter wolf presence from their property. WS staff trained 18 Minnesota MNDNR Conservation Officers and four county sheriffs' deputies in depredation investigation techniques.

**BASIC DATA FROM WS WOLF-LIVESTOCK DEPREDATION CONTROL PROGRAM IN MINNESOTA, 2006 - 2010**

|  | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|
| **Total complaints received** | 191 | 179 | 137 | 211 | 272 |
| **Total complaints verified*** | 91 | 102 | 75 | 97 | 130 |
| **No. complaints involving livest /poultry that were verified** | 86 | 93 | 71 | 85 | 106 |
| **Percentage of total complaints that were verified** | 47.6 | 56.9 | 51.8 | 46 | 47.8 |
| **# farms with verified livestock or poultry losses** | 73 | 63 | 66 | 73 | 93 |
| **# verified wolf depredations on domestic dogs** |  |  |  |  | 23 |
|  |  |  |  |  |  |
| **Complaints trapped** | 83 | 85 | 65 | 90 | 114 |
| **Wolves captured** | 131 | 133 | 143 | 199 | 192 |
| **Wolves killed** | 122 | 133 | 143 | 195 | 192 |
|  |  |  |  |  |  |
| **USDA verified domestic animal depredations by wolves** |  |  |  |  |  |
| calves killed | 75 | 83 | 42 | 82 | 80 |
| cows killed | 10 | 3 | 10 | 4 | 7 |
| sheep killed | 17 | 10 | 22 | 16 | 15 |
| dogs killed | 2 | 3 | 2 | 11 | 15 |
| horses killed | 1 | 2 | 2 | 2 | 1 |
| turkeys killed | 554 | 365 | 326 | 0 | 24 |
| other killed | 2 pigs | 0 | 26 chickens | 1 llama 1 donkey | ns, 1 rabbit, 1 |
| calves wounded |  |  |  |  | 9 |
| cows wounded |  |  |  |  | 3 |
| dogs wounded |  |  |  |  | 8 |
| other wounded |  |  |  |  | 0 |

* A verified complaint is one in which USDA determines that wolves have killed or injured one or more domestic animals as evidenced by:
(1) Observing wounded animals or remains of animals killed and (2) finding evidence of wolf-involvement.

Figure 2.  Summary of basic data from USDA Wolf-Livestock Depredation Control program, 2006 - 2010.

018616A



Figure 3.  Indices to wolf-livestock depredation in Minnesota.



Figure 4.  Wolves captured and/or removed in Minnesota.

018617A



Figure 5. Location of verified wolf complaints in Minnesota in 2010.

018618A

Verified wolf complaints occurred during every month except January, peaking during May and June. (see Figure 6).



Figure 6. Seasonal Distribution of Wolf Depredations in 2010.

As in previous years, verified damage was primarily to cattle (72% of all verified damage), followed by dogs, sheep, and other domestic animals. (see Figure 7).

018619A



Figure 7. 2010 verified wolf complaints by type

Wolf damage was verified in 23 Minnesota counties in 2010 (see Table 1).

| County | # of verified wolf depredations in 2010 | County | # of verified wolf depredations in 2010 |
|---|---|---|---|
| Aitkin | 7 | Mahnomen | 1 |
| Becker | 6 | Marshall | 8 |
| Beltrami | 11 | Mille Lacs | 1 |
| Carlton | 10 | Morrison | 4 |
| Cass | 9 | Pennington | 0 |
| Clearwater | 4 | Pine | 5 |
| Cook | 0 | Polk | 4 |
| Crow Wing | 2 | Red Lake | 0 |
| Hubbard | 2 | Roseau | 8 |
| Isanti | 0 | St. Louis | 12 |
| Itasca | 9 | Todd | 0 |
| Kanabec | 2 | Wadena | 2 |
| Kittson | 10 | | |
| Koochiching | 6 | Total | 130 |
| Lake | 3 | | |
| Lake of the Woods | 4 | | |

Table 1.  Verified wolf depredations by county.

018620A

## Compensation

Livestock verified as killed by wolves are eligible for compensation from the Minnesota Department of Agriculture (MDA).  No compensation is currently paid for pets that are killed or wounded in Minnesota.  No compensation is paid for livestock that are wounded, unless injuries are so severe the animal needs to be euthanized.

Through 2/10/10 in State FY 2010 (July 1, 2009 – June 30, 2010) compensation paid out by the MDA for verified wolf damage to livestock and poultry was $96,514 (see Table 2).

| State Fiscal year (July 1-June 30) | Total wolf claims | Number of wolf claims |
|---|---|---|
| | | |
| 1993 | $30,996.00 | |
| 1994 | $34,328.00 | |
| 1995 | $29,697.00 | |
| 1996 | $31,777.00 | |
| 1997 | $39,309.00 | |
| 1998 | $57,479.50 | 111 |
| 1999 | $66,052.25 | 103 |
| 2000 | $91,584.55 | 121 |
| 2001 | $80,174.19 | 70 |
| 2002 | $69,514.76 | 67 |
| 2003 | $82,645.80 | 97 |
| 2004 | $42,076.75 | 47 |
| 2005 | $45,099.50 | 37 |
| 2006 | $72,894.90 | 71 |
| 2007 | $81,683.19 | 82 |
| 2008 | $95,526.00 | 82 |
| 2009 | $88,366.00 | 87 |
| 2010 to 2/10/10 | $96,514.00 | 70 |

**2008 claims exceeded $100,000 fund so $14,852 in claims were paid in 2009**
**2009 claims exceeded $100,000 fund in October so  $58,867 in claims were paid in 2010**

Table 2.  Compensation paid by Minnesota Department of Agriculture for livestock destroyed by wolves.  Source: Minnesota Department of Agriculture.

Acknowledgements:

WS wolf damage control personnel during 2010 included: John Hart, Duane Sahr, Jeff Grabarkewitz, Shawn McDowell, Abraham Wolf, Paul Volkmann, Kevin Fuller, Gale

Halvorson, Jim Natvik, John Miedtke, Matt Gross, Byron Cole and WS Contractor Bill Paul.
WS received valuable administrative support for the wolf depredation control program from
Constance Timm.

*For more information contact:*
USDA-APHIS-Wildlife Services
34912 U.S. Hwy. 2 Grand Rapids, MN 55744
(218) 327-3350
e-mail:  john.p.hart@aphis.usda.gov

LITERATURE CITED

Erb, J. 2008. Distribution and abundance of wolves in Minnesota, 2007-08. Minnesota Department of
Natural Resources, St. Paul.

Downloaded from genome.cshlp.org on May 13, 2011 - Published by Cold Spring Harbor Laboratory Press

# Research

# A genome-wide perspective on the evolutionary history of enigmatic wolf-like canids

Bridgett M. vonHoldt,[1] John P. Pollinger,[1] Dent A. Earl,[2] James C. Knowles,[1] Adam R. Boyko,[3] Heidi Parker,[4] Eli Geffen,[5] Malgorzata Pilot,[6] Wlodzimierz Jedrzejewski,[7] Bogumila Jedrzejewska,[7] Vadim Sidorovich,[7] Claudia Greco,[8] Ettore Randi,[8] Marco Musiani,[9] Roland Kays,[10] Carlos D. Bustamante,[3] Elaine A. Ostrander,[4] John Novembre,[1] and Robert K. Wayne[1,11]

[1]Department of Ecology and Evolutionary Biology, University of California, Los Angeles, California 90095, USA; [2]Department of Biomolecular Engineering, University of California, Santa Cruz, California 95064, USA; [3]Department of Genetics, Stanford School of Medicine, Stanford, California 94305, USA; [4]Cancer Genetics Branch, National Human Genome Research Institute, National Institutes of Health, Bethesda, Maryland 20892, USA; [5]Department of Zoology, Tel Aviv University, Tel Aviv 69978, Israel; [6]Museum and Institute of Zoology, Polish Academy of Sciences, 00-679 Warszawa, Poland; [7]Mammal Research Institute, Polish Academy of Sciences, 17-230 Bialowieza, Poland; [8]Istituto Superiore per la Protezione e la Ricerca Ambientale (ISPRA), 40064 Ozzano Emilia (BO), Italy; [9]Faculty of Environmental Design, University of Calgary, Calgary, Alberta T2N 1N4, Canada; [10]New York State Museum, CEC 3140, Albany, New York 12230, USA

High-throughput genotyping technologies developed for model species can potentially increase the resolution of demographic history and ancestry in wild relatives. We use a SNP genotyping microarray developed for the domestic dog to assay variation in over 48K loci in wolf-like species worldwide. Despite the high mobility of these large carnivores, we find distinct hierarchical population units within gray wolves and coyotes that correspond with geographic and ecologic differences among populations. Further, we test controversial theories about the ancestry of the Great Lakes wolf and red wolf using an analysis of haplotype blocks across all 38 canid autosomes. We find that these enigmatic canids are highly admixed varieties derived from gray wolves and coyotes, respectively. This divergent genomic history suggests that they do not have a shared recent ancestry as proposed by previous researchers. Interspecific hybridization, as well as the process of evolutionary divergence, may be responsible for the observed phenotypic distinction of both forms. Such admixture complicates decisions regarding endangered species restoration and protection.

[Supplemental material is available for this article. The genotyping data are available at http://genome-mirror.bscb. cornell.edu/cgi-bin/hgGateway (see "SNPs" track under the Variations and Repeats heading).]

High-density single nucleotide polymorphism (SNP) genotyping arrays developed from domestic species can potentially enhance our understanding of population history and relationships of their close relatives. We use the Affymetrix Canine SNP Genome Mapping Array (version 2) to assess long-standing questions about diversification and admixture of charismatic wolf-like canids, including the gray wolf (Canis lupus), red wolf (C. rufus), Great Lakes wolf (C. lycaon or C. lupus lycaon), and coyote (C. latrans). These species are characterized by high mobility and weak patterns of intraspecific differentiation (e.g., Wayne et al. 1992; Roy et al. 1994, 1996; Forbes and Boyd 1997; Vilà et al. 1999). Similarly, large dispersal distances have led to the formation of extensive admixture zones in North America, where four morphologically distinguishable wolf-like canids can potentially interbreed: the gray wolf of Old World derivation, the coyote and red wolf (both of which originated in North America), and the Great Lakes wolf. The latter two taxa are of controversial ancestry and species status and readily hybridize with other wolf-like canids (Supplemental Table S1).

Their evolutionary origin has been explained either as a consequence of admixture between coyotes and varieties of the gray wolf, or as parallel evolution of a wolf-like phenotype independently in the New World from a common coyote-like ancestor (Fig. 1; Supplemental Table S1). Origin through ancient hybridization or an independent New World evolution might warrant greater preservation efforts and legal protection, whereas origin through recent hybridization would suggest a dynamic evolutionary zone of questionable conservation status, although the ecological significance of such hybrids should also be considered (Crandall et al. 2000; Kyle et al. 2006; Leonard and Wayne 2008). Specifically, the red wolf is protected as a distinct endangered species under the US Endangered Species Act (ESA) and wildlife management agencies dedicate considerable resources to study, monitor, and protect the red wolf (Phillips et al. 2003).

The vast majority of genetic studies on wild populations have utilized a small number of genetic markers for evolutionary inference. To better resolve population structure and admixture within wolf-like canids, we assayed 48,036 SNPs in a panel of 208 gray wolves (C. lupus) representing their worldwide distribution (Eurasia and North America), 57 coyotes and 12 red wolves (Fig. 2; Supplemental Table S2). To our knowledge, this represents the most extensive SNP survey of any wild vertebrate group and provides

[11]Corresponding author.
E-mail rwayne@ucla.edu.
Article published online before print. Article, supplemental material, and publication date are at http://www.genome.org/cgi/doi/10.1101/gr.116301.110.

Downloaded from genome.cshlp.org on May 13, 2011 - Published by Cold Spring Harbor Laboratory Press

vonHoldt et al.



**Figure 1.** Genetic variation of wolf-like canids in the 48K SNP data set. Sample size (N), average observed and expected heterozygosity ($H_O$, $H_E$), percent of loci that are polymorphic (P), and could not be scored (missingness, M) are shown. Except for dog (SE = 0.01), all standard errors for ($H_O$, $H_E$) are <0.001. A modified relationship tree (Lindblad-Toh et al. 2005) and divergence dates are presented (Perini et al. 2009). (*Inset*) Tree depicts admixture hypotheses with dashed lines among North American canid populations (Supplemental Table S1). Map depicts historic species distributions and admixture zone (data from Nowak 2009; Rutledge et al. 2010b).

an important precedent for testing the power of inferences about population subdivision, admixture, and species origin based on previous more limited genetic surveys (Supplemental Table S1). Our analysis reveals extensive population subdivision despite the high mobility of wolf-like canids. Further, we find strong signals of admixture with coyotes and gray wolves in the genomes of the red wolf and Great Lakes wolf, respectively. This finding implies that these taxa do not represent separately evolving lineages, and suggest that admixture has led to substantial phenotypic variation. Our results demonstrate how genomic tools developed for model species can enable new insights into the evolutionary history of wild relatives.

## Results

### Utility of the canine array to assess variability in wolf-like canids

The canine genotyping array interrogates variation in SNPs primarily ascertained from comparisons of boxer and poodle genomes, with additional comparisons to sequences from nine other dog breeds, four gray wolves, and a coyote (Lindblad-Toh et al. 2005; vonHoldt

et al. 2010). Less than 2% of the SNPs on the array were ascertained from comparison of genomic sequences from a domestic dog and a wild canid (vonHoldt et al. 2010). Hence, we predict an ascertainment bias of increasing monomorphism with genetic divergence from the discovery panel (e.g., Nielsen and Signorovitch 2003; Conrad et al. 2006; Rosenblum and Novembre 2007). To assess the severity of this predicted bias, we genotyped species from the wolf-like clade, spanning divergence dates to ~4 million years ago (Fig. 1; Lindblad-Toh et al. 2005; Perini et al. 2009). We found variation to decrease rapidly with phylogenetic distance from the domestic dog. The dog and its closest relatives, the gray wolf and coyote, had high levels of genomic variation (Fig. 1), but species having more than about one million years divergence from the domestic dog had little to no shared variation (e.g., black-backed and golden jackals) (Fig. 1). Given the decrease in polymorphism and increase in missingness with phylogenetic distance (Fig. 1), both SNP ascertainment as well as the failure of probe-target hybridization likely accounts for the limited utility of the array in distantly related species. Nonetheless, the high levels of segregating genotyped variants in gray wolves and coyotes support the use of the canine SNP array for quantifying genetic diversity in both of these species.

018632A

Downloaded from genome.cshlp.org on May 13, 2011 - Published by Cold Spring Harbor Laboratory Press

Genome-wide analysis of enigmatic wolf-like canids



**Figure 2.** Distribution map of gray wolf and coyote sample locations and regions. Sample sizes are indicated in parentheses.

observed heterozygosity was found in captive red and Mexican wolves and in historically bottlenecked populations (e.g., Spain, Italy, red, and Mexican wolves; $H_E = 0.16–0.18$). These results further support the use of SNP data to infer demographic history of wild canids (e.g., Gray et al. 2009).

## Global patterns of population subdivision

We found principal component analysis (PCA) of individual SNPs clearly discriminates domestic and wolf-like canids on the first two PC axes (Fig. 3; Supplemental Fig. S1). PC1 represents a wild versus domestic canid axis, whereas PC2 separates wolves ($n = 198$) and dogs ($n = 912$) from coyotes ($n = 57$) and red wolves ($n = 10$). Our result shows dogs and gray wolves are genetically distinct ($F_{ST} = 0.165$). PC2 in this analysis and in a subset of the data demonstrate a geographically based population hierarchy within gray wolves and coyotes (Fig. 3; Supplemental Figs. S2, S3). First, within gray wolves, Old and New World wolves are distinct. Second, regional geographic groupings in the Old World are evident, such

We found considerable genome-wide SNP variation at the population level in gray wolves and coyotes (Table 1). As predicted, large, and/or expanding populations had high levels of SNP variability (e.g., Canadian and Western wolves, $H_E = 0.24–0.29$), including those that are currently hunted (e.g., Russia and Poland/Belarus wolves, $H_E = 0.25–0.26$) (Table 1). Overall, the lowest

**Table 1.** Average observed ($H_O$) and expected ($H_E$) heterozygosity for 48K SNPs in populations of differing demographic histories (n, sample size)

| Demographic history | Population | n | $H_O$ ($H_E$) | References |
|---|---|---|---|---|
| **Old World gray wolf** | | | | |
| Large (recent) expanding population | Europe[a] | 57 | 0.24 (0.26) | Pilot et al. 2006 |
| Historic population bottleneck | Italy | 20 | 0.15 (0.17) | Gray et al. 2009; Fabbri et al. 2007 |
| Recent population bottleneck and subsequent expansion with continual hunting pressures | Poland and Belarus | 15 | 0.24 (0.25) | Jedrzejewski et al. 2005; Aspi et al. 2009 |
| | Russia | 18 | 0.25 (0.26) | Jedrzejewski et al. 2005; Aspi et al. 2009 |
| Recent population bottleneck | Spain | 10 | 0.18 (0.17) | Gray et al. 2009; Ramirez et al. 2006 |
| **North American wolf** | | | | |
| Founding from a large source population | Yellowstone National Park | 18 | 0.22 (0.22) | Gray et al. 2009; vonHoldt et al. 2008 |
| Large constant population size | Canada | 13 | 0.22 (0.24) | Gray et al. 2009; Carmichael et al. 2007; Musiani et al. 2007 |
| Large (recent) expanding population | Western | 60 | 0.21 (0.29) | Roy et al. 1994 |
| Recent population bottleneck and subsequent expansion | Minnesota and Southern Quebec | 12 | 0.19 (0.22) | Gray et al. 2009 |
| Recent range expansion and potential hybridization | Great Lakes[b] | 23 | 0.18 (0.21) | Roy et al. 1994; Kyle et al. 2006; Koblmüller et al. 2009 |
| Recent population bottleneck with managed breeding; possible hybrid-species origin | Red wolf | 12 | 0.16 (0.16) | Roy et al. 1994 |
| Recent population bottleneck with managed breeding | Mexican wolf | 10 | 0.12 (0.18) | Hedrick et al. 1997 |
| **Coyote** | | | | |
| Large (recent) expanding population | Western | 25 | 0.14 (0.18) | Roy et al. 1994 |
| | Northeastern | 13 | 0.20 (0.25) | Roy et al. 1994; Kyle et al. 2006; Koblmüller et al. 2009 |
| Recent range expansion and potential hybridization | Midwestern/Southern | 19 | 0.18 (0.24) | Roy et al. 1994; Kyle et al. 2006; Koblmüller et al. 2009 |

All estimates have a standard error less than ±0.001.
[a]Excludes Italian and Spanish wolves.
[b]Excludes Minnesota and Quebec wolves.

Downloaded from genome.cshlp.org on May 13, 2011 - Published by Cold Spring Harbor Laboratory Press

vonHoldt et al.



**Figure 3.** Principal component analysis of all wolf-like canids for the 48K SNP data set (IRNP, Isle Royale National Park).

SNPs ascertained by comparison of only dog and wolf or coyote sequences (Supplemental Fig. S4). Although lower in resolution, this analysis finds similar groupings of wild and domestic canids, suggesting that the specific ascertainment scheme does not strongly affect the overall pattern of clustering, a conclusion consistent with previous SNP and haplotype clustering analyses (vonHoldt et al. 2010).

Bayesian ancestry inference using the program *structure* resembles the PCA results, with dogs and wolf-like canids forming the first partitions (K = 2), followed by coyotes and gray wolves (K = 3), Old and New World wolves (K = 4), Italian wolves (K = 5), Mexican wolves (K = 6), Spanish wolves (K = 7), Middle Eastern wolves (K = 8), red wolves (K = 9), and Great Lakes wolves (K = 10) (Fig. 4). However, the red and Great Lakes wolves show consistent signals of admixture with coyotes (light green) (Fig. 4). Midwestern/Southern and Northeastern coyotes show a small degree of admixture with gray wolves (blue) and also with dogs (red) (Fig. 4). All probability intervals for individuals from putatively admixed populations indicated that the admixed assignments were meaningful (90% PI interval >0).

To assess possible population subdivision of nonadmixed populations, we purged our data set of all wolf populations showing evidence of interspecific admixture in *structure*, and analyzed Old

as Italy, Spain, the Middle East, and China. Third, groupings in the New World, such as Mexican, Great Lakes, Northern Quebec, and Western North America wolves appear distinct from wolves elsewhere (Fig. 3; Supplemental Fig. S2A–C). Italian and Spanish wolf populations are resolved on multiple PC axes, as well as wolves from the Middle East, China, Mexico, and the British Columbian coast (Supplemental Fig. S3A–C). In contrast, coyotes appear divided roughly into only three primary groupings from the American West, Midwest/South, and Northeast (Supplemental Figs. S2D, S3D–F). Finally, we examined apparent partitions for a reduced set of 710



**Figure 4.** *structure* clustering analysis of domestic and wild canids for the 44K SNP pruned data set (see Supplemental Table S2). Separate analyses of North American (n = 68) and Eurasian (n = 74) wolves further resolves biologically informative clusters (K = 7; the *top* layer in plot). The three captive Mexican wolf colonies (Studbook, S; Ghost Ranch, G; and Aragon, A) are shown. See discussion in the Supplemental Material for an explanation of how K values were chosen for presentation. Coyote abbreviations: Midwest/Southern, MID; Northeastern, NE; and Western, WEST. North American abbreviations: Algonquin, Alg; Isle Royale NP, IRNP; Minnesota, MN; Ontario, Ont; Wisconsin, WI; Alaska/Canada, AK/Ca; British Columbia, BC; Mexico, Mex; Northern Canada, NCa; Northern Quebec, NQue; and Yellowstone, YNP. Eurasian abbreviations: Belarus, Be; Bulgaria, Bu; Croatia, Cr; Greece, Gr; India, In; Iran, Ir; Israel, Is; Italy, It; Lithuania, Li; Middle East, ME; Oman, Om; Poland, Po; Russia, Ru; Saudi Arabia, SA; Slovakia, Sl; Southwest Asia, SWA; Spain, Sp; Sweden, Sw; Turkey, Tu; and Ukraine, Uk.

---

018634A

Downloaded from genome.cshlp.org on May 13, 2011 - Published by Cold Spring Harbor Laboratory Press

and New World wolves separately. In the Old World analysis, K = 7 resulted in distinct *structure* profiles of wolves from Spain, Italy, Eastern/Northern Europe, Southwest Asia and China, and an admixed grouping (two dominant colors) from the Middle East (Fig. 4). In the New World wolf analysis, at K = 7, differences in *structure* profiles suggest regional and habitat groupings of Northern Quebec (Eastern Atlantic forest), Northern Canada near and above the treeline (taiga and tundra), Yellowstone National Park (Rocky Mountain forest), Alaskan and Canadian Northern forest (boreal forest), British Columbian coast (Western Coastal forest), and Mexico (aridlands) (Fig. 4; Supplemental Fig. S7). Mexican wolves are further divided into Studbook and Aragon lineages with the Ghost Ranch lineage appearing as admixed. Similarly, the mixed profiles of Rocky Mountain and boreal forest wolves suggest that they are derived from heterogeneous migrants or are currently experiencing gene flow from other populations. Most of these regional subdivisions are also differentiated in $F_{ST}$ and AMOVA analyses (Supplemental Tables S3, S4).

Finally, to examine topological relationships among population groupings, we constructed neighbor-joining trees based on genome-wide allele sharing (Supplemental Fig. S5). We excluded wolf populations for which *structure* analysis suggested substantial admixture with coyotes (see above), as admixture would be expected to cause reticulation in relationship trees (Posada and Crandall 2001; Susnik et al. 2007; Addison and Pogson 2009). Rooted with the coyote, Old and New World populations are the first division in the gray wolf tree (Supplemental Fig. S5). In the Old World, the Chinese population is the first branch (red), followed by groupings of wolves from the Middle East and Southwest Asia (blue), and then a group containing European wolves (green and magenta, Supplemental Fig. S5). Within Europe, Northeastern and Southern Europe define separate groupings, and in the latter Bulgaria/Croatia/Greece define a Balkans grouping, whereas Italy and Spain define sister taxa (magenta and orange). In the New World, Mexican wolves are most basal, followed by British Columbian coastal forest wolves, then the Northern Quebec Atlantic forest and tundra/taiga wolves, and finally a mixed grouping of boreal and Rocky Mountain forests wolves. These locality and habitat associations largely support ecotype designations based on previous microsatellite analyses (Carmichael et al. 2007; Musiani et al. 2007; Koblmüller et al. 2009; Muñoz-Fuentes et al. 2009). However, in North American wolves, bootstrap support for boreal forest and Rocky Mountain forest groupings is low, and define a somewhat mixed cluster (Supplemental Fig. S5). For coyotes, the Northeastern populations are the most divergent grouping (green), followed by clusters of Midwestern/Southern coyotes (red), and lastly, groupings of Western coyotes, for which the easternmost population in Manitoba is most divergent (blue, Supplemental Fig. S5).

A notable feature of all trees is the high concordance with which individuals cluster to their population of origin. Such precise assignment in a genetic similarity tree was not anticipated given the dispersal ability of wolves and coyotes, and likely reflects the heightened power of genome-wide studies to detect a shared genealogical history within single populations (Jakobsson et al. 2008; Li et al. 2008).

## Relationships and admixture of enigmatic wolf-like canids

The evolutionary origin and relationships of the red wolf and Great Lakes wolf are controversial and clouded by admixture with related species (Supplemental Table S1). Our PCA and *structure* analyses suggest that the red wolf and Great Lakes wolf are genetically differentiated and are unlikely to share a common origin ($F_{ST}$ = 0.11; Supplemental Table S3). In a plot of PC1 and PC2, red wolves are genetically similar to coyotes, and on PC2, Great Lakes wolves and Mexican wolves are more similar to North American gray wolves (Fig. 3). *structure* analysis consistently assigned ~80% of the red wolf genome to the coyote (light green) (Fig. 4), whereas about the same fraction of the Great Lakes wolf genome is assigned to the gray wolf (blue). These contrasting patterns imply that red wolves are predominantly coyote ancestry, possibly with limited historic hybridization with gray wolves. Moreover, assignments are more variable in Great Lakes wolves, ranging from about 50% to 100% gray wolf ancestry (Fig. 4), suggesting a more heterogeneous process of admixture, with some individuals largely free of coyote ancestry, especially in more western populations (Koblmüller et al. 2009; Rutledge et al. 2010a). Notably, the distinctive wolves of Algonquin Provincial Park in central Ontario that have the archetypical C1 mtDNA haplotype thought to be representative of the Great Lakes wolf taxon (Wilson et al. 2000; Kyle et al. 2006) have the largest proportion of their genome assigned to coyotes. Finally, in the full analysis, at K = 9 and K = 10, the red wolf (orange) and Great Lakes wolf (dark green), respectively, show a distinct genetic signature that appears analogous to subspecific partitions such as the Mexican wolf (Fig. 4) or other distinct regional populations of wolves (Supplemental Figs. S1–S3).

## Analysis of linkage disequilibrium and autozygosity segments

Linkage disequilibrium (LD) is expected to be greater in inbred and admixed populations (Pritchard and Przeworski 2001; Gaut and Long 2003; Tang et al. 2006; Gray et al. 2009). To assess LD patterns, we estimated $r^2_{0.5}$, the physical distance at which the pairwise genotypic association ($r^2$) in the 48K SNP data set decays below a threshold of 0.5 (Fig. 5). We found that populations of North American Western wolves (n = 43) and coyotes (n = 25) have low levels of LD ($r^2_{0.5}$ < 2 Kb) as expected for outbred, non-admixed populations. These LD values are comparable to previous estimates of LD derived from targeted sequencing ($r^2$ = 0.5 at <10 Kb) (Gray et al. 2009). In contrast, LD was greatest in the Mexican wolf (n = 4;



**Figure 5.** (*Left*) Extent of LD (genotypic association, $r^2$) as a function of inter-SNP distance (Kb) for all North American canid populations. (*Right*) Autozygosity frequency distribution of runs of homozygosity (ROH) for all North American canid populations.

Downloaded from genome.cshlp.org on May 13, 2011 - Published by Cold Spring Harbor Laboratory Press

vonHoldt et al.

$r^2_{0.5} > 1$ Mb, average inbreeding coefficient ($f$) = 0.19) (Kalinowski et al. 1999) and the Isle Royale National Park wolf ($n = 3$, $r^2_{0.5} > 1$ Mb), consistent with known founding bottlenecks and subsequent inbreeding (Gray et al. 2009). Likewise, the red wolf has elevated levels of LD ($n = 6$, $r^2_{0.5} \approx$ 10–20 Kb) (Fig. 5), reflecting a founding bottleneck and increased inbreeding in the captive population (average $f$ = 0.04) (Kalinowski et al. 1999). Large non-inbred populations of wolves in the Great Lakes region have slightly lower LD ($n = 10$, $r^2_{0.5} \approx$ 1–2 Kb) followed by the Northeastern ($n = 13$) and Midwestern/Southern coyotes ($n = 19$, $r^2_{0.5} < 2$ Kb) (Fig. 5). Finally, LD estimates may be sensitive to sample size (Teare et al. 2002; England et al. 2006) and, consequently, we experimented with different sample sizes ranging from three to 10 individuals (Supplemental Fig. S6). The results suggest that the Great Lakes wolves have consistently inflated long-range LD. However, the rank order of LD in inbred populations such as Isle Royale National Park wolves and the Mexican wolf are not consistent.

To separate the effects of inbreeding and admixture on LD, we examined genome-wide autozygosity, which more directly measures recent inbreeding (Boyko et al. 2010). We assessed autozygosity as runs of homozygosity (ROH), and expected proportionally longer ROH in recently inbred populations and the converse in more ancestrally inbred populations (Boyko et al. 2010). The Isle Royale National Park and Mexican wolves had the highest fraction of autozygous segments across all fragment sizes, as well as the highest $r^2_{0.5}$ (Fig. 5). The red wolf had elevated

ROH relative to the outbred gray wolf and coyote populations; however, the curve was uniformly lower than the extremely inbred Mexican and Isle Royale National Park wolves (Fig. 5). Specifically, ROH was elevated for the Mexican and Isle Royale National Park wolves relative to outbred populations throughout the ROH curve, suggesting ancient and recent inbreeding. In contrast, Great Lakes wolves ($n = 10$) have low ROH, but slightly inflated linkage disequilibrium, suggesting that recent admixture rather than past inbreeding explains higher levels of LD (Fig. 5).

### Ancestry blocks and assignments

We used the program SABER to assign ancestry of chromosomal blocks based on two or three putative reference ancestral populations. In Great Lakes wolves, red wolves, and Algonquin wolves, we utilized 12 Western gray wolves and 12 Western coyotes as the reference ancestral populations. Because significant dog ancestry was identified in Midwestern/Southern and Northeastern coyotes by *structure* analyses, we included 12 modern domestic dogs as a third reference ancestor for analysis of these populations (Figs. 3, 6). For each ancestral individual, all ancestry blocks were correctly assigned to the appropriate parental population (e.g., Fig. 6A,B,F; Supplemental Tables S5, S6). In contrast, we found Great Lakes wolves ($n = 18$) to have, on average, 14.9% ± 0.3 of their genome assigned to coyotes (range: 13.4%–19.5%, Supplemental Table S5). In contrast, red wolves ($n = 12$) have, on average, 76.1% ± 0.3 of



**Figure 6.** Ancestry analysis of 38 canine autosomes. Plots show ancestry blocks and their assignments for representative individuals of canid populations with average size of blocks, percent ancestry, and number of generations since most recent admixture ($\tau$) indicated. Two-ancestor (coyote, *A*; gray wolf, *B*) analyses are presented for a Great Lakes wolf from Minnesota (*C*), a captive red wolf (*D*), and an Algonquin wolf (*E*). Three-ancestor analyses (coyote, *A*; gray wolf, *B*; dog, *F*) are presented for a Northeastern coyote from Vermont (*G*), a Southern coyote from Louisiana (*H*), and a Midwestern coyote from Ohio (*I*). Individual results are given in Supplemental Tables S5 and S6.

018636A

Downloaded from genome.cshlp.org on May 13, 2011 - Published by Cold Spring Harbor Laboratory Press

their genomic composition assigned to coyotes (range: 74.3%–78.1%; Supplemental Table S5). These results suggest that the two entities have distinct genomic compositions and ancestries (e.g., Fig. 6C,D). Finally, the phenotypically distinct Algonquin wolf ($n = 2$), suggested as the last remaining population retaining a substantial component of the Eastern wolf genome (Rutledge et al. 2010a), had a highly admixed genome with an average of 58.1% ± 2.2 derived from gray wolves and the remainder from coyotes (e.g., Fig. 6E; Supplemental Table S5).

The influence of ancestry and admixture is also evident in Northeastern ($n = 13$) and Midwestern/Southern ($n = 19$) coyotes. In the former, 8.7% ± 0.6 (range: 6.4%–13.1%) of segments are assigned to gray wolves, suggesting a limited impact of hybridization with Great Lakes wolves as coyotes invaded this region (Fig. 6; Wilson et al. 2009; Kays et al. 2010; Supplemental Table S6). In the latter, although gray wolves have been absent from the Midwestern/Southern regions of the US for 100 yr or more (Nowak 1979), we also detected gray wolf ancestry, specifically, on average, 4.1% ± 0.4 (range: 2.1%–6.4%) of the Southern coyote (Alabama, Louisiana, and Mississippi) and 1.4% ± 0.2 (range: 0.3%–2.9%) of the Midwestern (Illinois, Ohio, and Virginia) coyote genome is assigned to gray wolf (Fig. 6H,I; Supplemental Table S6). These two coyote populations also have assignments to dog ancestry, as the Northeastern coyote has on average 9.1% ± 0.7 (range: 5.2%–12.8%) dog ancestry and Midwestern/Southern population has 4.4% ± 0.6 (range: 1.9%–8.1%). The highest dog ancestry was identified in Ohio and Virginia (16.7% and 16.9%, respectively; Supplemental Table S6). Moreover, the considerable range in chromosome assignments across Midwestern/Southern coyotes suggests a varied history of hybridization (Supplemental Table S6).

### Timing of initial admixture

We used SABER to estimate the number of generations since admixture ($\tau$) (Tang et al. 2006). SABER estimates $\tau$ as a function of the inverse of the average inferred chromosomal block size across all assigned blocks. We estimate 297 ± 24 generations ($\tau$) since the initial admixture events between Great Lakes wolves and coyotes, which is equivalent to 546 to 963 yr ago assuming a 2–3-yr generation time (Supplemental Table S5). This ancient admixture suggests that hybridization events began prior to the recent invasion of coyotes into the Great Lakes area (Wilson et al. 2009; Kays et al. 2010). In the red wolf, the initiation of admixture with coyotes began about 144 ± 5 generations or 287–430 yr ago (Supplemental Table S5). In the Great Lakes wolves, segments assigned to wolf ancestry are nearly five times larger and more variable (8016 ± 135 Kb) than those assigned to coyotes (1735 ± 35 Kb) (Supplemental Fig. S8; Supplemental Table S5). This difference suggests historic admixture between the two species, followed by a predominance of backcrossing to gray wolf populations. Similarly, coyote ancestry block size is 2.6 times larger and more variable (6198 ± 115 Kb) than gray wolf blocks in the red wolf genome (2397 ± 49 Kb) (Supplemental Fig. S8A; Supplemental Table S5) and implies extensive backcrossing to coyotes after the initial admixture with gray wolves.

In Midwestern/Southern coyotes ($n = 19$), blocks of gray wolf and dog ancestry are small (874 ± 201 Kb and 2621 ± 412 Kb, respectively) and coyote ancestry blocks are much larger (18,837 ± 1501 Kb) (Supplemental Fig. S8). This disparity is consistent with a model of very limited admixture with gray wolves and dogs, followed by extensive backcrossing to coyotes. An average $\tau$ of 140

generations for wolf ancestry implies effective admixture with wolves occurring around 280 yr ago, assuming a generation time for coyotes of 2 yr (Bekoff and Wells 1986). However, individual values show considerable variability in $\tau$ (range: 39.0–595.6 generations), suggesting a varied history involving differing degrees of admixture and backcrossing at different times (Supplemental Table S6). In contrast, an average $\tau$ of 14.6 (range: 7.2–39.4) generations for dog ancestry implies much more recent admixture with dogs. Northeastern coyotes show similar average wolf and dog block sizes of 1110 ± 78 Kb and 2397 ± 373 Kb, respectively, on a background of an average coyote block size of 9060 ± 310 Kb, (Fig. 6). However, values of $\tau$ for wolf ancestry fragments in Northeastern coyotes are much less ($\tau = 50.6 ± 11.6$, range: 48.5–142.0) than those of Midwestern/Southern coyotes, but estimates of time since dog admixture are comparable ($\tau = 15.6 ± 1.2$) (Supplemental Table S6). These values imply the initial admixture between Northeastern coyotes and gray wolves occurred about 100 yr ago and with dogs about 30 yr ago, given a generation time of 2–3 yr.

## Discussion

### Population subdivision and relationships of wolf-like canids

Analysis with the canine SNP genotyping array adds considerable resolution at multiple levels to the population structure and relationships of wolf-like canids. First, we showed that even within gray wolves, a species with high dispersal abilities, regional and continental patterns of genetic subdivision are found. Many of these genetic partitions were not identified in previous studies of mtDNA sequence or microsatellite loci (Roy et al. 1994; Vilà et al. 1999), highlighting the ability of genome-wide SNP surveys to uncover variants unique to individual populations or that differ substantially in allele frequency (Rosenberg et al. 2002; Li et al. 2008; Novembre et al. 2008). Specifically, Old World wolf populations from Italy, Spain, and Eastern/Northern Europe comprised distinct units that correspond to three well-accepted Ice Age refugia (Fig. 4; Hewitt 1996). Italy and Spain were among the most divergent populations (Italy: mean $F_{ST} = 0.15$, Spain: mean $F_{ST} = 0.11$) (Supplemental Table S3C), which likely reflect historic Ice Age isolation as well as drift from recent population contractions (Randi and Lucchini 2002; Lucchini et al. 2004; Fabbri et al. 2007; Gray et al. 2009). Other genetically distinct populations include Eastern and Northern Europe, China, the Middle East, and Southwest Asia (Fig. 4; Supplemental Fig. S2B; Supplemental Table S3C).

Second, in the New World, Mexican wolves appear as the most genetically distinct group, corroborating the hypothesis that this subspecies is a remnant of an ancient invasion from Eurasia and of conservation importance (Fig. 4; Garcia-Moreno et al. 1996). Other genetic partitions were defined in North America as well, including distinct populations on the British Columbian coast, Northern Quebec, and interior North America (Fig. 4). *structure* and topological analyses provide limited support for habitat-related population structure that corresponds to Western Coastal, Eastern Atlantic, Rocky Mountain and Boreal forests, and tundra/taiga habitats (Fig. 4; Supplemental Fig. S5; Carmichael et al. 2007; Musiani et al. 2007; Koblmüller et al. 2009; Muñoz-Fuentes et al. 2009). These results highlight the importance of using genome-wide surveys to better define and evaluate genetic units for conservation, and further support the notion that in high mobile carnivores, ecology may have an important role in restricting gene flow among populations. Finally, within each population there is strong genealogical structure, with individuals generally assigned to the population from

Downloaded from genome.cshlp.org on May 13, 2011 - Published by Cold Spring Harbor Laboratory Press

which they were sampled (Fig. 4; Supplemental Fig. S5). This pattern suggests that even for highly mobile species, whole-genome analysis can effectively resolve hierarchies on multiple levels and assay genealogical structure within and among populations.

In contrast to gray wolves, coyote populations are not well partitioned in a *structure* analysis. As in gray wolves, coyotes have high dispersal ability, and this trait is manifested in their recent colonization of North America over the last 100 yr from a historic geographic range in the American South and Southwest (Kays et al. 2008, 2010), which likely weakened the establishment of genetic structure. Nonetheless, Western, Midwestern/Southern and Northeastern coyote population groupings are suggested by our data (Fig. 4; Supplemental Fig. S2D; Supplemental Table S3). The Northeastern population has been established over the last 70 yr (Kays et al. 2008, 2010) and was likely affected by hybridization with Great Lakes wolves throughout the colonization process (see below). The Midwestern coyote population was probably the source for these colonists and is closely related to the Northeastern population in genetic similarity trees (Supplemental Fig. S5). More fine-scale patterns of differentiation may be evident given better sampling of specific areas and ecotypes (e.g., Sacks et al. 2004, 2005, 2008).

## Admixture in enigmatic canids

The evolutionary history of the red wolf is controversial, with three primary theories of its origin as: (1) a distinct North American species most closely aligned with gray wolves of Old World origin; (2) a species derived independently from a coyote-like ancestor in the New World and possibly conspecific with the Great Lakes wolf; and (3) a hybrid population of coyotes and gray wolves (Supplemental Table S1). The red wolf was listed as an endangered species in 1967 because of dwindling populations in the American South and extensive hybridization with coyotes (McCarley 1962; Nowak 1979). Prior to extinction in the wild, 14 individuals from this population with supposed red wolf characteristics were chosen for captive breeding (Phillips and Parker 1988; Wayne and Jenks 1991; Hedrick and Fredrickson 2008). This process may have also unintentionally selected for admixed individuals with a higher proportion of gray wolf ancestry. Nonetheless, our genome-wide analysis of red wolves finds levels of divergence between them and coyotes ($F_{ST} = 0.08–0.10$) comparable to the level of genetic distinction between gray wolf populations such as European and North American wolves ($F_{ST} = 0.08$), Great Lakes and Western wolves ($F_{ST} = 0.05$), coastal B.C. and Northern Quebec wolves ($F_{ST} = 0.11$), or Mexican and Western gray wolves ($F_{ST} = 0.10$) (Supplemental Table S3). In the PC analysis, coyotes and red wolves are in close proximity on the first two axes, and *structure* analysis infers substantial coyote ancestry for red wolves (Figs. 3, 4). Red wolves are only resolved as distinct on more minor PC axes and at K = 9 in the *structure* analysis. However, caution needs to be used even in the interpretation of this result, because founder effect and inbreeding as well as small effective population size may inflate the probability of a cluster being defined in *structure* (Pritchard et al. 2000; Anderson and Dunham 2008).

In both *structure* and SABER analyses, red wolves appear to have an admixed ancestry with ~75%–80% of their genome attributed to coyotes and the remainder to gray wolves (Figs. 4, 6D; Supplemental Table S5). Detailed assignments of red wolf chromosomal segments found coyote ancestry blocks 2.6 times longer on average than those assigned to gray wolves, and more dispersed in size (Supplemental Fig. S8; Supplemental Table S5). These results support the hypotheses that red wolves are closely related to coyotes, but somewhat divergent from them due to a history of limited admixture with gray wolves. Such historic admixture between gray wolves and coyotes was followed by extensive backcrossing to coyotes, as the source population of gray wolves disappeared in the American South and the Southeast. We estimate admixture was initiated 144 generations (287–430 yr) ago, placing it approximately in a period when the Southeast U.S. was being converted to agriculture and predators were intensely hunted for fur or as pests (McCarley 1962; Paradiso 1968; McCarley and Carley 1979; Ferrell et al. 1980). Previous model-based analysis using microsatellite data also predicted a relatively recent hybridization between the two species, but the time interval was large (0–2500 yr ago) (Reich et al. 1999). The implications of our results are that a component of the phenotypic distinction of red wolves may be attributed to historic hybridization of distinct populations of gray wolves and coyotes. It has been suggested that hybrids are not clearly protected under the ESA (O'Brien and Mayr 1991), especially hybrids between nonlisted entities (U.S. Fish and Wildlife Service 1973). Since a critical aim of the red wolf recovery project is to maintain the introduced population free from hybridization (Hedrick and Fredrickson 2008), the rationale of the program may need reconsidering as the extant red wolves clearly derive from a process of admixture.

The Great Lakes wolf has generally been considered a subspecies of gray wolf (*Canis lupus lycaon*) with a distribution centered on the Northern Great Lakes region (for review, see Nowak 2002). However, recent genetic studies found unique mtDNA haplotypes in Great Lakes wolves that were allied with coyotes and red wolves, as well as shared microsatellite alleles, suggesting that Great Lakes and red wolves may be conspecific or that the former is a distinct species derived from coyotes (Wilson et al. 2000; Grewal et al. 2004; Fain et al. 2010). Our results show that the Great Lakes wolves are genetically distinct from Western gray wolves ($F_{ST} = 0.05$), although whether such distinction reflects subspecies, ecotype, or distinct population status is controversial (Cronin and Mech 2009; Koblmüller et al. 2009; Wheeldon and White 2009). However, we do not find genomic evidence of an association of Great Lakes wolves and red wolves. In fact, detailed reconstruction of ancestry segments across the genome finds dramatically different patterns in the two species and shows that the Great Lakes wolf genome largely consists of fragments assigned to gray wolf ancestry (>84%) (Fig. 6C; Supplemental Table S5). Such gray wolf–derived fragments tend to be much longer and more dispersed in size, suggesting extensive recent backcrossing to parental gray wolf populations (Supplemental Fig. S8). The high assignment to gray wolf agrees with the *structure* analysis that consistently shows admixture varying among individuals with the dominant component being derived from gray wolves. At K = 10, a distinct profile is evident that is typical of other gray wolf ecotypes or geographically distinct populations (Fig. 4). Further, Great Lakes wolves are clustered with gray wolves in PCA (Fig. 3). High LD and low ROH support admixture, rather than inbreeding in the Great Lakes wolves (Fig. 5). Consequently, our results suggest admixture between a variety of gray wolf and coyotes may have contributed to the distinct phenotype and intermediate size of the Great Lakes wolf (Nowak 2009). This intermediate-sized wolf might be better adapted for hunting deer, the dominant prey in the region, rather than larger ungulates found elsewhere, and is a unique example of hybridization contributing to adaptive differentiation in a mammal species (Kays et al. 2010).

Model-based analysis of chromosome fragments assigned to gray wolves and coyotes suggests that admixture of Great Lakes

018638A

Downloaded from genome.cshlp.org on May 13, 2011 - Published by Cold Spring Harbor Laboratory Press

wolves occurred on the order of 600–900 yr ago, prior to the recent invasion of coyotes into the area (Supplemental Table S5) (Grewal et al. 2004; Wilson et al. 2009; Rutledge et al. 2010b). However, extinct coyote-like mtDNA sequences have been described in 400–500-yr-old canid remains from Quebec (Rutledge et al. 2010b), and the presence of coyote-like mtDNA haplotypes in historic Great Lakes wolves implies that coyote–wolf hybridization has a longer history in the area (Leonard and Wayne 2008; Koblmüller et al. 2009). Moreover, pre-Columbian archeological remains establish coyotes in the Great Lakes area, but the reasons for their subsequent disappearance are unclear (Voigt and Berg 1987). Therefore, Great Lakes wolves may have hybridized with pre-Columbian, as well as contemporary coyotes. More recently, admixture could be augmented by human activities such as predator control and habitat conversion that could favor hybridization with the more common coyote (Lehman et al. 1991).

## Admixture in coyotes

Midwestern/Southern and Northeastern coyotes show a surprising fraction of admixture with gray wolves and dogs, which is maintained to some extent in their descendents who colonized the Great Lakes region and New England. The fraction of ancestry blocks that are associated with gray wolves in the SABER analysis is as much as 13.1% (Fig. 6I; Supplemental Table S6). *structure* analyses also suggest limited dog ancestry, and SABER analysis with dogs as a third ancestral population found similar levels overall of dog ancestry in Northeastern (9.1%) and Midwestern/Southern coyotes (7.5%) (Supplemental Table S6). Recent dog–coyote admixture is likely given the abundance of dogs associated with Native Americans and extensive human habitation of the Eastern US (Schwartz 1997; Morey 2010). Further, this possibility is supported by morphologic studies and genetic evidence of a dog-like mitochondrial DNA haplotype and dog-derived black coat color variants in coyotes of the Southeast (Mengel 1971; Freeman and Shaw 1979; Adams et al. 2003; Schmutz et al. 2007; Anderson et al. 2009; Kays et al. 2010; Supplemental Table S1). As in red wolves, our results suggest that historic admixture between gray wolves and coyotes began as long as 250–300 yr ago, coincident with the decline and extirpation of the gray wolf in the Midwestern and Southern US. This result reaffirms the importance of relative species abundance to admixture, and suggests that the processes that gave rise to the red wolf may be similar to those leading to admixture in Midwestern/Southern and Northeastern coyotes. The latter display the highest fraction of wolf ancestry and elevated LD relative to ROH (Fig. 5; Supplemental Table S5), suggesting the effect of recent admixture as coyotes expanded their range through the Great Lakes region beginning early in the last century.

In conclusion, we show how new genomic tools, such as SNP genotyping arrays developed from one species, greatly enhance an understanding of population subdivision and admixture in close relatives. Studies of wolf-like canids with the canine SNP microarray revealed a hierarchy of genetic partitions from individual populations to higher order regional and habitat-related groupings. We find a coyote–wolf admixture zone that stretched from Southern Texas to the Great Lakes and Northeastern US. This admixture zone is the largest in area ever described for a terrestrial vertebrate (Barton and Hewitt 1985; Arnold 1997) and is testimony to the dispersal ability of wolf-like canids as well as the influence of anthropogenic activities. In addition to possible natural and artificial selection for larger individuals (Kays et al. 2010), a shared history of coyote–wolf admixture likely contributed to the phe-

notypic and genetic similarity of the red wolf and Great Lakes wolf and their classification as conspecific or closely related unique species. Using a genome-wide approach, we show that the red and Great Lakes wolves have a distinct but admixed evolutionary history. This result has important implications for conservation policy, because current preservation efforts are focused on populations whose admixed genomes may be due in part to recent habitat changes and predator control efforts (Lehman et al. 1991; Wayne and Jenks 1991). However, these concerns must be weighed against the beneficial top-down ecosystem effects that admixed populations have in environments, which now may be unsuitable for large wolves. Such ecologic, rather than strictly taxonomic considerations are also integral to deciding which species and subspecies should be preserved (e.g., Crandall et al. 2000; Allendorf et al. 2001; Carroll et al. 2010).

## Methods

### Sample and data collection

We extracted genomic DNA from blood samples collected from 912 domestic dogs (*Canis familiaris*) and tissue and blood samples from gray wolves (*Canis lupus*), coyotes (*C. latrans*), red wolves (*C. rufus*), Mexican wolves (*C. l. baileyi*), black-backed jackals (*C. mesomelas*), Ethiopian wolves (*C. simensis*), golden jackals (*C. aureus*), and a side-striped jackal (*C. adustus*; Supplemental Table S2) (see also Boyko et al. 2010; vonHoldt et al. 2010). All samples were genotyped on the Affymetrix Canine version 2 genome-wide SNP mapping array, and quality control filters were applied for the genotyping algorithm (Boyko et al. 2010), from which we obtained a final set of 48,036 high-quality autosomal SNP loci excluding X-chromosome SNPs (48K).

### Single-SNP measures of genetic diversity

Single-marker descriptive statistics (e.g., observed/expected heterozygosity, polymorphism, missingness, and pairwise genotype associations) were estimated using PLINK (Purcell et al. 2007) for the complete 48K SNP data set. When pedigree data was known (Mexican and red wolf studbooks, or Yellowstone wolf pedigree), only individuals unrelated by at least two generations were included. Additionally, we identified a set of 43,953 SNPs (44K) after exclusion of highly linked SNPs ($r^2 > 0.5$) for all canids, and an additional subset of 30,168 unlinked SNPs (30K) in coyotes and wolves.

### PCA

To visualize the dominant relationships in the 48K SNP genotype data set of all canids, we used the smartpca program distributed in the Eigensoft package for principal component analysis (PCA) (Price et al. 2006). To determine how SNP ascertainment influences the PCA structure, we selected a set of 710 SNPs ascertained by comparison of only dog and wolf or coyote sequences for PCA with the same sample set (see vonHoldt et al. 2010).

### Estimating genetic differentiation and variation

We used an in-house program to calculate Weir and Cockerham's estimate of the $F_{ST}$ parameter between populations and species suggested by PCA, *structure*, and topological analyses (Weir and Cockerham 1984). An allele-similarity (IBS) matrix was constructed for wild canids using PLINK and used as input for ARLEQUIN version 3 in order to analyze molecular variance (AMOVA) within and among population and groups with 9999 permutations for significance testing (Excoffier et al. 2005).

Downloaded from genome.cshlp.org on May 13, 2011 - Published by Cold Spring Harbor Laboratory Press

vonHoldt et al.

___

## Genetic structure analysis

We used the Bayesian inference program *structure* (Pritchard et al. 2000) to assess genetic admixture for the 44K pruned SNP data set of 300 individuals: 53 dog breeds (one individual per modern breed), wolves (gray wolf, $n = 163$; red wolf, $n = 12$), and coyotes ($n = 57$) (vonHoldt et al. 2010). To limit the effect of the large number of dogs relative to other samples, we reduced the sampling of dogs to include only one individual per modern breed (see vonHoldt et al. 2010). We utilized 10,000 burn-in iterations and 10,000 MCMC iterations in *structure*, with three repetitions of these parameter settings. The alpha and likelihood statistics were verified to reach convergence before the 10,000 burn-in iterations were completed during each repetition for each number of K populations analyzed.

## Linkage disequilibrium analysis

We used PLINK (Purcell et al. 2007) to obtain genome-wide pairwise genotypic associations ($r^2$) as an estimate of linkage disequilibrium (LD). Analyses were performed independently on unrelated individuals from the three coyote populations (Western, $n = 25$; Midwestern/Southern, $n = 19$; Northeastern, $n = 13$), three wolf populations (Western, $n = 43$; Great Lakes, $n = 10$; and IRNP, $n = 3$), the red wolf ($n = 6$), and the Mexican wolf ($n = 4$). The physical distance at which LD decayed to $r^2 = 0.5$ ($r^2_{0.5}$) was estimated for each population grouping (see Gray et al. 2009). We assessed runs of homozygosity (ROH) from the pruned 30K SNP set using a hidden Markov model (Boyko et al. 2010) for the same sample set as the LD analysis. We assumed a 1.0-cM/Mb recombination rate and then assigned each ROH to either autozygosity (ROH > 1 Mb) or ancient coalescent event (ROH < 1 Mb) (Boyko et al. 2010).

## Modeling ancestry and timing of admixture

We used the program SABER (Tang et al. 2006) to assign ancestry to each haplotype block across the genome. SABER utilizes an extended Markov-Hidden Markov Model (MHMM) to account for background LD (Tang et al. 2006). We specified a 1.0-cM/Mb recombination rate (Boyko et al. 2010). We conducted two-ancestor and three-ancestor analyses. Both analyses included 12 individuals each of the Western coyote and Western North American wolf populations as the ancestral reference populations. Additionally, in a three-ancestor model, we included 12 dogs from 12 modern breeds (see Supplemental Material) for analysis of only the Midwestern/Southern and Northeastern coyote populations, because *structure* analyses suggested that these populations were admixed with dogs. Following previous studies that utilized subsets of ancestry informative markers (AIMs) that are diagnostic of parental populations to enhance haplotype assignment (Tian et al. 2006; Price et al. 2007; Rosenberg et al. 2010), we used a subset of 3102 (two-ancestor) and 7183 SNPs (three-ancestor) that had $F_{ST} \geq 0.4$ (see Supplemental Material).

## Tree reconstruction

We generated neighbor-joining (NJ) trees based on allele-sharing distances among the subset of nonadmixed individuals for the 48K SNP data set (Supplemental Fig. S5) with 1000 bootstrap iterations using the Microsat program (written by E Minch and A Ruiz-Linares, Stanford University, 1996). The resulting pairwise matrices were used in neighbor from the PHYLIP package, and consensus trees were generated using the majority rule option in the program consense from the PHYLIP package (Felsenstein 1993). Trees were visualized using Dendroscope (Huson and Richter 2007).

## Acknowledgments

Grants from NSF and NIH (C.D.B., J.N., M.M., and R.K.W.), the Intramural Program of the National Human Genome Research Institute (E.A.O.), the Searle Scholars program (J.N.), the Polish Ministry of Science and Higher Education (M.P. and W.J.), European Nature Heritage Fund EURONATUR (W.J.), New York State Museum (R.K.), National Sciences and Engineering Research Council (M.M.) supported this research. We thank Y. Zhang and team for their permission to include 10 Chinese wolf samples in this study. A NIH Training Grant in Genomic Analysis and Interpretation supported B.V.H.; the Foundation for Polish Science supported M.P. Wolf samples from Central/Eastern/Northern Europe and Turkey were collected as a result of an ongoing project on genetic differentiation in Eurasian wolves. We thank the project participants (M. Shkvyrya, I. Dikiy, E. Tsingarska, S. Nowak) for their permission to use 72 samples for this study. We acknowledge R. Hefner and the Zoological Collection at Tel Aviv University for Israel wolf samples. We also gratefully acknowledge Affymetrix Corporation and specifically Zuwei Qian from Affymetrix Asia Pacific for assistance. We also want to thank Adam Auton and Andy Reynolds for assistance with array genotyping, Scott Livingston for comments on the manuscript, and Hua Tang for advice with ancestry analyses.

## References

Adams JR, Leonard JA, Waits LP. 2003. Widespread occurrence of a domestic dog mitochondrial DNA haplotype in southeastern US coyotes. *Mol Ecol* **12:** 541–549.

Addison JA, Pogson GH. 2009. Multiple gene genealogies reveal asymmetrical hybridization and introgression among strongylocentrotid sea urchins. *Mol Ecol* **18:** 1239–1251.

Allendorf FW, Leary RF, Spruell P, Wenburg JK. 2001. The problems with hybrids: setting conservation guidelines. *Trends Ecol Evol* **16:** 613–622.

Anderson EC, Dunham KK. 2008. The influences of family groups on inferences made with the program Structure. *Mol Ecol Resources* **8:** 1219–1229.

Anderson T, vonHoldt B, Candille S, Musiani M, Greco C, Stahler DR, Smith DW, Padhukasahasram B, Randi E, Leonard J, et al. 2009. Molecular and evolutionary history of melanism in North American gray wolves. *Science* **323:** 1339–1343.

Arnold ML. 1997. *Natural hybridization and evolution.* Oxford University Press, NY.

Aspi J, Roininen E, Kiiskila J, Ruokonen M, Kojola I, Bljudnik L, Danilov P, Heikkinen S, Pulliainen E. 2009. Genetic structure of the northwestern Russian wolf population and gene flow between Russia and Finland. *Conserv Genet* **10:** 815–826.

Barton NH, Hewitt GM. 1985. Analysis of hybrid zones. *Annu Rev Ecol Syst* **16:** 113–148.

Bekoff M, Wells MC. 1986. The social ecology and behavior of coyotes (*Canis latrans*). *Adv Stud Behav* **16:** 251–338.

Boyko AR, Quignon P, Li L, Schoenebeck J, Degenhardt JD, Lohmueller KE, Zhao K, Brisbin A, Parker HG, vonHoldt BM, et al. 2010. A simple genetic architecture underlies morphological variation in dogs. *PLoS Biol* **8:** e1000451. doi: 10.1371/journal.pbio.1000451.

Carmichael LE, Krizan J, Nagy J, Fuglei E, Dumond M, Johnson D, Veitch A, Berteaux D, Strobeck C. 2007. Historical and ecological determinants of genetic structure in arctic canids. *Mol Ecol* **16:** 3466–3483.

Carroll C, Vucetich JA, Nelson MP, Rohlf DJ, Phillips MK. 2010. Geography and recovery under the U.S. Endangered Species Act. *Conserv Biol* **24:** 395–403.

Conrad DF, Jakobsson M, Coop G, Wen X, Wall JD, Rosenberg NA, Pritchard JK. 2006. A worldwide survey of haplotype variation and linkage disequilibrium in the human genome. *Nat Genet* **38:** 1251–1260.

Crandall KA, Bininda-Emonds ORP, Mace GM, Wayne RK. 2000. Considering evolutionary processes in conservation biology. *Trends Ecol Evol* **15:** 290–295.

Cronin MA, Mech LD. 2009. Problems with the claim of ecotype and taxon status of the wolf in the Great Lakes region. *Mol Ecol* **18:** 4991–4993.

England PR, Cornuet JM, Berthier P, Tallmon DA, Luikart G. 2006. Estimating effective population size from linkage disequilibrium: severe bias in small samples. *Conserv Genet* **7:** 303–308.

___

018640A

Downloaded from genome.cshlp.org on May 13, 2011 - Published by Cold Spring Harbor Laboratory Press

Excoffier L, Laval G, Schneider S. 2005. Arlequin (version 3.0): An integrated software package for population genetics data analysis. *Evol Bioinform Online* **1:** 47–50.

Fabbri E, Miquel C, Lucchini V, Santini A, Caniglia R, Duchamp C, Weber JM, Lequette B, Marucco F, Boitani L, et al. 2007. From the Apennines to the Alps: colonization genetics of the naturally expanding Italian wolf (*Canis lupus*) population. *Mol Ecol* **16:** 1661–1671.

Fain SR, Straughan DJ, Taylor BF. 2010. Genetic outcomes of wolf recovery in the Western Great Lakes states. *Conserv Genet*. doi: 10.1007/s10592-010-0068-x.

Felsenstein J. 1993. *PHYLIP version 3.5c*. Department of Genetics, University of Washington, Seattle, WA.

Ferrell R, Morizot D, Horn J, Carley C. 1980. Biochemical markers in a species endangered by introgression: the red wolf. *Biochem Genet* **18:** 39–49.

Forbes SH, Boyd DK. 1997. Genetic structure and migration in native and reintroduced Rocky Mountain wolf populations. *Conserv Biol* **11:** 1226–1234.

Freeman R, Shaw J. 1979. Hybridization in Canis (Canidae) in Oklahoma. *Southwest Nat* **24:** 485–500.

Garcia-Moreno J, Matocq M, Roy M, Geffen E, Wayne RK. 1996. Relationships and genetic purity of the endangered Mexican wolf based on analysis of microsatellite loci. *Conserv Biol* **10:** 376–389.

Gaut BS, Long A. 2003. The lowdown on linkage disequilibrium. *Plant Cell* **15:** 1502–1506.

Gray MM, Granka J, Bustamante CD, Sutter N, Boyko A, Zhu L, Ostrander EA, Wayne RK. 2009. Linkage disequilibrium and demographic history of wild and domestic canids. *Genetics* **181:** 1493–1505.

Grewal S, Wilson JP, Kung TK, Shami K, Theberge M, Theberge JB, White BN. 2004. A genetic assessment of the eastern wolf (*Canis lycaon*) in Algonquin Provincial Park. *J Mammal* **85:** 625–632.

Hedrick PW, Fredrickson J. 2008. Captive breeding and the reintroduction of Mexican and red wolves. *Mol Ecol* **17:** 344–350.

Hedrick PW, Miller PS, Geffen E, Wayne RK. 1997. Genetic evaluation of the three captive Mexican wolf lineages. *Zoo Biol* **16:** 47–69.

Hewitt G. 1996. Some genetic consequences of ice ages, and their role in divergence and speciation. *Biol J Linn Soc Lond* **58:** 247–276.

Huson D, Richter D. 2007. Dendroscope: An interactive viewer for large phylogenetic trees. *BMC Bioinformatics* **8:** 460–465.

Jakobsson M, Scholz S, Scheet P, Giggs JR, Vanliere J, Fung H, Szpiech Z, Degnan J, Wang K, Guerreiro R, et al. 2008. Genotype, haplotype and copy-number variation in worldwide human populations. *Nature* **451:** 998–1003.

Jedrzejewski W, Branicki W, Veit C, Medugorac I, Pilot M, Bunevich AN, Jedrzejewska B, Schmidt K, Theuerkauf J, Okarma H, et al. 2005. Genetic diversity and relatedness within packs in an intensely hunted population of wolves *Canis lupus*. *Acta Theriol (Warsz)* **50:** 3–22.

Kalinowski ST, Hedrick PW, Miller PS. 1999. No inbreeding depression observed in Mexican and red wolf captive breeding programs. *Conserv Biol* **13:** 1371–1377.

Kays RW, Gompper ME, Ray JC. 2008. Landscape ecology of eastern coyotes based on large-scale estimates of abundance. *Ecol Appl* **18:** 1014–1027.

Kays R, Curtis A, Kirchmann JJ. 2010. Rapid adaptive evolution of northeastern coyotes via hybridization with wolves. *Biol Lett* **6:** 89–93.

Koblmüller S, Nord M, Wayne RK, Leonard JA. 2009. Origin and status of the Great Lakes wolf. *Mol Ecol* **18:** 2313–2326.

Kyle CJ, Johnson AR, Patterson BR, Wilson PJ, Grewal SK, White BN. 2006. Genetic nature of eastern wolves: Past, present and future. *Conserv Genet* **7:** 273–287.

Lehman N, Eisenhawer A, Hansen K, Mech LD, Peterson RO, Gogan PJP, Wayne RK. 1991. Introgression of coyote mitochondrial DNA into sympatric North American gray wolf populations. *Evolution* **45:** 104–119.

Leonard JA, Wayne RK. 2008. Native Great Lakes wolves were not restored. *Biol Lett* **4:** 95–98.

Li JZ, Absher DM, Tang H, Southwick AM, Casto AM, Ramachandran S, Cann HM, Barsh GS, Feldman M, Cavalli-Sforza LL, et al. 2008. Worldwide human relationships inferred from genome-wide patterns of variation. *Science* **319:** 1100–1104.

Lindblad-Toh K, Wade C, Mikkelsen TS, Karlsson EK, Jaffe DB, Kamal M, Clamp M, Chang JL, Kulbokas EJ, Zody MC, et al. 2005. Genome sequence, comparative analysis and haplotype structure of the domestic dog. *Nature* **438:** 803–819.

Lucchini V, Galov A, Randi E. 2004. Evidence of genetic distinction and long-term population decline in wolves (*Canis lupus*) in the Italian Apennines. *Mol Ecol* **13:** 523–536.

McCarley H. 1962. The taxonomic status of wild canids (Canidae) in the south central United States. *Southwest Nat* **7:** 227–235.

McCarley H, Carley C. 1979. Recent changes in distribution and status of wild red wolves (*Canis rufus*). Endangered Species Report no. 4. U.S. Fish and Wildlife Service, Albuquerque, NM.

Mengel RM. 1971. A study of dog-coyote hybrids and implications concerning hybridization in Canis. *J Mammal* **52:** 316–336.

Morey D. 2010. *Dogs: Domestication and the development of a social bond*. Cambridge University Press, NY.

Muñoz-Fuentes V, Darimont CT, Wayne RK, Paquet PC, Leonard JA. 2009. Ecological factors drive differentiation in wolves from British Columbia. *J Biogeogr* **36:** 1516–1531.

Musiani M, Leonard JA, Cluff HD, Gates CC, Mariani S, Paquet PC, Vilà C, Wayne RK. 2007. Differentiation of tundra/taiga and boreal coniferous forest wolves: genetics, coat colour and association with migratory caribou. *Mol Ecol* **16:** 4149–4170.

Nielsen R, Signorovitch J. 2003. Correcting for ascertainment biases when analyzing SNP data: applications to the estimation of linkage disequilibrium. *Theor Popul Biol* **63:** 245–255.

Novembre J, Johnson T, Bryc K, Kutalik Z, Boyko A, Auton A, Indap A, King KS, Bergmann S, Nelson MR, et al. 2008. Genes mirror geography within Europe. *Nature* **456:** 98–101.

Nowak RM. 1979. *North American Quaternary* Canis. Monograph of the Museum of Natural History. University of Kansas, KS.

Nowak RM. 2002. The original status of wolves in eastern North America. *Southeast Nat* **1:** 95–130.

Nowak RM. 2009. Taxonomy, morphology, and genetics of wolves in the Great Lakes region of the United States. In *Recovery of gray wolves in the Great Lakes regions of the United States: An endangered species success story* (ed. AP Wydeven, et al.), pp. 233–250. Springer, NY.

O'Brien SJ, Mayr E. 1991. Bureaucratic mischief: recognizing endangered species and subspecies. *Science* **251:** 1187–1188.

Paradiso J. 1968. Canids recently confined in east Texas, with comments on the taxonomy of the red wolf. *Am Midl Nat* **80:** 529–535.

Perini FA, Russo CA, Schrago CG. 2009. The evolution of South American endemic canids: a history of diversification and morphological parallelism. *J Evol Biol* **23:** 311–322.

Phillips MK, Parker WT. 1988. Red wolf recovery: a progress report. *Conserv Biol* **2:** 139–141.

Phillips MK, Henry VG, Kelly BT. 2003. Restoration of the red wolf. In *Wolves: Behavior, ecology, and conservation* (ed. LD Mech, L Boitani), pp. 272–288. University of Chicago Press, Chicago, IL.

Pilot M, Jedrzejewski W, Branicki W, Sidorovich VE, Jedrzejewska B, Stachura K, Funk SM. 2006. Ecological factors influence population genetic structure of European grey wolves. *Mol Ecol* **15:** 4533–4553.

Posada D, Crandall KA. 2001. Intraspecific gene genealogies: trees grafting into networks. *Trends Ecol Evol* **16:** 37–45.

Price A, Patterson N, Plenge RM, Weinblatt ME, Shadick NA, Reich D. 2006. Principal components analysis corrects for stratification in genome-wide association studies. *Nat Genet* **38:** 904–909.

Price AL, Patterson N, Yu F, Cox DR, Waliszewska A, McDonald GJ, Tandon A, Schirmer C, Neubauer J, Bedoya G, et al. 2007. A genomewide admixture map for Latino populations. *Am J Hum Genet* **80:** 1024–1036.

Pritchard JK, Przewonski M. 2001. Linkage disequilibrium in humans: models and data. *Am J Hum Genet* **69:** 1–14.

Pritchard J, Stephens M, Donnelly P. 2000. Inference of population structure using multilocus genotype data. *Genetics* **155:** 945–959.

Purcell S, Neale B, Todd-Brown K, Thomas L, Ferreira MA, Bender D, Maller J, Sklar P, de Bakker PI, Daly MJ, et al. 2007. PLINK: a tool set for whole-genome association and population-based linkage analyses. *Am J Hum Genet* **81:** 559–575.

Ramírez O, Altet L, Enseñat C, Vilà C, Sanchez A, Ruiz A. 2006. Genetic assessment of the Iberian wolf *Canis lupus signatus* captive breeding program. *Conserv Genet* **7:** 861–878.

Randi E, Lucchini V. 2002. Detecting rare introgression of domestic dog genes into wild wolf (*Canis lupus*) populations by Bayesian admixture analyses of microsatellite variation. *Conserv Genet* **3:** 31–45.

Reich D, Wayne RK, Goldstein DB. 1999. Genetic evidence for a recent origin by hybridization of red wolves. *Mol Ecol* **8:** 139–144.

Rosenberg NA, Pritchard JK, Weber JL, Cann HM, Kidd KK, Zhivotovsky LA, Feldman MW. 2002. Genetic structure of human populations. *Science* **298:** 2381–2385.

Rosenberg NA, Huang L, Jewett EM, Szpiech Z, Jankovic I, Boehnke M. 2010. Genome-wide association studies in diverse populations. *Nat Rev Genet* **11:** 356–366.

Rosenblum EB, Novembre J. 2007. Ascertainment bias in spatially structured populations: a case study in the eastern fence lizard. *J Hered* **98:** 331–336.

Roy M, Geffen E, Smith D, Ostrander EA, Wayne RK. 1994. Patterns of differentiation and hybridization in North American wolflike canids, revealed by analysis of microsatellite loci. *Mol Biol Evol* **11:** 553–570.

Roy MS, Geffen E, Smith D, Wayne RK. 1996. Molecular genetics of pre-1940 red wolves. *Conserv Biol* **10:** 1413–1424.

Rutledge LY, Garroway CJ, Loveless KM, Patterson BR. 2010a. Genetic differentiation of eastern wolves in Algonquin Park despite bridging gene flow between coyotes and grey wolves. *Heredity* **105:** 520–531.

018641A

Downloaded from genome.cshlp.org on May 13, 2011 - Published by Cold Spring Harbor Laboratory Press

Rutledge LY, Bos KI, Pearce RJ, White BN. 2010b. Genetic and morphometric analysis of sixteenth century *Canis* skull fragments: implications for historic eastern and gray wolf distribution in North America. *Conserv Genet* **11**: 1273–1281.

Sacks BN, Brown SK, Ernest HB. 2004. Population structure of California coyotes correspond to habitat-specific breaks and illuminates species history. *Mol Ecol* **13**: 1265–1275.

Sacks BN, Mitchell BR, Williams CL, Ernest HB. 2005. Coyote movements and social structure along a cryptic population genetic subdivision. *Mol Ecol* **14**: 1241–1249.

Sacks BN, Bannasch DL, Chomel BB, Ernest HB. 2008. Coyotes demonstrate how habitat specialization by individuals of a generalist species can diversify population in a heterogeneous environment. *Mol Biol Evol* **25**: 1384–1394.

Schmutz SM, Berryere TG, Barta JL, Reddick KD. 2007. Agouti sequence polymorphisms in coyotes, wolves and dogs suggest hybridization. *J Hered* **98**: 351–355.

Schwartz M. 1997. *The history of dogs in the early Americas*. Yale University Press, New Haven, CT.

Susnik S, Weiss S, Odak T, Delling B, Treer T, Snoj A. 2007. Reticulate evolution: ancient introgression of the Adriatic brown trout mtDNA in softmouth trout *Salmo obtusirostris* (Teleostei: Salmonidae). *Biol J Linnean Soc* **90**: 139–152.

Tang H, Coram M, Wang P, Zhu X, Risch N. 2006. Reconstructing genetic ancestry blocks in admixed individuals. *Am J Hum Genet* **79**: 1–12.

Teare MD, Dunning AM, Durocher F, Rennart G, Easton DF. 2002. Sampling distribution of summary linkage disequilibrium measures. *Ann Hum Genet* **66**: 223–233.

Tian C, Hinds DA, Shigeta R, Kittles R, Ballinger DG, Seldin MF. 2006. A genomewide single-nucleotide-polymorphism panel with high ancestry information for African American admixture mapping. *Am J Hum Genet* **79**: 640–649.

U. S. Fish and Wildlife Service. 1973. Endangered Species Act. Department of the Interior, 108th Congress, Washington, DC.

Vilà C, Amorim IR, Leonard JA, Posada D, Castroviejo J, Petrucci-Fonseca F, Crandall KA, Ellegren H, Wayne RK. 1999. Mitochondrial DNA phylogeography and population history of the grey wolf *Canis lupus*. *Mol Ecol* **8**: 2089–2103.

Voigt DR, Berg WE. 1987. Coyote. In *Wild Furbearer Management and Conservation in North America* (ed. M Novak, et al.), pp. 345–357. Ontario Trappers Association, Peterborough, Ontario, Canada.

vonHoldt B, Stahler D, Smith DW, Earl DA, Pollinger JP, Wayne RK. 2008. The genealogy and genetic viability of reintroduced Yellowstone grey wolves. *Mol Ecol* **17**: 252–274.

vonHoldt B, Pollinger JP, Lohmueller KE, Han E, Parker HG, Quignon P, Degenhardt JD, Boyko AR, Earl DA, Auton A, et al. 2010. Genome-wide SNP and haplotype analyses reveal a rich history underlying dog domestication. *Nature* **464**: 898–902.

Wayne RK, Jenks S. 1991. Mitochondrial DNA analysis implying extensive hybridization of the endangered red wolf *Canis rufus*. *Nature* **351**: 565–568.

Wayne RK, Lehman N, Allard MW, Honeycutt RL. 1992. Mitochondrial DNA variability of the gray wolf: genetic consequences of population decline and habitat fragmentation. *Conserv Biol* **6**: 559–569.

Weir B, Cockerham C. 1984. Estimating F-statistics for the analysis of population structure. *Evolution* **38**: 1358–1370.

Wheeldon T, White B. 2009. Genetic analysis of historic western Great Lakes region wolf samples reveals early *Canis lupus/Canis lycaon* hybridization. *Biol Lett* **5**: 101–104.

Wilson P, Grewal S, Lawford ID, Heal JNM. 2000. DNA profiles of the eastern Canadian wolf and the red wolf provide evidence for a common evolutionary history independent of the gray wolf. *Can J Zool* **78**: 2156–2166.

Wilson PJ, Grewal SK, Mallory FF, White BN. 2009. Genetic characterization of hybrid wolves across Ontario. *J Hered* **100**: S80–S89.

*Received October 8, 2010; accepted in revised form April 4, 2011.*

018642A

Downloaded from genome.cshlp.org on May 13, 2011 - Published by Cold Spring Harbor Laboratory Press



# A genome-wide perspective on the evolutionary history of enigmatic wolf-like canids

Bridgett M. vonHoldt, John P. Pollinger, Dent A. Earl, et al.

*Genome Res.* published online May 12, 2011
Access the most recent version at doi:10.1101/gr.116301.110

| | |
|---|---|
| **Supplemental Material** | http://genome.cshlp.org/content/suppl/2011/04/08/gr.116301.110.DC1.html |
| **P<P** | Published online May 12, 2011 in advance of the print journal. |
| **Email alerting service** | Receive free email alerts when new articles cite this article - sign up in the box at the top right corner of the article or **click here** |

Advance online articles have been peer reviewed and accepted for publication but have not yet appeared in the paper journal (edited, typeset versions may be posted when available prior to final publication). Advance online articles are citable and establish publication priority; they are indexed by PubMed from initial publication. Citations to Advance online articles must include the digital object identifier (DOIs) and date of initial publication.

To subscribe to *Genome Research* go to:
**http://genome.cshlp.org/subscriptions**

Copyright © 2011 by Cold Spring Harbor Laboratory Press

018643A

# Supplemental Methods

*Single-SNP measures of genetic diversity*

Missingness was estimated as the proportion of SNPs that could not be called.

From the Yellowstone National Park wolves in the dataset (n=19), known pedigree

relationships were used to calibrate identity by state (IBS) or similarity scores (vonHoldt

et al. 2008) to identify closely related individuals. A minimum score of IBS>0.8 indicated

a relatedness status of half-siblings and values below this level were used for identifying

a set of unrelated wild canids for subsequent analyses.

SNPs were excluded based on high pairwise genotypic associations ($r^2$) using

`PLINK` (Purcell et al. 2007) to obtain a set of unlinked SNPs for two different datasets

either including all canids (dogs, wolves, coyotes) or just for a subset of canids (wolves

and coyotes).

*Assessing appropriate K values in `STRUCTURE` analyses*

To choose an appropriate K value for presentation we evaluated likelihood

values, the parameter Δ (Evanno et al. 2005) and assessed if clusters were biologically

realistic (as emphasized in the `STRUCTURE` manual). We initially analyzed the 300

sample dataset for K=2 through 12 and observed a maximum likelihood value at K=8

(Supplemental Fig. S7A) but results through K=10 were biologically informative (Fig. 4).

The variability among replicates for K>10 was very high (Supplemental Fig. S7A) and

likelihood values decreased precipitously so that no additional biologically informative

resolution was observed (see discussion in Pritchard et al. 2000). The parameter Δ

maximized at K=3 corresponding to the three canid species of gray wolf, coyote and dog

(Supplemental Fig. S7A). To confirm the signal of admixture found in North American

canids (coyotes, gray wolves, and red wolves), we calculated the 90% probability

intervals (PI) for the membership of an individual to clusters at K=3, as this resolves dogs, coyotes and gray wolves.

All analyses demonstrated a primary partition between New and Old World wolves; consequently, we also performed separate STRUCTURE analyses to enhance resolution within each of these two groupings (see discussion in Pritchard et al. 2000). Likelihood values increased until K=7 for both analyses (Supplemental Fig. S7B,C). The parameter Δ was maximal at this value in European wolves and at K=4 in North American wolves. However, we continued to observe biological informative clusters until K=7 in North American wolves (Fig. 4) and hence present results for K=7 for both areas.

*Linkage disequilibrium analysis*

We used PLINK (--r2 --ld-window 99999 --ld-window-r2 0 --maf 0.15) excluding SNPs with MAF<15%. Inter-SNP distances (Kb) were binned into the following classes: 1.25, 2.5, 3.75, 5, 7.5, 10, 15, 20, 30, 40, 60, 80, 115, 150, 212.5, 275, 387.5, 500, 737.5, 975 and 1000Kb. Genotypic associations were averaged for each inter-SNP distance class. Because LD estimates in particular are sensitive to sample size, we explored the trend of LD with sample size for a reduced random sample of 3, 6 and 10 individuals for each population (Supplemental Fig. S6)

*Modeling ancestry and timing of admixture*

We followed previous studies that utilized subsets of ancestry informative markers (AIMs) that are diagnostic of parental populations to enhance haplotype assignment (Tian et al. 2006; Price et al. 2007; Rosenberg et al. 2010). For the analysis using the western wolf and western coyote as the ancestral reference populations, we first performed a sensitivity analysis in SABER to examine the effect of SNP diagnostic power (coyote-wolf pairwise $F_{ST}$ value) paired with chromosomal spacing density. We

018645A

ranked all 48,036 SNPs by pairwise western coyote/western gray wolf $F_{ST}$ values and established datasets containing the highest rank $F_{ST}$ SNPs for each chromosome at a range of spacing densities from 1 SNP per 70Kb to 1 SNP per 2.5Mb. We found that an average SNP density greater than ~1 SNP per 750Kb (corresponding to SNPs with $F_{ST}$ values < 0.40) resulted in decreasing average block size estimates and unstable $\tau$ estimates. Consequently, we selected a subset of 3,102 SNPs and 7,083 SNPs with $F_{ST}$ ≥ 0.4 for analysis with two and three ancestral reference populations, respectively.

We also evaluated initial prior values for the number of generations to the composite admixture event, $\tau$ ($\tau$ = 1, 10, 100, 1000 and 10000 generations) using the combined analysis option for all 38 autosomes for the four groups: Great Lakes wolves, red wolves, northeastern coyotes and midwestern/southern coyotes. For all groupings, admixture time estimates were consistent for initial setting values of $\tau$ = 1, 10 and 100, but varied extensively at higher $\tau$ values of 1000 and 10000. We selected $\tau$ = 100 as the best-fit initial parameter estimate for final analysis of admixed samples, estimates of ancestry block assignments and sizes, and $\tau$.

Among the Great Lakes wolves, red wolves and Algonquin wolves analyzed by the two-ancestor model, we found two Great Lakes wolves that did not show any assignment to coyote or joint ancestry. These two individuals also had high assignment to the non-admixed Rocky Mountains Forest and Atlantic Forest wolf populations, respectively, in STRUCTURE. Additionally, the three Isle Royale National Park wolves are admixed with coyotes to the same extent as the mainland Great Lakes wolves (~15%), but with larger $\tau$ estimates likely as a result of the significant level of inbreeding in this population (see main text and Supplemental Table S6).

We separately analyzed the ancestry of the wolves from Northern Quebec (n=10) as a possible ancestral population and individually to evaluate if they were admixed to

018646A

any extent. Using the western coyote and western wolf as ancestral populations, we found the Northern Quebec wolves to have 100% wolf assignment. When the Northern Quebec wolves were used as an ancestral reference population, ancestry assignments from SABER of the admixed canids were comparable with regard to the fraction of gray wolf and coyote ancestry, and estimates of $\tau$ are generally within a few percent (Supplemental Tables S5 and S7). Overall, the length of assigned haplotype blocks is less (but with the same between-species ratios) when Northern Quebec wolves are used as an ancestral population, which may reflect the dominance of western gray wolves in the $F_{ST}$ rankings used to choose the top ranking SNPs for the analysis.

Additionally, we repeated the analyses for the northeastern and midwestern/southern admixed coyote populations assuming three ancestral populations (dogs, western coyotes, and western gray wolves). The same ancestral western gray wolf and western coyote individuals were used as for the two-ancestor model above, with the addition of an ancestral dog reference population consisting of 12 dogs from 12 modern breeds (American Cocker Spaniel, Basset Hound, Beagle, Border Collie, Collie, Doberman Pinscher, Golden Retriever, Greyhound, Giant Schnauzer, Scottish Terrier, Standard Poodle, and Whippet). As before, we selected subsets of SNPs that had $F_{ST}$ values >0.40 for three pairwise comparisons: between western gray wolves and western coyotes, western gray wolves and dogs, and western coyotes and dogs which resulted in a final SNP density of ~1 SNP per 750Kb for 7,083 AIM SNPs across all 38 canid chromosomes.

Finally, since chromosomes with very few ancestry blocks are likely to bias the timing estimates (Tang et al. 2006), we exercised caution in interpreting small differences in admixture timing. We also note that estimating $\tau$ assumes a simple model of admixture followed by population isolation and does not necessarily capture the

018647A

complexity of intermittent gene flow or backcrossing events discussed here (Tang et al.

2006).

018648A

**Literature Cited**

Evanno G, Regnaut S, Goudet J. 2005. Detecting the number of clusters of individuals using the software STRUCTURE: a simulation study. *Mol Ecol* **14**: 2611-2620.

Fain SR, Straughan DJ, Taylor BF. 2010. Genetic outcomes of wolf recovery in the Western Great Lakes states. *Conserv Genet* DOI: 10.1007/s10592-010-0068-x.

Ferrell R, Morizot D, Horn J, Carley C. 1980. Biochemical markers in a species endangered by introgression: the red wolf. *Biochem Genet* **18**: 39-49.

Freeman R, Shaw J. 1979. Hybridization in Canis (Canidae) in Oklahoma. *Southwest Nat* **24**: 485-500.

Kays R, Curtis A, Kirchmann JJ. 2010. Rapid adaptive evolution of northeastern coyotes via hybridization with wolves. *Biol Letters* **6**: 89-93.

Koblmüller S, Nord M, Wayne RK, Leonard JA. 2009. Origin and status of the Great Lakes wolf. *Mol Ecol* **18**: 2313-2326.

Kyle CJ, Johnson AR, Patterson BR, Wilson PJ, Grewal SK, White BN. 2006. Genetic nature of eastern wolves: Past, present and future. *Conserv Genet* **7**: 273-287.

Lehman N, Eisenhawer A, Hansen K, Mech LD, Peterson RO, Gogan PJP, Wayne RK. 1991. Introgression of coyote mitochondrial DNA into sympatric North American gray wolf populations. *Evolution* **45**: 104-119.

018649A

Leonard JA, Wayne RK. 2008. Native Great Lakes wolves were not restored. *Biol Letters* **4**: 95-98.

Lindblad-Toh K, Wade C, Mikkelsen TS, Karlsson EK, Jaffe DB, Kamal M, Clamp M, Chang JL, Kulbokas EJ, Zody MC, et al. 2005. Genome sequence, comparative analysis and haplotype structure of the domestic dog. *Nature* **438**: 803-819.

McCarley H. 1962. The taxonomic status of wild canids (Canidae) in the south central United States. *Southwest Nat* **7**: 227-235.

Mech LD, Federoff N. 2002. $\alpha$-1 antitrypson polymorphism and systematics of eastern North American wolves. *Can J Zoolog* **80**: 961-963.

Mengel RM. 1971. A study of dog-coyote hybrids and implications concerning hybridization in Canis. *J Mammal* **52**: 316-336.

Nowak RM. 1979. *North American Quaternary Canis*. Monograph of the Museum of Natural History, University of Kansas.

Nowak RM. 2002. The original status of wolves in eastern North America. *Southeast Nat* **1**: 95-130.

Nowak RM. 2009. Taxonomy, morphology, and genetics of wolves in the Great Lakes region of the United States. Recovery of Gray Wolves in the Great Lakes (Eds. Wydeven AP, et al.), pp. 233-250. Springer, New York, New York.

018650A

Paradiso J. 1968. Canids recently collected in east Texas, with comments on the taxonomy of the red wolf. *Am Midl Nat* **80**: 529-535.

Price AL, Patterson N, Yu F, Cox DR, Waliszewska A, McDonald GJ, Tandon A, Schirmer C, Neubauer J, Bedoya G, et al. 2007. A genomewide admixture map for Latino populations. *Am J Hum Genet* **80**: 1024-1036.

Pritchard J, Stephens M, Donnelly P. 2000. Inference of population structure using multilocus genotype data. *Genetics* **155**: 945-959.

Purcell S, Neale B, Todd-Brown K, Thomas L, Ferreira MA, Bender D, Maller J, Sklar P, de Bakker PI, Daly MJ, et al. 2007. PLINK: a tool set for whole-genome association and population-based linkage analyses. *Am J Hum Genet* **81**: 559-575.

Reich D, Wayne RK, Goldstein DB. 1999. Genetic evidence for a recent origin by hybridization of red wolves. *Mol Ecol* **8**: 139-144.

Rosenberg NA, Huang L, Jewett EM, Szpiech Z, Jankovic I, Boehnke M. 2010. Genome-wide association studies in diverse populations. *Nat Rev Genet* **11**: 356-366.

Roy M, Geffen E, Smith D, Ostrander EA, Wayne RK. 1994. Patterns of differentiation and hybridization in North American wolflike canids, revealed by analysis of microsatellite loci. *Mol Biol Evol* **11**: 553-570.

018651A

Roy MS, Geffen E, Smith D, Wayne RK. 1996. Molecular genetics of pre-1940 red wolves. *Conserv Biol* **10**: 1413-1424.

Rutledge L, Garroway CJ, Loveless KM, Patterson BR. 2010a. Genetic differentiation of eastern wolves in Algonquin Park despite bridging gene flow between coyotes and grey wolves. *Heredity* DOI: 10.1038/hdy.2010.6.

Rutledge L, Bos K, Pearce R, White BN. 2010b. Genetic and morphometric analysis of sixteenth century *Canis* skull fragments: implications for historic eastern and gray wolf distribution in North America. *Conserv Genet* **11**: 1273-1281.

Tang H, Coram M, Wang P, Zhu X, Risch N. 2006. Reconstructing genetic ancestry blocks in admixed individuals. *Am J Hum Genet* **79**: 1-12.

Tian C, Hinds DA, Shigeta R, Kittles R, Ballinger DG, Seldin MF. 2006. A genomewide single-nucleotide-polymorphism panel with high ancestry information for African American admixture mapping. *Am J Hum Genet* **79**: 640-649.

vonHoldt B, Stahler D, Smith DW, Earl DA, Pollinger JP, Wayne RK. 2008. The genealogy and genetic viability of reintroduced Yellowstone grey wolves. *Mol Ecol* **17**: 252-274.

vonHoldt B, Pollinger JP, Lohmueller KE, Han E, Parker HG, Quignon P, Degenhardt JD, Boyko AR, Earl DA, Auton A, et al. 2010. Genome-wide SNP and haplotype analyses reveal a rich history underlying dog domestication. *Nature* **464**: 898-902.

018652A

Wayne RK, Jenks S. 1991. Mitochondrial DNA analysis implying extensive hybridization of the endangered red wolf *Canis rufus. Nature* **351**: 565-568.

Wheeldon T, White B. 2009. Genetic analysis of historic western Great Lakes region wolf samples reveals early Canis lupus/Canis lycaon hybridization. *Biol Letters* **5**: 101-104.

Wilson P, Grewal S, Lawford ID, Heal JNM. 2000. DNA profiles of the eastern Canadian wolf and the red wolf provide evidence for a common evolutionary history independent of the gray wolf. *Can J Zoolog* **78**: 2156-2166.

Wilson GA, Rannala B. 2003. Bayesian inference of recent migration rates using multilocus genotypes. *Genetics* **163**: 1177-1191.

Wilson PJ, Grewal SK, Mallory FF, White BN. 2009. Genetic characterization of hybrid wolves across Ontario. *J Hered* **100**: S80-S89.

018653A

**SUPPLEMENTAL FIGURE LEGENDS**

Supplemental Figure S1. Plot of 10 principal components for all canids for the 48K SNP dataset.

Supplemental Figure S2. Principal component analysis of the 48K SNP dataset: Old and New World wolves (**A**); Old World wolves (**B**); North American wolves (**C**); and all coyotes (**D**). Abbreviations: AL, Alabama; BC, British Columbia; CA, California; CT, Connecticut; IL, Illinois; IRNP, Isle Royale National Park; LA, Louisiana; OH, Ohio; MB, Manitoba; MS, Mississippi; NH, New Hampshire; NY, New York; QC, Quebec; UT, Utah; VA, Virginia; VT, Vermont; and WA, Washington.

Supplemental Figure S3. PCA plots for the 48K SNP dataset: Old and New World wolves (**A**); Old World wolves (**B**); North American wolves (**C**); coyotes (**D**); North American canids (**E**); and North American canids excluding Mexican wolves (**F**).

Supplemental Figure S4. Principal component analysis of 710 SNPs ascertained by comparing dog genome sequence with that of wolf or coyote (see vonHoldt et al 2010).

Supplemental Figure S5. Neighbor-joining cladograms (**A**) and phylograms (**B**) utilizing the 48K SNP dataset for non-admixed wolf (**left**) and coyote populations (**right**). Bootstrap support >95% of 1,000 replicates are indicated as dots on branches. Branch colors either represent habitats in North American wolves (light blue, coastal forest; green, temperate forest; red, rocky mountain forest; purple, tundra/taiga; brown, aridlands) or localities. Outgroups are the coyote (**left**) and a golden jackal (**right**). (Lindblad-Toh et al. 2005).

Supplemental Figure S6. Average decay of LD (genotypic association, $r^2$) with increasing inter-SNP distance (Kb) for all North American canid populations with a random sampling of 10 (top), 6 (middle), and 3 (lower) individuals per population. If a population size was smaller than these sample sizes, it was excluded.

Supplemental Figure S7. Plot of log likelihood (red line) and delta K (blue line) (Evanno et al. 2005): complete dataset in Figure 4 (**A**); North American gray wolves (**B**); and Eurasian gray wolves (**C**).

Supplemental Figure S8. Histogram of ancestry block sizes, mean block size, genome-wide ancestry (%), and number of generations since admixture.

Supplemental Figure S1.



018655A

Supplemental Figure S2.



Supplemental Figure S3.
A.



B.

Supplemental Figure S3 (*continued*).
C.



D.



Supplemental Figure S3 (*continued*).
E.



F.

Supplemental Figure S4.



018660A

Supplemental Figure S5.



Supplemental Figure S6.



Supplemental Figure S7.

A.



B.



C.



Supplemental Figure S8.



21
018664A

Supplemental Table S1. Summary of taxonomic investigations of the red wolf (**A**) and Great Lakes wolf (**B**).

A.

| Reference* | Year | Approach | Taxonomic Conclusion | Hybridization** |
|---|---|---|---|---|
| *Red wolf* | | | | |
| 1 | 1937 | morphology | Unique species – gray wolf ancestry | Recent, minor |
| 2 | 1962 | morphology | Unique species, one subspecies is coyote-red wolf hybrid | Recent, hybrid swam |
| 3 | 1967 | morphology | Subspecies of gray wolf | Recent, hybrid swam |
| 4 | 1968 | morphology | Subspecies of coyote | Recent, hybrid swam |
| 5 | 1970 | Review of data | Gray wolf-coyote hybrid | Recent, hybrid swam |
| 6,7 | 1971,1978 | Brain morphology | Unique species – gray wolf ancestry | - |
| 8,9 | 1974,1978 | morphology | Unique species – gray wolf ancestry | Recent, hybrid swam |
| 10 | 1977 | morphology | Unique species | Recent, hybrid swam |
| 11 | 1979 | morphology | Unique species – gray wolf ancestry | Recent, extensive |
| 12-15 | 1979,1992,2002,2009 | morphology | Unique species – gray wolf ancestry | Recent, extensive |
| 16 | 1980 | morphology | Unique species | Recent, hybrid swam |
| 17 | 1991 | mtDNA | Gray wolf – coyote hybrid | Recent, hybrid swam |
| 18,19 | 1994,1996 | mtDNA, microsatellites | Gray wolf – coyote hybrid | Recent, hybrid swam |
| 20 | 1998 | microsatellites | Unique species – coyote ancestry | Recent |
| 21 | 1999 | microsatellites | Gray wolf – coyote hybrid | Ancient/recent, hybrid swam |
| 22-24 | 2000,2006,2008 | mtDNA, microsatellites | Hybrid species, possibly conspecific w/ coyotes | Recent, extensive |
| 25 | 2002 | protein electrophoresis | Unique species – coyote ancestry | Recent, extensive |
| 26 | 2002 | MHC | Closely related to coyotes | Recent |

Supplemental Table S1 (*continued*).

B.

| Reference* | Year | Approach | Taxonomic Conclusion | Hybridization** |
|---|---|---|---|---|
| *Great Lakes wolf* | | | | |
| 1 | 1937 | morphology | Gray wolf subspecies | Minor |
| 27 | 1971 | morphology | Gray wolf subspecies | Recent |
| 28 | 1975 | morphology | Gray wolf-coyote hybrid | Recent, extensive |
| 29 | 1985 | morphology | Gray wolf subspecies | Recent, extensive |
| 18,30 | 1991,1994 | mtDNA, microsatellites | Gray wolf – coyote hybrid | Recent, hybrid swam |
| 22-24,31,32 | 2000, 2003, 2006, 2008, 2009 | mtDNA, microsatellites | Unique species likely conspecific with red wolf – coyote ancestry | Recent, extensive |
| 13,14 | 2002, 2009 | morphology | Gray wolf subspecies | Recent, extensive |
| 25 | 2002 | protein electrophoresis | Gray wolf species or subspecies | Ancient |
| 33 | 2008 | mtDNA | - | Ancient/recent, hybrid swam |
| 34,35 | 2008, 2010 | Body size, review | Unique species | Recent, extensive |
| 36 | 2010 | morphology, mtDNA | -- | Recent, hybrid swam |
| 37 | 2009 | mtDNA, microsatellites | Gray wolf subspecies | Ancient/recent, extensive |
| 38-41 | 2009, 2010 | morphology, ancient and recent mtDNA | Unique species – coyote ancestry | Ancient/recent, extensive |
| 42 | 2009 | mtDNA, microsatellites | Unique species – coyote ancestry | Ancient/recent, extensive |
| 43 | 2010 | mtDNA, microsatellites | Unique species | Ancient/recent, extensive |

*We have cited multiple references in some rows to represent efforts of specific research groups, and in cases where data and analyses overlap considerably. However, many authors are often shared between papers in different rows.

**Hybridization with gray wolves, coyotes or both species. Recent, <500 years; Extensive, reported from multiple localities or a large geographic area; hybrid swam, hybridization throughout most of the population and/or the term specifically used by authors to describe the population.

Literature Cited: 1. Goldman 1937; 2. McCarley 1962; 3. Lawrence and Bossert 1967; 4. Paradiso 1968; 5. Mech 1970; 6. Atkins and Dillon 1971; 7. Atkins 1978; 8. Gipson et al. 1974; 9. Gipson 1978; 10. Elder and Hayden 1977; 11. Freeman and Shaw 1979; 12. Nowak 1979; 13. Nowak 2002; 14. Nowak 2009; 15. Nowak 1992; 16. Ferrell et al. 1980; 17. Wayne and Jenks 1991; 18. Roy et al. 1994; 19. Roy et al. 1996; 20. Bertorelle and Excoffier 1998; 21. Reich et al. 1999; 22. Wilson et al. 2000; 23. Kyle et al. 2006; 24. Kyle et al. 2008; 25. Mech and Federoff 2002; 26. Hedrick et al. 2002; 27. Mengel 1971; 28. Kolenosky and Stanfield 1975; 29. Schmitz and Kolenosky 1985; 30. Lehman et al. 1991; 31. Wilson et al. 2009; 32. Wilson and Rannala 2003; 33. Leonard and Wayne 2008; 34. Mech and Paul 2008; 35. Mech 2010; 36. Kays et al. 2010; 37. Koblmüller et al. 2009; 38. Rutledge et al. 2009; 39. Rutledge et al. 2010a; 40. Rutledge et al. 2010b; 41. Rutledge et al. 2010c; 42. Wheeldon and White 2009; and 43. Fain et al. 2010.

Supplemental Table S2. Number (N) of domestic and wild canids genotyped on the canine SNP array.

| Common Name | | N | Populations* |
|---|---|---|---|
| *Canis familiaris* | domestic dog | 912 | Worldwide |
| *Canis aureus* | golden jackal | 2 | Kenya, Africa |
| *Canis mesomelas* | black-backed jackal | 6 | South (2) and East (4) Africa |
| *Canis adustus* | side-striped jackal | 1 | Kenya, Africa |
| *Canis simensis* | Ethiopian wolf | 4 | Ethiopia, Africa |
| *Canis rufus* | red wolf | 12 | Captive colony |
| *Canis latrans* | *coyote* | 57 | |
| | midwestern/southern | 19 | Alabama (2), Illinois (5), Louisiana (3), Mississippi (2), Ohio (3), Virginia (4) |
| | northeastern | 13 | Connecticut (1), New Hampshire (1), New York (8), Quebec (1), Vermont (2) |
| | western | 25 | Alaska (2), California (12), Manitoba (5), Utah (2), Washington (4) |
| *Canis lupus* | *gray wolf* | 208 | |
| Western and eastern North America | | 3 | Alaska |
| | | 10 | North Quebec |
| | | 18 | Yellowstone NP |
| | | 26 | Canada |
| | | 3 | British Columbia |
| | Great Lakes | 19 | Isle Royale NP (3), Algonquin NP (2), Minnesota (11), southern Quebec (1), Ontario (2), and Wisconsin (4) |
| Balkans, eastern and northern Europe | | 57 | Belarus (7), Bulgaria (3), Croatia (3), Greece (1), Lithuania (1), Poland (8), Russia (18), Slovakia (3), Sweden (2), and Ukraine (11) |
| | | 20 | Italy |
| | | 10 | Spain |
| | Middle East | 16 | Israel (8), Oman (3), and Saudi Arabia (5) |
| | southwest Asia | 6 | India (3), Iran (2), and Turkey (1) |
| | China | 10 | |
| | Mexican wolf | 10 | Aragon (2), Ghost Ranch (3) and Studbook (5) lineages |

*sample size per population is indicated in parentheses

Supplemental Table S3. $F_{ST}$ for the 48K SNP dataset in North American canids (**A**), North American wolf populations (**B**), and Old World wolf populations (**C**; boxed areas represent Middle East, *upper left*, and Europe, *lower right*).

**A.**

| Group | midwestern/ southern coyote | northeastern coyote | western wolf | Great Lakes wolf | Mexican wolf | Red wolf |
|---|---|---|---|---|---|---|
| western coyote | 0.03 | 0.05 | 0.14 | 0.11 | 0.18 | 0.10 |
| midwestern/southern coyote | | 0.02 | 0.12 | 0.08 | 0.15 | 0.08 |
| northeastern coyote | | | 0.11 | 0.08 | 0.15 | 0.09 |
| western wolf | | | | 0.05 | 0.10 | 0.12 |
| Great Lakes wolf | | | | | 0.11 | 0.11 |
| Mexican wolf | | | | | | 0.18 |
| Red wolf | | | | | | |

**B.**

| Group | BC | Canada | N Quebec | Yellowstone | Algonquin | IRNP | Minnesota | Ontario | Wisconsin |
|---|---|---|---|---|---|---|---|---|---|
| Alaska | 0.07 | 0.01 | 0.06 | 0.03 | 0.04 | 0.10 | 0.04 | 0.00 | 0.06 |
| British Columbia | | 0.06 | 0.11 | 0.08 | 0.10 | 0.16 | 0.08 | 0.07 | 0.10 |
| Canada | | | 0.05 | 0.03 | 0.03 | 0.07 | 0.05 | 0.01 | 0.05 |
| N Quebec | | | | 0.08 | 0.05 | 0.11 | 0.07 | 0.00 | 0.08 |
| Yellowstone | | | | | 0.05 | 0.10 | 0.07 | 0.03 | 0.08 |
| Algonquin | | | | | | 0.12 | 0.01 | 0.00 | 0.04 |
| IRNP | | | | | | | 0.04 | 0.09 | 0.07 |
| Minnesota | | | | | | | | 0.02 | 0.00 |
| Ontario | | | | | | | | | 0.01 |

25

018668A

Supplemental Table S3 (continued).

C.

| Group | India | Iran | Israel | Oman | Turkey | Belarus | Bulgaria | Croatia | Greece | Italy | Lithuania | Poland | Russia | Slovakia | Spain | Sweden | Ukraine | China |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Saudi Arabia | 0.16 | 0.13 | 0.10 | 0.08 | 0.09 | 0.12 | 0.13 | 0.14 | 0.12 | 0.21 | 0.11 | 0.12 | 0.11 | 0.14 | 0.17 | 0.13 | 0.11 | 0.12 |
| India | | 0.01 | 0.09 | 0.12 | 0.14 | 0.09 | 0.11 | 0.11 | 0.16 | 0.19 | 0.15 | 0.09 | 0.07 | 0.12 | 0.15 | 0.14 | 0.06 | 0.08 |
| Iran | | | 0.05 | 0.07 | 0.11 | 0.05 | 0.06 | 0.02 | 0.13 | 0.16 | 0.13 | 0.05 | 0.04 | 0.09 | 0.13 | 0.13 | 0.01 | 0.05 |
| Israel | | | | 0.06 | -0.02 | 0.07 | 0.06 | 0.07 | 0.01 | 0.18 | 0.00 | 0.07 | 0.07 | 0.08 | 0.13 | 0.05 | 0.06 | 0.08 |
| Oman | | | | | -0.03 | 0.07 | 0.06 | 0.03 | 0.00 | 0.20 | -0.01 | 0.08 | 0.08 | 0.09 | 0.15 | 0.07 | 0.05 | 0.08 |
| Turkey | | | | | | -0.03 | -0.05 | -0.17 | 0.00 | 0.10 | 0.00 | -0.03 | -0.02 | 0.00 | 0.06 | 0.08 | -0.08 | -0.03 |
| Belarus | | | | | | | 0.01 | 0.04 | -0.04 | 0.15 | -0.06 | 0.01 | 0.00 | 0.02 | 0.09 | 0.01 | 0.00 | 0.05 |
| Bulgaria | | | | | | | | -0.02 | -0.07 | 0.15 | -0.06 | 0.01 | 0.01 | 0.02 | 0.10 | 0.03 | -0.02 | 0.04 |
| Croatia | | | | | | | | | -0.17 | 0.21 | -0.18 | 0.04 | 0.06 | 0.02 | 0.14 | -0.01 | 0.00 | 0.06 |
| Greece | | | | | | | | | | 0.09 | 0.00 | -0.04 | -0.02 | 0.06 | 0.06 | 0.08 | -0.09 | -0.02 |
| Italy | | | | | | | | | | | 0.09 | 0.14 | 0.12 | 0.16 | 0.16 | 0.11 | 0.14 | 0.16 |
| Lithuania | | | | | | | | | | | | -0.06 | -0.04 | -0.01 | 0.05 | 0.07 | -0.11 | -0.03 |
| Poland | | | | | | | | | | | | | 0.01 | 0.01 | 0.09 | 0.01 | 0.00 | 0.05 |
| Russia | | | | | | | | | | | | | | 0.02 | 0.08 | 0.00 | 0.01 | 0.05 |
| Slovakia | | | | | | | | | | | | | | | 0.11 | 0.00 | -0.01 | 0.05 |
| Spain | | | | | | | | | | | | | | | | 0.08 | 0.08 | 0.12 |
| Sweden | | | | | | | | | | | | | | | | | -0.02 | 0.03 |
| Ukraine | | | | | | | | | | | | | | | | | | 0.04 |

Supplemental Table S4. Analysis of molecular variation for groupings of coyote and wolf populations (df = degrees of freedom, SS = sum of squares; *p<0.05; **p<0.001).

| Groupings[‡] | Grouping tested | df | SS | Variance component | Percent of variation | Fixation Index |
|---|---|---|---|---|---|---|
| 1. All wolves: (Old World wolves)(North American wolves) | Among groups | 1 | 1.7 | 0.01* | 4.7 | $F_{ST}$ = 0.19 |
| | Among populations within groups | 5 | 2.3 | 0.02** | 14.2 | |
| | Within populations | 202 | 21.3 | 0.11** | 81.1 | |
| 2. Old World wolves: (China)(Europe)(Middle East, SW Asia) | Among groups | 2 | 1.0 | 0.01* | 6.0 | $F_{ST}$ = 0.27 |
| | Among populations within groups | 15 | 3.6 | 0.03** | 21.0 | |
| | Within populations | 95 | 8.8 | 0.09** | 73.0 | |
| 3. Old World wolves: (Italy)(Spain)(SW Asia)(China) | Among groups | 3 | 1.7 | 0.01 | 9.0 | $F_{ST}$ = 0.39 |
| | Among populations within groups | 2 | 0.3 | 0.04* | 30.2 | |
| | Within populations | 39 | 3.0 | 0.08** | 60.8 | |
| 4. North American wolves: (Western)(Great Lakes)(Mexican wolf) | Among groups | 2 | 0.9 | 0.01** | 10.4 | $F_{ST}$ = 0.24 |
| | Among populations within groups | 8 | 1.4 | 0.02** | 13.8 | |
| | Within populations | 60 | 5.3 | 0.09** | 75.8 | |
| 5. North American canids: (BC, N Quebec, Great Lakes, Mexican wolf, red wolf)(coyotes) | Among groups | 1 | 1.2 | 0.01 | 10.4 | $F_{ST}$ = 0.30 |
| | Among populations within groups | 6 | 2.2 | 0.02** | 19.1 | |
| | Within populations | 106 | 8.6 | 0.08** | 70.5 | |
| 6. North American canids: (BC, N Quebec, Great Lakes, Mexican wolf)(coyotes, red wolf) | Among groups | 1 | 1.3 | 0.02* | 14.0 | $F_{ST}$ = 0.31 |
| | Among populations within groups | 6 | 2.1 | 0.02** | 16.9 | |
| | Within populations | 106 | 8.6 | 0.08** | 69.1 | |

[‡]Groupings: *Old World wolves:* 1. Belarus, 2. Bulgaria, 3. Croatia, 4. Italy, 5. Poland, 6. Russia, 7. Slovakia, 8. Spain, 9. Sweden, 10. Ukraine, 11. Saudi Arabia, 12. Oman, 13. Israel, 14. India 15. Iran, 16. Turkey, 17. China; [Europe: 1-10] [Middle East: 11-13] [SW Asia: 14-16]; *North American wolves:* 18. Alaska, 19. British Columbia, 20. Canada Forest, 21. Canada Tundra, 22. North Quebec, 23. Yellowstone NP, 24. Algonquin, 25. IRNP, 26. Minnesota, 27. Quebec, 28. Ontario, 29. Wisconsin [western: 18-23] [Great Lakes: 24-29]; 30. Mexican wolf; *Coyotes:* 31. western, 32. midwestern/southern, 33. northeastern; and 34. Red wolf.

018670A

Supplemental Table S5. Haplotype block size (standard error, SE), generations since admixture ($\tau$) and genome-wide ancestry per individual. Joint indicates an assignment to both coyote and wolf ancestry.

| Individual | Coyote block (Kb) | Joint block (Kb) | Wolf block (Kb) | Coyote $\tau$ | Wolf $\tau$ | Coyote Ancestry (%) | Wolf Ancestry (%) |
|---|---|---|---|---|---|---|---|
| *Reference populations* | | | | | | | |
| western coyote (n=12) | | | | | | 100 | 0 |
| western gray wolf (n=12) | | | | | | 0 | 100 |
| *Algonquin wolf* | | | | | | | |
| 1 | 2783.5 | 4547.3 | 3466.3 | 125 | 125 | 44.1 | 55.9 |
| 2 | 3032.8 | 3291.8 | 4446.1 | 75.2 | 75.2 | 39.7 | 60.3 |
| Average (SE) | 6592.2 (280) | 3597.5 (100) | 3446.9 (134) | 100.1 (24.9) | 100.1 (24.9) | 41.9 (2.2) | 58.1 (2.2) |
| *Red wolf* | | | | | | | |
| 1 | 6470.3 | 3125.9 | 2612.2 | 148.9 | 192.8 | 76.8 | 23.2 |
| 2 | 6542.3 | 3243.0 | 2510.1 | 128.1 | 161.5 | 77.2 | 22.8 |
| 3 | 6183.7 | 2815.6 | 2549.7 | 124.9 | 156.3 | 75.3 | 24.7 |
| 4 | 6131.6 | 3534.8 | 2367.4 | 135.8 | 173.8 | 74.3 | 25.7 |
| 5 | 6286.3 | 3420.5 | 2502.3 | 128.5 | 162.3 | 74.9 | 25.1 |
| 6 | 6330.0 | 2680.0 | 2292.0 | 148.6 | 192.6 | 78.1 | 21.9 |
| 7 | 5739.0 | 3084.4 | 2416.6 | 140.3 | 180.5 | 75.1 | 24.9 |
| 8 | 5970.2 | 3180.8 | 2248.3 | 155.9 | 202.9 | 75.3 | 24.7 |
| 9 | 6449.2 | 3132.5 | 2379.9 | 133.6 | 170.3 | 76.2 | 23.8 |
| 10 | 6044.2 | 2978.2 | 2226.5 | 157.8 | 205.3 | 76.9 | 23.1 |
| 11 | 6162.7 | 2820.5 | 2600.0 | 146.5 | 189.5 | 76.2 | 23.8 |
| 12 | 6123.6 | 2933.6 | 2103.4 | 178.7 | 233.7 | 77.7 | 22.3 |
| Average (SE) | 6197.5 (115) | 3101.3 (52) | 2396.9 (49) | 143.5 (4.5) | 184.4 (6.5) | 76.1 (0.3) | 23.9 (0.3) |
| *Great Lakes wolf* | | | | | | | |
| 1 | 2066.9 | 3241.2 | 8459.0 | 254.5 | 194.5 | 15.7 | 84.3 |
| 2 | 2139.2 | 2883.0 | 9731.4 | 355.7 | 273.9 | 14.3 | 85.7 |
| 3 | 2006.2 | 3348.6 | 9482.4 | 272.7 | 208.3 | 14.4 | 85.6 |
| 4 | 2151.8 | 3324.4 | 9245.6 | 394.9 | 304.6 | 15.7 | 84.3 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 5 | 1710.8 | 3041.2 | 1014.0 | 277.4 | 212.7 | 13.4 | 86.6 |
| 6 | 1837.8 | 2983.8 | 9581.2 | 341.1 | 262.6 | 14.2 | 85.8 |
| 7 | 2180.9 | 2871.9 | 9358.9 | 341.8 | 262.8 | 14.6 | 85.4 |
| 8 | 2163.1 | 3132.1 | 1028.4 | 271.5 | 207.6 | 14.6 | 85.4 |
| 9 | 1870.8 | 2818.3 | 9725.5 | 243.9 | 186.5 | 14.8 | 85.2 |
| 10 | 2340.2 | 2939.8 | 1052.1 | 197.9 | 152.3 | 14.1 | 85.9 |
| 11 | 2162.5 | 2838.4 | 9340.6 | 417.6 | 322.2 | 13.9 | 86.1 |
| 12 | 2136.4 | 2924.6 | 10744.8 | 222.9 | 170.7 | 14.0 | 86.0 |
| 13 | 1387.0 | 2178.1 | 4884.7 | 102.7 | 100.8 | 19.5 | 80.5 |
| 14 | 1408.9 | 1683.9 | 6538.1 | 231.5 | 177.3 | 13.5 | 87.0 |
| 15 | 1383.3 | 1789.6 | 6968.6 | 166.8 | 131.3 | 13.7 | 86.3 |
| 16 | 1420.3 | 1560.1 | 5827.9 | 489.9 | 378.8 | 15.5 | 84.5 |
| 17 | 1602.8 | 1445.9 | 6199.2 | 435.8 | 336.7 | 16.2 | 83.8 |
| 18 | 1483.1 | 1809.0 | 5693.4 | 323.5 | 248.0 | 16.7 | 83.3 |
| Average (SE) | 1735.5 (35) | 2541.2 (45) | 8016.3 (135) | 296.7 (24) | 229.5 (18) | 14.9 (0.3) | 85.1 (0.4) |

29
018672A

30
018673A

Supplemental Table S6. Analysis of genome-wide ancestry for the admixed coyote populations assuming three non-admixed ancestral populations.

| Individual | Location/Population | Coyote $\tau$ | Wolf $\tau$ | Dog $\tau$ | Coyote Ancestry (%) | Wolf Ancestry (%) | Dog Ancestry (%) |
|---|---|---|---|---|---|---|---|
| *Reference populations* | | | | | | | |
| domestic dog (n=12) | | | | | 0 | 0 | 100 |
| western coyote (n=12) | | | | | 100 | 0 | 0 |
| western gray wolf (n=12) | | | | | 0 | 100 | 0 |
| *northeastern coyote* | | | | | | | |
| 1 | New York | 41.3 | 109.5 | 12.7 | 80.2 | 7.0 | 12.8 |
| 2 | Quebec | 111.9 | 64.7 | 11.4 | 81.8 | 9.4 | 8.8 |
| 3 | Vermont | 220.8 | 60.1 | 11.4 | 84.5 | 9.6 | 5.9 |
| 4 | Vermont | 54.5 | 64.0 | 15.2 | 84.2 | 8.3 | 7.5 |
| 5 | New York | 81.8 | 48.5 | 17.0 | 82.0 | 6.6 | 11.4 |
| 6 | Connecticut | 149.7 | 74.3 | 14.5 | 81.1 | 6.9 | 12.0 |
| 7 | New York | 52.6 | 87.9 | 17.4 | 84.1 | 10.7 | 5.2 |
| 8 | New York | 71.7 | 142.0 | 21.3 | 82.8 | 6.5 | 10.7 |
| 9 | New York | 147.2 | 88.4 | 11.1 | 83.7 | 10.0 | 6.3 |
| 10 | New York | 63.3 | 50.6 | 19.6 | 82.3 | 6.4 | 11.3 |
| 11 | New York | 125.8 | 129.4 | 16.5 | 80.0 | 9.7 | 10.3 |
| 12 | New York | 24.5 | 71.5 | 10.5 | 81.1 | 8.6 | 10.3 |
| 13 | New Hampshire | 101.9 | 123.1 | 24.1 | 80.6 | 13.1 | 6.3 |
| Average (SE) | | 95.9 (15.2) | 50.6 (11.6) | 15.6 (1.2) | 82.2 (0.4) | 8.7 (0.6) | 9.1 (0.7) |
| *midwestern/southern coyote* | | | | | | | |
| 1 | Illinois | 200.1 | 595.6 | 17.9 | 92.7 | 1.3 | 6.0 |
| 2 | Illinois | 45.6 | 145.2 | 16.3 | 94.5 | 1.4 | 4.1 |
| 3 | Illinois | 113.9 | 173.1 | 38.3 | 96.3 | 0.4 | 3.3 |
| 4 | Illinois | 94.2 | 91.9 | 21.0 | 93.0 | 1.1 | 5.9 |
| 5 | Illinois | 101.0 | 221.6 | 8.3 | 97.8 | 0.3 | 1.9 |
| 6 | Virginia | 17.9 | 66.4 | 9.3 | 80.7 | 2.4 | 16.9 |
| 7 | Virginia | 89.6 | 93.5 | 11.4 | 83.1 | 2.9 | 14.0 |
| 8 | Virginia | 46.2 | 138.5 | 12.0 | 86.0 | 2.3 | 11.7 |
| 9 | Virginia | 75.6 | 43.7 | 7.2 | 90.2 | 1.0 | 8.8 |
| 10 | Alabama | 101.1 | 147.2 | 18.4 | 90.8 | 3.8 | 5.4 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 11 | Alabama | 7.6 | 89.6 | 14.7 | 89.8 | 2.1 | 8.1 |
| 12 | Louisiana | 96.2 | 114.3 | 10.1 | 92.5 | 5.2 | 2.3 |
| 13 | Louisiana | 193.7 | 118.0 | 7.4 | 93.5 | 4.2 | 2.3 |
| 14 | Louisiana | 65.2 | 138.1 | 14.4 | 90.6 | 6.4 | 3.0 |
| 15 | Mississippi | 19.4 | 205.4 | 12.5 | 92.1 | 5.0 | 2.9 |
| 16 | Mississippi | 7.0 | 39.0 | 12.5 | 90.4 | 2.1 | 7.5 |
| 17 | Ohio | 63.1 | 78.6 | 20.4 | 90.4 | 0.9 | 8.7 |
| 18 | Ohio | 31.8 | 86.4 | 15.9 | 84.9 | 1.6 | 13.5 |
| 19 | Ohio | 62.6 | 72.3 | 9.4 | 81.8 | 1.5 | 16.7 |
| Average (SE) | | 75.4 (12.5) | 139.9 (27.8) | 14.6 (1.6) | 90.1 (1.1) | 2.4 (0.4) | 7.5 (1.1) |

31
018674A

Supplemental Table S7. Haplotype block size (standard error, SE), generations since admixture ($\tau$) and genome-wide ancestry per individual. Joint indicates an assignment to both western coyote and Northern Quebec gray wolf ancestry.

| Individual | Coyote block (Kb) | Joint block (Kb) | Wolf block (Kb) | Coyote $\tau$ | Wolf $\tau$ | Coyote Ancestry (%) | Wolf Ancestry (%) |
|---|---|---|---|---|---|---|---|
| *Reference populations* | | | | | | | |
| western coyote (n=12) | | | | | | 100 | 0 |
| Northern Quebec gray wolf (n=12) | | | | | | 0 | 100 |
| *Algonquin wolf* | | | | | | | |
| 1 | 1732 | 2367 | 2221 | 100.0 | 100.1 | 43.2 | 56.8 |
| 2 | 1788 | 1907 | 2791 | 74.8 | 74.9 | 39.5 | 60.5 |
| Average (SE) | 1760 (28) | 2137 (230) | 2506 (285) | 87.4 (12.6) | 87.4 (12.6) | 41.4 (1.9) | 58.7 (1.9) |
| *Red wolf* | | | | | | | |
| 1 | 4643 | 1997 | 1768 | 135.0 | 172.4 | 78.2 | 21.8 |
| 2 | 4618 | 1777 | 1654 | 133.7 | 170.5 | 79.0 | 21.0 |
| 3 | 4163 | 1861 | 1703 | 121.1 | 149.9 | 76.4 | 23.6 |
| 4 | 4345 | 1899 | 1816 | 135.5 | 173.2 | 76.9 | 23.1 |
| 5 | 4381 | 1923 | 1705 | 127.8 | 161.1 | 77.1 | 22.9 |
| 6 | 4303 | 2028 | 1517 | 148.5 | 192.4 | 78.1 | 21.9 |
| 7 | 4230 | 2020 | 1686 | 124.1 | 155.1 | 76.2 | 23.8 |
| 8 | 4498 | 1812 | 1615 | 152.0 | 197.3 | 77.2 | 22.8 |
| 9 | 4569 | 1804 | 1839 | 129.8 | 164.3 | 78.0 | 22.0 |
| 10 | 4182 | 1917 | 1452 | 154.2 | 200.3 | 78.1 | 21.9 |
| 11 | 4406 | 1799 | 1649 | 135.5 | 173.3 | 77.4 | 22.6 |
| 12 | 4582 | 2017 | 1585 | 161.3 | 210.3 | 78.5 | 21.5 |
| Average (SE) | 4410 (49) | 1905 (27) | 1666 (33) | 138.2 (3.7) | 176.7 (5.5) | 77.6 (0.3) | 22.4 (0.9) |
| *Great Lakes wolf* | | | | | | | |
| 1 | 1298 | 1739 | 6062 | 378.7 | 290.1 | 14.5 | 85.5 |
| 2 | 1390 | 1599 | 6476 | 416.3 | 321.5 | 13.8 | 86.2 |
| 3 | 1447 | 1743 | 6468 | 393.5 | 302.1 | 13.7 | 86.3 |

018675A

33
018676A

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 4 | 1404 | 1663 | 6122 | 379.9 | 291.9 | 15.0 | 85.0 |
| 5 | 1306 | 1750 | 6535 | 289.0 | 221.3 | 13.4 | 86.6 |
| 6 | 1184 | 1637 | 5860 | 478.9 | 371.3 | 13.8 | 86.2 |
| 7 | 1219 | 1602 | 5872 | 408.2 | 315.2 | 14.1 | 85.9 |
| 8 | 1376 | 1791 | 6627 | 268.4 | 205.1 | 13.5 | 86.5 |
| 9 | 1193 | 1725 | 6214 | 345.7 | 265.7 | 13.9 | 86.1 |
| 10 | 1320 | 1375 | 5979 | 240.6 | 183.8 | 13.8 | 86.2 |
| 11 | 1299 | 1640 | 6905 | 353.1 | 271.5 | 13.0 | 87.0 |
| 12 | 1348 | 1703 | 6847 | 257.9 | 197.3 | 14.1 | 85.9 |
| 13 | 1444 | 2136 | 4733 | 137.2 | 114.3 | 20.2 | 79.8 |
| 14 | 1321 | 1646 | 6972 | 235.7 | 180.3 | 12.5 | 87.5 |
| 15 | 1324 | 1837 | 6463 | 217.2 | 166.5 | 14.1 | 85.9 |
| 16 | 1421 | 1625 | 6070 | 445.5 | 343.3 | 15.2 | 84.8 |
| 17 | 1559 | 1580 | 6322 | 416.8 | 321.0 | 15.7 | 84.3 |
| 18 | 1411 | 1847 | 6049 | 339.4 | 260.6 | 15.8 | 84.2 |
| Average (SE) | 1348 (23) | 1702 (36) | 6254 (121) | 333.4 (21.7) | 256.8 (16.6) | 14.5 (0.4) | 85.6 (0.4) |

**State of Wisconsin**
DEPARTMENT OF NATURAL RESOURCES
101 S. Webster Street
Box 7921
Madison WI 53707-7921

Scott Walker, Governor
Cathy Stepp, Secretary
Telephone 608-266-2621
FAX 608-267-3579
TTY Access via relay - 711



September 12, 2011

Public Comments Processing
Attn.: Docket No. [FWS-R3-ES-2011-0029]
Division of Policy and Directive Management
U.S. Fish and Wildlife Service
4401 N. Fairfax Drive, MS2042-PDM
Arlington, VA 22203

      Subject: Reopening of Comment Period on Proposed Rule to revise listing of Gray Wolves in the Western
            Great Lakes  (Fed. Reg. 8/26/11), and review of paper on wolf genetics and taxonomy, by
            Chambers et al.

Dear Public Comments Processing:

The State of Wisconsin would like to comment on the paper, "An Account of the Taxonomy of North American Wolves from Morphological and Genetic Analyses", by S.M. Chambers, S.R. Fain, B. Fazio, and M. Amaral.  We will refer to the paper in our discussions as "Chambers et al."  We also note that the USFWS will consider the designation of two or more final rules from the proposed rule published in May 2011.  We concur that designation of gray wolf status in 29 eastern states outside the Great Lakes Western DPS of Gray wolves should be kept as a separate rule from the delisting in the Western Great Lakes States.

First, we wanted to restate our strong disagreement with the USFWS conclusion that a newly discovered species, the eastern wolf, exists in the Western Great Lakes as a separate species or population.  As this letter documents, the best available science suggests that the eastern wolf occurs in a relatively pure form only in and around areas of southern Ontario or southern Quebec. The Western Great Lakes wolf population is of mixed genetics of two species and their hybrids and should be treated as one population. The wolves in the Western Great Lakes behave as a single species and should be delisted as a single species as they were originally listed under the endangered species act more than 30 years ago. We need a solid and defensible delisting proposal.

Chambers et al. have conducted an intense level of work trying to bring together the confusing and sometimes contradictory work on the taxonomy of wolves across North America.  They review an extensive body of research on the morphology and genetics of North American wolves.  Their exhaustive review of genetic research included work on Mitochondria DNA, nuclear microsatellite DNA, Y- Chromosome DNA, and Single Nucleotide Polymorphisms (SNPs).  These DNA markers vary in their ability to test ancestry and relatedness among organisms, and rarely have DNA markers been compared directly to morphological characteristics.  While these genetic methods can provide great insight into relationship and ancestry, all methods have shortcomings and if sample sizes are inadequate (numbers of individuals or number of genetic markers ), or samples are not evenly distributed across geographic areas being described, analysis may lead to misleading interpretations.  After their extensive, although sometimes confusing analysis, Chambers et al., conclude that 3 species of wolves exist in North America, including, the gray wolf (*Canis lupus*), eastern wolf (*Canis lycaon),* and the red wolf (*Canis rufus*).  They also conclude that these 3 species all differ from the coyote (*Canis latrans*), but agree coyotes do hybridize fairly regularly with red and eastern wolves, but not with gray wolves.  On the other hand, eastern wolves do hybridize with gray wolves.  Chambers et al. also accept 4 subspecies of gray wolves across North America.



While Chambers et al. provide a scientific basis for arguing the existence of eastern wolves and red wolves as distinct species, it is not clear this represents a scientific consensus, nor does it necessarily represent majority opinions by mammalian taxonomists or geneticists on the taxonomy of wolves. Others continue to argue that eastern wolves are versions of gray wolves (Koblmuller et al. 2009, von Holdt et al. 2011). Chambers et al. do attempt to discuss these other studies, but are not able to completely dismiss these other possibilities. Chambers et al. provide only a limited discussion of SNPs DNA data as presented by Von Holdt et al. 2011, which represents a new system for genetic testing using the whole genome of organisms. This new genetic testing system using SNPs promises to open new opportunities for studying the ancestry and relatedness of populations.

The review by Chambers et al. provides scientific interpretation on the taxonomy of wolves in the Great Lakes region in line with the proposed delisting rule. They illustrate the regular presence of eastern wolf genes in the wolf population in the Western Great Lakes region, but they also point out that these wolves are mixed in with a population of gray wolves. They state on lines 1577-1578 that, "there is general agreement that there was a unique historical wolf population in the Great Lakes that has subsequently has been affected by hybridization." Further they state on lines 1878-1879 that, "In the western Great Lakes nearly all wolves have indications of admixture." The interpretations by Chambers supports the mixed ancestry of wolves in the western Great Lakes, but does not show the presence of 2 wolf species living side by side as separate entities in this region, but rather as an admixed population. Chambers et al. does not provide an adequate rationale for listing 2 separate wolf species in the Great Lakes Region.

Wolves in the Great Lakes region were initially listed as endangered in 1967 and 1974 as the eastern timber wolf (*Canis lupus lycaon*). The eastern timber wolf at the time was thought to be a smaller subspecies of gray wolves inhabiting eastern North America. It was not recognized at the time that the eastern wolf might be a separate species. In 1978 all gray wolves in Minnesota where considered threatened, while in the remaining conterminous states, gray wolves were considered endangered. In 1978 subspecies designations were dropped because there was confusion over exact boundaries between subspecies. "Gray wolves" were considered to be all large wolves living in Minnesota even though at the time it was not known that this was an admixed population. In the 1978 designation, wolves in Minnesota for the purpose of the classification were treated as a species of wolves. Thus there was recognition that the population of wolves living in Minnesota, not their specific ancestry, was the basis for listing wolves. These "Minnesota wolves" have spread out to repopulate northern Wisconsin and Upper Michigan. The Minnesota wolves listed in 1978 consisted of the same admixed population that exists currently, and recovery goals set in 1978 and 1992 were applied to this Minnesota population of wolves. This admixed population behaves and acts as a single metapopulation of wolves that are well suited to be considered in a single DPS of wolves covering the western Great Lakes region.

While the eastern wolves may be a separate species, there is no indication it exists as a separate distinct population of wolves in the Western Great Lakes region. The states in the WGLDPS are dedicated to maintaining the diversity of all wolves in their region and view them as important members of the native fauna and important to state biological diversity. Wisconsin and the other states in the region are dedicated to preserving the genetic diversity of Great Lakes wolves. There is no evidence or indications that under state management genetic diversity would be reduced or compromised. It does appear that relatively pure versions of eastern wolves may exist in southern Ontario or southern Quebec, and this population may need special conservation consideration. But the admixed population of wolves in the Western Great Lakes is very secure, and state management will continue to maintain a healthy and secure population.

While the wolf population in the Western Great Lakes is admixed, for practical and delisting purposes, they can be delisted as a DPS of gray wolves. In many ways they resemble gray wolves more than eastern wolves. Compared to eastern wolves in and around Algonquin Park, Western Great Lakes wolves, are larger, and skulls more closely match gray wolves to the west. Unlike eastern wolves, Western Great Lakes wolves rarely breed with coyotes. While eastern wolves are deer specialists, Western Great Lakes wolves readily kill moose (Isle Royale and N. MN), and readily kill elk (NW WI). The Western Great Lakes wolves represent a hybrid gray wolf

018839A

population that was listed as endangered and now has recovered across nearly all suitable habitat within the region. Because it was initially listed as a gray wolf population. goals were set based on the whole population in the region considered as gray wolves, and this population has spread and recovered across the region, the whole Western Great Lakes population of wolves should now be delisted across the region.

We agree with the statement Chambers et al. borrowed from Bowen and Karl (1999, Conservation Biology. 13:1013-1016), that "the relationship between conservation and taxonomy must be unidirectional; conservation strategies should be influenced by taxonomy, but taxonomy cannot be influenced by conservation priorities." Listing separate species of wolves for the Western Great Lakes region does little to promote sound conservation of wolves in the region and only adds confusion to attempts to reasonably manage this population. Acknowledging the mixed ancestry as displayed by Chambers et al., and managing the wolf population as a single interacting metapopulation by the states and tribes, will guarantee the long term health of this population and maintain its unique genetic structure.

In light of the strong evidence outlined in this review of the best available science, we urge the USFWS not to recognize the existence of another physically indistinguishable species in the WGL region. We feel this will jeopardize the delisting of the grey wolf, a delisting that is long overdue. We thank the U.S. Fish and Wildlife Service for the opportunity to comment on this important literature on wolf taxonomy and genetics. We urge the Service to continue moving the delisting process forward and return management to the states as soon as possible.

Sincerely Yours,

Cathy Stepp. Secretary, Wisconsin DNR

CC:  Ken Salazar. DOI, Washington. D.C.
      Dan Ashe. USFWS, Washington. D.C.
      Tom Melius. USFWS. Minneapolis. MN
      Wisconsin Congressional Delegation
      Wendy Riemann, Director of Federal Relations, Washington. D.C.

018840A

*Human Dimensions of Wildlife*, 14:353–365, 2009
Copyright © Taylor & Francis Group, LLC
ISSN: 1087-1209 print / 1533-158X online
DOI: 10.1080/10871200903045236



Downloaded by [US Fish & Wildlife Service] at 07:51 07 November 2012

# Assessing the Impact of Decision Frame and Existing Attitudes on Support for Wolf Restoration in the United States

ROBYN S. WILSON AND JEREMY T. BRUSKOTTER

School of Environment & Natural Resources, The Ohio State University, Columbus, Ohio, USA

*This article examines (a) the effect of previous restoration success and communication vividness on support for future wolf restoration efforts, (b) differentiates between the effect of these constructs and pre-existing attitudes, and (c) provides insight into improving communications about high-profile species restoration. Data were obtained from an online experiment conducted with U.S. residents in 2008. Attitudes toward protecting endangered species influenced participants' attitudes toward wolf restoration, associated voting preferences, and the amount they were willing to donate to future efforts. Priming subjects with information about past failed efforts resulted in a more negative attitude toward wolf restoration compared to those primed with information about successful efforts. This effect, however, did not extend to voting or donating preferences. These results suggest that both existing attitudes and the adopted decision frame contribute to how specific wolf restoration attitudes are formed and changed.*

**Keywords**    decision frame, loss aversion, attitudes, policy preferences, gray wolves

## Introduction

Few species capture our collective imagination like the gray wolf (*Canis lupus*). Perhaps this fascination stems from wolves' similarity with domestic dogs, or perhaps it is a function of the role wolves play in our myths, fables, and fairy tales. Regardless, the popularity of wolves is undeniable. In addition to numerous movies, books, and magazine articles in the popular media, the abundance of studies on the behavioral ecology of wolves led Mech (1996, p. 398) to speculate that the wolf was "probably the most studied carnivore." The long-term survival of wolves, however, ultimately depends on human tolerance (Mech, 1995, 1996). Thus, a new line of research emerged that seeks to understand our collective fascination with wolves by identifying the bases for people's attitudes toward wolves and preferences for wolf restoration and management (see Williams, Ericsson & Heberlein, 2002 for a review).

Research on attitudes toward wolves began to appear in the mid-1970s, following the passage of the Endangered Species Act. Many of these early studies sought to determine attitudes toward wolves or wolf reintroduction in states where sufficient habitat existed to support wolf recovery efforts (Bath, 1987a, 1987b; Bath & Phillips, 1990; McNaught, 1987; Minn, 1977). Subsequent research on attitudes toward wolves continued along these

Address correspondence to Robyn S. Wilson, The Ohio State University, School of Environment & Natural Resources, 2021 Coffey Road, Columbus, OH 43210, USA. E-mail: wilson.1376@osu.edu

018868A

Downloaded by [US Fish & Wildlife Service] at 07:51 07 November 2012

lines (Enck & Brown, 2002; Lohr, Ballard & Bath, 1996; Pate, Manfredo, Bright & Tishbein, 1996), but also included explanatory studies focused on the potential causes of attitudes toward wolves or wolf management policies from psychological (Bright & Manfredo, 1996; Bruskotter, Vaske & Schmidt, 2009), social (Heberlein & Ericsson, 2005; Williams et al., 2002; Wilson, 1997), and geographic (Karlsson & Sjöström, 2007) perspectives.

Some early explanatory studies found negative attitudes toward wolves were associated with lower education levels (Biggs, 1988; Hook & Robinson, 1982; Kellert, 1985; McNaught, 1987), lower knowledge about wolves (Bath & Phillips, 1990; Kellert, 1985), and "misconceptions" about wolves (Tucker & Pletscher, 1989). These findings contributed to the belief that attitudes toward wolves and wolf restoration could be made more positive by simply "educating" people. Yet, attempts to modify people's attitudes toward wolves via informational or persuasive communications have yielded little or no change (LaVine, 1995; Meadow, Reading, Phillips, Mehringer & Miller, 2005).

Despite these failures, and increasing evidence that attitudes toward wolves in the United States are generally stable (Bruskotter, Schmidt & Teel, 2007; Williams et al., 2002), there is some evidence that, at least under certain conditions, attitudes toward wolves *can* change. Specifically, while surveys of Adirondack Park area residents conducted in the mid-1990s found strong (76%) support for wolf restoration to the park, support dropped considerably to just 42% in subsequent studies (Duda, Bissell & Young, 1998; Enck & Brown, 2000). Enck and Brown (2002, p. 17) speculated the drop in support was a result of "extensive, mostly negative, media coverage" in the area. Such findings underscore the inability of wildlife managers to control either the source or the content of information about contentious wildlife management issues. These findings also highlight just how little we know about the extent to which source, content, and presentation of information affect attitudes toward this charismatic species.

This article examines how the decision frame, communication vividness, and general attitude toward endangered species protection impacts preferences for wolf restoration. Specifically, we (a) experimentally manipulate the effect of perceived previous management success and communication vividness on restoration attitude and public preferences for wolf restoration, (b) examine the separate effect of attitude toward endangered species protection, and (c) offer insight into how attitudes and preferences toward wolf restoration are formed or changed. A better understanding of the differing influence of these factors will help managers and policy makers better predict how communications might be impacting public attitudes and preferences, and devise more effective communications concerning wolves and their management.

## Theoretical Approach

Evidence from behavioral decision theory suggests that preferences are constructed during the decision process, not simply revealed (Slovic, 1995). In other words, preferences do not exist prior to the decision, but are created in response to a variety of cues available to the decision maker at the time that the preference is elicited. Preference construction is seemingly at odds with research on attitudes, which suggests our preferences for objects or entities (i.e., our attitudes) can be well formed and tend to remain stable over time (Eagly & Kulesa, 1997; Fishbein & Ajzen, 1975; Petty & Krosnick, 1995). Theory and empirical research, however, indicate some attitudes (e.g., those formed based on little experience with or information about the attitude object, those not linked to values, and those that are highly contextualized) are susceptible to change (Crano & Prislin, 2006; Eagly & Kulesa, 1997; Petty & Krosnick, 1995). Consequently, behavioral decision and attitude theories

Downloaded by [US Fish & Wildlife Service] at 07:51 07 November 2012

generally agree that the most specific types of preferences—decisions to support a specific action or engage in a particular behavior (i.e., behavioral intentions)—are susceptible to the way a problem is presented or framed.

An individual's decision frame is a subjective assessment of factors associated with a particular choice. The frame that an individual adopts for a particular decision is partially due to personal characteristics and societal norms, but is further influenced by how communication about the problem alters the status quo or reference point that individuals use when evaluating new information (Tversky & Kahneman, 1981). Decision frames are particularly malleable in contexts where multiple and conflicting objectives are at stake, perceived and technical risks are not well aligned, and difficult tradeoffs must be made in order to implement a particular strategy (Payne, Bettman & Johnson, 1992). In these situations, individual preferences are often subject to contextual manipulations that alter the decision frame. Gray wolf management is one such decision context. Ecological and economic objectives often clash, risk to individual livelihoods and public safety may be perceived as high despite expert assessments to the contrary, and differences in fundamental objectives and perceived risk make the necessary tradeoffs very difficult to assess.

We investigated two variables known to bias decision-making in complex, and uncertain contexts (a) beliefs about the success or failure of past restoration efforts (i.e., prompting the adoption of a gain versus loss-based decision frame), and (b) communication vividness (i.e., prompting an affective response and increasing the salience of the decision frame). Attention has been given to the impact that perceived losses (e.g., past failures) have on individual preferences. Behavioral decision theory suggests that individuals that adopt a loss frame are more likely to take action that will recover those losses compared to individuals that adopt a gain frame (Kahneman & Tversky, 1979; Tversky & Kahneman, 1981). Gregory, Lichtenstein, and MacGregor (1993), for example, found greater support for proposed environmental policies framed as a restoration of a loss compared to identical policies framed as an improvement from the status quo. Thus, individual preferences for policy and management can differ based on the individual's perception of the status quo or the particular reference point adopted in their decision frame.

Affect can also influence individual preferences. Affect is defined as an unconscious, valence-based reaction to a stimulus that guides future information processing (Slovic, Finucane, Peters & MacGregor, 2004). Finucane and collaborators proposed the use of an affect heuristic (Finucane, Alhakami, Slovic & Johnson, 2000) where over the course of an individual's life, positive and negative tags are assigned to specific stimuli. These tags are activated when that particular stimulus is encountered, shaping preferences and behavior. As a result, individual preferences can differ based on the affective meaning of the information that is being evaluated (Finucane & Holup, 2006; Loewenstein, Weber, Hsee & Welch, 2001). Other research suggests that providing vivid or salient imagery enhances the affective meaning of a communication effort (Keller, Siegrist & Gutscher, 2006).

Finally, we examined how existing attitudes toward endangered species protection impact specific attitudes toward wolf restoration and related preferences (i.e., voting and donating money). Existing attitudes can bias the processing of new information (Biek, Wood & Chaiken, 1996; Teel, Bright, Manfredo & Brooks, 2006), which affects how this information is evaluated, stored, and retrieved (Eagly & Chaiken, 1993; Wood, 2000). When well-formed or "strong" attitudes exist, individuals tend to defend their existing attitudes and beliefs, discounting any new information as inconsistent (Teel et al., 2006; Wood, 2000; Wood, Rhodes & Biek, 1995). Thus, the impact of new information on attitudes is often greater when people do not already have well-formed attitudes and beliefs about a particular attitude object. Experimental studies indicate that even when attitudes

Downloaded by [US Fish & Wildlife Service] at 07:51 07 November 2012

toward specific issues are not well-formed, specific attitudes are often deduced or constructed from existing, general attitudes (Prislin, Wood & Pool, 1998). These studies demonstrate that general attitudes can influence both preference formation and the effectiveness of communications meant to affect policy preferences.

### Study Hypotheses

We expected that existing attitudes toward endangered species protection would positively correlate with wolf restoration attitudes and future management preferences (both voting and amount willing to donate). We also expected that attitudes toward wolf restoration would become more negative when subjects were primed to believe that past restoration efforts had failed as opposed to succeeded. As a result, we predicted that knowledge about past failures would alter the status quo or reference point from which subjects evaluated their future options and increase the likelihood of voting for or donating to future restoration efforts to recover that loss. Finally, we expected that affect-laden imagery would enhance the vividness of the manipulated decision frame. Imagery invoking negative or positive affect in the failure and success condition was predicted to make the context more vivid and result in stronger preferences than when imagery was not present. The following hypotheses were advanced:

$H_1$. Subjects' existing endangered species protection attitude (ESA) will positively correlate with wolf restoration attitude (RA), voting preference (VP) and willingness to donate (WTD) to future restoration efforts (Greater ESA = Greater RA, VP, and WTD).

$H_2$. A belief that past restoration efforts have failed as opposed to succeeded, will lead to:

$H_{2a}$. An increased negative attitude toward wolf restoration (Figure 1, $RA_{C \& D} > RA_{A \& B}$);

$H_{2b}$. A greater likelihood to vote for future restoration efforts (Figure 1, $VP_{C \& D} < VP_{A \& B}$);

$H_{2c}$. Greater potential donations to future restoration efforts (Figure 1, $WTD_{C \& D} > WTD_{A \& B}$).

$H_3$. The presence of affect-laden imagery will enhance the previous effect in $H_2$ leading to no main effect of imagery on the dependent variables (Figure 1, A & C = B & D) but a significant interaction effect (Figure 1, A > B, C < D).

*Pre-Treatment Measure*:   Endangered Species Attitude (ESA)

|  |  | Images (Affect Rich) | No Images (Affect Poor) |
|---|---|---|---|
| *Independent Variable Manipulations*: | Success (Gain Frame) | *n* = 24 (A) | *n* = 36 (B) |
|  | Failure (Loss Frame) | *n* = 32 (C) | *n* = 31 (D) |

*Dependent Variables*:   *Wolf Restoration Attitude (RA)*
*Voting Preference (VP)*
*Willingness To Donate (WTD)*

**Figure 1.** Study design indicating the inclusion of a covariate attitude measure, four treatments consisting of one of two levels in each independent variable, and three dependent measures of wolf restoration attitude, voting preference, and amount willing to donate to a restoration effort.

018871A

Downloaded by [US Fish & Wildlife Service] at 07:51 07 November 2012

## Methods

### Sampling Frame

Data were obtained from subjects recruited via the nationally representative Knowledge Networks (KN) panel. KN panelists are randomly selected, expected to complete one study per week, and compensated for participation (see Dennis, 2001 for further information on the KN survey panel and how they control for potential panel effects). Each subject here was drawn from a probability sample of active members in KN's database and randomly assigned to one of four conditions. Demographic group estimated response rates were factored into the initial sample selection and the subject pool mirrored U.S. Census data. All aspects of the experiment took place on a secure Internet site.

### Variables

We manipulated the decision frame by presenting past restoration efforts as either successes (i.e., increased ecosystem health, no human–wildlife conflict) or failures (i.e., decreased ecosystem health, increased human–wildlife conflict). This manipulation attempted to alter subjects' reference point and represent either public perceptions of previous efforts or the arguments commonly used by wolf management interest groups. Half of the past restoration scenarios were paired with photos of wolves. The success frame was paired with two positive affect-rich photos (i.e., wolf pup and howling wolf); the failure frame was paired with two negative affect-rich photos (i.e., dead calf and wolf with kill). This manipulation was designed to enhance the communication vividness and invoke an affective response that would enhance the effect of the decision frame manipulation.

We assessed attitudes toward endangered species protection and wolf restoration using semantic differential scales (Osgood, Suci & Tannenbaum, 1957). Subjects responded to two statements (i.e., "Protecting wildlife in danger of extinction is . . ." and "The restoration of wolves to portions of their historic range is . . ."). Answers were recorded on seven-point, bi-polar scales (i.e., good–bad, beneficial–harmful, wise–foolish). We averaged across the three items to derive a single attitude score from one (favorable) to seven (unfavorable). To assess voting preferences, subjects indicated their level of agreement from one (strongly agree) to seven (strongly disagree) with the statement: "If given the opportunity I would vote for the restoration of wolves to portions of their historical range." To assess donation preferences, subjects indicated their willingness to donate to future restoration efforts on a scale from $0 to $50 using $10 increments.

### Experimental Design

Subjects ($n = 124$) completed a two by two factorial experiment with approximately 30 subjects in each of four treatments (Figure 1). Each experiment included the pre-test measure of attitude toward endangered species protection followed by information about previous restoration efforts designed to alter the decision frame to reflect either past success or failure. The decision frame manipulation was either presented in isolation or paired with affect-rich imagery intended to enhance communication vividness (Figure 1). Each of the four manipulated scenarios was followed by a series of post-test dependent measures (i.e., attitude toward wolf restoration, voting preferences, and donation preferences). A separate set of subjects ($n = 37$) were presented with the two pairs of images in a manipulation check to determine if the images chosen for the experimental manipulations invoked the expected level of negative or positive affect.

*R. S. Wilson and J. T. Bruskotter*

Downloaded by [US Fish & Wildlife Service] at 07:51 07 November 2012

*Analyses*

We calculated means and frequencies for all variables of interest and correlation coeffi-cients (i.e., Pearson's product-moment and point-biserial) to determine the strength of the zero-order relationships between these variables. Cronbach's Alpha was used to examine the reliability of multi-item scales. A multivariate analysis of covariance (MANCOVA) was conducted to assess the effect of the manipulated decision frame and communication vividness on the three dependent measures. Subject's attitude toward endangered species protection, measured pre-treatment, was the covariate in the MANCOVA.

## Results

### Response Rates and Demographics

Of the 243 individuals contacted and recruited for this experiment, 124 instruments were completed for an overall response rate of 51%. Respondents were largely representative of U.S. census data across gender, age, race, and degree of education. About half (49%) of respondents were male and 51% were female. Nine percent were between the ages of 18 and 24, 26% were between the ages of 25 and 34, 27% were between the ages of 35 and 44, 23% were between the ages of 45 and 54, and the remaining 15% were over the age of 55. Three-quarters (78%) self-identified themselves as white, 8% as black, 8% as Hispanic, and 6% as other or more than one race. Finally, 8% of respondents had less than a high school education, 28% had a high school degree, 30% had at least some college education, and 35% had at least a bachelor's degree.

### Reliability of Attitudinal Measures

Cronbach's alpha was used to assess the reliability of the two attitudinal measures: attitude toward endangered species protection and wolf restoration. Alpha was .95 and .96 for these measures, respectively, well above the recommended accepted level of .7 (Nunnaly & Berstein, 1994). A principle components analysis of the six items used to measure these atti-tudes revealed two distinct factors that corresponded with the two proposed attitudinal mea-sures. The resulting two-factor solution explained 93% of the variance across the six items.

### Manipulation Check

Control group subjects indicated how each pair of images made them feel on a scale from one (very good) to seven (very bad). The pair of images depicting a howling wolf and a pup was rated as affect-rich positive ($M = 1.78$, $SE = .165$); the pair of images depicting a dead calf and wolf on a kill were rated as slightly negative ($M = 4.76$, $SE = .199$), less affect-rich than expected. A paired $t$-test revealed that these ratings were significantly different ($t = 10.491$, $df = 36$, $p < .001$).

### Descriptive and Correlation Analyses

Scores were aggregated across treatments and donation preferences were dichotomized to examine the general relationship between attitudinal and preference measures. Subjects' attitude toward endangered species protection was extremely positive; approximately 83% expressed a favorable attitude (Table 1). Attitude toward wolf restoration was also

Case 1:13-cv-00186-BAH   Document 45-5   Filed 03/04/14   Page 215 of 350

**Table 1**

Descriptive statistics for measured independent and dependent variables aggregated across treatments[a]

| Variable | $n$ | $M$ | % favorable | % neutral | % unfavorable |
|---|---|---|---|---|---|
| Attitude toward endangered species restoration[b] | 124 | 2.1 | 83 | 9 | 8 |
| Attitude toward wolf restoration[b] | 124 | 3.0 | 67 | 18 | 15 |
| Intention to vote for wolf restoration[c] | 124 | 3.2 | 57 | 28 | 15 |
| Willingness to donate for wolf restoration[d] | 123 | NA | 46 | NA | 55 |

[a]With a sample of 124 and confidence level of 95%, the margin of error for these estimates is approximately +/– 9 percentage points.
[b]Measured on scales where 1 = favorable, 7 = unfavorable.
[c]Measured on scale where 1 = strongly agree, 7 = strongly disagree.
[d]Willingness to donate was dichotomized where 0 = no donation/unfavorable, 1 = donation/favorable).

**Table 2**

Correlations between variables of interest aggregated across treatments

| Variable | Correlations[a] 1 | 2 | 3 |
|---|---|---|---|
| (1) Attitude toward endangered species restoration[b] | 1 | | |
| (2) Attitude toward wolf restoration[b] | .47** | 1 | |
| (3) Intention to vote for wolf restoration[b] | .32** | .85** | 1 |
| (4) Willingness to donate to wolf restoration[c] | –.20* | –.39** | –.47** |

[a]Significance: **$p < .01$ and *$p < .05$ (two-tailed test).
[b]Measured on scales where 1 = favorable/strongly agree, 7 = unfavorable/strongly disagree.
[c]Willingness to donate was dichotomized where 0 = no donation and 1 = donation for this analysis.

positive, with roughly 66% of subjects responding favorably. Similarly, the majority of subjects (57%) expressed an intention to vote for wolf restoration; slightly less than half (46%) were willing to donate at least $10 or more to support wolf restoration.

Consistent with previous attitudinal research, subjects' general attitudes toward endangered species protection were positively related to their attitudes toward wolf restoration ($r = .47$, $p < .01$), voting preferences ($r = .32$, $p < .01$), and donation preferences ($r = .20$, $p < .05$; Table 2). The more specific attitude toward wolf restoration was also positively related to voting preferences ($r = .85$, $p < .01$) and donation preferences ($r = .39$, $p < .01$); the strength of these relationships can be characterized as substantial and typical, respectively (Gliner, Vaske & Morgan, 2001).

*Multivariate Analyses*

There was a significant effect of the covariate (i.e., pre-treatment endangered species attitude) on the three dependent variables ($p < .001$, eta$^2 = .262$, Table 3). Hypothesis 1

Downloaded by [US Fish & Wildlife Service] at 07:51 07 November 2012

Downloaded by [US Fish & Wildlife Service] at 07:51 07 November 2012

**Table 3**

Results of the hypothesis tests using multivariate analysis of covariance indicating
a significant main effect of decision frame and the covariate endangered species attitude.
The specific between-subjects effect of decision frame was significant for restoration
attitude, whereas the specific covariate effect of endangered species attitude
was significant for all three dependent variables

| Variable | $M(SE)$ | | $F^e$ | $df$ | $\eta^2$ |
| --- | --- | --- | --- | --- | --- |
| | Failure | Success | | | |
| Decision frame (DF)[a] | 2.94 (.17) | 2.45 (.13) | 6.18** | 3 | .14 |
| Restoration attitude[d] | 3.30 (.15) | 2.61 (.15) | 10.68** | 1 | .08 |
| Voting preference[d] | 3.42 (.18) | 2.98 (.19) | 2.82 | 1 | .02 |
| Donation preference[d] | 2.09 (.17) | 1.75 (.18) | 1.85 | 1 | .02 |
| | Imagery | No imagery | | | |
| Communication vividness (CV)[a] | 2.74 (.18) | 2.65 (.16) | .78 | 3 | .02 |
| DF × CV[b] | Fig 1A    Fig 1B | Fig 1C    Fig 1D | 1.85 | 3 | .05 |
| | 2.59(.27)  2.31(.22) | 2.89(.23)  2.98(.24) | | | |
| Endangered species attitude[c] | N/A | N/A | 13.77*** | 3 | .26 |
| Restoration attitude[d] | N/A | N/A | 37.27*** | 1 | .24 |
| Voting preference[d] | N/A | N/A | 15.89*** | 1 | .12 |
| Donation preference[d] | N/A | N/A | 4.06* | 1 | .03 |

[a]Independent variable main effect.
[b]Independent variable interaction effect.
[c]Covariate effect.
[d]Dependent variable between-subjects effect.
[e]Significance: ***$p < .001$, **$p < .01$, *$p < .05$.

predicted that attitude toward endangered species protection would positively correlate
with wolf restoration attitude, voting, and donation preferences. The results indicate that
endangered species attitude did explain a significant proportion of the variance in wolf
restoration attitude ($p < .001$, eta$^2$ = .240), likelihood of voting for future restoration efforts
($p < .001$, eta$^2$ = .119) and amount willing to donate to the effort ($p = .046$, eta$^2$ = .033).

After adjusting for the pre-treatment attitude measure, there was a significant main
effect of the decision frame manipulation ($p < .01$, eta$^2$ = .138, Table 3), but no significant
main effect of communication vividness and no interaction effect. Hypothesis 2 predicted
that a belief that past efforts had failed, as opposed to succeeded, would lead to an
increased negative attitude toward wolf restoration (2a), but a greater likelihood to vote
for future restoration efforts (2b), and greater donations to future restoration efforts (2c).
Hypothesis 2a was supported where subjects in the failure manipulation demonstrated a
more negative attitude toward wolf restoration than those in the success manipulation ($p < .01$,
eta$^2$ = .083, Table 3). Hypotheses 2b and 2c were not supported ($p > .05$). Hypothesis 3

Downloaded by [US Fish & Wildlife Service] at 07:51 07 November 2012

predicted that the presence of affect-laden imagery would enhance the previous effect. This hypothesis was supported by the lack of a main effect, but the expected interaction effect was not statistically significant ($p > .05$, Table 3).

## Discussion and Implications

This study compared how existing attitudes and third party information affect U.S. residents' policy preferences concerning wolves. Consistent with social psychological models that predict behavior or behavioral intentions from existing attitudes, norms, and beliefs (see Ajzen, 1985, 1991), our results indicated that positive attitudes toward endangered species protection are associated with positive attitudes toward wolf restoration, and support for wolves as indicated by voting and donation preferences. Attitudes differed based on the particular decision frame individuals adopted when making decisions about wolf restoration efforts. The adoption of a loss frame, based on the belief that previous efforts have failed, increased negative attitudes toward wolf restoration. This effect, however, did not extend to specific preferences or behavioral intentions like voting and donating money.

While both existing attitude toward endangered species and the decision frame were strong predictors of attitude toward wolf restoration, the effect of the endangered species attitude was considerably greater. Although this finding does not allow us to conclude that biased processing took place, the stronger relationship between endangered species and restoration attitude, as well as voting and donation preferences certainly suggests that existing attitudes biased individual processing of information. This bias may have lead to attitudes and preferences regarding wolf restoration that were consistent with their more general attitude toward endangered species protection.

Previous research has shown that introducing powerful, vivid imagery can increase or decrease support for policy and management (Keller et al., 2006; Sunstein, 2007). The inclusion of affect-laden imagery in this study, however, did not have the expected effect. For the high-profile case of wolf management, many individuals may already have a particular image in mind, reducing the power of the images that are presented to them. Our manipulation only induced weakly negative affect for the imagery associated with the failure condition. Although the affective response to the failure imagery was significantly different from the response induced by the positive pair of images, the effect may have been more pronounced had the images produced a stronger negative response. However, the fact that individuals did not respond more negatively is consistent with previous findings indicating that information is processed in a manner that is often consistent with current beliefs or attitudes (Teel et al., 2006). The extremely high levels of support for endangered species protection and wolf restoration may have resulted in a more tempered evaluation of the negative imagery in order to be consistent with the existing attitude.

Research on wolves has tended to focus on people's general attitudes toward and beliefs about the species, as opposed to more specific policy preferences. People's preferences for specific management policies (e.g., acceptability of lethal control) or intentions to engage in particular behaviors (e.g., voting on a ballot measure), however, are far more relevant to management than the very general attitude toward wolves typically employed in previous cross-sectional studies. Researchers have recently turned away from simply measuring general attitudes toward wolves to employing measures more relevant to management, such as the acceptability of management actions (Bruskotter et al., 2009; Decker, Jacobson & Brown, 2006; Zinn, Manfredo, Vaske & Wittmann, 1998) or the acceptability of the presence of a particular species (Kleiven, Bjerke & Kaltenborn, 2004).

018876A

Downloaded by [US Fish & Wildlife Service] at 07:51 07 November 2012

Rather than measuring attitudes toward wolves by aggregating responses to factual, belief-based statements about wolves as has been commonly done in previous studies, we measured attitudes toward wolf restoration (a policy) using scales designed to tap evaluative (as opposed to factual) meaning.

Previous studies of attitudes toward wolves and wolf restoration have also been almost exclusively cross-sectional in design and primarily concerned with describing populations. Our experimental findings aid researchers in determining the extent to which policy preferences regarding wolves in the United States are *capable* of being manipulated. Our findings confirm that subtle changes in the way a message is communicated to the public can impact attitudes toward wolf conservation. These results were confirmed in a representative sample of U.S. residents, as opposed to undergraduates in a psychology class, which is more common for experimental research but often criticized for lacking practical application and having low external validity. Although the effects of this particular decision frame were relatively small (Cohen, 1988) and did not extend to specific preferences or behavioral intentions, it is noteworthy that the effect was based on only one simple intervention. It is unclear how multiple competing or consistent messages distributed over time would affect attitudes toward wolf restoration and associated behaviors, although research indicates that increasing information generally results in a more extreme attitude (Liu & Latane, 1998). Additional research is also needed to understand how other types of frames, beyond the classic gain versus loss frame, impact attitudes and preferences regarding wolf conservation.

The experimental tests described here should be replicated with groups of individuals who represent greater diversity in their attitudes toward endangered species protection. However, although not ideal for theoretical tests, our findings provide a realistic assessment of how the adoption of different decision frames may affect attitudes and policy-related decisions for wolf management in the United States. In this respect, it is noteworthy that, consistent with numerous studies indicating attitudes toward wolves in North America are generally positive (Williams et al., 2002), our results show a corresponding positive attitude toward endangered species restoration. Our findings also highlight the utility of paying attention to how a decision frame is constructed and how it, in turn, impacts attitudes toward and preferences for conservation and management. By simply investigating the role of attitudes or contextual manipulations in isolation, we may be missing the more realistic influence of these factors in combination. Future efforts should continue to combine knowledge about these differing influences and attempt to more realistically model the context in which these contentious decisions are made.

## References

Ajzen, I. (1985). From intentions to actions: A theory of planned behavior. In J. Kuhl & J. Beckman (Eds.), *Action-control: From cognition to behavior* (pp. 11–39). Heidelberg: Springer-Verlag.

Ajzen, I. (1991). The theory of planned behavior. *Organizational Behavior and Human Decision Processes, 50*, 179–211.

Bath, A. J. (1987a). *Countywide survey of the general public in wyoming in counties around the park towards wolf reintroduction in yellowstone national park*. Mammoth, WY: U.S. National Park Service.

Bath, A. J. (1987b). *Statewide survey of the wyoming general public attitudes towards wolf reintroduction in yellowstone national park*. Mammoth, WY: U.S. National Park Service.

Bath, A. J., & Phillips, C. (1990). *Statewide surveys of montana and idaho resident attitudes toward wolf reintroduction in yellowstone national park*. Report submitted to Friends for Animals, National Wildlife Federation: U.S. Fish and Wildlife Service and U.S. National Park Service.

Downloaded by [US Fish & Wildlife Service] at 07:51 07 November 2012

Biek, M., Wood, W., & Chaiken, S. (1996). Working knowledge, cognitive processing, and attitudes: On the determinants of bias. *Personality and Social Pyschological Bulletin*, *22*, 547–556.

Biggs, J. R. (1988). *Reintroduction of the mexican wolf into new mexico: An attitude survey*. Unpublished Master's Thesis, New Mexico State University, Las Cruces, NM.

Bright, A. D., & Manfredo, M. J. (1996). A conceptual model of attitudes toward natural resource issues: A case study of wolf reintroduction. *Human Dimensions of Wildlife*, *1*(1), 1–21.

Bruskotter, J. T., Schmidt, R. H., & Teel, T. L. (2007). Are attitudes toward wolves changing? A case study in utah. *Biological Conservation*, *139*(1–2), 211–218.

Bruskotter, J. T., Vaske, J. J., & Schmidt, R. H. (2009). Social and cognitive determinants of utah residents' acceptance of the lethal contol of wolves. *Human Dimensions of Wildlife*, *14*(2), 119–132.

Cohen, J. (1988). *Statistical power for the behavioral sciences* (2nd ed.). Hillsdale, NJ: Lawrence Erlbaum.

Crano, W. D., & Prislin, R. (2006). Attitudes and persuasion. *Annual Review of Psychology*, *57*, 345–374.

Decker, D. J., Jacobson, C. A., & Brown, T. L. (2006). Situation-specific "impact dependency" as a determinant of management acceptability: Insights from wolf and grizzly bear management in alaska. *Wildlife Society Bulletin*, *34*(2), 426–432.

Dennis, J. M. (2001). Are internet panels creating professional respondents? *Marketing Research*, *13*(2), 34–38.

Duda, M. D., Bissell, S. J., & Young, K. C. (1998). *Wildlife and the American mind*. Harrisonburg, VA: Response Management.

Eagly, A. H., & Chaiken, S. (1993). *The psychology of attitudes*. Fort Worth, TX: Harcourt Brace Jovanovich College Publishers.

Eagly, A. H., & Kulesa, P. (1997). Attitudes, attitude structure, and resistance to change. In M. H. Bazerman, D.M. Messick, A.E. Tenbrunsel, & K. A. Wade-Benzoni (Eds.), *Environment, ethics, and behavior: The psychology of environmental valuation and degradation* (pp. 122–153). San Francisco, CA: The New Lexington Press.

Enck, J. W., & Brown, T. L. (2000). *Preliminary assessment of social feasibility for reintroducing gray wolves to the adirondack park in northern new york* (No. 00-3). Ithaca, NY: Human Dimensions Research Unit, Cornell University.

Enck, J. W., & Brown, T. L. (2002). New yorkers' attitudes toward restoring wolves to the Adirondack Park. *Wildlife Society Bulletin*, *30*(1), 16–28.

Finucane, M. L., Alhakami, A., Slovic, P., & Johnson, S. M. (2000). The affect heuristic in judgments of risks and benefits. *Journal of Behavioral Decision Making*, *13*, 1–17.

Finucane, M. L., & Holup, J. (2006). Risk as value: Combining affect and analysis in judgments. *Journal of Risk Research*, *9*(2), 141–164.

Fishbein, M., & Ajzen, I. (1975). *Belief, attitude, intention, and behavior: An introduction to theory and research*. Reading, MA: Addison-Wesley Pub. Co.

Gliner, J. A., Vaske, J. J., & Morgan, G. A. (2001). Null hypothesis significance testing: Effect size matters. *Human Dimensions of Wildlife*, *6*(4), 291–301.

Gregory, R., Lichtenstein, S., & MacGregor, D. (1993). The role of past states in determining reference points for policy decisions. *Organizational Behavior and Human Decision Processes*, *55*, 195–206.

Heberlein, T. A., & Ericsson, G. (2005). Ties to the countryside: Accounting for urbanites attitudes toward hunting, wolves, and wildlife. *Human Dimensions of Wildlife*, *10*(3), 213–227.

Hook, R. A., & Robinson, W. L. (1982). Attitudes of Michigan citizens toward predators. In G. H. Harrington & P. C. Paquet (Eds.), *Wolves in the world* (pp. 382–394). Park Ridge, NJ: Noyes.

Kahneman, D., & Tversky, A. (1979). Prospect theory: An analysis of decision under risk. *Econometrica*, *47*, 263–291.

Karlsson, J., & Sjöström, M. (2007). Human attitudes towards wolves, a matter of distance. *Biological Conservation*, *137*(4), 610–616.

Downloaded by [US Fish & Wildlife Service] at 07:51 07 November 2012

Keller, C., Siegrist, M., & Gutscher, H. (2006). The role of the affect and availability heuristics in risk communication. *Risk Analysis*, *26*(3), 631–639.

Kellert, S. R. (1985). Public perceptions of predators, particularly the wolf and coyote. *Biological Conservation*, *31*, 167–189.

Kleiven, J., Bjerke, T., & Kaltenborn, B. P. (2004). Factors influencing the social acceptability of large carnivore behaviors. *Biodiversity and Conservation*, *13*, 1647–1658.

LaVine, K. P. (1995). *The attitudes of utah residents toward gray wolves*. Unpublished Master's, Utah State University, Logan.

Liu, J. H., & Latane, B. (1998). The catastrophic link between the importance and extremity of political attitudes. *Political Behavior*, *20*(2), 105–126.

Loewenstein, G., Weber, E., Hsee, C., & Welch, N. (2001). Risk as feelings. *Psychological Bulletin*, *127*, 267–286.

Lohr, C. W., Ballard, W. B., & Bath, A. J. (1996). Attitudes toward gray wolf reintroduction to New Brunswick. *Wildlife Society Bulletin*, *24*, 414–420.

McNaught, D. A. (1987). Wolves in Yellowstone? Park visitors respond. *Wildlife Society Bulletin*, *15*, 518–521.

Meadow, R., Reading, R. P., Phillips, M., Mehringer, M., & Miller, B. J. (2005). The influence of persuasive arguments on public attitudes toward a proposed wolf restoration in the southern Rockies. *Wildlife Society Bulletin*, *33*(1), 154–163.

Mech, L. D. (1995). The challenge and opportunity of recovering wolf populations. *Conservation Biology*, *9*(2), 270–278.

Mech, L. D. (1996). A new era for carnivore conservation. *Wildlife Society Bulletin*, *24*(3), 397–401.

Minn, B. P. (1977). *Attitudes toward wolf reintroductions in Rocky Mountain National Park*. Unpublished Master's Thesis, Colorado State University, Fort Collins, CO.

Nunnaly, J. C., & Berstein, I. H. (1994). *Psychometric theory* (3rd ed.). New York: McGraw-Hill.

Osgood, C. E., Suci, G. J., & Tannenbaum, P. H. (1957). *The measurement of meaning*. Urbana: University of Illinois Press.

Pate, J., Manfredo, M. J., Bright, A. D., & Tishbein, G. (1996). Coloradans' attitudes toward reintroducing the gray wolf into Colorado. *Wildlife Society Bulletin*, *24*, 421–428.

Payne, J. W., Bettman, J. R., & Johnson, E. J. (1992). Behavioral decision research: A constructive processing perspective. *Annual Review of Psychology*, *43*, 87–132.

Petty, R. E., & Krosnick, J. A. (1995). *Attitude strength: Antecedents and consequences* (Vol. 4). Mahway, NJ: Lawrence Erlbaum Associates.

Prislin, R., Wood, W., & Pool, G. J. (1998). Structural consistency and the deduction of novel from existing attitudes. *Journal of Experimental Social Psychology*, *34*(1), 66–89.

Slovic, P. (1995). The construction of preference. *American Psychologist*, *50*, 364–371.

Slovic, P., Finucane, M. L., Peters, E., & MacGregor, D. G. (2004). Risk as analysis and risk as feelings: Some thoughts about affect, reason, risk and rationality. *Risk Analysis*, *24*(2), 1–12.

Sunstein, C. R. (2007). On the divergent american reactions to terrorism and climate change. *Columbia Law Review*, *107*(2), 503–557.

Teel, T. L., Bright, A. D., Manfredo, M. J., & Brooks, J. J. (2006). Evidence of biased processing of natural resource-related information: A study of attitudes toward drilling for oil in the Arctic National Wildlife Refuge. *Society & Natural Resources*, *19*, 447–463.

Tucker, P., & Pletscher, D. H. (1989). Attitudes of hunters and residents toward wolves in northwestern Montana. *Wildlife Society Bulletin*, *17*, 509–514.

Tversky, A., & Kahneman, D. (1981). The framing of decisions and the psychology of choice. *Science*, *211*, 453–458.

Williams, C., Ericsson, G., & Heberlein, T. A. (2002). A quantitative summary of attitudes toward wolves and their reintroduction (1972–2000). *Wildlife Society Bulletin*, *30*(2), 575–584.

Wilson, M. A. (1997). The wolf in Yellowstone: Science, symbol, or politics? Deconstructing the conflict between environmentalism and wise use. *Society & Natural Resources*, *10*, 453–468.

Wood, W. (2000). Attitude change: Persuasion and social influence. *Annual Review of Psychology*, *51*, 539–570.

Wood, W., Rhodes, N., & Biek, M. (1995). Working knowledge and attitude strength: An informa-tion-processing analysis. In R. E. Petty & J. A. Krosnick (Eds.), *Attitude strength: Antecedents and consequences* (Vol. 4, pp. 283–314). Mahway, NJ: Lawrence Erlbaum Associates.

Zinn, H. C., Manfredo, M. J., Vaske, J. J., & Wittmann, K. (1998). Using normative beliefs to deter-mine the acceptability of wildlife management actions. *Society & Natural Resources*, *11*(7), 649–662.

Downloaded by [US Fish & Wildlife Service] at 07:51 07 November 2012

# EXHIBIT GGG

[Federal Register Volume 76, Number 249 (Wednesday, December 28, 2011)]
[Rules and Regulations]
[Pages 81665-81726]
From the Federal Register Online via the Government Printing Office
[www.gpo.gov]
[FR Doc No: 2011-32825]

[[Page 81665]]

Vol. 76

Wednesday,

No. 249

December 28, 2011

Part III

Department of the Interior

-----------------------------------------------------------------------

Fish and Wildlife Service

-----------------------------------------------------------------------

50 CFR Part 17

Endangered and Threatened Wildlife and Plants; Revising the Listing of
the Gray Wolf (Canis lupus) in the Western Great Lakes; Final rule

Federal Register / Vol. 76, No. 249 / Wednesday, December 28, 2011 /
Rules and Regulations

[[Page 81666]]

-----------------------------------------------------------------------

DEPARTMENT OF THE INTERIOR

Fish and Wildlife Service

50 CFR Part 17

[Docket No. FWS-R3-ES-2011-0029; FXES11130900000C6-123-FF09E32000]
RIN 1018-AX57


Endangered and Threatened Wildlife and Plants; Revising the
Listing of the Gray Wolf (Canis lupus) in the Western Great Lakes

AGENCY: Fish and Wildlife Service, Interior.

ACTION: Final rule.

-----------------------------------------------------------------------

SUMMARY: We, the U.S. Fish and Wildlife Service (Service or USFWS) are
revising the 1978 listing of the Minnesota population of gray wolves
(Canis lupus) to conform to current statutory and policy requirements.
We rename what was previously listed as the Minnesota population of the
gray wolf as the Western Great Lakes (WGL) Distinct Population Segment
(DPS), and delineate the boundaries of the expanded Minnesota
population segment to include all of Minnesota, Wisconsin, and Michigan
and portions of the adjacent states. We are removing the WGL DPS from
the List of Endangered and Threatened Wildlife. We are taking this
action because the best available scientific and commercial information
indicates that the WGL DPS does not meet the definitions of threatened
or endangered under the Act.
    This final rule also removes the designated critical habitat for
the wolf in Minnesota and Michigan and the special regulations under
section 4(d) of the Act for wolves in Minnesota.
    We are separating our determination on the delisting of the Western
Great Lakes DPS from the determination on our proposal regarding all or
portions of the 29 eastern States we considered to be outside the
historical range of the gray wolf. This rule finalizes our
determination for the WGL DPS. A subsequent decision will be made for
the rest of the eastern United States.

DATES: This rule becomes effective on January 27, 2012.

ADDRESSES: This final rule is available on the Internet at
http://www.regulations.gov and at the U.S. Fish and Wildlife Service, Midwest
Regional Office, 5600 American Boulevard West, Suite 990, Bloomington,
Minnesota 55437. Comments and materials we received, as well as
supporting documentation we used in preparing this final rule, are

available for public inspection on http://www.regulations.gov at Docket
No. FWS-R3-ES-2011-0029, or by appointment, during normal business
hours at the following Ecological Services offices:

 Twin Cities, Minnesota Ecological Services Field Office, 4101
American Blvd. E., Bloomington, MN; (612) 725-3548.
 Green Bay, Wisconsin Ecological Services Field Office, 2661
Scott Tower Dr., New Franken, WI; (920) 866-1717.
 East Lansing, Michigan Ecological Services Field Office, 2651
Coolidge Road, Suite 101, East Lansing, MI; (517) 351-2555.

FOR FURTHER INFORMATION CONTACT: Laura Ragan, (612) 713-5350. Direct
all questions or requests for additional information to: GRAY WOLF
QUESTIONS, U.S. Fish and Wildlife Service, 5600 American Boulevard
West, Suite 990, Bloomington, Minnesota 55437. Additional information
is also available on our Web site at http://www.fws.gov/midwest/wolf.
Individuals who are hearing-impaired or speech-impaired may call the
Federal Relay Service at 1-(800) 877-8337 for TTY assistance.

SUPPLEMENTARY INFORMATION:

Background

Previous Federal Actions for WGL Wolves

    The eastern timber wolf (Canis lupus lycaon) was listed as
endangered in Minnesota and Michigan in the first list of species that
were protected under the 1973 Act, published in May 1974 (USDI 1974).
On March 9, 1978, we published a rule (43 FR 9607) reclassifying the
gray wolf at the species level (Canis lupus) as endangered throughout
the conterminous 48 States and Mexico, except for the Minnesota
population, which we classified to threatened. The separate subspecies
listings, including C. l. lycaon, thus were subsumed into the listings
for the gray wolf in Minnesota and the gray wolf in the rest of the
conterminous United States and Mexico. We considered the Minnesota
group of gray wolves to be a listable entity under the Act, and listed
it as threatened; we considered the gray wolf group in Mexico and the
48 conterminous States other than Minnesota to be another listable
entity, and listed it as endangered (43 FR 9607, 9610, respectively,
March 9, 1978). This reclassification was undertaken because of
uncertainty about the taxonomic validity of some of the previously
listed subspecies and because we recognized that wolf populations were
historically connected, and that subspecies boundaries were thus
malleable.
    However, the 1978 rule also stated that ``biological subspecies
would continue to be maintained and dealt with as separate entities''
(43 FR 9609), and offered ``the firmest assurance that [the Service]
will continue to recognize valid biological subspecies for purposes of
its research and conservation programs'' (43 FR 9610, March 9, 1978).
Accordingly, recovery plans were developed for the wolf populations in
the following regions of the United States: the northern Rocky
Mountains in 1980, revised in 1987; the eastern U.S. in 1978, revised
in 1992; and the Southwest, the revision of which is now under
way.
    In the 1978 rule, we also identified Isle Royale National Park,
Michigan, and Minnesota wolf management zones 1, 2, and 3, as critical
habitat. We also promulgated special regulations under section 4(d) of

019732A

the Act for operating a wolf management program in Minnesota at that time. The depredation control portion of the special regulation was later modified (50 FR 50793; December 12, 1985); these special regulations are found in 50 CFR 17.40(d)(2).

On April 1, 2003, we published a final rule revising the listing status of the gray wolf across most of the conterminous United States (68 FR 15804). Within that rule, we identified three DPSs for the gray wolf, including an Eastern DPS, which was reclassified from endangered to threatened, except where already classified as threatened. In addition, we established a second section 4(d) rule that applied provisions similar to those previously in effect in Minnesota to most of the Eastern DPS. The special rule was codified in 50 CFR 17.40(o).

U.S. District Court rulings in Oregon and Vermont on January 31, 2005, and August 19, 2005, respectively, invalidated the April 1, 2003, final rule. Consequently, the status of gray wolves outside of Minnesota reverted back to endangered status, as had been the case prior to the 2003 reclassification. The courts also invalidated the three DPSs identified in the April 1, 2003, rule, as well as the associated special regulations.

On March 27, 2006, we published a proposal (71 FR 15266–15305) to identify a WGL DPS of the gray wolf, to remove the WGL DPS from the protections of the Act, to remove designated critical habitat for the gray wolf in Minnesota and Michigan, and to remove special regulations for the gray wolf in Minnesota. The proposal was followed by a 90-day comment period,

[[Page 81667]]

during which we held four public hearings on the proposal.

On February 8, 2007, the Service issued a rule that identified and delisted the WGL DPS of the gray wolf (Canis lupus) (72 FR 6052). Three parties challenged this rule (Humane Society of the United States v. Kempthorne, 579 F. Supp. 2d 7 (D.D.C. 2008)), and on September 29, 2008, the court ruled in favor of the plaintiffs and vacated the rule and remanded it to the Service.

On December 11, 2008, we published a notice reinstating protections for the gray wolf in the western Great Lakes (and northern Rocky Mountains) pursuant to court orders (73 FR 75356).

On April 2, 2009, we published a final rule identifying the western Great Lakes populations of gray wolves as a DPS and revising the List of Endangered and Threatened Wildlife by removing the DPS from that list (74 FR 15070). We did not seek additional public comment on the 2009 final rule. On June 15, 2009, five parties filed a complaint against the Department and the Service alleging that we violated the Act, the Administrative Procedure Act (APA), and the court's remand order by publishing the 2009 final rule (74 FR 15070). On July 2, 2009, pursuant to a settlement agreement between the parties, the court issued an order remanding and vacating the 2009 final rule.

On March 1, 2000, we received a petition from Mr. Lawrence Krak of Gilman, Wisconsin, and on June 28, 2000, we received a petition from the Minnesota Conservation Federation. Mr. Krak's petition requested the delisting of gray wolves in Minnesota, Wisconsin, and Michigan. The Minnesota Conservation Federation requested the delisting of gray wolves in a Western Great Lakes DPS. Because the data reviews resulting from the processing of these petitions would be a subset of the review begun by our July 13, 2000, proposal (65 FR 43450) to revise the current listing of the wolf across most of the conterminous United

States, we did not initiate separate reviews in response to those two petitions. While we addressed these petitions in our February 8, 2007, final rule (72 FR 6052), this rule was vacated by the subsequent District Court ruling. While we view our actions on these petitions as final upon publication of the Federal Register determinations, we nevertheless restate our 90-day findings that the action requested by each of the petitions may be warranted, as well as our 12-month finding that the action requested by each petition is warranted.

On March 15, 2010, we received a petition from the Minnesota Department of Natural Resources requesting that the gray wolf in Minnesota be removed from the List of Endangered or Threatened Wildlife under the Act. Likewise, on April 26, 2010, we received a petition from the Wisconsin Department of Natural Resources requesting that the gray wolf in Minnesota and Wisconsin be delisted. On April 26, 2010, we received a petition from the Sportsmen's Alliance, representing five other organizations, requesting that gray wolves in the Great Lakes area be delisted. On June 17, 2010, we received a petition from Safari Club International, Safari Club International Foundation, and the National Rifle Association of America requesting that wolves of the western Great Lakes be delisted. In response to those four petitions, on September 14, 2010, we published a 90-day finding determining that the petitions presented substantial information that delisting may be warranted and reinitiated a full status review.

We published a proposal to revise the List of Endangered and Threatened Wildlife for the gray wolf (Canis lupus) in the eastern United States and to initiate status reviews for the gray wolf and for the eastern wolf (Canis lycaon) on May 5, 2011 (76 FR 26806). On August 26, 2011, we published a notice (76 FR 53379) reopening the public comment period on the May 5, 2011, proposal. We reopened the comment period to allow for additional public review and the inclusion of any new information, specifically concerning North American wolf taxonomy. That notice also informed the public that we were considering issuing separate final rules for our final determinations on the proposed delisting of the Western Great Lakes DPS and the proposed determination regarding all or portions of the 29 States considered to be outside the historical range of the gray wolf. On September 19, 2011, the Service published a notice (76 FR 57943) informing the public that supplementary materials were available. In recognition of intellectual property right laws, the manuscript made available on August 26 provided readers with references to the sources of several copyrighted figures, but did not include the figures themselves. The Service subsequently obtained approval to include all copyrighted figures in the manuscript and on September 7, 2011, uploaded a complete copy of the manuscript to http://www.regulations.gov.

Conformance With the Act's Definition of Species

Given the assurances we provided in the 1978 Canis lupus listing that we would continue to treat gray wolf subspecies as separate entities for conservation purposes (as noted in Previous Federal Actions for WGL Wolves, above), we identified a need to reconsider the listing in light of current statutory and policy standards regarding the Act's definition of species. The Act provides for listing at various taxonomic and subtaxonomic levels through its definition of ``species'' in section 3(16): The term species includes any subspecies of fish or wildlife or plants, and any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when

019734A

mature (16 U.S.C. 1532(16). As a matter of procedure, then, the Service
determines whether it is most appropriate to list an entity as a full
species, a subspecies, or a DPS of either a species or subspecies. The
gray wolf has a Holarctic range; the current listing encompasses the
United States-Mexico segment of the range and consists, in turn, of
multiple entities.

    The specific provision for listing distinct population segments of
vertebrates was enacted through the 1978 amendments to the Act (Pub. L.
95-362, November 10, 1978); these amendments replaced the ability to
list ``populations'' with the ability to list ``distinct population
segments'' and treat them as ``species'' under the Act. To interpret
and implement the 1978 DPS amendment, the Service and the National
Marine Fisheries Service jointly published the Policy Regarding the
Recognition of Distinct Vertebrate Population Segments Under the
Endangered Species Act (DPS policy) (61 FR 4722, February 7, 1996),
setting policy standards for designating populations as ``distinct.''

    The March 1978 gray wolf listing predated the November 1978
amendments to the Act. Although the 1978 rule lists two C. lupus
entities, i.e., the endangered and threatened entities described above,
these listings were not predicated upon a formal DPS analysis and do
not comport with current policy standards. Nonetheless, subsequent
recovery plans and all gray wolf rulemakings since 1996 have focused on
units reflective of the evident intent of the 1978 rule to manage and
recover the different gray wolf groups covered by the 1978 listings as
''separate entities'' (43 FR 9609), i.e., subspecies or populations.
This rule revises the 1978 threatened listing to bring that listing in
line, insofar as possible, with the Act's

[[Page 81668]]

requirements and current policy standards.

Wolf Taxonomy in the Western Great Lakes Region

    The taxonomic status of the wolves in the western Great Lakes
region has long been debated. They have been considered a subspecies of
gray wolf, Canis lupus lycaon (Goldman 1944; Hall and Kelson 1959); a
second subspecies of gray wolves, Canis lupus nubilis (Nowak 1995,
2002, 2003); a Canis lupus population that has been influenced by
interbreeding with coyotes (Lehman et al. 1991, Koblm[uuml]ller et al.
2009; vonHoldt et al. 2011); members of a full species Canis lycaon (or
eastern wolf) that is considered separate from Canis lupus (Wilson et
al. 2000; Baker et al. 2003); possibly the same species as the red
wolf, C. rufus (Wilson et al. 2000); the result of hybridization
between C. rufus and C. lupus (Nowak 2002, 2003, 2009); and as a mixed
population of C. lupus, C. lycaon, and their intercrosses (hybrids)
(Wheeldon and White 2009; Fain et al. 2010; Wheeldon et al. 2010).
These varying interpretations of the taxonomic status of western Great
Lakes wolves are summarized, respectively, below.

    Wolves in Michigan, Wisconsin, and eastern Minnesota were
considered by Goldman (1944, p. 437 and Figure 14) to be within the
range of the subspecies Canis lupus lycaon. Goldman based his
classification on variation in body size and proportions, and in pelage
(coat) color. According to Goldman, this was the subspecies of gray
wolf historically found across a wide range east of the Mississippi
River in the United States and in southeastern Canada. Wolves
immediately to the west of the Mississippi River were considered to be

019735A

part of the subspecies Canis lupus nubilus. This taxonomic interpretation was followed by Hall and Kelson (1959, p. 849) and Hall (1981, p. 932).

Based on a study of DNA variation in North American wolves, Wilson et al. (2000, p. 2165) proposed that the taxonomic standing of eastern wolves be elevated to full species as Canis lycaon. They found that eastern wolves were divergent from Canis lupus in both mitochondrial DNA (mtDNA) and autosomal microsatellite DNA composition. They considered the geographic range of C. lycaon as extending west across the Great Lakes region to Minnesota and Manitoba.

Nowak's (2002, p. 119; 2003, p. 243) revision of the subspecies taxonomy reduced the range of C. l. lycaon to southern Ontario and Quebec and northern portions of New York, Pennsylvania, and Ohio. Nowak's classification was primarily based on statistical analysis of measurements of skull features. He considered gray wolves that historically occupied Michigan, Wisconsin, and Minnesota to be within the range of C. l. nubilus. Based on analysis of additional specimens, Nowak (2002, p. 119; 2003; 2009, p. 238) continued to recognize western Great Lakes wolves as C. l. nubilus, but noted that historical specimens from the Upper Peninsula (UP) of Michigan were somewhat transitional between the two subspecies.

Leonard and Wayne (2008, pp. 2-3) have reported on maternally inherited mtDNA sequence haplotypes (DNA sequences or groups of alleles of different genes on a single chromosome that are inherited together as a single unit) from historical (``prerecovery'') wolves from Ontario, Quebec, Michigan, and Wisconsin compared with the recent population of the area. Their interpretation of these results is that the 6 unique haplotypes) identified in 15 historical individuals indicate that the pre-recovery population was ``an endemic American wolf,'' which they call ``the Great Lakes wolf'' (p. 1). However, only the two haplotypes most common in the historical sample still occur in the modern wolf population of the western Great Lakes area. Leonard and Wayne (2008) conclude that the modern population does not contain the diversity of Great Lakes wolf haplotypes found in the prerecovery population and that the current population is primarily a mixture of Canis lupus and coyote hybrids, with minor influence from the endemic Great Lakes wolf (p. 3).

Koblm[uuml]ller et al. (2009) examined wolves from the Great Lakes region (they do not separate between the western and eastern Great Lakes) using three types of genetic markers: mtDNA; Y-chromosome haplotypes based on microsatellite DNA loci on the Y-chromosome, which is a paternally inherited marker; and autosomal microsatellite DNA, which provides information on recent and ongoing interactions among populations rather than evolutionary lineage information. The historical sample from Minnesota was found to exhibit a third Great Lakes wolf mtDNA haplotype that is common in the modern population. However, the Y-chromosome haplotypes identified in the historical sample were more similar to those of western gray wolves, suggesting that interbreeding between Great Lakes wolves and western gray wolves had taken place before 1910, the year of collection.

Koblm[uuml]ller et al. (2009) conclude that, despite what they consider to be both ancient and recent incidences of interbreeding with coyotes and western gray wolves, Great Lakes wolves remain morphologically distinct and represent a ``distinct taxon'' of gray wolf (Canis lupus) that is adapted to the region. They do not, however, conclude that this taxon is differentiated enough to be recognized as a species separate from gray wolves, as proposed by Wilson et al. (2000).

019736A

Several recent studies conclude that the eastern wolf is a unique species and should be recognized as C. lycaon (Wheeldon and White 2009; Wilson et al. 2009; Fain et al. 2010, p. 15; Wheeldon et al. 2010). Wheeldon and White (2009, pp. 3-4) state that both the present-day and pre-recovery wolf populations in the western Great Lakes region are genetically similar and that both were derived from hybridization between C. lupus and the eastern wolf, C. lycaon. Fain et al. (2010, p. 10) recognize C. lycaon as a unique species of North American wolf, and based on mtDNA and Y-chromosome haplotypes and autosomal microsatellite markers, they establish that the population of wolves in the western Great Lakes region comprise C. lupus, C. lycaon, and their hybrids. Contrary to Koblm[uuml]ller et al. (2009), Fain et al. (2010, p. 14) found no evidence of interbreeding with coyotes. Furthermore, they conclude that the western Great Lakes States were included in the historical range of C. lycaon and that hybridization between the two species ``predates significant human intervention'' (Fain et al. 2010, pp. 13-14).

Wheeldon et al. (2010, p. 2) used multiple genetic markers in an attempt to clarify the taxonomic status of Canis species in the western Great Lakes region of Minnesota, Wisconsin, Michigan, and western Ontario. They conclude that the current western Great Lakes wolf population is ``composed of gray-eastern wolf hybrids that probably resulted from historic hybridization between the parental species'' (Wheeldon et al. 2010, p. 10), and that the appropriate taxonomic designation for the western Great Lakes hybrid wolves is C. lupus x lycaon.

Recently, vonHoldt et al. (2011) examined single nucleotide polymorphisms (SNPs) to investigate the genetic distinctiveness of North American canids. They conclude that wolves from the Great Lakes region are the product of low-level hybridization between coyotes and C. lupus that likely occurred prior to the recent invasion of coyotes into the area and found no evidence that C. lycaon exists as a distinct species (vonHoldt et al. 2011, pp. 8-9). They further find that Great

[[Page 81669]]

Lakes wolves are genetically distinct from other North American gray wolves and coyotes, but to what degree remains controversial (vonHoldt et al. 2011, p. 8). This study represents a new system for genetic testing using the whole genome of organisms. This new genetic testing system using SNPs promises to open new opportunities for studying the ancestry and relatedness of canid populations.

Chambers et al. (2011, in prep.) conducted a review of the available scientific literature to assess the taxonomic standing of wolves in North America. They conclude the most supportable interpretation is that the eastern wolf is not a subspecies (C. lupus lycaon), but a full species (C. lycaon). This is based on the available mtDNA and Y-chromosome haplotype data (pp. 91-95). The Service believes the Chambers et al. (in prep.) manuscript (that includes the information on which we at least partially based our proposal) is an important synthesis of the available data that advances and focuses the debate regarding canid taxonomy in North America. The authors themselves acknowledge, nevertheless, that further research may change some of their conclusions (p. 128).

Wolf taxonomic classification is a fast-changing field in which research capabilities have greatly expanded in recent years. It is clear from the studies discussed above that the taxonomic

019737A

classification of wolves in the western Great Lakes region is one that
has been, and will continue to be, debated in the scientific community.
Most researchers, however, agree that there is a unique and genetically
identifiable form of wolf that occupies the western Great Lakes region.
Researchers differ in whether this unique form of wolf should be
recognized as a species, a subspecies, or a distinct taxon or ecotype.
The taxonomic identity of eastern wolves has been controversial since
Wilson et al. (2000) first claimed that eastern wolves are a separate
species (Canis lycaon) from the western wolf (Canis lupus). In our May
5, 2011, proposed rule (76 FR 26806), we proposed to resolve the
ongoing controversy over the classification of wolves in the western
Great Lakes region by accepting what we considered at the time to be
the best scientific interpretation of the available data and
information. The scientific community then had the opportunity to
review our analysis and respond to it through the public and peer
review processes. Comments on the proposed rule, including comments
provided by leading researchers in the field of canid biology and
genetics, have led us to reconsider our proposed interpretation. While
Chambers et al. (in prep.) provide a scientific basis for arguing the
existence of eastern wolves as a distinct species, this represents
neither a scientific consensus nor the majority opinion of researchers
on the taxonomy of wolves, as others continue to argue that eastern
wolves are forms of gray wolves (Koblm[uuml]ller et al. 2009, vonHoldt
et al. 2011). In light of the ongoing scientific debate, and the lack
of clear resolution concerning the taxonomy of wolves in the western
Great Lakes, we are at this time continuing to recognize C. lupus as
the only species that occurs in the WGL. The wolves that occupy the WGL
DPS have long been accepted as gray wolves, C. lupus, and until greater
scientific consensus is reached regarding whether to revise this
taxonomic classification, the better conclusion is to continue to
recognize them as gray wolves.

Wolf-Coyote Relationships

     For a discussion on interpretations of wolf-coyote relationships in
the western Great Lakes, see the discussion under Factor E. Other
Natural or Manmade Factors Affecting Its Continued Existence in this
final rule.

Biology and Ecology of Wolves in the Western Great Lakes

     For a discussion of the biology and ecology of wolves in the WGL,
see the proposed WGL wolf rule published on May 5, 2011 (76 FR 26806-
26145).

Distinct Vertebrate Population Segment Policy Overview

     Pursuant to the Act, we consider whether the best scientific and
commercial data available are sufficient to indicate that listing,
reclassifying, or delisting any species, subspecies, or, for
vertebrates, any DPS of these taxa may be warranted. To interpret and
implement the DPS provision of the Act and congressional guidance, the
Service and the National Marine Fisheries Service (NMFS) published a
policy regarding the identification of distinct vertebrate population
segments under the Act (Policy Regarding the Recognition of Distinct
Vertebrate Population Segments Under the Endangered Species Act, 61 FR
4722, February 7, 1996) (hereafter DPS Policy). Under the DPS policy,

two factors are considered in a decision regarding the potential identification of a DPS: (1) Discreteness of the population segment in relation to the remainder of the taxon, and (2) the significance of the population segment to the taxon to which it belongs. If a population meets both tests, it can be identified as a DPS. Then a third factor, the DPS's conservation status, is evaluated in relation to the Act's standards for listing, delisting, or reclassification, meaning that we undertake an analysis to determine whether the DPS is endangered or threatened or does not meet the criteria for listing. All three steps are necessary components of a complete DPS analysis.

Past Practice and History of Using DPSs

    As of December 8, 2011, of the 388 native vertebrate listings, 80 are listed as less than an entire taxonomic species or subspecies (henceforth referred to in this discussion as populations) under one of several authorities, including the ``distinct population segment'' language in the Act's definition of species (section 3(16)). Thirty-three of these 80 populations, which span 49 different taxa, predate the 1996 DPS Policy; as such, the final listing determinations for these populations did not include formal policy-based analyses or expressly designate the listed entity as a DPS. In several instances, however, the Service and National Marine Fisheries Service (NMFS) have established a DPS and revised the List of Endangered and Threatened Wildlife in a single action, as shown in the following examples.
    In February 1985, the Service delisted the brown pelican (Pelecanus occidentalis) in the southeastern United States and continued to identify it as endangered throughout the remainder of its range (50 FR 4938). In June 1994, NMFS revised the entry for the gray whale (Eschrichtius robustus) to remove the eastern North Pacific population from the List while retaining the western North Pacific population as endangered (59 FR 31094). In July 2003, the Service established two DPSs of the Columbian white-tailed deer (Odocoileus virginianus leucurus)--the Douglas County DPS and the Columbia River DPS--and delisted only the Douglas County DPS, while retaining listed status for the Columbia River DPS (68 FR 43647). In March 2007, the Service established a DPS of the grizzly bear (Ursus arctos horribilis) for the Greater Yellowstone Area and surrounding area within the existing grizzly bear listing in the lower 48 States, and delisted this DPS (72 FR 14865). This decision was later vacated by the court; however, not on the grounds of the DPS. Also in March 2007, the Service identified the American crocodile (Crocodylus acutus) in Florida as a DPS within the existing endangered listing of the American crocodile and reclassified the Florida DPS from endangered to threatened (71

[[Page 81670]]

FR 13027). Revising and delisting the WGL DPS of wolves is consistent with the Service's past practice and does not represent a change in agency position.
    On February 8, 2007, the Service issued a rule that identified and delisted the WGL DPS of the gray wolf (Canis lupus) (72 FR 6052). Three parties challenged this rule (Humane Society of the United States v. Kempthorne, 579 F. Supp. 2d 7 (D.D.C. 2008)), and on September 29, 2008, the court ruled in favor of the plaintiffs and vacated the rule and remanded it to the Service. On remand, the Service was directed to provide an explanation as to how simultaneously identifying and

019739A

delisting a DPS is consistent with the Act's text, structure, policy objectives, legislative history, and any relevant judicial interpretations. The court's primary question was whether the Service has the authority to identify a DPS within a larger already-listed entity and, in the same decision, determine the DPS does not warrant the Act's protections even though the other populations of the species retain the original listing status.

Our authority to make these determinations and to revise the list accordingly is a reasonable interpretation of the language of the Act, and our ability to do so is an important component of the Service's program for the conservation of threatened and endangered species. Our authority to revise the existing listing of a species (the gray wolf in Minnesota and the gray wolf in the lower 48 States and Mexico, excluding Minnesota) to identify a Western Great Lakes DPS and determine that it is healthy enough that it no longer needs the Act's protections is found in the precise language of the Act. Moreover, even if that authority were not clear, our interpretation of this authority to make determinations under section 4(a)(1) and to revise the endangered and threatened species list to reflect those determinations under section 4(c)(1) is reasonable and fully consistent with the Act's text, structure, legislative history, relevant judicial interpretations, and policy objectives.

We consulted with the Solicitor of the Department of the Interior to address the issue in the court's opinion. On December 12, 2008, a formal opinion was issued by the Solicitor, ``U.S. Fish and Wildlife Service Authority Under Section 4(c)(1) of the Endangered Species Act to Revise Lists of Endangered and Threatened Species to `Reflect Recent Determinations' '' (U.S. DOI 2008). The Service fully agrees with the analysis and conclusions set out in the Solicitor's opinion. This final action is consistent with the opinion. The complete text of the Solicitor's opinion can be found at http://www.fws.gov/midwest/wolf/.

Western Great Lakes Distinct Population Segment

In 1978, based on what was at that time the best available biological data, the Service stated that there were two ``species'' of gray wolves in the coterminous United States: ``For purposes of this rulemaking, the gray wolf (Canis lupus) group in Mexico and the 48 conterminous States of the United States, other than Minnesota, is being considered as one `species,' and the gray wolf group in Minnesota is being considered as another `species.' (43 FR 9607, 9610, March 9, 1978). The Service then assigned a different status under the Act to each of those two ``species,'' finding the Minnesota gray wolf `species' to be threatened, while the other gray wolf ``species'' (the 48 conterminous States, except Minnesota, and in Mexico) to be endangered. The 1978 rule referred to the Minnesota listing as the listing of a ``species'' when, clearly, based on the information available at that time, the Minnesota wolves did not taxonomically constitute a separate species of wolf. However, ever since the amendment to the Act later in 1978 that revised the definition of ``species'' to include distinct population segments of vertebrate fish or wildlife, the 1978 Minnesota gray wolf listing has functioned effectively as a DPS.

The DPS Policy (61 FR 4725, February 7, 1996) expressly provides for reexamining pre-policy DPS listings: ``Any DPS of a vertebrate taxon that was listed prior to implementation of this policy will be reevaluated on a case-by-case basis as recommendations are made to

change the listing status for that distinct population segment. The appropriate application of the policy will also be considered in the 5-year reviews of the status of listed species required by section 4(c)(2) of the Act.'' Based on this provision, we are, within this rule, (1) recognizing that the 1978 Minnesota listing has functioned effectively as a DPS, (2) reevaluating that listing by applying the same reevaluation process to this and other de facto DPSs that we apply to formally established DPSs, and (3) revising that de facto DPS listing to meet the criteria in the DPS policy and to reflect the best available biological data.

A gray wolf DPS including only Minnesota would not meet the criteria in the DPS policy because it would not be discrete ``in relation to the remainder of the species to which it belongs'' (61 FR 4725, February 7, 1996). The Minnesota wolf population has expanded well beyond State boundaries and is connected to the wolf population in Wisconsin and Michigan, as evidenced by frequent movements of wolves among the States (Van Deelen 2009, p. 140; Treves et al. 2009, pp. 192-195) and genetic analyses that demonstrate the Wisconsin and Michigan wolves are mostly of the same genetic makeup as Minnesota wolves (Wheeldon and White 2009, p. 4; Fain et al. 2010). Therefore, we are revising the boundaries of the Minnesota DPS to meet the criteria in the DPS policy and to reflect the current geographic location of the population as discussed under the Distinct Population Segment Analysis, below.

Geographical Area of the Western Great Lakes DPS

The geographical area of the WGL DPS is shown in figure 1, below, and is described as all of Minnesota, Wisconsin, and Michigan; the portion of North Dakota north and east of the Missouri River upstream to Lake Sakakawea and east of the centerline of Highway 83 from Lake Sakakawea to the Canadian border; the portion of South Dakota north and east of the Missouri River; the portions of Iowa, Illinois, and Indiana north of the centerline of Interstate Highway 80; and the portion of Ohio north of the centerline of Interstate Highway 80 and west of the Maumee River at Toledo.

[[Page 81671]]

[GRAPHIC] [TIFF OMITTED] TR28DE11.000

Distinct Population Segment Analysis

Analysis for Discreteness

Under the 1996 DPS Policy (61 FR 4722), a population segment of a vertebrate taxon may be considered discrete if it satisfies either of the following conditions: (1) It is markedly separated from other populations of the same taxon as a consequence of physical, physiological, ecological, or behavioral factors (quantitative measures of genetic or morphological discontinuity may provide evidence of this separation); or (2) it is delimited by international governmental boundaries within which differences in control of exploitation, management of habitat, conservation status, or regulatory mechanisms exist that are significant in light of section 4(a)(1)(D) of the Act.

Markedly Separated from Other Populations of the Same Taxon--The western boundaries of the WGL DPS are approximately 400 mi (644 km) from the nearest known gray wolf packs in Wyoming and Montana. The

distance between those western packs and the nearest packs within the WGL DPS is nearly 600 mi (966 km). The area between Minnesota packs and northern Rocky Mountains (NRM) packs largely consists of unsuitable habitat, with only scattered islands of possibly suitable habitat, such as the Black Hills of eastern Wyoming and western South Dakota. There are no known populations of gray wolves to the south or east of the WGL DPS within the United States.

As discussed in the previous section, wolves are known to disperse over vast distances, but straight-line documented dispersals of 400 mi (644 km) or more are very rare. Only three records exist of tagged wolves dispersing from within the core of the WGL DPS that were known to travel a straight-line distance over 400 mi (644 km) (Treves et al. 2009). Although we cannot rule out the possibility of a WGL wolf traveling 600 mi (966 km) or more and joining or establishing a pack in the northern Rockies, such a movement has not been documented and is expected to happen very infrequently, if at all. Similar movements from the NRM wolf population into the WGL DPS are unknown and are expected to happen infrequently. The 2006 Sturgis (South Dakota) wolf is the closest that an NRM wolf has come to entering the WGL DPS (Fain in litt. 2006); however, the Sturgis

[[Page 81672]]

wolf would still have had to travel over 300 mi (500 km) before encountering the nearest wolf pack in the WGL DPS. As the discreteness criterion requires that the DPS be ``markedly separated'' from other populations of the taxon rather than requiring complete isolation, this high degree of physical separation between the WGL DPS and the northern Rocky Mountains satisfies the discreteness criterion.

Delimited by International Boundaries With Significant Management Differences--The DPS policy allows us to use international borders to delineate the boundaries of a DPS if there are differences in control of exploitation, conservation status, or regulatory mechanisms between the countries. The border between the United States and Canada has been used as the northern boundary of the listed entity since gray wolves were reclassified in the lower 48 States and Mexico in 1978. There remain significant cross-border differences in exploitation, management, conservation status, and regulatory mechanisms. About 52,000 to 60,000 wolves occur in Canada, where suitable habitat is abundant (Boitani 2003, p. 322). Because of this abundance, wolves in Canada are not protected by Federal laws and are only minimally protected in most Canadian provinces (Pletscher et al. 1991, p. 546). In the United States, unlike Canada, Federal protection and intensive management has been necessary to recover the wolf (Carbyn 1983).

In general, Canadian gray wolf populations are sufficiently large and healthy so that population regulation, rather than protection and close monitoring, is the management focus. There are an estimated 4,000 wolves in Manitoba (Manitoba Conservation undated). Hunting is allowed nearly province-wide, including in those provincial hunting zones adjoining northwestern Minnesota, with this year's season running from August 31, 2011, through March 31, 2012 (Manitoba Conservation 20011a). Trapping wolves is allowed province-wide, except in and immediately around Riding Mountain National Park (southwestern Manitoba), with this year's season running from September 1, 2011 through August 31, 2012 or October 14, 2011 through March 31, 2012 (varies with trapping zone) (Manitoba Conservation 20011b).

The Ontario Ministry of Natural Resources estimates there are 8,850

wolves in the province, based on prey composition and abundance, topography, and climate, and wolf numbers in most parts of the province are believed to be stable or increasing since about 1993 (Ontario MNR 2005a, pp. 7-9). In 2005, Ontario limited hunting and trapping of wolves by closing the season from April 1 through September 14 in central and northern Ontario (Ontario MNR 2005b). In the portion of Ontario that is adjacent to the WGL DPS, wolf hunting and trapping is permitted year round (Ontario MNR 2005c). If delisted, Minnesota, Wisconsin, and Michigan would carefully monitor and manage wolves to retain populations at or above the recovery goal (see Factor D). Therefore, even though biologically the WGL wolf population is simply a well-connected southern extension of wolves in Canada, we will continue to use the United States-Canada border to mark the northern boundary of the DPS due to the difference in control of exploitation, conservation status, and regulatory mechanisms between the two countries.

Conclusion--Based on our analysis of the best available scientific information, the WGL DPS is markedly separated from other U.S. populations of gray wolves and difference in control of exploitation, conservation status, and regulatory mechanisms justifies discreteness between U.S. and Canadian wolf populations. Therefore, the WGL DPS meets the criterion for discreteness under the DPS policy.

Analysis for Significance

If we determine that a population segment is discrete, we next consider available scientific evidence of its significance to the taxon to which it belongs. Our DPS policy states that this consideration may include, but is not limited to, the following: (1) Persistence of the discrete population segment in an ecological setting unusual or unique for the taxon; (2) evidence that loss of the discrete population segment would result in a significant gap in the range of the taxon; (3) evidence that the discrete population segment represents the only surviving natural occurrence of a taxon that may be more abundant elsewhere as an introduced population outside its historic range; and/or (4) evidence that the discrete population segment differs markedly from other populations of the species in its genetic characteristics. Factor 2 applies to the WGL DPS and is included in our analysis for significance. Factors 1, 3, and 4 do not apply to the WGL DPS and thus are not included in our analysis for significance.

Significant Gap in the Range of the Taxon--Gray wolves once lived throughout most of North America. Gray wolves have been extirpated from most of the southern portions of their historical North American range. The successful restoration of a viable gray wolf metapopulation (a regional group of connected populations of a species) to large parts of Minnesota, Wisconsin, and Michigan has filled a significant gap in the holarctic range of gray wolves in the United States, and it provides an important extension of the range of gray wolves in North America. The loss of the WGL gray wolf population would, therefore, represent a significant gap in the species' holarctic range in that the WGL wolf population is the only gray wolf population in the conterminous States east of the Rocky Mountains and currently holds about 70 percent of North American gray wolves known to occur south of Canada.

Conclusion--Based on our analysis of the best available scientific information, the WGL DPS is significant to the taxon to which it belongs because its loss would result in a significant gap in the range of the taxon. Therefore, the WGL DPS meets the criterion for significance under the DPS policy.

Discrete Vertebrate Population Segment Conclusion

Based on our review of the best available scientific data, we

determine that the WGL DPS is discrete from other gray wolf populations as a result of physical separation from other gray wolf populations in the United States and the international border with Canada. The DPS is significant to the taxon to which it belongs because it contains a wolf metapopulation that fills a large gap in the historical range of the taxon in the conterminous States. Therefore, we have determined that this population segment of wolves satisfies the discreteness and significance criteria required for a DPS. The evaluation of the appropriate conservation status for the WGL DPS is found below.

Delineating the Boundaries of the WGL Gray Wolf DPS

    In contrast to a species or a subspecies, a DPS is a biological population that is delineated by a boundary that is based on something other than established taxonomic distinctions. Therefore, the starting point for delineating a DPS is the biological population or metapopulation, and a geographical delineation of the DPS must reasonably represent the population or metapopulation and its biological characteristics and recovery needs.
    To delineate the boundary of the WGL DPS, we considered the current distribution of wolves in the Midwest and the characteristic movements of those wolves and of wolves elsewhere. We examined the best available

[[Page 81673]]

scientific data on long-distance movements, including long-distance movements followed by return movements to the vicinity of the natal pack. We concluded that wolf behavior and the nature of wolf populations require that we include within the area of the DPS some subset of known long-distance movement locations. However, as explained below, wolf biology and common sense argue against including all known or potential long-distance movements within the DPS's boundaries.
    The analysis detailed below resulted in the boundaries of the WGL DPS that are shown in figure 1. This DPS has been delineated to include the core recovered wolf metapopulation plus a wolf movement zone around the core wolf metapopulation. This geographic delineation is not intended to include all areas to which wolves have moved from the Great Lakes population. Rather, it includes the area currently occupied by wolf packs in Minnesota, Wisconsin, and Michigan; the nearby areas in these States in which wolf packs may become established in the foreseeable future; and a surrounding area into which Minnesota, Wisconsin, and Michigan wolves occasionally move but where persistent packs are not expected to be established because suitable habitat is rare and exists only as small patches. The area surrounding the core wolf populations includes the locations of most known dispersers from the core populations, especially the shorter and medium-distance movements from which wolves are most likely to return to the core areas and contribute to the wolf population. Therefore, the DPS encompasses the current range of the population, which is considered to be viable, including the primary range and the peripheral range.
    The WGL areas that are regularly occupied by wolf packs are well documented in Minnesota (Erb and Benson 2004, p. 12, fig. 3; Erb and Don Carlos 2009, pp. 57-60), Wisconsin (Wydeven et al. 2006, p. 33, fig. 1; Wydeven et al. 2009c, pp. 93-98), and the UP of Michigan (Huntzinger et al. 2005, pp. 25-27, figs. 4-6; Beyer et al. 2009, pp. 73-75). Wolves have successfully colonized most, perhaps all, suitable habitat in Minnesota. Minnesota data from the winter of 2007-08

indicate that wolf numbers and density have stabilized since 1997-98, and there was no expansion of occupied range in the State (Erb 2008, pp. 5-7). Wisconsin wolves now occupy most habitat areas believed to have a high probability of wolf occurrence except for some areas of northeastern Wisconsin, and the State's wolf population continues to annually increase in numbers and, to a lesser degree, in area (Wydeven and Wiedenhoeft 2009, p. 2). The UP of Michigan has wolf packs throughout the peninsula. In the last 22 years, the wolf population in the UP has grown every year except 1997 and 2010 (Roell 2010, pers. comm.). Over the past 5 years, the average annual growth has been about 7 percent. While the population trend continues to increase, the rate of increase has slowed, consistent with any population expanding into and then filling available habitat. The population may continue to grow or remain steady; however, a small or even negative growth rate may occur any year and should be considered a natural fluctuation seen in any wildlife population.

When delineating the WGL DPS, we had to consider the high degree of mobility shown by wolves. The dispersal of wolves from their natal packs and territories is a normal and important behavioral attribute of the species that facilitates the formation of new packs, the occupancy of vacant territories, and the expansion of occupied range by the ``colonization'' of vacant habitat. Data on wolf dispersal rates from numerous North American studies (summarized in Fuller et al. 2003, p. 179, Table. 6.6; Boyd and Pletscher 1999, p. 1102, Table 6) show dispersal rates of 13 to 48 percent of the individuals in a pack. Sometimes the movements are temporary, and the wolf returns to a location in or near its natal territory. In some cases, a wolf may continue its movement for scores or even hundreds of miles until it locates suitable habitat, where it may establish a territory or join an existing pack. In other cases, a wolf is found dead at a distance from its original territory, leaving unanswered the questions of how far it would have gone and whether it eventually would have returned to its natal area or population.

Minnesota--The current record for a documented movement by a wolf in North America is held by a Minnesota wolf that moved a minimum (that is, the straight-line distance from known starting point to most distant point) of at least 550 mi (886 km) northwest into Saskatchewan (Fritts 1983, pp. 166-167). Nineteen other primarily Minnesota movements summarized by Mech (in litt. 2005) averaged 154 mi (248 km). Their minimum distance of travel ranged from 32 to 532 mi (53-886 km) with the minimum dispersal distance shown by known returning wolves ranging from 54 mi (90 km) to 307 mi (494 km).

Wisconsin--In 2004, a wolf tagged in Michigan was killed by a vehicle in Rusk County in northwestern Wisconsin, 295 mi (475 km) west of his original capture location in the eastern UP (Wydeven et al. 2005b, p. 4). A north-central Wisconsin yearling female wolf traveled a similar distance (298 mi, 480 km) to the Rainy Lake region of Ontario during 1988-89 (Wydeven et al. 1995, p. 149).

Michigan--Drummer et al. (2002, pp. 14-15) reported 10 long-distance dispersal events involving UP wolves. One of these wolves moved to north-central Missouri and another to southeastern Wisconsin, both beyond the core wolf areas in the WGL. The average straight-line distance traveled by those two wolves was 377 mi (608 km), while the average straight-line distance for all 10 of these wolves was 232 mi (373 km). Their straight-line distances ranged from 41 to 468 mi (66 to 753 km).

Illinois and Indiana--In December 2002, a Marshall County

019745A

(Illinois) wolf likely dispersed from the Wisconsin wolf population, nearly 200 mi (322 km) to the north (Great Lakes Directory 2003). The Randolph County (Indiana) wolf had traveled a minimum distance of at least 428 mi (689 km) to get around Lake Michigan from its central Wisconsin birthplace; it likely traveled much farther than that unless it went through the city or suburbs of Chicago (Wydeven et al. 2004, pp. 10-11; Treves et al. 2009, p. 194). The Pike County (Illinois) wolf that was shot in late 2005 was about 300 mi (180 km) from the nearest wolf packs in central Wisconsin.

   North Dakota, South Dakota, and Nebraska--Licht and Fritts (1994, p. 77) tabulated seven wolves found dead in North Dakota and South Dakota from 1981 through 1992 that are believed to have originated from Minnesota, based on skull morphometrics. Although none of these wolves were marked or radio-tracked, making it impossible to determine the point of initiation of their journey, a minimum travel distance for the seven can be determined from the nearest wolf breeding range in Minnesota. For the seven, the average distance to the nearest wolf breeding range was 160 mi (257 km) and ranged from 29 to 329 mi (46 to 530 km). One of these seven wolves moved west of the Missouri River before it died.

   Genetic analysis of a wolf killed in Harding County, in extreme northwestern South Dakota, in 2001 indicated that it originated from the Minnesota-Wisconsin-Michigan wolf populations (Fain in litt. 2006). The straight-line travel distance to the

[[Page 81674]]

nearest Minnesota wolf pack is nearly 400 mi (644 km).

   The wolf from the Greater Yellowstone area that was killed by a vehicle on Interstate 90 near Sturgis, South Dakota, in March of 2006 traveled a minimum straight-line distance of about 270 mi (435 km) from the nearest known Greater Yellowstone pack before it died (USFWS et al. 2006, in USFWS Program Report, Figure 1).

   A large canid was shot by a Boyd County (Nebraska) rancher in late 1994 or early 1995, likely after crossing the frozen Missouri River from South Dakota (Anschutz in litt. 2006, Jobman in litt. 1995). It was determined to be a wolf that originated from the Great Lakes wolf populations (Fain in litt. 2006), whose nearest pack would have been about 300 mi (480 km) away. A wolf illegally killed near Spalding, Nebraska, in December of 2002 also originated from the Minnesota-Wisconsin-Michigan wolf population, as determined by genetic analysis (Anschutz in litt. 2003, Fain in litt. 2006). The nearest Minnesota wolf pack is nearly 350 mi (563 km) from this location.

   Other notable extra-territorial movements--The extra-territorial movements of several wolves were radio-tracked in sufficient detail to provide insight into their actual travel routes and total travel distances for each trek, rather than only documenting straight-line distance from beginning to end-point. Merrill and Mech (2000, pp. 429-431) reported on four such Minnesota wolves with documented travel distances ranging from 305 to 2,640 mi (490 to 4,251 km) and an average travel route length of 988 mi (1,590 km). Wydeven (1994, pp. 20-22) described a Wisconsin wolf that moved from northwestern Wisconsin to the northern suburbs of St. Paul, Minnesota, for 2 weeks (apparently not seen or reported to authorities by the local residents), then moved back to north-central Wisconsin. The total travel distance was 278 mi (447 km) from her natal pack into Minnesota and on to the north-central Wisconsin location where she settled down.

While investigating the origins of Scandinavian wolf populations, Linnell et al. (2005, p. 387) compiled wolf dispersal data from 21 published studies, including many cited separately here. Twenty-two of 298 compiled dispersals (7.4 percent) were more than 300 km (186 mi). Eleven dispersals (3.7 percent) were more than 500 km (311 mi). Because of the likelihood that many long-distance dispersers are never reported, they conclude that the proportion of long-distance dispersers is probably severely underestimated. Perhaps the longest documented wolf movement is that of a Scandinavian wolf that covered more than 678 miles (1,092 km) (Wabakken et al. 2007).

From these extra-territorial movement records, we conclude that wolf movements of more than 200 mi (320 km) straight-line distance have been documented on numerous occasions, while shorter distance movements are more frequent. Movements of 300 mi (480 km) straight-line distance or more are less common, but include one Minnesota wolf that journeyed a straight-line distance of 300 mi (480 km) and a known minimum-travel distance of 2,640 miles (4,251 km) before it reversed direction, as determined by its satellite-tracked collar. This wolf ultimately returned to a spot only 24 mi (40 km) from its natal territory (Merrill and Mech 2000, p. 430). Although much longer movements have been documented, including some by midwestern wolves, return movements to the vicinity of natal territories have not been documented for extra-territorial movements beyond 300 mi (480 km).

Based on these extra-territorial movement data, we conclude that affiliation with the midwestern wolf population is diminished and essentially lost when dispersal takes a Midwest wolf a distance of 250 to 300 mi (400 to 480 km) beyond the outer edge of the areas that are continuously occupied by wolf packs. Although some WGL wolves will move beyond this distance, available data indicate that longer distance dispersers are unlikely to return to their natal population. Therefore, they have lost their functional connection with, and potential conservation value to, the WGL wolf population.

Wolves moving substantial distances outward from the core areas of Minnesota, Wisconsin, and Michigan will encounter landscape features that are at least partial barriers to further wolf movement and that may, if crossed, impede attempts of wolves to return toward the WGL core areas. If such partial barriers are in a location that has separate utility in delineating the biological extent of a wolf population, they can and should be used to delineate the DPS boundary. Such landscape features are the Missouri River in North Dakota and downstream to Omaha, Nebraska, and Interstate Highway 80 from Omaha eastward through Illinois, Indiana, and into Ohio, ending where this highway crosses the Maumee River in Toledo, Ohio. We do not believe these are absolute barriers to wolf movement.

There is evidence that several Minnesota-origin wolves have crossed the Missouri River (Licht and Fritts 1994, pp. 75, 77, Fig. 1 and Table 1; Anschutz in litt. 2003, 2006) and some Midwest wolves have crossed interstate highways (Merrill and Mech 2000, p. 430). There is also evidence that some wolves are hesitant to cross highways (Whittington et al. 2004, pp. 7, 9; Wydeven et al. 2005b, p. 5; but see Blanco et al. 2005, pp. 315-316, 319-320 and Kohn et al. 2000, p. 22). Interstate highways and smaller roads are a known mortality factor for wolves and, therefore, pose a partial barrier to wolf movements (Blanco et al. 2005, p. 320). The death of a NRM wolf near Sturgis in western South Dakota (Fain in litt. 2006) suggests that the area of the Dakotas west of the Missouri River may be traversed by a small number of wolves coming from both the NRM and WGL wolf populations, as well as wolves

from Canada (Licht and Fritts 1994, pp. 75-77). Wolves in this area cannot be assumed to belong to the WGL wolf population, supporting our belief that the boundary should not be designed to include the locations of all known dispersers.

Recovery of Western Great Lakes Wolves

Recovery Criteria

    Recovery plans are intended to provide guidance to the Service, States, and other partners on methods of minimizing threats to listed species and on criteria that may be used to determine when recovery is achieved. They are not regulatory documents and cannot substitute for the determinations and promulgation of regulations required under section 4(a)(1) of the Act. These documents include, among other elements required under section 4(f) of the Act, criteria for determining when a species can be delisted. There are many paths to accomplishing recovery of a species; in fact, recovery of a species is a dynamic process requiring adaptive management that may, or may not, strictly adhere to the guidance provided in a recovery plan.
    We use recovery criteria in concert with evidence that threats have been minimized sufficiently and populations have achieved long-term viability to judge when a species can be reclassified from endangered to threatened or delisted. Recovery plans, including recovery criteria, are subject to change based upon new information and are revised accordingly and when practicable. In a similar sense, implementation of planned actions is subject to changing information and

[[Page 81675]]

availability of resources. We have taken these considerations into account in the following discussion.
    The 1978 Recovery Plan (hereafter Recovery Plan) and the 1992 Revised Recovery Plan for the Eastern Timber Wolf (hereafter Revised Recovery Plan) contain the same two recovery criteria. The first recovery criterion states that the survival of the wolf in Minnesota must be assured. We, and the Eastern Timber Wolf Recovery Team (Peterson in litt. 1997, 1998, 1999a, 1999b), have concluded that this recovery criterion remains valid. It addresses a need for reasonable assurances that future State, tribal, and Federal wolf management and protection will maintain a viable recovered population of wolves within the borders of Minnesota for the foreseeable future.
    Although the recovery criteria identified in the Recovery Plan predate identification of the conservation biology principles of representation (conserving the genetic diversity of a taxon), resilience (the ability to withstand demographic and environmental variation), and redundancy (sufficient populations to provide a margin of safety), those principles were incorporated into the recovery criteria. Maintenance of the Minnesota wolf population is vital in terms of representation and resilience, because the remaining genetic diversity of gray wolves in the eastern United States was carried by the several hundred wolves that survived in Minnesota into the early 1970s. The Recovery Team insisted that the remnant Minnesota wolf population be maintained and protected to achieve wolf recovery in the eastern United States. The successful growth of the remnant Minnesota population has maintained and maximized the representation of that genetic diversity among wolves in the WGL.

019748A

Although the Revised Recovery Plan did not establish a specific numerical criterion for the Minnesota wolf population, it did identify, for planning purposes only, a population goal of 1,251-1,400 animals for that Minnesota population (USFWS 1992, p. 28). A population of this size would increase the likelihood of maintaining its genetic diversity over the long term. This large Minnesota wolf population also provides resiliency to reduce the adverse impacts of unpredictable demographic and environmental events. Furthermore, the Revised Recovery Plan specifies a wolf population that is spread across about 40 percent of Minnesota (Zones 1 through 4) (USFWS 1992, p. 28), adding a geographic component to the resiliency of the Minnesota wolf population.

The second recovery criterion in the Recovery Plan states that at least one viable wolf population should be reestablished within the historical range of the eastern timber wolf outside of Minnesota and Isle Royale, Michigan (USFWS 1992, pp. 24-26). The reestablished population enhances both the resiliency and redundancy of the WGL metapopulation.

The Recovery Plan provides two options for reestablishing this second population. If it is an isolated population, that is, located more than 100 mi (160 km) from the Minnesota wolf population, the second population should consist of at least 200 wolves for at least 5 years, based upon late-winter population estimates, to be considered viable. Late-winter estimates are made at a time when most winter mortality has already occurred and before the birth of pups, thus, the count is made at the annual low point of the population. Alternatively, if the second population is located within 100 mi (160 km) of a self-sustaining wolf population (for example, the Minnesota wolf population), it should be maintained at a minimum of 100 wolves for at least 5 years, based on late-winter population estimates, to be considered viable. A nearby second population would be considered viable at a smaller size because it would be geographically close enough to exchange wolves with the Minnesota population (that is, they would function as a metapopulation), thereby bolstering the smaller second population both genetically and numerically.

The original Recovery Plan did not specify where in the eastern United States the second population should be reestablished. Therefore, the second population could have been established anywhere within the triangular Minnesota-Maine-Florida area covered by the Recovery Plan and the Revised Recovery Plan, except on Isle Royale (Michigan) or within Minnesota. The Revised Recovery Plan identified potential gray wolf reestablishment areas in northern Wisconsin, the UP of Michigan, the Adirondack Forest Preserve of New York, a small area in eastern Maine, and a larger area of northwestern Maine and adjacent northern New Hampshire (USFWS 1992, pp. 56-58). Neither the 1978 nor the 1992 recovery criteria suggest that the restoration of the gray wolf throughout all or most of what was thought to be its historical range in the eastern United States, or to all of these potential reestablishment areas, is necessary to achieve recovery under the Act.

In 1998, the Eastern Timber Wolf Recovery Team clarified the application of the recovery criterion for the second population to the wolf population that had developed in northern Wisconsin and the adjacent UP of Michigan. This second population is less than 100 mi (160 km) from the Minnesota wolf population. The Recovery Team recommended that the numerical recovery criterion for the Wisconsin-Michigan population be considered met when consecutive late-winter wolf surveys document that the population equals or exceeds 100 wolves (excluding Isle Royale wolves) for the 5 consecutive years between the

019749A

first and last surveys (Peterson in litt. 1998).

Recovery Trends for Wolves in the Western Great Lakes Region

Minnesota Recovery

     During the pre-1965 period of wolf bounties and legal public
trapping, wolves persisted in the remote northeastern portion of
Minnesota but were eliminated from the rest of the State. Estimated
numbers of Minnesota wolves before their listing under the Act in 1974
include 450 to 700 wolves in 1950-53 (Fuller et al. 1992, p. 43, based
on data in Stenlund 1955, p. 19), 350 to 700 wolves in 1963 (Cahalane
1964, p. 10), 750 wolves in 1970 (Leirfallom 1970, p. 11), 736 to 950
wolves in 1971-72 (Fuller et al. 1992, p. 44), and 500 to 1,000 wolves
in 1973 (Mech and Rausch 1975, p. 85). Although these estimates were
based on different methodologies and are not directly comparable, each
puts the prelisting abundance of wolves in Minnesota at 1,000 or less.
This was the only significant wolf population in the United States
outside Alaska during those time periods.
     After the gray wolf was listed as endangered under the Act in 1974,
the Minnesota population estimates increased (see table 1 below). Mech
estimated the population to be 1,000 to 1,200 wolves in 1976 (USFWS
1978, pp. 4, 50-52), and Berg and Kuehn (1982, p. 11) estimated that
there were 1,235 wolves in 138 packs in the winter of 1978-79. In 1988-
89, the Minnesota Department of Natural Resources (MN DNR) repeated the
1978-79 survey and also used a second method to estimate wolf numbers
in Minnesota. The resulting independent estimates were 1,500 and 1,750
wolves in at least 233 packs; the lower number was derived by a method
comparable to the 1978-79 survey (Fuller et al. 1992, pp. 50-51).
     During the winter of 1997-98, the MN DNR repeated a statewide wolf

[[Page 81676]]

population and distribution survey, using methods similar to those of
the two previous surveys. Field staff of Federal, State, tribal, and
county land management agencies and wood products companies were
queried to identify occupied wolf range in Minnesota. Data from 5
concurrent radio telemetry studies tracking 36 packs, representative of
the entire Minnesota wolf range, were used to determine average pack
size and territory area. Those figures were then used to calculate a
statewide estimate of wolf and pack numbers in the occupied range, with
single (nonpack) wolves factored into the estimate (Berg and Benson
1999, pp. 1-2).

Table 1--Minimum Winter Wolf Populations in Minnesota, Wisconsin, and
Michigan (Excluding Isle Royale) From 1976
                                              Through 2010.
     [Note That There are Several Years Between the First Three Estimates.
Minnesota Does Not Conduct Annual
                                             Surveys.]
-------------------------------------------------------------------------
-----------------------------------
                                                              Number of
wolves
                         -----------------------------------------------
-----------------------------------
               Year
Wisconsin and

| | Michigan | Michigan total | Minnesota | Wisconsin |
|---|---|---|---|---|
| 1976 | | | 1,000–1,200 | ................ |
| 1978–79 | | | 1,235 | ................ |
| 1988–89 | 3 | 34 | 1,500–1,750 | 31 |
| 1989–90 | 10 | 44 | ................ | 34 |
| 1990–91 | 17 | 57 | ................ | 40 |
| 1991–92 | 21 | 66 | ................ | 45 |
| 1992–93 | 30 | 70 | ................ | 40 |
| 1993–94 | 57 | 114 | ................ | 57 |
| 1994–95 | 80 | 163 | ................ | 83 |
| 1995–96 | 116 | 215 | ................ | 99 |
| 1996–97 | 113 | 261 | ................ | 148 |
| 1997–98 | 139 | 319 | 2,445 | 180 |
| 1998–99 | 169 | 374 | ................ | 205 |
| 1999–2000 | 216 | 464 | ................ | 248 |
| 2000–01 | 249 | 506 | ................ | 257 |
| 2001–02 | 278 | 604 | ................ | 327 |
| 2002–03 | 321 | 656 | ................ | 335 |
| 2003–04 | 360 | 733 | 3,020 | 373 |
| 2004–05 | 405 | 840 | ................ | 435 |
| 2005–06 | 434 | 899 | ................ | 467 |
| 2006–07 | 509 | 1,055 | ................ | 546 |
| 2007–08 | 520 | 1,069 | 2,921 | 549 |
| 2008–09 | 577 | 1,214 | ................ | 637 |
| 2009–10 | 557 | 1,247 | ................ | 704 |
| 2010–11 | 687 | 1,469 | ................ | 782 |

The 1997-98 survey concluded that approximately 2,445 wolves existed in about 385 packs in Minnesota during that winter period (90 percent confidence interval from 1,995 to 2,905 wolves) (Berg and Benson 1999, p. 4). This figure indicated the continued growth of the Minnesota wolf population at an average rate of about 3.7 percent annually from 1970 through 1997-98. Between 1979 and 1989 the annual growth rate was approximately 3 percent, and it increased to between 4 and 5 percent in the next decade (Berg and Benson 1999, p. 5; Fuller et al. 1992, p. 51). As of the 1998 survey, the number of Minnesota wolves had reached approximately twice the number specified in the recovery planning goal for Minnesota (USFWS 1992, p. 28).

Minnesota DNR conducted another survey of the State's wolf population and range during the winter of 2003-04, again using methodology similar to the previous surveys. That survey concluded that an estimated 3,020 wolves in 485 packs occurred in Minnesota (90 percent confidence interval for this estimate is 2,301 to 3,708 wolves) (Erb and Benson 2004, pp. 7, 9). The MN DNR conducted its most recent survey of wolf population and range during the winter of 2007-08. That survey concluded that an estimated 2,921 wolves in 503 packs occurred in Minnesota (90 percent confidence interval for this estimate is 2,192 to 3,525 wolves). The results of the past three surveys suggest that the wolf population has been numerically stable over the past 10 or more years (Erb 2008, p. 6).

As wolves increased in abundance in Minnesota, they also expanded their distribution. During 1948-53, the primary wolf range was estimated at 11,954 sq mi (31,080 sq km) (Stenlund 1955, p. 19). A 1970 questionnaire survey in Minnesota resulted in an estimated wolf range of 14,769 sq mi (38,400 sq km) (calculated by Fuller et al. 1992, p. 43, from Leirfallom 1970). Fuller et al. (1992, p. 44), using data from Berg and Kuehn (1982), estimated that Minnesota primary wolf range encompassed 14,038 sq mi (36,500 sq km) during the winter of 1978-79. By 1982-83, pairs or breeding packs of wolves were estimated to occupy an area of 22,000 sq mi (57,050 sq km) in northern Minnesota (Mech et al. 1988, p. 86). That study also identified an additional 15,577 sq mi (40,500 sq km) of peripheral range, where habitat appeared suitable but no wolves or only lone wolves existed. The 1988-89 study produced an estimate of 23,165 sq mi (60,200 sq km) as the contiguous wolf range at that time in Minnesota (Fuller et al. 1992, pp. 48-49; Berg and Benson 1999, pp. 3, 5), an increase of 65 percent over the primary range calculated for 1978-79.

The 1997-98 study concluded that the contiguous wolf range had expanded to 33,971 sq mi (88,325 sq km), a 47 percent increase in 9 years (Berg and Benson 1999, p. 5). By that time the Minnesota wolf population was using most of the available primary and peripheral range identified by Mech et al. (1988, p. 86). The wolf population in Minnesota had increased in abundance

[[Page 81677]]

and distribution to the point that its contiguous range covered approximately 40 percent of the State during 1997-98. In contrast, the 2003-04 survey failed to show a continuing expansion of wolf range in Minnesota, and any actual increase in wolf numbers since 1997-98 was attributed to increased wolf density within a stabilized range (Erb and Benson 2004, p. 7). The results of the 2007-08 survey also indicated that wolf range in Minnesota remained ``essentially unchanged'' since 2004 (Erb 2008, not paginated).

Although the Minnesota DNR does not conduct a formal wolf population survey annually, it includes the species in its annual carnivore track survey. This survey, standardized and operational since 1994, provides an annual index of abundance for several species of large carnivores by counting their tracks along 20-mile (32-km) long standardized survey routes in northern Minnesota. In 2009, wolves were detected on 71 percent of the 58 routes surveyed, and the resulting indices of abundance and distribution were not appreciably different from recent years (Erb 2009, not paginated).

Summary for Minnesota

The Minnesota wolf population has increased from an estimated 1,000 individuals in 1976 to nearly 3,000 today, and the estimated wolf range in the State has expanded by approximately 225 percent (from approximately 15,000 sq mi (38,850 sq km) to approximately 34,000 sq mi (88,060 sq km)) since 1970. Over the past 10-12 years, the population size and range have remained stable, as most of the primary and peripheral habitat has been occupied. Based on the current abundance and distribution of the Minnesota wolf population, we believe its continued survival is ensured, and it achieves the first recovery criterion of the Revised Recovery Plan.

Wisconsin Recovery

Wolves were considered to have been extirpated from Wisconsin by 1960. No formal attempts were made to monitor the State's wolf population from 1960 through 1978. Although individual wolves and an occasional wolf pair were reported from 1960 through 1975, (Thiel 1978, Thiel 1993), there was no documentation of wolf reproduction occurring in Wisconsin, and the wolves that were reported may have been dispersing animals from Minnesota.

Wolves are believed to have reestablished breeding packs in Wisconsin in the winter of 1975-76. The Wisconsin Department of Natural Resources (WI DNR) began wolf population monitoring in 1979-80, estimating a statewide population of 25 wolves at that time (Wydeven and Wiedenhoeft 2000, pp. 151, 159; Wydeven et al. 2009c, pp. 93-97). This population remained relatively stable for several years, and then declined to approximately 14 to 19 wolves in the mid-1980s. In the late 1980s, the Wisconsin wolf population began an increase that has continued into 2010, when 690 wolves were counted (Wydeven et al. 2010, Figure 3).

Since 1979, WI DNR has intensively surveyed its wolf population on an annual basis using a combination of aerial, ground, and satellite radio telemetry complemented by snow tracking and wolf sign surveys (Wydeven et al. 2006a, pp. 4-5; Wydeven et al. 2009c, pp. 90-91). Wolves are trapped from May through September and fitted with radio collars, with a goal of having at least one radio-collared wolf in approximately half of the wolf packs in Wisconsin. Aerial locations are obtained from each functioning radio-collar about once per week, and pack territories are estimated and mapped from the movements of the individuals who exhibit localized patterns. From December through March, the pilots make special efforts to visually locate and count the individual wolves in each radio-tracked pack.

Snow tracking is used to supplement the information gained from aerial sightings and to provide pack size estimates for packs lacking a radio-collared wolf. Tracking is done by assigning survey blocks to trained trackers, who then drive snow-covered roads in their blocks and follow all wolf tracks they encounter. Snowmobiles are used to locate wolf tracks in more remote areas with few roads. The results of the aerial and ground surveys are carefully compared to properly separate

019753A

packs and to avoid overcounting (Wydeven et al. 2006a, pp. 4-5). The
estimated number of wolves in each pack is based on the aerial and
ground observations made of the individual wolves in each pack over the
winter.

Because the monitoring methods focus on wolf packs, lone wolves are
likely undercounted in Wisconsin. As a result, the annual population
estimates are probably slight underestimates of the actual wolf
population within the State during the late-winter period. Fuller
(1989, p. 19) noted that lone wolves are estimated to compose from 2 to
29 percent of the total population in the area. Wisconsin DNR surveys
have estimated 2-15 percent of the winter population as loners (Wydeven
et al. 2009c, p. 96). These surveys, however, are focused on heavily
forested portions of northern and central Wisconsin; therefore,
dispersing wolves traveling in other portions of the State are less
likely to be detected, and often such wolves are only documented after
vehicle collisions or accidental shootings. Broader use of trail
cameras by members of the public is improving the WI DNR's ability to
detect lone wolves across the State.

As previously stated, population estimates are made at the low
point of the annual wolf population cycle. Thus, Wisconsin wolf
population estimates are conservative in two respects. They undercount
lone wolves, and the count is made at the annual low point of the
population. This methodology is consistent with the recovery criteria
established in the Revised Recovery Plan, which established numerical
criteria to be measured with data obtained by late-winter surveys.
Based on these considerations, an estimated 690 to 733 wolves in 181
packs, including 35 wolves on Native American reservations, were in
Wisconsin in early 2010, representing an 8 percent increase from 2009
(Wydeven et al. 2010, pp. 12-13).

In the winter of 1994-95, wolves were first documented in Jackson
County, Wisconsin, well to the south of the area occupied by other
Wisconsin wolf packs in the northern part of the State (Thiel et al
2009, pp. 109-110). The number of wolves in this central Wisconsin area
has dramatically increased since that time. During the winter of 2009-
10, there were 100-106 wolves in 25 packs in the central forest wolf
range (Zone 2 in the Wisconsin Wolf Management Plan; Wydeven et al.
2010, p. 5) and an additional 46 to 48 wolves in 12 or 13 packs in the
marginal habitat in Zone 3, located between Zone 1 (northern forest
wolf range) and Zones 2 and 4 (Wydeven et al. 2010, p. 5).

During the winter of 2004-05, 11 to 13 wolves were believed to be
primarily occupying Native American reservation lands in Wisconsin
(Wydeven in litt. 2005); this increased to 16 to 17 in 2005-06, 17 to
19 in 2007-08 (Wydeven and Wiedenhoeft 2008, Summary), approximately 27
in 2008-2009 (Wydeven and Wiedenhoeft 2008, p. 1), and approximately 35
in 2009-10 (Wydeven et al. 2010, p. 1). The 2009-10 survey consisted of
3 packs totaling 10-11 wolves on the Bad River Chippewa Reservation and
a pack of 2 wolves on the Lac Courtes Oreilles Chippewa Reservation,
both in northwestern Wisconsin. There also were two packs of five
wolves each on the Lac du Flambeau Reservation in north-central
Wisconsin. A pack of four wolves and three pairs occurred on the

[[Page 81678]]

Menominee Reservation and a three-wolf pack occurred on the Stockbridge
Reservation, both in northeastern Wisconsin (Wydeven et al. 2010, Table
6). A pack of four to five wolves spent time on portions of the Red
Cliff Chippewa Reservation along the Lake Superior shoreline. Wolf

019754A

packs also used scattered lands of the St. Croix Chippewa in northwest
Wisconsin, the Ho Chunk Nation in central Wisconsin, and Potawatomi in
northeast Wisconsin. The tribal land of the Ho-Chunk, St. Croix
Chippewa, and Potawatomi are composed mostly of scattered parcels of
land, and are not likely to provide significant amounts of wolf
habitat. About 90 percent of packs in northern Wisconsin Zone 1, and
northern portions of Zone 3 are located in ceded territory where
Chippewa Bands have retained hunting and gathering rights.

In 2002, wolf numbers in Wisconsin alone surpassed the 1992 Revised
Recovery Plan criterion for a second population within 100 miles of the
Minnesota population (100 wolves for a minimum of 5 consecutive years
(USFWS 1992, p. 4)). Furthermore, in 2004, Wisconsin wolf numbers
exceeded the 1992 recovery criterion of 200 animals for 6 successive
late-winter surveys for an isolated wolf population (USFWS 1992, p. 4).
Wisconsin population estimates for 1985 to 2010 increased from 15 to
690 wolves (see table 1 above) and from 4 to 181 packs (Wydeven et al.
2010, figure 3). This represents an annual population increase of 21
percent through 2000, and an average annual increase of 11 percent
annually for the period 2004-2010. The slower rates of increase since
2000 are an indication that the State's wolf population growth and
geographic expansion are beginning to level off.

Michigan Recovery

Except for Isle Royale, wolves were extirpated from Michigan as a
reproducing species long before they were listed as endangered under
the Act in 1974. Prior to 1989, the last known breeding population of
wild Michigan wolves outside Isle Royale occurred in the mid-1950s.
However, as wolves began to reoccupy northern Wisconsin, the Michigan
Department of Natural Resources (MI DNR) began noting single wolves at
various locations in the UP of Michigan. Wolf recovery in Michigan
began with the documentation of three wolves traveling together and
making territorial marks in the central UP during the fall of 1988; and
the subsequent birth of pups in this territory during spring 1989
(Beyer et al. 2009, p. 73). Since that time, wolf packs have spread
throughout the UP, with immigration occurring from Wisconsin on the
west and possibly from Ontario on the east. Wolves now are found in
every county of the UP, with the possible exception of Keweenaw County
(Huntzinger et al 2005, p. 6; Roell 2009, pers. comm.).

The MI DNR annually monitors the wolf population in the UP by
conducting a winter survey. Roads and trails are searched intensively
and extensively for wolf tracks and other wolf sign using trucks and
snowmobiles (Potvin et al. 2005). Complete surveys conducted from 1999
to 2006 provided an opportunity to evaluate multiple sampling
approaches (MI DNR 2008). Based on these evaluations, it was determined
that a geographically stratified sampling protocol produced unbiased,
precise estimates of wolf abundance (Potvin et al. 2005; Drummer,
unpublished data). The sampling protocol implemented in 2007 allows
trackers to spend more time in smaller areas (MI DNR 2008).

The UP is divided into 21 survey units from which a stratified
random sample is drawn, covering roughly 50 percent of the UP every
year (MI DNR 2008). Pack locations are derived from previous surveys,
citizen reports, and extensive ground and aerial tracking of radio-
collared wolves. During the winter of 2009-10, the UP had 557 wolves in
109 resident packs (MI DNR in litt. 2010, Table 1). Surveys along the
border of adjacent survey units are coordinated to avoid double
counting of wolves and packs occupying those border areas. In areas
with a high density of wolves, ground surveys by four to six surveyors
with concurrent aerial tracking are used to accurately delineate

territories of adjacent packs and count their members (Beyer et al. 2004, pp. 2-3; Huntzinger et al. 2005, pp. 3-6; Potvin et al. 2005, p. 1661). As with Wisconsin, the Michigan surveys likely miss lone wolves, thus underestimating the actual population.

Based on annual surveys in late winter, estimates of wolves in the UP increased from 57 wolves in 1994 to 557 in late winter 2009-10 (see table 1 above). Over the last 10 years, the annualized rate of increase has been about 12 percent (MI DNR in litt. 2010, table 1). This rate has varied from year to year, but there appear to be two distinct phases of population growth, with relatively rapid growth (25.8 percent average) from 1995 through 2000 and slower growth (10.1 percent average) from 2001 through 2010. In 2005, the number of wolves in the Michigan population alone surpassed the recovery criterion for an isolated wolf population of 200 animals for 6 successive late-winter surveys, as specified in the Revised Recovery Plan (USFWS 1992, pp. 24-26).

To date, no wolf packs are known to be primarily using tribal-owned lands in Michigan (Roell 2011, pers. comm.). Native American tribes in the UP of Michigan own small, scattered parcels of land relative to the size of wolf pack territories. Thus, no one tribal property would likely support a wolf pack. However, as wolves occur in all counties in the UP and are wide-ranging, tribal land is likely used periodically by wolves.

In October 2004, a coyote trapper mistakenly captured and killed a wolf in Presque Isle County in the northern Lower Peninsula (LP) of Michigan. This was the first verification of a wolf in the northern LP in at least 65 years (Roell et al. 2010, p. 4). This wolf had been trapped and radio-collared by the MI DNR the previous year (2003) while it was a member of an eastern UP pack. Since 2004, Michigan has surveyed the northern LP to determine whether wolves had successfully colonized the area. From 2005 through 2007, the survey had two components: a prioritized area search and a targeted area search based on citizen reports of wolves or wolf sign. USDA-Wildlife Services, Little Traverse Bay Band of Odawa Indians, and Central Michigan University worked cooperatively on the surveys. Nine units ranging in size from 200-400 sq mi (322-644 sq km) were surveyed; however, no wolf sign was found (Roell et al. 2010, p. 4). Beginning in 2008, a targeted search approach was used. The MI DNR issued a press release asking citizens to report any wolves or wolf sign; again, no wolves were detected in winters of 2008-10 (Roell et al. 2009, p. 5; Roell 2010, pers. comm.).

In 2008, the DNR recognized the likelihood that small numbers of wolves would eventually move into the northern LP and form persistent packs (Potvin 2003, pp. 29-30; Gehring and Potter 2005, p. 1242; Beyer et al. 2006, p. 35), and revised its Wolf Management Plan in part to incorporate provisions for wolf management in the northern LP (MI DNR 2008a, p. 46). In the summer of 2009, video images of single wolves were recorded in two of the three northern LP counties nearest to the UP (Roell et al. 2010, p. 4). The videos, taken in Emmet County in May 19, 2009, and Presque Isle County in July 27, 2009, may have been of the same animal (Roell 2009, pers. comm.). In 2010, USDA Wildlife Services and MI DNR staff reported a single breeding pair with three pups in Cheboygan County in the northern LP (MI DNR 2010). That 2010 report was based on an

[[Page 81679]]

019756A

assessment of the physical features of three pups that were captured and handled, observations of adult wolf-sized tracks, and remote camera photographs of large wolf-like canids. Subsequent DNA analysis indicated the pups were likely siblings and based on microsatellite genotyping, all three were classified as eastern coyotes rather than some form of Great Lakes wolf. The three pups shared an eastern wolf mtDNA haplotype, which suggests maternal introgression from a female wolf into their pedigree. Wheeldon (unpublished data) considers a likely scenario is that a female wolf bred with a male coyote and their female offspring backcrossed with male coyotes for an undetermined number of generations, culminating in the animals handled.

The wolf population of Isle Royale National Park, Michigan, is not considered to be an important factor in the recovery of wolves in the WGL. The Park population is small and isolated and lacks genetic uniqueness (Wayne et al. 1991, pp. 47-49). For genetic reasons and constraints on expansion due to the island's small size, this wolf population does not contribute significantly towards meeting numerical recovery criteria; however, long-term research on this wolf population has added a great deal to our knowledge of the species. The wolf population on Isle Royale has ranged from 12 to 50 wolves since 1959, and was 16 wolves in the winter of 2010-2011 (Vucetich and Peterson 2011, p. 3).

Summary for Wisconsin and Michigan

The two-State wolf population, excluding Isle Royale wolves, has exceeded 100 wolves since late-winter 1993-94 and has exceeded 200 wolves since late-winter 1995-96. Therefore, the combined wolf population for Wisconsin and Michigan has exceeded the second recovery criterion of the 1992 Revised Recovery Plan for a nonisolated wolf population, since 1999. Furthermore, the two-State population has exceeded the recovery criterion for an isolated second population since 2001.

Other Areas In and Near the Western Great Lakes DPS

No surveys have been conducted to document the number of wolves present in North Dakota or South Dakota, but an increasing number of wolves has apparently been detected in the eastern portions of these States. The eastern boundaries of North Dakota and South Dakota are approximately 19 and 81 mi (30 and 130 km), respectively, from occupied habitat in Minnesota. Biologists who are familiar with wolves in these States, however, generally agree that the wolves found there are primarily lone dispersers, although there were reports of pups being seen in the Turtle Mountains of North Dakota, in 1994 (Collins in litt. 1998).

Other records include an adult male shot near Devil's Lake, North Dakota, in 2002, another adult male shot in Richland County in extreme southeastern North Dakota in 2003 (Fain in litt. 2006), and a vehicle-killed adult male found near Sturgis, South Dakota, in 2006 (Larson in litt. 2006). In contrast to the other South Dakota wolves of the last 25 years, the animal found near Sturgis was genetically identified as having come from the Greater Yellowstone area (Fain in litt. 2006). Most recently, a wolf was shot in Roberts County, South Dakota, in January 2009 (reportedly running with two or three other wolves) (Prieksat in litt. 2009), and another wolf was found dead in a foothold trap that was set as part of an ongoing USDA Wildlife Service's coyote control operation in southeastern Eddy County, North Dakota (Bicknell in litt. 2009). See Delineating the Boundaries of the WGL DPS in this rule for a detailed discussion of movement of wolves.

Wolf dispersal is expected to continue as wolves travel away from

the more saturated habitats in the core range into peripheral areas where wolves are extremely sparse or absent. Unless they return to the primary range and join or start a pack there, they are unlikely to contribute to long-term maintenance of WGL wolf populations.

Although it is possible for these dispersers to encounter and mate with a mature wolf outside the primary range, the lack of large expanses of unfragmented habitat make it unlikely that wolf packs will persist in these peripheral areas; lack of contiguous habitat is expected to seriously impede further expansion. The only exception is the northern LP of Michigan, where several studies indicate that a persistent wolf population may develop (Gehring and Potter 2005, p. 1242; Potvin 2003, pp. 29-30), albeit dependent on occasional to frequent immigration of UP wolves. Despite the constraints on further expansion described here, however, current wolf populations in Minnesota, Wisconsin, and the UP of Michigan have already greatly exceeded the recovery levels defined in the 1992 Revised Recovery Plan, and maintenance of these numbers is not contingent on recruitment of wolves from areas outside the primary range that has been established for the WGL.

Summary of Wolf Recovery in the Western Great Lakes Region

Wolves in the WGL DPS greatly exceed the recovery criteria (USFWS 1992, pp. 24-26) for (1) a secure wolf population in Minnesota, and (2) a second population outside Minnesota and Isle Royale consisting of 100 wolves for 5 successive years. Based on the criteria set by the Eastern Wolf Recovery Team in 1992 and reaffirmed in 1997 and 1998 (Peterson in litt. 1997, in. litt. 1998), the DPS contains sufficient wolf numbers and distribution to ensure their long-term survival within the DPS.

The maintenance and expansion of the Minnesota wolf population has maximized the preservation of the genetic diversity that remained in the WGL DPS when its wolves were first protected in 1974. Furthermore, the Wisconsin-Michigan wolf population has exceeded the numerical recovery criterion even for a completely isolated second population. Therefore, even in the unlikely event that this two-State population was to become totally isolated and wolf immigration from Minnesota and Ontario completely ceased, it would still remain a viable wolf population for the foreseeable future, as defined by the Revised Recovery Plan (USFWS 1992, pp. 25-26). Finally, each of the wolf populations in Wisconsin and Michigan has exceeded 200 animals for 11 and 10 years, respectively, so if either were somehow to become isolated, they would remain viable, and each State has committed to manage its wolf population at or above viable population levels. The wolf's numeric and distributional recovery criteria in the WGL have been met.

Have the historical wolves of the western great lakes region been restored?

Leonard and Wayne (2008, p. 3) have stated that Great Lakes wolves have not been restored based on absence of certain historical mtDNA haplotypes from the current population, an estimated historical population size far greater than the current population size, and the admixture (similar to hybridization, but does not imply the generation in which the mixing occurred) of what they have identified as coyote and western wolf haplotypes in the current population.

The spatial representativeness of both the historical and recent

samples reported by Leonard and Wayne (2008) has been questioned by
Mech (2009). For example, 16 recent but no historical samples from
Minnesota were included in the study. Leonard and Wayne (2009)

[[Page 81680]]

responded that they did not believe that genetic differences were
likely to be pronounced at the geographic scale discussed by Mech and
Paul (2008) and Mech (2009).
    The current population of wolves in Minnesota, Wisconsin, and
Michigan is derived from expansion of the remnant population in
northeastern Minnesota (Fain et al. 2010, p. 12), supplemented by
western gray wolves (Mech and Frenzel 1971; Mech 2010, p. 135), and in
the case of UP Michigan, with possible contributions from wolves from
southern Ontario (Fain et al. 2010, p. 12).
    Subsequent studies with larger samples of the current wolf
population find, despite acknowledged influence of western gray wolves,
the current population is generally representative of the historical
population (Fain et al. 2010, p. 14; Wheeldon et al. 2010).
Koblm[uuml]ller et al. (2009, pp. 10-11) found ``comparatively slight''
differentiation at autosomal microsatellite DNA loci between historical
and current Great Lakes wolves. Wheeldon and White (2009, p. 4) present
microsatellite DNA evidence that the hybridization processes noted by
Leonard and Wayne (2008) were taking place over a century ago, so that
the current population is comparable to the historical population with
respect to admixture. They believe hybridization between eastern wolves
and western wolves in the western Great Lakes region occurred prior to
significant human effects on population size or habitat (Fain et al.
2010, p. 14). According to Fain et al. (2010, p. 14), the current
population of wolves in the western Great Lakes ``represents an ancient
component of the northeast ecosystem and have been established
throughout the region for thousands of years.''
    The loss of mtDNA haplotypes found in the historical but not the
current western Great Lakes wolf population reported by Leonard and
Wayne (2008, pp. 2-3), and the loss of allelic diversity (Fain et al.
2010, p. 11), indicate that a genetic bottleneck occurred when wolves
were nearly extirpated from the western Great Lakes region and during
the period of slow recovery that immediately followed. Despite these
``founder effects'' on the genetic composition of the western Great
Lakes population, various measures of genetic diversity remain
comparable to other wolf populations (Koblm[uuml]ller et al. 2009; Fain
et al. 2010, p. 12; Wheeldon et al. 2010), at least partially owing to
contributions from western gray wolves.
    Wolves in the WGL region display a healthy level of heterozygosity
(Fain et al. 2010, p. 12), and show no evidence that a genetic
bottleneck may have influenced genetic diversity (Koblm[uuml]ller et
al. 2009, p. 1). Schwartz and Vucetich (2009, p. 2) have stated that
``By all accounts, the return of wolves to the Great Lakes region has
been successful * * * they are doing superbly--both in terms of
population viability and ecological function.'' Cronin and Mech (2009,
p. 2) state, ``It is generally acknowledged that the Great Lakes wolf
population is fit, with abundant genetic variation'' (Cronin and Mech
2009, p. 2).
    When the Service revised the endangered species list in 1978 to
include the species Canis lupus in the lower 48 States and Mexico,
regulatory protections were applied to all gray wolves in the lower 48
States, including all subspecies of gray wolves. That rule classified

the Minnesota gray wolf population as a threatened ``species'' and gray wolves elsewhere in the lower 48 States and Mexico as another ``species'' with endangered status. This reclassification was undertaken because of uncertainty about the taxonomic validity of some of the previously listed subspecies and because we recognized that wolf populations were historically connected, and that subspecies boundaries were thus malleable.

This listing arrangement [of four subspecies] has not been satisfactory because the taxonomy of wolves is out of date, wolves may wander outside of recognized subspecific boundaries, and some wolves from unlisted subspecies may occur in certain parts of the lower 48 States. In any case, the Service wishes to recognize that the entire species Canis lupus is Endangered or Threatened to the south of Canada, and considers that this matter can be handled most conveniently by listing only the species name.'' (43 FR 9607).

Since then, except for the short periods during which wolves were delisted, all wolves in the WGL have been protected under that 1978 listing. The recovery of all wolves in the WGL was guided first by the 1978 Recovery Plan and then by the 1992 revised Recovery Plan for the Eastern Timber Wolf. The wolves that were the subject of those documents are the wolves that have been recovered in the WGL. The debate regarding the C. lupus nomenclature that was identified in the 1974 and 1978 listings and in the recovery plans continues to date in the scientific community. Regardless of this debate regarding nomenclature, those listings allowed the wolf population that remained in northern Minnesota to flourish and reestablish the population throughout the core range we have today in Minnesota, Wisconsin, and the UP of Michigan. It is clear that the existing wolves in the WGL are the descendants of the wolves that were listed in 1978; the wolves that were the subject of the recovery plans; the wolves that have met recovery goals; and the wolves that will be managed by States, Tribes, and other Federal agencies after delisting.

Summary of Comments and Recommendations

In the proposed rule published on May 5, 2011 (76 FR 26806), we requested that all interested parties submit written comments on the proposal by July 5, 2011. We also contacted appropriate Federal and State agencies, scientific experts and organizations, and other interested parties and invited them to comment on the proposal. Newspaper notices inviting general public comment were published in the Bangor Daily News (Maine), Duluth News-Tribune (Minnesota), Lansing State Journal (Michigan), Marquette Mining Journal (Michigan), Milwaukee Journal Sentinel (Wisconsin), Minneapolis Star Tribune (Minnesota), Portland Press Herald (Maine), and Wausau Daily Herald (Wisconsin). We held a public hearing on May 18, 2011, in Ashland, Wisconsin, and one on June 8, 2011, in Augusta, Maine. We also held two public information meetings, one in Grand Rapids, Minnesota, on June 14, 2011, and the other in Marquette, Michigan on June 16, 2011.

On August 25, 2011, we published a notice in the Federal Register (76 FR 53379) reopening the public comment period on the May 5, 2011, proposal. We reopened the comment period to allow for additional public review and the inclusion of any new information, specifically concerning North American wolf taxonomy. That notice also informed the public that we were considering issuing separate final rules for our

final determinations on the proposed delisting of the Western Great
Lakes DPS and the proposed determination regarding all or portions of
the 29 States considered to be outside the historical range of the gray
wolf. The second comment period closed on September 26, 2011.

    During the first comment period for the proposed rule, we received
713 unique comments directly addressing the proposed delisting of gray
wolves in the WGL DPS. During the second comment period for the
proposed rule, we received 124 unique comments directly addressing the
proposed delisting of gray wolves in the WGL DPS. These comments
included verbal and written comments received at the public hearings.
Comments were

[[Page 81681]]

submitted by 24 nongovernmental organizations representing a variety of
interest groups including preservation, conservation, animal welfare,
agriculture or livestock, and sportsmen's organizations. Two Federal
agency representatives provided comments, six State agency
representatives provided comments, and one elected official provided a
comment. Six comments were received from Native American Tribes or
tribal government agencies or organizations.

    In accordance with our peer review policy published on July 1, 1994
(59 FR 34270), we solicited expert opinion from four knowledgeable
individuals with scientific expertise that included familiarity with
wolves and their habitat, biological needs, and threats. We received
responses from three of the peer reviewers.

    We reviewed all comments received from the peer reviewers for
substantive issues and new information regarding delisting wolves in
the western Great Lakes. The peer reviewers concurred with our
conclusion that delisting wolves in the WGL DPS is warranted and
provided additional information, clarifications, and suggestions to
improve the final rule.

    Comments received are addressed in the following summary and
incorporated into the final rule as appropriate.

Comments

    (1) Comment: We received numerous comments, including from peer
reviewers, regarding wolf taxonomy, primarily with regards to whether
C. lycaon should be recognized as a separate species from C. lupus.

    Our Response: The extensive information submitted during the
comment periods and recent publications on the subject and the widely
diverging views expressed in the pertinent scientific studies
underscore the enduring debate regarding the taxonomy of North American
wolves--a debate that may not be resolved for some time (see Wolf
Taxonomy in the Western Great Lakes Region for a full discussion).
Although there is not a significant number of new publications that
have become available since we published our proposal in May 2011, the
substance of those new publications and the substantive comments we
received have led us to reconsider our proposed decision.

    Based on a reevaluation of the available scientific information and
the evolving and ongoing scientific debate, we reconsidered our
position, as expressed in the proposed rule (76 FR 26086), that the
gray wolf subspecies Canis lupus lycaon should be elevated to the full
species Canis lycaon and that the population of wolves in the WGL is a
mix of the two full species, Canis lupus and Canis lycaon. While there
are varying scientific opinions on the taxonomic history of North

American wolves, Canis lupus is the species that has been recognized in the WGL for a long time and throughout this technical debate, and there is significant information indicating that continuing to recognize Canis lupus as the species in the WGL is appropriate (see Wolf Taxonomy in the Western Great Lakes Region). Having reviewed and assessed all of the available scientific information, including, in particular, the comments received on the proposed rule and the information that has become available since the proposed rule was published, we have decided the better conclusion in to retain our previous taxonomic recognition of wolves in the WGL as gray wolves (Canis lupus). Therefore, in this final rule we consider all wolves in the WGL DPS to be gray wolves (Canis lupus) and are delisting them as such.

(2) Comment: We received numerous requests from diverse interest groups and individuals asking that we subdivide our final determination on delisting the WGL DPS from the final determination on the rest of the proposed actions for the eastern United States.

Our Response: We are separating our determination on the delisting of the Western Great Lakes DPS from the determination on our proposal regarding all or portions of the 29 eastern States we considered to be outside the historical range of the gray wolf. This rule finalizes our determination for the WGL DPS. A subsequent decision will be made for the rest of the eastern United States.

(3) Comment: We received numerous comments from diverse interest groups and individuals stating that the Service should treat wolves in the western Great Lakes area as a single, connected population and analyze them as such. Others commented that the wolves that occupy the WGL DPS, regardless of scientific species classification, were and continue to be the same wolves that were protected under the Act over 30 years ago. The wolves that are in the WGL DPS now are what was listed, what met the recovery goals, and what should be delisted.

Our Response: In this final rule we consider all wolves in the WGL DPS to be members of a single species, the gray wolf (Canis lupus) and are delisting them as such. When the Service revised the endangered species list in 1978 to include the species Canis lupus in the lower 48 States and Mexico, regulatory protections were applied to all gray wolves in the lower 48 States, including all subspecies of gray wolves. The wolf population in Minnesota was listed separately as a threatened species, while the rest of the lower 48 States and Mexico were listed as endangered. The recovery of all wolves in the WGL was guided first by the 1978 Recovery Plan and then by the 1992 revised Recovery Plan for the Eastern Timber Wolf. The wolves that were the subject of those documents are the wolves that have been recovered in the WGL. The debate regarding the C. lupus nomenclature that was identified in the 1974 and 1978 listings and in the recovery plans continues to date in the scientific community. Regardless of this debate regarding nomenclature, those listings allowed the wolf population that remained in northern Minnesota to flourish and reestablish the population throughout the core range we have today in Minnesota, Wisconsin, and the UP of Michigan. The existing wolves in the WGL are the descendants of wolves in the Minnesota C. lupus population that was protected in the 1978 listing; the wolves that were the subject of the recovery plans; the wolves that have met recovery goals; and the wolves that will be managed by States, Tribes, and other Federal agencies after delisting.

(4) Comment: The Service must analyze how hybridization with eastern wolves is affecting the viability of gray wolves.

Our Response: In light of the ongoing scientific debate, and the

lack of clear resolution concerning the taxonomy of wolves in the western Great Lakes, we are at this time continuing to recognize C. lupus as the only species that occurs in the WGL. The wolves that occupy the WGL DPS have long been accepted as gray wolves, C. lupus, and until greater scientific consensus is reached regarding whether to revise this taxonomic classification, the better conclusion is to continue to recognize them as gray wolves. See Wolf Taxonomy in the Western Great Lakes Region for a full discussion.

    (5) Comment: If two species of wolves exist in the WGL, those two species need to be evaluated separately to determine if each has independently been recovered; or the Service must determine whether the gray wolves (C. lupus) in the WGL, independent of C. lycaon, have met the numerical recovery criteria in the Eastern Timber Wolf Recovery Plan. Others express that because the WGL population is admixed, the Service cannot determine if the gray wolf (C. lupus) itself has been

[[Page 81682]]

recovered. We also received comments stating that the boundaries of the WGL DPS must be based on the gray wolf alone, not on the two species combined.

    Our Response: In light of the ongoing scientific debate, and the lack of clear resolution concerning the taxonomy of wolves in the western Great Lakes, we are at this time continuing to recognize C. lupus as the only species that occurs in the WGL. The wolves that occupy the WGL DPS have long been accepted as gray wolves, C. lupus, and until greater scientific consensus is reached regarding whether to revise this taxonomic classification, it is most logical to continue to recognize them as gray wolves. See Wolf Taxonomy in the Western Great Lakes Region for a full discussion.

    (6) Comment: A few commenters stated that wolves have not achieved recovery because disease, illegal killing, and other human-caused mortality, or inadequate regulatory mechanisms still threaten wolves in the WGL. Others stated that the Service has not provided a complete analysis of threats to wolves in the WGL.

    Our Response: Our detailed review of the past, current, and likely future threats to wolves within the WGL DPS identified human-caused mortality of all forms to constitute the majority of documented wolf deaths. However, the wolf populations in Wisconsin and Michigan have continued to expand in numbers and the Minnesota wolf population is at least maintaining itself at well over the population goal recommended in the 1992 Recovery Plan and at about twice the minimum level established in the 2001 Minnesota Wolf Plan. Healthy wolf populations clearly can withstand a high level of mortality, from human and other causes, and remain viable. We believe that, for purposes of this delisting decision, the numerical growth and range expansion shown by WGL DPS wolves indicate that adequate control of human-caused mortality already exists since the species is being maintained at healthy levels.

    With regard to disease, several diseases have had noticeable impacts on wolf population growth in the Great Lakes region in the past. Despite these and other diseases and parasites, the overall trend for wolf populations in the WGL DPS continues to be upward. Wolf management plans for Minnesota, Michigan, and Wisconsin include disease monitoring components that we expect will identify future disease and parasite problems in time to allow corrective action to avoid a significant decline in overall population viability. Disease may eventually limit overall wolf carrying capacity and contribute to

annual fluctuations in wolf abundance, but at current and foreseeable population levels, diseases are not likely to affect viability or put wolves at risk again of becoming endangered or threatened.

We conducted a thorough analysis of the existing and likely future threats to wolves, giving specific consideration to the five categories of threats set forth in section 4(a)(1) of the Act--(1) habitat destruction or degradation or a reduction in the range of the gray wolf; (2) utilization by humans; (3) disease, parasites, or predatory actions by other animals or humans; (4) State, Tribal, and Federal regulatory measures; and (5) other threats (see Summary of Factors Affecting the Species). Based on our consideration of these factors individually and in combination, we concluded the Western Great Lakes wolf population is neither in danger of extinction nor likely to become so in the foreseeable future, in all or a significant portion of the population's range.

(7) Comment: A number of comments expressed opposition to delisting, making statements such as ``wolves should always be protected'' by the Act and ``why do wolves have to be delisted.''

Our Response: The Act provides the Federal Government with authority to protect and recover threatened and endangered species. When a species has been recovered to the extent that it no longer meets the definition of ``threatened'' or ``endangered,'' the Act provides that it should be removed from the Federal List of Endangered and Threatened Wildlife and Plants and its management be returned to the appropriate States and tribes (in cases where treaties identify such authorities for tribes). The goal of the Act is to recover listed species and then to delist them when they no longer qualify as threatened or endangered, thereby allowing the Service to focus its efforts on the many other species that do qualify as threatened and endangered. The WGL gray wolf DPS no longer meets the definition of a threatened or endangered species, as it has achieved long-standing recovery criteria by greatly expanding in numbers and geographic range and threats to its long-term viability have been reduced or eliminated. Therefore, the Act requires delisting the species, but it also requires that we continue to monitor the status of the species for a minimum of 5 years after delisting, and we can list it again if the monitoring results show that to be necessary.

(8) Comment: The WGL DPS should be reclassified to threatened instead of delisted as this would allow Wisconsin and Michigan to implement depredation control programs while maintaining the Act's protections for wolves.

Our Response: We believe the gray wolf has achieved recovery in the WGL DPS and our five-factor analysis indicates that it is no longer endangered or threatened. Therefore, it should be delisted with management returning to the States and tribes.

(9) Comment: The Service should encourage North Dakota to revise its classification of the wolf and adopt a wolf management plan for the State.

Our Response: The core of the range for the western Great Lakes population of gray wolves is in Minnesota, Wisconsin, and Michigan. Wolf management plans are only needed for these three States for the Service to be assured that WGL wolves will be managed in such a manner that they are not likely to become an endangered species in the foreseeable future. If North Dakota or other States within the WGL DPS wish to develop wolf management plans, the Service will provide technical assistance and guidance as requested.

(10) Comment: A couple of commenters stated that the Service

improperly designated the WGL DPS for the purpose of delisting, further
stating that the DPS tool is intended to be used to protect a
population segment without having to list the entire species.

Our Response: In this rule we recognize that the Minnesota gray
wolf population listed as a species in 1978 has functioned effectively
as a DPS ever since the DPS provision was added to the Act later in
1978. Under the Act, the Service is authorized to reevaluate that
functional DPS listing and revise it to meet the criteria in the DPS
policy and to reflect the ``best available biological data'' (see
Western Great Lakes Distinct Population Segment). We are not
designating a previously unidentified DPS, but are revising a
preexisting listing of Canis lupus in Minnesota that functions as a
DPS. Our reevaluation of the Minnesota listing demonstrates that a gray
wolf DPS including only Minnesota (per the 1978 listing) would not meet
the criteria in the DPS policy, because it would not be discrete ``* *
* in relation to the remainder of the species to which it belongs'' (61
FR 4725, February 7, 1996). The Minnesota wolf population has expanded
well beyond State boundaries and is connected to the wolf population in
Wisconsin and Michigan, as evidenced by frequent movements of wolves
among the States (Van Deelen 2009, p. 140; Treves at al. 2009, pp. 192-
195) and genetic analyses that demonstrate

[[Page 81683]]

the Wisconsin and Michigan wolves are mostly from the same genetic mix
as Minnesota wolves (Wheeldon and White 2009, p. 4; Fain et al. 2010).
Therefore, we are delineating the boundaries of the expanded Minnesota
population segment to meet the criteria in the DPS policy and to
reflect the current geographic location of the population.

Moreover, even if we were identifying a new DPS at this time, we
interpret the Act to allow DPSs to be used for both listing and
delisting species. Section 4(a)(1) of the Act directs the Secretary of
the Interior to determine whether ``any species'' is endangered or
threatened. Numerous sections of the Act refer to adding and removing
``species'' from the list of threatened or endangered plants and
animals. Section 3(16) defines ``species'' to include any subspecies
``and any distinct population segment of any species of vertebrate fish
or wildlife'' Therefore, the Act authorizes us to revise the List of
Endangered and Threatened Wildlife and Plants to list, reclassify, and
delist species, subspecies, and DPSs of vertebrate species.
Furthermore, our ``Policy Regarding the Recognition of Distinct
Vertebrate Population Segments under the Endangered Species Act''
states that the policy is intended for ``the purposes of listing,
delisting, and reclassifying species under the Endangered Species Act *
* *.'' (61 FR 4722, Feb. 7, 1996), and that it ``guides the evaluation
of distinct vertebrate population segments for the purposes of listing,
delisting, and reclassifying under the Act.'' (61 FR 4725).

On December 12, 2008, the Solicitor of the Department of the
Interior issued a formal opinion, ``U.S. Fish and Wildlife Service
Authority Under Section 4(c)(1) of the Endangered Species Act to Revise
Lists of Endangered and Threatened Species to `Reflect Recent
Determinations' '' (U.S. DOI 2008). This opinion represents the views
of the Department of the Interior and fully supports the Department's
position that it is authorized in a single action to identify a DPS
within a larger listed entity, determine that the DPS is neither
endangered nor threatened, and then revise the List of Endangered and
Threatened Wildlife to reflect those determinations. The opinion also

019765A

notes that, although the term ``delist'' is not used in the Act, it is used extensively in the regulations implementing the section 4 listing provisions of the Act, such as 50 CFR 424.11(d). As explained in footnote 8 to the Solicitor's opinion, ``As used by FWS, ``delisting'' applies broadly to any action that revises the lists either to remove an already-listed entity from the appropriate list in its entirety, or to reduce the geographic or taxonomic scope of a listing to exclude a group of organisms previously included as part of an already-listed entity.'' The complete text of the Solicitor's formal opinion can be found at http://www.fws.gov/midwest/wolf/. Therefore, identification and delisting of a DPS is permissible.

(11) Comment: Two commenters stated that, when drawing the boundaries of the DPS, the Service must ensure that all significant portions of the range within the DPS support viable wolf populations. The boundaries should include, at most, core areas in which a population has fully recovered.

Our Response: We have analyzed whether the species is threatened or endangered in a significant portion of its range in the WGL DPS (see Is the Species Threatened or Endangered in a Significant Portion of Its Range?). We believe all significant portions of the species' range within the DPS support viable wolf populations and that the gray wolf has achieved recovery throughout the WGL DPS and is no longer threatened or endangered. Therefore, it should be delisted with management returning to the States and tribes.

We have delineated the DPS to be closely tied to the biological wolf population in the area, and to be consistent with the two relevant court rulings (Defenders of Wildlife v. Norton, 354 F. Supp. 2d 1156 (D. Or. 2005); National Wildlife Federation v. Norton, 386 F. Supp. 2d 553 (D. Vt. 2005)). Wolf biology makes it unreasonable to define a wolf population, and hence a wolf DPS, as solely the area where wolf packs are present at viable levels. Any area that hosts wolf packs also is producing a substantial number of dispersing wolves, some of which return after short absences, while others travel farther and some never return. Delineation of a wolf population must recognize and account for this dispersal behavior to some degree. We believe our DPS delineation is appropriately based on the biological features of the species and the nature of a wolf population by being centered on the areas occupied by the core population, but also including a surrounding area that encompasses a reasonable portion of the areas visited by core population wolves making longer distance movements from their natal areas. We have included nearby areas that are likely to be visited by wolves that have dispersed from the core recovery areas because we believe these wolves should be considered part of that biological population while they are within a reasonable distance from the core areas. The areas of potentially suitable habitat that are currently unoccupied are relatively small, and even if occupied in the future, will not make a significant contribution to the long-term viability of the gray wolf population in the DPS or in the United States, and thus are not considered to be a significant portion of the species range.

A critical component of delineating the boundaries of a DPS is gaining an understanding of the population/metapopulation that is being designated as a DPS. Wolf biology clearly shows that temporary and permanent movements beyond the pack's territory are a key element of wolf population dynamics, and as such, these movements must be considered when delineating a boundary for a DPS. Furthermore, a biologically based DPS boundary cannot follow the edge of the fully occupied core areas, as this comment seems to advocate. Individual

wolves would be constantly moving back and forth across such a
boundary, and pack territories may form on both sides of the line in
some years, and might disappear from one or both sides in subsequent
years, depending on a number of physical, biological, and societal
factors. We determined that the DPS boundary should recognize and
accommodate the normal behavior of the metapopulation members.

    (12) Comment: A few commenters suggested specific revisions to the
DPS boundaries, such as including or not including all of the Dakotas
or not including the northern Lower Peninsula of Michigan.

    Our Response: We considered the best available scientific data on
wolf distributions and movements in delineating the boundaries of the
Western Great Lakes DPS. We considered several options, among them
drawing a tight line around the core Great Lakes wolf population or
drawing a very large circle that included the core population as well
as all areas visited by known dispersers. In the end, however, we
determined that drawing the boundary line to include the core recovered
wolf population in the Great Lakes Region, plus a wolf movement zone
around the core population that includes areas visited by dispersers
known to contribute to the core population, was the most biologically
supported alternative. The determination was the result of a thorough
review of biological data and the regulatory guidance. Additionally,
the delineation of the DPS boundary was supported by the peer-
reviewers.

    (13) Comment: Corridors that allow safe movement of wolves among
the

[[Page 81684]]

Great Lakes States must be maintained, and the benefits of these
corridors must not be undermined by escalated lethal control of wolves.

    Our Response: Wolves are effective dispersers (Forbes and Boyd
1997), and existing habitat linkages among Minnesota, Wisconsin,
Michigan, and Canada allow long-distance movements. Long-distance
movements of wolves through human-dominated landscapes in Minnesota and
Wisconsin suggest highways and roads are not barriers (Mech et al.
1995, p. 368; Merrill and Mech 2000, pp. 429-431). Wolves are capable
of traveling through crop and range land (Licht and Fritts 1994, pp.
75, 77; Wydeven et al. 1998, pp. 777) and can cross ice-covered lakes
and rivers (Mech 1966, accessed at
http://www.cr.nps.gov/history/online_books/fauna7/fauna2a.htm, not paginated)
and unfrozen rivers
during the summer (Van Camp and Gluckie 1979, pp. 236-237).

    The Minnesota, Wisconsin, and Michigan State management plans all
include maintaining habitat linkages and dispersal corridors as a
management component. In Minnesota, most of the occupied wolf range is
contiguous; that is, most packs occur adjacent to or very near other
packs. In addition, all wolves in Minnesota are connected with the much
larger population inhabiting southern Canada (MN DNR 2001, p. 27). The
dispersal corridor between Minnesota and Wisconsin (within and
immediately to the south of management Zone 4) contains large land
areas in public ownership (the Nemadji, St. Croix State Forests,
Chengwatana State Forest, and St. Croix State Park) that are contiguous
with large areas of county forest land in Wisconsin. Because of the
habitat security of the public land base that is adjacent to Wisconsin
between the Twin Cities and Duluth, wolf dispersal corridors between
Minnesota and Wisconsin are well protected. The MN DNR will work in
cooperation with the WI DNR on assessments of the effects of future

development on dispersal in the interstate area (MN DNR 2001, p. 2).

The Wisconsin management plan (WI DNR 1999, p. 23) promotes cooperative habitat management with public land management agencies, industrial forests, and other private landowners, including protection of dispersal corridors on private, tribal, and public land to promote continued wolf movement to and from Michigan and Minnesota, as well as among Wisconsin packs. Furthermore, the Plan states that protection of corridor habitat should be a factor in considering acquisition of public land for other conservation purposes.

The MI management plan recognized the importance of continued movement of wolves within and among the states and Canada to help ensure the long-term viability of the wolf population. As a component of their management plan, the MI DNR will cooperate with Federal, State and tribal agencies and private landowners to identify and protect wolf habitat linkage zones (MI DNR 2008, pp. 39-40). The wolf management plans currently in place for Minnesota, Wisconsin, and Michigan will be more than sufficient to retain viable wolf populations in each State. These State plans provide a very high level of assurance that wolf populations in these three States will not decline to nonviable levels in the foreseeable future.

(14) Comment: Several commenters stated that the Service must ensure that State wolf management strategies accommodate tribal interests within reservation boundaries as well as honor the tribal role and authority in wolf management in the ceded territories. Furthermore, the Federal trust responsibility, as it pertains to wolf management, must be continued after delisting.

Our Response: The Service and the Department of the Interior recognize the unique status of federally recognized tribes, their right to self-governance, and their inherent sovereign powers over their members and territory. The Department, the Service, the Bureau of Indian Affairs (BIA), and other Federal agencies, as appropriate, will take the needed steps to ensure that tribal authority and sovereignty within reservation boundaries are respected as the States implement their wolf management plans and revise those plans in the future. Furthermore, there may be tribal activities or interests associated with the wolf encompassed within the tribes' retained rights to hunt, fish, and gather in treaty-ceded territories. The Department is available to assist in the exercise of those rights. If biological assistance is needed, the Service may provide it via our field offices. The Service will remain involved in the post-delisting monitoring of the gray wolf, but all Service management and protection authority under the Act will end with this delisting. Legal assistance may be provided to the tribes by the Department of the Interior, and the BIA will be involved, when needed.

(15) Comment: One commenter stated that the delisting process has highlighted the need for improved relationships between Tribes and the Service on wolf management issues. Several issues were highlighted: (a) The proposed rule states that ``Tribal representatives declined to participate'' in the development of a wolf management strategy for the lower 48 States. In fact, most Tribes in the country were given no opportunity to participate in this process, and the few intertribal organizations that had any opportunity were invited only after the process was already under way. (b) Many of the references to tribal management perspectives used in the proposal were 8-13 years old, disregarding the fact that tribal perspectives may change over time, possibly misrepresenting current tribal positions. (c) The section that discusses the Service's government-to-government relationship with the

Tribes notes that the Service will ``fully consider all of the comments on the proposed rule that are submitted by Tribes and Tribal members during the public comment period,'' reflecting again the Service's failure to correctly recognize the proper nature of the Service-Tribal relationship.

    Our Response: As discussed in the proposed rule, the Service embarked on a structured decisionmaking process in 2008 as a means of developing a more integrated and comprehensive strategy for gray wolf conservation in the lower 48 States and Mexico. The overall intent of the process was to identify appropriate wolf entities (i.e., listing units) for full status review, anticipating that such review would lead to either confirmation or revision of the existing gray wolf listing. We first conducted several iterations of the process in an internal Service effort to develop a viable framework for considering the scientific and policy questions that drive decisionmaking for wolves. Following our development of a satisfactory decisionmaking framework, we convened a workshop in August 2010 to generate and assess alternative taxonomic and population units at various scales and in various configurations, including the 1978 listing as the status quo alternative. The outcomes from the workshop provided input to our continuing effort to formulate a comprehensive vision of wolf conservation, which evolved into the proposed national wolf strategy discussed in the proposal. This strategy was a broad outline, the components of which are in various stages of execution. The process used to develop the proposed national wolf strategy evolved as we proceeded through our task, and different parties were engaged at different times.

    Although the Midwest Tribes and Inter-Tribal Natural Resource Management Agencies were not

[[Page 81685]]

participants at the August 2010 workshop, we worked hard to involve them in developing a proposal that was specific to the Midwest area. In doing so, to make sure that our proposal appropriately reflected the current status of Tribal wolf management activities, we contacted each Tribe in the Service's Midwest Region that we knew to be involved in wolf management activities in order to clarify their management efforts to date and the status of any Tribal wolf management plans. We hold our government-to-government relationship with Tribes in very high regard and respect Tribal sovereignty. Accordingly, all of the comments received from Tribes and Inter-Tribal Natural Resource Management Agencies in response to the proposed rule were considered in the final rule. In addition, during the comment period, we met with the Chippewa Ottawa Resources Authority Board and the Great Lakes Indian Fish and Wildlife Commission's Voigt Inter-Tribal Task Force to discuss the proposal. We also offered to meet individually with and discuss the proposal with any Tribe that wanted to do so, however none accepted our offer.

    (16) Comment: Post-delisting monitoring is critical and should extend beyond the typical 5-year period. Public harvest will likely take 3-5 years to implement, and this is the variable most likely to affect wolf populations. This variable cannot be adequately evaluated within the 5-year PDM period.

    Our Response: The Service will implement the PDM plan for at least 5 years after delisting the WGL DPS. During the monitoring period, if the Service detects a change in wolf populations or a significant

increase in threats, it can evaluate and change monitoring methods or consider relisting. At the end of the PDM period the Service will conduct a final internal review and may request reviews by the former members of the Eastern Gray Wolf Recovery Team and other independent specialists, as appropriate. If the final internal review indicates that substantive changes have been made to how wolves are managed, we may extend the monitoring period to evaluate potential impacts. Based on those final reviews, which will be posted on the Service's Internet site, the Service will decide whether to relist, extend the monitoring period, or end monitoring.

(17) Comment: One peer reviewer stated that the recent scientific literature contains a few additional pertinent papers on gray wolf diseases and parasites. She noted that those papers are in agreement with the discussion points and conclusions in the proposed rule (pp. 26112-26114).

Our Response: We have incorporated information from those recent scientific papers into our analysis of disease as a potential threat (see the discussion under C. Disease or Predation). That information does not alter our determination that diseases are not likely to affect the viability of wolves or put wolves in the WGL at risk.

(18) Comment: Several commenters expressed concern regarding whether the States would implement a public harvest or recreational hunting after wolves are federally delisted. Others commented that they support a public harvest or recreational hunting. A number provided suggestions on how or specifically where such a public harvest should be implemented, if it is.

Our Response: Unregulated killing was the primary threat to the species historically. The State management plans that will be implemented after delisting provide protection from unregulated killing. It is not the Service's position to decide whether a regulated harvest in and of itself is an appropriate management tool. Instead the Service is concerned with whether the use of that tool might reduce the number of wolves in such a way that they would again be considered a threatened or endangered species under the Act. A regulated harvest of wolves can be carried out in a manner that would not threaten their continued existence.

(19) Comment: A couple of commenters stated that the recovery criteria have not been achieved because either the wolf population data are wrong, or because the Wisconsin-Michigan wolf population is not a second population as is required by the recovery criteria found in the 1992 Recovery Plan.

Our Response: We are fully satisfied that the wolf population estimates provided by the Minnesota, Wisconsin, and Michigan DNRs demonstrate that the numerical recovery criteria have been achieved for far longer than the 5 years recommended in the Federal Recovery Plan. The methods used by WI and MI DNRs result in a conservative count of the wolves that are alive at the late-winter annual low point of the wolf population. The method used by the Minnesota DNR for its much larger wolf population is less precise, but even the lower bound of its 90 percent confidence interval (CI) exceeded the Federal Recovery Plan's Minnesota goal of 1,250-1,440 wolves back as far as the 1988-89 survey (Fuller et al. 1992, p. 50) and the CI lower bound has been well above that goal since then (Erb and Benson 2004, Table 1). Therefore, we see no problem with using these Minnesota population estimates. Members of the Recovery Team have also expressed confidence in the population estimates of all three States (Peterson in litt. 1999a, in litt. 1999b).

The 1992 Federal Recovery Plan describes two scenarios that would satisfy its goal for a second viable wolf population. One scenario deals with the development of an isolated wolf population; such a population must be composed of at least 200 wolves over five successive years. The second scenario is a population that is located within 100 miles of another viable wolf population; such a population must consist of only 100 wolves for five consecutive years (USFWS 1992, pp. 25-26). The Recovery Plan discusses the conservation tradeoffs of completely separate populations versus adjacent populations, and it specifically states that a wolf population larger than 100 wolves ``closely tied to the Minnesota population'' will be considered a viable population despite its small size, because of immigration of wolves from Minnesota (USFWS 1992, pp. 24-25). Although this Recovery Plan was written prior to the common acceptance and use of the conservation biology term ``metapopulation,'' this clearly was the concept being discussed and advocated in the Federal Recovery Plan. The second scenario describes what has occurred in the WGL DPS, and, therefore, the wolves in Wisconsin and Michigan qualify as a second population (see Recovery Criteria for a full discussion).

    (20) Comment: Delisting in the WGL will prevent wolves from further expanding into areas of their previous range. The Service cannot delist wolves in one portion of their range when the species remains endangered throughout the remainder of its historical range, and where viable habitat for the species exists such that further recovery within its historical range can be promoted.

    Our Response: Delisting the Western Great Lakes DPS does not discourage wolf conservation in other parts of their range. The Act defines ``conservation'' as ``the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary.'' 16 U.S.C. 1532(3). The States, tribes, and conservation groups have all played a key role in the recovery of the WGL wolf population and now, because the wolf population is recovered and healthy, continued conservation efforts under the Act are no longer necessary within

[[Page 81686]]

the DPS. The assertion that delisting the WGL DPS is inconsistent with the Act's conservation requirement is based on an apparent confusion of the term ``conservation'' with ``restoration.'' A species is conserved when it no longer meets the Act's definitions of endangered species or threatened species and, at such time, the species should be delisted. This does not require the range-wide restoration of the gray wolf to all areas that it historically inhabited before it may be delisted in the WGL region--an area that is inhabited by a healthy, recovered wolf population.

    Because this final rule does not alter the listing status of wolves under the Act outside of the DPS, it does not hinder the Service's or States' ability to implement reintroduction and recovery programs in other areas of the country. The commenters' focus on the alleged inability of wolves within the DPS to disperse to other areas is misdirected because it takes an overly narrow view of wolf recovery possibilities. This final rule in itself does not foreclose further wolf recovery in other areas of suitable habitat via reintroduction programs. Indeed, gray wolf populations in Wyoming, central Idaho, and the southwestern United States did not develop from dispersers, but

019771A

from wolf reintroductions that were planned and carried out by the Service and partner agencies and organizations. Continued wolf recovery in areas outside of the Western Great Lakes DPS is not prevented by delisting the Western Great Lakes DPS.

(21) Comment: Numerous commenters indicated that our delisting proposal was based on unspecified political considerations, pressure from the livestock industry, exaggerated fears for human safety, pressure from deer/bear hunters and furbearer trappers, and pressure from States. We were asked by other commenters to consider the value of wolves for keeping deer numbers in check, to maintaining healthy ungulate populations, for maintaining native vegetation and other species of wildlife, and in balancing nature. Others thought we should consider the economic benefits provided by a large wolf population. We also received numerous comments indicating that wolves should be delisted because of fear for public safety, increased wolf-human conflicts, reduced funding to control depredating wolves, and/or decreasing public tolerance for wolves.

Our Response: The Act requires that listing and delisting decisions be based entirely on whether a species is endangered or threatened due to one or more categories of threats (section 4(a)(1)) and that we make this determination ``solely on the basis of the best scientific and commercial data available.'' In compliance with the Act, the other nonscientific considerations and factors described above have not been used in making this decision. The WGL gray wolf DPS no longer meets the definition of a threatened or endangered species, and has achieved the recovery criteria established in the Eastern Timber Wolf Recovery Plan (Service 1992) by greatly expanding in numbers and geographic range, and threats to its long long-term viability have been reduced or eliminated.

(22) Comment: Several comments recommended that specific changes be made to the three State wolf management plans or that the State management plans are not ``protective enough'' of wolves.

Our Response: We have reviewed the 2001 Minnesota Plan, the 1999 and 2006 Updated Wisconsin Plan, and the 1997 and 2008 revised Michigan Plan. We reviewed these plans to determine if they will provide sufficient protection and reduce threats. We are primarily concerned with the outcome of the plan's implementation. Once a species is delisted, the details of its management are a State or tribal responsibility; the Federal responsibility is to monitor the plan's implementation and the species' response for at least 5 years to ensure that the plan's outcome is as expected. We have concluded that each plan provides adequate protection for wolves, and will keep threats at a sufficiently low level, so that the WGL DPS wolves will not become threatened or endangered in the foreseeable future. Suggestions for changes to the State wolf management plans should be directed to the respective State management agency for consideration.

(23) Comment: Several comments expressed distrust for State wolf protection, based on past State programs aimed at wolf eradication.

Our Response: We acknowledge the past involvement of State and Federal government agencies in intensive, and largely successful, programs to eradicate wolves. However, we believe that public sentiment and agency mandates have changed dramatically since the 1960s and earlier (see Public Attitudes Toward the Wolf). While wolf eradication might still be the wish of a small number of individuals, we believe there is broad support among the public and within governmental agencies to allow wolves to occupy our landscape, with some degree of management imposed to maintain control of the level of wolf-human

conflicts. Based on existing State laws and State management plans, we will rely on the States to provide sufficient protection to wolves until and unless it is shown they are unwilling or unable to do so.

(24) Comment: The delisting decision is based on the assumption that the State wolf management plans will be fully implemented and funded after Federal delisting.

Our Response: We are required to evaluate the likely future threats that a delisted wolf population will experience. We rely heavily on the State wolf management plans for our assessment of the degree of protection and monitoring that will occur after Federal delisting. Because these plans have received the necessary approvals within the State governments, we believe it is reasonable to assume the plans will be funded and implemented largely as written. Wisconsin and Michigan DNRs have led the efforts to restore wolves to their States for several decades. Based on their proven leadership in Midwest wolf recovery, we see no reason to doubt the continuing commitment of these State agencies to wolf conservation.

We recognize that State wolf plans can be changed by the respective DNR or State legislature, creating some uncertainty regarding plan implementation. However, given the high public visibility of wolf management, the extent of public interest and involvement in the development and updating of the States' plans, the vast amount of scientific data available regarding wolf management, and the status monitoring that we will be maintaining for the next 5 years, we believe it is reasonable and proper to assume that the three State wolf plans will not be significantly changed, nor will their implementation be critically underfunded, in a manner that would jeopardize the viability of any State's wolf population. If this assumption turns out to be incorrect, we have the ability to extend the monitoring period or relist the species, including an emergency relisting, if necessary.

(25) Comment: Human-caused mortality poses too high a risk to delist the wolf. The wolf cannot be delisted ``until this threat has been adequately controlled.''

Our Response: Our detailed review of the past, current, and likely future threats to wolves within the WGL DPS identified human-caused mortality of all forms to constitute the majority of documented wolf deaths. However, the wolf populations in Wisconsin and Michigan have continued to expand in numbers and the Minnesota wolf population is at least maintaining itself at well over the population goal

[[Page 81687]]

recommended in the 1992 Recovery Plan and at about twice the minimum level established in the 2001 Minnesota Wolf Plan. Healthy wolf populations clearly can withstand a high level of mortality, from human and other causes, and remain viable. Although the commenters do not provide any clarification on what is meant by ``adequately controlled'' we believe that, for purposes of this delisting decision, the numerical growth and range expansion shown by WGL DPS wolves indicate that ``adequate control'' already exists since the species is being maintained at healthy levels.

Summary of Changes From Proposed Rule

In this final rule, we make two substantive changes from the proposal. First, we are separating our determination on the delisting of the Western Great Lakes DPS from the determination on our proposal

regarding all or portions of the 29 States we considered to be outside the historical range of the gray wolf. This rule finalizes our determination for the WGL DPS. A subsequent decision will be made for the rest of the eastern United States.

In this final rule, we also amend our taxonomic interpretation of wolves in the WGL. In the proposed rule, we presented and proposed to recognize recent taxonomic information indicating that the gray wolf subspecies Canis lupus lycaon should be elevated to the full species C. lycaon. We believed the best available scientific information supported recognition of the eastern wolf, C. lycaon, as a species and that this species had intercrossed with C. lupus in the western Great Lakes region to constitute a population composed of C. lupus, C. lycaon, and their hybrids.

During the public comment period on the proposal, we received comments from diverse interest groups and individuals (including scientific researchers, State natural resource agencies, sportsmen's groups, cattlemen's groups, and conservation groups) highlighting the ongoing debate regarding the taxonomy of North American wolves. Some of those commenters questioned the position that C. lycaon be recognized as a species (rather than a subspecies); others stated that, in light of ongoing research and recent papers that present varying taxonomic alternatives, it is premature to accept C. lycaon as a separate species. To allow for further consideration of the taxonomy issue, on August 26, 2011, we reopened the public comment period on the proposal to allow for additional public review and comment specifically on the recognition of C. lycaon as a separate species. At that time we made available to the public a manuscript prepared by Service employees that is currently undergoing review for publication (Chambers et al., in prep.). The manuscript provides a review of the available scientific literature to assess the taxonomic standing of wolves in North America. Our recognition of C. lycaon as a separate species in the proposal was, in part, based on information summarized in that manuscript. During the reopened public comment period, we again received numerous comments focused on taxonomy.

Many of the comments we received during both comment periods came from leading researchers in the field of canid biology and genetics, including many of the scientists responsible for the research upon which we based the decision in our proposal. Many of the scientists who commented regarding taxonomy during the first comment period submitted additional comments after reviewing the Chambers et al. (in prep.) manuscript. Several recent publications on the subject were also submitted (e.g., Mech 2011, Mech et al. in press, vonHoldt et al. 2011).

One particular comment letter was signed by eight leading researchers in this field (Weeldon et al. in litt. 2011), many of whom also submitted individual comments on the proposal. In that letter they acknowledge their differing views on wolf taxonomy, yet express that they all disagree with the Service's conclusion in the proposal that two separate species of wolves inhabit the WGL. Those scientists state that research and data collection regarding whether two separate species of wolves inhabit the WGL and whether gray wolves (Canis lupus) historically occupied portions of the eastern United States is ongoing, and that such research will continue to elucidate the taxonomic history of wolves in North America.

L. David Mech, preeminent wolf researcher and peer reviewer for the proposal, submitted comments stating that the proposal to delist wolves in the WGL is well supported by the data, except for the data regarding

019774A

taxonomy (Mech in litt. 2011). He states: ``Although it is true that at
the writing of the proposed rule, it seemed like considerable evidence
had accumulated supporting the existence of the separate species, Canis
lycaon, or the eastern wolf, the vonHoldt et al. (2011) article
published since adds enough doubt as to question that proposition. At
the least, the vonHoldt et al. (2011) article evinces that there is not
consensus by the pertinent scientific community about the existence of
C. lycaon and therefore about the original range of C. lupus.''

    The Service also received a number of comments from conservation
groups that, while supporting the delisting of wolves in the WGL,
asserted that the Service's proposal to recognize C. lycaon as a full
species was not supported by the best available science. The Natural
Resources Defense Council (in litt 2011) cite that ``the Service's
decision to recognize a separate species of wolf, C. lycaon, in this
region is not supported by the best available science'' and ``while the
issue of wolf taxonomy has long been debated, the existence of an
eastern wolf, C. lycaon, as a separate species is not fully supported
by the scientific community. Additionally, the taxonomy of wolves in
this region is the subject of current and active research. As such, it
is premature to declare the existence of C. lycaon as a distinct
species.'' Defenders of Wildlife (in litt. 2011) state that ``a
definitive conclusion cannot be made [regarding the taxonomic status of
the eastern wolf] at this time.'' The National Wildlife Federation (in
litt. 2011) asserts that ``given the significant taxonomic debate that
is currently underway among respected scientists'' and ``because the
scientific community remains unsettled, the taxonomic revision proposed
in this rule is premature.''

    The State natural resource agencies in the WGL also expressed that
the debate regarding wolf taxonomy is unsettled. The MN DNR (in litt.
2011) states ``several competing theories exist surrounding the ongoing
controversy over wolf taxonomy in the Great Lakes region. There is no
general consensus regarding these theories, and * * * it will continue
to be of great debate in the scientific community.'' They further
contend that vonHoldt et al. (2011) ``which contradicts other recent
reports, exemplifies the limitations of drawing final conclusions from
the relatively new, rapidly evolving, and competing theories from the
science of molecular genetics. We recognize the ongoing controversy
over wolf taxonomy in the western Great Lakes region and suggest that
the Service has prematurely accepted only one of several competing
alternatives to the taxonomic classification of wolves.'' The WI DNR
(Stepp in litt. 2011) asserts that ``scientists continue to disagree
whether the eastern wolf is a separate species from gray wolves'' while
the MI DNR (in litt. 2011) states ``we recognize that the science
regarding which species of wolves occur in the Western Great Lakes is
not settled, but we also recognize that wolf conservation cannot be put
on hold

[[Page 81688]]

until every scientific question has a consensus answer.''
    Numerous other groups also commented on the issue of recognizing C.
lycaon as a separate species. Safari Club International (in litt. 2011)
states ``as is evidenced by the myriad comments offered by experts in
wolf biology and taxonomy that are either published in the scientific
literature or were submitted in response to the previous comment
opportunity, the question of a separate taxonomic species
classification for a new species of wolves in the Western Great Lakes

(WGL) is highly disputed and controversial at best.'' Both the Sierra Club (in litt. 2011) and the Michigan Environmental Council (in litt. 2011) declare that ``there is still a significant lack of clarity within the scientific community regarding the existence of Canis lycaon'' while the Center for Biological Diversity (in litt. 2011) states ``the evidence shows that declaring the eastern wolf a distinct species is not supported by the best available science.'' The Society for Conservation Biology (in litt. 2011) contends that ``the proposed rule's use of Canis lycaon to designate wolves in the northeastern United States is inconsistent with currently recognized scientific nomenclature'' and ``given this continued scientific controversy.* * *'' The Humane Society of the United States (in litt. 2011) asserts that the Service's proposal ``is based on unsettled science with respect to the recognition of a new species of wolf, the eastern wolf'' and the Service's conclusion regarding the eastern wolf ``is a matter of continuing scientific debate.''

   The extensive information submitted during the comment periods and recent publications on the subject and the widely diverging views expressed in the pertinent scientific studies underscore the enduring debate regarding the taxonomy of North American wolves--a debate that may not be resolved for some time (see Wolf Taxonomy in the Western Great Lakes Region for a full discussion). Although there is not a significant number of new publications that have become available since we published our proposal in May 2011, the substance of those new publications and the substantive comments we received have led us to reconsider our proposed decision.

   Based on a reevaluation of the available scientific information and the evolving and ongoing scientific debate, we reconsidered our position, as expressed in the proposed rule (76 FR 26086), that the gray wolf subspecies Canis lupus lycaon should be elevated to the full species Canis lycaon and that the population of wolves in the WGL is a mix of the two full species, Canis lupus and Canis lycaon. While there are varying scientific opinions on the taxonomic history of North American wolves, for a long time and throughout this technical debate, Canis lupus is the species that has been recognized in the WGL, and there is significant information indicating that continuing to recognize C. lupus as the species in the WGL is appropriate (see Wolf Taxonomy in the Western Great Lakes Region). Having reviewed and assessed all of the available scientific information, including, in particular, the comments received on the proposed rule and the information that has become available since the proposed rule was published, we have decided the better conclusion to draw at this time is our previous taxonomic recognition that all wolves in the WGL area are gray wolves (Canis lupus). Therefore, in this final rule we consider all wolves in the WGL DPS to be gray wolves (Canis lupus) and are delisting them as such.

Summary of Factors Affecting the Species

   Section 4 of the Act and its implementing regulations (50 CFR part 424) set forth the procedures for listing species, reclassifying species, or removing species from listed status. ``Species'' is defined by the Act as including any species or subspecies of fish or wildlife or plants, and any distinct vertebrate population segment of fish or wildlife that interbreeds when mature (16 U.S.C. 1532(16)). Once the ``species'' is identified, we then evaluate whether that species may be endangered or threatened because of one or more of the five factors

described in section 4(a)(1) of the Act. We must consider these same
five factors in delisting a species. We may delist a species according
to 50 CFR 424.11(d) if the best available scientific and commercial
data indicate that the species is neither endangered nor threatened
because (1) the species is extinct, (2) the species has recovered and
is no longer endangered or threatened, or (3) the original scientific
data used at the time the species was classified were in error.

A recovered species is one that no longer meets the Act's
definition of threatened or endangered. The analysis for a delisting
due to recovery must be based on the five factors outlined in section
4(a)(1) of the Act. This analysis must include an evaluation of threats
that existed at the time of listing, those that currently exist, and
those that could potentially affect the species once the protections of
the Act are removed.

In the context of the Act, the term ``threatened species'' means
any species or subspecies or, for vertebrates, Distinct Population
Segment (DPS) that is likely to become an endangered species within the
foreseeable future throughout all or a significant portion of its
range. The term ``endangered species'' means any species that is in
danger of extinction throughout all or a significant portion of its
range. The Act does not define the term ``foreseeable future.'' For the
purpose of this rule, we define the ``foreseeable future'' to be the
extent to which, given the amount and substance of available data, we
can anticipate events or effects, or reliably extrapolate threat trends
that relate to the status of the WGL DPS.

It took a considerable length of time for public attitudes and
regulations to result in a social climate that promoted and allowed for
wolf recovery in the WGL DPS. The length of time over which this shift
occurred, and the ensuing stability in those attitudes, gives us
confidence that this social climate will persist. Also, the States have
had a solid history of cooperating and assisting in wolf recovery and
have made a commitment, through legislative actions, to continue these
activities. We believe this commitment will continue. When evaluating
the available information, with respect to foreseeable future, we take
into account reduced confidence as we forecast further into the future.

A. The Present or Threatened Destruction, Modification, or Curtailment
of its Habitat or Range

A common misconception is that wolves inhabit only remote pristine
forests or mountainous areas, where human developments and other
activities have produced negligible change to the natural landscape.
Their extirpation south of Canada and Alaska, except for the heavily
forested portions of northeastern Minnesota, reinforced this popular
belief. However, the primary reason wolves survived in those areas was
not because of habitat conditions, but, rather, because remote areas
were sufficiently free of the human persecution that elsewhere killed
wolves faster than the species could reproduce (Mech 1995a, p. 271).

In the western Great Lakes region, wolves in the densely forested
northeastern corner of Minnesota have expanded into the more
agricultural portions of central and northwestern Minnesota, northern
and central Wisconsin, and the entire UP of Michigan. Habitats
currently being used

[[Page 81689]]

by wolves span the broad range from the mixed hardwood-coniferous

019777A

forest wilderness area of northern Minnesota, through sparsely settled but similar habitats in Michigan's UP and northern Wisconsin, and into more intensively cultivated and livestock-producing portions of central and northwestern Minnesota and central Wisconsin.

Wolf research and the expansion of wolf range over the last three decades have shown that wolves can successfully occupy a wide range of habitats, and they are not dependent on wilderness areas for their survival. In the past, for instance, wolf populations occupied nearly every type of habitat north of mid-Mexico that contained large ungulate prey species, including bison, elk, white-tailed deer, mule deer, moose, and woodland caribou; thus, wolves historically occupied the entire Midwest. Inadequate prey density or high levels of human-caused mortality appear to be the only factors that limit wolf distribution (Mech 1995a, p 271; 1995b, p. 544).

Suitable Habitat Within the Western Great Lakes DPS

Various researchers have investigated habitat suitability for wolves in the central and eastern portions of the United States. In recent years, most of these efforts have focused on using a combination of human density, density of agricultural lands, deer density or deer biomass, and road density, or have used road density alone to identify areas where wolf populations are likely to persist or become established (Mladenoff et al. 1995, pp. 284-285; 1997, pp. 23-27; 1998, pp. 1-8, 1999; pp. 39-43; Harrison and Chapin 1997, p. 3; 1998, p. 769-770; Wydeven et al. 2001a, pp. 110-113; Erb and Benson 2004, p. 2; Potvin et al. 2005, pp. 1661-1668; Mladenoff et al. 2009, pp. 132-135).

To a large extent, road density has been adopted as the best predictor of habitat suitability in the Midwest due to the connection between roads and human-related wolf mortality. Several studies demonstrated that wolves generally did not maintain breeding packs in areas with a road density greater than about 0.9 to 1.1 linear miles per sq mi (0.6 to 0.7 km per sq km) (Thiel 1985, pp. 404-406; Jensen et al. 1986, pp. 364-366; Mech et al. 1988, pp. 85-87; Fuller et al. 1992, pp. 48-51). Work by Mladenoff and associates indicated that colonizing wolves in Wisconsin preferred areas where road densities were less than 0.7 mi per sq mi (0.45 km per sq km) (Mladenoff et al. 1995, p. 289). However, recent work in the UP of Michigan indicates that, in some areas with low road densities, low deer density appears to limit wolf occupancy (Potvin et al. 2005, pp. 1667-1668) and may prevent recolonization of portions of the UP. In Minnesota, a combination of road density and human density is used by MN DNR to model suitable habitat. Areas with a human density up to 8 people per sq km are suitable if they also have a road density less than 0.5 km per sq km. Areas with a human density of less than 4 people per sq km are suitable if they have road densities up to 0.7 km per sq km (Erb and Benson 2004, Table 1).

Road density is a useful parameter because it is easily measured and mapped, and because it correlates directly and indirectly with various forms of other human-related wolf mortality factors. A rural area with more roads generally has a greater human density, more vehicular traffic, greater access by hunters and trappers, more farms and residences, and more domestic animals. As a result, there is a greater likelihood that wolves in such an area will encounter humans, domestic animals, and various human activities. These encounters may result in wolves being hit by motor vehicles, being controlled by government agents after becoming involved in depredations on domestic

animals, being shot intentionally by unauthorized individuals, being
trapped or shot accidentally, or contracting diseases from domestic
dogs (Mech et al. 1988, pp. 86-87; Mech and Goyal 1993, p. 332;
Mladenoff et al. 1995, pp. 282, 291). Based on mortality data from
radio-collared Wisconsin wolves from 1979 to 1999, natural causes of
death predominate (57 percent of mortalities) in areas with road
densities below 1.35 mi per sq mi (0.84 km per sq km), but human-
related factors produced 71 percent of the wolf deaths in areas with
higher road densities (Wydeven et al. 2001a, pp. 112-113).

Some researchers have used a road density of 1 mi per sq mi (0.6 km
per sq km) of land area as an upper threshold for suitable wolf
habitat. However, the common practice in more recent studies is to use
road density to predict probabilities of persistent wolf pack presence
in an area. Areas with road densities less than 0.7 mi per sq mi (0.45
km per sq km) are estimated to have a greater than 50 percent
probability of wolf pack colonization and persistent presence, and
areas where road density exceeded 1 mi per sq mi (0.6 km per sq km)
have less than a 10 percent probability of occupancy (Mladenoff et al.
1995. pp. 288-289; Mladenoff and Sickley 1998, p. 5; Mladenoff et al.
1999, pp. 40-41). Wisconsin researchers view areas with greater than 50
percent probability as ``primary wolf habitat,'' areas with 10 to 50
percent probability as ``secondary wolf habitat,'' and areas with less
than 10 percent probability as unsuitable habitat (WI DNR 1997, pp. 47-
48).

The territories of packs that do occur in areas of high road
density, and hence with low expected probabilities of occupancy, are
generally near broad areas of more suitable habitat that are likely
serving as a source of wolves, thereby assisting in maintaining wolf
presence in the higher road density and, therefore, less-suitable areas
(Mech 1989, pp. 387-388; Wydeven et al. 2001a, p.112). The predictive
ability of this model was questioned (Mech 2006a, 2006b) and responded
to (Mladenoff et al. 2006), and an updated analysis of Wisconsin pack
locations and habitat has been completed (Mladenoff et al. 2009). This
new model maintains that road density is still an important indicator
of suitable wolf habitat; however, lack of agricultural land is also a
strong predictor of habitat wolves occupy.

It appears that essentially all suitable habitat in Minnesota is
now occupied, range expansion has slowed or possibly ceased, and the
wolf population within the State has stabilized (Erb and Benson 2004,
p. 7; Erb and Don Carlos 2009, pp. 57, 60). This suitable habitat
closely matches the areas designated as Wolf Management Zones 1 through
4 in the Revised Recovery Plan (USFWS 1992, p. 72), which are identical
in area to Minnesota Wolf Management Zone A (see Figure 2, below; MN
DNR 2001, Appendix III).

Recent surveys for Wisconsin wolves and wolf packs show that wolves
have now recolonized the areas predicted by habitat models to have low,
moderate, and high probability of occupancy (primary and secondary wolf
habitat). The late-winter 2008-09 Wisconsin wolf survey identified
packs occurring throughout the central Wisconsin forest area (Wolf
Management Zone 2, Figure 3) and across the northern forest zone (Zone
1, Figure 3), with highest pack densities in the northwest and north-
central forest; pack densities are lower, but increasing, in the
northeastern corner of the State (Wydeven and Wiedenhoeft 2009, Figure
1).

Michigan wolf surveys in winter 2009-2010 continue to show wolf
pairs or packs (defined by Michigan DNR as two or more wolves traveling
together) in every UP county except Keweenaw County (Huntzinger et al.

2005, p. 6; Roell 2011, pers. comm.), which probably lacks a suitable ungulate prey

[[Page 81690]]

base during winter months (Potvin et al. 2005, p. 1665).

Habitat suitability studies in the Upper Midwest indicate that the only large areas of suitable or potentially suitable habitat areas that are currently unoccupied by wolves are located in the northern LP of Michigan (Mladenoff et al. 1997, p. 23; Mladenoff et al. 1999, p. 39; Potvin 2003, pp. 44-45; Gehring and Potter 2005, p. 1239). One published Michigan study (Gehring and Potter 2005, p. 1239) estimates that these areas could host 46 to 89 wolves; a graduate thesis estimates that 110-480 wolves could exist in the northern LP (Potvin 2003, p. 39). The northern LP is separated from the UP by the Straits of Mackinac, whose 4-mile (6.4-km) width freezes during mid- and late-winter in some years. In recent years there have been several documented occurrences of wolves in the northern LP, but until 2010, there had been no indication of persistence beyond several months. Prior to those occurrences, the last recorded wolf in the LP was in 1910.

In the first instance a radio-collared female wolf from the eastern UP was trapped and killed by a coyote trapper in Presque Isle County in late October 2004. In late November 2004, tracks from two wolves were verified in the same northern LP county. Follow-up winter surveys by the DNR in early 2005 failed to find additional wolf tracks in the northern LP (Huntzinger et al. 2005, p. 7); additional surveys conducted in 2006-10 also failed to find evidence of continued northern LP wolf presence (Roell et al. 2009, p. 5; Roell 2010, pers. comm.). A video of a single wolf was taken near Mackinac City in Cheboygan County in May 2009, and another trail-camera video-recorded a wolf in Presque Isle County in July 2009. These two sightings may have been the same animal (Roell 2009, pers. comm.). In 2010, USDA Wildlife Services and MI DNR staff confirmed a single breeding pair with pups in Cheboygan County in the northern LP (MI DNR 2010).

These northern LP patches of potentially suitable habitat contain a great deal of private land, are small in comparison to the occupied habitat on the UP and in Minnesota and Wisconsin, and are intermixed with agricultural and higher road density areas (Gehring and Potter 2005, p. 1240). Therefore, continuing wolf immigration from the UP may be necessary to maintain a future northern LP population. The Gehring and Potter study (2005, p. 1239) predicted 850 sq mi (2,198 sq km) of suitable habitat (areas with greater than a 50 percent probability of wolf occupancy) in the northern LP. Potvin (2003, p. 21), using deer density in addition to road density, believes there are about 3,090 sq mi (8,000 sq km) of suitable habitat in the northern LP. Gehring and Potter (2005, p. 1239) exclude from their calculations those northern LP low-road-density patches that are less than 19 sq mi (50 sq km), while Potvin (2003, pp. 10-15) does not limit habitat patch size in his calculations. Both of these area estimates are well below the minimum area described in the Revised Recovery Plan, which states that 10,000 sq mi (25,600 sq km) of contiguous suitable habitat is needed for a viable isolated gray wolf population, and half that area (5,000 sq mi or 12,800 sq km) is needed to maintain a viable wolf population that is subject to wolf immigration from a nearby population (USFWS 1992, pp. 25-26).

Based on the above-described studies and the guidance of the 1992

Revised Recovery Plan, the Service has concluded that suitable habitat for wolves in the WGL DPS can be determined by considering four factors: road density, human density, prey base, and size. An adequate prey base is an absolute requirement, but in much of the WGL DPS the white-tailed deer density is well above adequate levels, causing the other factors to become the determinants of suitable habitat. Prey base is primarily of concern in the UP where severe winter conditions cause deer to move away from some lakeshore areas, making otherwise suitable areas locally and seasonally unsuitable. Road density and human density frequently are highly correlated; therefore, road density is the best single predictor of habitat suitability. However, areas with higher road density may still be suitable if the human density is very low, so a consideration of both factors is sometimes useful (Erb and Benson 2004, p. 2). Finally, although the territory of individual wolf packs can be relatively small, packs are not likely to persist as a viable population if they occupy a small isolated island of otherwise unsuitable habitat.

Based on the information discussed above, we conclude that Minnesota Wolf Management Zone A (Federal Wolf Management Zones 1-4, Figure 2), Wisconsin Wolf Zones 1 and 2 (Figure 3), and the UP of Michigan contain a sufficient amount of suitable wolf habitat. The other areas within the DPS are unsuitable habitat, or are potentially habitat that is too small or too fragmented to be suitable for maintaining a viable wolf population.

Wolf Populations on Federal Lands

National forests, and the prey species found in their various habitats, have been important to wolf conservation and recovery in the core areas of the WGL DPS. There are five national forests in Minnesota, Wisconsin, and Michigan (Superior, Chippewa, Chequamegon-Nicolet, Ottawa, and Hiawatha National Forests) with wolf packs that exclusively or partially reside on them. Their wolf populations range from approximately 484 on the Superior National Forest in northeastern Minnesota, to an estimated 182 on the UP's Ottawa National Forest, 164 on the Chequamegon-Nicolet National Forest in northeastern Wisconsin, and another estimated 49 on the Hiawatha National Forest in the eastern UP (Delphey 2009, pers. comm.; Eklund 2009, pers. comm.; Roell 2011, pers. comm., Wydeven 2011, pers. comm.).

Voyageurs National Park, along Minnesota's northern border, has a land base of nearly 340 sq mi (882 sq km). As of the last survey in 2008, there were 31 to 46 wolves within 7 to 9 packs that exclusively or partially reside within the park, and at least 5 packs are located wholly inside the Park boundaries (Ethier et al. 2008, p. 5). The 2008 estimates fall within the range of wolf estimates for the Park from the 1990s (Gogan et al. 2004) and early 2000s (Fox et al. 2001, pp. 6-7).

Within the boundaries of the WGL DPS, we currently manage seven units within the National Wildlife Refuge System with significant wolf activity. Primary among these are Agassiz National Wildlife Refuge (NWR), Tamarac NWR, and Rice Lake NWR in Minnesota; Seney NWR in the UP of Michigan; and Necedah NWR in central Wisconsin. Agassiz NWR has had as many as 20 wolves in 2 to 3 packs in recent years. Although in 1999 mange and illegal shootings reduced them to a single pack of 5 wolves and a separate lone wolf, since 2001, two packs with a total of 10 to 12 wolves have been using the Refuge. About 60 percent of the packs' territories are located on the Refuge or on an adjacent State-owned wildlife management area (Huschle in litt. 2005).

019781A

Data collected by Agassiz NWR staff during winter wolf sign surveys conducted in cooperation with the MN DNR during both the winters of 2007-08 and 2008-09 support the above wolf totals. Winter track data from 2007-08 suggest that one pack on Agassiz had a minimum size of five and one had a minimum size of six. The following winter's survey information suggested a minimum pack size of five for both packs (Knutson 2009, pers. comm.). Two packs of wolves that currently include about eight and five members, respectively, use Tamarac NWR and the

[[Page 81691]]

territory of a third occurs partly on the Refuge (Brininger 2009, pers. comm.). The size of the one pack using Rice Lake NWR, in Minnesota, has been reported at six to nine in previous years; in 2009 a maximum of three wolves was confirmed on the Refuge (McDowell 2009, pers. comm.), although total pack size may be greater.

Other single or paired wolves pass through the Refuge frequently (Stefanski 2004, pers. comm.; McDowell in litt. 2005). Seney NWR has 3 packs, representing 8-10 wolves, which partially reside on the Refuge (Roell 2010, pers. comm.). In 2010, two packs of six wolves each and at least one loner were detected on Necedah NWR (Wydeven et al. 2010, p. 41). Over the past 10 years, Sherburne and Crane Meadows NWR Complex in central Minnesota have had intermittent, but reliable, observations and signs of individual wolves each year. To date, no established packs have been documented on either of those Refuges. The closest established packs are within 15 mi (24 km) of Crane Meadows NWR at Camp Ripley Military Installation and 30 mi (48 km) north of Sherburne NWR at Mille Lacs State Wildlife Management Area (Berkley 2009, pers. comm.).

Suitable Habitat Ownership and Protection

In Minnesota, public lands, including national forests, a national park, national wildlife refuges, tax-forfeit lands (managed mostly by counties), State forests, State wildlife management areas, and State parks, encompass approximately 42 percent of current wolf range. American Indians and Tribes own 3 percent, an additional 1,535 sq mi (2,470 sq km), in Minnesota's wolf range (see Erb and Benson 2004, Table 1). In its 2001 Minnesota Wolf Management Plan, MN DNR states that it ``will continue to identify and manage currently occupied and potential wolf habitat areas to benefit wolves and their prey on public and private land, in cooperation with landowners and other management agencies'' (MN DNR 2001, p. 25). MN DNR will monitor deer and moose habitat and, when necessary and appropriate, improve habitat for these species. MN DNR maintains that several large public land units of State parks and State forests along the Wisconsin border will likely ensure that the connection between the two States' wolf populations will remain open to wolf movements. Nevertheless, MN DNR stated that it would cooperate with Wisconsin DNR to incorporate the effects of future development ``into long-term viability analyses of wolf populations and dispersal in the interstate area'' (MN DNR 2001, p. 27).

The MN DNR Divisions of Forestry and Wildlife directly administer approximately 5,330 sq mi (13,805 sq km) of land in Minnesota's wolf range. The DNR has set goals of enlarging and protecting its forested land base by, in part, ``minimizing the loss and fragmentation of private forest lands'' (MN DNR 2000, p. 20) and by connecting forest habitats with natural corridors (MN DNR 2000, p. 21). It plans to

achieve these goals and objectives via several strategies, including the development of (Ecological) Subsection Forest Resource Management Plans (SFRMP) and to expand its focus on corridor management and planning.

In 2005, the Forest Stewardship Council (FSC) certified that 4.84 million acres (1.96 million hectares) of State-administered forest land are ``well managed'' (FSC 2005); the Sustainable Forestry Initiative (SFI) also certified that MN DNR was managing these lands to meet its standards. For the FSC certification, independent certifiers assessed forest management against FSC's Lakes States Regional Standard, which includes a requirement to maximize habitat connectivity to the extent possible at the landscape level (FSC 2005, p. 22).

Efforts to maximize habitat connectivity in the range of wolves would complement measures the MN DNR described in its State wolf plan (MN DNR 2001, pp. 26-27). The Service will review certification evaluation reports issued by FSC to assess MN DNR's ongoing efforts in this area as part of its post-delisting monitoring.

Counties manage approximately 3,860 sq mi (9,997 sq km) of tax forfeit land in Minnesota's wolf range (MN DNR unpublished data). We are aware of no specific measures that any county in Minnesota takes to conserve wolves. If most of the tax-forfeit lands are maintained for use as timber lands or natural areas, however, and if regional prey levels are maintained, management specifically for wolves on these lands will not be necessary. MN DNR manages ungulate populations ``on a regional basis to ensure sustainable harvests for hunters, sufficient numbers for aesthetic and nonconsumptive use, and to minimize damage to natural communities and conflicts with humans such as depredation of agricultural crops'' (MN DNR 2001, p. 17). Moreover, although counties may sell tax-forfeit lands subject to Minnesota State law, they generally manage these lands to ensure that they will retain their productivity as forests into the future. For example, Crow Wing County's mission for its forest lands includes the commitment to ``sustain a healthy, diverse, and productive forest for future generations to come.'' In addition, at least four counties in Minnesota's wolf range--Beltrami, Carlton, Koochiching, and St. Louis-- are certified by SFI, and four others (Aitkin, Cass, Itasca, and Lake) have been certified by FSC. About ten private companies with industrial forest lands in Minnesota's wolf range have also been certified by FSC.

There are no legal or regulatory requirements for the protection of wolf habitat, per se, on private lands in Minnesota. Land management activities such as timber harvest and prescribed burning carried out by public agencies and by private land owners in Minnesota's wolf range incidentally and significantly improves habitat for deer, the primary prey for wolves in the State. The impact of these measures is apparent from the continuing high deer densities in Minnesota's wolf range. The State's second largest deer harvest occurred in 2006, and approximately one-half of the Minnesota deer harvest is in the Forest Zone, which encompasses most of the occupied wolf range in the State (MN DNR 2009, Table 1).

Given the extensive public ownership and management of land within Minnesota's wolf range, as well as the beneficial habitat management expected from tribal lands, we believe suitable habitat, and especially an adequate wild prey base, will remain available to the State's wolf population for the foreseeable future. Management of private lands for timber production will provide additional habitat suitable for wolves and white-tailed deer.

Similarly, current lands in northern and central Wisconsin that are

judged to be primary and secondary wolf habitat are well protected from significant adverse development and habitat degradation due to public ownership or protective management that preserves the habitat and wolf prey base. Primary habitat (that is, areas with greater than 50 percent probability of wolf pack occupancy; Wydeven et al. 1999, pp. 47-48) totals 5,812 sq mi (15,053 sq km). The 1999 Wisconsin wolf plan listed land ownership of primary and secondary wolf habitat (Wydeven et al. 1999, p. 48). In 2006, Sickley (2006, pers. comm.) provided an update of the data with more accurate land ownership data. That data show that about 55 percent of primary habitat was in public land including, Federal, State, or county ownership, and 7 percent was on tribal land. County lands, mostly county forests, comprised 29 percent of the

[[Page 81692]]

primary habitat, and Federal lands, mostly the Chequamegon-Nicolet National Forest, included another 17 percent.

     Most tribal land (7 percent of primary habitat), while not public land, will likely remain as suitable deer and wolf habitat for the foreseeable future. State forest ownership protects 10 percent. Private industrial forest lands comprised another 10 percent of the primary habitat, although some of these lands have been subdivided for second or vacation home sites, reducing this acreage in recent years. The remaining 29 percent is in other forms of private ownership and is vulnerable to loss from the primary habitat category to an unknown extent (Sickley in litt. 2006, unpublished data updating Table C2 of WI DNR 1999, p. 48).

     Areas judged to be secondary wolf habitat by WI DNR (10 to 50 percent probability of occupancy by wolf packs; Wydeven et al. 1999, pp. 47-48) were somewhat more developed or fragmented habitats and were less well protected overall, because only 43 percent were in public ownership and 5 percent were in Native American reservations. Public land that maintained secure habitat included county (17 percent) and national (18 percent) forests ownership protecting the largest segments, and State land protected 7 percent. Private industrial forest ownership provided protection to 5 percent, and the remaining 47 percent was in other forms of private ownership (Sickley in litt. 2006).

     County forest lands represent the single largest category of primary wolf habitat in Wisconsin. Wisconsin Statute 28.11 guides the administration of county forests, and directs management for production of forest products together with recreational opportunities, wildlife, watershed protection, and stabilization of stream flow. This Statute also provides a significant disincentive to conversion for other uses. Any proposed withdrawal of county forest lands for other uses must meet a standard of a higher and better use for the citizens of Wisconsin, and be approved by two-thirds of the County Board. As a result of this requirement, withdrawals are infrequent, and the county forest land base is actually increasing.

     This analysis shows that nearly three-quarters of the primary habitat in Wisconsin receives substantial protection due to ownership or management for sustainable timber production. Over half of the secondary habitat is similarly protected. Portions of the primary habitat in northeastern Wisconsin remained sparsely populated with wolf packs until recently, but are filling in lately (Wydeven et al. 2010, Fig. 2, p. 66), although still allowing for some continuing wolf population expansion. In general, we believe this degree of habitat

019784A

protection is more than adequate to support a viable wolf population in Wisconsin for the foreseeable future.

In the UP of Michigan, State and Federal ownership comprises 2.0 and 2.1 million acres respectively, representing 19.3 percent and 20.1 percent of the land surface of the UP. The Federal ownership is composed of 87 percent national forest, 8 percent national park, and 5 percent national wildlife refuge. The management of these three categories of Federal land is discussed elsewhere, but clearly will benefit wolves and their prey.

State lands on the UP are 94 percent State forest land, 6 percent State park, and less than 1 percent in fishing and boating access areas and State game areas. Part 525, Sustainable Forestry on State Forestlands, of the Michigan Natural Resources and Environmental Protection Act, 1994 PA 451, as amended, directs State forestland management in Michigan. It requires the MI DNR to manage the State forests in a manner consistent with sustainable forestry, to prepare and implement a management plan, and to seek and maintain a third party certification that the lands are managed in a sustainable fashion (MI DNR 2005c, p. 1).

Much of the private land on the UP is managed or protected in a manner that will maintain forest cover and provide suitable habitat for wolves and white-tailed deer. Nearly 1.9 million acres (0.8 million hectares) of large-tract industrial forest lands and another 1.9 million acres (0.8 million hectares) of smaller private forest land are enrolled in the Commercial Forest Act (CFA). These 3.7 million acres (1.5 million hectares) are managed for long-term sustainable timber production under forest management plans written by certified foresters; in return, the landowners benefit from a reduction in property taxes. In addition, nearly 37,000 acres on the UP are owned by The Nature Conservancy, and continue to be managed to restore and preserve native plant and animal communities. Therefore, these private land management practices currently are preserving an additional 36 percent of the UP as suitable habitat for wolves and their prey species.

In total, 39 percent of the UP is federally and State-owned land whose management will benefit wolf conservation for the foreseeable future, and another 36 percent is private forest land that is being managed, largely under the incentives of the CFA, in a way that provides suitable habitat and prey for wolf populations. Therefore, a minimum of nearly three-quarters of the UP should continue to be suitable for wolf conservation, and we do not envision UP habitat loss or degradation as a problem for wolf population viability in the foreseeable future.

Hearne et al. (2003), determined that a viable wolf population (one having less than 10 percent chance of extinction over 100 years), should consist of at least 175 to 225 wolves (p. 170), and they modeled various likely scenarios of habitat conditions in the UP of Michigan and northern Wisconsin through the year 2020 to determine whether future conditions would support a wolf population of that size. Most scenarios of future habitat conditions resulted in viable wolf populations in each State through 2020. When the model analyzed the future conditions in the two States combined, all scenarios produced a viable wolf population through 2020. Their scenarios included increases in human population density, changes in land ownership that may result in decreased habitat suitability, and increased road density (pp. 101-151).

The large areas of unsuitable habitat in the eastern Dakotas; the

019785A

northern portions of Iowa, Illinois, Indiana, and Ohio; and the southern areas of Minnesota, Wisconsin, and Michigan; as well as the relatively small areas of unoccupied potentially suitable habitat, will not contribute to the viability of wolves in the WGL DPS. Therefore, we have determined that the existing and likely future threats to wolves outside the currently occupied areas, and especially to wolves outside of Minnesota, Wisconsin, and the UP, do not rise to the level that they threaten the long-term viability of wolf populations in Minnesota, Wisconsin, and the UP of Michigan.

In summary, wolves currently occupy the vast majority of the suitable habitat in the WGL DPS, and that habitat is adequately protected for the foreseeable future. Unoccupied areas that have the characteristics of suitable habitat exist in small and fragmented parcels and are not likely to develop viable wolf populations. Threats to those habitat areas will not adversely impact the recovered wolf metapopulation in the DPS.

Prey

Wolf density is heavily dependent on prey availability (for example, expressed as ungulate biomass, Fuller et al. 2003, pp. 170-171), but prey availability is not

[[Page 81693]]

likely to threaten wolves in the WGL DPS. Conservation of primary wolf prey in the WGL DPS, white-tailed deer and moose, is clearly a high priority for State conservation agencies. As Minnesota DNR points out in its wolf management plan (MN DNR 2001, p. 25), it manages ungulates to ensure a harvestable surplus for hunters, nonconsumptive users, and to minimize conflicts with humans. To ensure a harvestable surplus for hunters, MN DNR must account for all sources of natural mortality, including loss to wolves, and adjust hunter harvest levels when necessary. For example, after severe winters in the 1990's, MN DNR modified hunter harvest levels to allow for the recovery of the local deer population (MN DNR 2001, p. 25). In addition to regulation of human harvest of deer and moose, MN DNR also plans to continue to monitor and improve habitat for these species.

Land management carried out by other public agencies and by private land owners in Minnesota's wolf range, including timber harvest and prescribed fire, incidentally and significantly improves habitat for deer, the primary prey for wolves in the State. The success of these measures is apparent from the continuing high deer densities in the Forest Zone of Minnesota, and the fact that the State's five largest deer harvests have occurred in the last 6 years, with a deer harvest averaging 241,000 deer over the last 5 years. Approximately one-half of the Minnesota deer harvest is in the Forest Zone, which encompasses most of the occupied wolf range in the State (Cornicelli 2008, pp. 208-209). There is no indication that harvest of deer and moose or management of their habitat will significantly depress abundance of these species in Minnesota's core wolf range. Therefore, lack of prey availability is not likely to pose a threat to wolves in the foreseeable future in the State.

The deer populations in Wisconsin and the UP of Michigan declined somewhat from historically high levels in recent years. Wisconsin's preseason deer population has exceeded 1 million animals since 1984 (WI DNR undated a; Rolley 2007, p. 6; Rolley 2008, p. 6), and hunter

harvest has exceeded 400,000 deer in 10 of the last 12 years (WI DNR 2010, p. 57). Across northern Wisconsin wolf range (Zone 1), winter deer density in northern deer management units averaged from 22-30 deer per sq mi (8.5-11.6 deer per sq km) between 2001-07, but declined to 17-18 deer per sq mi (6.6-6.9 deer per sq km) in 2009 and 2010. In Central Forest wolf range (Zone 2), winter deer density in deer management units averaged 29-50 deer per sq mi (11.2-19.3 deer per sq km) from 2001 to 2007, and was 35 deer per sq mi (13.5 deer per sq km) in 2009, and 26 deer per sq mi (10.0 deer per sq km) in 2010 (WI DNR data).

Michigan's 2009 October forecast for the deer population was approximately 1.8 million deer, with about 312,800 residing in the UP; the 2010 estimates projected a slightly higher UP deer population (Doepker 2010, pers. comm.; Rudolph 2010, pers. comm.). Because of severe winter conditions (persistent, deep snow) in the UP, deer populations can change dramatically from year to year. Recently (2010) the MI DNR finalized a new deer management plan, to address ecological, social, and regulatory shifts. An objective of this plan is to manage deer at the appropriate scale, considering impacts of deer on the landscape and on other species, in addition to population size (MI DNR 2010, p. 20). Additionally, the Michigan wolf management plan addresses maintaining a sustainable population of wolf prey (MI DNR 2008, p. 36). Short of a major, and unlikely, shift in deer management and harvest strategies, there will be no shortage of prey for Wisconsin and Michigan wolves for the foreseeable future.

Summary of Factor A

The wolf population in the WGL DPS currently occupies all the suitable habitat area identified for recovery in the Midwest in the 1978 Recovery Plan and 1992 Revised Recovery Plan and most of the potentially suitable habitat in the WGL DPS. As discussed above under Suitable Habitat Ownership and Protection, much of the important wolf habitat in the DPS is in public ownership, and the suitable habitat in the DPS is adequately protected for the foreseeable future. We therefore conclude that destruction, modification, or curtailment of the species' habitat or range does not pose a significant threat to wolves within this DPS.

B. Overutilization for Commercial, Recreational, Scientific, or Educational Purposes

Threats to wolves resulting from uses for scientific or educational purposes are not likely to increase substantially following delisting of the WGL DPS, and any increased use for these purposes will be regulated and monitored by the States and Tribes in the core recovery areas. Since their listing under the Act, no wolves have been legally killed or removed from the wild in any of the nine States included in the WGL DPS for either commercial or recreational purposes. Some wolves may have been illegally killed for commercial use of the pelts and other parts, but illegal commercial trafficking in wolf pelts or parts and illegal capture of wolves for commercial breeding purposes happens rarely. State wolf management plans for Minnesota, Wisconsin, and Michigan help ensure that wolves will not be killed for commercial or recreational purposes for many years following Federal delisting, so these forms of mortality will not likely emerge as new threats upon delisting. See Factor D for a detailed discussion of State wolf

management plans, and for applicable regulations in States without wolf
management plans.

We do not expect the use of wolves for scientific purposes to
increase in proportion to total wolf numbers in the WGL DPS after
delisting. While listed, the intentional or incidental killing, or
capture and permanent confinement, of endangered or threatened wolves
for scientific purposes has only legally occurred under permits or
subpermits issued by the Service (under section 10(a)(1)(A)) or by a
State agency operating under a cooperative agreement with the Service
pursuant to section 6 of the Act (50 CFR 17.21(c)(5) and 17.31(b)).
Although exact figures are not available, throughout the conterminous
48 States, such permanent removals of wolves from the wild have been
very limited and probably comprise an average of not more than two
animals per year since the species was first listed as endangered. In
the WGL DPS, these animals were either taken from the Minnesota wolf
population during long-term research activities (about 15 wolves) or
were accidental takings as a result of research activities in Wisconsin
(5 to 6 mortalities and 1 long-term confinement) and in Michigan (4
mortalities) (Berg in litt. 1998; Mech in litt. 1998; Roell in litt.
2004; Roell in litt. 2005a; Roell 2011, pers. comm.; Wydeven 2009,
pers. comm.).

The Minnesota DNR plans to encourage the study of wolves with
radio-telemetry after delisting, with an emphasis on areas where they
expect wolf-human conflicts and where wolves are expanding their range
(MN DNR 2001, p. 19). Similarly, Wisconsin and Michigan DNRs plan to
continue to trap wolves for radio-collaring, examination, and health
monitoring for the foreseeable future (WI DNR 1999, pp. 19-21; MI DNR
2008a, pp. 31-32; WI DNR 2006a, p. 14). The continued handling of wild
wolves for research, including the administration of drugs, may result
in some accidental deaths of wolves. We believe that capture and radio-
telemetry-related injuries or mortalities will not increase

[[Page 81694]]

significantly above the level observed to date in proportion to wolf
abundance; adverse effects to wolves associated with such activities
have been minimal and would not constitute a threat to wolves in the
WGL DPS.

No wolves have been legally removed from the wild for educational
purposes in recent years. Wolves that have been used for such purposes
are the captive-reared offspring of wolves that were already in
captivity for other reasons, and this is not likely to change as a
result of Federal delisting. We do not expect taking for educational
purposes to constitute any threat to Midwest wolf populations in the
DPS for the foreseeable future.

See Factor E for a discussion of Taking of Wolves by Native
Americans for Certain Purposes. See the Depredation Control sections
under Factor D for discussion of other past, current, and potential
future forms of intentional and accidental take by humans, including
depredation control, public safety, and under public harvest. While
public harvest may include recreational harvest, it is likely that
public harvest will also serve as a management tool, so it is discussed
in Factor D.

Summary of Factor B

Taking wolves for scientific or educational purposes in the other

States in the WGL DPS may not be regulated or closely monitored in the future, but the threat to wolves in those States will not be significant to the long-term viability of the wolf population in the WGL DPS. The potential limited commercial and recreational harvest that may occur in the DPS will be regulated by State and/or Tribal conservation agencies and is discussed under Factor D. Therefore, we conclude that overutilization for commercial, recreational, scientific, or educational purposes will not pose a significant threat to wolves in the WGL DPS.

C. Disease or Predation

Disease

Many diseases and parasites have been reported for the wolf, and several of them have had significant impacts during the recovery of the species in the 48 conterminous States (Brand et al. 1995, p. 419; WI DNR 1999, p. 61). If not monitored and controlled by States, these diseases and parasites, and perhaps others, may threaten wolf populations in the future. Thus, to avoid a future decline caused by diseases or parasites, States and their partners will have to diligently monitor the prevalence of these pathogens in order to effectively respond to significant outbreaks.

Canine parvovirus (CPV) is a relatively new disease that infects wolves, domestic dogs, foxes, coyotes, skunks, and raccoons. Recognized in the United States in 1977 in domestic dogs, it appeared in Minnesota wolves (based upon retrospective serologic evidence) live-trapped as early as 1977 (Mech et al. 1986, p. 105). Minnesota wolves, however, may have been exposed to the virus as early as 1973 (Mech and Goyal 1995, p. 568). Serologic evidence of wolf exposure to CPV peaked at 95 percent for a group of Minnesota wolves live-trapped in 1989 (Mech and Goyal 1993, p. 331). In a captive colony of Minnesota wolves, pup and yearling mortality from CPV was 92 percent of the animals that showed indications of active CPV infections in 1983 (Mech and Fritts 1987, p. 6), demonstrating the substantial impacts this disease can have on young wolves. It is believed that the population impacts of CPV occur via diarrhea-induced dehydration leading to abnormally high pup mortality (WI DNR 1999, p. 61). CPV has been detected in nearly every wolf population in North America including Alaska (Bailey et al. 1995, p. 443), and exposure in wolves is now believed to be almost universal.

There is no evidence that CPV has caused a population decline or has had a significant impact on the recovery of the Minnesota wolf population. Mech and Goyal (1995, p. 566, Table 1, p. 568, Fig. 3), however, found that high CPV prevalence in the wolves of the Superior National Forest in Minnesota occurred during the same years in which wolf pup numbers were low. Because the wolf population did not decline during the study period, they concluded that CPV-caused pup mortality was compensatory, that is, it replaced deaths that would have occurred from other causes, especially starvation of pups. They theorized that CPV prevalence affects the amount of population increase and that a wolf population will decline when 76 percent of the adult wolves consistently test positive for CPV exposure. Their data indicate that CPV prevalence in adult wolves in their study area increased by an annual average of 4 percent during 1979-93 and was at least 80 percent during the last 5 years of their study (Mech and Goyal 1995, pp. 566, 568).

Additional data gathered since 1995 suggests that CPV reduced pup

survival both in the Superior National Forest and statewide, between 1984 and 2004; however, statewide there is some evidence of a slight increase in pup survival since about 1995. These conclusions are based on an inverse relationship between pup numbers in summer captures and seroprevalence of CPV antibodies in summer-captured adult wolves (Mech et al. 2008, pp. 827-830).

In a more recent study, Mech and Goyal (2011) looked more specifically at CPV influence on the Superior National Forest population by evaluating five 7-year periods to determine when CPV had its greatest effects. They found the strongest effect on wolf pup survival was from 1981 to 1993, and that after that time, little effect was seen despite the continued seroprevalence of CPV antibodies (Mech and Goyal 2011, pp. 28-29). They conclude that, after CPV became endemic in the population, the population developed immunity and was able to withstand severe effects from the disease (Mech and Goyal 2011, pp. 28-29). The observed population effects in the Superior National Forest population are consistent with results for studies in smaller, isolated populations in Wisconsin and on Isle Royale, Michigan (Wydeven et al. 1995; Peterson et al. 1998), but indicate that CPV also had only a temporary population effect in a larger population.

The WI DNR and the WI DNR Wildlife Health, in conjunction with the U.S. Geological Survey National Wildlife Health Center in Madison, Wisconsin, (formerly the National Wildlife Health Laboratory) have an extensive dataset on the incidence of wolf diseases, beginning in 1981. Canine parvovirus exposure was evident in 5 of 6 wolves tested in 1981, and probably stalled wolf population growth in Wisconsin during the early and mid-1980s when numbers there declined or were static; at that time 75 percent of the 32 wolves tested were positive for CPV. During the following years of population increase (1988-96), only 35 percent of the 63 wolves tested were positive for CPV (WI DNR 1999, p. 62). More recent exposure rates for CPV continue to be high in Wisconsin wolves, with annual rates ranging from 60 to 100 percent among wild wolves handled from 2001 through mid-2006. Part of the reason for high exposure percentages is likely an increased emphasis in sampling pups and Central Forest wolves starting in 2001, so comparisons of post- and pre-2001 data are of limited value.

CPV appears not to be a significant cause of mortality, as only a single wolf (male pup) is known to have died from CPV during this period (Wydeven and Wiedenhoeft 2002, p. 8 Table 4; 2003a, pp. 11-12 Table 4; 2004a, pp. 11-12 Table 5; 2005, pp. 19-20 Table 4; 2006, pp. 23-25 Table 4; 2009, Table 2; Wydeven et al. 2007, pp. 12-14; 2008,

[[Page 81695]]

pp. 19-21). While the difficulty of discovering CPV-killed pups must be considered, and it is possible that CPV-caused pup mortality is being underestimated, the continuing increase of the Wisconsin wolf population indicates that CPV mortality is no longer impeding wolf population growth in the State. It may be that many Wisconsin wolves have developed some degree of resistance to CPV, and this disease is no longer a significant threat in the State.

Similar to Wisconsin wolves, serological testing of Michigan wolves captured from 1992 through 2001 (most recent available data) shows that the majority of UP wolves have been exposed to CPV. Fifty-six percent of 16 wolves captured from 1992 to 1999 and 83 percent of 23 wolves captured in 2001 showed antibody titers at levels established as indicative of previous CPV exposure that may provide protection from

future infection from CPV (Beheler in litt. undated, in litt. 2004).
There are no data showing any CPV-caused wolf mortality or population
impacts to the wolf population on the UP, but few wolf pups are handled
in the UP (Hammill in litt. 2002, Beyer in litt. 2006a), so low levels
of CPV-caused pup mortality may go undetected there. Mortality data are
primarily collected from collared wolves, which until 2004 received CPV
inoculations. Therefore, mortality data for the UP should be
interpreted cautiously.

Sarcoptic mange is caused by a mite (Sarcoptes scabiei) infection
of the skin. The irritation caused by the feeding and burrowing mites
results in scratching and then severe fur loss, which in turn can lead
to mortality from exposure during severe winter weather. The mites are
spread from wolf to wolf by direct body contact or by common use of
``rubs'' by infested and uninfested animals. Thus, mange is frequently
passed from infested females to their young pups, and from older pack
members to their pack mates. In a long-term Alberta, Canada, wolf
study, higher wolf densities were correlated with increased incidence
of mange, and pup survival decreased as the incidence of mange
increased (Brand et al. 1995, p. 428).

From 1991 to 1996, 27 percent of live-trapped Wisconsin wolves
exhibited symptoms of mange. During the winter of 1992-93, 58 percent
showed symptoms, and a concurrent decline in the Wisconsin wolf
population was attributed to mange-induced mortality (WI DNR 1999, p.
61). Seven Wisconsin wolves died from mange from 1993 through October
15, 1998, and severe fur loss affected five other wolves that died from
other causes. During that period, mange was the third largest cause of
death in Wisconsin wolves, behind trauma (usually vehicle collisions)
and shooting (Thomas in litt. 1998). Largely as a result of mange, pup
survival was only 16 percent in 1993, compared to a normal 30 percent
survival rate from birth to 1 year of age (WI DNR 1999, p. 61).

Mange continues to occur on wolves in Wisconsin. From 2003 through
2007, researchers reported that 25 percent of live-trapped wolves
showed signs of mange, but that figure declined to 11 percent of wolves
handled in 2009 and 2010. Mortality data from closely monitored radio-
collared wolves provides a relatively unbiased estimate of mortality
factors, especially those linked to disease or illegal actions, because
nearly all carcasses are located within a few days of deaths. Diseased
wolves suffering from hypothermia or nearing death generally crawl into
dense cover and may go undiscovered if they are not radio-tracked
(Wydeven et al. 2001b, p. 14). Data from those closely monitored radio-
collared wolves show that mange mortality ranged from 22 percent of
deaths in 2006 and 12 percent in 2007 to 21 percent of deaths in 2008
(Wydeven in litt. 2009), 15 percent in 2009 (Wydeven et al. 2010, p.
13), and 6 percent in 2010 (Wydeven et al. 2011, p. 2).

Mange mortality does appear to be stabilizing or perhaps declining
in Wisconsin. Not all mangy wolves succumb; other observations showed
that some mangy wolves are able to survive the winter (Wydeven et al.
2001b, p. 14). Mange has been detected in Wisconsin wolves every year
since 1991 when only 45 to 52 wolves occurred in the State, and may
have slowed the growth of the wolf population in the early 1990s
(Wydeven et al. 2009c), but despite its constant presence as an
occasional mortality factor, the wolf population grew to its present
(2011) level of 782 or more wolves.

The survival of pups during their first winter is believed to be
strongly affected by mange. The highest to date wolf mortality (30
percent of radio-collared wolves; Wydeven and Wiedenhoeft 2004a, p. 12)
from mange in Wisconsin occurred in 2003 and may have had more severe

019791A

effects on pup survival than in previous years. The prevalence of the disease may have contributed to the relatively small population increase in 2003 (2.4 percent in 2003 as compared to the average 18 percent to that point since 1985). However, mange has not caused a decline in the State's wolf population, and even though the rate of population increase has slowed in recent years, the wolf population continues to increase despite the continued prevalence of mange in Wisconsin wolves. Although mange mortality may not be the primary limiting factor for wolf population growth in the State, the impacts of mange in Wisconsin need to be closely monitored, as identified and addressed in the Wisconsin wolf management plan (WI DNR 1999, p. 21; 2006a, p. 14).

Disease monitoring in Wisconsin has identified a second form of mange in the wild wolf population--demodectic mange (Wydeven and Wiedenhoeft 2008, p. 8). Demodectic mange mites are relatively common in domestic dogs, where symptoms are often minor. The WI DNR is closely monitoring wolf pups and examining all dead wolves to determine if this becomes a significant new cause of wolf mortality.

Wisconsin wolves had been treated with Ivermectin and vaccinated for CPV and canine distemper virus (CDV) when captured, but the practice was stopped in 1995 to allow the wolf population to experience more natural biotic conditions. Since that time, Ivermectin has been administered only to captured wolves with severe cases of mange. In the future, Ivermectin and vaccines will be used sparingly on Wisconsin wolves, but will be used to counter significant disease outbreaks (Wydeven in litt. 1998).

Seven Michigan wolves died from mange during 1993-1997, making it responsible for 21 percent of all mortalities, and constituted all of the disease-caused deaths, during that period (MI DNR 1997, p. 39). During bioyears (mid-April to mid-April) 1999-2009, mange-induced hypothermia killed 18 radio-collared Michigan wolves, representing 15 percent of the total mortality during those years. From 2004 through 2010, researchers found that 11 radio-collared wolves died from mange in the State (Roell 2010, pers. comm.). Before 2004, MI DNR treated all captured wolves with Ivermectin if they showed signs of mange. In addition, MI DNR vaccinated all captured wolves against CPV and CDV. These inoculations were discontinued in 2004 to provide more natural biotic conditions and to provide biologists with an unbiased estimate of disease-caused mortality rates in the population (Roell in litt. 2005b).

Among Minnesota wolves, mange may always have been present at low levels and may currently infect less than 10 percent of the State's wolves. Of the 407 wolves trapped by Wildlife Services during 2006-2008 in response to depredation complaints, 52 (13 percent)

[[Page 81696]]

exhibited signs of mange (Hart 2009, pers. comm.); the proportion of wolves with signs of mange decreased from 17 percent in 2006 to 10 percent in 2008. During the previous 3-year period (2003-2005), the proportion of trapped wolves with signs of mange was also about 13 percent, suggesting that mange has not increased in prevalence among wolves in Minnesota since 2003. The incidence of mange among wolves targeted by Wildlife Services is likely not representative of the prevalence of the disease in the statewide wolf population; wolves targeted for depredation control appear to be more likely to carry the disease (Hart 2009, pers. comm.).

019792A

In a separate study, mortality data from 12 years (1994-2005) of monitoring radio-collared wolves in 7 to 9 packs in north-central Minnesota show that 11 percent died from mange (DelGiudice in litt. 2005). However, the sample size (17 total mortalities, 2 from mange in 1998 and 2004) is far too small to deduce trends in mange mortality over time. Furthermore, these data are from mange mortalities, while the Wildlife Services' data are based on mange symptoms, not mortalities. Other data show that from 1998 to 2010 in the Superior National Forest, 7 of approximately 163 radio-collared wolves were known to have died of mange (Mech unpublished).

It is hypothesized that the current incidence of mange is more widespread than it would have otherwise been, because the WGL wolf range experienced a series of mild winters beginning with the winter of 1997-1998 (Van Deelen 2005, Fig. 2). Mange-induced mortality is chiefly a result of winter hypothermia, thus the less severe winters resulted in higher survival of mangy wolves, and increased spread of mange to additional wolves during the following spring and summer. The high wolf population, and especially higher wolf density on the landscape, may also be contributing to the increasing occurrence of mange in the WGL wolf population.

Lyme disease, caused by the spirochete Borrelia burgdorferi, is another relatively recently recognized disease, first documented in New England in 1975, although it may have occurred in Wisconsin as early as 1969. It is spread by ticks that pass the infection to their hosts when feeding. Host species include humans, horses, dogs, white-tailed deer, white-footed mice, eastern chipmunks, coyotes, and wolves. The prevalence of Lyme disease exposure in Wisconsin wolves averaged 70 percent of live-trapped animals in 1988-91, dropped to 37 percent during 1992-97 and was back up to 56 percent (32 of 57 tested) in 2002-04 (Wydeven and Wiedenhoeft 2004b, pp. 23-24 Table 7; 2005, pp. 23-24 Table 7). Clinical symptoms have not been reported in wolves, but infected dogs can experience debilitating conditions, and abortion and fetal mortality have been reported in infected humans and horses. It is possible that individual wolves may be debilitated by Lyme disease, perhaps contributing to their mortality; however, Lyme disease is not believed to be a significant factor affecting wolf populations (Kreeger 2003, p. 212).

The dog louse (Trichodectes canis) has been detected in wolves in Ontario, Saskatchewan, Alaska, Minnesota, and Wisconsin (Mech et al 1985, pp. 404-405; Kreeger 2003, p. 208; Paul in litt. 2005). Dogs are probably the source of the initial infections, and subsequently wild canids transfer lice by direct contact with other wolves, particularly between females and pups. Severe infestations result in irritated and raw skin, substantial hair loss, particularly in the groin. However, in contrast to mange, lice infestations generally result in loss of guard hairs but not the insulating under fur, thus, hypothermia is less likely to occur and much less likely to be fatal (Brand et al. 1995, p. 426). Even though observed in nearly 4 percent in a sample of 391 Minnesota wolves in 2003-05 (Paul in litt. 2005), dog lice infestations have not been confirmed as a cause of wolf mortality, and are not expected to have a significant impact even at a local scale.

Canine distemper virus (CDV) is an acute disease of carnivores that has been known in Europe since the sixteenth century and is now infecting dogs worldwide (Kreeger 2003, p. 209). CDV generally infects dog pups when they are only a few months old, so mortality in wild wolf populations might be difficult to detect (Brand et al 1995, pp. 420-421). CDV mortality among wild wolves has been documented in two

019793A

littermate pups and an adult male in Manitoba (Carbyn 1982, pp. 111-112; Stronen et al. 2011, p. 224), in two Alaskan yearling wolves (Peterson et al. 1984, p. 31), and in two Wisconsin wolves (an adult in 1985 and a pup in 2002) (Thomas in litt. 2006; Wydeven and Wiedenhoeft 2003b, p. 20). Carbyn (1982, pp. 113-116) concluded that CDV was a contributor to a 50 percent decline of the wolf population in Riding Mountain National Park (Manitoba, Canada) in the mid-1970s; current prevalence of CDV in that population is similar to that reported in the past (Stronen et al. 2011, pp. 223-226). Almberg et al. (2009, pp. 8-9) correlate high wolf pup mortality in Yellowstone National Park in 1999 and 2005 with serologic evidence of high CDV exposure in wolves as well as other canids. They detected CDV in three wolf carcasses in 2008, indicating that distemper deaths also may have occurred during that year. In this and a related paper (Almberg et al. 2010, p. 2072), the authors predict periodic short-term declines from CDV, but no long-term threat to the wolf population from maintenance of this virus among multiple hosts in the Yellowstone ecosystem.

Serological evidence indicates that exposure to CDV is high among some Midwest wolves--29 percent in northern Wisconsin wolves and 79 percent in central Wisconsin wolves in 2002-04 (Wydeven and Wiedenhoeft 2004b, pp. 23-24 Table 7; 2005, pp. 23-24 Table 7). However, the continued strong recruitment in Wisconsin and elsewhere in North American wolf populations indicates that distemper is not likely a significant cause of mortality (Brand et al. 1995, p. 421).

Other diseases and parasites, including rabies, canine heartworm, blastomycosis, bacterial myocarditis, granulomatous pneumonia, brucellosis, leptospirosis, bovine tuberculosis, hookworm, coccidiosis, and canine hepatitis have been documented in wild wolves, but their impacts on future wild wolf populations are not likely to be significant (Brand et al. 1995, pp. 419-429; Hassett in litt. 2003; Johnson 1995, pp. 431, 436-438; Mech and Kurtz 1999, pp. 305-306; Thomas in litt. 1998, Thomas in litt. 2006, WI DNR 1999, p. 61; Kreeger 2003, pp. 202-214). Continuing wolf range expansion, however, likely will provide new avenues for exposure to several of these diseases, especially canine heartworm, raccoon rabies, and bovine tuberculosis (Thomas in litt. 2000, in litt. 2006), further emphasizing the need for disease monitoring programs.

In addition, the possibility of new diseases developing and existing diseases, such as chronic wasting disease (CWD), West Nile Virus (WNV) and canine influenza (Crawford et al. 2005, 482-485), moving across species barriers or spreading from domestic dogs to wolves must all be taken into account, and monitoring programs will need to address such threats. Currently there is no evidence that CWD can directly affect canids (Thomas in litt. 2006; Wild et al. 2010, p. 87). Wisconsin wolves have been tested for WNV at necropsy since the first spread of the virus across the State: To date, all results have been negative. Although experimental infection of dogs produced

[[Page 81697]]

no ill effects, WNV is reported to have killed two captive wolf pups, so young wolves may be at some risk (Thomas in litt. 2006).

In aggregate, diseases and parasites were the cause of 21 percent of the diagnosed mortalities of radio-collared wolves in Michigan from 1999 through 2004 (Beyer 2005, unpublished data) and 27 percent of the diagnosed mortalities of radio-collared wolves in Wisconsin from October 1979 through December 2009 (Wydeven et al. 2010, p. 45). In

recent years (2006-10), disease has been the cause of death for 14 percent (10 of 70 dead wolves) of the diagnosed mortalities of radio-collared wolves in Wisconsin and 3 to 7 percent of all wolves (radio-collared and not collared) found dead in the State (72 to 94 wolves). During that time period, disease was the cause of death of 12 percent (5 of 43) of the diagnosed mortalities of radio-collared wolves in Michigan, and of 3 percent (6 of 199) of the total known wolf mortalities in Minnesota.

Many of the diseases and parasites are known to be spread by wolf-to-wolf contact. Therefore, the incidence of mange, CPV, CDV, and canine heartworm may increase as wolf densities increase in the more recently colonized areas (Thomas in litt. 2006). Because wolf densities generally are relatively stable following the first few years of colonization, wolf-to-wolf contacts will not likely lead to a continuing increase in disease prevalence in areas that have been occupied for several years or more and are largely saturated with wolf packs (Mech in litt. 1998).

Disease and parasite impacts may increase because several wolf diseases and parasites are carried and spread by domestic dogs. This transfer of pathogens from domestic dogs to wild wolves may increase as wolves continue to colonize non-wilderness areas (Mech in litt. 1998). Heartworm, CPV, and rabies are the main concerns (Thomas in litt. 1998), but dogs may become significant vectors for other diseases with potentially serious impacts on wolves in the future (Crawford et al. 2005, pp. 482-485). However, to date wolf populations in Wisconsin and Michigan have continued their expansion into areas with increased contacts with dogs and have shown no adverse pathogen impacts since the mid-1980s impacts from CPV.

Disease and parasite impacts are a recognized concern of the Minnesota, Michigan, and Wisconsin DNRs. The Michigan Gray Wolf Recovery and Management Plan states that necropsies will be conducted on all dead wolves, and that all live wolves that are handled will be examined, with blood, skin, and fecal samples taken to provide disease information. The Michigan Plan states that the Michigan DNR will continue to monitor the prevalence and impact of disease on wolf health following Federal delisting (MI DNR 2008, pp. 32, 40-42).

Similarly, the Wisconsin Wolf Management Plan states that as long as the wolf is State-listed as a threatened or endangered species, the WI DNR will conduct necropsies of dead wolves and test a sample of live-captured wolves for diseases and parasites, with a goal of screening 10 percent of the State wolf population for diseases annually. However, the plan anticipates that following State delisting (which occurred on August 1, 2004), disease monitoring will be scaled back because the percentage of the wolf population that is live-trapped each year will decline. Disease monitoring of captured wolves currently is focusing on diseases known to be causing noteworthy mortality, such as mange, and other diseases for which data are judged to be sparse, such as Lyme disease and ehrlichiosis (Wydeven and Wiedenhoeft 2006, p. 8). The State will continue to test for disease and parasite loads through periodic necropsy and scat analyses. The 2006 update to the 1999 plan also recommends that all wolves live-trapped for other studies should have their health monitored and reported to the WI DNR wildlife health specialists (WI DNR 1999, p.21; 2006c, p. 14). Furthermore, the 2006 update identifies a need for ``continued health monitoring to document significant disease events that may impact the wolf population and to identify new diseases in the population[hellip].'' (WI DNR 2006a, p. 24).

019795A

The Minnesota Wolf Management Plan states that MN DNR ``will collaborate with other investigators and continue monitoring disease incidence, where necessary, by examination of wolf carcasses obtained through depredation control programs, and also through blood or tissue physiology work conducted by the MN DNR and the U.S. Geological Survey. The DNR will also keep records of documented and suspected incidence of sarcoptic mange (MN DNR 2001, p. 32).'' In addition, it will initiate ``(R)egular collection of pertinent tissues of live captured or dead wolves'' and periodically assess wolf health ``when circumstances indicate that diseases or parasites may be adversely affecting portions of the wolf population (MN DNR 2001, p. 19).'' Unlike Michigan and Wisconsin, Minnesota has not established minimum goals for the proportion of its wolves that will be assessed for disease nor does it plan to treat any wolves, although it does not rule out these measures. Minnesota's less intensive approach to disease monitoring and management seems warranted in light of its much greater abundance of wolves than in the other two States.

In areas within the WGL DPS, but outside Minnesota, Wisconsin, and Michigan, we lack data on the incidence of diseases or parasites in transient wolves. However, the boundary of the WGL DPS is laid out in a manner such that the vast majority of, and perhaps all, wolves that will occur in the DPS in the foreseeable future will have originated from the Minnesota-Wisconsin-Michigan wolf metapopulation. Therefore, they will be carrying the ``normal'' complement of Midwestern wolf parasites, diseases, and disease resistance with them. For this reason, any new pairs, packs, or populations that develop within the DPS are likely to experience the same low to moderate adverse impacts from pathogens that have been occurring in the core recovery areas.

The most likely exceptions to this generalization would arise from exposure to sources of novel diseases or more virulent forms that are being spread by other canid species that might be encountered by wolves dispersing into currently unoccupied areas of the DPS. To increase the likelihood of detecting such novel or more virulent diseases and thereby reduce the risk that they might pose to the core of the metapopulation after delisting, we will encourage these States and Tribes to provide wolf carcasses or suitable tissue, as appropriate, to the USGS National Wildlife Health Center or the Service's National Wildlife Forensics Laboratory for necropsy. This practice should provide an early indication of new or increasing pathogen threats before they reach the core of the metapopulation or impact future transient wolves to those areas.

Disease Summary

We believe that several diseases have had noticeable impacts on wolf population growth in the Great Lakes region in the past. These impacts have been both direct, resulting in mortality of individual wolves, and indirect, by reducing longevity and fecundity of individuals or entire packs or populations. Canine parvovirus stalled wolf population growth in Wisconsin in the early and mid-1980s and has been implicated in the decline in the mid-1980s of the isolated Isle Royale wolf population in Michigan, and in attenuating wolf population growth in

[[Page 81698]]

Minnesota (Mech in litt. 2006). Sarcoptic mange has affected wolf recovery in Michigan's UP and in Wisconsin over the last 12 years, and it is recognized as a continuing issue.

Despite these and other diseases and parasites, the overall trend for wolf populations in the WGL DPS continues to be upward. Wolf management plans for Minnesota, Michigan, and Wisconsin include disease monitoring components that we expect will identify future disease and parasite problems in time to allow corrective action to avoid a significant decline in overall population viability. We conclude that diseases and parasites will not prevent continued population growth or the maintenance of viable wolf populations in the DPS. Delisting of wolves in the WGL DPS will not significantly change the incidence or impacts of disease and parasites on these wolves. Disease may eventually limit overall wolf carrying capacity and contribute to annual fluctuations in wolf abundance, but at current and foreseeable population levels, diseases are not likely to affect viability or place wolves at risk of again becoming endangered or threatened. Therefore, we conclude that diseases and parasites do not pose a significant threat to wolves in the WGL DPS

Natural Predation

No wild animals habitually prey on wolves. Large prey such as deer, elk, or moose (Mech and Nelson 1989, pp. 207-208; Smith et al. 2001, p. 3), or other predators, such as mountain lions (Puma concolor), grizzly bears (Ursus arctos horribilis), or black bears (Ursus americanus) where they are extant (USFWS 2005, p. 3; Ballard et al. 2003, pp. 260-264), occasionally kill wolves, but such events have rarely been documented. Coyotes have also attempted to attack wolf pups (Ballard et al. 2003, p. 267), and along with bears and various medium-sized predators could pose a risk to wolf pups if adult wolves are not present. Predation and death by prey species are small components of wolf mortality and will not likely increase with delisting.

Wolves frequently are killed by other wolves, most commonly when packs encounter and attack a dispersing wolf as an intruder or when two packs encounter each other along a territorial boundary (Mech 1994, p. 201). This form of mortality is likely to increase as more of the available wolf habitat becomes saturated with wolf pack territories, as is the case in northeastern Minnesota, but such a trend is not yet evident from Wisconsin or Michigan data. From October 1979 through June 1998, researchers found that 7 (12 percent) of the mortalities of radio-collared Wisconsin wolves resulted from wolves killing wolves, and 8 of 73 (11 percent) mortalities were from this cause during 2000-05 (Wydeven 1998, p. 16 Table 4; Wydeven and Wiedenhoeft 2001, p. 8 Table 5; 2002, pp. 8-9 Table 4; 2003a, pp. 11-12 Table 4; 2004a, pp. 11-12 Table 5, 2005, p. 21 Table 5).

Among radio-collared wolves dying from known causes between October 1979 and December 2009, overall rate of intraspecific strife was 17 of 151 mortalities or 11 percent (Wydeven et al. 2010, p. 45). Gogan et al. (2004, p. 7) studied 31 radio-collared wolves in northern Minnesota from 1987 to 1991 and found that 4 (13 percent) were killed by other wolves, representing 29 percent of the total mortality of radio-collared wolves. Intra-specific strife caused 50 percent of mortality within Voyageurs National Park and 20 percent of the mortality of wolves adjacent to the Park (Gogan et al. 2004, p. 22). The DelGiudice data (in litt. 2005) show a 17 percent mortality rate from other wolves in another study area in north-central Minnesota from 1994 to 2005. This behavior is normal in healthy wolf populations and is an expected outcome of dispersal conflicts and territorial defense, as well as occasional intra-pack strife. This form of mortality is something with

which the species has evolved, and it should not pose a threat to wolf
populations in the WGL DPS once delisted.

Human-Caused Mortality

     Because our concern about human-caused mortality is its overall
effect on wolf mortality, the following discussion addresses the major
human causes of wolf mortality, including illegal killing, depredation
control, and vehicle collisions.
     Humans have functioned as highly effective predators of the wolf in
North America for several hundred years. European settlers in the
Midwest attempted to eliminate the wolf entirely in earlier times, and
the U.S. Congress passed a wolf bounty that covered the Northwest
Territories in 1817. Bounties on wolves subsequently became the norm
for States across the species' range. In Michigan, an 1838 wolf bounty
became the ninth law passed by the First Michigan Legislature; this
bounty remained in place until 1960. A Wisconsin bounty was instituted
in 1865 and was repealed about the time wolves were extirpated from the
State in 1957. Minnesota maintained a wolf bounty until 1965.
     Subsequent to the gray wolf's listing as a federally endangered
species, the Act and State endangered species statutes prohibited the
killing of wolves except under very limited circumstances, such as in
defense of human life, for scientific or conservation purposes, or
under special regulations intended to reduce wolf depredations of
livestock or other domestic animals. The resultant reduction in human-
caused wolf mortality is the main cause of the wolf's reestablishment
in large parts of its historical range. It is clear, however, that
illegal killing of wolves has continued in the form of intentional
mortality and incidental deaths.
     Illegal killing of wolves occurs for a number of reasons. Some of
these killings are accidental (for example, wolves are hit by vehicles,
mistaken for coyotes and shot, or caught in traps set for other
animals); some of these accidental killings are reported to State,
Tribal, and Federal authorities. It is likely that most illegal
killings, however, are intentional and are never reported to government
authorities. Because they generally occur in remote locations and the
evidence is easily concealed, we lack reliable estimates of annual
rates of intentional illegal killings.
     In Wisconsin, all forms of human-caused mortality accounted for 56
percent of the diagnosed deaths of radio-collared wolves from October
1979 through December 2009 (Wydeven et al. 2010, p. 45). Thirty-four
percent of the diagnosed mortalities, and 62 percent of the human-
caused mortalities, were from illegal killing (mainly shootings).
Another 9 percent of all the diagnosed mortalities (15 percent of the
human-caused mortalities) resulted from vehicle collisions. (These
percentages and those in the following paragraphs exclude seven radio-
collared Wisconsin wolves that were killed in depredation control
actions by USDA--APHIS--Wildlife Services. The wolf depredation control
programs in the Midwest are discussed separately under Depredation
Control, below.) Data from 2006 through 2010 (68 diagnosed mortalities
of radio-collared wolves) show the mortality percentages for illegal
kills to be similar, with 35 percent of the diagnosed mortalities being
illegally killed. The mortality percentage for vehicle collisions
during this time period remained constant (13 percent) (Wydeven et al.
2007, p. 10; and Wydeven and Wiedenhoeft 2008, Summary). In 2010,
mortality data from actively monitored wolves show that, of wolves that
died, 38 percent were killed illegally (all shootings); 12 percent were

euthanized for human safety concerns; 6 percent of the deaths were
disease

[[Page 81699]]

related; 6 percent died from apparent old age, 6 percent, from
intraspecific strife, and 12 percent, from vehicle collisions; and the
causes for 19 percent of the deaths were unknown (Wydeven et al. 2011,
p. 2).
    During the periods that wolves were federally delisted (from March
2007 through September 2008 and from April through early July 2009), 92
wolves were killed for depredation control, including 8 legally shot by
private landowners (Wydeven and Wiedenhoeft 2008, p. 8; Wydeven et al.
2009b, p. 6; Wydeven et al. 2010, p. 13).
    As the Wisconsin population has increased in numbers and range,
vehicle collisions have increased as a percentage of radio-collared
wolf mortalities. During the October 1979 through June 1992 period,
only 1 of 27 (4 percent) known mortalities was from that cause; but
from July 1992 through June 1998, vehicle collisions caused 5 of the 26
(19 percent) known mortalities (Wydeven 1998, p. 6). From 2002 through
2004, of 45 known mortalities, 7 (16 percent) were from that cause
(Wydeven and Wiedenhoeft 2003a, pp. 11-12 Table 4; 2004a, pp. 11-12
Table 5; 2005, pp. 19-20 Table 4); and from 2005 through 2009, of 459
known mortalities, 126 (27 percent) were from that cause (Wydeven and
Wiedenhoeft 2005, p. 20; Wydeven and Wiedenhoeft 2006, p. 20; Wydeven
et al. 2007a, p.7; Wydeven et al. 2007b, p.10; Wydeven and Wiedenhoeft
2008, p. 7; Wydeven et al. 2009a, pp. 19-21; Wydeven and Wiedenhoeft
2009, Table 3; Wydeven et al. 2010, Table 7).
    A comparison over time for diagnosed mortalities of radio-collared
Wisconsin wolves shows that 18 of 57 (32 percent) were illegally killed
from October 1979 through 1998, while 12 of 42 (29 percent) were
illegally killed from 2002 through 2004, and 24 of 72 (33 percent) were
illegally killed from 2005 to March 2007 (WI DNR 1999, p. 63; Wydeven
and Wiedenhoeft 2003a, pp. 11-12 Table 4; 2004a, pp. 11-12 Table 4;
2005. pp. 19-20 Table 4; Wydeven et al. 2006a, p. 6; 2006b, p. 8; 2007,
pp. 6-7; 2008a, p. 10). In 2006, prior to the Federal delisting the
following year, 17 of 72 wolves found dead in the State were killed
illegally. Among nine radio-collared wolves that had died in 2006, six
(67 percent) were illegally killed. In 2007, after Federal delisting,
10 of 90 dead wolves found in the State were illegally killed, and 3
(19 percent) of the radio-collared wolves found dead were illegally
killed. In 2008, 14 of 94 dead wolves found in Wisconsin were illegally
killed, and 4 (28 percent) of 14 radio-collared wolves found dead were
illegal kills. In 2009, when wolves were again federally listed for
most of the year, 20 of the 72 dead wolves found in Wisconsin were
illegally killed, and 8 (62 percent) of 13 radio-collared wolves found
dead were illegal kills. In 2010, when wolves continued to be federally
listed, 15 of 72 dead wolves were illegally killed, and 7 (44 percent)
of 16 radio-collared wolves were illegally killed.
    Thus the number of known illegally killed wolves declined slightly
from 17 in 2006, to 10 in 2007 and 14 in 2008, increased to 20 in 2009,
and declined to 15 in 2010. Among radio-collared wolves found dead,
illegal killing represented 67 percent of all mortality in 2006, 19
percent in 2007, 23 percent in 2008, 62 percent in 2009, and 44 percent
in 2010 (Wydeven et al. 2010, p. 13; Wydeven et al. 2011, p. 2).
    In the UP of Michigan, human-caused mortalities accounted for 75
percent of the diagnosed mortalities, based upon 34 wolves recovered

from 1960 to 1997, including mostly non-radio-collared wolves. Twenty-eight percent of all the diagnosed mortalities and 38 percent of the human-caused mortalities were from shooting. In the UP during that period, about one-third of all the known mortalities were from vehicle collisions (MI DNR 1997, pp. 5-6). During the 1998 Michigan deer hunting season, three radio-collared wolves were shot and killed, resulting in one arrest and conviction (Hammill in litt. 1999, Michigan DNR 1999). During the subsequent 3 years, eight additional wolves were killed in Michigan by gunshot, and the cut-off radio-collar from a ninth animal was located, but the animal was never found. These incidents resulted in six guilty pleas, with three cases remaining open to date.

Data collected from radio-collared wolves from the 1999 to 2009 bioyears (mid-April to mid-April) show that human-caused mortalities still account for the majority of the wolf mortalities (66 percent) in Michigan. Deaths from vehicular collisions were about 18 percent of total mortality (27 percent of the human-caused mortality) and showed no trend over this 11-year period. Deaths from illegal killing constituted 39 percent of all mortalities (60 percent of the human-caused mortality) over the period. From 1999 through 2001, illegal killings were 31 percent of the mortalities, but this increased to 42 percent during the 2002 through 2004 bioyears and to 40 percent during bioyears 2005 through 2010 (Roell 2010, pers. comm.).

Most Michigan residents place a high priority on wolf management actions that address public concerns for human safety (Beyer et al. 2006). Quick and professional responses to wolf conflicts have been important for wolf recovery (Ruid et al. 2009, p. 280). In most cases, people can take simple, sensible measures to avoid those situations and protect themselves against harm. Other cases may warrant higher levels of concern and professional assistance. Michigan DNR solved most wolf-human conflicts using nonlethal methods (Roell 2010, pers. comm.). However, in a few incidents lethal control was warranted and carried out under Federal regulations (50 CFR 17.21, which allows the take of an endangered species when there is a ``demonstrable but nonimmediate threat'' to protect human safety, or to euthanize a sick or injured wolf, but only if it is not reasonably possible to translocate the animal alive), or while wolves were not federally protected (Roell 2010 et al., p. 9). Since 2004 the Michigan DNR and USDA-Wildlife Services have killed 13 animals (12 involving human safety and 1 sick wolf) under the authority of this regulation (Roell 2010 et al., p. 9). Two others were killed for human safety concerns while wolves were federally delisted (Roell 2010, pers. comm.).

North-central Minnesota data from 16 diagnosed mortalities of radio-collared wolves over a 12-year period (1994-2005) show that human-causes resulted in 69 percent of the diagnosed mortalities. This includes 1 wolf accidentally snared, 2 vehicle collisions, and 8 (50 percent of all diagnosed mortalities) that were shot (DelGiudice in litt. 2005). However, this data set of only 16 mortalities over 12 years is too small for reliable comparison to Wisconsin and Michigan data.

A smaller mortality dataset is available from a 1987-91 study of wolves in, and adjacent to, Minnesota's Voyageurs National Park, along the Canadian border. Of 10 diagnosed mortalities, illegal killing outside the Park was responsible for a minimum of 60 percent of the deaths (Gogan et al. 2004, p. 22). Furthermore, in the Superior National Forest from 1998 to 2010, of approximately 163 radio-collared wolves, 6 were known to have been killed illegally by humans (Mech

unpublished).

Two Minnesota studies provide some limited insight into the extent of human-caused wolf mortality before and after the species' listing. On the basis of bounty data from a period that predated wolf protection under the Act by 20 years, Stenlund (1955, p. 33) found an annual human-caused mortality rate of 41 percent. Fuller (1989, pp. 23-24) provided 1980-86 data from a north-central Minnesota study area and found an annual human-caused mortality rate

[[Page 81700]]

of 29 percent, a figure that includes 2 percent mortality from legal depredation control actions. Drawing conclusions from comparisons of these two studies, however, is difficult due to the confounding effects of habitat quality, exposure to humans, prey density, differing time periods, and vast differences in study design. Although these figures provide support for the contention that human-caused mortality decreased after the wolf became protected under the Act, it is not possible at this time to determine if human-caused mortality (apart from mortalities from depredation control) has significantly changed over the nearly 35-year period that the gray wolf has been listed as threatened or endangered.

Wolves were largely eliminated from the Dakotas in the 1920s and 1930s and were rarely reported from the mid-1940s through the late 1970s. Ten wolves were killed in these two States from 1981 to 1992 (Licht and Fritts 1994, pp. 76-77). Seven more were killed in North Dakota since 1992, with four of these mortalities occurring in 2002 and 2003; in 2001, one wolf was killed in Harding County in extreme northwestern South Dakota. The number of reported sightings of wolves in North Dakota is increasing. From 1993 to 1998, six wolf depredation reports were investigated in North Dakota, and adequate signs were found to verify the presence of wolves in two of the cases. A den with pups was also documented in extreme north-central North Dakota near the Canadian border in 1994. From 1999 to 2003, residents of North Dakota reported 16 wolf sightings or depredation incidents to USDA-APHIS-Wildlife Services, and 9 of these incidents were verified. Additionally, one North Dakota wolf sighting was confirmed in early 2004, two wolf depredation incidents were verified north of Garrison in late 2005, and one wolf was found dead in Eddy County in 2009. USDA-APHIS-Wildlife Services also confirmed a wolf sighting along the Minnesota border near Gary, South Dakota, in 1996, and a trapper with the South Dakota Game, Fish, and Parks Department sighted a lone wolf in the western Black Hills in 2002.

Several other unconfirmed sightings have been reported from these States, including two reports in South Dakota in 2003. Wolves killed in North and South Dakota were most often shot by hunters after being mistaken for coyotes, or were killed by vehicles. The 2001 mortality in South Dakota and one of the 2003 mortalities in North Dakota were caused by M-44 devices that had been legally set in response to complaints about coyotes.

In and around the core recovery areas in the Midwest, a continuing increase in wolf mortalities from vehicle collisions, both in actual numbers and as a percent of total diagnosed mortalities, is expected as wolves continue their colonization of areas with more human developments and a denser network of roads and vehicle traffic. In addition, the growing wolf populations in Wisconsin and Michigan are producing greater numbers of dispersing individuals each year, and this

also will contribute to increasing numbers of wolf-vehicle collisions. This increase in accidental deaths would be unaffected by a removal of wolves in the WGL DPS from the protections of the Act.

In those areas of the WGL DPS that are beyond the areas currently occupied by wolf packs in Minnesota, Wisconsin, and Michigan, we expect that human-caused wolf mortality in the form of vehicle collisions, shooting, and trapping have been removing all, or nearly all, the wolves that disperse into these areas. We expect this to continue after Federal delisting. Road densities are high in these areas, with numerous interstate highways and other freeways and high-speed thoroughfares that are extremely hazardous to wolves attempting to move across them. Shooting and trapping of wolves is likely to continue as a threat to wolves in these areas for several reasons. Especially outside of Minnesota, Wisconsin, and Michigan, hunters will not expect to encounter wolves, and may easily mistake them for coyotes from a distance, resulting in unintentional shootings.

It is important to note that, despite the difficulty in measuring the extent of illegal killing of wolves, all sources of wolf mortality, including legal (for example, depredation control) and illegal human-caused mortality, have not been of sufficient magnitude to stop the continuing growth of the wolf population in Wisconsin and Michigan, nor to cause a wolf population decline in Minnesota. This indicates that total wolf mortality does not threaten the continued viability of the wolf population in these three States, or in the WGL DPS.

Human-caused Mortality Summary

The high reproductive potential of wolves allows wolf populations to withstand relatively high mortality rates, including human-caused mortality. The principle of compensatory mortality was previously believed to occur in wolf populations. This means that human-caused mortality is not simply added to ``natural'' mortality, but rather replaces a portion of it. Thus, the addition of intentional killing of wolves to a wolf population was thought to reduce the mortality rates from other causes on the population (for example, Fuller et al. 2003). Creel and Rotella (2010) reexamined this concept with regards to wolves. They found that, contrary to the previously held belief, wolf population growth declined as human-caused mortality increased (Creel and Rotella 2010, p. 3). Their study concludes that wolves can be harvested within limits, but that human-caused mortality was strongly additive in total mortality (Creel and Rotella 2010, p. 6).

Minnesota, Wisconsin, and Michigan, however, have committed to continue to regulate human-caused mortality so that it does not reduce the WGL wolf population below recovery levels. The wolf populations in Minnesota, Wisconsin, and Michigan will stop growing when they have saturated the suitable habitat and are curtailed in less suitable areas by natural mortality (disease, starvation, and intraspecific aggression), depredation management, incidental mortality (for example, road kill), illegal killing, and other means. At that time, we should expect to see population declines in some years followed by short-term increases in other years, resulting from fluctuations in birth and mortality rates. Adequate wolf monitoring programs, as described in the Michigan, Wisconsin, and Minnesota wolf management plans, are likely to identify high mortality rates or low birth rates that warrant corrective action by the management agencies (see Regulatory Mechanisms in Minnesota, Wisconsin, and Michigan, below). The goals of all three State wolf management plans are to maintain wolf populations well above the numbers recommended in the Recovery Plan for the Eastern Timber Wolf to ensure long-term viable wolf populations. The State management

plans recommend a minimum wolf population of 1,600 in Minnesota, 250 in
Wisconsin (with a management goal of 350), and 200 in Michigan.

Despite human-caused mortalities of wolves in Minnesota, Wisconsin,
and Michigan, these wolf populations have continued to increase in both
numbers and range. As long as other mortality factors do not increase
significantly and monitoring is adequate to document, and if necessary
counteract (see Post-Delisting Monitoring, below), the effects of
excessive human-caused mortality should that occur, the Minnesota-
Wisconsin-Michigan wolf population will not decline to nonviable levels
in the foreseeable future as a result of human-caused killing or other
forms of

[[Page 81701]]

predation. Therefore, we conclude that predation, including all forms
of human-caused mortality, does not pose a significant threat to wolves
in the WGL DPS.

D. The Inadequacy of Existing Regulatory Mechanisms

The inadequacy of existing regulatory mechanisms is one of five
factors that, under the Endangered Species Act (Act), may result in a
determination as to whether a species should be listed or not. In
analyzing whether the existing regulatory mechanisms are adequate, the
Service reviews relevant Federal, State, and tribal laws, plans,
regulations, memoranda of understanding, cooperative agreements and
other such factors that influence conservation of the species in
question, including analyzing the extent to which those mechanisms can
be relied upon. Other examples include State governmental actions
enforced under a State statute or constitution, or Federal action under
statute.

Strongest weight is given to statutes and their implementing
regulations, and management direction that stems from those laws and
regulations. Some other agreements are more voluntary in nature; in
those cases we analyze the specific facts to determine the extent to
which it can be relied on in the future, including how it addresses
threats to the species. We consider all pertinent information,
including the efforts and conservation practices of State governments,
whether or not these are enforceable by law. Regulatory mechanisms, if
they exist, may preclude the need for listing if such mechanisms are
judged to adequately address the threat to the species such that
listing is not warranted. Conversely, threats on the landscape are
exacerbated when not addressed by existing regulatory mechanisms, or
when the existing mechanisms are not adequate (or not adequately
implemented or enforced).

The following sections discuss the adequacy of regulatory
mechanisms that would be implemented if the WGL DPS were delisted, that
is, removed from the List of Endangered and Threatened Wildlife. For
the reasons described in the following section, the Service has
determined that regulatory mechanisms that will be in place following
delisting will be adequate to ensure that this DPS of wolves remains
robust.

Regulatory Mechanisms in Minnesota, Wisconsin, and Michigan

State Wolf Management Planning
During the 2000 legislative session, the Minnesota Legislature

passed wolf management provisions addressing wolf protection, taking of
wolves, and directing MN DNR to prepare a wolf management plan. The MN
DNR revised a 1999 draft wolf management plan to reflect the
legislative action of 2000, and completed the Minnesota Wolf Management
Plan (MN Plan) in early 2001 (MN DNR 2001, pp. 8-9).

   The Wisconsin Natural Resources Board (NRB) approved the Wisconsin
Wolf Management Plan in October 1999 (WI Plan). In 2004 and 2005 the
Wisconsin Wolf Science Advisory Committee and the Wisconsin Wolf
Stakeholders group reviewed the 1999 Plan, and the Science Advisory
Committee subsequently developed updates and recommended modifications
to the 1999 Plan. The WI DNR presented the Plan updates and
modifications to the Wisconsin NRB on June 28, 2006, and the NRB
approved them at that time, with the understanding that some numbers
would be updated and an additional reference document would be added
(Holtz in litt. 2006). The updates were completed and received final
NRB approval on November 28, 2006 (WI DNR 2006a, p. 1).

   In late 1997, the Michigan Wolf Recovery and Management Plan (MI
Plan) was completed and received the necessary State approvals. It
primarily focused on wolf recovery, rather than long-term management of
a large wolf population and the conflicts that result as a consequence
of successful wolf restoration. In 2006 the MI DNR convened a Michigan
Wolf Management Roundtable committee (Roundtable) to provide guiding
principles to the DNR on changes and revisions to the 1997 Plan and to
guide management of Michigan wolves and wolf-related issues following
Federal delisting of the species. The MI DNR relied heavily on those
guiding principles as it drafted a new wolf management plan. The
Roundtable was composed of representatives from 20 Michigan stakeholder
interests in wolf recovery and management, and its membership is
roughly equal in numbers from the UP and the LP. During 2006, the
Roundtable provided its ``Recommended Guiding Principles for Wolf
Management in Michigan'' to the DNR in November (Michigan Wolf
Management Roundtable 2006. p. 2). Based on those Roundtable
recommendations, a revised Michigan Wolf Management Plan was completed
in July 2008 (MI DNR 2008a). The complete text of the Wisconsin,
Michigan, and Minnesota wolf plans can be found on our Web site (see
FOR FURTHER INFORMATION CONTACT).
The Minnesota Wolf Management Plan

   The Minnesota Plan is based, in part, on the recommendations of a
State wolf management roundtable (MN DNR 2001, Appendix V) and on a
State wolf management law enacted in 2000 (MN DNR 2001, Appendix I).
This law and the Minnesota Game and Fish Laws constitute the basis of
the State's authority to manage wolves. The Plan's stated goal is ``to
ensure the long-term survival of wolves in Minnesota while addressing
wolf-human conflicts that inevitably result when wolves and people live
in the same vicinity'' (MN DNR 2001, p. 2). It establishes a minimum
goal of 1,600 wolves in the State. Key components of the plan are
population monitoring and management, management of wolf depredation of
domestic animals, management of wolf prey, enforcement of laws
regulating take of wolves, public education, and increased staffing to
accomplish these actions. Following Federal delisting, Minnesota DNR's
management of wolves would differ from their current management while
wolves were listed as threatened under the Act. Most of these
differences deal with the control of wolves that attack or threaten
domestic animals.

   The Minnesota Plan divides the State into two wolf management
zones--Zones A and B (see Figure 2 below). Zone A corresponds to
Federal Wolf Management Zones 1 through 4 (approximately 30,000 sq mi

(77,700 sq km) in northeastern Minnesota) in the Service's Recovery
Plan for the Eastern Timber Wolf, whereas Zone B constitutes Zone 5 in
that recovery plan (MN DNR 2001, pp. 19-20 and Appendix III; USFWS
1992, p. 72). Within Zone A, wolves would receive strong protection by
the State, unless they were involved in attacks on domestic animals.
The rules governing the take of wolves to protect domestic animals in
Zone B would be less protective than in Zone A (see Post-delisting
Depredation Control in Minnesota below).
BILLING CODE 4310-55-P

[[Page 81702]]

[GRAPHIC] [TIFF OMITTED] TR28DE11.001

BILLING CODE 4310-55-C
    The MN DNR plans to allow wolf numbers and distribution to
naturally expand, with no maximum population goal, and if any winter
population estimate is below 1,600 wolves, it would take actions to
``assure recovery'' to 1,600 wolves (MN DNR 2001 p. 19). The MN DNR
plans to continue to monitor wolves in Minnesota to determine whether
such intervention is necessary. The MN DNR plans to conduct another
statewide population survey in the winter of 2012-13 and at subsequent
5-year intervals. In addition to these statewide population surveys, MN
DNR annually reviews data on depredation incident frequency and
locations provided by Wildlife Services and winter track survey indices
(see Erb 2008) to help ascertain annual trends in wolf population or
range (MN DNR 2001, pp. 18-19). The agency is currently evaluating
alternatives to its current methodology with the potential to improve
the efficiency and accuracy of its statewide population estimates
(Stark 2009a, pers. comm.).
    Minnesota (MN DNR 2001, pp. 21-24, 27-28) plans to reduce or
control illegal mortality of wolves through education, increased
enforcement of the State's wolf laws and regulations, discouraging new
road access in some areas, and maintaining a depredation control
program that includes compensation for livestock losses. The MN DNR
plans to use a variety of methods to encourage and support education of
the public about the effects of wolves on livestock, wild ungulate
populations, and human activities and the history and ecology of wolves
in the State (MN DNR 2001, pp. 29-30). These are all measures that have
been in effect for years in Minnesota, although increased enforcement
of State laws against take of wolves would replace enforcement of the
Act's take prohibitions. Financial compensation for livestock losses
has increased to the full market value of the animal, replacing
previous caps of $400 and $750 per animal (MN DNR 2001, p. 24). We do
not expect the State's efforts to result in the reduction of illegal
take of wolves from existing levels, but we believe these measures will
be crucial in ensuring that illegal mortality does not significantly
increase after Federal delisting.
    The likelihood of illegal take increases in relation to road
density and human population density, but

[[Page 81703]]

changing attitudes towards wolves may allow them to survive in areas
where road and human densities were previously thought to be too high
(Fuller et al. 2003, p. 181). The MN DNR does not plan to reduce
current levels of road access, but would encourage managers of land

areas large enough to sustain one or more wolf packs to ``be cautious about adding new road access that could exceed a density of one mile of road per square mile of land, without considering the potential effect on wolves'' (MN DNR 2001, pp. 27-28).

Under Minnesota law, the illegal killing of a wolf is a gross misdemeanor and is punishable by a maximum fine of $3,000 and imprisonment for up to 1 year. The restitution value of an illegally killed wolf is $2,000 (MN DNR 2001, p. 29). The MN DNR acknowledges that increased enforcement of the State's wolf laws and regulations would be dependent on increases in staff and resources, additional cross-deputization of tribal law enforcement officers, and continued cooperation with Federal law enforcement officers. Minnesota DNR has designated three conservation officers who are stationed in the State's wolf range as the lead officers for implementing the wolf management plan (MN DNR 2001, pp. 29, 32; Stark 2009a, pers. comm.).

Minnesota DNR will consider wolf population management measures, including public hunting and trapping seasons and other methods, in the future. In 2011, the State law was changed to allow the MN DNR to consider a public harvest season when wolves are federally delisted, rather than requiring that such consideration occur no sooner than 5 years after Federal delisting (Minnesota Statutes 97B.645 Subd. 9). With this change, the DNR is allowed to begin the process of determining whether Minnesotans want a wolf harvest season. After wolves are federally delisted, the MN DNR may prescribe open seasons and restrictions for taking gray wolves, but must seek authorization from the legislature and provide opportunity for public comment. The legislation does not change the way the DNR will determine if Minnesota should have a wolf harvest or how such a harvest would be implemented, it only allows them to begin the decision-making process earlier. The Minnesota management plan requires that population management measures be implemented in such a way to maintain a statewide late-winter wolf population of at least 1,600 animals (MN DNR 2001, pp. 19-20), well above the planning goal of 1,251 to 1,400 wolves for the State in the Revised Recovery Plan (USFWS 1992, p. 28), therefore, implementing such management measures under that requirement would ensure the wolf's continued survival in Minnesota.

Depredation Control in Minnesota--Although federally protected as a threatened species in Minnesota (since their 1978 reclassification), wolves that have attacked domestic animals have been killed by designated government employees under the authority of a special regulation (50 CFR 17.40(d)) under section 4(d) of the Act. However, no control of depredating wolves was allowed in Federal Wolf Management Zone 1, comprising about 4,500 sq mi (7,200 sq km) in extreme northeastern Minnesota (USFWS 1992, p. 72). In Federal Wolf Management Zones 2 through 5, employees or agents of the Service (including USDA-APHIS-Wildlife Services) have taken wolves in response to depredations of domestic animals within one-half mile of the depredation site. Young-of-the-year captured on or before August 1 must be released. The regulations that allow for this take (50 CFR 17.40(d)(2)(i)(B)(4)) do not specify a maximum duration for depredation control, but Wildlife Services personnel have followed internal guidelines under which they trap for no more than 10-15 days, except at sites with repeated or chronic depredation, where they may trap for up to 30 days (Paul 2004, pers. comm.).

During the period 1980-2010, the Federal Minnesota wolf depredation control program euthanized from 20 (in 1982) to 216 (in 1997) wolves annually. Annual averages (and percentage of statewide population) were

019806A

30 (2.2 percent) wolves killed from 1980 to 1984; 49 (3.0 percent),
from 1985 to 1989; 115 (6.0 percent), from 1990 to 1994; 152 (6.7
percent), from 1995 to 1999; and 128 wolves (4.2 percent), from 2000 to
2005. During 2006-2010 an average of 157 wolves were killed each year--
approximately 5.4 percent of wolves in the State (Erb 2008; USDA-
Wildlife Services 2010, p. 3). Since 1980, the lowest annual percentage
of Minnesota wolves killed under this program was 1.5 percent in 1982;
the highest percentage was 9.4 in 1997 (Paul 2004, pp. 2-7; 2006, p.
1). Following the return of wolves in Minnesota to the list of
threatened species in 2009, 195 and 192 wolves were killed in 2009 and
2010, respectively, in response to depredation of domestic animals in
Minnesota. This is the highest 2-year consecutive total since
authorization to control depredating wolves was allowed by special
regulation under section 4(d) of the Act while wolves were federally
listed.

    This level of wolf removal for depredation control has not
interfered with wolf recovery in Minnesota, although it may have slowed
the increase in wolf numbers in the State, especially since the late-
1980s, and may be contributing to the possibly stabilized Minnesota
wolf population suggested by the 2003-2004 and 2007-2008 estimates (see
additional information in Minnesota Recovery). Minnesota wolf numbers
grew at an average annual rate of nearly 4 percent between 1989 and
1998 while the depredation control program was taking its highest
percentages of wolves (Paul 2004, pp. 2-7).

    Under a Minnesota statute, the Minnesota Department of Agriculture
(MDA) compensates livestock owners for full market value of livestock
that wolves have killed or severely injured. An authorized investigator
must confirm that wolves were responsible for the depredation. The
Minnesota statute also requires MDA to periodically update its Best
Management Practices (BMPs) to incorporate new practices that it finds
would reduce wolf depredation (Minnesota Statutes 2010, Section 3.737,
subdivision 5).

    Post-delisting Depredation Control in Minnesota--When the WGL DPS
is delisted, depredation control will be authorized under Minnesota
State law and conducted in conformance with the Minnesota Wolf
Management Plan (MN DNR 2001). The Minnesota Plan divides the State
into Wolf Management Zones A and B. Zone A is composed of Federal Wolf
Management Zones 1-4, covering 30,728 sq mi (79,586 sq km),
approximately the northeastern third of the State. Zone B is identical
to the current Federal Wolf Management Zone 5, and contains the 54,603
sq mi (141,422 sq km.) that make up the rest of the State (MN DNR 2001,
pp. 19-20 and Appendix III; USFWS 1992, p. 72). The statewide survey
conducted during the winter of 2003-04 estimated that there were
approximately 2,570 wolves in Zone A and 450 in Zone B (Erb in litt.
2005). As discussed in Recovery Criteria above, the Federal planning
goal is 1,251-1,400 wolves for Zones 1-4 and no wolves in Zone 5 (USFWS
1992, p. 28).

    In Zone A wolf depredation control is limited to situations of (1)
immediate threat and (2) following verified loss of domestic animals.
In this zone, if the DNR verifies that a wolf destroyed any livestock,
domestic animal, or pet, and if the owner requests wolf control be
implemented, trained and certified predator controllers may take wolves
(specific number to be determined on a

[[Page 81704]]

case-by-case basis) within a 1-mile radius of the depredation site

(depredation control area) for up to 60 days. In contrast, in Zone B, predator controllers may take wolves (specific number to be determined on a case-by-case basis) for up to 214 days after MN DNR opens a depredation control area, depending on the time of year. Under State law, the DNR may open a control area in Zone B anytime within 5 years of a verified depredation loss upon request of the landowner, thereby providing more of a preventative approach than is allowed in Zone A, in order to head off repeat depredation incidents (MN DNR 2001, p. 22).

State law and the Minnesota Plan will also allow for private wolf depredation control throughout the State. Persons may shoot or destroy a wolf that poses ``an immediate threat'' to their livestock, guard animals, or domestic animals on lands that they own, lease, or occupy. Immediate threat is defined as ``in the act of stalking, attacking, or killing.'' This does not include trapping because traps cannot be placed in a manner such that they trap only wolves in the act of stalking, attacking, or killing. Owners of domestic pets may also kill wolves posing an immediate threat to pets under their supervision on lands that they do not own or lease, although such actions are subject to local ordinances, trespass law, and other applicable restrictions. The MN DNR will investigate any private taking of wolves in Zone A (MN DNR 2001, p. 23).

To protect their domestic animals in Zone B, individuals do not have to wait for an immediate threat or a depredation incident in order to take wolves. At any time in Zone B, persons who own, lease, or manage lands may shoot wolves on those lands to protect livestock, domestic animals, or pets. They may also employ a predator controller to trap a wolf on their land or within 1 mile of their land (with permission of the landowner) to protect their livestock, domestic animals, or pets (MN DNR 2001, p. 23-24).

The Minnesota Plan will also allow persons to harass wolves anywhere in the State within 500 yards of ``people, buildings, dogs, livestock, or other domestic pets or animals.'' Harassment may not include physical injury to a wolf.

Depredation control will be allowed throughout Zone A, which includes an area (Federal Wolf Management Zone 1) where such control has not been permitted under the Act's protection. Depredation in Zone 1, however, has been limited to 2 to 4 reported incidents per year, mostly of wolves killing dogs, although Wildlife Services received one livestock depredation complaint in Zone 1 in 2008 (Hart pers. comm. 2009), and some dog kills in this zone probably go unreported. In 2009, there was one probable and one verified depredation of a dog near Ely, Minnesota, and in 2010 Wildlife Services confirmed three dogs killed by wolves in Zone 1 (USDA-Wildlife Services 2009, p. 3; USDA-Wildlife Services 2010, p. 3). There are few livestock in Zone 1; therefore, the number of verified future depredation incidents in that Zone is expected to be low, resulting in a correspondingly low number of depredating wolves being killed there after delisting.

The final change in Zone A is the ability for owners or lessees to respond to situations of immediate threat by shooting wolves in the act of stalking, attacking, or killing livestock or other domestic animals. We believe this is not likely to result in the killing of many additional wolves, as opportunities to shoot wolves ``in the act'' will likely be few and difficult to successfully accomplish, a belief shared by the most experienced wolf depredation agent in the lower 48 States (Paul in litt. 2006, p. 5). It is also possible that illegal killing of wolves in Minnesota will decrease, because the expanded options for legal control of problem wolves may lead to an increase in public

tolerance for wolves (Paul in litt. 2006, p. 5).

Within Zone B, State law and the Minnesota Plan provide broad authority to landowners and land managers to shoot wolves at any time to protect their livestock, pets, or other domestic animals on land owned, leased, or managed by the individual. Such takings can occur in the absence of wolf attacks on the domestic animals. Thus, the estimated 450 wolves in Zone B could be subject to substantial reduction in numbers, and at the extreme, wolves could be eliminated from Zone B. However, there is no way to reasonably evaluate in advance the extent to which residents of Zone B will use this new authority, nor how vulnerable Zone B wolves will be. While wolves were under State management in 2007-08, landowners in Zone B shot six wolves under this authority. One additional wolf was trapped and euthanized in Zone B by a State certified predator controller in 2009 (Stark 2009b, pers. comm.).

The limitation of this broad take authority to Zone B is fully consistent with the Recovery Plan for the Eastern Timber Wolf's advice that wolves should be restored to the rest of Minnesota but not to Zone B (Federal Zone 5) because that area ``is not suitable for wolves'' (USFWS 1992, p. 20). The Recovery Plan for the Eastern Timber Wolf envisioned that the Minnesota numerical planning goal would be achieved solely in Zone A (Federal Zones 1-4) (USFWS 1992, p. 28), and that has occurred. Wolves outside of Zone A are not necessary to the establishment and long-term viability of a self-sustaining wolf population in the State, and, therefore, there is no need to establish or maintain a wolf population in Zone B. Accordingly, there is no need to maintain significant protection for wolves in Zone B in order to maintain a Minnesota wolf population that continues to satisfy the Federal recovery criteria after Federal delisting.

This expansion of depredation control activities will not threaten the continued survival of wolves in the State or the long-term viability of the wolf population in Zone A, the large part of wolf range in Minnesota. Significant changes in wolf depredation control under State management will primarily be restricted to Zone B, which is outside of the area necessary for wolf recovery (USFWS 1992, pp. 20, 28). Furthermore, wolves may still persist in Zone B despite the likely increased take there. The Eastern Timber Wolf Recovery Team concluded that the changes in wolf management in the State's Zone A would be ``minor'' and would not likely result in ``significant change in overall wolf numbers in Zone A.'' They found that, despite an expansion of the individual depredation control areas and an extension of the control period to 60 days, depredation control will remain ``very localized'' in Zone A. The requirement that such depredation control activities be conducted only in response to verified wolf depredation in Zone A played a key role in the team's evaluation (Peterson in litt. 2001). While wolves were under State management in 2007 and 2008, the number of wolves killed for depredation control (133 wolves in 2007 and 143 wolves in 2008) remained consistent with those killed under the special regulation under section 4(d) of the Act while wolves were federally listed (105, in 2004; 134, in 2005; and 122, in 2006).

Minnesota will continue to monitor wolf populations throughout the State and will also monitor all depredation control activities in Zone A (MN DNR 2001, p. 18). These and other activities contained in their plan will be essential in meeting their population goal of a minimum statewide winter population of 1,600 wolves, well above the planning goal of 1,251 to 1,400 wolves that the Revised Recovery Plan identifies as sufficient to ensure the

[[Page 81705]]

wolf's continued survival in Minnesota (USFWS 1992, p. 28).
The Wisconsin Wolf Management Plan

    Both the Wisconsin and Michigan Wolf Management Plans are designed
to manage and ensure the existence of wolf populations in the States as
if they are isolated populations and are not dependent upon immigration
of wolves from an adjacent State or Canada, while still maintaining
connections to those other populations. We support this approach and
believe it provides strong assurances that the wolf in both States will
remain a viable component of the WGL DPS for the foreseeable future.

    The WI Plan allows for differing levels of protection and
management within four separate management zones (see figure 3). The
Northern Forest Zone (Zone 1) and the Central Forest Zone (Zone 2) now
contain most of the State's wolf population, with approximately 6
percent of the Wisconsin wolves in Zones 3 and 4 (Wydeven and
Wiedenhoeft 2009, Table 1). Zones 1 and 2 contain all the larger
unfragmented areas of suitable habitat (see Wolf Range Ownership and
Protection, above), so most of the State's wolf packs will continue to
inhabit those parts of Wisconsin for the foreseeable future. At the
time the Wisconsin Wolf Management Plan was completed, it recommended
immediate reclassification from State-endangered to State-threatened
status, because Wisconsin's wolf population had already exceeded its
reclassification criterion of 80 wolves for 3 years. That State
reclassification occurred in 1999, after the population exceeded that
level for 5 years.

    The Wisconsin Plan further recommends that the State manage for a
wolf population of 350 wolves outside of Native American reservations,
and specifies that the species should be delisted by the State once the
population reaches 250 animals outside of reservations. The species was
proposed for State delisting in late 2003, and the State delisting
process was completed in 2004. Upon State delisting, the species was
classified as a ``protected nongame species,'' a designation that
continues State prohibitions on sport hunting and trapping of the
species (Wydeven and Jurewicz 2005, p. 1; WI DNR 2006b, p. 71). The
Wisconsin Plan includes criteria that would trigger State relisting to
threatened (a decline to fewer than 250 wolves for 3 years) or
endangered status (a decline to fewer than 80 wolves for 1 year). The
Wisconsin Plan will be reviewed annually by the Wisconsin Wolf Advisory
Committee and will be reviewed by the public every 5 years. Recently
the WI DNR began work on updating the State's wolf management plan,
which may include increasing the State management goal (Wydeven and
Wiedenhoeft 2009, p. 3).

    The WI Plan was updated during 2004-06 to reflect current wolf
numbers, additional knowledge, and issues that have arisen since its
1999 completion. This update is in the form of text changes, revisions
to two appendices, and the addition of a new appendix to the 1999 plan,
rather than as a major revision to the plan. Several components of the
plan that are key to our delisting evaluation are unchanged. The State
wolf management goal of 350 animals and the boundaries of the four wolf
management zones remain the same as in the 1999 Plan. The updated 2006
Plan continues access management on public lands and the protection of
active den sites. Protection of pack rendezvous sites, however, is no
longer considered to be needed in areas where wolves have become well
established, due to the transient nature of these sites and the larger
wolf population. The updated Plan states that rendezvous sites may need

protection in areas where wolf colonization is still underway or where pup survival is extremely poor, such as in northeastern Wisconsin (WI DNR 2006a, p. 17). The guidelines for the wolf depredation control program did not undergo significant alteration during the update process. The only substantive change to depredation control practices is to expand the area of depredation control trapping in Zones 1 and 2 to 1 mi (1.6 km) outward from the depredation site, replacing the previous 0.5 mi (0.8 km) radius trapping zone (WI DNR 2006a, pp. 3-4).

An important component of the WI Plan is the annual monitoring of wolf populations by radio collars and winter track surveys in order to provide comparable annual data to assess population size and growth for at least 5 years after Federal delisting. This monitoring will include health monitoring of captured wolves and necropsies of dead wolves that are found. Wolf scat will be collected and analyzed to monitor for canine viruses and parasites. Health monitoring will be part of the capture protocol for all studies that involve the live capture of Wisconsin wolves (WI DNR 2006a, p. 14).

Cooperative habitat management will be promoted with public and private landowners to maintain existing road densities in Zones 1 and 2, protect wolf dispersal corridors, and manage forests for deer and beaver (WI DNR 1999, pp. 4, 22-23; 2006a, pp. 15-17). Furthermore, in Zone 1, a year-round prohibition on tree harvest within 330 feet (100 m) of den sites, and seasonal restrictions to reduce disturbance within one-half mile of dens, will be WI DNR policy on public lands and will be encouraged on private lands (WI DNR 1999, p. 23; 2006a, p. 17).

[[Page 81706]]

[GRAPHIC] [TIFF OMITTED] TR28DE11.002

The 1999 WI Plan contains, and the 2006 update retains, other recommendations that will provide protection to assist in maintenance of a viable wolf population in the State: (1) Continue the protection of the species as a ``protected wild animal'' with penalties similar to those for unlawfully killing large game species (fines of $1,000-$2,000, loss of hunting privileges for 3-5 years, and a possible 6-month jail sentence), (2) maintain closure zones where coyotes cannot be shot during deer hunting season in Zone 1, (3) legally protect wolf dens under the Wisconsin Administrative Code, (4) require State permits to possess a wolf or wolf-dog hybrid, and (5) establish a restitution value to be levied in addition to fines and other penalties for wolves that are illegally killed (WI DNR 1999, pp. 21, 27-28, 30-31; 2006a, pp. 3-4).

The 2006 update of the WI Plan continues to emphasize the need for public education efforts that focus on living with a recovered wolf population, ways to manage wolves and wolf-human conflicts, and the ecosystem role of wolves. The Plan continues the State reimbursement for depredation losses (including dogs and missing calves), citizen stakeholder involvement in the wolf management program, and coordination with the Tribes in wolf management and investigation of illegal killings (WI DNR 1999, pp. 24, 28-29; 2006a, pp. 22-23).

Given the decline and ultimate termination in Federal funding for wolf monitoring that would occur upon delisting, Wisconsin and Michigan DNRs are seeking an effective, yet cost-efficient, method for detecting wolf population changes to replace the current labor-intensive and expensive monitoring protocols. Both DNRs have considered implementing a ``Minnesota-type'' wolf survey. Such methodology is less expensive

for larger wolf populations than the intensive radio monitoring and
track survey methods currently used by the two States, and if the wolf
population continues to grow there will be increased need to develop
and implement a less expensive method. However, each State conducted
independent field testing of the Minnesota method several years ago and
found that method to be unsuitable for both States' lower wolf
population density and uneven pack distribution. In both States the
application of that method resulted in an overestimate of wolf
abundance, possibly due to the more patchy distribution of wolves and
packs in these States and the difficulty in accurately delineating
occupied wolf range in areas where wolf pack density is relatively low
in comparison to Minnesota and where agricultural lands are
interspersed with forested areas (Wiedenhoeft 2005, pp. 11-12; Beyer in
litt. 2006b).

    Both States remain interested in developing accurate but less
costly alternate survey methods. WI DNR might test other methods
following any Federal delisting, but the State will not replace its
traditional radio tracking/snow tracking surveys during the 5-year
post-delisting monitoring period (Wydeven in litt. 2006b). The 2006
update to the Wisconsin Wolf Management Plan has not changed the

[[Page 81707]]

WI DNR's commitment to annual wolf population monitoring in a manner
that ensures accurate and comparable data (WI DNR 1999, pp. 19-20), and
we are confident that adequate annual monitoring will continue for the
foreseeable future.

    Depredation Control in Wisconsin--The rapidly expanding Wisconsin
wolf population has resulted in an increased need for depredation
control. From 1979 through 1989, there were only five cases (an average
of 0.4 per year) of verified wolf depredations in Wisconsin. Between
1990 and 1997, there were 27 verified depredation incidents in the
State (an average of 3.4 per year), and 82 incidents (an average of
16.4 per year) occurred from 1998 to 2002. Depredation incidents
increased to 23 cases (including 50 domestic animals killed and 4
injured) in 2003, 35 cases (53 domestic animals killed, 3 injured, and
6 missing) in 2004, and to 45 cases (53 domestic animals killed and 11
injured) in 2005 (Wydeven and Wiedenhoeft 2004a, pp. 2-3, 7-8 Table 3;
Wydeven et al. 2005b, p. 7; Wiedenhoeft et al. 2006b, p. 7). From 2005 to
2008, depredation incidents continued to increase, with 52 cases (92
domestic animals killed (includes 50 chickens) and 16 injured) in 2006,
60 cases (51 domestic animals killed, 18 injured, and 14 missing) in
2007, and 57 cases (67 domestic animals killed and 10 injured) in 2008
(Wydeven et al. 2007a, p. 7; Wydeven and Wiedenhoeft 2008, pp. 8, 25-
32; Wydeven et al. 2009a, p. 6). Similar levels of depredations
continued to occur in 2009, with 55 cases (65 domestic animals killed
and 11 injured), but increased again in 2010 with 81 cases (99 domestic animals
killed and 20 injured) in 2010 (Wydeven et al. 2010, pp. 9-10; Wydeven
et al. 2011, p. 3).

    The number of farms experiencing wolf depredations has increased
from 5 farms in 2000, to 28-32 farms from 2007 to 2009, and to 47 farms
in 2010, a nearly ten-fold increase in the number of farms experiencing
depredations during the last decade. The number of counties with wolf
depredations on farms also grew during that time period from 5 to 17
counties, indicating that wolf depredation problems on farms are
continuing to expand (Wydeven in litt. 2009; Wydeven et al. 2009a, p.
23; Wydeven et al. 2011, p. 3). Between 1995 and 2002, an average of 7

019812A

percent of packs in Wisconsin were involved in livestock depredations (Wydeven et al. 2004, p. 36), and between 2002 and 2010, an average of 13 percent (from 7 to 17) of the State's packs were involved in livestock depredation (WI DNR data). More aggressive lethal controls possible in 2007 and 2008 through State management following a temporary period of Federal delisting appear to have started to stabilize levels of livestock depredation in 2007-09, but loss of those control methods allowed major increases in levels of depredation in 2010.

A significant portion of depredation incidents in Wisconsin involve attacks on dogs, primarily those engaged in bear hunting activities or dogs being trained in the field for hunting. In most cases, these have been hunting dogs that were being used for, or being trained for, hunting bears, bobcats, coyotes, and snowshoe hare (Ruid et al. 2009, pp. 285-286). It is believed that the dogs entered the territory of a wolf pack and may have been close to a den, rendezvous site, or feeding location, thus triggering an attack by wolves defending their territory or pups. The frequency of attacks on hunting dogs has increased as the State's wolf population has grown. Between 1986 and 2010, wolves in Wisconsin killed 206 dogs and injured 80 (WI DNR data files and summary of wolf survey reports). Generally about 90 percent of dogs killed were hunting hounds, and about 50 percent of dogs injured were pet dogs attacked near homes (Ruid et al. 2009).

More than 80 percent of the dog kills occurred since 2001, with an average of 17.2 dogs killed annually (range 6 to 25 dogs killed per year), and 6.8 injured each year (range 1 to 14 dogs) during the period 2001-10 (WI DNR files). Data on recent depredations in 2009 and 2010 show a continued increase in wolf attacks on dogs, with 23 dogs killed and 11 injured by 20 wolf packs (12 percent of Wisconsin packs) in 2009, and 24 dogs killed and 14 injured by 21 wolf packs in 2010 (Wydeven et al. 2010, pp. 51-52; Wydeven et al. 2011 p. 3). While the WI DNR compensates dog owners for mortalities and injuries to their dogs, the DNR takes no action against the depredating pack unless the attack was on a dog that was leashed, confined, or under the owner's control on the owner's land. Instead, the DNR issues press releases to warn bear hunters and bear dog trainers of the areas where wolf packs have been attacking bear dogs (WI DNR 2008, p. 5) and provides maps and advice to hunters on the WI DNR web site (see http://www.dnr.state.wi.us/org/land/er/mammals/wolf/dogdepred.htm). In 2010, 14 wolf attacks on dogs had occurred near homes, which was the highest level seen of this type of depredation (Wydeven et al. 2011, p. 3).

Post-delisting Depredation Control in Wisconsin--Following Federal delisting, wolf depredation control in Wisconsin will be carried out according to the 2006 Updated Wisconsin Wolf Management Plan (WI DNR 2006a, pp. 19-23), Guidelines for Conducting Depredation Control on Wolves in Wisconsin Following Federal Delisting (WI DNR 2008), and any Tribal wolf management plans or guidelines that may be developed for reservations in occupied wolf range. The 2006 updates have not significantly changed the 1999 State Plan, and the State wolf management goal of 350 wolves outside of Indian reservations (WI DNR 2006a, p. 3) is unchanged. Verification of wolf depredation incidents will continue to be conducted by USDA-APHIS-Wildlife Services, working under a cooperative agreement with WI DNR, or at the request of a Tribe, depending on the location of the suspected depredation incident. If determined to be a confirmed or probable depredation by a wolf or wolves, one or more of several options will be implemented to address the depredation problem. These options include technical assistance,

loss compensation to landowners, translocating or euthanizing problem
wolves, and private landowner control of problem wolves in some
circumstances (WI DNR 2006a, pp. 3-4, 20-22).

Technical assistance, consisting of advice or recommendations to
prevent or reduce further wolf conflicts, will be provided. This may
also include providing to the landowner various forms of noninjurious
behavior modification materials, such as flashing lights, noise makers,
temporary fencing, and fladry (a string of flags used to contain or
exclude wild animals). Monetary compensation is also provided for all
verified and probable losses of domestic animals and for a portion of
documented missing calves (WI DNR 2006a, pp. 22-23).

The WI DNR compensates livestock and pet owners for confirmed
losses to depredating wolves. The compensation is made at full market
value of the animal (up to a limit of $2,500 for dogs) and can include
veterinary fees for the treatment of injured animals (WI DNR 2006c
12.54). Compensation costs have been funded from the endangered
resources tax check-off and sales of the endangered resources license
plates. Current Wisconsin law requires the continuation of the
compensation payment for wolf depredation regardless of Federal listing
or delisting of the species (WI DNR 2006c 12.50). In recent years
annual depredation compensation payments have ranged from $68,907.88
(2007) to $203,943.51 (2010). From 1985 through December 24, 2010, the
WI DNR had spent $1,083,162.62 on

[[Page 81708]]

reimbursement for damage caused by wolves in the State, with 82 percent
of that total spent since 2000
(http://dnr.wi.gov/org/land/er/mammals/wolf/pdfs/wolf_damage_payments_2010.pd
f).

For depredation incidents in Wisconsin Zones 1 through 3, where all
wolf packs currently reside, wolves may be trapped by Wildlife Services
or WI DNR personnel and, if feasible, translocated and released at a
point distant from the depredation site. If wolves are captured
adjacent to an Indian reservation or a large block of public land, the
animals may be translocated locally to that area. As noted above, long-
distance translocating of depredating wolves has become increasingly
difficult in Wisconsin and is likely to be used infrequently in the
future as long as the off-reservation wolf population is above 350
animals. In most wolf depredation cases where technical assistance and
nonlethal methods of behavior modification are judged to be
ineffective, wolves will be shot or trapped and euthanized by Wildlife
Services or DNR personnel. Trapping and euthanizing will be conducted
within a 1-mi (1.6-km) radius of the depredation in Zones 1 and 2, and
within a 5-mi (8-km) radius in Zone 3. There is no distance limitation
for depredation control trapping in Zone 4, and all wolves trapped in
Zone 4 will be euthanized, rather than translocated (WI DNR 2006a, pp.
22-23).

Following Federal delisting, Wisconsin landowners who have had a
verified wolf depredation will be able to obtain limited-duration
permits from WI DNR to kill a limited number of depredating wolves on
land they own or lease, based on the size of the pack causing the local
depredations (WI DNR 2008, p. 8). Such permits would be issued to: (1)
Landowners with verified permits on their property within the last 2
years; (2) landowners within 1 mile of properties with verified wolf
depredations during the calendar year; (3) landowners with vulnerable
livestock within WI DNR-designated proactive control areas; (4)

landowners with human safety concerns on their property, and (5) landowners with verified harassment of livestock on their property (WI DNR 2008, p. 8). Limits on the number of wolves to control will be based on the estimated number of wolves in the pack causing depredation problems. In addition, landowners and lessees of land statewide will be allowed to kill a wolf without obtaining a permit ``in the act of killing, wounding, or biting a domestic animal,'' the incident must be reported to a conservation warden within 24 hours and the landowners are required to turn any dead wolves over to the WI DNR (WI DNR 2006a, pp. 22-23; WI DNR 2008, p. 6). During the 19 months in 2007 and 2008 when wolves were federally delisted, 5 wolves were shot in the act of depredations on domestic animals, and 2 wolves were shot by 1 landowner out of 67 permits issued. One wolf was shot in the act of attack on domestic animals during 2 months when wolves were delisted in 2009.

The updated Wisconsin Plan also envisions the possibility of intensive control management actions in sub-zones of the larger wolf management zones (WI DNR 2006a, pp. 22-23). Triggering actions and type of controls planned for these ``proactive control areas'' are listed in recent versions of the WI DNR depredation control guidelines (WI DNR 2008, pp. 7-9). Controls on these actions would be considered on a case-by-case basis to address specific problems, and would likely be carried out only in areas that lack suitable habitat, have extensive agricultural lands with little forest interspersion, in urban or suburban settings, and only when the State wolf population is well above the management goal of 350 wolves outside Indian reservations in late-winter surveys. The use of intensive population management in small areas will be adapted as experience is gained with implementing and evaluating localized control actions (Wydeven 2006, pers. comm.).

We have evaluated future lethal depredation control based upon verified depredation incidents over the last decade and the impacts of the implementation of similar lethal control of depredating wolves under 50 CFR 17.40(d) for Minnesota, Sec. 17.40(o) for Wisconsin and Michigan, and section 10(a)(1)(A) of the Act for Wisconsin and Michigan. Under those authorities, WI DNR and Wildlife Services trapped and euthanized 17 wolves in 2003; 24 in 2004; 29 in 2005; 18 in 2006; 37 in 2007; 39 in 2008; 9 in 2009; and 16 in 2010 (WI DNR 2006a, p. 32; Wydeven et al. 2008, pp. 8-9; Wydeven et al. 2009, pp. 6-7; Wydeven et al. 2010, p. 15; Wydeven et al 2011, p. 3). Although these lethal control authorities applied to Wisconsin and Michigan DNRs for only a portion of 2003 (April through December) and 2005 (all of January for both States; April 1 and April 19, for Wisconsin and Michigan respectively, through September 13), they covered nearly all of the verified wolf depredations during 2003-05, and thus provide a reasonable measure of annual lethal depredation control. Lethal control authority only occurred for about 3.5 months in 2006.

For 2003, 2004, and 2005, this represents 5.1 percent, 6.4 percent, 7.4 percent (including the several possible wolf-dog hybrids), respectively, of the late-winter population of Wisconsin wolves during the previous winter. Note that some of the wolves euthanized after August 1 were young-of-the-year who were not present during the late-winter survey, so the cited percentages are overestimates.

This level of lethal depredation control was followed by a wolf population increase of 11 percent from 2003 to 2004, 17 percent from 2004 to 2005, and 7 percent from 2005 to 2006 (Wydeven and Jurewicz 2005, p. 5; Wydeven et al 2006a, p. 10). Limited lethal control authority was granted to WI DNR in 2006 by a section 10 permit resulting in removal of 18 wolves (3.9 percent of winter wolf

population), and this permit remained in effect for 3.5 months (Wydeven
et al. 2007, p. 7). Lethal depredation control was again authorized in
the State while wolves were delisted in 2007 (9.5 months) and 2008 (9
months). During those times, 40 and 43 wolves, respectively, were
killed for depredation control (by Wildlife Services or by legal
landowner action), representing 7 and 8 percent of the late-winter
population of Wisconsin wolves during the previous year.

This level of lethal depredation control was followed by a wolf
population increase of 0.5 percent from 2007 to 2008, and 12 percent
from 2008 to 2009 (Wydeven and Wiedenhoeft 2008, pp. 19-22; Wydeven et
al 2009a, p. 6). Authority for lethal control on depredating wolves
occurred for only 2 months in 2009. During that time, eight wolves were
euthanized for depredation control by USDA-WS, and one wolf was shot by
a landowner; additionally, later in 2009 after relisting, a wolf was
captured and euthanized by USDA-WS for human safety concerns (Wydeven
et al. 2010, p. 15). Thus in 2009, 10 wolves, or 2 percent of the
winter wolf population, was removed in control activities.

The Wisconsin wolf population in winter 2010 grew to 690 wolves, an
increase of 8 percent from the wolf population in 2009 (Wydeven et al.
2010, pp. 12-13). In 2010, authority for lethal control of wolves
depredating livestock was not available in Wisconsin, but 16 wolves or
2 percent of the winter population were removed for human safety
concerns (Wydeven et al. 2011, p. 3). This provides strong evidence
that this form and magnitude of depredation control will not adversely
impact the viability of the Wisconsin wolf population. The locations of
depredation incidents

[[Page 81709]]

provide additional evidence that lethal control will not have an
adverse impact on the State's wolf population. Most livestock
depredations are caused by packs near the northern forest-farm land
interface. Few depredations occur in core wolf range and in large
blocks of public land. Thus, lethal depredation control actions will
not impact most of the Wisconsin wolf population (WI DNR 2006a, p. 30).

Control actions in Wisconsin also resulted in removal of wolf-dog
hybrids from the wild that had begun associating with packs. Wolf-dog
hybrid removal in depredation control activity by USDA-WS included 3 in
2005; 1 in 2007; 2 in 2008; and 1 in 2010 (WI DNR files).

One substantive change to lethal control that will result from
Federal delisting is the ability of a small number of private
landowners, whose farms have a history of recurring wolf depredation,
to obtain DNR permits to kill depredating wolves (WI DNR 2006a, p. 23;
WI DNR 2008, p. 8). During the time wolves were federally delisted from
March 12, 2007, through September 29, 2008, the DNR issued 67 such
permits, resulting in 2 wolves being killed. Some landowners received
permits more than once, and permits were issued for up to 90 days at a
time and restricted to specific calendar years. During that same time
period, under Wisconsin depredation management guidelines, landowners
were allowed to shoot wolves in the act of attacks on domestic animals
on private land without a permit; under that authority, landowners
killed a total of five wolves. The death of these seven additional
wolves--only one percent of the State's wolves in 2008--did not affect
the viability of the population. Another substantive change after
delisting may be potential proactive trapping or ``intensive control''
of wolves in limited areas as described above. We are confident that
the number of wolves killed by these actions will not impact the long-

term viability of the Wisconsin wolf population, because generally less than 15 percent of packs cause depredations that would initiate such controls, and ``proactive'' controls will be carried out only if the State's late-winter wolf population exceeds 350 animals outside Indian reservations.

The State's current guidelines for conducting depredation control actions say that no control trapping will be conducted on wolves that kill ``dogs that are free-roaming, roaming at large, hunting, or training on public lands, and all other lands except land owned or leased by the dog owner'' (WI DNR 2008, p, 5). Controls would be applied on wolves depredating pet dogs attacked near homes and wolves attacking livestock, which in 2010 included 25 packs attacking livestock (23 packs that were also documented in the previous winter surveys), 8 packs attacking dogs at homes, and 5 packs attacking both livestock and dogs. Thus control would have been applied to 31 packs (17 percent of State packs) previously detected and 2 new packs. Because of these State-imposed limitations, we believe that lethal control of wolves depredating on hunting dogs will be rare and, therefore, will not be a significant additional source of mortality in Wisconsin.

Lethal control of wolves that attack captive deer is included in the WI DNR depredation control program, because farm-raised deer are considered to be livestock under Wisconsin law (WI DNR 2008, pp. 5-6; 2006c, 12.52). However, Wisconsin regulations for deer farm fencing have been strengthened, and it is unlikely that more than an occasional wolf will need to be killed to end wolf depredations inside deer farms in the foreseeable future. Claims for wolf depredation compensation are rejected if the claimant is not in compliance with regulations regarding farm-raised deer fencing or livestock carcass disposal (Wisconsin Statutes 90.20 & 90.21, WI DNR 2006c 12.54).

Data from verified wolf depredations in recent years indicate that depredation on livestock is likely to increase as long as the Wisconsin wolf population increases in numbers and range. Wolf packs establishing in more marginal habitat with high acreage of pasture land are more likely to become depredators (Treves et al. 2004, pp. 121-122). Most large areas of forest land and public lands are included in Wisconsin Wolf Management Zones 1 and 2, and they have already been colonized by wolves. Therefore, new areas likely to be colonized by wolves in the future will be in Zones 3 and 4, where they will be exposed to much higher densities of farms, livestock, and residences. During 2008, of farms experiencing wolf depredation, 25 percent (8 of 32) were in Zone 3, yet only 4 percent of the State wolf population occurs in this zone (Wydeven et al. 2009a, p. 23). Further expansion of wolves into Zone 3 would likely lead to an increase in depredation incidents and an increase in lethal control actions against Zone 3 wolves. However, these Zone 3 mortalities will have no impact on wolf population viability in Wisconsin because of the much larger wolf populations in Zones 1 and 2.

For the foreseeable future, the wolf population in Zones 1 and 2 will continue to greatly exceed the recovery goal in the Recovery Plan for the Eastern Timber Wolf of 200 late-winter wolves for an isolated population and 100 wolves for a subpopulation connected to the larger Minnesota population, regardless of the extent of wolf mortality from all causes in Zones 3 and 4. Ongoing annual wolf population monitoring by WI DNR will provide timely and accurate data to evaluate the effects of wolf management under the Wisconsin Plan.

The possibility of a public harvest of wolves is acknowledged in

the Wisconsin Wolf Management Plan and in plan updates (WI DNR 1999, Appendix D; 2006c, p. 23). However, the question of whether a public harvest will be initiated and the details of such a harvest are far from resolved. Public attitudes toward a wolf population in excess of 350 would have to be fully evaluated, as would the impacts from other mortalities, before a public harvest could be initiated.

The Wisconsin Conservation Congress, a group that advises the WI DNR on issues of fishing and hunting regulations, held hearings in 2008 (while wolves were federally delisted in the WGL) to gather information on the public's attitudes toward a public harvest of wolves in the State. Of the people attending those meetings, 86 percent recommended that efforts begin to develop public harvest regulations for wolves in the State, indicating a strong interest among hunters and anglers to begin such development. Establishing a public harvest, however, would be preceded by extensive public input, including public hearings, and would require legislative authorization and approval by the Wisconsin Natural Resources Board. Because of the steps that must precede a public harvest of wolves and the uncertainty regarding the possibility of, and the details of, any such program, we consider public harvest of Wisconsin wolves to be highly speculative at this time. The Service will closely monitor any steps taken by States and Tribes within the WGL DPS to establish any public harvest of wolves during our post-delisting monitoring program.

Future updates for the Wisconsin wolf management and conservation plan will likely contain more specific language on any potential public harvest for the State. The WI DNR is committed to maintaining a wolf population at 350 wolves outside of Indian reservations, which translates to a statewide population of 361 to 385 wolves in late winter. No harvest would be considered

[[Page 81710]]

if the wolf population fell below this goal (WI DNR 1999, pp. 15, 16). Any harvest would consist of limited permits on limited portions of the wolf range to reduce wolf-human conflict, and extensive areas in wolf range would be closed to harvest of wolves (WI DNR 1999, p. 21). Also, the fact that the Wisconsin Plan calls for State relisting of the wolf as a threatened species if the population falls to fewer than 250 for 3 years provides a strong assurance that any future public harvest is not likely to threaten the persistence of the population (WI DNR 1999, pp. 15-17). Based on wolf population data, the current Wisconsin Plan and the 2006 updates, we believe that any public harvest plan would continue to maintain the State wolf population well above the recovery goal of 200 wolves in late winter.

The Michigan Wolf Management Plan

In 1997, the Michigan DNR finalized the Michigan Gray Wolf Recovery and Management Plan (MI DNR 1997). That plan was developed when the number of wolves in the State was relatively small, and focused on recovery. In 2001, the MI DNR began reevaluating the 1997 Plan and appointed a committee to evaluate wolf recovery and management in the State. As a result of that evaluation, MI DNR concluded that the 1997 Plan needed revising, which prompted a more formal review, including extensive stakeholder input. Recognizing that wolf recovery had been achieved in Michigan, additional scientific knowledge had been gained, and new social issues had arisen since the 1997 Plan was drafted, the focus of the revised plan shifted from a recovery plan to a wolf management plan. To assist in this endeavor, the DNR convened a

Michigan Wolf Management Roundtable, composed of a diverse group of citizens spanning the spectrum of those interested in, and impacted by, wolf recovery and management in Michigan, including Tribal entities and organizations focused on agriculture, hunting and trapping, the environment, animal protection, law enforcement and public safety, and tourism.

The Roundtable was asked to review the 1997 wolf management goal, to set priorities for management issues, and to recommend strategic goals or policies the DNR should use in addressing the management issues. The Roundtable provided ``guiding principles'' for managing wolves and wolf-related issues following Federal delisting (Michigan Wolf Management Roundtable 2006, pp. 6-7). Those guiding principles strongly influenced the 2008 Michigan Wolf Management Plan (MI Plan) (MI DNR 2008a).

The 2008 MI Plan describes the wolf recovery goals and management actions needed to maintain a viable wolf population in the UP of Michigan, while facilitating wolf-related benefits and minimizing conflicts. The four principal goals are to ``1) maintain a viable Michigan wolf population above a level that would warrant its classification as threatened or endangered; 2) facilitate wolf-related benefits; 3) minimize wolf-related conflicts; and 4) conduct science-based wolf management with socially acceptable methods'' (MI DNR 2008a, p. 22). The Michigan Plan details wolf management actions, including public education and outreach activities, annual wolf population and health monitoring, research, depredation control, ensuring adequate legal protection for wolves, and prey and habitat management. It does not address the potential need for wolf recovery or management in the Lower Peninsula, nor wolf management within Isle Royale National Park (where the wolf population is fully protected by the National Park Service).

As with the WI Plan, the MI DNR has chosen to manage the State's wolves as though they are an isolated population that receives no genetic or demographic benefits from immigrating wolves, even though their population will continue to be connected with populations in Minnesota, Wisconsin, and Canada. The Michigan wolf population must exceed 200 wolves in order to achieve the Plan's first goal of maintaining a viable wolf population in the UP. This number is consistent with the Federal Recovery Plan for the Eastern Timber Wolf's definition of a viable, isolated wolf population (USFWS 1992, p. 25). The MI Plan, however, clearly states that 200 wolves is not the target population size, and that a larger population may be necessary to meet the other goals of the Plan. Therefore, the State will maintain a wolf population that will ``provide all of the ecological and social benefits valued by the public'' while ``minimizing and resolving conflicts where they occur'' (MI DNR 2008a, pp. 22-23). We strongly support this approach, as it provides assurance that a viable wolf population will remain in the UP regardless of the future fate of wolves in Wisconsin or Ontario.

The 2008 Michigan Plan identifies wolf population monitoring as a priority activity, and specifically states that the MI DNR will monitor wolf abundance annually for at least 5 years post-delisting (MI DNR 2008a, pp. 31-32). This includes monitoring to assess wolf presence in the northern Lower Peninsula. As discussed previously, the size of the wolf population in Michigan is determined by extensive radio and snow tracking surveys. Recently the MI DNR also conducted a field evaluation of a less expensive ``Minnesota-type'' wolf survey. However, similar to WI DNR's experience, the evaluation concluded that the method

019819A

overestimated wolf numbers, and is not suitable for use on the State's wolf population as it currently is distributed (Beyer in litt. 2006b).

From 1989 through 2006, the MI DNR attempted to count wolves throughout the entire UP. As the wolf population increased, this method became more difficult. In the winter of 2006-07, the MI DNR implemented a new sampling approach based on an analysis by Potvin et al. (2005, p. 1668) to increase the efficiency of the State survey. The new approach is based on a geographically based stratified random sample and produces an unbiased, regional estimate of wolf abundance. The UP was stratified into three sampling areas, and within each stratum the DNR intensively surveys roughly 40 to 50 percent of the wolf habitat area annually. Computer simulations have shown that such a geographically stratified monitoring program will produce unbiased and precise estimates of the total wolf population, which can be statistically compared to estimates derived from the previous method to detect significant changes in the UP wolf population (Beyer in litt 2006b, see attachment by Drummer; Lederle in litt. 2006; Roell et al. 2009, p. 3).

Another component of wolf population monitoring is monitoring wolf health. The MI DNR will continue to monitor the impact of parasites and disease on the viability of wolf populations in the State through necropsies of dead wolves and analyzing biological samples from captured live wolves. Prior to 2004, MI DNR vaccinated all captured wolves for canine distemper and parvovirus and treated them for mange. These inoculations were discontinued to provide more natural biotic conditions and to provide biologists with an unbiased estimate of disease-caused mortality rates in the population (Roell in litt. 2005b). Since diseases and parasites are not currently a significant threat to the Michigan wolf population, the MI DNR is continuing the practice of not actively managing disease. If monitoring indicates that diseases or parasites may pose a threat to the wolf population, the MI DNR will again consider more active management similar to that conducted prior to 2004.

[[Page 81711]]

The 2008 Plan includes maintaining habitat and prey necessary to sustain a viable wolf population in the State as a management component. This includes maintaining prey populations required for a viable wolf population while providing for sustainable human uses, maintaining habitat linkages to allow for wolf dispersal, and minimizing disturbance at known, active wolf dens (MI DNR 2008a, pp. 36-41).

The Plan does not determine whether a public harvest will be used as a management strategy in Michigan, but it discusses developing a ``socially and biologically responsible policy regarding public harvest'' (MI DNR 2008a, p. 65). Instituting public harvest during a regulated season would first require that the wolf be classified as a ``game animal'' in the State. Game-animal status in Michigan may be designated only by the State Legislature and, additionally, only the State Legislature could authorize the first harvest season. If such designation and authorization were conferred, the Michigan Natural Resources Commission would then need to enact regulations pertaining to the methods of a public harvest.

To minimize illegal take, the 2008 Plan calls for enacting and enforcing regulations to ensure adequate legal protection for wolves in the State. Under State regulations, wolves could be classified as a threatened, endangered, game, or protected animal, all of which

prohibit killing (or harming) the species except under a permit, license, or specific conditions. As discussed above, designating a species as a ``game animal'' would require action by the State Legislature. Michigan reclassified wolves from endangered to threatened in June 2002, and in April 2009, removed gray wolves from the State's threatened and endangered species list and amended the Wildlife Conservation Order to grant ``protected animal'' status to the gray wolf in the State (Roell 2009, pers. comm.). A person who commits a violation regarding the possession or taking of most wildlife species with the four legal designations (threatened, endangered, game, or protected animal) in Michigan is guilty of a misdemeanor punishable by imprisonment for not more than 90 days, or a fine of not less than $100 or more than $1,000, or both. Penalties may also include costs of prosecution, loss of hunting privileges, and reimbursing the value of the animal ($1,500 for a threatened or endangered species, $100 to $500 for most game species, and $100 for protected animals) (MI DNR 2008a, p. 35).

The 2008 Plan emphasizes the need for public education efforts that focus on living with a recovered wolf population and ways to manage wolves and wolf-human interaction (both positive and negative). The Plan recommends continuing reimbursement for depredation losses, citizen stakeholder involvement in the wolf management program, continuing important research efforts, and minimizing the impacts of captive wolves and wolf-dog hybrids on the wild wolf population (MI DNR 2008a, pp. 31, 59, 61, and 66).

The 2008 Michigan Plan calls for establishing a wolf management advisory group that would meet annually to monitor the progress made toward implementing the Plan. Furthermore, the Plan will be reviewed and updated at 5-year intervals, to address ``ecological, social, and regulatory'' changes (MI DNR 2008a, p. 66). The plan also addresses currently available and potential new sources of funding to offset costs associated with wolf management. The MI DNR has long been an innovative leader in wolf recovery efforts, exemplified by its initiation of the nation's first attempt to reintroduce wild wolves to vacant historical wolf habitat in 1974 (Weise et al. 1975). The MI DNR's history of leadership in wolf recovery and its repeated written commitments to ensure the continued viability of a Michigan wolf population above a level that would trigger State or Federal listing as threatened or endangered further reinforces that the revised 2008 Michigan Wolf Management Plan will provide adequate regulatory mechanisms for Michigan wolves. The DNR's primary goal remains to conduct management to maintain the wolf population in Michigan above the minimum size that is biologically required for a viable, isolated population and to provide for ecological and social benefits valued by the public while resolving conflicts where they occur (MI DNR 2008a, p. 22).

Depredation Control in Michigan--Data from Michigan show a general increase in confirmed events of wolf depredations on livestock (Table 2). These livestock depredations occurred at 59 different UP farms (approximately 7 percent of the existing farms); 16 (27 percent) of those 59 farms have experienced more than one depredation event. Over 80 percent of the depredation events were on cattle, with the rest on sheep, poultry, rabbits, and captive cervids (Roell et al. 2009, pp. 9, 11). In 2010, 26 (57 percent) of the depredation events occurred on a single farm. The relationship between the number of wolves and the number of depredation events suggests that for every 100 additional wolves in the population there will be about 3 additional livestock

depredation events per year (Roell et al. 2010, p. 6).

Table 2--Number of Verified Livestock Depredation Events by Wolves in Michigan by Year.

| Year | Number of animals killed |
|------|--------------------------|
| 1998 | 3 |
| 1999 | 1 |
| 2000 | 5 |
| 2001 | 3 |
| 2002 | 5 |
| 2003 | 13 |
| 2004 | 11 |
| 2005 | 5 |
| 2006 | 10 |
| 2007 | 14 |
| 2008 | 14 |
| 2009 | 12 |
| 2010 | 46 |

Michigan has not experienced as high a level of attacks on dogs by wolves as Wisconsin, although a slight increase in such attacks has occurred over the last decade. Yearly losses vary, and actions of a single pack of wolves can be an important influence. In Michigan, there is not a strong relationship between wolf depredation on dogs and wolf abundance (Roell et al. 2010, p. 7). The number of dogs killed in the State between 1996 and 2010 was 34; 12 additional dogs were injured in wolf attacks during that same period. Of the 34 wolf-related dog deaths during that time, 50 percent involved hounds used to hunt bears (Roell 2010, pers. comm.). Similar to Wisconsin, MI DNR has guidelines for its depredation control program, stating that lethal control will not be used when wolves kill dogs that are free-roaming, hunting, or training on public lands. Lethal control of wolves, however, would be considered if wolves have killed confined pets and remain in the area where more pets are being held (MI DNR 2005a, p. 6). However, in 2008, the Michigan Legislature passed a law that would allow dog owners or their designated agents to remove, capture, or, if deemed necessary, use lethal means to destroy a gray wolf that is in the act of preying upon the owner's dog, which includes dogs free-roaming or hunting on public lands.

During the several years that lethal control of depredating wolves had been conducted in Michigan, there was no evidence of resulting adverse impacts to the maintenance of a viable wolf population in the UP. A total of 41 wolves were killed by the MI DNR and

[[Page 81712]]

USDA-Wildlife Services in response to depredation events during the time period when permits or special rules were in effect or while wolves were not on the Federal list of threatened and endangered species (Roell et al. 2010, p. 8). Wolves were euthanized as follows: 4 (2003), 5 (2004), 2 (2005), 7 (2006), 14 (2007), 8 (2008), and 1 (during 2 months in 2009) (Beyer et al. 2006, p. 88; Roell in litt. 2006, p. 1; Roell et al. 2010, p. 19; Roell 2010, pers. comm.). This

019822A

represents 1.2 percent, 1.7 percent, 0.5 percent, 1.6 percent, 2.7 percent, 2.5 percent, and 0.2 percent, respectively, of the UP's late-winter population of wolves during the previous winter. Following this level of lethal depredation control, the UP wolf population increased 12 percent from 2003 to 2004, 13 percent from 2004 to 2005, 7 percent from 2005 to 2006, 17 percent from 2006 to 2007, 2 percent from 2007 to 2008, and 11 percent from 2008 to 2009, demonstrating that the wolf population continues to increase at a healthy rate (Huntzinger et al. 2005, p. 6; MI DNR 2006a, Roell et al. 2009, p. 4). Lethal control of wolves during livestock depredation was not available in 2010 or 2011.

Post-delisting Depredation Control in Michigan--Following Federal delisting, wolf depredation control in Michigan would be carried out according to the 2008 Michigan Wolf Recovery and Management Plan (MI DNR 2008) and any Tribal wolf management plans that may be developed in the future for reservations in occupied wolf range.

To provide depredation control guidance when lethal control is an option, MI DNR has developed detailed instructions for incident investigation and response (MI DNR 2005a). Verification of wolf depredation incidents will be conducted by MI DNR or USDA-APHIS-Wildlife Services personnel (working under a cooperative agreement with MI DNR or at the request of a Tribe, depending on the location) who have been trained in depredation investigation techniques. The MI DNR specifies that the verification process will use the investigative techniques that have been developed and successfully used in Minnesota by Wildlife Services (MI DNR 2005a, Append. B, pp. 9-10). Following verification, one or more of several options will be implemented to address the depredation problem. Technical assistance, consisting of advice or recommendations to reduce wolf conflicts, will be provided. Technical assistance may also include providing to the landowner various forms of noninjurious behavior modification materials, such as flashing lights, noise makers, temporary fencing, and fladry.

Trapping and translocating depredating wolves has been used in the past, resulting in the translocation of 23 UP wolves during 1998-2003 (Beyer et al. 2006, p. 88), but as with Wisconsin, suitable relocation sites are becoming rarer, and there is local opposition to the release of translocated depredators. Furthermore, none of the past translocated depredators have remained near their release sites, making this a questionable method to end the depredation behaviors of these wolves (MI DNR 2005a, pp. 3-4). Therefore, reducing depredation problems by relocation is no longer recommended as a management tool in Michigan (MI DNR 2008a, p. 57).

Lethal control of depredating wolves is likely to be the most common future response in situations when improved livestock husbandry and wolf behavior modification techniques (for example, flashing lights, noise-making devices) are judged to be inadequate. As wolf numbers continue to increase on the UP, the number of verified depredations will also increase, and will probably do so at a rate that exceeds the rate of wolf population increase. This will occur as wolves increasingly disperse into and occupy areas of the UP with more livestock and more human residences, leading to additional exposure to domestic animals. In a previous application for a lethal take permit under section 10(a)(1)(A) of the Act, MI DNR requested authority to euthanize up to 10 percent of the late-winter wolf population annually (MI DNR 2005b, p. 1). However, based on 2003-05 and 2007-09 depredation data, it is likely that significantly less than 10 percent lethal control will be needed over the next several years.

The MI Plan provides recommendations to guide management of various

conflicts caused by wolf recovery, including depredation on livestock and pets, human safety, and public concerns regarding wolf impacts on other wildlife. We view the MI Plan's depredation and conflict control strategies to be conservative, in that they commit to nonlethal depredation management whenever possible, oppose preventative wolf removal where problems have not yet occurred, encourage incentives for best management practices that decrease wolf-livestock conflicts without impacting wolves, and support closely monitored and enforced take by landowners of wolves ``in the act of livestock depredation'' or under limited permits if depredation is confirmed and nonlethal methods are determined to be ineffective. Based on these components of the revised MI Plan and the stated goal for maintaining wolf populations at or above recovery goals, the Service believes any wolf management changes implemented following delisting would not be implemented in a manner that results in significant reductions in Michigan wolf populations. The MI DNR remains committed to ensuring a viable wolf population above a level that would trigger relisting as either threatened or endangered in the future (MI DNR 2008a, p. 9).

    Similar to Wisconsin, Michigan livestock owners are compensated when they lose livestock as a result of a confirmed wolf depredation. Currently there are two complementary compensation programs in Michigan, one funded by the MI DNR and implemented by Michigan Department of Agriculture (MI DA) and another set up through donations (from Defenders of Wildlife and private citizens) and administered by the International Wolf Center (IWC), a nonprofit organization. From the inception of the program to 2000, MI DA has paid 90 percent of full market value of depredated livestock at the time of loss. The IWC account was used to pay the remaining 10 percent from 2000 to 2002 when MI DA began paying 100 percent of the full market value of depredated livestock. The IWC account continues to be used to pay the difference between value at time of loss and the full fall market value for depredated young-of-the-year livestock, and together the two funds have provided nearly $38,000 in livestock loss compensation through 2008 (Roell et al., p. 15). Neither of these programs provides compensation for pets or for veterinary costs to treat wolf-inflicted livestock injuries. The MI DNR plans to continue cooperating with MI DA and other organizations to maintain the wolf depredation compensation program (MI DNR 2008a, pp. 59-60).

    In 2008, Michigan passed two House Bills that would become effective after Federal delisting. Those bills authorized a livestock or dog owner (or a designated agent) to ``remove, capture, or use lethal means to destroy a wolf that is in the act of preying upon'' the owner's livestock or dog. During the 2 months that wolves were federally and State delisted in 2009, no wolves were killed under these authorizations. We are confident that the limited number of wolves expected to be taken under these bills would not affect the viability of the Michigan wolf population.

[[Page 81713]]

Regulatory Mechanisms in Other States and Tribal Areas Within the WGL DPS

North Dakota and South Dakota
    North Dakota lacks a State endangered species law or regulation. Any wolves in the State currently are classified as furbearers, with a closed season. North Dakota Game and Fish Department is unlikely to

change the species' State classification immediately following Federal delisting. Wolves are included in the State's Wildlife Action Plan as a ``Level 3'' Species of Conservation Priority. Level 3 species are those ``having a moderate level of conservation priority, but are believed to be peripheral or do not breed in North Dakota.'' Placement on this list gives species greater access to conservation funding, but does not afford any additional regulatory or legislative protection (Bicknell in litt. 2009).

Currently any wolves that may be in South Dakota are not State listed as threatened or endangered, nor is there a hunting or trapping season for them. Upon the effective date of any Federal delisting, gray wolves in eastern South Dakota will fall under general protections afforded all State wildlife. These protections require that specific provisions--seasons and regulations--be established prior to initiating any form of legal take. Thus, the State could choose to implement a hunting or trapping season for wolves east of the Missouri River; however, absent some definitive action to establish a season, wolves would remain protected. Following Federal delisting, any verified depredating wolves east of the Missouri will likely be trapped and killed by the USDA-APHIS-Wildlife Services program (Larson in litt. 2005). Non-depredating wolves in North and South Dakota not on the Federal list will continue to receive protection by the States' wildlife protection statutes unless specific action is taken to open a hunting or trapping season or otherwise remove existing protections.

Post-delisting Depredation Control in North and South Dakota--Since 1993, five incidents of verified wolf depredation have occurred in North Dakota, with one in September 2003 and two more in December 2005. There have been no verified wolf depredations in South Dakota in recent decades. Following Federal delisting we assume that lethal control of a small number of depredating wolves will occur in one or both of these States. Lethal control of depredating wolves may have adverse impacts on the ability of wolves to occupy any small areas of suitable or marginally suitable habitat that may exist in the States. However, lethal control of depredating wolves in these two States will have no adverse effects on the long-term viability of wolf populations in the WGL DPS as a whole, because the existence of a wolf or a wolf population in the Dakotas will not make a meaningful contribution to the maintenance of the current viable, self-sustaining, and representative metapopulation of wolves in the WGL DPS.
Other States in the Western Great Lakes DPS

The DPS includes the portion of Iowa that is north of Interstate Highway 80, which is approximately 60 percent of the State. The Iowa Natural Resource Commission currently lists wolves as furbearers, with a closed season (Howell in litt. 2005). Following Federal delisting of the DPS, wolves dispersing into northern Iowa will be protected by State law.

The portion of Illinois that is north of Interstate Highway 80, less than one-fifth of the State, is included in the DPS and is part of the geographic area where wolves are removed from Federal protection. Gray wolves are currently protected in Illinois as a threatened species under the Illinois Endangered Species Protection Act (520 ILCS 10). Thus, following Federal delisting, wolves dispersing into northern Illinois would continue to be protected from human take by State law.

The extreme northern portions of Indiana and northwestern Ohio are included within the DPS. Any wolves that are found in this area are no longer federally protected under the Act. The State of Ohio classifies the gray wolf as ``extirpated,'' and there are no plans to reintroduce

or recover the species in the State. The species lacks State
protection, but State action is likely to apply some form of protection
if wolves begin to disperse into the State (Caldwell in litt. 2005).
Indiana DNR lists the gray wolf as extirpated in the State, and the
species would receive no State protection under this classification
following any Federal delisting. The only means to provide State
protection would be to list them as State-endangered, but that is not
likely to occur unless wolves become resident in Indiana (Johnson in
litt. 2005, in litt. 2006). Thus, federally delisted wolves that might
disperse into Indiana and Ohio would lack State protection there,
unless these two States take specific action to provide new
protections.

     Because the portions of Iowa, Illinois, Indiana, and Ohio within
the WGL DPS do not contain suitable habitat or currently established
packs, depredation control in these States would not have any
significant impact on the continued viability of wolf populations in
the WGL DPS.

Tribal Management and Protection of Wolves

     Native American tribes and inter-tribal resource management
organizations have indicated to the Service that they will continue to
conserve wolves on most, and probably all, Native American reservations
in the core recovery areas of the WGL DPS. The wolf retains great
cultural significance and traditional value to many Tribes and their
members (additional discussion is found in Factor E), and to retain and
strengthen cultural connections, many tribes oppose unnecessary killing
of wolves on reservations and on ceded lands, even following any
Federal delisting (Hunt in litt. 1998; Schrage in litt. 1998a;
Schlender in litt. 1998). Some Native Americans view wolves as
competitors for deer and moose, whereas others are interested in
harvesting wolves as furbearers (Schrage in litt. 1998a). Many tribes
intend to sustainably manage their natural resources, wolves among
them, to ensure that they are available to their descendants.
Traditional natural resource harvest practices, however, often include
only a minimum amount of regulation by the Tribal governments (Hunt in
litt. 1998).

     Although not all Tribes with wolves that visit or reside on their
reservations have completed management plans specific to the wolf,
several Tribes have informed us that they have no plans or intentions
to allow commercial or recreational hunting or trapping of the species
on their lands after Federal delisting. The Red Lake Band of Chippewa
Indians (Minnesota) and the Little Traverse Bay Band of Odawa Indians
(Michigan) have developed wolf monitoring and/or management plans. The
Service has also awarded a grant to the Ho-Chunk Nation to identify
wolf habitat on reservation lands.

     As a result of many past contacts with, and previous written
comments from, the Midwestern Tribes and their inter-tribal natural
resource management agencies--the Great Lakes Indian Fish and Wildlife
Commission (GLIFWC), the 1854 Authority, and the Chippewa Ottawa Treaty
Authority--it is clear that their predominant sentiment is strong
support for the continued protection of wolves at a level that ensures
that viable wolf populations remain on reservations and throughout the
treaty-ceded lands surrounding the reservations. While several Tribes
stated that their members

[[Page 81714]]

may be interested in killing small numbers of wolves for spiritual or

019826A

other purposes, this would be carried out in a manner that would not impact reservation or ceded territory wolf populations.

The Red Lake Band of Chippewa Indians (Minnesota) completed a wolf management plan in 2010 (Red Lake Band of Chippewa Indians 2010). A primary goal of the management plan is to maintain wolf numbers at a level that will ensure the long-term survival of wolves on Red Lake lands. Key components of the plan are habitat management, public education, and law enforcement. To address human-wolf interactions, the plan outlines how wolves may be taken on Red Lake lands. Wolves thought to be a threat to public safety may be harassed at any time, and if they must be killed, the incident must be reported to tribal law enforcement. Agricultural livestock are not common on Red Lake lands, and wolf-related depredation on livestock or pets is unlikely to be a significant management issue. If such events do occur, tribal members may protect their livestock or pets by lethal means, but ``* * * all reasonable efforts should be made to deter wolves using non-lethal means'' (Red Lake Band of Chippewa Indians 2010, p. 15). Hunting or trapping of wolves on tribal lands will be prohibited. The Reservation currently has 7 or 8 packs with an estimated 40-48 wolves within its boundaries (Red Lake Band of Chippewa Indians 2010, p. 12).

In 2009, the Little Traverse Bay Bands of Odawa Indians (LTBB) finalized a management plan for the 1855 Reservation and portions of the 1836 ceded territory in the northern LP of Michigan (Little Traverse Bay Bands of Odawa Indians Natural Resource Department 2009). The plan provides the framework for managing wolves on the LTBB Reservation with the goal of maintaining a viable wolf presence on the LTBB Reservation or within the northern LP should a population become established by (1) prescribing scientifically sound biological wolf management, research, and monitoring strategies; (2) addressing wolf-related conflicts; (3) facilitating wolf-related benefits; and (4) developing and implementing wolf-related education and public information.

The Tribal Council of the Leech Lake Band of Minnesota Ojibwe (Council) approved a resolution that describes the sport and recreational harvest of wolves as an inappropriate use of the animal. That resolution supports limited harvest of wolves to be used for traditional or spiritual uses by enrolled Tribal members if the harvest is done in a respectful manner and would not negatively affect the wolf population. Over the last several years, the Council has been working to revise the Reservation Conservation Code to allow Tribal members to harvest some wolves after Federal delisting (Googgleye, Jr. in litt. 2004; Johnson 2011, pers. comm.). Until this revision occurs, it is unknown whether harvest will be allowed and how a harvest might be implemented. The Tribe is currently developing a wolf management plan (Mortensen 2011, pers. comm.) In 2005, the Leech Lake Reservation was home to an estimated 75 wolves, the largest population of wolves on a Native American reservation in the 48 conterminous States (Mortensen 2006, pers. comm.; White in litt. 2003). Although no recent surveys have been conducted, the number of wolves on the reservation likely remains about the same (Mortensen 2009, pers. comm.; Johnson 2011, pers. comm.).

The Fond du Lac Band (Minnesota) believes that the ``well being of the wolf is intimately connected to the well being of the Chippewa People'' (Schrage in litt. 2003). In 1998, the Band passed a resolution opposing Federal delisting and any other measure that would permit trapping, hunting, or poisoning of the wolf (Schrage in litt. 1998b; in litt. 2003; 2009, pers. comm.). If this prohibition is rescinded, the

Band's Resource Management Division will coordinate with State and Federal agencies to ensure that any wolf hunting or trapping would be ``conducted in a biologically sustainable manner'' (Schrage in litt. 2003).

The Red Cliff Band (Wisconsin) has strongly opposed State and Federal delisting of the gray wolf. Current Tribal law protects wolves from harvest, although harvest for ceremonial purposes would likely be permitted after Federal delisting (Symbal in litt. 2003).

The Menominee Indian Tribe of Wisconsin is committed to establishing a self-sustaining wolf population, continuing restoration efforts, ensuring the long-term survival of the wolf in Menominee, placing emphasis on the cultural significance of the wolf as a clan member, and resolving conflicts between wolves and humans. They are currently working on developing a Menominee Wolf Management Plan (Cox 2011, pers. comm.).

The Tribe has shown a great deal of interest in wolf recovery and protection. In 2002, the Tribe offered their Reservation lands as a site for translocating seven depredating wolves that had been trapped by WI DNR and Wildlife Services. Tribal natural resources staff participated in the soft release of the wolves on the Reservation and helped with the subsequent radio-tracking of the wolves. Although by early 2005 the last of these wolves died on the reservation, the tribal conservation department continued to monitor another pair that had moved onto the Reservation, as well as other wolves near the reservation (Wydeven in litt. 2006a). When that pair produced pups in 2006, but the adult female was killed, Reservation biologists and staff worked diligently with the WI DNR and the Wildlife Science Center (Forest Lake, Minnesota) to raise the pups in captivity in the hope that they could later be released to the care of the adult male. However, the adult male died prior to pup release, and they were moved back to the Wildlife Science Center (Pioneer Press 2006).

The Menominee Tribe continues to support wolf conservation and monitoring activity in Wisconsin. In recent years the Menominee Tribe has assisted the WI DNR in radio-telemetry wolf flights, allowing more regular flights to occur across all of northern Wisconsin.

The Keweenaw Bay Indian Community (Michigan) will continue to list the wolf as a protected animal under the Tribal Code following any Federal delisting, with hunting and trapping prohibited (Mike Donofrio 1998, pers. comm.). Furthermore, the Keweenaw Bay Community plans to develop a management plan that will address wolves (Donofrio in litt. 2003; Warner 20010, pers. comm.). At least four other Tribes (Stock-bridge Munsee Community, Lac Courte Oreilles Band of Ojibwe, the Mille Lacs Band of Ojibwe, and Grand Portage Band of Lake Superior Chippewa) have indicated that they are currently developing Tribal wolf management plans.

Several Midwestern Tribes (for example, the Bad River Band of Lake Superior Chippewa Indians and the LTBB) have expressed concern that Federal delisting will result in increased mortality of wolves on reservation lands, in the areas immediately surrounding the reservations, and in lands ceded by treaty to the Federal Government by the Tribes (Kiogama and Chingwa in litt. 2000). In 2006, a cooperative effort among tribal natural resource departments of several tribes in Wisconsin, WI DNR, the Service, and USDA Wildlife Services led to a wolf management agreement for lands adjacent to several reservations in Wisconsin. The goal is to reduce the threats to reservation wolf packs when they are temporarily off the reservation.

019828A

[[Page 81715]]

Other Tribes have expressed interest in such an agreement. This agreement, and additional agreements if they are implemented, provides supplementary protection to certain wolf packs in the western Great Lakes area.

    The GLIFWC has stated its intent to work closely with the States to cooperatively manage wolves in the ceded territories in the core areas, and will not develop a separate wolf management plan (Schlender in litt. 1998). Furthermore, the Voigt Intertribal Task Force of GLIFWC has expressed its support for strong protections for the wolf, stating ``[delisting] hinges on whether wolves are sufficiently restored and will be sufficiently protected to ensure a healthy and abundant future for our brother and ourselves'' (Schlender in litt. 2004).

    According to the 1854 Authority, ``attitudes toward wolf management in the 1854 Ceded Territory run the gamut from a desire to see total protection to unlimited harvest opportunity.'' However, the 1854 Authority would not ``implement a harvest system that would have any long-term negative impacts to wolf populations'' (Edwards in litt. 2003). In comments submitted for our 2004 delisting proposal for a larger Eastern DPS of the gray wolf, the 1854 Authority stated that the Authority is ``confident that under the control of State and tribal management, wolves will continue to exist at a self-sustaining level in the 1854 Ceded Territory. Sustainable populations of wolves, their prey and other resources within the 1854 Ceded Territory are goals to which the 1854 Authority remains committed. As such, we intend to work with the State of Minnesota and other tribes to ensure successful state and tribal management of healthy wolf populations in the 1854 Ceded Territory'' (Myers in litt. 2004). The 1854 Authority is currently developing a wolf management plan for the 1854 Ceded Territory, based on the above principles (Edwards 2011, pers. comm.).

    While there are few written Tribal protections currently in place for wolves, the highly protective and reverential attitudes that have been expressed by Tribal authorities and members have assured us that any post-delisting harvest of reservation wolves would be very limited and would not adversely impact the delisted wolf populations. Furthermore, any off-reservation harvest of wolves by tribal members in the ceded territories would be limited to a portion of the harvestable surplus at some future time. Such a harvestable surplus would be determined and monitored jointly by State and tribal biologists, and would be conducted in coordination with the Service and the Bureau of Indian Affairs (BIA), as is being successfully done for the ceded territory harvest of inland and Great Lakes fish, deer, bear, moose, and furbearers in Minnesota, Wisconsin, and Michigan. Therefore, we conclude that any future Native American take of delisted wolves will not significantly impact the viability of the wolf population, either locally or across the WGL DPS.

    The Service and the Department of the Interior recognize the unique status of the federally recognized tribes, their right to self-governance, and their inherent sovereign powers over their members and territory. Therefore, the Department, the Service, the Bureau of Indian Affairs, and other Federal agencies, as appropriate, will take the needed steps to ensure that tribal authority and sovereignty within reservation boundaries are respected as the States implement their wolf management plans and revise those plans in the future. Furthermore, there may be tribal activities or interests associated with wolves encompassed within the tribes' retained rights to hunt, fish, and

gather in treaty-ceded territories. The Department is available to assist in the exercise of any such rights. If biological assistance is needed, the Service may provide it via our field offices. Upon delisting, the Service will remain involved in the post-delisting monitoring of the wolves in the WGL, but all Service management and protection authority under the Act will end. Legal assistance will be provided to the tribes by the Department of the Interior, and the BIA will be involved, when needed. We strongly encourage the States and Tribes to work cooperatively toward post-delisting wolf management.

Consistent with our responsibilities to tribes and our goal to have the most comprehensive data available for our post-delisting monitoring, we will annually contact tribes and their designated intertribal natural resource agencies within the DPS during the 5-year post-delisting monitoring period to obtain any information they wish to share regarding wolf populations, the health of those populations, or changes in their management and protection. Reservations within the WGL DPS that may have significant wolf data to provide during the post-delisting period include Bois Forte, Bad River, Fond du Lac, Grand Portage, Keweenaw Bay Indian Community, Lac Courte Oreilles, Lac du Flambeau, Leech Lake, Menominee, Oneida, Red Lake, Stockbridge-Munsee Community, and White Earth. Throughout the 5-year post-delisting monitoring period, the Service will annually contact the natural resource agencies of each of these reservations and that of the 1854 Treaty Authority and Great Lakes Indian Fish and Wildlife Commission. We encourage the States and Tribes within the WGL DPS to work together on management and monitoring issues post-delisting.

Federal Lands

The five national forests with resident wolves (Superior, Chippewa, Chequamegon-Nicolet, Hiawatha, and Ottawa National Forests) in Minnesota, Wisconsin, and Michigan are all operating in conformance with standards and guidelines in their management plans that follow the 1992 Recovery Plan for the Eastern Timber Wolf's recommendations for the eastern timber wolf (USDA FS 2004a, chapter 2, p. 31; USDA FS 2004b, chapter 2, p. 28; USDA FS 2004c, chapter 2, p. 19; USDA FS 2006a, chapter 2, p. 17; USDA FS 2006b, chapter 2, pp. 28-29). Delisting is not expected to lead to an immediate change in these standards and guidelines; in fact, the Regional Forester for U.S. Forest Service Region 9 is expected to maintain the classification of the wolf as a Regional Forester Sensitive Species for at least 5 years after Federal delisting (Moore in litt. 2003; Eklund 2011, pers. comm.). Under these standards and guidelines, a relatively high prey base will be maintained, and road densities will be limited to current levels or decreased. For example, on the Chequamegon-Nicolet National Forest in Wisconsin, the standards and guidelines specifically include the protection of den sites and key rendezvous sites, and management of road densities in existing and potential wolf habitat (USDA 2004c, Chap. 2, p. 19).

The trapping of depredating wolves will likely be allowed on national forest lands under the guidelines and conditions specified in the respective State wolf management plans. However, there are relatively few livestock raised within the boundaries of national forests in the upper Midwest, so wolf depredation and lethal control of wolves is neither likely to be a frequent occurrence, nor constitute a significant mortality factor, for the wolves in the WGL DPS. Similarly, in keeping with the practice for other State-managed game species, any public hunting or trapping season for wolves that might be opened in the future by the States will likely include hunting and trapping

within the national forests (Lindquist in litt. 2005; Williamson in
litt. 2005; Piehler in litt. 2005; Evans in litt. 2005).

[[Page 81716]]

The continuation of current national forest management practices will
be important in ensuring the long-term viability of wolf populations in
Minnesota, Wisconsin, and Michigan.
    Wolves regularly use four units of the National Park System in the
WGL DPS and may occasionally use three or four other units. Although
the National Park Service (NPS) has participated in the development of
some of the State wolf management plans in this area, NPS is not bound
by States' plans. Instead, the NPS Organic Act and the NPS Management
Policy on Wildlife generally require the agency to conserve natural and
cultural resources and the wildlife present within the parks. National
Park Service management policies require that native species be
protected against harvest, removal, destruction, harassment, or harm
through human action, although certain parks may allow some harvest in
accordance with State management plans. Management emphasis in National
Parks after delisting will continue to minimize the human impacts on
wolf populations. Thus, because of their responsibility to preserve all
native wildlife, units of the National Park System are often the most
protective of wildlife. In the case of the wolf, the NPS Organic Act
and NPS policies will continue to provide protection following Federal
delisting.
    Management and protection of wolves in Voyageurs National Park,
along Minnesota's northern border is not likely to change after
delisting. The park's management policies require that ``native animals
will be protected against harvest, removal, destruction, harassment, or
harm through human action.'' No population targets for wolves will be
established for the National Park (Holbeck in litt. 2005). To reduce
human disturbance, temporary closures around wolf denning and
rendezvous sites will be enacted whenever they are discovered in the
park. Sport hunting is already prohibited on park lands, regardless of
what may be allowed beyond park boundaries (West in litt. 2004). A
radio-telemetry study conducted between 1987 and 1991 of wolves living
in and adjacent to the park found that all mortality inside the park
was due to natural causes (for example, killing by other wolves or
starvation), whereas the majority (60-80 percent) of mortality outside
the park was human-induced (for example, shooting and trapping) (Gogan
et al. 2004, p. 22). If there is a need to control depredating wolves
outside the park, which seems unlikely due to the current absence of
agricultural activities adjacent to the park, the park will work with
the State to conduct control activities where necessary (West in litt.
2004).
    The wolf population in Isle Royale National Park is described above
(see Michigan Recovery). The NPS has indicated that it will continue to
closely monitor and study these wolves. This wolf population is very
small and isolated from the other wolf populations in the WGL DPS; as
described above, it is not considered to be significant to the recovery
or long-term viability of the wolf (USFWS 1992, p. 28).
    Two other units of the National Park System, Pictured Rocks
National Lakeshore and St. Croix National Scenic Riverway, are
regularly used by wolves. Pictured Rocks National Lakeshore is a narrow
strip of land along Michigan's Lake Superior shoreline. Lone wolves
periodically use, but do not appear to be year-round residents of, the
Lakeshore. If denning occurs after delisting, the Lakeshore would

protect denning and rendezvous sites at least as strictly as the Michigan Plan recommends (Gustin in litt. 2003). Harvesting wolves on the Lakeshore may be allowed (if the Michigan DNR allows for harvest in the State), but trapping is not allowed. The St. Croix National Scenic Riverway, in Wisconsin and Minnesota, is also a mostly linear ownership. Approximately 54-58 wolves from 11 packs used the Riverway on the Wisconsin side in 2010 (Wydeven 2011, pers. comm.). The Riverway is likely to limit public access to denning and rendezvous sites and to follow other management and protective practices outlined in the respective State wolf management plans, although trapping is not allowed on NPS lands except possibly by Native Americans (Maercklein in litt. 2003).

At least one pack of 4-5 wolves used the shoreline areas of the Apostle Islands National Lake Shore, with a major deer yard area occurring on portions of the Park Service land. Wolf tracks have been detected on Sand Island, and a wolf was photographed by a trail camera on the island in September 2009. It is not known if wolves periodically swim to this and other islands, or if they only travel to islands on ice in winter.

Wolves occurring on NWRs in the WGL DPS will be monitored, and refuge habitat management will maintain the current prey base for them for a minimum of 5 years after delisting. Trapping or hunting by government trappers for depredation control will not be authorized on NWRs. Because of the relatively small size of these NWRs, however, most or all of these packs and individual wolves also spend significant amounts of time off these NWRs.

Wolves also occupy the Fort McCoy military installation in Wisconsin. In 2003, one pack containing five adult wolves occupied a territory that included the majority of the installation; in 2004 and 2006, the installation had one pack with two adults; in 2005 there was a single pack with four wolves. In 2008-09, there were seven wolves using the installation (Wilder 2009, pers. comm.). In 2010 a pack of three wolves occurred in the northern portions of the Fort, and a pack of two occurred on the south side (Wydeven et al. 2010, p.42). Management and protection of wolves on the installation would not change significantly after Federal or State delisting. Den and rendezvous sites would continue to be protected, hunting seasons for other species (coyote) would be closed during the gun-deer season, and current surveys would continue, if resources are available. Fort McCoy has no plans to allow a public harvest of wolves on the installation (Nobles in litt. 2004; Wydeven et al. 2005a, p. 25; 2006a, p. 25).

Minnesota National Guard's (MNG) Camp Ripley contains parts of two pack territories, which typically include 10 to 20 wolves. MNG wildlife managers try to have at least one wolf in each pack radio-collared and to fit an additional one or two wolves in each pack with satellite transmitters that may record long-distance movements. There have been no significant conflicts with military training or with the permit-only public deer-hunting program at the camp, and no new conflicts are expected following delisting. Long-term and intensive monitoring has detected only two wolf mortalities within the camp boundaries--both were of natural causes (Dirks 2009, pers. comm.).

The protection afforded to resident and transient wolves, their den and rendezvous sites, and their prey by five national forests, four National Parks, two military facilities, and numerous National Wildlife Refuges in Minnesota, Wisconsin, and Michigan will further ensure the conservation of wolves in the three States after delisting. In addition, wolves that disperse to other units of the National Refuge

System or the National Park System within the WGL DPS will also receive the protection afforded by these Federal agencies.

Summary of Factor D

In summary, upon delisting, there will be varying State and Tribal classifications and protections provided to wolves. The wolf management plans currently in place for Minnesota, Wisconsin, and Michigan will be more

[[Page 81717]]

than sufficient to retain viable wolf populations in each State. These State plans provide a very high level of assurance that wolf populations in these three States will not decline to nonviable levels in the foreseeable future. Furthermore, the 2006 Update to the Wisconsin Wolf Management Plan (WI DNR 2006a, p. 3-4) demonstrates the State's commitment by retaining the previous management goal of 350 wolves, and it did not weaken any significant component of the original 1999 Plan. Similarly, the 2008 revised Michigan wolf plan continues to maintain the State's commitments to maintain viable wolf populations after Federal delisting. While these State plans recognize there may be a need to control or even reduce wolf populations at some future time, none of the plans include a public harvest of wolves, and all would maintain sufficient numbers of wolves to ensure their continued survival.

When federally delisted, wolves in Minnesota, Wisconsin, and Michigan will continue to receive protection from general human persecution by State laws and regulations. Michigan met the criteria established in their management plan for State delisting and in April 2009 removed gray wolves from the State's threatened and endangered species list and amended the Wildlife Conservation Order to grant ``protected animal'' status to the gray wolf in the State (Roell 2009, pers. comm.). That status ``prohibit[s] take, establish[es] penalties and restitution for violations of the Order, and detail[s] conditions under which lethal depredation control measures could be implemented'' (Humphries in litt. 2004).

Since 2004 wolves have been listed as a ``protected wild animal'' by the WI DNR, allowing no lethal take unless special authorization is requested from the WI DNR (Wydeven et al. 2009c). Following Federal delisting, Wisconsin will fully implement that ``protected wild animal'' status for the species, including protections that provide for fines of $1,000 to $2,000 for unlawful hunting.

Minnesota DNR will consider population management measures, including public hunting and trapping, but this will not occur sooner than 5 years after Federal delisting, and MN DNR will maintain a wolf population of at least 1,600 animals (MN DNR 2001, p. 2). In the meantime, wolves may be taken legally in Zone A only when they pose an immediate threat to pets, domestic animals, or livestock or to protect human safety (MN DNR 2001, pp. 3-4). Since the wolf management plan was completed in 2001, MN DNR has fully staffed its conservation officer corps in the State's wolf range (Stark 2009a, pers. comm.).

Except for the very small portions of Indiana and Ohio, if delisted, wolves in the WGL DPS are likely to remain protected by various State designations for the immediate future. States within the boundaries of the DPS either currently have mechanisms in place to kill depredating wolves (North Dakota and South Dakota) or can be expected

to develop mechanisms following Federal delisting of the DPS, in order
to deal with wolf-livestock conflicts in areas where wolf protection
would no longer be required by the Act. Because these States (Illinois,
Indiana, Iowa, Ohio, North Dakota, and South Dakota) constitute only
about one-third of the land area within the DPS, and contain virtually
no suitable habitat of sufficient size to host viable wolf populations,
it is clear that even complete protection for wolves in these areas
would neither provide significant benefits to wolf recovery in the DPS,
nor to the long-term viability of the recovered populations that
currently reside in the DPS. Therefore, although current and potential
future regulatory mechanisms may allow the killing of wolves in these
six States, these threats, and the area in which they will be, will not
impact the recovered wolf populations in the DPS now or in the
foreseeable future.

Finally, based on our review of the completed Tribal management
plans and communications with Tribes and Tribal organizations,
federally delisted wolves are very likely to be adequately protected on
Tribal lands. Furthermore, the numerical recovery criteria (and for
Minnesota, the numerical planning goal) in the Recovery Plan will be
achieved and maintained (based on the population and range of off-
reservation wolves) even without Tribal protection of wolves on
reservation lands. In addition, on the basis of information received
from other Federal land management agencies in Minnesota, Wisconsin,
and Michigan, we expect National Forests, units of the National Park
System, military bases, and National Wildlife Refuges will provide
protections to wolves in the areas they manage that will match, and in
some cases will exceed, the protections provided by State wolf
management plans and State protective regulations.

We conclude that the regulatory mechanisms that will be in place
subsequent to Federal delisting are adequate to control threats to
wolves in the WGL DPS.

E. Other Natural or Manmade Factors Affecting Its Continued Existence

Taking of Wolves by Native Americans for Certain Purposes

As noted elsewhere in this rule, the wolf has great significance to
many Native Americans in the western Great Lakes area, especially to
Wolf Clan members, and has a central role in their creation stories.
The wolf, Ma''ingan, is viewed as a brother to the Anishinaabe people,
and their fates are believed to be closely linked. Ma''ingan is a key
element in many of their beliefs, traditions, and ceremonies, and wolf
pack systems are used as a model for Anishinaabe families and
communities. We are not aware of any takings of wolves in the Midwest
for use in these traditions or ceremonies while the wolf has been
listed as a threatened or endangered species. While wolves have been
listed as threatened in Minnesota, we have instructed Wildlife Services
to provide, upon request, wolf pelts and other parts from wolves killed
during depredation control actions to Tribes in order to partially
serve these traditional needs.

Some Tribal representatives, as well as the GLIFWC, have indicated
that if wolves are delisted, there is likely to be interest in the
taking of small numbers of wolves for traditional ceremonies (King in
litt. 2003; White in litt. 2003). This take could occur on reservation
lands where it could be closely regulated by a Tribe to ensure that it
does not affect the viability of the reservation wolf population. Such
takings might also occur on off-reservation treaty lands on which

certain Tribes retained hunting, fishing, and gathering rights when the land was ceded to the Federal Government in the 19th Century. Native American taking of wolves from ceded lands would be limited to a specified portion of a harvestable surplus of wolves that is established in coordination with the Tribes, consistent with past Federal court rulings on treaty rights. Such taking would not occur until such time as a harvestable surplus has been documented based on biological data, and regulations and monitoring have been established by the States and Tribes to ensure a harvest can be carried out in a manner that ensures the continued viability of the wolf population in that State. Previous court rulings have ensured that Native American treaty harvest of fish or wildlife species have not risked endangering the resource.

If requested by the Tribes, multitribal natural resource agencies, or the States, the Service or other appropriate Federal

[[Page 81718]]

agencies will work with these parties to help determine if a harvestable surplus exists, and if so, to assist in devising reasonable and appropriate methods and levels of harvest for delisted wolves for traditional cultural purposes.

We conclude that the small number of wolves that may be taken by Native Americans will not be a significant threat to wolves in the WGL DPS.

Public Attitudes Toward the Wolf

Human behavior has had a tremendous effect on wolf populations around the world. Theory and social science research have identified attitudes, and the beliefs on which they are based, as important drivers of behavior. Therefore, understanding public attitudes toward wolves is a key component of wolf management. The success of the United States wolf-eradication programs of the late-nineteenth and early twentieth centuries are often accepted as evidence of negative public attitudes that were based on perceptions and beliefs brought by European settlers that portrayed the wolf as an evil, menacing threat (Browne-Nunez and Taylor 2002, p. 1; Fogleman 1988; Kellert 1986; Schanning 2009, pp. 252-253) and were perpetuated by exaggerated accounts of marauding wolves preying on livestock (Schanning 2009, p. 253).

When the wolf populations were in significant decline, there was a shift in management and a parallel shift in attitudes (Kellert et al. 1996; Schanning 2009, pp. 253-254; Williams et al. 2002, p. 581). In the Great Lakes region, bounty systems were repealed (Wisconsin in 1957, Michigan in 1960, and Minnesota in 1965) and, in 1972, the first of many attitudinal studies regarding wolves was carried out in Minnesota (Johnson 1974). In the last three decades, investigations of attitudes toward wolves and wolf management have burgeoned.
Minnesota

The first empirical examination of attitudes toward wolves was conducted using a convenience sample of 1,692 attendees of the Minnesota State Fair (Johnson 1974). It was based on the premise that children's stories, which typically cast the wolf as a villainous creature, shape attitudes from an early age. Although it found children to be more negative toward the wolf, a vast majority of adults held positive beliefs and attitudes. Most respondents felt that wolves were

not a danger to humans, should not be exterminated, had value for Minnesota, and are good for the deer and moose populations.

Llewellyn (1978) reported the results of a content analysis of 1,083 public comment letters received by the Service regarding the proposed reclassification of the timber wolf in Minnesota from endangered to threatened. Of the 700 letters from Minnesota residents (the other letters were from out-of-state), 23 percent favored retention of endangered status, 7 percent supported reclassification, and 70 percent were in favor of delisting and return to State management. Of note were differences between urban and rural residents, with a large majority (78 percent) of urban residents and a minority (16 percent) of rural residents in favor of continued Federal protection of wolves. Support for delisting was largely based on concern for livestock and fear of wolves.

Kellert (1985) conducted a statewide phone survey of Minnesota residents' knowledge, attitudes, and behaviors toward the wolves. The study sample comprised the general public (Minneapolis-St. Paul residents and mostly rural, northern county residents), deer hunters, trappers, and livestock producers. Most respondents held favorable attitudes toward wolves (except farmers), supported protection of wolves and their habitat as long as it did not interfere with human needs, and supported control of problem wolves. Urban residents expressed more protectionist attitudes, while rural residents' attitudes were more utilitarian in nature. There was ``somewhat-limited'' factual knowledge among the general public, but a higher knowledge level among trappers and, to a lesser degree, hunters and individuals with a higher income. Fear of wolves was expressed by some respondents, although most did not feel that wolves are a threat to people. Rather large percentages of farmers (12 percent) and trappers (17 percent) reported capturing or killing a wolf, and a majority of farmer, hunter, trapper, and northern county respondents reported knowing someone who captured or killed a wolf. Additionally, almost one-third of farmers, hunters, and trappers and a quarter of northern county respondents indicated that, given the opportunity, they might shoot a wolf while deer hunting.

In 1999, a second statewide phone survey of Minnesota residents was conducted, similar to the 1985 study, using a stratified random sample of northern residents, southern residents, farmers, hunters, and trappers (Kellert 1999). During this study period, Minnesota wolves were being considered for Federal delisting. Compared to the 1985 survey, this study found an overall increase in positive perceptions of the wolf. The general public expressed more affection and ethical concern for wolves than did farmers, although there was not a significant difference between groups in level of dislike of wolves. Over 70 percent of respondents believed wolves symbolize the beauty in nature and a large portion of the sample perceived other values of wolves, including ecological, scientific, and moral. Suburban and urban residents, the college educated, and younger respondents were more likely to have positive attitudes. Farmers were more knowledgeable about the wolf and more likely to support delisting. Of note was a substantial increase in the number of northern Minnesota residents who reported either killing a wolf themselves or knowing someone who did.

Chavez et al. (2005) assessed attitudes of residents of northwestern Minnesota. The sample of 600 rural residents was stratified by location: inside wolf range and outside but adjacent to wolf range. The study did not find large differences between geographic groups or farmers and non-farmers, with all groups indicating slightly

unfavorable attitudes toward wolves. The authors suggest this could be attributable to shared rural cultural values and utilitarian attitudes. They also consider the possible influence of immigrant roots in Europe where folklore and early conflicts with wolves fostered negative attitudes. Both geographic groups agreed that wolves cause unacceptable levels of damage to northwestern Minnesota's livestock industry, although predators were perceived as less of an agricultural threat than other threats (e.g., livestock diseases, crop pests).

Using a random sample of 909 respondents (18 percent response rate), Schanning (2005) reported ``pragmatic/utilitarian'' beliefs regarding wolves among Minnesota residents. Most respondents supported compensation to livestock owners and having problem wolves shot by the DNR. Counter to Kellert's earlier findings, there was a significant level of fear of wolves among Schanning's sample, including fear for personal safety (31 percent), the safety of children (64 percent), and pets (70 percent).

Michigan

In Michigan, Hook and Robinson (1982, pp. 388-391) found that only a small percentage of respondents scored high on their anti-predator scale and most respondents were in favor of wolf restoration. Hunters were more positive toward predators than nonhunters. Fear of the wolf was the most important factor related to an anti-predator

[[Page 81719]]

attitude, followed by negativistic attitudes toward all animals, and age, with older people holding more negative attitudes.

Kellert (1990) conducted a statewide mail survey of Michigan residents' knowledge, attitudes, and behaviors toward wolves. There were 639 respondents from the Upper (UP) and Lower (LP) peninsulas and members of three special interest groups: hunters, trappers, and livestock producers. Livestock producers were the most likely of the special interest groups to hold negative attitudes toward the wolf. LP residents were more likely than UP residents to express fear and dislike of wolves. A majority of respondents in each group, except livestock producers, supported restoration (64 percent of UP residents, 57 percent of LP residents, 76 percent of hunters, 66 percent of trappers, and 37 percent of livestock producers). Support was primarily motivated by the existence, ecological, and cultural values of the wolf.

A 2002 statewide survey of 557 Michigan residents' attitudes toward wolf recovery found that support for recovery by UP residents had declined since Kellert's 1990 study (Mertig 2004). At the time this study was conducted, the UP's wolf population had risen to about 250 animals (Hammill 2007), but in the LP, where wolves were not known to be present, there was increased support for wolf recovery in the UP. Other differences from Kellert's (1990) findings included increased support for wolf control and for hunting and trapping for pelts.

Based on a sample of 1,017 Michigan residents (20 percent response rate), Schanning (2004) found that a majority of respondents in his survey agreed with pro-wolf statements including ``wolves are a part of our vanishing wilderness and should be protected'' (51 percent). Similar to his 2005 study of Minnesota residents and his 2003 study of Wisconsin residents (reported below), Schanning found a substantial level of fear of wolves among the Michigan sample. Respondents reported fear for their personal safety (40 percent), the safety of children (70 percent), pets (7 percent), and livestock (66 percent).

019837A

Using a stratified random sample of respondents from five regions in Michigan, Beyer (2006) measured tolerance of wolves using a scale for social carrying capacity. The scale was based on Michigan wolves' perceived range, numbers, and the type and number of interactions with people. The study found that most people were at the most tolerant end of the scale, with smaller percentages classified as intolerant (7 percent) or least tolerant (20 percent).

Wisconsin

Knight (1985, reported in Schanning 2009, p. 257) surveyed hunter attitudes in two Wisconsin counties in wolf range where a minority (20 percent) of hunters reported negative attitudes toward wolves and most (69 percent) believed that wolves should not be eliminated.

In 1988, when there were only 20 wolves in Wisconsin, Nelson and Franson (1988) compared farmer' and non-farmers' attitudes toward wolves and wolf recovery in six Wisconsin counties. A series of agree-disagree belief statements were used to gauge attitudes toward wolves. Non-farmers were more positive than farmers, and a majority agreed that the wolf ``symbolizes the beauty and wonder in nature'' and ``it would be wonderful to hear the wolf howl in the wild'' (64 percent and 62 percent respectively). Almost half of farmers agreed with the same statements. Both groups disagreed that they would be afraid of an attack if they saw a wolf while walking in the woods. Farmers and non-farmers were divided about wolf restoration, with half of farmers and about one-third of non-famers opposed. Both groups favored trapping and removal of problem wolves.

Wilson (1999) examined knowledge, attitudes, and behaviors toward wolves in a 1997 survey of two random samples: All Wisconsin license plate owners and those who purchased an Endangered Resources (ER) license plate. Fifty percent of all license plate owners and almost 90 percent of ER license plate owners supported efforts to increase the State wolf population. There were slight differences between hunters (47 percent) and non-hunters (54 percent) who support wolf recovery.

Naughton-Teves et al. (2003) assessed tolerance of wolves among 535 rural Wisconsin residents using a mail-back questionnaire (82 percent response rate). They examined the influence of compensation for livestock losses to wolves and preferences for wolf management actions among different segments of the sample, including livestock producers, bear hunters, general residents, wolf damage complainants, recipients of compensation, and demographic segments. The strongest predictor of tolerance was social group. A large majority of bear hunters (73 percent) were in favor of reducing or eliminating the wolf population, compared to 45 percent of the livestock producers and 29 percent of general residents. Individuals who had lost a domestic animal to a predator were less tolerant of wolves than those who had not. Preferences for management actions depended on the conflict situation. Approval for lethal control was highest for depredation on livestock and pets. Bear hunters also were highly in favor of lethal control when hunting hounds are killed, but other groups did not muster a majority for this option. Compensation was not associated with higher tolerance when comparing recipients to nonrecipients among those who reported losing a domestic animal to wolves.

Similar to his studies in Minnesota and Michigan, Schanning (2003) surveyed 644 Wisconsin residents' (13 percent response rate) attitudes toward wolves. He found a majority of respondents held pro-wolf attitudes based on their agreement with three belief statements: ``the wolf is a symbol of the beauty and wonder in nature,'' ``wolves are part of our vanishing wilderness and should be protected,'' and

``wolves are essential to maintaining the balance in nature'' (72 percent, 56 percent, and 62 percent in agreement, respectively). There was substantial support for wolf hunting (41 percent), and a majority (60 percent) indicated they would shoot a wolf if it threatened their pet.

In a followup to Naughton-Treves et al. (2003), Treves et al. (2009) reported attitudes of 1,364 respondents (62 percent response rate) toward compensation after wolf recovery. They compared the attitudes of individuals who contributed to Wisconsin's voluntary compensation fund with those of noncontributors and found that attitudes of each group differed in several ways. Contributors favored nonlethal over lethal problem wolf management actions and supported all types of payments more strongly with the exception of payment for hunting dogs injured or killed by wolves on public land, but a majority of respondents of both groups supported compensation ``even when wolves are no longer threatened or endangered.'' Noncontributors were more likely to believe that wolf damages were part of raising livestock and should not be compensated.

Treves et al. (in review) report the first longitudinal results for change in individual attitudes over time using findings from surveys conducted in 2001 (Naughton-Treves et al. 2003), 2004 (Treves et al. 2009), and 2009. During the data collection period, wolf numbers nearly tripled and greatly exceeded the State population goal, the level of wolf depredation on pets increased and became the third most

[[Page 81720]]

frequent conflict after attacks on beef calves and bear-hunting dogs, and wolf management authority was granted to State governments and subsequently revoked several times after Federal court challenges. The 2009 survey found attitudes toward wolves had become less favorable, and fear of wolves, perceived competition for deer, and reported inclination to illegally kill wolves increased. In the 2009 survey, 18 percent of hunters indicated they would shoot a wolf if they saw one while hunting. Nearly half of respondents agreed their tolerance for wolves in Wisconsin would increase if people could hunt them.

Shelley et al. (in review) compared attitudes of Ojibwe Indians and nontribal residents of Wisconsin's wolf range. Tribal membership was the best predictor of attitudes. Ojibwe respondents had more positive attitudes toward wolves, were more supportive of wolf protection policy, and were less supportive of a public wolf harvest and lethal control of problem wolves. A considerable percentage (Ojibwe 33 percent, nontribal 44 percent) of each group indicated they would be afraid if wolves lived near their homes. Fewer Ojibwe (8 percent) than nontribal respondents (16 percent) indicated that they would shoot a wolf if they saw one while hunting. Nontribal respondents (57 percent) were more likely than Ojibwe respondents (26 percent) to believe that wolves threaten deer hunting opportunities. Shelley et al. (in review) point out the potential significance of treaty rights, which grant the Tribe half of any harvest, including wolves, within the territories ceded by them in nineteenth century Federal treaties upheld by Federal courts in the 1980s.

Treves and Martin (2011) examined the attitudes of 2,320 respondents, hunters and nonhunters, living within or adjacent to wolf range in surveys conducted in Wisconsin in 2001 and 2004 (reported above) and the northern Rocky Mountain (NRM) States of Idaho, Montana, and Wyoming. A majority of respondents supported regulated, public wolf

hunting, although support was dependent on potential justifications for a hunting season.

In Wisconsin, bear hunters in 2001, followed by other hunters, were most likely to support an immediate hunt, whereas nonhunters in favor of wolf hunting were more likely to be supportive when managers estimate the wolf population could sustain harvests or when the majority of the public believe damages have become intolerable. There was a shift in 2004 when a majority of hunters indicated they would support wolf hunting when the population was deemed to be at a level that could sustain harvests. More nonhunters agreed with a hunt when the public felt damages had become intolerable. Inclination to kill a wolf illegally in Wisconsin in 2001 and 2004 was high among hunters, particularly among likely carnivore-hunters. These two groups favored a significant reduction (up to half) of the Wisconsin wolf population.

In addition to the studies summarized above, citizen input on the wolf management plans of Minnesota, Wisconsin, and Michigan has provided additional insight on public support for wolf recovery. Namely, it shows strong support for wolf recovery if the adverse impacts on recreational activities and livestock production can be minimized (MI DNR 1997, pp. 13-14, 50-56; MN DNR 1998, p. 2; WI DNR 1999, pp. 51-55; WI DNR 2006c, pp. 9-11).

Summary of Public Attitudes

While there is a lack of empirical data on early attitudes toward wolves, historical accounts describe an antagonist view of wolves during the 19th and early 20th centuries. Attitudinal research conducted throughout the lower 48 States in the last three decades has shown that a shift toward more positive attitudes took place during the 20th century (Browne-Nu[ntilde]ez and Taylor 2002, Kellert et al. 1996, Williams et al. 2002). Although the basis for this shift is not understood, suggested causes include changes in the portrayal of wolves in the media (Kellert et al. 1996) and a broader shift in societal values of wildlife (Manfredo et al. 2003).

Although direct comparisons cannot be made of each study summarized here, given different research methods and contextual circumstances, we can summarize some common findings and general conclusions. Similar to research conducted outside the Great Lakes region (summarized in Williams et al. 2002), many of the studies reviewed here demonstrate urban-rural differences in attitudes, with urban residents displaying more positive attitudes; farmers and livestock producers are more negative toward wolves; those with higher education levels have more positive attitudes; and compensation does not translate into increased tolerance.

In several studies, hunters were mostly positive toward wolves (Hook and Robinson 1982, Kellert 1990, Knight 1985), with the exception of Wisconsin bear hunters who were the most negative among special interest groups (Naughton-Treves et al. 2003). Cross-sectional studies suggest increasing support for control of problem wolves and public harvest of wolves (Kellert 1985, Mertig 2004, Naughton-Treves et al. 2003), and one recent study shows this support has increased among individuals re-sampled over time (Treves et al., in review). Some respondents indicated they had or would kill a wolf illegally (Kellert 1985; Treves et al., in review).

While most respondents were positive toward wolves, it is evident that there have long been competing attitudes toward wolves. While attitudes in other regions have been shown to be relatively stable (Williams et al. 2002, Wilson and Bruskotter 2009), a troubling finding for managers in the Great Lakes region is the most recent research

showing declining support for wolves (Hammill 2007; Mertig 2004; Treves et al., in review) and an increasing inclination to kill wolves illegally (Treves et al., in review). Possible explanations for this decline include increasing wolf numbers, negative interactions with humans, and negative media coverage (Hammill 2007). It is unclear how delisting will affect attitudes and behavior toward wolves. Also in question is how public wolf harvest might affect attitudes and behaviors. However, we expect that when allowed to adequately manage wolf-human conflicts, public attitudes are likely to support wolf restoration. Furthermore, the State wildlife agencies, as well as several other agencies and organizations, have professional education, information, and outreach components and will continue to present balanced science-based information to the public that will continue to foster general public support for wolf restoration and the necessity of conflict resolution to maintain public tolerance of wolves.

   While we do not believe the effects of public attitudes on wolves will be a significant threat to the species, as the status and management of the wolf evolves, there will be a need for continued collaboration between managers and researchers to monitor public attitudes toward wolves and their management.

Hybridization With Coyotes

   Genetic data relevant to possible interbreeding between North American wolves and coyotes were first reported in a study of mtDNA restriction fragment length polymorphisms by Lehman et al. (1991). They found mtDNA haplotypes in wolf populations in the Great Lakes region that they interpreted as being derived from coyotes (Lehman et al., p. 108). As wolf

[[Page 81721]]

haplotypes were not found in coyotes, the apparent introgression occurred through matings of wolf males with coyote females. They determined that a minimum of six instances of coyote-wolf hybridization could account for the diversity of ``coyote-type'' haplotypes observed in wolves (p. 112). Their general interpretation was that introgression primarily occurred as coyotes expanded their ranges into the Great Lakes region within historical time, although they allow that two coyote-type haplotypes commonly observed in Great Lakes wolves may have been the result of ancient hybridization. Their data also indicated (Lehman et al., Figure 4) that coyote-type haplotypes were less common in the western part of the Great Lakes region than in the east.

   Wilson et al. (2000, Figure 6, p. 2165) provided a different interpretation of wolf-coyote relationships in the region. They found coyote-like mtDNA sequences in eastern Canadian wolves from Algonquin Provincial Park, Ontario, southern Manitoba, and northeastern Minnesota that were intermediate in sequence divergence between coyotes and gray wolves. As these haplotypes were apparently absent in coyotes, they were thought not to result from hybridization with coyotes, but to represent an eastern wolf species, Canis lycaon. They suggest that these Canis lycaon haplotypes may have been previously reported as ``coyote-type'' in the study of Lehman et al. (1991).

   It is now generally agreed that historical and most contemporary Great Lakes wolves have unique mtDNA haplotypes that are distinct from those of other wolves, and more related to but still distinct from those of coyotes. Haplotypes specific to the early 20th century wolf

population of the western Great Lakes region were identified by Leonard and Wayne (2008, pp. 2-3), from a study of 17 historical specimens from Michigan, Wisconsin, Ontario, and Quebec. Of the 17 specimens that gave conclusive results, 14 were either the same or most similar to the haplotypes described by Wilson et al. (2000) as C. lycaon. Only one had a coyote haplotype. Wheeldon and White (2009) reported haplotypes from three additional historical specimens from the western Great Lakes region. Two individuals from Minnesota (collected 1899 and 1900) had the same coyote-like haplotypes (C13) found in a late 19th century specimen from Maine, 50 years before recorded coyote sightings in Maine (Wilson et al. 2003), as well as in contemporary western Great Lakes wolves from Minnesota to Quebec (Leonard and Wayne 2008, pp. 2-3). The third specimen, collected in the winter of 1907-1908 in Wisconsin, had the common Great Lakes wolf haplotype C1. Microsatellite DNA analysis of these three specimens grouped them with wolves rather than coyotes.

Koblm[uuml]ller et al. (2009) addressed the issue of coyote hybridization in the Great Lakes region from analyses of mtDNA sequence and both Y-chromosome and autosomal microsatellite DNA. They found evidence of repeated incidences of ancient introgression of coyotes into Great Lakes wolves, although they also suggested that introgression by coyotes is recent and ongoing, especially ``north'' of the Great Lakes. Although they use the term ``north,'' it is apparent they are referring to wolves in Ontario and Quebec, Canada east of the Great Lakes. Koblm[uuml]ller et al. (2009) failed to recognize that in the western Great Lakes, especially Minnesota and Wisconsin, wolves were exposed to coyotes throughout historical and recent geological time (Jackson 1961, pp. 285-286; Wydeven and Pils 2008, p. 260). Their paper demonstrates that hybridization of wolves with coyotes occurred mainly east of the Great Lakes and not in the western Great lakes region.

Wheeldon and White (2009, p. 2) and Fain et al. (2010) concluded that the coyote-related haplotype C13 is actually an eastern wolf (what they call C. lycaon) marker based on its presence mainly in C. lycaon-C. lupus hybrids in the western Great Lakes region, the absence of C13 in nonhybridizing coyotes, and its occurrence in historical eastern wolves. Assessments based on mtDNA, Y-chromosome, and autosomal microsatellite DNA data consistently found that the wolf population in the western Great Lakes region does not currently interbreed with coyotes (Fain et al. 2010, p. 14; Wheeldon et al. 2010).

Lehman et al.'s (1991, p. 114) interpretation of coyote introgression into Great Lakes wolves included an explanation that it occurred at a time when wolf population densities were low in the region, so that wolves would be less likely to find mates of the same species and mating with coyotes was more likely to take place. Conversely, Lehman et al. (1991) suggested that coyote introgression does not appear to occur when wolf densities are higher. If so, the increase in population size that has occurred over the last 30 years renders the western Great Lakes wolf population less vulnerable to whatever threat may have been presented by coyote introgression. The wolf population of the region has likely been exposed to this factor for centuries and has rebounded from near extirpation, yet retains essential genetic, behavioral, and other biological features of wolves without being displaced by coyotes. This fact suggests that the threat of coyote hybridization to the recovered WGL wolf population is small.

Conclusion of the 5-Factor Analysis

As required by the Act, we considered the five potential threat factors to assess whether the wolves in the WGL DPS are threatened or endangered throughout all or a significant portion of their range. When considering the status of the species, the first step in the analysis is to determine whether the species is in danger of extinction or likely to become endangered in the foreseeable future throughout all of its range.

The wolf population in the WGL DPS currently occupies all the suitable habitat area identified for recovery in the Midwest in the 1978 Recovery Plan and 1992 Revised Recovery Plan and most of the potentially suitable habitat in the WGL DPS. Much of the important wolf habitat in the DPS is in public ownership, and the suitable habitat in the DPS is adequately protected for the foreseeable future.

Human-caused mortality is the most significant issue to the long-term conservation status of the wolves in the WGL DPS. Therefore, managing this source of mortality remains the primary challenge to maintaining a recovered wolf population into the foreseeable future. We have concluded that Minnesota, Wisconsin, and Michigan will maintain their share and distribution of the WGL wolf population above recovery levels for the foreseeable future, and that the threats have been sufficiently reduced. All three States have wolf management laws, plans, and regulations that adequately regulate human-caused mortality. Each of the three States has committed to manage its wolf population at or above viable population levels, and this commitment is not expected to change.

Regulatory mechanisms in all three States are adequate to facilitate the maintenance of, and in no way threaten, the recovered status of the wolves in the WGL DPS. When federally delisted, wolves in Minnesota, Wisconsin, and Michigan will continue to receive protection from general human persecution by State laws and regulations. Violation of regulations will be subject to prosecution.

As long as populations are maintained at or above minimum recovery levels, wolf biology (namely the species' reproductive capacity) and the availability of large, secure blocks of suitable habitat will maintain strong

[[Page 81722]]

populations capable of withstanding all other foreseeable threats. In terms of habitat, the amount and distribution of suitable habitat in public ownership provides, and will continue to provide, large core areas that contain high-quality habitat of sufficient size to anchor a recovered wolf population. Our analysis of land management shows these areas will maintain their suitability into the foreseeable future, if not indefinitely.

While disease and parasites can temporarily impact population stability, as long as populations are managed above recovery levels, these factors are not likely to threaten the wolf population at any point in the foreseeable future. Natural predation is also likely to remain an insignificant factor in population dynamics into the foreseeable future. Finally, we believe that other natural or manmade factors, such as potential hybridization with coyotes and public attitudes, are unlikely to threaten the wolves in the WGL DPS in the foreseeable future in all portions of the range within the DPS.

We find that the threat of habitat destruction or degradation or a reduction in the range of the wolf; utilization by humans; disease, parasites, or predatory actions by other animals or humans; regulatory

019843A

measures by State, tribal, and Federal agencies; or other threats will not individually or in combination cause wolves in the WGL DPS to become endangered within the foreseeable future throughout all of the species' range in the DPS. Ongoing effects of recovery efforts over the past decades, which resulted in a significant expansion of the occupied range of wolves in the WGL DPS, in conjunction with future State, tribal, and Federal agency wolf management across that occupied range, will be adequate to ensure the conservation of the WGL DPS. These activities will maintain an adequate prey base, preserve denning and rendezvous sites, monitor disease, restrict human take, and keep wolf populations well above the numerical recovery criteria established in the Revised Recovery Plan (USFWS 1992, pp. 25-28). Thus, the gray wolves in the WGL DPS do not merit continued listing as threatened or endangered throughout all of their range.

Is the species threatened or endangered in a significant portion of its range?

    Having determined that wolves in the WGL DPS do not meet the definition of endangered or threatened throughout their entire range, we must next consider whether they are in danger of extinction or are likely to become so in a significant portion of their range. The Act does not define the term ``significant portion of its range.'' Therefore, we must give meaning to this phrase based on our experience and expertise. We interpret a portion of a species' range as being significant if it is part of the current range of the species (species used here is as defined in the Act, to include species, subspecies, or DPS) and if it is important to the conservation of the species because it contributes meaningfully to the representation, resiliency, or redundancy of the species. The contribution must be at a level such that its loss would result in a decrease in the ability to conserve the species.
    Applying the definition described above for determining whether a species is endangered or threatened in a significant portion of its range, we first address whether any portions of the range of wolves in the WGL DPS warranted further consideration. We evaluated the WGL DPS in the context of whether any potential remaining threats are concentrated in one or more areas, such that if there were concentrated impacts, those wolves might be threatened, and further, whether any such area might constitute a significant portion of the species' ranges.
    Wolves are highly adaptable habitat generalists, and their primary biological need is an adequate natural prey base of large ungulates. The primary current and likely future threats to wolves are excessive human-caused mortality and increased mortality from diseases and parasites. Based on the biology of the gray wolf, threats to its continued existence, and conservation biology principles, the Recovery Plan specifies that two populations (or what equates to a single metapopulation) are needed to ensure long-term viability (see Recovery Criteria, above). The Revised Recovery Plan states the importance of a large wolf population throughout Minnesota Wolf Management Zones 1 through 4 (geographically identical to Zone A in the 2001 Minnesota Wolf Management Plan, see Figure 2 earlier in the preamble to this rule) and the need for a second viable wolf population occupying 10,000 sq mi or 5,000 sq mi elsewhere in the eastern United States (depending on its isolation from the Minnesota wolf population) (USFWS 1992, pp. 24-29).

The Recovery Plan also discusses the importance of low-road-density areas, the importance of minimizing wolf-human conflicts, and the maintenance of an adequate natural prey base in the areas hosting these two necessary wolf populations. These portions of Minnesota (Management Zones 1 through 4) and the portions of the DPS that support the second viable wolf population (Wisconsin Zones 1 and 2 and the entire UP of Michigan) provide an adequate wild prey base, suitably low levels of human-caused mortality, and sufficient representation, resiliency, and redundancy to buffer the impacts of disease and parasite-induced mortality (See the discussion under Recovery Criteria, above, regarding how achieving the goals of the Recovery Plan for the Eastern Timber Wolf assures a viable wolf population in terms of representation, resiliency, and redundancy.).

Post-delisting wolf protection, management, and population and health monitoring by the States, Tribes, and Federal land management agencies will ensure the continuation of viable wolf populations above the Federal recovery criteria for the foreseeable future. The State management plans provide the greatest protections for the species in Minnesota Zone A, Wisconsin Zones 1 and 2, and across the UP of Michigan, (see the discussion of the three plans in State Wolf Management Planning, above). Post-delisting threats to wolves in Zone B in Minnesota, Zones 3 and 4 in Wisconsin, and in the Lower Peninsula of Michigan will be more substantial and may preclude the establishment of wolf packs in most or all of these areas. The Recovery Plan specifically recommends against managing for wolves in large areas of unsuitable habitat, stating that Minnesota Zone 5 (identical to Minnesota Wolf Management Zone B, Figure 2) should be managed with a goal of zero wolves there, because ``Zone 5 is not suitable for wolves. Wolves found there should be eliminated by any legal means'' (USFWS 1992, p 20). Therefore, the Recovery Plan views Zone 5, which is roughly 60 percent of the State, as not an important part of the range of the wolf. This portion of the State is predominantly agricultural land, with high road densities, and high potential for wolves to depredate on livestock. Although individual wolves and some wolf packs occupy parts of Zone 5, these wolves are using habitat islands or are existing in other situations where conditions generally are not conducive to their long-term persistence.

The northern LP of Michigan appears to have the only unoccupied potentially suitable wolf habitat in the Midwest that is of sufficient size to maintain wolf packs (Gehring and Potter 2005, p. 1239; Potvin 2003, pp. 44-45), although its small size and fragmented nature may mean that northern LP wolf population viability would be dependent upon continuing immigration from the UP.

[[Page 81723]]

The only part of Michigan's LP that may contain suitable habitat are those areas of fragmented habitat studied by Potvin (2003, pp. 44-45) and Gehring and Potter (2005, p. 1239). However, these areas amount to less than half of the minimal area identified by the Recovery Plan for the Eastern Timber Wolf as needed for the establishment of viable populations. These LP areas, therefore, might have difficulty maintaining wolf populations even with the help of occasional immigration of wolves from the UP (see Suitable Habitat Within the Western Great Lakes DPS, above, for additional discussion). While the UP wolves may be significant to any LP wolf population (occasional UP to LP movements may provide important genetic and demographic

augmentation crucial to a small population founded by only a few individuals), the reverse will not be true--LP wolves would not be important to the wolf population in the UP, as that population is already large enough in size and range to be self-sustaining.

The lack of sufficient areas of suitable habitat in those parts of North Dakota, South Dakota, Iowa, Illinois, Indiana, and Ohio that are within the WGL DPS are expected to preclude the establishment of viable populations in these areas, although dispersing wolves and packs may temporarily occur in some of these areas. As a result, wolf numbers in these areas will have no impact on the continued viability of wolves in the WGL DPS, and are not necessary to maintain adequate representation, resiliency, and redundancy for wolves in the DPS.

In conclusion, Minnesota Zone A, Wisconsin Zones 1 and 2, and the UP of Michigan provide an adequate wild prey base, suitably low levels of human-caused mortality, and sufficient numbers and distribution of wolves to ensure adequate representation, resiliency, and redundancy to buffer the impacts of disease and parasite-induced mortality. Post-delisting wolf protection, management, and population and health monitoring by the States, Tribes, and Federal land management agencies will ensure the continuation of viable wolf populations in those areas above the recovery criteria established in the Recovery Plan for the foreseeable future.

In coming to this determination, we considered the quality, quantity, and distribution of the habitat relative to the biological needs of the species, the need to maintain the remaining genetic diversity, the importance of geographic distribution in coping with catastrophes such as disease, the ability of the habitat to provide adequate wild prey, and the need to otherwise meet the conservation needs of the species. Reasonably foreseeable threats to wolves in all parts of the WGL DPS are not likely to threaten wolf population viability in the WGL DPS in the foreseeable future. Therefore, we find that wolves in the WGL DPS are not in danger of extinction and are not likely to become endangered in the foreseeable future throughout all or a significant portion of their range.

Determination

After a thorough review of all available information and an evaluation of the five factors specified in section 4(a)(1) of the Act, as well as consideration of the definitions of ``threatened'' and ``endangered'' contained in the Act and the reasons for delisting as specified in 50 CFR 424.11(d), we are (1) revising the 1978 listing of wolves in Minnesota as threatened by identifying it as the WGL DPS, which includes Minnesota, Wisconsin, and Michigan and portions of the adjacent States and (2) removing that WGL DPS from the List of Endangered and Threatened Wildlife (50 CFR 17.11). Wolves have recovered in the WGL DPS as a result of the reduction of threats as described in the analysis of the five categories of threats and no longer are in danger of extinction, nor are likely to become so in the foreseeable future, throughout all or a significant portion of their range.

Available Conservation Measures

Conservation measures provided to species listed as endangered or threatened under the Act include recognition, recovery actions, requirements for Federal protection, and prohibitions against certain

019846A

practices. Recognition through listing encourages and results in conservation actions by Federal, State, tribal, and private agencies, groups, and individuals. The Act provides for possible land acquisition and cooperation with the States and requires that recovery actions be carried out for all listed species. This final rule removes these Federal conservation measures for gray wolves within the WGL DPS.

Effects of the Rule

    This final rule revises the pre-DPS policy Minnesota ``species'' listing and establishes it as a WGL DPS of the gray wolf (C. lupus), expands the boundaries of that DPS, and removes the protections of the Act for that WGL DPS by removing the gray wolf in that DPS from the List of Endangered and Threatened Wildlife.
    This final rule removes the special regulations under section 4(d) of the Act for wolves in Minnesota. These regulations currently are found at 50 CFR 17.40(d).
    Critical habitat was designated for the gray wolf in 1978 (43 FR 9607, March 9, 1978). That rule (codified at 50 CFR 17.95(a)) identifies Isle Royale National Park, Michigan, and Minnesota wolf management zones 1, 2, and 3, as delineated in 50 CFR 17.40(d)(1), as critical habitat. Wolf management zones 1, 2, and 3 comprise approximately 25,500 sq km (9,845 sq mi) in northeastern and north-central Minnesota. This final rule removes the designation of critical habitat for gray wolves in Minnesota and on Isle Royale, Michigan.

Post-Delisting Monitoring

    Section 4(g)(1) of the Act, added in the 1988 reauthorization, requires us to implement a system, in cooperation with the States, to monitor for not less than 5 years the status of all species that have recovered and been removed from the Lists of Endangered and Threatened Wildlife and Plants (50 CFR 17.11 and 17.12). The purpose of this post-delisting monitoring (PDM) is to verify that a species delisted due to recovery remains secure from risk of extinction after it no longer has the protections of the Act. To do this, PDM generally focuses on evaluating (1) demographic characteristics of the species, (2) threats to the species, and (3) implementation of legal and/or management commitments that have been identified as important in reducing threats to the species or maintaining threats at sufficiently low levels. We are to make prompt use of the emergency listing authorities under section 4(b)(7) of the Act to prevent a significant risk to the well-being of any recovered species. Section 4(g) of the Act explicitly requires cooperation with the States in development and implementation of PDM programs, but we remain responsible for compliance with section 4(g) and, therefore, must remain actively engaged in all phases of PDM. We also will seek active participation of other entities that are expected to assume responsibilities for the species' conservation, after delisting.
    We developed a PDM plan for the wolves in the WGL DPS with the assistance of the Eastern Wolf Recovery Team. That document is available on our Web site (See FOR FURTHER INFORMATION CONTACT).
    The PDM program will rely on a continuation of State monitoring activities, similar to those which have been conducted by Minnesota, Wisconsin, and Michigan DNR's in recent years, and tribal monitoring.

[[Page 81724]]

Minnesota, Wisconsin, and Michigan comprise the core recovery areas within the DPS, and, therefore, the numerical recovery criteria in the Recovery Plan apply only to the area encompassed by these States' boundaries. These activities will include both population and health monitoring of individual wolves. During the PDM period, the Service and the Recovery Team will conduct a review of the monitoring data and program. We will consider various relevant factors (including but not limited to mortality rates, population changes and rates of change, disease occurrence, range expansion or contraction) to determine if the population of wolves within the DPS warrants expanded monitoring, additional research, consideration for relisting as threatened or endangered, or emergency listing.

Minnesota, Wisconsin, and Michigan DNRs have monitored wolves for several decades with significant assistance from numerous partners, including the U.S. Forest Service, National Park Service, USDA-APHIS-Wildlife Services, Tribal natural resource agencies, and the Service. To maximize comparability of future PDM data with data obtained before delisting, all three State DNRs have committed to continue their previous wolf population monitoring methodology, or will make changes to that methodology only if those changes will not reduce the comparability of pre- and post-delisting data.

In addition to monitoring wolf population numbers and trends, the PDM will evaluate post-delisting threats, in particular human-caused mortality, disease, and implementation of legal and management commitments. If at any time during the monitoring period we detect a substantial downward change in the populations or an increase in threats to the degree that population viability may be threatened, we will work with the States and Tribes to evaluate and change (intensify, extend, and/or otherwise improve) the monitoring methods, if appropriate, and/or consider relisting the WGL DPS, if warranted.

This monitoring program will extend for 5 years beyond the effective delisting date of the DPS. At the end of the 5-year period, we and the Recovery Team will conduct another review and post the results on our Web site. In addition to the above considerations, the review will determine whether the PDM program should be terminated or extended.

Required Determinations

Paperwork Reduction Act

Office of Management and Budget (OMB) regulations at 5 CFR 1320 implement provisions of the Paperwork Reduction Act (44 U.S.C. 3501 et seq.). The OMB regulations at 5 CFR 1320.3(c) define a collection of information as the obtaining of information by or for an agency by means of identical questions posed to, or identical reporting, recordkeeping, or disclosure requirements imposed on, 10 or more persons. Furthermore, 5 CFR 1320.3(c)(4) specifies that ``ten or more persons'' refers to the persons to whom a collection of information is addressed by the agency within any 12-month period. For purposes of this definition, employees of the Federal Government are not included. The Service may not conduct or sponsor, and you are not required to respond to, a collection of information unless it displays a currently valid OMB control number.

This final rule does not include any collections of information that require approval by OMB under the Paperwork Reduction Act. As

described under the Post-delisting Monitoring above, wolf populations
in the Western Great Lakes DPS will be monitored by the States of
Michigan, Minnesota, and Wisconsin in accordance with their wolf State
management plans. There may also be additional voluntary monitoring
activities conducted by a small number of tribes in these three States.
We do not anticipate a need to request data or other information from
10 or more persons during any 12-month period to satisfy monitoring
information needs. If it becomes necessary to collect standardized
information from 10 or more non-Federal individuals, groups, or
organizations per year, we will first obtain information collection
approval from OMB.

National Environmental Policy Act

    We have determined that an environmental assessment or an
environmental impact statement, as defined under the authority of the
National Environmental Policy Act of 1969, need not be prepared in
connection with regulations adopted pursuant to section 4(a) of the
Act. We published a notice outlining our reasons for this determination
in the Federal Register on October 25, 1983 (48 FR 49244).

Government-to-Government Relationship With Tribes

    In accordance with the President's memorandum of April 29, 1994,
Government-to-Government Relations with Native American Tribal
Governments (59 FR 22951), E.O. 13175, and the Department of the
Interior's manual at 512 DM 2, we readily acknowledge our
responsibility to communicate meaningfully with recognized Federal
Tribes on a government-to-government basis. In accordance with
Secretarial Order 3206 of June 5, 1997 (American Indian Tribal Rights,
Federal-Tribal Trust Responsibilities, and the Endangered Species Act),
we readily acknowledge our responsibilities to work directly with
Tribes in developing programs for healthy ecosystems, to acknowledge
that tribal lands are not subject to the same controls as Federal
public lands, to remain sensitive to Indian culture, and to make
information available to Tribes. We have coordinated the rule with the
affected Tribes and, furthermore, throughout several years of
development of earlier related rules and this rule, we have endeavored
to consult with Native American Tribes and Native American
organizations in order to both (1) provide them with a complete
understanding of the changes, and (2) to understand their concerns with
those changes. If requested, we will conduct additional consultations
with Native American Tribes and multitribal organizations subsequent to
this final rule in order to facilitate the transition to State and
tribal management of wolves within the WGL DPS. We fully considered all
of the comments on the proposed rule that were submitted by Tribes and
Tribal members during the public comment period and attempted to
address those concerns, new data, and new information where
appropriate.

Data Quality Act

    In developing this rule we did not conduct or use a study,
experiment, or survey requiring peer review under the Data Quality Act
(Pub. L. 106-554).

References Cited

A complete list of all references cited in this document is available on the Internet at http://www.regulations.gov or upon request from the Midwest Regional Office (see FOR FURTHER INFORMATION CONTACT).

Authors

    The primary authors of this rule are the staff members of the Midwest Regional Office (see FOR FURTHER INFORMATION CONTACT), with contributions from staff from Service Regions 2, 4, and 5. Staff from the Michigan DNR, Minnesota DNR, and Wisconsin DNR provided current information regarding wolves in their States. Staff from the Nelson Institute

[[Page 81725]]

for Environmental Studies at the University of Wisconsin-Madison compiled the current data on public attitudes toward the wolf.

List of Subjects in 50 CFR Part 17

    Endangered and threatened species, Exports, Imports, Reporting and recordkeeping requirements, Transportation.

Regulation Promulgation

    Accordingly, we hereby amend part 17, subchapter B of chapter I, title 50 of the Code of Federal Regulations, as set forth below:

PART 17--[AMENDED]

0
1. The authority citation for part 17 continues to read as follows:

    Authority: 16 U.S.C. 1361-1407; 16 U.S.C. 1531-1544; 16 U.S.C. 4201-4245; Pub. L. 99-625, 100 Stat. 3500; unless otherwise noted.


Sec.  17.11--[Amended]

0
2. Amend Sec.  17.11(h) by revising the entries for ``Wolf, gray'' and ``Wolf, gray [Northern Rocky Mountain DPS]'' under ``MAMMALS'' in the List of Endangered and Threatened Wildlife to read as follows:


Sec.  17.11  Endangered and threatened wildlife.

* * * * *
    (h) * * *

--------------------------------------------------------------------------
--------------------------------------------------------------------------
                        Species
Vertebrate population
-------------------------------------------------------  Historic range
where endangered or         Status    When listed    Critical     Special

```
        Common name             Scientific name
threatened                                  habitat      rules
---------------------------------------------------------------------------
---------------------------------------------------------------------------

Mammals
---------------------------------------------------------------------------
---------------------------------------------------------------------------
                                                        * * * *
* * *
Wolf, gray..................... Canis lupus........ Holarctic..........
U.S.A.: All of AL, AR,          E   1, 6, 13,              NA          NA.

CA, CO, CT, DE, FL, GA,             15, 35

KS, KY, LA, MA, MD, ME,

MO, MS, NC, NE, NH, NJ,

NV, NY, OK, PA, RI, SC,

TN, VA, VT and WV;

those portions of AZ,

NM, and TX not included

in an experimental

population as set forth

below; and portions of

IA, IN, IL, ND, OH, OR,

SD, UT, and WA as

follows:

(1) Southern IA, (that

portion south of the

centerline of Highway

80);

(2) Most of IN (that

portion south of the

centerline of Highway

80);

(3) Most of IL (that
```

portion south of the centerline of Highway 80);

(4) Western ND (that portion south and west of the Missouri River upstream to Lake Sakakawea and west of the centerline of Highway 83 from Lake Sakakawea to the Canadian border);

(5) Most of OH (that portion south of the centerline of Highway 80 and east of the Maumee River at Toledo);

(6) Western OR (that portion of OR west of the centerline of Highway 395 and Highway 78 north of Burns Junction and that portion of OR west of the centerline of Highway 95 south of Burns Junction);

019852A

(7) Western SD (that

portion south and west

of the Missouri River);

(8) Most of Utah (that

portion of UT south and

west of the centerline

of Highway 84 and that

portion of UT south of

Highway 80 from Echo to

the UT/WY Stateline);

and

[[Page 81726]]


(9) Western WA (that

portion of WA west of

the centerline of

Highway 97 and Highway

17 north of Mesa and

that portion of WA west

of the centerline of

Highway 395 south of

Mesa).

Mexico.
 Do............................ .....do............ .....do............
U.S.A. (portions of AZ,          XN         631         NA    17.84(k).

NM, and TX--see Sec.

17.84(k)).
Wolf, gray [Northern Rocky       Canis lupus........  U.S.A. (MT, ID, WY,
U.S.A. (WY--see Sec.             XN    561, 562           NA    17.84(i).
 Mountain DPS].                                       eastern WA,
17.84(i) and (n)).                                             17.84(n).
                                                     eastern OR, and

019853A

```
                                            north central UT).

                                                * * * *
* * *
-----------------------------------------------------------------------------
----------------------------------------------------------------------------

Sec.  17.40--[Amended]

0
3. Amend Sec.  17.40 by removing and reserving paragraph (d).


Sec.  17.95--[Amended]

0
4. Amend Sec.  17.95(a) by removing the critical habitat entry for
``Gray Wolf (Canis lupus).''

    Dated: December 13, 2011.
Daniel M. Ashe,
Director, U.S. Fish and Wildlife Service.
[FR Doc. 2011-32825 Filed 12-21-11; 11:15 am]
BILLING CODE 4310-55-P
```

# EXHIBIT HHH

Briging for Matt
3/28/05

## Option 1
downlist the listed entity in lower 48
remove error states in SE and CA/NV
delist in NE - choose best argument
1a - establish SW DPS

| Pros | Cons |
|---|---|
| 4(d) rules in place quickly | will delay delisting in GL - *need detailed wash* |
| consistent with recovery criteria | need to clearly describe threats to large area *State Management Plans* |
| consistent treatment of Canada wolves in NE | |
| manage dispersing wolves | |
| removes taxonomic/subspecies issues | |
| removes DPS issues | |
| fastest overall - one step | |

Decouple NE - Delist/List

Establish SW DPS
Leave Remaining areas/States endangered indefinitely
Delist some states as extinct?
Delist error states
Establish Recovery Plans for remaining areas/States

## Option 2
Establish and reclassify 2 DPS - dispersal
keep endangered outside DPSs
involves multiple sequenced actions

| Pros | Cons |
|---|---|
| Could delist GL quickly | remaining areas left unresolved |
| uses biological delineation | R2 might have to plan for recovery in remaining areas |
| Captures most dispersers | wolves in some states may be endangered forever |
| conduct threats analysis over smaller area | negative with some portion of the public - wolves not delisted |
| positive with some portion of public - wolves left protected forever | |

## Option 3
Option 2 - using State boundaries

| Pros | Cons |
|---|---|
| Could delist GL quickly | fewer options for managing dispersing wolves |
| threats analysis conducted on very small area | remaining States left unresolved |
| Strong State support from 6 states | negative with some portion of the public - wolves not delisted |
| positive with some portion of public - wolves left protected forever | wolves in some states may be endangered forever |





## Map 1 - Previous Listing

Endangered
in Mexico

## Map 2 - Proposed Listing

1  Western Distinct
   Population Segment

2  Western Great Lakes
   Distinct Population
   Segment

3  Northeastern Distinct
   Population Segment

4  Southwestern Distinct
   Population Segment
   (includes Mexico)



SW DPS
Extends Into
Mexico

## Map 3 - Final Listing

1  Western Distinct
   Population Segment

2  Eastern Distinct
   Population Segment

3  Southwestern Distinct
   Population Segment
   (includes Mexico)



SW DPS
Extends Into
Mexico