# EXHIBIT III



**BRIAN SCHWEITZER**
GOVERNOR



**DIRK KEMPTHORNE**
GOVERNOR

825220

March 30, 2005

The Honorable Gale A. Norton
U.S. Department of Interior
1849 C. Street N.W.
Washington, D.C. 20240

Dear Secretary Norton,

We understand the states of Wisconsin, Michigan, and Minnesota have written the Fish and Wildlife Service requesting immediate initiation of a focused delisting process to remove gray wolves from the endangered species list in their respective states. The states of Idaho and Montana would like to lend their voices to this timely request and offer our assistance and ideas.

Given Judge Jones' recent ruling in Oregon district court regarding the delineation and reclassification of Distinct Population Segments (DPS) for gray wolves, we would like to recommend alternate avenues for delisting recovered populations of wolves. As defendant intervenors in this case we respectfully request the Department of Interior collaborate with the five states that have complied with the delisting criteria to openly discuss both legal options to Judge Jones' decision and alternative delisting scenarios. Specifically, we recommend initiating a status review of wolves across the conterminous United States and delisting wolves in those areas that have healthy populations meeting or exceeding recovery goals and that have adequate regulatory mechanisms in place. It is our belief that the same federal/state partnership which proved so effective in creating the amended 10(j) rule for the Rocky Mountain experimental, non-essential wolf population can provide solutions to the legal and delisting questions we now face.

Much like the Great Lakes states, Idaho and Montana have for some time contained robust wolf populations that exceed the established delisting criteria. The Federal Recovery Plan for the Rocky Mountain Gray Wolf established the goal of 30 breeding pairs in the three state region (Idaho, Montana, and Wyoming) for three consecutive years. Not only has that goal been met, but also in 2004 the states of Idaho and Montana alone had 39 breeding pairs, and U.S. Fish and Wildlife Service approved state plans to manage a delisted wolf population.

Our proposal comports with ESA and provides critical relief to states that have nurtured and housed healthy populations of gray wolves while painstakingly developing regulatory

Collaboration Request
March 30, 2005
Page 2 of 2

frameworks for their conservation.  A working partnership with the federal government
gives incentive to those states with core populations to continue to conserve the gray
wolf, while also incenting states with peripheral range to encourage viable populations.

While we very much appreciate the new 10(j) rule, it is vital that we continue to work
toward the ultimate goal of delisting the gray wolf.  The year of 2004 saw another
increase in wolf depredations on livestock and domestic animals.  We echo the Great
Lakes states' concern that absent meaningful progress toward delisting, the fervor of the
anti-wolf movement will increase.

A meeting between these five states, the Department of Interior, and the Department of
Justice would be an important first step to achieving our mutual goal.  We propose the
parties select a date in late April to convene a meeting in Minneapolis.

Thank you for your time and consideration.

Sincerely,


BRIAN SCHWEITZER
Governor, State of Montana


DIRK KEMPTHORNE
Governor, State of Idaho


C:   Governor Jennifer M. Granholm, State of Michigan
     Governor Tim Pawlenty, State of Minnesota
     Governor Jim Doyle, State of Wisconsin
     Idaho Congressional Delegation
     Montana Congressional Delegation
     Michigan Congressional Delegation
     Minnesota Congressional Delegation
     Wisconsin Congressional Delegation
     Matt Hogan, USFWS
     Rebecca A. Humphries, Michigan DNR
     Gene Merriam, Minnesota DNR
     Scott Hassett, Wisconsin DNR

# EXHIBIT JJJ



**Ron Refsnider**

04/11/2005 07:23 AM

To: Clint Riley/AMBS/R9/FWS/DOI@FWS, Buddy
Fazio/R4/FWS/DOI@FWS, Eleanora Babij/ARL/R9/FWS/DOI@FWS,
Karen L Anderson/ARL/R9/FWS/DOI@FWS, Gloria
Bell/R4/FWS/DOI@FWS, John Fay/ARL/R9/FWS/DOI@FWS,
"Kristen.Gustafson@usdoj.gov" <Kristen.Gustafson@usdoj.gov>,
Tracy Scheffler/RO/R2/FWS/DOI@FWS, John
Morgart/RO/R2/FWS/DOI@FWS, Ed Bangs/R6/FWS/DOI@FWS,
Kathy Hollar/RO/R1/FWS/DOI@FWS, Michelle
Morgan/ARL/R9/FWS/DOI@FWS, TJ Miller/R3/FWS/DOI@FWS, Jill
Parker/R6/FWS/DOI@FWS, Chris Nolin/ARL/R9/FWS/DOI@FWS

cc: Laura Ragan/R3/FWS/DOI@FWS, Wendi Weber/R3/FWS/DOI@FWS,
(bcc: Ron Refsnider/R3/FWS/DOI)

Subject: ATTORNEY-CLIENT PRIVILEDED - DRAFT Summary of Marymount
Wolf Meeting & Options Paper

Here are the latest drafts of the Marymount documents. I've held off sending these out while awaiting
additional input from Margot, but these current drafts need to get to you. Sorry for the delay.

The "Options" paper probably will not change substantially, and so it can be treated as a final; Margot's
input is expected to be to the "Notes" document only.

---Ron

            

Marymount 2005 Notes - draft 8.c OPTIONS PAPER - Privileged, Predecisional - draft

**Attorney-Client Privileged/Attorney-Client Work Product**
**DRAFT 8**



# National Gray Wolf Meeting -- March 1-2, 2005
# Marymount University



1

**Attorney-Client Privileged/Attorney-Client Work Product**
**DRAFT 8**



## B. Control of Depredating and Other Problem Wolves

Various control options were discussed, but most time was spent on the use of 10(a)(1)(A) "recovery" permits, as section 6 take authority doesn't cover lethal control or permanent removal from the wild.

**Region 3** had issued a 10(a)(1)(A) subpermit to Wisconsin DNR (WI DNR) for limited lethal take of endangered wolves prior to the 2003 reclassification final rule. WI DNR has requested reissuance of that subpermit, as well as broader take authorities similar to those allowed by the 2003 4(d) rule. Region 3 has reissued a subpermit to WI DNR authorizing most of the pre-reclassification lethal take authorities, but that authority primarily covers livetrapping and translocation of depredating wolves. Verified second offenders (positive verification of a previous depredation) can be killed, up to 8 in 2005. WI DNR uses USDA-Wildlife Services as their agent. This subpermit gives no take authorization to private citizens.

Region 3 is considering a permit or subpermit to WI and MI DNRs (MI application was just received) covering lethal depredation control, perhaps as broad as that previously in the 4(d) rule.

**Region 6** plans to reissue their permit for lethal control in northwestern Montana and other areas, with similar provisions to what was used pre-reclassification.

**Region 1** received a request from Oregon for a permit or other authorization to remove depredating wolves under their recently completed wolf management plan. Question was raised on whether an over-riding federal recovery plan or control plan is needed; probably not, if state has its own plan which is adequate to conserve the wolf. *[discussion on this final point may have occurred outside of the meeting, during a break.]*



## C. Significant Portion of Range and Distinct Population Segments

[Much of the discussion under this topic appears elsewhere in this summary and is not repeated here.]



2

**Attorney-Client Privileged/Attorney-Client Work Product**
**DRAFT 8**



1.

2.

3.

D.

3

153

**Attorney-Client Privileged/Attorney-Client Work Product**
**DRAFT 8**

**E. Northeastern Wolves – How should we deal with the scientific uncertainty regarding the identity of the historical wolf in the northeastern states and adjacent Canada?**

Michael Amaral summarized the various theories regarding the identity of the historical wolf in the Northeast: (1) it was a form or subspecies of the gray wolf, possibly of hybrid (with the red wolf) origin; (2) it was the eastern Canadian wolf (*Canis lycaon*), which may include the red wolf as a second subspecies; and (3) there may have been two wolf taxa occupying the Northeast at different times, or simultaneously in different areas, with some overlap and hybridization possibly occurring. Because pre-European settlement wolf specimens are lacking, the controversy is not likely to be resolved in the near future, if ever. Until/unless it is resolved, the FWS cannot determine what, if any, wolf entity should be recovered in the Northeast under the ESA.

