Exhibit 1

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PUBLIC EMPLOYEES FOR ENVIRONMENTAL RESPONSIBILITY, <u>et al.</u>, | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) Civil Action No. 10-1067 (RBW) (DAR) ) |
| WALTER CRUICKSHANK, <u>et al.</u>, | ) Consolidated with: ) |
| Defendants, | ) Civil Action No. 10-1073 ) Civil Action No. 10-1079 |
| CAPE WIND ASSOCIATES, LLC, | ) Civil Action No. 10-1238 ) |
| Intervenor. | ) ) |
| ALLIANCE TO PROTECT NANTUCKET SOUND, <u>et al.</u>, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| SALLY JEWELL, <u>et al.</u>, | ) ) |
| Defendants, | ) ) |
| CAPE WIND ASSOCIATES, LLC, | ) ) |
| Intervenor. | ) ) |
| TOWN OF BARNSTABLE, MASSACHUSETTS, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| SALLY JEWELL, <u>et al.</u>, | ) ) |

|                                                  |   |
| ------------------------------------------------ | - |
| Defendants,                                      | ) |
|                                                  | ) |
| CAPE WIND ASSOCIATES, LLC,                       | ) |
|                                                  | ) |
| Intervenor.                                      | ) |
|                                                  | ) |
| THE WAMPANOAG TRIBE OF GAY HEAD (AQUINNAH)       | ) |
|                                                  | ) |
| Plaintiff,                                       | ) |
|                                                  | ) |
| v.                                               | ) |
|                                                  | ) |
| WALTER CRUICKSHANK, et al.,                      | ) |
|                                                  | ) |
| Defendants,                                      | ) |
|                                                  | ) |
| CAPE WIND ASSOCIATES, LLC,                       | ) |
|                                                  | ) |
| Intervenor.                                      | ) |

## ORDER

On September 3, 2014, the parties appeared before the Court for what the Court had intended to be a short status conference regarding a briefing schedule for the filing of supplemental summary judgment motions in this matter with the hope that this protracted litigation could be brought to an end in the near future.  But history should have forewarned that any attempt to bring this protected litigation to an expeditious conclusion would prove difficult. So it was no surprise that the litigious history of this litigation would reemerge and thwart the Court's intention, and result in the Court having to entertain oral arguments in response to the PEER Plaintiffs' Notice of Objections to the Adequacy of the Administrative Record Pertaining to the Remanded Decisions ("Pls.' Objections to the R."), which the Court construes as a

"motion to supplement the [administrative] record."[1]  Upon careful consideration of the parties'

submissions,[2] as well as their arguments presented to the Court during the September 3, 2014

hearing, the Court will deny the plaintiffs' motion to supplement the administrative record.

## RELEVANT BACKGROUND

After an initial round of summary judgment briefing, the Court remanded this case to the

Fish and Wildlife Service ("FWS") and the National Marine Fisheries Service ("NMFS") for

additional agency action on two matters.[3]  See Pub. Emps. for Envtl. Responsibility v. Beaudreu,

_ F. Supp. 2d. _, _, No. 10-cv-1067(RBW/DAR), 2014 WL 985394, at *42 (D.D.C. Mar. 14,

2014).  Specifically, the Court instructed the FWS on remand to "make an independent

determination about whether the feathering operational adjustment was a reasonable and prudent

measure,"[4] id., because "[w]ithout any indication [in the administrative record] that the FWS in

fact made an independent determination about whether the adjustment was appropriate, the Court

---

[1]  Hereinafter, the "PEER plaintiffs" will be referred to as the "plaintiffs" for purposes of this Order.  The Court reluctantly accepts the plaintiffs' invitation to "treat this filing as a motion to supplement the record and resolve it as such prior to the initiation of summary judgment briefing."  Pls.' Objections to the R. at 3 n.2.

[2]  In addition to the filings already mentioned, the Court considered: (1) [The] Federal Defendants' Response to Plaintiffs' Notice of Objections to the Administrative Records Pertaining to the Remanded Decisions ("Defs.' Resp. to Pls.' Objections to the R."); (2) [The] PEER Plaintiffs' Reply in Support of Their Objections to the Adequacy of the Administrative Record Pertaining to the Remanded Decisions ("Pls.' Reply"); (3) [The] Supplemental Notice of Violations of the Endangered Species Act in Connection With the Remanded Decisions Required in Public Employees for Envt'l Resp. et al. v. Cruickshank et al., Civ No. 10-1067 (RBW/DAR) ("Pls.' Supp'l Notice"); (4) [The] Defendants' Joint Motion to Set a Briefing Schedule and to Limit the Scope of Supplemental Summary Judgment Briefing ("Defs.' Mot. to Limit"); (5) [The] PEER Plaintiffs' Response to Defendants' Joint Motion to Set a Briefing Schedule and to Limit the Scope of Supplemental Summary Judgment Briefing ("Pls.' Resp. to Limit"); (6) [The] Defendants' Joint Reply in Support of Their Motion for Entry of a Briefing Schedule and to Limit the Scope of Supplemental Summary Judgment Briefing ("Defs.' Reply"); (7) [The] Notice of Completion of Remands by [the Federal Defendants] ("Notice of Remands"), ECF No. 390; and (8) [The] Administrative Record on Remand by [the Federal Defendants] ("Administrative R."), ECF No. 397.

