APPEAL,CLOSED,STAYED,TYPE−C

# U.S. District Court
# District of Columbia (Washington, DC)
# CIVIL DOCKET FOR CASE #: <u>1:13−cv−00186−BAH</u>

| | |
|---|---|
| HUMANE SOCIETY OF THE UNITED STATES et al v. SALAZAR et al | Date Filed: 02/12/2013 |
| | Date Terminated: 12/19/2014 |
| Assigned to: Judge Beryl A. Howell | Jury Demand: None |
| Cases:  1:07−cv−00677−PLF | Nature of Suit: 893 Environmental Matters |
|         1:09−cv−01092−PLF | Jurisdiction: U.S. Government Defendant |
| Case in other court:  USCA, 15−05041 | |
|                       USCA, 15−05043 | |
| Cause: 16:1540 Endangered Species Act | |

<u>**Plaintiff**</u>

| | | |
|---|---|---|
| **HUMANE SOCIETY OF THE UNITED STATES** | represented by | **Bruce A. Wagman** |
| | | SCHIFF HARDIN, LLP |
| | | One Market |
| | | Spear Tower, 32nd Floor |
| | | San Francisco, CA 94105 |
| | | (415) 901−8762 |
| | | Fax: (415) 901−8701 |
| | | Email: <u>bwagman@schiffhardin.com</u> |
| | | *PRO HAC VICE* |
| | | *ATTORNEY TO BE NOTICED* |
| | | |
| | | **Ralph E. Henry , Jr.** |
| | | HUMANE SOCIETY OF THE UNITED STATES |
| | | 2100 L Street, NW |
| | | Washington, DC 20037 |
| | | (202) 676−2324 |
| | | Fax: (202) 676−2357 |
| | | Email: <u>rhenry@hsus.org</u> |
| | | *ATTORNEY TO BE NOTICED* |

<u>**Plaintiff**</u>

| | | |
|---|---|---|
| **BORN FREE USA** | represented by | **Bruce A. Wagman** |
| | | (See above for address) |
| | | *PRO HAC VICE* |
| | | *ATTORNEY TO BE NOTICED* |
| | | |
| | | **Ralph E. Henry , Jr.** |
| | | (See above for address) |
| | | *ATTORNEY TO BE NOTICED* |

<u>**Plaintiff**</u>

| | | |
|---|---|---|
| **HELP OUR WOLVES LIVE** | represented by | **Bruce A. Wagman** |
| | | (See above for address) |

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ralph E. Henry , Jr.**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>Plaintiff</u>

**FRIENDS OF ANIMALS AND THEIR**          represented by  **Bruce A. Wagman**
**ENVIRONMENT**                                           (See above for address)
                                                          *PRO HAC VICE*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Ralph E. Henry , Jr.**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

V.

<u>Defendant</u>

**KENNETH LEE SALAZAR**                   represented by  **Andrea Gelatt**
*Secretary of the Interior*                               U.S. DEPARTMENT OF JUSTICE
*TERMINATED: 04/23/2013*                                  Land & Natural Resources Division
                                                          Ben Franklin Station
                                                          P.O. Box 7611
                                                          Washington, DC 20044−1420
                                                          (202) 305−0388
                                                          Fax: (202) 305−0275
                                                          Email: <u>andrea.gelatt@usdoj.gov</u>
                                                          *ATTORNEY TO BE NOTICED*

<u>Defendant</u>

**U.S. DEPARTMENT OF INTERIOR**           represented by  **Andrea Gelatt**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

<u>Defendant</u>

**FISH AND WILDLIFE SERVICE**             represented by  **Andrea Gelatt**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

<u>Defendant</u>

**SALLY JEWELL**                          represented by  **Andrea Gelatt**
*Secretary of the Interior*                               (See above for address)
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

V.

**Intervenor Defendant**

| | | |
|---|---|---|
| **STATE OF WISCONSIN** | represented by | **Cynthia R. Hirsch** |

WISCONSIN DEPARTMENT OF
JUSTICE
Environmental Protection Unit
17 West Main Street
P. O. Box 7857
Madison, WI 53707
(608) 266−8987
Fax: (608)266−2250
Email: hirschcr@doj.state.wi.us
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Thomas James Dawson , III**
WISCONSIN DEPARTMENT OF
JUSTICE
17 West Main Street
P. O. Box 7857
Madison, WI 53707
(608) 266−8987
Email: dawsontj@doj.state.wi.us
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Intervenor Defendant**

| | | |
|---|---|---|
| **WISCONSIN DEPARTMENT OF NATURAL RESOURCES** | represented by | **Cynthia R. Hirsch** |

(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Thomas James Dawson , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Intervenor Defendant**

| | | |
|---|---|---|
| **STATE OF MICHIGAN** | represented by | **Nathan Arthur Gambill** |

STATE OF MICHIGAN − ATTORNEY
GENERAL
P.O. Box 30755
Lansing, MI 48909
(517) 373−7540
Email: gambilln@michigan.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Pamela J. Stevenson**
MICHIGAN DEPARTMENT OF
ATTORNEY GENERAL
Natural Resources/Environmental Division

P.O. Box 30755
Lansing, MI 48909
(517) 373−7540
Email: stevensonp@michigan.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stephen D. Thill**
MICHIGAN DEPARTMENT OF
ATTORNEY GENERAL
Environment, Natural Resource and
Agriculture Division
525 West Ottawa Street
6th Floor William Building
Lansing, MI 48933
(517) 373−7540
Email: gambilln@michigan.gov
*ATTORNEY TO BE NOTICED*

**Intervenor Defendant**

**MICHIGAN DEPARTMENT OF**          represented by   **Nathan Arthur Gambill**
**NATURAL RESOURCES**                                (See above for address)
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Pamela J. Stevenson**
                                                     (See above for address)
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Stephen D. Thill**
                                                     (See above for address)
                                                     *ATTORNEY TO BE NOTICED*

**Intervenor Defendant**

**SAFARI CLUB INTERNATIONAL**       represented by   **Anna Margo Seidman**
                                                     SAFARI CLUB INTERNATIONAL
                                                     501 Second Street, NE
                                                     Washington, DC 20002
                                                     (202) 543−8733
                                                     Fax: (202) 543−1205
                                                     Email: aseidman@safariclub.org
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **William P. Horn**
                                                     BIRCH, HORTON, BITTNER AND
                                                     CHEROT
                                                     1155 Connecticut Avenue, NW
                                                     Suite 1200
                                                     Washington, DC 20036

(202) 659−5800
Fax: (202) 659−1027
Email: whorn@dc.bhb.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James Hardwick Lister**
BIRCH HORTON BITTNER AND
CHEROT, P.C.
1156 15th Street, NW
Suite 1020
Washington, DC 20005
(202) 659−5800
Email: jlister@dc.bhb.com
*ATTORNEY TO BE NOTICED*

**Intervenor Defendant**

**NATIONAL RIFLE ASSOCIATION OF AMERICA**   represented by   **Christopher A. Conte**
NATIONAL RIFLE ASSOCIATION OF
AMERICA
11250 Waples Mill Road
Floor 5N
Fairfax, VA 22030
(703) 267−1166
Fax: (703) 267−1164
Email: cconte@nrahq.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William P. Horn**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James Hardwick Lister**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Intervenor Defendant**

**U.S. SPORTSMEN'S ALLIANCE FOUNDATION**   represented by   **James Hardwick Lister**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William P. Horn**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Intervenor Defendant**

represented by

**WISCONSIN BEAR HUNTERS ASSOCIATION**

**James Hardwick Lister**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William P. Horn**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Intervenor Defendant**

**MICHIGAN UNITED CONSERVATION CLUBS**                represented by     **James Hardwick Lister**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John I. Kittel**
MAZUR & KITTEL, PLLC
30665 Northwestern Highway
Suite 175
Farmington Hills, MI 48334
(248) 432−8000
Fax: (248) 432−8010
Email: jkittel@mazur−kittel.com
*ATTORNEY TO BE NOTICED*

**Intervenor Defendant**

**WISCONSIN BOWHUNTERS ASSOCIATION**                represented by     **James Hardwick Lister**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William P. Horn**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Intervenor Defendant**

**UPPER PENINSULA BEAR HOUNDSMEN ASSOCIATION**                represented by     **James Hardwick Lister**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William P. Horn**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Intervenor Defendant**

represented by

**MICHIGAN HUNTING DOG FEDERATION**

**James Hardwick Lister**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William P. Horn**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Intervenor Defendant**

**ROCKY MOUNTAIN ELK FOUNDATION**

represented by **James Hardwick Lister**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William P. Horn**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John I. Kittel**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**MINNESOTA DEPARTMENT OF NATURAL RESOURCES**

represented by **David Peter Iverson**
OFFICE OF THE MINNESOTA
ATTORNEY GENERAL
445 Minnesota Street
Bremer Tower, Suite 1800
St. Paul, MN 55101−2134
(651) 757−1466
Fax: 651−297−1235
Email: dave.iverson@ag.state.mn.us
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kathryn Iverson Landrum**
MINNESOTA OFFICE OF THE
ATTORNEY GENERAL
445 Minnesota Street
Suite 1100
St. Paul, MN 55101
(651) 757−1189
Fax: (651) 282−5832
Email: kathryn.landrum@ag.state.mn.us
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**ASSOCIATION OF FISH AND**
**WILDLIFE AGENCIES**

represented by **Marilyn Carol Bambery**
BAMBERY LAW OFFICE
1124 S. Geneva Drive
Dewitt, MI 48820
(240) 515−6134
Email: cbambery@fishwildlife.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 02/12/2013 | 1 | | COMPLAINT against All Defendants ( Filing fee $ 350 receipt number 0090−3215700) filed by HELP OUR WOLVES LIVE, HUMANE SOCIETY OF THE UNITED STATES, FRIENDS OF ANIMALS AND THEIR ENVIRONMENT, BORN FREE USA. (Attachments: # 1 Civil Cover Sheet, # 2 Summons)(Henry, Ralph) (Entered: 02/12/2013) |
| 02/12/2013 | 2 | | NOTICE OF RELATED CASE by All Plaintiffs. Case related to Case No. 09−01092. (Henry, Ralph) (Entered: 02/12/2013) |
| 02/12/2013 | 3 | | LCvR 7.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by BORN FREE USA, FRIENDS OF ANIMALS AND THEIR ENVIRONMENT, HELP OUR WOLVES LIVE, HUMANE SOCIETY OF THE UNITED STATES (Henry, Ralph) (Entered: 02/12/2013) |
| 02/12/2013 | 4 | | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Bruce A. Wagman, :Firm− SCHIFF HARDIN LLP, :Address− One Market, Spear Street Tower, 32nd Floor, San Francisco, CA 94105. Phone No. − (415) 901−8700. Fax No. − (415) 901−8701 by BORN FREE USA, FRIENDS OF ANIMALS AND THEIR ENVIRONMENT, HELP OUR WOLVES LIVE, HUMANE SOCIETY OF THE UNITED STATES (Attachments: # 1 Declaration, # 2 Text of Proposed Order)(Henry, Ralph) (Entered: 02/12/2013) |
| 02/12/2013 | | | Case Assigned to Judge Paul L. Friedman. (ls, ) (Entered: 02/12/2013) |
| 02/12/2013 | 5 | | ELECTRONIC SUMMONS(5) Issued as to FISH AND WILDLIFE SERVICE, KENNETH SALAZAR, U.S. DEPARTMENT OF INTERIOR, U.S. Attorney and U.S. Attorney General (Attachments: # 1 Consent Form)(ls, ) (Entered: 02/12/2013) |
| 02/12/2013 | | | Case Reassigned to Judge Beryl A. Howell. Judge Paul L. Friedman no longer assigned to the case. (ls, ) (Entered: 02/13/2013) |
| 02/14/2013 | 6 | | STANDING ORDER. Signed by Judge Beryl A. Howell on 02/14/2013. (lcbah2) (Entered: 02/14/2013) |
| 02/14/2013 | | | MINUTE ORDER (paperless) granting 4 Motion to Admit Bruce A. Wagman Pro Hac Vice. Mr. Bruce A. Wagman may enter an appearance pro hac vice for the purpose of representing the plaintiffs in this action. Signed by Judge Beryl A. Howell on 02/14/2013. (lcbah2) (Entered: 02/14/2013) |
| 04/22/2013 | 9 | | MOTION to Intervene as Defendants by STATE OF WISCONSIN, WISCONSIN DEPARTMENT OF NATURAL RESOURCES (Attachments: # 1 Memorandum in Support, # 2 Proposed Answer, # 3 Certificate of Service, # 4 Text of Proposed Order)(znmw, ) (Entered: 04/23/2013) |

| 04/22/2013 | 10 | | MOTION to Intervene as Defendants by STATE OF MICHIGAN, MICHIGAN DEPARTMENT OF NATURAL RESOURCES (Attachments: # 1 Exhibit 1 − Proposed Answer, # 2 Exhibit 2 − Proposed Order, # 3 Exhibit 3 − Declaration)(znmw, ) (Entered: 04/23/2013) |
|---|---|---|---|
| 04/23/2013 | 7 | | NOTICE of Appearance by Andrea Gelatt on behalf of All Defendants (Gelatt, Andrea) (Entered: 04/23/2013) |
| 04/23/2013 | 8 | | ANSWER to Complaint by FISH AND WILDLIFE SERVICE, KENNETH LEE SALAZAR, U.S. DEPARTMENT OF INTERIOR.(Gelatt, Andrea) (Entered: 04/23/2013) |
| 04/23/2013 | 11 | | MOTION to Intervene as Defendants by SAFARI CLUB INTERNATIONAL, NATIONAL RIFLE ASSOCIATION OF AMERICA, U.S. SPORTSMEN'S ALLIANCE FOUNDATION, WISCONSIN BEAR HUNTERS ASSOCIATION, MICHIGAN UNITED CONSERVATION CLUBS, WISCONSIN BOWHUNTERS ASSOCIATION, UPPER PENINSULA BEAR HOUNDSMEN ASSOCIATION, MICHIGAN HUNTING DOG FEDERATION, ROCKY MOUNTAIN ELK FOUNDATION (Attachments: # 1 Certificate of Service, # 2 Exhibit Index, # 3 Exhibit A−M, # 4 Exhibit N−W, # 5 Exhibit Proposed Joint Answer, # 6 Exhibit 7.1 Certificates, # 7 Text of Proposed Order)(jf, ) (Entered: 04/23/2013) |
| 04/23/2013 | 12 | | ENTERED IN ERROR.....MOTION to Intervene as a Defendant by HUNTER CONSERVATION COALITION (Attachments: # 1 Index of Exhibits, # 2 Exhibits A−M, # 3 Exhibits N−W, # 4 Proposed Answer, # 5 LCvR 7.1 Certificates, # 6 Certificate of Service, # 7 Text of Proposed Order)(znmw, ) Modified on 5/7/2013 (rdj). (Entered: 04/24/2013) |
| 05/06/2013 | 13 | | MEET AND CONFER STATEMENT. (Attachments: # 1 Text of Proposed Order)(Gelatt, Andrea) (Entered: 05/06/2013) |
| 05/07/2013 | | | NOTICE OF CORRECTED DOCKET ENTRY: re 12 MOTION to Intervene was entered in error as a duplicate filing. (rdj) (Entered: 05/07/2013) |
| 05/07/2013 | | | MINUTE ORDER (paperless) granting 9 Unopposed Motion to Intervene as a Party Defendant by State of Wisconsin and Wisconsin Department of Natural Resources. Signed by Judge Beryl A. Howell on 05/07/2013. (lcbah2) (Entered: 05/07/2013) |
| 05/07/2013 | | | MINUTE ORDER (paperless) granting 10 Unopposed Motion of the State of Michigan and the Michigan Department of Natural Resources to Intervene as Defendants. Signed by Judge Beryl A. Howell on 05/07/2013. (lcbah2) (Entered: 05/07/2013) |
| 05/07/2013 | | | MINUTE ORDER (paperless) granting 11 Hunter Conservation Coalition's Unopposed Motion to Intervene. Signed by Judge Beryl A. Howell on 05/07/2013. (lcbah2) (Entered: 05/07/2013) |
| 05/07/2013 | | | MINUTE ORDER (paperless) Upon consideration of the parties' 13 Joint Report and Proposed Briefing Schedule, the Court imposes the following SCHEDULING ORDER to govern proceedings in this matter: Federal defendants shall lodge the Administrative Record by June 17, 2013. Plaintiffs shall notify informally the federal defendants of any objection to the contents of the Administrative Record, if necessary, by July 15, 2013. Plaintiffs shall move |

| | | |
|---|---|---|
| | | to compel completion of the Administrative Record or to supplement the Administrative Record with extra−record documents, if necessary, by August 1, 2013. Plaintiffs shall file a Motion for Summary Judgment (up to 45 pages) by August 1, 2013. The federal defendants shall file any Opposition/Cross−Motion for Summary Judgment (up to 45 pages) by September 12, 2013. In order to minimize duplication in arguments with the federal defendants, the defendant intervenors shall each file any Opposition/Cross−Motion (up to 45 pages) by September 19, 2013. Plaintiffs shall file a combined Opposition/Reply (up to 60 pages) responding to the arguments of both the federal defendants and defendant intervenors by October 3, 2013. The federal defendants shall file a Reply (up to 35 pages) by October 24, 2013. The defendant intervenors shall file any Replies (up to 25 pages) by October 31, 2013. Again, the Court directs the federal defendants and the defendant intervenors to confer and minimize duplication of arguments. The plaintiffs shall file a Joint Appendix by November 14, 2013. If the plaintiffs intend to bring a motion for temporary injunctive relief or a preliminary injunction, the plaintiffs shall provide 7 days written notice before bringing any such motion to allow time for the parties to meet and confer to establish a briefing schedule for submission jointly to the Court. Signed by Judge Beryl A. Howell on 05/07/2013. (lcbah2) (Entered: 05/07/2013) |
| 05/07/2013 | 14 | ANSWER to Complaint by STATE OF WISCONSIN, WISCONSIN DEPARTMENT OF NATURAL RESOURCES.(rdj) (Entered: 05/07/2013) |
| 05/07/2013 | 15 | ANSWER to Complaint by MICHIGAN DEPARTMENT OF NATURAL RESOURCES, STATE OF MICHIGAN.(rdj) (Entered: 05/07/2013) |
| 05/07/2013 | 16 | ANSWER to Complaint by MICHIGAN HUNTING DOG FEDERATION, MICHIGAN UNITED CONSERVATION CLUBS, NATIONAL RIFLE ASSOCIATION OF AMERICA, ROCKY MOUNTAIN ELK FOUNDATION, SAFARI CLUB INTERNATIONAL, U.S. SPORTSMEN'S ALLIANCE FOUNDATION, UPPER PENINSULA BEAR HOUNDSMEN ASSOCIATION, WISCONSIN BEAR HUNTERS ASSOCIATION, WISCONSIN BOWHUNTERS ASSOCIATION.(rdj) (Entered: 05/07/2013) |
| 05/07/2013 | 17 | LCvR 7.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by MICHIGAN HUNTING DOG FEDERATION, MICHIGAN UNITED CONSERVATION CLUBS, NATIONAL RIFLE ASSOCIATION OF AMERICA, ROCKY MOUNTAIN ELK FOUNDATION, SAFARI CLUB INTERNATIONAL, U.S. SPORTSMEN'S ALLIANCE FOUNDATION, UPPER PENINSULA BEAR HOUNDSMEN ASSOCIATION, WISCONSIN BEAR HUNTERS ASSOCIATION, WISCONSIN BOWHUNTERS ASSOCIATION (rdj) (Entered: 05/07/2013) |
| 05/07/2013 | | Set/Reset Deadlines: Administrative Record due by 6/17/2013; opposition due by 7/15/2013; motion for completion or to supplement administrative record due by 8/1/2013. Summary Judgment motion due by 8/1/2013; cross−motion and opposition to Motion for Summary Judgment due by 9/12/2013; intervenors cross−motion/opposition due by 9/19/2013; opposition/reply due by 10/3/2013; Federal Defendants reply due by 10/24/2013; intervenors' reply due 10/31/2013. Joint appendix due by 11/14/2013. (tg, ) (Entered: 05/08/2013) |
| 05/09/2013 | 18 | NOTICE of Appearance by John I. Kittel on behalf of MICHIGAN UNITED CONSERVATION CLUBS, ROCKY MOUNTAIN ELK FOUNDATION (Kittel, John) (Entered: 05/09/2013) |

| 05/21/2013 | 19 | | NOTICE of Appearance by Stephen D. Thill on behalf of MICHIGAN DEPARTMENT OF NATURAL RESOURCES, STATE OF MICHIGAN (Thill, Stephen) (Entered: 05/21/2013) |
|---|---|---|---|
| 06/06/2013 | 20 | | MOTION for Leave to File Amicus Curiae by MINNESOTA DEPARTMENT OF NATURAL RESOURCES (Attachments: # 1 Memorandum in Support, # 2 Declaration of EDWARD K. BOGGESS, # 3 Certificate of Service, # 4 Text of Proposed Order)(rdj) (Entered: 06/07/2013) |
| 06/07/2013 | | | MINUTE ORDER (paperless) granting 20 Unopposed Motion to Participate as Amicus Curiae by the Minnesota Department of Natural Resources. Signed by Judge Beryl A. Howell on 06/07/2013. (lcbah2) (Entered: 06/07/2013) |
| 06/17/2013 | 21 | | NOTICE *of Lodging of Administrative Record* by FISH AND WILDLIFE SERVICE, KENNETH LEE SALAZAR, U.S. DEPARTMENT OF INTERIOR (Gelatt, Andrea) (Entered: 06/17/2013) |
| 07/09/2013 | 22 | | MOTION to Modify *Current Scheduling Order* by BORN FREE USA, FRIENDS OF ANIMALS AND THEIR ENVIRONMENT, HELP OUR WOLVES LIVE, HUMANE SOCIETY OF THE UNITED STATES (Wagman, Bruce) (Entered: 07/09/2013) |
| 07/10/2013 | 23 | | ERRATA by BORN FREE USA, FRIENDS OF ANIMALS AND THEIR ENVIRONMENT, HELP OUR WOLVES LIVE, HUMANE SOCIETY OF THE UNITED STATES 22 MOTION to Modify *Current Scheduling Order* filed by HELP OUR WOLVES LIVE, BORN FREE USA, FRIENDS OF ANIMALS AND THEIR ENVIRONMENT, HUMANE SOCIETY OF THE UNITED STATES. (Attachments: # 1 Motion for Changes to Current Scheduling Order)(Wagman, Bruce) (Entered: 07/10/2013) |
| 07/11/2013 | | | MINUTE ORDER (paperless) granting unopposed 22 Motion for Changes to Current Scheduling Order. The SCHEDULING ORDER is hereby revised as follows: Plaintiffs shall notify informally the federal defendants of any objection to the contents of the Administrative Record, if necessary, by August 23, 2013. Plaintiffs shall move to compel completion of the Administrative Record or to supplement the Administrative Record with extra−record documents, if necessary, by September 6, 2013. Plaintiffs shall file a Motion for Summary Judgment (up to 45 pages) by September 6, 2013. The federal defendants shall file any Opposition/Cross−Motion for Summary Judgment (up to 45 pages) by October 18, 2013. In order to minimize duplication in arguments with the federal defendants, the defendant intervenors shall each file any Opposition/Cross−Motion (up to 45 pages) by October 25, 2013. Plaintiffs shall file a combined Opposition/Reply (up to 60 pages) responding to the arguments of both the federal defendants and defendant intervenors by November 12, 2013. The federal defendants shall file a Reply (up to 35 pages) by December 10, 2013. The defendant intervenors shall file any Replies (up to 25 pages) by December 17, 2013. The plaintiffs shall file a Joint Appendix by January 6, 2014. If the plaintiffs intend to bring a motion for temporary injunctive relief or a preliminary injunction, the plaintiffs shall provide 7 days written notice before bringing any such motion to allow time for the parties to meet and confer to establish a briefing schedule for submission jointly to the Court. Signed by Judge Beryl A. Howell on 07/11/2013. (lcbah2) (Entered: 07/11/2013) |
| 07/11/2013 | | | |

| | | | |
|---|---|---|---|
| | | | Set/Reset Deadlines: Objection to contents of Administrative Record due by 8/23/2013. Motion to compel or supplement Administrative Record due by 9/6/2013. Summary Judgment motion due by 9/6/2013; Cross Motion and opposition to Motion for Summary Judgment due by 10/18/2013; Opposition/Cross Motion by Intervenors due by 10/25/13; Reply/Opposition to Cross−Motion due by 11/12/2013; Reply to opposition to Cross−Motion due by 12/10/2013. Reply by Intervenors due by 12/17/2013. Joint Appendix due by 1/6/2014. (tg, ) (Entered: 07/11/2013) |
| 09/06/2013 | 24 | | MOTION for Summary Judgment by BORN FREE USA, FRIENDS OF ANIMALS AND THEIR ENVIRONMENT, HELP OUR WOLVES LIVE, HUMANE SOCIETY OF THE UNITED STATES (Attachments: # 1 Memorandum in Support, # 2 Declaration of Robert Waligora, # 3 Declaration of Linda Hatfield, # 4 Declaration of Nancy Warren, # 5 Declaration of Howard Goldman, # 6 Text of Proposed Order)(Wagman, Bruce) (Entered: 09/06/2013) |
| 10/01/2013 | 25 | | Unopposed MOTION to Stay *briefing due to lapse in appropriations* by FISH AND WILDLIFE SERVICE, KENNETH LEE SALAZAR, U.S. DEPARTMENT OF INTERIOR (Attachments: # 1 Text of Proposed Order)(Gelatt, Andrea) (Entered: 10/01/2013) |
| 10/01/2013 | | | MINUTE ORDER (paperless) GRANTING the defendant's 25 Unopposed Motion For Stay of Briefing. The Court stays briefing in this matter until such time as funding is restored to the Department of Justice. The parties shall, within seven days of funding being restored, jointly file any appropriate motion to amend the schedule set forth in this Court's Minute Order of July 11, 2013. Signed by Judge Beryl A. Howell on October 1, 2013. (lcbah1) (Entered: 10/01/2013) |
| 10/18/2013 | 26 | | Unopposed MOTION for Scheduling Order *and Notice of Restoration of Appropriations* by FISH AND WILDLIFE SERVICE, KENNETH LEE SALAZAR, U.S. DEPARTMENT OF INTERIOR (Attachments: # 1 Text of Proposed Order)(Gelatt, Andrea) (Entered: 10/18/2013) |
| 10/22/2013 | | | MINUTE ORDER (paperless) In accordance with the 26 Notice of Restoration of Appropriations and Motion for Briefing Schedule, the Court enters the following SCHEDULING ORDER to control the timing of proceedings in this matter: the Federal Defendants shall file any Opposition or Cross−Motion for Summary Judgment by December 4, 2013; the Defendant−Intervenors shall file any Opposition or Cross−Motion for Summary Judgment by December 11, 2013; the Plaintiffs shall file any combined Opposition or Reply by January 10, 2014; the Federal Defendants shall file any Reply by February 5, 2014; the Defendant−Intervenors shall file any Reply by February 12, 2014; and the Plaintiffs shall file a Joint Appendix as required by Local Rule 7(n) by March 4, 2014. Signed by Judge Beryl A. Howell on 10/22/2013. (lcbah2) (Entered: 10/22/2013) |
| 10/22/2013 | | | Set/Reset Deadlines: Cross Motion or Opposition to Motion for Summary Judgment due by the Federal Defendants by 12/4/2013; Cross Motion or Opposition to Motion for Summary Judgment due by the Defendant−Intervenors by 12/11/2013; Opposition to Cross Motions or Reply to Motions for Summary Judgment due by Plaintiffs by 1/10/2014; Reply in support of their Cross Motion due by the Federal Defendants by 2/5/2014; Reply in support of their Cross Motion due by the Defendant−Intervenors by 2/12/2014. Plaintiffs' Joint |

| | | | |
|---|---|---|---|
| | | | Appendix due by 3/4/2014. (tg, ) (Entered: 10/22/2013) |
| 12/04/2013 | 27 | | Cross MOTION for Summary Judgment *and Opposition to Plaintiffs' Motion for Summary Judgment* by FISH AND WILDLIFE SERVICE, KENNETH LEE SALAZAR, U.S. DEPARTMENT OF INTERIOR (Attachments: # 1 Text of Proposed Order)(Gelatt, Andrea) (Entered: 12/04/2013) |
| 12/04/2013 | 28 | | Memorandum in opposition to re 24 MOTION for Summary Judgment *and Cross−Motion for Summary Judgment* filed by FISH AND WILDLIFE SERVICE, KENNETH LEE SALAZAR, U.S. DEPARTMENT OF INTERIOR. (Attachments: # 1 Text of Proposed Order)(Gelatt, Andrea) (Entered: 12/04/2013) |
| 12/11/2013 | 29 | | Memorandum in opposition to re 24 MOTION for Summary Judgment filed by STATE OF WISCONSIN, WISCONSIN DEPARTMENT OF NATURAL RESOURCES. (Attachments: # 1 2011 Wisconsin Act 169, # 2 Affidavit of Bradley M. Koele & Ex. A, # 3 Affidavit of Laura L. Kolesik & Exs. A, B, # 4 Affidavit of David M. MacFarland & Exs. A, B, # 5 Affidavit of Adrian P. Wydeven & Ex. A, # 6 Certificate of Service)(Hirsch, Cynthia) (Entered: 12/11/2013) |
| 12/11/2013 | 30 | | Memorandum in opposition to re 24 MOTION for Summary Judgment filed by MICHIGAN DEPARTMENT OF NATURAL RESOURCES. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit)(Thill, Stephen) (Entered: 12/11/2013) |
| 12/11/2013 | 31 | | MEMORANDUM re 27 Cross MOTION for Summary Judgment *and Opposition to Plaintiffs' Motion for Summary Judgment* filed by U.S. DEPARTMENT OF INTERIOR, FISH AND WILDLIFE SERVICE, KENNETH LEE SALAZAR, 24 MOTION for Summary Judgment filed by HELP OUR WOLVES LIVE, BORN FREE USA, FRIENDS OF ANIMALS AND THEIR ENVIRONMENT, HUMANE SOCIETY OF THE UNITED STATES by MINNESOTA DEPARTMENT OF NATURAL RESOURCES. (Attachments: # 1 Declaration of Edward K. Boggess, # 2 Exhibit A − D, # 3 Certificate of Service)(Iverson, David) (Entered: 12/11/2013) |
| 12/11/2013 | 32 | | MOTION for Leave to File *Amicus Curiae Brief* by ASSOCIATION OF FISH AND WILDLIFE AGENCIES (Attachments: # 1 Exhibit Exhibits to Motion to Participate as Amicus Curiae, # 2 Exhibit Proposed Amicus Brief, # 3 Text of Proposed Order Proposed Order, # 4 Exhibit Corporate Disclosure Statement)(Bambery, Marilyn) (Entered: 12/11/2013) |
| 12/11/2013 | 33 | | Cross MOTION for Summary Judgment *and Opposition to Plaintiffs' Motion for Summary Judgment* by MICHIGAN HUNTING DOG FEDERATION, NATIONAL RIFLE ASSOCIATION OF AMERICA, ROCKY MOUNTAIN ELK FOUNDATION, SAFARI CLUB INTERNATIONAL, U.S. SPORTSMEN'S ALLIANCE FOUNDATION, UPPER PENINSULA BEAR HOUNDSMEN ASSOCIATION, WISCONSIN BEAR HUNTERS ASSOCIATION, WISCONSIN BOWHUNTERS ASSOCIATION (Attachments: # 1 Text of Proposed Order)(Horn, William) (Entered: 12/11/2013) |
| 12/11/2013 | 34 | | Memorandum in opposition to re 24 MOTION for Summary Judgment *and Cross−Motion for Summary Judgment* filed by MICHIGAN HUNTING DOG FEDERATION, NATIONAL RIFLE ASSOCIATION OF AMERICA, ROCKY |