Taxonomic uncertainty, combined with the current lack of a wolf population in the Northeast, raises substantial questions regarding the validity of a wolf listing there. If we were considering listing wolves in the Northeast at this time, there may be insufficient information to support a new listing, although several potential entities for listing in the Northeast were discussed.

4

**Attorney-Client Privileged/Attorney-Client Work Product**
**DRAFT 8**

**Participants**

| | |
|---|---|
| Margot Zallen | USDI Office of the Solicitor, Denver, CO |
| Dave Gayer | USDI Office of the Solicitor, DC |
| Clint Riley | FWS Director's Office |
| Bud Fazio | FWS Region 4, Red Wolf Recovery |
| Elena Babij | FWS WO, Recovery |
| Karen Anderson | FWS WO, Candidate Conservation |
| Gloria Bell | FWS R4 RO Endangered Species |
| Laura Ragan | FWS R3 RO Endangered Species |
| John Fay | FWS WO Endangered Species |
| Kristen Gustafson | US Dept. of Justice |
| Tracy Scheffler | FWS R2 RO, Recovery |
| John Morgart | FWS R2, Mexican Wolf Recovery |
| Ed Bangs | FWS R6, Rocky Mtn. Wolf Recovery |
| Kathy Hollar | FWS R1 RO Endangered Species |
| Michelle Morgan | FWS WO, Recovery & Delisting |
| Ron Refsnider | FWS R3 RO Endangered Species |
| TJ Miller | FWS R3 RO Endangered Species |
| Jill Parker | FWS R6 RO Endangered Species |
| Ben Jesup | USDI Office of the Solicitor, DC |
| Mike Young | USDI Office of the Solicitor, DC |
| Chris Nolin | FWS WO, Conservation and Classification |
| Philip Kline (by phone) | USDI Office of the Solicitor, |
| Tony Sullins (by phone) | USDI Office of the Solicitor, Ft. Snelling, MN |

DRAFT 4
**Attorney-Client Privileged – Litigation Sensitive – Predecisional
Not for Release – FOIA Exempt**



# OPTIONS PAPER from Gray Wolf Meeting – March 1-2, 2005
# Marymount University

**How do we deal with possible wolves in the Northeast?**

**Options for the Northeast:**
1. Delist gray wolf due to extinction
   > Pros:
   > - They are extirpated from these states
   > - No threats analysis needed
   >
   > Cons:
   > - There have been occasional dispersers coming in, likely to continue.
   > - 
   > - 
   > - 
   > - 

2. Delist gray wolf there and list another wolf entity – *C. lycaon*, or an expanded red wolf listing – or list a gray wolf DPS.

   > Pros:
   > - Keeps options open for recovery in the Northeast, if it is deemed necessary.
   > - 
   > - DPS listing may provide additional time to resolve taxonomic issues
   > - 
   > - Broad support from peer reviewers of Eastern DPS delisting proposal
   >
   > Cons:
   > - No current wolf population in northeastern U.S.

1

DRAFT 4
**Attorney-Client Privileged – Litigation Sensitive – Predecisional
Not for Release – FOIA Exempt**
======================================================================

- Entity is uncertain, no consensus among wolf experts as to the identity of the historical wolf in the Northeast
- Difficult to describe the taxon to be listed, and there's no precedent for listing a taxon whose identity is uncertain.
- Likely would have to include Canada in the DPS or in a listing of *C. lycaon*, and wolves in Canada are not in trouble.

3. Delist because any NE wolves would be biologically linked to Canadian wolves (regardless of taxonomy), and the U.S. area is not significant to the Canadian wolf population.
   Pros:
   - Don't have to define U.S. entity
   - Consistent with the court ruling on the Arizona population of the cactus ferruginous pygmy owl. ████████████████████████████████████████
   ██████████████████████████████

   Cons:
   - Inconsistent with other areas, such as Minnesota and Northern Rockies where wolves are connected with Canadian populations, but we listed a separate U.S. entity.
   - ████████████████████████████████████████████████████████

4. Sever the Northeast at time of Midwest wolf reclass/delisting, and leave NE as a listed remnant under Reclassification/Delisting Options 2 and 3, below (because of unknown taxonomy).


**How do we move forward to change the legal status of the recovered populations?**
**Reclassification/Delisting Options**
   * In all of the options, we would retain population viability as the core of our approach through the threats analysis in all suitable habitat in major geographic areas.

**Option 1**: Downlist the gray wolf except for experimental population areas; delist because of error in SE and portions of CA/NV; delist in NE (include discussion of taxonomic issues, extinction, insignificance…).
   Option 1a:  Establish Southwest (SW) DPS/entity and keep endangered.

   Pros:
   - Can get 4(d) rules in place for more states relatively quickly in order to deal with problem wolves.
   - Consistent with current reclassification criteria in Eastern and Rockies wolf recovery plans.

DRAFT  4
**Attorney-Client Privileged – Litigation Sensitive – Predecisional**
**Not for Release – FOIA Exempt**

=================================================================

- More consistent treatment of Canadian wolves because of reasons given in NE Options 1 and 3 in Item E, above.
- Would be able to better manage most dispersing wolves within the U.S. because they would be Threatened and we could promulgate an appropriate 4(d) rule
- Removes taxonomic/subspecies issues as impediments to gray wolf reclassification and delisting
- Probably fastest overall because just one step.

Cons:

- ████████████████████████████████████████
- Will delay (perhaps significantly) delisting the recovered Great Lakes (GL) wolf population because must downlist first and then wait for West and maybe SW to achieve their delisting criteria.
- Questionable support for downlisting if SW is not a separate DPS
- ███████████████████████████████████████████
- ███████████████████████████████████████████
- Threats analysis has to be done over an extremely large area.

**Option 2**:  Establish and reclassify or delist 2 DPSs – West and Great Lakes – based on dispersal (core states + large dispersal area); initially keep endangered elsewhere; involves sequenced actions.

Pros:

- Recovery criteria satisfied so could delist in GL quickly, without reclassification step
- Uses biological delineation (dispersal data) for DPS boundaries
- Deals with most dispersers and allows for management of dispersing wolves in growing populations.
- Less risk on SPR issue because threats analysis conducted on smaller geographic areas.
- ███████████████████████████████████████████

Cons:

- ███████████████████████████████████████████
- ███████████████████████████████████████████
- Remaining areas left unresolved; future wolves there may remain endangered forever ████████████████████████████████████
- ███████████████████████████████████████████

3

- Public perception could be negative because wolves in some states may remain "endangered forever."

**Option 3**: Establish and reclassify/delist 3-state Western DPS (ID, MT, and WY); establish and reclassify/delist 3-state Great Lakes DPS (MN, WI, MI); both DPSs use state lines for boundaries, providing small dispersal distances beyond core populations; initially keep endangered elsewhere; involves sequenced actions.

Pros:

- Recovery criteria satisfied so could delist GL quickly, without reclassification step
- ██████████████████████████
- Strong state support from 6 core states
- ██████████████████████████
- Positive public perception because some states will have their wolves "protected forever."

Cons:

- Fewer options for managing dispersing wolves, as dispersal areas within the reclassified DPSs are much smaller than for Option 2
- Remaining states left unresolved; future wolves there may remain endangered forever, ██████████████████████████
- ██████████████████████████
- Remaining states not happy because legal status of future wolves there is unresolved – possibly endangered forever or forced to recover them
- ██████████████████████████
- Negative public perception because wolves in some states may remain "endangered forever."