[3]  Because this Order is specifically intended for the parties' to this case, the Court will dispense with a detailed recitation of the facts and only restate those facts necessary to resolve the plaintiffs' motion.

[4]  The FWS considered the operational adjustment in an incidental take statement that was included with its 2008 biological opinion regarding roseate terns and piping plovers bird species.  See Pub. Emps. for Envtl. Responsibility, _ F. Supp. 2d at _, _, 2014 WL 985394, at *7-8, *25.  The FWS ultimately decided against implementing the adjustment.  See id. at *8.

cannot infer that such a determination ultimately factored into the FWS's decision," id. at *25.

The Court also instructed the NMFS on remand to "issue an incidental take statement for the take

of right whales along with its [2010] biological opinion," id. at *30, see also id. at *42, despite

the fact that the biological opinion stated that the Cape Wind project[5] was "not likely to

adversely affect right whales," as "the NMFS did not state that incidental take would not occur

or was not anticipated," id. at *29 (ellipses and internal quotations omitted).  Having addressed

the two matters remanded to the NFS and NMFS, the defendants have provided the Court with a

revised administrative record amassed by the FWS and the NMFS.[6]  See Notice of Remands,

ECF No. 390; Administrative R., ECF No. 397.  Upon review of this administrative record, the

plaintiffs have not only lodged objections to the adequacy of the record, but they have also

expressed their intent to amend their complaint to assert additional claims against the defendants.

See Pls.' Objections to the R. at 5-13; Pls.' Supp'l Notice at 11-12.

As to their argument concerning the inadequacy of the FWS administrative record, the

plaintiffs deem it incomplete because it does not include the plaintiffs' "extensive submissions"

that were sent "to the Director and Regional Director of [the FWS]" demonstrating that the "best

scientific and commercial data . . . now available[,] clearly support the imposition of modest

temporary shutdown measures to minimize collisions of [r]oseate terns and [p]iping plovers."

Pls.' Objections to the R. at 5 (internal quotations omitted); see also id. at 6-7 (describing

substance of their submissions).  Because these submissions were "indisputably received by,"

and thus were "'before' the FWS when the agency made its decision on remand" regarding the

---

[5]  The intervenor-defendant, Cape Wind Associates, LLC ("Cape Wind"), the architect of the Cape Wind project, seeks to make the Nantucket sound, a body of water located off the coast of Massachusetts, the home of one of the largest offshore wind projects in the world.  Id. at *6-7.

[6]  As used in this Order, the "administrative record" is meant to encompass the administrative record as amended by the agencies on remand.

operational adjustment, the plaintiffs urge the Court to supplement the FWS administrative

record with those documents.  Id. at 7, 8-10; see also Pls.' Reply at 2-6.

Likewise, the plaintiffs complain that the NMFS omitted materials that were before the

agency when it issued an incidental take statement for right whales.  Pls.' Objections to the R. at

11-13; Pls.' Reply at 3-6.  According to the plaintiffs, the NMFS administrative record omits

documents concerning "a recent rulemaking conducted by [the] NMFS pursuant to the Marine

Mammal Protection Act ('MMPA')."  Pls.' Objections to the R. at 11; see also id. at 13.  In

addition, the plaintiffs complain that the NMFS administrative record is lacking "comments

submitted by the PEER [p]laintiffs on the MMPA rulemaking."  Id. at 12.  Alternatively, the

plaintiffs contend that the Court should consider all of the plaintiffs' various submissions as

extra-record evidence in assessing the supplemental summary judgment submissions.  Id. at 13;

Pls.' Reply at 5-6.

Finally, given these alleged omissions, inter alia,[7] the plaintiffs represented their intent to

amend their complaint to include six new claims—which they want to brief in the supplemental

summary judgment submissions—against the defendants for their alleged violations of Section 7

of the Endangered Species Act ("ESA"), 16 U.S.C. § 1536 (2012), related to the agencies'

decisions made on remand.  See, e.g., Pls.' Supp'l Notice at 11-12 (identifying claims).