| | | |
|---|---|---|
| | | MOUNTAIN ELK FOUNDATION, SAFARI CLUB INTERNATIONAL, U.S. SPORTSMEN'S ALLIANCE FOUNDATION, UPPER PENINSULA BEAR HOUNDSMEN ASSOCIATION, WISCONSIN BEAR HUNTERS ASSOCIATION, WISCONSIN BOWHUNTERS ASSOCIATION. (Attachments: # 1 Text of Proposed Order)(Horn, William) (Entered: 12/11/2013) |
| 12/12/2013 | 35 | Memorandum in opposition to re 24 MOTION for Summary Judgment *[Filed to correct wording in last sentence of page 12 of Dkt 29]* filed by STATE OF WISCONSIN, WISCONSIN DEPARTMENT OF NATURAL RESOURCES. (Attachments: # 1 Certificate of Service)(Hirsch, Cynthia) (Entered: 12/12/2013) |
| 12/12/2013 | 36 | Memorandum in opposition to re 32 MOTION for Leave to File *Amicus Curiae Brief* filed by BORN FREE USA, FRIENDS OF ANIMALS AND THEIR ENVIRONMENT, HELP OUR WOLVES LIVE, HUMANE SOCIETY OF THE UNITED STATES. (Wagman, Bruce) (Entered: 12/12/2013) |
| 12/17/2013 | 37 | REPLY to opposition to motion re 32 MOTION for Leave to File *Amicus Curiae Brief* filed by ASSOCIATION OF FISH AND WILDLIFE AGENCIES. (Bambery, Marilyn) (Entered: 12/17/2013) |
| 12/19/2013 | | MINUTE ORDER (paperless) granting 32 Motion of the Association of Fish & Wildlife Agencies ("Association") to Participate as Amicus Curiae ("Amicus Mot."), over the plaintiffs' opposition. "District courts have inherent authority to appoint or deny amici which is derived from Rule 29 of the Federal Rules of Appellate Procedure." Jin v. Ministry of State Sec., 557 F. Supp. 2d 131, 136 (D.D.C. 2008) (internal citations omitted). Amicus participation is normally appropriate when (a) "a party is not represented competently or is not represented at all," (b) "the amicus has an interest in some other case that may be affected by the decision in the present case," or (c) "when the amicus has unique information or perspective that can help the court beyond the help that the lawyers for the parties are able to provide." Id. at 137. Upon careful consideration of the memoranda in support of, and opposition to, the instant motion, the Court is satisfied that the Association satisfies each of these three concerns. Specifically, the Association's interests are not adequately represented. See Amicus Mot. at 12, ECF No. 32 ("Currently, no existing party in this lawsuit represents the fifty states' collaborative interests in the relisting decision being asked of this court."). The Association, as the representative of Fish and Wildlife agencies in all fifty states, the territories, and the District of Columbia is concerned about on−going litigation over the relisting of the gray wolf. Id. at 13 n. 41 (noting that "the gray wolf's status continues to be litigated in various parts of the country"). Finally, the Association has expert knowledge in the conservation and management of gray wolves. Id. at 1314 (highlighting the Association's forthcoming Best Management Practices on gray wolf conservation and management). For these reasons, the motion is granted. Signed by Judge Beryl A. Howell on 12/19/2013. (lcbah2) (Entered: 12/19/2013) |
| 12/19/2013 | 38 | AMICUS BRIEF by ASSOCIATION OF FISH AND WILDLIFE AGENCIES. (rdj) (Entered: 12/23/2013) |
| 12/19/2013 | 39 | LCvR 7.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by ASSOCIATION OF FISH AND WILDLIFE AGENCIES (rdj) (Entered: 12/23/2013) |

| 01/10/2014 | 40 | | REPLY to opposition to motion re 33 Cross MOTION for Summary Judgment *and Opposition to Plaintiffs' Motion for Summary Judgment*, 27 Cross MOTION for Summary Judgment *and Opposition to Plaintiffs' Motion for Summary Judgment*, 24 MOTION for Summary Judgment *PLAINTIFFS' COMBINED REPLY AND OPPOSITION MEMORANDUM* filed by BORN FREE USA, FRIENDS OF ANIMALS AND THEIR ENVIRONMENT, HELP OUR WOLVES LIVE, HUMANE SOCIETY OF THE UNITED STATES. (Wagman, Bruce) (Entered: 01/10/2014) |
| 01/12/2014 | | | NOTICE OF ERROR re 40 Reply to opposition to Motion; emailed to bwagman@schiffhardin.com, cc'd 28 associated attorneys −− The PDF file you docketed contained errors: 1. Two−part docket entry, 2. Please refile document, 3. same document using t (Entered: 01/12/2014) |
| 01/12/2014 | 41 | | Memorandum in opposition to re 33 Cross MOTION for Summary Judgment *and Opposition to Plaintiffs' Motion for Summary Judgment*, 27 Cross MOTION for Summary Judgment *and Opposition to Plaintiffs' Motion for Summary Judgment PLAINTIFFS' COMBINED REPLY AND OPPOSITION MEMORANDUM* filed by BORN FREE USA, FRIENDS OF ANIMALS AND THEIR ENVIRONMENT, HELP OUR WOLVES LIVE, HUMANE SOCIETY OF THE UNITED STATES. (Wagman, Bruce) (Entered: 01/12/2014) |
| 02/05/2014 | 42 | | REPLY to opposition to motion re 27 Cross MOTION for Summary Judgment *and Opposition to Plaintiffs' Motion for Summary Judgment* filed by FISH AND WILDLIFE SERVICE, SALLY JEWELL, U.S. DEPARTMENT OF INTERIOR. (Gelatt, Andrea) (Entered: 02/05/2014) |
| 02/12/2014 | 43 | | REPLY to opposition to motion re 33 Cross MOTION for Summary Judgment *and Opposition to Plaintiffs' Motion for Summary Judgment*, 27 Cross MOTION for Summary Judgment *and Opposition to Plaintiffs' Motion for Summary Judgment* filed by MICHIGAN DEPARTMENT OF NATURAL RESOURCES. (Attachments: # 1 Exhibit Wildlife Conservation Order Amendment No. 14 of 2013)(Thill, Stephen) (Entered: 02/12/2014) |
| 02/12/2014 | 44 | | REPLY to opposition to motion re 33 Cross MOTION for Summary Judgment *and Opposition to Plaintiffs' Motion for Summary Judgment*, 27 Cross MOTION for Summary Judgment *and Opposition to Plaintiffs' Motion for Summary Judgment* filed by MICHIGAN HUNTING DOG FEDERATION, MICHIGAN UNITED CONSERVATION CLUBS, NATIONAL RIFLE ASSOCIATION OF AMERICA, ROCKY MOUNTAIN ELK FOUNDATION, SAFARI CLUB INTERNATIONAL, U.S. SPORTSMEN'S ALLIANCE FOUNDATION, UPPER PENINSULA BEAR HOUNDSMEN ASSOCIATION, WISCONSIN BEAR HUNTERS ASSOCIATION, WISCONSIN BOWHUNTERS ASSOCIATION. (Lister, James) (Entered: 02/12/2014) |
| 03/04/2014 | 45 | | ADMINISTRATIVE RECORD −− *Plaintiffs' Filing of Parties' Agreed Joint Appendix* by BORN FREE USA, FRIENDS OF ANIMALS AND THEIR ENVIRONMENT, HELP OUR WOLVES LIVE, HUMANE SOCIETY OF THE UNITED STATES. (Attachments: # 1 Exhibits A−B, # 2 Exhibit C, # 3 Exhibits D−I, # 4 Exhibits J−NN, # 5 Exhibits OO−HHH, # 6 Exhibits III−MMM)(Wagman, Bruce) (Entered: 03/04/2014) |
| 09/19/2014 | | | MINUTE ORDER (paperless) STAYING this matter until October 3, 2014 and DIRECTING the parties to submit their positions, if any, on whether a ruling on |

| | | | |
|---|---|---|---|
| | | | the merits of the plaintiffs' Administrative Procedures Act ("APA") challenge should be bifurcated from any ruling on potential remedies, if the plaintiffs' APA challenge is found to be meritorious. The defendant−intervenor Hunter Conservation Coalition ("HCC") suggests that consideration of any remedy is premature, since "it is difficult to brief remedy without having a liability finding in hand," and that the parties should be given "the opportunity to submit a supplemental brief on remedy should the Court find any non−harmless error by FWS in this case." 33 Def.−Interven. HCC's Cross−Mot. Summ. J. at 42. The parties shall, by October 3, 2014, submit their positions on Defendant Intervenor HCC's request, which the Court construes as one for bifurcating consideration of the merits of the plaintiffs' claim from consideration of any remedy. Signed by Judge Beryl A. Howell on September 19, 2014. (lcbah1) (Entered: 09/19/2014) |
| 09/19/2014 | | | Set/Reset Deadlines: Submission of parties positions on Defendant Intervenor HCC's request for bifurcating consideration of the merits of the plaintiffs' claim from consideration of any remedy due by 10/3/2014 (tg, ) (Entered: 09/19/2014) |
| 10/03/2014 | 46 | | MEMORANDUM re Order Staying Case,,,, by FISH AND WILDLIFE SERVICE, SALLY JEWELL, U.S. DEPARTMENT OF INTERIOR. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Gelatt, Andrea) (Entered: 10/03/2014) |
| 10/03/2014 | 47 | | NOTICE of Appearance by Nathan Arthur Gambill on behalf of MICHIGAN DEPARTMENT OF NATURAL RESOURCES, STATE OF MICHIGAN (Gambill, Nathan) (Entered: 10/03/2014) |
| 10/03/2014 | 48 | | MEMORANDUM re Order Staying Case,,,, by MICHIGAN DEPARTMENT OF NATURAL RESOURCES, STATE OF MICHIGAN. (Gambill, Nathan) (Entered: 10/03/2014) |
| 10/03/2014 | 49 | | RESPONSE TO ORDER OF THE COURT re Order Staying Case,,,, *HUNTER CONSERVATION COALITION'S VIEW ON WHETHER TO BIFURCATE LIABILITY AND REMEDY* filed by MICHIGAN HUNTING DOG FEDERATION, MICHIGAN UNITED CONSERVATION CLUBS, NATIONAL RIFLE ASSOCIATION OF AMERICA, ROCKY MOUNTAIN ELK FOUNDATION, SAFARI CLUB INTERNATIONAL, U.S. SPORTSMEN'S ALLIANCE FOUNDATION, UPPER PENINSULA BEAR HOUNDSMEN ASSOCIATION, WISCONSIN BEAR HUNTERS ASSOCIATION, WISCONSIN BOWHUNTERS ASSOCIATION. (Lister, James) (Entered: 10/03/2014) |
| 10/03/2014 | 50 | | MEMORANDUM by WISCONSIN DEPARTMENT OF NATURAL RESOURCES. (Hirsch, Cynthia) (Entered: 10/03/2014) |
| 10/03/2014 | 51 | | RESPONSE TO ORDER OF THE COURT re Order Staying Case,,,, filed by BORN FREE USA, FRIENDS OF ANIMALS AND THEIR ENVIRONMENT, HELP OUR WOLVES LIVE, HUMANE SOCIETY OF THE UNITED STATES. (Wagman, Bruce) (Entered: 10/03/2014) |
| 12/19/2014 | 52 | 24 | MEMORANDUM OPINION regarding the plaintiffs' 24 Motion for Summary Judgment; the defendants' 27 Cross−Motion for Summary Judgment; and defendant−intervenor Hunter Conservation Coalition's 33 Cross−Motion for Summary Judgment. Signed by Judge Beryl A. Howell on December 19, 2014. (lcbah1) (Entered: 12/19/2014) |

| | | | |
|---|---|---|---|
| 12/19/2014 | <u>53</u> | 22 | ORDER GRANTING the plaintiffs' <u>24</u> Motion for Summary Judgment; DENYING the defendants' <u>27</u> Motion for Summary Judgment and defendant−intervenor Hunter Conservation Coalition's <u>33</u> Motion for Summary Judgment; VACATING and SETTING ASIDE the Final Rule "Revising the Listing of the Gray Wolf (Canis lupus) in the Western Great Lakes (the "Final Rule"), 76 Fed. Reg. 81,666 (Dec. 28, 2011); and REINSTATING the rule regarding Reclassification of the Gray Wolf in the United States and Mexico, with Determination of Critical Habitat in Michigan and Minnesota, 43 Fed. Reg. 9607 (Mar. 9, 1978), to govern management of gray wolves in the nine states affected by the vacated Final Rule. See Order for further details. The Clerk is directed to close this case. Signed by Judge Beryl A. Howell on December 19, 2014. (lcbah1) (Entered: 12/19/2014) |
| 01/05/2015 | <u>54</u> | | MOTION for Extension of Time to *File Motion Relating to Attorney Fees and Costs* by BORN FREE USA, FRIENDS OF ANIMALS AND THEIR ENVIRONMENT, HELP OUR WOLVES LIVE, HUMANE SOCIETY OF THE UNITED STATES (Attachments: # <u>1</u> Attachment #1 − Motion for Extension of Time to File Rule 54(d) Motion, # <u>2</u> Attachment #2 − (Proposed) Order Granting Plaintiffs' Motion for Extension of Time to File Rule 54(d) Motion)(Wagman, Bruce) (Entered: 01/05/2015) |
| 01/06/2015 | | | MINUTE ORDER (paperless) GRANTING the plaintiffs' <u>54</u> Motion for Extension of Time to File Rule 54(d) Motion Relating to Attorney Fees and Costs. The plaintiffs' Motion for Extension of Time to File Motion for Attorney Fees and Costs, docketed at ECF No. 54−1, is deemed timely filed. Moreover, the District Court for the District of Columbia was closed by order of the Chief Judge on January 2, 2015, the last day for filing such a motion pursuant to Federal Rule of Civil Procedure 54(d)(2)(B). Thus, the plaintiffs' <u>54</u> Motion was timely filed on January 5, 2015, since the last day for filing under Rule 54(d)(2)(B) was a day on which the Court "clerk's office [was] inaccessible." *See* Fed. R. Civ. P. 6(a)(3)(A). Signed by Judge Beryl A. Howell on January 6, 2015. (lcbah1) (Entered: 01/06/2015) |
| 01/06/2015 | <u>55</u> | | MOTION for Extension of Time by BORN FREE USA, FRIENDS OF ANIMALS AND THEIR ENVIRONMENT, HELP OUR WOLVES LIVE, HUMANE SOCIETY OF THE UNITED STATES (Attachments: # <u>1</u> Text of Proposed Order)(rdj) (Entered: 01/06/2015) |
| 01/06/2015 | | | MINUTE ORDER (paperless) GRANTING the plaintiffs' <u>55</u> Motion for Extension of Time to File Motion for Attorney Fees and Costs. The plaintiffs shall file any motion for attorneys' fees and costs no later than thirty days following the deadline for appeal in this matter, or, if an appeal is noticed, thirty days following the final disposition of such appeal. Signed by Judge Beryl A. Howell on January 6, 2015. (lcbah1) (Entered: 01/06/2015) |
| 01/26/2015 | <u>56</u> | | NOTICE of Appearance by Kathryn Iverson Landrum on behalf of MINNESOTA DEPARTMENT OF NATURAL RESOURCES (Landrum, Kathryn) Modified on 1/27/2015 (rdj). (Entered: 01/26/2015) |
| 02/13/2015 | <u>57</u> | | NOTICE OF APPEAL TO DC CIRCUIT COURT as to <u>52</u> Memorandum & Opinion, <u>53</u> Order on Motion for Summary Judgment,,,,,,,,,,, by MICHIGAN HUNTING DOG FEDERATION, MICHIGAN UNITED CONSERVATION CLUBS, NATIONAL RIFLE ASSOCIATION OF AMERICA, ROCKY MOUNTAIN ELK FOUNDATION, SAFARI CLUB INTERNATIONAL, U.S. |

| | | | |
|---|---|---|---|
| | | | SPORTSMEN'S ALLIANCE FOUNDATION, UPPER PENINSULA BEAR HOUNDSMEN ASSOCIATION, WISCONSIN BEAR HUNTERS ASSOCIATION, WISCONSIN BOWHUNTERS ASSOCIATION. Filing fee $ 505, receipt number 0090−3993213. Fee Status: Fee Paid. Parties have been notified. (Lister, James) (Entered: 02/13/2015) |
| 02/13/2015 | 58 | | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 52 Memorandum & Opinion, 53 Order on Motion for Summary Judgment,,,,,,,,,,, by U.S. DEPARTMENT OF INTERIOR, SALLY JEWELL, FISH AND WILDLIFE SERVICE. Fee Status: No Fee Paid. Parties have been notified. (Attachments: # 1 ECF 52 − Order, # 2 ECF 53 − Opinion)(Gelatt, Andrea) (Entered: 02/13/2015) |
| 02/17/2015 | 59 | | Transmission of the Notice of Appeal, Order Appealed, and Docket Sheet to US Court of Appeals. The Court of Appeals fee was paid this date re 57 Notice of Appeal to DC Circuit Court. (znmw, ) (Entered: 02/17/2015) |
| 02/17/2015 | 60 | | Transmission of the Notice of Appeal, Order Appealed, and Docket Sheet to US Court of Appeals. The Court of Appeals docketing fee was not paid because the fee was an Appeal by the Government re 58 Notice of Appeal to DC Circuit Court. (znmw, ) (Entered: 02/17/2015) |
| 02/19/2015 | | | USCA Case Number 15−5041 for 57 Notice of Appeal to DC Circuit Court,, filed by ROCKY MOUNTAIN ELK FOUNDATION, MICHIGAN UNITED CONSERVATION CLUBS, SAFARI CLUB INTERNATIONAL, MICHIGAN HUNTING DOG FEDERATION, WISCONSIN BOWHUNTERS ASSOCIATION, NATIONAL RIFLE ASSOCIATION OF AMERICA, UPPER PENINSULA BEAR HOUNDSMEN ASSOCIATION, WISCONSIN BEAR HUNTERS ASSOCIATION, U.S. SPORTSMEN'S ALLIANCE FOUNDATION. (rd) (Entered: 02/19/2015) |
| 02/19/2015 | | | USCA Case Number 15−5043 for 58 Notice of Appeal to DC Circuit Court, filed by U.S. DEPARTMENT OF INTERIOR, SALLY JEWELL, FISH AND WILDLIFE SERVICE. (rd) (Entered: 02/19/2015) |
| 02/26/2015 | 61 | | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 52 Memorandum & Opinion, 53 Order on Motion for Summary Judgment,,,,,,,,,, by STATE OF WISCONSIN, WISCONSIN DEPARTMENT OF NATURAL RESOURCES. Filing fee $ 505, receipt number 0090−4005564. Fee Status: Fee Paid. Parties have been notified. (Dawson, Thomas) (Entered: 02/26/2015) |
| 02/26/2015 | 62 | | Transmission of the Notice of Appeal, Order Appealed, and Docket Sheet to US Court of Appeals. The Court of Appeals fee was paid this date re 61 Notice of Appeal to DC Circuit Court. (rdj) (Entered: 02/26/2015) |
| 02/27/2015 | 63 | 19 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 52 Memorandum & Opinion, 53 Order on Motion for Summary Judgment,,,,,,,,,, by MICHIGAN DEPARTMENT OF NATURAL RESOURCES, STATE OF MICHIGAN. Filing fee $ 505, receipt number 0090−4006587. Fee Status: Fee Paid. Parties have been notified. (Gambill, Nathan) (Entered: 02/27/2015) |

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

THE HUMANE SOCIETY OF THE
UNITED STATES and BORN FREE,
USA and HELP OUR WOLVES LIVE
("HOWL") and FRIENDS OF ANIMALS
AND THEIR ENVIRONMENT
("FATE"),

Plaintiffs,                                                  Civil Action No. 1:13-cv-00186-BAH

v

KENNETH SALAZAR, SECRETARY OF          **NOTICE OF APPEAL OF THE**
THE INTERIOR and UNITED STATES          **DEFENDANT-INTERVENORS**
DEPARTMENT OF THE INTERIOR              **STATE OF MICHIGAN AND THE**
and UNITED STATES FISH AND              **MICHIGAN DEPARTMENT OF**
WILDLIFE SERVICE,                       **NATURAL RESOURCES**

Defendants,

and

STATE OF MICHIGAN
530 West Allegan Street
Lansing, MI 48915,

and

MICHIGAN DEPARTMENT OF
NATURAL RESOURCES
530 West Allegan Street
Lansing, MI 48915,

      Defendant-Intervenor Applicants.
_____

## NOTICE OF APPEAL OF DEFENDANT-INTERVENORS
## STATE OF MICHIGAN AND THE MICHIGAN DEPARTMENT OF
## NATURAL RESOURCES

Notice is hereby given that the State of Michigan and the Michigan

Department of Natural Resources, Defendant-Intervenors in the above named case,

hereby appeal to the United States Court of Appeals for the District of Columbia

Circuit from the Court's December 19, 2014 Opinion, ECF No. 52, and Order, ECF

No. 53, granting judgment in favor of the plaintiffs and against the defendants and

defendant-intervenors, entered in this action on December 19, 2014.

Respectfully submitted,

Bill Schuette
Attorney General

/s/ Nate Gambill
Nate Gambill
(Mich. Bar No. P75506)
gambilln@michigan.gov
Pamela J. Stevenson
(Mich. Bar No. P40373)
stevensonp@michigan.gov
Assistant Attorneys General
Attorneys for State of Michigan and
Michigan Department of Natural
Resources
Environment, Natural Resources, and
Agriculture Division
P.O. Box 30755
Lansing, MI 48909
(517) 373-7540

Dated:  February 27, 2015

**CERTIFICATE OF SERVICE (E-FILE)**

I hereby certify that on February 27, 2015, I electronically filed the above

document(s) with the Clerk of the Court using the ECF System, which will provide

electronic copies to counsel of record.

<div align="right">

/s/ Nate Gambill
Nate Gambill
(Mich. Bar No. P75506)
gambilln@michigan.gov
Pamela J. Stevenson
(Mich. Bar No. P40373)
stevensonp@michigan.gov
Assistant Attorneys General
Attorneys for State of Michigan and
Michigan Department of Natural
Resources
Environment, Natural Resources, and
Agriculture Division
P.O. Box 30755
Lansing, MI 48909
(517) 373-7540

</div>

Dated:  February 27, 2015
LF/Humane Society v US Fish and Wildlife/2013-0032710-B/SOM & DNR's Notice of Appeal 2015-02-27

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| HUMANE SOCIETY OF THE UNITED STATES, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> SALLY JEWELL, *Secretary of the Interior*, *et al.*,1 <br><br> Defendants, <br><br> v. <br><br> STATE OF WISCONSIN, *et al.* <br><br> Intervenor-Defendants. | Civil Action No. 13-186 (BAH) |

## ORDER

Upon consideration of the plaintiffs' Motion for Summary Judgment, ECF No. 24, the defendants' Cross-Motion for Summary Judgment, ECF No. 27, defendant-intervenor Hunter Conservation Coalition's Cross-Motion for Summary Judgment, ECF No. 33, the submissions of defendant-intervenors, the States of Wisconsin and Michigan, ECF Nos. 29 and 30, the submissions of amici curiae the Minnesota Department of Natural Resources and the Association of Fish and Wildlife Agencies, ECF Nos. 31 and 38, the Administrative Record submitted by the defendants, ECF No. 45, the related legal memoranda in support and in opposition, the exhibits, declarations, and affidavits attached thereto, and the entire record herein, for the reasons set forth in the accompanying Memorandum Opinion, the Court finds that "there is no genuine dispute as to any material fact," FED. R. CIV. P. 56(a), and it is hereby

**ORDERED** that, because the plaintiffs are entitled to judgment as a matter of law, the

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Sally Jewell, Secretary of the Interior, is automatically substituted for her predecessor in office.

plaintiffs' Motion for Summary Judgment, is GRANTED; and it is further

**ORDERED** that the defendants' and defendant-intervenor's Cross-Motions for Summary

Judgment are DENIED; and it is further

**ORDERED** that, because the rule Revising the Listing of the Gray Wolf (Canis lupus) in

the Western Great Lakes (the "Final Rule"), 76 Fed. Reg. 81,666 (Dec. 28, 2011), is arbitrary

and capricious and violates the Endangered Species Act of 1973, as amended, 16 U.S.C. §§ 1531

*et seq.*, the Final Rule is VACATED and SET ASIDE; and it is further

**ORDERED** that the rule in effect prior to the Final Rule vacated by this Order, namely,

the rule regarding Reclassification of the Gray Wolf in the United States and Mexico, with

Determination of Critical Habitat in Michigan and Minnesota, 43 Fed. Reg. 9607 (Mar. 9, 1978),

is REINSTATED to govern management of gray wolves in the nine states affected by the

vacated Final Rule, pursuant to the Endangered Species Act; and it is further

**ORDERED** that the Clerk of the Court close this case.

**SO ORDERED**

Date: December 19, 2014

*This is a final and appealable Order. See* FED. R. APP. P. 4(a).

Digitally signed by Beryl A. Howell
DN: cn=Beryl A. Howell, o=District
Court for the District of Columbia,
ou=District Court Judge,
email=howell_chambers@dcd.usc
ourts.gov, c=US
Date: 2014.12.19 14:38:35 -05'00'

BERYL A. HOWELL
United States District Judge

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| HUMANE SOCIETY OF THE UNITED STATES, *et al.*, | |
| Plaintiffs, | |
| v. | Civil Action No. 13-186 (BAH) |
| SALLY JEWELL, *Secretary of the Interior, et al.*,[1] | Judge Beryl A. Howell |
| Defendants, | |
| v. | |
| STATE OF WISCONSIN *et al.*, | |
| Intervenor-Defendants. | |

**Table of Contents**

I.   BACKGROUND ........................................................................................................... 5

    A.   Statutory Framework: The Endangered Species Act Of 1973 .............................. 6

        1.   The 1973 Act ..................................................................................................... 9

        2.   The 1978 Amendment To The Definition Of "Species" ................................. 11

    B.   1966-1978: The Listing Of The Gray Wolf ........................................................ 14

        1.   1966–1976: Listing of Four Wolf Subspecies ................................................. 15

        2.   1977–78: Listing Of Gray Wolves At Taxonomic Species Level................... 17

    C.   1978-2000: General Recovery Efforts And The 1992 Recovery Plan................ 22

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Sally Jewell, Secretary of the Interior, is automatically substituted for her predecessor in office.

D.     2000 to Present: Attempts To Delist The Gray Wolf ......................................... 26

    1.     The 2003 Rule ............................................................................... 27

    2.     The 2007 Rule ............................................................................... 33

    3.     The 2009 Rule ............................................................................... 38

E.     The Challenged Final Rule .................................................................... 40

    1.     The NPRM ..................................................................................... 41

    2.     Promulgating The Final Rule ........................................................ 45

F.     Procedural History ................................................................................ 47

II.     LEGAL STANDARD ................................................................................... 48

A.     Summary Judgment ............................................................................... 48

B.     *Chevron* Framework ............................................................................. 49

C.     Administrative Procedure Act ............................................................... 51

III.     DISCUSSION ............................................................................................... 54

A.     The Plaintiffs Have Standing ............................................................... 55

B.     The FWS's Interpretation Of The ESA Is Unreasonable And Therefore Not

    Entitled To Deference ........................................................................... 63

    1.     A DPS Cannot Be Identified To Delist A Vertebrate Population ................... 64

    2.     Designating And Delisting A DPS Of A Broader Listed Species Violates The

    ESA ................................................................................................. 76

2

    C.     The Delisting Of The Western Great Lakes DPS Was Contrary To The Evidence

          Before The Agency ............................................................................. 93

      1.     Failure To Explain Why Territory Suitable For Wolf Occupation Is Not

           A Significant Part Of The Gray Wolf's Range ................................................ 93

      2.     Failure To Explain Impact Of Combined Mortality Factors ........................ 100

      3.     Failure To Explain The Adequacy Of Non-Existent State Regulatory

           Schemes ...................................................................................... 103

      4.     Failure To Explain How A State Plan To Allow Virtually Unregulated Killing

           Of Wolves In More Than Fifty Percent Of The State Does Not Constitute A

           Threat To Species ......................................................................... 105

    D.    Remedy........................................................................................... 107

IV.   CONCLUSION................................................................................... 110

## MEMORANDUM OPINION

The gray wolf, like the bald eagle and the grizzly bear, has become a symbol of endangered species but, perhaps more than other such species, the gray wolf is also a lightning rod for controversy.  *See generally* Jamison E. Colburn, *Canis (Wolf) and Ursus (Grizzly): Taking the Measure of an Eroding Statute*, 22-FALL NAT. RESOURCES & ENV'T 22 (2007).  The instant suit, brought by a group of "animal protection and conservation organizations," Compl. ¶ 1, ECF No. 1, against the United States Department of the Interior (the "DOI") and the National Fish and Wildlife Service (the "FWS"), is the latest iteration in a long-running dispute over the

fate of the gray wolf that predates the Endangered Species Act of 1973 (the "ESA"), 16 U.S.C. §
1531 *et seq*.

Since 2003, the FWS has promulgated rules to remove federal protections under the ESA
for the gray wolf population at issue in this matter four times.  The first three times, the FWS
rescinded the proposed rule "delisting" the gray wolf, twice on the orders of Federal courts and
once on its own initiative when facing another likely legal challenge.  The instant lawsuit
challenges the FWS's fourth attempt reflected in a Final Rule, which took effect in January 2012,
that "delisted," or removed from the ESA's list of protected species, the gray wolves in nine
states in the Midwest.  *See* Revising the Listing of the Gray Wolf (Canis Lupus) in the Western
Great Lakes (the "Final Rule"), 76 Fed. Reg. 81,666 (Dec. 28, 2011).  The plaintiffs, the Humane
Society of the United States ("HSUS"), Born Free, USA ("Born Free"), Help Our Wolves Live
("HOWL"), and Friends of Animals and Their Environment ("FATE"), allege that the Final Rule
violates the ESA and the Administrative Procedure Act (the "APA"), 5 U.S.C. § 551 *et seq.*, by,
*inter alia*, (1) improperly designating and delisting a distinct population segment of a species that
was already listed as "endangered," *see* Compl. ¶¶ 113–120; (2) improperly relying on
inadequate state regulatory mechanisms to protect gray wolves following their removal from the
protections of the ESA, *see id.* ¶¶ 121–126; and (3) improperly designating a group of wolves as
a distinct population segment without sufficient knowledge about the species to which the
wolves in that population belong, *see id.* ¶¶ 127–130.

Pending before the Court are three cross-motions for summary judgment filed by (1) the
plaintiffs, Pls.' Mot. Summ. J. at 1 ("Pls.' Mot."), ECF No. 24; (2) the defendants, the Secretary
of the Interior, the DOI, and the FWS (collectively, the "Federal defendants" or the
"defendants"), Fed. Defs.' Cross-Mot. Summ. J. ("Defs.' Mot") at 1, ECF No. 27; and (3) the

4

Defendant-Intervenor Hunter Conservation Coalition ("HCC"),[2] HCC's Cross-Mot. Summ. J. ("HCC's Mot.") at 1, ECF No. 33.[3]  The States of Wisconsin and Michigan oppose the plaintiffs' Motion and support the Federal defendants' motions as defendant-intervenors.  Wisconsin's Opp'n Pls.' Mot. ("Wisc. Opp'n"), ECF No. 29; State of Michigan and Michigan Dep't of Nat. Resources' Opp'n Pls.' Mot. and Concurring in Fed. Defs.' Mot. ("Mich. Opp'n"), ECF No. 30. The State of Minnesota and the Association of Fish and Wildlife Agencies have filed briefs as amicus curiae.  Amicus Minnesota Dep't of Nat. Resources' Mem. Supp. Defs.' Cross-Mot. Summ. J. and Opp'n Pls.' Mot. ("Minn. Opp'n"), ECF No. 31; Brief of Amicus Curiae Assoc. of Fish and Wildlife Agencies ("AFWA Brief"), ECF No. 38.

The D.C. Circuit has noted that, at times, a court "must lean forward from the bench to let an agency know, in no uncertain terms, that enough is enough."  *Pub. Citizen Health Res. Grp. v. Brock*, 823 F.2d 626, 627 (D.C. Cir. 1987).  This case is one of those times.  The FWS's Final Rule challenged in this action is no more valid than the agency's three prior attempts to remove federal protections for a population of gray wolves, which are otherwise members of an endangered species.  The challenged Final Rule is predicated on both an untenable reading of the ESA and otherwise flawed findings.  For the reasons more fully detailed below, the plaintiffs' motion is granted and the defendants and defendant-intervenor's motions are denied.

## I.       BACKGROUND

The issues posed by the instant suit are best understood in the context of the general statutory framework and the history of efforts to bring the gray wolf back from the brink of

---

[2] The HCC is made up of the U.S. Sportsmen's Alliance Foundation, Safari Club International, the National Rifle Association, the Wisconsin Bear Hunters Association, the Michigan United Conservation Clubs, the Wisconsin Bowhunters Association, the Upper Peninsula Bear Houndsmen Association, the Michigan Hunting Dog Federation, and the Rocky Mountain Elk Foundation.

[3] The plaintiffs have requested oral argument on the pending motion, Pls.' Mot. at 2, but given the sufficiency of the parties' written submissions to resolve the pending motions, this request is denied.  LCvR 7(f) (stating that allowing oral hearing is "within the discretion of the court").

extinction.  These subjects are examined first, followed by an overview of previous attempts by the FWS to delist the wolf population at issue and the specific facts and procedural history of this case.

### A.       Statutory Framework: The Endangered Species Act Of 1973

The ESA is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation" in the world.  *Tenn. Valley Auth. v. Hill,* 437 U.S. 153, 180 (1978); *In re Am. Rivers & Idaho Rivers United,* 372 F.3d 413, 414 (D.C. Cir. 2004) (quoting *id.*).  The multi-faceted purpose of this landmark legislation is "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, to provide a program for the conservation of such endangered species and threatened species, and to take such steps as may be appropriate to achieve the purposes of the treaties and conventions" that the United States has joined to protect threatened animals and ecosystems.  16 U.S.C. § 1531(b).

The ESA's scope is broad, potentially encompassing all fish, plant and wildlife on Earth. *See* 16 U.S.C. § 1531.  To provide guidance, Congress delegated many of the details of enforcing the ESA's mandate to the Secretary of the Interior, who is required "to promulgate regulations listing those species of animals that are 'threatened' or 'endangered' under specified criteria, and to designate their 'critical habitat.'"  *Bennett v. Spear,* 520 U.S. 154, 157–58 (1997) (citing 16 U.S.C. § 1533).  This authority has been delegated to the FWS.[4]  50 C.F.R. § 402.01(b); *In re Polar Bear Endangered Species Act Listing & Section 4(d) Rule Litig.—MDL No. 1993* (*In re Polar Bear*), 709 F.3d 1, 3 (D.C. Cir. 2013), *cert. denied*, 134 S. Ct. 310 (2013).  To determine whether a particular animal, plant, fish, or insect belongs on the list of "endangered" or

---

[4] The National Marine Fisheries Service "share[s] responsibilities for administering the Act," 50 C.F.R. § 402.01, but the FWS is responsible for the management of the species at issue in the instant matter.