**Future Steps for Options 2 and 3**:
- Decouple NE (do this somehow in either option) (step)
- Establish SW DPS (step or option)
- Leave remaining states endangered indefinitely (not a preference) (option)
- Delist remaining states as extinct (option)
- Establish recovery plan(s) for remaining states (However, this is contrary to FWS' understanding that the ESA focuses on long-term viability, rather than requiring the filling of all available habitat with the taxon.) (option)
- State management plans for remaining states – delist based on state plans eliminating threats (may need to do this in all states, at least temporarily) (option)
- Section 10 permits for remaining states (option)
- Combination of extinction/state management plans/recovery/section 10 permits (option)

DRAFT  4
**Attorney-Client Privileged – Litigation Sensitive – Predecisional**
**Not for Release – FOIA Exempt**
============================================================

**Other Issues/Options Discussed over the two days**:
1. Delist Error states (Southeast and parts of CA/NV)
   - Can be part of every option
   - 1st phase for options 2 and 3
   - Hard to draw lines for CA and NV.  May extend into AZ and UT.
   - Of questionable value if we have to do CA/NV separately▮▮▮▮▮▮▮▮▮▮▮
     ▮▮▮▮▮▮▮▮▮▮ It may not be a high priority then.



3. Revise delisting regulations
   - Add other ways to delist other then error, extinction, and recovery.  (e.g., range remnants that are not necessary for recovery).
   - How many species would this apply to?

   Pros:
   - Could clean up old listings

5

DRAFT 4
**Attorney-Client Privileged – Litigation Sensitive – Predecisional
Not for Release – FOIA Exempt**

========================================================================

- May come up with a way to not have to designate DPSs to remove remnants

Cons:
- █████████████
- Time and feasibility

4. Develop policy on SPR and relation to DPS

A logical approach that would provide a consistent standard for the Service to apply in its recovery programs; however, the Service is not likely to pursue this option at this time.

6

# EXHIBIT KKK

Attorney-Client Privileged -- Litigation Sensitive -- Not for Release -- FOIA Exempt
========================================================================

### Thoughts on Delineating a Gray Wolf DPS for Recovered Wolves
### in the Midwest Following the Ruling by the Oregon District Court

Judge Jones clearly stated his belief that Western Great Lakes gray wolf populations have recovered. ("The Western Great Lakes and Northern Rockies populations achieved the recovery goals…. Instead of drawing a line around the distinct populations in the Western Great Lakes and the Northern Rockies, FWS extended the boundaries from these cores areas to encompass the wolf's entire historical range.") Thus, while he disagreed with our DPS boundaries, the way we defined SPRs within each DPS, and our threats analysis for the SPRs, he did not seem to oppose downlisting/delisting gray wolves where appropriate, or the use of DPSs to do so.

The challenge is to decide where to draw DPS boundaries that include the core recovery areas as well as some portion of the dispersers from the core area population, while also complying with Judge Jones' ruling that we must assess threats to wolves in all SPR within the DPS.

So the DPS boundary decision needs to address two points:
- What is the wolf "population?" It must be discrete and significant to comply with our DPS policy. To what extent are dispersers part of the population?
- Are there SPRs outside the core recovery area that should have additional recovered wolf populations prior to delisting/downlisting the DPS? (to determine if the population in the DPS still fits the definition of T or E) If so, the potential DPS might be too large, or downlisting/delisting that DPS might be premature.

Areas routinely/regularly occupied by wolf packs are well documented in MN (2004 data), WI (2005), and MI (2005) = core recovery areas
Wolf reports in the 3 states beyond "core recovery areas" are very common; although many are of dubious validity, there is no doubt that numerous wolves move out of the core recovery areas, at least temporarily, into marginal or unsuitable habitat.
Longer-distance dispersers from the Great Lakes core wolf population have been verified by wolf carcasses or via other evidence from highly credible observers in ND, SD, MO, IL, IN, and the Lower Peninsula (LP) of MI. These animals all have been found in unsuitable habitat.

A population of mobile animals lacks a fixed and distinct geographical outer limit, as individuals and small groups are continually moving about in response to positive and negative influences (of both instinctual and environmental origin). These influences include seeking a mate, looking for suitable habitat, searching for food, avoiding competitors (both conspecifics and others), and fleeing from threats or other unsuitable conditions. Some of these movements will take the individuals/groups away from their natal population permanently, perhaps because of mortality resulting from the movement or perhaps because they successfully "settled" in a distant location. Alternatively, some of the moving individ/grps. may return to their natal population, to the same or a different site from their departure point.

The bottom line is that these movements – be they permanent long-distance dispersals or brief wanderings – make it impossible to draw a definitive boundary around a biological population (unless it is also surrounded by a barrier impermeable to the species). The movements create a biological boundary <u>zone</u>, rather than a boundary <u>line</u>, around populations.

1

Attorney-Client Privileged -- Litigation Sensitive -- Not for Release -- FOIA Exempt
=====================================================================

Dispersers that do not return to their natal population do not contribute to its viability/recovery, but they may make such contributions to other (or new) populations, by being population founders in unoccupied suitable habitat or by the demographic or genetic additions they provide to existing populations that they encounter and join.

"Returnees" may contribute to their natal population upon their return by distributing genetic material within the population and by demographically supplementing areas that may not have achieved biological carrying capacity.

[The "value" of dispersers at various times during recovery.] Thus, the biological value of extra-population and intra-population movements varies at different stages of population recovery. When the number of individuals is low and/or not all patches of local suitable habitat are occupied, dispersers are of enormous value in colonizing new areas nearby, supplementing new and struggling populations, and in minimizing genetic problems by increasing genetic diversity. [this benefit can also occur later if threats are very high and local extinctions occur]  However, later in recovery, when local recovery has been achieved and all nearby suitable habitat has been occupied, dispersers lose most or all of their value to the local recovery program.  They may continue to be important in establishing/supplementing populations in available suitable habitat that is beyond the recovery program, but within dispersal distance.  [but very limited situations like this in Midwest]
In the Western Great Lakes area, gray wolf dispersal from Minnesota and southern Ontario was the key to re-establishing populations in northern WI and the Upper Peninsula of Michigan. Subsequent dispersal resulted in the filling of most suitable habitat in those areas, as well as the establishment of a disjunct population of 50-plus wolves in central Wisconsin.  Dispersal will likely produce one or more wolf packs in the northern portion of Michigan's Lower Peninsular in the foreseeable future.  However, all gray wolf recovery goals in the Midwest (Under the ETW Rec. Plan) have been achieved and these dispersers are providing no additional recovery benefits.  Even if a wolf population becomes established in the LP, it will provide very little or no additional long-term security for the Great Lakes wolf population, because the habitat in the Northern LP is marginal, and the LP population's long-term survival will likely depend on continuing immigration of UP wolves.

Gray wolves have been documented to disperse 500 miles and more, and there is no reason to think their movements cannot be several hundred miles greater on rare occasions.  Such long dispersals probably don't occur frequently, but the fact that they do occur means that any attempts to delineate a DPS by including all dispersers would result in a huge DPS, perhaps of a size that would be rejected by Judge Jones' ruling.  Furthermore, DPS boundaries based on maximum dispersal distances (or even the 500-mile dispersers) will overlap neighboring gray wolf DPSs; e.g., straight-line 500-mile dispersal westward from the MN wolf population would take a wolf west of Glasgow and Miles City, MT; a similar eastward dispersal of a Yellowstone wolf would take it east of Bismarck, ND, or Pierre, SD.  [To avoid such overlapping DPSs, our 2003 final rule placed a DPS boundary midway between the N. Rockies recovery population and the Southwestern wolf population – roughly 250-350 miles between known wolf packs.]

**Attorney-Client Privileged -- Litigation Sensitive -- Not for Release -- FOIA Exempt**
=====================================================================

Defining a population so as to include all dispersers is impractical in most cases, as it results in a DPS with undefined outer limits, unless absolute barriers surround the population. Wolves are not subject to absolute barriers, and have repeatedly shown their ability to cross highways, rivers, etc.