## LEGAL ANALYSIS

### I.      The Plaintiffs' Motion To Supplement The Administrative Record

"[A]bsent clear evidence to the contrary, an agency is entitled to a presumption that it

properly designated the administrative record."  Calloway v. Harvey, 590 F. Supp. 2d 29, 37

---

[7] The plaintiffs have alleged several reasons why an amended complaint is appropriate at this juncture.  See, e.g., Pls.' Supp'l Notice at 11-12.  But the Court will not analyze each and every reason the plaintiffs have provided.  As explained herein, the Court will let the plaintiffs determine which claims they believe should be briefed in their supplemental summary judgment submissions in light of this Order.

(D.D.C. 2008) (Walton, J.). However, in exceptional cases, this presumption of regularity may be rebutted and the Court may either (1) supplement an incomplete record with materials that were before the agency and were considered directly or indirectly by the agency decisionmaker, or (2) permit the introduction of "extra-record evidence." Marcum v. Salazar, 751 F. Supp. 2d 74, 78 (D.D.C. 2010) (emphasis added). The Court will address each exception in turn.

### A.      Whether Supplementation of the Administrative Record is Proper

Parties are prohibited from supplementing an administrative record "unless they can demonstrate unusual circumstances justifying a departure from this general rule." Tex. Rural Legal Aid, Inc. v. Legal Servs. Corp., 940 F.2d 685, 698 (D.C. Cir. 1991). To rebut the presumption of regularity, the party seeking supplementation must "put forth concrete evidence that the documents it seeks to 'add' to the record were actually before the decisionmakers." Marcum, 751 F. Supp. 2d at 78; WildEarth Guardians v. Salazar, 670 F. Supp. 2d 1, 5 (D.D.C. 2009) (citations omitted). Conclusory statements will not suffice; rather, the plaintiff "must identify reasonable, non-speculative grounds for its belief that the documents were considered by the agency and not included in the record." Marcum, 751 F. Supp. 2d at 78 (quoting Pac. Shores Subdivision Cal. Water Dist. v. U.S. Army Corps of Eng'rs, 448 F. Supp. 2d 1, 6 (D.D.C. 2006)) (internal quotation marks omitted). "A party moving to supplement the administrative record 'must do more than imply that the documents at issue were in the [agency's] possession'; they 'must prove that the documents were before the actual decisionmakers involved in the determination.'" Ivy Sports Medicine, LLC v. Sebelius, No. 11-cv-1006(RLW), 2012 WL 5248176, at *1 (D.D.C. Oct. 24, 2012) (quoting Sara Lee Corp. v. Am. Bakers Ass'n, 252 F.R.D. 31, 34 (D.D.C. 2008)). If the party can present such proof showing that an agency "did not include materials that were part of its record, whether by design or accident, then

supplementation is appropriate." Marcum, 751 F. Supp. 2d at 78; see also Natural Res. Def.

Council, Inc. v. Train, 519 F.2d 287, 292 (D.C. Cir. 1975) (holding that review of a "partial and

truncated record" by the district court was error, and remanding the case for review "on the

entire administrative record").

### 1. The FWS Administrative Record

With respect to the FWS's decision to not include the feathering operational adjustment

as a reasonable and prudent measure in the incidental take statement for roseate terns and piping

plovers, the plaintiffs complain that their two 2014 submissions should have been included in the

FWS administrative record because the FWS had an obligation to make its decision using the

best scientific and commercial data available when the decision to strike the operational

adjustment from the incidental take statement was made following the Court's remand. Pls.'

Objections to the R. at 5-6. The plaintiffs' argument relies entirely on the theory that the "first"

time the FWS made an independent determination about the adjustment was following the

remand. Id. at 9 n.3; Pls.' Reply at 2-5. And the plaintiffs posit that the best scientific and

commercial data available regarding whether to include the adjustment in the incidental take

statement was reflected in the plaintiffs' submissions. Pls.' Objections to the R. at 6-9; Pls.'

Reply at 3-4. The defendants argue that as a threshold matter, while the plaintiffs' submissions

may have been "before" the FWS, the FWS must have a legal obligation to review them.[8] The

Court agrees with the defendants, concurring with the parties who—in a rare moment of

agreement—advised the Court at the September 3, 2014 hearing, that its analysis should be

---

[8] Except for Defenders of Wildlife v. Kempthorne, 535 F. Supp 2d. 121 (D.D.C. 2008), discussed herein, the cases cited by the plaintiffs, see Pls.' Objections to the R. at 4-5, 8-10; Pls.' Reply at 5-6, do not bear on this nuanced issue.

guided by <u>Defenders of Wildlife v. Kempthorne</u>, 535 F. Supp. 2d 121 (D.D.C. 2008).  <u>See</u> Defs.'
Resp. to Pls.' Objections to the R. at 5-7; Pls.' Reply at 3.