"threatened" species, "the [FWS] must first define the species so the agency can estimate its population." *Am. Wildlands v. Kempthorne*, 530 F.3d 991, 994 (D.C. Cir. 2008).

The ESA defines the term "species" to "include[] any subspecies of fish or wildlife or plants, and any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature."  16 U.S.C. § 1532(16).  Thus, a wildlife "species" refers not only to a taxonomic species or subspecies, but also to a smaller "distinct population segment." *Id.* Neither of the terms "subspecies" or "distinct population segment" is defined. *Id.*; Policy Regarding the Recognition of Distinct Vertebrate Population Segments Under the Endangered Species Act ("DPS Policy"), 61 Fed. Reg. 4722, 4722 (Feb. 7, 1996).

The definition of "species" has particular importance under the ESA since this word is part of the terms "endangered species" and "threatened species," both of which designations, when bestowed on an organism by the FWS, entitle that organism to the panoply of federal protections available under the ESA. *See* 16 U.S.C. § 1532(6) (defining "endangered species"); *id.* § 1532(20) (defining "threatened species").  An "endangered species" is, according to the ESA, "any species which is in danger of extinction throughout all or a significant portion of its range," excluding certain types of insects. *Id.* § 1532(6).  A "threatened species" is "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id.* § 1532(20).  The phrase "all or a significant portion of its range," incorporated in the definitions for both endangered and threatened species, is also not a defined term. *See id.*; Final Rule, 76 Fed. Reg. at 81,722 ("The [ESA] does not define the term 'significant portion of its range.'").

When determining if a species ought to be listed as threatened or endangered, the FWS is required by the ESA to base its finding on any of five factors: "(A) the present or threatened

7

destruction, modification, or curtailment of [the species'] habitat or range; (B) overutilization for commercial, recreational, scientific, or educational purposes; (C) disease or predation; (D) the inadequacy of existing regulatory mechanisms; or (E) other natural or manmade factors affecting its continued existence."  16 U.S.C. § 1533(a)(1).  The determination must rest "solely on the basis of the best scientific and commercial data available."  16 U.S.C. § 1533(b)(1)(A); *Am. Wildlands,* 530 F.3d at 994.

Once a species is determined to be threatened or endangered, and then published on the ESA's list of such species, many statutory prohibitions and federal regulations take effect to protect that species.  *See, e.g.*, 16 U.S.C. § 1536(a)(2) (requiring federal agencies to insure any federal action "is not likely to jeopardize the continued existence of any endangered species or threatened species"); *id.* § 1538 (prohibiting variety of acts relating to endangered and threatened species); *see also In re Polar Bear*, 709 F.3d at 2; *Humane Soc'y of U.S. v. Kempthorne,* 527 F.3d 181, 182 (D.C. Cir. 2008) (detailing ESA prohibition on taking of endangered species); *Ariz. Cattle Growers' Assoc. v. Salazar*, 606 F.3d 1160, 1172 (9th Cir. 2010) ("Listing alone results in certain protections for the species" including those that "may impose economic burdens.").  A species listed as threatened is entitled to any protections the Secretary authorizes through the promulgation of regulations that are "necessary and advisable to provide for the conservation of such species."  16 U.S.C. § 1533(d); *Fund For Animals v. Norton*, 295 F. Supp. 2d 1, 4 (D.D.C. 2003).

The lack of statutory definitions for key terms in the ESA often exacerbates disputes over the appropriate classification of a species, as it has in the instant matter.  Thus, a closer look at the legislative changes to the definitions of "species," "endangered species," and "threatened

species" in the ESA is helpful in reviewing the FWS's interpretation of these pivotal statutory terms.

### 1.   *The 1973 Act*

As originally enacted in 1973, the ESA defined "species" as follows: "The term 'species' includes any subspecies of fish or wildlife or plants and any other group of fish or wildlife of the same species or smaller taxa in common spatial arrangement that interbreed when mature." Endangered Species Act of 1973, Pub. L. 93-205, §3(11), 87 Stat. 884, 886 (1973).[5] "[E]ndangered species" were defined as "any species which is in danger of extinction throughout all or a significant portion of its range," except for insects that "would present an overwhelming and overriding risk to man" if protected. *Id.* § 3(4), 87 Stat. at 885. "[T]hreatened species" were defined as "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id.* § 3(15), 87 Stat. at 886.

These definitions represented a marked shift from those used in the previous conservation laws, passed in 1966 and 1969. These predecessor laws limited the scope of federal protections to those "species of native fish and wildlife . . . that are threatened with extinction," Endangered Species Preservation Act of 1966, Pub. L. 89-669 § 1(a), 80 Stat. 926, 926 (1966), and generally required a global assessment. This global assessment requirement was made explicit in the 1969 version. *See* Endangered Species Conservation Act of 1969, Pub. L. 91-135 § 2, 83 Stat. 275, 275 (1969) (limiting protections to "species or subspecies of fish or wildlife which the Secretary has determined . . . to be threatened with worldwide extinction"). The ESA was intended to

---

[5] The ESA definition of "species" generally tracks the commonly understood use of this word, which is defined as "a taxonomic class of organisms uniquely distinguished from other classes by shared characteristics and usually by an inability to interbreed with members of other classes." BLACK'S LAW DICTIONARY 1527 (9th ed. 2009). Similarly, a "subspecies" is "a category in biological classification that ranks immediately below a species and designates a population of a particular geographic region genetically distinguishable from other such populations of the same species and capable of interbreeding successfully with them where its range overlaps theirs." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 1174 (10th ed. 1998).

provide more flexibility to list species threatened with extinction based on more localized assessments and, thereby, improve protections for such species.  *See, e.g.*, 119 Cong. Rec. 30,162–63 (1973) (Statement of Rep. John Dingell, Jr.), *reprinted in* U.S. Sen. Comm. on Environment and Public Works, 97th Congress, Legislative History of the Endangered Species Act of 1973 ("Leg. Hist."), Serial No. 97-6 (February 1982) at 193 ("The existing laws are sound, as far as they go, but later events have shown that they do not go far enough.  Present laws need to be made more flexible, to adapt themselves to the needs of the animals themselves and to deal with problems which did not exist until a few years ago.").[6]  To help accomplish this purpose, two significant changes were made in the definitions in the ESA.  First, the definition of "species" was broadened to include reference to "other group[s]" or "smaller taxa" of a fish or wildlife species that met certain conditions.  *See* § 3(11), 87 Stat. at 886; Leg. Hist. at 150 (House Report on the bill that became the ESA noting that "'[s]pecies' is defined broadly enough to include any subspecies of fish or wildlife or plants, or any population of such species.").

Second, the phrase "significant portion of its range" was inserted into the definitions of "endangered species" and "threatened species."  *See id.* §§ 3(4), 87 Stat. at 885 (defining endangered species); 3(15), 87 Stat. at 886 (defining threatened species).  This phrase was intended to extend federal protection to animals when their numbers were dwindling significantly, even if populations of those animals continued to persist somewhere.  *See* Leg. Hist. at 193 (Statement of Rep. Dingell) (noting phrase "significant portion of range" would "extend[] protection to animals which are in trouble in any significant portion of their range, rather than threatened, a[s] they must now be, with worldwide extinction"); *id.* at 200 (Statement

---

[6] The legislative history of the ESA was compiled by the Congressional Research Service of the Library of Congress in 1982 for the use of the Senate Committee on Environment and Public Works.  Leg. Hist. at III.  For ease of reference, references to the ESA's legislative history throughout this Memorandum Opinion will refer to this volume and use pinpoint citations to its pages.

10

of Rep. Charles M. Price) (same); *id.* at 202 (Statement of Rep. Mario Biaggi) ("[W]e are

defining the problem as broadly as possible.  Instead of merely protecting those species which

are now in danger, we are developing a concept of protection which will have continuous force.

We are including those species which, at some future date, might become endangered.").  In

urging passage of the bill that became the ESA, a House sponsor summed up the ESA's purpose

and scope, stating that "[b]y heeding the warnings of possible extinction today, we will prevent

tomorrow's crisis.  *Id.* at 205 (Statement of Rep. Benjamin Gilman).

The Senate's consideration of its version of the ESA echoed the House's concerns and

made clear that the ESA was designed to prevent the extinction of species by providing greater

flexibility in adopting prophylactic measures and extending federal protection to species before

they reached the absolute brink of worldwide extinction, as had been the case under previous

laws.  The report of the Senate Committee on Commerce, which recommended passage of the

ESA, noted that the legislation "provide[d] a broadened concept of 'endangered species' by

affording the Secretary the additional power to list animals which he determines are likely within

the foreseeable future to become threatened with extinction."  LEG. HISTORY at 302 (S. Rep. No.

93-307).  This "[f]lexibility in regulation is enhanced by a provision which allows for listing if

the animal is endangered over a 'substantial portion of its range.'"  *Id.*

### 2.   *The 1978 Amendment To The Definition Of "Species"*

Five years after passage of the ESA, Congress adopted amendments to the ESA to

streamline the administrative process for listing species as endangered or threatened.

Specifically, these amendments addressed "the application for, and review of, an exemption from

the prohibition against agency actions which jeopardize endangered or threatened species or their

critical habitat," and "improve[d] the process whereby species or their critical habitats are

designated."  LEG. HIST. at 643 (Endangered Species Act Amendments ("ESAA") of 1978,

11

Public Law 95-632, *Background*).  One ESAA provision modified the definition of "species" to include the phrase "distinct population segment" as follows: "The term 'species' includes any subspecies of fish or wildlife or plants, and any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature."  Endangered Species Act Amendments of 1978, Pub. L. 95-632 § 2(5), 92 Stat. 3751, 3752 (1978).

        As noted, the phrase "distinct population segment" is not defined in the ESA, nor is this phrase "commonly used in scientific discourse" or "recognized in formal taxonomic terms." DPS Policy at 4722.  Plainly, the addition of the phrase "DPS" to the definition of "species" authorized the listing of some entities that were not classified at the taxonomic level of species or subspecies.  *See* ESAA § 2(5), 92 Stat. at 3752.  The legislative history for this amended definition in the ESAA is sparse, with virtually no discussion of the term's meaning or the intended effect of this change in the definition of "species."  Nevertheless, a report the next year by the Senate Committee on Environment and Public Works (the "1979 Senate Committee Report") provides relevant post hoc guidance on the meaning of this term.

        The 1979 Senate Committee Report accompanying a bill to, *inter alia*, reauthorize appropriations for the ESA, addressed recommendations made by the General Accounting Office ("GAO") (now named the "Government Accountability Office") during an oversight hearing "to determine the necessary reauthorization amounts."  Leg. Hist. at 1393 (1979 Senate Committee Report, S. Rep. 96-151).  The GAO expressed concern over aspects of the DOI's implementation of the ESA and singled out the definition of "species," which referenced "distinct population segment," as worthy of amendment.  *See id.* at 1396–97; *see also* General Accounting Office, *Endangered Species: A Controversial Issue Needing Resolution,* CED-79-65 (July 2, 1979) ("GAO Report") at 52–59.  The GAO opined that the definition of "species" was too broad and

12

conferred expansive authority on the FWS, citing as an example that the 1978 definition of "species" could result in "squirrels in a specific city park . . . be[ing] listed as endangered, even though an abundance of squirrels lived in other parks in the same city and elsewhere."  GAO Report at 52.  Among the GAO's recommendations was a proposal that Congress eliminate the phrase "distinct population segment" from the definition of "species."  Leg. Hist. at 1396 (1979 Senate Committee Report); *see also* GAO Report at ii, 57-60.  The FWS opposed the GAO's recommendation citing the agency's need for broad flexibility to "adopt different management practices for healthy, threatened or endangered populations."  Leg. Hist. at 1396.

Siding with the FWS, the Senate Committee rejected the GAO's recommended definitional change, explaining that "the U.S. population of an animal should not necessarily be permitted to become extinct simply because the animal is more abundant elsewhere in the world."  *Id.* at 1397.  According to the 1979 Senate Committee Report, "listing of populations may be necessary when the preponderance of evidence indicates that a species faces a widespread threat, but conclusive data is available with regard to only certain populations."  *Id.* While acknowledging "the great potential for abuse of this authority," this report cautioned the FWS "to use the ability to list populations sparingly and only when the biological evidence indicates that such action is warranted."  *Id.*

Both the GAO and Senate reports in 1979 were focused on the 1978 definition's expansion of the FWS's authority to *extend* protection to discrete population groups within taxonomic species, even when that species was *not* otherwise endangered.  Neither report made any reference to a possible use of this amended definition to *remove* protection from such population groups within an already listed taxonomic species.  Indeed, the GAO Report expressed concern that the FWS would use DPS designations to extend Federal protection too

13

broadly by listing "geographically limited populations of vertebrate species . . . even though they may not be endangered or threatened throughout all or a significant portion of their existing ranges," which could "create increase the number of potential conflicts with Federal, State, and private projects and programs."  GAO Report at 51.  Rather than continue permitting the listing of discrete population segments, the GAO recommended that listings be limited to "entire species."  *Id*. at 55.  This was the context in which the Senate Committee rejected the GAO's recommendation.  *See* LEG. HIST. at 1396–97; GAO Report at 52–59.  The notion that the FWS would use the 1978 definitional change to delist and remove protections from a DPS-designated population of an already listed taxonomic species was not acknowledged as a potential problem, perhaps in light of the overall purpose of the ESA "to protect, conserve, propagate, and restore endangered species."  LEG HIST. at 393 (Statement of Sen. John Tunney).

Almost twenty years after the phrase "distinct population segment" was first incorporated into the ESA without a statutory definition, the FWS promulgated its own policy, in 1996, to guide the identification of threatened and endangered DPSs.  The agency outlined "three elements" required for designation of a population as a DPS: the "[d]iscreteness of the population segment[,]" the "[s]ignificance of the population segment[,]" and the "population segment's conservation status."  DPS Policy, 61 Fed. Reg. 4725.  These elements are discussed in more detail *infra* at Part III.B.2.

**B.      1966-1978: The Listing Of The Gray Wolf**

The gray wolf (*Canis lupus*) has been at the forefront of the movement to conserve endangered species for many years and, in certain respects, is one of its success stories, considering the gray wolf's status when conservation efforts began.  "By the 1930s, wolves were nearly erased from the lower 48 States as a result of one of the most effective eradication campaigns in modern history."  Hope M. Babcock, *The Sad Story of the Northern Rocky*

14

*Mountain Gray Wolf Reintroduction Program*, 24 FORDHAM ENVTL. L. REV. 25, 38 (2013) (internal quotation marks omitted).  Consequently, multiple subspecies of gray wolves were among the earliest wildlife to be protected by federal law.  The history of the gray wolf's listing as an endangered species is illuminating in evaluating the positions of the parties in the instant case.

### 1.    *1966–1976: Listing of Four Wolf Subspecies*

The first federal legislation protecting endangered species, the Endangered Species Preservation Act of 1966 (the "1966 Act"), provided the authority for listing the "timber wolf" (*Canis lupus lycaon*) as "threatened with extinction."  Endangered Species, 32 Fed. Reg. 4001, 4001 (Mar. 11, 1967).  Such a listing required, according to the 1966 Act, the Secretary of the Interior to find "that its existence is endangered because its habitat is threatened with destruction, drastic modification, or severe curtailment, or because of overexploitation, disease, predation, or because of other factors, and that its survival requires assistance."  1966 Act § 1(c).  The "timber wolf" was one of only fourteen mammals identified at that time as "threatened with extinction," along with, *inter alia*, the grizzly bear and the Florida panther.  Endangered Species, 32 Fed. Reg. at 4001.

Federal law protecting endangered species was enhanced in 1969 with the passage of the Endangered Species Conservation Act of 1969 (the "1969 Act"), the immediate precursor to the ESA.  *See* Endangered Species Conservation Act of 1969, Pub. L. 91-135, 83 Stat. 275 (1969).  The revisions prohibited, *inter alia*, the import and sale of endangered species, *see id.* § 4, whereas the 1966 Act addressed only the taking or harming of endangered species or their habitat on federal land, *see* 1966 Act § 4(c), 80 Stat. at 928.  As noted, the 1969 Act, however, applied expressly only to species "threatened with worldwide extinction," a narrow focus later broadened by the ESA.  *See* 1969 Act § 2.  The timber wolf's place on the list of protected

15

species remained unchanged under the 1969 Act until it was joined by another gray wolf subspecies, the Northern Rocky Mountain Wolf, *Canis lupus irremotus*, in 1973, shortly before enactment of the ESA.  Amendments to Lists of Endangered Fish and Wildlife, 38 Fed. Reg. 14,678, 14,678 (June 4, 1973).  Upon passage of the ESA, the two subspecies—*Canis lupus lycaon* (now referred to as the Eastern timber wolf) and *Canis lupus irremotus* (the Northern Rocky Mountain wolf)—remained on DOI's list of "endangered native wildlife," but the gray wolf species, *Canis lupus*, as a whole was not listed.  *See* § 17.12 Endangered Native Wildlife, 39 Fed. Reg. 1175, 1175 (Jan. 4, 1974).

The Eastern timber wolf and the Northern Rocky Mountain wolf were joined by the Mexican wolf (*Canis lupus baileyi*), on the list of endangered species in 1976.  Determination that Two Species of Butterflies are Threatened Species and Two Species of Mammals are Endangered Species, 41 Fed. Reg. 17,736, 17,737 (Apr. 28, 1976).  In proposing the Mexican wolf for listing as endangered, the FWS noted that the subspecies "formerly was common in Arizona, New Mexico, southwestern Texas, and much of Mexico" but had "declined substantially in numbers and distribution, because of habitat loss and killing by man."  Lists of Endangered and Threatened Fauna, 40 Fed. Reg. 17,590, 17,590 (Apr. 21, 1975).  In 1975, it was believed that fewer than 200 members of this gray wolf subspecies remained in Mexico and in the United States.  *Id.*  The piecemeal listing of gray wolf subspecies continued when, later in 1976, a fourth subspecies of the gray wolf, *Canis lupus monstrabilis*, with a range encompassing Texas, New Mexico, and Mexico, was added to the list of endangered species.  Endangered Status for 159 Taxa of Animals, 41 Fed. Reg. 24,062, 24,066 (June 14, 1976).  Altogether, by mid-June 1976, four subspecies of the gray wolf were officially listed as endangered species by the FWS.

At the same time that the FWS was adding gray wolf subspecies to the lists of federally protected species, the Commissioner of the Minnesota Department of Natural Resources petitioned the agency "seeking to exclude Minnesota from the range over which the eastern timber wolf (*Canis lupus lycaon*) is determined to be an endangered species . . . ."  Eastern Timber Wolf in Minnesota, Review of Status, 39 Fed. Reg. 40,877, 40,877 (Nov. 21, 1974).  This petition was considered, along with plans to address threats to the gray wolf, in a major revision of the gray wolf's listing in 1978.  *See* Proposed Reclassification of the Gray Wolf in the United States and Mexico, With Proposed Critical Habitat in Michigan and Minnesota ("1977 NPRM"), 42 Fed. Reg. 29,527, 29,528 (June 9, 1977).

### 2.     *1977–78: Listing Of Gray Wolves At Taxonomic Species Level*

By 1977, the listing of gray wolves by subspecies had become "[un]satisfactory because the taxonomy of wolves [was] out of date, wolves may wander outside of recognized subspecific boundaries, and some wolves from unlisted subspecies may occur in certain parts of the lower 48 states."  1977 NPRM, 42 Fed. Reg. at 29,527.  Although the gray wolf, *Canis lupus*, as a species, "formerly occurred in most of the conterminous United States and Mexico[,] [b]ecause of widespread habitat destruction and human persecution, the species now occupies only a small part of its original range in these regions."  *Id.*  In proposing to remove the four gray wolf subspecies from the List of Endangered and Threatened Wildlife and, instead, list the gray wolf at the higher taxonomic level of "species," the FWS "wishe[d] to recognize that the entire species *Canis lupus* is Endangered or Threatened to the south of Canada, and [FWS] considers that this matter can be handled most conveniently by listing only the species name."  *Id.*

The FWS particularly focused on the eastern timber wolves in Minnesota in 1977, noting that the "original range of the subspecies . . . included most of the region from Georgia to Maine, and between the Atlantic and the Great Plains," and that range had been reduced to a single

17

"substantial gray wolf population . . . in northern Minnesota."  *Id.* at 29,528.  The FWS

acknowledged that the Minnesota wolf population had survived following its listing as

endangered in 1967 "and it became apparent that the species was not in immediate danger of

being extirpated in the State."  *Id.*  While "the Minnesota population . . . represent[ed] the last

significant element of a species that once occupied a vastly larger range in the lower 48 States,"

the FWS noted that "long term trends may be working against the wolf."  *Id.* at 29,528–29.

Human-wolf conflicts appeared to be increasing as the wolves began to experience "an overall

increase in range," with the result that "[s]ome wolves . . . entered areas with relatively extensive

human settlement and made depredations on domestic animals."  *Id.* at 29,528.  The FWS

proposed that the gray wolf be listed as "threatened" in Minnesota and as "endangered" at the

species, rather than the subspecies, level in the other 47 conterminous states.  *Id.*

      The 1977 NPRM, which was adopted without substantial revision, *see* Reclassification of

the Gray Wolf in the United States and Mexico, with Determination of Critical Habitat in

Michigan and Minnesota (the "1978 Rule"), 43 Fed. Reg. 9607, 9608 (Mar. 9, 1978), met with

considerable resistance from the State of Minnesota.  For example, "[t]he Governor of Minnesota

stated that the wolf in Minnesota should be classified neither as Endangered nor Threatened,"

because, *inter alia*, "the [ESA] regulations would not allow for adequate control of depredating

wolves."  *Id.*  Similarly, the Minnesota legislature passed a resolution calling for complete

declassification of the wolf in Minnesota," stating that

> the wolf population had reached carrying capacity in many areas and was
> expanding into areas 'not heretofore inhabited'; hardship was resulting from wolf
> depredations; the State had adequate resources and authority to effectively
> manage the wolf; and the Legislature believed it best for the State to have
> exclusive control of its resident wolf population.

*Id.*  Despite the resistance from Minnesota, the FWS concluded that the State's expressed

concerns over wolf depredations, State resources, and State autonomy, were not among those

"that may legally be considered in determining the classification of a species under the Endangered Species Act." *Id.* at 9608. The FWS further stated that "while it is recognized that the wolf may recently have increased its range in Minnesota, it is not entirely correct to say that the involved areas were 'not heretofore inhabited,' because at one time the wolf occupied the entire State." *Id.* Thus, even if the wolf had "reached carrying capacity in some parts of Minnesota," those "areas represent[ed] a comparatively small portion of the original range of the species, and population density alone will not assure long-term welfare." *Id.*

The FWS addressed the accusations that "a small interest group" improperly influenced the classification of the gray wolf in Minnesota, stating that, to the contrary, the proposed classification of the gray wolf at the species level was "an accurate classification and proper regulations [were] being established" to protect the gray wolf in Minnesota and the other 47 conterminous states. *See id.* at 9609. At the same time that Minnesota disagreed with any designation of the Minnesota population of wolves, certain environmental groups disagreed with FWS's classification of gray wolves in Minnesota as merely "threatened," rather than "a tiny and Endangered remnant of a former wide-ranging species."[7] *Id.* In response to this disagreement, the FWS indicated "that no matter how the Minnesota population is viewed, it, by itself, is more properly classified as Threatened." *Id.*

The FWS also addressed concerns about the impact of the reclassification on the management of different subspecies of gray wolves. For example, the United States Forest Service "requested assurance that biological subspecies would continue to be maintained and dealt with as separate entities." *Id.* at 9609. The FWS stated it could "give this assurance,"

---

[7] None of the environmental groups expressing concern over the wolves' designation in 1978 is a party to the instant suit. *Compare* 1978 Rule, 43 Fed. Reg. at 9609 (listing environmental groups offering comments on 1977 NPRM) *with* Compl. at 1.

without an explanation of the legal basis for such differential treatment. *See id.*  Similarly, the

North American Wolf Society posited that removing subspecies designations for gray wolves

"could jeopardize efforts to locate and maintain stocks of the various subspecies," but the FWS

offered "the firmest assurance that it will continue to recognize valid biological subspecies for

purposes of its research and conservation programs." *Id.* at 9610.

Relying on the pre-1978 definition of "species" in the ESA, which did not contain the

term "distinct population segment," the FWS found that, for the purposes of the listing, "the gray

wolf (*Canis lupus*) group in Mexico and the 48 conterminous States of the United States, other

than Minnesota, is being considered as one 'species', and the gray wolf group in Minnesota is

being considered as another 'species.'" *Id.*  In applying the five factors to determine whether the

two species were endangered or threatened, as required by Section 4(a) of the ESA, the FWS

explained, first, in considering "[t]he present or threatened destruction, modification, or

curtailment of its habitat or range," that the Minnesota population of gray wolves "represent[ed]

the last significant element of a species that once occupied a vastly larger range in the lower 48

States, and long-term trends may be working against the wolf." *Id.* at 9611.  With respect to the

second factor, "[o]verutilization for commercial, sporting, scientific, or educational purposes,"

the FWS found that "[d]irect killing by man . . . has been the major direct factor in the decline of

wolves in the conterminous United States" and that "[w]olves still are regularly shot, especially

when they appear in settled areas that are not part of their regular range.  Illegal killing is a

problem in Minnesota and other areas where the wolf still occurs." *Id.*  With regard to the final

three factors, the FWS cited the "confusing taxonomy of wolf subspecies" and the lack of non-

federal protections in some states as evidence of the "inadequacy of existing regulatory

mechanisms," while cautioning that the inability to kill wolves "that may be attacking livestock

and pets" could be "creating an adverse public attitude toward the whole species." *Id.* The new

classification took effect April 10, 1978. *Id.* at 9607.

After the reclassification of the gray wolf in 1978, the FWS re-affirmed the propriety of

the species' listing status in 1989 and 1990 when considering and rejecting petitions to remove

the gray wolf from the List of Endangered and Threatened Wildlife. *See* Notice of Finding on

Petition to Delist the Gray Wolf (the "1989 Petition"), 54 Fed. Reg. 16,380, 16,380 (Apr. 24,

1989); Notice of Finding on a Petition to Delist the Gray Wolf (Canis lupus) (the "1990

Petition"), 55 Fed. Reg. 49,656, 49,656 (Nov. 30, 1990). The 1989 Petition, filed by a private

citizen, argued that "wolves are in no danger of total extinction," citing a Minnesota wolf

population of 1,500. 1989 Petition at 16,380. The FWS found that the citizen's "brief petition

did not present any significant information bearing on the status" of the gray wolf and that "the

best scientific and commercial information available to the Service indicates the goals of the gray

wolf recovery plans have not been met and the present classification of the wolf is correct." *Id.*

The 1990 Petition, filed by the Farm Bureau Federations of Wyoming, Montana, and

Idaho, took a different tack in challenging the 1978 listing decision for the gray wolf species.

1990 Petition at 49,656. This petition contended that "gray wolves are hybridizing with other

canids, especially coyotes," and, consequently, "[t]he gray wolf is not a species, and thus is not

eligible for listing and protection under the" ESA or, in the alternative, the FWS could not

"distinguish 'pure' wolves from hybrid wolves so it is impossible to effectively carry out a

program designed for the eventual recovery of the gray wolf." *Id.* After reviewing the

references submitted by the Farm Bureau Federations and other scientific literature, the FWS

found that populations of non-hybridized gray wolves did exist and that genetic evidence did not

support the Farm Bureau Federations' arguments. *Id.* at 49,656–57. Moreover, the FWS pointed

out that it was "not permitted to consider the probability of successfully recovering a species when making a decision to list or delist a species" and, therefore, that the ability to delineate "pure" wolves from hybrids was essentially irrelevant. *Id.* at 49,658. The FWS concluded that "[t]he best scientific and commercial data available support continued listing for the gray wolf." *Id.*

<p style="text-align:center">*      *      *</p>

In sum, since the enactment of the first legislation to protect endangered species in 1966, all gray wolves in the lower 48 States have been brought under federal protection. Although the FWS initially listed subspecies of the gray wolf in a piecemeal fashion, by 1978 the agency had rejected that practice in favor of listing the gray wolf species, *Canis lupus*, as endangered in every conterminous State, except Minnesota, where it was separately listed as threatened. As described next, after listing the gray wolf at the species taxonomic level, the FWS took steps to recover the gray wolf in Minnesota and elsewhere, including with the 1992 Eastern Timber Wolf Recovery Plan, which figures prominently in the instant challenged Final Rule.

## C.    1978-2000: General Recovery Efforts And The 1992 Recovery Plan

The ESA requires federal agencies to "seek to conserve endangered species and threatened species and . . . utilize their authorities in furtherance of the purposes of [the ESA]." 16 U.S.C. § 1531(c). Consistent with this statutory mandate, the FWS undertook significant efforts to recover the gray wolf, including reintroducing wolves to areas where they were previously abundant but had been extirpated. Such experimental populations were reintroduced into the Northern Rocky Mountain region, Establishment of a Nonessential Experimental Population of Gray Wolves in Central Idaho and Southwestern Montana, 59 Fed. Reg. 60,266, 60,266 (Nov. 22, 1994), and the Southwestern United States, Establishment of a Nonessential

<p style="text-align:center">22</p>

Experimental Population of the Mexican Gray Wolf in Arizona and New Mexico, 63 Fed. Reg.

1752, 1752 (Jan. 12, 1998), in the 1990s.

      To assist in accomplishing these goals, the ESA requires DOI to "develop and implement

plans," known as recovery plans, "for the conservation and survival of endangered species and

threatened species."  16 U.S.C. § 1533(f)(1).  Recovery plans must incorporate, *inter alia*, "a

description of such site-specific management actions as may be necessary to achieve the plan's

goal for the conservation and survival of the species," and "objective, measurable criteria which,

when met, would result in a determination . . . that the species be removed from the list."  *Id.* §

1533(f)(1)(B).  An initial recovery plan for the eastern timber wolf was prepared and approved in

1978 and revised in 1992.  *See* AR Ex. A (U.S. Fish and Wildlife Service, *Recovery Plan for the

Eastern Timber Wolf* (1992) (the "Recovery Plan")) at 2A, ECF No. 45-1.[8]

      The Recovery Plan set out a "recovery objective" for the eastern timber wolf

"subspecies" of "delisting."  Recovery Plan at 5A.  As of 1992, "[a] stable and growing

population estimated at 1550 to 1750 wolves . . . exist[ed] in Minnesota," an additional "45 to 60

wolves comprise[d] a second population in northern Wisconsin and the Upper Peninsula of

Michigan," and an isolated population of "thirteen or fourteen wolves . . . [existed] in Isle Royale

National Park, Michigan."  *Id.*  These wolves inhabited parts of Minnesota, Michigan, and

Wisconsin, "about three percent of [their] original range," after formerly inhabiting "most of the

eastern United States and southeastern Canada."  *Id.* at 11A.  The three states of Minnesota,

Wisconsin, and Michigan (hereinafter "the Tri-State Area") were "believed" to have "sufficient

suitable habitat . . . to achieve the recovery criteria."  *Id.* at 5A.

---

[8] Citations to page numbers of documents contained in the Administrative Record refer to the "Bates" stamp number
that appears in the lower right corner of each Administrative Record page.

To qualify as "recovered," the eastern timber wolf had to have "[a]t least two viable populations within the 48 [conterminous] United States," including a "stable or growing" Minnesota population and "a second population outside of Minnesota and Isle Royale . . . having at least 100 wolves in late winter if located within 100 miles of the Minnesota wolf population" or at least 200 wolves "if located beyond that distance." *Id.* The need for at least two populations was consistent with the "basic concept of conservation biology that a species can never be assumed to be secure from extinction if only a single population exists" since the "only satisfactory means of reducing the threat of extinction from an unexpected catastrophe is to ensure that more than a single population is established prior to declaring the species recovered." *Id.* at 25A. Moreover, "ideal multiple recovery populations should: (1) be completely separated from each other so as to eliminate the possibility of transmission of disease, parasites, etc. from one population to the other, thereby potentially transferring a catastrophe," while still being close enough to allow some exchange of genetic material. *Id.* at 25A–26A. The Recovery Plan considered the "immigration corridor between the Minnesota and Wisconsin/Michigan populations [to be] narrow," which would keep "the threat of disease transmission . . . at an acceptably low level" for a second viable population to be established in Wisconsin and Michigan apart from the Minnesota wolves. *Id.* at 26A.

The Recovery Plan listed five factors as "critical to the long-term survival of the eastern timber wolf:"

> (1) large tracts of wild land with low human densities and minimal accessibility by humans, (2) ecologically sound management, (3) availability of adequate wild prey, (4) adequate understanding of wolf ecology and management, and (5) maintenance of populations that are either free of, or resistant to, parasites and diseases new to wolves or are large enough to successfully contend with their adverse effects.

24

*Id.* at 17A.  With respect to the first factor, maintaining tracts of wild land, the Recovery Plan noted that wolf packs generally range over twenty to 214 square miles and the Recovery Plan "estimated that a minimum of 4,000 to 5,000 square miles" with low road density and sparse human habitation was necessary to maintain a viable wolf population.  *Id.* at 19A.  Northeastern Minnesota was identified as "primary wolf range," and the southern, more populated portions of the State, was considered "peripheral range."  *See id.* at 15A–16A.