Whether to include dispersers within a DPS would seem to depend upon the recovery value of those dispersers. If the core population is still recovering, they have value because they may return to a different part of the core populations [arguing for the same level of protection as the core population]. If the core population has recovered (as Judge Jones and FWS agree is the case for the WGL population) dispersers have little or no value to that population, and thus do not necessarily need similar protective status. For example, if there was another "nearby" recovery program that might benefit from stricter protection for dispersers from recovered population, consideration should be given to establishing a boundary between the recovered and recovering DPSs that maintained a high level of protection for the dispersers from both populations. However if there is no "nearby" recovering population, it may be best to downlist/delist most or all dispersers along with their natal population so that they can be managed by state or tribal authorities in a manner that complements the long-term conservation of the core recovery populations.

Such is the case with gray wolves in the Midwest. Currently there are no Federal, State, or Tribal wolf recovery programs – either in existence or planned – that are within reasonable dispersal distance of the core wolf populations in MN, WI, and MI. [In fact, the only nearby habitat that is even marginally suitable for establishing a wolf population is in the northern LP of MI, and perhaps in the Turtle Mountains on the ND – Manitoba border. More distant – and much more marginal habitat may exist in southern MO, southern IL, southern IN, southern OH, and in western and central PA. However, habitat is those areas is so marginal that at this time we cannot envision any Federal, state, or tribal plans to reintroduce or recover wolves in these areas.

[add discussion on northern Lower Peninsula wolf habitat; use Potvin thesis and Gehring and Potter in press; can hold a viable or semi-viable wolf population, but not needed to achieve or maintain recovery goals in Midwest, so threats to NLP wolves do not rise to the level of having any impact on the core recovery populations in MN, WI, or on the UP.]

[add very brief discussion of "island" nature of Turtle Mountains]

In the Midwest it boils down to this: We can easily map the area that is more or less full of wolves. Numerous dispersers are moving out of that core recovery area annually, but they provide negligible recovery benefit to the wolf populations already established in MN, WI, and MI. Furthermore, because other areas of unoccupied potentially suitable habitat are beyond reasonable dispersal distance, dispersers are highly unlikely to contribute to wolf recovery elsewhere. In reality, dispersers that are near the core recovery populations often will need to be actively managed and controlled to reduce their conflicts with humans in order to maintain public support for a recovered wolf population and to promote the long-term conservation of the species in the Midwest. Thus, rather than have continuing protection under the ESA, nearby dispersers need to be managed by the states and tribes as part of their long-term wolf management plans. In contrast, those dispersers who have moved a long distance beyond the

3

**Attorney-Client Privileged -- Litigation Sensitive -- Not for Release -- FOIA Exempt**
=================================================================================

core recovery areas have effectively ceased being part of that population, and will not be linked to it under ESA classification.

Therefore, this Western Great Lakes Gray Wolf DPS has been developed to include the core recovery areas, plus those adjacent areas into which most known dispersers have moved, but to stop short of protecting all of the long-distance dispersers. [For example, it does not include a know MN disperser that was found west of the MO R. in south central SD.] The dispersal zone of approximately 200 to 300 miles beyond the core occupied range [and potentially suitable habitat in the NLP that is likely to be occupied by wolves in the near future] is included in the DPS to facilitate the management of most dispersers by the states/tribes in such unsuitable or marginally suitable habitat where wolf-human conflicts are most likely to need management, while promoting continued conservation of the species in the core recovery areas to ensure long-term viability in the Western Great Lakes DPS. However, this DPS does not include (and hence will not result in the delisting of) wolves who have dispersed away from the core recovery areas in the WGL area, and who may be approaching marginally suitable habitat elsewhere.

Thus, the WGLDPS includes all of the states of Minnesota, Wisconsin, and Michigan; ND east of the MO River and U.S. Hwy. 83; SD east of the MO R.; all of Iowa; MO east and north of the MO R.; those parts of Illinois, Indiana, and western Ohio that are north of Interstate Hwy. 70, and eastern OH north of Interstate Hwys. 71, 76, and 80. Major rivers and highways are used in order to provide clear on-the-ground delineations of DPS boundaries in order to ease public understanding of wolf protections and to promote their enforcement by law enforcement personnel. Additional, such features function as partial barriers to dispersing wolves and thus serve to reinforce the discreteness of the DPS.

4

EXHIBIT LLL

Attorney-Client Privileged -- Litigation Sensitive -- Not for Release -- FOIA Exempt
==============================================================================

**Introductory Discussion on Drawing DPS boundaries for Gray Wolves .....**

General: The Act and our DPS Policy provide limited guidance for selecting the locations of DPS boundaries. They provide the authority to list and treat "distinct population segments of any species of vertebrate" just like a species or subspecies, and require that the boundaries of the DPS enclose an area that contains a vertebrate population that is discrete from others of the same taxon and is significant to the taxon of which is a part. The DPS Policy provides that marked separation, rather than total isolation, is sufficient to meet the discreteness criterion, and it provides several examples of evidence of significance. [Contrary to common belief, the Policy contains no prohibition on the use of state boundaries or other political delineations for DPS boundaries; rather, the DPS Policy only prohibits the use of state boundaries to establish discreteness, in contrast to its allowance of international boundaries to establish discreteness. If a population is discrete due to other factors, there is no prohibition against using state boundaries to geographically define the DPS.]

[50 CFR 17.3 defines a "population" to be "a group of fish or wildlife in the same taxon below the subspecific level, in common spatial arrangement that interbreed when mature." However, this definition has some problems in meshing with biology, as plants are also grouped into "populations". Furthermore, members of a *species* can constitute a biological population, so this definition should not restrict populations to below subspecies level. And the "interbreed when mature" requirement has its own suite of problems (parthenogenic organisms; limited opportunities for individuals to breed across all demes of metapopulations, etc.) This definition appears to be obsolete and should be used with great caution, or not at all, in DPS decisions.]

The meager guidance in the Act and DPS Policy establishes the only requirements for the geographic location for DPS boundaries: **they must surround a vertebrate population that is markedly separate from other populations.** [The complaint by NWF et al v. Norton (in VT District Court) and Judge Jones' ruling in Defenders v. Norton (Oregon District Court) both raise the possibility that the existence of a "population" might not be a requirement for establishing a DPS, but there has been no ruling on this point. I firmly believe that a DPS cannot be established without the presence of a "P," simply by reason of the plain meaning of the words in the phrase "distinct population segment."]

[Judge Jones, in his January 31, 2005, ruling in *Defenders et al. v. Norton et al.* expressed his opposition to the large gray wolf DPSs that FWS established in 2003. However, his concern was not with the size of the DPSs *per se*; rather he struck down the large DPSs because FWS had not assessed the threats to gray wolves in all significant portions of the range within the DPSs. Instead, FWS had limited its threats assessments to the much smaller areas within the DPSs where FWS had restored gray wolves. The question of whether Judge Jones would have accepted the large DPSs, if supported by broader threats assessments, remains unresolved.]

Therefore, the FWS has a great deal of discretion in establishing the precise boundary of the DPS. The boundary can be placed anywhere between the population that is the subject of the DPS and any other populations of the same taxon - Period! [If the two populations abut, this suggests they are not "markedly separate."]

**Attorney-Client Privileged -- Litigation Sensitive -- Not for Release -- FOIA Exempt**
==================================================================

Because there are no other guidelines or requirements, it is difficult to see how FWS could be found to be "arbitrary and capricious" even if we established DPS boundaries based entirely on non-biological considerations.  However, because the ESA's goal is to recover rare species and then return their management to the states and tribes, there are several biological factors and non-biological factors that should generally play a role in DPS boundary decisions.  The relative importance of these factors will vary from species to species, and will also depend upon whether the DPS is being established at the time of initial listing of the taxon or as part of a downlisting or delisting action.