In <u>Defenders of Wildlife</u>, the plaintiffs had previously filed suit challenging a 1998 FWS
decision to not list the Florida black bear ("black bear") under the Endangered Species Act.  535
F. Supp. 2d at 123, 124.  In a 2001 summary judgment opinion, a former member of this Court
remanded the case to the FWS because a FWS 1998 decision "did not satisfactorily explain why
the black bear did not warrant protection due to the inadequacy of existing regulatory
mechanisms."  <u>Id.</u> at 124.  The Court found "it was unclear whether the regulatory mechanism
cited in the 1998 [FWS] [d]ecision were in effect at the time of the decision, or whether they
were instead future or speculative regulatory mechanisms . . . that had not yet been enacted."  <u>Id.</u>
And the Court noted that it was "impermissible for the [FWS] to rely on future or speculative
regulatory mechanisms."  <u>Id.</u>  After the Court's remand in 2004, the FWS explained that its 1998
decision to not list the black bear was based on regulatory mechanisms in existence as of that
time.  <u>Id.</u>

Subsequent to the 2004 FWS decision, the plaintiffs filed suit against the FWS again,
contending that the Court's 2001 summary judgment opinion required FWS "to analyze
regulatory mechanisms that were in effect in 2004, as opposed to 1998," <u>id.</u> at 126, and thus the
use of "the regulatory mechanisms that were in effect in 1998 did not constitute [use of] the best
available scientific and commercial data that were available in 2004," <u>id.</u> at 127 (internal
quotations omitted).  The Court disagreed with the plaintiffs, explaining that the 2001 summary
judgment opinion remanded the 1998 FWS decision "for clarification as to whether the
regulatory mechanisms that were in effect in 1998 adequately protected the black bear."  <u>Id.</u> at
126; <u>see also</u> <u>id.</u> at 127.  Accordingly, the Court's remand "did <u>not require</u> the [FWS] to make a

wholly new determination as to whether to list the black bear." Id. at 127 (emphasis added).

Thus, the FWS did not need "to rely on the best available data when reexamining or clarifying an

earlier determination." Id. at 128 (emphasis in original).

Of critical importance to the motion now before the Court is that the Court in Defenders

of Wildlife arrived at its conclusion, notwithstanding the fact that the FWS "include[d] some

post-1998 data in footnotes throughout the 2004 [d]ecision," id. at 127 n.4, and the fact that

"there was some language indicating that the [FWS] 'determined,' in 2004, that the black bear

was not a threatened species," id. at 128 n.5. On the latter point, the Court found the use of the

term "determined" in "2004 d[id] not constitute a new determination." Id. (emphasis added).

"Rather, [the Court concluded that] this language [wa]s responsive to the 2001 [summary

judgment] [o]pinion's mandate that the [FWS] confirm that, taking all future regulatory

mechanisms out of the calculus, it still would find regulatory mechanisms that existed in 1998

adequately protected the black bear." Id.

Here, the FWS decision to not adopt the operational adjustment was not a "wholly new

determination." Defenders of Wildlife, 535 F. Supp. 2d at 127 (emphasis added). In the Court's

summary judgment opinion, the Court explained that was "it [wa]s not clear from the reasonable

and prudent measures issued by the FWS that its ultimate decision was based on its independent

determination, or whether the FWS merely deferred [that decision] to determinations made by"

third parties. Pub. Emps. for Envtl. Responsibility, _ F. Supp. 2d at _, 2014 WL 985394, at *25.

Thus, the opinion stated that if the FWS could provide some "indication that the FWS in fact

made an independent determination about whether the [feathering operational] adjustment was

appropriate, the Court [could then] infer that such a determination ultimately factored into the

FWS's decision." Id. The Court is now satisfied that the FWS has demonstrated that it first

made an independent determination to not adopt the operational adjustment in 2008 and not in

2014.

   For example, the administrative record includes a declaration from the FWS "[s]ervice

employee responsible for decision-making on remand" that it has notified the Bureau of Ocean

Energy Management[9] ("BOEM") about its "independent rationale that confirmed our prior

decision not to include the feathering measure in the [incidental take statement]."  Administrative

R., ECF No. 397-2, Exhibit ("Ex.") 2 (Declaration of Paul R. Phifer Certifying the U.S. Fish and

Wildlife Service's Administrative Record on Remand ("Phifer Decl.")) ¶¶ 5, 6 (emphasis added);

see also id., ECF No. 397-3, Ex. 3 (Phifer Letter to BOEM ("Phifer Letter")) at 2 (amending the

incidental take statement administratively "to remove any suggestion that we may have simply

delegated our authority . . . to BOEM and [Cape Wind] in making our decision about the