The second factor, ecologically sound management, included providing "protection where needed to help restore the eastern timber wolf to areas of its original range and to preserve a naturally functioning population that can serve as a living museum, as a scientific subject, and as a reservoir to repopulate adjacent areas."  *Id.* at 21A.  Noting that wolves in Minnesota have "begun to colonize" portions of Minnesota even beyond the "peripheral range," including "a high proportion of intensively farmed areas" in the southern portion of the state, *id.* at 16A, the Recovery Plan expressed support for taking wolves when they stray into such areas, *see id.* at 21A ("Zone 5 [southern Minnesota] is not suitable for wolves.  Wolves found there should be eliminated by any legal means.").[9]

Regarding the third and fourth factors, the Recovery Plan suggested reintroduction of some prey species to the wolves' range, including the woodland caribou, and continuing public education efforts since "considerable misinformation still exists among several segments of the Minnesota and Michigan population," necessitating the continued provision of "concerted information and education."  *Id.* at 23A.  With respect to the final factor, the Recovery Plan briefly noted that since "the wolf's range has been reduced, parasites and diseases may become

---

[9] The Recovery Plan discussed the impact of the eastern timber wolf on Minnesota's livestock industry, noting that "[a]pproximately five cattle are claimed lost per 10,000, and approximately twelve sheep per 10,000, in wolf range per year," and that "[t]he Minnesota Department of Agriculture has paid compensation for livestock killed by wolves averaging $26,762 per year."  Recovery Plan at 12A.

25

more significant mortality factors." *Id.* at 13A.  In particular, the Recovery Plan noted that "over half of the variation in annual pup production and a third of the variation in wolf population change in the Superior National Forest" was caused by a single canine disease, canine parvovirus ("CPV").  *Id.*  Thus, "CPV could be important in limiting isolated or disjunct wolf populations such as those in Wisconsin and Michigan."  *Id.*  Indeed, the Recovery Plan cautioned that "[w]olf populations will be able to survive only if they are somehow able to contend with these new threats" from disease.  *Id.* at 23A–24A.  Nevertheless, the Recovery Plan cited scientific evidence that a wolf population can support "annual mortality of 28 percent to 50 percent" while remaining "healthy, productive wolf populations."  *Id.* at 17A (internal citations omitted).

To maintain the species post-recovery, i.e., post delisting, the Recovery Plan envisioned that certain regulations would remain in place in Minnesota, including a ban on the taking of wolves, except in circumstances of depredation control, in certain areas of the state and substantial efforts to improve the habitat of the wolves' prey.  *See id.* at 28A.  The Recovery Plan cautioned that "future circumstances are unpredictable and those that now exist could change drastically."  *Id.*  Consequently, the Recovery Plan advocated taking "[a] conservative approach . . . when one is dealing with threatened or endangered populations," such as the Minnesota wolves.  *Id.*  The Recovery Plan concluded that "it is important to explore all possibilities and to give the highest priority throughout this entire recovery plan to the biological and ecological considerations" because "[t]hey are the only ones that will be significant 100 years from now." *Id.* at 30A.

### D.    2000 to Present: Attempts To Delist The Gray Wolf

Beginning in 2000, eight years after the last revision of the eastern timber wolf recovery plan, the FWS published a proposed rule "to change the classification of the gray wolf (*Canis lupus*) . . . [because] the species' current classification is no longer appropriate throughout most

of its range."  Proposal to Reclassify and Remove the Gray Wolf From the List of Endangered

and Threatened Wildlife in Portion of the Conterminous United States; Proposal To Establish

Three Special Regulations for Threatened Gray Wolves, 65 Fed. Reg. 43,450, 43,450 (July 13,

2000).  The proposed rule touched off more than a decade of litigation over the appropriate

classification of the gray wolf.  *See infra*.  Since the Final Rule at issue in this case is the latest

chapter of that dispute, examination of the previous iterations of proposed classification changes,

to which successful challenges were raised, is useful context for evaluating the current challenge.

        1.    ***The 2003 Rule***

      The proposed rule published in 2000 took effect on April 1, 2003.  *See* Final Rule to

Reclassify and Remove the Gray Wolf From the List of Endangered and Threatened Wildlife in

Portions of the Conterminous United States; Establishment of Two Special Regulations for

Threatened Gray Wolves (the "2003 Rule"), 68 Fed. Reg. 15,804, 15,804 (Apr. 1, 2003).  The

2003 Rule divided the endangered gray wolf species into "three distinct population segments:"

an Eastern DPS and Western DPS, in which gray wolves were reclassified as "threatened," and a

Southwestern DPS, in which gray wolves remained endangered.  *Id.* at 15,804.  Regulations

substantially similar to those in effect in Minnesota since 1978 regarding the taking of wolves

were applied "to most of the Eastern DPS," the effect of which would have been to relax

restrictions on the killing of wolves in those states.  *See id.*; 1978 Rule, 43 Fed. Reg. at 9612–

9615.  In sixteen states, mainly in the southern and eastern portions of the United States, gray

wolves were "removed from the protections of the [ESA] . . . where the species historically did

not occur."  2003 Rule, 68 Fed. Reg. at 15,804.  The FWS explained this part of the proposal,

stating that the "1978 listing of the gray wolf throughout the 48 States and Mexico was partially

in error," thus justifying the delisting in those southern and eastern states.  *See id.* at 15,859.

The 2003 Rule contained one significant change from its original proposal that is of particular relevance to the instant case.  The agency had initially proposed to delist gray wolves outside the boundaries of the four proposed DPSs since the FWS had "no plans to restore gray wolves in those areas" and, in the agency's view, "there was no reason to maintain the [ESA's] protection for any gray wolves that might turn up there."  *Id.* at 15,826.  Based on "further analysis of the [ESA] and [its] implementing regulations," the FWS determined that its proposal was contrary to the ESA and the statutory requirements for delisting a "species."  *Id.* Specifically, the agency noted that the ESA

> does not provide for delisting a species in parts of its listed historical range because restoration of wolves in these areas is unnecessary, *even if wolf recovery is proceeding successfully in other areas*.  Delisting can *only* occur when a species (or subspecies or DPS) is recovered, when it is extinct, or when the original data or analysis that led to the listing was in error.

*Id.* (emphasis added).  The 2003 Rule was challenged as invalid under the ESA and the APA by environmental groups in two Federal district courts.  *Defenders of Wildlife v. Sec'y, U.S. Dep't of the Interior* (*Oregon Wolves*), 354 F. Supp. 2d 1156, 1158–59 (D. Or. 2005); *Nat'l Wildlife Fed'n v. Norton* (*Vermont Wolves*), 386 F. Supp. 2d 553, 557 (D. Vt. 2005).  Both courts sided with the plaintiffs and vacated the 2003 Rule, but for slightly different reasons.  *See Oregon Wolves*, 354 F. Supp. 2d at 1174 (enjoining and vacating 2003 Rule); *Vermont Wolves*, 386 F. Supp. 2d at 568 (vacating and remanding 2003 Rule for reconsideration).  These court decisions are discussed below.

<p style="text-align:center;">a)      The Oregon Wolves Challenge</p>

In *Oregon Wolves*, the district court rejected the FWS's delisting of the wolves in the proposed Eastern DPS (comprising, roughly, the upper Midwest and the Northeastern United States) and Western DPS (comprising, roughly, the Rocky Mountain West and the Pacific Northwest) because the "justification for not considering threats to large areas of suitable habitat

<p style="text-align:center;">28</p>

. . . [was] unreasonable." *Oregon Wolves*, 354 F. Supp. 2d at 1168.  The 2003 Rule

acknowledged that viable wolf habitat existed within the historic range of the gray wolf, for

instance, in Maine, New York, the Dakotas, and Washington, but the FWS considered that

territory, which was not then-inhabited by gray wolves, to be "insignificant."  *See id.* at 1167–68.

The FWS reached that conclusion because gray wolves were not in danger of extinction within

the core recovery areas in Minnesota, Michigan, and Wisconsin (for the proposed Eastern DPS)

and in Idaho, Montana, and Wyoming (for the proposed Western DPS).  *See id.*  Consequently,

in the FWS's view, since the gray wolf, as a species, would survive in the Tri-State Area and the

Rocky Mountain West, any other suitable habitat in the gray wolf's historic range was

"insignificant."  *Id.* at 1168.

The *Oregon Wolves* court flatly rejected the agency's interpretation, stating that the FWS

had limited "the phrase 'significant portion of [a species'] range'" in the definition of

"endangered species" so much that, by definition, virtually any DPS that contained an area where

a population of vertebrates lived would qualify for delisting.  *See id.* at 1168–69.  Such an

"interpretation runs counter to Congressional intent," because the FWS's interpretation of

"significant portion of [a species'] range" erroneously equated the gray wolf's "viability within

the DPS," with the viability of the gray wolf at the species taxonomic level.  *See id.*  The *Oregon

Wolves* court found that such a limitation "ignores the statutory modification [in the ESA] to

protect species in '*any* portion of its range.'"  *Id.* at 1168.  (quoting H.R. Rep. No. 93-412

(1973)) (emphasis in original).  In effect, the *Oregon Wolves* court found that the FWS's

interpretation turned the definition of "endangered species" on its head: rather than determining,

as the ESA mandates, whether a species was *threatened* with extinction in any significant portion

29

of its range, the FWS was determining whether a species was *viable* in any significant portion of

its range and, if so, finding the rest of the species' historical range to be insignificant.  *See id.*

In addition, the *Oregon Wolves* court found that the FWS had erroneously created large

DPS designations that "encompass[ed] the wolf's entire historical range," rather than "drawing a

line around the distinct populations in the Western Great Lakes and the Northern Rockies."  *Id.*

at 1171.  The court observed that "the conservation status of populations within each DPS varies

dramatically," which was an "inversion of" and "inconsistent with the [agency's] DPS Policy."

*Id.*  Since the DPSs were overbroad, the *Oregon Wolves* court found that the FWS failed to apply

properly the five factors for listing evaluations found in the ESA to vast swathes of territory

encompassed by the proposed DPSs, in violation of the statute.  *Id.* at 1172.  Even though the

2003 Rule would have only downlisted the gray wolf from "endangered" to "threatened" in two

of the three DPSs, leaving the endangered listing unchanged in the third DPS, the *Oregon*

*Wolves* court concluded that the corresponding reduction in protection under the ESA was

harmful to the gray wolf as a species.  *See id.* at 1173.  Consequently, the *Oregon Wolves* court

vacated the 2003 Rule.

### b)      The Vermont Wolves *Challenge*

The plaintiffs in *Vermont Wolves* were a different group of environmental groups than

those that brought the *Oregon Wolves* action.  *See Vermont Wolves*, 386 F. Supp. 2d at 557.  The

*Vermont Wolves* plaintiffs challenged the 2003 Rule as violative of the ESA and the APA

because, *inter alia*, the FWS "(1) failed to provide the public with adequate notice and

opportunity for comment on the Eastern DPS; (2) designated DPSs that violate the [ESA]; [and]

(3) arbitrarily determined that the gray wolf is not at risk in a significant portion of its range."

*Id.* at 559.

30

The *Vermont Wolves* court agreed with the plaintiffs that the FWS failed to provide an adequate opportunity for notice and comment since the proposed version of the 2003 Rule would have created four DPSs, including a "Northeastern DPS," and the final 2003 Rule included only three DPSs, with the entire land mass previously identified as a separate Northeastern DPS subsumed within the newly designated "Eastern DPS." *Id.* at 561–62.  This, the court found, constituted a substantial deviation, such that the FWS was required—and failed—to provide a period for notice and comment as required by the APA.  *Id.* at 562.

The court also, similarly to the *Oregon Wolves* court, rejected the FWS's interpretation of its authority to define the boundaries of DPSs.  *Id.* at 564–65.  The FWS explained that because the gray wolf was already a listed entity at the species taxonomic level, the agency had to account for all of the historical range in which the species was listed as "endangered" or "threatened," in the new DPSs , which range consisted of the conterminous 48 states, so that there was no "non-DPS remnant."  *See id.*  According to the FWS, this left "only two options": "(1) delist the Northeast [DPS] for extinction or original listing error, or (2) incorporate [the Northeast] geographic area into the nearest DPS."  *Id.* at 564.  The agency chose the second option, which the *Vermont Wolves* court described as "'lump[ing] together' a core population," i.e.*,* the gray wolf population in the Tri-State Area, "with a low to non-existent population," in the Northeastern United States.  *Id.* at 565.

The *Vermont Wolves* court concluded that the agency's action was prohibited by the ESA.  *Id.*  At the time the 2003 Rule was promulgated, virtually no gray wolves were extant in the Northeast and the FWS was prohibited by the structure and purpose of the ESA from designating a non-existent "population" of gray wolves in the Northeast as a DPS.  *See id.* at 564 (noting that "a wolf population must exist for the Secretary to designate a DPS").  In "lump[ing]

31

the Northeast in with wolves in the Midwest to create the Eastern DPS," the FWS avoided the problem of creating a DPS for non-existent animals, but created another problem of skipping the necessary step of applying the ESA's five statutory factors to determine if the gray wolf was still endangered or threatened in the Northeast.  *See id.* at 564–65.  The *Vermont Wolves* court found that the FWS violated the ESA and its own policy for designating DPSs by failing to review the factors mandated by the ESA for the Northeast but nonetheless combining the Northeast DPS with the Midwest to create the "Eastern" DPS.  *Id.* at 565.[10]

The *Vermont Wolves* court further opined that even if the DPS's boundaries had been drawn properly, the FWS erroneously applied the five statutory listing factors to designate DPSs. *See id.* at 566.  Specifically, in evaluating whether the gray wolf was threatened with extinction throughout all or a significant portion of its range within each of the three proposed DPSs, the FWS reviewed the threats to and conditions of the core population of wolves in a DPS, rather than the threats and conditions for wolves throughout the entire geographic area covered by the DPS.  *See id.* at 565.  This practice, the court found, was "contrary to the plain meaning of the ESA phrase 'significant portion of its range.'"  *Id.* at 566.  In other words, the *Vermont Wolves* court found that the FWS could not ignore the conditions gray wolves faced outside of their core population areas in the Tri-State Area and the northern Rocky Mountain West when determining if gray wolves were threatened or endangered within the much larger areas covered by the Eastern and Western DPSs, respectively.  *See id.*  The *Vermont Wolves* court held that these fundamental errors, independently and in combination, required that the 2003 rule be vacated and remanded for reconsideration.  *Id.* at 568.

---

[10] The *Vermont Wolves* court concluded that the FWS's creation of three recovery plans instead of a single, national recovery plan for the gray wolf was entitled to *Chevron* deference and declined to find the FWS had violated the ESA by doing so.  *Vermont Wolves*, 386 F. Supp. 2d at 568.

32

*          *          *

The 2003 Rule, which was predicated on the FWS's interpretation of its authority to create DPSs to reduce protections for population segments of a species already listed as endangered or threatened, was rejected in its entirety by two district courts in two different circuits, with both courts concluding that the agency was not permitted to designate a DPS without consideration of the status of the listed species in its historic range and the entire range covered by the DPS. The 2003 Rule was vacated and remanded, which led to the FWS's next attempt to delist the gray wolf, culminating in a new rule in 2007.

## 2. *The 2007 Rule*

In the immediate aftermath of the 2003 Rule's vacatur in *Oregon Wolves*, Wisconsin requested "authority to implement a depredation control program with respect to the endangered gray wolf pursuant to" § 1539 of the ESA, which allows the FWS to permit "any act otherwise prohibited" by 16 U.S.C. § 1538 "for scientific purposes or to enhance the propagation or survival of the affected species." 16 U.S.C. § 1539(a)(1)(A); *Humane Soc'y of U.S. v. Kempthorne* (*2006 Wolves*), 481 F. Supp. 2d 53, 57 (D.D.C. 2006) (Kollar-Kotelly, J.), *vacated as moot*, 527 F.3d 181, 182 (D.C. Cir. 2008). The FWS granted the permit and authorized "the lethal take of up to 34 wolves in 2005." *2006 Wolves*, 481 F. Supp. 2d at 57. This Court vacated that permit and issued a permanent injunction after determining that the FWS "failed to provide an opportunity for notice and comment before issuing the 2005 []permit." *Id*. (discussing *Defenders of Wildlife v. Norton (2005 Wolves)*, Civil Action No. 05-1573 (D.D.C. 2005) (Huvelle, J.)). Before the injunction was imposed, "29 of the 34 wolves authorized to be lethally taken in Wisconsin had already been killed." *Id.*

Undeterred, Wisconsin reapplied for a permit to kill an even greater number of depredating, endangered wolves, which the FWS granted, after a notice and comment period, in

33

April 2006.  *2006 Wolves* at 57–58.  The FWS granted the permit on the grounds that "in the absence of adequate measures to control known depredating wolves, public support for wolf recovery and wolf reintroduction programs will likely erode and individuals will resort to illegal killing to protect their pets and livelihood."  *Id.* at 58 (citation omitted).  That permit, which would have allowed the killing of "up to 43 endangered wolves for depredation control purposes," was challenged in this Court by a group of conservation and animal rights groups including the plaintiffs in the instant matter.  *Id.*

Once again, the FWS's action was invalidated, the permit was vacated, and the FWS was enjoined from allowing "any further killing of gray wolves pursuant to the" permit at issue.  *Id.* at 72.  The *2006 Wolves* court found that allowing endangered wolves to be killed, purportedly to "foster[] greater social tolerance for wolves," *id.* at 54, ran counter to the plain language, intent, and legislative history of the ESA and could not be permitted, *see generally id.*  Indeed, the *2006 Wolves* court noted that the FWS had failed to remedy the perceived logical deficiency pointed out by the *2005 Wolves* court, which had observed "I have a hard time understanding the notion you kill the wolves to save the wolves."  *Id.* at 63 (citation omitted).  The *2006 Wolves* court was "similarly confounded by Defendants' approach as applied to an *endangered* species in light of the language found in [16 U.S.C. § 1539(a)(1)(A)], which the Court finds on its face would preclude a lethal depredation control program."  *Id.* (emphasis in original).

About one month before the FWS approved Wisconsin's second application for a permit to kill depredating wolves, the FWS proposed a new rule removing entirely Wisconsin's wolves, along with the rest of the wolves in the Midwest, from the List of Endangered and Threatened Wildlife by "establish[ing] the Western Great Lakes Distinct Population Segment (WGL DPS) of the gray wolf (*Canis lupus*)," encompassing essentially the same land area at issue in the Final

Rule challenged in this suit. *See* Designating the Western Great Lakes Population of Gray Wolves as a Distinct Population Segment; Removing the Western Great Lakes Distinct Population Segment of the Gray Wolf From the List of Endangered and Threatened Wildlife (the "2007 Proposed Rule"), 71 Fed. Reg. 15,266, 15,266 (Mar. 27, 2006); *compare 2006 Wolves*, 481 F. Supp. 2d at 58 (noting second permit issued on April 24, 2006) *with* 2007 Proposed Rule (noting initial publication on March 27, 2006).

Despite the *2006 Wolves* court's invalidation of Wisconsin's second permit and injunction against any killing of endangered gray wolves in Wisconsin on August 9, 2006, the FWS issued a final rule designating the wolves in the Western Great Lakes as a DPS and simultaneously removing them from any protection under the ESA. Final Rule Designating the Western Great Lakes Populations of Gray Wolves as a Distinct Population Segment; Removing the Western Great Lakes Distinct Population Segment of the Gray Wolf From the List of Endangered and Threatened Wildlife (the "2007 Rule"), 72 Fed. Reg. 6052, 6052 (Feb. 8, 2007). The 2007 Rule was challenged as arbitrary and capricious and violative of the APA and the ESA by a group of conservation and animal rights groups, including most of the plaintiffs in the instant action, in this Court. *See Humane Society of U.S. v. Kempthorne* (*2008 Wolves*), 579 F. Supp. 2d 7, 9 (D.D.C. 2008) (Friedman, J.).

The *2008 Wolves* court vacated the 2007 Rule because the "FWS failed to acknowledge and address crucial statutory ambiguities in the course of promulgating the [2007] Rule," and remanded the 2007 Rule to the FWS for further proceedings. *Id.* This ruling centered on the FWS's use of the ESA's authority to identify a "distinct population segment" to delist populations of otherwise listed species. *See id.* at 14. The plaintiffs in *2008 Wolves* contended that "Congress did not intend to authorize FWS to simultaneously designate and delist DPSs

35

within broader listings—that is, to 'carve out' healthy sub-populations of otherwise endangered or threatened species and remove from those sub-populations the protections of the [ESA]." *Id.* at 14.  The FWS countered that the "plain meaning of the ESA" allowed the FWS to designate a portion of a species as a DPS and simultaneously delist it.  *See id.* at 14–15.  The FWS's position was fatal to the 2007 Rule and firmly rejected by this Court.

Contrary to the agency's view about "the plain meaning" of the ESA, the *2008 Wolves* court found that "the ESA is ambiguous with respect to the precise question at issue: whether the ESA permits FWS to use the DPS tool to remove the protections of the statute from a healthy subpopulation of a listed species, even if that sub-population was neither designated as a DPS nor listed as endangered or threatened beforehand." *Id.* at 15.[11]  Since the 2007 Rule was "based on FWS's erroneous conclusion that the ESA is unambiguous on this point," the *2008 Wolves* court declined to defer to the FWS's interpretation or accept the plaintiffs' plausible alternative construction.  *Id.*  Instead, the *2008 Wolves* court found it that "it must remand the [2007] Rule to FWS to permit the agency to address the ESA's ambiguity in light of its expertise, experience and insight into the ESA's objectives."  *Id.*

---

[11] Specifically, the *2008 Wolves* court accepted as "indisputable" that "FWS may delist DPSs when appropriate" or "under some circumstances," pursuant to 16 U.S.C. § 1533(a)(1)(listing five factors Secretary must consider to determine whether species is endangered or threatened), and § 1533(c)(2)(B)(requiring FWS periodically to review all species "included in a list . . . which is in effect at the time of such review," and "determine on the basis of such review whether any such species should—(i) be removed from such list; (ii) be changed in status from an endangered species to a threatened species; or (iii) be changed in status from a threatened species to an endangered species").  579 F. Supp. 2d at 16.  While the FWS construed these ESA provisions as requiring the agency "to designate as a DPS and delist any healthy sub-population within a broader listing," *id.*, the court concluded that "[t]he text of the ESA resists FWS'[s] interpretation," *id.* at 17.  Contrary to the agency's view of the plain meaning of the statute, the court found that these two provisions do "not suggest that FWS may simultaneously designate and delist a previously unlisted sub-population of vertebrates within a broader listing."  *Id.*  Instead, the court found that these two provisions "quite strongly suggest[]—consistent with common usage—that the *listing* of any species (such as the western Great Lakes DPS) is a precondition to the *delisting* of that species."  *Id.* (emphasis in original).  Moreover, the court cited other reasons to "resist[] FWS'[s] interpretation," *id.*, including  that (1) Congress made the "definitional choice" to limit "the use of the DPS tool to vertebrate organisms," which supports the "not implausible" assumption "that the DPS tool would be used only to *list* species in the first instance," *id.* at 17; and (2) legislative history "suggest[ing] that Congress thought of the DPS tool primarily—if not exclusively—as a tool for listing locally vulnerable populations," *id.* at 18 n.12.

The *2008 Wolves* court vacated the 2007 Rule to enable the FWS to reconsider its authority on remand since the deficiency in the 2007 Rule's logic was "fundamental: FWS failed to acknowledge crucial statutory ambiguities, and failed to explain how its interpretation of the ESA comports with the policy objectives of the [ESA]." *Id.* at 21.  Moreover, the court found that "the ESA's preference for protecting endangered species counsels strongly in favor of vacating the [2007] Rule while FWS revisits its statutory interpretation." *Id.*  Although the vacatur of the rule would "have a palpable regulatory effect," any such "'disruption' [was] not a substantial concern," since "state and federal wolf management authorities have been working in tandem for years." *Id.*

Notably, the *2008 Wolves* court issued its decision on September 29, 2008.  *Id.* at 7. Three months earlier, on June 3, 2008, the D.C. Circuit vacated the judgment in *2006 Wolves* as moot in light of the 2007 Rule, which was shortly thereafter vacated by the *2008 Wolves* court. *See Humane Soc'y of U.S. v. Kempthorne*, 527 F.3d 181, 182 (D.C. Cir. 2008).  The D.C. Circuit found that since the *2006 Wolves* court had based its decision regarding depredation controls for wolves in Wisconsin on the wolves' status as endangered, and the 2007 Rule removed all ESA protections from those wolves, the entire matter was moot and the *2006 Wolves* judgment had to be vacated in its entirety.  *See id.* at 185–88.  The result of these two decisions was that, by September 2008, wolves in the upper Midwest were returned to the status they had occupied for the twenty-five years between 1978 and 2003: the gray wolf was "threatened" in Minnesota and "endangered" in all other states.[12]

---

[12] At the same time that the FWS promulgated the 2007 Rule pertaining to the wolves in the western Great Lakes, the agency published another Final Rule designating and delisting "a DPS of gray wolves in the northern Rocky Mountains."  *2008 Wolves*, 579 F. Supp. 2d at 9 n.2.  That rule was enjoined preliminarily by a different federal district court.  *Defenders of Wildlife v. Hall*, 565 F. Supp. 2d 1160, 1178 (D. Mont. 2008).  Unlike the 2003 Rule, which created three DPSs in a single rulemaking, in 2007 the FWS used two different rulemakings for the western

### 3.     *The 2009 Rule*

Six months after the *2008 Wolves* decision, the FWS published a new final rule on April

2, 2009.  Final Rule To Identify the Western Great Lakes Populations of Gray Wolves as a

Distinct Population Segment and to Revise the List of Endangered and Threatened Wildlife (the

"2009 Rule"), 74 Fed. Reg. 15,070, 15,070 (Apr. 2, 2009).  Rather than providing notice and

comment for this new final rule, FWS merely added a section to the previously vacated 2007

Rule entitled "Issues on Remand," in which the FWS offered further explanation for its

interpretation of its authority to designate DPSs and use such designations to delist species.  *See*

*id.* at 15, 075.  The FWS opined that the *2008 Wolves* court did "not accurately describe what

[the FWS] did in the [2007] Rule."  *Id.*  According to the FWS, contrary to the finding in *2008*

*Wolves*, the agency did not designate and delist the western Great Lakes DPS in the 2007 Rule.

*Id.*  Rather, in a palpable hair-splitting exercise, the FWS explained the 2007 Rule merely

"revised the existing listing of a species" on the List of Endangered and Threatened Wildlife to

"reflect a determination that a sub-part of that species (the Western Great Lakes DPS) was

healthy enough that it no longer needed the ESA's protections."  *Id.*  Despite this verbal

legerdemain, the 2007 Rule clearly reflects that the mechanism used by the FWS to "revise[]"

the listing was to identify for the first time the western Great Lakes DPS and to delist the wolves

inhabiting that newly created DPS.  *See id.*; *see also* 2007 Rule, 72 Fed. Reg. at 6052 (describing

2007 Rule as "*establish[ing]* the Western Great Lakes (WGL) Distinct Population Segment . . .

[and] *also remov[ing]* the WGL DPS from the List of Endangered and Threatened Wildlife")

---

Great Lakes and northern Rocky Mountains DPSs.  *See 2008 Wolves*, 579 F. Supp. 2d at 9 n.2.  Thus, the *2008*
*Wolves* decision only applied to the rule establishing the western Great Lakes DPS.  *Id.* at 9.

(emphasis added).[13]

Moreover, contrary to the *2008 Wolves* court's conclusion that the ESA was ambiguous—the very reason that prompted the vacatur and remand of the 2007 Rule—the FWS flatly stated that its "authority to make these determinations and to revise the list accordingly is found in the precise language of the ESA." 2009 Rule, 74 Fed. Reg. at 15,075. The agency stated that "even if that authority was not clear, [its] interpretation of this authority to make determinations under section 4(a)(1) [of the ESA, 16 U.S.C. § 1533(a)(1)] and to revise the endangered and threatened species list to reflect those determinations," it was still "reasonable and fully consistent with the ESA's text[,] structure, legislative history, relevant judicial interpretations, and policy objectives." *Id.* The FWS pointed out that on this issue, the 2009 Rule was "consistent with" the "analysis and conclusions set out in the" Solicitor of the Department of the Interior's opinion regarding the FWS's authority to designate and delist DPSs, published on December 12, 2008. *Id.* at 15,076 (citing A.R. Ex. G ("U.S. Fish and Wildlife Service Authority under Section 4(c)(1) of the Endangered Species Act to Revise Lists of Endangered and Threatened Species to 'Reflect Recent Determinations'" (the "Solicitor's Opinion")), M-37018 (Dec. 12, 2008)).[14] Finally, the FWS concluded that since the agency was

---

[13] The agency's discounting of the reasoning in *2008 Wolves* and positing that the FWS was merely revising an existing listing, suggests an implicit acknowledgement that designating a DPS made up of vertebrates already listed at a more general taxonomic level is on shaky statutory ground.

[14] Indeed, the FWS has relied heavily on the Solicitor's Opinion in both the 2009 Rule and the challenged Final Rule at issue in this case. *See* Final Rule, 76 Fed. Reg. at 81,683 (noting that Solicitor Opinion "represents the view of the [DOI] and fully supports the Department's position that it is authorized in a single action to identify a DPS within a larger listed entity, determine that the DPS is neither endangered nor threatened, and then revise the List of Endangered and Threatened Wildlife to reflect those determinations."). This Solicitor's Opinion "reject[s]" and finds "in error," Solicitor's Opinion at 494A, the *2008 Wolves* court's conclusions, to reach the contrary conclusion that "a plain reading of the [ESA] as a whole demonstrates that section 4(c)(2) [16 U.S.C. § 1533(c)(2)] does not limit FWS's discretion to revise the lists of endangered and threatened species at any time to reflect determinations made under section 4(a)(1) [16 U.S.C. § 1533(a)(1)]," *id.* at 496A, and remove a recovered and newly created DPS of healthy animals from a broader already-listed species, *id.* at 499A. Notwithstanding this critical view of the reasoning in *2008 Wo*lves, the agency filed no appeal from that decision, which has been cited with approval for the

"simply responding to the narrow legal issues raised by the Court" in the *2008 Wolves* case, "the Administrative Procedure Act . . . does not require an additional period of public notice and comment." *Id.* at 15,076.

Once again, several environmental groups, including the plaintiffs in the instant matter, challenged the 2009 Rule in this Court. *See* Compl. at 1, *Humane Soc'y of the U.S. v. Salazar*, No. 09-1092 (D.D.C. June 15, 2009), ECF No. 1. In addition to challenging the 2009 Rule on grounds previously raised in *2008 Wolves*, the plaintiffs singled out the FWS's decision not to provide an opportunity for public notice and comment before issuing the 2009 Rule as an independent reason that the 2009 Rule violated the APA. *Id.* ¶ 106.

Two weeks after the suit was filed, in a stipulated settlement, the FWS "concede[d] that [it] erred by publishing the 2009 . . . Rule without providing for notice and comment as required by [the] APA." Stipulated Settlement Agreement and Order at 2, *Humane Soc'y of the U.S. v. Salazar*, No. 09-1092 (D.D.C. July 2, 2009), ECF No. 27. Consequently, the 2009 Rule was "vacated and remanded back to the [FWS]" and the wolves in the "Western Great Lakes DPS [were] returned to the listing status under the ESA that they had before the 2009 . . . Rule went into effect." *Id.* at 3.

### E.    The Challenged Final Rule

After being rebuffed by multiple district courts in previous efforts to delist populations of the gray wolf, the FWS tried again in 2011. *See* Proposed Rule to Revise the List of Endangered and Threatened Wildlife for the Gray Wolf (*Canis lupus*) in the Eastern United States, Initiation of Status Reviews for the Gray Wolf and for the Eastern Wolf (*Canis lycaon*) (the "NPRM"), 76

---

finding that 16 U.S.C. § 1533 is ambiguous. *See, e.g., In re Polar Bear Endangered Species Act Listing and § 4(d) Rule Litigation*, 748 F. Supp. 2d 19, 28–29 (D.D.C. 2010).

Fed. Reg. 26,086, 26,086 (May 5, 2011).  The NPRM is summarized below, followed by a summary of the challenged Final Rule.

> 1.     *The NPRM*

The NPRM proposed to "revise" the listing of the Minnesota population of gray wolves by "establish[ing] it as a WGL DPS of the gray wolf (*C. lupus*), expand[ing] the boundaries of that DPS" beyond Minnesota, "[and] removing the gray wolf wolves [sic] in that DPS from the List of Endangered and Threatened Wildlife."  NPRM, 76 Fed. Reg. at 26,142.  As discussed in more detail below, the NPRM made three significant sets of findings to support this proposal, while also providing legal and factual rationales for the simultaneous establishment and delisting of this DPS.

> *a)     The NPRM's Significant Findings*

The principal theory underlying both the significant findings in the NPRM and the proposed listing changes was that new genetic-level research indicated that the wolf population in the western Great Lakes region was sufficiently different from the listed *C. lupus* species to warrant different listing treatment, even if the precise nature of those differences continued to be a matter of significant taxonomic debate.  *See* NPRM, 76 Fed. Reg. at 26,089–91.  The significant findings outlined in the NPRM are summarized below.