A. Population Factors
   1. What is the biological population within the DPS?
   2. Where is the population's biological boundary?
   3. Is the population discrete and significant in compliance with DPS Policy?
   4. What about dispersers and extra-population movements of individuals and small groups?
B. Habitat Factors:
   1. Is there unoccupied suitable, marginally suitable, or potentially suitable habitat nearby?
   2. Is there … ditto … at a greater distance, but within range of dispersers?
   3. Is such habitat important to the establishment of a viable population in the DPS?
C. Recovery Factors:
   1. Can recovery be achieved within the DPS boundary under consideration?
   2. Is there another existing or planned FWS recovery program for the taxon nearby?
   3. Is there an existing or planned state or tribal recovery program nearby?
D. Management Factors:
   1. Would future state/tribal management of a viable recovered and delisted population in the DPS benefit from one boundary location over other locations?
   2. If states/tribes have completed FWS-supported species management plans, can DPS boundaries be established in a manner to facilitate these plans?
E. Enforcement Factors:
   1. Is the DPS boundary easily located "on the ground" by the public?
   2. ditto… by law enforcement agents?


**… discussion will continue by using revised/expanded text from the previous draft to explain how these factors can be used in DPS boundary establishment, both in general, and as applied specifically to gray wolf DPSs in Midwest.**

# EXHIBIT MMM

**projectmail**                                                    GWD 269

| | |
|---|---|
| **From:** | Peggy Struhsacker [Struhsacker@nwf.org] |
| **Sent:** | Monday, June 26, 2006 12:45 PM |
| **To:** | WGLwolfdelist@fws.gov |
| **Subject:** | WGL wolf delisting comments |

Please find attached comments submitted by National Wildlife Federation.
Thank you.
Peggy

NWF's mission is to inspire Americans to protect wildlife for our children's future.

Peggy Struhsacker
NWF Wolf Team Leader
NNRC -58 State Street
Montpelier, VT 05602
802-229-0650 / cell: 802-272-1244
struhsacker@nwf.org



**NATIONAL WILDLIFE FEDERATION.**

GWD·269

June 14, 2006

WGL Wolf Delisting
U.S. Fish & Wildlife Service
Whipple Federal Building
1 Federal Drive
Ft. Snelling, MN 55111-4056

RIN 1018-AU54

The National Wildlife Federation ("NWF") was founded in 1936 as the national voice of state and local conservation groups, and has since emerged as the nation's foremost grassroots conservation organization, leading an integrated network of members and supporters and 47 affiliated organizations throughout the United States and its territories. NWF and our affiliate organizations in Wisconsin, Minnesota and Michigan have been involved in gray wolf conservation issues for three decades.

NWF appreciates the opportunity to comment on the U.S. Fish & Wildlife Service's ("FWS") proposed delisting of gray wolves in the Western Great Lakes region and submits the following comments on the proposed rule *Designating the Western Great Lakes Population of Gray Wolves as a Distinct Population Segment and Removing the Western Great Lakes Distinct Population Segment of the Gray Wolf from the List of Endangered and Threatened Wildlife*, 71 Fed. Reg. 15266, March 27, 2006 ("Proposed Rule"). We specifically request that this letter, all attachments and documents referred to in this letter be included in the administrative record for this matter.

Based on our review of the Proposed Rule and the management plans of Wisconsin, Michigan and Minnesota that describe how the gray wolf will be managed following delisting, NWF fully supports the FWS proposal to delist wolves in the Western Great Lakes ("WGL") distinct population segment. The recovery of gray wolves in the Western Great Lakes is an Endangered Species Act ("Act") success story. This success story has resulted from federal protection of the gray wolf, but ultimately from the support and cooperation of the people and state agencies of the states of Wisconsin, Minnesota and Michigan. Indeed, wolf recovery has been so successful that wolves in the WGL no longer need the protections the Act provides. Delisting is based upon the Secretary's application of five statutory listing/delisting factors:

1. The present or threatened destruction, modification, or curtailment of its habitat or range;
2. Overutilization for commercial, recreational, scientific, or educational purposes;
3. Disease or predation;

4.  The inadequacy of existing regulatory mechanisms; or
5.  Other natural or manmade factors affecting its continued existence.

GWD·209

16 U.S.C. § 1533(a)(1)(A)-(E); 50 C.F.R. § 424.11(c) (2002). Each factor carries equal weight and must be considered individually and in combination with the other factors. 50 C.F.R. § 424.11(c). Delisting based on recovery can only be made "if the best scientific and commercial data available indicate that [the species] is no longer endangered or threatened." 50 C.F.R. § 424.11(d)(2). Here the best available data indicate that delisting is appropriate, but the continued success of the species depends upon the ability of the states to carry out their wolf management plans—an ability that hinges upon adequate funding. Below are NWF's specific comments regarding the Proposed Rule.

**Current Wolf Populations**

The wolf population numbers in the Western Great Lakes have not only met the recovery goals in the FWS recovery plan for the Eastern Timber Wolf (1992), they have greatly exceeded those original goals. The FWS established a recovery goal of 1,250 – 1,400 wolves in Minnesota in order to ensure genetic diversity for the population over the long term. The most recent monitoring survey in 2004 showed a population point estimate of 3,020 wolves (90% confidence interval of 2,301 to 3,708 wolves), more than double the recovery goal.

The FWS also established a recovery goal for a second viable wolf population outside of Minnesota that would have at least 100 wolves if located within 100 miles of the Minnesota wolf population or at least 200 wolves if located more than 100 miles from the Minnesota wolf population. Notably, the wolf populations in Wisconsin and Michigan have each exceeded the 200 wolf goal for the last 7 years. Indeed, as of the 2006 winter count, over 800 wolves total were counted in Wisconsin and Michigan.

The success of the wolf populations in Wisconsin and Michigan is a testament to both the health of the Minnesota wolf population and the efficacy of the Endangered Species Act.

**State Management Plans**

The wolf management plans of Michigan (1997), Wisconsin (1999) and Minnesota (2001) all provide effective tools for ensuring the continued vitality of the WGL wolves.

The 5-year review and update process for the Wisconsin plan is near completion. The management changes that are being proposed for approval by the state's Natural Resources Board later this month should not have a negative impact on the long-term survival of wolves in Wisconsin. The initial Michigan plan focused on wolf recovery; now that wolf numbers have recovered, the plan is in process of comprehensive review and revision with focus on management of the recovered wolf population. Public participation is a major component of this review process, including participation in a Roundtable, which will meet for the first time this month.

The Departments of Natural Resources of Minnesota, Wisconsin and Michigan have demonstrated that they are committed not only to the biological recovery of the wolf populations

**Comment [CR1]:** The following sentence was deleted because it can be construed to be misleading. It suggests that the Minnsota woes are regularly dispersing into those states, whereas there ave only been 1 or 2 wolves that have been found in each of the states listed below, which is not much of a dispersal.

**Deleted:** ¶

**Comment [CR2]:** major changes include increasing the distance for trapping depredating wolves from 1/2 mile to 1 mile and deleting protection of rendezvous sites.

in their respective states and to wolf research, but also to providing useful information to the public about wolves in order to foster positive attitudes about wolves and reduce wolf/human conflicts.

GWD·269

## Funding

Although the state plans call for continued collaring/monitoring of wolves and public outreach and education after delisting, as a practical matter the budgets for these activities in all three states are under increased pressure. The ongoing ability of the wildlife managers to carry out the on-the-ground provisions of the plans will likely be negatively affected without additional resources. This danger has not been appropriately addressed by the FWS proposal; to the contrary, FWS has made clear that Federal funding for wolf monitoring will "likely decline" and "ultimate[ly] terminat[e]. Therefore we urge the FWS to recognize the funding limitations of these states and to *provide allocations specifically for wolf conservation* so that the long-term survival of wolves is not compromised.