[adjustment]").  Based on the current administrative record, the Court cannot conclude that the

FWS made a "wholly new determination" requiring the FWS to consider the plaintiffs'

submissions of post-2008 data.  Defenders of Wildlife, 535 F. Supp. 2d at 127.  To the contrary,

the record now shows that no "wholly new" incidental take statement was issued by the FWS

following the remand.  The FWS has demonstrated that it was merely "reexamining or clarifying

an earlier determination" as the FWS did in Defenders of Wildlife.  Id. at 128 (emphasis in

original).[10]  Accordingly, the FWS did not need to consider and rely on what the plaintiffs

---

[9]  BOEM was the lead federal agency responsible for coordinating Cape Wind's effort with other federal agencies to obtain the necessary permits for the project.  See Pub. Emps. for Envtl. Responsibility, _ F. Supp. 2d at _, 2014 WL 985394, at *7.

[10]  The plaintiffs concede that if this were a case—which the Court finds it is—where "the court remanded for an agency to supply a further explanation for a decision previously made," then consideration of their 2014 submissions is unnecessary.  Pls.' Objections to the R. at 9 n.3.

contend was the best scientific and commercial data available after the Court issued its summary judgment opinion and remanded the case to the FWS.  See id.

The plaintiffs do not appear to dispute that the FWS relied on data from 2008 to arrive at its decision to remove the adjustment from the incidental take statement.  See Pls.' Objections to the R. at 7-8.  Rather, the plaintiffs take issue with the FWS's inclusion of some "new information" post-dating 2008 in the administrative record.  Id. at 7-8 (emphasis in original); see also Pls.' Reply at 3-5.  But the inclusion of post-2008 materials in the administrative record does not necessarily lead to the conclusion that the FWS made a "wholly new determination" justifying supplementation of the record.  See Defenders of Wildlife, 535 F. Supp. 2d at 127 n.4 (acknowledging that the agency's decision contained footnotes that alluded to post-decision data); Administrative R., ECF No. 397-3, Ex. 3 (Phifer Letter) at 2 ("our analysis of the [feathering operational adjustment as a reasonable and prudent measure] relies on the information available to us when we finalized the [2008 biological opinion] and [incidental take statement]" (emphasis added)).  As the defendants represented at the September 3, 2014 hearing, the post-2008 materials in the FWS administrative record reflect an additional analysis of the decision to leave out the adjustment in the incidental take statement.  Of course, no additional analysis could be done if an analysis was not undertaken in the first instance.[11]  See Administrative R., ECF No. 397-2, Ex. 2 (Phifer Decl.) ¶ 6 (declaring that the FWS conducted an "independent rationale that confirmed our prior decision not to include the feathering measure in the [incidental take statement]" (emphasis added)); id., ECF No. 397-3, Ex. 3 (Phifer Letter) at

---

[11]  To the extent that the plaintiffs suggest there is some language in the administrative record suggesting that a new determination was made, see Pls.' Reply at 4, that alone is not a reason for the Court to alter its conclusion.  See Defenders of Wildlife, 535 F. Supp. 2d at 128 n.5.  The Court interprets any such language as being "responsive" to the Court's remand.  Id.; see also Administrative R., ECF No. 397-3, Ex. 3 (Phifer Letter) at 1 (issuing "purely administrative amendment in response to [the Court's summary judgment opinion]").

2 ("administratively amend the [incidental take statement] to remove any suggestion that we may have simply delegated our authority . . . to BOEM and [Cape Wind] in making our decision about the [adjustment]").  In short, because the Court concludes that the FWS did not have an obligation to consider the plaintiffs' submissions, the record will not be supplemented.

## 2. The NMFS Administrative Record

According to the plaintiffs, the NMFS administrative record is missing documents that it relied upon when it issued the right whale incidental take statement "for the first time."  Pls.' Objections to the R. at 10-11.  In particular, the plaintiffs cite a memorandum which allegedly states that the right whale incidental take statement "is supported by a recent rulemaking conducted by [the] NMFS pursuant to the Marine Mammal Protection Act . . . ."  Id. at 11.  As a result, the plaintiffs contend that these MMPA "proposed and final rules were 'directly considered' by [the] NMFS in reaching its decision on the [r]ight whale [incidental take statement]."  Id. (emphasis in the original) (internal ellipses omitted).  They further note that the NMFS administrative record also does not include "comments submitted by the PEER [p]laintiffs on the MMPA rulemaking."  Id. at 12.  The defendants oppose the plaintiffs' attempt to have the NMFS record supplemented.  Defs.' Resp. to Pls.' Objections to the R. at 9-13.