First, based upon "recent taxonomic information," the NPRM proposed to elevate the gray wolf subspecies *Canis lupus lycaon* to a full species of *Canis lycaon*.  *Id.* at 26,086.  The taxonomic information relied on for this finding consisted of the "results of recent molecular genetic analyses," *id.* at 26,088; *id.* (referring to "molecular genetics studies of the last few years"), which purportedly showed that "a unique and genetically identifiable form of wolf [] occupies the western Great Lakes region, and that this form has hybridized with *Canis lupus*," *id.* at 26,093.  Chromosomal-level "divergence" from *C. lupus* "favors recognition of the eastern

41

wolf as a species," namely, *C. lycaon*.  *Id*; *see id*. at 26,095 ("Currently, the [FWS] subscribes to the view that what was formerly recognized as the subspecies *C. lupus lycaon* should be recognized as a unique species, *C. lycaon*.").  Since this new taxonomic species had not previously been reviewed under the ESA, the FWS announced that the agency was "initiating a rangewide review of the conservation status of *C. lycaon* in the United States and Canada."  *Id*. at 26,086.

Second, the NPRM opined that the "molecular genetic analyses" showed that "New England and portions of the upper Midwest (eastern and western Great Lakes regions) historically were occupied by *C. lycaon*," the newly recognized taxonomic species, while "the gray wolf (*C. lupus*) did not occur in the eastern United States."  *Id*. at 26,088; *see id*. (noting that "the best available taxonomic information indicates that *Canis lupus* did not occupy large portions of the eastern United States"); *id*. at 26,088–89 ("in the eastern United States, the historical range of *C. lupus* is considered to fall outside the historical ranges of *C. lycaon* and *C. rufus*," the latter of which historically occupied "the mid-Atlantic and southeastern United States").  Consequently, the NPRM proposed to "remov[e] all or parts of 29 eastern states" that the agency determined were properly considered the range of the newly recognized species *C. lycaon* or the subspecies *C. rufus* and "were not part of the historical range of the gray wolf . . . [that] should not have been included in the original listing of the gray wolf."  *See id*. at 26,086; *id*. at 26,090 (stating that "[n]ew information" indicated that "all or parts of 29 eastern states . . . should not have been included in the original listing of the gray wolf.").[15]

_____

[15] Those 29 states are: Maine, Massachusetts, Connecticut, New Hampshire, Rhode Island, Vermont, New York, New Jersey, Pennsylvania, Delaware, Maryland, Virginia, North Carolina, South Carolina, Georgia, Florida, Ohio, West Virginia, Kentucky, Tennessee, Alabama, Mississippi, Louisiana, Texas, Oklahoma, Arkansas, Missouri, Indiana, and Illinois.  NPRM, 76 Fed. Reg. at 26,088.

Finally, the NPRM focused specifically on the wolf population in Minnesota and the greater western Great Lakes region. *Id.* at 26,090. While noting the long-standing debate over the "taxonomic classification of wolves in the western Great Lakes region," the NPRM nonetheless reached the conclusion that "the best available scientific information . . . establishes that this species [*C. lycaon*] has intercrossed with *C. lupus* in the western Great Lakes region to constitute a population composed of *C. lupus*, *C. lycaon*, and their hybrids." *Id*. at 26,093. The NPRM acknowledged that in the western Great Lakes region, "[t]he ranges of *C. lupus* and *C. lycaon* overlap," *id*. at 26,089; *id*. at 26,093 (recognizing the "existence of two wolf species in the western Great Lakes region"), but indicated that the "predominant[]" population in that region is *C. lycaon*, *id*. at 26,094; *id.* (noting that "various genetic investigations of western Great Lakes wolves clearly show a distribution of eastern wolf (*C. lycaon*) genetic markers throughout the region").

Despite recognizing "that not all individual wolves in the WGL region are in fact, gray wolves, *Canis lupus*," since that population also includes *C. lycaon*, or hybrids of the two, with each species distinguishable only at the molecular genetic level, the NPRM proceeded to propose delisting the *C. lupus* species in the region entirely and initiating a status review for *C. lycaon,* noting that "[t]hese two actions combined will address all wolves in the WGL region." *Id.* at 26,094.

b) *The Rationale For Establishing The DPS*

The NPRM stated that the 1978 rule pertaining to gray wolves was "in need of revision" for two interrelated reasons: first, "the best available taxonomic information" indicated that the listed gray wolf species, *C. lupus*, "did not occupy large portions of the eastern United States;" and second, "current statutory and policy requirements under the [ESA]" militated in favor of the change. *Id.* at 26,088. As to the first reason, the FWS relied on its finding that, contrary to its

43

previous finding that *Canis lupus* occupied all 48 conterminous states, the northeastern United States was "occupied by the eastern wolf (*C. lycaon*), now considered a separate subspecies of *lupus*." *Id.* Consequently, the NPRM proposed a finding that the 1978 listing of the gray wolf as an endangered species in those 29 States was in error. *See id.*; *id.* at 26,090 ("The historical range of *C. lycaon* also extends into the northeastern United States, which the 1978 listing inaccurately treated as part of the range of *C. lupus*.").

As for the second rationale for the change in listing—the "current statutory and policy requirements"— the NPRM recognized that the 1978 listings of the gray wolf as an endangered species outside of, and a threatened species within, Minnesota were "not predicated upon a formal DPS analysis and do not comport with current policy standards." *Id.* at 26,089. This listing artifact, the NPRM contended, necessitated a "revision of the 1978 listing of the group of gray wolves in Minnesota." *Id.* at 26,094. Although the NPRM noted that the western Great Lakes region contained overlapping species of wolves, without any precise numbers about the presence of *C. lupus*, or *C. lycaon*, or their hybrids, *see id.*, the NPRM nonetheless explained that *C. lupus* in the western Great Lakes met the criteria for a DPS since that population was "markedly separated from other United States populations of gray wolves," and because the loss of the western Great Lakes population "would result in a significant gap in the range of the taxon," thus meeting the two requirements of discreteness and significance under the FWS's DPS policy, *id.* at 26,103. The NPRM proposed to designate any members of *Canis lupus* found in the western Great Lakes region as a DPS and delist them, while simultaneously instituting a review of *Canis lycaon*, which made up the "close related species" that existed in proximity to *Canis lupus* in the western Great Lakes. *Id.* at 26,141. In the view of the FWS, this new designation would bring the 1978 listings into line with the FWS's current practices. *See id.*

44

c)       *The FWS's Authority To Take The Proposed Actions*

The NPRM reiterated the view rejected by the *2008 Wolves* court that FWS's "authority to revise the existing listing of a species (the gray wolf in Minnesota and the gray wolf in the lower 48 States and Mexico," in order "to identify a Western Great Lakes DPS and determine that it is healthy enough that it no longer needs the [ESA's] protections is found in the precise language of the [ESA]." *Id.* at 26,091.[16]  Consequently, the NPRM proceeded to propose simultaneously recognizing the *Canis lupus* population in the western Great Lakes as a DPS and finding that those wolves covered by the newly recognized western Great Lakes DPS did not qualify for protection under the ESA.  *See id.* at 26,106–26,140.  The NPRM declared that the presence of wolves in parts of the Tri-State Area ensured "that wolves in the WGL DPS are not in danger of extinction and are not likely to become endangered in the foreseeable future throughout all or a significant portion of their range." *Id.* at 26,141.  This conclusion was based, at least in part, on the determination that the then-existing population of wolves in the Tri-State Area was sufficiently large to "meet the conservation needs of the species." *Id.*

## 2.       *Promulgating The Final Rule*

The FWS promulgated the Final Rule on December 28, 2011.[17]  Final Rule, 76 Fed. Reg.

---

[16] Relying on this interpretation of its authority to use the DPS tool for delisting populations of a species already listed at a broader taxonomic level, the FWS laid out in the NPRM a "National Wolf Strategy" to use the same approach in other regions of the United States.  *See* NPRM, 76 Fed. Reg. at 26,089–90.  Specifically, the FWS planned to "move forward with a rulemaking to replace the remainder of the 1978 listing with more targeted regional units, as appropriate, concurrently with publication of the final rule for the WGL DPS." *Id.* at 26,090.  The FWS acknowledged that its strategy would "result in removal of the [ESA]'s protections in areas of the historical *C. lupus* range, such as the Great Plains States and areas of the western States," but concluded that these regions "do not support extant wolf populations *and* do not play a role in the recovery of any of the four gray wolf entities." *Id.* (emphasis in original).  The FWS opined that "recovery in these areas is both unrealistic and unnecessary," since those areas "lack sufficient suitable habitat for wolf pack persistence." *Id.*  This finding is directly contrary to the agency's finding in the 2003 Rule that "neither the [ESA] nor its implementing regulations allow the delisting of a portion of a listed species' historical range because restoration is not necessary and not feasible in that area." 2003 Rule, 68 Fed. Reg. at 15,859.  The Final Rule offers no explanation for this *volte-face*.

[17] Before issuing the Final Rule, the FWS reopened public comment on the NPRM, on August 26, 2011, to elicit further comment on two proposals: (1) the NPRM's "recognition of *C. lycaon* as a separate species;" and (2) the

45

at 81,666 (Dec. 28, 2011).  The Final Rule differed in two significant respects from the NPRM.

*See id.*; *id.* at 81,669.  First, the Final Rule reversed the agency's initial view, reflected in the

NPRM, that "eastern wolves" were a "distinct species" from gray wolves, since that view

represented "neither a scientific consensus nor the majority opinion of researchers on the

taxonomy of wolves."  *Id.* at 81,669.  Consequently, "[i]n light of the ongoing scientific debate,

and the lack of clear resolution concerning the taxonomy of wolves in the western Great Lakes,

[the FWS is] at this time continuing to recognize *C. lupus* as the only species that occurs in the

WGL."  *Id.*

Second, rather than proceeding to delist gray wolves in the 29 eastern States as

improperly listed, as proposed in the NPRM, the FWS announced it would separate that portion

of the NPRM from the proposal to recognize and delist the western Great Lakes DPS.  *Id.* at

81,687.  Thus, "[a] subsequent decision will be made for the rest of the eastern United States,"

leaving the status of gray wolves in the states outside the western Great Lakes unchanged until

such a decision could be made.  *Id.*

Consistent with the NPRM, the Final Rule designated the wolves previously listed as

"threatened" in Minnesota as part of a new western Great Lakes DPS encompassing the Tri-State

area of Minnesota, Wisconsin, and Michigan, as well as parts of six other States (i.e., North

Dakota, South Dakota, Iowa, Illinois, Indiana, and Ohio).  *Id.* at 81,670.  This new western Great

Lakes DPS was then delisted and removed from the protections of the ESA based on the FWS's

finding that the wolves in this DPS were not "in danger of extinction, nor are likely to become so

---

possibility of to "issuing separate final rules for [the agency's] final determinations on the delisting of the Western
Great Lakes DPS and the delisting of all or portions of the 29 States outside the historical range of the gray wolf,
which may itself be split into separate rules for the Northeast and Southeast."  Revising the List of Endangered and
Threatened Wildlife for the Gray Wolf (Canis lupus) in the Eastern United States, 76 Fed. Reg. 53,379, 53,380
(Aug. 26, 2011).

in the foreseeable future, throughout all or a significant part of their range," with that range

defined by the borders of the DPS.  *Id.* at 81,723.  As a result of the delisting, the Final Rule

eliminated: (1) the special restrictions on the taking of wolves in Minnesota instituted when those

wolves were designated a "threatened species" in 1978; and (2) "the designation for critical

habitat for gray wolves in Minnesota and on Isle Royale, Michigan."  *Id.* at 81,723.  As required

by the ESA, the FWS provided for five years of post-delisting monitoring, which appears to

consist of reviewing surveys conducted by Wisconsin, Minnesota, and Michigan of the wolf

populations in those states to determine if there has been "a substantial downward change in the

populations or an increase in threats to the degree that population viability may be threatened."

*Id.* at 81,724.  The Final Rule became effective on January 27, 2012.  *Id.* at 81,666.

      **F.**     **Procedural History**

      The plaintiffs subsequently filed the instant suit claiming that the Final Rule: (1) violates

"the ESA's conservation mandate" by simultaneously designating and delisting a DPS without

first making findings to support listing the DPS, and delineating boundaries of the DPS that are

excessively expansive to include "large expanses presently unoccupied by wolves," Compl. ¶¶

113–120 ("Count I"); (2) erroneously restricts the FWS's analysis of threats to the species and

the significant portion of the range of the species to the western Great Lakes DPS instead of the

gray wolf population in the conterminous United States and improperly relies on inadequate state

regulatory mechanisms to ensure the WGL DPS' long term survival, *id.* ¶¶ 121–126 ("Count

II"); and (3) mistakenly designates the western Great Lakes wolf population as a DPS despite

taxonomic uncertainty over "what species of wolves now occupy and have historically occupied

the western Great Lakes region," *id.* ¶¶ 127–130 ("Count III").

      The states of Wisconsin and Michigan, along with the HCC, have been granted leave to

intervene in this matter as defendants.  Minute Orders, May 7, 2013 (granting motions to

47

intervene).  In addition, the Minnesota Department of Natural Resources and the Association of

Fish and Wildlife Agencies (the "AFWA")—a group representing the "state fish and wildlife

agencies of all fifty states and the District of Columbia," AFWA's Mot. to Participate as Amicus

Curiae at 1 n.2, ECF No. 32—were granted leave to participate as amicus curiae.  Minute Order,

June 7, 2013 (granting Minnesota's motion); Minute Order, Dec. 19, 2013 (granting AFWA's

motion).

Cross-motions for summary judgment filed by the plaintiffs, the defendants, and

defendant-intervenor HCC are now pending.  Pls.' Mot.; Defs.' Mot.; HCC's Mot.  In response

to a request contained in the HCC's cross-motion, the Court provided the parties an opportunity

to state their positions as to whether a "liability" finding, i.e., a ruling on whether the FWS had

committed any non-harmless error in promulgating the Final Rule, should be bifurcated from any

discussion of remedy.  Minute Order, Sept. 19, 2014.  The plaintiffs, defendants, and the

defendant-intervenors each submitted responses.  ECF Nos. 46–51.

## II.    LEGAL STANDARD

### A.    Summary Judgment

Pursuant to Federal Rule of Civil Procedure 56, summary judgment may be granted when

the court finds, based upon the pleadings, depositions, and affidavits and other factual materials

in the record, "that there is no genuine dispute as to any material fact and the movant is entitled

to judgment as a matter of law."  FED. R. CIV. P. 56(a), (c); *see Tolan v. Cotton*, 134 S. Ct. 1861,

1866 (2014) (per curiam); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986).  "A

genuine issue of material fact exists if the evidence, 'viewed in a light most favorable to the

nonmoving party,' could support a reasonable jury's verdict for the non-moving party."

*Muwekma Ohlone Tribe v. Salazar*, 708 F.3d 209, 215 (D.C. Cir. 2013) (quoting *McCready v.*

*Nicholson,* 465 F.3d 1, 7 (D.C. Cir. 2006)).

48

In APA cases such as this one, involving cross-motions for summary judgment, "the district judge sits as an appellate tribunal.  The 'entire case' on review is a question of law."  *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (collecting cases). Accordingly, this Court need not and ought not engage in lengthy fact finding, since "[g]enerally speaking, district courts reviewing agency action under the APA's arbitrary and capricious standard do not resolve factual issues, but operate instead as appellate courts resolving legal questions."  *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1096 (D.C. Cir. 1996); *see also Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006) ("Under the APA . . . the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did.") (quotation marks and citation omitted)); *accord McDonough v. Mabus,* 907 F. Supp. 2d 33, 42 (D.D.C. 2012); *Wilson v. McHugh,* 842 F. Supp. 2d 310, 315 (D.D.C. 2012).  Judicial review is limited to the administrative record, since it "is black-letter administrative law that in an [Administrative Procedure Act] case, a reviewing court should have before it neither more nor less information that did the agency when it made its decision."  *CTS Corp. v. EPA*, 759 F.3d 52, 64 (D.C. Cir. 2014) (internal citations and quotation marks omitted; alteration in original); *see* 5 U.S.C. § 706(2)(F) ("[T]he Court shall review the whole record or those parts of it cited by a party . . . ."); *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743 (1985) (in applying the arbitrary and capricious standard under the APA, "[t]he focal point for judicial review should be the administrative record already in existence . . . ." (quoting *Camp v. Pitts,* 411 U.S. 138, 142 (1973)).

### B.    *Chevron* Framework

The familiar two-step process set out in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.* (*Chevron*), 467 U.S. 837, 845 (1984), applies to judicial review of claims

that an agency has acted "in excess of statutory jurisdiction, authority or limitations, or short of statutory right" under the APA.  *See Am. Fed'n of Gov't Emps. Local 3669 v. Shinseki*, 709 F.3d 29, 33 (D.C. Cir. 2013).  At the first step of the inquiry, a court must "ask whether Congress has directly addressed the precise question at issue." *Mayo Found. for Med. Educ. & Research v. United States,* 131 S. Ct. 704, 711 (2011) (internal citations omitted).  "'If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.'"  *City of Arlington, Tex. v. FCC,* 133 S. Ct. 1863, 1868 (2013) (quoting *Chevron*, 467 U.S. at 842–43).

On the other hand, if "Congress has not directly addressed the precise [interpretative] question at issue . . . the agency is charged with filling the 'gap left open' by the ambiguity." *EPA v. EME Homer City Generation, L.P.* (*EME Homer*), 134 S. Ct. 1584, 1603 (2014) (quoting *Chevron*, 467 U.S. at 843, 866) (first alteration in original).  Thus, if the statute is silent or ambiguous with respect to the specific issue under consideration, the analysis shifts to *Chevron* step two, where "the question for the court is whether the agency's answer is based on a permissible construction of the statute." *City of Arlington, Tex.,* 133 S. Ct. at 1868; *see CSX Transp., Inc. v. Nat'l Surface Transp. Bd.*, 754 F.3d 1056, 1063 (D.C. Cir. 2014) (same).  The job of the courts is not to engage in "their own interstitial lawmaking" and "mak[e] public policy by prescribing the meaning of ambiguous statutory commands."  *City of Arlington, Tex.*, 133 S. Ct. at 1873 (quoting *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 568 (1980)).  Rather, the "archetypal *Chevron* questions, about how best to construe an ambiguous term in light of competing policy interests" belong to the "agencies that administer the statutes."  *See id.*

When Congress has delegated to the agency authority to make rules carrying the force of law, and the challenged agency interpretation was promulgated in the exercise of that authority,

50

then the agency's rule is entitled to deference "as long as it is a permissible construction of the statute, even if it differs from how the court would have interpreted the statute in the absence of an agency regulation." *Sebelius v. Auburn Reg'l Med. Ctr.,* 133 S. Ct. 817, 826 (2013); *see also EME Homer*, 134 S. Ct. at 1606 (determining if agency's interpretation of ambiguous phrase is "permissible construction of statute" as second step of *Chevron* analysis); *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.,* 545 U.S. 967, 980 (2005) ("If a statute is ambiguous, and if the implementing agency's construction is reasonable, *Chevron* requires a federal court to accept the agency's construction of the statute, even if the agency's reading differs from what the court believes is the best statutory interpretation."). Courts "routinely accord dispositive effect to an agency's reasonable interpretation of ambiguous statutory language." *EME Homer*, 134 S. Ct. at 1603 (citation omitted). "Deference is appropriate even if the agency's interpretation first appears during litigation, unless the interpretation conflicts with prior interpretations or amounts to nothing more than a convenient litigating position." *Shieldalloy Metallurgical Corp. v. Nuclear Regulatory Comm'n*, 768 F.3d 1205, 1208–09 (D.C. Cir. 2014) (internal quotation marks and citations omitted). A court "need not conclude that the [agency's] interpretation of the [s]tatute is the only one it permissibly could have adopted or even the interpretation deemed *most* reasonable by the courts," so long as it is reasonable. *Nat'l Treasury Emps. Union v. Fed. Labor Relations Auth.*, 754 F.3d 1031, 1042 (D.C. Cir. 2014) (internal quotation marks and citations omitted; emphasis in original).

### C.    Administrative Procedure Act

Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *id.* § 706(2)(C), or "without observance of

51

procedure required by law," *id.* § 706(2)(D); *see Otis Elevator Co. v. Sec'y of Labor*, 762 F.3d

116, 120–21 (D.C. Cir. 2014) (citing *Fabi Constr. Co. v. Sec'y of Labor*, 370 F.3d 29, 33 (D.C.

Cir. 2004)).

In evaluating agency actions under the "arbitrary and capricious" standard, courts "must

consider whether the [agency's] decision was based on a consideration of the relevant factors and

whether there has been a clear error of judgment." *Marsh v. Ore. Natural Res. Council,* 490 U.S.

360, 378 (1989) (citation and internal quotation marks omitted); *Citizens to Preserve Overton*

*Park, Inc. v. Volpe* (*Overton Park*)*,* 401 U.S. 402, 416 (1971), *overruled on unrelated grounds*

*by Califano v. Sanders*, 430 U.S. 99, 105 (1977); *Blue Ridge Envtl. Def. League v. Nuclear*

*Regulatory Comm'n*, 716 F.3d 183, 195 (D.C. Cir. 2013). The scope of review under this

standard "is narrow and a court is not to substitute its judgment for that of the agency." *Motor*

*Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.* (*State Farm*), 463 U.S. 29, 43 (1983); *see*

*also Fogo De Chao (Holdings) Inc. v. U.S. Dep't of Homeland Sec.*, 769 F.3d 1127, 1135(D.C.

Cir. 2014) (same) (quoting *Judulang v. Holder*, 132 S. Ct. 476, 483 (2011)); *Agape Church, Inc.*

*v. FCC*, 738 F.3d 397, 408 (D.C. Cir. 2013) (same) (quoting *Cablevision Sys. Corp. v. FCC,* 597

F.3d 1306, 1311 (D.C. Cir. 2010)).

"[T]he arbitrary and capricious standard is 'highly deferential' and 'presumes agency

action to be valid[.]'" *Am. Trucking Ass'ns, Inc. v. Fed. Motor Carrier Safety Admin.,* 724 F.3d

243, 245 (D.C. Cir. 2013) (quoting *Am. Wildlands v. Kempthorne,* 530 F.3d 991, 997 (D.C. Cir.

2008)); *Envtl. Def. Fund, Inc. v. Costle,* 657 F.2d 275, 283 (D.C. Cir. 1981) (same). If an

agency, however, "failed to provide a reasoned explanation, or where the record belies the

agency's conclusion, [the court] must undo its action." *Cnty. of Los Angeles v. Shalala,* 192 F.3d

1005, 1021 (D.C. Cir. 1999) (quoting *BellSouth Corp. v. FCC*, 162 F.3d 1215, 1222 (D.C.

1999)); *see Select Specialty Hosp.-Bloomington, Inc. v. Burwell*, 757 F.3d 308, 312 (D.C. Cir. 2014) ("[T]here are cases where an agency's failure to state its reasoning or to adopt an intelligible decisional standard is so glaring that we can declare with confidence that the agency action was arbitrary and capricious." (quoting *Checkosky v. SEC*, 23 F.3d 452, 463 (D.C. Cir. 1994)) (alteration in original). At the very least, the agency must have reviewed relevant data and articulated a satisfactory explanation establishing a "rational connection between the facts found and the choice made." *State Farm,* 463 U.S. at 43 (internal quotation marks and citation omitted); *EME Homer*, 134 S. Ct. at 1602 (holding that agency "retained discretion to alter its course [under a regulation] provided it gave a reasonable explanation for doing so"); *see also Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) ("[A] fundamental requirement of administrative law is that an agency set forth its reasons for decision; an agency's failure to do so constitutes arbitrary and capricious agency action." (internal quotation marks and citation omitted)). "[C]onclusory statements will not do; an agency's statement must be one of *reasoning*." *Amerijet Int'l Inc.*, 753 F.3d at 1350 (internal quotation marks omitted; emphasis in original).

An agency's action is arbitrary and capricious if that action "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Am. Wildlands,* 530 F.3d at 997–98 (internal quotation marks omitted). While the agency's explanation cannot "run[ ] counter to the evidence," *State Farm,* 463 U.S. at 43, courts should "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned," *Bowman Transp., Inc. v. Ark.–Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974).

53

Furthermore, when "an agency has acted in an area in which it has 'special expertise,' the court must be particularly deferential to [the agency's] determinations."  *Sara Lee Corp. v. Am. Bakers Ass'n Ret. Plan,* 512 F. Supp. 2d 32, 37 (D.D.C. 2007) (quoting *Bldg. & Constr. Trades Dep't, AFL–CIO v. Brock,* 838 F.2d 1258, 1266 (D.C. Cir. 1988)). "Deferring as appropriate to the agency's expertise and looking only for 'a rational connection between the facts found and the choice made,'" *Am. Trucking Ass'ns, Inc.,* 724 F.3d at 249 (quoting *State Farm,* 463 U.S. at 43), "we remain ever mindful that in performing 'a searching and careful inquiry into the facts, we do not look at the [agency's] decision as would a scientist, but as a reviewing court exercising our narrowly defined duty of holding agencies to certain minimal standards of rationality.'"  *Id.* (quoting *Nat'l Envtl. Dev. Ass'ns Clean Air Project v. EPA,* 686 F.3d 803, 810 (D.C. Cir. 2012)).

## III.   DISCUSSION

The plaintiffs contend that the Final Rule violates the spirit and the letter of the ESA.  *See* Pls.' Mem. Supp. Pls.' Mot. ("Pls.' Mem.") at 2, ECF No. 24-1 (contending that the Final Rule "fail[s] to show that using the DPS tool to delist the wolves is consistent with the ESA overall, or with the protective Congressional intent in adding the DPS tool as further safeguard for species like the wolves").  The Court agrees, for two primary reasons.  First, the structure, history, and purpose of the ESA demonstrate that the agency may not designate a DPS only for the purpose of delisting the covered vertebrate population, particularly when those vertebrates are already protected at a higher taxonomic classification.  *See infra* Part III.B.  Second, assuming, *arguendo*, that FWS could designate and delist a population of vertebrates, which is already listed at a higher taxonomic level, doing so with respect to the gray wolves in the western Great Lakes region is not supported by the record evidence before the agency and was thus arbitrary and capricious under the APA.  *See infra* Part III.C.  Each of these reasons for rejection, standing

54

alone, would be sufficient to grant summary judgment to the plaintiffs and each is examined separately below.[18] Before turning to the merits of the plaintiffs' claims, however, Defendant-intervenor HCC has challenged the plaintiffs' standing, which is a threshold issue that must be resolved. Def. HCC's Mem. Opp'n Pls.' Mot. Summ. J. & Cross-Mot. Summ. J. ("HCC's Mem.") at 37–41, ECF No. 33.[19]

### A. The Plaintiffs Have Standing

"[T]he requirement that a claimant have 'standing is an essential and unchanging part of the case-or-controversy requirement of Article III.'" *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 733 (2008) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). Where, as here, organizations "claim representational standing on behalf of their members," the organizations may bring suit so long as "[1] [their] members would otherwise have standing to sue in their own right, [2] the interests [they] seek[] to protect are germane to the organization's

[18] The plaintiffs also allege that the challenged "Final Rule was driven by promises made to members of Congress, not science." Pls.' Mem. at 15. This political influence, the plaintiffs contend, is contrary to the ESA because "the ESA commands that the FWS '*shall*' make a delisting determination '*solely* on the basis of the best scientific and commercial data available.'" *Id.* (emphasis in original). The defendants counter, correctly, that it is not "improper to discuss [potential rulemaking actions] with members of Congress or to respond to Congressional inquiries." Defs.' Mem. Supp. Defs.' Mot. and Opp'n Pls.' Mot. ("Defs.' Mem.") at 35 n.22, ECF No. 27. Protecting endangered wildlife under the ESA is a mission mandated by Congress, which may, as the defendants point out, sometimes supersede the FWS's decisions regarding certain species. *See* Defs.' Reply Mem. Supp. Defs.' Mot. ("Defs.' Reply") at 18 n.13, ECF No. 42 (noting example when Congress "permanently altered" the 1978 listing of the gray wolf by "delisting part of the Northern Rocky Mountains DPS" (citing Reissuance of Final Rule To Identify the Northern Rocky Mountain Population of Gray Wolf as a Distinct Population Segment and To Revise the List of Endangered and Threatened Wildlife, 76 Fed. Reg. 25,590 (May 5, 2011)). Nevertheless, this Court is mindful that "courts reviewing agency decisions involving political interference must be attuned to the heightened possibility that political influence will have caused agencies to cut corners." *AERA Energy LLC v. Salazar*, 642 F.3d 212, 224 (D.C. Cir. 2011). Even if elected officials expressed interest in the timing of the issuance of the Final Rule, *see, e.g.*, A.R. Ex. X (Letter from Sen. Amy Klobuchar to Secretary Ken Salazar, Dec. 7, 2010) at 2732A (requesting expedited process to delist wolves in western Great Lakes), ECF No. 45-4, whether such "pressure crosse[d] the line and prevent[ed the] agency from performing its statutorily prescribed duties," *AERA Energy*, 642 F.3d at 224, is far from clear. The appropriate remedy to remove any improper "taint" from the Final Rule would be remand of the Final Rule to "the agency to use the traditional administrative tools at its disposal to render a politically untainted decision." *AERA Energy*, 642 F.3d at 224. Since the challenged Final Rule is fatally flawed in at least three respects, *see infra*, which mandates the vacatur of the Final Rule on those grounds, the Court need not opine on whether the political pressure in this case "crosse[d] the line," since the end result is identical.

[19] Neither the defendants nor the other defendant-intervenors challenge the plaintiffs' standing. *See generally* Defs.' Mem.; Mich. Opp'n; Wisc. Opp'n.

purpose, and [3] neither the claim asserted nor the relief requested requires the participation of individual members." *Natural Res. Def. Council v. EPA* (*NRDC*), 755 F.3d 1010, 1016 (D.C. Cir. 2014) (citation omitted).   Thus, the Court's organizational standing analysis involves two distinct determinations: first, whether the organizations have put forward members who "would otherwise have standing to sue in their own right" and, second, whether the organizations themselves fulfill the remaining requirements for organizational standing.   *Id.*   In the instant matter, the plaintiff organizations easily fulfill both prongs of this analysis.

To establish Article III standing as an individual, a claimant must show: (1) he or she has suffered an "injury in fact" that is (a) "concrete and particularized" and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is "fairly traceable to the challenged action of the defendant;" and (3) it is likely, as opposed to merely speculative, that the injury will be "redressed by a favorable judicial decision."   *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1386 (2014); *Mendoza v. Perez*, 754 F.3d 1002, 1010 (D.C. Cir. 2014). The "injury in fact" requirement in an environmental case is satisfied if a party adequately shows that he or she has an aesthetic or recreational interest in a particular place or animal, and that interest is impaired by a defendant's conduct.   *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 183 (2000).   Although a "generalized harm to the forest or the environment will not alone support standing, if that harm in fact affects the recreational or even the mere esthetic interests of the plaintiff, that will suffice."   *Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009) (citing *Sierra Club v. Morton*, 405 U.S. 727, 734–36 (1972)); *see WildEarth Guardians v. Jewell*, 738 F.3d 298, 305–06 (D.C. Cir. 2013) (finding that affidavits from environmental groups' members "attesting to those members' aesthetic interests in the land

. . . and specific plans to visit the area regularly for recreational purposes" sufficient to support Article III standing).

The record contains four affidavits from members of the organizational plaintiffs. Decl. of Robert Waligora ("Waligora Decl.") (Minnesota resident and member of Plaintiff FATE), ECF No. 24-2; Decl. of Linda Hatfield ("Hatfield Decl.") (Minnesota resident, director of Plaintiff HOWL, member of plaintiff Born Free USA, member of Plaintiff HSUS), ECF No. 24-3; Decl. of Nancy Warren ("Warren Decl.") (Michigan resident and member of Plaintiff HSUS), ECF No. 24-4; Decl. of Howard Goldman ("Goldman Decl.") (Minnesota resident and member of Plaintiff HSUS), ECF No. 24-5. The plaintiffs' members' affidavits establish that those affiants have the requisite concrete interests to support Article III standing in this case. Plaintiff FATE's declarant, for instance, states that he has made twenty-five trips into the "Boundary Waters" area of Minnesota and "plan[s] to continue these trips in the future." Waligora Decl. ¶ 4. While on these trips, Plaintiff FATE's declarant states that "wolves are the animals [he] hope[s] to experience when he camp[s] and hike[s]," and has either heard wolves nearby or seen evidence of their presence on more than one occasion. *See id.*[20] Linda Hatfield, who is Plaintiff HOWL's director and a member of Plaintiffs Born Free USA and HSUS, Hatfield Decl. ¶¶ 2, 5, avers that she "spend[s] much of [her] vacation time hiking in northern Minnesota," particularly the Superior National Forest, where she "sometimes stop[s] and take[s] time to do pencil illustration" and take photographs, *id.* ¶ 7. Hatfield states that "[t]he opportunity to view wolves and other wildlife is [her] main reason to hike trails in the northern part of [Minnesota]," she has seen wolves "[o]n a couple of occasions . . . while hiking," and looks for wolf tracks. *Id.* ¶ 7.

---

[20] FATE's declarant also details four additional wilderness areas in Minnesota, Wisconsin, and Michigan that he has visited before, plans to visit again, and at which he "seek[s] out opportunities to see wolves and other wildlife." Waligora Decl. ¶ 5.

Both declarants, therefore, have indisputably established, at the very least, an aesthetic interest in the preservation of the gray wolf in the area affected by the Final Rule. *See WildEarth Guardians*, 738 F.3d at 305–06.