*In the unlikely event that wolf populations in the WGL Distinct Population Segment ("DPS") fall below the recovery targets in the 1992 recovery plan, the gray wolf could and should be relisted and be provided the full protection of the Endangered Species Act.*[1] *Should this come to pass, NWF would fully support relisting the wolf in the WGL.*

## Western Great Lakes Distinct Population Segment Designation

NWF also supports the FWS designation of the Western Great Lakes DPS. The area and states included within this DPS are reasonable calculations of wolf dispersal patterns. Unlike previous proposals that violated the language of the ESA involving distant population segments and significant portion of the range, in this proposal much of the DPS boundary is based on where Western Great Lakes wolves have *actually* dispersed, rather than speculation on where they could go under particular circumstances, no matter how geographically distant.

The WGL DPS is an appropriate delineation precisely because wolves currently residing in this DPS have all dispersed from the original population of wolves in Minnesota. From that original group, wolves have dispersed and established viable populations in both Wisconsin and the Upper Peninsula of Michigan and have been seen in the eastern Dakotas and Illinois – other states which are included in the WGL DPS. The current boundaries of the WGL DPS are appropriate not only because wolves in the future will presumably expand their range into these areas, but *because they already have*. To the degree this is the case, the WGL DPS is based not on conjecture, but on good science.

## Post – Delisting Monitoring

Sectoin 4(g)(1) of the Act, requires FWS to implement a system, in cooperation with the States, to monitor for not less than 5 years the status of the species. Post-delisting monitoring is essential to the continued viability of the species, and places an expensive burden upon state and Tribal management efforts. In the past, Minnesota, Wisconsin and Michigan's monitoring

---

[1] In that case, the Service could exercise its authority of emergency listing under section 4(b)(7).

GWP·269

practices have been supported by "significant assistance from numerous partners, including the U.S. Forest Service, National Park Service, USDA-APHIS-Wildlife Services, Tribal natural resource agencies, and the Service." As the state agencies assume primary responsibility for monitoring, allocations from FWS will be necessary to ensure that adequate monitoring occurs. Section 4(g) mandates not only monitoring, but "effective" monitoring for a **minimum** of five years.[2]

We want to emphasize the importance of ensuring that the post-delisting monitoring period is of a biologically meaningful duration such that it allows for the early detection of declining populations. We further emphasize the importance of ensuring that the post-delisting monitoring plan allows for timely and adequate management responses in the event of a significant downward change in populations or an increase in threats on a scale that endangers population viability.

**National Recovery Plan for the Gray Wolf**

Though NWF supports the delisting of the WGL DPS, NWF continues to object to the Service's failure to develop a recovery plan for the entire species of the gray wolf. Section 4(f)(1) of the ESA provides that "the Secretary shall develop and implement [recovery] plans for the conservation and survival of endangered species and threatened species listed pursuant to this section." 16 U.S.C. § 1533(f)(1). FWS has recognized the need for a National Recovery Plan for the Gray Wolf as opposed to a piecemeal approach, yet it has failed to prepare one. Without a National Recovery Plan, the Service cannot determine whether protecting existing species is sufficient, or whether restoration is required to achieve recovery. Section 4(f)(1)'s recovery plan requirement is a mandatory, nondiscretionary duty that the Secretary must fulfill.

The Services' continued refusal to develop a National Recovery Plan will jeopardize the sustained recovery of the gray wolf throughout its range. Although the Service has prepared a recovery plan for each of the DPS, this fragmented approach does not establish the "basic road map to recovery" envisioned by the ESA. See Fund for Animals v. Babbit, 903 F.Supp. 96, 103 (D.D.C. 1995). Therefore, NWF's acquiescence in this delisting is tempered by its concern over the lack of a National Recovery Plan.

**Conclusion**

Gray wolves are and will continue to be a species that is difficult to manage in the modern landscape. Where the provisions of the Act serve to recover a species such as the wolf, delisting is appropriate both because the species is no longer in need of the Act's protection and also because doing so provides confidence for other reintroduction efforts and confirms that the Act does, in fact, work.

---

[2] Section 4(g)(1): "The Secretary shall implement a system in cooperation with the States to monitor **effectively** for not less than five years the status of all species which have recovered to the point at which the measures provided pursuant to this chapter are no longer necessary" (emphasis added).

GWD·209

For these reasons, NFW fully supports the FWS proposal to designate a Western Great Lakes distinct population segment for gray wolves and to delist those wolves from the list of Endangered and Threatened Wildlife.

Thank you again for the opportunity to comment on this important proposal.

Andy Buchsbaum
Director, Great Lakes Natural Resource Center

Margaret Struhsacker
NWF's Wolf Project Leader



June 23, 2006                                          **GWD   291**

WGL Wolf Delisting
U.S. Fish and Wildlife Service
Whipple Federal Building
1 Federal Drive
Fort Snelling, MN 55111-4056                      CAG RECEIVED

Subject:       WGL Wolf Delisting; RIN 1018-AU54      JUL 0 3 2006

On behalf of Defenders of Wildlife ("Defenders") and our nearly 500,000
supporters, including more than 85,000 in the Western Great Lakes states, we
thank you for the opportunity to comment on the U.S. Fish and Wildlife Service's
("Service") proposal designating the Western Great Lakes (WGL) population of
gray wolves as a distinct population segment (DPS) and removing the WGL DPS
of the gray wolf from the list of endangered and threatened wildlife.

Defenders of Wildlife is a non-profit, conservation organization that has a long
and extensive involvement in wolf restoration and protection in North America.
Defenders of Wildlife is a science-based advocacy organization focused on
conserving and restoring native species and the habitat upon which they depend.
Since 1947, Defenders of Wildlife staff and members have been directly involved
in making gray wolf recovery a reality in the lower 48 states.

We commend the Service and the states of Minnesota, Wisconsin, and Michigan
for their wolf management, which has enabled the wolf population within the
western Great Lakes region to increase from less than 1,000 to nearly 4,000
individuals in this portion of their former range. However, while great progress
has been made towards wolf recovery in these states, we do have some concerns
about this proposal and believe that state wolf management plans must be
reviewed in light of the proposed delisting. Our comments and questions are as
follows:

I.      WHETHER THE WESTERN GREAT LAKES GRAY WOLF
POPULATION QUALIFIES AS A LISTABLE ENTITY AS A DISTINCT
POPULATION SEGMENT

We acknowledge that the western Great Lakes gray wolf population may
constitute a DPS as that term is defined by the Service/NMFS DPS policy. We
find scientific and legal justification for the boundaries established for this newly
created DPS.

First, there is no doubt that this wolf population is discrete from the population in
Canada based on an international boundary that demarcates differences in control

**National Headquarters**
1130 Seventeenth Street, NW
Washington, DC 20036-4604
Telephone: 202-682-9400
Fax: 202-682-1331
www.defenders.org

1

Printed on Recycled Paper



GWD·291

of exploitation, conservation status and regulatory mechanisms, and we concur that morphological differences seem to distinguish the wolves of the western Great Lakes from other wolf populations (e.g., on average, western Great Lakes wolves are smaller in size and weight than the gray wolf populations in the northern Rockies, etc.).

We also agree that this population is separate from other wolf populations due to geographic factors. Nearly 600 miles separate the wolf packs within the proposed WGL DPS from the nearest wolf packs in the northern Rockies.

Second, there can be no question that the western Great Lakes gray wolf population is exceedingly significant to the taxon as a whole. As one of only three existing gray wolf populations in the coterminous U.S., the western Great Lakes gray wolf population is absolutely critical to the species' conservation in the U.S.

Moreover, this population persists in an ecological setting that is vastly different from the wolf populations in the northern Rockies and southwest. For example, all three regions differ in climate, vegetation, topography and prey. Wolves in the western Great Lakes are thus significant not only for the gap in range their loss would cause but also for the unique ecological setting in which they reside.