Here, the presumption of regularity afforded to the agency's record has not been rebutted.  Most importantly, the Court only instructed the NMFS on remand to render a right whale incidental take statement consistent with its 2010 biological opinion.  Pub. Emps. for Envtl. Responsibility, _ F. Supp. 2d at _, 2014 WL 985394, at *30 (remanding case to the NMFS to "issue an incidental take statement for the take of right whales along with its biological opinion" (emphasis added)).  The NMFS undoubtedly accomplished what the Court ordered on remand.  See Administrative R., ECF No. 397-1, Ex. 1 (Transmittal Memorandum With Amended

Incidental Take Statement For the 2010 Cape Wind Biological Opinion ("Incidental Take Statement Mem.")) at 4 (observing that 2010 NMFS biological opinion "concluded" that Cape Wind project "was not likely to adversely affect right whales and that incidental take was not likely to occur"); id. at 5 ("address[ing] the [C]ourt's remand order" by "amending" the corresponding incidental take statement to state that no take of right whales was anticipated and "setting the incidental take amount at zero" for the right whale).

Despite following the Court's instruction on remand, the plaintiffs remain unsatisfied. They complain that the NMFS ignored relevant materials that were "indisputably 'before' the agency," but were not considered when the right whale incidental take statement was issued.[12] Pls.' Objections to the R. at 10-12; Pls.' Reply at 2-4. Thus, they argue that these materials should have been included in the NMFS administrative record. Pls.' Objections to the R. at 10-12; Pls.' Reply at 2-4. Specifically, the plaintiffs point out that the NMFS administrative record contains a memorandum which describes a MMPA rulemaking proceeding that the NMFS allegedly relied on in issuing a right whale incidental take statement. Pls.' Objections to the R. at 11. Additionally, the plaintiffs note that as part of the MMPA process, they submitted information that was potentially "adverse to NMFS's decision" regarding the right whale incidental take statement. Id. at 12. For several reasons, the plaintiffs' contentions fail.

First, as the defendants correctly observe, and the plaintiffs do not argue otherwise, that the plaintiffs' allegedly omitted materials were not "before" the actual decisionmakers in the

---

[12] To the extent that the plaintiffs are arguing that these materials contain the best scientific and commercial data available at the time the NMFS issued the right whale incidental take statement, see Pls.' Reply at 3, this argument is misplaced. As already explained, the Court remanded the case to the NMFS to issue a right whale incidental take statement that was consistent with its 2010 biological opinion which already determined that the Cape Wind project "was not likely to adversely affect right whales and that incidental take was not likely to occur." Pub. Emps. for Envtl. Responsibility, _ F. Supp. 2d at _, 2014 WL 985394, at *30. In accordance with Defenders of Wildlife, the Court agrees that the NMFS did not have to consider the best scientific and commercial data available following the remand, as it was "reexamining or clarifying an earlier determination." Id. at 128 (emphasis in original).

NMFS, i.e., those NMFS personnel specifically handling the remand issue regarding the right whale incidental take statement. Defs.' Resp. to Pls.' Objections to the R. at 13 (identifying NMFS Office of Protected Resources in Silver Spring, Maryland as handling the MMPA issue and the NMFS regional office in Gloucester, Massachusetts as handling the Court's remand regarding the right whale incidental take statement); see also Linemaster Switch Corp. v. U.S. E.P.A., 938 F.2d 1299, 1305-06 (D.C. Cir. 1991) (refusing to find that material submitted to the EPA was "before" the agency where material was sent to an EPA regional office "in Boston pursuant to an unrelated administrative consent order between the company and the agency" and it was "never submitted . . . to [the] EPA's Hazardous Site Evaluation Division, which was conducting the entirely separate . . . rulemaking proceeding in Washington, D.C."); Marcum, 751 F. Supp. 2d at 78 (supplementing permissible when there is "concrete evidence that the documents it seeks to 'add' to the record were actually before the decisionmakers"); WildEarth Guardians, 670 F. Supp. 2d at 5 (citations omitted).