Two other declarants, who are members of Plaintiff HSUS, make similarly detailed statements.  Nancy Warren, a member of Plaintiff HSUS, moved to the Western Upper Peninsula of Michigan after she "fell in love with the area because of its abundance of wildlife."  Warren Decl. ¶ 2.  Her property "has become a haven for waterfowl, marsh birds, and amphibians," as well as serving "as a refuge for turtles and an oasis for other wildlife, including deer, bear, bobcat, coyote and wolves."  *Id.*  The declarant notes that "a pack of wolves has claimed a portion of [her] property as part of its territory, and [she has] developed relationships with these wolves," through which she is able to distinguish the pack members' individual howls.  *Id.* ¶ 5.  The declarant states that she has witnessed three members of the pack after their deaths—one after being hit by a car and two after being illegally shot.  *Id.*  The declarant states that following the deaths of these three wolves, the "resident wolf pack has become less vocal and it is now rare that [she] hear[s] them howl."  *Id.*  She notes that her property is "part of Wolf Management Unit B," where wolf hunting is permitted under Michigan law.  *Id.*

Declarant Howard Goldman is the Minnesota State Director for Plaintiff HSUS.  Goldman Decl. ¶ 1.  He states that he has visited "on several occasions . . . and intend[s] to continue to visit, forests, parks, and other wilderness areas in the State of Minnesota where gray wolf populations live."  *Id.* ¶ 7.  He notes that he has seen and heard wolves during these trips, including to the "Boundary Waters Canoe Area Wilderness," and that he "consider[s] it a great privilege to see wolves and [is] thrilled every time [he] see[s] or hear[s] a wolf."  *Id.*  The declarant avers that, since the delisting of the gray wolf in the western Great Lakes, he now must

"plan [his] hiking trips around hunting and trapping seasons and try to avoid areas on which hunters might be or on which hidden traps might be set." *Id.* ¶ 8.

The D.C. Circuit has noted that "when a defendant adversely affects a plaintiff's enjoyment of flora or fauna, which the plaintiff wishes to enjoy again upon the cessation of the defendant's actions," Article III standing in an environmental case will lie. *See Am. Soc'y for Prevention of Cruelty to Animals v. Ringling Bros. and Barnum & Bailey Circus* (*Ringling Bros.*), 317 F.3d 334, 337 (D.C. Cir. 2003). Recently, the D.C. Circuit reaffirmed the holding in *Ringling Bros.* by holding that organizational members who "expressed an interest in preserving [a] 'beautiful mountain landscape,'" which would be threatened by the area's removal from the National Register of Historic Places, had made a sufficient showing to support Article III standing. *See Sierra Club v. Jewell*, 764 F.3d 1, 5–6 (D.C. Cir. 2014).

Here, each of the plaintiffs' declarants has stated that he or she makes affirmative efforts to seek out and enjoy wolves in nature, will continue to do so, and, at least in Declarant Goldman's case, adjust his behavior because of the practices allowed under state management that were not allowed under the previously existing federal ESA protections. *See supra*. Consequently, the plaintiffs have made the requisite showing that their membership includes persons who have alleged sufficiently a concrete and particularized "injury in fact."

Defendant-intervenor HCC challenges the plaintiffs' standing by attacking the plaintiffs' showing of causation, the second prong of the individual inquiry. *See* HCC's Mem. at 38–41. HCC contends that the plaintiffs cannot demonstrate that the injury in fact complained of— decreased sighting and enjoyment of gray wolves—is caused by the FWS's delisting of the gray wolf. *See id.* at 41 (contending that delisting "does not automatically result in population reductions that would decrease [the plaintiffs'] ability to see, hear and enjoy wolves"). Since

59

delisting merely allows States to permit the killing of wolves for population management, HCC reasons that the population of wolves in the western Great Lakes will not decline since the gray wolf's rapid reproductive capabilities will counterbalance any population loss resulting from the newly authorized killing of wolves. *See id.* at 38–39. To bolster this reasoning, HCC cites "research on wolf mortality impact" suggesting that wolf populations historically have decreased when "their total average annual mortality was 40 percent or more." *Id.* at 38 (citing Final Rule, 76 Fed. Reg. at 26,118). Extrapolating from this data, HCC points to the plaintiffs' allegations of a proposed take below forty percent of the affected gray wolf populations to conclude that the wolf population will not decline and, therefore, the affiants will suffer no injury. *See id.* at 39–40 (citing Goldman Decl. ¶ 9 (estimating take of Wisconsin's wolves at 33 percent) and Hatfield Decl. ¶ 15 (alleging decrease in enjoyment based on numbers representing a take below twenty-five percent of the estimated wolf population)).

HCC's premise that delisting does not necessarily result in a decreased gray wolf population is contradicted by data supplied by defendant-intervenors Wisconsin and Michigan. Wisconsin avers that, based on population modeling, the Wisconsin gray wolf population will decrease by an estimated 12.72% in the 2013 season if the cull quota is met and 275 wolves are killed. Aff. of David M. MacFarland ("MacFarland Aff.") (Wildlife Ecologist, Wisc. Dep't of Natural Res.) ¶¶ 9–10, ECF No. 29-4. Further, in 20 years, Wisconsin estimates that its wolf population will diminish from 815–880 wolves,[21] to approximately 595 wolves. *See id.* ¶¶ 4, 10. A population survey of gray wolves in Minnesota, conducted every five years, pursuant to Minnesota's Wolf Management Plan, similarly demonstrates that, following the opening of the 2012–2013 wolf hunting season after the delisting caused by the challenged Final Rule, the gray

---

[21] The "current" population estimate of 815–880 gray wolves in Wisconsin reflects the wolf population as of April 2012. MacFarland Aff. ¶ 4.

wolf population in Minnesota was approximately "700 wolves less than in 2007." Amicus Minn. Dep't Natural Res.' Mem. Supp. Defs.' Mot. & Opp'n Pls.' Mot. Ex. D (John Erb and Barry Sampson, Distribution and Abundance of Wolves in Minnesota, 2012–13  (2013)) at 29, ECF No. 31-2. In the Final Rule, the FWS anticipated that, as a result of delisting, "[t]he wolf populations in Minnesota, Wisconsin, and Michigan will stop growing" based on natural and human-caused mortality, and "[a]t that time, we should expect to see population declines in some years followed by *short-term* increases in other years[.]" Final Rule, 76 Fed. Reg. at 81,700 (emphasis added).

These statistics show that the removal of ESA protections for gray wolves and the transfer of management authority to the States in the Tri-State Area are resulting in a decrease in the gray wolf population. For Article III standing purposes, the Final Rule delisting the gray wolves and the contemporaneous opening of wolf hunting seasons in the Tri-State Area, which had previously been prohibited, reduces the likelihood that the plaintiffs' members will be able to enjoy wild wolves for the obvious reason that significantly fewer of them will be alive. *See* Defs.' Mem. Supp. Defs.' Mot. and Opp'n Pls.' Mot. ("Defs.' Mem.") at 43, ECF No. 27. Thus, the plaintiffs have demonstrated that their injury in fact—the inability to see and enjoy wild wolves—is being caused by the defendants' actions, namely the removal of ESA protections, leaving the affected states free to permit, as they have, the hunting and killing of gray wolves. Restoring ESA protections to the gray wolves in the western Great Lakes could be reasonably expected to reverse this trend of gray wolf population decreases, since restoration of protected status for the gray wolf would, once again, make them illegal to hunt and kill.

Since the plaintiffs have shown that their individual members would have standing in their own right to sue, examining the other two prongs of organizational standing is straight-

forward.  All of the organizational plaintiffs are animal rights and/or conservation groups.

Waligora Decl. ¶ 3 (describing Plaintiff FATE as organization "committed to the protection and

preservation of Minnesota wildlife"); Hatfield Decl. ¶ 3 (describing Plaintiff HOWL as

organization with mission "to be an advocate for the protection and preservation of the gray

wolf, lynx, wolverine, and other endangered or threatened species of a predatory nature"); *id.* ¶ 6

(describing Plaintiff Born Free USA as "national non-profit organization working to alleviate the

unnecessary suffering of wild animals in captivity, rescue individual animals in need, protect

wildlife—including highly endangered species—in their natural habitats, and encourage

compassionate conservation globally"); Goldman Decl. ¶ 2 (describing Plaintiff HSUS as "the

largest animal protection organization in the world" with mission "to promote the humane

treatment of animals and to foster respect, understanding, and compassion for all creatures").  As

groups dedicated to the protection of wildlife, their members' interests in enjoying wild animals

"are germane to the organization's purpose" such that the second prong of organizational

standing is met.  *See NRDC*, 755 F.3d at 1016.

   The plaintiffs also meet the final prong of organizational standing: "neither the claim

asserted nor the relief requested requires the participation of individual members."  *Id.*  None of

the parties or amici contend that "the claim asserted" or "the relief requested" by the plaintiffs in

the instant case requires the direct participation of the plaintiffs' members.  The injury-in-fact

alleged—the loss of enjoyment of wild wolves—is essentially the same for all of the plaintiffs'

members and is not predicated upon any individual member's unique circumstances.  Therefore,

this final prong is satisfied.

   In sum, the individual members of the organizational plaintiffs have standing to bring the

instant suit on their own, the suit is germane to the plaintiff organizations' purposes, and neither

the claims asserted or the relief requested are dependent upon any of the plaintiff organizations' members' direct participation.  Consequently, the plaintiffs have sufficiently demonstrated representational standing.

> **B.**    **The FWS's Interpretation Of The ESA Is Unreasonable And Therefore Not Entitled To Deference**

A core issue underlying the challenge to the Final Rule is the extent of the FWS's authority to designate DPSs.  The plaintiffs challenge two related aspects of the FWS's interpretation of its DPS authority.  First, the plaintiffs contend that "there is no authority in the ESA for the FWS to delist a DPS simultaneous to its recognition and listing."  Pls.' Mem. at 26. In the plaintiffs' view, the agency's position that the ESA authorizes the designation of a group of vertebrates as a DPS for the simultaneous purpose of delisting that group is erroneous.  *See id.* Second, the plaintiffs dispute the defendants' assertion that the ESA mandates a determination of whether the western Great Lakes population of gray wolves are "a proper ESA entity (here a DPS) and, if so, to evaluate its conservation status."  Defs.' Mem. at 16.  According to the plaintiffs, the FWS's interpretation of its authority to designate as a DPS and delist a group of vertebrates when those vertebrates already belong to a listed taxonomic species, would allow FWS to "delist[] *any* endangered species whose remaining populations are clustered in isolated pockets," undermining the over-arching goals of ESA.  *See* Pls.' Mem. at 22 (emphasis in original).  The Court agrees with the plaintiffs.

The FWS's interpretation is unreasonable on two levels.  First, the structure, history, and purpose of the ESA do not permit the designation of a DPS for the purpose of delisting the vertebrates that are members of the DPS.  Second, the ESA does not allow the designation of a DPS made up of vertebrates already protected under the ESA at a more general taxonomic level.

These two reasons to reject the FWS's interpretation of its authority to designate DPSs, each of which is fatal to the Final Rule, are examined separately below.

### 1.    *A DPS Cannot Be Identified To Delist A Vertebrate Population*

The FWS's interpretation of its authority to designate a DPS in order to delist the covered vertebrates raises a significant issue of statutory construction that has previously been identified as problematic. *See supra* n.11 (discussing *2008 Wolves*, 579 F. Supp. 2d at 16–18). In *2008 Wolves*, the court found the ESA ambiguous as to whether "the agency can designate as a DPS a sub-population of a listed species and then 'delist' that sub-population—even if it had not been recognized as a DPS or listed beforehand." 579 F. Supp. 2d at 16.[22] The statutory text made it "not implausible" that this tool was intended to "be used only to *list* species in the first instance," not to delist members of an otherwise listed taxonomic species. *Id*. at 17 (emphasis in original). For this reason, the court remanded the case for the agency to consider the issue first, since the agency had erroneously interpreted the ESA as unambiguously providing authority to designate and delist DPSs. *Id.* at 15.

Now, after more than a decade of rulemaking, delisting, litigation, vacatur by District Courts, and relisting of the gray wolf, the time has come to resolve this long-running dispute. The Court first addresses the FWS's contention, renewed in this matter in reliance on the 2008 Solicitor's Opinion, that the ESA authorizes the simultaneous creation of a DPS and removal of federal protection for that DPS. *See* Defs.' Mem. at 16–20. The Court next turns to the FWS's alternative justification in this case that simultaneous designation and delisting of a DPS did not

---

[22] In *2008 Wolves*, the court expressly rejected the FWS position, reasserted here, Defs.' Mem. at 16, "that FWS is not only authorized but required to designate as a DPS and delist any healthy sub-population within a broader listing," 579 F. Supp. 2d at 16. In this case, the agency makes this argument under a slightly different guise, namely, that it must evaluate and delist a DPS in response to a "citizen petition," *see* Defs.' Mem. at 16, but with the same result: since the ESA does not allow the simultaneous designation and delisting of a DPS, the agency cannot be "required" to do so, either on its own initiative or in response to a citizen petition.

64

actually occur because the Final Rule merely re-defines an already existing DPS for the western

Great Lakes wolves and that existing DPS was delisted.  *See id.* at 15–16; Defs.' Reply Mem.

Supp. Defs.' Mot. ("Defs.' Reply") at 6, ECF No. 42 ("FWS revised the boundaries of the

Minnesota population, which was already listed as a threatened species, to come into line with

the 1996 DPS Policy.").

<div align="center">

*a)*        *The FWS's Interpretation Of The ESA Is Erroneous*

</div>

At the outset, the FWS urges that its interpretation of the ESA as authorizing the agency

to "simultaneously identify[] a DPS and revis[e] its status" Defs.' Mem. at 16, "'must be given

controlling weight unless it is plainly erroneous or inconsistent with the regulation,'" Defs.'

Reply at 8 (quoting *In re Polar Bear,* 709 F.3d at 11).  As explained below, the FWS's

interpretation of the ESA cannot be reconciled with the structure and purpose of the ESA and,

consequently, is not entitled to "controlling weight."

The FWS contends that before delisting the gray wolves at issue, the "Plaintiffs would

prefer that FWS first define the boundaries of a DPS in a separate rulemaking, wait some

indefinite amount of time, and then proceed with rulemaking to re-evaluate whether that DPS

meets the five statutory listing factors, even if the entity's conservation status is 'recovered'

when the DPS boundaries are clarified."  Defs.' Mem. at 16–17.  Regardless of whether this is an

accurate characterization of the plaintiffs' preference, the agency's focus on the timing of the

decision-making regarding a DPS fails to grasp the logical fallacy in its own interpretation.  This

fallacy is not necessarily temporal, or with the "simultaneous" nature of the FWS's purported

creation of and delisting a DPS, although the simultaneity of designating and delisting a

vertebrate population in the same rule-making exacerbates the problem.  Instead, the problem is

that designation of a DPS for the purpose of *not* listing a vertebrate population makes no sense

within the context of the ESA.  To be clear, the FWS is plainly authorized to modify the

<div align="center">65</div>

classification of an existing DPS, including delisting or removing the covered vertebrates from the list of endangered or threatened species. *See* 16 U.S.C §§ 1532 (16), 1533(c)(2); *2008 Wolves*, 579 F. Supp. 2d at 16–17. That authorization is not at issue here, however. Rather, the issue is whether a DPS may be created to cover a vertebrate population that the FWS has determined is not eligible for, and should not be, listed.

The ESA provides significant power to command the resources of the Federal government for the preservation of endangered species but, at the same time, the statute is carefully circumscribed. Unless and until a species of organisms is designated an "endangered species" or a "threatened species," the enforcement mechanisms under the ESA, including preemptive limits on State action and requirements for Federal action, do not apply. *See, e.g.*, 16 U.S.C. § 1536(a)(1) (requiring all Federal agencies to assist in and carry out "programs for the conservation of endangered species and threatened species"); *id.* § 1538(a)(1) (listing prohibited acts under Federal law "with respect to any endangered species of fish or wildlife"). In other words, whether a group of organisms is a "species" within the meaning of 16 U.S.C. § 1532(16), a definition that includes DPSs, is of no legal consequence under the ESA until a determination is made that the group is an endangered or threatened species.

Qualifying for listing status is critical for identification of a DPS. To identify a DPS, the FWS is required to determine that the covered vertebrates, as a distinct group, are threatened with extinction and, absent that determination, the ESA does not authorize the FWS to recognize and create the DPS at all. *See* 16 U.S.C. § 1533(c). Indeed, a DPS has no "status" under the ESA to "revise" if the vertebrates covered by the DPS are not listed as either "endangered" or "threatened." *See id.* ("The Secretary . . . shall publish in the Federal Register a list of all species determined by him . . . to be endangered species [or] threatened species"). In short, the creation

66

or initial designation of a DPS operates as a one-way ratchet to provide ESA protections to the covered vertebrates.  Only after a DPS has been created to afford protection to the covered vertebrates may the DPS be revised and the covered vertebrates down-listed.  If the ESA's protections are removed altogether from the vertebrates covered by a DPS, that DPS, as a legal grouping entitled to the ESA's regulatory protections, ceases to exist, since the grouping is a creature of statute in the first instance.

This interpretation of the initial use of the DPS tool as a one-way ratchet is reflected in the agency's own DPS Policy.  The FWS recognizes that the ESA "is intended to authorize listing of some entities that are not accorded the taxonomic rank of species."  DPS Policy, 61 Fed. Reg. at 4723.  Implicit in this statement is an acknowledgement that a prerequisite for designation of a DPS is that the covered vertebrates qualify for listing as endangered or threatened.  *See id.* at 4725.  The DPS Policy confirms this conclusion by setting out three elements to be "considered in a decision regarding the status of a *possible* DPS as endangered or threatened under the [ESA]."  *Id.* (emphasis added). The first two elements require evaluation of the population in relation "to the species to which it belongs," and the third element requires evaluation of the population's status "in relation to the Act's standard for listing."  *Id.*  If the third element is not met and the vertebrate population under review does not qualify as "as endangered or threatened under the [ESA]," no DPS may be designated and the fact that the population meets the other two elements is immaterial for ESA purposes.[23]

Even the 2008 Solicitor's Opinion touted by the FWS describes consideration of the third element as the second step of "a two-step process," the first step of which determines whether a vertebrate population "is discrete and significant."  Solicitor's Opinion at 499A.  The second step

---

[23] The DPS Policy and its application to the Minnesota population of gray wolves is explored in greater detail *infra* in Part III.B.1.b.

is reached only if the population "passes these tests" of discreteness and significance.  *Id*.  The second step "requires a conservation-status determination to determine if it is endangered or threatened."  *Id*.  If the result of the conservation-status determination is that the population under review is not "endangered or threatened," then the "*possible*" DPS fails the "second step" and no DPS may be recognized.  *See id.*; DPS Policy, 61 Fed. Reg. at 4725.  In short, a DPS does not move beyond the "possible" to one that is officially recognized until the DPS is added to the List of Endangered and Threatened Wildlife, *i.e.,* becomes a listed entity.  *See* Solicitor's Opinion at 499A.  Consequently, "simultaneously identifying a DPS and revising its status," Defs.' Mem. at 16, to "delist" the covered vertebrates cannot be reconciled with the fact that no DPS can exist without *first* identifying  the covered vertebrates *for* protection under the ESA.

Indeed, over a decade ago, the FWS recognized as much in the 2003 Rule.  In that Rule, the agency took pains to note that it was "[d]elisting [o]nly in [a]reas [w]here [p]reviously [l]isted in error," since

> neither the [ESA] nor its implementing regulations allow the delisting of a portion of a listed species' historical range because restoration is not necessary and not feasible in that area.  *Delisting can only occur if the listed species is recovered, if the listed species is extinct, or if the original listing was based on data, or data interpretation, that were in error.*

2003 Rule, 68 Fed. Reg. at 15,859 (citing 50 C.F.R. § 424.11(d)) (emphasis added).  Noticeably absent from this statement is any mention of delisting "a portion of a listed species' historical range" by designating that portion a DPS.  *See id.*  Although an agency may certainly "change its interpretation of a statute, especially where its prior determination is based on error," *Phoenix Hydro Corp. v. FERC*, 775 F.2d 1187, 1191 (D.C. Cir. 1985), there is no evidence in the record that such a change has occurred here.  The implementing regulation cited and relied upon by the 2003 Rule, 50 C.F.R. § 424.11(d), is unchanged since 2003.  *See* 50 C.F.R. § 424.11(d).

68

Another argument asserted by the FWS further undermines, rather than supports, the agency's interpretation that delisting the western Great Lakes DPS in the same rulemaking where the DPS is first identified is authorized by the ESA. The FWS argues that the agency should not be required to "proceed with rulemaking . . . even if the entity's conservation status is 'recovered' when the DPS boundaries are clarified." Defs.' Mem. at 17. The word "recovered," for ESA purposes, refers to "species" that were once listed as endangered or threatened but no longer qualify for the ESA's protections. 16 U.S.C. § 1533(g); *see* David A. Goble, *Recovery in a Cynical Time—With Apologies to Eric Arthur Blair*, 82 WASH. L. REV. 581, 582 (2007) ("The Act's measures are no longer necessary when a species is no longer at risk of extinction—when it has been recovered."). A DPS must, therefore, have once been "protected" or, more specifically, listed as a "threatened" or "endangered" species before the covered vertebrates may be declared "recovered," as that term is used in the ESA. *See* 16 U.S.C. § 1533(g).

The FWS's interpretation of the ESA as authorizing the simultaneous designation and delisting of DPSs—or the designation of a DPS solely for the purpose of delisting—directly conflicts with the structure of the ESA and, consequently, this interpretation is entitled to no deference under *Chevron* step two. The ESA is remarkably clear: the FWS must identify "species" that are "threatened" or "endangered," afford them the protections necessary to help them "recover," and then re-evaluate the listed entities once such "species" are recovered. *See* 16 U.S.C. § 1533. The ESA makes no provision for creating a DPS and removing protections from the covered vertebrates at the same time because, by definition, a DPS cannot be protected under the ESA unless the vertebrates have been identified as a "threatened" or "endangered" species first. *See* 16 U.S.C. §§ 1536; 1538. An "unprotected DPS" is, in short, an oxymoron. The FWS strains to overcome this logical flaw with an alternative justification for the Final Rule:

69

that the western Great Lakes DPS actually existed prior to the challenged Final Rule and, therefore, the Final Rule does not violate the ESA or the APA. This alternative justification is also fatally flawed, as explained below.

> b)      *The Western Great Lakes DPS Did Not Exist Prior To The Final Rule*

In light of the ESA's structure, which does not allow for the removal of protections from a DPS before that DPS has first been identified and protected, the FWS asserts that the population of wolves in Minnesota designated as "threatened" in 1978 "has functioned as a DPS ever since the term was added to the [ESA]," and the challenged Final Rule merely revises the boundaries of that extant DPS and reevaluates its status. *See* Defs.' Mem. at 14–15, 14 n.6. This revisionist history fails to save the Final Rule for three reasons.

First, the Minnesota wolf population was not and has never been designated a DPS until this population was incorporated into a newly created DPS in the challenged Final Rule. As an initial and undisputed matter, the population of gray wolves in Minnesota was not formally designated as a DPS in 1978 because the term DPS did not even appear in the text of the ESA until after the 1978 Rule took effect. *Compare* 1978 Rule (dated Mar. 9, 1978) *with* Endangered Species Act Amendments of 1978, Pub. L. 95-632, 92 Stat. 3751 (dated Nov. 10, 1978). The 1978 Rule does not identify any statutory authority for designating wolves in Minnesota as a separate "species" from those in the 48 conterminous States but merely noted that the "eastern timber wolf," which was the listed subspecies that encompassed the Minnesota wolves, "was listed as Endangered in 1967," under the 1966 Act, when the law did not provide for a "threatened" category. 1978 Rule, 43 Fed. Reg. at 9608.

Furthermore, between 1978 and 2000, the term DPS does not appear to have been applied to the Minnesota population of gray wolves. This is not for lack of opportunity. The 1992

70

Recovery Plan, which focused on this wolf population, referred only to the "eastern timber wolf," which is described as a gray wolf subspecies with a historic range over much of the eastern United States.[24]   Recovery Plan at 11A.  Similarly, the FWS's response to the citizen petition from 1989 to delist wolves in the Tri-State Area did not identify those wolves as a DPS. *See* 1989 Petition, 54 Fed. Reg. at 16,380.  Instead, the FWS's response to the 1989 Petition reiterated that it considered "the present classification of the wolf [to be] correct."  *Id.*  Every subsequent effort to identify a DPS in the western Great Lakes region has been rejected by the Federal courts.  *See generally Oregon Wolves* (rejecting 2003 Rule designating and delisting "Eastern DPS"); *Vermont Wolves* (same); *2008 Wolves* (rejecting 2007 Rule designating and delisting "western Great Lakes DPS").  Thus, contrary to the FWS's predicate for the challenged Final Rule, no evidence is in the record that the Minnesota wolves listed as threatened in 1978 were ever considered a DPS, or that this wolf population has been treated as such.[25]   Rather, the Minnesota wolf population was, as the FWS noted in 1978, "the last significant element of a species that once occupied a vastly larger range in the lower 48 States."  1978 Rule, 43 Fed. Reg. at 9611.  Consequently, the FWS's current suggestion that the Minnesota wolf population was already an extant DPS is unsupportable.

Second, in addition to the Minnesota wolves not being designated or treated as a DPS, the Minnesota wolf population did not and could not have met the FWS's requirements to become a

---

[24] In the 1992 Recovery Plan, the "eastern timber wolf" is identified as "one of 32 subspecies or geographic races of the gray wolf, 24 of which originally inhabited North America."  Recovery Plan at 11A.  The Recovery Plan makes no mention of the fact that the entire species of gray wolves, *Canis lupus*, has been listed as endangered since 1978.

[25] Arguably, the Recovery Plan, combined with the assurances regarding subspecies offered to the U.S. Forest Service in the 1978 Rule, *see* 1978 Rule, 43 Fed. Reg. at 9609, suggests that the Minnesota wolves were treated as a subspecies separate and distinct from the greater gray wolf species.  The parties do not make this argument, however, and the challenged Final Rule appears expressly to reject it by recognizing that the wolves in the western Great Lakes region are members of the listed species, *Canis lupus*.  *See* Final Rule, 76 Fed. Reg. at 81,669 ("The wolves that occupy the WGL DPS have long been accepted as gray wolves, *C. lupus*, and until greater scientific consensus is reached regarding whether to revise this taxonomic classification, the better conclusion is to continue to recognize them as gray wolves.").

71

DPS in 1978 and, thus, cannot be deemed to have even "functioned as a DPS." Defs.' Mem. at 14 n.6. The DPS Policy was not adopted by the FWS until 1996, almost twenty years after the Minnesota wolves were separately listed, and, thus, the challenged Final Rule concedes that the 1978 listings of two wolf populations, with one in Minnesota, "were not predicated on a formal DPS analysis." 1978 Rule, 76 Fed. Reg. at 81,667. More importantly, the FWS concedes that the identification and boundaries of the Minnesota wolf population in 1978 runs afoul of the FWS's DPS Policy. *Id.* (noting that the 1978 decision to list the wolves in Minnesota as a threatened species "do[es] not comport with current policy standards"). The DPS Policy recognizes that "infra-national political boundaries offer opportunities to provide incentives for the favorable management of species if they were used as a basis for recognizing discrete entities for delisting or for exclusion from a listing." DPS Policy, 61 Fed. Reg. 4724. In particular, use of infra-national boundaries could allow for the "delisting or reclassification of a relatively widespread species for which a recovery program is being successfully carried out in some States." *Id.* Despite these "attractive possibilities," the FWS rejected the use of political boundaries other than international boundaries, concluding that only the latter type of boundaries reflect "differences in control of exploitation, management of habitat, conservation status, or regulatory mechanisms" that are significant for the purposes of the ESA. *See id.* at 4725. In direct contravention of the agency's subsequent DPS Policy that eschewed delimiting DPSs by State boundaries, the 1978 Rule set the boundaries of the Minnesota wolf population at the Minnesota borders. *See* 1978 Rule, 43 Fed. Reg at 9612 (delineating "special rules" for dividing "the State of Minnesota . . . into the following five zones" for wolf management purposes).

The third and final reason for rejection of the FWS's argument that the challenged Final Rule is merely "revising the boundaries" of an existing entity that "functioned as a DPS" is that

72

the boundaries of the western Great Lakes DPS are significantly different from those of

Minnesota.  The dramatic expansion of the size and contours of the purported DPS from a single

State to a territory covering all or parts of nine States in the challenged Final Rule runs counter to

the generally static nature of a DPS reflected in the agency's own DPS Policy.

　　　For example, the first element required for establishment of a DPS, as described in the

DPS Policy, is the "discreteness of the population segment in relation to the remainder of the

species to which it belongs."  DPS Policy, 61 Fed. Reg. at 4725.  To be discrete, the FWS

requires that a potential DPS be either (1) "markedly separated from other populations of the

same taxon as a consequence of physical, physiological, ecological, or behavioral factors," or (2)

"delimited by international governmental boundaries within which differences in control of

exploitation, management of habitat, conservation status, or regulatory mechanisms exist that are

significant in light of [16 U.S.C. § 1533(a)(1)(D)]."  *Id.*  The limitations described by the DPS

Policy in determining the "discreteness" of a DPS militate strongly against subsequent radical

alteration of the DPS's boundaries.  Regarding the first sub-element, a DPS's physiological or

behavioral factors are not likely to change in such a way as to remove a "marked[] separat[ion]"

between the DPS and the rest of its taxon in a short period.  Similarly, physical or ecological

factors that could lead to such separations would have to be drastic to cause a "marked[]

separat[ion]" between the DPS and the rest of its species.  For instance, a sudden change in the

channel of a river could create a new physical and ecological boundary between populations of a

species that cannot cross the river, but such dramatic natural changes would seem to occur rarely.

The second sub-element focuses on the conservation status of organisms in other countries to

determine if the DPS is "discrete," and requires the population to be "delimited by international

governmental boundaries." DPS Policy, 61 Fed. Reg. at 4725.  Like the factors set out in the first

sub-element, international borders are, at least in most parts of the world, static.

The second element to be examined under the DPS Policy is a population's

"significance."  *Id.*  Four non-exclusive factors are enumerated as relevant to evaluating

"significance . . . in light of Congressional guidance . . . that the authority to list DPSs be used . .

. sparingly:"  whether (1) the population exists "in an ecological setting unusual or  unique for

the taxon;" (2) "loss of the discrete population segment would result in a significant gap in the

range of a taxon;" (3) the population "represents the only surviving natural occurrence of a taxon

that may be more abundant elsewhere as an introduced population outside its historic range;" or

(4) the population "differs markedly from other populations of the species in its genetic

characteristics."  *Id.*  Each of these factors, again, refers to static, or nearly static, conditions.  A

population cannot suddenly exist in a unique ecological setting or spontaneously generate highly

differentiated genetic characteristics.  Similarly, barring some catastrophic event, a potential DPS

cannot suddenly gain the characteristic of a population segment for which the loss "would result

in a significant gap in the range of a taxon," since the range of a taxon is relatively static.  *Id.*

Finally, whether a DPS is "the only surviving natural occurrence of a taxon" is subject to change,

but the limitations placed on this factor by the FWS, namely, that another population of the taxon

"may be more abundant elsewhere as an introduced population outside its historic range," would

seem to limit the applicability of this factor: it would only apply when the DPS is part of a taxon

in which a population was introduced outside the taxon's "historic range," and that population is

now more abundant than the original population.  *See id.*

In sum, the DPS Policy's factors are designed to identify a discrete and significant

population occupying a particular ecological niche and, therefore, a DPS is, for the most part, a

74

static designation that is unlikely to change in the short-term, barring some kind of dramatic occurrence.  *See* DPS Policy, 61 Fed. Reg. at 4725.  If, as the FWS contends, the Minnesota wolf population "functioned as a DPS" when it was treated separately for conservation purposes in the 1978 Rule, the fact that the DPS's boundaries expanded from one to nine States militates heavily against finding that the Minnesota wolf population was, in fact, a DPS.  Such a finding would suggest that the wolves in Minnesota suddenly acquired "physical, physiological, ecological, or behavioral factors" that are shared with other wolves in the new nine-State area that differentiate them from all other gray wolves, such that the DPS's boundaries must be significantly expanded.  *See id.*  The record simply does not support such a finding.

<p style="text-align:center">*       *       *</p>

The FWS's contention that the Minnesota gray wolves were always a DPS and the Final Rule merely "revise[s] the boundaries of the Minnesota population . . . to come into line with the 1996 DPS Policy," Defs.' Reply at 6, is incorrect as a matter of law and not supported by substantial evidence.  In conceding that the Minnesota wolf population was never identified as a DPS and did not meet the requirements for a DPS designation when this population was listed separately from the rest of the *Canis lupus* species in 1978, Final Rule, 76 Fed. Reg. at 81,667– 68, the FWS cannot now claim that the western Great Lakes DPS existed prior to its recognition in the instant challenged Final Rule.  Moreover, the fact that the FWS is purporting to "revise[]" the boundaries of the Minnesota population" significantly undercuts the agency's position, since under the agency's own DPS Policy, DPS designations are defined in such a way as to  be relatively static.

Ultimately, the conclusion that the Minnesota wolf population was not a DPS is fatal to the challenged Final Rule.  As noted *supra* in Part III.B.1.a, the FWS may not designate a new

DPS to remove protections from the covered vertebrates because a DPS, as an entity, has no

legal significance if the covered vertebrates are not entitled to protection under the ESA.  Thus,

since the FWS designated and delisted the western Great Lakes DPS in the same rulemaking, the

rulemaking is contrary to the ESA and invalid.