## II.    WHETHER DELISTING IS WARRANTED FOR THE WESTERN GREAT LAKES GRAY WOLF POPULATION

The standard for delisting and reclassifying species and distinct populations under the Endangered Species Act ("ESA") is the same as that which governs listing determinations (*see* 50 C.F.R. § 424.11.). The ESA requires the Secretary to determine, "based upon the best scientific and commercial data available," whether a species is endangered or threatened because of any one or a combination of five factors: (1) the present or threatened destruction, modification, or curtailment of its habitat or range; (2) overutilization for commercial, recreational, scientific, or educational purposes; (3)disease or predation; (4) the inadequacy of existing regulatory mechanisms; and (5) other natural or manmade factors affecting its continued existence." (16 U.S.C. § 1533(b)(1)(A); 1533(a)(1).)

As we review the five delisting factors, we have noted concerns with the delisting proposal for the following reasons:

A. The Inadequacy of Existing Regulatory Mechanisms

1. Minnesota Wolf Management Plan

National Headquarters
1130 Seventeenth Street, NW
Washington, DC 20036-4604
Telephone: 202-682-9400
Fax: 202-682-1331
www.defenders.org

2

Printed on Recycled Paper



GWD·291

We continue to have significant concerns regarding portions of Minnesota's wolf management plan, primarily the reinstatement of a $150 bounty to be offered to certified predator controllers for the taking of problem wolves. This provision is similar to the bounties that nearly exterminated the species from this region in the early twentieth century. Furthermore, the timeframe that control measures may be administered is very broad and may not target problem wolves. Within Zone A, the alleged wolf protection zone, wolf control areas can be set up for 60 days and in Zone B, the timeframe is not regulated at all.

In addition, the two zone divisions established within the state management plan will allow the taking of wolves by individuals if wolves are considered to be a threat, with threat defined as the perception that wolves are "stalking, attacking, or killing livestock, a guard animal or a domestic pet." The term "stalking" is a more obscure description of behavior and virtually anyone could claim they believe a wolf was "stalking" their livestock, if observed in the vicinity of their farm. Absent more precise definition of the term "threat" and elimination of the bounty to be paid for killing problem wolves, it is not clear that the Minnesota plan is an adequate regulatory mechanism for protecting wolves in the absence of the ESA.

2. Management Plan Updates

Although management plans in Wisconsin and Michigan have been reviewed by the Service, both plans are currently up for their five-year review. Those reviews should be completed and the plans revised as discussed below before delisting proceeds.

According to this proposed rule, the Wisconsin Wolf Management Plan should not change significantly and will be completed mid – 2006. For the plan to be adequate, Defenders believes that the following provisions currently included in the state management plans must be retained: no state hunting of wolves for recreational purposes for several years after delisting, assisting livestock producers with identifying and implementing non-lethal methods to prevent conflicts with wolves, intense monitoring of wolf populations in each of the states and continued monitoring of disease, maintaining coyote closure zones during deer hunting, maintaining protections for wolf dens and rendezvous sites, penalizing illegal killing of wolves, and continuing public education about wolves.

The current Michigan Gray Wolf Recovery and Management Plan also contains favorable components that should be retained, including: closure of coyote season in the Upper Peninsula during the November firearm deer season to prevent the killing of wolves misidentified as coyotes, maintaining large tracts of land with low human densities, and restricting land use around dens and pup rendezvous

**National Headquarters**
1130 Seventeenth Street, NW
Washington, DC 20036-4604
Telephone: 202-682-9400
Fax: 202-682-1331
www.defenders.org

3

Printed on Recycled Paper



GWD·291

sites, administering periodic surveys to gauge the public's attitudes towards wolves, and advocating non-lethal approaches to reduce livestock losses and the resultant conflict.

However, the Michigan plan was created when few wolves inhabited the state and several wolf management elements are absent within the plan. The current plan does not contain specific criteria regarding actions to be taken in response to wolf depredations or any type of potential population management methods to be implemented. These guidelines should be added.

Additionally, the Michigan plan does not contain any management guidelines for wolves dispersing into the northern Lower Peninsula. Recent verified wolf sightings confirm wolves have dispersed from the Upper to the Lower Peninsula. The revised Michigan plan must address this dispersal.

We are also concerned that the population goals in all three states not be decreased during plan revisions. Currently, the Minnesota, Michigan and Wisconsin plans identify wolf population goals or minimums for each of the states at 1,600, 200 and 350 respectively. These are modest goals, especially in Michigan and Wisconsin, and any reduction in population levels will threaten the long-term viability of wolves in this region.

Furthermore, while Tribes with wolves on or near Reservations have informed the Service of their wolf management intentions, none of them has completed wolf management plans. 71 Fed. Reg. at 15298. These plans should be created and reviewed before the Service removes federal protections in the WGL DPS.

3. The Inclusion in the WGL DPS of Portions of Six States That Do Not Contain Current Wolf Populations Included in the WGL DPS

The proposed DPS expands the region designated as the WGL to include states that do not currently contain established wolf populations, including the part of North Dakota that is north and east of the Missouri River upstream as far as Lake Sakakawea and east of Highway 83 from Lake Sakakawea to the Canadian border; the part of South Dakota that is north and east of the Missouri River; the parts of Iowa, Illinois, and Indiana that are north of Interstate Highway 80; and the part of Ohio north of Interstate Highway 80 and west of the Maumee River (at Toledo). 71 Fed. Reg. at 15274.

The proposal effectively documents the dispersal distances of wolves in the three core states and justifies the various landscape barriers providing clear borders that will provide barriers to prevent further movement. None of the states outside of the core states has a wolf management plan in place. In fact, some states do not even have state laws that will offer any protections for individuals dispersing into

**National Headquarters**
1130 Seventeenth Street, NW
Washington, DC 20036-4604
Telephone: 202-682-9400
Fax: 202-682-1331
www.defenders.org

4

Printed on Recycled Paper

GWD·291



these areas. We recommend that the Service require these states to develop state management plans and establish laws offering state-wide protections for gray wolves before delisting wolves in those states. Historically, wolves dispersing from the core states into the neighboring states are killed in collisions with vehicles or shot by hunters because they are mistaken for coyotes. These factors will impede any future dispersal and natural establishment into these states. For this reason, these neighboring states should also adapt public education efforts to educate the public about wolves that may potentially disperse into their states.

4. Risk of State Management Plans Becoming Unfunded, and Therefore Unenforceable.

Before the Service can consider creating and delisting a WGL DPS, the Service must be assured that adequate funding will be available to implement and enforce the wolf conservation measures set forth in the Michigan, Minnesota and Wisconsin state management plans. Moreover, because state funding of wolf management programs is key to the long-term success of the recovery efforts, only the funded aspects of the state management plans can be properly considered in the Services' delisting calculus. In other words, the Service cannot rely on unfunded provisions of the plans or otherwise meaningless regulatory mechanisms to justify the delisting of a WGL DPS. Funding is necessary to assure appropriate monitoring of the wolf population as it changes over time.

5. Monitoring of Delisted Populations

Currently, wolf populations face several threats, such as disease, illegal killings and other forms of human-caused mortality. In the absence of federal protections, additional threats will be introduced in the form of wolf management tools. Several potential control methods have been identified in the state management plans that could be implemented upon delisting, including lethal control in response to conflicts between wolves and livestock or humans, proactive lethal control when state population goals are achieved, and public harvest. For this reason, it is imperative that states continue to intensively monitor population size using several monitoring forms, including radio telemetry, snow tracking and wolf sign surveys and not only rely on the ad hoc method used by the state of Minnesota. It will also be crucial that the public education efforts identified in the proposal are implemented by the states.