Second, to conclude that the NMFS "directly considered" the MMPA proceeding and the submissions made by the plaintiffs in that proceeding in amending the incidental take statement to include right whales, see Pls.' Objections to the R. at 11-12, would require a strained reading by the Court of the NMFS memorandum.[13] This it will not do. The NMFS memorandum merely explains the "the interplay of the ESA and the MMPA." Administrative R., ECF No. 397-1, Ex. 1 (Incidental Take Statement Mem.) at 7; Defs.' Resp. to Pls.' Objections to the R. at 14-15. The fact that the MMPA proceeding was referenced in the NMFS memorandum, without

---

[13] The plaintiffs citation of the amended incidental take statement is unavailing. Pls.' Reply at 4 n.1 (citing Administrative R., ECF No. 397-1, Ex. 1 (Incidental Take Statement Mem.) at 16). The language clearly indicates that "certain mitigation measures" will have to be undertaken to "further reduce the risk of taking marine mammals" pursuant to the MMPA, and not the ESA. Administrative R., ECF No. 397-1, Ex. 1 (Incidental Take Statement Mem.) at 19. From no fair reading of this sentence, can there be an implication that the incidental take statement for the right whale relied on the "mitigation measures" identified as part of the MMPA proceeding.

even mentioning the plaintiffs' submissions in the proceeding, does not create an opportunity for

the plaintiffs to supplement the administrative record.[14]  Marcum, 751 F. Supp. 2d at 80-81

("references to documents in the administrative record do not prove that . . . the documents were

'before' the deciding agency" (citing WildEarth Guardians, 670 F. Supp. 2d at 6)); see also Kent

Cnty., Del. Levy Court v. U.S. E.P.A., 963 F.2d 391, 396 (D.C. Cir. 1992) (discussing

supplementation of administrative EPA record and cautioning that it was not "the EPA's

responsibility to find all documents discussing [the topic] located in any office" (emphasis in

original));  Cape Hatteras Access Preservation Alliance v. U.S. Dep't of Interior, 667 F. Supp. 2d

111, 114 (D.D.C. 2009) (finding that references to a biological opinion in the record do "not

prove that it was before the agency when it made its decision").  Further, as the plaintiffs

concede, the MMPA proceeding did not even touch upon the right whale—the subject of the

incidental take statement at issue.  Pls.' Objections to the R. at 11 ("That rulemaking considered

[Cape Wind]'s application for authorization under the MMPA to 'harass' various species of

marine mammals (but excluded Right whales) in connection with surveying activities for the

project." (emphasis added)); Administrative R., ECF No. 397-1, Ex. 1 (Incidental Take

Statement Mem.) at 7 (describing MMPA proceeding involving "species [that] are protected

under the MMPA[,] but are not listed as threatened or endangered under the ESA").  Having

resorted to speculation as the basis of their belief that the NMFS right whale incidental take

statement accounted for the MMPA proceeding, Pls.' Objections to the R. at 12 (contending that

their submissions were before NMFS decisionmakers handling the remand regarding the right

whale incidental take statement because the submissions were available "during exactly the same

---

[14]  The plaintiffs make much ado about the length of the passage in the NMFS memorandum regarding the MMPA proceeding.  See Pls.' Reply at 4 n.1.  But this is irrelevant, as it is the substance of the passage that guides the Court's analysis.

time frame in which" the NMFS was addressing the MMPA issue), the Court will not grant their request to supplement the record, <u>Marcum</u>, 751 F. Supp. 2d at 81 (parties "must offer non-speculative grounds for their belief that the [FWS] actually considered [their] materials").

### B. Whether Consideration of Extra-Record Evidence is Proper

In the alternative, the plaintiffs contend that "these materials should nonetheless be available for judicial review as extra-record evidence outside of or in addition to the administrative record that was not necessarily considered by the agency." Pls.' Objections to the R. at 9 (internal quotations omitted); Pls.' Reply at 5-6. According to the plaintiffs, their submissions are essential to the Court's assessment of whether the agency "failed to examine all relevant factors." Pls.' Objections to the R. at 9-10.

In <u>Esch v. Yeutter</u>, 876 F.2d 976, 991 (D.C. Cir. 1989), the District of Columbia Circuit stated that extra-record evidence was reviewable if it fell within one of eight exceptions. Since then, the Circuit appears to have narrowed these exceptions to four: (1) when the agency failed to examine all relevant factors; (2) when the agency failed to explain adequately its grounds for decision; (3) when the agency acted in bad faith; or (4) when the agency engaged in improper behavior. <u>See</u> <u>IMS, P.C. v. Alvarez</u>, 129 F.3d 618, 624 (D.C. Cir. 1997); <u>see also</u> <u>Cape Hatteras</u>, 667 F. Supp. 2d at 116 (noting the Circuit's narrowing of the <u>Esch</u> exceptions in its <u>IMS</u> decision). "Underlying all of these exceptions is the assessment that 'resort to extra-record information [is necessary] to enable judicial review to become effective.'" <u>Calloway</u>, 590 F. Supp. 2d at 38 (quoting <u>Esch</u>, 876 F.2d at 991); <u>see also</u> <u>Cnty. of San Miguel v. Kempthorne</u>, 587 F. Supp. 2d 64, 79 (D.D.C. 2008) (Walton, J.) ("in order to invoke one of these exceptions, a party seeking a court to review extra-record evidence must first establish that the agency acted in bad faith or otherwise behaved improperly, or that the record is so bare that it prevents effective

judicial review" (internal quotations omitted) (citing <u>Fund for the Animals v. Williams</u>, 245 F. Supp. 2d 49, 57-58 (D.D.C. 2003))).