This holding that the Final Rule violates the ESA and the APA resolves this case and,

under the APA, this Court is required to "hold unlawful and set aside [the] agency action."  5

U.S.C. § 706(2).  The appropriate remedy is addressed *infra* in Part III.D, but in the interest of

clarity and guidance to the agency, two additional, though related grounds for holding the Final

Rule to violate the ESA and the APA are discussed below.

### 2.      *Designating And Delisting A DPS Of A Broader Listed Species Violates The ESA*

The challenged Final Rule designated the western Great Lakes DPS at the same time that

its members were reaffirmed as belonging to the taxonomic species *Canis lupus*, which was

already listed, everywhere in the conterminous United States, as an endangered or threatened

species.  *See generally* 1978 Rule.  Even if the designation of the DPS were valid, the protections

afforded the wolves encompassed by this DPS are controlled by the listing of the entire *Canis*

*lupus* species and may not be reduced below that level through manipulation of the definition of

"species" to treat the DPS's members as if they were a different, unlisted species when they are

not.  This principle is inherent in the purpose and structure of the ESA.  Consequently, the

challenged Final Rule is *ultra vires* and violates the ESA and the APA.

#### a)      *Use Of The DPS Tool To Delist Healthy Populations of Broader Listed Species Subverts The Purposes Of The ESA*

As noted *supra* Part I.A.1, the ESA was intended, at least in part, to remedy perceived

limitations in previous conservation laws and extend the Federal government's power to

conserve species before they were on the brink of extinction worldwide.  *See* LEG. HIST. at 193

(Statement of Rep. John Dingell) (noting ESA would "extend[] protection to animals which are in trouble in any significant portion of their range, rather than threatened, a[s] they must now be, with worldwide extinction").  The extensive federal regulation authorized in the ESA carries a concomitant intrusion on what are traditionally issues decided by the States.  Consequently, the definitions of "species" and "endangered species" are carefully calibrated to grant the FWS the necessary flexibility to protect only the wildlife in need of federal protection.  *See, e.g.*, *id.* at 359 (Statement of Sen. John Tunney) ("Central authority is necessary to oversee endangered species protection programs and to insure that local political pressures do not lead to the destruction of a vital national asset.").  These dual purposes—protection of species before global extinction and protection targeted only where necessary—are reflected in two definitional changes made to the ESA that were absent in previous federal conservation laws: first, a change to the definition of "species," added the phrase "any other group of fish or wildlife of the same species or smaller taxa in common spatial arrangement," Endangered Species Act of 1973, Pub. L. 93-205 § 3(11), 87 Stat. 884, 886 (1973); and, second, a change to the definition of "endangered species," added the phrase "all or a significant portion of its range," *id.* at 885.  As a consequence of these changes, the ESA authorized the protection of wildlife species or smaller population groups that were threatened with extinction within all *or* a significant portion of their range.[26]  This regulatory flexibility to designate smaller population groups was highlighted as a solution to the

---

[26] In making these changes, Congress discussed instances where certain members of a species would be *listed* as an endangered DPS while the species as a whole remained unlisted, including the eastern timber wolf.  *See* Leg. Hist. at 477–79.  During final debate on the passage of the ESA, one of the conferees, who was also the ESA's primary sponsor, was asked whether the Secretary of the Interior could designate the eastern timber wolf "as an endangered species in all States of the Union except Minnesota," which prompted the response that the "responsibility and discretion" the Secretary of the Interior would have to list species "would extend to particular species, subspecies or populations of wolves and other kinds of endangered or threatened animals."  *Id.* at 478 (statements of Rep. Robert Bergland and Rep. John Dingell, respectively).  In context, the discussion made clear that the initial decision as to whether to protect a given "species, subspecies or population[] of wolves" would include a decision on the appropriate level of taxonomy to protect.  *See id.*

problem posed by prior conservation laws, which provided an all-or-nothing approach: mandating complete bans on certain state conservation practices for species listed as endangered, but no protection when the species was not "threatened with worldwide extinction."  *See generally* 1969 Act.  The subsequent 1978 amendment to the definition of "species," which incorporated the authority to designate vertebrate populations as DPSs, is fully consistent with these dual purposes of the ESA.

Yet, with this increased flexibility under the ESA to tailor conservation solutions, the FWS chose, in 1978, to list as "endangered" all gray wolves, *Canis lupus*, everywhere in the conterminous United States, except Minnesota, mandating the highest level of protection.  *See generally* 1978 Rule.  In Minnesota, the FWS chose to designate the gray wolf as threatened, which allowed some conservation methods that would have otherwise been unavailable with an endangered listing, such as the limited taking of wolves involved in depredation incidents.  *See id*. at 9612–15 (delineating special rules for taking of wolves in certain parts of Minnesota in certain circumstances).  This 1978 decision to list the gray wolf at the "species" taxonomic level, with a lower level of listing protection afforded the gray wolf population in Minnesota, was defended by the FWS as the result of a careful determination, after examining the threats affecting all gray wolves, as the best way to conserve these animals.  *See* 1978 Rule at 9607.

The challenged Final Rule takes a very different approach and, unlike even the vacated 2003 Rule, removes *all* federal protections for the gray wolf within the boundaries of the western Great Lakes DPS.  Final Rule at 81,666.  Instead of considering the status of the listed entity, the *Canis lupus* species, as a whole, the Final Rule purposely *avoids* a comprehensive evaluation of this endangered species throughout its historical range, focusing solely on the viability of a single population of gray wolves in only a part of that range.  *See* Final Rule at 81,685–86

78

(stating lack of threats to wolves within western Great Lakes DPS made "continued conservation efforts under the [ESA] . . . no longer necessary *within the DPS*" but noting continued need for protection outside DPS (emphasis added)).  This blinkered focus, which blocks out the larger picture of the status of *Canis lupus* as a whole, is sanctioned, according to FWS, by the authority to designate DPSs set out in the definition of "species."  Contrary to the agency's position, this approach of using a DPS designation to delist a population of a broader listed species is not consistent with the purposes of the ESA, a view the FWS seems to have endorsed as recently as 2003.  *See* 2003 Rule, 68 Fed. Reg. at 15,859 ("Delisting can only occur if the *listed species* is recovered, if the *listed species* is extinct, or if the *original listing* was based on data, or data interpretation, that were in error." (emphasis added)).

The use of the DPS tool to delist populations of broader listed species defeats the specific purposes for incorporating DPS into the definition of "species" to facilitate *greater* protection of vertebrates while avoiding the need for broad taxonomic species listings and the concomitant federal interference with local management of wildlife within State borders.  *See* LEG. HIST. at 360; 477.  The debate triggered by the 1979 GAO recommendation to eliminate reference to DPS in the definition of "species" illuminates these purposes of the DPS tool.  *See generally* GAO Report.  In response to GAO's criticism that the FWS was designating too many species at insignificant levels, at the expense of other national priorities and inviting unnecessary conflicts with State and private projects, *id.* at 52, the FWS countered that the GAO's proposal "(1) might necessitate a needless allocation of resources to . . . consultations on biologically nonendangered [sic] populations of certain species which would have to be listed in total and (2) could prevent FWS from providing legal protection to widespread species, such as the gray wolf, which are listed solely to protect populations in the conterminous United States."  *Id.* at 58; *id.* (letter from

79

DOI Assistant Secretary to GAO Director of Community and Economic Development Division,

June 15, 1979,) at 122 (explaining "disagree[ment]" with "GAO's recommendation . . . that

would limit listings of vertebrates to species and subspecies").

The gravamen of the first reason given by the FWS in defense of the DPS tool is that this

authority allowed targeted federal protection of vertebrates rather than the listing of species "in

toto".  *See id*. at 122 (emphasis in original).  In the second reason, the FWS explained that

limiting listing authority to only the taxonomic species and subspecies level would effectively

strip protections from wide-ranging species, such as the gray wolf, because they were not in

danger of extinction outside the United States.  *See id.* at 58.  Although the GAO definitional

proposal was not adopted, the Senate committee report acknowledged the GAO's concern that

the DPS designation authority gave the FWS extensive power to protect population groups

within a broader species and cautioned the FWS to exercise the power to designate DPSs

"sparingly and only when biological evidence indicates that such action is warranted."  LEG.

HIST. at 1397.  This cautionary language about the potential abuse of the DPS tool reinforces the

conclusion that designation of a DPS was designed to be an affirmative protective tool.  The

"great potential for abuse," cited in the Senate Report, LEG. HIST. at 1397, stemmed from the

possible *extension* of federal protection using the DPS tool, not from designating a DPS for the

purpose of *removing* protection from a group of vertebrates.

Notably, the FWS's now-proffered interpretation of the purposes of the DPS tool

undermines its own view that it may be used to delist populations of broader listed species.  The

2008 Solicitor's Opinion and the agency's briefing dismisses as "illogical" the interpretation

described in *2008 Wolves* "that the DPS language should only be used to list species in the first

instance," because this interpretation "finds no support in the legislative history."  Solicitor's

Opinion at 498A (citing *2008 Wolves*, 579 F. Supp. 2d at 17); *see* Defs.' Mem. at 19–20.  In the

agency's view, "the reasons for including the DPS language are unclear from the legislative

history," but nonetheless the Solicitor's Opinion posits that this amendment reflects "the fact that

Congress wanted to narrow the circumstances in which FWS could list a population of a

species," since plants and invertebrates were excluded from the exercise of DPS authority and

"Congress left in place FWS's ability to specify as threatened or endangered a 'significant

portion' of the range of any 'species' (i.e., why limit FWS's ability to list populations of a

species or subspecies when FWS retains the ability to list portions of the range of the same

species or subspecies?)."  Solicitor's Opinion at 498A.

    The view articulated in the Solicitor's Opinion that the DPS amendment was intended to

"narrow" the agency's listing authority is correct in one significant respect: fully consistent with

the original goals of the ESA to provide flexibility to the agency in extending federal protection

to endangered species only where necessary, the DPS amendment gave express authorization to

protect vertebrate populations in smaller groups than species—or even subspecies—as a whole.

Such a narrow focus on the threatened or endangered populations presumably better targets

federal resources where needed and avoids unnecessary federal preemption of state regulatory

authority.  The FWS's interpretation of its authority to use the DPS tool for delisting populations

of broader listed species would have the opposite effect by encouraging the listing of broader

taxonomic species or subspecies, because relief from the ESA's regulations could be provided

through use of the DPS tool for piecemeal carve-outs of removed DPSs.[27]  The FWS fails to

---

[27] The 2008 Solicitor's Opinion articulates various policy goals that would be served by the FWS's interpretation of
its DPS authority to identify and remove healthy DPSs from broader species listings, including that such authority
would "avoid[] needless expenditure of federal resources in areas where the species is no longer endangered or
threatened," Solicitor's Opinion at 507A; "direct funding to species that are still in danger of extinction," *id*. at
508A; "allow[] FWS to focus conservation efforts on the those populations" that remain listed, *id*.; "fulfill[] the

appreciate that interpreting its authority to use the DPS tool for delisting upsets the careful, cautious approach intended by Congress to list "species" as narrowly as necessary at the outset to achieve the conservation goals of the ESA.

> b)    *Use of DPS Tool to Delist Populations Of Broader Listed Species*
> *Subverts Operation of ESA Provisions*

When deciding whether a vertebrate requires federal protection under the ESA, the FWS may also determine the scope of such protection, including whether listing is warranted at the granular, DPS level or a broader, taxonomic species listing.  *See* 16 U.S.C. §§ 1532(16); 1533(a)(1).  Listing a group of vertebrates as an endangered or threatened DPS, when justified biologically, targets federal protections to the area inhabited by the DPS rather than across the full or significant portion of the range of the entire taxonomic species or subspecies.  *See* 16 U.S.C. §§ 1533; 1536; 1538; 1540.  The scope of the listing decision has obvious and significant repercussions in preempting local choices in managing the listed entity.  *See generally* 16 U.S.C. §§ 1533; 1534; 1537.  By designating the species *Canis lupus* as endangered throughout its entire range of the conterminous United States, with the exception of Minnesota, in which the species was threatened, in 1978, the FWS sacrificed regulatory flexibility for protection.  *See* 1978 Rule at 9607.  The agency did so because "the entire species *Canis lupus* is Endangered or Threatened to the south of Canada, and . . . [management] can be handled most conveniently by listing only the species name."  *Id.*

---

[ESA's] policy objective of fostering international cooperation in protecting" listed species, *id.*; and "encourage State conservation efforts if those efforts result in returning species management to those States" and thereby "likely . . . protect and improve the ecosystems that the species depends upon, *id.* at 509A.  The Solicitor's Opinion warns that rejection of the agency's interpretation could "prompt FWS to slow down the listing process" to analyze "individual DPSs of a species that may be critically imperiled range-wide for fear that it could not later remove DPSs of that species should they recover sooner than the whole." *Id.* at 497A.  While these policy goals are commendable, none is incompatible with strict adherence to the text and structure of the ESA.  Indeed, the FWS's interpretation of the ESA as authorizing the use of the DPS tool as a shortcut to avoid "slow[ing] down the listing process," *id.*, appears to circumvent the "institutionalized caution" mandated by the ESA, *see Tenn. Valley Auth.*, 437 U.S. at 194.

Despite the findings underlying the 1978 Rule regarding "the entire species," the FWS now contends that the DPS tool may be used to remove the listed status of only some members of *Canis lupus* while the remaining members of the species remain protected on the list.  Final Rule, 76 Fed. Reg. at 81,686 ("this final rule does not alter the listing status under the [ESA] outside of the DPS"); Defs.' Mem. at 14 ("This litigation does not turn on speculation about future rulemaking for the gray wolf.").  This position is based on the premise articulated in the 2008 Solicitor's Opinion that "FWS impliedly lists any DPSs that are part of a larger species or subspecies listing," and, consequently, "when identifying and removing a DPS from a broader species listing, FWS is not identifying and delisting a new DPS, it is separately recognizing an already-listed entity for the first time because it now has a different conservation status than the whole."  Solicitor's Opinion at 497A.  The DPS tool is used simply to "alter[] the listing for the wider-ranging species to reflect that its range no longer includes the DPS that is being removed."  *Id*. at 501A.[28]

The predicate for this legal argument is fundamentally flawed.  Neither the ESA nor the

---

[28] Notably, the Solicitor's Opinion cites the Greater Yellowstone Area population of the grizzly bear and the Northern Rocky Mountain gray wolf population as examples where the FWS used the DPS tool "to identify that population and assess whether it qualifies as a DPS and, if so, remove it from the broader species listing if it is no longer endangered or threatened."  Solicitor's Opinion at 500A; *id.* 499A n.12; (citing Final Rule Designating the Greater Yellowstone Area Population of Grizzly Bears as a Distinct Population Segment; Removing the Yellowstone Distinct Population Segment of Grizzly Bears From the Federal List of Endangered and Threatened Wildlife; 90-Day Finding on a Petition to List as Endangered the Yellowstone Distinct Population Segment of Grizzly Bears, 72 Fed. Reg. 14,866 (Mar. 29, 2007) and Final Rule Designating the Northern Rocky Mountain Population of Gray Wolf as a Distinct Population Segment and Removing This Distinct Population Segment From the Federal List of Endangered and Threatened Wildlife, 73 Fed. Reg. 10,514 (Feb. 27, 2008)).  Subsequent to the issuance of the Solicitor's Opinion, however, both of the cited rules failed to withstand judicial scrutiny and were vacated, albeit on grounds other than the particular use of the DPS authority to remove listing protection from an otherwise listed taxonomic species.  *See Greater Yellowstone Coalition, Inc. v. Servheen*, 672 F. Supp. 2d 1105, 1126 (D. Mont. 2009)(vacating grizzly bear rule), *affirmed in part, reversed in part on other grounds*, 665 F.3d 1015, 1020 (9th Cir. 2011); *Defenders of Wildlife v. Salazar*, 729 F. Supp. 2d 1207, 1211 (D. Mont. 2010) (vacating Northern Rocky Mountain gray wolf rule).

FWS's regulations contain any reference to the "implied" listing of species.[29]  Instead, each "species," including each DPS, must be published in the Federal Register "by scientific and common name or names," along with specification "with respect to each such species over what portion of its range it is endangered or threatened." 16 U.S.C. § 1533 (c)(1).  This specific listing requirement promotes clarity as to the covered vertebrates subject to federal regulation and ensures that changes in the listing status are focused precisely on the listed species; otherwise evaluating the need for listing changes would amount to a moving target subject to redefinition at agency whim.

Moreover, interpreting the ESA in the manner urged by the FWS, in reliance on the Solicitor's Opinion, to permit the use of the DPS tool for piecemeal reclassification and delisting of parts of a listed species would have two results, neither of which is contemplated by or reconcilable with the statutory language.  First, allowing an "implied" DPS of a broader listed species to be delisted, would render meaningless the original listing decisions for a species at risk "throughout all or a significant portion of its range."  15 USC §§ 1532(6) and (20).  That specified "range" would be subject to alteration essentially at any time that the agency designates a DPS.  *See Greater Yellowstone Coalition, Inc. v. Servheen*, 672 F. Supp. 2d 1105, 1125 n.9 (D. Mont. 2009) *affirmed in part, reversed in part on other grounds by* 665 F.3d 1015, 1020 (9th Cir. 2011) ("Under such an interpretation, the [FWS] could remove virtually any species from the threatened and endangered list simply by designating it a DPS.").

Indeed, if the ESA's authority to designate a DPS is construed to permit the drawing of

---

[29] The *2008 Wolves* court briefly described this "implied listing" argument skeptically, noting "that no species—including a DPS—may be said to be 'included in a list' unless *that species itself* is subjected to the five-factor analysis of Section 1533(a)(1)."  579 F. Supp. 2d at 17 n.10 (emphasis in original).  The *2008 Wolves* court ultimately did not have to opine further on the legitimacy of this interpretation because "FWS ha[d] offered no interpretation on th[at] score to which the Court could defer."  *Id.*

84

DPS boundaries around a species' current range, any need to consider the contraction in a species' historical range would be eliminated because of the interplay between the definitions of "species" and "endangered species."  *See id.*; *see also Vermont Wolves*, 386 F. Supp. 2d at 566 (holding that the FWS may not limit its analysis of a significant portion of a species' range "to areas that ensure the validity of the DPS" and finding that the FWS could not delist a gray wolf DPS on the basis that a core population was viable without addressing unoccupied portions of the gray wolf's current and historical range); *Oregon Wolves* at 354 F. Supp. 2d at 1167 (rejecting FWS interpretation as "not consistent with the *Defenders* interpretation that 'a species can be extinct throughout a significant portion of its range if there are major geographical areas in which it is no longer viable but once was'" (citing *Defenders of Wildlife v. Norton* , 258 F.3d 1136, 1145 (9th Cir. 2001)).

Second, the agency's proffered interpretation that "implied" DPSs may be found within broader listed species would permit the FWS to avoid its statutory duties (1) to review the listed species' status as whole and (2) to change the listing status only for the reasons enumerated in the ESA.  A brief summary of the statutory requirements for changing the status of a listed species makes plain that cherry-picking healthy populations of a listed species for delisting subverts the review and delisting process.

Once a species is listed as endangered or threatened, that listing may periodically be changed in three enumerated ways: the listed species may be "removed from such list" or "changed in status" from endangered to threatened or vice versa.  16 U.S.C. **§** 1533 (c)(2)(B). Changes in listing status may be justified upon consideration of the same five factors used for the listing decision and set out in16 U.S.C. § 1533(a).  The FWS's regulations for delisting a species follow, to a large extent, the structure of the ESA itself.  Species may be removed from the list

"only if . . . the best scientific and commercial data available to the Secretary after conducting a review of the status of the species . . . substantiate that it is neither endangered nor threatened for one or more of" three reasons: (1) if the species is found to be extinct; (2) if the species is found to be recovered; or (3), if "[s]ubsequent investigations . . . .show that the best scientific or commercial data available when the species was listed, or the interpretation of such data, were in error."  50 C.F.R. § 424.11(d); *accord* 2003 Rule, 68 Fed. Reg. at 15,859.  The regulations require that the FWS "conduct[] a review of the status of the species," and, after doing so, determine if one of the three reasons listed in the regulation applies to allow the delisting of the species.  50 C.F.R. § 424.11(d).

Just as a DPS has no legal status and is not eligible for protection under the ESA until it has been identified as "endangered" or "threatened," *supra* Part. III.B.1, under the FWS's regulations, a "species" cannot be "delisted" unless it is first listed and a "review" has been conducted.  *See* 50 C.F.R. § 424.11(d).  Indeed, the regulations require a review for *any* change in the status, whether listing, delisting, or changing from one protected status to another.  50 C.F.R. § 424.11.  The level at which a group of vertebrates is listed—DPS, subspecies, or species—becomes the listed entity that the FWS must review if any change in that entity's status is proposed.  *See id.*  If a species is defined as a DPS, a review of that "species" status for listing purposes, 50 C.F.R. § 424.11(c), or delisting purposes, *id*. § 424.11(d), is conducted only regarding that DPS.  Similarly, when a listed taxonomic "species" is reviewed, the analysis is conducted of the entire "species."  *See id.*  Simply put, once an entity is identified and listed, that *entity* is afforded protection under the ESA, *see* 16 U.S.C. § 1533(c), and the agency's  actions must address that entire listed entity, regardless of whether the entity is a DPS, a subspecies, or a taxonomic species.

For species such as the gray wolf, which have vast historic ranges, extending endangered species protection at the taxonomic species level, rather than at the subspecies or DPS level, may pose significant obstacles for subsequent delisting decisions, since any "review" must take into account the "status of the species" throughout "all or a significant portion of its range." *See* 16 U.S.C. § 1533(c)(2). When the FWS designated the entire species *Canis lupus* as "endangered" or "threatened" in the conterminous United States, it assumed that burden. To reclassify or delist *Canis lupus*, the FWS must review the status of *Canis lupus*, the listed entity, throughout its range, which the listing rule defined as the conterminous United States, and decide whether it is still threatened with extinction throughout "all or a significant portion of its range." 50 C.F.R. § 424.11.[30] Use of the DPS tool to circumscribe the status review required for a listing change in order to limit such review to only part of the listed species, as the FWS appears to suggest, is contrary to the statutory direction. [31] *See* 2003 Rule, 68 Fed. Reg. at 15,859.

Finally, listing species on a broad taxonomic level and delisting members of that species on a piecemeal basis contradicts the ESA's requirement that the *same* standards be applied in a delisting decision as a listing decision. *See* 16 U.S.C. § 1533(c)(1) ("The Secretary shall from time to time revise each list published under the authority of this subsection to reflect recent determinations, designations, and revisions *made in accordance with subsections (a) and (b) of*

---

[30] Indeed, the Solicitor's Opinion lays out this alternative mechanism to "simultaneous identification and removal of recovered DPSs from broader species listings" to "achieve the same result." Solicitor's Opinion, at 496A n.9. This alternative would involve "proposing to delist the entire species if it is no longer endangered or threatened over its entire range and simultaneously proposing to list any DPS or significant portion of its range where that species still remains endangered or threatened." *Id.*

[31] This is exactly the action taken by the FWS in the Final Rule. The defendants respond to the plaintiffs' complaint that the defendants failed to consider the status of listed gray wolves outside the boundaries of the western Great Lakes DPS, by noting that, once a DPS is recognized, the DPS is a "species," regardless of the vertebrate's actual taxonomic classification or whether the population would be commonly understood as a distinct species. *See* Defs.' Mem. at 20–21; Defs.' Reply at 5. Under the FWS's reasoning, once the agency recognized the western Great Lakes DPS, no consideration need be given to the status of gray wolves anywhere else, because those wolves are another "species," thereby absolving the FWS from any statutory duty to examine the status of gray wolves outside of the western Great Lakes. *See* Defs.' Mem. at 20–21; Defs.' Reply at 5.

*this section*.") (emphasis added).[32]  In short, what the FWS contends it did in the challenged Final Rule is simply not permitted by the ESA due to the agency's prior listing of the *Canis lupus* species.  Any reclassification or delisting of the species *Canis lupus* may only be undertaken after a review of the "status" of *Canis lupus*, the "species" that was listed on the List of Endangered and Threatened Wildlife.  50 C.F.R. § 424.11(d).

Congress intended with the ESA and the subsequent inclusion of the DPS designation authority to give the FWS the flexibility to tailor federal protection at the appropriate taxonomic level needed to conserve populations of endangered vertebrates.  *Supra* Part III.B.2.a.  The FWS's efforts to remove federal protections from the gray wolves in the western Great Lakes are rejected as violative of the ESA not because the statute provides insufficient flexibility to the agency but because the agency adopted a listing of the species in 1978 that carries with it consequences under the law.

The FWS may alter a species' status upon discovering a mistake in classification, but that is not what occurred with the challenged Final Rule.  On the contrary, the best scientific evidence indicated that the FWS did not make a mistake when it determined that *Canis lupus* was the large canid species that roamed over large portions of North America.  *See* Final Rule at 81,667–69 (noting that the "gray wolf has a Holarctic range," of which there are subspecies that spread over the conterminous United States and that "the better conclusion is to continue to recognize [wolves in the western Great Lakes] as gray wolves").  The FWS may also change a listing status upon determining that a species is not in danger of extinction over all or a significant portion of its range, but the challenged Final Rule did not do this either.  Instead, the agency completely

---

[32] The FWS's DPS Policy confirms the operation of the ESA's status review mechanism as requiring evaluation of a listed entity using the same parameters as those under which it was listed, stating that the ESA "provides no basis for applying different standards for delisting than those adopted for listing."  DPS Policy, 61 Fed. Reg. at 4724.

88

ignored all portions of the gray wolf's range outside the proposed western Great Lakes DPS. The FWS may also change a listing status upon determining that a species is "extinct," and therefore eligible for delisting, but this, again, did not occur here. The FWS set the parameters under which the gray wolf would be evaluated when it chose to list the gray wolf at the taxonomic species level in 1978 and, until that listing status changes, the agency is bound by those legal parameters.[33]

The ESA and the agency's implementing regulations place certain restrictions on the FWS's ability to act regarding a listed species. By listing the gray wolf at the general taxonomic level of species, the FWS obligated itself to address the gray wolf in the conterminous United States as a general species in any future decisions regarding reclassification or delisting of members of the species. *See* 16 U.S.C. § 1533; 50 C.F.R. § 424.11. The FWS appears to have recognized these limitations in the NPRM, but ignores them in promulgating the Final Rule, as explained below.

<div align="center">

c)     ***The FWS's Finding That The Western Great Lakes Wolves Are Gray Wolves Is Fatal To The Final Rule***

</div>

The NPRM states that the FWS's "review of the best available taxonomic information . . . indicates that *Canis lupus* did not occupy large portions of the eastern United States: *i.e.*, the northeastern United States was occupied by the eastern wolf (*C. lycaon*), now considered a separate species of *Canis* rather than a subspecies of *lupus*."  NPRM, 76 Fed. Reg. at 26,088. This finding would be significant in demonstrating an error in the prior combining of *Canis lycaon* with *Canis lupus* in a single listing and thereby permit, under the applicable regulations, a

---

[33] Notably, the FWS's contention in *Vermont Wolves* that it could not "create 'non-DPS remnant' endangered species areas outside of [a new] DPS" was correct, but for the wrong reason. *See Vermont Wolves*, 386 F. Supp. 2d at 564. In trying to break the gray wolf's range into separate DPSs, the FWS seemingly tried to conduct a species-wide review and examine the gray wolf's status throughout its entire range in 2003. *See generally* 2003 Rule. It ran afoul of the APA and the ESA when it ignored the status of the species in the northeastern United States and simply lumped those States into the DPS covering the Tri-State Area. *See Vermont Wolves*, 386 F. Supp. 2d at 564.

<div align="center">89</div>

new listing decision for *Canis lycaon*.  *See* 50 C.F.R. § 424.11(d)(3) (allowing for delisting after

review of a species' status if the review indicates that "the best scientific or commercial data

available when the species was listed, or the interpretation of such data, were in error")

Indeed, the FWS used this proposed finding to exclude all or parts of twenty-nine states

from the "historic range" of the gray wolf, finding instead that those areas belonged to *Canis*

*lycaon* or the separately listed *Canis rufus*.  *See* NPRM, 76 Fed. Reg. at 26,088.  Based on this

proposed finding, the FWS stated that it "now recognize[s] three wolf species with ranges in the

conterminous United States: *Canis lupus, Canis lycaon,* and *Canis rufus*."  *Id.* at 26,089.  As for

the western Great Lakes region, the FWS stated that "[m]ost researchers . . . appear to agree that

there is a unique and genetically identifiable form of wolf that occupies the western Great Lakes

region, and that this form has hybridized with *Canis lupus*, whose origins were from elsewhere

in North America."  *Id.* at 26,093.  The FWS determined that "the best available scientific

information supports recognition of the eastern wolf, *C. lycaon*, as a species" separate from

*Canis lupus*.  *Id.*

This proposed finding proved to be incorrect.  In the Final Rule, the FWS acknowledged

substantial debate over the appropriate taxonomy of the gray wolf and conceded that the

proposed finding regarding *Canis lycaon* had relied to a large extent on a study by "Chambers *et*

*al.*," which found that "the most supportable interpretation is that the eastern wolf is not a

subspecies . . . but a full species."  Final Rule, 76 Fed. Reg. at 81,669.[34]  The Final Rule noted

that the authors of the Chambers study "themselves acknowledge . . . that further research may

change some of their conclusions."  *Id.*  Based on the comments FWS received from "leading

---

[34] The study's authors were then-current employees of the FWS.  Steven M. Chambers *et al.*, *An Account of the Taxonomy of North American Wolves From Morphological and Genetic Analyses*, Docket No. FWS-R3-ES-2011-0029 (Sep. 7, 2011) at 1.

researchers in the field of canid biology and genetics," the FWS determined that "[w]hile Chambers *et al.* . . . . provide a scientific basis for arguing the existence of eastern wolves as a distinct species, this represents neither a scientific consensus nor the majority opinion of researchers on the taxonomy of wolves." *Id.* Thus, the FWS stated it was "continuing to recognize *C. lupus* as the only species that occurs in the [western Great Lakes]." *Id.*

Although the Final Rule relegates to only one paragraph the discussion of this reversal of a fundamental proposed finding that the eastern wolf was not part of the same species as the endangered *Canis lupus*, the ramification of this change for the Final Rule is significant. Had the FWS been correct in its initial evaluation that the wolves in the western Great Lakes were not *Canis lupus* at all and, instead, were a separate species, then the designation of a DPS of those animals in the United States may have been acceptable. In determining that the western Great Lakes wolves were, in fact, not a taxonomically separate species from the listed entity, *Canis lupus*, however, the FWS was required by the ESA to address that entity and was therefore prohibited by the structure, history, and purpose of the ESA and its implementing regulations from designating a DPS form of "species," at a smaller taxonomic level than the level at which the gray wolf was already listed. *Supra* Part III.B.2.b.[35]

Notwithstanding the abandonment of the key scientific premise in the NPRM that the western Great Lakes wolves were predominantly a different species from *Canis lupus*, the FWS

---

[35] Emails between FWS employees during the drafting the NPRM indicate concerns over this strategy in preparation of the NPRM. *See* AR Ex. CC (Email chain between Laura Ragan and Maricela Constantino, December 2010) at 2832A (referring to potential strategy of "delist[ing] the current [gray wolf] entity due to error and replac[ing] it with what should be listed (removing wolves in the WGL area due to recovery and not defining a DPS)"); *id.* at 2831A (criticizing, in same email chain, proposed strategy because "finalizing a delist due to error for lower 48 and Mexico would remove protections for areas that we believe still need them); AR Ex. DD (Email chain between Lynn Lewis, Asst. Reg'l. Dir., Midwest Region, FWS and Patrick Leonard, FWS Region 5) at 2847A (referring to proposed plan to designate and delist western Great Lakes gray wolves, in email between FWS employees, and noting that they have "also heard that solicitors are drafting a paper on why this won't work (so tell us what will work, already)").

promulgated the Final Rule designating and delisting the western Great Lakes DPS.  The

challenged Final Rule does not follow the ESA's statutory mandate to review the status of the

"species" listed, it does not follow the FWS's own regulatory requirement to do the same, and it

relies upon a scientific finding that turned out to be, at best, premature, or at worst, erroneous.

Consequently, the Final Rule is arbitrary and capricious under the APA.

<div align="center">*     *     *</div>

The holding that the FWS may not reclassify members of an already listed species as a

DPS for the purpose of delisting—and thereby subvert the normal review and delisting process—

is supported by the structure and purpose of the ESA and its implementing regulations.

Consequently, on this ground alone, apart from the fact that the ESA does not permit the

designation of a DPS for the sole purpose of delisting the covered population in the same

rulemaking, the Final Rule is arbitrary and capricious and cannot stand.

Few listed species have the same combination of former ubiquity, subsequent near-

extirpation, and a listing at such a broad taxonomic level as the gray wolf.  This combination of

attributes for the gray wolf has consequences under the ESA on the options available to the FWS

to manage the species and consider legitimate State and local concerns.  Even if the FWS were

able to designate a DPS and delist that population in the same rulemaking, which it cannot, *supra*

Part III.B.1, and even if the FWS were able to carve out for delisting a DPS with a viable

population of animals belonging to an already listed taxonomic species, which it cannot, *supra*

Part III.B.2, the FWS's justifications for the challenged Final Rule were contrary to the evidence

before the agency and the Final Rule is, thus, violative of the ESA and the APA.  The critical

areas of insufficient evidence in support of the Final Rule are detailed below.