B. Disease or Predation

The proposal documents several diseases that historically played a role in decreasing or curbing population growth. Health monitoring of wolves will need to be continued as threats caused by the spread of disease will continue to be a problem. Furthermore, as wolf populations continue to disperse, disease

National Headquarters
1130 Seventeenth Street, NW
Washington, DC 20036-4604
Telephone: 202-682-9400
Fax: 202-682-1331
www.defenders.org

5

Printed on Recycled Paper



GWP.291

occurrences may increase as populations are introduced to new diseases and increased contact with domestic canids occurs.

## IV. ADDITIONAL ISSUES REQUIRING CONSIDERATION BY THE SERVICE.

### A. Post Delisting Population Monitoring

Before the Service may delist the WGL DPS, it must develop and implement an effective post-delisting monitoring plan. Pursuant to section 4 of the ESA, the Service must "implement a system . . . to monitor effectively for not less then five years the status of all species which have recovered" and have been delisted. 16 U.S.C. § 1533(g)(1). This section also mandates that the Service "shall make prompt use of the [emergency listing] authority . . . to prevent a significant risk to the well being of any such recovered species." *Id.* § 1533(g)(2).

The Proposal states "[t]he goal of post-delisting monitoring is to confirm that a delisted species does not require relisting as threatened or endangered after removal of the Act's protections." 71 Fed. Reg. at 15303 (Emphasis added). This, however, misstates the fundamental purpose of a post-delisting monitoring plan. A species may only be delisted when the "best scientific and commercial data available . . . substantiate that it is neither endangered or threatened." 50 C.F.R. § 424.11(d). Thus, the post-delisting monitoring requirement should not be seen as a means to check that the Service was justified in delisting the species, rather it provides the mechanism to ensure that any future threats to the species' continued recovery that arise are identified and addressed. Indeed, the objective of a monitoring plan is "to detect declines in measures of population status in time to reverse or stabilize population trends, and therefore keep the [species] from becoming threatened or endangered." *See* FWS, Responses to Comments on the Monitoring Plan for the American Peregrine Falcon A Species Recovered Under the Endangered Species Act, December 2003. In this instance, because one of the most significant threats to the gray wolf is the inadequacy of regulatory protections, this objective should include the detection of the removal of regulatory protections which would thereby allow for the unsustainable take of large numbers of wolves.

As the Service is ultimately responsible for the successful implementation of this monitoring plan, the Service must establish, with specificity, every element of the plan. First, the Service must catalog which entities, both federal and state, will be involved in operation and management of the plan. This will require the Service to define personnel resources that will be committed, and enumerate the authority and duties these individuals will have. Defining these roles is vital because the Service will have the task of coordinating the efforts of not only its staff, but personnel from many different state agencies. The Service must also specify what

**National Headquarters**
1130 Seventeenth Street, NW
Washington, DC 20036-4604
Telephone: 202-682-9400
Fax: 202-682-1331
www.defenders.org

6

Printed on Recycled Paper



GWD·291

resources it expects the States to provide and establish an effective way to monitor that these resources will be available when needed. Finally, the Service must establish how the plan will be funded and how these funds will be distributed among the various partners in the plan.

The Service must also establish a specific methodology that will be used in this program to ensure that high quality usable information is generated. Therefore, the Service must establish, with particularity, the parameters that will be measured, the specific protocols that must be followed, the geographic scope of the monitoring, the frequency with which the monitoring will occur and the type of analysis that will be conducted.

Specifically, the parameters chosen should reflect the potential threats to the wolf's continued recovery. The Service states that the monitoring plan will assess not only "population number and trends" but will also "evaluate post delisting threats, in particular human caused mortality, disease, and implementation of legal and management commitments." 71 Fed. Reg. at 15303. While the factors enumerated by the Service are certainly important, this does not go far enough. Other specific biological factors that will determine the wolf's chance for continued recovery, including amounts of available, suitable and occupied habitat, must also be monitored. In addition, other factors such as the wolf's use of habitat in areas that may increase the likelihood of the wolf-human interactions, such as agricultural areas should be tracked. Moreover, the monitoring plan must contain mechanisms to gage non-biological factors such as the status of state protective measures and the general acceptance of wolves among the residence of the states where wolves are found or may disperse.

Furthermore, the development of specific protocols governing the collection of the relevant data is required to ensure that effective analysis is possible. The Service clearly intends to rely on the states to perform the majority of the survey effort. *See* 71 Fed. Reg. 15303. However, the states' survey efforts are not uniform, even within the few states that have organized survey efforts. Id. (Wisconsin and Michigan have conducted "Minnesota-type" surveys on a "trial basis"). The Service must ensure at the outset that the data collection protocols are standardized, so that the information obtained will be useable.

The plan must account for threats that may affect the continued recovery of the gray wolf within all of the states throughout the WGL DPS. The Service must also be certain to establish specific criteria by which both the health of the species and any potential, future threats can be measured. These specific, numeric and narrative criteria must take into account all of the parameters to be monitored by the Service and must reflect both expected and desired goals for the species, throughout the monitoring period. For example, the Service must establish numeric criteria, not only for population size, but also population trend and

**National Headquarters**
1130 Seventeenth Street, NW
Washington, DC 20036-4604
Telephone: 202-682-9400
Fax: 202-682-1331
www.defenders.org

7

Printed on Recycled Paper



GWD·291

dynamics, along with habitat requirements. Moreover, development of specific numeric and narrative criteria which can be used to assess the potential effect of the removal of existing state regulatory measures, and the effect these actions will have on population size and distribution as well as the total human-caused take of individuals, is required.

In turn, these criteria should be used in the development of "triggers," which if met would require the Service to take some action to protect the species. These triggers should be established not only at a levels where relisting would occur, but also a levels where the Service would take action, in coordination with the states, to address threats that may arise. The threshold level for these action triggers should be sensitive enough to allow the Service to respond to changes in the wolf's population or other biological parameters that indicate that species may be in decline, or even if it is not growing at an expectable rate. Moreover, triggers should be established to require action in response to new threats, such as the removal of state regulatory protections that may arise and jeopardize the species continuing recovery.

The Service must complete and implement a final, comprehensive monitoring plan before the WGL DPS is delisted. In developing the plan, the Service should continue the past practice of releasing a draft monitoring plan for public review and comment. In doing so, the Service will benefit from public input and comments on the types of parameters to be measured and the appropriate threshold levels for the triggers.

## V. SUMMARY.

Defenders agrees that the gray wolves in the western Great Lakes area qualify for designation as a DPS. However, the Service must ensure that adequate regulatory mechanisms are in place to ensure that continuing and future threats against the wolf have been addressed. Accordingly, the Service should ensure the development of wolf conservation and management plans by state and tribal governments in compliance with the ESA, prior to reduction or removal of federal protections for wolves in the WGL DPS.

Defenders acknowledges the achievements of the partnerships among the Service, the state agencies and the conservation organizations in recovering wolves in the Great Lakes states of Minnesota, Michigan and Wisconsin. We appreciate these efforts to pursue wolf recovery that ensures the species' long-term survival. Furthermore, the wolf recovery accomplishments in this region demonstrate the important role the Endangered Species Act plays in recovering imperiled species.

Thank you for the opportunity to provide comments on the Service's proposed designation of a WGL DPS for gray wolves. If you have any questions about

**National Headquarters**
1130 Seventeenth Street, NW
Washington, DC 20036-4604
Telephone: 202-682-9400
Fax: 202-682-1331
www.defenders.org

8

Printed on Recycled Paper



GWD·291

these comments, please contact Gina Schrader at (202) 772-3238 or
gschrader@defenders.org.

Sincerely,

Jamie Rappaport Clark
Executive Vice President

**National Headquarters**
1130 Seventeenth Street, NW
Washington, DC 20036-4604
Telephone: 202-682-9400
Fax: 202-682-1331
www.defenders.org

9

Printed on Recycled Paper

8256