Here, and again, the plaintiffs have not rebutted the presumption of regularity. There is no allegation that: (1) either the FWS or the NMFS failed to explain adequately its grounds for decision; (2) either the FWS or the NMFS acted in bad faith; or (3) either the FWS or the NMFS engaged in improper behavior. <u>See</u> <u>IMS</u>, 129 F.3d at 624; <u>see also</u> <u>Theodore Roosevelt Conservation P'ship v. Salazar</u>, 616 F.3d 497, 514 (D.C. Cir. 2010) (permitting extra-record review "'when there has been a strong showing of bad faith or improper behavior or when the record is so bare that it prevents effective judicial review.'" (quoting <u>Commercial Drapery Contractors, Inc. v. United States</u>, 133 F.3d 1, 7 (D.C. Cir. 1998) (internal quotations omitted))). The plaintiffs only assert that the FWS did not examine all relevant factors because it ignored the best scientific and commercial data available in 2014. <u>See</u> Pls.' Objections to the R. at 10; Pls.' Reply at 4-5. But as explained above, neither the FWS nor the NMFS was not required to consider the plaintiffs' 2014 submissions that allegedly contained the best scientific and commercial data when the case was remanded to the agencies. What was relevant for the FWS and NMFS to consider upon remand was the best scientific and commercial data that existed when they issued their respective biological opinions underlying the bases for their decisions that they made on remand. Thus, the Court's refusal to consider the plaintiffs' submissions outside of the administrative record will not prevent the Court from effective judicial review as the record contains the information necessary for the Court to ensure that the agencies followed its instructions on remand.[15] <u>See</u> <u>Theodore Roosevelt Conservation P'ship</u>, 616 F.3d at 514

---

[15] The plaintiffs do not appear to dispute that the agencies relied on the best scientific and commercial data available when the relevant biological opinions were issued.

(explaining that extra-record review is permitted if "'the record is so bare that it prevents effective judicial review'" (quoting Commercial Drapery, 133 F.3d at 7)).[16]  And the Court has concluded that both agencies satisfied what the Court required of them on remand.

## II.     The Proper Scope of Supplemental Summary Judgment Briefing

Having already expended more resources than the Court intended in setting a supplemental summary judgment briefing schedule, the Court is loath to spend any additional resources instructing the parties as to what they can and cannot include in their supplemental summary judgment briefs.  This is especially so where, in light of this Order, there is a possibility that the parties can agree on what the proper scope of summary judgment briefing should be.  See Defs.' Reply at 4-5.  Accordingly, the Court will only offer the following guideposts:  (1) the parties should not brief any claims regarding the BOEM as this agency was not involved with any aspect of the Court's remand to the FWS and NMFS; (2) the parties should not brief any claims that could have been asserted and briefed previously during summary judgment as those claims have been waived; and (3) the parties should not brief any claims that would be inconsistent with this Order.

## CONCLUSION

For the foregoing reasons, in construing the PEER Plaintiffs' Notice of Objections to the Adequacy of the Administrative Record Pertaining to the Remanded Decisions as a motion to supplement the record, the Court will **DENY** the motion.  It is hereby **ORDERED** that:

(1)     any supplemental complaint shall be filed on or before October 3, 2014;

(2)     the supplemental opening brief for summary judgment will be due on or before October 3, 2014, and cannot be more than 25 pages;

---

[16]  Not a single case cited by the plaintiffs for consideration of extra-record evidence is analogous to this case.  See Pls.' Objections to the R. at 9-10; Pls.' Reply at 6.

(3) the supplemental opposition brief for summary judgment will be due on or before October 17, 2014, and cannot be more than 25 pages;

(4) the supplemental reply brief for summary judgment will be due on or before October 24, 2014, and cannot be more than 15 pages;

(5) the supplemental sur-reply brief for summary judgment will be due on or before October 31, 2014, and cannot be more than 15 pages;

(6) any pages exceeding these limits will not be considered by the Court;

(7) all of the plaintiffs will file only one joint brief; and

(8) all of the defendants, including the intervenor-defendant, will file only one joint brief.[17]

**SO ORDERED** this 12th day of September, 2014.

REGGIE B. WALTON
United States District Judge

---

[17] The Court is "exercis[ing] its prerogative to manage its docket[] and [using] its discretion to determine how best to accomplish this goal." Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner, 101 F.3d 145, 151 (D.C. Cir. 1996).