C.      **The Delisting Of The Western Great Lakes DPS Was Contrary To The Evidence Before The Agency**

The interpretive fallacies underlying the Final Rule render the Final Rule invalid, regardless of the findings as to whether the gray wolf in the western Great Lakes should remain listed.  Nevertheless, assuming, *arguendo*, that the Final Rule were a proper exercise of the FWS's authority, it would still be invalid because the FWS offers "an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'"  *Am. Wildlands,* 530 F.3d at 998 (quoting *State Farm,* 463 U.S. at 43).  Specifically, the FWS failed adequately to explain (1) why parts of six states outside the "core population areas" of wolves in the western Great Lakes DPS were not "significant portion[s] of [wolf] range" in which the gray wolf remained threatened or endangered; (2) why the western Great Lakes wolf population's vulnerability to disease in combination with human-caused mortality does not represent a continuing threat to its existence; (3) how the lack of management plans or other regulatory schemes to protect the wolf in two-thirds of the States that make up the western Great Lakes DPS does not constitute a threat to the species; and (4) how the state management plans permitting the unlimited killing of wolves in certain areas, which FWS admits will result in the deaths of hundreds of gray wolves, does not constitute a threat to the species.  Each failing in the rule is addressed separately below.

1.      *Failure To Explain Why Territory Suitable For Wolf Occupation Is Not A Significant Part Of The Gray Wolf's Range*

In the Final Rule, the FWS found that "[r]easonably foreseeable threats to wolves in all parts of the WGL DPS are not likely to threaten wolf population viability in the WGL DPS in the foreseeable future."  Final Rule, 76 Fed. Reg. at 81,723.  This finding is based on the agency's brief observation that the wolf population in northeastern Minnesota, northern Wisconsin, and the Upper Peninsula of Michigan are sufficiently self-sustaining to make all remaining areas of

land in the western Great Lakes not "significant portions" of the wolf's range.  *See id.* at 81,722–

73.  To understand the inherent fallacy in the agency's reasoning, and the way in which the

FWS's reasoning is contrary to the record evidence, the FWS's interpretation of "significant

portion of [a species'] range" is explained first before turning to the application of that

interpretation in the Final Rule.

<p style="text-align:center"><em>a)    Meaning of "Significant Portion of Its Range"</em></p>

The parties do not dispute that the phrase "significant portion of its range" is, for *Chevron*

purposes, ambiguous, *see* Defs.' Mem. at 26; *see generally* Pls.' Reply Mem. Supp. Pls.' Mot. &

Opp'n Defs.' Mot. and HCC's Mot. ("Pls.' Reply"), ECF No. 41, and the Court concurs, *see,*

*e.g.*, *Defenders of Wildlife v. Norton*, 258 F.3d 1136, 1141 (9th Cir. 2001) ("The statute is . . .

inherently ambiguous"); *Colo. River Cutthroat Trout v. Salazar*, 898 F. Supp. 2d 191, 201

(D.D.C. 2012) (finding phrase ambiguous); *W. Watersheds Project v. Ashe*, 948 F. Supp. 2d

1166, 1184 (D. Idaho 2013) ("Because the phrase is ambiguous, the [FWS] has a wide degree of

discretion in determining whether the [species] is in danger 'throughout a significant portion of

its range'").  Thus, under *Chevron* Step Two, the agency's interpretation of the phrase is entitled

to deference if it is reasonable.  *Chevron*, 467 U.S. at 843.

In *Defenders of Wildlife*, the Ninth Circuit did not defer to the FWS's interpretation of the

phrase "significant portion of its range," despite noting that the statute was "puzzling" and

"inherently ambiguous."  258 F.3d at 1141.  The court found that "a species can be "extinct

'throughout . . . a significant portion of its range' if there are major geographical areas in which

it is no longer viable but once was."  *Id.* at 1145.  Before analysis of the species' listing status

may be restricted to a contracted part of its historical range, however, the court required the

agency to provide an explanation.  *Id.*  The Ninth Circuit explained that where "it is on the record

apparent that the area in which the [species] is expected to survive is much smaller than its

<p style="text-align:center">94</p>

historical range, the Secretary must at least explain her conclusion that the area in which the species can no longer live is not a 'significant portion of its range.'" *Id.* (citing *Asarco, Inc. v. EPA,* 616 F.2d 1153, 1159 (9th Cir. 1980)).   Several Judges of this Court have since adopted the Ninth Circuit's reasoning, compelling the FWS to explain why territory, which is part of a species' historical range but no longer occupied by that species, falls outside a significant portion of the species' range.   *See Colo. River Cutthroat Trout*, 898 F. Supp. 2d at 202–03 (adopting and applying "the Ninth Circuit's approach of requiring that the FWS provide some reasoning for why a historical contraction in range does not reflect a 'risk of extinction throughout . . . a significant portion of its range[.]'"); *WildEarth Guardians v. Salazar*, 741 F. Supp. 2d 89, 100–01 (D.D.C. 2010) (vacating and remanding FWS finding where agency had not explained why eighty-seven percent range reduction was not significant portion of species' range); *Sw. Ctr. For Biological Diversity v. Norton*, No. 98-934, 2002 WL 1733618, at *14 (D.D.C. July 29, 2002) (adopting Ninth Circuit's rationale); *Defenders of Wildlife v. Norton* (*Lynx I*), 239 F. Supp. 2d 9, 21 (D.D.C. 2002) *vacated in part on other grounds*, 89 F. App'x 273 (D.C. Cir. 2004) (finding FWS's rule arbitrary and capricious and contrary to ESA where FWS did not "explain [its] conclusion that the area in which the [species] can no longer live is not a 'significant portion of its range.'" (first alteration in original)).   Set against this long-settled standard for evaluating the range of a species subject to a listing or delisting decision, the challenged Final Rule fails to provide an adequate explanation for the contraction of the gray wolves' historical range.

### b)      *Insufficiency Of Explanation In The Final Rule*

The challenged Final Rule defines "a portion of a species' range as . . . significant if it is *part of the current range of the species* . . . and if it is important to the conservation of the species because it contributes meaningfully to the representation, resiliency, or redundancy of the species."   Final Rule at 81,722 (emphasis added).   Despite the focus in the Final Rule only on a

95

species' "current range," the FWS appears to concede in its briefing that analysis of "the lost

portions of historical range of gray wolves within the DPS" is also required to "evalute[] whether

any of those portions constituted 'significant portions' of that range."  Defs.' Mem. at 27.  The

FWS asserts that the Final Rule meets these analytical requirements.  *Id.*[36]  The FWS is

incorrect.

The Final Rule defines the western Great Lakes DPS as encompassing all of Minnesota,

Wisconsin, and Michigan, and portions of six other States.  Final Rule, 76 Fed. Reg. at 81,670.[37]

This territory represents a small portion of the area once occupied by the gray wolf, even within

the western Great Lakes DPS, since the Final Rule notes that this population of "gray wolves

historically occupied the entire Midwest." *Id.* at 81,689; Pls.' Mem. at 21; Defs.' Mem. at 27.

Given this contraction in the historical range, the FWS must explain why the lost territory is not

a significant portion of the western Great Lakes wolf population's range based upon evidence

before the agency.  *See Colo. River Cutthroat Trout*, 898 F. Supp. 2d at 202–03.

The defendants acknowledge that the FWS must at least address any historical

contraction in the range of the western Great Lakes wolf population, and contends that it has

done so in the Final Rule.  *See* Defs.' Mem. at 27.  Although the FWS provides conclusory

statements in the Final Rule that any unoccupied territory within the western Great Lakes DPS

---

[36] The HCC agrees with the FWS that the agency may confine its "significant portion of the range" analysis to the geographic boundaries that define the WGL DPS.  HCC's Mem. at 6–7.
[37] The Final Rule contains a map delineating the boundary of the western Great Lakes DPS, 76 Fed. Reg. at 81,671, as well as the following textual description of its boundaries:

> The geographical area of the WGL DPS is . . . described as all of Minnesota, Wisconsin, and Michigan; the portion of North Dakota north and east of the Missouri River upstream to Lake Sakakawea and east of the centerline of Highway 83 from Lake Sakakawea to the Canadian border; the portion of South Dakota north and east of the Missouri River; the portions of Iowa, Illinois, and Indiana north of the centerline of Interstate Highway 80; and the portion of Ohio north of the centerline of Interstate Highway 80 and west of the Maumee River at Toledo. *Id.* at 81,670.

96

boundaries is not a significant portion of the species' range in the Final Rule, this analysis falls

short for three reasons.

First, the Final Rule contains a detailed description of the areas of suitable habitat in

portions of the Tri-State Area—the "current range" of the WGL DPS—based on the three states'

management plans.  Final Rule, 76 Fed. Reg. at 81,722–23.  The Final Rule does not, however,

explain why analyses must be limited to "suitable habitat."  *See id.*  The ESA itself would seem

to preclude such a limitation, since the first factor the Secretary must analyze in determining

whether a species is threatened or endangered is "the present or threatened destruction,

modification, or curtailment of its habitat or range."  16 U.S.C. § 1533(a)(1)(A).  If anything, the

ESA requires the FWS to draw the opposite conclusion from a finding that suitable habitat has

disappeared: such "curtailment" of habitat is a contributing factor to the threatened nature of a

species.  *See id.*

Moreover, by defining "significant portion of a species' range" in the final rule as

referring only to a species' "current range," the FWS explicitly contradicts the conclusions by

courts finding that "range" must include the "historical range" and the ESA's legislative history.

LEG. HIST. at 742 (H. Rep. 95-1625, from Committee on Merchant Marine and Fisheries,

regarding ESAA) ("The term 'range' [in the ESA] is used in the general sense, and refers to the

historical range of the species."); *Defenders of Wildlife*, 258 F.3d at 1145.  It also renders

meaningless the word "curtailment" in 16 U.S.C. § 1533(a)(1)(A), since it is impossible to

determine the "present . . . curtailment of [a species'] habitat or range" without knowing what the

species' historical range was prior to being curtailed.

Second, the Final Rule does not provide any explanation for why the territory identified

as part of the western Great Lakes DPS in the six states outside the Tri-State Area, or other parts

97

of the Midwest that constitute the western Great Lakes DPS' historical range, are no longer

significant portions of the gray wolf's current range.  The Final Rule focuses on the suitability of

habitat in the Tri-State Area—the western Great Lakes wolf population's "current range"—but

gives only cursory attention to "other areas within the DPS," describing those other areas as

unsuitable habitat, "too small or too fragmented to be suitable for maintaining a viable wolf

population."  Final Rule, 76 Fed. Reg. at 81,690.  Indeed, the Final Rule fails to provide any

analysis applying relevant factors such as "road density, human density, prey base, and size," to

"other areas within the DPS" to support or explain the conclusion that these other areas "are

unsuitable habitat."  *See id.*

      Finally, without applying the relevant factors for evaluating the suitability of habitat

throughout the DPS, the FWS nevertheless concludes that "the restoration of the gray wolf

throughout all or most of what was thought to be its historical range in the eastern United States"

is not necessary because the FWS's recovery plan, which was developed in 1978 and revised in

1992, has never "suggest[ed]" that this is "necessary."  *Id.* at 81,675.  Adherence to the FWS's

own recovery plan, however, is not the standard by which courts evaluate whether the FWS has

sufficiently explained the historical contraction in a species' range.  Although the FWS is

entitled to deference in its interpretation of "significant portion of its range," courts still require

the FWS to provide "some reasoning for why a historical contraction in range does not reflect a

'risk of extinction throughout . . . a significant portion of its range'" even where the FWS

"explicitly define[s] the term 'range' as signifying . . . *current* range."  *See Colo. River Cutthroat

Trout*, 898 F. Supp. 2d at 202–03 (emphasis and first alteration in original); *see also Tucson

Herpetological Soc. v. Salazar*, 566 F.3d 870, 876–77 (9th Cir. 2009) ("[T]he Secretary [of the

Interior] must develop some rational explanation for why the lost and threatened portions of a species' range are insignificant before deciding not to designate the species for protection.").

*WildEarth Guardians* and *Defenders of Wildlife* are particularly instructive on this point. In *WildEarth Guardians*, another Judge on this Court vacated and remanded a rule downlisting the Utah prairie dog that did not explain why "an eighty-seven percent reduction in the Utah prairie dog's historical range . . . is not 'a significant portion of [the species'] range." 741 F. Supp. 2d 89, 100 (D.D.C. 2010). The Court found the agency decision arbitrary and capricious, even though "[i]t may very well be that these reductions do not amount to a significant portion of the species range," because the FWS did not address the issue at all in its final rule. *Id.* at 100–01.

Similarly, in *Defenders of Wildlife v. Norton* (*Lynx I*), another Judge on this Court remanded a rule designating the lynx in a DPS as "threatened" rather than "endangered" because the FWS had failed to explain why the areas the Canada Lynx historically occupied, but was currently extirpated from, was not a significant portion of the lynx's range. 239 F. Supp. 2d at 18–21. The agency's rule at issue in that case acknowledged that the lynx no longer occupied "at least two of its historical regions," but "justifie[d] its determination" that these areas were not significant portions of the range "by arguing that Lynx are naturally rare in the contiguous U.S., particularly in those" regions comprising the Lynx's lost historical range. *Id.* at 18–19. The Court found this explanation insufficient, concluding that it was "arbitrary, capricious, and contrary to the ESA and its sweeping purpose" because, given the rule's acknowledgment that there are territories "in which the Lynx is no longer viable but once was, the [FWS] must, at a minimum, 'explain [its] conclusion that the area in which the [lynx] can no longer live is not a 'significant portion of its range.'" *Id.* at 21. Although the agency's abbreviated explanation in

99

that case, unlike the instant case, attempted to account for lost historical range, the rule was still found arbitrary and capricious due to the FWS's cursory treatment of the contraction in the lynx's range.  *See id.*

The challenged rule in this case contains no justification for why the lost historical range of the gray wolf population in the Midwest is not a significant portion of its range and need not be considered in evaluating the listing status of the gray wolf in the DPS.  A single sentence declaring that territory previously occupied by the western Great Lakes wolves are "too small or too fragmented to be suitable for maintaining a viable wolf population," Final Rule, 76 Fed. Reg. at 81,690, is insufficient and, indeed, immaterial because the ESA does not limit the range subject to consideration to only "suitable habitat."  Rather, the ESA would appear to mandate that the loss of suitable habitat cuts in *favor* of extending protections, since it would represent a "present . . . curtailment of [the species'] habitat or range."  16 U.S.C. § 1533(a)(1)(A).

Accordingly, the FWS's explanation of the Final Rule is arbitrary and capricious for neglecting to explain why the portion of the historical range no longer occupied by the gray wolf in the western Great Lakes DPS is no longer a significant portion of the species' range.

### 2.    *Failure To Explain Impact Of Combined Mortality Factors*

The Final Rule discusses the effects of disease and takings on the western Great Lakes DPS, as it must in any examination of a species' status under the ESA.  16 U.S.C. § 1533(a)(1)(C).  Yet, despite the threats to the western Great Lakes DPS from disease and takings by people, the agency reaches the conclusion that these myriad threats do not render the wolves in the western Great Lakes DPS threatened or endangered.  Such a conclusion runs contrary to the evidence before the agency and is, therefore, arbitrary and capricious.

First, with respect to diseases, as the Recovery Plan noted, "new disease and parasites have been clearly documented as occurring in wolf populations" and such diseases "have the

potential to become limiting factors acting upon survival, reproduction, and dispersal of large numbers of wolves, and thus may determine the fate of isolated wolf populations."  Recovery Plan at 23A.  This is unsurprising, since "a species can never be assumed to be secure from extinction if only a single population exists," particularly since "disease, loss of prey species, catastrophic habitat modifications, etc." have larger impacts on isolated populations.  *Id.* at 25A. Indeed, the Recovery Plan's requirement that there be more than one viable population of eastern timber wolves before the species could be declared recovered expressly considered the possibility that disease could wipe out a single population.  *Id.* at 25A–26A.

The vulnerability of the gray wolf population to disease is described amply in the Final Rule itself, with the discussion of Canine Parvovirus ("CPV"), mange, and other diseases.  Final Rule, 76 Fed. Reg. at 81,694–97.  Still, the Final Rule determined that, even with disease related declines in wolf populations in the Tri-State Area over the past thirty years, "the overall trend for wolf populations in the WGL DPS continues to be upward."  *Id.* at 81,698.

Second, the single largest factor in the gray wolf's near extinction in the conterminous United States is human-caused mortality due to illegal killing, "depredation control," or legal killing, and collisions with motor vehicles.  *See id.* (noting humans caused fifty-six percent of wolf deaths in Wisconsin between 1979 and 2009).  Nevertheless, the Final Rule concludes that "all sources of wolf mortality, including legal (for example, depredation control) and illegal human-caused mortality, have not been of sufficient magnitude to stop the continuing growth of the wolf population in Wisconsin and Michigan, nor to cause a wolf population decline in Minnesota."  *Id.* at 81,700.

Although an agency's determination based upon the exercise of its expertise is entitled to deference, *see Marsh*, 490 U.S. at 377, such deference may be suspended when an agency's

decision "fail[s] to provide a reasoned explanation, or where the record belies the agency's conclusion," *Cnty. of Los Angeles*, 192 F.3d at 1021.  The Final Rule's explanation of why wolves in the western Great Lakes are not threatened by disease or human-caused mortality is deficient in failing to address how the two factors could interact with each other, given that the Final Rule acknowledges that both could, individually, represent a clear threat to the species. *See* Final Rule, 76 Fed. Reg. at 81,694–81,701.  Indeed, the record shows that, even with a near total prohibition on the taking of wolves and vaccination efforts to prevent disease, the threats posed by disease and humans have had significant adverse impacts on wolf mortality, at times stalling the population's growth or contributing to its decline.  *See id.*

The FWS's reasoning appears to proceed as follows: despite acknowledgment that humans are the biggest threat to the continued viability of the wolf, followed closely by habitat destruction and disease, and that the management of habitat destruction and the prohibition on the killing of wolves has allowed the wolf to recover to some extent, somehow the ending of federal management and elimination of the taking prohibition is no longer necessary.  This conclusion is disconnected from and belied by the record.  As such, it was arbitrary and capricious for the FWS to determine that the threat of disease combined with human taking of wolves has been reduced to such a degree in the western Great Lakes region so as to render the removal of all ESA protections from wolves in the region appropriate.

The agency minimizes any concern over increased mortality rates due to human killing of wolves because of the purported sufficiency of state management plans to maintain wolf populations through disease monitoring and limits on wolf hunting.  *See* Final Rule, 76 Fed. Reg. at 81,700.  Yet, the arbitrariness of the agency's conclusion is further demonstrated by the Final

102

Rule's inadequate consideration of those state management plans and the effect of such plans on the threats to the western Great Lakes DPS.

### 3. Failure To Explain The Adequacy Of Non-Existent State Regulatory Schemes

The FWS is required by the ESA to consider whether the "inadequacy of existing regulatory mechanisms" renders a species "threatened" or "endangered."  16 U.S.C. § 1533(a)(1)(D).  Regarding this factor, the Final Rule concludes that existing regulatory mechanisms present no threat to the gray wolf in the western Great Lakes.  Final Rule at 81,717.  Although the FWS details the regulatory mechanisms present in the Tri-State Area, *id.* at 81,701–12, the agency does not adequately address the threat posed to the gray wolf by the virtual absence of any regulations to protect the species in the other six states that make up the western Great Lakes DPS.  This failure renders the agency's finding on this factor contrary to the evidence in the record.

In North and South Dakota, the gray wolf is subject to a "closed season," where no hunting licenses are issued for the wolf, but otherwise the two states have no other regulations protecting the species.  *Id.* at 81,713.  Indeed, North Dakota "lacks a State endangered species law or regulation," and in South Dakota, "wolves . . . are not State listed as threatened or endangered."  *Id.*  Similarly to North Dakota, in Iowa wolves are the subject of a "closed season," but are not otherwise protected.  *Id.*  No protections are afforded to wolves in Indiana or Ohio, where the gray wolf is listed as "extirpated."  *Id.*  Of the six states outside the Tri-State Area in the western Great Lakes DPS, only Illinois has endangered species regulations in place that protects gray wolves.  *Id.*  Still, the FWS avers that any wolves in those six states "will not make a meaningful contribution to the maintenance of the current viable, self-sustaining, and representative metapopulation of wolves in the WGL DPS," meaning the near total lack of

103

protection for wolves in the Dakotas, Iowa, Indiana, and Ohio has no bearing on whether the western Great Lakes wolves are threatened by the inadequacy of state regulatory mechanisms. *See id.* The fact that few, if any, wolves are currently present in the six states outside the Tri-State Area does not foreclose the possibility of an increased presence there, since the Final Rule makes clear that wolves show "a high degree of mobility," and, indeed, many wolves have been identified and killed western Great Lakes States other than Minnesota, Michigan, and Wisconsin. *See id.* at 81,673–74.

The Final Rule's acceptance as adequate of the State regulatory mechanisms in the western Great Lakes DPS is in stark contrast to the finding in 1978 when the gray wolf was listed at the "species" taxonomic level. The lack of adequate regulatory mechanisms was considered a threat outside of Minnesota because "[t]here still [were] some places in the lower 48 States, such as Washington and North Dakota, where wolves may occur and where they are not under Federal protection." 1978 Rule, 43 Fed. Reg. at 9611. More than thirty years later, little appears to have changed regarding regulatory mechanisms, since "North Dakota lacks a State endangered species law or regulation." Final Rule, 76 Fed. Reg. at 81,713. Yet, even though the six states other than Minnesota, Michigan, and Wisconsin "constitute . . . about one-third of the land area with the DPS," and "current and potential future regulatory mechanisms may allow the killing of wolves in these six States," the Final Rule states that such threats "will not impact the recovered wolf populations in the DPS now or in the foreseeable future." *Id.* at 81,717. This conclusory statement is not a sufficient explanation as to why the highly mobile gray wolf population in the western Great Lakes is not threatened or endangered by virtue of the inadequacy of regulatory mechanisms, as required by 16 U.S.C. § 1533(a)(1)(D). Thus, the Final Rule is arbitrary and capricious under the APA.

104

4.        *Failure To Explain How A State Plan To Allow Virtually Unregulated Killing Of Wolves In More Than Fifty Percent Of The State Does Not Constitute A Threat To Species*

In addition to the near total lack of regulatory mechanisms to protect the gray wolf in five of the nine states comprising the western Great Lakes DPS,[38] the Final Rule fails to explain adequately how the presence of an unregulated killing zone for wolves allowed under the Minnesota Wolf Management Plan presents no threat to the gray wolf over a significant portion of its range.  This is of particular significance in light of the FWS's recent insistence that Wyoming contract the boundaries of a similar zone in that State before the FWS would delist the Northern Rocky Mountain Wolf there.  *See Defenders of Wildlife v. Jewell*, Nos. 12-1833, 12-1965, 2014 WL 4714847, at *4–5 (D.D.C. Sept. 23, 2014) (noting FWS rejected State regulations as insufficient in Wyoming where gray wolves in large portion of state would be subject to unregulated taking).

The Final Rule explains that Minnesota's management plan "divides the state into Wolf Management Zones A and B."  Final Rule, 76 Fed. Reg. at 81,703.  Zone A constitutes roughly one-third of the state while Zone B constitutes the remaining two-thirds.  *Id.*  Zone A encompasses the northeastern portion of the state where wolves are most numerous.  *Id.* at 81,702.  While the Minnesota plan would maintain strict controls on the killing of wolves in Zone A, virtual *carte blanche* for the killing of wolves in Zone B would be permitted.  *See id.* at 81,704.  Specifically, the plan "provide[s] broad authority to landowners and land managers to shoot wolves at any time to protect their livestock, pets, or other domestic animals on land owned, leased, or managed by the individual."  *Id.*  Importantly, wolves can be killed in Zone B

---

[38] Of the states that make up the western Great Lakes DPS, Minnesota, Michigan, Wisconsin, and Illinois extend formal regulatory protection to the gray wolf in some way; North Dakota, South Dakota, Iowa, Indiana, and Ohio do not.  *See* Final Rule, 76 Fed. Reg. at 81,701–17.

"in the absence of wolf attacks on the domestic animals." *Id.* The Final Rule admits that "the estimated 450 wolves in Zone B could be subject to substantial reduction in numbers and, at the extreme, wolves could be eliminated from Zone B." *Id.* In other words, virtually no controls exist under the Minnesota plan on the killing of wolves in two-thirds of the state. *See id.*

The Final Rule minimizes the threat presented by this virtually unregulated taking, stating that it "is fully consistent with the Recovery Plan for the Eastern Timber Wolf's advice that wolves should be restored to the rest of Minnesota but not to Zone B." *Id.* The Recovery Plan criteria for determining whether the eastern timber wolf is "recovered" in the eastern United States are largely immaterial as a justification for the instant Final Rule. That Recovery Plan considered only a subspecies of the gray wolf, not the listed entity *Canis lupus*. *See generally* Recovery Plan. In addition, such recovery plans do not "limit the agency when it is deciding whether to delist a species." *Friends of Blackwater v. Salazar*, 691 F.3d 428, 437 (D.C. Cir. 2012). Rather, the D.C. Circuit has held that the only acceptable criteria under which the FWS may delist a listed entity are the five statutory criteria required by the ESA. *See id.* at 434.

The FWS's reliance on findings in the Recovery Plan, without a separate finding that the recommendations in the twenty-two-year-old Recovery Plan are still based on the "best available biological and commercial data" is not consistent with the ESA's statutory requirements. *See* 16 U.S.C. § 1533(a)(1). Consequently, merely stating that a state plan allowing the virtually unregulated killing of nearly one-sixth of all wolves in the state, and the ability to kill any wolf that wanders into sixty-five percent of the State is "consistent with the Recovery Plan" is an unreasonable justification as to why the Minnesota Plan represents an adequate regulatory mechanism to prevent gray wolves from being extirpated again.

Thus, apart from the FWS's inadequate justification for the adequacy of regulatory mechanisms in six of the nine western Great Lakes DPS states, the Final Rule's reliance on the regulatory mechanisms under the Minnesota Wolf Management Plan are also inconsistent with a conclusion that existing regulatory mechanisms do not constitute a threat to the gray wolf in the western Great Lakes.  Consequently, the Final Rule is arbitrary and capricious, since the FWS's explanation is unreasonable.

### D.    Remedy

In light of the finding that the challenged Final Rule violates the ESA and the APA, the APA requires the Court ordinarily to "hold unlawful and set aside [the] agency action, findings, and conclusions."  5 U.S.C. § 706(2).  Nevertheless, the precedent in this Circuit allows remedies short of complete vacatur in APA cases under certain circumstances.  *Allied-Signal, Inc. v. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150–151 (D.C. Cir. 1993).  The parties' briefing in this matter focused largely on the "liability" issue, namely, whether the challenged Final Rule was consistent with the ESA and the APA.  Thus, the Court provided the parties an opportunity to state their positions regarding a potential bifurcation of its decision between the merits and the remedy in response to a request from defendant-intervenor HCC.  Minute Order, Sept. 19, 2014.

The defendants and defendant-intervenors contend that additional briefing is necessary on the question of whether the Final Rule should be vacated if this Court finds, as it has, that the Final Rule violates the APA and the ESA.  Defs.' Position in Favor of Bifurcated Briefing at 1, ECF No. 46; Michigan's Statement in Support of Bifurcation at 2, ECF No. 48; HCC's Resp. to Court's Sept. 19, 2014 Minute Order Requesting The Parties' Views On Whether To Bifurcate Liability And Remedy at 2, ECF No. 49; Wisconsin's Position in Favor of Bifurcated Briefing at 1, ECF No. 50.  For their part, the plaintiffs contend that "[n]o further briefing on remedies would be necessary or useful if Plaintiffs succeed on any claim," because the only remedy

<div align="center">107</div>

available for the plaintiffs' claims is vacatur.  Pls.' Response to Minute Order as to Remedies Briefing ("Pls.' Remedy Resp.") at 1, ECF No. 51.  As applied to this matter, the plaintiffs are correct.

The law in this Circuit directs consideration of two principal factors in deciding "whether to vacate a flawed agency action": "(1) 'the seriousness of the . . . deficiencies' of the action, that is, how likely it is 'the [agency] will be able to justify' its decision on remand; and (2) 'the disruptive consequences of vacatur.'"  *Heartland Reg'l Med. Ctr. v. Sebelius*, 566 F.3d 193, 197 (D.C. Cir. 2009) (quoting *Fox Television Stations, Inc. v. FCC*, 280 F.3d 1027, 1048–49 (D.C. Cir. 2002), *modified on reh'g on other grounds*, 293 F.3d 537, 541 (D.C. Cir. 2002)) (alterations in original); *see also Allied-Signal, Inc.* at 150–151.  The Court's discretion in fashioning a remedy depends on "the seriousness of the [challenged] order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed."  *Int'l Union, United Mine Workers of Am. v. Fed. Mine Safety & Health Admin.*, 920 F.2d 960, 967 (D.C. Cir. 1990).

Application of these factors in this case militates strongly in favor of vacatur, as requested by the plaintiffs.  First, the Final Rule is arbitrary and capricious for three independent, substantive reasons: the Final Rule purports to designate a DPS in order to delist the covered vertebrates, which is not permitted under the ESA; the Final Rule purports to strip protections from a viable population of a listed endangered species by designating that population as a DPS without considering the remainder of the listed species, which is not permitted under the ESA; and the Final Rule comes to an unreasonable conclusion that the population identified as a DPS is neither threatened nor endangered, based on insufficient explanation and contrary to the evidence before the agency.  *Supra* Parts III.B–C.

108

"When an agency may be able readily to cure a defect in its explanation of a decision, the first factor in *Allied-Signal* counsels remand without vacatur." *Heartland Reg'l Med. Ctr.*, 566 F.3d at 198.  By contrast, in the instant matter, the defects in the challenged Final Rule go far beyond a mere failure in explanation.  Rather, the challenged Final Rule falls outside the FWS's statutory authority under the ESA and is predicated on an interpretation of the ESA that is contrary to the statute's purpose.  *See* 16 U.S.C. § 1531.  The challenged Final Rule, therefore, presents an even more likely candidate for vacatur than the rule at issue in *2008 Wolves*, where the court merely could not "be sure the agency will arrive at the same conclusion after further consideration." *2008 Wolves*, 579 F. Supp. 2d at 21.  In the instant matter, the Court is certain that the agency cannot arrive at the same conclusions reached in the Final Rule because the actions taken were not statutorily authorized.  *See supra.*  Thus, the first factor strongly favors vacatur.

The second *Allied-Signal* factor, the "disruptive consequences of the vacatur," 988 F.2d at 150–51, is a closer question, but ultimately does not tip the scales in favor of letting the Final Rule stand.  The effect of the repeated shifts between State and Federal management of the gray wolf populations in the Midwest is far from ideal and must be frustrating to both the FWS and the affected States.  *See, e.g.*, AR Ex. DD at 2847A (noting FWS "solicitors are drafting a paper on why this [delisting] won't work (so tell us what will work, already)").  Nevertheless, as the *2008 Wolves* court noted, disruption is mitigated when the "regulatory regime that was in place from 1978 to 2007," and, again, from 2008 through 2011, is reinstated, "particularly given the fact that state and federal wolf management authorities have been working in tandem for years." *2008 Wolves*, 579 F. Supp. 2d at 21.  Thus, while the Court acknowledges that some disruption is inevitable as a result of vacating the challenged Final Rule and restoring protections to the gray

109

wolf in the western Great Lakes, such disruption is not so substantial as to outweigh the serious substantive errors, which make clear the FWS cannot reach the same conclusion expressed in the challenged Final Rule.  Consequently, no additional briefing is necessary for the Court to determine that vacatur of the challenged Final Rule and the immediate restoration of the gray wolf's protected status in the purported western Great Lakes DPS is the only appropriate remedy in this matter.

## IV.    CONCLUSION

Wolves are the subject of heated disputes, with those on every side of the issue offering heartfelt arguments as to how best to manage this unique species.  The last decade of litigation is a testament to those passions.  While the FWS and the defendant-intervenors may have practical policy reasons for attempting to remove the gray wolf in the western Great Lakes from the List of Endangered and Threatened Wildlife, those policy reasons cannot overcome the strictures imposed by the ESA.  The ESA offers the broadest possible protections for endangered species by design.  This law reflects the commitment by the United States to act as a responsible steward of the Earth's wildlife, even when such stewardship is inconvenient or difficult for the localities where an endangered or threatened species resides.

The plaintiffs' Cross-Motion for Summary Judgment is granted and the defendants and defendant-intervenors' Motions for Summary Judgment are denied.  The challenged Final Rule designating a western Great Lakes DPS and delisting that DPS is vacated and the defendants are ordered to reinstate immediately the protections for gray wolves in the affected area as these protections existed prior to the Final Rule's effective date.

An Order consistent with this Memorandum Opinion will issue contemporaneously.

Date: December 19, 2014



Digitally signed by Beryl A. Howell
DN: cn=Beryl A. Howell, o=District
Court for the District of Columbia,
ou=District Court Judge,
email=howell_chambers@dcd.usc
ourts.gov, c=US
Date: 2014.12.19 14:38:35 -05'00'

_____
BERYL A. HOWELL
United States District Judge

111